**Consolidated Case Nos. 25-3552 and 25-3800**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,

**Plaintiff-Appellant**,

v.

R. JOHN TAYLOR, an individual, CONNIE TAYLOR HENDERSON, an individual, JAMES BECK, an individual, MICHAEL W. CASHMAN, SR., an individual, CROP USA INSURANCE AGENCY, INC., an Idaho corporation, CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company, AIA SERVICES CORPORATION, an Idaho corporation, AND AIA INSURANCE, INC., an Idaho corporation,

**Defendants-Appellees**,

and

Reed J. Taylor, an individual,

**Third-Party Defendant-Appellee.**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO,
CHIEF DISTRICT COURT JUDGE DAVID C. NYE, PRESIDING

**APPELLANT'S EXCERPTS OF THE RECORD – VOLUME - 2**

Roderick C. Bond
Roderick Bond Law Office, PLLC
10900 NE 4th St., Suite 2300
Bellevue, WA 98004
Tel: (425) 591-6903
Email: rod@roderickbond.com
Attorney for Appellant

Andrew Schwam
Andrew Schwam Law Firm
705 SW Fountain St.
Pullman, WA 99163-2128
Tel: (208) 874-3684
Email: amschwam@turbonet.com
Attorney for Appellant

LEE H. ROUSSO, ISB No. 8353
LAW OFFICES OF LEE H. ROUSSO PLLC
800 Fifth Avenue, Suite 4100
Seattle, WA  98104
Tel: (206) 623-3818
Fax: (206) 705-1240
lee@leerousso.com

Attorneys for Plaintiffs Donna J. Taylor and Dale Miesen

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| DONNA J. TAYLOR and DALE MIESEN, as shareholders who are bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiffs,<br><br>v.<br><br>HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; RICHARD A. RILEY, an individual; D. JOHN ASHBY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; KENT PETERSEN, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; HUDSON INSURANCE GROUP; a Delaware corporation; and GROWERS NATIONAL COOPERATIVE INSURANCE AGENCY, an Idaho corporation,<br><br>Defendants. | Case No.:<br><br>COMPLAINT |

COMPLAINT - 1

Plaintiffs Donna J. Taylor and Dale Miesen, by and through their attorney of record, allege as follows:

## I.   STATEMENT OF JURISDICTION

**1.1**   This Court has jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1332(a)(1) as the amount in controversy exceeds $75,000.00 and the action is between citizens of different States.  Pursuant to *In re Digimarc Corp. Derivative Litigation,* 549 F.3d 1223 (9th Cir. 2008), diversity is maintained in a derivative action where the board is deemed antagonistic to the interests of shareholders and is clearly opposed to the initiation of the derivative action.

**1.2**   This Court also has jurisdiction over the subject matter of this lawsuit under 18 U.S.C. § 1964(c), which grants federal jurisdiction to actions brought under § 1962 of the federal Racketeering and Corruption Influenced Organizations ("RICO") statute, 18 U.S.C. § 1961 *et seq.*

**1.3**   This Court has supplemental jurisdiction, 28 U.S.C. § 1367(a), over the state claims asserted herein as the state claims arise from the same common nucleus of operative facts as the federal claims.

## II.   STATEMENT OF VENUE

**2.1**   Venue is proper in the District of Idaho under 28 U.S.C. § 1391(a)(2) as a substantial part of the errors and omissions giving rise to these claims occurred in this district.

**2.2**   Venue is also proper in the District of Idaho under 18 U.S.C. § 1965(a), as this action involves a civil RICO claim under 18 U.S.C. § 1964, and the RICO defendants reside in the District of Idaho.

COMPLAINT - 2

### III.    PARTIES

**3.1**    Plaintiff Donna J. Taylor is a resident of Clarkston, Washington.  Donna Taylor is bringing this derivative action on behalf of the preferred and common shareholders of AIA Services Corporation ("**AIA Services**").  In addition, Plaintiff also brings a double derivative on behalf of AIA Insurance, Inc. ("**AIA Insurance**"), which is a wholly owned subsidiary of AIA Services.  AIA Services and AIA Insurance are collectively referred to as "**AIA**."  AIA Services and AIA Insurance are nominal defendants because they are controlled by the Controlling Defendants in this action and are therefore antagonistic to the shareholders' interest.

**3.2**    Plaintiff Dale Miesen ("**Miesen**") is a resident of Colleyville, Texas.  Miesen is bringing this derivative action on behalf of the preferred and common shareholders of AIA Services.  In addition, Miesen also brings a double derivative on behalf of AIA Insurance, which is a wholly owned subsidiary of AIA Services.

**3.3**    Defendant Hawley Troxell Ennis & Hawley LLP ("**Hawley Troxell**") is an Idaho limited liability partnership in the business of practicing law, with its principle place of business in Boise, Idaho.  Hawley Troxell has no office in the state of Washington or in the state of Texas. None of the individual members of Hawley Troxell are residents of Washington or Texas. Hawley Troxell has purportedly acted as counsel for AIA Services, AIA Insurance and CropUSA Insurance Agency, Inc. ("**CropUSA**").   Hawley Troxell is named herein as it is liable for the acts and/or omissions of defendants Gary D. Babbitt, Richard Riley, and D. John Ashby.

**3.4**    Defendant Gary D. Babbitt ("**Babbitt**") is an individual residing in the state of Idaho and is an attorney practicing law in the state of Idaho with and for Hawley Troxell.

COMPLAINT - 3

2-ER-181

**3.5** Defendant Richard A. Riley ("**Riley**") is an individual residing in the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

**3.6** Defendant D. John Ashby "**Ashby**" is an individual residing in the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

**3.7** Defendant R. John Taylor ("**Taylor**") is an individual residing in the state of Idaho. At all times relevant to this lawsuit, Taylor served on the Board of Directors for AIA Services, AIA Insurance, and CropUSA and continues to serve on those boards. Taylor also served as an officer of each of these corporations during all times relevant to this lawsuit. Taylor is licensed to practice law in the state of Idaho. Taylor is a common shareholder in AIA Services and asserts that he is a shareholder in CropUSA. Taylor also owns shares in other entities that have engaged in inappropriate transactions with AIA.

**3.8** Defendant James Beck ("**Beck**") is an individual residing in the state of Minnesota. Beck currently serves on the Board of Directors for AIA Services and AIA Insurance and has served on those boards during certain periods relevant to this lawsuit. Beck asserts that he is a shareholder in AIA Services and CropUSA.

**3.9** Defendant Michael Cashman, Sr. ("**Cashman**") is an individual residing in the state of Minnesota. Cashman has served on the Board of Directors for AIA Services during certain times relevant to this lawsuit. Cashman asserts that he is a shareholder in AIA Services and CropUSA. Taylor, Beck and Cashman are collectively referred to herein as the "**Controlling Defendants**."

**3.10** Defendant Kent Petersen ("**Petersen**") is an individual residing in the state of Kansas. Petersen formerly served, simultaneously, as President of AIA Services and CropUSA. Upon information and belief, Petersen is now employed by Hudson Insurance

COMPLAINT - 4

Group.

**3.11**   Defendant AIA Services is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501.  At all time relevant to this lawsuit, AIA Services is or has been the parent corporation of AIA Insurance.

**3.12**   Defendant AIA Insurance is an Idaho corporation with its principle place of business at 111 Main Street, Lewiston, Idaho, 83501.  AIA Insurance is a wholly owned subsidiary of AIA Services.

**3.13**   Defendant CropUSA is an Idaho corporation with its principle place of business at 111 Main Street, Lewiston, Idaho, 83501.

**3.14**   Defendant Hudson Insurance Group ("**Hudson**") is a Delaware corporation with its headquarters in New York City, New York.

**3.15**   Defendant Growers National Cooperative Insurance Agency, Inc. ("**Growers National**") is an Idaho corporation with its principle place of business at 111 Main Street, Lewiston, Idaho, 83501.

## IV.   FACTS

**4.1**   AIA Services is a closely held Idaho corporation that was formed as a holding company for AIA Insurance and other subsidiaries.  AIA's business model was to work with growers' associations to form trusts and/or related cooperatives through various growers and farmers associations, with the members of those associates also becoming members of the trusts and/or cooperatives. For example, AIA created the Grain Growers Membership & Insurance Trust, the National Contract Poultry Grower's Membership & Insurance Trust, and other, similar trusts.  By way of its relationships with these various organizations, AIA was able to market health insurance (*e.g.*, Group Universal Health

COMPLAINT - 5

Policies) to the members of the various associations. Reed Taylor, a non-party to this suit, and his former wife, plaintiff Donna Taylor, were issued Series A Preferred and common shares in AIA Services. Pursuant to the dissolution of the Reed Taylor/Donna Taylor marriage, Donna Taylor was issued 200,000 shares of Series A Preferred shares on or about February 12, 1988, and has held those shares ever since, less those shares which have been redeemed over the years. Donna Taylor is also the beneficial owner of one half of the shares of AIA Services held by the estate of her deceased daughter, Sara Taylor, who had owned the shares since at least 1995.

**4.2** Plaintiff Dale Miesen is a former agent for AIA and is the owner of 45,000 shares of common stock in AIA Services. Miesen tendered approximately $500,000.00 in consideration for these shares. Miesen has been a shareholder at all times relevant to this lawsuit as he has owned shares continuously since at least 1995. Miesen brings this derivative action on behalf of all common shareholders.

**4.3** In 1995 the Controlling Defendants and Richard Campanaro (a non-party) sought to gain operational control of AIA Services and did in fact obtain operational control by having AIA Services enter into an agreement wherein AIA Services redeemed the common shares in AIA Services owned by Reed Taylor. Campanaro purchased his shares with funds provided by Beck and Cashman and later transferred those shares back to Beck and Cashman. The Controlling Defendants have maintained operational control of AIA from 1995 through the date of this complaint.

**4.4** Since acquiring operational control of AIA Services in 1995, the Controlling Defendants have engaged in repeated acts of faithless self-dealing, transactions detrimental to AIA, and have committed intentional torts, have conspired to commit

COMPLAINT - 6

intentional torts, and have aided and abetted in the commission of intentional torts, to the detriment of AIA and its innocent shareholders, including but not limited to: (1) controlling the Board of Directors and/or the decisions made by the Board and refusing to act in the best interests of AIA; (2) violating AIA's bylaws, including but not limited to failing to hold shareholder meetings; (3) violating AIA's articles of incorporation; (4) diverting corporate opportunities belonging to AIA; (5) conveying, encumbering, utilizing, and/or pledging corporate assets to themselves or other entities; (6) improperly retaining, without consent from disinterested constituents, counsel to represent and/or provide legal services to AIA when counsel also represented CropUSA and/or the individual defendants, and therefore had irreconcilable conflicts of interest; (7) inappropriately redeeming, acquiring and/or issuing shares of stock and/or making payments on put options, including but not limited to, issuing shares to the Controlling Defendants; (8) inappropriately paying dividends; (9) intentionally failing to comply with conflict of interest provisions in AIA bylaws; (10) guaranteeing loans for CropUSA and failing to guarantee loans for AIA; (11) paying excessive compensation to officers and directors, including but not limited to, paying Taylor $250,000.00 per year to purportedly act as CEO and President of AIA Services after his contractual entitlement to such salary had expired and Taylor had represented that he would not take salary in certain years; (12) wasting corporate assets; (13) divulging and/or utilizing AIA's trade secrets for the benefit of themselves and other entities; (14) soliciting and transferring AIA employees to work for CropUSA; (15) engaging in acts and/or decisions without making full disclosure and without obtaining the required approval of shareholders; (16) engaging in millions of dollars of transactions wherein AIA conveyed benefits without the receipt of

COMPLAINT - 7

consideration; (17) forming and operating entities in direct competition with AIA in the insurance marketplace, including without limitation, CropUSA and Pacific Empire Holdings Corp.; (18) making false representations, including, without limitation, regarding share values, omitting material facts in AIA's financial statements, falsely certifying AIA's financial statements, and that AIA was being operated for the benefit of the corporation; (19) concealing and failing to disclose material facts to AIA pertaining to loans, transfers, and utilization of assets, including without limitation; concealing or omitting material facts, including the facts related to virtually each and every transaction described herein; (20) making false representations to AIA, including without limitation, making and certifying false and misleading financial statements to AIA; (21) inappropriately loaning corporate funds to themselves and to other entities under their control; (22) failing to obtain security, failing to charge interest, and failing to collect on loans of at least $307,000.00 made to Taylor; (23) paying attorneys' fees and costs in various legal proceedings on behalf of past and present directors when it was clear that the individual past and present directors had intentionally failed to act in good faith and by failing to obtain security for repayment of said funds; (24) acquiring a parking lot with AIA funds and charging AIA, and making AIA pay, excessive rent for use of the parking lot even though AIA did not actually use the parking lot; (25) failing to seat the full and required board of directors; (26) improperly transferring shares held by AIA to themselves, including without limitation shares in Pacific Empire Radio Corp., and Pacific Empire Holding Corp., with damages occurring and set on the date of transfer; (27) failing to honor AIA contracts; (28) failing to take appropriate legal action in the interests AIA; (29) removing a tenant from an AIA owned building to another building

COMPLAINT - 8

**2-ER-186**

owned personally by Taylor; (30) failing to properly allocate expenses to CropUSA; (31) forming and funding Growers National with AIA's funds and corporate assets; (32) selling assets and or/contracts belonging to AIA to others; and (33) assisting one another and others (including Hawley Troxell, Babbitt, Riley and Ashby) in committing the intentional torts described herein and concealing acts and omissions that constituted intentional torts against AIA.

4.5     From 1995 to the filing of this suit, each of the Controlling Defendants has served at various times on the board of directors for AIA Services, AIA Insurance and/or CropUSA.  The Controlling Defendants have also served from time to time on purported "advisory boards" that make decisions on behalf of AIA and CropUSA.  Beck receives $5,000.00 per quarter to sit on the board of AIA and also receives shares for his "service."  Beck has stated that he serves on this board to protect his own interests and those of his friends.

4.6     By 1998, AIA's ability to sell health insurance had been impaired by undercapitalization in its underwriting subsidiary the Universal Life.  Accordingly, the company considered proposals to sell other forms of insurance, and in particular crop insurance. In 1999, AIA Services, then under the control of Controlling Defendants, began selling crop insurance through a wholly owned subsidiary of AIA Services formed under the name "AIA Crop Insurance, Inc."  The first purported meeting of shareholders of AIA Crop Insurance, Inc. was held on January 11, 2000. (See *Minutes of the First Meeting of Shareholders, January 11,* 2000, which is attached as **Exhibit A**[1] to this Complaint and incorporated by reference herein.**)**  The first purported meeting of the AIA

---

[1] The documents attached to this Complaint as exhibits have never been provided to the disinterested shareholders and were otherwise concealed from AIA.

COMPLAINT - 9

Crop Insurance, Inc., board of directors was held on the same day. (See *Minutes of the First Meeting of Directors, January 11, 2000*, which is attached as **Exhibit B** to this Complaint and incorporated by reference herein.**)** The purported minutes of the shareholder's meeting indicate that Taylor claimed to be the sole shareholder of AIA Crop Insurance at the time of incorporation. At the time of its formation, Riley was providing legal services to AIA Crop Insurance, Inc. At a special meeting of the shareholders of AIA Crop Insurance, Inc., held on November 13, 2000, AIA Crop Insurance, Inc., was renamed CropUSA. The minutes of the November 13, 2000, special meeting of the shareholders also show that Taylor continued to claim that he was the sole shareholder of CropUSA, while he was simultaneously representing in business plans provided to others that CropUSA was a subsidiary of AIA. At the time CropUSA was formed, Taylor was employed by AIA Services under an Executive Officer's Agreement, dated August 1, 1995, which contained express covenants not to compete. Upon information and belief, Taylor's Executive Officer's Agreement was drafted by defendant Riley.

**4.7**     CropUSA held its purported annual shareholder's meeting on January 10, 2001. By this time, the illegal "spin off" of CropUSA had been accomplished by having AIA's Preferred C shareholders (primarily the Controlling Defendant) exchange their Preferred C shares for common shares in CropUSA. (If CropUSA were in fact an independent entity, these maneuvers would have been completely unnecessary.) The minutes for this meeting reveal that CropUSA had retained defendant Hawley Troxell as its advisor and SEC counsel and, upon information and belief, Hawley Troxell has served continuously as counsel ever since. (See *Minutes of the Board of Directors, January 10, 2001,* which

COMPLAINT - 10

is attached as **Exhibit C** to this Complaint and incorporated by reference herein.) According to the minutes, negotiations between AIA Services and CropUSA had resulted in an agreement whereby AIA Services would no longer operate CropUSA as a subsidiary. However, the negotiations referred to in minutes did not occur. There was no decision, nor has there ever been a decision, on the part of AIA Services to discontinue the subsidiary status of CropUSA. None of the preferred or common shareholders of AIA Services (other than those present at the January 10, 2001, meeting) was given notice of or the opportunity to approve this corporate action. In spite the fact that Taylor asserted on January 10, 2001 that CropUSA would no longer be a subsidiary of AIA, Taylor wrote in a February 27, 2001, letter to Donna Taylor that "AIA is developing a new crop insurance program through a new company called CropUSA." (See *February 27, 2001, Letter to Donna Taylor*, which is attached as **Exhibit D** to this Complaint and is incorporated by reference herein.) The letter went on to state that "[t]he costs of putting the CropUSA program together have been paid. *AIA* now needs to launch five new territories next Month." (emphasis added) This letter constitutes an unambiguous representation by Taylor that CropUSA was a subsidiary of AIA and was being operated for the benefit of AIA. This representation was false.

4.8     Notwithstanding the fact that Taylor was operating under an employment agreement that required that he not compete with AIA Services, and notwithstanding the fact that he owed fiduciary duties to the shareholders of AIA Services, Taylor set forth his plans to exploit the assets of AIA Services for the benefit of CropUSA (and himself as the majority purported shareholder) in the purported minutes of the purported January 10, 2001, meeting. For example, the meeting minutes reveal that CropUSA authorized its

COMPLAINT - 11

officers to execute a Master Marketing Agreement with AIA Insurance that would allow CropUSA access to all of AIA's customers and customer lists, as well as all of AIA's trade secrets. AIA received no consideration for conveying this access. CropUSA's officers (including Taylor) were also purportedly authorized to enter into a Management Agreement with AIA Insurance wherein AIA Insurance purportedly agreed to provide management and administrative support to CropUSA without charge. However, Taylor has since testified that AIA's board never authorized this agreement. The innocent shareholders of AIA (nor AIA) were never given notice of these proposed agreements, nor were they given the opportunity to approve or reject these agreements. Each of these agreements, if executed, would constitute a violation of Taylor's Executive Officer's Agreement, which contains a strict non-compete clause. Each of these agreements, if executed, would also constitute a breach of fiduciary duty on behalf of each of the Controlling Directors.

**4.9** In or around 2000, AIA wrote to the federal government requesting a ruling or opinion that would allows AIA to establish a national cooperative for selling crop insurance whereby the members of the association would receive dividends based on the amount of policy premiums. The federal government advised that such a cooperative would be permissible. Consequently, AIA established Growers National with its own funds and corporate assets. All of CropUSA's rights (and later Hudson's rights) to Growers National policies are, and always have been, the rightful property of AIA. The purported CropUSA meeting minutes of January 10, 2001, also reveal the intent of the Controlling Defendants to "pass through" the assets improperly obtained from AIA to CropUSA through Growers National. This transfer of corporate assets, both tangible and

COMPLAINT - 12

intangible, also occurred without notice of the innocent shareholders of AIA, who are the rightful owners of all benefits conferred on Growers National by way its business with CropUSA.

**4.10**   Upon information and belief, Hawley Troxell was providing legal services to CropUSA and/or its board of directors as of January 10, 2001, and such provision of services has continued through the date of this complaint.  Upon information and belief, from January 10, 2001, and continuing through the period relevant to this lawsuit, Hawley Troxell and Riley (and later Babbitt and Ashby) had knowledge of Taylor's Executive Officer's Agreement with AIA Services, had knowledge of the conflict of interest provision in AIA's bylaws, and had knowledge of provisions in AIA's articles of incorporation, but intentionally refused to comply with them.   Hawley Troxell and Riley knew or should have known that the purported Master Marketing Agreement and Management Agreement constituted breaches of Taylor's Executive Officer's Agreement, violations of AIA's articles of incorporation, violations of AIA bylaws,  and consequently breaches of his fiduciary duties to AIA Services.  Upon information and belief, Hawley Troxell and Riley also representing CropUSA from January 10, 2001, to the present, and by way of that representation Hawley Troxell, Babbitt, Riley and/or Ashby breached their fiduciary duties to AIA (including their undivided duty of loyalty owed to AIA) and took steps that materially assisted Taylor and the Controlling Defendants in the commission of the various torts described in this complaint and assisted in the concealment of those torts.

**4.11**   Beginning in 1999 and continuing through the date of this Complaint, CropUSA has been funded and operated with assets improperly transferred from AIA, including,

COMPLAINT - 13

but not limited to, operating capital, customer lists and other trade secrets, agents and staff, and goodwill.  CropUSA paid nothing for most of these assets.

**4.12**    The Controlling Defendants were all shareholders of AIA at the time CropUSA was formed and later purportedly became shareholders of CropUSA.  The Controlling Defendants all served on a purported "advisory board" of CropUSA and/or AIA, and this advisory board exercised actual control over these corporations.  By exercising control over these entities and committing acts that benefitted CropUSA at the expense of AIA, these defendants engaged in a conspiracy to defraud AIA, which have right and title to the property of CropUSA.  Due to the fact that the Controlling Defendants have complete control over AIA and would never assert claims against themselves on behalf of AIA, the adverse dominion doctrine applies to all claims asserted herein, thereby barring any defense based on a statute of limitations.  *Freeland v. Enosis Corp.,* 540 F.3d 721 (7th Cir. 2008);

**4.13**    On January 10, 2002, CropUSA purportedly entered into a Memorandum of Understanding with the Controlling Defendants.  Under the terms of this memorandum, Beck and Cashman were obligated to guarantee loans on behalf of CropUSA.  However, Beck and Cashman were also obligated to guarantee loans on behalf of AIA.  Notwithstanding this obligation, the Controlling Defendants subsequently arranged for AIA to guarantee CropUSA's lines of credit even though the guarantees were barred by AIA's articles of incorporation and bylaws.

**4.14**    On January 1, 2003, defendant Petersen entered into an Officer's Agreement with AIA Insurance. According to this document, CropUSA had directed AIA Insurance to appoint Petersen as President/COO of Operations of CropUSA.  CropUSA had no legal

COMPLAINT - 14

authority to issue this or any other directive to AIA Insurance. The agreement required that Petersen devote his entire time and effort to CropUSA, although Petersen was to receive his compensation as an employee of AIA Insurance, and Petersen was in fact an employee of AIA Insurance. The Petersen contract also contained a non-compete clause similar to that contained in Taylor's Executive Officer's Agreement.

4.15   In 2004, the Controlling Defendants attempted to raise capital for CropUSA by selling shares in CropUSA to private investors by way of a $10,000,000.00 private placement. Upon information and belief, Hawley Troxell drafted the July 15, 2004, Private Placement Memorandum, despite its obligations to AIA.

4.16   When CropUSA began distributing the Private Placement Memorandum in 2004, the company was experiencing financial difficulties that made it difficult, if not impossible, to attract investors to the private placement. In addition, the company's financial difficulties threatened its ability to participate in the Federal Crop Insurance program.

4.17   In order to boost CropUSA's balance sheet for the purpose of operating the company, attracting investors and maintaining access to the Federal Crop Insurance program, the Controlling Defendants devised a scheme to illegally transfer a large sum of money from AIA Insurance to CropUSA. The Controlling Defendants conspired with each other in the formation and execution of this scheme. Upon information and belief, Hawley Troxell provided counsel to CropUSA with respect to the unlawful transfer of funds and/or has at a minimum assisted in covering up the facts of this illegal transfer.

4.18   In August, 2004, AIA Insurance received a payment of $1,510,693 from Trustmark.

COMPLAINT - 15

2-ER-193

**4.19**   Rather than deposit the payment of $1,510,693 into the account of AIA Insurance, where it would have benefited AIA and its innocent shareholders, Taylor deposited the funds into a new account entitled "AIA Insurance Inc. CropUSA."  The address for this account coincided with the address for Taylor's personal residence at 2020 Broadview Drive in Lewiston, Idaho.

**4.20**   Shortly after diverting the $1,510,693 into the "AIA Insurance Inc./CropUSA" account, AIA Insurance illegally transferred the funds to CropUSA.  The Controlling Defendants attempted to disguise this conversion of funds by characterizing the transaction as a purchase of Preferred C Shares in AIA Services.  However, as the Controlling Defendants acknowledged at the time, there was no market for these shares. At the time these funds were converted by CropUSA, there was no authorization of any kind for the transaction.  In order to create a plausible explanation for the transfer of funds, CropUSA eventually produced a Consent in Lieu of Meeting dated August 24, 2004.  (See *Consent in Lieu of Meeting, August 26, 2004*, attached as **Exhibit E** to this Complaint and incorporated by reference herein.)   However, this document itself is completely fraudulent, as it was retroactively created months later than the purported date in order to deceive auditors who questioned the validity of this transaction.  Furthermore, this transaction violated the terms of AIA Services' Articles of Incorporation, which required that all Preferred C shares be redeemed equally and simultaneously. Additionally, while Donna Taylor is not asserting a direct claim in this lawsuit, it is also true that as holder of Preferred A shares, she had priority claim to any funds held by AIA.

**4.21**   CropUSA realized a gain of $1,489,000 on this purported sale of shares, which indicates that CropUSA was carrying the shares on its books at a value of $21,693.  (See

COMPLAINT - 16

*CropUSA Financial Statement,* relevant pages of which attached as **Exhibit F** to this Complaint and incorporated by reference herein.)

4.22    Taylor was CEO and director of AIA Services, AIA Insurance and CropUSA at the time of the fraudulent transaction described in paragraphs 4.18 through 4.21 and other fraudulent transactions, and unlawfully benefited from those transactions.

4.23    The Controlling Defendants were all purported shareholders of CropUSA and benefited from the fraudulent transaction described in paragraphs 4.18 through 4.21 of this Complaint and other unlawful transactions.

4.24    The innocent shareholders of AIA Services were given no notice of the 2004 stock transaction, nor were any proper board meetings held to approve the transaction. However, as with CropUSA, a fraudulent Consent if Lieu of Meeting dated August 26, 2004, was prepared several months later for the purpose of providing documentation of the transfer of funds.  (See *Consent in Lieu of Meeting, August 26, 2004, AIA Insurance*, attached as **Exhibit G** to this Complaint and incorporated by reference herein).

4.25    Upon information and believe, Hawley Troxell provided legal services to both AIA and CropUSA at the time of the 2004 transaction.  Hawley Troxell, Babbitt, Ashby and/or Riley at various times, as purported counsel for AIA, failed to disclose to AIA that the acts of the Controlling Defendants constituted a breach of their fiduciary duties owed to AIA.  Hawley Troxell failed to disclose to AIA, or to anyone else, that this transaction was unlawful on many levels, including but not limited to the fact that it did not comply with articles of incorporation and bylaws, caused a breach of AIA's other contracts, and could not be justified by the balance sheet of either AIA Insurance or CropUSA.

COMPLAINT - 17

**4.26**   After draining AIA Insurance of over $1,500,000.00 in 2004, the Controlling Defendants continued to operate CropUSA with assets both tangible and intangible that rightly belonged to AIA and continued to cover up the transactions.

**4.27**   Under the management and direction of the Controlling Defendants, AIA regularly failed to allocate costs to CropUSA and other entities and failed to charge markup, interest or profit on costs paid for other entities.  For example, Taylor's own salary of $250,000.00 was allocated entirely to AIA Services even though Taylor's contractual right to salary from AIA Services had expired in 1998 and had never been renewed by an authorized board. (And, further, Taylor performed no actual work for AIA during the time in question.)  Hawley Troxell failed to take appropriate action or to advise AIA or duly authorized disinterested constituents of AIA that the failure to allocate costs to CropUSA constituted fraud, conversion, and breach of fiduciaries and/or aiding and abetting the breach of fiduciary duties on the part of the Controlling Defendants.   Taylor, with the knowledge and complicity of the other Controlling Defendants also performed work for other entities while on AIA's payroll, *i.e.*, Pacific Empire Radio Corp., Pacific Empire Communications Corp., Pacific Empire Holdings Corp., Radio Leasing I LLC and Radio Leasing II LLC.  Taylor also had other AIA employees work for these entities without compensation to AIA.

**4.28**   On November 15, 2004, Kent Petersen executed an Officer's Agreement with CropUSA.  Between January 1, 2003, and November 15, 2004, Petersen had purportedly worked full time for CropUSA while drawing a paycheck as an employee of AIA Insurance.  Petersen's agreement with CropUSA also contained a non-compete clause. This clause also purported to protect AIA from all future competitive acts by Petersen.

COMPLAINT - 18

**4.29**    Between its founding in 1999 and the filing of this lawsuit, CropUSA and other entities generated tens of millions of dollars of revenue (including premiums) and other benefits that would have flowed to AIA  but for the unlawful and unauthorized acts of the Controlling Defendants.

**4.30**    As of 2006, Taylor owed AIA at least $307,000.00 for personal loans he had taken from the company without shareholder knowledge or approval.  For several years, Taylor concealed these loans be engaging in false accounting whereby loans to him were treated as payments of principle on AIA's indebtedness to Reed Taylor.  In 2006, Taylor "corrected" an accounting "error" by increasing the balance due on Reed Taylor's note to $6 million.  Taylor has still not repaid his unauthorized personal loans.  Taylor also had AIA pay his personal maid, his personal credit card bills, donations, cash advances, family cell phone bills, and other personal expenses.  Taylor also had AIA purchase several vehicles from him, and Taylor continued to drive these vehicles after the sales. Taylor also had AIA employees perform work on his personal residence and on other real property not owned by AIA.  These acts were all committed with the knowledge and complicity of the Controlling Defendants.

**4.31**    On March 28, 2007, Reed Taylor, the founder of AIA Services, filed suit in Idaho state court against AIA Services, AIA Insurance, CropUSA and various individuals, including the Controlling Defendants, alleging nonpayment of over $6 million, in Nez Perce County Case No. CV 07-00208  *Taylor v. AIA Services, et al.*   In the course of this litigation, the Controlling Defendants, acting through Taylor as a purported member of the CropUSA Board, and Beck as a purported member of the AIA boards, have engaged

COMPLAINT - 19

in conduct, and concealed conduct, adverse to AIA.  Also in the course of this litigation and other litigation, Hawley Troxell and the named lawyer defendants have taken action adverse to the interests of AIA and in violation of their duties of loyalty to AIA and have failed to represent AIA's best interests.

**4.32**   In the course of litigating *Taylor v. AIA Services,* Hawley Troxell entered into and/or participated in Joint Defense/Common Interest Agreements, without obtaining independent counsel or approval from duly authorized disinterested constituents, knowing that AIA Services, AIA Insurance, CropUSA, and other named defendants had irreconcilable and nonwaivable conflicts of interest and knowing that this representation was to the detriment of AIA.  (See *Joint Minutes of a Special Meeting of Directors, April 30, 2007*, attached as **Exhibit H** to this Complaint and incorporated by reference herein.) Upon information and belief, Hawley Troxell, Ashby, Riley, and/or Babbitt attended purported meetings of the AIA Services board of directors and drafted tolling agreements wherein AIA Services agreed not to pursue claims against the members of the board and other individuals in an effort to make the representations appear proper.  These tolling agreements worked to the detriment of AIA and are *prima facie* proof that Hawley Troxell, Babbitt, Ashby and/or Riley knew that the representations and the tolling agreements were not in the best interests of AIA, and assisted in concealing this information from the disinterested shareholders, while at the same time allowing the Controlling Defendants to drain AIA without any apparent thought to the fact that the corporation did in fact have shareholders of common stocks. These tolling agreements also bar certain defendants from asserting statute of limitations defenses for certain claims. Upon information and belief, these agreements were later modified for purposes

COMPLAINT - 20

of litigation, again, for the sole effort of making the representations appear proper and authorized when Hawley Troxell and the named attorney defendants knew their acts were improper. None of the purported waivers, consents or tolling agreement were obtained or approved by a properly seated board of disinterested shareholders of AIA or any other duly authorized and disinterested constituents from AIA.

4.33 As the purported attorneys for AIA, two entities, Hawley Troxell, Babbitt, Ashby and/or Riley owed duties of loyalty, care, and good faith to AIA and these defendants breached these duties by engaging in the simultaneous representation of the Controlling Defendants, CropUSA, and other parties with interests adverse to AIA. In addition, and/or in the alternative, these attorney defendants have exceeded the scope of their representation and all acts taken beyond the scope of representation constitute acts of aiding and abetting exposing the lawyer defendants to liability as joint tortfeasors.

4.34 In connection with Hawley Troxell, Babbitt, Asbby, and/or Riley's' improper representation and/or Common Interest Defense of the Controlling Defendants, CropUSA, and others, Hawley Troxell accepted payments of attorneys' fees and costs, which, upon information and belief have exceeded $1 million. This money was obtained by way of an ongoing breach of fiduciary duty by the lawyer defendants and as faithless fiduciaries. In making any allegation in this Complaint with respect to the representation provided by these defendants, plaintiffs do not concede that any of these lawyer defendants was properly retained by AIA or ever authorized to represent AIA. To the contrary, plaintiffs specifically allege that, due to their improper control of AIA, the Controlling Defendants lacked authority to retain or direct these attorneys and that their purported acts of representation were exclusively outside their scope of representation.

COMPLAINT - 21

2-ER-199

**4.35**   With full knowledge that Donna Taylor had asserted a legal right, and a had a legal obligation, to appoint a person of her choice to serve on AIA Services' board of directors, these lawyer defendants proceeded to take direction from the Controlling Defendants when the lawyers knew that the purported board of AIA was disqualified by conflicts of interests that made it impossible for the board to properly represent AIA. With the full knowledge and assistance of these attorney defendants, the purported boards of AIA took actions when the boards were not properly seated, when the entire purported board was conflicted from making any decision common, and when the boards intentionally refused to hold annual shareholder meetings or otherwise take steps to give information and notice to disinterested shareholders of AIA.   These acts and/or omissions render all acts of these purported boards null and void, and the plaintiffs seek a declaratory judgment on this issue.

**4.36**   In April 2007, Hawley Troxell permitted and/or assisted interested parties in holding a joint board meeting of AIA Services and AIA Insurance with full knowledge that Donna Taylor was being intentionally denied her right to be on the board of AIA Services and participate in such meetings and that duly authorized and disinterested constituents were not present at the meeting.   At the meeting held in April 2007, Hawley Troxell permitted and/or assisted Taylor in appointing Beck to the boards of AIA Services and AIA Insurance knowing that he was an interested party against whom AIA Services and/or AIA Insurance should be pursuing claims, knowing that he purportedly held shares in CropUSA, and knowing that he was inappropriately being paid $20,000 per year to attend the board meetings of a nearly insolvent corporation.

COMPLAINT - 22

**4.37**   In August, 2007, AIA settled litigation with the state of Idaho whereby AIA received a promissory worth approximately $1.5 million. Although AIA Insurance paid the costs of this litigation, The Controlling Defendants, with the assistance of Riley and Hawley Troxell, improperly titled the note in the name of AIA Services only, and then pledge the note to CropUSA so that the Controlling Defendants could borrow money to pay their attorneys' fees to Hawley Troxell.   This transaction worked to defraud the innocent shareholders of AIA Services, who received no notice of this transaction.   Upon information and belief, the pledge agreement was drafted by Hawley Troxell and/or Riley, although they later asserted that they were only "scriveners" for the transaction.

**4.38**   On October 26, 2007, Hawley Troxell and/or Riley drafted and delivered an opinion letter falsely representing that AIA Insurance was authorized to guarantee a $15,000,000.00 line of credit on behalf of CropUSA.   (See *Hawley Troxell Opinion Letter, October 26, 2007*, which is attached as **Exhibit I** to this Complaint and is incorporated by reference herein.)    This letter was delivered in violation of the Amended Articles of Incorporation of AIA Services, the bylaws of AIA Services and the bylaws of AIA Insurance, and in violation of the duty of loyalty owed by Hawley Troxell to AIA. This letter was distributed in furtherance of the scheme to enrich CropUSA at the expense of AIA and to further the RICO enterprise. Additionally, Lancelot, the lender on this $15,000,000.00 line of credit was subsequently exposed as a Ponzi scheme, and its founder, Gregory Bell, pleaded guilty to criminal charges in federal court.   Mr. Bell was the signee for Lancelot on the $15,000,000.00 line of credit.   These facts, along with others, were never disclosed to AIA or duly authorized and disinterested constituents of AIA by Hawley Troxell or the attorney defendants.

COMPLAINT - 23

**2-ER-201**

**4.39**   On or about August 29, 2008, CropUSA sold certain business assets to Hudson after Hudson had acquired CropUSA's debt to Lancelot.  As part of this transaction, Hudson acquired business assets from CropUSA (assets rightfully belonging to AIA) and in exchange CropUSA agreed to write off $7.52 million in debt owed by CropUSA, including personal debts owed by certain CropUSA shareholders.  The details as to which personal debts were retired by way of this transaction have never been disclosed to AIA are not known to plaintiffs at this time.  At the time of this transaction, Taylor represented to CropUSA shareholders that the transaction would result in a profit of $10 million for CropUSA, which such profit was the rightful property of AIA.  (See *Letter From John Taylor re: Hudson, August 29, 2008*, attached as **Exhibit J** to this Complaint and incorporated by reference herein.)  The Controlling Defendants never disclosed this transaction to disinterested constituents of AIA.

**4.40**   In connection with Hudson transaction, which worked to defraud AIA, Taylor was unjustly rewarded by Hudson with a purported consulting contract that paid Taylor $120,000.00 over the course of a year when these funds should have been property of AIA.  This purported consulting contract was yet another breach of Taylor's Executive Officer's Agreement as well as another breach of his fiduciary duties to AIA.

**4.41**   Hudson engaged in this transaction with CropUSA with knowledge that Taylor, who negotiated the transaction on behalf of CropUSA, was bound by a non-compete clause in his contract with AIA Services and was in violation of that contract clause. Hudson also had knowledge that Petersen was bound by a non-compete clause in his contract with AIA and was in violation of that contract clause.

COMPLAINT - 24

**4.42**    Hudson knowingly entered into this transaction with CropUSA (and subsequently acquired AIA's rightful contract with Growers National) with the knowledge that allegations had been made in a lawsuit that CropUSA had unlawfully converted assets belonging to AIA, *i.e.,* that CropUSA did not have lawful title to the assets it sold to Hudson.  Hudson was not an innocent buyer in good faith when it purchased these assets.  To the contrary, Hudson knew it was purchasing assets with a disputed claim of title.  All of the defendants named in this suit either assisted in the execution of this transaction or assisted in its concealment.

**4.43**    At the time of the sale of assets from CropUSA to Hudson, Petersen was simultaneously serving as both an officer and employee of both AIA and CropUSA.  Petersen's employment contract with CropUSA contained a non-compete clause that extended to protect AIA from competitive acts on the part of Petersen.

**4.44**    As a further breach of his contract with AIA, Petersen was offered and accepted employment at Hudson in further consideration for his arrangement of the unlawful transfer of assets from CropUSA.  By transferring assets to Hudson and subsequently accepting employment at Hudson Insurance Group, Petersen violated the non-compete clause of his Officer's Agreement with AIA and breached his fiduciary duties owed to AIA.

**4.45**    At the time of the 2008 sale of assets to Hudson, Hawley Troxell, Babbitt, Ashby and/or Riley were inappropriately acting as counsel for, or providing legal services on behalf of AIA Services, AIA Insurance, CropUSA, the Controlling Defendants in the *Reed Taylor* litigation.  Upon information and belief, Hawley Troxell, Babbitt, Ashby and/or Riley allowed the transaction to close in spite of their actual knowledge that AIA

COMPLAINT - 25

had *bona fide* claims to the assets conveyed.

**4.46** Sometime in 2008 or 2009, AIA Insurance received approximately $800,000.00 as a result of a settlement with GGMIT. These funds have been used to further finance the ongoing RICO enterprise alleged in this complaint.

**4.47** In 2010, Hudson, acquired, through CropUSA, the contract with Growers National that rightfully belonged to AIA. The consideration paid by Hudson to CropUSA for this contract, and all benefits flowing to Hudson as a result, are the rightful property of AIA. Hudson knew that AIA had founded and operated Growers National and had claims to the contract that Hudson acquired with it.

**V.    CERTIFICATE OF COMPLIANCE WITH I.C. § 30-1-742, FED. R. CIV. P. 23.1, AND I.R.C.P.  23(1)(A) and OTHER FACTS**

**5.1** As a prerequisite to filing this lawsuit under Idaho Code § 30-1-742, Federal Rule of Civil Procedure 23.1, and Idaho Rule of Civil Procedure 23(1)(a), Donna Taylor served a derivative demand letter on the purported boards of directors of AIA Services and AIA Insurance on July 21, 2008. See *Derivative Demand Letter, July 21, 2008*, attached as **Exhibit l** and incorporated by reference herein. RICO actions may be brought derivatively. *Diduck v. Kaszycki & Sons, Contractors, Inc.,* 737 F. Supp. 792 (S.D.N.Y. 1990).

**5.2** On July 23, 2008, Hawley Troxell, Babbitt, Ashby and Riley, filed a Motion for Stay of Proceedings in *Taylor v. AIA Services*, and asserted that the stay was necessary so that AIA Services and AIA Insurance could conduct an inquiry into the demands made by Donna Taylor in her letter of July 21, 2008.

**5.3** On July 31, 2008, attorney James LaRue, representing Hawley Troxell and the attorney defendants, responded to those portions of the demand letter that asked the

COMPLAINT - 26

**2-ER-204**

purported board of directors to terminate Hawley Troxell.   In this letter, LaRue disingenuously demanded that Donna Taylor provide the complete factual basis for each and every one of her claim when he knew that his clients and the Controlling Defendants had full knowledge of Donna Taylor's claims and unfettered access to and control of all documents relevant to claims asserted in Donna Taylor's demand letter.

5.4     On August 14, 2008, Hawley Troxell and the attorney defendants disingenuously filed a petition for a court appointed independent inquiry on behalf of AIA when they had no intention of following through with the inquiry.

5.5     On September 4, 2008, Reed Taylor responded to the petition for a court appointed independent inquiry.  Notably, Reed Taylor did not oppose the appointment of independent investigators.  Instead, he objected to the investigators proposed by Hawley Troxell, Judges Schilling and Reinhardt, as both of these judges had previous professional relationships with the defendants and their attorneys, and that the court merely appoints disinterested and knowledgeable persons to conduct the investigation.

5.6     Although the parties had filed briefing with respect to the appointment of independent investigators, Hawley Troxell and the attorney defendants never noted the motion for a hearing and the court never ruled on the request, and they intentionally abandoned the appointment of an independent inquiry.

5.7     Upon information and belief, the defendants have never conducted a further investigation of the demands made in Donna Taylor's letter of July 21, 2008.

5.8     The defendants have not taken any of the actions demanded by Donna Taylor in her demand letter.  All of the claims made in this lawsuit were reasonably contemplated by the derivative demand letter, as it demanded that the board take all actions against all

COMPLAINT - 27

parties.

**5.9** Donna Taylor's derivative demand letter gave the boards of AIA Services and AIA Insurance adequate notice of claims that should be pursued on behalf of AIA. Accordingly, plaintiff Dale Miesen is not required to submit a separate demand letter to the boards. See, e.g., *In re the Pittsburgh and Lake Erie Raikroad Co. Securities and Antitrust Litigation* 392 F.Supp. 492 (E.D. Penn. 1975).

**5.10** In the alternative, plaintiff Miesen is excused from submitting a separate derivative demand letter under the doctrine of futility. While Idaho's code does not include a futility exception to the requirement of a derivative demand letter, the doctrine of futility still applies to federal claims, including RICO claims, and thus the federal exception would apply. Futility is proven in this action as the plaintiffs have shown that the boards are hostile to their interests. All of AIA's presented purported board members have irreconcilable, conflicting, and diverging interests to those of AIA, and these boards are controlled by the Controlling Defendants, who also all have the same conflicts of interest and differing interests. AIA's purported boards of directors have not, and would not, take action against themselves and other members of the board as they are controlled by the Controlling Defendants. AIA's present board of directors are interested parties by way of their involvement in the millions of dollars of corporate malfeasance and unlawful transactions occurring at AIA over the years, and their interests are hostile to AIA's interests as they would never assert claims against themselves and the Controlling Defendants. These directors and the Controlling Defendants have refused to comply with the bylaws and articles of incorporation for AIA and they have intentionally refused to hold shareholder meetings as required. All of these acts establish hostility on the part of

COMPLAINT - 28

the board and establish a futility exception with respect to the requirement of any further demand letter.

**5.11**    Although Donna Taylor may have priority over certain damages obtained by way of this Complaint, she is disregarding any potential priority for purposes of prosecuting this action and is pursuing all claims made in this Complaint equally and fairly on behalf of all preferred and common shareholders of AIA.   Plaintiffs will deposit all funds recovered in this suit with the Court for a determination of proper distribution. Additionally, plaintiffs are not pursuing this matter in a collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims.

## VI.    CAUSES OF ACTION

The facts alleged in paragraphs 4.1 through 4.47 and paragraphs 5.1 through 5.11 are re-alleged and restated herein to the extent necessary to maintain each cause of action herein.   Where necessary, each of the causes of action pled herein shall be construed as having been pled in the alternative.

### FIRST CAUSE OF ACTION—RICO, 18 U.S.C. § 1961 *et seq.*
### (Taylor, Beck, Cashman, Petersen, CropUSA, Hudson, Hawley Troxel, Riley, Babbitt and Ashby)

**6.1**    Under 18 U.S. C. § 1961(1), "racketeering activity" includes a violation of certain federal statutes, including 18 U.S.C.  § 1341, which makes it a crime to "devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses representations or promises…" with a further requirement that the fraud include the use of the mails or interstate carriers.   Racketeering activity also includes fraud committed through the use of interstate wires.   18 U.S.C. § 1343.   A "pattern or racketeering activity" includes at least two acts of racketeering occurring after

COMPLAINT - 29

the enactment of the statute, with the last act occurring within ten years of the prior act. 18 U.S.C. § 1961(5).

**6.2**    18 U.S.C. 1962(a) makes it illegal for anyone who has received income from a pattern of racketeering activity to invest any of the income received in any enterprise which is engaged in or effects interstate or international commerce.  18 U.S.C. 1962(b) makes it illegal for a person to obtain interest in or control over any enterprise engaged in or effecting interstate or international commerce by engaging in a pattern of racketeering activity.  18 U.S.C. 1962(c) makes it illegal for employees or associates of enterprises engaged in or effecting interstate or international commerce to participate in or conduct the enterprise's affairs through a pattern of racketeering activity.  18 U.S.C. § 1962(d) makes it illegal for any person to conspire with another to violate subsections (a),(b) or (c) of the statute.  A person damaged by any violation of 18 U.S.C. § 1962 has a cause of action for treble damages under 18 U.S.C. § 1964(c).

**6.3**    CropUSA was formed by the Controlling Defendants in 2000, and was operated thereafter as a scheme or artifice to defraud AIA or to obtain money or property from AIA by means of false or fraudulent pretenses, representations, or promises, *i.e.*, as a "racketeering enterprise" under 18 U.S.C. § 1961(4).  The RICO Defendants utilized the United States mail and/or interstate wire communications in furtherance of this scheme or artifice, and their actions had an effect on interstate commerce.

**6.4**    The actions taken by CropUSA and the Controlling Defendants with respect to the purported January 10, 2001, shareholders' meeting advanced the scheme to obtain money or property by means of false or fraudulent pretenses, representations, or promises. These defendants falsely represented that negotiations had taken place and that AIA

COMPLAINT - 30

Services had authorized CropUSA to operate as an independent company, rather than as a wholly-owned subsidiary.  These defendants further acted to deprive AIA of money and property by agreeing to transfer AIA corporate assets, including trade secrets, to CropUSA, without compensation to AIA.  This scheme to deprive AIA of money and property was advanced by concealing the contents of the purported January 10, 2001 board of directors meeting from the innocent shareholders of AIA.

6.5     From 2000 and continuing through the filing of this lawsuit, CropUSA and the Controlling Defendants further acted to fraudulently deprive AIA of money and property by arranging for AIA to pay CropUSA's expenses, including but not limited to the salaries of Taylor and Petersen, and employee benefits, as well as arranging for AIA to provide corporate infrastructure to CropUSA without compensation to AIA.

6.6     The Controlling Defendants and CropUSA further acted to deprive AIA of money and property in 2004, when CropUSA converted over $1.5 million belonging to AIA Insurance for its own use.

6.7     All defendants named under this cause of action further acted to deprive AIA of money and property in 2007, when the deed of trust received from the state of Idaho in settlement of a lawsuit was titled to AIA Services and subsequently pledged to CropUSA so that CropUSA could borrow money to pay the attorney's fees of Hawley Troxell, Babbitt, Ashby and Riley for providing legal services beyond their respective scopes of representation.

6.8     All defendants named under this cause of action further acted to fraudulently deprive AIA of money and property in 2008 when CropUSA sold certain business assets rightfully belonging to AIA to Hudson.  By way of this transaction, which conferred no

COMPLAINT - 31

benefit on AIA, debts of CropUSA and the debts of at least one individual shareholder of CropUSA were retired.

6.9     The predicate acts described in paragraphs 6.3 through 6.8 are not an exhaustive list of the racketeering activities engaged in by the defendants and are submitted for notice pleading purposes only.

6.10    With respect to the illegal acts described in paragraphs 6.3 through 6.8, the defendants utilized the United States mail and/or interstate wires, *e.g.,* email, in furtherance of their activities, thereby establishing a predicate offense to RICO under 18 U.S. C. § 1341 and/or 18 U.S.C. § 1343.  18 U.S.C. § 1961(1).  For example, the scheme to unlawfully obtain funds from AIA in 2004 (the Trustmark settlement) was executed by use of emails, regular mail, and the funds were transferred by way of interstate wires.  By way of further example, the United States mails were used to advance the 2008 transfer of assets to Hudson, and CropUSA and Hudson exchanged letters and documents by mail.   By way of further example, interstate wires were used pervasively to transmit premiums from agents up the corporate ladder in furtherance of the racketeering enterprise.   The defendants also used mail and wire communications to communicate with Hawley Troxell in furtherance of the racketeering enterprise.

6.11    The Controlling Defendants all used funds and/or assets received through a pattern of racketeering activity to invest in or obtain control of an enterprise  engaged in a pattern of racketeering activity and are liable to AIA for treble damages and attorney's fees under 18 U.S.C. § 1962(a).  Specifically, each of these defendants used money and assets obtained in 2004 and on an ongoing basis thereafter to further the continued existence and operation of the racketeering enterprise, CropUSA.

COMPLAINT - 32

6.12    Defendants Beck, Cashman and Petersen were all employees or associates (as purported board members) of CropUSA during the period of racketeering activities and participated in or controlled its affairs.  Beck and Cashman were members of CropUSA's purported "advisory board," were involved in all important financial decisions, and otherwise participated in the activities of CropUSA in furtherance of racketeering activity.  Petersen served as CropUSA's CEO and participated in the negotiations leading to the 2008 transaction with Hudson.  These defendants are liable to AIA under 18 U.S.C. § 1962(c) for treble damages and attorney's fees for the damages caused by their conduct.

6.13    All defendants named under this cause of action had knowledge of CropUSA's pattern of racketeering activity, agreed with the objectives of the racketeering activity, and took overt acts to advance the interests of CropUSA, thereby rendering each of these defendants liable to the innocent shareholders of AIA under 18 U.S.C. § 1962(d) for triple damages and attorney's fees for damages caused by their conduct.  With respect to Hawley Troxell, Babbitt, Ashby and/or Riley, a cause of action against corporate counsel of the RICO enterprise exists where the law firm communicates or disseminates the misrepresentations of the RICO enterprise or breaches fiduciary duties to clients in the course of providing representation to the RICO enterprise, which describes the conduct of these defendants in this case. See, e.g., *Design Pallets, Inc., v. GrayRobinson P.A.*, 515 F.Supp.2d 1246 (M.D. Fla. 2007).  RICO liability can also arise from nondisclosure of material facts where there is a duty to disclose, which once again describes the conduct of these defendants in this case.  *Design Pallets*, 515 F.Supp.2d at 1255.

COMPLAINT - 33

## SECOND CAUSE OF ACTION—BREACH OF FIDUCIARY DUTY
### (Taylor, Beck, Cashman, Petersen, Babbitt, Riley, Ashby, Hawley Troxell)

**6.14** As members, or purported members of the board of directors for AIA Services and/or AIA Insurance, the Controlling Defendants owed fiduciary duties to the corporations. As a corporate officer, and as an attorney, Taylor owed an elevated level of fiduciary duties to the corporations. As a corporate employee, Petersen owed fiduciary duties to AIA, including an undivided duty of loyalty. As AIA's retained corporate counsel, Hawley Troxell, if authorized, owed fiduciary duties to the corporations. This duty extended to defendants Babbitt, Riley and Ashby. If not authorized to act as counsel, Hawley Troxell acted with apparent authority as agent and owes fiduciary duties as a result of that agency relationship. All of these defendants have breached their fiduciary duties to AIA and those breaches are the proximate cause of the damages claimed herein.

**6.15** By using AIA corporate assets to fund, form and operate CropUSA, a competing entity, the defendants breached their fiduciary duties to the corporation.

**6.16** Hawley Troxell represented or was retained by AIA at the time CropUSA was formed. By failing to advise that shareholder approval of any such transaction would be necessary, and by failing to advise that the transaction constituted a breach of fiduciary duty, individually and collectively, on the part of the board members, and by failing to advise that the transaction constituted a violation of the non-compete clause in Taylor's employment contract, Hawley Troxell breached the fiduciary duties it owed to AIA. A shareholder's allegations of a law firm's conflict of interest in representing two corporations is sufficient to state a claim for breach of fiduciary duty. *Reis v. Barley, Snyder, Senft & Cohen LLC,* 484 F.Supp.2d 337 (E.D. Pa. 2007)

COMPLAINT - 34

**2-ER-212**

**6.17**   The defendants further breached their fiduciary duties to the corporation when they orchestrated the transfer of over $1.5 million to CropUSA in 2004.   These defendants unlawfully funneled funds from AIA Insurance to CropUSA to enrich themselves and to artificially enhance CropUSA's balance sheet.

**6.18**   The defendants on AIA's board of directors further breached their fiduciary duties to the corporation by allowing CropUSA to utilize AIA Services' corporate assets, including agents, customer lists and trade secrets.

**6.19**   All defendants named under this cause of action breached their fiduciary duties to AIA when they caused the deed of trust received through the settlement of litigation with the state of Idaho to be titled with AIA Services and subsequently pledged to CropUSA so that CropUSA could borrow money to pay the attorney's fees of Hawley Troxell.

**6.20**   All defendants named under this cause of action further breached their fiduciary duties to AIA when they caused AIA Insurance to guarantee a $15 million line of credit on behalf of and for the sole benefit of CropUSA, and thereafter concealed this transaction from AIA.   Hawley Troxell and/or Riley violated its fiduciary duties to AIA by writing an opinion letter stating that AIA had authority to make this loan when this loan guarantee was in fact barred by the articles of incorporation and bylaws of AIA.

**6.21**   The defendants named in this cause of action further breached their fiduciary duties to the corporation by failing to act on Donna Taylor's July 21, 2008 demand letter and by taking positions hostile to the corporation in the course of the *Reed Taylor v. AIA Services* litigation and other litigation.

**6.22**   All defendants named under this cause of action further breached their fiduciary duties owed to AIA when they caused corporate assets upon which AIA asserted a claim

COMPLAINT - 35

**2-ER-213**

of ownership to be transferred to Hudson.  This breach of fiduciary duties is exacerbated by the fact that the transaction was apparently executed to retire person debts of Taylor and/or Beck and/or Cashman.  As counsel for AIA, Hawley Troxell, Riley, Babbitt and/or Ashby had duties to inform AIA of this transaction.

6.23   Hawley Troxell and the individual lawyers have acted continuously as purported counsel for AIA and CropUSA during the period from 2001, at the latest, and  through the filing of this lawsuit.  As counsel, Hawley Troxell, has committed numerous acts and/or omissions that were detrimental to the interests of AIA, and, upon information and belief, was providing legal advice when the Controlling Defendants, without notice or authority, converted CropUSA from a wholly owned subsidiary of AIA Services into a separate corporate entity of which Taylor was purportedly the sole shareholder.  These defendants provided legal advice with respect to CropUSA's Private Offering Memorandum, while at the same time representing AIA.  Hawley Troxell was providing legal advice when AIA, CropUSA, Taylor and others entered into a Joint Defense Agreement that tethered AIA to parties adverse to AIA's interests and against whom AIA should have been pursuing claims.  Hawley Troxell was providing legal advice and wrote an opinion letter in 2007 that resulted in AIA Services being obligated as the guarantor of CropUSA's debt. Hawley Troxell was providing legal advice in 2008 when CropUSA transferred assets with disputed title to Hudson in a deal where the consideration apparently included relief for the personal debts of defendants Taylor and/or Beckman and/or Cashman.

6.24   Each of these defendants is a "faithless fiduciary" as defined by law and is therefore required to disgorge all compensation and consideration received from AIA

COMPLAINT - 36

**2-ER-214**

and/or CropUSA.  The disgorgement is in addition to liability caused by the breaches of fiduciary duty.  In the case of Hawley Troxell, the disgorgement goes to all fees received from any of the defendants.  In the case of the faithless board members, the disgorgement goes to all salary, bonuses, warrants, stock options, or stock received from AIA.

**6.25**    The defendants named under this cause of action are jointly and severally liable to AIA for all damages arising from their breaches of fiduciary duty.

**THIRD CAUSE OF ACTION—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY**
**(Taylor, Beck, Cashman, Petersen, Hawley Troxell, Babbitt, Riley, Ashby, Hudson, Growers National)**

**6.26**    One who counsels, advises, abets or assists in the commission of an actionable wrong is responsible to the injured person for the entire loss or damage.  86 C.J.S. Torts § 105; RESTATEMENT (FIRST) OF TORTS § 876 (1939).  Aiding and abetting in the commission of an actionable wrong may be inferred from the fact that one aided and abetted efforts to conceal the wrong. 86 C.J.S. Torts § 105. Liability for aiding and abetting the commission of a tort may be established by showing the person was present at the time of the actionable wrong and did not disapprove or oppose the action. Plaintiffs alleging aiding and abetting need not prove that the aiding and abetting was necessary for the commission of the tort, only that the aiding and abetting made it easier for the tort to occur.  *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12 (2002).

**6.27**    During certain relevant times, each of the defendants named under this cause of action had knowledge of the other defendants' act and omissions, knew that the acts or omissions constituted a breach of fiduciary duty, did not disapprove of the acts or omissions, took no steps to prevent the commission of the torts, and assisted in the

COMPLAINT - 37

**2-ER-215**

concealment of the acts and omissions described herein, thereby damaging AIA.

**6.28** Taylor aided and abetted the breaches of fiduciary duty on the part of Petersen by arranging for Petersen to work at CropUSA while an employee of AIA and by authorizing Petersen to negotiate the unlawful sale of CropUSA assets to Hudson, as well as his own employment with Hudson. Taylor also aided and abetted Hawley Troxell and the attorney defendants in their breaches of fiduciary duties to AIA by giving direction to Hawley Troxell when Taylor's own interests were in conflict with those of AIA.

**6.29** Beck, Cashman and Petersen aided and abetted the breaches of fiduciary duty committed by Taylor by assisting in and concealing the actions described in this complaint. Beck and Cashman aided and abetted the purported "spin off" of CropUSA from AIA Services, aided and abetted Taylor's scheme to divert $1.5 million from AIA Insurance in 2004, aided and abetted Taylor's failed effort to achieve a private placement for CropUSA (the "exit strategy"), aided and abetted the 2007 scheme to pledge the mortgage owned by AIA Services to CropUSA, aided and abetted the action of Taylor in having AIA Services guarantee CropUSA's line of credit when Beck and Cashman should have guaranteed the line of credit, aided and abetted Taylor's plan to sell CropUSA assets to Hudson to retire both corporate and personal debt, and aided and abetted Taylor in the course of the *Reed Taylor* litigation by taking positions adverse to AIA. Petersen aided and abetted Taylor by agreeing to work for CropUSA while on the AIA payroll, by agreeing to violate the non-compete clause in his contract, and by negotiating the terms of the 2008 transaction with Hudson (with whom he subsequently accepted employment). Hudson and Growers National, in turn, aided and abetted breaches of fiduciary duty by agreeing to transfer assets belonging to AIA when these

COMPLAINT - 38

**2-ER-216**

entities had knowledge of AIA's claims.

**6.30**    Hawley Troxell and each of the named attorney defendants aided and abetted in the commission of torts committed by Taylor, Beck, Cashman and Petersen by assisting in and covering up the tortious acts described herein.  Hawley Troxell and the named attorneys were present at the commission of the torts and did not disapprove or oppose the acts.  To the contrary, Hawley Troxell and the named attorneys provided legal advice and/or opinion letters that facilitated the breaches of fiduciary duty by the other defendants.  Hawley Troxell was present as counsel when Taylor purportedly spun off CropUSA and failed to counsel that the conduct was improper and, in fact, concealed the impropriety from AIA.  Hawley Troxell assisted in 2004 when Taylor, Beck and Cashman engineered the illicit transfer of funds from AIA Insurance in order to prop up the proposed private placement, which Hawley Troxell also handled.  Hawley Troxell was present as counsel and issued an improper opinion letter when Taylor, Beck and Cashman arranged for AIA Services to guarantee the line of credit of CropUSA.  Hawley Troxell, Babbitt, Ashby and Riley assisted when Taylor, Beck and Cashman pledged a $1.2 million mortgage belonging to CropUSA so that CropUSA could borrow money to pay Hawley Troxell's attorney's fees, and failed to counsel that the transaction was improper.  Hawley Troxell assisted when CropUSA sold assets rightly owned by AIA to Hudson to retire both corporate and personal debts, and failed to counsel that the transaction was improper.  Hawley Troxell also aided and abetted the Controlling Defendant duties by representing both AIA and CropUSA in the *Reed Taylor v. AIA Services et al.,* litigation and taking positions hostile and adverse to AIA.

COMPLAINT - 39

**2-ER-217**

**6.31** Each of these defendants, by aiding and abetting the acts described herein, is jointly and severally liable for all damages resulting from these breaches of fiduciary duty.

### FOURTH CAUSE OF ACTION—BREACH OF CONTRACT
### (John Taylor)

**6.32** On August 1, 1995, Taylor and AIA Services entered into an Executive Officer's Agreement.

**6.33** Section 9 of the Executive Officer's Agreement sets for express covenants not to compete. Subsection A of the covenants prohibits Taylor from soliciting AIA customers or otherwise diverting the business of AIA Services customers. Subsection B prohibits Taylor from participating in any insurance business that underwrites, markets or administers insurance products for commodity associations. Subsection C prohibits Taylor from soliciting AIA Services employees for other employment. Subsection D of the covenants bars Taylor from divulging or exploiting trade secrets belonging to AIA.

**6.34** By forming CropUSA as anything other than a wholly-owned subsidiary of AIA, Taylor breached all four subsections of Section 9 of the Executive Officer's Agreement.

**6.35** By continuing to operate CropUSA with assets belonging to AIA, including AIA employees, Taylor has committed an ongoing breach of all four subsections of Section 9 of the Executive Officer's Agreement. Taylor has further breached Section 9 by operating Pacific Empire Holdings.

**6.36** Taylor's breaches of the Executive Officer's Agreement have damaged AIA.

### FIFTH CAUSE OF ACTION—TORTIOUS INTERFERENCE WITH
### CONTRACTUAL RELATIONSHIPS/ BUSINESS EXPECTANCIES
### (Taylor, Beck, Cashman, Petersen, Hudson, Grower's National)

**6.37** A person commits the tort of interference with a contract or business expectancy

COMPLAINT - 40

**2-ER-218**

when (1) a contract or business expectancy exists; (2) defendants have knowledge of the contract or business expectancy; (3) defendants interfere with the contract or business expectancy; and (4) plaintiff suffers damages as a result. See, e.g., *Jensen v. Westberg,* 115 Idaho 1021, 772 P.2d 228 (1988).

**6.38**   In 1999, when the Controlling Defendants formed CropUSA, AIA had business expectancies with Growers National by way of the farmer's cooperatives that were the purchasers of AIA's policies.   These defendants had knowledge of AIA's business expectancies.

**6.39**   By marketing to AIA's customers and using AIA's assets, CropUSA, the Controlling Defendants, and Growers National, interfered with AIA's reasonable business expectancies.  AIA was proximately damaged as a result of this interference.

**6.40**   CropUSA also interfered with AIA's business expectancies when it sold AIA business assets to Hudson Insurance Group.   AIA was proximately damages by this interference.  By purchasing these assets with full knowledge that CropUSA could not lawfully sell the asset, Hudson Insurance Group also interfered with the business expectancies of AIA and is jointly and severally liable to AIA for damages arising from this business tort.

**SIXTH CAUSE OF ACTION—LEGAL MALPRACTICE**
**(Hawley Troxell, Babbitt, Riley, Ashby)**

**6.41**   A law firm is liable for malpractice where (1) there exists and attorney client relationship; (2) where the lawyers owe duties pursuant to the relationship; (3) where the lawyers breach their duties or negligently perform them; and (4) such breaches proximately cause damage to the plaintiffs.  *Harrigfeld v. Hancock,* 140 Idaho 134, 90 P.3d 884 (2004).  A legal malpractice claim may be brought in a derivative action.

COMPLAINT - 41

**2-ER-219**

*Schulman v. Wolf & Samson, PC,* 951 A.2d 1051 (N.J. 2008).   Upon information and belief, Hawley Troxell has provided ongoing legal services to AIA from 1999 through the filing of this complaint.   An attorney-client relationship exists between AIA and Hawley Troxell.

6.42     Pursuant to the attorney-client relationship, Hawley Troxell and its lawyers owe AIA an undivided duty of loyalty.   Hawley Troxell and its lawyers, including those named in this complaint, are required at all times to provide legal advice and take action that is in the best interests of AIA.   Hawley Troxell violated this duty of loyalty by simultaneously representing AIA and CropUSA, and by taking funds from AIA for the defense of CropUSA and the Controlling Defendants.

6.43     Hawley Troxell and the named lawyers are liable to AIA in malpractice for all damages proximately caused by their acts and omission.

### SEVENTH CAUSE OF ACTION—BREACH OF CONTRACT
### (Kent Petersen)

6.44     Pursuant to appointment by the unlawful boards of AIA Services and CropUSA, Kent Petersen served as President for both entities.

6.45     Petersen's Officer's Agreement with AIA Services contained a non-compete clause.

6.46     Petersen's Officer's Agreement with CropUSA, signed almost two years after Petersen began devoting his full efforts to CropUSA, contained a non-compete clause drafted to protect both CropUSA and AIA from competition.   Petersen breached this contract when he accepted employment at Hudson Insurance Group in 2008.

6.47     Petersen negotiated the 2008 sale of CropUSA assets to Hudson Insurance Group. Petersen engaged in these negotiations with knowledge that AIA claimed ownership

COMPLAINT - 42

rights in all business assets purportedly owned by CropUSA.

**6.48** By facilitating this transaction with knowledge of AIA's claims, Petersen breached his employment contract.

**6.49** By accepting employment at Hudson Insurance Group in conjunction with the unlawful sale of assets rightfully belonging to AIA, Petersen further breached the terms of his employment contract.

**6.50** Petersen is liable to AIA for all damages resulting from his breaches of the employment contract.

### EIGHTH CAUSE OF ACTION—FRAUD/FRAUDULENT CONCEALMENT/CONSTRUCTIVE FRAUD
### (Taylor, Beck, Cashman, Petersen)

**6.51** These defendants are liable to AIA for fraud because each of them (1) made representations of fact as asserted throughout this complaint, including but not limited to representations that CropUSA was being operated for the benefit of AIA; (2) which were false; (3) which were material; (4) which they knew to be false; (5) intended that there be reliance; (6) where other party was ignorant of the falsity of the statement; (7) and the other party did rely; (8) and the reliance was justified; and (9) injury resulted. *Mannos v. Moss,* 143 Idaho 927, 155 P.3d 1166 (2007)(holding that misrepresentations in financial statements precluded summary judgment). Constructive fraud is identical to fraud, except that the plaintiff need not prove speaker's knowledge of the fraud and the speaker's intent that the other party rely on the representations. 37 Am. Jur. 2d Fraud and Deceit § 9.

**6.52** In addition to making false representations, these defendants also concealed information from AIA with knowledge that the concealed information was material and

COMPLAINT - 43

that the concealment would cause AIA to suffer otherwise avoidable damages. Failure to disclose a fact where one has a duty to disclose is the legal equivalent of representing the non-existence of the fact. Where facts are fraudulently concealed, plaintiffs need not show reliance as there is nothing other than silence upon which to rely.

6.53    The Controlling Defendants represented to AIA Services that CropUSA was a wholly owned subsidiary of AIA Services. Simultaneously, the Controlling Defendants adopted the position, not disclosed to AIA or its shareholders, that CropUSA was an independent entity with Taylor as its sole shareholder. These representations were false, the defendants knew of their falsity, these defendants intended that there be reliance, there was justifiable reliance and AIA was damaged as a result.

6.54    By operating CropUSA as an independent entity, and by using CropUSA as a vehicle for misappropriating and converting corporate assets, the named defendants committed ongoing fraud that has persisted through the date of this complaint.

6.55    The Controlling Defendants also made misrepresentations to AIA in the form of false, misleading and fraudulent financial statements, upon which AIA reasonably relied, with that reliance being the proximate cause of AIA's damages.

6.56    When the Controlling Defendants transferred more than $1.5 million to CropUSA in 2004, they concealed the fact of this transaction from AIA and AIA was damaged by this concealment.

6.57    When the Controlling Defendants transferred AIA corporate assets, including employees, goodwill and trade secrets, to CropUSA, they concealed the fact of this transfer from AIA and AIA was damaged by this concealment.

6.58    When the Controlling Defendants had AIA pay CropUSA's corporate expenses,

COMPLAINT - 44

including the salaries of Taylor and Petersen, they concealed this fact from AIA and its innocent shareholders.  AIA suffered damages as a result of this concealment.

6.59    When the Controlling Defendants pledged the mortgage obtained by AIA from the state of Idaho to CropUSA so that CropUSA could borrow money to pay the attorney's fees of Hawley Troxell, they concealed this fact from AIA and its innocent shareholders.  AIA suffered damages as a result of this concealment.

6.60    When the Controlling Defendants had AIA Insurance guarantee CropUSA's $15 million line of credit, they concealed the fact of this guarantee from AIA.

6.61    When the Controlling Defendants and Petersen arranged for Hudson Insurance Group to acquire CropUSA assets in exchange for the retirement of corporate and personal debts, they concealed the fact of this transaction from AIA.

6.62    These defendants are jointly and severally liable to AIA for all damages arising from the fraud described herein and, further, are the ongoing fraud bars these defendants from asserting a statute of limitations defense.

### NINTH CAUSE OF ACTION—AIDING AND ABETTING FRAUD
### (Taylor, Beck, Cashman, Babbitt, Riley, Ashby, Hawley Troxell)

6.63    As discussed under the Third Cause of Action, one who aids and abets in the commission of a tort is liable with the primary tortfeasor(s) for all damages resulting from the tort.  Aiding and abetting is established where one has knowledge of the tort, does not disapprove, and takes no action to prevent the commission of the tort.  Hawley Troxell and one or more of the named lawyer defendants were providing legal representation to AIA at the time of each of the fraudulent acts alleged in this complaint. The individual non-lawyer defendants, in addition to committing individual acts of fraud, aided and abetted each other's actions.

COMPLAINT - 45

**6.64** Hawley Troxell and/or the individual lawyers named herein knew or should have known that the acts of the Controlling Defendants constituted fraud. Hawley Troxell and the individual lawyers knew or should have known that these acts were detrimental to of AIA. Hawley Troxell's silence, failure to act and intentional acts to cover up fraud upon AIA constituted aiding and abetting the fraud upon AIA.

**6.65** Hawley Troxell and the individual lawyers knew or should have known that the transfer of AIA assets to CropUSA constituted a fraud against AIA.

**6.66** Hawley Troxell and the individual lawyers knew or should have known that the transfer of approximately $1,500,000.00 to CropUSA constituted a fraud on AIA.

**6.67** Hawley Troxell and the individual lawyers knew or should have known that the practice of allocating CropUSA expenses to AIA, and otherwise failing to maintain arms' length transactions between CropUSA and AIA, constituted a fraud on AIA.

**6.68** Hawley Troxell and the individual lawyers knew or should have known that the sale of CropUSA assets to Hudson, when all parties to the sale already had notice that AIA Services had a claim to those assets, constituted a fraud against AIA.

**6.69** By knowingly providing legal cover for the fraudulent acts described herein, Hawley Troxell and the individual lawyers have aided and abetted the fraud committed by the Controlling Defendants and Petersen.

**6.70** As aiders and abettors, Hawley Troxell and the individual lawyers are liable to the innocent shareholders of AIA Services to the same extent as the primary tortfeasors. RESTATEMENT (FIRST) OF TORTS § 876 (1939). Likewise, Taylor, Beck, Cashman and Petersen are all liable for aiding and abetting each other in the commission of fraud.

COMPLAINT - 46

**2-ER-224**

### TENTH CAUSE OF ACTION—EXCESSIVE COMPENSATION/CORPORATE WASTE
### (Taylor and Beck)

**6.71**   To support a claim for excessive compensation, plaintiff need only show that the board lacked independence and/or lacked good faith.  *In Re: Tyson Foods, Inc.,* 919 A.2d 563 (Del. 2000).  The Controlling Defendants have controlled AIA's boards from 1995 to the present.  They lack independence and have not acted in good faith.

**6.72**   The Controlling Defendants paid excessive compensation and have wasted corporate assets during the course of managing the corporations.

**6.73**   These defendants are liable to AIA for damages caused by paying excessive compensation and otherwise wasting corporate assets.

### ELEVENTH CAUSE OF ACTION—ACCOUNT STATED
### (John Taylor)

**6.74**   John Taylor established an account by borrowing $307,000.00 from AIA for his personal use.

**6.75**   Taylor subsequently confirmed the amount of the debt by "correcting" an accounting "error" so that AIA's book show that AIA is creditor and Taylor is debtor for $307,000.00.

**6.76**   Taylor has not paid any portion of this debt and the entire balance remains due and payable to AIA.

**6.77**   Taylor is liable to AIA for $307,000.00 on the account stated, plus prejudgment interest according to statute.

COMPLAINT - 47

## VII.   JURY DEMAND

**7.1**   Plaintiffs hereby demand a trial by jury on all causes of action for which a jury trial is allowed by law.

## VIII.   PRAYER FOR RELIEF

Wherefore Plaintiffs pray for the following relief:

1.   For a judgment jointly and severally against all defendants for damages in an amount to be proven at trial, but not less than $15,000,000.00;

2.   For judgments against individual defendants in an amount to be proven at trial, where appropriate, for damages for which joint and several liability does not apply to all defendants;

3.   For a judgment of treble damages against all RICO defendants as authorized by statute;

4.   For an order requiring the Hawley Troxell to disgorge all attorneys fees paid to it by AIA Services, AIA Insurance, CropUSA and any of the named defendants and judgment in favor of AIA for that amount;

5.   For an order requiring John Taylor, James Beck, Michael Cashman, Sr., and Kent Petersen, to disgorge all compensation received from AIA or CropUSA since 1999, including stock, cash and other assets, including, without limitation, as faithless fiduciaries.

6.   For an award to plaintiffs of attorneys' fees and cost incurred in this action as allowed by statute, contract, or recognized grounds of equity;

7.   For an order requiring that all funds recovered as a result of this litigation, minus fees, costs  and bona fide debts, be deposited with the Court registry and

COMPLAINT - 48

**2-ER-226**

distributed only after court order, and that no funds from this litigation be paid to faithless fiduciaries Taylor, Beck and Cashman.

8.      For judgments against the Taylor, Beck and Cashman, jointly and severally, as the alter-ego of CropUSA for all damages incurred by AIA and attributable in whole or in part to CropUSA.

9.      For any such further relief or remedy, including injunctive relief, as Plaintiffs may demand prior to or at trial or as this Court may find just and equitable.

DATED this the 11th day of August, 2010 in Seattle, Washington.

LAW OFFICE OF LEE H. ROUSSO


By: /s/ Lee H. Rousso
Lee H. Rousso, ISB # 8353
800 Fifth Avenue, Suite 4100
Seattle, Washington 98104
 (206) 623-3818
 lee@leerousso.com
 Attorneys for Donna J. Taylor and Dale Miesen

COMPLAINT - 49

**2-ER-227**

VERIFICATION

STATE OF IDAHO            )
                         ) ss.
COUNTY OF NEZ PERCE  )

I, Donna J. Taylor, being first duly sworn on oath, deposes and says:

I am one of the plaintiffs in the above-entitled action. I have read the contents of this Complaint, know the contents of this Complaint, and have knowledge that the facts alleged herein are true, except those facts have been alleged upon information and belief, and as to those matters I believe them to be true.

_Donna J. Taylor_

Donna J. Taylor

SUBSCRIBED AND SWORN to before me this 31st day of July, 2010.

_Sarah L Riedle_

Notary Public for Idaho
Residing at: _Lewiston_
My commission expires: _6/11/2014_

COMPLAINT - 49

2-ER-228



CropUSA
Insurance

111 Main Street • P.O. Box 538
Lewiston, ID 83501
800-635-1519
208-799-9000
208-746-8159 fax
www.CropUSAinsurance.com

August 18, 2008

Dear Shareholder:

Enclosed is a Notice for a special shareholders meeting of CropUSA for August 28, 2008, to be held in the Company's Lewiston office. We, CropUSA's shareholders, will be voting on a proposal to authorize the Company to transfer most of our crop insurance business to Hudson Insurance Company. Many of our employees will become employees of Hudson Insurance Company. Our employees in Lewiston will remain with CropUSA. After the transaction is closed, CropUSA will perform some administrative services for Hudson and operate as a Hudson general agency. After the closing, all commission checks, payroll for the employees employed by Hudson, adjuster fees, and other payments will be paid by Hudson Insurance Company.

Although we have been with Hudson for just two years, the proposed transaction is financially too good for CropUSA to pass up. (I have enclosed an outline of the proposed deal) The sale of the current block will result in a gain in excess of $10 million for the Company, it will retire all of our high cost debt, and it will allow us to concentrate on marketing through the Growers National Co-op, which is one of our strongest attributes.

After the majority vote of the shareholders and the closing of the transaction with Hudson, the 2009 SRA for Hudson will be released and we can begin processing fall business. Hudson is part of the OdysseyRe Insurance Group and a sister company to our current SRA holder, Clearwater Insurance Company. Odyssey (NY stock exchange symbol ORH) has assets of $3 billion and a net worth of $1 billion. You can look up more information on them through your favorite search engine.

The Board of Directors has weighed all the Company's options going forward. We unanimously think this is the way to go and ask you to vote for this proposal. Thank you. See you at the shareholders' meeting on the 28th.

Sincerely,

John Taylor
Chairman and CEO

**Exhibit - J**                                                    AIA0027471

**Description of Transaction**

**Purchaser:**            Hudson Insurance Company

**Seller:**               CropUSA Insurance Agency, Inc

**Type of Transaction:**  Asset Sale

**Assets Sold:**          All 2008 Crop Insurance business of CropUSA, including related premiums receivable, agent advances, commissions payable, fees payable and other items specifically detailed in an amount estimated to be $3.78 million, at July 31, 2008.

**Debt Relieved:**        Hudson will forgive the Company's debt of $7.52 million, including approximately $1.6 million that is owed to certain shareholders and the Company who made collateral available to secure the Company's indebtedness.

**Employees:**            Hudson will assume the payroll costs for all employees, except those based in Lewiston, including accrued vacation obligations. These employees will become part of a Hudson Insurance Company unit.

**Lewiston Operations:**  Lewiston-based employees will remain with CropUSA. CropUSA will receive administrative fees for six months, subject to continuation for a longer period by mutual agreement.

**Agency Agreement:**     CropUSA will receive an agency agreement, requiring CropUSA to exclusively represent Hudson for the 2009 crop year. The agency agreement can be extended by the agreement of Hudson and CropUSA.

**Non-Compete:**          John Taylor will execute a non-compete/consulting agreement for one year and will be paid $10,000 per month. The consulting agreement can be extended by the agreement of Hudson and John Taylor.

AIA0027472

James D. LaRue  ISB #1780
Loren C. Ipsen  ISB #1767
ELAM & BURKE, P.A.
251 East Front Street, Suite 300
P.O. Box 1539
Boise, Idaho 83701
Telephone:  (208) 343-5454
Facsimile:  (208) 384-5844
jdl@elamburke.com
lci@elamburke.com

Attorneys for Defendants, Hawley Troxell Ennis & Hawley, LLP,
Gary D. Babbitt, Richard A. Riley, and D. John Ashby

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONNA J. TAYLOR and DALE MIESEN, as shareholders who are bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,<br><br>    Plaintiffs,<br><br>v.<br><br>HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY BABBITT, an individual; RICHARD A. RILEY, an individual; D. JOHN ASHBY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R JOHN TAYLOR, an individual; KENT PETERSEN, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; HUDSON INSURANCE GROUP; a Delaware corporation; and GROWERS NATIONAL COOPERATIVE INSURANCE AGENCY, an Idaho corporation,<br><br>    Defendants. | Case No. 1:10-cv-00404-LMB<br><br>MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR STAY OF ACTION |

INTRODUCTION

The present lawsuit is the latest volley in a barrage of litigation unleashed by Reed J. Taylor

and those acting in concert with him[1] to seize control of AIA Insurance, Inc., an Idaho corporation,

_____

[1]   Plaintiff Donna J. Taylor is the former spouse of Reed J. Taylor and the sole owner of Series A Preferred Stock issued by AIA Services Corporation.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 1

**2-ER-231**

and to punish any who oppose his efforts to wrest corporate control from current management.  The Hawley Troxell defendants[2] have moved to dismiss the complaint as to plaintiff Dale Miesen on the ground that it fails to state a cause of action, and have further moved on the basis of application of the federal abstention doctrine for dismissal of the complaint without prejudice as to plaintiff Donna J. Taylor, or in the alternative, for a stay pending the resolution of parallel cases that are pending in state court.

STATEMENT OF FACTS AND CONTENTIONS

Reed J. Taylor[3] was the founder and, prior to August 1995, the majority shareholder of AIA Services Corporation ("AIA Services"), an Idaho corporation headquartered in Lewiston, Idaho. AIA Services is and was the parent company of AIA Insurance, Inc. ("AIA Insurance"), an insurance agency which sells health, life and other insurance policies to farmers and members of various agricultural growers associations.  In 1995 Mr. Taylor owned the majority of the outstanding shares of AIA Services' common stock and was its Chief Executive Officer and the Chairman of its Board of Directors.  (Riley Affidavit, ¶ 4.)

As became apparent in 1995, the AIA companies were in financial trouble and faced daunting business challenges.  Reed Taylor fashioned an exit plan.  Effective July 22, 1995, he entered into a written agreement with AIA Services (the "1995 Stock Redemption Agreement") pursuant to which the corporation agreed to redeem all 613,494 of his shares of the common stock of AIA Services.  Under the terms of the 1995 Stock Redemption Agreement, he received, among other

---

[2]   Gary D. Babbitt, Richard A. Riley and D. John Ashby are attorneys currently employed by Hawley Troxell Ennis & Hawley LLP.

[3]   After Reed J. Taylor sold his stock in AIA, his brother R. John Taylor succeeded him as president of the corporation.  The relationship between the brothers deteriorated, and Reed J. Taylor sued R. John Taylor among other parties.  In order to avoid confusion, all references in this brief to "Mr. Taylor" refer to Reed J. Taylor.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 2

**2-ER-232**

things, (a) $1,500,000 cash down payment at closing (converted into a promissory note payable October 20, 1995 (the "Down Payment Note") by the Addendum to the 1995 Stock Redemption Agreement); (b) a promissory note in the original principal amount of $6,000,000 plus interest (the "$6M Note"); (c) elimination of $568,000 of indebtedness he owed to AIA; and (d) title to certain airplanes and other tangible personal property.  (Riley Affidavit, Exhibit A.)

AIA Services was unable to pay the $1.5 million Down Payment Note to Reed Taylor when it became due October 20, 1995, which led to further negotiations over the redemption of Mr. Taylor's stock, resulting in restructuring the transaction in 1996.  The 1995 Stock Redemption Agreement was superseded by a Stock Redemption Restructure Agreement dated July 1, 1996 (the "1996 Restructure Agreement"), which called for the $1.5 million down payment note to be paid in full on October 31, 1996, and the $6M Note to be paid in installments of interest only for ten years, with payment in full to be on July 1, 2005; provided, however, that payment of principal of the $6M Note was expressly subordinated to complete redemption of the Series A Preferred Stock of AIA Services issued to Donna Taylor in connection with her divorce from Reed Taylor in 1989.  (*Id.*, ¶¶ 5-7.)

Reed  Taylor filed suit on January 29, 2007, in state court against AIA Services, AIA Insurance and several officers, directors and employees of AIA Services and their spouses (Babbitt Affidavit, ¶3),[4] alleging, among other things, that AIA Services failed to pay the balance of the $6M Note when it matured, that AIA Services was in default for failing to appoint him to its board of directors or file a bond, that AIA Services loaned money to affiliates in violation of a Stock

---

[4]  The lawsuit, which will be referred to as the "Underlying Case," was filed as Case No. CV 07-00208 in the District Court of the Second Judicial District of the State of Idaho, Nez Perce County.  Included among the defendants were Reed J. Taylor's brother, R. John Taylor, along with Connie Taylor, Brian Freeman, Jolee Duclos, James Beck and Corrine Beck.  (Babbitt Affidavit, Exhibit B.)

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 3

Redemption Restructure Agreement, and that AIA Services was insolvent. (*Id.*, ¶ 5.) Shortly after filing suit, Mr. Taylor attempted unsuccessfully to exercise to self-help to take over AIA Insurance but was thwarted by law enforcement.[5]  Michael E. McNichols of Clements, Brown & McNichols initially appeared in the lawsuit in behalf of AIA Services, AIA Insurance and R. John Taylor.  Mr. McNichols withdrew from representation of AIA Service and AIA Insurance, and Hawley Troxell substituted in as defense counsel in the Underlying Case for those two companies.  Mr. McNichols continued as defense counsel for R. John Taylor in the Underlying Case.[6]

As one of their defenses in the Underlying Case, the defendants raised the issue that AIA Services did not have sufficient earned surplus to redeem Mr. Taylor's common stock in AIA Services as required by Idaho statute.    The defendants argued that the redemption of Reed J. Taylor's stock violated Idaho Code § 30-1-6, as in effect prior to 1997, which restricted a corporation from purchasing its own stock when it lacked sufficient earned surplus.  It was contended the transaction was therefore illegal and the $6M Note was unenforceable.  (*Id.*, ¶¶ 6-8.)

In a June 17,  2009, Opinion and Order the state court granted partial summary judgment in favor of the defendants, holding that the redemption of Mr. Taylor's stock was illegal and unenforceable because the company did not have sufficient earned surplus to redeem his shares. (*Id.*, ¶ 9.)[7]  Having found the Stock Redemption Agreement to be illegal and unenforceable, the state court concluded that it must "leave the parties where [the Court] finds them."  This conclusion precluded Reed J. Taylor from being able to collect the remaining amount he claimed due on the

---

[5]  Reed Taylor and accomplices were discovered by Lewiston police at 3:00 o'clock a.m. trying to break into the offices of AIA.   (Babbitt Affidavit, Exhibit A.)

[6]  Babbitt Affidavit, ¶ 3.

[7]   Mr. Taylor conceded that the corporation lacked sufficient earned surplus to fund the redemption. (Babbitt Affidavit, Exhibit F.)

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 4

AIA Services note, but it also denied AIA Services the ability to recover the substantial amounts already paid him pursuant to the illegal contract.  Mr. Taylor moved for reconsideration, which motion was denied.  (*Id.*, ¶ 10.)  The trial court certified its decision as final for purposes of Rule 54(b), and Mr. Taylor filed an appeal to the Idaho Supreme Court, which is pending.[8]  (*Id.*, ¶ 11.)

While the Underlying Case was pending, Reed Taylor and his former wife Donna Taylor, represented by the same attorneys, sent a shareholder derivative demand letter dated July 21, 2008, to the boards of directors of AIA Services and AIA Insurance, demanding that the corporations initiate legal action against current and former members of their boards, AIA Services and AIA Insurance's litigation counsel, Hawley Troxell, and Mr. McNichols' law firm.  (*Id.*, ¶ 13.)  AIA Services and AIA Insurance responded by moving the court in the Underlying Case to appoint an independent panel under Idaho Code § 30-1-742 to investigate the derivative demand. (*Id.*)  Reed Taylor filed a concurrence with the demand to appoint an independent panel, although he objected to the panel members nominated by AIA Services and AIA Insurance.  (*Id.*)   However, before the motion could be decided, Reed Taylor moved to disqualify Hawley Troxell as counsel for AIA Services and AIA Insurance in the Underlying Case, thus leading the trial court to enter a stay of further proceedings until the disqualification motion was resolved.  (*Id.*, ¶ 12.) Ultimately, the court denied the motion to disqualify.  (*Id.*, ¶ 12.)  In the meantime, Reed Taylor initiated lawsuits in state court in Nez Perce County, Idaho,[9] against Mr. McNichols and the Clements Brown law firm and against Hawley Troxell and four of its attorneys.[10]  (*Id.*, ¶¶ 14-15.) Those suits alleged conversion,

---

[8]   Taylor v. AIA Services Corporation *et al.*, Docket No. 36916-2009, Idaho Supreme Court.

[9]   Reed J. Taylor v. Michael E. McNichols, et al., Case No. 08-07163, in the District Court of the Second Judicial District of the State of Idaho, Nez Perce County (hereinafter the "McNichols Lawsuit.")

[10]   Reed J. Taylor v. Hawley Troxell, *et al*,  Case No. CV 08-01765, in the District Court of the Second Judicial District of the State of Idaho, Nez Perce County (hereinafter "Hawley Troxell I").

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 5

breach of fiduciary duties, tortious interference with contract, malpractice, violations of the Idaho Consumer Protection Act, and aiding, abetting and conspiring with others in the commission of tortious acts.  (*Id.*, ¶ 16, Exhibits S and Q .)

In response to Rule 12(b)(6) motions filed by the defendants, the state trial court in Nez Perce County held that Mr. Taylor's complaints against defense counsel failed to state a cause of action and dismissed with prejudice both the McNichols Lawsuit and Hawley Troxell I.  (*Id.*, ¶ 18.)  Mr. Taylor moved to amend his complaint to bring claims of fraud against Mr. Riley and others, and that motion was denied by the trial court.  (*Id.*, ¶¶ 17-18.)  The trial court awarded attorneys fees against Reed Taylor pursuant to Idaho Code § 12-121 because his claims were brought and pursued frivolously, unreasonably and without foundation.  (*Id.*, ¶¶ 19-22.)  Mr. Taylor appealed the two cases to the Idaho Supreme Court.[11]  (*Id.*, ¶ 23.)  The consolidated appeal was recently decided in favor of the defendants, including affirming the award of attorney's fees by the trial court and awarding attorney's fees to the defendants at the appellate level.[12]  *Taylor v. McNichols*, 2010 WL 3448851 (Idaho 2010) (hereinafter referred to as the "Reported Case").  A Remittitur has been entered and the decision on appeal is final.  (Babbitt Affidavit, ¶ 23.)

Seeking yet another bite of the apple  while the appeal of Hawley Troxell I was pending, Mr. Taylor filed a second state court action against Hawley Troxell, Mr. Riley and Eberle Berlin (Mr. Riley's former law firm)  in Ada County, Idaho.[13]  (Riley Affidavit, ¶ 9.)  Defendants were granted

---

[11]  Reed J. Taylor v. Michael E. McNichols *et al.* and Reed J. Taylor v. Gary D. Babbitt *et al.*, Consolidated Docket Nos. 36130-2009 and 36131-2009, Idaho Supreme Court.

[12]  The Idaho Supreme Court held that an award of attorney's fees against Reed Taylor was justified because "this appeal was brought spuriously and without foundation, for harassment purposes only."  Reported Case, 2010 WL 3448851*24.

[13]  Reed J. Taylor v. Richard A. Riley, et al., Case No. CV-OC-0918868, in the District Court of the Fourth Judicial District of the State of Idaho, Ada County (hereinafter "Hawley Troxell II").

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 6

partial summary judgment in that case, primarily upon the ground of *res judicata*, because the issues were the same as were raised or could have been raised in Hawley Troxell I.  Some issues remain to be decided in Hawley Troxell II.  (*Id.*, ¶ 10.)  Donna Taylor, through the same attorneys who represented Reed Taylor in the Underlying Case and Hawley Troxell I and II, opened another front in the Taylors' litigation warfare by filing a suit against R. John Taylor and his ex-wife[14] and a separate suit against AIA Services[15] in state court.  (Babbitt Affidavit, ¶ 24.)  Thus, the present lawsuit is the sixth to be filed arising out of the same operative nucleus of facts and involving the same or related parties.  The various remaining state court actions have been stayed due to the need to resolve the AIA appeal to provide the trial courts with further guidance.  (*Id.*, ¶ 25; Riley Affidavit, ¶11.)

<u>THE DEMAND REQUIREMENT APPLICABLE TO SHAREHOLDER
DERIVATIVE ACTIONS IS GOVERNED BY STATE LAW</u>

Plaintiffs have framed their complaint as a shareholder derivative action.  They assert that, as a shareholder and a secured creditor of AIA Services, they should be allowed to advance claims on behalf of the corporation.

> The derivative form of action permits an individual shareholder to bring "suit to enforce a *corporate* cause of action against officers, directors and third parties." Devised as a suit in equity, the purpose of the derivative action was to place in the hands of the individual shareholders a means to protect the interests of the corporation from the misfeasance and malfeasance of "faithless directors and managers."  To prevent abuse of this remedy, however, equity courts established as a precondition "for the suit" that the shareholder demonstrate "that the corporation itself has refused to proceed after suitable demand, unless excused by extraordinary conditions."

---

[14]   Donna J. Taylor v. R. John Taylor and Connie Taylor, Case No. CV 08-01150, in the District Court of the Second Judicial District of the State of Idaho, Nez Perce County (hereinafter "Donna Taylor I").

[15]   Donna J. Taylor v. AIA Services Corp., Case No. CV 09-02470, in the District Court of the Second Judicial District of the State of Idaho, Nez Perce County (hereinafter "Donna Taylor II").

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 7

*Kamen v. Kemper Fin. Services, Inc.*, 500 U.S. 90, 95-96, 111 S.Ct. 1711, 1716,114 L.Ed 2d 152

(1991) (emphasis in original and citations omitted).

*Kamen* holds that a federal court entertaining a derivative action must look to the law of the

state where the corporation is incorporated to determine the extent of any demand requirement

applicable to bringing a shareholder derivative suit, and whether such requirement has been complied

with.  As noted in *Kamen*, Federal Rule of Civil Procedure 23.1 does not excuse the requirement of

complying with state law.

> But although Rule 23.1 clearly *contemplates* both the demand requirement and the
> possibility that demand may be excused, it does not *create* a demand requirement of
> any particular dimension.  On its face, Rule 23.1 speaks only to the adequacy of the
> shareholder representative's pleadings.  Indeed, as a rule of procedure issued
> pursuant to the Rules Enabling Act, Rule 23.1 cannot be understood to "abridge,
> enlarge or modify any substantive right."  28 U.S.C. § 2072(b).  The purpose of the
> demand requirement is to "affor[d] the directors an opportunity to exercise their
> reasonable business judgment and 'waive a legal right vested in the corporation in the
> belief that its best interests will be promoted by not insisting on such right.'"  *Daily
> Income Fund, Inc. v. Fox*, 464 U.S., at 533, 104 S.Ct. at 836-837, quoting *Corbus v.
> Alaska Treadwell Gold Mining Co.*, 187 U.S. 455, 463, 23 S.Ct. 157, 160, 47 L.Ed.
> 256 (1903).  Ordinarily it is only when demand is excused that the shareholder enjoys
> the right to initiate "suit on behalf of his corporation in disregard of the directors'
> wishes."  R. Clark, Corporation Law § 15.2, p. 640 (1986).  In our view, the function
> of the demand doctrine in delimiting the respective powers of the individual
> shareholder and of the directors to control corporation litigation clearly is a matter
> of "substance," not "procedure."

*Id*. at 96-97,  111 S.Ct. 1711 at 1716.

### IDAHO LAW REQUIRES A WRITTEN DEMAND AS A CONDITION PRECEDENT TO INSTITUTING A SHAREHOLDER DERIVATIVE ACTION

Idaho Code §30-1-742 provides:

**30-1-742. Demand. –** No shareholder may commence a derivative proceeding until:

(1)     A written demand has been made upon the corporation to take suitable action; and

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 8

**2-ER-238**

(2)     Ninety days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the ninety (90) day period.

The requirement for written demand is mandatory, and failure to comply with such requirement is generally fatal to the plaintiff's derivative action. *Mannos v. Moss*, 143 Idaho 927, 933-34, 155 P.3d 1166, 1172-73 (2007). Idaho no longer recognizes "futility" as an exception to the requirement of demand as a condition preceding the institution of a shareholder derivative action. *McCann v. McCann*, 138 Idaho 228, 236, 61 P.3d 585, 593 (2002).

Failure to comply with the demand requirement is sufficient to dispose of the complaint under FRCP 12(b)(6) with respect to one of the plaintiffs, Dale Miesen, who concededly made no written demand. Mr. Miesen is not entitled to piggyback on the demand letter delivered by the Taylors; as a common shareholder his interest and claims are entirely different that those asserted by Reed Taylor as a secured creditor of the corporation or by Donna Taylor as the sole holder of Series A Preferred Stock.[16] *See Smachlo v. Birkelo*, 576 F.Supp. 1439, 1444 (D.Del. 1983), applying Delaware law, and *Potter v. Hughes*, 546 F.3d 1051, 1057-58 ( 9th Cir. 2008), applying California law, both holding that a shareholder who fails to make written demand on the corporation in his own name may not bring a shareholder derivative action based upon a demand made by another shareholder, even though they may represented by the same counsel or may ultimately intend to assert the same or similar legal theories. Because the directors, not the shareholders, control a corporation (*see* I.C. § 30-1-801), the requirement of making a written demand on the board prior

---

[16]   Even if Mr. Miessen were entitled to piggyback on the derivative demand of Reed and Donna Taylor, the corporation's right to evaluate the demand is governed by state law. See discussion of Idaho Code §30-1-744, *infra*.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 9

to filing a shareholder derivative action is not a mere technicality or unimportant requirement. As stated by the Court in *Potter, Id.* at 1057-58:

> The identity of the shareholder is also an important practical element of a demand. The identity of the complaining shareholder may shed light on the veracity or significance of the facts alleged in the demand letter, and the Board might properly take a different course of action depending on the shareholder's identity. Before a demand letter can properly invoke a duty of a corporate board to take action to correct alleged wrongdoing, the board is entitled to know with specificity the identity of the person making the demand. *See generally* 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.1.08 ("The demand requirement permits the board to correct the alleged wrong, encourages intra-corporate dispute resolution, and allows the board to use its expertise and resources to control litigation.").

Even if Mr. Miesen were permitted to piggyback on the Taylors' demand letter, he is bound by the same requirements as are applicable to them once a demand has been made. The making of a shareholder demand is the beginning, not the end, of the process. The following section of this memorandum discusses the procedures that are triggered by the making of a shareholder demand.

### IT IS INCUMBENT UPON THE BOARDS OF DIRECTORS OF AIA SERVICES AND AIA INSURANCE OR AN INDEPENDENT PANEL APPOINTED BY A COURT TO ACCEPT OR REJECT THE DEMAND MADE BY REED AND DONNA TAYLOR

The range of possibilities activated by a shareholder demand letter is also a matter of state law. If the board decides to assume the litigation, that is the end of the matter as far as the demanding shareholder is concerned. *Kamen v. Kemper Fin. Services, Inc.*, supra, at 102-03. On the other hand, the board may determine that it is necessary or advisable to appoint a special litigation subcommittee of disinterested board members to review the demand and make a recommendation to the board or, if no disinterested board members exist, an independent panel of examiners may be appointed by a court to make a determination whether proceeding with the litigation would be in the best interest of the corporation. Idaho Code § 30-1-744 provides the procedure to be followed:

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 10

**30-1-744. Dismissal.** – (1) A derivative proceeding shall be dismissed by the court on motion by the corporation if one (1) of the groups specified in subsection (2) or (6) of this section has determined in good faith after conducting a reasonable inquiry upon which its conclusions are based that the maintenance of the derivative proceeding is not in the best interests of the corporation.

(2)    Unless a panel is appointed pursuant to subsection (6) of this section, the determination in subsection (1) of this section shall be made by:

(a)    A majority vote of independent directors present at a meeting of the board of directors if the independent directors constitute a quorum;

(b)    A majority vote of a committee consisting of two (3) or more independent directors appointed by majority vote of independent directors present at a meeting of the board of directors, whether or not such independent directors constituted a quorum.

(3)    None of the following shall by itself cause a director to be considered not independent for purposes of this section:

(a)    The nomination or election of the director by persons who are defendants in the derivative proceeding or against whom action is demanded;

(b)    The naming of the director as a defendant in the derivative proceeding or as a person against whom action is demanded; or

(c)    The approval by the director of the act being challenged in the derivative proceeding or demand if the act resulted in no personal benefit to the director.

(4)    If a derivative proceeding is commenced after a determination has been made rejecting a demand by a shareholder, the complaint shall allege with particularity facts establishing either (a) that a majority of the board of directors did not consist of independent directors at the time the determination was made, or (b) that the requirements of subsection (1) of this section have not been met.

(5)    If a majority of the board of directors does not consist of independent directors at the time the determination is made, the corporation shall have the burden of proving that the requirements of subsection (1) of this section have been met. If a majority of the board of directors consists of independent directors at the time the determination is made, the plaintiff shall have the burden of proving that the requirements of subsection (1) have not been met.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 11

**2-ER-241**

(6)     The court may appoint a panel of one (1) or more independent persons upon motion by the corporation to make a determination whether the maintenance of the derivative proceeding is in the best interests of the corporation.  In such case, the plaintiff shall have the burden of proving that the requirements of subsection (1) of this section have been met.

Reed and Donna Taylor triggered the procedure specified by the statute cited above when they made written demand on the boards of directors of AIA Services and AIA Insurance.  The corporations responded by petitioning the Idaho state court to appoint an independent panel to determine whether pursuing the litigation was in the best interest of the corporations. That petition is still pending and has not been abandoned as alleged by the plaintiffs in this case.   Rather, the matter is stayed because of additional claims brought by Reed J. Taylor, namely Reed Taylor's motion to disqualify defense counsel in the Underlying Case, by his appeal of partial summary judgment in the Underlying Case, and by his choice to pursue two separate lawsuits against the attorneys for AIA Services.   The motion to disqualify was denied; and Hawley Troxell I has been finally decided adversely to Mr. Taylor.  Following entry of partial summary judgment in favor of defendants in Hawley Troxell II, certain claims remain pending in that case.   While all of this illustrates the Taylors have a tendency to get ahead of themselves and create procedural issues by filing repetitive lawsuits, the point is that the state court has jurisdiction over the corporation's response to the shareholder demand and Reed Taylor's concurrence in the corporation's motion to appoint an independent panel pursuant to the Idaho Business Corporation Act, Idaho Code § 30-1-704.  This Court should abstain from exercising jurisdiction over a matter which is already before the state court.   It would be duplicative and wasteful of judicial resources to have two separate courts appointing two separate independent panels to assess the merits of the Taylor derivative demand; this Court should abstain from acting while the state court works through the statutory process.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 12

## THE COLORADO RIVER DOCTRINE
### SHOULD BE APPLIED IN THE PRESENT ACTION

The key question at this point in the litigation is whether the Court should accept the plaintiffs' invitation to join the fray by assuming jurisdiction over a case which is being contemporaneously litigated in state forums.  The potential not only for dissipating judicial resources as well as ending up with different and conflicting adjudications is obvious.  Dismissal, or alternatively a stay, of this action is warranted by the *Colorado River* doctrine, which recognizes that federal courts can refrain from exercising their jurisdiction in the interests of judicial administration when parallel proceedings are filed and under the proper circumstances.

While it is generally recognized that the federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," *Colorado River Water Conservation District v. United States,* 414 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1952), under certain circumstances a dismissal or stay of a federal action may be warranted based on considerations of "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation."  *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183, 72 S.Ct. 219, 96 L.Ed.2d 200 (1952).    This doctrine, known as the Colorado River doctrine,[17] allows federal courts to refrain from exercising jurisdiction where "exceptional circumstances" exist.  *Colorado River*, 424 U.S. at 818.[18]

---

[17]   Although commonly referred to as an abstention doctrine, the U.S. Supreme Court has made it clear that the Colorado River doctrine is not technically a matter of federal-state comity but of "[w]ise judicial administration." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 10, 103 S.Ct. 927, 934, 74 L.Ed. 2d 765 (1983); See 17A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4247, at 150-51 (2d Ed. 1988). Nonetheless, the courts generally speak of the Colorado River doctrine as a species of abstention.

[18]   The *Colorado River* doctrine is only one of a number of doctrines the federal courts can utilize to refrain from exercising jurisdiction.  Other recognized abstention doctrines are: (A) *Younger* abstention, which is appropriate where (1) there is an ongoing state judicial proceeding; (2) the proceeding implicates important state interests; (3) the state proceeding offers an adequate opportunity to raise constitutional issues; and (4) the federal

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 13

Under the *Colorado River* doctrine, the Court must first determine whether parallel proceedings exist in state and federal court. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 28, 103 S.Ct. 927, 74 L.Ed.2d 705 (1983). "Parallel proceedings" exist when substantially similar parties are contemporaneously litigating similar issues in both state and federal courts. *Nakash v. Marciano*, 882 F.2d 1411, 2416 (9th Cir. 1989). The parties do not have to be identical in both suits. Nor do the issues have to be precisely the same. "[T]he mere presence of additional parties or issues in one of the cases will not necessarily preclude a finding that they are parallel." *Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 700-701 (7th Cir. 1992).[19] For example, in *Enfission v. Leaver*, 408 F.Supp.2d 1093 (W.D.Wash. 2005), a stockholder and former president of a corporation filed a shareholder derivative action in state court alleging the impropriety of his removal from corporate office and subsequent "freezing out" from management. While the suit was pending, the corporation filed an action in federal court alleging the former president was interfering with the business of the corporation by exerting control over its email systems and website, entering into contracts with vendors and salesmen, ordering goods and services on behalf of the corporation and otherwise seeking to exert corporate control. It was evident

---

court action would enjoin the state court proceeding or have the practical effect of doing so; (B) *Pullman* abstention, which is proper where (1) the complaint touches a sensitive area of social policy upon which the federal courts ought not enter unless no alternative to their adjudication is open; (2) such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy; and (3) the possibly determinative issue of state law is doubtful; (C) *Burford* abstention, applicable where federal adjudication would interfere with proceedings of state administrative agencies (1) when the state has concentrated suits involving local issues in a particular court; (2) there are difficult questions of state law whose importance transcends the result in the case at bar; and (3) federal review would disrupt state efforts to establish a coherent policy with respect to a matter of substantial policy concern, *See Caudill v. Eubanks Farms, Inc.*, 301 F.2d 658 (6th Circuit 2002); and (D) *Brillhart* abstention, which applies only to declaratory judgment actions or where appended claims for equitable relief are merely illusory. This is not intended to be an exhaustive recitation of all circumstances in which a federal court may abstain from exercising jurisdiction.

[19] Exact parallelism is not required. "It is enough if the two proceedings are substantially similar." *Nakash v. Marciano*, 882 F.2d 1141, 1146 (9th Cir. 1989), citing with approval *Interstate Material Corp. v. City of Chicago*, 847 F.2d 1285, 1288 (7th Cir. 1988); *Lumen Const. Inc. v. Brant Const. Co.*, 780 F.2d 691, 695 (7th Cir. 1985); *Telecso v. Telesco Fuel & Masons' Materials, Inc.*, 765 F.2d 356, 362 (2d Cir. 1985).

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 14

to the Court that, although the claims and counterclaims were not precisely the same in each case, substantially similar issues and interests were being litigated in both the state and federal actions. Therefore, the Court found the federal action was a parallel proceeding to the state action.

In *Beck v. Dombrowski*, 449 F.2d 680 (7th Cir. 1009), a shareholder in a real estate investment trust (REIT) brought a derivative action in federal court against the REIT's directors alleging the making false statements in a shareholder proxy solicitation in violation of federal securities laws and breach of their fiduciary duties under state law. Other shareholders had previously filed suits in state court identical to the plaintiff's state-law claim, which suits were then on appeal. The decision of the federal court to dismiss the state law claims under the *Colorado River* doctrine was upheld on appeal, even though the parties in the suits were not identical. Writing for the Court, Judge Posner held it was not critical that the plaintiff in the federal case was not a party to the state court proceedings:

> For if it were, different members of what should be a single class could file identical suits in federal and state courts to increase their chances of a favorable settlement. The state-law issues that our plaintiff has presented to the federal courts will be definitively resolved by the courts of the state whose law governs those issues, and our court would be required to defer to that resolution because state courts are the authoritative expositors of the own state's laws.

559 F.3d at 686. Accordingly, it was held the federal court acted well within its discretion in declining to exercise jurisdiction over the plaintiff's state-law claim.

The same considerations apply to the case at bar. While not a party to the present suit, Reed Taylor should not be allowed to file suit in state court and then again in federal court using his ex-wife as the nominal plaintiff in order to increase his chances of a favorable result or settlement[20].

_____

[20] The identity of interest of Reed Taylor and Donna Taylor are demonstrated by their representation by the same attorneys on each of the state court actions, the July 21, 2008, derivative demand letter delivered on their joint behalf by their joint counsel (Babbitt Affidavit, Ex. N), and Donna's subordination of her priority rights as

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 15

It is clear the Taylors are merely attempting to maximize their leverage by asserting the same claims in both state and federal court litigation.

In order to meet the test of parallelism, the "two suits need not be identical."  *Clark v. Lacy*, 376 F.3d 682, 686 (7th Cir. 1988).  Instead, one suit will be deemed parallel to another to the extent that "substantially the same parties are contemporaneously litigating the same issues in another forum." *Id.*   The *Clark* court observed:

> To be sufficiently similar it is not necessary that there be formal symmetry between the two actions.  Rather, there should be a substantial likelihood that the state litigation will dispose of all claims presented in the federal case.

*Id.* (internal quotation marks and citations omitted)

In determining that a federal shareholder derivative suit was parallel to a state shareholder derivative suit, *Clark* noted that both lawsuits involved the same parties in interest, the same or substantially the same factual predicate and effectively the same claims.[21]  *Id.* at 686-687.   Those indicators are present in the case at bar.  Reed J. Taylor and his ex-spouse both seek to bring shareholder derivative actions against the same corporations, officers, directors and lawyers (with minor variations) based upon the same factual predicate and involving the same theories.[22]

---

Series A Preferred Stockholder to Reed's claims against AIA Services pursuant to the 2006 Subordination Agreement (Riley Affidavit, Ex. C).  *See also* Babbitt Affidavit Ex. FF note 4 at p. 15 (in which counsel for both Reed and Donna alludes to derivative claims to be brought by Donna Taylor through other counsel).

[21]  The Colorado River analysis is applicable when federal and state proceedings involve substantially the same parties and substantially the same issues.  *See, e.g.,United States v. City of Las Cruces*, 280 F.3d 1170, 1182 (10th Cir. 2002) ("[S]tate and federal proceedings are sufficiently parallel if substantially the same parties litigate substantially the same issues." (quotation marks and citation omitted)); *AAR Int'l. Inc. v. Nimelia Enter. S.A.*, 250 F.3d 510, 518 (7th Cir. 2001) ("Suits are parallel if substantially the same parties are litigating substantially the same issues simultaneously in the two fora." (quotation marks and citation omitted)); *Romine v. Copuserve Corp.*, 160 F.3d 337, 340 (6th Cir. 1998) ("Exact parallelism is not required; it is enough if the two proceedings are substantially similar.").

[22]  The only difference being that Donna Taylor has attempted to plead a claim for civil RICO, but as will be discussed *infra*, this claim can also be brought in state court.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 16

The next issue is whether "exceptional circumstances" exist to warrant *Colorado River* abstention.[23]  The Courts have listed the factors to be considered variously; among them are the following:

> (1) whether a state or federal court has assumed jurisdiction over a *res*; (2) the inconvenience of a federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether state or federal law controls the decision on the merits; and (6) whether state law can adequately protect the rights of the parties.  460 U.S. at 24, 103 S.Ct. 927.  Another factor mentioned, but not applied by the Court in *Cone*, was the vexatious or reactive nature of the federal suit.  *Id.* at 17 n. 20, 103 S.Ct. 927.  Consequently, federal courts have also used that factor in their analysis for purposes of the *Colorado River* doctrine analysis.  *See, e.g., Villa Marina Yacht Sales, Inc. V. Hatteras Yachts*, 947 F.2d 529, 534 (1st Cir. 1991) (holding that a district court did not abuse its discretion when considering the reactive nature of the federal claim); *see also Medema v. Medema Builders, Inc.*, 854 F.2d 210, 213 (7th Cir. 1988) (recognizing that the *Colorado River* doctrine is necessary to "ensure judicial economy and deter abusive 'reactive' litigation").  The Ninth Circuit has also added that another factor to consider is forum-shopping.  *American Int'l Underwriters v. Continental Ins. Co.*, 843 F.2d 1253, 1259 (9th Cir. 1988); *Holder v. Holder*, 305 F.3d 854, 870 (9th Cir. 2002).

Other factors mentioned by some courts are the (9) relative progress of the state and federal proceedings and (10) the presence or absence of concurrent jurisdiction. *Oakland County Employee's Retirement System v. Massaro*, 702 F.Supp.2d 1012 (N.D. Ill. 2010).   "The decision whether to abstain does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case."   *Board of Education of Valley View Community Unit. School Dist. No. 365U v. Bosworth*, 713 F.2d 1316 1321 (7th Cir. 1983).

---

[23]   The doctrine of abstention is an "extraordinary and narrow exception to the duty of a court to adjudicate a controversy before it."  *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188, 79 S.Ct. 1060, 3 L.Ed. 2d 1163 (1959).  However, "because a federal court's duty to exercise jurisdiction is *not absolute*, federal courts have the power to refrain from hearing specific cases, including, inter alia, certain cases 'which are duplicative of pending state court proceeding.'" *Shallal v. Elson*, 1999 WL 33957906*2 (S.D. Fla. 1999).  (Emphasis in original)

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 17

The first factor mentioned above is not applicable, as there is no *res* involved in this case. The second factor, the inconvenience of a federal forum, weighs in favor to the defendants as there is no doubt that it is inconvenient to litigate in a federal forum issues which are already being litigated in state court. The third factor, the desirability to avoid piecemeal litigation, weighs heavily in favor of the defendants for the same reason. It is undoubtedly wasteful of resources to litigate the same or similar issues in six different cases. Jurisdiction was obviously obtained first by the state courts; therefore, the fourth factor weighs in favor of the defendants. With respect to the fifth factor, state law is the law of decision with only one partial exception. Plaintiffs have added a new wrinkle to the present case by attempting to plead a federal civil RICO claim. But even there, the RICO claims can be litigated in state court.[24] The sixth factor also militates strongly in favor of abstention. State law can protect the rights of the parties. Indeed, it is entirely sensible and logical that the corporate governance of an Idaho corporation should be determined under the laws of Idaho. The weight to be given the seventh factor, the reactive or vexatious nature of the suit, should be obvious. This is now the sixth related lawsuit the Taylor plaintiffs have engineered against the same or similar defendants. At some point there should be an end to the multiplicity of suits. The same considerations apply to the eighth factor, forum shopping. It should be clear the Taylors are taking their campaign to as may different forums as possible in the hope they will obtain more favorable results than in the past.[25] The ninth factor, the relative progress of the state and federal litigation, weighs strongly in defendants' favor. There is nothing to be gained by re-litigating in federal court

---

[24]  *Tafflin v. Levitt*, 493 U.S. 455, 110 S.Ct. 792, 107 L.ED2d 887 (1990).

[25]  The plaintiff's attempt to forum shop or to avoid adverse rulings by the state court is a factor which weighs strongly in favor of abstention. "We have no interest in encouraging this practice [forum shopping]." *Nakash v. Marciano*, 882 F.2d 1411, 1417 (9th Cir. 1989). Donna Taylor's subordination of her claim to Reed Taylor's claim merely serves to emphasize that she is acting as the stalking horse for him. (Riley Aff., ¶ 8.)

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 18

issues which have been litigated in state court and which have, at least in the instance of Hawley

Troxell I, been reviewed by the highest court of the state.  Finally, the tenth factor, the presence or

absence of concurrent jurisdiction, also weighs strongly in favor of defendants.  No new legal vistas

are opened to the plaintiffs by pursuing their case in federal, as opposed to state, court.  Even with

respect to civil RICO, it has been definitively established that state and federal courts have

concurrent jurisdiction over civil actions brought under the Racketeer Influenced and Corrupt

Organizations Act (RICO), 18 U.S.C §§ 1961-1968.  *Tafflin v. Levitt*, 493 U.S. 455, 110 S.Ct. 792,

107 L.ED2d 887 (1990).   Indeed, in *Tafflin* it was held that dismissal was appropriate under the

federal abstention doctrine because the state courts have concurrent jurisdiction over civil RICO

claims and the plaintiffs could raise their RICO claims in an action pending in state court.  The same

result should be reached here.   The Taylors should not be permitted to litigate their claims over and

over again in six separate lawsuits.

## THE COURT HAS DISCRETION TO DISMISS THE ACTION WITHOUT PREJUDICE OR ENTER A STAY PENDING RESOLUTION OF THE STATE COURT LITIGATION

If it finds that the Colorado River doctrine is applicable, the Court has discretion to either

dismiss this action without prejudice or stay the action pending the resolution of parallel state

proceedings.[26]   As recognized in *Comm. Casualty Ins. Co. v. Swarts, Manning & Assocs., Inc.*, 616

F.Supp.2d 1027, 1037 (D.Nev. 2007),  "the choice of a stay rather than a dismissal will have no

practical effect if all the parties' issues are resolved by the state proceeding."  That Court noted:

> In a case where a district court invokes *Colorado River*, it generally makes little
> difference to the state proceeding whether the federal action is stayed or dismissed.
> Staying this case should be equivalent to dismissal because the court has concluded
> that parallel state court litigation will be an "adequate vehicle for the complete and

---

[26]  "In a case where a district court invokes *Colorado River*, it makes no difference to the state proceeding whether the federal court action is stayed or dismissed."  *Attwood v. Mendocino Coast Dist. Hosp.*, 886 F.2d 241, 243 (9th Cir. 1989).

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 19

prompt resolution of the issues between the parties." Thus, the court's decision to invoke *Colorado River* necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case.

*Id*. at 1037 (citations omitted).

While some courts have elected to dismiss the federal case without prejudice, *Fireman's Fund Ins. Co. v. Quackenbush*, 87 F.3d 290 ( 9th Cir. 1996); *Trent v. Dial Medical of Florida, Inc.,* 33 F.3d 217 (3d Cir. 1994); *Ins. Co. of the State of Pennsylvania v. Syntex Corp*., 964 F.2d 829 (8th Cir. 1992), other courts have preferred to order a stay pending resolution of the parallel state proceedings, *Jimenez v. Rodriguez-Pagan,* 597 F. 3d. 18 (1st Cir. 2010); *Moorer v. Demopolis Waterworks and Sewer Bd.*, 374 F.3d 994 (11th Cir. 2004); *40234 Washington Street Corp. v. Lusardi*, 976 F.2d 587 (9th Cir. 1992); *Nakash v. Marciano*, 882 F.2d 1141 (9th Cir. 1989).   "This holding [entry of a stay] ensures that the federal forum will remain open if 'for some reason the state forum does turn out to be inadequate.'" *Attwood v. Mendocino Coast Dist. Hosp*., 886 F. 2d 241, 243 (9th Cir. 1989).

CONCLUSION

The present case is the sixth parallel lawsuit regarding the squabble over control of AIA Insurance.  Because the matter is properly before the state courts, where the same issues are being litigated, the federal courts should abstain from exercising jurisdiction.  For these reasons, the case should be dismissed without prejudice or stayed pending resolution of the parallel state litigation.

DATED this 25th day of October, 2010.

ELAM & BURKE, P.A.

By: _/s/ James D. LaRue_
    James D. LaRue, Of the Firm
    Attorneys for Defendants, Hawley Troxell Ennis &
    Hawley, LLP, Gary D. Babbitt, Richard A. Riley,
    and D. John Ashby

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 20

FILED

2008 FEB 1  PM 12 57

PATTY O WEEKS
CLERK OF THE DIST COURT
**DIANE ASH**
DEPUTY

COPY

RODERICK C. BOND
NED A. CANNON, ISB #2331
SMITH, CANNON & BOND PLLC
508 8th Street
Lewiston, Idaho 83501
Telephone: (208) 743-9428
Fax: (208) 746-8421
Attorneys for Plaintiff Reed J. Taylor

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

REED J. TAYLOR, a single person,

Plaintiff,

v.

AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation; R. JOHN TAYLOR and CONNIE TAYLOR, individually and the community property comprised thereof; BRYAN FREEMAN, a single person; JOLEE DUCLOS, a single person; CROP USA INSURANCE AGENCY, INC., an Idaho Corporation; and JAMES BECK and CORRINE BECK, individually and the community property comprised thereof;

Defendants.

Case No.: CV-07-00208

FIFTH AMENDED COMPLAINT

Plaintiff Reed J. Taylor submits this Fifth Amended Complaint against the Defendants alleging as follows:

FIFTH AMENDED COMPLAINT – 1

EXHIBIT "B"

## I. PARTIES, JURISDICTION AND VENUE

1.1     Plaintiff Reed J. Taylor ("**Reed**") is a single person and a resident of Lewiston, Nez Perce County, Idaho.

1.2     Defendant AIA Services Corporation ("**AIA Services**") is an Idaho corporation with its principal place of business located in Lewiston, Nez Perce County, Idaho.

1.3     Defendant AIA Insurance, Inc. ("**AIA Insurance**") is an Idaho corporation with its principal place of business is located in Lewiston, Nez Perce County, Idaho. AIA Insurance is a wholly owned subsidiary of AIA Services.

1.4     Defendant Connie Taylor ("**Connie**") is a single person residing in Lewiston, Nez Perce County, Idaho.

1.5     Defendants R. John Taylor and Connie Taylor, were husband and wife until on or about December 16, 2005 (collectively "**John**"), and at all relevant times were residents of Lewiston, Nez Perce County, Idaho. All references to "**John**" are for acts, omissions, claims, causes of action, damages, and/or liabilities that accrued on or before December 16, 2005, are for John individually, and were also performed on behalf of R. John Taylor and Connie Taylor's marital community (which benefited from R. John Taylor's acts and/or omissions) as to divided and undivided community property. All references to "**John**" for acts, omission, claims, causes of action, damages, and/or liabilities that accrued after December 16, 2005, are for John individually and pertain to Connie as to their divided and undivided community property, including, without limitation, community property in which Reed is requesting to be awarded.

1.6     Defendant JoLee Duclos ("**Duclos**") is a single person residing in Clarkston, Washington.

///

FIFTH AMENDED COMPLAINT – 2

1.7     Defendant Bryan Freeman ("**Freeman**") is a single person residing in Lewiston, Nez Perce County, Idaho.

1.8     Defendant Crop USA Insurance Agency, Inc. ("**Crop USA**") is an Idaho corporation, with its principal place of business located in Lewiston, Nez Perce County, Idaho.

1.9     Defendant James Beck and Corrine Beck (individually and collectively "**Beck**") are residents of the state of Minnesota. All references to "Beck" are for acts, omissions, claims, causes of action, damages, and/or liabilities that accrued are for James Beck individually, and were also performed on behalf of James Beck and Corrine Beck's marital community (which benefited from James Beck's acts and/or omissions) and pertain to Corrine Beck as to damages, acts and/or omissions on behalf of their community and as to all community property, including, without limitation, community property Reed is seeking to be awarded.

1.10    The District Court has jurisdiction over this matter under I.C. § 1-705.

1.11    Venue is proper in the District Court of the Second Judicial District, Nez Perce County pursuant to I.C. § 5-404.

## II. FACTUAL BACKGROUND

2.1     John, was at all relevant times, an officer and director of AIA Services, AIA Insurance, and Crop USA. During the certain relevant times in which John was a director and officer of AIA Insurance, AIA Services and Crop USA, he owed fiduciary duties to Reed as the single largest creditor of AIA Insurance and AIA Services.   John and Connie are the majority shareholders in AIA Services and own approximately 40% of the outstanding shares of Crop USA, specifically 4,645,000 shares as of July 31, 2006.

2.2     R. John Taylor and Connie were divorced through an Interlocutory Decree filed on December 16, 2005, under which only a portion of their community assets were divided and

FIFTH AMENDED COMPLAINT – 3

other property remained undivided. This action includes, but is not limited to, acts, omissions, transactions, debts, claims, and/or causes of action which accrued prior to R. John Taylor and Connie's dissolution. All references to "**John**" in this Complaint are for, but not limited to, claims, causes of action, breaches of duties, fraud, acts, omissions and liabilities incurred by R. John Taylor on behalf of the marital community of R. John Taylor and Connie, together with their community property, whether divided or not through the effective date of their dissolution decree entered on or about December 16, 2005. Reed Is requesting and entitled to be awarded shares of stock and property jointly owned by R. John Taylor and Connie.

2.3    After the effective date of R. John Taylor and Connie Taylor's decree of dissolution, all references to "**John**" in this Complaint are for claims, breaches of duties, acts, omissions and/or liabilities incurred by John individually. One of the reasons Connie is named as a party in this action for her liabilities and/or derivative liability by virtue of her marriage to John and her interest in the community property of the marriage (including all divided and undivided community property of their marriage for which Reed is requesting to be awarded through a constructive trust) all of which is subject to liability for the allegations in this Complaint of the acts, breaches of duties, claims, omissions, and conduct of John on and prior to December 16, 2005.

2.4    During the certain relevant times that Connie was a director of AIA Insurance and AIA Services, she owed fiduciary duties to Reed as the single largest creditor of AIA Services. Connie is also individually liable for all claims, breaches of duties, acts, omissions and/or liabilities during certain relevant times in which she was a member of the board of directors of AIA Services and AIA Insurance.

///

FIFTH AMENDED COMPLAINT – 4

2.5    Duclos is, and was at certain relevant times, an officer and director of AIA Services, AIA Insurance, and Crop USA. Duclos is a shareholder in AIA Services and Crop USA. During the certain relevant times that Duclos was a director and officer of AIA Insurance and AIA Services, she owed fiduciary duties to Reed as the single largest creditor of AIA Services.

2.6    Freeman is, and was at certain relevant times, a director and/or officer of AIA Services, AIA Insurance, and Crop USA. Freeman is a shareholder in AIA Services and Crop USA. During the certain relevant times that Freeman was a director of AIA Insurance and AIA Services, he owed fiduciary duties to Reed as the single largest creditor of AIA Services.

2.7    Crop USA was formed and operated using AIA Services and AIA Insurance's assets, funds, employees, office space, trade secrets, business relationships, equipment, good will, reputation, financial wherewithal (including loan guarantees), and other assets. But for AIA Insurance's assets, trade secrets, reputation and relationships, Crop USA would never have been formed and operated. Since Crop USA's formation, funds were inappropriately loaned and/or transferred back and forth from AIA Services and/or AIA Insurance to and from Crop USA and other entities partially owned by John and/or Connie.

2.8    John and Connie own approximately 40% of Crop USA, which also remained undivided community property at the time Reed filed his original Complaint.

2.9    Beck is a shareholder in AIA Services and Crop USA and acquired Crop USA shares from the inappropriate and/or unlawful conversation of their Preferred C Shares of AIA Services to shares of Crop USA. During the certain relevant times that Beck was a member of the board of directors boards of AIA Insurance, AIA Services and/or Crop USA, he owed fiduciary duties to Reed as the single largest creditor of the corporations. During certain relevant

FIFTH AMENDED COMPLAINT – 5



times, Beck was a member of the boards for Crop USA, AIA Insurance, and/or AIA Services and directed, consented, approved and/or acquiesced in inappropriate and/or unlawful corporate activities at AIA Insurance, AIA Services and/or Crop USA.

2.10    Reed was the founder and majority shareholder of AIA Services. In 1995, John desired to redeem Reed's 613,494 shares of common stock in AIA Services through a stock redemption agreement. Upon the closing of the transaction of AIA Services' redemption of Reed's shares, John became the majority shareholder in AIA Services.

2.11    AIA Insurance, a subsidiary of AIA Services, is wholly owned by AIA Services and where virtually all of AIA Services' revenues are derived and was the basis for security interests provided to Reed. AIA Insurance is lessee of the office building located at 111 Main Street, Lewiston, Idaho.

2.12    On or about July 22, 1995, AIA Services and Reed entered into a Stock Redemption Agreement, Stock Pledge Agreement, and Security Agreement. Under the terms of the Stock Redemption Agreement and related agreements, AIA Services agreed to execute promissory note to timely pay Reed $1,500,000 Million in 90 days ("**Down Payment Note**") and $6,000,000, plus accrued interest due and payable monthly at the rate of 8¼% per annum ("**Promissory Note**").

2.13    The Promissory Note was executed by John on behalf of AIA Services on or about August 1, 1995. Under the terms of the Promissory Note, AIA Services was required to timely pay all accrued interest monthly to Reed and the principal amount of $6,000,000, plus all accrued but unpaid interest was due and payable on August 1, 2005. Donna Taylor, the holder of the Series A Preferred Shares in AIA Services, subordinated all of her rights to payment of the redemption of her shares in favor of Reed. Through the date of Reed's Complaint, AIA Services

FIFTH AMENDED COMPLAINT – 6



**2-ER-256**

had not timely and properly paid all sums owed to Donna Taylor.

2.14    Under the terms of the Stock Redemption Agreement, AIA Services and AIA Insurance also agreed to contemporaneously execute a Security Agreement and Stock Pledge Agreement, among other agreements and documents.  The Stock Redemption Agreement, Stock Pledge Agreement, and Security Agreement were all either authorized by the Board of Directors of AIA Services and/or AIA Insurance and/or approved by a shareholder vote.

2.15    When AIA Services was unable to comply with the Stock Redemption Agreement, Stock Pledge Agreement, and Security Agreement, John, on behalf of AIA Services and AIA Insurance, entered into negotiations with Reed regarding restructuring the obligations. In 1996, AIA Services, AIA Insurance and Reed agreed to modify the Stock Redemption Agreement and executed the Stock Redemption Restructure Agreement ("**Restructure Agreement**"). Contemporaneously with the execution of the Restructure Agreement, the parties executed the Amended and Restated Stock Pledge Agreement ("**Amended Stock Pledge Agreement**") and Amended and Restated Security Agreement ("**Amended Security Agreement**").

2.16    Under the terms of the Restructure Agreement, the terms of the Promissory Note remained unchanged and were not modified (including the $6,000,000 principal amount, due date, and required monthly interest payments).  Under the terms of the Amended Security Agreement, Reed received a security interest in all of AIA Services and AIA Insurance's commissions and related services (and all proceeds thereof), and AIA Services and AIA Insurance were required to have a Lock Box for all commissions for the protection and benefit of Reed.

///



FIFTH AMENDED COMPLAINT – 7

2.17    Under the terms of the Amended Stock Pledge Agreement, AIA Services pledged all of the outstanding shares in AIA Insurance to Reed as partial security for AIA Services' indebtedness to Reed under the Promissory Note, Restructure Agreement, and Amended Security Agreement. Under the terms of the Amended Stock Pledge Agreement, AIA Services' failure to timely pay Reed interest or principal under the Promissory Note or the Down Payment Note constituted an Event of Default. In an Event of Default for failure to timely pay interest or principal under the Promissory Note, AIA Services' insolvency, or AIA Services' failure to maintain the required Lock Box (among other Events of Default), AIA Services' right to vote the pledged shares of AIA Insurance ceased and terminated and vested exclusively in Reed.

2.18    Under the terms of the Amended Stock Pledge Agreement, AIA Services and/or AIA Insurance owed Reed continuing contractual obligations, including, without limitation, the obligation that Reed was required to be a member of the board of directors of AIA Services until Reed was paid in full or sufficient security was posted to ensure the payment of the Promissory Note. AIA Services never posted bonds or other security for the payment of the Promissory Note. AIA Services, John, Duclos, Freeman, Connie, and/or Beck have intentionally refused to appoint Reed to the Board of AIA Services as required and/or unilaterally created new conditions upon which Reed's appointment would be based. A new right to be a member of the board of AIA Services is created every year as directors are required to be elected yearly under the Bylaws of AIA Services. Despite Reed's demands and AIA Services' continuing contractual obligations to keep Reed on the board of directors, AIA Services, John, Duclos, Freeman, Connie, and/or Beck have refused to appoint Reed to the Board of Directors of AIA Services as required. Because Reed has not been on the Board of AIA Services as required, all actions taken by AIA Services' board were not properly authorized and, therefore, not ratified by AIA

FIFTH AMENDED COMPLAINT – 8

Services; and such acts are the personal actions of John, Duclos, Freeman, Connie, and/or Beck during their tenure on the board of AIA Services.

2.19   Under the Amended Stock Pledge Agreement, AIA Services had continuing contractual obligations to not loan money to any affiliate other than a wholly owned subsidiary. AIA Services has loaned money on countless occasions to and/or lent other services, office space or benefits to affiliates and other parties in violation of the Amended Stock Pledge Agreement, and such loans or benefits were made during times in which John, Duclos, Freeman, Connie, and/or Beck were board members of AIA Services and/or AIA Insurance.   In addition, the Amended Articles of Incorporation of AIA Services prevents it or any of its subsidiaries (including, without limitation, AIA Insurance), from guaranteeing the loans of any other entity that is not a wholly owned subsidiary of AIA Services.

2.20   The Promissory Note required monthly interest payments with an acceleration clause if payments were not timely or properly made to Reed.   The acceleration clause requires written notice from Reed to AIA Services of default and AIA Services would be entitled to a five day opportunity to cure before Reed could exercise his rights under the Amended Stock Pledge Agreement or Amended Security Agreement.   The obligations owed to Reed under the Promissory Note are independent of any other obligations owed by the Defendants and secured by the Restructure Agreement, Amended Stock Pledge Agreement and Amended Security Agreement.

2.21   During relevant times, the fair-market value of AIA Services and AIA Insurance was less than the aggregate amount of their total debts, which constitutes AIA Services and AIA Insurance's insolvency. During relevant times, AIA Services and/or AIA Insurance were unable to pay their debts as they became due (including, without limitation, debts to Reed and Donna



FIFTH AMENDED COMPLAINT – 9

Taylor), which also constitutes AIA Services insolvency and AIA Insurance's insolvency.

2.22    During all relevant times, Reed was the largest and most significant creditor of AIA Services. Because AIA Services has failed to timely and properly pay creditors as required during certain relevant times and/or was insolvent, John, Duclos, Freeman, Connie, and/or Beck owed fiduciary duties to creditors, specifically Reed because of his status as AIA Services' largest and most significant creditor.

2.23    The value of AIA Services and AIA Insurance's assets (including, without limitation, if both corporations are sold and/or their assets independently sold) at the time Reed filed his original Complaint was insufficient to pay Reed the $6,000,000, plus prejudgment interest in excess of $2,000,000 owed to him. The value of AIA Services and AIA Insurance's assets (including if both corporations are sold) for at least 7 years of time preceding the time Reed filed his original Complaint was insufficient to pay Reed the $6,000,000 principal, plus prejudgment interest owed to him.

2.24    During certain relevant times, AIA Services and/or AIA Insurance were in default of various provisions of the agreements with Reed, insolvent and/or unable to timely pay its debts to Reed and/or other creditors, including Donna Taylor. During certain relevant times, AIA Services has failed to comply with the terms of the Promissory Note.

2.25    Instead of paying Reed as required, AIA Services, AIA Insurance, Crop USA, John, Duclos, Connie, Beck, and/or Freeman utilized funds that Reed had a security interest in to make investments in, transfer assets to, or loan money to, or provide services on behalf of Crop USA, John and/or entities operated and/or partially owned by John, Connie, Beck, Freeman, Duclos, and/or one or more of the other Defendants.

///

FIFTH AMENDED COMPLAINT – 10

2.26   On or about December 12, 2006, Reed provided AIA Services written notice of default under various provisions of the Restructure Agreement, Amended Stock Pledge Agreement, and Amended Security Agreement, including, without limitation, AIA Services' failure to pay principal and interest due under the Promissory Note, failure to maintain the Lock Box, loaning money to non-wholly owned subsidiaries (including guaranteeing the $15 Million revolving line-of-credit for Crop USA), failure to provide all required financial information, and other defaults as set forth in the notice. AIA Services and AIA Insurance have failed to timely cure the defaults and all applicable cure periods have expired. As of the date of this Complaint, the principal owed to Reed under the Promissory Note of $6,000,000, plus accrued interest of over $2,000,000 had not been paid in full as required.

2.27   Prior to Reed's Notice of Default dated December 12, 2006, Reed had never accelerated any of the indebtedness due under the Promissory Note. Even though AIA Services and AIA Insurance failed to cure the defaults specifically set forth in Reed's Notice of Default dated December 12, 2006, AIA Services continued to make partial and inconsistent interest payments (including the payment of certain employees and other services on behalf of Reed) before and after the date of Reed's original Complaint. All amounts due under the Promissory Note are secured by the remedies available under the Promissory Note, Restructure Agreement, Amended Stock Pledge Agreement and Amended Security Agreement.

2.28   Despite Reed's demands, AIA Services, AIA Insurance, John, Freeman, Duclos, Connie, and/or Beck have failed to comply and/or as officers and/or directors to ensure that AIA Services and AIA Insurance complies with the obligations owed to Reed under the terms of the Promissory Note, Restructure Agreement, Amended Stock Pledge Agreement, and Amended Security Agreement. Under the Amended Stock Pledge Agreement, the right to vote all of AIA



FIFTH AMENDED COMPLAINT – 11

Insurance's shares ceased and terminated for AIA Services and became vested in Reed when AIA Services failed to timely pay the required monthly interest payments due under the Promissory Note and its subsequent failure to pay the $6,000,000 principal due under the Promissory Note on August 1, 2005 (and other breaches set forth in this Complaint). AIA Services was in default and had failed to cure such defaults before Reed demanded to exercise his right to hold a special shareholder meeting to vote the shares to appoint a new board of directors for AIA Insurance.

2.29    On December 12, 2006, Reed timely provided notice of his demand for a special shareholder meeting of AIA Insurance for the purpose of removing and appointing new board members on December 26, 2006. AIA Services, AIA Insurance, John, Duclos, and/or Freeman (and the other Defendants if applicable) refused to comply with Reed's demand for a special shareholder meeting by representing that AIA Insurance's offices were closed on December 26, 2006.

2.30    Through a letter dated January 3, 2007, John acknowledged Reed's right to call a shareholder meeting under the Amended Stock Pledge Agreement when he stated "I fully recognize that [Reed] Taylor may take actions he deems appropriate, including calling a special shareholders meeting."

2.31    On or about January 25, 2007, Reed hand delivered another demand for a special shareholder meeting for the removal and appointment of the board of directors for February 5, 2007, pursuant to his rights under the Amended Stock Pledge Agreement. Through a letter from Duclos, AIA Insurance refused Reed's request and denied that he had the right to call a meeting to vote the AIA shares. Despite Reed's demands, AIA Insurance refused to hold a special shareholder meeting.

FIFTH AMENDED COMPLAINT – 12

2.32 Despite Reed's demands, AIA Services and AIA Insurance failed to cure the numerous Defaults under the terms of the Promissory Note, Restructure Agreement, Amended Stock Pledge Agreement and Amended Security Agreement, among other obligations (as described above). Through the date of this Complaint, AIA Services and AIA Insurance's Defaults were not timely cured and they remained in default of the foregoing Agreements.

2.33 On February 22, 2007, Reed exercised his right to vote the pledged shares by executing a Consent in Lieu of Special Shareholder Meeting of AIA Insurance removing John, Duclos and Freeman from the Board of Directors and appointed himself the sole Board Member, pursuant to his right to vote the pledged shares under the Amended Stock Pledge Agreement. Because AIA Services' right to vote the pledged shares had ceased and terminated when it became in Default and failed to timely cure such Defaults, the right to vote the pledged shares in AIA Insurance vested exclusively in Reed and he exercised his right to vote the pledged shares pursuant to the Amended Stock Pledge Agreement and the Articles of Incorporation of AIA Insurance. Because the shares pledged to Reed account for all the outstanding shares of AIA Insurance, Reed had the authority to waive the notice requirement, notice period, and the formality of holding a shareholder meeting as he was the only party authorized to vote any shares of AIA Insurance. Because Reed appointed himself as the sole director of AIA Insurance, he had the exclusive authority to appoint himself as the officers of AIA Insurance through a Consent in Lieu of a Board Meeting.

2.34 In the weeks leading up to the filing of this action, Reed discovered that more than one transfer of assets occurred during the time in which AIA Services had failed to service its debt to Reed. In 2004, AIA Insurance paid $1,510,693 to purchase Series C Preferred Shares in AIA Services from Crop USA. This transaction inappropriately, unlawfully, and/or



FIFTH AMENDED COMPLAINT – 13

fraudulently transferred $1,510,693 of AIA Insurance's funds to Crop USA when such funds should have been tendered to Reed or been retained to benefit AIA Insurance. This $1,510,693 transfer occurred at a time in which AIA Services was insolvent. This $1,510,693 transfer also occurred at the same time that AIA Services' 401(k) Plan (the "Plan") held over $750,000 in Preferred C Shares in AIA Services. No shares were purchased or redeemed from the Plan, even though John and Duclos were the Co-Trustees of the Plan at the time of the transfer. This transaction constitutes the fraudulent transfer of funds from AIA Insurance to Crop USA.

2.35    Reed also discovered that John and Connie had purchased a parking lot for $8,000 and later entered into a lease agreement with AIA Services and/or AIA Insurance to lease the parking lot from John and Connie for $1,250 per month. This transaction was also the fraudulent transfer of funds to John and Connie, when such funds should have been paid to Reed during a time in which AIA Services was unable to service its debt to Reed and was otherwise insolvent. John and Connie also inappropriately paid lump sums for rent before such inappropriate rent was due. The parking lot is not utilized by AIA Insurance or AIA Services. Such acts and/or transfers have occurred during John, Freeman, Duclos, Connie, and/or Beck's tenure as members of the boards of AIA Insurance and/or AIA Services.

2.36    Based upon the above-referenced acts, transfers and transactions, together with transactions referenced in the notes to AIA Services and/or AIA Insurance's financial statements, there are other unauthorized and inappropriate transfers, loans, payments, advances and other actions which occurred during times AIA Services defaults and inability to timely pay Reed and at times in which AIA Services was insolvent. Forensic accounting and further scrutiny of AIA Insurance and/or AIA Services' books and records will reveal additional improper, unlawful and/or fraudulent transfers, transactions and the like that directly and/or indirectly benefited the

FIFTH AMENDED COMPLAINT – 14

individual Defendants, Crop USA and/or entities partially owned by John.

2.37    During times in which John, Freeman, Duclos, Connie, and/or Beck owed Reed fiduciary duties, they have used AIA Services and AIA Insurance as their personal source of funds and/or assets, including, without limitation, acts in which John has transferred assets to his name; taken advances that John never paid back; transferred assets, resources, and/or funds to Crop USA, Sound Insurance and/or other entities partially owned or controlled by John and/or the other individual Defendants; entered into transactions which constitute a violation of AIA Insurance and/or AIA Services' Articles of Incorporation; made transfers and/or entered into transactions which benefited them; and provided services for entities partially owned by them without such actions being arms-length transactions.  The above acts occurred when John, Duclos, Freeman, Connie, and/or Beck were directors and/or officers of AIA Services, AIA Insurance and/or Crop USA. All of the above acts occurred during certain relevant times in which AIA Services was not current with payments of interest and/or principal owed to Reed under the Promissory Note and when AIA Services was insolvent.

2.38    On February 22, 2007 (after executing the Consent in Lieu of Special Shareholder Meeting), Reed executed a Consent in Lieu of Board Meeting to terminate all officers, terminate the employment of John, authorize the change of locks, and take such other actions deemed appropriate.  When Reed attempted to take action in accordance with the Consents described above, the Defendants refused to abide by the Consents.

2.39    During certain relevant times that John, Duclos, Freeman, Connie, and/or Beck were directors of AIA Services and AIA Insurance, they failed make proper corporate governance decisions and failed to take appropriate legal action on behalf of AIA Insurance and/or AIA Services to protect Reed's interests.  During the relevant times that John, Duclos,

FIFTH AMENDED COMPLAINT – 15

Freeman, Connie, and/or Beck were directors and/or officers of AIA Services and AIA Insurance, they breached their fiduciary duties owed to Reed.

2.40 Sometime after filing Reed's original Complaint, Freeman and Duclos resigned as members of the board of directors of AIA Insurance and AIA Services. John, in breach of his fiduciary duties owed to Reed and in violation of Reed's right to vote the shares and prior vote of the pledge shares in AIA Insurance, appointed himself, Connie and Beck to the board of AIA Insurance. John also appointed himself, Connie and Beck to the board of AIA Services in breach of his fiduciary duties owed to Reed. These appointments were conflicts of interest and breaches of John's fiduciary duties owed to Reed and the appointed Defendants' acceptance of such appointments was a further breach of duties owed to Reed. Finally, Beck, John and Connie approved inappropriate payments to the directors of AIA Services and AIA Insurance, which such payments must all be disgorged and awarded to Reed.

2.41 During certain relevant times that John, Connie and Beck were directors of AIA Services and AIA Insurance, they failed to take appropriate legal action on behalf of AIA Insurance and AIA Services. During certain relevant times that John, Connie and Beck were directors of AIA Services and AIA Insurance, they breached their fiduciary duties owed to Reed.

2.42 Reed has a valid and perfected security interest in all commissions from sale of insurance and related services received by or on behalf of, or payable to, AIA Insurance and AIA Services, proceeds thereof and interest thereon. Reed demanded that no funds which he had a security interest in and/or which should be paid to him could be used to pay the legal fees of any of the individual Defendants. Despite Reed's demands, the Defendants have unlawfully, improperly and inappropriately diverted funds to the individual Defendants for their attorneys' fees and costs, and the Defendants have unlawfully and/or inappropriately accepted such

FIFTH AMENDED COMPLAINT – 16





payments.    Because all of AIA Services' revenues are derived from AIA Insurance's commissions and related services that Reed has a valid security interest in, such payments also constitute an illegal and/or unauthorized dividend from AIA Insurance to AIA Services, conversion, fraud and fraudulent conveyances.

2.43    Prior to the filing of Reed's original Complaint and without Reed's knowledge or consent, John paid a debt he owed to AIA Services in the amount of $307,271 by transferring said indebtedness to Reed's Promissory Note.  Such payment constitutes fraud (as set forth below) and John later moved the debt back to Reed's Promissory Note.

2.44    Pacific Empire Holdings Corporation d/b/a Sound Insurance has been operating through AIA Services and/or AIA Insurance and with funds, assets, rent, and/or services provided by AIA Services and/or AIA Insurance for free or at rates below fair-market-value during certain relevant times that John, Freeman, Duclos, Connie, and/or Beck owed fiduciary duties to Reed.  Since the filing of Reed's Original Complaint, Crop USA purchased Sound Insurance from John and/or other unknown parties.  The Defendants' operation of Sound Insurance and subsequent sale constitutes breaches of fiduciary duties, conversion, fraud and/or a fraudulent conveyance.

2.45    Global Travel was a tenant in AIA Insurance's office building located in Lewiston, Idaho.  Since the filing of Reed's original Complaint, Global Travel has relocated as a tenant in an office building owned by John.  Such actions are a breach of John  Duclos, Freeman, Connie, and Beck's fiduciary duties owed to Reed, fraud and/or a fraudulent conveyance.

2.46    Through a letter dated February 27, 2001, John represented to Reed (individually and on behalf of the corporations) that AIA Services and/or AIA Insurance was developing a new crop insurance program through a new company called Crop USA.  Reed relied on AIA

FIFTH AMENDED COMPLAINT – 17

Services, AIA Insurance and John's representations that AIA Services and/or AIA Insurance were the owners of Crop USA and developing Crop USA, when AIA Services, AIA Insurance and John's representations were false in that Crop USA was never owned by AIA Insurance or AIA Services, but instead owned by John, Connie, Duclos, Beck, Freeman, and others. By John's own admission, Crop USA should have been a subsidiary of AIA Services or AIA Insurance but for certain liabilities.

2.47    John made representations to Reed and Donna Taylor that he would not be taking a salary in certain year(s). Reed relied on John's false representation when he did not accelerate payments due to him or place AIA Services in default, and in late 2006 or early 2007 learned that John had in fact taken a salary during the respective times to Reed's detriment.

2.48    John, Beck, Duclos, and/or Freeman made representations and/or omitted material facts to Reed through letters and financial statements that AIA Services and AIA Insurance were being operated for the benefit of AIA Services and AIA Insurance. AIA Services and AIA Insurance made representations and/or omitted material facts to Reed through correspondence and their financial statements that they were being operated for the benefit of AIA Insurance and AIA Services. Reed relied on John, Beck, Duclos and/or Freeman's false representations and/or omissions of material facts when in fact AIA Services and AIA Insurance were not being operated for the benefit of the corporations, but instead were being operated for the benefit of John, Freeman, Duclos, Crop USA, Sound Insurance, Beck, and other entities controlled or partially owned by John and/or Connie. As directors, Freeman, John, Duclos, and/or Beck also made the false representations and/or omitted material facts by and through the corporations' financial statements.

///

FIFTH AMENDED COMPLAINT – 18



2.49    John, Freeman, Duclos, and/or Beck breached their fiduciary duties owed to Reed when AIA Insurance inappropriately and/or fraudulently guaranteed a $15,000,000 loan for Crop USA. This guarantee is also a violation of AIA Services' Amended Articles of Incorporation, AIA Services and AIA Insurance's Bylaws, and the terms of the Amended Stock Pledge Agreement. AIA Insurance received no benefit from this loan and received no consideration.

2.50    After the inappropriate and fraudulent transfer of $1,510,693 to Crop USA described above, the wrongful transfer was misrepresented on the financial statements of AIA Insurance as an investment with a value of approximately $1,500,000, when the "investment" was worthless. John, Duclos, Beck and/or Freeman were aware, or should have been aware, of this false fact as AIA Services was insolvent.

2.51    Reed believes that there are other acts, fraud, breaches of fiduciary duties, wrongful transfers and/or fraudulent transactions that he will itemize and detail through future amended complaints upon completion of discovery and/or at trial. By and through this paragraph, the Defendants should be placed on notice that Reed intends to recover every dollar of funds, assets, services, loans, barters and the like that were taken, utilized and/or transferred from AIA Services and/or AIA Insurance through fraud, constructive fraud, breaches of fiduciary duties, fraudulent conveyances, and any other causes of action set forth below.

2.52    The unity and commonality of the ownership, officers and/or directors of AIA Services, AIA Insurance and/or Crop USA is such that the separate personalities of the corporations and the individuals no longer exist. Equity should prevent the acts and omissions from being solely those of AIA Services, AIA Insurance and/or Crop USA. As a result of the commonality of ownership and governance, unlawful acts, conduct, omissions, fraud, failure to observe corporate governance, and breaches of fiduciary duties as set forth in this Complaint,

FIFTH AMENDED COMPLAINT – 19

AIA Insurance, AIA Services and/or Crop USA are the alter-egos of John, Duclos, Freeman, Connie, and/or Beck and such corporate veils should be pierced thereby imposing personal liability on John, Duclos, Freeman, Connie and/or Beck.

2.53    AIA Services, AIA Insurance, John, Duclos, Freeman, Connie, and/or Beck unlawfully provided Crop USA, Sound Insurance, and/or other entities with free or reduced rent, labor, funds, services, resources, and/or other assets without any and/or fair compensation to the detriment of AIA Services, AIA Insurance and Reed.  John, Duclos, Freeman, Connie, and/or Beck entered into or approved transactions that were not fair for AIA Services or AIA Insurance, transactions that were not entered into in good faith, transactions that involved self-dealing, and transactions that involved any one or more of the interested individual Defendants in violation of applicable conflicts of interest procedures and/or proper corporate governance.

2.54    During certain relevant times, John utilized AIA Services, AIA Insurance and/or Crop USA as a means to pay personal bills, obtain loans, and obtain reimbursements for "alleged" expenses he incurred on behalf of AIA Services, AIA Insurance and/or Crop USA. However, many of the expenses for food, lodging and travel were inappropriately charged to AIA Services and/or AIA Insurance.  This is further evidenced by the fact that John failed to remit and/or fully complete forms required by AIA Services and AIA Insurance for employees to be reimbursed.

2.55    From August 1, 1995, through the present time, John owed obligations and duties to AIA Services and Reed (including, without limitation, obligation to not compete and confidentiality) through the Executive Officer's Agreement between John and AIA Services dated August 1, 1995.  John has breached the forgoing obligations, which such breaches also constitute breaches of John, Duclos, Freeman, Connie, and/or Beck's fiduciary duties owed to

FIFTH AMENDED COMPLAINT – 20

Reed. AIA Insurance and Reed are also third party beneficiaries of John's Executive Officer's Agreement and entitled to damages from the Defendants for such breached obligations.

2.56    AIA Insurance and AIA Services could have been operated with a substantially lower number of employees than presently employed and with reduced overhead and costs. The Defendants have represented that Crop USA (and other parties) have been reimbursing AIA Services and/or AIA Insurance for all employee labor, expenses, costs, assets, and services utilized for Crop USA's benefit, when such representations are false. The Defendants have failed to disclose material facts that AIA Services and AIA Insurance employees, expenses, costs, assets, and services have also been utilized for the benefit of John, Connie, and entities partially owned by John and/or Connie without them paying AIA Services or AIA Insurance.

2.57    The Defendants have represented through board resolutions, private placement memorandum, correspondence, agreements, and/or other transactions that AIA Services and/or AIA Insurance have benefited from transactions with Crop USA (including, without limitation, Crop USA's $15 Million line of credit and the repurchase of the Series C Preferred Shares of AIA Services), which the Defendants knew that such transactions were not beneficial to AIA Services and/or AIA Insurance. In fact, AIA Services and/or AIA Insurance did not benefit from such false representations and Reed's collateral was also impaired.

2.58    The Defendants have engaged in the improper and/or unlawful activities of utilizing AIA Services and AIA Insurance for their benefit and/or for the benefit of themselves and/or entities partially owned by one or more of the individual Defendants to the detriment of Reed.

2.59    Should any part or one or more of the following causes of action or relief be denied at or before trial, such allegations and requested relief are incorporated by reference here

FIFTH AMENDED COMPLAINT – 21

to support other causes of action and/or requested relief.

### III. FIRST CAUSE OF ACTION—BREACHES OF CONTRACT

3.1     Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or the relief sought under this cause of action.

3.2     The Defendants owed Reed obligations and/or continuing contractual obligations to timely pay him and comply with specific terms, conditions, covenants, warranties and the like required by the Promissory Note, Amended Stock Pledge Agreement, Amended Security Agreement, and Restructure Agreement.

3.3     AIA Services, AIA Insurance, Crop USA, John, Freeman, Duclos, Beck, and/or Connie's acts, omissions and failure to pay Reed the amounts owed and comply with continuing contractual obligations under the Promissory Note, Amended Stock Pledge Agreement, Amended Security Agreement and Restructure Agreement constitute a breach of their contractual obligations owed to Reed (whether or not any of the foregoing agreements were orally modified as alleged by the Defendants or not).

3.4     As a result of AIA Services, AIA Insurance, Crop USA, John, Freeman, Duclos, Beck, and/or Connie's acts and/or omissions which constitute breaches of their contractual obligations, Reed has suffered and is entitled to damages of $6,000,000, plus accrued interest in an amount to be determined at trial, jointly and severally or to be allocated between the defendants as the evidence and claims show at trial.     As set forth in this Complaint, the Defendants are jointly and severally liable for all claims and damages flowing from the various breaches by and through the legal theories set forth in this Complaint.  In addition, Reed is entitled to an award of attorneys' fees and costs as under the Promissory Note, Amended Stock

FIFTH AMENDED COMPLAINT - 22

Pledge Agreement, I.C. § 12-120 and/or I.C. § 12-121.

## IV.  SECOND CAUSE OF ACTION—FRAUDULENT TRANSFERS/CONVEYANCES

4.1     Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or the relief sought under this cause of action.

4.2     The Defendants' actions constitute fraudulent transfers and/or conveyances under I.C. § 55-901, *et seq.* and/or the common law doctrine of Fraudulent Transfers/Conveyances.

4.3     As a result of John, Duclos, Freeman, Connie, and/or Beck's participation, consent, approval and/or acquiescence of the fraudulent transfers and/or as direct recipients and/or indirect recipients (also by and through their ownership of shares in the recipient corporations) of the fraudulent transfers, John, Duclos, Freeman, Connie, and/or Beck are personally liable for all fraudulent transfers, plus accrued interest, in an amount to be proved at trial. All fraudulent transfers should be avoided and/or rescinded to the extent possible and/or all assets placed in a constructive trust for the benefit of Reed and such assets awarded to Reed.

4.4     John, Duclos, Freeman, Connie, Beck, and/or Crop USA and other entities controlled or partially owned by John or the Defendants are and/or were the recipients of various fraudulent transfers from AIA Services and/or AIA Insurance, and should be required to return all funds to Reed, rescind all transactions; and John, Connie, Freeman, Duclos, and/or Beck's ownership interests in Crop USA and such other entities should be placed in a constructive trust for the benefit of Reed and such shares and/or ownership awarded to him.

///

///

///

FIFTH AMENDED COMPLAINT – 23

## V. THIRD CAUSE OF ACTION—MISREPRESENTATIONS/FRAUD
### (Fraud, Constructive Fraud, and/or Shareholder, Officer Director Fraud)

5.1 Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

5.2 AIA Services, AIA Insurance, Crop USA, Beck, Freeman, Connie, Duclos, and/or John made, ratified, acquiesced, and/or consented to statements of fact and/or omitted material statements of fact, including, without limitation, those facts and/or omissions of fact set forth in Paragraphs 2.23, 2.36, 2.44-2.49 and 2.51 above; such statements of fact were false or omitted material facts; such false statements or omitted facts were material; AIA Services, AIA Insurance, Crop USA, Beck, Freeman, Duclos, Connie and/or John knew or should have known the falsity of such statements; AIA Services, AIA Insurance Crop USA, Beck, Freeman, Duclos, and/or John intended to induce reliance; Reed was ignorant to the falsity of such statements and/or omissions; and Reed relied on such statements and/or omissions; Reed had a right to rely on such false statements and/or omissions.

5.3 By and through the Defendants' fraudulent acts and/or omissions, including, without limitation, the allegations set forth in this Complaint and as specifically alleged in Paragraphs 2.22, 2.25, 2.34, 2.35, 2.37, 2.40, 2.43-2.49, 2.53, 2.54, 2.57 and 2.58 above, AIA Services, AIA Insurance, Crop USA, John, Freeman, Duclos, Connie, and/or Beck's acts and/or omissions constitute fraud, constructive fraud (e.g., the Defendants owed Reed fiduciary duties, duties to maintain AIA Insurance's assets to protect Reed, and other duties contemplated by the parties and/or referenced in this Complaint, and the Defendants breached such duties), and/or shareholder/officer/director fraud (e.g., the siphoning off of corporate assets to the individual

FIFTH AMENDED COMPLAINT – 24

Defendants' gain and to the detriment of Reed), including, without limitation, the less stringent means of proving fraud as set forth in *Smith v. Great Basin Grain Co.*, 98 Idaho 266, 561 P.2d 1299 (1977) (and other law relating to shareholder, officer and/or director fraud), and Reed is entitled to recover all damages attributable to such fraud. Under the theory discussed in *Smith v. Great Basin Grain Co.* (and other cases), AIA Services, AIA Insurance, Crop USA, John, Freeman, Duclos, Connie, and/or Beck are liable for all funds, assets, and services that were unlawfully and/or inappropriately transferred and/or utilized directly and/or indirectly to their benefit during their tenure as officers, directors, and/or shareholders in AIA Services, AIA Insurance, and/or Crop USA.

5.4    As a consequential and/or proximate result of AIA Services, AIA Insurance, Crop USA, John, Duclos, Freeman, Connie, and/or Beck's fraud (including, without limitation, any one or more of the types of fraud listed above), Reed has suffered and is entitled to recover all damages from the Defendants, jointly and severally.

## VI. FOURTH CAUSE OF ACTION—CONVERSION

6.1    Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

6.2    AIA Services, AIA Insurance, Crop USA, John, Duclos, Connie, Freeman, and/or Beck's (including, without limitation, as officers and/or members of the boards) conduct and/or consent to such conduct constitutes the willful interference with Reed's property and money which should have been paid to him or been held for his benefit (including, without limitation, money in which Reed had a valid and perfected security interest, e.g., whether through UCC filings and/or through security interests and/or rights in the Amended Stock Pledge Agreement),

FIFTH AMENDED COMPLAINT – 25

without lawful justification, which deprived Reed of the possession of such money and/or property. Crop USA, John, Duclos, Freeman, Connie, Beck and/or entities controlled or partially owned by John were recipients of the converted assets, funds, labor, and/or services (including for any attorneys' fees and costs paid by AIA Services and/or AIA Insurance for any of the individual Defendants).

6.3     As a result of the AIA Services, AIA Insurance, Crop USA, John, Duclos, Freeman, Connie, and/or Beck's unlawful acts, conduct, and interference with Reed's valid and perfected security interests and other rights, Reed has been damaged and is entitled to damages proven at trial.

## VII. FIFTH CAUSE OF ACTION—ALTER EGO/PIERCING CORPORATE VAIL
### (A Cause of Action and/or Remedy)

7.1     Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim under this cause of action and/or requested relief.

7.2     Reed also specifically re-alleges and incorporates Paragraph 2.52 above.

7.3     AIA Insurance, AIA Services, and Crop USA have been operated, organized and controlled, and their affairs are so conducted that they are the instrumentality, agency, and/or conduit of one another and for John, Beck, Duclos, Freeman and/or Connie to their benefit and Reed's detriment.

7.4     Because of the lack of proper corporate governance; common officers, directors, and shareholders; lack of capitalization; fraud; overreaching; breaches of good faith and fair dealing; and the other unlawful and/or inappropriate acts and/or omissions of AIA Insurance, AIA Services, Crop USA, John, Duclos, Freeman, Beck, and Connie, the corporate veils of AIA

FIFTH AMENDED COMPLAINT – 26

Services, AIA Insurance and Crop USA should be pierced thereby holding AIA Services, AIA Insurance, Crop USA, John, Duclos, Freeman, Connie, and/or Beck jointly and severally liable for all of Reed's damages that lie in tort or contract (including, without limitation, the sums due under the Promissory Note) as equity requires such action.

7.5     In addition and/or in the alternative, because of the common ownership, common governance, fraud, conversion, breached duties, unlawful acts, improper acts and/or omissions of John, Duclos, Freeman, Connie, and/or Beck, the corporations AIA Services and Crop USA should be liable for all of Reed's damages under the theory of reverse piercing of the corporate veil.

## VIII.   SIXTH CAUSE OF ACTION—CONSTRUCTIVE TRUST
### (A Cause of Action and/or as Remedies)

8.1     Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

8.2     Reed has a valid security interest in AIA Services and/or AIA Insurance's commissions and all of the outstanding shares of AIA Insurance, among other security interests. The boards of AIA Services and AIA Insurance owed Reed fiduciary duties to Reed. AIA Services, AIA Insurance, Crop USA, John, Duclos, Freeman, Connie, and/or Beck fraudulently, wrongfully and/or improperly used funds, transferred assets and/or provided services (which should have been paid to Reed or benefited AIA Services and/or AIA Insurance) for investments, personal use, inappropriate transactions, loans, advances, self-dealing, and/or other wrongful, fraudulent and/or inappropriate purposes (including, without limitation, approving, consenting, and/or acquiescing in such activities and the failure to take appropriate action).

FIFTH AMENDED COMPLAINT – 27

8.3     AIA Services, AIA Insurance, Crop USA John, Duclos, Freeman, Connie, and/or Beck's acts and/or omissions resulted in Crop USA, John, Duclos, Freeman, Connie and/or Beck's acquisition of money, securities and/or services which should have been paid to Reed or retain by AIA Insurance but for their fraud, deepening insolvency, civil conspiracy, misrepresentation(s), bad faith, self-dealing, fraudulent conveyances, breached fiduciary duties, and/or overreaching activities; and AIA Services, Crop USA, John, Duclos, Freeman, Beck and/or other entities' retention of the money, investments, securities and property would be unjust.

8.4     Reed requests the imposition of a constructive trust for his benefit to recover the proceeds of all from the Defendants' fraud, fraudulent conveyances, breaches of fiduciary duties, overreaching, conspiracy, deepening insolvency (as a remedy only), improper, self-dealing, wrongful and/or inappropriate transfers, acts and/or omissions.

## IX.  SEVENTH CAUSE OF ACTION—DIRECTOR LIABILITY
### (A Cause of Action and/or a Remedy)

9.1     Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

9.2     John, Duclos, Freeman, Connie, and/or Beck are personally liable for all relevant breached fiduciary duties, deepening insolvency, wrongful acts, improper acts, omissions, overreaching transactions, fraud, civil conspiracy, faithless fiduciary activities, loans, advances, improper loan guarantees and/or fraudulent conveyances which occurred during their tenure as a member of the board of directors of AIA Service, Crop USA and/or AIA Insurance.

///

FIFTH AMENDED COMPLAINT – 28

9.3    Because John, Duclos and Freeman were both directors and officers during certain relevant times, they owed Reed even more elevated fiduciary duties. John, Duclos, and Freeman breached their elevated fiduciary duties owed to Reed.

9.4    During the relevant times that John, Connie, Beck, Freeman and/or Duclos were members of boards of AIA Insurance, AIA Services, and/or Crop USA, they each should be held personally liable for all Reed's damages in contract and tort.

## X.  EIGHTH CAUSE OF ACTION—SPECIFIC PERFORMANCE
### (A Cause of Action and/or as Remedies)

10.1    Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

10.2    Under the Amended Stock Pledge Agreement, Amended Security Agreement, and Restructure Agreement, Reed is entitled to vote the pledged shares of AIA Insurance (and all ancillary rights, including, without limitation, to vote the shares to remove the board and take all actions related in any way to his right to vote the pledged shares), sell the shares of AIA Insurance at public or private sale, judicially sell the pledged shares in AIA Insurance, entitled to timely receive audited financial statements and financial information, and/or seize all of the AIA Insurance and AIA Services' commissions in the required Lock Box. When AIA Services became in Default, it lost its right to vote the pledged shares of AIA Insurance and the right vested exclusively in Reed.

10.3    Despite Reed's demands for the Defendants to comply with the provisions in the Promissory Note, Amended Stock Pledge Agreement, Amended Security Agreement and Restructure Agreement, AIA Services, AIA Insurance, the Defendants have refused to comply.

FIFTH AMENDED COMPLAINT – 29

Reed is entitled to the relief afforded to him or reasonably contemplated under the foregoing agreements and such other rights, remedies and/or relief as may be available under Idaho Code, including, without limitation, any action, relief and/or order authorized under I.C. § 30-1-701 *et seq.* and/or I.C. § 28-9-101 *et seq.* (including the sale of the pledged shares, protection of security interest, seizure of security, and any other available remedy).

10.4   As a direct or proximate result of the Defendants' acts and/or omissions, Reed has suffered and is entitled to an award of attorneys' fees and costs incurred, at or before trial, in enforcing any provision of the Promissory Note, Amended Stock Pledge Agreement, Amended Security Agreement, and/or Restructure Agreement for relief sought before or at trial.

## XI. NINTH CAUSE OF ACTION—BREACH OF FIDUCIARY DUTIES

11.1   Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

11.2   During certain relevant times, John, Connie, Beck, Duclos,, and/or Freeman owes and/or owed Reed fiduciary duties, including, without limitation, because of his status as the largest creditor of AIA Services, AIA Insurance and/or Crop USA; and because AIA Services and/or AIA Insurance were insolvent as described in this Complaint. The individual Defendants' fiduciary duties include, without limitation, the duties of care and loyalty to Reed. During the relevant times that John, Freeman and Duclos acted as both a director and an officer of AIA Insurance, AIA Services and/or Crop USA, they owed even more elevated fiduciary duties to Reed as the single largest creditor of AIA Services and/or AIA Insurance.

11.3   John, Connie, Beck, Duclos, and/or Freeman breached their fiduciary duties owed to Reed, including, without limitation, when they failed to operate AIA Services and AIA

FIFTH AMENDED COMPLAINT – 30

**2-ER-280**

Insurance for the benefit of Reed. John, Connie, Beck, Duclos, and/or Freeman breached their fiduciary duties when they failed to take legal action against past and/or present officers and/or directors of AIA Services and AIA Insurance, and when they prevented Reed from taking any action he deemed appropriate under the Amended Stock Pledge Agreement, Amended Security Agreement and/or Restructure Agreement.

11.4    As a result of John, Connie, Beck, Duclos, and/or Freeman's breaches of their fiduciary duties owed to Reed, they are individually liable to Reed for all damages he suffered and/or deemed the product of their breached fiduciary duties, including without limitation, all damages attributable to inappropriate transfers of assets and/or services, inappropriate use of assets and/or services, inappropriate payment of salaries, the failure to pursue claims against other past and/or present officers and directors, inappropriate guarantee of loans, all claims in this Complaint, and such other wrongful acts and/or omissions that Reed may demonstrate at trial.

## XII. TENTH CAUSE OF ACTION—BREACH OF IMPLIED COVENANTS OF GOOD FAITH AND FAIR DEALING

12.1    Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

12.2    There is an implied obligation of good faith and fair dealing between the parties in the performance and enforcement of the terms and conditions of the Promissory Note, Amended Stock Pledge Agreement, Amended Security Agreement and Restructure Agreement. This duty embraces, among other things, an implied obligation that AIA Services, AIA Insurance, and their directors and officers, specifically, Defendants Duclos, Freeman, John, Connie, and/or Beck

FIFTH AMENDED COMPLAINT – 31

shall not do anything to injure or destroy Reed's rights to receive the benefits of the Promissory Note, Amended Stock Pledge Agreement, Amended Security Agreement and/or Restructure Agreement. The Defendants have breached their obligations of good faith and fair dealing owed to Reed when they, among other things, intentionally injured and/or destroyed Reed rights.

12.3   As a result of the Defendants' acts and/or omissions, Reed has suffered and is entitled to damages in the amount to be proven at trial, including, without limitation, all damages incurred since the Defendants have refused to abide by the terms and conditions of the Promissory Note, Restructure Agreement, Amended Stock Pledge Agreement and/or Amended Security Agreement. In addition, Reed is entitled to recover all damages incurred after his vote of the pledged shares under because of the individual Defendants' interference with Reed's contractual rights.

### XIII. ELEVENTH CAUSE OF ACTION—CIVIL CONSPIRACY
(A Cause of Action and/or Remedy)

13.1   Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

13.2   AIA Services, AIA Insurance, Crop USA, John, Connie, Duclos, Freeman, and/or Beck engaged in a pattern of behavior and/or agreement to accomplish an unlawful objective and/or to accomplish a lawful objective in an unlawful manner. AIA Services, AIA Insurance, Crop USA, John, Connie, Duclos, Freeman, and/or Beck's acts, omissions, and/or acquiescence constitute civil conspiracy.

13.3   As a result of AIA Services, AIA Insurance, Crop USA, John, Connie, Duclos, Freeman, and/or Beck's wrongful and unlawful acts and/or acquiescence, they should all be held

FIFTH AMENDED COMPLAINT – 32

jointly and severally liable for all of Reed's damages in this action.

## XIV.  PRAYER FOR RELIEF

Without waiving any claims, rights and/or remedies under any of the above-referenced agreements and/or Idaho Code as a secured party, Reed respectfully requests the following relief:

14.1    For a judgment against AIA Services for the principal of $6,000,000, plus accrued pre-judgment interest, in the total amount to be proven at or before trial.

14.2    Reed requests a preliminary and permanent injunction against the Defendants as follows (any one or more of the following at or before trial):

> (a) Enjoining any of the Defendants from interfering with the actions taken pursuant to the February 22, 2007, Consent in Lieu of Special Meeting of Shareholders of AIA Insurance and the actions taken pursuant to the February 22, 2007, Consent in Lieu of Meeting of Board of Directors of AIA Insurance.
>
> (b) Enjoining any of the Defendants from preventing Reed from exercising his right under the Amended Stock Pledge Agreement to vote the pledged shares in AIA Insurance and taking any ancillary actions which relate in any way to voting the pledged shares, including, without limitation, removing the board of directors of AIA Insurance and appointing a revised board and such other actions he deems appropriate in his sole discretion as the exclusive person entitled to vote all the outstanding shares of AIA Insurance.
>
> (c) Requiring the Defendants to timely and promptly provide Reed with all financial information required under the Amended Stock Pledge Agreement.
>
> (d) Enjoining John and any of the other individual Defendants from entering the offices of AIA Insurance, if necessary

FIFTH AMENDED COMPLAINT – 33

(e) Enjoining the Defendants and any entity owned, partially owned or operated by any one or more of them from interfering with, disturbing, and transferring any of AIA Services, AIA insurance and Crop USA's customers, trade secrets, contracts, agreements and business.

(f) Enjoining the Defendants from utilizing, transferring or disposing of any funds, assets, property, labor, facilities or services of AIA Insurance, AIA Services and/or Crop USA for any other person, entity or business, unless such transactions are arms-length and payment is received by AIA Insurance, AIA Services and/or Crop USA prior to providing such funds, assets, labor, facilities or services (e.g., no free use or credit arrangements for such activities).

(g) Enjoining the Defendants from disposing of, using, transferring or utilizing any of the funds, assets (including, without limitation, mortgages) and/or property received from AIA Services, AIA Insurance, and/or Crop USA from the lawsuit entitled In re: Universe Liquidator Grain Growers Trust, et al. v. Idaho Department of Insurance a/k/a GGMIT suit, all other lawsuits, litigation and disputes in which AIA Services, AIA Insurance and/or Crop USA obtains any financial gain. All funds, assets and/or property from the foregoing should be held in trust until further notice from the Court.

(h) Enjoining the Defendants from negotiating or entering into any loans, credit arrangements, credit facilities, or borrowing any funds under any loan, line-of-credit, credit facility, open account and the like for which AIA Insurance or AIA Services is a guarantor or a signatory, unless utilized for the exclusive

FIFTH AMENDED COMPLAINT – 34

benefit of AIA Insurance to provide funding for AIA Insurance and approved by Reed or such other party appointed by Reed or the Court.

(i) Enjoining the Defendants from destroying, altering, deleting, purging, and/or removing any documents (including drafts, proposals, electronic files, email, back-up media and the like), property, computers and the like from AIA Insurance, AIA Services and Crop USA's offices.

(j) Enjoining the Defendants from advancing or lending any funds, assets or services to John, Duclos, Freeman, Connie, Beck, or AIA Services without first obtaining written consent from Reed or permission from the Court.

(k) Enjoining the Defendants from entering into or negotiating any substantive contracts or agreements without first obtaining approval from Reed or permission from the Court.

(l) Enjoining the Defendants from holding, calling or participating in any shareholder meetings, board meeting, and/or executing any Consents in Lieu of the foregoing without permitting Reed to vote the pledged shares or take such other action permitted to him as the holder of the right to vote all outstanding shares of AIA Insurance.

(m) Enjoining the Defendants from using or transferring any funds, assets, or services of AIA Insurance for the purpose of providing any retainers or payments for the legal services for John, Freeman, Duclos, Connie, and/or Beck.

(n) Enjoining John from being paid compensation for work not performed for AIA Insurance and/or AIA Services.   John's time expended for Crop USA

FIFTH AMENDED COMPLAINT – 35

and any other entities partially or wholly owned by him shall be paid by the appropriate entity and not AIA Insurance, AIA Services, but by the entity for which John performed the work.

(o) Enjoining the Defendants from paying any of the members of the board of directors of AIA Services or AIA Insurance unreasonable compensation for serving on the board of directors of AIA Services or AIA Insurance.

(p) Enjoining the Defendants requiring AIA Insurance, AIA Services and Crop USA to accurately and properly itemize every employee's daily time sheet to reflect the number of hours of work performed for AIA Services, AIA Insurance, Crop USA and any other entities or persons.

(q) Enjoining the Defendants from such other actions as may be reasonably contemplated from this Complaint, the Amended Stock Pledge Agreement, the Amended Security Agreement, the Restructure Agreement and/or which would otherwise protect Reed's interests and to prevent further deepening of the insolvency at AIA Services.

(r) Enjoining John, Beck, Freeman, Duclos, and/or Connie from appointing any directors for Crop USA, AIA Services and AIA Insurance.

(s) Invalidating the appointment of Connie and Beck from the Boards of AIA Services and AIA Insurance.

14.3   Enjoining the Defendants from transferring, encumbering or otherwise disposing of any improperly and/or fraudulently obtained and/or transferred assets under I.C. § 55-916, et seq. and/or other applicable legal authority.

///

FIFTH AMENDED COMPLAINT – 36

14.4    For the imposition of a constructive trust for the benefit of Reed and awarding to Reed all shares of common and/or preferred shares in Crop USA owned and/or held by John, Connie, Freeman, Duclos, and Beck and for all ancillary actions necessary to transfer said shares to Reed.

14.5    For the imposition of a constructive trust for the benefit of Reed and awarding to Reed that certain real property located in Nez Perce County and owed by John and Connie that was purchased from the Camas Praire RailNet, Inc., recorded under instrument number 672508 in Nez Perce County and all rental proceeds paid from AIA Services and/or AIA Insurance to John and Connie.

14.6    For a prejudgment writ of attachment against certain assets, funds and/or property of AIA Services, AIA Insurance, Crop USA and any other assets, funds and/or property of any of the other Defendants shown to be the proceeds or result of any or all of the Defendants' wrongful, unlawful, fraudulent and/or inappropriate acts and/or omissions.

14.7    For an order and/or judgment permitting Reed to sell the pledged shares of AIA Insurance at public or private sale or, in the alternative, judicially.  In the event the pledged shares of AIA Insurance are sold (whether or not Reed is the high bidder), for a deficiency judgment against the Defendants for all amounts exceeding the amount received and/or credited from the sale, including, without limitation, all damages, attorneys' fees and costs incurred by Reed in this action.  In the event Reed elects to purchase or otherwise obtain the shares of AIA Insurance, he hereby requests that only relief necessary for him to carry out his rights as owner of the shares of AIA Insurance.

14.8    For a judgment against the Defendants and/or the $200,000 bond posted for the preliminary injunction against Reed for all damages, attorneys' fees, costs and expenses incurred

FIFTH AMENDED COMPLAINT - 37

by Reed from being wrongfully enjoined, plus judgment against the Defendants for all amounts exceeding the $200,000 bond.

14.9   For judgment against the Defendants, jointly and severally, for all damages incurred by Reed as a result of the Defendants' breaches of implied duties of good faith and fair dealing, conversion, deepening insolvency, breaches of fiduciary duties and other claims, including, without limitation, pre and post filing damages that include, but are not limited to: all pay to present directors and officers, damages for the compensation and benefits paid to all employees paid by AIA Services or AIA Insurance that would not have been needed, lost tenants, misuse of assets and labor, and all other items detailed at trial.

14.10   For an order compelling an audit of AIA Services, AIA Insurance and Crop USA.

14.11   For a declaratory judgment or order requiring specific performance of AIA Services and/or AIA Insurance's obligations, covenants, warranties and/or other rights granted to Reed under the Amended Stock Pledge Agreement, Amended Security Agreement, Promissory Note and/or Restructure Agreement.

14.12   For judgment that AIA Insurance, AIA Services and Crop USA have been operated as the alter-egos of John, Duclos, Freeman, Connie and/or Beck, and their corporate veils should be pierced thereby imposing personal liability on all of the individual and corporate Defendants, jointly and severally, for all of Reed's damages and sums owed to him under the Promissory Note in an amount to be proven at trial.

14.13   For judgment that Crop USA is the alter-ego of AIA Insurance and AIA Services and all the foregoing corporations for all of Reed's damages and sums owed to him in both contract and tort in an amount to be proven at trial.

14.14   For a declaratory judgment and/or order enforcing the February 22, 2007, Consent

FIFTH AMENDED COMPLAINT – 38

in Lieu of Special Meeting of Shareholders of AIA Insurance and the actions taken pursuant to the February 22, 2007, Consent in Lieu of Meeting of Board of Directors of AIA Insurance.

14.15  For a judgment for damages and attorneys' fees incurred by Reed as a result of being wrongfully enjoined by the Defendants.

14.16  For such other relief that Reed may request before or at trial to enforce his rights under the Amended Stock Pledge Agreement, Amended Security Agreement, and/or Restructure Agreement, including, without limitation, any action or order authorized under I.C. § 30-1-701 *et seq.* and/or I.C. § 28-9-101 *et seq.*

14.17  For judgment, order and/or declaratory relief as may be necessary for Reed to effectuate any and all rights and remedies under I.C. § 28-9-101 *et seq.*, including, without limitation, the sale of the pledged shares, protection of security interest, seizure of security, return of funds protected by his security interest (e.g., attorneys fees paid for individual directors, etc.) and any other available remedy.

14.18  For the avoidance/rescission of the improper and/or fraudulent transactions, transfers of funds, assets and/or services from AIA Services and/or AIA Insurance to John, Beck, Freeman, Connie, Duclos, Crop USA, and any entity partially owned by John, and/or any other party who received such transfers under I.C. § 55-916, *et seq.* and/or other applicable legal authority.

14.19  For judgment against John and Connie for $307,271, plus accrued interest, for the money he owed AIA Services which was improperly paid by inappropriately transferring his indebtedness to Reed's Promissory Note and then backing out the transaction in 2006 or 2007, and awarding this account receivable from AIA Services to Reed.

///

FIFTH AMENDED COMPLAINT – 39

14.20  For judgment against Connie to the fullest extent of her liability by virtue of her marriage to John and/or his acts during their marriage, and her interest in the community property in an amount to be proven at the time of trial, plus prejudgment interest.

14.21  For judgment against Connie individually for an amount to be proven at trial, plus pre-judgment interest.

14.22  For a judgment against John (both individually and through his marriage to Connie) in an amount to be proven at trial, plus prejudgment interest.

14.23  For judgment against John, Connie, Duclos, Freeman, and Beck, jointly and severally, for all funds, assets, services, property and/or any other benefit fraudulently transferred, converted and/or fraudulently conveyed, and which such transferred thing of value may not be avoided, rescinded and/or paid to Reed.

14.24  For judgment against Crop USA for all sums and the fair market value of all services, labor, funds, and assets wrongfully, fraudulently, and/or inappropriately transferred, converted and/or conveyed, directly or indirectly, from AIA Insurance and/or AIA Services.

14.25  For judgment against John, Duclos, Connie, Freeman, and Beck, jointly and severally, for amounts owed to Reed in an amount to be proven at the time of trial because AIA Services and AIA Insurance are alter egos of John, Duclos, Freeman, and Beck.

14.26  For judgment against John, Connie, Duclos, Freeman, and Beck disgorging all salaries, compensation (including payments of fees for being board members and/or advisory board members), benefits, assets, stock (including, without limitation, shares held directly or indirectly in Crop USA) and other ill-gotten gains as a result of the breaches of their fiduciary duties, fraudulent transfers, unlawful acts, fraud and/or other causes of action.

///

FIFTH AMENDED COMPLAINT – 40

14.27  For the imposition of a constructive trust for the benefit of Reed and awarding to Reed all funds, investments, loans, advances, securities, property, transactions, services and/or self-dealing which were converted or fraudulently, wrongfully, unlawfully and/or improperly made for the benefit of Duclos, Freeman, John, Beck, Connie and/or other parties or entities controlled and/or partially owned by any of them as may be requested at trial.

14.28  For the imposition of a constructive trust for the benefit of Reed and awarding to Reed all securities, stock, options and the like transferred, together with all proceeds thereof, converted, sold or awarded or acquired by John and/or Connie from AIA Services, AIA Insurance and/or Crop USA, including, without limitation, shares (and proceeds thereof) and/or funds, and/or distributions received in or from Pacific Empire Holdings Corporation, Pacific Empire Radio Corporation, and Pacific Empire Communications Corporation.

14.29  For the imposition of a constructive trust for the benefit of Reed and awarding to Reed all shares and options of AIA Services and Crop USA acquired by the Defendants during their employment and/or when they were officers and/or members of the boards of AIA Insurance, AIA Services, and/or Crop USA.

14.30  For the disgorgement of all salary, bonuses, compensation (including all compensation and benefits received as directors), stock options, benefits, reimbursements (all proper, improper and/or undocumented reimbursements for travel, meals, lodging, etc.) and any other payments and/or assets received by John, Connie, Beck, Duclos, and Freeman and award all such funds and assets to Reed.

14.31  For a judgment against John, Freeman, Duclos, Connie and Beck, jointly and severally, for all damages resulting from the breaches of their fiduciary duties owed to Reed during the periods of time of their relevant tenures as directors of AIA Insurance and AIA

FIFTH AMENDED COMPLAINT – 41

Services, in an amount to be proven at trial.

14.32  For a declaratory judgment imposing personal liability on the individual Defendants and Crop USA for all loans guaranteed by AIA Services or AIA Insurance.

14.33  For an award of Reed's attorneys' fees and costs from all of the Defendants, jointly and severally, under the Promissory Note, Amended Stock Pledge Agreement, I.C. § 12-120, I.C. § 12-121 and/or as may be available under equity and law.

14.34  For judgment against the Defendants, jointly and severally, for all damages in tort and contract proven by Reed at trial based upon one or more of the following: civil conspiracy, fraud (any type, including misrepresentations), fraudulent conveyances, conversion, breaches of contract, alter-ego, breaches of fiduciary duties, deepening insolvency, breaches of implied duties of good faith and fair dealing, specific performance of any of Reed's rights under contract or law.

14.35  John, Connie, Beck, Duclos, and Freeman's wrongful, self-serving, fraudulent, deepening insolvency, conspiracy, inappropriate and unlawful acts and/or omissions as described in this Complaint constitute that of "faithless fiduciaries." Accordingly, all salary, compensation (including all compensation and benefits received as directors), stock options, benefits, reimbursements (all proper, improper and/or undocumented reimbursements for travel, meals, lodging, etc.) and any other payments and/or assets received by John, Connie, Beck, Duclos, and/or Freeman should be disgorged and awarded to Reed.

14.36  AIA Services and AIA Insurance have alleged that Reed agreed to orally modify the terms of the Promissory Note, Amended Stock Pledge Agreement, Amended Security Agreement and Restructure Agreement, which such allegations Reed expressly denies. If the Defendants are able to prove that such an oral modification exists at or before trial, AIA

FIFTH AMENDED COMPLAINT – 42

Services, AIA Insurance and Crop USA are in breach of such orally modified agreements and Reed is entitled to the damages and relief set forth in this Complaint.

14.37  Reed incorporates by reference into this Section all allegations and requested relief set forth in the above causes of action and/or remedies. Should any of the causes of action fail at or before trial, all of such allegations are incorporated by reference into this Section as requested relief and/or as support for Reed's requested relief.

14.38  Reed expressly reserves the right to amend this Complaint upon the completion of discovery and/or present causes of action and remedies which conform to the evidence at the time of trial.

14.39  For judgment against the Defendants and/or such relief for all claims and causes of action which conform to the evidence obtained through discovery and/or forensic accounting.

14.40  For such other relief as Reed may request before or at the time of trial and/or that the Court may find just, equitable, or warranted before or at the time of trial.

14.41  The Defendants are placed on notice that future amendments to this Complaint will be likely and Reed reserves the right to do so, particularly based upon the Defendants' intentional refusal to respond to Reed's discovery requests.

///

///

///

///

///

///

FIFTH AMENDED COMPLAINT – 43

14.42   The Defendants are placed on notice that Reed may likely move the Court in the future to permit him to request an award of punitive damages against the Defendants at trial.

DATED this 1ˢᵗ day of February, 2008.

SMITH, CANNON & BOND PLLC

By: _____
Roderick C. Bond
Ned A. Cannon
Attorneys for Plaintiff Reed J. Taylor

FIFTH AMENDED COMPLAINT – 44



## CERTIFICATE OF SERVICE

I, Roderick C. Bond, declare that, on the date indicated below, I served a true and correct copy of Plaintiff Reed Taylor's Fifth Amended Complaint on the following parties via the methods indicated below:

David A. Gittins
Law Office of David A. Gittins
P.O. Box 191
Clarkston, WA 99403
Attorney for Defendants JoLee Duclos and
Bryan Freeman

**Via:**
( ) U.S. Mail, Postage Prepaid
(X) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(X) Email (pdf attachment)

Michael E. McNichols
Clements Brown & McNichols
321 13th Street
Lewiston, ID 83501
Attorney for R. John Taylor

**Via:**
( ) U.S. Mail, Postage Prepaid
(X) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(X) Email (pdf attachment)

Jonathan D. Hally
Clark & Feeney
P.O. Box 285
Lewiston, ID 83501
Attorney for Connie Taylor, James Beck and
Corrine Beck

**Via:**
( ) U.S. Mail, Postage Prepaid
(X) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(X) Email (pdf attachment)

Gary D. Babbitt
D. John Ashby
Hawley Troxell Ennis & Hawley LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, Idaho 83701-1617
Attorneys for AIA Services, AIA Insurance, and
Crop USA Insurance Agency

**Via:**
(X) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(X) Email (pdf attachment)

FIFTH AMENDED COMPLAINT – 45

James J. Gatziolis
Charles E. Harper
Quarles & Brady LLP
Citigroup Center, 500 West Madison Street
Suite 3700
Chicago, IL  60661-2511
Attorneys for Crop USA Insurance Agency

**Via:**
(X)  U.S. Mail, Postage Prepaid
( )  Hand Delivered
( )  Overnight Mail
( )  Facsimile
(X)  Email (pdf attachment)

Signed this 1st day of February, 2008, at Lewiston, Idaho.

_____
Roderick C. Bond

FIFTH AMENDED COMPLAINT – 46

2-ER-296

## Campbell, Bissell & Kirby, PLLC

Attorneys & Counselors at Law

Michael S. Bissell  •  Licensed in WA, ID & AK
Richard D. Campbell  •  Licensed in WA, ID & MT
Patrick J Kirby  •  Licensed in WA & ID

July 21, 2008

**Via Certified Mail and
Regular Mail**

Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc.
111 Main Street
Lewiston, ID 83501

Re:   Demand of Donna Taylor and Reed Taylor Pursuant to Idaho Code 30-1-742

Dear Board Members of AIA Services Corporation and AIA Insurance Inc :

As you know, this firm represents Donna J. Taylor ("Donna"), the Series A Preferred Shareholder in AIA Services Corporation ("AIA Services"), and Reed Taylor ("Reed"), the pledgee of AIA Insurance, Inc. ("AIA Insurance") and creditor of AIA Services who is owed over $8.5 Million.

Donna and Reed hereby make demand upon the Board of Directors of AIA Services and AIA Insurance pursuant to Idaho Code 30-1-742 to take the action described herein Specifically, demand is made that said entities immediately take action against the law firms of Hawley Troxell Ennis & Hawley; Clements, Brown & McNichols; Quarles & Brady; together with the responsible attorneys of said firms (and any other firms which have wrongfully represented the entities) for violating applicable Rules of Professional Conduct, malpractice, breach of fiduciary duties, and aiding and abetting, including, without limitation, all acts related to or involving the following claims and/or causes of action:

1. Wrongfully simultaneously representing Crop USA Insurance Agency, Inc ("Crop USA") and AIA Services and AIA Insurance, while knowing these entities had divergent interests;

2 Taking action against the best interests of AIA Services and/or AIA Insurance;

3 Assisting in the commission of fraud and/or illegal activities;

4. Wrongfully allowing interested directors and other interested parties to direct litigation in light of substantial claims against them;

5 Issuing inappropriate opinion letters to lenders and auditors;

6 Failing to recover moneys and/or stock in Crop USA;

509 455-7100 • Fax 509 455 7 11 • www.cbklawyers.com
416 Symons Building • 7 South Howard Street • Spokane, Washington 99201

EXHIBIT "N"

**2-ER-297**



Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc.
July 21, 2008
Page - 2

7. Preventing claims from being made against present and past directors, including, without limitation, R. John Taylor, Michael Cashman, James Beck and Connie Taylor;

8. Failing to take action against Crop USA to recover funds owed;

9. Failing to take action against responsible present and past directors for violating the corporate opportunity doctrine by permitting Crop USA to become a separate company from AIA;

10. Failing to take action against interested directors and parties who took part in fraud, conspiracy and other illegal activities, including, without limitation, R. John Taylor, James Beck, Michael Cashman and Connie Taylor;

11. Breaching fiduciary duties (including the duty of loyalty) owed to AIA Services and AIA Insurance;

12. Aiding and abetting R. John Taylor, James Beck, Michael Cashman, Connie Taylor, Crop USA, and other interested parties who participated in the misappropriation of assets, opportunities, and funds of AIA Services and AIA Insurance (including the $1.5 Million wrongfully transferred from AIA Insurance to Crop USA);

13. Not ensuring that separate counsel was retained for AIA Services;

14. Not ensuring that separate counsel was retained for AIA Insurance knowing that it was pledged to Reed;

15. Assisting in illegal loan guarantees by AIA Services and/or AIA Insurance;

16. Wrongfully entering into a Joint Defense Agreement knowing that such an agreement was inappropriate in light of the significant claims AIA Services and AIA Insurance have against interested individuals and Crop USA;

17. Wrongfully obtaining shareholder consent to pay the attorneys' fees of past and present directors of AIA Services and AIA Insurance without full disclosure or obtaining votes only from disinterested shareholders;

18. Permitting Michael McNichols and Clements, Brown & McNichols to remain as counsel for R. John Taylor in violation of their duty of loyalty to AIA Services and AIA Insurance;



**2-ER-298**



Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc.
July 21, 2008
Page - 3

19. Assisting in pledging the assets of AIA Services and AIA Insurance to Crop USA for the payment of attorneys' fees and costs of interested parties and others;

20. Permitting the business and employees of AIA Insurance and AIA Services to be detrimentally effected by the actions of interested parties (e.g., transferring AIA Insurance's employees to Crop USA);

21. Failing to take action against R. John Taylor and Connie Taylor for the significant breaches of R. John Taylor's employment agreement with AIA Services;

22. Failing to comply with contractual obligations owed to Reed and Donna;

23. Failing to recover inappropriate salaries, advances, loans, benefits, and compensation paid to R. John Taylor, Connie Taylor, James Beck and others;

24. Assisting in, and failing to take action pertaining to, the improper allocation expenses, labor, rent and other expenditures inappropriately utilized for the benefit of Crop USA.

25. Accepting payments of attorneys' fees in violation of the Rules of Professional Conduct;



26. Representing AIA Services and/or AIA Insurance in making inappropriate arguments (including alleged illegality of the debt to Reed) knowing that such arguments were counter to AIA Services' obligations to Reed and Donna and knowing that Richard Riley was a witness who provided a legal opinion counter to such arguments; and

27. Accepting payment of attorneys' fees and costs which should have been allocated to other parties, including, without limitation, fees and costs that should have been paid by Crop USA, R. John Taylor, James Beck, Michael Cashman and Connie Taylor.

Based upon the above wrongful acts (and others reasonably contemplated from the above acts and other acts known only to insiders at AIA Services and/or AIA Insurance), demand is made upon you to initiate legal action against the above-referenced law firms and lawyers to recover all applicable damages and to require a disgorgement of all attorneys' fees and costs paid to them, including, without limitation, for all inappropriate transactions and the litigation involving Reed and/or Donna. Based upon the foregoing demand is also made for action against R. John Taylor, Michael Cashman, James Beck, Connie Taylor, Crop USA and all other responsible parties for the recovery of damages and the disgorgement of all compensation and attorneys' fees and costs paid to or on their behalf.

Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc
July 21, 2008
Page - 4


Please note that I have sent a copy of this notice to present counsel for AIA Services and AIA Insurance, and trust that they will ensure copies of this Notice are provided to all board members and shareholders  I would appreciate it if you would let me know as soon as possible whether AIA Services and/or AIA Insurance will be taking any of the requested action.  The failure to respond or to immediately take action shall be construed as a rejection of the demands made by this letter.


Nothing herein should be considered or relied upon as a waiver of Donna and Reed's right to take immediate action on behalf of AIA Services and/or AIA Insurance due to exigent circumstances.


Very truly yours,

CAMPBELL, BISSELL & KIRBY, PLLC


MICHAEL S  BISSELL

MSB:mah
cc:  Gary Babbitt (via email)
     D  John Ashby (via email)
     James Gatziolis (via email)
     Charles Harper (via email)
     Michael McNichols (via email)
     David Gittins (via email)
     Jon Hally (via email)
     Roderick Bond (via email)
     Reed Taylor (via email)
     Donna Taylor (via regular mail)
Data\13 12\notice 072108 doc

2-ER-300

Gary D. Babbitt, ISB No. 1486
D. John Ashby, ISB No. 7228
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone: (208) 344-6000
Facsimile: (208) 342-3829
Email: gdb@hteh.com
        jash@hteh.com

Attorneys for AIA Services Corporation,
AIA Insurance, Inc., and CropUSA
Insurance Agency, Inc.

## IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT

## OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| REED J. TAYLOR, a single person,<br><br>   Plaintiff,<br><br>vs<br><br>AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation; R. JOHN TAYLOR and CONNIE TAYLOR, individually and the community property comprised thereof; BRYAN FREEMAN, a single person; JOLEE DUCLOS, a single person; CROP USA INSURANCE AGENCY, INC., an Idaho Corporation; and JAMES BECK and CORRINE BECK, individually and the community property comprised thereof,<br><br>   Defendants<br><br>_____<br><br>AIA SERVICES CORPORATION, an Idaho | Case No. CV-07-00208<br><br>AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO I.C. § 30-1-743 AND I.C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY PROCEEDINGS |

AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO
I.C. § 30-1-743 AND I.C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY
PROCEEDINGS - 1

EXHIBIT "O"

**2-ER-301**

corporation; and AIA INSURANCE, INC , an )
Idaho corporation,                        )
                                          )
            Counterclaimants,             )
vs                                        )
                                          )
REED J TAYLOR, a single person,           )
                                          )
            Counterdefendant              )
                                          )

Defendants AIA Services Corporation and AIA Insurance, Inc. (collectively, "AIA"), by and through their counsel of record, move this Court to for an order (1) appointing, pursuant to Idaho Code Section 30-1-744(6), an independent person/panel to make a determination whether the maintenance of a derivative proceeding against AIA's defense counsel and other defendants' counsel is in the best interests of the two corporations and other defendants' counsel, as more particularly explained below; and (2) granting AIA's motion, previously filed on July 23, 2008, to stay all proceedings in this case until the independent inquiry under Idaho Code Section 30-1-744(6) has been completed and the issues concerning legal representation of the two corporations have been fully resolved   This motion is based on the Affidavit of Gary D  Babbitt in Support of Motion for Stay previously filed on July 23, 2008 and the Affidavit of Gary D. Babbitt filed contemporaneously with this motion.

**Independent inquiry into purportedly derivative claims.** In connection with the Motion for Stay of Proceedings previously filed on July 23, 2008, AIA advised the Court of the circumstances involving AIA's receipt of a July 21, 2008 letter from attorney Michael S Bissell purportedly under Idaho Code Section 30-1-742 demanding, on behalf of Donna Taylor and Reed Taylor, that the boards of directors of the two corporations, who are defendants in this lawsuit brought by Reed J Taylor, take action against the corporations' defense counsel and

AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO
I C  § 30-1-743 AND I.C  § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY
PROCEEDINGS - 2

40005 0006 1261375 4

**2-ER-302**

other attorneys involved in this case for alleged malpractice, violation of the Idaho Rules of Professional Conduct, breach of fiduciary duties, and "aiding and abetting" the defendants in various transactions and/or the handling of the defense of this litigation. Pursuant to Idaho Code Section 30-1-742 and Rule 23(f) of the Idaho Rules of Civil Procedure, the demand letter is a condition precedent to commencement of a derivative action by Donna Taylor and Reed Taylor on behalf of the corporations.

This petition is being filed at this time in compliance with the Court's Order dated July 25, 2008 and filed July 28, 2008 that, within the next twenty (20) days, counsel for AIA shall notify the Court in the event that the corporations undertake an inquiry pursuant to Idaho Code Section 30-1-743 into the demand submitted by Reed Taylor and Donna Taylor via Mr. Bissell's July 21, 2008 letter. The boards of directors of the two corporations met on August 7, 2008 and considered how to respond to that demand. The boards concluded that, because Reed Taylor has sued all present directors of AIA Services Corporation and AIA Insurance, Inc., there are no independent directors serving on the corporations' boards of directors; and the corporations are therefore unable to appoint independent directors to conduct a good faith reasonable inquiry as contemplated by Idaho Code Section 30-1-744(2)(a) or (b). Accordingly, the boards of directors of AIA Services Corporation and AIA Insurance, Inc. directed their counsel of record to petition the Court to appoint, pursuant to Idaho Code Section 30-1-744(6), an independent person/panel to conduct in good faith a reasonable inquiry into the claims made in Mr. Bissell's letter and to determine whether maintenance of a derivative proceeding by Donna Taylor and Reed Taylor on behalf of the two corporation is in the best interest of the two corporations.

AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO I.C. § 30-1-743 AND I.C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY PROCEEDINGS - 3

40005.0006 1261375.4

Accordingly, AIA hereby requests that this Court's appoint, pursuant to Idaho Code Section 30-1-744(6), an independent person/panel to conduct an inquiry and make a determination whether the maintenance of a derivative proceeding against counsel for the defendants is in the best interests of AIA Services Corporation and AIA Insurance, Inc. In particular, AIA suggests that the Court appoint the Honorable Ronald Schilling (retired), or the Honorable George R. Reinhardt (retired), or such other independent retired judge or lawyer as the Court, in its discretion, deems qualified to conduct the inquiry and make the determination contemplated by Idaho Code Section 30-1-744

**Motion for Stay of Proceedings.** The allegations against defense counsel set forth in Mr. Bissell's letter and the action that Donna and Reed Taylor demand be taken by the two corporations would directly pit the AIA entities against their attorneys of record in this case As a result, until the propriety of the threatened derivative action is resolved by the independent person/panel appointed by the Court, the ability of AIA's chosen lawyers to represent the defendant corporations is potentially compromised. By merely submitting the demand, Plaintiffs' co-counsel has manufactured the appearance of a conflict of interest between client and clients' chosen attorneys without having proven a single allegation Moreover, Plaintiff's counsel Roderick C. Bond has notified defendants that Reed Taylor will seek to disqualify all defense counsel in this case (except Dave Gittins), presumably on the same grounds as alleged by his co-counsel in the July 21, 2008 demand letter.

Accordingly, in order to protect the rights of AIA Service Corporation and AIA Insurance, Inc. to be represented by their chosen defense attorneys in this case, AIA requests that the Court grant AIA's previously filed motion for a stay of all proceedings in this action until the

AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO I.C § 30-1-743 AND I.C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY PROCEEDINGS - 4

40005 0006 1261375 4

statutory inquiry and determination contemplated by Idaho Code Sections 30-1-744(6) have been completed and the status of AIA's counsel of record in this case has been resolved.

DATED THIS __14__ day of August, 2008

HAWLEY TROXELL ENNIS & HAWLEY LLP

By_____
Gary D. Babbitt, ISB No 1486
Attorneys for AIA Services Corporation,
AIA Insurance, Inc , and CropUSA

AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO
I C. § 30-1-743 AND I C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY
PROCEEDINGS - 5

40005 0006 1261375 4

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **14** day of August, 2008, I caused to be served a true copy of the foregoing AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO I.C. § 30-1-743 AND I.C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY PROCEEDINGS by the method indicated below, and addressed to each of the following:

Roderick C. Bond
Ned A. Cannon
Smith, Cannon & Bond PLLC
508 Eighth Street
Lewiston, ID 83501
[Attorneys for Plaintiff]

_____ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
_____ Telecopy
__✔__ Email

Michael S. Bissell
Campbell, Bissell & Kirby, PLLC
416 Symons Building
7 South Howard Street
Spokane, WA 99201
[Attorneys for Plaintiff]

_____ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
__✔__ Email

David A. Gittins
Law Office of David A. Gittins
P.O. Box 191
Clarkston, WA 99403
[Attorney for Defendants Duclos and Freeman]

_____ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
_____ Telecopy
__✔__ Email

Michael E. McNichols
Clements Brown & McNichols
321 13th Street
Lewiston, ID 83501
[Attorneys for Defendant R. John Taylor]

_____ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
_____ Telecopy
__✔__ Email

Jonathan D. Hally
Clark & Feeney
P.O. Box 285
Lewiston, ID 83501
[Attorneys for Defendants Connie Taylor, James Beck and Corrine Beck]

_____ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
_____ Telecopy
__✔__ Email

AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO I.C. § 30-1-743 AND I.C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY PROCEEDINGS - 6

40005.0008.1261375.4

**2-ER-306**

James J Gatziolis
Charles E. Harper
QUARLES & BRADY LLP
500 West Madison Street, Suite 3700
Chicago, Illinois 60661-2511
[Attorneys for Crop USA Insurance]

_____ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
_____ Telecopy
__✓__ Email

Gary D Babbitt

AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO I.C § 30-1-743 AND I.C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY PROCEEDINGS - 7

40005 0006 1261375 4

2-ER-307

RODERICK C. BOND *(Pro Hac Vice)*
NED A. CANNON, ISB No. 2331
SMITH, CANNON & BOND PLLC
508 Eighth Street
Lewiston, Idaho 83501
Telephone: (208) 743-9428
Fax: (208) 746-8421

MICHAEL S. BISSELL, ISB No. 5762
CAMPBELL, BISSELL & KIRBY PLLC
7 South Howard Street, Suite 416
Spokane, WA 99201
Tel: (509) 455-7100
Fax: (509) 455-7111

Attorneys for Plaintiff Reed J. Taylor

## IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| REED J. TAYLOR, a single person,<br><br>Plaintiff,<br><br>v.<br><br>AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation; R. JOHN TAYLOR and CONNIE TAYLOR, individually and the community property comprised thereof; BRYAN FREEMAN, a single person; JOLEE DUCLOS, a single person; CROP USA INSURANCE AGENCY, INC., an Idaho Corporation; and JAMES BECK and CORRINE BECK, individually and the community property comprised thereof;<br><br>Defendants. | Case No.: CV-07-00208<br><br>REED TAYLOR'S RESPONSE IN OPPOSITION TO MOTION TO STAY PROCEEDING AND RESPONSE IN OPPOSITION TO AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY AND RESPONSE IN OPPOSITION TO R. JOHN TAYLOR'S MOTION FOR SCHEDULING CONFERENCE |

REED TAYLOR'S RESPONSE IN OPPOSITION TO MOTION TO STAY,
PETITION FOR APPOINTMENT AND MOTION FOR SCHEDULING CONFERENCE – 1

EXHIBIT "P"

Reed Taylor ("Reed") submits the following Response in Opposition to AIA Services and AIA Insurance's Motion to Stay, AIA's Petition for Court Appointed Independent Inquiry, and R. John Taylor's Motion for Scheduling Conference:

## I. LEGAL AUTHORITY AND ARGUMENT

### A. AIA's Motion To Stay Should Be Denied.

If a party has initiated a derivative action, I.C. 30-1-743 sets forth the limited instances in which a derivative action may be stayed:

> If the corporation commences an inquiry into the allegations made in the demand or complaint, the court may stay any derivative proceeding for such a period as the court deems appropriate.

I.C. 30-1-743 (emphasis added).

Here, AIA Services and AIA Insurance are inappropriately requesting a stay to this case based upon a derivative demand made to the boards of AIA Services and AIA Insurance. However, no derivative action has been filed against Hawley Troxell or the other attorneys. Moreover, I.C. 30-1-743 provides no legal basis to stay the present case and AIA Services and AIA Insurance have failed to cite any other authority that permits the Court to stay this action. See I.R.C.P. 62 (which does not apply to this case).

AIA Services and AIA Insurance's Motion to Stay should be denied because there is no basis to stay this action. Moreover, AIA Services and AIA Insurance's request can only be construed as an attempt by John Taylor and others to have an additional 3 months to inappropriately operate the companies and retain commissions to which they are not entitled.

///

///

REED TAYLOR'S RESPONSE IN OPPOSITION TO MOTION TO STAY, PETITION FOR APPOINTMENT AND MOTION FOR SCHEDULING CONFERENCE – 2

## B. An Independent Inquiry Should Be Appointed By The Court

### 1. AIA's Petition Should Be Granted, But Not As Requested.

A Court appointed panel is appropriate when disinterested parties cannot be appointed:

> The court may appoint a panel of one (1) or more independent persons upon motion by the corporation to make a determination whether the maintenance of the derivative proceeding is in the best interests of the corporation...

I.C. § 30-1-744(6).

Here, John Taylor, Connie Taylor, and James Beck are all interested purported directors of AIA Services and AIA Insurance by way of their ownership of CropUSA shares and the significant claims Reed Taylor has asserted against them. AIA is correct that a court appointed panel is appropriate, but only a panel that is comprised of truly independent persons.[1]

### 2. Respectfully, Judges Schilling And Reinhardt Should Not Be Appointed.

AIA Services and AIA Insurance requests that the Court appoint Judge Schilling and Judge Reinhardt as member(s) of a panel. However, they are not independent.

Judge Schilling admits in his April 3, 2007, letter that he would "probably recuse [himself] based upon the appearance of a conflict of interest." *See* Bond Aff., Ex. B, p. 2. Judge Schilling has also known Connie Taylor for many years and she supported his "candidacy for re-election." *See* Bond Aff., Ex. B, p.1. Finally, Judge Schilling has a long-term relationship with Mike McNichols and his family. *See* Bond Aff., p. 1, ¶ 3. Therefore, Judge Schilling would not be considered independent and should not be appointed.

---

[1] Reed Taylor's belief that an independent panel would be appropriate does not change the fact that a stay is not authorized or appropriate for this action based upon the appointment of a panel. Again, such a stay should only be construed by the court as a mechanism for delay since AIA's commissions will soon be depleted.

REED TAYLOR'S RESPONSE IN OPPOSITION TO MOTION TO STAY,
PETITION FOR APPOINTMENT AND MOTION FOR SCHEDULING CONFERENCE – 3

Similarly, Connie Taylor clerked for Judge Reinhardt from 1991-1993. Presumably, some of the attorneys involved know and/or are friends with Judge Reinhardt. Therefore, Judge Reinhardt would also not be considered independent and should not be appointed.

### 3. The Court Should Appoint An Appropriate Independent Panel.

The Court has the authority to appoint an independent panel to investigate all of the claims asserted in Michael Bissell's demand letter. I.C. § 30-1-744(6).

This case involves significant issues of corporate malfeasance, tortious conduct, violations of Idaho Rules of Professional Conduct, and claims relating to the foregoing. Therefore, the Court should appoint a panel of at least two attorneys to a panel, who have no connection or acquaintance with any of the attorneys or parties involved in this action. One attorney should have expertise in corporate governance, fiduciary duties and related areas of law. The other attorney should have a practice that involves at least a limited amount of cases asserting claims against attorneys. The Court should then order the panel to conduct an independent investigation, which would include discussing claims and issues with Reed's counsel.

### C.   John Taylor's Motion For Scheduling Conference Should Be Denied.

Every motion "shall be made in writing, shall state with particularity the grounds therefore including the number of the applicable civil rule, if any..." I.R.C.P. 7(b)(1). The Court has authority to sanction a party for signing inappropriate motions on its own accord and award reasonable attorneys' fees. I.R.C.P. 11(1)(a). I.R.C.P. 16 applies to case scheduling orders, not a vehicle for a party to get random stays to litigation or such other relief that accommodates their vacation schedule.

REED TAYLOR'S RESPONSE IN OPPOSITION TO MOTION TO STAY,
PETITION FOR APPOINTMENT AND MOTION FOR SCHEDULING CONFERENCE – 4

Here, John Taylor requests a scheduling conference to enable his attorney to not attend any hearings and effectively stay this action for two weeks. In addition, John Taylor requests, by only citing authority for case scheduling orders, that Reed Taylor should be prevented from filing a motion to disqualify John Taylor's counsel to permit discovery.

First, John Taylor's Motion is entirely inappropriate and clearly not contemplated by the Idaho Rules of Civil Procedure or any Idaho case. Second, Mr. McNichols has several other attorneys at his firm who could attend hearings while Mr. McNichols is out of the office. Third, there is no Idaho case or rule that permits a party to seek a court order preventing another party in litigation from bringing a motion.

Finally, discovery is not appropriate or warranted regarding Reed Taylor's Motion to Disqualify. As indicated in Reed Taylor's Motion to Disqualify, Reed's counsel has been advising all attorneys in this action that the Motion to Disqualify would be forthcoming. Moreover, no amount of time will cure the irreconcilable conflicts of interest that involve Mr. McNichols and the other attorneys referenced in Reed Taylor's Motion to Disqualify.

John Taylor's Motion for Scheduling Conference should be denied and the Court should award Reed Taylor his attorneys' fees and costs.

///

///

///

///

REED TAYLOR'S RESPONSE IN OPPOSITION TO MOTION TO STAY,
PETITION FOR APPOINTMENT AND MOTION FOR SCHEDULING CONFERENCE – 5

## II. CONCLUSION

AIA's Motion to Stay should be denied. There is no applicable authority to grant such a request and it can only be viewed as delay tactics. The authority cited by AIA is only applicable to derivative actions that have already been filed. No derivative actions have been filed against the attorneys yet.

The Court should appoint at least two independent lawyers who specialize in corporate governance and pursuing claims against attorneys, both of whom are completely independent with no ties to any of the defense counsel or defendants. However, such an appointment does not provide authority for a stay to this action, as this action was not even the proper forum.

Finally, John Taylor's Motion for Scheduling Conference should be denied in full. John Taylor fails to cite any applicable legal authority to support his motion and the motion. The Court should award Reed Taylor his attorneys' fees and costs incurred in responding to the Motion.

DATED: This 4th day of September, 2008.

SMITH, CANNON & BOND PLLC
CAMPBELL, BISSELL & KIRBY PLLC

By: _____
Roderick C. Bond
Ned A. Cannon
Michael S. Bissell
Attorneys for Plaintiff Reed J. Taylor

REED TAYLOR'S RESPONSE IN OPPOSITION TO MOTION TO STAY,
PETITION FOR APPOINTMENT AND MOTION FOR SCHEDULING CONFERENCE – 6

## CERTIFICATE OF SERVICE

I, Roderick C. Bond, declare that, on the date indicated below, I served a true and correct copy of the Reed Taylor's Response in Opposition to AIA Services and AIA Insurance's Motion to Stay Proceedings, Opposition to AIA's Petition for Court Appointed Inquiry, and Opposition to John Taylor's Motion for Scheduling Conference; Affidavit of Roderick C. Bond in Opposition to Motion to Reconsider Admission of Plaintiff's Counsel Pro Hac Vice, Affidavit of Reed Taylor in Opposition to Motion to Reconsider and Opposition to Court Appointed Inquiry; Affidavit of Roderick Bond in Opposition to  AIA's Motions, John Taylor's Motion for Scheduling Conference, and Opposition to Intervention, on the following parties via the methods indicated below:

David A. Gittins
Law Office of David A. Gittins
P.O. Box 191
Clarkston, WA 99403
Attorney for Defendants JoLee Duclos and
Bryan Freeman

**Via:**
( ) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(**X**) Email (pdf attachment)

Michael E. McNichols
Clements Brown & McNichols
321 13th Street
Lewiston, ID  83501
Attorney for R. John Taylor

**Via:**
( ) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(**X**) Email (pdf attachment)

David R. Risley
Randall, Blake & Cox
1106 Idaho St.
Lewiston, ID 83501
Attorney for Connie Taylor, James Beck and
Corrine Beck

**Via:**
( ) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(**X**) Email (pdf attachment)

REED TAYLOR'S RESPONSE IN OPPOSITION TO MOTION TO STAY,
PETITION FOR APPOINTMENT AND MOTION FOR SCHEDULING CONFERENCE – 7

Gary D. Babbitt
D. John Ashby
Hawley Troxell Ennis & Hawley LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, Idaho  83701-1617
Attorneys for AIA Services, AIA Insurance, and
Crop USA Insurance Agency

**Via:**
( ) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(**X**) Email (pdf attachment)


James J. Gatziolis
Charles E. Harper
Quarles & Brady LLP
Citigroup Center, 500 West Madison Street
Suite 3700
Chicago, IL  60661-2511
Attorneys for Crop USA Insurance Agency

**Via:**
( ) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(**X**) Email (pdf attachment)


Signed this 4th day of September, 2008, at Lewiston, Idaho.

_____
Roderick C. Bond


REED TAYLOR'S RESPONSE IN OPPOSITION TO MOTION TO STAY,
PETITION FOR APPOINTMENT AND MOTION FOR SCHEDULING CONFERENCE – 8

JUN-03-2008 11:47 From:CLEMENTS BROWN & MCN 208 746 9295      To:Harvey Troxell      P.2/5
JUN. 3. 2008  9:26AM    DISTRICT COURT                        NO. 2405    P. 1

FILED

2008 JUN 2 PM 4 33

PATTY O. WEEKS
CLERK OF THE DIST. COURT

DEPUTY

MICHAEL S. BISSELL, ISB No. 5762
CAMPBELL, BISSELL & KIRBY PLLC
7 South Howard Street, Suite 416
Spokane, WA 99201
Tel: (509) 455-7100
Fax: (509) 455-7111

Attorneys for Plaintiff Donna J. Taylor

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE
STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| DONNA J. TAYLOR;<br><br>Plaintiff,<br><br>v.<br><br>R. JOHN TAYLOR;<br><br>Defendant. | Case No.: CV08-01150<br><br>**COMPLAINT**<br><br>Category: A.1.<br>Fee: $88.00 |

Donna Taylor, by and through her attorneys of record, CAMPBELL, BISSELL &

KIRBY, PLLC, alleges as follows:

## I. PARTIES

1.      Plaintiff Donna J. Taylor is a resident of Clarkston, Washington.

2.      Defendant R. John Taylor is a resident of Lewiston, Nez Perce County,

Idaho.

## II. JURISDICTION AND VENUE

3.      Defendant resides in Nez Perce County and damages exceed $10,000.

Jurisdiction and venue are, therefore, appropriate in Nez Perce County District Court.

COMPLAINT - 1

**ORIGINAL**

EXHIBIT "EE"

JUN-03-2008 11:47 From:CLEMENTS BROWN & MCN 208 746 9295     To:He  s Troxell     P.3/5
 ~UN. 3, 2008  9:28AM    DISTRICT COURT                       VU 2405   Y. 3

## III. FACTS/CAUSES OF ACTION

3.    Plaintiff Donna J. Taylor is the sole owner of all outstanding Preferred A Shares in AIA Services Corporation. Under the Articles of Incorporation of AIA Services Corporation, Plaintiff Donna Taylor's Preferred A Shares has priority of payment over all other shares in AIA Services Corporation, including priority over any distributions to commons shares owned by the Defendant R. John Taylor.

4.    From 2004 through the present time, Defendant R. John Taylor was the Chairman of the Board of Directors of AIA Services Corporation and its subsidiary AIA Insurance, Inc. From 2004 through the present time, Defendant R. John Taylor was the Chief Executive Officer and/or President of AIA Services Corporation and its subsidiary AIA Insurance, Inc.

5.    From 2004 through the present time, Defendant R. John Taylor owed fiduciary duties to the Plaintiff Donna J. Taylor. From 2004 through the present time, Defendant R. John Taylor was also an attorney and a director of a publicly traded company, Avista Corporation, and had sophisticated knowledge of the legal obligations associated with his fiduciary duties owed to shareholders, including Plaintiff Donna Taylor.

6.    Under the terms of the Series A Preferred Shareholder Agreement dated July 1, 1996 (which was executed by Defendant R. John Taylor on behalf of AIA Services Corporation), AIA Services Corporation was required to complete its payment obligations to Plaintiff Donna J. Taylor prior to 2005, but AIA Services Corporation failed to do so.

COMPLAINT - 2

JUN-03-2008 11:47 From:CLEMENTS BROWN & MCN 208 746 9295          To:H    Troxell       P.4/5
..UN. 3. 2008  9:28AM     DIS RICT COURT                              VU. 2405   r.  ␣

7.     In 2004, AIA Services Corporation was in default of its obligations to Plaintiff Donna Taylor and was required to pay her over $700,000. In 2004, Defendant R. John Taylor represented to Plaintiff Donna Taylor that AIA Services Corporation did not have the funds to pay her when if fact AIA Services Corporation, through its wholly owned subsidiary AIA Insurance, Inc., had the funds to pay Plaintiff Donna J. Taylor in full as required.

8.     In 2004, instead of paying the Plaintiff Donna J. Taylor as required, Defendant R. John Taylor unlawfully and/or fraudulently transferred $1,510,693 from AIA Insurance, Inc. to Crop USA Insurance Agency, Inc., a corporation in which the Defendant R. John Taylor owned approximately 40% of the outstanding common shares and neither AIA Services Corporation nor AIA Insurance, Inc. held any ownership interest.

9.     From 2004 through the present time, Defendant R. John Taylor paid himself excessive compensation of hundreds of thousands of dollars when AIA Services Corporation had not complied with its obligations to Plaintiff Donna Taylor. From 2004 through the present time, Defendant R. John Taylor sold crop insurance by funding and/or operating Crop USA Insurance Agency, Inc. in violation of the corporate opportunity doctrine, when Defendant R. John Taylor represented to Plaintiff Donna Taylor that Crop USA Insurance Agency, Inc. was being developed by AIA Services Corporation and/or AIA Insurance, Inc. Defendant R. John Taylor also inappropriately provided Crop USA Insurance Agency, Inc. with AIA Insurance, Inc.'s labor, expenses, office space and trade secrets.

COMPLAINT - 3

JUN-03-2008 11:47 From:CLEMENTS BROWN & MCN 208 746 9295          To:Haree Troxell          P.5/5
    JUN. 3.2008   9:28AM     DISTRICT COURT                              VO. 2405   P. 5

10.    At the time of the unlawful transfer of $1,510,693 to Crop USA Insurance Agency, Inc. and the other acts of Defendant R. John Taylor as described herein, AIA Services Corporation owed over $700,000 to Plaintiff Donna J. Taylor, which such amount was due and should have been paid in full. Plaintiff Donna J. Taylor had a right to rely on Defendant R. John Taylor's representations and relied on the same. Defendant R. John Taylor's acts, including, without limitation, those acts described above, constitute fraud and breaches of his fiduciary duties owed to Plaintiff Donna J. Taylor.

11.    As a result of the acts of Defendant R. John Taylor, including, without limitation, those acts described in the above paragraphs, Plaintiff Donna J. Taylor has been damaged and is entitled to judgment against Defendant R. John Taylor in the amount of $421,623.58.

## IV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Donna J. Taylor prays for the following relief:

1.    For a judgment against Defendant R. John Taylor, individually, in the amount of $421,623.58, the exact amount to be proven at trial or on summary judgment, plus an award of pre-judgment and post-judgment interest.

2.    For an award of Plaintiff Donna J. Taylor's attorneys fees and costs incurred in this action pursuant to Idaho Law, including, I.C. § 12-120 and/or I.C. § 12-121.

DATED this 2 day of May, 2008.

CAMPBELL, BISSELL & KIRBY PLLC

By: _____
Michael S. Bissell
Attorneys for Plaintiff Donna J. Taylor

COMPLAINT - 4

RODERICK C. BOND, ISB No. 8082
MICHAEL S. BISSELL, ISB No. 5762
CAMPBELL, BISSELL & KIRBY, PLLC
7 South Howard Street, Suite 416
Spokane, WA 99201
Tel: (509) 455-7100
Fax: (509) 455-7111

FILED

NOV 23  AM 11: 19

PATTY O. WEEKS
CLERK OF THE DIST. COURT

KATHY SUTTEY
DEPUTY

Attorneys for Plaintiff-Petitioner Donna J. Taylor

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE STATE OF
IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

DONNA J. TAYLOR, an individual;

Plaintiff-Petitioner,

v.

AIA SERVICES CORPORATION, an Idaho
corporation;

Defendant-Respondent.

Case No.: **CV09-0247U**

VERIFIED COMPLAINT/PETITION FOR
APPOINTMENT OF A RECIEVER FOR AIA
SERVICES CORPORATION AND ITS
WHOLLY OWNED SUBSIDIARY AIA
INSURANCE

Fee Category G-3; Fee: $88.00

Plaintiff-Petitioner Donna J. Taylor ("Donna Taylor"), by and through her attorneys of
record, Campbell, Bissell & Kirby, PLLC, moves for the appointment of a receiver pursuant to
I.C. § 8-601, et seq., and/or the common law:

## I.   FACTUAL BACKGROUND

1.      Plaintiff-Petitioner Donna J. Taylor is a resident of Clarkston, Asotin County,
Washington.

2.      Defendant-Respondent AIA Services Corporation ("AIA Services"), a closely
held Idaho corporation, with its principal place of business located in Lewiston, Nez Perce
County, Idaho.  AIA Insurance, Inc. ("AIA Insurance") is a wholly owned subsidiary of AIA
Services, with its principal place of business being located in Lewiston, Nez Perce County,

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 1

EXHIBIT "FF"

Idaho.

3.      Jurisdiction and venue are appropriate in the Second Judicial District of Nez Perce County District Court in Nez Perce County, Idaho as AIA Services is an Idaho corporation with its principal place of business located in Lewiston, Nez Perce County, Idaho.

4.      Donna Taylor is the sole Series A Preferred Shareholder in AIA Services.  Donna Taylor is also the beneficial owner of one-half of the 18,593 common shares in AIA Services owned by the estate of Sara Taylor.[1]

5.      Under the terms of AIA Services' Amended Articles of Incorporation, the Amended Articles may not be further amended or modified without the express written consent of the majority holders of the Series A Preferred Shares in AIA Services; and Donna Taylor, the sole Series A Preferred Shareholder, has never provided such consent.

6.      Under the terms of AIA Services' Amended Articles of Incorporation, Donna Taylor is required to be a member of the board of directors of AIA Services until all of her shares are redeemed.  Despite demands by Donna Taylor's law firm, she has not been appointed to the board of AIA Services for years.

7.      Under the terms of certain letter agreements and/or the Series A Preferred Shareholder Agreement, Donna Taylor was required to have all of her preferred shares in AIA Services redeemed no later than 2004.  Donna Taylor is presently owed over $430,000 for the Series A Preferred Shares held by her in AIA Services, which such amount should have been paid in full and was required to be paid in full in or before 2004.

8.      From 1995 to the present, R. John Taylor ("John Taylor"), James Beck, Michael Cashman, Connie Taylor, JoLee Duclos, Bryan Freemen and/or other individuals (collectively "Responsible Individuals") have engaged in unlawful acts utilizing the assets, trade secrets,

---

[1] Reed Taylor is the beneficial owner of the other one-half of the common shares.

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 2

business opportunities, funds, employees and other assets of AIA Services and AIA Insurance for the benefit of themselves and entities in which they hold substantial ownership interests.

9. Under the terms of AIA Services' Amended Articles of Incorporation, AIA Services and its subsidiaries may not make or guarantee any loans to any entities not controlled by them. By and through John Taylor and the Responsible Parties, AIA Insurance guaranteed a $15,000,000 line-of-credit for CropUSA Insurance Agency, Inc. ("CropUSA") without receiving any compensation or benefit and in violation of AIA Services' Amended Articles of Incorporation. John Taylor and the Responsible Individuals are the majority shareholders in CropUSA.

10. Under the terms of AIA Services and AIA Insurance's Amended Bylaws, the corporations' boards of directors are required to hold annual shareholder meetings to elect board members. AIA Services and AIA Insurance have not held annual shareholder meetings to elect directors for over five years.

11. For over five years, the purported board of directors and officers of AIA Services has failed to provide any financial information to AIA Services' shareholders.

12. John Taylor, Connie Taylor, and James Beck are the purported board members of AIA Services and AIA Insurance and have been the purported board members since 2007. John Taylor has been a purported board member of AIA Services for many years (including, without limitation, from 1995 to the present time). Any references to actions taken by them as board members does not constitute Donna Taylor's waiver that they have never been properly elected as board members of AIA Services or AIA Insurance.

13. John Taylor has been a member of the board of Avista Corporation since 1985. John Taylor obtained this position by and through his employment with AIA Services. John

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 3

Taylor is also an attorney licensed to practice law in the state of Idaho and he has been licensed as an attorney in the state of Idaho for over 20 years. John Taylor also has an accounting degree and briefly worked as an accountant. As a result, John Taylor is well versed with the law and the fiduciary duties owed to a corporation and its shareholders. John Taylor has intentionally breached his fiduciary duties to AIA Services, AIA Insurance and their shareholders. In his Avista Corporation bio on the corporation's website, John Taylor admits that he formed CropUSA and that he is Chairman of the Board of Pacific Empire Radio Corporation.

14. Connie Taylor is also an attorney licensed to practice law in the state of Idaho and she has been licensed in Idaho for over fifteen years. As a result, like John Taylor, Connie Taylor is well versed with the law and fiduciary duties owed to corporations and their shareholders. Connie Taylor, like John Taylor, has intentionally breached her fiduciary duties owed to AIA Services, AIA Insurance and their shareholders.

15. By the admission of John Taylor and other Responsible Individuals, AIA Services has not held annual shareholder meetings for over five years.

16. From 1995 to the present time, John Taylor and the Responsible Individuals have engaged in many acts that have violated the conflict of interest provisions set forth in AIA Services' Amended Articles of Incorporation and Amended Bylaws.

17. From 1995 to the present time, AIA Services and/or AIA Insurance have invested and lent hundreds of thousands of dollars to Pacific Empire Radio and Pacific Empire Communications, entities partially owned by John Taylor and Connie Taylor. All such loans were in violation of AIA Services' Amended Articles of Incorporation. AIA Services and/or AIA Insurance also invested hundreds of thousands of dollars in Pacific Empire Radio and Pacific Empire Communications and all such shares have been transferred to John Taylor and

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 4

Connie Taylor. Even if the shares had not been transferred to John Taylor and Connie Taylor, the investments and loans were not in the best interests of AIA Services and AIA Insurance.

18.    In 1995, John Taylor entered into an Executive Officer's Agreement with AIA Services after redeeming Reed Taylor's shares. Under the terms of the Executive Officer's Agreement, John Taylor was prohibited from operating any businesses that competed with AIA Services (selling insurance products) and from soliciting any employees from AIA Services and AIA Insurance, among other obligations. John Taylor has intentionally breached the terms of the Executive Officer's Agreement to the detriment of AIA Services and AIA Insurance.

19.    From 1995 to the present time, John Taylor has paid himself and Connie Taylor millions of dollars in funds, assets, benefits and compensation from AIA Services and AIA Insurance, including, without limitation, during times in which John Taylor was intentionally breaching his Executive Officer's Agreement and fiduciary duties owed to AIA Services and AIA Insurance, among other obligations and the commission of torts.

20.    From 1995 to the present time, John Taylor and Responsible Individuals have redeemed over $650,000 in common shares when Donna Taylor's Preferred A Shares had priority over such shares and when such funds should have been paid to redeem Donna Taylor's Preferred A Shares or otherwise be used for the benefit of AIA Services.

21.    From 1995 through 1997, John Taylor and Responsible Individuals paid over $650,000 in dividends to Series C Preferred Shares when Donna Taylor's Preferred A Shares had priority over such shares and when paying such dividends were not in the best interests of AIA Services.

22.    In 1999, John Taylor formed CropUSA. At that time, CropUSA was called "AIA Crop Insurance, Inc." However, AIA Crop Insurance's name was later changed to CropUSA.

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 5

CropUSA executed a board resolution stating that AIA Services has declined to continue operating CropUSA as a subsidiary, even though there are no such resolutions in the board meeting minutes or resolutions for AIA Services or AIA Insurance.

23. John Taylor advised Donna Taylor and others that CropUSA was a subsidiary of AIA Services and/or AIA Insurance. Despite being formed and operated using AIA Services and AIA Insurance's funds, assets, trade secrets, employees and other assets, CropUSA is majority owned by John Taylor and the Responsible Individuals. AIA Services and AIA Insurance have never owned any shares in CropUSA according to the corporation's stock register and John Taylor's testimony. Forming, operating and making the ownership of CropUSA in the name of John Taylor, the Responsible Individuals and other persons was not in the best interest of AIA Services and AIA Insurance and also violated AIA Services Amended Articles of Incorporation, AIA Services' Amended Bylaws, John Taylor's Executive Officer's Agreement, the corporate opportunity doctrine, and the law. John Taylor represented to certain individuals (including Donna Taylor) that CropUSA was owned by AIA, despite the evidence that AIA never owned any shares or part of CropUSA.

24. AIA Services and/or AIA Insurance formed and operated Growers National at significant expense to AIA Services and/or AIA Insurance for the purpose of selling crop insurance. Through AIA Services and AIA Insurance's efforts, Growers National obtained the right from the U.S. government to offer dividends to members for the sale of crop insurance. Growers National was formed and operated using AIA Insurance's funds and significant contractual relations with various growers associations and co-ops. Despite these facts, the contract with Growers National was with CropUSA and not AIA Services or AIA Insurance.

///

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 6

25. In 2004, John Taylor and the Responsible Individuals inappropriately transferred $1,510,693 to CropUSA, which such transaction was called a "stock redemption" by John Taylor (and which John Taylor advised AIA's CFO the shares should be canceled), although he later referred to the transaction as an "investment." Even today, AIA Insurance represents the value of its alleged investment in AIA Services (its parent corporation) as being worth $1,510,693 against the recommendation of AIA Insurance's auditors. The true worthless value of the Preferred C Shares held by AIA Insurance after the purported "investment" is demonstrated by the fact that the full value of the $1,510,693 alleged investment is eliminated on AIA Services' consolidated financial statements.

26. In 2001, John Taylor and the Responsible Individuals issued hundreds of thousands of common shares in AIA Services to certain Responsible Individuals and others when they had not complied with their contractual obligations to guarantee a $1,000,000 loan for AIA Services (which was the consideration to be awarded the right to acquire the shares in the first place). In addition, John Taylor and the Responsible Individuals engaged in inappropriate acts of converting certain Responsible Individuals and other parties' Series C Preferred Shares in AIA Services into commons shares of CropUSA without shareholder approval or consent. John Taylor, through written letters, referred to this transaction as an "exit strategy" for certain Responsible Individuals and other investors in AIA Services who received preferential treatment to the detriment of AIA Services, its shareholders and its creditors.

27. In 2001, John Taylor and Connie Taylor purchased a parking lot that was located near AIA Insurance's offices using AIA Insurance's line-of-credit. Shortly after purchasing the parking lot, John Taylor substantially increased the rent paid for the parking lot to $15,000 per year when such rent was not in the best interests of the corporations and a violation of AIA

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 7

Services' Bylaws and fiduciary obligations owed by John Taylor and Connie Taylor to AIA Services and AIA Insurance. The yearly rent of $15,000 exceeded the purchase price paid for the parking lot. The parking lot should have been purchased by AIA Services or AIA Insurance and no rent paid. Instead, John Taylor and/or Connie Taylor have received over $60,000 in rent for a parking lot that should be owned by AIA Services or AIA Insurance and when such funds should have been used to pay creditors and preferred shareholders.

28. In 2005, John Taylor and certain Responsible Individuals issued John Taylor 450,000 shares of common stock in AIA Services pursuant to John Taylor's Executive Officer's Agreement, which was the same agreement that John Taylor had not complied with his contractual obligations owed to AIA Services, including, without limitation, John Taylor's obligation to not compete with AIA or to solicit any of its employees.

29. John Taylor and certain Responsible Individuals also issued hundreds of thousands of dollars in Series C Preferred Shares in AIA Services to its 401(k) plan. John Taylor and the Responsible Individuals transferred $1,510,693 to CropUSA to redeem/purchase Series C Preferred Shares when they were obligated under AIA Services' Amended Articles of Incorporation to equally purchase/redeem from all shareholders holding Series C Preferred Shares in AIA Services. John Taylor admitted that the $1,510,693 was transferred to CropUSA because the corporation badly needed capital, even though he also testified that AIA Services and AIA Insurance had never owned any shares in CropUSA.

30. In 2008, CropUSA sold assets for $10,000,000. AIA Services and AIA Insurance did not receive a single dollar from this asset sale. Instead and in addition, John Taylor received $10,000 per month for a purported consulting agreement/non-compete agreement with Hudson Insurance (the buyer of the $10,000,000 in assets from CropUSA), which such funds should have

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 8

been paid by John Taylor to AIA Services and/or AIA Insurance for the benefit of the corporations and their creditors and shareholders.

31.     On November 16, 2009, the Lewiston Tribune published a list of parties who had failed to pay property taxes for the year 2006. Included in the list were multiple entries of unpaid taxes owed by AIA Insurance totaling over $55,000. Under the terms of AIA Insurance's lease of the premises known as the Lewis-Clark Plaza, AIA Insurance is contractually obligated to timely and fully pay all property taxes on the Lewis-Clark Plaza. The mortgage on the Lewis-Clark Plaza was obtained by AIA Services from litigation funded by AIA Insurance involving AIA Services' former subsidiary The Universe. The failure to pay property taxes impacts the value of the Lewis-Clark Mortgage and results in a default in AIA Insurance's lease with Washington Bank Properties for premises located at the Lewis-Clark Plaza. AIA Services and AIA Insurance have not paid property taxes from 2006 to the present time in an amount believed to exceed $150,000.

32.     From its incorporation in 2000, through the present time, CropUSA was funded and operated using AIA Services and/or AIA Insurance's funds, employees, trade secrets, contractual relationships with various growers associations and co-ops, office space, equipment and other assets; and AIA Services and AIA Insurance have never been paid a profit or interest for all such loans and the use of such assets and millions of dollars of funds and unallocated expenses borne by AIA Services/AIA Insurance have not been paid back to the corporations. AIA Services and AIA Insurance have paid, and not been reimbursed for, hundreds of thousands of dollars, if not millions of dollars, in unallocated expenses paid for CropUSA for which AIA Services and AIA Insurance have not been reimbursed and will likely never be reimbursed

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 9

because significant amounts of such expenses were never allocated and charged to CropUSA.[2]

33. In 2008, John Taylor sold Pacific Empire Holdings to CropUSA for $240,000. Pacific Empire Holdings[3] was formed and operated using AIA Services and/or AIA Insurance's funds, employees, office space, trade secrets and other assets to sell general insurance policies. Like other corporations formed by John Taylor such as CropUSA, John Taylor was prohibited from operating businesses that sold insurance products under his Executive Officer's Agreement. However, such obligations did not stop John Taylor and when Pacific Empire Holdings was sold, no funds or benefit was given to AIA Services or AIA Insurance, despite the corporation being derived from AIA.

34. On July 21, 2008, Donna Taylor served a derivative demand upon the purported boards of AIA Services and AIA Insurance demanding for the corporations to take action. Despite her derivative demand letter, John Taylor and the Responsible Individuals have failed to take any action and have instead taken specific action in protecting their own individual interests instead of protecting the interests of the AIA corporations, their creditors and their shareholders.

35. AIA Services and AIA Insurance's only substantial businesses are comprised of running off commissions and servicing insurance policies issued and/or sold over 10 years ago, and John Taylor admitted that AIA's ability to sell proprietary insurance products had ended many years ago. Thus, instead of rightfully using the corporate opportunity to sell crop insurance through AIA Services and AIA Insurance as represented to Donna Taylor and others and in business plans, the corporate opportunity to sell crop insurance was inappropriately given

---

[2] In all of the millions of dollars of funds and expenses paid for CropUSA by AIA Services and/or AIA Insurance which was purportedly repaid by CropUSA, John Taylor and the Responsible Individuals never charged any interest, profit or overhead to benefit AIA Services and/or AIA Insurance for such loans and advanced funds/services.
[3] To clarify, Pacific Empire Holdings was a different corporation from Pacific Empire Radio and Pacific Empire Communications (which are also discussed in this Complaint), with the latter two corporations owning radio station assets (some of which were derived from AIA such as KATW FM in Lewiston).

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 10

to CropUSA, an entity not partially or wholly owned by AIA Services or AIA Insurance, to the detriment of the AIA corporations, their creditors and their shareholders.

36.    John Taylor has borrowed over $307,000 from AIA Services and/or AIA Insurance for his and Connie Taylor's benefit and such indebtedness has not been paid to AIA Services and/or AIA Insurance.  John Taylor and Connie Taylor have done nothing to secure this obligation or take action to the benefit of AIA Services for this $307,000+ debt, let alone make any interest payments or even permit interest to accrue on such debt.

37.    During relevant times, John Taylor has been paid over $2,500,000 in compensation for doing little, if anything at all, for the benefit of AIA Services and AIA Insurance, while he transferred and misappropriated millions of dollars of AIA Services and AIA Insurance's assets, funds, trade secrets, business opportunities, loan guarantees, employees and other assets to his benefit and to the determinant of AIA Services and AIA Insurance's shareholders and creditors.  John Taylor has been a faithless fiduciary.

38.    Since John Taylor and the Responsible Individuals have been and are in control of AIA Services and AIA Insurance, they have failed to take legal action against John Taylor for the sums owed by him, for John Taylor's breaches of his Executive Officer's Agreement with AIA Services, and for the torts that John Taylor and the Responsible Individuals have committed against AIA Services, AIA Insurance and their shareholders.

39.    Over the course of the past 8 years, John Taylor has utilized funds from AIA Services and/or AIA Insurance to purchase vehicles from him for his benefit and to the determinant of AIA Services, AIA Insurance, their shareholders and their creditors.

40.    From 2007 to the present time, John Taylor and the Responsible Individuals have permitted AIA Services and AIA Insurance to pay directors $20,000 per year to serve on the

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 11

boards of AIA Services and AIA Insurance when such directors have not complied with the corporations' Articles of Incorporation, Bylaws, conflict of interest laws, fiduciary duties and the law (including, without limitation, failing to hold annual shareholder meetings for the common shareholders to elect directors and failing to appoint Donna Taylor or her representative to the board of AIA Services as required under the Amended Articles of Incorporation). These directors are being paid $20,000 per year to look after their own interests and to ignore their fiduciary obligations owed to AIA Services, AIA Insurance, their creditors and their shareholders.

41. From 1995 to the present, John Taylor has utilized AIA Services and/or AIA Insurance's employees, without compensation or payment to AIA Services/AIA Insurance, to perform services for his and Connie Taylor's residences and properties and other entities owned by John Taylor and the Responsible Individuals (including CropUSA, Pacific Empire Radio, Pacific Empire Communications, and Radio Leasing).

42. From 1995 to the present time, John Taylor and/or JoLee Duclos have been the trustees of AIA Services' 401(k) plan to the detriment of the plan participants who hold shares in AIA Services in the plan. John Taylor and JoLee Duclos have failed in their duties to the 401(k) plan.

43. From 1995 to the present, John Taylor and the Responsible Individuals have misappropriated millions of dollars of funds and assets belonging to AIA Services and AIA Insurance. AIA Services and AIA Insurance have not and are not paying their debts as they become due. AIA Services is insolvent by way of the acts of John Taylor and the Responsible Individuals or in imminent danger of insolvency. AIA Insurance is also insolvent by way of the acts of John Taylor and the Responsible Individuals or in imminent danger of insolvency.

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 12

**2-ER-331**

44. From 1995 to the present time, John Taylor and the Responsible Individuals have entered into millions of dollars of loans, transactions, advancing of funds, payment of expenses for non-AIA persons and entities, and other transactions or business arrangements which were not arms-length transactions, not in the best interests of AIA Services or AIA Insurance, and which did not provide any benefit or profit for AIA Services or AIA Insurance.

45. All of the acts referenced above are not the sole acts subjecting John Taylor and the Responsible Individuals to liability or which supports the appointment of a receiver for AIA Services. All of the acts referenced above were not in the best interest of AIA Services and/or its wholly owned subsidiary AIA Insurance and were not in the best interests of the preferred and common shareholders of AIA Services and its creditors. All of the acts referenced above have been taken to benefit John Taylor and/or the Responsible Individuals, to the detriment of, and not in the best interests of AIA Services, AIA Insurance, their shareholders and their creditors. John Taylor and the Responsible Individuals have not operated AIA Services and AIA Insurance as corporate entities, but instead as their alter-egos and for their own personal benefit and gain. All of the above-referenced acts and/or omissions constitute John Taylor and the Responsible Individuals' intentional breaches of fiduciary duties, fraud, conversion, and breach of obligations owed to AIA Services and/or AIA Insurance and/or the commission of torts against AIA Services, AIA Insurance, their creditors and their shareholders.

46. As a result of the above-referenced acts and/or omissions, it appears unlikely that Donna Taylor or any other preferred shareholders and creditors of AIA Services would receive the funds owed to them unless a receiver is appointed to safeguard the corporation's assets and appropriate and warranted legal action is successfully prosecuted against John Taylor, the Responsible Individuals and other persons and entities.

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 13

47. As a result of the above-referenced acts and/or omissions, a receiver should be appointed to safeguard AIA Services' assets, businesses and revenues, while ensuring that the interests of creditors and shareholders are also safeguarded and any distributions are only made to the appropriate parties as contractually or legally required and/or after obtaining any required consent and/or court order.

## II.   PRAYER FOR RELIEF

WHEREFORE, Donna Taylor prays for the following relief:

1. For an order finding that AIA Services is insolvent or in imminent danger of insolvency pursuant to I.C. § 8-601(5);

2. For an order finding (in addition or in the alternative) the appointment of a receiver for AIA Services is warranted, based upon all of the acts of malfeasance, breaches of fiduciary duties, torts and other conflicted and/or inappropriate acts set forth above, pursuant to common law and/or I.C. § 8-601(6);

3. For an order appointing a receiver for AIA Services pursuant to I.C. § 8-601, *et seq.*, and/or under the common law;

4. For an order granting the receiver appointed for AIA Services the power and authority to do the following, including, without limitation: (1) control and operate AIA Services and its subsidiaries (including AIA Insurance), (2) to collect sums owed to AIA Services and AIA Insurance, (3) to administer and service AIA Insurance's few remaining insurance policies, (4) to pay AIA Services and AIA Insurance's bona-fide debts, (5) to marshal AIA Services and AIA Insurance's assets, (6) to pursue new business interests for AIA Insurance and AIA Services, (7) to protect, negotiate and extend AIA Insurance's contracts with growers associations, co-ops and insurance companies (including Trustmark), (8) to pursue causes of

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 14

**2-ER-333**

action against the appropriate persons and entities[4] and/or (9) be granted all other powers authorized under I.C. § 8-601, *et seq.*, and/or the common law;

5.      For a preliminary injunction ordering AIA Services to appoint Donna Taylor or a representative of her choice to the board of AIA Services pending the appointment of a receiver and to bar AIA Services and its subsidiary AIA Insurance from: (1) transferring assets; (2) loaning money to John Taylor, the Responsible Individuals, CropUSA, Pacific Empire Radio and/or any other person or entity; (3) paying Connie Taylor, James Beck or any other person $20,000 or any other compensation for purportedly serving on the board of AIA Services or its subsidiary AIA Insurance; (4) failing to comply with all applicable Bylaws, Articles of Incorporation, and laws are complied with by AIA Services and AIA Insurance's purported boards of directors (including, without limitation, all provisions and laws dealing with conflicts of interest; (5) failing to provide financial information and specific details of all claims and lawsuits to all shareholders at least quarterly or when necessary; and (6) such other action as is required from time to time as deemed in the best interest of AIA Services and/or its wholly owned subsidiary AIA Insurance; and

6.      For such other relief as may be sought at or before hearing by Donna Taylor that the Court deems just and equitable.

DATED this 23rd day of November, 2009.

CAMPBELL, BISSELL & KIRBY, PLLC

By:_____
        Roderick C. Bond
        Michael S. Bissell
        Attorneys for Donna Taylor

---

[4] Donna Taylor, through other counsel, will be pursing derivative claims against many persons and entities, including, John Taylor and the Responsible Individuals. In her Complaint, she will request that all funds and assets recovered, less attorneys' fees and costs, be paid to the receiver appointed for AIA Services.

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 15

## VERIFICATION

STATE OF WASHINGTON    )
                                  ) ss.

COUNTY OF ASOTIN         )

I, Donna J. Taylor, being first duly sworn on oath, deposes and says:

I am the Plaintiff-Petitioner in the above-entitled action. I have read the contents of this Complaint/Petition, know the contents of this Complaint/Petition, and believe that the facts in set forth in this Complaint/Petition are true and accurate to the best of my knowledge and belief.

_____
Donna J. Taylor

SUBSCRIBED AND SWORN to before me this 23rd day of November, 2009.

_____
Notary Public for Washington
Residing at: _Clarkston, WA_
My commission expires: _2/28/2011_

COMPLAINT/PETITION FOR APPOINTMENT OF A RECEIVER - 16

Robert A. Faucher (ISB # 4745)
B. Newal Squyres (ISB # 1621)
A. Dean Bennett (ISB # 7735)
HOLLAND & HART LLP
101 South Capitol Blvd., Suite 1400
P.O. Box 2527
Boise, Idaho  83701-2527
Telephone:   (208) 342-5000
Facsimile:   (208) 343-8869
E-mail:  rfaucher@hollandhart.com
         nsquyres@hollandhart.com
         adbennett@hollandhart.com

Attorneys for Defendants Hudson Insurance Company and Kent Petersen

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| DONNA J. TAYLOR and DALE MIESEN, as shareholders who are bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,<br><br>                Plaintiffs,<br>v.<br><br>HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; RICHARD A. RILEY, an individual; D. JOHN ASHBY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; KENT PETERSEN, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation; HUDSON INSURANCE GROUP; a Delaware corporation; and GROWERS NATIONAL COOPERATIVE INSURANCE AGENCY, an Idaho corporation,<br><br>                Defendants. | Case No. 10-cv-00404-LMB<br><br>**MEMORANDUM IN SUPPORT OF THE HUDSON DEFENDANTS' MOTION TO DISMISS** |

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................1

II.   SUMMARY OF FACTS AND PROCEDURAL HISTORY ...................................2

III.  SUMMARY OF ARGUMENT .............................................................................3

     A.   Donna's Written Demand is Insufficient Under Idaho Law. ...........................3

     B.   Donna Lacks Standing Because She Cannot Fairly Represent AIA Services...................4

     C.   Miesen's Allegation of Demand Futility is Insufficient Under Idaho Law......................4

     D.   Plaintiffs Fail to State Non-RICO Claims Upon Which Relief can be Granted. ..............4

     E.   Plaintiffs Fail to State RICO Claims Upon Which Relief can be Granted.......................4

IV.  STANDARD ON RULE 12(B)(6) MOTION TO DISMISS ...................................5

V.   ARGUMENT........................................................................................................5

     A.   State Substantive Law Controls Who Can Assert a Shareholder Derivative Action. .....................................................................................................5

         1.   Donna's Demand is Plainly Insufficient Because it Does not Name the Hudson Defendants or Describe the Factual Basis of any Alleged Wrongdoing by the Hudson Defendants. ...................................................5

             a.   Idaho's Derivative Action Demand Requirements. ...........................5

             b.   Donna's Written Demand Fails Under Idaho Law. ...........................6

         2.   Donna Lacks Standing to Assert this Derivative Action Because she Cannot Fairly and Adequately Represent the Interests of the Corporation. ..........................9

         3.   Miesen Cannot Rely on Donna's Demand and his Assertion of Demand Futility is Properly Rejected.......................................................9

             a.   Miesen Cannot Rely on Donna's Demand........................................9

             b.   Miesen's Allegation of Demand Futility is Properly Rejected. ........10

         4.   The Failure to Make a Demand Requires Dismissal with Prejudice of All of Plaintiffs' Claims Against the Hudson Defendants...................................11

     B.   Plaintiffs' Non-RICO Claims Must be Dismissed Because Plaintiffs Fail to Plead Allegations Upon Which Relief Can be Granted. .................................12

         1.   Fifth Cause of Action – Tortious Interference With Contractual Relationships/Business Expectancies.......................................................13

             a.   Plaintiffs Fail to Plead Tortious Interference With Contract. ..........13

b.    Plaintiffs Fail to Plead Intentional Interference With a Prospective Economic Advantage. ..............................................................................13

2.    Eighth Cause of Action–Fraud/Fraudulent Concealment/Constructive Fraud....................................................................................................14

3.    Ninth Cause of Action – Aiding and Abetting Fraud...............................15

C.    Plaintiffs' RICO Claims  Must be Dismissed Because Plaintiffs Fail to Plead Allegations Upon Which Relief Under RICO Can Be Granted. .....................................15

1.    Plaintiffs' Allegations Lack the Required Specificity..............................16

2.    Plaintiffs' Alleged "RICO Enterprise" is Also a Corporate Defendant. ..................17

3.    Plaintiffs Fail to Allege a Pattern of Racketeering Activity....................17

4.    Plaintiffs Fail to Allege Continuity. .......................................................18

D.    Plaintiffs' Non-RICO and RICO Claims Should be Dismissed With Prejudice.............19

VI.  CONCLUSION................................................................................................................20

## TABLE OF CASES

### FEDERAL CASES

*Aikens v. U.S. Transformer, Inc.*, No. CV-07-138-E-EJL-LMB, 2008 WL 695021
(D. Idaho Mar. 11, 2008) ............................................................................................18

*Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388 (9th Cir. 1989) ..........................16

*Allison on Behalf of Gen. Motors Corp. v. Gen. Motors Corp.*, 604 F. Supp. 1106
(D.C. Del. 1985) .............................................................................................................6

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................................................5, 12

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) ........................................................5, 12

*Bennett v. U.S. Trust Co. of N.Y.*, 770 F.2d 308 (2d Cir. 1985) .....................................17

*Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612 (S.D.N.Y. 2006) .........................15

*Foman v. Davis*, 371 U.S. 178 (1962) ...........................................................................19

*Galef v. Alexander*, 615 F.2d 51 (2d Cir. 1980) ...........................................................11

*Grossman v. Johnson*, 89 F.R.D. 656 (D. Mass. 1981) .................................................11

*Guenther v. Pac. Telecom, Inc.*, 123 F.R.D. 341 (D. Ore. 1987) ....................................9

*H.J. Inc. v. Nw. Bell Telegraph Co.*, 492 U.S. 229 (1989) ............................................18

*Halprin v. Babbitt*, 303 F.2d 138 (1st Cir. 1962) ........................................................7, 8

*Holder v. Holder*, 305 F.3d 854 (9th Cir. 2002) .............................................................1

*Howard v. Am. Online Inc.*, 208 F.3d 741 (9th Cir. 2000) ......................................17, 18

*In re Sapient Corp. Derivative Litig.*, 555 F. Supp. 2d 259 (D. Mass. 2008) ...............11

*In Re: Section 16(b) Litig.*, 602 F. Supp. 2d 1202 (W.D. Wash. 2009) .....................8, 10

*In re Silicon Graphics Inc. Secs. Litig.*, 183 F.3d 970 (9th Cir. 1999) .........................11

*J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815 (7th Cir. 1991) ......................20

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991) ..................................................5

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) ...........................................14

**2-ER-339**

*Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397 (9th Cir. 1991) ...............16

*Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531 (9th Cir. 1989)............................................14

*Noll v. Peterson*, No. Civ. 01-02-N-EJL, 2001 WL 721733 (D. Idaho May 14, 2001) ................15

*Potter v. Hughes*, 546 F.3d 1051 (9th Cir. 2008) ................................................6, 8, 9, 10

*Renfro v. F.D.I.C.*, 773 F.2d 657 (5th Cir. 1985) ........................................................................8

*Rouser v. White*, 630 F. Supp. 2d 1165 (E.D. Cal. 2009) ..............................................................1

*Saine v. A.I.A., Inc.*, 582 F. Supp. 1299 (D. Colo. 1984).....................................................16, 18, 20

*Schreiber Distrib. Co. v. Serv-Well Furn. Co., Inc.*, 806 F.2d 1393 (9th Cir. 1986).....................18

*Sever v. Alaska Pulp Corp.*, 978 F.2d 1529 (9th Cir. 1992) ...........................................................17

*Shlensky v. Dorsey*, 574 F.2d 131 (3rd Cir. 1978).........................................................7, 8, 11, 12

*Smachlo v. Birkelo*, 576 F. Supp. 1439 (D.C. Del. 1983)..............................................................11

*Sorosky v. Burroughs Corp.*, 826 F.2d 794 (9th Cir. 1987)............................................................19

*Sun Savings and Loan Ass'n v. Dierdorff*, 825 F.2d 187 (9th Cir. 1987) ......................................15

*Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007) ...............................................................3, 14

*Telesaurus VPC, LLC v. Power*, ___ F.3d ___, 2010 WL 3928945 (9th Cir. 2010)...............19, 20

*United Energy Owners Comm., Inc. v. U.S. Energy Mgmt. Sys., Inc.*, 837 F.2d 356 (9th Cir. 1988) ..............................................................................................................17

*Weisbuch v. County of Los Angeles*, 119 F.3d 778 (9th Cir. 1997) .........................................5, 17

## FEDERAL RULES

Federal Rule of Civil Procedure 23.1 ...........................................................................5, 6, 10, 11

Federal Rule of Civil Procedure 8 .........................................................................................4

Federal Rule of Civil Procedure 9(b).............................................................................4, 14, 15, 16

## STATE CASES

*Ass'n of Commonwealth Claimants v. Hake*, 2 Neb. App. 123, 507 N.W.2d 665 (Ct. App. 1993) ........................................................................................................6

*Cantwell v. City of Boise*, 146 Idaho 127, 191 P.3d 205 (2008)....................................14

*Johnston v. Box*, 903 N.E.2d 1115 (Mass. 2009)..........................................................11

*Mannos v. Moss*, 143 Idaho 927, 155 P.3d 1166 (2007) ..............................................10

*McCann v. McCann*, 138 Idaho 228, 61 P.3d 585 (2002) ..............................6, 7, 8, 9, 10

*New Crawford Valley, Ltd. v. Benedict*, 847 P.2d 642 (Colo. App. 1993) ......................9

*Orrock v. Appleton*, 147 Idaho 613, 213 P.3d 398 (2009)...............................................6

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) ..............................................................11

*Taylor v. McNichols*, ___ Idaho ___, 2010 WL 3448851 (Sept. 3, 2010).................2, 9

*Wesco Autobody Supply, Inc. v. Ernest,* ___ Idaho ___, 2010 WL 2927078 (July 28, 2010) ..............................................................................................13, 14

*Witt v. Jones*, 111 Idaho 165, 722 P.2d 474 (1986) ......................................................15

## STATE STATUTES

Idaho Code § 30-1-741 ................................................................................................5, 9

Idaho Code § 30-1-742 ....................................................................................................5

## SECONDARY SOURCES

19 Am. Jur. 2d Corporations § 2277 (1986) ................................................................5, 6

3B Moore's Federal Practice pp. 23.1-81 to 23.1-82 (2d ed. 1977) .................................7

13 William M. Fletcher et al., Cyclopedia of the Law of Private Corporations § 5968 (rev. perm. ed. 1991)..................................................................................................6

7C Wright Miller and Kane, Federal Practice and Procedure § 1831 (3d ed. 2007) .......5

Defendants Hudson Insurance Company ("Hudson")[1] and Kent Petersen ("Petersen," or together "the Hudson Defendants"), through their attorneys, Holland & Hart LLP, respectfully submit this memorandum in support of their motion to dismiss.

## I.    INTRODUCTION

The Hudson Defendants are innocent bystanders in a legal grudge match that Reed Taylor and his ex-wife Donna have launched against Reed's brother John Taylor; John's ex-wife Connie; John's business associates; companies of which John has some measure of control; and the companies' attorneys.  This is the *seventh* lawsuit filed by Reed or Donna in the last four years arising out of the same basic fact pattern.  Having failed so far to obtain their pound of flesh in the Idaho state court system against the other nine defendants, Plaintiffs now attempt to drag the Hudson Defendants and Growers National Cooperative Insurance Agency into this morass through this action styled as a shareholder derivative lawsuit with jurisdiction based on a frivolous RICO claim.

The Hudson Defendants anticipate that the other defendants will ask the Court to dismiss or abstain from taking up this litigation because of the pending state court actions.[2]  The Hudson Defendants, however, respectfully request this Court dismiss the claims against them with prejudice because Plaintiffs failed to make an adequate demand as required under Idaho law. The Hudson Defendants also seek dismissal with prejudice because Plaintiffs assert no discernable legal claim against them and leave to amend the Complaint to "fix" the deficiencies would be futile.  The facts underlying the Complaint have now been pled in seven cases.  And the complaints in many of the cases have been amended numerous times.  Plaintiffs have had

---

[1] Hudson is misnamed in the Complaint as "Hudson Insurance Group."

[2] "Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Dunn v. Castro*, --- F.3d ----, 2010 WL 3547637, at *8 n.6 (9th Cir. 2010).  And "[a] court may take judicial notice of orders and filings in another court."  *Rouser v. White*, 630 F. Supp. 2d 1165, 1171 n.1 (E.D. Cal. 2009) (citing *Holder v. Holder*, 305 F.3d 854, 866 (9th Cir. 2002)).  To the extent the Court does not dismiss the Hudson Defendants based on the arguments herein, the Hudson Defendants join the abstention arguments raised by the other defendants.

MEMORANDUM IN SUPPORT OF THE HUDSON DEFENDANTS' MOTION TO DISMISS - 1

more than ten bites at the apple.  They are not entitled to another.  The Hudson Defendants have no business being the subject of Reed's and Donna's personal vendetta.

## II.    SUMMARY OF FACTS AND PROCEDURAL HISTORY

Given this Court's strict briefing page limit, the Hudson Defendants will not attempt to summarize the epic legal battle waged by Reed and Donna against Reed's brother John.  The Hudson Defendants believe that the other defendants will provide much of this background to the Court as part of their pre-answer motions.  Also, some of the background is available in *Taylor v. McNichols*, ___ Idaho ___, 2010 WL 3448851 (Sept. 3, 2010) (the "Reported Decision").  The Hudson Defendants will focus on those particular factual matters relevant to their motion.

This lawsuit is ostensibly a derivative action brought by Plaintiffs Donna Taylor and Dale Miesen on behalf of AIA Services Corporation ("AIA Services") and its wholly-owned subsidiary AIA Insurance, Inc. ("AIA Insurance," and, together with AIA Services, the "Companies").  One of the Complaint's key allegations is that John Taylor and his allies improperly seized the Companies' corporate opportunity when John founded Defendant Crop USA Insurance Agency, Inc. ("Crop USA") to participate in the crop insurance business.  Plaintiffs allege that the Hudson Defendants participated in the principal defendants' wrongdoing when Hudson purchased Crop USA's assets in 2008.  As they must, the Hudson Defendants will assume for the purposes of their motion that the Complaint's factual allegations are true.

Plaintiffs' Complaint asserts the following claims against the Hudson Defendants:

| Hudson Defendant | Cause of Action |
|---|---|
| Hudson Insurance Company | 1—RICO<br>3—Aiding and Abetting Breaches of Fiduciary Duty<br>5—Tortious Interference with Contractual Relationship/<br>     Business Expectancies |
| Kent Petersen | 1—RICO<br>2—Breach of Fiduciary Duty<br>3—Aiding and Abetting Breaches of Fiduciary Duty<br>5—Tortious Interference with Contractual Relationship/<br>     Business Expectancies<br>7—Breach of Contract<br>8—Fraud/Fraudulent Concealment/Constructive Fraud |

MEMORANDUM IN SUPPORT OF THE HUDSON DEFENDANTS' MOTION TO DISMISS - 2

Reed Taylor, in his personal capacity, previously filed four lawsuits in the Idaho state court system against John Taylor or related defendants, while Reed's ex-wife Donna Taylor, in her personal capacity, previously filed two such lawsuits. Among Donna's pending lawsuits is *Donna Taylor v. AIA Services Corp.*, Case No. CV 09-2470, Second Judicial District Court, County of Nez Perce. That lawsuit is hereinafter referred to as "Donna Taylor II" and the First Amended Complaint in that lawsuit is attached hereto as Exhibit A. In Donna Taylor II, Donna sued AIA Services seeking, among other things, a judgment awarding her damages of at least $430,000. Donna Taylor II is stayed pending the outcome of other state court litigation regularly referred to by the parties as the "Underlying Case." (The Idaho Supreme Court, in the Reported Decision, also refers to that litigation as the Underlying Case.)

Recognizing that a derivative claim must rely on a preceding demand upon the corporate board, Plaintiffs rely on a July 21, 2008 demand letter (the "Demand") from Donna and her ex-husband Reed to the Companies' boards (the "Boards"). The Complaint states that the Demand is attached as an exhibit, but it is not. The Demand is attached hereto as Exhibit B and is properly considered in ruling on the Hudson Defendants' motion. *See Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) ("court may consider a writing referenced in a complaint but not explicitly incorporated therein").

Like this lawsuit, the Demand is substantially based upon the supposed diversion of the Companies' corporate opportunity in the crop insurance business to Crop USA. However, while the Demand articulates 27 factual instances of purported wrongdoing and identifies eight potential defendants, the Demand does not mention the Hudson Defendants at all. Nor does it contain a single word regarding the transaction between the Hudson Defendants and Crop USA. And the Complaint admits that co-plaintiff Dale Miesen made no demand upon the Companies.

### III.    SUMMARY OF ARGUMENT

#### A.    DONNA'S WRITTEN DEMAND IS INSUFFICIENT UNDER IDAHO LAW.

The Complaint references the Demand that Reed and Donna delivered to the Boards on July 21, 2008. Dkt. 1, ¶ 5.1. This is the only written demand on the Boards. The Demand is

MEMORANDUM IN SUPPORT OF THE HUDSON DEFENDANTS' MOTION TO DISMISS - 3

facially deficient and cannot support a derivative action against the Hudson Defendants because it fails to identify any of the Hudson Defendants as potential targets of a claim, and the allegations against the Hudson Defendants in the Complaint do not appear at all, in any form, in the Demand. *Infra* at 5-8.

**B.      DONNA LACKS STANDING BECAUSE SHE CANNOT FAIRLY REPRESENT AIA SERVICES.**

Where a shareholder files suit on her own behalf seeking to recover damages from the corporation for her own benefit, she does not have standing to bring a derivative action. Donna filed Donna Taylor II, still pending in Nez Perce County, against AIA Services seeking on her own behalf, among other relief, corporate money and assets in an amount not less than $430,000. She therefore lacks standing to pursue derivative claims in this case. *Infra* at 8-9.

**C.      MIESEN'S ALLEGATION OF DEMAND FUTILITY IS INSUFFICIENT UNDER IDAHO LAW.**

Plaintiff Dale Miesen pleads demand futility as a justification for his failure to make a written demand. But Idaho courts do not recognize the doctrine of demand futility. And Miesen cannot argue demand futility because Donna, his co-plaintiff, made a demand. *Infra* at 9-12.

**D.      PLAINTIFFS FAIL TO STATE NON-RICO CLAIMS UPON WHICH RELIEF CAN BE GRANTED.**

Plaintiffs assert a number of claims that require pleading with particularity under Rule 9(b). But Plaintiffs fail to plead those claims with particularity. Moreover, Plaintiffs' recitation of the elements of a claim, supported only by mere conclusory statements, do not suffice to meet the pleading standard of Rule 8 as set forth by the United States Supreme Court. Ignoring legal conclusions couched as factual allegations, Plaintiffs are left with no allegations to suggest any entitlement to relief against the Hudson Defendants. *Infra* at 12-15.

**E.      PLAINTIFFS FAIL TO STATE RICO CLAIMS UPON WHICH RELIEF CAN BE GRANTED.**

The legal standards applicable to determining whether civil RICO claims are sufficiently pled is distinct from those applicable to other civil claims. The necessary analysis is set forth below, and reveals, unsuprisingly, that the Complaint's RICO allegations fall far short of legal requisites. Plaintiffs' RICO claims must also be dismissed. *Infra* at 15-19.

### IV.    STANDARD ON RULE 12(b)(6) MOTION TO DISMISS

The Court is well aware of the applicable Rule 12(b) standards.  A court may dismiss under Rule 12(b)(6) in two circumstances.  First, a court may dismiss a complaint where its factual allegations establish a bar to the relief the plaintiff seeks.  *Weisbuch v. County of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997).  Second, the more familiar situation warranting dismissal occurs where "the factual allegations in [the] complaint" do not "plausibly suggest an entitlement to relief."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544, 561 (2007) .  The Hudson Defendants' motion is properly granted under both standards.

### V.    ARGUMENT

**A.    STATE SUBSTANTIVE LAW CONTROLS WHO CAN ASSERT A SHAREHOLDER DERIVATIVE ACTION.**

Since the United States Supreme Court's decision in *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90 (1991), "it has been clear that state law controls what constitutes a sufficient demand or excuse and federal Rule 23.1 speaks solely to whether plaintiff has set forth adequate allegations to meet that requirement."  *See* 7C Wright Miller and Kane, Federal Practice and Procedure § 1831 (3d ed. 2007).  Idaho Code § 30-1-741 describes who can bring a shareholder derivative action, and Idaho Code § 30-1-742 provides that a qualifying shareholder must make a written demand before bringing a derivative action.  Neither Donna nor Dale Miesen satisfies Idaho's substantive legal requirements as applied to the Hudson Defendants.  All claims against the Hudson Defendants must be dismissed.

**1.    Donna's Demand is Plainly Insufficient Because it Does not Name the Hudson Defendants or Describe the Factual Basis of any Alleged Wrongdoing by the Hudson Defendants.**

**a.    Idaho's Derivative Action Demand Requirements.**

Idaho Code § 30-1-742 states that "[n]o shareholder may commence a derivative proceeding until . . . [a] written demand has been made upon the corporation to take suitable action."  The Idaho Supreme Court has set forth the requirements of a written demand:

> Statements should be presented to the directors showing the wrong complained of, accompanied by sufficient responsible data which

MEMORANDUM IN SUPPORT OF THE HUDSON DEFENDANTS' MOTION TO DISMISS - 5

**2-ER-346**

> will enable the directors to determine whether litigation could be engaged in with some hope of success.  The shareholder must state facts, not mere general charges and conclusions.
>
> The demand should give the directors a fair opportunity to initiate the action which the shareholder wants to undertake, and name the potential defendants, as well as the shareholder making the demand.

*McCann v. McCann*, 138 Idaho 228, 234-35, 61 P.3d 585, 591-92 (2002) (quoting 19 Am. Jur. 2d Corporations § 2277, 172-73, (1986)); *see also Orrock v. Appleton*, 147 Idaho 613, 620, 213 P.3d 398, 405 (2009).

Other jurisdictions with similar demand statutes have articulated the same requirements. *See, e.g.*, *Ass'n of Commonwealth Claimants v. Hake*, 2 Neb. App. 123, 130, 507 N.W.2d 665, 669-70 (Ct. App. 1993) ("The demand notice and request should set forth the persons to be sued, and should describe all the claims which it is intended to assert.") (quoting 13 William M. Fletcher et al., Cyclopedia of the Law of Private Corporations § 5968 at 178 (rev. perm. ed. 1991)); *Allison on Behalf of Gen. Motors Corp. v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1117 (D.C. Del. 1985).

The demand requirement "is not merely a technical or unimportant requirement." *Potter v. Hughes*, 546 F.3d 1051, 1057 (9th Cir. 2008).  "[T]he general rule of American law is that the board of directors controls a corporation." *Id.*  Therefore, "strict compliance with Rule 23.1 and the applicable substantive law is necessary before a derivative suit can wrest control of an issue from the board of directors." *Id.*

### b.     Donna's Written Demand Fails Under Idaho Law.

In July 2008, Donna made her Demand on the Boards.  *See* Exhibit B attached hereto.  In the Demand she asserts 27 "claims and/or causes of action" for "violating Rules of Professional Conduct, malpractice, breach of fiduciary duties, and aiding and abetting."  Donna demanded the Boards initiate legal action against the law firms of Hawley Troxell; Clements, Brown & McNichols; Quarles & Brady; individuals R. John Taylor, Michael Cashman, James Beck, Connie Taylor, and the corporation Crop USA.  The Demand fails under Idaho law as to the Hudson Defendants because the Demand *does not even mention* Hudson or Petersen.  And none

of the "claims or causes of action" asserted in the Demand identify the factual allegations underlying the claims pled against Hudson or Petersen in Plaintiffs' Complaint.

**(1)      Donna Taylor's Demand Fails to Identify any of the Hudson Defendants.**

The Idaho Supreme Court expressly adopted the requirement that potential defendants must be named in the demand. *See McCann*, 138 Idaho at 234-35, 61 P.3d at 591-92 ("The demand should give the directors a fair opportunity to initiate the action which the shareholder wants to undertake, *and name the potential defendants*, as well as the shareholder making the demand.") (emphasis added).  Idaho courts have not examined a demand that fails to name the potential defendants.  But other courts have.  Where the complaint names a defendant not named in the demand, the complaint is properly dismissed as to that defendant.  *See, e.g.*, *Shlensky v. Dorsey*, 574 F.2d 131, 142 (3rd Cir. 1978).

In *Shlensky*, the plaintiff/shareholder failed to name the defendant in the demand letters sent by the plaintiffs' attorneys to the board of directors.  *Id.* at 141.  And "there was nothing in the letter suggesting that [the defendant] . . . was intended to be included among the individuals referred to in the letter as responsible for damages incurred by the corporation."  *Id.*  The plaintiffs argued the defendant did not need to be named because "that the letters informed the directors of the basis of the claim they wished enforced by the corporation and that this was sufficient notice."  *Id.*  The court disagreed.  "[T]here can be no claim for damages against an unknown and unspecified party."  *Id.*  The court continued in stating that the demand was "completely lacking in the specificity which would give the directors a fair opportunity to initiate the action, which the shareholders subsequently undertook, which it is the purpose of the demand requirement of the rule to provide."  *Id.* (citing *Halprin v. Babbitt*, 303 F.2d 138, 141 (1st Cir. 1962); 3B Moore's Federal Practice pp. 23.1-81 to 23.1-82 (2d ed. 1977)).

The Hudson Defendants are not named as potential defendants or even mentioned in the Demand.  Nor could they be because the asset acquisition complained of did not occur until after the date of the Demand.  *Compare* Exhibit B attached hereto (date of Demand July 21, 2008) *with* Dkt. 1, ¶ 4.39 (date of acquisition August 29, 2008).  The Boards did not have a fair

MEMORANDUM IN SUPPORT OF THE HUDSON DEFENDANTS' MOTION TO DISMISS - 7

opportunity to initiate an action against the Hudson Defendants as required by Idaho law.

Plaintiffs' claims against the Hudson Defendants must be dismissed for failure to make a

demand. *McCann*, 138 Idaho at 234-35, 61 P.3d at 591-92; *Shlensky*, 574 F.2d at 142.

### (2) Donna's Demand Fails to Assert the Alleged Wrongdoing.

The Demand further fails to identify the supposed wrongdoing of the Hudson Defendants

Plaintiffs allege in their Complaint. Donna gave no indication in the Demand of the "wrong

complained of" or the "action which the shareholder wants to undertake" against the Hudson

Defendants. *See McCann*, 138 Idaho at 234-35, 61 P.3d at 591-92; *see also Potter*, 546 F.3d at

1057 (stating that a board is not "required to piece together by inference the disparate events that,

if taken together, might have been sufficient to require corporate action"); *Halprin*, 303 F.2d at

141 (noting that directors must be "given full knowledge of the basis for the claim").[3]

A district court within the Ninth Circuit recently addressed this issue. *See In Re: Section

16(b) Litig.*, 602 F. Supp. 2d 1202 (W.D. Wash. 2009). The court dismissed the plaintiff's

complaint because the demand letters "failed to sufficiently identify the factual basis of the

wrongful acts." *Id.* at 1212. Specifically, the court concluded that the "demand letters do not

describe the same alleged wrongdoing that she later describes in her complaints." *Id.* The Fifth

Circuit reached the same conclusion. *See Renfro v. F.D.I.C.*, 773 F.2d 657, 660 (5th Cir. 1985).

The court affirmed the district court's grant of the defendant's motion to dismiss stating that the

demand "included no information about the allegedly wrongful actions of the [defendants]." *Id.*

The allegations against the Hudson Defendants set forth in Plaintiffs' Complaint are not

contained or even suggested in Donna's Demand. For this reason Plaintiffs' claims against the

Hudson Defendants must be dismissed.

---

[3] The timing of Donna's (and Reed's) Demand is telling. They made the Demand before the asset acquisition complained of, and they made the Demand shortly before Reed filed his second lawsuit in Idaho state court. (This suit is referred to by other defendants as "Hawley Troxell I"). The Demand was clearly prepared for that litigation and the Hudson Defendants were not and are not part of that litigation. The Demand simply does not contemplate a suit against the Hudson Defendants, and certainly did not give the Boards an opportunity to evaluate the merits of a lawsuit against the Hudson Defendants.

MEMORANDUM IN SUPPORT OF THE HUDSON DEFENDANTS' MOTION TO DISMISS - 8

**2.   Donna Lacks Standing to Assert this Derivative Action Because she Cannot Fairly and Adequately Represent the Interests of the Corporation.**

Idaho Code § 30-1-741 provides that "[a] shareholder may not commence or maintain a derivative proceeding unless the shareholder . . . [f]airly and adequately represents the interests of the corporation in enforcing the right of the corporation."  Where a plaintiff previously filed suit seeking to recover corporate money or assets for her own benefit, she cannot fairly and adequately represent the interests of the corporation.  *Taylor*, 2010 WL 3448851, at *25 n.6 (citing *New Crawford Valley, Ltd. v. Benedict*, 847 P.2d 642, 647 (Colo. App. 1993) (noting where a "plaintiff seeks to have the [corporation's] assets applied to the satisfaction of a personal claim, rather than transferred to the corporation, represents a serious conflict of interest"); *Guenther v. Pac. Telecom, Inc.*, 123 F.R.D. 341, 345 (D. Ore. 1987) (same)).

In November 2009, Donna filed Donna Taylor II as an individual against AIA Services. In that suit, currently stayed pending the outcome of the Underlying Case, Donna seeks a ruling that AIA Services breached a contract to her, and that she is entitled to more than $430,000.  *See* Exhibit A attached hereto, ¶¶ 48-50.  That action, seeking to recover corporate money and assets of AIA Services for her own benefit, prevents Donna from "fairly and adequately representing the interests of the corporation."  *Taylor*, 2010 WL 3448851, at *25 n.6.  Her derivative claims against the Hudson Defendants therefore must be dismissed.

**3.   Miesen Cannot Rely on Donna's Demand and his Assertion of Demand Futility is Properly Rejected.**

Dale Miesen, co-plaintiff to Donna Taylor in this action, did not make a written demand on the Boards.  Miesen asserts that he is not required to make a demand on the Boards because Donna made a demand.  Dkt. 1, ¶ 5.9.  In the alternative, Miesen asserts that he is excused from submitting a separate demand under the doctrine of demand futility.  *Id.*, ¶ 5.10.  Controlling case law specifically rejects both of Miesen's arguments.

**a.   Miesen Cannot Rely on Donna's Demand.**

Aside from the fact that Donna's written Demand is insufficient under Idaho law as applied to the Hudson Defendants, Miesen cannot rely on her Demand as the predicate for his Complaint.  *McCann*, 138 Idaho at 234-35, 61 P.3d at 591-92 ("The demand should . . . name the

MEMORANDUM IN SUPPORT OF THE HUDSON DEFENDANTS' MOTION TO DISMISS - 9

. . . shareholder making the demand."); *see also Potter*, 546 F.3d at 1057 (holding that the identification of one plaintiff in a demand letter does not relieve a co-plaintiff of the obligation to make a demand specifically identifying himself as the demander).  In *Potter*, the Ninth Circuit reasoned, "[t]he identity of the complaining shareholder may shed light on the veracity or significance of the facts alleged in the demand letter, and the Boards might properly take a different course of action depending on the shareholder's identity."  *Id.*

Miesen did not make his own demand on the Boards as required under Idaho law.  His failure to make a demand identifying himself as the shareholder requires dismissal of his claims. *See Potter*, 546 F.3d at 1057.

> **b.      Miesen's Allegation of Demand Futility is Properly Rejected.**

Miesen asserts that he is excused from submitting a derivative demand letter under the doctrine of futility.  Dkt. 1, ¶ 5.10.  But that assertion is properly rejected for two independent reasons: (1) Idaho does not recognize the doctrine of demand futility; and (2) Donna's July 21, 2008 Demand precludes co-plaintiff Miesen from asserting futility.

> **(1)      Idaho Courts do not Recognize the Doctrine of Futility, and the "Federal Exception" That Miesen Seeks Does not Exist.**

Miesen properly concedes that Idaho courts do not recognize the doctrine of demand futility.  Dkt. 1, ¶ 5.10.[4]  Miesen erroneously asserts, however, that "the doctrine of futility still applies to federal claims, including RICO claims, and thus the federal [futility] exception would apply."  *Id.*, ¶ 5.11.

Miesen is wrong.  There is no such thing as a federal futility exception.  Federal Rule of Civil Procedure 23.1 is merely the "procedural manifestation of the state law of corporate governance regarding the right of a shareholder to bring a derivative suit on behalf of a corporation."  *In Re: Section 16(b) Litig.*, 602 F. Supp. 2d at 1211 (looking to state substantive law to determine if Plaintiff could pursue her derivative suit claiming a violation of § 16(b) of

---

[4] The Idaho Supreme Court held that "the legislative intent in enacting Idaho Code § 30-1-742 was to no longer recognize 'futility' as an exception to the requirement of demand as a condition preceding the institution of a shareholder's derivative action."  *Mannos v. Moss*, 143 Idaho 927, 934, 155 P.3d 1166, 1173 (2007).

MEMORANDUM IN SUPPORT OF THE HUDSON DEFENDANTS' MOTION TO DISMISS - 10

the Securities and Exchange Act of 1934).  "Rule 23.1 . . . does not establish the circumstances under which a demand would be futile . . . [f]or these standards, we turn to the law of the state of incorporation."  *In re Silicon Graphics Inc. Secs. Litig*, 183 F.3d 970, 989-90 (9th Cir. 1999).  Miesen's argument that the a "federal exception" applies is properly rejected.

### (2)   Donna's Demand Precludes Miesen from Arguing Futility.

Even if an allegation of futility were proper under Idaho law, which it is not, Donna's Demand precludes co-plaintiff Miesen from asserting futility.  *Johnston v. Box*, 903 N.E.2d 1115, 1121 (Mass. 2009) ("[W]hen one plaintiff, who is a party to a suit, makes a demand on the board, both the plaintiff and any coplaintiffs are precluded from arguing demand futility").  By making her July 2008 Demand on the Boards, Donna conceded the independence and disinterestedness of a majority of the board.  *See Rales v. Blasband*, 634 A.2d 927, 935 n.12 (Del. 1993).  Miesen, as her co-plaintiff, is therefore precluded from arguing that a demand on the Boards would have been futile.

### 4.   The Failure to Make a Demand Requires Dismissal with Prejudice of All of Plaintiffs' Claims Against the Hudson Defendants.

Plaintiffs' claims against the Hudson Defendants must be dismissed with prejudice.  *See, e.g., Smachlo v. Birkelo*, 576 F. Supp. 1439, 1445 (D. Del. 1983) (dismissing complaint with prejudice because the plaintiffs failed to make a proper demand on the board).  And dismissal with prejudice is supported by sound reasoning.  "Rule 23.1 specifically calls upon the complaint to show that demand was made or was properly excused; there is no provision for *thereafter* remedying an omission in the same suit, especially after the defendants have moved to dismiss because of the absence of a demand."  *In re Sapient Corp. Derivative Litig.*, 555 F. Supp. 2d 259, 262 (D. Mass. 2008) (emphasis in original); *Galef v. Alexander*, 615 F.2d 51, 59 (2d Cir. 1980) ("Rule 23.1 . . . is essentially a requirement that a stockholder exhaust his intracorporate remedies before bringing a derivative action").  To hold that a derivative demand "may be made on the directors *after* a derivative suit has been initiated would be to reduce the demand requirement of the rule to a meaningless formality."  *Shlensky*, 574 F.2d 131 at 142 (emphasis added).  "Indeed, such an approach would effectively cripple the spirit and intent of the rule,

which is to give corporate authorities an opportunity to deal with shareholder grievances prior to a derivative action being brought." *Grossman v. Johnson*, 89 F.R.D. 656, 661 (D. Mass. 1981). "[A] shareholder demand must be made of appropriate corporate authorities *before* bringing suit. A post-suit demand simply does not meet the Rule's procedural prerequisite." *Id.* at 660-61 (emphasis added).

Plaintiffs failed to abide by the statutory requirement of a demand on the board *before* asserting this derivative suit. Dismissal of Plaintiffs' claims without prejudice would reduce the demand requirement of the rule to a meaningless formality. *Shlensky*, 574 F.2d 131 at 142. All of their claims against the Hudson Defendants must be dismissed with prejudice.

**B.      PLAINTIFFS' NON-RICO CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFFS FAIL TO PLEAD ALLEGATIONS UPON WHICH RELIEF CAN BE GRANTED.**

The Supreme Court has recently considered the principles relevant to a motion to dismiss in *Iqbal*, 129 S. Ct. 1937, and *Twombly*, 550 U.S. 544. The Supreme Court directed federal courts to apply a more demanding standard to complaints in order to prevent "anemic cases" from going forward. *Twombly*, 550 U.S. at 559. In *Iqbal*, the Court reiterated that "[a] pleading that offers 'labels and conclusions' or a formulaic recitation of the elements of a cause of action will not do.'" 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). A claim will survive a motion to dismiss only if it "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Supreme Court drew an important distinction between the weight to be given the factual allegations in a complaint on one hand, and legal conclusions on the other. "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. Courts must first identify "the allegations in the complaint that are not entitled to the assumption of truth" and then

to "consider the factual allegations in . . . [the] complaint to determine if they plausibly suggest an entitlement to relief." *Iqbal*, 129 S. Ct. at 1951.

Plaintiffs assert two non-RICO claims against Hudson, and five non-RICO claims against Petersen.  Each claim against Hudson must be dismissed for failure to make proper factual allegations.  And three of the five claims against Petersen—tortious interference with contractual relationships/business expectancies, fraud/fraudulent concealment/constructive fraud, and aiding and abetting fraud—must be dismissed for the same reason.

> **1.      Fifth Cause of Action – Tortious Interference With Contractual Relationships/Business Expectancies.**

Plaintiffs assert their fifth cause of action against both Hudson Defendants.  But it is unclear what claim Plaintiffs intend to assert by their fifth cause of action for "tortious interference with contractual relationships/business expectancies."  *See* Dkt. 1, ¶¶ 6.37-6.40. While Idaho recognizes claims for "tortious interference with contract" and for "intentional interference with a prospective economic advantage," Plaintiffs' Complaint fails to allege factual allegations to support either claim against either of the Hudson Defendants.

> **a.      Plaintiffs Fail to Plead Tortious Interference With Contract.**

Tortious interference with contract requires: "(1) the existence of a contract; (2) knowledge of the contract on the part of the defendant; (3) intentional interference causing a breach of the contract; and (4) injury to the plaintiff resulting from the breach."  *Wesco Autobody Supply, Inc. v. Ernest*, ___ Idaho ___, 2010 WL 2927078, at *12 (July 28, 2010).  Plaintiffs do not even allege the threshold requirement—existence of a contract.  As must follow, Plaintiffs do not assert factual allegations to support the other three elements of the claim.  This claim must be dismissed.

> **b.      Plaintiffs Fail to Plead Intentional Interference With a Prospective Economic Advantage.**

Intentional interference with a prospective economic advantage has five elements: "(1) the existence of a valid economic expectancy, (2) knowledge of the expectancy on the part of the interferer, (3) intentional interference inducing termination of the expectancy, (4) the

MEMORANDUM IN SUPPORT OF THE HUDSON DEFENDANTS' MOTION TO DISMISS - 13

interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted." *Wesco Autobody*, 2010 WL 2927078, at \*10.

As an initial matter, the only business expectancy Plaintiffs allege is between AIA and Growers National. *See* Dkt. 1, ¶ 6.38 ("AIA has business expectancies with Growers National"). Because Plaintiffs bring their lawsuit "on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance" (*see* Dkt. 1 at p. 1), the alleged business expectancy is nothing more than an expectancy between a plaintiff and a defendant, which is insufficient as a matter of law. *See Cantwell v. City of Boise*, 146 Idaho 127, 138, 191 P.3d 205, 216 (2008). On this basis alone, this claim fails as to both of the Hudson Defendants.

And the specific allegations pled against each of the Hudson Defendants further demonstrates that dismissal is appropriate. Plaintiffs' only allegation against Hudson provides: "By purchasing these assets with full knowledge that Crop USA could not lawfully sell the asset, Hudson Insurance Group also interfered with the business expectancies of AIA and is jointly and severally liable to AIA for damages arising from the business tort." *See* Dkt. 1, ¶ 6.40. This single conclusory allegation fails the *Iqbal/Twombly* standard, requiring dismissal of this claim against Hudson. Plaintiffs list Petersen as a defendant against whom they assert their fifth cause of action. *See* Dkt. 1 at p. 40. But Plaintiffs make no factual allegations as to Petersen relative to this claim. This claim against Petersen therefore also must be dismissed.

### 2. Eighth Cause of Action–Fraud/Fraudulent Concealment/Constructive Fraud.

Plaintiffs assert their eighth cause of action against Petersen and three other defendants who are not Hudson Defendants. Federal Rule of Civil Procedure 9(b) imposes a requirement that "a party must state with particularity the circumstances constituting fraud or mistake." A fraud claim must describe the alleged fraud in enough detail, so that a defendant can prepare a sufficient answer. *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).

When a fraud claim involves multiple defendants as in this case, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to

MEMORANDUM IN SUPPORT OF THE HUDSON DEFENDANTS' MOTION TO DISMISS - 14

differentiate their allegations . . . [to] inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz*, 476 F.3d at 765. "Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged" in order to satisfy Rule 9(b). *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).

Plaintiffs failed to comply with the particularity requirements of Rule 9(b). Their allegations of "concealment" against Petersen are vague and non-specific. *See* Dkt. 1, ¶¶ 6.58 & 6.61. The allegations merely lump together John Taylor, James Beck, Michael Cashman and Kent Petersen. Plaintiffs do allege any specifics about the fraud and fail to assert any allegations as to the nine required elements of a fraud claim. *See Witt v. Jones*, 111 Idaho 165, 168, 722 P.2d 474, 477 (1986) (setting forth the nine elements of a fraud claim in Idaho). Plaintiffs offer only bare, conclusory statements. This is completely inadequate to state any claim, let alone a fraud claim.

### 3.    Ninth Cause of Action – Aiding and Abetting Fraud

Plaintiffs made allegations as to this cause of action against Petersen but do not attribute this cause of action to Petersen. *See* Dkt. 1 at p. 45 (naming Taylor, Beck, Cashman, Babbitt, Riley, Ashby, Hawley Troxell). To the extent Plaintiffs allege this claim against Defendant Petersen, the claim must be dismissed for the same reasons Plaintiffs' fraud/ fraudulent concealment/constructive fraud claim must be dismissed.

**C.    PLAINTIFFS' RICO CLAIMS  MUST BE DISMISSED BECAUSE PLAINTIFFS FAIL TO PLEAD ALLEGATIONS UPON WHICH RELIEF UNDER RICO CAN BE GRANTED.**

Plaintiffs' RICO claim is a hollow attempt to manufacture federal jurisdiction and a right to treble damages and attorneys' fees. To state a RICO claim, Plaintiffs must allege injury due to: "(1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sun Savings and Loan Ass'n v. Dierdorff,* 825 F.2d 187, 191 (9th Cir. 1987); *see also Noll v. Peterson*, No. Civ. 01-02-N-EJL, 2001 WL 721733, at *4 (D. Idaho May 14, 2001) (dismissing a RICO claim that failed to plead "the *prima facie* elements of a civil RICO violation"). "In considering civil RICO claims, a court must be mindful of the devastating effect such claims may have on defendants. Civil RICO should not be used to transform a 'garden variety fraud or

MEMORANDUM IN SUPPORT OF THE HUDSON DEFENDANTS' MOTION TO DISMISS - 15

breach of contract case . . . into a vehicle for treble damages.'"  *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 622 (S.D.N.Y. 2006).

Plaintiffs' RICO claim must be dismissed because it: (1) lacks the required specificity; (2) fails to allege an "enterprise" separate from the corporate defendants; (3) fails to allege a "pattern of racketeering activity;" and (4) fails to allege a threat of "continuity" of the enterprise. Plaintiffs instead allege ordinary tort, breach, and fraud claims (which also fail under Rule 12).

### 1.    Plaintiffs' Allegations Lack the Required Specificity.

The Ninth Circuit "has repeatedly insisted" that Rule 9(b) controls "RICO actions alleging the predicate act of mail fraud."  *Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991).  Failure to allege specifics of time, place or nature of alleged communications forming predicate acts is a "fatal defect."  *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1989).  As one court has observed regarding specificity:

> Because it is a complicated statute that covers conduct ranging from sports bribery to white slave traffic, a defendant needs a substantial amount of information to prepare a response.  *A RICO defendant also needs to be protected from unscrupulous claimants lured by the prospect of treble damages, and it should be the policy of the law, within the procedural constraints of our system, to provide this protection.*  A charge of racketeering, with its implications of links to organized crime, should not be easier to make than accusations of fraud.  *RICO should not be construed to give a pleader license to bully and intimidate nor to fire salvos from a loose cannon.*

*Saine v. A.I.A., Inc.*, 582 F. Supp. 1299, 1306 n.5 (D. Colo. 1984) (emphasis added).

Plaintiffs' allegations fall woefully short of the specificity requirement.  First, Plaintiffs essentially concede lack of specificity, noting that their RICO allegations "are submitted for notice pleading purposes only."  Dkt. 1, ¶ 6.9.  Second, Plaintiffs do not identify a single piece of mail, email, fax or wire transfer involving the Hudson Defendants.  Plaintiffs identify Petersen only three times in connection with the RICO claim (*see id.*, ¶¶ 6.5, 6.12), and identify Hudson only two times in connection with the RICO claim (*see id.*, ¶¶ 6.10, 6.12).  None of these allegations identifies a time, place or nature of alleged communications forming predicate acts. And Plaintiffs' allegations that lump Hudson and Petersen together with "all defendants named

under this cause of action" likewise fail to identify a time, place or nature of alleged communications forming predicate acts.  *See id*. ¶¶ 6.3, 6.10, 6.13.

Plaintiffs' general and vague allegations "based on mail and wire fraud" are a "fatal defect" to Plaintiffs' RICO claim.  *See Albright,* 862 F.2d at 1392.  On this basis alone, Plaintiffs' RICO claim must be dismissed.

### 2.      Plaintiffs' Alleged "RICO Enterprise" is Also a Corporate Defendant.

The Ninth Circuit has stated that a "RICO defendant and the RICO enterprise cannot be the same entity under RICO section 1962(c)."  *United Energy Owners Comm., Inc. v. U.S. Energy Mgmt. Sys., Inc.,* 837 F.2d 356, 358 (9th Cir. 1988).  "Under RICO, an 'enterprise' is a being different from, not the same as or part of, the person whose behavior the act was designed to prohibit."  *Sever v. Alaska Pulp Corp*., 978 F.2d 1529, 1533-1534 (9th Cir. 1992).  "[A] corporate entity may not be simultaneously the 'enterprise' and the 'person' who conducts the affairs of the enterprise through a pattern of racketeering activity."  *Bennett v. U.S. Trust Co. of N.Y.*, 770 F.2d 308, 315 (2d Cir. 1985).  A complaint that places a corporation in both roles is properly dismissed.  *Id.*

Plaintiffs name Crop USA as a defendant in the lawsuit (Dkt. 1, ¶ 3.13), *and* allege that Crop USA "was operated thereafter as a scheme or artifice to defraud AIA . . . i.e., as a 'racketeering enterprise' under 18 U.S.C. § 1961(4)" (*id*., ¶ 6.3).  By naming Crop USA as both a defendant and the RICO enterprise, Plaintiffs have pled factual allegations that establish a bar to the relief they seek.  *See Weisbuch*, 119 F.3d at 783 n.1.  Plaintiffs' RICO claim must therefore be dismissed.

### 3.      Plaintiffs Fail to Allege a Pattern of Racketeering Activity.

Even if Plaintiffs dismiss Crop USA as a defendant and continue to characterize Crop USA as the RICO enterprise, the result still must be dismissal.  Plaintiffs have not and cannot allege a pattern of racketeering activity.  RICO defines a "pattern of racketeering activity" as "at least two acts of racketeering activity" within 10 years of each other.  *Howard v. Am. Online Inc.*, 208 F.3d 741, 746 (9th Cir. 2000).  To show a "pattern," a plaintiff must prove a sufficient

MEMORANDUM IN SUPPORT OF THE HUDSON DEFENDANTS' MOTION TO DISMISS - 17

number of "indictable" predicate acts and a threat of continued criminal activity.  *Id*. at 748; *see also Aikens v. U.S. Transformer, Inc.*, No. CV-07-138-E-EJL-LMB, 2008 WL 695021, at \*17 (D. Idaho Mar. 11, 2008).  Plaintiffs look to the usual suspect predicates, mail and wire fraud.  Dkt. 1, ¶ 6.1.  These criminal statutes require more than sending letters and emails; they require "indictable" conduct, namely that: (1) defendants formed a scheme or artifice to defraud; (2) with the specific intent; and (3) used either the U.S. mail or wires to do so.  *Schreiber Dist. Co. v. Serv-Well Furn. Co., Inc.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

Plaintiffs fail to allege any specific acts of fraudulent use of mails or wires by either Hudson or Petersen, individually or together.  Nor do Plaintiffs identify which specific predicate acts occurred within 10 years of one another.  *Howard*, 208 F.3d at 746.  Rather, Plaintiffs "fire salvos from a loose cannon," *Saine,* 582 F. Supp. at 1306 n. 5, by making generalized, ill-defined allegations such as: "the defendants utilized the United States mail and/or interstate wires, e.g., email, in further of their activities" (Dkt. 1, ¶ 6.10); and "all defendants named under this [RICO] cause of action had knowledge of CropUSA's pattern of racketeering activity . . . and took overt acts to advance the interests of CropUSA" (*id.* ¶, 6.13).  These allegations fail to assert a pattern of racketeering activity.  For this reason Plaintiffs' RICO claim must be dismissed.

### 4.    Plaintiffs Fail to Allege Continuity.

"To satisfy the continuity requirement, Plaintiffs must prove either a series of related predicates extending over a substantial period of time, . . . or past conduct that by its nature projects into the future with a threat of repetition."  *Howard,* 208 F.3d at 750.  The predicate acts must be both related and pose a threat of continued criminal activity.  *Aikens*, 2008 WL 695021, at \*18 (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

With respect to Petersen, the Complaint appears to allege only three specific acts of "wrongful" conduct: (1) executing an "Officer's Agreement" with AIA on January 1, 2003 (Dkt. 1, ¶ 4.14); (2) executing an "Officer's Agreement" with Crop USA on November 15, 2004 (*id.*, ¶ 4.28); and (3) violating a non-compete clause on August 29, 2008 (*id.*, ¶ 4.43).  But none of these acts constitute wire fraud or mail fraud.  And there is no allegation of a relationship

between these alleged predicate acts to demonstrate a threat of continuing activity. *Howard,* 208 F.3d at 750.

"Continuity" is even more difficult to discern with regard to Hudson, a corporate entity. Plaintiffs allege that Hudson: (1) "acquired business assets from CropUSA (assets rightfully belonging to AIA)" on August 29, 2008 (*id.*, ¶ 4.39); (2) "in exchange CropUSA agreed to write off $7.52 million in debt owed by CropUSA" (no date specified) (*id.*); (3) wrongfully employed Petersen (no date specified) (*id.*, ¶ 6.28); (4) "aided and abetted breaches of fiduciary duty" by Petersen (no date specified) (*id.*, ¶ 6.29); and (5) "interfered with the business expectancies of AIA" (no date specified) (*id.*, ¶ 6.40).  Again, these acts have no connection to wire or mail fraud, and cannot constitute a "pattern" of anything.

Petersen and Hudson are alleged to have engaged in very few *unrelated* acts of inherently *lawful* activity such as entering into agreements and acquiring assets. Plaintiff have not pled that Petersen or Hudson engaged in predicate acts that pose a threat of continued criminal activity.  Plaintiffs' RICO claims must also be dismissed for this reason.

**D.     PLAINTIFFS' NON-RICO AND RICO CLAIMS SHOULD BE DISMISSED WITH PREJUDICE.**

A court may dismiss claims with prejudice where a "plaintiff had several opportunities to amend its complaint and repeatedly failed to cure deficiencies." *Telesaurus VPC, LLC v. Power*, ___ F.3d ___, 2010 WL 3928945, at * 3 (9th Cir. 2010) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  A court may also dismiss claims with prejudice where the "allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Id.*;  *see also Sorosky v. Burroughs Corp.*, 826 F.2d 794, 804-805 (9th Cir. 1987) (leave to amend "may be denied for reasons such as . . . futility of amendment, or prejudice to the opposing party").

The factual allegations underlying Plaintiffs' Complaint have now been pled in seven cases.  And the complaints in those cases have been amended many times.  Plaintiffs (or Reed Taylor) have taken more than ten opportunities to plead and replead the factual allegations of their complaints.  In this latest iteration, they plead a tortious interference with contract claim without alleging the existence of a contract.  They plead a fraud claim without addressing the

nine specific elements that Idaho requires pled with particularity. They have had more than 10 bites at the apple and are not entitled to another bite.

As to the RICO claim, there is simply no way for Plaintiffs to assert a cognizable RICO claim by alleging additional facts consistent with what they have already pled. *See Telesaurus*, 2010 WL 3928945, at * 3. Plaintiffs identify one of the main defendants as the enterprise. And the wrongdoing they plead is inherently lawful conduct that cannot be the basis of a pattern of racketeering activity or of a threat of continued criminal actively. There is no way to "fix" the defective claim and any effort to do so is futile. "Adding more warts to the hog still does not make it a dragon." *See J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 821 (7th Cir. 1991) (noting that further efforts to "repackage its allegations cannot transform this contract fraud suit into a proper civil RICO suit").

Allowing Plaintiffs to amend their RICO claim will also further prejudice Hudson and Petersen. "A RICO defendant [] needs to be protected from unscrupulous claimants lured by the prospect of treble damages, and it should be the policy of the law, within the procedural constraints of our system, to provide this protection." *Saine*, 582 F. Supp. at 1306 n.5. Leave to replead this claim is to allow Plaintiffs to further "fire salvos from a loose cannon," in hopes of hitting something. *Id*. The Court should not arm Plaintiffs with that cannon.

### VI.    CONCLUSION

Neither Donna Taylor nor Dale Miesen made a proper demand on the Boards. Each specific claim against Hudson and four of the six claims pled against Petersen are fatally flawed. The Hudson Defendants therefore respectfully request dismissal with prejudice of all claims asserted against them. Leave to amend is properly denied because amendment is futile. Plaintiffs have had numerous bites at the apple through six other lawsuits. This should be the end of the line for Plaintiffs' claims against the Hudson Defendants.

MEMORANDUM IN SUPPORT OF THE HUDSON DEFENDANTS' MOTION TO DISMISS - 20

DATED this 25th day of October, 2010.

HOLLAND & HART LLP


By: _____ *s/s Robert A. Faucher* _____
Robert A. Faucher, of the firm
Attorneys for Defendants Hudson Insurance
Company and Kent Petersen


## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of October, 2010, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

- **Lee H. Rousso**
  lee@leerousso.com

- **David R. Risley**
  david@risleylawoffice.com

- **Theodore O Creason**
  tcreason@cmd-law.com

I further certify that on this same day, I served the following via U.S. Mail, postage prepaid:

Matthew J. Salzman
Misty Cooper Watt
STINSON MORRISON HECKER LLP
1201 Walnut #2900
Kansas City,  MO  64106-2150


_____ */s/ Robert A. Faucher* _____
for Holland & Hart LLP


4927019_10.DOC

# EXHIBIT A

RODERICK C. BOND, ISB No. 8082
MICHAEL S. BISSELL, ISB No. 5762
CAMPBELL, BISSELL & KIRBY, PLLC
7 South Howard Street, Suite 416
Spokane, WA 99201
Tel: (509) 455-7100
Fax: (509) 455-7111

Attorneys for Plaintiff-Petitioner Donna J. Taylor

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE STATE OF
IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| DONNA J. TAYLOR, an individual; <br><br> Plaintiff-Petitioner, <br><br> v. <br><br> AIA SERVICES CORPORATION, an Idaho corporation; <br><br> Defendant-Respondent. | Case No.: CV 09-02470 <br><br> FIRST AMENDED VERIFIED COMPLAINT/PETITION FOR DAMAGES, FOR DECLARATORY RELIEF, AND FOR APPOINTMENT OF A RECIEVER FOR AIA SERVICES CORPORATION |

Plaintiff-Petitioner Donna J. Taylor ("Donna Taylor"), by and through her attorneys of record, Campbell, Bissell & Kirby, PLLC, submits this Verified First Amended Complaint/Petition requesting the following relief:

## I.  FACTUAL BACKGROUND

1.      Plaintiff-Petitioner Donna J. Taylor is a resident of Clarkston, Asotin County, Washington.

2.      Defendant-Respondent AIA Services Corporation ("AIA Services"), a closely held Idaho corporation, with its principal place of business located in Lewiston, Nez Perce County, Idaho.  AIA Insurance, Inc. ("AIA Insurance") is a wholly owned subsidiary of AIA Services, with its principal place of business being located in Lewiston, Nez Perce County,

FIRST AMENDED COMPLAINT - 1

**2-ER-364**

Idaho.

3. Jurisdiction and venue are appropriate in the Second Judicial District of Nez Perce County District Court in Nez Perce County, Idaho as AIA Services is an Idaho corporation with its principal place of business located in Lewiston, Nez Perce County, Idaho.

4. Donna Taylor is the sole Series A Preferred Shareholder in AIA Services. Donna Taylor is also the beneficial owner of one-half of the 18,593 common shares in AIA Services owned by the estate of Sara Taylor.[1]

5. Under the terms of AIA Services' Amended Articles of Incorporation, the Amended Articles may not be further amended or modified without the express written consent of the majority holders of the Series A Preferred Shares in AIA Services; and Donna Taylor, the sole Series A Preferred Shareholder, has never provided such consent.

6. Under the terms of AIA Services' Amended Articles of Incorporation, Donna Taylor is required to be a member of the board of directors of AIA Services until all of her shares are redeemed. Despite demands by Donna Taylor's law firm, she has not been appointed to the board of AIA Services for years.

7. Under the terms of certain letter agreements and the later executed Series A Preferred Shareholder Agreement, Donna Taylor was required to have all of her preferred shares in AIA Services redeemed no later than 2004. Donna Taylor is presently owed over $430,000 for the Series A Preferred Shares held by her in AIA Services, which such amount should have been paid in full and was required to be paid in full in or before 2004. AIA Services ceases all payments to Donna Taylor in 2008.

8. From 1995 to the present, R. John Taylor ("John Taylor"), James Beck, Michael Cashman, Connie Taylor, JoLee Duclos, Bryan Freemen and/or other individuals (collectively

---

[1] Reed Taylor is the beneficial owner of the other one-half of the common shares.

FIRST AMENDED COMPLAINT - 2

"Responsible Individuals") have engaged in unlawful acts utilizing the assets, trade secrets, business opportunities, funds, employees and other assets of AIA Services and AIA Insurance for the benefit of themselves and entities in which they hold substantial ownership interests.

9. Under the terms of AIA Services' Amended Articles of Incorporation, AIA Services and its subsidiaries may not make or guarantee any loans to any entities not controlled by them. By and through John Taylor and the Responsible Parties, AIA Insurance guaranteed a $15,000,000 line-of-credit for CropUSA Insurance Agency, Inc. ("CropUSA") without receiving any compensation or benefit and in violation of AIA Services' Amended Articles of Incorporation. John Taylor and the Responsible Individuals are the majority shareholders in CropUSA.

10. Under the terms of AIA Services and AIA Insurance's Amended Bylaws, the corporations' boards of directors are required to hold annual shareholder meetings to elect board members. AIA Services and AIA Insurance have not held annual shareholder meetings to elect directors for over five years.

11. For over five years, the purported board of directors and officers of AIA Services has failed to provide any financial information to AIA Services' shareholders.

12. John Taylor, Connie Taylor, and James Beck are the purported board members of AIA Services and AIA Insurance and have been the purported board members since 2007. John Taylor has been a purported board member of AIA Services for many years (including, without limitation, from 1995 to the present time). Any references to actions taken by them as board members does not constitute Donna Taylor's waiver that they have never been properly elected as board members of AIA Services or AIA Insurance.

13. John Taylor has been a member of the board of Avista Corporation since 1985.

FIRST AMENDED COMPLAINT - 3

John Taylor obtained this position by and through his employment with AIA Services. John Taylor is also an attorney licensed to practice law in the state of Idaho and he has been licensed as an attorney in the state of Idaho for over 20 years. John Taylor also has an accounting degree and briefly worked as an accountant. As a result, John Taylor is well versed with the law and the fiduciary duties owed to a corporation and its shareholders. John Taylor has intentionally breached his fiduciary duties to AIA Services, AIA Insurance and their shareholders. In his Avista Corporation bio on the corporation's website, John Taylor admits that he formed CropUSA and that he is Chairman of the Board of Pacific Empire Radio Corporation.

14. Connie Taylor is also an attorney licensed to practice law in the state of Idaho and she has been licensed in Idaho for over fifteen years. As a result, like John Taylor, Connie Taylor is well versed with the law and fiduciary duties owed to corporations and their shareholders. Connie Taylor, like John Taylor, has intentionally breached her fiduciary duties owed to AIA Services, AIA Insurance and their shareholders.

15. By the admission of John Taylor and other Responsible Individuals, AIA Services has not held annual shareholder meetings for over five years.

16. From 1995 to the present time, John Taylor and the Responsible Individuals have engaged in many acts that have violated the conflict of interest provisions set forth in AIA Services' Amended Articles of Incorporation and Amended Bylaws.

17. From 1995 to the present time, AIA Services and/or AIA Insurance have invested and lent hundreds of thousands of dollars to Pacific Empire Radio and Pacific Empire Communications, entities partially owned by John Taylor and Connie Taylor. All such loans were in violation of AIA Services' Amended Articles of Incorporation. AIA Services and/or AIA Insurance also invested hundreds of thousands of dollars in Pacific Empire Radio and

FIRST AMENDED COMPLAINT - 4

8/23/2010 11:53:12 AM    Tina Slegers    Hawley Troxell    Page 7
Case 1:10-cv-00404-DCN-CWD   Document 14-1   Filed 10/25/10   Page 33 of 53

Pacific Empire Communications and all such shares have been transferred to John Taylor and Connie Taylor. Even if the shares had not been transferred to John Taylor and Connie Taylor, the investments and loans were not in the best interests of AIA Services and AIA Insurance.

18.    In 1995, John Taylor entered into an Executive Officer's Agreement with AIA Services after redeeming Reed Taylor's shares. Under the terms of the Executive Officer's Agreement, John Taylor was prohibited from operating any businesses that competed with AIA Services (selling insurance products) and from soliciting any employees from AIA Services and AIA Insurance, among other obligations. John Taylor has intentionally breached the terms of the Executive Officer's Agreement to the detriment of AIA Services and AIA Insurance.

19.    From 1995 to the present time, John Taylor has paid himself and Connie Taylor millions of dollars in funds, assets, benefits and compensation from AIA Services and AIA Insurance, including, without limitation, during times in which John Taylor was intentionally breaching his Executive Officer's Agreement and fiduciary duties owed to AIA Services and AIA Insurance, among other obligations and the commission of torts.

20.    From 1995 to the present time, John Taylor and Responsible Individuals have redeemed over $650,000 in common shares when Donna Taylor's Preferred A Shares had priority over such shares and when such funds should have been paid to redeem Donna Taylor's Preferred A Shares or otherwise be used for the benefit of AIA Services.

21.    From 1995 through 1997, John Taylor and Responsible Individuals paid over $650,000 in dividends to Series C Preferred Shares when Donna Taylor's Preferred A Shares had priority over such shares and when paying such dividends were not in the best interests of AIA Services.

22.    In 1999, John Taylor formed CropUSA. At that time, CropUSA was called "AIA

FIRST AMENDED COMPLAINT - 5

Crop Insurance, Inc." However, AIA Crop Insurance's name was later changed to CropUSA. CropUSA executed a board resolution stating that AIA Services has declined to continue operating CropUSA as a subsidiary, even though there are no such resolutions in the board meeting minutes or resolutions for AIA Services or AIA Insurance.

23.     John Taylor advised Donna Taylor and others that CropUSA was a subsidiary of AIA Services and/or AIA Insurance. Despite being formed and operated using AIA Services and AIA Insurance's funds, assets, trade secrets, employees and other assets, CropUSA is majority owned by John Taylor and the Responsible Individuals. AIA Services and AIA Insurance have never owned any shares in CropUSA according to the corporation's stock register and John Taylor's testimony. Forming, operating and making the ownership of CropUSA in the name of John Taylor, the Responsible Individuals and other persons was not in the best interest of AIA Services and AIA Insurance and also violated AIA Services Amended Articles of Incorporation, AIA Services' Amended Bylaws, John Taylor's Executive Officer's Agreement, the corporate opportunity doctrine, and the law. John Taylor represented to certain individuals (including Donna Taylor) that CropUSA was owned by AIA, despite the evidence that AIA never owned any shares or part of CropUSA.

24.     AIA Services and/or AIA Insurance formed and operated Growers National at significant expense to AIA Services and/or AIA Insurance for the purpose of selling crop insurance. Through AIA Services and AIA Insurance's efforts, Growers National obtained the right from the U.S. government to offer dividends to members for the sale of crop insurance. Growers National was formed and operated using AIA Insurance's funds and significant contractual relations with various growers associations and co-ops. Despite these facts, the contract with Growers National was with CropUSA and not AIA Services or AIA Insurance.

FIRST AMENDED COMPLAINT - 6

25.      In 2004, John Taylor and the Responsible Individuals inappropriately transferred $1,510,693 to CropUSA, which such transaction was called a "stock redemption" by John Taylor (and which John Taylor advised AIA's CFO the shares should be canceled), although he later referred to the transaction as an "investment." Even today, AIA Insurance represents the value of its alleged investment in AIA Services (its parent corporation) as being worth $1,510,693 against the recommendation of AIA Insurance's auditors. The true worthless value of the Preferred C Shares held by AIA Insurance after the purported "investment" is demonstrated by the fact that the full value of the $1,510,693 alleged investment is eliminated on AIA Services' consolidated financial statements.

26.      In 2001, John Taylor and the Responsible Individuals issued hundreds of thousands of common shares in AIA Services to certain Responsible Individuals and others when they had not complied with their contractual obligations to guarantee a $1,000,000 loan for AIA Services (which was the consideration to be awarded the right to acquire the shares in the first place). In addition, John Taylor and the Responsible Individuals engaged in inappropriate acts of converting certain Responsible Individuals and other parties' Series C Preferred Shares in AIA Services into commons shares of CropUSA without shareholder approval or consent. John Taylor, through written letters, referred to this transaction as an "exit strategy" for certain Responsible Individuals and other investors in AIA Services who received preferential treatment to the detriment of AIA Services, its shareholders and its creditors.

27.      In 2001, John Taylor and Connie Taylor purchased a parking lot that was located near AIA Insurance's offices using AIA Insurance's line-of-credit. Shortly after purchasing the parking lot, John Taylor substantially increased the rent paid for the parking lot to $15,000 per year when such rent was not in the best interests of the corporations and a violation of AIA

FIRST AMENDED COMPLAINT - 7

Services' Bylaws and fiduciary obligations owed by John Taylor and Connie Taylor to AIA Services and AIA Insurance. The yearly rent of $15,000 exceeded the purchase price paid for the parking lot. The parking lot should have been purchased by AIA Services or AIA Insurance and no rent paid. Instead, John Taylor and/or Connie Taylor have received over $60,000 in rent for a parking lot that should be owned by AIA Services or AIA Insurance and when such funds should have been used to pay creditors and preferred shareholders.

28. In 2005, John Taylor and certain Responsible Individuals issued John Taylor 450,000 shares of common stock in AIA Services pursuant to John Taylor's Executive Officer's Agreement, which was the same agreement that John Taylor had not complied with his contractual obligations owed to AIA Services, including, without limitation, John Taylor's obligation to not compete with AIA or to solicit any of its employees.

29. John Taylor and certain Responsible Individuals also issued hundreds of thousands of dollars in Series C Preferred Shares in AIA Services to its 401(k) plan. John Taylor and the Responsible Individuals transferred $1,510,693 to CropUSA to redeem/purchase Series C Preferred Shares when they were obligated under AIA Services' Amended Articles of Incorporation to equally purchase/redeem from all shareholders holding Series C Preferred Shares in AIA Services. John Taylor admitted that the $1,510,693 was transferred to CropUSA because the corporation badly needed capital, even though he also testified that AIA Services and AIA Insurance had never owned any shares in CropUSA.

30. In 2008, CropUSA sold assets for $10,000,000. AIA Services and AIA Insurance did not receive a single dollar from this asset sale. Instead and in addition, John Taylor received $10,000 per month for a purported consulting agreement/non-compete agreement with Hudson Insurance (the buyer of the $10,000,000 in assets from CropUSA), which such funds should have

FIRST AMENDED COMPLAINT - 8

been paid by John Taylor to AIA Services and/or AIA Insurance for the benefit of the corporations and their creditors and shareholders.

31.     On November 16, 2009, the Lewiston Tribune published a list of parties who had failed to pay property taxes for the year 2006. Included in the list were multiple entries of unpaid taxes owed by AIA Insurance totaling over $55,000. Under the terms of AIA Insurance's lease of the premises known as the Lewis-Clark Plaza, AIA Insurance is contractually obligated to timely and fully pay all property taxes on the Lewis-Clark Plaza. The mortgage on the Lewis-Clark Plaza was obtained by AIA Services from litigation funded by AIA Insurance involving AIA Services' former subsidiary The Universe. The failure to pay property taxes impacts the value of the Lewis-Clark Mortgage and results in a default in AIA Insurance's lease with Washington Bank Properties for premises located at the Lewis-Clark Plaza. AIA Services and AIA Insurance have not paid property taxes from 2006 to the present time in an amount believed to exceed $150,000.

32.     From its incorporation in 2000, through the present time, CropUSA was funded and operated using AIA Services and/or AIA Insurance's funds, employees, trade secrets, contractual relationships with various growers associations and co-ops, office space, equipment and other assets; and AIA Services and AIA Insurance have never been paid a profit or interest for all such loans and the use of such assets and millions of dollars of funds and unallocated expenses borne by AIA Services/AIA Insurance have not been paid back to the corporations. AIA Services and AIA Insurance have paid, and not been reimbursed for, hundreds of thousands of dollars, if not millions of dollars, in unallocated expenses paid for CropUSA for which AIA Services and AIA Insurance have not been reimbursed and will likely never be reimbursed

FIRST AMENDED COMPLAINT - 9

Case 1:10-cv-00404-DCN-CWD   Document 14-1   Filed 10/25/10   Page 38 of 53

because significant amounts of such expenses were never allocated and charged to CropUSA.[2]

33.     In 2008, John Taylor sold Pacific Empire Holdings to CropUSA for $240,000. Pacific Empire Holdings[3] was formed and operated using AIA Services and/or AIA Insurance's funds, employees, office space, trade secrets and other assets to sell general insurance policies. Like other corporations formed by John Taylor such as CropUSA, John Taylor was prohibited from operating businesses that sold insurance products under his Executive Officer's Agreement. However, such obligations did not stop John Taylor and when Pacific Empire Holdings was sold, no funds or benefit was given to AIA Services or AIA Insurance, despite the corporation being derived from AIA.

34.     On July 21, 2008, Donna Taylor served a derivative demand upon the purported boards of AIA Services and AIA Insurance demanding for the corporations to take action. Despite her derivative demand letter, John Taylor and the Responsible Individuals have failed to take any action and have instead taken specific action in protecting their own individual interests instead of protecting the interests of the AIA corporations, their creditors and their shareholders.

35.     AIA Services and AIA Insurance's only substantial businesses are comprised of running off commissions and servicing insurance policies issued and/or sold over 10 years ago, and John Taylor admitted that AIA's ability to sell proprietary insurance products had ended many years ago. Thus, instead of rightfully using the corporate opportunity to sell crop insurance through AIA Services and AIA Insurance as represented to Donna Taylor and others and in business plans, the corporate opportunity to sell crop insurance was inappropriately given

---

[2] In all of the millions of dollars of funds and expenses paid for CropUSA by AIA Services and/or AIA Insurance which was purportedly repaid by CropUSA, John Taylor and the Responsible Individuals never charged any interest, profit or overhead to benefit AIA Services and/or AIA Insurance for such loans and advanced funds/services.
[3] To clarify, Pacific Empire Holdings was a different corporation from Pacific Empire Radio and Pacific Empire Communications (which are also discussed in this Complaint), with the latter two corporations owning radio station assets (some of which were derived from AIA such as KATW FM in Lewiston).

FIRST AMENDED COMPLAINT - 10

to CropUSA, an entity not partially or wholly owned by AIA Services or AIA Insurance, to the detriment of the AIA corporations, their creditors and their shareholders.

36.    John Taylor has borrowed over $307,000 from AIA Services and/or AIA Insurance for his and Connie Taylor's benefit and such indebtedness has not been paid to AIA Services and/or AIA Insurance. John Taylor and Connie Taylor have done nothing to secure this obligation or take action to the benefit of AIA Services for this $307,000+ debt, let alone make any interest payments or even permit interest to accrue on such debt.

37.    During relevant times, John Taylor has been paid over $2,500,000 in compensation for doing little, if anything at all, for the benefit of AIA Services and AIA Insurance, while he transferred and misappropriated millions of dollars of AIA Services and AIA Insurance's assets, funds, trade secrets, business opportunities, loan guarantees, employees and other assets to his benefit and to the determinant of AIA Services and AIA Insurance's shareholders and creditors. John Taylor has been a faithless fiduciary.

38.    Since John Taylor and the Responsible Individuals have been and are in control of AIA Services and AIA Insurance, they have failed to take legal action against John Taylor for the sums owed by him, for John Taylor's breaches of his Executive Officer's Agreement with AIA Services, and for the torts that John Taylor and the Responsible Individuals have committed against AIA Services, AIA Insurance and their shareholders.

39.    Over the course of the past 8 years, John Taylor has utilized funds from AIA Services and/or AIA Insurance to purchase vehicles from him for his benefit and to the determinant of AIA Services, AIA Insurance, their shareholders and their creditors.

40.    From 2007 to the present time, John Taylor and the Responsible Individuals have permitted AIA Services and AIA Insurance to pay directors $20,000 per year to serve on the

FIRST AMENDED COMPLAINT - 11

boards of AIA Services and AIA Insurance when such directors have not complied with the corporations' Articles of Incorporation, Bylaws, conflict of interest laws, fiduciary duties and the law (including, without limitation, failing to hold annual shareholder meetings for the common shareholders to elect directors and failing to appoint Donna Taylor or her representative to the board of AIA Services as required under the Amended Articles of Incorporation). These directors are being paid $20,000 per year to look after their own interests and to ignore their fiduciary obligations owed to AIA Services, AIA Insurance, their creditors and their shareholders.

41. From 1995 to the present, John Taylor has utilized AIA Services and/or AIA Insurance's employees, without compensation or payment to AIA Services/AIA Insurance, to perform services for his and Connie Taylor's residences and properties and other entities owned by John Taylor and the Responsible Individuals (including CropUSA, Pacific Empire Radio, Pacific Empire Communications, and Radio Leasing).

42. From 1995 to the present time, John Taylor and/or JoLee Duclos have been the trustees of AIA Services' 401(k) plan to the detriment of the plan participants who hold shares in AIA Services in the plan. John Taylor and JoLee Duclos have failed in their duties to the 401(k) plan.

43. From 1995 to the present, John Taylor and the Responsible Individuals have misappropriated millions of dollars of funds and assets belonging to AIA Services and AIA Insurance. AIA Services and AIA Insurance have not and are not paying their debts as they become due. AIA Services is insolvent by way of the acts of John Taylor and the Responsible Individuals or in imminent danger of insolvency. AIA Insurance is also insolvent by way of the acts of John Taylor and the Responsible Individuals or in imminent danger of insolvency.

FIRST AMENDED COMPLAINT - 12

44.     From 1995 to the present time, John Taylor and the Responsible Individuals have entered into millions of dollars of loans, transactions, advancing of funds, payment of expenses for non-AIA persons and entities, and other transactions or business arrangements which were not arms-length transactions, not in the best interests of AIA Services or AIA Insurance, and which did not provide any benefit or profit for AIA Services or AIA Insurance.

45.     All of the acts referenced above are not the sole acts subjecting John Taylor and the Responsible Individuals to liability or which supports the appointment of a receiver for AIA Services. All of the acts referenced above were not in the best interest of AIA Services and/or its wholly owned subsidiary AIA Insurance and were not in the best interests of the preferred and common shareholders of AIA Services and its creditors. All of the acts referenced above have been taken to benefit John Taylor and/or the Responsible Individuals, to the detriment of, and not in the best interests of AIA Services, AIA Insurance, their shareholders and their creditors. John Taylor and the Responsible Individuals have not operated AIA Services and AIA Insurance as corporate entities, but instead as their alter-egos and for their own personal benefit and gain. All of the above-referenced acts and/or omissions constitute John Taylor and the Responsible Individuals' intentional breaches of fiduciary duties, fraud, conversion, and breach of obligations owed to AIA Services and/or AIA Insurance and/or the commission of torts against AIA Services, AIA Insurance, their creditors and their shareholders.

46.     As a result of the above-referenced acts and/or omissions, it appears unlikely that Donna Taylor or any other preferred shareholders and creditors of AIA Services would receive the funds owed to them unless a receiver is appointed to safeguard the corporation's assets and appropriate and warranted legal action is successfully prosecuted against John Taylor, the Responsible Individuals and other persons and entities.

FIRST AMENDED COMPLAINT - 13

47.     As a result of the above-referenced acts and/or omissions, a receiver should be appointed to safeguard AIA Services' assets, businesses and revenues, while ensuring that the interests of creditors and shareholders are also safeguarded and any distributions are only made to the appropriate parties as contractually or legally required and/or after obtaining any required consent and/or court order.

## II.   FIRST CAUSE OF ACTION—BREACHES OF CONTRACT

48.     Donna Taylor re-alleges all facts asserting in the preceding paragraphs necessary to support this cause of action and/or her requested relief.

49.     AIA Services owed Donna Taylor contractual obligations under the Series A Preferred Shareholder Agreement, the previously executed letter agreements between the parties in 1995 (alternative cause of action), and/or AIA Services' Amended Articles of Incorporation to redeem Donna Taylor Series A Preferred Shares in AIA Services and make certain payments to her and other obligations. AIA Services has breached its contractual obligations owed to Donna Taylor, including, without limitation, the obligations to timely pay her and/or redeem her shares and appoint a person of her choice to the Board of AIA Services.

50.     As a direct and/or proximate result of foregoing breaches, Donna Taylor has been damaged and is presently owed in excess of $430,000, and, is therefore entitled to judgment and/or relief on this claim in an amount to be proven at trial. Donna Taylor also requests specific performance of AIA Services' obligations owed to Donna Taylor. To the extent no money judgment may be granted because of AIA Services' financial condition, for such other relief as may be requested by Donna Taylor to protect future payments should be ordered, including, without limitation, the appointment of a receiver as requested below.

///

FIRST AMENDED COMPLAINT - 14

## III.  SECOND CAUSE OF ACTION—APPOINTMENT OF A RECIEVER

51.  Donna Taylor re-alleges all facts asserting in the preceding paragraphs necessary to support this cause of action and/or her requested relief.

52.  As a result of AIA Services' insolvency and/or imminent danger of insolvency and the acts of corporate fraud, malfeasance and other unlawful acts set forth above (together with the significant funds owed to Donna Taylor) the appointment of a receiver for AIA Services is necessary and warranted.

53.  As direct and/or proximate cause of all the acts set forth above and the over $430,000 owed to Donna Taylor, the Court should appoint a receiver for AIA Services in this action to manage its affairs and those of its wholly owned subsidiary AIA Insurance.

54.  AIA Services is expected to assert that it is unable to pay Donna Taylor and therefore she may not obtain judgment for the sums owed to her.  Under this rationale, the appointment of a receiver is even more appropriate and warranted in this action, and, consequently will be requested regardless of whether a money judgment is obtained.  To permit the present management to not pay Donna Taylor and continue siphoning away and/or unlawfully transfer or utilize the few remaining funds and assets of AIA Services and AIA Insurance for their benefit would defeat the purpose for appointing a receiver.

## IV.  THIRD CAUSE OF ACTION—DECLARATORY JUDGMENT/ SPECIFIC PERFORMANCE

55.  Donna Taylor re-alleges all facts asserting in the preceding paragraphs necessary to support this cause of action and/or her requested relief.

56.  Donna Taylor requests a declaratory judgment and/or specific performance, to the extent necessary, to grant her the relief requested in this Complaint (including, without limitation, a declaratory judgment ordering AIA Services comply with its Bylaws, Amended

FIRST AMENDED COMPLAINT - 15

Articles of Incorporation, and contractual obligations) and/or such relief as may be requested at or before trial.

## V.  PRAYER FOR RELIEF

WHEREFORE, Donna Taylor prays for the following relief:

1.      For a judgment in the amount to be proven at or before trial and/or a judgment in the amount permissible under the law;

2.      For a declaratory judgment, specific performance, preliminary injunction and/or permanent injunction ordering AIA Services and any of its actual or purported officers and directors to comply with all provisions of the corporation's Bylaws and Amended Articles of Incorporation.  To the extent any part of such relief includes redeeming Donna Taylor's shares or making payment on such shares and there are insufficient funds available for those payments, then she requests that AIA Services and/or the receiver appointed to operate it be ordered to pay those funds when they become available and when approved by the Court and to safeguard the corporation and its assets in the interim.

3.      For an order and/or declaratory judgment finding that AIA Services is insolvent or in imminent danger of insolvency pursuant to I.C. § 8-601(5), Idaho law, and/or common law;

4.      For an order and/or declaratory judgment finding (in addition or in the alternative) the appointment of a receiver for AIA Services is warranted, based upon all of the acts of malfeasance, breaches of fiduciary duties, torts and other conflicted and/or inappropriate acts set forth above, pursuant to common law, Idaho law, and/or I.C. § 8-601(6);

5.      For an order and/or declaratory judgment appointing a receiver for AIA Services pursuant to I.C. § 8-601, et seq., Idaho law, and/or under the common law;

///

FIRST AMENDED COMPLAINT - 16

8/23/2010 12:00:16 PM      Tina Slegers      Hawley Troxell      Page 19
Case 1:10-cv-00404-DCN-CWD   Document 14-1   Filed 10/25/10   Page 45 of 53

6.     For declaratory judgment and/or specific performance ordering AIA Services to appoint to its board of directors the person that Donna Taylor appoints to the board through the written vote of her shares, regardless of whether such vote occurs at any shareholder meetings or by Donna Taylor delivering her written vote to the management of AIA Services, and that AIA Services has no right to determine who she appoints to the board as there are no limiting factors in AIA Services' Amended Articles of Incorporation.

7.     For an order and/or declaratory judgment granting the receiver appointed for AIA Services the power and authority to do the following, including, without limitation: (1) control and operate AIA Services and its subsidiaries (including AIA Insurance), (2) to collect sums owed to AIA Services and AIA Insurance, (3) to administer and service AIA Insurance's few remaining insurance policies, (4) to pay AIA Services and AIA Insurance's bona-fide debts, (5) to marshal AIA Services and AIA Insurance's assets, (6) to pursue new business interests for AIA Insurance and AIA Services, (7) to protect, negotiate and extend AIA Insurance's contracts with growers associations, co-ops and insurance companies (including Trustmark), (8) to pursue causes of action against the appropriate persons and entities[4] and/or (9) be granted all other powers authorized under I.C. § 8-601, *et seq.*, Idaho law, and/or the common law or as may be reasonably necessary for the receiver to properly and efficiently carry out his duties;

8.     For specific performance, a declaratory judgment, preliminary injunction and/or permanent injunction ordering AIA Services and its subsidiary AIA Insurance (collectively "them" below) (including, without limitation, pending the appointment of a receiver): (1) barring them from transferring, selling or encumbering any assets without Court approval (including,

---

[4] Donna Taylor, through other counsel, will be pursing derivative claims against many persons and entities, including, John Taylor and the Responsible Individuals. In her Complaint, she will request that all funds and assets recovered, less attorneys' fees and costs, be paid to the receiver appointed for AIA Services. None of the claims in this Complaint are being asserted derivatively and all claims are being asserted solely against AIA Services.

FIRST AMENDED COMPLAINT - 17

without limitation, the Lewis-Clark Hotel or the mortgage on such property; (2) barring them from loaning any money to John Taylor, the Responsible Individuals, CropUSA, Pacific Empire Radio and/or any other person or entity, including any entities partially or wholly owned by the Responsible Individuals without Court approval; (3) barring them from paying Connie Taylor, James Beck or any other person $20,000 or any other compensation (except for reasonable expenses attending properly noted board meetings) for purportedly serving on the board of AIA Services or its subsidiary AIA Insurance and instead order the corporation to obtain director's liability insurance with said funds; (4) ordering them to comply with all applicable Bylaws, Articles of Incorporation, and laws (including, without limitation, all provisions and laws dealing with conflicts of interest; (5) ordering them to provide financial information and specific details of all claims and lawsuits to all shareholders as required under the law to keep them reasonably information to be provided at least quarterly or when necessary; and (6) ordering them to stop providing funds, services, assets, labor and trade secrets to CropUSA; (7) ordering a full accounting of all funds, services, assets, labor and trades secrets utilized by, lent to, or provided to CropUSA and any other entity or person since 1995; and (8) such other action as is requested by Donna Taylor or required from time to time as deemed in the best interest of AIA Services and AIA Insurance.

9.     For an award of Donna Taylor's attorneys' fees and costs incurred in this action, as provided under Idaho law, including, without limitation, I.C. § 12-120 and/or I.C. § 12-121.

///

///

///

FIRST AMENDED COMPLAINT - 18

Case 1:10-cv-00404-DCN-CWD   Document 14-1   Filed 10/25/10   Page 47 of 53

10.    For such other declaratory relief, injunctive relief and/or general or specific relief and/or judgments as may be sought at or before trial by Donna Taylor and/or such other relief that the Court deems just and equitable.

DATED this 5th day of February, 2010.

CAMPBELL, BISSELL & KIRBY, PLLC

By:_____
Roderick C. Bond
Michael S. Bissell
Attorneys for Donna Taylor

VERIFICATION

STATE OF WASHINGTON        )
                           ) ss.
COUNTY OF ASOTIN           )

I, Donna J. Taylor, being first duly sworn on oath, deposes and says:

I am the Plaintiff-Petitioner in the above-entitled action. I have read the contents of this Complaint/Petition, know the contents of this Complaint/Petition, and believe that the facts in set forth in this Complaint/Petition are true and accurate to the best of my knowledge and belief.

_____
Donna J. Taylor

SUBSCRIBED AND SWORN to before me this 5th day of February, 2010.

_____
Notary Public for Washington
Residing at: Clarkston, WA
My commission expires: _____

FIRST AMENDED COMPLAINT - 19

## CERTIFICATE OF SERVICE

I, Roderick Bond, declare that, on the date indicated below, I served a true and correct copy of the foregoing on the following party(ies) via the method(s) indicated below:

Gary D. Babbitt
D. John Ashby
Hawley Troxell Ennis & Hawley LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, Idaho 83701-1617

**Via:**
( ) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(**X**) Email (pdf attachment)

Signed this 5th day of February, 2010, at Clarkston, Washington.

Roderick C. Bond

FIRST AMENDED COMPLAINT - 20

# EXHIBIT B

# *Campbell, Bissell & Kirby, PLLC*

### Attorneys & Counselors at Law

Michael S. Bissell • Licensed in WA, ID & AK
Richard D. Campbell • Licensed in WA, ID & MT
Patrick J. Kirby • Licensed in WA & ID

July 21, 2008

**Via Certified Mail and
Regular Mail**

Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc.
111 Main Street
Lewiston, ID 83501

**Re:   Demand of Donna Taylor and Reed Taylor Pursuant to Idaho Code 30-1-742**

Dear Board Members of AIA Services Corporation and AIA Insurance Inc.:

As you know, this firm represents Donna J. Taylor ("Donna"), the Series A Preferred Shareholder in AIA Services Corporation ("AIA Services"), and Reed Taylor ("Reed"), the pledgee of AIA Insurance, Inc. ("AIA Insurance") and creditor of AIA Services who is owed over $8.5 Million.

Donna and Reed hereby make demand upon the Board of Directors of AIA Services and AIA Insurance pursuant to Idaho Code 30-1-742 to take the action described herein. Specifically, demand is made that said entities immediately take action against the law firms of Hawley Troxell Ennis & Hawley; Clements, Brown & McNichols; Quarles & Brady; together with the responsible attorneys of said firms (and any other firms which have wrongfully represented the entities) for violating applicable Rules of Professional Conduct, malpractice, breach of fiduciary duties, and aiding and abetting, including, without limitation, all acts related to or involving the following claims and/or causes of action:

1. Wrongfully simultaneously representing Crop USA Insurance Agency, Inc. ("Crop USA") and AIA Services and AIA Insurance, while knowing these entities had divergent interests;

2. Taking action against the best interests of AIA Services and/or AIA Insurance;

3. Assisting in the commission of fraud and/or illegal activities;

4. Wrongfully allowing interested directors and other interested parties to direct litigation in light of substantial claims against them;

5. Issuing inappropriate opinion letters to lenders and auditors;

6. Failing to recover moneys and/or stock in Crop USA;

509-455-7100 • Fax 509-455-7111 • www.cbklawyers.com
416 Symons Building • 7 South Howard Street • Spokane, Washington 99201

**2-ER-385**

Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc.
July 21, 2008
Page - 2

7. Preventing claims from being made against present and past directors, including, without limitation, R. John Taylor, Michael Cashman, James Beck and Connie Taylor;

8. Failing to take action against Crop USA to recover funds owed;

9. Failing to take action against responsible present and past directors for violating the corporate opportunity doctrine by permitting Crop USA to become a separate company from AIA;

10. Failing to take action against interested directors and parties who took part in fraud, conspiracy and other illegal activities, including, without limitation, R. John Taylor, James Beck, Michael Cashman and Connie Taylor;

11. Breaching fiduciary duties (including the duty of loyalty) owed to AIA Services and AIA Insurance;

12. Aiding and abetting R. John Taylor, James Beck, Michael Cashman, Connie Taylor, Crop USA, and other interested parties who participated in the misappropriation of assets, opportunities, and funds of AIA Services and AIA Insurance (including the $1.5 Million wrongfully transferred from AIA Insurance to Crop USA);

13. Not ensuring that separate counsel was retained for AIA Services;

14. Not ensuring that separate counsel was retained for AIA Insurance knowing that it was pledged to Reed;

15. Assisting in illegal loan guarantees by AIA Services and/or AIA Insurance;

16. Wrongfully entering into a Joint Defense Agreement knowing that such an agreement was inappropriate in light of the significant claims AIA Services and AIA Insurance have against interested individuals and Crop USA;

17. Wrongfully obtaining shareholder consent to pay the attorneys' fees of past and present directors of AIA Services and AIA Insurance without full disclosure or obtaining votes only from disinterested shareholders;

18. Permitting Michael McNichols and Clements, Brown & McNichols to remain as counsel for R. John Taylor in violation of their duty of loyalty to AIA Services and AIA Insurance;

**2-ER-386**

Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc.
July 21, 2008
Page - 3

19. Assisting in pledging the assets of AIA Services and AIA Insurance to Crop USA for the payment of attorneys' fees and costs of interested parties and others;

20. Permitting the business and employees of AIA Insurance and AIA Services to be detrimentally effected by the actions of interested parties (e.g., transferring AIA Insurance's employees to Crop USA);

21. Failing to take action against R. John Taylor and Connie Taylor for the significant breaches of R. John Taylor's employment agreement with AIA Services;

22. Failing to comply with contractual obligations owed to Reed and Donna;

23. Failing to recover inappropriate salaries, advances, loans, benefits, and compensation paid to R. John Taylor, Connie Taylor, James Beck and others;

24. Assisting in, and failing to take action pertaining to, the improper allocation expenses, labor, rent and other expenditures inappropriately utilized for the benefit of Crop USA.

25. Accepting payments of attorneys' fees in violation of the Rules of Professional Conduct;

26. Representing AIA Services and/or AIA Insurance in making inappropriate arguments (including alleged illegality of the debt to Reed) knowing that such arguments were counter to AIA Services' obligations to Reed and Donna and knowing that Richard Riley was a witness who provided a legal opinion counter to such arguments; and

27. Accepting payment of attorneys' fees and costs which should have been allocated to other parties, including, without limitation, fees and costs that should have been paid by Crop USA, R. John Taylor, James Beck, Michael Cashman and Connie Taylor.

Based upon the above wrongful acts (and others reasonably contemplated from the above acts and other acts known only to insiders at AIA Services and/or AIA Insurance), demand is made upon you to initiate legal action against the above-referenced law firms and lawyers to recover all applicable damages and to require a disgorgement of all attorneys' fees and costs paid to them, including, without limitation, for all inappropriate transactions and the litigation involving Reed and/or Donna. Based upon the foregoing demand is also made for action against R. John Taylor, Michael Cashman, James Beck, Connie Taylor, Crop USA and all other responsible parties for the recovery of damages and the disgorgement of all compensation and attorneys' fees and costs paid to or on their behalf.

Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc.
July 21, 2008
Page - 4


Please note that I have sent a copy of this notice to present counsel for AIA Services and AIA Insurance, and trust that they will ensure copies of this Notice are provided to all board members and shareholders. I would appreciate it if you would let me know as soon as possible whether AIA Services and/or AIA Insurance will be taking any of the requested action. The failure to respond or to immediately take action shall be construed as a rejection of the demands made by this letter.

Nothing herein should be considered or relied upon as a waiver of Donna and Reed's right to take immediate action on behalf of AIA Services and/or AIA Insurance due to exigent circumstances.

Very truly yours,

CAMPBELL, BISSELL & KIRBY, PLLC

MICHAEL S. BISSELL

MSB:mah
cc:  Gary Babbitt (via email)
D. John Ashby (via email)
James Gatziolis (via email)
Charles Harper (via email)
Michael McNichols (via email)
David Gittins (via email)
Jon Hally (via email)
Roderick Bond (via email)
Reed Taylor (via email)
Donna Taylor (via regular mail)
Data\1312\notice.072108.doc

**2-ER-388**

DAVID R. RISLEY
RISLEY LAW OFFICE, PLLC
P.O. Box 1247
1443 Idaho Street
Lewiston, ID  83501
(208) 743-5338
(208) 743-5307 (Fax)
david@risleylawoffice.com
ISB No. 1789

Attorney for Defendants Michael W. Cashman, Sr.,
James Beck, R. John Taylor, CROP USA Insurance Agency, Inc.,
AIA Services Corporation and AIA Insurance, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| DONNA J. TAYLOR and DALE MIESEN, as shareholders who are brining this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.; | ) CASE NO.: 1:10-CV-00404-LMB ) ) ) |
| | ) DEFENDANTS' MICHAEL W. CASHMAN, ) SR.; JAMES BECK; R. JOHN TAYLOR; ) CROP USA INSURANCE AGENCY, INC.; |
| Plaintiffs, | ) AIA SERVICES CORPORATION; AND ) AIA INSURANCE, INC.'s |
| v. | ) MEMORANDUM IN SUPPORT OF ) MOTION TO DISMISS |
| HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN, SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; KENT PETERSEN, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation; HUDSON INSURANCE GROUP, a Delaware corporation; and GROWERS NATIONAL COOPERATIVE INSURANCE AGENCY, an Idaho corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

RISLEY LAW OFFICE, PLLC
LEWISTON, IDAHO

**TABLE OF CONTENTS**

I.   INTRODUCTION/JOINDER/RESERVATION OF DEFENSES ..................................... 1

II.  ABSTENTION ................................................................................................. 1

  A.   Introduction ............................................................................................ 1

  B.   Donna Played Key Role In All Litigation ................................................. 4

  C.   Court Should Exercise Its Discretion to Abstain .................................... 6

III. PLAINTIFFS' DERIVATIVE CLAIM SHOULD BE DISMISSED ............................... 8

IV.  JOINDER IN HUDSON'S MOTION TO DISMISS ................................................. 9

  A.   Donna's Demand is Ineffective ............................................................... 9

  B.   Donna Lacks Standing ........................................................................... 10

  C.   Plaintiffs' Non-RICO Claims Should be Dismissed ............................... 10

  D.   Plaintiffs' RICO Claims Should be Dismissed ...................................... 11

    1.   Plaintiffs Have Failed to State A Claim Under RICO ............................ 11

    2.   Plaintiffs Have Failed to Plead Predicate Acts ................................... 12

    3.   Plaintiffs Have Failed to Plead Causation .......................................... 12

V.   CONCLUSION .............................................................................................. 14

i

## TABLE OF AUTHORITIES

**Cases**

*American Int'l Underwriters v. Continental Ins. Co.,* 843 F.2d 1253, 159 (9th Cir. 1988) ............ 7

*Desoto v. Condon*, 371 Fed. Appx. 822, 824 (9th Cir. 2010) ........................................................ 12

*Grimmet v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996).................................................................... 11

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)..................................................... 13

*LaVay v. Dominion Fed. Sav. & Loan Ass'n*, 830 F.2d 522, 529 (4th Cir. 1987)......................... 14

*Manion v. Freund*, 967 F.2d 1183, 1186 (8th Cir. 1992) .............................................................. 14

*Poulos v. Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004) ............................................... 13

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) ........... 12

*Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216, 217 (S.D.N.Y. 2002)......................... 11

**Statutes**

18 U.S.C. § 1964(c) ......................................................................................................................... 11

18 U.S.C. §§ 1341 and 1343 ........................................................................................................... 12

Fed. R. Civ. P 12(b)(6)...................................................................................................................... 8

Fed. R. Civ. P. 9(b) ......................................................................................................................... 12

I.C. § 12-121 ..................................................................................................................................... 6

Idaho Code § 30-1-742 ..................................................................................................................... 8

Idaho Code § 30-1-744 ..................................................................................................................... 8

Idaho Code § 30-1-744(1)................................................................................................................. 8

**Other Authorities**

Idaho Rules of Professional Conduct 3.1.......................................................................................... 6

ii

COMES NOW, the Defendants, MICHAEL W. CASHMAN, SR., JAMES BECK, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AIA SERVICES CORPORATION, and AIA INSURANCE, INC., by and through their attorney of record, David R. Risley of Risley Law Office, PLLC, and respectfully provides the following memorandum in support of their *Motion to Dismiss*:

## I.      INTRODUCTION/JOINDER/RESERVATION OF DEFENSES

All the above-named Defendants join in the *Motion to Dismiss, or, in the Alternative, for Stay of Action* (hereinafter "HTEH's Motion to Dismiss") filed by Defendants Hawley Troxell Ennis & Hawley, LLP; Gary D. Babbitt; Richard A. Riley; and D. John Ashby (hereinafter collectively referred to as "HTEH").

All the above-named Defendants also join in *The Hudson Defendants' Motion to Dismiss* (hereinafter "Hudson's Motion to Dismiss") filed by Defendants Hudson Insurance Company and Kent Petersen (hereinafter collectively referred to as "the Hudson Defendants").

While the above-named Defendants join in and support the motions to dismiss filed by HTEH and the Hudson Defendants, they reserve additional defenses and claims to be raised if this Court fails to grant the dispositive motions currently before it.

## II.      ABSTENTION

A.      Introduction

The factual background cited in HTEH's *Memorandum in Support of Motion to Dismiss or, in the Alternative, For Stay of Action* (hereinafter HTEH's Memorandum") in support of abstention by this Court is substantially accurate, but will be supplemented hereinafter.

A review of the prior litigation leads to three conclusions:

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 1

**2-ER-392**

1.     The Plaintiff, Donna J. Taylor (hereinafter "Donna") and her ex-husband, Reed J. Taylor (hereinafter "Reed"), beginning in December of 2006 and culminating in the filing of this lawsuit, have acted in concert.

2.     This case is the seventh proceeding filed by Donna and/or Reed as Plaintiffs, and all state court proceedings have been decided in favor of the defendants and/or stayed pending the outcome of the Idaho Supreme Court appeal of *Reed Taylor v. AIA*, et al. (hereinafter "Underlying Case").

3.     The core allegations in all six state court proceedings are essentially the same and are replicated in the allegations in this matter.

It may be helpful to view the course of prior litigation, in table form, with the relevant court order referenced in the attached footnotes:

| Date | Case Name and Caption | Status | Counsel |
|------|----------------------|--------|---------|
| 1/29/07 | Reed Taylor v. AIA, et al. Nez Perce County District Court—CV07-00208 Referred to as the "Underlying Case" | On Appeal[1] | Campbell & Bissell, PLLC (Roderick C. Bond) |
| 6/2/08 | Donna Taylor v. R. John Taylor, et al. Nez Perce County District Court—CV08-1150 | Stayed[2] | Campbell & Bissell, PLLC (Michael S. Bissell) |
| 7/21/08 | Donna's Demand | Current[3] Stayed | Campbell & Bissell, PLLC (Michael S. Bissell) |

---

[1] *See*, the *Affidavit of Gary D. Babbitt in Support of Motion to Dismiss or, in the Alternative, for Stay of Action*, Exhibit H.

[2] *See*, the *Affidavit of Gary D. Babbitt in Support of Motion to Dismiss or, in the Alternative, for Stay of Action*, Exhibit GG.

[3] *See*, the *Affidavit of Gary D. Babbitt in Support of Motion to Dismiss or, in the Alternative, for Stay of Action*, Exhibit N.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 2

| Date | Case Name and Caption | Status | Counsel |
|---|---|---|---|
| 8/18/08 | Reed Taylor v. McNichols, et al. Nez Perce County District Court—CV08-1763 | Dismissed[4] | Campbell & Bissell, PLLC (Michael S. Bissell) |
| 8/18/08 | Reed Taylor v. HTEH, et al. Nez Perce County District Court—CV08-1765 Referred to as "HTEH I" | Dismissed[5] | Campbell & Bissell, PLLC (Michael S. Bissell) |
| 9/4/08 | Reed Taylor v. AIA, et al. Reed's Motion to Disqualify HTEH & McNichols | Denied[6] | Campbell & Bissell (Roderick C. Bond) |
| 10/1/09 | Reed Taylor v. HTEH, et al. Ada County District Court—CV-OC-0918868 Referred to as "HTEH II" | Dismissed[7] & Stayed | Campbell & Bissell, PLLC (Roderick C. Bond) |
| 11/23/09 | Donna Taylor v. AIA, et al. Nez Perce County District Court—CV09-02470 | Stayed[8] | Campbell & Bissell, PLLC (Roderick C. Bond) |

The history of the litigation described above is detailed in the *Affidavit of Richard A. Riley in Support of Motion to Dismiss, or, in the Alternative for Stay of Action* and *Affidavit of Gary D. Babbitt in Support of Motion to Dismiss or, in the Alternative, for Stay of Action* filed herein.  However, it is fair to note that Donna and reed were represented by the same counsel in all state court proceedings.

---

[4] *See*, the *Affidavit of Gary D. Babbitt in Support of Motion to Dismiss or, in the Alternative, for Stay of Action*, Exhibit CC.

[5] *See*, the *Affidavit of Gary D. Babbitt in Support of Motion to Dismiss or, in the Alternative, for Stay of Action*, Exhibit CC.

[6] *See*, the *Affidavit of Gary D. Babbitt in Support of Motion to Dismiss or, in the Alternative, for Stay of Action*, Exhibit M.

[7] *See*, the *Affidavit of Richard A. Riley in Support of Motion to Dismiss, or, in the Alternative for Stay of Action*, Exhibits G and H.

[8] *See*, the *Affidavit of Gary D. Babbitt in Support of Motion to Dismiss or, in the Alternative, for Stay of Action*, Exhibit HH.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 3

B.      Donna Played Key Role In All Litigation

Litigation against AIA Services Corporation and AIA Insurance, Inc. (collectively referred to as "AIA") begins with a document entitled *Subordination Agreement*.  Donna by the terms of the Subordination Agreement, subordinated to Reed "…all amounts, rights, obligations, and remedies owed to her [by AIA] in favor of (and junior to) Reed J. Taylor…."  *See*, the *Affidavit of Richard A. Riley in Support of Motion to Dismiss, or, in the Alternative for Stay of Action*, Exhibit "C," p. 1, ¶ 2.  Specifically, the Subordination Agreement contemplated that Reed would "…collect, litigate, obtain judgment, and/or enforce…" his claims against AIA and others.  *Id*. at p.1, ¶ 1.  Without this subordination, Donna would be entitled to be paid before Reed could be paid the principal sums he claims due from AIA and others.  By reason of this subordination, Reed could and did file the Underlying Case in January of 2007 and Donna loosed the torrent of litigation that brings us to this proceeding.

In June of 2008, Donna joined the fray by suing R. John Taylor (hereinafter "John") and Connie Taylor in Nez Perce County, Idaho.

On July 21, 2008, Donna, in concert with Reed, made her *Demand of Donna Taylor and Reed Taylor Pursuant to Idaho Code 30-1-742* (hereinafter "Donna's Demand").  *See*, the *Affidavit of Gary D. Babbitt in Support of Motion to Dismiss or, in the Alternative, for Stay of Action*, Exhibit "N."  Donna's Demand is aimed squarely at HTEH and had the effect, and likely the intent of, limiting AIA's ability to have the full benefit of the representation of its long time and trusted counsel, HTEH—its most effective advocates.  Reed's counsel represented Donna in making this Demand.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 4

The core allegations Donna made against HTEH in Donna's Demand were carried forward by Reed and Donna's counsel in their Motion to Disqualify in the Underlying Case; then in the lawsuit against HTEH in HTEH I; and then in the second suit against HTEH in Ada County (referred to as "HTEH II").

By June of 2010, the core claims common to Donna and Reed against HTEH had been rejected by the Honorable Jeff Brudie in the Nez Perce County District Court by his denial of their Motion to Disqualify HTEH in the Underlying Case; by Judge Brudie's dismissal of the Nez Perce County suit against HTEH in HTEH I; and by Judge Greenwood's dismissal of the Ada County suit against HTEH in HTEH II.

For the first time since January of 2007, no lawsuits were being actively litigated.

That calm was broken by the filing of this action in mid-August of 2010.

In August of 2010, that Donna continued the assault on HTEH by filing this action, taking up the fight she first started in concert with Reed in her July 21, 2008 Demand. Additional Defendants were named and a new Plaintiff added in this case, but a reading of the prior complaints, motions and decisions regarding HTEH shows the core allegations remained constant with some elaborations.

The assault on HTEH was brought in two separate court suits (before this one) and in the Motions to Disqualify in the Underlying Case. All of these actions were denied at the trial court level. While the case against HTEH lacked merit, it was an effective litigation tactic by diverting HTEH from its primary duty of defending AIA.

On September 3, 2010 the Idaho Supreme Court rejected this litigation tactic in the strongest language:

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 5

**2-ER-396**

> . . . it cannot be said that the district court abused his discretion in finding that Reed brought this claim spuriously, for the [sic] harassment purposes only.

*See*, the *Affidavit of Gary D. Babbitt in Support of Motion to Dismiss, or, in the Alternative for Stay of Action*, Exhibit "CC", p. 24.

Justice Burdick also found HTEH was entitled to attorneys' fees on appeal.

> Respondents are entitled to attorney fees under I.C. § 12-121 and I.A.R. 41 as this appeal was brought spuriously and without foundation, for harassment purposes only.

*Id*. at p. 24.

Justice Burdick's language essentially paraphrased Idaho Rules of Professional Conduct 3.1 which reads:

> A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.

Plaintiffs' *Complaint* herein invites this Court to entertain yet another chapter of this doubtful litigation tactic.  For this reason, and for the reasons cited in HTEH's Motion and supporting Memorandum, this Court is urged to decline the invitation.

C.      Court Should Exercise Its Discretion to Abstain

The choice of whether to abstain or not is vested in the sound discretion of this Court.  The authorities cited by HTEH are sufficient to make that point and will not be repeated.  On these unusual facts, the Court is urged to abstain and dismiss this case.

First, in all of the cases cited in support of abstention, the undersigned could not find a case where a federal court was approached after six cases involving substantially the same

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 6

2-ER-397

predicate facts were brought.  In effect, having failed to find a state court that agreed with her or with Reed, Donna is seeking a seventh bite at the apple.

The reasons for abstention and dismissal are clear with respect to HTEH.  Two different state court judges of good reputation and the Idaho Supreme Court have rejected the allegations made in Donna's Demand and then carried by Reed in his Motions to Disqualify in the Underlying Case in two different lawsuits.  A reading of Donna's Demand (Exhibit "N" to the *Affidavit of Richard A. Riley in Support of Motion to Dismiss, or, in the Alternative for Stay of Action* and the *Complaint*) shows the essential continuity between the spurious claims made against HTEH in the state court litigation and now in this matter.

However, abstention and dismissal is also appropriate for the case against AIA and John.  AIA and John have been sued multiple times for the same predicate acts as are set forth in the *Complaint* in this matter, and, having won a measure of victory in the various state courts, now face the daunting prospect of starting over in this Court.

As noted in the HTEH Memorandum, the 9th Circuit Court of Appeals has specifically included 'forum shopping' as a basis for a federal court to abstain from hearing a case.  *See*, *American Int'l Underwriters v. Continental Ins. Co.,* 843 F.2d 1253, 159 (9th Cir. 1988).

Having failed in multiple proceedings, in more than one county and in both the District Court and the Appellate Court levels, Donna now turns to this Court.  A more egregious example of forum shopping is unlikely to be found.

This Court is urged to abstain and dismiss this doubtful proceeding.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 7

### III.    PLAINTIFFS' DERIVATIVE CLAIM SHOULD BE DISMISSED

Again, counsel for HTEH set out the facts and the legal authorities that should result in the dismissal of this matter.  The work of HTEH will not be repeated here.

Two facts, however, should be emphasized.  First, Donna's flagrant disregard of the requirements of Idaho Code § 30-1-742 are ample grounds to dismiss this matter as to Plaintiff Dale Miesen.  *See*, HTEH's Memorandum, p. 9.  Second, the state court has before it the remedial process established in Idaho Code § 30-1-744 for consideration of the same claims against HTEH raised in Donna's Demand.  This process was stayed by Judge Brudie while he considered Reed's Motion to Disqualify.  *See*, the *Affidavit of Gary D. Babbitt in Support of Motion to Dismiss or, in the Alternative, for Stay of Action*, Exhibit M.  This state action will decide questions regarding Idaho's corporate regulatory scheme which could well be determinative of Donna's ability to bring this derivative claim.

For example, Idaho Code § 30-1-744(1) provides that the court "shall" dismiss the derivative claim if the proper process results in a determination by the corporation that a derivative action is "…not in the best interests of the corporation." *Id.*

Simply put, Donna invites this Court to act in derogation of the corporate regulatory scheme of the State of Idaho with regard to derivative actions and to circumvent the decisions by three different state court judges to stay these processes pending the outcome of the Idaho Supreme Court appeal in the Underlying Case.  This Court should ignore Donna's invitation and dismiss pursuant to Fed. R. Civ. P 12(b)(6).

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 8

IV.    JOINDER IN HUDSON'S MOTION TO DISMISS

The above-named Defendants join in the Motion to Dismiss filed by the Hudson Defendants.  While the facts and authorities cited by Hudson will not be repeated here, there are areas of particular emphasis and relevance to the above-named Defendants.

A.    Donna's Demand is Ineffective

The Hudson Defendants' *Memorandum in Support of The Hudson Defendants' Motion to Dismiss* (hereinafter "Hudson Memorandum") concretely establishes the principle that to be effective a demand for a derivative action must set forth not only the persons to be sued but also should "…describe all the claims which it is intended to assert."  *See*, Hudson Memroandum, p. 6.

Donna's Demand listed 27 alleged "bad acts" by HTEH, Clement, Brown and McNichols, P.A. and Quarles & Brady, and demanded suit be brought on those alleged grounds against those law firms, "….together with the responsible attorneys of said firms (and any other firms which have wrongfully represented the entities) . . . .  *See*, Donna's Demand, attached to the *Affidavit of Gary D. Babbitt in Support of Motion to Dismiss or, in the Alternative, for Stay of Action*, Exhibit N.

Donna's Demand does not identify the wrongdoing, other than by the lawyers, that would be a basis for such claims.  As such, the demand is defective as a matter of law.

In reliance on the authorities cited by the Hudson Defendants, this matter should be dismissed as against the above-named defendants.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 9

B.      Donna Lacks Standing

Hudson's Memorandum at p. 9 sets out facts and authorities that provide for dismissal based on the fact that Donna's interests are in conflict with those of common shareholders.  In addition, this Court is urged to review ¶ 4.20 of Plaintiffs' *Complaint* where Plaintiffs allege:

> Additionally, While Donna Taylor is not asserting a direct claim in this lawsuit, it is also true that as holder of Preferred A shares, she had priority claim to any funds held by AIA.

*Id*.

Taken at face value, Donna is claiming and reserving (not in "this lawsuit" but certainly in other litigation) that she has a "priority claim" against "any funds' that AIA might recover.  If so, far from representing the common shareholders, Donna is attempting to use the derivative process to obtain money to which she would have a "priority claim" adverse to the class she purports to represent.

C.      Plaintiffs' Non-RICO Claims Should be Dismissed

Hudson's Memorandum, pp. 12-15, clearly reveals the fatal defects in Plaintiffs' *Complaint* as to the Hudson Defendants, and, by extension, Growers National Cooperative Agency.

The dismissal of the Hudson Defendants (and Growers National) would reduce this matter to essentially the same parties and causes of action plead and now stayed in the various state court proceedings.  This provides an additional basis, should the Court grant Defendant Hudson's Motion to Dismiss, to abstain from hearing the same proceedings now pending in the various state court proceedings.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 10

The above-named Defendants reserve, should this Court not dismiss this action on the pending motions, to move the Court for the dismissal of the non-RICO claims upon the same fatal pleading defects so persuasively identified by the Hudson Defendants.

D.        Plaintiffs' RICO Claims Should be Dismissed

1.        Plaintiffs Have Failed to State A Claim Under RICO

The Hudson Defendants' counsel has well-stated the standard for this Court's review of pleadings that it can only be repeated:  Judged by the standard, Plaintiffs' RICO claims should be dismissed.

Plaintiffs' attempt to assert a derivative claim under 18 U.S.C. § 1964(c) ("RICO"), which creates a civil cause of action for a pattern of racketeering, without either alleging predicate acts with sufficiency specificity to establish a pattern of racketeering or alleging that the inadequately alleged predicate acts caused any injury is incorrect.  Instead, Plaintiffs' repeat the general allegations regarding breaches of fiduciary duty, tarted up with conclusory allegations tracking the statutory elements of a RICO claim, in hopes of "transform[ing] garden variety claims of fraud and breach of fiduciary duty into a RICO action."  *See*, *Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216, 217 (S.D.N.Y. 2002).  This is insufficient.

To state a civil RICO claim, Plaintiffs must plead (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'"  *Grimmet v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996).  Plaintiffs have pleaded neither predicate acts nor causation.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 11

2.      Plaintiffs Have Failed to Plead Predicate Acts

Plaintiffs state that the predicate acts upon which they base their RICO claim are mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.  *See*, Plaintiffs' *Complaint*, p. 32, ¶ 6.10.  However, Plaintiffs do not plead any of these alleged acts of mail or wire fraud with the specificity necessary under Fed. R. Civ. P. 9(b), which requires that they "state the time, place, and specific content of the false representations as wells as the identities of the parties to the misrepresentation."  *Desoto v. Condon*, 371 Fed. Appx. 822, 824 (9th Cir. 2010) (unpublished) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).

Instead, Plaintiffs offer vague allegations that Defendants "executed," "advance[d]," and acted "in furtherance" of the plans to defraud AIA "by use of emails, regular mail, and . . . interstate wires."  *See*, Plaintiffs' *Complaint*, p. 32, ¶ 6.10.  Plaintiffs do not allege the specific content of these alleged communications, nor do they allege who made them when, where, or to whom.  Such sweeping generalities are insufficient to support a RICO claim.   *Desoto*, 371 Fed. Appx. at 824.

3.      Plaintiffs Have Failed to Plead Causation

The vagueness of Plaintiffs' allegations of the predicate acts of mail and wire fraud is such that it is impossible to know *what* fraud was allegedly committed, let alone whether such fraud caused the injuries alleged.  In order to state a RICO claim, Plaintiffs must allege facts that, if proved, would establish that their injury was caused by the above-named Defendants' commission of the predicate acts (in this case, mail and wire fraud).  *Poulos v. Caesars World,*

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 12

*Inc.*, 379 F.3d 654, 664 (9th Cir. 2004) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).

Plaintiffs again offer only conclusory allegations that the above-named Defendants operated CropUSA as a RICO enterprise "to defraud AIA or to obtain money or property from AIA by means of false or fraudulent pretenses, representations or promises," and that they "utilized United States mail and/or interstate wire communications" to do so. *See*, Plaintiffs' *Complaint*, p. 30, ¶ 6.3. What Plaintiffs do not allege, as they cannot, is that these unspecified alleged predicate acts of mail and wire fraud caused any damages at all. The injuries as alleged – the transfer of AIA corporate assets without compensation to AIA and the payment of CropUSA's expenses, *Id.* at pp. 30-31, ¶ 6.4, 6.5 – were not caused by fraud at all, but (when read most favorably to Plaintiffs) by the Defendants' alleged breaches of fiduciary duty. Mail and wire fraud were wholly unnecessary for the Defendants, as officers and directors allegedly in complete control of AIA, to loot the company. Where the alleged looting of a corporation by its officers and directors is not accomplished by the mail or wire frauds identified as predicate acts, the alleged RICO violation is not the proximate cause of the alleged injury. *Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216, 219 (S.D.N.Y. 2002).

In *Vicon*, the plaintiff brought a RICO claim, alleging "pilfering of its corporate fisc by three supposedly faithless officers, directors and employees." *Id.* Because the pilfering was not accomplished by the acts of mail and wire fraud alleged as the predicate acts underlying the plaintiff's RICO claim – transmission of proxy solicitations to shareholders and a form 10QSB to the SEC, none of which disclosed that the defendants had pilfered from the company – the plaintiff's claim was dismissed for failure to allege that the RICO violation caused the injury. *Id.*

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 13

Here, as in *Vicon*, Plaintiffs allege that the above-named Defendants looted AIA in violation of their duties as fiduciaries, but they make no allegations that would support the conclusion that the barely alleged predicate acts caused those injuries, nor could they make such allegations. Plaintiffs allege that the same Defendants who made the misrepresentations were in "complete control over AIA." *See*, Plaintiffs' *Complaint*, p. 14, ¶ 4.12. Defendants could not have relied on their *own* alleged misrepresentations to the detriment of AIA. Defendants' alleged breaches of fiduciary duty (which are the legal and natural causes of the alleged injury) are wholly independent of the alleged mail and wire fraud. But, breach of fiduciary duty is not a predicate act under RICO and cannot support Plaintiffs' claim. *Manion v. Freund*, 967 F.2d 1183, 1186 (8th Cir. 1992) ("breach of fiduciary duty is not one of the specified state crimes listed in the definition of 'racketeering activity.'"); *LaVay v. Dominion Fed. Sav. & Loan Ass'n*, 830 F.2d 522, 529 (4th Cir. 1987) ("under no circumstances could a breach of fiduciary duty constitute a pattern of racketeering activity."). Without predicate acts or an injury caused by them, Plaintiffs' claim must be dismissed.

## V.  CONCLUSION

Beginning in December of 2006, Donna Taylor and Reed Taylor have waged a legal war of attrition against AIA and the individual defendants. Six lawsuits in state court, a subsidiary Motion to Disqualify, and Donna's Demand for derivative relief have all required AIA, R. John Taylor and the other above-named Defendants to defend, and defend, and defend.

A central strategy in this wasting strategy was to attack opposing counsel, particularly HTEH. The "spurious" assault on opposing counsel (as quoted by Justice Burdick) came to grief some three weeks after this case was filed. Not only was Judge Brudie's outright 12(b)(6)

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 14

dismissal of the complaint upheld by the Idaho Supreme Court, but defendants were awarded costs on appeal because the appeal was spurious as well.

Having been soundly and decisively beaten in state court, the same claims are now being pressed in this Court. To that extent, this Court should abstain and dismiss as to HTEH, even if other defendants might be treated differently.

The Hudson Defendants and Growers National Cooperative Agency, for the reasons set out in Hudson's Memorandum, appear to have been hauled into this case in an attempt to try to distinguish this case from the six underlying proceedings. These defendants ought to be dismissed as well.

The RICO claims are also an attempt to make this case look different than the underlying matters and to give a federal veneer to what is truly a matter of corporate law and disputes premised in state law actions. A dismissal of the RICO claims is well-supported and further erodes the apparent difference between this matter and the underlying cases.

Finally, the remnant defendants face the uncertainty of the outcome in the Underlying Case now on appeal. Two other suits by Donna, and one by Reed against former counsel for AIA, remain stayed while the appeal is considered. The decision on appeal in the Underlying Case will be necessary to a systematic and coherent resolution of the state law actions. Three different state court judges have so held.

By June of 2010, with the entry of the stay order in Ada County, all of this litigation had come to an end. Unsatisfied with the results of their efforts, Donna filed in this Court asking for a different judge and hoping for a different result. This is "forum shopping" at its worst, and invites this Court to continue litigation that is well and truly tried before the courts of the State of

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 15

**2-ER-406**

Idaho and to continue countenancing an assault on HTEH which was already found to be "spurious."

This Court has the discretion to abstain, and it is hard to imagine a more appropriate case for the Court to so conclude.

The above-named Defendants' respectfully request all pending Motions to Dismiss be granted herein.

DATED this 1st day of November, 2010.

RISLEY LAW OFFICE, PLLC
Attorney for Defendants Michael W. Cashman, Sr.,
James Beck, R. John Taylor, CROP USA Insurance Agency, Inc.,
AIA Services Corporation and AIA Insurance, Inc.


By:_____/s/ *David R. Risley*_____
        DAVID R. RISLEY
        ISB NO. 1789

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS—Page 16

**2-ER-407**

Case 1:10-cv-00404-LMB   Document 35   Filed 01/14/11   Page 1 of 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

Donna Taylor

        Plaintiff,

vs.

Hawley Troxell Ennis &Hawley LLP

        Defendant

Case No. 1:10-cv-00404-LMB

**NOTICE OF ASSIGNMENT TO A
UNITED STATES MAGISTRATE
JUDGE AND CONSENT FORM**

---

In accordance with District of Idaho General Order No. 237, you are notified that the above entitled action has been assigned to a United States Magistrate Judge to conduct all proceedings in this case, including trial and entry of final judgment.

Exercise of this jurisdiction by a United States Magistrate Judge is, however, permitted only if all parties file a written consent form, a copy of which is part of this notice. You may also, without adverse consequences, request immediate reassignment to a District Judge. No Judge will be informed of a party's response to this notification, unless all parties have consented to the assignment of the matter to a United States Magistrate Judge. All parties are requested to return this form within 60 days of receipt to the Clerk of Court. Any party deciding to proceed before a United States Magistrate Judge should sign the consent to proceed form and return it to the Clerk of Court by e-mailing the same in .pdf format to the following address: consents@id.uscourts.gov. If you are a pro se litigant, you should mail this form to the following address: U.S. District Court, 550 W. Fort St. Room 400, Boise, ID 83724. The parties may submit a joint consent, similar to a stipulation, before or after receiving this Notice.

An appeal from a judgment entered by a United States Magistrate Judge will be directly to the United States Court of Appeals for the Ninth Circuit in the same manner as an appeal from any other judgment of this District Court. 28 U.S.C. § 636(c); Fed.R.Civ.P. 73.

### CONSENT TO THE EXERCISE OF JURISDICTION
### BY A UNITED STATES MAGISTRATE JUDGE

In accordance with provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and District of Idaho General Order No. 237, the undersigned party to this case consents to have a United States Magistrate Judge conduct any and all proceedings in this case, including the trial, and order the entry of a final judgment.

| Party Represented | Signature | Date |
|---|---|---|
| Hawley Troxell Ennis &
Hawley, LLP, Gary D. Babbitt
Richard A. Riley and
D. John Ashby | *[signature]* | 3-7-11 |

**2-ER-408**

Case 1:10-cv-00404-LMB   Document 35   Filed 01/14/11   Page 1 of 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Donna Taylor<br><br>    Plaintiff,<br><br>vs.<br><br><br>Hawley Troxell Ennis &Hawley LLP<br><br>    Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:10–cv–00404–LMB<br><br><br><br>**NOTICE OF ASSIGNMENT TO A<br>UNITED STATES MAGISTRATE<br>JUDGE AND CONSENT FORM** |

In accordance with District of Idaho General Order No. 237, you are notified that the above entitled action has been assigned to a United States Magistrate Judge to conduct all proceedings in this case, including trial and entry of final judgment.

Exercise of this jurisdiction by a United States Magistrate Judge is, however, permitted only if all parties file a written consent form, a copy of which is part of this notice. You may also, without adverse consequences, request immediate reassignment to a District Judge. No Judge will be informed of a party's response to this notification, unless all parties have consented to the assignment of the matter to a United States Magistrate Judge. All parties are requested to return this form within 60 days of receipt to the Clerk of Court. Any party deciding to proceed before a United States Magistrate Judge should sign the consent to proceed form and return it to the Clerk of Court by e—mailing the same in .pdf format to the following address: consents@id.uscourts.gov. If you are a pro se litigant, you should mail this form to the following address: U.S. District Court, 550 W. Fort St. Room 400, Boise, ID 83724. The parties may submit a joint consent, similar to a stipulation, before or after receiving this Notice.

An appeal from a judgment entered by a United States Magistrate Judge will be directly to the United States Court of Appeals for the Ninth Circuit in the same manner as an appeal from any other judgment of this District Court. 28 U.S.C. § 636(c); Fed.R.Civ.P. 73.

### CONSENT TO THE EXERCISE OF JURISDICTION
### BY A UNITED STATES MAGISTRATE JUDGE

In accordance with provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and District of Idaho General Order No. 237, the undersigned party to this case consents to have a United States Magistrate Judge conduct any and all proceedings in this case, including the trial, and order the entry of a final judgment.

| Party Represented | Signature | Date |
|---|---|---|
| Michael W. Cashman, Sr. | /s/ David R. Risley | 3/18/2011 |
| James Beck<br>R. John Taylor<br>CROP USA Insurance Agency, Inc.<br>AIA Service Corporation<br>AIA Insurance, Inc. | | |

Case 1:10-cv-00404-DCN-CWD   Document 43   Filed 03/21/11   Page 3 of 3
Case 1:10-cv-00404-LMB   Document 35   Filed 01/14/11   Page 1 of 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

Donna Taylor )
      Plaintiff, ) Case No. 1:10-cv-00404-LMB
)
vs. ) **NOTICE OF ASSIGNMENT TO A**
) **UNITED STATES MAGISTRATE**
) **JUDGE AND CONSENT FORM**
Hawley Troxell Ennis &Hawley LLP )
      Defendant )
)
)

In accordance with District of Idaho General Order No. 237, you are notified that the above entitled action has been assigned to a United States Magistrate Judge to conduct all proceedings in this case, including trial and entry of final judgment.

Exercise of this jurisdiction by a United States Magistrate Judge is, however, permitted only if all parties file a written consent form, a copy of which is part of this notice. You may also, without adverse consequences, request immediate reassignment to a District Judge. No Judge will be informed of a party's response to this notification, unless all parties have consented to the assignment of the matter to a United States Magistrate Judge. All parties are requested to return this form within 60 days of receipt to the Clerk of Court. Any party deciding to proceed before a United States Magistrate Judge should sign the consent to proceed form and return it to the Clerk of Court by e-mailing the same in .pdf format to the following address: consents@id.uscourts.gov. If you are a pro se litigant, you should mail this form to the following address: U.S. District Court, 550 W. Fort St. Room 400, Boise, ID 83724. The parties may submit a joint consent, similar to a stipulation, before or after receiving this Notice.

An appeal from a judgment entered by a United States Magistrate Judge will be directly to the United States Court of Appeals for the Ninth Circuit in the same manner as an appeal from any other judgment of this District Court. 28 U.S.C. § 636(c); Fed.R.Civ.P. 73.

### CONSENT TO THE EXERCISE OF JURISDICTION
### BY A UNITED STATES MAGISTRATE JUDGE

In accordance with provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and District of Idaho General Order No. 237, the undersigned party to this case consents to have a United States Magistrate Judge conduct any and all proceedings in this case, including the trial, and order the entry of a final judgment.

Party Represented        Signature        Date

_Plaintiffs_        _[signature]_        _3/18/11_

**2-ER-410**

RODERICK C. BOND, ISB No. 8082
RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA  98004
Telephone:  (425) 591-6903
Fax:  (425) 321-0343
Email: rod@roderickbond.com

Attorney for Plaintiff Donna J. Taylor

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONNA J. TAYLOR, a shareholder who is bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>    Plaintiff,<br><br>    v.<br><br>HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CONNIE TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation,<br><br>    Defendants. | Civil No. 1:10-cv-00404-MLB<br><br>NOTICE OF APPEARANCE (RODERICK C. BOND) AND RESPONSE IN OPPOSITION TO MOTION TO DISMISS |

TO:            The Clerk of the Court;

AND TO:      All Attorneys of Record.

NOTICE OF APPEARANCE AND RESPONSE
RESPONSE IN OPPOSITION TO MOTION TO DISMISS - 1

2-ER-412

The undersigned attorney hereby enters a Notice of Appearance in the above entitled action for and on behalf of the Plaintiff Donna J. Taylor and requests that all papers, documents, filings and pleadings in this action be served upon said attorney at the address indicated on page 1 of this Notice of Appearance.

The Plaintiff Donna J. Taylor having appeared through the undersigned attorney respectfully asserts that the pending Motion to Dismiss (Dkt. 57) should be rendered moot. The undersigned apologizes to counsel and the Court for any delay in the filing and serving of this Notice of Appearance. Without waiving any attorney-client privilege, the undersigned attorney was first contacted on Friday, March 16, 2012 regarding appearing in this matter.

DATED: This 18th day of March, 2012.

RODERICK BOND LAW OFFICE, PLLC

By:                    /s/
        Roderick C. Bond
        Attorney for Plaintiff Donna J. Taylor

NOTICE OF APPEARANCE AND RESPONSE
RESPONSE IN OPPOSITION TO MOTION TO DISMISS - 2

**2-ER-412**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of March, 2012, I have filed a copy of the foregoing Notice of Appearance and Response in Opposition to Motion to Dismiss electronically through the CM/EDF system, which caused the following parties or counsel to be served by electronic means, as indicated on the Notice of Electronic Filing.

Lee H. Rousso
lee@leerousso.com
Former attorney for plaintiff

David R. Risley
david@risleylawoffice.com
Attorney for Michael W. Cashman, Sr.
R. John Taylor, Crop USA Insurance
Agency, Inc., AIA Services Corporation
and AIA Insurance Inc.

James D. LaRue
jdl@elamburke.com
Loren C. Ipsen
lci@elamburke.com
Attorneys for Richard A. Riley, Hawely Troxell
Ennis & Hawley LLP, Gary D. Babbitt and
D. John Ashby

                                    _____/s/_____
                                    Roderick C. Bond

NOTICE OF APPEARANCE AND RESPONSE
RESPONSE IN OPPOSITION TO MOTION TO DISMISS - 3

**2-ER-413**

MICHAEL D. GAFFNEY, ISB No. 3558
BEARD ST. CLAIR GAFFNEY PA
2105 Coronado Street
Idaho Falls, Idaho 83404
Tel:    (208) 523-5171
Fax:    (208) 529-9732
Email:  gaffney@beardstclair.com

RODERICK C. BOND, ISB No. 8082
RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA  98004
Telephone:  (425) 591-6903
Fax:  (425) 321-0343
Email: rod@roderickbond.com

Attorneys for Plaintiff Donna J. Taylor

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONNA J. TAYLOR, a shareholder who is bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>v.<br><br>HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CONNIE TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation,<br><br>Defendants. | Civil No. 1:10-cv-00404-MLB<br><br>PLAINTIFF DONNA J. TAYLOR'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO LIFT STAY |

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 1

Plaintiff Donna J. Taylor, by and through her undersigned counsel, submits this Memorandum of Law in Support of her Motion to Lift Stay:

## I.   INTRODUCTION

Upon the request of the defendants, the Court stayed this case pending the resolution of other non-derivative lawsuits. During the stay, the defendants successfully asserted that the redemption of Reed Taylor's shares was illegal—that the minority shareholders were harmed. With that ruling in their pocket, R. John Taylor ("John Taylor"), Connie Taylor Henderson, James Beck and Michael Cashman have mocked this Court by embarking on an illegal and oppressive scheme to squeeze out the minority shareholders for ten cents per share through a reverse stock split and eliminate their standing to pursue derivative claims.

Donna Taylor, with the support of thirteen other shareholders, requests that the stay be lifted in this case so that appropriate action may be taken to ensure that AIA Services and AIA Insurance recovers the millions of dollars in funds and assets taken by the defendants and to ensure that the corporations and their minority shareholders are made whole.

## II.   FACTUAL BACKGROUND

The following Factual Background ("Facts"), together with all Affidavits cited below, are incorporated by reference into each and every argument asserted in Section III below.

**A.** On December 14, 1987, Reed and Donna Taylor executed a Property Settlement Agreement for their divorce. (Bond Aff., Ex. 1.) They contributed the shares of several entities, including AIA Insurance, to consolidate all of their holdings under the umbrella of AIA Services, and in exchange, received 200,000 Series A Preferred Shares and additional common shares in AIA Services. (*Id.*, Ex. 1, p. 2-4, 33-34.) Under that Agreement, Donne Taylor received the

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 2

Series A Preferred Shares and the articles of incorporation were amended to reflect the Agreement. (Bond Aff., Ex. 1, p. 2-4, 29-58; Ex. 2.) On December 2, 1993, Donna Taylor exercised her right to have Preferred A Shares redeemed. (*Id.*, Ex. 50, p. 20.) Later, AIA Services, through John Taylor, executed a Series A Preferred Shareholder Agreement for the redemption of her shares. (*Id.*, Ex. 8.) The Series A Preferred Shareholder Agreement was drafted by Richard Riley, required all of her shares to be redeemed within ten years and that shares were redeemed as payments were made. (*Id.* at p. 3 & 7; Ex. 38, p. 2; Ex. 50, p. 20.)

B.      In 1995, John Taylor desired to redeem Reed Taylor's shares to obtain control of AIA and bring in a new management team to shift AIA Services' focus to selling other products. (*Id.*, Ex. 5, p. 20 & 37; Ex. 9 p. 121.) Thus, to carry out this new plan, John Taylor, James Beck, Michael Cashman and Richard Campanaro sought to purchase Reed Taylor's shares in AIA Services through a leveraged stock redemption.[1] (*Id.*, Ex. 5, p. 12-14, 32, 49, 62-77, 87.) Michael Cashman, James Beck and John Taylor executed an Investment Agreement wherein Cashman and Beck were not obligated to purchase Series C Preferred Shares until Reed Taylor's shares were redeemed on terms acceptable to them, and they entered into a voting agreement. (Bond Aff., Ex. 5, p. 69, §9(d)-(f).) Reed Taylor never exerted his majority control to effectuate the redemption and Richard Riley provided Reed Taylor with an Opinion Letter stating that no laws were violated and the all required shareholder consents had been obtained, among other material representations.[2] (*Id.*, Ex. 5, p. 2, ¶2; Ex. 6.) In a letter to the shareholders, John Taylor stated: "I

---

[1] By saddling AIA Services with the debt, John Taylor, James Beck and Michael Cashman breached their fiduciary duties to AIA Services, but obtained control of AIA Services without being personally liable.

[2] This is the Opinion Letter subject to the claims asserted in *Taylor v. Riley, et al.*, which case is set for trial in December 2012 and has no bearing on the claims in this lawsuit. (Bond Aff., ¶9.)

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 3

urge you to support and ratify the transactions proposed in these documents."[3] (Bond Aff., Ex. 5, p. 14.) John Taylor and Connie Taylor (both attorneys) became the majority shareholders in AIA Services by redeeming Reed's shares in an effort to take the company public. (*Id.*, ¶12, Ex. 5, p. 87, Ex. 9, p. 121; Ex. 10, p. 211; Ex. 12, p. 28 & 70; Ex. 15, p. 86-88; Ex. 51, p. 7.) Even John Taylor's self-serving Executive Officer's Agreement[4] admits: "AIA proposes to purchase the Common Stock of Reed J. Taylor, majority shareholder of AIA, so that [John Taylor] and Richard Campanaro,[5] will obtain operational and financial control of AIA." (*Id.*, Ex. 7, p. 1.)

C.     To persuade the shareholders to have AIA Services redeem Reed Taylor's shares, John Taylor, James Beck and Michael Cashman promised to guaranty a $1 Million loan for AIA Services, but they never did. (*Id.*, ¶9, Ex. 5, p. 32 & 63, §3.) Instead, in 1996 and 1997, John Taylor placed 92,500 Series C Preferred Shares in the employees' 401(k) retirement plan, which provided $925,000 of the retirement funds to help fund the their "plan." (*Id.*, Ex. 50, p. 21-22.) According to Paul Pederson, a former auditor, "beginning in 1999, AIA management begins to conduct a series of questionable transactions that divert funds away from AIA to the benefit of other entities…" (*Id.*, Ex. 61, p. 10, ¶15.) In a 2000 Business Plan drafted by AIA that was never produced in discovery, John Taylor represented that "AIA, through its new subsidiary AIA Crop Insurance, Inc., will begin providing a line of multi-peril crop insurance at the request of farm associations." (*Id.*, Ex. 65, p. 3.) However, later that year "AIA Crop Insurance, Inc." changed its name to "CropUSA Insurance Agency, Inc." (*Id.*, Ex. 64.) The defendants put into action their

---

[3] The Private Placement Memorandum  was one of "these documents" provided to the shareholders. The Investment Agreement was never provided to the shareholders. (*Id*., Ex. 5, p. 15--77.)

[4] This is the same Executive Officer's Agreement that is subject to Donna Taylor's claims in this lawsuit. That Agreement contains non-compete and non-solicitation provisions that John Taylor has and continues to breach. (*Id*., Ex. 7, p. 2-4; Ex. 5, p. 32; First Amended Complaint, p. 30-31.)

[5] Richard Campanaro acted as the lead investor for Beck and Cashman, but he was later terminated by AIA Services and his shares were transferred to Beck and Cashman. (*Id*., ¶10.)

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 4

plan to commit a double fraud against AIA by first transferring ownership of CropUSA to themselves and then using AIA's funds and assets as a platform to fund it. (Bond Aff., Ex. 61, p. 14-20.) The obvious self-dealing is evidenced by the board resolution stating that, without consideration: "AIA Services Corporation has declined to continue to operate the company as a subsidiary of AIA and wants the Company to be independent." (*Id*., Ex. 56, p. 6.) Next, John Taylor wrote the "exit strategy" letter to the Series C Shareholders (Beck and Cashman):

> Over the last few years, AIA's management and directors have been looking for ways to create an exit strategy for your investment in AIA. We had originally planned to take AIA public, but it is unlikely in the foreseeable future…With Crop USA, we believe there is a better opportunity for a clearly defined exit strategy…Crop USA will have the potential to be acquired or become fully tradable…Crop USA was created by AIA…

(*Id*., Ex. 55, p. 1; *see also id.,* Ex. 14, p. 83, 87-88, 90.) Not surprisingly, all of the Series C Shareholders elected to convert their AIA shares into common shares of CropUSA, since AIA had no products to sell. (*Id*., Ex. 9, p. 161; Ex. 56.) No conversion offer was made to the Preferred C Shares held in the 401(k) Plan and no shareholder approval was obtained. (*Id*., ¶50; Ex. 14, p. 83; Ex. 56, p. 3-4.) At that time, John Taylor, Connie Taylor, Michael Cashman and James Beck were the controlling majority shareholders of CropUSA, while AIA owned nothing. (*Id*., Ex. 9, p. 108-09; Ex. 37, p. 8.) By email, James Beck confirmed to John Taylor the great opportunity that they had stolen from AIA: "Mike [Cashman] and I are so convinced that Crop USA is a winner that anything standing in the way of a good result will be a crime." (*Id*., Ex. 53.)

**D.**     In 2000, although the conditions were never met to trigger the warrants, the defendants issued additional common shares to the former Preferred C Shareholders who later unlawfully converted their shares into common shares of CropUSA (these shares are at issue in this case). (*Id*., p. ¶61; Ex. 5, p. 12; Ex. 67, p. 9; First Amended Complaint, p. 37.) Although the defendants

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 5

initially gave some of those "free" common shares to the other Preferred C Shareholder, the 401(k) Plan, those shares were taken away two years later. (Bond Aff., Ex. 67, p. 6 & 9.)

E.    On August 4, 2004, John Taylor and the others embarked on a scheme to illegally transfer AIA Insurance's year-end bonus check of $1,510,693 by depositing those funds into a new bank account with his home address on that account and cloaked the transaction as AIA Insurance's re-purchase of the Preferred C Shares. (Bond Aff., Ex. 58-61.) Notably, the purported purchase price was based upon the same $1,510,693 that AIA Insurance received from Trustmark and the work papers of AIA's in-house accountant noted "fixing" the books, taking notes of John Taylor's instructions, the parties present at meetings, and that the $1,510,693 was actually additional paid in capital to CropUSA. (*Id.*, Ex. 48, p. 1-4.) John Taylor initially classified the purchase as a redemption by AIA Services and stated the shares were to be canceled, but they were later held by AIA Insurance as an "investment" in its parent AIA Services. (Bond Aff., Ex. 58, p. 3.) The CropUSA board meeting minutes conceded: "CropUSA desires to liquidate…the Preferred Shares to provide resources for its expansion plans…the marketability of the shares to a third party would be problematic." (*Id.*, Ex. 60.) As Mr. Pederson noted: "[t]his appears to be a thinly veiled attempt to capitalize CropUSA while depleting the financial resources of AIA." (*Id.*, Ex. 61, p.16.) This "transaction" acted as a double fraud upon AIA because CropUSA used AIA's money to pay off debts owed to AIA of $360,693 and $273,576.14, respectively. (*Id.*, Ex. 61, p. 1.) If the transaction had not occurred, then AIA would have an additional $1,510,693 in cash and CropUSA would owe AIA $634,269.14, plus interest—an improvement of over $2,100,000 to AIA's balance sheet. (*Id.*) Moreover, the purchase violated the Amended Articles of Incorporation since a "prorata" amount of Preferred

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 6

C Shares was not purchased from the 401(k) Plan.[6] (*Id.*, Ex. 3, p. 14, §4.3.5(b); Ex. 10, p. 34.)

F.    In 2005, despite having received an option grant that was based upon the illegal purchase of Reed Taylor's shares and having breached his Executive Officer's Agreement by competing against AIA and violating other terms of that Agreement, John Taylor exercised his options and acquired an additional 475,000 shares in AIA Services. (*Id.*, Ex. 7, p. 2-4 & 7, §16; Ex. 67, p. 3.) These shares further dilute the minority shareholders' ownership interest and are at issue in this case, i.e., subject to rescission or disgorgement. (First Amended Complaint, p. 37.)

G.    In 2006, the defendants had AIA Insurance guaranty a $15 Million line-of-credit for CropUSA. (First Amended Complaint, p. 18-19.) James Beck even conceded the problems with that guaranty posed: "[s]ince AIA Insurance is a guarantor, how does Reed Taylor enter into the discussion and what obligations do we have with Reed."  (Bond Aff., Ex. 54.) Those same problems plague them with the corporations and that guaranty violated the Amended Articles of Incorporation. (*Id.*, Ex. 3, p. 5, §4.2.9(c).) Richard Riley, the same attorney who provided Reed with the Opinion Letter, opined that this $15 Million guaranty was permissible, when it was barred. (*Id.*, ¶6; Ex. 3, p. 5, §4.2.9(c); First Amended Complaint, p. 18 & Ex. G.)

H.    On June 13, 2008, all of the defendants made a settlement offer to Reed Taylor in *Taylor v. AIA Services, et al.* (Bond Aff., Ex. 16.) The offer essentially provided that the remaining assets of AIA Services would be given to Reed Taylor and there were no provisions for the Series C Preferred Shareholders or minority common shareholders. (*Id.*) In response, Reed Taylor demanded, *inter alia*, that the Series A and Series C Preferred Shareholders be paid in full, that CropUSA be merged back into AIA, that the innocent minority shareholders receive

---

[6] Any reasonable, prudent director and officer, particularly one who is an attorney, would have acted equally redeeming Preferred C Shares in the 401(k) Plan before embarking on preferential treatment of others.

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 7

10 shares or more shares for each share they presently held,[7] and that the minority shareholders approve any settlement after full disclosure. (*Id.*, Ex. 17, p. 4.) That offer was rejected and the defendants never provided any payment to the minority shareholders. (*Id.*, p. 6-7, ¶14.)

I.      Paul Pederson, a former auditor for Arthur Andersen & Co., opined on the self-dealing after a preliminary investigation: (1) ownership of CropUSA was transferred from AIA; (2) AIA subsidized CropUSA; (3) none of John Taylor's compensation was allocated to CropUSA; (4) it is impossible to know the extent of unallocated expenses paid by AIA for CropUSA; (5) there was over $500,000 of identified expenses paid by AIA that were never allocated or billed to CropUSA; (6) CropUSA was capitalized with over $1.5 Million cash by having AIA Insurance re-purchase Series C Preferred Shares in its parent corporation, while AIA Insurance paid the taxes on that $1.5 Million; (7) AIA Insurance guaranteed a $15 Million loan for CropUSA for no consideration;[8] (8) CropUSA's sale of $10 Million in assets that were derived from AIA; (9) AIA purchased over $400,000 of shares in Pacific Empire Radio Corp. ("PERC") and then transferred those shares to John Taylor; (10) AIA Insurance transferred a $95,000 receivable owed by PERC to CropUSA;[9] (11) AIA was providing labor and services at no cost for other entities owned by John Taylor; (12) AIA paid excessive compensation to John Taylor;[10] (13) AIA was redeeming hundreds of thousands of dollars of other common shares; (14) John Taylor and Connie Taylor purchased a parking lot, using AIA's line-of-credit, and promptly increased

[7] Contrast Reed's attempt to require the minority shareholders receive ten or more shares for each share they held to John Taylor, Connie Taylor and James Beck's attempt to eliminate them as shareholders altogether for ten cents per share through a reverse stock split. (Bond Aff., Ex. 51, p. 8.) Similarly, Donna refuses to settle unless payment is made to the innocent minority common shareholders. (*Id.*, Ex. 41, p. 10-11.)

[8] This guaranty violated the Amended Articles of Incorporation. (Bond Aff., Ex. 3, p. 5-8, §4.2.9.)

[9] The loans to PERC violated the Amended Articles of Incorporation. (*Id.*)

[10] Although in 2008, John Taylor admitted that he worked for CropUSA (Bond Aff., Ex. 9, p. 82), he was contractually obligated to "devote [his] entire time and efforts to AIA's business and affairs…" (*Id.*, Ex. 7, p. 2, §3.) Contrary to his testimony, the $250,000 salary was only for the first three years. (*Id.* at §4.) There was no board approval for the payment of the $250,000 in yearly salary for any years after the initial three-year term.

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 8

the $5,000 yearly rent paid by AIA to $15,000; and (15) AIA purchased vehicles from John

Taylor, among other transactions.[11] (Bond Aff., Ex. 61, p. 14-20.) Mr. Pederson concluded:

> The previously noted financial transactions identified to date represent deliberate instances of self-dealing and questionable business transactions involving the use of AIA as a financial platform to fund other unrelated or competing opportunities. Without doubt, these transactions were detrimental to AIA…

(*Id*., Ex. 61, p. 20, ¶28.) By their own admissions, John Taylor, James Beck, and JoLee Duclos

operated the companies for their benefit with complete disregard to the minority and preferred

shareholders. (*Id*., Ex. 9-15.) Peter Jarvis, an author ethics treatises and desk books, addressed

the self-dealing and ethical dilemmas facing the defendants (Bond Aff., Ex. 21, p. 5-12):

> Even if AIA Services were not insolvents, its corporate officers, and therefore its counsel would owe duties to see to it that AIA Services was run for the benefit of the entity itself, including all of its shareholders, and not for the benefit of the majority shareholder or others with an interest in misappropriating the assets of AIA Services. The same is true for AIA Insurance, which was and is not insolvent; its officers and its counsel owed and owe duties to see to it that AIA Insurance is run for the benefit of the entity itself, including all of its shareholders, and not for the benefit of the majority shareholder or others with an interest in misappropriating the assets of AIA Insurance…
>
> The defenses mounted by AIA Services and AIA Insurance in this case would thus appear to have little or nothing to do with the protection of the interests of AIA Services and AIA Insurance and much if not everything to do with the defense of John Taylor and other individual defendants who have actually or allegedly worked with him to the detriment of AIA Services and AIA Insurance…John Taylor [is] calling the shots for reasons having little or nothing to do with the interests of AIA Services or AIA Insurance and far more to do with his own self-interest and the interests of his friends and colleagues.

(*Id*., Ex. 21, p. 8-9, ¶¶(f) & (i).) Mr. Jarvis' opinions are even more applicable here.

   **J.**   When the defendants asserted that the redemption of Reed Taylor's shares was illegal,

Connie Taylor asserted that she and James Beck could be liable to the minority shareholders for

---

[11] Notably, the defendants have never provided full and fair disclosure about any of the malfeasance.

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 9

"breach of [their] fiduciary duties as board members" if AIA continued making payments to Reed Taylor. (Bond Aff., Ex. 23, p. 2.)  Later, Connie Taylor and James Beck asserted in their Memo that the minority shareholders were being harmed, that statutory restrictions were in place to protect the "minority shareholders from the fate now befalling the AIA Services minority shareholders," that "the illegal stock redemption agreement [should be invalidated] to protect the minority shareholders," that "one of the central purposes of stock redemption statutes is to prevent an insider majority shareholder…from stepping in front of the minority shareholders" and ensure that "that all equally situated shareholders will share equally in the corporation's assets" (*Id.*, Ex. 22, p. 3-5, 30-31, 33-34.) On appeal, the Respondents took this same position in a Joint Brief, which is contrary to their present position of exerting their majority control to squeeze-out the minority shareholders for ten cents per share.[12] (*Id.*, Ex. 24, p. 24-26; Ex. 51.)

K.     On July 21, 2008, Donna Taylor served a derivative demand upon the boards of AIA Services and AIA Insurance. (*Id.*, Ex. 18.) In response, AIA petitioned the court to appoint an independent inquiry. (*Id.*, Ex. 19.) Reed Taylor supported the requested inquiry, but the defendants never followed through and no inquiry was ever conducted. (*Id.*, ¶17; Ex. 20.) On August 11, 2010 (over two years later), Donna Taylor filed her Complaint in this action. (Complaint.) At the request of the defendants, the Court stayed this action.

L.     On September 7, 2011, the Idaho Supreme Court affirmed the illegality of the redemption of Reed Taylor's shares, but noted "the malfeasance of the other parties and their attorneys in engineering this illegal agreement and unlawfully transferring millions of dollars from AIA Services to another entity, CropUSA." *Taylor v. AIA Services Corp.*, 151 Idaho 552,

---

[12] Connie Taylor and James Beck were represented before the district court and on appeal by David Risley. (Bond Aff., Ex. 22 & 24.) Donna objects to Mr. Risley purportedly represents all of the non-attorney defendants in this action, which is impermissible under the Rules of Professional Conduct. (*See e.g. Id.*, Ex. 21, p. 5-12.)

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 10

**2-ER-423**

567, 261 P.3d 829 (2011). Although ruled irrelevant on that appeal, those issues are squarely before this Court and the defendants have not denied any of those facts.[13] On November 4, 2011, Donna Taylor's counsel wrote an email to David Risley regarding settlement for all preferred and minority common shareholders and requested financial information on the corporations, but he received no response. (Bond Aff., Ex. 26.) On December 29, 2011, Judge Brudie denied Reed Taylor's Motion to Amend and granted the defendants Motion for Judgment on the Pleadings, and he no longer has any claims pending in that case. (*Id.*, ¶24; Ex. 27.) On January 4, 2012, Donna Taylor voluntarily dismissed, without prejudice, her action to appoint a receiver for AIA Services because it was no longer insolvent. (Bond Aff., ¶25; Ex. 28.) Donna Taylor's case against John Taylor and Connie Taylor remains stayed and she has not, and could not, assert both direct and derivative claims in that case. (*Id.*, ¶45.)

**M.**    On March 30, 2012, John Taylor, without obtaining shareholder approval, terminated AIA Services' Employee Stock Ownership Plan and paid those shareholders three cents per share. (*Id.*, Ex. 29; Ex. 51, p. 9.) According to the 2007 stock ledger, this action eliminated another 88,225 common shares in AIA Services. (*Id.*, Ex. 67, p. 1.)  Between March 31, 2012 and April 3, 2012, Donna Taylor's counsel wrote numerous emails to David Risley and other attorneys objecting to the termination of the ESOP Plan and requesting information, but none of the attorneys responded (which included a demand by six shareholders for the board to take action on a number of items and to comply with the articles of incorporation and bylaws). (Bond

---

[13] In *Taylor v. McNichols*, 149 Idaho 826, 243 P.3d 642 (2010), the Idaho Supreme Court held that Reed Taylor's claims were frivolous because they were not properly pled, although it found that "[u]nder this same reasoning, the allegations of aiding and abetting in the commission of tortious acts, although marginally pled, must await resolution of the Underlying Case." *Id.* at 843. Although this finding is inconsistent with awarding fees against Reed Taylor because his entire complaint was not frivolous, Donna Taylor has adequately pled aiding and abetting claims against all of the defendants in this action and there is no litigation privilege to protect them because the claims are being pursued on behalf of the corporations.

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 11

Aff., ¶¶28-31; Ex. 31-34.) This derivative demand was also delivered to AIA Services' office, but no response was ever received to that demand. (*Id.*, ¶29; Ex. 32.)

**N.** Despite the prior unlawful loans and guaranties, John Taylor and the others transferred a $95,000 loan due from PERC to CropUSA at the end of 2006, and since that time they have lent PERC an additional $806,562 (PERC is 46.32% owned by John and Connie Taylor and AIA has no ownership interest in that entity). (*Id.*, Ex. 37, p. 9 & 11, n. 10; Ex. 38, p. 2.) The foregoing loans are barred by the Amended Articles of Incorporation and Restated Bylaws. (*Id.*, Ex. 3, p. 8, §4.2.9(g); Ex. 4, p. 9, §4.14, p. 23, §14.1.)

**O.** On July 3, 2012, after years of ignored requests for financial information and demands for annual shareholder meetings, John Taylor sent a letter, notice of shareholder meeting, proxy statement, proxy and Consolidated Financial Statements to AIA Services' shareholders regarding having the first annual shareholder meeting in over eight years. (Bond Aff., ¶¶32-36; Ex. 25-26, 30-38; Hostetler Aff., ¶6; Miesen Aff., ¶4; Legg Aff., ¶4.) The notice of the meeting, sent over the 4th of July holiday week, stated that AIA Services intended to effectuate a 53,000 to 1 reverse stock split, by order of the purported board of directors (who did not disclose any conflicts of interest under I.C. § 30-1-1003). (Bond Aff., Ex. 51, p. 3, 8-9.) Notably, John Taylor, Connie Taylor and James Beck assert that ten cents per share was a fair price, when John Taylor had valued his shares at almost $1.5 Million in 2005 and Connie Taylor had stated her community interest in the share was $900,000 in 2007—both of which occurred before the debt of over $8.5 Million owed to Reed Taylor was eliminated, before AIA received the $1.3 Million Lewis Clark Mortgage and before AIA received $800,000 (both of the foregoing were litigation settlements). (Bond Aff., ¶43; Ex. Ex. 15, p. 139-40; Ex. 49.) Thus, after AIA's balance sheet improved by

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 12

over $10.6 Million, a reverse stock split is warranted and the value of the minority shareholders' stock is ten cents per share. (*Id.*, Ex. 37.) John and Connie Taylor's valuations are at odds with the ten cents per share they are offering the minority shareholders. (*Id.*, Ex. Ex. 15, p. 139-40; Ex. 49.) Moreover, the ten cents per share placed no value on the millions of dollars sought in this lawsuit and none of the transactions outlined in these Facts were credited to the balance sheets. (*Id.*, Ex. 37-38.) Fourteen shareholders (holding over 132,000 shares) voted against the reverse stock split, made demands for appraisal and made derivative demands, while John Taylor and one other shareholder holding less than 2,000 shares voted in favor, over objections. (*Id.*, ¶¶35-39; Ex. 39-41; Miesen Aff., ¶4-7.) Notably, the share purchase purportedly valuing the shares at ten cents per share was based upon John Taylor's purchase of the common shares that were illegally issued at no cost to CropUSA shareholders. (Bond Aff., Ex. 51, p. 8; Facts, §D.) In addition, the recent financial statements contain notes which were either never previously provided or were materially different than the last financial statements with notes. (*Compare Id.*, Ex. 37, 50 & 62.) While the recent financial statements provide the first disclosure of the defendants' ownership in competing companies, they do not explain how the ownership was acquired nor do they disclose the malfeasance involving the defendants. (*Id.*, Ex. 37.)

P.     Prior to the shareholder meeting on July 16, 2012, Dale Miesen, who had traded a book of renewal business worth over $500,000 for his 45,000 shares in AIA Services, personally delivered the original proxies and demands for payment. (Miesen Aff., ¶¶2-5; Bond Aff., ¶36; Ex. 39-40.) Mr. Miesen and counsel for twelve other shareholders attended the meeting and objected to the appointment of John Taylor, Connie Taylor and James Beck to the board of AIA Services and objected to the reverse stock split. (Bond Aff., ¶38; Ex. 39-41; Miesen Aff., ¶¶5-8.)

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 13

When Mr. Miesen questioned John Taylor as to how he acquired his ownership interest in CropUSA and why AIA had lent over $800,000 to PERC, John Taylor replied "no comment." (Miesen Aff., ¶; Bond Aff., ¶39; Ex. 38, p. 2.) When counsel asked John Taylor how he and the others were qualified to serve on the board based upon their conflicts of interest and whether his shares were qualified to vote on the reverse stock split since it was a preferential transaction, he replied "no comment" to both questions and later refused to answer any more questions. (Bond Aff., ¶¶37-39.)  When Mr. Miesen asked John Taylor to name one reason for the reverse stock split, he replied: "we obviously want to turn this company into an LLC." (Miesen Aff., ¶6.) After the shareholder meeting, counsel for thirteen of the shareholders sent numerous emails to counsel for AIA Services, Doug Siddoway, requesting information and making shareholder demands, but he only responded one time stating that he was representing AIA Services and inquired whether the undersigned counsel was representing Paul Durant. (Bond Aff., ¶¶40-42; Ex. 42-48.) Despite the demands and objections, AIA Services filed an Amended Articles of Incorporation and proceeded to file a lawsuit against all fourteen shareholders. (*Id.*, Ex. 52 & 66.)

Q.    Fourteen shareholders, representing over 132,000 common shares, objected to and voted against the reverse stock split, *inter alias*, since no payments may be made to common shareholders because: (1) no dividends could be declared or paid in the Series C Preferred Shares if payments were in arrears on the Preferred A Shares; and (2) no common shares could be purchased by AIA Services, whether whole or fractional, if dividends had not been paid on the Series C Preferred Shares. (Bond Aff., Ex. 3, p. 8, §4.2.9(f), p. 10, §4.2.12, p. 12, §4.3.3.) Donna Taylor presently holds over $400,000 in Series A Preferred Shares and AIA Services is in arrears on those payments under the Amended Articles of Incorporation and the Series A Preferred

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 14

2-ER-427

Shareholder Agreement. (*Id.*; & Ex. 37, p. 3 & p. 10 n. 5; Ex. 41, p. 10-11, §19.) Although John Taylor will dispute the amount owed to Donna Taylor, there is no dispute that her Series A Preferred Shares have not been redeemed and payments are in arrears to her. (*Id.*, & Ex. 15, p. 152-53.) As of December 31, 2011, the face value of $925,000, plus over $1,202,500 in accrued and unpaid dividends, was owed on the 401(k) Plan's Series C Preferred shares. (*Id.*, Ex. 37, p. 10 n. 6.) According to Lee Ann Hostetler, she never receives statements for the over $200,000 Preferred C Shares held in her name in the 401(k) Plan and she has been unable to withdraw any funds. (Hostetler Aff., ¶¶4-5; Bond Aff., Ex. 37, p. 10 n. 6.)

R.     James Beck testified that he serves on the board of directors of AIA Services to look after him and his friends' ownership interest in CropUSA. (*Id.*, Ex. 13, p. 20-21.) John Taylor testified that he is not concerned about complying with any securities laws, obtaining shareholder approval for spinning off a new business and that he makes all of the decisions for CropUSA and AIA. (*See e.g., Id.*, Ex. 9, p. 152-53; Ex. 10, p. 208-09; Ex. 11, p. 199.) James Beck, John Taylor and Connie Taylor testified that they understood that preferred shares had payment priority, yet they are attempting to effectuate a reverse stock split by paying off lower priority common shares when the Preferred A Shares have not been redeemed and they are inappropriately valuing the Preferred Shares at only $7.36 per share, which is less than the $10 face value, plus accrued dividends of over $12 per share. (Bond Aff., Ex. 9, p. 116-17; Ex. 13, p. 92; Ex. 15, p. 152-53; Ex. 37, p. 10.) Connie Taylor, an attorney and purported member of the board of AIA Services, testified that she has done nothing to recover the $1.5 Million transferred to CropUSA. (*Id.*, Ex. 15, p. 154-55.) John Taylor, Connie Taylor or James Beck have never addressed or disclosed the malfeasance or any of their irreconcilable conflicts of interest. (Bond Aff., Ex. 9-14, 37.)

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 15

**2-ER-428**

### III.    ARGUMENT

"[A] derivative suit is a device to protect shareholders against abuses by the corporation, its officers, and directors and is a vehicle to ensure corporate accountability." 19 Am. Jur. 2d Corporations § 1945 (2012). "A court's power to stay is discretionary…" 1 Am. Jur. 2d Action § 69 (2012). "[T]he pendency of a state court action in personam is no ground for abatement or stay of a like action in the federal court, although the same issues are being tried and the federal action is subsequent to the state court action." *Ermentrout v. Commonwealth Oil Company*, 220 F.2d 527 (5th Cir. 1955). "There is no rule of law to prevent the maintenance of two in personam derivative actions." 19 Am. Jur. 2d Corporations § 2132 (2012).

The Court exercised its discretion when it stayed this action. Based upon the Facts set forth above and any one or more of the arguments below, it is time to protect the minority shareholders of AIA Services and ensure the accountability of the defendants in this action by lifting the stay—a stay that has prejudiced the minority shareholders at the hands of the defendants since this action could have been tried by now and the millions of dollars recovered.

**A. The stay should be lifted to prevent the defendants from eliminating the minority shareholders' derivative claims for tens cents per share.**

A valid reverse stock may result in the elimination of a shareholder's rights to pursue derivative claims. *See Quinn v. Anvil Corp.*, 620 F.3d 1005, 1012-13 (9th Cir. 2010.)

Here, because John Taylor and the others are clearly attempting to squeeze out the minority shareholders for ten cents per share thereby eliminating their derivative claims, the Court should lift the stay in this action. (Facts, §§O-Q.) Since fourteen shareholders timely served demands for appraisal and asserted that an appraisal should not be completed before this action is resolved, it is imperative that this action be set for trial as soon as possible. At the

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 16

**2-ER-429**

shareholder meeting, John Taylor responded to material questions with "no comment." (Facts, §P.) Significantly, it appears that the defendants may be attempting to eliminate their personal liability by permitting judgment to be entered against AIA Services for the appraised value. *See* I.C. §§ 30-1-1330(5), 30-1-1331(4). For that reason alone, this action needs to proceed to trial in order to ensure AIA Services has the funds to pay any attorneys' fees, expenses and damages for any judgment in the appraisal lawsuit—assuming that the reverse stock split withstands the shareholder challenges. Moreover, even if the reverse stock split was legal (an issue that will be hotly challenged) and the payments are finally made to the minority shareholders, Donna Taylor will remain a Series A Preferred Shareholder and Lee Ann Hostetler will remain a the beneficial holder of approximately $200,000 in Series C Preferred Shares. (Facts, §Q.) Thus, in any event, they will still be able to pursue the claims in this action for the benefit of the corporations and AIA Services' preferred and innocent minority shareholders—no one else has or will do so.

B. **The stay should be lifted because the reverse stock split violates I.C. § 30-1-1302.**

A shareholder may challenge a reverse stock split if it violates the articles of incorporation, violates the bylaws, involve conflicts of interest and/or fraud. I.C. § 30-1-1302(4); *see also* I.C. §§ 30-1-830, 30-1-841, 30-1-842, 30-1-862, 30-1-863.

Here, the reverse split will be challenged based upon all of the above grounds.[14] Even if the reverse stock split was legal and passed the "smell test" as a compelling business purpose, the payments to the minority common shareholders, whether for whole or fractional shares, cannot be made until the over $1,200,000 in accrued dividends are paid on the Series C Preferred

---

[14] In addition, Donna Taylor and other shareholders intend to challenge the reverse stock split based upon the fact that there is no legitimate purpose for the transaction. *See e.g. Shivers v. Amerco*, 832-35 (9th Cir. 1982) (Under the compelling business reason test, a shareholder must prove he acted in good faith or upon a compelling business purpose); *The Ravenswood Investment Co. v. Bishop Capital Corp.*, 374 F.Supp.2d 1055 (D. Wyoming 2005). John Taylor and Connie Taylor Henderson, both attorneys, have failed to meet any of the required burdens.

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 17

Shares and those payments may not be made until the over $400,000 in arrears payments are made on the Series A Preferred Shares. (Facts, §Q.)  The damages in this lawsuit will be required to make all of those payments and make the corporations and the minority shareholders whole. (Facts, §B-R.) As such, the stay should be lifted on this basis alone.

## C. **This case will resolve factual and legal issues in this case could render the reverse stock split moot, or, at a minimum, substantially increase any appraisal.**

Donna Taylor, with the support of thirteen other shareholders, is seeking millions of dollars in damages and other relief from John Taylor and the other defendants that would impact the ultimate outcome of the reverse stock split—assuming that it was legal. (Facts, §§B-R.) If this action results in a judgment against John Taylor, all of his shares in AIA Services could be executed upon to satisfy a portion of that judgment. AIA Services' execution upon John and Connie Taylor's common shares, whether through a pre-judgment writ of attachment or after obtaining judgment, would likely satisfy only a fraction of any favorable judgment in this case— but would eliminate John and Connie Taylor as shareholders and would unwind the reverse stock split altogether—a result that would be in the best interests of AIA Services. This lawsuit also stands to recover millions of dollars—again for the benefit of the corporations and their preferred and common shareholders. (Facts, §§B-R.)

## D. **The Idaho Supreme Court never addressed the defendants' liability to the corporations and their minority shareholders.**

When the Idaho Supreme Court affirmed the illegality of Reed Taylor's redemption, it acknowledged: "the malfeasance of the other parties and their attorneys in engineering this illegal agreement and unlawfully transferring millions of dollars from AIA Services to another entity, CropUSA." *Taylor v. AIA Services Corp.*, 151 Idaho 552, 567, 261 P.3d 829 (2011).

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 18

2-ER-431

While the Idaho Supreme Court left Reed Taylor where it found him, there was no such ruling for the individual defendants in this lawsuit who engineered that illegal redemption. (Facts, §§B-G.) Moreover, after asserting illegality allegedly for the benefit of the minority shareholders, John Taylor and the others are now attempting to squeeze-out those same minority shareholders that they represented to the Supreme Court they were protecting and eliminate their derivative claims. (Facts, §§J, O-R.) The defendants have been talking out of both sides of their mouth.

**E. It would conserve judicial time and the resources of all parties if the stay is lifted in this lawsuit and certain other shareholders join as plaintiffs.**

Since Donna Taylor filed this action, there are now thirteen additional shareholders who support her and are requesting that action be taken on behalf of the corporations. (Bond Aff., Ex. 41; Facts, §§O-Q.) At least six other shareholders who are not residents of Idaho wish to join this lawsuit. (Bond Aff., ¶37; Miesen Aff., ¶9; Hostetler Aff., ¶13; Ex. A; Legg Aff., ¶8.) It would be a waste of judicial resources to require those shareholders to all file new lawsuits, when this lawsuit has been filed and pending for almost two years.[15] 19 Am. Jur. 2d Corporations § 1945 (2012). This lawsuit should be promptly tried for the benefit of the corporations and AIA Services' shareholders—regardless of the legality of the reverse split.

### IV.  CONCLUSION

For any one or more of the reasons articulated above, the Court should lift the stay in this action. Neither Donna Taylor nor any of the other minority shareholders should be further prejudiced through any further stay in this action. Moreover, the defendants should not be permitted to avoid personal liability through an illegal reverse stock split. Even if the reverse

---

[15] For example, the holders of the Series C Preferred Shares in AIA Services' 401(k) Plan could also pursue an ERISA action against the same defendants in this action. *See* ERISA § 404, 29 U.S.C. § 1104. John Taylor was the trustees of the 401(k) Plan during the significant malfeasance. (Bond Aff., Ex. 63, p. 1.)  Lifting the stay and setting this case for trial would also likely prevent the need for one or more other federal lawsuits.

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 19

split was legal, this action should be set for trial forthwith so that any future appraisals made to

value the stock are made after including the damages recovered in this case.[16]

DATED: This 30th day of July, 2012.

BEARD ST. CLAIR GAFFNEY PA             RODERICK BOND LAW OFFICE, PLLC


By:_____/s/ Michael D. Gaffney_____        By: _/s/ Roderick C. Bond_____
Michael D. Gaffney                     Roderick C. Bond
Attorney for Plaintiff Donna J. Taylor        Attorney for Plaintiff Donna J. Taylor

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of July, 2012, I have filed a copy of the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as indicated on the Notice of Electronic Filing.

David R. Risley
david@risleylawoffice.com
Attorney for Michael W. Cashman, Sr.
R. John Taylor, James Beck, Crop USA Insurance
Agency, Inc., AIA Services Corporation
and AIA Insurance Inc.

James D. LaRue
jdl@elamburke.com
Loren C. Ipsen
lci@elamburke.com
Attorneys for Richard A. Riley, Hawely Troxell
Ennis & Hawley LLP, Gary D. Babbitt and
D. John Ashby

_____/s/ Roderick C. Bond/_____
Roderick C. Bond

---

[16] Donna Taylor and other shareholders will challenge the legality of the reverse stock split on numerous grounds. If that reverse split is proven to be legal, then they will request the district court to stay any appraisal proceeding until this case is resolved. Thus, it is imperative that this case be set for trial as soon as possible.

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO LIFT STAY - 20

MICHAEL D. GAFFNEY, ISB No. 3558
BEARD ST. CLAIR GAFFNEY PA
2105 Coronado Street
Idaho Falls, Idaho 83404
Tel:     (208) 523-5171
Fax:     (208) 529-9732
Email: gaffney@beardstclair.com

RODERICK C. BOND, ISB No. 8082
RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA  98004
Telephone:  (425) 591-6903
Fax:  (425) 321-0343
Email: rod@roderickbond.com

Attorney for Plaintiff Donna J. Taylor

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONNA J. TAYLOR, a shareholder who is bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.; <br><br> Plaintiff, <br><br> v. <br><br> HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CONNIE TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation, <br><br> Defendants. | Civil No. 1:10-cv-00404-MLB <br><br> AFFIDAVIT OF JERRY A.  LEGG |

AFFIDAVIT OF JERRY A. LEGG - 1

2-ER-434

STATE OF OKLAHOMA           )
                           ) ss:
COUNTY OF KAY              )

I, Jerry A. Legg, being first duly sworn on oath, deposes and says:

1.      I am a citizen of the United States, a resident of Oklahoma State, over the age of eighteen, competent to testify in court, and make this Affidavit based upon my own personal knowledge.

2.      I am the owner of 12,000 common shares in AIA Services Corporation ("AIA Services"), which I have held since before 1995. I have never received any compensation or dividends on my 12,000 shares. To my recollection, I worked at AIA from 1982 or 1983 through until about 1995. I was the Oklahoma state manager for AIA for group health insurance.

3.      I was compensated through receiving a commission from AIA for any policies that I personally sold.  I also received an override commission for any policies sold by other agents in Oklahoma. I also received commission compensation for renewals of the policies that I sold and for the renewals of policies that other agents sold in Oklahoma for AIA. At one time, there were four area managers in Oklahoma and approximately a total of 21 agents working in Oklahoma selling group health insurance policies for AIA.

4.      Sometime in the first week or two of July, 2012, I received a proxy statement, proxy, notice of shareholder meeting, financial statements and letter from AIA Services. Prior to receiving these documents, I had not been provided any notices or communications regarding any annual shareholder meetings or copies of any financial statements from AIA Services for at least over eight years.

5.      Attached to the Affidavit of Roderick C. Bond are true and correct copies of my proxy, my demand for payment and my shareholder demand. Upon my instructions, they were

AFFIDAVIT OF JERRY A. LEGG - 2

**2-ER-435**

2-ER-436

all to be delivered to AIA Services Dale Miesen or Paul Durant on or before July 16, 2012. It is my understanding that Dale Miesen delivered these documents to AIA Services before the vote on the reverse stock split.  Like many others, I objected to the reverse stock split and objected to the ten cents that was proposed to be paid for the my shares.  I specifically voted against the reverse stock split and the appointment of John Taylor, Connie Taylor Henderson and James Beck to the board of AIA Services.  I have not been advised of, nor provided with full disclosure of, any conflicts of interest pertaining to John Taylor, Connie Taylor Henderson and James Beck as it pertains to their purported service on the board of AIA Services or any other transaction.

6.      As demonstrated by their attempt to effectuate a reverse stock split that would pay us 10 cents per share and as seen in the Consolidated Financial Statements provided to us that fail to disclose a number of transactions and why other loans and transactions occurred, it is clear to me that John Taylor, Connie Taylor Henderson and James Beck only care about themselves and their interests in CropUSA and the other entities that have benefited from AIA's funds, assets and personnel to the detriment of the corporations and all of the minority shareholders and preferred shareholders. Since 1995, John Taylor and the others in control have never done anything for the minority shareholders of AIA Services. This fact could not be better evidenced through the present reverse stock split that he is pursuing.

7.      I support Donna Taylor and respectfully request that the Court permit her to immediately pursue the claims in this case for the benefit of all of the minority common and preferred shareholders of AIA Services. Although I understand that Reed Taylor attempted to obtain a settlement for the minority shareholders, Donna Taylor has been the only person willing to look after our interests. The persons in control—John Taylor, Connie Taylor Henderson, James Beck and Michael Cashman have never looked after our interests.  Regardless of whether

AFFIDAVIT OF JERRY A. LEGG - 3

**2-ER-436**

I am able to join this lawsuit, I am confident that Donna Taylor will look after the interests of the minority common and preferred shareholders of AIA Services and I urge the Court to permit her to proceed on our behalf, as I know other minority shareholders request.  I consent to Donna Taylor pursuing the claims on my behalf in this case.

8.      If the Court lifts the stay, I intend on requesting that I become a named plaintiff along with Donna Taylor and further support her and the other innocent minority shareholders of AIA Services to recover funds, assets and damages for the benefit of the corporations. If the Court does not permit this lawsuit to proceed, I fear that my common shares in AIA Services will not ever receive the value that we all deserve and are duly owed. The other innocent shareholders of AIA Services who did not have the wherewithal or knowledge to vote against the reverse stock split also need to be made whole.  We all deserve far more than 10 cents per share and we all deserve to have the full value paid for our common shares, along with full disclosure of everything that has transpired since 1995.

DATED:  This 30th day of July, 2012.

_____/s/ *Jerry A. Legg*_____
Jerry A. Legg

SUBSCRIBED AND SWORN to before me this 27th day of July, 2012.

_____/s/_____
Notary Public for Oklahoma
Residing at:_____/s/_____
Commission expires:_____/s/_____

AFFIDAVIT OF JERRY A. LEGG - 4

**2-ER-437**

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of July, 2012, I have filed a copy of the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as indicated on the Notice of Electronic Filing.

David R. Risley
david@risleylawoffice.com
Attorney for Michael W. Cashman, Sr.
R. John Taylor, James Beck, Crop USA Insurance
Agency, Inc., AIA Services Corporation
and AIA Insurance Inc.

James D. LaRue
jdl@elamburke.com
Loren C. Ipsen
lci@elamburke.com
Attorneys for Richard A. Riley, Hawely Troxell
Ennis & Hawley LLP, Gary D. Babbitt and
D. John Ashby

       /s/                       
Roderick C. Bond

AFFIDAVIT OF JERRY A. LEGG - 5

## 2-ER-438

MICHAEL D. GAFFNEY, ISB No. 3558
BEARD ST. CLAIR GAFFNEY PA
2105 Coronado Street
Idaho Falls, Idaho 83404
Tel:    (208) 523-5171
Fax:    (208) 529-9732
Email:  gaffney@beardstclair.com

RODERICK C. BOND, ISB No. 8082
RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA  98004
Telephone:  (425) 591-6903
Fax:  (425) 321-0343
Email: rod@roderickbond.com

Attorney for Plaintiff Donna J. Taylor

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONNA J. TAYLOR, a shareholder who is bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>v.<br><br>HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CONNIE TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation,<br><br>Defendants. | Civil No. 1:10-cv-00404-MLB<br><br>AFFIDAVIT OF DALE L. MIESEN |

AFFIDAVIT OF DALE L. MIESEN - 1

**2-ER-439**

STATE OF TEXAS                    )
                                  ) ss:
COUNTY OF TARRENT                 )

I, Dale L. Miesen, being first duly sworn on oath, deposes and says:

1.      I am a citizen of the United States, a resident of Texas, over the age of eighteen, competent to testify in court, and make this Affidavit based upon my own personal knowledge.

2.      I am the owner of 45,000 common shares in AIA Services Corporation ("AIA Services"), which I have held since about 1988.  The original amount was about 19,552, of which I assigned a total of 4,552 shares jointly to my children and retained 15,000. Subsequently, there was a 3 for 1 split and the total shares went from 19,552 to 58,656. Neither I nor my children have ever received any compensation or dividends on my 45,000 shares or our additional jointly held 13,656 shares. John Taylor advised me prior to the exchange of my insurance commissions and renewals in 1988 that that AIA Services would effectuate a public offering. Based upon that representation, I traded AIA Services my rights to all renewal commissions on insurance premiums, which had paid AIA in excess of $500,000 by mid-1991.

3.      I had worked hard selling the group health insurance policies and managing several states as a Regional VP (on straight commission paying my own expenses) when I traded for my original 19,552 common shares, now totaling 58,656 collectively, which I have received absolutely no dividends or compensation on since those shares were issued to me. I sold group health policies in Kansas, Idaho, Colorado, Utah and Nebraska. After trading my renewals, AIA Services accidently provided me with a statement some years later, about mid-1991, of the renewal income from the policies that I sold.  That statement confirmed that the value of the renewal premiums at that point exceeded the $500,000 that I believed they were worth.

AFFIDAVIT OF DALE L. MIESEN - 2

4.      While I was out of town from my home near Dallas Texas, visiting in Idaho, I received word of John Taylor's letter and proxy materials.  Fortunately, I was able to reschedule some things so I could personally attend the shareholder meeting. I later learned that I received a proxy statement, proxy, notice of shareholder meeting, financial statements and letter from AIA Services. Prior to receiving these documents, I had not been provided any notices or communications regarding any annual shareholder meetings or copies of any financial statements from AIA Services for at least over eight years, and probably at least twelve years, despite my repeated requests for financial statements. Other than a separate log-in for the AIA website to review the mostly irrelevant documents identified in Lee Ann Hostetler's Affidavit, I received the same documents that are attached to Lee Ann Hostetler's Affidavit and Mr. Bond's Affidavit.

5.      Attached to the Affidavit of Roderick C. Bond are true and correct copies of my proxy, my demand for payment and my shareholder demand. Prior to the start of the shareholder meeting on July 16, 2012, I delivered to AIA Services the originals of the proxies and demands for payment for fourteen shareholders. During the meeting, I delivered the original Shareholder Demands to John Taylor.  As with the other thirteen shareholders, I objected to the reverse stock split and objected to the ten cents that was proposed to be paid for the my shares.  I specifically voted against the reverse stock split and the appointment of John Taylor, Connie Taylor Henderson and James Beck to the board of AIA Services.  I have not been advised of, nor provided with full disclosure of, any conflicts of interest pertaining to John Taylor, Connie Taylor Henderson and James Beck as it pertains to their purported service on the board of AIA Services or any other transaction.

6.      I traveled from Texas to personally attend the shareholder meeting held on July 16, 2012. When I asked John Taylor how he acquired his interest in CropUSA, he replied: "no

AFFIDAVIT OF DALE L. MIESEN - 3

**2-ER-441**

comment." When I asked John Taylor why AIA had lent money to Pacific Empire Radio, he replied: "no comment." When I asked John Taylor to identify the reasons for the reverse stock split, he replied "we discussed various business reasons." When I asked him to name one, he replied: "we obviously want to turn this company into an LLC." When I asked John Taylor that until this case is concluded, how can he come to a fair valuation, he replied: "I'm sure it will be be." But the Consolidated Financial Statements provided no specific value or line-item entry for the millions of dollars requested in this lawsuit. When I advised John Taylor that I felt the reverse split violated the law and the bylaws, John replied: "there will be no further comment on this." When I asked John Taylor what consideration and compensation we got for CropUSA, he replied: "No comment." When I attempted to ask additional questions, John Taylor replied that the meeting was closed, despite the fact that I had traveled from Texas to be at the meeting. I objected to the meeting, the reverse stock split and the appointment of John Taylor, Connie Taylor Henderson and James Beck to the board of AIA Services.

7.      As demonstrated by their attempt to effectuate a reverse stock split that would pay us 10 cents per share and as seen in the Consolidated Financial Statements provided to us that fail to disclose a number of transactions and why other loans and transactions occurred, it is clear to me that John Taylor, Connie Taylor Henderson and James Beck only care about themselves and their interests in CropUSA and the other entities that have benefited from AIA's funds, assets and personnel to the detriment of the corporations and all of the minority shareholders and preferred shareholders. Since 1995, and even before, John Taylor and the others in control have never done anything for the minority shareholders of AIA Services. This fact could not be better evidenced through the present reverse stock split that he is pursuing.

AFFIDAVIT OF DALE L. MIESEN - 4

**2-ER-442**

8.      I support Donna Taylor and respectfully request that the Court permit her to immediately pursue the claims in this case for the benefit of all of the minority common and preferred shareholders of AIA Services. Although I understand that Reed Taylor attempted to obtain a settlement for the minority shareholders, Donna Taylor has been the only person willing to look after our interests. The persons in control—John Taylor, Connie Taylor Henderson, James Beck and Michael Cashman have never looked after our interests.  Regardless of whether I am able to join this lawsuit, I am confident that Donna Taylor will look after the interests of the minority common and preferred shareholders of AIA Services and I urge the Court to permit her to proceed on our behalf, as I know other minority shareholders request.  I consent to Donna Taylor pursuing the claims on my behalf in this case.

9.      If the Court lifts the stay, I intend on requesting that I become a named plaintiff along with Donna Taylor and further support her and the other innocent minority shareholders of AIA Services to recover funds, assets and damages for the benefit of the corporations. If the Court does not permit this lawsuit to proceed, I fear that my common shares in AIA Services will not ever receive the value that we all deserve and are duly owed. The other innocent shareholders of AIA Services who did not have the wherewithal or knowledge to vote against the reverse stock split also need to be made whole.  We all deserve far more than 10 cents per share and we all deserve to have the full value paid for our common shares, along with full disclosure of everything that has transpired since 1995.

DATED:  This 30th day of July, 2012.

_____

Dale L. Miesen

AFFIDAVIT OF DALE L. MIESEN - 5

**2-ER-443**

SUBSCRIBED AND SWORN to before me this 30th day of July, 2012.

_____/s/_____
Notary Public for Texas
Residing at: _____/s/_____
My commission expires: _____/s/_____

AFFIDAVIT OF DALE L. MIESEN - 6

**2-ER-444**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 30th day of July, 2012, I have filed a copy of the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as indicated on the Notice of Electronic Filing.

David R. Risley
david@risleylawoffice.com
Attorney for Michael W. Cashman, Sr.
R. John Taylor, James Beck, Crop USA Insurance
Agency, Inc., AIA Services Corporation
and AIA Insurance Inc.

James D. LaRue
jdl@elamburke.com
Loren C. Ipsen
lci@elamburke.com
Attorneys for Richard A. Riley, Hawely Troxell
Ennis & Hawley LLP, Gary D. Babbitt and
D. John Ashby

_____/s/_____
Roderick C. Bond

AFFIDAVIT OF DALE L. MIESEN - 7

**2-ER-445**

MICHAEL D. GAFFNEY, ISB No. 3558
BEARD ST. CLAIR GAFFNEY PA
2105 Coronado Street
Idaho Falls, Idaho 83404
Tel:    (208) 523-5171
Fax:    (208) 529-9732
Email: gaffney@beardstclair.com

RODERICK C. BOND, ISB No. 8082
RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA  98004
Telephone:  (425) 591-6903
Fax:  (425) 321-0343
Email: rod@roderickbond.com

Attorney for Plaintiff Donna J. Taylor

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONNA J. TAYLOR, a shareholder who is bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>v.<br><br>HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CONNIE TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation,<br><br>Defendants. | Civil No. 1:10-cv-00404-MLB<br><br>AFFIDAVIT OF LEE ANN HOSTETLER |

AFFIDAVIT OF LEE ANN HOSTETLER - 1

**2-ER-446**

STATE OF IDAHO                         )
                                      ) ss:
COUNTY OF NEZ PERCE                    )

I, Lee Ann Hostetler, being first duly sworn on oath, deposes and says:

1.      I am a citizen of the United States, a resident of Washington State, over the age of eighteen, competent to testify in court, and make this Affidavit based upon my own personal knowledge.

2.      I worked at AIA from 1976 until about 2001—almost 25 years. John Taylor ran the financial affairs of AIA Services Corporation ("AIA Services") and everyone knew that if they disputed or challenged John Taylor, it was to no avail. John had the final word.  Crossing him significantly could result in termination.

3.      In or about 1996 and 1997, John Taylor invested a substantial portion of my retirement and other employees' retirement in AIA Services' 401(k) Plan ("Plan") into Series C Preferred Shares in AIA Services. When I resigned from AIA Services in 2011, I moved my retirement to another financial institution.  However, I was unable to access the portion of my retirement that John Taylor had invested in the Series C Preferred Shares in AIA Services Corporation.

4.      Since I left AIA Services, I have never been provided regular statements for my portion of the Series C Preferred Shares held in the Plan.  According to my calculations, the face value of those shares is approximately $100,000, excluding accrued dividends. Upon my information and belief, the accrued and unpaid dividends are over $100,000 and my portion of the Plan should be over $200,000.

5.      In 2010, based upon my request to Randall & Hurley, I was able to obtain a statement on the alleged value of my Series C Preferred Shares. At that time I sent a letter to

AFFIDAVIT OF LEE ANN HOSTETLER - 2

**2-ER-447**

Randall & Hurley requesting instructions on how to redeem this stock.  Attached as ***Exhibit A*** is a true and correct copy of the statement that I obtained from Randall & Hurley.  Since that time and more recently, I have again requested statements on the value of my Series C Preferred Shares from Randall & Hurley and AIA Services and my requests have gone unanswered. I am unable to access any funds or withdraw any funds from the amount stated on Exhibit A, and have been unable to do so since I left AIA Services.  I also note that in Exhibit E John Taylor acknowledges that over $1 Million is owed on accrued dividends on the Series C Preferred Shares in the Plan, but nothing has been paid on them, despite John Taylor and the others transferring and loaning millions of dollars to other entities as described in Donna Taylor's First Amended Complaint in this case and as shown on the financial statements attached as Exhibit E.

6.      On or about July 12, 2012, I received a proxy statement, proxy, financial statements and letter from John Taylor. Prior to this time, I had not received a financial statement from AIA Service for eight or more years. Attached as ***Exhibit B*** is a true and correct copy of the letter from John Taylor dated July 3, 2012. Attached as ***Exhibit C*** is a true and correct copy of the notice of shareholder meeting and proxy statement. Attached as ***Exhibit D*** is a true and correct copy of the proxy. Attached as ***Exhibit E*** is a true and correct copy of the Consolidated Financial Statements for AIA Services for March 31, 2012 and December 31, 2012.  Prior to receiving Exhibits B-E, I have not received anything for an annual shareholder meeting or financial statements from AIA Services for at least over eight years.

7.      Exhibit C also referenced a website that I could obtain other documents. The only other documents on that website were: (1) Lee Rousso's Motion to Withdraw as counsel in this case; (2) copies of the two financial statements attached as Exhibit E; (3) the Idaho Supreme Court's decision in *Taylor v. AIA Services, et al.*; (4) the First Amended Complaint in this case

AFFIDAVIT OF LEE ANN HOSTETLER - 3

(without any of the exhibits that I was provided by my attorney); (5) Donna Taylor's Notice of Voluntary Dismissal Without Prejudice in *Donna Taylor v. AIA Services*; (6) Plaintiff Reed Taylor's Amended Motion and Memorandum of Law in Support of Motion to Amend and Supplement Complaint in *Taylor v. AIA Services, et al.*; (7) Opinion and Order on Plaintiff's Amended Motion to Amend and Supplement Complaint and Defendants' Motion for Judgment on the Pleadings in *Taylor v. AIA Services, et al.*; and (8) the Order Staying this case. No other documents were provided. I do not see the relevance to any of the documents listed above, except for being evidence that our shares are worth more than ten cents per share and that John Taylor, Connie Taylor Henderson and James Beck should not be running AIA Services or be permitted to be on its board of directors.

8.      There were no explanations any of the documents on the website or that were provided to me what has gone on for the past ten or more years since I left. No explanation how AIA Services no longer owed Reed Taylor over $8.5 Million, how it recovered a $1.3 Million Lewis Clark Mortgage and received a $800,000 settlement in other litigation, but our shares our now worth only ten cents per share. In other words, John Taylor and Connie Taylor Henderson both valued their shares in AIA Services at $1.5 Million in 2005 and 2007, respectively, and now that AIA Services' balance sheet has improved by over $10 Million our shares are worth ten cents? There was no explanation as to any of the allegations contained in Donna Taylor's First Amended Complaint in this case. Conveniently absent were copies of prior period financial statements, explanations for the notes to the financial statements in Exhibit E, and disclosure of many other transaction and loans.  There were no documents explaining many transactions, including, but not limited to, how John Taylor, Connie Taylor Henderson, James Beck and Michael Cashman became the majority shareholder of CropUSA, while AIA Services owns

AFFIDAVIT OF LEE ANN HOSTETLER - 4

nothing. There was no explanation why AIA Services lent over $750,000 to Pacific Empire Radio Corporation—an entity controlled by John Taylor.

9.      I objected to this proposed reverse stock split, among other things.  Attached to the Affidavit of Roderick C. Bond are true and correct copies of my proxy, my demand for payment and my shareholder demand. Upon my instructions, they were all to be delivered to AIA Services Corporation by Dale Miesen on or before July 16, 2012.

10.      It is noteworthy that John Taylor was behind having AIA Services Corporation redeem Reed Taylor's shares in 1995. Reed Taylor was never trying to force the sale of his shares back to AIA Services Corporation. After John Taylor, Connie Taylor Henderson and James Beck successfully persuaded the Court that the redemption of Reed Taylor's shares was illegal and AIA Services is no longer obligated to pay Reed Taylor, they are trying to give us pennies on the dollar for our common shares and pennies on the dollar for those of us having Series C Preferred Shares in AIA Services Corporation. I have since reviewed the letter sent by Reed Taylor's counsel dated July 11, 2008 (which is attached to Mr. Bond's Affidavit) wherein Reed Taylor was trying to resolve his claims against AIA Services Corporation, John Taylor and others, but only if the minority shareholders also received 10 or more shares for each common share we held, that our Series C Preferred Shares be paid in full, that full disclosure of everything be provided to the minority shareholders and that the minority shareholders voted on and approved the settlement. Until I read that letter, I had no idea that Reed Taylor was actually the only person trying to make things right for us, both as common shareholders and as Series C Preferred Shareholders. Because we never received full disclosure or a settlement, I am presuming that John Taylor and the others rejected Reed Taylor's offer.  We have never received full disclosure.

AFFIDAVIT OF LEE ANN HOSTETLER - 5

11. As demonstrated by their attempt to effectuate a reverse stock split that would pay us 10 cents per share, it is clear that John Taylor, Connie Taylor Henderson and James Beck only care about themselves and their interests in CropUSA and the other entities that have benefited from AIA's funds, assets and personal to the detriment of all of the minority shareholders and preferred shareholders. From the time John Taylor put together the deal to redeem Reed Taylor's shares in AIA Services Corporation through the present time, John Taylor and the others in control have never done anything for the minority shareholders of AIA Services Corporation. He ran AIA Services Corporation the way he wanted and demanded, and no one could question his decisions. This fact could not be better evidenced through the present reverse stock split that he is pursuing.

12. I support Donna Taylor and respectfully request that the Court permit her to immediately pursue the claims in this case for the benefit of all of the minority common and preferred shareholders of AIA Services Corporation. Although I understand that Reed Taylor attempted to obtain a settlement for the minority shareholders, Donna Taylor has been the only person willing to look after our interests. The persons in control—John Taylor, Connie Taylor Henderson, James Beck and Michael Cashman have never looked after our interests. Regardless of whether I am able to join this lawsuit, I am confident that Donna Taylor will look after the interests of the minority common and preferred shareholders of AIA Services Corporation and I urge the Court to permit her to proceed on our behalf, as I know other minority shareholders request. I consent to Donna Taylor pursuing the claims on my behalf in this case.

13. If the Court lifts the stay, I intend on requesting that I become a named plaintiff along with Donna Taylor and further support her and the other innocent minority shareholders of AIA Services Corporation. If the Court does not permit this lawsuit to proceed, I fear that my

AFFIDAVIT OF LEE ANN HOSTETLER - 6

**2-ER-451**

retirement and common shares in AIA Services Corporation will not ever receive the value that we all deserve and are duly owed. The other innocent shareholders of AIA Services Corporation who did not have the wherewithal or knowledge to vote against the reverse stock split also need to be made whole.  We all deserve far more than 10 cents per share and we all deserve to have the full value paid for our common shares (whether through a reverse split or the ultimate dissolution of the corporation) and the full face value of $10 per share for our Series C Preferred Shares, plus all accrued yearly dividends in the amount of 10%, in our retirement Plan. It is long over-due for the minority shareholders to receive the compensation that they deserve.

DATED:  This 23rd day of July, 2012.

_____/s/_____
Lee Ann Hostetler

SUBSCRIBED AND SWORN to before me this 23rd day of July, 2012.

_____/s/_____
Notary Public for Idaho
Residing at: _____/s/_____
My commission expires: _____/s/_____

AFFIDAVIT OF LEE ANN HOSTETLER - 7

**2-ER-452**

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of July, 2012, I have filed a copy of the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as indicated on the Notice of Electronic Filing.

David R. Risley
david@risleylawoffice.com
Attorney for Michael W. Cashman, Sr.
R. John Taylor, James Beck, Crop USA Insurance
Agency, Inc., AIA Services Corporation
and AIA Insurance Inc.

James D. LaRue
jdl@elamburke.com
Loren C. Ipsen
lci@elamburke.com
Attorneys for Richard A. Riley, Hawely Troxell
Ennis & Hawley LLP, Gary D. Babbitt and
D. John Ashby

_____/s/_____
Roderick C. Bond

AFFIDAVIT OF LEE ANN HOSTETLER - 8

## 2-ER-453

From: Randall & Hurley                    509 838 1388        07/14/2010 09:59   #975  P.002/002

208-791-6942


RANDALL & HURLEY, INC.
Pension and Employee Benefits


601 West Riverside, Suite 1600
Spokane, Washington 99201
(888) 682-4406
info@randall-hurley.com
www.randall-hurley.com

## AIA Services Corporation 401(k) Profit Sharing Plan
### For The Period 1/01/10 - 3/31/10

Hostetler, Lee Ann

**PARTICIPANT INFORMATION**

Birthdate: 
Employment Date:                05/18/1976

### SUMMARY BY SOURCE

| SOURCE | BEGINNING BALANCE | GAIN OR LOSS | CONTRI-BUTIONS | FORFEI-TURES | WITH-DRAWALS | TRANSFERS | ENDING BALANCE | VEST % | VESTED BALANCE |
|---|---|---|---|---|---|---|---|---|---|
| 401(k) Pre-tax | 15,988.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | $15,988.18 | 100 | $15,988.18 |
| Employer Match | 20,157.98 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | $20,157.98 | 100 | $20,157.98 |
| Employer Account | 30,947.64 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | $30,947.64 | 100 | $30,947.64 |
| After-Tax Account | 15,768.51 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | $15,768.51 | 100 | $15,768.51 |
| Total | $82,862.31 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $82,862.31 | | $82,862.31 |

### SUMMARY BY INVESTMENT FUND

| INVESTMENT FUND | BEGINNING BALANCE | GAIN OR LOSS | CONTRI-BUTIONS | FORFEI-TURES | WITH-DRAWALS | TRANSFERS | ENDING BALANCE |
|---|---|---|---|---|---|---|---|
| AIA STOCK | 82,862.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | $82,862.31 |
| Total | $82,862.31 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $82,862.31 |

### HISTORICAL INVESTMENT RETURNS

| Mar 31 Quarter | 2009 YTD | 2008 Annual | 2007 Annual | 2006 Annual | 2005 Annual | 2004 Annual | 2003 Annual | 2002 Annual |
|---|---|---|---|---|---|---|---|---|
| 1.75% | 13.22% | (13.98)% | 1.49% | 8.79% | 8.63% | 9.44% | 26.92% | (14.74)% |

Exhibit  A - Page - 1

## AIA SERVICES CORPORATION

### NOTICE OF ANNUAL MEETING OF SHAREHOLDERS
### TO BE HELD ON JULY 16, 2012

TO: THE SHAREHOLDERS OF AIA SERVICES CORPORATION:

The annual meeting (the "Annual Meeting") of shareholders of AIA SERVICES CORPORATION (the "Company"), an Idaho corporation, will be held in the second floor conference room of the Company's executive offices, located at 111 Main Street, Lewiston, Idaho 83501, at 10:00 a.m., local time, on Monday, July 16, 2012 for the following purposes:

- to elect three directors of the Company to serve until their successors are elected and qualified; and

- to consider and approve an amendment to the articles of incorporation of the Company, pursuant to which, if it is approved:  (a) each issued and outstanding share of common stock of the Company, including any outstanding shares of common stock held by the Company as treasury stock, would be converted into $1/53,000^{th}$ of a share of common stock (the equivalent of one share of common stock for every 53,000 outstanding shares of common stock); and (b) each holder of fewer than 53,000 shares immediately prior to the time of the amendment, being the date articles of amendment to the articles of incorporation of the Company are filed with the Secretary of State of the State of Idaho (the "Effective Time"), would receive, in lieu of a fractional share, an amount determined by multiplying the number of shares of common stock owned beneficially and of record by such holder immediately prior to the Effective Time by ten cents ($0.10).

Shareholders of record at the close of business on June 30, 2012 are entitled to vote at the Annual Meeting and any adjournment(s) or postponement(s) thereof.

Whether or not you plan to attend the Annual Meeting in person, please sign, date, and return the enclosed proxy in the reply envelope provided for your convenience.  The prompt return of your proxy will assist us in preparing for the meeting.

BY ORDER OF THE BOARD OF DIRECTORS

JoLee K. Duclos, Secretary

F:\users\40468\Reverse Stock Split\Annual Meeting Notice (Marked 06.30.12)

Exhibit C - Page - 1

2-ER-455

## AIA SERVICES CORPORATION

### PROXY STATEMENT
### FOR
### ANNUAL MEETING OF SHAREHOLDERS

#### JULY 16, 2012

This proxy statement is furnished in connection with the solicitation of proxies by the board of directors of AIA SERVICES CORPORATION, an Idaho corporation (the "Company"), for the annual meeting of shareholders of the Company to be held at 10:00 a.m., local time, on Monday, July 16, 2012, and any adjournment thereof (the "Annual Meeting").

The Annual Meeting will be held in the second floor conference room of the Company's executive offices, located at 111 Main Street in Lewiston, Idaho 83501.

#### PURPOSES OF THE ANNUAL MEETING

The Annual Meeting is being called for the following purposes:

- to elect three directors of the Company to serve until their successors are elected and qualified; and

- to consider and approve an amendment to the articles of incorporation of the Company, pursuant to which, if it is approved: (a) each issued and outstanding share of common stock of the Company, including any outstanding shares of common stock held by the Company as treasury stock, would be converted into 1/53,000th of a share of common stock (the equivalent of one share of common stock for every 53,000 outstanding shares of common stock); and (b) each holder of fewer than 53,000 shares immediately prior to the time of the amendment, being the date articles of amendment to the articles of incorporation of the Company are filed with the Secretary of State of the State of Idaho (the "Effective Time"), would receive, in lieu of a fractional share, an amount determined by multiplying the number of shares of common stock owned beneficially by such holder immediately prior to the Effective Time by ten cents ($0.10).

Shareholders of record at the close of business on June 30, 2012 are entitled to vote at the Annual Meeting

#### VOTING RIGHTS AND SOLICITATIONS

The Company's common stock is the only types of security entitled to vote at the Annual Meeting. If you were a shareholder of record of common stock of the Company at the close of business on June 30, 2012 (the "record date"), you may vote at the Annual Meeting. On all matters requiring a shareholder vote at the Annual Meeting, each shareholder is entitled to one vote, in person or by proxy, for each share of common stock of the Company recorded in his or her name.

1

Exhibit C - Page - 2

2-ER-456

On the record date, 1,647,768 shares of common stock were outstanding. All of such shares are eligible to be voted at the Annual Meeting.

Pursuant to the Idaho Business Corporation Act and the Company's articles of incorporation, the affirmative vote of the holders of a majority of the shares present at the Annual Meeting in person or by proxy is required to elect directors (Item 1) and to approve the amendment to the Company's articles of incorporation (Item 2). Abstentions and broker non-votes will be treated as present for purposes of obtaining a quorum with respect to all matters to be considered at the Annual Meeting, but will not be counted for or against any of the proposals to be voted upon at the meeting.

If you are unable to attend the Annual Meeting, you may vote by proxy. The enclosed proxy card is solicited by the board of directors of the Company and when returned, properly completed, will be voted as you direct. If the proxy card is returned with no instructions on how the shares are to be voted, shares represented by such proxies will be voted **FOR** the election of each of the nominees to the board of directors and **FOR** approval of the amendment to the Company's articles of incorporation.

You may revoke or change your proxy at any time before it is exercised at the Annual Meeting. To do this, you must send a written notice of revocation or another signed proxy bearing a later date to the secretary of the Company at its principal executive office. You may also revoke your proxy by giving notice and voting in person at the Annual Meeting.

### COSTS OF SOLICITATION

The cost of soliciting proxies will be borne by the Company. Proxies may also be solicited personally or by telephone by certain of the Company's directors, executive officers and regular employees, who will not receive additional compensation therefore. The total cost of proxy solicitation, including legal fees and expenses incurred in connection with the preparation of this Proxy Statement, is estimated to be $3,500.

[The balance of this page has been left blank intentionally.]

2

Exhibit C - Page - 3

2-ER-457

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth information as of the record date concerning the names and addresses of, and number of shares of common stock of the Company beneficially owned by persons known to the Company to own more than five percent (5%) of each such class of stock; the names of, and number of shares beneficially owned by each director and executive officer of the Company; and the number of shares beneficially owned by, of all directors and executive officers as a group.

| Name and Address of Beneficial Owner, and Title or Position Held (if a director of executive officer) | Amount and Nature of Beneficial Ownership (all direct unless otherwise noted) | Percent of Class |
|---|---|---|
| R. John Taylor<br>111 Main Street<br>Lewiston, ID 83501<br>President and a Director of the Company | 1,378,493.5 | 83.66% |
| Connie Taylor Henderson [1]<br>900 Washington, Suite 1020<br>Vancouver, WA 98660<br>Director of the Company | - | 0.00% |
| James W. Beck<br>5152 Belmont Avenue South<br>Minneapolis, MN 55419<br>Director of the Company | - | 0.00% |
| Bryan Freeman – Vice President<br>111 Main Street<br>Lewiston, ID 83501<br>Vice President of the Company | - | 0.00% |
| JoLee Duclos<br>111 Main Street<br>Lewiston, ID 83501<br>Secretary of the Company | - | 0.00% |
| Aimee Gordon<br>111 Main Street<br>Lewiston, ID 83501<br>Treasurer of the Company | - | 0.00% |
| All directors and executive officers as a group (6 persons) | 1,378,493.5 | 83.66% |

[Table continued on following page]

3

Exhibit C - Page - 4

2-ER-458

| Name and Address of Beneficial Owner, and Title or Position Held (if a director of executive officer) | Amount and Nature of Beneficial Ownership (all direct unless otherwise noted) | Percent of Class |
|---|---|---|
| Raymond R. Heilman [2] 213 Yellow Rose Trail Road Georgetown, TX 78633 | 89,740.5 | 5.45% |

(1)     Excludes any community property interest of Mrs. Henderson in the shares held by R. John Taylor.

(2)     Includes 36,035 shares held by the Raymond R. Heilman Self Employment Retirement Plan.

---

## ITEM NO. 1 – ELECTION OF DIRECTORS

---

Three directors are to be elected at the Annual Meeting. Unless authority to vote is withheld on a proxy, proxies in the form enclosed will be voted for the director-nominees identified below. If any nominee is not available for election (a contingency which the Company does not now foresee), it is the intention of the board of directors to recommend the election of a substitute nominee, and proxies in the form enclosed will be voted for the election of such substitute nominee unless authority to vote such proxies in the election of directors has been withheld.

*Identity and Background of Nominees to the Board of Directors*. The nominees to the board of directors are R. John Taylor, James W. Beck and Connie Taylor Henderson.

R. John Taylor of Lewiston, Idaho, is the President and Chief Executive Officer of both the Company AIA Insurance, Inc. He has held those positions for over five years. Mr. Taylor is also Chairman of the Board and Chief Executive Officer of CropUSA Insurance Agency, Inc. and affiliated companies. He also serves on the boards of directors of Pacific Empire Radio Corporation, Avista Corporation, and the Idaho Endowment Fund Investment Board. Mr. Taylor is a licensed attorney in the state of Idaho and a member of the Idaho State Bar.

Connie Taylor Henderson is a practicing attorney in Vancouver, Washington and the former spouse of R. John Taylor. Her practice focuses on personal injury and medical negligence. Mrs. Henderson graduated from the University of Idaho College of Law in 1993, and for approximately the next seventeen years was a member of the Clark & Feeney law firm in Lewiston, Idaho. In 2010, she established her practice in Vancouver. Ms. Henderson has been a member of the boards of the Idaho Trial Lawyers Association, The Spence Trial Lawyers College Alumni Association, Lewis & Clark State College Foundation, Northwest Children's Home, and the Lewiston Foundation for Education. She also is an instructor at the Spence Trial Lawyers College and teaches trial advocacy in the University of Idaho College of Law's clinical law program.

4

Exhibit C - Page - 5

2-ER-459

**James W. Beck** earned a Bachelor of Science Degree from the University of Minnesota – Carlson School of Business. He is currently a co-owner of EMCllc, based in Minneapolis, Minnesota. EMCllc is a firm engaged in the engineering, design and implementation of energy efficient lighting systems for industrial and commercial applications throughout North and South America in new construction and retrofit markets. In addition, Mr. Beck is currently Chairman of Data Risk Consultants, a joint venture engaged in the development and deployment of software designed for entities requiring more stringent data security for personal and financial records. Mr. Beck's experience also includes sales and management of insurance products sold through brokers and captive agents.

*Requisite Approval.*   The affirmative vote of the holders of a majority of the shares present at the annual meeting in person or by proxy is required to elect directors.   Shareholders are not entitled to cumulate their votes in voting for directors.

### THE BOARD OF DIRECTORS RECOMMENDS A VOTE <u>FOR</u> THE FOREGOING NOMINEES TO THE BOARD OF DIRECTORS.

### APPROVAL OF THE AMENDMENT TO THE COMPANY'S ARTICLES OF INCORPORATION

The shareholders of the Company will be asked to consider and approve an amendment to the articles of incorporation of the Company, pursuant to which, if it is approved:  (a) each issued and outstanding share of common stock of the Company, including any outstanding shares of common stock held by the Company as treasury stock, would be converted into $1/53,000^{th}$ of a share of common stock (the equivalent of one share of common stock for every 53,000 outstanding shares of common stock); and (b) each holder of fewer than 53,000 shares immediately prior to the time of the amendment, being the date articles of amendment to the articles of incorporation of the Company are filed with the Secretary of State of the State of Idaho (the "Effective Time"), would receive, in lieu of a fractional share, an amount determined by multiplying the number of shares of common stock owned beneficially by such holder immediately prior to the Effective Time by ten cents ($0.10).

*Purpose of the Amendment.*   The amendment is one component of the Company's overall plan to simplify its capital structure, the other being the eventual elimination of all of the outstanding Series A preferred stock. The amendment accomplishes this purpose by reducing the number of outstanding shares of common stock through a reverse stock split, and by then redeeming, for cash, the outstanding shares held by those shareholders who would otherwise hold fractional shares. The Company believes a simplified capital structure will better enable it to attract financing on favorable terms so that it can successfully compete in the changing and challenging farm insurance markets.

*Board of Directors' Recommendation.*   The board of directors of the Company has adopted the amendment to the Company's articles of incorporation and recommends its approval by the shareholders at the Annual Meeting.  The board of directors considered a number of factors in reaching these decisions, not the least of which were the dramatic changes in the insurance markets in which the Company does business or proposes to do business, its possible need for significant financing in order to pursue profitable business opportunities in these

5

Exhibit C - Page - 6

2-ER-460

markets, the difficulties and expenses associated with the Company's complicated capital structure, and the advantages of simplifying its capital structure and possibly reorganizing itself as a partnership.

The board of directors also considered a number of factors in determining the price per share ($0.10) the Company would pay to those holders of outstanding shares of common stock who would otherwise become fractional holders if the amendment is approved, among them: the current book value of the common stock (being $0.031 per share); the Series C liquidating preference; the price that was paid for the common stock in a privately negotiated transaction earlier this year (being $0.10 per share); the prospective future value of net operating tax loss carry-forwards; the prospective additional value that might be obtained if pending lawsuits to which the Company or its affiliates are parties are resolved; and the prospective value that might be obtained if the Company is successful in obtaining title to the Lewis and Clark Plaza office building in Lewiston through its pending foreclosure proceeding.

***Dissenter's Appraisal Rights.***   The Company's shareholders have statutory rights of appraisal under the Idaho Business Corporation Act in connection with the proposed amendment, meaning that if they vote against the amendment and take other steps to perfect their rights, summarized below, they will be entitled to receive the fair value of their common stock in cash. The procedures for exercising and perfecting these appraisal rights are complicated, and for this reason the Company's shareholders are urged to read the relevant provisions of the Idaho Business Corporation Act that are included in this Proxy Statement as Exhibit B.  The following is only a summary of these procedures and is not intended to be inclusive.

A shareholder wishing to exercise these rights must vote against approving the amendment to the articles of incorporation, and prior to the taking of such vote at the Annual Meeting, must also deliver written notice to the Company that he or she intends to demand payment for his or her shares if the amendment is approved.  If the amendment is approved, the Company must, within ten days, send written notice to the shareholder, accompanied by a form for demanding payment and related information.  The shareholder must thereafter return the form to the Company, accompanied by the shareholder's stock certificate(s), within the time prescribed by the form, which may not be less than 40 nor more than 60 days.

Upon receipt of the form and the shareholder's stock certificate(s), the Company will pay the shareholder the fair value of his shares, accompanied by financial information and a statement of how the fair value was determined.  Should the shareholder disagree with the Company's fair value determination, he must reject the payment, following which either the Company or the shareholder may initiate a court proceeding in Idaho to adjudicate such value.  The costs of any such proceeding, including the costs of any appraisers or other experts, shall be borne by the Company, but at the court's discretion may also be assessed against the shareholder.

***Financial Statements of the Company.***   The balance sheets of the Company as at December 31, 2011 and 2010, and the related statements of operation, statements of cash flows and statements of changes in shareholders' equity for the twelve-month periods then ended appear elsewhere in this Proxy Statement.  Shareholders should note that these financial statements have been prepared by management of the Company and are unaudited.

Exhibit C - Page - 7

2-ER-461

## CONCLUSION

**It is important that proxies be returned promptly.  Shareholders are requested to vote, sign, date and promptly return the proxy in the enclosed self-addressed envelope.**

The board of directors knows of no other matters which may be presented for shareholder action at the Annual Meeting.  If other matters do properly come before the meeting, it is intended that the persons named in the proxies will vote on such proposals according to their best judgment.

BY ORDER OF THE BOARD OF DIRECTORS

JoLee K. Duclos, Secretary

7

Exhibit C - Page - 8

2-ER-462

Exhibit A to Proxy Statement
(Proposed Form of Amendment to Articles of Incorporation)

### ARTICLES OF AMENDMENT
### TO THE ARTICLES OF INCORPORATION
### OF
### AIA SERVICES CORPORATION

Pursuant to the provisions of Sections 30-1-58, 30-1-59 and 30-1-61 of the Idaho Business Corporation Act, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation as filed on December 20, 1983, and previously amended on October 14, 1986; December 29, 1987; April 11, 1995; August 3, 1995; and March 8, 1996.

1.      The name of the corporation is AIA Services Corporation.

2.      The Articles of Amendment provide for an exchange, reclassification, or cancellation of issued shares.

3.      The existing Articles of Incorporation are revised pursuant to the following amendment:

Article 4.4 of the Articles of Incorporation is hereby amended by reference to the existing provisions as (a) and adding the following paragraph as (b):

(b) Without regard to any other provision of these Articles of Incorporation, each 53,000 shares of common stock, either issued and outstanding or held by the Corporation as treasury stock, immediately prior to the time this amendment becomes effective, shall be and is hereby automatically reclassified and changed (without any further act) to one fully paid and non-assessable share of common stock with a par value of $0.01 per share, without increasing or decreasing the amount of stated capital or paid-in surplus of the Corporation, provided that no fractional shares of common stock shall be issued to any holder of fewer than 53,000 shares of common stock immediately prior to the time this amendment becomes effective. Instead of issuing such fractional shares, the Corporation shall pay, in cash at the time this amendment becomes effective, Ten Cents ($0.10) for each share held by any holder of fewer than 53,000 shares of common stock immediately before the time when this amendment becomes effective.

4.      These Articles of Amendment were duly approved at an annual meeting of shareholders held on July 16, 2012.  The Articles of Amendment were approved by the shareholders as follows:

a.      On the day of adoption, there were 1,647,768 shares outstanding.  On such date, there were _____ shares (_____ %) represented at the meeting and entitled to vote on the Articles of Amendment.

b.      Of the _____ total common shares represented at the meeting, _____ shares (_____ %) were voted in favor of the Articles of Amendment, _____ shares (_____ %) were voted against the Articles of Amendment, and _____ shares (_____ %) abstained.

8

Exhibit C - Page - 9

     c.     The number of shares cast in favor of the Articles of Amendment was sufficient for approval.

5.     The terms and provisions of these Articles of Amendment shall become effective at _____ a.m/p.m. on July _____, 2012.

By:     _____
     R. John Taylor,
     President and Chief Executive Officer

9

Exhibit C - Page - 10

2-ER-464

Exhibit B to Proxy Statement
(Dissenter's Appraisal Rights Provisions of the Idaho Business Corporation Act)

TITLE 30
CORPORATIONS
CHAPTER 1
GENERAL BUSINESS CORPORATIONS
PART 13.
APPRAISAL RIGHTS

**30-1-1301. DEFINITIONS.** In this part:

(1)      "Affiliate" means a person that directly or indirectly through one (1) or more intermediaries controls, is controlled by, or is under common control with another person or is a senior executive thereof. For purposes of section 30-1-1302(2)(d), Idaho Code, a person is deemed to be an affiliate of its senior executives.

(2)      "Beneficial shareholder" means a person who is the beneficial owner of shares held in a voting trust or by a nominee on the beneficial owner's behalf.

(3)      "Corporation" means the issuer of the shares held by a shareholder demanding appraisal and, for matters covered in sections 30-1-1322 through 30-1-1331, Idaho Code, includes the surviving entity in a merger.

(4)      "Fair value" means the value of the corporation's shares determined:

(a)      Immediately before the effectuation of the corporate action to which the shareholder objects;

(b)      Using customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal; and

(c)      Without discounting for lack of marketability or minority status except, if appropriate, for amendments to the articles pursuant to section 30-1-1302(1)(e), Idaho Code.

(5)      "Interest" means interest from the effective date of the corporate action until the date of payment, at the rate of interest on judgments in this state on the effective date of the corporate action.

(6)      "Preferred shares" means a class or series of shares whose holders have preference over any other class or series with respect to distributions.

(7)      "Record shareholder" means the person in whose name shares are registered in the records of the corporation or the beneficial owner of shares to the extent of the rights granted by a nominee certificate on file with the corporation.

(8)      "Senior executive" means the chief executive officer, chief operating officer, chief financial officer, and anyone in charge of a principal business unit or function.

(9)      "Shareholder" means both a record shareholder and a beneficial shareholder.

**30-1-1302. RIGHT TO APPRAISAL.** (1) A shareholder is entitled to appraisal rights, and to obtain payment of the fair value of that shareholder's shares, in the event of, any of the following corporate actions:

(a)      Consummation of a merger to which the corporation is a party:

(i)      If shareholder approval is required for the merger by section 30-1-1104, Idaho Code, and the shareholder is entitled to vote on the merger, except that appraisal rights shall not be available to any shareholder of the corporation with respect to shares of any class or series that remain outstanding after consummation of the merger; or

10

Exhibit C - Page - 11

     (ii)     If the corporation is a subsidiary and the merger is governed by section 30-1-1105, Idaho Code;

(b)     Consummation of a share exchange to which the corporation is a party as the corporation whose shares will be acquired, if the shareholder is entitled to vote on the exchange, except that appraisal rights shall not be available to any shareholder of the corporation with respect to any class or series of shares of the corporation that is not exchanged;

(c)     Consummation of a disposition of assets pursuant to section 30-1-1202, Idaho Code, if the shareholder is entitled to vote on the disposition;

(d)     An amendment of the articles of incorporation with respect to a class or series of shares that reduces the number of shares of a class or series owned by the shareholder to a fraction of a share if the corporation has the obligation or right to repurchase the fractional share so created; or

(e)     Any other amendment to the articles of incorporation, merger, share exchange or disposition of assets to the extent provided by the articles of incorporation, bylaws or a resolution of the board of directors.

(2)     Notwithstanding subsection (1) of this section, the availability of appraisal rights under subsections (1)(a), (b), (c) and (d) shall be limited in accordance with the following provisions:

(a)     Appraisal rights shall not be available for the holders of shares of any class or series of shares which are:

     (i)     Listed on the New York stock exchange or the American stock exchange or designated as a national market system security on an interdealer quotation system by the national association of securities dealers, inc.; or

     (ii)     Not so listed or designated, but have at least two thousand (2,000) shareholders and the outstanding shares of such class or series have a market value of at least twenty million dollars ($20,000,000), exclusive of the value of such shares held by its subsidiaries, senior executives, directors and beneficial shareholders owning more than ten percent (10%) of such shares.

(b)     The applicability of subsection (2)(a) of this section shall be determined as of:

     (i)     The record date fixed to determine the shareholders entitled to receive notice of, and vote at, the meeting of shareholders to act upon the corporate action requiring appraisal rights; or

     (ii) The day before the effective date of such corporate action if there is no meeting of shareholders.

(c)     Subsection (2)(a) of this section shall not be applicable and appraisal rights shall be available pursuant to subsection (1) of this section for the holders of any class or series of shares who are required by the terms of the corporate action requiring appraisal rights to accept for such shares anything other than cash or shares of any class or any series of shares of any corporation, or any other proprietary interest of any other entity, that satisfies the standards set forth in subsection (2)(a) of this section at the time the corporate action becomes effective.

(d)     Subsection (2)(a) of this section shall not be applicable and appraisal rights shall be available pursuant to subsection (1) of this section for the holders of any class or series of shares where:

     (i)     Any of the shares or assets of the corporation are being acquired or converted, whether by merger, share exchange or otherwise, pursuant to the corporate action by a person, or by an affiliate of a person, who:

     (A)     Is, or at any time in the one (1) year period immediately preceding approval by the board of directors of the corporate action requiring appraisal rights was, the beneficial owner of twenty percent

11

Exhibit C - Page - 12

2-ER-466

(20%) or more of the voting power of the corporation, excluding any shares acquired pursuant to an offer for all shares having voting power if such offer was made within one (1) year prior to the corporate action requiring appraisal rights for consideration of the same kind and of a value equal to or less than that paid in connection with the corporate action; or

(B) Directly or indirectly has, or at any time in the one (1) year period immediately preceding approval by the board of directors of the corporation of the corporate action requiring appraisal rights had, the power, contractually or otherwise, to cause the appointment or election of twenty-five percent (25%) or more of the directors to the board of directors of the corporation; or

(ii) Any of the shares or assets of the corporation are being acquired or converted, whether by merger, share exchange or otherwise, pursuant to such corporate action by a person, or by an affiliate of a person, who is, or at any time in the one (1) year period immediately preceding approval by the board of directors of the corporate action requiring appraisal rights was, a senior executive or director of the corporation or a senior executive of any affiliate thereof, and that senior executive or director will receive, as a result of the corporate action, a financial benefit not generally available to other shareholders as such, other than:

(A) Employment, consulting, retirement or similar benefits established separately and not as part of or in contemplation of the corporate action; or

(B) Employment, consulting, retirement or similar benefits established in contemplation of, or as part of, the corporate action that are not more favorable than those existing before the corporate action or, if more favorable, that have been approved on behalf of the corporation in the same manner as is provided in section 30-1-862, Idaho Code; or

(C) In the case of a director of the corporation who will, in the corporate action, become a director of the acquiring entity in the corporate action or one (1) of its affiliates, rights and benefits as a director that are provided on the same basis as those afforded by the acquiring entity generally to other directors of such entity or such affiliate.

(e) For the purposes of subsection (2)(d) of this section only, the term "beneficial owner" means any person who, directly or indirectly, through any contract, arrangement, or understanding, other than a revocable proxy, has or shares the power to vote, or to direct the voting of, shares, provided that a member of a national securities exchange shall not be deemed to be a beneficial owner of securities held directly or indirectly by it on behalf of another person solely because such member is the record holder of such securities if the member is precluded by the rules of such exchange from voting without instruction on contested matters or matters that may affect substantially the rights or privileges of the holders of the securities to be voted. When two (2) or more persons agree to act together for the purpose of voting their shares of the corporation, each member of the group formed thereby shall be deemed to have acquired beneficial ownership, as of the date of such agreement, of all voting shares of the corporation beneficially owned by any member of the group.

(3) Notwithstanding any other provision of this section, the articles of incorporation as originally filed or any amendment thereto may limit or eliminate appraisal rights for any class or series of preferred shares, but any such limitation or elimination contained in an amendment to

12

Exhibit C - Page - 13

2-ER-467

the articles of incorporation that limits or eliminates appraisal rights for any of such shares that are outstanding immediately prior to the effective date of such amendment or that the corporation is or may be required to issue or sell thereafter pursuant to any conversion, exchange or other right existing immediately before the effective date of such amendment shall not apply to any corporate action that becomes effective within one (1) year of that date if such action would otherwise afford appraisal rights.

(4)     A shareholder entitled to appraisal rights under this part may not challenge a completed corporate action for which appraisal rights are available unless such corporate action:

(a)     Was not effectuated in accordance with the applicable provisions of part 10, 11 or 12 of this chapter or the corporation's articles of incorporation, bylaws or board of directors' resolution authorizing the corporate action; or

(b)     Was procured as a result of fraud or material misrepresentation.

**30-1-1303. ASSERTION OF RIGHTS BY NOMINEES AND BENEFICIAL OWNERS.** (1) A record shareholder may assert appraisal rights as to fewer than all the shares registered in the record shareholder's name but owned by a beneficial shareholder only if the record shareholder objects with respect to all shares of the class or series owned by the beneficial shareholder and notifies the corporation in writing of the name and address of each beneficial shareholder on whose behalf appraisal rights are being asserted. The rights of a record shareholder who asserts appraisal rights for only part of the shares held of record in the record shareholder's name under this subsection shall be determined as if the shares as to which the record shareholder objects and the record shareholder's other shares were registered in the names of different record shareholders.

(2)     A beneficial shareholder may assert appraisal rights as to shares held on behalf of the shareholder only if such shareholder:

(a)     Submits to the corporation the record shareholder's written consent to the assertion of such rights no later than the date referred to in section 30-1-1322(2)(b)(ii), Idaho Code; and

(b)     Does so with respect to all shares of the class or series that are beneficially owned by the beneficial shareholder.

**30-1-1320. NOTICE OF APPRAISAL RIGHTS.** (1) If proposed corporate action described in section 30-1-1302(1), Idaho Code, is to be submitted to a vote at a shareholders' meeting, the meeting notice must state that the corporation has concluded that shareholders are, are not or may be entitled to assert appraisal rights under this part. If the corporation concludes that appraisal rights are or may be available, a copy of this part must accompany the meeting notice sent to those record shareholders entitled to exercise appraisal rights.

(2)     In a merger pursuant to section 30-1-1105, Idaho Code, the parent corporation must notify in writing all record shareholders of the subsidiary who are entitled to assert appraisal rights that the corporate action became effective. Such notice must be sent within ten (10) days after the corporate action became effective and include the materials described in section 30-1-1322, Idaho Code.

**30-1-1321. NOTICE OF INTENT TO DEMAND PAYMENT.** (1) If proposed corporate action requiring appraisal rights under section 30-1-1302, Idaho Code, is submitted to a vote at a shareholders' meeting, a shareholder who wishes to assert appraisal rights with respect to any class or series of shares:

(a)     Must deliver to the corporation before the vote is taken written notice of the shareholder's intent to demand payment if the proposed action is effectuated; and

(b)     Must not vote, or cause or permit to be voted, any shares of such class or series in favor of the proposed action.

13

Exhibit C - Page - 14

**2-ER-468**

(2)     A shareholder who does not satisfy the requirements of subsection (1) of this section is not entitled to payment under this part.

**30-1-1322.  APPRAISAL NOTICE AND FORM.  (1)** If proposed corporate action requiring appraisal rights under section 30-1-1302, Idaho Code, becomes effective, the corporation must deliver a written appraisal notice and form required by subsection (2)(a) of this section to all shareholders who satisfied the requirements of section 30-1-1321, Idaho Code. In the case of a merger under section 30-1-1105, Idaho Code, the parent must deliver a written appraisal notice and form to all record shareholders who may be entitled to assert appraisal rights.

(2)     The appraisal notice must be sent no earlier than the date the corporate action became effective and no later than ten (10) days after such date and must:

(a)     Supply a form that specifies the date of the first announcement to shareholders of the principal terms of the proposed corporate action and requires the shareholder asserting appraisal rights to certify:

(i)     Whether or not beneficial ownership of those shares for which appraisal rights are asserted was acquired before that date; and

(ii)     That the shareholder did not vote for the transaction;

(b)     State:

(i)     Where the form must be sent and where certificates for certificated shares must be deposited and the date by which those certificates must be deposited, which date may not be earlier than the date for receiving the required form under subsection (2)(b)(ii) of this section;

(ii)     A date by which the corporation must receive the form, which date may not be fewer than forty (40) nor more than sixty (60) days after the date the appraisal notice and form in subsection (1) of this section are sent, and state that the shareholder shall have waived the right to demand appraisal with respect to the shares unless the form is received by the corporation by such specified date;

(iii)     The corporation's estimate of the fair value of the shares;

(iv)     That, if requested in writing, the corporation will provide, to the shareholders so requesting, within ten (10) days after the date specified in subsection (2)(b)(ii) of this section the number of shareholders who return the forms by the specified date and the total number of shares owned by them; and

(v)     The date by which the notice to withdraw under section 30-1-1323, Idaho Code, must be received, which date must be within twenty (20) days after the date specified in subsection (2)(b)(ii) of this section; and

(c)     Be accompanied by a copy of this part.

**30-1-1323.  PERFECTION OF RIGHTS -- RIGHT TO WITHDRAW. (1)** A shareholder who receives notice pursuant to section 30-1-1322, Idaho Code, and who wishes to exercise appraisal rights must certify on the form sent by the corporation whether the beneficial owner of such shares acquired beneficial ownership of the shares before the date required to be set forth in the notice pursuant to section 30-1-1322(2)(a), Idaho Code. If a shareholder fails to make this certification, the corporation may elect to treat the shareholder's shares as after-acquired shares under section 30-1-1325, Idaho Code. In addition, a shareholder who wishes to exercise appraisal rights must execute and return the form and, in the case of certificated shares, deposit the shareholder's certificates in accordance with the terms of the notice by the date referred to in the notice pursuant to section 30-1-1322(2)(b)(ii), Idaho Code. Once a shareholder deposits that shareholder's certificates or, in the case of uncertificated shares, returns the executed forms, that shareholder loses all rights as a shareholder, unless the shareholder withdraws pursuant to subsection (2) of this section.

14

Exhibit C - Page - 15

**2-ER-469**

(2)     A shareholder who has complied with subsection (1) of this section may nevertheless decline to exercise appraisal rights and withdraw from the appraisal process by so notifying the corporation in writing by the date set forth in the appraisal notice pursuant to section 30-1-1322(2)(b)(v), Idaho Code. A shareholder who fails to so withdraw from the appraisal process may not thereafter withdraw without the corporation's written consent.

(3)     A shareholder who does not execute and return the form and, in the case of certificated shares, deposit that shareholder's share certificates where required, each by the date set forth in the notice described in section 30-1-1322(2), Idaho Code, shall not be entitled to payment under this part.

**30-1-1324.  PAYMENT.**  (1) Except as provided in section 30-1-1325, Idaho Code, within thirty (30) days after the form required by section 30-1-1322(2)(b)(ii), Idaho Code, is due, the corporation shall pay in cash to those shareholders who complied with section 30-1-1323(1), Idaho Code, the amount the corporation estimates to be the fair value of their shares, plus interest.

(2)     The payment to each shareholder pursuant to subsection (1) of this section must be accompanied by:

(a)     Financial statements of the corporation that issued the shares to be appraised, consisting of a balance sheet as of the end of a fiscal year ending not more than sixteen (16) months before the date of payment, an income statement for that year, a statement of changes in shareholders' equity for that year, and the latest available interim financial statements, if any;

(b)     A statement of the corporation's estimate of the fair value of the shares, which estimate must equal or exceed the corporation's estimate given pursuant to section 30-1-1322(2)(b)(iii), Idaho Code; and

(c)     A statement that shareholders described in subsection (1) of this section have the right to demand further payment under section 30-1-1326, Idaho Code, and that if any shareholder does not do so within the time period specified therein, such shareholder shall be deemed to have accepted such payment in full satisfaction of the corporation's obligations under this part.

**30-1-1325.  AFTER-ACQUIRED SHARES.**  (1) A corporation may elect to withhold payment required by section 30-1-1324, Idaho Code, from any shareholder who did not certify that beneficial ownership of all of the shareholder's shares for which appraisal rights are asserted was acquired before the date set forth in the appraisal notice sent pursuant to section 30-1-1322(2)(a), Idaho Code.

(2)     If the corporation elected to withhold payment under subsection (1) of this section, it must, within thirty (30) days after the form required by section 30-1-1322(2)(b)(ii), Idaho Code, is due, notify all shareholders who are described in subsection (1) of this section:

(a)     Of the information required by section 30-1-1324(2)(a), Idaho Code;

(b)     Of the corporation's estimate of fair value pursuant to section 39-1-1324(2)(b) [30-1-1324(2)(b)], Idaho Code;

(c)     That they may accept the corporation's estimate of fair value, plus interest, in full satisfaction of their demands or demand appraisal under section 30-1-1326, Idaho Code;

(d)     That those shareholders who wish to accept such offer must so notify the corporation of their acceptance of the corporation's offer within thirty (30) days after receiving the offer; and

(e)     That those shareholders who do not satisfy the requirements for demanding appraisal under section 30-1-1326, Idaho Code, shall be deemed to have accepted the corporation's offer.

(3)     Within ten (10) days after receiving the shareholder's acceptance pursuant to subsection (2) of this section, the corporation must pay in cash the amount it offered under

15

Exhibit C - Page - 16

**2-ER-470**

subsection (2)(b) of this section to each shareholder who agreed to accept the corporation's offer in full satisfaction of the shareholder's demand.

(4)     Within forty (40) days after sending the notice described in subsection (2) of this section, the corporation must pay in cash the amount it offered to pay under subsection (2)(b) of this section to each shareholder described in subsection (2)(e) of this section.

**30-1-1326.** PROCEDURE IF SHAREHOLDER DISSATISFIED WITH PAYMENT OR OFFER. (1) A shareholder paid pursuant to section 30-1-1324, Idaho Code, who is dissatisfied with the amount of the payment must notify the corporation in writing of that shareholder's estimate of the fair value of the shares and demand payment of that estimate plus interest, less any payment under section 30-1-1324, Idaho Code. A shareholder offered payment under section 30-1-1325, Idaho Code, who is dissatisfied with that offer must reject the offer and demand payment of the shareholder's stated estimate of the fair value of the shares plus interest.

(2)     A shareholder who fails to notify the corporation in writing of that shareholder's demand to be paid the shareholder's stated estimate of the fair value plus interest under subsection (1) of this section within thirty (30) days after receiving the corporation's payment or offer of payment under section 30-1-1324 or 30-1-1325, Idaho Code, respectively, waives the right to demand payment under this section and shall be entitled only to the payment made or offered pursuant to those respective sections.

**30-1-1330.** COURT ACTION. (1) If a shareholder makes demand for payment under section 30-1-1326, Idaho Code, which remains unsettled, the corporation shall commence a proceeding within sixty (60) days after receiving the payment demand and petition the court to determine the fair value of the shares and accrued interest. If the corporation does not commence the proceeding within the sixty-day period, it shall pay in cash to each shareholder the amount demanded pursuant to section 30-1-1326, Idaho Code, plus interest.

(2)     The corporation shall commence the proceeding in the appropriate court of the county where the corporation's principal office is located, or, if none in this state, Ada county. If the corporation is a foreign corporation, it shall commence the proceeding in the county in this state where the principal office of the domestic corporation merged with the foreign corporation was located or, if the domestic corporation did not have its principal office in this state at the time of the transaction, in Ada county.

(3)     The corporation shall make all shareholders, whether or not residents of this state, whose demands remain unsettled parties to the proceeding, as in an action against their shares, and all parties must be served with a copy of the petition. Nonresidents may be served by registered or certified mail or by publication as provided by law.

(4)     The jurisdiction of the court in which the proceeding is commenced under subsection (2) of this section is plenary and exclusive. The court may appoint one (1) or more persons as appraisers to receive evidence and recommend a decision on the question of fair value. The appraisers shall have the powers described in the order appointing them, or in any amendment to it. The shareholders demanding appraisal rights are entitled to the same discovery rights as parties in other civil proceedings. There shall be no right to a jury trial.

(5)     Each shareholder made a party to the proceeding is entitled to judgment:

(a)     For the amount, if any, by which the court finds the fair value of the shareholder's shares, plus interest, exceeds the amount paid by the corporation to the shareholder for such shares; or

(b)     For the fair value, plus interest, of the shareholder's shares for which the corporation elected to withhold payment under section 30-1-1325, Idaho Code.

16

Exhibit C - Page - 17

**30-1-1331.** COURT COSTS AND COUNSEL FEES. (1) The court in an appraisal proceeding commenced under section 30-1-1330, Idaho Code, shall determine all costs of the proceeding, including the reasonable compensation and expenses of appraisers appointed by the court. The court shall assess the costs against the corporation, except that the court may assess costs against all or some of the shareholders demanding appraisal, in amounts the court finds equitable, to the extent the court finds such shareholders acted arbitrarily, vexatiously, or not in good faith with respect to the rights provided by this part.

(2)     The court in an appraisal proceeding may also assess the fees and expenses of counsel and experts for the respective parties, in amounts the court finds equitable:

(a)     Against the corporation and in favor of any or all shareholders demanding appraisal if the court finds the corporation did not substantially comply with the requirements of section 30-1-1320, 30-1-1322, 30-1-1324 or 30-1-1325, Idaho Code; or

(b)     Against either the corporation or a shareholder demanding appraisal, in favor of any other party, if the court finds that the party against whom the fees and expenses are assessed acted arbitrarily, vexatiously, or not in good faith with respect to the rights provided by this part.

(3)     If the court in an appraisal proceeding finds that the services of counsel for any shareholder were of substantial benefit to other shareholders similarly situated, and that the fees for those services should not be assessed against the corporation, the court may award to such counsel reasonable fees to be paid out of the amounts awarded to shareholders who were benefited.

(4)     To the extent the corporation fails to make a required payment pursuant to section 30-1-1324, 30-1-1325 or 30-1-1326, Idaho Code, the shareholder may sue directly for the amount owed and, to the extent successful, shall be entitled to recover from the corporation all costs and expenses of the suit, including counsel fees.

F:\users\40468\Reverse Stock Split\Annual Meeting Statement (Marked 07.03.12)

17

Exhibit C - Page - 18

**2-ER-472**