**Consolidated Case Nos. 25-3552 and 25-3800**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,

**Plaintiff-Appellant**,

v.

R. JOHN TAYLOR, an individual, CONNIE TAYLOR HENDERSON, an individual, JAMES BECK, an individual, MICHAEL W. CASHMAN, SR., an individual, CROP USA INSURANCE AGENCY, INC., an Idaho corporation, CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company, AIA SERVICES CORPORATION, an Idaho corporation, AND AIA INSURANCE, INC., an Idaho corporation,

**Defendants-Appellees**,

and

Reed J. Taylor, an individual,

**Third-Party Defendant-Appellee.**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO,
CHIEF DISTRICT COURT JUDGE DAVID C. NYE, PRESIDING

**APPELLANT'S EXCERPTS OF THE RECORD – VOLUME - 3**

| | |
|---|---|
| Roderick C. Bond | Andrew Schwam |
| Roderick Bond Law Office, PLLC | Andrew Schwam Law Firm |
| 10900 NE 4th St., Suite 2300 | 705 SW Fountain St. |
| Bellevue, WA  98004 | Pullman, WA  99163-2128 |
| Tel: (425) 591-6903 | Tel: (208) 874-3684 |
| Email: rod@roderickbond.com | Email: amschwam@turbonet.com |
| Attorney for Appellant | Attorney for Appellant |

ORIGINAL

# PROPERTY SETTLEMENT AGREEMENT

THIS PROPERTY SETTLEMENT AGREEMENT (hereinafter "Agreement") is made and entered into this 14 day of Dec. , 198 7, by and between **REED J. TAYLOR** (hereinafter "Husband") and **DONNA J. TAYLOR** (hereinafter "Wife").

### WITNESSETH:

**WHEREAS,** the parties hereto were married on July 4, 1963, and their three children have reached the age of majority; and

**WHEREAS,** substantial irreconcilable differences have arisen between the parties and have destroyed the legitimate objects of matrimony, and the parties now seek a dissolution of their marriage; and

**WHEREAS,** the parties have acquired and accumulated certain community property and community debts during the course of their marriage which they desire to be equitably divided.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

1. **Division of Non-Business Real and Personal Property.**

    1.1 **Transfers to Wife.** Husband hereby transfers, assigns and conveys unto Wife, as her sole and separate property, all of his right, title and interest in the items of real and personal property more particularly described on Schedule 1.1, and hereby forever waives any and all rights in and to such property.

    1.2 **Transfers to Husband.** Wife hereby transfers, assigns and conveys unto Husband, as his sole and separate property, all of her right, title and interest in all other real and personal property, tangible or intangible, owned by the community (including, without limitation, the property more particularly

PROPERTY SETTLEMENT AGREEMENT - P. 1

Exhibit 1 - Page - 1

3-ER-474

described on Schedule 1.2), except the property specifically allocated to her in this Agreement; and Wife hereby forever waives any and all rights in and to such property transferred to Husband hereunder.

1.3   **Cooperation.** Each party shall cooperate with the other party and his/her representatives to see that all personal property which is granted to each party, but which is not now in his or her possession, is delivered to the party designated to receive such property.

1.4   **Awareness of Personal Property.** Wife acknowledges that she and/or her personal property appraiser have reviewed, and appraised or estimated the values of, the personal property located at the McCall, Idaho condominium and the residence and AIA's offices in Lewiston, Idaho and that she is fully aware of all such property. Husband acknowledges that he had the opportunity to review, and to appraise or estimate the values of, the personal property at the Condominium or otherwise in Wife's possession and that he is fully aware of all such property.

2.   **Division of Interests in Businesses.** The community owns interests in the following business enterprises ("Businesses"): AIA Services Corporation (an Idaho corporation hereinafter referenced as "Services") and its wholly-owned subsidiaries The Universe Life Insurance Company (a Nevada life insurance company) and AIA Wyoming Insurance, Inc. (a Wyoming corporation); A.I.A., Inc. (an Idaho corporation hereinafter referenced as "AIA"); Taylor Brothers Aircraft (an Idaho joint venture); AIA Travel Services, Inc. (an Idaho corporation formerly known as Global Travel of Northern Idaho, Inc.); and AIA Bancard Services Corporation (an Idaho corporation).

2.1.   **Business Reorganization.** Husband shall cause these Businesses to be organized into the AIA Services Corporation holding company system

PROPERTY SETTLEMENT AGREEMENT - P. 2

Exhibit 1 - Page - 2

3-ER-475

substantially in accordance with the plan of reorganization reflected in the AIA Reorganization Plan attached hereto as Schedule 2.1. The attached plan may be modified as necessary or desirable, in the judgment of the Businesses' legal counsel and accountants, to minimize tax liabilities and to meet regulatory requirements incident to such reorganization. Wife hereby consents to such reorganization, grants to Husband an irrevocable proxy, coupled with an interest, to vote the community's shares of stock or other voting interests in the Businesses and conveys to Husband all of her right, title and interest in any community dividend or other distribution by any Business from and after September 14, 1987, provided that such dividends or other distributions, in the aggregate, shall not cause the post-reorganization financial condition of Services to differ materially and adversely from the pro forma financial condition projected in the AIA Reorganization Plan.

2.2   **Preferred Stock**. Services will issue to Wife, as part of the reorganization and in exchange for Wife's community property interest in the Businesses (or assets thereof) transferred to Services, two hundred thousand (200,000) shares of Stated Value Preferred Stock (without par value) of Services. Such Stated Value Preferred Stock shall have the rights and preferences set forth in the Articles of Amendment of the Articles of Incorporation of AIA Services Corporation in substantially the form attached hereto as Schedule 2.2 or as the parties may hereafter agree. Conditioned upon and effective on the business day following the reorganization of the Businesses pursuant to Section 2.1, Husband shall and does hereby transfer to Wife all of his community property interest in the two hundred thousand (200,000) shares of Stated Value Preferred Stock (without par value) of Services issued to Wife in the reorganization.

PROPERTY SETTLEMENT AGREEMENT - P. 3

Exhibit 1 - Page - 3

3-ER-476

2.3   **Other Business Interests.**   Conditioned upon and effective on the business day immediately following the reorganization of the Businesses pursuant to Section 2.1 of this Agreement, Wife shall and does hereby assign, transfer and convey to Husband all of her remaining community property interests in the Businesses except for the Stated Value Preferred Stock of Services to be issued to her pursuant to Section 2.1 of this Agreement; and except for the Stated Value Preferred Stock of Services, all of the community's interest in the Businesses shall hereafter constitute Husband's sole and separate property.

2.4   **Lewiston Land Company.**   As part of the reorganization, Husband shall cause AIA and Lewiston Land Company to revise the note payable by Lewiston Land Company to AIA to provide that the net proceeds of sale of any substantial asset of Lewiston Land Company shall promptly be applied to repay the note payable and that no distributions shall be made to Lewiston Land Company's partners until the note has been repaid in full.  In the event of sale of any substantial asset of Lewiston Land Company and the resulting application of net proceeds to repayment of the note, Husband shall cause AIA promptly to transfer such proceeds to Services and shall cause Services promptly to apply such proceeds to the redemption of Stated Value Preferred Stock of Services.

3.   **Cash Payments**.   Husband shall make and/or shall cause one or more of the Businesses to make cash payments aggregating Three Hundred Thousand Dollars ($300,000), payable to the trust account of Wife's attorneys, Givens, McDevitt, Pursley, Webb & Buser, in the amounts of (i) Ninety Thousand and No/100 Dollars ($90,000) paid on November 9, 1987, (ii) approximately Sixty-Seven Thousand Dollars ($67,000) due upon execution of this Agreement, (iii) approximately Sixty-Eight Thousand Dollars ($68,000) due in accordance with Section 4 of this Agreement, and (iv) Seventy-Five Thousand Dollars ($75,000),

PROPERTY SETTLEMENT AGREEMENT - P. 4

Exhibit 1 - Page - 4

3-ER-477

without interest, due on or before September 14, 1988. Wife shall cause her attorneys to apply these cash payments to the extent necessary to pay all legal, accounting and valuation experts' fees and costs (including those fees and costs itemized on Schedule 3, which Wife shall pay on or before December 31, 1987) incurred by Wife on behalf of herself, the marital community and/or the community's Businesses and deductible in connection with the reorganization of the Businesses, shareholder relations, tax advice and planning, negotiation and determination of alimony and other purposes for which deductions may be taken under applicable federal or state income tax laws. Wife shall cause her attorneys, accountants and other experts to prepare and deliver detailed itemized statements of all services rendered and costs incurred prior to December 31, 1987, and shall furnish copies of such statements to Husband, on or before January 31, 1988, for the purposes of this Section 3. To the extent such payments are made prior to the earlier of January 1, 1988 or the entry of the divorce decree and applied to deductible expenses, they shall be treated as payment of a community debt. To the extent such payments are made by Husband on or after the earlier of January 1, 1988 or the entry of the divorce decree and applied to Wife's deductible expenses, the payments shall be deemed to be made on behalf of Wife, and shall be treated as additional alimony. To the extent any payments under this Section 3 are not deductible, they shall constitute a transfer of community property incident to the parties' divorce, rather than alimony or support payments.

4. **Condominium Mortgage to Fund Cash Payment**. Husband and Wife will cooperate in obtaining a loan of approximately Sixty-Eight Thousand Dollars ($68,000), secured by a mortgage or deed of trust on the Salem, Oregon condominium described in Schedule 1.1A (the "Condominium"). The net proceeds

PROPERTY SETTLEMENT AGREEMENT - P. 5

Exhibit 1 - Page - 5

3-ER-478

of this loan shall be disbursed to Wife by the lender, in partial satisfaction of Husband's obligations under Section 3, upon execution of this Agreement (or as soon as thereafter as the loan can be closed). Utilization of the Condominium as security is an accommodation by Wife to facilitate the financing of the division of community property. Wife shall not be liable to repay the loan except to make the monthly debt service payments thereon pursuant to Section 7.3 of this Agreement. Husband shall pay Wife the original principal amount of this loan, without interest, on or before the date of redemption of the Stated Value Preferred Stock of Services; provided however that, if at the date of such payment the loan has not previously been repaid in full or assumed by a third party upon sale of the Condominium, Husband's payment shall be applied first to the full payment of the remaining principal of the loan and thereafter to Wife. Husband's payment under this Section 4 shall not constitute an alimony or support payment but rather constitutes a transfer of Wife's share of the community property.

5. **Alimony**. On the first day of each month commencing on October 1, 1987, Husband has paid and shall continue to pay Wife in the form of separate maintenance Eight Thousand Dollars ($8,000) per month through the earlier of Wife's death or the first day of month in which a decree of divorce is entered in the pending divorce action pursuant to Section 11 of this Agreement. Commencing on the first day of the month after entry of such divorce decree, Husband shall pay Wife alimony in the amount of Seven Thousand Dollars ($7,000) per month through the earlier of Wife's death or the first day of the month immediately preceding the date of redemption of the Stated Value Preferred Stock issued to Wife pursuant to Section 2.2 of this Agreement. Payments treated as alimony or separate maintenance under this Agreement shall

PROPERTY SETTLEMENT AGREEMENT - P. 6

Exhibit 1 - Page - 6

3-ER-479

be includable in the gross income of Wife and deductible from the gross income of Husband.

6. **Division of Retirement Plan Accounts.** The parties agree to an equal division of their retirement benefits under the AIA, Inc. 401(k) Profit Sharing Plan and Trust and the Keogh Plan. In order to eliminate the necessity for Husband to maintain the Keogh Plan after the parties' divorce, the parties agree to the following equivalent and substantially equal division and distribution of the retirement benefits, based upon the calculations and assumptions in the attached Schedule 6A:

The balance in Husband's Keogh Plan account shall be distributed in its entirety to Wife. Each of Husband's accounts in the A.I.A., Inc. 401(k) Profit Sharing Plan, valued as of the close of business on September 30, 1987, shall be deemed to have been divided, on a like-kind basis, and to have been segregated into two separate accounts, one for the benefit of Wife and consisting of a 41.4% interest in the Plan account balance, and the other for the benefit of Husband and consisting of a 58.6% interest in the Plan account balance. Wife shall receive, pursuant to a Qualified Domestic Relations Order ("QDRO") in substantially the form attached hereto as Schedule 6B, the value (determined as of the most recent practicable date preceding distribution to Wife by the respective plan administrators pursuant to the QDRO) of the assets allocated to her segregated accounts in the A.I.A., Inc. 401(k) Profit Sharing Plan and the entirety of the balance in the Keogh Plan. Husband's and Wife's segregated accounts in the Profit Sharing Plan shall continue to be jointly managed by the trustee of the plan until the value of the assets in Wife's segregated accounts is distributed to her pursuant to the QDRO. Wife's segregated accounts, like Husband's shall continue to be subject to market forces subsequent to September

PROPERTY SETTLEMENT AGREEMENT - P. 7

Exhibit 1 - Page - 7

3-ER-480

14, 1987 and through the date of valuation by the plan trustee for purposes of distribution to Wife pursuant to the QDRO; and all income, expenses, and realized and unrealized gains and losses attributable to the assets in each segregated account shall inure to the benefit or detriment of that account as the separate property of its owner. Any contributions or forfeitures allocated to AIA Profit Sharing Plan participants after September 14, 1987 shall be credited to Husband's segregated account. The parties shall cooperate in promptly obtaining the QDRO, the plan administrators' approval of the QDRO and the distribution to Wife pursuant to the QDRO.

    7. **Assumption and Payment of Debts**.

        7.1 **Payment of Debts by Husband**. Husband hereby assumes and shall be responsible for paying the debts and other liabilities enumerated on Schedule 7.1.

        7.2 **Payment of Debts by Wife**. Wife hereby assumes and shall be responsible for paying any and all outstanding debts and other liabilities she has incurred, in her own name or otherwise, since the separation of the parties, including (without limitation) the debts and liabilities enumerated on Schedule 7.2. The parties' separation date was September 1, 1984.

        7.3 **Payment of Debt Service by Wife**. Wife shall pay the debt service (including principal, accrued interest, taxes, insurance and all other reserve payments) on the $68,000 loan obtained pursuant to Section 4 of this Agreement, until the earlier of (i) the assumption or repayment of the loan upon sale of the Condominium to a third party, or (ii) the date of redemption of the Stated Value Preferred Stock of Services, or (iii) such date earlier than the redemption date as Husband pays the amount of the original principal balance of the loan under Section 4 of this Agreement. If Wife defaults on any such loan

PROPERTY SETTLEMENT AGREEMENT - P. 8

Exhibit 1 - Page - 8

3-ER-481

payment, Husband may cure such default; and the monthly payments under Section 5 of this Agreement shall be reduced by the amount of the loan payments in default, together with any penalties and interest paid by Husband to cure such default.  Any payments made by Husband to cure any such default by Wife shall be deemed to be made on behalf of Wife and shall constitute alimony.

8.  **Transfers Incident to Divorce.**  Pursuant to the Domestic Relations Tax Reform Act of 1984, as amended by Tax Reform Act of 1986, the parties intend that all transfers of interests in the Businesses and of the other real and personal property conveyed by one party to the other party under this Agreement shall constitute transfers incident to the parties' divorce and related to the cessation of the parties' marriage and shall be a non-taxable division of community property for purposes of parties' joint or separate federal and state income tax liability.

9.  **Separate Property and Debts.**  From and after September 14, 1987, any and all earnings, income and gains of and property acquired by either party shall be the separate property of the party who has acquired it; and the other party shall have no claim thereon.  Likewise, except as specifically provided in Section 11.3, any and all debts incurred by either party from and after September 14, 1987 shall remain the separate responsibility of the party who incurred said debts without right of contribution or reimbursement from the other party.  Each party is released, absolved, protected, indemnified and held harmless by the other party from any obligation or liability for the future acts and omissions of such other party.

10.  **Omitted Property and Debts.**  The parties intend by this Agreement to accomplish a substantially equal division of all of their community property and community debts.  Any community property with a fair market value of more

PROPERTY SETTLEMENT AGREEMENT - P. 9

Exhibit 1 - Page - 9

3-ER-482

than \$2,500 which is not identified and divided between the parties in this Agreement or its Schedules shall continue to be owned by the parties as tenants-in-common. Either party, upon discovery of the existence of any such community property, may seek an equitable division of that property by the Court, which shall have continuing jurisdiction for that purpose. (For the purpose of this Section 10, all unspecified personal property located at the Lewiston residence or the McCall condominium or AIA's place of business and allocated to Husband under Section 1.2 of this Agreement, and all unspecified personal property located at the Condominium and allocated to Wife under Section 1.1 of this Agreement, shall be deemed to be identified and divided between the parties in this Agreement or its Schedules.) Any community obligation which is not identified and divided between the parties in this Agreement or its Schedules shall be assumed by and constitute the separate property of the party who incurred such obligation.

11. **Pending Divorce.**

11.1 **Court Approval of Agreement.** Wife has filed a divorce action in the Second Judicial District for the County of Nez Perce (Case No. 51057). Following reorganization of the Businesses substantially in accordance with the plan attached hereto as Schedule 2.1, this Agreement shall be filed in such divorce action and shall be ratified, confirmed and approved by the Court. Except for the sole purpose of its enforcement, however, this Agreement (including, without limitation, the terms of Sections 3, 5 and 7.3 of this Agreement pertaining to alimony) shall not be modified or modifiable by the Court in the absence of written agreement by both parties. This Agreement shall survive the execution and delivery of any and all of the instruments required by this Agreement.

PROPERTY SETTLEMENT AGREEMENT - P. 10

Exhibit 1 - Page - 10

3-ER-483

11.2  Ground for Divorce.  The Court shall enter a judgment and decree granting Wife a divorce on the grounds of the parties' irreconcilable differences.

11.3  Litigation Costs.  Each party shall be responsible for paying the attorneys', accountants', experts' and other fees and costs incurred by such party in connection with the pending divorce action and the negotiation and execution of this Agreement, except that:  (i) Wife shall pay or shall reimburse Husband for payment of the following witness fees and costs for the preparation for and the taking of the depositions of John Scott, CPA ($1,011); Linda Garner of Stephens, Inc. ($3,786.93); and Keith Tucker of Tri-Vest ($6,690.84); and (ii) Husband shall pay or shall reimburse Wife for payment of the following witness fees and costs for the preparation for and the taking of the depositions of Roger Martell ($1,025); John Jacques ($3,041); Coopers & Lybrand (Christy Armstrong ($2,058.75) and Allen Suderman ($1,753.75)); Dr. Minard ($555); and Walker & Associates (Dr. Lenore Walker ($2,625)). The payments shall be made by each party either to the other party's legal counsel for distribution to the appropriate witnesses or directly to the witness with a copy of the payment documentation provided to the other party's legal counsel.

12.  Medical Insurance.  To the extent one of the Businesses does not provide group medical insurance coverage for Wife at any time prior to September 14, 1997, Husband shall obtain, at his sole cost, a medical insurance policy providing coverage of Wife, through September 14, 1997, comparable to the coverage provided by AIA's group health insurance policy at the date of this Agreement.

13.  Advice of Counsel; Equitable Division of Community Property.  Each party has been represented by both tax advisors and legal counsel and is familiar

PROPERTY SETTLEMENT AGREEMENT - P. 11

Exhibit 1 - Page - 11

3-ER-484

with and understands the terms and conditions of this Agreement. Each party has had an opportunity to appraise and value the community assets set forth herein. Where professional appraisals of community property were not obtained, each party has relied upon his/her own best judgment, based upon information available to him/her, concerning estimated values of property items. The parties are satisfied with all valuations of community properties, whether or not they have been professionally appraised. Each party has received the advice of independent counsel before executing this Agreement. The division of community assets and liabilities accomplished by this Agreement is substantially equal, equitable and fair; and this Agreement does not result from any fraud, duress, overreaching or undue influence by either party or his/her representatives.

14. **Additional Documents**. Each party shall promptly execute and deliver any and all such deeds, automobile titles, stock certificates, corporate documents, assignments of partnership interests and other intangible personal property, and other documents as may be requested by the other party to carry out the purpose and intent of this Agreement, including quitclaim deeds in the forms attached hereto as Schedule 14A through 14M. Each party shall also promptly execute and deliver any and all other documents as may reasonably be requested for the purpose of advising third party creditors and other interested parties (such as banks, savings & loan companies, financial institutions or brokerage houses) that (i) the property and financial obligations which were formerly in the names of both parties are now to be known and considered in the name of only one party and (ii) the ownership or obligation has been changed in status from community to separate property or separate obligation, as the case may be, pursuant to this Agreement.

PROPERTY SETTLEMENT AGREEMENT - P. 12

Exhibit 1 - Page - 12

15. <u>Releases and Indemnification</u>.

15.1   <u>Mutual Release</u>.   In consideration of the division of community property set forth in this Agreement, and except as otherwise specifically provide in this Agreement, (i) Wife does hereby release, remise, acquit and forever discharge Husband, Services, AIA, Lewiston Land Company, Taylor Brothers Aircraft, AIA Travel Services, Inc. and AIA Bancard Services Corporation, together with their directors, officers, employees, agents, representatives, successors and assigns, from any and all liabilities, debts, obligations, costs, expenses, claims, contracts, promises, controversies, demands, damages, representations, interests, equities, losses, actions and causes of action, of whatsoever kind or nature, whether known or unknown, absolute or contingent, liquidated or unliquidated, arising or resulting from or in connection with the parties' marriage or the community assets or debts allocated to Wife under this Agreement; and (ii) and Husband does hereby release, remise, acquit and forever discharge Wife from any and all liabilities, debts, obligations, costs, expenses, claims, contracts, promises, controversies, demands, damages, representations, interests, equities, losses, actions and causes of action, of whatsoever kind or nature, whether known or unknown, absolute or contingent, liquidated or unliquidated, arising or resulting from or in connection with the parties' marriage or the community assets or debts allocated to Husband under this Agreement.

15.2   <u>Indemnification by Husband</u>.   Except as provided in Section 15.3 of this Agreement, Husband shall indemnify Wife and hold her harmless from any income tax liability whatsoever (including penalties and interest thereon), federal or state, attributable to tax years ended prior to January 1, 1988, and from the debts and other liabilities enumerated on Schedule 7.1 and the debts assumed in

PROPERTY SETTLEMENT AGREEMENT - P. 13

Exhibit 1 - Page - 13

Section 9 of this Agreement. Husband shall indemnify Wife and hold her harmless from any income tax liability whatsoever (including penalties and interest thereon), federal or state, attributable to income, earnings or gains required by this Agreement to be separately reported for tax years beginning after December 31, 1987.

15.3 **Indemnification by Wife**. Wife shall indemnify and hold Husband harmless from the debts and other liabilities assumed in Sections 7.2 and 9 and the debt service payments required by Section 7.3 of this Agreement. In addition, Wife shall indemnify Husband and hold him harmless from any income tax liability determined at his highest marginal 1987 tax rate on $24,000, which amount is equal to the aggregate amount of the payments to Wife in calendar year 1987 under Section 5 of this Agreement. The amount to be indemnified shall be paid by Wife by offsetting one-fifth (1/5) of such amount against each of five consecutive monthly alimony payments under Section 5 beginning with the first monthly alimony payment due after Husband has paid such taxes. Wife shall indemnify Husband and hold him harmless from any income tax liability whatsoever (including penlties and interest thereon), federal or state, attributable to income, earnings or gains required by this Agreement to be separately reported for tax years beginning after December 31, 1987.

15.4 **Inheritance**. Each party waives any and all right to inherit the estate of the other party at his or her death, and to take property from the other by devise or bequest (unless under a Will executed subsequent to the date hereof, or unless as beneficiary of an insurance policy or policies or a qualified retirement plan pursuant to a beneficiary designation executed subsequent to the date hereof and in effect at time of death), or to claim any family allowance or probate homestead, or to act as personal representative upon intestacy of the

PROPERTY SETTLEMENT AGREEMENT - P. 14

Exhibit 1 - Page - 14

3-ER-487

other's estate (except as the nominee of another person legally entitled to the right), or to act as personal representative under the Will of the other (unless under a Will executed subsequent to the date hereof).

15.5 **Support**. This Agreement is a complete and final adjustment of all claims for spousal support and alimony and resolves all such issues, rights and obligations to maintenance growing out of or in connection with the marriage relationship. Each party renounces and relinquishes any and all claims or rights to alimony, spousal support or maintenance, except as provided in this Agreement.

16. **Taxes**.

16.1 **Tax Consequences**. In reaching this Agreement, each party has considered the income tax consequences to such party which arise from the division of the parties' real and personal properties, the division of their interests in the Businesses and in the requirement plans, the payment of alimony, and other matters of consequence to such party.

16.2 **Cooperation**. The parties shall cooperate with each other and with their respective accountants to assist in the preparation of their federal and state income tax returns for 1987 and (if necessary) for previous years. Husband shall have the right to determine whether separate or joint tax returns shall be filed for 1987. Separate returns shall be filed for 1988 and thereafter.

16.3 **Tax Indemnity**. Should either party fail to cooperate with the other party in implementing these tax provisions or refuse or fail to abide by the terms of this Agreement with respect to the reporting, payment or refund of taxes, to the extent said non-cooperation, failure or refusal causes damages to the other party, the party who violates this Agreement shall pay for all such damages to or incurred by the other party and shall indemnify and hold the

PROPERTY SETTLEMENT AGREEMENT - P. 15

Exhibit 1 - Page - 15

3-ER-488

other party harmless with respect to any liability caused by the violating party.

### 17. Miscellaneous Provisions.

17.2 **Prior Agreements**. This Agreement supersedes all prior agreements between the parties hereto concerning any matters contained herein, including the Court stipulation on September 14, 1987. Any such prior agreements between the parties hereto concerning any of the matters contained herein, whether in writing or otherwise, shall have no force or effect upon and after the date of execution of this Agreement. This Agreement contains the entire understanding of the parties; and there are no representations, promises, warranties, covenants, or undertakings other than those contained herein.

17.3 **Attorneys' Fees.** The firm of Givens, McDevitt, Pursley, Webb & Buser has represented Wife in the negotiation and drafting of this Agreement; and the firm of Eberle, Berlin, Kading, Turnbow & Gillespie, Chartered has represented Husband in the negotiation and drafting of this Agreement. No presumption shall exist in the favor of or against either party to this Agreement as a result of the drafting of this document by such counsel. In the event suit is instituted by either party to enforce this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and expenses from the other party.

17.4 **Execution**. This Agreement shall be executed in triplicate. One original will be lodged with the Court as an exhibit to the divorce decree; and one other original shall be delivered to each party.

17.5 **Amendment**. This Agreement may not be altered, amended or modified except by an instrument in writing signed by both the parties hereto.

17.6 **Titles**. The section titles used in this Agreement are provided for

PROPERTY SETTLEMENT AGREEMENT - P. 16

Exhibit 1 - Page - 16

3-ER-489

the convenience of the parties for identification only and in no way limit or modify any of the provisions hereof.

17.7 **Governing Law**. This Agreement shall be construed and interpreted in accordance with the laws of the State of Idaho.

17.8 **Severability**. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal, invalid or unenforceable for any reason whatsoever, such illegality, invalidity or unenforceability shall not affect the remainder of the Agreement.

17.9 **No Waiver**. No waiver of any breach of the terms of this Agreement shall be deemed a waiver of any subsequent breach.

17.10 **Disclosure**. Each party represents to the other party that he/she has made full disclosure of all community assets and community liabilities of which he/she is aware.

PROPERTY SETTLEMENT AGREEMENT - P. 17

Exhibit 1 - Page - 17

3-ER-490

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

REED J. TAYLOR

DONNA J. TAYLOR

APPROVED AS TO FORM:

Givens, McDevitt, Pursley
  Webb & Buser, Attorneys
  for Wife

By _____
  Paul J. Buser, Member of Firm

APPROVED AS TO FORM:

Eberle, Berlin, Kading, Turnbow
  & Gillespie, Chartered,
  Attorneys for Husband

By _____
  William J. McKlveen, Member of Firm

PROPERTY SETTLEMENT AGREEMENT - P. 18

Exhibit 1 - Page - 18

STATE OF IDAHO )
                      :ss.
County of Nez Perce )

On this /8th day of Dec , 1987, before me the undersigned notary public, personally appeared **REED J. TAYLOR,** known or identified to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same.

**IN WITNESS WHEREOF,** I have hereunto set my hand and seal the day and year in this acknowledgement first above written.

Notary Public for Idaho
Residing at Lewiston, Idaho

STATE OF _____ )
                          :ss.
County of _____ )

On this ____ day of _____, 198__, before me the undersigned notary public, personally appeared **DONNA J. TAYLOR,** known or identified to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same.

**IN WITNESS WHEREOF,** I have hereunto set my hand and seal the day and year in this acknowledgment first above written.

Notary Public for _____
Residing at _____

PROPERTY SETTLEMENT AGREEMENT - P. 19

Exhibit 1 - Page - 19

3-ER-492

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

_____
REED J. TAYLOR

_____
DONNA J. TAYLOR

APPROVED AS TO FORM:

Givens, McDevitt, Pursley
    Webb & Buser, Attorneys
    for Wife

By _____
    Paul J. Buser, Member of Firm

APPROVED AS TO FORM:

Eberle, Berlin, Kading, Turnbow
    & Gillespie, Chartered,
    Attorneys for Husband

By_____
    William J. McKlveen, Member of Firm

PROPERTY SETTLEMENT AGREEMENT - P. 18

Exhibit 1 - Page - 20

3-ER-493

STATE OF IDAHO  )
                :ss.
County of Nez Perce  )

On this ____ day of _____, 198_, before me the undersigned notary public, personally appeared **REED J. TAYLOR,** known or identified to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same.

**IN WITNESS WHEREOF,** I have hereunto set my hand and seal the day and year in this acknowledgement first above written.

_____
Notary Public for Idaho
Residing at Lewiston, Idaho

STATE OF OK  )
             :ss.
County of MULT .  )

On this 14th day of December 198 7, before me the undersigned notary public, personally appeared **DONNA J. TAYLOR,** known or identified to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same.

**IN WITNESS WHEREOF,** I have hereunto set my hand and seal the day and year in this acknowledgment first above written.

Notary Public for _____
Residing at _____

Caldwell
J. CALDWELL
NOTARY PUBLIC OREGON
My Commission Expires 2-8-91

PROPERTY SETTLEMENT AGREEMENT - P. 19

Exhibit 1 - Page - 21

3-ER-494

## SCHEDULE 1.1

## WIFE'S NON-BUSINESS REAL AND PERSONAL PROPERTY

1.    The entire right, title, equity and other interest in the Salem, Oregon condominum (subject to a mortgage or deed of trust securing an approximately $70,000 loan), as more particularly described on Schedule 1.1A, together with the personal property (including, without limitation, appliance, furniture, personal effects, tools, equipment and objects of art) located therein.

2.    An undeveloped lot on Priest Lake, more particularly described on Schedule 1.1B.

3.  The personal property described on Schedule 1.1C.

4.  The 1983 Model 320I BMW automobile, VIN WBAAG3309D9003829, now in Wife's possession.

5.  The 1981 Volkswagon Sirroco automobile, VIN WVWCA0532BK025759.

SCHEDULE 1.1 TO PROPERTY SETTLEMENT AGREEMENT - P. 1

Exhibit 1 - Page - 22

SCHEDULE 1.1A

SALEM CONDOMINIUM

COMMON NAME

Salem Condo

STREET ADDRESS

1162 Cayuse Circle
Salem, Oregon  97306

LEGAL DESCRIPTION

Beginning at a point on the East line of Lot 2, Block 2, Kooskooskee (recorded in Volume 37, Page 14, Book of Town Plats, Marion County, Oregon) said point being 17.80 feet South $01^\circ$ 41' 28" West 92.00 feet to the West boundary line of Lot 1, Block 2, Kooskooskee; thence South $01^\circ$ 26' West 19.14 feet to the Westerly Northwest corner of Lot 2, Block 2, Kooskooskee; thence Southwesterly along the Southwesterly line along the arc of a 36.85 foot radius curve to the left (the chord of which bears South $26^\circ$ 12' East 34.18 feet); thence South $53^\circ$ 50' East 60.0 feet to the most Southerly Southeast corner of Lot 2, Block 2, Kooskooskee; thence North $26^\circ$ 01' 20" East 64.46 feet to an angle point in the East line of said Lot 2, Block 2; thence North $01^\circ$ 26' East along the East line of said Lot 2, a distance of 25.20 feet to the point of beginning.

SCHEDULE 1.1A - SALEM CONDOMINUM

Exhibit 1 - Page - 23

SCHEDULE 1.1B

PRIEST LAKE LOT

COMMON NAME

Priest Lake Property

STREET ADDRESS

Priest Lake, Idaho

LEGAL DESCRIPTION

Lot 4 in Block 1 of Sandpiper Shores, according to the plat thereof, recorded in Book 3 of Plats, Page 51, records of Bonner County, Idaho.

SCHEDULE 1.1B - PRIEST LAKE LOT

Exhibit 1 - Page - 24

## SCHEDULE 1.1C

1.  Barbara Clark water color paintings.
2.  Pewter dishes.
3.  Pewter silverware.
4.  Bedspread (Jay's room).
5.  Trampoline (Jud's birthday present).
6.  Grand piano.
7.  Upright piano.
8.  Desk, chair, toys, etc. (Jud), everything in bedroom loft.
9.  Set of children's encyclopedias.
10. One couch, two chairs, two ottomans, one coffee table, one end table, one rug.
11. Sara's loft: Shelves (4 made for Sara's dolls), glass shelving from Sara's bedroom and bathroom.
12. One futon base.
13. One book shelf.
14. Outside Christmas light (given to Donna by her mother).
15. One set children's furniture (stove, frig., sink & hutch).
16. One box in cellar (children's toys, miscellaneous).
17. One child's desk (in garage).
18. One child's trike (in garage).

SCHEDULE 1.1 C TO PROPERTY SETTLEMENT AGREEMENT - P. 1

Exhibit 1 - Page - 25

## SCHEDULE 1.2

### HUSBAND'S NON-BUSINESS REAL AND PERSONAL PROPERTY

1.   The residence located in Lewiston, Idaho, more particularly described on Schedule 1.2A.

2.   The interest in the McCall, Idaho condominum more particularly described on Schedule 1.2B.

3.   One Thousand Three Hundred Sixty (1360) Shares of Seaport Bancorp, Inc. colmmon stock.

4.   One Thousand Five Hundred (1500) Shares of Seaport Bancorp, Inc. preferred stock.

5.   One Thoussand Five Hundred Fifty (1550) Shares of Twin River National Bank common stock.

6.   Limited partnership interest in Josephine Crek Ranch Limited Partnership.

7.   Note receivable from Gary Brown.

8.   Interest in Utah mining venture.

9.   Prints of family photographs.

10.   Airplanes; boats; horse trailers; the furniture, appliances, artwork, personal effects, guns, tools, equipment, animals, statuary, trophies and other personal property (except the property itemized on Schedule 1.1C) located at the Lewiston, Idaho residence described on Schedule 1.2A or at the McCall, Idaho condominium described on Schedule 1.2B or at AIA's principal place of business in Lewiston, Idaho; and the right to receive any tax refunds.

SCHEDULE 1.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 1

Exhibit 1 - Page - 26

SCHEDULE 1.2A

LEWISTON RESIDENCE

That certain real property situate in Nez Perce County, Idaho,
more particularly described as follows:

That part of the South Half of Section 2, Township
35 North, Range 5 W.B.M., described as follows:

Commencing at the Southeast corner of the Southwest
Quarter Southeast Quarter (SW$\frac{1}{4}$ SE$\frac{1}{4}$) of said Section 2;
thence South 89°42' W. 21.6 feet and North 0°18' W.
330.0 feet to the Point of beginning; thence South
89°42' W. 660.00 feet; thence North 51°50'30" W.
996.32 feet; thence North 89°42' E. 1416.69 feet
to the West line of the County Road; thence along
said West line South 0°18' E. 601.0 feet to the
Point of Beginning.   Containing 14.32 acres, more
or less.

SCHEDULE 1.2A - LEWISTON RESIDENCE

Exhibit 1 - Page - 27

SCHEDULE 1.2B

McCALL CONDOMINIUM

That certain real property situate in Valley County, Idaho,
more particularly described as follows:

Unit No. 24 in Building No. D. as shown on the Condominium Map for The Aspens Condominium Subdivision, appearing in the records of the Valley County, Idaho, as Instrument No. 107935 and defined and described in that certain Condominium Declaration for The Aspens Condominium, recorded in the records of Valley County, Idaho, as Instrument No. 107936, together with the percentage interest in the common areas appurtenant to said unit as set forth in the Condominium Declaration.

SCHEDULE 1.2B - McCALL CODOMINIUM

Exhibit 1 - Page - 28

## SCHEDULE 2.1

## AIA REORGANIZATION PLAN

|     |                                                                                                              | PAGE |
| --- | ------------------------------------------------------------------------------------------------------------ | ---- |
| 1.  | AIA Reorganization Steps.                                                                                    | 2    |
|     | Describes in general terms the steps incident to the reorganization.                                        |      |
| 2.  | AIA Reorganization - Stock Issuance.                                                                         | 4    |
|     | Summary of stock issued as more fully described in attachment #1 above.                                      |      |
|     | Relative Values for Common Stock Issuance                                                                    | 5    |
|     | Preferred Stock Stated Value.                                                                                | 6    |
| 3.  | Projected Financial Statements.                                                                             |      |
|     | Projects financial position immediately after the reorganization on both consolidated and individual company basis. |      |
|     | - Consolidated                                                                                              | 7    |
|     | - AIA Services                                                                                              | 8    |
|     | - A.I.A., Inc.                                                                                              | 9    |
|     | - AIA Travel (old and new)                                                                                  | 10   |
|     | - Taylor Brothers Aircraft ("TBA")                                                                         | 11   |
| 4.  | AIA Related Party Transactions                                                                               | 12   |
|     | Summarizes debt owed between related parties before and after the reorganization.                           |      |
| 5.  | Reed Taylor - Projected Cash Flow.                                                                          | 13   |
|     | Summarizes known obligations and level of salary (net of tax) necessary to meet those obligations.          |      |
| 6.  | John Taylor - Projected Cash Flow.                                                                          | 14   |
|     | Summarizes known obligations and level of salary (net of tax) necessary to meet those obligations.          |      |

SCHEDULE 2.1 TO PROPERTY SETTLEMENT AGREEMENT - P. 1

Exhibit 1 - Page - 29

## AIA REORGANIZATION STEPS

1. Prior to December 31, 1987.

   a. A.I.A., Inc. distributes about $1.4 million to Reed Taylor in the form of notes receivable owing by Reed Taylor, TBA, and AIA Travel Services, Inc. [The exact amount of the note payable by Reed is dependent on AIA's 12/31 profit.]

   b. Reed contributes to TBA the note payable by TBA, thereby cancelling the debt.

   c. Distribution to Reed of the AIA Travel note payable to AIA increases the AIA Travel note payable to Reed.

   d. Distribution to Reed of the AIA note receivable from Reed decreases Reed's note payable to AIA.

2. AIA Travel, Inc. ("Travel") is newly formed by Ray Heilman (82%) and each of Reed's three children (6% each) in December 1987.

   a. Each existing shareholder of old AIA Travel Services, Inc., including Reed's children, consents to sale of assets; and Travel purchases (1/1/88) the assets of old AIA Travel Services, Inc., for $1 and assumption of all liabilities except debt owing to Reed and John Taylor.

   b. AIA Travel Services, Inc. then liquidates with Reed and John Taylor receiving no payment on the debts owing to them.

3. Corporate Recognition of Community Property Interests.

   Before reorganization, stock certificates for Services, AIA and Bancard are issued in joint names of Reed J. Taylor and Donna J. Taylor, (if not already so issued), subject to a voting trust or irrevocable proxy granting Reed the right to vote and receive dividends on such stock.

4. AIA Services Corporation IRC Section 351 Reorganization January 1, 1988.

   a. Services issues 200,000 shares, $1,600,000 to $2,000,000 redemption/liquidation value, $1,432,951 book value preferred stock to Donna Taylor and 5,963 shares $1.00 par value common stock to Reed Taylor in exchange for:

        97% of A.I.A., Inc. (3,395 common shares)
        16.67% of AIA Bancard (200 common shares)
        75% interest in TBA (undivided interest)

   b. Services issues 2,289 shares $1.00 par value common stock to John Taylor in exchange for:

SCHEDULE 2.1 TO PROPERTY SETTLEMENT AGREEMENT - P. 2

Exhibit 1 - Page - 30

> 25% interest in TBA (undivided interest)
> 16.67% of AIA Bancard (200 common shares)

    c.    Services issues 1,814 shares $1.00 par value common stock, 453-1/2 shares each to Ray Heilman, Ted Hartshorn, Mary Frost and **Paul Durant in exchange for their 200 shares each** in AIA Bancard.

    d.    Services issues 10,340 shares $1.00 par value common stock to Ray Heilman and 756 shares of common stock to each of Mr. Taylor's children in exchange for all the outstanding shares of Travel.

    e.    Services issues 5,441 shares $1.00 par value common stock to each of Jay, Judd and Sara Taylor in exchange for their shares in A.I.A., Inc.

    f.    See attached summary of stock issued (page 4).

5.    Lewiston Land Company ("LLC").

LLC will transfer to A.I.A., Inc., the following properties in part payment of the note payable by LLC to A.I.A.

> 80 acres dry grazing land (Culdesac)
> 5 acre tract, 12th & Birch (undivided 2/3 interest)
> 2 lots Sunset Palisades

The LLC note payable to A.I.A. will be redrafted to provide that the net proceeds of sale of any property retained by LLC shall be applied to repay the note payable and that no distributions shall be made to LLC's partners until the note has been repaid in full.

6.    Property Settlement Agreement, incident to divorce and related to the cessation of the parties' marriage, in accordance with the Domestic Relations Tax Reform Act of 1984, as amended by the Tax Reform Act of 1986. IRC Section 1041.

    a.    Reed conveys to Donna all of his community interest in preferred stock of reorganized Services.

    b.    Donna conveys to Reed all of her community interest in common stock of reorganized Services plus her interest in Lewiston Land Company and old AIA Travel Services, Inc.

SCHEDULE 2.1 TO PROPERTY SETTLEMENT AGREEMENT - P. 3

Exhibit 1 - Page - 31

AIA REORGANIZATION
COMMON STOCK ISSUANCE

SHARES ISSUED
IN REORGANIZATION

| COMMON STOCK | PERCENT | SHARES AT 10-31-87 | A.I.A.,INC. | T.B.A.C. | A.I.A. BANCARD | A.I.A. TRAVEL | POST REORG. SHARES | PERCENT |
|---|---|---|---|---|---|---|---|---|
| REED TAYLOR | 74.903% | 600,250 | | 5,510 | 453 | | 606,213 | 72.165% |
| JOHN TAYLOR | 25.000% | 200,250 | | 1,836 | 453 | | 202,539 | 24.112% |
| KAY HELZMAN | 0.031% | 250 | | | 454 | 10,340 | 11,044 | 1.315% |
| JOY TAYLOR | 0.000% | | 5,442 | | | 756 | 6,198 | 0.738% |
| JUD TAYLOR | 0.000% | | 5,442 | | | 756 | 6,198 | 0.739% |
| SARAH TAYLOR | 0.000% | | 5,441 | | | 756 | 6,197 | 0.733% |
| TED HARTSHORN | 0.000% | | | | 453 | | 453 | 0.054% |
| PAUL DURANT | 0.000% | | | | 454 | | 454 | 0.054% |
| MARY FROST | 0.031% | 250 | | | 454 | | 704 | 0.084% |
| | 100.000% | 801,000 | 16,325 | 7,346 | 3,721 | 12,608 | 840,000 | 100.000% |

Exhibit 1 - Page - 32

3-ER-505

RELATIVE VALUES FOR COMMON STOCK ISSUANCE

| Company | Relative Value | Consolidating Value Of Common Shares To Be Issued | Common Shares To Be Issued** |
|---|---|---|---|
| AIA Services | $2,600,000 | N/A | N/A |
| AIA Bancard | 10,000 | $10,000 | 2,721 |
| TBA | 27,000 | 27,000 | 7,346 |
| AIA, Inc. | 2,000,000 | 60,000* | 16,325 |
| AIA Travel | 46,340 | 46,340 | 12,608 |
| | $ 4,683,340 | $ 143,340. | |
| less minimum redemption/ liquidation value of preferred | (1,600,000.) | | |
| | $ 3,083,340 | $ 143,340 | 39,000 shares |

\* 3% interest of Taylor children in AIA, Inc.

\*\* $x = 801{,}000 \times \left( \dfrac{3{,}083{,}340}{3{,}083{,}340 - 143{,}340} \right)$

  $x = 840{,}000$ common shares to be outstanding after reorganization.

Number of new common shares to be issued in reorganization is $840{,}000 - 801{,}000 = 39{,}000$.

Exhibit 1 - Page - 33

AIA Services Preferred Stock
Stated Value on Post-Consolidation Books

| | |
|---|---|
| AIA Services Total Equity (Est. 12/31/87) | $ 3,275,018 |
| Equity of Merged Companies (Est. 12/31/87) | 482,978 |
| Total Equity of Consolidated Company | $ 3,757,996 |
| Less Minority Shareholder Equity | |

| | | |
|---|---|---|
| Bancard (84%) | 8,333 | |
| AIA, Inc. (3%) | 12,000 | |
| Travel (100%) | 46,340 | |
| TBA (25%) | 6,660 | |
| Services (25%) | 818,770 | (892,103) |

| | |
|---|---|
| Net Equity    Reed & Donna Taylor | $2,865,902 |
| 50% Common stock | $1,432,951 |
| 50% Preferred stock | $1,432,951 |

Exhibit 1 - Page - 34

3-ER-507

| | AIA SERVICES 1-1-88 | AIA INC 1-1-88 | AIA TRAVEL 1-1-88 | AIA BANCARD | ELIMINATION | CONSOLIDATE 1-1-88 |
|---|---|---|---|---|---|---|
| CASH | 2,066,106 | (267,565) | 56,135 | 10,000 | | 1,844,726 |
| INVESTMENTS | | | | | | 0 |
| C.D. | | | | | | 0 |
| BONDS | 4,655,551 | 55,000 | | | | 4,710,551 |
| STOCKS | 567,557 | | | | (456,340) | 111,247 |
| MORTGAGE LOANS | 446,445 | | | | | 446,445 |
| POLICY LOANS | 554,000 | | | | | 554,000 |
| REAL ESTATE | 3,070,166 | 75,000 | | | | 3,145,166 |
| EQUIPMENT | 925,000 | 345,000 | 53,764 | | | 1,323,764 |
| RECEIVABLES | | | | | | 0 |
| REINSURANCE | 454,764 | | | | | 454,764 |
| INTEREST | 167,457 | | | | | 167,457 |
| OTHER | 265,380 | 777,776 | (110,465) | | | 954,691 |
| PARENT/OFFICERS | 270,370 | 395,732 | | | | 666,102 |
| PREMIUMS DUE | 534,345 | | | | | 534,345 |
| PREPAID EXPENSES | 45,372 | 525,549 | 5,636 | | | 596,557 |
| EXCESS OF COST | | | | | | 0 |
| OVER NET ASSETS | 3,996,504 | | 170,344 | | | 6,167,748 |
| NOTES RECEIVABLE | | | | | | 0 |
| LEWISTON LAND CO | | 536,159 | | | | 536,159 |
| TAYLOR BROTHERS | | | | | | 0 |
| GLOBAL TRAVEL | | | | | | 0 |
| TOTAL ASSETS | 14,554,155 | 2,540,744 | 175,714 | 10,000 | (456,340) | 17,757,701 |
| | | | | | | |
| POLICY RESERVES | 6,597,124 | | | | | 6,597,124 |
| UNPAID CLAIMS | 125,655 | | | | | 125,655 |
| HELD POLICY | | | | | | 0 |
| LIABILITIES | 130,995 | | | | | 130,995 |
| AMOUNTS DUE | | | | | | 0 |
| REINSURANCE | 3,565 | | | | | 3,565 |
| ACCRUED EXPENSES/ | | | | | | 0 |
| ACCOUNTS PAYABLE | 315,555 | 285,107 | 71,619 | | | 676,531 |
| INCOME TAXES | 51,000 | | | | | 51,000 |
| UNEARNED | | | | | | |
| COMMISSIONS | | 1,149,483 | | | | 1,149,483 |
| MSVR | 55,760 | | | | | 55,760 |
| LONG-TERM-DEBT | 4,645,575 | 795,054 | 55,755 | | | 4,960,559 |
| LTD - AIA | | | | | | |
| LTD - OFFICERS | | | | | | |
| TOTAL LIABILITIES | 11,335,197 | 2,245,744 | 133,974 | | | 13,615,715 |
| | | | | | | |
| PREFERRED STOCK | 1,401,951 | | | | | 1,401,951 |
| COMMON STOCK | 345,000 | 3,500 | 1,000 | 1,240 | (5,700) | 345,000 |
| PAID IN CAPITAL | 1,135,045 | 1,745 | 45,740 | 5,800 | (56,552) | 1,135,045 |
| RETAINED EARNINGS | 366,000 | 797,700 | | | (777,700) | 761,077 |
| TOTAL EQUITY | 3,757,956 | 411,112 | 41,740 | 10,000 | (456,340) | 3,757,996 |
| TOTAL LIAB. & EQUITY | 14,554,155 | 2,245,744 | 175,714 | 10,000 | (456,340) | 17,757,701 |

Exhibit 1 - Page - 35

3-ER-508

| | BALANCE SHEET 9-30-87 | PROJECTED PROFIT OCT TO DEC | BALANCE SHEET 12-31-87 | REOR-GANIZATION | BALANCE SHEET 1-1-87 |
|---|---|---|---|---|---|
| CASH | 2,053,562 | | 2,053,562 | 12,544 | 2,066,106 |
| INVESTMENTS | | | | | |
| C.D. | | | | | |
| BONDS | 4,655,551 | | 4,655,551 | | 4,655,551 |
| STOCKS | 111,247 | | 111,247 | 456,340 | 567,587 |
| MORTGAGE LOANS | 446,445 | | 446,445 | | 446,445 |
| POLICY LOANS | 554,033 | | 554,033 | | 554,033 |
| REAL ESTATE | 2,070,166 | | 2,070,166 | | 2,070,166 |
| EQUIPMENT | | | | 825,000 | 825,000 |
| RECEIVABLES | | | | | |
| REINSURANCE | 454,734 | | 454,734 | | 454,734 |
| INTEREST | 165,057 | | 165,057 | | 165,057 |
| OTHER | 126,032 | 215,163 | 341,095 | (75,515) | 265,580 |
| PARENT/OFFICERS | 272,870 | | 272,870 | | 272,870 |
| PREMIUMS DUE | 634,348 | | 634,348 | | 634,348 |
| PREPAID EXPENSES | 15,572 | | 15,572 | | 15,572 |
| EXCESS OF COST | | | | | |
| OVER NET ASSETS | 1,995,514 | | 1,995,514 | | 1,995,514 |
| NOTES RECEIVABLE | | | | | |
| LEWISTON LAND CO | | | | | |
| TAYLOR BROTHERS | | | | | |
| GLOBAL TRAVEL | | | | | |
| TOTAL ASSETS | 13,524,751 | 215,163 | 13,775,914 | 1,218,369 | 14,994,283 |
| | | | | | |
| POLICY RESERVES | 6,597,124 | | 6,597,124 | | 6,597,124 |
| UNPAID CLAIMS | 122,359 | | 122,359 | | 122,359 |
| MISC POLICY | | | | | |
| LIABILITIES | 182,975 | | 182,975 | | 182,975 |
| AMOUNTS DUE | | | | | |
| REINSURANCE | 7,589 | | 7,589 | | 7,589 |
| ACCRUED EXPENSES/ | | | | | |
| ACCOUNTS PAYABLE | 313,773 | | 304,773 | 4,017 | 318,789 |
| INCOME TAXES | 11,717 | | 11,717 | | 11,717 |
| UNEARNED | | | | | |
| COMMISSIONS | | | | | |
| MSVR | 55,760 | | 55,760 | | 55,760 |
| LONG-TERM-DEBT | 3,214,795 | | 3,214,795 | 771,474 | 4,145,775 |
| LTD - AIA | | | | | |
| LTD - OFFICERS | | | | | |
| TOTAL LIABILITIES | 10,506,792 | | 11,511,756 | 775,591 | 11,772,457 |
| PREFERRED STOCK | | | | 1,493,551 | 1,493,551 |
| COMMON STOCK | 901,000 | | 931,000 | 39,000 | 940,000 |
| PAID IN CAPITAL | 2,116,912 | | 2,114,912 | (988,573) | 1,126,343 |
| UNASSIGNED SURPLUS | 144,937 | 215,163 | 360,000 | | 361,000 |
| TOTAL EQUITY | 3,055,955 | 215,163 | 3,275,915 | 461,373 | 3,757,996 |
| TOTAL LIAB. & EQUITY | 13,524,751 | 215,163 | 13,775,914 | 1,218,369 | 14,994,283 |

Exhibit 1 - Page - 36

| | BALANCE SHEET 10-30-87 | PROJECTED PROFIT NOV. & DEC. | DECLARE DIVIDEND | PAYMENT FROM LLC | BALANCE SHEET 12-31-87 |
|---|---|---|---|---|---|
| CASH | (387,565) | | | | (267,565) |
| INVESTMENTS | | | | | 0 |
| C.D. | 55,000 | | | | 55,000 |
| BONDS | | | | | 0 |
| STOCKS | | | | | 0 |
| MORTGAGE LOANS | | | | | 0 |
| POLICY LOANS | | | | | |
| REAL ESTATE | | | | 75,000 | 75,000 |
| EQUIPMENT | 245,773 | | | | 245,773 |
| RECEIVABLES | | | | | 0 |
| REINSURANCE | | | | | |
| INTEREST | | | | | 0 |
| OTHER | 281,001 | 518,775 | | | 799,776 |
| PARENT/OFFICERS | 985,755 | | (572,006) | | 555,752 |
| PREMIUMS DUE | | | | | 0 |
| PREPAID EXPENSES | 525,249 | | | | 525,249 |
| EXCESS OF COST | | | | | 0 |
| OVER NET ASSETS | | | | | 0 |
| NOTES RECEIVABLE | | | | | |
| LEWISTON LAND CO | 915,155 | | | (75,000) | 835,155 |
| TAYLOR BROTHERS | 767,002 | | (767,002) | | 0 |
| GLOBAL TRAVEL | 465,514 | | (465,514) | | 0 |
| TOTAL ASSETS | 3,576,201 | 518,775 | (1,407,522) | | 3,245,744 |

| | BALANCE SHEET 10-30-87 | PROJECTED PROFIT NOV. & DEC. | DECLARE DIVIDEND | PAYMENT FROM LLC | BALANCE SHEET 12-31-87 |
|---|---|---|---|---|---|
| POLICY RESERVES | | | | | 0 |
| UNPAID CLAIMS | | | | | 0 |
| MISC POLICY | | | | | 0 |
| LIABILITIES | | | | | 0 |
| AMOUNTS DUE | | | | | |
| REINSURANCE | | | | | 0 |
| ACCRUED EXPENSES, | | | | | |
| ACCOUNTS PAYABLE | 375,807 | | | | 375,807 |
| INCOME TAXES | | | | | 0 |
| UNEARNED | | | | | |
| COMMISSIONS | 1,145,455 | | | | 1,145,455 |
| MSVR | | | | | 0 |
| LONG-TERM-DEBT | 755,354 | | | | 755,354 |
| LTD - AIA | | | | | 0 |
| LTD - OFFICERS | | | | | 0 |
| TOTAL LIABILITIES | 2,245,744 | | | | 2,245,744 |
| PREFERRED STIO | | | | | |
| COMMON STOCK | 1,500 | | | | 1,500 |
| PAID IN CAPITAL | 2,745 | | | | 2,745 |
| RETAINED EARNINGS | 1,326,212 | 518,775 | 1,407,522 | | 751,752 |
| | 1,288,377 | 518,775 | 1,407,522 | | 1,400,000 |
| | 3,576,201 | 518,775 | 1,407,522 | | 3,245,744 |

Exhibit 1 - Page - 37

3-ER-510

| | BALANCE SHEET 9-30-97 | PROJECTED PROFIT OCT TO DEC | CAPITAL CONTRIBUTIO | SALE OF ASSETS 1-1-88 | BALANCE SHEET 1-1-88 |
|---|---|---|---|---|---|
| CASH | 56,125 | | | (56,185) | |
| INVESTMENTS | | | | | |
| C.D. | | | | | |
| BONDS | | | | | |
| STOCKS | | | | | |
| MORTGAGE LOANS | | | | | |
| POLICY LOANS | | | | | |
| REAL ESTATE | | | | | |
| EQUIPMENT | 53,764 | | | (53,764) | |
| RECEIVABLES | | | | | |
| REINSURANCE | | | | | |
| INTEREST | | | | | |
| OTHER | (83,065) | (33,400) | | 116,465 | |
| PARENT/OFFICERS | | | | | |
| PREMIUMS DUE | | | | | |
| PREPAID EXPENSES | 5,686 | | | (5,686) | |
| EXCESS OF COST | | | | | |
| OVER NET ASSETS | 118,134 | | | (170,944) | (52,760) |
| NOTES RECEIVABLE | | | | | |
| LEWISTON LAND CO | | | | | |
| TAYLOR BROTHERS | | | | | |
| GLOBAL TRAVEL | | | | | |
| TOTAL ASSETS | 145,954 | (33,400) | | (176,314) | (52,760) |
| | | | | | |
| POLICY RESERVES | | | | | |
| UNPAID CLAIMS | | | | | |
| MISC POLICY | | | | | |
| LIABILITIES | | | | | |
| AMOUNTS DUE | | | | | |
| REINSURANCE | | | | | |
| ACCRUED EXPENSES/ | | | | | |
| ACCOUNTS PAYABLE | 71,619 | | | (71,619) | |
| INCOME TAXES | | | | | |
| UNEARNED | | | | | |
| COMMISSIONS | | | | | |
| MSVR | | | | | |
| LONG-TERM-DEBT | 58,555 | | | (52,353) | |
| LTD - AIA | 468,514 | | (468,514) | | |
| LTD - OFFICERS | 624,609 | | | | 624,609 |
| TOTAL LIABILITIES | 1,223,697 | | (468,514) | (126,974) | 624,609 |
| | | | | | |
| COMMON STOCK | 19,740 | | | (1000) | 18,740 |
| PAID IN CAPITAL | 215,530 | | 468,514 | (45,340) | 638,744 |
| RETAINED (DEFICIT) | (1,314,500) | (33,400) | | 12,424 (1,338,703) | |
| TOTAL EQUITY | (1,077,163) | (33,400) | 468,514 | (46,340) | (677,389) |
| TOTAL LIAB. & EQUITY | 145,954 | (33,400) | | (176,314) | (52,760) |

Exhibit 1 - Page - 38

3-ER-511

| | BALANCE SHEET 10-30-87 | PROJECTED PROFIT NOV. & DEC. | ADJUST TO G.A.A.P. | DEBT PAY-OFF | BALANCE SHEET 12-31-87 |
|---|---|---|---|---|---|
| CASH | 12,544 | | | | 12,544 |
| INVESTMENTS | | | | | |
| C.D. | | | | | |
| BONDS | | | | | |
| STOCKS | | | | | |
| MORTGAGE LOANS | | | | | |
| POLICY LOANS | | | | | |
| REAL ESTATE | | | | | |
| EQUIPMENT | 337,044 | | 457,756 | | 225,000 |
| RECEIVABLES | | | | | |
| REINSURANCE | | | | | |
| INTEREST | | | | | |
| OTHER | (11,539) | (60,478) | | | (75,515) |
| PARENT/OFFICERS | | | | | |
| PREMIUMS DUE | | | | | |
| PREPAID EXPENSES | | | | | |
| EXCESS OF COST OVER NET ASSETS | | | | | |
| NOTES RECEIVABLE | | | | | |
| LEWISTON LAND CO | | | | | |
| TAYLOR BROTHERS | | | | | |
| GLOBAL TRAVEL | | | | | |
| TOTAL ASSETS | 338,049 | 60,478 | 457,756 | | 760,029 |
| POLICY RESERVES | | | | | |
| UNPAID CLAIMS | | | | | |
| MISC POLICY LIABILITIES | | | | | |
| AMOUNTS DUE REINSURANCE | | | | | |
| ACCRUED EXPENSES/ ACCOUNTS PAYABLE | 4,007 | | | | 4,007 |
| INCOME TAXES | | | | | |
| UNEARNED COMMISSIONS | | | | | |
| 43VR | | | | | |
| LONG-TERM-DEBT | 701,174 | | | | 701,174 |
| LTD - AIG | 357,556 | | | (357,556) | |
| LTD - OFFICERS | | | | | |
| TOTAL LIABILITIES | 1,445,734 | | | (357,556) | 705,351 |
| OWNERS' EQUITY | (764,475) | 457,756 | 457,756 | 357,556 | 35,103 |
| TOTAL EQUITY | (764,475) | 60,478 | 457,756 | 357,556 | 35,103 |
| TOTAL LIABS. & EQUITY | 338,049 | 60,478 | 457,756 | | 760,029 |

Exhibit 1 - Page - 39

3-ER-512

AIA REORGANIZATION
RELATED PARTY TRANSACTIONS

| DEBT OWING TO AIA GROUP BEFORE REORGANIZATION | TOTAL | REED | JOHN |
|---|---|---|---|
| AIA SERVICES-REED | 272,870 | 204,652 | 68,218 |
| AIA INC-LEWISTON LAND CO | 708,159 | 521,119 | 227,040 |
| AIA INC-TAYLOR BROS | 367,332 | 275,499 | 91,933 |
| AIA INC-AIA TRAVEL SERVICES,INC | 468,514 | 751,386 | 117,128 |
| AIA INC-REED | 965,758 | 965,758 | |
| TOTAL | 2,982,633 | 2,478,414 | 504,219 |

| PAY-OFFS AS A RESULT OF REORGANIZATION | | | |
|---|---|---|---|
| AIA INC-TAYLOR BROS | (367,332) | (275,499) | (91,833) |
| AIA INC-GLOBAL TRAVEL | (468,514) | (351,386) | (117,128) |
| AIA INC- REED | (572,006) | (572,006) | |
| AIA INC-LEWISTON LAND COMPANY | (75,000) | (58,500) | (16,500) |
| REED TO JOHN TO BALANCE TBAC EQUITY | | (92,364) | 92,364 |
| BALANCE AFTER THE REORGANIZATION | 1,496,781 | 1,128,657 | 368,122 |

RECAP

| | TOTAL | REED | JOHN |
|---|---|---|---|
| AIA SERVICES(AIA,INC.)-REED | 272,870 | 204,652 | 68,218 |
| AIA INC-LEWISTON LAND | 830,159 | 622,619 | 207,540 |
| AIA INC-TAYLOR BROS | 0 | | |
| AIA INC-AIA TRAVEL SERVICES,INC | 0 | | |
| AIA INC-REED | 393,752 | 393,752 | |
| | 1,496,781 | 1,221,023 | 275,758 |

Exhibit 1 - Page - 40

3-ER-513

REED TAYLOR
PROJECTED CASH FLOW 1988 TO 1993

| | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 |
|---|---|---|---|---|---|---|---|
| **TAXABLE INCOME** | | | | | | | |
| SALARY | 131,000 | 480,000 | 480,000 | 480,000 | 480,000 | 480,000 | 480,000 |
| INTEREST | 15,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| A.I.A, INC. 1-31-87 | (91,593) | | | | | | |
| A.I.A, INC 12-31-87 | 250,000 | 151,000 | 250,000 | 250,000 | | | |
| A.I.A. TRAVEL, INC. | (75,400) | | | | | | |
| LEWISTON LAND CO. | (121,375) | | | | | | |
| TAYLOR BROS. | (95,115) | | | | | | |
| JOSEPHINE CR. RANCH | (5,500) | | | | | | |
| LIMIT ON PASSIVE LOSS | 112,700 | | | | | | |
| OTHER | 11,740 | | | | | | |
| ALIMONY | | (94,000) | (94,000) | (94,000) | (94,000) | (94,000) | (94,000) |
| ADJUSTED GROSS INCOME | 412,540 | 545,000 | 545,000 | 545,000 | 395,000 | 395,000 | 395,000 |
| TAXES | 45,000 | 51,000 | 50,000 | 51,000 | 51,000 | 51,000 | 51,000 |
| INTEREST | 21,550 | 27,000 | 21,000 | 21,000 | 15,000 | 15,000 | 15,000 |
| CHARITABLE | 5,000 | | | | | | |
| EXEMPTIONS | 5,700 | 1,950 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| TOTAL DEDUCTIONS | 75,250 | 78,950 | 74,000 | 75,000 | 50,000 | 50,000 | 50,000 |
| TAXABLE INCOME | 374,290 | 569,050 | 574,000 | 573,000 | 345,000 | 345,000 | 345,000 |
| TAX | 127,000 | 161,000 | 164,000 | 163,000 | 95,000 | 95,000 | 95,000 |
| **CASH FLOW** | | | | | | | |
| SALARY | | 480,000 | 480,000 | 480,000 | 480,000 | 480,000 | 480,000 |
| PAYMENT FROM JOHN ON TRAC NOTE | | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| INCOME TAX | | (161,000) | (160,000) | (162,000) | (93,000) | (95,000) | (95,000) |
| FICA | | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) |
| STATE INCOME TAX | | (31,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) |
| HOME MORTGAGE PAYMENT | | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) |
| ALIMONY | | (94,000) | (94,000) | (94,000) | (94,000) | (94,000) | (94,000) |
| PROPERTY SETTLEMENT CASH | | (75,000) | | | | | |
| PROPERTY SETTLEMENT PAY-OFF JOHN'S LOAN | | | | | | | 65,000 |
| PAY-OFF AIA,INC AND AIA SERVICES NOTES | | (25,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) |
| CAPITAL CONTRIBUTION TO LEWISTON LAND COMPANY | | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) |
| CASH FLOW FOR PERSONAL DEBT AND LIVING | | 55,000 | 55,000 | 51,000 | 140,000 | 140,000 | 71,000 |

Exhibit 1 - Page - 41

3-ER-514

JOHN TAYLOR
PROJECTED CASH FLOW 1988 TO 1992

| | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 |
|---|---|---|---|---|---|---|
| **TAXABLE INCOME** | | | | | | |
| SALARY | 200,000 | 365,000 | 365,000 | 365,000 | 365,000 | 365,000 |
| INTEREST AND DIVIDENDS | 15,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| A.I.A. TRAVEL | (25,000) | | | | | |
| LEXISTON LAND CO. | (47,125) | | | | | |
| TAYLOR BROS. | (65,075) | 117,290 | | | | |
| LIMIT ON PASSIVE LOSS | 81,745 | (42,619) | | | | |
| OTHER | 5,545 | | | | | |
| ADJUSTED GROSS INCOME | 165,799 | 441,662 | 371,000 | 371,000 | 371,000 | 371,000 |
| TAXES | 15,000 | 35,000 | 34,000 | 34,000 | 34,000 | 34,000 |
| INTEREST | 17,400 | 14,500 | 12,500 | 11,500 | 10,500 | 11,500 |
| CHARITABLE | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| EXEMPTIONS | 7,600 | 7,600 | 7,600 | 7,600 | 7,600 | 7,600 |
| TOTAL DEDUCTIONS | 41,600 | 67,100 | 56,100 | 55,100 | 54,100 | 54,100 |
| TAXABLE INCOME | 174,175 | 375,562 | 314,700 | 315,900 | 316,900 | 316,800 |
| TAX | 35,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **CASH FLOW** | | | | | | |
| SALARY | | 365,000 | 365,000 | 365,000 | 365,000 | 365,000 |
| INCOME TAX | | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) |
| FICA | | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) |
| STATE INCOME TAX | | (75,000) | (25,000) | (25,000) | (25,000) | (25,000) |
| PAYMENT TO SEED ON TBAC NOTE | | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) |
| CAPITAL CONTRIBUTION TO LEXISTON LAND | | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) |
| CASH FLOW FOR PERSONAL DEBT AND LIVING COSTS | | 75,000 | 81,000 | 81,000 | 81,000 | 81,000 |

Exhibit 1 - Page - 42

3-ER-515

## SCHEDULE 2.2

### ARTICLES OF AMENDMENT
### OF
### THE ARTICLES OF INCORPORATION
### OF
### AIA SERVICES CORPORATION

Pursuant to the provisions of Section 30-1-61 of the Idaho Business Corporation Act, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation.

**FIRST:** The name of the corporation is **AIA SERVICES CORPORATION**.

**SECOND:** The following amendment to Article Fourth of the Articles of Incorporation was adopted by majority vote of the shareholders of the corporation on the ___ day of _____, 1987, in the manner prescribed by the Idaho Business Corporation Act:

### "FOURTH

**4.1 Authorized Capital.** This corporation is authorized to issue two classes of stock to be designated, respectively, "Stated Value Preferred Stock" and "Common Stock". The total number of shares which this corporation is authorized to issue is 5,200,000 shares, of which 200,000 shares shall be Stated Value Preferred Stock, without par value, and 5,000,000 shares shall be common stock, $1.00 par value. The Stated Value Preferred Stock shall be issued in a single series; and each share of Stated Value Preferred Stock shall have the rights and preferences conferred in this Article Fourth. Holders of Stated Value Preferred Stock shall have no rights to share in any distribution of the profits or assets of the corporation, whether in the form of cash or stock or dividends or otherwise, except to the extent specifically provided herein.

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 1

Exhibit 1 - Page - 43

**4.2** **No Dividends.** The Stated Value Preferred Stock shall not pay or accrue any dividends.

**4.3** **Demand for Redemption.** (a) The holder of Stated Value Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds upon breach of any covenant of the corporation set forth in this Article Fourth, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares. This right may be exercised by giving the corporation written notice of demand for redemption specifying the default and a redemption date not less than ninety (90) days from the date such notice delivered to the corporation; provided however that, if the corporation cures such specified default within sixty (60) days after receipt of such notice by corporation, the right to redeem Stated Value Preferred Stock on account of such specified default shall be extinguished.

(b) The holder of Stated Value Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds at any time after September 14, 1993, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares. This right may be exercised by giving the corporation written notice of demand for redemption specifying a redemption date after September 14, 1993 and not less than ninety (90) days or more than one hundred eighty (180) days from the date such notice is delivered to the corporation.

**4.4** **Call for Redemption.** The Stated Value Preferred Stock may be called for redemption by the corporation, in whole or in part, upon payment of the redemption price from legally available funds at any time prior to demand for

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 2

Exhibit 1 - Page - 44

3-ER-517

redemption by the holder of Stated Value Preferred Stock. Notice of such call for redemption, specifying the redemption date not less than thirty (30) days from the date such notice is mailed, shall be mailed to each record holder of Stated Value Preferred Stock. If fewer than all shares of Stated Value Preferred Stock are to be redeemed, the shares shall be redeemed prorata from the holders thereof.

4.5 **Redemption Price;**. If Stated Value Preferred Stock is redeemed on or before September 14, 1990, the redemption price is $8.00 per share if paid in a lump sum. If Stated Value Preferred Stock is redeemed any time during the three-year period beginning September 15, 1990 and ending on September 14, 1993, the redemption price is $8.50 per share if paid in a lump sum. If not paid in a lump sum on or before September 14, 1993, the redemption price for Stated Value Preferred Stock is $10.00 per share, provided that the redemption price may be paid, at the corporation's sole option, in monthly installments on a fifteen (15) year amortization schedule beginning on the day after the redemption date and accruing interest at a rate one-and one-half (1-1/2) points under The First Interstate Bank of Idaho, N.A., prime lending rate, adjusted quarterly.

4.6 **Redemption Procedure and Effect.**

(a) **Lump Sum Payment**. If the redemption price is to be paid in a lump sum, the corporation shall deposit, or shall cause its nominee to deposit, on or before the redemption date specified in the notice of redemption, the aggregate redemption price of the shares of Stated Value Preferred Stock to be redeemed with a bank or trust company specified in the notice, payable on the redemption date in the amounts and to the respective orders of the holders of the shares of Stated Value Preferred Stock to be redeemed, on endorsement to the corporation or its nominee as may be required and upon surrender of the

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 3

Exhibit 1 - Page - 45

3-ER-518

certificates for such shares.    Unless the corporation or its nominee fails to pay the lump sum redemption price on or before the redemption date, the shares of Stated Value Preferred Stock subject to such redemption shall be deemed to have been redeemed, and shall be deemed no longer to be outstanding, from and after the redemption date set forth in the notice of redemption.    On or after the redemption date, subject only to payment of the redemption price, Stated Value Preferred Stock so called for redemption shall cease to be entitled to any interest or right in the corporation; and holders of such Stated Value Preferred Stock shall thereafter cease to be shareholders and shall be entitled only to payment of the amount of the redemption price, without interest, upon surrender of the certificates evidencing such stock.    If the lump sum redemption price shall be paid by a nominee of the corporation, such nominee shall upon such payment become the owner of the shares with respect to which such payment was made; and certificates of stock may be issued to such nominee in evidence of such ownership.

(b)    Installment Payment.    If the corporation elects to pay the redemption price in installments, the number of shares of Stated Value Preferred Stock equal to the principal portion of each installment divided by $10.00 per share shall be deemed to have been redeemed and to be no longer outstanding from and after the date of payment of such installment.    On and after such payment date, such number of shares of Stated Value Preferred Stock shall cease to be entitled to any interest or right in the corporation; and holders of such shares shall thereafter cease to be shareholders of the corporation with respect to such shares, whether or not the certificates evidencing such shares have been surrendered.    Upon request of the corporation from time to time, certificates evidencing shares of Stated Value Preferred Stock including redeemed shares

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 4

Exhibit 1 - Page - 46

3-ER-519

shall be surrendered to and reissued by the corporation in reduced amount to reflect any and all installment redemptions of shares prior to such request.

4.7   **Liquidation Preference**.   In case of the voluntary liquidation or dissolution of the corporation, the holder of Stated Value Preferred Stock shall have the right to be paid in full, before any amount shall be paid to the owners of the common stock, as follows:

$8.00 per share if the liquidation price is paid on or before September 14, 1990.

$8.50 per share if the liquidation price is paid after September 14, 1990 and on or before September 14, 1993.

$10.00 per share if the liquidation price is paid after September 14, 1993.

In case of the involuntary liquidation or dissolution of the corporation, the holder of Stated Value Preferred Stock shall have the right to be paid $10.00 per share, in full, before any amount shall be paid to the owners of the common stock.   After payment to the holders of the Stated Value Preferred Stock of the full preferential amounts hereinabove provided, the holders of the Stated Value Preferred Stock as such shall have no right or claim to any of the remaining assets of the corporation either upon any distribution of such assets or upon dissolution, liquidation or winding up; and the remaining assets to be distributed, if any, upon a distribution of such assets or upon dissolution, liquidation or winding up, may be distributed among the holders of the common stock.

4.8   **Limited Voting Rights**.   The Stated Value Preferred Stock shall have no right (except as required by law or as provided by Section 4.11 of this Article Fourth) to receive notice of or to vote at any regular or special meeting of stockholders, except that the holders of a majority of the shares of Stated Value Preferred Stock shall have the right, voting separately as a class, to elect one director to the board of directors of the corporation.

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 5

Exhibit 1 - Page - 47

3-ER-520

**4.9**   Covenants.   So long as any shares of Stated Value Preferred Stock are outstanding, and except with the consent of the holders of a majority of the outstanding shares of Stated Value Preferred Stock:

(a)   Common Stock.   The corporation shall not issue any common stock for less than book value (determined as of the end of the immediately preceding fiscal year), except for common stock issued to pay a dividend payable solely in shares of common stock or issued to employees or agents pursuant to incentive stock option or bonus plan.

(b)   Preferred Stock.   The corporation shall issue no preferred stock other than the Stated Value Preferred Stock, nor any securities convertible into such stock.

(c)   Indebtedness.   The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume, guaranty or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(1)   The corporation may remain liable in respect of Indebtedness outstanding on the date of adoption of this Article Fourth by the corporation's shareholders.

(2)   The corporation and its Subsidiaries may become and remain liable with respect to Indebtedness that is not secured by a Lien on any of the assets of the corporation or its Subsidiaries, provided that the aggregate principal amount of such unsecured Indebtedness shall not exceed Consolidated Net Worth less goodwill of the corporation at any time; and

(3)   The corporation and its Subsidiaries may become and remain liable in respect of Indebtedness secured by any of the following Liens:

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 6

Exhibit 1 - Page - 48

3-ER-521

(i)   Liens for taxes, assessments or governmental charges or claims the payment of which is not yet delinquent or is being contested in good faith, if such reserve or other provision, if any, as shall be required by generally accepted accounting principles, consistently applied, shall have been made therefor;

(ii)   Statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen and other liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by generally accepted accounting principles, consistently applied, shall have been made therefor;

(iii)   Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(iv)   Any attachment or judgment Lien; provided that if the judgment it secures exceeds $250,000 (alone or when aggregated with all other judgments secured by Liens permitted by this clause (iv)), such judgment shall, within 45 days after the entry thereof, have been discharged or execution thereof stayed pending appeal, or shall have been discharged within 45 days after the expiration of any such stay;

(v)   Easements, rights-of-way, restrictions and other

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 7

Exhibit 1 - Page - 49

3-ER-522

similar charges or encumbrances not interfering with the ordinary conduct of the business of the corporation or any of its Subsidiaries;

(vi)  Any interest or title of a lessor under any lease;

(vii)  Any Lien existing on any asset of any corporation at the time such corporation becomes a Subsidiary if such Lien was not created in contemplation of such event;

(viii)  Any Lien on any asset securing Indebtedness incurred or assumed for the purpose of financing not more than eighty-five percent (85%) of the cost of acquiring such asset; provided that such Lien attaches to such asset concurrently with or within 90 days after the acquisition thereof;

(ix)  Any Lien on any asset of any corporation existing at the time such corporation is merged into or consolidated with the corporation or a Subsidiary, if such Lien was not created in contemplation of such event;

(x)  Any Lien existing on any asset prior to the acquisition thereof by the corporation or a Subsidiary, if such Lien was not created in contemplation of such acquisition;

(xi)  Any Lien arising out of the refinancing, extension, renewal or refunding of any Indebtedness secured by any Lien permitted by any of the foregoing clauses of this Section 4.9(c); provided that the amount of such Indebtedness is not increased and that such Indebtedness is not secured by any additional assets; and

(xii)  Liens not otherwise permitted by the foregoing clauses of this Section 4.9(c) (including, without limitation, Liens on stock of Subsidiaries, whether consolidated or unconsolidated) securing

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 8

Exhibit 1 - Page - 50

Indebtedness in an aggregate principal amount at any time outstanding not to exceed 10% of the difference between Consolidated Net Worth and the amount of the goodwill of the corporation.

(d)  Corporate Existence.  The corporation will maintain its corporate existence and will not liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or enter into any transaction of merger or consolidation with any Person (including any Subsidiary) unless (i) this corporation is the surviving corporation following any such merger or consolidation, and (ii) the Consolidated Net Worth of the surviving corporation immediately following such merger or consolidation equals or exceeds the Consolidated Net Worth of this corporation immediately prior to such merger or consolidation.

(e)  Sale of Assets.  The corporation will not, and will not permit any of its Subsidiaries to, convey, sell, lease, transfer or otherwise dispose of all or any material part of its business, property or assets, whether now owned or hereafter acquired, except:

(1)  The corporation and its Subsidiaries may convey, sell, lease, transfer or otherwise dispose of investment assets in the ordinary course of business;

(2)  The corporation and its Subsidiaries may sell or otherwise dispose of Capital Assets or real property if the asset so disposed of is concurrently replaced by a substantially equivalent asset having a value equal to or greater than the asset disposed of;

(3)  The corporation and its Subsidiaries may sell or otherwise dispose of obsolete or worn out property in the ordinary course of business;

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 9

Exhibit 1 - Page - 51

3-ER-524

(4)   The corporation and its Subsidiaries may sell and lease back any newly acquired asset for the purpose of financing the acquisition of such asset and securing the repayment of Indebtedness, provided that such Indebtedness shall not exceed eighty-five percent (85%) of the cost of such asset and is otherwise permitted by the covenants contained in this Article Fourth; and

(5)   The corporation and its Subsidiaries may sell or otherwise dispose of any of their other assets; provided that any such sale or other disposition is made for the fair market value of such assets.

(f)   Acquisitions.   The corporation will not, and will not permit any of its Subsidiaries to, acquire by purchase or otherwise all or substantially all the business, property or fixed assets, or the stock or other evidence of beneficial ownership, of any Person unless, immediately prior to and after giving effect to such transaction, no violation of any of the covenants or other provisions contained in this Article Fourth shall have occurred and be continuing or would be caused by such acquisition.

(g)   Transactions with Shareholders and Affiliates.   The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease, loan or exchange of any property or the rendering of any service) with any director or officer or any holder of equity securities of the corporation, or with any Affiliate of the corporation or of such director, officer or holder, on terms that are less favorable to the corporation or that Subsidiary, as the case may be, than those which might be obtained at the time from Persons who are not such a director, officer, holder or Affiliate; provided that the forgoing restriction shall not apply to (1) any transaction in effect at

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 10

Exhibit 1 - Page - 52

3-ER-525

the date of adoption of this Article Fourth by the corporation's shareholders; (2) any transaction between the corporation and any of its wholly-owned Subsidiaries or between any of its wholly-owned Subsidiaries; (3) compensation (net of amounts contributed or repaid to the corporation or any Subsidiary or to Lewiston Land Company and contributed or repaid to the corporation or any Subsidiary), by way of salary or bonus, paid to directors or officers of the corporation in an amount, as to any one individual, not greater than the greater of $400,000 or the total compensation paid in calendar year 1986; (4) compensation paid to any director or officer of the corporation in amounts equal to income tax liability of such director or officer attributable to transactions involving the corporation, A.I.A., Inc., AIA Travel Services, Inc., AIA Travel, Inc., Lewiston Land Company, AIA Bancard Services Corporation or Taylor Brothers Aircraft on or before January 1, 1988 or to other personal income tax liability of such director or officer for tax years ended before January 1, 1988; or (5) any loan to or account receivable from an officer, director or shareholder which is repaid in full at least annually on or before the last day of the fiscal year.

(h)  Consolidated Net Worth.  The corporation will not permit Consolidated Net Worth any date to be less than the number of shares of Stated Value Preferred Stock outstanding at such date multiplied by $10.00 per share.

(i)  Dividend Restriction.  The corporation will not, directly or indirectly, declare, order, make or set apart any sum for payment of any dividend in respect of its common stock (other than a dividend payable solely in shares of common stock), except that the corporation may declare and pay

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 11

Exhibit 1 - Page - 53

common stock dividends in an aggregate amount not exceeding the Dividend Availability Amount.

(j)   Debt/Equity Ratio.   Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of Consolidated Long Term Debt to Consolidated Net Worth exceeds, or such additional Indebtedness would cause such ratio to exceed, 3.6 to 1.0.

(k)   Debt Service Coverage.   Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of (i) Consolidated Net Income plus depreciation and amortization expenses plus compensation contributed or repaid to the corporation, any Subsidiary, Lewiston Land Company or AIA Travel Services, Inc. during the immediately preceding fiscal year of the corporation, divided by (ii) current maturities of Long Term Debt is, or such additional Indebtedness would cause such ratio to be, less than .8 to 1.0.

4.10   Definitions.   For the purpose of Section 4.9 of this Article Fourth, the following terms shall have the following meanings:

"Affiliate", as applied to any Person, shall mean any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.   For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 12

Exhibit 1 - Page - 54

3-ER-527

"**Capital Asset**" shall mean, as at any date of determination, those assets of a Person that would, in conformity with generally accepted accounting principles, consistently applied, be classified as plant, property or equipment on the balance sheet of that Person.

"**Consolidated Long Term Debt**" shall mean, as at any date of determination, the total of all Long Term Debt of the corporation and its Subsidiaries on a consolidated basis determined in accordance with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

"**Consolidated Net Worth**" shall mean, as at any date of determination, the sum of (a) the capital stock and additional paid-in capital, (b) plus retained earnings (or minus accumulated deficit) of the corporation and its Subsidiaries on a consolidated basis, determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

"**Consolidated Net Income**" for any period, shall mean the net income (or loss) of the corporation and its Subsidiaries on a consolidated basis determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

"**Dividend Availability Amount**" shall mean, as at any date of determination, an amount equal to 50% of Consolidated Net Income for the period (taken as single accounting period) commencing January 31, 1987 and ending on the last day of the fiscal quarter immediately preceding such date of determination.

"**Indebtedness**" as applied to any person, means (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to finance leases

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 13

Exhibit 1 - Page - 55

3-ER-528

which is capitalized on a balance sheet in conformity with generally accepted accounting principles, consistently applied, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money, (d) any obligation owed for all or any part of the deferred purchase price of property or services which purchase price is (i) due more than six month from the date of incurrence of the obligation in respect thereof, or (ii) evidenced by a note or similar written instrument, and (e) all indebtedness secured by any Lien or vendor's interest under any conditional sale or other title retention agreement existing on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person; provided, however, that "Indebtedness" shall not include policy claims, policy reserves or mandatory securities valuation reserves of a regulated insurance company; and further provided that "Indebtedness" shall not include indebtedness of the corporation to any Subsidiary.

"Lien" shall mean any lien, mortgage, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give a security interest).

"Long Term Debt", as applied to any Person, shall mean all Indebtedness of that Person which by its terms or by the terms of any instrument or agreement relating thereto matures more than one year, or is directly renewable or extendable at the option of the debtor to a date more than one year (including an option of the debtor under a revolving credit or similar agreement obligating the lenders to extend credit over a period of one year or more), from the date

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 14

Exhibit 1 - Page - 56

3-ER-529

of creation thereof, but excluding any payments due under the terms thereof within 12 months of any date of determination.

"**Person**" shall mean an individual, corporation, partnership, joint venture, trust, unincorporated organization or any other jurisdictional entity, or a foreign state or any agency or political subdivision thereof.

"**Subsidiary**" shall mean any corporation of which at least a majority of the outstanding stock having by the terms thereof ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether or not at the time stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the corporation or one or more of its Subsidiaries or by the corporation and one or more of its Subsidiaries.

4.11  **Conversion Right; Right to Require Registration**.  [To be inserted].

4.12  **Modification of Rights and Preferences**.  The rights and preferences hereby conferred on the Stated Value Preferred Stock shall not be changed, altered or revoked without the consent of the holders of the majority of the Stated Value Preferred Stock outstanding at the time."

**THIRD:**  At the date of adoption of the amendment by the corporation's shareholders, 801,000 shares of common stock were issued and outstanding, 801,000 shares of common stock were entitled to vote at such meeting, 801 000 shares of common stock were voted in favor of adoption of the amendment, and 0 shares of common stock were voted against adoption of the amendment.

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 15

Exhibit 1 - Page - 57

3-ER-530

DATED this _18th_ day of _Dec._, 1987.

AIA SERVICES CORPORATION

By _[signature]_
Reed J. Taylor, President

ATTEST:
By _[signature]_
R. John Taylor, Secretary

## VERIFICATION

STATE OF IDAHO    )
                  ss:
County of Nez Perce )

**REED J. TAYLOR** and **R. JOHN TAYLOR**, being first duly sworn upon oath, depose and say:

That Reed J. Taylor is the President and R. John Taylor is the Secretary, respectively, of AIA Services Corporation, and that they have read the foregoing instrument, know the contents thereof and believe the facts therein stated to be true to the best of their knowledge and belief.

_[signature]_
REED J. TAYLOR

_[signature]_
R. JOHN TAYLOR

**SUBSCRIBED AND SWORN** to before me on this _18th_ day of _Dec._, 1987.

_[signature]_
Notary Public for Idaho
Residing at Lewiston, Idaho
My Commission Expires: _3/15/88_

SCHEDULE 2.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 16

Exhibit 1 - Page - 58

## SCHEDULE 3

### TAX DEDUCTIBLE COSTS INCURRED BY WIFE AND PAID FROM COMMUNITY FUNDS IN 1987

| | |
|---|---|
| Coopers and Lybrand | $ 2,213.75 |
| Touche Ross & Co. | 3,825.00 |
| Givens, McDevitt, et al. | |
|     Chas. F. McDevitt 7/87-9/87 | 31,072.50 |
|     Paul J. Buser 4/87-10/87 | 30,000.00 |
|     Costs | 11,408.00 |
| Total | $78,519.25 |

SCHEDULE 3 TO PROPERTY SETTLEMENT AGREEMENT - P. 1

Exhibit 1 - Page - 59

3-ER-532

## SCHEDULE 6A

### RETIREMENT BENEFIT DIVISION

VALUATION

AIA Profit Sharing Plan

| | |
|---|---|
| Value of Plan Assets (9/30/87) | $889,683 |
| Value of Reed Taylor's 20.200903% interest | $179,724 |

Keogh Plan

| | |
|---|---|
| Value at 11/2/87 | 30,598 |
| Interest (asuming 6% rate and 1/2/88 distribution, approximately $5/day) | 300 |

| | |
|---|---|
| Total Retirement Benefits divided at 9/20/87 | $210,622 |
| One-half of 9/30/87 Profit Sharing Plan balances | $ 89,862 |
| One-half of 11/2/87 Keogh Plan balance plus interest | 15,449 |
| Equal division 9/30/87 | $105,311 |

### CALCULATION OF PERCENTAGES FOR DIVIDING PROFIT SHARING PLAN ASSETS AS OF SEPTEMBER 30, 1987

| | |
|---|---|
| Donna's one half interest in retirement benefits | $105,311 |
| Less 100% Keogh Plan balance plus interest | 30,898 |
| Donna's Share of Profit Sharing Plan | $ 74,413 |

Donna's Percentage $\dfrac{74,413}{179,724} = 41.4\%$

Reed's Percentage $\dfrac{105,311}{179,724} = 58.6\%$

RECAP

| | | |
|---|---|---|
| Donna: | Keogh Plan (100%) | $ 30,898 |
| | Profit Sharing Plan (41.6%) | 74,413 |
| | | $105,311 |
| Reed: | Profit Sharing Plan (58.6%) | $105,311 |

SCHEDULE 6A TO PROPERTY SETTLEMENT AGREEMENT - P. 1

Exhibit 1 - Page - 60

SCHEDULE 6B TO PROPERTY SETTLEMENT AGREEMENT

WILLIAM J. McKLVEEN
RICHARD A. RILEY
B. NEWAL SQUYRES, JR.
EBERLE, BERLIN, KADING, TURNBOW
  & GILLESPIE, CHARTERED
300 North Sixth Street
Post Office Box 1368
Boise, Idaho 83701
Telephone:  (208) 344-8535

Attorneys for Defendant/Counterclaimant

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE

STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| DONNA J. TAYLOR,<br><br>    Plaintiff,<br><br>vs.<br><br>REED J. TAYLOR,<br><br>    Defendant.<br>_____<br><br>REED J. TAYLOR,<br><br>    Counterclaimant,<br><br>vs.<br><br>DONNA J. TAYLOR,<br><br>    Counterdefendant.<br>_____ | Case No. 51057<br><br>QUALIFIED DOMESTIC<br>RELATIONS ORDER |

Pursuant to the Property Settlement Agreement between the parties dated _____, 198__, and the record of this matter, the Court finds as follows:

SCHEDULE 6B TO PROPERTY SETTLEMENT AGREEMENT

QUALIFIED DOMESTIC RELATIONS ORDER - P. 1

Exhibit 1 - Page - 61

I.

The parties to this action were married to each other on July 4, 1963.

II.

The parties have entered into a Property Settlement Agreement which, in part, makes an equitable division of the Profit Sharing and Keogh Plan benefits owned by the community.

III.

This Court has personal jurisdiction over the subject matter, this Order and the divorce action.

IV.

The parties to this action and the Court intend this Order to be a Qualified Domestic Relations Order, as that term is used in Section 414(p) of the Internal Revenue Code 1986, as amended; and this Order shall be administered and interpreted in conformity with that Act.

Based upon the Property Settlement Agreement and these findings, IT IS HEREBY ORDERED as follows:

A.  Definitions:

(1)  The term "Participant" means Reed J. Taylor, whose last known mailing address is One Lewis Clark Plaza, P. O. Box 538, Lewiston, Idaho 38501.  Participant's Social Security Number is ███████.  Participant is 51 years of age.

QUALIFIED DOMESTIC RELATIONS ORDER - P. 2

Exhibit 1 - Page - 62

(2)  The term "Alternate Payee" means Donna J. Taylor, whose last known mailing address is c/o Givens, McDevitt, Pursley, Webb & Buser, P. O. Box 2720, Boise, ID 83701. Alternate Payee's Social Security Number is ███████.

(3)  The term "Alternate Payee Beneficiaries" means Jay Reed Taylor, whose last known mailing address is _____ and whose Social Security Number is _____; Jud Regan Taylor, whose last known mailing address is _____, and whose Social Security Number is _____; and Sara Jocelyn Taylor, whose last known mailing address is _____ and whose Social Security Number is _____.

(4)  The term "Plans" shall refer to both the (a) AIA, Inc. 401(k) Profit Sharing Trust (singularly referred to as "Profit Sharing Trust") and (b) the First Trust Corporation Keogh Plan and Trust adopted by Reed J. Taylor as Employer (singularly referred to as "Keogh").

(5)  The term "Plan Administrator" in reference to the AIA, Inc. 401(k) Profit Sharing Trust is IPC Pension Services Co., Inc.; and the term "Plan Administrator" in reference to the First Trust Corporation Keogh Plan and Trust is First Trust Corporation.

B.  The Alternate Payee is the former spouse of the Participant.  The Alternate Payee Beneficiaries are children of the Participant.

QUALIFIED DOMESTIC RELATIONS ORDER - P. 3

Exhibit 1 - Page - 63

3-ER-536

C.  This Order is entered pursuant to Idaho Code §32-712, governing the division of marital property between spouses and former spouses in divorce actions.

D.  This Order hereby creates or recognizes the existence of the Alternative Payee's community property right to a portion of the Participant's benefits under the Plans.  The Alternate Payee is hereby awarded 100 percent of Participant's account balance in the Keogh.  The Alternate Payee is hereby awarded 41.4 percent of Participant's account balances in the Profit Sharing Plan to be determined as follows:  The Plan Administrator shall value Alternate Payee's interest in the Profit Sharing Plan by valuing Participant's account balances as of the most recent practicable date preceding the date of distribution as provided below, subtracting any post-September 14, 1987 forfeiture and contributions allocated to Participant's accounts.  The amount so determined shall be multiplied by 41.4 percent to determine Alternate Payee's interest in the Profit Sharing Plan.  As Participant has attained "early retirement age" (as defined under I.R.C. §414(p)(4)(B)), Alternate Payee's interest shall be paid to Alternate Payee in a lump sum within a reasonable time after the Plan Administrators determine whether this Order is a Qualified Domestic Relations Order, as set forth below.  In the event of Alternate Payee's death prior to her receipt of her interest in the .Plans, said interest shall be

QUALIFIED DOMESTIC RELATIONS ORDER - P. 4

Exhibit 1 - Page - 64

payable to the Alternate Payee Beneficiaries, equally, share and share alike.

E. Nothing contained in this Order shall be construed to require any Plan or Plan Administrator:

(1) To provide any type or form of benefit, or any option, not otherwise available to the Participant under the Plans;

(2) To provide increased benefits (determined on the basis of actuarial value) not otherwise available to the Participant; or

(3) To pay benefits to an Alternate Payee which are required to be paid to another alternate payee under another Order previously determined to be a qualified domestic relations order.

F. A copy of this Order shall be sent to the respective Plan Administrators who shall:

(1) Promptly notify the Participant, the Alternate Payee, and the Alternate Payee Beneficiaries of:

(a) The receipt of a copy of this Order by the Plan Administrator; and

(b) The plans and procedures for determining the qualified status of domestic relations orders;

(2) Within a reasonable period of time after receipt of a copy of this Order, determine whether this Order is a Qualified Domestic Relations Order and notify the Participant, the

QUALIFIED DOMESTIC RELATIONS ORDER - P. 5

Exhibit 1 - Page - 65

Alternate Payee, and the Alternate Payee Beneficiaries of such determination; and

(3) Pending the determination of whether this Order is a Qualified Domestic Relations Order, separately account for the amounts which would have been payable to the Alternate Payee during such period if this Order had been determined to be a Qualified Domestic Relations Order as of the date hereof.

G.  The Court hereby reserves jurisdiction over the language of the Qualified Domestic Relations Order should, for some reason, there be a needed change or modification to assist the parties in qualifying the Order pursuant to the terms of the Retirement Equity Act of 1984, the regulations thereunder, or any requests that are made by the Plan Administrators.

DATED this _____ day of _____, 198___.


_____
                    MAGISTRATE

APPROVED AS TO FORM AND CONTENT:

EBERLE, BERLIN, KADING, TURNBOW
        & GILLESPIE, CHARTERED

By_____
        Attorneys for Reed J. Taylor

GIVENS, McDEVITT, PURSLEY, WEBB
        & BUSER

By_____
        Attorneys for Donna J. Taylor


QUALIFIED DOMESTIC RELATIONS ORDER - P. 6

Exhibit 1 - Page - 66

## SCHEDULE 7.1

## DEBTS ASSUMED BY HUSBAND

1. Notes payable consisting of the following:

    (a) Unsecured note payable to First Interstate Bank in the original principal amount of $75,000.

    (b) Unsecured account payable to First Interstate Bank in the original principal amount of $25,000.

    (c) Mortgage loan on Lewiston residence payable to First Interstate Bank.

2. All indebtedness of third parties contingently payable under guarantees by Husband.

3. All state and federal income tax liabilities of the parties (including interest and penalties) for the year ended December 31, 1987 and for prior years, except taxes at Husband's highest marginal 1987 tax rate on $24,000, which is equal to the aggregate amount paid to Wife in calendar year 1987 pursuant to Section 5 of the Agreement.

4. All other community joint debts of Husband and Wife, except (i) those debts specifically assumed by Wife in the Agreement, (ii) debts incurred solely by Wife at any time and (iii) subject to Sections 3 and 11.3 of the Agreement, Wife's attorneys' and other experts' fees and costs incurred in the pending divorce action.

SCHEDULE 7.1 TO PROPERTY SETTLEMENT AGREEMENT - P. 1

Exhibit 1 - Page - 67

## SCHEDULE 7.2

## DEBTS ASSUMED BY WIFE

### EXPENSES INCURRED SINCE SEPARATION (THROUGH AUGUST 7, 1987):

| | |
|---|---|
| Telephone | $ 4,580.41 |
| Gas for home | 1,449.62 |
| Electric | 809.98 |
| Bank Charges | 359.29 |
| Garbage | 227.29 |
| Newspaper | 408.50 |
| Water and Sewer | 529.17 |
| Landscaping | 925.00 |
| Cleaning | 13.25 |
| Kooskooskee Association Fees | 907.50 |
| Vet and Supplies | 2,401.85 |
| Hair | 434.00 |
| Car Gas and Repair | 2,263.00 |
| Dentist, Doctors, Drugs (Donna/Sara) | 4,992.30 |
| Food | 2,051.12 |
| Norstrom | 6,423.20 |
| Meier & Frank | 4,400.69 |
| House and Miscellaneous Stores | 3,290.76 |
| Crescent | 1,149.97 |
| Sara (living & education) | 9,202.25 |
| Jud (living/doctor bills/ education) | 10,077.31 |
| Jay (living/doctor bills/education | 725.00 |
| Gifts | 2,090.00 |
| Lawyer Fees | 3,917.51 |
| Miscellaneous Cash | 3,700.00 |
| Entertainment | 218.70 |
| Vitamins | 285.75 |
| Jay Miller | 1,200.00 |
| Treadmill | 1,200.00 |
| Miscellaneous Checks | 1,522.00 |
| Loan from Mother | 7,100.00 |
| Total | $78,855.78 |

### CURRENT INDEBTEDNESS (AS OF JULY 8, 1987):

| | |
|---|---|
| Nordstrom's | $ 2,400.00 |
| Meier & Frank | 360.00 |
| Smith's | 828.00 |
| Lloyd's Interiors | 368.00 |
| Wife's Mother | 7,100.00 |
| Total | $11,465.00 |

SCHEDULE 7.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 1

Exhibit 1 - Page - 68

## DIVORCE LITIGATION FEES:

Except as provided in Sections 3 and 11.3 of the Agreement, Wife's attorneys' and other experts' fees and costs incurred in the pending divorce litigation.

SCHEDULE 7.2 TO PROPERTY SETTLEMENT AGREEMENT - P. 2

Exhibit 1 - Page - 69

RODERICK C. BOND
NED A. CANNON, ISBA #2331
SMITH, CANNON & BOND PLLC
Attorneys for Plaintiff
508 Eighth Street
Lewiston, Idaho  83501
Fax:  (208) 746-8421

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE
STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| REED J. TAYLOR, a single person,<br><br>Plaintiff,<br><br>v.<br><br>AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation; R. JOHN TAYLOR and CONNIE TAYLOR, individually and the community property comprised thereof; BRYAN FREEMAN, a single person; JOLEE DUCLOS, a single person; CROP USA INSURANCE AGENCY, INC., an Idaho Corporation; and JAMES BECK and CORRINE BECK, individually and the community property comprised thereof;<br><br>Defendants. | Case No.: CV-07-00208<br><br>AFFIDAVIT OF REED J. TAYLOR IN OPPOSITION TO AIA SERVICES AND AIA INSURANCE'S MOTION TO AMEND ANSWER AND MOTION FOR RULE 67 DEPOSIT AND IN OPPOSITION TO CONNIE TAYLOR, JAMES BECK AND CORRINE BECK'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

STATE OF IDAHO          )
                                        ) ss:
COUNTY OF NEZ PERCE   )

I, Reed J. Taylor, being first duly sworn on oath, deposes and says:

1.      I am over the age of eighteen years, competent to testify in court, the plaintiff in this action, and make this Affidavit based upon my personal knowledge.

AFFIDAVIT OF REED J. TAYLOR - 1

Exhibit 5 - Page - 1

2.     John Taylor, Richard Campanaro, James Beck and Michael Cashman sought to have my shares in AIA Services redeemed so that John Taylor and Richard Campanaro could take operational control of AIA Services.  Attached as **Exhibit A** is a copy of a letter from Richard Campanaro to me and my brother John Taylor dated April 14, 1995.  To my knowledge, none of the defendants in this action have provided any correspondence from or to Richard Companaro when my attorneys have specifically requested such information.  As seen in the attached letter, I was being solicited to sell my shares in AIA Services.

3.     Attached as **Exhibit B** is a Notice of Special Meeting of Shareholders dated June 27, 1995, that was provided to the shareholders of AIA Services in connection with the company's restructure, the redemption of my shares, and the other actions sought to be taken by John Taylor and the other shareholders.

4.     Attached as **Exhibit C** is a letter to AIA Services' shareholders signed by R. John Taylor dated July 10, 1995.  This letter was provided to my attorneys through discovery by AIA Services.  In Exhibit C, John Taylor urged AIA Services' shareholders to approve the contemplated transactions, including, the redemption of my shares in AIA Services.  AIA Services represented that the redemption of my shares had the necessary approvals.

5.     Attached as **Exhibit D** is a copy of a Private Placement Memorandum that was sent to all shareholders and was referenced in Exhibit C.

6.     Attached as **Exhibit E** is an Investment Agreement between AIA Services, Richard Campanaro, James Beck and Michael Cashman dated June 30, 1995, in which the forgoing parties placed a condition that my shares would be redeemed.  This

AFFIDAVIT OF REED J. TAYLOR - 2

Exhibit 5 - Page - 2

3-ER-544

agreement was provided to my attorneys through discovery by AIA Services.

7.     Attached as **Exhibit F** is the Subscription Agreement for James Beck's purchase of his Preferred C Shares that was provided to my attorneys through discovery by AIA Services.

8.     Attached as **Exhibit G** is a Preferred C Shareholder list that was provided to my attorneys through discovery by AIA Services.  As indicated on the shareholder list, James Beck did not become a shareholder until after my shares were redeemed by AIA Services.  James Beck had full knowledge of all of the details of the redemption of my shares and was one of the persons behind trying to redeem my shares.

9.     Attached as **Exhibit H** is a shareholder list for AIA Services that was provided to my attorneys through discovery by AIA Services.  This document shows that my shares were canceled by AIA Services.  The shareholder list indicates that the shares owned by John and Connie Taylor are listed only in John Taylor's name.

10.     Attached as **Exhibit I** is an opinion letter provided to me on August 15, 1995, by counsel for AIA Services stating that the redemption of my shares was legal, that AIA Services had the power and authority to redeem my shares and that AIA Services had received the necessary shareholder approval for the redemption of my shares.

11.     Attached as **Exhibit J** are pertinent pages of AIA Services' Bylaws that were provided to my attorneys through discovery by AIA Services.

DATED: This 9th day of May, 2008.

Reed J. Taylor

AFFIDAVIT OF REED J. TAYLOR - 3

Exhibit 5 - Page - 3

3-ER-545

SUBSCRIBED AND SWORN to before me this 9th day of May, 2008.

Notary Public for Idaho
Residing at: _Lewiston_
My commission expires: _3/28/2014_

AFFIDAVIT OF REED J. TAYLOR - 4

Exhibit 5 - Page - 4

3-ER-546

Richard W. Campanaro
1 Ocean Ridge Court
Ponte Vedra Beach
Florida 32082

April 14, 1995

Mr. Reed Taylor
Mr. John Taylor
AIA Services Corp
One Lewis Clark Plaza
Lewiston, Idaho 83501

Dear Reed & John:

As you both know, following the Board of Director's and Stockholder's meetings held in Boise, Idaho in early March, Mr. Michael Cashman, myself, Mr. Jim Beck, and the representatives of John G. Kinnard expected a response from Mr. Reed Taylor detailing the sale of his stock in AIA. Mr. Reed Taylor specifically indicated to both Mr. Cashman and myself that such a response would be immediately forthcoming; that, in fact, he had retained the services of an attorney for the purpose of attempting to finalize the details of our sale and purchase agreement.

New information has become available to me since that time which force me, on behalf of all the investors involved, to withdraw the original proposal that Mr. Reed Taylor was familiar with. This action is being taken, in no small part, after discussions with the primary investors this past week in Minneapolis, detailing not only the new preliminary financials but Mr. Reed Taylor's and Mr. Ernie Dantini's actions while I was in Lewiston on April 4,5,6. I will, in the spirit of good will, attempt to summarize our concerns and preliminarily propose a new structure that more accurately reflects the current value of AIA Services.

Please understand that I am acting on behalf of not only myself and the investment I am personally willing to make in your company but numerous others that have joined me in this attempt. I must, therefore, be prudent in my evaluations in order to preserve my integrity with these associates. Kindly accept this memorandum in that context. I have tried extremely hard to get Mr. Reed Taylor's attention to important matters to no avail and I can only assume that, perhaps, he has decided to venture out in a different direction. If that is the case, as his associate and advisor Mr. Dantini has indicated to me, then I wish you both



EXHIBIT A

Exhibit 5 - Page - 5

**3-ER-547**

page 2

the very best. If that is not the case, I request a response to this letter at your earliest convenience. I can not emphasize enough that Mr. Reed Taylor has delayed matters to the point of already discouraging a number of the interested investor group; whether or not I can re-establish their excitement remains to be seen.

Preliminary 1994 year end numbers have come to my attention that demand, by themselves, a restructuring of our offer. I can not ignore an approximate $4 million GAAP loss. Nor can I ignore the fact that the marketing field force was decimated beyond the indications you both gave me initially and definitely beyond my expectations.   Prior to knowing the entire financial picture ( 1994) I was having a difficult time justifying to my associates and other interested parties $ 15 per share as a fair market value for AIA Services. Evaluations of true worth ranged from $3.50 to a maximum of $7.00 per share, depending upon the weight given the sales force and value of the association franchises. I truly struggled with those investing with me to keep the price up for Mr. Reed Taylor because I gave him my word I would do so and I felt we could capitalize on the momentum of the regulatory issues being resolved and the risk being sold to Centennial. However, much to my chagrin and surprise, Mr. Reed Taylor has taken actions to even abort any momentum that might have been gained.

Again, I beg your indulgence but I must enumerate, now, those actions that I felt obligated to address with my associates and that "speak directly" to the purchase price we are willing to offer.

( 1) Mr. Reed Taylor has refused to negotiate an agreement  The letter to John, I presume, was a joke.
( 2) Mr. Taylor has allowed his associate, Mr. Dantini, to disrupt the entire operations of AIA on behalf of an insurance program that will not be part of our purchase agreement. Further, Mr. Dantini  has spent, in 1995, over $200,000 on this program, the entire cost of which must be reflected in any agreement we might reach in the future. Lastly, Mr. Dantini has been a negative influence on the employees of AIA by continuing to degrade my efforts and those of my associates. Therefore, please take notice that no possible purchase agreement will be reached without the understanding that the CAP program and Mr. Dantini are permanently off-premises at the time of closing, and

Exhibit 5 - Page - 6

3-ER-548

page 3

        the CAP program will officially be separated from any AIA involvement.

(3) Mr. Reed Taylor addressed issues with his attorney, Scott Bell, that, as the Chairman of the Board of Directors, he should have known were heretofore resolved. This indicates to me a lack of seriousness on his part or a complete lack of understanding of the structure we were attempting to avail ourselves of in order to effect this purchase. It appears that Mr. Reed Taylor was attempting to sabotage, for whatever reason, the entire purchase agreement.

(4) Mr. Taylor has undermined the marketing momentum by failing to either cooperate with us or discuss the actions of Gary Modrell that have been seriously detrimental to AIA. He has even forced Mr. William Tarbart to the point of eliminating himself from the team I had hoped to have with me in this endeavor. If I cannot convince Mr. Tarbart to change his mind, it will be a major obstacle to my moving forward at all.

I sincerely hope you both understand my current position. I was, and continue to be, a sincere purchaser of Mr. Reed Taylor's stock and the restructuring of AIA. However, given all of the above, which I cannot ignore, you have left me absolutely no choice but to reconsider my offer and to bring it into line with current financial values. Further, any potential for my involvement must also take into consideration those qualitative, judgmental issues which now seem to be negative rather than positive. I don't know how else to express it, unfortunately. We would have a great deal more to overcome and rebuild now as opposed to earlier evaluations.

If you continue to have an interest in pursuing a possible agreement, please do so with the following in mind.

1. I will offer Mr. Reed Taylor the $1.5 million down payment as agreed to.

2. I will not offer Mr. Taylor any guarantee for the balance of his stock purchase price over and above a value of $5.00 per share. In other words, if 500,000 shares continues to be the number to be sold by Reed, these shares are worth a total of $2.5 million. After the $1.5 million down payment, I will be willing to structure some sort of agreeable guarantee for a balance of $1 million.

Exhibit 5 - Page - 7

3-ER-549

page 4

Whatever is to be paid over $5.00 per share, and that remains to be re-negotiated, Mr. Taylor will have to assume the risk along with the investor groups.

3. I will entertain a re-negotiated price per share providing it is within a reasonable range of the current stock value.

4. I will not pay an interest rate of prime + 1/2% on the balance of the stock purchase price. I will entertain paying prime or 7%, whichever is less.

5. I would prefer to purchase all of Mr. Reed Taylor's stock rather then risk further negative influences on his part. However, that price, as stated, must be re-negotiated.

6. All expenses accrued by the CAP program in 1995 must be made whole for AIA at closing.

7. The CAP program must be removed from AIA prior to closing and Mr. Dantini must be off-premises, permanently, by any closing date.

8. Mr. Reed Taylor must agree to testify for AIA as to the actions detrimental to AIA by Mr. Gary Modrell. Mr. Modrell will be terminated, without renewals, immediately following closing and, should a law suit be instigated, Mr. Taylor must assume the identical posture in this regard that he stated to be fact prior to the "agents" meeting in Dallas, Texas; i.e., Mr. Modrell had committed actions in direct conflict to AIA's best interests. Mr. Modrell has been given more than adequate time to perform since being advised of AIA's marketing direction; he has been given time and notice as to termination; and he has been offered the opportunity to negotiate a settlement with the Company. Mr. Reed Taylor interfered with that process to the detriment of AIA and must now help to rectify the situation.

9. Additional covenants will be included in any purchase agreement, all of which cannot be enumerated herewith. However, the above are the basic necessary terms of any future agreement and, if they are not acceptable, it serves no useful purpose to proceed.

It is my understanding that Mr. Bruce Sweeney is the Chairman of a Board committee appointed to finalize any agreement with Mr. Reed Taylor. Therefore, by way of a copy of this letter, I am informing him of these new developments. I am also sending Dick Riley a copy so that he might appropriately respond to the letter of intent drafted by Scott T. Bell, which, in my opinion, is another indication of Reed Taylor's lack of seriousness concerning the sale of his stock.

Exhibit 5 - Page - 8

3-ER-550

page 5

I sincerely hope we can reach an agreement to proceed with this transaction in a reasonable period of time. If you both wish to pursue the matter, please advise me as soon as possible. Collectively, we have a great deal of time, effort, and money invested in this opportunity. Moreover, I respectfully request Mr. Reed Taylor and his attorney to address any future letter of intent to me as opposed to John Taylor. I believe it's inappropriate to assume that John Taylor can negotiate with Reed Taylor on my behalf, given their relationship.

Sincerely,

Richard W.Campanaro

cc: Mr. Bruce Sweeney
Mr. Dick Riley

**Hard copy to follow

Exhibit 5 - Page - 9

3-ER-551

**AIA SERVICES CORPORATION**
One Lewis Clark Plaza
Lewiston, Idaho 83501

**NOTICE OF SPECIAL MEETING OF SHAREHOLDERS**
July 18, 1995, at 3:30 p.m. PDT

You are cordially invited to attend a special meeting of shareholders of AIA Services Corporation ("Company"). The meeting will be held at the Company's offices at One Lewis Clark Plaza, Lewiston, Idaho on Tuesday, July 18, 1995, at 3:30 p.m. PDT.

The Company's shareholders previously approved a plan of reorganization and recapitalization at a special meeting on March 11, 1995. Since that time, however, changed circumstances have necessitated changes in the reorganization plan. Some components of the revised plan require shareholder approval.

The meeting will be held for the purpose of considering and voting upon certain corporate transactions necessary to implement the Company's revised plan to reorganize the Company's capitalization, ownership and operations. The proposed reorganization includes the following transactions:

1. Amendment of the Company's Articles of Incorporation to decrease the par value of Company's Common Stock from $1.00 per share to $0.01 per share, to cancel the previously authorized 735,000 shares of Series B 10% Preferred Stock, to increase the number of authorized shares of Series C 10% Convertible Preferred Stock from 150,000 shares to 500,000 shares, and to allow the holders of the Series C Preferred Stock to elect two directors to the Company's Board of Directors.

2. Cancellation of the previous authorization to issue Series B Warrants to purchase up to 22.64% of the Company's Common Stock and Series C Warrants to purchase up to 10.4% of the Company's Common Stock; and authorization to issue Series C Warrants to purchase up to 15.33% of Company's Common Stock.

3. Issuance of 150,000 shares of Series C Preferred Stock and the Series C Warrants to purchase up to 4.6% of Company's Common Stock, pursuant to an Investment Agreement with Messrs. Cashman and Beck.

4. Issuance of a special warrant to Messrs. Cashman and Beck to purchase up to 6% of Company's Common Stock.

5. Redemption of all of Reed J. Taylor's 613,494 shares of Company's Common Stock for $7.5 million and certain other consideration, pursuant to the terms of a Stock Redemption Agreement, a Consulting Agreement and related documentation; application of the proceeds of sale of 150,000 shares of Series C Preferred Stock and attendant Series C Warrants to the $1.5 million down payment of the redemption price for Reed J. Taylor's Common Stock; issuance of the Company's $6 million promissory note for the balance of the redemption price for Mr.

NOTICE OF SPECIAL MEETING
OF SHAREHOLDERS                           1

AIA0025495

EXHIBIT B

Exhibit 5 - Page - 10

3-ER-552

Taylor's Common Stock; and related transactions with Mr. Taylor, including (without limitation) the Consulting Agreement and certain documents pursuant to which, to secure the payment of the promissory, Mr. Taylor is granted a security interest in the stock and the commission income of Company's operating subsidiaries.

6.   Borrowing of $2.8 million from West One Bank; and the issuance of warrants to purchase up to nine per cent (9%) of Company's Common Stock in consideration of loan guarantees by Messrs. Cashman & Beck.

7.   Application of a portion of the proceeds of West One Bank loan to the partial redemption of the outstanding Series A Stated Value Preferred Stock and the full payment of the Company's indebtedness to First Interstate Bank.

8.   Contribution of at least $1.0 million of the proceeds of West One Bank loan to the Company's subsidiary, The Universe Life Insurance Company ("ULIC"); and distribution of ULIC's subsidiary, AIA Insurance, Inc., to the Company.

9.   Approval of an amendment to Company's 1989 Stock Option Plan for key employees to increase the number of shares of Common Stock reserved for issuance upon exercise of options granted under the plan from 400,000 to 500,000.

10.  Authorization of a three-for-one (3:1) split of Company's Common Stock.

11.  Authorization to issue additional shares of Series C Preferred Stock and, attendant to each such share, a Series C Warrant to purchase .0000307% of Company's Common Stock.

12.  All other corporate actions necessary to recapitalize and reorganize the Company (including, without limitation, all necessary regulatory filings to obtain approval of change of control of Company's insurance subsidiaries) in accordance with plan approved by Board of Directors.

As soon as possible prior to the meeting, the Company will forward a Disclosure Statement which summarizes the various transactions included in the proposed plan of reorganization, together with a form of proxy for your use in the event you are unable to attend the meeting. If you attend the meeting, you may vote either in person or by your proxy.

If you have any questions, please do not hesitate to contact us.

JoLEE K. DUCLOS
Asst. Secretary

Lewiston, Idaho
June 27, 1995

NOTICE OF SPECIAL MEETING
OF SHAREHOLDERS                                    2

AIA0025496

Exhibit 5 - Page - 11

3-ER-553



**AIA Universe**

AIA Universe Insurance Group
One Lewis Clark Plaza
P.O. Box 538
Lewiston, Idaho 83501-0538
(208) 799-9000 FAX (208) 746-8159

July 10, 1995

AIA Services Corporation Shareholders:

A special meeting of the shareholders of AIA Services Corporation ("Company") will be held on July 18, 1995, at 3:30 p.m. PDT at Company's offices at One Lewis Clark Plaza, Lewiston, Idaho, to consider a revised plan of reorganization of the Company. As you may have heard, the Kinnard offering for Series B Preferred Stock of AIA Services Corporation ("Company") was not successfully completed. The offering and our agency agreement with Kinnard were terminated in May. We have continued discussions with various other interested investors.

Mr. Mike Cashman and Mr. Jim Beck have agreed to purchase $1.5 million of Series C 10% Convertible Preferred Stock and related Series C Warrants. In addition, they have agreed to guarantee a bank loan for $1 million. Mr. Campanaro and some of his friends may also guarantee a bank loan to the Company or purchase Series C Preferred Stock and Warrants for an additional $1 million. The guarantors will receive Warrants for up to 9% of Company's Common Stock as consideration for their guarantees.

With the proceeds from the sale of the Series C Shares and Warrants and from bank loans we will be able to reorganize the Company. The transactions comprising the reorganization are detailed in the enclosures. The reorganization includes the Company's purchase of all Reed Taylor's shares of Common Stock; issuance of a 10 year promissory note to Mr. Taylor, interest-only payable for 10 years with the $6 million balance due at maturity and secured by security interests in the stock and commission income of Company's operating subsidiaries; discharge of approximately $480,000 of Mr. Taylor's indebtedness to the Company; transfer of the airplanes and related debt to Mr. Taylor; and other related transactions.

We are seeking shareholder approval of an amendment to the Company's Articles of Incorporation to change the par value of Company's Common Stock from $1.00 to $.01 per share, to cancel all the previously authorized Series B Preferred Stock, and to increase the number of authorized shares of Series C Stock from 150,000 to

1

EXHIBIT C

AIA0025490

Exhibit 5 - Page - 12

**3-ER-554**

Page Two

500,000 shares. (This change in par value does not affect the value of your shares.) The Company will continue to market the Series C Shares and related Warrants to qualified individual investors even after the closing of the reorganization transactions. The proceeds from the sale of such additional shares of Series C Stock will be used to retire the Series A Preferred Stock held by Donna Taylor, to retire bank debt and/or to fund the balance of the redemption price due to Mr. Reed Taylor. In addition, the Company intends to borrow an additional $800,000 from West One Bank to pay off the First Interstate Bank note.

Under the Company's revised plan of reorganization, the previously approved merger with RJ Holdings will no longer be necessary. Instead, John Taylor will receive options to purchase 475,000 shares of Common Stock, and Rich Campanaro will receive options, which will become exercisable only after certain performance goals are met, to purchase 625,000 shares of Common Stock. Mr. Campanaro and Mr. Taylor will execute employment agreements with the Company.

Also, your shares will be split three-for-one. On a fully diluted basis, (i.e., assuming that all presently outstanding options are exercised), minority shareholders now own 13.4% of the Company, excluding Reed and John's shares. After the reorganization and the 3:1 split, the minority shareholders (other than Mr. Campanaro and John) will own 552,000 shares which equals 21.15% of the Company (assuming exercise of the options granted to Mr. Campanaro and Mr. Taylor).

If all the Warrants are exercised (other than the loan guarantee warrants) and all the Series C Preferred Shares are converted to Common Stock, the minority shareholders' percentage of the Company will decrease to 17.96%, based upon the minimum offering. If all authorized Series C Shares and related Warrants are sold, however, the minority shareholders' interest could ultimately be reduced to 10.58% (excluding any Warrants to be issued as compensation for guaranteeing the bank loans).

Because the revised reorganization plan no longer includes the previously authorized merger with RJ Holdings, dissenting shareholders will not have any statutory "dissenters' right" to liquidate their stock; and the Company does not intend to offer to purchase any of your shares at this time.

The Company still intends to follow its business plan to market insurance products to the agricultural commodity associations, but will not incur any additional insurance underwriting risk.

2

AIA0025491

Exhibit 5 - Page - 13

3-ER-555

Page Three

I have enclosed for your review several documents including:

1.    A Confidential Private Placement Memorandum dated June 1, 1995, and a Supplemental Disclosure Statement which describe the reorganization and the proposed business plan.

2.    Proposed Articles of Amendment of the Company's Articles of Incorporation.

3.    A proposed amended 1989 Stock Option Plan.

4.    The proposed form of Series C Warrant.

5.    A form of proxy to record your vote in the event you are unable to attend the shareholder meeting.

I urge you to support and ratify the transactions proposed in these documents.  I believe this is the best possible scenario for the ultimate survival and continued prosperity of the Company and all of us as shareholders.

Sincerely yours,

R. John Taylor
RJT/jd
Enclosures

3

AIA0025492

Exhibit 5 - Page - 14

# AIA SERVICES CORPORATION

## Confidential Private Placement Memorandum

June 1, 1995

Offered by:

AIA Services Corporation
One Lewis Clark Plaza
Lewiston, ID  83501
(208) 799-9000

Name of Offeree

Memorandum Number


EXHIBIT D   AIA0002297
Exhibit 5 - Page - 15

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

**AIA Services Corporation**
One Lewis Clark Plaza
P.O. Box 538
Lewiston, Idaho 83501

Series C Preferred Shares with Warrant
$10 per Share
Minimum Purchase:  5,000 shares

AIA Services Corporation ("Company") is offering 500,000 shares of Series C 10% Preferred Stock ("Shares"), each of which is convertible into 0.0000693% of Company's common stock (with certain anti-dilution protection), together with a five year Series C Warrant ("Warrant") to purchase shares of the Company's Common Stock ("Warrant Shares") equal to 0.0000307% of the outstanding Common Stock of the Company, on a fully-diluted basis, at the time the Warrants become exercisable.  The placement price of the Shares was determined by the Company and is not related to the assets of the Company or other financial criteria.  There is no market for the Shares or Warrants; and there can be no assurance that a market for such securities will ever exist or that the Shares offered hereby can be resold.  The Shares are restricted securities and an investor must purchase the Shares offered hereby for his of her own account and must assume the economic risk of investment for an indefinite period of time.

THE SHARES ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK AND SUBSTANTIAL DILUTION AND SHOULD BE PURCHASED ONLY BY PERSONS WHO CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT.  (SEE "RISK FACTORS".)

THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSIONS, BUT ARE OFFERED PURSUANT TO CLAIMED EXEMPTIONS FROM REGISTRATION PROVIDED BY THE SECURITIES ACT OF 1993, AND APPLICABLE STATE EXEMPTIONS.

|  | Offering Price | Proceeds to Company[1] |
|---|---|---|
| Per Share[2] | $     10.00 | $     10.00 |
| Minimum Total 150,000 shares[3] | $1,500,000 | $1,500,000 |
| Maximum Total 500,000 shares[3] | $5,000,000 | $5,000,000 |

1  The amount of net proceeds to the Company is before deduction of expenses payable by the Company in connection with this offering, estimated at $150,000 excluding any broker/dealer expenses.
2  The Company may in its discretion sell fewer than the minimum shares to any one investor.
3  The Minimum Required Financing is 150,000 shares for an aggregate offering price of $1,500,000.  The Company expects to receive a subscription for 150,000 Shares from an investment group (See "Restructuring"; "Certain Relationships and Transactions").  All proceeds from subscriptions will be held by the Company pending satisfaction of certain conditions, including amendment of the Company's Articles of Incorporation and receipt of subscriptions for the Minimum Required Financing.  If subscriptions for the Minimum Required financing are not received by August 1, 1995, (or such date not later than August 15, 1995, which the Company may agree to extend this offering), all subscription proceeds will be refunded promptly to subscribers, without deduction of any commissions or expenses.  (See "Plan of Distribution".)

AIA0002298

Exhibit 5 - Page - 16

THIS MEMORANDUM CONSTITUTES AN OFFER ONLY TO THE PERSON NAMED ON THE COVER PAGE THEREOF AND NOT TO ANYONE TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION OR IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS UNLAWFUL OR NOT AUTHORIZED.  THE SHARES ARE  AVAILABLE FOR SALE ONLY TO PERSONS WHO  MEET APPROPRIATE  FINANCIAL  AND  OTHER  QUALIFICATIONS  AS  "ACCREDITED INVESTORS", ACQUIRE THE SHARES FOR INVESTMENT AND NOT FOR RESALE AND WHO ARE OTHERWISE DEEMED ELIGIBLE TO PARTICIPATE IN THE PLACEMENT.  (SEE "INVESTOR SUITABILITY" AND ATTACHED SUBSCRIPTION AGREEMENT.)


## INTRODUCTORY STATEMENT

The summaries of the material terms of documents discussed herein are not complete and should not be relied upon by any investor without a complete reading of all relevant documents and a full understanding of their contents.  Offerees, or their purchaser representatives, desiring additional information about the Company, its business, this Memorandum or any documents discussed in this Memorandum should contact R. John Taylor, President of the Company, during normal business hours, at (208) 799-9100.  In order to purchase the Shares, investors and their purchaser representatives, if any, will be asked to represent that they were given the opportunity to obtain such additional information and that they either did so or elected to waive such opportunity.  No person is authorized to give any information with respect to the Company and its operation other than that contained in this Memorandum or other information furnished by the Company. Information not contained herein or furnished by the Company must not be relied upon as having been authorized by the Company.


## NOTICES TO POTENTIAL INVESTORS GENERALLY

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.  THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES  COMMISSION  OR  REGULATORY  AUTHORITY.   FURTHERMORE,  THE  FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.


## NOTICE TO PROSPECTIVE PURCHASERS IN FLORIDA

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT IN RELIANCE UPON AN EXEMPTION THEREFROM.  ANY SALE MADE PURSUANT TO SUCH EXEMPTION IS VOIDABLE BY A FLORIDA PURCHASER WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER OR AN ESCROW AGENT IN PAYMENT FOR SUCH SECURITIES.

AIA0002299

- ii

Exhibit 5 - Page - 17

3-ER-559

## TABLE OF CONTENTS

INTRODUCTORY STATEMENT ............................................ ii

NOTICE TO INVESTORS .............................................. ii

SUMMARY OF OFFERING .............................................. 5
    The Company ................................................... 5
    The Placement ................................................. 6
    Use of Proceeds ............................................... 6
    Selected Historical Financial Data ............................ 6
    Pro Forma Financial Information and Notes ..................... 7
    Selected Projected Financial Information ...................... 9
    Assumptions .................................................. 10

RISK FACTORS ...................................................... 12

RESTRUCTURING ..................................................... 17

BUSINESS .......................................................... 19
    Overview ..................................................... 19
    Subsidiaries ................................................. 20
    Business Strategy ............................................ 21
    Marketing Plan .............................................. 22
    Current Products ............................................. 24
    Association Relationships .................................... 25
    Clients ...................................................... 26
    Agreements ................................................... 26
    Regulation ................................................... 27
    Legal Proceedings ........................................... 29

MANAGEMENT ........................................................ 30
    Directors and Executives .................................... 30
    Board of Directors and Officers ............................. 30
    Director Compensation ....................................... 32
    Stock Option Plan ........................................... 32
    Employment Agreements ....................................... 33
    Certain Relationships and Transactions ...................... 33
    Indemnification ............................................. 34

PRINCIPAL AND MANAGEMENT SHAREHOLDINGS ............................ 36

DESCRIPTION OF SECURITIES ......................................... 38

PLAN OF DISTRIBUTION .............................................. 42

-iii-

AIA0002300

Exhibit 5 - Page - 18

3-ER-560

INVESTOR SUITABILITY ............................................................ 43

ADDITIONAL MATERIALS ......................................................... 44

ATTACHMENTS

     A.    Financial Statements:
           1991, 1992, 1993 and 1994 Audited
           March 31, 1995 and 1994 Unaudited

     B.    Subscription Agreement

-iv-

AIA0002301

Exhibit 5 - Page - 19

3-ER-561

SUMMARY OF OFFERING

*?.... following is a summary only of certain information contained elsewhere herein about the company and the offering and is qualified in its entirety by the more detailed information appearing elsewhere herein.*

**The Company**

AIA Services Corporation (the "Company") is an insurance holding company based in Lewiston, Idaho. Its principal business is marketing insurance products and services to a captive market of over 450,000 ranchers and farmers, many of whom are members of agricultural associations ("Associations"). The Company's current products include group health and life insurance, individual life insurance, long term care insurance and college funding programs. These products are marketed through two subsidiaries, AIA Insurance, Inc. ("AIA Insurance") and AIA Midamerica ("AIA Midamerica"), which had a total career agency force of over 300 licensed agents as of December 1, 1994.

The Company has established relationships with over 30 state and regional Associations including the National Association of Wheat Growers ("NAWG"), American Soybean Association ("ASA") and the National Contract Poultry Growers Association. These Associations were formed through the common interests of their members to promote specific segments of the agriculture industry. They are the primary recognized organizations representing the interests of grain growers, soybean growers and poultry growers in the U.S. The Company's principal business is selling group health insurance to these Associations and their members and providing administrative services for such insurance. During 1994, approximately 17,000 Association members participated in group health programs either marketed and/or administered by the Company. Recently, the Association members have demanded a variety of new products including disability insurance, annuities, retirement plans and mutual funds.

The Company provides services to the Associations by acting as the marketer and administrator for Association trusts through which group insurance programs are made available to Association members. The Company also acts as the marketer and administrator for a non-Association trust whose participants engage in farming, ranching or other agriculture related businesses. As part of the Company's administrative duties, the Company collects Association dues through its regular customer billing procedure, thereby creating an important link between the Company and the Associations. In return, the Associations endorse the Company and certain of its products and services, granting the Company a unique captive market.

Until recently, the Company underwrote the products it sold through its own insurance subsidiaries, The Universe Life Insurance Company ("Universe Life") and Great Fidelity Life Insurance Company ("Great Fidelity"). However, on October 1, 1994 the Company entered into an agreement with The Centennial Life Insurance Company ("Centennial") to sell a substantial portion of its current book of group health and life insurance business to Centennial and have Centennial assume the underwriting risk on future business. As a result, the primary focus of the Company has shifted from insurance underwriting to marketing insurance products and services as well as other financial products.

In conjunction with this shift of business focus, the Company is in the process of restructuring its management, capital structure and business strategy. As part of this restructuring, the Company will acquire a majority of the shares held by its current Chairman, Reed J. Taylor, who is retiring. A new senior management team led by Richard Campanaro (see "Management") joined the Company January 1, 1995 and will receive a substantial interest in the Company's Common Stock coincident with the closing of this offering and the Company's repurchase of Mr. Taylor's shares. (See "Restructuring"). The change in ownership must be approved by state insurance regulators; and such approvals were received in May 1995.

AIA0002302

– 5 –

Exhibit 5 - Page - 20

3-ER-562

The Placement

*Capital Stock Outstanding*
*Immediately After Closing*
*of this Offering and*          (See "Principal and Management Shareholdings--May 1, 1995",
*Related Transactions*          "Restructuring", "Management--Certain Relationships and Transactions").

*Securities Offered*            Minimum:      150,000 Shares
                                Maximum:      500,000 Shares

*Share Description* Each share comprises one share of Series C 10% Preferred Stock and a five year Series C Warrant to purchase that number of shares of Common Stock equal to 0.0000307% of the outstanding Common Stock of the Company at the time the Warrants are exercised (assuming full dilution including exercise of all Warrants) at an exercise price equal to the lesser of (i) 50% of the price at which the Company may sell securities in certain Equity Offerings or (ii) the conversion rate of the Series C Preferred Stock (i.e. 0.0000693% of common for each C Share), or the lesser of 75% of book value per share or such Series C Preferred Stock conversion price if the Equity Offering has not occurred within two years. Further, if such sale of Company securities has not occurred within two years, the number of shares that may be purchased pursuant to the Warrant increases on a compound basis by 2.5% every 90 days until the Company completes the required sale of securities. The Series C Preferred Stock may be redeemed by the Company at any time, but must be redeemed if the Company completes an Equity Offering. In the event the Company does not redeem the Series C Preferred Stock within two years, the emption price increases from 100% of the liquidation value of $10.00 per share by 5% each 180 days until emed. See "Description of Securities".

*Offering Price*        $10.00 per Share. The minimum purchase is 5,000 shares, although fewer shares may be sold to any subscriber in the Company's discretion.

*Offering Period*       $1,500,000 minimum proceeds by August 1, 1995, subject to 15-day extension by the Company.

Use of Proceeds
        To provide capital to the Company's subsidiary, Universe Life; to redeem Series A Preferred Stock; to redeem Company common stock; and for working capital purposes (see "Use of Proceeds").

Selected Historical Financial Data
        The selected historical financial data as of December 31, 1993, 1992, and 1991 and for the three years then ended have been derived from financial statements audited by independent public accountants. The selected financial data as of September 30, 1994 and 1993 and for the nine month periods then ended are derived from the Company's

AIA0002303

- 6 -

Exhibit 5 - Page - 21

3-ER-563

v-qudited interim financial statements and, in the Company's opinion, include all adjustments (consisting of normal recurring adjustments) that the Company considers necessary for a fair presentation of such data. The data s... forth below should be read in conjunction with the Company's financial statements and notes thereto and the reports of the Company's independent public accountants.

| | 1993 | 1992[1] | 1991[1] | September 30, 1994 | 1993 |
|---|---|---|---|---|---|
| | | | (In Thousands) | | |
| **Revenues** | | | | | |
| Commissions and fees | $6,539 | $ 4,594 | $ 3,617 | $ 4,181 | $ 5,055 |
| Net investment income | 3,134 | 6,367 | 5,885 | 1,913 | 2,975 |
| Insurance premium and Other | 47,767 | 51,684 | 41,204 | 31,042 | 38,097 |
| Total | 57,440 | 62,645 | 50,706 | 37,136 | 46,127 |
| Net income (loss) | 1,648 | 3,102 | (2,718) | ( 792) | 1,568 |
| Assets | 69,914 | 64,706 | 82,736 | 63,349 | 64,407 |
| Stockholders' equity [2] | 6,229 | 4,997 | 3,163 | 4,728 | 6,582 |

[1]  1991 and 1992 are restated to reallocate the purchase price of a block of insurance policies acquired and then sold in 1991.

[2]  Includes Preferred Stock.

### Pro Forma Financial Information and Notes

The pro forma financial information for the year ended December 31, 1993 is based on historical financial information including appropriate adjustments assuming the agreement with Centennial Life Insurance Company (described elsewhere herein) and the disposition of all of the Company's individual major medical business were effective on December 31, 1992. The pro forma information for the year ended December 31, 1994 is based on historical financial information for the nine-month period ended September 30, 1994, including appropriate adjustments assuming the above-described transactions were effective December 31, 1993, and projected through December 31, 1994 based on the pro forma results for the nine-month period. Management of the Company believes the estimates and assumptions provide a reasonable basis for presenting the significant effects of the above-described transactions and that the pro forma adjustments give appropriate effect to these estimates and assumptions and are properly applied to the unaudited pro forma consolidated statements of income. The unaudited pro forma financial information should be read in conjunction with the historical financial information included herein. The

AIA0002304

‌‌audited pro forma financial information does not purport to present the results of operations of the Company the above-described transactions taken place on the dates indicated, nor is it necessarily indicative of the results or operations which may be expected to occur in the future.

| | Year Ended December 31, 1993 | | | Year Ended December 31, 1994 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Historical | Adjustments | Pro Forma | Historical | Adjustments | Fourth qtr projected | Pro Forma |
| Revenues | | | | | | | |
| Commissions and fees | $ 6,539 | $ 6,693 (a) | $13,232 | $ 4,181 | $ 5,716(a) | $ 3,537 | $13,434 |
| Net investment income | 3,134 | (509)(b) | 2,625 | 1,913 | (322)(b) | 496 | 2,087 |
| Insurance premiums and other | 47,767 | (39,859)(c) | 7,908 | 31,042 | (26,050)(c) | 1,665 | 6,657 |
| Total revenues | 57,440 | (33,675) | 23,765 | 37,136 | (20,656) | 5,698 | 22,178 |
| Benefits and Expenses | | | | | | | |
| Commissions | 9,721 | (2,634)(c) | 7,087 | 5,716 | (1,028)(c) | 1,557 | 6,245 |
| Policy benefits | 30,989 | (23,777)(c) | 7,212 | 21,109 | (16,843)(c) | 1,422 | 5,688 |
| General and admini-strative | 15,127 | (6,061)(d) | 9,066 | 11,460 | (4,121)(d) | 2,456 | 9,795 |
| Total benefits and expenses | 55,837 | (32,472) | 23,365 | 38,285 | (21,992) | 5,435 | 21,728 |
| Net income before taxes | 1,603 | (1,203) | 400 | (1,149) | 1,336 | 263 | 450 |
| Income taxes | (350) | 228 | (122) | 357 | (436) | (63) | (142) |
| Cumulative effect of accounting change | 395 | - | 395 | - | - | - | - |
| Net income | $ 1,648 | $ (975) | $ 673 | $ (792) | $ 900 | $ 200 | $ 308 |

(a)   Commissions on group business have historically been paid to the marketing companies by Universe and its reinsurers with only the commissions paid by the reinsurers recognized as commission income on a consolidated basis. This adjustment assumes that Centennial pays all group commissions during the periods presented. Accordingly, commission income is increased to recognize commissions paid by companies outside the consolidated group. It is further assumed that first year commissions on SBA/UB premiums are paid at 40%. No SBA/UB commissions were paid in 1993 or 1994. In addition, fee income ‌‌‌increased to recognize administrative fees paid to the Company by Centennial.

AIA0002305

- 8 -

Exhibit 5 - Page - 23

3-ER-565

This adjustment eliminates investment income on investments supporting the group reserves ~~imed~~ to be transferred to Centennial. In addition, it is assumed that Universe recognized a gain of approximately $6.7 million on the sale of its group business to Centennial to be received over a five-year period subject to certain profitability criteria. The resulting receivable from Centennial is computed as the present value of expected future cash flows using a discount rate of 10%. Investment income is computed at 10% of the outstanding balance of the receivable.

(c)    This adjustment eliminates the group premiums and the individual major medical premiums from the pro forma operating results. Corresponding adjustments were made to eliminate the associated policy benefits and commission expenses.

(d)    The Company has incurred certain regulatory and other expenses considered to be non-recurring and, accordingly, such expenses have been eliminated from the pro forma operating results. In addition, certain departmental and other administration and marketing expenses are assumed to be eliminated or reduced as a result of selling the group and individual insurance business and the resulting restructuring of the Company.

Selected Projected Financial Information

The selected projected financial information as of December 31, 1995, 1996, and 1997, and for the three years then ending, were prepared by the Company, with significant input from the Campanaro Team (see "Management"), assuming that the Company no longer underwrites the Group Universal-Health or ~~individual~~ accident and health insurance business and that the Company is subject to all Centennial ~~agreements~~. While approximately 50% of the Group Universal Health business is not planned for transfer to Centennial until mid-1995, management of the Company believes the 1995 projected net income would not be materially affected. The projected financial information is designed to provide information for a potential private placement investor. The projections have not been reviewed by an independent public accountant; nor have they been prepared to be in compliance with public disclosure and regulatory requirements. The assumptions disclosed herein are those that the Company believes are significant to the projection. Although the Company has prepared these projections in good faith, there can be no assurance that the projections will be realized or the results disclosed therein realized. (See "Risk Factors".)

AIA Services Corporation
Selected Projected Financial Information
For the Years Ending December 31, 1995, 1996, and 1997
(In thousands)

|                              | 1995     | 1996     | 1997     |
|------------------------------|----------|----------|----------|
| Revenues                     |          |          |          |
| Commissions and fees         | $23,690  | $37,730  | $60,950  |
| Net investment income        | 2,700    | 2,900    | 3,000    |
| Insurance premiums and other | 7,200    | 7,200    | 7,200    |
|                              | $33,590  | $47,830  | $71,150  |
| income                       | $ 2,690  | $ 4,750  | $ 8,830  |

AIA0002306

- 9 -

Exhibit 5 - Page - 24

3-ER-566

umptions to Selected Projected Financial Information

*Basis of accounting*—The selected projected financial information was prepared on a basis consistent with Generally Accepted Accounting Principles.

*Commissions and fees* represents commission income and administrative fees paid to AIA Insurance by Centennial on the GUH Plan and on other products sold by the Company which are typically underwritten by Centennial or other insurance companies. First year and renewal commissions are typically 40% and 15%, respectively. The administrative fees are 3.5% of total premiums based on the following premium schedule:

ESTIMATED TOTAL PREMIUM REVENUE
(In Thousands)

|  | 1995 | 1996 | 1997 |
|---|---|---|---|
| GUH-new | $20,000 | $ 25,000 | $ 25,000 |
| GUH-renewal | 60,000 | 72,000 | 87,300 |
| New products-new | 15,000 | 35,000 | 75,000 |
| New products-renewal | 0 | 13,500 | 43,650 |
|  | $ 95,000 | $145,500 | $230,950 |

*Investment income* is computed assuming a yield of approximately 6.5% for all projected periods.

*Insurance premiums and other* represents renewal premiums on the insurance business remaining in Universe and Great Fidelity following the transfer of the GUH Plan business to Centennial. Premium income for the projected periods is assumed to approximate the average premiums for such business in 1993 and 1994.

*Policy benefits* are assumed to be 90% of premium income, consistent with prior years for such business.

*Commission expense* represents commissions paid by AIA Insurance and AIA Midamerica to their agents and is based on the following commission scale for all projected periods:

(Percent of premium income)

| | |
|---|---|
| GUH-new | 30.0% |
| GUH-renewal | 7.5% |
| New products-new | 29.0% |
| New products-renewal | 7.5% |

*General and administrative expenses* for 1995 are expected to be consistent with 1994 to recognize the presence of underutilized capacity. Such expenses for 1996 and 1997 are assumed to increase due to necessity to keep marketing and administrative capacities in line with premium growth.

AIA0002307

– 10 –

Exhibit 5 - Page - 25

3-ER-567

*Interest expense* is assumed to be equal to the 1994 level which includes interest expense on current debt of $800,000, as well as the Series A Preferred Stock currently being redeemed.  In addition, interest expense at 10% on the $6 million Common Stock repurchase obligation to Reed J. Taylor is included.  (See "Restructuring".)  The projections do not include any interest expense for up to $2 million in additional bank debt which would be required to complete the contemplated redemption in the event the minimum offering is sold.

*Income taxes*—The assumed effective income tax rate of 30% recognizes the availability of net operating loss carryforwards as well as a small life company deduction for the insurance entities.

AIA0002308

– 11 –

Exhibit 5 - Page - 26

3-ER-568

## RISK FACTORS

INVESTMENT IN THE SHARES OFFERED HEREBY IS HIGHLY SPECULATIVE, INVOLVES A
GH DEGREE OF RISK AND IS NOT APPROPRIATE FOR PERSONS WHO CANNOT AFFORD
THE LOSS OF THEIR ENTIRE INVESTMENT. PROSPECTIVE INVESTORS SHOULD BE FULLY
AWARE OF THE FOLLOWING RISK FACTORS AND SHOULD REVIEW CAREFULLY THE
INFORMATION CONTAINED HEREIN AND ELSEWHERE IN THE MEMORANDUM

### Dependence on Key Agent and Administrator Relationships

The Company's revenues are materially dependent upon AIA Insurance as the agent and
administrator of several trusts including the Grain Growers, Soybean Growers and Poultry Growers Trusts.
This subsidiary is responsible for marketing insurance programs to members of agricultural Associations
which have formed trusts in conjunction with the Company. It is anticipated that AIA Insurance will also
become responsible for maintaining the relationship with, and selecting the appropriate products from,
the insurance companies which provide products to be marketed. The appointment as agent and
administrator of the Grain Growers, Soybean Growers, and Poultry Growers Trusts is annually renewable
by the directors of the trusts for a three year term. Therefore, if this appointment as agent and
administrator of any of these trusts is not renewed, it would expire at the end of the third year. The loss
of these positions as trust agent and administrator could have adverse effects upon the Company. (See
"Business-Association Relationships".)

### Insurance Business Risks

Although the Company has sold a large portion of its Group Universal Health business to
Centennial, its subsidiaries, Universe Life and Great Fidelity, still maintain a significant amount of
urance in force. Profitability in the insurance industry is affected by numerous factors. Excess claims,
cy lapses or non renewals, fluctuations in interest rates, increased medical costs, the loss of key agents,
changes in regulatory requirements, and similar events could all have adverse effects upon the Company's
insurance business. The growth of the Company will depend significantly on its ability to attract and retain
experienced agents, particularly as it relates to the future strategy for becoming primarily a marketing
organization. Competition for such agents is great and there can be no assurance that the Company will
be able to attract or retain a sufficient number of agents to carry out the Company's business plan.

### Competition

The insurance industry is highly competitive. Many of the Company's competitors have substantially
greater financial and other resources than the Company, and there can be no assurance that the Company
will be able to compete effectively against such competitors in the future. While the Company is the only
entity endorsed by the Associations, individual Association members may purchase insurance from any
insurance provider.

### Shift in Corporate Strategy

On October 1, 1994 the Company executed an agreement with Centennial Life Insurance Company
to transfer a substantial portion of its Group Universal Health underwriting risk. This agreement, among
other things, allows the Company to focus its strategy on the marketing of insurance products because the
Company will not assume any additional underwriting risk until such time as the Company's management
determines that capital conditions and market factors warrant such actions. Through Centennial and other
insurance companies, the Company can expand its product line to include the new products sought by
ociation members, including disability insurance, life insurance, annuities, retirement plans, and mutual

AIA0002309

- 12 -

Exhibit 5 - Page - 27

3-ER-569

r ᐧds.   After the new strategy is implemented, the focus of the Company's operations will change ᐧificantly. The success of this shift in focus will depend upon the marketing skills of the Company and the acceptance of new products in the marketplace. There can be no guarantee that the new strategy will be successful.

### New Management and Dependence on Key Individuals

To date, the Company's operations have been materially dependent upon the efforts of Reed J. Taylor, its Chairman, and R. John Taylor, its President. On January 1, 1995, Richard W. Campanaro, Bill Tarbart and Andrew Chua joined the Company for the purposes of building significant additional marketing and sales programs and posturing the Company as a marketing organization. While Reed J. Taylor will be retiring as Chairman of the Company, he will remain active as a consultant and Board member for a period of at least three years. The loss of services of any of the above mentioned individuals could have adverse effects on the Company. It is anticipated that key person life insurance will be maintained by the Company on these active individuals.

### Insurance Regulation

The insurance activities of the Company and its subsidiaries are subject to licensing and regulation by the jurisdictions in which they conduct such activities. Failure by the Company or its subsidiaries to obtain or maintain such licenses would have a material adverse effect on the Company. Various insurance laws and regulations specify allowable types and the amounts of assets held by insurers to satisfy insurance solvency requirements. Failure of the Company to maintain adequate assets and capital by type and amount may jeopardize the ability of the Company to offer new insurance or maintain existing insurance ᐧlicies. (See "Business-Regulation".)

### kᐧgulatory Approvals Required For Change of Control

The Company will acquire the shares held by its current Chairman, Reed J. Taylor, who is retiring (see "Restructuring"); and a new senior management team led by Richard Campanaro, which has played an integral role in shaping current strategy (see "Management"), joined the Company on January 1, 1995. The new management team will acquire control of the Company prior to or contemporaneously with the closing of this offering, subject to receipt of certain regulatory approvals.   Under Idaho, Indiana and Texas insurance holding company legislation, prior regulatory approval is required for changes in control of the Company, which is defined by the acquisition of more than 10% of the outstanding shares of Common Stock by one or more affiliated parties. The Company received regulatory approvals in May 1995.

### Regulatory Approval Required for Distribution of AIA Insurance

AIA Insurance, Inc. is presently a wholly-owned subsidiary of Universe Life. The contemplated reorganization of AIA Insurance as a direct subsidiary of the Company will be accomplished by an extraordinary dividend of the AIA Insurance stock by Universe Life to the Company, and the replacement of the value of AIA Insurance on Universe Life's books by the Company's contribution to Universe Life of a portion of the proceeds of this offering. Payment of an extraordinary dividend requires prior approval of the Idaho Department of Insurance. The Idaho Department has previously approved the extraordinary dividend of the AIA Insurance stock to the Company, based on the assumption that the transfer of the Company's GUH business would be completed by December 31, 1994, and that the Company would r  tributed $4.2 million to Universe Life. However, the Company and Centennial have subsequently ᐧd and have advised the Idaho Department that the transfer of the GUH business will be completed ᐧs of June 30, 1995, and that the capital contribution will be reduced to no less than $1 million. Because some of the assumptions for the Idaho Department's prior approval have changed, management of the

AIA0002310

- 13 -

Exhibit 5 - Page - 28

ompany may conclude that the distribution of AIA Insurance to the Company should be resubmitted to Idaho Department for confirmation of its previous approval of the extraordinary dividend. There can be no guarantee of such confirmation.

**Possible Need for Additional Financing**

Assuming that the Company sells the maximum number of Shares offered hereby, the net proceeds from this private placement are expected to be sufficient to permit the Company to meet regulatory capital requirements; and it is expected that sale of the maximum number of Shares will enable the Company to meet such requirements and redeem its Series A Preferred Stock. If the Company's growth exceeds expectations, or sales objectives are not achieved, or expenditures exceed expectations without a corresponding increase in revenue, the Company may be required to find sources of financing before it can generate the revenues required to sustain operations. Such additional financing may be sought from a number of sources, including possible further sales of equity securities or loans from banks or other financial institutions. No assurance can be given that the Company will be able to obtain additional financing from any source, on terms favorable to the Company. If the Company is able to sell additional securities, it may be required to do so at a price that is less than the price of the Shares offered hereby. Further sales of equity securities could result in substantial dilution to investors purchasing the Shares offered hereby.

If the Company sells only the minimum number of shares, additional financing will be required to complete the proposed reorganization. The Company, along with certain Board members and officers, has committed to obtain a loan from a commercial bank of at least $2.0 million to complete the proposed reorganization.

**Projections**

The financial projections contained herein have been prepared by the Company (including substantial input from its new management team) and are based on assumptions stated therein that have not been independently reviewed. In addition, the assumptions have been (and may continue to be) affected by ongoing negotiations with Centennial concerning the marketing and administration of the GUH business. The projections were not prepared with a view to public disclosure or compliance with published guidelines of the Securities Exchange Commission or the guidelines established by the American Institute of Certified Public Accountants. In addition, the estimates and assumptions underlying the projections are subject to significant economic and competitive uncertainties and contingencies which are beyond the Company's control, and the projections cover a period of more than one year which makes such predictions more difficult. There can be no assurance that the projections will be realized; and actual results may be lower than those set forth in the projections. Because of the limitations of these projections, investors are cautioned about placing undue reliance thereon.

**Corporate Action Required to Authorize Securities**

Neither the Series C Preferred Stock nor Series C Warrants have been duly authorized as of the date of this Memorandum. Before this offering can be closed and the Series C Preferred Stock and the respective Warrants can be issued, the Company's Articles of Incorporation must be amended to define the preferences, limitations and relative rights of the Series C Preferred Stock and the respective Warrants and to authorize the creation and issuance of such securities. The Idaho Business Corporation Act governs the amendment of the Company's Articles of Incorporation and requires that the Company's Board of Directors adopt a resolution setting forth the proposed amendment and directing that it be submitted to a vote of the Company's shareholders. The amendment authorizing the Series C Preferred Stock and the respective Warrants must thereafter be adopted by the affirmative vote of the holders of

- 14 -

AIA0002311

Exhibit 5 - Page - 29

3-ER-571

majority of the shares of each class of Company's stock entitled to vote thereon; provided that the mative vote of the holders of two-thirds of the shares entitled to vote thereon shall be required to authorize the Warrants.

This offering will not close, the subscribers' funds will not be released to the Company and the Shares will not be issued unless and until the Agent receives the opinion of Company's legal counsel that the Shares C Preferred Stock and the Series C Warrants have been duly authorized and that, upon delivery of and payment for the Series C Preferred Stock and the Warrants will be validly issued, fully paid and nonassessable, and will conform to the description thereof contained in this Offering Memorandum.

Management believes the Company's Board of Directors will adopt the resolutions necessary to amend the Company's Articles of Incorporation to authorized the new securities. Reed J. Taylor and R. John Taylor together own more than two-thirds of the outstanding shares of the Company's common stock and are committed to vote their shares in favor of adoption of the amendment to the Company's Articles of Incorporation necessary to authorize the Series C Preferred Stock and Warrants to be issued upon closing of this offering. Although the outstanding Series A Preferred Stock is generally not entitled to vote at any regular or special meeting of stockholders (except to elect one director to the Board), the consent of the Series A Preferred Stockholder is a condition precedent to the necessary amendment, the issuance of the new securities and related transactions.

### Minimum-Maximum Offering

The Shares are being offered on a "best efforts, all or none basis" for the first 150,000 Shares and a "best efforts" basis for additional Shares. Subscription proceeds will be held by the Company during offering period. Unless the Minimum Required Financing of $1.5 million (or 150,000 Shares) is completed by August 1, 1995, which period may be extended by the Company until August 15, 1995, the offering will terminate and monies received will be refunded to the subscribers without interest earned thereon. During the offering period, the subscribers will not have the opportunity to have their funds returned. Thus, subscribers for the Shares will lose the use of their funds during the offering.

### Lack of Transferability of Shares and Warrants

Neither the Series C Preferred Stock or Warrants, nor the Warrant Shares have been registered under the Act, or the securities laws of the various states, and such securities may not be resold unless they are subsequently registered under the Act and such states' laws, or exemptions from registration requirements are obtained. The Shares will bear a legend specifying these restrictions. As a result, an investor must bear the risk of an investment in these securities for an indefinite period of time.

### No Market for Securities; Determination of Offering Price

There is no present market for any of the Company's securities, and there can be no assurance that the Company will ever effect a public offering of its securities. Even if the Company does effect a public offering of its Common Stock, there can be no assurance that any of the Shares offered hereby, or the Warrants included, therein will be included in such public offering; and an investor may be subject to the restrictions of Rule 144 under the Securities Act which requires that securities be held for at least two years and imposes limitations on the number of securities that can be sold. The price of the Shares was determined by the Company and bears no relationship to, among other things, the Company's current net tible book value, lack of earnings, net worth or financial statements. As a result, the offering price for Shares should not be considered an indication of actual value of the securities offered hereby. There can be no assurance that the Shares or Warrants offered hereby could be sold at the offering price or any other price.

AIA0002312

- 15 -

Exhibit 5 - Page - 30

3-ER-572

### 1994 Operating Results

A change in insurance regulations and statutes has severely limited or disallowed Universe Life's investment holdings in common stock of subsidiaries for meeting statutory capital requirements. This regulatory change has limited the ability of the Company to issue new policies during 1994 and caused a decrease in insurance premiums and commission revenues during 1994. Additionally, the Company spent several months during the year, as well as substantial legal, accounting and actuarial fees, seeking regulatory approvals and reapprovals of its Group Universal Plan for Health policy form and associated statutory reserving methods. During this period, new sales were severely restricted or suspended pending the approvals. Although the Company believes these current limitations will not continue since new GUH Plan business will be written through Centennial and all Centennial policy approvals are expected by August 1, 1995, it is not known what effect this limitation on sales will have in the future.

### Uncertainty Related to Health Care Reform Measures

In October 1993, the Clinton Administration submitted proposed comprehensive health care reform legislation to Congress. The Clinton proposal was designed to overhaul the health care system to, among other things, (i) control or reduce public and private spending on health care; (ii) provide for uniform health insurance benefits packages and administrative efficiency in the health care system and (iii) provide universal access to health care by 1997. Other comprehensive health care reform proposals have subsequently been introduced by others in Congress and in State legislatures. Some proposals involve single-payor systems. Such proposals, if adopted, could adversely affect the Company's business in the future. Although the Company cannot predict whether any such legislative initiatives or regulatory reform proposals will be adopted, there can be no assurance that such initiatives or proposals will not have a material adverse affect upon the Company. In addition, there have been a number of federal and state proposals to subject the pricing of health care products and services to government control. It is uncertain what legislative proposals will be adopted or what actions federal, state or private payors for health care goods and services may take in response to any health care reforms and no assurance can be given that any such reforms will not have a material adverse affect on the Company. A change in composition of the federal legislature and certain state legislatures in January 1995 has added to the uncertainties regarding potential health care reform measures.

### Dividend Policy

The Company has never paid cash dividends on its Common Stock. The Company's present intention is to retain all earnings, if any, for working capital, capital expenditures, and general corporate operational purposes. The Company does not anticipate paying cash dividends on its Common Stock in the foreseeable future.

AIA0002313

- 16 -

Exhibit 5 - Page - 31

**3-ER-573**

## RESTRUCTURING

The Offering contemplated herein is part of a restructuring of the Company that will result in a change in management of the Company, a corporate reorganization, a shift in the Company's operating strategy and a material change of its ownership.

On January 1, 1995, three senior level executives joined the Company. Richard W. Campanaro assumed overall responsibility for the Company's agency operations. William Tarbart joined AIA Insurance, Inc., a subsidiary of the Company, as chief marketing executive. Andrew Chua has assumed the duties of chief actuarial officer of the Company. (See "Management".) Coincident with the closing of this offering, Mr. Campanaro and the Company's current President, R. John Taylor, will receive options to acquire company common stock. As a result of the grant of the options, the Company will acquire employment contracts committing Mr. Campanaro and Mr. Taylor to be employed by the Company for three years and bind them to non-competition covenants for a reasonable period of time after termination of employment. (See "Management—Employment Agreements".)

The Company will sell 150,000 shares of the Company's Series C Preferred Stock for $1,500,000 to a group of investors which includes Richard W. Campanaro, James W. Beck and Michael W. Cashman. The funds from the sale will be used to pay the down payment on the $7.5 million aggregate price for the repurchase, from retiring Company Chairman Reed J. Taylor, of 500,000 of his 613,494 shares of the Company's Common Stock. The Company will give Mr. Taylor its interest only ten-year note payable for the $6 million balance of the repurchase price for such shares. To secure payment of the note, Company "' grant Mr. Taylor a security interest in the stock and commission income of its operating subsidiaries, ding Universe Life and AIA Insurance, Inc. (See "Management—Certain Relationships and Transactions", "Description of Securities—Series C Preferred Stock".)

Concurrent with the purchase of the 500,000 shares of Reed J. Taylor's common stock, the Company will redeem Mr. Taylor's remaining common stock of 113,494 shares by transferring the Company's aircraft to Mr. Taylor, subject to its debt of approximately $590,000, and cancellation of approximately $480,000 in indebtedness to the Company. The Company will also transfer all interest in the College Advantage Plan to Mr. Taylor. Mr. Taylor will receive $145,000 per year for three years as full and final compensation of his personal interest in any renewal commission overrides due him for GUH business sold prior to closing.

Prior to the closing of this offering, Company will obtain a commitment (currently expected to be obtained from West One Bank) for a $2.0 million loan, to be partially guaranteed by certain officers and members of the Board. At least $1.0 million of the loan proceeds will be contributed to Universe Life, and $800,000 will be used to redeem Series A Preferred Stock. To the extent the proceeds of the offering exceed $1.5 million, the amount of the bank loan may be correspondingly reduced.

Currently, the Company has two direct subsidiaries, The Universe Life Insurance Company ("Universe Life") and AIA Midamerica. Universe Life has two subsidiaries as well: Great Fidelity Life Insurance Company ("Great Fidelity") and AIA Insurance, Inc. ("AIA Insurance"). Coincident with the closing of this offering and as part of an agreement with the Idaho Department of Insurance, the Company v contribute, from the proceeds of this offering, at least $1,000,000 in capital to Universe Life, and AIA .rance will be reorganized as a direct subsidiary of the Company. This reorganization is consistent with regulatory concerns and objectives of the Company to replace AIA Insurance carrying value for Universe Life's capital purposes. (See "Business-Regulation".)

AIA0002314

– 17 –

Exhibit 5 - Page - 32

3-ER-574

On October 1, 1994, the Company entered into an agreement with The Centennial Life Insurance Company whereby Universe Life sold a substantial portion of its group health insurance business in force to Centennial, and whereby Centennial will underwrite a significant portion of the Company's insurance products in the future. The Company intends to transfer the balance of the GUH business to Centennial effective June 30, 1995. These agreements allow the Company to shift its strategic focus from underwriting insurance products through its insurance subsidiaries to marketing and administering insurance and financial products through AIA Insurance. As a result, Universe Life, which has historically underwritten the Company's primary product, the Group Universal Health ("GUH") Plan (see "Business—Current Products"), will underwrite no new insurance risk for the foreseeable future. The Company may determine, at some time, that market opportunity and capital availability support a decision to allow Universe Life to once again underwrite insurance products; however, it has no current plans to do so. Universe Life will remain as a subsidiary of the Company, retaining the appropriate state licenses to operate as an insurance company and will continue to process remaining renewal business. (See "Business-Agreements".)

Use of Proceeds

The proceeds from this offering will allow the Company to effect its reorganization. (See "Restructuring".) Pursuant to such reorganization, a minimum of $1.0 million will be contributed to Universe Life, the Company's subsidiary, to replace AIA Insurance as an admitted asset on the books of Universe Life. (This capital contribution will be funded from the proceeds of this offering to the extent subscriptions exceed the $1.5 million Minimum Required Financing, with a bank loan guaranteed by certain officers and Board members funding any remaining balance of the contribution) AIA Insurance will then be reorganized as a direct subsidiary of AIA Services Corporation. Such use of proceeds will olve certain regulatory concerns of the Idaho and Texas Insurance Commissioners. In addition, proceeds will be applied to redemption of the outstanding Series A Preferred Stock. If the maximum offering proceeds are obtained, the Company's Series A Preferred Stock will be redeemed in its entirety. The Company will use any remaining proceeds for working capital purposes. The Company believes the minimum proceeds allow it to implement its proposed business plan outlined herein and maintain positive cash flow.

The following table represents the use of proceeds, net of gross commissions and estimated expenses, from the sale of Series C Preferred Stock occurring concurrently with the closing of this offering.

| | Minimum Proceeds | Maximum Proceeds |
|---|---|---|
| Capital Contribution to Universe Life | - | $ 1,000,000 |
| Redeem Series A Preferred Stock | - | 1,785,000 |
| Repurchase Mr. Taylor's Common Stock | $ 1,500,000 | 1,500,000 |
| Working Capital | - | 715,000 |
| Total | $ 1,500,000 | $ 5,000,000 |

AIA0002315

Exhibit 5 - Page - 33

3-ER-575

## BUSINESS

**Overview**

AIA Services Corporation (the "Company") is an insurance holding company that engages in business through its operating subsidiaries. The Company commenced business as a general insurance agency and third-party administrator in 1974 and reorganized as an insurance holding company system upon incorporation of AIA Services Corporation under the laws of the State of Idaho on December 20, 1983.

The Company's insurance agency subsidiaries are AIA Insurance, Inc. (AIA Insurance) and AIA Midamerica, Inc. (AIA Midamerica). During 1994, 17,000 families participated in the GUH Plan marketed and/or administered by these agency subsidiaries. Most of such participants are members of the National Association of Wheat Growers ("NAWG") or the American Independent Agricultural Producers Association ("AIAPT"), with which the Company has had a relationship since 1974 and 1988 respectively. During 1993, the Company also introduced similar insurance programs for members of the American Soybean Association ("ASA") and the National Contract Poultry Growers Association ("NCPGA").

From 1974 to 1989, Association group policies marketed by the Company were underwritten by unrelated insurance companies. From 1989 to 1994 the Company has underwritten its insurance plans through its two insurance companies; The Universe Life Insurance Company (Universe Life) and Great Fidelity Life Insurance Company (Great Fidelity). The Company's principal insurance product has been its Group Universal Health Plan, which provides health and other insurance coverages for members of the associations, their employees and dependents. Under the GUH Plan, the insurer issues a master policy e trust established by an Association; and participants in the trust are issued certificates of insurance coverage under the master policy. (See "Business--Current Products".)

On October 1, 1994, the Company entered into an agreement with The Centennial Life Insurance Company to sell a substantial portion of its current book of GUH Plan business to Centennial and have Centennial assume the underwriting risk on such business in the future. The Company expects to transfer the balance of the GUH business to Centennial effective June 30, 1995. (See "Business--Agreements".) As a result, the primary focus of the Company has shifted from insurance underwriting to marketing insurance products and services.

In past years, the Company has focused on developing relationships with agriculture Associations. These relationships are beneficial to both the Company and the Associations. The Company receives third party endorsement from the Associations and support through letters, magazine articles, and convention recognition. The Company also receives member and potential membership lists and information.

The Associations benefit from this relationship as the Company not only collects dues at no cost to the Associations but also, through the Company's agents, represents the Associations to prospective members. The Company's sales professionals, each calling on dozens of farmers a week, are offering prospective members the information and opportunity for membership in their commodity Association. When the Associations supply brochures and incentives, the Company's agents distribute them to all growers contacted, even those who decline enrollment in the insurance plans. The Associations, through r trust representatives, define and customize insurance plans for their membership; and with the size e program, the Association achieves group buying power to provide plans needed by farmers, at competitive prices.

AIA0002316

- 19 -

Exhibit 5 - Page - 34

3-ER-576

The relationships between the Associations and the Company have been enhanced by the recent 'eement with Centennial Life Insurance Company (see "Business-Agreements"). The Centennial agreement allows the Company to accomplish a number of important objectives including: (1) satisfy regulatory concerns of the Texas and Idaho Insurance Departments relating to capitalization of Universe Life and its insurance reserves; (2) focus the Company's strategy of marketing to the expanded memberships available to it through the Poultry Growers and Soybean Growers Associations; (3) expand the Company's product line marketed by AIA Insurance to the Associations by utilizing the products of Centennial and other insurance companies; and, (4) expand the Company's marketing capabilities to 12 new states over the next 18 months.

#### Subsidiaries
*AIA Insurance, Inc. (AIA Insurance)*

AIA Insurance commenced business in 1969 as a general insurance agency and has since become a full-service third party administrator for five trusts as well. These trusts provide a vehicle for Association members as well as for independent farmers, ranchers and agriculture related business persons who are not Association members, to obtain group health and life insurance.

The Grain Growers Association Membership and Insurance Trust ("Grain Growers Trust") was established in July 1974. In 1980 National Growers and Stockmen Trust was formed to serve wheat growers who resided in states not serviced by the Grain Growers Trust. In 1988, the American Independent Agricultural Producers Group Insurance Trust was formed whereby members of local agricultural Associations not included in the Grain Growers Trust (such as the Nebraska Corn Growers `;sociation, the Tennessee Pork Producers, the Rolling Plans Cotton Growers and the Oklahoma and :as Peanut Growers Associations) as well as persons engaged in agricultural related and support businesses, are able to purchase group health and life insurance products sold by AIA Insurance. In 1993, The American Soybean Association Membership and Insurance Trust ("Soybean Growers Trust") was established for members of the American Soybean Association and affiliated state Associations; and the Poultry Growers Membership and Insurance Trust ("Poultry Growers Trust") was established for members of the National Contract Poultry Growers Association (a federal co-operative).

As administrator for each of these trusts, AIA Insurance is responsible for obtaining master group insurance policies for the trusts; investment of trust funds; payment of trust insurance premiums, commissions, and other expenses; maintenance of trust records; trust accounting; and assisting certificate holders in making claims for insurance benefits. In addition, as administrator of the trusts (except the National Growers and Stockmen Trust) and in conjunction with collection of premiums for its insurance products, AIA Insurance collects Association dues from members of participating Associations and remits such dues and an accounting thereof to the Associations.

AIA Insurance or its affiliate, AIA Midamerica, is designated as the agent of record for all insurance policies issued to the trusts, and is entitled to all insurance commissions or fees on all policies issued to the trusts. AIA Insurance has entered into Agent Agreements with over 300 persons as of

AIA0002317

– 20 –

Exhibit 5 - Page - 35

3-ER-577

:ember 1, 1994 who receive a non-exclusive territory and are compensated on a commission basis. AIA  ırance has also designated and entered into agreements with 42 district marketing directors who are assigned territories and are responsible for attracting and retaining agents and for generating product sales within their districts.

*AIA Midamerica*

AIA Midamerica is a marketing company designated as the agent of record for policies issued to the American Soybean Association Membership and Insurance Trust and the Poultry Grower Membership and Insurance Trust, which were established in 1993. It is also the agent of record for policies issued to the State of Indiana Retired Teachers Association. However, all of the Company's products are marketed by AIA Insurance.

*The Universe Life Insurance Company (Universe Life)*

Universe Life was incorporated under the laws of the State of Nevada in 1947. Universe Life was acquired by the Company in 1986 and was redomesticated from Nevada to Idaho on December 31, 1989. Universe Life has underwritten, primarily, a proprietary Group Universal Health insurance policy designed to permit health insurance participants to provide flexible funding and develop cash surrender values under certain circumstances. Because of the recent agreement with Centennial, Universe will no longer be assuming any new underwriting risk of the Association programs until such time as the Company's management determines that capital conditions and market factors warrant such actions.

*The Great Fidelity Life Insurance Company (Great Fidelity)*

Great Fidelity is a stock life insurance company based in Ft. Wayne, Indiana that was founded in 2. It was purchase by Universe Life in 1991 and is primarily engaged in the underwriting and development of long term care (nursing home) products. It is currently underwriting such products for the Indiana Retired Teachers Association.

Business Strategy

The Company's sales are driven by specific Association endorsements. Recently, the Associations have become very aggressive in requesting the kinds of insurance and financial services needed to protect the health and financial welfare of their members. To date, the Company has provided primarily health insurance plans such as the Group Universe Health Plan. As part of the Company's new strategy, it is the objective of the Company to make available life insurance, retirement products and disability income products to Association members and to farmers and ranchers who are eligible to become Association members.

The Company's basic strategy is to maximize its penetration of the Association populations by providing products needed and requested by Association members including disability income, life insurance, retirement plans. Products such as these are generally more profitable than health insurance as a result of the higher commission margins usually associated with these types of products. The agreement with Centennial essentially changes the focus of the Company from insurance underwriting to insurance marketing and generating commissions and/or fees. The Company will emphasize strengthening existing relationships and developing new Association relationships, while establishing marketing relationships with insurance product providers in order to most effectively provide insurance products and vices to its expanding captive market of over 450,000 farmers and ranchers.

AIA0002318

- 21 -

Exhibit 5 - Page - 36

3-ER-578

Upon the completion of this offering and following the sale of its business to Centennial, the mpany plans to implement the following strategies:

• AIA Insurance will identify new products from independent sources, including Centennial, to sell into its expanding captive market on a commission basis. The Company believes it will be able to obtain products such as life insurance, disability income and retirement plans from other underwriters because the potential premium growth of this rural niche market is attractive. Insurers will be carefully selected as product providers.

• The Company, as marketer, will immediately begin to implement an expansion plan into those states in which the Soybean and Poultry growers are concentrated. (See Business-Marketing Plan"). The addition of Mr. Campanaro and Mr. Tarbart is essential to this expansion because of their experience in nationwide marketing of insurance products and their ability to recruit and retain the caliber of sales and sales management personnel required for such expansion.

• Simultaneously, the current sales force of AIA Insurance and their compensation plan will be restructured in order to better penetrate the market with additional products as identified by the Company and as requested by the farm commodity Associations. The Company plans to structure a sales compensation and incentive plan that gives greater weight to new business than to renewal business, while at the same time restructuring the vesting provisions of the agents' contracts for commissions on policy renewals.

The geographic scope of the Company's market has become nationwide with the addition of the bean and Poultry Growers Associations. To date, the Company has marketed its health products primarily to Association members in the western and plains states where its sales force is now concentrated. The Company intends to increase its number of producing agents to build a national sales presence (See "Business-Marketing Plan-Recruiting".)

Marketing Plan

The Company's objective is to increase its share of the rural market either through the Associations or other similar organizations with which the Company may establish similar relationships. Future expansion of Association endorsements could include cattlemen, cotton, and tobacco producer Associations, as well as additional state endorsements from the Wheat, Soybean and Poultry Growers Associations.

AIA0002319

– 22 –

Exhibit 5 - Page - 37

3-ER-579

The Company has targeted specific state Associations for the expansion of its marketing efforts. Below is a table listing those Associations with the Company's estimated year of penetration:

### Targeted State Association Prospects

| Year | States | Association |
|------|--------|-------------|
| 1995 | Iowa | Soybean[1] |
| | Wisconsin | Soybean |
| | Florida | Soybean, Poultry[2] |
| | Louisiana | Soybean, Poultry |
| | Georgia | Soybean, Poultry |
| | North Carolina | Grain,[3] Soybean, Poultry |
| | South Carolina | Soybean, Poultry |
| 1996 | Ohio | Soybean |
| | Michigan | Soybean |
| | Kentucky | Grain, Soybean, Poultry |
| | Illinois | Soybean |
| | Delaware | Soybean, Poultry |
| | Virginia | Soybean, Poultry |
| | Maryland | Soybean, Poultry |

[1] Soybean - American Soybean Association
[2] Poultry - National Contract Poultry Growers Association
[3] Grain - National Association of Wheat Growers

### Leads/Prospects Program

Associations participating in the various trusts provide AIA Insurance with the names of their members and potential members. The Associations also provide AIA Insurance with an endorsement letter of the approved insurance plans. The endorsement letters are mailed to prospective clients prior to contact by AIA Insurance agents. AIA Insurance agents are provided with lists of members and potential members who have received these materials. The Company currently has over 450,000 names of such potential agriculture related clients. The direct mail advertising and endorsements are augmented with advertising and articles in the Associations' national magazines. Additional marketing materials will be developed in conjunction with the participating state and national farm Associations as new products are developed and marketed.

### Recruiting

The Company plans to aggressively recruit producing agents to the sales force. Several steps are being considered to enhance its ability to recruit. The Company is formulating a modified commission structure which, when coupled with Association sponsorship and letters of introduction to potential clients from the Associations, is intended to increase the potential for recruiting new agents and to increase production. (See "Business-Business Strategy".) Moreover, the Association relationships enhance the recruiting process because they provide prospective sales and sales management personnel with a built in prospect population. Finally, the Company's recruiting efforts will be enhanced by the management team's contacts throughout the insurance industry.

- 23 -

AIA0002320

Exhibit 5 - Page - 38

3-ER-580

_...roduction of New Products_

In the future, selling additional products to existing insureds, or cross selling, will be an integral part of the strategy of AIA Insurance. Two new products will immediately serve the existing Association marketplace: life insurance and disability income. It is usually a lender requirement to have life insurance and disability income insurance when farmers receive a line of credit or a loan. Negotiations are currently in process to procure life products and disability products from other insurance companies. The procurement of these products is in direct response to the Associations' desires to better serve their members.

Finally, annuity and financial products are an important consideration for the farm and ranch market. Farmers have significant assets to protect and require estate and financial planning. The Company is uniquely positioned to introduce these financial and insurance products to the Associations' members.

**Current Products**

The Company has in the past specialized in providing a group major medical program for Association members. The product, called the GUH Plan, is a major medical program which includes features such as premium levelization, flexible deductibles and incidental life insurance benefits. Generally, comprehensive major medical rates tend to increase each year due to claim experience, health care costs and inflation. The GUH Plan, however, is designed to levelize premiums for as long as possible. This new concept greatly benefits the certificate holder; and in the face of inflation of health care costs, the GUH Plan has provided a viable alternative to traditional plans.

The GUH Plan is comprised of three principal types of insurance benefits: comprehensive Major Medical Benefits, Survivor Income Benefits, and the Supplemental Benefit Accumulation ("SBA") or "Universal Benefits" ("UB") as it is called in later forms of the GUH Plan.

_Comprehensive Major Medical._ The GUH Plan's Comprehensive Major Medical Benefits provide reimbursement of specified medical expenses incurred by a participant. The expenses covered are those generally covered under "major medical" health insurance policies and are generally subject to the same limitations, exclusions and co-payment requirements provided under such insurance policies.

As is typically the case with such coverages, major medical expense reimbursement under the GUH Plan is subject to a deductible. Participants are offered a choice of deductibles for the first policy year. Each year thereafter, the deductible amount increases by a fixed amount, up to an administratively set maximum. A participant may choose not to take this automatic increase in the deductible by paying an additional premium which is actuarially equivalent to the difference in deductible amounts.

_Survivor Income Benefits._ The GUH Plan's Survivor Income Benefits provide scheduled term life insurance coverage on the life of the participant, with a death benefit being payable to the participant's designated beneficiary.

_Supplemental Benefit Accumulation/Universal Benefits ("SBA/UB")._ The SBA/UB provisions of the GUH Plan were designated to address the two major problems of the health insurance industry: (a) escalating premiums; and (b) poor persistency among participants. Over the past decade, medical costs have inflated dramatically, causing premiums for health insurance to increase significantly faster than prices of other consumer goods. As a result of escalating premiums,

AIA0002321

– 24 –

Exhibit 5 - Page - 39

persistency of group health insurance plans has typically been low among the healthier members of the group who tend to jump in and out of the group depending on the current year's premium and the availability of price-competitive products. This tendency of healthier members to price shop and withdraw from the group, thereby leaving a higher percentage of less healthy members in the group, is a process known as "adverse selection." This phenomenon results in magnification of rate increases induced by medical cost inflation as the overall health of the remaining group population deteriorates, which in turn causes more of the healthy group members to withdraw, the overall health of the remaining group to decline, and rates to increase even further. Adverse selection thus results in an "assessment spiral" of increasing premiums.

The GUH Plan uses a "levelized" or "stabilized" premium concept to solve these two linked problems. The GUH Plan design previously involved cash accumulation in the SBA to reward persistency and to fund the "levelized" premium benefit and, on the other hand, imposition of surrender charges against withdrawals of accumulated cash value to discourage lapses. More recent forms of the GUH Plan eliminate surrender charges and provide for scheduled cash values known as Universal Benefits. The SBA/UB, an integral part of the insurance contract, is designed as a premium stabilization accumulation fund to stabilize escalation of premiums due to inflation of health care costs. In order to provide level premiums, premium stabilization accumulation funds are present in all non-cancelable and guaranteed-renewable health insurance, as well as disability and whole life policies. The difference between Universe Life's SBA/UB and the typical premium stabilization accumulation fund is that Universe life allows insureds to determine the timing and amount of application of an allocable portion of the premium stabilization accumulation fund in light of their own particular financial and health circumstances. The GUH Plan allows insureds to apply amounts credited to the SBA/UB to offset premium increases and, in the event of claims, to cover medical expenses otherwise subject to the deductible. The amounts credited to the SBA/UB are therefore available to insureds as a policy benefit to offset premium increases or to cover actual medical expenses otherwise subject to the deductible.

### Association Relationships

AIA Insurance receives exclusive endorsements by the Associations as the approved agent of record and third party administrator. This endorsement to Association members gives AIA Insurance a captive market (currently over 450,000 farmers and ranchers) from which to solicit the sale of its products. Members of the Associations have demonstrated an affinity for such Association endorsed products and services. Because the relationships with Associations have proved successful the Company will expand through the anticipated development of additional agreements with other agricultural related organizations.

The Company and certain of its products are endorsed primarily by the following three Associations:

### National Association of Wheat Growers

AIA Insurance has had a 25 year relationship with state wheat growers associations, which are affiliates of the National Association of Wheat Growers. This relationship has been integral in building the Company's program. While endorsements began with state Associations, the Company and the program is now endorsed by NAWG, which has 65,000 members out of approximately 350,000 wheat -owers in the United States. Although wheat is grown nationwide, it is a primary crop in 18 western -tes. AIA Insurance is endorsed by 15 of the 18 active state Associations as well as the National Association; and AIA's prospect list includes 278,030 wheat growers. Approximately 30% of its active membership participates in the program by purchasing insurance from the Company.

- 25 -

AIA0002322

Exhibit 5 - Page - 40

3-ER-582

### .ıerican Soybean Association

This relationship began in the spring of 1993. AIA Insurance was selected through a competitive process because of its customized products and its dues collection services. There are approximately 440,000 soybean growers in 25 states, of which 32,800 are currently ASA members. AIA Insurance currently has the endorsements of the national association and 12 state associations; and AIA's prospect list includes 206,641 soybean growers. Thus far, only 5% of active members participate in the Company's programs.

### National Contract Poultry Growers Association

This relationship began in the fall of 1993. There are approximately 72,000 poultry growers in 16 states, of which 3,500 are NCPGA members. Poultry growers are different from the typical wheat or soybean grower. They require fewer acres (as little as five), have lower gross incomes, and often have other jobs to supplement their household income, making their insurance needs more diverse. Of the three states currently penetrated by the Company, about one-third of the approximately 2,500 active members are participants. AIA's prospect list includes 27,930 poultry growers.

### Additional Associations

In addition to being agent of record for the three major national Associations, AIA Insurance is also the agent of record for the Rolling Plains Cotton Growers, Oklahoma and Texas Peanut Growers, Nebraska Corn Growers, and the Tennessee Pork Producers. All are state commodity Associations specializing in specific crops. AIA's prospect list includes 53,318 of these specialty commodity growers. Members participate in the Company's insurance plans offered through American Independent Agricultural Producers Group Insurance Trust.

### ᴄ..ents

Virtually all the current participants in the Company's insurance programs are individuals who work directly in farming or agricultural-related industries. The average certificate holder is 43 years old and has 2.2 persons insured on each health certificate. Over 95% of the group universal health coverage is sold to individual families without employees.

### Agreements
### Associations

Administrative agreements with the Grain Growers, Soybean Growers and Poultry Growers Trusts provide that AIA Insurance may be replaced as the administrator of the trusts by the Board of Directors of the trusts upon three years notice. Upon termination, the Company will no longer collect dues, and no other competing insurance products may be endorsed by the Associations for two years thereafter. The other Trust Agreements do not contain specific provisions with respect to replacement of the administrator.

In addition to administrative agreements with the trusts, AIA Insurance has administrative agreements with the insurers of policies written to the trusts, under which it is compensated for administrative services, such as risk selection and claims adjudication, rendered to those insurers. The trusts also receive an annual administrative allowance from the insurers who write group insurance for the trust. The exact amount of this allowance depends both on the total amount of the annual premium and persistency levels, which are percentages based on the number of individuals who retain their coverage r after year. AIA Insurance also is entitled to interest earned on trust fund deposited pending their .rılization.

AIA0002323

Exhibit 5 - Page - 41

**3-ER-583**

*he Centennial Life Insurance Company*

Effective Oct. 1, 1994, AIA Insurance entered into various agreements with The Centennial Life Insurance Company, pursuant to which Universe Life is selling its GUH Plan business and through which AIA Insurance will continue to market and administer health products for the Associations ("Centennial Agreement"). Under a transfer agreement and related reinsurance agreements, Universe Life is transferring a substantial portion of its GUH Plan underwriting risk to Centennial for consideration with an expected present value of $4.9 million, subject to the profitability of the existing business. The Company also will receive a profit sharing incentive equal to 25 % of the profit on new business sold by AIA Insurance. The Company transferred approximately 44% of its GUH business (once the transfer is completed) to Centennial at December 31, 1994, and expects to transfer the balance effective June 30, 1995, pursuant to a reinsurance agreement currently being negotiated. The terms of the new reinsurance agreement may affect the assumptions used in the Selected Projected Financial Information.

Under an administrative services agreement with Centennial, Centennial appoints AIA Insurance to perform certain billing, accounting, record keeping and other functions pertaining to the general administrative duties relating to all policies issued by Centennial to the trusts. The annual compensation of AIA Insurance under these administrative agreements is an amount equal to 5 % of earned premiums on policies issued to the trusts and 0.5 % of the average reserve values in the supplemental benefit and the flexible premium annuity funds under policies issued to the trusts. Also, AIA Insurance receives an annual fee ranging from $ 25 to $ 85 for each certificate issued to a policy participant and up to a $ 5.00 fee per billing for each time AIA Insurance is required to prepare and transmit premium due statements either by mail or electronically.

AIA Insurance is also appointed as the agent of record for certain trusts and as general agent for insurers on all policies issued by any insurance company to the trusts. Under a marketing agreement with Centennial, AIA Insurance receives commissions equal to 40% of the first year's premium. Commissions payable on renewals equal 15% of premiums paid for health, life and accident policies issued to the trusts, excluding premiums for the Universal Benefits and Supplemental Benefits.

Regulation

Insurance companies including Universe Life and Great Fidelity are subject to comprehensive regulations by state insurance directors or commissioners in the jurisdictions in which they do business. Such regulations relate to, among other things, prior approval of the acquisition of a controlling interest in an insurance company; standards of solvency which must be met and maintained; licensing of insurers and their agents; the nature of and limitations on investments; deposits of securities for the benefit of policy holders; approval of policy forms and premium rates; annual and other reports required to be filed on the financial condition of insurers and for other purposes; requirements regarding reserves for unearned premiums, losses, and other matters; and minimum benefits and loss ratios for health insurance.

The National Association of Insurance Commissioners ("NAIC") has, in recent years, taken an active role in developing standards for regulation of insurance companies and has effectively required states to conform to such standards. The NAIC is a voluntary association of state insurance regulators which, despite its leading role, is not accountable to any federal or state legislative body. The NAIC is not required to allow insurance company representation in any of its deliberations; and there exists no ocedure for appeal of its decisions. Among the NAIC's new requirements for insurance companies is .erence to the NAIC's risk-based capital ("RBC") rules, which are described in detail in the notes to

AIA0002324

– 27 –

Exhibit 5 - Page - 42

3-ER-584

Company's financial statements. The NAIC has recently taken an increasingly consumer-oriented viewpoint. Future regulatory requirements imposed by the NAIC, particularly in the area of health insurance reform, could adversely affect the Company's business.

The domestic state insurance regulator is required to periodically conduct financial and market conduct examinations of an insurer. The last examination of Universe Life was conducted jointly by the Idaho, Nevada, and Texas insurance departments. It was initiated in September 1993 for the two year period ended December 31, 1992; and, although the examination report has yet to be issued, the examiners proposed significant accounting changes which would have been detrimental to Universe Life, as follows:

The examination proposed that the valuation for statutory accounting purposes of AIA Insurance, currently a subsidiary of Universe Life, common stock be reduced from its cost basis to its GAAP book value, net of all deferred acquisition costs. This proposed adjustment would cause a $5,706,713 write down of the carrying value of AIA Insurance.

The examiners proposed that the aggregate reserves for the GUH Plan be increased from $13,848,500 to $18,511,137 on an aggregate basis, before reinsurance credits. The Company's reserves equal the estimated present value of future policyholder liabilities. The examiners' proposed reserves equal the maximum policy liability. This adjustment would have had the effect of reducing the Company's capital and surplus by a corresponding amount.

Based on the proposed examination adjustments to Universe Life, the Texas Department of Insurance ("TDI") issued an ex parte cease and desist order against Universe Life in March 21, 1994, suspending Universe Life's ability to conduct business in Texas.

As a result of the cease and desist order, Universe Life has been subjected to a show cause order, suspension hearings, and other administrative actions in several other states. At the present time, Universe Life has agreed to suspend new sales in Alaska, California, Illinois, Nebraska and Washington, on a voluntary basis, until the valuation of its investment in AIA Insurance stock and any other examination issues are settled. In addition, Universe Life voluntarily allowed the suspension of its certificate of authority in Mississippi, Oregon and Utah pending resolution of the examination issues. Historically, the amount of business done by the Company in such states (other than Nebraska and Oregon) has not been significant. The Company expects that the contribution of offering proceeds to Universe Life and the reorganization of AIA Insurance as a direct subsidiary of the Company will result in lifting of such suspensions.

The Company has negotiated the settlement of the TDI cease and desist order; and by Consent Order issued on October 10, 1994, the earlier cease and desist order was superseded. TDI abandoned the proposed adjustments for increased reserves; and it approved the reserves and reserving methodology of Universe Life at essentially the levels established by the insurance company, subject to minor modifications proposed by an independent actuary retained by TDI to review the Company's reserving method. As part of the October Consent Order, Universe Life agreed to modify its reserves, if necessary, by year end 1996. The Company believes changes in the aggregate health and accident reserves will be immaterial. In addition, Universe Life agreed in the Consent Order to reduce the carrying value of its investment in AIA Insurance stock to GAAP book value by December 31, 1996. TDI approved the sale and transfer of the Plan business to Centennial as proposed by the Company.

AIA0002325

- 28 -

Exhibit 5 - Page - 43

Although the examination report has not yet been issued, Universe Life has also reached an a :ment with the Idaho Insurance Department concerning the principal examination adjustments proposed by the examiners. The Idaho Insurance Department will not require Universe Life to record any adjustments to the value of its investment in its wholly-owned subsidiary, AIA Insurance, Inc., or to the amount of its SBA/UB reserves as of December 31, 1993. The carrying value of AIA Insurance, Inc. will be adjusted to GAAP book value, including deferred acquisition costs, at July 1, 1995; and the Department will permit the Company to make the required reserve adjustments ratably, on a quarterly basis beginning with the third quarter of 1995 and ending December 31, 1996, in accordance with the Texas Consent Order.

The Idaho Insurance Department has approved Universe Life's sale of its GUH Plan business to Centennial and has granted approval of the admission of the gain on this transaction as an asset on the insurer's books and the methodology for determining the value of that asset, conditioned upon realization of future cash flows as anticipated.

Legal Proceedings
In August 1993, judgment was entered against Universe Life in Texas for $72,000 actual damages and $500,000 exemplary damages in connection with a denied medical claim. An appellate court reduced the exemplary damage award to $300,000. Both parties have requested review by the Texas Supreme Court.

The Company and its subsidiaries are not parties to any other legal proceedings outside the ·¹·nary course of the Company's business or to any other legal proceeding which, if adversely determined, ·d have a material adverse effect on the Company or its business.

AIA0002326

– 29 –

Exhibit 5 - Page - 44

3-ER-586

## MANAGEMENT

**Directors and Executives**

The following table sets forth certain information with respect to each of the persons who are anticipated to be directors and executive officers of the Company upon the closing of this offering.

| Name | Age | Position(s) |
|---|---|---|
| R. John Taylor | 45 | Chairman of the Board and Director |
| Richard W. Campanaro | 52 | President, CEO and Director |
| Reed J. Taylor | 58 | Director |
| Michael W. Cashman | 45 | Director |
| Bruce Sweeney | 63 | Director |
| Albert E. Cooper | 60 | Director |
| Cumer L. Green | 53 | Director |
| William Tarbart | 46 | President and Chief Marketing Officer, AIA Insurance, Inc. |
| Andrew Chua | 40 | Executive Vice President |
| Paul D. Durant II | 63 | President, The Universe Life Insurance Company & Great Fidelity Life Insurance Company, and Executive Vice President, AIA Services Corporation |
| Dan L. Spickler | 46 | Vice President and Secretary |
| Rick L Johnson | 39 | Vice President of Finance and Treasurer |

The Company has assembled an experienced management team that will be augmented by the addition of Richard W. Campanaro, William Tarbart and Andrew Chua (the "Campanaro Team") who have extensive experience in managing and growing insurance marketing companies. The Company's management can, and has, developed new products unique to the industry; reviewed and completed strategic acquisitions and successfully organized the Company to administer the business for the benefit of the farm Associations, policyholders, employees and shareholders. With the addition of the Campanaro team, and the sale of the current underwriting risk to Centennial, the Company believes it is postured for growth.

**Board of Directors and Officers**

The Company's Board of Directors currently consists of seven persons, three of whom are not employees of the Company or any of its subsidiaries. Upon completion of this offering, it is contemplated that the Board will be expanded to nine members, and will include Reed J. Taylor, R. John Taylor, Richard W. Campanaro, Michael W. Cashman, Cumer L. Green, Bruce Sweeney, Albert E. Cooper and a representative appointed by the Agent.

*R. John Taylor* has served in the positions as Secretary, Treasurer and President of the Company since he and his brother, Reed J. Taylor founded the Company in 1983. Mr. Taylor has been largely responsible for establishing and maintaining the relationships with the Associations. Mr. Taylor will serve as Chairman of the Company. He serves as a director of The Washington Water Power Company of Spokane, Washington. Mr. Taylor is a licensed attorney and has been engaged in the insurance business since 1976.

AIA0002327

Exhibit 5 - Page - 45

**3-ER-587**

*Richard W. Campanaro* has been in the insurance business since 1966, most recently as Chairman and C.E.O. of Tandem Financial Group, a former joint venture of The Equitable Life Assurance Society and Merrill Lynch. (Merrill Lynch acquired 100% of the Tandem Financial Group in 1990 and now operates it as part of the Merrill Lynch Insurance Group in Jacksonville, Florida). Mr. Campanaro joined Tandem in 1985 when it was founded. Along with the management team he established, Mr. Campanaro grew Tandem to $4.5 billion in premium revenue by the time of his departure in 1990. From 1990 to 1994, during the period of his non-compete agreement with Tandem, Mr. Campanaro worked on a number of different insurance related projects as a consultant. Mr. Campanaro was Executive Vice President of Liberty Life Insurance Company, Greenville, S.C., from 1979 to 1985 and prior to that occupied various sales and management positions with Metropolitan Life Insurance Company from 1966 to 1979.

*Reed J. Taylor* has served as Chairman, President and Director for the Company since he founded the Company with his brother, R. John Taylor, in 1983. Mr. Taylor was also the founder and President or Chairman of AIA Insurance from 1969 to present. Mr Taylor has been actively engaged in the insurance business since 1964 and is currently licensed as an insurance agent in several states.

*Michael W. Cashman* has been in the insurance business since 1972 when he joined E. W. Blanch Company, a reinsurance brokerage firm which has grown to become the largest independent reinsurance brokerage firm in the United States. Until his recent retirement, Mr. Cashman served as President, Chief Operating Officer and Director of E.W. Blanch Holdings, Inc., a professional reinsurance services firm providing reinsurance brokerage and reinsurance risk management services. In addition, Mr. Cashman was chairman, Chief Executive and Director of E.W. Blanch Company. Mr. Cashman is a member of the International Insurance Society, was one of two founders of the Chair of Insurance at the University of Thomas, and has served on its advisory board. Additionally, Mr. Cashman is a trustee on the Board of the University of St. Thomas.

*Bruce Sweeney* has served as a Director of the Company since December, 1988. During the past 11 years, he has been engaged in the construction contracting and land development business. He had previously served on the boards of several corporations, including Pacific Empire Life Insurance Company. In addition to business interests, Mr. Sweeney serves as minority leader of the Idaho State Senate.

*Albert E. Cooper* became a Director for Great Fidelity Life Insurance Company and The Universe Life Insurance Company and the Company in November 1993. He is currently President of two financial consulting services, A.E. Cooper Associates and Greenwood Financial Services. Mr. Cooper has an extensive insurance background. He was employed by the Indiana Department of Insurance from 1976 to 1980, where he was Chief Auditor, promoted to Chief Deputy, and later appointed by the Governor as Commissioner of Insurance in 1980. Thereafter, Mr. Cooper was employed in senior executive positions with the National Association of Mutual Insurance Companies, Atek Information Services, HealthPlus HMO, and Indiana Insurance Companies.

*Cumer L. Green* became a Director of the Company in 1994, elected by the Series A Preferred Shareholder. Mr. Green is a certified public accountant and has been an attorney since 1969.

*William Tarbart* has been in the insurance business since 1970 and since 1990 has served as a consultant to such companies as Protective Life Insurance Company of Birmingham, Alabama and Florida icians Insurance Company. He began his career with the Equitable Life Assurance Society and

– 31 –                                                    AIA0002328

Exhibit 5 - Page - 46

**3-ER-588**

...aained with them until joining Mr. Campanaro at Tandem Financial Group with responsibilities i....ding product design, pricing, marketing and sales. Mr. Tarbart will became President and Chief M....keting Officer of AIA Insurance, Inc.

*Andrew Chua* has a Masters in Actuarial Science from Georgia State University and has been in the insurance business since 1978, serving in various capacities with CIGNA, Phoenix Mutual Life Insurance Company, Sun America Corporation and Tandem Financial Group. With Tandem, Mr. Chua was primarily responsible for annuity product development and the monitoring of the investment portfolio. He has developed specialized software for investment portfolio management, insurance company tracking software and pricing systems.

*Paul D. Durant, II* has served as executive vice president and a director of the Company, as president and a director of Universe Life since 1987, and as a director of Great Fidelity since 1990 and as president since 1994. Mr. Durant is a certified public accountant engaged in the insurance business since 1965. He has maintained senior executive positions with The Sentry Insurance Companies, Southland Life Insurance Company of Dallas, Texas, and American Investors Life Insurance Company of Topeka, Kansas. He also serves on the Board of Directors of the Council for Affordable Health and the National Alliance of Life Insurance Companies.

*Daniel L. Spickler* holds the offices of Vice President and Secretary for the Company and its affiliates, and serves as General Counsel for the entire holding company system. He has been employed by the Company since 1988. Prior to his association with the Company, Mr. Spickler practiced law in Idaho for seven years. Mr. Spickler is a member of the Idaho State Bar Association, American Life rance Counsel Association, and National Association of Corporate Secretaries.

*Rick L Johnson* has served as Vice President of Finance and Treasurer of the Company since 1989. He began his career in public accounting in 1980 with Arthur Andersen & Co. where he served insurance companies, banks and savings and loan associations. Mr. Johnson is a Certified Public Accountant and a member of the American Institute of Certified Public Accountants.

### Director Compensation

It is the Company's policy to pay a fixed fee of $1,000 for each calendar quarter to each director and $300 to any employee or director for each Board Meeting attended. It is also the policy of the Company to reimburse all directors for expenses incurred in attending directors meetings.

### Stock Option Plan

The shareholders and directors of the Company have adopted the 1989 Stock Option Plan for key employees of the Company and its subsidiaries. Under the Plan, the option price may not be less than the fair market value of the Common Stock of the Company on the date on which an option is granted. However, options may be granted to employees who own more than 5% of the Company's outstanding Common Stock only at an option price which is at least 110% of the fair market value of the Common Stock on the date the option is granted. The Plan provides that no option granted thereunder may be exercised more than ten years after the date it was granted. The Plan has reserved for issuance 1,200,000 shares of Common Stock of the Company, but no options have yet been granted under the Plan. The Company intends to increase the reserved shares to 1,500,000.

AIA0002329

Exhibit 5 - Page - 47

3-ER-589

**Employment Agreements**

R. John Taylor and Richard W. Campanaro will enter into employment agreements with the Company prior to closing of this offering. Although the terms of the agreements remain to be negotiated, they will include commitments by Messrs. Taylor and Campanaro to be employed for at least three years and non-compete agreements for a three-year period after termination of employment. During 1995, Mr. Taylor will receive a base salary and other employee compensation of $225,000 to $250,000. Mr. Campanaro will receive a base salary and other employee compensation of $200,000 to $225,000. The other officers of the Company will receive a base salary and compensation of 40% to 75% of Mr. Campanaro's base salary. All officers will also receive that Company's standard health insurance, paid vacation and other employment-based benefits that all employees of the Company receive. Mr. Taylor received total compensation and taxable employee benefits of $305,322 in 1993 and $249,624 in 1994 from the Company. Mr. Campanaro did not receive any compensation in 1993 or 1994 from the Company.

Seven employees of the Company, including R. John Taylor, Paul D. Durant II and Rick L Johnson, who are directors and/or officers of the Company, are each entitled to receive a termination severance payment from the Company in the event such person is terminated as an employee of the Company for any reason other than for cause or upon reaching normal retirement age. The severance payment for the seven employees, except Mr. Durant and Mr. Johnson, would be 50% of the person's salary for the year prior to such termination plus the same amount for each five years that the person was employed by the Company. The maximum severance payment would be twice the person's salary for the year prior to termination. These severance pay provisions may be canceled upon the approval of a majority of these seven employees of the Company if a stock option plan is implemented which provides options to these persons with a value comparable to their severance benefits. Mr. Durant's termination severance payment would be nine months salary. Mr. Johnson's severance payment would be six months salary.

The Company has entered into various agreements with Paul D. Durant II, Executive Vice President of the Company, under which Mr. Durant has the option to purchase 32,127 shares of Common Stock at $1.23 per share. These options were granted between November 11, 1987, and September 14, 1993, based upon the Company's attainment of Net Income targets during the period. No stock has been issued under this agreement.

**Certain Relationships and Transactions**

Since 1989, all transactions between the Company and any officer, director, or controlling person of the Company or any affiliate of any such person have been required to be approved or ratified by a majority of the disinterested outside directors of the Company.

*Sale of Series C Preferred Stock and Warrants Pursuant to Investment Agreement*

Michael W. Cashman, James W. Beck, and Richard Campanaro will purchase 150,000 shares of Series C Preferred Stock and Series C Warrants for $1,500,000. Such Series C Preferred Stock has the same terms as the other shares of Series C Preferred Stock offered herein. However, Mr. Taylor and Mr. Campanaro have agreed to elect Mr. Beck (if he so desires) and Mr. Cashman to the Board through a voting agreement, if not already so elected by the Preferred shareholders. As directors, Messrs. Beck and Cashman will receive Warrants equal to 6% of the Company prior to an Equity Offering. In addition, Messrs. Beck and Cashman have agreed to guarantee a bank loan of $1 million for the Company in the event less than the maximum offering is sold. As compensation for the loan guarantee, they may receive additional Warrants for up to 9% of the Company. These Warrants, as a compensation for the loan, will be at a nominal price.

- 33 -

AIA0002330

Exhibit 5 - Page - 48

**3-ER-590**

*Redemption of Donna Taylor's Series A Preferred Shares*

Donna Taylor owns 185,250 outstanding shares of Series A (Stated Value) Preferred Stock that are currently being redeemed over 10 years at their stated value of $10.00 per share plus interest. (See "Description of Securities-Series A Preferred Stock)". The Company will pay $700,000 from a bank loan or from the proceeds of this offering (to the extent the offering proceeds exceed $2.5 million) and $100,000 from its working capital in connection with the redemption of the Series A Preferred Stock. In addition, to the extent the offering proceeds exceed $3.2 million, the Company will use such net offering proceeds to redeem the Series A Preferred Stock up to the full amount of the unpaid principal balance of the redemption price, estimated to be $1,850,000 on May 1, 1995. Any unpaid principal balance of the redemption price will be paid in monthly installments based upon a ten-year amortization at prime rate plus ¼%. (See "Summary of Offering- Use of Proceeds", "Restructuring".)

*Redemption of Reed J. Taylor's Common Stock*

Simultaneously with the closing of this offering, the Company will enter into an agreement with its principal shareholder, Reed J. Taylor, to repurchase 500,000 shares of Common Stock for $15 per share, or $7.5 million in the aggregate. The Company will use the $1.5 million proceeds of the sale of Series C Preferred Stock and Series C Warrants for the down payment for such repurchase. The 500,000 shares of Common Stock will be retired to treasury; and the Company will give Mr. Taylor its interest only ten-year note payable for the $6 million balance of the repurchase price for such shares. Principal payments on this note will be subordinated to principal payments to redeem the Series A Preferred Stock. To secure payment of the note, Company will grant Mr. Taylor a security interest in the stock and commission income of its operating subsidiaries, including Universe Life and AIA Insurance, Inc.

Concurrent with the purchase of the 500,000 shares of Reed J. Taylor's common stock, the Company will redeem Mr. Taylor's remaining common stock of 113,494 shares by transferring the Company's aircraft to Mr. Taylor, subject to its debt of approximately $590,000, and cancellation of approximately $480,000 in indebtedness to the Company. The Company will also transfer all interest in the College Advantage Plan to Mr. Taylor. Mr. Taylor will receive $145,000 per year for three years as full and final compensation of his personal interest in any renewal commission overrides due him for GUH business sold prior to closing.

**Indemnification**

The Company's Articles of Incorporation, as amended ("Articles of Incorporation"), provide for indemnification of the Company's directors, officers, employees and agents to the fullest extent permitted by law. Insofar as indemnification for liabilities under the Securities Act may be permitted to directors, officers or controlling persons of the Company pursuant to the Company's Articles of Incorporation, Bylaws and the Idaho Business Corporation Act, the Company has been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in such Act and is therefore unenforceable.

As permitted by the Idaho Business Corporation Act, the Articles of Incorporation provide that directors of the Company shall not be personally liable to the Company or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's of loyalty to the Company or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 30-1-48 of the Idaho

- 34 -

AIA0002331

Exhibit 5 - Page - 49

3-ER-591

...siness Corporation Act, relating to prohibited dividends or distributions or the repurchase or ...mption of stock or (iv) for any transaction from which the director derives an improper personal b...efit. As a result of this provision, the Company may be unable to obtain monetary damages from a director for breach of his or her duty of care.

– 35 –

AIA0002332

Exhibit 5 - Page - 50

## PRINCIPAL AND MANAGEMENT SHAREHOLDINGS

: following table represents the fully-diluted[1] equity capital structure of the Company as if the offering and the concurrent sale of Series C Preferred Stock were completed, and shares of Series A Preferred Stock were redeemed.

| | Minimum Offering | | Maximum Offering | |
| --- | --- | --- | --- | --- |
| | Shares | Percentage | Shares | Percentage |
| **Preferred Stock** | | | | |
| Series A[2] | 115,250 | 43.45% | 0 | 0.00% |
| Series C | 150,000 | 56.55% | 500,000 | 100.00% |
| TOTAL | 265,250 | 100.00% | 885,000 | 100.00% |
| **Common Stock** | | | | |
| R. John Taylor[3] | 1,033,000 | 39.58% | 1,033,000 | 39.58% |
| Richard W. Campanaro[3] | 625,000 | 23.95% | 625,000 | 23.95% |
| ESOP[4] | 176,484 | 6.76% | 176,484 | 6.76% |
| Paul D. Durant II[5] | 39,519 | 1.52% | 39,519 | 1.52% |
| Other Officers & Agents | 5,100 | 0.02% | 5,100 | 0.02% |
| Other Non-Employees | 330,879 | 12.67% | 330,879 | 12.67% |
| Current Stock Option Plan[6] | 400,000 | 15.32% | 400,000 | 15.32% |
| TAL | 2,609,982[1] | 100.00% | 2,609,982[1] | 100.00% |

[1] This table includes the effect of a 3:1 common stock split coincident to closing of the transaction.

[2] Assumes redemption of 70,000 of the outstanding Series A Preferred Stock upon completion of the offering of the minimum number of Shares, and redemption of all Series A Preferred Stock upon successful completion of the maximum amount of the offering.

[3] Includes an option to be issued to Mr. Taylor of 475,000 shares and to Mr. Campanaro of 625,000 shares, at closing.

[4] Includes 43,950 shares issued in December 1994 to the ESOP pursuant to a purchase by the ESOP of such shares at $6.34 per share for 1994 contributions made by the Company.

[5] Includes 32,157 shares which may be acquired by Mr. Durant pursuant to exercisable stock options.

[6] Includes shares reserved for issuance upon exercise of options which may be granted under the Stock Option Plan for Officers and Employees adopted in 1989, and to be amended in 1995: To date, no options have been granted under the plan.

AIA0002333

Exhibit 5 - Page - 51

**3-ER-593**

### PRINCIPAL AND MANAGEMENT SHAREHOLDINGS  (Continued)

The following table represents the fully-diluted[8] equity capital structure of the Company as if the offering and the concurrent sale of Series C Preferred Stock were completed, and assuming further redemption of Series A Preferred Stock, Conversion of Series C Preferred Stock, and exercise of Series C Warrants.

| | Minimum Offering | | Maximum Offering | |
|---|---|---|---|---|
| | Shares | Percentage | Shares | Percentage |
| **Preferred Stock** | | | | |
| Series A[1] | 115 | 100.00% | 0 | 0.00% |
| Series C | 0 | 0.00% | 0 | 0.00% |
| TOTAL | 115 | 100.00% | 0 | 0.00% |
| **Common Stock** | | | | |
| R. John Taylor[2] | 1,035 | 24.17% | 1,035 | 17.45% |
| Richard W. Campanaro[2,3] | 625 | 14.60% | 625 | 10.54% |
| ESOP[5] | 176 | 4.12% | 176 | 2.98% |
| Paul D. Durant II[6] | 40 | 0.92% | 40 | 0.67% |
| Other Officers & Agents | 5 | 0.12% | 5 | 0.08% |
| Other Non-Employees | 331 | 7.73% | 331 | 5.58% |
| Current Stock Option Plan[4] | 400 | 9.34% | 400 | 6.75% |
| ᴧ Beck[3,7] | 428 | 10.00% | 415 | 7.00% |
| Michael Cashman[3,7] | 856 | 20.00% | 830 | 14.00% |
| Other loan guarantee warrants[9] | 385 | 9.00% | 0 | 0.00% |
| Other Series C Shareholders[3] | 0 | 0.00% | 2,072 | 34.95% |
| TOTAL | 4,281[7] | 100.00% | 5,929[7] | 100.00% |

[1] Assumes redemption of 70,000 shares of the Series A Preferred Shares upon completion of the minimum offering and further redemptions on schedule over the next two years; and the redemption of all Series A Preferred Shares in the event of the completion of the maximum offering.

[2] Includes a grant of 475,000 and 625,000 options to Mr. Taylor and Mr. Campanaro.

[3] Includes conversion of all Series C Preferred Stock to the Company's Common Stock on a fully-diluted basis and exercise of Series C Warrants for the Company's Common Stock on a fully-diluted basis.

[4] Includes shares reserved for issuance pursuant to options to be granted under the Stock Option Plan for officers and Employees adopted in 1989. No options have been granted under the Plan.

[5] Includes 43,950 shares purchased by ESOP in December 1994.

[6] Includes 32,157 shares which may be acquired by Mr. Durant pursuant to exercisable stock options.

[7] Includes warrants issued to Messrs. Beck and Cashman or other investors who may guarantee notes to the Company to complete the restructuring, if only the minimum C shares are sold.

[8] This table includes the effect of a 3:1 stock split for holders of record on September 1, 1995. This table is based upon the capital structure reflected in the previous table. There can be no assurance that the ultimate capital structure will be the same as that presented herein due to the possibility of further issuance of Company securities prior to exercise of the Warrants or version of the Series C Preferred Stock.

[9] Assumes Messrs. Beck and Cashman and other investors assist the Company by co-signing for loans, if less than the maximum is sold.

- 37 -

AIA0002334

Exhibit 5 - Page - 52

3-ER-594

## DESCRIPTION OF SECURITIES

*Capital Stock*

The Company's Articles of Incorporation, when amended, will authorize the issuance of 5,000,000 shares of common stock (par value $.01 per share), 200,000 shares of Series A $10 Stated Value Preferred Stock, and 500,000 shares of Series C 10% Preferred Stock ($1.00 par value).

The following descriptions of Capital Stock are subject to the detailed provisions of the shares contained in the Company's Amended and Restated Articles of Incorporation, which are available for inspection upon request.

*Common Stock*

The Company is authorized to issue 5,000,000 shares of Common Stock par value $.01 per share. All outstanding shares of Common Stock are fully paid and nonassessable. Holders of the Common Stock are entitled to one vote per share on all matters to be voted on by shareholders, including the election of directors. Holders of Common Stock of the Company will be entitled to elect seven of the nine directors. The holders of classes of Preferred Stock of the Company have a preference over the holders of Common Stock of the Company on the assets of the Company legally available for distribution to stockholders in the event of any liquidation, dissolution, or winding up of the affairs of the Company. In the event of any liquidation, dissolution or winding up of the affairs of the Company, holders of the Common Stock will share ratably in any assets of the Company legally available for distribution to holders of Common Stock. Holders of Series C Preferred Stock have a preference over the holders of Common Stock as to the payment of dividends. Holders of Common Stock have rights, share for share, to receive dividends if and when declared by the Board of Directors out of funds legally available thereof after paying preferred dividends to the holders of Series C Preferred Stock. The Company has never paid any dividends and does not intend to pay Common Stock dividends in the future.

*Series A Stated Value Preferred Stock*

The Company is authorized to issue 200,000 shares of Stated Value Preferred Stock ("Series A Preferred Stock"), without par value, of which all 200,000 shares were issued and of which 185,250 are currently outstanding. All outstanding shares of Series A Preferred Stock are held by one person and are fully paid and nonassessable. Holders of the Series A Preferred Stock are not entitled to vote on any matter to be voted on by shareholders, except that the holders of Series A Preferred Stock are entitled to elect one director to the Board of Directors of the Company. Holders of the Series A Preferred Stock have no preemptive rights to subscribe for any securities of the Company and are not entitled to receive cash dividends from the Company. In the event of any liquidation, dissolution, or winding up of the affairs of the Company, holders of the Series A Preferred Stock are entitled to a preference over the holders of Series C Preferred Stock and the Common Stock of the Company in an amount equal to $10.00 per share.

The Company has entered into certain covenants with the holders of the Preferred Stock which provide generally that the Company will not, without consent of the holders of the majority of the outstanding Preferred Stock (i) issue any Common Stock for less than book value, (ii) issue any additional preferred stock, (iii) guarantee or incur unsecured indebtedness in excess of an amount equal to the Company's consolidated net worth minus its goodwill, (iv) guarantee or incur any secured indebtedness exceeding 10% of an amount equal to the Company's consolidated net worth minus its goodwill, (v) guarantee or incur any secured indebtedness except for certain specified liens which arise in the ordinary course of business and certain liens incurred or assumed in connection with the acquisition of assets or corporations, (vi) terminate its corporate existence except for a merger or consolidation in which the

– 38 –

AIA0002335

Exhibit 5 - Page - 53

mpany is the surviving corporation and if its consolidated net worth does not decrease as a result of merger or consolidation, (vii) dispose of all or a material part of the Company's assets unless such d. position of assets is made at the fair market value thereof, (viii) engage in certain types of transactions with its shareholders or affiliates, (ix) permit its consolidated net worth to decrease below $2,000,000, (x) incur any indebtedness which would cause the Company's debt to equity ratio to exceed 3.6 to 1 or which would cause its debt service coverage ratio of income to current maturities on long-term debt to exceed .8 to 1.

The Company began redeeming the Series A Preferred Stock in December 1993 at the $10.00 stated value per share plus interest. As of June 1, 1995, approximately 185,250 shares of Series A Preferred Stock will remain outstanding. Upon closing this offering, at least 70,000 additional shares of Series A Preferred Stock will be redeemed; and any remaining shares will be redeemed over a ten-year period. Beginning February 1, 1995, monthly redemption payments will be computed on a ten year amortization at the prime rate of the First Interstate Bank plus ¼%.

*Corporate Action Required to Authorize Securities*
The Shares and Warrants have not been duly authorized as of the date of this Offering Memorandum. Before this offering can be closed and the Shares and Warrants can be issued, the Company's Articles of Incorporation must be amended to define the preferences, limitations and relative rights of the Shares and Warrants and to authorize the creation and issuance of such securities. The Idaho Business Corporation Act governs the amendment of the Company's Articles of Incorporation: The Company's Board of Directors must adopt a resolution setting forth the proposed amendment and directing that it be submitted to a vote of the Company's shareholders. The amendment authorizing the res and Warrants must thereafter be adopted by the affirmative vote of the holders of a majority of t.. shares of each class of stock entitled to vote thereon; provided that the affirmative vote of the holders of two-thirds of the shares entitled to vote thereon shall be required to authorize the Warrants.

This offering will not close, the subscribers' funds will not be released from escrow to the Company and the Shares and Warrants will not be issued unless and until the Agent receives the opinion of Company's legal counsel that the Shares and Warrants have been duly authorized and that, upon delivery of and payment for the Shares, the shares of Shares and Warrants will be validly issued, fully paid and nonassessable, and will conform to the description thereof contained in this Offering Memorandum.

Management believes the Company's Board of Directors will adopt the resolutions necessary to amend the Company's Articles of Incorporation to authorized the new securities. Reed J. Taylor and R. John Taylor together own more than two-thirds of the outstanding shares of the Company's common stock and are committed to vote their shares in favor of adoption of the amendment to the Company's Articles of Incorporation necessary to authorize the Shares and Warrants to be issued upon closing of this offering. Although the outstanding Series A Preferred Stock is generally not entitled to vote at any regular or special meeting of stockholders (except to elect one director to the Board), the Series A Preferred Stockholder has consented to the necessary amendment, the issuance of the Shares and related transactions.

*Series C Preferred Stock*
The rights and preferences of the up to 500,000 shares of Series C 10% Preferred Stock (the "Series ares") to be issued by Company shall be as follows:

– 39 –

AIA0002336

Exhibit 5 - Page - 54

3-ER-596

*Voting Rights.* The holders of the Series C Shares will have no right to vote for any shareholder purposes. However, the holders of a majority of the Series C Shares shall have the right to elect one director to the Company's Board.

*Dividends.* The Holders of the Series C Shares shall be entitled to receive out of any funds at any time legally available for the declaration of dividends, when and as declared by the Board of Directors, cash dividends at the rate of 10% of the liquidation payment provided in subparagraph (c) hereof per annum per share, such dividends to be payable annually each December 31. Unpaid dividends on shares of the Series C Preferred Stock shall be cumulative, whether or not declared. In no event shall any dividend be paid or declared, nor shall any distribution be made, on the Company's Common Stock, nor shall any Common Stock be purchased or otherwise acquired by the Company for value (other than payment of amounts due on the Company's note payable to Reed J. Taylor for redemption of his Common Stock), unless all dividends on the Series C Preferred Shares for all past periods shall have been paid or shall have been declared and a sum sufficient for the payment thereof set apart for payment.

*Liquidation.* In the event of any liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary, before any other distribution or payment is made to the holders of Common Stock or any other series of Preferred Stock, except the Company's Series A Preferred Stock which maintains preference over the holders of Series C Shares, will be entitled to receive, out of the assets of the Company legally available therefor, a liquidation payment in cash per Series C Share equal to $10.00 (subject to equitable adjustment in the event of any stock dividend, split, distribution, or combination with respect to Series C Shares) (the "Liquidation Rate"). In addition to such amount, a further amount equal to the dividends accumulated and unpaid thereon to the date of such liquidation payment will also be paid. If upon any liquidation or dissolution of the Company, the assets available for distribution are insufficient to pay the holders of all outstanding Series C Shares such amount per Series C Share, the holders of the Series C Shares will share pro rata in any such distribution of assets.

*Conversion:* Each holder of Series C Preferred Stock shall have the right, exercisable at any time prior to or on the closing date of an Equity Offering, to convert any or all of such shares of Series C Preferred Stock into Common Stock at the following Conversion Rate: Each share of Series C Preferred Stock shall be convertible into that number of shares of Common Stock which equals 0.0000693% of the outstanding Common Stock on a fully diluted basis at the effective date of exercise. Any holder of Series C Preferred Stock who exercises this conversion right prior to the closing date of an Equity Offering shall be protected against dilution in the event of any Common Stock issuance or other transaction which occurs prior to an Equity Offering and increases the number of outstanding shares of Common Stock on a fully diluted basis: For each share of Common Stock received upon such conversion of Series C Preferred Stock prior to an Equity Offering, the Company shall issue to the holder thereof such number of additional shares as necessary to maintain, at all times prior to an Equity Offering, such holder's 0.0000693% interest in Company's outstanding Common Stock on a fully diluted basis.

*Redemption.* Subject to the foregoing conversion rights, the Company may redeem the Series C Shares at any time, and is required to redeem the Series C Shares upon the closing of an Equity Offering (see definition under "Series C Warrants" below). The redemption rate will be 100% of the Liquidation Rate if redemption occurs within two (2) years from the issuance of the first Series C Shares. After such two (2) year period an amount equal to 5% of the Liquidation Rate will be

AIA0002337

Exhibit 5 - Page - 55

3-ER-597

added to the redemption rate immediately and each 180 days thereafter so that if redemption occurs after such two (2) year period, but prior to 180 days from the end of such two (2) year period, the redemption rate will be 105% of the Liquidation Rate, if past 180 days but prior to 360 days, such escalation of the redemption rate will be 110% of the Liquidation Rate and such escalation of the Redemption Rate will continue in such manner until the Series C Preferred Shares are redeemed.

*Adjustment of Liquidation Rate.* In case the Company at any time subdivides its outstanding shares of Common Stock into a greater number of shares, whether by stock split, stock dividend or otherwise, the Liquidation Rate in effect immediately prior to such subdivision will be proportionately reduced. Conversely, in case the outstanding shares of Common Stock of the Company are combined into a smaller number of shares, whether by reverse stock split or otherwise, the Liquidation Rate in effect immediately prior to such combination will be proportionately increased.

*Preemptive Rights*
Holders of the Company's capital stock are not entitled to preemptive rights. A preemptive right would allow a shareholder, in certain circumstances, to acquire a pro rata portion of newly issued shares of the Company's capital stock before they are offered to non-shareholders.

*Series C Warrants*
The Series C Warrants included as part of the Shares may be transferred separately from the Shares immediately upon issuance, subject to restrictions on their transfer. The Warrants become exercisable at ime as the exercise price for the Warrants is established and remain exercisable for five years after s. __ce. Each Warrant allows the holder to purchase from the Company that number of shares of Company Common Stock equal to 0.0000307% of Company's common stock at a price to be determined as follows:

(a) Upon the earliest to occur of the following events prior to two (2) years from the date on which the first Series C Share is issued by the Company, then the Warrant Exercise Price will be the lesser of (1) 50% of the offering or conversion price per share of the Company's Common Stock upon the earliest of the following events ("Equity Offerings"):

(i) an offering conducted pursuant to the registration requirements of the 1933 Act in which gross proceeds of at least $5,000,000 are raised;

(ii) an offering pursuant to exemptions from registration under 1933 Act in which gross proceeds of at least $ 5,000,000 are raised; or

(iii) any securities convertible into Company Common Stock that are sold in an offering that conforms to the parameters of subparagraphs (i) and (ii) above

or (2) the conversion rate of the Series C Preferred Stock (i.e., 0.0000693% of Common Company cash share of Common Stock).

(b) If an exercise price has not been established pursuant to (a) above within such two (2) year period, then the exercise price shall be established at the lesser of: (i) 75% of the Company's book value per share of Common Stock (excluding indebtedness owed to Reed J. Taylor incurred

as a result of the Company purchasing certain shares of Company Common Stock from Mr. Taylor) based upon a balance sheet to be prepared as of the end of the month previous to the date two (2) years from the issuance of the first Series C Shares; or (ii) the conversion rate per share of the Series C Shares.

The number of shares of Common Stock that may be acquired upon exercise of the Series C Warrant will equal that number of shares representing 0.0000307% of the Company's outstanding Common Stock on a fully diluted basis (including any shares issuable upon exercise of the Series C Warrants and upon conversion of the Series C Preferred Stock). The calculation of the number of shares issuable upon exercise of the Series C Warrant will occur on the date the exercise price of the Warrant is established or two years from the date of issuance of the first Series C Shares, whichever is earlier.

The Warrant further provides that if the Company does not complete one of the Equity Offerings within two (2) years from the date the first Series C Preferred Stock is sold, the number of shares that may be purchased pursuant to the Warrant will immediately increase by 2.5% and continue to increase each 90 days thereafter by 2.5 % on a compounded basis until one of the Equity Offerings has occurred or the Warrant expires pursuant to its terms. The exercise price and the number of shares of Common Stock purchasable upon exercise of the Warrants are subject to adjustment upon the occurrence of certain events, including stock splits, stock dividends, reclassification and combinations of Common Stock, or the merger, consolidation or disposition of substantially all the assets of the Company.

The Series C Warrant holders, as such, will have no voting, preemptive liquidation or other rights of a shareholder, except the right, voting as a class, to elect one director. The Warrant provides that the mpany will use its best efforts to allow Warrant holders, and the holders of Common Stock issued suant to the  Warrant, to have their shares of Common Stock issued or issuable pursuant to the Warrant included in certain registrations and qualifications that may be conducted by the Company. The Warrant expires if and to the extent not exercised within five years from the date the first Series C Share is sold.

The above description of the Warrants is subject to the detailed provisions of the form of Warrant attached hereto as Attachment.

## PLAN OF DISTRIBUTION

The Shares offered hereby are offered and will be sold only to "accredited investors" (as such term in defined in Rule 501(a) of Regulation D under the 1933 Act) on a best efforts basis exclusively by the Company. The offering will terminate on August 1, 1995,  subject to a 15-day extension by the Company. Investor's payments will be held by the Company. If commitments for the Minimum Required Financing ($1,500,000) are not received by August 1, 1995, which date may be extended by the Company to August 15, 1995, this offering will terminate and the Subscribers' payments will be returned. Once commitments for the Minimum Required Financing are received, the Company may use funds and accrued interest on such funds for the Company's purposes. Notwithstanding receipt of minimum financing, the Company may terminate the offering and refund payments.

No public market exists for the Shares or Warrants; and no assurance can be given that the Company will ever conduct an Initial Public Offering ("IPO") or that a market for any of the Company's rities will develop or be sustained in the future.  The price of the Shares and the exercise price of the arrants to investors has been determined by negotiations between the Company and the Placement gent and are not related to the assets of the Company or other financial criteria.

- 42 -

AIA0002339

Exhibit 5 - Page - 57

3-ER-599

## INVESTOR SUITABILITY

An investment in the Shares involves substantial risks and possible loss by investors of their entire investment. See "Risk Factors". The Shares and the Warrants included therein, will be offered and sold only to prospective investors who: (i) represent, among other things, that they are acquiring Shares for their own account, for investment only and not with a view toward the resale or distribution thereof, that they are aware that neither the Shares nor the Warrants have been registered under the 1933 Act and that their transfer rights with respect to the Shares and the Warrants are restricted by the 1933 Act, by applicable state securities laws and by the absence of a market for such securities and (ii) are investors meeting the suitability standards hereinafter set forth.

The Company will require as a general investor suitability standard that each investor represent in writing that (i) he or she is a natural person who has a net worth or joint net worth with his or her spouse in excess of $1,000,000 at the time of his or her purchase; or (ii) he or she is a natural person who had an individual income of $200,000 in each of the two most recent calendar years or a joint income with his or her spouse in excess of $300,000 (available only to residents in certain states) in each of those years and has a reasonable expectation of reaching the same income level in the current year, or (iii) he or she is a director or executive officer of the Company, or (iv) it is either (a) a bank as defined in Section 3(a)(2) of the 1933 Act or a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the 1933 Act, whether acting in its individual or fiduciary capacity, (b) a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended, (c) an insurance company as defined in Section 2(13) of the 1933 Act, (d) an investment company registered under the Investment Company Act of 1940, as amended, or a business development company as defined in Section 2(a)(48) such act, (e) a Small Business Investment Company licensed by the United States Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958, as amended, (f) a plan established and maintained by a state or its political subdivisions, or any agency or instrumentality of a state or its political subdivision, for the benefit of its employees, if such plan had total assets in excess of $5,000,000 or (g) an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, as amended, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which plan fiduciary is a bank, a savings and loan association, an insurance company or a registered investment advisor, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons who otherwise meet these suitability standards, or (v) it is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended, or (vi) it is an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, a corporation, a Massachusetts or similar business trust or a partnership not formed for the specific purpose of acquiring the Share, with total assets in excess of $5,000,000, or (vii) it is a trust, with total assets in excess of $5,000,000 not formed for the specific purpose of acquiring the Shares, whose purchase is directed by a sophisticated person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of the prospective investment; or (viii) it is a corporation or partnership, and each and every equity owner of such entity certifies that he or she meets the qualifications set forth in any of (i), (ii), (iii), (iv), (v), (vi) or (vii) above. As used in this Memorandum, the term "net worth" means the excess of total assets over total liabilities. In determining income; an investor should add to his or her adjusted gross income any amounts attributable to tax-exempt income received, losses claimed as a limited partner in any limited partnership, deductions claimed for etion, contributions to an IRA or Keogh retirement plan, alimony payments and any amount by which come form long-term capital gains has been reduced in arriving at adjusted gross income.

– 43 –

AIA0002340

Exhibit 5 - Page - 58

3-ER-600

The Company will require as a further specific suitability requirement that each investor represent writing that (i) the investor is experienced in and capable of analyzing and evaluating the merits and ults of investments in insurance-related companies, or has been advised as to this investment by persons who ave such knowledge and experience and are independent of the Company and the Agent, (ii) that the investor has carefully reviewed this Memorandum and has made such other inquiry and investigation of the Company, its business and its business as the investor deems appropriate, and (iii) that the investor has not relied on any representation of the Company or the Agent not contained in this Memorandum or any recommendation of the Agent in deciding to make this investment.

The suitability standards referenced above represent minimum suitability requirements for prospective investors; and the satisfaction of such standards by a prospective investor does not necessarily mean that the Shares are a suitable investment for such prospective investor. The Company and the Agent reserve the right to modify the suitability standards and the minimum investment with respect to certain investors, in order to comply with any applicable state or local laws, regulations or otherwise.

THE SUITABILITY STANDARDS DISCUSSED ABOVE REPRESENT MINIMUM SUITABILITY STANDARDS FOR PROSPECTIVE INVESTORS. EACH PROSPECTIVE INVESTOR SHOULD DETERMINE WHETHER THIS INVESTMENT IS APPROPRIATE FOR SUCH INVESTOR.

## ADDITIONAL MATERIALS

All prospective investors and their representatives will be provided access to, and are invited to review, all materials available to the Company with respect to the Company, its business, this offering or other matter set forth in this Memorandum, including (without limitation) the following:

Articles of Incorporation and Bylaws
Articles of Amendment
Form of Series C Warrant
Campanaro/Taylor Employment Agreements
Financial and Accounting Records
Centennial Agreements
Regulatory Agreements
Stock Redemption Agreements with Series A Preferred Shareholder and Principal Common
    Shareholder

The Company will answer inquiries from prospective investors and their representatives relating to the Company, its business, this offering and the sale of the Shares and will afford prospective investors and their representatives the opportunity to obtain any additional information (to the extent that the Company possesses such information or can acquire it without unreasonable effort or expense) necessary to verify the accuracy of the information in this Memorandum.

AIA0002341

– 44 –

Exhibit 5 - Page - 59

3-ER-601

### INVESTMENT AGREEMENT

This Investment Agreement (the "Agreement") is made and entered into as of this 30th day of June, 1995 by and among AIA Services Corporation, an Idaho corporation based in Lewiston, Idaho ("Company"), Richard W. Campanaro, presently of Jacksonville, Florida ("Campanaro"), and James W. Beck and Michael W. Cashman, individuals residing in Minneapolis, Minnesota (collectively "Investors").

### W I T N E S E T H

WHEREAS, the Company is an insurance holding company based in Lewiston, Idaho, with its principal business in marketing insurance products and services to captive markets;

WHEREAS, Campanaro has been recruited to lead a management team in developing the business of the Company;

WHEREAS, Campanaro has recruited the Investors, both as independent consultants and potential directors for the Company and to form part of his management team;  and

WHEREAS, Investors are willing to loan Campanaro certain funds so that he and the Investors can invest in a certain convertible preferred series of stock of the Company ("Series C Preferred").

NOW THEREFORE, the Company, Campanaro and the Investors in consideration of the mutual representations, warranties, covenants and agreements and upon the terms and subject to the conditions hereinafter set forth do hereby agree as follows:

1.  **Campanaro Loan**.   The Investors shall lend Campanaro $500,000.00 (the "Loan") the proceeds of which shall only be utilized to allow Campanaro to participate in the subscription for 50,000 shares of the Series C Preferred.  The Loan will be made upon the following terms:

a.  **Generally**.  The Loan will be evidenced by a promissory note (the "Note") which will be due and payable on demand and pay interest at 10% per annum which interest shall be payable quarterly on the Note.  The Note shall be in form substantially identical to the note attached hereto as **Exhibit A**.


EXHIBIT E

AIA0002102

Exhibit 5 - Page - 60

3-ER-602

b.    Commitment Fee.  As and for a commitment fee for the Loan, Campanaro shall immediately upon closing assign and transfer his rights in and to any and all warrants which he shall receive from the Company, in conjunction with his investment in the Series C Preferred shares.

c.    Pledge and Security Agreement.  Campanaro shall execute a Pledge and Security Agreement in form and substance identical to the Pledge and Security Agreement attached hereto as Exhibit B.  To perfect the security interest granted to the Investors, Campanaro agrees to execute an appropriate Assignment Separate From Certificate in their favor.  The Company also agrees to place an appropriate notation on the Series C Preferred shares issued to Campanaro evidencing this Pledge and Security Agreement.

d.    Security for Payment of Interest.  Campanaro agrees to immediately forward and assign his rights in dividends which will be payable on the Series C Preferred owned by him for security for payment of interest on the Note.

e.    Payment.  Campanaro agrees that upon demand by the Investors for repayment of the Note, he shall be obligated to either repay the Investors in cash, or by transferring assignment of his 50,000 Series C Preferred shares.  Such option for repayment shall be at the sole discretion of the Investors.

2.   Preferred Shares.   The Investors and Campanaro will invest $1,500,000.00 for 150,000 shares of the 500,000 Series C Preferred to be authorized and issued by the Company with the following characteristics:

a.    Generally.  The holders of the Series C Preferred shall be entitled to receive dividends at the rate of ten percent (10%) per annum.  Dividends shall be on a cumulative basis from the date of issuance and shall be paid prior to redemption or conversion at the discretion of the Company. All accrued and unpaid dividends on the Series C Preferred are due at any time any other dividends are paid on any other class or series of stock or upon redemption or conversion of the Series C Preferred.

2

AIA0002103

Exhibit 5 - Page - 61

3-ER-603

b.   <u>Partial Dividends</u>.  In the event that sufficient funds are not legally available to pay dividends on the Series C Preferred, the Company shall use funds as are legally available to pay a partial dividend on a pro-rata basis on the Series C Preferred.

c.   <u>Preference</u>.  No dividends or distributions shall be made on nor any repurchase made of any of the common stock or other preferred stock of the Company, directly or indirectly, except for payments to Donna Taylor for her preferred shares and Reed Taylor for his common shares (jointly referred to herein as the "Taylors' Shares") as are evidenced in detail in <u>Exhibit C</u> between the parties and until all accrued and unpaid dividends of the Series C Preferred shall be paid in full.

d.   <u>Redemption</u>.  By the terms of the Series C Preferred and subject to the conversion rights of the Investors, the Company shall be required to redeem the Series C Preferred at the earlier of: (i) any sale of stock or the sale of substantially all assets of The Great Fidelity Life Insurance Company occurring after two years following the issuance of the Series C Preferred ; (ii)  the closing of the sale of a public or private offering where at least $5,000,000 worth of the Company's common stock or securities convertible or exercisable into common stock are placed and which is defined as an "Equity Offering" in the Company's Amended Articles of Incorporation in § 4.3.5 as filed in the Secretary of State's office in Idaho on April 11, 1995, ("Equity Offering")  or; (iii) as soon as the Company determines it is able and willing to execute such redemption.

The redemption price shall be 100% or $10.00 through the second anniversary of the issuance of the Series C Preferred. If the redemption occurs thereafter, the redemption price shall increase immediately to 105% and increase by 5% for each 180 day period or any portion thereof outstanding.

e.   <u>Liquidation</u>.  Upon the liquidation (whether complete or partial), dissolution or winding up of the Company, whether voluntary or involuntary, the holders of Series C Preferred shall be entitled to payment before any dividend, distribution or any other payment is made to any other holders of any other class or series of common or preferred stock to be paid except the Taylors' Shares, of the par value of each share, Ten Dollars ($10.00), subject to equitable adjustment in the event of any stock split, distribution or combination and all accrued but unpaid dividends to the date of liquidation.

f.   <u>Voting Rights</u>.  Holders of the Series C Preferred shall be entitled to voting rights allowing them to elect one member of the Board of Directors of the Company.

3

AIA0002104

Exhibit 5 - Page - 62

**3-ER-604**

g.   Convertibility.  The Series C Preferred shall be convertible, at the option of the Investors, into 10.4% of the voting common stock of the Company on a fully diluted basis, just prior to the closing of an Equity Offering and such conversion shall be in conjunction with the agreement between Richard Campanaro and the Company.  Such conversion option shall become exerciseable immediately and it shall expire if not exercised prior to the successful completion and closing of an Equity Offering.

3.   **Loan Guaranty**.  The Investors will personally guaranty $1,000,000 of a loan with West One Bank (Cashman $666,666.66 and Beck $333,333.33) for a maximum period of two years.  For each month, or any part thereof, the Guaranty is in place, the Company shall grant them .75% of the total outstanding common stock of the Company on a fully diluted basis, as shall exist just prior to the closing of its intended Equity Offering.  The maximum percentage of common stock which the Investors shall receive for such Guaranty shall be 9% of the Company's Common Stock, which amount shall have accrued after the Guaranty has been in place for twelve months.  The form of such Guaranty shall be attached hereto as Exhibit G.

4.   **Warrants**.  The Company shall issue contemporaneously with the Series C Preferred, warrants for 4.6%, on a fully diluted basis, of the total outstanding common stock of the Company just prior to the closing of its intended Equity Offering.  The terms and form of such warrants shall be as detailed in the Exhibit D Warrant form attached.  The strike price for these warrants shall be fifty percent (50%) of the per share Equity Offering price of the common stock if the Company completes an Equity Offering within two years of issuance of the Series C Preferred.  Thereafter, the maximum price for each share of Common Stock shall be the lesser of: (i) 75% of the Company's book value per share on the second anniversary date; or (ii) the conversion price of the Series C Preferred Shares which shall equal $1.5 million dollars divided by the number of shares issued for such consideration.  Further, the number of shares represented by the Investors' warrants shall increase by 2.5% (from 4.6% to 4.72%) in the first 90 day period following the second anniversary and increase an additional 2.5% for each successive 90 day period following the second anniversary that the Company does not complete an Equity Offering.

5.   **Consulting**.  The Investors will be available, at such times and in such manner as will not interfere with their other working opportunities, to consult with the Company.  Mr. Cashman agrees to sit on the Board of Directors immediately and shall receive warrants in the form of Exhibit H, with a $.01 per share exercise price for 4% of the outstanding common stock on a fully diluted basis just prior to the closing of the Company's intended Equity Offering.  Mr. Beck shall agree to sit on the Board, if so requested and shall have the right to sit on the Board, if he so requests.   For such consulting and agreement he shall receive

4

AIA0002105

Exhibit 5 - Page - 63

warrants in the form of Exhibit H, with a $.01 per share exercise price for 2% of the outstanding common stock on a fully diluted basis just prior to the closing of the Company's intended Equity Offering.

6. **Security**. The Company and Campanaro will do whatever is legally permissible and possible to offer the greatest possible security to the Investors for payment of dividends and redemption of the Series C Preferred including, but not limited to, requiring the affirmative vote of the Investors' representative on the board prior to any sale, transfer or reorganization of Great Fidelity Life Insurance Company.

7. **Representations and Warranties**. Except as set forth in Schedule 7, the Company and Campanaro, jointly and severally, represent and warrant to Investors as follows:

a. **Organization: Power and Authority**. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Idaho, and has all requisite power and authority to execute, deliver and, as of Closing, will have all requisite authority to perform its obligations under this Agreement, corporate and otherwise and to consummate the transactions contemplated hereby. The Company has full corporate power and authority to carry on the business as it is now being conducted. The Company and each of its subsidiaries and affiliates (the "Group") is duly qualified to do business and is in good standing as a foreign corporation in each state or country where such qualification is necessary because of the assets owned by it therein or because of the nature of the business conducted by it therein.

b. **Due Authorization and Execution: Effect Of Agreement**. The Company has full corporate power and authority to execute, deliver and, as of Closing, will have full authority to perform this Agreement issue securities and carry out the transactions contemplated hereby. The Board of Directors has taken, and as of Closing, the Board of Directors and Shareholders will have taken, all action required by law, its Articles of Incorporation, its Bylaws or otherwise to authorize the execution and delivery of this Agreement and the securities and transactions contemplated hereby and no other corporate action will be necessary to authorize the execution and delivery hereof or the consummation of the issuance of the securities or other transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Company and Campanaro and will constitute the valid and binding obligation of the Company and Campanaro, enforceable in accordance with its terms. The execution, delivery and performance by the Company and Campanaro of this Agreement and the consummation by the Company and Campanaro of the

5

AIA0002106

Exhibit 5 - Page - 64

3-ER-606

transactions contemplated hereby will not, with or without the giving of notice or the lapse of time, or both:

(i) violate any provision of any law, rule or regulation to which the Company, Campanaro or the business is subject;

(ii) violate any order, judgment or decree applicable to the Company, Campanaro or the business; or

(iii) conflict with or result in a breach of or a default under any term or condition of the Group's Articles of Incorporation or Bylaws or any agreement or other instrument to which any member of the Group or Campanaro is a party or by which the Group or Campanaro are bound.

c.  <u>Litigation Involving the Group or Campanaro</u>. There is no action, suit, proceeding or investigation pending (including, without limitation, any action, suit, proceeding or investigation with respect to any federal, state or local laws, rules or regulations, or threatened against or affecting any member of the Group or Campanaro, which could materially and adversely affect the business and no governmental entity has served upon any member of the Group or Campanaro, any notice claiming any violation of any statute, ordinance, or regulation or noting the need for any repair or remediation with respect to the business, requesting data or access or requiring any change in the Group's means or method of conducting business.

d.  <u>Consents</u>. No consent, approval or authorization of, exemption by, or filing with, any governmental or regulatory authority or any third party is required in connection with the execution, delivery or performance by the Company or Campanaro of this Agreement and the consummation of the transactions contemplated hereby.

e.  <u>Financial Information and Private Placement Memo</u>. The Company has furnished to the Investors the Company's Private Placement Memorandum dated January 12, 1995.  The Company has also furnished to the Investors the December 31, 1994, and March 31, 1995 draft financial statements (GAAP-based) of AIA Services Corporation, AIA Insurance, Inc., The Universal Life Insurance Company and The Great Fidelity Life Insurance, and the statutory annual statements (statutory) of ULIC and GLF as of 12/31/94 (collectively, "Financial Statements"). All information in such Confidential Placement Memorandum and Financial Statements, including, but not limited to the financial statements contained in the Memorandum present fairly, and in all material respects, the financial position of the Company and the results of its

6

AIA0002107

Exhibit 5 - Page - 65

3-ER-607

operation as of and for the respective dates and periods therein and in conformity with generally accepted accounting principles (or statements as the case may be) or such other means and methods of description as are appropriate and applicable for the business. The Company has no liabilities or obligations with respect to the business of any nature (absolute, accrued, contingent or otherwise) which are not reflected or reserved against on the Financial Statements except for obligations incurred in the ordinary course of business and consistent with the past practice since the date hereof. All non-financial information within the Private Placement Memorandum (as updated by the Schedule 7 disclosures) is presented to the Investors as a full and complete disclosure for their investment in the Series C Preferred and their respective warrants. The terms of the Private Placement Memorandum are hereby incorporated herein as if set forth in detail.

f. <u>No Material Adverse Change</u>. Since March 31, 1995, there has not occurred any material adverse change in the condition (financial or otherwise) of the business or any damage, destruction or loss, whether or not covered by insurance, which has materially affected the business, and since such date the Company has, with respect to the business: (a) not incurred any material liabilities, and not sold any material assets or entered into any agreements which relate to the business, except in the ordinary course of business and except as set forth in this Agreement, and (b) conducted the business only in the ordinary course.

g. <u>Compliance With Applicable Laws</u>. The Group is in compliance with all federal, state and local and foreign laws, statutes, rules and regulations applicable to the Group. The Group has conducted the business in compliance with all federal, state, local and foreign laws, statutes, rules and regulations applicable to it and the business. The Group has conducted all of its past activities and operations in compliance with all federal, state, local and foreign laws, statutes, rules and regulations, as the same existed from time to time. The Group has not received any notification that it is in violation of any laws, regulations or orders and no such violation exists. All permits and licenses required by any federal, state, local or foreign law, rule or regulation and necessary for the operation of the Business as currently being conducted have been obtained and are currently in effect.

h. <u>Brokers, Finders, etc</u>. All negotiations relating to this Agreement and the transactions contemplated hereby have been carried on without the intervention of any person acting on behalf of the Company in such manner as to give rise to any valid claim against the Company or Investors for any brokerage or finder's commission, fee or similar compensation.

7

AIA0002108

Exhibit 5 - Page - 66

3-ER-608

i.   Full Disclosure.  None of the information supplied by the Company herein or in the exhibits or in the schedules hereto contain any untrue statement of a material fact or omits to state a material fact required to be stated herein or necessary in order to make the statements, in light of the circumstances under which they are made, not misleading.

8.   Closing.  The closing of the transactions contemplated hereby (the "Closing") shall take place at the offices of AIA Services Corporation, One Lewis Clark Plaza, Lewiston, Idaho 83501, on July 19, 1995 at 10:00 a.m. or at such other place or on such other date which the parties may mutually agree in writing (the "Closing Date").  All transfers and other proceedings required to be made or taken at the Closing shall be deemed to have taken place simultaneously and no delivery shall be considered to have been made until all of such proceedings have been completed.

a.   Company and Campanaro Deliverables.  The Company and Campanaro shall deliver to the Investors the following:

(i)    Note;

(ii)   Security and Pledge Agreement;

(iii)  Campanaro's Series C Preferred shares, together with Assignment Separate from Certificate completed in blank;

(iv)   150,000 shares of Series C Preferred Stock issued as follows:

| | |
|---|---|
| Cashman | 66,667 shares |
| Beck | 33,333 shares |
| Campanaro | 50,000 shares |

(v)   a sufficient number of warrants to equal 4.6% of the Company's total outstanding common stock just prior to its Equity Offering issued to Cashman, Beck and Campanaro in the same proportions as provided in Section 8.a.iv. above;

(vi)  a sufficient number of warrants to equal 6% of the Company's total outstanding common stock just prior to its Equity Offer for issuance to Beck (2%) and Cashman (4%);

(vii)  a certificate executed by the Secretary of the Company in form satisfactory to the Investors and their counsel, setting forth the resolutions adopted by the Board of Directors and Shareholders of the Company authorizing the execution of the Agreement, the issuance of the Series C Preferred shares, the Warrants and the

8

AIA0002109

Exhibit 5 - Page - 67

3-ER-609

taking of any and all actions deemed necessary or advisable to consummate the transactions contemplated hereby;

(viii)   an Officer's Certificate from a duly authorized officer of the Company that:

(A)   the warranties and representations made by the Company and Campanaro in this Agreement were true, complete and correct at the time of execution and upon the Closing Date; and

(B)   all obligations of the Company under this Agreement and the documents and agreements related hereto required to have been performed at or prior to the Closing have been satisfied or appropriately waived; and

(C)   a favorable opinion of the Company counsel, Eberle, Berlin, Kading, Turnbow & McKlveen, Chartered, dated as of the Closing and addressed to the Investors in form and substance reasonably satisfactory to the Investors and covering the opinions set out in Exhibit E.

b.   Investors Deliverables.   Beck and Cashman shall deliver to Campanaro and the Company the following:

(i)   the $500,000.00 loan amount to Mr. Campanaro;

(ii)   the $1,000,000.00 investment for the Company;

(iii)   the Subscription Agreement for the Series C Preferred Shares and Warrants in the form of Exhibit F; and

(iv)   their individual personal guaranty's for $666,666.67 and $333,333.33 in the form of Guaranty in Exhibit G.

9.   Conditions To Investors Obligations at the Closing.   The obligations of Investors are subject to the fulfillment, prior to or on the Closing Date, as indicated below, of each of the following conditions, all or any of which may be waived in whole or in part by Investors pursuant to Section 12f hereof, except as otherwise provided by law:

9

AIA0002110

Exhibit 5 - Page - 68

3-ER-610

a.   <u>Richard Campanaro Transaction</u>.  Richard Campanaro shall successfully conclude his transaction with the Company in such a way that he is provided shares or rights to the shares with essentially a zero strike price representing at least 15% of the common stock, on a fully diluted basis of the Company.

b.   <u>Loan</u>.   The Company shall have secured a loan with West One Bank for $2,800,000 with a minimum of two years on terms and conditions satisfactory to the Investors.

c.   <u>Share Issuance</u>.   The Company and Campanaro will obtain all approvals and agree to issue the Series C Preferred Shares and Warrants on terms that are satisfactory to the Investors and consistent with this Agreement.

d.   <u>Reed Taylor Buyout</u>.  The Company shall successfully negotiate and conclude its transaction with Reed Taylor for the purchase of all of his stock and stock rights in and to Company stock, in form and substance satisfactory to the Investors.

e.   <u>Donna Taylor Waiver and Buyout</u>.   The Company and Reed Taylor shall obtain a waiver in form and substance satisfactory to the Investors: (i) waiving any and all defaults, breaches and/or rights to acceleration of the payments that Donna Taylor may have been due to her under any of her agreements with the Company; and (ii) stating that she has reviewed the Reed Taylor Buyout Agreement and that it is acceptable in its present form and she will not make any claim for acceleration for her payments based on any term contained in the Reed Taylor Buyout Agreement or from the consummation of any of the transactions contemplated therein.

f.   The Investors shall have entered into a valid Shareholder Voting Agreement with John Taylor and Campanaro assuring the Investors that Cashman and, if requested, Beck will be elected to the Board of Directors of the Company as detailed in Section 7.

g.   <u>Representations and Warranties of Company and Campanaro to be True</u>.

(i)   The representations and warranties of Company and Campanaro contained in this Agreement shall be true and correct in all material respects on the date hereof and as of the Closing Date with the same effect as though such representations and warranties had been made or given again at and as of the Closing Date, except for any representation or warranty expressly stated to have been made or given as of a specified date, which, at the

10

AIA0002111

Exhibit 5 - Page - 69

Closing Date, shall be true and correct in all material respects as of the date expressly stated. Without limitation of the foregoing, Investors shall be reasonably satisfied that the warranties and representations of the Company and Campanaro set forth in Section 7 shall be true and correct as of the Closing Date.

(ii) Investors and Campanaro shall have performed and complied with all of their agreements, covenants and conditions required by this Agreement to be performed or complied with by them prior to or at the Closing Date.

h. <u>Consents</u>. All notices to, and declarations, filings and registrations with, and consents, approvals and waivers for, governmental and regulatory agencies required to consummate the transactions contemplated hereby and all consents, approvals and waivers from third parties required under this Agreement required to have been obtained prior to Closing, shall have been obtained.

i. <u>No Proceeding or Litigation</u>.

(i) No preliminary or permanent injunction or other order shall have been issued by any court, whether federal, state, local or foreign, or by any governmental or regulatory body, whether federal, state, local or foreign, nor shall any statute, rule, regulation or executive order be promulgated or enacted by any governmental authority, whether federal, state, local or foreign, which prevents the consummation of the transactions contemplated in this Agreement.

(ii) No suit, action, claim, proceeding or investigation before any court, arbitrator or administrative, governmental, or regulatory body, whether federal, state, local or foreign, shall have been commenced and be pending against the Company or Investors or any of their affiliates, associates, officers or directors seeking to prevent the issuance of the Series C Preferred asserting that the sale of the Series C Preferred would be illegal.

(iii) On or prior to the Closing Date, no party to the transactions contemplated hereby or any of the affiliates shall have received any notice of any threatened litigation or regulatory proceeding being instituted or contemplated which could have a material adverse effect on the transaction contemplated hereby or the Company's business.

11

AIA0002112

Exhibit 5 - Page - 70

3-ER-612

j.   Documents.   The Company shall have authorized, executed and delivered the Series C Preferred, the associated warrants and all other documents issuing such securities to Investors free and clear of all liens, claims, encumbrances.

k.   Rights Of Inspection.   Prior to the Closing, Investors shall have the right to review all aspects of the operation of the business, which shall include, without limitation, the right, at Investors' sole cost and expense, to have its legal counsel, accountants and other representatives review the books and records of Investors with respect to the business; provided, however, that Investors shall undertake such study, review, inspection, examination and audit so as not to unreasonably interfere with or disrupt the operations of the business.   Investors shall be satisfied with the results of all such examinations.

l.   Charter Documents, etc.   The Company shall have delivered such certificates or other documents as may be reasonably requested by Investors or its counsel, including without limitation certificates of legal existence, good standing and certified charter documents on file with the Secretary of State of the State of Idaho and any other relevant state for any of its subsidiaries or affiliates, certificates of the Secretary or Assistant Secretary of the Company with respect to directors' resolutions, bylaws and any other relevant matters.

m.   Completion Of Due Diligence.   Until the Closing Date, Investors and their counsel, accountants and other authorized representatives shall have the right to make or cause to be made such investigation of the business (and its financial and legal condition) as Investors deem necessary or advisable and shall be reasonably satisfied with the results of such investigation.

n.   No Prohibition.   No statute, law, rule, regulation or order of any court or administrative agency shall be in effect which enjoins, restrains or prohibits the Company or Investors from consummating the transactions contemplated hereby.

o.   Approval Of Exhibits And Schedules.   Investors shall have approved the form and content of the exhibits and schedules delivered by the Company pursuant to this Agreement. Such approval shall be given within ten (10) days of the delivery of each such exhibits and schedules by the Company.

p.   Other Obligations.   The Company and Campanaro shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by them at or prior to the Closing Date.

12

AIA0002113

Exhibit 5 - Page - 71

3-ER-613

q.    General.  All instruments and legal and corporate proceedings in connection with the transaction contemplated by this Agreement shall be reasonably satisfactory in form and substance to Investors, and Investors shall have received counterpart original, or certified or other copies, of all documents, including records of corporate proceedings, that it may reasonably request in connection therewith.

10.  Covenants of the Company.  The Company hereby covenants and agrees with Investors as follows:

a.    Access To Information: Records.  From the date hereof through the Closing Date, the Company shall, subject to applicable fiduciary, privacy and other legal obligations, afford to Investors and Investors's accountants, counsel and other representatives reasonable access, upon reasonable notice to all properties, books, contracts, commitments and records.

b.    Cooperation By The Company.  From the date hereof, the Company will use its best efforts to secure all necessary consents, approvals, authorizations, exemptions and waivers from third parties as shall be required in order to enable the Company to effect the transactions contemplated hereby, and will otherwise use its best efforts to cause the consummation of the transactions contemplated hereby in accordance with the terms and conditions hereof.

c.    Conduct Of Business.  Prior to Closing, the Company shall conduct business only in the normal and ordinary course and use its best efforts to preserve its business organization intact, to retain the services of its present employees and to preserve the goodwill of its customers and suppliers.

d.    Preferred Share Redemption.  If requested to do so by the Investors at any time after the second anniversary date of the issuance of the Series C Preferred, the Company will do all that is possible to attempt to liquidate The Great Fidelity Life Insurance Company and use the proceeds to redeem the Series C Preferred.

e.    Investors Approval.  Company shall obtain the approval of the Investors should there be any investment in the Company which (i) is equal or above $1,000,000 or (ii) grants rights in any fashion or form for the potential granting or purchase of 10% or more of the Common Stock of the Company.  Should the Investors not grant the written approval for any such offering, the Company shall have the right to accept such investment if and only if it redeems for cash the Series C Preferred Stock or Common Shares, if previously converted, purchased by the Investors at a price of $2,250,000 if such redemption occurs within 12 months of the Closing Date

13

AIA0002114

Exhibit 5 - Page - 72

3-ER-614

or $3,000,000 if such redemption occurs thereafter. Campanaro agrees any premium paid on his preferred shares shall be delivered to the Investors as a premium paid on the Loan. The Company shall also obtain the release of the Investors' Guaranty at West One Bank. The Investors may reject such a proposal and retain their ownership interest, but they shall lose their ability to object to the investment offering triggering such redemption right proposal.

f.   Taxes.   All excise, sales, value added, use, registration, stamp, transfer and similar taxes, levies, charges and fees incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Company.

g.   Preparation For Closing. The Company agrees to use its reasonable efforts to bring about the fulfillment of the conditions precedent in this Agreement.

11. Indemnification by Company and Campanaro.

a.   Hold Harmless. By way of additional indemnification and in no way limiting any other indemnification that the Investors may have, the Company and Campanaro shall (except as provided below) jointly and severally defend and indemnify Investors in all of their capacities and hold the Investors wholly harmless from and against any and all losses, liabilities, damages, claims, demands, actions, causes of action, judgments, settlements, assessments, awards, costs including without limitation, court costs and expenses (including without limitation, interest, penalties, investigation expenses and reasonable attorneys' fees) of any nature whatsoever (herein collectively referred to as "Losses") asserted against, resulting from, imposed upon or incurred by the Investors, directly or indirectly by reason of or resulting from any of the following:  (i) any breach or non-performance of any representation, warranty, covenant or agreement of the Company or Campanaro contained in or made in connection with the transactions contemplated by this Agreement, the schedules or exhibits hereto, or any facts or circumstances constituting such a breach or non-performance, regardless of whether the breach or non-performance is material or not; (ii) the failure of any such representation or warranty to be true and correct in all respects as of the Closing Date; or (iii) for any suits or threats initiated by anyone or any entity associated or interacting with any member of the Group or Campanaro.  Notwithstanding the foregoing, the Company shall not be liable to indemnify or defend Investors from any Losses arising from any suit or threat against Campanaro unrelated in any way to any of the Company's Business affairs or from obligations of Campanaro under Section 1 hereof.

14

AIA0002115

Exhibit 5 - Page - 73

3-ER-615

b.    Survival. The Company's and Campanaro's obligations to indemnify the Investors pursuant to this Section 8 shall remain in force until the earlier of:  (i) the expiration of all relevant statutes of limitations unless such statutes have been extended by consent or otherwise, then until the end of such extension period, or (ii) three (3) years following the Closing Date, except in all cases as to matters as to which the Investors have given written notice of a claim for indemnification on or prior to such date, in which case the right to indemnification with respect thereto shall survive the expiration of such period until such claim is finally resolved and any obligations with respect thereto are fully satisfied.

c.    Knowledge. The agreement of Investors to close the transactions contemplated hereby with knowledge that a representation or warranty was not true and accurate shall not be deemed as a waiver of, or affect in any manner the rights of the Investors to indemnification hereunder.  It is understood and agreed that the obligation of the Company and Campanaro to indemnify the Investors in accordance with the provisions of this Section 8 shall in no way be affected or modified by the agreement, either in this Agreement or otherwise, of Investors to consummate the transactions contemplated hereby even though the Company and Campanaro were not able to make the required representations and warranties at the Closing.

d.    Not Sole Remedy. Nothing contained in this Section 8 shall limit the right of the Investors to seek other remedies, either at law or equity, to enforce the terms of this Agreement.

12.  **Miscellaneous**

a.    Survival.  The representations, warranties, and indemnification, made in this Agreement or in any certificate or other document delivered pursuant hereto or in connection herewith and the covenants and agreements contained herein to be performed or complied with at the Closing, prior to the Closing Date or in connection with the Closing shall survive the Closing.

b.    Entire Agreement and Amendment. Except as detailed herein, this Agreement, together with the Separate Campanaro Management Agreement with the Investors, constitutes the sole understanding of the parties with respect to the subject matter hereof.  No amendment, modification or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by the parties hereto.

15

AIA0002116

Exhibit 5 - Page - 74

3-ER-616

c.   Successors And Assigns.   The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties hereto; provided, however, that this Agreement may not be assigned by any party without the express prior written consent of the other party hereto.

d.   Counterparts.   This Agreement may be executed in counterparts, each of which shall, for all purposes, be deemed to be an original and all of which taken together shall constitute the same instrument.

e.   Headings.   The headings of the Sections and paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction hereof.

f.   Waiver.   Any of the terms or conditions of this Agreement may be waived in writing at any time by the party which is entitled to the benefits thereof.   No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of such provisions at any time in the future or a waiver of any other provision hereof.

g.   Expenses.   The Company and Investors shall each pay all costs and expenses incurred by it or on its behalf in connection with this Agreement and the transactions contemplated hereby, including without limitation, fees and expenses of its own financial consultants, accountants and counsel.   Notwithstanding the foregoing, the Company shall reimburse the Investors for one-half of their legal fees incurred in conjunction with the negotiation and consummation of this transaction.

h.   Notices.   Any notice, request, instruction, consent or other document to be given hereunder by either party hereto to the other party shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, and shall be deemed given when postmarked and addressed as follows:

<u>If to the Company or:</u>    AIA Services Corporation
<u>Campanaro</u>                      One   Lewis   Clark   Plaza
                                   P.O. Box 538
                                   Lewiston, Idaho   83501

<u>If to Investors:</u>            James W. Beck
                                   c/o Belmont Associates
                                   530 5th Avenue Northwest
                                   Minneapolis, Minnesota 55112

                                   and

16

AIA0002117

Exhibit 5 - Page - 75

3-ER-617

> Michael W. Cashman
> 17950 Breezy Point Road
> Wayzata, Minnesota 55391
>
> with a copy to:
>
> Brink & Brink, Ltd.
> 4700 Norwest Center
> 90 South Seventh Street
> Minneapolis, MN  55402
> Attention:  Charles P. Brink

or at such other address for a party as shall be specified by like notice.  Any notice which is delivered personally in the manner provided herein shall be deemed to have been duly given to the party to whom it is directed upon actual receipt by such party or its agent for notices hereunder.  Any notice which is addressed and mailed in the manner herein provided shall be conclusively presumed to have been duly given to the party to which it is addressed at the close of business, local time of the recipient, on the third day it is so placed in the mail.

i.  <u>Governing Law</u>.  This Agreement shall be construed in accordance with and governed by the laws of the State of Minnesota.

j.  <u>Arbitration</u>.  All disputes or controversies arising under, out of, in connection with, or relating to this Agreement, except as otherwise provided herein, shall be determined and settled by a panel of three arbitrators in Hennepin County, Minnesota, in accordance with the then applicable rules and procedures of and under the administration of the American Arbitration Association, or its successor.  The Investors and the Company shall each select an arbitrator familiar with business acquisitions for such arbitration and the two arbitrators so selected shall pick a third arbitrator to form a panel.  Any award or judgment rendered therein shall be final and binding on each and all parties thereto and their assigns, and judgment upon the award rendered may be entered in any court having jurisdiction thereof.  All costs incurred with respect to the arbitration, including reasonable attorneys' fees, shall be allocated by the arbitrators to either or any of the parties.

17

AIA0002118

Exhibit 5 - Page - 76

3-ER-618

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on its behalf as of the date first above written.

AIA Services Corporation

By _____

Its _____

_____
Richard W. Campanaro

_____
James W. Beck

_____
Michael W. Cashman

18

AIA0002119

Exhibit 5 - Page - 77

AIA SERVICES CORPORATION

SUBSCRIPTION AGREEMENT
INCLUDING INVESTMENT REPRESENTATIONS

TOTAL OFFERING:  $1,500,000

James W. Beck (the "Investor") hereby subscribes for the purchase of 33,333 units, each Unit (the "Units") consisting of 1 share of Class C 10% Preferred Stock (the "Shares") of AIA Services Corporation, an Idaho corporation (the "Company") and a warrant to purchase shares of Company Common Stock (the "Warrants"), as more fully described in the Investment Agreement, at $10.00 per Unit, in the aggregate amount of $333,330.

1.      Certain Representations of the Subscriber.  In connection with, and in consideration of, the sale of the Units to the Investor, the Investor hereby represents and warrants to the Company and its officers, directors, employees, agents and shareholders that the Investor:

(a)     Has had an opportunity to review all of the representations and warranties in the Investment Agreement and all scheduled exceptions thereto; Company's Amended and Restated Articles of Incorporation as filed April 11, 1995; the December 31, 1994 and March 31, 1995 draft financial statements (GAAP-based) of the Company, AIA Insurance, Inc., The Universe Life Insurance Company, and The Great Fidelity Life Insurance Company, and the December 31, 1994 annual statutory financial statements of ULIC and GFL; the draft of the Report on Examination of The Universe Life Insurance Company as of December 31, 1992; the Confidential Private Placement Memorandum dated January 12, 1995; the Shareholder Disclosure Statement dated February 9, 1995, and the Supplement thereto dated February 27, 1995; and such other financial and other documents and information as the Investor and/or Investor's advisors deems necessary or desirable to make an informed investment decision with respect to the purchase of the Units (the "Additional Materials") and to ask questions of R. John Taylor, President of the Company, concerning the Company, and desires no further information respecting such Additional Materials.

(b)     Realizes that a purchase of the Units represents a speculative investment involving a high degree of risk.

(c)     Can bear the economic risk of an investment in the Units for an indefinite period of time, can afford to sustain a complete loss of such investment, has no need for liquidity in connection with an investment in the Units, and can afford to hold the Unit indefinitely.

(d)     Realizes that there will be no market for the Units, Shares, or Warrants and that there are significant restrictions on the transferability of the such securities.



EXHIBIT F      AIA0002219

Exhibit 5 - Page - 78

(e) Realizes that neither the Units, nor Shares, Warrants or shares issuable upon exercise of the Warrants (the "Warrant Shares") have been registered for sale under the Securities Act of 1933, as amended (the "Act") or applicable state securities laws (the "State Laws"), and may be sold only pursuant to registration under the Act and State Laws, or an opinion of counsel that such registration is not required.

(f) Is experienced and knowledgeable in financial and business matters, has sufficient experience in evaluating and investing in private placement transactions of securities in businesses similar to the Company and sufficient background in and knowledge and understanding of the insurance industry and the particular insurance market that forms the basis of the Company's current business and proposed business (or Investor is relying on advisors or consultants with such background, experience and knowledge who are not affiliated with the Agent or the Company) so that Investor is capable of evaluating the merits and risks of investing in the Units, and does not need or desire the assistance of a knowledgeable representative to aid in the evaluation of such risks (or, in the alternative, has a knowledgeable representative whom such investor intends to use in connection with a decision as to whether to purchase the Units).

(g) The Company is currently reorganizing its business operations and there can be no assurance such operations will prove successful of generating sufficient revenues to pay the dividend on the Shares or to provide an appropriate return on the Investor's investment in the Units.

2. Investment Intent. The Investor has been advised that neither the Units, Shares, Warrants or Warrant Shares have been registered under the Act or the relevant State Laws but are being offer, and will be offered, and sold pursuant to exemptions from the Act and State Laws, and that the Company's reliance upon such exemptions is predicated in part on the Investor's representations contained herein. The Investor represents and warrants that the Units, Shares and Warrants are being purchased for the Investor's own account and for long term investment and without the intention of reselling or redistributing the Units, Shares or Warrants or Warrant Shares, that the Investor has made no agreement with others regarding any of the Units, Shares or Warrants or Warrant Shares, and that the Investor's financial condition is such that it is not likely that it will be necessary for the Investor to dispose of any of the Units, Shares or Warrants or Warrant Shares in the foreseeable future. The Investor is aware that (i) there is presently no public market for the Units, Shares or Warrants or Warrant Shares, and, in the view of the Securities and Exchange Commission, a purchase of securities with an intent to resell by reason of any foreseeable specific contingency or anticipated change in market values, or any change in the liquidation or settlement of any loan obtained for the acquisition of any of the Units, Shares or Warrants or Warrant Shares and for which the Units, Shares or Warrants or Warrant Shares were or may be pledged as security would represent an intent inconsistent with the investment representations set forth above and (ii) the transferability of the Units, Shares, Warrants or Warrant Shares is restricted and (A) requires the written consent of the Company, and (B) will be

2

AIA0002220

Exhibit 5 - Page - 79

3-ER-621

further restricted by a legend placed on the certificate(s) representing the Units, Shares and Warrants containing substantially the following language:

"The securities represented by this certificate have not been registered, under either the Securities Act of 1933, as amended, or applicable state securities laws. They may not be sold, offered or sale or transferred in the absence of an effective registration under the Securities Act of 1933, as amended, and the applicable state securities laws or an opinion of counsel satisfactory in form and substance to counsel for the Company that such transaction will not result in a prohibited transaction under the Securities Act of 1933, as amended, or the applicable state securities laws."

The Investor further represents and agrees that if, contrary to the Investor's foregoing intentions, the Investor should later desire to dispose of or transfer any of the Units, Shares, Warrants or Warrant Shares in any manner, the Investor shall not do so without first obtaining (i) an opinion of counsel satisfactory to the Company that such proposed disposition or transfer may be made lawfully without the registration of such securities pursuant to the Act and applicable State Laws, or (ii) registration of such securities (it being expressly understood that the Company shall not have any obligation to register such securities except as provided in the Warrants).

3.    Confidentiality.  The Investor shall keep confidential and will not disclose or divulge (other than to:  (a) counsel to and accountants of the Investor; (b) the Investor's employees; (c) the Investor's outside consultants; (d) employees of an entity controlling, controlled by or under common control with such Investor; (e) constituent partners of an Investor (in each case if such employee, consultant or constituent partner has a need to know such information and has been informed of the confidential nature of such information); or (f) persons or entities as required by law or judicial order), (i) any confidential, proprietary or secret information which such Investor may obtain from or regarding the Company in connection with the financial statements, reports and other material submitted by the Company as required hereunder or (ii) in connection with inspection and inquiry rights granted hereunder unless such information is known to the public, or until such information becomes available to the public without any fault of such Investor.

4.    Residence.  The Investor represents and warrants that the Investor is a bona fide resident of (or if an entity is organized or incorporated under the laws of), and is domiciled in, the State listed on the signature page of this Agreement, that the Investor has received and has executed this Agreement in such state, and that the Shares are being purchased by the Investor in the Investor's name solely for the Investor's own beneficial interest and not as nominee for, on behalf of, for the beneficial interest of, or with the intention to transfer to, any other person, trust, or organization (except as specifically set forth in paragraph 7 of this Agreement).

PARAGRAPHS 5,6 AND 7 ARE REQUIRED IN CONNECTION WITH THE EXEMPTIONS FROM THE ACT AND STATE LAWS BEING RELIED ON BY THE COMPANY WITH RESPECT TO THE OFFER AND SALE OF THE SHARES.  ALL OF

3

AIA0002221

Exhibit 5 - Page - 80

3-ER-622

SUCH INFORMATION WILL BE KEPT CONFIDENTIAL, AND WILL BE REVIEWED ONLY BY THE AGENT, THE COMPANY AND THEIR COUNSEL. The Investor agrees to furnish any additional information which the Agent, the Company or their counsel deems necessary in order to verify the responses set forth below.

     5.    <u>Accredited Status</u>. The Investor represents and warrants as follows (CHECK IF APPLICABLE):

     I.    Accredited Investor:

<u>INDIVIDUALS</u>



X    (a)    The Investor is an individual with a net worth, or a joint net worth together with his or her spouse, in excess of $1,000,000. (In calculating net worth, you may include equity in personal property and real estate, including your principal residence, cash, short term investments, stock and securities. Equity in personal property and real estate should be based on the fair market value of such property minus debt secured by such property.)

X    (b)    The Investor is an individual that had an individual income in excess of $200,000 in each of the prior two years and reasonably expects an income in excess of $200,000 in the current year; or

X    (c)    The Investor is an individual that had with his/her spouse joint income in excess of $300,000 in each of the prior two years and reasonably expects joint income in excess of $300,000 in the current year.

_____    (d)    The Investor is a director or executive officer of the Company.

<u>ENTITIES</u>

_____    (e)    The Investor, if other than an individual, is an entity all of whose equity owners meet one of the tests set forth in (a) through (d) above.

_____    (f)    The Investor is an entity, and is an "Accredited Investor" as defined in Rule 501(a) of Regulation D under the Act. This representation is based on the following (check one or more, as applicable):

_____    (i)    The Investor (or, in the case of a trust, the Investor trustee) is a bank or savings and loan association as defined in Sections 3(a)(2) and 3(a)(5)(A), respectively, of the Act acting either in its individual or fiduciary capacity.

_____    (ii)    The Investor is an insurance company as defined in Section 2(13) of the Act.

4

AIA0002222

Exhibit 5 - Page - 81

3-ER-623

_____ (iii) The Investor is an investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act.

_____ (iv) The Investor is a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

_____ (v) The Investor is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974 <u>and</u> either (check one or more, as applicable):

    _____ (a) the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser; or

    _____ (b) the employee benefit plan has total assets in excess of $5,000,000; or

    _____ (c) the plan is a self-directed plan with investment decisions made solely by persons who are "Accredited Investors" as defined under the 1933 Act.

(vi) The Investor is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

(vii) The Investor has total assets in excess of $5,000,000, was not formed for the specific purpose of acquiring shares of the Company <u>and</u> is one or more of the following (check one or more, as appropriate):

    _____ (a) an organization described in Section 501(c)(3) of the Internal Revenue Code; or

    _____ (b) a corporation; or

    _____ (c) a Massachusetts or similar business trust; or

    _____ (d) a partnership.

_____ (viii) The Investor is a trust with total assets exceeding $5,000,000, which was not formed for the specific purpose of acquiring shares of the Company and whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the investment in the Shares. (IF ONLY THIS

5

AIA0002223

Exhibit 5 - Page - 82

3-ER-624

RESPONSE IS CHECKED, please contact the Company to receive and complete an information statement before this subscription can be considered by the Company.)

II.    Nonaccredited Investor:

___    (a)    The Investor does not meet any of the financial qualifications set forth in I(a)-(f) above.

6.    Entities. If the Investor is an entity, the individual signing on behalf of such entity and the entity jointly and severally agree and certify that:

(a)    the Investor was not organized for the specific purpose of acquiring the Shares; and

(b)    this Agreement has been duly authorized by all necessary action on the part of the Investor, has been duly executed by an authorized officer or representative of the Investor, and is a legal, valid, and binding obligation of the Investor enforceable in accordance with its terms.

7.    Miscellaneous.

(a)    Manner In Which Title Is To Be Held:  (check one)

(1)  __X__  Individual Ownership (please sign Signature Page for Individuals)

(2)  _____  Joint Tenant with Right of Survivorship (please sign Signature Page for Individuals)

(3)  _____  Community Property (please sign Signature Page for Individuals)

(4)  _____  Tenants in Common (please sign Signature Page for Individuals)

(5)  _____  General Partnership (please sign Signature Page for Individuals)

(6)  _____  Corporation (please sign Signature Page for Entities)

(7)  _____  Limited Partnership with Only "Accredited Investors" as Equity Owners (please sign Signature Page for Entities)

(8)  _____  Trust with Assets in Excess of $5,000,000 (please sign Signature Page for Entities)

(9)  _____  Revocable Grantor Trust (please sign Signature Page for Individuals)

(10)  _____  IRA or Qualified Plan (please sign Signature Page for Individuals)

6

AIA0002224

Exhibit 5 - Page - 83

(b)    The Investor agrees that the Investor understands the meaning and legal consequences of the agreements, representations and warranties contained herein, agrees that such agreements, representations and warranties shall survive and remain in full force and effect after the execution hereof and payment for the Units and further agrees to indemnify and hold harmless the Company, each current and future officer, director, employee, agent and shareholder from and against any and all loss, damage or liability due to, or arising out of, a breach of any agreement, representation or warranty of the Investor contained herein.

(c)    This Agreement shall be construed and interpreted in accordance with Idaho law.

7

AIA0002225

Exhibit 5 - Page - 84

SIGNATURE PAGE FOR INDIVIDUALS

(Complete if Category I(a), I(b), I(c), I(d), or I(f)(v) was checked on pages 4-5)

NAME(S): _James W. Beck_

LEGAL ADDRESS: _5152 Belmont Ave. So._

_Minneapolis, MN 55419_

STATE OF LEGAL RESIDENCE: _Minnesota_

SOCIAL SECURITY NUMBER: 

SECOND INDIVIDUAL'S: 

MAILING ADDRESS:
(IF DIFFERENT FROM ADDRESS ABOVE)

8

AIA0002226

Exhibit 5 - Page - 85

3-ER-627

**AIA SERVICES CORPORATION**
**PREFERRED C STOCK**
**SHAREHOLDER LIST**

| | Date Of Issue | Shares Purchased | Par Value | Rate | Days | 1995 Dividend | |
|---|---|---|---|---|---|---|---|
| Michael W. Cashman 17950 Breezy Point Road Wayzata, MN 55391 | 8/16/95 | 66,667 | 666,670 | 10% | 137 | 25,022.96 | a |
| James W. Beck 7001 Oxford Minneapolis, MN 55426 | 8/16/95 | 33,333 | 333,330 | 10% | 137 | 12,511.29 | |
| Richard W. Campanaro One Ocean Ridge Court Ponte Vedra Beach, FL 32082 | 8/16/95 | 50,000 | 500,000 | 10% | 137 | 18,767.12 | b |
| Charles B Rapp 6610 Vernon Hills Road Edina, MN 55436 | 8/16/95 | 5,000 | 50,000 | 10% | 137 | 1,876.71 | |
| Bruce Knutson 1128 Harman Place, Suite 308 Minneapolis, MN 55403 | 8/16/95 | 10,000 | 100,000 | 10% | 137 | 3,753.42 | |
| Daryl R. Verdoorn 28210 woodside Road Shorewoold, MN 55331 | 8/29/95 | 5,000 | 50,000 | 10% | 124 | 1,698.63 | |
| Distribution Services, Inc. 1230 Trappn Road Eagan, Mn 55121 | 9/26/95 | 10,000 | 100,000 | 10% | 96 | 2,630.14 | |
| Michael W. Cashman, Jr. 6617 Lynnwood Blvd Richfield, MN 55423 | 11/7/95 | 5,000 | 50,000 | 10% | 54 | 739.73 | |
| Equity IRA Company SBO Michael W. Cashman IRA 17950 Breezy Point Road Wayzata, MN 55391 | 12/28/95 | 15,000 | 150,000 | 10% | 3 | 123.29 | a |
| | | 200,000 | 2,000,000 | | | 67,123.3 | |

a    Check issued in 1996
b    Checks issued in 1996 per assignment documents to:

| | |
|---|---|
| Michael Cashman | 12,511.41 |
| James Beck | 6,255.71 |
| | 18,767.12 |

*Accrued 12-31-95*   *43,913.37 = CCI*

*Paid in 1996*

1/18/96
STOCK.XLS

Page 1

Dividends-95

*CCI-5*

AIA0018468



EXHIBIT G

Exhibit 5 - Page - 86

**3-ER-628**

AIA SERVICES CORPORATION
COMMON STOCK
SHAREHOLDERS LIST

Per amended Articles of Incorporation dated August 3, 1995, authorized 11,000,000 shares of Common Stock at $.01 Par per Share

| | Number of Shares Jan 1, 1995 | Redemption of Reed's Shares | Cancelled or Surrendered | Three for One Stock Split Aug 28, 1995 | Number of Shares Dec 31, 1995 |
|---|---|---|---|---|---|
| Reed J. Taylor | 613,493.50 a | (613,493.50) | | | - |
| R. John Taylor | 186,611.50 | | | 373,223.00 | 559,834.50 |
| Mary K. Frost | 9,453.50 | | | 18,907.00 | 28,360.50 |
| Paul D. Durant | 2,453.50 | | | 4,907.00 | 7,360.50 |
| Dale Maisen | 19,552.00 | | | 39,104.00 | 58,656.00 |
| Raymond R. Heilman | 20,849.50 | | | 41,699.00 | 62,548.50 |
| Jay R. Taylor | 6,197.67 | | | 12,395.34 | 18,593.01 |
| Jud R. Taylor | 6,197.67 | | | 12,395.34 | 18,593.01 |
| Sara J. Taylor | 6,197.66 | | | 12,395.32 | 18,592.98 |
| Lee Ann Hostetler | 400.00 | | | 800.00 | 1,200.00 |
| Bobette Ruddell | 400.00 | | | 800.00 | 1,200.00 |
| Carlton Kent Gray | 400.00 | | | 800.00 | 1,200.00 |
| Sally J. Reed | 400.00 | | | 800.00 | 1,200.00 |
| Chris W. Ferwalt | 400.00 | | | 800.00 | 1,200.00 |
| Bruce Sweeney | 500.00 | | | 1,000.00 | 1,500.00 |
| Tom Lankenau | 250.00 | | | 500.00 | 750.00 |
| FSB Trust - ASOP | 857.50 | | | 1,715.00 | 2,572.50 |
| FSB Trust - ESOP | 58,828.50 | | | 117,657.00 | 176,485.50 |
| Rock Wilson | 8,000.00 | | | 16,000.00 | 24,000.00 |
| Sonny Hairston | 5,000.00 | | | 10,000.00 | 15,000.00 |
| Jerry Legg | 4,000.00 | | | 8,000.00 | 12,000.00 |
| Jerry Thayer | 4,000.00 | | | 8,000.00 | 12,000.00 |
| Ray Heilman Profit Sharing | 9,064.00 | | | 18,128.00 | 27,192.00 |
| Bill Cady | 3,600.00 | | | 7,200.00 | 10,800.00 |
| Alton Woodworth | 6,227.00 | | | 12,454.00 | 18,681.00 |
| | 973,333.50 | (613,493.50) | - b | 719,680.00 | 1,079,520.00 |
| Treasury stock | 60,046.00 | 613,493.50 | (673,539.50) | - | - |
| | 1,033,379.50 | - | (673,539.50) | 719,680.00 | 1,079,520.00 |

| | |
|---|---|
| Total shres issued | 1,079,520.00 |
| Par value per share | 0.01 |
| Total common stock per general ledger | 10,795.20 |

ᴵᴵⁱ

a Company purchased per stock redemption agreement dated July 22, 1995
b Split is for shareholders of record on June 26, 1995

Stock options:
| | | |
|---|---|---|
| John R. Taylor | 475,000 sh. | immediately exercisable at $.01 per share |
| Richard W. Campanaro | 625,000sh. | exercisable at $.01 per share upon satisfaction of performance goals within three years |
| 1989 Stock Option Plan | 1,500,000sh. | reserved for issuance under the plan |

Christy Laird                                        Page 1                                        1/10/96

II-(

AIA0018486



EXHIBIT H
Exhibit 5 - Page - 87

3-ER-629

EBERLE, BERLIN, KADING, TURNBOW & McKLVEEN,
CHARTERED

ATTORNEYS AND COUNSELORS AT LAW
CAPITOL PARK PLAZA
300 NORTH SIXTH STREET
POST OFFICE BOX 1368
BOISE, IDAHO 83701

TELEPHONE
(208) 344-8535

FACSIMILE
(208) 344-8542

JAMES L. BERLIN
OF COUNSEL

T. H. EBERLE (1922-1977)

August 15, 1995

Reed J. Taylor
P.O. Box 538
Lewiston ID 83501

Re:    Common Stock Redemption

Dear Mr. Taylor:

This opinion is being delivered to you pursuant to Section 2.5(j) of the Stock Redemption Agreement dated July 22, 1995 ( "Agreement") by and between AIA Services Corporation, an Idaho corporation ("Company") and Reed J. Taylor . All capitalized terms not defined herein shall have the respective meanings ascribed to them in the Agreement. The phrase "Transaction Documents" refers collectively to the Agreement, together with the Note, the Pledge Agreement, the Security Agreement, the Consulting Agreement and the Noncompetition Agreement, as such documents are defined in the Agreement.

We have acted as general counsel for the Company in connection with the transactions contemplated by the Agreement. As such general counsel, we have assisted in the negotiation, and have examined executed counterparts (or photostatic copies of executed counterparts) of the Agreement and other Transaction Documents.

In addition, we have examined originals, executed counterparts or copies of such agreements, corporate records, instruments and certificates, certificates of public authorities and such matters of law as we have deemed necessary for the purpose of rendering the opinions set forth herein. To the extent we deemed necessary for the purposes of this opinion, we have relied upon (i) the statements and representations of the Company as to factual matters, (ii) the corporate records provided to us by the Company, and (iii) certificates and other documents obtained from public officials. We have further relied as to factual matters on the representations and warranties contained in the Agreement and the other Transaction Documents (including, without limitation, Mr. Taylor's representations in Article IV of the Agreement) and on the Company's representations in Schedule III (attached) to the Agreement; and we have assumed the completeness and accuracy of all such representations and warranties as to factual matters. We have assumed the genuineness of all signatures (other than those of the Company), the legal capacity of Mr. Taylor to execute the Agreement and all other documents we have reviewed, the authenticity of all documents submitted to us as originals, and the conformity to original documents of all documents submitted to us as certified, photostatic, reproduced or conformed copies. We have further assumed that the Agreement and the other Transaction Documents have



EXHIBIT I
Exhibit 5 - Page - 88

24/10 2008 13:46 FAX 1 206 587 2308          CAIRNCROSS                                    ☒002

Reed J. Taylor
August 15, 1995
Page 2

been duly authorized, executed and delivered by Mr. Taylor and are enforceable against him in accordance with their respective terms, and that the execution, delivery and performance of the Agreement and the other Transaction Documents by Mr. Taylor does not and will not result in a breach of, or constitute a default under, any agreement, instrument or other document to which Mr. Taylor is a party, or any order, judgment, writ or decree applicable to such party to which Mr. Taylor's property is subject.

Whenever our opinion with respect to the existence or absence of facts is indicated to be based on our knowledge, we are referring to the actual knowledge of R. M. Turnbow and Richard A. Riley, who are the sole attorneys in Eberle, Berlin, Kading, Turnbow & McKlveen, Chartered who have represented the Company during the course of our representation in this transaction. Except as expressly set forth herein, we have not undertaken any independent legal or factual investigation to determine the existence or absence of such facts, and no inference as to our knowledge of the existence or absence of such facts should be drawn from such representation.

Based upon and subject to our examination and assumptions as aforesaid and subject to the qualifications hereinafter set forth, we are of the opinion that, except as set forth in the attached Schedule III and/or the Schedules attached to the Agreement:

1.      The Company is a corporation duly organized and validly existing under the laws of the State of Idaho.  Based solely on the attached Certificates of Corporate Status issued by the Idaho Secretary of State, the Company, The Universe Life Insurance Company ("Universe"), AIA Insurance, Inc. ("AIAI") and Farmers Health Alliance Administrators, Inc. ("Farmers") are corporations incorporated under the corporation laws of the State of Idaho and in good standing on the records of the Idaho Secretary of State.

2.      The Company and its Subsidiaries have full corporate power and authority to enter into, execute and deliver the Transactions Documents and to perform their respective obligations thereunder; all corporate action on the part of Company and its Subsidiaries, and their respective directors and shareholders, necessary for the authorization, execution, delivery and performance by Company and its Subsidiaries of the Transaction Documents and the consummation of the transactions contemplated thereby has been taken; and the Transaction Documents have been duly executed and delivered by Company and its Subsidiaries.  The Transaction Documents constitute the valid and binding obligation of Company and its Subsidiaries enforceable against them in accordance with their respective terms, except that enforceability may be limited by (a) applicable bankruptcy, insolvency, moratorium, reorganization, fraudulent transfer, receivership, conservatorship or similar laws affecting creditor's rights generally, (b) the exercise of judicial discretion in accordance with general principles of equity (whether applied by a court of law or equity) and (c) considerations of public

Exhibit 5 - Page - 89

3-ER-631

24/10 2008 13:47 FAX 1 206 587 2308       CAIRNCROSS                              ☒003

Reed J. Taylor
August 15, 1995
Page 3

policy.

3.    Neither the execution and delivery of the Transaction Documents by Company and its Subsidiaries, nor the consummation of the transactions contemplated thereby, will (a) conflict with or violate any provision of their respective Articles of Incorporation or Bylaws, as amended; or (b) constitute a violation or default under any indebtedness, indenture, mortgage, deed of trust, note, bond, license, lease agreement, or other material agreement or instrument to which Company or any of its Subsidiaries is a party or to which any of its assets or the assets of its Subsidiaries may be subject; or (c) to the best of our knowledge, violate any law, rule, license, regulation, judgment, order, ruling, or decree, including any insurance laws or regulations of any jurisdiction to which Company or any of its Subsidiaries are subject, governing or affecting the operation of Company or its Subsidiaries in any material respect. Neither the execution and delivery of the Transaction Documents by Company and its Subsidiaries, nor the consummation of the transactions contemplated thereby, will constitute an event permitting termination of any material agreement or the acceleration of any indebtedness of the Company or other liability, with or without notice or lapse of time, or result in the creation or imposition of any lien upon the Collateral.

4.    No consent, authorization, approval or exemption by, or filing with, any Person or any Governmental Authority is required in connection with the execution, delivery and performance by Company and its Subsidiaries of the Transaction Documents, or the taking of any action contemplated thereby, except such as have been obtained prior to Closing.

5.    All of the currently outstanding Pledged Shares are owned beneficially and of record by Company and, to the best of our knowledge, there are no warrants, options, or other rights to purchase such Pledged Shares.

6.    Except for the lien of First Interstate Lien upon the First Interstate Shares, and any interest in the Commission collateral created or granted in favor of The Centennial Life Insurance Company pursuant to that certain Reimbursement Agreement dated August 11, 1995 among The Centennial Life Insurance Company, AIA Services Corporation, AIA Insurance, Inc., The Universe Life Insurance Company and AIA MidAmerica, Inc., the Collateral is free and clear of all pledges, liens, encumbrances, security interests, equities, claims, or options. Upon delivery of certificates representing the Pledged Shares of AIAI and Farmers to Shareholder at Closing, Shareholder shall have at Closing a perfected first priority security interest in such Pledged Shares.

7.    To our knowledge, there are no claims, actions, suits, proceedings or investigations pending or threatened against or relating to Company or any of its Subsidiaries, at law or in equity before or by any Governmental Authority, nor has any such action, suit,

Exhibit 5 - Page - 90

3-ER-632

24/10 2008 13:47 FAX 1 206 587 2308     CAIRNCROSS

☑004

Reed J. Taylor
August 15, 1995
Page 4

proceeding or investigation been pending during the three-year period preceding the date hereof. Neither Company nor any of its Subsidiaries is in default with respect to any adjudicatory order, writ, injunction or decree of any Governmental authority, and neither Company nor any of its Subsidiaries is a party to any cease and desist order, supervisory agreement or arrangement, consensual or otherwise, with any Governmental Authority.

The foregoing opinions are limited to the laws and regulations of the State of Idaho (excluding the principles of conflicts of laws); and we have not considered and expressed no opinion on the laws or regulations of any other jurisdiction. This opinion is rendered only with respect to the laws and the rules, regulations and orders (excluding the principles of conflicts of laws) of the State of Idaho that are in effect as of the date hereof. We assume no responsibility for updating this opinion to take into account any event, action, interpretation or change of law occurring subsequent to the date hereof that may affect the validity of any of the opinions expressed herein.

The enforceability opinion expressed in opinion ¶2 of this letter is subject to the following additional qualifications:

(i)     The terms of any commission agreement, lockbox agreement or other account agreement which may affect the Commission Collateral, the rights of the parties (other than Company or any of its Subsidiaries) to any such agreement, and any claim or defense of such parties against the Company or any of its Subsidiaries rising under or outside any such agreement.

(ii)     The qualification that certain rights, remedies and waivers contained in the Transaction Documents may be rendered ineffective, or be limited, by applicable Idaho laws or judicial decisions governing such rights, remedies and waivers; but the inclusion of such rights, remedies and waivers does not affect the validity or enforceability of other provisions of the Transaction Documents and, in the event the Company or any of its Subsidiaries does not comply with the material terms of the Transaction Documents, Mr. Taylor may exercise remedies that would normally be available under Idaho law to a secured party provided Idaho law applies and Mr. Taylor proceeds in accordance with such law.

(iii)     We express no opinion with respect to the perfection or the relative priority of the security interests granted to Mr. Taylor in the Commission Collateral.

Exhibit 5 - Page - 91

3-ER-633

Reed J. Taylor
August 15, 1995
Page 5

_____

This opinion is furnished by us solely for your benefit for use in connection with the Transaction Documents and the transactions contemplated thereby; and it may not be furnished or quoted to, or relied upon, by any other person.

Very truly yours,

Eberle Berlin Kading Turnbow & McKlveen, Chtd.

s/

Exhibit 5 - Page - 92

3-ER-634

## SCHEDULE III TO STOCK PURCHASE AGREEMENT

This Schedule sets forth the exceptions to representations and warranties made by the Company to the Shareholder in Article III of the Stock Redemption Agreement dated July 22, 1995 ("Agreement") between AIA Services Corporation ("Company") and Reed J. Taylor ("Shareholder").

### I.    EXCEPTIONS APPLYING TO THE COMPANY GENERALLY.

A.    Sections 3.3 and 3.11. The Company's representation that the execution, delivery and performance of the Agreement and the consummation of the transactions contemplated thereby will not result in a violation or default under any material agreement or other instrument by which the Company or any Subsidiary is bound and the Company's representation that it is not in violation of any such agreement or instrument are qualified as follows:

The Company is currently in technical default of certain financial covenants contained in the First Interstate Loan agreement. Those covenant defaults are described in the attached letter to First Interstate Bank from Rick L Johnson, the Company Vice President, Finance. Absent the Bank's written consent, completion of transactions contemplated in the Agreement may cause additional technical defaults of negative financial covenants contained in the Bank loan agreement.

The Company has thoroughly disclosed to the Bank all details regarding the proposed transactions. In view of the current defaults, the Company has not asked for nor has the Bank volunteered written consent.

As the Company is current in all payments due to Bank, the Company does not anticipate adverse action by the Bank prior to the scheduled loan payoff date of July 20, 1996.

B.    Sections 3.2 and 3.3. The Company's representations concerning consents in Sections 3.2 and 3.3 are qualified as follows:

1.    The Company has been made aware that the Texas Department of Insurance has taken the position that the distribution of AIA Insurance, Inc. requires prior departmental approval due to the status the Company's Subsidiary, The Universe Life Insurance Company ("ULIC"), as "commercially domiciled" in Texas. The Company, while disputing the necessity of such approval, has none the less filed the necessary forms to obtain such approval. The Texas Insurance Department has not yet given its approval for distribution of AIA Insurance, Inc.

The California Department of Insurance requires the submission of a prior approval form for the Centennial reinsurance treaty. Since the transaction does not affect any California insureds, and ULIC is not being dissolved or merged, approval is expected in due course. Approval from California has not yet been obtained.

SCHEDULE III - Page 1

Exhibit 5 - Page - 93

2.    As described above in connection with Section 3.3., certain transactions contemplated by the Agreement would violate provisions of the First Interstate Bank Loan Agreement and related documents.

C.    Section 3.6.  The Company's financial representations contained in Section 3.6 are supplemented by the following attached financial statements related to the quarter ended June 30, 1995:

AIA Services Consolidated Balance Sheets at June 30, 1995.

AIA Services Consolidated Statement of Income For Six Months Ending June 30, 1995.

The Universe Life Preliminary Results of Operations (Statutory Basis) For Three and Six Months Ending June 30, 1995.

Great Fidelity Preliminary Results of Operations (Statutory Basis) For Three and Six Months Ending June 30, 1995.

AIA Services Consolidated Preliminary Results of Operations For Six Months Ending June 30, 1995.

## II.    EXCEPTIONS APPLYING SOLELY TO UNIVERSE LIFE.

Sections 3.1, 3.9 and 3.11.  The Company's representations concerning Universe Life's good standing and qualification to transact business in various states and its compliance with state insurance laws are qualified by the following description of regulatory proceedings in the various states in which the insurance company transacts business.

Texas.  On March 22, 1994, the State of Texas issued Cease and Desist Order No. 94-0282 against Universe Life and its subsidiary, AIA Insurance, Inc.  The Order was based on preliminary examination findings reported to the Texas Department of Insurance ("TDI") by the examiners.  The Order alleged that Universe Life and its affiliate engaged in unfair methods of competition and deceptive practice of insurance and that Universe Life was in hazardous financial condition.  Following discussions with the company and receipt of additional documentation, TDI issued a Consent Order dated May 17, 1994 which superseded the Cease and Desist Order in its entirety.  The Consent Order abandoned allegations of unfair competition and deceptive practices and focused on TDI's concerns with the proper reserving for the Supplemental Benefit Accumulation ("SBA") feature of Universe Life's GUH product and the valuation of Universe Life's investment in its subsidiary, AIA Insurance, Inc.

To address its concern with conflicting actuarial opinions on the proper reserves for the SBA, the May 17, 1994 Consent Order directed Universe Life to select an independent actuary to review Universe Life's SBA reserving methods and factors.  Universe Life and the Department agreed that this actuarial review would be performed by Donna R. Claire, F.S.A., of Claire Thinking, an independent consulting actuary. Ms. Claire performed an asset adequacy analysis of Universe Life's reported December 31, 1993 SBA reserves, including a thorough review of GUH product features, actuarial assumptions, actual experience and historical trends. Ms. Claire's analysis is contained in her Asset Adequacy Report dated June 12, 1994.

SCHEDULE III - Page 2

Exhibit 5 - Page - 94

3-ER-636

In her Report, Ms. Claire observed that Universe Life's GUH product, with its SBA feature, is an innovative product and that , "[a]s such, there is no current reserve standard for the SBA in state law that specifically fits this benefit". Ms. Claire concluded that (i) Universe Life's independent consulting actuaries, Milliman and Robertson, had developed "a methodology which follows the basic standards of establishing reserves that reflect the underlying risks of the product"; (ii) "[t]he reserve methodology used by [Universe Life's actuaries] does appear to be reasonable"; and (iii) "given the experience that was developed through 1993, the reserves reported in the [1993] Annual Statement were adequate". Based on sensitivity tests which showed that the reported reserves may be inadequate if adverse trends occur, however, Ms. Claire recommended that the reserves be increased on the basis of "somewhat stronger" reserve assumptions. Applying the same gross premium valuation methodology used by Universe Life to develop its reported reserves, Ms. Claire developed new reserving factors reflecting her more conservative assumptions. Universe Life agreed with TDI that the SBA reserves for the Texas certificateholders under GUH policy would be determined prospectively in accordance with the factors developed by Donna Claire, with any increase in reserves being applied ratably beginning July 1, 1995 and with the final entry being made December 31, 1996.

With respect to the valuation of AIA Insurance, Inc., TDI acknowledged that Universe Life's accounting for the value of AIA Insurance was permissible under Texas law; but, in light of a Texas statute allowing the Commissioner to ascribe any other valuation he believes more appropriate (after hearing) and the impending statutory change in the Idaho Insurance Code effective July 1, 1995 (see below), the May 17, 1994 Consent Order directed that Universe Life's investment in AIA Insurance, Inc. be reduced, ratably over a three-year period beginning December 31, 1994, to the lesser of net worth as determined in accordance with generally accepted accounting principles or the valuation amount reflected in the final report of this examination.

During the period of discussions between Universe Life and TDI, the Texas Insurance Commissioner approved Universe Life's new GUH III product and the transfer of Universe Life's group health and life insurance business in Texas by reinsuring, on an assumption basis, all of such business with The Centennial Life Insurance Company. See "Market Conduct Activities – Policy Form Filings and Approvals" and "Subsequent Events—Sale of Group Universal Health Business" above.

On October 13, 1994, TDI issued a further Consent Order which superseded the May 17, 1994 Consent Order in its entirety. The October Order recited Universe Life's agreement concerning the implementation of the Claire factors for reserving for the SBA and ordered that Universe Life reduce the reported value of its subsidiary, AIA Insurance, Inc., to the lesser or net worth (as determined in accordance with generally accepted accounting principles) or the valuation amount reflected in the final report of this examination, provided that the adjustment in the AIA Insurance carrying value would be made ratably over a three-year period beginning December 31, 1994.

Idaho. Based on the financial concerns raised by the preliminary examination results and the issuance of the Texas Cease and Desist Order, the Idaho Department of Insurance ("Department") initiated an inquiry resulting in a Voluntary Agreement Concerning Supervisor, dated April 26, 1994 between Universe Life and the Department. Under the Agreement, Universe Life has provided financial and other information to the Department on a regular basis

SCHEDULE III - Page 3

Exhibit 5 - Page - 95

3-ER-637

to enable the Department to informally monitor Universe Life's financial condition and operations to assure that policyholders' interests were protected during the period required to resolve the financial and other examination issues. During the period of discussions, the Department has approved Universe Life's new GUH III product, the transfer of Universe Life's individual health insurance business to States General Life Insurance Company and the transfer of its group health and life insurance business to The Centennial Life Insurance Company.

By agreement dated December 23, 1994, the Idaho Department approved Donna Claire's gross premium valuation method and Ms. Claire's reserving factors for calculating SBA reserves in accordance with her Asset Adequacy Report dated June 12, 1994. The Department agreed that Universe Life would not be required to restate its 1992 or 1993 Annual Statements and that implementation of the Donna Claire reserve adjustment will be made prospectively, in accordance with TDI's October 13, 1994 Consent Order, on a quarterly basis beginning with the third quarter of 1995 and ending December 31, 1996. The following table shows the effect of the Donna Claire adjustments to Universe Life's reported aggregate reserve for accident and health policies and to its capital and surplus at December 31, 1992, 1993 and 1994:

|  | 1992 | 1993 | 1994 |
|---|---|---|---|
| Capital & surplus reported by Universe Life: | $ 5,418,748 | $ 5,140,830 | $ 4,182,781 |
| Aggregate reserve for A & H policies |  |  |  |
| As reported | 10,376,371 | 14,040,419 | 9,193,850 |
| As calculated by Claire factor | 7,843,186 | 14,801,661 | 9,579,581 |
| Claire factor adjustment | 2,533,184 | ( 761,242) | ( 385,731) |
| Capital & surplus after Claire factor adjustment: | $ 7,951,932 | $ 4,379,588 | $ 3,797,050 |

In the December 23, 1994 agreement, the Idaho Insurance Department acknowledged that, until July 1, 1995, the Idaho Insurance Code permits Universe Life to continue to report its investment in AIA Insurance, Inc. at historical cost (subject to a 15% of assets limitation) on its 1992, 1993, and 1994 Annual Statements. Although permitted by Idaho statute, this valuation of AIA Insurance, Inc. deviates from the NAIC standards for investment in subsidiaries as set forth in the NAIC Accounting Practices and Procedures Manual for Life and Accident and Health Insurance Companies. See "Valuation of AIA Insurance, Inc." above under the caption "Comments on 1992 Financial Statements: Common Stock". On July 1, 1995, Universe Life will be required to reduce the value of its investment in AIA Insurance, Inc., for statutory accounting purposes, to the net book value of AIA Insurance, Inc (which was $2,424,097 at December 31, 1992).

Other States. The following regulatory proceedings in other jurisdictions were precipitated by the issuance of the Texas Cease and Desist Order and/or the preliminary examination findings contained therein:

A Notice of Hearing and Order to Show Cause with Suspension Instanter was issued by the Oklahoma Insurance Commissioner on April 6, 1994 based on the Texas Cease and Desist Order. On May 26, 1994, by letter agreement based on the May 17, 1994 TDI Consent Order and Universe Life's April 26, 1994 Voluntary Agreement with the Idaho Insurance Department, the Oklahoma Department agreed to suspend and terminate the prior Notice and Order to Show

SCHEDULE III - Page 4

Exhibit 5 - Page - 96

3-ER-638

24/10 2008 13:51 FAX 1 206 587 2308    CAIRNCROSS    ☒010

Cause and to allow Universe Life to continue to solicit business from its existing policyholder associations.

An Order of Suspension based on the Texas Cease and Desist Order was issued by the Illinois Department of Insurance on April 26, 1994. The Suspension Order was lifted by Stipulation and Consent Order dated July 27, 1994, pursuant to which Universe Life agreed to notify the Illinois Department before transacting new business in the state during the next three years.

A notice to show cause regarding suspension from doing business in the State of Mississippi was issued by the Mississippi Insurance Department on May 6, 1994, based on the Texas Cease and Desist Order. Suspension of Universe Life's certificate of authority was initially stayed by the Department; however, on September 8, 1994, a Suspension Order was entered based upon the appearance that Universe Life was then in an unsound condition.

The Alaska Insurance Department issued an Order suspending Universe Life's certificate of authority on May 19, 1994, based on the Texas Cease and Desist Order. Universe Life entered into an Agreement to Suspend New Sales on July 27, 1994; and the Alaska Insurance Department withdrew the suspension order. Universe Life had not been writing new business in Alaska, so the Agreement to Suspend New Sales has had no financial effect on Universe Life's operations.

The Missouri Insurance Department issued a Notice of Institution of Case and Statement of Charges dated June 2, 1994, based upon the Texas Cease and Desist Order. A hearing in the matter has been continued indefinitely, to be re-set upon further notice to Universe Life.

In June 1994, the California Insurance Department initiated an informal inquiry based on the Texas Cease and Desist Order. Universe Life entered into a confidential voluntary agreement to cease writing new business in California. Universe Life had not been writing new business in California; so the confidential agreement has had no financial effect on Universe Life's operations.

On June 6, 1994, a Suspension Order was issued by the Wyoming Department of Insurance without prior notice or hearing, based on the Illinois Suspension Order. Based upon subsequent withdrawal of the Illinois and Texas orders, Wyoming lifted the Order of Suspension and entered a Stipulation and Consent Order dated July 28, 1994, pursuant to which Universe Life was permitted to continue soliciting its existing policyholder association but agreed not to solicit other business in Wyoming without the Department's consent.

Universe Life voluntarily agreed to suspend new business in Oregon pending resolution of the Oregon Insurance Department's concerns under a unique Oregon statute regarding valuation of Universe Life's investment in AIA Insurance, Inc. A Consent Order was issued June 30, 1994. A Suspension Order was issued August 23, upon expiration of the Consent Order. Universe Life requested a hearing; and an Amended Suspension Order prohibiting new sales was entered November 2, 1994.

A Notice of Summary Suspension was issued by the Iowa Division of Insurance on August 15, 1994, based on failure of Universe Life to file its annual audited financial report by

SCHEDULE III - Page 5

Exhibit 5 - Page - 97

24/10 2008 13:52 FAX 1 206 587 2308      CAIRNCROSS                          ⨳011

June 1, 1994. (The auditor's report on Universe Life's 1993 financial statements was delayed pending Idaho's determination of financial issues raised by the examination. A draft of the audited financial statements had previously been provided to Iowa Division of Insurance.) The Order of Suspension was rescinded and the administrative proceeding dismissed on September 6, 1994. On January 6, 1995, the Division issued a Notice of Hearing to determine whether Universe Life's surplus met statutory minimums. Outside counsel informed Universe Life on April 10, 1995 that Iowa is dropping the action.

Universe Life entered into an Agreement with the Washington Insurance Department dated August 18, 1994, in which Universe Life voluntarily agreed not to write any new business in the State without prior approval of the Commissioner, pending submission of information establishing that Universe Life's financial condition is not detrimental to Washington policyholders.

On September 9, 1994, the Utah Insurance Department issued a Notice of Informal Adjudicative Proceeding summarily suspending Universe Life's Certificate of Authority for failure to maintain minimum capital and surplus as calculated under unique Utah statutes. Universe Life's hearing request was withdrawn after the Department's Chief Examiner advised that the suspension order could be lifted upon informal presentation by Universe Life's management after year-end demonstrating compliance with minimum capital and surplus requirements.

The Nebraska Department contacted Universe Life on October 14, 1994, concerning Universe Life's financial condition. Universe Life signed a Consent Order to suspend new sales on October 28, 1994.

SCHEDULE III - Page 6

Exhibit 5 - Page - 98

*effective 4-10-89*
*ratified at 5-5-89 board*
*meeting*

### NEW RESTATED BYLAWS

#### OF

### AIA SERVICES CORPORATION
(an Idaho corporation)

#### ARTICLE I

#### OFFICES

Section 1.1  **Registered Office.**  The registered office of the corporation required by the Idaho Business Corporation Act to be maintained in the State of Idaho may, but need not be, identical with the principal office in the State of Idaho; and the address of the registered office may be changed from time to time by the Board of Directors or the President of the corporation.  (Idaho Code Sections 30-1-12(a) and 30-1-13.)

Section 1.2  **Principal Office; Other Offices.**  The corporation shall also have and maintain an office or principal place of business in Lewiston, Idaho or at such other place as may be fixed by the Board of Directors, and may also have offices at such other places, both within and without the State of Idaho, as the Board of Directors may from time to time determine or the business of the corporation may require.

#### ARTICLE II

#### CORPORATE SEAL

Section 2.1  **Corporate Seal.**  The corporate seal shall consist of a die bearing the name of the corporation and the inscription, "Corporate Seal -- State of Idaho".  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.  The seal may be altered at the pleasure of the Board of Directors.  (Idaho Code Section 30-1-4(c)).

#### ARTICLE III

#### STOCKHOLDERS' MEETINGS

Section 3.1  **Place of Meetings.**  The Board of Directors may designate any place, either within or without the State of Idaho, as the place of meeting for any annual meeting or for any special meeting of stockholders called by the Board of Directors.  A waiver of notice signed

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 1

AIA0002563


EXHIBIT J

Exhibit 5 - Page - 99

may be voted by him, either in person or by proxy, without a transfer of such shares into his name. Shares standing in the name of a trustee may be voted by him, either in person or by proxy; but no trustee shall be entitled to vote shares held by him without a transfer of such shares into his name. (Idaho Code Section 30-1-33(f)).

Shares standing in the name of a receiver may be voted by such receiver; and shares held by or under the control of a receiver may be voted by such receiver without the transfer thereof into his name if authority so to do be contained in an appropriate order of the court by which such receiver was appointed. (Idaho Code Section 30-1-33(g)).

A stockholder whose shares are pledged shall be entitled to vote such shares until the shares have been transferred into the name of the pledgee; and thereafter the pledgee shall be entitled to vote the shares so transferred unless the pledgor shall have obtained from the pledgee a proxy to vote or take other action thereon in accordance with law. (Idaho Code Section 30-1-33(c)(3),(h)).

Neither treasury shares of its own stock held by the corporation, nor shares held by another corporation if a mahority of the shares entitled to vote for the elections of directors of such other corporation is held by the corporation, shall be voted at any meeting or counted in determining the total number of outstanding shares at any given time. (Idaho Code Section 30-1-33(b)).

Section 3.10  Joint Owners of Stock. If shares or other securities having voting power stand of record in the names of two (2) or more persons, whether fiduciaries, members of a partnership, joint tenants, tenants in common, tenants by the entirety, or otherwise, or if two (2) or more persons have the same fiduciary relationship respecting the same shares, unless the Secretary is given written notice to the contrary and is furnished with a copy of the instrument or order appointing them or creating the relationship wherein it is so provided, their acts with respect to voting shall have the following effect: (a) if only one votes, his act binds all; (b) if more than one votes, the act of the majority so voting binds all; (c) if more than one votes, but the vote is evenly split on any particular matter, each faction may vote the securities in question proportionally. If the instrument filed with the secretary shows that any such tenancy is held in unequal interests, a majority or even-split for the purpose of this Section 3.10 shall be a majority or even-split interest.

The Board of Directors may adopt by resolution a procedure whereby a stockholder of the corporation may certify in writing to the corporation that all or a portion of the shares registered in the name of such stockholder are held for the account of a specified person or persons. The resolution shall set forth (a) the classification of stockholder who may certify, (b) the purpose or purposes for which the certification may be made, (c) the form of certification and information to be contained therein, (d) the number of days before or after any record date or date

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 4

AIA0002566

Exhibit 5 - Page - 100

3-ER-642

RAR

## EBERLE, BERLIN, KADING, TURNBOW & McKLVEEN, CHARTERED

ATTORNEYS AND COUNSELORS AT LAW
CAPITOL PARK PLAZA
300 NORTH SIXTH STREET
POST OFFICE BOX 1368
BOISE, IDAHO 83701

TELEPHONE
(208) 344-8535

FACSIMILE
(208) 344-8542

JAMES L. BERLIN
OF COUNSEL

T. H. EBERLE (1922-1977)

August 15, 1995

Reed J. Taylor
P.O. Box 538
Lewiston ID 83501

Re:     Common Stock Redemption

Dear Mr. Taylor:

This opinion is being delivered to you pursuant to Section 2.5(j) of the Stock Redemption Agreement dated July 22, 1995 ( "Agreement") by and between AIA Services Corporation, an Idaho corporation ("Company") and Reed J. Taylor . All capitalized terms not defined herein shall have the respective meanings ascribed to them in the Agreement. The phrase "Transaction Documents" refers collectively to the Agreement, together with the Note, the Pledge Agreement, the Security Agreement, the Consulting Agreement and the Noncompetition Agreement, as such documents are defined in the Agreement.

We have acted as general counsel for the Company in connection with the transactions contemplated by the Agreement.  As such general counsel, we have assisted in the negotiation, and have examined executed counterparts (or photostatic copies of executed counterparts) of the Agreement and other Transaction Documents.

In addition, we have examined originals, executed counterparts or copies of such agreements, corporate records, instruments and certificates, certificates of public authorities and such matters of law as we have deemed necessary for the purpose of rendering the opinions set forth herein.  To the extent we deemed necessary for the purposes of this opinion, we have relied upon (i) the statements and representations of the Company as to factual matters, (ii) the corporate records provided to us by the Company, and (iii) certificates and other documents obtained from public officials. We have further relied as to factual matters on the representations and warranties contained in the Agreement and the other Transaction Documents (including, without limitation, Mr. Taylor's representations in Article IV of the Agreement) and on the Company's representations in Schedule III (attached) to the Agreement; and we have assumed the completeness and accuracy of all such representations and warranties as to factual matters. We have assumed the genuineness of all signatures (other than those of the Company), the legal capacity of Mr. Taylor to execute the Agreement and all other documents we have reviewed, the authenticity of all documents submitted to us as originals, and the conformity to original documents of all documents submitted to us as certified, photostatic, reproduced or conformed copies. We have further assumed that the Agreement and the other Transaction Documents have

Exhibit 6 - Page - 1

Reed J. Taylor
August 15, 1995
Page 2

been duly authorized, executed and delivered by Mr. Taylor and are enforceable against him in accordance with their respective terms, and that the execution, delivery and performance of the Agreement and the other Transaction Documents by Mr. Taylor does not and will not result in a breach of, or constitute a default under, any agreement, instrument or other document to which Mr. Taylor is a party, or any order, judgment, writ or decree applicable to such party to which Mr. Taylor's property is subject.

Whenever our opinion with respect to the existence or absence of facts is indicated to be based on our knowledge, we are referring to the actual knowledge of R. M. Turnbow and Richard A. Riley, who are the sole attorneys in Eberle, Berlin, Kading, Turnbow & McKlveen, Chartered who have represented the Company during the course of our representation in this transaction. Except as expressly set forth herein, we have not undertaken any independent legal or factual investigation to determine the existence or absence of such facts, and no inference as to our knowledge of the existence or absence of such facts should be drawn from such representation.

Based upon and subject to our examination and assumptions as aforesaid and subject to the qualifications hereinafter set forth, we are of the opinion that, except as set forth in the attached Schedule III and/or the Schedules attached to the Agreement:

1.      The Company is a corporation duly organized and validly existing under the laws of the State of Idaho. Based solely on the attached Certificates of Corporate Status issued by the Idaho Secretary of State, the Company, The Universe Life Insurance Company ("Universe"), AIA Insurance, Inc. ("AIAI") and Farmers Health Alliance Administrators, Inc. ("Farmers") are corporations incorporated under the corporation laws of the State of Idaho and in good standing on the records of the Idaho Secretary of State.

2.      The Company and its Subsidiaries have full corporate power and authority to enter into, execute and deliver the Transactions Documents and to perform their respective obligations thereunder; all corporate action on the part of Company and its Subsidiaries, and their respective directors and shareholders, necessary for the authorization, execution, delivery and performance by Company and its Subsidiaries of the Transaction Documents and the consummation of the transactions contemplated thereby has been taken; and the Transaction Documents have been duly executed and delivered by Company and its Subsidiaries. The Transaction Documents constitute the valid and binding obligation of Company and its Subsidiaries enforceable against them in accordance with their respective terms, except that enforceability may be limited by (a) applicable bankruptcy, insolvency, moratorium, reorganization, fraudulent transfer, receivership, conservatorship or similar laws affecting creditor's rights generally, (b) the exercise of judicial discretion in accordance with general principles of equity (whether applied by a court of law or equity) and (c) considerations of public

Exhibit 6 - Page - 2

3-ER-644

Reed J. Taylor
August 15, 1995
Page 3

policy.

3. Neither the execution and delivery of the Transaction Documents by Company and its Subsidiaries, nor the consummation of the transactions contemplated thereby, will (a) conflict with or violate any provision of their respective Articles of Incorporation or Bylaws, as amended; or (b) constitute a violation or default under any indebtedness, indenture, mortgage, deed of trust, note, bond, license, lease agreement, or other material agreement or instrument to which Company or any of its Subsidiaries is a party or to which any of its assets or the assets of its Subsidiaries may be subject; or (c) to the best of our knowledge, violate any law, rule, license, regulation, judgment, order, ruling, or decree, including any insurance laws or regulations of any jurisdiction to which Company or any of its Subsidiaries are subject, governing or affecting the operation of Company or its Subsidiaries in any material respect. Neither the execution and delivery of the Transaction Documents by Company and its Subsidiaries, nor the consummation of the transactions contemplated thereby, will constitute an event permitting termination of any material agreement or the acceleration of any indebtedness of the Company or other liability, with or without notice or lapse of time, or result in the creation or imposition of any lien upon the Collateral.

4. No consent, authorization, approval or exemption by, or filing with, any Person or any Governmental Authority is required in connection with the execution, delivery and performance by Company and its Subsidiaries of the Transaction Documents, or the taking of any action contemplated thereby, except such as have been obtained prior to Closing.

5. All of the currently outstanding Pledged Shares are owned beneficially and of record by Company and, to the best of our knowledge, there are no warrants, options, or other rights to purchase such Pledged Shares.

6. Except for the lien of First Interstate Lien upon the First Interstate Shares, and any interest in the Commission collateral created or granted in favor of The Centennial Life Insurance Company pursuant to that certain Reimbursement Agreement dated August 11, 1995 among The Centennial Life Insurance Company, AIA Services Corporation, AIA Insurance, Inc., The Universe Life Insurance Company and AIA MidAmerica, Inc., the Collateral is free and clear of all pledges, liens, encumbrances, security interests, equities, claims, or options. Upon delivery of certificates representing the Pledged Shares of AIAI and Farmers to Shareholder at Closing, Shareholder shall have at Closing a perfected first priority security interest in such Pledged Shares.

7. To our knowledge, there are no claims, actions, suits, proceedings or investigations pending or threatened against or relating to Company or any of its Subsidiaries, at law or in equity before or by any Governmental Authority, nor has any such action, suit,

Exhibit 6 - Page - 3

Reed J. Taylor
August 15, 1995
Page 4

proceeding or investigation been pending during the three-year period preceding the date hereof. Neither Company nor any of its Subsidiaries is in default with respect to any adjudicatory order, writ, injunction or decree of any Governmental authority, and neither Company nor any of its Subsidiaries is a party to any cease and desist order, supervisory agreement or arrangement, consensual or otherwise, with any Governmental Authority.

The foregoing opinions are limited to the laws and regulations of the State of Idaho (excluding the principles of conflicts of laws); and we have not considered and expressed no opinion on the laws or regulations of any other jurisdiction. This opinion is rendered only with respect to the laws and the rules, regulations and orders (excluding the principles of conflicts of laws) of the State of Idaho that are in effect as of the date hereof. We assume no responsibility for updating this opinion to take into account any event, action, interpretation or change of law occurring subsequent to the date hereof that may affect the validity of any of the opinions expressed herein.

The enforceability opinion expressed in opinion ¶2 of this letter is subject to the following additional qualifications:

(i)      The terms of any commission agreement, lockbox agreement or other account agreement which may affect the Commission Collateral, the rights of the parties (other than Company or any of its Subsidiaries) to any such agreement, and any claim or defense of such parties against the Company or any of its Subsidiaries rising under or outside any such agreement.

(ii)     The qualification that certain rights, remedies and waivers contained in the Transaction Documents may be rendered ineffective, or be limited, by applicable Idaho laws or judicial decisions governing such rights, remedies and waivers; but the inclusion of such rights, remedies and waivers does not affect the validity or enforceability of other provisions of the Transaction Documents and, in the event the Company or any of its Subsidiaries does not comply with the material terms of the Transaction Documents, Mr. Taylor may exercise remedies that would normally be available under Idaho law to a secured party provided Idaho law applies and Mr. Taylor proceeds in accordance with such law.

(iii)    We express no opinion with respect to the perfection or the relative priority of the security interests granted to Mr. Taylor in the Commission Collateral.

Exhibit 6 - Page - 4

3-ER-646

Reed J. Taylor
August 15, 1995
Page 5

This opinion is furnished by us solely for your benefit for use in connection with the Transaction Documents and the transactions contemplated thereby; and it may not be furnished or quoted to, or relied upon, by any other person.

Very truly yours,

Eberele Berlin Kading Turnbow & McKlveen, Chtd.

s/

Exhibit 6 - Page - 5

## SCHEDULE III TO STOCK PURCHASE AGREEMENT

This Schedule sets forth the exceptions to representations and warranties made by the Company to the Shareholder in Article III of the Stock Redemption Agreement dated July 22, 1995 ("Agreement") between AIA Services Corporation ("Company") and Reed J. Taylor ("Shareholder").

### I.   EXCEPTIONS APPLYING TO THE COMPANY GENERALLY.

A.   Sections 3.3 and 3.11. The Company's representation that the execution, delivery and performance of the Agreement and the consummation of the transactions contemplated thereby will not result in a violation or default under any material agreement or other instrument by which the Company or any Subsidiary is bound and the Company's representation that it is not in violation of any such agreement or instrument are qualified as follows:

The Company is currently in technical default of certain financial covenants contained in the First Interstate Loan agreement. Those covenant defaults are described in the attached letter to First Interstate Bank from Rick L Johnson, the Company Vice President, Finance. Absent the Bank's written consent, completion of transactions contemplated in the Agreement may cause additional technical defaults of negative financial covenants contained in the Bank loan agreement.

The Company has thoroughly disclosed to the Bank all details regarding the proposed transactions. In view of the current defaults, the Company has not asked for nor has the Bank volunteered written consent.

As the Company is current in all payments due to Bank, the Company does not anticipate adverse action by the Bank prior to the scheduled loan payoff date of July 20, 1996.

B.   Sections 3.2 and 3.3. The Company's representations concerning consents in Sections 3.2 and 3.3 are qualified as follows:

1.   The Company has been made aware that the Texas Department of Insurance has taken the position that the distribution of AIA Insurance, Inc. requires prior departmental approval due to the status the Company's Subsidiary, The Universe Life Insurance Company ("ULIC"), as "commercially domiciled" in Texas. The Company, while disputing the necessity of such approval, has none the less filed the necessary forms to obtain such approval. The Texas Insurance Department has not yet given its approval for distribution of AIA Insurance, Inc.

The California Department of Insurance requires the submission of a prior approval form for the Centennial reinsurance treaty. Since the transaction does not affect any California insureds, and ULIC is not being dissolved or merged, approval is expected in due course. Approval from California has not yet been obtained.

SCHEDULE III - Page 1

Exhibit 6 - Page - 6

**3-ER-648**

2.     As described above in connection with Section 3.3., certain transactions contemplated by the Agreement would violate provisions of the First Interstate Bank Loan Agreement and related documents.

C.     Section 3.6. The Company's financial representations contained in Section 3.6 are supplemented by the following attached financial statements related to the quarter ended June 30, 1995:

AIA Services Consolidated Balance Sheets at June 30, 1995.

AIA Services Consolidated Statement of Income For Six Months Ending June 30, 1995.

The Universe Life Preliminary Results of Operations (Statutory Basis) For Three and Six Months Ending June 30, 1995.

Great Fidelity Preliminary Results of Operations (Statutory Basis) For Three and Six Months Ending June 30, 1995.

AIA Services Consolidated Preliminary Results of Operations For Six Months Ending June 30, 1995.

## II.     EXCEPTIONS APPLYING SOLELY TO UNIVERSE LIFE.

Sections 3.1, 3.9 and 3.11. The Company's representations concerning Universe Life's good standing and qualification to transact business in various states and its compliance with state insurance laws are qualified by the following description of regulatory proceedings in the various states in which the insurance company transacts business.

Texas. On March 22, 1994, the State of Texas issued Cease and Desist Order No. 94-0282 against Universe Life and its subsidiary, AIA Insurance, Inc. The Order was based on preliminary examination findings reported to the Texas Department of Insurance ("TDI") by the examiners. The Order alleged that Universe Life and its affiliate engaged in unfair methods of competition and deceptive practice of insurance and that Universe Life was in hazardous financial condition. Following discussions with the company and receipt of additional documentation, TDI issued a Consent Order dated May 17, 1994 which superseded the Cease and Desist Order in its entirety. The Consent Order abandoned allegations of unfair competition and deceptive practices and focused on TDI's concerns with the proper reserving for the Supplemental Benefit Accumulation ("SBA") feature of Universe Life's GUH product and the valuation of Universe Life's investment in its subsidiary, AIA Insurance, Inc.

To address its concern with conflicting actuarial opinions on the proper reserves for the SBA, the May 17, 1994 Consent Order directed Universe Life to select an independent actuary to review Universe Life's SBA reserving methods and factors. Universe Life and the Department agreed that this actuarial review would be performed by Donna R. Claire, F.S.A., of Claire Thinking, an independent consulting actuary. Ms. Claire performed an asset adequacy analysis of Universe Life's reported December 31, 1993 SBA reserves, including a thorough review of GUH product features, actuarial assumptions, actual experience and historical trends. Ms. Claire's analysis is contained in her Asset Adequacy Report dated June 12, 1994.

SCHEDULE III - Page 2

Exhibit 6 - Page - 7

In her Report, Ms. Claire observed that Universe Life's GUH product, with its SBA feature, is an innovative product and that , "[a]s such, there is no current reserve standard for the SBA in state law that specifically fits this benefit". Ms. Claire concluded that (i) Universe Life's independent consulting actuaries, Milliman and Robertson, had developed "a methodology which follows the basic standards of establishing reserves that reflect the underlying risks of the product"; (ii) "[t]he reserve methodology used by [Universe Life's actuaries] does appear to be reasonable"; and (iii) "given the experience that was developed through 1993, the reserves reported in the [1993] Annual Statement were adequate".  Based on sensitivity tests which showed that the reported reserves may be inadequate if adverse trends occur, however, Ms. Claire recommended that the reserves be increased on the basis of "somewhat stronger" reserve assumptions.  Applying the same gross premium valuation methodology used by Universe Life to develop its reported reserves, Ms. Claire developed new reserving factors reflecting her more conservative assumptions.  Universe Life agreed with TDI that the SBA reserves for the Texas certificateholders under GUH policy would be determined prospectively in accordance with the factors developed by Donna Claire, with any increase in reserves being applied ratably beginning July 1, 1995 and with the final entry being made December 31, 1996.

With respect to the valuation of AIA Insurance, Inc., TDI acknowledged that Universe Life's accounting for the value of AIA Insurance was permissible under Texas law; but, in light of a Texas statute allowing the Commissioner to ascribe any other valuation he believes more appropriate (after hearing) and the impending statutory change in the Idaho Insurance Code effective July 1, 1995 (see below), the May 17, 1994 Consent Order directed that Universe Life's investment in AIA Insurance, Inc. be reduced, ratably over a three-year period beginning December 31, 1994, to the lesser of net worth as determined in accordance with generally accepted accounting principles or the valuation amount reflected in the final report of this examination.

During the period of discussions between Universe Life and TDI, the Texas Insurance Commissioner approved Universe Life's new GUH III product and the transfer of Universe Life's group health and life insurance business in Texas by reinsuring, on an assumption basis, all of such business with The Centennial Life Insurance Company.  See "Market Conduct Activities -- Policy Form Filings and Approvals" and "Subsequent Events—Sale of Group Universal Health Business" above.

On October 13, 1994, TDI issued a further Consent Order which superseded the May 17, 1994 Consent Order in its entirety.  The October Order recited Universe Life's agreement concerning the implementation of the Claire factors for reserving for the SBA and ordered that Universe Life reduce the reported value of its subsidiary, AIA Insurance, Inc., to the lesser or net worth (as determined in accordance with generally accepted accounting principles) or the valuation amount reflected in the final report of this examination, provided that the adjustment in the AIA Insurance carrying value would be made ratably over a three-year period beginning December 31, 1994.

Idaho.  Based on the financial concerns raised by the preliminary examination results and the issuance of the Texas Cease and Desist Order, the Idaho Department of Insurance ("Department") initiated an inquiry resulting in a Voluntary Agreement Concerning Supervisor, dated April 26, 1994 between Universe Life and the Department.  Under the Agreement, Universe Life has provided financial and other information to the Department on a regular basis

SCHEDULE III - Page 3

Exhibit 6 - Page - 8

3-ER-650

to enable the Department to informally monitor Universe Life's financial condition and operations to assure that policyholders' interests were protected during the period required to resolve the financial and other examination issues. During the period of discussions, the Department has approved Universe Life's new GUH III product, the transfer of Universe Life's individual health insurance business to States General Life Insurance Company and the transfer of its group health and life insurance business to The Centennial Life Insurance Company.

By agreement dated December 23, 1994, the Idaho Department approved Donna Claire's gross premium valuation method and Ms. Claire's reserving factors for calculating SBA reserves in accordance with her Asset Adequacy Report dated June 12, 1994. The Department agreed that Universe Life would not be required to restate its 1992 or 1993 Annual Statements and that implementation of the Donna Claire reserve adjustment will be made prospectively, in accordance with TDI's October 13, 1994 Consent Order, on a quarterly basis beginning with the third quarter of 1995 and ending December 31, 1996. The following table shows the effect of the Donna Claire adjustments to Universe Life's reported aggregate reserve for accident and health policies and to its capital and surplus at December 31, 1992, 1993 and 1994:

| | 1992 | 1993 | 1994 |
|---|---|---|---|
| Capital & surplus reported by Universe Life: | $ 5,418,748 | $ 5,140,830 | $ 4,182,781 |
| Aggregate reserve for A & H policies | | | |
| As reported | 10,376,371 | 14,040,419 | 9,193,850 |
| As calculated by Claire factor | 7,843,186 | 14,801,661 | 9,579,581 |
| Claire factor adjustment | 2,533,184 | ( 761,242) | ( 385,731) |
| Capital & surplus after Claire factor adjustment: | $ 7,951,932 | $ 4,379,588 | $ 3,797,050 |

In the December 23, 1994 agreement, the Idaho Insurance Department acknowledged that, until July 1, 1995, the Idaho Insurance Code permits Universe Life to continue to report its investment in AIA Insurance, Inc. at historical cost (subject to a 15% of assets limitation) on its 1992, 1993, and 1994 Annual Statements. Although permitted by Idaho statute, this valuation of AIA Insurance, Inc. deviates from the NAIC standards for investment in subsidiaries as set forth in the NAIC Accounting Practices and Procedures Manual for Life and Accident and Health Insurance Companies. See "Valuation of AIA Insurance, Inc." above under the caption "Comments on 1992 Financial Statements: Common Stock". On July 1, 1995, Universe Life will be required to reduce the value of its investment in AIA Insurance, Inc., for statutory accounting purposes, to the net book value of AIA Insurance, Inc (which was $2,424,097 at December 31, 1992).

Other States. The following regulatory proceedings in other jurisdictions were precipitated by the issuance of the Texas Cease and Desist Order and/or the preliminary examination findings contained therein:

A Notice of Hearing and Order to Show Cause with Suspension Instanter was issued by the Oklahoma Insurance Commissioner on April 6, 1994 based on the Texas Cease and Desist Order. On May 26, 1994, by letter agreement based on the May 17, 1994 TDI Consent Order and Universe Life's April 26, 1994 Voluntary Agreement with the Idaho Insurance Department, the Oklahoma Department agreed to suspend and terminate the prior Notice and Order to Show

SCHEDULE III - Page 4

Exhibit 6 - Page - 9

Cause and to allow Universe Life to continue to solicit business from its existing policyholder associations.

An Order of Suspension based on the Texas Cease and Desist Order was issued by the Illinois Department of Insurance on April 26, 1994. The Suspension Order was lifted by Stipulation and Consent Order dated July 27, 1994, pursuant to which Universe Life agreed to notify the Illinois Department before transacting new business in the state during the next three years.

A notice to show cause regarding suspension from doing business in the State of Mississippi was issued by the Mississippi Insurance Department on May 6, 1994, based on the Texas Cease and Desist Order. Suspension of Universe Life's certificate of authority was initially stayed by the Department; however, on September 8, 1994, a Suspension Order was entered based upon the appearance that Universe Life was then in an unsound condition.

The Alaska Insurance Department issued an Order suspending Universe Life's certificate of authority on May 19, 1994, based on the Texas Cease and Desist Order. Universe Life entered into an Agreement to Suspend New Sales on July 27, 1994; and the Alaska Insurance Department withdrew the suspension order. Universe Life had not been writing new business in Alaska, so the Agreement to Suspend New Sales has had no financial effect on Universe Life's operations.

The Missouri Insurance Department issued a Notice of Institution of Case and Statement of Charges dated June 2, 1994, based upon the Texas Cease and Desist Order. A hearing in the matter has been continued indefinitely, to be re-set upon further notice to Universe Life.

In June 1994, the California Insurance Department initiated an informal inquiry based on the Texas Cease and Desist Order. Universe Life entered into a confidential voluntary agreement to cease writing new business in California. Universe Life had not been writing new business in California; so the confidential agreement has had no financial effect on Universe Life's operations.

On June 6, 1994, a Suspension Order was issued by the Wyoming Department of Insurance without prior notice or hearing, based on the Illinois Suspension Order. Based upon subsequent withdrawal of the Illinois and Texas orders, Wyoming lifted the Order of Suspension and entered a Stipulation and Consent Order dated July 28, 1994, pursuant to which Universe Life was permitted to continue soliciting its existing policyholder association but agreed not to solicit other business in Wyoming without the Department's consent.

Universe Life voluntarily agreed to suspend new business in Oregon pending resolution of the Oregon Insurance Department's concerns under a unique Oregon statute regarding valuation of Universe Life's investment in AIA Insurance, Inc. A Consent Order was issued June 30, 1994. A Suspension Order was issued August 23, upon expiration of the Consent Order. Universe Life requested a hearing; and an Amended Suspension Order prohibiting new sales was entered November 2, 1994.

A Notice of Summary Suspension was issued by the Iowa Division of Insurance on August 15, 1994, based on failure of Universe Life to file its annual audited financial report by

SCHEDULE III - Page 5

Exhibit 6 - Page - 10

3-ER-652

June 1, 1994. (The auditor's report on Universe Life's 1993 financial statements was delayed pending Idaho's determination of financial issues raised by the examination. A draft of the audited financial statements had previously been provided to Iowa Division of Insurance.) The Order of Suspension was rescinded and the administrative proceeding dismissed on September 6, 1994. On January 6, 1995, the Division issued a Notice of Hearing to determine whether Universe Life's surplus met statutory minimums. Outside counsel informed Universe Life on April 10, 1995 that Iowa is dropping the action.

Universe Life entered into an Agreement with the Washington Insurance Department dated August 18, 1994, in which Universe Life voluntarily agreed not to write any new business in the State without prior approval of the Commissioner, pending submission of information establishing that Universe Life's financial condition is not detrimental to Washington policyholders.

On September 9, 1994, the Utah Insurance Department issued a Notice of Informal Adjudicative Proceeding summarily suspending Universe Life's Certificate of Authority for failure to maintain minimum capital and surplus as calculated under unique Utah statutes. Universe Life's hearing request was withdrawn after the Department's Chief Examiner advised that the suspension order could be lifted upon informal presentation by Universe Life's management after year-end demonstrating compliance with minimum capital and surplus requirements.

The Nebraska Department contacted Universe Life on October 14, 1994, concerning Universe Life's financial condition. Universe Life signed a Consent Order to suspend new sales on October 28, 1994.

08/16/95 4:21pm/s
A:\USERS\EA\WTO\WPDATA\A\AISCR\MORRISON-III

# State of Idaho

## Department of State

CERTIFICATE OF CORPORATE STATUS

OF

THE UNIVERSE LIFE INSURANCE COMPANY

I, PETE T. CENARRUSA, Secretary of State of the State of Idaho, hereby certify that I am the custodian of the corporation records of this State.

I FURTHER CERTIFY That the records of this office show that the above named corporation was incorporated under the laws of Idaho and was issued a certificate of incorporation in Idaho on December 29, 1989 under the file number C 91082.

I FURTHER CERTIFY That the corporation is in goodstanding on the records of this office.

Dated: August 16, 1995



_Pete T. Cenarrusa_

SECRETARY OF STATE

By _____

Exhibit 6 - Page - 12

3-ER-654

# State of Idaho

## Department of State

CERTIFICATE OF CORPORATE STATUS

OF

FARMERS HEALTH ALLIANCE ADMINISTRATORS, INC.

I, PETE T. CENARRUSA, Secretary of State of the State of Idaho, hereby certify that I am the custodian of the corporation records of this State.

I FURTHER CERTIFY That the records of this office show that the above named corporation was incorporated under the laws of Idaho and was issued a certificate of incorporation in Idaho on April 14, 1995 under the file number C 110233.

I FURTHER CERTIFY That the corporation is in goodstanding on the records of this office.

Dated: August 16, 1995



*Pete T. Cenarrusa*

SECRETARY OF STATE

By _____

Exhibit 6 - Page - 13

3-ER-655

# State of Idaho

## Department of State

CERTIFICATE OF CORPORATE STATUS

OF

AIA INSURANCE, INC.

I, PETE T. CENARRUSA, Secretary of State of the State of Idaho, hereby certify that I am the custodian of the corporation records of this State.

I FURTHER CERTIFY That the records of this office show that the above named corporation was incorporated under the laws of Idaho and was issued a certificate of incorporation in Idaho on January 31, 1977 under the file number C 54973.

I FURTHER CERTIFY That the corporation is in goodstanding on the records of this office.

Dated:  August 16, 1995



*Pete T. Cenarrusa*
SECRETARY OF STATE

By _____

Exhibit 6 - Page - 14

3-ER-656

## EXECUTIVE OFFICER'S AGREEMENT

This Agreement ("Agreement") is effective the 1st day of August, 1995 between AIA Services Corporation, an Idaho corporation ("AIA"), and R. John Taylor ("Employee").

WHEREAS, AIA is a corporation engaged in the business of acquiring, managing and administering the operations of insurance companies and insurance agencies.

WHEREAS, AIA proposes to purchase the Common Stock of Reed J. Taylor, majority shareholder of AIA, so that Employee and Richard W. Campanaro, will obtain operational and financial control of AIA.

WHEREAS, Employee is experienced as an executive officer in the conduct of AIA's business and desires to accept employment by AIA.

WHEREAS, AIA desires to engage the Employee as an executive officer of AIA.

NOW, THEREFORE, in consideration of the mutual promises set forth in this Agreement, and intending to be legally bound hereby, the parties agree as follows:

Section 1. <u>Agreement for Employment</u>. Subject to this Agreement's terms and conditions, AIA engages Employee, and Employee accepts such employment, as an executive officer. Employee shall have the title of Chairman of the Board of Directors or any other title as shall be designated by AIA's Board of Directors.

Section 2. <u>Term</u>. The initial term of employment shall commence effective August 1, 1995, and shall continue for three (3) years until July 31, 1998. Unless terminated as set forth in this Agreement, the term of such employment shall automatically be extended from year to year thereafter under the same terms and conditions as shall be in effect on the last previous termination

EXECUTIVE OFFICER'S AGREEMENT #2 - Page 1
9/5/95 - ct

Exhibit 7 - Page - 1

3-ER-657

date. Either party shall have the right to terminate this Agreement at the expiration of the initial term or any extension thereof by giving the other party sixty (60) days notice prior thereto.

Section 3. Duties. The Employee shall perform such duties as are typically performed by the Chairman of AIA's Board of Directors and shall at all times remain subject to the Board of Directors' direction and control. The Employee shall devote the Employee's entire time and efforts to AIA's business and affairs, and shall not engage in any other business activity for remuneration or compensation without AIA's prior written consent. This restriction is not intended to apply to the Employee's supervision of any currently existing or future personal investments so long as those investments do not interfere with the Employee's services to be rendered or cause a breach of the restrictions set forth in Section 9 hereof.

Section 4. Base Compensation. During the initial three-year term of this Agreement, AIA shall pay the Employee, as base compensation, the sum of $250,000 per annum, payable at such payroll intervals as AIA shall pay other executives. Base compensation in subsequent years shall be determined by the Board of Directors.

Section 5. Life Insurance. AIA shall provide, at its own expense, $500,000 of term life insurance coverage on Employee's life. Employee shall have full discretion to name the beneficiary of this insurance. AIA shall have the right, at its own expense and for its own benefit, to purchase additional insurance on the Employee's life; and Employee shall cooperate providing necessary information, submitting to required medical examinations, and otherwise complying with the insurance carrier's requirements.

Section 6. Fringe Benefits. AIA shall make Employee the beneficiary of, and Employee shall receive, the standard package of fringe benefits provided by AIA to other executives similarly situated. Fringe benefits intended to be included in this standard benefit package include but are not

EXECUTIVE OFFICER'S AGREEMENT #2 - Page 2
9/5/95 - ct

Exhibit 7 - Page - 2

3-ER-658

limited to medical, surgical, and major medical insurance coverages, vacations, and sick leave. Recognizing the AIA has no executive disability benefit, in the event of Employees inability to work, whether by reason of accident or illness, AIA will continue Employee's base compensation and fringe benefits (without entitlement to a bonus) for six (6) months if the disability occurs during the calendar year ending 1995, and for one year if the disability occurs thereafter during the term of this Agreement.

Section 7. **Bonus Program**. AIA shall make Employee a participant in an executive bonus program, applicable to the fiscal year ending 1995. It is intended that a similar program will be adopted for subsequent fiscal years, the precise terms of which will be negotiated between the parties and subject to approval of the Board of Directors.

Section 8. **Stock Options**. AIA does not contemplate that Employee will participate in any other management stock option plans.

Section 9. **Covenants Not to Compete**. Employee expressly covenants and agrees that, while employed and during the three (3) years immediately following the effective date of termination of Employee's employment under this Agreement (except as related to Subsection [c] of this Section), with or (except as provided in Section 11 hereof) without cause, the Employee shall observe and be subject to the following restrictions:

(a)     Employee will not in any way, directly or indirectly, on the Employee's own behalf or on behalf of or in conjunction with any other person, partnership, firm or corporation solicit, divert, take away, or attempt to take away any person, partnership, firm, or corporation (or their business or patronage) that has been a customer of AIA or its affiliated companies within three (3) years of such employment termination.

EXECUTIVE OFFICER'S AGREEMENT #2 - Page 3
9/5/95 - ct

Exhibit 7 - Page - 3

3-ER-659

(b)     Employee will not directly or indirectly own, manage, operate, control, participate in, or be affiliated as an officer, employee, partner, creditor, or guarantor of any person, partnership, firm or corporation that is engaged or about to become engaged in the insurance business of underwriting, marketing or administering insurance products for commodity associations, or any other business that is developed by AIA during Employee's employment.

(c)     Employee will not in any way, directly or indirectly, on Employee's own behalf or on behalf of or in conjunction with any person, partnership, firm, or corporation, solicit, entice, hire, employ, or endeavor to employ any of AIA's employees during the two (2) years immediately following the effective date of termination of Employee's employment under this Agreement.

(d)     Employee will not divulge to others or use for the benefit of Employee or any other person any confidential information obtained during Employee's employment relating to the business or operations of AIA or its affiliates, including (without limitation) information concerning business strategy, customer lists, lists of prospective customers, employee lists, number and location of sales agents, new and existing programs and services, prices and terms, and any other proprietary information as may exist or be developed from time to time.

**Section 10.** **Remedy for Breach**. Employee acknowledges that a violation of any of the provisions of this Agreement, including its covenants not to compete, will cause irreparable damage to AIA. Employee hereby agrees that any violation of this Agreement shall entitle AIA, in addition to any other rights or remedies AIA may have, to an immediate injunction restraining such violation.

EXECUTIVE OFFICER'S AGREEMENT #2 - Page 4
9/5/95 - ct

Exhibit 7 - Page - 4

3-ER-660

Section 11. AIA's Right to Terminate Without Cause. AIA shall be entitled to terminate Employee's employment, without cause, upon ninety (90) days' prior notice to the Employee. Such right may be exercised only upon an affirmative vote of at least two thirds of AIA's Board of Directors. In the event of termination of Employee's employment by AIA without cause prior to the expiration of the initial term of Employee's employment or any extension thereof, covenants (a) and (b) in Section 9 hereof shall be extinguished.

Section 12. Termination for Cause. AIA shall have the right to terminate Employee's employment at any time, immediately and without prior notice, for "cause". The term "cause" shall mean:

(a)     Conduct on Employee's part intended to or likely to injure AIA's business or reputation;

(b)     Employee's perpetration of a crime involving moral turpitude, whether relating to employment or otherwise; or

(c)     Failure by Employee to substantially perform Employee's duties and obligations as set forth in this Agreement (provided that such failure is not the result of Employee's illness or physical or mental incapacity).

Section 13. Severance Benefits. Upon termination of Employee's employment for any reason (including, without limitation, Employee's disability or the expiration of the initial term of this Agreement or any extension thereof or the exercise of AIA's right to terminate such employment without cause under Section 11 hereof) other than for cause or reaching normal retirement age, Employee shall be entitled to be paid by AIA a lump sum severance benefit equal to twice the base compensation payable to Employee during the twelve-month period immediately proceeding such termination.

EXECUTIVE OFFICER'S AGREEMENT #2 - Page 5
9/5/95 - ct

Exhibit 7 - Page - 5

3-ER-661

Section 14. <u>Severability.</u> In case any one of more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality or unenforceability of the remaining provisions contained herein and any other application thereof shall not in any way be affected or impaired thereby. The covenants not to compete, set forth in Section 9 of this Agreement, are independent of any other covenant or provision of this Agreement; and the existence of any claim or cause of action against AIA of any company affiliated with or related to AIA, whether predicated on this Agreement, or any other agreement, or otherwise, shall not constitute a defense to the enforcement of these covenants.

Section 15. <u>Applicability of Restrictions.</u> The restrictions established in Section 9 shall apply unconditionally if Employee's employment is terminated

    (a)    for cause;

    (b)    by reason of Employee's voluntary resignation at a time other than the expiration of the initial term of Employee's employment or any extension thereof; or

    (c)    at the expiration of the initial term of Employee's employment or any extension thereof.

The restrictions established in Section 9 shall be inapplicable if the Employee's employment is terminated

    (a)    by reason of this Agreement's breach by AIA;

    (b)    without cause under Section 11 hereof prior to the expiration of the initial term of Employee's employment or any extension thereof.

EXECUTIVE OFFICER'S AGREEMENT #2 - Page 6
9/5/95 - ct

Exhibit 7 - Page - 6

3-ER-662

16.     Option to Purchase AIA Stock.

16.1     Effective Date.  The provisions of Section 16 of this Agreement shall become effective at the effective date of the Stock Purchase Agreement between Reed J. Taylor and AIA whereby AIA purchases all the Common Stock held by Reed J. Taylor.

16.2     Option Grant.  AIA does hereby grant and extend to Employee, effective as of the effective date set forth in Section 16.1 hereof, the irrevocable exclusive option ("Option") to purchase four hundred seventy-five thousand (475,000) of AIA Common Stock for $.01 per share at any time during the ten year period following the effective date.

16.3     Exercise.  At any time during the option period, Employee may exercise the Option to purchase AIA Stock from AIA by delivery of written notice to AIA stating that the Option is being exercised.  The exercise notice shall be deemed delivered upon delivery to AIA at the address set forth in Section 17 hereof, or upon the date of the postmark on the envelope containing the notice when mailed in the United States mail, postage prepaid, addressed to AIA, at such address.

16.4     Regulatory Approvals.  Closing of Employee's purchase of the AIA Stock pursuant to this Agreement is conditioned upon receipt of all required regulatory approvals, if any.

16.5     Closing.  Within ten (10) days after the later of Employee's receipt of notice of exercise of the Option or the receipt of all required regulatory approvals of Employee's purchase of the AIA Stock, Employee and AIA shall close the transfer of the AIA Stock as follows:  AIA shall deliver to Employee a stock certificate evidencing the AIA Stock.  Employee, in turn, shall pay the option price for the AIA Stock to AIA in cash or by cashier's check.

Exhibit 7 - Page - 7

3-ER-663

16.6   **Further Assurances**. Employee and AIA hereby covenant and agree to execute, on demand, any and all legal instruments which may be necessary or convenient to carry out the provisions of Section 16 of this Agreement. In particular (but without limitation), Employee and AIA agree to cooperate in preparing and filing with applicable insurance regulators, at AIA's expense, all filings for required regulatory approvals.

Section 17.   **Notices**. All notices, requests, demands, and other communications that are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid:

To AIA:   .   AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

To the Employee:   R. John Taylor
2020 Broadview Drive
Lewiston, ID  83501

Section 18.   **Governing Law**. This Agreement shall be construed and enforced in accordance with the laws of the State of Idaho.

Section 19.   **Entire Agreement**. This Agreement contains the entire agreement among the parties concerning the employment relationship between Employee and AIA. There are no agreements, representations or warranties concerning the employment relationship between Employee and AIA that are not set forth herein. All prior negotiations, agreements and understandings are superseded. This Agreement may not be amended or revised except by writing signed by both parties.

EXECUTIVE OFFICER'S AGREEMENT #2 - Page 8
9/5/95 - ct

Exhibit 7 - Page - 8

3-ER-664

Section 20.   Binding Effect. This Agreement shall be binding upon and inure to the benefit of the heirs, legal representatives, and successors of the respective parties; provided, however, that this Agreement and all its rights may not be assigned by either party except by or with the written consent of the other party.

Section 21.   Counterparts.   This Agreement may be executed in any number of counterparts, each of which, when bearing original signatures, shall be deemed to be a duplicate original.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

AIA:

Employee:

AIA SERVICES CORPORATION

By _____

_____
R. John Taylor

Per Board meeting dated

EXECUTIVE OFFICER'S AGREEMENT #2 - Page 9
9/5/95 - ct

Exhibit 7 - Page - 9

3-ER-665

| | |
|---|---|
| **From:** | Jim Beck [jbeck@emcllc.us] |
| **Sent:** | Wednesday, February 16, 2005 3:53 PM |
| **To:** | John Taylor |
| **Cc:** | MWCASHMAN@aol.com; Kent Petersen |
| **Subject:** | Summary of Conversation |

Thanks for your time on the phone today. Mike and I are so convinced that Crop USA is a winner that anything standing in the way of a good result will be a crime. Having said that, the following is an attempt at a summation of our conversation and what needs to be done:

1. Everyone on the sales and home office team will work as best they can between now and March 15 to sell and process as much crop insurance business as possible without being combative or disruptive concerning Reed, his associates and their activities.

2. On March 16, a meeting will be held with Reed Taylor to confront the consequences of his actions, including his constant undermining of company policies and procedures, usurping of authority, disrupting agents and prospective agents, and overall affect on morale and productivity.

3. Reed's activities have proved to be very disruptive and they have the potential to ruin our relationships with Austin Mutual, the RMA, re-insurers, associations, employees, and regulators.

4. John Taylor will engage an attorney to represent Crop USA to make certain that any steps taken with Reed will fall within legal limits and options will be explored where we have any vulnerability.

5. John Taylor will reduce to writing any areas of vulnerability with regard to moving ahead with Crop USA and not including Reed in any part of the transaction. Since Reed has no interest in Crop USA, John will examine what effect, if any, Reeds taking over of AIA would have.

6. In attempting to reach an agreement with Reed, it may be necessary to give Reed AIA. John and the Board are prepared to deal with this eventuality by cutting all ties to Reed.

7. Although we explained to Adrian Johnson that we will be hiring a new Sales Manager and asking Reed to leave, Reed's latest outbursts have called into question the need to re-educate Adrian on the potential problems and for him to accept the challenge. It is imperative that the Reed situation be dealt with on March 16 and an agreement must be made to remove Reed from having any influence what so ever. Should Reed decide not to step aside, then he must be given AIA and Crop USA will survive on its own.

8. I must have this assurance in writing before I talk with Adrian and bring him up to speed. An acknowledgement via return e-mail is fine.

9. I will be awarded 100,000 shares of Crop USA for putting together the real estate equity.

10. Mike and John will correspond on the terms and conditions of the dilution issue.

Please let me know if I have captured the subject matter discussed.

Jim

AIA0000204625

**Exhibit 53 - Page - 1**

**3-ER-666**

June 18, 2001

Daryl R. Verdoorn
C H Robinson Co
8100 Mitchell Road
Eden Prairie, MN  55344

Dear Mr. Verdoorn:

I have enclosed the proxy for the annual meeting of AIA Services Corporation.   In addition, you will find an offer from Crop USA to exchange your AIA Services Series C Preferred stock for common stock of Crop USA.

Over the last few years, AIA's management and directors have been looking for ways to create an exit strategy for your investment in AIA.  We had originally planned to take AIA public, but it is unlikely in the foreseeable future.  Market conditions may change, but there can be no assurance for a public market.

With Crop USA, we believe there is a better opportunity for a clearly defined exit strategy.  Once the company reaches its goal of $100 million in crop insurance premiums, management believes that Crop USA will have the potential to be acquired or become fully tradable.

AIA has been working on a project and market strategy referred to as Crop USA.  Crop USA was created by AIA as a property and casualty insurance agency which markets crop insurance to members of sponsoring agricultural associations, such as the wheat growers, soybean growers, etc. that are already affiliated with AIA.  Crop USA also manages the Growers National Cooperative Insurance Agency (GNCIA), an insurance buying cooperative owned by farmers.  Crop USA is designed to give farmers more competitive pricing and the agents of Crop USA a more precise target market.

The crop insurance agency market is very fragmented.  Only a few crop agencies in the U.S. have $10 million or more of placed premiums.  Crop USA expects to help consolidate the market by combining the business of about 200 local agencies each year. Crop USA believes it can consolidate over $100 million of crop insurance premium over the next few years.  A complete description of the business model is attached as a draft Form 1-A filing.

EXHIBIT 53

AIA0001080



Exhibit 55 - Page - 1

3-ER-667

Page Two

Crop USA will offer stock options to local agents to join the business model and accelerate sales. These stock options must be registered. We will also register an additional one million shares.

Crop USA is offering all Series C Preferred shareholders the opportunity to exchange your Series C Preferred stock for common stock in Crop USA. For each $10 par value Series C Preferred share of AIA Services Corporation, Crop USA will exchange 10.66 shares of its common stock. Individuals who hold a majority of the Series C Preferred stock have agreed to the exchange. The form 1-A prospectus assumes that all Series C Preferred shareholders will accept the exchange offer. If you decide not to accept, we will modify the registration appropriately.

Please review the enclosed materials. If you decide to accept the exchange offer, you must do so by July 23, 2001. After that date, the offer will be withdrawn. After review of the materials, please feel free to call me for any additional information.

Sincerely,


R. John Taylor
President and CEO

AIA0001081

Exhibit 55 - Page - 2

3-ER-668

LETTER OF TRANSMITTAL

To Surrender Certificates for Shares of Common Stock of

CROP USA INSURANCE AGENCY, INC.

Pursuant to the Exchange Offer Approved by the
Shareholders of Crop USA, Inc. on June 12, 2001

AGENT

JoLee Duclos, Secretary
P.O. Box 538
Lewiston, ID  38501
208-799-9043

| DESCRIPTION OF AIA SERVICES CORPORATION SERIES C PREFERRED SHARES SURRENDERED | | |
|---|---|---|
| Name and Address of Registered Owner | Certificate(s) Surrendered | |
| | Certificate Number(s) | Total Number of AIA Services Corporation Series C Preferred Shares Represented by Certificate(s)* |
| Corrine M. Beck 5152 Belmont Avenue South Minneapolis, MN  55419 | 19 | 50,000 |
| | | |
| | | |

*Unless otherwise indicated, it will be assumed that all such AIA Services Corporation Series C Preferred Shares evidenced by such certificate(s) have been surrendered.

Gentlemen:

In connection with the agreement between AIA Services Corporation and Crop USA Insurance Agency, Inc. to offer to exchange AIA Services Series C Preferred shares for Crop USA common stock, the undersigned, who is the registered holder of the above-listed certificate(s) or the assignee of such registered holder, hereby surrenders the above-listed certificate(s) representing shares of AIA Services Series C Preferred $10.00 state par value stock ("AIA shares") in exchange for 10.66 common shares of Crop USA for each AIA Services Corporation Series C Preferred share hereby surrendered.

The undersigned represents and warrants that the AIA shares represented by such certificate(s) are owned by the undersigned free and clear of all liens, restrictions, charges, and encumbrances and will not be subject to any adverse claim when the Agent makes the exchange to the recipient designated in this Letter of Transmittal. The undersigned further represents and warrants that he has full authority to surrender such certificate(s) and to receive or to designate the recipient of Crop USA shares for the AIA shares represented by such certificate(s). Upon request, the undersigned will execute and deliver any additional documents deemed appropriate or necessary by the Agent in connection with the surrender of such certificate(s). All authority



EXHIBIT
57

AIA0001084

Exhibit 56 - Page - 1

3-ER-669

herein conferred or agreed to be conferred shall survive the death or incapacity of the undersigned; and any obligation for the undersigned hereunder shall be binding upon the heirs, personal representatives, successors, and assigns of the undersigned.

The undersigned hereby constitutes and appoints Agent as the true and lawful agent and attorney-in-fact of the undersigned with respect to such AIA shares, with full power of substitution (such power of attorney being deemed to be an irrevocable power coupled with an interest), to cancel the certificate(s) for such AIA shares, together with all accompanying evidences of transfer and authenticity, upon exchange for Crop USA shares.

---

SIGN HERE

X  _Corine M Deik_

Signature(s) of Owner(s) or Authorized Agent

Dated _June 30_ ,2001

(Must be signed by registered holder(s) exactly as name(s) appear on certificate(s) for AIA Services Corporation Series C Preferred Shares, or by person(s) authorized to become registered holder(s) by certificates and documents transmitted herewith.

If the information maintained by AIA Services Corporation is incorrect, please legibly print the correct information below.

Name(s) _____

_____

Address _____

_____

Telephone Number (include area code) _____

---

AIA0001085

Exhibit 56 - Page - 2

3-ER-670

**Series C Preferred Shareholder Decisions**
to exchange for Crop USA Shares

| Shareholder | Yes | No | # Shares | Request Received |
|---|---|---|---|---|
| Corrine Beck | X | | 50,000 | 7/20/01 |
| Michael W. Cashman | X | | 100,000 | 7/12/01 |
| M. Cashman IRA | X | | 15,000 | 7/12/01 |
| Michael Cashman Jr. | X | | 5,000 | 7/22/01 |
| Distribution Services | X | | 10,000 | 7/19/01 |
| Bruce Knutson | X | | 15,000 | 7/23/01 |
| Charles Rapp | X | | 5,000 | 7/20/01 |
| Daryl Verdoorn | X | | 5,000 | 7/20/01 |



AIA0001079

EXHIBIT

tabbies

Exhibit 56 - Page - 3

## AIA SERVICES CORPORATION
### *PREFERRED C STOCK*
### SHAREHOLDER LIST
### 12/31/02
Per amended Articles of Incorporation dated August 3, 1995, authorized 500,000 shares of Series C
10% convertible Preferred Stock at $1 Par per Share

| Shareholder | Percentage of Ownership | Number of Shares Jan 1, 2002 | Issued | Transferred | Number of Shares Dec 31, 2002 | Percentage of Ownership |
|---|---|---|---|---|---|---|
| AIA Services 401(k) Plan | 100.00% | 92,500 | | | 92,500 | 31.09% |
| Crop USA, Inc. | | - | - | 205,000.00 | 205,000 | 68.91% |
| **Total** | 100.00% | 92,500 | - | 205,000.00 | 297,500 | 100.00% |

⟨A-12⟩

Dividend rate 10%, cumulative, based on $10 per share value, paid through 3/31/98.

1/9/03                                    Stock1                                    II1-3



EXHIBIT

AIA0023950

Exhibit 56 - Page - 4

**3-ER-672**

Case: 25-3552, 01/20/2026, DktEntry: 23.4, Page 201 of 228

Case 1:10-cv-00404-CWD   Document 67-57   Filed 07/30/12   Page 5 of 7

3-ER-673

Exhibit 56 - Page - 5



INCORPORATED UNDER THE LAWS OF IDAHO

NUMBER
21

SHARES
205,000

# AIA SERVICES CORPORATION

FULLY PAID                                                                 NON-ASSESSABLE

This Certifies that ___CropUSA Insurance Agency, Inc._____ is the

registered holder of ___Two Hundred Five Thousand_____ Shares

OF SERIES C PREFERRED STOCK OF AIA SERVICES CORPORATION

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed this ___20th___ day of ___December___ A.D. 20 01

SECRETARY                                                                  PRESIDENT

CROP00    1

MINUTES OF THE BOARD OF DIRECTORS
Crop USA Insurance Agency, Inc.

The annual meeting was called to order on January 10, 2001, by Chairman, R. John Taylor. Others in attendance were JoLee Duclos and Paul Schrette. The minutes of the prior meeting were reviewed and approved without comment.

The Directors reviewed the business model and written business plan of the Company and authorized the President and Chairman to finalize negotiations with Great American to begin operations. Great American has been selected as the insurer through which Crop USA will market its business.

The Directors discussed the necessity for additional funding to operate the corporation. AIA Services Corporation has declined to continue to operate the company as a subsidiary of AIA and wants the Company to be independent. As part of the negotiations with AIA, the Directors believe it would be in the best interest of the company that Crop USA offer to purchase the Series C Preferred stock currently outstanding of AIA as set forth in a Master Marketing Agreement with AIA. The Directors authorized the officers to continue negotiations on Crop USA's purchase of AIA Services Corporation's outstanding Series C Preferred stock.

It was moved, seconded and unanimously passed that Crop USA enter into and its executive officers be authorized to execute the following agreements on behalf of the corporation:

1)      Crop Insurance Division Agency-Company Agreement with Great American Insurance Companies;
2)      Master Marketing Agreement with AIA Insurance, Inc. that provides Crop USA access to grower associations represented by AIA Insurance;
3)      Management Agreement in which AIA Insurance agrees to provide management and administrative support services to Crop USA;
4)      Management Agreement with Growers National Cooperative Insurance Agency, Inc. in which Crop USA agrees to provide management and administrative support services to Growers National, with the assistance of AIA Insurance; and
5)      Agency and Development Agreement with Growers National Cooperative that provides for the appointment of the cooperative as a sub-agent of Crop USA.

The Board authorized, subject to shareholder agreement, amendment of Crop USA's Articles of Incorporation to increase the authorized common stock from one million shares to twenty million shares.



EXHIBIT
CROP000069

Exhibit 56 - Page - 6

3-ER-674

The following nominees for officers were unanimously elected:

| | |
|---|---|
| President /CEO | Paul D. Schrette |
| Vice President | Bryan Freeman |
| Vice President | Jay Taylor |
| Vice President/Secretary | JoLee K. Duclos |
| Treasurer | R. John Taylor |

The board reviewed a proposal to retain the law firm of Hawley, Troxell, Ennis & Hawley LLP of Boise, Idaho, as its advisor and SEC counsel. The motion was so made, second and approved. A copy of said agreement is attached hereto and incorporated herein by reference.

There being no further business, the meeting was adjourned.

_____
Secretary

CROP000070

Exhibit 56 - Page - 7

3-ER-675

AIA INC
Trust Mark 3Q2004 Journal Entries
09/30/04

| J/E # | Account Name | Account # | Debit | Credit | Company Code |
|---|---|---|---|---|---|
| TM1 | Cash | 100017 | $ 1,510,693.00 | | AIA |
| | Misc. Income | 400000 | | $ 1,510,693.00 | AIA |

To record Original deposit on 08/04/2004 at AmericanWest Bank For Trust Mark YE Bonus

*PI-1*

| | | | | | |
|---|---|---|---|---|---|
| TM2 | Investment in AIA SVCS | 1000?? | $ 1,510,693.00 | | AIA |
| | Additional Paid In Capital (Per BDO 9/10/04) | 310000 | | $ - | AIA |
| | Cash | 10001? | | $ 1,510,693.00 | AIA |

To Record the purchase of 205,000 shares of AIA Services Preferred C Stock from Crop USA. Preferred C Stock Current value per BS 06/30/2004 $21,850 or $0.106586 (Crop Books) $9.39 per share from latest 3rd party Appraisal completed 10/04.

*PI.2*

| | | | | | |
|---|---|---|---|---|---|
| TM3 | Misc. Income | 400000 | $ 360,693.00 | | AIA |
| | A/R Crop USA | 120020 | | $ 360,693.00 | AIA |

To correct CR800 on 08/09/2004 and show money from CROP USA Ck#???? Am.West on 08/05

*PI.3*

A/R- R. John Taylor AmWest Ck# 9999 08/06

| | | | | | |
|---|---|---|---|---|---|
| TM5 | Zion's Bank LOC | 120004 | $ 158,576.14 | | AIA |
| | A/R- R. John Taylor AmWest Ck# ???? 08/06 | 120004 | $ 20,000.00 | | AIA |
| | A/R- R.John Taylor AmWest Ck# 1001 08/06 | 120004 | $ 20,000.00 | | AIA |
| | A/R- PERC AmWest Ck#1002 08/06 | 120011 | $ 75,000.00 | | AIA |
| | A/R CropUSA | 120020 | | $ 273,576.14 | AIA |

Per JT 11/01/2004. Record as AR-Jtaylor
Per JT 11/01/04. Record on Crop Books as Prepaid. Offset in 4Q04 etc with amounts Crop owes AIA

*PI-4*

Crop USA Insurance Agency, Inc.
Trust Mark 3Q2004 Journal Entries
09/30/04

| | | | | | |
|---|---|---|---|---|---|
| TM1 | Cash AmWest Bank | 100017 | $ 1,510,693.00 | | Crop |
| | Investment in AIA SVCS | 100040 | | $ 21,850.00 | Crop |
| | Additional Paid In Capital (Per BDO 9/10/04) | 310000 | | $ 1,488,843.00 | Crop |

To Record the sale of Investment in AIA Services. 205,000 shares of Preferred C Stock to AIA Inc (Co. 6). Preferred C Stock Current value per BS 06/30/2004 $21,850 or $0.106586. per share Latest Appraisal $9.39 completed 10/04.

| | | | | | |
|---|---|---|---|---|---|
| TM2 | Cash AmWest Bank | 10001? | $ 1,705.97 | | Crop |
| | Due to AIA | 200006 | | $ 1,705.97 | Crop |

To Record Interest earned on AmWest Account

| | | | | | |
|---|---|---|---|---|---|
| TM3 | Line of Credit | 200002 | $ 40,000.00 | | Crop |
| | Cash AmWest Bank | 10001? | | $ 40,000.00 | Crop |

To correct CR838 on 09/15/2004. See AmWest check #1003

| | | | | | |
|---|---|---|---|---|---|
| TM4 | Due to AIA Insurance | 200006 | $ 360,693.00 | | Crop |
| | Cash AmWest Bank | 10001? | | $ 360,693.00 | Crop |

To Record Ck# ???? On 08/05 from AmWest Account to AIA Inc for payment on account.

AIA0001415

3Q2004 WORK PAPERS

EXHIBIT 56 1/PI-1

Exhibit 58 - Page - P. 1

3-ER-676

cus McNabb

To:            Marcus McNabb
Subject:       Meeting Notes 10/29/04

Meeting on 11/01/04 with JoLee in the room:
**Crop**
- Adjust 3Q2004 Crop books for Preferred Stock entry
- Adjust 3Q2004 Crop Books for Investment in AIA Services (AIA Inc. Purchased for $1.5mil).
- Adjust Line of Credit by $40,000. Show ending balance as $560,000
- Leave Pre-paid alone for 3rd quarter. Adjust out in 4th quarter by amounts owed to AIA Inc.

**AIA**
- Make entry for Income of $1.5mil from TrustMark
- Make entry for purchase of investment in Services from Crop for $1.5 mil.
- Make entry to adjust GL account 120020 for $360,693 showing money from Crop. This will correct an earlier entry CR800.
- Record AmWest checks to AR -J.Taylor (120004) of $198,576.14.  Offset GL 120020.
- Record AmWest check #1002 for $75,000 as AR-PERC offset GL 120020.
- Make entry showing Services selling investment in PERC for $75,000 in exchange for Services debt to Inc.
- Make entry showing AIA selling investment in PERC to J.Taylor for $75,000 in exchange for AR Note from JT.

**Services**
- Services sold AIA investment in PERC for $75,000 in exchange for reduction in debt from Services to AIA
- Services should show stockholder of Preferred Stock (205,000 shares) as AIA Inc.



Meeting with John on 10/29/2004 to cover various accounting issue:

**Crop:**
In accounting for the Trustmark check of $1,510,693 it was determined that what we did for 3rd quarter has to stay.  We should adjust the following accounts in 4th quarter:

- Fix the Investment in AIA Services -$21,850.  AIA Inc actually purchased this investment for $1,510,693 from services, all dividend rights go with this transaction.  Crop should record a ($1,488,843) PIC transaction, $1,510,693 Cash, and Investment of ($21,850).
- The cash amounts should be changed to reflect the following:
  - Payment on account to AIA for $360,693. Offset AIA Crop AR for $360,693.
  - Crop should record a $1,705.97 entry for Interest (not AIA).
  - Correct CR838 on 09/15 (AmWest Check #1003) to show money from New AmWest Account. This will fix line of Credit $600,000 to be $560,000
  - Prepaid should be adjusted for:
    - $3,500 (Ck#1004) for Travel expenses for JT in Europe (Crop Expense).
    - $158,576.14 (Ck#9999). Charge AP to AIA on Crop's books. On AIA's Books show AR to JT and AR to Crop.
    - $20,000.00 (Ck #????). Charge AP to AIA on Crop's books. On AIA's Books show AR to JT and AR to Crop.
    - $20,000.00 (Ck#1001). Charge AP to AIA on Crop's books. On AIA's Books show AR to JT and AR to Crop.
    - $75,000.00 (Ck#1002). Charge AP to AIA on Crop's books. On AIA's Books show AR to PERC.

**AIA**

We could fix AIA's books for 3rd qtr since they have not been completed (per Marcus). We will be out of balance between AIA and Crop in 3rd Qtr but will fix it in 4th qtr.  This will also allow us to better state our overall financial position, by at least recognizing expenses and where the money went.

- To record the initial deposit from TrustMark:
  - Cash, Misc Income $1,510,693.00
- To show the purchase of the investment from Crop (AIA Services Preferred Stock)
  - Investment in AIA Services, Cash $1,510,693.00

1

AIA0001416    PI-18

Exhibit 58 - Page - 2
p. 2
3-ER-677

...us McNabb

| | |
|---|---|
| From: | John Taylor |
| Sent: | Saturday, October 09, 2004 9:15 AM |
| To: | Marcus McNabb |
| Subject: | RE: Additional transactions for Crop / AIA |

I see what your saying in #1. We will need to make additional journal entries on Crop to clear this up.
The basic transaction is AIA Services is redeeming the AIAS preferrred stock that Crop owns. The Services preferred
stock is to be cancelled.   The original deposit was a year end bonus check from Trustmark, deposited to
to the new Crop (Am West) bank account in contemplation of the preferred redemption transaction.   The increase
in the line of credit to Private Bank is an error or a result of the deposit of check #1003.  Please verify the LOC balance.
talk to you thursday

-----Original Message-----

| | |
|---|---|
| From: | Marcus McNabb |
| Sent: | Friday, October 08, 2004 3:26 PM |
| To: | John Taylor |
| Subject: | Additional transactions for Crop / AIA |

Hi John,
Thanks for taking the time to update me with the information on Crop's books.  I noticed a few things about the entries
that I need you help on:

The account shows several checks written. I would like to record these expenses in Crop's books before closing out
the quarter. Could you please let me know who the checks were made payable to and the reason for the check
(expense category):

- Check #1001    09/06/2004    $ 20,000.00
- Check #1002    09/15/2004    $ 75,000.00
- Check #1003    09/16/2004    $ 40,000.00
- Check #1004    09/14/2004    $  3,500.00
- Check #9999    08/06/2004    $158,576.14
- Check #blank   08/05/2004    $360,693.00

I also noticed that we recorded an entry to show cash moving from Crop USA to AIA for $674,269.14.  Did you plan on
physically moving  this money from American West Bank, or did you have something else in mind?

Can you help me understand how the line of credit from Private Bank of Minnesota increased from $560,000 to
$600,000?  I was thinking that is where the cash came from before you left for your trip to Europe. Maybe I was
mistaken.

Last question for now... I am assuming that the bank account at American West only has your name on it, and you are
the only signer.  Do you want us to contact the bank and have the recon sent here, or do you have something else in
mind?

This should help us keep the books on Crop, AIA and AIA Services straight, and get September closed.  I have
contacted JoLee to get the shareholder's listing for the newly issued Preferred Stock from Crop.

Thanks John for your help in these issues.
Marcus

1

AIA0001417

Exhibit 58 - Page - 3   Note from John Pl-16
p.3

**3-ER-678**

day Sep 29, 2004  3:23 PM
-------------------------------------------------------------------

cr Thru 09/28/2004        DDA History Inquiry                Branch  66

ount          0=================================================

  mber  6600800376  Customer Name  A I A INSURANCE  Balance       834,629.83
-------------------------------------------------------------------

                                            Date Last Stmt 09/06/2004
-------------------------------------------------------------------

| Date | Description | Check | Amount | Balance |
|------|-------------|-------|--------|---------|
| )08/04/2004*Opening Deposit | | | 1,510,693.00 | 1,510,693.00 |
| )08/05/2004*Check | | | 360,693.00 | 1,150,000.00 |
| )08/05/2004*Accr Earning Pymt | | | 134.49 | 1,150,134.49 |
| 08/06/2004*Check | | 9999 | 158,576.14 | 991,558.35 |
| )08/06/2004*Check | | | 20,000.00 | 971,558.35 |
| )09/06/2004*Accr Earning Pymt | | | 1,571.48 | 973,129.83 |
| )09/13/2004 Check | | 1001 | 20,000.00 | 953,129.83 |
| )09/14/2004 Check | | 1004 | 3,500.00 JT Travel | 949,629.83 |
| )09/15/2004 Check | | 1002 | 75,000.00 | 874,629.83 |
| )09/16/2004 Check | | 1003 | 40,000.00 | 834,629.83 |

(handwritten) ① 10?1?7? 8/06   158 576.14

Check # 1001    20,000

Check # 1004    3500

c. ..k # 1002   75,000

check # 1003    40,000      JE #16   Nothing on AIA

Check # 7777   360 693.00   JE #1B   Nothing on AIA

Check # 9999   158,576.14

Check # ?7?   20,000.00

Ⓐ  Deposit from Trustmark To AIA    Cash
                                    misc Income   AIA   1510643.00
                                                  AIA          1510693.00
Ⓐ₁  Purchase AIA Services Stock from Crop   Investment
                                            cash.   AIA   1510693.00
                                                    AIA          1510693.00
Ⓐ₂  Record Cash Purchase of Invest (Crop)  Cash          Crop  1510643.00
                                            Pic | Investment  Crop          1510643.00
Ⓑ  Record Payment To AIA on Account   AR-AIA    Crop
                                      Cash      Crop
Ⓑ₁  To Record Cash Received from Crop   Cash    AIA
                                        AR-Crop  AIA
Ⓒ  To Record Interest Earned   Interest Earned   Crop
                               Cash              Crop

AIA0001418    D1-14

Exhibit 58 - Page - 4

3-ER-679



**ACCOUNT NUMBER**

6600800376

24-HR CUSTOMER SERVICE

**800-772-5479**

A I A INSURANCE INC
CROP U S A
2020 BROADVIEW DR
LEWISTON ID 83501

Member FDIC and of the Communities We Serve

**STATEMENT DATE**

Aug 5, 2004

Pg   1 of   1

08/04/2004 Beginning Balance          MMA NonPersonal                    .00
            2 Deposits and Other Additions          +       1,510,827.49
            1 Checks and Other Deductions           -         360,693.00
08/05/2004 Ending Balance          2 Days in Statement Period        1,150,134.49

Deposits and Other additions to your account
08/04/2004 Opening Deposit                           1,510,693.00
08/05/2004 Accr Earning Pymt                                134.49
            Added to Account

Checks listed in numerical order; (*) indicates gap in sequence
Check   Date      Amount   Check   Date      Amount   Check   Date      Amount

6196    08/05   360,693.00  A*

Daily Ending Balance
8/04   1510,693.00  08/05   1150,134.49

Earnings Summary
** Below is an itemization of the Earnings **
** paid this period **
Interest Paid This Period            134.49  Annual Percentage Yield Earned   1.86
Interest Paid YTD                    134.49  Days in Earnings Period             2
                                             Avg Earnings Balance       1,330,346.50
************* A WARNING ABOUT CHECK THEFT *************

Business and home burglaries are on the rise. Thieves often focus on stealing
blank and cancelled checks to use in forgery schemes.

You can protect yourself by doing the following:
   1. Store your blank and cancelled checks in a secure location. Shred
   any old checks you no longer need.
   2. Have your next check order delivered to your local bank branch
   instead of to your mailbox.
   3. Examine all bank statements and notices promptly and report any
   suspicious transactions to the bank and to law enforcement immediately.
   4. If you are the victim of a burglary, check your cancelled and blank
   checks and report any missing items to the bank immediately. Remember
   to look for missing items in the middle or bottom of a check bundle.

**EXHIBIT**     AIA0002081

Exhibit 59 - Page - 1

**3-ER-680**

**FILED/EFFECTIVE**

00 NOV 20 AM 10: 39

~~SECRETARY OF STATE~~
STATE OF IDAHO

ARTICLES OF AMENDMENT
TO THE ARTICLES OF INCORPORATION
OF
AIA CROP INSURANCE, INC.

Pursuant to the provisions of Sections 30-1-59 and 30-1-61 of the Idaho Business Corporation Act, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation.

**FIRST:** The name of the corporation is AIA CROP INSURANCE, INC.

**SECOND:** Effective November 13, 2000, the sole shareholder of the corporation adopted and approved the following amendment to the Articles of Incorporation of AIA Crop Insurance, Inc., pursuant to which Article One of the original Articles of Incorporation of AIA Crop Insurance, Inc. as filed on November 18, 1999, shall read as follows:

ARTICLE ONE
Name

The name of the corporation shall be **CROP USA INSURANCE AGENCY, INC.**

**THIRD:** The number of shares of the corporation outstanding at the time of such adoption was one (1) and the number of shares entitled to vote thereon was one (1).

**FOURTH:** The designation and number of outstanding shares of each class entitled to vote thereon as a class were as follows:

C 131214



EXHIBIT #9

Exhibit 64 - Page - 1

**3-ER-681**

| Class | Number of Shares |
|-------|------------------|
| Common | -1- |

**FIFTH:** The number of shares voted for such amendment was one (1) and the number of shares voted against such amendment was zero.

DATED this 13th day of November, 2000.

AIA Crop Insurance, Inc.

Paul D. Schrette, President

ATTEST:

By: JoLee K. Duclos, Secretary

## VERIFICATION

STATE OF IDAHO          )
                        :  ss.
County of Nez Perce )

The undersigned, a Notary Public, does hereby certify that on this 13t day of November, 2000, personally appeared before me Paul D. Schrette, who, being by me first duly sworn, declared that he is the President of AIA Crop Insurance, Inc., that he signed the foregoing document as President of the corporation, and that the statements contained therein are true.

Notary Public in and for the State of Idaho, residing at Lewiston
My Commission Expires: 8/8/02

Exhibit 64 - Page - 2

3-ER-682

## MISSION STATEMENT

The mission of AIA Insurance, Inc. is to become the premier insurance and financial services marketing company in rural America for members of sponsoring associations by bringing value-added products and services to members utilizing diverse distribution methods employing the latest database and e-commerce technology.



EXHIBIT 51

Exhibit 65 - Page 1

RJT 00001

**3-ER-683**

## CONFIDENTIALITY

This document is being furnished to the recipient on a confidential basis solely in connection with potential debt or equity financing of AIA Services Corporation ("AIA"). Certain information herein is deemed by AIA to be proprietary and wrongful disclosure to others could have a material adverse affect on AIA business and prospects. Accordingly, neither this document nor the information contained herein is to be disclosed to any other person or used for any other purpose. By accepting and reading this document, in whole or in part, the recipient agrees to comply with the terms stated herein and to return this document (without retaining any copy or extract there from) promptly upon the request of AIA.

This document does not in any way constitute an offer to sell, or a solicitation of offers to purchase, any AIA securities.

This document contains various projections, forecasts and estimates, based upon assumptions and other value judgments, primarily for internal use by AIA management in the course of preparing their long-range corporate strategy and capital-planning program. These have been included in this report only as a general indication and expression of AIA's long-term business plans and financial objectives and not as guarantees or assurances that any such forecasts or projections can or will, in fact, be realized. The material contained herein, while compiled from information supplied by AIA, and to it from other sources considered to be reliable, is not guaranteed as to truth or accuracy, nor does this document necessarily represent a complete statement of all material facts related to AIA, its business, or affairs.

Exhibit 65 - Page - 2

**3-ER-684**

real needs for the participating associations and their members. AIA also considers a product provider's ability to adapt to the market AIA operates in with their associations. As an example, an insurance carrier that has never offered their insurance products to associations or their members will likely be unwilling to customize benefits and services unique to the associations' needs. AIA generally chooses carriers and providers who have some experience dealing with associations. Another key item is a carrier's rating. AIA strives to work with carriers rated highly by A.M. Best and other industry rating services.

The following are the current products offered to members through various sponsoring associations.

| Product | Carrier |
|---|---|
| Major Medical Insurance | Trustmark Insurance Company |
| High Deductible Major Medical Insurance | Trustmark Insurance Company |
| Small Group Health Insurance | Trustmark Insurance Company |
| Long Term Care Insurance | CNA |
| Medicare Supplement Insurance | Guarantee Trust Life |
| Life Insurance | Interstate Assurance Company |
| College Life Insurance Plan | Trustmark Insurance Company |
| Accident Insurance | United American Insurance |
| Cancer Insurance | United American Insurance |
| Accident Insurance | AFLAC |
| Cancer Insurance | AFLAC |
| Harvest Rewards™ | AIA Insurance, Inc. |

Based on the nature of AIA's business, the Company's pricing strategy for the products it has selected for sponsorship is appropriate for an affinity-based marketing program. This pricing strategy collectively factors product quality, customer service and price with an eye toward offering our clients the best possible value proposition. AIA has no interest in offering the lowest priced insurance or financial service products to its target market if such cut-rate pricing results in diminished product quality, rate instability, or poor customer care. Instead, the Company intends to provide our target market with the highest possible product quality and customer service while maintaining stable, competitive pricing, which can easily fit into most household budgets.

Because AIA chooses to focus its marketing efforts on the association marketplace, it has the ability to utilize the group buying power of its affinity partners to negotiate lower insurance premiums or association discounts for its clients without sacrificing quality of coverage or customer care. In this way, AIA is consistently able to bring high value product and service offerings to its target market.

The Crop Insurance Reform Act of 1996 has sparked an explosive opportunity in crop insurance. AIA, through its new subsidiary, AIA Crop Insurance, Inc., will begin providing a line of multi-peril crop insurance at the request of the farm associations. There is an emerging opportunity to be the first with a pilot program to utilize the association endorsements and strategic alliances with an Internet-based enrollment approach. AIA will place the business with Great American Insurance Group of Cincinnati, Ohio, and implement an association-based crop insurance program during the year 2000.

### 4.2   Regulatory Issues

The insurance industry is marked by extensive, costly and time-consuming regulation. AIA has expended considerable effort to comply and adapt to this reality. As Agent of Record and Administrator of the insurance plans offered to association members, AIA holds both agency and Third Party Administrator (TPA) licensing. Currently, AIA is licensed to operate as an agency (or agent) in 24 states and as a TPA in 27 states. As some states do not require a license or use the license of an individual agent instead of a corporate license, AIA is authorized to operate in a total of 40 states.

16

Exhibit 65 - Page - 3

3-ER-685

AIA markets to members of associations only, and with those members we desire to place as much premium within each household or farm as possible. Farm association members will be targeted with health insurance, life insurance, senior products and crop/hail insurance. Professional association members will be targeted with health insurance, life insurance, and disability income insurance. Our goal is to move from 30-40% of a member's insurance budget to 70-80%.

## 7.3    Implementation of Crop/Hail Insurance Project

AIA is becoming licensed as a crop insurance agency through a subsidiary, AIA Crop Insurance, Inc., on a national basis. It will cost about $100,000 to license AIA Crop Insurance in the appropriate states. At the request of the wheat growers, soybean growers, and other farm associations, we will begin offering multi-peril and crop insurance as a general agency for Great American Insurance Group. We are developing a program with Great American to allow the grower to input his ten-year by field history, current production, harvest data, and other relative information for the federal crop insurance program. We will pass on some of the administrative cost savings for such input by the farmer by reducing premium from the standardized rates. The federal government sets standardized rates. We have proposed to provide a 7% reduction from the standard MPIC rates for the farmers who directly input their own data. However, if the farmer decides to involve an agent, we will provide an agent to service the account, but no discount will be available. The association members, who tend to be the more successful, prosperous farmers, will be attracted to this program because of the premium savings. This program will be a departure from the current agency system, but expected and welcomed by the industry and the farm association members. It is not expected that the Multi-peril Crop Insurance Corporation (MPIC,USDA) will finalize regulations for the 2000 crop year, but final regulations are expected for the 2001 selling season. This is a $3 billion line of business for growers.

AIA will also begin a crop program through the National Growers and Stockmen's Association for nursery growers on the West Coast. In this program, AIA will be offering the Great American catastrophic coverage (CAT) for nurseries by using a captive agency force during 2000. In successive years, we will target nurserymen in the Southeast and Northeast.

## 7.4    Technology

AIA will continue to develop its Internet technology, specifically the aiagents.com web site that will provide our sales force with pertinent information about members and potential members. Our agents will be able to receive policy information, forms, commission statements, and underwriting status on line. The site will be completed in early 2000. It will substantially reduce our printing and mailing costs to our agents and will allow AIA to attract more technically sophisticated agents.

The aiainsurance.com web site continues to be developed. It will allow online enrollment for members of the associations who wish to purchase sponsored products, as well as download information to compare product benefits with other vendors. Online health insurance will be the first product.

## 7.5    New Associations

AIA will grow by adding new associations, both in the farm business and with professional and trade associations. AIA recently signed contracts with Better Homes & Gardens™ Real Estate Service (nationally), the Johnson County (KS) Board of Realtors, the Iowa Optometric Association, and the Iowa Pork Producers Association. We will select other trade and professional organizations that need an insurance benefits management company on an

27

Exhibit 65 - Page - 4

3-ER-686

## AIA Services Corporation
11,000,000 common stock authorized
200,000 Class A Preferred authorized
500,000 Class C Preferred authorized
**39447**

**Preferred Class A**
Donna Taylor                          Check w/ accounting

| Preferred Class C | 12/31/2006 | 12/31/2007 |
|---|---|---|
| AIA Services Profit Share Plan | 92,500 | 92,500 |
| AIA Insurance, Inc. | 205,000 | 205,000 |
| | **297,500** | **297,500** |

| Common | 12/31/2006 | 12/31/2007 | ESOP Adjustments | |
|---|---|---|---|---|
| Corrine M. Beck | 101,090.00 | 101,090.00 | Sue Willmon | 207.06 |
| Michael W. Cashman | 202,179.00 | 202,179.00 | Frank Johnson | 1761.69 |
| Michael W. Cashman Sr. IRA | 15,146.00 | 15,146.00 | | |
| Michael W. Cashman Jr. | 5,049.00 | 5,049.00 | | |
| Distribution Services, Inc. | 10,097.00 | 10,097.00 | | |
| Paul D. Durant | 7,360.50 | 7,360.50 | | |
| Employee Stock Ownership Plan & Trust | 90,194.33 | 88,225.58 | ESOP 12/31/06 | 90,194.33 |
| Chris W. Ferwalt | 1,200.00 | 1,200.00 | less | 1968.75 |
| Carlton Kent Gray | 1,200.00 | 1,200.00 | ESOP 12/31/07 | 88,225.58 |
| Raymond R. Heilman | 53,706.00 | 53,706.00 | | |
| Raymond R. Heilman - Profit Share | 36,034.50 | 36,034.50 | | |
| LeeAnn Hostetler | 1,200.00 | 1,200.00 | | |
| Bruce E. Knutson | 15,146.00 | 15,146.00 | | |
| Clifford Latimer | 2,366.00 | 2,366.00 | | |
| Jerry A. Legg | 12,000.00 | 12,000.00 | | |
| Dale L. Miesen | 45,000.00 | 45,000.00 | | |
| Heather Miesen Living Trust | 4,446.00 | 4,446.00 | | |
| Jennifer May Miesen Living Trust | 4,446.00 | 4,446.00 | | |
| Robert L. Miesen Living Trust | 4,446.00 | 4,446.00 | | |
| Dale L. Miesen & Jonathan Eckburg Brown Jr. JT | 318.00 | 318.00 | | |
| Charles B. Rapp | 5,049.00 | 5,049.00 | | |
| Sally J. Reed | 1,200.00 | 1,200.00 | | |
| Bobette N. Ruddell | 1,200.00 | 1,200.00 | | |
| Bruce Sweeney | 1,500.00 | 1,500.00 | | |
| Jay R. Taylor - deceased | 18,593.00 | 18,593.00 | | |
| Jud R. Taylor | 18,593.00 | 18,593.00 | | |
| R. John Taylor | 1,034,834.50 | 1,034,834.50 | | |
| Sara J. Taylor - deceased | 18,593.00 | 18,593.00 | | |
| Daryl R. Verdoorn | 5,049.00 | 5,049.00 | | |
| Alton D. Woodworth | 18,681.00 | 18,681.00 | | |
| Kay Hanchett | 788.28 | 788.28 | | |
| Kimberly McDowell Ells | 148.64 | 148.64 | | |
| Kristine Mason | 901.94 | 901.94 | | |
| Sue Willmon | 0.00 | 207.06 | | |
| | **1,737,755.69** | **1,735,786.94** | | |



**EXHIBIT**
**67**

Exhibit 67 - Page - 1

**3-ER-687**

## AIA Services Corporation
11,000,000 common stock authorized
200,000 Class A Preferred authorized
500,000 Class C Preferred authorized
### December 31, 2006

**Preferred Class A**
Donna Taylor                    Check w/ accounting

| Preferred Class C | 12/31/2005 | 12/31/2006 |
|---|---|---|
| AIA Services Profit Share Plan | 92,500 | 92,500 |
| AIA Insurance, Inc. | 205,000 | 205,000 |
| | 297,500 | 297,500 |

| Common | 12/31/2005 | 12/31/2006 | ESOP Adjustments | |
|---|---|---|---|---|
| Corrine M. Beck | 101,090.00 | 101,090.00 | Kristine Mason | 901.94 |
| Michael W. Cashman | 202,179.00 | 202,179.00 | | |
| Michael W. Cashman Sr. IRA | 15,146.00 | 15,146.00 | | |
| Michael W. Cashman Jr. | 5,049.00 | 5,049.00 | | |
| Distribution Services, Inc. | 10,097.00 | 10,097.00 | | |
| Paul D. Durant | 7,360.50 | 7,360.50 | | |
| Employee Stock Ownership Plan & Trus | 91,096.27 | 90,194.33 | ESOP 12/31/05 | 91,096.27 |
| Chris W. Ferwalt | 1,200.00 | 1,200.00 | less | 901.94 |
| Carlton Kent Gray | 1,200.00 | 1,200.00 | ESOP 12/31/06 | 90,194.33 |
| Raymond R. Heilman | 53,706.00 | 53,706.00 | | |
| Raymond R. Heilman - Profit Sh | 36,034.50 | 36,034.50 | | |
| LeeAnn Hostetler | 1,200.00 | 1,200.00 | | |
| Bruce E. Knutson | 15,146.00 | 15,146.00 | | |
| Clifford Latimer | 2,366.00 | 2,366.00 | | |
| Jerry A. Legg | 12,000.00 | 12,000.00 | | |
| Dale L. Miesen | 45,000.00 | 45,000.00 | | |
| Heather Miesen Living Trust | 4,446.00 | 4,446.00 | | |
| Jennifer May Miesen Living Trus | 4,446.00 | 4,446.00 | | |
| Robert L. Miesen Living Trust | 4,446.00 | 4,446.00 | | |
| Dale L. Miesen & Jonathan Eckburg Bro | 318.00 | 318.00 | | |
| Charles B. Rapp | 5,049.00 | 5,049.00 | | |
| Sally J. Reed | 1,200.00 | 1,200.00 | | |
| Bobette N. Ruddell | 1,200.00 | 1,200.00 | | |
| Bruce Sweeney | 1,500.00 | 1,500.00 | | |
| Jay R. Taylor - deceased | 18,593.00 | 18,593.00 | | |
| Jud R. Taylor | 18,593.00 | 18,593.00 | | |
| R. John Taylor | 1,034,834.50 | 1,034,834.50 | | |
| Sara J. Taylor - deceased | 18,593.00 | 18,593.00 | | |
| Daryl R. Verdoorn | 5,049.00 | 5,049.00 | | |
| Alton D. Woodworth | 18,681.00 | 18,681.00 | | |
| Kay Hanchett | 788.28 | 788.28 | | |
| Kimberly McDowell Ells | 148.64 | 148.64 | | |
| Kristine Mason | 0.00 | 901.94 | | |
| | 1,737,755.69 | 1,737,755.69 | | |

AIA0002043

Exhibit 67 - Page - 2

**3-ER-688**

**AIA Services Corporation**
11,000,000 common stock authorized
200,000 Class A Preferred authorized
500,000 Class C Preferred authorized
December 31, 2005

12,771 · +
26 · –
56 · –
4,750 · +
13 · –
13 · –
37 · –
1 · +

17,377 · *

0 · *

**Preferred Class A**
Donna Taylor — Check w/ accounting     008

**Preferred Class C**

| | 12/31/2004 | 12/31/2005 |
|---|---|---|
| AIA Services Profit Share Plan | 92,500 | 92,500 |
| AIA Insurance, Inc. | 205,000 | 205,000 |
| | 297,500 | 297,500 |

| Common | 12/31/2004 | 12/31/2005 | ESOP adjustments | |
|---|---|---|---|---|
| Corrine M. Beck | 101,090.00 | 101,090.00 | Shelly Henderson | 2,358.5700 |
| Michael W. Cashman | 202,179.00 | 202,179.00 | Cathy Warnock | 867.3500 |
| SW Securities fbo MC | 15,146.00 | 15,146.00 | Dorene Druffel | 465.3100 |
| Michael Cashman Jr. | 5,049.00 | 5,049.00 | Kimberly Ellis | 148.6400 |
| Distribution Services | 10,097.00 | 10,097.00 | Carmen Taylor (Jay's estate) | 1,798.2800 |
| Paul D. Durant | 7,360.50 | 7,360.50 | | |
| ESOP | 96,734.42 | 91,096.27 | | |
| Chris Ferwalt | 1,200.00 | 1,200.00 | | 5,638.1500 |
| Carlton Kent Gray | 1,200.00 | 1,200.00 | | |
| Raymond Heilman | 53,706.00 | 53,706.00 | | |
| Raymond Heilman – Profit Share | 36,034.50 | 36,034.50 | | |
| Lee Ann Hostetler | 1,200.00 | 1,200.00 | ESOP 12/31/04 | 96,734.4200 |
| Bruce Knutson | 15,146.00 | 15,146.00 | less | 5,638.1500 |
| Clifford Latimer | 2,366.00 | 2,366.00 | ESOP 12/31/05 | 91,096.2700 |
| Jerry A. Legg | 12,000.00 | 12,000.00 | | |
| Dale Miesen | 45,000.00 | 45,000.00 | | |
| Heather Miesen Living Trust | 4,446.00 | 4,446.00 | | |
| Jennifer Miesen Living Trust | 4,446.00 | 4,446.00 | | |
| Robert Miesen Living Trust | 4,446.00 | 4,446.00 | | |
| Dale Miesen & Jonathan Brown | 318.00 | 318.00 | | |
| Charles Rapp | 5,049.00 | 5,049.00 | | |
| Sally Reed | 1,200.00 | 1,200.00 | | |
| Bobette Ruddell | 1,200.00 | 1,200.00 | | |
| Bruce Sweeney | 1,500.00 | 1,500.00 | | |
| Jay R. Taylor | 18,593.00 | 18,593.00 | | |
| Jud R. Taylor | 18,593.00 | 18,593.00 | | |
| R. John Taylor | 559,834.50 | 1,034,834.50 | Exercised stock options 8/05 | |
| Sara J. Taylor | 18,593.00 | 18,593.00 | | |
| Daryl Verdoorn | 5,049.00 | 5,049.00 | | |
| Alton D. Woodworth | 18,681.00 | 18,681.00 | | |
| Kay Hanchett | 788.28 | 788.28 | | |
| Carrie Ball | 1,277.11 | 0.00 | | |
| Krista Ellis | 1,327.76 | 0.00 | | |
| Mary Nordhagen | 3,650.82 | 0.00 | | |
| Kimberly McDowell Ellis | 0.00 | 148.64 | | |
| | 1,274,500.89 | 1,737,755.69 | | |

−56.38

+4,750.00

−12.77
−13.28
−36.51
+1.49
_____
+4,692.13

3100-(

AIA0024874

Exhibit 67 - Page - 3

**AIA SERVICES CORPORATION**
COMMON STOCK
*SHAREHOLDER LIST GL# 3100*
December 31, 2004
Per amended Articles of Incorporation dated August 3, 1995, authorized 11,000,000 shares of Common Stock at
$.01 Par per Share

| | Percentage of Ownership | Number of Shares Jan 1, 2003 | Issued | Purchased | Number of Shares December 31, 2003 | Percentage of Ownership | Cost of Treasury Stock |
|---|---|---|---|---|---|---|---|
| AIA Services 401(k) Plan | 0.00% | - | | | - | 0.00% | |
| Beck, Jim | 7.83% | 101,090.00 | | | 101,090.00 | 7.92% | |
| Cashman, Michael | 15.66% | 202,179.00 | | | 202,179.00 | 15.83% | |
| Cashman, Michael Pension Plan | 1.17% | 15,146.00 | | | 15,146.00 | 1.19% | |
| Cashman, Michael Jr. | 0.39% | 5,049.00 | | | 5,049.00 | 0.40% | |
| Distribution Services, Inc. | 0.78% | 10,097.00 | | | 10,097.00 | 0.79% | |
| Durant, Paul D. | 0.57% | 7,360.50 | | | 7,360.50 | 0.58% | |
| Ferwalt, Chris W. | 0.09% | 1,200.00 | | | 1,200.00 | 0.09% | |
| ESOP | 7.98% | 102,990.11 | | | 102,990.11 | 8.06% | |
| Gray, Carlton Kent | 0.09% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Hainston, Sonny | 0.00% | - | | | - | 0.00% | |
| Hanchett, Kay | 0.06% | 788.28 | | | 788.28 | 0.06% | |
| Heilman, Ray Profit Sharing | 2.79% | 36,034.50 | | | 36,034.50 | 2.82% | |
| Heilman, Raymond R. | 4.16% | 53,706.00 | | | 53,706.00 | 4.21% | |
| Hostetler, Lee Ann | 0.09% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Knutson, Bruce | 1.17% | 15,146.00 | | | 15,146.00 | 1.19% | |
| Latimer, Clifford | 0.18% | 2,366.00 | | | 2,366.00 | 0.19% | |
| Legg, Jerry | 0.93% | 12,000.00 | | | 12,000.00 | 0.94% | |
| Miesen, Dale L. and Brown, Jonathan (joint tenants) | 0.02% | 318.00 | | | 318.00 | 0.02% | |
| Miesen, Heather Living Trust | 0.34% | 4,446.00 | | | 4,446.00 | 0.35% | |
| Miesen, Jennifer May Living Trust | 0.34% | 4,446.00 | | | 4,446.00 | 0.35% | |
| Miesen, Robert L. Living Trust | 0.34% | 4,446.00 | | | 4,446.00 | 0.35% | |
| Miesen, Dale | 3.49% | 45,000.00 | | | 45,000.00 | 3.52% | |
| Rapp, Charles | 0.39% | 5,049.00 | | | 5,049.00 | 0.40% | |
| Reed, Sally J. | 0.09% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Reisdorph, Pam | 0.20% | 2,643.60 | | | 2,643.60 | 0.21% | |
| Ruddell, Bobette | 0.09% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Sherry, Mark | 0.00% | - | | | - | 0.00% | - |
| Sweeney, Bruce | 0.12% | 1,500.00 | | | 1,500.00 | 0.12% | |
| Taylor, Jay R. | 1.44% | 18,593.00 | | | 18,593.00 | 1.46% | |
| Taylor, Jud R. | 1.44% | 18,593.00 | | | 18,593.00 | 1.46% | |
| Taylor, R. John | 43.37% | 559,834.50 | | | 559,834.50 | 43.83% | |
| Taylor, Sara J. | 1.44% | 18,593.00 | | | 18,593.00 | 1.46% | |
| Thayer, Jerry | 1.05% | 13,611.75 | | (13,611.75) | - | 0.00% | 7,214.23 |
| Verdoorn, Daryl | 0.39% | 5,049.00 | | | 5,049.00 | 0.40% | |
| Woodworth, Alton | 1.45% | 18,681.00 | - | - | 18,681.00 | 1.46% | - |
| Subtotal-Issued and Outstanding | 100.00% | 1,290,756.24 | - | (13,611.75) | 1,277,144.49 | 100.00% | 7,214.23 |
| Treasury stock | 0.00% | - | - | - | - | 0.00% | |
| | 100.00% | 1,290,756.24 | - | (13,611.75) | 1,277,144.49 | 100.00% | |

Total shares issued — 1,277,144.49
Par value per share — 0.01

Total common stock per general ledger — 12,771.44

2Q04 Entry
0003105E - Treasury Stock    -
0003100E - Common Stock    -
0003200E - Add'l Paid-in Cap    -
to record redemption of (shareholder name) Stock

3/18/2005

Z:\acct\services\Stock1

AIA0024812

Exhibit 67 - Page - 4

3-ER-690

## AIA SERVICES CORPORATION
### COMMON STOCK
*SHAREHOLDER LIST*
December 31, 2003
Per amended Articles of Incorporation dated August 3, 1995, authorized 11,000,000 shares of Common Stock at
$.01 Par per Share

| | Percentage of Ownership | Number of Shares Jan 1, 2003 | Issued | Purchased | Number of Shares December 31, 2003 | Percentage of Ownership | Cost of Treasury Stock |
|---|---|---|---|---|---|---|---|
| AIA Services 401(k) Plan | 0.00% | - | | | - | 0.00% | |
| Beck, Jim | 7.72% | 101,090.00 | | | 101,090.00 | 7.72% | |
| Cashman, Michael | 15.43% | 202,179.00 | | | 202,179.00 | 15.43% | |
| Cashman, Michael Pension Plan | 1.16% | 15,146.00 | | | 15,146.00 | 1.16% | |
| Cashman, Michael Jr. | 0.39% | 5,049.00 | | | 5,049.00 | 0.39% | |
| Distribution Services, Inc. | 0.77% | 10,097.00 | | | 10,097.00 | 0.77% | |
| Durant, Paul D. | 0.56% | 7,360.50 | | | 7,360.50 | 0.56% | |
| Ferwalt, Chris W. | 0.09% | 1,200.00 | ⟨ɪɔ\-ᴀᴇ⟩ | | 1,200.00 | 0.09% | |
| ESOP | 8.91% | 116,801.45 | (3,431.88) | (10,379.46) | 102,990.11 | 7.86% | 5,572.49 |
| Gray, Carlton Kent | 0.09% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Hairston, Sonny | 0.00% | - | | | - | 0.00% | |
| Hanchett, Kay | 0.00% | - | 788.28 | | 788.28 | 0.06% | |
| Hellman, Ray  Profit Sharing | 2.75% | 36,034.50 | | | 36,034.50 | 2.75% | |
| Hellman, Raymond R. | 4.10% | 53,706.00 | | | 53,706.00 | 4.10% | |
| Hostetler, Lee Ann | 0.09% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Knutson, Bruce | 1.16% | 15,146.00 | | | 15,146.00 | 1.16% | |
| Latimer, Clifford | 0.18% | 2,366.00 | | | 2,366.00 | 0.18% | |
| ᴀg, Jerry | 0.92% | 12,000.00 | | | 12,000.00 | 0.92% | |
| ᴀsen, Dale L. and Brown, Jonathan (joint tenants) | 0.02% | 318.00 | | | 318.00 | 0.02% | |
| Miesen, Heather Living Trust | 0.34% | 4,446.00 | | | 4,446.00 | 0.34% | |
| Miesen, Jennifer May Living Trust | 0.34% | 4,446.00 | | | 4,446.00 | 0.34% | |
| Miesen, Robert L. Living Trust | 0.34% | 4,446.00 | | | 4,446.00 | 0.34% | |
| Misen, Dale | 3.43% | 45,000.00 | | | 45,000.00 | 3.43% | |
| Rapp, Charles | 0.39% | 5,049.00 | | | 5,049.00 | 0.39% | |
| Reed, Sally J. | 0.09% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Reisdorph, Pam | 0.00% | - | 2,643.60 | | 2,643.60 | 0.20% | |
| Ruddell, Bobette | 0.09% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Sherry, Mark | 0.00% | - | | - | - | 0.00% | - |
| Sweeney, Bruce | 0.11% | 1,500.00 | | | 1,500.00 | 0.11% | |
| Taylor, Jay R. | 1.42% | 18,593.00 | | | 18,593.00 | 1.42% | |
| Taylor, Jud R. | 1.42% | 18,593.00 | | | 18,593.00 | 1.42% | |
| Taylor, R. John | 42.73% | 559,834.50 | | | 559,834.50 | 42.73% | |
| Taylor, Sara J. | 1.42% | 18,593.00 | | | 18,593.00 | 1.42% | |
| Thayer, Jerry | 1.04% | 13,611.75 | | | 13,611.75 | 1.04% | |
| Verdoorn, Daryl | 0.39% | 5,049.00 | | | 5,049.00 | 0.39% | |
| Woodworth, Alton | 1.43% | 18,681.00 | - | - | 18,681.00 | 1.43% | - |
| Subtotal-Issued and Outstanding | 99.30% | 1,301,135.70 | (0.00) | (10,379.46) ⟨ɪɪ\-ᴀ⟩ | 1,290,756.24 | 98.51% | 5,572.49 ⟨ɪɪ\-ᴀ⟩ |
| Treasury stock | 0.70% | 9,165.61 | - | 10,379.46 | 19,545.07 | 1.49% | |
| | 100.00% | 1,310,301.31 | (0.00) | - | 1,310,301.31 | 100.00% | |

Total shares issued ................................................ 1,290,756.24
Par value per share ................................................ 0.01

ᴀl common stock per general ledger ......................... 12,907.56
⟨A-12⟩

2/5/04

Z:\acct\services\Stock1

ɪɪ\-1

AIA0024727

Exhibit 67 - Page - 5

3-ER-691

**AIA SERVICES CORPORATION**
**COMMON STOCK**
*SHAREHOLDER LIST*
December 31, 2002
Per amended Articles of Incorporation dated August 3, 1995, authorized 11,000,000 shares of Common Stock at
$.01 Par per Share

| | Percentage of Ownership | Number of Shares Jan 1, 2002 | Issued | Purchased | Number of Shares March 31, 2002 | Percentage of Ownership | Cost of Treasury Stock |
|---|---|---|---|---|---|---|---|
| AIA Services 401(k) Plan | 0.00% | - | | | - | 0.00% | |
| Beck, Jim | 7.72% | 101,090.00 | | | 101,090.00 | 7.72% | |
| Cashman, Michael | 15.43% | 202,179.00 | | | 202,179.00 | 15.43% | |
| Cashman, Michael Pension Plan | 1.16% | 15,146.00 | | | 15,146.00 | 1.16% | |
| Cashman, Michael Jr. | 0.39% | 5,049.00 | | | 5,049.00 | 0.39% | |
| Distribution Services, Inc. | 0.77% | 10,097.00 | | | 10,097.00 | 0.77% | |
| Durant, Paul D. | 0.56% | 7,360.50 | | | 7,360.50 | 0.56% | |
| Ferwalt, Chris W. | 0.09% | 1,200.00 | | | 1,200.00 | 0.09% | |
| ESOP | 9.61% | 125,967.06 | | (9,165.61) | 116,801.45 | 8.91% | 7,167.52 |
| Gray, Carlton Kent | 0.09% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Hairston, Sonny | 0.00% | - | | | - | 0.00% | |
| Heilman, Ray Profit Sharing | 2.75% | 36,034.50 | | | 36,034.50 | 2.75% | |
| Heilman, Raymond R. | 4.10% | 53,706.00 | | | 53,706.00 | 4.10% | |
| Hostetler, Lee Ann | 0.09% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Knutson, Bruce | 1.16% | 15,146.00 | | | 15,146.00 | 1.16% | |
| Latimer, Clifford | 0.18% | 2,366.00 | | | 2,366.00 | 0.18% | |
| Legg, Jerry | 0.92% | 12,000.00 | | | 12,000.00 | 0.92% | |
| esen, Dale L. and Brown, Jonathan (joint tenants) | 0.02% | 318.00 | | | 318.00 | 0.02% | |
| Miesen, Heather Living Trust | 0.34% | 4,446.00 | | | 4,446.00 | 0.34% | |
| Miesen, Jennifer May Living Trust | 0.34% | 4,446.00 | | | 4,446.00 | 0.34% | |
| Miesen, Robert L. Living Trust | 0.34% | 4,446.00 | | | 4,446.00 | 0.34% | |
| Misen, Dale | 3.43% | 45,000.00 | | | 45,000.00 | 3.43% | |
| Rapp, Charles | 0.39% | 5,049.00 | | | 5,049.00 | 0.39% | |
| Reed, Sally J. | 0.09% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Ruddell, Bobette | 0.09% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Sherry, Mark | 0.00% | - | | - | - | 0.00% | - |
| Sweeney, Bruce | 0.11% | 1,500.00 | | | 1,500.00 | 0.11% | |
| Taylor, Jay R. | 1.42% | 18,593.00 | | | 18,593.00 | 1.42% | |
| Taylor, Jud R. | 1.42% | 18,593.00 | | | 18,593.00 | 1.42% | |
| Taylor, R. John | 42.73% | 559,834.50 | | | 559,834.50 | 42.73% | |
| Taylor, Sara J. | 1.42% | 18,593.00 | | | 18,593.00 | 1.42% | |
| Thayer, Jerry | 1.04% | 13,611.75 | | | 13,611.75 | 1.04% | |
| Verdoorn, Daryl | 0.39% | 5,049.00 | | | 5,049.00 | 0.39% | |
| Woodworth, Alton | 1.43% | 18,681.00 | - | - | 18,681.00 | 1.43% | - |
| | | | | ⟨II1-a⟩ | | | ⟨II1-a⟩ |
| Subtotal-Issued and Outstanding | 100.00% | 1,310,301.31 | - | (9,165.61) | 1,301,135.70 | 99.30% | 7,167.52 |
| Treasury stock | 0.00% | - | - | 9,165.61 | 9,165.61 | 0.70% | |
| | 100.00% | 1,310,301.31 | - | - | 1,310,301.31 | 100.00% | |

Total shares issued 1,310,301.31
Par value per share 0.01

al common stock per general ledger 13,103.01
⟨A-12⟩

1/15/03                                         Z:\acct\services\Stock1

II1-1

AIA0023941

Exhibit 67 - Page - 6

3-ER-692

## AIA SERVICES CORPORATION
### COMMON STOCK
*SHAREHOLDER LIST*
**December 31, 2001**
Per amended Articles of Incorporation dated August 3, 1995, authorized 11,000,000 shares of Common Stock at
$.01 Par per Share

| | Percentage of Ownership | Number of Shares Jan 1, 2001 | Issued | Purchased | Number of Shares Dec 31, 2001 | Percentage of Ownership | Cost of Treasury Stock |
|---|---|---|---|---|---|---|---|
| AIA Services 401(k) Plan | 6.50% | 93,435.00 | | | - | 0.00% | |
| Beck, Jim | 7.04% | 101,090.00 | | | 101,090.00 | 7.53% | |
| Cashman, Michael | 14.07% | 202,179.00 | | | 202,179.00 | 15.05% | |
| Cashman, Michael Pension Plan | 1.05% | 15,146.00 | | | 15,146.00 | 1.13% | |
| Cashman, Michael Jr. | 0.35% | 5,049.00 | | | 5,049.00 | 0.38% | |
| Distribution Services, Inc. | 0.70% | 10,097.00 | | | 10,097.00 | 0.75% | |
| Durant, Paul D. | 0.51% | 7,360.50 | | | 7,360.50 | 0.55% | |
| Ferwalt, Chris W. | 0.08% | 1,200.00 | | | 1,200.00 | 0.09% | |
| ESOP | 10.65% | 153,008.95 | | (27,041.89) | 125,967.06 | 9.38% | 40,782.82 |
| Gray, Carlton Kent | 0.08% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Hairston, Sonny | 0.00% | - | | | - | 0.00% | |
| Heilman, Ray  Profit Sharing | 2.51% | 36,034.50 | | | 36,034.50 | 2.68% | |
| Heilman, Raymond R. | 3.74% | 53,706.00 | | | 53,706.00 | 4.00% | |
| Hostetler, Lee Ann | 0.08% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Knutson, Bruce | 1.05% | 15,146.00 | | | 15,146.00 | 1.13% | |
| Latimer, Clifford | 0.16% | 2,366.00 | | | 2,366.00 | 0.18% | |
| Legg, Jerry | 0.84% | 12,000.00 | | | 12,000.00 | 0.89% | |
| Miesen, Dale L. and Brown, Jonathan (joint tenants) | 0.02% | 318.00 | | | 318.00 | 0.02% | |
| ...n, Heather Living Trust | 0.31% | 4,446.00 | | | 4,446.00 | 0.33% | |
| ...en, Jennifer May Living Trust | 0.31% | 4,446.00 | | | 4,446.00 | 0.33% | |
| Miesen, Robert L. Living Trust | 0.31% | 4,446.00 | | | 4,446.00 | 0.33% | |
| Misen, Dale | 3.13% | 45,000.00 | | | 45,000.00 | 3.35% | |
| Rapp, Charles | 0.35% | 5,049.00 | | | 5,049.00 | 0.38% | |
| Reed, Sally J. | 0.08% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Ruddell, Bobette | 0.08% | 1,200.00 | | | 1,200.00 | 0.09% | |
| Sherry, Mark | 0.42% | 6,021.00 | | (6,021.00) | - | 0.00% | 11,740.95 |
| Sweeney, Bruce | 0.10% | 1,500.00 | | | 1,500.00 | 0.11% | |
| Taylor, Jay R. | 1.29% | 18,593.00 | | | 18,593.00 | 1.38% | |
| Taylor, Jud R. | 1.29% | 18,593.00 | | | 18,593.00 | 1.38% | |
| Taylor, R. John | 38.96% | 559,834.50 | | | 559,834.50 | 41.67% | |
| Taylor, Sara J. | 1.29% | 18,593.00 | | | 18,593.00 | 1.38% | |
| Thayer, Jerry | 0.93% | 13,611.75 | | | 13,611.75 | 1.01% | |
| Verdoorn, Daryl | 0.35% | 5,049.00 | | | 5,049.00 | 0.38% | |
| Woodworth, Alton | 1.30% | 18,681.00 | - | - | 18,681.00 | 1.39% | - |
| Subtotal-Issued and Outstanding | 100.00% | 1,436,799.20 | - | (33,062.89) | 1,310,301.31 | 97.54% | 52,523.77 |
| Treasury stock | 0.00% | - | - | 33,062.89 | 33,062.89 | 2.46% | |
| | 100.00% | 1,436,799.20 | - | - | 1,343,364.20 | 100.00% | |

Total shares issued        1,343,364.20
Par value per share        0.01

Total common stock per general ledger        13,433.64

8/5/02

Z:\acct\services\Stock1

II-1  (2001)

AIA0024037

Exhibit 67 - Page - 7

3-ER-693

**AIA SERVICES CORPORATION**
**COMMON STOCK**
**SHAREHOLDER LIST**
December 31, 2000
Per amended Articles of Incorporation dated August 3, 1995, authorized 11,000,000 shares of Common Stock at
$.01 Par per Share

| | Percentage of Ownership | Number of Shares Jan 1, 2000 | Issued | Purchased | Number of Shares Dec 31, 2000 | Percentage of Ownership | Cost of Treasury Stock |
|---|---|---|---|---|---|---|---|
| AIA Services 401(k) Plan | 0.00% | - | 93,435.00 | | 93,435.00000 | 6.50% | |
| Beck, Jim | 0.00% | - | 101,090.00 | | 101,090.00000 | 7.04% | |
| Cashman, Michael | 0.00% | - | 202,179.00 | | 202,179.00000 | 14.07% | |
| Cashman, Michael Pension Plan | 0.00% | - | 15,146.00 | | 15,146.00000 | 1.05% | |
| Cashman, Michael Jr. | 0.00% | - | 5,049.00 | | 5,049.00000 | 0.35% | |
| Distribution Services, Inc. | 0.00% | - | 10,097.00 | | 10,097.00000 | 0.70% | |
| Durant, Paul D. | 0.64% | 7,360.50 | | | 7,360.50000 | 0.51% | |
| Ferwalt, Chris W. | 0.10% | 1,200.00 | | | 1,200.00000 | 0.08% | |
| ESOP | 13.44% | 154,672.50 | | (1,663.55) | 153,008.95150 | 10.65% | 3,194.01 |
| Gray, Carlton Kent | 0.10% | 1,200.00 | | | 1,200.00000 | 0.08% | |
| Hairston, Sonny | 0.00% | - | | | - | 0.00% | |
| Heilman, Ray Profit Sharing | 3.13% | 36,034.50 | | | 36,034.50000 | 2.51% | |
| Heilman, Raymond R. | 4.67% | 53,706.00 | | | 53,706.00000 | 3.74% | |
| Hostetler, Lee Ann | 0.10% | 1,200.00 | | | 1,200.00000 | 0.08% | |
| Knutson, Bruce | 0.00% | - | 15,146.00 | | 15,146.00000 | 1.05% | |
| Latimer, Clifford | 0.21% | 2,366.00 | | | 2,366.00000 | 0.16% | |
| Legg, Jerry | 1.04% | 12,000.00 | | | 12,000.00000 | 0.84% | |
| Miesen, Dale L. and Brown, Jonathan (joint tenants) | 0.03% | 318.00 | | | 318.00000 | 0.02% | |
| ..., Heather Living Trust | 0.39% | 4,446.00 | | | 4,446.00000 | 0.31% | |
| M...en, Jennifer May Living Trust | 0.39% | 4,446.00 | | | 4,446.00000 | 0.31% | |
| Miesen, Robert L. Living Trust | 0.39% | 4,446.00 | | | 4,446.00000 | 0.31% | |
| Misen, Dale | 3.91% | 45,000.00 | | | 45,000.00000 | 3.13% | |
| Rapp, Charles | 0.00% | - | 5,049.00 | | 5,049.00000 | 0.35% | |
| Reed, Sally J. | 0.10% | 1,200.00 | | | 1,200.00000 | 0.08% | |
| Ruddell, Bobette | 0.10% | 1,200.00 | | | 1,200.00000 | 0.08% | |
| Sherry, Mark | 0.52% | 6,021.00 | | | 6,021.00000 | 0.42% | |
| Sweeney, Bruce | 0.13% | 1,500.00 | | | 1,500.00000 | 0.10% | |
| Taylor, Jay R. | 1.62% | 18,593.00 | | | 18,593.00000 | 1.29% | |
| Taylor, Jud R. | 1.62% | 18,593.00 | | | 18,593.00000 | 1.29% | |
| Taylor, R. John | 48.64% | 559,834.50 | | | 559,834.50000 | 38.96% | |
| Taylor, Sara J. | 1.62% | 18,593.00 | | | 18,593.00000 | 1.29% | |
| Thayer, Jerry | 1.18% | 13,612.00 | | | 13,612.00000 | 0.95% | |
| Verdoorn, Daryl | 0.00% | - | 5,049.00 | | 5,049.00000 | 0.35% | |
| Woodworth, Alton | 1.62% | 18,681.00 | - | - | 18,681.00000 | 1.30% | - |
| Subtotal | 85.68% | 986,223.00 | 452,240.00 | (1,663.55) | 1,436,799.45 | 100.00% | 3,194.01 |
| Treasury stock | 14.32% | 164,833.00 | (166,496.55) | 1,663.55 | (0.00000) | 0.00% | |
| | 100.00% | 1,151,056.00 | 285,743.45 | - | 1,436,799.45150 | 100.00% | |

| | |
|---|---|
| Total shares issued | 1,436,799.45150 |
| Par value per share | 0.01000 |
| Total common stock per general ledger | 14,367.99452 |

4/1/02                                      mn                                      Stock.xlt

IF 1-1 (2000)

AIA0024039

Exhibit 67 - Page - 8

**AIA SERVICES CORPORATION**
**COMMON STOCK**
**SHAREHOLDER LIST**
December 31, 2000
Per amended Articles of Incorporation dated August 3, 1995, authorized 11,000,000 shares of Common Stock at
$.01 Par per Share

| | Percentage of Ownership | Number of Shares Jan 1, 2000 | Issued | Purchased | Number of Shares Dec 31, 2000 | Percentage of Ownership | Cost of Treasury Stock |
|---|---|---|---|---|---|---|---|
| AIA Services 401(k) Plan | 0.00% | - | 93,435.00 | | 93,435.00000 | 6.50% | |
| Beck, Jim | 0.00% | - | 101,090.00 | | 101,090.00000 | 7.04% | |
| Cashman, Michael | 0.00% | - | 202,179.00 | | 202,179.00000 | 14.07% | |
| Cashman, Michael Pension Plan | 0.00% | - | 15,146.00 | | 15,146.00000 | 1.05% | |
| Cashman, Michael Jr. | 0.00% | - | 5,049.00 | | 5,049.00000 | 0.35% | |
| Distribution Services, Inc. | 0.00% | - | 10,097.00 | | 10,097.00000 | 0.70% | |
| Durant, Paul D. | 0.64% | 7,360.50 | | | 7,360.50000 | 0.51% | |
| Ferwalt, Chris W. | 0.10% | 1,200.00 | | | 1,200.00000 | 0.08% | |
| ESOP | 13.44% | 154,672.50 | | (1,663.55) | 153,008.95150 | 10.65% | 3,194.01 |
| Gray, Carlton Kent | 0.10% | 1,200.00 | | | 1,200.00000 | 0.08% | |
| Hairston, Sonny | 0.00% | - | | | - | 0.00% | |
| Heilman, Ray Profit Sharing | 3.13% | 36,034.50 | | | 36,034.50000 | 2.51% | |
| Heilman, Raymond R. | 4.67% | 53,706.00 | | | 53,706.00000 | 3.74% | |
| Hostetler, Lee Ann | 0.10% | 1,200.00 | | | 1,200.00000 | 0.08% | |
| Knutson, Bruce | 0.00% | - | 15,146.00 | | 15,146.00000 | 1.05% | |
| Latimer, Clifford | 0.21% | 2,366.00 | | | 2,366.00000 | 0.16% | |
| Legg, Jerry | 1.04% | 12,000.00 | | | 12,000.00000 | 0.84% | |
| Miesen, Dale L. and Brown, Jonathan (joint tenants) | 0.03% | 318.00 | | | 318.00000 | 0.02% | |
| ﹍, Heather Living Trust | 0.39% | 4,446.00 | | | 4,446.00000 | 0.31% | |
| Miesen, Jennifer May Living Trust | 0.39% | 4,446.00 | | | 4,446.00000 | 0.31% | |
| Miesen, Robert L. Living Trust | 0.39% | 4,446.00 | | | 4,446.00000 | 0.31% | |
| Miesen, Dale | 3.91% | 45,000.00 | | | 45,000.00000 | 3.13% | |
| Rapp, Charles | 0.00% | - | 5,049.00 | | 5,049.00000 | 0.35% | |
| Reed, Sally J. | 0.10% | 1,200.00 | | | 1,200.00000 | 0.08% | |
| Ruddell, Bobette | 0.10% | 1,200.00 | | | 1,200.00000 | 0.08% | |
| Sherry, Mark | 0.52% | 6,021.00 | | | 6,021.00000 | 0.42% | |
| Sweeney, Bruce | 0.13% | 1,500.00 | | | 1,500.00000 | 0.10% | |
| Taylor, Jay R. | 1.62% | 18,593.00 | | | 18,593.00000 | 1.29% | |
| Taylor, Jud R. | 1.62% | 18,593.00 | | | 18,593.00000 | 1.29% | |
| Taylor, R. John | 48.64% | 559,834.50 | | | 559,834.50000 | 38.96% | |
| Taylor, Sara J. | 1.62% | 18,593.00 | | | 18,593.00000 | 1.29% | |
| Thayer, Jerry | 1.18% | 13,612.00 | | | 13,612.00000 | 0.95% | |
| Verdoorn, Daryl | 0.00% | - | 5,049.00 | | 5,049.00000 | 0.35% | |
| Woodworth, Alton | 1.62% | 18,681.00 | - | - | 18,681.00000 | 1.30% | - |
| Subtotal | 85.68% | 986,223.00 | 452,240.00 | (1,663.55) | 1,436,799.45 | 100.00% | 3,194.01 |
| Treasury stock | 14.32% | 164,833.00 | (166,496.55) | 1,663.55 | (0.00000) | 0.00% | |
| | 100.00% | 1,151,056.00 | 285,743.45 | - | 1,436,799.45150 | 100.00% | |

| | |
|---|---|
| Total shares issued | 1,436,799.45150 |
| Par value per share | 0.01000 |
| Total common stock per general ledger | 14,367.99452 |

4/1/02           mn           Stock.xlt

IF1-1 (2000)

AIA0024039

Exhibit 67 - Page - 9

**3-ER-695**

Case 1:10-cv-00404-CWD   Document 67-68   Filed 07/30/12   Page 10 of 14

**AIA SERVICES CORPORATION**
**COMMON STOCK**
**SHAREHOLDER LIST**
December 31, 1999
Per amended Articles of Incorporation dated August 3, 1995, authorized 11,000,000 shares of Common Stock at
$.01 Par per Share

| | Percentage of Ownership | Number of Shares Jan 1, 1999 | Issued | Purchased | Number of Shares Dec 31, 1999 | Percentage of Ownership | Cost of Treasury Stock |
|---|---|---|---|---|---|---|---|
| Durant, Paul D. | 0.64% | 7,360.50 | | | 7,360.50 | 0.64% | |
| Ferwalt, Chris W. | 0.10% | 1,200.00 | | | 1,200.00 | 0.10% | |
| FSB Trust - ESOP | 20.79% | 239,351.50 | (2,366.00) | (82,313.00) | 154,672.50 | 13.44% | 211,335.72 |
| Gray, Carlton Kent | 0.10% | 1,200.00 | | | 1,200.00 | 0.10% | |
| Hairston, Sonny | 0.00% | - | | | - | 0.00% | |
| Heilman, Ray  Profit Sharing | 3.13% | 36,034.50 | | | 36,034.50 | 3.13% | |
| Heilman, Raymond R. | 4.67% | 53,706.00 | | | 53,706.00 | 4.67% | |
| Hostetler, Lee Ann | 0.10% | 1,200.00 | | | 1,200.00 | 0.10% | |
| Latimer, Clifford | 0.00% | - | 2,366.00 | | 2,366.00 | 0.21% | |
| Legg, Jerry | 1.04% | 12,000.00 | | | 12,000.00 | 1.04% | |
| Miesen, Dale L. and Brown, Jon | 0.03% | 318.00 | | | 318.00 | 0.03% | |
| Miesen, Heather Living Trust | 0.39% | 4,446.00 | | | 4,446.00 | 0.39% | |
| Miesen, Jennifer May Living Tru | 0.39% | 4,446.00 | | | 4,446.00 | 0.39% | |
| Miesen, Robert L. Living Trust | 0.39% | 4,446.00 | | | 4,446.00 | 0.39% | |
| Misen, Dale | 3.91% | 45,000.00 | | | 45,000.00 | 3.91% | |
| Reed, Sally J. | 0.10% | 1,200.00 | | | 1,200.00 | 0.10% | |
| Ruddell, Bobette | 0.10% | 1,200.00 | | | 1,200.00 | 0.10% | |
| Sherry, Mark | 0.52% | 6,021.00 | | | 6,021.00 | 0.52% | |
| Sweeney, Bruce | 0.13% | 1,500.00 | | | 1,500.00 | 0.13% | |
| Taylor, Jay R. | 1.62% | 18,593.00 | | | 18,593.00 | 1.62% | |
| Taylor, Jud R. | 1.62% | 18,593.00 | | | 18,593.00 | 1.62% | |
| Taylor, R. John | 48.64% | 559,834.50 | | | 559,834.50 | 48.64% | |
| Taylor, Sara J. | 1.62% | 18,593.00 | | | 18,593.00 | 1.62% | |
| Thayer, Jerry | 1.18% | 13,612.00 | | | 13,612.00 | 1.18% | |
| Woodworth, Alton | 1.62% | 18,681.00 | - | - | 18,681.00 | 1.62% | - |
| Subtotal | 92.83% | 1,068,536.00 | - | (82,313.00) | 986,223.00 | 85.68% | 211,335.72 |
| Treasury stock | 7.17% | 82,520.00 | - | 82,313.00 | 164,833.00 | 14.32% | |
| | 100.00% | 1,151,056.00 | - | - | 1,151,056.00 | 100.00% | |

Total shares issued                                            1,151,056.00
Par value per share                                                     0.01

Total common stock per general ledger                          11,510.56

4/1/02                                         mn                                        Stock.xlt

II1-1  (1999)

AIA0024040

Exhibit 67 - Page - 10

3-ER-696

**AIA SERVICES CORPORATION**
**COMMON STOCK**
**SHAREHOLDER LIST**
December 31, 1998
Per amended Articles of Incorporation dated August 3, 1995, authorized 11,000,000 shares of Common Stock at
$.01 Par per Share

| | Percentage of Ownership | Number of Shares Jan 1, 1998 | Issued | Purchased | Number of Shares Dec 31, 1998 | Percentage of Ownership | Cost of Treasury Stock |
|---|---|---|---|---|---|---|---|
| Durant, Paul D. | 0.65% | 7,360.50 | | | 7,360.50 | 0.64% | |
| Ferwalt, Chris W. | 0.11% | 1,200.00 | | | 1,200.00 | 0.10% | |
| FSB Trust - ESOP | 19.03% | 214,292.50 | 25,059.00 | | 239,351.50 | 20.79% | |
| Gray, Carlton Kent | 0.11% | 1,200.00 | | | 1,200.00 | 0.10% | |
| Hairston, Sonny | 1.33% | 15,000.00 | | (15,000.00) | - | 0.00% | 29,250.00 |
| Hellman, Ray Profit Sharing | 3.20% | 36,034.50 | | | 36,034.50 | 3.13% | |
| Hellman, Raymond R. | 4.77% | 53,706.00 | | | 53,706.00 | 4.67% | |
| Hostetler, Lee Ann | 0.11% | 1,200.00 | | | 1,200.00 | 0.10% | |
| Legg, Jerry | 1.07% | 12,000.00 | | | 12,000.00 | 1.04% | |
| Miesen, Dale L. and Brown, Jon | 0.03% | 318.00 | | | 318.00 | 0.03% | |
| Miesen, Heather Living Trust | 0.39% | 4,446.00 | | | 4,446.00 | 0.39% | |
| Miesen, Jennifer May Living Tru | 0.39% | 4,446.00 | | | 4,446.00 | 0.39% | |
| Miesen, Robert L. Living Trust | 0.39% | 4,446.00 | | | 4,446.00 | 0.39% | |
| Misen, Dale | 4.00% | 45,000.00 | | | 45,000.00 | 3.91% | |
| Reed, Sally J. | 0.11% | 1,200.00 | | | 1,200.00 | 0.10% | |
| Ruddell, Bobette | 0.11% | 1,200.00 | | | 1,200.00 | 0.10% | |
| Sherry, Mark | 0.53% | 6,021.00 | | | 6,021.00 | 0.52% | |
| Sweeney, Bruce | 0.13% | 1,500.00 | | | 1,500.00 | 0.13% | |
| Taylor, Jay R. | 1.65% | 18,593.00 | | | 18,593.00 | 1.62% | |
| Taylor, Jud R. | 1.65% | 18,593.00 | | | 18,593.00 | 1.62% | |
| Taylor, R. John | 49.72% | 559,834.50 | | | 559,834.50 | 48.64% | |
| Taylor, Sara J. | 1.65% | 18,593.00 | | | 18,593.00 | 1.62% | |
| Thayer, Jerry | 1.21% | 13,612.00 | | | 13,612.00 | 1.18% | |
| Woodworth, Alton | 1.66% | 18,681.00 | - | - | 18,681.00 | 1.62% | - |
| Subtotal | 94.00% | 1,058,477.00 | 25,059.00 | (15,000.00) | 1,068,536.00 | 92.83% | 29,250.00 |
| Treasury stock | 6.00% | 67,520.00 | | 15,000.00 | 82,520.00 | 7.17% | 151,209.89 * |
| | 100.00% | 1,125,997.00 | 25,059.00 | - | 1,151,056.00 | 100.00% | 180,459.89 |

Total shares issued      1,151,056.00
Par value per share      0.01

Total common stock per general ledger      11,510.56

\*   Cost of treasury stock owned 12/31/97

II 1-1 (1998)

AIA0024041

Exhibit 67 - Page - 11

**AIA SERVICES CORPORATION**
**COMMON STOCK**
**SHAREHOLDER LIST**
**December 31, 1997**
Per amended Articles of Incorporation dated August 3, 1995, authorized 11,000,000 shares of Common Stock at
$.01 Par per Share

| | Percentage of Ownership | Number of Shares Jan 1, 1997 | Issued | Purchased | Number of Shares Dec 31, 1997 | Percentage of Ownership | Cost of Treasury Stock |
|---|---|---|---|---|---|---|---|
| R. John Taylor | 51.86% | 559,834.50 | | | 559,834.50 | 49.72% | |
| Mary K. Frost | 2.63% | 28,360.50 | | (28,360.50) | - | 0.00% | 77,992.75 |
| Paul D. Durant | 0.68% | 7,360.50 | | | 7,360.50 | 0.65% | |
| Dale Miesen | 4.17% | 45,000.00 | | | 45,000.00 | 4.00% | |
| Heather Miesen Living Trust | 0.41% | 4,446.00 | | | 4,446.00 | 0.39% | |
| Jennifer May Miesen Living Trust | 0.41% | 4,446.00 | | | 4,446.00 | 0.39% | |
| Robert L. Miesen Living Trust | 0.41% | 4,446.00 | | | 4,446.00 | 0.39% | |
| Dale L. Miesen and Jonathan Ekburg Brown, Jr. joint tenants | 0.03% | 318.00 | | | 318.00 | 0.03% | |
| Raymond R. Heilman | 4.97% | 53,706.00 | | | 53,706.00 | 4.77% | |
| Jay R. Taylor | 1.72% | 18,593.00 | | | 18,593.00 | 1.65% | |
| Jud R. Taylor | 1.72% | 18,593.00 | | | 18,593.00 | 1.65% | |
| Sara J. Taylor | 1.72% | 18,593.00 | | | 18,593.00 | 1.65% | |
| Lee Ann Hostetler | 0.11% | 1,200.00 | | | 1,200.00 | 0.11% | |
| Bobette Ruddell | 0.11% | 1,200.00 | | | 1,200.00 | 0.11% | |
| Carlton Kent Gray | 0.11% | 1,200.00 | | | 1,200.00 | 0.11% | |
| Sally J. Reed | 0.11% | 1,200.00 | | | 1,200.00 | 0.11% | |
| Chris W. Ferwalt | 0.11% | 1,200.00 | | | 1,200.00 | 0.11% | |
| Bruce Sweeney | 0.14% | 1,500.00 | | | 1,500.00 | 0.13% | |
| Tom Lankenau | 0.07% | 750.00 | | (750.00) | - | 0.00% | 1,462.50 |
| FSB Trust - ASOP | 0.24% | 2,572.50 | 1,037.00 | (3,609.50) | - | 0.00% | 3,894.64 |
| FSB Trust - ESOP | 16.35% | 176,485.50 | 37,807.00 | | 214,292.50 | 19.03% | |
| Rock Wilson | 2.22% | 24,000.00 | | (24,000.00) | - | 0.00% | 46,800.00 |
| Sonny Hairston | 1.39% | 15,000.00 | | | 15,000.00 | 1.33% | |
| Jerry Legg | 1.11% | 12,000.00 | | | 12,000.00 | 1.07% | |
| Jerry Thayer | 1.11% | 12,000.00 | 1,612.00 | | 13,612.00 | 1.21% | |
| Ray Heilman Profit Sharing | 3.34% | 36,034.50 | | | 36,034.50 | 3.20% | |
| Bill Cady | 1.00% | 10,800.00 | | (10,800.00) | - | 0.00% | 21,060.00 |
| Alton Woodworth | 1.73% | 18,681.00 | | | 18,681.00 | 1.66% | |
| Mark Sherry | 0.00% | - | 6,021.00 | - | 6,021.00 | 0.53% | - |
| Subtotal | 100.00% | 1,079,520.00 | 46,477.00 | (67,520.00) | 1,058,477.00 | 94.00% | 151,209.89 |
| Treasury stock | 0.00% | - | | 67,520.00 | 67,520.00 | 6.00% | |
| | 100.00% | 1,079,520.00 | 46,477.00 | - | 1,125,997.00 | 100.00% | |

| | |
|---|---|
| Total shares issued | 1,125,997.00 |
| Par value per share | 0.01 |
| Total common stock per general ledger | 11,259.97 |

4/1/02                                     MN                                     Stock.xlt

I7I-1 (1997)

AIA0024042

Exhibit 67 - Page - 12

3-ER-698

**AIA SERVICES CORPORATION**
**COMMON STOCK**
**SHAREHOLDER LIST**
December 31, 1996
Per amended Articles of Incorporation dated August 3, 1995, authorized 11,000,000 shares of Common Stock at
$.01 Par per Share

| | Percentage of Ownership | Number of Shares Jan 1, 1996 | Transferred, Cancelled or Surrendered | Number of Shares Dec 31, 1996 | Percentage of Ownership |
|---|---|---|---|---|---|
| R. John Taylor | 51.86% | 559,834.50 | | 559,834.50 | 51.86% |
| Mary K. Frost | 2.63% | 28,360.50 | | 28,360.50 | 2.63% |
| Paul D. Durant | 0.68% | 7,360.50 | | 7,360.50 | 0.68% |
| Dale Miesen | 4.17% | 45,000.00 | | 45,000.00 | 4.17% |
| Heather Miesen Living Trust | 0.41% | 4,446.00 | | 4,446.00 | 0.41% |
| Jennifer May Miesen Living Trust | 0.41% | 4,446.00 | | 4,446.00 | 0.41% |
| Robert L. Miesen Living Trust | 0.41% | 4,446.00 | | 4,446.00 | 0.41% |
| Dale L. Miesen and Jonathan Ekburg Brown, Jr. joint tenants | 0.03% | 318.00 | | 318.00 | 0.03% |
| Raymond R. Heilman | 5.49% | 59,271.00 | (5,565.00) | 53,706.00 | 4.97% |
| Jay R. Taylor | 1.72% | 18,593.00 | | 18,593.00 | 1.72% |
| Jud R. Taylor | 1.72% | 18,593.00 | | 18,593.00 | 1.72% |
| Sara J. Taylor | 1.72% | 18,593.00 | | 18,593.00 | 1.72% |
| Lee Ann Hostetler | 0.11% | 1,200.00 | | 1,200.00 | 0.11% |
| Bobette Ruddell | 0.11% | 1,200.00 | | 1,200.00 | 0.11% |
| Carlton Kent Gray | 0.11% | 1,200.00 | | 1,200.00 | 0.11% |
| Sally J. Reed | 0.11% | 1,200.00 | | 1,200.00 | 0.11% |
| Chris W. Ferwalt | 0.11% | 1,200.00 | | 1,200.00 | 0.11% |
| Bruce Sweeney | 0.14% | 1,500.00 | | 1,500.00 | 0.14% |
| Tom Lankenau | 0.07% | 750.00 | | 750.00 | 0.07% |
| FSB Trust - ASOP | 0.24% | 2,572.50 | | 2,572.50 | 0.24% |
| FSB Trust - ESOP | 16.35% | 176,485.50 | | 176,485.50 | 16.35% |
| Rock Wilson | 2.22% | 24,000.00 | | 24,000.00 | 2.22% |
| Sonny Hairston | 1.39% | 15,000.00 | | 15,000.00 | 1.39% |
| Jerry Legg | 1.11% | 12,000.00 | | 12,000.00 | 1.11% |
| Jerry Thayer | 1.11% | 12,000.00 | | 12,000.00 | 1.11% |
| Ray Heilman Profit Sharing | 2.82% | 30,469.50 | 5,565.00 | 36,034.50 | 3.34% |
| Bill Cady | 1.00% | 10,800.00 | | 10,800.00 | 1.00% |
| Alton Woodworth | 1.73% | 18,681.00 | | 18,681.00 | 1.73% |
| | 100.00% | 1,079,520.00 | - | 1,079,520.00 | 100.00% |

| | |
|---|---|
| Total shares issued | 1,079,520.00 |
| Par value per share | 0.01 |
| Total common stock per general ledger | 10,795.20 |

Stock options:
John R. Taylor          475,000 sh.
1989 Stock Option Plan   1,500,000 sh.

4/1/02                          MN                          Stock.xlt

II1 - 1 (1996)

AIA0024043

Exhibit 67 - Page - 13

**AIA SERVICES CORPORATION**
**COMMON STOCK**
**SHAREHOLDER LIST**
**December 31, 1995**
Per amended Articles of Incorporation dated August 3, 1995, authorized 11,000,000 shares of Common Stock at
$.01 Par per Share

| | Percentage of Ownership | Number of Shares Jan 1, 1995 | Redemption of Reed's Shares | Transferred, Cancelled or Surrendered | Three for One Stock Split Aug 26, 1995 | Number of Shares Dec 31, 1995 | Percentage of Ownership |
|---|---|---|---|---|---|---|---|
| Reed J. Taylor | 63.03% | 613,493.50 a | (613,493.50) | | | - | |
| R. John Taylor | 19.17% | 186,611.50 | | | 373,223.00 | 559,834.50 | 51.86% |
| Mary K. Frost | 0.97% | 9,453.50 | | | 18,907.00 | 28,360.50 | 2.63% |
| Paul D. Durant | 0.25% | 2,453.50 | | | 4,907.00 | 7,360.50 | 0.68% |
| Dale Miesen | 1.54% | 15,000.00 | | | 30,000.00 | 45,000.00 | 4.17% |
| Heather Miesen Living Trust | 0.15% | 1,482.00 | | | 2,964.00 | 4,446.00 | 0.41% |
| Jennifer May Miesen Living Trust | 0.15% | 1,482.00 | | | 2,964.00 | 4,446.00 | 0.41% |
| Robert L. Miesen Living Trust | 0.15% | 1,482.00 | | | 2,964.00 | 4,446.00 | 0.41% |
| Dale L. Miesen and Jonathan Ekburg Brown, Jr. joint tenants | 0.01% | 106.00 | | | 212.00 | 318.00 | 0.03% |
| Raymond R. Heilman | 2.14% | 20,849.50 | | (1,092.50) | 39,514.00 | 59,271.00 | 5.49% |
| Jay R. Taylor | 0.64% | 6,197.67 | | | 12,395.33 | 18,593.00 | 1.72% |
| Jud R. Taylor | 0.64% | 6,197.67 | | | 12,395.33 | 18,593.00 | 1.72% |
| Sara J. Taylor | 0.64% | 6,197.66 | | | 12,395.34 | 18,593.00 | 1.72% |
| Lee Ann Hostetler | 0.04% | 400.00 | | | 800.00 | 1,200.00 | 0.11% |
| Bobette Ruddell | 0.04% | 400.00 | | | 800.00 | 1,200.00 | 0.11% |
| Carlton Kent Gray | 0.04% | 400.00 | | | 800.00 | 1,200.00 | 0.11% |
| ...ly J. Reed | 0.04% | 400.00 | | | 800.00 | 1,200.00 | 0.11% |
| ..s W. Forwalt | 0.04% | 400.00 | | | 800.00 | 1,200.00 | 0.11% |
| Bruce Sweaney | 0.05% | 500.00 | | | 1,000.00 | 1,500.00 | 0.14% |
| Tom Lankenau | 0.03% | 250.00 | | | 500.00 | 750.00 | 0.07% |
| FSB Trust - ASOP | 0.09% | 857.50 | | | 1,715.00 | 2,572.50 | 0.24% |
| FSB Trust - ESOP | 6.04% | 58,828.50 | | | 117,657.00 | 176,485.50 | 16.35% |
| Rock Wilson | 0.82% | 8,000.00 | | | 16,000.00 | 24,000.00 | 2.22% |
| Sonny Hairston | 0.51% | 5,000.00 | | | 10,000.00 | 15,000.00 | 1.39% |
| Jerry Legg | 0.41% | 4,000.00 | | | 8,000.00 | 12,000.00 | 1.11% |
| Jerry Thayer | 0.41% | 4,000.00 | | | 8,000.00 | 12,000.00 | 1.11% |
| Ray Heilman Profit Sharing | 0.93% | 9,064.00 | | 1,092.50 | 20,313.00 | 30,469.50 | 2.82% |
| Bill Cady | 0.37% | 3,600.00 | | | 7,200.00 | 10,800.00 | 1.00% |
| Alton Woodworth | 0.64% | 6,227.00 | | | 12,454.00 | 18,681.00 | 1.73% |
| | 100.00% | 973,333.50 | (613,493.50) | - b | 719,680.00 | 1,079,520.00 | 100.00% |
| Treasury stock | | 60,046.00 | 613,493.50 | (673,539.50) | - | - | |
| | | 1,033,379.50 | - | (673,539.50) | 719,680.00 | 1,079,520.00 | |

| | |
|---|---|
| Total shares issued | 1,079,520.00 |
| Par value per share | 0.01 |
| Total common stock per general ledger | 10,795.20 |

a   Company purchased per stock redemption agreement dated July 22, 1995
b   Split is for shareholders of record on June 26, 1995

...ck options:
John R. Taylor          475,000 sh.      immediately exercisable at $.01 per share
1989 Stock Option Plan  1,500,000 sh.    reserved for issuance under the plan

4/1/02                          MN                          Stock.xlt

II 1-1 (1995)

AIA0024044

Exhibit 67 - Page - 14