**Consolidated Case Nos. 25-3552 and 25-3800**

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,

**Plaintiff-Appellant**,

v.

R. JOHN TAYLOR, an individual, CONNIE TAYLOR HENDERSON, an individual, JAMES BECK, an individual, MICHAEL W. CASHMAN, SR., an individual, CROP USA INSURANCE AGENCY, INC., an Idaho corporation, CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company, AIA SERVICES CORPORATION, an Idaho corporation, AND AIA INSURANCE, INC., an Idaho corporation,

**Defendants-Appellees**,

and

Reed J. Taylor, an individual,

**Third-Party Defendant-Appellee.**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO,
CHIEF DISTRICT COURT JUDGE DAVID C. NYE, PRESIDING

**APPELLANT'S EXCERPTS OF THE RECORD – VOLUME - 4**

| | |
|---|---|
| Roderick C. Bond | Andrew Schwam |
| Roderick Bond Law Office, PLLC | Andrew Schwam Law Firm |
| 10900 NE 4th St., Suite 2300 | 705 SW Fountain St. |
| Bellevue, WA 98004 | Pullman, WA 99163-2128 |
| Tel: (425) 591-6903 | Tel: (208) 874-3684 |
| Email: rod@roderickbond.com | Email: amschwam@turbonet.com |
| Attorney for Appellant | Attorney for Appellant |

Douglas J. Siddoway, ISB # 2388
RANDALL | DANSKIN, P.S.
601 West Riverside Avenue, Suite 1500
Spokane, WA  99201
Phone:        509.747.2052
Facsimile:    509.624.2528

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE
STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| AIA SERVICES CORPORATION, an Idaho corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PAUL D. DURANT; KAY HANCHETT; LEE ANN HOSTETLER; JERRY A. LEGG; DALE L. MIESEN; HEATHER MIESEN LIVING TRUST, DALE L. MIESEN, TRUSTEE; JENNIFER MAY MIESEN LIVING TRUST, DALE L. MIESEN, TRUSTEE; ROBERT L. MIESEN LIVING TRUST, DALE L. MIESEN, TRUSTEE; DALE L. MIESEN AND JONATHON EKBERG BROWN, JR., JOINT TENANTS; CARMEN S. TAYLOR; DONNA J. TAYLOR; JUD R. TAYLOR; REED J. TAYLOR; AND BOBETTE N. RUDDELL,<br><br>Defendants. | No. CV-12-01483<br><br>AMENDED COMPLAINT FOR DECLARATORY JUDGMENT |

AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT - 1

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON  99201-0653
(509) 747-2052

Exhibit - T

Plaintiff AIA Services Corporation, by its attorneys, Randall | Danskin, P.S., for their complaint against the defendants, and each of them, state as follows:

## I.    PARTIES, JURISDICTION AND VENUE

1.01    Plaintiff is a corporation organized and existing under the laws of the State of Idaho, having its principal place of business in Lewiston, Idaho.

1.02    Defendant Paul D. Durant is a resident of Lewiston, Idaho.

1.03    Defendant Kay Hanchett is a resident of Lewiston, Idaho.

1.04    Defendant Lee Ann Hostetler is a resident of Asotin, Washington.

1.05    Defendant Jerry A. Legg is a resident of Tonkawa, Oklahoma.

1.06    Defendant Dale L. Miesen is a resident of Grapevine, Texas.

1.07    Defendant Heather Miesen Living Trust is a trust whose sole trustee, Dale L. Miesen is a resident of Grapevine, Texas.

1.08    Defendant Jennifer May Miesen Living Trust is a trust whose sole trustee, Dale L. Miesen, is a resident of Grapevine, Texas.

1.09    Defendant Robert L. Miesen Living Trust is a trust whose sole trustee, Dale L. Miesen, is a resident of Grapevine, Texas.

1.10    Defendant Dale L. Miesen and Jonathon Ekberg Brown, Jr., Joint Tenants is a joint tenancy having its principal place of business in Grapevine, Texas.

1.11    Defendant Carmen S. Taylor is a resident of Long Beach, Washington.

1.12    Defendant Donna J. Taylor is a resident of Clarkston, Washington.

1.13    Defendant Jud R. Taylor is a resident of Lewiston, Idaho.

1.14    Defendant Reed J. Taylor is a resident of Lewiston, Idaho.

AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT - 2

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

Exhibit - T

1.15   Defendant Bobette N. Ruddell is a resident of Lewiston, Idaho.

1.16   This is a declaratory judgment action to determine the validity of corporate actions undertaken and proposed to be undertaken by plaintiff in respect to the issued and outstanding shares of common stock and Series C preferred stock of plaintiff severally owned beneficially or of record by defendants.

1.17   The Court has jurisdiction over defendants pursuant to Idaho Code § 5-514(a), since the cause of action arises out of defendants' transaction of business within the state. The Court also has jurisdiction over defendants pursuant to Idaho Code § 30-1-1330(4), since the cause of action also arises out of prospective demands for payment under Idaho Code § 30-1-1326.

1.18   Venue is proper pursuant to Idaho Code § 5-404 and Idaho Code§ 30-1-1330(2).

## II.   RELEVANT FACTS

2.01   Plaintiff's equity capitalization comprises 11,700,000 shares of capital stock, of which 11,000,000 shares having a par value of $0.01 per share are designated common stock (the "Common Stock"), 200,000 shares without par value are designated Series A Preferred Stock (the "Series A Stock") and 500,000 shares having a par value of $1.00 per share are designated Series C Preferred Stock (the "Series C Stock").

2.02   Immediately prior to the effective time of the Reverse Stock Split Transaction defined in paragraph 2.04 of this complaint, defendants (with the possible exclusions of Carmen S. Taylor, Donna J. Taylor and Reed J. Taylor, none of whom are holders of shares of Common Stock according to plaintiff's records) severally owned or

AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT - 3

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

Exhibit - T

purported to own 99,797.78 shares of Common Stock beneficially or of record, comprising only 6.06 percent of the then issued and outstanding shares of Common Stock.

2.03 Defendants Lee Ann Hostetler, Carmen S. Taylor, Jud R. Taylor and Reed J. Taylor also severally own or purport to own 24,588.296 shares of Series C Stock beneficially through the plaintiff's profit sharing plan, comprising 26.58 of the shares of Series C Stock held by the plan and only 13.29 percent of the issued and outstanding Series C Stock.

2.04 At the annual meeting of shareholders of plaintiff duly called and held on July 16, 2012 (the "2012 Annual Meeting"), the holders of Common Stock approved an amendment to the articles of incorporation of plaintiff, as theretofore amended and restated, pursuant to which (a) each issued and outstanding share of Common Stock, including any outstanding shares of Common Stock held by plaintiff as treasury stock, was converted into $1/53,000^{th}$ of a share of Common Stock (the equivalent of one share of Common Stock for every 53,000 outstanding shares of Common Stock); and (b) each holder of fewer than 53,000 shares of Common Stock would receive, in lieu of a fractional share, an amount determined by multiplying the number of shares of Common Stock owned beneficially by such holder immediately prior to the effective time of the amendment (being July 17, 2012, when the amendment to the articles of incorporation were filed with the Idaho Secretary of State) by $0.10 (the "Reverse Stock Split Transaction").

AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT - 4

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

Exhibit - T

2.05   The Reverse Stock Split Transaction was approved by the holders of 1,379,693.5 shares of Common Stock, comprising 89.79% of the shares of Common Stock represented at the 212 Annual Meeting in person or by proxy.  The holders of 99,797.78 shares of Common Stock, comprising 6.75% of the shares of Common Stock represented at the 2012 Annual Meeting in person or by proxy, voted against the Reverse Stock Split Transaction.  No shareholders abstained.

2.06   At the 2012 Annual Meeting, the holders of Common Stock also elected R. John Taylor, Connie Taylor Henderson and James W. Beck to serve as directors of plaintiff for the ensuing year and until their successors are elected and qualified.

2.07   True and correct copies of the notice of annual meeting, proxy statement and proxy that were mailed to the holders of Common Stock in conjunction with the 2012 Annual Meeting are annexed to this complaint as Exhibit A.  Consistent with the requirements of the Idaho Business Corporation Act, the proxy statement disclosed to such holders that the Reverse Stock Split Transaction invoked the dissenters' appraisal rights provisions of the act and instructed them how to exercise and perfect such rights, should they choose to do so.

2.08   Defendants, by and through their counsel, Roderick C. Bond, delivered written notices of their intention to exercise their dissenters' appraisal rights to plaintiff at the 2012 Annual Meeting.  True and correct copies of these notices are annexed to this complaint as Exhibit B.

2.09   The notices purport to satisfy defendants' notification obligations pursuant to Idaho Code § 30-1-1331.  In addition, the notices also assert that, in defendants' view,

AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT - 5

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

Exhibit - T

the fair value of the Common Stock cannot be determined until claims pending in a federal court action brought by Donna J. Taylor (who is not a holder of Common Stock) are resolved, and that the actions taken at the June 16, 2012 annual meeting of shareholders -- these being the approval of the Reverse Stock Split Transaction and the election of three directors to plaintiff's board of directors -- are unlawful because: (a) the Reverse Stock Split violates subsection 4.3.3 of the plaintiff's articles of incorporation; (b) the Reverse Stock Split violates subsections 4.14 and 5.2 of the plaintiff's bylaws; (c) the shares of Common Stock owned beneficially and of record by R. John Taylor and Connie Taylor Henderson are disqualified from voting and certain of their shares were improperly issued; (d) plaintiff's directors violated their fiduciary duties to defendants by approving and recommending shareholder approval of the Reverse Stock Split Transaction; (e) the Reverse Stock Split Transaction and past and present operations of plaintiff constitute the unlawful oppression and squeezing out of defendants by plaintiff's directors and others; and (f) the Reverse Stock Split otherwise violates unspecified portions of Idaho law as it pertains to the duties of plaintiff's directors and officers.

2.10  Defendants, again acting by and through their attorney, Mr. Bond, supplemented their views concerning the lawfulness of the corporate actions taken at the 2012 Annual Meeting by delivering identical written "shareholder demands to plaintiff subsequent to the meeting. A true and correct representative copy of these demands is annexed to this complaint as Exhibit C.

2.11  Defendants' views were further articulated by Mr. Bond in a series of emails he sent to plaintiff's counsel immediately after the 2012 Annual Meeting had

AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT - 6

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

Exhibit - T

concluded, in which he makes various demands for information and records. True and correct copies of these emails are annexed to this complaint as Exhibit D.

2.12   Plaintiff reasonably believes the notices, shareholder demands and emails described in the preceding paragraphs evidence Mr. Bond's intention to initiate yet another vexatious, costly and time-consuming lawsuit against plaintiff and its directors and officers over circumstances and events that have previously been litigated or are the subject of prolonged litigation in this and other forums.

2.13   In view of these threats, plaintiff seeks judicial approval of the corporate actions approved at 2012 Annual Meeting before implementing them.

2.14   On or about September 26, 2012, plaintiff sent written notice to Donna Taylor and to her attorney, Mr. Bond, that plaintiff would redeem and make final payment for 7,590 remaining issued and outstanding shares of Series A Preferred Stock owned by Mrs. Taylor on October 30, 2012, and that the amount of that final payment, determined in accordance with the plaintiff's amended and restated articles of incorporation, would be $82,435.10.

2.15   On or about October 3, 2012, Mr. Bond sent plaintiff's counsel an email stating that Donna Taylor was owed at least $414,247.22 in redemption of her Series A Preferred Stock and that, in any event (and apparently notwithstanding the redemption provisions of plaintiff's amended and restated articles of incorporation) she would not accept any payments from AIA in redemption of her preferred stock "until all outstanding issues are resolved and until payment is approved by a Court order." A true and correct copy of Mr. Bond's October 3rd email is annexed to this complaint as Exhibit E.

AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT - 7

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

Exhibit - T

2.16   In view of Mr. Bond's statements, presumably made on behalf of Donna Taylor, plaintiff seeks judicial approval of the final redemption payment before making it.

### III.   CLAIM FOR RELIEF

### DECLARATORY JUDGMENT

3.01   Plaintiff incorporates the allegations of paragraphs 1.01 through 2.16 as if fully set forth herein.

3.02   There is an actual and existing controversy between plaintiff and defendants concerning both the corporate actions that were approved by plaintiff's shareholders at the July 16, 2012 annual meeting and the final amount payable to Donna Taylor in redemption of her Series A Preferred Stock.

3.03   Plaintiff and defendants have genuine and opposing interests in the controversies.

3.04   Plaintiff and defendants have direct and substantial interests in the controversies.

3.05   Judicial determination of the controversies will be final and conclusive.

WHEREFORE, plaintiffs pray as follows:

1.      for a declaration that, insofar as they are conditional and assert claims relating or pertaining to the lawfulness of the Reverse Stock Split Transaction, the notices described in paragraphs 2.09 and 2.10 of this complaint do not satisfy defendants' notification obligations pursuant to Idaho Code § 30-1-1331 and that defendants have

AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT - 8

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

Exhibit - T

waived their right to seek and obtain an appraisal of the fair value of their Common Stock;

2.    if defendants have not waived their right to seek and obtain an appraisal, for a declaration that the fair value of their Common Stock can be determined prior to the resolution of claims brought by Donna J. Taylor in the pending federal court action;

3.    for a declaration that the Reverse Stock Split Transaction does not violate subsection 4.3.3 of plaintiff's articles of incorporation because plaintiff's funds will not be used to pay defendants or other holders of Common Stock for their shares, and because it is a foregone conclusion, given the ownership of plaintiff's Common Stock and its Series C Stock, that any amendment of subsection 4.3.3 to permit such payments would readily be approved;

4.    for a declaration that the Reverse Stock Split Transaction does not violate subsection 4.14 or subsection 5.2 of the plaintiff's bylaws;

5.    for a declaration that the shares of Common Stock owned beneficially and of record by R. John Taylor and Connie Taylor Henderson are and were qualified to vote at the annual meeting;

6.    for a declaration that all of the shares of Common Stock issued to R. John Taylor and Connie Taylor Henderson were validly issued;

7.    for a declaration that plaintiff's directors did not violate their fiduciary duties to defendants in approving and recommending shareholder approval of the Reverse Stock Split Transaction;

AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT - 9

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

Exhibit - T

8.    for a declaration that the Reverse Stock Split Transaction does not constitute the unlawful oppression and squeezing out of defendants by plaintiff's directors and others;

9.    for a declaration that the Reverse Stock Split does not otherwise violate Idaho law as it pertains to the duties of plaintiff's directors and officers;

10.    in light of other pending litigation brought by Mr. Bond on behalf of his clients and his threat of yet another suit against plaintiff and its directors and officers, for a declaration that his email requests to plaintiff's counsel demanding information do not comply with the requirements of Idaho Code §30-1-1602 (3) (b) and (c), and that plaintiff is not required to respond to them;

11.    for a declaration that AIA has heretofore paid Donna Taylor the redemption price on all but 7,590 shares of Series A Preferred Stock, and that the remaining redemption amount payable by AIA to Donna Taylor in respect of those shares is currently $82,435.10;

12.    for an award of plaintiff's reasonable attorneys' fees and costs, pursuant to Idaho Code §§ 12-121 and 10-1210; and

13.    for such other and further relief as the Court deems appropriate.

DATED this 16th day of November, 2012.

RANDALL | DANSKIN, P.S.

By: _____
Douglas J. Siddoway, ISB # 2388
Attorneys for Plaintiffs

AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT - 10

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

Exhibit - T

4-ER-711

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of November, 2012, I caused a true and correct copy of the foregoing to be served on the parties to this action or their counsel at the address and in the manner set forth below:

Roderick C. Bond
Roderick Bond Law Office, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
*Attorney for Defendants*

☑ Via First Class Mail
☐ By Hand Delivery
☐ Via Facsimile – (425) 321-0343
☑ By E-mail – rod@roderickbond.com
☐ By Overnight Delivery

F:\users\40468\Reverse Stock Split\Amended Complaint

AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT - 11

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

Exhibit - T

**4-ER-712**

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of November, 2012, I caused a true and correct copy of the foregoing to be served on the parties to this action or their counsel at the address and in the manner set forth below:

Roderick C. Bond
Roderick Bond Law Office, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
*Attorney for Defendants*

☐ Via First Class Mail
☐ By Hand Delivery
☐ Via Facsimile – (425) 321-0343
☐ By E-mail – rod@roderickbond.com
☐ By Overnight Delivery

F:\users\40468\Reverse Stock Split\Amended Complaint

AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT - 11

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

Exhibit - T

# Exhibit A

## Exhibit - T

4-ER-714

## AIA SERVICES CORPORATION

### NOTICE OF ANNUAL MEETING OF SHAREHOLDERS
### TO BE HELD ON JULY 16, 2012

TO: THE SHAREHOLDERS OF AIA SERVICES CORPORATION:

The annual meeting (the "Annual Meeting") of shareholders of AIA SERVICES CORPORATION (the "Company"), an Idaho corporation, will be held in the second floor conference room of the Company's executive offices, located at 111 Main Street, Lewiston, Idaho 83501, at 10:00 a.m., local time, on Monday, July 16, 2012 for the following purposes:

- to elect three directors of the Company to serve until their successors are elected and qualified; and

- to consider and approve an amendment to the articles of incorporation of the Company, pursuant to which, if it is approved: (a) each issued and outstanding share of common stock of the Company, including any outstanding shares of common stock held by the Company as treasury stock, would be converted into 1/53,000th of a share of common stock (the equivalent of one share of common stock for every 53,000 outstanding shares of common stock); and (b) each holder of fewer than 53,000 shares immediately prior to the time of the amendment, being the date articles of amendment to the articles of incorporation of the Company are filed with the Secretary of State of the State of Idaho (the "Effective Time"), would receive, in lieu of a fractional share, an amount determined by multiplying the number of shares of common stock owned beneficially and of record by such holder immediately prior to the Effective Time by ten cents ($0.10).

Shareholders of record at the close of business on June 30, 2012 are entitled to vote at the Annual Meeting and any adjournment(s) or postponement(s) thereof.

Whether or not you plan to attend the Annual Meeting in person, please sign, date, and return the enclosed proxy in the reply envelope provided for your convenience. The prompt return of your proxy will assist us in preparing for the meeting.

BY ORDER OF THE BOARD OF DIRECTORS


JoLee K. Duclos, Secretary


F:\users\40468\Reverse Stock Split\Annual Meeting Notice (Marked 06.30.12)

Exhibit - T

**4-ER-715**

Case 1:10-cv-00404-LMB   Document 83-15   Filed 12/03/12   Page 15 of 80

## AIA SERVICES CORPORATION

### PROXY STATEMENT
### FOR
### ANNUAL MEETING OF SHAREHOLDERS

### JULY 16, 2012

This proxy statement is furnished in connection with the solicitation of proxies by the board of directors of AIA SERVICES CORPORATION, an Idaho corporation (the "Company"), for the annual meeting of shareholders of the Company to be held at 10:00 a.m., local time, on Monday, July 16, 2012, and any adjournment thereof (the "Annual Meeting").

The Annual Meeting will be held in the second floor conference room of the Company's executive offices, located at 111 Main Street in Lewiston, Idaho 83501.

### PURPOSES OF THE ANNUAL MEETING

The Annual Meeting is being called for the following purposes:

- to elect three directors of the Company to serve until their successors are elected and qualified; and

- to consider and approve an amendment to the articles of incorporation of the Company, pursuant to which, if it is approved: (a) each issued and outstanding share of common stock of the Company, including any outstanding shares of common stock held by the Company as treasury stock, would be converted into $1/53,000^{th}$ of a share of common stock (the equivalent of one share of common stock for every 53,000 outstanding shares of common stock); and (b) each holder of fewer than 53,000 shares immediately prior to the time of the amendment, being the date articles of amendment to the articles of incorporation of the Company are filed with the Secretary of State of the State of Idaho (the "Effective Time"), would receive, in lieu of a fractional share, an amount determined by multiplying the number of shares of common stock owned beneficially by such holder immediately prior to the Effective Time by ten cents ($0.10).

Shareholders of record at the close of business on June 30, 2012 are entitled to vote at the Annual Meeting

### VOTING RIGHTS AND SOLICITATIONS

The Company's common stock is the only types of security entitled to vote at the Annual Meeting. If you were a shareholder of record of common stock of the Company at the close of business on June 30, 2012 (the "record date"), you may vote at the Annual Meeting. On all matters requiring a shareholder vote at the Annual Meeting, each shareholder is entitled to one vote, in person or by proxy, for each share of common stock of the Company recorded in his or her name.

1

Exhibit - T

**4-ER-716**

On the record date, 1,732,088 shares of common stock were outstanding. All of such shares are eligible to be voted at the Annual Meeting.

Pursuant to the Idaho Business Corporation Act and the Company's articles of incorporation, the affirmative vote of the holders of a majority of the shares present at the Annual Meeting in person or by proxy is required to elect directors (Item 1) and to approve the amendment to the Company's articles of incorporation (Item 2). Abstentions and broker non-votes will be treated as present for purposes of obtaining a quorum with respect to all matters to be considered at the Annual Meeting, but will not be counted for or against any of the proposals to be voted upon at the meeting.

If you are unable to attend the Annual Meeting, you may vote by proxy. The enclosed proxy card is solicited by the board of directors of the Company and when returned, properly completed, will be voted as you direct. If the proxy card is returned with no instructions on how the shares are to be voted, shares represented by such proxies will be voted **FOR** the election of each of the nominees to the board of directors and **FOR** approval of the amendment to the Company's articles of incorporation.

You may revoke or change your proxy at any time before it is exercised at the Annual Meeting. To do this, you must send a written notice of revocation or another signed proxy bearing a later date to the secretary of the Company at its principal executive office. You may also revoke your proxy by giving notice and voting in person at the Annual Meeting.

## COSTS OF SOLICITATION

The cost of soliciting proxies will be borne by the Company. Proxies may also be solicited personally or by telephone by certain of the Company's directors, executive officers and regular employees, who will not receive additional compensation therefore. The total cost of proxy solicitation, including legal fees and expenses incurred in connection with the preparation of this Proxy Statement, is estimated to be $3,500.

[The balance of this page has been left blank intentionally.]

2

Exhibit - T

4-ER-717

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth information as of the record date concerning the names and addresses of, and number of shares of common stock of the Company beneficially owned by persons known to the Company to own more than five percent (5%) of each such class of stock; the names of, and number of shares beneficially owned by each director and executive officer of the Company; and the number of shares beneficially owned by, of all directors and executive officers as a group.

| Name and Address of Beneficial Owner, and Title or Position Held (if a director of executive officer) | Amount and Nature of Beneficial Ownership (all direct unless otherwise noted) | Percent of Class |
|---|---|---|
| R. John Taylor<br>111 Main Street<br>Lewiston, ID 83501<br>President and a Director of the Company | 1,378,493.5 | 83.66% |
| Connie Taylor Henderson [t]<br>900 Washington, Suite 1020<br>Vancouver, WA 98660<br>Director of the Company | - | 0.00% |
| James W. Beck<br>5152 Belmont Avenue South<br>Minneapolis, MN 55419<br>Director of the Company | - | 0.00% |
| Bryan Freeman — Vice President<br>111 Main Street<br>Lewiston, ID 83501<br>Vice President of the Company | - | 0.00% |
| JoLee Duclos<br>111 Main Street<br>Lewiston, ID 83501<br>Secretary of the Company | - | 0.00% |
| Aimee Gordon<br>111 Main Street<br>Lewiston, ID 83501<br>Treasurer of the Company | - | 0.00% |
| All directors and executive officers as a group (6 persons) | 1,378,493.5 | 83.66% |

[Table continued on following page]

3

Exhibit - T

**4-ER-718**

| Name and Address of Beneficial Owner, and Title or Position Held (if a director of executive officer) | Amount and Nature of Beneficial Ownership (all direct unless otherwise noted) | Percent of Class |
|---|---|---|
| Raymond R. Heilman [2] 213 Yellow Rose Trail Road Georgetown, TX 78633 | 89,740.5 | 5.45% |

(1)      Excludes any community property interest of Mrs. Henderson in the shares held by R. John Taylor.

(2)   .   Includes 36,035 shares held by the Raymond R. Heilman Self  Employment Retirement Plan.

## ITEM NO. 1 – ELECTION OF DIRECTORS

Three directors are to be elected at the Annual Meeting.  Unless authority to vote is withheld on a proxy, proxies in the form enclosed will be voted for the director-nominees identified below.  If any nominee is not available for election (a contingency which the Company does not now foresee), it is the intention of the board of directors to recommend the election of a substitute nominee, and proxies in the form enclosed will be voted for the election of such substitute nominee unless authority to vote such proxies in the election of directors has been withheld.

*Identity and Background of Nominees to the Board of Directors.*  The nominees to the board of directors are R. John Taylor, James W. Beck and Connie W. Henderson.

R. John Taylor of Lewiston, Idaho, is the President and Chief Executive Officer of both the Company AIA Insurance, Inc.  He has held those positions for over five years.  Mr. Taylor is also Chairman of the Board and Chief Executive Officer of CropUSA Insurance Agency, Inc. and affiliated companies.   He also serves on the boards of directors of Pacific Empire Radio Corporation, Avista Corporation, and the Idaho Endowment Fund Investment Board.  Mr. Taylor is a licensed attorney in the state of Idaho and a member of the Idaho State Bar.

Connie Taylor Henderson is a practicing attorney in Vancouver, Washington and the former spouse of R. John Taylor.  Her practice focuses on personal injury and medical negligence.  Mrs. Henderson graduated from the University of Idaho College of Law in 1993, and for approximately the next seventeen years was a member of the Clark & Feeney law firm in Lewiston, Idaho.  In 2010, she established her practice in Vancouver.  Ms. Henderson has been a member of the boards of the Idaho Trial Lawyers Association, The Spence Trial Lawyers College Alumni Association, Lewis & Clark State College Foundation, Northwest Children's Home, and the Lewiston Foundation for Education.  She also is an instructor at the Spence Trial Lawyers College and teaches trial advocacy in the University of Idaho College of Law's clinical law program.

4

Exhibit - T

James W. Beck is currently a co-owner of EMCllc, based in Minneapolis, Minnesota, which is engaged in the engineering, design and implementation of energy efficient lighting systems for industrial and commercial applications throughout the United States and Puerto Rico. Prior to becoming affiliated with EMCllc, Mr. Beck was involved in various sales and management capacities in the insurance industry. Mr. Beck holds a Bachelor of Science Degree from the University of Minnesota's Carlson School of Business.

*Requisite Approval.* The affirmative vote of the holders of a majority of the shares present at the annual meeting in person or by proxy is required to elect directors. Shareholders are not entitled to cumulate their votes in voting for directors.

## THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE FOREGOING NOMINEES TO THE BOARD OF DIRECTORS.

---

## APPROVAL OF THE AMENDMENT TO THE COMPANY'S ARTICLES OF INCORPORATION

---

The shareholders of the Company will be asked to consider and approve an amendment to the articles of incorporation of the Company, pursuant to which, if it is approved: (a) each issued and outstanding share of common stock of the Company, including any outstanding shares of common stock held by the Company as treasury stock, would be converted into 1/53,000th of a share of common stock (the equivalent of one share of common stock for every 53,000 outstanding shares of common stock); and (b) each holder of fewer than 53,000 shares immediately prior to the time of the amendment, being the date articles of amendment to the articles of incorporation of the Company are filed with the Secretary of State of the State of Idaho (the "Effective Time"), would receive, in lieu of a fractional share, an amount determined by multiplying the number of shares of common stock owned beneficially by such holder immediately prior to the Effective Time by ten cents ($0.10).

*Purpose of the Amendment.* The amendment is one component of the Company's overall plan to simplify its capital structure, the other being the eventual elimination of all of the outstanding Series A preferred stock. The amendment accomplishes this purpose by reducing the number of outstanding shares of common stock through a reverse stock split, and by then redeeming, for cash, the outstanding shares held by those shareholders who would otherwise hold fractional shares. The Company believes a simplified capital structure will better enable it to attract financing on favorable terms so that it can successfully compete in the changing and challenging farm insurance markets.

*Board of Directors' Recommendation.* The board of directors of the Company has adopted the amendment to the Company's articles of incorporation and recommends its approval by the shareholders at the Annual Meeting. The board of directors considered a number of factors in reaching these decisions, not the least of which were the dramatic changes in the insurance markets in which the Company does business or proposes to do business, its possible need for significant financing in order to pursue profitable business opportunities in these markets, the difficulties and expenses associated with the Company's complicated capital structure, and the advantages of simplifying its capital structure and possibly reorganizing itself as a partnership.

5

Exhibit - T

The board of directors also considered a number of factors in determining the price per share ($0.10) the Company would pay to those holders of outstanding shares of common stock who would otherwise become minority holders if the amendment is approved, among them: the current book value of the common stock (being a *negative* $0.10 per share); the prices that was paid for the common stock in a privately negotiated transaction earlier this year (being $0.10 per share); the prospective future value of net operating tax loss carryforwards; the prospective additional value that might be obtained if pending lawsuits to which the Company or its affiliates are parties are resolved favorably; and the prospective value that might be obtained if the Company is successful in obtaining title to the Lewis and Clark Plaza office building in Lewiston through its pending foreclosure proceeding.

*Dissenter's Appraisal Rights.* The Company's shareholders have statutory rights of appraisal under the Idaho Business Corporation Act in connection with the proposed amendment, meaning that if they vote against the amendment and take other steps to perfect their rights, summarized below, they will be entitled to receive the fair value of their common stock in cash. The procedures for exercising and perfecting these appraisal rights are complicated, and for this reason the Company's shareholders are urged to read the relevant provisions of the Idaho Business Corporation Act that are included in this Proxy Statement as Exhibit B. The following is only a summary of these procedures and is not intended to be inclusive.

A shareholder wishing to exercise these rights must vote against approving the amendment to the articles of incorporation, and prior to the taking of such vote at the Annual Meeting, must also deliver written notice to the Company that he or she intends to demand written payment for his shares if the amendment is approved. If the amendment is approved, the Company must, within ten days, send written notice to the shareholder, accompanied by a form for demanding payment and related information. The shareholder must thereafter return the form to the Company, accompanied by the shareholder's stock certificate(s), within the time prescribed by the form, which may not be less than 40 nor more than 60 days.

Upon receipt of the form and the shareholder's stock certificate(s), the Company will pay the shareholder the fair value of his shares, accompanied by financial information and a statement of how the fair value was determined. Should the shareholder disagree with the Company's fair value determination, he must reject the payment, following which either the Company or the shareholder may initiate a court proceeding in Idaho to adjudicate such value. The costs of any such proceeding, including the costs of any appraisers or other experts, shall be borne by the Company, but at the court's discretion may also be assessed against the shareholder.

*Financial Statements of the Company.* The balance sheets of the Company as at December 31, 2011 and 2010, and the related statements of operation, statements of cash flows and statements of changes in shareholders' equity for the twelve-month periods then ended appear elsewhere in this Proxy Statement. Shareholders should note that these financial statements have been prepared by management of the Company and are unaudited.

6

Exhibit - T

## CONCLUSION

**It is important that proxies be returned promptly. Shareholders are requested to vote, sign, date and promptly return the proxy in the enclosed self-addressed envelope.**

The board of directors knows of no other matters which may be presented for shareholder action at the Annual Meeting. If other matters do properly come before the meeting, it is intended that the persons named in the proxies will vote on such proposals according to their best judgment.

BY ORDER OF THE BOARD OF DIRECTORS

JoLee K. Duclos, Secretary

7

Exhibit - T

Exhibit A to Proxy Statement
(Proposed Form of Amendment to Articles of Incorporation)


ARTICLES OF AMENDMENT
TO THE ARTICLES OF INCORPORATION
OF
AIA SERVICES CORPORATION

Pursuant to the provisions of Sections 30-1-58, 30-1-59 and 30-1-61 of the Idaho Business Corporation Act, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation as filed on December 20, 1983, and previously amended on October 14, 1986; December 29, 1987; April 11, 1995; August 3, 1995; and March 8, 1996.

1.      The name of the corporation is AIA Services Corporation.

2.      The Articles of Amendment provide for an exchange, reclassification, or cancellation of issued shares.

3.      The existing Articles of Incorporation are revised pursuant to the following amendment:

Article 4.4 of the Articles of Incorporation is hereby amended by reference to the existing provisions as (a) and adding the following paragraph as (b):

(b) Without regard to any other provision of these Articles of Incorporation, each 53,000 shares of common stock, either issued and outstanding or held by the Corporation as treasury stock, immediately prior to the time this amendment becomes effective, shall be and is hereby automatically reclassified and changed (without any further act) to one fully paid and non-assessable share of common stock with a par value of $0.01 per share, without increasing or decreasing the amount of stated capital or paid-in surplus of the Corporation, provided that no fractional shares of common stock shall be issued to any holder of fewer than 53,000 shares of common stock immediately prior to the time this amendment becomes effective. Instead of issuing such fractional shares, the Corporation shall pay, in cash at the time this amendment becomes effective, Ten Cents ($0.10) for each share held by any holder of fewer than 53,000 shares of common stock immediately before the time when this amendment becomes effective.

4.      These Articles of Amendment were duly approved at an annual meeting of shareholders held on July 16, 2012. The Articles of Amendment were approved by the shareholders as follows:

a.      On the day of adoption, there were 1,732,088 shares outstanding. On such date, there were _____ shares (_____ %) represented at the meeting and entitled to vote on the Articles of Amendment.

b.      Of the _____ total common shares represented at the meeting, _____ shares (_____ %) were voted in favor of the Articles of Amendment, _____ shares (_____ %) were voted against the Articles of Amendment, and _____ shares (_____ %) abstained.


8

Exhibit - T

    c.     The number of shares cast in favor of the Articles of Amendment was sufficient for approval.

5.    The terms and provisions of these Articles of Amendment shall become effective at _____ a.m/p.m. on July _____, 2012.

By: _____

R. John Taylor,
President and Chief Executive Officer

9

Exhibit - T

**4-ER-724**

Exhibit B to Proxy Statement
(Dissenter's Appraisal Rights Provisions of the Idaho Business Corporation Act)

### TITLE 30
### CORPORATIONS
### CHAPTER 1
### GENERAL BUSINESS CORPORATIONS
### PART 13.
### APPRAISAL RIGHTS

30-1-1301. DEFINITIONS. In this part:

(1)     "Affiliate" means a person that directly or indirectly through one (1) or more intermediaries controls, is controlled by, or is under common control with another person or is a senior executive thereof. For purposes of section 30-1-1302(2)(d), Idaho Code, a person is deemed to be an affiliate of its senior executives.

(2)     "Beneficial shareholder" means a person who is the beneficial owner of shares held in a voting trust or by a nominee on the beneficial owner's behalf.

(3)     "Corporation" means the issuer of the shares held by a shareholder demanding appraisal and, for matters covered in sections 30-1-1322 through 30-1-1331, Idaho Code, includes the surviving entity in a merger.

(4)     "Fair value" means the value of the corporation's shares determined:

(a)     Immediately before the effectuation of the corporate action to which the shareholder objects;

(b)     Using customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal; and

(c)     Without discounting for lack of marketability or minority status except, if appropriate, for amendments to the articles pursuant to section 30-1-1302(1)(e), Idaho Code.

(5)     "Interest" means interest from the effective date of the corporate action until the date of payment, at the rate of interest on judgments in this state on the effective date of the corporate action.

(6)     "Preferred shares" means a class or series of shares whose holders have preference over any other class or series with respect to distributions.

(7)     "Record shareholder" means the person in whose name shares are registered in the records of the corporation or the beneficial owner of shares to the extent of the rights granted by a nominee certificate on file with the corporation.

(8)     "Senior executive" means the chief executive officer, chief operating officer, chief financial officer, and anyone in charge of a principal business unit or function.

(9)     "Shareholder" means both a record shareholder and a beneficial shareholder.

30-1-1302. RIGHT TO APPRAISAL. (1) A shareholder is entitled to appraisal rights, and to obtain payment of the fair value of that shareholder's shares, in the event of, any of the following corporate actions:

(a)     Consummation of a merger to which the corporation is a party:

(i)     If shareholder approval is required for the merger by section 30-1-1104, Idaho Code, and the shareholder is entitled to vote on the merger, except that appraisal rights shall not be available to any shareholder of the corporation with respect to shares of any class or series that remain outstanding after consummation of the merger; or

10

Exhibit - T

(ii)   If the corporation is a subsidiary and the merger is governed by section 30-1-1105, Idaho Code;

(b)   Consummation of a share exchange to which the corporation is a party as the corporation whose shares will be acquired, if the shareholder is entitled to vote on the exchange, except that appraisal rights shall not be available to any shareholder of the corporation with respect to any class or series of shares of the corporation that is not exchanged;

(c)   Consummation of a disposition of assets pursuant to section 30-1-1202, Idaho Code, if the shareholder is entitled to vote on the disposition;

(d)   An amendment of the articles of incorporation with respect to a class or series of shares that reduces the number of shares of a class or series owned by the shareholder to a fraction of a share if the corporation has the obligation or right to repurchase the fractional share so created; or

(e)   Any other amendment to the articles of incorporation, merger, share exchange or disposition of assets to the extent provided by the articles of incorporation, bylaws or a resolution of the board of directors.

(2)   Notwithstanding subsection (1) of this section, the availability of appraisal rights under subsections (1)(a), (b), (c) and (d) shall be limited in accordance with the following provisions:

(a)   Appraisal rights shall not be available for the holders of shares of any class or series of shares which are:

(i)   Listed on the New York stock exchange or the American stock exchange or designated as a national market system security on an interdealer quotation system by the national association of securities dealers, inc.; or

(ii)   Not so listed or designated, but have at least two thousand (2,000) shareholders and the outstanding shares of such class or series have a market value of at least twenty million dollars ($20,000,000), exclusive of the value of such shares held by its subsidiaries, senior executives, directors and beneficial shareholders owning more than ten percent (10%) of such shares.

(b)   The applicability of subsection (2)(a) of this section shall be determined as of:

(i)   The record date fixed to determine the shareholders entitled to receive notice of, and vote at, the meeting of shareholders to act upon the corporate action requiring appraisal rights; or

(ii) The day before the effective date of such corporate action if there is no meeting of shareholders.

(c)   Subsection (2)(a) of this section shall not be applicable and appraisal rights shall be available pursuant to subsection (1) of this section for the holders of any class or series of shares who are required by the terms of the corporate action requiring appraisal rights to accept for such shares anything other than cash or shares of any class or any series of shares of any corporation, or any other proprietary interest of any other entity, that satisfies the standards set forth in subsection (2)(a) of this section at the time the corporate action becomes effective.

(d)   Subsection (2)(a) of this section shall not be applicable and appraisal rights shall be available pursuant to subsection (1) of this section for the holders of any class or series of shares where:

(i)   Any of the shares or assets of the corporation are being acquired or converted, whether by merger, share exchange or otherwise, pursuant to the corporate action by a person, or by an affiliate of a person, who:

(A)   Is, or at any time in the one (1) year period immediately preceding approval by the board of directors of the corporate action requiring appraisal rights was, the beneficial owner of twenty percent

11

Exhibit - T

(20%) or more of the voting power of the corporation, excluding any shares acquired pursuant to an offer for all shares having voting power if such offer was made within one (1) year prior to the corporate action requiring appraisal rights for consideration of the same kind and of a value equal to or less than that paid in connection with the corporate action; or

(B)   Directly or indirectly has, or at any time in the one (1) year period immediately preceding approval by the board of directors of the corporation of the corporate action requiring appraisal rights had, the power, contractually or otherwise, to cause the appointment or election of twenty-five percent (25%) or more of the directors to the board of directors of the corporation; or

(ii)   Any of the shares or assets of the corporation are being acquired or converted, whether by merger, share exchange or otherwise, pursuant to such corporate action by a person, or by an affiliate of a person, who is, or at any time in the one (1) year period immediately preceding approval by the board of directors of the corporate action requiring appraisal rights was, a senior executive or director of the corporation or a senior executive of any affiliate thereof, and that senior executive or director will receive, as a result of the corporate action, a financial benefit not generally available to other shareholders as such, other than:

(A)   Employment, consulting, retirement or similar benefits established separately and not as part of or in contemplation of the corporate action; or

(B)   Employment, consulting, retirement or similar benefits established in contemplation of, or as part of, the corporate action that are not more favorable than those existing before the corporate action or, if more favorable, that have been approved on behalf of the corporation in the same manner as is provided in section 30-1-862, Idaho Code; or

(C)   In the case of a director of the corporation who will, in the corporate action, become a director of the acquiring entity in the corporate action or one (1) of its affiliates, rights and benefits as a director that are provided on the same basis as those afforded by the acquiring entity generally to other directors of such entity or such affiliate.

(e)   For the purposes of subsection (2)(d) of this section only, the term "beneficial owner" means any person who, directly or indirectly, through any contract, arrangement, or understanding, other than a revocable proxy, has or shares the power to vote, or to direct the voting of, shares, provided that a member of a national securities exchange shall not be deemed to be a beneficial owner of securities held directly or indirectly by it on behalf of another person solely because such member is the record holder of such securities if the member is precluded by the rules of such exchange from voting without instruction on contested matters or matters that may affect substantially the rights or privileges of the holders of the securities to be voted. When two (2) or more persons agree to act together for the purpose of voting their shares of the corporation, each member of the group formed thereby shall be deemed to have acquired beneficial ownership, as of the date of such agreement, of all voting shares of the corporation beneficially owned by any member of the group.

(3)   Notwithstanding any other provision of this section, the articles of incorporation as originally filed or any amendment thereto may limit or eliminate appraisal rights for any class or series of preferred shares, but any such limitation or elimination contained in an amendment to

12

Exhibit - T

the articles of incorporation that limits or eliminates appraisal rights for any of such shares that are outstanding immediately prior to the effective date of such amendment or that the corporation is or may be required to issue or sell thereafter pursuant to any conversion, exchange or other right existing immediately before the effective date of such amendment shall not apply to any corporate action that becomes effective within one (1) year of that date if such action would otherwise afford appraisal rights.

     (4)    A shareholder entitled to appraisal rights under this part may not challenge a completed corporate action for which appraisal rights are available unless such corporate action:

     (a)    Was not effectuated in accordance with the applicable provisions of part 10, 11 or 12 of this chapter or the corporation's articles of incorporation, bylaws or board of directors' resolution authorizing the corporate action; or

     (b)    Was procured as a result of fraud or material misrepresentation.

**30-1-1303. ASSERTION OF RIGHTS BY NOMINEES AND BENEFICIAL OWNERS.** (1) A record shareholder may assert appraisal rights as to fewer than all the shares registered in the record shareholder's name but owned by a beneficial shareholder only if the record shareholder objects with respect to all shares of the class or series owned by the beneficial shareholder and notifies the corporation in writing of the name and address of each beneficial shareholder on whose behalf appraisal rights are being asserted. The rights of a record shareholder who asserts appraisal rights for only part of the shares held of record in the record shareholder's name under this subsection shall be determined as if the shares as to which the record shareholder objects and the record shareholder's other shares were registered in the names of different record shareholders.

     (2)    A beneficial shareholder may assert appraisal rights as to shares held on behalf of the shareholder only if such shareholder:

     (a)    Submits to the corporation the record shareholder's written consent to the assertion of such rights no later than the date referred to in section 30-1-1322(2)(b)(ii), Idaho Code; and

     (b)    Does so with respect to all shares of the class or series that are beneficially owned by the beneficial shareholder.

**30-1-1320. NOTICE OF APPRAISAL RIGHTS.** (1) If proposed corporate action described in section 30-1-1302(1), Idaho Code, is to be submitted to a vote at a shareholders' meeting, the meeting notice must state that the corporation has concluded that shareholders are, are not or may be entitled to assert appraisal rights under this part. If the corporation concludes that appraisal rights are or may be available, a copy of this part must accompany the meeting notice sent to those record shareholders entitled to exercise appraisal rights.

     (2)    In a merger pursuant to section 30-1-1105, Idaho Code, the parent corporation must notify in writing all record shareholders of the subsidiary who are entitled to assert appraisal rights that the corporate action became effective. Such notice must be sent within ten (10) days after the corporate action became effective and include the materials described in section 30-1-1322, Idaho Code.

**30-1-1321. NOTICE OF INTENT TO DEMAND PAYMENT.** (1) If proposed corporate action requiring appraisal rights under section 30-1-1302, Idaho Code, is submitted to a vote at a shareholders' meeting, a shareholder who wishes to assert appraisal rights with respect to any class or series of shares:

     (a)    Must deliver to the corporation before the vote is taken written notice of the shareholder's intent to demand payment if the proposed action is effectuated; and

     (b)    Must not vote, or cause or permit to be voted, any shares of such class or series in favor of the proposed action.

13

Exhibit - T

(2)  A shareholder who does not satisfy the requirements of subsection (1) of this section is not entitled to payment under this part.

**30-1-1322. APPRAISAL NOTICE AND FORM.** (1) If proposed corporate action requiring appraisal rights under section 30-1-1302, Idaho Code, becomes effective, the corporation must deliver a written appraisal notice and form required by subsection (2)(a) of this section to all shareholders who satisfied the requirements of section 30-1-1321, Idaho Code. In the case of a merger under section 30-1-1105, Idaho Code, the parent must deliver a written appraisal notice and form to all record shareholders who may be entitled to assert appraisal rights.

(2)  The appraisal notice must be sent no earlier than the date the corporate action became effective and no later than ten (10) days after such date and must:

(a)  Supply a form that specifies the date of the first announcement to shareholders of the principal terms of the proposed corporate action and requires the shareholder asserting appraisal rights to certify:

(i)  Whether or not beneficial ownership of those shares for which appraisal rights are asserted was acquired before that date; and

(ii)  That the shareholder did not vote for the transaction;

(b)  State:

(i)  Where the form must be sent and where certificates for certificated shares must be deposited and the date by which those certificates must be deposited, which date may not be earlier than the date for receiving the required form under subsection (2)(b)(ii) of this section;

(ii)  A date by which the corporation must receive the form, which date may not be fewer than forty (40) nor more than sixty (60) days after the date the appraisal notice and form in subsection (1) of this section are sent, and state that the shareholder shall have waived the right to demand appraisal with respect to the shares unless the form is received by the corporation by such specified date;

(iii)  The corporation's estimate of the fair value of the shares;

(iv)  That, if requested in writing, the corporation will provide, to the shareholders so requesting, within ten (10) days after the date specified in subsection (2)(b)(ii) of this section the number of shareholders who return the forms by the specified date and the total number of shares owned by them; and

(v)  The date by which the notice to withdraw under section 30-1-1323, Idaho Code, must be received, which date must be within twenty (20) days after the date specified in subsection (2)(b)(ii) of this section; and

(c)  Be accompanied by a copy of this part.

**30-1-1323. PERFECTION OF RIGHTS -- RIGHT TO WITHDRAW.** (1) A shareholder who receives notice pursuant to section 30-1-1322, Idaho Code, and who wishes to exercise appraisal rights must certify on the form sent by the corporation whether the beneficial owner of such shares acquired beneficial ownership of the shares before the date required to be set forth in the notice pursuant to section 30-1-1322(2)(a), Idaho Code. If a shareholder fails to make this certification, the corporation may elect to treat the shareholder's shares as after-acquired shares under section 30-1-1325, Idaho Code. In addition, a shareholder who wishes to exercise appraisal rights must execute and return the form and, in the case of certificated shares, deposit the shareholder's certificates in accordance with the terms of the notice by the date referred to in the notice pursuant to section 30-1-1322(2)(b)(ii), Idaho Code. Once a shareholder deposits that shareholder's certificates or, in the case of uncertificated shares, returns the executed forms, that shareholder loses all rights as a shareholder, unless the shareholder withdraws pursuant to subsection (2) of this section.

14

Exhibit - T

(2)     A shareholder who has complied with subsection (1) of this section may nevertheless decline to exercise appraisal rights and withdraw from the appraisal process by so notifying the corporation in writing by the date set forth in the appraisal notice pursuant to section 30-1-1322(2)(b)(v), Idaho Code. A shareholder who fails to so withdraw from the appraisal process may not thereafter withdraw without the corporation's written consent.

(3)     A shareholder who does not execute and return the form and, in the case of certificated shares, deposit that shareholder's share certificates where required, each by the date set forth in the notice described in section 30-1-1322(2), Idaho Code, shall not be entitled to payment under this part.

**30-1-1324. PAYMENT.** (1) Except as provided in section 30-1-1325, Idaho Code, within thirty (30) days after the form required by section 30-1-1322(2)(b)(ii), Idaho Code, is due, the corporation shall pay in cash to those shareholders who complied with section 30-1-1323(1), Idaho Code, the amount the corporation estimates to be the fair value of their shares, plus interest.

(2)     The payment to each shareholder pursuant to subsection (1) of this section must be accompanied by:

(a)     Financial statements of the corporation that issued the shares to be appraised, consisting of a balance sheet as of the end of a fiscal year ending not more than sixteen (16) months before the date of payment, an income statement for that year, a statement of changes in shareholders' equity for that year, and the latest available interim financial statements, if any;

(b)     A statement of the corporation's estimate of the fair value of the shares, which estimate must equal or exceed the corporation's estimate given pursuant to section 30-1-1322(2)(b)(iii), Idaho Code; and

(c)     A statement that shareholders described in subsection (1) of this section have the right to demand further payment under section 30-1-1326, Idaho Code, and that if any shareholder does not do so within the time period specified therein, such shareholder shall be deemed to have accepted such payment in full satisfaction of the corporation's obligations under this part.

**30-1-1325. AFTER-ACQUIRED SHARES.** (1) A corporation may elect to withhold payment required by section 30-1-1324, Idaho Code, from any shareholder who did not certify that beneficial ownership of all of the shareholder's shares for which appraisal rights are asserted was acquired before the date set forth in the appraisal notice sent pursuant to section 30-1-1322(2)(a), Idaho Code.

(2)     If the corporation elected to withhold payment under subsection (1) of this section, it must, within thirty (30) days after the form required by section 30-1-1322(2)(b)(ii), Idaho Code, is due, notify all shareholders who are described in subsection (1) of this section:

(a)     Of the information required by section 30-1-1324(2)(a), Idaho Code;

(b)     Of the corporation's estimate of fair value pursuant to section 39-1-1324(2)(b) [30-1-1324(2)(b)], Idaho Code;

(c)     That they may accept the corporation's estimate of fair value, plus interest, in full satisfaction of their demands or demand appraisal under section 30-1-1326, Idaho Code;

(d)     That those shareholders who wish to accept such offer must so notify the corporation of their acceptance of the corporation's offer within thirty (30) days after receiving the offer; and

(e)     That those shareholders who do not satisfy the requirements for demanding appraisal under section 30-1-1326, Idaho Code, shall be deemed to have accepted the corporation's offer.

(3)     Within ten (10) days after receiving the shareholder's acceptance pursuant to subsection (2) of this section, the corporation must pay in cash the amount it offered under

15

Exhibit - T

subsection (2)(b) of this section to each shareholder who agreed to accept the corporation's offer in full satisfaction of the shareholder's demand.

(4)     Within forty (40) days after sending the notice described in subsection (2) of this section, the corporation must pay in cash the amount it offered to pay under subsection (2)(b) of this section to each shareholder described in subsection (2)(e) of this section.

**30-1-1326.  PROCEDURE IF SHAREHOLDER DISSATISFIED WITH PAYMENT OR OFFER.** (1) A shareholder paid pursuant to section 30-1-1324, Idaho Code, who is dissatisfied with the amount of the payment must notify the corporation in writing of that shareholder's estimate of the fair value of the shares and demand payment of that estimate plus interest, less any payment under section 30-1-1324, Idaho Code. A shareholder offered payment under section 30-1-1325, Idaho Code, who is dissatisfied with that offer must reject the offer and demand payment of the shareholder's stated estimate of the fair value of the shares plus interest.

(2)     A shareholder who fails to notify the corporation in writing of that shareholder's demand to be paid the shareholder's stated estimate of the fair value plus interest under subsection (1) of this section within thirty (30) days after receiving the corporation's payment or offer of payment under section 30-1-1324 or 30-1-1325, Idaho Code, respectively, waives the right to demand payment under this section and shall be entitled only to the payment made or offered pursuant to those respective sections.

**30-1-1330.  COURT ACTION.** (1) If a shareholder makes demand for payment under section 30-1-1326, Idaho Code, which remains unsettled, the corporation shall commence a proceeding within sixty (60) days after receiving the payment demand and petition the court to determine the fair value of the shares and accrued interest. If the corporation does not commence the proceeding within the sixty-day period, it shall pay in cash to each shareholder the amount demanded pursuant to section 30-1-1326, Idaho Code, plus interest.

(2)     The corporation shall commence the proceeding in the appropriate court of the county where the corporation's principal office is located, or, if none in this state, Ada county. If the corporation is a foreign corporation, it shall commence the proceeding in the county in this state where the principal office of the domestic corporation merged with the foreign corporation was located or, if the domestic corporation did not have its principal office in this state at the time of the transaction, in Ada county.

(3)     The corporation shall make all shareholders, whether or not residents of this state, whose demands remain unsettled parties to the proceeding, as in an action against their shares, and all parties must be served with a copy of the petition. Nonresidents may be served by registered or certified mail or by publication as provided by law.

(4)     The jurisdiction of the court in which the proceeding is commenced under subsection (2) of this section is plenary and exclusive. The court may appoint one (1) or more persons as appraisers to receive evidence and recommend a decision on the question of fair value. The appraisers shall have the powers described in the order appointing them, or in any amendment to it. The shareholders demanding appraisal rights are entitled to the same discovery rights as parties in other civil proceedings. There shall be no right to a jury trial.

(5)     Each shareholder made a party to the proceeding is entitled to judgment:

(a)     For the amount, if any, by which the court finds the fair value of the shareholder's shares, plus interest, exceeds the amount paid by the corporation to the shareholder for such shares; or

(b)     For the fair value, plus interest, of the shareholder's shares for which the corporation elected to withhold payment under section 30-1-1325, Idaho Code.

16

Exhibit - T

**4-ER-731**

**30-1-1331.** COURT COSTS AND COUNSEL FEES. (1) The court in an appraisal proceeding commenced under section 30-1-1330, Idaho Code, shall determine all costs of the proceeding, including the reasonable compensation and expenses of appraisers appointed by the court. The court shall assess the costs against the corporation, except that the court may assess costs against all or some of the shareholders demanding appraisal, in amounts the court finds equitable, to the extent the court finds such shareholders acted arbitrarily, vexatiously, or not in good faith with respect to the rights provided by this part.

(2)   The court in an appraisal proceeding may also assess the fees and expenses of counsel and experts for the respective parties, in amounts the court finds equitable:

(a)   Against the corporation and in favor of any or all shareholders demanding appraisal if the court finds the corporation did not substantially comply with the requirements of section 30-1-1320, 30-1-1322, 30-1-1324 or 30-1-1325, Idaho Code; or

(b)   Against either the corporation or a shareholder demanding appraisal, in favor of any other party, if the court finds that the party against whom the fees and expenses are assessed acted arbitrarily, vexatiously, or not in good faith with respect to the rights provided by this part.

(3)   If the court in an appraisal proceeding finds that the services of counsel for any shareholder were of substantial benefit to other shareholders similarly situated, and that the fees for those services should not be assessed against the corporation, the court may award to such counsel reasonable fees to be paid out of the amounts awarded to shareholders who were benefited.

(4)   To the extent the corporation fails to make a required payment pursuant to section 30-1-1324, 30-1-1325 or 30-1-1326, Idaho Code, the shareholder may sue directly for the amount owed and, to the extent successful, shall be entitled to recover from the corporation all costs and expenses of the suit, including counsel fees.

F:\users\40468\Reverse Stock Split\Annual Meeting Statement (Marked 06.30.12)

17

Exhibit - T

---

## PROXY

---

### ANNUAL MEETING OF SHAREHOLDERS OF
### AIA SERVICES CORPORATION
### JULY 16, 2012

The undersigned hereby constitutes and appoints R. John Taylor and JoLee K. Duclos, and each of them, the undersigned's attorney-in-fact and proxy to vote all of the shares of common stock of AIA Services Corporation (the "Company") owned of record by the undersigned on June 30, 2012 at the annual meeting of shareholders of the Company to be held on July 16, 2012 or any adjournment(s) or postponement(s) thereof.

### UNLESS OTHERWISE INDICATED, THE SHARES OF COMMON STOCK OWNED BY THE UNDERSIGNED WILL BE VOTED IN FAVOR OF ITEMS 1 AND 2.

**ITEM 1.     ELECTION OF DIRECTORS**

[ ] FOR        [ ] AGAINST        [ ] ABSTAIN

With respect to the election of the following director-nominees:
  R. John Taylor        James W. Beck        Connie W. Henderson

NOTE: To withhold authority to vote for a particular director-nominee(s), strike a line through such director-nominee(s) name.

**ITEM 2.     APPROVAL OF AMENDMENT TO ARTICLES OF INCORPORATION TO CHANGE THE PAR VALUE OF THE COMMON STOCK**

[ ] FOR        [ ] AGAINST        [ ] ABSTAIN

approval of an amendment to the Company's articles of incorporation of the Company, pursuant to which: (a) each issued and outstanding share of common stock of the Company, including any outstanding shares of common stock held by the Company as treasury stock, would be converted into 1/53,000th of a share of common stock (the equivalent of one share of common stock for every 53,000 outstanding shares of common stock); and (b) each holder of fewer than 53,000 shares immediately prior to the time of the amendment, being the date articles of amendment to the articles of incorporation of the Company are filed with the Secretary of State of the State of Idaho (the "Effective Time"), would receive, in lieu of a fractional share, an amount determined by multiplying the number of shares of common stock owned beneficially and of record by such holder immediately prior to the Effective Time by ten cents ($0.10).

DATED: _____, 2012

_____          _____
Signature of Shareholder                 Additional Signature, if Jointly Owned


_____          _____
Print Name                               Print Name
f:\users\40468\Reverse Stock Split\Annual Meeting Proxy (Marked 06.30.12)

# Exhibit - T

**4-ER-733**

# Exhibit B

Exhibit - T

## NOTICE OF INTENT TO DEMAND PAYMENT (I.C. § 30-1-1321)

1.      Pursuant to I.C. § 30-1-1321 and I.C. § 30-1-1301 *et seq.*, if the proposed reverse stock split is effectuated, the undersigned shareholder(s) hereby demands full and fair payment and hereby asserts appraisal rights as to all common shares owned and/or beneficially held by the undersigned shareholder(s) in AIA Services Corporation ("Company"). This demand, if executed and/or delivered by facsimile or pdf attachment, shall constitute an original document.

2.      The undersigned shareholder(s) asserts that no fair valuation of any common shares may be determined until the claims pending in *Donna J. Taylor v. Hawley Troxell, R. John Taylor, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case") have been resolved and the amount of damages recovered and considered in any fair valuation. Until the Federal Court Case is resolved and all improper payments, distributions and transfers have been recovered, it is impossible and prejudicially unfair to attempt making a determination or appraisal of the fair value of the common shares held or beneficially owned by the undersigned shareholder(s).

3.      By making the demands in Paragraphs 1-2 above, the undersigned shareholder(s) does not waive any legal rights or remedies pertaining to the legality of the reverse stock split, the determination of fair value or any other acts and/or omissions, including, without limitation: (a) the reverse split violates the Company's Articles of Amendment to the Articles of Incorporation filed on May 8, 1996 (*See* Articles 4.2.9(f), 4.3.3 and 11); (b) the reverse stock split violates the Company's Restated Bylaws (*See* Sections 4.14 and 5.2); (c) R. John Taylor and Connie Taylor Henderson's shares are disqualified from voting on the reverse split and other matters and 818,659 of their shares were unlawfully issued; (d) the reverse stock split violates the fiduciary duties owed by John Taylor, Connie Taylor Henderson and James Beck to the minority shareholders (notwithstanding the fact that they have never been properly elected and are disqualified from serving based upon their acts of malfeasance and aiding and abetting the commission and covering up of torts against the Company and its minority shareholders); (e) the reverse stock split and the past and present operation of the Company constitutes the unlawful squeezing out and oppression of minority shareholders by R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman and others purporting to act as officers of the Company (including JoLee Duclos); and (f) the reverse stock split violates Idaho law (including as it pertains to the duties and obligations of directors and officers to the Company).

4.      The undersigned shareholder(s) does not consent to or ratify any prior or future purported service of R. John Taylor, Connie Taylor Henderson or James Beck on the Company's Board of Directors and asserts that they have not been properly elected and are not properly qualified to serve based upon their conflicts of interest, acts and/or omissions. Any resolutions or decision of the alleged Board of Directors purportedly approving the reverse stock split and other resolutions are illegal and void.

5.      The undersigned shareholder(s) reserves all legal rights, claims and remedies, including, without limitation, the  right to seek damages, injunctive relief or rescission of: the reverse stock split should it be effectuated; any appointment of R. John Taylor, Connie Taylor Henderson and/or James Beck to the Company's Board of Directors, and/or the appointment of any officer of the Company by any of the foregoing parties, including, without limitation, the appointment of R. John Taylor, Connie Taylor Henderson, James Beck, JoLee Duclos or Aimee Gordon to serve as officers of the Company.

Dated this ___ day of July, 2012.

Paul D. Durant

Exhibit - T

**4-ER-735**

## NOTICE OF INTENT TO DEMAND PAYMENT (I.C. § 30-1-1321)

1.       Pursuant to I.C. § 30-1-1321 and I.C. § 30-1-1301 *et seq.*, if the proposed reverse stock split is effectuated, the undersigned shareholder(s) hereby demands full and fair payment and hereby asserts appraisal rights as to all common shares owned and/or beneficially held by the undersigned shareholder(s) in AIA Services Corporation ("Company"). This demand, if executed and/or delivered by facsimile or pdf attachment, shall constitute an original document.

2.       The undersigned shareholder(s) asserts that no fair valuation of any common shares may be determined until the claims pending in *Donna J. Taylor v. Hawley Troxell, R. John Taylor, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case") have been resolved and the amount of damages recovered and considered in any fair valuation. Until the Federal Court Case is resolved and all improper payments, distributions and transfers have been recovered, it is impossible and prejudicially unfair to attempt making a determination or appraisal of the fair value of the common shares held or beneficially owned by the undersigned shareholder(s).

3.       By making the demands in Paragraphs 1-2 above, the undersigned shareholder(s) does not waive any legal rights or remedies pertaining to the legality of the reverse stock split, the determination of fair value or any other acts and/or omissions, including, without limitation: (a) the reverse split violates the Company's Articles of Amendment to the Articles of Incorporation filed on May 8, 1996 (*See* Articles 4.2.9(f), 4.3.3 and 11); (b) the reverse stock split violates the Company's Restated Bylaws (*See* Sections 4.14 and 5.2); (c) R. John Taylor and Connie Taylor Henderson's shares are disqualified from voting on the reverse split and other matters and 818,659 of their shares were unlawfully issued; (d) the reverse stock split violates the fiduciary duties owed by John Taylor, Connie Taylor Henderson and James Beck to the minority shareholders (notwithstanding the fact that they have never been properly elected and are disqualified from serving based upon their acts of malfeasance and aiding and abetting the commission and covering up of torts against the Company and its minority shareholders); (e) the reverse stock split and the past and present operation of the Company constitutes the unlawful squeezing out and oppression of minority shareholders by R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman and others purporting to act as officers of the Company (including JoLee Duclos); and (f) the reverse stock split violates Idaho law (including as it pertains to the duties and obligations of directors and officers to the Company).

4.       The undersigned shareholder(s) does not consent to or ratify any prior or future purported service of R. John Taylor, Connie Taylor Henderson or James Beck on the Company's Board of Directors and asserts that they have not been properly elected and are not properly qualified to serve based upon their conflicts of interest, acts and/or omissions. Any resolutions or decision of the alleged Board of Directors purportedly approving the reverse stock split and other resolutions are illegal and void.

5.       The undersigned shareholder(s) reserves all legal rights, claims and remedies, including, without limitation, the right to seek damages, injunctive relief or rescission of: the reverse stock split should it be effectuated; any appointment of R. John Taylor, Connie Taylor Henderson and/or James Beck to the Company's Board of Directors, and/or the appointment of any officer of the Company by any of the foregoing parties, including, without limitation, the appointment of R. John Taylor, Connie Taylor Henderson, James Beck, JoLee Duclos or Aimee Gordon to serve as officers of the Company.

Dated this **13** day of July, 2012.

_____
Kay Blanchett

Exhibit - T

4-ER-736

## NOTICE OF INTENT TO DEMAND PAYMENT (I.C. § 30-1-1321)

1.      Pursuant to I.C. § 30-1-1321 and I.C. § 30-1-1301 *et seq.*, if the proposed reverse stock split is effectuated, the undersigned shareholder(s) hereby demands full and fair payment and hereby asserts appraisal rights as to all common shares owned and/or beneficially held by the undersigned shareholder(s) in AIA Services Corporation ("Company"). This demand, if executed and/or delivered by facsimile or pdf attachment, shall constitute an original document.

2.      The undersigned shareholder(s) asserts that no fair valuation of any common shares may be determined until the claims pending in *Donna J. Taylor v. Hawley Troxell, R. John Taylor, et al.,* United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case") have been resolved and the amount of damages recovered and considered in any fair valuation. Until the Federal Court Case is resolved and all improper payments, distributions and transfers have been recovered, it is impossible and prejudicially unfair to attempt making a determination or appraisal of the fair value of the common shares held or beneficially owned by the undersigned shareholder(s).

3.      By making the demands in Paragraphs 1-2 above, the undersigned shareholder(s) does not waive any legal rights or remedies pertaining to the legality of the reverse stock split, the determination of fair value or any other acts and/or omissions, including, without limitation: (a) the reverse split violates the Company's Articles of Amendment to the Articles of Incorporation filed on May 8, 1996 (*See* Articles 4.2.9(f), 4.3.3 and 11); (b) the reverse stock split violates the Company's Restated Bylaws (*See* Sections 4.14 and 5.2); (c) R. John Taylor and Connie Taylor Henderson's shares are disqualified from voting on the reverse split and other matters and 818,659 of their shares were unlawfully issued; (d) the reverse stock split violates the fiduciary duties owed by John Taylor, Connie Taylor Henderson and James Beck to the minority shareholders (notwithstanding the fact that they have never been properly elected and are disqualified from serving based upon their acts of malfeasance and aiding and abetting the commission and covering up of torts against the Company and its minority shareholders); (e) the reverse stock split and the past and present operation of the Company constitutes the unlawful squeezing out and oppression of minority shareholders by R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman and others purporting to act as officers of the Company (including JoLee Duclos); and (f) the reverse stock split violates Idaho law (including as it pertains to the duties and obligations of directors and officers to the Company).

4.      The undersigned shareholder(s) does not consent to or ratify any prior or future purported service of R. John Taylor, Connie Taylor Henderson or James Beck on the Company's Board of Directors and asserts that they have not been properly elected and are not properly qualified to serve based upon their conflicts of interest, acts and/or omissions. Any resolutions or decision of the alleged Board of Directors purportedly approving the reverse stock split and other resolutions are illegal and void.

5.      The undersigned shareholder(s) reserves all legal rights, claims and remedies, including, without limitation, the right to seek damages, injunctive relief or rescission of: the reverse stock split should it be effectuated; any appointment of R. John Taylor, Connie Taylor Henderson and/or James Beck to the Company's Board of Directors, and/or the appointment of any officer of the Company by any of the foregoing parties, including, without limitation, the appointment of R. John Taylor, Connie Taylor Henderson, James Beck, JoLee Duclos or Aimee Gordon to serve as officers of the Company.

Dated this 13 day of July, 2012.

Lee Ann Hostetler

Exhibit - T

**4-ER-737**

## NOTICE OF INTENT TO DEMAND PAYMENT (I.C. § 30-1-1321)

1.     Pursuant to I.C. § 30-1-1321 and I.C. § 30-1-1301 *et seq.*, if the proposed reverse stock split is effectuated, the undersigned shareholder(s) hereby demands full and fair payment and hereby asserts appraisal rights as to all common shares owned and/or beneficially held by the undersigned shareholder(s) in AIA Services Corporation ("Company"). This demand, if executed and/or delivered by facsimile or pdf attachment, shall constitute an original document.

2.     The undersigned shareholder(s) asserts that no fair valuation of any common shares may be determined until the claims pending in *Donna J. Taylor v. Hawley Troxell, R. John Taylor, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case") have been resolved and the amount of damages recovered and considered in any fair valuation. Until the Federal Court Case is resolved and all improper payments, distributions and transfers have been recovered, it is impossible and prejudicially unfair to attempt making a determination or appraisal of the fair value of the common shares held or beneficially owned by the undersigned shareholder(s).

3.     By making the demands in Paragraphs 1-2 above, the undersigned shareholder(s) does not waive any legal rights or remedies pertaining to the legality of the reverse stock split, the determination of fair value or any other acts and/or omissions, including, without limitation: (a) the reverse split violates the Company's Articles of Amendment to the Articles of Incorporation filed on May 8, 1996 (*See* Articles 4.2.9(f), 4.3.3 and 11); (b) the reverse stock split violates the Company's Restated Bylaws (*See* Sections 4.14 and 5.2); (c) R. John Taylor and Connie Taylor Henderson's shares are disqualified from voting on the reverse split and other matters and 818,659 of their shares were unlawfully issued; (d) the reverse stock split violates the fiduciary duties owed by John Taylor, Connie Taylor Henderson and James Beck to the minority shareholders (notwithstanding the fact that they have never been properly elected and are disqualified from serving based upon their acts of malfeasance and aiding and abetting the commission and covering up of torts against the Company and its minority shareholders); (e) the reverse stock split and the past and present operation of the Company constitutes the unlawful squeezing out and oppression of minority shareholders by R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman and others purporting to act as officers of the Company (including JoLee Duclos); and (f) the reverse stock split violates Idaho law (including as it pertains to the duties and obligations of directors and officers to the Company).

4.     The undersigned shareholder(s) does not consent to or ratify any prior or future purported service of R. John Taylor, Connie Taylor Henderson or James Beck on the Company's Board of Directors and asserts that they have not been properly elected and are not properly qualified to serve based upon their conflicts of interest, acts and/or omissions. Any resolutions or decision of the alleged Board of Directors purportedly approving the reverse stock split and other resolutions are illegal and void.

5.     The undersigned shareholder(s) reserves all legal rights, claims and remedies, including, without limitation, the right to seek damages, injunctive relief or rescission of: the reverse stock split should it be effectuated; any appointment of R. John Taylor, Connie Taylor Henderson and/or James Beck to the Company's Board of Directors, and/or the appointment of any officer of the Company by any of the foregoing parties, including, without limitation, the appointment of R. John Taylor, Connie Taylor Henderson, James Beck, JoLee Duclos or Aimee Gordon to serve as officers of the Company.

Dated this _11_ day of July, 2012.

_Jerry A. Legg_
Jerry A. Legg

Exhibit - T

**4-ER-738**

## NOTICE OF INTENT TO DEMAND PAYMENT (I.C. § 30-1-1321)

1.      Pursuant to I.C. § 30-1-1321 and I.C. § 30-1-1301 *et seq.*, if the proposed reverse stock split is effectuated, the undersigned shareholder(s) hereby demands full and fair payment and hereby asserts appraisal rights as to all common shares owned and/or beneficially held by the undersigned shareholder(s) in AIA Services Corporation ("Company"). This demand, if executed and/or delivered by facsimile or pdf attachment, shall constitute an original document.

2.      The undersigned shareholder(s) asserts that no fair valuation of any common shares may be determined until the claims pending in *Donna J. Taylor v. Hawley Troxell, R. John Taylor, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case") have been resolved and the amount of damages recovered and considered in any fair valuation. Until the Federal Court Case is resolved and all improper payments, distributions and transfers have been recovered, it is impossible and prejudicially unfair to attempt making a determination or appraisal of the fair value of the common shares held or beneficially owned by the undersigned shareholder(s).

3.      By making the demands in Paragraphs 1-2 above, the undersigned shareholder(s) does not waive any legal rights or remedies pertaining to the legality of the reverse stock split, the determination of fair value or any other acts and/or omissions, including, without limitation: (a) the reverse split violates the Company's Articles of Amendment to the Articles of Incorporation filed on May 8, 1996 (*See* Articles 4.2.9(f), 4.3.3 and 11); (b) the reverse stock split violates the Company's Restated Bylaws (*See* Sections 4.14 and 5.2); (c) R. John Taylor and Connie Taylor Henderson's shares are disqualified from voting on the reverse split and other matters and 818,659 of their shares were unlawfully issued; (d) the reverse stock split violates the fiduciary duties owed by John Taylor, Connie Taylor Henderson and James Beck to the minority shareholders (notwithstanding the fact that they have never been properly elected and are disqualified from serving based upon their acts of malfeasance and aiding and abetting the commission and covering up of torts against the Company and its minority shareholders); (e) the reverse stock split and the past and present operation of the Company constitutes the unlawful squeezing out and oppression of minority shareholders by R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman and others purporting to act as officers of the Company (including JoLee Duclos); and (f) the reverse stock split violates Idaho law (including as it pertains to the duties and obligations of directors and officers to the Company).

4.      The undersigned shareholder(s) does not consent to or ratify any prior or future purported service of R. John Taylor, Connie Taylor Henderson or James Beck on the Company's Board of Directors and asserts that they have not been properly elected and are not properly qualified to serve based upon their conflicts of interest, acts and/or omissions. Any resolutions or decision of the alleged Board of Directors purportedly approving the reverse stock split and other resolutions are illegal and void.

5.      The undersigned shareholder(s) reserves all legal rights, claims and remedies, including, without limitation, the right to seek damages, injunctive relief or rescission of: the reverse stock split should it be effectuated; any appointment of R. John Taylor, Connie Taylor Henderson and/or James Beck to the Company's Board of Directors, and/or the appointment of any officer of the Company by any of the foregoing parties, including, without limitation, the appointment of R. John Taylor, Connie Taylor Henderson, James Beck, JoLee Duclos or Aimee Gordon to serve as officers of the Company.

Dated this ___ll___ day of July, 2012.

_Dale Miesen_

Dale Miesen

Exhibit - T

## NOTICE OF INTENT TO DEMAND PAYMENT (I.C. § 30-1-1321)

1.      Pursuant to I.C. § 30-1-1321 and I.C, § 30-1-1301 *et seq.*, if the proposed reverse stock split is effectuated, the undersigned shareholder(s) hereby demands full and fair payment and hereby asserts appraisal rights as to all common shares owned and/or beneficially held by the undersigned shareholder(s) in AIA Services Corporation ("Company"). This demand, if executed and/or delivered by facsimile or pdf attachment, shall constitute an original document.

2.      The undersigned shareholder(s) asserts that no fair valuation of any common shares may be determined until the claims pending in *Donna J. Taylor v. Hawley Troxell, R. John Taylor, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case") have been resolved and the amount of damages recovered and considered in any fair valuation. Until the Federal Court Case is resolved and all improper payments, distributions and transfers have been recovered, it is impossible and prejudicially unfair to attempt making a determination or appraisal of the fair value of the common shares held or beneficially owned by the undersigned shareholder(s).

3.      By making the demands in Paragraphs 1-2 above, the undersigned shareholder(s) does not waive any legal rights or remedies pertaining to the legality of the reverse stock split, the determination of fair value or any other acts and/or omissions, including, without limitation: (a) the reverse split violates the Company's Articles of Amendment to the Articles of Incorporation filed on May 8, 1996 (*See* Articles 4.2.9(f), 4.3.3 and 11); (b) the reverse stock split violates the Company's Restated Bylaws (*See* Sections 4.14 and 5.2); (c) R. John Taylor and Connie Taylor Henderson's shares are disqualified from voting on the reverse split and other matters and 818,659 of their shares were unlawfully issued; (d) the reverse stock split violates the fiduciary duties owed by John Taylor, Connie Taylor Henderson and James Beck to the minority shareholders (notwithstanding the fact that they have never been properly elected and are disqualified from serving based upon their acts of malfeasance and aiding and abetting the commission and covering up of torts against the Company and its minority shareholders); (e) the reverse stock split and the past and present operation of the Company constitutes the unlawful squeezing out and oppression of minority shareholders by R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman and others purporting to act as officers of the Company (including JoLee Duclos); and (f) the reverse stock split violates Idaho law (including as it pertains to the duties and obligations of directors and officers to the Company).

4.      The undersigned shareholder(s) does not consent to or ratify any prior or future purported service of R. John Taylor, Connie Taylor Henderson or James Beck on the Company's Board of Directors and asserts that they have not been properly elected and are not properly qualified to serve based upon their conflicts of interest, acts and/or omissions. Any resolutions or decision of the alleged Board of Directors purportedly approving the reverse stock split and other resolutions are illegal and void.

5.      The undersigned shareholder(s) reserves all legal rights, claims and remedies, including, without limitation, the right to seek damages, injunctive relief or rescission of: the reverse stock split should it be effectuated; any appointment of R. John Taylor, Connie Taylor Henderson and/or James Beck to the Company's Board of Directors, and/or the appointment of any officer of the Company by any of the foregoing parties, including, without limitation, the appointment of R. John Taylor, Connie Taylor Henderson, James Beck, JoLee Duclos or Aimee Gordon to serve as officers of the Company.

Dated this 12 day of July, 2012.

Heather Miesen
Heather Miesen Living Trust

Exhibit - T

**4-ER-740**

## NOTICE OF INTENT TO DEMAND PAYMENT (I.C. § 30-1-1321)

1.      Pursuant to I.C. § 30-1-1321 and I.C. § 30-1-1301 *et seq.*, If the proposed reverse stock split is effectuated, the undersigned shareholder(s) hereby demands full and fair payment and hereby asserts appraisal rights as to all common shares owned and/or beneficially held by the undersigned shareholder(s) in AIA Services Corporation ("Company"). This demand, If executed and/or delivered by facsimile or pdf attachment, shall constitute an original document.

2.      The undersigned shareholder(s) asserts that no fair valuation of any common shares may be determined until the claims pending In *Donna J. Taylor v. Hawley Troxell, R. John Taylor, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case") have been resolved and the amount of damages recovered and considered In any fair valuation. Until the Federal Court Case is resolved and all improper payments, distributions and transfers have been recovered, it is Impossible and prejudicially unfair to attempt making a determination or appraisal of the fair value of the common shares held or beneficially owned by the undersigned shareholder(s).

3.      By making the demands in Paragraphs 1-2 above, the undersigned shareholder(s) does not waive any legal rights or remedies pertaining to the legality of the reverse stock split, the determination of fair value or any other acts and/or omissions, including, without limitation: (a) the reverse split violates the Company's Articles of Amendment to the Articles of Incorporation filed on May 8, 1996 (*See* Articles 4.2.9(f), 4.3.3 and 11); (b) the reverse stock split violates the Company's Restated Bylaws (*See* Sections 4.14 and 5.2); (c) R. John Taylor and Connie Taylor Henderson's shares are disqualified from voting on the reverse split and other matters and 818,659 of their shares were unlawfully issued; (d) the reverse stock split violates the fiduciary duties owed by John Taylor, Connie Taylor Henderson and James Beck to the minority shareholders (notwithstanding tho fact that they have never been properly elected and are disqualified from serving based upon their acts of malfeasance and aiding and abetting the commission and covering up of torts against the Company and its minority shareholders); (e) the reverse stock split and the past and present operation of the Company constitutes the unlawful squeezing out and oppression of minority shareholders by R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman and others purporting to act as officers of the Company (including JoLee Duclos); and (f) the reverse stock split violates Idaho law (including as it pertains to the duties and obligations of directors and officers to the Company).

4.      The undersigned shareholder(s) does not consent to or ratify any prior or future purported service of R. John Taylor, Connie Taylor Henderson or James Beck on the Company's Board of Directors and asserts that they have not been properly elected and are not properly qualified to serve based upon their conflicts of interest, acts and/or omissions. Any resolutions or decision of the alleged Board of Directors purportedly approving the reverse stock split and other resolutions are illegal and void.

5.    .  The undersigned shareholder(s) reserves all legal rights, claims and remedies, including, without limitation, the  right to seek damages, injunctive relief or rescission of: the reverse stock split should it be effectuated; any appointment of R. John Taylor, Connie Taylor Henderson and/or James Beck to the Company's Board of Directors, and/or the appointment of any officer of the Company by any of the foregoing parties, including, without limitation, the appointment of R. John Taylor, Connie Taylor Henderson, James Beck, JoLee Duclos or Aimee Gordon to serve as officers of the Company.

Dated this ____ day of July, 2012.

Jennifer Miesen
Jennifer Miesen Living Trust

Exhibit - T

## NOTICE OF INTENT TO DEMAND PAYMENT (I.C. § 30-1-1321)

1.    Pursuant to I.C. § 30-1-1321 and I.C. § 30-1-1301 *et seq.*, If the proposed reverse stock split is effectuated, the undersigned shareholder(s) hereby demands full and fair payment and hereby asserts appraisal rights as to all common shares owned and/or beneficially held by the undersigned shareholder(s) in AIA Services Corporation ("Company"). This demand, If executed and/or delivered by facsimile or pdf attachment, shall constitute an original document.

2.    The undersigned shareholder(s) asserts that no fair valuation of any common shares may be determined until the claims pending In *Donna J. Taylor v. Hawley Troxell, R. John Taylor, et al.,* United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case") have been resolved and the amount of damages recovered and considered in any fair valuation. Until the Federal Court Case Is resolved and all improper payments, distributions and transfers have been recovered, It is Impossible and prejudicially unfair to attempt making a determination or appraisal of the fair value of the common shares held or beneficially owned by the undersigned shareholder(s).

3.    By making the demands In Paragraphs 1-2 above, the undersigned shareholder(s) does not waive any legal rights or remedies pertaining to the legality of the reverse stock split, the determination of fair value or any other acts and/or omissions, Including, without limitation: (a) the reverse split violates the Company's Articles of Amendment to the Articles of Incorporation filed on May 8, 1996 (*See* Articles 4.2.9(f), 4.3.3 and 11); (b) the reverse stock split violates the Company's Restated Bylaws (*See* Sections 4.14 and 5.2); (c) R. John Taylor and Connie Taylor Henderson's shares are disqualified from voting on the reverse split and other matters and 818,659 of their shares were unlawfully issued; (d) the reverse stock split violates the fiduciary duties owed by John Taylor, Connie Taylor Henderson and James Beck to the minority shareholders (notwithstanding the fact that they have never been properly elected and are disqualified from serving based upon their acts of malfeasance and aiding and abetting the commission and covering up of torts against the Company and its minority shareholders); (e) the reverse stock split and the past and present operation of the Company constitutes the unlawful squeezing out and oppression of minority shareholders by R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman and others purporting to act as officers of the Company (including JoLee Duclos); and (f) the reverse stock split violates Idaho law (Including as it pertains to the duties and obligations of directors and officers to the Company).

4.    The undersigned shareholder(s) does not consent to or ratify any prior or future purported service of R. John Taylor, Connie Taylor Henderson or James Beck on the Company's Board of Directors and asserts that they have not been properly elected and are not properly qualified to serve based upon their conflicts of Interest, acts and/or omissions. Any resolutions or decision of the alleged Board of Directors purportedly approving the reverse stock split and other resolutions are Illegal and void.

5.    The undersigned shareholder(s) reserves all legal rights, claims and remedies, Including, without limitation, the right to seek damages, injunctive relief or rescission of: the reverse stock split should It be effectuated; any appointment of R. John Taylor, Connie Taylor Henderson and/or James Beck to the Company's Board of Directors, and/or the appointment of any officer of the Company by any of the foregoing parties, Including, without limitation, the appointment of R. John Taylor, Connie Taylor Henderson, James Beck, JoLee Duclos or Aimee Gordon to serve as officers of the Company.

Dated this __12__ day of July, 2012.

*Robert Miesen*

Robert L. Miesen
Robert L. Miesen Living Trust

Exhibit - T

**4-ER-742**

## NOTICE OF INTENT TO DEMAND PAYMENT (I.C. § 30-1-1321)

1.      Pursuant to I.C. § 30-1-1321 and I.C. § 30-1-1301 *et seq.*, if the proposed reverse stock split is effectuated, the undersigned shareholder(s) hereby demands full and fair payment and hereby asserts appraisal rights as to all common shares owned and/or beneficially held by the undersigned shareholder(s) in AIA Services Corporation ("Company"). This demand, if executed and/or delivered by facsimile or pdf attachment, shall constitute an original document.

2.      The undersigned shareholder(s) asserts that no fair valuation of any common shares may be determined until the claims pending in *Donna J. Taylor v. Hawley Troxell, R. John Taylor, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case") have been resolved and the amount of damages recovered and considered in any fair valuation. Until the Federal Court Case is resolved and all improper payments, distributions and transfers have been recovered, it is impossible and prejudicially unfair to attempt making a determination or appraisal of the fair value of the common shares held or beneficially owned by the undersigned shareholder(s).

3.      By making the demands in Paragraphs 1-2 above, the undersigned shareholder(s) does not waive any legal rights or remedies pertaining to the legality of the reverse stock split, the determination of fair value or any other acts and/or omissions, including, without limitation: (a) the reverse split violates the Company's Articles of Amendment to the Articles of Incorporation filed on May 8, 1996 (*See* Articles 4.2.9(f), 4.3.3 and 11); (b) the reverse stock split violates the Company's Restated Bylaws (*See* Sections 4.14 and 5.2); (c) R. John Taylor and Connie Taylor Henderson's shares are disqualified from voting on the reverse split and other matters and 818,659 of their shares were unlawfully issued; (d) the reverse stock split violates the fiduciary duties owed by John Taylor, Connie Taylor Henderson and James Beck to the minority shareholders (notwithstanding the fact that they have never been properly elected and are disqualified from serving based upon their acts of malfeasance and aiding and abetting the commission and covering up of torts against the Company and its minority shareholders); (e) the reverse stock split and the past and present operation of the Company constitutes the unlawful squeezing out and oppression of minority shareholders by R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman and others purporting to act as officers of the Company (including JoLee Duclos); and (f) the reverse stock split violates Idaho law (including as it pertains to the duties and obligations of directors and officers to the Company).

4.      The undersigned shareholder(s) does not consent to or ratify any prior or future purported service of R. John Taylor, Connie Taylor Henderson or James Beck on the Company's Board of Directors and asserts that they have not been properly elected and are not properly qualified to serve based upon their conflicts of interest, acts and/or omissions. Any resolutions or decision of the alleged Board of Directors purportedly approving the reverse stock split and other resolutions are illegal and void.

5.      The undersigned shareholder(s) reserves all legal rights, claims and remedies, including, without limitation, the right to seek damages, injunctive relief or rescission of: the reverse stock split should it be effectuated; any appointment of R. John Taylor, Connie Taylor Henderson and/or James Beck to the Company's Board of Directors, and/or the appointment of any officer of the Company by any of the foregoing parties, including, without limitation, the appointment of R. John Taylor, Connie Taylor Henderson, James Beck, JoLee Duclos or Aimee Gordon to serve as officers of the Company.

Dated this __11__ day of July, 2012.

_____
Dale L. Miesen

_____
Jonathan Eckburg Brown Jr.

_____
Jonathan Ekberg *corrected*

Exhibit - T

## NOTICE OF INTENT TO DEMAND PAYMENT (I.C. § 30-1-1321)

1.      Pursuant to I.C. § 30-1-1321 and I.C. § 30-1-1301 *et seq.*, if the proposed reverse stock split is effectuated, the undersigned shareholder(s) hereby demands full and fair payment and hereby asserts appraisal rights as to all common shares owned and/or beneficially held by the undersigned shareholder(s) in AIA Services Corporation ("Company"). This demand, if executed and/or delivered by facsimile or pdf attachment, shall constitute an original document.

2.      The undersigned shareholder(s) asserts that no fair valuation of any common shares may be determined until the claims pending in *Donna J. Taylor v. Hawley Troxell, R. John Taylor, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case") have been resolved and the amount of damages recovered and considered in any fair valuation. Until the Federal Court Case is resolved and all improper payments, distributions and transfers have been recovered, it is impossible and prejudicially unfair to attempt making a determination or appraisal of the fair value of the common shares held or beneficially owned by the undersigned shareholder(s).

3.      By making the demands in Paragraphs 1-2 above, the undersigned shareholder(s) does not waive any legal rights or remedies pertaining to the legality of the reverse stock split, the determination of fair value or any other acts and/or omissions, including, without limitation: (a) the reverse split violates the Company's Articles of Amendment to the Articles of Incorporation filed on May 8, 1996 (*See* Articles 4.2.9(f), 4.3.3 and 11); (b) the reverse stock split violates the Company's Restated Bylaws (*See* Sections 4.14 and 5.2); (c) R. John Taylor and Connie Taylor Henderson's shares are disqualified from voting on the reverse split and other matters and 818,659 of their shares were unlawfully issued; (d) the reverse stock split violates the fiduciary duties owed by John Taylor, Connie Taylor Henderson and James Beck to the minority shareholders (notwithstanding the fact that they have never been properly elected and are disqualified from serving based upon their acts of malfeasance and aiding and abetting the commission and covering up of torts against the Company and its minority shareholders); (e) the reverse stock split and the past and present operation of the Company constitutes the unlawful squeezing out and oppression of minority shareholders by R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman and others purporting to act as officers of the Company (including JoLee Duclos); and (f) the reverse stock split violates Idaho law (including as it pertains to the duties and obligations of directors and officers to the Company).

4.      The undersigned shareholder(s) does not consent to or ratify any prior or future purported service of R. John Taylor, Connie Taylor Henderson or James Beck on the Company's Board of Directors and asserts that they have not been properly elected and are not properly qualified to serve based upon their conflicts of interest, acts and/or omissions. Any resolutions or decision of the alleged Board of Directors purportedly approving the reverse stock split and other resolutions are illegal and void.

5.      The undersigned shareholder(s) reserves all legal rights, claims and remedies, including, without limitation, the right to seek damages, injunctive relief or rescission of: the reverse stock split should it be effectuated; any appointment of R. John Taylor, Connie Taylor Henderson and/or James Beck to the Company's Board of Directors, and/or the appointment of any officer of the Company by any of the foregoing parties, including, without limitation, the appointment of R. John Taylor, Connie Taylor Henderson, James Beck, JoLee Duclos or Aimee Gordon to serve as officers of the Company.

Dated this __11__ day of July, 2012.

_Carmen S Taylor_
Carmen S. Taylor (for the shares held in the name of Jay R. Taylor)

Exhibit - T

## NOTICE OF INTENT TO DEMAND PAYMENT (I.C. § 30-1-1321)

1.    Pursuant to I.C. § 30-1-1321 and I.C. § 30-1-1301 *et seq.*, If the proposed reverse stock split Is effectuated, each of the undersigned shareholder(s) hereby demands full and fair payment and hereby asserts appraisal rights as to each of their one-half of the common shares owned in the name of Sara Taylor (all 18,593 common shares are included In this demand for payment) and beneficially held/own by the undersigned shareholder(s) In AIA Services Corporation ("Company"). This demand, if executed and/or delivered by facsimile or pdf attachment, shall constitute an original document.

2.    The undersigned shareholder(s) asserts that no fair valuation of any common shares may be determined until the claims pending in *Donna J. Taylor v. Hawley Troxell, R. John Taylor, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case") have been resolved and the amount of damages recovered and considered In any fair valuation. Until the Federal Court Case is resolved and all improper payments, distributions and transfers have been recovered, it is impossible and prejudicially unfair to attempt making a determination or appraisal of the fair value of the common shares held or beneficially owned by the undersigned shareholder(s).

3.    By making the demands in Paragraphs 1-2 above, the undersigned shareholder(s) does not waive any legal rights or remedies pertaining to the legality of the reverse stock split, the determination of fair value or any other acts and/or omissions, including, without limitation: (a) the reverse split violates the Company's Articles of Amendment to the Articles of Incorporation filed on May 8, 1996 (*See* Articles 4.2.9(f), 4.3.3 and 11); (b) the reverse stock split violates the Company's Restated Bylaws (*See* Sections 4.14 and 5.2); (c) R. John Taylor and Connie Taylor Henderson's shares are disqualified from voting on the reverse split and other matters and 818,659 of their shares were unlawfully issued; (d) the reverse stock split violates the fiduciary duties owed by John Taylor, Connie Taylor Henderson and James Beck to the minority shareholders (notwithstanding the fact that they have never been properly elected and are disqualified from serving based upon their acts of malfeasance and aiding and abetting the commission and covering up of torts against the Company and its minority shareholders); (e) the reverse stock split and the past and present operation of the Company constitutes the unlawful squeezing out and oppression of minority shareholders by R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman and others purporting to act as officers of the Company (including JoLee Duclos); and (f) the reverse stock split violates Idaho law (including as it pertains to the duties and obligations of directors and officers to the Company).

4.    The undersigned shareholder(s) does not consent to or ratify any prior or future purported service of R. John Taylor, Connie Taylor Henderson or James Beck on the Company's Board of Directors and asserts that they have not been properly elected and are not properly qualified to serve based upon their conflicts of interest, acts and/or omissions. Any resolutions or decision of the alleged Board of Directors purportedly approving the reverse stock split and other resolutions are illegal and void.

5.    The undersigned shareholder(s) reserves all legal rights, claims and remedies, including, without limitation, the right to seek damages, injunctive relief or rescission of: the reverse stock split should it be effectuated; any appointment of R. John Taylor, Connie Taylor Henderson and/or James Beck to the Company's Board of Directors, and/or the appointment of any officer of the Company by any of the foregoing parties, including, without limitation, the appointment of R. John Taylor, Connie Taylor Henderson, James Beck, JoLee Duclos or Aimee Gordon to serve as officers of the Company.

Dated this __15__ day of July, 2012.                Dated this __15__ day of July, 2012.

_____                        _____
Reed J. Taylor                                      Donna J. Taylor

Exhibit - T

## NOTICE OF INTENT TO DEMAND PAYMENT (I.C. § 30-1-1321)

1.      Pursuant to I.C. § 30-1-1321 end I.C. § 30-1-1301 *et seq.*, If the proposed reverse stock split is effectuated, the undersigned shareholder(s) hereby demands full and fair payment and hereby asserts appraisal rights as to all common shares owned and/or beneficially held by the undersigned shareholder(s) in AIA Services Corporation ("Company"). This demand, if executed and/or delivered by facsimile or pdf attachment, shall constitute an original document.

2.      The undersigned shareholder(s) asserts that no fair valuation of any common shares may be determined until the claims pending in *Donna J. Taylor v. Hawley Troxell, R. John Taylor, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case") have been resolved and the amount of damages recovered and considered in any fair valuation. Until the Federal Court Case is resolved and all improper payments, distributions and transfers have been recovered, it is impossible and prejudicially unfair to attempt making a determination or appraisal of the fair value of the common shares held or beneficially owned by the undersigned shareholder(s).

3.      By making the demands in Paragraphs 1-2 above, the undersigned shareholder(s) does not waive any legal rights or remedies pertaining to the legality of the reverse stock split, the determination of fair value or any other acts and/or omissions, including, without limitation: (a) the reverse split violates the Company's Articles of Amendment to the Articles of Incorporation filed on May 8, 1996 (*See* Articles 4.2.9(f), 4.3.3 and 11); (b) the reverse stock split violates the Company's Restated Bylaws (*See* Sections 4.14 and 5.2); (c) R. John Taylor and Connie Taylor Henderson's shares are disqualified from voting on the reverse split and other matters and 818,659 of their shares were unlawfully issued; (d) the reverse stock split violates the fiduciary duties owed by John Taylor, Connie Taylor Henderson and James Beck to the minority shareholders (notwithstanding the fact that they have never been properly elected and are disqualified from serving based upon their acts of malfeasance and aiding and abetting the commission and covering up of torts against the Company and its minority shareholders); (e) the reverse stock split and the past and present operation of the Company constitutes the unlawful squeezing out and oppression of minority shareholders by R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman and others purporting to act as officers of the Company (including JoLee Duclos); and (f) the reverse stock split violates Idaho law (including as it pertains to the duties and obligations of directors and officers to the Company).

4.      The undersigned shareholder(s) does not consent to or ratify any prior or future purported service of R. John Taylor, Connie Taylor Henderson or James Beck on the Company's Board of Directors and asserts that they have not been properly elected and are not properly qualified to serve based upon their conflicts of interest, acts and/or omissions. Any resolutions or decision of the alleged Board of Directors purportedly approving the reverse stock split and other resolutions are illegal and void.

5.      The undersigned shareholder(s) reserves all legal rights, claims and remedies, including, without limitation, the  right to seek damages, injunctive relief or rescission of: the reverse stock split should it be effectuated; any appointment of R. John Taylor, Connie Taylor Henderson and/or James Beck to the Company's Board of Directors, and/or the appointment of any officer of the Company by any of the foregoing parties, including, without limitation, the appointment of R. John Taylor, Connie Taylor Henderson, James Beck, JoLee Duclos or Aimee Gordon to serve as officers of the Company.

Dated this _13_ day of July, 2012.

_____
R. Taylor

Exhibit - T

**4-ER-746**

**NOTICE OF INTENT TO DEMAND PAYMENT (I.C. § 30-1-1321)**

1.      Pursuant to I.C. § 30-1-1321 and I.C. § 30-1-1301 *et seq.*, if the proposed reverse stock split is effectuated, the undersigned shareholder(s) hereby demands full and fair payment and hereby asserts appraisal rights as to all common shares owned and/or beneficially held by the undersigned shareholder(s) in AIA Services Corporation ("Company"). This demand, if executed and/or delivered by facsimile or pdf attachment, shall constitute an original document.

2.      The undersigned shareholder(s) asserts that no fair valuation of any common shares may be determined until the claims pending in *Donna J. Taylor v. Hawley Troxell, R. John Taylor, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case") have been resolved and the amount of damages recovered and considered in any fair valuation. Until the Federal Court Case is resolved and all improper payments, distributions and transfers have been recovered, it is impossible and prejudicially unfair to attempt making a determination or appraisal of the fair value of the common shares held or beneficially owned by the undersigned shareholder(s).

3.      By making the demands in Paragraphs 1-2 above, the undersigned shareholder(s) does not waive any legal rights or remedies pertaining to the legality of the reverse stock split, the determination of fair value or any other acts and/or omissions, including, without limitation: (a) the reverse split violates the Company's Articles of Amendment to the Articles of Incorporation filed on May 8, 1996 (*See* Articles 4.2.9(f), 4.3.3 and 11); (b) the reverse stock split violates the Company's Restated Bylaws (*See* Sections 4.14 and 5.2); (c) R. John Taylor and Connie Taylor Henderson's shares are disqualified from voting on the reverse split and other matters and 818,659 of their shares were unlawfully issued; (d) the reverse stock split violates the fiduciary duties owed by John Taylor, Connie Taylor Henderson and James Beck to the minority shareholders (notwithstanding the fact that they have never been properly elected and are disqualified from serving based upon their acts of malfeasance and aiding and abetting the commission and covering up of torts against the Company and its minority shareholders); (e) the reverse stock split and the past and present operation of the Company constitutes the unlawful squeezing out and oppression of minority shareholders by R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman and others purporting to act as officers of the Company (including JoLee Duclos); and (f) the reverse stock split violates Idaho law (including as it pertains to the duties and obligations of directors and officers to the Company).

4.      The undersigned shareholder(s) does not consent to or ratify any prior or future purported service of R. John Taylor, Connie Taylor Henderson or James Beck on the Company's Board of Directors and asserts that they have not been properly elected and are not properly qualified to serve based upon their conflicts of interest, acts and/or omissions. Any resolutions or decision of the alleged Board of Directors purportedly approving the reverse stock split and other resolutions are illegal and void.

5.      The undersigned shareholder(s) reserves all legal rights, claims and remedies, including, without limitation, the right to seek damages, injunctive relief or rescission of: the reverse stock split should it be effectuated; any appointment of R. John Taylor, Connie Taylor Henderson and/or James Beck to the Company's Board of Directors, and/or the appointment of any officer of the Company by any of the foregoing parties, including, without limitation, the appointment of R. John Taylor, Connie Taylor Henderson, James Beck, JoLee Duclos or Aimee Gordon to serve as officers of the Company.

Dated this _11th_ day of July, 2012.

Bobbie N. Ruddell

Exhibit - T

**4-ER-747**

# Exhibit C

Exhibit - T

## SHAREHOLDER DEMAND

The undersigned shareholder(s), as an owner(s) of record or beneficial holder(s) of preferred and/or common shares in AIA Services Corporation, hereby makes the following Shareholder Demand upon AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc. (collectively "Company") and the Company's Boards of Directors (this Demand also constitutes a derivative demand and double derivative demand) (collectively "Demand"):

1.      That R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, JoLee Duclos and Aimee Gordon be barred from serving as directors or officers of the Company based upon the ongoing malfeasance, conflicts of interest, failure to act in good faith, breaches of fiduciary duties (including the duties of loyalty, care and good faith) and other acts and/or omissions committed under their direction, participation and/or acquiescence, including, without limitation, those acts and/or omissions identified in the First Amended Complaint in *Donna J. Taylor* v. *Hawley Troxell Ennis & Hawley, R. John Taylor, Michael Cashman, James Beck, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case"), which said First Amended Complaint is incorporated by reference herein, and that legal action be taken against them.

2.      That Paul D. Durant be appointed as a director of AIA Services Corporation as requested and duly authorized and appointed by the sole Series A Preferred Shareholder of the Company, Donna J. Taylor.

3.      That Paul D. Durant be appointed as the President of AIA Services Corporation and AIA Insurance, Inc., to be duly compensated, and to operate those entities in the best interests of the corporations and their shareholders (with an emphasis on recovering damages and sums from majority shareholder R. John Taylor and Connie Taylor Henderson and others for the benefit of the corporations and their innocent shareholders) and to retain and/or terminate such employee(s) and/or officer(s) as he deems appropriate to properly operate the corporations and pursue any claims set forth in the First Amended Complaint in the Federal Court Case and similar or other claims against named and unnamed parties. Mr. Durant should also be authorized to appoint other parties to the Board of Directors to serve until the next annual meeting as provided under the Restated Bylaws.

4.      That the Company (regardless of Mr. Durant's appointment as an officer or director of the Company), and Paul D. Durant if appointed as an director and/or officer, be authorized to pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case through the date of this Demand and for all related acts after the date of this Demand, including, without limitation, requesting and praying for punitive damages against the parties named in the Federal Court Case and any other responsible parties named in this Demand. A copy of said First Amended Complaint is incorporated by reference herein and is already in the possession of the Company and its purported officers and purported directors (a copy can also be obtained from PACER (the online filing system for the United States District Court for the District of Idaho)).

5.      That the Company refrain from pursuing e reverse stock split (which violates Articles 4.2.9(f), 4.3.3 and 11 of the Company's amended articles of incorporation and the Company's Restated Bylaws) or any other corporate action which is not in the best interests of the Company's preferred shareholders and minority shareholders or otherwise violates the Company's articles of incorporation, restated bylaws and/or Idaho law (including oppressive conduct and breaches of fiduciary duties). That any and all shares held by R. John Taylor and/or Connie Taylor Henderson be barred and disqualified from voting on the reverse stock split since that transaction is preferential to them and is being pursued without full disclosure.

1

Exhibit - T

6.      That the Company demand repayment of, and refrain from paying or advancing, any sums or assets for the payment of all attomeys' fees, expert witness fees, costs and expenses paid, advanced or lent by the Company for JoLee Duclos, R. John Taylor, Connie Taylor Henderson, James Beck, Corrine Beck, Michael Cashman, Jane Doe Cashman, and CropUSA Insurance Agency, Inc.

7.      That Paul D. Durant be authorized to appoint persons to committee(s) of the Board of Directors of the Company, with each committee comprised of at least two (2) of the minority shareholders of the Company to be determined in Mr. Durant's sole discretion and at least one (1) outside and independent person (or more should Mr. Durant desire). Said committee(s) should be used by Mr. Durant, in his discretion, to govern the Company and to maximize the value of the Company's shareholders and to wind up the affairs of the Company should no new viable businesses be obtained and the assets and funds used to pay creditors, preferred shareholders and distributed to common shareholders. Mr. Durant should be authorized to obtain approval for any acts from the Judge in the Federal Court Case or other court of competent jurisdiction to the extent required (including ultimately filing an action or taking action to dissolve the Company once all assets and funds have been identified and recovered or upon court or shareholder approval).

8.      That the Company rescind and/or revoke 818,659 of the common shares held by R. John Taylor and Connie Taylor Henderson as those shares were unlawfully issued by the Company when R. John Taylor violated his Executive Officer's Agreement with Company and they have acted as faithless fiduciaries of the Company (500,000 were granted as an option of the Executive Officers Agreement breached by R. John Taylor) and the other 318,659 shares obtained by R. John Taylor and/or Connie Taylor Henderson from Michael W. Cashman and Corrine M. Beck and/or James Beck were unlawfully issued to them and other former Series C Preferred Shareholders of the Company and are therefore not properly issued shares and those certificates and any subsequent certificates representing those common shares are illegal and void. The foregoing shares, along with the common shares unlawfully issued to Distribution Services, Inc., Bruce E. Knutson, Charles B. Rapp, Daryl R. Verdoorn and any other commons shares unlawfully issued to the former Series C Preferred Shareholders were illegally issued and void. The proper rescission and/or revocation of the foregoing shares increases the minority shareholder's ownership interest in the Company, instead of improperly diluting their ownership interest and increasing R. John Taylor and Connie Taylor Henderson's majority interest.

9.      That the Company terminate JoLee Duclos as the trustee of the Company's 401(k) Plan ("Plan") and appoint a disinterested party or person as the trustee of said Plan and that said person be provided full disclosure of all transactions, loans, malfeasance, redemptions, transfers and all other acts and/or omissions of R. John Taylor and JoLee Duclos as the former co-trustees of the Plan.

10.     That the Company rescind and cancel the prior payments for the recent termination of the Employee Stock Ownership Plan of the Company ("ESOP") because the value of said shares cannot be fairly ascertained until the Federal Court Case has been concluded or resolved and other matters and claims resolved by the Company. The participants in the ESOP, like the other common shareholders, should receive the benefit of a fair valuation and/or distribution at the appropriate time.

11.     That Paul D. Durant be authorized to conduct such investigations and retain such services as he deems appropriate and/or necessary pertaining to any and all past transactions, loans, encumbrances, asset sales, share sales or transfers, share redemptions, salaries, payments, exchange offers and/or any other act or omission pertaining to the operations of AIA Services Corporation and AIA Insurance, Inc. and that the Company report said findings to the appropriate authorities and/or State Bar Associations and/or to take such other actions as Mr. Durant deems appropriate and in the best interest of the corporations.

2

Exhibit - T

12.     That the common shares of R. John Taylor, Connie Taylor Henderson and the other persons and entities identified in Paragraph 8 be barred from voting on any matters relative to the appointment of themselves to the Board of Directors and any other matters in which their shares have a conflict of interest by way of their participation in the malfeasance and/or covering up of the malfeasance against the Company and its other shareholders.

13.     That R. John Taylor, Connie Taylor Henderson, JoLee Duclos, James Beck and Michael Cashman be required to disgorge all compensation, directors fees, indemnification payments or cost advances, benefits, salaries, bonuses, reimbursements, and shares obtained through or from the Company (until the Federal Court Case is resolved) based of them being faithless fiduciaries of the Company.

14.     All actions and demands that are demanded to be taken by Paul Durant are also hereby demanded to be taken by the Company and/or its authorized Board of Directors to the extent persons named in this Demand or others seek to thwart any action by Paul Durant.

15.     That the Company fully disclose all transactions, obligations, loans and footnotes in the recent financial statements provided to shareholders and fully disclose how R. John Taylor, Connie Taylor Henderson and other persons identified in this Demand acquired their respective ownership interests in the entities identified in the footnotes, how the Company's ownership interests were eliminated, transferred or otherwise extinguished and how the transactions, obligations, loans, and share transfers, redemptions and issuances were authorized by the Company, the Company's amended articles of incorporation and restated bylaws.

16.     By making this Demand, the undersigned shareholder(s) does not waive any legal rights or remedies and hereby maintains and asserts that the Company is being irreparably injured and reserves the right to take legal action, without a derivative demand, based upon such irreparable injury.

17.     This Demand may be executed by counterparts and by facsimile and/or pdf attachment, which together shall constitute an original. The undersigned shareholder(s) authorize Dale Miesen or Paul Durant to deliver this Demand to the Company at the time of the shareholder meeting scheduled for July 16, 2012 or anytime before or thereafter.

18.     To the extent that any of the above-referenced demands pertain to me taking action or accepting the appointment as a director or officer of the Company, I am joining in those demands upon the request of the other shareholders who have made the same demands.

Dated this _____ day of July, 2012.

Paul D. Durant

3

Exhibit - T

# Exhibit D

## Exhibit - T

## Doug Siddoway - AIA Services Corporation

**From:**    "Roderick Bond" <rod@roderickbond.com>
**To:**       <doug@randalldanskin.com>
**Date:**    7/16/2012 11:44 AM
**Subject:**  AIA Services Corporation

HI Mr. Siddoway:

I represent a number of shareholders in AIA Services Corporation and attended a shareholder meeting this morning. At that meeting, R. John Taylor advised us that you represented AIA Services Corporation. Can you please confirm whether that is true or not? Thank you.

By: Roderick C. Bond
Roderick Bond Law Office, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Website: www.roderickbond.com

This email and any attachments may be attorney-client privileged, protected as attorney work product, and/or subject to any other applicable privileges. The unauthorized viewing or dissemination of any email or attachment is prohibited. If you have recieved this email in error or it was not intended to be delivered to you, please immediately delete this email and all attachments and contact the sender at the address indicated above. Thank you.

file:///C:/Users/Doug/AppData/Local/Temp/XPgrpwise/5003FEB8Randall-Danskin... 7/17/2012

Exhibit T

**Doug Siddoway - AIA Services Corporation**

| | |
|---|---|
| **From:** | "Roderick Bond" <rod@roderickbond.com> |
| **To:** | <doug@randalldanskin.com> |
| **Date:** | 7/16/2012 6:02 PM |
| **Subject:** | AIA Services Corporation |
| **Attachments:** | A - Signed Demands for Payment_0002.pdf; A - Signed Proxies_0002.pdf; A - Signed Shareholder Demands_0002.pdf; A - Signed Shareholder Resolutions_0002.pdf |

Dear Mr. Siddoway:

I emailed you earlier regarding your representation of AIA Services Corporation for a reverse stock split, but have not heard back from you. In light of today's events, I am emailing you again. As I mentioned, I represent a number of common shareholders in AIA Services Corporation (some of whom also own Preferred Shares). At the shareholding meeting today, John Taylor provided your name as the attorney who represented AIA Services Corporation regarding the reverse stock split. John Taylor voted his shares in favor of that transaction.

Attached for your review are the proxies voting against the reverse stock split and the appointment of John Taylor, Connie Taylor Henderson and James Beck to the Board of AIA Services Corporation and the Notices of Intent for Demand also executed by the same shareholders. The originals of these documents were delivered to AIA Services Corporation prior to today's shareholder meeting. Although we assert that the reverse stock split, coupled with the significant malfeasance and failure to provide full disclosure, is not authorized nor is John Taylor's shares eligible to vote on the reverse split based upon the foregoing and the irreconcilable conflicts of interest and minority shareholder oppression. Moreover, as I am sure you were aware, under AIA Services Corporation's Amended Articles of Incorporation, no shares may be purchased by the Company (which includes fractional shares) when dividends have not been paid or the funds set aside on the Series C Preferred Shares. As John Taylor admits for the first time on financial statements, over $1 Million dollars in dividends are due and owing on those Series C Preferred Shares and said dividends have not been paid nor have the funds been set aside for those dividends as required under Article 4.3.3 of the Company's Amended Articles of Incorporation. Therefore, notwithstanding all of the reasons (including those stated above) why the reverse stock split must not be effectuated, the reverse split and subsequent shares purchases violates Article 4.3.3 of the Amended Articles of Incorporation and is barred by those provisions. Moreover, no dividends may be declared or paid on Series C Preferred Shares when payments are in arrears to the Series A Preferred Shareholder (which is the case) as provided under Articles 4.2.9(f)-(g)

file:///C:/Users/Doug/AppData/Local/Temp/XPgrpwise/50045750Randall-Danskin...  7/17/2012

**4-ER-754**

& (i), 4.3.3, 4.3.4 and 4.4 of the Company's Amended Articles of Incorporation. I am happy to email you a copy of those Amended Articles for your review. In sum, the reverse stock split is nothing short of illegal and oppressive.

Lastly, my clients have all made shareholder demands, some of which pertain directly to the reverse stock split and other transactions and issues which impact the value of my clients' common and preferred shares and constitute the illegal dilution of my clients' common shares. Attached for your review are the shareholder demands delivered to AIA Services Corporation today at the shareholder meeting, along with a copy of the First Amended Complaint in the Federal Court Case and the exhibits to that Complaint (see case number in the attached documents). I have also attached the resolutions passed by the proxy vote of the minority shareholders, which was presented for vote by Dale Miesen today at the meeting. Please let me know if the Company intends on honoring any of the attached shareholder resolutions for which my clients assert that John Taylor and Connie Taylor Henderson's shares are not qualified to vote on. Of note, John Taylor refused to answer questions regarding AIA Services Corporation's financial statements by responding in some cases "no comment" or refused to answer altogether. The meeting was a complete sham.

Please advise me if you are going to continue representing AIA Services Corporation with respect to the reverse stock split and related matters. There are a lot of facts that you obviously have not been told by John Taylor. I am happy to fill you in and provide significant documentation. Nothing in this email should be construed as a waiver of any of my clients' rights or remedies.

Thank you for your time. I look forward to hearing from you.


By: Roderick C. Bond
Roderick Bond Law Office, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Website: www.roderickbond.com

This email and any attachments may be attorney-client privileged, protected as attorney work product, and/or subject to any other applicable privileges. The unauthorized viewing or dissemination of any email or attachment is prohibited. If you have recieved this email in error or it was not intended to be delivered to you, please immediately delete this email and all attachments and contact the sender at the address indicated above. Thank you.

file:///C:/Users/Doug/AppData/Local/Temp/XPgrpwise/50045750Randall-Dansk... Exhibit 1/17/2012

## Doug Siddoway

| | |
|---|---|
| **From:** | "Roderick Bond" <rod@roderickbond.com> |
| **To:** | <doug@randalldanskin.com> |
| **Date:** | 7/17/2012 8:22 AM |
| **Attachments:** | First Amended Complaint.pdf |

Mr. Siddoway:

I inadvertently forgot to attach the First Amended Complaint for the derivative action in Federal Court. Attached is a copy without the exhibits. Please let me know if you would like the exhibits. Please note that I, along with Mike Gaffney of Idaho Falls, are the attorneys of record in the attached case for Donna Taylor. Thanks and I look forward to hearing from you.

**By: Roderick C. Bond**
**Roderick Bond Law Office, PLLC**
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Website: www.roderickbond.com

This email and any attachments may be attorney-client privileged, protected as attorney work product, and/or subject to any other applicable privileges. The unauthorized viewing or dissemination of any email or attachment is prohibited. If you have recieved this email in error or it was not intended to be delivered to you, please immediately delete this email and all attachments and contact the sender at the address indicated above. Thank you.

file:///C:/Users/Doug/AppData/Local/Temp/XPgrpwise/500520ADRandall-DanskinSeaErl...  7/17/2012

Exhibit - T

**Doug Siddoway - AIA Services**

---

**From:** "Roderick Bond" <rod@roderickbond.com>
**To:** <doug@randalldanskin.com>
**Date:** 7/18/2012 4:26 PM
**Subject:** AIA Services

---

Mr. Siddoway:

Please be advised that I now also represent Carmen Taylor. All further communications to her should be directed to me. Please also ensure that John Taylor and AIA is aware of this. Thank you.

As you are aware, there are also many omissions of material fact and misrepresentations of material fact in the proxy statements, financial statements and related materials sent to shareholders. John Taylor would not even respond to any questions at the shareholder meeting regarding some of the omissions, including how he acquired his shares in CropUSA. Therefore, the reverse stock split is illegal and improper based upon the flawed and fraudulent proxy statements as well.

Also, could you please forward me copies of the purchase and sale agreements between John Taylor and Beck, Cashman and the other shareholders who allegedly sold their shares to John Taylor for 10 cents per share, along with any valuation for those shares? Don't bother sending me anything on the purchase price originally paid by the selling shareholders, as I already know that they didn't pay anything for those shares. Please be advised that those shares were not legally issues to begin with and you can follow those same shareholders as illegal owners of CropUSA stock. That alleged share exchange is referenced in the Federal Court First Amended Complaint. If you are not going to respond to any of my questions or requests for documents made on behalf of my clients, please just tell me so. Thank you.

By: Roderick C. Bond
Roderick Bond Law Office, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Website: www.roderickbond.com

This email and any attachments may be attorney-client privileged, protected as attorney work product, and/or subject to any other applicable privileges. The unauthorized viewing or dissemination of any email or attachment is prohibited. If you have recieved this email in error or it was not intended to be delivered to you, please immediately delete this email and all attachments and contact the sender at the address indicated above. Thank you.

file:///C:/Users/Doug/AppData/Local/Temp/XPgrpwise/5006E3A3Randall-Danskin...

EXHIBIT T    7/18/2012

**Doug Siddoway**

From: "Roderick Bond" <rod@roderickbond.com>
To: <doug@randalldanskin.com>
Date: 7/19/2012 7:38 AM

Mr. Siddoway:

My clients also request a copy of the purported resolution from board of directors and/or meeting minutes that purportedly authorized the reverse stock split. Please note that the proxies all stated that it was by order of the board of directors. Please also note that those directors were never elected prior to purported approving the reverse stock split. It is pretty pathetic to cram down a reverse stock split at the first annual shareholder meeting held many years. I would have thought you would have wanted to have directors validly elected prior to attempting to effectuate the reverse stock split, assuming that it was legal in the first place. My client also want financial statements covering the 5 year periods prior to the recent ones provided and separate financial statements for the same period time for AIA Insurance and the other entities referenced in the financial statements.

If you will not be providing copies of the documents requested in this email and my prior emails, then this is a formal demand under Idaho law to inspect the records to copy the documents requested in this email and my prior emails. Thank you.

By: Roderick C. Bond
Roderick Bond Law Office, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Website: www.roderickbond.com

This email and any attachments may be attorney-client privileged, protected as attorney work product, and/or subject to any other applicable privileges. The unauthorized viewing or dissemination of any email or attachment is prohibited. If you have recieved this email in error or it was not intended to be delivered to you, please immediately delete this email and all attachments and contact the sender at the address indicated above. Thank you.

file:///C:/Users/Doug/AppData/Local/Temp/XPgrpwise/5007B969Randall-Danskin Seattl... 7/19/2012

Exhibit 2

**Doug Siddoway**

From:   "Roderick Bond" <rod@roderickbond.com>
To:     <doug@randalldanskin.com>
Date:   7/19/2012 9:55 AM

Mr. Siddoway:

My clients also request copies of the present valuation of the Series C Preferred Shares and any appraisals on the shares. In particular, my client Lee Ann Hostetler has not received statements for the value of the Series C Preferred Shares held in her 401(k) plan with AIA Services, her calls to AIA and the administrator requesting documentation have gone unanswered, and she is requesting information as to the number and present alleged value of Series C Preferred Shares held by her. Therefore, my clients also demand to inspect documents and records pertaining to the foregoing, as provided under Idaho law.

My clients specifically and expressly object to any reverse split or other scheme to illegally purchase shares prior to the time that the Series C Preferred Shares have been paid in full, along with all accrued dividends. As you know, the dividends have not been paid on those shares since 1996 or 1997. Those dividends must be paid before any reverse stock split could occur because AIA Services is barred from purchasing any shares until that is done, which includes any fractional shares. As you also know, no dividends may be paid on the Series C shares when AIA Services is in arrears in payment to the Series A Preferred Shareholder, Donna Taylor. She expressly objects to any payments, regardless of the scheme, on any shares with priority lower than her Preferred A Shares. Again, the proxy statements, reverse split and any subsequent appraisal or purchase of those common shares are not authorized and are all illegal.

I apologize for the numerous emails, but my clients want their objections noted and their request for information honored.

By: Roderick C. Bond
Roderick Bond Law Office, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA  98004
Tel: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Website: www.roderickbond.com

This email and any attachments may be attorney-client privileged, protected as attorney work product, and/or subject to any other applicable privileges. The unauthorized viewing or dissemination of any email or attachment is prohibited. If you have recieved this email in error or it was not intended to be delivered to you, please immediately delete this email and all attachments and contact the sender at the address indicated above. Thank you.

file:///C:/Users/Doug/AppData/Local/Temp/XPgrpwise/5007D98ERandall-DanskinSeafirst... 7/20/2012

EXhibit - 1

Exhibit E

Exhibit - T

4-ER-760

## Doug Siddoway

| | |
|---|---|
| **From:** | "Roderick Bond" <rod@roderickbond.com> |
| **To:** | "'Doug Siddoway'" <djs@randalldanskin.com> |
| **Date:** | 10/3/2012 11:48 AM |
| **CC:** | <jtaylor@AIAinsurance.com>, "'John Taylor'" <jtaylor@cropusainsurance.com> |
| **Attachments:** | Donna Taylor Payments.pdf; July 08 Letter from John to Donna.pdf; Series A Shareholder Notices_01.pdf |

Mr. Siddoway:

I know that you are representing AIA Services in connection with the recent documents sent to me and her regarding AIA Services' attempt to redeem her Series A Preferred Shares for $82,435.10. As you know, Donna Taylor's shares were authorized to be redeemed under AIA Services' Amended Articles of Incorporation.  On June 24, 2008, John Taylor wrote a letter to Donna Taylor advising that AIA Services would no longer make any payments to her.  A copy of that letter is attached. According to AIA Services' internal documents, the amount owed as of that date was $414,247.22. Assuming that amount was correct, the proper amount owed to Donna Taylor is $414,247.22, plus accrued interest, plus attorneys' fees and costs incurred enforcing her rights. As you also know, you have not permitted her board appointee Paul Durant to attend any board meetings.

To be clear, Donna Taylor will not accept payment of $82,435.10 for her remaining outstanding Series A Preferred Shares.

In addition, based upon all of the malfeasance that has occurred because of your client John Taylor and the other parties you are fully aware of, Donna Taylor will also not accept any payments from AIA Services until all outstanding issues are resolved and until any payment is approved by a Court order. Please let me know if I need to take any further action or contact AIA Services directly.  Since you are acting as counsel for AIA Services with respect to the recent solicitation to attempt to redeem Donna Taylor's Series A Preferred Shares, I will not respond further.  However, I am carbon copying John Taylor on this email just to make sure.

Please let me know if you have any questions. Also, please let me know if you would like to discuss any of the malfeasance so we can work together to make AIA Services and its innocent shareholders whole.  I look forward to hearing from you in this regard.

By: Roderick C. Bond
**Roderick Bond Law Office, PLLC**

file:///C:/Users/Doug.RANDALLDANSKIN/AppData/Local/Temp/XPgrpwise/50... 10/7/2012

Exhibit - T

**4-ER-761**

800 Bellevue Way NE, Suite 400
Bellevue, WA  98004
Tel: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Website: www.roderickbond.com

This email and any attachments may be attorney-client privileged, protected as attorney work product, and/or subject to any other applicable privileges. The unauthorized viewing or dissemination of any email or attachment is prohibited. If you have recieved this email in error or it was not intended to be delivered to you, please immediately delete this email and all attachments and contact the sender at the address indicated above. Thank you.

file:///C:/Users/Doug.RANDALLDANSKIN/AppData/Local/Temp/XPgrpwise/506C2610...  10/7/2012

Exhibit - T

RODERICK C. BOND, ISB No. 8082
RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA  98004
Tel: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com

Attorney for Defendants

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| AIA SERVICES CORPORATION, an Idaho corporation,<br><br>     Plaintiff,<br><br>  vs.<br><br>PAUL D. DURANT; KAY HANCHETT; LEE ANN HOSTETLER; JERRY A. LEGG; DALE L. MIESEN; HEATHER MIESEN LIVING TRUST, DALE L. MIESEN, TRUSTEE; JENNIFER MAY MIESEN LIVING TRUST, DALE L. MIESEN, TRUSTEE; ROBERT L. MIESEN LIVING TRUST, DALE L. MIESEN, TRUSTEE; DALE L. MIESEN AND JONATHON EKBERG BROWN, JR., JOINT TENANTS; CARMEN S. TAYLOR; DONNA J. TAYLOR; JUD R. TAYLOR; REED J. TAYLOR; AND BOBETTE N. RUDDELL,<br><br>     Defendants. | Case No.: CV-12-01483<br><br>DEFENDANTS' MOTION TO DISMISS PURSUANT TO IRCP 12(b)(6) AND MOTION FOR A MORE DEFINATE STATEMENT |

The above-referenced defendants (collectively "Defendants") move the Court as follows:

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 1

Exhibit - U

4-ER-763

## I. INTRODUCTION

This lawsuit was filed based upon nothing more than greed.[1] Before the ink had even dried on the Idaho Supreme Court's decision in *Taylor v. AIA Services Corp.*, 151 Idaho 552, 261 P.3d 829 (2011) (wherein Reed Taylor's majority interest in AIA Services was eliminated), John Taylor, together with James Beck, Michael Cashman and Connie Taylor (John Taylor's "henchmen") implemented the next phase of their plan to eliminate the remaining minority shareholders of AIA Services to illegally gain complete ownership of the company.

First, they needed to get rid of the employees who worked tirelessly for AIA Services in exchange for ownership in the Employee Stock Ownership Plan ("ESOP"). Thus, John Taylor and his henchmen illegally terminated AIA Services' Employee Stock Ownership Plan and illegally paid those participants three cents per share for their shares. The next step was to eliminate the remaining common shareholders—including shareholders like Dale Miesen—who contributed over $500,000 worth of insurance business to AIA Services in exchange for common shares. To accomplish this last act of greed, John Taylor and his henchmen implemented a plan to effectuate an illegal reverse stock split—in an effort to eliminate the Defendants as shareholders in exchange for the illegal payment of ten cents per share. In other words, Dale Miesen would receive a whopping $5,000 for the over $500,000 that he paid for his shares.

However, John Taylor and his henchmen hit an unexpected speed bump—the fourteen shareholders named as defendants in this action. When they challenged the illegal reverse stock split and asserted appraisal rights, John Taylor and his henchmen, by and through AIA Services, filed this lawsuit. Since the relief sought in AIA Services' Complaint is all traced directly to and

---

[1] Since AIA Services is in arrears in over $400,000 in payments to the Series A Preferred Shareholder Donna Taylor and has failed to pay over $1,200,000 in accrued and unpaid dividends of to the Series C Preferred Shares held in AIA Services' 401(k) Plan, it is incomprehensible how the company's purported board of directors—John Taylor, Connie Taylor and James Beck—could expend company resources litigating over this lawsuit. (9/17/12 Bond Aff., ¶16 & Ex. D, p. 10 n. 6.)

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 2

# Exhibit - U

pertain exclusively to that illegal reverse stock split, AIA Services' claims and relief in its Complaint fail to state a claim and, therefore, fail as a matter of law. 19 CJS Corporations § 674 ("An illegal act of a corporation is one expressly prohibited by statute...").

Alternatively, under I.C. § 30-1-1330, a corporation may file a petition with the court to determine the "fair value" of shares held by shareholdings asserting appraisal rights to any corporate action. There is nothing under I.C. § 30-1-1301, *et seq.* that authorizes a corporation to not follow the provisions of that Code and to violate other Code Sections to carry out a so-called "appraisal action." Simply put, AIA Services' Complaint should provide a definite statement that this action is an "appraisal proceeding" and that it is proceeding in accordance with I.C. § 30-1-1301, *et seq.* and Idaho law. For example, AIA Services admits in its Complaint that it cannot effectuate the reverse stock split by alleging that "plaintiff's funds will not be used to pay defendants or other holders of Common Stock for their shares..." (Complaint, p. 8, ¶3.) It is impossible for the Defendants to properly respond to the Complaint unless and until they know exactly what they are responding to and exactly how AIA Services proposes to legally effectuate the reverse stock split. Thus, an order requiring AIA Services to provide a more definite statement is appropriate and warranted.

## II.  FACTS

The Defendants submit the following Statement of Facts ("Facts"):

A.   On September 7, 2011, the Idaho Supreme Court affirmed the illegality of the redemption of Reed Taylor's common shares because that redemption explicitly violated I.C. § 30-1-6. *Taylor v. AIA Services Corp.*, 151 Idaho 552, 261 P.3d 829 (2011). December 31, 2011, John Taylor, without obtaining shareholder approval, terminated AIA Services' Employee Stock Ownership Plan and paid those shareholders three cents per share. (9/17/12 Bond Aff., Ex. C.)

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 3

# Exhibit - U

According to the 2007 stock ledger, this action eliminated another 88,225 common shares in AIA Services. (*Id.*, Ex. I, p. 1.)

   **B.**     On July 3, 2012, after years of ignored requests for financial information and demands for annual shareholder meetings, John Taylor sent a letter, notice of shareholder meeting, proxy statement, proxy and Consolidated Financial Statements to AIA Services' shareholders regarding having the first annual shareholder meeting in over eight years. (Complaint, Ex. A; 9/17/12 Bond Aff., Ex. D-E, Ex. M, ¶6, Ex. K, ¶4, Ex. L, ¶4.) The notice of the meeting, sent over the 4th of July holiday week, stated that AIA Services intended to effectuate a 53,000 to 1 reverse stock split, by order of the purported board of directors (who did not disclose any conflicts of interest under I.C. § 30-1-1003(2)). (Complaint, Ex. A.) Notably, John Taylor, Connie Taylor and James Beck assert that ten cents per share was a fair price, when John Taylor had valued his shares at almost $1.5 Million in 2005 and Connie Taylor had stated her community interest in the share was $900,000 in 2007—both of which occurred before the debt of over $8.5 Million owed to Reed Taylor was eliminated, before AIA received the $1.3 Million Lewis Clark Mortgage and before AIA received $800,000 (both of the foregoing were litigation settlements). (9/17/12 Bond Aff., Ex. B, p. 139-40; Ex. F & H.) Thus, after AIA's balance sheet improved by over $10.6 Million, a reverse stock split is warranted and the value of the minority shareholders' stock is ten cents per share. (*Id.*) John and Connie Taylor's valuations, when AIA Services was still indebted to Reed Taylor, were many times greater than the ten cents per share they are offering the minority shareholders. (*Id.*) Fourteen shareholders (holding over 132,000 shares) voted against the reverse stock split, made demands for appraisal and made derivative demands, while John Taylor and one other shareholder holding less than 2,000 shares voted in favor, over objections. (*Id.*, ¶¶10-12; Ex. J, Ex. K, ¶4-7; Complaint, Ex. B.) Notably, the share purchase purportedly

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 4

Exhibit - U

**4-ER-766**

valuing the shares at ten cents per share was based upon John Taylor's purported purchase of the common shares that were illegally issued at no cost to CropUSA shareholders. (9/17/12 Bond Aff., Ex. I; Complaint, Ex. A, p. 6.) In addition, the recent financial statements contain notes which were either never previously provided or were materially different than the last financial statements with notes. (*Compare* 9/17/12 Bond Aff., ¶5, Ex. D-E & H.) While the recent financial statements provide the first disclosure of the defendants' ownership in competing companies, they do not explain how the ownership was acquired nor do they disclose the malfeasance involving the defendants. (*Id.*)

C.   Prior to the shareholder meeting on July 16, 2012, Dale Miesen, who had traded a book of renewal business worth over $500,000 for his 45,000 shares in AIA Services, personally delivered the original proxies and demands for payment. (9/17/12 Bond Aff., ¶10, Ex. J & K, ¶¶2-5.) Mr. Miesen and counsel for thirteen other shareholders attended the meeting and objected to the appointment of John Taylor, Connie Taylor and James Beck to the board of AIA Services and objected to the reverse stock split. (*Id.*, ¶¶10-12, Ex. K, ¶¶5-8, Ex. J; Complaint, Ex. B.) When Mr. Miesen questioned John Taylor as to how he acquired his ownership interest in CropUSA and why AIA had lent over $800,000 to Pacific Empire Radio, John Taylor replied "no comment." (9/17/12 Bond Aff., ¶¶10-12, Ex. E, p. 2, Ex. K, ¶¶4-8.) When Mr. Miesen asked John Taylor to name one reason for the reverse stock split, he replied: "we obviously want to turn this company into an LLC."[2] (*Id.*, Ex. K, ¶6.) After the shareholder meeting, counsel for thirteen of the shareholders sent numerous emails to counsel for AIA Services, Doug Siddoway, requesting information and making various shareholder demands that were ignored. (Complaint,

---

[2] The allegation that John Taylor and his henchmen wanted to turn AIA Services into a limited liability company makes absolutely no business sense. It also flies directly in the face of their arguments to Judge Brudie and the Idaho Supreme Court that the redemption of Reed Taylor's shares should be illegal to protect the minority shareholders and to insure that they share equally in AIA Services' assets. Ten cents per share is hardly sharing equally in AIA Services' assets.

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 5

Exhibit - U

**4-ER-767**

Ex. D.) Despite the demands and objections over the refusal to comply with the Articles of Incorporation, AIA Services filed an Amended Articles of Incorporation and proceeded to file a lawsuit against all fourteen shareholders. (9/17/12 Bond Aff., Ex. G; Complaint.)

D.    Fourteen shareholders, representing over 132,000 common shares, objected to and voted against the reverse stock split, *inter alias*, since no payments may be made to common shareholders because: (1) no dividends could be declared or paid in the Series C Preferred Shares if payments were in arrears on the Preferred A Shares; and (2) no common shares could be purchased by AIA Services, whether whole or fractional, if dividends had not been paid on the Series C Preferred Shares. (Complaint, Ex. C; 9/17/12 Bond Aff., Ex. A, p. 8, §4.2.9(f), p. 10, §4.2.12, p. 12, §4.3.3.) Donna Taylor presently holds over $400,000 in Series A Preferred Shares and AIA Services is in arrears on those payments under the Amended Articles of Incorporation and the Series A Preferred Shareholder Agreement. (*Id.*, ¶16, Ex D, p. 3 & p. 10 n. 5.) Although John Taylor and his henchmen will dispute the amount owed to Donna Taylor, there is no dispute that her Series A Preferred Shares have not been redeemed and payments are in arrears to her. (*Id.*, & Ex. B, p. 152-53.) As of December 31, 2011, the face value of $925,000, plus over $1,202,500 in accrued and unpaid dividends, was owed on the 401(k) Plan's Series C Preferred shares. (*Id.*, Ex. D, p. 10 n. 6.) According to Lee Ann Hostetler, she never receives statements for the over $200,000 Preferred C Shares held in her name in the 401(k) Plan and she has been unable to withdraw any funds. (9/17/12 Bond Aff., Ex. D, p. 10 n. 6, Ex. M, ¶¶4-5.)

E.    The reason AIA Services' Complaint alleges that the "payments" would <u>not</u> be made with AIA Services' funds to redeem the fractional shares created by the reverse stock split is simple—it is barred from making such payments under its Amended Articles of Incorporation unless and until all Series A Shares are redeemed:

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 6

Exhibit - U

> The corporation will not, and will not permit any of its Subsidiaries to, acquire by purchase or otherwise...the stock or other evidence of beneficial ownership, of any Person unless, immediately prior to and after giving effect to such transaction, no violation of any of the covenants or other provisions contained in this Article Forth shall have occurred....

(9/17/12 Bond Aff., Ex. A, p. 8, §4.2.9(f); *see also* §4.2.9.) However, even if the Series A Shares had been redeemed or the payments were not in arrears, any payments to effectuate a reverse stock split are also barred under the Series C Share provisions in AIA Services' Amended Articles of Incorporation:

> No dividend shall be declared or paid upon Common Stock nor shall any Common Stock be purchased or otherwise acquired by the corporation for value...unless all dividends on the Series C Preferred Stock for all past periods shall have been paid or shall be been declared and a sum sufficient for the payment thereof set apart for payment.

(*Id.*, Ex. A, p. 12, §4.3.3.) Notably, AIA Services has admitted that it has not redeemed all of Donna Taylor's Series A Preferred Shares. (*Id.*, Ex. D, p. 10, n. 5.)

> No dividends shall be declared or paid on the Series C Preferred Stock if the redemption payments due to the holders of the Series A Preferred Stock under Section 4.2 of this Article Fourth are in arrears.

(*Id.*, Ex. A, p. 12, §4.3.3.) Thus, AIA Services may not pay the over $1,200,000 in accrued dividends owed on the Series C Preferred Shares until it has paid Donna Taylor's Series A Preferred Shares. (*Id.*) Since Donna Taylor's Series A Shares have not been redeemed and the over $1,200,000 in accrued dividends have not been paid on the Series C Preferred Shares, AIA Services is barred from, directly or indirectly, purchasing any common shares—whether such purchases are through a reverse stock split or some other means like the termination of the ESOP. Significantly, AIA Services' Complaint concedes that it can't make the payments:

> the Reverse Stock Split Transaction does not violate subsection 4.3.3 of plaintiff's articles of incorporation <u>because plaintiff's funds will not be used to pay the defendants or other holders of Common Stock for their shares</u>...

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 7

Exhibit - U

**4-ER-769**

(Complaint, p. 8, ¶3 (emphasis added).) Although AIA Services illegally moved forward with the illegal reverse split by filing Amended Articles of Incorporation on July 17, 2012, it did not obtain the consent of Donna Taylor as required: "[t]he rights and preferences hereby conferred on the Series A Preferred Stock shall not be changed, altered or revoked without the consent of the holders of the majority of the Series A Preferred Stock outstanding at the time." (9/17/12 Bond Aff., Ex. A, p. 11, §4.2.12.) Thus, AlA Services' Amended Articles of Incorporation bar any payments to redeem shares, whether made directly or indirectly, to any common shareholder or Series C Preferred shareholder until AIA Services has paid the over $400,000 owed to her. (*Id.*, Ex. A, p. 8, §4.2.9(f) & p. 12, §4.3.3.)However, even if AIA Services paid Donna Taylor, it would still be barred from redeeming any common shares until it has paid the over $1,200,000 in accrued and unpaid dividends owed on the Series C Shares.

### III. ARGUMENTS

#### A. AIA Services' Complaint should be dismissed for failure to state a claim.

On a motion to dismiss for failure to state a claim, the Court looks only at the pleadings, and all inferences are viewed in favor of the non-moving party. *Young v. City of Ketchum*, 137 Idaho 102, 104, 44 P.3d 1157 (2002). When considering a motion to dismiss a complaint, all facts alleged are to be considered true, and it is plaintiff's alleged right to relief that is thereby challenged. *Argonaut Ins. Co. v. White*, 86 Idaho 374, 376, 386 P.2d 964, 964 (1963). If a Court considers matters outside of the pleadings, then the Motion must be disposed of in accordance with Rule 56. IRCP 12(b).

Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." IRCP 56(c).

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 8

Exhibit - U

**4-ER-770**

> Once the moving party has provided sufficient evidence to support the motion, the party against whom a motion for summary judgment is sought may not merely rest on allegations contained in the pleadings, but must come forward and produce evidence by way of deposition or affidavit to contradict the assertions of the moving party and establish a genuine issue of material fact.

*Post v. Idaho Farmway, Inc.*, 135 Idaho 475, 478, 20 P.3d 11, 14 (2001) (citing I.R.C.P. 56(e);

*McCoy v. Lyons*, 120 Idaho 765, 770, 820 P.2d 360, 365 (1991)). "Such evidence must consist

of specific facts, and cannot be conclusory or based on hearsay." *Id.* (emphasis added).

> The moving party is entitled to judgment when the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case on which that party will bear the burden of proof at trial.

*Thomas v. Medical Center Physicians, P.A.*, 138 Idaho 200, 205, 61 P.3d 557, 562 (2002) (citing

*Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 254, 91 L.Ed.2d 265 (1986)).

"The Court has the duty to raise the issue of illegality *sua sponte.*" *Taylor v. AIA Services

Corp.*, 151 Idaho 552, 564, 261 P.3d 829, 841 (2011) (citation omitted).

1. **AIA Services fails to state a claim because the reverse stock split is barred by its Amended Articles of Incorporation and violates Idaho law.**

"The articles of incorporation may set forth...[p]rovisions not inconsistent with law

regarding...defining, limiting and regulating the powers of the corporation, its board of directors,

and shareholders..." I.C. § 30-1-202. "Unless its articles of incorporation provide otherwise,

every corporation...has the same powers...to carry out its business and affairs..." I.C. § 30-1-

302. "A corporation may amend its articles of incorporation at any time to...add or change a

provision that...is permitted in the articles in incorporation..." I.C. § 30-1-1001. "Unless the

articles of incorporation provide otherwise, a corporation's board of directors may adopt

amendments to the corporation's articles of incorporation without shareholder approval..." I.C. §

30-1-1005. "A shareholder entitled to appraisal rights" may "challenge a completed corporate

action" if the corporate action "[w]as not effectuated in accordance with...the corporation's

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 9

# Exhibit - U

articles of incorporation..." I.C. § 30-1-1302(4).

Here, John Taylor and his henchmen, by and through AIA Services, attempted to effectuate a 53,000 to 1 reverse stock split, which would result in making all of the Defendants in this action holding a fractional share that would be purchased by AIA Services. (Complaint, Ex. A.) Under the terms of that reverse stock split, the fractional shareholders would be paid ten cents per share for their common shares:

> Without regard to any other provision of these Articles of Incorporation, each 53,000 shares of common stock, either issues and outstanding or held by the Corporation as treasury stock, immediately prior to the time this amendment becomes effective, shall be and is hereby automatically reclassified and changed (without any further act) to one fully paid and non-assessable share of common stock...provided that no fractional shares of common stock shall be issued to any holder of fewer than 53,000 shares of common stock immediately prior to the time this amendment becomes effective. Instead of issuing such fractional shares, the Corporation shall pay, in case at the time this amendment becomes effective, Ten Cents ($0.10) for each share held by any holder of fewer than 53,000 shares of common stock immediately before the time when this amendment becomes effective.

(Complaint, Ex. A, p. 8; 9/17/12 Bond Aff., Ex. G, p. 1.) However, John Taylor and his henchmen overlooked, ignored or intentionally violated two separate provisions of AIA Services' Amended Articles of Incorporation that bar the payment of any sums, let alone ten cents per share, to any common shareholders until the Series A Preferred Shares have been redeemed and the over $1,200,000 in accrued and unpaid dividends on the Series C Preferred Shares have been paid:

> The corporation will not, and will not permit any of its Subsidiaries to, acquire by purchase or otherwise...the stock or other evidence of beneficial ownership, of any Person unless, immediately prior to and after giving effect to such transaction, no violation of any of the covenants or other provisions contained in this Article Forth shall have occurred....

(9/17/12 Bond Aff., Ex. A, p. 8, §4.2.9(f); *see also* §4.2.9.) Moreover, "[t]he rights and preferences hereby conferred on the Series A Preferred Stock shall not be changed, altered or

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 10

Exhibit - U

**4-ER-772**

revoked without the consent of the holders of the majority of the Series A Preferred Stock outstanding at the time." (*Id.*, Ex. A, p. 11, §4.2.12.) Substantially similar provisions are included for the Series C Preferred Shares under AIA Services' Amended Articles of Incorporation.

> No dividend shall be declared or paid upon Common Stock nor shall any Common Stock be purchased or otherwise acquired by the corporation for value...unless all dividends on the Series C Preferred Stock for all past periods shall have been paid or shall be been declared and a sum sufficient for the payment thereof set apart for payment.

(*Id.*, Ex. A, p. 12, §4.3.3.)

Consequently, the reverse stock split and the termination of the ESOP violate numerous provisions of AIA Services' Amended Articles of Incorporation, which results in the violation of numerous provisions of Idaho Code when it "[w]as not effectuated in accordance with...the corporation's articles of incorporation..." I.C. § 30-1-1302(4); I.C. § 30-1-202; I.C. § 30-1-302; I.C. § 30-1-1001; I.C. § 30-1-1005. The Amended Articles of Incorporation filed in July 17, 2012 and the termination of the ESOP are both void. (Facts, §§D-E; 9/17/12 Bond Aff., Ex. G.)

**2. AIA Services fails to state a claim because it is barred from making any payments to any common shareholders.**

"A board of directors may authorize and the corporation may make distributions to its shareholders <u>subject to restriction by the articles of incorporation</u>..." I.C. § 30-1-640(1) (emphasis added). For purposes of I.C. § 30-1-640, <u>a "distribution' means a direct or indirect transfer of money</u> or other property...[and] may be <u>in the form of...a purchase, redemption, or other acquisition of shares</u>..."[3] I.C. § 30-1-140 (emphasis added).

---

[3] Under the official ABA Comment for "Distribution" under I.C. § 30-1-140, it states that "Section 140(6) in turn defines 'distribution' to include all transfers of money or other property made by a corporation to any shareholder in respect of the corporation's shares, except mere changes in the unit of interest such as share dividends and share splits. Thus, a 'distribution' includes the declaration or payment of a dividend, a purchase by a corporation of its own shares...The term 'indirect' in the definition of 'distribution' is intended to include transactions like the repurchase of parent company shares by a subsidiary whose actions are controlled by the parent. It also is intended to include any other transaction in which the substance is clearly the same as a typical dividend or shares repurchase, no matter how structured or labeled."

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 11

Exhibit - U

Here, AIA Services may not directly or indirectly purchase the Defendants' common shares. Indeed, AIA Services' Complaint concedes that making any payments to shareholders is barred by its Amended Articles of Incorporation:

> the Reverse Stock Split Transaction does not violate subsection 4.3.3 of plaintiff's articles of incorporation **because plaintiff's funds will not be used to pay the defendants or other holders of Common Stock for their shares**...

(Complaint, p. 8, ¶3 (emphasis added); *see also* 9/17/12 Bond Aff., Ex. A, p. 12, §4.3.3.) Moreover, AIA Services does not address the additional violation of Section 4.2.9(f) of AIA Services' Amended Articles of Incorporation, which separately bars payments to common shareholders. (9/17/12 Bond Aff., Ex. A, p. 8, §4.2.9(f).) Apparently, the defendants believe that they can side-step their way around Idaho Code and AIA Services' Amended Articles of Incorporation by using funds from another source, presumably from John Taylor and/or his henchmen. This argument is fatally flawed, however, because reverse stock splits are redemptions through the corporation, not individual shareholders—even if the money comes from another source, it still must pass through AIA Services because the corporation, and it alone, is who purchases the fractional shares created from the reverse stock split. (9/17/12 Bond Aff., Ex. G; Complaint, Ex. A, p. 8; Facts, §§D-E.) The fact that John Taylor and his henchmen intend to pay the minority shareholders with someone else's funds simply proves that it is an illegal scheme—because any available corporate funds must first be paid first to the Series A and Series C Preferred Shareholders.[4] Therefore, since the payments under the reverse stock split violate two separate provisions of the Amended Articles of Incorporation, the reverse stock split and the termination of the ESOP violate I.C. § 30-1-640(1) and are both illegal distributions.

---

[4] It was not pure coincidence that John Taylor and Connie Taylor Henderson acquired the common shares illegal issue to and held by their henchmen to effectuate the reverse stock split. (Complaint, Ex. A, p. 6; 9/17/2012 Bond Aff., Ex. D, p. 8.) This entire reverse stock split, like the plundering and theft that has gone on at AIA Services, was undoubtedly planned and executed between John Taylor and his henchmen.

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 12

Exhibit - U

**3. The reverse stock split and the termination of the ESOP are both illegal transactions and, consequently, the Amended Articles of Incorporation filed on July 17, 2012 is void and unenforceable.**

When a corporation redeems stock in violation of a statute, the redemption is illegal. *Taylor v. AIA Services Corp.*, 151 Idaho 552, 261 P.3d 829 (2011); 19 CJS Corporations § 674 ("An illegal act of a corporation is one expressly prohibited by statute...As a general rule, corporate transactions and contracts which are illegal...are void and cannot support an action nor become enforceable by performance, ratification, or estoppel.").

As set forth above, the reverse stock split and the termination of the ESOP both violated numerous provisions in AIA Services' Amended Articles of Incorporation and Idaho Code. (Facts, §§A-E.) Therefore, both transactions are illegal and void, which results in the Amended Articles of Incorporation filed in July 17, 2012 being void and the termination of the ESOP being void. (9/17/12 Bond Aff., Ex. C, G & I.) The Court should make a specific finding that both are void and the common shares should be returned to the ESOP. That way, the Court will provide appropriate notice to the Idaho Secretary of State so that it can undo the illegal filing of the Amended Articles of Incorporation.

**4. The Defendants are entitled to their attorneys' fees and costs.**

"The court in an appraisal proceeding may also assess the fees and expenses of counsel..." I.C. § 30-1-1331(2). Since AIA Services failed to comply with I.C. § 1322 (failure to provide an appraisal notice and form) and acted arbitrarily and in bad faith, the Court should award attorneys' fees and costs for the Defendants for all aspects of this lawsuit and the reverse stock split, including the travel time and expenses incurred by Dale Miesen. I.C. § 30-1-1331(2)(a) & (3). However, the issue of fees and costs is best left to be determined when this action is dismissed in full and a final judgment has been entered.

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 13

Exhibit - U

**B. If the Court does not dismiss AIA Services' Complaint, it should be ordered to provide a more definitive statement.**

"If a pleading to which a responsive pleadings is permitted...is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for...a more definitive statement before interposing the responsive pleading." IRCP 12(e).

**1. AIA Services' Complaint does not comply with I.C. § 30-1-1301, *et seq*.**

"If a shareholder makes demand for payment under section 30-1-1326, Idaho Code, which remains unsettled, the corporation shall commence a proceeding...and <u>petition</u> the court to determine the fair value of the shares and accrued interest." I.C. § 30-1-1330(1) (emphasis added). "The corporation shall make all shareholders...whose demands remain unsettled parties to the proceeding, as in an action against their shares, and all parties must be served with a copy of the <u>petition</u>." I.C. § 30-1-1330(3) (emphasis added).

AIA Services' Complaint does not comply with the requirements of an appraisal proceeding. (Complaint.) AIA Services should be ordered to file a Petition, not a Complaint, that complies with I.C. § 30-1-1301, *et seq*. AIA Services should also be ordered to allege facts that it complied with all applicable Code Sections, including, without limitation, that it provided the Defendants a payment offer and complied with I.C. §§ 30-1-1322 and 30-1-1325. If AIA Services intends to proceed with an appraisal action, it is incumbent upon it to plead facts in a Petition that it satisfied all of the requirements and prerequisites of I.C. § 30-1-1301, *et seq*.

**2. AIA Services' prayer for declaratory relief within an appraisal action is not appropriate.**

"The jurisdiction of the court in which the proceeding is commenced...is plenary and exclusive." I.C. § 30-1-1330(4). "The shareholders demanding appraisal rights are entitled to the same discovery rights as parties in other civil proceedings. There shall be no right to a jury trial."

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 14

Exhibit - U

**4-ER-776**

*Id.* "Nonresidents may be served by registered or certified mail..." I.C. § 30-1-1330(3).

In AlA Services' Complaint, it asserts that jurisdiction and venue are proper in this action pursuant to I.C. §§ 30-1-1330(4) and 30-1-1326. (Complaint, p. 3, ¶1.17.) It also asserts ten items of declaratory relief, but fails to specifically request that a fair value be determined for the Defendants' shares as the primary purpose of this action. (Complaint, p. 7-9.) Indeed, Paragraphs 5-9 are requesting declaratory relief for persons who are not even parties to this action, i.e., John Taylor and his henchmen. AIA Services is not authorized to mix declaratory judgment relief in with an appraisal petition under I.C. § 30-1-1301, *et seq.* In fact, there is no right to a jury trial under a petition for an appraisal proceeding, while the rule is exactly the opposite for a party in a declaratory judgment action. I.C. § 10-1209; IRCP 57(a).

Moreover, the fact that AIA Services mixes declaratory relief with an appraisal action simply confirms that this really isn't an appraisal action. In fact, much of the declaratory relief is not being pursued by the proper parties and any judgment would be ineffectual against those parties. For example, if the Court made a finding that John Taylor, Connie Taylor Henderson and James Beck breached their fiduciary duties, they would not be bound by that judgment since they are not parties to this action. In reality, this lawsuit appears to be an ill-conceived effort to illegally eliminate shareholders and threaten complaining shareholders by filing baseless litigation.

As such, it is impossible for the Defendants to frame an Answer until and unless they know what they are responding to and whether this is in fact an appraisal action. Either this is an appraisal action or not. If AIA Services intends to pursue other claims, then it should specifically allege that the relief is different from the appraisal proceeding so that the Defendants may properly request a jury trial for those claims. If this action is solely an appraisal action, AIA

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 15

Exhibit - U

Services should be ordered to file the proper Petition so that the Defendants may respond. If the Court will permit various claims from both sides to be blended into an appraisal action, then direction from the Court would be helpful prior to the Defendants serving their Answers.

### 3. Since the reverse stock split violates AIA Services' Articles of Incorporation, a more definite statement is required.

"The articles of incorporation may set forth...[p]rovisions not inconsistent with law regarding...defining, limiting and regulating the powers of the corporation, its board of directors, and shareholders..." I.C. § 30-1-202. "Unless its articles of incorporation provide otherwise, every corporation...has the same powers...to carry out its business and affairs..." I.C. § 30-1-302. "A corporation may amend its articles of incorporation at any time to...add or change a provision that...is permitted in the articles in incorporation..." I.C. § 30-1-1001. "Unless the articles of incorporation provide otherwise, a corporation's board of directors may adopt amendments to the corporation's articles of incorporation without shareholder approval..." I.C. § 30-1-1005. "A shareholder entitled to appraisal rights" may "challenge a completed corporate action" if the corporate action "[w]as not effectuated in accordance with...the corporation's articles of incorporation..." I.C. § 30-1-1302(4).

Since it has been conclusively established above that the reverse stock split violates at least two separate provisions of AIA Services' Amended Articles of Incorporation, AIA Services should be required to plead facts that demonstrate the requested relief is legally available to it, i.e., that it can legally complete the reverse stock split. (Facts, §§A-E.) In other words, AIA Services must plead facts that the reverse stock split was legal when the Amended Articles of Incorporation were filed on July 17, 2012 and that it is authorized under the law to make the required payments to shareholders, not that so-called third parties will be illegally making those payments. (9/17/12 Bond Aff., Ex. G.) Otherwise, AIA Services should voluntarily dismiss its

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 16

Exhibit - U

Complaint now and limit the amount of fees and costs that it should be required to pay.[5] Simply put, John Taylor and his henchmen should not be permitted to utilize AIA Services as a vehicle to carry out their illegal acts and transactions. AIA Services must independently plead facts that it is able to legally carry out the reverse stock split.[6]

**4. A more definite statement is required to demonstrate how someone other than AIA Services is able to pay the money for the redemption of the shares.**

"A board of directors may authorize and the corporation may make distributions to its shareholders subject to restriction by the articles of incorporation..." I.C. § 30-1-640(1). For purposes of I.C. § 30-1-640, a "distribution' means a direct or indirect transfer of money or other property...[and] may be in the form of...a purchase, redemption, or other acquisition of shares..."[7] I.C. § 30-1-140.

AIA Services' Complaint concedes that the reverse stock split was illegal:

> the Reverse Stock Split Transaction does not violate subsection 4.3.3 of plaintiff's articles of incorporation **because plaintiff's funds will not be used to pay the defendants or other holders of Common Stock for their shares**...

(Complaint, p. 8, ¶3 (emphasis added).) The reasons the Complaint asserted that the "payments" would <u>not</u> be made with AIA Services' funds is because it making such payments are expressly barred under AIA Services' articles of incorporation. Specifically, the financial statements admit that AIA Services owes the Series C Preferred Shareholders over $1,200,000 in accrued and

---

[5] The Defendants will ask that John Taylor and his henchmen be ordered to personally pay all of the attorneys' fees and costs incurred by both sides.

[6] However, the reverse stock split was either legal or illegal when it occurred. An illegal transaction may not be made legal at a later date. 19 CJS Corporations § 674.

[7] Under the official ABA Comment for "Distribution" under I.C. § 30-1-140, it states that "Section 140(6) in turn defines 'distribution' to include all transfers of money or other property made by a corporation to any shareholder in respect of the corporation's shares, except mere changes in the unit of interest such as share dividends and share splits. Thus, a 'distribution' includes the declaration or payment of a dividend, a purchase by a corporation of its own shares...The term 'indirect' in the definition of 'distribution' is intended to include transactions like the repurchase of parent company shares by a subsidiary whose actions are controlled by the parent. It also is intended to include any other transaction in which the substance is clearly the same as a typical dividend or shares repurchase, no matter how structured or labeled."

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 17

# Exhibit - U

unpaid dividends as of December 31, 2011. (9/17/12 Bond Aff., Ex. D, p. 10 n. 6.) AIA Services'

articles of incorporation bar any payments to common shareholders at this time:

> No dividend shall be declared or paid upon Common Stock nor shall any Common Stock be purchased or otherwise acquired by the corporation for value...unless all dividends on the Series C Preferred Stock for all past periods shall have been paid or shall be been declared and a sum sufficient for the payment thereof set apart for payment.

(*Id.*, Ex. A, p. 12, §4.3.3.) Moreover, a similar provision protects the Series A Preferred Shares:

> The corporation will not, and will not permit any of its Subsidiaries to, acquire by purchase or otherwise...the stock or other evidence of beneficial ownership, of any Person unless, immediately prior to and after giving effect to such transaction, no violation of any of the covenants or other provisions contained in this Article Forth shall have occurred....

(*Id.*, at p. 8, §4.2.9(f); *see also* §4.2.9.) AIA Services has conceded that it has not redeemed all of

Donna Taylor's Series A Preferred Shares. (*Id.*, Ex. D, p. 10, n. 5.) Since Donna Taylor's Series

A Shares have not been redeemed and the over $1,200,000 in accrued dividends have not been

paid on the Series C Preferred Shares, AIA Services is barred from purchasing any common

shares—whether such purchases are through a reverse stock split or some other transaction.

Indeed, as set forth above, the defendants' scheme to effectuate a reverse stock split and

payments to the affected common shareholders violates the provisions in AIA Services' articles

of incorporation and Idaho law. *See* I.C. § 30-1-1302(4)(a)-(b); I.C. § 30-1-830(1); I.C. § 30-1-

631(1); I.C. § 30-1-640(1); I.C. § 30-1-1005; I.C. § 30-1-302; I.C. § 30-1-304. Consequently, the

reverse stock split is an illegal transaction since it violates Idaho Code. *See Taylor v. AIA

Services Corp.*, 151 Idaho 552, 261 P.3d 829 (2011) (a redemption that violates a statute is

illegal and unenforceable). AIA Services must be required to state how the reverse stock split

and the termination of the ESOP were both legal and that payments made to those shareholders

were legal or would be legal at the time of the transactions.


MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 18

# Exhibit - U

## IV.  CONCLUSION

For the reasons articulated above, the Court should void the Amended Articles of Incorporation filed in July 17, 2012 and order the common shares returned to the ESOP, since both transactions violated I.C. §§ 30-1-1302(4), 30-1-202, 30-1-302, 30-1-640(1), 30-1-1001 and 30-1-1005 and are, therefore, illegal transactions. Since all of the AIA Services' requested relief can be traced directly to the legality of the reverse stock split, its entire Complaint should be dismissed. In the alternative, the Court should order AIA Services to provide a more definite statement through a properly drafted and filed pleading.

DATED this 17ᵗʰ day of September, 2012.

RODERICK BOND LAW OFFICE, PLLC

By:_____
Roderick C. Bond, ISB No. 8082
Attorney for Defendants

### CERTIFICATE OF SERVICE

I, Roderick Bond, declare that, on the date indicated below, I served a true and correct copy of the foregoing on the following party(ies) via the method(s) indicated below:

Douglas Siddoway
Randall & Danskin
1500 Bank of America Financial Center
601 West Riverside Ave., Suite 1500
Spokane, WA  99201-0626

**Via:**
( ) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile - (509) 624-2528
(X) Email (pdf attachment) (by Agreement)

Signed this 17ᵗʰ day of September, 2012.

_____
Roderick C. Bond

MOTION TO DISMISS AND MOTION
FOR A MORE DEFINATE STATEMENT - 19

Exhibit - U

**4-ER-781**

FILED

'13 APR 29 PM 2 32

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

AIA SERVICES CORPORATION, an
Idaho corporation,

        Plaintiff,

        v.

PAUL D. DURANT; KAY HANCHETT;
LEE ANN HOSTETLER; JERRY A.
LEGG; DALE L. MIESEN; HEATHER
MIESEN LIVING TRUST, DALE L.
MIESEN, TRUSTEE; JENNIFER MAY
MIESEN LIVING TRUST, DALE L.
MIESEN, TRUSTEE; ROBERT L.
MIESEN LIVING TRUST, DALE L.
MIESEN, TRUSTEE; DALE L. MIESEN
AND JONATHON EKBERG BROWN, JR.,
JOINT TENANTS; CARMEN S. TAYLOR;
DONNA J. TAYLOR; JUD R. TAYLOR;
REED J. TAYLOR; AND BOBETTE N.
RUDDELL,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV2012-01483

MEMORANDUM OPINION
AND ORDER ON
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT,
PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT
AND DEFENDANTS' MOTION
TO STRIKE

This matter came before the Court on the Defendants' Motion for Summary

Judgment, the Plaintiff's Cross-Motion for Summary Judgment and Defendants' Motion

to Strike. The Plaintiff was represented by Douglas J. Siddoway, of the firm Randall

MEMORANDUM OPINION AND ORDER    1
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

**Exhibit - A**

Danskin. The Defendants were represented by Roderick Bond, of Roderick Bond Law Office. The Court heard oral argument on February 26, 2013. The Court, having heard the argument of counsel and being fully advised in the matter, hereby renders its decision.

## BACKGROUND

AIA Insurance is an insurance agency founded by Reed Taylor and based in Lewiston, Idaho.[1] The insurance agency sells insurance products to farmers and other agricultural based entities. Reed Taylor was the majority shareholder of AIA Services, a holding company which has wholly-owned AIA Insurance. In 1995 Reed Taylor held sixty-three percent of approximately 973,000 outstanding shares of AIA Services common stock and served as the chairman of the Board of Directors and the Chief Executive Officer of AIA Services. *Taylor v. AIA Services Corp.*, 151 Idaho 552, 556, 261 P.3d 829, 833 (2011).

Reed Taylor was married to Donna Taylor until 1987, when the couple divorced. *Affidavit of Donna J. Taylor*, at 2. In conjunction with the divorce, Reed and Donna entered into a Property Settlement Agreement on December 14, 1987. Under the terms of this agreement, Reed and Donna contributed substantial assets to AIA Services; in exchange AIA Services issued to Reed and Donna Series A Preferred Shares and additional common shares. *Id.* In 1993, Donna provided a written demand to AIA Services for the redemption of Donna's Series A Preferred Shares. The Series A Preferred Shares were required to be redeemed over a fifteen year period. *Id.* On

---

[1] The history of AIA Insurance and AIA Services, Corp., is set forth in detail in *Taylor v. AIA Services Corp.,* 151 Idaho 552, 261 P.3d 829 (2011). While the case at hand addresses unique issues which were not before the Idaho Supreme Court in 2011, the history of AIA Services and its founders is useful in order to fully understand the matter that is currently before this Court.

MEMORANDUM OPINION AND ORDER          2
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

**Exhibit - A**

January 11, 1995, AIA Services and Donna entered into an agreement revising the redemption period of Donna's shares from a fifteen year redemption period to a ten year redemption period. *Id., Exhibit B.*

On March 7, 1995, at a special meeting of shareholders, AIA Services shareholders approved the purchase of 500,000 of Reed Taylor's shares of AIA common stock for $7.5 million. *Taylor v. AIA Services Corp.*, 151 Idaho 552, 556-557, 261 P.3d 829, 833-834 (2011). The plan to redeem Reed Taylor's shares was not consummated because AIA Services failed to raise the necessary funds. *Id.* at 557, 261 P.3d at 834.[2] Ultimately, Reed Taylor filed suit against AIA Services as a result of failed payments for a $1.5 million Note and a $6 million Note. The district court determined the Stock Redemption Agreement was illegal and unenforceable; this determination was affirmed by the Idaho Supreme Court in 2011. "[T]he Stock Redemption Agreement is precisely the type of agreement that public policy prohibits, as it was entered into when AIA Services had no earned surplus and was not authorized to use capital surplus; thus, the agreement implicates concerns that it was intended to favor Reed Taylor at the expense of minority shareholders and creditors." *Id.* at 567, 261 P.3d at 844.

---

[2] On July 18, 1995, AIA Services' Board of Directors authorized the redemption of Reed Taylor's common stock for $7.5 million and other consideration. *Id.* at 557, 261 P.3d at 834. AIA Services and Reed Taylor entered into a Stock Redemption Agreement effective July 22, 1995 to effectuate the redemption of the stock; however, the parties entered into an Addendum whereby AIA Services would issue a $1.5 million down payment note payable ninety days after closing. *Id.* The balance of the $7.5 redemption price was to be paid pursuant to a promissory note for the amount of $6 million, dated August 1, 1995. AIA Services was not able to pay the $1.5 million note when it came due on October 20, 1995, thus the parties executed a Stock Redemption Restructure Agreement, changing the dates the two notes would be due. *Id.* at 558, 261 P.3d at 835. AIA Services failed to pay the $1.5 million Note when it became due, and also fell behind on making interest payments on the $6 million Note. *Id.* As a result, Reed Taylor filed suit against AIA.

MEMORANDUM OPINION AND ORDER          3
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

**Exhibit - A**

From 2007 to present, a myriad of lawsuits[3] have spawned between these parties regarding various issues between the shareholders and the corporation. There are two cases currently stayed in other courts: *Donna Taylor v. R. John Taylor*, Nez Perce County Case CV-2008-1150 and *Donna Taylor v. AIA, et al.*, District Court for the District of Idaho Civil No. 1:10-cv-00404-MLB.

The case currently pending before this Court was initiated by AIA Services on July 26, 2012. On July 16, 2012, AIA Services held an annual meeting wherein the holders of Common Stock approved an amendment to the articles of incorporation which resulted in a Reverse Stock Split Transaction.[4] *Amended Complaint*, at 4. As a result of the amendment, each issued and outstanding share of Common Stock was converted into 1/53,000[th] of a share of Common Stock (the equivalent of one share of Common Stock for every 53,000 outstanding shares of Common Stock). In addition, each holder of fewer than 53,000 shares of Common Stock would receive, in lieu of a fractional share, an amount determined by multiplying the number of shares of Common Stock owned beneficially by such holder immediately prior to the effective time of the amendment by $0.10. *Id.* at 4. The Reverse Stock Split Transaction was approved by the holders of the

---

[3] *Reed Taylor v. AIA, et al.*, Nez Perce County Case CV-2007-00208, affirmed by the Idaho Supreme Court in *Taylor v. AIA Services Corp.*, 151 Idaho 552, 556-557, 261 P.3d 829, 833-834 (2011).
*Donna Taylor v. R. John Taylor*, CV-2008-1150: currently stayed pending the outcome of CV-2007-0208.
*Reed Taylor v. McNichols, et al.*, CV-2008-1763: defendants' motion to dismiss granted, affirmed by the Idaho Supreme Court in *Taylor v. McNichols*, 149 Idaho 826, 243 P.3d 642 (2010).
*Reed Taylor v. HTEH et al.*, CV-2008-1765: Defendants' motion to dismiss granted.
*Donna Taylor v. AIA et al.*, CV-2009-2470: Stayed pending the outcome of CV-2007-0208, then voluntarily dismissed by Plaintiff.
*Donna Taylor v. HTEH et al.*, Civil No. 1:10-cv-00404-MLB: stayed pending the outcome of CV-2007-0208.
[4] AIA Services Board of Directors at the time of the reverse stock split included John Taylor, Connie Taylor and James Beck. John Taylor and Reed Taylor are brothers.

MEMORANDUM OPINION AND ORDER          4
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

# Exhibit - A

1,379,693.5 shares of Common Stock, or 89.79%. The holders of 99,797.78 shares of Common Stock, or 6.75% voted against the Reverse Stock Split Transaction. While much of the focus of this procedural history discusses stocks owned by Reed and Donna Taylor, the lawsuit before this Court also pertains to former employees of AIA who worked in exchange for ownership in the Employee Stock Ownership Plan (hereinafter "ESOP"). The ESOP was terminated via payment to those shareholders at three cents per share.

Initially, the Defendants filed a motion to dismiss this case pursuant to I.R.C.P. 12(b)(6). Because the Court is required to look beyond the pleadings in this matter, the motion was converted to a motion for summary judgment. In addition, the Plaintiff filed a cross-motion for summary judgment and the Defendants' have filed a motion to Strike the Affidavit of Douglass Siddoway.[5] Both motions for summary judgment are intertwined, and thus, aspects of each will be considered, and reference will be made to the Amended Complaint for purposes of determining the motions before this Court.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. I.R.C.P. 56(c). In determining whether summary judgment is appropriate, the court must construe the pleadings, depositions, admissions, and affidavits in a light most favorable to the nonmoving party. *Ruffing v. Ada County* Paramedics, 145 Idaho 943, 945, 188 P.3d 885,

---

[5] The Court has considered the motion to strike and denies the motion for purposes of this Memorandum Opinion and Order. However, the Court notes that only relevant and admissible evidence has been considered with respect to this determination.

MEMORANDUM OPINION AND ORDER 5
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

**Exhibit - A**

887 (2008); *Conway v. Sonntag*, 141 Idaho 144, 146, 106 P.3d 470, 472 (2005), *citing Infanger v. City of Salmon*, 137 Idaho 45, 44 P.3d 1100 (2002).

When a motion for summary judgment is "supported by a particularized affidavit, the opposing party may not rest upon bare allegations or denials in his pleadings," but must set forth "specific facts" showing a genuine issue. I.R.C.P. 56(e); *Verbillis v. Dependable Appliance Co.*, 107 Idaho 335, 337, 689 P.2d 227, 229 (Ct. App. 1984). A "mere scintilla" of evidence or only a "slight doubt" as to the facts is insufficient to withstand summary judgment. *Finholt v. Cresto*, 143 Idaho 894, 896, 155 P.3d 695, 697 (2007); *see also Jenkins v. Boise Cascade Corp.*, 141 Idaho 233, 238, 108 P.3d 380, 385 (2005).

Finally, the initial burden of establishing the absence of a genuine issue of material fact is on the moving party, and once this burden is met, it is incumbent upon the non-moving party to establish an issue of fact regarding that element. *Meikle v. Watson*, 138 Idaho 680, 683, 69 P.3d 100, 103 (2003); *Yoakum v. Hartford Fire Ins. Co.*, 129 Idaho 171, 923 P.2d 416 (1996).

## ANALYSIS

As noted above, the parties to this lawsuit have been involved in protracted litigation since 2007 via lawsuits which have been initiated by parties who are defendants of the current case. The corporate structure of AIA Services, and the ownership of certain stock are at the core of these lawsuits. AIA Services, via declaratory judgment, is attempting to bring to a close this recent spate of litigation and proceed in the operations of the corporation. There is overlap between the previous lawsuits and the case at hand,

MEMORANDUM OPINION AND ORDER     6
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

# Exhibit - A

which must be considered for purposes of judicial economy.  Thus, this Court will first consider issues surrounding Donna Taylor's Series A Preferred Stock, and the litigation which is currently pending in other courts.  Second, this Court will consider whether the minority stockholders followed the correct procedure to avoid waiving their right to seek and obtain an appraisal pursuant to I.C. § 30-1-1301 through § 30-1-1331.  Third, this Court will consider whether the Reverse Stock Split violates AIA Services' Articles of Incorporation.

### 1. Issues surrounding Donna Taylor's Series A Preferred Stock.

The Amended Complaint seeks a determination that the defendants have waived their right to seek and obtain an appraisal of the fair value of their Common Stock.  In the alternative, "if the defendants have not waived their right to seek and obtain an appraisal, for a declaration that the fair value of their Common Stock can be determined prior to the resolution of claims brought by Donna J. Taylor in the pending federal action." *Amended Complaint*, at 9.  AIA Services then moves for summary judgment, seeking an order declaring that "the Series A Preferred Shareholders Agreement governing the redemption of Donna Taylor's Series A stock is illegal and unenforceable for the same reasons the Stock Redemption Agreement was held to be illegal and unenforceable in *Reed Taylor v. AIA Services Corporation et al.*" *Plaintiff's Cross-Motion for Summary Judgment*, at 2.

AIA Services presents argument in support of the claim that the Series A Preferred Shareholders Agreement is illegal and unenforceable.  However, there is nothing in the record which supports AIA Services assertion that a determination should be made on these issues prior to the resolution of claims in the pending federal action.

MEMORANDUM OPINION AND ORDER            7
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

**Exhibit - A**

This Court takes judicial notice of the fact that there is a pending federal lawsuit[6], and also notes there is also suit pending in Nez Perce County, *Donna Taylor v. R. John Taylor, et al.*, CV-2008-1150[7], that may also address issues similar to the federal suit.

For purposes of judicial economy, this Court finds that it is inappropriate to address these issues in a manner that leaves the possibility of conflicting resolutions. There is a risk of duplication of efforts and inconsistent results if this Court were to begin issuing decisions while the matter was still pending in federal court. While it is understandable that AIA Services is taking action to move forward to conduct business, it appears the plaintiff is rushing to a new forum to seek resolutions that are appropriately addressed in currently pending lawsuits.

The defendant's motion to dismiss claims which relate to the redemption value of Donna Taylor's Series A Preferred Stock is granted on the basis that there is risk of inconsistent results between the case at hand and the two other cases stated above. Further, because the process of determining the value of the Series C Stock and the Common Stock are inextricably intertwined with that of determining the value of the Series A Preferred Stock, it is appropriate to dismiss these claims as well.[8]

---

[6] Because this matter has been converted into a motion for summary judgment, it is appropriate for the Court to take judicial notice of the fact that other lawsuits are currently pending in other courts.
[7] A review of the Register of Actions in this case indicates the matter was stayed pending the outcome of *Reed Taylor v. AIA Services, et al.*, 151 Idaho 552, 261 P.3d 829 (2011). The ROA does not indicate further action has taken place in this matter.
[8] As will be discussed in section two of this analysis, there is no evidence that the defendants waived their right to seek and obtain an appraisal of the fair value of their stock. Both sides have presented evidence of what they claim the stock is worth, however, the record is silent as to an expert opinion or appraisal from either party.

MEMORANDUM OPINION AND ORDER          8
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

**Exhibit - A**

**2. Whether the minority stockholders followed the correct procedure to avoid waiving their right to seek and obtain an appraisal pursuant to I.C. §§ 30-1-1301 – 30-1-1331.**

I.C. § 30-1-1302 sets forth corporate actions which entitle shareholders to appraisal rights. This statute states in pertinent part:

> (1) A shareholder is entitled to appraisal rights, and to obtain payment of the fair value of that shareholder's shares, in the event of, any of the following corporate actions:
> . . .
> (b) Consummation of a share exchange to which the corporation is a party as the corporation whose shares will be acquired, if the shareholder is entitled to vote on the exchange, except that appraisal rights shall not be available to any shareholder of the corporation with respect to any class or series of shares of the corporation that is not exchanged;
> . . .
> (d) An amendment of the articles of incorporation with respect to a class or series of shares that reduces the number of shares of a class or series owned by the shareholder to a fraction of a share if the corporation has the obligation or right to repurchase the fractional share so created; or
> (e) Any other amendment to the articles of incorporation, merger, share exchange or disposition of assets to the extent provided by the articles of incorporation, bylaws or a resolution of the board of directors.

I.C. § 30-1-1302(b)(d)(e).  Within the Notice of Annual Meeting of Shareholders to be Held on July 16, 2012, and accompanying proxy statement the following information was provided to shareholders regarding Dissenter's Appraisal Rights:

> The Company's shareholders have statutory rights of appraisal under the Idaho Business Corporation Act in connection with the proposed amendment, meaning that if they vote against the amendment and take other steps to perfect their rights, summarized below, they will be entitled to receive the fair value of their common stock in cash.  The procedures for exercising and perfecting these appraisal rights are complicated, and for this reason the Company's shareholders are urged to read the relevant provisions of the Idaho Business Act that are included in this Proxy Statement as Exhibit B.  The following is only a summary of these procedures and not intended to be inclusive.

MEMORANDUM OPINION AND ORDER         9
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

**Exhibit - A**

A shareholder wishing to exercise against these rights must vote against approving the amendment to the articles of incorporation, and prior to the taking of such vote at the Annual Meeting, must also deliver written notice to the Company that he or she intends to demand written payment for his shares if the amendment is approved.  If the amendment is approved, the Company must, within ten days, send written notice to the shareholder, accompanied by a form for demanding payment and related information.  The shareholder must thereafter return the form to the Company, accompanied by the shareholder's stock certificate(s), within the time prescribed by the form, which may not be less than 40 nor more than 60 days.

Upon receipt of the form and the shareholder's stock certificate(s), the Company will pay the shareholder the fair value of his shares, accompanied by financial information and a statement how the fair value was determined.  Should the shareholder disagree with the Company's fair value determination, he must reject the payment, following which either the Company or the shareholder may initiate a court proceeding in Idaho to adjudicate such value.  The cost of any such proceeding, including the costs of any appraisers or experts, shall be borne by the Company, but at the court's discretion may also be assessed against the shareholder.

*Amended Complaint, Exhibit A,* at 6.  AIA Services asserts that the defendants are delaying the appraisal process so they can litigate their claims in other courtrooms.  Specifically AIA points to the presently stayed federal case mentioned above.  The plaintiff's argument is disingenuous however, when considering that the federal law suit was filed well in advance to the corporate actions which gave rise to this lawsuit and the defendant's dissenters' appraisal rights.

Other than arguing that the defendants are purposely stalling in order to avoid the negative consequences that might result from the statutory appraisal, AIA fails to establish how the defendants have waived their appraisal rights pursuant to I.C. § 30-1-1301 – § 30-1-1331.  The defendants were given notice of appraisal rights from AIA Services, as required by § 30-1-1320.  In response, the defendants each filed a Notice of

MEMORANDUM OPINION AND ORDER       10
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

**Exhibit - A**

Intent to Demand Payment. I.C. §30-1-1321 sets forth the requirements a shareholder must meet in order to notify the corporation of the shareholder's intent to dissent.

> (1) If proposed corporate action requiring appraisal rights under section 30-1-1302, Idaho Code, is submitted to a vote at a shareholders' meeting, a shareholder who wishes to assert appraisal rights with respect to any class or series of shares:
>> (a) Must deliver to the corporation before the vote is taken written notice of the shareholder's intent to demand payment if the proposed action is effectuated; and
>> (b) Must not vote, or cause or permit to be voted, any shares of such class or series in favor of the proposed action.
> (2) A shareholder who does not satisfy the requirements of subsection (1) of this section is not entitled to payment under this part.

I.C. § 30-1-1321.[9] Each defendant complied with the notice requirements set forth.

*Amended Complaint, Exhibit B.* Further notice was provided on July 15, 2012, one day before the meeting took place on July 16, 2012. *Id.*

Based upon the record before this Court, there is no evidence to support AIA Services argument that the defendants waived their appraisal rights. Thus, the defendants' motion for summary judgment seeking to dismiss this claim is granted.

3. **Whether the Reverse Stock Split and termination of the ESOP violates the Articles of Incorporation.**

The defendants argue that the Reverse Stock Split and the termination of the ESOP violate AIA Services' Articles of Incorporation, thus this case must be dismissed based upon these illegal transactions. The defendants focus on Section 4.3.3 Cumulative

---

[9] The Idaho Reporter's Comment explains that prior to this state's adoption of the Model Act in 1997, Idaho and Ohio were the only jurisdictions that did not require the shareholder to notify the corporation of the shareholder's intent to dissent before the shareholders' meeting or before the vote on the particular action is taken. Prior to this time, the belief was that requiring dissenting shareholders to give notice was unduly limited dissenting rights. According to the Comment, "In the words of the Idaho bar committee at the time of the 1979 revision, ". . .this requirement unduly limited dissenting rights. Many shareholders are not sufficiently informed of corporate action and dissenting rights to properly give such a notice prior to the vote on this issue." I.C. § 30-1-1322, Idaho Reporter's Comment.

MEMORANDUM OPINION AND ORDER          11
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

**Exhibit - A**

Dividend Preference initially, which establishes an order of priority for paying dividends.

*Affidavit of Rod Bond, filed September 18, 2012, Exhibit A, pg. 12.*

> The Series C Preferred Stock shall be entitled to receive, when and as declared by the corporation's Board of Directors, cash dividends at the per annum rate of 10% of the Liquidation Rate (as defined in Section 4.3.4), cumulative, payable quarterly at March 31, June 30, September 30 and December 31 of each calendar year out of any funds legally available for the payment of dividends, and in preference to any dividends upon the Common Stock. The dividends on the Series C Preferred Stock shall be cumulative, whether or not declared, so that, if for any period such dividend shall not be paid, the right to such dividend shall accumulate as against the Common Stock; and all arrears so accumulated shall be paid before any dividends shall be declared or paid on the Common Stock. No dividends shall be declared or paid on the Series C Preferred Stock if the redemption payments due to the holders of the Series A Preferred Stock under Section 4.2 of this Article Fourth are in arrears. No dividend shall be declared or paid upon the Common Stock nor shall any Common Stock be purchased or otherwise acquired by the corporation for value (other than payment of the amount due to Reed J. Taylor for redemption of his Common Stock), unless all dividends on the Series C Preferred Stock for all past period shall have been paid or shall have been declared and a sum sufficient for the payment thereof set apart for payment.

*Id.* The defendants assert that until Donna Taylor is paid for her Series A Preferred Stock, AIA Services cannot legally complete the reverse stock split. This issue is directly associated with the analysis above; until the issues surrounding Donna Taylor's Series A Preferred Stock are settled, pursuing this matter may lead to inconsistent results. In addition, AIA Services contends that subsection 4.3.3 was never properly adopted; or in the alternative, was adopted to accommodate stock redemption transactions that were subsequently found to be illegal and unenforceable. *Plaintiff's Memorandum in Response to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment, pg. 13-14.* Because this issue cannot be separated from those matters to be addressed in other pending lawsuits, this Court need not make a

MEMORANDUM OPINION AND ORDER          12
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

**Exhibit - A**

determination regarding whether the reverse stock split is illegal at this time. However, the defendant's motion for summary judgment is granted with respect to these claims.

### 4. Remaining claims

The remaining claims set forth within the Amended Complaint include requests for: a declaration that the shares of Common Stock owned beneficially and of record by R. John Taylor and Connie Taylor Henderson are and were qualified to vote at the annual meeting; a declaration that the shares of Common Stock issued to R. John Taylor and Connie Taylor Henderson were validly issued; a declaration that the plaintiff's directors did not violate their fiduciary duties to the defendants, among others. These claims are directly tied to the issues set forth above, and cannot be separated in a manner that would allow for adjudication at this time. Therefore, the defendants' motion for summary judgment seeking to dismiss these claims is also granted.

### 5. Attorney's fees

Both parties are seeking attorney's fees for pursuing their respective motions for summary judgment. The Court may consider whether I.C. § 12-121 is applicable.

> Fees under I.C. § 12–121 are not awarded to a prevailing party as a matter of right but, rather, are subject to the district court's discretion. *Coward v. Hadley,* 150 Idaho 282, 290, 246 P.3d 391, 399 (2010). A district court should only award fees "when it is left with the abiding belief that the action was pursued, defended, or brought frivolously, unreasonably, or without foundation." *C & G, Inc. v. Rule,* 135 Idaho 763, 769, 25 P.3d 76, 82 (2001) (internal quotation marks omitted). However, "when a party pursues an action which contains fairly debatable issues, the action is not considered to be frivolous and without foundation." *Id.* A claim is not necessarily frivolous simply because the district court concludes it fails as a matter of law. *Gulf Chem. Employees Fed. Credit Union v. Williams,* 107 Idaho 890, 894, 693 P.2d 1092, 1096 (Ct.App.1984). Furthermore, "[a] misperception of the law, or of one's interest under the law is not, by itself, unreasonable. Rather, the question

MEMORANDUM OPINION AND ORDER   13
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

**Exhibit - A**

> is whether the position adopted was not only incorrect, but so plainly fallacious that it could be deemed frivolous, unreasonable, or without foundation." *Snipes v. Schalo,* 130 Idaho 890, 893, 950 P.2d 262, 265 (Ct.App.1997) (internal citation omitted) (internal quotation marks omitted).

*Garner v. Povey,* 151 Idaho 462, 468, 259 P.3d 608, 614 (2011).  Ultimately, this Court cannot find that AIA Services pursued this action frivolously and without foundation.

## CONCLUSION

Based upon the foregoing analysis, the defendants' motion for summary judgment is granted.  The claims presented cannot be adjudicated until matters are settled in other pending lawsuits.  Consequently, the plaintiff's cross motion for summary judgment is denied.

MEMORANDUM OPINION AND ORDER      14
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

**Exhibit - A**

**ORDER**

The Defendants' Motion for Summary Judgment is GRANTED.  IT IS

FURTHER ORDERED that the Plaintiff's Cross-motion for Summary Judgment is

DENIED. Counsel for the Defendants' is ordered to submit a final judgment pursuant to

I.R.C.P. 54(a) and I.R.C.P. 58(a) to the Court for review.

IT IS SO ORDERED.


Dated this _29th_ day of April 2013.


_____
CARL B. KERRICK – District Judge


MEMORANDUM OPINION AND ORDER       15
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

**Exhibit - A**

**4-ER-796**

CERTIFICATE OF MAILING

I hereby certify that a true copy of the foregoing MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' MOTION TO STRIKE was:

_____ faxed this ____ day of April, 2013, or

_____ hand delivered via court basket this ____ day of April, 2013, or

__2__ mailed, postage prepaid, by the undersigned at Lewiston, Idaho, this 29th day of April, 2013, to:

Douglas J. Siddoway
Randall Danskin, P.S.
601 West Riverside Ave, Ste. 1500
Spokane, WA 99201

Roderick C. Bond
Roderick Bond Law Office, PLLC
800 Bellevue Way NE, Ste. 400
Bellevue, WA 98004

PATTY O. WEEKS, CLERK

By: _____
            Deputy

MEMORANDUM OPINION AND ORDER          16
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE

**Exhibit - A**

| 12/16/2013 | 101 | DOCKET ENTRY ORDER: Due to administrative reasons, the underlying case is reassigned to another magistrate judge for all further proceedings.. Signed by Judge Larry M. Boyle. ((bk) |
|---|---|---|

FILED

**NOT FOR PUBLICATION**

DEC 30 2015

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| DONNA J. TAYLOR, a shareholder who is bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc., <br><br> Plaintiff - Appellant, <br><br> v. <br><br> HAWLEY TROXELL ENNIS & HAWLEY, LLP, an Idaho limited liability partnership; et al., <br><br> Defendants - Appellees. | No. 13-36043 <br><br> D.C. No. 1:10-cv-00404-LMB <br><br> MEMORANDUM[*] |

Appeal from the United States District Court
for the District of Idaho
Larry M. Boyle, Magistrate Judge, Presiding

Argued and Submitted December 7, 2015
Seattle, Washington

Before: HAWKINS and McKEOWN, Circuit Judges and GLEASON,[**] District Judge.

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**] The Honorable Sharon L. Gleason, District Judge for the U.S. District Court for the District of Alaska, sitting by designation.

4-ER-799

Donna Taylor appeals the denial of a motion to lift a *Colorado River* stay in this derivative suit against AIA Services Corporation ("AIA Services"), its subsidiaries, certain of its board members, AIA Services' law firm Hawley Troxell Ennis & Hawley, LLP ("Hawley Troxell"), and certain Hawley Troxell attorneys including Richard Riley, arising from alleged corporate malfeasance and attorney malpractice. *See Colorado River Water Dist. v. United States*, 424 U.S. 800 (1976). In light of changed circumstances, we have jurisdiction, and we reverse.[1] The *Colorado River* doctrine stay orders are appealable under the collateral order exception to the general rule limiting appellate jurisdiction to orders issuing final judgments. *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 276 (1988)*; Nakash v. Marciano*, 882 F.2d 1411, 1413 (9th Cir. 1989). The order at issue here, entered in May 2013, stayed this case pending the outcome of an Idaho state court case, *Reed Taylor v. Riley, et al.* ("*Riley*"),[2] and is appropriate for our review because circumstances have changed and that appeal has been resolved.

---

[1] Donna Taylor also appeals a subsequent order denying her motion for reconsideration or, in the alternative, for bifurcation of her claims. We do not have jurisdiction to review such an interlocutory, non-final order.

[2] A *Colorado River* stay was initially entered in this case in 2011, pending the outcome of several state court cases. The 2013 order considered here was prompted by a motion by Donna Taylor to have the 2011 stay lifted. The 2011 order was not challenged or appealed.

2

**4-ER-800**

*Riley* was filed in 2009 by AIA Services' former CEO, Reed Taylor, against attorneys who advised him in 1995 to enter a deal transferring his majority stake in AIA Services to a group of the company's directors, after the Idaho Supreme Court found the deal unenforceable. *Taylor v. AIA Services Corp.*, 261 P.3d 829 (Idaho 2011). These attorneys included Richard Riley and his then-employer, the law firm of Eberle Berlin. While the complaint also named Hawley Troxell—Richard Riley's subsequent employer, current counsel to AIA Services, and a party here—the *Riley* court in 2010 dismissed Hawley Troxell from the action with prejudice. At the time of the order before us, *Riley* was on a permissive, interlocutory appeal before the Idaho Supreme Court challenging the lower court's ruling that Riley and Eberle Berlin owed a duty of care to Reed Taylor.[3]

Thus (irrespective of whether we should still consider Hawley Troxell a party to this action), at the relevant moment, *Riley* and the present suit shared only Riley as a common party. Further, Donna Taylor's claims here revolve around post-1995 malfeasance by certain AIA Services directors since they took over Reed Taylor's

---

[3] The parties' reports on the status of all litigation arising from facts related to the present case suggest that sometime after the order on appeal here was issued, Reed Taylor appealed the Idaho state court's previous dismissal of certain causes of action against Hawley Troxell, and that a decision is pending. Hawley Troxell's dismissal from *Riley* was not subject to any challenge at the time the order on appeal here was filed, however.

**4-ER-801**

majority stake. *Riley*, by contrast, concerns misconduct relating only to the 1995 deal and its lack of enforceability; and a judgment in Reed Taylor's favor would compensate only him.

Because of the present status of the *Riley* litigation and the fact that no exceptional circumstances warrant a stay, the "balance heavily weigh[s] in favor of the exercise of jurisdiction," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983). We conclude that the district court erred in denying the motion to lift the stay.

**REVERSED AND REMANDED. EACH PARTY SHALL BEAR ITS OWN COSTS ON APPEAL.**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| DONNA TAYLOR,<br><br>                    Plaintiff,<br><br>v.<br><br>HAWLEY TROXELL ENNIS &<br>HAWLEY LLP, GARY D. BABBITT,<br>RICHARD A. RILEY, D. JOHN<br>ASHBY, NICHAEL W. CASHMAN<br>SR., JAMES BECK, R. JOHN<br>TAYLOR, CROP USA INSURANCE<br>AGENCY INC., AIA SERVICES<br>CORP., and AIA INSURANCE, INC.,<br><br>                    Defendants. | Case No. 1:10-cv-00404-CWD<br><br>**ORDER** |

Upon receipt of the Mandate (Dkt. 108) and Memorandum (Dkt. 105) issued by the United States Court of Appeals for the Ninth Circuit, the Court hereby vacates the Order (Dkt. 46) dated June 29, 2011 and lifts the stay.

A telephonic status conference is set for **March 7, 2016 11:00 a.m**. in Boise, Courtroom 6 before Judge Candy W. Dale. Plaintiff's counsel is directed to initiate the call when all parties are on the line, connect to the courtroom at (208) 334-9945.

**IT IS SO ORDERED.**

Dated: **February 02, 2016**

**ORDER - 1**

Honorable Candy W. Dale
United States Magistrate Judge

**4-ER-803**

RODERICK C. BOND, ISB No. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com

Attorney for Plaintiffs Dale Miesen and Donna Taylor

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONNA J. TAYLOR and DALE MIESEN, as shareholders who is bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>v.<br><br>HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CONNIE TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation,<br><br>Defendants. | Civil No. 1:10-cv-00404-CWD<br><br>NOTICE OF SUBSTITUTION OF COUNSEL FOR THE PLAINTIFF DALE MIESEN AND REQUEST TO TURN OFF ECF AS TO LEE H. ROUSSO |

NOTICE OF SUBSTITUTION OF COUNSEL - 1

**4-ER-804**

Notice is hereby given that Roderick C. Bond on behalf of Roderick Bond Law Office, PLLC substitutes in place of Lee H. Rousso of the Law Office of Lee H. Rousso, PLLC as counsel for the Plaintiff Dale Miesen in the above-entitled action. Effective the date indicated below, the Plaintiff Dale Miesen shall be represented solely by Roderick C. Bond, Roderick Bond Law Office, PLLC, 601 108th Ave. NE, Suite 1900, Bellevue, WA   98004 (425) 591-6903, rod@roderickbond.com.

Further, by signing below, Lee H. Rousso of the Law Office of Lee H. Rousso, PLLC hereby requests that the clerk terminate him from all further ECF notices.

DATED:  This 23rd day of March, 2016.

LAW OFFICE OF LEE H. ROUSSO, PLLC          RODERICK BOND LAW OFFICE, PLLC


By:      /s/  Lee H. Rousso                    By:  /s/ Roderick C. Bond
    Lee H. Rousso                                  Roderick C. Bond

NOTICE OF SUBSTITUTION OF COUNSEL - 2

**4-ER-805**

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of March, 2016, I have filed a copy of the foregoing electronically through the CM/ECF system, which caused all registered recipients to be served by electronic means the foregoing and that there are no known unregistered parties or counsel other than AIA Services Corporation and AIA Insurance, Inc. (both are not presently represented by counsel).

*/s/ Roderick C. Bond*
Roderick C. Bond

NOTICE OF SUBSTITUTION OF COUNSEL - 3

**4-ER-806**

RODERICK C. BOND, ISB No. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com

Attorney for Plaintiffs Dale Miesen and Donna Taylor

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONNA J. TAYLOR and DALE MIESEN, as shareholders who is bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>v.<br><br>HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; and AIA INSURANCE, INC.; an Idaho corporation,<br><br>Defendants. | Civil No. 1:10-cv-00404-CWD<br><br>DECLARATION OF RODERICK C. BOND RE: COURT'S ORDER TO MEET AND CONFER (Dkt. No. 125) |

I, Roderick C. Bond, declare:

DECLARATION OF RODERICK C. BOND - 1

**4-ER-807**

1.      I am the attorney for the Plaintiffs Dale Miesen and Donna Taylor in this lawsuit. This Declaration is based on my personal knowledge and is being submitted because I want this Court to be advised of sufficient facts as to why the parties were unable to agree on a Litigation Plan and to determine how this case should proceed.

2.      On April 14, 2016, I sent a letter to counsel for the defendants regarding meeting and conferring with respect to a Litigation Plan, as ordered by this Court. Attached as ***Exhibit A*** is a true and correct copy of my letter dated April 14, 2016. Although I asked counsel for the defendants to provide me with a letter regarding their positions, I received nothing from them. As indicated in the attached letter in Exhibit A, I recognized that it appeared that we might have problems agreeing on a Litigation Plan when all parties and their counsel were not present and did not agree.

3.      Nevertheless, on April 15, 2016, I met and conferred in person with counsel for the defendants at the offices of Elam & Burke, P.A. in Boise, Idaho for approximately two hours. I traveled from Bellevue, Washington to Boise, Idaho to attend this conference with the defendants' counsel.

4.      The Defendants AIA Services Corporation and AIA Insurance, Inc. were not present nor were they represented by counsel.

5.      I requested that counsel stipulate to substituting the Plaintiff Dale Miesen, or another common shareholder Jerry Legg, in place of the Plaintiff Donna J. Taylor because they are solely common shareholders in AIA Services Corporation ("AIA Services") and thus more appropriate plaintiffs because Donna Taylor is a Series A Preferred Shareholder with priority over other common and preferred shareholders and the defendants have also alleged that she cannot fairly represent the interests of all shareholders. However, counsel for the defendants refused to

DECLARATION OF RODERICK C. BOND - 2

stipulate to Dale Miesen or Jerry Legg being substituted in place of Donna J. Taylor. In addition, counsel for the defendants alleged that Dale Miesen was required to provide his own derivative demand, despite the comment to I.C. § 30-1-742, which expressly states: "It should be noted that the shareholder bringing suit does not necessarily have to be the person making the demand. Only one demand need be made." Finally, counsel for the defendants alleged that Dale Miesen had been dismissed as a plaintiff, even though there was no notice of dismissal pursuant to Rule 41(a), there was no court order dismissing him and his claims pursuant to Rule 41(b), and there was no court approval any dismissal of Dale Miesen and/or his claims as required under Rule 23.1. As I have maintained, there are essentially two complaints in this lawsuit: the original complaint (Dkt. No. 1) with Dale Miesen as the plaintiff and the first amended complaint (Dkt. No. 23) with Donna Taylor as the plaintiff.

6.       As a result, I believe that it is appropriate for the issues identified in the preceding paragraph to be litigated and resolved as the determination of those issues will determine future amended complaints and any future agreements regarding a Litigation Plan. Until the identity of the plaintiffs are confirmed, i.e., Donna Taylor, Dale Miesen and Jerry Legg—or any one of them or combination of them, the necessary parties to agree on a Litigation Plan, in full or in part, are not present or represented. Counsel for the defendants agree with me that these issues need be resolved, but we were unable to agree on the appropriate language for a joint report or stipulation. If this Court orders us to litigate these issues, to the extent possible, I could prepare and file certain motion(s) to determine certain issues regarding the ultimate plaintiff(s) on or May 20, 2016 (this was in line with what me and counsel for the defendants attempted to agree on but could not). However, upon further reflection after our failed negotiations for a joint report, I may want to tie in the motions to determine the issues in this paragraph and the preceding paragraph with the

DECLARATION OF RODERICK C. BOND - 3

motion to amend the complaint for the claims which will be asserted after the next derivative demand. As a result, I would request that this Court allow me the option to address these issues with future motion(s) to amend as certain issues could be moot.[1] Either way, I will ensure that motion(s) are filed to resolve this issues and the amended complaints before this Courts scheduled October amendment deadline.

7.      I discussed with counsel for the defendants my clients' motions to amend. I advised them that I could move to amend the complaint based on derivative demands which have been previously made, including demands as to Connie Taylor Henderson (a former director of AIA Services Corporation and AIA Insurance, Inc., who, for example, improperly authorized the original illegal Guarantees), JoLee Duclos (the long-term Secretary and former director for AIA Services Corporation and AIA Insurance, Inc.), and GemCap Lending I, LLC (a lender who loaned CropUSA Insurance Agency, Inc. and CropUSA Insurance Services LLC over $8,000,000 (with a balance now exceeding $12,000,000), which AIA Services Corporation and AIA Insurance, Inc. allegedly guaranteed in violation of the amended articles of incorporation and bylaws)). I further advised counsel for the defendants that I have been working on a comprehensive additional derivative demand letter which would address further claims and additional parties based on alleged acts, omissions, claims and damages occurring since the last derivative demands (the original derivative demand was provided in 2008 and others were made after that date and ignored just like the first one in 2008). I indicted my desire to assert the most claims possible in one lawsuit

---

[1] For example, the defendants' counsel maintain that Dale Miesen was dismissed as a plaintiff. While I disagree with them because there was no court order or court approval to dismiss him as a plaintiff, Mr. Miesen will be alleged as a plaintiff in the next amended complaint (whether through a motion to intervene or some other motion) just to ensure that he is a plaintiff. And it would make no sense for Mr. Miesen to file another lawsuit.

DECLARATION OF RODERICK C. BOND - 4

instead of having any of my clients file additional lawsuits, which could then be consolidated with this one. I advised them that it seemed to me that it would be most efficient to resolve those claims here. No agreement could be reached on how to proceed.

8.      Loren Ipsen and I also discussed the necessary of having GemCap Lending I, LLC being named as a party because John Taylor had executed a Settlement Agreement requiring judgment be entered against AIA Services Corporation and AIA Insurance, Inc. for over $12,000,000[2] and that the Plaintiffs maintain that the Guarantees which led to that Settlement Agreement and the Settlement Agreement itself were illegal and ultra-virus because they violated AIA Services Corporation's amended articles of incorporation, restated bylaws and other laws (certain of these issues are also presently at issue on appeal before the Ninth Circuit Court of Appeals under Docket No.  15-55332 and the briefing has been completed for that appeal).[3] In addition and by way of another example, John Taylor and/or other insiders at AIA Services have already transferred AIA Services' over 60% interest in its corporate headquarters (worth over $1 million) to GemCap Lending I, LLC, which such transfer my clients maintain was illegal and not authorized by the shareholders as well. While Loren Ipsen and I agreed that GemCap Lending I, LLC needed to be a party to this lawsuit (Loren raised the issue of it being possible that GemCap Lending I, LLC could own or be entitled to any recovery in this lawsuit), Ms. Perdue and Mr. Wieland would not agree that GemCap Lending I, LLC was a necessary party. Attached as *Exhibit*

---

[2] GemCap Lending I, LLC made a hard money loan of over $8,000,000 with interest accruing at $18.5% per annum. John Taylor personally guaranteed the loan too, but no judgment has been entered against him yet.

[3] Donna Taylor sought to intervene in the California Federal Court action to assert illegality and other defenses, but the California federal court denied the motion as untimely. Donna Taylor appealed that order and is asserting on appeal that the Ninth Circuit Court of Appeals has a duty to address the illegal of the Guarantees and Settlement Agreement *sua sponte*. If this Court were to review the briefing on this appeal, it would see that Donna Taylor's assertions that the Guarantees and Settlement Agreement are illegal have never been denied. Instead, GemCap Lending I, LLC and the other Appellees (including John Taylor) have asserted other defenses, which should separately fail according to the briefing.

DECLARATION OF RODERICK C. BOND - 5

**B** is a true and correct copy of the Settlement Agreement my clients maintain is illegal.[4] I would note that, on page 2 of the Assignment Agreement 1, the Settlement Agreement states that the authority to enter into the agreement "has been challenged by certain shareholders of AIA." This Settlement Agreement was barred aby and violates the restrictive covenants under AIA Services Amended Articles of Incorporation, as even confirmed by Doug Siddoway and David Risley in their quoted admissions in Exhibit C. (*See* Dkt. No. 67-3 at 5-10.) As a result, I believed that it was appropriate for the Plaintiffs to finalize and serve any additional derivative demands pertaining to GemCap Lending I, LLC and that it be named as a defendant to this lawsuit to resolve any issues surrounding it, including, without limitation, whether the Guarantees and Settlement Agreement entered into with GemCap Lending I, LLC are illegal (John Taylor never obtained Donna Taylor's consent or any other shareholder consent for them), whether it could be the ultimate owner of, or recipient of, certain damages which could be recovered in this lawsuit, and/or whether my clients' have any equitable subordination or other defenses.

9. As I have indicated, I have been working on another derivative demand. I can complete and serve the derivative demand referenced in the preceding paragraph on or before May 20, 2016. I discussed with Ms. Perdue and Mr. Wieland whether they could have their client John Taylor (who is presently the sole member of the board of directors for AIA Services and AIA Insurance) could promptly reject the demand so I could quickly move to amend, but they could not provide any commitment and stated that they do not represent the corporations (even though they represent AIA Insurance in another lawsuit filed by Zion's Bank). Nevertheless, I advised

---

[4] As I pointed out in the briefing in the Ninth Circuit Court of Appeals, the Settlement Agreement is separately illegal because John Taylor promised to not file bankruptcy on behalf of AIA Services or AIA Insurance and it purports to assign malpractice claims. GemCap Lending I, LLC has already sued Quarles & Brady, the Hawley Troxell Defendants' former co-counsel in California federal court and relied upon pleadings filed in cases that I was involved in, which alleged fraud, to obtain denial of Quarles & Brady's motion to dismiss.

DECLARATION OF RODERICK C. BOND - 6

counsel for the defendants that once the 90 days have expired after the derivative demand has been served and no action has been taken by AIA Services Corporation and AIA Insurance, Inc., or the derivative demand has been rejected in writing by John Taylor in (he is presently the sole director of AIA Services AIA Insurance),[5] I would endeavor to promptly file a motion to amend the complaint to assert any additional claims and name any additional parties. Mr. Wieland raised the issue of what would transpire if there was an independent investigation conducted for the new derivative demands. I stated that such investigation could slow down the process for amendment. I also reminded Mr. Wieland that the defendants had sought to conduct such an investigation in 2008, but abandoned it and never did so. I advised the defendants' counsel that although this Court had stated that the October amendment deadline was not set in stone, that I was working off that deadline and did not want to file a motion to amend close to the deadline. Based on the issues that I have discussed in this paragraph and above, I believe that, to the extent possible, it would be best and most efficient to assert one motion to amend for the parties to address, and this Court to decide, instead of having the Plaintiffs asserting numerous motions to amend and that it would be most efficient to do so after the pending derivative demand has been served as discussed above.

10.     Loren Ipsen, counsel for the Hawley Troxell Defendants, I agreed that this case should be on a complex track, not the legal track. Mr. Ipsen also agreed with me that GemCap Lending I, LLC was a necessary party.

11.     I received no information regarding the nature of the defendants' defenses, other

---

[5] When I refer to John Taylor has being the sole director of AIA Services in this Declaration, I am not conceding that he is the sole properly authorized director. In fact, my clients maintain that he is not properly elected and that he and the other defendants have refused to honor Donna Taylor's appointment of another common shareholder, Paul Durant, to the board of AIA Services, as is her unqualified right under the amended articles of incorporation. (*See* Dkt. No. 67-3 at 5, §4.2.8.) Donna Taylor has been attempting to exercise this right since 2009 to no avail.

DECLARATION OF RODERICK C. BOND - 7

than the discrete issues addressed above. I later reminded counsel for the defendants that they had a duty under Rule 26(f)(2) to advise me of "the nature and basis of [your clients'] claims and defenses." Yet, the defendants counsel has provided me nothing in terms of their defenses, other than the issues discussed above and those addressed in the Hawley Troxell Defendants' pending motion to dismiss the RICO claim. Ms. Perdue and Mr. Wieland have constantly alleged on the record before this Court and not me (including at our meet and confer) that they will be filing a motion to dismiss, yet they refuse to provide me with the nature of those defenses. I reiterated to the defendants' counsel that if they advised me of any pleading deficiency or other issue, I would be happy to address the issue by either curing it, or by withdrawing the claim, to the extent possible to save everyone time and money as well. For some reason, the defendants' counsel believe that they are entitled to conceal their clients' defenses from me. As a result, I would request that this Court order the defendants' counsel to provide me with the nature of their defenses as required by Rule 26(f)(2). I was very candid with the defendants' counsel regarding my clients' positions, and it is only fair that they be candid with me, too.

12.     I discussed with the defendants' counsel that it would be impossible for us to agree on a Litigation Plan or the admissibility of evidence and depositions from other cases without having all defense counsel present to agree or not agree. Since my clients will be amending their complaints to name JoLee Duclos, Connie Taylor Henderson and GemCap Lending I, LLC as defendants, I believe that it would be prudent to await this Court's decisions on the motion to amend (including the naming and appearance of counsel for GemCap Lending I, LLC, Connie Taylor Henderson, JoLee Duclos and/or such other parties) and any related motions so that all counsel for all parties can be present when the parties can meet again to attempt to reach an agreement or narrow any disputes regarding a Litigation Plan. The defendants' counsel agreed

DECLARATION OF RODERICK C. BOND - 8

with this approach, but the parties were unable to agree on the terms of a joint report to this Court. I believe that it would be futile to agree on any Litigation Plan (including whether deposition transcripts and documents obtained from other lawsuits may be used in this lawsuit in lieu of conducting certain discovery) until all parties have been served with any future amended complaint and their counsel have appeared because they may not agree to any Litigation Plan or related agreements between the undersigned counsel regarding discovery and other matters. Once all parties have been named, the parties can also meet and confer regarding the timing and content of initial disclosures.

13. At the meet and confer, I was assured by Mr. Wieland that a shareholder request to inspect and copy documents would be honored (Doug Siddoway previously refused to comply with a prior request made by my clients). On April 22, 2016, I faxed a letter to AIA Services and AIA Insurance and emailed a copy to Mr. Wieland and Ms. Perdue, as counsel for John Taylor (the sole director of AIA Services and AIA Insurance). Attached as **_Exhibit C_** is a true and correct copy of that letter. As I pointed out in the attached letter, the former attorneys for certain of the defendants, Doug Siddoway and David Risley, conceded that the Guarantees to GemCap Lending I, LLC were prohibited. I am requesting the information in the attached letter to ensure that the final derivative demand letter mentioned above is as thorough as possible to expedite the resolution of this case to the extent possible.

14. To recap the above, on behalf of my clients, I am respectfully advising this Court of, and requesting, the following:

- This Court allow the parties time to resolve the proper plaintiffs and the naming of additional defendants before meeting and conferring again regarding a Litigation Plan. Unless AIA Services and AIA Insurance seek to delay the

DECLARATION OF RODERICK C. BOND - 9

pending derivative demands by conducting an inquiring (something they have never done), then I will be able to file all necessary motions well before this Court's deadline on amendments in October. At that time, all parties and counsel should be present to meet and confer on a Litigation Plan, including the discovery issues raised in my letter (Exhibit A). Until those motions are decided and the amended complaint has been filed, this Court should keep the status quo (with everyone reserving all rights) as to pending motion by the Hawley Troxell Defendants and that the defendants need not answer the present complaints.

- I will finalize and provide to AIA Services and AIA Insurance the applicable derivative demand on or before May 20, 2016. The timing, comprehensiveness and completeness of this derivative demand will be predicated in part on the documents provided to my request in Exhibit C. If I do not receive this information, then I will do the best with what I have.

- This Court order the defendants to provide my clients with the nature of their defenses as they were required to do at our meet and confer under Rule 26(f)(2). That way, if there is any limited discovery which I may need to conduct, I can address the issue with this Court. In addition, at this early stage, it would enable me to address any technical defenses (such as pleading deficiencies) or other discrete and easily curable issues in my clients' future motion(s) to amend.

- If necessary, I respectfully request that this Court schedule a status conference to address any of the issues above or any other concerns this Court may have. I understand this Court's position that this case must get moving as this Court previously indicated, but I am trying to achieve that goal in an efficient manner

DECLARATION OF RODERICK C. BOND - 10

and without the necessity of my clients' filing additional lawsuits as to claims

against the present parties or the parties mentioned above who will be named in

an amended complaint.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF IDAHO THAT THE FOREGOING IS TRUE AND CORRECT.


*April 26, 2016, Bellevue, Washington*          */s/ Roderick C. Bond*
Date and City and State Signed          Roderick C. Bond

DECLARATION OF RODERICK C. BOND - 11

**4-ER-817**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 26th day of April, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:    jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:    jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:    lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:    sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:    swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

_____/s/ Roderick C. Bond_____
Roderick C. Bond

DECLARATION OF RODERICK C. BOND - 12

**4-ER-818**



# Roderick Bond
## Law Office, PLLC

April 14, 2016

**_VIA EMAIL ONLY_**

Loren C. Ispen
Elam & Burke, PA
251 E. Front St., Suite 300
Boise, ID  83701

Shawnee Perdue
Steve Wielend
Wieland Perdue PLLC
380 S. 4th Street, Suite 202
Boise, Idaho 83702

**Re:**     ***Donna Taylor/Dale Miesen v. Hawley Troxell, et al.***, **Case No.: 1:10-cv-00404-CWD**

Dear Counsel:

I apologize for not getting this letter to you sooner, but I have been swamped on other matters. The purpose of this letter is to provide an overview the significant issues prior to our meeting tomorrow in Boise.[1] If there are any typos, I apologize but I was short on time.

**Stipulation for Substitution**

As I have already advised you, my clients will be moving to amend their complaint to assert additional causes of action and to clarify any issues with respect to Dale Miesen and to have him be the sole plaintiff. In lieu of filing and litigating motions in this regard, I would request that you all agree now that we can stipulate to have Dale Miesen be substituted in place of Donna Taylor to simply and efficiently lay this issue to rest. Mr. Miesen is exclusively a common shareholder and we maintain to be the most appropriate plaintiff. It would be redundant and unnecessary to require Donna Taylor to also continue being a plaintiff. As to Loren's argument that Mr. Miesen must have separately made a demand, he is incorrect. *See* **I.C. § 30-1-742 cmt. 3** ("It should be noted that the shareholder bringing suit does not necessarily have to be the person making the demand. Only one demand need be made"). The new Code Section is identical. *See* **I.C. § 30-29-742**. I would also note that this seems particularly appropriate as your clients have previously alleged that Donna Taylor cannot fairly represent the interests of all of AIA Services' shareholders. Finally, Donna Taylor's other state court cases should not impact the other shareholders, so this is one more reason to have Mr. Miesen as the sole plaintiff. Thus, stipulating to have Mr. Miesen be the sole plaintiff will eliminate any need to litigate that issue too.

---

[1] This letter is not intended to be exhaustive, nor is it. This case involves many claims and complex issues.

601 108th Ave, Suite 1900, Bellevue, WA 98004  |  Phone: (425) 591-6903  |  Web: www.roderickbond.com
Roderick C. Bond - Attorney  |  Email: rod@roderickbond.com  |  Licensed in Washington and Idaho

# Exhibit - A
## 4-ER-819

Loren C. Ipsen
Shawnee Perdue
Steve Wielend
April 14, 2016
Page - 2

**Unrepresented Parties**

AIA Services and AIA Insurance are not presently represented by counsel. We need to address this issue. Steve and Shawnee represent the people who control AIA Services and AIA Insurance. And Shawnee presently represents AIA Insurance in another lawsuit. I would like to know your positions. While my clients are seeking to recover for AIA Services and AIA Insurance, they are clearly antagonistic. Further, my clients intend on including declaratory relief in the next amended complaint requiring AIA Services and AIA Insurance to comply with their amended articles of incorporation, bylaws and the law. Nevertheless, the fact that AIA Services and AIA Insurance are not being represented is problematic upon my review of the Rules, including Rule 26(f) ("the parties must confer…"). Thus, at a minimum, I think that it would be appropriate to have Judge Dale enter an order of default so there is no confusion.

**Future Parties**

As we have already discussed, in addition to any other parties who may be included as a result of the future demand (my clients are not waiving the right to seek relief based on irreparable injury), my clients will be moving to amend the complaint to include Connie Taylor Henderson, JoLee Duclos, and GemCap Lending I, LLC as defendants in this lawsuit. I know that Shawnee and Steve presently represent Connie in Donna's state court claims. However, I am not sure if they will represent JoLee Duclos. I presume so, but maybe Shawnee and Steve can confirm this. As to GemCap, I presume that it will be represented by Anderson Banducci. We should consider these issues as well, including for all of the issues discussed below. In other words, we may be only able to agree on certain issues, subject to later approval of other counsel.

**Nature of Claims**

While I will be moving to amend, the general allegations and claims in present complaints will remain as to the present defendants and new ones named. The amended complaint will also address malfeasance, acts, omissions and claims occurring after the filing of the Complaint and First Amended Complaint. The malfeasance, improper conduct, concealment, and claims alleged in the Complaint and First Amended Complaint have only accelerated and broadened since those complaints were filed. Steve and Shawnee's clients (in this lawsuit and Donna's others) are well aware of what has transpired. I know that Loren has been monitoring things as well. John Taylor confessed judgment against him in the amount of $12,126,584.61 and illegal stipulated to the same judgment being entered against AIA Services and AIA Insurance through an illegal Settlement Agreement. While Loren has already alleged my client's claims are frivolous, I heard the same allegations from him and Eberle Berlin's attorneys in *Taylor v. Riley* (including baseless Rule 11 allegation). Unfortunately, I cannot discuss what ultimately transpired, but I will not hesitate to file a motion to Judge Dale to disclose the confidential settlement terms if necessary. So I would appreciate you putting an end to your frivolous lawsuit allegations. I will address the discovery regarding my clients' claims below.

## Exhibit - A
### 4-ER-820

Loren C. Ipsen
Shawnee Perdue
Steve Wielend
April 14, 2016
Page - 3

**Nature of Defenses**

I have received no initial disclosures and no Answer from Steven and Shawnee regarding their clients' defenses. While Loren's clients have filed an Answer and provided initial disclosures, there is little useful information to me to evaluate the defenses and discovery required for those defenses. I need more information from Loren regarding the Hawley Troxell Defendants' defenses and the discovery he needs as well for those defenses. Thus, I am unable to even confer with you regarding what discovery my clients will need to seek (including depositions) to fairly oppose any of your defenses because I do not have the required information. While you have complaints with detailed facts and claims (and Loren knows of many of the claims through discovery in *Taylor v. Riley*), I do not have sufficient information to even provide you with what I need for a discovery plan.

**Discovery Plan**

We need to agree on a date for initial disclosures. We also need to agree that the initial disclosures much comply with the Rules and provide the information required by the Rules. As mentioned above, the Hawley Troxell defendants' initial disclosures are inadequate and do not address the required issues. Obviously, amending the complaint will provide additional need for disclosures by all parties. I have considered moving to amend in two phases. One amendment in the next week or so and another later after my clients' pending derivative demand is served. In addition, with the complexity of this case and the information both sides will require, I think that the initial disclosures need to be comprehensive as to both sides. Because other parties will be named as defendants and at least one additional complaint will be at issue, I would suggest that we agree to provide comprehensive initial disclosures based on the present complaints (which comply with the Rules) on or before May 30, 2016. This will allow us to get moving on the case as to the presently pleaded facts and claims since they will remain generally unchanged for purpose of our disclosures.[2] in address the timing of initial disclosures after the amended complaint(s) have been filed and all of the parties and their respective counsel have appeared.

With the amount of discovery and the number of depositions which will be required for this case, I do not believe that discovery should be conducted in phases. It also seems to make sense to me that we not conduct any formal discovery until all of the parties have been named and their counsel, if any, have appeared. If I was going to be counsel for a newly named defendant, I know that I would want to be present at every deposition.

---

[2] As I previously indicated, it is possible that the RICO claims could change, expand or be withdrawn in full or part, but I have not been able to address that issue yet. I will keep you advised. However, the other claims will proceed.

**Exhibit - A**
**4-ER-821**

Loren C. Ipsen
Shawnee Perdue
Steve Wielend
April 14, 2016
Page - 4

I know that Judge Dale prefers one motion for summary judgment. I think that we should agree to more. I think that it will be difficult for all of us to address issues in one motion for summary judgment. I do, however, think that we need to conduct discovery before motions for summary judgment are filed so the facts are fully developed and my experts have had the opportunity to review deposition transcripts and other evidence obtained in discovery.

One of the big issues that has been raised is the applicability of discovery in other lawsuits. I do not think we can conclusively address this issue until all parties have been named and their counsel have appeared. Nevertheless, I will address the issue from my clients' perspective.

First, Dale Miesen has not been a plaintiff in any other lawsuit, other than being named as a plaintiff with Donna Taylor and Paul Durant to invalidate the GemCap illegal $10 million loan. This is an important fact as Donna Taylor's other lawsuits were from her position as a Series A Preferred Shareholder and for claims individual to her only. The facts and claims in this lawsuit are the only derivative ones pending, other than Donna's assertion of certain defenses in California to the illegal $10 million guarantee of the loan by GemCap (which was unlawfully approved by three of your clients—John Taylor, Connie Taylor Henderson and James Beck).

Second, in *Taylor v. AIA Services*, as counsel for Reed Taylor, I obtained thousands of pages of accounting information (including certain electronic accounting records). I would propose that we stipulate that all parties can use these documents and information. This would include emails produced by AIA in that lawsuit. The problem, however, is that the information was only provided through part of 2008 (I need to double check the dates). Thus, my clients need the information from that time through the present, including emails. This information can be supplemented by the limited documents produced by Doug Siddoway in Donna Taylor's state court case, but Mr. Siddoway improperly failed to produce many documents and provided no electronic files.

Third, while a number of depositions have been take in Donna Taylor and Reed Taylor's cases, those depositions were taken for purposes of their respective claims. While certain of those depositions curtained touched upon and discussed certain issues or claims asserted here, those depositions were never taken for this derivative lawsuit or for the purpose of perpetuating testimony for this lawsuit. I would note that Loren (or anyone from his firm) did not attend most of those depositions either and neither did Shawnee or Steve. This also applies to any new counsel, who I would presume may have their own questions. I note that even GemCap has reserved its fraud and misrepresentation claims against John Taylor, even though he confessed judgment for $12,126,584.61. Also, in Donna Taylor's case, Steve improperly stopped Donna Taylor's deposition of James Beck at noon when I had traveled to Minnesota to depose him. I would never allow my client to leave a deposition early when another attorney is deposing my client unless there was inappropriate conduct. I want to make it very clear that future depositions are conducted appropriately. At the end of the day, while the depositions previously taken in other cases may have value, they were never taken for this lawsuit and this lawsuit is the only derivative action pending asserting these claims.

## Exhibit - A
### 4-ER-822

Loren C. Ipsen
Shawnee Perdue
Steve Wielend
April 14, 2016
Page - 5


We need to discuss these issues at our conference.

## Electronically Stored Information

My clients want electronically stored emails and accounting data in this lawsuit. As mentioned above, while some of that information was produced through part of 2008 in *Taylor v. AIA Services*, we have received nothing since then. There are also new email accounts for John Taylor. My clients need electronic files, data and email through the conclusion of this lawsuit. As in *Taylor v. AIA Services*, we will want a mirror image taking of the servers at AIA/CropUSA. In that lawsuit, we also obtained a mirror image of the hard drive of John Taylor's personal computer. We will want the information on that hard drive produced. Further, we will want that information produced through the conclusion of this lawsuit. We will also seek the electronic files, data and emails in the possession of the Hawley Troxell defendants. We need to discuss an agreement to facilitate the production of this electronic information. In addition, this is notice to all parties to ensure that no data or information is destroyed or lost and that all hard drives are kept intact.

## Privilege

This lawsuit includes claims for malpractice against the Hawley Troxell defendants. Thus, privilege has been waived. I would propose that we come up with an agreement regarding the handling of this information. If your clients are asserting a common interest agreement, then I need to know that. Further, irrespective of whether privilege is asserted or may apply, that does not preclude you from producing non-privileged information. I will also need and expect privilege logs. If those are not provided, we will assert waiver of privilege, to the extent that it may even apply. I would note that the Hawley Troxell defendants have already disclosed previously privileged documents in their initial disclosures, so we appear to be in agreement in this regard. We need to address this issue and come up with a plan or agreement to address it.

## Interrogatories

To help facilitate discovery for this complex case and in light of the number of claims and the extensive facts, I need additional interrogatories. I am happy to give additional ones to your clients too.  Thus, I would propose that we agree to increase the number of interrogatories to 40.

# Exhibit - A
## 4-ER-823

Loren C. Ipsen
Shawnee Perdue
Steve Wielend
April 14, 2016
Page - 6


**<u>Depositions</u>**

Even without knowing the substance or factual basis for your clients' affirmative defenses or other defenses, I need to depose a number of people. Some of these depositions will be needed to perpetuate testimony, including, for out-of-state deponents and those persons who cannot be subpoenaed to testify because they do not live within 100 miles of Boise. In addition, while I intend to have a number of other shareholders at AIA Services testify, it is possible that they may have conflicts or may not be willing to take time to travel to Boise as they reside more than 100 miles away.

In addition, I need at least four two-day depositions and possibly more than two days for certain ones. There are tens of thousands of pages of documents and the claims and issues span over a decade. There is no way that depositions for certain individuals and entities can be taken in one day. Excluding any depositions regarding your defenses or affirmative defenses, the following is a list of parties who may need to be deposed and the minimal number of days for the deposition (assuming you agree to increase the number of interrogatories to at least 40 and excluding any depositions for any additional defendants):[3]

1. Expert 1 for Hawley Troxell Defendants
2. Expert 2 for Hawley Troxell Defendants
3. Expert 1 for Steve and Shawnee's clients
4. Expert 2 for Steve and Shawnee's clients
5. James Beck
6. Michael Cashman, Sr.
7. Connie Henderson
8. John Taylor (two days)
9. Aimee Gordon
10. JoLee Duclos
11. Brian Freeman
12. Marcus McNabb
13. Martin Hannah
14. Justin Ralston
15. Allan Coalson
16. Richard Riley (two days)
17. John Ashby
18. Gary Babbitt
19. Craig Meadows
20. Merlyn Clark
21. Kenneth Howell

---

[3] This is just a preliminary list of possible deponents.

**Exhibit - A**
**4-ER-824**

Loren C. Ipsen
Shawnee Perdue
Steve Wielend
April 14, 2016
Page - 7

22.   Thomas Chandler (former Hawley Troxell attorney)
23.   Rule 30(b) deponent for Hawley Troxell
24.   Daniel Spickler
25.   Rule 30(b) deponent for CropUSA (two days)
26.   Rule 30(b) deponent for AIA Insurance (two days)
27.   Rule 30(b) deponent for AIA Services (two days)
28.   James Gatziolis
29.   Rule 30(b) deponent for Quarles & Brady
30.   Rule 30(b) deponent for Hudson Insurance
31.   Dan Glasser
32.   Subpoenas to Banks for AIA, CropUSA and others
33.   Rule 30(b) deponent for GemCap
34.   Richard Ellis
35.   Randy Lamberjack
36.   Kenneth Goods
37.   Rule 30(b) deponent for Pacific Empire Radio Corp.

Thus, I would propose that we stipulate to taking 25 depositions with at least five two-day depositions. If I need to perpetuate testimony for trial of certain AIA Services shareholders, they will require additional depositions (e.g., Paul Durant, Lee Ann Hostetler, Jerry Legg, Bobbette Ruddell, Carmen Taylor, Jud Taylor, etc.) It is likely that I may need more depositions and three days for certain deponents, but I think it would be premature to ask now until I have actually deposed certain parties for two days. By making this proposal, I am not conceding that more may not be needed or that I would not ask for more.

**Prompt Settlement**

I can see the merit in trying to promptly resolve this case, but my previous suggestions to mediate have been rebuffed and ignored. The only request for mediation of the claims in this case has come from Loren's clients in *Taylor v. Riley*, and they previously offered to settle Reed Taylor's claims in *Taylor v. Riley* and Donna Taylor's claims here for $1,000,000 (which is also fatal to Loren's arguments that the claims here are frivolous and proof to Steve and Shawnee's clients that the Hawley Troxell defendants are looking after their interests first). That offer was rejected by Reed Taylor for a number of reasons, including that the claims here could not be combined or mediated with his claims. This case will be expensive and John Taylor now has confessed a $12,126,584.61 judgment. Thus, the remaining defendants and others parties' belief that delay would benefit them has now played out to be wrong. They have been left holding the bag. It would seem to that a global mediation could be held now, including with GemCap, Connie Taylor Henderson and JoLee Duclos, before everyone starts incurring significant attorneys' fees and costs. My clients are willing to do so. Thus, I need your clients' position. That said, I can tell you that my clients have no expectation of any settlement short of a trial in this case based on what has transpired.

# Exhibit - A
## 4-ER-825

Loren C. Ipsen
Shawnee Perdue
Steve Wielend
April 14, 2016
Page - 8


Based on the above, I believe that this case needs to be on the complex track, rather than the legal track you allege should apply.

I hope the above information has provided you with something to consider prior to tomorrow's conference. Again, the above is not exhaustive. I will be prepared to address other issues. I would appreciate receiving a letter regarding your defenses and positions regarding the above. I look forward to your meeting tomorrow.

Sincerely,

RODERICK BOND LAW OFFICE, PLLC

By: Roderick C. Bond

cc:  Donna Taylor
     Dale Miesen

# Exhibit - A
## 4-ER-826



## SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This Settlement Agreement and Release of Claims ("Agreement") is made and effective as of the 15th day of September, 2014, by and between the undersigned parties hereto. Those parties include R. John Taylor, in his individual capacity, CropUSA Insurance Agency, Inc., CropUSA Insurance Services, LLC, AIA Insurance, Inc., AIA Services Corporation, Reinsurance Partners, LLC, Greenleaf Reinsurance Partners, LLC, and all related affiliates and entities (collectively, "Settling Defendants"), and GemCap Lending I, LLC ("Settling Plaintiff"). CropUSA Insurance Agency, Inc., and CropUSA Insurance Services, LLC are collectively referred to as ("Crop Defendants"). AIA Insurance, Inc. and AIA Services Corporation are collectively referred to herein as ("AIA Defendants"). The parties are sometimes referred to collectively as the "Settling Parties."

### RECITALS

This Agreement is made with reference to the following:

A.    On or about July 30, 2013, Settling Plaintiff initiated legal action against Settling Defendants in the United States District Court, Central District of California, Case No. 2:13-CV-05504-SJO-MAN ("District Court Case"). The allegations in the Complaint were superseded on September 15, 2014 by the Court's Final Pre-Trial Order.

B.    The Final Pre-Trial Order, and each and every cause of action contained therein, with the exception of the causes of action for Misrepresentation and Fraud, which are hereinafter referred to as the Misrepresentation causes of action, are collectively referred to in this Agreement as "The Released Claims".

C.    On September 15, 2014, the parties reached a resolution whereby they agreed to settle and forever discharge all matters relating between them as to the "Released Claims."

Therefore, for good and valuable consideration, including the conditions, covenants and agreements contained herein, the parties agree as follows:

### AGREEMENT

1.    For and in consideration of and subject to the promises and conditions and the consideration set forth below, Settling Plaintiff, on its own behalf as well as its shareholders, employees, officers, directors, agents, successors in interest, predecessors

1

19705

# Exhibit - B

## 4-ER-827



in interests, subsidiaries, parents and affiliates, do hereby release and forever discharge Settling Defendants, as well as their shareholders, employees, officers, directors, agents, successors, predecessors, assigns, subsidiaries, affiliates and parents of and from any and all actions, suits, proceedings, claims, demands, assessments, judgments, damages, deficiencies, liens, penalties, fines, costs and expenses, including reasonable attorney fees, existing as of the date of the execution of this Agreement that are claimed or alleged or that could have been claimed or alleged resulting from, based upon, or arising out of the Released Claims. The Settling Parties understand and agree that Settling Plaintiff is not releasing any claims for Misrepresentation against Settling Defendants, and Settling Plaintiff specifically reserves the right to pursue said Misrepresentation claims in the manner specified at Paragraph 5 below or for any rights that it may have for breach of this Agreement. Settling Defendants also are not releasing claims or waiving any rights they may have for breach of this Agreement.

2.      **Settlement Amount.** The Settling Parties agree that the Settling Defendants shall provide the following consideration in exchange for settling this lawsuit and executing this Agreement. It is the intent of the Settling Defendants to pay Settling Plaintiff the principal sum of $8,140,165.82, plus $3,986,368.78, in interest, penalties and costs, for a total sum of $12,126,584.61 ("Minimum Settlement Amount"), (subject to verification via *in camera* review by Judge Otero regarding the attorney fees claimed by Settling Plaintiff, or by another method of verification mutually agreed to by the parties), in exchange for a dismissal of the District Court Case, and funded as described in Paragraph 3, but that Settling Plaintiff shall be entitled to the total amount of recovery calculated as follows: the sum of the total recovery specified above, less the net of any amounts specifically and unambiguously stated to.be allocated to any Settling Defendants ("Recovery Amount"). In the event that any aspect of the funding of the Minimum Settlement Amount requires cooperation by the Settling Defendants, and Settling Defendants do not cooperate with Settling Plaintiff in a reasonable fashion, then, at the Settling Plaintiff's sole discretion, it can either declare Settling Defendants to be in default of this Agreement, or Settling Plaintiff can modify the Collection of Settlement terms below so as to obtain the desired result of receiving the Minimum Settlement Amount as referenced above.

2

19705

# Exhibit - B

**4-ER-828**



3.    Collection of Settlement. The subsections referenced below are each separately enforceable agreements between the Settling Defendants and Settling Plaintiff to ensure prompt and effective payment of the Minimum Settlement Amount.   Many of the delineated subsections set forth below will necessarily be accompanied by Assignments from various Settling Defendants to Settling Plaintiff. It is an agreed condition precedent to this Agreement that Settling Defendants agree to, and will, promptly and properly execute all necessary Assignments that are set forth below in order to allow and enhance Settling Plaintiff's ability to recover the Minimum Settlement Amount:

  i. Real Property; Main Street Building:  AIA Defendants shall transfer, assign, or otherwise pledge their entire interest, which constitutes their sixty-seven percent interest of the property, title, and rights, contingent or direct, directly or indirectly, in the mortgage on that real property commonly known as 111 Main Street, Lewiston, Idaho ("Main Street Property"). The aforementioned assignment is referred to herein and attached hereto as Assignment I.  It is understood that the Main Street Property is subject to real estate taxes in the estimated amount of $120,000, a lien in favor of Syringa Bank in the estimated amount of $60,000 and legal fees and costs in the estimated amount of $81,000 associated with the pending judicial foreclosure.  AIA Defendants further agree to execute any other necessary documentation, upon reasonable request, to memorialize the assignment described herein. The Parties shall work cooperatively to sell the Main Street Property so as to maximize its value, but the manner and timing of the sale shall be done in accordance with Settling Plaintiff's sole, exclusive and absolute judgment.

  ii. Weskan Agency, LLC and/or Affiliated Entities:  Settling Defendants shall assign and transfer to Settling Plaintiff all of their rights and entitlements to any and all assets, money and property, owed, or owing by CGB Diversified Services, Inc., dba Diversified Crop Insurance Services and/or any of their Affiliates (hereafter "Diversified"), to Weskan, for the crop year 2013 through present time (as of the date of execution below). Documentation of said Assignment is referred to herein and is attached

3

19705

# Exhibit - B

**4-ER-829**


hereto as Assignment II. It is, in part, the intent of the undersigned, with respect to this subsection for Weskan Agency, LLC and its Affiliates (hereafter "Weskan") to pay to Settling Plaintiff all monies owed or owing from Diversified to Weskan for the crop year 2013 to the current date of execution of this Agreement. Settling Defendants agree to provide access to any and all business records of Weskan upon reasonable request by Settling Plaintiff, including all documentation maintained at the Weskan offices in the state of Kansas.

iii.   **Proceeds from Diversified**: Settling Defendants shall make their best reasonable efforts to obtain, cooperate and otherwise assist in securing the release of any and all commissions, management fees and/or other monies due it by Diversified (as Diversified is defined in paragraph ii above), for immediate payment to Settling Plaintiff. As used throughout this Agreement, "best reasonable efforts" shall mean, with respect to a given goal, the efforts that a reasonable person in the position of Settling Defendants would use so as to achieve that goal as expeditiously as possible. This subsection is intended to include any and all commissions subject to the Court's Preliminary Injunction Order ("Undisputed Commissions"). To this end, Settling Defendants will execute and agree to the release of any Undisputed Commissions as soon as possible to Settling Plaintiff. The Settling Parties agree to the form of the Proposed Stipulation and Order Releasing Enjoined Proceeds attached hereto.

iv.   **Insurance Policies and Benefits**: Crop Defendants shall provide their full cooperation and their best reasonable efforts in securing the proceeds of any and all insurance benefits and proceeds being applied and/or paid to Settling Plaintiff ("Policy Proceeds"). Said Crop Defendants (including R. John Taylor) agree that they shall use their best reasonable efforts to obtain and preserve any and all policy proceeds so that the proceeds can be maximized for the benefit of payment to the Settling Plaintiff. Defendant Taylor agrees that he will not change his position with Crop Defendants, including, but not limited to, refraining from resigning from

4

19705

# Exhibit - B

## 4-ER-830

any position as officer, director or other employment position with Crop Defendants during the pendency of the Judgment Collection efforts.

v.   **Legal Malpractice Claim(s):**   Settling Defendants agree to cooperate, assign, pledge, transfer (to the extent possible), and assist in the prosecution, in Settling Plaintiff's sole, exclusive and absolute judgment against any and all law firms that assisted Settling Defendants in the negotiation of and execution of the Loan Agreements that resulted in and gave rise to the District Court Case specified above. Settling Defendants acknowledge that they retained legal counsel to negotiate, advise, consult, and draft all Loan Documents and Loan Agreements that ultimately gave rise to the District Court Case referred to above. Specifically,   The Settling Defendants acknowledge that the law firm of Quarles & Brady, LLP represented the Borrower in connection with the negotiation, execution and delivery of the Loan Documents, including the Legal Opinion Letter, to Settling Plaintiff. Paragraph 6.5 of the Loan Agreement required as a condition of the loan placement a legal opinion letter from Borrower's counsel addressed to GemCap (Settling Plaintiff), and that the Loan was placed in reliance upon receipt of said Legal Opinion Letter. Thus, it is hereby agreed that Settling Defendants will at all times, use their best reasonable efforts to cooperate in any and all efforts made by Settling Plaintiff to recover sums against said law firms, including but not limited to Quarles & Brady, with respect to amounts owed by Settling Defendants to Settling Plaintiff under this Agreement. These efforts include, but are not limited to, a full and complete Assignment of all rights against said law firms, including, but not limited to Quarles & Brady, in the District Court Case referred to above, and the following acts within a reasonable time frame of Settling Plaintiff's request: a production to Settling Plaintiff of all documentation relating to the legal services in connection with the negotiation, execution and delivery of the Loan Documents provided by said legal professionals to Settling Defendants, providing any documentation upon demand to Settling Plaintiff, signing

5

19705

declarations, appearing for depositions, assisting in discovery, and providing trial testimony as necessary. Said Assignment is attached hereto, and referred to herein as Assignment III. Moreover, nothing in this Agreement shall adversely affect or impact any and all direct rights that Settling Plaintiff has, or may have, against said law firms, including, but not limited to Quarles & Brady. Settling Defendants also agree to execute any other documentation necessary to reflect this Assignment.

vi. **Diversified Litigation:** Settling Defendants agree to assign, transfer, convey, cooperate, and/or otherwise enter into an agreement whereby any and all claims, rights, contentions, causes of action, or other forms of potential recovery ("Claims") against Diversified (as defined in paragraph ii above) shall be for the benefit of Settling Plaintiff. Said Assignment is incorporated herein, and referred to, and attached hereto as Assignment IV. Settling Defendants represent and warrant that they have certain Claims against Diversified, and the right to said Claims shall be assigned to, and for the exclusive benefit of, Settling Plaintiff. Settling Defendants believe that the certain Claims they have against Diversified are estimated to be no less than the sum reflected in Schedule A attached to Assignment IV. This subsection is understood to require Settling Defendants to cooperate with Settling Plaintiff, and vice versa, and that said cooperation by Settling Defendants is to include an Assignment of all rights that they have against Diversified, effective as of the execution of this Agreement. Cooperation also means that, within a reasonable time frame Settling Defendants shall, provide documentation on demand to Settling Plaintiff, sign declarations, appear for depositions, assist in discovery, and provide trial testimony as necessary. Settling Defendants also agree to execute any other documentation necessary to reflect this Assignment.

vii. **Settling Defendant John Taylor: Stipulated Judgment:** Settling Defendant John Taylor shall confess a stipulated judgment which said judgment complies with applicable Federal Court rules and statutes, including Federal Rule of Civil Procedure, Rules 54 and 58, as well as

6

U.S.C. 1961, in the amount of the Minimum Settlement Amount for the claims against him for breaching the Guarantee Agreement in the form attached hereto ("Taylor Stipulated Judgment"). Taylor agrees that if he seeks bankruptcy protection, then he stipulates that Settling Plaintiff may initiate its lawsuit for Misrepresentation pursuant to the procedure specified at Paragraph 5, below. The settling Defendant Taylor in his individual capacity and in his capacity as representative of each Settling Defendant shall not take any action to initiate or cause the voluntary filing of any bankruptcy proceeding of any Settling Defendant. Settling Plaintiff agrees not to record or to execute on the Taylor Stipulated Judgment unless and until it has completed Judgment Collection efforts as specified herein, or in the event of default by any of the Settling Defendants in their obligations under this Agreement. Defendant R. John Taylor understands and agrees that in the event that judgment is entered, that post-judgment interest at the federal statutory rate shall accrue from September 15, 2014 pursuant to the Court's ruling of January 9, 2015.

viii. **Settling Crop Defendants; Stipulated Judgment**: Settling Crop Defendants shall confess a stipulated judgment in the amount of the Minimum Settlement Amount for the claims against them for breach of the Loan Agreement in the form attached hereto (Crop USA Defendants Stipulated Judgment). Settling Plaintiff agrees not to execute on the Crop Defendants' Stipulated Judgment until it has completed its Judgment Collection efforts, as specified herein, or in the event of a default of any of the Settling Defendants in their obligations under this Agreement. Crop Defendants agree that post-judgment interest at the federal statutory rate shall accrue commencing on September 15, 2014 pursuant to the Court's ruling of January 9, 2015.

ix. **Settling AIA Defendants; Stipulated Judgment; Financial Audit**: Settling AIA Defendants shall confess a stipulated judgment in the amount of the Minimum Settlement Amount for the claims against them for breach of the Guarantee Agreement in the form attached hereto (AIA

7

19705

# Exhibit - B

## 4-ER-833

Defendants' Stipulated Judgment). Settling Plaintiff agrees not to execute on the AIA Defendants' Stipulated Judgment until it has completed its Judgment Collection efforts, as specified herein, or in the event of a default of any of the Settling Defendants in their obligations under this Agreement. The Parties further agree that the Settling AIA Defendants have represented that they provided their most current financial data, including but not limited to, all reported income sources, in a manner, consistent with the historical business practice and the Settling Plaintiff makes no claim at this time on the income sources of AIA. AIA Defendants agree that post-judgment interest at the federal statutory rate shall accrue commencing on September 15, 2014 pursuant to the Court's ruling of January 9, 2015.

x.   **Participation by Settling Defendants in Potential Recovery**:   After Settling Plaintiff obtains recovery of the then outstanding amount due pursuant to the lending agreements at issue in the Lawsuit, plus all fees and costs and the maximum amount of interest arising to or related to the loan at issue in the Lawsuit ("Payoff Amount"), any recovery in excess of the Payoff Amount shall be divided with Settling Plaintiff receiving 50% and Settling Defendants   receiving 50% ("Participation Agreement"). This    Participation Agreement shall not, and does not, create any obligations, be it fiduciary or otherwise, in any manner, respect, or form, between the Settling Plaintiff and Settling Defendants.   The Settling Plaintiff can act or direct any aspect of the Judgment Collection efforts in any manner it sees fit in its sole and absolute judgment.  Furthermore, this Agreement does not compel or require Settling Plaintiff to prosecute, continue, or maintain any lawsuits or other form of collection activities.

4.   **Waiver of Civil Code Section 1542**.  The Settling Parties expressly understand and acknowledge that it is possible that unknown losses or claims exist or that present losses may have been underestimated in amount or severity, and explicitly took that into account in the making of this agreement.  With respect to unknown claims or losses related to the released claims, the Settling Parties, and each of them, hereby expressly

8

19705

# Exhibit - B

## 4-ER-834



relinquish and waive all rights conferred upon them by the provisions of California Civil Code Section 1542, which provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH A CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

5.      <u>Misrepresentation Claims</u>. The Settling Parties agree that the Settling Plaintiff will dismiss without prejudice the Misrepresentation Claims in the District Court Case. Settling Plaintiff has agreed to this dismissal because of the Tolling Agreement that the Settling Parties have signed which is attached hereto and incorporated by reference. The settling Defendant Taylor in his individual capacity and in his capacity as representative of each Settling Defendant shall not take any action to initiate or cause the voluntary filing of any bankruptcy proceeding of any Settling Defendant. The Settling Defendants agree that Plaintiff's Misrepresentation Causes of Action are tolled, including if such claims are scheduled in any subsequent bankruptcy proceeding. In the event of  either a default by any of the Settling Defendants of this Settlement Agreement, or in the event of a bankruptcy proceeding involving any of the Settling Defendants, Settling Plaintiff shall file its Misrepresentation claims in the United States District Court, Central District of California, and that the matter will be heard by The Honorable S. James Otero without a jury. The parties specifically understand that any bankruptcy proceeding will not impede or affect the prosecution of the Misrepresentation claims at trial, and will cooperate as necessary to procedurally have such claims adjudicated by The Honorable S. James Otero.

6.      <u>Dismissal with Prejudice</u>. Within five (5) days of execution of this Agreement Settling Plaintiff's counsel shall serve a Stipulation and Order for Dismissal with Prejudice with respect to the complaint in this matter on the Settling Defendant's counsel, subject to approval as to form by counsel for Settling Defendants. Within five (5) days of the receipt of the approved by counsel Stipulation and Order for Dismissal with Prejudice, Settling Defendants will sign the stipulation, and file with this court for execution of the Order.

9

19705

# Exhibit - B

## 4-ER-835






7.    No Admission. The Parties understand and agree that, with the exception of the Stipulated Judgments referred to above, this Agreement is not an admission of any liability whatsoever, but that it is a compromise of disputed liability.  No action taken by the parties hereto, or any of them, previously or in connection with this Agreement, shall be deemed or considered to be an admission of the truth or falsity or any claims hereto made or an acknowledgment or admission by any party of any fault or liability whatsoever to any other party or to any third party.  Settling Defendants herein expressly deny liability.

8.    Attorney Fees and Costs. Except with respect to the Judgment Collection activities described at Paragraph 3.(x.) above, each party shall bear its own costs, attorney fees and other fees incurred in connection with this Agreement and in connection with the Released Claims.

9.    Future Attorney Fees. If any legal or equitable action is necessary to enforce or interpret the terms of this agreement, the prevailing party shall be entitled to a reasonable sum of attorney fees and costs which are actually incurred and paid, in addition to any other relief to which party may be entitled.

10.    Assignments. The Settling Parties agree that with respect to Paragraph 3 (i through x), delineated above, there are various agreements and Assignments.  It is a condition to this Agreement that the parties execute the Assignments delineated above, and Assignments I through IV, are attached hereto and made a part of this Agreement.

11.    Confidentiality. The Parties shall not disclose this Agreement or its terms to any person or entity except as required by law or with the written consent of the others; provided, however, that nothing in this Agreement shall prevent the Parties from disclosing the terms of this Agreement (1) to any accountant or attorney in the course of the Parties' legal and or business affairs; or (2) in response to judicial process, in any judicial proceeding to enforce or construe this Agreement.

12.    Authority. Each party represents and warrants that the undersigned has the authority to act on behalf of and bind it and all who may claim through it to the terms and conditions of this Agreement.

13.    Governing Law. This Agreement shall be construed under and governed by the laws of the state of California.

10

19705



# Exhibit - B

## 4-ER-836



14. <u>Severability</u>. If any provisions of this agreement or the application thereof to any person, place or circumstance shall be held by a court of competent jurisdiction to be invalid, unenforceable, or void, the remainder of this agreement and such provision as applied to other persons, places and circumstances shall remain in full force and effect.

15. <u>Voluntary Execution of Agreement</u>. This agreement is executed voluntarily and without any duress or undue influence on the part of on behalf of the parties hereto, with the full intent of releasing Released Claims. The parties acknowledge that:

    (a)    They have read this agreement;

    (b)    They have been represented in the preparation, negotiation and execution of this Agreement by legal counsel of their own choice or have had the opportunity to consult an attorney of their choice;

    (c)    They understand the terms and consequences of this Agreement and of the release;

    (d)    They are fully aware of the legal and binding effect of this Agreement.

16. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts. Each signed counterpart shall be deemed an original, and all together shall constitute one in the same instrument. For the purposes of this Agreement, signatures transmitted by facsimile, by electronic mail in "portable document format" form or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document will have the same legal effect as physical delivery of the paper document bearing an original signature.

17. <u>Remedies.</u> This Agreement may be pleaded as a complete defense to, and may be used as a basis for an injunction against the bringing any claims for the matters released herein of this Settlement Agreement.

18. <u>Continuing Jurisdiction</u>. The parties stipulate and agree that the United States District Court for the Central District of California shall retain continued jurisdiction over this Settlement Agreement to enforce the terms of this Agreement and any potential further actions by and between Settling Plaintiff and Defendant John Taylor, or with respect to any further actions by and between Settling Plaintiff and Settling Defendants.

19. <u>Dispute Resolution</u>. Any dispute which arises under or with respect to this Settlement Agreement shall in the first instance, be subject to informal negotiations

11

19705

# Exhibit - B

**4-ER-837**

between the parties in this dispute. Informal negotiations shall not exceed ninety (90) days from the time of the dispute shall be considered to have arisen, when one party sends the other party a written notice of the dispute. In the event the parties cannot resolve the dispute by negotiations, the parties shall submit the matter to this court for mediation by the Honorable S. James Otero, and, in the event that Judge Otero is unavailable, by the assigned Magistrate Judge, and, in the event of unavailability, by a mutually agreed upon mediator. Each disputing party shall bear its own attorney fees. If the dispute remains unresolved for more than ninety (90) days after the delivery of the notice of dispute, any party can dispute and file an action in the United States District Court with the Central District of California. In any court action to enforce the terms of this Settlement Agreement, the prevailing party shall be entitled to an award of reasonable attorney fees and costs incurred. The Settling Parties understand and agree that the Dispute Resolution procedure specified herein shall not apply to either Settling Plaintiff's Judgment Collection efforts, or to Settling Plaintiff's declaration of a default by any Settling Defendant.

20.    **Joint Drafting.** This Settlement Agreement has been jointly negotiated and drafted and the language of the Settlement Agreement shall not be construed in favor of or against any of the parties based on the parties respective roles in the drafting process.

21.    **Cooperation.** The Settling Defendants agree that they individually and collectively shall cooperate with Settling Plaintiff. This cooperation requires Defendants to provide periodic reports on efforts to recover insurance proceeds from Navigators for the benefit of Settling Plaintiff, at intervals of not less than every 90 days. Defendants also agree to provide full and complete financial documentation of assets to Settling Plaintiff, and to provide further information as demanded by Settling Plaintiff. The parties understand and agree that failure to provide full, complete and accurate financial information may result in the scheduling of a debtor's examination at a location to be determined by Settling Plaintiff in the state of California. Settling Plaintiff shall request sole and absolute judgment and discretion in any manner and duration to further reasonable collection efforts for Settling Plaintiff.

22.    **Status Quo.** Reinsurance Partners, LLC, and Greenleaf Reinsurance Partners, LLC shall maintain status quo and are prohibited from making any substantive changes in

12

19705

**Exhibit - B**

**4-ER-838**

their business structures during the pendency of the Judgment Collection procedure, that may prejudice Settling Plaintiff, without first obtaining the express written consent of Settling Plaintiff herein.

23.   **Entire Agreement**. This Agreement contains the entire Agreement between the parties pertaining to the Released Claims and supersedes and replaces all prior and contemporaneous agreements and discussions among the parties with respect to the subject matter hereof, whether expressed or implied, oral or written. The terms of this Agreement are contractual and not a mere recital. This Agreement may not be contradicted or amended by evidence or by contemporaneous oral agreements or discussions among the parties. Any amendments or additions to this Agreement must be in writing and signed by the parties.

24. **Opportunity to Cure**. Upon any alleged default by Settling Defendants, Settling Plaintiff agrees to provide Settling Defendants and its counsel of record with five (5) calendar days advance written notice of its default. Notice shall be deemed given upon mailing of written notice by certified mail return receipt requested to Settling Defendants and their counsel as identified in this agreement. Settling Plaintiff shall also fax and e-mail a copy of its written notice to the Settling Defendants and their counsel on the same day that it mails its written notice to them. Failure to provide written notice in the manner prescribed herein shall be deemed ineffective and such notice shall have no legal effect and shall not subject Settling Defendants to the penalties set forth herein. Upon getting proper written notice, Settling Defendants shall have three (3) calendar days to cure any alleged default of this Agreement.

In witness of the foregoing, the parties, through their duly authorized representatives, affix their signatures.

Date: _____   _____
GEMCAP LENDING, LLC

Date: _____   _____
CROPUSA INSURANCE AGENCY, INC.

Date: _____   _____
CROPUSA INSURANCE SERVICES, LLC

13

19705

# Exhibit - B

**4-ER-839**

Date: _____  _____
                       AIA INSURANCE, INC.

Date: _____  _____
                       AIA SERVICES CORPORATION

Date: _____  _____
                       REINSURANCE PARTNERS, LLC

Date: _____  _____
                       GREENLEAF REINSURANCE PARTNERS, LLC

Date: _____  _____
                       R. JOHN TAYLOR

14

19705

**Exhibit - B**

**4-ER-840**



<u>ASSIGNMENT AGREEMENT I</u>

This Assignment Agreement is made by and between:

AIA Insurance, Inc., and AIA Services Corporation (hereinafter "Assignors"), and GemCap Lending I, LLC (hereinafter "Assignee").

WHEREAS, the Assignors are, and represent themselves to be, the owners of the mortgage of said real property commonly known as and referred to as 111 Main Street, Lewiston, Idaho ("Subject Property").

WHEREAS, the Assignors have agreed to assign their ownership interests in the Subject Property, subject to real estate taxes, and a lien in favor of Syringa Bank in the estimated total of $60,000, pursuant to the terms of the Settlement Agreement pertaining to that Federal District Court Case identified as *GemCap Lending I, LLC v. Crop USA Insurance Agency, Inc., et. al.*, case no. 2:13-CV-055040-SJO-MAN. In terms of the Settlement Agreement in the above Federal District Court Case, this current document will be Assignment I; and

WHEREAS, the Assignee is desirous of acquiring the entire right, title and interest in said property that is owned by Assignors.

NOW THEREFORE, TO ALL WHOM IT MAY CONCERN, be it known for good and valuable consideration, the parties hereby agree as set forth below.

1. ASSIGNMENT:   The Assignors hereby irrevocably assign and transfer to Assignee all of its ownership interest in said Subject Property previously identified as 111 Main Street, Lewiston, Idaho effective as of the execution date below, all rights, title and interest in and to said property, together with all associative rights, for Assignee's own use, as well as the use of any of Assignee's successors, assigns or other legal representatives as fully and entirely as the same would have enjoyed by Assignor if this Agreement had not been made, subject to the known and described Syringa Bank loan estimated around $60,000, and subject to real estate taxes estimated around $121,000 and legal fees and costs estimated around $81,000 associated with the pending judicial foreclosure, subject to verification. Assignor represents it only holds a 67% ownership interest in said Subject Property.

# Exhibit - B

## 4-ER-841



2. AUTHORIZATION TO ASSIGN:  Assignors have the authority to transfer and assign their full and complete ownership interest, title and rights to the Subject Property.  This authority has been challenged by certain shareholders of AIA in two separate derivative suits filed by certain shareholders and in a third pending consolidated case filed by Donna Taylor.

3. CONTINUING OBLIGATIONS:  Assignors agree to assist Assignee, upon request, by taking any reasonable acts that may be necessary for further perfecting title, and completing this assignment. Assignee agrees to release the liens on the remaining real property of AIA.

4. APPLICATION Of PROCEEDS TO DEBT REDUCTION:  The value of the assignment or any proceeds therefrom will reduce the debt owed to CropUSA Insurance Agency, Inc, by AIA.

5. BINDING EFFECT:   The covenants and conditions contained in this Assignment shall apply to and bind the parties hereto, as well as their parents, subsidiaries, legal representatives, successors in interest, and predecessors in interest.

6. GOVERNING LAW:  This Assignment shall be governed and construed in accordance with the laws of the State of Idaho.

7. COUNTERPARTS:   This Assignment may be signed in any number of counterparts each of which shall be deemed to be an original and all of it taken shall constitute one and the same instrument.

8. REPRESENTATION: Each signatory hereto acknowledges and agrees that,
   (i) Such signatory has been represented in the negotiations for and in preparation of this Assignment by counsel of signatory's own choosing, or that being advised to obtain counsel such same party has chosen not to obtain counsel;
   (ii) Such signatory has read this Assignment;
   (iii)Such signatory is fully aware of the contents and legal effects of this Assignment.

# Exhibit - B

## 4-ER-842

IN WITNESS WHEREOF, the Assignors and Assignee have indicated their acceptance by executing this Assignment effective January _____, 2015.

Date:_____          _____

GemCap Lending I, LLC

Date:_____          _____

AIA Insurance, Inc.

Date:_____          _____

AIA Services Corporation

# Exhibit - B

**4-ER-843**



## ASSIGNMENT AGREEMENT II

This Assignment Agreement is made by and between:

AIA Insurance, Inc., AIA Services Corporation, CropUSA Insurance Agency, Inc., CropUSA Insurance Services, LLC, Reinsurance Partners, LLC, Greenleaf Reinsurance Partners, LLC, and R. John Taylor (hereinafter "Assignors"), and GemCap Lending I, LLC (hereinafter "Assignee").

WHEREAS, the Assignors and Assignee have settled the litigation issues in that Federal District Court Case identified as *GemCap Lending I, LLC v. Crop USA Insurance Agency, Inc., et. al.*, case no. 2:13-CV-055040-SJO-MAN ("District Court Case"). In the terms of the Settlement Agreement in the above District Court Case, this current assignment document was referenced and will be referred to herein as Assignment II; and

WHEREAS, pursuant to the terms of the Settlement Agreement in the District Court Case, Assignors and their affiliates agreed to assign and convey to Assignee all monies owed or owing by CGB Diversified Services, Inc. dba Diversified Crop Insurance Services and/or its affiliates ("Diversified") to Weskan Agency, LLC or any of its affiliates ("Weskan") for the Crop year 2013 until execution of the current Assignment; and

WHEREAS, the Assignee is desirous of obtaining and acquiring all monies, assets and properties owed by Diversified to Weskan.

NOW THEREFORE, TO ALL WHOM IT MAY CONCERN, be it known for good and valuable consideration, the parties hereby agree as set forth below.

1. ASSIGNMENT:  The Assignors hereby irrevocably assign and transfer to Assignee all of their rights and entitlements to any and all assets, money owed or owing by Diversified to Weskan with respect to the Crop year 2013 until execution of the current Assignment.  Thus, it is the intent of Assignors and Assignee to have Assignee now hold all of Assignor's rights to obtain any and all all monies, owed or owing Weskan is entitled to receive from Diversified. Pursuant to the Agreement of the undersigned parties, "Affiliate" shall be defined as broadly as the law may allow and is intended to include any individual and/or entity, including subsidiaries, parents, officers, directors, successors in interest, predecessors in interest, or any other person or entity that could be broadly defined as an "Affiliate."

# Exhibit - B

## 4-ER-844





2.  AUTHORIZATION TO ASSIGN: Assignors have the authority to transfer and assign their full and complete rights with respect to the money, assets and/or property being assigned and referenced above.

3.  CONTINUING OBLIGATIONS:  Assignors agree to assist Assignee, upon request, by taking any reasonable acts that may be necessary for the purpose of completing this Assignment.

4.  BINDING EFFECT:   The covenants and conditions contained in this Assignment shall apply to and bind the parties hereto, as well as their parents, subsidiaries, legal representatives, successors in interest, and predecessors in interest.

5.  GOVERNING LAW:  This Assignment shall be governed and construed in accordance with the laws of the State of California.

6.  COUNTERPARTS:   This Assignment may be signed in any number of counterparts each of which shall be deemed to be an original and all of it taken shall constitute one and the same instrument.

7.  REPRESENTATION:  Each signatory hereto acknowledges and agrees that,

    (i)    Such signatory has been represented in the negotiations for and in preparation of this Assignment by counsel of signatory's own choosing, or that being advised to obtain counsel such same party has chosen not to obtain counsel;

    (ii)    Such signatory has read this Assignment;

    (iii)    Such signatory is fully aware of the contents and legal effects of this Assignment.

IN WITNESS WHEREOF, the Assignors and Assignee have indicated their acceptance by executing this Assignment effective January _____, 2015.


Date:_____          _____
                                       GemCap Lending I, LLC


Date:_____          _____
                                       AIA Insurance, Inc.

# Exhibit - B

## 4-ER-845

Date:_____

AIA Services Corporation

Date:_____

CropUSA Insurance Agency, Inc.

Date:_____

CropUSA Insurance Services, LLC

Date:_____

Reinsurance Partners, LLC

Date:_____

Greenleaf Insurance Partners, LLC

Date:_____

R. John Taylor

# Exhibit - B

**4-ER-846**

## ASSIGNMENT AGREEMENT III

This Assignment Agreement is made by and between:

AIA Insurance, Inc., AIA Services Corporation, CropUSA Insurance Agency, Inc., CropUSA Insurance Services, LLC, Reinsurance Partners, LLC, Greenleaf Reinsurance Partners, LLC, and R. John Taylor (hereinafter "Assignors"), and GemCap Lending I, LLC (hereinafter "Assignee").

**WHEREAS**, the Assignors are, and represent themselves to be, the possible and potential owners, directly or indirectly, of any rights there may be against any and all law firms that assisted Settling Defendants in the negotiation of and execution of the Loan Agreements that resulted in and gave rise to the District Court Case referenced herein. This Assignment includes but is not limited to Assignments of any and all rights against the law firm of Quarles & Brady, who represented the borrower in connection with the negotiation, execution and delivery of the loan documents referenced above, and who, pursuant to paragraph 6.5 of the Loan Agreement provided a legal opinion letter to Settling Plaintiff GemCap, who then relied on said letter and opinion; and,

**WHEREAS**, the Assignors and Assignee were involved in the Federal District Court Case identified as *GemCap Lending I, LLC v. Crop USA Insurance Agency, Inc., et. al.*, case no. 2:13-CV-055040-SJO-MAN ("District Court Case"). The litigation of that case involved issues pertaining to the Loan Agreement referenced above. In the terms of the Settlement Agreement in the above District Court Case, this current document is referenced and will be referred to as Assignment III; and,

**WHEREAS**, the Assignee is desirous of acquiring all rights and interests that Assignors have or may in the future have with respect to claims against Assignor's counsel including, but not limited to, Quarles & Brady.

**NOW THEREFORE, TO ALL WHOM IT MAY CONCERN**, be it known for good and valuable consideration, the parties hereby agree as set forth below.

1. ASSIGNMENT: The Assignors hereby irrevocably assign and transfer to Assignee all rights and entitlements they now have or in the future may acquire against any and all law firms that assisted Settling Defendants in the negotiation of and execution of the Loan Agreements that resulted in and gave rise to the District Court Case referenced herein, including but not limited to,

# Exhibit - B

## 4-ER-847



the law firm of Quarles & Brady with respect to said counsel's work on the Loan Documents and the Loan Agreement which were subject matters of the District Court Case referenced above. Specifically, Assignors and Assignee acknowledge that paragraph 6.5 of the Loan Agreement required, as a condition of the loan placement, a legal letter from Assignor's counsel addressed to GemCap, and that Assignee relied upon said legal opinion letter prior to entering into the Loan Agreement which was the subject matter of the District Court referenced above. This Assignment is effective as against all of Assignors' legal counsel who negotiated, designed, or drafted said Loan Agreements, including, but not limited to Quarles & Brady, and shall be effective as of the date of the execution set forth below and includes all rights and interests that Assignors have or in the future may obtain, together with all associative rights, for Assignee's own use, as well as the use of any of Assignee's successors, assigns, or other legal representatives as fully and entirely as the same would have been enjoyed by Assignors if this Agreement had not been made. Moreover, nothing in this Assignment shall detract from or minimize any direct rights that Assignee has or may in the future have against said law firms, including but not limited to Quarles & Brady. This agreement is not intended to relate to or convey rights regarding any attorneys of record or firms beyond those that assisted Settling Defendants in the negotiation of and execution of the Loan Agreements that resulted in and gave rise to the District Court Case referenced herein.

2. AUTHORIZATION TO ASSIGN: Assignors represent that they have the authority to transfer and assign their full and complete rights and interest against any and all law firms that assisted Settling Defendants in the negotiation of and execution of the Loan Agreements that resulted in and gave rise to the District Court Case referenced herein, including but not limited to Quarles & Brady who were involved in negotiating and executing the Loan Agreements and Loan Documents which were the subject matter of the District Court Case referenced above.

# Exhibit - B

**4-ER-848**

3. CONTINUING OBLIGATIONS: Assignors agree to assist Assignee, upon request, by taking any reasonable acts that may be necessary for further implementing and completing this assignment.

4. BINDING EFFECT: The covenants and conditions contained in this Assignment shall apply to and bind the parties hereto, as well as their parents, subsidiaries, legal representatives, successors in interest, and predecessors in interest.

5. GOVERNING LAW: This Assignment shall be governed and construed in accordance with the laws of the State of California.

6. COUNTERPARTS: This Assignment may be signed in any number of counterparts each of which shall be deemed to be an original and all of it taken shall constitute one and the same instrument.

7. REPRESENTATION: Each signatory hereto acknowledges and agrees that,

   (i) Such signatory has been represented in the negotiations for and in preparation of this Assignment by counsel of signatory's own choosing, or that being advised to obtain counsel such same party has chosen not to obtain counsel;

   (ii) Such signatory has read this Assignment;

   (iii)Such signatory is fully aware of the contents and legal effects of this Assignment.

IN WITNESS WHEREOF, the Assignors and Assignee have indicated their acceptance by executing this Assignment effective January ___, 2015.

Date: _____

GemCap Lending I, LLC

Date: _____

AIA Insurance, Inc.

Date: _____

AIA Services Corporation

# Exhibit - B

**4-ER-849**

Date:

CropUSA Insurance Agency, Inc.

Date:

CropUSA Insurance Services, LLC

Date: _____

Reinsurance Partners, LLC

Date:

Greenleaf Insurance Partners, LLC

Date: _____

R. John Taylor

**Exhibit - B**

**4-ER-850**

ASSIGNMENT AGREEMENT IV

This Assignment Agreement is made by and between:

AIA Insurance, Inc., AIA Services Corporation, CropUSA Insurance Agency, Inc., CropUSA Insurance Services, LLC, Reinsurance Partners, LLC, Greenleaf Reinsurance Partners, LLC, and R. John Taylor (hereinafter "Assignors"), and GemCap Lending I, LLC (hereinafter "Assignee").

WHEREAS, the Assignors and Assignee have recently resolved their differences pertaining to that Federal District Court Case identified as *GemCap Lending I, LLC v. CropUSA Insurance Agency, Inc., et. al.*, case no. 2:13-CV-055040-SJO-MAN; and

WHEREAS, Assignors are owed certain amounts by CGB Diversified Services, Inc., and/or any of their affiliates ("Diversified"), and the sum of these amounts owed by Diversified by Settling Defendants is estimated to be no less than the sum reflected in Schedule A attached to the Settlement Agreement; and

WHEREAS, Assignors and Assignee have agreed that Assignors herein' have agreed to assist Assignee with respect to recovery of all amounts due and owing with respect to the collection of the Minimum Settlement Amount, as referenced in paragraph 3 of the Settlement Agreement and Release, and in recognition of the Agreement, Assignors will provide full and complete cooperation with respect to collecting said amounts. Assignors have agreed to assign all of their rights with respect to said amounts owed to them by Diversified as a condition to the underlying Settlement Agreement.

NOW THEREFORE, TO ALL WHOM IT MAY CONCERN, be it known for good and valuable consideration, the parties hereby agree as set forth below.

1. ASSIGNMENT:  The Assignors hereby irrevocably assign and transfer to Assignee all rights and entitlements they now have or in the future may have with respects to amounts owed to them by Diversified (as defined above). With respect to the Settlement Agreement, as well as this as this Assignment, Assignors agree, that after execution, Assignee will have the full right to all said sums owed to Assignors by Diversified and that after execution Assignee owns these rights, together with all associative rights, as well as the rights of Assignee's successors, assigns or other legal representatives as fully and entirely as the same would have been enjoyed by Assignors if this Agreement

# Exhibit - B

## 4-ER-851



had not been made. This Assignment is referred to herein, and is attached and incorporated into the Agreement as Assignment IV.

2. AUTHORIZATION TO ASSIGN:  Assignors have the authority to transfer and assign their full and complete rights with respect to their claims against Diversified.

3. CONTINUING OBLIGATIONS:  Assignors agree to assist Assignee, upon request, by taking any reasonable acts that may be necessary for further implementing and completing this assignment.

4. PARTICPATION AGREEMENT: After Assignee obtains  recovery of the then outstanding amount due pursuant to the lending agreements at issue in the Lawsuit, plus all fees and costs and the maximum amount of interest arising from or related to the loan at issue in the Lawsuit ("Payoff Amount"), any recovery in excess of the Payoff Amount shall be divided with the Assignee receiving 50% and the Assignors receiving 50% ("Participation Agreement").

5. BINDING EFFECT:   The covenants and conditions contained in this Assignment shall apply to and bind the parties hereto, as well as their parents, subsidiaries, legal representatives, successors in interest, and predecessors in interest.

6. GOVERNING LAW:  This Assignment shall be governed and construed in accordance with the laws of the State of California.

7. COUNTERPARTS:   This Assignment may be signed in any number of counterparts each of which shall be deemed to be an original and all of it taken shall constitute one and the same instrument.

8. REPRESENTATION: Each signatory hereto acknowledges and agrees that,

(i)   Such signatory has been represented in the negotiations for and in preparation of this Assignment by counsel of signatory's own choosing, or that being advised to obtain counsel such same party has chosen not to obtain counsel;

(ii)   Such signatory has read this Assignment;

# Exhibit - B

## 4-ER-852

(iii) Such signatory is fully aware of the contents and legal effects of this Assignment.

IN WITNESS WHEREOF, the Assignors and Assignee have indicated their acceptance by executing this Assignment effective January _____, 2015.

Date:_____          _____
                                GemCap Lending I, LLC

Date:_____          _____
                                AIA Insurance, Inc.

Date:_____          _____
                                AIA Services Corporation

Date:_____          _____
                                CropUSA Insurance Agency, Inc.

Date:_____          _____
                                CropUSA Insurance Services, LLC

Date:_____          _____
                                Reinsurance Partners, LLC

Date:_____          _____
                                Greenleaf Insurance Partners, LLC

Date:_____          _____
                                R. John Taylor

1097545/21411824v.1

# Exhibit - B

## 4-ER-853



**Schedule A to Assignment IV**

Assignors AIA Insurance, Inc., AIA Services Corporation, CropUSA Insurance Agency, Inc., CropUSA Insurance Services, LLC, Reinsurance Partners, LLC, Greenleaf Reinsurance Partners, LLC, and R. John Taylor are owed certain amounts by CGB Diversified Services, Inc., and/or any of their affiliates ("Diversified"). Settling Defendants believe that the certain Claims they have against Diversified are estimated to be: $1,292,907 claim for commissions due Settling Defendants, $4,323,400 claim for conversion of the policy expirations for the 2014 crop year, $12,500,000 claim for failure to provide a reinsurance treaty for 2014 and damage to Settling Defendants, and, $8,640,000 claim for unjust enrichment.

1097545/22050884v.1

# Exhibit - B

## 4-ER-854



# Roderick Bond
## Law Office, PLLC

April 22, 2016

<u>*VIA Facsimile (208) 799-9172*</u>

AIA Services Corporation
John Taylor, CEO, President and Director
JoLee Duclos, Secretary
P.O. Box 538
Lewiston, ID  83501

**Re:**    ***Shareholder Demand to Inspect Documents***

Dear Mr. Taylor and Ms. Duclos:

As you are well aware, this firm represents certain common shareholders in AIA Services Corporation ("<u>AIA Services</u>"), including, without limitation, Dale Miesen, Paul Durant, Jerry Legg, and Donna Taylor (as the Personal Representative of the Estate of Sara Taylor), who have all been common shareholders of record for over six months. This firm also represents Donna Taylor, who is the sole Series A Preferred Shareholder of AIA Services. Ms. Taylor has also been a Series A Preferred Shareholder of record for over six months.

The purpose of this letter is for me to request documents on behalf of the above-referenced shareholders as provided under Idaho Code, which is a separate and distinct right in addition to any rights a party has in discovery in litigation.[1] While I recognize that you ignored a prior request when Doug Siddoway was purportedly representing AIA Services, I have been advised by John Taylor's present counsel, Mr. Weiland, that it will be different this time.

For your convenience, I will address your obligations under Idaho Code. As you know, Idaho Code Section 30-29-1602 provides verbatim:

> (1) A shareholder of a corporation is entitled to inspect and copy, during regular business hours at the corporation's principal office, any of the records of the corporation described in section 30-29-1601(5), Idaho Code, if he gives the corporation written notice of his demand at least five (5) business days before the date on which he wishes to inspect and copy.

---

[1] This request to inspect records does not include the right of Paul Durant, as a director appointed by Donna Taylor under the amended articles of incorporation, to separately inspect records because you have refused to honor his appointment. Your blatant refusal to honor his appointment has been, and continues to be, a breach of your fiduciary duties as officers and/or directors of AIA Services.

# Exhibit - C
## 4-ER-855

(2) A shareholder of a corporation is entitled to inspect and copy, during regular business hours at a reasonable location specified by the corporation, any of the following records of the corporation if the shareholder meets the requirements of subsection (3) of this section and gives the corporation written notice of his demand at least five (5) days before the date on which he wishes to inspect and copy:

(a) Excerpts from minutes of any meeting of the board of directors, records of any action of a committee of the board of directors while acting in place of the board of directors on behalf of the corporation, minutes of any meeting of the shareholders, and records of action taken by the shareholders or board of directors without a meeting, to the extent not subject to inspection under section 30-29-1602(1), Idaho Code;

(b) Accounting records of the corporation; and

(c) The record of shareholders.

(3) A shareholder may inspect and copy the records described in subsection (2) of this section only if:

(a) He has been a holder of record of shares or of voting trust certificates for at least six (6) months immediately preceding his demand or shall be the holder of record of, or the holder of record of voting trust certificates for, at least five percent (5%) of all the outstanding shares of the corporation;

(b) His demand is made in good faith and for a proper purpose;

(c) He describes with reasonable particularity his purpose and the records he desires to inspect; and

(d) The records are directly connected with his purpose.

(4) The right of inspection granted by this section may not be abolished or limited by a corporation's articles of incorporation or bylaws.

(5) **This section does not affect:**

(a) The right of a shareholder to inspect records under section 30-29-720, Idaho Code, or, if the shareholder is in litigation with the corporation, to the same extent as any other litigant; or

# Exhibit - C
## 4-ER-856

(b) The power of a court, independently of this chapter, to compel the production of corporate records for examination.

(6) For purposes of this section, "shareholder" includes a beneficial owner whose shares are held in a voting trust or by a nominee on his behalf.

**I.C. § 30-29-1602** (emphasis added). Idaho Code Section 30-29-603 provides verbatim:

(1) A shareholder's agent or attorney has the same inspection and copying rights as the shareholder represented.

(2) The right to copy records under section 30-29-1602, Idaho Code, includes, if reasonable, the right to receive copies by xerographic or other means, including copies through an electronic transmission if available and so requested by the shareholder.

(3) The corporation may comply at its expense with a shareholder's demand to inspect the record of shareholders under section 30-29-1602(2)(c), Idaho Code, by providing the shareholder with a list of shareholders that was compiled no earlier than the date of the shareholder's demand.

(4) The corporation may impose a reasonable charge, covering the costs of labor and material, for copies of any documents provided to the shareholder. The charge may not exceed the estimated cost of production, reproduction or transmission of the records.

**I.C. § 30-29-603**. In addition, Idaho Code Section 30-29-1620 provides verbatim:

(1) A corporation upon written shareholder request shall furnish its shareholders annual financial statements or, if annual financial statements are not available, other appropriate accounting records, which may be consolidated or combined statements of the corporation and one (1) or more of its subsidiaries, as appropriate, that include a balance sheet as of the end of the fiscal year, an income statement for that year, and a statement of changes in shareholders' equity for the year unless that information appears elsewhere in the financial statements. If financial statements are prepared for the corporation on the basis of generally accepted accounting principles, the annual financial statements must also be prepared on that basis.

(2) If any annual financial statements furnished pursuant to subsection (1) of this section are reported upon by a public accountant, his report must accompany them. If not, the statements must be accompanied by a statement of the president or the person responsible for the corporation's accounting records:

# Exhibit - C
**4-ER-857**

(a) Stating his reasonable belief whether the statements were prepared on the basis of generally accepted accounting principles and, if not, describing the basis of preparation; and

(b) Describing any respects in which the statements were not prepared on a basis of accounting consistent with the statements prepared for the preceding year.

**I.C. § 30-29-1620**. In addition to obligations under Idaho Code and the common law, John Taylor and JoLee Duclos are both required to comply with AIA Services' Restated Bylaws and Amended Articles of Incorporation. JoLee Duclos, as Secretary of AIA Services, is separately obligated to:

> The secretary shall: (a) attend all meetings and keep the minutes of· the proceedings of the stockholders and of the Board of Directors in one or more books provided for that purpose; (b) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law; (c) be custodian of the corporate records and of the seal of the corporation and see that the seal of the corporation is affixed to all documents the execution of which on behalf of the corporation under its seal is duly authorized; (d) keep a register of the post office address of each shareholder which shall be furnished to the secretary by such shareholder; (e) sign, with the president, or a vice president, certificates for shares of the corporation, issuance of which shall have been authorized by resolution of the Board of Directors; (f) have general charge of the. stock transfer books of the corporation; and (g) in general perform all duties commonly incident to the office of secretary and such other duties as from time to time may be assigned to him by the president or by the Board of Directors.

(AIA Services' Restated Bylaws, § 5.2(d).)

As you know, AIA Services has not provided year-end consolidated financial statements or any accounting information to its shareholders for a number of years nor has it even bothered to hold an annual shareholder meeting for a number of years. And AIA Services, through John Taylor and/or others, has refused to honor Donna Taylor's appointment of Paul Durant to AIA Services' board of directors. A new lawsuit was filed in California federal court alleging fraud and other torts against John Taylor and others, and you both unlawfully had AIA Services and AIA Insurance guarantee a $10 million line-of-credit for CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC. Then, you entered into an unlawful settlement agreement requiring judgment to be entered against AIA Services and AIA Insurance for over $12,000,000. We are also aware that John Taylor has confessed judgment in excess of $12,000,000 in favor of GemCap Lending I, LLC, too, but that enforcement of that judgment will await certain collection efforts undertaken by GemCap Lending I, LLC. We are aware that you have allowed GemCap Lending I, LLC to conduct audits and you have provided it with substantial financial information, yet you have not provided any financial information to any of the shareholders for years. I would note that

# Exhibit - C
**4-ER-858**

Doug Siddoway, as agent for AIA Services, and David Risley, as agent for John Taylor made the following admission in Donna Taylor's consolidated lawsuits:

> John Taylor personally guaranteed the loan. Gemcap alleges that AIA did, too, but that allegation is disputed. In any event, Gemcap has not pursued the AIA guaranty (or the Taylor guaranty for that matter).
>
> If the California court ultimately determines that AIA guaranteed the CropUSA loan and the lender pursues the remedies that are available to it under the guaranty, then AIA will have incurred a prohibited indebtedness under subsection 4.2.9(c) [of the amended articles of incorporation].

(Response to Plaintiff's Motion for Summary Judgment dated May 9, 2014, p. 8 (which was filed in the consolidated cases filed by Donna Taylor in Nez Perce County District Court regarding the payment of her Series A Preferred Shares and related torts).) This is a judicial admission of the obvious—that the Guarantees and subsequent settlement agreement in the California litigation was barred by the amendment articles of incorporation and thus is illegal and, at a minimum, ultra vires. As you know, the Guarantees and Settlement Agreement were also barred by the Restated Bylaws. Then, ironically, you had David Risley foreclose on the Lewis/Clark Plaza property in the name of GemCap Lending I, LLC and the 401(k) Plan and assist in transferring AIA Services' ownership interest in the Lewis/Clark Plaza to GemCap Lending I, LLC pursuant to the terms of the illegal Settlement Agreement, which also illegally promised to not file bankruptcy on behalf of AIA Services and AIA Insurance. In sum, you have opened up AIA Service and AIA Insurance's books and records to GemCap Lending I, LLC and have transferred assets to it, yet will have provided no information to shareholders for years. Thus, while John Taylor awaits what appears to be his ultimate financial ruin and/or bankruptcy as he does not have the money or assets to pay the over $12,000,000 judgment, you have continued to not provide any financial information to shareholders and have refused to properly operate AIA Services in accordance with the law, its amendment articles of incorporation and its bylaws.

Based upon the above and pursuant to I.C. § 30-29-1601, *et seq*. (including the Idaho Code Sections quoted above), the undersigned attorney, along with one or more of the above-referenced shareholders, demands to inspect and copy the following records during regular business hours on April 29, 2016, at the offices of AIA Services at 111 Main Street in Lewiston, Idaho:

1. AIA Services' articles of incorporation and all amendments thereto currently in effect.

2. AIA Services' bylaws and all amendments thereto currently in effect.

3. The minutes of all shareholder meetings for AIA Services, together with records of all action taken by shareholders without a meeting, for the past three (3) years.

# Exhibit - C
## 4-ER-859

4. Excerpts from minutes of any meeting of the board of directors, records of any action of a committee of the board of directors while acting in place of the board of directors on behalf of the corporation, minutes of any meeting of the shareholders, and records of action taken by the shareholders or board of directors without a meeting, to the extent not subject to inspection under section 30-29-1602(1), Idaho Code, for the last five (5) years.

5. All written communications to AIA Services' shareholders generally without the past three (3) years, including the financial statements furnished for the past three (3) years under Idaho Code §§ 30-1-1620 and 30-29-1620.

6. A list of the names and business addresses of AIA Services' current directors and officers and a copy of the most recent Annual Report filed with the Idaho Secretary of State.

7. AIA Services' common and preferred shareholder lists showing the name, addresses and number of shares held by each shareholder, including, without limitation, the names and addresses of shareholders who own or owned within the last three (3) years common shares through AIA Services Corporation's ESOP or beneficially owned Series C Preferred Shares in AIA Services Corporation's 401(k) Plan within the last three (3) years. Please note that to the extent AIA Services' records show otherwise, I have provided the current addresses for the shareholders indicted on page 1 below.

8. AIA Services' accounting records. At this time, my clients are only requesting the following information and they have all been shareholders for well over six (6) months:

- The year-end and quarterly accounting notebooks for AIA Services and its wholly owned subsidiary AIA Insurance, Inc. ("AIA Insurance") for the past five (5) years.
- Copies of the check registers and bank statements for AIA Services and AIA Insurance for the past five (5) years.
- Copies of all tax returns and amendments thereto for AIA Services and AIA Insurance for the past five (5) years.
- AIA Services' consolidated financial statements for the past five (5) years, including the consolidated financial statement for the period ending March 31, 2016.
- The accounting records used to prepare AIA Services Corporation's financial statements for the past five (5) years.
- All financial statements, financial records and information for AIA Services and/or AIA Insurance which you have provided to GemCap Lending I, LLC or any of its auditors or attorneys.
- If no financial statements are available for AIA Services and AIA Insurance for the full year of 2015, then such other appropriate accounting records (which may be consolidated), including a year-end balance sheets for year-end 2015, income statements for 2015, statements of changes in shareholders' equity for 2015, and such

# Exhibit - C
**4-ER-860**

other information required by I.C. §30-29-1620 (including the appropriate statements accompanying the information).

- Accounting records for all payments made to GemCap Lending I, LLC or any party on its behalf and for any assets transferred to it (including AIA Services' interest in the Lewis/Clark Plaza).
- Accounting records for all loans or guarantees AIA Services and/or AIA Insurance are or were obligated to pay for the past five (5) years, including, without limitation, statements and records for loans to Syringa Bank (and its successor), U.S. Bank, GemCap Lending I, LLC or any other lender or party.
- Accounting records pertaining to any and all attorneys' fees and costs paid on behalf of any of the past or present officers and/or directors of AIA Services and/or AIA Insurance, paid to any attorney or law firm representing AIA Services and/or AIA Insurance and any and all attorneys' fees paid for any other party for any litigation. The foregoing requests are for the past ten (10) years (including for Michael Cashman, Sr.). This request includes the billing statements received from any attorneys or law firms.
- Accounting records pertaining to any and all compensation, salary, benefits, advances and loans of money, shares or other property provided directly or indirectly from AIA Services or its subsidiary AIA Insurance, Inc., to John Taylor, James Beck, Connie Taylor Henderson, JoLee Duclos, and Michael Cashman Sr., for the last seven (7) years.
- Accounting records pertaining to all loans, payments, promissory notes and any other transaction pertaining to Pacific Empire Radio Corp. (including all loans made to Pacific Empire Radio and any repayments of such loans) for the past ten (10) years.
- Accounting records regarding all transactions, advances, loans, credits, and/or payments by or between AIA Services or AIA Insurance and any entity partially or wholly owned by R. John Taylor, including, without limitation, CropUSA Insruance Agency, Inc., CropUSA Insurance Services, LLC, and the Green Leaf entities for the past five (5) years.
- Accounting records regarding all commissions and fees paid for all health insurance policies or premiums paid to AIA Insurance for the past five (5) years, including all checks or payments received from Trustmark.
- Accounting records pertaining to any audits conducted by GemCap Lending I, LLC or any other auditor.

9. If AIA Services Corporation has indemnified or advanced expenses to a present or former director, all reports required by I.C. § 30-29-1621(1).

My firm will remit payment for the reasonable labor and copying costs necessary for AIA Services to assemble and copy the above-referenced documents. In lieu of inspecting and copying the above-referenced records, AIA Services may assemble, copy and provide them to the undersigned attorney via scanned email files or in paper on or before April 28, 2016.

# Exhibit - C
## 4-ER-861

As you are well aware (including for the reasons discussed above), my clients' request to inspect records is in good faith—they have a right to financial information concerning AIA Services and its wholly owned subsidiary AIA Insurance, and obtain the other information required by Idaho Code. All of the information above should be readily available. As mentioned above, these rights are, in addition to, and not in lieu of rights to obtain any information through discovery in litigation.

In addition, so there is no confusion as my clients have never been provided any shareholder lists and address for many years, please note the current addresses for the shareholders listed on page 1 of this letter (although any communications other than shareholder communications should be directed to me):

> Common Shareholders
>
> Jerry Legg
> 701 West Grand
> Tonkwa, OK 74653
>
> Dale Miesen (as to him individually and as trustee for his children)
> 5121 Stonebridge Dr.
> Colleyville, TX  76034
>
> Paul D. Durant
> 3440 Selway Dr.
> Lewiston, ID  83501
>
> Donna J. Taylor
> Personal Representative of the Estate of Sara Taylor
> 2940 Dove Place
> Clarkston, WA  99403
>
> Series A Preferred Shareholder
>
> Donna J. Taylor
> 2940 Dove Place
> Clarkston, WA  99403

As you have already known that Donna Taylor is the Personal representative of the Estate of her deceased daughter Sara Taylor, to the extent you have not done so, please issue a new stock certificate for the common shares which was previously issued to Sara Taylor.

# Exhibit - C
## 4-ER-862

Thank you for your prompt attention to the above matters. I apologize in advance for any typographical errors, but I needed to get this letter sent to you. I look forward to receiving the documents requested above in lieu of inspecting them so long as they are provided on or before April 28, 2016, or, alternatively, to inspect the documents and copy them on April 29, 2016. My clients are also willing to consider other amicable arrangements for obtaining these documents.

Sincerely,

RODERICK BOND LAW OFFICE, PLLC

By: Roderick C. Bond

cc:  Dale Miesen
     Donna Taylor
     Paul Durant
     Jerry Legg
     Steve Wielend (counsel for John Taylor, the President and sole director of AIA Services)
     Shawnee Perdue (counsel for John Taylor, the President and sole director of AIA Services)

# Exhibit - C
## 4-ER-863

**Roderick Bond**

| | |
|---|---|
| **From:** | ecf@id.uscourts.gov |
| **Sent:** | Tuesday, June 14, 2016 5:01 PM |
| **To:** | CourtMail@idd.uscourts.gov |
| **Subject:** | Activity in Case 1:10-cv-00404-CWD Taylor et al v. Hawley Troxell Ennis & Hawley LLP et al Order on Motion to Dismiss |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of Idaho (LIVE Database)Version 6.1

### Notice of Electronic Filing

The following transaction was entered on 6/14/2016 at 6:00 PM MDT and filed on 6/14/2016
**Case Name:**      Taylor et al v. Hawley Troxell Ennis & Hawley LLP et al
**Case Number:**     1:10-cv-00404-CWD
**Filer:**
**Document Number:** 136(No document attached)

**Docket Text:**
**DOCKET ENTRY ORDER: Having reviewed Plaintiffs' Motion to Amend and Supplement Complaints (Dkt. [130]), the Notices of Non-Opposition filed by the Defendants in this action (Dkts. [133] and [135]), and finding good cause therefor, the Court will GRANT Plaintiffs' Motion. Plaintiffs shall file their Amended Complaint within five (5) business days of this Order. Further, the proposed Amended Complaint (Dkt. [130-1]) does not allege a RICO cause of action--the claim Defendants seek to dismiss pursuant to its motion to partially dismiss (Dkt. [116]). Accordingly the Court will DENY as MOOT Defendants' Motion (Dkt. [116].) It is so ordered. Signed by Judge Candy W. Dale. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (tmp)**

**1:10-cv-00404-CWD Notice has been electronically mailed to:**

David R Risley (Terminated)     david@risleylawoffice.com, judy@risleylawoffice.com

James D LaRue     jdl@elamburke.com, sd@elamburke.com

1

**4-ER-864**

Jeffrey A Thomson     jat@elamburke.com, nlp@elamburke.com

Lee H Rousso (Terminated)     lee@leerousso.com

Loren C Ipsen     lci@elamburke.com, nlp@elamburke.com

Roderick Cyr Bond     rod@roderickbond.com

Shawnee S Perdue     sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland     swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

**1:10-cv-00404-CWD Notice will be served by other means to:**

AIA Insurance, Inc.


AIA Services Corporation


Theodore O Creason
DECEASED

**4-ER-865**

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiffs

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual and the Personal representative of the Estate of Sarah Taylor; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC.; | Civil No. 1:10-cv-00404-CWD<br><br>SECOND AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL |
| Plaintiffs, | |
| v. | |
| CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation, | |
| Defendants. | |

SECOND AMENDED COMPLAINT - i

**4-ER-866**

**TABLE OF CONTENTS**

I.     STATEMENT OF JURISDICTION ........................................................................ 1

II.    STATEMENT OF VENUE ................................................................................... 1

III.   PARTIES AND DEFINITIONS OF THE PARTIES ............................................. 1

IV.    FACTS ................................................................................................................. 5

A.    The Background Facts Regarding AIA Services and AIA Insurance ................................. 5

B.    John, Connie, Beck and Cashman Take Operational Control of AIA and AIA
      Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in
      Its Amended Articles of Incorporation ............................................................. 6

C.    AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer
      CropUSA to Themselves ............................................................................. 9

D.    The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants
      in Taking CropUSA from AIA and Having AIA Fund CropUSA ................................... 13

E.    The Controlling AIA Defendants Steal $1,510,693 From AIA to Fund CropUSA
      and Then They Use $634,269 of Those Funds to Repay a Debt CropUSA Owed to
      AIA—thereby Resulting in a $2,144,962 Fraud Against AIA. ...................................... 15

F.    The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and
      Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal ......... 19

G.    The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and
      Financial Wherewithal with the Improper Assistance from the Hawley Troxell
      Defendants ............................................................................................ 21

H.    The Controlling AIA Defendants Enter Into Tolling Agreements, but Those
      Tolling Agreements Do Not Save the Hawley Troxell Defendants from the
      Unwaivable Conflicts of Interest .................................................................. 22

I.    The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA
      and Intentionally Committing Torts against AIA with the Assistance of the Hawley
      Troxell Defendants—Even While this Lawsuit Was Pending ...................................... 27

J.    There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and
      Intentional Torts Committed by the Controlling AIA Defendants ................................... 31

V.    CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742
      AND FEDERAL RULE OF CIVIL PROCEDURE 23.1 ................................................... 35

VI.   COUNT I—BREACH OF FIDUCIARY DUTY ............................................................... 38

VII.  COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES ....... 40

VIII. COUNT III—LEGAL MALPRACTICE ........................................................................... 41

IX.   COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/
      CONSTRUCTIVE FRAUD ................................................................................................ 42

X.    COUNT V—AIDING AND ABETTING FRAUD .......................................................... 46

XI.   COUNT VI—BREACH OF CONTRACT ....................................................................... 47

XII.  COUNT VII—DECLARATORY JUDGMENT ............................................................... 48

XIII. COUNT VIII—EXCESSIVE COMPENSATION/CORPORATE WASTE .................... 49

XIV.  COUNT IX—ACCOUNT STATED ................................................................................. 50

XV.   JURY DEMAND ............................................................................................................... 51

XVI.  PRAYER FOR RELIEF .................................................................................................... 51

VERIFICATION OF DALE L. MIESEN ...................................................................................... 53

VERIFICATION OF DONNA J. TAYLOR ................................................................................... 54

CERTIFICATE OF SERVICE ....................................................................................................... 55

Plaintiffs Donna J. Taylor and Dale L. Miesen allege cumulatively and, when necessary and/or applicable, in the alternative, as follows:

## I.    STATEMENT OF JURISDICTION

1.    This Court has jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1332(a)(1), as the amount in controversy exceeds $75,000 and the action, when filed, was between citizens of different states.

## II.    STATEMENT OF VENUE

2.    Venue is proper in the District of Idaho under 28 U.S.C. § 1391(b)(2), as a substantial part of the errors and omissions giving rise to the claims asserted in this Second Amended Complaint occurred in the District of Idaho.

3.    Venue is also proper in the District of Idaho under 18 U.S.C. § 1391(c), as certain of the defendants reside in the District of Idaho.

## III.    PARTIES AND DEFINITIONS OF THE PARTIES

4.    Plaintiff Dale L. Miesen ("Miesen") is a resident of Colleyville, Texas.  Miesen has been a common shareholder of AIA Services during all relevant times.

5.    Plaintiff Donna J. Taylor, as an individual and the Personal Representative of the Estate of Sara Taylor (collectively "Donna"), is a resident of Clarkston, Washington. Donna has been a Series A Preferred Shareholder of AIA Services during all relevant times. Donna has also been a common shareholder of AIA Services during all relevant times, through her beneficial ownership as the Personal Representative of the Estate of Sara Taylor.

6.    Plaintiffs Dale Miesen and Donna J. Taylor are collectively referred to as the "Plaintiffs" in this Second Amended Complaint, and they were innocent minority shareholders.

7.    Plaintiffs are bringing this derivative action on behalf of AIA Services Corporation ("AIA Services"). In addition, Plaintiffs are bringing this action as a double derivative action on

SECOND AMENDED COMPLAINT - 1

**4-ER-869**

behalf AIA Insurance, Inc. ("AIA Insurance"), which is a wholly owned subsidiary of AIA Services. AIA Services and AIA Insurance are collectively referred to as "AIA" in this Second Amended Complaint. The definition of "AIA" includes AIA Services and/or AIA Insurance for purposes of pleading in the alternative, and includes the Plaintiffs to extent they are required to support any derivative cause of action set forth in this Second Amended Complaint.

8.      Defendant AIA Services is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. At all times relevant to this lawsuit, AIA Services is or has been the parent corporation of AIA Insurance.

9.      Defendant AIA Insurance is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. AIA Insurance is, or was at all relevant times, a wholly owned subsidiary of AIA Services.

10.     Defendant CropUSA Insurance Agency, Inc. ("CropUSA") is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. CropUSA was formerly known as AIA Crop Insurance, Inc.

11.     Defendant R. John Taylor ("John") is an individual residing in the state of Idaho. At all times relevant to this lawsuit, John served on the Board of Directors of AIA Services, AIA Insurance, and CropUSA and continues to serve on those boards. John also served as President of each of these corporations during all times relevant to this lawsuit. John is also licensed to practice law in the state of Idaho. John is a common shareholder of AIA Services and a common shareholder of the CropUSA. John also owns shares or ownership interests in other entities that have engaged in inappropriate transactions with AIA and/or which have improperly benefitted from AIA during all relevant times.

///

SECOND AMENDED COMPLAINT - 2

**4-ER-870**

12.     Defendant James Beck ("Beck") is an individual residing in the state of Minnesota. Beck served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until he resigned in 2014. Beck was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA.

13.     Defendant Michael Cashman, Sr. ("Cashman") is an individual residing in the state of Minnesota. Cashman served on the Board of Directors of AIA Services during certain relevant times. Cashman was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA.

14.     Defendant Connie Taylor Henderson ("Connie") is a resident of Vancouver, Washington. Connie served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2014. Connie jointly owns with John the common shares of AIA Services held in John's name. Connie has actively asserted community ownership of those shares and specifically did so before the district court and on appeal in *Taylor v. AIA Services Corp.*, *et al.*

15.     Defendant JoLee K. Duclos ("Duclos") is a resident of Clarkston, Washington. Duclos has served as Secretary of AIA Services, AIA Insurance, CropUSA and other entities partially or wholly owned by John during certain relevant times. Duclos served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2007. Duclos is a common shareholder of CropUSA. Duclos has knowledge of the law by and through her training and performing the duties of a paralegal. Duclos has served as John's "lieutenant" during all relevant times.

16.     John, Beck, Cashman, Connie and Duclos are collectively referred to herein as the "Controlling AIA Defendants." The Controlling AIA Defendants have acted in concert and

SECOND AMENDED COMPLAINT - 3

**4-ER-871**

assisted one another in committing various torts described in this Second Amended Complaint and covering up and/or concealing those torts. The definition of "Controlling AIA Defendants" includes the acts and/or omissions of one or more of John, Beck, Connie, Cashman and/or Duclos for purposes of pleading in the alternative.

17.    Defendant Gary D. Babbitt ("Babbitt") is an individual residing in the state of Idaho and was an attorney practicing law in the state of Idaho with and for Hawley Troxell.

18.    Defendant Richard A. Riley ("Riley") is an individual residing in the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

19.    Defendant D. John Ashby ("Ashby") is an individual residing in the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

20.    Defendant Hawley Troxell Ennis & Hawley LLP ("Hawley Troxell") is an Idaho limited liability partnership in the business of practicing law, with its principal place of business in Boise, Idaho. Hawley Troxell has no office in the state of Washington. None of the individual partners of Hawley Troxell are residents of Washington. Hawley Troxell, though its attorneys, acted as counsel for AIA Services, AIA Insurance and CropUSA during certain relevant times and in certain lawsuits. Hawley Troxell is also named herein as it is vicariously liable for the acts and/or omissions of Babbitt, Riley, Ashby and its other attorneys.

21.    Babbitt, Ashby, Riley, other Hawley Troxell attorneys, and Hawley Troxell are collectively referred to as the "Hawley Troxell Defendants" in this Second Amended Complaint. The definition of "Hawley Troxell Defendants" includes the acts and/or omissions of one or more of Babbitt, Ashby, Riley, other attorneys at Hawley Troxell and/or Hawley Troxell for purposes of pleading in the alternative.

///

SECOND AMENDED COMPLAINT - 4

**4-ER-872**

## IV.  FACTS

### A.  The Background Facts Regarding AIA Services and AIA Insurance

22.     In 1983, AIA Services was formed as a closely held Idaho corporation for the purpose of acting as a holding company for various other wholly owned subsidiaries. AIA's business model was to work with farmers and growers to form trusts and/or related cooperatives through various growers and farmers' associations and the members of those associates also becoming members of the trusts and/or cooperatives.

23.     AIA created the Grain Growers Membership & Insurance Trust, the National Contract Poultry Grower's Membership & Insurance Trust, and other, similar trusts. By way of its relationships with these various organizations, AIA held contracts for the exclusive right to market health insurance (*e.g.*, Group Universal Health Policies) and other insurance products to the members of the various trusts and associations.

24.     In 1987, Donna and Reed Taylor, a non-party to this suit, were issued Series A Preferred Shares in AIA Services in connection with their divorce. Pursuant to the dissolution of their marriage, Donna was issued the 200,000 shares of Series A Preferred shares on or about February 12, 1988, and has held those shares ever since, less those shares which have been redeemed in part over the years. (*See* Dkt. #67-1 and #67-2.)

25.     In connection with the issuance of the Series A Preferred Shares to Donna, AIA Services' shareholders adopted amendments to its articles of incorporation with restrictions on the manner in which AIA Services and its subsidiaries could conduct business. (*See* Dkt. #67-3.) AIA Services' amended articles of incorporation included, without limitation, the restrictions that: (a) barred AIA Services and AIA Insurance from guaranteeing any loans for any individual or entities which were not wholly owned subsidiaries; (b) barred certain transactions with shareholders and affiliates; and (c) required AIA Services to comply with certain financial covenants. (*Id.*)

SECOND AMENDED COMPLAINT - 5

26.     In addition, AIA Services' amended articles of incorporation also provided Donna with the unqualified right, as the Series A Preferred Shareholder, to appoint a person, to be determined in her sole discretion, to the Board of Directors of AIA Services. (*See* Dkt. #67-3.)

27.     The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the restrictions under AIA Services' amended articles of incorporation for the benefit of AIA Services and the Series A Preferred Shares.

28.     Donna's Series A Preferred Shares have not been fully redeemed to this day, and the restrictions under AIA Services' amended articles of incorporation remain in full force and effect to this day and fully applicable. (*See* Dkt. #67-42, pp. 10-11 ¶ 19.)

B.    **John, Connie, Beck and Cashman Take Operational Control of AIA and AIA Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in Its Amended Articles of Incorporation**

29.     In 1995, the Controlling AIA Defendants, other than Duclos (although she did assist the Controlling AIA Defendants as an employee and officer (assistant secretary) of AIA), spearheaded a transaction to redeem Reed Taylor's majority common stock interest in AIA Services. (*See* Dkt. 67-5 and #67-6.)

30.     As part of the redemption, Beck, Cashman and certain of their friends acquired Series C Preferred Shares in AIA Services. When AIA Services amended its articles of incorporation to allow the issuance of the Series C Preferred Shares, AIA Services included additional restrictions in its articles of incorporation. Riley assisted in drafting and/or approving these restrictions and he was fully aware of them.

31.     Under the new and additional restrictions in AIA Services' amended articles of incorporation (these restrictions were in addition to others adopted in connection with the issuance of Donna's Series A Preferred Shares), AIA Services was barred from engaging in a number of

SECOND AMENDED COMPLAINT - 6

**4-ER-874**

corporate actions, including, but not limited to: (a) AIA Services could not acquire any common shares from any shareholders unless all dividends due on the Series C Preferred Shares has been paid (10% dividend per year) or those funds were set aside; (b) the Series C Preferred Shareholders had the right to elect one director to AIA Services' Board of Directors; and (c) if any Series C Preferred Shares are redeemed, such redemptions must be equally from all shareholders. (*See* Dkt. #67-3.)

32.     Although the Series C Preferred Shares held by Beck, Cashman and their friends were eventually unlawfully and effectively redeemed by AIA, other Series C Preferred Shares were later issued to the AIA Services 401(k) Plan and those shares remain issued and outstanding to this day and no dividends have been paid as required since approximately 1997. As a result, these new restrictions under AIA Services amended articles of incorporation were in place for the benefit of AIA Services and the Series C Preferred Shares, which have remained in full force and effect to this day.  The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the additional restrictions under AIA Services' amended articles of incorporation.

33.     Upon the redemption of Reed Taylor's majority common shares, Beck, Cashman, John and Connie directly or indirectly became the majority common shareholders of AIA Services. (*See* Dkt. #67-5.) In addition, Beck, Cashman and John entered into a Voting Agreement to ensure that they would maintain control of AIA Services' Board of Directors. As a result, the Controlling AIA Defendants have maintained operational control of AIA from 1995 through the present time.

34.     In connection with the redemption of Reed Taylor's shares, John entered into an Executive Officer's Agreement with AIA Services, which guaranteed him certain salary payments and other compensation for three years; that agreement also contained non-compete and non-solicitation provisions. (*See* Dkt. #67-8.) John's salary after the first three years was required to be

SECOND AMENDED COMPLAINT - 7

determined by AIA Services' Board of Directors, which was never done after the first three years.

35.     From 1999-2012, John improperly paid himself millions of dollars pursuant to his Executive Officer's Agreement for his and Connie's benefit (the amount of which in itself was improper based on AIA's business prospects and John's inability to do anything for the benefit of AIA), while he intentionally and repeatedly violated the non-compete and non-solicitation provisions of his Executive Officer's Agreement.

36.     In connection with the redemption of Reed Taylor's shares in August 1995, AIA Services contributed funds to The Universe Life Insurance Company, which was a wholly owned subsidiary of AIA Services, in order to make AIA Insurance, which was then a wholly owned subsidiary of The Universe Life Insurance Company, a subsidiary of AIA Services. After that transaction, AIA Insurance became a wholly owned subsidiary of AIA Services.

37.     As a result, from August 1995 through all relevant times, AIA Insurance was a wholly owned subsidiary through which AIA Services derived its commissions and administrative fees from insurance policies, which accounted the bulk of AIA's revenues and profits.

38.     From 1995 through 2005, AIA Insurance generated over $65 million in revenues from commissions (over $33 million) and administrative fees (over $27 million), and it continued to generate revenues thereafter.

39.     From 1995 through all relevant times, each of the Controlling AIA Defendants has served at various times on the Board of Directors for AIA Services, AIA Insurance and/or CropUSA, while John has continuously served as the President of AIA and Duclos has continuously served as a Secretary of AIA.

40.     From 1999 through certain relevant times, the Controlling AIA Defendants have also served from time to time on purported "advisory board" of CropUSA, which actually made

SECOND AMENDED COMPLAINT - 8

the decisions on behalf of AIA and CropUSA. Specifically, Cashman, Beck and John served on the "advisory board" of CropUSA from 1999 through certain relevant times.

41.     The Controlling AIA Defendants intentionally concealed from AIA and AIA Services' minority shareholders of the existence and authority of the "advisory board" of CropUSA.

C. **AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer CropUSA to Themselves**

42.     By 1998, AIA's ability to sell health insurance had been impaired by undercapitalization in its underwriting subsidiary the Universal Life. Accordingly, the company considered proposals to sell other forms of insurance, and in particular crop insurance, to be underwritten by other insurance companies. At a 1998 Board Directors of Meeting, AIA Services' Board of Directors specifically discussed selling crop insurance and elected to have AIA pursue selling crop insurance.

43.     In 1999, AIA, then under the control of Controlling AIA Defendants, began selling crop insurance through a wholly owned subsidiary of AIA Services formed under the name "AIA Crop Insurance, Inc."

44.     The first purported meeting of shareholders of AIA Crop Insurance, Inc. ("AIA Crop Insurance") was held on January 11, 2000. The first purported meeting of the AIA Crop Insurance's Board of Directors was held on the same day. The purported minutes of the shareholder's meeting indicate that John, not the true owner AIA Services, claimed to be the sole shareholder of AIA Crop Insurance at the time of incorporation; these facts were concealed from AIA and AIA Services' innocent minority shareholders.

45.     Upon information and belief, at or shortly after the time of its formation, the Hawley Troxell Defendants began providing legal services to AIA Crop Insurance.

SECOND AMENDED COMPLAINT - 9

46.     At a special meeting of the shareholders of AIA Crop Insurance held on November 13, 2000, AIA Crop Insurance was renamed CropUSA in an apparent attempt to conceal its corporate lineage and origins.

47.     The minutes of the November 13, 2000 special meeting of the shareholders also show that John continued to claim that he was the sole shareholder of CropUSA, while he was simultaneously representing in business plans provided to others that CropUSA was a subsidiary of AIA Insurance. (*See* Dkt. # 67-66.)

48.     At the time CropUSA was formed, John was employed by AIA Services under an Executive Officer's Agreement, dated August 1, 1995, Dkt. #67-8, which contained express covenants not to compete. Upon information and belief, John's Executive Officer's Agreement and AIA Service's amended articles of incorporation and restated bylaws were drafted and/or approved by Riley, and he had full knowledge of the restrictions under the terms of the foregoing documents.

49.     CropUSA held its purported annual shareholder's meeting on January 10, 2001. By this time, the illegal "spin off" of CropUSA had been accomplished by having AIA Service's Series C Preferred Shareholders (primarily Beck and Cashman) exchange their Series C Preferred Shares for common shares in CropUSA (if CropUSA were in fact an independent entity, these maneuvers would have been completely unnecessary).

50.     The minutes for the shareholder meeting held on January 10, 2001 for CropUSA revealed that CropUSA had retained Hawley Troxell as its advisor and SEC counsel and, upon information and belief, the Hawley Troxell Defendants have served continuously as CropUSA's attorneys in one form or the other ever since. According to the minutes, negotiations between AIA Services and CropUSA had resulted in an agreement whereby AIA Services would no longer

SECOND AMENDED COMPLAINT - 10

operate CropUSA as a subsidiary.

51.    However, the negotiations referred to in the January 10, 2001 shareholder meeting minutes for CropUSA did not in fact occur. There was no decision, nor has there ever been a decision, on the part of AIA Services to discontinue the subsidiary status of CropUSA. The January 10, 2001 meeting minutes for CropUSA were concealed from AIA.

52.    None of the preferred or common shareholders of AIA Services (other than those present at the January 10, 2001 meeting) were given notice of or the opportunity to approve or oppose this corporate action; instead, it was concealed from them and AIA.

53.    In spite the fact that John asserted on January 10, 2001 that CropUSA would no longer be a subsidiary of AIA Services, John wrote in a letter dated February 27, 2001, sent on behalf of AIA to Donna, that "AIA is developing a new crop insurance program through a new company called CropUSA." (The letter went on to state that "[t]he costs of putting the CropUSA program together have been paid. AIA now needs to launch five new territories next Month"). This January 27, 2001 letter constituted an unambiguous representation by John to AIA and Donna that CropUSA was a subsidiary of AIA and was being operated for the benefit of AIA and implicitly also for AIA Services' innocent minority shareholders (which included Donna). This representation to AIA and Donna was false, and John knew it was false. Upon information and belief, the other Controlling AIA Defendants were aware of this January 27, 2001 letter and the misrepresentations contained within the letter.

54.    Notwithstanding the fact that John was obligated under the terms of his Executive Officer's Agreement that required that he not compete with AIA Services, and notwithstanding the fact that he owed fiduciary duties to the AIA and AIA Services' shareholders, John set forth his plans to exploit the assets of AIA for the benefit of CropUSA (and himself as the majority

SECOND AMENDED COMPLAINT - 11

purported shareholder) in the purported minutes of the purported January 10, 2001 meeting.

55.     The January 10, 2001 meeting minutes reveal that CropUSA authorized its officers to execute a Master Marketing Agreement with AIA Insurance that would allow CropUSA access to all of AIA's customers and customer lists, as well as all of AIA's trade secrets. AIA received no consideration for conveying this access or to enter into these agreements.

56.     CropUSA's officers (including John) were also purportedly authorized to enter into a Management Agreement with AIA Insurance wherein AIA Insurance purportedly agreed to provide management and administrative support to CropUSA without charge. However, John has since testified under oath that AIA's Board of Directors never authorized this agreement, although the Board has acquiesced in the action.

57.     AIA itself was never given notice of the Master Marketing Agreement and the Management Agreement, nor was AIA given the opportunity to approve or reject these agreements or any subsequent ones. Each of these agreements, when executed, constituted a violation of John's Executive Officer's Agreement, which contains a strict non-compete clause. Each of these agreements also constituted a direct breach of fiduciary duty or the aiding and abetting on behalf of each of the Controlling AIA Defendants in the commission of torts against AIA.

58.     Meanwhile, in 2001, John and Connie acquired a parking lot for $8,000 using AIA's line-of-credit. Upon information and belief, AIA was required to maintain control of the parking lot as part of its lease with Washington Bank Properties. John then increased the rent that AIA paid to use the parking lot to benefit him and Connie. For example, although John and Connie paid only $8,000 for the parking lot, they subsequently charged AIA $60,750 in rent to use the parking lot from 2004 through 2006. These unfair and self-serving rental payments to John and Connie were concealed from AIA and AIA Services' innocent minority shareholders and were

SECOND AMENDED COMPLAINT - 12

never disclosed to either of them, as was John and Connie's purchase of the parking lot.

**D. The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants in Taking CropUSA from AIA and Having AIA Fund CropUSA**

59.     Upon information and belief, the Hawley Troxell Defendants were providing legal services to CropUSA and/or its board of directors as of January 10, 2001, and such providing of legal services has continued through certain relevant times.

60.     Upon information and belief, from January 10, 2001, and continuing through the period relevant to this lawsuit, the Hawley Troxell Defendants had knowledge of John's Executive Officer's Agreement with AIA Services, had knowledge of the conflict of interest provisions in AIA's bylaws, and had knowledge of restrictions in AIA's amended articles of incorporation, but intentionally refused to comply with them and assisted John in violating them or covering up the violations.

61.     The Hawley Troxell Defendants knew or should have known that the purported Master Marketing Agreement and Management Agreement constituted breaches of John's Executive Officer's Agreement, violations of AIA Service' amended articles of incorporation, violations of AIA Services' restated bylaws, and constituted breaches of John and the other Controlling AIA Defendants' fiduciary duties owed to AIA and AIA Services' minority shareholders.

62.     Upon information and belief, the Hawley Troxell Defendants were also representing CropUSA from January 10, 2001, through certain relevant times, and by way of that representation they breached their fiduciary duties to AIA (including their undivided duty of loyalty owed to AIA) and took steps that materially assisted John and the Controlling AIA Defendants in the commission of the various torts described in this Second Amended Complaint and assisted in the concealment of those torts.

SECOND AMENDED COMPLAINT - 13

**4-ER-881**

63.     Beginning in 1999 and continuing through the through the time CropUSA ceased operating, CropUSA was funded and operated with assets improperly transferred from AIA, including, but not limited to, operating capital, office space, customer lists and other trade secrets, agents and staff, goodwill and other assistance. CropUSA paid nothing for these assets.

64.     The Controlling AIA Defendants, except Duclos, were all shareholders of AIA at the time CropUSA was formed and later purportedly became shareholders of CropUSA.

65.     The Controlling AIA Defendants, except Duclos (although she improperly took part in the meetings and acted as the Secretary) and Connie, all served on a purported "advisory board" of CropUSA and/or AIA, and this advisory board exercised actual control over CropUSA and AIA. By exercising control over these entities and committing acts that benefitted CropUSA at the expense of AIA, the Controlling AIA Defendants engaged in a conspiracy to defraud AIA, which should have had the right and title to the property of CropUSA.

66.     Due to the fact that the Controlling AIA Defendants have complete control over AIA and would never assert claims against themselves on behalf of AIA, the adverse dominion doctrine applies to all claims asserted herein, thereby barring any defense based on a statute of limitations. *Freeland v. Enosis Corp.,* 540 F.3d 721 (7th Cir. 2008).

67.     On January 10, 2002, CropUSA purportedly entered into a Memorandum of Understanding with the Controlling AIA Defendants. Under the terms of this memorandum, Beck and Cashman were obligated to guarantee loans on behalf of CropUSA.

68.     Notably, Beck and Cashman had also been obligated to guarantee over $1,000,000 in loans on behalf of AIA since 1995, but they never did. Notwithstanding this obligation, the Controlling AIA Defendants subsequently arranged for AIA to guarantee CropUSA's lines of credit, even though the guarantees were barred by AIA's amended articles of incorporation and

SECOND AMENDED COMPLAINT - 14

bylaws.

69.     In 2004, the Controlling AIA Defendants attempted to raise capital for CropUSA by selling shares in CropUSA to private investors by way of a $10,000,000 private placement. The Hawley Troxell Defendants drafted the July 15, 2004 Private Placement Memorandum, despite their knowledge of the illegal "spin-off" of CropUSA and the fiduciary duties they owed to AIA.

70.     When CropUSA began distributing the Private Placement Memorandum in 2004, the company was experiencing financial difficulties that made it difficult, if not impossible, to attract investors to purchase shares pursuant to the private placement.

71.     In addition, in 2004, the CropUSA's lack of adequate funding threatened its ability to participate in the Federal Crop Insurance program. To alleviate these problems, the Controlling AIA Defendants would improperly turn to AIA to obtain the necessary funding.

**E.  The Controlling AIA Defendants Steal $1,510,693 From AIA to Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt CropUSA Owed to AIA— thereby Resulting in a $2,144,962 Fraud Against AIA.**

72.     In order to boost CropUSA's balance sheet for the purpose of operating the company, attracting investors and maintaining access to the Federal Crop Insurance program, the Controlling AIA Defendants devised a scheme to illegally transfer $1,510,693 from AIA Insurance to CropUSA.

73.     The Controlling AIA Defendants conspired with each other in the formation and execution of this scheme to unlawfully transfer $1,510,693 of AIA's funds to CropUSA, and aided and abetted one another in carrying out the scheme and ultimately covering it up.

74.     Upon information and belief, the Hawley Troxell Defendants provided counsel to CropUSA with respect to the unlawful transfer of funds and/or has at a minimum assisted in covering up the facts of this illegal transfer.

SECOND AMENDED COMPLAINT - 15

75.     The scheme involved money derived from AIA Insurance. In August 2004, AIA Insurance received a payment of $1,510,693 from Trustmark. (*See* Dkt. #67-59.) Rather than deposit the payment of $1,510,693 into the account of AIA Insurance, where it would have benefited AIA and its innocent shareholders, John deposited the funds into a new account entitled "AIA Insurance Inc. CropUSA." (*See* Dkt. #67-60.) The address for this account coincided with the address for John's personal residence at 2020 Broadview Drive in Lewiston, Idaho, rather than any address used by AIA. (*Id.*)

76.     Shortly after diverting the $1,510,693 into the "AIA Insurance Inc. CropUSA" account, the Controlling AIA Defendants illegally transferred the funds to CropUSA. The Controlling AIA Defendants attempted to disguise this conversion of AIA Insurance's funds by characterizing the transaction as an alleged purchase by AIA Insurance of Series C Preferred Shares in its parent corporation, AIA Services. (*See* Dkt. #67-59.) Then, the Controlling AIA Defendants carried AIA Insurance's alleged investment in the Series C Preferred Shares as having a purported value of $1,510,693 when that was not the true value of the shares.

77.     However, as the Controlling AIA Defendants acknowledged at the time, there was no market for the Series C Preferred Shares which were purportedly being repurchased. At the time the $1,510,693 in funds were converted by CropUSA, there was no authorization of any kind for the transaction, and the transaction was concealed from AIA.

78.     In order to create a plausible explanation for the transfer of the $1,510,693, CropUSA eventually produced a document designated as a Consent in Lieu of Meeting dated August 26, 2004. (*See* Dkt. #67-61.) However, this document itself is completely fraudulent, as it was retroactively created the following year in order to deceive auditors who questioned the validity of this transaction.

SECOND AMENDED COMPLAINT - 16

79.     In addition, this $1,510,693 purported repurchase of shares separately violated the terms of AIA Services' amended articles of incorporation, which required that all Series C Preferred Shares be redeemed equally and simultaneously from all shareholders. (*See* Dkt. #67-3.) Instead of repurchasing an equal portion of the Series C Preferred Shares from AIA Services' 401(k) Plan, the Controlling AIA Defendants intentionally only repurchased the Series C Preferred Shares held by CropUSA (which had been previously held by Beck, Cashman and their friends).

80.     CropUSA was carrying these Series C Preferred Shares in AIA Services on its books with a value of $21,693, which means that CropUSA realized a gain of $1,489,000 on this purported sale of shares. (*See* Dkt. #67-59.) At that time, although the Controlling AIA Defendants had not properly accounted for all funds, assets, labor and other costs advanced from AIA for CropUSA, they had actually accounted for there being a debt of $634,269 owed by CropUSA to AIA.

81.     After unlawfully transferring the $1,510,693 received by AIA Insurance to CropUSA, the Controlling AIA Shareholders had CropUSA repay the $634,269 debt owed to AIA, thereby committing a double fraud upon AIA, i.e., AIA should have the $1,510,693 in its bank account now and it should have never lent the $634,269 to CropUSA in the first place. In other words, those fraudulent transactions alone resulted in the loss of $2,144,962 in funds to AIA and thus damaged AIA in the amount of $2,144,962. The Controlling AIA Defendants have actively concealed, or covered up, these transactions from AIA with the assistance of the Hawley Troxell Defendants.

82.     AIA and the innocent shareholders of AIA Services were never given notice of the 2004 stock transaction, nor were any proper board or shareholder meetings held to approve the transaction. However, as with the fraudulent document prepared on behalf of CropUSA, a

SECOND AMENDED COMPLAINT - 17

fraudulent Consent if Lieu of Meeting, dated August 26, 2004, was prepared on behalf of AIA. This document was actually produced several months after the transaction and was created to deceive auditors.

83.     Upon information and believe, the Hawley Troxell Defendants provided legal services to both AIA and CropUSA at the time of the 2004 transaction or had actually knowledge of the 2004 transaction.

84.     The Hawley Troxell Defendants at various times, as purported counsel for AIA, failed to disclose to AIA the 2004 transaction to transfer $1,510,693 to CropUSA and that the acts of the Controlling AIA Defendants constituted an intentional breach of their fiduciary duties (including the duty of loyalty) owed to AIA and a concealment of a prohibited transaction. For this reason alone, the Hawley Troxell Defendants could not reasonably rely on a tolling agreement to represent AIA, CropUSA and the interest of the Controlling AIA Defendants in later litigation.

85.     The Hawley Troxell Defendants failed to disclose to AIA, or to anyone else, that this $1,510,693 transaction was unlawful on many levels, including but not limited to the fact that it did not comply with articles of incorporation and bylaws, caused a breach of AIA's other contracts, and could not be justified by the balance sheet of either AIA Insurance or CropUSA. Upon information and belief, the Hawley Troxell Defendants had knowledge of the back-dated Consent in Lieu of Meeting documents.

86.     On February 16, 2005, Beck sent an email to John and Cashman confirming the Controlling AIA Defendants' scheme to steal CropUSA in an effort to profit: "[Cashman] and I are so convinced that CropUSA is a winner that anything standing in the way of a good result will be a crime." (Dkt. #67-54.) The crime was stealing CropUSA from AIA and then to drain AIA of its funds and assets to pursue the Controlling AIA Defendants' scheme.

SECOND AMENDED COMPLAINT - 18

**4-ER-886**

**F. The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal**

87.     After unlawfully taking $2,144,962 from AIA Insurance in 2004, the Controlling AIA Defendants continued to operate CropUSA with assets both tangible and intangible that rightfully belonged to AIA, continued to improperly subsidize CropUSA with AIA's assets and labor, and continued to conceal their actions from AIA and AIA Services' innocent minority shareholders.

88.     Under the management and direction of the Controlling AIA Defendants, AIA regularly failed to allocate costs to CropUSA and other entities and failed to charge markup, interest or profit on costs paid for other entities. For example, John's own salary of $250,000 was allocated entirely to AIA Services even though John's contractual right to salary from AIA Services had expired in 1998 and had never been renewed by an authorized board. (And, further, John performed no actual work for AIA during the time in question.)

89.     John, with the knowledge and complicity of the other Controlling AIA Defendants, also performed work for other entities owned in full or in part by him while on AIA's payroll, i.e., CropUSA, Pacific Empire Radio Corp., Pacific Empire Communications Corp., Pacific Empire Holdings Corp., Radio Leasing I LLC and Radio Leasing II LLC. John also had other AIA employees work for these entities without compensation to AIA. These facts, like virtually all of the others referenced in this Second Amended Complaint, were concealed from AIA and AIA Services' innocent minority shareholders.

90.     Between its founding in 1999 and the filing of this lawsuit, CropUSA and other entities generated tens of millions of dollars of revenue (including premiums) and other benefits that would have flowed to AIA but for the unlawful and unauthorized acts of the Controlling AIA Defendants.

SECOND AMENDED COMPLAINT - 19

91.     As of 2006, John owed AIA at least $307,000 for personal loans he had taken from AIA Services. For several years, John concealed these loans by engaging in false accounting whereby loans to him were treated as payments of principal on AIA Service' indebtedness due to Reed Taylor on his $6 million promissory note (which was later ruled to be illegal).  In 2006, John "corrected" the alleged accounting "error" by increasing the balance due on Reed Taylor's note to $6 million and reinstating John's $307,000 debt. John had still not repaid this personal loan.

92.     Over the years, John had AIA pay his personal maid, his personal credit card bills, donations, cash advances, family cell phone bills, and other personal expenses. John also had AIA purchase several vehicles from him, and he continued to drive these vehicles after the sales and purchase other vehicles with AIA's funds to use for his benefit when there was no reason to do so. John also had AIA employees perform work on his personal residence and on other real property not owned by AIA. These acts were all committed with the knowledge and complicity of the Controlling AIA Defendants and without paying AIA the fair value of the services or expenses.

93.     At year-end 2006, AIA had improperly lent $95,000 to Pacific Empire Radio Corp., a corporation partially owned by John and Connie and in which they both served as directors at certain times. The Controlling AIA Defendants transferred that $95,000 receivable from AIA to CropUSA. By the end of 2012, AIA would lend over $1,400,000 in additional funds to Pacific Empire Radio Corp., when all such loans violated AIA Services' amended articles of incorporation and were not authorized under the circumstances by AIA Services' restated bylaws.

94.     In August 2007, AIA settled litigation with the state of Idaho whereby AIA received a mortgage worth approximately $1.5 million for the amounts owed by Washington Bank

SECOND AMENDED COMPLAINT - 20

Properties on the real property where AIA's offices are located. Although AIA Insurance paid the costs of this litigation, the Controlling AIA Defendants, with the assistance of the Hawley Troxell Defendants, improperly titled the note in the name of AIA Services only, and then pledged the note to CropUSA so that the Controlling AIA Defendants could borrow money to pay their attorneys' fees and costs incurred defending in *Taylor v. AIA Services Corp., et al.* to the Hawley Troxell Defendants.

95.    As with the 2004 transactions, the transaction pledging the mortgage owned by AIA Services to CropUSA for purportedly paying the Hawley Troxell Defendants' attorneys' fees and costs incurred representing AIA, CropUSA and the Controlling AIA Defendants was a blatant misappropriation and/or illegal pledging of AIA's asset. The loan documents and the pledge agreement were drafted by the Hawley Troxell Defendants, although they later asserted that they were only "scriveners" for the transaction. This transaction was improper and barred by AIA's amended articles of incorporation and bylaws.

G. **The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and Financial Wherewithal with the Improper Assistance from the Hawley Troxell Defendants**

96.    On October 26, 2007, the Hawley Troxell Defendants drafted and delivered an opinion letter falsely representing that AIA Insurance was authorized to guarantee a $15,000,000 line-of-credit on behalf of CropUSA, which carried a hard-money loan with an exorbitant interest rate.

97.    The Hawley Troxell Defendants' opinion letter was delivered for a loan guarantee which violated AIA Services' amended articles of incorporation, its restated bylaws and AIA Insurance's bylaws, and in violation of the duty of loyalty owed by the Hawley Troxell Defendants to AIA.

SECOND AMENDED COMPLAINT - 21

**98.**     Additionally, Lancelot, the lender for this $15,000,000 line-of-credit was subsequently exposed as a Ponzi scheme, and its founder, Gregory Bell, pleaded guilty to criminal charges in federal court. Mr. Bell was the signee for Lancelot on the $15,000,000 line-of-credit. These facts pertaining to the $15,000,000 loan for CropUSA and AIA Insurance's guarantee of that loan, along with other transactions, were never disclosed to AIA by the Hawley Troxell Defendants or the Controlling AIA Defendants and the payment of interest on that loan was detrimental to AIA because most of CropUSA's assets could be traced directly to AIA (and the depletion of CropUSA's funds resulted in less funds available to recover).

**H.  The Controlling AIA Defendants Enter Into Tolling Agreements, but Those Tolling Agreements Do Not Save the Hawley Troxell Defendants from the Unwaivable Conflicts of Interest**

**99.**     In 2007, Reed Taylor filed suit against AIA and certain of the Controlling AIA Defendants, asserting claims for breaches of contract, breaches of fiduciary duties, conversion, fraud and other claims ("*Taylor v. AIA Services Corp., et al.*"). In 2007, the Hawley Troxell Defendants appeared as counsel for AIA Services and AIA Insurance in that lawsuit. Later, Reed Taylor amended his complaint and named CropUSA as a defendant, after recognizing that millions of dollars had been transferred to it from AIA, among other improper transactions (including some of those transactions described in this Second Amended Complaint). (*See* Dkt. #82-2.) The Hawley Troxell Defendants also appeared and represented CropUSA in that lawsuit. (*Id*.)

**100.**     As the purported attorneys for AIA, two entities, the Hawley Troxell Defendants owed duties of loyalty, care, and good faith to AIA and the Hawley Troxell Defendants breached their duties of care and fiduciary duties by engaging in the simultaneous representation of the Controlling AIA Defendants, AIA, CropUSA, and other parties (including Bryan Freeman) with interests adverse to the interests of AIA.

SECOND AMENDED COMPLAINT - 22

**4-ER-890**

101.    In 2007, Connie and Beck were purportedly appointed the Boards of Directors of AIA Service and AIA Insurance by John. Connie and Beck were paid $5,000 per quarter to sit on the Boards of AIA and also were to receive common shares for their purported "service." Beck later testified that he serves on AIA's Boards to protect his own interests and those of his friends (the same friends who previously acquired Series C Preferred Shares in AIA Services and illegally exchanged them for common shares in CropUSA).

102.    In 2007 and 2008, the Controlling AIA Defendants entered into written tolling agreements in connection with the various litigation directly or indirectly involving AIA. The Hawley Troxell Defendants were improperly involved with and/or facilitated the Controlling AIA Defendants entering into such tolling agreements for the purpose of allowing the Hawley Troxell Defendants to continue to represent AIA, CropUSA and directly or indirectly certain of the Controlling AIA Defendants.

103.    By tolling the statute of limitation for claims against the Controlling AIA Defendants, the Hawley Troxell Defendants sought to use the tolling agreements to authorize the waiver of their conflicts of interest representing AIA, CropUSA and the interests of the Controlling AIA Defendants in litigation that could have and should have exposed the fraud and intentional breaches of fiduciary duties committed by the Controlling AIA Defendants.

104.    The purpose of a properly drafted and executed tolling agreement is to allow conflicts of interest to be waived under certain limited permissible circumstances in order to waive a conflict of interest so that an attorney or law firm can represent clients with diverging interests. Those limited permissible circumstances were not present here.

105.    The Hawley Troxell Defendants knew or should have known that the Controlling AIA Defendants had committed intentional acts of fraud and breaches of fiduciary duties

SECOND AMENDED COMPLAINT - 23

(including the duty of loyalty) owed to AIA. The Hawley Troxell Defendants knew or should have known that by allowing the Controlling AIA Defendants to continue to operate and control AIA that they would continue to conceal their past torts and likely continue to commit new torts, which is precisely what occurred here as demonstrated by the facts alleged in this Second Amended Complaint.

106.    Although these tolling agreements tolled the statute of limitations for claims AIA could assert against the Controlling AIA Defendants (which eliminates any defense they may have to assert any statute of limitations defenses), the facts set forth in this Second Amended Complaint provide a classic example of why such tolling agreements were improper under the circumstances as the agreements involved tolling intentional torts committed against AIA. While the claims were being tolled, the Controlling AIA Defendants' continued to unlawfully use AIA's cash, resources and ability to borrow to fund other businesses and pay compensation to themselves.

107.    During the course of the litigation in *Taylor v. AIA Services Corp.*, *et al*., Reed Taylor attempted to negotiate a settlement, but he insisted that any settlement must include full disclosure to, and authorization by, AIA Services' minority shareholders and to allow them to participate in CropUSA common share ownership. (*See* Dkt. #67-18.) Not only did the Controlling AIA Defendants and Hawley Troxell Defendants reject Reed Taylor's offer, but they still refused and failed to provide full disclosure to AIA and AIA Services' innocent minority shareholders of the malfeasance and torts committed against AIA. The untenable position of the Hawley Troxell Defendants was confirmed when the only person seeking to require full and fair disclosure was a creditor, Reed Taylor. (*Id.*)

108.    During the course of *Taylor v. AIA Services Corp, et al.*, Connie and Beck represented to Judge Brudie, the Idaho Supreme Court and AIA that the redemption of Reed

SECOND AMENDED COMPLAINT - 24

Taylor's shares should be illegal to benefit AIA Services' minority shareholders. (*See* Dkt. #67-23 and #67-25.)

109. After Judge Brudie ruled the redemption of Reed Taylor's shares was illegal, neither Connie, Beck nor any of the other Controlling AIA Defendants did anything to benefit the minority shareholders of AIA Services nor did they ever have any intention of helping them, contrary to what they had represented to Judge Brudie and the Idaho Supreme Court.

110. Instead of sharing equally in AIA's assets with AIA Services' innocent minority shareholders, the Controlling AIA Defendants later sought to eliminate those minority shareholders for only ten cents per share, even though Connie and John both previously valued the shares much higher even after considering the over $6 million that AIA Services owed to Reed Taylor at the time of valuation (a debt that was later ruled to be illegal and void). (*See* Dkt. #67-24 and #67-50.)

111. Riley was an attorney at the law firm of Eberle Berlin at the time of the redemption of Reed Taylor's shares in 1995 and he breached his duty of care by advising AIA Services and Reed Taylor[1] to enter into the illegal stock redemption transaction. *See Taylor v. AIA Servs. Corp.*, 151 Idaho 552, 261 P.3d 829 (2011).

112. The illegal redemption of Reed Taylor's common shares ultimately led to AIA incurring over $1 million in attorneys' fees and costs litigating and resulted in AIA Services being required to report to the IRS a gain from the $6 million it never had to pay Reed Taylor.

---

[1] The Controlling AIA Defendants have brought bread to many defense attorneys. Notably, the Controlling AIA Defendants (except Cashman, who was not a party to the lawsuit) successfully asserted that the Stock Redemption Agreement was illegal. (*See* Dkt. #83-5.) Consequently, Reed Taylor sued Riley, Turnbow and Eberle Berlin for their incorrect third-party closing opinion letter. *Taylor v. Riley*, 157 Idaho 323, 336 P.3d 256, 261 (2014). He later settled his claims against Turnbow and Eberle Berlin, but his claims against Riley are on appeal as noted by the Ninth Circuit Court of Appeals. *Taylor v. Hawley Troxell Ennis & Hawley, LLP*, 628 Fed.Appx. 490 (9th Cir. 2015). Reed Taylor also sued his independent counsel. *Taylor v. Bell*, 185 Wn. App. 270, 273-79, 340 P.3d 951, 954-56 (2014), *review denied*, 352 P.3d 188 (2015).

SECOND AMENDED COMPLAINT - 25

113.    Upon information and belief, the Controlling AIA Defendants never reported the gain from the extinguished $6 million debt to Reed Taylor on AIA Services' tax return. If the Controlling AIA Defendants did not report the $6 million income to the IRS and AIA Services is obligated to pay taxes, penalties and interest on that gain, the Controlling AIA Defendants are liable for those sums as well for breaching their fiduciary duties owed to AIA.

114.    Based on the intentional acts of the Hawley Troxell Defendants, AIA has been decimated because the Controlling AIA Defendants remained in control of AIA through those tolling agreements. The end result of these tolling agreements was that the Hawley Troxell Defendants improperly ensured that the Controlling AIA Defendants would retain control over AIA to the detriment of AIA and for the improper benefit to the Hawley Troxell Defendants and the Controlling AIA Defendants.

115.    In or around 2007 or 2008, AIA Insurance received a settlement of approximately $800,000 for litigation that AIA Insurance had funded for certain policy holders. Instead of utilizing or retaining those funds exclusively for AIA, the Controlling AIA Defendants improperly used those funds, in full or in part, to continue their intentional acts of funding CropUSA, litigation caused by them or other unauthorized uses. Upon information and belief, the Hawley Troxell Defendants had knowledge of the receipt of those funds, yet they did nothing to protect the funds even though the funds were at issue in *Taylor v. AIA Services Corp., et al*.

116.    In 2008, the Controlling AIA Defendants and the Hawley Troxell Defendants permitted CropUSA to sell over $10,000,000 in crop insurance business to Hudson Insurance for the benefit of CropUSA when approximately 75% of the business had been derived directly from AIA's agency force (i.e., such agents as Larry Whitehead). The over $7.5 million should have been paid to AIA rather than to pay the debts incurred by the Controlling AIA Defendants through

SECOND AMENDED COMPLAINT - 26

CropUSA.

117.    Sometime after CropUSA sold the bulk of its assets to Hudson in 2008, which were derived primarily from AIA, the Controlling AIA Defendants obtained further funds from Hudson Insurance for Growers National Cooperative Insurance Agency, Inc. ("Growers National"), an entity formed and funded by AIA for purposed of selling crop insurance and providing a form of rebate to farmers.

118.    Upon information and belief, CropUSA received over $500,000 from Hudson for Growers National. These funds should have been paid to AIA and the receipt of the funds was concealed from AIA. Plaintiffs will establish the exact amount of funds that the Controlling AIA Defendants and/or CropUSA received from Hudson for Growers National at the time of trial.

I.   **The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA and Intentionally Committing Torts against AIA with the Assistance of the Hawley Troxell Defendants—Even While this Lawsuit Was Pending**

119.    Upon information and belief, the Hawley Troxell Defendants have been paid the bulk of the over $2,000,000 in attorneys' fees and costs incurred and/or paid for the various lawsuits. Plaintiffs will establish the exact amount of funds paid to the Hawley Troxell Defendants by AIA and/or on behalf of AIA, which Plaintiffs are seeking to be disgorged and returned to AIA.

120.    From 2009 through the present time, Donna exercised her right under the amended articles of incorporation to appoint two different directors to AIA Services' Board of Directors, but the Controlling AIA Defendants and/or the Hawley Troxell Defendants refused to honor her unqualified right thereby resulting in all actions taken by AIA Services' Board of Directors during that period of time being unauthorized and thus a breach of the fiduciary duties of the Controlling AIA Defendants.

///

SECOND AMENDED COMPLAINT - 27

121.    In December 2009, Donna filed suit against AIA Services to exercise her unequivocal right to appoint her designee, Patrick Moran, to the Board of Directors of AIA Services and to appoint a receiver for AIA Services. The Hawley Troxell Defendants once again appeared in that lawsuit and successfully opposed Donna's designee being appointed to the Board of Directors or a receiver being appointed by improperly seeking a stay in the lawsuit.

122.    Had the Hawley Troxell Defendants joined Donna in having a receiver appointed for AIA Services, which the Hawley Troxell Defendants should have done in light of the countless intentional torts committed against AIA by the Controlling AIA Defendants, there is no doubt that they could have stopped the Controlling AIA Defendants from carrying out their ongoing fraud, intentional breaches of fiduciary duties and their ultimate decimation of AIA. At a minimum, the Hawley Troxell Defendants acts and/or omissions in this regard was a substantial factor of the improper transactions, unlawful acts, and the ultimate decimation of AIA, which occurred after 2009.

123.    This lawsuit was filed by Plaintiffs on August 11, 2010, and subsequently stayed at the request of the Controlling AIA Defendants and the Hawley Troxell Defendants. During that stay, inappropriate and unlawful transactions continued to occur.

124.    In March 2012, the Controlling AIA Defendants, with, upon information and belief, the improper assistance of new attorneys at the law firm of Randall & Danskin, improperly terminated AIA Services' ESOP and paid those shareholders three cents per shares for their hard-earned common shares and failed to disclose the facts pertaining to the malfeasance and torts described in this Second Amended Complaint to those shareholders. (*See* Dkt. #67-30-33, 34.)

125.    However, the Controlling AIA Defendants knew that AIA Services' amended articles of incorporation barred all stock redemptions, including any purchases of shares held by

SECOND AMENDED COMPLAINT - 28

the ESOP, until the Series A Preferred Shares were all fully redeemed and the Series C Preferred Shares had been paid the over $1,000,000 in dividends owed. The repurchase of the ESOP shares for three cents per shares was illegal, ultra-vires and improper.

126.    In 2012, the Controlling AIA Defendants, again with the improper assistance of Randall & Danskin (*See* Dkt. #67-48, 67-48), improperly sought to effectuate a reverse stock split and to only pay AIA Services' minority common shareholders ten cents per share to repurchase those common shareholders (including Plaintiffs) without disclosing any facts and without offering full and fair compensation for the value of the shares. (*See* Dkt. #66-3.) The notice to the shareholders was signed by Duclos and the improper and unlawful reverse stock split was approved by Beck, John and Connie. (*Id.*)

127.    Thirteen shareholders objected. (*See* Dkt. #67-41.) The ill-conceived reverse stock split violated AIA Services' amended articles of incorporation and the Controlling AIA Defendants did not even bother to comply with Idaho Code, including, by failing to provide the form for the shareholders to state the value that they believed should be paid for their common shares thereby further establishing the true improper purpose of the failed reverse stock split.

128.    In response to the thirteen shareholder objections and notices of demands for payment, the Controlling AIA Defendants, through Randall & Danskin and without regard to the fact that they would expend tens of thousands of dollars more in funds litigating the issue rather than simply paying the shareholders the true fair value of their shares, had AIA Services file suit against the thirteen shareholders. (*See* Dkt. #83-15.) Judge Carl Kerrick properly dismissed the lawsuit, and further noted that it was disingenuous to seek a reverse stock split until this lawsuit was resolved. (*See* Dkt. #86-1.)

///

SECOND AMENDED COMPLAINT - 29

129. The failed reverse stock split fiasco drained AIA of significant and unnecessary attorneys' fees and costs (fees and costs which could have been paid to those shareholders or for other AIA obligations). This purported reverse stock split was approved and/or acquiesced in by the Controlling AIA Defendants. Upon information and belief, the Hawley Troxell Defendants were aware of the scheme to effectuate reverse stock split to eliminate AIA Services' innocent minority shareholders, which would in turn eliminate common shareholder standing for this lawsuit.

130. After the Controlling AIA Defendants had AIA Services file suit against the thirteen objecting common shareholders who demanded fair payment, Nez Perce County District Court Judge Carl Kerrick dismissed the lawsuit and awarded those minority shareholders attorneys' fees and costs. That judgment in favor of those shareholders has still never been paid by the Controlling AIA Defendants or AIA, and the Controlling AIA Defendants should be required to pay that judgment on behalf of AIA.

131. From 2009 through 2015, the Controlling AIA Defendants continued loaning money to, or allowed money to be lent to, Pacific Empire Radio Corporation in an amount exceeding $1,400,000 by year-end 2012 when that corporation had no ability to repay the sums owed and it benefitted John and Connie (who owned shares in that corporation at certain relevant times) as those were funds they would not have to personally provide to Pacific Empire Radio Corp.

132. From 1999 through 2012, the Controlling AIA Defendants concealed their ownership interests in other entities from AIA, which were derived from and/or funded by AIA, including, without limitation, CropUSA, CropUSA Insurance Services, LLC, Pacific Empire Holdings Corp.

SECOND AMENDED COMPLAINT - 30

**133.** From 1995 through 2012, John received over $2,729,557 in cash compensation from AIA. This amount does not include any compensation, payments or other improper distributions he may have received from CropUSA and other entities funded or launched using AIA. At a minimum, John should be required to disgorge the over $2,038,657 he received from AIA from 1999 through 2012 and other compensation or funds received since 1999, which John received while improperly competing against AIA through CropUSA and other entities (including Pacific Empire Holdings Corp.).

**J. There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants**

**134.** Since acquiring operational control of AIA Services in 1995, the Controlling AIA Defendants have engaged in repeated acts of faithless self-dealing, transactions detrimental to AIA, committed intentional torts (including fraud and breaches of fiduciary duties), breached their fiduciary duties (including their duties of loyalty), concealed, conspired to commit intentional torts, aided and abetted in the commission of intentional torts and to cover up those torts, to the detriment of AIA, including, but not limited to, the following specific examples: **(a)** controlling the Board of Directors and/or the decisions made by the Board and refusing to act in the best interests of AIA; **(b)** violating AIA Services' restated bylaws, including but not limited to, failing to hold annual shareholder meetings, failing to obtain proper shareholder approval for certain transactions, failing to comply with conflicts of interest provision in the bylaws and articles of incorporation which restricted many of the unlawful or improper transactions described herein, and failing to properly comply with applicable corporate governance; **(c)** violating AIA's amended articles of incorporation thereby allowing substantial funds and assets to be depleted from AIA and obligating AIA to be liable for loans or guarantees which were barred by those amended articles of incorporation; **(d)** diverting corporate opportunities belonging to AIA; **(e)** conveying,

SECOND AMENDED COMPLAINT - 31

encumbering, utilizing, and/or pledging corporate assets to themselves or other entities; **(f)** inappropriately redeeming, acquiring and/or issuing shares of stock and/or making payments on put options, including but not limited to, issuing shares to the Controlling AIA Defendants; **(g)** inappropriately paying dividends; **(h)** intentionally failing to comply with conflict of interest provisions in AIA's bylaws; **(i)** guaranteeing loans for CropUSA and failing to guarantee loans for AIA; **(j)** paying excessive compensation to officers and directors, including but not limited to, paying John $250,000 per year to purportedly act as CEO and President of AIA Services after his contractual entitlement to such salary had expired and John had represented that he would not take salary in certain years; **(k)** wasting corporate assets, including by paying Connie and Beck $20,000 per year to purportedly serve on the Board of Directors of AIA Services; **(l)** divulging and/or utilizing AIA's trade secrets for the benefit of themselves and other entities, including CropUSA; **(m)** soliciting and transferring AIA employees to work for CropUSA; **(n)** engaging in acts and/or decisions without making full disclosure and without obtaining the required approval of shareholders; **(o)** engaging in millions of dollars of transactions wherein AIA conveyed benefits without the receipt of any consideration or without being repaid; **(p)** forming and operating entities in direct competition with AIA in the insurance marketplace, including without limitation, CropUSA and Pacific Empire Holdings Corp.; **(q)** making false representations, including, without limitation, regarding share values, omitting material facts in AIA's financial statements, falsely certifying AIA's financial statements, and that AIA was being operated for the benefit of the corporation; **(r)** concealing and failing to disclose material facts to AIA pertaining to loans, transfers, and utilization of assets, including without limitation, concealing or omitting material facts, including all of the necessary facts related to virtually each and every transaction described in this Second Amended Complaint; **(s)** making false representations to AIA, including without

SECOND AMENDED COMPLAINT - 32

limitation, making and certifying false and misleading financial statements to AIA and representing that AIA was being properly operated when it was instead being used to fund the lifestyle, payments and other businesses owned or partial owned by the Controlling AIA Defendants; **(t)** inappropriately loaning AIA's funds, or guaranteeing loans, to themselves and to other entities under their control in violation of AIA's amended articles of incorporation, bylaws and fiduciary duties; **(u)** paying tens of thousands of dollars in yearly fees to purportedly serve on the Board of Directors of AIA and other compensation and benefits, when such amounts were excessive and they were violating their fiduciary duties owed to AIA and they were all acting as faithless fiduciaries; **(v)** paying attorneys' fees and costs in various legal proceedings on behalf of the Controlling AIA Defendants and others when it was clear that they had intentionally failed to act in good faith, were not entitled to indemnification or to have attorneys' fees and costs advanced on their behalf, and by failing to obtain security for repayment of said funds; **(x)** acquiring a parking lot with AIA funds and charging AIA, and making AIA pay, excessive rent for use of the parking lot even though AIA did not actually use the parking lot; **(y)** failing to seat the full and required Board of Directors for AIA Services, including, without limitation, by failing to honor Donna's appointment of Patrick Moran and Paul Durant to AIA Services' Board of Directors; **(z)** improperly purchasing and transferring shares held by AIA or which should have been held by AIA to themselves, including without limitation shares in Pacific Empire Radio Corp., Pacific Empire Communications Corp., and Pacific Empire Holdings Corp. (this entity was formed with AIA's assets by John, improperly competed against AIA, and was later sold for $240,000); **(aa)** allowing John to profit from CropUSA's sale of assets to Hudson by improperly allowing him to retain a monthly fee of $10,000 per month when those funds should have gone to AIA; **(bb)** failing to take appropriate legal action in the interests of AIA; **(cc)** removing a tenant from an AIA owned

SECOND AMENDED COMPLAINT - 33

**4-ER-901**

building to another building owned personally by John and/or other Controlling AIA Defendants; **(dd)** improperly subsidizing CropUSA and other entities with AIA's funds, labor and assets, failing to properly allocate expenses to CropUSA and failing to have other expenses paid back at all (which have already been identified as being approximately $500,000 as of 2008); **(ee)** selling and/or transferring assets and or/contracts belonging to AIA to others (including the contract with Growers National); **(ff)** improperly paying numerous law firms other than the Hawley Troxell Defendants hundreds of thousands of dollars representing AIA and the Controlling AIA Defendants in litigation caused by their own intentional acts and torts; **(gg)** paying more of AIA's funds to litigate disputes (including with Donna in the Idaho state courts) than it would have taken to simply pay the money owed; **(hh)** failing to obtain security, failing to charge interest, and failing to collect on loans of at least $307,000 made to John; **(ii)** removing the $400,000 held in the court registry and the over $200,000 in a bank account in *Taylor v. AIA Services Corp., et al.*, and allowing the Controlling AIA Defendants to utilize those funds when the Hawley Troxell Defendants should have ensured that those funds were kept from them; **(jj)** expending significant sums on the illegal repurchase of common shares in AIA Services, which also resulted in the ownership interest of the Controlling AIA Defendants increasing; and **(kk)** allowing AIA to engage in the transactions identified in this Second Amended Complaint when no dividends had been declared or paid on the Series C Preferred Shares held in the AIA Services 401(k) Plan and those shares now have accrued dividends owed of over $1,000,000. The Controlling AIA Defendants and/or the Hawley Troxell Defendants have assisted one another and others in committing the intentional torts against AIA described herein and concealing, or covering up, the facts and the intentional torts committed against AIA, including those specifically referenced in this paragraph and elsewhere in this Second Amended Complaint.

SECOND AMENDED COMPLAINT - 34

135.     At all relevant times, John was CEO, President and director of AIA Services, AIA Insurance and CropUSA and a shareholder of AIA Services at the time of all of the improper transactions with CropUSA and other improper acts identified in this Second Amended Complaint (also a classic example of a conflict of interest), and he improperly benefited from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

136.     At all relevant times, John was also owned interests in other entities who improperly benefitted directly or indirectly from AIA, which were additional conflicts of interest and proof of self-dealing.

137.     During certain relevant times, the Controlling AIA Defendants were all purported shareholders of CropUSA and either majority shareholders (as a group) or officers of AIA Services at the time of the improper transactions and malfeasance identified in this Second Amended Complaint (also a classic example of conflict of interest), and they improperly benefited, directly or indirectly, from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

138.     As a result of the acts and omissions set forth and/or contemplated above and other acts and/or omissions which will be established at or before trial, the Controlling AIA Defendants and the Hawley Troxell Defendant have proximately caused AIA millions of dollars in damages.

**V.   <u>CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742
       AND FEDERAL RULE OF CIVIL PROCEDURE 23.1</u>**

139.     As a prerequisite to filing this lawsuit under Idaho Code § 30-1-742 and Federal Rule of Civil Procedure 23.1, Plaintiffs (and over ten other shareholders of AIA Services) have been shareholders of AIA Services during all relevant times to the claims asserted in this Second

SECOND AMENDED COMPLAINT - 35

Amended Complaint.

140.     On July 21, 2008, Donna served a written derivative demand letter on the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #23-9 and #67-19.)

141.     On July 23, 2008, the Hawley Troxell Defendants filed a Motion for Stay of Proceedings in *Taylor v. AIA Services Corp.*, *et al.*, and asserted that the stay was necessary so that AIA Services and AIA Insurance could conduct an inquiry into the demands made by Donna in her letter dated July 21, 2008.

142.     On August 14, 2008, in *Taylor v. AIA Services Corp.*, *et al.*, the Hawley Troxell Defendants disingenuously filed a petition for a court appointed independent inquiry on behalf of AIA when they had no intention of following through with the inquiry. (*See* Dkt. #67-20.)

143.     On September 4, 2008, Reed Taylor supported the appointment of independent investigators. However, Reed Taylor objected to the investigators proposed by the Hawley Troxell Defendants, who were purportedly representing AIA, and the Controlling AIA Defendants. (*See* Dkt. #67-21.) Reed Taylor believed totally independent people should be appointed.

144.     Although the parties had filed briefing with respect to the appointment of independent investigators, the Hawley Troxell Defendants never noted the motion for a hearing and the court never ruled on the request, and they intentionally abandoned the appointment of an independent inquiry.

145.     The Hawley Troxell Defendants and Controlling AIA Defendants have never conducted a further investigation of the demands made in Donna's derivative demand letter of July 21, 2008. No action was ever taken by the Boards of Directors.

146.     On April 3, 2012, Plaintiffs made another written demand on the Boards of Directors of AIA Services and AIA Insurance, which included demands to keep the $400,000 cash

SECOND AMENDED COMPLAINT - 36

held in the Court registry in *Taylor v. AIA Services Corp.*, *et al.*, to comply with AIA's amended articles of incorporation, to comply with AIA's bylaws, provide full disclosure, and to protect certain other assets. (Dkt. #67-33.) This particular demand was copied directly to Babbitt and Ashby, so they had full knowledge of it. This demand, like all of the others, was ignored. (*See* Dkt. #67, p. 11 ¶ 29.)

147.     On July 16, 2012, the Plaintiffs and over ten other shareholders of AIA Services served additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #67-42.) The demands requested, among other things, that AIA pursue this lawsuit with all claims as of July 16, 2012 and future claims, including punitive damages. (*Id*.) In addition, Plaintiffs have made additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance, but no action has ever been taken by the Boards of Directors.

148.     Over ninety days have elapsed since the Plaintiffs' written derivative demands were made and no action has been taken by AIA whatsoever, and all of the claims asserted in this lawsuit flowed from those derivative demands.

149.     As owner of Preferred A Shares in AIA Services, and as beneficial owner common shares in AIA Services, Donna fairly represents the interests of shareholders not named in this lawsuit. She also assisted in defeating the litigation involved the Controlling AIA Defendants' efforts to effectuate an improper reverse stock split to eliminate shareholder standing in this lawsuit, when she could have simply sought to solely protect her interests only. Donna is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims. Donna has pursued this lawsuit solely for the benefit of AIA and their innocent shareholders.

///

SECOND AMENDED COMPLAINT - 37

150.    As the second largest common shareholder AIA Services (who traded a book of insurance business worth approximately $500,000 to AIA Services in exchange for his common shares), Miesen also fairly represents the interest of AIA and their shareholders. Miesen has never received a penny in return for his investment in AIA. Miesen is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims. Miesen has pursued this lawsuit solely for the benefit of AIA and their innocent shareholders.

## VI.    COUNT I—BREACH OF FIDUCIARY DUTIES
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

151.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

152.    The Controlling AIA Defendants owed fiduciary duties to AIA as the majority and controlling shareholders. As members, or purported members, of the Board of Directors for AIA Services and/or AIA Insurance, the Controlling AIA Defendants, who have each served as a director of AIA Services at one time, owed fiduciary duties to the corporations. As corporate officers of AIA, John, as President and CEO, and Duclos, as Secretary, owed fiduciary duties to AIA, which were further elevated during the times in which the both served as directors too (which is from 1995 to the present time for John).

153.    As attorneys for AIA, the Hawley Troxell Defendants owed fiduciary duties to AIA (including the undivided duty of loyalty). If not authorized to act as attorneys for AIA, the Hawley Troxell Defendants acted with apparent authority as agents and owed fiduciary duties as a result of that agency relationship. The Hawley Troxell Defendants had conflicts of interest when they undertook to represent AIA and CropUSA, and when they proceeded in the manner directed by

SECOND AMENDED COMPLAINT - 38

**4-ER-906**

any one or more of the Controlling AIA Defendants, thereby improperly representing the interests of the Controlling AIA Defendants, instead of the best interests of AIA. *Reis v. Barley, Snyder, Senft & Cohen LLC,* 484 F.Supp.2d 337 (E.D. Pa. 2007).

154.    Based on any and/or all of the acts and/or omissions set forth in this Second Amended Complaint and/or those facts proven at or before the time of trial, the Controlling AIA Defendants and the Hawley Troxell Defendants have breached their fiduciary duties owed to AIA, including, without limitation, breaching their undivided duties of loyalty, trust and confidence owed to AIA, and by placing their interest in earning hundreds of thousands of dollars, and ultimately over $1,000,000, in attorneys' fees over looking after the interests of AIA.

155.    The Hawley Troxell Defendants have separately breached their fiduciary duties as matter of law when they simultaneously represented AIA and CropUSA. In addition, Riley was aware that CropUSA was derived from AIA and he was further aware of the restrictions in AIA Services' amended articles of incorporation as he helped draft them. The Hawley Troxell Defendants have further breached their fiduciary duties as a matter of law for the violations of the Rules of Professional Conduct dealing with loyalty to a client and conflicts of interest.

156.    As a direct and/or proximate cause of the Controlling AIA Defendants and the Hawley Troxell Defendants breaches of their fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

157.    In addition, each of the Controlling AIA Defendants and the Hawley Troxell Defendants is a "faithless fiduciary" as defined by law and is therefore required to disgorge all compensation and consideration received from AIA and/or CropUSA. The disgorgement is in addition to liability caused by the breaches of fiduciary duty. In the case of the Hawley Troxell Defendants, the disgorgement goes to all fees received for or paid on behalf of AIA and CropUSA.

SECOND AMENDED COMPLAINT - 39

**4-ER-907**

In the case of the faithless Controlling AIA Defendants, the disgorgement goes to all salary, bonuses, warrants, stock options, or stock received from AIA.

## VII.    COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES
(Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

158.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

159.    One who counsels, advises, abets or assists in the commission of an actionable wrong is responsible to the injured person for the entire loss or damage. 86 C.J.S. Torts § 105; RESTATEMENT (FIRST) OF TORTS § 876 (1939). Aiding and abetting in the commission of an actionable wrong may be inferred from the fact that one aided and abetted efforts to conceal the wrong. 86 C.J.S. Torts § 105. Liability for aiding and abetting the commission of a tort may be established by showing the person was present at the time of the actionable wrong and did not disapprove or oppose the action. Plaintiffs alleging aiding and abetting need not prove that the aiding and abetting was necessary for the commission of the tort, only that the aiding and abetting made it easier for the tort to occur. *See Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12 (2002).

160.    During certain relevant times, the Hawley Troxell Defendants and the Controlling AIA Defendants had knowledge of the other defendants' acts and/or omissions as described in this Second Amended Complaint and as proven at trial, knew that such acts and/or omissions constituted breaches of fiduciary duties, did not disapprove of such acts or omissions, took no steps to prevent the commission of the breaches of fiduciary duties flowing from the acts and/or omissions, and assisted in the concealment of such acts and/or omissions described herein, thereby damaging AIA.

SECOND AMENDED COMPLAINT - 40

161.     As a direct and/or proximate cause of the Hawley Troxell Defendants and the Controlling AIA Defendants aiding and abetting one another in the breaches of fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

## VIII.     COUNT III—LEGAL MALPRACTICE
### (Against the Hawley Troxell Defendants)

162.     Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

163.     A legal malpractice claim may be brought in a derivative action. *Schulman v. Wolf & Samson, PC,* 951 A.2d 1051 (N.J. 2008).

164.     Since at least 1999, the Hawley Troxell Defendants had an attorney-client relationship with AIA, while Riley has had an attorney-client relationship with AIA since prior to 1995. The Hawley Troxell Defendants owed duties to AIA, including, without limitation, duties of care, good faith and loyalty. Despite the duties owed to AIA, the Hawley Troxell Defendants also improperly represented CropUSA.

165.     The Hawley Troxell Defendants have breached their duties owed to AIA, including, without limitation, the breached duties described in this Second Amended Complaint. The Hawley Troxell Defendants have further violated their duty of loyalty owed to AIA by improperly simultaneously representing AIA and CropUSA, together with directly and/or indirectly improperly representing the interests of the Controlling AIA Defendants.

166.     AIA suffered damages as a direct, foreseeable and/or proximate result of the breaches of duty and the acts of the Hawley Troxell Defendants, including those acts described in this Second Amended Complaint and/or proven at the time of trial. At a minimum, the Hawley Troxell Defendants were also a substantial factor in the harm and damages inflicted upon AIA,

SECOND AMENDED COMPLAINT - 41

including, without limitation, the ultimate decimation of AIA by the Controlling AIA Defendants. Had the Hawley Troxell Defendants properly discharged their duties, the Controlling AIA Defendants would never have decimated AIA.

167.    As a direct and/or proximate cause of such acts and/or omissions, the Hawley Troxell Defendants are liable to AIA for damages in the amount to be proven at or before the time of trial.

## IX.    COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ CONSTRUCTIVE FRAUD
### (Against the Controlling AIA Defendants)

168.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

169.    The Controlling AIA Defendants are liable to AIA for fraud because: **(a)** they made representations of fact to AIA and AIA Services' innocent minority shareholders as asserted throughout this Second Amended Complaint, including but not limited to, (i) representations that CropUSA was being operated for the benefit of AIA, (ii) representations that AIA was being properly operated (including that the Boards of Directors had properly authorized certain transactions when Donna's designee was not on the Board of AIA Services and the provisions in the amended articles and bylaws had not been complied with), (iii) representations that the information on AIA's financial statements was true (John separately certified to auditors and others that the information contained on certain of AIA's financial statements was true and correct), (iv) representations that expenses and loans between AIA and other entities or parties were properly entered into and accounted for (i.e., there are hundreds of thousands of dollars, if not millions of dollars, in funds and other assets used by CropUSA which were derived from AIA and never

SECOND AMENDED COMPLAINT - 42

accounted for), and (v) other representations referenced in this Second Amended Complaint; **(b)** these representations were false; **(c)** these representations were material; **(d)** they knew these representations were false; **(e)** they intended that there be reliance; **(f)** AIA was ignorant of the falsity of these representations; **(g)** AIA relied on these representations; **(h)** AIA's reliance was justified; and **(i)** injury resulted. *See, e.g., Mannos v. Moss,* 143 Idaho 927, 155 P.3d 1166 (2007) (holding that misrepresentations in financial statements precluded summary judgment). Constructive fraud is identical to fraud, except that the plaintiff need not prove speaker's knowledge of the fraud and the speaker's intent that the other party rely on the representations.

170.    The Controlling AIA Defendants owed duties to AIA during certain relevant times as majority shareholders, board members and/or officers of AIA. In addition to making false representations, the Controlling AIA Defendants also concealed information from AIA and its innocent minority shareholders with knowledge that the concealed information was material and that the concealment would cause AIA to suffer otherwise avoidable damages, including without limitation, information contained in this Second Amended Complaint. The Controlling AIA Defendants' failure to disclose a fact to AIA and AIA Services' innocent minority shareholders where one has a duty to disclose is the legal equivalent of representing the non-existence of the fact. Where facts are fraudulently concealed, Plaintiffs need not show reliance as there is nothing other than silence upon which to rely.

171.    The Controlling AIA Defendants represented to AIA Services that CropUSA was a wholly owned subsidiary of AIA Services. Simultaneously, the Controlling AIA Defendants adopted the position, not disclosed to AIA or its innocent minority shareholders, that CropUSA was an independent entity with John as its alleged sole shareholder and subsequently failed to disclose that CropUSA was not a separate entity. These representations were false, the Controlling

SECOND AMENDED COMPLAINT - 43

**4-ER-911**

AIA Defendants knew of their falsity, the Controlling AIA Defendants intended that there be reliance, there was justifiable reliance by AIA and AIA Services' innocent minority shareholders, and AIA was damaged as a result.

172.   By operating CropUSA as an independent entity, and by using CropUSA as a vehicle for misappropriating and converting corporate assets, the Controlling AIA Defendants committed ongoing fraud that has persisted through the date of this Second Amended Complaint.

173.   The Controlling AIA Defendants also made misrepresentations to AIA and AIA Services' innocent minority shareholders in the form of false, misleading and fraudulent financial statements (which such financial statements also failed to disclose numerous improper and unlawful transactions and their ownership interests in CropUSA and other entities), upon which AIA and AIA Services' innocent minority shareholders reasonably relied, with that reliance being the proximate cause of AIA's damages.

174.   When the Controlling AIA Defendants transferred more than $1.5 million to CropUSA in 2004, they concealed the fact of this transaction from AIA and AIA Services' innocent minority shareholders and AIA was damaged by this concealment.

175.   When the Controlling AIA Defendants transferred AIA corporate assets, including funds, employees, goodwill and trade secrets to CropUSA and other entities and were subsidizing CropUSA and other entities, they concealed these facts from AIA and AIA Services' innocent minority shareholders. AIA suffered damages by these concealments.

176.   When the Controlling AIA Defendants had AIA pay certain of CropUSA's corporate expenses, they concealed this fact from AIA.  AIA suffered damages as a result of this concealment.

///

SECOND AMENDED COMPLAINT - 44

**4-ER-912**

177.     When the Controlling AIA Defendants pledged the mortgage obtained by AIA from the state of Idaho to CropUSA so that CropUSA could borrow money to pay the attorney's fees of the Hawley Troxell Defendants, they concealed this fact from AIA.  AIA suffered damages as a result of this concealment.

178.     When the Controlling AIA Defendants had AIA Insurance guarantee CropUSA's $15 million line of credit and later sold over $10,000,000 in assets derived from AIA to Hudson Insurance, they concealed the fact of this guarantee and asset sale from AIA.

179.     When the Controlling AIA Defendants finally disclosed their ownership interests in CropUSA, CropUSA Insurance Services, LLC and other entities in AIA Services' financial statements in July 2012[2] (*See* Dkt. #67-38), they continued to conceal how they obtained their ownership interest in those entities (and in the case of CropUSA that the ownership interest came from AIA) and many transactions and purported loans between the entities and AIA (loans and guarantees made by AIA which were prohibited by AIA Services' amended articles of incorporation and restated bylaws).

180.     As a direct and/or proximate cause of the Controlling AIA Defendants' fraudulent acts, AIA has been damaged in an amount to be proven at or before trial, and the ongoing fraud bars the Controlling AIA Defendants from asserting statute of limitations defenses. To the extent that the Hawley Troxell Defendants seek to assert the statute of limitations as a defense, they too are barred from doing so through their fraudulent concealment of facts from AIA.

///

///

///

---

[2] While the financial statements were dated as of year-end 2011, they were not provided to AIA or its shareholders until July 2012 in connection with the failed ill-conceived reverse stock split.

SECOND AMENDED COMPLAINT - 45

## X.    COUNT V—AIDING AND ABETTING FRAUD
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

181.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

182.    One who aids and abets in the commission of a tort is liable with the primary tortfeasor(s) for all damages resulting from the tort. Aiding and abetting is established where one has knowledge of the torts, does not disapprove, and takes no action to prevent the commission of the torts or assists in covering up such torts. The foregoing applies to the Controlling AIA Defendants and the Hawley Troxell Defendants.

183.    The Controlling AIA Defendants have aided and abetted in one another's fraud committed against AIA. The Controlling AIA Defendants' silence, failure to act and intentional acts to cover up fraud upon AIA constitutes the aiding and abetting of fraud upon AIA.

184.    The Hawley Troxell Defendants have aided and abetted in the fraud committed against AIA by the Controlling AIA Defendants by assisting in the commission of fraud. The Hawley Troxell Defendants' silence, failure to act and intentional acts to cover up fraud upon AIA constitutes the aiding and abetting the fraud upon AIA.

185.    The Hawley Troxell Defendants knew or should have known that the transfer of AIA's assets, loans and other unauthorized transactions to CropUSA constituted a fraud against AIA.

186.    The Hawley Troxell Defendants knew or should have known that the transfer of approximately $1,500,000 to CropUSA in 2004 constituted a fraud on AIA.

187.    The Hawley Troxell Defendants knew or should have known that the practice of allocating CropUSA expenses to AIA, and otherwise failing to maintain arms' length transactions

SECOND AMENDED COMPLAINT - 46

**4-ER-914**

between CropUSA and AIA, constituted a fraud on AIA.

188.    By knowingly providing legal cover for the fraudulent acts described herein, the Hawley Troxell Defendatns have aided and abetted the fraud committed by the Controlling AIA Defendants and CropUSA.

189.    As aiders and abettors, the Hawley Troxell Defendants are liable to AIA to the same extent as the primary tortfeasors. RESTATEMENT (FIRST) OF TORTS § 876 (1939). Likewise, the Controlling AIA Defendants are all liable for aiding and abetting each other in the commission of fraud against AIA.

190.    As a direct and/or proximate cause of the Hawley Troxell Defendants and the Controlling AIA Defendant aiding and abetting in fraud, AIA has been damaged in the amount to be proven at or before the time of trial.

### XI.    COUNT VI—BREACH OF CONTRACT
#### (Against John)

191.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

192.    On August 1, 1995, John and AIA Services entered into an Executive Officer's Agreement. (*See* Dkt. #67-8.)

193.    The Executive Officer's Agreement contains contractual provisions preventing John from doing certain acts. For example, Section 9 of the Executive Officer's Agreement sets for express covenants not to compete. Subsection A of the covenants prohibits John from soliciting AIA customers or otherwise diverting the business of AIA customers. Subsection B prohibits John from participating in any insurance business that underwrites, markets or administers insurance products for commodity associations. Subsection C prohibits John from soliciting AIA Services

SECOND AMENDED COMPLAINT - 47

employees for other employment.  Subsection D of the covenants bars John from divulging or exploiting trade secrets belonging to AIA.

194.    John has breached his contractual obligations owed to AIA, including, without limitation, by forming CropUSA as anything other than a wholly-owned subsidiary of AIA, competing against AIA with CropUSA and other entities (including Pacific Empire Holdings and CropUSA Insurance Services, LLC). John has breached all four subsections of Section 9 of the Executive Officer's Agreement.

195.    As a direct and/or proximate cause of John's breaches of the Executive Officer's Agreement, AIA has been damaged in an amount to be proven at or before trial. Such breaches also constitute the breaches of his fiduciary duties owed to AIA.

## XII.    COUNT VII—DECLARATORY JUDGMENT
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

196.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

197.    Plaintiffs seek a declaratory judgment against Controlling AIA Defendants, including, without limitation, for the following relief: (a) for a full accounting with supporting documentation of all of AIA's funds, assets, loans and other transactions from 1999 through the present time; (b) requiring the Controlling AIA Defendants to comply with AIA's amended articles of incorporation, bylaws and the Idaho Business Corporation Act; (c) rescinding the purchases of the shares held by the ESOP and/or ensuring that those shareholders receive fair value for their shares; (d) rescinding and/or declaring void the common shares issued to John through is Executive Officer's Agreement; and (d) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this Second

SECOND AMENDED COMPLAINT - 48

**4-ER-916**

Amended Complaint).

198.    Plaintiffs seek a declaratory judgment against the Hawley Troxell Defendants, including, without limitation, for the following relief: (a) that the representation agreement, fee agreements and any related agreements entered into with them and AIA be declared void (including, without limitation, because such agreements violated the applicable Rules of Professional Conduct); (b) any agreements or accounts regarding any sums owed by AIA, if any, be declared void; and (c) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this Second Amended Complaint).

## XIII.    COUNT VIII—EXCESSIVE COMPENSATION/CORPORATE WASTE
### (Against the Controlling AIA Defendants)

199.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

200.    To support a claim for excessive compensation, Plaintiffs need only show that the board lacked independence and/or lacked good faith. *In Re: Tyson Foods, Inc.,* 919 A.2d 563 (Del. 2000). The Controlling AIA Defendants have been officers and/or controlled AIA's Boards of Directors from 1995 through certain relevant times.  The Controlling AIA Defendants have lacked independence and have not acted in good faith, including, without limitation, by committing the intentional acts and/or omissions described in this Second Amended Complaint.

201.    The Controlling AIA Defendants paid excessive compensation and have wasted corporate assets during the course of managing and/or operating AIA, including, without limitation, by paying themselves excessive compensation (and practically speaking, any compensation at all based on their acts and omissions) and operating AIA for the benefit of

SECOND AMENDED COMPLAINT - 49

**4-ER-917**

CropUSA, the Controlling AIA Defendants and other entities they partially or wholly own, including Pacific Empire Radio Corp., CropUSA Insurance Services, LLC, and Pacific Empire Holdings Corp. The Controlling AIA Defendants also decimated AIA's agency force and caused them to transfer to CropUSA and ultimately Hudson and other entities. In addition, notwithstanding the fact that John is not entitled to retain any of his compensation or benefits as a faithless fiduciary, it was separately corporate waste to pay him in the first place as he did nothing for AIA (AIA's business was simply running off the commissions received for policies sold years before). The other transactions and malfeasance described in this Second Amended Complaint also constitute corporate waste, and none of those transactions and malfeasance were properly disclosed to all of AIA Services' shareholders nor was any authorization from them ever sought or obtained.

202.   The Controlling AIA Defendants are liable to AIA for damages caused by paying excessive compensation and otherwise wasting and needlessly depleting AIA's funds and assets for their own benefit and with disregard for AIA.

203.   As a direct and/or proximate cause of the Controlling AIA Defendants' waste, AIA has been damaged in the amount to be proven at or before trial.

### XIV.   COUNT IX—ACCOUNT STATED
#### (Against John)

204.   Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

205.   John established an account by borrowing $307,000 from AIA for his personal use. John subsequently confirmed the amount of the debt by "correcting" an alleged so-called accounting "error" when he had previously extinguished the $307,000 debt by improperly crediting the payment of Reed Taylor's $6 million promissory after the issue arose in *Taylor v.*

SECOND AMENDED COMPLAINT - 50

**4-ER-918**

*AIA Services Corp., et al.*, so that AIA's book show that AIA is creditor and John is debtor for $307,000, i.e., the correction was only made because Reed Taylor demanded it and he was suing AIA Services for repaying of the $6 million note.

206.    John has not paid any portion of this debt and the entire balance remains due and payable to AIA. John is liable to AIA for $307,000 on the account stated and/or such other amount as may be presently owed, plus prejudgment interest from the date the obligation was incurred. If John has since paid back the $307,000 or any part of the sums he owes, then Plaintiffs still seek the balance owed and prejudgment interest for the benefit of AIA, including, because John has been a faithless fiduciary who is not entitled to any interest-free loans from AIA.

## XV.    JURY DEMAND

207.    Plaintiffs hereby demand a trial by jury of no less than the maximum number of jurors permitted on all causes of action for which a jury trial is allowed by law.

## XVI.    PRAYER FOR RELIEF

Wherefore Plaintiffs pray for the following relief:

1.    For a judgment jointly and severally against the Controlling AIA Defendants and the Hawley Troxell Defendants for damages in an amount to be proven at trial, plus prejudgment interest;

2.    For judgments against the Controlling AIA Defendants and the Hawley Troxell Defendants in an amount to be proven at trial for damages for which joint and several liability does not apply to all defendants, plus prejudgment interest;

3.    For a judgment or order requiring the Hawley Troxell Defendants to disgorge all attorneys' fees and costs paid to them by AIA Services, AIA Insurance, CropUSA and by any other party on behalf of those entities in the amount to be proven at the time of trial, plus prejudgment interest;

SECOND AMENDED COMPLAINT - 51

4.      For a judgment or order requiring the Controlling AIA Defendants to disgorge all compensation received from AIA or CropUSA since 1999, including stock, cash, benefits, and other assets, including based on intentionally breaching their fiduciary duties and being faithless fiduciaries;

5.      For judgment against John in the amount to be proven at the time of trial, plus prejudgment interest;

6.      For an order requiring that all funds recovered as a result of this litigation, minus fees, costs and bona fide debts, be deposited with the Court registry and distributed only after court order, and that no funds from this litigation be paid to faithless fiduciary Controlling AIA Defendants;

7.      For judgments against the Controlling AIA Defendants, jointly and severally, as the alter-ego of CropUSA or to pierce its corporate veil, for all damages incurred by AIA and attributable in whole or in part to CropUSA;

8.      For a declaratory judgment for the relief specified in this Second Amended Complaint and any other declaratory relief requested at or before trial;

9.      For an award of the attorneys' fees and cost incurred in this action as allowed by statute, contract, or recognized grounds of equity; and

10.      For any such further relief or remedy, including preliminary and/or permanent injunctive relief, as Plaintiffs may request or as this Court may find just and equitable.

DATED: This 20th day of June, 2016.

RODERICK BOND LAW OFFICE, PLLC


By: _/s/ Roderick C. Bond_____
    Roderick C. Bond
    Attorney for Plaintiffs

SECOND AMENDED COMPLAINT - 52

**4-ER-920**

**VERIFICATION OF DALE L. MIESEN**

STATE OF TEXAS                         )
                                       ) ss.
COUNTY OF TARRANT                      )

I, Dale L. Miesen, being first duly sworn on oath, deposes and says:

I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Second Amended Complaint, know the contents of this Second Amended Complaint, and believe that the facts in set forth in this Second Amended Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.

_____
Dale L. Miesen

SUBSCRIBED AND SWORN to before me this 20 day of June, 2016.

_____
Notary Public for Texas
Residing at: 1000 Norwood, Hurst TX 76054 / Tarrant county
My commission expires: 7/3/2017

Karen R. Burton
Commission Expires
07-03-2017

SECOND AMENDED COMPLAINT - 53

## VERIFICATION OF DONNA J. TAYLOR

STATE OF IDAHO ) 
                      ) ss.

COUNTY OF NEZ PERCE )

I, Donna J. Taylor, being first duly sworn on oath, deposes and says:

I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Second Amended Complaint, know the contents of this Second Amended Complaint, and believe that the facts in set forth in this Second Amended Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.

_Donna J. Taylor_
Donna J. Taylor

SUBSCRIBED AND SWORN to before me this 25th day of June, 2016.

_Sarah L. Acree_
Notary Public for Idaho
Residing at: Lewiston
My commission expires: 8/21/20

SECOND AMENDED COMPLAINT - 54

**4-ER-922**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 20th day of June, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:    jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:     jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:     lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:     sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:     swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

_/s/ Roderick C. Bond_
Roderick C. Bond

SECOND AMENDED COMPLAINT - 55

**4-ER-923**

Loren C. Ipsen  ISB #1767
ELAM & BURKE, P.A.
251 East Front Street, Suite 300
P.O. Box 1539
Boise, Idaho 83701
Telephone:  (208) 343-5454
Facsimile:  (208) 384-5844
lci@elamburke.com

Steve Wieland, ISB #8282
Shawnee Perdue, ISB #8888
WIELAND PERDUE, PLLC
380 S. 4th Street, Suite 202
Boise, Idaho  83702
Telephone:  (208) 401-9219
Facsimile:  (208) 401-9218
swieland@wielandperdue.com
sperdue@wielandperdue.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual and the Personal Representative of the Estate of Sarah Taylor; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC; <br><br> Plaintiffs, <br><br> v. <br><br> HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; et al., <br><br> Defendants. | Case No. 1:10-cv-00404-CWD <br><br> MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1) |

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1)  - 1

**4-ER-924**

## INTRODUCTION

U.S. district courts have original jurisdiction over civil actions between citizens of different states where the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332.  In order for jurisdiction to exist under § 1332, there must be complete diversity between the parties; no individual plaintiff and no individual defendant can be citizens of the same state.  *Strawbridge v. Curtiss*, 7 U.S. 267, 3 Cranch 267, 2 L.Ed. 436 (1806) (hereinafter "*Strawbridge*"); *Mas v. Perry,* 489 F.2d 1396, 1398-99 (5th Cir. 1974), *cert. denied*, 419 U.S. 842, 95 S.Ct. 74, 42 L.Ed.2d 70 (1975); Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *13E Fed. Prac. & Proc. Juris.* § 3606 (3d ed.).  For the purpose of determining diversity jurisdiction, an individual is a citizen of the state where he or she is domiciled.  *Preston v. Tenet Healthsystem Memorial Medical Center, Inc.,* 485 F.3d 793, 797 (5th Cir. 2007).

The plaintiffs originally filed the present case in federal court, invoking federal question[1] and diversity jurisdiction.  Plaintiffs have filed a second amended complaint, dropping their RICO claim and joining two non-diverse defendants.[2]  In addition, plaintiff Donna Taylor alleges that she is suing numerous Idaho defendants in her capacity as the personal representative of an Idaho decedent. As a consequence, the Court lacks subject matter jurisdiction.  Dismissal without prejudice is the only course available.

## STANDARD OF REVIEW

Federal courts are courts of limited jurisdiction.  They may only adjudicate cases that the Constitution and Congress have granted them authority to hear.  *Morris v. City of Hobart*, 39

---

[1]  Plaintiffs originally pled a cause of action for federal RICO.

[2]  Defendants JoLee Duclos and Connie Taylor Henderson are alleged to be citizens of the State of Washington, as is plaintiff Donna J. Taylor.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1)  - 2

F.3d 1105, 1110 (10th Cir. 1994). Statutes conferring jurisdiction on federal courts are to be strictly construed. *F & S Construction Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964). When ruling on a Rule 12(b)(1) motion, the court must accept the factual allegations regarding jurisdiction as true. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *Basso v. Utah Power and Light Co*., 495 F.2d 906, 909 (10th Cir. 1974).

## ARGUMENT

As a general rule, federal courts examine jurisdictional facts as they exist at the time the case was filed. *Grupo Dataflux v. Atlas Global Group, L.P.,* 541 U.S. 567, 570 (2004). Once jurisdiction is properly established, subsequent events, such as changes in a party's domicile, will generally not divest the court of jurisdiction. Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *13F Fed. Prac. & Proc. Juris*., § 3638 (3d.ed.). In *Freeport–McMoRan, Inc. v. K N Energy, Inc.,* 498 U.S. 426, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991), the U.S. Supreme Court held that if diversity of citizenship jurisdiction exists at the time the complaint is filed, such jurisdiction is not divested by a later substitution of parties under F.R.C.P. 25.[3] The Supreme Court later explained, however, that "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell International Corp. v. U.S.,* 549 U.S. 457, 473-74, 127 S.Ct. 1397, 1409, 167 L.Ed.2d 190 (2007).

*Freeport McMoRan* involved the substitution of a non-diverse plaintiff pursuant to Rule 25(c) of the Federal Rules of Civil Procedure, resulting from a transfer of interest while the

---

[3] Rule 25(c) permits substitution of parties because of death, incompetency, transfer of interest, or a public official's separation from office.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1) - 3

litigation was pending. 498 U.S. at 428. In the present case, in contrast, the lack of diversity results from a voluntary amendment of the plaintiffs' complaint pursuant to Rule 15. In *Freeport McMoRan*, the U.S. Supreme Court took care to specify that it was not overruling *Owen Equipment & Erection Co. v Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed. 2d 274 (1978), which held that the jurisdiction of the district court did not extend to the entertaining of a claim by the original plaintiff in a diversity action against a non-diverse third-party defendant impleaded by the defendant pursuant to F.R.C.P. 14(a)

A number of circuit courts have rejected the proposition that *Freeport–McMoran* limits the determination of whether diversity jurisdiction exists to the date of filing of the original complaint. Rather, it has been rather uniformly held that an amendment of the complaint under F.R.C.P. 15 to join a non-diverse defendant destroys diversity jurisdiction. *See, e.g., Cobb v. Delta Exports, Inc.,* 186 F.3d 675, 680 (5th Cir.1999) (explaining that *Freeport–McMoRan* is limited to the context of an additional party added pursuant to Fed.R.Civ.P. 25);[4] *American Fiber & Finishing, Inc. v. Tyco Healthcare Group, LP.,* 362 F.3d 136, 141–42 (1st Cir.2004)(collecting cases and explaining that when the plaintiff amended its complaint to add a non-diverse defendant, "complete diversity was destroyed just as surely as if it had sued [the non-diverse defendant] in the first instance"); *Martinez v. Duke Energy Corp.,* 130 Fed. Appx. 629, 635 (4th Cir. 2005) (rejecting plaintiff's argument that amended complaint which added non-diverse

---

[4] *Cobb v. Delta Exports, Inc.,* explained: "Granted, the *Freeport–McMoRan* Court's broad statement that 'diversity jurisdiction, once established, is not defeated by the addition of a nondiverse party to the action,' 498 U.S. at 429, 111 S.Ct. 858, read in a vacuum, would suggest that the joinder of [the non-diverse parties] did not destroy diversity. There are good reasons, however, to read this broad statement as dictum and to understand *Freeport–McMoRan* as limited to the context of an addition under Fed.R.Civ.P. 25." 186 F.3d at 680.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1) - 4

defendants did not destroy diversity jurisdiction under *Freeport–McMoRan*); *Estate of Alvarez v. Donaldson Co.,* 213 F.3d 993, 995 (7th Cir. 2000) (holding that plaintiff's amended complaint which added non-diverse defendants destroyed diversity jurisdiction and noting that *Freeport– McMoRan* is limited to the substitution of parties pursuant to Rule 25); *Ingram v. CSX Transp., Inc.,* 146 F.3d 858, 861 (11th Cir.1998) ("*Freeport–McMoRan* does not stand for the proposition that all additions of nondiverse parties are permissible as long as complete diversity existed at the time of commencement of the lawsuit."); *Casas Office Machines, Inc. v. Mita Copystar America, Inc.,* 42 F.3d 668, 674-75 (1st Cir. 1994) (holding that the joinder of non-diverse defendants after removal destroys diversity, regardless of whether such defendants are dispensable or indispensable to the action); *Mayes v. Rapoport*, 198 F.3d 457, 461-62 (4th Cir. 1999) (holding that in a case removed from state court, where the plaintiff is allowed to join a non-diverse defendant whose joinder destroys subject matter jurisdiction, the Court must remand the action to state court); *Ingram v. CSX Transport, Inc.*, 146 F.3d 858, 861 (11th Cir. 1998) ("[T]he holding in *Freeport McMoRan* relies upon the assignee's having been substituted as a plaintiff under Fed.R.Civ.P. 25(c)); *Bishop v. Moore*, 2000 WL 246583 at *2-3 (D.Kan., Feb. 4, 2000) ("The *Freeport McMoRan* holding is limited to the issue of substitution of parties pursuant to Fed.R.Civ.Pro. 25."); *Yniques v. Cabral*, 985 F.2d 1031, 1034-36 (9th Cir. 1993) (holding that where a federal district court allows post-removal joinder of a non-diverse party that destroys jurisdiction, remand to state court is required); *Washington Suburban Sanitary Comm'n v. CRS/Sirrine, Inc.*, 917 F.2d 834, 835 (4th Cir. 1990) (holding that the district court's decision to remand action after allowing joinder of defendant which destroyed diversity jurisdiction was not reviewable on appeal); *Doleac ex rel. Doleac v. Michalson*, 264 F.3d 470, 476 (5th Cir. 2001) (holding that amended complaint adding defendant who was resident of same state as plaintiff

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1)  - 5

destroyed diversity, and thus defeated federal subject matter jurisdiction, regardless of whether the new defendant had been added a new party or substituted for a John Doe defendant). *Accord Omni Equities*, *Inc. v. Pearl S. Buck Foundation*, 850 F.Supp. 290 (E.D. Pa. 1994) ('substitution of parties pursuant to Federal Rule of Civil Procedure 25(c) [presents] a vastly different set of circumstances than those under scrutiny here, where Rule 19(b) was invoked"). The second amended complaint only alleges the residence of the parties. The test for diversity under 28 U.S.C. § 1332 with respect to individuals is citizenship, not residence. But the purpose of determining diversity jurisdiction, an individual is a citizen of the state where he or she is domiciled. The burden is on the party invoking federal jurisdiction to affirmatively plead and prove subject matter jurisdiction. *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

Both the federal district courts and the federal circuit courts have held overwhelmingly that the joinder of non-diverse defendants after the case is filed deprives the Court of diversity jurisdiction. For example, in *National Westminster Bank, PLC v. Grant Prideco, Inc.*, 343 F.Supp.2d 256 (S.D.N.Y. 2004), it was held that *Freeport-McMoRan* did not require retention of jurisdiction where the diverse defendant assigned its crossclaim to a non-diverse third-party and bowed out of the litigation.

In *New Cannon Clocks v. Unites States Fidelity & Guaranty*, 904 F.Supp. 621, 622 (E.D. Mich. 1995), the Court held that although there was complete diversity of citizenship when the suit was removed from state court, the subsequent joinder of non-diverse defendants after removal destroyed complete diversity, requiring remand.

In *Merit Tat Intern, Ltd. v. Wynnchurch Capital Partners*, 689 F.Supp.2d 1088, 1091-93 (N.D.Ill. 2010), it was held that the fact the original parties were diverse did not prevent the

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1) - 6

court's jurisdiction from being divested when the plaintiff amended its complaint to join non-defendants.

*Wiltz v. Advance America,* 2011 WL 5119060, at *2-3 (E.D. La. Oct. 26, 2011), was a case where a citizen of Louisiana filed suit in federal court against a foreign corporation, alleging he had been injured when attempting to open a glass door in a store owned by the defendant. Plaintiff invoked diversity jurisdiction pursuant to § 1332.  After the suit was filed, plaintiff amended his complaint to join two new non-diverse defendants.  Upon this fact pattern, which is identical to the present case, it was held that federal subject matter jurisdiction did not exist after the plaintiff amended his complaint.

In *Sharp v. Kmart Corp.,* 991 F. Supp. 519 (M.D.La. 1998), it was held that a case removed from state court must be remanded if a non-diverse, indispensable defendant has been added by amendment of the complaint after removal, thus destroying complete federal jurisdiction.  The Court specifically stated, "This Court finds that the United States Supreme Court's holding [in] *Freeport* is limited to a case where a party is added under Rule 25(c)."  *Id.* at 527.

*Boyce v. Citi Mortgage, Inc.*, 992 F.Supp.2d 709 (W.D.Tex. 2014), held that where a district court permits amendment of the plaintiff's pleadings in removed action to a non-diverse defendant, thereby destroying diversity, the court must then remand to state court.   *See also Herrero v. Sears, Roebuck & Co.*, 2015 WL 6159141 at *5 (E.D.La. Oct. 20, 2015) ([In a removal case], "[o]nce the amendment [joining a non-diverse defendant] has been permitted, however, the action must be remanded to state court.")

In *Wyatt v. National R.R. Passenger Corp.*, 881 F.Supp. 919, 924 (S.D.N.Y. 1995), a passenger who was injured when she tripped and fell in a train station filed suit in state court.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1)  - 7

After the action was removed to federal court by the railroad on the basis of diversity of citizenship, the plaintiff amended her complaint to join a non-diverse janitorial contractor as an additional defendant.  The Court held that, where a court permits joinder of a defendant whose citizenship destroys diversity, the court is <u>required</u> to remand the case.  The only exception to this rule is in the case of a so-called "fraudulent joinder;" that is, where an adverse party seeks to join a nominal party solely for the purpose of destroying federal jurisdiction.  "Unless a plaintiff seeks to add a non-diverse party solely to destroy the court's jurisdiction, the court is required to remand the action to state court."  *Id*. at 923, *quoting Short v. Mulk-Matic Transport Co.*, 1994 WL 363941 at \*2 (S.D.N.Y., July 13, 1994).  In the case at bar, the defendants are not seeking to join extraneous parties simply to destroy diversity jurisdiction; rather, the plaintiffs themselves joined the non-diverse defendants.  Plaintiffs cannot be heard to complain of their own acts.

In *Curry v. U.S. Bulk Transport, Inc*., 462 F.3d 536 (6th Cir. 2006), an Ohio plaintiff  who was injured when a truck carrying corrosive chemicals overturned filed a state court action against a Pennsylvania corporation that owned the truck.  The truck owner removed the case to federal court, invoking diversity jurisdiction.  The plaintiff then amended his complaint to join the truck driver and other defendants who were also Ohio residents.  The Court held that although complete diversity existed at the time the case was filed, the joinder of the Ohio defendants destroyed diversity and, thus, the federal court's jurisdiction.  It was further held that the Court of Appeals would not cure the lack of subject-matter jurisdiction by dismissing the non-diverse defendants.

It is clear, then, that subject matter jurisdiction does not exist in this case; therefore, plaintiffs' complaint must be dismissed.  The Court lacks jurisdiction to hear any further motions that might be brought by the plaintiffs.  *See Newman-Green, Inc. v.* Alfonzo *Larrain*, 831 F.2d

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1)  - 8

417 (7th Cir. 1987), *rev'd en banc*, 854 F.21d 916 (7th Cir. 1988), holding that the Court of Appeals could not cure the lack of subject matter jurisdiction retroactively by dismissing the non-diverse defendant.  Upon review, the U.S. Supreme Court reversed the *en banc* opinion, holding that federal "courts of appeals have the authority to dismiss dispensable non-diverse party" to cure a jurisdictional defect.  However, the Supreme Court emphasized that "such power should be exercised sparingly."  *Newman-Green*, 490 U.S. 826, 837, 109 S.Ct. 2218, 104 L.Ed.23d 893 (1989).  In the present case, the plaintiffs are the parties who elected to join non-diverse parties and thereby to destroy diversity jurisdiction.  The only available course of action is to dismiss the case for lack of jurisdiction, particularly where the new, non-diverse parties are corporate insiders who are alleged joint tortfeasors.

See *Ronald Lane*, *Inc. v. Antero Resources Appalachian Corp*, 2011 WL 3102116 at \*7 (N.D.W.Va., July 25, 2011) ("[P]ost-removal joinder of a non-diverse defendant does destroy complete diversity, 28 U.S.C. § 1447(e), and thus strips the Court of subject matter jurisdiction. .. .")

*Schur v. L.A. Weight Loss Centers, Inc*., 577 F.3d 752 (7th Cir. 2009), held that where joinder of a non-diverse party after removal would destroy subject matter jurisdiction, the district court's only options were (1) to deny joinder, or (2) to permit joinder and remand the case to state court.  The district court may not permit joinder of a non-diverse defendant and also retain jurisdiction.

*Abraham Natural Foods Corp. v. Mount Vernon Fire Ins. Cos*., 576 F. Supp. 421 (E.D.N.Y. 2008), involved a case originally filed in state court and then removed to federal district court on the basis of diversity.  The plaintiff joined new, non-diverse defendants to the action.  The Court found that the plaintiff's permissive joinder of non-diverse parties after

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1)  - 9

removal was allowable under F.R.C.P. 20.  It was held that upon such joinder, the only action available to the federal court was remand to state court.

*Cobb v. Delta Exports, Inc*., 186 F.3d 675 (5ᵗʰ Cir. 1999), was an action originally brought in state court against citizens of other states by a motorist who was injured in a collision with a front-end loader.  The defendants removed the case to federal court on the basis of diversity jurisdiction.  The plaintiff amended his complaint to join two new non-diverse defendants (both new defendants were citizens of the same state as the plaintiff).  In response to the motion of the defendants, the federal district court remanded the case to state court.  The Court held that post-removal of joinder of non-diverse defendants destroys diversity of citizenship for jurisdictional purposes and requires remand even when the newly joined parties are not indispensable.

*Farver v. Glaxo Wellcome, Inc*., 181 F.Supp.2d 781 (N.D. Ohio 2001), was a products liability case originally filed in federal court based on diversity of citizenship, which existed between the plaintiff and defendant when suit was filed.  At the case management conference, plaintiff was granted leave to join additional parties.  Plaintiff amended her complaint to join two new non-diverse parties.  As the result of filing the amended complaint and joining two additional defendants, diversity of citizenship no longer existed between the plaintiff and all defendants.

Defendants moved to dismiss for lack of jurisdiction.  Plaintiff argued that under *Freeport MacMoRan*, the joinder of additional dispensable parties did not destroy preexisting diversity between existing parties.  The Court in *Farver* debunked the supposed distinction between dispensable and indispensable parties for jurisdictional purposes:

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1) - 10

**4-ER-933**

After *Freeport–McMoRan,* litigants seized on the Court's broad statement about jurisdiction not being divested by subsequent events, where it existed when the complaint was filed. In response, most courts concluded that the language and holding of *Freeport–McMoRan* were limited to substitutions under Rule 25, and were not applicable to joinder under Rule 19. *Estate of Alvarez v. Donaldson Co., Inc.,* 213 F.3d 993, 994 (7th Cir.2000) (*Freeport–McMoRan* "looked at a limited part of diversity in which there was a substitution of parties."); *Cobb v. Delta Exports, Inc.,* 186 F.3d 675, 680 (5th Cir.1999) ("diversity jurisdiction is unaffected by post-removal joinder of dispensable, non-diverse parties pursuant to Fed.R.Civ.P. 19."); *Ingram v. CSX Transp., Inc.,* 146 F.3d 858, 861 (11th Cir.1998) ("the holding in *Freeport–McMoRan* relies upon the assignee's having been substituted as a plaintiff under Fed.R.Civ.P. 25(c)"); *Bishop v. Moore,* 2000 WL 246583, at *2–3 (D.Kan. Feb.4, 2000) ("The *Freeport–McMoRan* holding is limited to the issue of substitution of parties pursuant to Fed.R.Civ.P. 25"). *Accord Doleac ex rel. Doleac v. Michalson,* 264 F.3d 470, 476 (5th Cir.2001); *Omni Equities, Inc. v. Pearl S. Buck Foundation,* 850 F.Supp. 290 (E.D.Pa.1994) ("substitution of parties [presents] a vastly different set of circumstances than those under scrutiny here, where Rule 19(b) was invoked").

*Farver v. Glaxo Wellcome Inc.,* 181 F. Supp. 2d 781, 783 (N.D. Ohio 2001).

Accordingly, the case was dismissed for want of federal jurisdiction, regardless of whether the newly joined parties were properly characterized as dispensable or indispensable parties. As support for its holding, the court cited to Wright & Miller:

[P]arties that are joined under Rules 19 and 20 or as additional parties to a permissive counterclaim must independently satisfy the jurisdictional requirements. This limitation on ancillary jurisdiction is thought to be necessary in order to prevent diversity jurisdiction from being artificially created by utilizing Rule 19 or Rule 20 to bring in a nondiverse party after the initial complaint is filed; otherwise, the rule of complete diversity might be undermined and the limited subject matter jurisdiction of the federal courts improperly expanded.

Charles A. Wright & Arthur R.Miller, *Federal Practice & Procedure*, § 3608 (1984).

*Id.*, at 784.

The Court concluded by voicing a sound precaution, applicable to the case at bar:

These observations remain sound and pertinent after *Freeport–McMoRan.* To extend that decision to Rule 19 joinders would promote manipulation of diversity

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1) - 11

jurisdiction, while sending courts unnecessarily into the tricky reaches of Rule 19. Whenever a district court retained jurisdiction post-joinder, its ruling would always be at risk of reversal on appeal. Reversal for want of jurisdiction would undo the trial court's work, making its efforts a wasteful expenditure of its and the parties' resources. These problems can be avoided by rejecting any suggestion that the Supreme Court's decision in *Freeport–McMoRan* has any bearing on Rule 19 joinders.

*Id*. at 784.

There is another reason why diversity jurisdiction has been destroyed. Plaintiff Donna Taylor alleges that she is suing as the personal representative of the estate of her deceased daughter, Sara Taylor. The second amended complaint neglects to allege the citizenship of Sara Taylor at the time of her death. However, the court records of the State of Idaho show that Sara Taylor was an Idaho resident and that Donna Taylor was appointed as her personal representative in an Idaho court proceeding. (Declaration of Loren C. Ipsen filed herewith). U.S.C. § 1332(c)(2) provides that:

> The legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.

In 1988, Congress amended 28 U.S.C. § 1332(c)(2) to provide that an executor (personal representative) of an estate is deemed to be a citizen only of the same state as the decedent. *See generally*, Oakley, *Recent Statutory Changes in the Law of Jurisdiction and Venue: The Judicial Improvement Acts of 1988 and 1990, 1991*, 24 U. C. Davis L. Rev. 735, 746. *See also Gustafson v. zumBrunnen*, 546 F.3d 398, 402 (7th Cir. 2008) ("[T]he federal diversity statute  treats 'the legal representative' of a decedent's estate (or the estate of an infant or incompetent) as a citizen of the same state as the decedent, . . ."); *Thomas v. Brooks Run Min. Co., LLC*, 504 F.Supp.2d 121, 127 (S.D.W.Va. 2007) ("Applying the plain meaning of 28 U.S.C. § 1332(c)(2), the

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1)  - 12

**4-ER-935**

personal representative of the decedent in a West Virginia wrongful death suit must therefore be deemed to be a citizen of the same state as the decedent."); *Vaka v. Embraer-Empresa Brasileira De Aeronautica, S.A.*, 303 F.Supp.2d 1333, 1334 (S.D.Fla. 2003) ("[F]or purposes of determining diversity of citizenship, a decedent's personal representative is deemed a citizen of the same state as the decedent."); *Latka v. Miles*, 2015 WL 1410378 at *6 (E.D.N.C., March 26, 2005) (holding that a widow who brought claim as the personal representative of the decedent's estate was a citizen of North Carolina because the decedent was a citizen of North Carolina).

## CONCLUSION

The same result should be reached in the present case as in the cases cited above. The plaintiffs themselves elected to join new non-diverse defendants whose presence destroys diversity jurisdiction. Were this Court to accept plaintiffs' contention that plaintiffs can later join non-diverse defendants without destroying diversity jurisdiction, a plaintiff could easily circumvent the requirement of complete diversity by simply suing only the diverse defendants and then adding by amended complaint any and all non-diverse joint tortfeasors.[5] This would obliterate the longstanding requirement under *Strawbridge* that there must be complete diversity of citizenship among the parties in order for diversity jurisdiction to exist. The rule in shareholder derivative suits is that the citizenship of the plaintiff shareholder controls for purposes of determining diversity, and the corporation is treated as a party defendant. Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *13F Fed. Prac. & Proc. Juris.*, § 3638 (3d ed.).

---

[5]   *See Omni Equities, Inc. v. Pearl S. Buck Foundation*, 850 F.Supp. 290, 296, n. 12 (E.D. Pa. 1994), where the Court rejected the contention that where diversity was present at the outset when the complaint was filed, subsequent addition of non-diverse parties does not defeat jurisdiction,. This contention, stated the Court, "violates the most rudimentary principles of diversity jurisdiction and . . . would enable scads of nondiverse parties to bring their actions to federal court just by withholding a few selected parties for later joinder."

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1)  - 13

Accordingly, when Donna Taylor, a citizen of the State of Washington, amended her complaint to join as defendants JoLee Duclos and Connie Taylor Henderson, also Washington citizens, the Court was immediately divested of jurisdiction.  As the Seventh Circuit put it, "[T]he plaintiff was doing in two steps what, if [the plaintiff] had done it in one, would have clearly disclosed the absence of federal jurisdiction. . . ."  *Am. Nat'l Bank & Trust Co. v. Bailey*, 750 F2d 577, 583 (7th Cir. 1994).  Additionally, when Donna Taylor filed suit against Idaho defendants as the personal of her deceased daughter, an Idaho resident, diversity of citizenship was lost.  Her failure to disclose the facts to the Court does not allow her to avoid the jurisdictional requirements of 28 U.S.C. § 1332.  The only result available is dismissal because the Court lacks subject matter jurisdiction.

DATED this ___21st___ day of June, 2016.

ELAM & BURKE, P.A.

By:___/s/ Loren C. Ipsen_____
     Loren C. Ipsen, Of the Firm
     Attorneys for Defendants, Hawley Troxell
     Ennis & Hawley, LLP, Gary D. Babbitt,
     Richard A. Riley, and D. John Ashby

WIELAND PERDUE, PLLC

By: ___/s/ Steve Wieland_____
     Steve Wieland, Of the Firm
     Attorneys for Defendants R. John Taylor,
     Michael W. Cashman, Sr., James Beck, and
     Crop USA Insurance Agency, Inc.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1)  - 14

<u>**CERTIFICATE OF SERVICE**</u>

  I hereby certify that on this  21st  day of June, 2016, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons via email:

  Roderick C. Bond
  rod@roderickbond.com
  *Attorney for Plaintiff*

  Steven P. Wieland
  swieland@wielandperdue.com
  Shawnee S. Perdue
  sperdue@wielandperdue.com
  *Attorneys for Michael W. Cashman, Sr., R. John Taylor,*
  *and James Beck*


         /s/ Loren C. Ipsen
        Loren C. Ipsen

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO F.R.C.P.
12(b)(1)  - 15

**4-ER-938**