**Consolidated Case Nos. 25-3552 and 25-3800**

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,

**Plaintiff-Appellant**,

v.

R. JOHN TAYLOR, an individual, CONNIE TAYLOR HENDERSON, an individual, JAMES BECK, an individual, MICHAEL W. CASHMAN, SR., an individual, CROP USA INSURANCE AGENCY, INC., an Idaho corporation, CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company, AIA SERVICES CORPORATION, an Idaho corporation, AND AIA INSURANCE, INC., an Idaho corporation,

**Defendants-Appellees**,

and

Reed J. Taylor, an individual,

**Third-Party Defendant-Appellee.**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO,
CHIEF DISTRICT COURT JUDGE DAVID C. NYE, PRESIDING

**APPELLANT'S EXCERPTS OF THE RECORD – VOLUME - 5**

Roderick C. Bond
Roderick Bond Law Office, PLLC
10900 NE 4th St., Suite 2300
Bellevue, WA  98004
Tel: (425) 591-6903
Email: rod@roderickbond.com
Attorney for Appellant

Andrew Schwam
Andrew Schwam Law Firm
705 SW Fountain St.
Pullman, WA  99163-2128
Tel: (208) 874-3684
Email: amschwam@turbonet.com
Attorney for Appellant

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiffs

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual and the Personal representative of the Estate of Sarah Taylor; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC.;<br><br>Plaintiff,<br><br>v.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation,<br><br>Defendants. | Civil No. 1:10-cv-00404-CWD<br><br>PLAINTIFFS DALE L. MIESEN AND DONNA J. TAYLOR'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO AMEND COMPLAINT AND/OR MOTION TO VOLUNTARILY DISMISS THE NEWLY NAMED PARTIES WITHOUT PREJUDICE AND THE COURT SHOULD RULE ON THESE MOTIONS BEFORE IT RULES ON DEFENDANTS' MOTION TO DISMISS |

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................... 1

II. FACTS .................................................................................................................... 2

III. ARGUMENT AND AUTHORITIES ..................................................................... 4

A. This Court Should Grant the Plaintiffs' Motion to Amend the Complaint to
Drop the Newly Named Dispensable Parties, Which Will Render the Defendants'
Motion to Dismiss Moot. ............................................................................................ 5

  1. This Court Should Grant the Plaintiffs' Motion to Amend the Complaint to Drop
the Newly Named Parties and to Clarify Other Allegations in the Complaint ...................... 5

  2. This Court Should Also Approve the Amendment to the Complaint Under Rule 23.1
and Order the Controlling AIA Defendants to Turn Over to Plaintiffs' Counsel the
Names and Addresses of All Common and Preferred Shareholders of AIA Services. ........... 9

B. To the Extent Necessary or in the Alternative, this Court Should Grant the Plaintiffs'
Motion to Voluntarily Dismiss, *Without Prejudice*, the Newly Named Dispensable
Parties, which Will Again Render the Defendants Motion to Dismiss Moot ......................... 10

  1. This Court Should Voluntarily Dismiss, *Without Prejudice*, Connie Taylor Henderson
and JoLee Duclos as Defendants and Donna Taylor in Her Capacity as the Personal
Representative of the Estate of Sara Taylor. ............................................................... 10

  2. This Court Should Also Approve the Dismissal Under Rule 23.1 and Order the
Controlling AIA Defendants to Turn Over to Plaintiffs' Counsel the Names and
Addresses of All Common and Preferred Shareholders of AIA Services ............................ 15

C. This Court Should Enter Its Order on Plaintiffs' Motion to Amend Complaint and
Motion to Voluntarily Dismiss the Newly Named Parties Before It Enters Its Order on
Defendants' Motion to Dismiss Because Plaintiffs' Motions Should Render the
Defendants' Motion Moot. ......................................................................................... 16

IV. CONCLUSION ..................................................................................................... 16

CERTIFICATE OF SERVICE ..................................................................................... 18

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - i

5-ER-941

Plaintiffs Donna J. Taylor and Dale L. Miesen (collectively "Plaintiffs") submit this Memorandum of Law in Support of their Motion to Amend Complaint and/or Motion to Voluntarily Dismiss the Newly Named Parties Without Prejudice as follows:

## I.  INTRODUCTION

As this Court is aware, the Plaintiffs discussed amending the complaint before this Court and the defendants to include other dispensable parties in an effort to most efficiently litigate the many years of corporate malfeasance which has occurred at AIA. (Dkt. 128.) The defendants never disclosed to this Court or Plaintiffs' counsel that they would seek to dismiss this lawsuit based on the lack of diversity if the Plaintiffs named two additional dispensable parties as defendants, Connie Taylor Henderson and JoLee Duclos. Plaintiffs' counsel believed the parties were moving toward a more courteous resolution of the merits of this lawsuit when the defendants filed non-oppositions to the Plaintiffs' motion to amend and supplement the complaints. (Dkt. 133-135.)

However, when the defendants filed a fifteen-page motion to dismiss, Dkt. 138, *one* day after Plaintiffs filed their Second Amended Complaint, Dkt. 137, it became clear that the defendants had ulterior motives. But the Plaintiffs are not willing to risk the millions of dollars in damages at stake in this lawsuit or risk the creation of issues which may be appealed after a trial on the merits simply to try to more efficiently litigate against Connie Taylor Henderson and JoLee Duclos, two dispensable parties. Thus, rather than litigate over the unsettled issue of whether a party may amend a complaint years later to name additional dispensable parties and to prevent the creation of any more appealable issues, the Plaintiffs seek to amend their complaint to drop the newly named dispensable parties. And, to the extent necessary or in the alternative, Plaintiffs seek to accomplish this goal by moving to voluntarily dismiss the newly named parties, which will render the defendants' motion to dismiss moot. (Dkt. 138.) There is no prejudice to the defendants.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 1

## II.   FACTS

On August 11, 2010, Dale Miesen and Donna Taylor filed this lawsuit. (Dkt. 1.) This lawsuit has been pending since August 11, 2010 and involves years of corporate malfeasance occurring at AIA and torts committed against AIA. (Dkt. 1.) Shortly thereafter, defendants named in the original complaints moved to dismiss or stay this case under the abstention doctrine. (*Id.*; Dkt. 12, 16, 23, 32, 33.) On April 27, 2011, Judge Boyle entered a stay for this case pending his decision on the motions. (Dkt. 45.)

On June 29, 2011, Judge Boyle entered an order staying this case. (Dkt. 46.) On July 30, 2012, Donna Taylor moved to lift the stay in this lawsuit, which the defendants opposed. (Dkt. 62-78.) A hearing was held on November 14, 2012, and Judge Boyle ordered additional submissions. (Dkt. 81.) After the additional submissions were filed, Dkt. 82-86, Judge Boyle denied the motion to lift the stay and later denied the motion to reconsider. (Dkt. 88-95.)

During that stay originally imposed and while Donna Taylor was appealing the district court's denial of her motion to lift the original stay, the defendants named in the original complaints continued to pillage AIA and engage in other illegal conduct such as having AIA illegally guarantee a $10-million-dollar loan for CropUSA Insurance Agency, Inc., which led to additional derivative demands being served. (*See e.g.*, Dkt. 67-33, 67-42, 128; 2016 WL 1546760.)

On February 25, 2014, Donna Taylor was named the Personal Representative of the Estate of Sara Taylor and Letters of Administration were issued. (Dkt. 138-3-138-7.)

On December 30, 2015, the Ninth Circuit Court of Appeals reversed. ***Taylor v. Hawley Troxell Ennis & Hawley, LLP***, 628 Fed.Appx. 490 (9th Cir. 2015). On January 26, 2016, the Ninth Circuit Court of Appeals issued its mandate. (Dkt. 108.) On January 28, 2016, the attorney representing AIA moved to withdraw as counsel. (Dkt. 109). On February 1, 2016, this Court

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 2

granted that motion and ordered that no further proceedings affecting AIA "shall be had in this action for a period of 21 days." (Dkt. 110 at 2.) On February 2, 2016, this Court lifted the stay imposed by Judge Boyle. (Dkt. 112.)

On March 7, 2016, this Court and counsel held a status conference for the instant case. (Dkt. 118.) At that scheduling conference, the undersigned counsel made clear to this Court and counsel that he sought to efficiently resolve the instant case for the years of malfeasance by naming additional parties in an attempt to prevent further lawsuits from being filed (including malfeasance which occurred after the last demand letter, but which would be subject to another demand letter). (Dkt. 139-3 at ¶ 2.)

On April 14, 2016, the undersigned counsel sent a letter to counsel for the defendants in preparation for the meeting scheduled regarding the litigation plan to be held in Boise on April 15, 2016. (Dkt. 128 at 2, ¶ 2; 13-20.) In that letter, the undersigned counsel was clear that the Plaintiffs intended on naming Connie Taylor Henderson and JoLee Duclos as additional parties and that a future derivative demand would be forthcoming. (Dkt. 128 at 14.) At the conference held on April 15, 2016, the defendants counsel did not object or allege that there would be a jurisdictional problem by naming Connie Taylor Henderson and JoLee Duclos as new defendants. (Dkt. 139-3 at ¶ 2.)

On May 27, 2016, Plaintiffs filed a motion to amend asserting, *inter alia*, the proposed Second Amended Complaint would "prevent the necessity of the Plaintiffs or other shareholders of AIA Services from filing additional lawsuits." (Dkt. 130 at 3.) When the Plaintiffs' submitted an amended motion on May 29, 2016, they again asserted "prevent the necessity of the Plaintiffs or other shareholders of AIA Services from filing additional lawsuits." (Dkt. 131-1 at 3.) The defendants filed non-oppositions to the Plaintiffs' motion to amend. (Dkt. 134-135.) On June 14,

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 3

2016, this Court granted the Plaintiffs' motion to amend. (Dkt. 136.)

On June 20, 2016, Plaintiffs filed their Verified Second Amended Complaint. (Dkt. 137.) On June 21, 2016—one day after Plaintiffs filed their Second Amended Complaint—the defendants filed a motion to dismiss with a fifteen-page memorandum of law, even though the defendants' counsel had never previously objected or stated that the newly named parties would destroy diversity and they would move to dismiss. (Dkt. 138-1, 139-3.) The defendants allege that diversity was destroyed because Donna Taylor is a citizen of Washington and so is Connie Taylor Henderson and JoLee Duclos, and that Donna Taylor is separately an Idaho citizen through her capacity as the Personal Representative of the Estate of Sara Taylor.[1] (Dkt. 138-1.)

After Plaintiffs' counsel requested that the defendants stipulate to amending the complaint to drop Connie Taylor, JoLee Duclos and Donna Taylor in her capacity as the Personal Representative of the Estate of Sara Taylor, these motions followed. (Dkt. 139-3 at ¶¶ 5 & 7.) The Plaintiffs would be prejudiced if this Court did not grant their motions in full or in part, and allow them to cure any of the allegations regarding diversity jurisdiction. (Dkt. 139-3 at ¶¶ 2-8.)

### III.   ARGUMENT AND AUTHORITIES

Before this Court is defendants' Motion to Dismiss Pursuant to F.R.C.P. 12(b)(1). (Dkt. 138). The defendants argue that diversity jurisdiction was destroyed when the Plaintiffs filed their

---

[1] The United States Supreme Court has "consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events." *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428, 111 S.Ct. 858, 860, 112 L.Ed.2d 951 (1991). The Supreme Court explained that "[d]iversity jurisdiction, once established, is not defeated by the addition of a nondiverse party to an action. A contrary rule could well have the effect of deterring normal business transactions during the pendency of what might be lengthy litigation. Such a rule is not in any way required to accomplish the purposes of diversity jurisdiction." 498 U.S. at 428-29. While the defendants correctly point out that there are a number of cases on this issue and calling into question the holding in *Freeport-McMoRan*, Dkt. 138-1, the instant case is precisely the type of case that fits within the ambit of this rule of law because the amendment here involved events occurring years after the original complaint was filed and the newly named parties are not indispensable. Nevertheless, the Plaintiffs do not wish to dispute the issue and create an issue which may be appealed by the defendants later after trial. Likewise, the Plaintiff do not wish to risk the issue.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 4

Second Amended Complaint, Dkt. 137, naming Connie Henderson and JoLee Duclos as two new defendants, Dkt. 138-1 at 3-12, and by also naming the Plaintiff Donna Taylor in her capacity as the Personal Representative of the Estate of Sara Taylor. (Dkt. 138-1 at 12-13.) Consequently, this Court should grant Plaintiffs' motion(s) as follows to render those arguments moot:

**A.** **This Court Should Grant the Plaintiffs' Motion to Amend the Complaint to Drop the Newly Named Dispensable Parties, Which Will Render the Defendants' Motion to Dismiss Moot.**

    **1. This Court Should Grant the Plaintiffs' Motion to Amend the Complaint to Drop the Newly Named Parties and to Clarify Other Allegations in the Complaint.**

Since the Plaintiffs' Proposed Third Amended Complaint attached as Exhibit A cures the alleged jurisdictional defects (assuming the defendants' arguments are well-taken and the fact support them), this Court should grant Plaintiffs' Motion to Amend Complaint. Moreover, the defendants will be unable to establish bad faith, undue prejudice, undue delay or futility. Indeed, had the defendants simply advised Plaintiffs' counsel that they would challenge the Second Amended Complaint on a diversity jurisdiction technicality, the Plaintiffs would have filed a complaint in the form similar to the Proposed Third Amended Complaint. (Dkt. 139-3 at ¶ 2.)

"The court should freely give leave when justice so requires." **Fed. R. Civ. P. 15(a)(2)**. Within the Ninth Circuit, Fed. R. Civ. P. 15 "is to be applied extraordinary liberality." ***Morongo Band of Mission Indians v. Rose***, 893 F.2d 1074, 1079 (9th Cir. 1990) (citation omitted). The Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." **Fed. R. Civ. P. 1**.

"Four factors are commonly used to determine the propriety of a motion for leave to amend. These are: bad faith, undue delay, prejudice to the opposing party, and futility of amendment. These factors, however, are not of equal weight in that delay, by itself, is insufficient to justify

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 5

denial of leave to amend." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (citations omitted). "Where there is lack of prejudice to the opposing party and the amended complaint is obviously not frivolous or made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny such motion." *Hurn v. Retirement Fund Trust of Plumbing, Heating & Piping Industry of So. Calif.*, 648 F.2d 1252, 1254 (9th Cir. 1981).

Most importantly, however, is that "an action should not be dismissed for lack of jurisdiction without giving the plaintiff an opportunity to be heard unless it is clear the deficiency cannot be overcome by amendment." *Jones v. Community Redevelopment Agency*, 733 F.2d 646, 650 (9th Cir. 1984); *May Dept. Store v. Graphic Process Co.*, 637 F.2d 1211, 1216 (9th Cir. 1980) (holding that an appellate court may "remand with instructions that [the plaintiff] be allowed to amend its complaint to attempt to properly allege" jurisdiction under 15 U.S.C. § 13). As succinctly stated by the Second Circuit Court of Appeals:

> Leave to amend a complaint under Fed.R.Civ.P. 15(a) after there has been a responsive pleading is within the discretion of the trial court, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971), but in cases where leave is sought to eliminate a defendant in order to preserve diversity jurisdiction, "unless it appears that a non-diverse defendant cannot be dropped from an action without prejudice to the remaining defendants, the [Rule 15(a)] motion should be granted and a failure to do so is an abuse of discretion." *Kerr v. Compagnie de Ultramar*, 250 F.2d 860, 864 (2d Cir. 1958).

*Samaha v. Presbyterian Hosp. in City of New York*, 757 F.2d 529 (2d Cir. 1985). *See also Soberay Mach. & Equipment Co. v. MRF Ltd., Inc.*, 181 F.3d 759, 763 (6th Cir. 1999) ("Although we agree that a party may not create diversity by dropping a nondiverse and indispensable party, we note that it is appropriate to drop a nondiverse and dispensable party from litigation in order to achieve diversity." (citations omitted)). *C.f. City Bank v. Glenn Const. Corp.*, 68 F.R.D. 511, 512 (D. Hawaii 1975) ("This court would be inclined to preserve its jurisdiction and grant plaintiff's

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 6

**5-ER-947**

request to amend were leave of court required. Under Rule 15(a), however, plaintiff need only proceed to file its amended complaint, which will relate back to the date on which it moved to amend."); *Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874, 886-87 (3d Cir. 1992); *Pacific Gas & Elec. Co. v. Fibreboard Products, Inc.*, 116 F.Supp. 377, 382-83 (D.C. Cal. 1953). *See also* **Hells Canyon Pres. Council v. U.S. Forest Serv.**, 403 F.3d 683, 687 (9th Cir. 2005) ("[W]ithdrawals of individual claims against a given defendant are governed by [Rule] 15, which addresses amendments to pleadings."); **6 CYC. OF FEDERAL PROC. § 21:125 (3d ed.)** "(If the plaintiff seeks to drop or dismiss a nondiverse party defendant in order to maintain diversity jurisdiction, and not in order to cure defects of misjoinder, the proper remedy is by motion for amendment of pleadings under Fed. R. Civ. P 15(a) and not by motion under Rule 21.").

Here, this Court should grant the Plaintiffs' Motion to Amend Complaint and allow them to file the Third Amended Complaint attached as Exhibit A to this Memorandum. The proposed amended complaint accepts as true all allegations and legal theories asserted in the defendants' motion to dismiss and cures the issues by dropping Connie Taylor Henderson and JoLee Duclos as defendants and Donna Taylor in her capacity as the Personal Representative of the Estate of Sara Taylor. (*See* the attached Exhibit A.) The Plaintiffs simply do not wish to litigate over these issues and risk an appeal after trial in this lawsuit, and it would be prejudicial to the Plaintiffs if this Court did not allow the amendment. (Dkt. 139-3.) The amendment simply returns the parties to this lawsuit back to the *status quo*, i.e., the same parties who were in the lawsuit since shortly after it was filed, so there can be no prejudice to the defendants. There is no quicker, more just or speedy way of laying to rest the defendants' allegations regarding jurisdiction.

Indeed, the Plaintiffs have not even served the Second Amended Complaint upon the newly named defendants Connie Taylor Henderson and JoLee Dulcos. (Dkt. 139-3 at ¶ 3.) Had the

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 7

defendants disclosed their present position to this Court or the Plaintiffs' counsel, Dkt. 139-3 at ¶ 2, the Plaintiffs would not have risked naming the new parties and would have simply filed an amended complaint in the form attached as Exhibit A (Dkt. 139-2) to this Memorandum. (Dkt. 139-3 at ¶ 2.) For this reason, the defendants cannot show bad faith because, if anyone is guilty of bad faith, it is them for planning their motion (and filing the fifteen-page memorandum the day after the Second Amended Complaint was filed) and wasting everyone's time and money by not disclosing the issues at any of the conferences or when the Plaintiffs sought to amend their complaints. Notwithstanding their tactical motion to dismiss, Plaintiffs' counsel still attempted to prevent these motions from being filed to no avail. (Dkt. 139-3 at ¶¶ 5 & 7.) And the Plaintiffs would be the parties who will be prejudiced if the motion to dismiss, Dkt. 138, is granted because the defendants, in particular Hawley Troxell, will undoubtedly argue statute of limitations defenses when any one or more of the Plaintiffs, or other shareholders, re-filed the lawsuit. (Dkt. 139-3.)

In addition, the defendants cannot argue futility in the proposed amendment because it cures the allegations in their motion to dismiss by dropping the dispensable nondiverse parties. (*Compare* Dkt. 137 *with* 139-2 (Exhibit A hereto).) And the defendants cannot argue that the motion is untimely as this Court's tentative deadline for amendments is set for October, 2016. (Dkt. 139-3 at ¶ 5.) Simply put, the defendants cannot show any prejudice and, if they could not show prejudice when Plaintiffs previously moved to amend their complaints, they certainly cannot show prejudice to this one. Significantly, the almost five-year delay to this lawsuit was caused by the defendants when they moved to stay this case and then continued pillaging AIA while that stay was in place. (Dkt. 137.)

Moreover, as explained in Section B(1) below (which is incorporated by reference herein), Connie Taylor Henderson and JoLee Duclos are not indispensable defendants, but they are simply

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 8

joint tortfeasors who may be sued separately. (*See* Dkt. 137 at 38-52.) The Plaintiffs are more than willing to accommodate their request at the unfortunate increased expense for all. The same hold true for Donna Taylor has a plaintiff in her capacity as Personal Representative of the Estate of Sara Taylor. She is not an indispensable plaintiff in that capacity, as she will remain a plaintiff in her individual capacity as a Series A Preferred Shareholder, which was the basis she brought this lawsuit under in 2010. (*Compare* Dkt. 137 *with* Dkt. 139-2.)

Finally, in addition to curing the issues raised in the defendants' motion to dismiss (assuming that they are true and they are entitled to a dismissal without prejudice), the Plaintiffs' proposed Third Amended Complaint also clarifies some other allegations to hopefully prevent other technical jurisdictional arguments.

Thus, because the defendants cannot show that the Plaintiffs' proposed amendment was pursued with bad faith, undue prejudice, undue delay or futility, this Court should grant the Plaintiffs' Motion to Amend Complaint, which will render moot the defendants' motion to dismiss.

**2. This Court Should Also Approve the Amendment to the Complaint Under Rule 23.1 and Order the Controlling AIA Defendants to Turn Over to Plaintiffs' Counsel the Names and Addresses of All Common and Preferred Shareholders of AIA Services.**

Although the removal of the allegations in the Second Amended Complaint as to Donna Taylor being the Personal Representative of the Estate of Sarah Taylor appear to not result in the dismissal of a "derivative action" because Donna Taylor will still remain a plaintiff, this Court should separately approve the amended complaint as to that issue and the dropping of the defendants Connie Taylor Henderson and JoLee Duclos *without prejudice*.

"A derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval. Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." **Fed. R. Civ. P. 23.1(c)**.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 9

Here, although it appears unnecessary, this Court should still separately approve the filing of the Third Amended Complaint and the dropping Connie Taylor Henderson and JoLee Duclos as defendants and the dropping of Donna Taylor in her capacity as the Personal Representative of the Estate of Sara Taylor as a plaintiff (she will remain a plaintiff in her individual capacity). Further, this Court should order the Plaintiffs, through their counsel, to provide notice of that amendment to all of AIA Services' shareholders, including the Series C Preferred Shareholders indirectly holding those shares in AIA Services' 401(k) Plan, the former ESOP common shareholders, and the common shareholders. (Dkt. 139-3 at ¶ 6.) Based on the undersigned counsel's experience, John Taylor cannot be trusted to ensure that proper notice is provided and it is time for all of those shareholders to be aware of this lawsuit, including the 401(k) Plan participants who are owed over $1,000,000 in past due dividends). (Dkt. 139-3 at ¶ 6.) To accomplish this task, this Court should further order John Taylor to provide the names and last known addresses for all of the shareholders mentioned above.

**B.** **To the Extent Necessary or in the Alternative, this Court Should Grant the Plaintiffs' Motion to Voluntarily Dismiss, *Without Prejudice*, the Newly Named Dispensable Parties, which Will Again Render the Defendants Motion to Dismiss Moot.**

1. **This Court Should Voluntarily Dismiss, *Without Prejudice*, Connie Taylor Henderson and JoLee Duclos as Defendants and Donna Taylor in Her Capacity as the Personal Representative of the Estate of Sara Taylor.**

The Plaintiffs' Motion to Amend Complaint and attached Proposed Third Amended Complaint should resolve the issues and render the defendants' motion to dismiss moot. However, to the extent the Plaintiffs' Motion to Amend the Complaint does not conclusively resolve the jurisdictional issues or in the alternative, Plaintiffs request that this Court dismiss without prejudice the newly named defendants Connie Taylor Henderson and JoLee Duclos and dismiss without prejudice the newly named plaintiff Donna Taylor in her capacity as the Personal Representative

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 10

of the Estate of Sara Taylor (not in her individual capacity). This, too, will moot the defendants' motion to dismiss. (Dkt. 138.)

**First**, this Court should dismiss the defendants Connie Taylor Henderson and JoLee Duclos *without prejudice* as they are not indispensable parties to this lawsuit—they are simply joint tortfeasors who may be sued separately, so they dispensable.

"Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party." **Fed. R. Civ. P. 21**. It is black letter law that there is no requirement of diversity being present at the time a complaint is filed.

> There is no requirement that diversity exist at the time of the filing of the complaint. According to the Supreme Court in *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989), "it is well settled that Rule 21 invests district courts with authority to allow a dispensable non-diverse party to be dropped at any time, even after judgment has been rendered." *Id*. at 832, 109 S.Ct. at 2222. In fact, *Newman–Green* establishes that "any stage of the action" includes the appeal, holding that an appellate court has the same Rule 21 power as a district court to dismiss a nondiverse party as long as doing so does not prejudice the remaining parties. Otherwise, the Supreme Court reasoned, if the suit were dismissed altogether for lack of subject matter jurisdiction, the plaintiff would simply refile against the defendants in the district court without the non-diverse parties. *Id*. at 837, 109 S.Ct. at 2225. "Nothing but a waste of time and resources would be engendered by ... forcing these parties to begin anew." *Id*. at 838, 109 S.Ct. at 2225; *see also Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1523 (9th Cir.1987) ("Despite earlier case law to the contrary, it is now settled in this circuit that practicality prevails over logic and that we may dismiss a dispensable, non-diverse party in order to perfect retroactively the district court's original jurisdiction.").

*Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1154 (9th Cir. 1998). *See also **Cason v. Puerto Rico Elec. Power Authority***, 770 F.3d 971, 977 (1st Cir. 2014) ("Dismissal of a nondiverse dispensable party has long been recognized as a way to cure a jurisdictional defect and Rule 21 explicitly vests district courts with authority to allow a dispensable nondiverse party to be dropped at any time."); *Kerr*, 250 F.2d at 863 ("The propriety of dismissing a dispensable party to maintain diversity has

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 11

subsequently been recognized in numerous cases."). The Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." **Fed. R. Civ. P. 1**.

"It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp., Ltd.*, 498 U.S. 5, 7, 111 S.Ct. 315, 316, 112 L.Ed.2d 263 (1990); *Ward v. Apple Inc.*, 791 F.3d 1041 (9th Cir. 2015); *Bank of America Nat Trust and Sav Assn v Hotel Rittenhouse Associates*, 844 F.2d 1050, 1054 (3d Cir. 1988) ("A defendant's right to contribution or indemnity from an absent non-diverse party does not render that absentee indispensable pursuant to Rule 19."); *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955) (holding that co-conspirators are not indispensable parties).

Here, while the Plaintiffs moved to add the new parties in an effort to prevent other lawsuits from being filed, Dkt. 139-3, the defendants Connie Taylor Henderson and JoLee Duclos should be dropped, *without prejudice*, as defendants from this lawsuit. They are joint tortfeasors and are not indispensable parties. (*See* Dkt. 137, 139-2.) The tort claims asserted against Connie Taylor Henderson and JoLee Duclos are breaches of fiduciary duties, fraud, corporate waste and aiding and abetting in the commission of those torts, which are joint and several liability torts and result in them not being indispensable parties to this lawsuit. (Dkt. 137.) Because Connie Taylor Henderson and JoLee Duclos have not even been served with the Second Amended Complaint or waived service, Dkt. 139-3 at ¶ 3, they cannot show any prejudice. (Dkt. 139-3.) Likewise, the other defendants cannot show prejudice because dropping Connie Taylor Henderson and JoLee Duclos as defendants simply returns this to the *status quo* on June 19, 2016—the day before Plaintiffs filed the Second Amended Complaint less than thirty days ago. (*Compare* Dkt. 137 *with*

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 12

139-2.)

**Second**, this Court should voluntarily dismiss Donna Taylor in her capacity as the Personal Representative of the Estate of Sara Taylor (but not in her individual capacity) *without prejudice*. Although Donna Taylor simply sought to ensure that she had properly pleaded her capacity as Personal Representative as to her deceased daughter's common shares, she does not need those shares or that capacity to pursue this lawsuit because she remains a Series A Preferred Shareholder in her individual capacity.

A "plaintiff" may voluntarily dismiss an action "[s]ubject to Rules 23(e), 23.1(c), 23.2, and 66 and any applicable federal statute, the plaintiff may dismiss an action without a court order by filing: (i) a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment." **Fed. R. Civ. P. 41(a)(1)(A)**. "Unless the notice or stipulation states otherwise, the dismissal is without prejudice." **Fed. R. Civ. P. 41(a)(1)(B)**. "Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper…Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice." **Fed. R. Civ. P. 41(a)(2)**. The Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." **Fed. R. Civ. P. 1**.

Here, Donna Taylor, in her capacity as the Personal Representative of the Estate of Sara Taylor, is not an indispensable plaintiff. (*See* Dkt. 137 at 1, ¶ 5.) Indeed, Donna Taylor, in her individual capacity, is also a Series A Preferred Shareholder. (Dkt. 137 at 137, ¶ 5.) She will remain as a plaintiff in her individual capacity, which was the basis she filed this lawsuit under. (Dkt. 1 at 6, ¶ 4.1; 23 at 5, ¶ 4.1.) Moreover, Dale Miesen is also a plaintiff and a common shareholder. (Dkt. 137 at 1 ¶ 4.) Thus, even if something happened to Donna Taylor, Dale Miesen is a plaintiff. Once

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 13

again, there is no prejudice to the defendants by dropping Donna Taylor in her capacity as Personal Representative and simply return this lawsuit to the status quo the day before the Second Amended Complaint was filed on June 19, 2016, which is less than thirty days ago. There simply can be no prejudice to the defendants by dropping Donna Taylor solely in her capacity as Personal Representative. She would remain a plaintiff in her individual capacity—back to the *status quo*.

Indeed, this Court could voluntarily dismiss Donna Taylor without prejudice in both capacities because Dale Miesen would still be a plaintiff and the need to dismiss Connie Taylor Henderson and JoLee Duclos would be rendered moot. However, the Plaintiffs would prefer not to proceed in this manner as it is presumed that the defendants would argue later that Dale Miesen did not provide his own derivative demand in 2008 prior to filing suit in 2010 (Dkt. 67-19), albeit that argument is contrary to the clear interpretation of I.C. § 30-1-702 and comment 3 thereto ("It should be noted that the shareholder bringing suit does not necessarily have to be the person making the demand. Only one demand need be made in order for the corporation to consider whether to take corrective action."). Thus, Dale Miesen need not have filed his own demand, which the defendants conceded when they did not address the issue on the last motion to amend. (Dkt. 130 at 3; 131-1 at 3-4; 133-135.) If this Court elects to go this route, the Plaintiffs' respectfully request that this Court expressly find that Dale Miesen need not make his own demand under I.C. § 30-1-702 (which would only apply to the 2008 demand, Dkt. 67-19).

Thus, if this Court does not find that the Plaintiffs' Motion to Amend Complaint and the Proposed Third Amended Complaint, Dkt. 139-2, does not cure all of the allegations regarding the destruction of diversity, Dkt. 138, then this Court should drop Connie Taylor Henderson and JoLee Duclos as defendants because they are not indispensable parties and drop Donna Taylor as a plaintiff, but only as to her capacity as Personal Representative. Once again, this, too, would render

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 14

**5-ER-955**

the defendants' motion to dismiss moot.

**2. This Court Should Also Approve the Dismissal Under Rule 23.1 and Order the Controlling AIA Defendants to Turn Over to Plaintiffs' Counsel the Names and Addresses of All Common and Preferred Shareholders of AIA Services**

Although it appears unnecessary, this Court should approve the voluntary dismissal, *without prejudice*, of Connie Taylor Henderson and JoLee Duclos as defendants and Donna Taylor in her capacity as Personal Representative of the Estate of Sara Taylor.

"A derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval. Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." **Fed. R. Civ. P. 23.1(c)**.

Here, although it appears unnecessary, this Court should still separately approve the dropping Connie Taylor Henderson and JoLee Duclos as defendants and the dropping of Donna Taylor in her capacity as the Personal Representative of the Estate of Sara Taylor as a plaintiff (she will remain a plaintiff in her individual capacity). Further, this Court should order the Plaintiffs, through their counsel, to provide notice of that dismissal to all of AIA Services' shareholders, including the Series C Preferred Shareholders indirectly holding those shares in AIA Services' 401(k) Plan, the former ESOP common shareholders, and the common shareholders. (Dkt. 139-3 at ¶ 6.) Based on the undersigned counsel's experience, John Taylor cannot be trusted to ensure that proper notice is provided and it is time for all of those shareholders to be aware of this lawsuit, including the 401(k) Plan participants who are owed over $1,000,000 in past due dividends. (Dkt. 139-3 at ¶ 6.) To accomplish this task, this Court should order John Taylor to provide the names and last known addresses for all of the above-reference shareholders.

///

///

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 15

**C. This Court Should Enter Its Order on Plaintiffs' Motion to Amend Complaint and Motion to Voluntarily Dismiss the Newly Named Parties Before It Enters Its Order on Defendants' Motion to Dismiss Because Plaintiffs' Motions Should Render the Defendants' Motion Moot.**

This Court should decide the Plaintiffs motion first because they should render the defendants' motion to dismiss moot, which would conserve this Court's time and resources.

Although there is no mandatory "sequencing of jurisdictional issues," jurisdictional questions ordinarily must precede merits determinations in dispositional order. ***Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.***, 549 U.S. 422, 431, 127 S.Ct. 1184, 167 L.Ed.2d 15 (2007) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999)).

Here, this Court should decide the Plaintiffs motions before deciding the defendants' motion to dismiss. (Dkt. 138.) The crucial issue before this Court are the jurisdictional challenges raised by the defendants in their motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1). (Dkt. 138.) That jurisdictional issue will be rendered moot by the above motions. Thus, this Court should decide the above motions before deciding the defendants' motion to dismiss. (Dkt. 138.)

## IV. CONCLUSION

For the reasons stated above, this Court should grant Plaintiffs' Motion to Amend the Complaint, and allow them to file the Third Amended Complaint in the form attached as Exhibit A. The undersigned counsel also requests approval to correct any typographical and grammatical errors in Exhibit A prior to filing it. To the extent necessary or in the alternatively, this Court should grant the Plaintiffs' motion to Voluntarily Dismiss Certain Parties *Without Prejudice*. Under any scenario, there is no prejudice to any of the defendants.

And, under any scenario, this Court should approve the motion(s) under Rule 23.1 and order John Taylor to provide a list of the names and last known addresses to Plaintiffs' counsel so

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 16

that he can provide the appropriate notice.

Finally, this Court should decide Plaintiffs motion before deciding defendants' motion to dismiss because Plaintiffs' motions should render that motion, Dkt. 138, moot.

DATED:  This 15th day of July, 2016.

RODERICK BOND LAW OFFICE, PLLC


By:   */s/ Roderick C. Bond*
          Roderick C. Bond
          Attorney for Plaintiffs

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 17

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 15th day of July, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:    jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:    jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:    lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:    sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:    swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

*/s/ Roderick C. Bond*
Roderick C. Bond

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS
TO AMEND AND/OR VOLUNTARY DISMISSAL OF NEWLY NAMED PARTIES - 18

**5-ER-959**

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiffs

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC.; <br><br> Plaintiffs, <br><br> v. <br><br> HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation, <br><br> Defendants. | Civil No. 1:10-cv-00404-CWD <br><br> THIRD AMENDED COMPLAINT <br><br> DEMAND FOR JURY TRIAL <br><br> [PROPOSED] |

THIRD AMENDED COMPLAINT - i

# Exhibit - A
## 5-ER-960

**TABLE OF CONTENTS**

I.     STATEMENT OF JURISDICTION......................................................................... 1

II.    STATEMENT OF VENUE ................................................................................. 1

III.   PARTIES AND DEFINITIONS OF THE PARTIES.......................................... 1

IV.    FACTS ................................................................................................................ 4

A.     The Background Facts Regarding AIA Services and AIA Insurance................................ 4

B.     John, Beck and Cashman Take Operational Control of AIA and AIA
       Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions
       in Its Amended Articles of Incorporation ...................................................................... 6

C.     AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer
       CropUSA to Themselves ................................................................................................ 9

D.     The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants
       in Taking CropUSA from AIA and Having AIA Fund CropUSA .................................... 13

E.     The Controlling AIA Defendants Steal $1,510,693 From AIA to Fund CropUSA
       and Then They Use $634,269 of Those Funds to Repay a Debt CropUSA Owed to
       AIA—thereby Resulting in a $2,144,962 Fraud Against AIA. ......................................... 15

F.     The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and
       Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal ......... 19

G.     The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and
       Financial Wherewithal with the Improper Assistance from the Hawley Troxell
       Defendants .................................................................................................................... 21

H.     The Controlling AIA Defendants Enter Into Tolling Agreements, but Those
       Tolling Agreements Do Not Save the Hawley Troxell Defendants from the
       Unwaivable Conflicts of Interest .................................................................................. 22

I.     The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA
       and Intentionally Committing Torts against AIA with the Assistance of the Hawley
       Troxell Defendants—Even While this Lawsuit Was Pending............................................ 27

THIRD AMENDED COMPLAINT - ii

# Exhibit - A
## 5-ER-961

J.      There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and
        Intentional Torts Committed by the Controlling AIA Defendants ..................................... 31

V.      CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742
        AND FEDERAL RULE OF CIVIL PROCEDURE 23.1 ...................................................... 36

VI.     COUNT I—BREACH OF FIDUCIARY DUTY ................................................................. 40

VII.    COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES ....... 42

VIII.   COUNT III—LEGAL MALPRACTICE ............................................................................ 43

IX.     COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/
        CONSTRUCTIVE FRAUD.................................................................................................. 44

X.      COUNT V—AIDING AND ABETTING FRAUD ............................................................. 47

XI.     COUNT VI—BREACH OF CONTRACT........................................................................... 49

XII.    COUNT VII—DECLARATORY JUDGMENT.................................................................. 50

XIII.   COUNT VIII—EXCESSIVE COMPENSATION/CORPORATE WASTE .................... 51

XIV.    COUNT IX—ACCOUNT STATED.................................................................................... 52

XV.     JURY DEMAND ................................................................................................................... 53

XVI.    PRAYER FOR RELIEF ....................................................................................................... 53

VERIFICATION OF DALE L. MIESEN ...................................................................................... 55

VERIFICATION OF DONNA J. TAYLOR .................................................................................. 56

CERTIFICATE OF SERVICE ....................................................................................................... 57

THIRD AMENDED COMPLAINT - iii

# Exhibit - A
## 5-ER-962

Plaintiffs Donna J. Taylor and Dale L. Miesen allege cumulatively and, when necessary and/or applicable, in the alternative, as follows:

## I.   STATEMENT OF JURISDICTION

1.   This Court has jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1332(a)(1), as the amount in controversy exceeds $75,000 and the action, when filed, was between citizens of different states.

2.   This Court also has personal jurisdiction pursuant to I.C. § 5-514 because the defendants: (a) committed torts within the state of Idaho and covered up and aided in the commission of torts committed within the state of Idaho, which injured AIA in Idaho; and (b) transacted business within the state of Idaho and engaged in transactions with the state of Idaho in an effort to obtain a pecuniary benefit and/or enhance their investment in Idaho corporations (including, without limitation, CropUSA Insurance Agency, Inc.). Examples of the specific facts supporting personal jurisdiction are set forth in certain of the paragraphs below.

## II.   STATEMENT OF VENUE

3.   Venue is proper in the District of Idaho under 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the acts, errors and omissions giving rise to the claims asserted in this Third Amended Complaint and the torts committed against AIA occurred in the District of Idaho, and certain of the defendants reside in the District of Idaho. Examples of the specific facts supporting venue are set forth in certain of the paragraphs below.

## III.   PARTIES AND DEFINITIONS OF THE PARTIES

4.   Plaintiff Dale L. Miesen ("Miesen") is a citizen and resident of Colleyville, Texas. Miesen has been a common shareholder of AIA Services during all relevant times.

5.   Plaintiff Donna J. Taylor ("Donna") is a citizen and resident of Clarkston, Washington. Donna has been a Series A Preferred Shareholder of AIA Services during all relevant

THIRD AMENDED COMPLAINT - 1

# Exhibit - A
## 5-ER-963

times.

6.      Plaintiffs Dale Miesen and Donna J. Taylor are collectively referred to as the "Plaintiffs" in this Third Amended Complaint, and they were innocent minority shareholders.

7.      Plaintiffs are bringing this derivative action on behalf of AIA Services Corporation ("AIA Services"). In addition, Plaintiffs are bringing this action as a double derivative action on behalf AIA Insurance, Inc. ("AIA Insurance"), which is a wholly owned subsidiary of AIA Services. AIA Services and AIA Insurance are collectively referred to as "AIA" in this Third Amended Complaint. The definition of "AIA" includes AIA Services and/or AIA Insurance for purposes of pleading in the alternative, and includes the Plaintiffs to extent they are required to support any derivative cause of action set forth in this Third Amended Complaint.

8.      Defendant AIA Services is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. At all times relevant to this lawsuit, AIA Services is or has been the parent corporation of AIA Insurance.

9.      Defendant AIA Insurance is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. AIA Insurance is, or was at all relevant times, a wholly owned subsidiary of AIA Services.

10.     Defendant CropUSA Insurance Agency, Inc. ("CropUSA") is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. CropUSA was formerly known as AIA Crop Insurance, Inc.

11.     Defendant R. John Taylor ("John") is citizen and resident of the state of Idaho. At all times relevant to this lawsuit, John served on the Board of Directors of AIA Services, AIA Insurance, and CropUSA and continues to serve on those boards. John also served as President of each of these corporations during all times relevant to this lawsuit. John is also licensed to practice

THIRD AMENDED COMPLAINT - 2

# Exhibit - A
## 5-ER-964

law in the state of Idaho. John is a common shareholder of AIA Services and a common shareholder of the CropUSA. John also owns shares or ownership interests in other entities that have engaged in inappropriate transactions with AIA and/or which have improperly benefitted from AIA during all relevant times.

12.     Defendant James Beck ("Beck") is a citizen and resident of the state of Minnesota. Beck served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until he resigned in 2014. Beck was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA.

13.     Defendant Michael Cashman, Sr. ("Cashman") is a citizen and resident of the state of Minnesota. Cashman served on the Board of Directors of AIA Services during certain relevant times. Cashman was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA.

14.     John, Beck, and Cashman, are collectively referred to herein as the "Controlling AIA Defendants." The Controlling AIA Defendants have acted in concert and assisted one another in committing various torts described in this Third Amended Complaint and covering up and/or concealing those torts. The definition of "Controlling AIA Defendants" includes the acts and/or omissions of one or more of John, Beck, and/or Cashman for purposes of pleading in the alternative.

15.     Defendant Gary D. Babbitt ("Babbitt") is a citizen and resident of the state of Idaho and was an attorney practicing law in the state of Idaho with and for Hawley Troxell.

16.     Defendant Richard A. Riley ("Riley") is a citizen and resident of the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

///

THIRD AMENDED COMPLAINT - 3

# Exhibit - A
## 5-ER-965

17.     Defendant D. John Ashby ("Ashby") is a citizen and resident of the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

18.     Defendant Hawley Troxell Ennis & Hawley LLP ("Hawley Troxell") is an Idaho limited liability partnership in the business of practicing law, with its principal place of business in Boise, Idaho. Hawley Troxell has no office in the state of Washington. None of the individual partners of Hawley Troxell are residents of Washington. Hawley Troxell, though its attorneys, acted as counsel for AIA Services, AIA Insurance and CropUSA during certain relevant times and in certain lawsuits. Hawley Troxell is also named herein as it is vicariously liable for the acts and/or omissions of Babbitt, Riley, Ashby and its other attorneys.

19.     Babbitt, Ashby, Riley, other Hawley Troxell attorneys, and Hawley Troxell are collectively referred to as the "Hawley Troxell Defendants" in this Third Amended Complaint. The definition of "Hawley Troxell Defendants" includes the acts and/or omissions of one or more of Babbitt, Ashby, Riley, other attorneys at Hawley Troxell and/or Hawley Troxell for purposes of pleading in the alternative. The Hawley Troxell Defendants conducted business from their office in Boise, Idaho during all relevant times.

## IV.     FACTS

### A.  The Background Facts Regarding AIA Services and AIA Insurance

20.     In 1983, AIA Services was formed as a closely held Idaho corporation for the purpose of acting as a holding company for various other wholly owned subsidiaries. AIA's business model was to work with farmers and growers to form trusts and/or related cooperatives through various growers and farmers' associations and the members of those associates also becoming members of the trusts and/or cooperatives.

21.     AIA created the Grain Growers Membership & Insurance Trust, the National Contract Poultry Grower's Membership & Insurance Trust, and other, similar trusts. By way of its

THIRD AMENDED COMPLAINT - 4

# Exhibit - A
## 5-ER-966

relationships with these various organizations, AIA held contracts for the exclusive right to market health insurance (*e.g.*, Group Universal Health Policies) and other insurance products to the members of the various trusts and associations.

22.     In 1987, Donna and Reed Taylor, a non-party to this suit, were issued Series A Preferred Shares in AIA Services in connection with their divorce. Pursuant to the dissolution of their marriage, Donna was issued the 200,000 shares of Series A Preferred shares on or about February 12, 1988, and has held those shares ever since, less those shares which have been redeemed in part over the years. (*See* Dkt. #67-1 and #67-2.)

23.     In connection with the issuance of the Series A Preferred Shares to Donna, AIA Services' shareholders adopted amendments to its articles of incorporation with restrictions on the manner in which AIA Services and its subsidiaries could conduct business. (*See* Dkt. #67-3.) AIA Services' amended articles of incorporation included, without limitation, the restrictions that: (a) barred AIA Services and AIA Insurance from guaranteeing any loans for any individual or entities which were not wholly owned subsidiaries; (b) barred certain transactions with shareholders and affiliates; and (c) required AIA Services to comply with certain financial covenants. (*Id.*)

24.     In addition, AIA Services' amended articles of incorporation also provided Donna with the unqualified right, as the Series A Preferred Shareholder, to appoint a person, to be determined in her sole discretion, to the Board of Directors of AIA Services. (*See* Dkt. #67-3.)

25.     The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the restrictions under AIA Services' amended articles of incorporation for the benefit of AIA Services and the Series A Preferred Shares.

26.     Donna's Series A Preferred Shares have not been fully redeemed to this day, and the restrictions under AIA Services' amended articles of incorporation remain in full force and

THIRD AMENDED COMPLAINT - 5

# Exhibit - A
## 5-ER-967

effect to this day and fully applicable. (*See* Dkt. #67-42, pp. 10-11 ¶ 19.)

**B. John, Beck and Cashman Take Operational Control of AIA and AIA Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in Its Amended Articles of Incorporation**

27. In 1995, the Controlling AIA Defendants spearheaded a transaction to redeem Reed Taylor's majority common stock interest in AIA Services. (*See* Dkt. 67-5 and #67-6.)

28. As part of the redemption, Beck, Cashman and certain of their friends acquired Series C Preferred Shares in AIA Services through an Investment Agreement, which was entered into with AIA Services and transmitted to AIA Services in Idaho and involved the transaction to redeem Reed Taylor's common shares in Idaho. When AIA Services amended its articles of incorporation to allow the issuance of the Series C Preferred Shares, AIA Services included additional restrictions in its articles of incorporation. Riley assisted in drafting and/or approving these restrictions and he was fully aware of them.

29. Under the new and additional restrictions in AIA Services' amended articles of incorporation (these restrictions were in addition to others adopted in connection with the issuance of Donna's Series A Preferred Shares), AIA Services was barred from engaging in a number of corporate actions, including, but not limited to: (a) AIA Services could not acquire any common shares from any shareholders unless all dividends due on the Series C Preferred Shares has been paid (10% dividend per year) or those funds were set aside; (b) the Series C Preferred Shareholders had the right to elect one director to AIA Services' Board of Directors; and (c) if any Series C Preferred Shares are redeemed, such redemptions must be equally from all shareholders. (*See* Dkt. #67-3.)

30. Although the Series C Preferred Shares held by Beck, Cashman and their friends were eventually unlawfully and effectively redeemed by AIA, other Series C Preferred Shares

THIRD AMENDED COMPLAINT - 6

# Exhibit - A
## 5-ER-968

were later issued to the AIA Services 401(k) Plan and those shares remain issued and outstanding to this day and no dividends have been paid as required since approximately 1997. As a result, these new restrictions under AIA Services amended articles of incorporation were in place for the benefit of AIA Services and the Series C Preferred Shares, which have remained in full force and effect to this day. The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the additional restrictions under AIA Services' amended articles of incorporation.

31.     Upon the redemption of Reed Taylor's majority common shares, Beck, Cashman, and John directly or indirectly became the majority common shareholders of AIA Services. (*See* Dkt. #67-5.) In addition, Beck, Cashman and John entered into a Voting Agreement to ensure that they would maintain control of AIA Services' Board of Directors, which was signed by Beck and Cashman and transmitted by them to Idaho. As a result, the Controlling AIA Defendants have maintained operational control of AIA from 1995 through the present time. Beck and Cashman attended certain board and shareholder meetings for AIA Services in person in Idaho and via telephone from Minnesota for meetings held in Idaho.

32.     In connection with the redemption of Reed Taylor's shares, John entered into an Executive Officer's Agreement with AIA Services, which guaranteed him certain salary payments and other compensation for three years; that agreement also contained non-compete and non-solicitation provisions. (*See* Dkt. #67-8.) John's salary after the first three years was required to be determined by AIA Services' Board of Directors, which was never done after the first three years.

33.     From 1999-2012, John improperly paid himself millions of dollars pursuant to his Executive Officer's Agreement for his benefit (the amount of which in itself was improper based on AIA's business prospects and John's inability to do anything for the benefit of AIA), while he intentionally and repeatedly violated the non-compete and non-solicitation provisions of his

THIRD AMENDED COMPLAINT - 7

# Exhibit - A
## 5-ER-969

Executive Officer's Agreement.

34.     In connection with the redemption of Reed Taylor's shares in August 1995, AIA Services contributed funds to The Universe Life Insurance Company, which was a wholly owned subsidiary of AIA Services, in order to make AIA Insurance, which was then a wholly owned subsidiary of The Universe Life Insurance Company, a subsidiary of AIA Services. After that transaction, AIA Insurance became a wholly owned subsidiary of AIA Services.

35.     As a result, from August 1995 through all relevant times, AIA Insurance was a wholly owned subsidiary through which AIA Services derived its commissions and administrative fees from insurance policies, which accounted the bulk of AIA's revenues and profits.

36.     From 1995 through 2005, AIA Insurance generated over $65 million in revenues from commissions (over $33 million) and administrative fees (over $27 million), and it continued to generate revenues thereafter.

37.     From 1995 through all relevant times, each of the Controlling AIA Defendants has served at various times on the Board of Directors for AIA Services, AIA Insurance and/or CropUSA, while John has continuously served as the President of AIA.

38.     From 1999 through certain relevant times (Plaintiffs' counsel has purported copies of certain of these meetings through 2006), the Controlling AIA Defendants have also served from time to time on a purported so-called "advisory board" of CropUSA, which actually made the decisions on behalf of AIA and CropUSA. Upon information and belief, Cashman, Beck and John served on the "advisory board" of CropUSA. Certain of the so-called "advisory board" meetings were conducted via telephone originating in Idaho and in person in Idaho.

39.     The Controlling AIA Defendants intentionally concealed from AIA and AIA Services' minority shareholders of the existence and authority of the "advisory board" of

THIRD AMENDED COMPLAINT - 8

Exhibit - A
5-ER-970

CropUSA.

**C. AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer CropUSA to Themselves**

40.     By 1998, AIA's ability to sell health insurance had been impaired by undercapitalization in its underwriting subsidiary the Universal Life. Accordingly, the company considered proposals to sell other forms of insurance, and in particular crop insurance, to be underwritten by other insurance companies. At a 1998 Board Directors of Meeting, AIA Services' Board of Directors specifically discussed selling crop insurance and elected to have AIA pursue selling crop insurance.

41.     In 1999, AIA, then under the control of Controlling AIA Defendants, began selling crop insurance through a wholly owned subsidiary of AIA Services formed under the name "AIA Crop Insurance, Inc."

42.     The first purported meeting of shareholders of AIA Crop Insurance, Inc. ("AIA Crop Insurance") was held on January 11, 2000. The first purported meeting of the AIA Crop Insurance's Board of Directors was held on the same day. The purported minutes of the shareholder's meeting indicate that John, not the true owner AIA Services, claimed to be the sole shareholder of AIA Crop Insurance at the time of incorporation; these facts were concealed from AIA and AIA Services' innocent minority shareholders.

43.     Upon information and belief, at or shortly after the time of its formation, the Hawley Troxell Defendants began providing legal services to AIA Crop Insurance.

44.     At a special meeting of the shareholders of AIA Crop Insurance held on November 13, 2000, AIA Crop Insurance was renamed CropUSA in an apparent attempt to conceal its corporate lineage and origins.

///

THIRD AMENDED COMPLAINT - 9

# Exhibit - A
## 5-ER-971

45.    The minutes of the November 13, 2000 special meeting of the shareholders also show that John continued to claim that he was the sole shareholder of CropUSA, while he was simultaneously representing in business plans provided to others that CropUSA was a subsidiary of AIA Insurance. (*See* Dkt. # 67-66.)

46.    At the time CropUSA was formed, John was employed by AIA Services under an Executive Officer's Agreement, dated August 1, 1995, Dkt. #67-8, which contained express covenants not to compete. Upon information and belief, John's Executive Officer's Agreement and AIA Service's amended articles of incorporation and restated bylaws were drafted and/or approved by Riley, and he had full knowledge of the restrictions under the terms of the foregoing documents.

47.    CropUSA held its purported annual shareholder's meeting on January 10, 2001. By this time, the illegal "spin off" of CropUSA had been accomplished by having AIA Service's Series C Preferred Shareholders (primarily Beck and Cashman) exchange their Series C Preferred Shares for common shares in CropUSA (if CropUSA were in fact an independent entity, these maneuvers would have been completely unnecessary).  The documents for Beck and Cashman to "exchange" their Series C Preferred Shares in AIA Services for common shares in CropUSA were transmitted to them from Idaho and they delivered the signed documents to AIA's offices in Idaho.

48.    The minutes for the shareholder meeting held on January 10, 2001 for CropUSA revealed that CropUSA had retained Hawley Troxell as its advisor and SEC counsel and, upon information and belief, the Hawley Troxell Defendants have served continuously as CropUSA's attorneys in one form or the other ever since. According to the minutes, negotiations between AIA Services and CropUSA had resulted in an agreement whereby AIA Services would no longer operate CropUSA as a subsidiary.

THIRD AMENDED COMPLAINT - 10

# Exhibit - A
## 5-ER-972

49.     However, the negotiations referred to in the January 10, 2001 shareholder meeting minutes for CropUSA did not in fact occur. There was no decision, nor has there ever been a decision, on the part of AIA Services to discontinue the subsidiary status of CropUSA. The January 10, 2001 meeting minutes for CropUSA were concealed from AIA.

50.     None of the preferred or common shareholders of AIA Services (other than those present at the January 10, 2001 meeting) were given notice of or the opportunity to approve or oppose this corporate action; instead, it was concealed from them and AIA.

51.     In spite the fact that John asserted on January 10, 2001 that CropUSA would no longer be a subsidiary of AIA Services, John wrote in a letter dated February 27, 2001, sent on behalf of AIA to Donna, that "AIA is developing a new crop insurance program through a new company called CropUSA." (The letter went on to state that "[t]he costs of putting the CropUSA program together have been paid. AIA now needs to launch five new territories next Month"). This January 27, 2001 letter constituted an unambiguous representation by John to AIA and Donna that CropUSA was a subsidiary of AIA and was being operated for the benefit of AIA and implicitly also for AIA Services' innocent minority shareholders (which included Donna). This representation to AIA and Donna was false, and John knew it was false. Upon information and belief, the other Controlling AIA Defendants were aware of this January 27, 2001 letter and the misrepresentations contained within the letter.

52.     Notwithstanding the fact that John was obligated under the terms of his Executive Officer's Agreement that required that he not compete with AIA Services, and notwithstanding the fact that he owed fiduciary duties to the AIA and AIA Services' shareholders, John set forth his plans to exploit the assets of AIA for the benefit of CropUSA (and himself as the majority purported shareholder) in the purported minutes of the purported January 10, 2001 meeting.

THIRD AMENDED COMPLAINT - 11

# Exhibit - A
## 5-ER-973

53.    The January 10, 2001 meeting minutes reveal that CropUSA authorized its officers to execute a Master Marketing Agreement with AIA Insurance that would allow CropUSA access to all of AIA's customers and customer lists, as well as all of AIA's trade secrets. AIA received no consideration for conveying this access or to enter into these agreements.

54.    CropUSA's officers (including John) were also purportedly authorized to enter into a Management Agreement with AIA Insurance wherein AIA Insurance purportedly agreed to provide management and administrative support to CropUSA without charge. However, John has since testified under oath that AIA's Board of Directors never authorized this agreement, although the Board has acquiesced in the action.

55.    AIA itself was never given notice of the Master Marketing Agreement and the Management Agreement, nor was AIA given the opportunity to approve or reject these agreements or any subsequent ones. Each of these agreements, when executed, constituted a violation of John's Executive Officer's Agreement, which contains a strict non-compete clause. Each of these agreements also constituted a direct breach of fiduciary duty or the aiding and abetting on behalf of each of the Controlling AIA Defendants in the commission of torts against AIA.

56.    Meanwhile, in 2001, John acquired a parking lot for $8,000 using AIA's line-of-credit. Upon information and belief, AIA was required to maintain control of the parking lot as part of its lease with Washington Bank Properties. John then increased the rent that AIA paid to use the parking lot to benefit him. For example, although John paid only $8,000 for the parking lot, they subsequently charged AIA $60,750 in rent to use the parking lot from 2004 through 2006. These unfair and self-serving rental payments to John were concealed from AIA and AIA Services' innocent minority shareholders and were never disclosed to either of them, as was John's purchase of the parking lot.

THIRD AMENDED COMPLAINT - 12

# Exhibit - A
## 5-ER-974

D. **The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants in Taking CropUSA from AIA and Having AIA Fund CropUSA**

57. Upon information and belief, the Hawley Troxell Defendants were providing legal services to CropUSA and/or its board of directors as of January 10, 2001, and such providing of legal services has continued through certain relevant times.

58. Upon information and belief, from January 10, 2001, and continuing through the period relevant to this lawsuit, the Hawley Troxell Defendants had knowledge of John's Executive Officer's Agreement with AIA Services, had knowledge of the conflict of interest provisions in AIA's bylaws, and had knowledge of restrictions in AIA's amended articles of incorporation, but intentionally refused to comply with them and assisted John in violating them or covering up the violations.

59. The Hawley Troxell Defendants knew or should have known that the purported Master Marketing Agreement and Management Agreement constituted breaches of John's Executive Officer's Agreement, violations of AIA Service' amended articles of incorporation, violations of AIA Services' restated bylaws, and constituted breaches of John and the other Controlling AIA Defendants' fiduciary duties owed to AIA and AIA Services' minority shareholders.

60. Upon information and belief, the Hawley Troxell Defendants were also representing CropUSA from January 10, 2001, through certain relevant times, and by way of that representation they breached their fiduciary duties to AIA (including their undivided duty of loyalty owed to AIA) and took steps that materially assisted John and the Controlling AIA Defendants in the commission of the various torts described in this Third Amended Complaint and assisted in the concealment of those torts.

61. Beginning in 1999 and continuing through the through the time CropUSA ceased

THIRD AMENDED COMPLAINT - 13

operating, CropUSA was funded and operated with assets improperly transferred from AIA, including, but not limited to, operating capital, office space, customer lists and other trade secrets, agents and staff, goodwill and other assistance. CropUSA paid nothing for these assets.

62. The Controlling AIA Defendants were all shareholders of AIA at the time CropUSA was formed and later purportedly became shareholders of CropUSA.

63. The Controlling AIA Defendants all served on a purported "advisory board" of CropUSA and/or AIA, and this advisory board exercised actual control over CropUSA and AIA. By exercising control over these entities and committing acts that benefitted CropUSA at the expense of AIA, the Controlling AIA Defendants engaged in a conspiracy to defraud AIA, which should have had the right and title to the property of CropUSA.

64. Due to the fact that the Controlling AIA Defendants have complete control over AIA and would never assert claims against themselves on behalf of AIA, the adverse dominion doctrine applies to all claims asserted herein, thereby barring any defense based on a statute of limitations. *Freeland v. Enosis Corp.,* 540 F.3d 721 (7th Cir. 2008).

65. On January 10, 2002, CropUSA purportedly entered into a Memorandum of Understanding with the Controlling AIA Defendants. Under the terms of this memorandum, Beck and Cashman were obligated to guarantee loans on behalf of CropUSA. The Controlling AIA Defendants guaranteed loans for CropUSA in Idaho and sent their financial information to Idaho for the guarantees.

66. Notably, Beck and Cashman had also been obligated to guarantee over $1,000,000 in loans on behalf of AIA since 1995, but they never did. Notwithstanding this obligation, the Controlling AIA Defendants subsequently arranged for AIA to guarantee CropUSA's lines of credit, even though the guarantees were barred by AIA's amended articles of incorporation and

THIRD AMENDED COMPLAINT - 14

bylaws.

67.     In 2004, the Controlling AIA Defendants attempted to raise capital for CropUSA by selling shares in CropUSA to private investors by way of a $10,000,000 private placement. The Hawley Troxell Defendants drafted the July 15, 2004 Private Placement Memorandum, despite their knowledge of the illegal "spin-off" of CropUSA and the fiduciary duties they owed to AIA.

68.     When CropUSA began distributing the Private Placement Memorandum in 2004, the company was experiencing financial difficulties that made it difficult, if not impossible, to attract investors to purchase shares pursuant to the private placement.

69.     In addition, in 2004, the CropUSA's lack of adequate funding threatened its ability to participate in the Federal Crop Insurance program. To alleviate these problems, the Controlling AIA Defendants would improperly turn to AIA to obtain the necessary funding.

**E.   The Controlling AIA Defendants Steal $1,510,693 From AIA to Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt CropUSA Owed to AIA— thereby Resulting in a $2,144,962 Fraud Against AIA.**

70.     In order to boost CropUSA's balance sheet for the purpose of operating the company, attracting investors and maintaining access to the Federal Crop Insurance program, the Controlling AIA Defendants devised a scheme to illegally transfer $1,510,693 from AIA Insurance to CropUSA.

71.     The Controlling AIA Defendants conspired with each other in the formation and execution of this scheme to unlawfully transfer $1,510,693 of AIA's funds to CropUSA, and aided and abetted one another in carrying out the scheme and ultimately covering it up.

72.     Upon information and belief, the Hawley Troxell Defendants provided counsel to CropUSA with respect to the unlawful transfer of funds and/or has at a minimum assisted in covering up the facts of this illegal transfer.

THIRD AMENDED COMPLAINT - 15

# Exhibit - A
## 5-ER-977

73.    The scheme involved money derived from AIA Insurance. In August 2004, AIA Insurance received a payment of $1,510,693 from Trustmark. (*See* Dkt. #67-59.) Rather than deposit the payment of $1,510,693 into the account of AIA Insurance, where it would have benefited AIA and its innocent shareholders, John deposited the funds into a new account entitled "AIA Insurance Inc. CropUSA." (*See* Dkt. #67-60.) The address for this account coincided with the address for John's personal residence at 2020 Broadview Drive in Lewiston, Idaho, rather than any address used by AIA. (*Id.*)

74.    Shortly after diverting the $1,510,693 into the "AIA Insurance Inc. CropUSA" account, the Controlling AIA Defendants illegally transferred the funds to CropUSA. The Controlling AIA Defendants attempted to disguise this conversion of AIA Insurance's funds by characterizing the transaction as an alleged purchase by AIA Insurance of Series C Preferred Shares in its parent corporation, AIA Services. (*See* Dkt. #67-59.) Then, the Controlling AIA Defendants carried AIA Insurance's alleged investment in the Series C Preferred Shares as having a purported value of $1,510,693 when that was not the true value of the shares.

75.    However, as the Controlling AIA Defendants acknowledged at the time, there was no market for the Series C Preferred Shares which were purportedly being repurchased. At the time the $1,510,693 in funds were converted by CropUSA, there was no authorization of any kind for the transaction, and the transaction was concealed from AIA.

76.    In order to create a plausible explanation for the transfer of the $1,510,693, CropUSA eventually produced a document designated as a Consent in Lieu of Meeting dated August 26, 2004. (*See* Dkt. #67-61.) However, this document itself is completely fraudulent, as it was retroactively created the following year in order to deceive auditors who questioned the validity of this transaction.

THIRD AMENDED COMPLAINT - 16

**Exhibit - A**
**5-ER-978**

77.     In addition, this $1,510,693 purported repurchase of shares separately violated the terms of AIA Services' amended articles of incorporation, which required that all Series C Preferred Shares be redeemed equally and simultaneously from all shareholders. (*See* Dkt. #67-3.) Instead of repurchasing an equal portion of the Series C Preferred Shares from AIA Services' 401(k) Plan, the Controlling AIA Defendants intentionally only repurchased the Series C Preferred Shares held by CropUSA (which had been previously held by Beck, Cashman and their friends).

78.     CropUSA was carrying these Series C Preferred Shares in AIA Services on its books with a value of $21,693, which means that CropUSA realized a gain of $1,489,000 on this purported sale of shares. (*See* Dkt. #67-59.) At that time, although the Controlling AIA Defendants had not properly accounted for all funds, assets, labor and other costs advanced from AIA for CropUSA, they had actually accounted for there being a debt of $634,269 owed by CropUSA to AIA.

79.     After unlawfully transferring the $1,510,693 received by AIA Insurance to CropUSA, the Controlling AIA Shareholders had CropUSA repay the $634,269 debt owed to AIA, thereby committing a double fraud upon AIA, i.e., AIA should have the $1,510,693 in its bank account now and it should have never lent the $634,269 to CropUSA in the first place. In other words, those fraudulent transactions alone resulted in the loss of $2,144,962 in funds to AIA and thus damaged AIA in the amount of $2,144,962. The Controlling AIA Defendants have actively concealed, or covered up, these transactions from AIA with the assistance of the Hawley Troxell Defendants.

80.     AIA and the innocent shareholders of AIA Services were never given notice of the 2004 stock transaction, nor were any proper board or shareholder meetings held to approve the transaction. However, as with the fraudulent document prepared on behalf of CropUSA, a

THIRD AMENDED COMPLAINT - 17

fraudulent Consent if Lieu of Meeting, dated August 26, 2004, was prepared on behalf of AIA. This document was actually produced several months after the transaction and was created to deceive auditors.

81.     Upon information and believe, the Hawley Troxell Defendants provided legal services to both AIA and CropUSA at the time of the 2004 transaction or had actually knowledge of the 2004 transaction.

82.     The Hawley Troxell Defendants at various times, as purported counsel for AIA, failed to disclose to AIA the 2004 transaction to transfer $1,510,693 to CropUSA and that the acts of the Controlling AIA Defendants constituted an intentional breach of their fiduciary duties (including the duty of loyalty) owed to AIA and a concealment of a prohibited transaction. For this reason alone, the Hawley Troxell Defendants could not reasonably rely on a tolling agreement to represent AIA, CropUSA and the interest of the Controlling AIA Defendants in later litigation.

83.     The Hawley Troxell Defendants failed to disclose to AIA, or to anyone else, that this $1,510,693 transaction was unlawful on many levels, including but not limited to the fact that it did not comply with articles of incorporation and bylaws, caused a breach of AIA's other contracts, and could not be justified by the balance sheet of either AIA Insurance or CropUSA. Upon information and belief, the Hawley Troxell Defendants had knowledge of the back-dated Consent in Lieu of Meeting documents.

84.     On February 16, 2005, Beck sent an email to John and Cashman confirming the Controlling AIA Defendants' scheme to steal CropUSA in an effort to profit: "[Cashman] and I are so convinced that CropUSA is a winner that anything standing in the way of a good result will be a crime." (Dkt. #67-54.) The crime was stealing CropUSA from AIA and then to drain AIA of its funds and assets to pursue the Controlling AIA Defendants' scheme. This was not the only

THIRD AMENDED COMPLAINT - 18

email exchanged between the Controlling AIA Defendants, as they emailed one another on numerous occasions, including emails originating from Idaho or directed to a recipient in Idaho.

**F.** **The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal**

85.     After unlawfully taking $2,144,962 from AIA Insurance in 2004, the Controlling AIA Defendants continued to operate CropUSA with assets both tangible and intangible that rightfully belonged to AIA, continued to improperly subsidize CropUSA with AIA's assets and labor, and continued to conceal their actions from AIA and AIA Services' innocent minority shareholders.

86.     Under the management and direction of the Controlling AIA Defendants, AIA regularly failed to allocate costs to CropUSA and other entities and failed to charge markup, interest or profit on costs paid for other entities. For example, John's own salary of $250,000 was allocated entirely to AIA Services even though John's contractual right to salary from AIA Services had expired in 1998 and had never been renewed by an authorized board. (And, further, John performed no actual work for AIA during the time in question.)

87.     John, with the knowledge and complicity of the other Controlling AIA Defendants, also performed work for other entities owned in full or in part by him while on AIA's payroll, i.e., CropUSA, Pacific Empire Radio Corp., Pacific Empire Communications Corp., Pacific Empire Holdings Corp., Radio Leasing I LLC and Radio Leasing II LLC. John also had other AIA employees work for these entities without compensation to AIA. These facts, like virtually all of the others referenced in this Third Amended Complaint, were concealed from AIA and AIA Services' innocent minority shareholders.

88.     Between its founding in 1999 and the filing of this lawsuit, CropUSA and other entities generated tens of millions of dollars of revenue (including premiums) and other benefits

THIRD AMENDED COMPLAINT - 19

that would have flowed to AIA but for the unlawful and unauthorized acts of the Controlling AIA Defendants.

89.     As of 2006, John owed AIA at least $307,000 for personal loans he had taken from AIA Services. For several years, John concealed these loans by engaging in false accounting whereby loans to him were treated as payments of principal on AIA Service' indebtedness due to Reed Taylor on his $6 million promissory note (which was later ruled to be illegal).  In 2006, John "corrected" the alleged accounting "error" by increasing the balance due on Reed Taylor's note to $6 million and reinstating John's $307,000 debt. John had still not repaid this personal loan.

90.     Over the years, John had AIA pay his personal maid, his personal credit card bills, donations, cash advances, family cell phone bills, and other personal expenses. John also had AIA purchase several vehicles from him, and he continued to drive these vehicles after the sales and purchase other vehicles with AIA's funds to use for his benefit when there was no reason to do so. John also had AIA employees perform work on his personal residence and on other real property not owned by AIA. These acts were all committed with the knowledge and complicity of the Controlling AIA Defendants and without paying AIA the fair value of the services or expenses.

91.     At year-end 2006, AIA had improperly lent $95,000 to Pacific Empire Radio Corp., a corporation partially owned by John in which he served as a director during all relevant times. The Controlling AIA Defendants transferred that $95,000 receivable from AIA to CropUSA. By the end of 2012, AIA would lend over $1,400,000 in additional funds to Pacific Empire Radio Corp., when all such loans violated AIA Services' amended articles of incorporation and were not authorized under the circumstances by AIA Services' restated bylaws.

THIRD AMENDED COMPLAINT - 20

# Exhibit - A
## 5-ER-982

92. In August 2007, AIA settled litigation with the state of Idaho whereby AIA received a mortgage worth approximately $1.5 million for the amounts owed by Washington Bank Properties on the real property where AIA's offices are located. Although AIA Insurance paid the costs of this litigation, the Controlling AIA Defendants, with the assistance of the Hawley Troxell Defendants, improperly titled the note in the name of AIA Services only, and then pledged the note to CropUSA so that the Controlling AIA Defendants could borrow money to pay their attorneys' fees and costs incurred defending in *Taylor v. AIA Services Corp., et al.* to the Hawley Troxell Defendants.

93. As with the 2004 transactions, the transaction pledging the mortgage owned by AIA Services to CropUSA for purportedly paying the Hawley Troxell Defendants' attorneys' fees and costs incurred representing AIA, CropUSA and the Controlling AIA Defendants was a blatant misappropriation and/or illegal pledging of AIA's asset. The loan documents and the pledge agreement were drafted by the Hawley Troxell Defendants, although they later asserted that they were only "scriveners" for the transaction. This transaction was improper and barred by AIA's amended articles of incorporation and bylaws.

G. **The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and Financial Wherewithal with the Improper Assistance from the Hawley Troxell Defendants**

94. On October 26, 2007, the Hawley Troxell Defendants drafted and delivered an opinion letter falsely representing that AIA Insurance was authorized to guarantee a $15,000,000 line-of-credit on behalf of CropUSA, which carried a hard-money loan with an exorbitant interest rate.

95. The Hawley Troxell Defendants' opinion letter was delivered for a loan guarantee which violated AIA Services' amended articles of incorporation, its restated bylaws and AIA

THIRD AMENDED COMPLAINT - 21

Insurance's bylaws, and in violation of the duty of loyalty owed by the Hawley Troxell Defendants to AIA.

96.     Additionally, Lancelot, the lender for this $15,000,000 line-of-credit was subsequently exposed as a Ponzi scheme, and its founder, Gregory Bell, pleaded guilty to criminal charges in federal court. Mr. Bell was the signee for Lancelot on the $15,000,000 line-of-credit. These facts pertaining to the $15,000,000 loan for CropUSA and AIA Insurance's guarantee of that loan, along with other transactions, were never disclosed to AIA by the Hawley Troxell Defendants or the Controlling AIA Defendants and the payment of interest on that loan was detrimental to AIA because most of CropUSA's assets could be traced directly to AIA (and the depletion of CropUSA's funds resulted in less funds available to recover).

**H.  The Controlling AIA Defendants Enter Into Tolling Agreements, but Those Tolling Agreements Do Not Save the Hawley Troxell Defendants from the Unwaivable Conflicts of Interest**

97.     In 2007, Reed Taylor filed suit against AIA and certain of the Controlling AIA Defendants, asserting claims for breaches of contract, breaches of fiduciary duties, conversion, fraud and other claims ("*Taylor v. AIA Services Corp., et al.*"). In 2007, the Hawley Troxell Defendants appeared as counsel for AIA Services and AIA Insurance in that lawsuit. Later, Reed Taylor amended his complaint and named CropUSA as a defendant, after recognizing that millions of dollars had been transferred to it from AIA, among other improper transactions (including some of those transactions described in this Third Amended Complaint). (*See* Dkt. #82-2.) The Hawley Troxell Defendants also appeared and represented CropUSA in that lawsuit. (*Id.*)

98.     As the purported attorneys for AIA, two entities, the Hawley Troxell Defendants owed duties of loyalty, care, and good faith to AIA and the Hawley Troxell Defendants breached their duties of care and fiduciary duties by engaging in the simultaneous representation of the

THIRD AMENDED COMPLAINT - 22

Controlling AIA Defendants, AIA, CropUSA, and other parties (including Bryan Freeman) with interests adverse to the interests of AIA.

99.    In 2007, Beck was purportedly appointed the Boards of Directors of AIA Service and AIA Insurance by John. Beck was improperly paid $5,000 per quarter to sit on the Boards of AIA and also were to receive common shares for his purported "service." Beck attended certain AIA board meetings in person in Idaho or through telephone calls directed to, or originating from, Idaho. Beck later testified that he serves on AIA's Boards to protect his own interests and those of his friends (the same friends who previously acquired Series C Preferred Shares in AIA Services and illegally exchanged them for common shares in CropUSA).

100.    In 2007 and 2008, the Controlling AIA Defendants entered into written tolling agreements in connection with the various litigation directly or indirectly involving AIA. The Hawley Troxell Defendants were improperly involved with and/or facilitated the Controlling AIA Defendants entering into such tolling agreements for the purpose of allowing the Hawley Troxell Defendants to continue to represent AIA, CropUSA and directly or indirectly certain of the Controlling AIA Defendants.

101.    By tolling the statute of limitation for claims against the Controlling AIA Defendants, the Hawley Troxell Defendants sought to use the tolling agreements to authorize the waiver of their conflicts of interest representing AIA, CropUSA and the interests of the Controlling AIA Defendants in litigation that could have and should have exposed the fraud and intentional breaches of fiduciary duties committed by the Controlling AIA Defendants.

102.    The purpose of a properly drafted and executed tolling agreement is to allow conflicts of interest to be waived under certain limited permissible circumstances in order to waive a conflict of interest so that an attorney or law firm can represent clients with diverging interests.

THIRD AMENDED COMPLAINT - 23

# Exhibit - A
## 5-ER-985

Those limited permissible circumstances were not present here.

103.     The Hawley Troxell Defendants knew or should have known that the Controlling AIA Defendants had committed intentional acts of fraud and breaches of fiduciary duties (including the duty of loyalty) owed to AIA. The Hawley Troxell Defendants knew or should have known that by allowing the Controlling AIA Defendants to continue to operate and control AIA that they would continue to conceal their past torts and likely continue to commit new torts, which is precisely what occurred here as demonstrated by the facts alleged in this Third Amended Complaint.

104.     Although these tolling agreements tolled the statute of limitations for claims AIA could assert against the Controlling AIA Defendants (which eliminates any defense they may have to assert any statute of limitations defenses), the facts set forth in this Third Amended Complaint provide a classic example of why such tolling agreements were improper under the circumstances as the agreements involved tolling intentional torts committed against AIA. While the claims were being tolled, the Controlling AIA Defendants' continued to unlawfully use AIA's cash, resources and ability to borrow to fund other businesses and pay compensation to themselves.

105.     During the course of the litigation in *Taylor v. AIA Services Corp.*, *et al.*, Reed Taylor attempted to negotiate a settlement, but he insisted that any settlement must include full disclosure to, and authorization by, AIA Services' minority shareholders and to allow them to participate in CropUSA common share ownership. (*See* Dkt. #67-18.) Not only did the Controlling AIA Defendants and Hawley Troxell Defendants reject Reed Taylor's offer, but they still refused and failed to provide full disclosure to AIA and AIA Services' innocent minority shareholders of the malfeasance and torts committed against AIA. The untenable position of the Hawley Troxell Defendants was confirmed when the only person seeking to require full and fair disclosure was a

THIRD AMENDED COMPLAINT - 24

Exhibit - A
5-ER-986

creditor, Reed Taylor. (*Id.*)

106.    During the course of *Taylor v. AIA Services Corp, et al.*, Hawley Troxell, Ashby, Babbitt, Riley and Beck represented to Judge Brudie, the Idaho Supreme Court and AIA that the redemption of Reed Taylor's shares should be illegal to benefit AIA Services' minority shareholders. (*See* Dkt. #67-23 and #67-25.)

107.    After Judge Brudie ruled the redemption of Reed Taylor's shares was illegal, neither Beck, the Hawley Troxell Defendants nor any of the other Controlling AIA Defendants did anything to benefit the minority shareholders of AIA Services nor did they ever have any intention of helping them, contrary to what they had represented to Judge Brudie and the Idaho Supreme Court.

108.    Instead of sharing equally in AIA's assets with AIA Services' innocent minority shareholders, the Controlling AIA Defendants later sought to eliminate those minority shareholders for only ten cents per share, even though John previously valued the shares much higher even after considering the over $6 million that AIA Services owed to Reed Taylor at the time of valuation (a debt that was later ruled to be illegal and void). (*See* Dkt. #67-50.)

109.    Riley was an attorney at the law firm of Eberle Berlin at the time of the redemption of Reed Taylor's shares in 1995 and he breached his duty of care by advising AIA Services and Reed Taylor[1] to enter into the illegal stock redemption transaction. *See Taylor v. AIA Servs. Corp.*, 151 Idaho 552, 261 P.3d 829 (2011).

---

[1] The Controlling AIA Defendants have brought bread to many defense attorneys. Notably, the Controlling AIA Defendants (except Cashman, who was not a party to the lawsuit) successfully asserted that the Stock Redemption Agreement was illegal. (*See* Dkt. #83-5.) Consequently, Reed Taylor sued Riley, Turnbow and Eberle Berlin for their incorrect third-party closing opinion letter. *Taylor v. Riley*, 157 Idaho 323, 336 P.3d 256, 261 (2014). He later settled his claims against Turnbow and Eberle Berlin, but his claims against Riley are on appeal as noted by the Ninth Circuit Court of Appeals. *Taylor v. Hawley Troxell Ennis & Hawley, LLP*, 628 Fed.Appx. 490 (9th Cir. 2015). Reed Taylor also sued his independent counsel. *Taylor v. Bell*, 185 Wn. App. 270, 273-79, 340 P.3d 951, 954-56 (2014), *review denied*, 352 P.3d 188 (2015).

THIRD AMENDED COMPLAINT - 25

# Exhibit - A
## 5-ER-987

110.    The illegal redemption of Reed Taylor's common shares ultimately led to AIA incurring over $1 million in attorneys' fees and costs litigating and resulted in AIA Services being required to report to the IRS a gain from the $6 million it never had to pay Reed Taylor.

111.    Upon information and belief, the Controlling AIA Defendants never reported the gain from the extinguished $6 million debt to Reed Taylor on AIA Services' tax return. If the Controlling AIA Defendants did not report the $6 million income to the IRS and AIA Services is obligated to pay taxes, penalties and interest on that gain, the Controlling AIA Defendants are liable for those sums as well for breaching their fiduciary duties owed to AIA.

112.    Based on the intentional acts of the Hawley Troxell Defendants, AIA has been decimated because the Controlling AIA Defendants remained in control of AIA through those tolling agreements. The end result of these tolling agreements was that the Hawley Troxell Defendants improperly ensured that the Controlling AIA Defendants would retain control over AIA to the detriment of AIA and for the improper benefit to the Hawley Troxell Defendants and the Controlling AIA Defendants.

113.    In or around 2007 or 2008, AIA Insurance received a settlement of approximately $800,000 for litigation that AIA Insurance had funded for certain policy holders. Instead of utilizing or retaining those funds exclusively for AIA, the Controlling AIA Defendants improperly used those funds, in full or in part, to continue their intentional acts of funding CropUSA, litigation caused by them or other unauthorized uses. Upon information and belief, the Hawley Troxell Defendants had knowledge of the receipt of those funds, yet they did nothing to protect the funds even though the funds were at issue in *Taylor v. AIA Services Corp., et al*.

114.    In 2008, the Controlling AIA Defendants and the Hawley Troxell Defendants permitted CropUSA to sell over $10,000,000 in crop insurance business to Hudson Insurance for

THIRD AMENDED COMPLAINT - 26

the benefit of CropUSA when approximately 75% of the business had been derived directly from AIA's agency force (i.e., such agents as Larry Whitehead). The over $7.5 million should have been paid to AIA rather than to pay the debts incurred by the Controlling AIA Defendants through CropUSA.

115.    Sometime after CropUSA sold the bulk of its assets to Hudson in 2008, which were derived primarily from AIA, the Controlling AIA Defendants obtained further funds from Hudson Insurance for Growers National Cooperative Insurance Agency, Inc. ("Growers National"), an entity formed and funded by AIA for purposed of selling crop insurance and providing a form of rebate to farmers.

116.    Upon information and belief, CropUSA received over $500,000 from Hudson for Growers National. These funds should have been paid to AIA and the receipt of the funds was concealed from AIA. Plaintiffs will establish the exact amount of funds that the Controlling AIA Defendants and/or CropUSA received from Hudson for Growers National at the time of trial.

I.    **The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA and Intentionally Committing Torts against AIA with the Assistance of the Hawley Troxell Defendants—Even While this Lawsuit Was Pending**

117.    Upon information and belief, the Hawley Troxell Defendants have been paid the bulk of the over $2,000,000 in attorneys' fees and costs incurred and/or paid for the various lawsuits. Plaintiffs will establish the exact amount of funds paid to the Hawley Troxell Defendants by AIA and/or on behalf of AIA, which Plaintiffs are seeking to be disgorged and returned to AIA.

118.    From 2009 through the present time, Donna exercised her right under the amended articles of incorporation to appoint two different directors to AIA Services' Board of Directors, but the Controlling AIA Defendants and/or the Hawley Troxell Defendants refused to honor her unqualified right thereby resulting in all actions taken by AIA Services' Board of Directors during

THIRD AMENDED COMPLAINT - 27

**Exhibit - A**
**5-ER-989**

that period of time being unauthorized and thus a breach of the fiduciary duties of the Controlling AIA Defendants.

119.    In December 2009, Donna filed suit against AIA Services to exercise her unequivocal right to appoint her designee, Patrick Moran, to the Board of Directors of AIA Services and to appoint a receiver for AIA Services. The Hawley Troxell Defendants once again appeared in that lawsuit and successfully opposed Donna's designee being appointed to the Board of Directors or a receiver being appointed by improperly seeking a stay in the lawsuit.

120.    Had the Hawley Troxell Defendants joined Donna in having a receiver appointed for AIA Services, which the Hawley Troxell Defendants should have done in light of the countless intentional torts committed against AIA by the Controlling AIA Defendants, there is no doubt that they could have stopped the Controlling AIA Defendants from carrying out their ongoing fraud, intentional breaches of fiduciary duties and their ultimate decimation of AIA. At a minimum, the Hawley Troxell Defendants acts and/or omissions in this regard was a substantial factor of the improper transactions, unlawful acts, and the ultimate decimation of AIA, which occurred after 2009.

121.    This lawsuit was filed by Plaintiffs on August 11, 2010, and subsequently stayed at the request of the Controlling AIA Defendants and the Hawley Troxell Defendants. During that stay, inappropriate and unlawful transactions continued to occur.

122.    In March 2012, the Controlling AIA Defendants, with, upon information and belief, the improper assistance of new attorneys at the law firm of Randall & Danskin, improperly terminated AIA Services' ESOP and paid those shareholders three cents per shares for their hard-earned common shares and failed to disclose the facts pertaining to the malfeasance and torts described in this Third Amended Complaint to those shareholders. (*See* Dkt. #67-30-33, 34.)

THIRD AMENDED COMPLAINT - 28

# Exhibit - A
## 5-ER-990

123.    However, the Controlling AIA Defendants knew that AIA Services' amended articles of incorporation barred all stock redemptions, including any purchases of shares held by the ESOP, until the Series A Preferred Shares were all fully redeemed and the Series C Preferred Shares had been paid the over $1,000,000 in dividends owed. The repurchase of the ESOP shares for three cents per shares was illegal, ultra-vires and improper.

124.    Effective March 23, 2012, Beck and Cashman purportedly transacted with John to sell their purported common shares in AIA Services (some of which were never properly or legally issued to them and, even if they were properly issued, common shares were never properly issued to AIA Services' 401(k) Plan when it also held Series C Preferred Shares) to John through a written agreement, which was executed and transmitted by Beck and Cashman to Idaho and provided that Idaho law applied. Upon information and belief, the Controlling AIA Defendants entered into that agreement in preparation for their plan to attempt to effectuate a reverse stock split and to provide false information as to other share sales in an attempt to justify the share price offered for the reverse stock split.

125.    In 2012, the Controlling AIA Defendants, again with the improper assistance of Randall & Danskin (*See* Dkt. #67-48, 67-48), improperly sought to effectuate a reverse stock split and to only pay AIA Services' minority common shareholders ten cents per share to repurchase those common shareholders (including Plaintiffs) without disclosing any facts and without offering full and fair compensation for the value of the shares. (*See* Dkt. #66-3.) The notice to the shareholders and the improper and unlawful reverse stock split was approved by the Controlling AIA Defendants.

126.    Thirteen shareholders objected. (*See* Dkt. #67-41.) The ill-conceived reverse stock split violated AIA Services' amended articles of incorporation and the Controlling AIA

THIRD AMENDED COMPLAINT - 29

# Exhibit - A
## 5-ER-991

Defendants did not even bother to comply with Idaho Code, including, by failing to provide the form for the shareholders to state the value that they believed should be paid for their common shares thereby further establishing the true improper purpose of the failed reverse stock split.

127.    In response to the thirteen shareholder objections and notices of demands for payment, the Controlling AIA Defendants, through Randall & Danskin and without regard to the fact that they would expend tens of thousands of dollars more in funds litigating the issue rather than simply paying the shareholders the true fair value of their shares, had AIA Services file suit against the thirteen shareholders. (*See* Dkt. #83-15.) Judge Carl Kerrick dismissed the lawsuit, and further noted that it was disingenuous to seek a reverse stock split until this lawsuit was resolved. (*See* Dkt. #86-1.)

128.    The failed reverse stock split fiasco drained AIA of significant and unnecessary attorneys' fees and costs (fees and costs which could have been paid to those shareholders or for other AIA obligations). This purported reverse stock split was approved and/or acquiesced in by the Controlling AIA Defendants. Upon information and belief, the Hawley Troxell Defendants were aware of the scheme to effectuate reverse stock split to eliminate AIA Services' innocent minority shareholders, which would in turn eliminate common shareholder standing for this lawsuit.

129.    After the Controlling AIA Defendants had AIA Services filed suit against the thirteen objecting common shareholders who demanded fair payment, Nez Perce County District Court Judge Carl Kerrick dismissed the lawsuit and awarded those minority shareholders attorneys' fees and costs. That judgment in favor of those shareholders has still never been paid by the Controlling AIA Defendants or AIA, and the Controlling AIA Defendants should be required to pay that judgment on behalf of AIA.

THIRD AMENDED COMPLAINT - 30

# Exhibit - A
## 5-ER-992

130.    From 2009 through 2015, the Controlling AIA Defendants continued loaning money to, or allowed money to be lent to, Pacific Empire Radio Corporation in an amount exceeding $1,400,000 by year-end 2012 when that corporation had no ability to repay the sums owed and it benefitted John (who owned shares in that corporation at certain relevant times) as those were funds they would not have to personally provide to Pacific Empire Radio Corp.

131.    From 1999 through 2012, the Controlling AIA Defendants concealed their ownership interests in other entities from AIA, which were derived from and/or funded by AIA, including, without limitation, CropUSA, CropUSA Insurance Services, LLC, Pacific Empire Holdings Corp.

132.    From 1995 through 2012, John received over $2,729,557 in cash compensation from AIA. This amount does not include any compensation, payments or other improper distributions he may have received from CropUSA and other entities funded or launched using AIA. At a minimum, John should be required to disgorge the over $2,038,657 he received from AIA from 1999 through 2012 and other compensation or funds received since 1999, which John received while improperly competing against AIA through CropUSA and other entities (including Pacific Empire Holdings Corp.).

J.    **There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants**

133.    Since acquiring operational control of AIA Services in 1995, the Controlling AIA Defendants have engaged in repeated acts of faithless self-dealing, transactions detrimental to AIA, committed intentional torts (including fraud and breaches of fiduciary duties), breached their fiduciary duties (including their duties of loyalty), concealed, conspired to commit intentional torts, aided and abetted in the commission of intentional torts and to cover up those torts, to the detriment of AIA in Idaho, including, but not limited to, the following specific examples: **(a)**

THIRD AMENDED COMPLAINT - 31

# Exhibit - A
## 5-ER-993

controlling the Board of Directors and/or the decisions made by the Board and refusing to act in the best interests of AIA; **(b)** violating AIA Services' restated bylaws, including but not limited to, failing to hold annual shareholder meetings, failing to obtain proper shareholder approval for certain transactions, failing to comply with conflicts of interest provision in the bylaws and articles of incorporation which restricted many of the unlawful or improper transactions described herein, and failing to properly comply with applicable corporate governance; **(c)** violating AIA's amended articles of incorporation thereby allowing substantial funds and assets to be depleted from AIA and obligating AIA to be liable for loans or guarantees which were barred by those amended articles of incorporation; **(d)** diverting corporate opportunities belonging to AIA; **(e)** conveying, encumbering, utilizing, and/or pledging AIA's assets to themselves or other entities; **(f)** inappropriately redeeming, acquiring and/or issuing shares of stock and/or making payments on put options in AIA Services and CropUSA, including but not limited to, issuing shares to the Controlling AIA Defendants; **(g)** inappropriately paying dividends from AIA Services; **(h)** intentionally failing to comply with conflict of interest provisions in AIA's bylaws; **(i)** guaranteeing loans for CropUSA and failing to guarantee loans for AIA; **(j)** paying excessive compensation to officers and directors, including but not limited to, paying John $250,000 per year to purportedly act as CEO and President of AIA Services after his contractual entitlement to such salary had expired and John had represented that he would not take salary in certain years; **(k)** wasting corporate assets and making improper payments, including by paying Beck $20,000 per year to purportedly serve on the Board of Directors of AIA Services; **(l)** divulging and/or utilizing AIA's trade secrets for the benefit of themselves and other entities, including CropUSA; **(m)** soliciting and transferring AIA employees to work for CropUSA; **(n)** engaging in acts and/or decisions without making full disclosure and without obtaining the required approval of AIA

THIRD AMENDED COMPLAINT - 32

# Exhibit - A
## 5-ER-994

Services' shareholders; **(o)** engaging in millions of dollars of transactions wherein AIA conveyed benefits without the receipt of any consideration or without being repaid; **(p)** forming and operating entities in direct competition with AIA in the insurance marketplace, including without limitation, CropUSA and Pacific Empire Holdings Corp.; **(q)** making false representations, concealing facts, and omitting material facts from AIA, including, without limitation, regarding share values in AIA's financial statements, assets and debts in AIA's financial statements, funds and assets utilized for other entities (including CropUSA), and that AIA was being operated for the benefit of the corporation; **(r)** concealing and failing to disclose material facts to AIA pertaining to loans, transfers, and utilization of assets, including without limitation, concealing or omitting material facts, including all of the necessary facts related to virtually each and every transaction described in this Third Amended Complaint in this lawsuit; **(s)** making false representations to AIA, including without limitation, making and certifying false and misleading financial statements to AIA and representing that AIA was being properly operated when it was instead being used to fund the lifestyle, payments and other businesses owned or partial owned by the Controlling AIA Defendants; **(t)** inappropriately loaning AIA's funds, or guaranteeing loans, to themselves and to other entities under their control in violation of AIA's amended articles of incorporation, bylaws and fiduciary duties; **(u)** paying tens of thousands of dollars in yearly fees to purportedly serve on the Board of Directors of AIA and other compensation and benefits, when such amounts were excessive and they were violating their fiduciary duties owed to AIA and they were all acting as faithless fiduciaries; **(v)** paying attorneys' fees and costs in various legal proceedings on behalf of the Controlling AIA Defendants and others when it was clear that they had intentionally failed to act in good faith, were not entitled to indemnification or to have attorneys' fees and costs advanced on their behalf, and by failing to obtain security for repayment

THIRD AMENDED COMPLAINT - 33

**Exhibit - A**
**5-ER-995**

of said funds; **(x)** acquiring a parking lot with AIA funds and charging AIA, and making AIA pay, excessive rent for use of the parking lot even though AIA did not actually use the parking lot; **(y)** failing to seat the full and required Board of Directors for AIA Services, including, without limitation, by failing to honor Donna's appointment of Patrick Moran and Paul Durant to AIA Services' Board of Directors; **(z)** improperly purchasing and transferring shares held by AIA or which should have been held by AIA to themselves, including without limitation shares in Pacific Empire Radio Corp., Pacific Empire Communications Corp., and Pacific Empire Holdings Corp. (this entity was formed with AIA's assets by John, improperly competed against AIA, and was later sold for $240,000); **(aa)** allowing John to profit from CropUSA's sale of assets to Hudson by improperly allowing him to retain a monthly fee of $10,000 per month when those funds should have gone to AIA; **(bb)** failing to take appropriate legal action in the interests of AIA; **(cc)** removing a tenant from an AIA owned building to another building owned personally by John and/or other Controlling AIA Defendants; **(dd)** improperly subsidizing CropUSA and other entities with AIA's funds, labor and assets, failing to properly allocate expenses to CropUSA and failing to have other expenses paid back at all (which have already been identified as being approximately $500,000 as of 2008); **(ee)** selling and/or transferring assets and or/contracts belonging to AIA to others (including the contract with Growers National); **(ff)** improperly paying numerous law firms other than the Hawley Troxell Defendants hundreds of thousands of dollars representing AIA and the Controlling AIA Defendants in litigation caused by their own intentional acts and torts; **(gg)** paying more of AIA's funds to litigate disputes (including with Donna in the Idaho state courts) than it would have taken to simply pay the money owed; **(hh)** failing to obtain security, failing to charge interest, and failing to collect on loans of at least $307,000 made to John; **(ii)** removing the $400,000 held in the court registry and the over $200,000 in a bank account in

THIRD AMENDED COMPLAINT - 34

**Exhibit - A**
**5-ER-996**

*Taylor v. AIA Services Corp., et al.*, and allowing the Controlling AIA Defendants to utilize those funds when the Hawley Troxell Defendants should have ensured that those funds were kept from them; **(jj)** expending significant sums on the illegal repurchase of common shares in AIA Services, which also resulted in the ownership interest of the Controlling AIA Defendants increasing; **(kk)** allowing AIA to engage in the transactions identified in this Third Amended Complaint when no dividends had been declared or paid on the Series C Preferred Shares held in the AIA Services 401(k) Plan and those shares now have accrued dividends owed of over $1,000,000; and **(ll)** engaged in a number of transactions in Idaho for the benefit of, or with, CropUSA in an effort to profit from CropUSA.  The Controlling AIA Defendants and/or the Hawley Troxell Defendants have assisted one another and others in committing the intentional torts against AIA described herein and concealing, or covering up, the facts and the intentional torts committed against AIA, including those specifically referenced in this paragraph and elsewhere in this Third Amended Complaint.

134.    At all relevant times, John was CEO, President and director of AIA Services, AIA Insurance and CropUSA and a shareholder of AIA Services at the time of all of the improper transactions with CropUSA and other improper acts identified in this Third Amended Complaint (also a classic example of a conflict of interest), and he improperly benefited from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

135.    At all relevant times, John was also owned interests in other entities who improperly benefitted directly or indirectly from AIA, which were additional conflicts of interest and proof of self-dealing.

///

THIRD AMENDED COMPLAINT - 35

# Exhibit - A
## 5-ER-997

136.     During certain relevant times, the Controlling AIA Defendants were all purported shareholders of CropUSA and either majority shareholders (as a group) or officers of AIA Services at the time of the improper transactions and malfeasance identified in this Third Amended Complaint (also a classic example of conflict of interest), and they improperly benefited, directly or indirectly, from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

137.     Beck and Cashman engaged in numerous telephone conversations and emails with John and other representatives from AIA in Idaho, including regarding CropUSA and the status of various lawsuits.

138.     As a result of the acts and omissions set forth and/or contemplated above and other acts and/or omissions which will be established at or before trial, the Controlling AIA Defendants and the Hawley Troxell Defendant committed torts in Idaho and proximately caused AIA millions of dollars in damages in Idaho.

## V.     CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 AND FEDERAL RULE OF CIVIL PROCEDURE 23.1

139.     As a prerequisite to filing this lawsuit under Idaho Code § 30-1-742 and Federal Rule of Civil Procedure 23.1, Plaintiffs (and over ten other shareholders of AIA Services) are shareholders of AIA Services and have been shareholders of AIA Services during all relevant times to the claims asserted in this Third Amended Complaint.

140.     On July 21, 2008, Donna served a written derivative demand letter on AIA and the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #23-9 and #67-19.) Miesen was not required to serve a separate written demand under I.C. § 30-1-702 because that statute does not require every shareholder filing suit to serve a separate demand, as confirmed by the comment

THIRD AMENDED COMPLAINT - 36

## Exhibit - A
### 5-ER-998

to that statute: "It should be noted that the shareholder bringing suit does not necessarily have to be the person making the demand. Only one demand need be made in order for the corporation to consider whether to take corrective action."

141.    On July 23, 2008, the Hawley Troxell Defendants filed a Motion for Stay of Proceedings in *Taylor v. AIA Services Corp.*, *et al.*, and asserted that the stay was necessary so that AIA Services and AIA Insurance could conduct an inquiry into the demands made by Donna in her letter dated July 21, 2008.

142.    On August 14, 2008, in *Taylor v. AIA Services Corp.*, *et al.*, the Hawley Troxell Defendants disingenuously filed a petition for a court appointed independent inquiry on behalf of AIA when they had no intention of following through with the inquiry. (*See* Dkt. #67-20.)

143.    On September 4, 2008, Reed Taylor supported the appointment of independent investigators. However, Reed Taylor objected to the investigators proposed by the Hawley Troxell Defendants, who were purportedly representing AIA, and the Controlling AIA Defendants. (*See* Dkt. #67-21.) Reed Taylor believed totally independent people should be appointed.

144.    Although the parties had filed briefing with respect to the appointment of independent investigators, the Hawley Troxell Defendants never noted the motion for a hearing and the court never ruled on the request, and they intentionally abandoned the appointment of an independent inquiry.

145.    Upon information and belief, neither AIA Services, AIA Insurance, the Hawley Troxell Defendants nor the Controlling AIA Defendants ever conducted a further investigation of the demands made in Donna's derivative demand letter of July 21, 2008. No action was ever taken by AIA or AIA's Boards of Directors regarding July 21, 2008 demand. (Dkt. #23-9 and #67-19.)

///

THIRD AMENDED COMPLAINT - 37

**Exhibit - A**
**5-ER-999**

146.     On April 3, 2012, Plaintiffs, although only one demand was required, made another written demand on AIA and the Boards of Directors of AIA, which included demands to keep the $400,000 cash held in the Court registry in *Taylor v. AIA Services Corp.*, *et al.*, to comply with AIA's amended articles of incorporation, to comply with AIA's bylaws, provide full disclosure, and to protect certain other assets. (Dkt. #67-33.) This particular demand was copied directly to Babbitt and Ashby, so they had full knowledge of it. This demand, like all of the others, was ignored by AIA and AIA's Boards of Directors. (*See* Dkt. #67, p. 11 ¶ 29.)

147.     On July 16, 2012, while the instant case was stayed, the Plaintiffs and other common and preferred shareholders of AIA Services, although only one demand was required, served additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #67-42.) The demands requested, among other things, that AIA pursue this lawsuit with all claims as of July 16, 2012 and future claims, including punitive damages (and also provided AIA and the Boards of Directors yet another opportunity to address the demands previously made by Donna on in 2008 (although Plaintiffs were under no obligation to provide another demand and did not waive the prior demand)). (*Id*.) In addition, Plaintiffs have made additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance, but no action has ever been taken by AIA or AIA's Boards of Directors to any of the demands.

148.     Over ninety days have elapsed since the Plaintiffs' written derivative demands were made to AIA and AIA's Boards of Directors and no action has been taken by AIA or AIA's Boards of Directors whatsoever, and all of the claims asserted in this lawsuit flowed from those derivative demands.

///

THIRD AMENDED COMPLAINT - 38

# Exhibit - A
## 5-ER-1000

149.   As owner of Preferred A Shares in AIA Services seeking to recover all possible funds and damages for the benefit of AIA, Donna fairly represents the interests of all shareholders not named in this lawsuit (including prior employees who participated in AIA Services' ESOP, whose shares were eliminated for pennies without disclosure). Donna is not seeking the payment of her Series A Preferred Shares in this lawsuit nor could she. Donna has proven her efforts to fairly representing the interests of all shareholders by spearheading and assisting in defeating the litigation involved the Controlling AIA Defendants' efforts to effectuate an improper reverse stock split to eliminate shareholder standing in this lawsuit (Dkt. #86-1) and when she intervened in *GemCap Lending I, LLC v. CropUSA Insurance Agency, Inc., et al.,* U.S. District Court for the Central District of California Case No. CV13-5504 SJO (MAN) to assert AIA's $10 million guarantees of loans for CropUSA were illegal and ultra-virus and later appealed the denial of her effort to intervene to the Ninth Circuit Court of Appeals in Docket No. 15-55332, when she had no obligation to do so. Donna also paid the attorneys' fees and costs necessary to defend and prevent the illegal reverse stock split which would have eliminated many of AIA Services' common shareholders for pennies when she had no obligation to do so. Many other shareholders have asserted that they fully support Donna. (Dkt. #67-42.) Donna is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims. Donna is pursuing this lawsuit solely for the benefit of AIA and their innocent shareholders.

150.   As the second largest common shareholder AIA Services (who traded a book of insurance business worth approximately $500,000 to AIA Services in exchange for his common shares), Miesen also fairly represents the interest of AIA and their shareholders. Miesen has never received a penny in return for his investment in AIA. Miesen is not pursuing this lawsuit in a

THIRD AMENDED COMPLAINT - 39

# Exhibit - A
## 5-ER-1001

collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims. Miesen is pursuing this lawsuit solely for the benefit of AIA and their innocent shareholders.

### VI.    COUNT I—BREACH OF FIDUCIARY DUTIES
**(Against the Controlling AIA Defendants and the Hawley Troxell Defendants)**

151.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

152.    The Controlling AIA Defendants owed fiduciary duties to AIA as the majority and controlling shareholders. As members, or purported members, of the Board of Directors for AIA Services and/or AIA Insurance, the Controlling AIA Defendants, who have each served as a director of AIA Services at one time, owed fiduciary duties to the corporations. As corporate officers of AIA, John, as President and CEO owed fiduciary duties to AIA, which were further elevated during the times in which the both served as directors too (which is from 1995 to the present time for John).

153.    As attorneys for AIA, the Hawley Troxell Defendants owed fiduciary duties to AIA (including the undivided duty of loyalty). If not authorized to act as attorneys for AIA, the Hawley Troxell Defendants acted with apparent authority as agents and owed fiduciary duties as a result of that agency relationship. The Hawley Troxell Defendants had conflicts of interest when they undertook to represent AIA and CropUSA, and when they proceeded in the manner directed by any one or more of the Controlling AIA Defendants, thereby improperly representing the interests of the Controlling AIA Defendants, instead of the best interests of AIA. *Reis v. Barley, Snyder, Senft & Cohen LLC,* 484 F.Supp.2d 337 (E.D. Pa. 2007).

///

THIRD AMENDED COMPLAINT - 40

# Exhibit - A
## 5-ER-1002

154.    Based on any and/or all of the acts and/or omissions set forth in this Third Amended Complaint and/or those facts proven at or before the time of trial, the Controlling AIA Defendants and the Hawley Troxell Defendants have breached their fiduciary duties owed to AIA, including, without limitation, breaching their undivided duties of loyalty, trust and confidence owed to AIA, and by placing their interest in earning hundreds of thousands of dollars, and ultimately over $1,000,000, in attorneys' fees over looking after the interests of AIA.

155.    The Hawley Troxell Defendants have separately breached their fiduciary duties as matter of law when they simultaneously represented AIA and CropUSA. In addition, Riley was aware that CropUSA was derived from AIA and he was further aware of the restrictions in AIA Services' amended articles of incorporation as he helped draft them. The Hawley Troxell Defendants have further breached their fiduciary duties as a matter of law for the violations of the Rules of Professional Conduct dealing with loyalty to a client and conflicts of interest.

156.    As a direct and/or proximate cause of the Controlling AIA Defendants and the Hawley Troxell Defendants breaches of their fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

157.    In addition, each of the Controlling AIA Defendants and the Hawley Troxell Defendants is a "faithless fiduciary" as defined by law and is therefore required to disgorge all compensation and consideration received from AIA and/or CropUSA. The disgorgement is in addition to liability caused by the breaches of fiduciary duty. In the case of the Hawley Troxell Defendants, the disgorgement goes to all fees received for or paid on behalf of AIA and CropUSA. In the case of the faithless Controlling AIA Defendants, the disgorgement goes to all salary, bonuses, warrants, stock options, or stock received from AIA.

///

THIRD AMENDED COMPLAINT - 41

# Exhibit - A
## 5-ER-1003

## VII.   COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

158.   Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

159.   One who counsels, advises, abets or assists in the commission of an actionable wrong is responsible to the injured person for the entire loss or damage. 86 C.J.S. Torts § 105; RESTATEMENT (FIRST) OF TORTS § 876 (1939). Aiding and abetting in the commission of an actionable wrong may be inferred from the fact that one aided and abetted efforts to conceal the wrong. 86 C.J.S. Torts § 105. Liability for aiding and abetting the commission of a tort may be established by showing the person was present at the time of the actionable wrong and did not disapprove or oppose the action. Plaintiffs alleging aiding and abetting need not prove that the aiding and abetting was necessary for the commission of the tort, only that the aiding and abetting made it easier for the tort to occur. *See Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12 (2002).

160.   During certain relevant times, the Hawley Troxell Defendants and the Controlling AIA Defendants had knowledge of the other defendants' acts and/or omissions as described in this Third Amended Complaint and as proven at trial, knew that such acts and/or omissions constituted breaches of fiduciary duties, did not disapprove of such acts or omissions, took no steps to prevent the commission of the breaches of fiduciary duties flowing from the acts and/or omissions, and assisted in the concealment of such acts and/or omissions described herein, thereby damaging AIA.

161.   As a direct and/or proximate cause of the Hawley Troxell Defendants and the Controlling AIA Defendants aiding and abetting one another in the breaches of fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

THIRD AMENDED COMPLAINT - 42

Exhibit - A
5-ER-1004

## VIII.   COUNT III—LEGAL MALPRACTICE
### (Against the Hawley Troxell Defendants)

162.     Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

163.     A legal malpractice claim may be brought in a derivative action. *Schulman v. Wolf & Samson, PC,* 951 A.2d 1051 (N.J. 2008).

164.     Since at least 1999, the Hawley Troxell Defendants had an attorney-client relationship with AIA, while Riley has had an attorney-client relationship with AIA since prior to 1995. The Hawley Troxell Defendants owed duties to AIA, including, without limitation, duties of care, good faith and loyalty. Despite the duties owed to AIA, the Hawley Troxell Defendants also improperly represented CropUSA.

165.     The Hawley Troxell Defendants have breached their duties owed to AIA, including, without limitation, the breached duties described in this Third Amended Complaint. The Hawley Troxell Defendants have further violated their duty of loyalty owed to AIA by improperly simultaneously representing AIA and CropUSA, together with directly and/or indirectly improperly representing the interests of the Controlling AIA Defendants.

166.     AIA suffered damages as a direct, foreseeable and/or proximate result of the breaches of duty and the acts of the Hawley Troxell Defendants, including those acts described in this Third Amended Complaint and/or proven at the time of trial. At a minimum, the Hawley Troxell Defendants were also a substantial factor in the harm and damages inflicted upon AIA, including, without limitation, the ultimate decimation of AIA by the Controlling AIA Defendants. Had the Hawley Troxell Defendants properly discharged their duties, the Controlling AIA Defendants would never have decimated AIA.

THIRD AMENDED COMPLAINT - 43

# Exhibit - A
## 5-ER-1005

167. As a direct and/or proximate cause of such acts and/or omissions, the Hawley Troxell Defendants are liable to AIA for damages in the amount to be proven at or before the time of trial.

## IX. COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ CONSTRUCTIVE FRAUD
### (Against the Controlling AIA Defendants)

168. Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

169. The Controlling AIA Defendants are liable to AIA for fraud because: **(a)** they made representations of fact to AIA and AIA Services' innocent minority shareholders as asserted throughout this Third Amended Complaint, including but not limited to, (i) representations that CropUSA was being operated for the benefit of AIA, (ii) representations that AIA was being properly operated (including that the Boards of Directors had properly authorized certain transactions when Donna's designee was not on the Board of AIA Services and the provisions in the amended articles and bylaws had not been complied with), (iii) representations that the information on AIA's financial statements was true (John separately certified to auditors and others that the information contained on certain of AIA's financial statements was true and correct), (iv) representations that expenses and loans between AIA and other entities or parties were properly entered into and accounted for (i.e., there are hundreds of thousands of dollars, if not millions of dollars, in funds and other assets used by CropUSA which were derived from AIA and never accounted for), and (v) other representations referenced in this Third Amended Complaint; **(b)** these representations were false; **(c)** these representations were material; **(d)** they knew these representations were false; **(e)** they intended that there be reliance; **(f)** AIA was ignorant of the

THIRD AMENDED COMPLAINT - 44

## Exhibit - A
### 5-ER-1006

falsity of these representations; **(g)** AIA relied on these representations; **(h)** AIA's reliance was justified; and **(i)** injury resulted. *See, e.g., Mannos v. Moss,* 143 Idaho 927, 155 P.3d 1166 (2007) (holding that misrepresentations in financial statements precluded summary judgment). Constructive fraud is identical to fraud, except that the plaintiff need not prove speaker's knowledge of the fraud and the speaker's intent that the other party rely on the representations.

170.    The Controlling AIA Defendants owed duties to AIA during certain relevant times as majority shareholders, board members and/or officers of AIA. In addition to making false representations, the Controlling AIA Defendants also concealed information from AIA and its innocent minority shareholders with knowledge that the concealed information was material and that the concealment would cause AIA to suffer otherwise avoidable damages, including without limitation, information contained in this Third Amended Complaint. The Controlling AIA Defendants' failure to disclose a fact to AIA and AIA Services' innocent minority shareholders where one has a duty to disclose is the legal equivalent of representing the non-existence of the fact. Where facts are fraudulently concealed, Plaintiffs need not show reliance as there is nothing other than silence upon which to rely.

171.    The Controlling AIA Defendants represented to AIA Services that CropUSA was a wholly owned subsidiary of AIA Services. Simultaneously, the Controlling AIA Defendants adopted the position, not disclosed to AIA or its innocent minority shareholders, that CropUSA was an independent entity with John as its alleged sole shareholder and subsequently failed to disclose that CropUSA was not a separate entity. These representations were false, the Controlling AIA Defendants knew of their falsity, the Controlling AIA Defendants intended that there be reliance, there was justifiable reliance by AIA and AIA Services' innocent minority shareholders, and AIA was damaged as a result.

THIRD AMENDED COMPLAINT - 45

# Exhibit - A
## 5-ER-1007

172.    By operating CropUSA as an independent entity, and by using CropUSA as a vehicle for misappropriating and converting corporate assets, the Controlling AIA Defendants committed ongoing fraud that has persisted through the date of this Third Amended Complaint.

173.    The Controlling AIA Defendants also made misrepresentations to AIA and AIA Services' innocent minority shareholders in the form of false, misleading and fraudulent financial statements (which such financial statements also failed to disclose numerous improper and unlawful transactions and their ownership interests in CropUSA and other entities), upon which AIA and AIA Services' innocent minority shareholders reasonably relied, with that reliance being the proximate cause of AIA's damages.

174.    When the Controlling AIA Defendants transferred more than $1.5 million to CropUSA in 2004, they concealed the fact of this transaction from AIA and AIA Services' innocent minority shareholders and AIA was damaged by this concealment.

175.    When the Controlling AIA Defendants transferred AIA corporate assets, including funds, employees, goodwill and trade secrets to CropUSA and other entities and were subsidizing CropUSA and other entities, they concealed these facts from AIA and AIA Services' innocent minority shareholders. AIA suffered damages by these concealments.

176.    When the Controlling AIA Defendants had AIA pay certain of CropUSA's corporate expenses, they concealed this fact from AIA.  AIA suffered damages as a result of this concealment.

177.    When the Controlling AIA Defendants pledged the mortgage obtained by AIA from the state of Idaho to CropUSA so that CropUSA could borrow money to pay the attorney's fees of the Hawley Troxell Defendants, they concealed this fact from AIA.  AIA suffered damages as a result of this concealment.

THIRD AMENDED COMPLAINT - 46

# Exhibit - A
## 5-ER-1008

178.     When the Controlling AIA Defendants had AIA Insurance guarantee CropUSA's $15 million line of credit and later sold over $10,000,000 in assets derived from AIA to Hudson Insurance, they concealed the fact of this guarantee and asset sale from AIA.

179.     When the Controlling AIA Defendants finally disclosed their ownership interests in CropUSA, CropUSA Insurance Services, LLC and other entities in AIA Services' financial statements in July 2012[2] (*See* Dkt. #67-38), they continued to conceal how they obtained their ownership interest in those entities (and in the case of CropUSA that the ownership interest came from AIA) and many transactions and purported loans between the entities and AIA (loans and guarantees made by AIA which were prohibited by AIA Services' amended articles of incorporation and restated bylaws).

180.     As a direct and/or proximate cause of the Controlling AIA Defendants' fraudulent acts, AIA has been damaged in an amount to be proven at or before trial, and the ongoing fraud bars the Controlling AIA Defendants from asserting statute of limitations defenses. To the extent that the Hawley Troxell Defendants seek to assert the statute of limitations as a defense, they too are barred from doing so through their fraudulent concealment of facts from AIA.

### X.     COUNT V—AIDING AND ABETTING FRAUD
**(Against the Controlling AIA Defendants and the Hawley Troxell Defendants)**

181.     Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

182.     One who aids and abets in the commission of a tort is liable with the primary tortfeasor(s) for all damages resulting from the tort. Aiding and abetting is established where one

---

[2] While the financial statements were dated as of year-end 2011, they were not provided to AIA or its shareholders until July 2012 in connection with the failed ill-conceived reverse stock split.

THIRD AMENDED COMPLAINT - 47

has knowledge of the torts, does not disapprove, and takes no action to prevent the commission of the torts or assists in covering up such torts. The foregoing applies to the Controlling AIA Defendants and the Hawley Troxell Defendants.

183.    The Controlling AIA Defendants have aided and abetted in one another's fraud committed against AIA. The Controlling AIA Defendants' silence, failure to act and intentional acts to cover up fraud upon AIA constitutes the aiding and abetting of fraud upon AIA.

184.    The Hawley Troxell Defendants have aided and abetted in the fraud committed against AIA by the Controlling AIA Defendants by assisting in the commission of fraud. The Hawley Troxell Defendants' silence, failure to act and intentional acts to cover up fraud upon AIA constitutes the aiding and abetting the fraud upon AIA.

185.    The Hawley Troxell Defendants knew or should have known that the transfer of AIA's assets, loans and other unauthorized transactions to CropUSA constituted a fraud against AIA.

186.    The Hawley Troxell Defendants knew or should have known that the transfer of approximately $1,500,000 to CropUSA in 2004 constituted a fraud on AIA.

187.    The Hawley Troxell Defendants knew or should have known that the practice of allocating CropUSA expenses to AIA, and otherwise failing to maintain arms' length transactions between CropUSA and AIA, constituted a fraud on AIA.

188.    By knowingly providing legal cover for the fraudulent acts described herein, the Hawley Troxell Defendatns have aided and abetted the fraud committed by the Controlling AIA Defendants and CropUSA.

189.    As aiders and abettors, the Hawley Troxell Defendants are liable to AIA to the same extent as the primary tortfeasors. RESTATEMENT (FIRST) OF TORTS § 876 (1939). Likewise, the

THIRD AMENDED COMPLAINT - 48

# Exhibit - A
## 5-ER-1010

Controlling AIA Defendants are all liable for aiding and abetting each other in the commission of fraud against AIA.

**190.**   As a direct and/or proximate cause of the Hawley Troxell Defendants and the Controlling AIA Defendant aiding and abetting in fraud, AIA has been damaged in the amount to be proven at or before the time of trial.

## XI.   COUNT VI—BREACH OF CONTRACT
### (Against John)

**191.**   Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

**192.**   On August 1, 1995, John and AIA Services entered into an Executive Officer's Agreement. (*See* Dkt. #67-8.)

**193.**   The Executive Officer's Agreement contains contractual provisions preventing John from doing certain acts. For example, Section 9 of the Executive Officer's Agreement sets for express covenants not to compete. Subsection A of the covenants prohibits John from soliciting AIA customers or otherwise diverting the business of AIA customers. Subsection B prohibits John from participating in any insurance business that underwrites, markets or administers insurance products for commodity associations. Subsection C prohibits John from soliciting AIA Services employees for other employment.  Subsection D of the covenants bars John from divulging or exploiting trade secrets belonging to AIA.

**194.**   John has breached his contractual obligations owed to AIA, including, without limitation, by forming CropUSA as anything other than a wholly-owned subsidiary of AIA, competing against AIA with CropUSA and other entities (including Pacific Empire Holdings and CropUSA Insurance Services, LLC). John has breached all four subsections of Section 9 of the

THIRD AMENDED COMPLAINT - 49

## Exhibit - A
### 5-ER-1011

Executive Officer's Agreement.

195.    As a direct and/or proximate cause of John's breaches of the Executive Officer's Agreement, AIA has been damaged in an amount to be proven at or before trial. Such breaches also constitute the breaches of his fiduciary duties owed to AIA.

### XII.    COUNT VII—DECLARATORY JUDGMENT
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

196.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

197.    Plaintiffs seek a declaratory judgment against Controlling AIA Defendants, including, without limitation, for the following relief: (a) for a full accounting with supporting documentation of all of AIA's funds, assets, loans and other transactions from 1999 through the present time; (b) requiring the Controlling AIA Defendants to comply with AIA's amended articles of incorporation, bylaws and the Idaho Business Corporation Act; (c) rescinding the purchases of the shares held by the ESOP and/or ensuring that those shareholders receive fair value for their shares; (d) rescinding and/or declaring void the common shares issued to John through is Executive Officer's Agreement; (d) rescinding certain common shares issued to Beck, Cashman and their friends which were improperly issued or, alternatively, declare that the same ratio of common shares in AIA Services be issued to AIA Services' 401(k) Plan based on the Series C Preferred Shares issued to that Plan; and (e) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this Third Amended Complaint).

198.    Plaintiffs seek a declaratory judgment against the Hawley Troxell Defendants, including, without limitation, for the following relief: (a) that the representation agreement, fee

THIRD AMENDED COMPLAINT - 50

agreements and any related agreements entered into with them and AIA be declared void (including, without limitation, because such agreements violated the applicable Rules of Professional Conduct); (b) any agreements or accounts regarding any sums owed by AIA, if any, be declared void; and (c) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this Third Amended Complaint).

### XIII.   COUNT VIII—EXCESSIVE COMPENSATION/CORPORATE WASTE
### (Against the Controlling AIA Defendants)

199.   Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

200.   To support a claim for excessive compensation, Plaintiffs need only show that the board lacked independence and/or lacked good faith. *In Re: Tyson Foods, Inc.,* 919 A.2d 563 (Del. 2000). The Controlling AIA Defendants have been officers and/or controlled AIA's Boards of Directors from 1995 through certain relevant times.  The Controlling AIA Defendants have lacked independence and have not acted in good faith, including, without limitation, by committing the intentional acts and/or omissions described in this Third Amended Complaint.

201.   The Controlling AIA Defendants paid excessive compensation and have wasted corporate assets during the course of managing and/or operating AIA, including, without limitation, by paying themselves excessive compensation (and practically speaking, any compensation at all based on their acts and omissions) and operating AIA for the benefit of CropUSA, the Controlling AIA Defendants and other entities they partially or wholly own, including Pacific Empire Radio Corp., CropUSA Insurance Services, LLC, and Pacific Empire Holdings Corp. The Controlling AIA Defendants also decimated AIA's agency force and caused

THIRD AMENDED COMPLAINT - 51

## Exhibit - A
### 5-ER-1013

them to transfer to CropUSA and ultimately Hudson and other entities. In addition, notwithstanding the fact that John is not entitled to retain any of his compensation or benefits as a faithless fiduciary, it was separately corporate waste to pay him in the first place as he did nothing for AIA (AIA's business was simply running off the commissions received for policies sold years before). The other transactions and malfeasance described in this Third Amended Complaint also constitute corporate waste, and none of those transactions and malfeasance were properly disclosed to all of AIA Services' shareholders nor was any authorization from them ever sought or obtained.

202.   The Controlling AIA Defendants are liable to AIA for damages caused by paying excessive compensation and otherwise wasting and needlessly depleting AIA's funds and assets for their own benefit and with disregard for AIA.

203.   As a direct and/or proximate cause of the Controlling AIA Defendants' waste, AIA has been damaged in the amount to be proven at or before trial.

### XIV.   COUNT IX—ACCOUNT STATED
#### (Against John)

204.   Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

205.   John established an account by borrowing $307,000 from AIA for his personal use. John subsequently confirmed the amount of the debt by "correcting" an alleged so-called accounting "error" when he had previously extinguished the $307,000 debt by improperly crediting the payment of Reed Taylor's $6 million promissory after the issue arose in *Taylor v. AIA Services Corp., et al.*, so that AIA's book show that AIA is creditor and John is debtor for $307,000, i.e., the correction was only made because Reed Taylor demanded it and he was suing AIA Services for repaying of the $6 million note.

THIRD AMENDED COMPLAINT - 52

# Exhibit - A
## 5-ER-1014

206.    John has not paid any portion of this debt and the entire balance remains due and payable to AIA. John is liable to AIA for $307,000 on the account stated and/or such other amount as may be presently owed, plus prejudgment interest from the date the obligation was incurred. If John has since paid back the $307,000 or any part of the sums he owes, then Plaintiffs still seek the balance owed and prejudgment interest for the benefit of AIA, including, because John has been a faithless fiduciary who is not entitled to any interest-free loans from AIA.

## XV.    JURY DEMAND

207.    Plaintiffs hereby demand a trial by jury of no less than the maximum number of jurors permitted on all causes of action for which a jury trial is allowed by law.

## XVI.    PRAYER FOR RELIEF

Wherefore Plaintiffs pray for the following relief:

1.    For a judgment jointly and severally against the Controlling AIA Defendants and the Hawley Troxell Defendants for damages in an amount to be proven at trial, plus prejudgment interest;

2.    For judgments against the Controlling AIA Defendants and the Hawley Troxell Defendants in an amount to be proven at trial for damages for which joint and several liability has not been proven as to all defendants, plus prejudgment interest;

3.    For a judgment or order requiring the Hawley Troxell Defendants to disgorge all attorneys' fees and costs paid to them by AIA Services, AIA Insurance, CropUSA and by any other party on behalf of those entities in the amount to be proven at the time of trial, plus prejudgment interest;

4.    For a judgment or order requiring the Controlling AIA Defendants to disgorge all compensation received from AIA or CropUSA since 1999, including stock, cash, benefits, and other assets, including based on intentionally breaching their fiduciary duties and being faithless

THIRD AMENDED COMPLAINT - 53

# Exhibit - A
## 5-ER-1015

fiduciaries;

5.      For judgment against John in the amount to be proven at the time of trial, plus prejudgment interest;

6.      For an order requiring that all funds recovered as a result of this litigation, minus fees, costs and bona fide debts, be deposited with the Court registry and distributed only after court order, and that no funds from this litigation be paid to faithless fiduciary Controlling AIA Defendants;

7.      For judgments against the Controlling AIA Defendants, jointly and severally, as the alter-ego of CropUSA or to pierce its corporate veil, for all damages incurred by AIA and attributable in whole or in part to CropUSA;

8.      For a declaratory judgment for the relief specified in this Third Amended Complaint and any other declaratory relief requested at or before trial;

9.      For an award of the attorneys' fees and cost incurred in this action as allowed by statute, contract, or recognized grounds of equity; and

10.     For any such further relief or remedy, including preliminary and/or permanent injunctive relief, as Plaintiffs may request or as this Court may find just and equitable.

    DATED: This ____ day of _____, 2016.

                              RODERICK BOND LAW OFFICE, PLLC


                         By: ___/s/ Roderick C. Bond_____
                              Roderick C. Bond
                              Attorney for Plaintiffs




THIRD AMENDED COMPLAINT - 54

# Exhibit - A
## 5-ER-1016

## <u>VERIFICATION OF DALE L. MIESEN</u>

STATE OF TEXAS            )

                                       ) ss.

COUNTY OF TARRANT         )

I, Dale L. Miesen, being first duly sworn on oath, deposes and says:

I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Third Amended Complaint, know the contents of this Third Amended Complaint, and believe that the facts set forth in this Third Amended Complaint are true and accurate to the best of my knowledge and belief.

_____
Dale L. Miesen

SUBSCRIBED AND SWORN to before me this _____ day of _____, 2016.

_____
Notary Public for Texas
Residing at: _____
My commission expires: _____

THIRD AMENDED COMPLAINT - 55

# Exhibit - A
## 5-ER-1017

## VERIFICATION OF DONNA J. TAYLOR

STATE OF IDAHO                    )
                                 )  ss.
COUNTY OF NEZ PERCE              )

    I, Donna J. Taylor, being first duly sworn on oath, deposes and says:

    I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Third Amended Complaint, know the contents of this Third Amended Complaint, and believe that the facts set forth in this Third Amended Complaint are true and accurate to the best of my knowledge and belief.

_____

Donna J. Taylor

SUBSCRIBED AND SWORN to before me this \_\_\_ day of _____, 2016.

_____

Notary Public for Idaho
Residing at: _____
My commission expires: _____

THIRD AMENDED COMPLAINT - 56

# Exhibit - A
## 5-ER-1018

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the ___ day of _____, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:   jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:   jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:   lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:   sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:   swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

*/s/ Roderick C. Bond*
Roderick C. Bond

THIRD AMENDED COMPLAINT - 57

# Exhibit - A
## 5-ER-1019

Alyson A. Foster
aaf@aswblaw.com
Idaho Bar No. 9719
ANDERSEN SCHWARTZMAN WOODARD BRAILSFORD PLLC
101 S. Capitol Blvd., Suite 1600
Boise, ID 83702
Telephone: 208.342.4411
Facsimile:  208.342.4455

*Attorneys for Third Party Intervenor GemCap Lending I, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual and the Personal Representative of the Estate of Sarah Taylor; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; et al., <br><br> Defendants. | Case No. 1:10-cv-00404-CWD <br><br> **MOTION OF THIRD PARTY GEMCAP LENDING I, LLC** <br><br> • **TO INTERVENE AND** <br><br> • **TO SEAL EXHIBIT B IN DKT. 128** |

MOTION OF THIRD PARTY GEMCAP LENDING I, LLC TO INTERVENE AND TO SEAL EXHIBIT B IN DKT. 128– 1

5-ER-1020

GemCap Lending I, LLC ("GemCap"), through its counsel Andersen Schwartzman PLLC, respectfully moves (1) to intervene in this lawsuit for the limited purpose of seeking to seal a settlement agreement filed by Plaintiffs as Exhibit B in Dkt. 128 and (2) to seal that agreement. In support of this Motion, GemCap files herewith (1) a Memorandum in Support and (2) the Declaration of Alyson A. Foster in Support, which are incorporated into this Motion as if fully set forth herein. A summary of GemCap's grounds for relief is as follows:

1.   Pursuant to Rules 24(a) and 24(b) of the Federal Rules of Civil Procedure, GemCap seeks leave to intervene for the limited purpose of seeking an order sealing a confidential settlement agreement that Plaintiffs filed publicly as Exhibit B to the Declaration of Roderick C. Bond, Dkt. 128. Plaintiffs are not parties to that agreement. The agreement bears no relevance to the issues in this case, particularly given the content of the operative Second Amended Complaint filed by Plaintiffs on June 20, 2016, Dkt. 137. GemCap's intervention would not cause undue delay or prejudice to the parties or trial schedule, and is the appropriate mechanism for GemCap to obtain the protection it seeks.

2.   If granted leave to intervene, GemCap requests, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure and Local Rule 5.1 of the Local Rules of Practice—Civil Rules, that the Court seal Exhibit B to Dkt. 128. Exhibit B is a confidential Settlement Agreement reached among GemCap, certain defendants in this case, and other parties who are not in this case, that all of the signatories uniformly agreed to keep confidential. The Agreement contains sensitive, proprietary business information about GemCap and other entities, as well as information regarding the litigation practices of GemCap that, if revealed to the

MOTION OF THIRD PARTY GEMCAP LENDING I, LLC TO INTERVENE AND TO SEAL EXHIBIT B IN DKT. 128– 2

public, would impair GemCap's ability to pursue recovery of assets under that agreement. Any public interest in the agreement is strongly outweighed by GemCap's interest in protecting the secrecy of its terms. Indeed, the court presiding over the litigation in which the Settlement Agreement was reached—the U.S. District Court of the Central District of California—sealed the Agreement as soon as it was reached, seals all papers discussing the Agreement, and seals all court hearings (locking the courtroom doors) addressing the Agreement. Similarly, the District Court for the Second Judicial District of Idaho sealed the agreement when another non-signatory filed the Agreement in state litigation involving Taylor and the AIA entities in this matter. Under Rule 26(c), the Settlement Agreement should be sealed in this case as well.

In sum, GemCap respectfully requests that the Court (1) allow GemCap to intervene in this case and (2) issue an order sealing the Settlement Agreement filed as Exhibit B within Dkt. 128.

DATED this 18th day of July, 2016.

**ANDERSEN SCHWARTZMAN WOODARD BRAILSFORD PLLC**

/s/ *Alyson A. Foster*

Alyson A. Foster
Counsel for GemCap Lending I, LLC

MOTION OF THIRD PARTY GEMCAP LENDING I, LLC TO INTERVENE AND TO SEAL EXHIBIT B IN DKT. 128– 3

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiffs

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual and the Personal representative of the Estate of Sarah Taylor; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC.; <br><br>    Plaintiff, <br><br>  v. <br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation, <br><br>    Defendants. | Civil No. 1:10-cv-00404-CWD <br><br> DECLARATION OF DONNA J. TAYLOR |

DECLARATION OF DONNA J. TAYLOR - 1

**5-ER-1023**

I, Donna J. Taylor, declare:

1. I am one of the plaintiffs in the above-captioned lawsuit, a citizen of the United States, over the age of eighteen, and competent to testify in court, including as to matters set forth or contemplated in this Declaration. This Declaration is based upon my personal knowledge.

2. The Series A Preferred Shares in AIA Services Corporation ("AIA Services") held by me were originally issued in connection with my divorce with Reed Taylor. In that divorce, we contributed our ownership in various entities to AIA Services in exchange for additional common shares and 200,000 Series A Preferred Shares, which were issued to me. In connection with the divorce, AIA Services agreed to amend its articles of incorporation for the issuance of the Series A Preferred Shares and to adopt numerous restrictive covenants to protect me and AIA Services from improper or inappropriate transactions until my Series A Preferred Shares were fully redeemed. Those restrictive covenants could not be waived by AIA Services or me without my consent. I exercised my right to require AIA Services to redeem my shares in 1993. Under the terms of AIA Services' amended articles of incorporation, each of my Series A Preferred Share has a stated value of $10 per share because AIA Services elected to amortize the payments to me over a fifteen-year schedule in lieu of making a lump sum payment and thus AIA Services was also required to pay me interest at the rate of 1½% under the First Interstate Bank, N.A. prime lending rate. AIA Services commenced making the redemption payments. True and correct copies of the applicable AIA Services' amended articles of incorporation are attached as Exhibit 1 to the Declaration of Roderick C. Bond.

3. In 1995, AIA Services, John Taylor and others sought to redeem Reed Taylor's majority interest in AIA Services' common shares. At that time, AIA Services needed my consent to redeem Reed Taylor's shares because of the various restrictions adopted under AIA Services'

DECLARATION OF DONNA J. TAYLOR - 2

amended articles of incorporation to protect me. In exchange for my consent and irrespective of whether or not the redemption of Reed Taylor's shares occurred, on January 11, 1995, AIA Services agreed to amortize the payments to me over a ten-year schedule (instead of a fifteen-year amortization) and increase the interest rate paid to me to the prime lending rate plus ¼% (instead of 1½% under the prime lending rate). Attached as *__Exhibit A__* is a true and correct copy of the letter agreement dated January 11, 1995.

4.      On March 22, 1995, my attorney, Cumer Green, requested and required Richard Riley, the same person who is a defendant in this lawsuit, to sign a letter agreement representing that I would be paid based on the payment terms of the letter agreement in Exhibit A. Richard Riley represented to me that AIA Services was obligated to make the payments to me in accordance with the terms of the letter agreement in Exhibit A. Attached as *__Exhibit B__* is a true and correct copy of the letter dated March 22, 1995, which was signed by Richard Riley. Under the terms of Exhibit A, my shares were required to be redeemed on or before December 2003. In connection with the restructuring of the obligations to Reed Taylor in 1996, AIA Services agreed to pay an additional $100,000 every six months after Reed Taylor's $1.5 Million Down Payment Note was paid in full. That note was paid in 2001, but AIA Services never made any of the required $100,000 payments.

5.      The last payment I received from AIA Services was on or about May 30, 2008. While AIA Services made substantial payments to me over the years, I was ultimately forced to file suit against it, John Taylor and others to obtain payment of my 41,651.25 Series A Preferred Shares (41,651.25 were the remaining Series A Preferred Shares of the 200,000 originally issued to me).  AIA Services has not made any payments to me since 2008. Despite the fact that John Taylor borrowed millions of dollars from GemCap Lending I, LLC ("GemCap") (albeit

DECLARATION OF DONNA J. TAYLOR - 3

unlawfully) and he was paid hundreds of thousands of dollars in compensation from AIA (millions of dollars in compensation since he signed the agreement to redeem by shares in Exhibit A), he could not even pay me a single payment since 2008. As indicated in the recent financial statements produced by John Taylor, he would rather pay attorneys over $400,000 fighting me than to pay me the over $400,000 rightfully owed to me. This, like virtually everything John Taylor does, makes no sense to me at all to me. He should have just paid me the money that was owed, as he promised to do when he signed Exhibit A.

6.      Although Judge Brudie originally ruled that I held the 41,651.25 in Series A Preferred Shares (as indicated on AIA Services' financial statements in 2008), he changed his mind on June 15, 2015 and ruled that the higher interest rate and shorter amortization period agreed to in Exhibit A was never properly authorized by AIA Services' shareholders. Attached as ***Exhibit C*** is a true and correct copy of Judge Brudie's Opinion and Order on Second Motion to Reconsider dated June 15, 2015. Based on that decision, Mr. Riley's representations to me in Exhibit B were false and I now hold only 7,110 Series A Preferred Shares in AIA Services. Shortly after Judge Brudie ruled, he orally granted my motion for a Rule 54(b) certification of his decision, but he has not entered a written order or Rule 54(b) judgment. I have a hearing scheduled for August 18, 2016 to obtain a Rule 54(b) judgment. However, irrespective of whether I own 41,651.25 Series A Preferred Shares or 7,110 Series A Preferred Shares, the provisions and restrictions under AIA Services' amended articles of incorporation regarding the Series A Preferred Shares still apply. I have not yet decided how I will proceed to resolve this issue.

7.      While I was litigating against AIA Services, John Taylor and the others to seek payment of the sums owed to me for my Series A Preferred Shares, my attorney, Roderick Bond learned that AIA Services and AIA Insurance had purportedly guaranteed loans to CropUSA

DECLARATION OF DONNA J. TAYLOR - 4

5-ER-1027

Insurance Agency, Inc. ("CropUSA Insurance Agency") and CropUSA Insurance Services LLC ("CropUSA Insurance Services") from GemCap through a "Limited Continuing Guarantee" dated November 23, 2011 (which limited the guarantee to $1,113,930) and through a "Security Agreement–Guarantee" dated October 1, 2012 (which was an unlimited guarantee of the full amount of the $10 million loan), respectively (collectively "Guarantees"). Both of the foregoing guarantees are attached to the Declaration of Richard Ellis dated September 3, 2014, which was filed in the lawsuit that me and two other shareholders, Dale Miesen and Paul Durant, filed against GemCap, AIA Services and AIA Insurance (which Judge Brudie dismissed for lack of standing). There is no final judgment in that lawsuit, and, if necessary, I stand ready to seek a final judgment and appeal Judge Brudie's decision.

8. After GemCap filed suit against John Taylor, AIA Services, AIA Insurance and other defendants, they purportedly agreed to settle the case by allowing, among other things, judgments to be entered against AIA Services and AIA Insurance for $12,126,584.61 (which was purportedly comprised of $3,986,368.78 in interest, penalties and costs). My attorney, Mr. Bond, provided me with a copy of that Settlement Agreement dated effective September 15, 2014 ("Settlement Agreement"), which is the same Settlement Agreement GemCap is seeking to have sealed in this lawsuit. I have spoken with other people regarding the Settlement Agreement and specific terms of the Settlement Agreement, and I am not bound by any promise to keep that agreement confidential.

9. From the time that the Guarantees and the Settlement Agreement were purportedly signed by AIA Services and AIA Insurance through the present time: (i) I have not consented to, nor would I ever consent to, AIA Services and AIA Insurance entering into the Guarantees with GemCap or any other lender; (ii) I have not consented to, nor would I ever consent to, AIA Services

DECLARATION OF DONNA J. TAYLOR - 5

**5-ER-1027**

Case 1:10-cv-00404-CWD   Document 152   Filed 08/12/16   Page 6 of 10

and AIA Insurance being bound by the purported Settlement Agreement or the $12,126,584.61 sum on that agreement in favor of GemCap or any other lender; (iii) CropUSA Insurance Agency and CropUSA Insurance Services have not been subsidiaries of AIA Services or AIA Insurance, so AIA Services and AIA Insurance are barred from guaranteeing any loans for them; (iv) I was never asked to consent, nor would I ever consent, to waiving any of the restrictions under AIA Services' amended articles of incorporation for purposes of authorizing AIA Services or AIA Insurance to be bound by, or enter into, the Guarantees or the Settlement Agreement with GemCap or any other lender (other than the loan from Reed Taylor in 1995); (v) I have never received any formal notices, full disclosures, or requests for shareholder approval or votes for the Guarantees or the Settlement Agreement from John Taylor or any of the other defendants; (vi) I have never been provided with full disclosure of the terms of the Guarantees or the Settlement Agreement by John Taylor or any of the other defendants in this lawsuit; and (vii) John Taylor and the other defendants concealed from me and the other innocent minority shareholders the existence of the Guarantees, the terms of the Guarantees, the existence of the Settlement Agreement and the terms of the Settlement Agreement (although John Taylor recently revealed limited information in the financial statements attached as Exhibit F below).

10.     On December 28, 2009, I appointed attorney Patrick Moran to be my designee on the board of directors of AIA Services. My appointment of Mr. Moran was never honored, despite the clear and unequivocal terms of my right under AIA Services' amended articles of incorporation. No notices or any board meetings were ever provided to me or Mr. Moran from December 28, 2009 through July 15, 2012 and, thus, Mr. Moran never attended any board meetings (nor was he asked). In fact, Hawley Troxell worked with AIA Services to refuse to appoint Mr. Durant, yet Hawley Troxell backed the continued participation of John Taylor on the board (which

DECLARATION OF DONNA J. TAYLOR - 6

makes absolutely no sense to me at all). On July 15, 2012, I appointed Paul D. Durant as my designee to the board of directors of AIA Services. Attached as ***Exhibit D*** is a true and correct copy of the Appointment of Director and Consent in Lieu of Meeting Vote dated July 15, 2012. I was with my attorney when Exhibit A was hand delivered to AIA Services. Despite repeated demands upon the attorneys representing AIA Services to honor my appointment to the board of AIA Services, Mr. Durant's appointment to the board of directors has never been honored. Despite John Taylor and the other defendants' refusal to honor my appointments to the board of AIA Services, I maintain Mr. Durant is a director and that no meetings or director action could be taken without his consent. Since the Guarantees and the Settlement Agreement were all executed without the consent of my board designee and because John Taylor and the other defendants all had conflicts of interest, there could be no proper authorization by the board for the Guarantees and the Settlement Agreement, assuming that they were not prohibited by AIA Services' amended articles of incorporation.

11. Attached as ***Exhibit E*** is a true and correct copy of AIA Services' financial statements dated December 31, 2011 and 2010, which were provided to me (by stating the attached are true and correct, I am merely stating that it is correct copy of what I was provided, not that John Taylor or the other defendants provided accurate information). Exhibit E was the first time John Taylor and the other defendants provided some information on the entities that they have formed and operated, but they never provided full disclosure regarding the funds transferred or utilized by those entities. As seen from the attached Exhibit E, AIA Services could not even enter into the Guarantees with GemCap based on the financial covenants alone (either the $1,113,930 in the original Guarantee in 2011 or the $10 million one in 2012). As mentioned above, I never

DECLARATION OF DONNA J. TAYLOR - 7

5-ER-1029

consented either. In addition, there is no mention in Exhibit E of the Guarantees or any relationship or debt with GemCap.

12.     Attached as ***Exhibit F*** is a true and correct copy of AIA Services' financial statements dated December 31, 2015 and 2014 which were provided to me (by stating the attached are true and correct, I am merely stating that it is correct copy of what I was provided, not that John Taylor or the other defendants provided accurate information). Exhibit F was provided only after many demands by Mr. Bond and letters demanding to inspect documents. We have still never been allowed to inspect and copy documents as required by Idaho Code. As seen the attached Exhibit F, AIA Services could not even enter into the Settlement Agreement and agree to pay any money, let alone $12,126,584.61, based on the financial covenants in AIA Services' amended articles of incorporation. As mentioned above, I never consented either. As is John Taylor and the other defendants' practices, there is no full and fair disclosure of all of the inappropriate transactions and unlawful acts in Exhibit F. In addition, John Taylor and the other defendants could not even disclose that we prevailed against them in the reverse stock split lawsuit that they filed against me and other shareholders, that we were awarded attorneys' fees and costs, and that the judgment has never been paid. There is not even a disclosure of the $12,126,584.61 judgments John Taylor permitted to be entered against AIA Services and AIA Insurance.

13.     I am respectfully requesting that this Court declare the Guarantees and the Settlement Agreement illegal and unenforceable as to AIA Services and AIA Insurance. Neither AIA Services, AIA Insurance, me nor any of the other innocent shareholders should be harmed or prejudiced by the unlawful acts taken by John Taylor and the other named defendants. The Settlement Agreement should also not be sealed.

DECLARATION OF DONNA J. TAYLOR - 8

14.     Contrary to what the Hawley Troxell Defendants represent, I am not going to name thirteen other attorneys and law firms as defendants in this lawsuit. My attorney, Roderick C. Bond, merely sent derivative demands addressing many possible claims, including particular ones based on the over $12,000,000 unlawful judgment and transfer of property from AIA Services to GemCap (the law firms in the letter improperly assisted in, among other things, the unlawful Guarantees or Settlement Agreement or assisted in unlawfully transferring AIA Services' assets to GemCap or all of the foregoing). If I pursue claims against any other lawyers or law firms, it will be in a different forum and lawsuit. I am not seeking to complicate this lawsuit, but instead seeking to have the claims tried before a jury as soon as possible in an effort to make AIA Services and AIA Insurance whole and recover the maximum amount of damages possible.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF IDAHO THAT THE FOREGOING IS TRUE AND CORRECT.

| *August 11, 2016, Lewiston, Idaho* | */s/ Donna J. Taylor* |
|---|---|
| Date and City and State Signed | Donna J. Taylor |

DECLARATION OF DONNA J. TAYLOR - 9

**5-ER-1031**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 11th day of August, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:   jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:   jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:   lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:   sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:   swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501


_____/s/ Roderick C. Bond_____
Roderick C. Bond

DECLARATION OF DONNA J. TAYLOR - 10

**5-ER-1032**

January 11, 1995

Cumer L. Green, Esq.
Green Law Offices
P.O. Box 2597
Boise, ID  83701

     Re:   AIA Services Corporation/Donna Taylor

Dear Cumer:

     This letter memorializes our agreement concerning Donna J. Taylor's interest in AIA Services Corporation as the holder of its Stated Value Preferred Stock and in the pending reorganization of thte company, including the contribution of additional capital through a private placement to be conducted by J.G. Kinnard and Company, Incorporated.

     1.   Effective February 1, 1995, regardless of the outcome of the private placement, the monthly preferred stock redemption payments shall be converted from a fifteen year amortization at prime rate less 1-1/2% to a ten-year payout at prime rate plus 1/4%, to conform with the terms of the anticipated note payment to Reed J. Taylor for redemption of his common stock.  In addition, your client will be entitled to accelerate the redemption obligation upon lapse of fifteen days after default in payment of the principal or iterest.

     Further, AIA Services Corporation's note or any note payable to Reed J. Taylor for the $6,000,000 purchase price for his common shares will be subordinated to the redemption rights of your client so that Reed J. Taylor will receive no principal payments on said note until Donna Taylor's stock has been completely redeemed.  Reed J. Taylor will receive no interest payments on the note payable to him if payments to Donna Taylor are in default.  Should Reed J. Taylor transfer his remaining 113,494 shares of AIA Services common stock to the Corporation, directly or indirectly or effecuate a reduction or elimination of his note in some other fashion, Donna Taylor's redemption obligation shall become due and fully payable.

# Exhibit - A, p. 1

**5-ER-1033**

2.    In the interim prior to closing of the private placement, all of your client's existing claims are preserved and discovery may continue.  AIA Services agrees to cooperate with you in setting a hearing, if the offering is unsuccessful, within sixty days after termination of the offering.

3.    If the private placement is successful, AIA Services will pay to Donna Taylor a lump sum redemption payment of $700,000 plus $100,000 for professional fees incurred by your client in pursuing her claims to date.   In addition, to the extent the offering proceeds exceed the minimum offering level of $5,350,000, AIA Services will pay your client each dollar of net offering proceeds in excess of the minimum up to the full amount of the unpaid principal balance of the redemption price.   If the offering proceeds exceed the minimum but do not reach the maximum, any unpaid principal balance of the redemption price will be paid in monthly installments based upon the ten-year amortization at prime plus 1/4%.

4.    Conditioned upon the successful completion of the private placement and your client's receipt of the foregoing payments, Donna Taylor releases AIA Services Corporation and it subsidiaries, their respective officers, directors, shareholders, employees, affiliates and other agents in their official capacities, from all claims arising prior to closing of the private placement including, without limitation, her assertion of purported dissenter's rights in connection with the Centennial transaction and all claims against the Corporation which are the subject of the various pleadings you have filed on behalf of your client in the divorce action (Case No. 51057) in Nez Perce County. However, such release does not release Reed Taylor individually from his obligation to Donna Taylor arising from said divorce action.  Further, Donna Taylor's rights and protections as a preferred shareholder which are set forth in the Amended Articles of Incorporation shall be preserved.   In addition, subject to the same conditions, Donna Taylor consents to, and agrees that she will not assert dissenter's rights in connection with all corporate transactions necessary to effectuate the private placement, including (without limitation) amendment of the corporation's Articles of Incorporation to authorize the creation of the necessary preferred stock and warrants, the issuance of such securities to the private placement investors, the Agency Agreement with J. G. Kinnard and Company, Incorporated and the conduct of the private placement in accordance therewith, the use of the proposed Confidential Private Placement Memorandum representing that your client has consented to all such transactions, the merger of Rich Campanaro's Delaware corporation into AIA Services Corporation and all other actions necessary to achieve the capital structure (as of the closing of the private placement) reflected in the Private Placement Memorandum.  Such corporate transactions will not be allowed to become effective unless the offering is successful; and therefore, your client shall

## Exhibit - A, p. 2

SENT BY:

Case 1:10-cv-00404-CWD   Document 152-1   Filed 08/12/16   Page 3 of 3

01/12/1995   14:5.   **** PANAFAX UF-400 ****                    06609049   P.04

not waive any rights or be prejudiced by her consent to, and waiver of dissenter's rights in connection with those transactions.

If the corporation completely redeems your client's preferred stock, Donna Taylor completely releases AIA Services Corporation and its subsidiaries, their respective officers, directors, shareholders, employees, affiliates and other agents, and Reed J. Taylor as an individual, from all claims.

If this letter accurately states our agreement, please sign and obtain your client's signature below, and fax a copy of this fully executed letter to us as soon as possible. Eberle Berlin and you will mutually prepare a draft of a definitive settlement agreement incorporating the foregoing terms and other documents necessary to effectuate the terms of this Agreement.

Very truly yours,

AIA SERVICES CORPORATION

By _____
   R. John Taylor

_____
Reed J. Taylor

_____
Donna J. Taylor

_____
Cumer L. Green

# GREEN LAW OFFICES

P.O. Box 2597
Boise, Idaho 83701-2597

Telephone: (208) 342-8915
Telecopier: (208) 342-2718

March 22, 1995

- via telecopy -

Richard A. Riley, Esq.
EBERLE, BERLIN, KADING, TURNBOW
 & McKLVEEN
300 N. 6th Street
Boise, ID  83701

Re: Taylor v. Taylor
GLO File No.: 4068 00 001

Dear Dick:

Just a note to memorialize our understanding that the amortization contemplated under the letter of January 11, 1995 (the Donna Taylor agreement) was that recalculated payments would begin in such an amount (as of February 1, 1995) that the amount due to Donna Taylor would be amortized over a period of time which would be ten years from the date the redemption began (107 payments commencing on February 1, 1995).

Would you kindly confirm by way of a signed fax copy of this letter and advise AIA Services to make the appropriate adjustments to those payments which already have been made and which will be made under the Donna Taylor agreement.

Thank you for your courtesy and cooperation in these regards.

GREEN LAW OFFICES

Cumer L. Green

CLG:df

cc: Ms. Susan Eastlake, C.P.A.
    Ms. Donna Taylor

AGREED:
By
Richard A. Riley

**Exhibit - B**

## APPOINTMENT OF DIRECTOR AND CONSENT IN LIEU OF MEETING VOTE

**To:** **AIA Services Corporation for inclusion in the minutes and filing with the corporate records.**

The undersigned, Donna J. Taylor, the sole shareholder of all outstanding Series A Preferred shares of AIA Services Corporation ("Company"), takes the following actions:

Pursuant to Article 4.2.8 of the Articles of Amendment to the Articles of Incorporation of AIA Services Corporation ("Amended Articles of Incorporation") and effective immediately, Donna J. Taylor hereby nominates and votes all of her Series A Preferred Shares in Company and appoints Paul D. Durant as a Director of the Board of Directors of the Company. Donna J. Taylor certifies that she has not assigned or encumbered her Series A Preferred Shares nor has she granted any other person or entity the right to vote such shares. Prior notice of any meetings of the Board of Directors, or action by the Directors, must be made to Paul D. Durant as follows:

> Paul D. Durant
> 3440 Selway Dr.
> Lewiston, ID  83501
> Tel: (208) 743-0930

This consent also constitutes a vote by Donna J. Taylor, without a meeting, nominating and voting all of her Series A Preferred Shares in favor of the election and appointment of Paul D. Durant to Company's Board of Directors as provided under I.C. § 30-1-704. Although Donna Taylor disputes the number of Series A Preferred Shares indicated on recently provided Company financial statements, the dispute is irrelevant for purposes of this vote and the appointment of Paul D. Durant as a Director because she is the sole Series A Preferred Shareholder of the Company and has voted all of her shares to appoint Paul D. Durant.

Dated this 15 day of July, 2012, at Clarkston, WA.

_____
Donna J. Taylor

SUBSCRIBED AND SWORN BEFORE ME THIS 15 DAY OF JULY, 2012.

_____
Roderick C. Bond
Notary Public for the State of Washington
Residing at Bellevue, WA.

1

**Exhibit - D**

**5-ER-1037**

05/09/2014 14:54 FAX 5096242528          RANDALL-DANSKIN                    002/018

Douglas J. Siddoway, ISB # 2388
RANDALL | DANSKIN, P.S.
601 West Riverside Avenue, Suite 1500
Spokane, WA 99201
Phone: 509.747.2052
Facsimile: 509.624.2528

David R. Risley, ISB # 1789
RISLEY LAW OFFICE, PLLC
1443 Idaho Street
Lewiston, ID 83501
Phone: 208.743.5338
Facsimile: 208.743.5307

FILED

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE
STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

DONNA J. TAYLOR,

    Plaintiff,

vs.

R. JOHN TAYLOR and CONNIE
TAYLOR,

    Defendants,

and

DONNA J. TAYLOR,

    Plaintiff,

vs.

AIA SERVICES CORPORATION, an
Idaho corporation; R. JOHN TAYLOR;
CONNIE TAYLOR HENDERSON;
JAMES BECK; and MICHAEL
CASHMAN, SR.,

    Defendants.

Consolidated Case Nos. CV-08-01150
and CV-13-0001075

RESPONSE TO PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 1

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

**Exhibit - 3, p. 1**

**5-ER-1038**

## INTRODUCTION

Plaintiff seeks summary judgment on four issues: that she presently holds 41,509.69 shares of AIA preferred stock, not 7,110 shares; that the Individual Defendants prevented AIA from redeeming her shares by tortiously siphoning millions of dollars to other entities in violation of AIA's articles and in breach of their fiduciary duties; that she did not breach the Series A Preferred Shareholder Agreement by entering into the Subordination Agreement; and that she is entitled to pre-judgment interest.

None of her arguments are grounded in fact or law and summary judgment should be denied.

## ARGUMENT

A. **Plaintiff's reliance on AIA's pre-2010 financial statements and the illegality doctrine is misplaced. She cannot benefit from an illegal and void contract.**

Plaintiff concedes the January 1995 letter agreement concerning the redemption of her preferred shares is illegal and void. Nevertheless, she wants the Court to find she holds 41,509.69 shares, which is the same number of shares she would hold were the agreement legal and operative. She reasons the Court should give her this number of shares because it is the same number of shares that AIA reported as outstanding in its financial statements as recently as 2008. She also argues she is entitled to the shares because the illegality doctrine requires the Court to leave the parties to an illegal contract where it finds them – in this case, with AIA having previously reported that 41,509.69 preferred shares were unredeemed.

Her argument is circular. It also glosses over two important and undisputed facts. The financial statements she is relying on predate the Idaho Supreme Court's 2010 decision in the Underlying Case by at least two years. While correct at the time, they were based on the assumption, shared by AIA and plaintiff, that AIA's redemption was legal. That assumption was proven incorrect by the 2010 decision. As a consequence,

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 2

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

## Exhibit - 3, p. 2

the number of unredeemed preferred shares depicted in AIA's financial statements was also incorrect.

The second glossed over fact concerns the Series A Preferred Shareholder Agreement. Much as she would like, she cannot pretend the agreement did not exist or that she breached it when she and her former husband signed the secret Subordination Agreement. The Series A Preferred Shareholder Agreement did exist and it expressly superseded the letter agreement on which she now relies. Had she not upended the redemption hierarchy by giving her former husband a senior position, it is safe to say that none of the ensuing litigation would have occurred and all of her shares would have been purchased.

Plaintiff's arguments also fail as a matter of law. AIA is not equitably estopped from contending the number of outstanding preferred shares is anything other than what it reported in its financial statements. As the Idaho courts have made clear, there are four elements to equitable estoppel and all of them must be established: (1) a false representation or concealment of a material fact with actual or constructive knowledge of the truth, (2) that the party asserting estoppel did not know of or could not discover the truth, (3) that the false representation or concealment was made with the intent that it be relied upon, and (4) that the person to whom the representation was made, or from whom the facts were concealed, relied and acted upon the representation or concealment to his or her prejudice. *Regjovich v. First Western Investment, Inc.*, 134 Idaho 154, 158, 997 P. 3d 615, 619 (2000). *See also Clearwater REI, LLC v. Boling*, 155 Idaho 954, 961, 318 P.3d 944, 951 (2013), *Silicon Intern. Ore, LLC v. Monsanto Co.*, 155 Idaho 954, 538, 548, 314 P.3d 593, 603 (2013).

None of these elements are present here. AIA did not falsely represent the number of outstanding preferred shares in its financial statements nor conceal any material fact concerning those shares. Neither it nor plaintiff had actual or constructive knowledge that the share number would later be rendered incorrect, nor could they have; both were of the belief that AIA's redemption of her shares was lawful, a belief that was undermined only many years later. Elements one, two and three therefore have not been

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 3

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

**Exhibit - 3, p. 3**

met. Element four is also unmet. The financial statements plaintiff presumably relied on never depicted a different number of unredeemed preferred shares than she now claims to hold. She has not been prejudiced by the representation.

Plaintiff's argument concerning the application of the illegality doctrine also fails as a matter of law. The doctrine does not require a court to leave the parties to an illegal contract where it finds them. Rather, it requires a court to leave the parties *where the law finds them,* a distinction that admits of the possibility that a party to an otherwise illegal contract who is at fault must bear the consequences of his or her actions. As the Idaho Supreme Court made clear in *Trees v. Kersey,* 138 Idaho 3, 56 P.3d 756, "The rationale for leaving the parties where the law finds them is premised on the notion that both parties are equally at fault. The doctrine normally applies as a common law defense against a party seeking to enforce an illegal contract". *Id.,* at 9, 56 P.3d 771.

The doctrine is not inviolate and exceptions have been recognized. As the court stated in *McShane v. Quillen,* 47 Idaho 542, 547, 277 P. 554, 559 (1929), where the parties are not in *pari delicto,* which is to say where one of them is more at fault than the other, then the illegality doctrine will allow the innocent party to recover. Examples include cases where fraud, undue influence or duress are present, *Trees,* 138 Idaho at 10, 56 P.3d at 772; where the plaintiff is innocent and the agreement does not violate a statute, *Williams v. Cont'l Life & Acc. Co.,* 100 Idaho 71, 73, 593 P.2d 708, 710 (1979); and where it would be inequitable not to allow the aggrieved party to recover under an unjust enrichment or *quantum meruit* theory, *Barry v. Pacific West Const., Inc.,* 140 Idaho 827, 833, 100 P.3d 440, 446 (2004); *Farrell v. Whiteman,* 146 Idaho 604, 613, 200 P.3d 1153, 1162 2009).

This case falls squarely within the exceptions recognized in *Trees, Barry* and *Farrell.* While AIA and plaintiff may share equal blame for engaging in a redemption transaction in violation of statutory law, they are not equally responsible for the events that precipitated the Underlying Case and triggered the 2010 court decision. Plaintiff is not an innocent party. Her problems are the result of her own doing. The Series A Preferred Shareholder Agreement obligated her to obtain AIA's written consent to any

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 4

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

**Exhibit - 3, p. 4**

amendment, modification, waiver or supplement to the agreement. She did not do this. Instead, she signed the Subordination Agreement in secret, materially changing AIA's and John Taylor's commitments, and setting the stage for the many lawsuits (both hers and her former husband's) that have consumed the time and attention of several Idaho courts and multiple attorneys for the better part of the last seven years.

This was a breach of the shareholder agreement. It is also a basis for acknowledging the exceptions to the illegality doctrine recognized in *McShane* and its progeny. Allowing plaintiff to reap the benefit of the illegal agreements – and to be clear, it is her, not AIA who is attempting to legitimize the agreement and capitalize on its more favorable redemption provisions – would be unjust and inequitable.

**B.** **Plaintiff's claim that the Individual Defendants engaged in tortious conduct and breached their fiduciary duties to her is conclusory in nature and demonstrates a fundamental misunderstanding of the law. Her argument that such conduct deprived AIA of the ability to redeem her shares further establishes that her tort-related claims should be dismissed under the economic loss rule.**

**1.** **None of the acts and transactions plaintiff complains about supports her claims that the Individual Defendants engaged in tortious conduct or otherwise violated AIA's articles.**

Plaintiff seeks a judgment that the Individual Defendants tortuously siphoned millions of dollars of AIA's funds to other entities in violation of the protective provisions of its articles, depriving AIA of the ability to redeem her shares. She loosely points to eight corporate acts and transactions as evidence of their alleged perfidy. As the following discussion (and the Declaration of John Taylor filed herewith) makes clear, none of these acts and transactions are as she represents them, and none support her contentions.

The Pacific Empire Radio Corporation loan. The contention here is that AIA loaned Pacific Empire Radio Corporation over $1.4 million in violation of one or more of the covenants of subsection 4.2.9(c) of its articles. Plaintiff does not explain which of the several covenants AIA violated, only that they were violated.

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 5

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

**Exhibit - 3, p. 5**

Plaintiff has it backwards. Subsection 4.2.9(c) prevents AIA and its subsidiaries from *incurring* any indebtedness except under specified circumstances; it does not prevent them from making loans. This is clear from the preamble to the subsection, which states that "[t]he corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume, guaranty or otherwise become or remain directly or indirectly liable with respect to any Indebtedness . . .." It is also consistent with the overall tenor and purpose of the subsection, which is to limit or restrict AIA from incurring additional indebtedness so long as its redemption obligations remain unfulfilled.

AIA's loan to Pacific Empire Radio Corporation cannot possibly violate the covenants for the simple reason that AIA is the lender, not the borrower. AIA did not incur any additional indebtedness as a consequence of the loan; it merely exchanged one balance sheet asset (namely, cash, which was used to fund the loan) for another balance sheet asset of equal or greater value (namely, the interest-bearing convertible promissory note issued by its borrower).

The Series C redemption. Plaintiff's claim here is that AIA improperly redeemed $30,000 worth of its outstanding Series C preferred stock without first redeeming all of her preferred stock. She contends this violates the protective provisions of its articles.

Plaintiff is again wrong. None of the protective provisions prohibit AIA from redeeming its outstanding shares of capital stock. The only provisions that touch on the corporation's capital stock are subsection 4.2.9(a), which generally prohibits AIA from issuing any common stock for less than book value; subsection 4.2.9(b), which prohibits it from creating and issuing a new class of preferred stock (other than the Series A and Series C preferred stock) or securities convertible into such new class; and subsection 4.2.9(f), which allows it to acquire, among other things, the stock of any person only if the acquisition would not otherwise violate the protective provisions of the articles. Plaintiff has not alleged nor can she demonstrate that this *de minimus* redemption of the Series C shares otherwise violated the protective provisions of its articles.

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 6

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

**Exhibit - 3, p. 6**

**5-ER-1043**

The illegal repurchase of hundreds of thousands of dollars of common shares to increase the Individual Defendants' ownership interest. The claim here is that the Individual Defendants illegally purchased hundreds of thousands of dollars of common stock to increase their ownership interest. It is an outrageous claim, made more so by the fact that plaintiff offers absolutely no evidence or legal argument to support it. Her only statement in this regard, a statement that she has asserted or repeated in almost every pleading she has filed, is that the Individual Defendants have engaged in a massive conspiracy to take control of AIA and loot it of its assets for their own personal benefit. As the defendants pointed out in their opening brief, she cannot explain how this occurred, what was looted, or for that matter, how the alleged looting would have been prevented if AIA had redeemed all of her shares and eliminated her as a shareholder.

This is not argument, it is sophistry. There is nothing in AIA's financial statements, its corporate financing history or any other objective measure of reality that even remotely supports her wild assertions. And even if there were some truth to them – and to be clear, there is not – they would have had no effect on her redemption claim. The Individual Defendants' purchase of AIA common stock put funds *in to* the corporation, it did not take money *out* of the corporation.

John Taylor's salary. Plaintiff claims AIA has overpaid John Taylor for his services as a director and chief executive officer over an unspecified number of years. Again she offers no legal argument or evidence to support her contention, only conclusory statements. It is not incumbent on the defendants to do plaintiff's thinking for her. She has not articulated a cognizable salary-related claim.

AIA's failure to keep its net assets at least equal to the sums it owed to plaintiff. The claim here is that the Individual Defendants caused AIA to violate its articles by not maintaining net assets equal or greater than the amounts it owed plaintiff. It is yet another example of plaintiff's undisciplined reading of the protective provisions. Subsection 4.2.9(h) does not requires AIA to maintain a specified level of net assets, as she asserts, but a specified "consolidated net worth," which is defined in subsection 4.2.10 to be the sum of AIA's and its subsidiaries' (a) capital stock and additional paid in

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 7

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

**Exhibit - 3, p. 7**

**5-ER-1044**

capital plus (b) its retained earnings (or minus its accumulated deficit) on a consolidated basis, determined in accordance with generally accepted accounting principles consistently applied (or in the case of a subsidiary that is an insurance company, according to statutory accounting principles consistently applied).

Plaintiff does not tell us when AIA failed to meet this requirement, if ever, or what the Individual Defendants did or did not do to cause the alleged breach. Her claim fails as a matter of law on that basis alone. Regardless, AIA is not in breach of the covenant. At December 31, 2012, its consolidated net worth was $221,152 and its redemption obligation (determined by multiplying the number of outstanding preferred shares by the $10 per share redemption price) was $71,110. Although it has not yet released its year-end 2013 financial statements, AIA is confident its consolidated net worth will exceed its redemption obligation at such date.

The California loan guarantee. Plaintiff claims AIA has guaranteed the repayment of an $8.7 million loan from a California lender in violation of one or more of the protective covenants in subsection 4.2.9(c) of its articles. She does not bother to explain which of the covenants AIA supposedly violated, only that they were violated.

The loan in question, a revolving credit facility by and between Gemcap Lending I, LLC, as lender, and CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC, as borrowers, is the subject of pending litigation in the United States District Court for the Central District of California, Western Division, *Gemcap Lending I, LLC v. CropUSA Insurance Agency, Inc. et al.* (Case No. CV13-5504 SJO). John Taylor personally guaranteed the loan. Gemcap alleges that AIA did, too, but that allegation is disputed. In any event, Gemcap has not pursued the AIA guaranty (or the Taylor guaranty for that matter).

If the California court ultimately determines that AIA guaranteed the CropUSA loan and the lender pursues the remedies that are available to it under the guaranty, then AIA will have incurred a prohibited indebtedness under subsection 4.2.9(c). Unless and until that occurs, there has been no violation of the protective provision.

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 8

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

**Exhibit - 3, p. 8**

The other alleged acts of malfeasance and self-dealing. Plaintiff claims the Individual Defendants engaged in countless other acts of malfeasance and self-dealing, but does not bother to recount them. Her contentions are by definition conclusory.

The alleged cover up. Plaintiff alleges the Individual Defendants actively covered up their malfeasance and unlawful acts, but offers no evidence as to how it was effected or exactly what was covered up. The fact that she and others have been able to pursue numerous lawsuits against AIA, the Individual Defendants and various attorneys and law firms in the last seven years, all predicated on the same set of facts, is hardly suggestive of a cover up.

> 2.    **The Individual Defendants do not owe any fiduciary duty to plaintiff with respect to the redemption of her shares.**

Plaintiff also seeks a judgment that the Individual Defendants breached their fiduciary duty to her by allowing AIA to engage in the eight transactions (described in subsection B.1, above) that allegedly prevented AIA from redeeming her shares.

Once again she is wrong. The concept of fiduciary duty is much more nuanced than plaintiff allows. That mere fact that some or all of Individual Defendants were directors, officers or majority shareholders at various times does not establish a duty in this context. There is nothing to suggest (and certainly no evidence proving) her contract damages are causally connected to the acts and conduct that constitute the alleged breach. The gravamen of her complaint is that AIA has breached a contractual obligation to redeem her shares. This was not because of any bad conduct on the part of the Individual Defendants that deprived AIA of necessary funds; it is because AIA did not have any earned surplus or capital surplus, and could not have redeemed her shares without violating the Idaho Business Corporation Act.

Put more plainly, her allegations do not establish a claim for breach of fiduciary duty under Idaho law. As the Idaho Supreme Court held in *Stephan v. Hoopes Const. Co.*, 115 Idaho 894, 897, 771 P.2d 912, 914 (1989), "there is no authority for the proposition that a corporate officer's fiduciary duty extends to non-corporate assets such as the stock holdings of individual stockholders." There is also no authority for the

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 9

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

**Exhibit - 3, p. 9**

proposition that a fiduciary duty exists where the issue in controversy (in these case, AIA's redemption obligation) is the product of an arms-length business transaction such as that evidenced by the letter agreement and the Series A Preferred Shareholder Agreement here. *Wade Baker & Sons Farms v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints*, 136 Idaho 922, 928, 42 P.3d 715, 721 (Ct.App.2002); *High Valley Concrete, L.L.C. v. Sargent*, 149 Idaho 423, 428, 234 P.3d 747, 752 (2010). Put even more plainly, plaintiff has made no showing that the Individual Defendants' fiduciary duty to her existed independent of its contractual redemption obligation.[1],[2]

That is not the only reason plaintiff's fiduciary claim should be disregarded, however. It also fails because any claim she may have regarding the Individual Defendants' alleged malfeasance, self-dealing and other depletions of corporate assets can only be pursued by her through a derivative action and she has not complied with the statutory requirements for instituting a derivate action set forth in Idaho Code § 30-1-742. *Mannos v. Moss*, 143 Idaho 927, 933-34, 155 P.3d 1166, 1172-73 (2007). See also *McCann v. McCann*, 138 Idaho 228, 233, 61 P.3d 585, 590 (2002) ("a stockholder may bring a direct action for an injury directly affecting him, however if the gravamen of the complaint is injury to the corporation's assets or to the whole body of his stock, then the shareholder's action is derivative").

Her fiduciary claim thus fails either way. If it is a contract claim for the redemption of her shares, then the Individual Defendants do not owe her a fiduciary duty. On the other hand, if it is a claim that the Individual Defendants engaged in malfeasance,

---

[1] Ironically, the Individual Defendants *would* be breaching their fiduciary duties to AIA and its shareholders if they acquiesced to plaintiff's demands and used corporate assets to redeem her remaining preferred shares. In view of its current financial condition, any such redemption would violate the Idaho Business Corporation Act.

[2] As defendants' argued in their opening brief, plaintiff's fiduciary duty claims also fail under the economic loss rule. See, for example, *SW. Bell Tel. Co. v. Delanney*, 809 S.W. 2d 493, 494 (Tex. 1991) ("the economic loss rule bars a breach of fiduciary duty claim where the only loss or damage is the subject matter of the contract").

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 10

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

**Exhibit - 3, p. 10**

self-dealing or other acts that depleted AIA's assets, then she cannot bring a direct action against them, only a derivative action.

>    **3.    Plaintiff's claim that the alleged acts and transactions deprive AIA of the ability to redeem her shares further establishes that all of her tort-related claims should be dismissed under the economic loss rule. Alternatively, her tort claims should be dismissed because she cannot prove they are the proximate cause of her claimed damages.**

Defendants have asked the Court to dismiss plaintiff's tort claims (i.e., her claims of fraud, constructive fraud, breach of fiduciary duty and aiding and abetting breach of fiduciary duty) under the economic loss rule. (Their arguments are found at 4 through 6 of their opening brief and will not be reiterated here.) Suffice it to say that the case for dismissal is only reinforced by plaintiff's latest pleadings. If they establish anything, it is that her tort claims against the Individual Defendants are not separate and distinct claims giving rise to independent damages, but haphazard assertions designed to hold the Individual Defendants accountable for AIA's contractual obligations. They should be dismissed under the economic loss rule.

Alternatively, plaintiff's tort claims against the Individual Defendants should be dismissed because she has made no showing that their alleged actions and conduct were the proximate cause her damages. The only arguments she has attempted to advance on this score are her or her attorney's conclusory statements. That is not sufficient. The essential elements of a tort action are (1) a duty duly recognized by law requiring the defendant to certain standards of conduct, (2) a breach of that duty, (3) a causal connection between defendant's conduct and the resulting injury, and (4) actual loss or damages resulting from that injury. *O'Guin v. Bingham County*, 142 Idaho 49, 52, 122 P.3d. 308, 311 (2005) citing *Black Canyon Racquetball Club, Inc. v. Idaho First Nat'l Bank, N.A.*, 119 Idaho 171, 175-76, 804 P.2d 900, 904-05 (1991). Assuming any of the other elements have been met, plaintiff has made absolutely no showing that the Individual Defendants' acts were the proximate cause of AIA's inability to redeem all of her preferred shares. Nor can she. As stated elsewhere in this response, AIA was (and is)

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 11

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

precluded from redeeming her shares for the simple reason that it does not have the earned surplus or capital surplus to do so.

        **C.**    **Plaintiff breached the Series a Preferred Shareholder Agreement by entering into the Subordination Agreement.**

Plaintiff makes three arguments in support of her contention that she did not breach the Series A Preferred Shareholder Agreement by signing the secret Subordination Agreement, all specious.

Her first argument, found at page 29 of her brief, is that the defendants have not proved the Series A Preferred Shareholder Agreement existed or was valid and enforceable as among AIA, plaintiff and Reed Taylor. Because of this, she asserts, they cannot now argue that she breached it or that she should suffer the consequences of her breach.

Her argument makes no sense. There can be no doubt that the Series A Preferred Shareholder Agreement existed or that the parties believed and acted upon it as though it were valid and enforceable. It governed AIA's redemption of her shares for the better part of fourteen years. More to the point, it is the basis for plaintiff's breach of contract claims in Donna Taylor I and Donna Taylor II, a fact she is estopped from denying. Defendants should not have to prove the shareholder agreement existed so that they can later prove that plaintiff breached it.

Her second argument, at page 30 of her brief, is that AIA breached the Series A Preferred Shareholder Agreement – this being the same shareholder agreement that she also claims never existed – long before she breached it. AIA's breach, she asserts, was a "complete failure of consideration".

This is Alice-in-Wonderland thinking. Plaintiff's own expert has confirmed that AIA paid her approximately $2.7 million for her preferred stock over the fourteen year period beginning in 1993 and ending in 2008 pursuant to the January 1995 letter agreement and the superseding Series A Preferred Shareholder Agreement. This is hardly the "total failure of consideration" that plaintiff recklessly asserts. Moreover, her

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 12

**RANDALL | DANSKIN**
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

**Exhibit - 3, p. 12**

self-serving chronology is wrong; AIA was current in its redemption obligations in 2006, when she signed the Subordination Agreement.

Her third argument for avoiding liability, found at page 31 of her brief, is much harder to fathom. She contends she could not possibly have entered into the Subordination Agreement or, for that matter, any agreement that subordinated AIA's obligations to her to its obligations to Reed Taylor, because Reed Taylor's indebtedness was illegal. In other words, she could not have breached the Series A Preferred Shareholder Agreement by signing the secret Subordination Agreement because the Subordination Agreement was not operative after the Idaho Supreme Court issued its decision in the Underlying Case.

This is revisionist thinking. Had she not signed the Subordination Agreement, Reed Taylor could not have sued AIA in the Underlying Case to compel payment of $6 million for his common stock. Moreover, AIA likely would have had the ability, financial and otherwise, to continue redeeming her preferred stock.

It is also another example of her faulty reasoning. The Idaho Supreme Court's decision in the Underlying Case did not invalidate the Subordination Agreement, only the agreements governing the redemption of Reed Taylor's common shares, and by extension the agreements governing the redemption of plaintiff's preferred shares.

Finally, plaintiff signed the Subordination Agreement some four years before the underlying redemption agreements were rendered illegal and void. The fact that the 2010 decision thwarted Reed Taylor's plan to capitalize on the secret arrangement does not mean her conduct was harmless. The consequences to AIA of her having breached the Series A Preferred Shareholder Agreement have been devastating.

D.     Plaintiff is not entitled to prejudgment interest.

Plaintiff contends she is entitled to prejudgment interest at the statutory rate of 12% per annum from December 2003, when AIA's obligations to her supposedly matured, until the date judgment is entered. She basis her claim on the fact that none of the illegal and void letter agreements or the Series A Preferred Shareholder Agreement

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 13

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON  99201-0653
(509) 747-2052

**Exhibit - 3, p. 13**

contain a post-maturity interest rate, and her assertion that the amount owed here is fixed and determinable.

Her argument betrays a colossal misunderstanding of corporate law and the governing redemption provisions of AIA's articles. Plaintiff's unredeemed shares of preferred stock are equity securities, not debt securities, and her relationship to AIA is that of a tendering shareholder to a redeeming corporation, not that of a creditor to a debtor. AIA has no obligation to redeem her remaining shares unless it can do so using legally available funds consistent with the earned surplus and capital surplus requirements of the Idaho Business Corporation Act.

This is elemental corporate law. It is also an express provision of subsection 4.2.3(b) of AIA's articles, the overarching provision that governs the redemption of plaintiff's shares:

> (b) The holder of Series A Preferred Stock shall have the right to require the corporation to redeem such stock *from any legally available funds* at any time after September 14, 1993, but only to the extent such redemption *shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares.* This right may be exercised by giving the corporation written notice of demand for redemption specifying a redemption date after September 14, 1993 and not less than ninety (90) days or more than one hundred eighty (180) days from the date such notice is delivered to the corporation. (Emphasis added.)

AIA is not delinquent in redeeming her shares. Her claim for prejudgment interest should be denied.

### CONCLUSION

For the foregoing reasons defendants respectfully ask the Court to enter an order:

1.    denying plaintiff's motion for summary judgment in its entirety and granting summary judgment in their favor; and

2.    awarding AIA and the Individual Defendants their attorneys' fees and costs in an amount to be determined.

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 14

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

**Exhibit - 3, p. 14**

**5-ER-1051**

DATED this 9th day of May, 2014.

RANDALL | DANSKIN, P.S.

By: _____
Douglas Siddoway, ISB #2388
Attorneys for AIA

RISLEY LAW OFFICE, PLLC

By: _____
David R. Risley, ISB #1789
Attorneys for the Individual Defendants

I, Patty O. Weeks, Clerk of the above entitled Court do hereby certify the foregoing to be a full, true and correct copy of the original _____ in the above entitled cause as the same now appears on file and of record in my office.
WITNESS my hand and official seal this _____
PATTY O. WEEKS, Clerk
By _____
Deputy

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 15

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

**Exhibit - 3, p. 15**

DATED this 9th day of May, 2014.

RANDALL | DANSKIN, P.S.

By: _____
Douglas Siddoway, ISB #2388
Attorneys for AIA

RISLEY LAW OFFICE, PLLC

By: _____
David R. Risley, ISB #1789
Attorneys for the Individual Defendants

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 15

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

**Exhibit - 3, p. 16**

CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of May, 2014, I caused a true and correct copy of the foregoing to be served on the parties to this action or their counsel at the address and in the manner set forth below:

Roderick C. Bond
Roderick Bond Law Office, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
*Attorney for Defendants*

☐ Via First Class Mail
☐ By Hand Delivery
☑ Via Facsimile – (425) 321-0343
☑ By E-mail – rod@roderickbond.com
☐ By Overnight Delivery

_____

F:\users\40468\Taylor v. AIA Services (State)\Response to Motion for Partial Summary Judgment

RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT - 16

RANDALL | DANSKIN
A Professional Service Corporation
1500 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0653
(509) 747-2052

**Exhibit - 3, p. 17**

**5-ER-1054**

FILED

2013 OCT 1 PM 1 55

PATTY O. WEEKS
CLERK OF THE DIST COURT

DEPUTY

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE
STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

|  |  |
|---|---|
| AIA SERVICES CORPORATION, an Idaho corporation, <br><br> Plaintiff, <br><br> v. <br><br> PAUL D. DURANT; KAY HANCHETT; LEE ANN HOSTETLER; JERRY A. LEGG; DALE L. MIESEN; HEATHER MIESEN LIVING TRUST, DALE L. MIESEN, TRUSTEE; JENNIFER MAY MIESEN LIVING TRUST, DALE L. MIESEN, TRUSTEE; ROBERT L. MIESEN LIVING TRUST, DALE L. MIESEN, TRUSTEE; DALE L. MIESEN AND JONATHON EKBERG BROWN, JR., JOINT TENANTS; CARMEN S. TAYLOR; DONNA J. TAYLOR; JUD R. TAYLOR; REED J. TAYLOR; AND BOBETTE N. RUDDELL, <br><br> Defendants. | CASE NO. CV2012-01483 <br><br> AMENDED FINAL JUDGMENT |

Judgment has been entered on all claims for relief, and the matter is final pursuant to I.R.C.P. 54(a) and I.R.C.P. 58(a). IT IS HEREBY THE FINAL JUDGMENT OF THE COURT THAT THE PETITION FOR DECLARATORY JUDGMENT IS DISMISSED.

AMENDED FINAL JUDGMENT                    1

## Exhibit - A

THE DEFENDANTS ARE AWARDED FEES AND COSTS IN THE AMOUNT OF

$10,107.72 (Ten thousand, One hundred two Dollars and Seventy-two Cents).

IT IS SO ORDERED.

DATED this __1st__ day of October 2013.

CARL B. KERRICK – District Judge

AMENDED FINAL JUDGMENT                    2

# Exhibit - A

CERTIFICATE OF MAILING

I hereby certify that a true copy of the foregoing AMENDED FINAL JUDGMENT was:

_____ faxed this _____ day of October, 2013, or

_____ hand delivered via court basket this _____ day of October, 2013, or

___2___ mailed, postage prepaid, by the undersigned at Lewiston, Idaho, this 1st day of October, 2013, to:

Douglas J. Siddoway
Randall Danskin, P.S.
601 West Riverside Ave, Ste. 1500
Spokane, WA 99201

Roderick C. Bond
Roderick Bond Law Office, PLLC
800 Bellevue Way NE, Ste. 400
Bellevue, WA 98004

PATTY O. WEEKS, CLERK

By: _____
              Deputy

AMENDED FINAL JUDGMENT                    3

# Exhibit - A

## 5-ER-1057

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiff

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual and the Personal representative of the Estate of Sarah Taylor; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC.;<br><br>Plaintiff,<br><br>v.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation,<br><br>Defendants. | Civil No. 1:10-cv-00404-CWD<br><br>PLAINTIFF DALE L. MIESEN'S MOTION TO AMEND AND SUPPLEMENT COMPLAINT |

PLAINTIFF'S MOTION TO AMEND & SUPPLEMENT COMPLAINT - 1

Plaintiff Dale L. Miesen ("Plaintiff") submits the following memorandum of law in support of his motion to amend and supplement his complaint in the form attached as Exhibit A:

## I.   FACTS

In order to facilitate this amendment and despite the delay caused by the Controlling AIA Defendants refusal to allow Plaintiff to inspect and copy records as previously represented to this Court at a prior scheduling conference (Dkt. 139-3, p. 3, ¶ 4), Plaintiff, along with other shareholders, served two additional derivative demand letters upon AIA Services and AIA Insurance's Boards of Directors on June 13, 2016 and August 23, 2016, respectively. (*Id.*; Ex. A, p. 48, ¶¶ 168-170.)  AIA has refused to take any action. (*Id.*)

Consequently, Plaintiff seeks to amend this complaint to clarify facts, assert additional facts and claims (including claims accruing or discovered since the Second Amended Complaint was filed), and to name two additional defendants. (*Compare* Ex. A *with* B.)  The parties are aware that GemCap Lending I, LLC ("GemCap") was a required party to this lawsuit (and the Hawley Troxell Defendants have maintained that GemCap is a necessary party), and CropUSA Insurance Services, LLC ("CropUSA Insurance Services"), another entity controlled by John Taylor, is also a necessary party to this lawsuit because it is a party to the illegal and/or ultra-vires Settlement Agreement and the $10,000,000 GemCap Loan.  (*Id.*)  On October 31, 2016, this Court entered an order setting November 4, 2016 as the deadline to add additional parties. (Dkt. 178, p. 14.)  This motion followed.

## II.   ARGUMENT AND AUTHORITIES

Plaintiff respectfully request leave to amend and supplement his complaint (Dkt. 137) to clarify facts, name two additional defendants and assert additional facts and claims. Since the defendants cannot show prejudice, undue delay, bad faith or futility, this Court should grant the

PLAINTIFF'S MOTION TO AMEND & SUPPLEMENT COMPLAINT - 2

motion and allow Plaintiff to file the Third Amended Complaint attached as Exhibit A.

"The court should freely give leave when justice so requires." **Fed. R. Civ. P. 15(a)(2)**. "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." **Fed. R. Civ. P. 15(d)**.

Within the Ninth Circuit, Fed. R. Civ. P. 15 "is to be applied extraordinary liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir.1990). "Where there is lack of prejudice to the opposing party and the amended complaint is obviously not frivolous or made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny such motion." *Hurn v. Retirement Fund Trust of Plumbing, Heating & Piping Industry of So. Calif.*, 648 F.2d 1252, 1254 (9th Cir.1981).

"Four factors are commonly used to determine the propriety of a motion for leave to amend. These are: bad faith, undue delay, prejudice to the opposing party, and futility of amendment. These factors, however, are not of equal weight in that delay, by itself, is insufficient to justify denial of leave to amend." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (citations omitted). "Where there is lack of prejudice to the opposing party and the amended complaint is obviously not frivolous or made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny such motion." *Hurn v. Retirement Fund Trust of Plumbing, Heating & Piping Industry of So. Calif.*, 648 F.2d 1252, 1254 (9th Cir. 1981).

Here, this Court should allow the Plaintiff to file the Proposed Third Amended Complaint in the form attached as *Exhibit A*.  Plaintiff has also submitted a red-line comparison, attached as *Exhibit B*, showing the changes between the Second Amended Complaint and the Proposed Third Amended Complaint. (*See* Ex. B.)  The Third Amendment Complaint is appropriate and warranted.

PLAINTIFF'S MOTION TO AMEND & SUPPLEMENT COMPLAINT - 3

For example, Plaintiff has clarified certain facts, asserted new facts, asserted new causes of action, and named two new defendants, GemCap and CropUSA Insurance Services. While Plaintiff withdrew his previous motion to amend with the intention of making slight revisions to the Proposed Third Amended Complaint, Plaintiff decided to make additional revisions and assertions in an effort to prevent or limit future challenges to the causes of action and relief requested. This has resulted in additional facts being alleged to the proposed Third Amended Complaint. (*See* Ex. A.) Thus, this Court should grant Plaintiff's motion and allow him to file his proposed Third Amended Complaint.

Plaintiff's counsel apologizes to this Court and counsel because he indicated at the last hearing that GemCap would be the only other party who needed to be named as a new defendant. Plaintiff's counsel, however, inadvertently failed to consider and advise this Court that CropUSA Insurance Services, another entity controlled by John Taylor (Ex. A, p. 3, ¶ 10), was also a party to the $10,000,000 loan with GemCap and a party to the illegal Settlement Agreement that will be at issue in this case. (*See* Dkt. 128, p. 21-57.)  While Plaintiff maintains that the Guarantees and Settlement Agreement are illegal and unenforceable as to AIA Services and AIA Insurance (*See* Dkt. 156, p. 5-13), the Guarantees and Settlement Agreement are, at a minimum, ultra-vires. In order to seek relief to set aside unauthorized contracts and instruments, all of the parties to the contract must be parties to the litigation:

> In a shareholder's proceeding under subsection (2)(a) of this section to enjoin an unauthorized corporate act, the court may enjoin or set aside the act, if equitable **and if all affected persons are parties to the proceeding**, and may award damages for loss, other than anticipated profits, suffered by the corporation...

**I.C. § 30-29-304(3)**; **I.C. § 30-1-304(3)** (emphasis added).  Consequently, CropUSA Insurance Services must be named as a defendant because it could be an "affected" party.  *Id.* (Dkt. 128, p. 21-57.)  While the information known by Plaintiffs at this time indicates that CropUSA Insurance

PLAINTIFF'S MOTION TO AMEND & SUPPLEMENT COMPLAINT - 4

5-ER-1061

5-ER-1062

Services might only be an additional nominal party to this lawsuit, it must be named as an additional defendant, too, because of the illegal and ultra-vires Settlement Agreement. **I.C. § 30-29-304(3)**; **I.C. § 30-1-304(3)**. (*See* Dkt. 128, p. 21-57.)  As a result, AIA Services and AIA Insurance are also more than nominal defendants.

Moreover, there is no evidence of bad faith, undue delay, prejudice or futility in permitting the filing of the Third Amended Complaint, and the defendants will be unable to show any. Indeed, as this Court recently noted, there has not even been any discovery exchanged or a discovery plan submitted by the parties. Indeed, the defendants cannot argue that they will be prejudiced. To the contrary, it is the Plaintiff and other shareholders who have been prejudiced by the conduct of the Controlling AIA Defendants while this lawsuit has been pending. (*Compare* Ex. A *with* Ex. B *and with* Dkt. 23.) While this lawsuit was pending, the Controlling AIA Defendants have continued to misappropriate AIA's assets and enter into unauthorized and illegal contracts and transactions. If there is any delay, it has been caused the defendants.

## III.   CONCLUSION

For the reasons stated above, this Court should grant Plaintiff's Motion to Amend and Supplement Complaint, and allow him to file the Third Amended Complaint in the form attached as Exhibit A.

DATED:  This 4ᵗʰ day of November, 2016.

RODERICK BOND LAW OFFICE, PLLC


By:    */s/ Roderick C. Bond*
            Roderick C. Bond
            Attorney for Plaintiffs


PLAINTIFF'S MOTION TO AMEND & SUPPLEMENT COMPLAINT - 5

**5-ER-1062**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 4th day of November, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Alyson Anne Foster     aaf@aswblaw.com, mar@aswblaw.com
James D LaRue:    jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:     jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:     lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:     sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:     swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

_/s/ Roderick C. Bond_
Roderick C. Bond

PLAINTIFF'S MOTION TO AMEND & SUPPLEMENT COMPLAINT - 6

**5-ER-1063**

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiff

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>v.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>Defendants. | Civil No. 1:10-cv-00404-CWD<br><br>THIRD AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

THIRD AMENDED COMPLAINT - i

# Exhibit - A
## 5-ER-1064

## TABLE OF CONTENTS

I.     STATEMENT OF JURISDICTION.................................................................... 1

II.    STATEMENT OF VENUE ............................................................................... 1

III.   PARTIES AND DEFINITIONS OF THE PARTIES............................................ 1

IV.    FACTS ......................................................................................................... 6

A.     The Background Facts Regarding AIA Services and AIA Insurance................................. 6

B.     John, Connie, Beck and Cashman Take Operational Control of AIA and AIA Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in Its Amended Articles of Incorporation ................................. 8

C.     AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer CropUSA to Themselves ................................................................. 11

D.     The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants in Taking CropUSA from AIA and Having AIA Fund CropUSA ................................... 15

E.     The Controlling AIA Defendants Unlawfully Transfer $1,510,693 From AIA to Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt that CropUSA Owed to AIA—thereby Resulting in a $2,144,962 Fraud Against AIA........... 17

F.     The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal ......... 21

G.     The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and Financial Wherewithal with the Improper Assistance from the Hawley Troxell Defendants ............................................................................. 23

H.     The Controlling AIA Defendants Enter Into Tolling Agreements, but Those Tolling Agreements Do Not Save the Hawley Troxell Defendants from the Unwaivable Conflicts of Interest ....................................................................... 24

I.     The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA and Intentionally Committing Torts against AIA with the Assistance of the Hawley Troxell Defendants—Even While This Lawsuit Was Pending............................ 30

THIRD AMENDED COMPLAINT - ii

# Exhibit - A
## 5-ER-1065

J.      The Controlling AIA Defendants, with GemCap Aiding and Abetting Them, Illegally Had AIA Guarantee Loans Made to CropUSA by GemCap, Concealed the Guarantees from AIA, Illegally Entered into Settlement Agreements with GemCap, Concealed the Settlement Agreements from AIA, and Unlawfully Transferred Property to GemCap Thereby Damaging AIA. .................................................. 35

K.      John Unlawfully Transfers Certain Real Property to AIA and Requires AIA to Pay the Liabilities on the Property and He Alleges that AIA Owes Him $545,563 in Accrued Salary. ................................................................................................. 43

L.      John Unlawfully Amends AIA Services and AIA Insurance's Bylaws and Issues Himself Series A Preferred Shares in AIA Services. ........................................... 44

M.      There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants .................................... 45

V.      CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 .......... 53

VI.     COUNT I—BREACH OF FIDUCIARY DUTIES ............................................................. 56

VII.    COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES ....... 60

VIII.   COUNT III—LEGAL MALPRACTICE .......................................................................... 60

IX.     COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ ......................................... 62

X.      COUNT V—AIDING AND ABETTING AND CONSIPIRACY OF FRAUD ............... 66

XI.     COUNT VI—BREACH OF CONTRACT ......................................................................... 67

XII.    COUNT VII—DECLARATORY JUDGMENT ............................................................... 68

XIII.   COUNT VIII—STATUTORY RELIEF (INCLUDING FOR ULTRA VIRES) .............. 70

XIV.    COUNT IX—CORPORATE WASTE/EXCESSIVE COMPENSATION ....................... 71

XV.     COUNT X—VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT ....... 73

XVI.    COUNT XI—ACCOUNT STATED ................................................................................. 74

XVII.   JURY DEMAND ................................................................................................................. 75

THIRD AMENDED COMPLAINT - iii

# Exhibit - A
## 5-ER-1066

5-ER-1067

XVIII.   PRAYER FOR RELIEF ................................................................................ 75

VERIFICATION OF DALE L. MIESEN ...................................................................... 79

CERTIFICATE OF SERVICE ...................................................................................... 80

*THIRD AMENDED COMPLAINT - iv*

# Exhibit - A
## 5-ER-1067

Plaintiff Dale L. Miesen alleges cumulatively, or when necessary and where applicable in the alternative, as follows:

## I.   STATEMENT OF JURISDICTION

1.   This Court has jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and this action is between citizens of different states.

2.   This Court has personal jurisdiction pursuant to I.C. § 5-514 because the defendants: (a) committed torts within the state of Idaho (including conspiring to commit, covering up, and aiding in the commission of torts committed within the state of Idaho), which injured AIA in Idaho; and/or (b) transacted business within the state of Idaho and engaged in transactions within the state of Idaho in an effort to obtain a pecuniary benefit and/or enhance their investment in Idaho corporations named as defendants in this Third Amended Complaint. Examples of the specific facts supporting personal jurisdiction are set forth in certain of the paragraphs below.

## II.   STATEMENT OF VENUE

3.   Venue is proper in the District of Idaho under 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the acts, errors and omissions giving rise to the claims asserted in this Third Amended Complaint (and the torts committed against AIA Services Corporation and AIA Insurance, Inc.) occurred in the District of Idaho and certain of the defendants are citizens and residents of the District of Idaho.

## III.   PARTIES AND DEFINITIONS OF THE PARTIES

4.   Plaintiff Dale L. Miesen ("Plaintiff" or "Miesen") is a citizen and resident of Colleyville, Texas.  Plaintiff is, and has been, a common shareholder of AIA Services Corporation ("AIA Services") during all relevant times and specifically at the time of the transactions, acts, omissions, malfeasance, and damages at issue in this lawsuit. Plaintiff is also presently a creditor

THIRD AMENDED COMPLAINT - 1

# Exhibit - A
## 5-ER-1068

of AIA Services.

5.      Plaintiff is bringing this derivative action as a shareholder and on behalf of AIA Services. In addition, Plaintiff is bringing this action as a double derivative action on behalf of AIA Insurance, Inc. ("AIA Insurance"), which is a wholly-owned subsidiary of AIA Services. AIA Services and AIA Insurance are collectively referred to as "AIA" in this Third Amended Complaint. The definition of "AIA" includes AIA Services and/or AIA Insurance for purposes of pleading in the alternative, and includes the Plaintiff to the extent he is required to support any cause of action and/or any of the relief requested in this Third Amended Complaint.

6.      Defendant AIA Services is a citizen of Idaho because it is an Idaho corporation, its principal place of business is in Lewiston, Idaho, and its primary purported officer, John Taylor, resides in Lewiston, Idaho. During all relevant times, AIA Services is or has been the parent corporation of AIA Insurance.

7.      Defendant AIA Insurance is a citizen of Idaho because it is an Idaho corporation, its principal place of business is in Lewiston, Idaho, and its primary purported officer, John Taylor, resides in Lewiston, Idaho.  During all relevant times, AIA Insurance has been a wholly-owned subsidiary of AIA Services.

8.      Plaintiff's assertions as to AIA Services' and/or AIA Insurance's board of directors and/or officers in this Third Amended Complaint is not intended to be an admission or an acknowledgement that the board of directors or officers were properly seated and elected or that the necessary quorum was present, and Plaintiff asserts that such was not the case for a number of years.

9.      Defendant CropUSA Insurance Agency, Inc. ("CropUSA") is a citizen of Idaho because it is an Idaho corporation, its principal place of business is in Lewiston, Idaho, and its

THIRD AMENDED COMPLAINT - 2

primary purported officer, John Taylor, resides in Lewiston, Idaho. CropUSA was formerly known as AIA Crop Insurance, Inc.

10.      Defendant CropUSA Insurance Services, LLC ("CropUSA Insurance Services") is a citizen of Idaho because it is an Idaho limited liability company, its principal place of business is in Lewiston, Idaho, and its manager, John Taylor, is a resident of Lewiston, Idaho.

11.      CropUSA and CropUSA Insurance Services are referred to collectively and/or individually when pleading in the alternative as "CropUSA" in this Third Amended Complaint.

12.      Defendant R. John Taylor ("John" or "John Taylor") is a citizen and resident of Lewiston, Idaho. During all times relevant to this lawsuit, John served on the Board of Directors of AIA Services, AIA Insurance, and CropUSA and continues to serve on those boards. John also served as President of each of these corporations during all times relevant to this lawsuit. John is also licensed to practice law in the state of Idaho. John is a common shareholder of AIA Services and a common shareholder of CropUSA (although Plaintiff asserts those shares were unlawfully issued to him). John also owns shares or ownership interests in other entities that have engaged in inappropriate transactions with AIA and/or which have improperly benefitted from AIA during all relevant times.

13.      Defendant James Beck ("Beck") is a citizen and resident of the state of Minnesota. Beck served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times. Beck was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA (although Plaintiff maintains that his common shares in AIA Services and CropUSA were unlawfully issued).

14.      Defendant Michael Cashman, Sr. ("Cashman") is a citizen and resident of the state of Minnesota. Cashman served on the Board of Directors of AIA Services during certain relevant

THIRD AMENDED COMPLAINT - 3

# Exhibit - A
## 5-ER-1070

times. Cashman was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA (although Plaintiff maintains that his common shares in AIA Services and CropUSA were unlawfully issued).

15.     Defendant Connie Taylor Henderson ("Connie") is a citizen and resident of the state of Washington. Connie served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2014. Connie jointly owns with John the common shares of AIA Services held in John's name. Connie has actively asserted community ownership of those shares and specifically did so before the district court and on appeal in *Taylor v. AIA Services*.

16.     Defendant JoLee K. Duclos ("Duclos") is a citizen and a resident of Washington, or, alternatively, upon information and belief, she is now a citizen and a resident of the state of Idaho. Duclos has served as Secretary of AIA Services, AIA Insurance, CropUSA and other entities partially or wholly owned by John during certain relevant times. Duclos served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2007. Duclos also served as a director of CropUSA curing certain relevant times. Duclos is a common shareholder of CropUSA (although Plaintiff maintains that those shares were unlawfully issued). Duclos has knowledge of the law by and through her training and performing the duties of a paralegal. Duclos has served as John's "lieutenant" during all relevant times.

17.     John, Beck, Cashman, Connie and Duclos are collectively referred to herein as the "Controlling AIA Defendants." The Controlling AIA Defendants have acted in concert and assisted one another in committing various torts described in this Third Amended Complaint and covering up and/or concealing those torts. The definition of "Controlling AIA Defendants" includes the acts and/or omissions of one or more of John, Beck, Connie, Cashman and/or Duclos

THIRD AMENDED COMPLAINT - 4

# Exhibit - A
## 5-ER-1071

for purposes of pleading in the alternative.

18.      Defendant Gary D. Babbitt ("Babbitt") is a citizen and resident of the state of Idaho and was an attorney practicing law in the state of Idaho with and on behalf of Hawley Troxell. Upon information and belief, Babbitt began representing AIA and CropUSA in 2007.

19.      Defendant Richard A. Riley ("Riley") is a citizen and resident of the state of Idaho and is an attorney in the state of Idaho with and on behalf of Hawley Troxell. Riley represented AIA and/or CropUSA from time to time from 1995 through the present time.

20.      Defendant D. John Ashby ("Ashby") is a citizen and resident of the state of Idaho and is an attorney in the state of Idaho with and on behalf of Hawley Troxell. Upon information and belief, Ashby began representing AIA and CropUSA in 2007.

21.      Defendant Hawley Troxell Ennis & Hawley LLP ("Hawley Troxell") is a citizen of the state of Idaho because it is an Idaho limited liability partnership in the business of practicing law, with its principal place of business in Boise, Idaho, and its principal officers or managers reside in the state of Idaho. Hawley Troxell has no office in the state of Washington. None of the individual partners of Hawley Troxell are residents of Washington. Hawley Troxell, though its attorneys, acted as counsel for AIA Services, AIA Insurance and CropUSA during certain relevant times and in certain lawsuits. Hawley Troxell is also named herein as it is vicariously liable for the acts and/or omissions of Babbitt, Riley, Ashby and its other attorneys.

22.      Babbitt, Ashby, Riley, other Hawley Troxell attorneys, and Hawley Troxell are collectively referred to as the "Hawley Troxell Defendants" in this Third Amended Complaint. The definition of "Hawley Troxell Defendants" includes the acts and/or omissions of one or more of Babbitt, Ashby, Riley, other attorneys at Hawley Troxell and/or Hawley Troxell for purposes of pleading in the alternative. The Hawley Troxell Defendants conducted business from their office

THIRD AMENDED COMPLAINT - 5

# Exhibit - A
## 5-ER-1072

in Boise, Idaho.

23.     Defendant GemCap Lending I, LLC ("GemCap") is a Delaware limited liability company and it conducts business throughout the United States, including in Nez Perce County, Idaho with CropUSA and CropUSA Insurance Services, respectively, both of which have principal places of business in Lewiston, Idaho. GemCap is a citizen of California because its principal place of business is in Malibu, California and its primary officers, Richard Ellis and David Ellis, are residents of the state of California. However, AIA conducts no business in California.

24.     Donna J. Taylor ("Donna Taylor"), a non-party to this lawsuit, is and has been the sole Series A Preferred Shareholder of AIA Services during all relevant times, and she never authorized any of the transactions at issue in this lawsuit from 1995 through the present time. While John alleges to have "purchased" 7,500 Series A Preferred Shares in 2016, Plaintiff maintains that the purchase was unauthorized and improper, and that Donna Taylor remains the sole Series A Preferred Shareholder of AIA Services.

## IV.     FACTS

### A.  The Background Facts Regarding AIA Services and AIA Insurance

25.     In 1983, AIA Services was formed as a closely-held Idaho corporation for the purpose of acting as a holding company for various other wholly-owned subsidiaries. AIA's business model was to work with farmers and growers to form trusts and/or related cooperatives through various growers and farmers' associations and sell insurance products to the members of those associations also becoming members of the trusts and/or cooperatives.

26.     AIA created the Grain Growers Membership & Insurance Trust, the National Contract Poultry Grower's Membership & Insurance Trust, and other, similar trusts. By way of its relationships with these various organizations, AIA held contracts for the exclusive right to market health insurance (*e.g.*, Group Universal Health Policies) and other insurance products to the

THIRD AMENDED COMPLAINT - 6

members of the various trusts and associations.

27.     In 1987, Donna Taylor and Reed Taylor, non-parties to this lawsuit, were issued Series A Preferred Shares in AIA Services in connection with their divorce. Pursuant to the dissolution of their marriage, Donna Taylor was issued 200,000 shares of Series A Preferred shares on or about February 12, 1988, and has held those shares ever since, less those shares which have been redeemed in part over the years. (*See* Dkt. 67-1 and 67-2.)

28.     In connection with the issuance of the Series A Preferred Shares to Donna Taylor, AIA Services' shareholders adopted amendments to its articles of incorporation with restrictions on the manner in which AIA Services and its subsidiaries could conduct business. (*See* Dkt. 67-3.) AIA Services' amended articles of incorporation included, without limitation, the restrictions that: (a) barred AIA Services and AIA Insurance from guaranteeing any loans for any individual or entities which were not wholly-owned subsidiaries; (b) barred certain transactions with shareholders and affiliates; and (c) required AIA Services to comply with certain financial covenants. (*Id.*)  These amendments were expressly adopted to protect AIA from precisely the type of acts, omissions, guarantees, loans and transactions at issue in this lawsuit.

29.     In addition, AIA Services' amended articles of incorporation also provided Donna Taylor with the unqualified right, as the Series A Preferred Shareholder, to appoint a person, to be determined in her sole discretion, to the Board of Directors of AIA Services. (*See* Dkt. 67-3.)

30.     The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the restrictions under AIA Services' amended articles of incorporation and bylaws.

31.     Donna Taylor's Series A Preferred Shares have not been fully redeemed to this day, and the restrictions under AIA Services' amended articles of incorporation remain in full force and effect to this day and fully applicable. (*See* Dkt. 67-42, pp. 10-11 ¶ 19.)

THIRD AMENDED COMPLAINT - 7

# Exhibit - A
## 5-ER-1074

**B. John, Connie, Beck and Cashman Take Operational Control of AIA and AIA Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in Its Amended Articles of Incorporation**

32.     In 1995, the Controlling AIA Defendants, other than Duclos (although she did assist the Controlling AIA Defendants as an employee and officer (assistant secretary) of AIA), spearheaded a transaction to redeem Reed Taylor's majority common stock interest in AIA Services. (*See* Dkt. 67-5 and 67-6.)

33.     As part of the redemption, Beck and Cashman acquired Series C Preferred Shares in AIA Services, through an Investment Agreement, which was entered into with AIA Services and transmitted to AIA Services in Idaho and involved the transaction to redeem Reed Taylor's common shares in Idaho. When AIA Services amended its articles of incorporation to allow the issuance of the Series C Preferred Shares, AIA Services included additional restrictions in its articles of incorporation. Riley assisted in drafting and/or approving these restrictions and he was fully aware of them.

34.     Under the new and additional restrictions in AIA Services' amended articles of incorporation (these restrictions were in addition to others adopted in connection with the issuance of Donna Taylor's Series A Preferred Shares), AIA Services was barred from engaging in a number of corporate actions, including, but not limited to: (a) AIA Services could not acquire any common shares from any shareholders unless all dividends due on the Series C Preferred Shares had been paid (10% dividend per year) or those funds were set aside; (b) the Series C Preferred Shareholders had the right to elect one director to AIA Services' Board of Directors; and (c) if any Series C Preferred Shares were redeemed, such redemptions must be equally from all shareholders. (*See* Dkt. 67-3.)

THIRD AMENDED COMPLAINT - 8

# Exhibit - A
## 5-ER-1075

35.    Although the Series C Preferred Shares held by Beck, Cashman and their friends were eventually unlawfully and effectively redeemed by AIA, other Series C Preferred Shares were later issued to the AIA Services 401(k) Plan and those shares remain issued and outstanding to this day and no dividends have been paid as required since approximately 1997. As a result, these new restrictions under AIA Services amended articles of incorporation were in place for the benefit of AIA Services and the Series C Preferred Shares, which have remained in full force and effect to this day.  The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the additional restrictions under AIA Services' amended articles of incorporation.

36.    Upon the redemption of Reed Taylor's majority common shares, Beck, Cashman, John and Connie directly or indirectly became the majority common shareholders of AIA Services. (*See* Dkt. 67-5.) In addition, Beck, Cashman and John entered into a Voting Agreement to ensure that they would maintain control of AIA Services' Board of Directors, which was signed by Beck and Cashman and transmitted by them to Idaho. As a result, the Controlling AIA Defendants have maintained operational control of AIA from 1995 through the present time. Beck and Cashman attended certain board and shareholder meetings for AIA Services in person in Idaho and via telephone from Minnesota for meetings held in Idaho.

37.    In connection with the redemption of Reed Taylor's shares, John entered into an Executive Officer's Agreement with AIA Services, which guaranteed him certain salary payments and other compensation for three years; that agreement also contained non-compete and non-solicitation provisions. (*See* Dkt. 67-8.) John's salary after the first three years was required to be determined by AIA Services' Board of Directors, which was never done after the first three years.

38.    From 1999-2012, John improperly paid himself millions of dollars pursuant to his Executive Officer's Agreement for his and Connie's benefit (the amount of which in itself was

THIRD AMENDED COMPLAINT - 9

# Exhibit - A
## 5-ER-1076

improper based on AIA's business prospects and John's inability to do anything for the benefit of AIA), while he intentionally and repeatedly violated the non-compete and non-solicitation provisions of his Executive Officer's Agreement.

39.     In connection with the redemption of Reed Taylor's shares in August 1995, AIA Services contributed funds to The Universe Life Insurance Company, which was a wholly-owned subsidiary of AIA Services, in order to make AIA Insurance, which was then a wholly-owned subsidiary of The Universe Life Insurance Company, a subsidiary of AIA Services. After that transaction, AIA Insurance became a wholly-owned subsidiary of AIA Services.

40.     As a result, from August 1995 through all relevant times, AIA Insurance was a wholly-owned subsidiary through which AIA Services derived its commissions and administrative fees from insurance policies, which accounted for the bulk of AIA's revenues and profits.

41.     From 1995 through 2005, AIA Insurance generated over $65 million in revenues from commissions (over $33 million) and administrative fees (over $27 million), and it continued to generate revenues thereafter.

42.     From 1995 through all relevant times, each of the Controlling AIA Defendants has served at various times on the Board of Directors for AIA Services, AIA Insurance and/or CropUSA, while John has continuously served as the President of AIA and Duclos has continuously served as the Secretary of AIA.

43.     From 1999 through certain relevant times, the Controlling AIA Defendants have also served from time to time on purported "advisory board" of CropUSA, which actually made the decisions on behalf of AIA and CropUSA. Specifically, Cashman, Beck and John served on the "advisory board" of CropUSA from 1999 through certain relevant times. Certain of the so-called "advisory board" meetings were conducted via telephone originating in Idaho and in person

THIRD AMENDED COMPLAINT - 10

in Idaho.

44.     The Controlling AIA Defendants intentionally concealed from AIA and AIA Services' minority shareholders of the existence and authority of the "advisory board" of CropUSA.

**C. AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer CropUSA to Themselves**

45.     By 1998, AIA's ability to sell health insurance had been impaired by undercapitalization in its underwriting subsidiary, The Universe Life Insurance Company. Accordingly, the company considered proposals to sell other forms of insurance, and in particular crop insurance, to be underwritten by other insurance companies. At a 1998 Board of Directors meeting, AIA Services' Board of Directors specifically discussed selling crop insurance and elected to have AIA pursue selling crop insurance.

46.     In 1999, AIA, then under the control of the Controlling AIA Defendants, began selling crop insurance through a wholly-owned subsidiary of AIA Services formed under the name "AIA Crop Insurance, Inc."

47.     The first purported meeting of shareholders of AIA Crop Insurance, Inc. ("AIA Crop Insurance") was held on January 11, 2000. The first purported meeting of the AIA Crop Insurance's Board of Directors was held on the same day. The purported minutes of the shareholder's meeting indicate that John, not the true owner AIA Services, claimed to be the sole shareholder of AIA Crop Insurance at the time of incorporation; these facts were concealed from AIA and AIA Services' innocent minority shareholders.

48.     Upon information and belief, at or shortly after the time of its formation, the Hawley Troxell Defendants began providing legal services to AIA Crop Insurance.

THIRD AMENDED COMPLAINT - 11

49.     At a special meeting of the shareholders of AIA Crop Insurance held on November 13, 2000, AIA Crop Insurance was renamed CropUSA in an apparent attempt to conceal its corporate lineage and origins.

50.     The minutes of the November 13, 2000 special meeting of the shareholders also show that John continued to claim that he was the sole shareholder of CropUSA, while he was simultaneously representing in business plans provided to others that CropUSA was a subsidiary of AIA Insurance. (*See* Dkt. 67-66.)

51.     At the time CropUSA was formed, John was employed by AIA Services under an Executive Officer's Agreement, dated August 1, 1995, Dkt. 67-8, which contained express covenants not to compete. Upon information and belief, John's Executive Officer's Agreement and AIA Service's amended articles of incorporation and restated bylaws were drafted and/or approved by Riley, and he had full knowledge of the restrictions under the terms of the foregoing documents.

52.     CropUSA held its purported annual shareholder's meeting on January 10, 2001. By this time, the illegal "spin off" of CropUSA had been accomplished by having AIA Services' Series C Preferred Shareholders (primarily Beck and Cashman) exchange their Series C Preferred Shares for common shares in CropUSA (if CropUSA were in fact an independent entity, these maneuvers would have been completely unnecessary).

53.     The minutes for the shareholder meeting held on January 10, 2001 for CropUSA revealed that CropUSA had retained Hawley Troxell as its advisor and SEC counsel and, upon information and belief, the Hawley Troxell Defendants have served continuously as CropUSA's attorneys in one form or the other ever since. According to the minutes, negotiations between AIA Services and CropUSA had resulted in an agreement whereby AIA Services would no longer

THIRD AMENDED COMPLAINT - 12

operate CropUSA as a subsidiary.

54.    However, the negotiations referred to in the January 10, 2001 shareholder meeting minutes for CropUSA did not in fact occur. There was no decision, nor has there ever been a decision, on the part of AIA Services to discontinue the subsidiary status of CropUSA. The January 10, 2001 meeting minutes for CropUSA were concealed from AIA.

55.    None of the preferred or common shareholders of AIA Services (other than those present at the January 10, 2001 meeting) were given notice of or the opportunity to approve or oppose this corporate action; instead, it was concealed from them and AIA.

56.    In spite of the fact that John asserted on January 10, 2001 that CropUSA would no longer be a subsidiary of AIA Services, John wrote in a letter dated February 27, 2001, sent on behalf of AIA to Donna Taylor, that "AIA is developing a new crop insurance program through a new company called CropUSA." The letter went on to state that "[t]he costs of putting the CropUSA program together have been paid. AIA now needs to launch five new territories next Month." This February 27, 2001 letter constituted an unambiguous representation by John to AIA (and Donna Taylor) that CropUSA was a subsidiary of AIA and was being operated for the benefit of AIA and implicitly also for AIA Services' innocent minority shareholders (which included Donna Taylor). This representation to AIA was false, and John knew it was false. Upon information and belief, the other Controlling AIA Defendants were aware of this February 27, 2001 letter and the misrepresentations contained within the letter.

57.    Notwithstanding the fact that John was obligated under the terms of his Executive Officer's Agreement that required that he not compete with AIA Services, and notwithstanding the fact that he owed fiduciary duties to the AIA and AIA Services' shareholders, John set forth his plans to exploit the assets of AIA for the benefit of CropUSA (and himself as the majority

THIRD AMENDED COMPLAINT - 13

# Exhibit - A
## 5-ER-1080

purported shareholder) in the purported minutes of the purported January 10, 2001 meeting.

58.     The January 10, 2001 meeting minutes reveal that CropUSA authorized its officers to execute a Master Marketing Agreement with AIA Insurance that would allow CropUSA access to all of AIA's customers and customer lists, as well as all of AIA's trade secrets. AIA received no consideration for conveying this access or to enter into these agreements.

59.     CropUSA's officers (including John) were also purportedly authorized to enter into a Management Agreement with AIA Insurance wherein AIA Insurance purportedly agreed to provide management and administrative support to CropUSA without charge. However, John has since testified under oath that AIA's Board of Directors never authorized this agreement, although the Board has acquiesced in the action.

60.     AIA itself was never given notice of the Master Marketing Agreement and the Management Agreement, nor was AIA given the opportunity to approve or reject these agreements or any subsequent ones. Each of these agreements, when executed, constituted a violation of John's Executive Officer's Agreement, which contains a strict non-compete clause. Each of these agreements also constituted a direct breach of fiduciary duty or the aiding and abetting on behalf of each of the Controlling AIA Defendants in the commission of torts against AIA.

61.     Meanwhile, in 2001, John and Connie acquired a parking lot for $8,000 using AIA's line-of-credit. Upon information and belief, AIA was required to maintain control of the parking lot as part of its lease with Washington Bank Properties. John then increased the rent that AIA paid to use the parking lot to benefit him and Connie. For example, although John and Connie paid only $8,000 for the parking lot, they subsequently charged AIA $60,750 in rent to use the parking lot from 2004 through 2006. These unfair and self-serving rental payments to John and Connie were concealed from AIA and AIA Services' innocent minority shareholders and were

THIRD AMENDED COMPLAINT - 14

never disclosed to either of them, as was John and Connie's purchase of the parking lot.

### D. The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants in Taking CropUSA from AIA and Having AIA Fund CropUSA

62. Upon information and belief, certain of the Hawley Troxell Defendants were providing legal services to CropUSA and/or its board of directors as of January 10, 2001, and such providing of legal services has continued through certain relevant times.

63. Upon information and belief, from January 10, 2001, and continuing through the period relevant to this lawsuit, the Hawley Troxell Defendants had knowledge of John's Executive Officer's Agreement with AIA Services, had knowledge of the conflict of interest provisions in AIA's bylaws, and had knowledge of restrictions in AIA's amended articles of incorporation, but intentionally refused to comply with them and assisted John in violating them or covering up the violations.

64. The Hawley Troxell Defendants knew or should have known that the purported Master Marketing Agreement and Management Agreement constituted breaches of John's Executive Officer's Agreement, violations of AIA Service' amended articles of incorporation, violations of AIA Services' restated bylaws, and constituted breaches of John and the other Controlling AIA Defendants' fiduciary duties owed to AIA and AIA Services' minority shareholders.

65. Upon information and belief, the Hawley Troxell Defendants were also representing CropUSA from January 10, 2001, through certain relevant times, and by way of that representation they breached their fiduciary duties to AIA (including their undivided duty of loyalty owed to AIA) and took steps that materially assisted John and the Controlling AIA Defendants in the commission of the various torts described in this Third Amended Complaint and assisted in the concealment of those torts.

THIRD AMENDED COMPLAINT - 15

# Exhibit - A
## 5-ER-1082

66.     Beginning in 1999 and continuing through the time CropUSA ceased operating, CropUSA was funded and operated with assets improperly transferred from AIA, including, but not limited to, operating capital, office space, customer lists and other trade secrets, agents and staff, goodwill and other assistance. CropUSA paid nothing for these assets.

67.     The Controlling AIA Defendants, except Duclos, were all shareholders of AIA at the time CropUSA was formed and later purportedly became shareholders of CropUSA.

68.     The Controlling AIA Defendants, except Duclos (although she improperly took part in the meetings and acted as the Secretary) and Connie, all served on a purported "advisory board" of CropUSA and/or AIA, and this advisory board exercised actual control over CropUSA and AIA. By exercising control over these entities and committing acts that benefitted CropUSA at the expense of AIA, the Controlling AIA Defendants engaged in a conspiracy to defraud AIA, which should have had the right and title to the property of CropUSA.

69.     On January 10, 2002, CropUSA purportedly entered into a Memorandum of Understanding with the Controlling AIA Defendants. Under the terms of this memorandum, Beck and Cashman were obligated to guarantee loans on behalf of CropUSA. Beck and Cashman guaranteed loans for CropUSA, an Idaho corporation, in Idaho and sent their financial information to Idaho for the guarantees.

70.     Notably, Beck and Cashman had also been obligated to guarantee over $1,000,000 in loans on behalf of AIA since 1995, but they never did. Notwithstanding this obligation, the Controlling AIA Defendants subsequently arranged for AIA to guarantee CropUSA's lines of credit, even though the guarantees were barred by AIA's amended articles of incorporation and bylaws.

THIRD AMENDED COMPLAINT - 16

# Exhibit - A
## 5-ER-1083

71.     In 2004, the Controlling AIA Defendants attempted to raise capital for CropUSA by selling shares in CropUSA to private investors by way of a $10,000,000 private placement. The Hawley Troxell Defendants drafted the July 15, 2004 Private Placement Memorandum, despite their knowledge of the illegal "spin-off" of CropUSA and the fiduciary duties they owed to AIA.

72.     When CropUSA began distributing the Private Placement Memorandum in 2004, the company was experiencing financial difficulties that made it difficult, if not impossible, to attract investors to purchase shares pursuant to the private placement.

73.     In addition, in 2004, CropUSA's lack of adequate funding threatened its ability to sell crop insurance. To alleviate these problems, the Controlling AIA Defendants improperly turned to AIA to obtain the necessary funding.

**E.   The Controlling AIA Defendants Unlawfully Transfer $1,510,693 From AIA to Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt that CropUSA Owed to AIA—Thereby Resulting in a $2,144,962 Fraud Against AIA.**

74.     In order to boost CropUSA's balance sheet for the purpose of operating the company, the Controlling AIA Defendants devised a scheme to illegally transfer $1,510,693 from AIA Insurance to CropUSA. The Controlling AIA Defendants conspired with each other in the formation and execution of this scheme to unlawfully transfer $1,510,693 of AIA's funds to CropUSA, and aided and abetted one another in carrying out the scheme and ultimately covering it up.  Upon information and belief, the Hawley Troxell Defendants provided counsel to CropUSA with respect to the unlawful transfer of funds and/or has, at a minimum, assisted in covering up the facts of this illegal transfer.

75.     The scheme involved money derived from AIA Insurance. In August 2004, AIA Insurance received a payment of $1,510,693 from Trustmark. (*See* Dkt. 67-59.) Rather than deposit the payment of $1,510,693 into the account of AIA Insurance, where it would have benefited AIA

THIRD AMENDED COMPLAINT - 17

Exhibit - A
5-ER-1084

and its innocent shareholders, John deposited the funds into a new account entitled "AIA Insurance Inc. CropUSA." (*See* Dkt. 67-60.) The address for this account coincided with the address for John's personal residence at 2020 Broadview Drive in Lewiston, Idaho, rather than any address used by AIA. (*Id.*)

76. Shortly after diverting the $1,510,693 into the "AIA Insurance Inc. CropUSA" account, the Controlling AIA Defendants illegally transferred the funds to CropUSA. The Controlling AIA Defendants attempted to disguise this conversion of AIA Insurance's funds by characterizing the transaction as an alleged purchase by AIA Insurance of Series C Preferred Shares in its parent corporation, AIA Services. (*See* Dkt. 67-59.) Then, the Controlling AIA Defendants carried AIA Insurance's alleged investment in the Series C Preferred Shares as having a purported value of $1,510,693 when that was not the true value of the shares.

77. However, as the Controlling AIA Defendants acknowledged at the time, there was no market for the Series C Preferred Shares which were purportedly being repurchased. At the time the $1,510,693 in funds were converted by CropUSA, there was no authorization of any kind for the transaction, and the transaction was concealed from AIA.

78. In order to create a plausible explanation for the transfer of the $1,510,693, CropUSA eventually produced a document designated as a Consent in Lieu of Meeting dated August 26, 2004. (*See* Dkt. 67-61.) However, this document itself is completely fraudulent, as it was retroactively created the following year in order to deceive auditors who questioned the validity of this transaction.

79. In addition, this $1,510,693 purported repurchase of shares separately violated the terms of AIA Services' amended articles of incorporation, which required that all Series C Preferred Shares be redeemed equally and simultaneously from all shareholders. (*See* Dkt. 67-3.)

THIRD AMENDED COMPLAINT - 18

# Exhibit - A
## 5-ER-1085

Instead of repurchasing an equal portion of the Series C Preferred Shares from AIA Services'

401(k) Plan, the Controlling AIA Defendants intentionally only repurchased the Series C Preferred

Shares held by CropUSA (which had been previously held by Beck, Cashman and their friends).

80.     CropUSA was carrying these Series C Preferred Shares in AIA Services on its books with a value of $21,693, which means that CropUSA realized a gain of $1,489,000 on this purported sale of shares. (*See* Dkt. 67-59.) At that time, although the Controlling AIA Defendants had not properly accounted for all funds, assets, labor and other costs advanced from AIA for CropUSA, they had actually accounted for there being a debt of $634,269 owed by CropUSA to AIA.

81.     After unlawfully transferring the $1,510,693 received by AIA Insurance to CropUSA, the Controlling AIA Shareholders had CropUSA repay the $634,269 debt owed to AIA, thereby committing a double fraud upon AIA, i.e., AIA should have the $1,510,693 in its bank account now and it should have never lent the $634,269 to CropUSA in the first place. In other words, those fraudulent transactions alone resulted in the loss of $2,144,962 in funds to AIA and thus damaged AIA in the amount of $2,144,962. The Controlling AIA Defendants have actively concealed, or covered up, these transactions from AIA with the assistance of the Hawley Troxell Defendants.

82.     AIA and the innocent shareholders of AIA Services were never given notice of the 2004 stock transaction, nor were any proper board or shareholder meetings held to approve the transaction. However, as with the fraudulent document prepared on behalf of CropUSA, a fraudulent Consent in Lieu of Meeting, dated August 26, 2004, was prepared on behalf of AIA. This document was actually produced several months after the transaction and was created to deceive auditors.

THIRD AMENDED COMPLAINT - 19

# Exhibit - A
## 5-ER-1086

83.     Upon information and believe, the Hawley Troxell Defendants provided legal services to both AIA and CropUSA at the time of the 2004 transaction or had actual knowledge of the 2004 transaction.

84.     The Hawley Troxell Defendants at various times, as purported counsel for AIA, failed to disclose to AIA the 2004 transaction to transfer $1,510,693 to CropUSA and that the acts of the Controlling AIA Defendants constituted an intentional breach of their fiduciary duties (including the duty of loyalty) owed to AIA and a concealment of a prohibited transaction. For this reason alone, the Hawley Troxell Defendants could not reasonably rely on a tolling agreement to represent AIA, CropUSA and the interest of the Controlling AIA Defendants in later litigation.

85.     The Hawley Troxell Defendants failed to disclose to AIA, or to anyone else, that this $1,510,693 transaction was unlawful on many levels, including but not limited to the fact that it did not comply with the articles of incorporation and bylaws, caused a breach of AIA's other contracts, and could not be justified by the balance sheet of either AIA Insurance or CropUSA. Upon information and belief, the Hawley Troxell Defendants had knowledge of the back-dated Consent in Lieu of Meeting documents.

86.     On February 16, 2005, Beck sent an email to John and Cashman confirming the Controlling AIA Defendants' scheme to misappropriate CropUSA in an effort to profit at the expense of AIA: "[Cashman] and I are so convinced that CropUSA is a winner that anything standing in the way of a good result will be a crime." (Dkt. 67-54.) The crime was stealing CropUSA from AIA and then to drain AIA of its funds and assets to pursue the Controlling AIA Defendants' scheme. This was not the only email exchanged between the Controlling AIA Defendants, as they emailed one another on numerous occasions, including emails directed to recipients in Idaho.

THIRD AMENDED COMPLAINT - 20

# Exhibit - A
## 5-ER-1087

**F.  The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal**

87.     After unlawfully taking $2,144,962 from AIA Insurance in 2004, the Controlling AIA Defendants continued to operate CropUSA with assets both tangible and intangible that rightfully belonged to AIA, continued to improperly subsidize CropUSA with AIA's assets and labor, and continued to conceal their actions from AIA and AIA Services' innocent minority shareholders.

88.     Under the management and direction of the Controlling AIA Defendants, AIA regularly failed to allocate costs to CropUSA and other entities and failed to charge markup, interest or profit on costs paid for other entities. For example, John's own salary of $250,000 was allocated entirely to AIA Services even though John's contractual right to a salary from AIA Services had expired in 1998 and had never been renewed by an authorized board. (And, further, John performed no actual work for AIA during the time in question.)

89.     John, with the knowledge and complicity of the other Controlling AIA Defendants, also performed work for other entities owned in full or in part by him while on AIA's payroll, i.e., CropUSA, Pacific Empire Radio Corp., Pacific Empire Communications Corp., Pacific Empire Holdings Corp., Radio Leasing I LLC and Radio Leasing II LLC. John also had other AIA employees work for these entities without compensation to AIA. These facts, like virtually all of the others referenced in this Third Amended Complaint, were concealed from AIA and AIA Services' innocent minority shareholders.

90.     Between its founding in 1999 and the filing of this lawsuit, CropUSA and other entities generated tens of millions of dollars of revenue (including premiums) and other benefits that would have flowed to AIA but for the unlawful and unauthorized acts of the Controlling AIA Defendants.

THIRD AMENDED COMPLAINT - 21

# Exhibit - A
## 5-ER-1088

91.     As of 2006, John owed AIA at least $307,000 for personal loans he had taken from AIA Services. For several years, John concealed these loans by engaging in false accounting whereby loans to him were treated as payments of principal on AIA Services' indebtedness due to Reed Taylor on his $6 million promissory note (which was later ruled to be illegal).  In 2006, John "corrected" the alleged accounting "error" by increasing the balance due on Reed Taylor's note to $6 million and reinstating John's $307,000 debt. John had still not repaid this personal loan.

92.     Over the years, John had AIA pay his personal maid, his personal credit card bills, donations, cash advances, family cell phone bills, and other personal expenses. John also had AIA purchase several vehicles from him, and he continued to drive these vehicles after the sales and purchase of other vehicles with AIA's funds to use for his benefit when there was no reason to do so. John also had AIA employees perform work on his personal residence and on other real property not owned by AIA. These acts were all committed with the knowledge and complicity of the Controlling AIA Defendants and without paying AIA the fair value of the services or expenses.

93.     At year-end 2006, AIA had improperly lent $95,000 to Pacific Empire Radio Corp., a corporation partially owned by John and Connie and in which they both served as directors at certain times. The Controlling AIA Defendants transferred that $95,000 receivable from AIA to CropUSA. By the end of 2012, AIA would lend over $1,400,000 in additional funds to Pacific Empire Radio Corp., when all such loans violated AIA Services' amended articles of incorporation and were not authorized under the circumstances by AIA Services' restated bylaws.

94.     In August 2007, AIA settled litigation with the state of Idaho whereby AIA received a mortgage worth approximately $1.5 million for the amount owed by Washington Bank Properties

THIRD AMENDED COMPLAINT - 22

Exhibit - A
5-ER-1089

on the real property where AIA Services' headquarters was located.[1] Although AIA Insurance paid the costs of this litigation, the Controlling AIA Defendants, with the assistance of the Hawley Troxell Defendants, improperly titled the note in the name of AIA Services only, and then pledged the note to CropUSA so that the Controlling AIA Defendants could borrow money to pay their attorneys' fees and costs incurred defending in *Taylor v. AIA Services* to the Hawley Troxell Defendants.

95.     As with the 2004 transactions, the transaction pledging the mortgage owned by AIA Services to CropUSA for purportedly paying the Hawley Troxell Defendants' attorneys' fees and costs incurred representing AIA, CropUSA and the Controlling AIA Defendants was a blatant misappropriation and/or illegal pledging of AIA's assets. The loan documents and the pledge agreement were drafted by the Hawley Troxell Defendants, although they later asserted that they were only "scriveners" for the transaction. This transaction was improper and barred by AIA's amended articles of incorporation and bylaws.

G. **The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and Financial Wherewithal with the Improper Assistance from the Hawley Troxell Defendants**

96.     On October 26, 2007, the Hawley Troxell Defendants drafted and delivered an opinion letter falsely representing that AIA Insurance was authorized to guarantee a $15,000,000 line-of-credit on behalf of CropUSA, which carried a hard-money loan with an exorbitant interest rate.

---

[1] AIA Services' headquarters was previously owned by its wholly-owned subsidiary the Universe Life Insurance Company, which had sold the building through a lease-back with an option to purchase in the 1990s. After the state of Idaho later took control of Universe Life through a receivership when the capital requirements were changed, the state of Idaho became the owner of the mortgage. Later, AIA was involved in litigation with the state of Idaho over its receivership over Universe Life. The litigation was settled and the state of Idaho transferred the mortgage back to AIA as the consideration for the settlement. AIA ultimately foreclosed on the mortgage thereby obtaining ownership of its headquarters, which was later unlawfully transferred to GemCap, as discussed below.

THIRD AMENDED COMPLAINT - 23

# Exhibit - A
## 5-ER-1090

97.     The Hawley Troxell Defendants' opinion letter was delivered for a loan guarantee which violated AIA Services' amended articles of incorporation, its restated bylaws and AIA Insurance's bylaws, and in violation of the duty of loyalty owed by the Hawley Troxell Defendants to AIA.

98.     Lancelot, the lender for this $15,000,000 line-of-credit was subsequently exposed as a Ponzi scheme, and its founder, Gregory Bell, pleaded guilty to criminal charges in federal court. Mr. Bell was the signee for Lancelot on the $15,000,000 line-of-credit. These facts pertaining to the $15,000,000 loan for CropUSA and AIA Insurance's guarantee of that loan, along with other transactions, were never disclosed to AIA by the Hawley Troxell Defendants or the Controlling AIA Defendants and the payment of interest on that loan was detrimental to AIA because most of CropUSA's assets could be traced directly to AIA (and the depletion of CropUSA's funds resulted in less funds available to recover).

H.     **The Controlling AIA Defendants Enter Into Tolling Agreements, but Those Tolling Agreements Do Not Save the Hawley Troxell Defendants from the Unwaivable Conflicts of Interest**

99.     In 2007, Reed Taylor filed suit against AIA and certain of the Controlling AIA Defendants, asserting claims for breaches of contract, breaches of fiduciary duties, conversion, fraud and other claims ("*Taylor v. AIA Services*"). In 2007, the Hawley Troxell Defendants appeared as counsel for AIA Services and AIA Insurance in that lawsuit. Later, Reed Taylor amended his complaint and named CropUSA as a defendant, after recognizing that millions of dollars had been transferred to it from AIA, among other improper transactions (including some of those transactions described in this Third Amended Complaint). (*See* Dkt. 82-2.) The Hawley Troxell Defendants also appeared and represented CropUSA in that lawsuit. (*Id.*) Although Riley did not formally appear as counsel in *Taylor v. AIA Services*, Riley took an active interest in *Taylor*

THIRD AMENDED COMPLAINT - 24

# Exhibit - A
## 5-ER-1091

*v. AIA Services* and consulted with Babbitt, Ashby and/or other attorneys at Hawley Troxell relative to that case. The scope of representation of the Hawley Troxell Defendants in *Taylor v. AIA Services* could not have included representing the interest of CropUSA or the Controlling AIA Defendants.

100.    As the purported attorneys for AIA, two entities, the Hawley Troxell Defendants owed duties of loyalty, care, and good faith to AIA and the Hawley Troxell Defendants breached their duties of care and fiduciary duties by engaging in the simultaneous representation of the Controlling AIA Defendants, AIA, CropUSA, and other parties (including Bryan Freeman) with interests adverse to the interests of AIA.

101.    The Controlling AIA Defendants, and any other former AIA directors or officers, had conflicts of interest that prevented any of them from waiving the conflicts of interest involved in the Hawley Troxell Defendants' joint representation of AIA Services, AIA Insurance and CropUSA. In addition, the Controlling AIA Defendants had conflicts of interest that prevented them from being disinterested or proper constituents or officers of AIA to direct the Hawley Troxell Defendants' representation of AIA Services, AIA Insurance and CropUSA.

102.    In 2007, Connie and Beck were purportedly appointed to the Boards of Directors of AIA Service and AIA Insurance by John. Connie and Beck were paid $5,000 per quarter to "serve" on the Boards of Directors of AIA and they also were to receive common shares for their purported "service." Beck and Connie attended certain AIA board meetings in person in Idaho or through telephone calls to Idaho, which further directed aspects of AIA's businesses and certain other transactions. Beck later testified that he serves on AIA's Boards to protect his own interests and those of his friends (the same friends who previously acquired Series C Preferred Shares in AIA Services and illegally exchanged them for common shares in CropUSA).

THIRD AMENDED COMPLAINT - 25

# Exhibit - A
## 5-ER-1092

103.    In 2007 and 2008, the Controlling AIA Defendants entered into written tolling agreements in connection with the various litigations directly or indirectly involving AIA. The Hawley Troxell Defendants were improperly involved with and/or facilitated the Controlling AIA Defendants entering into such tolling agreements for the purpose of allowing the Hawley Troxell Defendants to continue to represent AIA, CropUSA and directly or indirectly certain of the Controlling AIA Defendants.

104.    By tolling the statute of limitations for claims against the Controlling AIA Defendants, the Hawley Troxell Defendants sought to use the tolling agreements to authorize the waiver of their conflicts of interest representing AIA, CropUSA and the interests of the Controlling AIA Defendants in litigation that could have and should have exposed the fraud and intentional breaches of fiduciary duties committed by the Controlling AIA Defendants.

105.    The limited permissible circumstances when tolling agreements and conflict waivers may be appropriate were not present when the Hawley Troxell Defendants prepared and/or entered into agreements with AIA, CropUSA and/or the Controlling AIA Defendants. Upon information and belief, the Hawley Troxell Defendants prepared and/or entered into agreements and/or amended agreements without requiring AIA to have independent counsel and without involving disinterested and unconflicted constituents from AIA in violation of the Rules of Professional Conduct, including RPC 1.7, RPC 1.8 and RPC 1.13. Throughout the Hawley Troxell Defendants' representation of AIA and CropUSA, they failed to act in the best interests of AIA and to address the conflicts of interest and malfeasance committed against AIA with the highest unconflicted and disinterested constituents from AIA in violation of the Rules of Professional Conduct, including, RPC 1.13.

THIRD AMENDED COMPLAINT - 26

# Exhibit - A
## 5-ER-1093

106.    The Hawley Troxell Defendants knew or should have known that the Controlling AIA Defendants had committed intentional acts of fraud and breaches of fiduciary duties (including the duty of loyalty) owed to AIA. The Hawley Troxell Defendants knew or should have known that by allowing the Controlling AIA Defendants to continue to operate and control AIA that they would continue to conceal their past torts and likely continue to commit new torts, which is precisely what occurred here as demonstrated by the facts alleged in this Third Amended Complaint.

107.    Although these tolling agreements tolled the statute of limitations for claims AIA could assert against the Controlling AIA Defendants (which eliminates any defense they may have to assert any statute of limitations defenses), the facts set forth in this Third Amended Complaint demonstrate why such tolling agreements were improper under the circumstances as the agreements involved tolling intentional torts committed against AIA. While the claims were being tolled, the Controlling AIA Defendants continued to unlawfully use AIA's cash, resources and ability to borrow to fund other businesses and pay compensation to themselves.

108.    During the course of the litigation in *Taylor v. AIA Services*, Reed Taylor attempted to negotiate a settlement, but he insisted that any settlement must include full disclosure to, and authorization by, AIA Services' minority shareholders and to allow them to participate in CropUSA common share ownership. (*See* Dkt. 67-18.) Not only did the Controlling AIA Defendants and Hawley Troxell Defendants reject Reed Taylor's offer, but they still refused and failed to provide full disclosure to AIA and AIA Services' innocent minority shareholders of the malfeasance and torts committed against AIA. The untenable position of the Hawley Troxell Defendants was confirmed when the only person seeking to require full and fair disclosure to the shareholders and for them to rightfully participate in AIA's business was a former creditor, Reed

THIRD AMENDED COMPLAINT - 27

Exhibit - A
5-ER-1094

Taylor. (*Id.*)

109.    During the course of *Taylor v. AIA Services*, Connie and Beck represented to Judge Brudie, the Idaho Supreme Court, and AIA that the redemption of Reed Taylor's shares should be illegal to benefit AIA Services' minority shareholders. (*See* Dkt. 67-23 and 67-25.) After Judge Brudie ruled the redemption of Reed Taylor's shares was illegal, neither Connie, Beck, the Hawley Troxell Defendants nor any of the other Controlling AIA Defendants did anything to benefit AIA or its minority shareholders nor did they ever have any intention of helping them, contrary to what they had represented to Judge Brudie and the Idaho Supreme Court.

110.    Instead of sharing equally in AIA's assets with AIA Services' innocent minority shareholders, the Controlling AIA Defendants later sought to eliminate those minority shareholders for only ten cents per share, even though Connie and John both previously valued the shares much higher even after considering the over $6 million that AIA Services owed to Reed Taylor at the time of valuation (a debt that was later ruled to be illegal and void). (*See* Dkt. 67-24 and 67-50.)

111.    Riley was an attorney at the law firm of Eberle Berlin at the time of the redemption of Reed Taylor's shares in 1995 and he breached his duty of care by advising AIA Services to enter into the illegal stock redemption transaction. *See Taylor v. AIA Servs. Corp.*, 151 Idaho 552, 261 P.3d 829 (2011). Riley concealed facts from AIA regarding the redemption.

112.    The illegal redemption of Reed Taylor's common shares ultimately led to AIA incurring over $1 million in attorneys' fees and costs litigating and resulted in AIA Services being required to report to the IRS a gain from the $6 million it never had to pay Reed Taylor.

113.    Upon information and belief, the Controlling AIA Defendants never reported the gain from the extinguished $6 million debt to Reed Taylor on AIA Services' tax return. If the

THIRD AMENDED COMPLAINT - 28

# Exhibit - A
## 5-ER-1095

Controlling AIA Defendants did not report the $6 million income to the IRS and AIA Services is obligated to pay taxes, penalties and interest on that gain, the Controlling AIA Defendants and Hawley Troxell Defendants are liable for those sums as well for breaching their fiduciary duties owed to AIA.

114.    Based on the intentional acts of the Hawley Troxell Defendants, AIA has been decimated because the Controlling AIA Defendants remained in control of AIA through those tolling agreements and the Hawley Troxell Defendants' ongoing representation of AIA. The end result of these tolling agreements and ongoing representation was that the Hawley Troxell Defendants improperly ensured that the Controlling AIA Defendants would retain control over AIA to the detriment of AIA and for the improper benefit to the Hawley Troxell Defendants and the Controlling AIA Defendants.

115.    In or around 2007 or 2008, AIA Insurance received a settlement of approximately $800,000 for litigation that AIA Insurance had funded for certain policy holders. Instead of utilizing or retaining AIA's portion of such funds exclusively for AIA, the Controlling AIA Defendants improperly used those funds to, *inter alia*, continue their intentional acts of funding CropUSA and to pay litigation expenses caused by them or other unauthorized uses. Upon information and belief, the Hawley Troxell Defendants had knowledge of the receipt of those funds, yet they did nothing to protect the funds even though the funds were at issue in *Taylor v. AIA Services*.

116.    In 2008, the Controlling AIA Defendants and the Hawley Troxell Defendants permitted CropUSA to sell a book of crop insurance business to Hudson Insurance for the benefit of CropUSA when approximately 75% of the business had been derived directly from AIA's agency force (i.e., agents such as Larry Whitehead). The over $15 million sale price should have

THIRD AMENDED COMPLAINT - 29

been paid to AIA, rather than to CropUSA or to pay the debts incurred by the Controlling AIA Defendants through CropUSA. Even if the sale of this book of business rightfully occurred, AIA should have been the recipient of the sale proceeds and there should not have been any money owed to Lancelot or others because the Controlling AIA Defendants had engaged in corporate waste and other breached fiduciary duties that resulted in the sums being allegedly owed.

117.    Sometime after CropUSA sold the bulk of its assets to Hudson Insurance in 2008, which were derived primarily from AIA, the Controlling AIA Defendants obtained further funds from Hudson Insurance for Growers National Cooperative Insurance Agency, Inc. ("Growers National"), an entity formed and funded by AIA for the purpose of selling crop insurance that allowed the members to participate in the agency by receiving patronage dividends.

118.    Upon information and belief, CropUSA received over $500,000 from Hudson Insurance for Growers National. These funds should have been paid to AIA and the receipt of the funds was concealed from AIA. Plaintiff will establish the exact amount of funds that the Controlling AIA Defendants and/or CropUSA received from Hudson Insurance for Growers National at the time of trial.

I.    **The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA and Intentionally Committing Torts against AIA with the Assistance of the Hawley Troxell Defendants—Even While This Lawsuit Was Pending**

119.    Upon information and belief, the Hawley Troxell Defendants have been paid the bulk of the over $2,000,000 in attorneys' fees and costs incurred and/or paid for the various lawsuits. Plaintiff will establish the exact amount of funds paid to the Hawley Troxell Defendants by AIA and/or on behalf of AIA, which Plaintiff is seeking to be disgorged and returned to AIA.

120.    From 2009 through the present time, Donna Taylor exercised her right under the amended articles of incorporation to appoint two different directors to AIA Services' Board of

THIRD AMENDED COMPLAINT - 30

Directors, but the Controlling AIA Defendants and/or the Hawley Troxell Defendants refused to honor her unqualified right thereby resulting in all actions taken by AIA Services' Board of Directors during that period of time being unauthorized and thus a breach of the fiduciary duties of the Controlling AIA Defendants.

121.    In December 2009, Donna Taylor filed suit against AIA Services to exercise her unequivocal right to appoint her designee, Patrick Moran, to the Board of Directors of AIA Services and to appoint a receiver for AIA Services. The Hawley Troxell Defendants once again appeared in that lawsuit and successfully opposed Donna Taylor's designee being appointed to the Board of Directors or a receiver being appointed by improperly seeking a stay in the lawsuit.

122.    Had the Hawley Troxell Defendants joined Donna Taylor in having a receiver appointed for AIA Services, which the Hawley Troxell Defendants should have done in light of the countless intentional torts committed against AIA by the Controlling AIA Defendants, there is no doubt that they could have stopped the Controlling AIA Defendants from carrying out their ongoing fraud, intentional breaches of fiduciary duties and their destruction of AIA. At a minimum, the Hawley Troxell Defendants' acts and/or omissions in this regard was a substantial factor of the improper transactions, unlawful acts, and the cause of millions of dollars of damages to AIA.

123.    This lawsuit was filed by Plaintiff on August 11, 2010, and subsequently stayed at the request of the Controlling AIA Defendants and the Hawley Troxell Defendants. During that stay, inappropriate and unlawful transactions continued to occur.

124.    The Controlling AIA Defendants continued to utilize AIA's funds, assets, labor, trade secrets and borrowing ability to unlawfully assist CropUSA and other entities owned by the Controlling AIA Defendants.

THIRD AMENDED COMPLAINT - 31

# Exhibit - A
## 5-ER-1098

125.    In March 2012, the Controlling AIA Defendants, improperly terminated AIA Services' ESOP and paid those shareholders three cents per share for their hard-earned common shares. At no time prior to or after the termination of the ESOP did the Controlling AIA Defendants disclose the facts pertaining to the malfeasance and torts existing at that time (as described in this Third Amended Complaint or otherwise) to those shareholders. (*See* Dkt. 67-30-33, 34.)   AIA Services was separately barred from purchasing or redeeming the common shares held in the ESOP.

126.    However, the Controlling AIA Defendants knew that AIA Services' amended articles of incorporation barred all stock redemptions, including any purchases of shares held by the ESOP, until the Series A Preferred Shares were all fully redeemed and the Series C Preferred Shares had been paid the over $1,000,000 in dividends owed. The repurchase of the ESOP shares for three cents per share was illegal, ultra vires and improper.

127.    Effective March 23, 2012, Beck and Cashman purportedly entered into an agreement with John to sell their purported common shares in AIA Services, which such shares had never been properly or lawfully issued in the first place. The agreement provided that Idaho law applied and, upon information and belief, Beck and Cashman entered into that agreement in connection with the failed effort to effectuate a reverse stock split to eliminate the minority shareholders.

128.    In 2012, the Controlling AIA Defendants improperly sought to effectuate a reverse stock split and to only pay AIA Services' minority common shareholders ten cents per share to repurchase those common shares (including Plaintiff's shares) without disclosing any facts and without offering full and fair compensation for the value of the shares. (*See* Dkt. 66-3, 67-48, 67-

THIRD AMENDED COMPLAINT - 32

Exhibit - A
5-ER-1099

48.) The notice to the shareholders was signed by Duclos and the improper and unlawful reverse stock split was approved by Beck, John and Connie. (*Id.*)

129. Fourteen shareholders objected to the alleged reverse stock split. (*See* Dkt. 67-41.) The ill-conceived reverse stock split violated AIA Services' amended articles of incorporation and the Controlling AIA Defendants did not comply with Idaho Code, including, by failing to provide the form for the shareholders to state the value that they believed should be paid for their common shares thereby further establishing the true improper purpose of the failed reverse stock split. The reverse stock split was not pursued for any proper business purpose.

130. In response to the fourteen shareholder objections and notices of demands for payment, the Controlling AIA Defendants, without regard to the fact that they would expend tens of thousands of dollars more in funds litigating the issue rather than simply paying the shareholders the true fair value of their shares, had AIA Services file suit against the fourteen shareholders. (*See* Dkt. 83-15.) Judge Carl Kerrick dismissed the lawsuit, and further noted that it was disingenuous to seek a reverse stock split until this lawsuit was resolved. (*See* Dkt. 86-1.) Judge Kerrick later awarded attorneys' fees and costs to the shareholder defendants. That judgment in favor of those fourteen shareholders has still never been paid by the Controlling AIA Defendants or AIA, and the Controlling AIA Defendants should be required to pay that judgment on behalf of AIA.

131. The failed reverse stock split drained AIA of significant and unnecessary attorneys' fees and costs (fees and costs which could have been paid to those shareholders or for other AIA obligations) and constituted a waste of AIA's assets. This purported reverse stock split was approved and/or acquiesced in by the Controlling AIA Defendants, which was a breach of their fiduciary duties. Upon information and belief, the Hawley Troxell Defendants were aware of the scheme to effectuate the reverse stock split to eliminate AIA Services' innocent minority

THIRD AMENDED COMPLAINT - 33

Exhibit - A
5-ER-1100

shareholders, which would in turn eliminate common shareholder standing for this lawsuit.

132. From 2009 through 2016, the Controlling AIA Defendants continued loaning money to, or allowed money to be lent to, Pacific Empire Radio Corporation in an amount exceeding $1,600,000 by year-end 2015 when that corporation had no ability to repay the sums owed and it benefitted John and Connie (who owned shares in that corporation at certain relevant times) as those were funds they would not have to personally provide to Pacific Empire Radio Corporation.  In 2015 and 2016, the IRS filed liens against Pacific Empire Radio Corporation in excess of $500,000 for the non-payment of employee withholding taxes, yet the Controlling AIA Defendants permitted AIA Services to lend over $1,600,000 to Pacific Empire Radio Corporation.

133. From 1999 through 2012, the Controlling AIA Defendants concealed their ownership interests in other entities from AIA, which were derived from and/or funded by AIA, including, without limitation, CropUSA, CropUSA Insurance Services, LLC, and Pacific Empire Holdings Corp.

134. From 1995 through 2016, John received over $2,700,000 in cash salary, compensation, benefits and property from AIA. This amount does not include any compensation, payments or other improper distributions he may have received from CropUSA and other entities funded or launched using AIA. At a minimum, John should be required to disgorge the over $2,000,000 that he received from AIA from 1999 through 2016 and other compensation, funds and benefits received from AIA since 1999, which John received while acting as a faithless fiduciary and while improperly competing against AIA through CropUSA and other entities (including Pacific Empire Holdings Corp.).

///

///

THIRD AMENDED COMPLAINT - 34

# Exhibit - A
## 5-ER-1101

**J.** **The Controlling AIA Defendants, with GemCap Aiding and Abetting Them, Illegally Had AIA Guarantee Loans Made to CropUSA by GemCap, Concealed the Guarantees from AIA, Illegally Entered into Settlement Agreements with GemCap, Concealed the Settlement Agreements from AIA, and Unlawfully Transferred Property to GemCap Thereby Damaging AIA.**

135.    While the instant lawsuit was pending, the Controlling AIA Defendants sought additional funding for CropUSA. GemCap agreed to make the loan to CropUSA in Idaho for the purpose of operating its business in Idaho. On or about November 23, 2011, the Controlling AIA Defendants obtained a $5,000,000 line-of-credit from GemCap for CropUSA, which was subsequently amended on April 1, 2012, July 18, 2012, and February 4, 2013 to be a $10,000,000 line-of-credit (the original loan and all subsequent modifications and amendments are collectively the "GemCap Loan").

136.    On November 23, 2011, the Controlling AIA Defendants, with the substantial assistance from GemCap, had AIA Services and AIA Insurance guarantee $1,113,930 of the GemCap Loan. In connection with that guarantee, John, Beck and Connie executed a board resolution for AIA Services purportedly authorizing that guarantee, even though they all had conflicts of interest that prevented them from authorizing the guarantee, AIA was separately barred from guaranteeing the loans, they did not obtain consent from Donna Taylor for the guarantee, and Donna Taylor's designee on AIA Services' Board of Directors was not provided notice of the GemCap Loan. On October 1, 2012, the Controlling AIA Defendants had AIA purportedly guaranteed the entire $10,000,000 GemCap Loan (the 2011 $1,113,930 limited guarantee executed in 2011 and the $10,000,000 unlimited guarantee executed in 2012 are collectively referred to as the "Guarantees").  Even though AIA purportedly executed the Guarantees, AIA could not borrow funds from the GemCap Loan and AIA obtained no benefit whatsoever.

THIRD AMENDED COMPLAINT - 35

# Exhibit - A
## 5-ER-1102

137.     Upon information and belief, GemCap was aware of the existence of this lawsuit, or should have been aware of its existence, at the time of the GemCap Loan and AIA's Guarantees (which asserted claims based on other unlawful guarantees and alleged substantial other misconduct, including claims against the assets GemCap was purportedly accepting from AIA and CropUSA). Upon information and belief, GemCap was aware or should have been aware, that AIA Services' board of directors was not fully and properly seated (including that the Controlling AIA Defendants were not honoring Donna Taylor's unequivocal right to appoint a director) and that AIA's officers were not properly elected. Upon information and belief, GemCap knew, or should have known, that AIA Services was not conducting the required annual shareholder meetings and was not lawfully complying with fundamental corporate governance procedures.

138.     When GemCap accepted the first of the Guarantees from AIA, GemCap requested and was provided with an Officer's Certificate, signed by John and Duclos, that attached copies of AIA Services' amended articles of incorporation and bylaws (both of which contained provisions barring the Guarantees). As a result, GemCap was aware, or should have been aware, that AIA, and its purported officers, were not authorized to execute the Guarantees or pledge any of its assets to GemCap. AIA received no consideration for entry into the Guarantees and most of the GemCap Loan's indebtedness was already owed as of the date of the unlimited Guarantee executed on October 1, 2012.

139.     In connection with the GemCap Loan and AIA's Guarantees of that loan, GemCap requested, and was provided with, copies of AIA Services' amended articles of incorporation and restated bylaws, which expressly barred the Guarantees because, *inter alia*, the GemCap Loan was not for a wholly-owned subsidiary of AIA Services and the Loan implicated conflicts of interest

THIRD AMENDED COMPLAINT - 36

Exhibit - A
5-ER-1103

provisions that pertained to the Controlling AIA Defendants. As a result, GemCap was fully aware, or should have been fully aware, that AIA was not authorized to execute the Guarantees or to perform under the Guarantees.

140. The Guarantees were signed by John Taylor, as the purported President of AIA Services and the purported President of AIA Insurance. GemCap was aware, or should have been aware with the exercise of reasonable diligence, that John Taylor had no authority to execute the Guarantees on behalf of AIA Services or AIA Insurance, and that, under the circumstances, the Guarantees were barred by AIA Services' amended articles of incorporation and AIA's bylaws. The Controlling AIA Defendants all had knowledge of the Guarantees and the fact that they were barred, and they never provided notice of the Guarantees or obtained shareholder approval from them (including, without limitation, approval from Donna Taylor, who was the sole Series A Preferred Shareholder of AIA Services). The Guarantees are illegal and/or ultra vires because they violated AIA Services' amended articles of incorporation, AIA's bylaws and numerous Idaho Code sections.

141. On December 20, 2012, GemCap filed a UCC financing statement with the Idaho Secretary of State stating that AIA Services and AIA Insurance had pledged "All of each of Debtor's right, title and interest, whether now existing or hereafter acquired, in and to all assets of such Debtor, wherever located, whether tangible or intangible, and the proceeds and products thereof" ("Financing Statement"). The Financing Statement was not properly authorized or disclosed to AIA's shareholders, and it violated AIA Services' amended articles of incorporation and AIA's bylaws.

142. Under the terms of the GemCap Loan, CropUSA could borrow up to $10,000,000. Upon information and belief, CropUSA owed GemCap $8,676,288.39, plus interest, attorneys'

THIRD AMENDED COMPLAINT - 37

**Exhibit - A**
**5-ER-1104**

fees and costs, as of July 26, 2013. Under the terms of the hard-money GemCap Loan, interest accrued at 18.5% per annum and 24% upon a default.

143.   According to a document later filed in 2014 in federal court in California, from April 15, 2013 through April 19, 2013, GemCap's agent traveled to Idaho to conduct a purported audit of CropUSA, AIA, and other entities at AIA's headquarters in Lewiston, Idaho.  John was present at the purported audit. Upon information and belief, GemCap's agent discovered facts that demonstrated that AIA and other entities owned by the Controlling AIA Defendants were engaging in improper transactions. This audit further reveals that the Hawley Troxell Defendants provided further legal work for CropUSA (despite the allegations and claims in this lawsuit). Upon information and belief, GemCap's agent traveled to Idaho to conduct other audits of CropUSA and AIA in Lewiston, Idaho. GemCap and the Controlling AIA Defendants never disclosed or provided the results of any of the audits to disinterested constituents at AIA or to AIA Services' minority shareholders.

144.   Upon information and belief, Gemcap provided CropUSA and other parties a notice of default through a notice dated July 16, 2013. Upon information and belief, GemCap provided a purported notice of default and demand for payment to AIA Services and AIA Insurance of the $8,676,288.39 owed by CropUSA through a notice dated July 29, 2013.

145.   GemCap, CropUSA and the Controlling AIA Defendants failed to disclose to properly elected and unconflicted directors of AIA, the Plaintiff, or AIA Services' other innocent minority common shareholders the GemCap Loan (including its terms), AIA's Guarantees (including their terms), and the subsequent notices of default of the GemCap Loan.

146.   On July 30, 2013, GemCap filed suit against CropUSA, John and others for the default of the GemCap Loan. GemCap asserted claims for breach of contract, fraud, conversion

THIRD AMENDED COMPLAINT - 38

and other claims. The Controlling AIA Defendants and GemCap did not provide any notice of this lawsuit to AIA Services' shareholders nor did they take any action to proceed in the best interests of AIA.

147.    After certain of AIA Services' shareholders learned of the GemCap lawsuit in California, GemCap was advised that AIA's Guarantees and the Settlement Agreements were unauthorized and illegal and that AIA was not being properly operated. Nevertheless, GemCap sought to collect from AIA based on the unauthorize and illegal Guarantees. At this point in time, GemCap had further actual knowledge of the unauthorized and illegal Guarantees and that AIA was not being operated properly (including that the Controlling AIA Defendants were breaching fiduciary duties owed to AIA), assuming that it was not aware of these facts prior to accepting AIA's Guarantees. As a result, GemCap was aware that AIA's Guarantees had been improperly and unlawfully executed.

148.    Despite complaints from AIA Services' minority shareholders and even though GemCap, AIA, CropUSA and the Controlling AIA Defendants knew that AIA was barred from executing the Guarantees and entering into any settlement agreement that required the payment of any funds or transfer of any assets from AIA. GemCap and AIA, purportedly on behalf of John, purportedly entered into a purported settlement and a written settlement agreement sometime after January 9, 2015 (collectively the "Settlement Agreement" or "Settlement Agreements"). The Settlement Agreements were concealed from AIA and its shareholders by the Controlling AIA Defendants and GemCap, and further constitute a conspiracy to defraud AIA. AIA received no consideration for the Settlement Agreements.

149.    Under the terms of the Settlement Agreements, AIA Services and AIA Insurance were require to transfer certain real property to GemCap and judgments would be entered against

THIRD AMENDED COMPLAINT - 39

# Exhibit - A
## 5-ER-1106

them in the amount of $12,126,584.61, which included $3,986,368.78 in interest, penalties and costs. The Settlement Agreements were barred by AIA Services' amended articles of incorporation and AIA's bylaws for the same reasons that the Guarantees were barred, and it was a breach of John's fiduciary duties owed to AIA when he executed the Settlement Agreement (which GemCap was fully aware). In addition, the Settlement Agreements illegally provided that AIA would not file for bankruptcy protection and that malpractice claims would be assigned to GemCap. The Settlement Agreements are illegal and/or ultra vires because they violated AIA Services' amended articles of incorporation, AIA's bylaws, numerous Idaho Code sections, and were the product of intentional breaches of John's fiduciary duties owed to AIA.

150.    Under the terms of the Settlement Agreements, GemCap required John and/or certain other Controlling AIA Defendants to continue to improperly and unlawfully operate AIA in the manner that AIA had been operated in the past. The Controlling AIA Defendants have continued to improperly and unlawfully operate AIA since that time by and through their direct or indirect participation, lack of action, acquiescence and covering up of the improper and unlawful operation of AIA, which further resulted in GemCap substantially assisting and acquiescing in the Controlling AIA Defendants' breaches of fiduciary duties, fraud and other malfeasance by and through the continued improper operation of AIA, including, without limitation, allowing the Controlling AIA Defendants to operate AIA without having shareholder meetings, without having proper boards of directors, and in violation of AIA's amended articles of incorporation and bylaws.

151.    Upon information and belief, the Controlling AIA Defendants were aware of the GemCap litigation and Settlement Agreements, but they and GemCap continued to aid and abet John by allowing him to unlawfully enter into the Settlement Agreements and to improperly operate AIA. The Controlling AIA Defendants and GemCap, assisted, acquiesced and assisted in

THIRD AMENDED COMPLAINT - 40

Exhibit - A
5-ER-1107

covering up the transactions.

152.    According to the financial statements for AIA for 2015 (which were belatedly provided to AIA Services' shareholders in August 2016 after many demands),[2] AIA disclosed the Guarantees and Settlement Agreements for the first time to AIA Services' shareholders. However, John inaccurately stated that the "Company admitted no liability, but entered into settlement discussions and reached a confidential settlement agreement in late 2014…".  However, John failed to disclose to AIA Services' shareholders that he had agreed to allow judgments in the amount of $12,126,584.61 to be unlawfully and inappropriately entered against AIA and that any judgment against him would be delayed (i.e., he once again placed his interests above the interests of AIA, even assuming that the Settlement Agreement was legal and authorized).

153.    The real property located at 111 Main Street, Lewiston, Idaho (AIA Services' former headquarters) was ultimately transferred to GemCap and sold. As with the Guarantees and Settlement Agreements, the transfer of AIA Services' former headquarters to GemCap was not disclosed or authorized by AIA Services' shareholders.  According to recently provided 2015 financial statements for AIA (which were provided in August 2016), John disclosed for the first time that the real property located at 111 Main Street, Lewiston, Idaho (AIA Services' headquarters) was purportedly transferred to GemCap as a reduction of amounts allegedly owed to CropUSA, when AIA owed nothing to CropUSA and CropUSA actually owed AIA.  Upon information and belief, AIA Services' headquarters had a replacement value exceeding $7,000,000.

---

[2] Plaintiff is not alleging in this Third Amended Complaint that the applicable financial statements prepared for AIA or CropUSA are accurate. To the contrary, Plaintiff is alleging that certain financial statements were fraudulently prepared and/or approved by the Controlling AIA Defendants.

THIRD AMENDED COMPLAINT - 41

# Exhibit - A
## 5-ER-1108

154.    As a result of the Guarantees and Settlement Agreements, AIA paid sums for CropUSA and other entities, incurred and/or paid substantial attorneys' fees and costs, and/or were damaged. Once again, John placed his interests and the interests of the other Controlling AIA Defendants above the interests of AIA by improperly stipulating to judgments against AIA in excess of $12,000,000, but no judgment was entered against him even though he personally guaranteed the GemCap Loan, too. To the extent that the Guarantees and/or Settlement Agreements are not declared illegal or ultra vires and Plaintiff recovers all damages, the Controlling AIA Defendants are liable for all such damages not recovered and they are separately liable for any other damages caused by the ultra vires acts.

155.    GemCap knew that John had no apparent or actual authority to execute the Guarantees and Settlement Agreements on behalf of AIA, which is further supported by the fact that GemCap's attorneys were specifically advised that the Guarantees and Settlement Agreements were not authorized. GemCap knew that, by making the GemCap Loan, accepting the Guarantees and entering in the Settlement Agreements, it would be aiding and abetting and conspiring with the Controlling AIA Defendants and CropUSA by providing improper funding to the Controlling AIA Defendants and CropUSA and by assisting them in engaging in unauthorized, intra vires, ultra vires and/or illegal conduct.

156.    GemCap knew that the Controlling AIA Defendants breached their fiduciary duties owed to AIA, and/or aiding and abetting others in those breaches, by entering into the Guarantees and Settlement Agreements (and requiring AIA's assets and/or funds to be paid to GemCap or others because of GemCap (including attorneys)) and participating in, and covering up, the Controlling AIA Defendants' breaches of fiduciary duties against AIA. GemCap has aided and abetted one or more of the Controlling AIA Defendants in breaching their fiduciary duties and in

THIRD AMENDED COMPLAINT - 42

the commission of fraud against AIA. GemCap has also aided and abetted the Controlling AIA Defendants by allowing them to maintain control over AIA when GemCap knew that they were not operating AIA in the best interests of AIA, and by concealing and covering up the Controlling AIA Defendants' breaches of fiduciary duties and fraud.

**K.  John Unlawfully Transfers Certain Real Property to AIA and Requires AIA to Pay the Liabilities on the Property and He Alleges that AIA Owes Him $545,563 in Accrued Salary.**

157.  Subsequent to the GemCap Loan and according to AIA Services' purported 2015 financial statements (which were belatedly provided in August 2016 after many demands), John allegedly executed quitclaim deeds purportedly transferring certain real property, held in the name of other entities John controls, to AIA with a purported book value of $820,668, and AIA was improperly required to assume a purported $393,863 in debts on the real property. These real property transfers and assumptions of debts were unauthorized and ultra vires. Upon information and belief, GemCap was involved in these real property transfers and assumption of debts, and GemCap knew that such transfers were aiding and abetting John and other Controlling AIA Defendants in the breach of their fiduciary duties owed to AIA.

158.  Even if authorized, the determination of the $820,668 purported book value of such real property was not authorized and John and the Controlling AIA Defendants had conflicts of interest that prevented any of them from making any determination of value or authorizing the alleged transfers or assumption of debts. AIA's proper Board of Directors did not authorize the transactions nor did AIA Services' shareholders.

159.  According to the same recently provided financial statements for AIA for 2015, John alleges that AIA owes him $545,563 in alleged accrued salary as of December 31, 2015, but AIA owes John nothing and he is not entitled to any compensation because he has been a faithless

THIRD AMENDED COMPLAINT - 43

fiduciary of AIA.  Upon information and belief, at least one of the parcels of real property has already been transferred or lost as a result of foreclosure proceedings for less than the purported book value.  AIA seeks to rescind the real property transfers and assumption of debts.

**L. John Unlawfully Amends AIA Services and AIA Insurance's Bylaws and Issues Himself Series A Preferred Shares in AIA Services.**

160.     According to the recently provided financial statements for AIA for 2015 (which were belatedly provided in 2016 after many demands), sometime in 2016, John purportedly purchased 7,500 Series A Preferred Shares in AIA Services, but those shares were improperly issued and were never authorized by a properly seated and unconflicted Board of Directors of AIA Services, as required. In addition, AIA Services' amended articles of incorporation authorized the Series A Preferred Shares to only be issued to Donna Taylor in connection with the prior restructuring of AIA Services, and not to issue more Series A Preferred Shares to John.

161.     It is unclear why John improperly issued the 7,500 Series A Preferred Shares in AIA Services when those shares were not purchased or issued for any legitimate business purposes, they were never properly authorized by AIA Services' Board of Directors or shareholders, and John had conflicts of interest that prevented him from purchasing or issuing those shares on behalf of the Board of Directors of AIA Services even if the shares were authorized to be issued under AIA Services' amended articles of incorporation (which they were not).

162.     According to the same recently provided financial statements for AIA for 2015 and the letter accompanying those financial statements, John allegedly amended the bylaws of AIA Services and AIA Insurance to provide for an award of attorneys' fees and costs for "intracompany suits" if a "claiming party does not obtain a favorable judgment on the merits of the claim." These purported amendments were never adopted for a legitimate purpose, John had conflicts of interest that prevented him from adopting the provision, and the provisions are unenforceable.

THIRD AMENDED COMPLAINT - 44

163.    According to the same recently provided financial statements for AIA for 2015, the Controlling AIA Defendants have spent over $400,000 litigating against Donna Taylor in an effort to not pay her the just over $400,000 in principal owed on her Series A Preferred Shares. This further demonstrates the breached fiduciary duties and corporate waste occurring at AIA by and through the Controlling AIA Defendants because AIA Services should have simply paid Donna Taylor the $400,000 instead of spending that money to fight her.

**M. There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants**

164.    Since acquiring operational control of AIA Services in 1995, the Controlling AIA Defendants have engaged in repeated acts of faithless self-dealing, transactions detrimental to AIA, committed intentional torts (including fraud and breaches of fiduciary duties), breached their fiduciary duties (including their duties of loyalty), concealed, conspired to commit intentional torts, aided and abetted in the commission of intentional torts and to cover up those torts, to the detriment of AIA in Idaho, including, but not limited to, the following intentional acts:

(a) Controlling AIA's Board of Directors and/or the decisions made by AIA's Board of Directors and intentionally refusing to act in the best interests of AIA;

(b) Violating AIA Services' restated bylaws, including but not limited to, failing to hold annual shareholder meetings, failing to provide notice or obtain proper shareholder approval for certain transactions, failing to comply with conflicts of interest provision in the bylaws and articles of incorporation which restricted many of the unlawful or improper transactions described in this Third Amended Complaint, and failing to properly comply with applicable corporate governance;

(c) Violating AIA's amended articles of incorporation thereby allowing substantial funds and assets to be depleted from AIA and obligating AIA to be liable for loans or guarantees which were barred by those amended articles of incorporation;

THIRD AMENDED COMPLAINT - 45

# Exhibit - A
## 5-ER-1112

(d) Diverting corporate opportunities belonging to AIA, including CropUSA and Pacific Empire Holdings Corp. (a/k/a Sound Insurance);

(e) Unlawfully conveying, encumbering, utilizing, and/or pledging AIA's assets to themselves or other entities;

(f) Inappropriately redeeming, acquiring and/or issuing shares of stock and/or making payments on put options in AIA Services, including but not limited to, issuing shares to the Controlling AIA Defendants;

(g) Inappropriately paying dividends and failing to pay dividends;

(h) Engaging in transactions and actions in direct conflict of interest with their duties owed to AIA and failing to comply with conflict of interest provisions in AIA's bylaws and the law;

(i) Guaranteeing loans for CropUSA and failing to guarantee loans for AIA;

(j) Paying excessive compensation to officers and directors, including but not limited to, paying John $250,000 per year to purportedly act as CEO and President of AIA Services after his contractual entitlement to such salary had expired, when John had conflicts of interest that barred him from determining his pay, and he had represented that he would not take salary in certain year(s);

(k) Wasting AIA's assets and making improper payments, including by paying Connie and Beck $20,000 per year to purportedly serve on the Boards of Directors of AIA and paying John compensation when he was doing nothing for the benefit of AIA;

(l) Divulging and/or utilizing AIA's trade secrets for the benefit of themselves and other entities, including CropUSA (including, without limitation, AIA's agency force and customer lists);

(m) Soliciting and transferring AIA employees to work for CropUSA;

THIRD AMENDED COMPLAINT - 46

# Exhibit - A
## 5-ER-1113

(n) Engaging in acts and/or decisions without making full disclosure and without obtaining the required approval of AIA Services' shareholders resulting in none of the transactions and acts referenced in this Third Amended Complaint (and any that may be at issue at or before trial) being properly ratified by AIA Services, AIA Insurance or their shareholders;

(o) Engaging in millions of dollars of transactions that resulted in AIA conveying benefits without the receipt of any consideration, without being repaid and/or without being paid any mark-up or profit;

(p) Forming and operating entities in direct competition with AIA in the insurance marketplace, including without limitation, CropUSA and Pacific Empire Holdings Corp.;

(q) Making false representations, concealing facts, and omitting material facts from AIA, including, without limitation, regarding share values, items in AIA's financial statements (including notes), assets and debts in AIA's financial statements, the true value of funds and assets (including employees and trade secrets) utilized for other entities (including CropUSA), and that AIA was being operated for the benefit of the corporation;

(r) Concealing and failing to disclose material facts to AIA pertaining to loans, transfers, and utilization of assets, including without limitation, concealing or omitting material facts, including all of the necessary facts related to virtually each and every transaction described in this Third Amended Complaint;

(s) Making false representations to AIA, including without limitation, making and certifying false and misleading financial statements to AIA and representing that AIA was being properly operated when it was instead being used to fund the lifestyle, payments and other businesses owned or partially owned by the Controlling AIA Defendants;

THIRD AMENDED COMPLAINT - 47

Exhibit - A
5-ER-1114

(t) Inappropriately loaning AIA's funds, or guaranteeing loans, to themselves and to other entities under their control in violation of AIA's amended articles of incorporation, bylaws and fiduciary duties;

(u) Paying tens of thousands of dollars in yearly fees to purportedly serve on the Board of Directors of AIA and other compensation and benefits, when such amounts were excessive and they were violating their fiduciary duties owed to AIA and they were all acting as faithless fiduciaries;

(v) Paying attorneys' fees and costs in various legal proceedings on behalf of the Controlling AIA Defendants and others when it was clear that they had intentionally failed to act in good faith, were not entitled to indemnification or to have attorneys' fees and costs advanced on their behalf, and by failing to obtain security for repayment of said funds;

(x) Acquiring a parking lot with AIA funds and charging AIA, and making AIA pay excessive rent for use of the parking lot (John increased the rent to $15,000 per year) even though AIA did not actually use the parking lot. Later, upon information and belief, the parking lot was transferred to Jordan Taylor, John and Connie's son (who is also a lawyer), for no consideration so he could sell it for $50,000;

(y) Failing to seat the full and required Board of Directors for AIA Services and thus there was never a required quorum for AIA Services' Board to take any action and further resulting in all purported actions being unauthorized, including, without limitation, by failing to honor Donna Taylor's appointment of Patrick Moran and Paul Durant to AIA Services' Board of Directors;

(z) Improperly purchasing and transferring shares held by AIA or which should have been held by AIA to themselves, including without limitation shares in Pacific Empire Radio Corp., Pacific Empire Communications Corp., and Pacific Empire Holdings Corp. (this entity was formed

THIRD AMENDED COMPLAINT - 48

# Exhibit - A
## 5-ER-1115

with AIA's assets by John, improperly competed against AIA, and was later sold for $240,000);

(aa) Allowing John to profit from CropUSA's sale of assets to Hudson Insurance by improperly allowing him to retain a monthly fee of $10,000 per month when those funds should have gone to AIA;

(bb) Failing to take appropriate legal action in the interests of AIA, including by failing to bar John from being an officer and director of AIA and failing to claw back CropUSA as a subsidiary of AIA and properly operate CropUSA (which would have resulted in CropUSA being worth millions of dollars);

(cc) Removing tenants from an AIA owned building to another building owned personally by John and/or other Controlling AIA Defendants;

(dd) Improperly subsidizing CropUSA and other entities with AIA's funds, labor and assets, failing to properly allocate expenses to CropUSA and failing to have other expenses paid back at all (which have already been identified as being approximately $500,000 as of 2008 after Plaintiff's expert was able to identify certain transactions that were actually accounted for);

(ee) Selling and/or transferring assets and or/contracts belonging to AIA to others (including the contract with Growers National);

(ff) Improperly paying numerous law firms other than the Hawley Troxell Defendants hundreds of thousands of dollars representing AIA and the Controlling AIA Defendants in litigation caused by their own intentional acts and torts and when the Controlling AIA Defendants had not acted in good faith or complied with their duties of loyalty to AIA;

(gg) Paying more of AIA's funds to litigate disputes (including with Donna Taylor in the Idaho state courts) than it would have taken to simply pay the money owed;

THIRD AMENDED COMPLAINT - 49

# Exhibit - A
## 5-ER-1116

(hh) Failing to obtain security, failing to charge interest, and failing to collect on loans of at least $307,000 made to John;

(ii) Removing the $400,000 held in the court registry and the over $200,000 in a bank account in *Taylor v. AIA Services*, and allowing the Controlling AIA Defendants to utilize those funds when the Hawley Troxell Defendants should have ensured that those funds were kept from them;

(jj) Expending significant sums on the illegal repurchase of common shares in AIA Services, which also resulted in increasing the ownership interest of the Controlling AIA Defendants;

(kk) Allowing AIA to engage in the transactions identified in this Third Amended Complaint when no dividends had been declared or paid on the Series C Preferred Shares held in the AIA Services 401(k) Plan and those shares now have accrued dividends owed of over $1,000,000;

(ll) Wasting AIA's funds and assets (and CropUSA's) on needlessly rented office space, unneeded employees and other wasted expenditures;

(mm) Allowing Connie to represent CropUSA in litigation involving Growers National in conflict with her duties of loyalty as a director of AIA, which such litigation resulted in approximately $500,000 being transferred to CropUSA for Growers National, even though AIA created Growers National (she separately aided and abetted in CropUSA's receipt of these funds);

(nn) Allowing John to make decisions for the management and operation of AIA when he had conflicts of interest and a long-standing track record of diverting money, labor, credit, trade secrets and other assets to CropUSA and other entities that he partially or wholly owned;

THIRD AMENDED COMPLAINT - 50

# Exhibit - A
## 5-ER-1117

(oo) Engaging in numerous illegal, ultra vires, and intra vires acts and transactions for, or in the name of, AIA, including, without limitation, entering into the Guarantees for the $10,000,000 GemCap Loan, and later transferring property worth over $1,000,000 to GemCap;

(pp) Engaging in countless improper transactions in Idaho for the benefit of themselves, CropUSA and/or other entities partially or wholly owned by the Controlling AIA Defendants (including the other transactions and allegations set forth in this Third Amended Complaint);

(qq) Organized, operated, controlled, and conducted CropUSA as their instrumentality, agency and/or conduit to the detriment of AIA, and they have further operated CropUSA improperly without complying with proper corporate governance procedures and as a means to defraud AIA.

The Controlling AIA Defendants, CropUSA, GemCap and/or the Hawley Troxell Defendants have assisted one another and others in committing the intentional acts and torts against AIA described in this paragraph and concealing, or covering up, the facts and the intentional torts committed against AIA, including those specifically referenced in this paragraph and elsewhere in this Third Amended Complaint. The Hawley Troxell Defendants continued to conceal facts from AIA and to aid and abet the Controlling AIA Defendants and CropUSA even after any representation may have terminated when they owed the duty to AIA to not do so.

165.    At all relevant times, John was CEO, President and director of AIA Services, AIA Insurance and CropUSA and a shareholder of AIA Services at the time of all of the improper transactions with CropUSA and other improper acts identified in this Third Amended Complaint (which were also conflicts of interest), and he improperly benefited from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

THIRD AMENDED COMPLAINT - 51

# Exhibit - A
## 5-ER-1118

In 2016, John became the sole purported director, secretary and president of AIA Services, AIA Insurance and CropUSA Insurance Agency, Inc.

166.    At all relevant times, John also owned interests in other entities who improperly benefitted directly or indirectly from AIA and CropUSA (including Green Leaf Alliance, Green Leaf Re, Reinsurance Partners and Pacific Empire Radio Corp.), which were additional conflicts of interest and proof of self-dealing. The Controlling AIA Defendants were aware of these facts.

167.    During certain relevant times, the Controlling AIA Defendants were all purported shareholders of CropUSA and either majority shareholders (as a group) or officers of AIA Services at the time of the improper transactions and malfeasance identified in this Third Amended Complaint (which were also conflicts of interest), and they improperly benefited, directly or indirectly, from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

168.    As a result of the acts and omissions set forth and/or contemplated above and other acts and/or omissions which will be established at or before trial, the Controlling AIA Defendants, CropUSA, GemCap and the Hawley Troxell Defendants have committed numerous torts against AIA in Idaho thereby proximately causing AIA to incur millions of dollars in damages. Indeed, had the Hawley Troxell Defendants simply sought on behalf of AIA to immediately bar John from serving as a director and officer of AIA Services and ensured that AIA was properly operated and its assets and CropUSA properly marshalled, the GemCap Guarantees and Settlement Agreement would never had occurred and AIA would not have been damaged by millions of dollars.

169.    Because discovery has not yet commenced, Plaintiff expects to obtain additional evidence in discovery and to conduct further investigation, which will further support the causes

THIRD AMENDED COMPLAINT - 52

## Exhibit - A
### 5-ER-1119

of action and relief requested below.

170.    Due to the fact that the Controlling AIA Defendants have had complete control over AIA during all relevant times and have never asserted, nor would they ever assert, claims against themselves or others on behalf of AIA, the adverse dominion doctrine bars the assertion of statute of limitations defenses to all claims and relief requested in this Third Amended Complaint. *Freeland v. Enosis Corp.,* 540 F.3d 721 (7th Cir. 2008).

## V.    CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 AND FEDERAL RULE OF CIVIL PROCEDURE 23.1

171.    As a prerequisite to filing this lawsuit under Idaho Code §§ 30-1-742, 30-29-742, and Federal Rule of Civil Procedure 23.1, Plaintiff has been a common shareholder of AIA Services during all relevant times to the transactions at issue and the claims asserted in this Third Amended Complaint.

172.    On July 21, 2008, Donna Taylor, another shareholder of AIA Services, served a written derivative demand letter on the Boards of Directors of AIA Services and AIA Insurance. (Dkt. 23-9 and 67-19.)  In accordance with the then-applicable I.C. § 30-1-742, the Plaintiff was not required to make another demand under I.C. § 30-1-742 because that statute does not require every shareholder filing suit to serve a separate demand, as confirmed by the comment: "It should be noted that the shareholder bringing suit does not necessarily have to be the person making the demand. Only one demand need be made in order for the corporation to consider whether to take corrective action."

173.    On July 23, 2008, the Hawley Troxell Defendants filed a Motion for Stay of Proceedings in *Taylor v. AIA Services* and asserted that the stay was necessary so that AIA Services and AIA Insurance could conduct an inquiry into the demands made by Donna Taylor in her letter dated July 21, 2008 (Donna Taylor was not a party to that lawsuit, however).

THIRD AMENDED COMPLAINT - 53

# Exhibit - A
## 5-ER-1120

174. On August 14, 2008, in *Taylor v. AIA Services*, the Hawley Troxell Defendants filed a purported petition for a court appointed independent inquiry on behalf of AIA when they had no intention of following through with the inquiry. (*See* Dkt. 67-20.)

175. On September 4, 2008, Reed Taylor supported the appointment of independent investigators. However, Reed Taylor objected to the investigators proposed by the Hawley Troxell Defendants, who were purportedly representing AIA, and the Controlling AIA Defendants. (*See* Dkt. 67-21.) Reed Taylor believed totally independent people should be appointed.

176. Although the parties had filed briefing with respect to the appointment of independent investigators in *Taylor v. AIA Services*, the Hawley Troxell Defendants never noted the motion for a hearing and the court never ruled on the request, and they intentionally abandoned the appointment of an independent inquiry. The Hawley Troxell Defendants and Controlling AIA Defendants have never conducted a further investigation of the demands made in Donna Taylor's derivative demand letter of July 21, 2008. No action was ever taken by AIA or AIA's Boards of Directors.

177. On April 3, 2012, Plaintiff, along with other shareholders, made another written demand on the Boards of Directors of AIA Services and AIA Insurance, which included demands to keep the $400,000 cash held in the Court registry in *Taylor v. AIA Services* to comply with AIA's amended articles of incorporation, to comply with AIA's bylaws, provide full disclosure, and to protect certain other assets. (Dkt. 67-33.) This particular demand was copied directly to Babbitt and Ashby, so they had full knowledge of it. This demand, like all the others, was ignored. (*See* Dkt. 67, p. 11 ¶ 29.)

178. On July 16, 2012, while the instant case was stayed, the Plaintiff, along with over ten other shareholders of AIA Services, served additional written derivative demands upon the

THIRD AMENDED COMPLAINT - 54

Boards of Directors of AIA Services and AIA Insurance. (Dkt. 67-42.) The demands requested, among other things, that AIA pursue this lawsuit with all claims as of July 16, 2012 and future claims, including punitive damages, which also provided AIA and the Board of Directors yet another opportunity to address the demands previously made by Donna Taylor in 2008 (although Plaintiff was under no obligation to do so).

179.    On June 13, 2016, in accordance with I.C. § 30-29-742, Plaintiff, along with other shareholders of AIA Services, served yet another detailed derivative demand upon the Boards of Directors of AIA Services and AIA Insurance. (*See* Dkt. 148-2.) Plaintiff demanded, *inter alia*, that additional claims be asserted against the previously named defendants (including for more recent torts and damages) and to assert claims against GemCap and CropUSA Insurance Services. AIA failed to respond to this demand within ninety days.

180.    On August 23, 2016, in accordance with I.C. § 30-29-742, Plaintiff, along with other shareholders of AIA Services, served a substantially similar demand previously provided (Dkt. 148-2) in which Plaintiff demanded further action be taken, including, without limitation, to seek, *inter alia*, further claims and damages since the last derivative demand, to seek damages against GemCap for selling AIA's property, to void the improperly and allegedly amended bylaws of AIA Services and AIA Insurance, and to rescind the Series A Preferred Shares that John improperly issued to himself. The August 23, 2016 demand was made by Plaintiff as a shareholder and as a creditor of AIA Services. AIA's purported Board of Directors, through John, responded to this demand in writing, rejected the demand, belatedly rejected the prior June 13, 2016 demand (after ninety days had already expired), and refused to have AIA pursue the claims.

181.    In addition, Plaintiff has made additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance, but no action has ever been taken by the

THIRD AMENDED COMPLAINT - 55

# Exhibit - A
## 5-ER-1122

purported Boards of Directors.

182.    Over ninety days have elapsed since the written derivative demands set forth above were made to AIA and its Boards of Directors, and no action has been taken by AIA whatsoever, and all of Plaintiff's claims and requested relief asserted in this lawsuit flow from those derivative demands.  AIA and its purported Boards of Directors never asked for any additional information or specificity regarding the derivative demands.

183.    As the second largest common shareholder of AIA Services (who traded a book of insurance business worth approximately $500,000 to AIA Services in exchange for his common shares), the Plaintiff fairly represents the interest of AIA and their shareholders (including the preferred shareholders, 401(k) Plan shareholders, and former ESOP shareholders) and lawful creditors (to the extent that AIA Services is deemed to be insolvent). Plaintiff has never received a return on his investment in AIA Services. Plaintiff is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist, but instead to only pursue *bona fide* claims on behalf of, for the benefit of, AIA and their innocent shareholders.

184.    Plaintiff is pursuing this derivative action to make AIA whole and recover the millions of dollars in damages inflicted upon it by the defendants. Upon obtaining judgment, the funds will allow AIA to continue to operate as a going concern or, alternatively, to be dissolved with the funds used to pay lawful creditors and the remaining funds to be distributed to the Series A Preferred Shareholders, the Series C Preferred Shareholders and then to the common shareholders.

## VI.    COUNT I—BREACH OF FIDUCIARY DUTIES
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

185.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause

THIRD AMENDED COMPLAINT - 56

Exhibit - A
5-ER-1123

of action.

186.    As members, or purported members, of the Board of Directors for AIA Services and/or AIA Insurance, the Controlling AIA Defendants, who have each served as a director of AIA Services during certain relevant times, owed fiduciary duties to AIA, including, without limitation, duties of good faith and to act in the best interests of AIA. Beck, Cashman and John continued to also serve on the board of directors of AIA Services through a so-called "advisory board," which controlled AIA and CropUSA. As corporate officers of AIA, John, as President and CEO, and Duclos, as Secretary, owed fiduciary duties to AIA, which were further elevated during the times in which they both served as directors of AIA, too (which is from 1995 to the present time for John).  During certain relevant times, Beck, Cashman, John and Connie owed fiduciary duties to AIA because they were the majority shareholders of AIA Services, including, without limitation, to use their majority control of AIA in a fair, just and equitable manner. The Controlling AIA Defendants had conflicts of interest by and through their positions as officers, directors and/or shareholders of AIA Services and CropUSA.

187.    As attorneys for AIA, the Hawley Troxell Defendants owed fiduciary duties to AIA (including the undivided duty of loyalty). If not authorized to act as attorneys for AIA, the Hawley Troxell Defendants acted with apparent authority as agents and owed fiduciary duties as a result of that agency relationship. The Hawley Troxell Defendants had conflicts of interest when they undertook to represent AIA and CropUSA, and when they improperly proceeded in the manner directed by any one or more of the Controlling AIA Defendants, thereby improperly representing the interests of the Controlling AIA Defendants, instead of the best interests of AIA. The Hawley Troxell Defendants were never retained to represent AIA and CropUSA by disinterested and unconflicted officers and directors of AIA. The Hawley Troxell Defendants placed their self-

THIRD AMENDED COMPLAINT - 57

interests in earning in excess of $1,000,000 in fees in various lawsuits ahead of, and in direct conflict with, AIA's interests in having undivided and unconflicted representation. The Hawley Troxell Defendants knew that they were improperly retained to purportedly represent CropUSA and AIA when AIA's litigation decisions were being made by, and AIA improperly operated by, disinterested and unconflicted officers and directors who were also placing their self-interests ahead of AIA's interests, as more full discussed throughout this Third Amended Complaint.

188.    Based on any and/or all of the acts and/or omissions set forth in this Third Amended Complaint and/or those facts proven at or before the time of trial (including conflicts of interest that prevent the Controlling AIA Defendants to use the business judgment rule as a defense), the Controlling AIA Defendants and the Hawley Troxell Defendants breached their fiduciary duties owed to AIA, including, without limitation, breaching their undivided duties of loyalty, care, good faith, trust and confidence owed to AIA and/or engaging in collusive acts and behavior against AIA. In addition, Beck, Cashman, John and Connie have further breached their fiduciary duties owed to AIA as to the controlling majority shareholders of AIA Services by and through, *inter alia*, using their control of AIA in an unjust, unfair and inequitable manner to benefit themselves and other entities that they partially own or control to the detriment of AIA and Plaintiff.

189.    The Hawley Troxell Defendants have separately breached their fiduciary duties as matter of law by violating the Rules of Professional Conduct, including, without limitation, when they: (a) simultaneously represented AIA and CropUSA; (b) failed to proceed in the best interests of AIA; (c) failed to obtain information consent from authorized, unconflicted and disinterred constituents of AIA; (d) placed their interests in earning over $1,000,000 in attorneys' fees over the interests of AIA; (e) prepared and/or entered into Agreements and/or Amended Agreements involving AIA, CropUSA and/or the Controlling AIA Defendants that were not in the best interest

THIRD AMENDED COMPLAINT - 58

of AIA and without requiring AIA to obtain independent counsel; and (f) assisting the Controlling AIA Defendants in the commission and/or covering up of fraud (including by failing to require full disclosure to AIA and AIA Services' shareholders). In addition, Riley was previously aware that CropUSA was derived from AIA (the other Hawley Troxell Defendants became aware in *Taylor v. AIA Services*) and they were further aware of the restrictions in AIA Services' amended articles of incorporation and bylaws when Riley had been aware of them, and assisted in preparing them. The Hawley Troxell Defendants have further breached their fiduciary duties as a matter of law for the violations of the Rules of Professional Conduct dealing with loyalty to a client and conflicts of interest, which separately requires disgorgement of all compensation (the over $1,000,000 in attorneys' fees and costs paid to it by and/or on behalf of AIA).

190.    As a direct and/or proximate cause of the Controlling AIA Defendants' and the Hawley Troxell Defendants' breaches of their fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

191.    In addition, each of the Controlling AIA Defendants and the Hawley Troxell Defendants is a "faithless fiduciary" as defined by law and is therefore required to disgorge all compensation and consideration received from AIA and/or CropUSA, irrespective of if they prove that they acted in AIA's interests as to any other issues. The disgorgements sought are in addition to liability caused by the breaches of fiduciary duty. In the case of the Hawley Troxell Defendants, the disgorgement includes all fees and costs received for or paid on behalf of AIA and/or CropUSA. In the case of the faithless Controlling AIA Defendants, the disgorgement includes all salary, bonuses, benefits, warrants, stock options, or stock received from AIA.

///

///

THIRD AMENDED COMPLAINT - 59

# Exhibit - A
## 5-ER-1126

## VII.   COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES
**(Against the Controlling AIA Defendants, the Hawley Troxell Defendants, CropUSA, and GemCap)**

192.   Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

193.   During certain relevant times, the Hawley Troxell Defendants, the Controlling AIA Defendants, CropUSA and/or GemCap: (a) had knowledge of the other defendants' acts and/or omissions constituting the breaches of fiduciary duties owed to AIA (including duties of loyalty, good faith and proceeding in the best interests of AIA) as further described in this Third Amended Complaint and/or proven at the time of trial; (b) knew that such acts and/or omissions by other defendants constituted breaches of fiduciary duties owed to AIA; (c) substantially participated in such breaches of fiduciary duties owed to AIA; (d) did not disapprove or seek ratification or disclosure of such breaches of fiduciary duties owed to AIA; (e) took no steps to prevent such breaches of fiduciary duties owed to AIA; and/or (f) assisted in the concealment, and covering up, of such breaches of fiduciary duties owed to AIA.

194.   As a direct and/or proximate cause of the Hawley Troxell Defendants, the Controlling AIA Defendants, CropUSA and GemCap's aiding and abetting of one another and/or others in the breaches of fiduciary duties owed by other defendants to AIA, AIA has been damaged in the amount to be proven at or before trial. As aiders and abettors, the defendants are jointly and severally liable for the underlying tort committed by one or more defendants.

## VIII.   COUNT III—LEGAL MALPRACTICE
**(Against the Hawley Troxell Defendants)**

195.   Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause

THIRD AMENDED COMPLAINT - 60

of action.

196.    The Hawley Troxell Defendants owed duties to AIA, including, without limitation, duties of care, good faith and loyalty.

197.    The Hawley Troxell Defendants have breached their duties of care, good faith and loyalty owed to AIA, including, without limitation, the breached duties attributable to the acts and omissions described in this Third Amended Complaint. The Hawley Troxell Defendants have further breached their duties of good faith, care and loyalty owed to AIA by improperly simultaneously representing AIA and CropUSA, together with directly and/or indirectly improperly representing the interests of the Controlling AIA Defendants.

198.    AIA suffered damages as a direct, foreseeable and/or proximate result of the breaches of duty and the acts of the Hawley Troxell Defendants, including, without limitation, those acts described in this Third Amended Complaint and/or proven at the time of trial (including damages and the lost profits associated with CropUSA). At a minimum, the Hawley Troxell Defendants were also a substantial factor in the harm and damages inflicted upon AIA, including, without limitation, inflicting millions of dollars of damages against AIA by the Controlling AIA Defendants and the failure of CropUSA to be a profitable and valuable subsidiary of AIA today. Had the Hawley Troxell Defendants properly discharged their duties, the Controlling AIA Defendants would never have significantly damaged AIA, and it and CropUSA would be profitable today (and CropUSA a valuable subsidiary of AIA). In addition and/or alternative, millions of dollars of AIA's funds, assets, trade secrets, labor and other valuable consideration would have been recovered and/or not unlawfully transferred and/or utilized by CropUSA, the Controlling AIA Defendants and/or other entities that they own.

THIRD AMENDED COMPLAINT - 61

# Exhibit - A
## 5-ER-1128

199.     As a direct and/or proximate cause of such acts and/or omissions, the Hawley Troxell Defendants are liable to AIA for damages in the amount to be proven at or before the time of trial.

### IX.     COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ CONSTRUCTIVE FRAUD
#### (Against the Controlling AIA Defendants, CropUSA and GemCap)

200.     Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

201.     The acts, omissions, decisions, contracts, transactions, allocations, investments, and/or other business dealings of the Controlling AIA Defendants that were purportedly entered into on behalf of AIA were not disclosed or approved by fully seated and disinterested Boards of Directors of AIA and, therefore, AIA had no knowledge of any such acts, omissions, decisions, contracts, transactions, allocations, investments, and/or malfeasance.

202.     The Controlling AIA Defendants are liable to AIA for fraud because: **(a)** they made representations of material fact to AIA and AIA Services' innocent minority shareholders as asserted throughout this Third Amended Complaint, including but not limited to: (i) representations that CropUSA was being operated for the benefit of AIA, (ii) representations that AIA was being properly operated (including that the Boards of Directors had properly authorized certain transactions when Donna Taylor's designee was not on the Board of AIA Services and the provisions in the amended articles of incorporation and bylaws had not been complied with), (iii) representations that the information on AIA's financial statements was true (John separately certified to auditors and others that the information contained on certain of AIA's financial

THIRD AMENDED COMPLAINT - 62

statements was true and correct), (iv) representations that expenses, compensation, and/or loans between AIA and other entities or parties were properly entered into and accounted for (i.e., there are hundreds of thousands of dollars, if not millions of dollars, in funds and other assets used by CropUSA which were derived from AIA and never accounted for), (v) representations that they had the authority to act on behalf of AIA when they did not (including failing to disclose conflicts of interest that prevented them from acting on behalf of AIA); and (vi) other representations referenced in this Third Amended Complaint and/or proven at or before trial since discovery has not begun; **(b)** such representations were false; **(c)** such representations were material and AIA would never have entered into or approved any of the acts, conduct or transactions if AIA had been provided with full disclosure and the true representations); **(d)** they knew such representations were false; **(e)** they intended that there be reliance by AIA on such representations; **(f)** AIA was ignorant of the falsity of such representations; **(g)** AIA relied on such representations; **(h)** AIA's reliance was justified; and **(i)** injury resulted to AIA.

203. Constructive fraud is identical to fraud, except that the Plaintiff need not prove the Controlling AIA Defendants' knowledge of the fraud and their intent that AIA rely on the representations.

204. The Controlling AIA Defendants owed duties to AIA during certain relevant times as majority shareholders, board members and/or officers of AIA. In addition to making false representations, the Controlling AIA Defendants also concealed information from AIA and its innocent minority shareholders with knowledge that the concealed information was material and that the concealment would cause AIA to suffer otherwise avoidable damages, including without limitation, information contained in this Third Amended Complaint. The Controlling AIA Defendants' failure to disclose a fact to AIA and AIA Services' innocent minority shareholders

THIRD AMENDED COMPLAINT - 63

Exhibit - A
5-ER-1130

where one has a duty to disclose is the legal equivalent of representing the non-existence of the fact. Where facts are fraudulently concealed, Plaintiff need not show reliance as there is nothing other than silence upon which to rely.

205.    The Controlling AIA Defendants represented to AIA Services that CropUSA was a wholly-owned subsidiary of AIA Services. Simultaneously, the Controlling AIA Defendants adopted the position, not disclosed to AIA or its innocent minority shareholders, that CropUSA was an independent entity with John as its alleged sole shareholder and subsequently failed to disclose that CropUSA was not a separate entity. These representations were false, the Controlling AIA Defendants knew of their falsity, the Controlling AIA Defendants intended that there be reliance, there was justifiable reliance by AIA and AIA Services' innocent minority shareholders, and AIA was damaged as a result.

206.    By operating CropUSA as an independent entity, and by using CropUSA as a vehicle for misappropriating and converting corporate assets, the Controlling AIA Defendants committed ongoing fraud that has persisted through the date of this Third Amended Complaint.

207.    The Controlling AIA Defendants also made misrepresentations to AIA and AIA Services' innocent minority shareholders in the form of false, misleading and fraudulent financial statements (which such financial statements also failed to disclose numerous improper and unlawful transactions and their ownership interests in CropUSA and other entities), upon which AIA and AIA Services' innocent minority shareholders reasonably relied, with that reliance being the proximate cause of AIA's damages.

208.    When the Controlling AIA Defendants transferred more than $1.5 million to CropUSA in 2004, they concealed the fact of this transaction from AIA and AIA Services' innocent minority shareholders and AIA was damaged by this concealment.

THIRD AMENDED COMPLAINT - 64

# Exhibit - A
## 5-ER-1131

209.     When the Controlling AIA Defendants transferred AIA corporate assets, including funds, employees, goodwill and trade secrets to CropUSA and other entities and were subsidizing CropUSA and other entities, they concealed these facts from AIA and AIA Services' innocent minority shareholders. AIA suffered damages by these concealments.

210.     When the Controlling AIA Defendants had AIA pay certain of CropUSA's corporate expenses and unfairly used AIA's employees, trade secrets and facilities for CropUSA, they concealed these facts from AIA.  AIA suffered damages as a result of these concealments.

211.     When the Controlling AIA Defendants pledged the mortgage obtained by AIA from the state of Idaho to CropUSA so that CropUSA could borrow money to pay the attorney's fees of the Hawley Troxell Defendants to facilitate covering up the AIA Defendants' fraud, they concealed these facts from AIA.  AIA suffered damages as a result of these concealments.

212.     When the Controlling AIA Defendants had AIA Insurance guarantee CropUSA's $15 million line of credit and later sold over $10,000,000 in assets derived from AIA to Hudson Insurance, they concealed the fact of this guarantee and asset sale from AIA.

213.     When the Controlling AIA Defendants finally disclosed their ownership interests in CropUSA, CropUSA Insurance Services, LLC and other entities in AIA Services' financial statements in July 2012[3] (*See* Dkt. 67-38), they continued to conceal how they obtained their ownership interest in those entities (and in the case of CropUSA that the ownership interest came from AIA) and many transactions and purported loans between the entities and AIA (loans and guarantees made by AIA which were prohibited by AIA Services' amended articles of incorporation and restated bylaws).

---

[3] While the financial statements were dated as of year-end 2011, they were not provided to AIA or its shareholders until July 2012 in connection with the failed ill-conceived reverse stock split.

THIRD AMENDED COMPLAINT - 65

# Exhibit - A
## 5-ER-1132

214. The Controlling AIA Defendants, CropUSA and GemCap concealed from AIA that they had AIA unlawfully and improperly enter into the Guarantees, Settlement Agreements and related agreements and instruments, together with unlawfully transferring property and making payments under those unlawful agreements and instruments.

215. As a direct and/or proximate cause of the Controlling AIA Defendants' fraudulent acts, AIA has been damaged in an amount to be proven at or before trial, and the ongoing fraud bars the Controlling AIA Defendants from asserting statute of limitations defenses. To the extent that the Hawley Troxell Defendants seek to assert the statute of limitations as a defense, they too are barred from doing so through their fraudulent concealment of facts from AIA.

## X.    COUNT V—AIDING AND ABETTING AND CONSIPIRACY OF FRAUD
**(Against the Controlling AIA Defendants, CropUSA, GemCap and the Hawley Troxell Defendants)**

216. Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

217. During certain relevant times, the Hawley Troxell Defendants, the Controlling AIA Defendants, CropUSA and/or GemCap: (a) had knowledge of the other defendants' acts and/or omissions constituting fraud upon AIA (including fraudulent concealment) as further described in this Third Amended Complaint and/or proven at the time of trial; (b) knew that such acts and/or omissions by other defendants constituted fraud upon AIA; (c) substantially participated in such fraud upon AIA; (d) did not disapprove or seek ratification or disclosure of such fraud upon AIA; (e) took no steps to prevent such fraud upon AIA; and/or (f) assisted in the concealment, and covering up, of such fraud upon AIA.

218. In addition, through various agreements and actions, the Controlling AIA Defendants, CropUSA and/or GemCap: (a) conspired to defraud AIA and were members of the

THIRD AMENDED COMPLAINT - 66

# Exhibit - A
## 5-ER-1133

conspiracy at relevant times; (b) provided a substantial act and/or a substantial effect in furtherance of the conspiracy against AIA in Idaho; (c) are attributable to the acts of one another; and (d) engaged in a pattern of behavior and/or agreements to accomplish unlawful objectives and/or to accomplish a lawful objectives in an unlawful manner.

219.   As a direct and/or proximate cause of the Hawley Troxell Defendants, the Controlling AIA Defendants, CropUSA and/or GemCap's aiding and abetting of one another and/or others in the commission of fraud upon AIA, AIA has been damaged in the amount to be proven at or before trial.

## XI.   COUNT VI—BREACH OF CONTRACT
### (Against the Controlling AIA Defendants)

220.   Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

221.   On August 1, 1995, John and AIA Services entered into an Executive Officer's Agreement. (*See* Dkt. 67-8.) The Executive Officer's Agreement contains contractual provisions preventing John from doing certain acts. For example, Section 9 of the Executive Officer's Agreement sets forth express covenants not to compete. Subsection A of the covenants prohibits John from soliciting AIA customers or otherwise diverting the business of AIA customers. Subsection B prohibits John from participating in any insurance business that underwrites, markets or administers insurance products for commodity associations. Subsection C prohibits John from soliciting AIA Services employees for other employment.  Subsection D of the covenants bars John from divulging or exploiting trade secrets belonging to AIA.

222.   John has breached his contractual obligations owed to AIA, including, without limitation, by forming CropUSA as anything other than a wholly-owned subsidiary of AIA,

THIRD AMENDED COMPLAINT - 67

# Exhibit - A
## 5-ER-1134

competing against AIA with CropUSA and other entities (including Pacific Empire Holdings and CropUSA Insurance Services, LLC). John has breached all four subsections of Section 9 of the Executive Officer's Agreement.

223.    As a direct and/or proximate cause of John's breaches of the Executive Officer's Agreement, AIA has been damaged in an amount to be proven at or before trial. Such breaches also constitute the breaches of his fiduciary duties owed to AIA.

224.    Upon information and belief, certain and/or all of the Controlling AIA Defendants entered into agreements with AIA regarding the payment of certain of their attorneys' fees and costs in litigation, which such agreements were never properly presented to or approved by disinterested shareholders. Upon information and belief, such agreements required the Controlling AIA Defendants to pay back the funds advanced for their defense if it was determined that they did not act in good faith or in accordance with other required standards.  Certain and/or all of the Controlling AIA Defendants breached their contracts when they failed to discharge their duties in good faith and failed to comply with all applicable standards. As a direct and/or proximate cause of such breaches, AIA has been damaged and is entitled to be paid back for all attorneys' fees and costs advanced or paid, directly or indirectly, by AIA, plus prejudgment interest.

### XII.    COUNT VII—DECLARATORY JUDGMENT
**(Against the Controlling AIA Defendants, the Hawley Troxell Defendants, CropUSA and GemCap)**

225.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

226.    Plaintiff seeks a declaratory judgment against Controlling AIA Defendants, Hawley Troxell Defendants, CropUSA, and GemCap, including, without limitation, for the following relief: (a) for a full accounting with supporting documentation of all of AIA's funds, assets, loans

THIRD AMENDED COMPLAINT - 68

# Exhibit - A
## 5-ER-1135

and other transactions from 1999 through the present time; (b) requiring the Controlling AIA Defendants to comply with AIA's amended articles of incorporation, bylaws and the Idaho Business Corporation Act; (c) rescinding the purchases of the shares held by the ESOP and/or ensuring that those shareholders receive fair value for their shares; (d) rescinding and/or declaring void the common shares issued to John through his Executive Officer's Agreement; (e) voiding any purported common interest or joint defense agreements, jurisdiction consent agreements and any other improper agreement pertaining to AIA Services and/or AIA Insurance; (f) declaring illegal, at a minimum as to AIA Services and AIA Insurance, the Guarantees and Settlement Agreements entered into in favor of GemCap; (g) declaring as illegal and/or setting aside any agreements between AIA Services and/or AIA Insurance and CropUSA; (h) setting aside, rescinding and/or voiding any transfers of real property or other purported asset to AIA from John (John executed quitclaim deeds to AIA for certain properties held in the names of others, did not properly value the properties, and required AIA to assume the liabilities for those properties without proper board or shareholder approval); (i) settling aside, voiding or rescinding recent purported amendments to AIA Services and AIA Insurance's bylaws, which were adopted without shareholder approval and for improper purposes (including because John had conflicts of interest); (j) setting aside, voiding and/or rescinding the 7,500 Series A Preferred Shares purportedly issued to John, including, because a proper board never authorized the issuance of those shares, the shares were not issued for legitimate purposes, and the articles of incorporation were not amended to authorize the issuance of any Series A Preferred Shares to anyone other than Donna Taylor; (k) setting aside, rescinding and/or voiding any contracts, agreements, guarantees, financing statements and/or other instruments that were illegal, intra vires, ultra vires (including transfers of real or personal property); (l) setting aside, voiding and/or rescinding the 475,000 common shares

THIRD AMENDED COMPLAINT - 69

# Exhibit - A
## 5-ER-1136

purportedly issued to John and/or Connie under John's Executive Officer's Agreement (which he breached countless times) and because he is a faithless fiduciary and is not entitled to any compensation; (m) rescinding the common shares issued originally to Beck, Cashman and the other Series C Preferred Shareholders, which were later transferred to John; (n) for a determination that the Controlling AIA Defendants did not act in good faith and were not entitled to have any attorneys' fees or costs paid or advanced for them by AIA; and (o) such other declaratory relief as may be requested at or before trial (including any declaratory relief related to any other acts and/or omissions described in this Third Amended Complaint or as may be contemplated by any cause of action).

227.   Plaintiff seeks a declaratory judgment against the Hawley Troxell Defendants, including, without limitation, for the following relief: (a) that the representation agreement, fee agreements and any related agreements entered into with them and AIA be declared void (including, without limitation, because such agreements violated the applicable Rules of Professional Conduct); (b) any agreements or accounts regarding any sums owed by AIA, if any, be declared void; and (c) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this Third Amended Complaint).

### XIII.   COUNT VIII—STATUTORY RELIEF (INCLUDING FOR ULTRA VIRES)
(Against All Defendants)

228.   Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

229.   Plaintiff seeks all damages, equitable relief, injunctive relief and other relief available against the Defendants under applicable Idaho Code, including, but not limited to I.C. §§

THIRD AMENDED COMPLAINT - 70

30-1-304 and 30-29-304: (a) if this Court does not find the Guarantees and/or Settlement Agreements illegal as to AIA Services and AIA Insurance, Plaintiff requests a judgment that the Guarantees and/or Settlement Agreements are ultra vires and this Court should set aside the Guarantees, Settlement Agreements and related instruments (including Financing Statements and deeds) and enjoin AIA Services and AIA Insurance from complying with the Guarantees, Settlement Agreements and related instruments; (b) award damages to AIA Services and AIA Insurance for damages and losses already sustained from the Guarantees and Settlement Agreements (including attorneys' fees and costs); (c) award AIA Services and AIA Insurance anticipated lost profits and other losses, including, the lost profits and damages attributable to the money received by GemCap for the sale of AIA Services' former headquarters in Lewiston, Idaho (approximately $1,000,000) and any other damages and lost profits relating to that property and any other damage claim, and enjoin the transfer of any funds to GemCap; (d) setting aside and/or enjoining any other transfers, payments, obligations, notes, contracts, agreements, guarantees, and instruments (including deeds) which were ultra vires (including the payment of attorneys' fees and costs for any of the defendants); and (e) award all damages and relief (including setting aside any agreements) pertaining to all ultra vires acts involving AIA Services and/or AIA Insurance.

230.     To the extent that there is no cause of action under this Count VIII, then the allegations in this Count VIII are incorporated by reference to support other causes of action and relief in this Third Amended Complaint (including in Count VII and the prayer for relief below).

### XIV.     COUNT IX—CORPORATE WASTE/EXCESSIVE COMPENSATION
#### (Against the Controlling AIA Defendants)

231.     Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

THIRD AMENDED COMPLAINT - 71

# Exhibit - A
## 5-ER-1138

232.   The Controlling AIA Defendants have been officers and/or controlled AIA's Boards of Directors from 1995 through certain relevant times.  The Controlling AIA Defendants have lacked independence and have not acted in good faith, including, without limitation, by committing the intentional acts and/or omissions described in this Third Amended Complaint.

233.   The Controlling AIA Defendants' waste and excessive compensation, includes, without limitation: (a) the payment of excessive and unnecessary compensation to officers and employees; (b) the waste of corporate assets during the course of managing and/or operating AIA, including, without limitation, by paying themselves excessive compensation (and practically speaking, any compensation at all based on their acts and omissions) and using millions of dollars of AIA's funds, assets, employees and property for improper and unnecessary purposes; (c) diverting millions of dollars of AIA's assets and funds to benefit CropUSA, themselves, and other entities they partially or wholly own, including Pacific Empire Radio Corp., CropUSA Insurance Services, LLC, and Pacific Empire Holdings Corp. (a/k/a Sound Insurance); (d) destroying AIA's agency force and causing them to transfer to CropUSA and ultimately Hudson Insurance and other entities; (e) diverting CropUSA's business from AIA and running that business improperly by renting needless office space, employing unnecessary persons (including high-paying executives who did nothing for the business), entering into unnecessary high-interest loans, and engaging in other improper and unnecessary transactions (some of which AIA received no consideration); and (f) impairing and destroying AIA's businesses, including CropUSA. In addition, notwithstanding the fact that the Controlling AIA Defendants are not entitled to retain any of their compensation or benefits as a faithless fiduciary, it was separately corporate waste to pay them in the first place as they have done nothing to benefit AIA.

THIRD AMENDED COMPLAINT - 72

# Exhibit - A
## 5-ER-1139

234.    The other transactions and malfeasance described in this Third Amended Complaint also constitute corporate waste, and none of those transactions and malfeasance were properly disclosed to all of AIA Services' shareholders nor was any authorization from them ever sought or obtained.

235.    The Controlling AIA Defendants are liable to AIA for damages caused by paying excessive compensation and otherwise diverting, wasting and needlessly depleting AIA's funds and assets for their own benefit and with disregard for AIA.

236.    As a direct and/or proximate cause of the Controlling AIA Defendants' waste and excessive compensation, AIA has been damaged in the amount to be proven at or before trial.

## XV.    COUNT X—VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT
### (Against GemCap)

237.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

238.    GemCap is defined as a "Person" under I.C. § 48-602(1).  GemCap knowingly had AIA enter into the written Settlement Agreements and related agreements and instruments when the transactions were one-sided in favor of GemCap and the transactions were a pattern of conduct that would outrage and offend the public conscience as provided under I.C. § 48-603C. Such unconscionable conduct includes knowingly and intentionally violating AIA Services' amended articles of incorporation, AIA's bylaws and Idaho Code sections, together with contractual provisions which violate the law and public policy without regard to AIA or their innocent minority shareholders.

239.    As described in this Third Amended Complaint and/or as proven at or before trial, GemCap engaged in misleading, false and deceptive practices when it entered into and negotiated

THIRD AMENDED COMPLAINT - 73

## Exhibit - A
### 5-ER-1140

the one-sided written Settlement Agreement when it knew that AIA Services' shareholders were challenging the Guarantees and they had never been presented with the facts nor were they even asked to authorize the Settlement Agreement and related agreements and instruments, including, without limitation, through illegal provisions in the Settlement Agreement barring AIA from seeking bankruptcy protection and unlawfully requiring legal malpractice claims to be assigned. The Settlement Agreements and the prior Guarantees were all entered into with GemCap.

240.    GemCap's acts and/or practices, as described above and in this Third Amended Complaint and/or as proven at or before trial, are misleading, deceptive, and unconscionable methods, acts and practices in the conduct of trade and commerce in violation of the Idaho Consumer Protection Act, I.C. § 48-602, *et seq*. Based on the ongoing flagrant violations that commenced with the original Guarantee and continued through the unlimited Guarantee and the subsequently written Settlement Agreement, the Guarantees and Settlement Agreements should be voided and GemCap should be ordered to pay punitive damages of three times the damages inflicted upon AIA, which now stand at over $1,000,000 by way of the property transferred via the written Settlement Agreement.

241.    As a direct and/or proximate cause of GemCap's violations of the Idaho Consumer Protection Act, AIA has been damaged in the amount to be proven at or before trial, including for the approximately $1,000,000 in cash proceeds unconscionably obtained by GemCap in 2016 for the sale of AIA Services' former headquarters, and all other damages incurred by AIA, and this Court should award punitive damages for all such damages.

## XVI.    COUNT XI—ACCOUNT STATED
### (Against John)

242.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause

THIRD AMENDED COMPLAINT - 74

# Exhibit - A
## 5-ER-1141

of action.

243.    John established an account by borrowing $307,000 from AIA for his personal use. John subsequently confirmed the amount of the debt by "correcting" a purported accounting "error" when he had previously extinguished the $307,000 debt by improperly crediting the payment of Reed Taylor's $6 million promissory note after the issue arose in *Taylor v. AIA Services* so that AIA's books show that AIA is creditor and John is debtor for $307,000, i.e., the correction was only made because Reed Taylor demanded it and he was suing AIA Services for repayment of the $6 million promissory note.

244.    Upon information and belief, John has not paid any portion of this debt and the entire balance remains due and payable to AIA. John is liable to AIA for $307,000 on the account stated and/or such other amount as may be presently owed, plus prejudgment interest from the date the obligation was incurred. If John has since paid back the $307,000 or any part of the sums he owes, then Plaintiff still seeks the balance owed and prejudgment interest for the benefit of AIA, including, because John has been a faithless fiduciary who is not entitled to any interest-free loans from AIA.

## XVII.    JURY DEMAND

1.    Plaintiff, through the signature of his attorney below, hereby demands a trial by jury of no less than the maximum number of jurors permitted on all causes of action for which a jury trial is allowed by law.

## XVIII.    PRAYER FOR RELIEF

Wherefore, Plaintiff prays for the following relief:

1.    For a judgment against the defendants, jointly and severally and/or individually, for all damages in an amount to be proven for each defendant at or before trial, including, without limitation, consequential damages, incidental damages, lost profits, lost business opportunities,

THIRD AMENDED COMPLAINT - 75

# Exhibit - A
## 5-ER-1142

unlawful distributions, corporate waste, and all other damages, plus prejudgment interest;

2.     For a judgment or order requiring the Hawley Troxell Defendants for all damages and ordering them to disgorge all attorneys' fees and costs paid to them by AIA Services, AIA Insurance, CropUSA and by any other party on behalf of those entities in the amount to be proven at the time of trial, plus prejudgment interest;

3.     For a judgment or order requiring the Controlling AIA Defendants to disgorge all compensation received from AIA or CropUSA since 1999 for being faithless fiduciaries and breaching their fiduciary duties, including, without limitation, all stock, cash, benefits, and other cash and non-cash compensation, attorneys' fees and costs (i.e., Connie received payments for attorneys' fees and costs from AIA or from CropUSA in violation of her duties to AIA) and that John is owed no compensation by AIA;

4.     For judgment against GemCap, AIA, John and CropUSA declaring that AIA's Guarantees, the Settlement Agreements and all related agreements and instruments illegal, ultra vires, intra vires, void and/or unenforceable and awarding AIA damages;

5.     For judgment against John in the amount to be proven at the time of trial, plus prejudgment interest;

6.     For judgments against the Controlling AIA Defendants, jointly and severally, as the alter-ego of CropUSA and/or to pierce its corporate veil, for all damages incurred by AIA and attributable in whole or in part to CropUSA;

7.     For judgments against any one or more of the defendants and for any and all damages and relief available under Idaho Code (including, without limitation, I.C. §§ 30-29-304, 30-29-833 (and their predecessors), 48-608, and the common law;

THIRD AMENDED COMPLAINT - 76

# Exhibit - A
## 5-ER-1143

8.      For a preliminary and/or permanent injunction and/or declaratory relief against AIA enjoining them from complying with the unauthorized, improper, intra vires, and ultra vires transactions and agreements relating in any way to AIA, including, without limitation, the Guarantees, Settlement Agreements, and all agreements and instruments related to the foregoing (including from transferring any money or property and from distributing the proceeds of any property or asset sales); to set aside and void such agreements and instruments; and award damages;

9.      For declaratory judgment requiring the reissuance of the common shares in AIA Services to the ESOP participants and voiding and/or rescinding John's alleged purchase of 7,500 Series A Preferred Shares in AIA Services and the 475,000 common shares in AIA Services improperly issued to him under his Executive Officer's Agreement that he violated on countless occasions;

10.     For a declaratory judgment requiring AIA Services to reissue the common shares formerly held by the innocent ESOP participants because the Controlling AIA Defendants' improperly terminated the ESOP;

11.     For an order requiring that all funds recovered as a result of this litigation, minus fees, costs and bona fide debts, be deposited with the Court registry and distributed only after court order, and that no funds recovered from this litigation be paid to, or for the benefit of, the Controlling AIA Defendants;

12.     To the extent that GemCap is deemed to be owed any money as a creditor, for a judgment declaring any such rights or judgments to be inferior to AIA and AIA Services' innocent minority shareholders (including those holding shares through the ESOP and 401(k) Plan), under an equitable subordination theory or such other theory Plaintiff may assert at or before trial;

THIRD AMENDED COMPLAINT - 77

# Exhibit - A
## 5-ER-1144

13.     For a declaratory judgment for the relief specified in this Third Amended Complaint and any other declaratory relief requested at or before trial, including, without limitation, setting aside obligations, notes, guarantees, settlement agreements, agreements, contracts, transfers of assets, amendments to AIA's bylaws, and repurchase or the issuance of shares;

14.     For an award of the attorneys' fees and costs incurred in this action as allowed by statute, contract, or recognized grounds of equity, including, under I.C. § 12-121; and

15.     For any such further relief or remedy, including preliminary and/or permanent injunctive relief, equitable subordination, or other relief Plaintiff may request and/or as this Court may find just and equitable.

DATED:  This ___ day of _____, 2016.

RODERICK BOND LAW OFFICE, PLLC


By:   ___/s/ Roderick C. Bond_____
        Roderick C. Bond
        Attorney for Plaintiff

THIRD AMENDED COMPLAINT - 78

# Exhibit - A
## 5-ER-1145

## VERIFICATION OF DALE L. MIESEN

STATE OF TEXAS                )
                              ) ss.
COUNTY OF TARRANT             )

I, Dale L. Miesen, being first duly sworn on oath, depose and say:

I am the Plaintiff in the above-entitled action. I have read the contents of this Third Amended Complaint, know the contents of this Third Amended Complaint, and believe that the facts set forth in this Third Amended Complaint are true and accurate to the best of my knowledge and belief.

_____
Dale L. Miesen

SUBSCRIBED AND SWORN to before me this _____ day of _____, 2016.

_____
Notary Public for Texas
Residing at: _____
My commission expires: _____

THIRD AMENDED COMPLAINT - 79

# Exhibit - A
## 5-ER-1146

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the ___ day of _____, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:   jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:   jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:   lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:   sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:   swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

_/s/ Roderick C. Bond_
Roderick C. Bond

THIRD AMENDED COMPLAINT - 80

# Exhibit - A
## 5-ER-1147

Steve Wieland, ISB No. 8282
Shawnee Perdue, ISB No. 8888
WIELAND PERDUE PLLC
405 South 8th Street, Suite 295
Boise, Idaho 83702
p: 208.401.9219
f: 208.401.9218
swieland@wielandperdue.com
sperdue@wielandperdue.com

*Attorneys for Defendants Connie Taylor Henderson,*
*Jolee Duclos, R. John Taylor, Michael W. Cashman Sr.,*
*James Beck, and Crop USA Insurance Agency, Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| **Dale Miesen**, an individual, a shareholder bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,<br><br>      Plaintiff,<br><br>      vs.<br><br>**Connie Taylor Henderson**, an individual; **et al.**,<br><br>      Defendants. | Case No. 1:10-CV-00404-CWD<br><br>**Brief in Opposition to Plaintiff's Motion to Amend and Supplement Complaint [Doc. 182]** |

Defendants Connie Taylor Henderson, Jolee Duclos, R. John Taylor, Michael W.

Cashman Sr., and James Beck (the "**Directors**"), and Crop USA Insurance Agency, Inc.

("**Crop USA**"), through their counsel of record, WIELAND PERDUE PLLC, respectfully

submit this Brief in Opposition to Plaintiff's Motion to Amend and Supplement Complaint

Brief in Opposition to Plaintiff's Motion to Amend and Supplement
Complaint                                         Page 1 of 18

**5-ER-1148**

("**Brief**"). Collectively, this Brief refers to the Directors and Crop USA as the "**Defendants**."

## I.   INTRODUCTION

The Motion to Amend and Supplement Complaint ("**Motion**") seeks leave to file a Third Amended Complaint ("**TAC**"). The TAC would add wide-ranging allegations that Defendants improperly caused AIA Services to guarantee a loan from GemCap Lending I ("**GemCap**") to Crop USA and then improperly permitted John Taylor to settle a subsequent collection suit filed by GemCap against AIA when Crop USA defaulted. (TAC ¶¶ 135–56.) The TAC also adds other allegations that John Taylor improperly transferred real estate to AIA Services, that the Directors spent too much on attorney fees defending a state-court lawsuit brought by Plaintiff's counsel on behalf of Donna Taylor, and that John Taylor "improperly" amended the bylaws and was issued additional Series A shares. (TAC ¶¶ 157–63.)[1]

The Court should deny the Motion because: Plaintiff has failed to seek board action by submitting a proper derivative demand letter; Plaintiff's allegations are futile in significant part; and the Motion is not brought timely or in good faith. Instead, to keep this litigation moving smoothly, the Court should require Plaintiff to seek leave to file a complaint that: (i) omits all the new claims in the TAC; (ii) complies with a reasonable page limit[2]; and (iii) complies with Rule 8 pleading requirements for directness and concision.

---

[1] Nothing in this Brief is intended to suggest that Defendants took part in any illegal conduct or are liable for any of the new or preexisting claims in the TAC.

[2] Defendants suggest that 30 pages, plus a reasonable number of attachments, would be an appropriate page limit. *See Cal. Coalition for Families & Children v. San Diego Cnty. Bar Ass'n*, --- Fed App'x ---, 2016 WL 4174772, at *1–2 (9th Cir. Aug. 8, 2016) (affirming dismissal where

Brief in Opposition to Plaintiff's Motion to Amend and Supplement Complaint

## II.   GOVERNING STANDARD

In deciding whether to grant leave to amend, the Court should consider five factors: "(1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the plaintiff has previously amended his complaint." *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004). Although the Court can consider all the factors, "[f]utility alone can be enough to deny a motion for leave to amend." *Schwartz v. Adams Cnty.*, No. CV 09-019-S-EJL-CWD, 2010 WL 2011582, at *3 (D. Idaho May 20, 2010) (citing *Nunes*, 375 F.3d at 808)).

## III.   ARGUMENT ON FUTILITY

None of the new derivative claims against Defendants are viable because Plaintiff has failed to make a proper demand, thereby failing to make even a prima facie showing of a substantive—not merely procedural—element of his requested new derivative claims. Further, Plaintiffs new claims that are unrelated to the GemCap transaction are not viable for other reasons. On these grounds alone the Court can refuse the Motion.

### A.    The Amendment Should Not Be Permitted Because Plaintiff Has Failed to Attempt to Obtain Board Action Through a Proper Demand Letter

A derivative plaintiff in federal court must state with particularity the efforts the plaintiff made to obtain the desired actions from the board of directors. Fed. R. Civ. P. 23.1(b)(3). Although Rule 23.1 creates a federal pleading requirement, the demand is a substantive element of a derivative lawsuit. The substantive demand requirement is governed by the law of the state where the company is incorporated, which is Idaho in this case. *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014).

---

plaintiffs failed to reduce a 175-page amended complaint to 30 pages as required by the district court).

Brief in Opposition to Plaintiff's Motion to Amend and Supplement Complaint

In Idaho, as a precondition to ***commencing*** a derivative suit, the plaintiff must make a written demand upon the corporation to take suitable action to redress the plaintiff's concerns. I.C. § 30-29-742. The demand requirement rests on an "important policy" of protecting the board of director's right to direct the company's affairs. *Kugler v. Nelson*, 160 Idaho 408, ---, 374 P.3d 571, 578 (2016) (applying Delaware law). "[T]he demand requirement implements 'the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 100, 111 S. Ct. 1711, 1718 (1991). In short, the demand requirement prevents shareholders from abusing the derivative-suit process. *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 542, 104 S. Ct. 831, 841 (1984).

Again, the demand letter "is not merely a technical or unimportant requirement." *Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008). To ensure the board of directors had an adequate opportunity to evaluate potential litigation, the plaintiff "must make an earnest and sincere, and not a feigned or simulated, effort to induce the directors to take remedial action." *McCann v. McCann*, 138 Idaho 228, 235, 61 P.3d 585, 592 (2002) (quotation omitted). The amendments relating to the GemCap transactions rest on two derivative demand letters dated June 13, 2016, and August 23, 2016, respectively (the "**Demand Letters**"). (TAC ¶¶ 179–80.) Neither is attached to the TAC, but Defendants provided them to the Court contemporaneously with this Brief.[3] (Taylor Decl. Exs. A, B.) The Demand Letters do not satisfy the demand requirement for three broad reasons.

---

[3] The June 2016 letter also was attached to a declaration filed by Mr. Ipsen, [Doc. 148-2], but the August 2016 letter has not found its way into the record yet.

Brief in Opposition to Plaintiff's Motion to Amend and Supplement Complaint                                                                          Page 4 of 18

To start, the letters taken together are not an "earnest and sincere" effort to help the AIA board remedy Plaintiff's alleged concerns. Rather than an attempt to alert the AIA board to discrete issues for investigation, the letters read as if Plaintiff's counsel viewed the task as a mere formality, listing every conceivable claim AIA might consider asserting against any conceivable person. Moreover, on September 12, 2016, the board informed Plaintiff in writing that his Demand Letters were too nebulous to enable the board to investigate the alleged claims. (Taylor Decl. Ex. C.) Rather than attempting to clarify the grounds for the Demand Letters or to describe discrete claims, Plaintiff simply filed the Motion. *See McCann*, 138 Idaho at 235, 61 P.3d at 592 (stating that the shareholder cannot merely make a "feigned or simulated . . . effort to induce the directors to take remedial action").

Second, the letters must specifically identify the alleged wrongdoers. A demand must "name the potential defendants." *McCann*, 138 Idaho at 235, 61 P.3d at 592 (quotation omitted). It cannot simply describe an open universe of wrongdoers. *See Simmons v. Credit Suisse Sec. (USA) LLC*, 638 F.3d 1072, 1092 (9th Cir. 2010) *vacated on other grounds*, 132 S. Ct. 1414 (2012) (noting that a letter barely met this requirement because it "identified a closed set of alleged wrongdoers").

Here, however, the Demand Letters give an open universe of potential defendants. They describe the term "Combined Defendants" to include the defendants of this lawsuit plus "agents of AIA," an enormous group of people numbering in the thousands. (Taylor Decl. Ex. A, at 2, Ex. B, at 2.) Many of the numbered paragraphs are directed at certain people plus "any other parties" that may have taken part in some real or imagined transaction. (*E.g.* Taylor Decl. Ex. B, ¶¶ 19, 27, 29, 47.) Other paragraphs name no potential defendant at all. (*E.g. id.* ¶¶ 42, 45.) Simply identifying these formless categories

Brief in Opposition to Plaintiff's Motion to Amend and Supplement Complaint                                                                 Page 5 of 18

is not enough to meet the demand requirement. *See Shlensky v. Dorsey*, 574 F.2d 131, 141 (3rd Cir. 1978) (stating that it was insufficient to request action against "responsible individuals" for "all damages").

Third, the letter must give sufficient information about the claims themselves to enable a board to determine if litigation would be successful. The letter "must state facts, not mere general charges and conclusions." *McCann*, 138 Idaho at 235, 61 P.3d at 592 (quotation omitted). Particularity is necessary since, otherwise, "to require a board to investigate claims asserted ambiguously in an equivocal communication would not be an efficient use of corporate resources, because the board would lack the information to make a good faith inquiry." *Yaw v. Talley*, Civ. A. No. 12882, 1994 WL 89019, at \*8 (Del. Ch. Mar. 2, 1994).

Another federal derivative case is illustrative. In *Stoner v. Walsh*, 772 F. Supp. 790 (S.D.N.Y. 1991), plaintiff's counsel sent a letter with a list of generalized grievances, for example demanding that the board undo "the decision to reward some of the very individuals responsible for [the company's] financial decay with lavish raises, bonuses and other perks," and to punish the board for "the company's decision to squander $200 million to construct its new art bedecked headquarters." 772 F. Supp. at 793 (quotations omitted; modification added). In other words, the letter merely made conclusory accusations rather than providing facts and information upon which the board in that case could base an investigation. Accordingly, the court observed that these allegations did not describe the company's potential causes of action with sufficient particularity. *Id.* at 797.

The Demand Letters dramatically exceed the *Stoner* letter in their breadth and lack of particularity. Both the Demand Letters open their list of grievances by instructing the AIA board to "[p]ursue all possible claims and defenses" for "all possible tort claims . . .

contract claims, declaratory relief, injunctive relief and punitive damages based on all acts, omissions, concealments, and failure [sic] to disclose through the date of this letter and for the foregoing which continues past the date of this letter." (Taylor Decl. Ex. A ¶ 1, Ex. B ¶ 1.) Both letters follow this broad demand description with dozens of numbered claim paragraphs, but those numbered paragraphs are only given *by way of example*. (*Id.*) Put another way, the Demand Letters seek board action on all claims against any agent who has ever acted on behalf of AIA at any time, past, present, and future.

Even if it were possible to draw a line around any specific claims identified in the Demand Letters, the individually numbered items describe the subject matter so broadly that no board could possibly have investigated them. Although the Demand Letters overlap significantly, Plaintiff's counsel described a combined total of over 100 categories for the AIA board to investigate. (Taylor Decl. Exs. A, B.) Each of them are standalone examples of impossibly broad subject matter, such as one demanding the board "[p]ursue all possible claims against the Combined Defendants for their torts committed against AIA," or another demanding the board "[p]ursue all possible claims against the Controlling AIA Defendants and any other responsible party" for paying attorney fees to any of nine law firms that supposedly committed malpractice at some point in AIA's history. (Taylor Decl. ¶¶ 20, 29.) No board of directors could use this information to investigate a company's claims against anyone. *See Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 409 (S.D.N.Y. 2007) ("[T]he demand must inform the board with particularity of the complained of acts and the potential defendants." (quotation omitted)).

In addition, the Court should deny the Motion *without* allowing Plaintiff leave to amend. A derivative claim failing to comply with the demand requirement must be dismissed with prejudice. In re *Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 991 (9th

Brief in Opposition to Plaintiff's Motion to Amend and Supplement
Complaint                                                              Page 7 of 18

Cir. 1999). The Ninth Circuit has overturned a district court decision granting dismissal without prejudice where the plaintiff failed to make an adequate demand. *Simmonds*, 638 F.3d at 1097. Both potentially operative Demand Letters are now before the Court, so Plaintiff cannot allege any additional facts that might show compliance with the demand requirement. (Taylor Decl. Exs. A and B.) Since no amendment would save Plaintiff's allegations, the Court should deny the Motion without leave to amend. *E.g. Gulbrandsen v. Stumpf*, No. 12-5968 JSC, 2013 WL 6406922, at *10 (N.D. Cal. Dec. 6, 2013) (dismissal with prejudice); *Weinstein v. Kirkman*, No. C13-0769-JCC, 2013 WL 12121125, at *5 (W.D. Wash. Sep. 16, 2013) (dismissal with prejudice). Further, refusal without leave to amend is necessary because the corporation has a substantive right to investigate potential wrongdoing before a shareholder sues, not after.[4]

**B.     Breach-of-Fiduciary-Duty Claims Relating to Bylaw Amendments, Stock Issuances, Property Contributions, and Litigation Costs Are Futile**

Idaho applies the business judgment rule, *McCann v. McCann*, 152 Idaho 809, 815, 275 P.3d 824, 830 (2012), but appellate case law provides little guidance, see *Steelman v. Mallory*, 110 Idaho 510, 513, 716 P.2d 1282, 1285 (1986) (stating the general rule). The legislature, however, has helped fill some gaps.[5] A plaintiff asserting breach of fiduciary

---

[4] Plaintiff might be allowed leave to amend if he merely failed to *allege* making a proper derivative demand, but here the problem is not a procedural failure of pleading but a substantive failure of compliance. *See In re Polycom, Inc.*, 78 F. Supp. 3d 1006, 1021 (N.D. Cal. 2015) (granting dismissal without prejudice because the shareholder failed to plead demand futility under Delaware law).

[5] It appears the legislature enacted the statutes as an "adjunct" to the court-made business-judgment rule. I.C. § 30-1-831 (2004) Rptr. Cmt.; *cf. Jordan v. Hunter*, 124 Idaho 899, 905 n.3, 865 P.2d 990, 996 n.3 (Ct. App. 1993) (stating that the statute in effect at the time was "essentially a codification" of the business-judgment rule but had no effect on director or officer fiduciary duties). In addition to statutes, Idaho's appellate courts also look to case law from other states when applying the business-judgment rule. *E.g. Steelman*, 110 Idaho at 513, 716 P.2d at 1285 (citing Colorado, Arizona, and Oregon cases); *McCann*, 152 Idaho at 817, 275 P.3d at 832 (citing a Massachusetts case).

duty must prove that liability is not limited by the articles of incorporation and, pertinent here, the conduct was an:

> (i)    Action not in good faith; or
>
> (ii)    A decision:
>
>> (A)    Which the director did not reasonably believe to be in the best interests of the corporation; or
>>
>> (B)    As to which the director was not informed to an extent the director reasonably believed appropriate in the circumstances . . . ; or
>
> (iii)    [A result of a] lack of objectivity due to the director's familial, financial, or business relationship with . . . another person having a material interest in the challenged conduct . . . ; or
>
> . . .
>
> (v)    Receipt of a financial benefit to which the director was not entitled . . . .

I.C. § 30-29-831(b).[6] Then, the plaintiff must prove causation, damages, and any other elements otherwise necessary to prevail on the claim for legal or equitable relief. I.C. § 30-29-831(2).

In federal court, the plaintiff cannot plead facts "that are merely consistent with a defendant's liability," but must provide sufficient factual content for the Court to infer that the defendant is liable. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). Since overcoming the business-judgment rule is a substantive element of proof, Plaintiff must allege facts sufficient to rebut or "plead around" the presumption that the

---

[6] The legislature replaced an earlier corporate code with a very similar statutory regime effective July 1, 2015. 2015 Idaho Sess. Laws ch. 243. There is no significant difference between the current and old statutes cited here and their numbering schemes are the same, so for brevity the current sections will be cited. *Compare, e.g.*, I.C. § 30-1-831 (2004) *with* I.C. § 30-29-831 (2015).

directors acted within their permissible business judgment. *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 679–80 (N.D. Tex. 2011).

Applying this pleading standard shows that many of the new allegations in the TAC do not state a claim for breach of fiduciary duty and are therefore futile.

### 1.    *Transfer and Valuation of Real Estate by John Taylor*

The TAC alleges that John Taylor transferred real property from related entities to AIA, had AIA assume $393,863 in debts on the properties, and improperly assigned a book value to them. (TAC ¶¶ 157–58.) There are no facts suggesting that transferring the properties or assigning a given book value was done in bad faith; without a legitimate purpose; or, as a potentially conflicting-interest transaction, harmed AIA. *See* I.C. § 30-29-831(2) (requiring a showing of harm to merit damages); *see generally McGowan v. Ferro*, 859 A.2d 1012 (Del. Ch. 2004) (discussing whether a board's decision to extend a merger agreement was a breach of loyalty). For instance, there is no allegation the encumbrances exceeded the properties' value, that the book value is too low or, even if it was, that having a low book value harms the company. These allegations do not state a cause of action.

### 2.    *Issuance of Series A Shares to John Taylor*

Next, the TAC alleges John Taylor was issued 7,500 Series A Preferred Shares in AIA Services. (TAC ¶¶ 160–61.) The TAC does not suggest the company received insufficient value or that the issuance was a conflicting interest transaction that harmed the company or Plaintiff. *See Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 655 (Del. Ch. 2013) (stating that overpayment in stock can be actionable). There are no facts amounting to an improper business purpose, either, since exchanging cash for shares is certainly a proper corporate endeavor, especially when a company is cash-strapped. To

**5-ER-1157**

the extent such an issuance might conceivably dilute the rights of the only other Series A shareholder, Donna Taylor, her claim would be direct, not derivative, and she is not a party. *See Lipton v. News Int'l, PLC*, 514 A.2d 1075, 1079 (Del. 1986) (holding that a shareholder should bring a direct action to challenge a stock exchange agreement that supposedly violated the shareholder's voting rights) *abrogated on other grounds by Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1037–38 (Del. 2004).

### 3. *Amendment of Bylaws*

The TAC alleges that John Taylor improperly amended the AIA bylaws to require an unsuccessful plaintiff in an intracompany lawsuit to pay attorney fees. (TAC ¶ 162.) Such provisions are valid unless adopted for an improper purpose. *ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014). Given that AIA and its constituents have been racked by unrelenting and unsuccessful litigation over the past nine years, the obvious purpose for the bylaw is a proper one: to deter meritless litigation. *See id.* at 560 (stating that even an intent to generally deter all litigation would not necessarily invalidate a fee-shifting bylaw). The TAC asserts no invalid purpose for the bylaw amendment and therefore states no claim.

### 4. *Overspending on Donna Taylor Litigation*

Last, the TAC alleges that the Directors overspent on attorney fees defending a lawsuit Donna Taylor filed against AIA to collect redemption payments for stock she received in her divorce from Reed Taylor. (TAC ¶ 163.) Plaintiff alleges no facts suggesting that defending the litigation was not done for a legitimate business purpose or suggested the case was meritless. Like the others, this claim is futile.

**C.**     **The New Fraud, Concealment, and Constructive Fraud Allegations in Count V Do Not State a Cause of Action**

     *1.*     *Plaintiff Fails to Plead His Fraud Claim with Particularity*

A party alleging fraud must state with particularity the circumstances constituting the fraud. Fed. R. Civ. P. 9(b). A fraud claim must specifically allege facts such as the times, dates, places, benefits received, and other details of the alleged fraudulent activity. *Neubronner v. Milken*, 6 F.3d. 666, 672 (9th Cir. 1993). Plaintiff's new allegations do not satisfy the heightened pleading requirement under Rule 9(b). Plaintiff fails to allege the specific content of the alleged fraudulent communications and the times and dates that such conduct occurred.  For these reasons, Plaintiff's new fraud claims in Count V are not properly pled.

     *2.*     *Plaintiff Fails to State a Cause of Action for Fraud or Constructive Fraud in His New Allegations*

A party alleging fraud must make the following allegations with specificity: (1) the defendant made a statement or representation of fact; (2) it's falsity; (3) it's materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) the reliance by the hearer; (8) justifiable reliance; and (9) resultant injury. *Doe v. Boy Scouts of America*, 159 Idaho 103, 108, 356 P.3d 1049, 1055 (2015).  A party alleging constructive fraud must plead that there was a duty of trust and confidence between plaintiff and the defendant, the duty was breached, and (1) the defendant made a statement or representation of fact; (2) it's falsity; (3) it's materiality; (4) the hearer's ignorance of the falsity of the statement; (5) the reliance by the hearer; (6) justifiable reliance; and (7) resultant injury. *Id*. at 109, 356 P.3d at 1055. Last, in a claim for fraud by concealment, a plaintiff must plead at the very least that there was a nondisclosure, the plaintiff relied on the nondisclosure, plaintiff's reliance on

Brief in Opposition to Plaintiff's Motion to Amend and Supplement Complaint                                                                                      Page 12 of 18

**5-ER-1159**

the nondisclosure was material to the transaction, and that plaintiff was damaged because of the nondisclosure. *Watts v. Krebs*, 131 Idaho 616, 620, 962 P.2d 387, 391 (1998).

In the TAC, Plaintiff alleges the following:

The Controlling AIA Defendants, Crop USA, and GemCap concealed from AIA that they had AIA unlawfully and improperly enter into the Guarantees, Settlement Agreements, and related agreements and instruments, together with unlawfully transferring property and making payments under those unlawful agreements and instruments.

(TAC ¶ 214).

Plaintiff's allegations, even taken together with the existing fraud allegations, fail to properly plead a claim for fraud or constructive fraud. Although conclusory accusations abound, Plaintiff has failed to plead with particularity that Defendants made any misrepresentations of fact or material nondisclosures, that anyone actually relied on those misrepresentations or nondisclosures, that such activity caused damages, or that the other elements of fraud or constructive fraud exist. *See Stack v. Lobo*, 903 F. Supp. 1361, 1367 (N.D. Cal. 1995) ("[M]ere conclusory allegations of fraud are insufficient."). Further, Plaintiff has failed to allege how Crop USA or GemCap could have concealed anything from AIA. For this reason, Plaintiff's request to add new allegations for fraud should be denied.

## D.     The New Conspiracy to Commit Fraud Allegations in Count V Do Not State a Cause of Action

A civil conspiracy that gives rise to legal remedies exists only if there is an agreement between two or more to accomplish an unlawful objective or to accomplish a lawful objective in an unlawful manner. "'Civil conspiracy is not, by itself, a claim for relief.'" *Mannos v. Moss*, 143 Idaho 927, 935, 155 P.3d 1166, 1174 (2007) (quoting *McPheters v. Maile*, 138 Idaho 391, 395, 64 P.3d 317, 324 (2003)). A conspiracy is only

actionable if some actionable wrong results from an agreed effort to achieve that wrong. *Id.* "An agreement is the foundation of a conspiracy charge and there must be some showing of specific evidence of a plan or agreement to defraud to demonstrate the pendency of the conspiracy at the time the alleged fraud occurred." *Id.* Where a plaintiff's conspiracy claims are based in fraud, the conspiracy claim must also be pled with particularity. *Taylor v. McNichols,* 149 Idaho 826, 844, 243 P.3d 642, 660 (2010).

As noted above, Plaintiff has failed to properly plead a claim for fraud against Defendants, which alone renders his conspiracy claim futile. Further, Plaintiff has failed to plead with particularity, or at all, that there was any plan or agreement to defraud the Company or Plaintiff. Plaintiff has failed to properly plead a claim for aiding and abetting and conspiracy of fraud. Count V of the TAC is therefore futile.

**E.    Count VIII Does Not State a Valid Cause of Action for "Statutory Relief"**

Finally, under a new Count VII, Plaintiff wants damages and equitable relief under I.C. §§ 30-1-304 (repealed) and 30-29-304. The statutes Plaintiff relies on merely describe who can raise the ultra-vires doctrine when challenging corporate transactions and what remedies are available if certain classes of challengers succeed. I.C. § 30-29-304(2). The statutes provide rules and remedies to guide that apply to causes of action such as derivative claims for breach of fiduciary duty or for direct suits against a company to enjoin acts. However, "when a statute is silent regarding private enforcement, courts may recognize a private right only when it is necessary to assure the effectiveness of the statute." *Brock v. Bd. of Directors, Indep. Sch. Dist. No. 1*, 134 Idaho 520, 523, 5 P.3d 981, 984 (2000). "In the absence of strong indicia of a contrary legislative intent, courts must conclude that the legislature provided precisely the remedies it considered appropriate."

*Yoakum v. Hartford Fire Ins. Co.*, 129 Idaho 171, 176, 923 P.2d 416, 421 (1996). Count VIII is futile because it alleges no private cause of action.

### IV.   ARGUMENT ON FACTORS OTHER THAN FUTILITY

If the Court determines that the Motion does not fail on the grounds of futility alone, the other factors also weigh against granting the Motion.

### A.   Bad Faith

This factor weighs against granting the Motion. The Civil Rules require "a short and plain statement of the claim" and that "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(a)(2) and 8(d)(1). "Something labeled a complaint but written more as a press release, prolix in evidentiary detail, yet without simplicity, conciseness and clarity as to whom plaintiffs are suing for what wrongs, fails to perform the essential functions of a complaint." *Flores v. EMC Mortg. Co.*, 997 F. Supp. 2d 1088, 1102 (E.D. Cal. 2014).

The TAC is anything but simple and direct—it is a "laundry list" of most of the significant transactions any of the Defendants have taken part in since the 1990s. Unlike most pleadings, which clearly separate allegations of fact from accusations of wrongdoing, many of the new allegations are extended paragraphs mixing argumentative assertions with factual allegations. (*E.g.* TAC ¶¶ 145–56, 172, 179–81.) Perhaps most egregious is TAC ¶ 164, which comprises several pages of sweeping but conclusory allegations. *Cf. McHenry v. Renne*, 84 F.3d 1172, 1177 (9th Cir. 1996) (affirming dismissal of a complaint that was "argumentative, prolix, replete with redundancy, and largely irrelevant").

Instead, the object of the TAC is not to clarify the issues but to obfuscate them. Defendants and Hawley Troxell extricated AIA from a redemption agreement between

AIA and Reed Taylor in 2011. *See generally Taylor v. AIA Services Corp.*, 151 Idaho 552, 261 P.3d 829 (2011). This litigation is part of an ongoing effort against Defendants, Hawley Troxell, and other law firms on the periphery of the redemption deal through relentless litigation. Similar allegations appear in numerous other lawsuits, and this Motion is merely a continuation of the attrition strategy.[7]

Further, Plaintiff accuses the Directors of wrongfully resisting a lawsuit brought by another of Plaintiff counsel's clients, Donna Taylor, to recover redemption payments from AIA. (*See* TAC ¶ 163.). Offering this allegation is particularly inappropriate given that Plaintiff's counsel represents Donna Taylor in the suit and is a major factor driving litigation costs. Further, it is questionable whether Plaintiff's counsel can continue pursuing a lawsuit for Donna Taylor, who seeks a direct personal judgment against AIA, while also representing Plaintiff, who seeks to recover and conserve corporate resources in this derivative suit. This is especially problematic because AIA's case against Donna Taylor demonstrably has merit.[8]

### B. Undue Delay

Plaintiff has unduly delayed in bringing claims relating to the GemCap loan guarantees. Plaintiff filed his Second Amended Complaint in June 2016. (2nd Am. Compl., June 20, 2016 [Doc. 137].) Plaintiff should have brought claims he was aware of at that

---

[7] These other lawsuits include: *Reed Taylor v. AIA Services Corp., et al.*, Nez Perce County No. CV-07-208; *Donna Taylor v. John Taylor*, Nez Perce County No. CV-08-1150; *Donna Taylor v. AIA Services Corp., et al.*, Nez Perce County No. CV-13-1075; *Taylor v. McNichols*, 149 Idaho 826, 243 P.3d 642 (2010); *Taylor v. Riley*, 157 Idaho 323, 336 P.3d 256 (2014); *Durant v. GemCap Lending I, LLC*, Nez Perce County No. CV-14-1444.

[8] Plaintiff omits the fact that AIA has, through dispositive motion practice, successfully reduced Donna Taylor's original claim of $450,000 (plus interest) to less than a quarter of that amount. AIA has been so successful that the court vacated trial set for the summer of 2015 so Donna Taylor could appeal the rulings against her on a 54(b) certificate. Plaintiff's counsel successfully had trial vacated by arguing that going to trial would not be worth the expense if the claims were so limited.

Brief in Opposition to Plaintiff's Motion to Amend and Supplement Complaint

time. *See Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990) (stating that a court can deny leave to amend where the movant failed to bring known claims in the original pleading). Now, Plaintiff offers new allegations that the Directors improperly authorized AIA Services to guarantee Crop USA's loan from GemCap Lending I, LLC ("**GemCap**") in 2011–2012. (TAC ¶¶ 135–36.) GemCap filed suit against AIA, plus others, in California in July 2013. (*Id.* ¶ 146.) Yet, Plaintiff waited years before filing the Motion. *See Garcia v. Vilsack*, 628 F. Supp. 2d 1306, 1312 (D.N.M. 2009) (holding that a Court can deny leave to amend where a plaintiff knew of the facts upon which the new claim was based at the time of filing original complaint).

## C.     Previous complaints

This factor also weighs against the amendment. Plaintiff has amended the complaint twice before, including once already this year in June. Plaintiff offers no explanation why he did not attempt to obtain board action sooner to file these new derivative claims in June of this year.

## D.     Prejudice

Last, prejudice would result if the Motion is granted. For the reasons described throughout this brief, the amendment would subject Defendants to a case of sprawling and amorphous scope, including new claims not properly presented to the AIA directors, prejudicing Defendants' ability to marshal the evidence and mount a defense. Accordingly, the Court should reject the Motion. Further, the Court should require Plaintiff to seek leave to file a new complaint without the new claims that also is within a reasonable page limit and complies with Rule 8.

## V.   CONCLUSION

The Court should resist Plaintiff's attempt to broaden and complicate this already onerous lawsuit with derivative claims never properly presented to AIA's board for investigation. Instead, the Court should require Plaintiff to file a new complaint of reasonable length that also complies with the pleading rules.

Dated November 28, 2016.

WIELAND PERDUE PLLC

_____
Steve Wieland, ISB No. 8282

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

| | |
|---|---|
| **Roderick Cyr Bond**<br>rod@roderickbond.com<br>*Attorney for Plaintiff Dale Miesen* | **Loren C. Ipsen**<br>lci@elamburke.com<br><br>**James D. LaRue**<br>jdl@elamburke.com |
| **Alyson Anne Foster**<br>aaf@aswblaw.com<br>*Attorney for Intervenor GemCap Lending I LLC* | **Jeffrey A. Thomson**<br>jat@elamburke.com<br><br>*Attorneys for Hawley Troxell Defendants* |

I further certify that on such date I served the foregoing on the following non-CM/ECF registered participants by email as follows:

| | |
|---|---|
| **AIA Services Corporation**<br>P.O. Box 538<br>Lewiston, ID  83501<br>jtaylor@cropusainsurance.com | **AIA Insurance, Inc.**<br>P.O. Box 538<br>Lewiston, ID  830501<br>jtaylor@cropusainsurance.com |

_____

Steve Wieland
Attorney for Defendants R. John Taylor, Michael W. Cashman Sr., James Beck, Connie Taylor Henderson, JoLee Duclos, and Crop USA Insurance Agency, Inc.

**5-ER-1166**

Steve Wieland, ISB No. 8282
Shawnee Perdue, ISB No. 8888
WIELAND PERDUE PLLC
405 South 8th Street, Suite 295
Boise, Idaho 83702
p: 208.401.9219
f: 208.401.9218
swieland@wielandperdue.com
sperdue@wielandperdue.com

*Attorneys for Defendants Connie Taylor Henderson,*
*Jolee Duclos, R. John Taylor, Michael W. Cashman Sr.,*
*James Beck, and Crop USA Insurance Agency, Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| **Dale Miesen**, an individual, a shareholder bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,<br><br>Plaintiff,<br><br>vs.<br><br>**Connie Taylor Henderson**, an individual; **et al.**,<br><br>Defendants. | Case No. 1:10-CV-00404-CWD<br><br>**Declaration of R. John Taylor in Opposition to Plaintiff's Motion to Amend and Supplement Complaint [Doc. 182]** |

I, R. John Taylor, declare:

1.      I am a named defendant in the above action and serve as president and director of Defendants AIA Services Corporation and AIA Insurance, Inc.

Declaration of R. John Taylor in Opposition to Motion to Amend and          Page 1 of 2
Supplement Complaint [Doc. 182]

**5-ER-1167**

2.      Attached as **Exhibit A** is a true and correct copy of a derivative demand letter, dated June 13, 2016, which I received from Plaintiff's counsel via U.S. Mail and fax.

3.      Attached as **Exhibit B** is a true and correct copy of a derivative demand letter, dated August 23, 2016, which I received from Plaintiff's counsel via U.S. Mail, fax, and email.

4.      Attached as **Exhibit C** is a true and correct copy of a letter I sent to Plaintiff's counsel, dated September 12, 2016, via U.S. Mail.

**I declare under penalty of perjury under the laws of the United States of America and the State of Idaho that the foregoing is true and correct.**

November 28, 2016 at Lewiston, Idaho
Date, City, and State Signed                        R. John Taylor

Declaration of R. John Taylor in Opposition to Motion to Amend and          Page 2 of 2
Supplement Complaint [Doc. 182]

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

| | |
|---|---|
| **Roderick Cyr Bond**<br>rod@roderickbond.com<br>*Attorney for Plaintiff Dale Miesen* | **Loren C. Ipsen**<br>lci@elamburke.com<br><br>**James D. LaRue**<br>jdl@elamburke.com |
| **Alyson Anne Foster**<br>aaf@aswblaw.com<br>*Attorney for Intervenor GemCap Lending I LLC* | **Jeffrey A. Thomson**<br>jat@elamburke.com<br><br>*Attorneys for Hawley Troxell Defendants* |

I further certify that on such date I served the foregoing on the following non-CM/ECF registered participants by email as follows:

| | |
|---|---|
| **AIA Services Corporation**<br>P.O. Box 538<br>Lewiston, ID  83501<br>jtaylor@cropusainsurance.com | **AIA Insurance, Inc.**<br>P.O. Box 538<br>Lewiston, ID  830501<br>jtaylor@cropusainsurance.com |

_____

Steve Wieland
Attorney for Defendants R. John Taylor, Michael W. Cashman Sr., James Beck, Connie Taylor Henderson, JoLee Duclos, and Crop USA Insurance Agency, Inc.



June 13, 2016

***VIA U.S. Mail and Facsimile (208) 799-9172***

Board of Directors
AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

Board of Directors
AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  83501

**Re:**     ***Shareholder Derivative Demand***

Dear Purported Boards of Directors:

As you are well aware, Dale Miesen, Jerry Legg and Donna Taylor (individually and as Personal Representative of the Estate of Sara Taylor) have all been shareholders of AIA Services Corporation since well before 1995, and this firm represents them for purposes of this shareholder derivative demand ("derivative demand").

As you know, there have been, and continues to be, extensive malfeasance, torts and illegal conduct occurring at AIA Services Corporation and AIA Insurance, Inc., and the unlawfully covering up of the foregoing acts, omissions and torts. Consequently, this letter is yet another derivative demand being provided in accordance with Idaho Code, including I.C. §§ 30-1-742 and 30-29-742 (to the extent that the former may apply to certain acts, omissions and/or torts). However, despite my prior requests to inspect documents and records on behalf of the below named shareholders in accordance with Idaho Code, you have refused to allow such inspections to take place or otherwise provide responsive documents. As a result, this derivative demand was delayed and is based only on the most recent information obtained to date.

601 108th Ave, Suite 1900, Bellevue, WA 98004  l  Phone: (425) 591-6903  l  Web: www.roderickbond.com
Roderick C. Bond - Attorney  l  Email: rod@roderickbond.com  l  Licensed in Washington and Idaho

EXHIBIT A

**5-ER-1170**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 2

For purposes of this derivative demand, the following terms shall apply: (a) "AIA" means AIA Services Corporation and its wholly owned subsidiary AIA Insurance; (b) "CropUSA" means CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC; (c) "John" means R. John Taylor and his spouse as to any property transferred to such spouse, together with any entities partially or wholly owned by him (including Green Leaf RE, Reinsurance Partners, Weskan Agency, Pacific Empire Holdings, Sound Insurance and other entities); (d) "Connie" means Connie Taylor, Connie Taylor Henderson, and Connie Wright Henderson and her spouse as to any property transferred to such spouse; (e) "Beck" means James Beck and his spouse as to any property transferred to such spouse; (f) "Cashman" means Michael W. Cashman, Sr. and his spouse as to any property transferred to such spouse; (g) "Duclos" means JoLee K. Duclos and her spouse as to any property transferred to such spouse; (h) "Hawley Troxell" means Hawley Troxell Ennis & Hawley LLP and the applicable present and former attorneys at Hawley Troxell (including, without limitation, D. John Ashby, Gary Babbitt and Richard A. Riley); (i) "Pacific Empire Radio" means Pacific Empire Radio Corporation; (j) "GemCap" means GemCap Lending I, LLC, together with all of its applicable officer(s) and agents; (k) "Combined Defendants" means all of the foregoing parties except as to AIA (but includes attorneys, law firms and agents of AIA), but "Combined Defendants may include or not include Hawley Troxell and/or Pacific Empire Radio to the extent applicable based on certain facts and circumstances and/or when such facts and circumstance ocurred; and (l) "Controlling AIA Defendants" means John, Connie, Beck, Cashman and Duclos.  For each of the foregoing terms which define more than one party, each such term shall also mean any one or more of the defined parties for purposes of demanding in the alternative.

Dale Miesen, Jerry Legg and Donna Taylor hereby demand that all possible claims and legal action be immediately taken in a court of law on behalf of AIA as follows (including claims which may be contemplated and/or related in any way to the following):[1]

1. Pursue all possible claims and defenses, and seek the maximum damages, against the Combined Defendants, including, without limitation, all possible tort claims (including, without limitation, aiding and abetting in the commission of torts against AIA), contract claims, declaratory relief, injunctive relief and punitive damages based on all acts, omissions, concealments, and failure to disclose. Without limiting the foregoing and so there is no confusion (even though you are well aware of the facts, lawsuits and legal issues as having full access to information at AIA and the most of the Combined Defendants), more specific examples are included below and demand is hereby made to take action against those parties and any of the other Combined Defendants to recover damages based on any of such specific examples.

---

[1] This derivative demand shall also be construed as being provided by any and/or all of the other innocent minority common and preferred shareholders of AIA Services Corporation. The undersigned apologizes for any spelling or grammatical errors, but he wanted to get this derivative demand submitted to AIA as soon as possible.

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 3

2.  Pursue all possible claims and defenses against the Combined Defendants relating in any way to all loans, guarantees, settlement agreements and any other agreements or instruments involving GemCap and AIA (including, without limitation, the loans, guarantees, security agreements, settlements, agreements and all other instruments which are the subject matter of the lawsuit *Gemcap Lending I, LLC v. CropUSA Insurance Agency, Inc., et al.*, in the U.S. District Court, Central District of California, Case No. CV 13-05504 SJO (MANx) ("California Lawsuit"). As you know, AIA was barred from guaranteeing any loans for CropUSA or entering into any settlement agreements under AIA Services' amended articles of incorporation and restated bylaws and all agreements and guarantees were not properly authorized by AIA's board of directors (i.e., Donna Taylor's board designee did not authorize the guarantees and settlements). In addition, AIA received no consideration for entering into the guarantees, security agreements or settlement agreements. As a result, demand is further made to assert all possible claims and defenses in any pending and future lawsuits to have the guarantees, instruments, all settlement agreements and judgments declared illegal, ultra-vires acts, void or voidable and thus unenforceable and to pursue all related claims against GemCap, the Controlling AIA Defendants, and any other responsible parties or parties who have aided and abetted or assisted in such acts and/or omissions.

3.  Pursue all possible claims and defenses against GemCap and the other Combined Defendants to recover all property, real property and/or funds transferred or paid to it directly or indirectly from AIA (including, without limitation, the transfer of AIA Services' interest in the mortgage and real property known as the Lewis/Clark Plaza located at 111 Main Street in Lewiston, Idaho), together with all damages, attorneys' fees and costs paid or incurred by AIA based on the foregoing.

4.  Pursue all possible claims and defenses against GemCap, and to the extent necessary any of the other Combined Defendants, to extricate AIA from all settlement agreements entered into with GemCap and have such agreements declared illegal and/or unenforceable as to AIA, including, without limitation, the written Settlement Agreement which was filed by Doug Siddoway in Nez Perce County District Court dated effective September 15, 2014, together with all Assignments Agreements, related agreements, related instruments and judgments relating in any way to that Settlement Agreement and any prior or subsequent settlement agreements (including amendments or modifications thereto) in the California Lawsuit.

5.  Pursue all possible claims and defenses against GemCap, and to the extent necessary any of the other Combined Defendants, to vacate any judgments entered in favor of GemCap against AIA, including, without limitation the judgments entered in the California Lawsuit and any subsequently entered foreign judgments (including, upon belief, the foreign judgment recently entered against AIA Insurance in Nez Perce County District Court). Included in this demand is also the demand to assert that there was no jurisdiction over AIA in the California Lawsuit and thus the judgments should be voided.

EXHIBIT A
5-ER-1172

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 4

6.   Pursue all possible claims and defenses against GemCap for aiding and abetting John, Connie, Beck, Cashman, CropUSA, Pacific Empire Radio any other parties in committing torts against AIA (including assisting in breaches of fiduciary duties, fraud and other torts and covering up such breaches and torts). GemCap was aware of the malfeasance occurring at AIA when it first entered into the loans and guarantees with CropUSA and AIA, that AIA was being used improperly by the Controlling AIA Defendants to fund and/or support entities partially or wholly owned by them, and GemCap became more aware of these facts as time went on, yet GemCap continued to assist the foregoing parties committing and covering up torts against AIA (including, without limitation, breaches of fiduciary duties and fraud).

7.   Pursue all possible claims against the Combined Defendants for their torts committed against AIA (including, without limitation, breaches of fiduciary duties, fraud and any other claims contemplated or related to any of the facts or issues disclosed in this letter) and the aiding and abetting of torts committed against AIA by one or more of the Combined Defendants (including, without limitation, assisting in the commission of the torts or covering up the torts).

8.   Pursue all possible claims against Controlling AIA Defendants requiring them to disgorge all compensation, consulting fees, fees, salary, benefits or any other type of payments made to them directly or indirectly from AIA (including, based on being faithless fiduciaries and/or receiving such compensation without proper authorization from AIA) and to require them to repay any funds, expenses, fees, reimbursements, and costs incurred by AIA or paid by AIA for their benefit in any legal action or matter and to obtain damage judgments for such payments and compensation. Included in this demand is disgorgement or damages for all salary, bonuses, benefits and other compensation paid to John, Beck, Connie, Cashman and Duclos from being an officer, director or other agent of AIA and all attorneys' fees, expenses and costs paid on their behalf. This demand includes the $5,000 per quarter paid to Connie and Beck to purportedly serve on AIA's Board of Directors and all compensation paid to John and Duclos for purportedly being officers and/or directors of AIA.

9.   Pursue all possible claims against GemCap and the other responsible Combined Defendants (including the Controlling AIA Defendants) for all of the attorneys' fees, costs, expenses and damages proximately caused directly or indirectly from GemCap's loans to CropUSA and AIA's guarantees of those loans, including, without limitation, all attorneys' fees, costs and expensed incurred or paid directly or indirectly by AIA for the California Lawsuit and any other lawsuit. But for GemCap agreeing to improperly make the loans and improperly agree to accept AIA's guarantees, none of the lawsuits would have occurred.

10.  Pursue all possible claims and defenses against GemCap that it was not a good faith lender, had unclean hands, and/or is not entitled to any relief against AIA.

EXHIBIT A
**5-ER-1173**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 5

11. Pursue all possible claims against Hawley Troxell requiring it to disgorge all compensation received or paid to Hawley Troxell directly or indirectly from AIA based on Hawley Troxell's conflicts of interest, breached fiduciary duties (including the duties of loyalty) and related malpractice, including, without limitation, all subsequent payments made by AIA to Hawley Troxell.

12. Pursue all possible claims against Pacific Empire Radio for all sums owed by it to AIA, including, without limitation, the over $1,400,000 owed as disclosed in 2015) and all amounts which have been subsequently improperly lent to Pacific Empire Radio.

13. Pursue all possible claims against the Controlling AIA Defendants for allowing any funds to be lent to Pacific Empire Radio in the first place (including without limitation, for the breaches of fiduciary duties by them as present or former officers and/or directors of AIA and the aiding and abetting in assisting and/or covering up of the improper loans to Pacific Empire Radio). As you are fully aware, these loans violated AIA's amended articles of incorporation, AIA's bylaws, constituted conflicts of interest, provided no benefit to AIA and were made when AIA was not meeting its obligations to others.

14. Pursue all possible claims against Pacific Empire Radio, the Controlling AIA Defendants and any other parties relating to any agreements and subordination agreements improperly entered into between AIA, Pacific Empire Radio and any other party, as such agreements were not authorized by AIA and were not in AIA's best interests.

15. Pursue all possible claims against the Controlling AIA Defendants for allowing John to operate AIA for his benefit and/or to assist AIA in funding and the operation of entities partially or wholly owned by the Controlling AIA Defendants without AIA receiving any benefit, proper compensation, without full disclosure to AIA, in violation of applicable conflicts of interest (including under AIA Services' amended articles of incorporation and bylaws) and without obtaining proper authorization from AIA or its innocent minority shareholders.

16. Pursue all possible claims against the Controlling AIA Defendants and any other responsible party for all damages relating to all payments made directly or indirectly from AIA to the attorneys and law firms of Hawley Troxell, Crumb & Munding, Gordon & Reese, Risley Law Office PLLC, Randall Blake and Cox, Clark and Feeney, Quarles & Brady, Randall Danskin, David Gittins, Connie Taylor (and her law firms Clark and Feeney and Henderson Law Firm) and any other law firm (including for declaratory relief that no further sums are owed by AIA to any of the foregoing and that any fee agreements or conflict waivers are void), as such payments should never have been made, were never authorized by AIA, were not properly incurred or necessary for AIA, were never authorized by AIA's shareholders after full disclosure was made, and involved the attorneys and law firms taking action or performing work not in the best interests of AIA and/or in violation

EXHIBIT A
5-ER-1174

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 6

of the duty of loyalty owed to AIA. Demand is further made to pursue all possible claims, including, without limitation, for the disgorgement of all fees, costs and expenses paid or discharge of any debts allegedly owed, to any of the foregoing attorneys, law firms and/or attorneys working at such law firms to the extent that they represented AIA based on conflicts of interest, breached fiduciary duties (including the duty of loyalty), and malpractice. To the extent that any of the forgoing law firm and attorneys did not represent AIA, then demand is made to pursue all possible claims against the Controlling AIA Defendants for all sums paid and/or owed to such attorneys and law firms by AIA. In addition, demand is made to assert all possible claims against the foregoing parties for participating and/or allowing AIA to be improperly utilized to fund the defense and prosecution of lawsuits which were not in AIA's best interests, but were instead pursued based on the interests of the Controlling AIA Defendants.

17. Pursue all possible claims against the Controlling AIA Defendants, and to the extent necessary AIA or any other Combined Defendant to ensure that AIA is not bound or obligated by any act or omission of the Controlling AIA Defendants or AIA, for not honoring Donna Taylor's unqualified appointment of a designee to AIA Services' Board of Directors (Patrick Moran and Paul Durant) and for declaratory relief that all such actions purportedly taken by the Board of Directors of AIA Services without the consent or approval of Donna Taylor's designee (who would have been the only director without a conflict of interest) were the unauthorized acts of AIA, ultra-vires and void. Such acts and omissions, include, without limitation, all guarantees and settlements with GemCap, all loans to Pacific Empire Radio, all conflict waivers or other agreements with attorneys and law firms, all board resolutions (including any resolutions provided to GemCap), and all other acts of the purported Board of Directors of AIA Services.

18. Pursue all possible claims against the Controlling AIA Defendants, CropUSA and any other of the Combined Defendants or responsible parties for all payments made to any and all vendors, creditors, consultants, agents, customers or other parties owed money by CropUSA, by the Controlling AIA Defendants, any entity partially or wholly owned by any one of the Controlling AIA Defendants, or paid at the direction of any one or more of the Controlling AIA Defendants, including, without limitation, the more recent hundreds of thousands of dollars in payments AIA made to certain agents and customers of CropUSA in 2013 and any previously or subsequently paid for CropUSA and any other entity.

19. Pursue all possible claims against the Combined Defendants for taking action violating AIA's amended articles of incorporation, violating AIA's bylaws, violating statutory and common law, and committing torts against AIA, together with aiding and abetting others (including other Combined Defendants) in covering up the torts committed against AIA. Examples of the torts and the covering up of those torts are contained with the proposed Second Amended Complaint recently filed in the federal derivative lawsuit by Dale Miesen and Donna Taylor—the facts and torts alleged in that Second Amended Complaint have continued since prior demands.

EXHIBIT A
**5-ER-1175**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 7

20. Pursue all possible claims against the Combined Defendants for failing to properly allocate costs, labor, expenses and other items between AIA and other entities, including, CropUSA, and by allowing such issues to take place in the first place, including, without limitation, based on the conflicts of interest and restrictions under AIA's amended articles of incorporation, bylaws and the undivided duties of loyalty owed by the Controlling AIA Defendants to AIA, among others, and for continuing to conceal and cover up all such issues and related issues.

21. Pursue all possible claims against the Controlling AIA Defendants for all damages, fees and costs incurred or paid by AIA for attempting to effectuate a reverse stock split to eliminate the minority common shareholders of AIA Services in violation of AIA Services' amended articles of incorporation, bylaws and Idaho Code, including, without limitation, the hundreds of thousands of dollars of attorneys' fees and costs paid to Randall Danskin for the improper reverse stock split and to purportedly represent AIA in the subsequent lawsuit against certain of AIA Services' shareholders. Demand is further made to pursue all possible claims against Doug Siddoway (and any other responsible attorney) and Randall Danskin, including, for breach fiduciary duties, conflicts of interest, and disgorgement of all attorneys' fees and costs paid to them and to have declared unlawful or uncollectable any attorneys' fees and costs allegedly owed to them by AIA, including, without limitation, based on their malpractice, breaches of duty of loyalty owed to AIA, conflicts of interest, for aiding and abetting the Controlling AIA Defendants in the commission of torts (including in that lawsuit and others), and taking action in violation of their undivided fiduciary duties of loyalty owed to AIA. To be clear, full and complete disgorgement should be sought and obtained for all fees, costs and expenses paid directly or indirectly by AIA (or by GemCap) to Randall Danskin for all work that it and its attorneys have directly or indirectly performed for AIA and for concealing from AIA the conflicts of interest, breaches of fiduciary duties and malpractice committed by Randall Danskin against AIA—Mr. Siddoway and Randall Danskin placed their interests in earning fees ahead of AIA's interests, are faithless fiduciaries and are not entitled to retain any compensation relating to AIA.

22. Pursue all possible claims against John Munding and Crumb & Munding (or such other firm Mr. Munding is operating through) for malpractice, breach of fiduciary duties and to disgorge all attorneys' fees, costs and expenses paid to them directly or indirectly by AIA for the California Lawsuit as Mr. Munding intentionally violated his duties owed to AIA, including, without limitation, his duties of loyalty owed to AIA and by taking direction and action benefitting other defendants (including John's) and placing their interests in front of AIA and by representing CropUSA, AIA and other parties when there were conflicts of interest in doing so and Mr. Munding knew that he could not properly represent AIA's interests and when he had no intention of doing so. Demand is further made to pursue all possible claims against Mr. Munding and Crumb & Munding for improperly failing to assert that the guarantees and settlement agreements entered into by AIA were not

EXHIBIT A
**5-ER-1176**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 8

authorized and were thus illegal or ultra-vires and by allowing AIA to enter into them in the first place. Mr. Munding places his interests in earning fees ahead of AIA's interests.

23. Pursue all possible claims against the Controlling Defendants, the applicable Combined Defendants and any other parties or entities to recover all sums paid directly or indirectly on behalf of any such parties (including the Controlling Defendants) by AIA, including, without limitation, loan payments (including loans paid for John and others), consulting fees (including for past and present employees and/or purported consultants for CropUSA, Sound Insurance, Weskan, AIA (to the extent unnecessary) and other entities or parties, and wages or benefits paid for the foregoing), expenses, costs, litigation expenses, commission refunds, credit card payments (made for John and others) cell phone bills, insurance payments, CropUSA commissions to agents (which was hundreds of thousands of dollars), telephone costs, advances (including to John, Weskan Agency, and others), tax payments, and other payments. As you are aware, the foregoing are easily determined by reviewing AIA's check registers and by ascertaining from John, Duclos or others regarding items not listed in the check registers, including, such information which has never been disclosed to AIA's minority shareholders or their attorneys and all subsequent ones to this demand.

24. Pursue all possible claims against the Controlling Defendants for wasting AIA's assets and funds and paying excessive compensation to any and/or all of them, including, without limitation, for the purpose of concealing and aiding and abetting in the covering up of torts committed against AIA.

25. Pursue all possible claims against the Controlling Defendants for allowing other entities partially or wholly owned by them, including CropUSA, to compete against AIA in violation of John's Executive Officer's Agreement and the undivided duty of loyalty owed to AIA by them as majority shareholders, directors, and/or officers of AIA.

26. Pursue all possible claims against John for representing AIA in any lawsuit, including, without limitation, the lawsuit that Dale Miesen, Donna Taylor and Paul Durant filed against GemCap and AIA to have the illegal guarantees and settlement agreements, which were the subject matter of the California Lawsuit, voided, including, without limitation, claims for intentional breaches of fiduciary duty and intentional malpractice for failing to represent the interests of AIA and by breaching the duty of loyalty owed to AIA.

27. Pursue all possible claims against the Combined Defendants for all damages and relief proximately caused from their acts and/or omissions in leading to the decimation of AIA and its present financial condition.

28. Pursue all possible claims against the Controlling AIA Defendants for any and all damages, tax liabilities, interest, penalties and any other source of damages causes by their acts, omissions and/or torts against AIA.

EXHIBIT A
**5-ER-1177**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 9

29. Pursue all possible claims requiring an accounting of all funds, assets, labor, expenses, costs and the allocation of such items between or among other individuals and parties (including the Controlling AIA Defendants and any entities partially or wholly owned by any one or more them).

30. To the extent necessary, pursue all possible claims and defenses for equitable subordination, indemnification (including equitable indemnification) and all related claims and defenses against the Combined Defendants in any pending or future lawsuit.

31. Pursue all possible claims and relief to obtain an accounting from Trustmark of all payments made to AIA and the subsequent use of such funds.

32. Pursue all possible claims seeking all necessary declaratory relief to make AIA whole and its innocence minority common and preferred shareholders whole (to the extent that shares have been cancelled or redeemed).

33. Pursue all possible claims requiring Donna Taylor's designee to be appointed to the Board of Directors of AIA Services and to require that the board of directors comply with AIA's amended articles of incorporation, AIA's bylaws, statutory and common law and to ensure full disclosure is made to AIA.

34. Pursue all possible claims that CropUSA and other entities (including Pacific Empire Radio) are the alter-ego of the Controlling AIA Defendants and thus they are individually liable for all damages.

35. To the extent John or others of the Controlling AIA Defendants have transferred real or personal property to their present or former spouses or any other party, pursue all possible claims to recover such property for the benefit of AIA and to help satisfy any judgment(s) which may be entered in favor of AIA.

36. Pursue all possible claims to prevent any of the Controlling AIA Defendants from being directors or officers of AIA.

37. Pursue all possible claims to seek declaratory judgment requiring AIA's officers, directors and shareholders to comply with AIA's amended articles of incorporation, AIA's bylaws and statutory and common law.

38. Pursue all possible claims against David Riley and his law firm (including Riley Law Offices) for malpractice and breaching his fiduciary duties owed to AIA, including, without limitation, requiring the repayment of all sums paid to them directly or indirectly from AIA, for disgorgement of all attorneys' fees, costs and expenses paid to them when they breached their fiduciary duties owed to AIA (including the undivided duty of loyalty),

EXHIBIT A
5-ER-1178

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 10

engaged in impermissible conflicts of interest (representing the interests of the Controlling AIA Defendants over the interest of AIA), aided and abetted the Controlling AIA Defendants, and for all other damages (including, without limitation, allowing property owned by AIA to be transferred to others (including GemCap) and/or utilized by the Controlling AIA Defendants).

39.  Pursue all possible claims against the Combined Defendants and any and all of the parties listed above for concealing from AIA the facts, conflicts and failing to disclose all necessary facts and claims.

40.  Pursue all possible claims against John and Connie relative to litigation expenses and costs paid for other lawsuits (including the lawsuit against John and Connie in Ada County), including fees and costs paid to Connie (or her firm) and/or on behalf of her or John.

41.  Pursue all possible claims against the Combined Defendants, which have not been specifically stated above, to recover all damages and money owed and/or traced directly or indirectly to AIA and/or otherwise derived from its labor, office space, trade secrets, funds, commissions, agency force, loans, guarantees, lines of credit and/or any other asset.

42.  Pursue all possible claims of prejudgment interest for all sums and damages owed to AIA in the maximum amount permitted under the law.

43.  Pursue all possible claims against any of the Combined Defendants or any other parties identified above to recover any attorneys' fees and costs incurred in any lawsuit or litigation directly or indirectly involving AIA.

44.  To the extent that the conduct and claims discussed above continues after this derivative demand, to pursue all possible claims based on all future action based upon the same or similar acts, omissions, conduct, claims and damages.

Please note that to the extent that any of the above demands overlap or are duplicative with prior demands or may include acts and claims which occurred after one of the prior demands, Dale Miesen, Jerry Legg and Donna Taylor are not waiving any claims for such prior demands or conceding that you have the right to now address those demands nor are they waiving the right to seek relief based on irreparable harm to AIA. To the contrary, Dale Miesen and Donna Taylor are already asserting, or seeking to assert, many claims on behalf of AIA.

In addition, please note that time is of the essence on many of the above claims and to the extent that AIA is harmed based on your failure to promptly act or promptly reject this derivative demand, you and any others (including other Controlling AIA Defendants) will be held liable. The torts, facts and issues are well known to you and you are in control of the facts and documents. Thus, you bear the risk of dragging out this demand and failing to take action on behalf of AIA.

EXHIBIT A
**5-ER-1179**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 11


Sincerely,

RODERICK BOND LAW OFFICE, PLLC

By: Roderick C. Bond

cc:  Dale Miesen
     Donna Taylor
     Jerry Legg
     Steve Wielend
     Shawnee Perdue

EXHIBIT A
**5-ER-1180**



# Roderick Bond
## Law Office, PLLC

August 23, 2016

_**VIA U.S. Mail and Facsimile (208) 798-0110 and Email: johntaylor@greenleafalliance.com**_

Board of Directors
AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

Board of Directors
AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  83501

**Re:**  _**Shareholder Derivative Demand**_

Dear Purported Boards of Directors:

As you are well aware, Dale Miesen, Jerry Legg and Donna Taylor (individually and as Personal Representative of the Estate of Sara Taylor) have all been shareholders of AIA Services Corporation since well before 1995 and creditors of AIA Services since October 1, 2013, and this firm represents them for this shareholder/creditor derivative demand ("derivative demand").

As you know, there have been, and continues to be, extensive malfeasance, torts and illegal conduct occurring at AIA Services Corporation and AIA Insurance, Inc., and the unlawfully covering up of the foregoing acts, omissions and torts. Consequently, this letter is yet another derivative demand being provided in accordance with Idaho Code, including I.C. §§ 30-1-742 and 30-29-742 (to the extent that the former may apply to certain acts, omissions and/or torts). However, despite my prior requests to inspect documents and records on behalf of the below named shareholders in accordance with Idaho Code, you have refused to allow such inspections to take place or otherwise provide responsive documents. As a result, this derivative demand was delayed and is based only on the most recent information obtained to date. More recently, John Taylor provided purported financial statements for the periods ending December 31, 2014 and December 31, 2015, respectively. He also provided copies of alleged amended bylaws, which are contrary to law and improperly adopted. For these reasons and others, yet another derivative demand is being provided.

601 108th Ave, Suite 1900, Bellevue, WA 98004 ∣ Phone: (425) 591-6903 ∣ Web: www.roderickbond.com
Roderick C. Bond - Attorney ∣ Email: rod@roderickbond.com ∣ Licensed in Washington and Idaho

EXHIBIT B

**5-ER-1181**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 2

For purposes of this derivative demand, the following terms shall apply: (a) "AIA" means AIA Services Corporation and its wholly owned subsidiary AIA Insurance; (b) "CropUSA" means CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC; (c) "John" means R. John Taylor and his spouse as to any property transferred to such spouse, together with any entities partially or wholly owned by him (including Green Leaf RE, Reinsurance Partners, Weskan Agency, Pacific Empire Holdings, Sound Insurance and other entities); (d) "Connie" means Connie Taylor, Connie Taylor Henderson, and Connie Wright Henderson and her spouse as to any property transferred to such spouse; (e) "Beck" means James Beck and his spouse as to any property transferred to such spouse; (f) "Cashman" means Michael W. Cashman, Sr. and his spouse as to any property transferred to such spouse; (g) "Duclos" means JoLee K. Duclos and her spouse as to any property transferred to such spouse; (h) "Hawley Troxell" means Hawley Troxell Ennis & Hawley LLP and the applicable present and former attorneys at Hawley Troxell (including, without limitation, D. John Ashby, Gary Babbitt and Richard A. Riley); (i) "Pacific Empire Radio" means Pacific Empire Radio Corporation; (j) "GemCap" means GemCap Lending I, LLC, together with all of its applicable officer(s) and agents; (k) "Combined Defendants" means all of the foregoing parties except as to AIA (but includes attorneys, law firms and agents of AIA), but "Combined Defendants may include or not include Hawley Troxell and/or Pacific Empire Radio to the extent applicable based on certain facts and circumstances and/or when such facts and circumstance occurred; and (l) "Controlling AIA Defendants" means John, Connie, Beck, Cashman and Duclos. For each of the foregoing terms which define more than one party, each such term shall also mean any one or more of the defined parties for purposes of demanding in the alternative.

Dale Miesen, Jerry Legg and Donna Taylor hereby demand that all possible claims and legal action be immediately taken in courts of law on behalf of AIA as follows (including claims which may be contemplated and/or related in any way to the following and this derivative demand is not seeking or requiring that all of the claims and parties be named in a single lawsuit):[1]

1.  Pursue all possible claims and defenses, and seek the maximum damages, against the Combined Defendants and any other party or entity named in this derivative demand, including, without limitation, all possible tort claims (including, without limitation, aiding and abetting in the commission of torts against AIA), contract claims, declaratory relief, injunctive relief and punitive damages based on all acts, omissions, concealments, and failure to disclose through the date of this letter and for the foregoing which continues past the date of this letter. Without limiting the foregoing and so there is no confusion (even though you are well aware of the facts, lawsuits and legal issues as having full access to information at AIA and the most of the Combined Defendants), more specific examples are included below and demand is hereby made to take action against those parties and any of the other Combined Defendants to recover damages based on any of such specific examples.

---

[1] This derivative demand shall also be construed as being provided by any and/or all of the other innocent creditors, minority common and preferred shareholders of AIA Services Corporation.

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 3

2.  Pursue all possible claims against John, the Combined Defendants, any other party or entity named in this derivative demand, and any of their responsible agents and/or attorneys for improperly amending AIA Services and AIA Insurance's bylaws to include the illegal, unauthorized and improper provisions allegedly on May 26, 2016, including, without limitation, because such amendments are contrary to the law and public policy in Idaho (including, without limitation, by creating an improper standard for fees to be awarded in derivative actions through improperly acting as the Idaho Legislature to extend the circumstances fees can be awarded under I.C. § 30-29-746, which is contrary to Idaho law and would discourage derivative actions by shareholders seeking to address wrongs to an Idaho corporation), such amendments were allegedly adopted through John when he had conflicts of interest (including under common law, Idaho Code, the bylaws and the articles of incorporation) and thus could not approve such amendments as the sole board member, when Donna Taylor's designee was not appointed to the board of directors and thus such amendments were not properly authorized, when such amendments should have been submitted to the minority shareholders for vote with John's shares being conflicted from voting on such amendments, creating new standards through such amendments which are inconsistent with Idaho law, AIA's existing bylaws at the time of the purported amendment and AIA's amended articles of incorporation, and by improperly seeking to retroactively adopt improper provisions after years of malfeasance, fraud and breached fiduciary duties by the Controlling AIA Defendants.

3.  Pursue all possible claims and defenses against John, the Combined Defendants, any other party or entity named in this derivative demand, and any of their responsible agents and/or attorneys for the improper and unlawful issuance of the purported 7,500 Series A Preferred Shares to John, including, without limitation, claims pertaining to the fact that the only Series A Preferred Shares authorized were the 200,000 shares originally issued to Donna Taylor and, even if additional shares were authorized, John's acquisition of them was unauthorized and violated Idaho law because such acquisition was not for proper purposes, a proper board of directors was not seated at the time of such acquisition (including, without limitation, Donna Taylor's board designee), no proper authorization was obtained for such acquisition or the consideration therefore, John had conflicts of interest which prevented him from making or approving the acquisition (including, without limitation, under Idaho Code, the bylaws and articles of incorporation), the other shareholders of AIA Services were never offered the Series A Preferred Shares, the purported issuance of the shares served no legitimate business transaction, and the sums owed by John for his acts and omissions against AIA far exceed any sums to which he could have used to acquire such Series A Preferred Shares.

4.  Pursue all possible claims against John, the Combined Defendants and any other person or entity named in this derivative demand for the property transferred to AIA from John and debts assumed for such property (including taxes, insurance or other expenses paid after transfer), including, without limitation, to rescind such transactions based on conflicts of interest and failure to property obtain approval from the rightfully seated board or

EXHIBIT B
5-ER-1183

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 4

shareholders, AIA had no business assuming more debt or acquiring property requiring funds it did not have to maintain (e.g., corporate waste), entering into any transactions with John, or, alternatively, to determine the true fair value of the property if the transfers are upheld (these transfers were disclosed to shareholders for the very first time in the recent financial statements).

5. Pursue all claims against the Controlling AIA Defendants for all litigation expenses incurred directly and indirectly by AIA, including, without limitation, as to any foreclosure action because such action would not have taken place but for the Controlling AIA Defendants' acts and omissions depleting AIA's funds and assets for their self-interests.

6. Pursue all possible claims against Jordan Taylor for any property (including money or real property derived directly or indirectly from AIA or funds derived from AIA) transferred to him from John or any of the other Combined Defendants, including, without limitation, the parking lot transferred to Jordan Taylor located in Lewiston, Idaho (which had been previously purchased with AIA Insurance's line-of-credit).

7. Pursue all possible claims against the Controlling AIA Defendants (including for breaching their fiduciary duties and aiding and abetting in the breach of those fiduciary duties) by incurring nearly as much or more attorneys' fees and costs fighting Donna Taylor for the redemption of her Series A Preferred Shares as it would have taken to simply pay her the sums the Controlling AIA Defendants and AIA Services promised to pay (as reflected in the recent financial statements).

8. Pursue all possible claims against GemCap, its representatives and attorneys (including David Risley and Risley Law Office) for improperly recording in Idaho an unlawfully obtained, non-final judgment from California Federal Court, including, without limitation, all damages, attorneys' fees and costs incurred as a result of the recording of that judgment and/or the removal thereof.

9. Pursue all possible claims against John for placing his interests above those of AIA and their innocent minority shareholders, including, without limitation, by allowing the transfer and sale of any property held by AIA to GemCap.

10. Pursue all possible claims against John, and against the other Controlling AIA Defendants for continuing to aid and abet him, for continuing to fail to properly disclose all financial information and transactions, for continuing to violate AIA's bylaws and articles of incorporation (including, without limitation the conflict of interest provisions), intentionally breach his fiduciary duties owed to AIA (including the duty of loyalty), for continuing to intentionally violate Idaho Code and common law and for all other claims mentioned in this derivative demand.

EXHIBIT B
5-ER-1184

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 5

11. Pursue all possible claims against the Controlling AIA Defendants for entering into any notes, deeds of trust, mortgages or any other instruments with Randall Danskin, Risley Law Office or any other law firm named in this derivative demand (and to take action against them as necessary to rescind such instruments and recover all funds paid). These instruments include those recently disclosed for the first time in the recent financial statements).

12. Pursue all possible claims and defendants against the Combined Defendants and/or any other person or entity named in this derivative demand for all ultra-vires actions taken by the boards of AIA as all such action dating back to at least 2001 was improper based on conflicts of interest, Donna Taylor's designee not being named to the board of AIA Services, and/or a designee representing the interests of the Series C Preferred Shareholders was never designated. As a result, no purported board action was properly authorized.

13. Pursue all possible claims against the Controlling AIA Defendants, including declaratory relief, barring them from requesting and AIA from paying, advancing or indemnifying the Controlling AIA Defendants for any attorneys' fees, costs, damages and any other claims or defenses.

14. Pursue all possible claims against John, GemCap and the Controlling AIA Defendants and any other persons or entities named in this derivative demand requiring them to disclose any and all agreements, deeds, deeds of trust, mortgages, settlements, settlement agreements and/or other instruments, whether oral or written, with GemCap or any of its agents or assigns, including, without limitation, any agreements and instruments relating in any way to any sums and/or property owed, borrowed, transferred and/or pledged or promised to GemCap.

15. Pursue all claims set forth and/or contemplated in the Second Amended Complaint and/or the Third Amended Complaint (depending on which complaint is operative after the pending motions) filed in U.S. District Court of Idaho. This demand is based is to clarify that the above-named shareholders have also been creditors of AIA Services to the extent that a court may deem AIA Services and/or AIA Insurance are insolvent and rule that fiduciary duties are no longer owed to the shareholders or corporation (issues the above-named shareholders dispute). In other words, the above-named shareholders have standing as shareholders or creditors.

16. Pursue all possible claims and defenses against GemCap and the other Combined Defendants to recover all proceeds from any sale of the real property known as the Lewis/Clark Plaza located at 111 Main Street in Lewiston, Idaho), together with all damages, attorneys' fees and costs paid or incurred by AIA based on the foregoing.

17. Pursue all possible claims and defenses against GemCap, and to the extent necessary any of the other Combined Defendants, to extricate AIA from all settlement agreements entered

EXHIBIT B
5-ER-1185

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 6

into with GemCap and have such agreements declared illegal and/or unenforceable as to AIA, including, without limitation, any agreements, stipulations or orders since the last derivative demand was provided (which includes the alleged sealed order entered in the California Federal Court action and any related or subsequent agreements, stipulations, orders, or judgments).

18. Pursue all possible claims and defenses against GemCap, and to the extent necessary any of the other Combined Defendants, to vacate any judgments entered in favor of GemCap against AIA, including, without limitation the judgments entered in the California Lawsuit and any subsequently entered foreign judgments (including, upon belief, the foreign judgment recently entered against AIA Insurance in Nez Perce County District Court). Included in this demand is also the demand to assert that there was no jurisdiction over AIA in the California Lawsuit and thus the judgments should be voided.

19. Pursue all possible claims and defenses against GemCap for aiding and abetting John, Connie, Beck, Cashman, CropUSA, Pacific Empire Radio any other parties in committing torts against AIA (including assisting in breaches of fiduciary duties, fraud and other torts and covering up such breaches and torts). GemCap was aware of the malfeasance occurring at AIA when it first entered into the loans and guarantees with CropUSA and AIA, that AIA was being used improperly by the Controlling AIA Defendants to fund and/or support entities partially or wholly owned by them, and GemCap became more aware of these facts as time went on, yet GemCap continued to assist the foregoing parties committing and covering up torts against AIA (including, without limitation, breaches of fiduciary duties and fraud).

20. Pursue all possible claims against the Combined Defendants for their torts committed against AIA (including, without limitation, breaches of fiduciary duties, fraud and any other claims contemplated or related to any of the facts or issues disclosed in this letter) and the aiding and abetting of torts committed against AIA by one or more of the Combined Defendants (including, without limitation, assisting in the commission of the torts or covering up the torts).

21. Pursue all possible claims against Controlling AIA Defendants requiring them to disgorge all compensation, consulting fees, fees, salary, benefits or any other type of payments made to them directly or indirectly from AIA (including, based on being faithless fiduciaries and/or receiving such compensation without proper authorization from AIA) and to require them to repay any funds, expenses, fees, reimbursements, and costs incurred by AIA or paid by AIA for their benefit in any legal action or matter and to obtain damage judgments for such payments and compensation. Included in this demand is disgorgement or damages for all salary, bonuses, benefits and other compensation paid to John, Beck, Connie, Cashman and Duclos from being an officer, director or other agent of AIA and all attorneys' fees, expenses and costs paid on their behalf. This demand includes the $5,000 per quarter paid to Connie and Beck to purportedly serve on AIA's Board of Directors and

EXHIBIT B
5-ER-1186

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 7

all compensation paid to John and Duclos for purportedly being officers and/or directors of AIA.

22. Pursue all possible claims against GemCap and the other responsible Combined Defendants (including the Controlling AIA Defendants) for all of the attorneys' fees, costs, expenses and damages proximately caused directly or indirectly from GemCap's loans to CropUSA and AIA's guarantees of those loans, including, without limitation, all attorneys' fees, costs and expensed incurred or paid directly or indirectly by AIA for the California Lawsuit and any other lawsuit. But for GemCap agreeing to improperly make the loans and improperly agree to accept AIA's guarantees, none of the lawsuits would have occurred.

23. Pursue all possible claims and defenses against GemCap that it was not a good faith lender, had unclean hands, and/or is not entitled to any relief against AIA.

24. Pursue all possible claims against Hawley Troxell requiring it to disgorge all compensation received or paid to Hawley Troxell directly or indirectly from AIA based on Hawley Troxell's conflicts of interest, breached fiduciary duties (including the duties of loyalty) and related malpractice, including, without limitation, all subsequent payments made by AIA to Hawley Troxell.

25. Pursue all possible claims against Pacific Empire Radio for all sums owed by it to AIA, and all amounts which have been subsequently improperly lent to Pacific Empire Radio.

26. Pursue all possible claims against the Controlling AIA Defendants for allowing any funds to be lent to Pacific Empire Radio in the first place (including without limitation, for the breaches of fiduciary duties by them as present or former officers and/or directors of AIA and the aiding and abetting in assisting and/or covering up of the improper loans to Pacific Empire Radio). As you are fully aware, these loans violated AIA's amended articles of incorporation, AIA's bylaws, constituted conflicts of interest, provided no benefit to AIA and were made when AIA was not meeting its obligations to others.

27. Pursue all possible claims against Pacific Empire Radio, the Controlling AIA Defendants and any other parties relating to any agreements and subordination agreements improperly entered into between AIA, Pacific Empire Radio and any other party, as such agreements were not authorized by AIA and were not in AIA's best interests.

28. Pursue all possible claims against the Controlling AIA Defendants for allowing John to operate AIA for his benefit and/or to assist AIA in funding and the operation of entities partially or wholly owned by the Controlling AIA Defendants without AIA receiving any benefit, proper compensation, without full disclosure to AIA, in violation of applicable conflicts of interest (including under AIA Services' amended articles of incorporation and bylaws) and without obtaining proper authorization from AIA or its innocent minority shareholders.

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 8

29. Pursue all possible claims against the Controlling AIA Defendants and any other responsible party for all damages relating to all payments made directly or indirectly from AIA to the attorneys and law firms of Hawley Troxell, Crumb & Munding, Gordon & Reese, Risley Law Office PLLC, Randall Blake and Cox, Clark and Feeney, Quarles & Brady, Randall Danskin, David Gittins, Connie Taylor (and her law firms Clark and Feeney and Henderson Law Firm) and any other lawyer and law firm (including any attorneys who have represented AIA) for malpractice, for declaratory relief that no further sums are owed by AIA to any of the foregoing and that any fee agreements or conflict waivers are void), as such payments should never have been made, were never authorized by AIA, were not properly incurred or necessary for AIA, were never authorized by AIA's shareholders after full disclosure was made, and involved the attorneys and law firms taking action or performing work not in the best interests of AIA and/or in violation of the duty of loyalty owed to AIA. Demand is further made to pursue all possible claims, including, without limitation, for the disgorgement of all fees, costs and expenses paid or discharge of any debts allegedly owed, to any of the foregoing attorneys, law firms and/or attorneys working at such law firms to the extent that they represented AIA based on conflicts of interest, breached fiduciary duties (including the duty of loyalty), and malpractice. To the extent that any of the forgoing law firm and attorneys did not represent AIA, then demand is made to pursue all possible claims against the Controlling AIA Defendants for all sums paid and/or owed to such attorneys and law firms by AIA. In addition, demand is made to assert all possible claims against the foregoing parties for participating and/or allowing AIA to be improperly utilized to fund the defense and prosecution of lawsuits which were not in AIA's best interests, but were instead pursued based on the interests of the Controlling AIA Defendants.

30. Pursue all possible claims against the Controlling AIA Defendants, and to the extent necessary AIA or any other Combined Defendant to ensure that AIA is not bound or obligated by any act or omission of the Controlling AIA Defendants or AIA, for not honoring Donna Taylor's unqualified appointment of a designee to AIA Services' Board of Directors (Patrick Moran and Paul Durant) and for declaratory relief that all such actions purportedly taken by the Board of Directors of AIA Services without the consent or approval of Donna Taylor's designee (who would have been the only director without a conflict of interest) were the unauthorized acts of AIA, ultra-vires and void. Such acts and omissions, include, without limitation, all guarantees and settlements with GemCap, all loans to Pacific Empire Radio, all conflict waivers or other agreements with attorneys and law firms, all board resolutions (including any resolutions provided to GemCap), and all other acts of the purported Board of Directors of AIA Services.

31. Pursue all possible claims against the Controlling AIA Defendants, CropUSA and any other of the Combined Defendants or responsible parties for all payments made to any and all vendors, creditors, consultants, agents, customers or other parties owed money by CropUSA, by the Controlling AIA Defendants, any entity partially or wholly owned by

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 9

any one of the Controlling AIA Defendants, or paid at the direction of any one or more of the Controlling AIA Defendants, including, without limitation, the more recent hundreds of thousands of dollars in payments AIA made to certain agents and customers of CropUSA in 2013 and any previously or subsequently paid for CropUSA and any other entity.

32. Pursue all possible claims against the Combined Defendants for taking action violating AIA's amended articles of incorporation, violating AIA's bylaws, violating statutory and common law, and committing torts against AIA, together with aiding and abetting others (including other Combined Defendants) in covering up the torts committed against AIA. Examples of the torts and the covering up of those torts are contained with the proposed Second and Third Amended Complaints recently filed in the federal derivative lawsuit by Dale Miesen and Donna Taylor—the facts and torts alleged in that Second Amended Complaint have continued since prior demands.

33. Pursue all possible claims against the Combined Defendants for failing to properly allocate costs, labor, expenses and other items between AIA and other entities, including, CropUSA, and by allowing such issues to take place in the first place, including, without limitation, based on the conflicts of interest and restrictions under AIA's amended articles of incorporation, bylaws and the undivided duties of loyalty owed by the Controlling AIA Defendants to AIA, among others, and for continuing to conceal and cover up all such issues and related issues.

34. Pursue all possible claims against the Controlling AIA Defendants for all damages, fees and costs incurred or paid by AIA for attempting to effectuate a reverse stock split to eliminate the minority common shareholders of AIA Services in violation of AIA Services' amended articles of incorporation, bylaws and Idaho Code, including, without limitation, the hundreds of thousands of dollars of attorneys' fees and costs paid to Randall Danskin for the improper reverse stock split and to purportedly represent AIA in the subsequent lawsuit against certain of AIA Services' shareholders. Demand is further made to pursue all possible claims against Doug Siddoway (and any other responsible attorney) and Randall Danskin, including, for breach fiduciary duties, conflicts of interest, and disgorgement of all attorneys' fees and costs paid to them and to have declared unlawful or uncollectable any attorneys' fees and costs allegedly owed to them by AIA, including, without limitation, based on their malpractice, breaches of duty of loyalty owed to AIA, conflicts of interest, for aiding and abetting the Controlling AIA Defendants in the commission of torts (including in that lawsuit and others), and taking action in violation of their undivided fiduciary duties of loyalty owed to AIA. To be clear, full and complete disgorgement should be sought and obtained for all fees, costs and expenses paid directly or indirectly by AIA (or by GemCap) to Randall Danskin for all work that it and its attorneys have directly or indirectly performed for AIA and for concealing from AIA the conflicts of interest, breaches of fiduciary duties and malpractice committed by Randall Danskin against AIA—Mr. Siddoway and Randall Danskin placed their interests in earning

EXHIBIT B
**5-ER-1189**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 10

fees ahead of AIA's interests, are faithless fiduciaries and are not entitled to retain any compensation relating to AIA.

35.  Pursue all possible claims against John Munding and Crumb & Munding (or such other firm Mr. Munding is operating through) for malpractice, breach of fiduciary duties and to disgorge all attorneys' fees, costs and expenses paid to them directly or indirectly by AIA for the California Lawsuit as Mr. Munding intentionally violated his duties owed to AIA, including, without limitation, his duties of loyalty owed to AIA and by taking direction and action benefitting other defendants (including John's) and placing their interests in front of AIA and by representing CropUSA, AIA and other parties when there were conflicts of interest in doing so and Mr. Munding knew that he could not properly represent AIA's interests and when he had no intention of doing so. Demand is further made to pursue all possible claims against Mr. Munding and Crumb & Munding for improperly failing to assert that the guarantees and settlement agreements entered into by AIA were not authorized and were thus illegal or ultra-vires and by allowing AIA to enter into them in the first place. Mr. Munding places his interests in earning fees ahead of AIA's interests.

36.  Pursue all possible claims against the Controlling Defendants, the applicable Combined Defendants and any other parties or entities to recover all sums paid directly or indirectly on behalf of any such parties (including the Controlling Defendants) by AIA, including, without limitation, loan payments (including loans paid for John and others), consulting fees (including for past and present employees and/or purported consultants for CropUSA, Sound Insurance, Weskan, AIA (to the extent unnecessary) and other entities or parties, and wages or benefits paid for the foregoing), expenses, costs, litigation expenses, commission refunds, credit card payments (made for John and others) cell phone bills, insurance payments, CropUSA commissions to agents (which was hundreds of thousands of dollars), telephone costs, advances (including to John, Weskan Agency, and others), tax payments, and other payments. As you are aware, the foregoing are easily determined by reviewing AIA's check registers and by ascertaining from John, Duclos or others regarding items not listed in the check registers, including, such information which has never been disclosed to AIA's minority shareholders or their attorneys and all subsequent ones to this demand.

37.  Pursue all possible claims against the Controlling Defendants for wasting AIA's assets and funds and paying excessive compensation to any and/or all of them, including, without limitation, for the purpose of concealing and aiding and abetting in the covering up of torts committed against AIA.

38.  Pursue all possible claims against the Controlling Defendants for allowing other entities partially or wholly owned by them, including CropUSA, to compete against AIA in violation of John's Executive Officer's Agreement and the undivided duty of loyalty owed to AIA by them as majority shareholders, directors, and/or officers of AIA.

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 11

39. Pursue all possible claims against John for representing AIA in any lawsuit, including, without limitation, the lawsuit that Dale Miesen, Donna Taylor and Paul Durant filed against GemCap and AIA to have the illegal guarantees and settlement agreements, which were the subject matter of the California Lawsuit, voided, including, without limitation, claims for intentional breaches of fiduciary duty and intentional malpractice for failing to represent the interests of AIA and by breaching the duty of loyalty owed to AIA.

40. Pursue all possible claims against the Combined Defendants for all damages and relief proximately caused from their acts and/or omissions in leading to the decimation of AIA and its present financial condition.

41. Pursue all possible claims against the Controlling AIA Defendants for any and all damages, tax liabilities, interest, penalties and any other source of damages causes by their acts, omissions and/or torts against AIA.

42. Pursue all possible claims requiring an accounting of all funds, assets, labor, expenses, costs and the allocation of such items between or among other individuals and parties (including the Controlling AIA Defendants and any entities partially or wholly owned by any one or more them).

43. To the extent necessary, pursue all possible claims and defenses for equitable subordination, indemnification (including equitable indemnification) and all related claims and defenses against the Combined Defendants in any pending or future lawsuit.

44. Pursue all possible claims and relief to obtain an accounting from Trustmark of all payments made to AIA and the subsequent use of such funds, including, without limitation, identifying any checks or payments made directly into any account by John or any of the other Controlling AIA Defendants.

45. Pursue all possible claims seeking all necessary declaratory relief to make AIA whole and its innocence minority common and preferred shareholders whole (to the extent that shares have been cancelled or redeemed).

46. Pursue all possible claims requiring Donna Taylor's designee to be appointed to the Board of Directors of AIA Services and to require that the board of directors comply with AIA's amended articles of incorporation, AIA's bylaws, statutory and common law and to ensure full disclosure is made to AIA.

47. Pursue all possible claims that CropUSA and other entities (including Pacific Empire Radio) are the alter-ego of the Controlling AIA Defendants and thus they are individually liable for all damages.

EXHIBIT B
5-ER-1191

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 12

48. To the extent John or others of the Controlling AIA Defendants have transferred real or personal property to their present or former spouses or any other party, pursue all possible claims to recover such property for the benefit of AIA and to help satisfy any judgment(s) which may be entered in favor of AIA.

49. Pursue all possible claims to prevent any of the Controlling AIA Defendants from being directors or officers of AIA.

50. Pursue all possible claims to seek declaratory judgment requiring AIA's officers, directors and shareholders to comply with AIA's amended articles of incorporation, AIA's bylaws and statutory and common law.

51. Pursue all possible claims against David Risley and his law firm (including Risley Law Offices) and any other attorneys or law firms named or referenced in this derivative demand (including those listed only as agents or attorneys) for malpractice and breaching his fiduciary duties owed to AIA, including, without limitation, requiring the repayment of all sums paid to them directly or indirectly from AIA, for disgorgement of all attorneys' fees, costs and expenses paid to them when they breached their fiduciary duties owed to AIA (including the undivided duty of loyalty), engaged in impermissible conflicts of interest (representing the interests of the Controlling AIA Defendants over the interest of AIA), aided and abetted the Controlling AIA Defendants, and for all other damages (including, without limitation, allowing property owned by AIA to be transferred to others (including GemCap) and/or utilized by the Controlling AIA Defendants).

52. Pursue all possible claims against the Combined Defendants and any and all of the parties listed above for concealing from AIA the facts, conflicts and failing to disclose all necessary facts and claims.

53. Pursue all possible claims against John and Connie relative to litigation expenses and costs paid for other lawsuits (including the lawsuit against John and Connie in Ada County), including fees and costs paid to Connie (or her firm) and/or on behalf of her or John.

54. Pursue all possible claims against the Combined Defendants, which have not been specifically stated above, to recover all damages and money owed and/or traced directly or indirectly to AIA and/or otherwise derived from its labor, office space, trade secrets, funds, commissions, agency force, loans, guarantees, lines of credit and/or any other asset.

55. Pursue all possible claims and/or declaratory relief that the Controlling AIA Defendants and/or any other party named in this derivative demand is not entitled to be indemnified by AIA and must repay all sums paid to date and/or judgment be obtained against them.

56. Pursue all possible claims of prejudgment interest for all sums and damages owed to AIA in the maximum amount permitted under the law.

EXHIBIT B
**5-ER-1192**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 13

57. Pursue all possible claims against any of the Combined Defendants or any other parties identified above to recover any attorneys' fees and costs incurred in any lawsuit or litigation directly or indirectly involving AIA.

58. To the extent that the conduct and claims discussed above continues after this derivative demand, to pursue all possible claims based on all future action based upon the same or similar acts, omissions, conduct, claims and damages.

Please note that to the extent that any of the above demands overlap or are duplicative with prior demands or may include acts and claims which occurred after one of the prior demands, Dale Miesen, Jerry Legg and Donna Taylor are not waiving any claims for such prior demands or conceding that you have the right to now address those demands nor are they waiving the right to seek relief based on irreparable harm to AIA. To the contrary, Dale Miesen and/or Donna Taylor are already asserting, or seeking to assert, many claims on behalf of AIA.

In addition, please note that time is of the essence on many of the above claims and to the extent that AIA is harmed based on your failure to promptly act or promptly reject this derivative demand, you and any others (including other Controlling AIA Defendants) will be held liable. The torts, facts and issues are well known to you and you are in control of the facts and documents. Thus, you bear the risk of dragging out this demand and failing to take action on behalf of AIA.

Sincerely,

RODERICK BOND LAW OFFICE, PLLC

By: Roderick C. Bond

cc: Dale Miesen
    Donna Taylor
    Jerry Legg
    Lee Ann Hostetler
    Paul Durant
    Steve Wieland
    Shawnee Perdue

EXHIBIT B
**5-ER-1193**

 **AIA Services Corporation**

AIA Services Corporation
One Lewis Clark Plaza
PO Box 538
Lewiston, Idaho 83501-0538
(208) 799-9000    FAX (208) 746-8159

September 12, 2016

Roderick Bond
Roderick Bond Law Office, PLLC
601 108th Ave., Suite 1900
Bellevue, WA 98004

Re:    June 13, 2016, Shareholder Derivative Demand Letter;
       August 23, 2016, Shareholder Derivative Demand Letter

Dear Mr. Bond:

In response to your shareholder derivative demand letters dated June 13, 2016, and August 23, 2016 (the "Demand Letters", the  boards of directors of AIA Services Corporation and of AIA Insurance, Inc. (the "Boards"), have determined not to take any action in response to the Demand Letters.

The Boards have rejected your Demand Letters because they do not provide a coherent description of the wrongful transactions for which you seek a remedy. The scope of conduct described in the Demand Letters is so broad they are impossible to address in any meaningful way. Although the Boards are not able to determine the wrongful conduct you seek to remedy, it appears that any legal remedies would be futile for numerous reasons, including without limitation applicable law relating to fiduciary duties; statutes of limitations; res judicata; the business judgment rule; equitable remedies such as laches and unclean hands. The Demand Letters also seem to refer to transactions that involved no conflict of interest or which were properly approved by disinterested directors pursuant to Idaho state law. Last, it appears that some or all of the shareholders you represent lack standing to bring a derivative claim.

EXHIBIT C

The Board has determined it would not be in the best interest of either the corporation or its shareholders to take any action.   Further, the claims appear to be subject to other pending actions.

Because of a pattern of abusive and frivolous litigation against the company and its managers, the bylaws for both corporations now include Section 11.11. Provisions like it have been upheld in other states such as Delaware. Section 11.11 permits the company's constituents, including individual directors, to recover attorney fees against shareholders who fail to fully succeed on their derivative claims. Given the sweeping scope of the Demand Letters, it is almost certain your clients will not prevail on all of their claims, and therefore will be liable for directors' attorney fees in future litigation.

Sincerely,

John Taylor
President
AIA Services Corporation and AIA Insurance, Inc.

EXHIBIT C

5-ER-1195

**Roderick Bond**

| | |
|---|---|
| **From:** | ecf@id.uscourts.gov |
| **Sent:** | Monday, December 5, 2016 4:01 PM |
| **To:** | CourtMail@idd.uscourts.gov |
| **Subject:** | Activity in Case 1:10-cv-00404-CWD Taylor et al v. Hawley Troxell Ennis & Hawley LLP et al |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of Idaho (LIVE Database)Version 6.1**

## Notice of Electronic Filing

The following transaction was entered on 12/5/2016 at 5:01 PM MST and filed on 12/5/2016
**Case Name:** Taylor et al v. Hawley Troxell Ennis & Hawley LLP et al
**Case Number:** 1:10-cv-00404-CWD
**Filer:**
**Document Number:** 190(No document attached)

**Docket Text:**
**DOCKET ENTRY ORDER: In consideration of the Hawley Troxell Defendants' non-opposition to Plaintiff's motion to amend (Dkt. [183]) and in an effort to keep this case moving forward, the Court will approve the third amended complaint, in part, as it relates to the Hawley Troxell Defendants only. The Hawley Troxell Defendants must file an answer to the Third Amended Complaint no later than December 19, 2016. See Fed. R. Civ.P. 15(a)(3). Signed by Judge Candy W. Dale. (tmp)**

**1:10-cv-00404-CWD Notice has been electronically mailed to:**

Alyson Anne Foster     aaf@aswblaw.com, cme@aswblaw.com, mar@aswblaw.com, tie@aswblaw.com

David R Risley (Terminated)     david@risleylawoffice.com, judy@risleylawoffice.com

James D LaRue     jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson     jat@elamburke.com, nlp@elamburke.com

Lee H Rousso (Terminated)     lee@leerousso.com

1

**5-ER-1196**

Loren C Ipsen    lci@elamburke.com, nlp@elamburke.com

Roderick Cyr Bond    rod@roderickbond.com

Shawnee S Perdue    sperdue@wielandperdue.com, admin@wielandperdue.com, rtway@wielandperdue.com, sbutler@wielandperdue.com

Steven P Wieland    swieland@wielandperdue.com, admin@wielandperdue.com, rtway@wielandperdue.com, sbutler@wielandperdue.com

**1:10-cv-00404-CWD Notice will be served by other means to:**

AIA Insurance, Inc.


AIA Services Corporation


Theodore O Creason
DECEASED

2

**5-ER-1197**