**Consolidated Case Nos. 25-3552 and 25-3800**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,

**Plaintiff-Appellant**,

v.

R. JOHN TAYLOR, an individual, CONNIE TAYLOR HENDERSON, an individual, JAMES BECK, an individual, MICHAEL W. CASHMAN, SR., an individual, CROP USA INSURANCE AGENCY, INC., an Idaho corporation, CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company, AIA SERVICES CORPORATION, an Idaho corporation, AND AIA INSURANCE, INC., an Idaho corporation,

**Defendants-Appellees**,

and

Reed J. Taylor, an individual,

**Third-Party Defendant-Appellee.**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO,
CHIEF DISTRICT COURT JUDGE DAVID C. NYE, PRESIDING

**APPELLANT'S EXCERPTS OF THE RECORD – VOLUME - 6**

Roderick C. Bond
Roderick Bond Law Office, PLLC
10900 NE 4th St., Suite 2300
Bellevue, WA  98004
Tel: (425) 591-6903
Email: rod@roderickbond.com
Attorney for Appellant

Andrew Schwam
Andrew Schwam Law Firm
705 SW Fountain St.
Pullman, WA  99163-2128
Tel: (208) 874-3684
Email: amschwam@turbonet.com
Attorney for Appellant

FILED

Alyson Foster (ISB No. 9719)
aaf@aswblaw.com
**ANDERSEN SCHWARTZMAN
WOODARD BRAILSFORD, PLLC**
101 S. Capitol Boulevard, Suite 1600
Boise, ID 83702
Telephone: (208) 342-4411
Facsimile: (208) 342-4455

2016 NOV 17 PM 2: 08

PATTY O. WEEKS
CLERK
DEPUTY

*Attorney for Plaintiff GemCap Lending I, LLC*

## IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE

## STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>AIA SERVICES CORPORATION, an Idaho corporation; AIA SERVICES CORPORATION 401(K) PROFIT SHARING PLAN; R. JOHN TAYLOR, an individual; R. JOHN TAYLOR, as Trustee of AIA SERVICES CORPORATION 401(K) PROFIT SHARING PLAN; R. JOHN TAYLOR, as President of AIA SERVICES CORPORATION,<br><br>Defendants. | Case No. **CV16-02207**<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff GEMCAP LENDING, LLC ("Plaintiff" or "GemCap") hereby alleges as follows:

1.      This case is brought under the Idaho Uniform Voidable Transactions Act

("UVTA"), I.C. 55-901 et seq., and arises out fraudulent transfers of a promissory note and deed

Case Assigned to:
**JEFF M. BRUDIE**

COMPLAINT AND DEMAND FOR JURY TRIAL - 1

# Exhibit - C

of trust by R. John Taylor ("Taylor") in an effort to hinder, delay, or defraud GemCap, a creditor of Taylor and some of his companies. Specifically, on August 7, 2013, Taylor executed and recorded documents transferring, from AIA Services Corporation ("AIA Services") (a debtor of GemCap) to AIA Services Corporation 401(k) Profit Sharing Plan ("AIA Profit Sharing Plan") (not a debtor of GemCap), a 23% interest in a $1,975,500 promissory note and deed of trust given as security. Taylor signed the agreement on behalf of both the transferor (AIA Services) and the transferee (AIA Profit Sharing Plan), and backdated the transfer to April 10, 2010. This was precisely one week after GemCap had filed a lawsuit against AIA Services, Taylor, and others to collect a $10MM loan that AIA Services and Taylor had guaranteed.

2.  On September 11, 2014—precisely one day before trial was scheduled to commence in the collection lawsuit—Taylor executed and recorded a second agreement transferring 10% of the promissory note from AIA Services to the AIA Profit Sharing Plan. This agreement was backdated to February 10, 2014.

3.  GemCap learned of the AIA Profit Sharing Plan's 33% interest in the promissory note and deed of trust for 111 Main Street when, during settlement negotiations with Taylor, Taylor agreed to transfer AIA Services' 67% interest in 111 Main Street to GemCap.

4.  At this stage, 111 Main Street has been sold and 33% of the proceeds placed in escrow for the AIA Profit Sharing Plan. The transfers of interest, however, were fraudulently conducted to hide assets from AIA Services' creditor GemCap and hinder GemCap in its ability to collect.

5.  In this lawsuit, GemCap seeks relief that would return to GemCap the portion of the sale proceeds currently held in escrow for the AIA Profit Sharing Plan. Thus, GemCap seeks an order (1) adjudging these transfers to be void and avoided to the extent necessary to satisfy

**COMPLAINT AND DEMAND FOR JURY TRIAL - 2**

# Exhibit - C

## 6-ER-1200

GemCap's claim to sale proceeds of 111 Main Street ($264,076, plus interest) under I.C. §§ 55-906, 55-913, 55-914, and 55-916(1)(a); (2) granting GemCap a prejudgment attachment against the proceeds of the sale of 111 Main Street currently held in escrow for the AIA Profit Sharing Plan, as provided for in Idaho Code § 55-916(1)(b); (3) levying execution on the proceeds of the sale, as provided for in Idaho Code § 55-916(2); and (4) enjoining the AIA Profit Sharing Plan and Taylor, as Trustee of the AIA Profit Sharing Plan, along with his representatives, attorneys, and agents, from further disposing of the property sale proceeds currently held in escrow for the AIA Profit Sharing Plan.

## PARTIES

6.     Plaintiff GemCap is, and at all times relevant was, a Delaware limited liability company with its principal place of business in Malibu, California. All members of GemCap are domiciled in California. At certain times mentioned herein, GemCap held an ownership interest in real property in the County of Nez Perce, State of Idaho.

7.     Defendant AIA Services, and its parent corporation AIA Insurance, Inc. ("AIA Insurance"), is an Idaho corporation with its principal place of business located at 111 Main Street Lewiston, Idaho 83501. AIA Services is therefore an Idaho citizen.

8.     Defendant AIA Profit Sharing Plan is a single-employer Employee Benefit Plan formed on or about February 1, 1978 in accordance with Sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 and Sections 6047(e), 6057(b) and 6058(a) of the Internal Revenue Code. On information and belief, AIA Profit Sharing Plan is administered in Lewiston, Idaho. The AIA Profit Sharing Plan's corpus includes certain real property recorded in Nez Perce County.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 3**

# Exhibit - C

## 6-ER-1201

9.        Defendant R. John Taylor a/k/a Ray Johnson Taylor a/k/a R. Johnson Taylor a/k/a Raymond J. Taylor ("Taylor") is an individual domiciled in Lewiston, Idaho. Taylor is the President of both AIA Insurance and its wholly owned subsidiary, AIA Services. Defendant Taylor has been the Trustee for the AIA Profit Sharing Plan since approximately November 4, 2009.

## VENUE AND JURISDICTION

10.        Venue in this court is proper under Idaho Code § 5-404 because all of the defendants reside in Nez Perce County, the transfers at issue occurred in Nez Perce County, and the property that is the subject of the transfers is located in Nez Perce County.

11.        In addition, Idaho Code § 55-919(2) provides that a claim under the UVTA is governed by the local law of the jurisdiction in which the debtor is located when the transfer is made or the obligation incurred. Idaho Code § 55-919(1)(a) further states that an individual debtor's location is located at the individual's place of residence, and § 55-919(c) states that an organization's location with more than one (1) place of business is located at its chief executive office. Therefore, venue in this Court is proper.

12.        Defendants are subject to the general jurisdiction of this court as well as under Idaho Code § 5-514.

13.        This court has original jurisdiction over this case under Idaho Code § 1-705.

## GENERAL ALLEGATIONS

**I.        The GemCap Loan**

14.        On or about November 23, 2011, Taylor, on behalf of his companies Crop USA Insurance Agency, Inc. and Crop USA Insurance Services, LLC (collectively, "Crop USA"), entered into a commercial asset-based loan with GemCap. Taylor also guaranteed the GemCap

**COMPLAINT AND DEMAND FOR JURY TRIAL - 4**

# Exhibit - C

## 6-ER-1202

Loan personally and on behalf of AIA Insurance and AIA Services (together, "AIA"). As a condition of the GemCap loan, Taylor executed a Security Agreement agreeing that the real property owned by AIA would be pledged to GemCap and would serve as security for the performance under the GemCap Loan.

15. On or about July 16, 2013, GemCap provided Taylor, Crop USA and AIA written notice of default of the GemCap Loan. On July 29, 2013, GemCap provided written notice to Taylor and Crop USA of its election to accelerate the obligations under the GemCap Loan and to pursue its legal remedies in accordance with its rights in the GemCap Loan.

## II. The GemCap Litigation and Settlement

16. On July 30, 2013, GemCap initiated a lawsuit in the United States District Court for the Central District of California (Case No. CV 13-05504 SJO (MANx)) against, among others, Taylor, Crop USA, AIA Insurance, and AIA Services in connection with the default of the GemCap Loan.

17. On September 12, 2014, the GemCap lawsuit proceeded to trial. The litigation culminated in a stipulated settlement agreement between all of the parties named, favoring GemCap's rights to enforce and collect on its loan agreement. The settlement was effective on September 15, 2014, and proposed stipulated judgments against the defaulting parties, including Taylor, were entered on February 3, 2015.

18. At the time of the settlement, Taylor represented to GemCap that AIA Services only owned a sixty-seven percent interest in that certain parcel of real property in downtown Lewiston, located at 111 Main Street, and commonly known as the Lewis and Clark Plaza Property ("The Property," see below). Taylor and AIA further represented that the remaining thirty-three percent ownership interest in The Property was held by the AIA Profit Sharing Plan.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 5**

# Exhibit - C

# 6-ER-1203

Taylor and AIA proposed that the Property be sold and that the sales proceeds be divided with GemCap receiving 67% of the sales proceeds and the AIA Profit Sharing Plan receiving 33%.

## III.   Ownership of The Property

19.   Prior to December 30, 1993, The Property was owned by Universal Life Insurance Company ("Universal Life"). On or about December 30, 1993, Universal Life sold the building to Washington Bank Properties ("WBP"), who in return entered into a lease agreement with AIA Insurance. This arrangement permitted AIA to continue occupying The Property as a tenant under the terms of a lease between WBP and AIA Insurance. Under the structure of the sale, AIA Insurance made lease payments to WBP, which were applied to WBP's mortgage obligation on the promissory note ("WBP Promissory Note"). On information and belief, Taylor executed these agreements on behalf of Universal Life and AIA Insurance. The AIA Insurance lease was set to expire on December 30, 2008. However after the expiration date, AIA Insurance remained in possession of the Property and did not revise any of the terms of the Lease Agreement.

20.   On information and belief, on or about March 4, 1996, the acting director of the Idaho Department of Insurance initiated rehabilitation proceedings against Universal Life and assumed its assets. The proceedings culminated in a cessation of Universal Life as a going concern in 2007. In the rehabilitation and subsequent proceedings, AIA petitioned the Idaho Director of Insurance to agree to assign the WBP Promissory Note, Deed of Trust and Escrow Agreement to AIA Services Corporation. This petition was granted on July 23, 2007, in the form of a Notice of Assignment of Promissory Note, Deed of Trust and Escrow ("Notice of Assignment"). The Notice of Assignment was recorded on September 28, 2007, in Nez Perce

**COMPLAINT AND DEMAND FOR JURY TRIAL - 6**

# Exhibit - C

# 6-ER-1204

County. A true and correct copy is attached hereto as Exhibit A and incorporated by reference as if set forth in full herein.

21.     The WBP Promissory Note matured and became fully due and payable on May 1, 2011. WBP did not pay when the Promissory Note became due. On September 23, 2011, AIA Services recorded a Lis Pendens and initiated legal action against WBP in the Second Judicial District of Idaho (Case No. CV11-01927), seeking a decree of judicial foreclosure on The Property securing the obligation on the Promissory Note. In its Complaint, AIA Services claimed sole ownership interest in the deed of trust and promissory note securing the Property.

22.     On July 30, 2013, the Second Judicial District entered a decree of judicial foreclosure in favor of AIA Services and against WBP (Case No. CV2011-01927). A true and correct copy of the judicial decree is attached hereto as Exhibit B and incorporated by reference as if set forth in full herein.

23.     On August 7, 2013, one week after the judicial decree was entered and one week after GemCap commenced its collection litigation against AIA Services, AIA Services recorded a Memorandum of Agreement ("Transfer No. 1") purporting to assign an undivided twenty-three percent interest in the WBP Promissory Note to the AIA Profit Sharing Plan. Transfer No. 1 is signed by Taylor as assignor, in his capacity as President of AIA Services, and also as assignee, in his capacity as the Trustee for AIA Services' AIA Profit Sharing Plan. A true and correct copy is attached hereto as Exhibit C and incorporated by reference as if set forth in full herein.

24.     Transfer No. 1 reflects no consideration given for the assignment of interest to the AIA Profit Sharing Plan. Upon information and belief, the transfer was made without AIA Services receiving a reasonably equivalent value in exchange or, indeed, any consideration whatsoever.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 7**

# Exhibit - C

**6-ER-1205**

25.     On September 11, 2014, one day before the GemCap trial commenced, Taylor recorded a second Memorandum of Agreement ("Transfer No. 2"). Transfer No. 2 stated that it was effective February 28, 2014, and purported to assign an additional ten percent of the WBP Promissory Note to the AIA Profit Sharing Plan, "for the benefit of R. John Taylor." Transfer No. 2 was signed by Taylor, as assignor, in his capacity as President of AIA Services, and also as assignee, in his capacity as the Trustee for the AIA Profit Sharing Plan. A true and correct copy is attached hereto as Exhibit D and incorporated by reference as if set forth in full herein.

26.     Transfer No. 2 reflects no consideration given for the assignment of interest to the AIA Profit Sharing Plan. Upon information and belief, the transfer was made without AIA Services receiving a reasonably equivalent value in exchange or, indeed, any consideration whatsoever.

27.     On or about September 18, 2016, the Property was sold to a third party and the sales proceeds are being held in escrow in Nez Perce County. The AIA Profit Sharing Plan claims an interest in $264,076 of the sales proceeds as property of the AIA Profit Sharing Plan.

### COUNT ONE –FRAUDULENT CONVEYANCE
**(All Defendants—Transfer No. 1 (23%))**
**(Idaho Code §§ 55-906, 55-913(1)(a), 55-913(1)(b), and 55-914)**

28.     GemCap realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 27.

29.     On or about August 7, 2013, in order to defraud GemCap, AIA Services through Taylor, for no consideration, purported to assign a twenty-three percent interest in the WBP Promissory Note to the AIA Profit Sharing Plan through Taylor. Taylor and AIA Services did this knowing that GemCap had a claim against them. Taylor fraudulently back-dated the Effective Date of the Partial Assignment to the AIA Profit Sharing Plan of March 10, 2010. AIA

COMPLAINT AND DEMAND FOR JURY TRIAL - 8

# Exhibit - C

**6-ER-1206**

Services and Taylor did not disclose this purported partial assignment to the AIA Profit Sharing Plan any time during the application process of the GemCap loan between 2011 and 2013, and did not disclose the assignment paperwork to GemCap at any time.

30.     AIA Services/Taylor's conveyance in Transfer No. 1 was made with intent to delay or defraud creditor GemCap within the meaning of I.C. § 55-906 and is thus void as to GemCap under that section.

31.     AIA Services/Taylor's conveyance in Transfer No. 1 was made with actual intent to hinder, delay, or defraud creditor GemCap within the meaning of I.C. § 55-913(1)(a) and is thus voidable as to GemCap under that section.

32.     AIA Services/Taylor's conveyance in Transfer No. 1 was made (i) without receiving a reasonably equivalent value in exchange for the transfer, and (ii) when AIA Services/Taylor were engaged in business (the loan agreement and guaranty) for which the remaining assets of AIA Services/Taylor were unreasonably small in relation to those transactions, and thus Transfer No. 1 is voidable as to GemCap within the meaning of I.C. § 55-913(1)(b).

33.     AIA Services/Taylor's conveyance in Transfer No. 1 was made after their obligations to GemCap arose, was made without receiving a reasonably equivalent value in exchange for the transfer, and was made when AIA Services/Taylor were insolvent, and thus Transfer No. 1 is voidable as to GemCap within the meaning of I.C. § 55-914.

34.     Transfer No. 1 has badges of fraud that include the following.

        a.      Transfer No. 1 was an insider transfer, as Taylor solely executed and authorized both sides of the conveyance, was the President of the transferor, and was the sole Trustee of the transferee.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 9**

# Exhibit - C
## 6-ER-1207

b.      Taylor, as sole Trustee to the AIA Profit Sharing Plan, remained in possession and control of the twenty-three percent interest in The Property after the transfer.

c.      Transfer No. 1 was made and recorded one week after GemCap filed its collection lawsuit against AIA Services and Taylor (as well as other of Taylor's entities.

d.      By transferring the twenty-three percent interest to AIA Profit Sharing Plan, Taylor and AIA Services effectively removed assets from the reach of creditor GemCap.

e.      On information and belief, AIA Services was insolvent or should have known it was insolvent at the time of the transfer, as its debts were greater than its assets.

35.     GemCap is entitled to avoidance of this transfer to the extent necessary to enforce the terms of its settlement agreement with Taylor and AIA Services under I.C. §§ 55-906, 55-913, 55-914, and 55-916(1)(a).

36.     As a proximate result of the aforementioned acts of Taylor, GemCap has been damaged in a sum subject to proof at trial, but in an amount not less than the total amount of funds GemCap is entitled to, for the remaining twenty-three percent interest in proceeds of the sale of The Property, including interest at the legal rate.

37.     GemCap is informed and believes and thereon alleges that in committing the acts herein, Taylor, in both his individual capacity and capacity as President of AIA Services and Trustee of the AIA Profit Sharing Plan, acted fraudulently, maliciously, and in conscious disregard of his liability to GemCap.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 10**

# Exhibit - C

# 6-ER-1208

## COUNT TWO—FRAUDULENT CONVEYANCE
### (All Defendants—Transfer No. 2 (10%))
### (Idaho Code §§ 55-906, 55-913(1)(a), 55-913(1)(b), and 55-914)

38.     GemCap realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 37.

39.     On or about September 11, 2014, in order to defraud GemCap, as creditor to Taylor and AIA, Taylor, for no consideration, purported to assign a ten-percent interest in the WBP Promissory Note to the AIA Profit Sharing Plan.

40.     AIA Services/Taylor's conveyance in Transfer No. 2 was made with intent to delay or defraud creditor GemCap within the meaning of I.C. § 55-906 and is thus void as to GemCap under that section.

41.     AIA Services/Taylor's conveyance in Transfer No. 2 was made with actual intent to hinder, delay, or defraud creditor GemCap within the meaning of I.C. § 55-913(1)(a) and is thus voidable as to GemCap under that section.

42.     AIA Services/Taylor's conveyance in Transfer No. 2 was made (i) without receiving a reasonably equivalent value in exchange for the transfer, and (ii) when AIA Services/Taylor were engaged in transactions (the loan agreement and guaranty) or about to engage in transactions (the settlement agreement) for which the remaining assets of AIA Services/Taylor were unreasonably small in relation to those transactions, and thus Transfer No. 2 is voidable as to GemCap within the meaning of I.C. § 55-913(1)(b).

43.     AIA Services/Taylor's conveyance in Transfer No. 2 was made after their obligations to GemCap arose, was made without receiving a reasonably equivalent value in exchange for the transfer, and was made when AIA Services/Taylor were insolvent, and thus Transfer No. 2 is voidable as to GemCap within the meaning of I.C. § 55-914.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 11**

# Exhibit - C

44. Transfer No. 2 has badges of fraud that include the following.

    a. Transfer No. 2 was an insider transfer, as Taylor solely executed and authorized both sides of the conveyance, was the President of the transferor, and was the sole Trustee of the transferee.

    b. Taylor, as sole Trustee to the AIA Profit Sharing Plan, remained in possession and control of the ten-percent interest in The Property after the transfer.

    c. Transfer No. 2 was made and recorded one day before trial commenced in GemCap's its collection lawsuit against AIA Services and Taylor.

    d. Transfer No. 2 occurred shortly (i.e. four days) before Taylor, AIA Services, and other Taylor entities stipulated to a judgment against them in an amount exceeding $12.1 million.

    e. By transferring the ten percent interest to AIA Profit Sharing Plan, Taylor and AIA Services effectively removed assets from the reach of creditor GemCap.

    f. On information and belief, AIA Services was insolvent or should have known it was insolvent at the time of the transfer, as its debts were greater than its assets.

45. GemCap is entitled to avoidance of this transfer to the extent necessary to enforce the terms of its settlement agreement with Taylor and AIA Services under I.C. §§ 55-906, 55-913, 55-914, and 55-916(1)(a).

46. As a proximate result of the aforementioned acts of Taylor, GemCap has been damaged in a sum subject to proof at trial, but in an amount not less than the total amount of

**COMPLAINT AND DEMAND FOR JURY TRIAL - 12**

# Exhibit - C

funds GemCap is entitled to, for the remaining twenty-three percent interest in the proceeds of the sale of The Property, including interest at the legal rate.

47.     GemCap is informed and believes and thereon alleges that in committing the acts herein, Taylor, in both his individual capacity and capacity as President of AIA Services and Trustee of the AIA Profit Sharing Plan, acted fraudulently, maliciously, and in conscious disregard of his liability to GemCap.

## PRAYER FOR RELIEF

**WHEREFORE**, GemCap prays for judgment against Defendants as follows:

1.     That the interest assignments to the AIA Profit Sharing Plan be voided and set aside as to GemCap to the extent necessary to satisfy GemCap's claim in the sum of $264,076, for the proceeds of The Property sale, plus interest.

2.     That The Property sale proceeds currently held in escrow for the AIA Profit Sharing Plan be attached in accordance with the provision of Section 55-916(1)(b) of the Idaho Code.

3.     That execution shall be levied on The Property sale proceeds currently held in escrow for the AIA Profit Sharing Plan in accordance with the provision of Section 55-916(2) of the Idaho Code

4.     That Defendant AIA Profit Sharing Plan and Defendant Taylor, as Trustee of the AIA Profit Sharing Plan, along with his representative, attorneys, and agents, be enjoined from further disposing of the Property proceeds currently held in escrow for the AIA Profit Sharing Plan;

5.     For reasonable attorneys' fees and costs incurred in bringing and maintaining this action; and

**COMPLAINT AND DEMAND FOR JURY TRIAL - 13**

# Exhibit - C

## 6-ER-1211

6.      For such other and further relief as the Court may deem just and proper.

DATED this 17th day of November 2016

ANDERSEN SCHWARTZMAN WOODARD
BRAILSFORD, PLLC

By:_____
Alyson A. Foster
*Attorney for Plaintiff*
GEMCAP LENDING I, LLC, a Delaware
limited liability company

**COMPLAINT AND DEMAND FOR JURY TRIAL - 14**

# Exhibit - C

## 6-ER-1212

# EXHIBIT A

## Exhibit - C

**6-ER-1213**

.12087465812          Land Title                              03:47:47 p.m.      10-21-2009      1/7

INST. NO. __749210__

FILED FOR RECORD
FEE 2100 REC. BY **LAND TITLE**

When Recorded, Mail to:

Patrick V Collins
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 West Main Street, Suite 1000
Boise, Idaho 83702
Telephone: (208) 344-6000

2007 SEP 28 PM 12 03

PATTY O. WELKS
RECORDER, NEZ PERCE CO. ID.
BY BRimbold DEPUTY

---

SPACE ABOVE THIS LINE RESERVED FOR RECORDING PURPOSES

---

## NOTICE OF ASSIGNMENT OF PROMISSORY NOTE, DEED OF TRUST AND ESCROW AGREEMENT

PLEASE TAKE NOTICE that effective as of the *23* day of *July*, 2007, William W. Deal, Director of the Idaho Department of Insurance, in his capacity as Liquidator of The Universe Life Insurance Company, in Liquidation, the holder of the Promissory Note ("Note") secured by the deed of trust on the real property more particularly described in the Deed of Trust dated December 30, 1993, and recorded in the real property records of Nez Perce County, Idaho on December 30, 1993, as Instrument No. 580883, and attached hereto as Exhibit "A" ("Deed of Trust"), has assigned all right, title and interest of The Universe Life Insurance Company in the Note, as the Seller, and the Deed of Trust, as its Beneficiary, to AIA Services Corporation, an Idaho corporation, pursuant to that certain Order Granting Petition for Approval of Settlement Agreement and to Dismiss Claims re: AIA Services, Inc. and AIA Insurance, Inc , executed by Ada County District Court Judge Thomas F. Neville, and entered into the Court Records of Consolidated Case Nos. CV OC 9601126D and CV OC 0201884D  The complete mailing address of AIA Services Corporation is 111 Main Street, P. O  Box 538, Lewiston, Idaho 83501

THIS NOTICE SHALL ALSO CONSTITUTE A SUMMARY OF AN INSTRUMENT FOR RECORDATION PURSUANT TO IDAHO CODE § 55-818. A description of the interest or interests in real property created by the instrument is an Assignment of Promissory Note, Deed of Trust and Escrow Agreement, dated as of the date hereof

DATED this *23* day of *July*, 2007

William W. Deal, Director of the Idaho
Department of Insurance, in his capacity as
Liquidator of The Universe Life Insurance
Company, in Liquidation

By: _____
William A Deal/Director

NOTICE OF ASSIGNMENT                    Page 1

40005 0006 931280 1

# Exhibit - C

## 6-ER-1214

12087465812        Land Title                                          03:48:05 p.m.    10-21-2009        2/7

749210

STATE OF IDAHO            )
                         ) ss.
County of Ada            )

On this 23rd day of ~~June~~ July 2007, before me, _Thomas A. Donovan_ a Notary Public in and for said State, personally appeared WILLIAM W. DEAL, known or identified to me to be the Director of the Idaho Department of Insurance, in his capacity as Liquidator of The Universe Life Insurance Company, in Liquidation, the ~~Agency of the State of Idaho~~ corporation that executed the within instrument, or the person who executed the instrument on behalf of said ~~Director of the~~ corporation ~~Idaho Department of Insurance,~~ and acknowledged to me that such ~~Director of the Idaho~~ corporation ~~Department of Insurance~~ executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public for Idaho,
Residing at: _Boise_
My commission expires: _2/17/2013_

NOTICE OF ASSIGNMENT                    Page 2

                                        40005 0008 931260 1

# Exhibit - C

# 6-ER-1215

12087465812          Land Title                                  03:48:16 p.m.    10-21-2009          3/7

**749210**

**EXHIBIT A**

(See the attached Deed of Trust)

NOTICE OF ASSIGNMENT                          Page 3

40005 0006 931280 1

**Exhibit - C**

**6-ER-1216**

~~5014~~

**MICROFILM NO.**

| | |
|---|---|
| INDEXED | ( ) |
| FILMED | ( ) |
| DELIVERED | ( ) |
| MAILED | ( ) |

**580883**

DEED OF TRUST

This Deed of Trust, made on December 30, 1993 between Washington Bank Properties located at P.O. Box 2233, Friday Harbor, Washington, 98250, herein called Grantor, and Land Title of Nez Perce County, Inc., with its principal place of business at 1230 Idaho Street, city of Lewiston, County of Nez Perce, State of Idaho, herein called Trustee; and The Universe Life Insurance Company, 111 Main Street, City of Lewiston, County of Nez Perce, State of Idaho, hereinafter called Beneficiary,

Witnesseth: that Grantor does hereby irrevocably grant, bargain, sell and convey to Trustee in trust, with power over sale, that property in the County of Nez Perce, State of Idaho, described as follows:

See attached Exhibit A,

together with all and singular the tenements, hereditaments, and appurtenances thereunto belonging or in any manner appertaining that shall be deemed to include but not be limited to (1) all rents, issues, profits, damages, royalties, revenues, and benefits therefrom, subject, however, to any right, power, and authority hereinafter given to and conferred on beneficiary to collect the same; (2) all water and ditch rights, however evidenced, used in and on or appurtenant thereto; and (3) all fixtures now or hereafter attached to or used in connection with the premises.

This Deed of Trust is executed for the purpose of securing payment of that certain Promissory Note ("Note") dated December 30, 1993, executed and delivered by Grantor, as maker, to Beneficiary, as payee, in the principal sum of One Million Nine Hundred Eighty-Seven Thousand Five Hundred Dollars ($1,987,500.00) and secures payment prior to January 1, 2011, the maturity date of the Note and this Deed of Trust, of such other principal sums Beneficiary may additionally loan to and for the account of Grantor, together with interest, and the costs and charges in case of default. The terms and representations contained in said Promissory Note are incorporated herein by this reference. The making of any further loans, advances, or expenditures shall be optional with Beneficiary. It is the express intention of the parties that this Deed of Trust shall stand as continuing security until all such advances together with interest thereon have been paid.

With the prior written consent of Beneficiary (which consent shall not unreasonably be withheld), Grantor may substitute other property as security for payment of the Note, provided that such substitute collateral has a value equal to, or greater than, the value of the real property described in, and encumbered by, this Deed of Trust, and provided such substitute collateral is replacement property resulting from a casualty loss under the Lease

- 1 -

J:\C05811\M13671\00015541.2

# Exhibit - C

**6-ER-1217**

defined in the Note.  Upon such substitution of collateral, this Deed of Trust shall be deemed satisfied and released and Beneficiary shall promptly execute whatever documents are necessary to evidence such release on the public record.  In the event Grantor receives insurance proceeds for the market value of the real property described in, and encumbered by, this Deed of Trust due to a casualty loss where the damaged property is not rebuilt, such insurance proceeds shall first be applied to any accrued interest and outstanding principal balance under the Note.

By acceptance of this Deed of Trust, Grantor acknowledges and approves the terms as set forth herein.

In witness whereof, Grantor has set Grantor's hand and seal on the date first written above.

WASHINGTON BANK PROPERTIES

By: _____
    Dane Armstrong - Managing Partner

STATE OF WASHINGTON )
                    )ss
COUNTY OF SAN JUAN  )

On this 29th day of December, 1993, before me, a Notary Public in and for the State of Washington, personally appeared DANE ARMSTRONG, known or identified to me to be the Managing Partner of Washington Bank Properties and the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my official seal the day and year first above written.

_Carrie Brooks_____
(Signature)

_Carrie Brooks_____
(Please print name legibly)

NOTARY PUBLIC in and for the State of Washington, residing at Friday Harbor
My commission expires: 11/1/94

- 2 -

J:\C05811\M13671\00015541.2

# Exhibit - C

## 6-ER-1218

EXHIBIT "A"

SITUATE IN NEZ PERCE COUNTY, STATE OF IDAHO TO WIT:

PARCEL NO. 1:

Lots 1, 2 and 3, 4 and 5, Block 24, CITY OF LEWISTON , according
to the recorded plat thereof, records of Nez Perce County, Idaho.

PARCEL NO. 2:

Lots 6, 7 and 8, Block 24, of the plat of E. B. TRUE'S survey to
the City of Lewiston, according to the recorded plat thereof,
records of Nez Perce County, Idaho.

ALSO the South 4 feet approximately, more or less, of "D" Street
shown on said plat adjacent to said Lot 7 and adjacent to said
Lot 6, such South portion of said "D" Street being the portion
thereof that was occupied by occupants of said Lot 7 and 6, and
not open or in use as a street when said E. B. True made the
survey from which said plat was made, as found in the findings of
the court on November 20, 1905 in Scully against Squier, et al,
No. 990 in the District court of said Nez Perce County, affirmed
13 Idaho 417; also affirmed 215 U.S. 144; 30 S.Ct. 51; 54 L.Ed.
131 in which finding the Court said:  "Said survey and plat - cut
off approximately 4 feet from the North end of building then
standing and actual use and occupancy - in Blocks 23 and 24 of
the City of Lewiston - - - that the South line of "D" Street as
thence established by user was approximately 4 feet North of the
line originally shown on the E.B. True map - as the South line of
"D" Street.

ALSO the East 2 feet of Second Street as shown on said plat
adjacent to said Lots 7 and 8, conveyed to Robert Grostein and
Abraham Binnard, January 12, 1881, Book 27 of Deeds page 173, by
T. S. Billings, Mayor of said City.

EXCEPTING HOWEVER from land hereinabove described, the following:

TRACTS, viz:  That portion from South side of said Lot 3,
described in Deed from Robert Grostein and A. Binnard to T. S.
Billings, Mayor of the City of Lewiston, dated January 11, 1881,
Book 27 of Deeds, page 175, as follows:

Commencing at the intersection of the Northerly line of "E"
Street with the Easterly line of Second Street; thence Northerly
along said Easterly line of Second Street a distance of 10 feet;
thence Easterly at right angles to said Easterly line of Second
Street a distance of 40 feet to its intersection with the

# Exhibit - C

## 6-ER-1219

EXHIBIT "A"

SITUATE IN NEZ PERCE COUNTY, STATE OF IDAHO TO WIT:

Northerly line of "E" Street; and thence Westerly along said
Northerly line of "E" Street a distance of 43 feet to the POINT
OF BEGINNING.

PARCEL NO. 3:

All that block of land bounded on the West by First Street, on
the South by Main Street, on the East by Second Street, and on
the North by "D" Street, said property being sometimes described
as Blocks 25, 26 and Courthouse Block, and that certain alley
lying between said Block 25 and the Courthouse Block and Block
26, all shown by the plat of the City of Lewiston, Nez Perce
County, Idaho.

TOGETHER WITH all that portion of Second Street situate between
the South line of "D" Street and the North line of Main Street in
the City of Lewiston, Idaho, according to the original plat
thereof, the same being the 1874 survey of E. B. True, EXCEPT the
East 2 feet of Second Street as shown on said plat adjacent to
Lots 7 and 8, conveyed to Robert Grostein and Abraham Binnard,
January 12, 1881, Book 27 of Deeds, page 173, by T. S. Billings,
Mayor of said City.

INST. NO. 586883
FILED FOR RECORD
FEE 12.00 REG. BY LAND TITLE.

1993 DEC 30 P 2: 29

BETTY J. WILSEY
RECORDER, NEZ PERCE CO. ID.
BY Cathy Lawrie DEPUTY

# Exhibit - C

**6-ER-1220**

# EXHIBIT B

## Exhibit - C

**6-ER-1221**

From GraceOtt 1.509.624.2528 Tue Jan 27 16:37:48 2015 MST Page 3 of 29

RECEIVED
AUG - 1 2013
By:
Lukins & Annis, P.S.

FILED
2013 JUL 30 PM 3 18
PATTY O. WEEKS
CLERK OF THE DIST. COURT
DEPUTY

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE
STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

AIA SERVICES CORPORATION, an
Idaho corporation,

    Plaintiff,

v.

WASHINGTON BANK PROPERTIES,
a General Partnership,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.  CV2011-01927

DECREE OF FORECLOSURE

THIS MATTER having come before the Court on June 25, 2013, on the

*Plaintiff's Motion for Entry of Judgment*, the Court having heard and considered the

admitted evidence, and good cause appearing;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

That Plaintiff, AIA SERVICES CORPORATION, an Idaho Corporation, have

and recover a judgment and decree of foreclosure against Defendant, WASHINGTON

BANK PROPERTIES, a General Partnership, in the sum of ONE MILLION FOUR

HUNDRED THIRTY FOUR THOUSAND FIVE HUNDRED EIGHTY-SEVEN and

54/100 DOLLARS ($1,434,587.54) together with interest in the sum of TWO

DECREE OF FORECLOSURE          1

# Exhibit - C

# 6-ER-1222

From GraceOtt 1.509.624.2528 Tue Jan 27 16:37:48 2015 MST Page 4 of 29

HUNDRED EIGHTY-FIVE and no/100 DOLLARS ($285.00) per diem on or after January 1, 2012.

The Mortgage held by the Plaintiff on the Property described below is a valid mortgage on the Property and said mortgage has priority over all other liens, mortgages or other interests in the Property.

That the following described mortgaged premises be sold at public auction in the County of Nez Perce, State of Idaho, by and under the direction of the said Sheriff of Nez Perce County, Idaho, subject to the statutory right of Defendant to redeem the same in accordance with the laws of the State of Idaho, to-wit:

SEE, EXHIBIT "A"

Together with any and all tenements, hereditaments and appurtenances thereunto belonging or used in connection therewith.

That in case of a sale pursuant hereto, the said Sheriff give notice of such sale in the manner provided by law; that either or any of the parties to this action may purchase at such sale; that the Sheriff do make, execute and deliver to the purchaser or purchasers a certificate of sale and, following the expiration of the period of redemption, a Sheriff's Deed of the premises so sold, setting forth each tract or parcel of the land so sold and the sum paid therefore; that out of the monies arising from such sale, after deducting the amount of his fees and expenses of such sale, the Sheriff pay to the Plaintiff or to the Plaintiff's attorney the total sum set forth above, together with interest thereon from the date hereof at the rate allowed by law upon Judgments, and that such Sheriff deposit the surplus money, if any, arising from such sale of the mortgage property under this judgment with the Clerk of this court, subject to the further order of this court and that the

DECREE OF FORECLOSURE                    2

**Exhibit - C**

**6-ER-1223**

From GraceOtt 1.509.624.2528 Tue Jan 27 16:37:48 2015 MST Page 5 of 29

Sheriff make a report of such sale and file it with the Clerk of this court within the time required by law.

That after the sale of said mortgaged premises, the purchaser or purchasers at such sale, or their heirs or assigns, be let into possession of the premises so sold upon production of the Certificate of Sale or a duly authenticated copy thereof.

That WASHINGTON BANK PROPERTIES and any unknown heirs or devisees of the foregoing named parties who may be deceased, be, and thereby are, forever barred and foreclosed of and from all right, title, claim and interest in and to said mortgaged premises and in and to every part or parcel thereof, except for such rights of redemption as they may have pursuant thereto, and that said persons, and each of them, be, and they hereby are enjoined and restrained from removing or destroying any of the buildings, the improvements or appurtenances, or otherwise damaging the lands or premises prior to redemption from such sale.

The Plaintiff may pay any taxes on the mortgaged premises which shall hereafter and before sale become due, and Plaintiff shall have a lien on such premises for the amount so paid, with interest thereon as provided by the laws of the State of Idaho and in case of such payment and upon application to the court, Plaintiff may have an order directing that the amount so paid with interest be paid out of the proceeds of the sale of such premises.

In the event the proceeds from the sale of the Property shall be insufficient to satisfy the amounts due herein, together with the costs of sale and other proper charges, as shown by the Sheriff's return on sale, then Plaintiff shall not be entitled to a deficiency judgment against Defendant.

DECREE OF FORECLOSURE                    3

# Exhibit - C

**6-ER-1224**

This Decree of Foreclosure shall be issued for the purpose of foreclosing upon the property, in acknowledgement of the amount sought by the creditor. This Court makes no findings or determinations that would be to the prejudice of either party regarding economic issues in other pending litigation between the parties.

IT IS FURTHER ORDERED that jurisdiction of this cause is hereby expressly reserved and retained for the purpose of making further orders as may be necessary in order to carry this Judgment and Decree of Foreclosure into effect and correct any mathematical error, to grant any accrued credits, or for the purposes of making such further orders as may be necessary or desirable.

Dated this 30 day of July 2013.

CARL B. KERRICK – District Judge

Defendant's last known address: c/o George T. Cowan, 11120 NE 2nd Street, Suite 200, Bellevue, WA 98004-8337

DECREE OF FORECLOSURE                    4

# Exhibit - C

## 6-ER-1225

# EXHIBIT C

## Exhibit - C

## 6-ER-1226

Instrument # 814504
NEZ PERCE COUNTY
8-7-2013      04:27:13   No. of Pages: 17
Recorded for : RISLEY LAW OFFICE ✱
PATTY WEEKS               Fee: 68.00
Ex-Officio Recorder  Deputy_____
Index to: MISC

✱ via messenger

## MEMORANDUM OF AGREEMENT

On and effective April 10, 2010, AIA Services Corporation, an Idaho Corporation, assigned to AIA Services Corporation 401K Profit Sharing Plan, by the terms of that certain *Partial Assignment of Promissory Note, Deed of Trust and Escrow Agreement*, a true copy thereof being attached hereto as Exhibit "1" and included herein by reference as if fully set forth, certain real property located in Nez Perce County, State of Idaho, more particularly described in the instrument attached hereto as Exhibit "1."

AIA SERVICES CORPORATION

By:_____
R. JOHN TAYLOR, President

AIA SERVICES CORPORATION 401(k)
PROFIT SHARING PLAN

By:_____
R. JOHN TAYLOR, Trustee

MEMORANDUM OF AGREEMENT---Page 1

## Exhibit - C

0814504

STATE OF IDAHO          )
                        :ss
County of Nez Perce      )

On this 7th day of August, 2013, before me, the undersigned, a Notary Public in and for said State, personally appeared R. JOHN TAYLOR known to me to be the President of AIA Services Corporation, the corporation that executed the instrument or the person who executed the instrument on behalf of said corporation, and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal on the day and year in this certificate first above written.



_Natalie H. Holman_
Notary Public in and for the State of Idaho,
Residing in the State of Idaho or employed
In and Doing Business in the State of Idaho.
My Commission Expires: **9-1-2016**

STATE OF IDAHO          )
                        :ss
County of Nez Perce      )

On this 7th day of August, 2013, before me, the undersigned, a Notary Public in and for said State, personally appeared R. JOHN TAYLOR known to me to be the Trustee of the AIA Services Corporation 401K Profit Sharing Plan, the Plan that executed the instrument or the person who executed the instrument on behalf of said Plan, and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal on the day and year in this certificate first above written.



_Natalie H. Holman_
Notary Public in and for the State of Idaho,
Residing in the State of Idaho or employed
In and Doing Business in the State of Idaho.
My Commission Expires: **9-1-2016**

MEMORANDUM OF AGREEMENT—Page 2

# Exhibit - C

**6-ER-1228**

0814504

# EXHIBIT "1"

## PARTIAL ASSIGNMENT OF PROMISSORY NOTE, DEED OF TRUST AND ESCROW AGREEMENT

AIA Services Corporation, an Idaho corporation ("Assignor"), whose address is 111 Main Street, P.O. Box 538, Lewiston, Idaho 83501, effective April, 10, 2010, hereby assigns and transfers to the AIA Services Corporation 401(k) Profit Sharing Plan ("Assignee"), an undivided twenty-three percent (23%) of its right, title and interest in and to that certain Promissory Note dated December 30, 1993, made by Washington Bank Properties and payable to the order of The Universe Life Insurance Company in the original principal amount of One Million Nine Hundred Eighty Seven Thousand Five Hundred Dollars ($1,975,500) ("Note") a true copy of which is appended as Exhibit A and that certain Deed of Trust dated December 30, 1993, and executed by Washington Bank Properties as Grantor to Land Title of Nez Perce County, Inc. as Trustee and recorded December 30, 1993, as Instrument No. 580883 in the records of Nez Perce County, State of Idaho ("Deed of Trust") given to secure said Note. The Deed of Trust and a description of the real property are attached hereto as Exhibit B. Said Note and Deed of Trust were thereafter assigned to Assignor by Order Granting Petition for Approval of Settlement Agreement and to Dismiss Claims Re: AIA Services, Inc. and AIA Insurance, Inc. filed in the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada, on June 8, 2007.

Assignee acknowledges that the note is or may be in default, and that legal proceedings may be necessary to realize on the remaining value of the Note.

Assignee authorizes and directs Assignor to take all action necessary to collect upon the Note and the Deed of Trust in Assignor's name with the understanding that the expenses of litigation would be divided between Assignor and Assignee; with Assignee being liable to reimburse Assignor for 23% of all litigation expenses, including costs, attorneys fees, and any other expense incurred in the prosecution of such litigation.

# Exhibit - C

**6-ER-1229**

0814504

## *EXHIBIT "1"*

The original Note and Deed of Trust are currently held in Escrow No. 298 at the office of Land Title of Nez Perce County, Inc., 1230 Idaho Street, Lewiston, Idaho 83501, pursuant to that certain Escrow Agreement dated December 30, 1993, by and between The Universe Life Insurance Company as Seller, AIA Insurance, Inc., as Tenant, and Land Title of Nez Perce County, Inc. as Escrow Agent, which Is attached hereto as Exhibit C.

Assignor – AIA Services Corporation

By: _____
R. John Taylor, President

Assignee – AIA Services Corporation 401(k)
Profit Sharing Plan

By: _____
R. John Taylor, Trustee

## Exhibit - C

## 6-ER-1230

0814504

12087465812      Land Title

**EXHIBIT "1"**   02:26:47 p.m   04-30-2008      2/4

PROMISSORY NOTE

Lewiston, Idaho

$1,987,500.00                                    December 30, 1993

For value received, the undersigned ("Maker") promises to pay to the order of The Universe Life Insurance Company ("Universe Life"), on or before May 1, 2011, the sum of ONE MILLION NINE HUNDRED EIGHTY-SEVEN THOUSAND FIVE HUNDRED DOLLARS ($1,987,500.00) in lawful money of the United States of America, together with interest at the rate of eight percent (8%) per annum, until paid. Said interest shall commence accruing as of January 1, 1994.

Payment shall be as follows: monthly payments of principal and interest in the amount of SIXTEEN THOUSAND DOLLARS ($16,000.00) shall be due and payable commencing on July 1, 1994 and continuing in like amount on the first day of each month thereafter through December 1, 2010, with the unpaid balance, including all remaining interest and principal, due and payable on January 1, 2011; provided, however, that if AIA Insurance, Inc. ("AIA") (or any assignee of AIA Insurance, Inc. or successor tenant under the Lease), fails to pay when due its rent obligations (including, without limitation, all rent charges, fees, taxes, environmental remediation costs, and other charges, howsoever denominated, collectively "Rent Obligations") to Maker as set forth in that certain lease ("Lease") dated December 30, 1993 executed by and between Maker, as Lessor, and AIA Insurance, Inc., as Lessee, Maker shall be authorized to set off against the payment(s) next required to be made to Universal Life under this Promissory Note an amount equal to the unpaid Rent Obligations, it being the intent of The Universe Life Insurance Company and Maker that the monthly Lease payments of AIA Insurance, Inc. will provide the source of Maker's payments, as required by this Note, to The Universe Life Insurance Company. This right of setoff shall continue in effect for as long as AIA Insurance, Inc. (or any assignee or successor tenant under the Lease) fails to pay when due the Rent Obligations under the Lease. Any provision of this Note to the contrary notwithstanding, in the event, and for as long as, Maker exercises its right of setoff with respect to payments required by this Note, this Note shall not be deemed to be, and the holder hereof shall have no authority to declare this Note, in default for failure of the Maker to make payments as required by this Note.

- 1 -

J:\C80011\WL3671\84015637.2

Exhibit A

**Exhibit - C**

**6-ER-1231**

0814504

*EXHIBIT "1"* 02:27:17 p.m.   04-30-2008   3/4

12087465812      Land Title

AIA Insurance, Inc. is a wholly-owned subsidiary of The Universe Life Insurance Company. The Universe Life Insurance Company hereby acknowledges, represents, and warrants as follows: 1) as of the date of this Note, Universe is solvent (i.e., the total value of its assets exceeds the total amount of its liabilities); 2) Universe is receiving substantial economic value from its sale of the subject real property to Maker; 3) Universe is receiving reasonably equivalent value for its sale of the subject real property to Maker; 4) following, and as a consequence of, sale of the subject real property to Maker, Universe will not become insolvent, will not be engaging in business for which it has unreasonably small capital, and will not incur debts that are beyond Universe's ability to pay.

All payments shall be applied first to interest and the balance, if any, shall be applied to principal. If Maker fails to make any payment hereunder when due and such failure continues for fifteen (15) days after receipt of written notice thereof, the holder may upon written notice declare the entire principal and interest thereon immediately due and payable. All delinquent installments not made within said 15-day cure period shall bear interest at the highest legal rate authorized by the State of Idaho from the end of the cure period until paid.

Satisfaction of the obligations evidenced by this Note shall release that certain deed of trust ("Deed of Trust") dated December 30, 1993 executed by Maker, as grantor, in favor of The Universe Life Insurance Company, as beneficiary, to secure repayment of the obligation evidenced by this Note.

In case suit or action is instituted to collect this Note, or any portion thereof, Maker promises and agrees to pay, in addition to the costs and disbursements provided by statute, such additional sum as the Court may adjudge reasonable for attorney's fees to be allowed in said suit or action.

This Note shall be governed by, and construed in accordance with, the laws of the State of Idaho.

Any provision of this Note or the Deed of Trust seemingly to the contrary notwithstanding, the property legally described in the Deed of Trust shall be the sole recourse of the holder in the event of a default by Maker, and the liability of Maker and any individual partner of Maker shall be limited to their respective interests in such property.

[continued on next page]

- 2 -

J:\COS811\M13673\00015637.2

**Exhibit A**

# Exhibit - C

**6-ER-1232**

0814504

## EXHIBIT "1"

12087465812    Land Title          02:27:45 p.m    04-30-2008        4/4

Maker reserves the right to pay any and all sums due under this Note at any time without penalty.

Each and every party signing or endorsing this Note waives presentment, demand, protest and notice of non-payment thereof.

WASHINGTON BANK PROPERTIES

By: _____
Dane Armstrong — Managing Partner

The terms and representations
set forth in the foregoing
instrument are hereby
acknowledged and approved:

THE UNIVERSE LIFE INSURANCE COMPANY

By _____

Its _____

- 3 -

J:\CG5011\M13671\00015937.2

**Exhibit A**

# Exhibit - C

# 6-ER-1233

MICHOFILM NO.
EXHIBIT "1"
550883

0814504    INDEXED  ( )
           FILMED   ( )
           DELIVERED ( )
           MAILED   ( )

## DEED OF TRUST

This Deed of Trust, made on December 30, 1993 between Washington Bank Properties located at P.O. Box 2233, Friday Harbor, Washington, 98250, herein called Grantor, and Land Title of Nez Perce County, Inc., with its principal place of business at 1230 Idaho Street, city of Lewiston, County of Nez Perce, State of Idaho, herein called Trustee; and The Universe Life Insurance Company, 111 Main Street, City of Lewiston, County of Nez Perce, State of Idaho, hereinafter called Beneficiary,

Witnesseth: that Grantor does hereby irrevocably grant, bargain, sell and convey to Trustee in trust, with power over sale, that property in the County of Nez Perce, State of Idaho, described as follows:

See attached Exhibit A,

together with all and singular the tenements, hereditaments, and appurtenances thereunto belonging or in any manner appertaining that shall be deemed to include but not be limited to (1) all rents, issues, profits, damages, royalties, revenues, and benefits therefrom, subject, however, to any right, power, and authority hereinafter given to and conferred on beneficiary to collect the same; (2) all water and ditch rights, however evidenced, used in and on or appurtenant thereto; and (3) all fixtures now or hereafter attached to or used in connection with the premises.

This Deed of Trust is executed for the purpose of securing payment of that certain Promissory Note ("Note") dated December 30, 1993, executed and delivered by Grantor, as maker, to Beneficiary, as payee, in the principal sum of One Million Nine Hundred Eighty-Seven Thousand Five Hundred Dollars ($1,987,500.00) and secures payment prior to January 1, 2011, the maturity date of the Note and this Deed of Trust, of such other principal sums Beneficiary may additionally loan to and for the account of Grantor, together with interest, and the costs and charges in case of default. The terms and representations contained in said Promissory Note are incorporated herein by this reference. The making of any further loans, advances, or expenditures shall be optional with Beneficiary. It is the express intention of the parties that this Deed of Trust shall stand as continuing security until all such advances together with interest thereon have been paid.

With the prior written consent of Beneficiary (which consent shall not unreasonably be withheld), Grantor may substitute other property as security for payment of the Note, provided that such substitute collateral has a value equal to, or greater than, the value of the real property described in, and encumbered by, this Deed of Trust, and provided such substitute collateral is replacement property resulting from a casualty loss under the Lease

- 1 -

J:\C05811\M13671\00015541.2

**EXHIBIT B**

# Exhibit - C

# 6-ER-1234

0814504

## EXHIBIT "1"

defined in the Note.  Upon such substitution of collateral, this Deed of Trust shall be deemed satisfied and released and Beneficiary shall promptly execute whatever documents are necessary to evidence such release on the public record.  In the event Grantor receives insurance proceeds for the market value of the real property described in, and encumbered by, this Deed of Trust due to a casualty loss where the damaged property is not rebuilt, such insurance proceeds shall first be applied to any accrued interest and outstanding principal balance under the Note.

By acceptance of this Deed of Trust, Grantor acknowledges and approves the terms as set forth herein.

In witness whereof, Grantor has set Grantor's hand and seal on the date first written above.

WASHINGTON BANK PROPERTIES

By: _____
Dane Armstrong - Managing Partner

STATE OF WASHINGTON )
                     )ss
COUNTY OF SAN JUAN   )

On this 29th day of December, 1993, before me, a Notary Public in and for the State of Washington, personally appeared DANE ARMSTRONG, known or identified to me to be the Managing Partner of Washington Bank Properties and the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my official seal the day and year first above written.

_____
(Signature)

Carrie Brooks
(Please print name legibly)

NOTARY PUBLIC in and for the State of Washington, residing at Friday Harbor
My commission expires: 11/1/94

J:\COS811\M13671\00015541.2

- 2 -

**EXHIBIT B**

# Exhibit - C

## 6-ER-1235

## EXHIBIT "1"
EXHIBIT "A"

0814504

:TUATE IN NEZ PERCE COUNTY, STATE OF IDAHO TO WIT:

PARCEL NO. 1:

Lots 1, 2 and 3, 4 and 5, Block 24, CITY OF LEWISTON , according to the recorded plat thereof, records of Nez Perce County, Idaho.

PARCEL NO. 2:

Lots 6, 7 and 8, Block 24, of the plat of E. B. TRUE'S survey to the City of Lewiston, according to the recorded plat thereof, records of Nez Perce County, Idaho.

ALSO the South 4 feet approximately, more or less, of "D" Street shown on said plat adjacent to said Lot 7 and adjacent to said Lot 6, such South portion of said "D" Street being the portion thereof that was occupied by occupants of said Lot 7 and 6, and not open or in use as a street when said E. B. True made the survey from which said plat was made, as found in the findings of the court on November 20, 1905 in Scully against Squier, et al, No. 990 in the District court of said Nez Perce County, affirmed 13 Idaho 417; also affirmed 215 U.S. 144; 30 S.Ct. 51; 54 L.Ed. 131 in which finding the Court said: "Said survey and plat - cut off approximately 4 feet from the North end of building then standing and actual use and occupancy - in Blocks 23 and 24 of the City of Lewiston - - - that the South line of "D" Street as thence established by user was approximately 4 feet North of the line originally shown on the E.B. True map - as the South line of "D" Street.

ALSO the East 2 feet of Second Street as shown on said plat adjacent to said Lots 7 and 8, conveyed to Robert Grostein and Abraham Binnard, January 12, 1881, Book 27 of Deeds page 173, by T. S. Billings, Mayor of said City.

EXCEPTING HOWEVER from land hereinabove described, the following:

TRACTS, viz:  That portion from South side of said Lot 3, described in Deed from Robert Grostein and A. Binnard to T. S. Billings, Mayor of the City of Lewiston, dated January 11, 1881, Book 27 of Deeds, page 175, as follows:

Commencing at the intersection of the Northerly line of "E" Street with the Easterly line of Second Street; thence Northerly along said Easterly line of Second Street a distance of 10 feet; thence Easterly at right angles to said Easterly line of Second Street a distance of 40 feet to its intersection with the

**EXHIBIT B**

# Exhibit - C

**6-ER-1236**

## *EXHIBIT "1"*

EXHIBIT "λ"

0814504

SITUATE IN NEZ PERCE COUNTY, STATE OF IDAHO TO WIT:

Northerly line of "E" Street; and thence Westerly along said Northerly line of "E" Street a distance of 43 feet to the POINT OF BEGINNING.

PARCEL NO. 3:

All that block of land bounded on the West by First Street, on the South by Main Street, on the East by Second Street, and on the North by "D" Street, said property being sometimes described as Blocks 25, 26 and Courthouse Block, and that certain alley lying between said Block 25 and the Courthouse Block and Block 26, all shown by the plat of the City of Lewiston, Nez Perce County, Idaho.

TOGETHER WITH all that portion of Second Street situate between the South line of "D" Street and the North line of Main Street in the City of Lewiston, Idaho, according to the original plat thereof, the same being the 1874 survey of E. B. True, EXCEPT the East 2 feet of Second Street as shown on said plat adjacent to Lots 7 and 8, conveyed to Robert Grostein and Abraham Binnard, January 12, 1881, Book 27 of Deeds, page 173, by T. S. Billings, Mayor of said City.

INST. NO 586883
FILED FOR RECORD
FEE 12.00 REG. BY LAND TITLE

1993 DEC 30 P 2: 29

BETTY J. WILSEY
RECORDER, NEZ PERCE CO. ID.
BY _____ DEPUTY

**EXHIBIT B**

# Exhibit - C

**6-ER-1237**

0814504

# EXHIBIT "1"

### ESCROW AGREEMENT

This Escrow Agreement is entered as of December 30, 1993, by and between THE UNIVERSE LIFE INSURANCE CO. ("Seller"), AIA INSURANCE, INC. ("Tenant"), WASHINGTON BANK PROPERTIES ("Buyer"), and LAND TITLE OF NEZ PERCE COUNTY, in Lewiston, Idaho, as escrow agent ("Escrow"). Tenant is a wholly-owned subsidiary of Seller.

### Recitals

A.   Seller and Buyer have entered into that certain Agreement of Purchase and Sale dated December 10, 1993, as amended (the "Purchase Agreement"), pursuant to which Buyer purchased the property described therein (the "Property").

B.   Buyer granted to Seller that certain Deed of Trust dated December 30, 1993 (the "Deed of Trust") and made that certain Promissory Note dated December 30, 1993 (the "Note"), both of which are in the original principal amount of $1,987,500 and have been deposited to Escrow to be held by and disposed of by Escrow in accordance with this Agreement. Copies of the Note and Deed of Trust are each attached hereto as Exhibits A and B, respectively.

C.   Buyer and Tenant have entered into that certain Lease dated December 30, 1993 (the "Lease"), a copy of which has been deposited to Escrow to be held by and disposed of by Escrow in accordance with this Agreement. A copy of the Lease is attached hereto as Exhibit C.

### Agreement

In consideration of the execution of the Agreement and the mutual promises and covenants herein contained, the parties hereto agree as follows:

1.   <u>Escrow Agent</u>. Seller, Tenant and Buyer hereby designate and appoint Escrow as the escrow agent to serve in accordance with the terms of this Agreement, and Escrow agrees to act in such capacity upon the terms, conditions and provisions provided in this Agreement.

2.   <u>Deposit of the Escrow Documents</u>. On or before the execution of this Agreement, the Note, the Deed of Trust and the Lease have been delivered to Escrow, the receipt of which is hereby acknowledged by Escrow.

3.   <u>Note and Deed of Trust</u>.

a.   Commencing upon the date of this Agreement, Escrow shall hold the Note and Deed of Trust and Escrow shall collect on behalf of Seller all payments made by Buyer under the terms of the Note and Deed of Trust and credit the same to Seller's account, promptly disbursing to Seller any net cash balance (if any, after

- 1 -

**EXHIBIT C**

EXHIBIT
D

## Exhibit - C

## 6-ER-1238

0814504

# EXHIBIT "1"

payment of all current due and payable amounts under the Lease) remaining in Seller's account. The first payment of principal and interest by Buyer is due and payable on July 1, 1994.

b. Upon satisfaction of the Note, Escrow shall cause the Deed of Trust to be reconveyed. Escrow is authorized to deduct from the final payment to Seller an amount equal to the cost of any tax stamps which may be required by law to be affixed to the deed and other costs associated with reconveyance of the Deed of Trust.

c. If Seller declares a default, Seller shall deliver written notice of such default to Escrow in duplicate, and as many additional copies as Escrow may deem necessary, with instructions to Escrow to mail the original of such notice to Buyer by registered or certified mail. The duplicate notice of default shall be retained by Escrow. If a default is declared, Seller agrees to pay in advance Escrow's charges for handling and mailing the notices of default.

d. The parties acknowledge and agree that, pursuant to the terms of the Note and Deed of Trust, Buyer is authorized to set off against any payment due under the Note an amount equal to any unpaid Rent Obligations (as defined in the Note) due and payable under the Lease, and any amount so set off shall be considered a credit against the payment amount due from Buyer under the Note, and Buyer shall not be considered in default for failure to pay any amount so set off.

4. Lease. Commencing July 1, 1994, the parties agree that Tenant shall pay to Escrow all rents due and payable by Tenant under the Lease. Escrow shall collect all rent payments on behalf of Buyer and credit the same to Buyer's account, promptly disbursing to Buyer any net cash balance in Buyer's account.

5. Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

6. Miscellaneous

a. Notices or other written communications placed in the United States mail, postage prepaid and addressed to the undersigned, or any of them, at their post office address, shall be deemed to have been given on the date of the mailing.

b. Any payment made by Buyer or Tenant hereunder other than in cash shall be credited conditionally, pending Escrow's receipt of available funds. Escrow has no obligation to disburse payments until it has good funds in its bank account.

c. It shall be the duty of the parties hereto to keep Escrow advised of any change of address. Such advice shall sufficiently identify the escrow concerned and the parties involved

- 2 -

J:\C05811\M13671\00016057.9cm

**EXHIBIT C**

# Exhibit - C

# 6-ER-1239

0814504

# EXHIBIT "1"

and shall be mailed by certified or registered mail with return receipt requested to Escrow and to all parties concerned. All notices given pursuant to the terms of any document placed in this escrow must be given through Escrow as hereinabove provided at the expense of the party giving notice, and Escrow shall not be required to recognize service of notice given in any other manner. Escrow shall not be responsible for any damages arising out of or relating to the failure of any party to comply with such notice and mailing requirements.

d.    In the event that this escrow is cancelled or forfeited in accordance with applicable State law, it is agreed that Escrow shall return the documents to the appropriate parties upon demand.

e.    Escrow assumes no responsibility for determining that the parties to the escrow have complied with the requirements of the Truth In Lending, Consumer (Credit) Protection Act, or similar laws.

f.    Escrow's fees and charges for administering this escrow shall be paid equally by Buyer and Seller according to the schedule of fees attached hereto as Exhibit D.

g.    In the event of any disagreement between the parties hereto or any parties herein, resulting in adverse claims and demands being made by them or any of them, in connection herewith, upon Escrow, Escrow shall be entitled at its option to refuse to comply with said demands so long as such disagreement shall continue, and in so refusing, Escrow may refuse to deliver any monies, papers or property involved in or affected by this escrow; and in so refusing, Escrow shall not be or become liable to the parties to this escrow for its failure and/or refusal to comply with the conflicting or adverse demands of the parties hereto; provided Escrow shall be entitled to continue to so refrain to act until the earlier of:

(1)   the parties hereto have reached an agreement in their differences and shall have notified Escrow in writing of such agreement, or

(2)   the rights of the parties have been duly adjudicated by a Court of competent jurisdiction.

h.    It is expressly understood between the parties hereto that Escrow is considered and held to be a depository only, and shall not be responsible or liable in any manner whatsoever for the sufficiency or correctness as to form, manner or execution, or validity of any instrument deposited in this escrow, nor as to the identity, authority or rights of any person executing the same; and that Escrow assumes no responsibility, nor is it to be held liable as to the conditions of the title to any of the property involved herein, nor as to any assignments, liens or encumbrances against said property; and that its duties hereunder shall be limited to

- 3 -

J:\C05811\K13671\00016057.gcm

**EXHIBIT C**

# Exhibit - C

## 6-ER-1240

0814504

# EXHIBIT "1"

the safekeeping of such money, instruments or other documents received by it as Escrow, and for the delivery of the same in accordance with this Agreement; and Escrow shall in no case or event be liable for the failure of any of the conditions of this escrow or damage or loss caused by the exercise of Escrow's reasonable discretion, except in the event of Escrow's gross negligence or willful misconduct.

i.   Escrow reserves the right upon prior written notice to transfer, set over and assign its rights, obligations and duties as Escrow to a duly qualified successor escrowholder, and the term "Escrow" as used herein shall mean such successor escrowholder. Escrow further reserves the right at any time to resign as Escrow, in which case the undersigned parties or their successors in interest at their expense shall promptly select a successor escrowholder to which Escrow shall deliver the escrowed documents. In the event the undersigned parties have not selected a successor escrowholder within 30 days of the resignation of Escrow, a duly qualified successor escrowholder may be selected by Escrow, and any cost associated therewith shall be shared equally by Buyer and Seller.

j.   Any instrument or document placed in escrow is accepted upon the condition that Escrow may at its option for any reasonable reason, within 15 days from the deposit of such instrument, refuse to accept the same, in which event Escrow shall notify all parties hereto in writing of such refusal and shall return such instruments, together with the fee paid in connection therewith to the party or parties depositing the same.

k.   Escrow shall have no responsibility or liability for procuring or maintaining insurance coverage or for payment of taxes and assessments on any property associated with this escrow.

l.   In the event any specified portion of Buyer's payment to Seller herein is to be remitted by Escrow to any third party on account of liens or prior escrows affecting the property associated herewith, Escrow assumes no responsibility for the manner in which such remittances are applied to the underlying debt or obligations, and Escrow assumes no responsibility for the failure of any such remittances to fully discharge said underlying debt or obligation.

m.   In case any party shall assign its rights under any documents deposited hereunder, or should any party create in a third party any right, interest, lien or encumbrance under any document deposited hereunder or in the property covered by this Agreement, Escrow, as a matter of accommodation to the parties will make a reasonable effort to comply with such assignment or creation of rights upon satisfactory notification given to it and delivery of written notice to any party hereto affected by such action.

- 4 -

J:\COS811\M13671\00016057.gcm

**EXHIBIT C**

# Exhibit - C

0814504

# *EXHIBIT "1"*

n.    In the event of a conflict or ambiguity between the escrowed documents and the provisions of this Agreement, this Agreement shall control.

o.    Escrow acknowledges receipt of $ *400.00* as set-up fee, and $ *60.00 (1st year)* as disbursement fee.

p.    The Note, Deed of Trust and Lease are incorporated herein by this reference.

q.    This Agreement shall be governed by Idaho law.

The undersigned have read the foregoing instructions, understand the contents thereof, and agree that Escrow, in the administration of the escrow, is bound only and solely by the foregoing written instructions, and such further written and signed instructions as we may hereafter deliver to Escrow and the same be accepted by it in writing.

IN WITNESS WHEREOF, the undersigned have signed as of the date first set forth above.


UNIVERSE LIFE INSURANCE CO.

By _____

Its _____

Federal Tax ID No. _____

Address:   111 Main Street
           Lewiston, ID  83501
           Attn: Robert Petersen


AIA INSURANCE, INC.

By _____

Its _____

Federal Tax ID No. _____

Address:   111 Main Street
           Lewiston, ID  83501
           Attn: Robert Peterson


- 5 -

J:\C05811\13671\00016057.9cm

**EXHIBIT C**

# Exhibit - C

# 6-ER-1242

0814504

# EXHIBIT "1"

WASHINGTON BANK PROPERTIES

By _____
    Dane Armstrong, Managing Partner

Federal Tax ID No. _____

Address:   P.O. Box 2233
           Friday Harbor, WA  98250


LAND TITLE OF NEZ PERCE COUNTY

By _____

Its ___President____

Address:   1230 Idaho Street
           P.O. Box 1536
           Lewiston, ID  83501

- 6 -

J:\C05811\H13671\00016057.gcm

**EXHIBIT C**

# Exhibit - C

# 6-ER-1243

# EXHIBIT D

## Exhibit - C

## 6-ER-1244

Instrument # 824666
NEZ PERCE COUNTY
9-11-2014     09:11:10   No. of Pages: 17
Recorded for : AIA SERVICES CORP
PATTY WEEKS                Fee: 58.00 .
Ex-Officio Recorder  Deputy _____
Index to: MEMO OF AGMT

## MEMORANDUM OF AGREEMENT

On and effective February 28, 2014, AIA Services Corporation, an Idaho

Corporation, assigned to the AIA Services corporation 401k Profit Sharing Plan, by terms

of that certain Partial Assignment of Promissory Note, Deed of Trust and Escrow

Agreement, a true copy there being attached hereto as Exhibit "1" and included herein by

reference as if full set forth, certain real property located in Nez Perce County, State of

Idaho, more particularly described in instrument attached as exhibit "1".


AIA Services Corporation

By: R. John Taylor, President


AIA Services Corporation 401 (k)
Profit Sharing Plan

By: R. John Taylor, Trustee


AIA SERVICES CORP
PO BOX 538
LEWISTON, ID   83501


Memorandum of Agreement

# Exhibit - C

# 6-ER-1245

824666

STATE OF IAHO                           )
                                        : ss
COUNTY OF NEZ PERCE                     )

On this 10th day of September, 2014, before me, the undersigned, a Notary Public in and for said State, personally appeared R. John Taylor known to me to be the President of AIA Services Corporation, the corporation that executed the instrument or the person who executed the instrument on behalf of said corporation and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal on the day and year in this certificate first above written.

JAIME ROSCO
Notary Public
State of Idaho

Notary Public in for the sate of Idaho, residing in the State of Idaho or employed in and doing business in the State of Idaho.
My Commission expires: __11-8-18__

STATE OF IDAHO                          )
                                        : ss
COUNTY OF NEZ PERCE                     )

On this 10th day of September, 2014, before me, the undersigned, a Notary Public in and for said State, personally appeared R. John Taylor known to me to be the Trustee of the AIA Services Corporation 401(k) Profit Sharing Plan, the plan that executed the instrument or the person who executed the instrument on behalf of said plan and acknowledged to me that such plan executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal on the day and year in this certificate first above written.

JAIME ROSCO
Notary Public
State of Idaho

Notary Public in for the sate of Idaho , residing in the State of Idaho, or employed in and doing business in the State of Idaho.
My Commission expires: __11-8-18__

# Exhibit - C

**6-ER-1246**

824666

## PARTIAL ASSIGNMENT OF PROMISSORY NOTE, DEED OF TRUST AND ESCROW AGREEMENT

AIA Services Corporation, an Idaho corporation (Assignor), whose address is 111Main Street, P.O. Box 538, Lewiston, Idaho 83501, effective February 28, 2014, hereby assigns and transfers to the AIA Services Corporation 401k Profit Sharing Plan (Assignee") for benefit of R. John Taylor an undivided ten per cent (10%) interest of the right, title, and interest in and to that certain Promissory Note dated December 30, 1993, made by Washington Bank Properties and payable to the order of The Universe Life Insurance Company, in the original principal amount of One Million Nine Hundred Seven Five Thousand Five Hundred Dollars ($1,975,500) ("Note") a true copy of which is appended as Exhibit A and that certain Deed of trust Dated December 30, 1993 and executed by Washington Bank properties as Grantor to Land Title of Nez Perce County, Inc, as Trustee and recorded December 30, 1993, as Instrument No. 580883 in the records of Nez Perce County, State of Idaho ("Deed Of Trust") given to secure said Note. The Deed of Trust and description of the real property are attached hereto as Exhibit B. Said Note and Deed of Trust were thereafter assigned to Assignor by Order Granting Petition of Approval of Settlement Agreement and to Dismiss claims Re: AIA Services, Inc, and AIA Insurance, Inc filed in the District Court of the Fourth Judicial District of the State of Idaho, in for the County of Ada, June 8, 2007.

Assigned acknowledges that the note is may be in default and that legal proceedings may be necessary to realize on the remaining value of the Note.

Assignee authorizes and directs Assignor to take all action necessary to collect upon the Note and the Deed of Trust in the Assignor's name with the understanding that the expenses of litigation would be divided between the Assignor and Assignee; with the Assignee being liable to reimburse Assignor for 10% of all litigation expenses, including

Partial Assignment

# Exhibit - C

## 6-ER-1247

824666

costs, attorney frees, and other expenses in the prosecution of such litigation after the date of this assignment.

The original Note and Deed of Trust are currently held in Escrow No. 298 at the office of Land Title of Nez Perce County, Inc., 1230 Idaho Street, Lewiston, Idaho 83501, pursuant to that certain Escrow Agreement dated December 30, 1993, by and between The Universe Life Insurance Company as Seller, AIA Insurance, Inc, as Tenant and Land Title of Nez Perce County, Inc, as Escrow Agent, which is attached hereto as Exhibit C.

Assignor – AIA Services Corporation

By: _____
R. John Taylor, President

Assignee – AIA Services Corporation 401 (k) Profit Sharing Plan

By: _____
R. John Taylor, Trustee

Partial Assignment

# Exhibit - C

824666

**EXHIBIT "1"**   02:26:47 p.m   04-30-2008

12087465812   Land Title

PROMISSORY NOTE

Lewiston, Idaho

$1,987,500.00                                    December 30, 1993

For value received, the undersigned ("Maker") promises to pay to the order of The Universe Life Insurance Company ("Universe Life"), on or before May 1, 2011, the sum of ONE MILLION NINE HUNDRED EIGHTY-SEVEN THOUSAND FIVE HUNDRED DOLLARS ($1,987,500.00) in lawful money of the United States of America, together with interest at the rate of eight percent (8%) per annum, until paid. Said interest shall commence accruing as of January 1, 1994.

Payment shall be as follows: monthly payments of principal and interest in the amount of SIXTEEN THOUSAND DOLLARS ($16,000.00) shall be due and payable commencing on July 1, 1994 and continuing in like amount on the first day of each month thereafter through December 1, 2010, with the unpaid balance, including all remaining interest and principal, due and payable on January 1, 2011; provided, however, that if AIA Insurance, Inc. ("AIA") (or any assignee of AIA Insurance, Inc. or successor tenant under the Lease), fails to pay when due its rent obligations (including, without limitation, all rent charges, fees, taxes, environmental remediation costs, and other charges, howsoever denominated, collectively "Rent Obligations") to Maker as set forth in that certain lease ("Lease") dated December 30, 1993 executed by and between Maker, as Lessor, and AIA Insurance, Inc., as Lessee, Maker shall be authorized to set off against the payment(s) next required to be made to Universal Life under this Promissory Note an amount equal to the unpaid Rent Obligations, it being the intent of The Universe Life Insurance Company and Maker that the monthly Lease payments of AIA Insurance, Inc. will provide the source of Maker's payments, as required by this Note, to The Universe Life Insurance Company. This right of setoff shall continue in effect for as long as AIA Insurance, Inc. (or any assignee or successor tenant under the Lease) fails to pay when due the Rent Obligations under the Lease. Any provision of this Note to the contrary notwithstanding, in the event, and for as long as, Maker exercises its right of setoff with respect to payments required by this Note, this Note shall not be deemed to be, and the holder hereof shall have no authority to declare this Note, in default for failure of the Maker to make payments as required by this Note.

- 1 -

J:\CS5011\WCLN473\64015637.3

**Exhibit A**

**Exhibit - C**

**6-ER-1249**

824666

## EXHIBIT "1"

12087465812    Land Title                    02:27:17 p.m.    04-30-2008       3/4

AIA Insurance, Inc. is a wholly-owned subsidiary of The Universe Life Insurance Company. The Universe Life Insurance Company hereby acknowledges, represents, and warrants as follows; 1) as of the date of this Note, Universe is solvent (i.e., the total value of its assets exceeds the total amount of its liabilities); 2) Universe is receiving substantial economic value from its sale of the subject real property to Maker; 3) Universe is receiving reasonably equivalent value for its sale of the subject real property to Maker; 4) following, and as a consequence of, sale of the subject real property to Maker, Universe will not become insolvent, will not be engaging in business for which it has unreasonably small capital, and will not incur debts that are beyond Universe's ability to pay.

All payments shall be applied first to interest and the balance, if any, shall be applied to principal. If Maker fails to make any payment hereunder when due and such failure continues for fifteen (15) days after receipt of written notice thereof, the holder may upon written notice declare the entire principal and interest thereon immediately due and payable. All delinquent installments not made within said 15-day cure period shall bear interest at the highest legal rate authorized by the State of Idaho from the end of the cure period until paid.

Satisfaction of the obligations evidenced by this Note shall release that certain deed of trust ("Deed of Trust") dated December 30, 1993 executed by Maker, as grantor, in favor of The Universe Life Insurance Company, as beneficiary, to secure repayment of the obligation evidenced by this Note.

In case suit or action is instituted to collect this Note, or any portion thereof, Maker promises and agrees to pay, in addition to the costs and disbursements provided by statute, such additional sum as the Court may adjudge reasonable for attorney's fees to be allowed in said suit or action.

This Note shall be governed by, and construed in accordance with, the laws of the State of Idaho.

Any provision of this Note or the Deed of Trust seemingly to the contrary notwithstanding, the property legally described in the Deed of Trust shall be the sole recourse of the holder in the event of a default by Maker, and the liability of Maker and any individual partner of Maker shall be limited to their respective interests in such property.

[continued on next page]

- 2 -

J:\COS811\M13671\09015617.2

**Exhibit A**

# Exhibit - C

## 6-ER-1250

824666

**EXHIBIT "1"**   02:27:45 p.m   04-30-2008   4/4

12067465812    Land Title

Maker reserves the right to pay any and all sums due under this Note at any time without penalty.

Each and every party signing or endorsing this Note waives presentment, demand, protest and notice of non-payment thereof.

WASHINGTON BANK PROPERTIES

By: _____
Dane Armstrong — Managing Partner

The terms and representations set forth in the foregoing instrument are hereby acknowledged and approved:

THE UNIVERSE LIFE INSURANCE COMPANY

By _____

Its _____

- 3 -

J:\CGS811\M13671\00015537.2

**Exhibit A**

# Exhibit - C

**6-ER-1251**

824666

MICROFILM NO.
## EXHIBIT "1"
SSC883

INDEXED    ( )
FILMED     ( )
DELIVERED  ( )
MAILED     ( )

## DEED OF TRUST

This Deed of Trust, made on December 30, 1993 between Washington Bank Properties located at P.O. Box 2233, Friday Harbor, Washington, 98250, herein called Grantor, and Land Title of Nez Perce County, Inc., with its principal place of business at 1230 Idaho Street, city of Lewiston, County of Nez Perce, State of Idaho, herein called Trustee; and The Universe Life Insurance Company, 111 Main Street, City of Lewiston, County of Nez Perce, State of Idaho, hereinafter called Beneficiary,

Witnesseth: that Grantor does hereby irrevocably grant, bargain, sell and convey to Trustee in trust, with power over sale, that property in the County of Nez Perce, State of Idaho, described as follows:

See attached Exhibit A,

together with all and singular the tenements, hereditaments, and appurtenances thereunto belonging or in any manner appertaining that shall be deemed to include but not be limited to (1) all rents, issues, profits, damages, royalties, revenues, and benefits therefrom, subject, however, to any right, power, and authority hereinafter given to and conferred on beneficiary to collect the same; (2) all water and ditch rights, however evidenced, used in and on or appurtenant thereto; and (3) all fixtures now or hereafter attached to or used in connection with the premises.

This Deed of Trust is executed for the purpose of securing payment of that certain Promissory Note ("Note") dated December 30, 1993, executed and delivered by Grantor, as maker, to Beneficiary, as payee, in the principal sum of One Million Nine Hundred Eighty-Seven Thousand Five Hundred Dollars ($1,987,500.00) and secures payment prior to January 1, 2011, the maturity date of the Note and this Deed of Trust, of such other principal sums Beneficiary may additionally loan to and for the account of Grantor, together with interest, and the costs and charges in case of default. The terms and representations contained in said Promissory Note are incorporated herein by this reference. The making of any further loans, advances, or expenditures shall be optional with Beneficiary. It is the express intention of the parties that this Deed of Trust shall stand as continuing security until all such advances together with interest thereon have been paid.

With the prior written consent of Beneficiary (which consent shall not unreasonably be withheld), Grantor may substitute other property as security for payment of the Note, provided that such substitute collateral has a value equal to, or greater than, the value of the real property described in, and encumbered by, this Deed of Trust, and provided such substitute collateral is replacement property resulting from a casualty loss under the Lease

- 1 -

J:\COS811\M13671\00015541.2

**EXHIBIT B**

# Exhibit - C

# 6-ER-1252

824666

# EXHIBIT "1"

defined in the Note. Upon such substitution of collateral, this Deed of Trust shall be deemed satisfied and released and Beneficiary shall promptly execute whatever documents are necessary to evidence such release on the public record. In the event Grantor receives insurance proceeds for the market value of the real property described in, and encumbered by, this Deed of Trust due to a casualty loss where the damaged property is not rebuilt, such insurance proceeds shall first be applied to any accrued interest and outstanding principal balance under the Note.

By acceptance of this Deed of Trust, Grantor acknowledges and approves the terms as set forth herein.

In witness whereof, Grantor has set Grantor's hand and seal on the date first written above.

WASHINGTON BANK PROPERTIES

By: _Dane Armstrong - Managing Partner_

STATE OF WASHINGTON )
                     )ss
COUNTY OF SAN JUAN )

On this 29th day of December, 1993, before me, a Notary Public in and for the State of Washington, personally appeared DANE ARMSTRONG, known or identified to me to be the Managing Partner of Washington Bank Properties and the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my official seal the day and year first above written.

_Carrie Brooks_
(Signature)

_Carrie Brooks_
(Please print name legibly)

NOTARY PUBLIC in and for the State of Washington, residing at Friday Harbor
My commission expires: 11/1/94

- 2 -

J:\C05811\M13671\00015541.2

**EXHIBIT B**

# Exhibit - C

## 6-ER-1253

824666

## EXHIBIT "1"
EXHIBIT "A"

:TUATE IN NEZ PERCE COUNTY, STATE OF IDAHO TO WIT:

PARCEL NO. 1:

Lots 1, 2 and 3, 4 and 5, Block 24, CITY OF LEWISTON , according to the recorded plat thereof, records of Nez Perce County, Idaho.

PARCEL NO. 2:

Lots 6, 7 and 8, Block 24, of the plat of E. B. TRUE'S survey to the City of Lewiston, according to the recorded plat thereof, records of Nez Perce County, Idaho.

ALSO the South 4 feet approximately, more or less, of "D" Street shown on said plat adjacent to said Lot 7 and adjacent to said Lot 6, such South portion of said "D" Street being the portion thereof that was occupied by occupants of said Lot 7 and 6, and not open or in use as a street when said E. B. True made the survey from which said plat was made, as found in the findings of the court on November 20, 1905 in Scully against Squier, et al, No. 990 in the District court of said Nez Perce County, affirmed 13 Idaho 417; also affirmed 215 U.S. 144; 30 S.Ct. 51; 54 L.Ed. 131 in which finding the Court said: "Said survey and plat - cut off approximately 4 feet from the North end of building then standing and actual use and occupancy - in Blocks 23 and 24 of the City of Lewiston - - - that the South line of "D" Street as thence established by user was approximately 4 feet North of the line originally shown on the E.B. True map - as the South line of "D" Street.

ALSO the East 2 feet of Second Street as shown on said plat adjacent to said Lots 7 and 8, conveyed to Robert Grostein and Abraham Binnard, January 12, 1881, Book 27 of Deeds page 173, by T. S. Billings, Mayor of said City.

EXCEPTING HOWEVER from land hereinabove described, the following:

TRACTS, viz: That portion from South side of said Lot 3, described in Deed from Robert Grostein and A. Binnard to T. S. Billings, Mayor of the City of Lewiston, dated January 11, 1881, Book 27 of Deeds, page 175, as follows:

Commencing at the intersection of the Northerly line of "E" Street with the Easterly line of Second Street; thence Northerly along said Easterly line of Second Street a distance of 10 feet; thence Easterly at right angles to said Easterly line of Second Street a distance of 40 feet to its intersection with the

**EXHIBIT B**

# Exhibit - C

**6-ER-1254**

824666

# EXHIBIT "1"
## אבהיבית "ג"

SITUATE IN NEZ PERCE COUNTY, STATE OF IDAHO TO WIT:

Northerly line of "E" Street; and thence Westerly along said
Northerly line of "E" Street a distance of 43 feet to the POINT
OF BEGINNING.

PARCEL NO. 3:

All that block of land bounded on the West by First Street, on
the South by Main Street, on the East by Second Street, and on
the North by "D" Street, said property being sometimes described
as Blocks 25, 26 and Courthouse Block, and that certain alley
lying between said Block 25 and the Courthouse Block and Block
26, all shown by the plat of the City of Lewiston, Naz Perce
County, Idaho.

TOGETHER WITH all that portion of Second Street situate between
the South line of "D" Street and the North line of Main Street in
the City of Lewiston, Idaho, according to the original plat
thereof, the same being the 1874 survey of E. B. True, EXCEPT the
East 2 feet of Second Street as shown on said plat adjacent to
Lots 7 and 8, conveyed to Robert Grostein and Abraham Binnard,
January 12, 1881, Book 27 of Deeds, page 173, by T. S. Billings,
Mayor of said City.

INST. NO. 586883
FILED FOR RECORD
FEE 12.00 REG. BY  LAND TITLE.

1993 DEC 30 P 2: 29

BETTY J. WILSEY
RECORDER, NEZ PERCE CO. ID.

BY _____ DEPUTY

**EXHIBIT B**

# Exhibit - C

**6-ER-1255**

824666

## EXHIBIT "1"

### ESCROW AGREEMENT

This Escrow Agreement is entered as of December 30, 1993, by and between THE UNIVERSE LIFE INSURANCE CO. ("Seller"), AIA INSURANCE, INC. ("Tenant"), WASHINGTON BANK PROPERTIES ("Buyer"), and LAND TITLE OF NEZ PERCE COUNTY, in Lewiston, Idaho, as escrow agent ("Escrow"). Tenant is a wholly-owned subsidiary of Seller.

### Recitals

A.    Seller and Buyer have entered into that certain Agreement of Purchase and Sale dated December 10, 1993, as amended (the "Purchase Agreement"), pursuant to which Buyer purchased the property described therein (the "Property").

B.    Buyer granted to Seller that certain Deed of Trust dated December 30, 1993 (the "Deed of Trust") and made that certain Promissory Note dated December 30, 1993 (the "Note"), both of which are in the original principal amount of $1,987,500 and have been deposited to Escrow to be held by and disposed of by Escrow in accordance with this Agreement. Copies of the Note and Deed of Trust are each attached hereto as Exhibits A and B, respectively.

C.    Buyer and Tenant have entered into that certain Lease dated December 30, 1993 (the "Lease"), a copy of which has been deposited to Escrow to be held by and disposed of by Escrow in accordance with this Agreement. A copy of the Lease is attached hereto as Exhibit C.

### Agreement

In consideration of the execution of the Agreement and the mutual promises and covenants herein contained, the parties hereto agree as follows:

1.    __Escrow Agent__. Seller, Tenant and Buyer hereby designate and appoint Escrow as the escrow agent to serve in accordance with the terms of this Agreement, and Escrow agrees to act in such capacity upon the terms, conditions and provisions provided in this Agreement.

2.    __Deposit of the Escrow Documents__.    On or before the execution of this Agreement, the Note, the Deed of Trust and the Lease have been delivered to Escrow, the receipt of which is hereby acknowledged by Escrow.

3.    __Note and Deed of Trust__.

a.    Commencing upon the date of this Agreement, Escrow shall hold the Note and Deed of Trust and Escrow shall collect on behalf of Seller all payments made by Buyer under the terms of the Note and Deed of Trust and credit the same to Seller's account, promptly disbursing to Seller any net cash balance (if any, after

- 1 -

J:\C05811\H13671\00016057.gcm

EXHIBIT C



EXHIBIT
D

## Exhibit - C

## 6-ER-1256

824666

# EXHIBIT "1"

payment of all current due and payable amounts under the Lease) remaining in Seller's account. The first payment of principal and interest by Buyer is due and payable on July 1, 1994.

b.   Upon satisfaction of the Note, Escrow shall cause the Deed of Trust to be reconveyed. Escrow is authorized to deduct from the final payment to Seller an amount equal to the cost of any tax stamps which may be required by law to be affixed to the deed and other costs associated with reconveyance of the Deed of Trust.

c.   If Seller declares a default, Seller shall deliver written notice of such default to Escrow in duplicate, and as many additional copies as Escrow may deem necessary, with instructions to Escrow to mail the original of such notice to Buyer by registered or certified mail. The duplicate notice of default shall be retained by Escrow. If a default is declared, Seller agrees to pay in advance Escrow's charges for handling and mailing the notices of default.

d.   The parties acknowledge and agree that, pursuant to the terms of the Note and Deed of Trust, Buyer is authorized to set off against any payment due under the Note an amount equal to any unpaid Rent Obligations (as defined in the Note) due and payable under the Lease, and any amount so set off shall be considered a credit against the payment amount due from Buyer under the Note, and Buyer shall not be considered in default for failure to pay any amount so set off.

4.   Lease. Commencing July 1, 1994, the parties agree that Tenant shall pay to Escrow all rents due and payable by Tenant under the Lease. Escrow shall collect all rent payments on behalf of Buyer and credit the same to Buyer's account, promptly disbursing to Buyer any net cash balance in Buyer's account.

5.   Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

6.   Miscellaneous

a.   Notices or other written communications placed in the United States mail, postage prepaid and addressed to the undersigned, or any of them, at their post office address, shall be deemed to have been given on the date of the mailing.

b.   Any payment made by Buyer or Tenant hereunder other than in cash shall be credited conditionally, pending Escrow's receipt of available funds. Escrow has no obligation to disburse payments until it has good funds in its bank account.

c.   It shall be the duty of the parties hereto to keep Escrow advised of any change of address. Such advice shall sufficiently identify the escrow concerned and the parties involved

- 2 -

J:\C05811\H13671\00016057.9   **EXHIBIT C**

# Exhibit - C

**6-ER-1257**

824666

# EXHIBIT "1"

and shall be mailed by certified or registered mail with return receipt requested to Escrow and to all parties concerned. All notices given pursuant to the terms of any document placed in this escrow must be given through Escrow as hereinabove provided at the expense of the party giving notice, and Escrow shall not be required to recognize service of notice given in any other manner. Escrow shall not be responsible for any damages arising out of or relating to the failure of any party to comply with such notice and mailing requirements.

d. In the event that this escrow is cancelled or forfeited in accordance with applicable State law, it is agreed that Escrow shall return the documents to the appropriate parties upon demand.

e. Escrow assumes no responsibility for determining that the parties to the escrow have complied with the requirements of the Truth In Lending, Consumer (Credit) Protection Act, or similar laws.

f. Escrow's fees and charges for administering this escrow shall be paid equally by Buyer and Seller according to the schedule of fees attached hereto as Exhibit D.

g. In the event of any disagreement between the parties hereto or any parties herein, resulting in adverse claims and demands being made by them or any of them, in connection herewith, upon Escrow, Escrow shall be entitled at its option to refuse to comply with said demands so long as such disagreement shall continue, and in so refusing, Escrow may refuse to deliver any monies, papers or property involved in or affected by this escrow; and in so refusing, Escrow shall not be or become liable to the parties to this escrow for its failure and/or refusal to comply with the conflicting or adverse demands of the parties hereto; provided Escrow shall be entitled to continue to so refrain to act until the earlier of:

(1) the parties hereto have reached an agreement in their differences and shall have notified Escrow in writing of such agreement, or

(2) the rights of the parties have been duly adjudicated by a Court of competent jurisdiction.

h. It is expressly understood between the parties hereto that Escrow is considered and held to be a depository only, and shall not be responsible or liable in any manner whatsoever for the sufficiency or correctness as to form, manner or execution, or validity of any instrument deposited in this escrow, nor as to the identity, authority or rights of any person executing the same; and that Escrow assumes no responsibility, nor is it to be held liable as to the conditions of the title to any of the property involved herein, nor as to any assignments, liens or encumbrances against said property; and that its duties hereunder shall be limited to

- 3 -

J:\C05511\M13671\00016057.9CB

**EXHIBIT C**

# Exhibit - C

# 6-ER-1258

824666

# EXHIBIT "1"

the safekeeping of such money, instruments or other documents received by it as Escrow, and for the delivery of the same in accordance with this Agreement; and Escrow shall in no case or event be liable for the failure of any of the conditions of this escrow or damage or loss caused by the exercise of Escrow's reasonable discretion, except in the event of Escrow's gross negligence or willful misconduct.

i.   Escrow reserves the right upon prior written notice to transfer, set over and assign its rights, obligations and duties as Escrow to a duly qualified successor escrowholder, and the term "Escrow" as used herein shall mean such successor escrowholder. Escrow further reserves the right at any time to resign as Escrow, in which case the undersigned parties or their successors in interest at their expense shall promptly select a successor escrowholder to which Escrow shall deliver the escrowed documents. In the event the undersigned parties have not selected a successor escrowholder within 30 days of the resignation of Escrow, a duly qualified successor escrowholder may be selected by Escrow, and any cost associated therewith shall be shared equally by Buyer and Seller.

j.   Any instrument or document placed in escrow is accepted upon the condition that Escrow may at its option for any reasonable reason, within 15 days from the deposit of such instrument, refuse to accept the same, in which event Escrow shall notify all parties hereto in writing of such refusal and shall return such instruments, together with the fee paid in connection therewith to the party or parties depositing the same.

k.   Escrow shall have no responsibility or liability for procuring or maintaining insurance coverage or for payment of taxes and assessments on any property associated with this escrow.

l.   In the event any specified portion of Buyer's payment to Seller herein is to be remitted by Escrow to any third party on account of liens or prior escrows affecting the property associated herewith, Escrow assumes no responsibility for the manner in which such remittances are applied to the underlying debt or obligations, and Escrow assumes no responsibility for the failure of any such remittances to fully discharge said underlying debt or obligation.

m.   In case any party shall assign its rights under any documents deposited hereunder, or should any party create in a third party any right, interest, lien or encumbrance under any document deposited hereunder or in the property covered by this Agreement, Escrow, as a matter of accommodation to the parties will make a reasonable effort to comply with such assignment or creation of rights upon satisfactory notification given to it and delivery of written notice to any party hereto affected by such action.

- 4 -

J:\C05811\H13671\00016057.gcm

**EXHIBIT C**

# Exhibit - C

824666

# EXHIBIT "1"

n.    In the event of a conflict or ambiguity between the escrowed documents and the provisions of this Agreement, this Agreement shall control.

o.    Escrow acknowledges receipt of $ *400.00* as set-up fee, and $ *60.00 (1st year)* as disbursement fee.

p.    The Note, Deed of Trust and Lease are incorporated herein by this reference.

q.    This Agreement shall be governed by Idaho law.

The undersigned have read the foregoing instructions, understand the contents thereof, and agree that Escrow, in the administration of the escrow, is bound only and solely by the foregoing written instructions, and such further written and signed instructions as we may hereafter deliver to Escrow and the same be accepted by it in writing.

IN WITNESS WHEREOF, the undersigned have signed as of the date first set forth above.


UNIVERSE LIFE INSURANCE CO.

By _____

Its _____

Federal Tax ID No. _____

Address:   111 Main Street
           Lewiston, ID  83501
           Attn: Robert Petersen


AIA INSURANCE, INC.

By _____

Its _____

Federal Tax ID No. _____

Address:   111 Main Street
           Lewiston, ID  83501
           Attn: Robert Peterson


- 5 -

J:\COS811\W13671\00016057.gcm

**EXHIBIT C**


# Exhibit - C

# 6-ER-1260

*EXHIBIT "1"*                               824666

WASHINGTON BANK PROPERTIES

By _____

Dane Armstrong, Managing Partner

Federal Tax ID No. _____

Address:   P.O. Box 2233
           Friday Harbor, WA  98250


LAND TITLE OF NEZ PERCE COUNTY

By _____

Its _____

Address:   1230 Idaho Street
           P.O. Box 1536
           Lewiston, ID  83501

- 6 -

J:\C05811\H13671\00018057.gcm

**EXHIBIT C**

Exhibit - C

6-ER-1261

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiff Dale L. Miesen

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual and the Personal representative of the Estate of Sarah Taylor; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC.; <br><br> Plaintiff, <br><br> v. <br><br> CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation, <br><br> Defendants. | Civil No. 1:10-cv-00404-CWD <br><br> DECLARATION OF RICHARD T. McDERMOTT |

DECLARATION OF RICHARD T. McDERMOTT - 1

**6-ER-1262**

I, Richard T. McDermott, declare:

1.      I am over the age of eighteen and am competent to testify in court, including as to the matters set forth in this declaration. This declaration and my opinions herein are based on personal knowledge, education, training, and experience.

2.      In 1962, I received a B.A. from Marquette University. In 1966, I obtained a J.D. from Fordham University School of Law.

3.      In 1967, I was admitted to practice law in the State of New York. I am presently in good standing and licensed to practice law in the State of New York. I have been admitted to practice law in New York for over 48 years.  I am also a member of the New York State Bar Association Securities Regulation Committee.

4.      From 1966 through 1990, I was an Associate and Partner with the law firm of Alexander & Green/Walter Conston Alexander & Green (the firms combined). From 1990 through 2004, I was a Partner of Rogers & Wells/Clifford Chance LLP (the firms merged in 2000).  While at that firm, I chaired the Legal Personnel Committee, and was responsible for the training, development, evaluation and advancement of associate attorneys and counsel, as well as being involved in the partner selection process.

5.      From 2000 through the present time, I have been an Adjunct Professor at Fordham University School of Law. From 1980 through 1998, I was an Adjunct Professor at New York University School of Law.  In both positions, I taught law school classes on the Legal Aspects of Corporate Finance, and covered such subjects as debentures, indentures, preferred stock, convertible securities, dividends and stock repurchases as well as third party opinions in corporate transactions.

6.      I am the co-author of Chapters 1 and 2 (Introduction and Elements of Opinion

DECLARATION OF RICHARD T. McDERMOTT - 2

Letters, respectively) and author of Chapter 3 (Legal Opinions on Corporate Matters) of the Treatise: *LEGAL OPINION LETTERS A Comprehensive Guide to Opinion Practice* (Third Edition). I have been a member of the TriBar Opinion Committee for 25 years. The TriBar Opinion Committee is a nationally recognized committee that publishes Reports on various aspects of opinion practice.

7.      I am the author of *Legal Aspects of Corporate Finance* (5ᵗʰ ed. 2013) and a 2016 Supplement thereto which is published by LexisNexis Carolina Academic Press. It is my understanding that the book has been used at approximately twenty-two law schools. I have authored other articles and materials (including a Teacher's Manual for *Legal Aspects of Corporate Finance*).

8.      In 1988, I was a visiting lecturer at Monash University in Melbourne, Australia and the University of Adelaide, Australia, Corporate and Business Law Centre. In 1999, I co-lectured with former Delaware Chancellor William Allen and James Fuld, author of *Legal Opinions In Business Transactions - An Attempt to Bring Some Order Out of Some Chaos*, 28 Bus. Law. 915 (1973), on the Law and Business of Investment Banking at the New York University Center for Law and Business.

9.      From 2009 through the present time, I have served as a Special Master for the New York State Supreme Court Appellate Division, First Department.

10.     I have extensive experience in the area of corporate governance of privately held and publicly traded corporations (including Fortune 500 companies) providing legal advice to Boards of Directors for matters involving significant transactions, corporate governance, derivative and class action shareholder suits, the payment of directors' expenses (including attorneys' fees), and related matters. I also have extensive experience with the preparation of:

DECLARATION OF RICHARD T. McDERMOTT - 3

proxy statements, Reports to the Securities and Exchange Commission, reports to shareholders, disclosures to shareholders, notices of shareholder meetings, shareholder resolutions, notices of board meetings, and board resolutions. I also have extensive experience in reviewing and interpreting certificates/articles of incorporation, bylaws, shareholder agreements, notices to shareholders, shareholder resolutions, notices to board members and board resolutions; and ensuring that shareholder resolutions and board resolutions comply with a corporation's articles of incorporation, bylaws, and applicable restrictions under statutory and common law.  I have experience advising the boards of directors of corporations in transactions, including, the board of directors of Fortune 500 companies.

11.     I have extensive experience in domestic and international corporate finance, mergers and acquisitions, tender offers, strategic alliances, bankruptcy reorganizations and other corporate matters. I have experience in the preparation of Proxy Statements and Reports to shareholders and the preparation of reports filed with the Securities and Exchange Commission.

12.     My experience in corporate law includes, but is not limited to: domestic and international corporate finance, mergers and acquisitions, purchases and redemptions by a corporation of its own shares (and formulating and evaluating proposals therefor) from both substantial shareholders and the investing public in issuer tender offers and open market transactions, strategic alliances, going private transactions, bankruptcy reorganizations, the legal and equitable theories of piercing the corporate veil and alter-ego (as well as taking appropriate corporate action to prevent such claims), and other general corporate matters.

13.     I have practiced corporation and securities law for more than 35 years. I have represented domestic and international acquiring and acquired clients in mergers and acquisition transactions involving acquisition amounts from less than $1 million to more than $1 billion.

DECLARATION OF RICHARD T. McDERMOTT - 4

Included in that work was the participation in and supervision of others with respect to pre-transaction due diligence and the rendering of reports pertaining to pre-transaction due diligence.

14.     I have been retained to provide expert testimony in this lawsuit regarding various matters pertaining to the defendants (including the Hawley Troxell Defendants and the yet to be a defendant GemCap Lending I, LLC (but it is named in the Proposed Third Amended Complaint).

**Facts, Data and Assumptions Relied Upon for My Opinions**

15.     In formulating and rendering my opinions in this Declaration, I am relying on various facts, data and assumptions, including, without limitation, those expressly stated below.

16.     I have reviewed tens of thousands of pages of documents that have been produced in the various lawsuits involving one or more of the defendants in this lawsuit, including, without limitation, various financial statements, accounting documents, board meeting minutes, shareholder meeting minutes, declarations, affidavits, filings, and related documents.

17.     I have reviewed AIA Services' articles of incorporation and all subsequent amendments thereto and restatements thereof. I have reviewed AIA Services' Restated Bylaws, which have been in effect since April 10, 1989. I have also reviewed the purported amendments thereto that John Taylor allegedly and purported recently adopted.  I have reviewed the annual reports for AIA Services and AIA Insurance purportedly showing John Taylor as the sole officer and director of those corporations. I am familiar with facts alleged in the Proposed Third Amended Complaint.

18.     I have reviewed the derivative demand letters from Roderick C. Bond to the Boards of Directors of AIA Services and AIA Insurance dated June 13, 2016 and August 23, 2016, respectively (collectively the "Derivative Demand Letters").  I have also reviewed John Taylor's letter to Roderick C. Bond dated September 12, 2016.  All three of the foregoing letters are attached

DECLARATION OF RICHARD T. McDERMOTT - 5

to John Taylor's declaration (Dkt. 186).

19.     I refer to R. John Taylor ("John Taylor"), Connie Taylor Henderson, JoLee Duclos, James Beck, and Michael Cashman Sr. collectively as the "Individual AIA Defendants", and each of them has served as an officer and/or director of AIA Services and/or AIA Insurance during the certain relevant times alleged in the Proposed Third Amended Complaint.

**Opinions**

20.     Based upon my knowledge, education and/or experience, together with the authorities and information I have reviewed, assumed and disclosed above, I render the following opinions:

21.     In all my years of practice and experience, I have never seen such wide-spread corporate malfeasance and inappropriate conduct as was committed by the defendants in this lawsuit and/or covered up by them as demonstrated by the documents that I have reviewed.  While the defendants John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, Sr., JoLee Duclos and CropUSA Insurance Agency, complain about the length of Dale Miesen's Proposed Third Amended Complaint in this lawsuit, I believe that the length of that complaint is necessary to cover the substantial history of facts and the claims at issue in this lawsuit.

22.     In my opinion, the two Derivative Demand Letters at issue in the pending motion, Dkts. 186-1 and 186-2, more than sufficiently state the required names, facts, causes of action and relief that I would expect to see, and have seen, in derivative demand letters provided to boards of directors for claims such as those asserted against the parties named in the Proposed Third Amended Complaint.  I am familiar with and/or have knowledge of, the transactions and items identified in the Derivative Demand Letters. It is disingenuous for John Taylor, as the sole purported director and officer for AIA Services and AIA Insurance, to state that he lacks

DECLARATION OF RICHARD T. McDERMOTT - 6

information as to any of the detailed items in the Derivative Demand Letters as he was directly or indirectly involved with each of the items listed in the Derivative Demand Letters.

23.    Because of John Taylor's conflicts of interest by way of involvement in the various items listed in the Derivative Demand Letters (including through his ownership in CropUSA Insurance Agency, AIA Services, Pacific Empire Radio, and in other entities listed in the Derivative Demands and/or his involvement in the items listed in the Derivative Demands), John Taylor was unable to respond on behalf of AIA Services and AIA Insurance to the Derivative Demands or make any decisions whether to pursue the claims listed in the Derivative Demands based upon his conflicts of interest and his bad faith conduct. Those same conflicts of interest, together with the acts of placing their own self-interests ahead of the best interests of AIA Services and AIA Insurance, apply to virtually all of the breach of fiduciary duty claims in this lawsuit (and possibly every one of them) thereby resulting in the business judgment rule having no application to the Individual AIA Defendants during the applicable times that they owed fiduciary duties as officers and/or directors and/or controlling shareholders of AIA Services and/or AIA Insurance as alleged in the Proposed Third Amended Complaint.  Moreover, the Individual AIA Defendants have not acted in good faith with respect to the transactions and acts at issue in the Proposed Third Amended Complaint.

24.    As I mentioned above, I will be prepared to render opinions as to the breaches of fiduciary duties and related conduct of each of the defendants in this lawsuit (including the Hawley Troxell Defendants), together with opinions regarding proximate causation.  I am informing the Court of these facts so that the Court understands that the causes of action and damages at issue in this lawsuit are substantiated.

DECLARATION OF RICHARD T. McDERMOTT - 7

6-ER-1268

6-ER-1269

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF IDAHO THAT THE FOREGOING IS TRUE AND CORRECT.

*January 5, 2016, New York, New York*                    */s/ Richard T. McDermott*
Date and City and State Signed                    Richard T. McDermott

DECLARATION OF RICHARD T. McDERMOTT - 8

**6-ER-1269**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 5th day of January, 2017, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Alyson Anne Foster     aaf@aswblaw.com, mar@aswblaw.com

James D LaRue:     jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:     jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:     lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:     sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:     swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

_/s/ Roderick C. Bond_
Roderick C. Bond

DECLARATION OF RICHARD T. McDERMOTT - 9

**6-ER-1270**

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiff

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual and the Personal representative of the Estate of Sarah Taylor; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC.;<br><br>                   Plaintiff,<br><br>        v.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation,<br><br>                   Defendants. | Civil No. 1:10-cv-00404-CWD<br><br>PLAINTIFF DALE L. MIESEN'S REPLY IN SUPPORT OF MOTION TO AMEND AND SUPPLEMENT COMPLAINT **[Dkt. 182]** **[CORRECTED]** |

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND & SUPP. COMPLAINT - i

**6-ER-1271**

**TABLE OF CONTENTS**

I.  ARGUMENT ........................................................................................................ 1

A.  Plaintiff's Claims and Relief Are All Viable and the AIA Defendants' Futility Arguments Are Without Merit. ..................................................................... 1

    1.  The Stringent Legal Standard Required to Overcome to Prove Futility. ................. 1

    2.  Plaintiff's Two Derivative Demand Letters Were More Than Sufficient as They Contained Exhaustive Information Detailing the Claims and Bad Acts, Which More than Complies With Idaho's Minimal Derivative Demand Requirements. .. 1

    3.  The Plaintiff's Breach of Fiduciary Duty Claims Are Adequately Pleaded. .......... 4

    4.  The TAC Sufficiently Pleads Fraud, Constructive Fraud and Concealment. ......... 7

    5.  The TAC Sufficiently Pleads Conspiracy to Committ Fraud. .............................. 7

    6.  The TAC Properly Seeks Statutory Relief for Ultra Vires and Other Improper Acts. ..................................................................................................... 8

B.  The AIA Defendants Cannot Show Any Bad Faith, Undue Delay, or Prejudice. .............. 8

    1.  There Is No Bad Faith or Undue Delay and the Prior Amendment Is Irrelevant. .. 8

    2.  The AIA Defendants Have Failed to Show How They Would Be Prejudiced. ....... 9

C.  If this Court Finds that Any of Plaintiff's Claims Are Not Sufficiently Pleaded, this Court Should Allow Any Defects to Be Cured Through an Amended Complaint. .......... 10

II.  CONCLUSION ................................................................................................... 10

Plaintiff Dale L. Miesen ("Plaintiff") submits this corrected reply in support of his motion to amend and supplement his complaint (Dkt. 182) to address the AIA Defendants' response (Dkt. 185):

## I.   ARGUMENT

### A.   Plaintiff's Claims and Relief Are All Viable and the AIA Defendants' Futility Arguments Are Without Merit.

#### 1.   The Stringent Legal Standard Required to Overcome to Prove Futility.

"In analyzing whether the proposed amendment is futile, the Court accepts all factual allegations set forth in the proposed amended complaint as true and draws all reasonable inferences in favor of the plaintiff. *FragranceNet.com, Inc. v. FragranceX.com, Inc.*, 493 F.Supp.2d 545, 546 (E.D.N.Y. 2007) (citations omitted). "[A] proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Miller v. Rykoff–Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988).  While, "'it may appear on the face of the pleadings that a recovery is very remote and unlikely[,] ... that is not the test.'" *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (quoting S*cheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).  "'The issue is not whether the plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Id.*  "Since the jurisdiction of the federal court in this case is based on diversity of citizenship, the law of Idaho is controlling on substantive issues." *Food Machinery & Chemical Corp. v. Meader*, 294 F.2d 377, 383 (9th Cir. 1961).

#### 2.   Plaintiff's Two Derivative Demand Letters Were More Than Sufficient as They Contained Exhaustive Information Detailing the Claims and Bad Acts, Which More than Complies With Idaho's Minimal Derivative Demand Requirements.

The AIA Defendants argue that Plaintiff's two derivative demand letters at issue for the claims and relief in the Proposed Third Amended Complaint ("TAC") were insufficient as a matter

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND & SUPP. COMPLAINT - 1

6-ER-1273

of law and, thus, amendment should be denied on this basis alone.  (Dkt. 185, p. 3-8.)[1]  Plaintiffs'

two exhaustive derivative demand letters (eleven and thirteen pages long, respectively) more than

satisfy Idaho's minimal derivative demand requirements.  (Dkts. 186-1, 186-2.)

"The substantive law which determines whether demand is, in fact, futile is provided by

the state of incorporation of the entity on whose behalf the plaintiff is seeking relief."  ***Rosenbloom***

***v. Pyott***, 765 F.3d 1137, 1148 (9th Cir. 2014) (citation omitted).  Because AIA Services and AIA

Insurance are Idaho corporations (Dkt. 137, p. 5, ¶¶ 8-9; Dkt. 180-2, ¶¶ 6-7), Idaho law governs

Plaintiff's two derivative demand letters.  Idaho Code sections 30-1-742 and 30-29-742 provide:

> No shareholder may commence a derivative proceeding until: (1) A written demand
> upon the corporation has been made to take suitable action.[2]

**I.C. § 30-1-742(1)**; **I.C. § 30-29-742(1)**. "Suitable" is defined as "fit and appropriate for their

intended purpose." **BLACK'S LAW DICTIONARY** (10th ed. 2014). "Statutory interpretation begins

with the literal language of the statute. Provisions should not be read in isolation, but must be

interpreted in the context of the entire document."  ***Farber v. Idaho State Ins. Fund***, 147 Idaho

307, 310, 208 P.3d 289, 292 (2009). The Idaho Supreme Court held that the statute simply requires

"an explicit demand upon the corporation to take suitable action."[3]  ***McCann v. McCann***, 138

Idaho 228, 235, 61 P.3d 585, 592 (2002) (explaining that names, facts, claims and related

information is all that is required for a derivative demand).

Here, Plaintiff served two exhaustive derivative demand letters on June 13, 2016 (eleven

---

[1] When citing to other docket numbers, Plaintiff will cite to the blue file-stamped page numbers referenced on the top of each page of each docket (not to any page numbers at the bottom of the pages).

[2] While Idaho Code section 30-1-742 was repealed effective July 1, 2015, Idaho Code section 30-29-742 is identical. Because certain acts occurred before Idaho Code section 30-1-29-742 was repealed, both appear to apply.

[3] Because the Idaho Legislature eliminated the futility of demand exception recognized by most jurisdictions, this further supports the notion that only a "written demand upon the corporation has been made to take suitable action" is necessary. *See* **I.C. § 30-29-742**.

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND & SUPP. COMPLAINT - 2

pages long) and August 23, 2016 (thirteen pages long), respectively, which provided detailed information regarding specific names, facts, causes of action, requested relief and damages. (Dkts. 186-1, 186-2.)  While the AIA Defendants do not like the predicament that they presently face for their years of malfeasance and tortious conduct, Plaintiff's two derivative demand letters are more than sufficient to comply with the plain meaning of Idaho Code sections 30-1-742 and 30-29-742. The AIA Defendants' other arguments are equally without merit.

**First**, the AIA Defendants argue that "the letters taken together are no an 'earnest and sincere' effort to help the AIA board remedy Plaintiff's concerns" and the demands "were too nebulous to enable the board to investigate." (Dkt. 185, p. 5.)  The Boards of Directors of AIA Services and AIA Insurance is comprised of just John Taylor—and he is fully aware of precisely what transpired in all of the items listed in the demand letters. (Dkts. 186-1, 186-2, 194-2, 194-3.) Next, the September 12, 2016 response letter came too late—over ninety days after the June 13, 2016 demand letter. (Dkts. 186-1, 186-3.)  Finally, John Taylor's response letter did not ask for any clarification nor did he has for any additional information. (Dkt. 186-3.) He can hardly complain when he made no specific requests for information or clarification—assuming that he had no knowledge of the items listed in the derivative demand letters.

**Second**, contrary to the AIA Defendants' allegations (Dkt. 185, p. 5-6), the demand letters specifically name each and every one of the defendants named in the TAC and specifically states facts, claims and damages relating to them.  (Dkts. 182-2, 186-1, 186-2.)  While it is unclear to the undersigned whether this Court may consider expert testimony for this issue, Professor Richard McDermott opined that the demand letters were more than sufficient as to the claims and parties named in the TAC and that John Taylor had conflicts of interest that prevented him from rejecting or considering the demand letters.  (Dkt. 194-6, ¶¶ 20-23, 194-2, 194-3.)

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND & SUPP. COMPLAINT - 3

**Third**, contrary to the AIA Defendants arguments (Dkt. 185, p. 7-8), a comparison of the demand letters and the allegations in the TAC demonstrates that the named defendants, together with the facts, claims, relief and damages asserted against them, matches up perfectly.  (Dkt. 182-2, 186-1, 186-2.)  As Professor McDermott noted, John Taylor (who is presently the sole purported officer and director of AIA Services and AIA Insurance), knows good and well what has transpired with each and every item listed in the derivative demand letters since he participated directly or indirectly with each and every one of them.  (Dkt. 194-6, ¶¶ 21-24.)  The allegations that the demand letter are unclear or that John Taylor even sought clarification or more information, is completely unsupported by the record.  (Dkts. 186, 186-1, 186-2, 186-3.)

### 3. The Plaintiff's Breach of Fiduciary Duty Claims Are Adequately Pleaded.

The AIA Defendants argue that the business judgment rule somehow insulates them from liability and makes Plaintiff's newest claims futile as to certain transactions.  (Dkt. 185, p. 8-11.) Their arguments ignore the allegations in the TAC, which must be taken as true, and thus fail.

Officers, directors and controlling shareholders owe fiduciary duties to the corporation and shareholders.  ***McCann v. McCann***, 152 Idaho 809, 815-816, 275 P.3d 824, 830-831 (2011); ***Steelman v. Mallory***, 110 Idaho 510, 513, 716 P.2d 1282, 1285 (1986); ***Weatherby v. Weatherby Lumber Co.***, 94 Idaho 504, 506, 492 P.2d 43, 45 (1972); ***Munson v. Valley Energy Inv. Fund, U.S., LP***, 333 P.1102 (Or. Ct. App. 2014).  "'[C]lassic example[s]" of breaches of the duty of loyalty are "when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders.'" ***Mann v. GTCR Golder Rauner, L.L.C.***, 483 F.Supp.2d 884, 900 (D. Arizona 2007) (citation omitted). Indeed, when a person is an officer and director, the fiduciary duties owed are heightened.  ***Hall v. Staha***, 858 S.W.2d 672, 676 (Ark. 1993).

While Idaho law has never specifically addressed all of the exceptions to the business

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND & SUPP. COMPLAINT - 4

judgment rule other than bad faith (*Steelman*, 110 Idaho at 513), they include when directors or officers: (a) appear on both sides of the transaction; (b) expect to derive any personal financial benefit from a transaction in the sense of self-dealing, i.e., instead of benefiting the corporation and all of its shareholders; (c) have "abdicated their functions"; (d) failed to act; and (e) have conflicts of interest; (f) take action without reasonable inquiry or with improper motives; or (g) have engaged in fraudulent or dishonest acts; or (h) are guilty of bad faith by "dishonest purpose or moral obliquity" (and good faith may be presumed by the absence of adverse financial interest). *Mann*, 483 F.Supp.2d at 901-903; ***Bader v. Anderson***, 179 Cal.App.4th 775, 787 (Cal. Ct. App. 2009).

Here, Plaintiff's allegations in the Third Amended Complaint are more than sufficient to meet the pleading standard. (Dkt. 182-2, p. 15-77.) Plaintiff re-alleges all of the facts in his complaint sufficient to plead his breach of fiduciary duty claims. (*Id*., p. 60-63 ¶¶ 185-191.) The allegations in the TAC, which must be accepted as true for purposes of this motion, state valid causes of action for breaches of fiduciary duties as directors, officers and controlling shareholders, including under each of the exceptions to the business judgment rule as noted above. *Steelman*, 110 Idaho at 513; *Mann*, 483 F.Supp.2d at 901-903; *Bader*, 179 Cal.App.4th at 787. For these same reasons, the AIA Defendants' arguments as to certain transactions also fail.

**First**, the AIA Defendants argue that there is no assertions that John Taylor's purported transfer of certain real estate was done in bad faith, without a legitimate purpose or as conflict of interest. (Dkt. 185, p. 10.) These arguments ignore the allegations in the TAC, which alleges: (a) "These real property transfers and assumptions of debt were unauthorized and ultra vires"; (b) "the $820,668 purported book value…was not authorized and John and the Controlling AIA Defendants had conflicts of interest…AIA's proper Board of Directors did not authorize the

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND & SUPP. COMPLAINT - 5

transactions nor did AIA Services' shareholders." (Dkt. 182-2, p. 47, ¶¶ 157-158.)  As a matter of law, John Taylor was improperly on both sides of these transactions. (*Id*.) The TAC also alleges that the AIA Defendants failed to comply with conflicts of interest provisions under the bylaws and articles of incorporation, refused to act in the best interests of AIA, engaged in transactions that benefitted themselves, and obligated AIA to be liable for loans in violation of the articles of incorporation.  (*Id*., p. 49, 54 ¶¶ 164(a)-(c), (nn), p. 60-63.)  The TAC alleges the property was improperly valued and no proper approval was obtained. (*Id*., p. 73, ¶ 226(h).) The TAC also alleges instances of fraud and countless other acts of bad faith. (*Id*., p. 11-67.)

**Second**, the AIA Defendants argue that there are no allegations that AIA did not receive sufficient value for the 7,500 Series A Preferred Shares allegedly issue to John Taylor or that the issuance of those shares was a conflicting transaction. (185, p. 10-11.)  Once again, they are incorrect as the TAC alleges: (a) "those shares were improperly issued and were never authorized by a properly seated and unconflicted Board of Directors;" (b) AIA's articles only permitted those shares to be issued to Donna Taylor; and (c) "those shares were not purchased or issued for any legitimate business purposes…and John had conflicts of interest that prevented him from purchasing or issuing those shares."  (Dkt. 182-2, p. 44, ¶¶ 160-161.) The TAC alleges that the shares were issued for an improper purpose and without amending the articles. (*Id*., p. 69, ¶ 226(j).) As a matter of law, John Taylor was on both sides of this transaction, too. (*Id*.) These allegations, together with the other allegations in the TAC, are more than sufficient.  (*Id*., p. 15-77.)

**Third**, the AIA Defendants argue that the "TAC asserts no invalid purpose for the bylaw amendment and therefore states no claim."  (Dkt. 185, p. 11.)  Once again, they are incorrect as the TAC alleges: "These purported amendments were never adopted for a legitimate purpose and John had conflicts of interest that prevented him from adopting the provision." (Dkt. 182-2, p. 48,

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND & SUPP. COMPLAINT - 6

¶ 162.)  As a matter of law, John Taylor was on both sides of this transaction, too. (*Id*.) The TAC also alleges that they failed to "comply with conflicts of interest provision in the bylaws and articles of incorporation…" (*Id*., p. 49, ¶ 164(b).) The TAC alleged further conflicts of interest and improper purposes.  (*Id*., p. p. 60-63, 73, ¶ 226(i).)

**Fourth**, the Individual Defendants argue that the TAC fails to state a claim "that the Directors overspent on attorney fees defending a lawsuit Donna Taylor filed against AIA."  (Dkt. 185, p. 11.) The TAC alleges that they spent over $400,000 fighting Donna Taylor, rather than just paying her.  (Dkt. 182-2, p. 49, ¶ 163.) The TAC also alleges further conflicts of interest.  (*Id*., p. 49, ¶ 164(b), p. 60-63.)  Once again, John Taylor and the other AIA Defendants were on both sides of these transactions, too.

### 4.  The TAC Sufficiently Pleads Fraud, Constructive Fraud and Concealment.

The AIA Defendants argue that the TAC fails to properly plead fraud claims.  (Dkt. 185, p. 12-13.)  While Paragraph 214 of the TAC alleges certain facts regarding the illegal GemCap guarantees, the AIA Defendants fail to mention that the other paragraphs in the TAC pleaded the other elements of fraud, constructive fraud and concealment and further incorporated by reference all necessary other allegations contained elsewhere in the TAC.  (Dkt. 182-2, p. 66-72.)  *See, e.g., Doe v. Boy Scouts of America*, 159 Idaho 103, 356 P.3d 1049 (2015); *Sowards v. Rathbun*, 134 Idaho 702, 707 8 P.3d 1245, 1250 (2000) (silence is a misrepresenation); *Bethlahmy v. Bechtel*, 91 Idaho 55, 415 P.2d 698 (1966) (failure to disclose or concealment is a misrepresentation).

### 5.  The TAC Sufficiently Pleads Conspiracy to Committ Fraud.

The AIA Defendants argue that Plaintiff has improperly pleaded a conspiracy as a separate claim.  (Dkt. 185, p. 13-14.)  Once again, they are incorrect.  The TAC alleges, rightfully so, that the AIA Defendants have engaged in agreements to commit a conspiracy to defraud AIA.  (182-2,

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND & SUPP. COMPLAINT - 7

p. 70-71, ¶¶ 216-219.) *Mannos v. Moss*, 143 Idaho 927, 935, 155 P.3d 1166, 1174 (2007). That claim, like others, also incorporates other allegations contained elsewhere within the TAC. (*Id.*) Thus, the TAC has more than sufficiently pleaded conspiracy to defraud.

**6. The TAC Properly Seeks Statutory Relief for Ultra Vires and Other Improper Acts.**

The AIA Defendants argue that the TAC fails to state a claim for relief for statutory violations. (Dkt. 185, p. 14.) Idaho Code sections 30-1-304 (repealed) and 30-29-304 expressly provide for relief, including, without limitation, setting aside contracts and awarding damages and other relief. Thus, the TAC properly alleges a cause of action for such relief. (Dkt. 182-2, p. 74-75, ¶¶ 228-230.) The problem is that the AIA Defendants do not like the damages and relief available, including, their personal liability.

**B. The AIA Defendants Cannot Show Any Bad Faith, Undue Delay, or Prejudice.**

**1. There Is No Bad Faith or Undue Delay and the Prior Amendment Is Irrelevant.**

The AIA Defendants argue, without any evidence, that amendment should be delayed based on undue delay, bad faith and prior amendments, which fail. (Dkt. 185, p. 15-17.)

"To oppose a motion for leave to amend on grounds of bad faith, a party must show 'sharp practice' tactics..." *SAES Getters S.p.A. v. Aeronex, Inc.*, 219 F.Supp.2d 1081, 1095 (S.D. Cal. 2002) "[D]elay, by itself, is insufficient to justify denial of leave to amend." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (citations omitted). While this Court's discretion to deny an amendment is extremely broad after prior amendments have been granted, "dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." *Griggs v. Pace American Group, Inc.*, 170 F.3d 877, 879 (9th Cir. 1999) (citation omitted).

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND & SUPP. COMPLAINT - 8

Here, there is no evidence of bad faith or undue delay. And, delay, by itself, is no reason to deny amendment. Indeed, it was John Taylor and his counsel who delayed the filing of the TAC months because they refused to provide any financial information (despite representations to this Court that they would provide documents) and waited until over ninety days to respond to the June 13, 2016 demand letter.  (Dkts. 139-3 ¶ 4, 186-1, 186-3.)  Moreover, even if prior amendments have been granted, this Court should still grant the amendment because the claims and relief are all valid.  While the AIA Defendants make conclusory and unsupported allegations of delay and bad faith, they have failed to meet their burden of proving either.  Their arguments fail.

### 2.  The AIA Defendants Have Failed to Show How They Would Be Prejudiced.

The AIA Defendants nakedly argue that they would be prejudiced. (Dkt. 185, p. 17.)

"'Undue prejudice' means substantial prejudice or substantial negative effect[.]" *SAES Getters S.p.A. v. Aeronex, Inc.*, 219 F. Supp.2d 1081, 1086 (S.D. Cal. 2002).  "[T]he Ninth Circuit has found such substantial prejudice where the claims sought to be added 'would have greatly altered the nature of the litigation and would have required defendants to have undertaken, at a late hour, an entirely new course of defense.'" *Id*. (citation omitted). "The party opposing amendment bears the burden of showing prejudice." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987).

Here, the AIA Defendants fail to set forth any admissible evidence or rational argument to support any prejudice—nor does any exist at this early stage in this complex case.  (Dkts. 185-186.) This complex case is just starting and a trial date has not even been set. (Dkt. 191.)  As to the number of pages in the TAC, the Hawley Troxell Defendants had no problem answering the Third Amended Complaint nor did they have any questions.  (Dkt. 183.) According to Professor McDermott, the length of the TAC is warranted and he has never seen such wide-spread corporate

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND & SUPP. COMPLAINT - 9

malfeasance as is present here.  (Dkt. 194-6, ¶ 21.) There simply is no prejudice. Moreover, as to any allegations regarding whether Plaintiff is seeking to obtain the full measure of damages and relief possible for AIA Services and AIA Insurance, it is noteworthy that the AIA Defendants counsel is representing AIA Service and AIA Insurance in another fraud lawsuit involving John Taylor and they have been getting paid by AIA tens of thousands of dollars for their work in this lawsuit and others. (Dkt. 194-1, ¶ 5, Ex. C-D.) In any event, there is no prejudice in allowing an amendment to file the TAC.

**C.** **If this Court Finds that Any of Plaintiff's Claims Are Not Sufficiently Pleaded, this Court Should Allow Any Defects to Be Cured Through an Amended Complaint.**

While Plaintiff maintains that all of his claims and requested relief are adequately pleaded in the TAC (Dkt. 182-2), this Court should allow the Plaintiff to cure any perceived defects by filing an amended complaint.  *Griggs*, 170 F.3d at 879. The parties have agreed that this lawsuit is a complex one, discovery has not even commenced since GemCap is not a party, and the deadline for filing dispositive motions is not until May 1, 2018.  (Dkt. 191.)

## II.  CONCLUSION

For the reasons articulated above, this Court should grant the Plaintiffs' motion to amend and supplement complaint (Dkt. 182) in its entirety. If, however, this Court finds that any of the causes of action are not adequately pleaded, this Court should allow those defects to be cured by amendment. Attached as ***Exhibit A*** is a red-line version showing the minimal corrections.

DATED:  This 6th day of January, 2017.

RODERICK BOND LAW OFFICE, PLLC


By: ___/s/ Roderick C. Bond_____
Roderick C. Bond
Attorney for Plaintiff

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND & SUPP. COMPLAINT - 10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 6th day of January, 2017, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Alyson Anne Foster     aaf@aswblaw.com, mar@aswblaw.com

James D LaRue:     jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:     jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:     lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:     sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:     swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

_/s/ Roderick C. Bond_
Roderick C. Bond

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND & SUPP. COMPLAINT - 11

**6-ER-1283**

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiff

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>v.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>Defendants. | Civil No. 1:10-cv-00404-CWD<br><br>THIRD AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

THIRD AMENDED COMPLAINT - i

**6-ER-1284**

## TABLE OF CONTENTS

I.      STATEMENT OF JURISDICTION.................................................................... 1

II.     STATEMENT OF VENUE ............................................................................... 1

III.    PARTIES AND DEFINITIONS OF THE PARTIES........................................... 1

IV.     FACTS ........................................................................................................... 6

A.      The Background Facts Regarding AIA Services and AIA Insurance................................. 6

B.      John, Connie, Beck and Cashman Take Operational Control of AIA and AIA
        Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in
        Its Amended Articles of Incorporation ................................................................ 8

C.      AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer
        CropUSA to Themselves ........................................................................ 11

D.      The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants
        in Taking CropUSA from AIA and Having AIA Fund CropUSA ................................... 15

E.      The Controlling AIA Defendants Unlawfully Transfer $1,510,693 From AIA to
        Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt that
        CropUSA Owed to AIA—thereby Resulting in a $2,144,962 Fraud Against AIA........... 17

F.      The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and
        Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal ......... 21

G.      The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and
        Financial Wherewithal with the Improper Assistance from the Hawley Troxell
        Defendants ......................................................................................... 23

H.      The Controlling AIA Defendants Enter Into Tolling Agreements, but Those
        Tolling Agreements Do Not Save the Hawley Troxell Defendants from the
        Unwaivable Conflicts of Interest ......................................................... 24

I.      The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA
        and Intentionally Committing Torts against AIA with the Assistance of the
        Hawley Troxell Defendants—Even While This Lawsuit Was Pending........................... 30

THIRD AMENDED COMPLAINT - ii

J.      The Controlling AIA Defendants, with GemCap Aiding and Abetting Them, Illegally Had AIA Guarantee Loans Made to CropUSA by GemCap, Concealed the Guarantees from AIA, Illegally Entered into Settlement Agreements with GemCap, Concealed the Settlement Agreements from AIA, and Unlawfully Transferred Property to GemCap Thereby Damaging AIA. ................................................................ 35

K.      John Unlawfully Transfers Certain Real Property to AIA and Requires AIA to Pay the Liabilities on the Property and He Alleges that AIA Owes Him $545,563 in Accrued Salary. ............................................................................................................. 43

L.      John Unlawfully Amends AIA Services and AIA Insurance's Bylaws and Issues Himself Series A Preferred Shares in AIA Services. ............................................... 44

M.      There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants .................................. 45

V.      CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 .......... 53

VI.     COUNT I—BREACH OF FIDUCIARY DUTIES ............................................................. 56

VII.    COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES ....... 60

VIII.   COUNT III—LEGAL MALPRACTICE ............................................................................ 60

IX.     COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ .......................................... 62

X.      COUNT V—AIDING AND ABETTING AND CONSIPIRACY OF FRAUD .............. 66

XI.     COUNT VI—BREACH OF CONTRACT ......................................................................... 67

XII.    COUNT VII—DECLARATORY JUDGMENT ............................................................... 68

XIII.   COUNT VIII—STATUTORY RELIEF (INCLUDING FOR ULTRA VIRES) .............. 70

XIV.    COUNT IX—CORPORATE WASTE/EXCESSIVE COMPENSATION ....................... 71

XV.     COUNT X—VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT ....... 73

XVI.    COUNT XI—ACCOUNT STATED ................................................................................. 74

XVII.   JURY DEMAND ............................................................................................................... 75

THIRD AMENDED COMPLAINT - iii

XVIII.   PRAYER FOR RELIEF ............................................................................ 75

VERIFICATION OF DALE L. MIESEN ...................................................................... 79

CERTIFICATE OF SERVICE ..................................................................................... 80

THIRD AMENDED COMPLAINT - iv

Plaintiff Dale L. Miesen alleges cumulatively, or when necessary and where applicable in the alternative, as follows:

## I.   STATEMENT OF JURISDICTION

1.      This Court has jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and this action is between citizens of different states.

2.      This Court has personal jurisdiction pursuant to I.C. § 5-514 because the defendants: (a) committed torts within the state of Idaho (including conspiring to commit, covering up, and aiding in the commission of torts committed within the state of Idaho), which injured AIA in Idaho; and/or (b) transacted business within the state of Idaho and engaged in transactions within the state of Idaho in an effort to obtain a pecuniary benefit and/or enhance their investment in Idaho corporations named as defendants in this Third Amended Complaint. Examples of the specific facts supporting personal jurisdiction are set forth in certain of the paragraphs below.

## II.   STATEMENT OF VENUE

3.      Venue is proper in the District of Idaho under 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the acts, errors and omissions giving rise to the claims asserted in this Third Amended Complaint (and the torts committed against AIA Services Corporation and AIA Insurance, Inc.) occurred in the District of Idaho and certain of the defendants are citizens and residents of the District of Idaho.

## III.   PARTIES AND DEFINITIONS OF THE PARTIES

4.      Plaintiff Dale L. Miesen ("Plaintiff" or "Miesen") is a citizen and resident of Colleyville, Texas.  Plaintiff is, and has been, a common shareholder of AIA Services Corporation ("AIA Services") during all relevant times and specifically at the time of the transactions, acts, omissions, malfeasance, and damages at issue in this lawsuit. Plaintiff is also presently a creditor

THIRD AMENDED COMPLAINT - 1

of AIA Services.

5.     Plaintiff is bringing this derivative action as a shareholder and on behalf of AIA Services. In addition, Plaintiff is bringing this action as a double derivative action on behalf of AIA Insurance, Inc. ("AIA Insurance"), which is a wholly-owned subsidiary of AIA Services. AIA Services and AIA Insurance are collectively referred to as "AIA" in this Third Amended Complaint. The definition of "AIA" includes AIA Services and/or AIA Insurance for purposes of pleading in the alternative, and includes the Plaintiff to the extent he is required to support any cause of action and/or any of the relief requested in this Third Amended Complaint.

6.     Defendant AIA Services is a citizen of Idaho because it is an Idaho corporation, its principal place of business is in Lewiston, Idaho, and its primary purported officer, John Taylor, resides in Lewiston, Idaho. During all relevant times, AIA Services is or has been the parent corporation of AIA Insurance.

7.     Defendant AIA Insurance is a citizen of Idaho because it is an Idaho corporation, its principal place of business is in Lewiston, Idaho, and its primary purported officer, John Taylor, resides in Lewiston, Idaho.  During all relevant times, AIA Insurance has been a wholly-owned subsidiary of AIA Services.

8.     Plaintiff's assertions as to AIA Services' and/or AIA Insurance's board of directors and/or officers in this Third Amended Complaint is not intended to be an admission or an acknowledgement that the board of directors or officers were properly seated and elected or that the necessary quorum was present, and Plaintiff asserts that such was not the case for a number of years.

9.     Defendant CropUSA Insurance Agency, Inc. ("CropUSA") is a citizen of Idaho because it is an Idaho corporation, its principal place of business is in Lewiston, Idaho, and its

THIRD AMENDED COMPLAINT - 2

primary purported officer, John Taylor, resides in Lewiston, Idaho. CropUSA was formerly known as AIA Crop Insurance, Inc.

10.     Defendant CropUSA Insurance Services, LLC ("CropUSA Insurance Services") is a citizen of Idaho because it is an Idaho limited liability company, its principal place of business is in Lewiston, Idaho, and its manager, John Taylor, is a resident of Lewiston, Idaho.

11.     CropUSA and CropUSA Insurance Services are referred to collectively and/or individually when pleading in the alternative as "CropUSA" in this Third Amended Complaint.

12.     Defendant R. John Taylor ("John" or "John Taylor") is a citizen and resident of Lewiston, Idaho. During all times relevant to this lawsuit, John served on the Board of Directors of AIA Services, AIA Insurance, and CropUSA and continues to serve on those boards. John also served as President of each of these corporations during all times relevant to this lawsuit. John is also licensed to practice law in the state of Idaho. John is a common shareholder of AIA Services and a common shareholder of CropUSA (although Plaintiff asserts those shares were unlawfully issued to him). John also owns shares or ownership interests in other entities that have engaged in inappropriate transactions with AIA and/or which have improperly benefitted from AIA during all relevant times.

13.     Defendant James Beck ("Beck") is a citizen and resident of the state of Minnesota. Beck served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times. Beck was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA (although Plaintiff maintains that his common shares in AIA Services and CropUSA were unlawfully issued).

14.     Defendant Michael Cashman, Sr. ("Cashman") is a citizen and resident of the state of Minnesota. Cashman served on the Board of Directors of AIA Services during certain relevant

THIRD AMENDED COMPLAINT - 3

times. Cashman was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA (although Plaintiff maintains that his common shares in AIA Services and CropUSA were unlawfully issued).

15.    Defendant Connie Taylor Henderson ("Connie") is a citizen and resident of the state of Washington. Connie served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2014. Connie jointly owns with John the common shares of AIA Services held in John's name. Connie has actively asserted community ownership of those shares and specifically did so before the district court and on appeal in *Taylor v. AIA Services*.

16.    Defendant JoLee K. Duclos ("Duclos") is a citizen and a resident of Washington, or, alternatively, upon information and belief, she is now a citizen and a resident of the state of Idaho. Duclos has served as Secretary of AIA Services, AIA Insurance, CropUSA and other entities partially or wholly owned by John during certain relevant times. Duclos served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2007. Duclos also served as a director of CropUSA curing certain relevant times. Duclos is a common shareholder of CropUSA (although Plaintiff maintains that those shares were unlawfully issued). Duclos has knowledge of the law by and through her training and performing the duties of a paralegal. Duclos has served as John's "lieutenant" during all relevant times.

17.    John, Beck, Cashman, Connie and Duclos are collectively referred to herein as the "Controlling AIA Defendants." The Controlling AIA Defendants have acted in concert and assisted one another in committing various torts described in this Third Amended Complaint and covering up and/or concealing those torts. The definition of "Controlling AIA Defendants" includes the acts and/or omissions of one or more of John, Beck, Connie, Cashman and/or Duclos

THIRD AMENDED COMPLAINT - 4

for purposes of pleading in the alternative.

18.     Defendant Gary D. Babbitt ("Babbitt") is a citizen and resident of the state of Idaho and was an attorney practicing law in the state of Idaho with and on behalf of Hawley Troxell. Upon information and belief, Babbitt began representing AIA and CropUSA in 2007.

19.     Defendant Richard A. Riley ("Riley") is a citizen and resident of the state of Idaho and is an attorney in the state of Idaho with and on behalf of Hawley Troxell. Riley represented AIA and/or CropUSA from time to time from 1995 through the present time.

20.     Defendant D. John Ashby ("Ashby") is a citizen and resident of the state of Idaho and is an attorney in the state of Idaho with and on behalf of Hawley Troxell. Upon information and belief, Ashby began representing AIA and CropUSA in 2007.

21.     Defendant Hawley Troxell Ennis & Hawley LLP ("Hawley Troxell") is a citizen of the state of Idaho because it is an Idaho limited liability partnership in the business of practicing law, with its principal place of business in Boise, Idaho, and its principal officers or managers reside in the state of Idaho. Hawley Troxell has no office in the state of Washington. None of the individual partners of Hawley Troxell are residents of Washington. Hawley Troxell, though its attorneys, acted as counsel for AIA Services, AIA Insurance and CropUSA during certain relevant times and in certain lawsuits. Hawley Troxell is also named herein as it is vicariously liable for the acts and/or omissions of Babbitt, Riley, Ashby and its other attorneys.

22.     Babbitt, Ashby, Riley, other Hawley Troxell attorneys, and Hawley Troxell are collectively referred to as the "Hawley Troxell Defendants" in this Third Amended Complaint. The definition of "Hawley Troxell Defendants" includes the acts and/or omissions of one or more of Babbitt, Ashby, Riley, other attorneys at Hawley Troxell and/or Hawley Troxell for purposes of pleading in the alternative. The Hawley Troxell Defendants conducted business from their office

THIRD AMENDED COMPLAINT - 5

in Boise, Idaho.

23.     Defendant GemCap Lending I, LLC ("GemCap") is a Delaware limited liability company and it conducts business throughout the United States, including in Nez Perce County, Idaho with CropUSA and CropUSA Insurance Services, respectively, both of which have principal places of business in Lewiston, Idaho. GemCap is a citizen of California because its principal place of business is in Malibu, California and its primary officers, Richard Ellis and David Ellis, are residents of the state of California. However, AIA conducts no business in California.

24.     Donna J. Taylor ("Donna Taylor"), a non-party to this lawsuit, is and has been the sole Series A Preferred Shareholder of AIA Services during all relevant times, and she never authorized any of the transactions at issue in this lawsuit from 1995 through the present time. While John alleges to have "purchased" 7,500 Series A Preferred Shares in 2016, Plaintiff maintains that the purchase was unauthorized and improper, and that Donna Taylor remains the sole Series A Preferred Shareholder of AIA Services.

### IV.     FACTS

#### A.  The Background Facts Regarding AIA Services and AIA Insurance

25.     In 1983, AIA Services was formed as a closely-held Idaho corporation for the purpose of acting as a holding company for various other wholly-owned subsidiaries. AIA's business model was to work with farmers and growers to form trusts and/or related cooperatives through various growers and farmers' associations and sell insurance products to the members of those associations also becoming members of the trusts and/or cooperatives.

26.     AIA created the Grain Growers Membership & Insurance Trust, the National Contract Poultry Grower's Membership & Insurance Trust, and other, similar trusts. By way of its relationships with these various organizations, AIA held contracts for the exclusive right to market health insurance (*e.g.*, Group Universal Health Policies) and other insurance products to the

THIRD AMENDED COMPLAINT - 6

members of the various trusts and associations.

27.     In 1987, Donna Taylor and Reed Taylor, non-parties to this lawsuit, were issued Series A Preferred Shares in AIA Services in connection with their divorce. Pursuant to the dissolution of their marriage, Donna Taylor was issued 200,000 shares of Series A Preferred shares on or about February 12, 1988, and has held those shares ever since, less those shares which have been redeemed in part over the years. (*See* Dkt. 67-1 and 67-2.)

28.     In connection with the issuance of the Series A Preferred Shares to Donna Taylor, AIA Services' shareholders adopted amendments to its articles of incorporation with restrictions on the manner in which AIA Services and its subsidiaries could conduct business. (*See* Dkt. 67-3.) AIA Services' amended articles of incorporation included, without limitation, the restrictions that: (a) barred AIA Services and AIA Insurance from guaranteeing any loans for any individual or entities which were not wholly-owned subsidiaries; (b) barred certain transactions with shareholders and affiliates; and (c) required AIA Services to comply with certain financial covenants. (*Id.*)  These amendments were expressly adopted to protect AIA from precisely the type of acts, omissions, guarantees, loans and transactions at issue in this lawsuit.

29.     In addition, AIA Services' amended articles of incorporation also provided Donna Taylor with the unqualified right, as the Series A Preferred Shareholder, to appoint a person, to be determined in her sole discretion, to the Board of Directors of AIA Services. (*See* Dkt. 67-3.)

30.     The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the restrictions under AIA Services' amended articles of incorporation and bylaws.

31.     Donna Taylor's Series A Preferred Shares have not been fully redeemed to this day, and the restrictions under AIA Services' amended articles of incorporation remain in full force and effect to this day and fully applicable. (*See* Dkt. 67-42, pp. 10-11 ¶ 19.)

THIRD AMENDED COMPLAINT - 7

**B. John, Connie, Beck and Cashman Take Operational Control of AIA and AIA Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in Its Amended Articles of Incorporation**

32.　In 1995, the Controlling AIA Defendants, other than Duclos (although she did assist the Controlling AIA Defendants as an employee and officer (assistant secretary) of AIA), spearheaded a transaction to redeem Reed Taylor's majority common stock interest in AIA Services. (*See* Dkt. 67-5 and 67-6.)

33.　As part of the redemption, Beck and Cashman acquired Series C Preferred Shares in AIA Services, through an Investment Agreement, which was entered into with AIA Services and transmitted to AIA Services in Idaho and involved the transaction to redeem Reed Taylor's common shares in Idaho. When AIA Services amended its articles of incorporation to allow the issuance of the Series C Preferred Shares, AIA Services included additional restrictions in its articles of incorporation. Riley assisted in drafting and/or approving these restrictions and he was fully aware of them.

34.　Under the new and additional restrictions in AIA Services' amended articles of incorporation (these restrictions were in addition to others adopted in connection with the issuance of Donna Taylor's Series A Preferred Shares), AIA Services was barred from engaging in a number of corporate actions, including, but not limited to: (a) AIA Services could not acquire any common shares from any shareholders unless all dividends due on the Series C Preferred Shares had been paid (10% dividend per year) or those funds were set aside; (b) the Series C Preferred Shareholders had the right to elect one director to AIA Services' Board of Directors; and (c) if any Series C Preferred Shares were redeemed, such redemptions must be equally from all shareholders. (*See* Dkt. 67-3.)

THIRD AMENDED COMPLAINT - 8

35.     Although the Series C Preferred Shares held by Beck, Cashman and their friends were eventually unlawfully and effectively redeemed by AIA, other Series C Preferred Shares were later issued to the AIA Services 401(k) Plan and those shares remain issued and outstanding to this day and no dividends have been paid as required since approximately 1997. As a result, these new restrictions under AIA Services amended articles of incorporation were in place for the benefit of AIA Services and the Series C Preferred Shares, which have remained in full force and effect to this day.  The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the additional restrictions under AIA Services' amended articles of incorporation.

36.     Upon the redemption of Reed Taylor's majority common shares, Beck, Cashman, John and Connie directly or indirectly became the majority common shareholders of AIA Services. (*See* Dkt. 67-5.) In addition, Beck, Cashman and John entered into a Voting Agreement to ensure that they would maintain control of AIA Services' Board of Directors, which was signed by Beck and Cashman and transmitted by them to Idaho. As a result, the Controlling AIA Defendants have maintained operational control of AIA from 1995 through the present time. Beck and Cashman attended certain board and shareholder meetings for AIA Services in person in Idaho and via telephone from Minnesota for meetings held in Idaho.

37.     In connection with the redemption of Reed Taylor's shares, John entered into an Executive Officer's Agreement with AIA Services, which guaranteed him certain salary payments and other compensation for three years; that agreement also contained non-compete and non-solicitation provisions. (*See* Dkt. 67-8.) John's salary after the first three years was required to be determined by AIA Services' Board of Directors, which was never done after the first three years.

38.     From 1999-2012, John improperly paid himself millions of dollars pursuant to his Executive Officer's Agreement for his and Connie's benefit (the amount of which in itself was

THIRD AMENDED COMPLAINT - 9

6-ER-1296

improper based on AIA's business prospects and John's inability to do anything for the benefit of AIA), while he intentionally and repeatedly violated the non-compete and non-solicitation provisions of his Executive Officer's Agreement.

39.     In connection with the redemption of Reed Taylor's shares in August 1995, AIA Services contributed funds to The Universe Life Insurance Company, which was a wholly-owned subsidiary of AIA Services, in order to make AIA Insurance, which was then a wholly-owned subsidiary of The Universe Life Insurance Company, a subsidiary of AIA Services. After that transaction, AIA Insurance became a wholly-owned subsidiary of AIA Services.

40.     As a result, from August 1995 through all relevant times, AIA Insurance was a wholly-owned subsidiary through which AIA Services derived its commissions and administrative fees from insurance policies, which accounted for the bulk of AIA's revenues and profits.

41.     From 1995 through 2005, AIA Insurance generated over $65 million in revenues from commissions (over $33 million) and administrative fees (over $27 million), and it continued to generate revenues thereafter.

42.     From 1995 through all relevant times, each of the Controlling AIA Defendants has served at various times on the Board of Directors for AIA Services, AIA Insurance and/or CropUSA, while John has continuously served as the President of AIA and Duclos has continuously served as the Secretary of AIA.

43.     From 1999 through certain relevant times, the Controlling AIA Defendants have also served from time to time on purported "advisory board" of CropUSA, which actually made the decisions on behalf of AIA and CropUSA. Specifically, Cashman, Beck and John served on the "advisory board" of CropUSA from 1999 through certain relevant times. Certain of the so-called "advisory board" meetings were conducted via telephone originating in Idaho and in person

THIRD AMENDED COMPLAINT - 10

in Idaho.

44.     The Controlling AIA Defendants intentionally concealed from AIA and AIA Services' minority shareholders of the existence and authority of the "advisory board" of CropUSA.

### C. AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer CropUSA to Themselves

45.     By 1998, AIA's ability to sell health insurance had been impaired by undercapitalization in its underwriting subsidiary, The Universe Life Insurance Company. Accordingly, the company considered proposals to sell other forms of insurance, and in particular crop insurance, to be underwritten by other insurance companies. At a 1998 Board of Directors meeting, AIA Services' Board of Directors specifically discussed selling crop insurance and elected to have AIA pursue selling crop insurance.

46.     In 1999, AIA, then under the control of the Controlling AIA Defendants, began selling crop insurance through a wholly-owned subsidiary of AIA Services formed under the name "AIA Crop Insurance, Inc."

47.     The first purported meeting of shareholders of AIA Crop Insurance, Inc. ("AIA Crop Insurance") was held on January 11, 2000. The first purported meeting of the AIA Crop Insurance's Board of Directors was held on the same day. The purported minutes of the shareholder's meeting indicate that John, not the true owner AIA Services, claimed to be the sole shareholder of AIA Crop Insurance at the time of incorporation; these facts were concealed from AIA and AIA Services' innocent minority shareholders.

48.     Upon information and belief, at or shortly after the time of its formation, the Hawley Troxell Defendants began providing legal services to AIA Crop Insurance.

THIRD AMENDED COMPLAINT - 11

**6-ER-1298**

49. At a special meeting of the shareholders of AIA Crop Insurance held on November 13, 2000, AIA Crop Insurance was renamed CropUSA in an apparent attempt to conceal its corporate lineage and origins.

50. The minutes of the November 13, 2000 special meeting of the shareholders also show that John continued to claim that he was the sole shareholder of CropUSA, while he was simultaneously representing in business plans provided to others that CropUSA was a subsidiary of AIA Insurance. (*See* Dkt. 67-66.)

51. At the time CropUSA was formed, John was employed by AIA Services under an Executive Officer's Agreement, dated August 1, 1995, Dkt. 67-8, which contained express covenants not to compete. Upon information and belief, John's Executive Officer's Agreement and AIA Service's amended articles of incorporation and restated bylaws were drafted and/or approved by Riley, and he had full knowledge of the restrictions under the terms of the foregoing documents.

52. CropUSA held its purported annual shareholder's meeting on January 10, 2001. By this time, the illegal "spin off" of CropUSA had been accomplished by having AIA Services' Series C Preferred Shareholders (primarily Beck and Cashman) exchange their Series C Preferred Shares for common shares in CropUSA (if CropUSA were in fact an independent entity, these maneuvers would have been completely unnecessary).

53. The minutes for the shareholder meeting held on January 10, 2001 for CropUSA revealed that CropUSA had retained Hawley Troxell as its advisor and SEC counsel and, upon information and belief, the Hawley Troxell Defendants have served continuously as CropUSA's attorneys in one form or the other ever since. According to the minutes, negotiations between AIA Services and CropUSA had resulted in an agreement whereby AIA Services would no longer

THIRD AMENDED COMPLAINT - 12

operate CropUSA as a subsidiary.

54.     However, the negotiations referred to in the January 10, 2001 shareholder meeting minutes for CropUSA did not in fact occur. There was no decision, nor has there ever been a decision, on the part of AIA Services to discontinue the subsidiary status of CropUSA. The January 10, 2001 meeting minutes for CropUSA were concealed from AIA.

55.     None of the preferred or common shareholders of AIA Services (other than those present at the January 10, 2001 meeting) were given notice of or the opportunity to approve or oppose this corporate action; instead, it was concealed from them and AIA.

56.     In spite of the fact that John asserted on January 10, 2001 that CropUSA would no longer be a subsidiary of AIA Services, John wrote in a letter dated February 27, 2001, sent on behalf of AIA to Donna Taylor, that "AIA is developing a new crop insurance program through a new company called CropUSA." The letter went on to state that "[t]he costs of putting the CropUSA program together have been paid. AIA now needs to launch five new territories next Month." This February 27, 2001 letter constituted an unambiguous representation by John to AIA (and Donna Taylor) that CropUSA was a subsidiary of AIA and was being operated for the benefit of AIA and implicitly also for AIA Services' innocent minority shareholders (which included Donna Taylor). This representation to AIA was false, and John knew it was false. Upon information and belief, the other Controlling AIA Defendants were aware of this February 27, 2001 letter and the misrepresentations contained within the letter.

57.     Notwithstanding the fact that John was obligated under the terms of his Executive Officer's Agreement that required that he not compete with AIA Services, and notwithstanding the fact that he owed fiduciary duties to the AIA and AIA Services' shareholders, John set forth his plans to exploit the assets of AIA for the benefit of CropUSA (and himself as the majority

THIRD AMENDED COMPLAINT - 13

purported shareholder) in the purported minutes of the purported January 10, 2001 meeting.

58.     The January 10, 2001 meeting minutes reveal that CropUSA authorized its officers to execute a Master Marketing Agreement with AIA Insurance that would allow CropUSA access to all of AIA's customers and customer lists, as well as all of AIA's trade secrets. AIA received no consideration for conveying this access or to enter into these agreements.

59.     CropUSA's officers (including John) were also purportedly authorized to enter into a Management Agreement with AIA Insurance wherein AIA Insurance purportedly agreed to provide management and administrative support to CropUSA without charge. However, John has since testified under oath that AIA's Board of Directors never authorized this agreement, although the Board has acquiesced in the action.

60.     AIA itself was never given notice of the Master Marketing Agreement and the Management Agreement, nor was AIA given the opportunity to approve or reject these agreements or any subsequent ones. Each of these agreements, when executed, constituted a violation of John's Executive Officer's Agreement, which contains a strict non-compete clause. Each of these agreements also constituted a direct breach of fiduciary duty or the aiding and abetting on behalf of each of the Controlling AIA Defendants in the commission of torts against AIA.

61.     Meanwhile, in 2001, John and Connie acquired a parking lot for $8,000 using AIA's line-of-credit. Upon information and belief, AIA was required to maintain control of the parking lot as part of its lease with Washington Bank Properties. John then increased the rent that AIA paid to use the parking lot to benefit him and Connie. For example, although John and Connie paid only $8,000 for the parking lot, they subsequently charged AIA $60,750 in rent to use the parking lot from 2004 through 2006. These unfair and self-serving rental payments to John and Connie were concealed from AIA and AIA Services' innocent minority shareholders and were

THIRD AMENDED COMPLAINT - 14

never disclosed to either of them, as was John and Connie's purchase of the parking lot.

**D.  The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants in Taking CropUSA from AIA and Having AIA Fund CropUSA**

62.     Upon information and belief, certain of the Hawley Troxell Defendants were providing legal services to CropUSA and/or its board of directors as of January 10, 2001, and such providing of legal services has continued through certain relevant times.

63.     Upon information and belief, from January 10, 2001, and continuing through the period relevant to this lawsuit, the Hawley Troxell Defendants had knowledge of John's Executive Officer's Agreement with AIA Services, had knowledge of the conflict of interest provisions in AIA's bylaws, and had knowledge of restrictions in AIA's amended articles of incorporation, but intentionally refused to comply with them and assisted John in violating them or covering up the violations.

64.     The Hawley Troxell Defendants knew or should have known that the purported Master Marketing Agreement and Management Agreement constituted breaches of John's Executive Officer's Agreement, violations of AIA Service' amended articles of incorporation, violations of AIA Services' restated bylaws, and constituted breaches of John and the other Controlling AIA Defendants' fiduciary duties owed to AIA and AIA Services' minority shareholders.

65.     Upon information and belief, the Hawley Troxell Defendants were also representing CropUSA from January 10, 2001, through certain relevant times, and by way of that representation they breached their fiduciary duties to AIA (including their undivided duty of loyalty owed to AIA) and took steps that materially assisted John and the Controlling AIA Defendants in the commission of the various torts described in this Third Amended Complaint and assisted in the concealment of those torts.

THIRD AMENDED COMPLAINT - 15

**6-ER-1302**

66.    Beginning in 1999 and continuing through the time CropUSA ceased operating, CropUSA was funded and operated with assets improperly transferred from AIA, including, but not limited to, operating capital, office space, customer lists and other trade secrets, agents and staff, goodwill and other assistance. CropUSA paid nothing for these assets.

67.    The Controlling AIA Defendants, except Duclos, were all shareholders of AIA at the time CropUSA was formed and later purportedly became shareholders of CropUSA.

68.    The Controlling AIA Defendants, except Duclos (although she improperly took part in the meetings and acted as the Secretary) and Connie, all served on a purported "advisory board" of CropUSA and/or AIA, and this advisory board exercised actual control over CropUSA and AIA. By exercising control over these entities and committing acts that benefitted CropUSA at the expense of AIA, the Controlling AIA Defendants engaged in a conspiracy to defraud AIA, which should have had the right and title to the property of CropUSA.

69.    On January 10, 2002, CropUSA purportedly entered into a Memorandum of Understanding with the Controlling AIA Defendants. Under the terms of this memorandum, Beck and Cashman were obligated to guarantee loans on behalf of CropUSA. Beck and Cashman guaranteed loans for CropUSA, an Idaho corporation, in Idaho and sent their financial information to Idaho for the guarantees.

70.    Notably, Beck and Cashman had also been obligated to guarantee over $1,000,000 in loans on behalf of AIA since 1995, but they never did. Notwithstanding this obligation, the Controlling AIA Defendants subsequently arranged for AIA to guarantee CropUSA's lines of credit, even though the guarantees were barred by AIA's amended articles of incorporation and bylaws.

THIRD AMENDED COMPLAINT - 16

71.     In 2004, the Controlling AIA Defendants attempted to raise capital for CropUSA by selling shares in CropUSA to private investors by way of a $10,000,000 private placement. The Hawley Troxell Defendants drafted the July 15, 2004 Private Placement Memorandum, despite their knowledge of the illegal "spin-off" of CropUSA and the fiduciary duties they owed to AIA.

72.     When CropUSA began distributing the Private Placement Memorandum in 2004, the company was experiencing financial difficulties that made it difficult, if not impossible, to attract investors to purchase shares pursuant to the private placement.

73.     In addition, in 2004, CropUSA's lack of adequate funding threatened its ability to sell crop insurance. To alleviate these problems, the Controlling AIA Defendants improperly turned to AIA to obtain the necessary funding.

**E.**   **The Controlling AIA Defendants Unlawfully Transfer $1,510,693 From AIA to Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt that CropUSA Owed to AIA—Thereby Resulting in a $2,144,962 Fraud Against AIA.**

74.     In order to boost CropUSA's balance sheet for the purpose of operating the company, the Controlling AIA Defendants devised a scheme to illegally transfer $1,510,693 from AIA Insurance to CropUSA. The Controlling AIA Defendants conspired with each other in the formation and execution of this scheme to unlawfully transfer $1,510,693 of AIA's funds to CropUSA, and aided and abetted one another in carrying out the scheme and ultimately covering it up.  Upon information and belief, the Hawley Troxell Defendants provided counsel to CropUSA with respect to the unlawful transfer of funds and/or has, at a minimum, assisted in covering up the facts of this illegal transfer.

75.     The scheme involved money derived from AIA Insurance. In August 2004, AIA Insurance received a payment of $1,510,693 from Trustmark. (*See* Dkt. 67-59.) Rather than deposit the payment of $1,510,693 into the account of AIA Insurance, where it would have benefited AIA

THIRD AMENDED COMPLAINT - 17

and its innocent shareholders, John deposited the funds into a new account entitled "AIA Insurance Inc. CropUSA." (*See* Dkt. 67-60.) The address for this account coincided with the address for John's personal residence at 2020 Broadview Drive in Lewiston, Idaho, rather than any address used by AIA. (*Id.*)

76.    Shortly after diverting the $1,510,693 into the "AIA Insurance Inc. CropUSA" account, the Controlling AIA Defendants illegally transferred the funds to CropUSA. The Controlling AIA Defendants attempted to disguise this conversion of AIA Insurance's funds by characterizing the transaction as an alleged purchase by AIA Insurance of Series C Preferred Shares in its parent corporation, AIA Services. (*See* Dkt. 67-59.) Then, the Controlling AIA Defendants carried AIA Insurance's alleged investment in the Series C Preferred Shares as having a purported value of $1,510,693 when that was not the true value of the shares.

77.    However, as the Controlling AIA Defendants acknowledged at the time, there was no market for the Series C Preferred Shares which were purportedly being repurchased. At the time the $1,510,693 in funds were converted by CropUSA, there was no authorization of any kind for the transaction, and the transaction was concealed from AIA.

78.    In order to create a plausible explanation for the transfer of the $1,510,693, CropUSA eventually produced a document designated as a Consent in Lieu of Meeting dated August 26, 2004. (*See* Dkt. 67-61.) However, this document itself is completely fraudulent, as it was retroactively created the following year in order to deceive auditors who questioned the validity of this transaction.

79.    In addition, this $1,510,693 purported repurchase of shares separately violated the terms of AIA Services' amended articles of incorporation, which required that all Series C Preferred Shares be redeemed equally and simultaneously from all shareholders. (*See* Dkt. 67-3.)

THIRD AMENDED COMPLAINT - 18

Instead of repurchasing an equal portion of the Series C Preferred Shares from AIA Services' 401(k) Plan, the Controlling AIA Defendants intentionally only repurchased the Series C Preferred Shares held by CropUSA (which had been previously held by Beck, Cashman and their friends).

80.     CropUSA was carrying these Series C Preferred Shares in AIA Services on its books with a value of $21,693, which means that CropUSA realized a gain of $1,489,000 on this purported sale of shares. (*See* Dkt. 67-59.) At that time, although the Controlling AIA Defendants had not properly accounted for all funds, assets, labor and other costs advanced from AIA for CropUSA, they had actually accounted for there being a debt of $634,269 owed by CropUSA to AIA.

81.     After unlawfully transferring the $1,510,693 received by AIA Insurance to CropUSA, the Controlling AIA Shareholders had CropUSA repay the $634,269 debt owed to AIA, thereby committing a double fraud upon AIA, i.e., AIA should have the $1,510,693 in its bank account now and it should have never lent the $634,269 to CropUSA in the first place. In other words, those fraudulent transactions alone resulted in the loss of $2,144,962 in funds to AIA and thus damaged AIA in the amount of $2,144,962. The Controlling AIA Defendants have actively concealed, or covered up, these transactions from AIA with the assistance of the Hawley Troxell Defendants.

82.     AIA and the innocent shareholders of AIA Services were never given notice of the 2004 stock transaction, nor were any proper board or shareholder meetings held to approve the transaction. However, as with the fraudulent document prepared on behalf of CropUSA, a fraudulent Consent in Lieu of Meeting, dated August 26, 2004, was prepared on behalf of AIA. This document was actually produced several months after the transaction and was created to deceive auditors.

THIRD AMENDED COMPLAINT - 19

83. Upon information and believe, the Hawley Troxell Defendants provided legal services to both AIA and CropUSA at the time of the 2004 transaction or had actual knowledge of the 2004 transaction.

84. The Hawley Troxell Defendants at various times, as purported counsel for AIA, failed to disclose to AIA the 2004 transaction to transfer $1,510,693 to CropUSA and that the acts of the Controlling AIA Defendants constituted an intentional breach of their fiduciary duties (including the duty of loyalty) owed to AIA and a concealment of a prohibited transaction. For this reason alone, the Hawley Troxell Defendants could not reasonably rely on a tolling agreement to represent AIA, CropUSA and the interest of the Controlling AIA Defendants in later litigation.

85. The Hawley Troxell Defendants failed to disclose to AIA, or to anyone else, that this $1,510,693 transaction was unlawful on many levels, including but not limited to the fact that it did not comply with the articles of incorporation and bylaws, caused a breach of AIA's other contracts, and could not be justified by the balance sheet of either AIA Insurance or CropUSA. Upon information and belief, the Hawley Troxell Defendants had knowledge of the back-dated Consent in Lieu of Meeting documents.

86. On February 16, 2005, Beck sent an email to John and Cashman confirming the Controlling AIA Defendants' scheme to misappropriate CropUSA in an effort to profit at the expense of AIA: "[Cashman] and I are so convinced that CropUSA is a winner that anything standing in the way of a good result will be a crime." (Dkt. 67-54.) The crime was stealing CropUSA from AIA and then to drain AIA of its funds and assets to pursue the Controlling AIA Defendants' scheme. This was not the only email exchanged between the Controlling AIA Defendants, as they emailed one another on numerous occasions, including emails directed to recipients in Idaho.

THIRD AMENDED COMPLAINT - 20

**F.** **The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal**

87.     After unlawfully taking $2,144,962 from AIA Insurance in 2004, the Controlling AIA Defendants continued to operate CropUSA with assets both tangible and intangible that rightfully belonged to AIA, continued to improperly subsidize CropUSA with AIA's assets and labor, and continued to conceal their actions from AIA and AIA Services' innocent minority shareholders.

88.     Under the management and direction of the Controlling AIA Defendants, AIA regularly failed to allocate costs to CropUSA and other entities and failed to charge markup, interest or profit on costs paid for other entities. For example, John's own salary of $250,000 was allocated entirely to AIA Services even though John's contractual right to a salary from AIA Services had expired in 1998 and had never been renewed by an authorized board. (And, further, John performed no actual work for AIA during the time in question.)

89.     John, with the knowledge and complicity of the other Controlling AIA Defendants, also performed work for other entities owned in full or in part by him while on AIA's payroll, i.e., CropUSA, Pacific Empire Radio Corp., Pacific Empire Communications Corp., Pacific Empire Holdings Corp., Radio Leasing I LLC and Radio Leasing II LLC. John also had other AIA employees work for these entities without compensation to AIA. These facts, like virtually all of the others referenced in this Third Amended Complaint, were concealed from AIA and AIA Services' innocent minority shareholders.

90.     Between its founding in 1999 and the filing of this lawsuit, CropUSA and other entities generated tens of millions of dollars of revenue (including premiums) and other benefits that would have flowed to AIA but for the unlawful and unauthorized acts of the Controlling AIA Defendants.

THIRD AMENDED COMPLAINT - 21

91.     As of 2006, John owed AIA at least $307,000 for personal loans he had taken from AIA Services. For several years, John concealed these loans by engaging in false accounting whereby loans to him were treated as payments of principal on AIA Services' indebtedness due to Reed Taylor on his $6 million promissory note (which was later ruled to be illegal).  In 2006, John "corrected" the alleged accounting "error" by increasing the balance due on Reed Taylor's note to $6 million and reinstating John's $307,000 debt. John had still not repaid this personal loan.

92.     Over the years, John had AIA pay his personal maid, his personal credit card bills, donations, cash advances, family cell phone bills, and other personal expenses. John also had AIA purchase several vehicles from him, and he continued to drive these vehicles after the sales and purchase of other vehicles with AIA's funds to use for his benefit when there was no reason to do so. John also had AIA employees perform work on his personal residence and on other real property not owned by AIA. These acts were all committed with the knowledge and complicity of the Controlling AIA Defendants and without paying AIA the fair value of the services or expenses.

93.     At year-end 2006, AIA had improperly lent $95,000 to Pacific Empire Radio Corp., a corporation partially owned by John and Connie and in which they both served as directors at certain times. The Controlling AIA Defendants transferred that $95,000 receivable from AIA to CropUSA. By the end of 2012, AIA would lend over $1,400,000 in additional funds to Pacific Empire Radio Corp., when all such loans violated AIA Services' amended articles of incorporation and were not authorized under the circumstances by AIA Services' restated bylaws.

94.     In August 2007, AIA settled litigation with the state of Idaho whereby AIA received a mortgage worth approximately $1.5 million for the amount owed by Washington Bank Properties

THIRD AMENDED COMPLAINT - 22

on the real property where AIA Services' headquarters was located.[1] Although AIA Insurance paid the costs of this litigation, the Controlling AIA Defendants, with the assistance of the Hawley Troxell Defendants, improperly titled the note in the name of AIA Services only, and then pledged the note to CropUSA so that the Controlling AIA Defendants could borrow money to pay their attorneys' fees and costs incurred defending in *Taylor v. AIA Services* to the Hawley Troxell Defendants.

95.     As with the 2004 transactions, the transaction pledging the mortgage owned by AIA Services to CropUSA for purportedly paying the Hawley Troxell Defendants' attorneys' fees and costs incurred representing AIA, CropUSA and the Controlling AIA Defendants was a blatant misappropriation and/or illegal pledging of AIA's assets. The loan documents and the pledge agreement were drafted by the Hawley Troxell Defendants, although they later asserted that they were only "scriveners" for the transaction. This transaction was improper and barred by AIA's amended articles of incorporation and bylaws.

**G. The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and Financial Wherewithal with the Improper Assistance from the Hawley Troxell Defendants**

96.     On October 26, 2007, the Hawley Troxell Defendants drafted and delivered an opinion letter falsely representing that AIA Insurance was authorized to guarantee a $15,000,000 line-of-credit on behalf of CropUSA, which carried a hard-money loan with an exorbitant interest rate.

---

[1] AIA Services' headquarters was previously owned by its wholly-owned subsidiary the Universe Life Insurance Company, which had sold the building through a lease-back with an option to purchase in the 1990s. After the state of Idaho later took control of Universe Life through a receivership when the capital requirements were changed, the state of Idaho became the owner of the mortgage. Later, AIA was involved in litigation with the state of Idaho over its receivership over Universe Life. The litigation was settled and the state of Idaho transferred the mortgage back to AIA as the consideration for the settlement. AIA ultimately foreclosed on the mortgage thereby obtaining ownership of its headquarters, which was later unlawfully transferred to GemCap, as discussed below.

THIRD AMENDED COMPLAINT - 23

97.     The Hawley Troxell Defendants' opinion letter was delivered for a loan guarantee which violated AIA Services' amended articles of incorporation, its restated bylaws and AIA Insurance's bylaws, and in violation of the duty of loyalty owed by the Hawley Troxell Defendants to AIA.

98.     Lancelot, the lender for this $15,000,000 line-of-credit was subsequently exposed as a Ponzi scheme, and its founder, Gregory Bell, pleaded guilty to criminal charges in federal court. Mr. Bell was the signee for Lancelot on the $15,000,000 line-of-credit. These facts pertaining to the $15,000,000 loan for CropUSA and AIA Insurance's guarantee of that loan, along with other transactions, were never disclosed to AIA by the Hawley Troxell Defendants or the Controlling AIA Defendants and the payment of interest on that loan was detrimental to AIA because most of CropUSA's assets could be traced directly to AIA (and the depletion of CropUSA's funds resulted in less funds available to recover).

**H.  The Controlling AIA Defendants Enter Into Tolling Agreements, but Those Tolling Agreements Do Not Save the Hawley Troxell Defendants from the Unwaivable Conflicts of Interest**

99.     In 2007, Reed Taylor filed suit against AIA and certain of the Controlling AIA Defendants, asserting claims for breaches of contract, breaches of fiduciary duties, conversion, fraud and other claims ("*Taylor v. AIA Services*"). In 2007, the Hawley Troxell Defendants appeared as counsel for AIA Services and AIA Insurance in that lawsuit. Later, Reed Taylor amended his complaint and named CropUSA as a defendant, after recognizing that millions of dollars had been transferred to it from AIA, among other improper transactions (including some of those transactions described in this Third Amended Complaint). (*See* Dkt. 82-2.) The Hawley Troxell Defendants also appeared and represented CropUSA in that lawsuit. (*Id.*) Although Riley did not formally appear as counsel in *Taylor v. AIA Services*, Riley took an active interest in *Taylor*

THIRD AMENDED COMPLAINT - 24

**6-ER-1311**

*v. AIA Services* and consulted with Babbitt, Ashby and/or other attorneys at Hawley Troxell relative to that case. The scope of representation of the Hawley Troxell Defendants in *Taylor v. AIA Services* could not have included representing the interest of CropUSA or the Controlling AIA Defendants.

100.    As the purported attorneys for AIA, two entities, the Hawley Troxell Defendants owed duties of loyalty, care, and good faith to AIA and the Hawley Troxell Defendants breached their duties of care and fiduciary duties by engaging in the simultaneous representation of the Controlling AIA Defendants, AIA, CropUSA, and other parties (including Bryan Freeman) with interests adverse to the interests of AIA.

101.    The Controlling AIA Defendants, and any other former AIA directors or officers, had conflicts of interest that prevented any of them from waiving the conflicts of interest involved in the Hawley Troxell Defendants' joint representation of AIA Services, AIA Insurance and CropUSA. In addition, the Controlling AIA Defendants had conflicts of interest that prevented them from being disinterested or proper constituents or officers of AIA to direct the Hawley Troxell Defendants' representation of AIA Services, AIA Insurance and CropUSA.

102.    In 2007, Connie and Beck were purportedly appointed to the Boards of Directors of AIA Service and AIA Insurance by John. Connie and Beck were paid $5,000 per quarter to "serve" on the Boards of Directors of AIA and they also were to receive common shares for their purported "service." Beck and Connie attended certain AIA board meetings in person in Idaho or through telephone calls to Idaho, which further directed aspects of AIA's businesses and certain other transactions. Beck later testified that he serves on AIA's Boards to protect his own interests and those of his friends (the same friends who previously acquired Series C Preferred Shares in AIA Services and illegally exchanged them for common shares in CropUSA).

THIRD AMENDED COMPLAINT - 25

**103.** In 2007 and 2008, the Controlling AIA Defendants entered into written tolling agreements in connection with the various litigations directly or indirectly involving AIA. The Hawley Troxell Defendants were improperly involved with and/or facilitated the Controlling AIA Defendants entering into such tolling agreements for the purpose of allowing the Hawley Troxell Defendants to continue to represent AIA, CropUSA and directly or indirectly certain of the Controlling AIA Defendants.

**104.** By tolling the statute of limitations for claims against the Controlling AIA Defendants, the Hawley Troxell Defendants sought to use the tolling agreements to authorize the waiver of their conflicts of interest representing AIA, CropUSA and the interests of the Controlling AIA Defendants in litigation that could have and should have exposed the fraud and intentional breaches of fiduciary duties committed by the Controlling AIA Defendants.

**105.** The limited permissible circumstances when tolling agreements and conflict waivers may be appropriate were <u>not</u> present when the Hawley Troxell Defendants prepared and/or entered into agreements with AIA, CropUSA and/or the Controlling AIA Defendants. Upon information and belief, the Hawley Troxell Defendants prepared and/or entered into agreements and/or amended agreements without requiring AIA to have independent counsel and without involving disinterested and unconflicted constituents from AIA in violation of the Rules of Professional Conduct, including RPC 1.7, RPC 1.8 and RPC 1.13. Throughout the Hawley Troxell Defendants' representation of AIA and CropUSA, they failed to act in the best interests of AIA and to address the conflicts of interest and malfeasance committed against AIA with the highest unconflicted and disinterested constituents from AIA in violation of the Rules of Professional Conduct, including, RPC 1.13.

THIRD AMENDED COMPLAINT - 26

106.     The Hawley Troxell Defendants knew or should have known that the Controlling AIA Defendants had committed intentional acts of fraud and breaches of fiduciary duties (including the duty of loyalty) owed to AIA. The Hawley Troxell Defendants knew or should have known that by allowing the Controlling AIA Defendants to continue to operate and control AIA that they would continue to conceal their past torts and likely continue to commit new torts, which is precisely what occurred here as demonstrated by the facts alleged in this Third Amended Complaint.

107.     Although these tolling agreements tolled the statute of limitations for claims AIA could assert against the Controlling AIA Defendants (which eliminates any defense they may have to assert any statute of limitations defenses), the facts set forth in this Third Amended Complaint demonstrate why such tolling agreements were improper under the circumstances as the agreements involved tolling intentional torts committed against AIA. While the claims were being tolled, the Controlling AIA Defendants continued to unlawfully use AIA's cash, resources and ability to borrow to fund other businesses and pay compensation to themselves.

108.     During the course of the litigation in *Taylor v. AIA Services*, Reed Taylor attempted to negotiate a settlement, but he insisted that any settlement must include full disclosure to, and authorization by, AIA Services' minority shareholders and to allow them to participate in CropUSA common share ownership. (*See* Dkt. 67-18.) Not only did the Controlling AIA Defendants and Hawley Troxell Defendants reject Reed Taylor's offer, but they still refused and failed to provide full disclosure to AIA and AIA Services' innocent minority shareholders of the malfeasance and torts committed against AIA. The untenable position of the Hawley Troxell Defendants was confirmed when the only person seeking to require full and fair disclosure to the shareholders and for them to rightfully participate in AIA's business was a former creditor, Reed

THIRD AMENDED COMPLAINT - 27

Taylor. (*Id.*)

109.   During the course of *Taylor v. AIA Services*, Connie and Beck represented to Judge Brudie, the Idaho Supreme Court, and AIA that the redemption of Reed Taylor's shares should be illegal to benefit AIA Services' minority shareholders. (*See* Dkt. 67-23 and 67-25.) After Judge Brudie ruled the redemption of Reed Taylor's shares was illegal, neither Connie, Beck, the Hawley Troxell Defendants nor any of the other Controlling AIA Defendants did anything to benefit AIA or its minority shareholders nor did they ever have any intention of helping them, contrary to what they had represented to Judge Brudie and the Idaho Supreme Court.

110.   Instead of sharing equally in AIA's assets with AIA Services' innocent minority shareholders, the Controlling AIA Defendants later sought to eliminate those minority shareholders for only ten cents per share, even though Connie and John both previously valued the shares much higher even after considering the over $6 million that AIA Services owed to Reed Taylor at the time of valuation (a debt that was later ruled to be illegal and void). (*See* Dkt. 67-24 and 67-50.)

111.   Riley was an attorney at the law firm of Eberle Berlin at the time of the redemption of Reed Taylor's shares in 1995 and he breached his duty of care by advising AIA Services to enter into the illegal stock redemption transaction. *See Taylor v. AIA Servs. Corp.*, 151 Idaho 552, 261 P.3d 829 (2011). Riley concealed facts from AIA regarding the redemption.

112.   The illegal redemption of Reed Taylor's common shares ultimately led to AIA incurring over $1 million in attorneys' fees and costs litigating and resulted in AIA Services being required to report to the IRS a gain from the $6 million it never had to pay Reed Taylor.

113.   Upon information and belief, the Controlling AIA Defendants never reported the gain from the extinguished $6 million debt to Reed Taylor on AIA Services' tax return. If the

THIRD AMENDED COMPLAINT - 28

Controlling AIA Defendants did not report the $6 million income to the IRS and AIA Services is obligated to pay taxes, penalties and interest on that gain, the Controlling AIA Defendants and Hawley Troxell Defendants are liable for those sums as well for breaching their fiduciary duties owed to AIA.

114. Based on the intentional acts of the Hawley Troxell Defendants, AIA has been decimated because the Controlling AIA Defendants remained in control of AIA through those tolling agreements and the Hawley Troxell Defendants' ongoing representation of AIA. The end result of these tolling agreements and ongoing representation was that the Hawley Troxell Defendants improperly ensured that the Controlling AIA Defendants would retain control over AIA to the detriment of AIA and for the improper benefit to the Hawley Troxell Defendants and the Controlling AIA Defendants.

115. In or around 2007 or 2008, AIA Insurance received a settlement of approximately $800,000 for litigation that AIA Insurance had funded for certain policy holders. Instead of utilizing or retaining AIA's portion of such funds exclusively for AIA, the Controlling AIA Defendants improperly used those funds to, *inter alia*, continue their intentional acts of funding CropUSA and to pay litigation expenses caused by them or other unauthorized uses. Upon information and belief, the Hawley Troxell Defendants had knowledge of the receipt of those funds, yet they did nothing to protect the funds even though the funds were at issue in *Taylor v. AIA Services*.

116. In 2008, the Controlling AIA Defendants and the Hawley Troxell Defendants permitted CropUSA to sell a book of crop insurance business to Hudson Insurance for the benefit of CropUSA when approximately 75% of the business had been derived directly from AIA's agency force (i.e., agents such as Larry Whitehead). The over $15 million sale price should have

THIRD AMENDED COMPLAINT - 29

been paid to AIA, rather than to CropUSA or to pay the debts incurred by the Controlling AIA Defendants through CropUSA. Even if the sale of this book of business rightfully occurred, AIA should have been the recipient of the sale proceeds and there should not have been any money owed to Lancelot or others because the Controlling AIA Defendants had engaged in corporate waste and other breached fiduciary duties that resulted in the sums being allegedly owed.

117.    Sometime after CropUSA sold the bulk of its assets to Hudson Insurance in 2008, which were derived primarily from AIA, the Controlling AIA Defendants obtained further funds from Hudson Insurance for Growers National Cooperative Insurance Agency, Inc. ("Growers National"), an entity formed and funded by AIA for the purpose of selling crop insurance that allowed the members to participate in the agency by receiving patronage dividends.

118.    Upon information and belief, CropUSA received over $500,000 from Hudson Insurance for Growers National. These funds should have been paid to AIA and the receipt of the funds was concealed from AIA. Plaintiff will establish the exact amount of funds that the Controlling AIA Defendants and/or CropUSA received from Hudson Insurance for Growers National at the time of trial.

I.    **The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA and Intentionally Committing Torts against AIA with the Assistance of the Hawley Troxell Defendants—Even While This Lawsuit Was Pending**

119.    Upon information and belief, the Hawley Troxell Defendants have been paid the bulk of the over $2,000,000 in attorneys' fees and costs incurred and/or paid for the various lawsuits. Plaintiff will establish the exact amount of funds paid to the Hawley Troxell Defendants by AIA and/or on behalf of AIA, which Plaintiff is seeking to be disgorged and returned to AIA.

120.    From 2009 through the present time, Donna Taylor exercised her right under the amended articles of incorporation to appoint two different directors to AIA Services' Board of

THIRD AMENDED COMPLAINT - 30

Directors, but the Controlling AIA Defendants and/or the Hawley Troxell Defendants refused to honor her unqualified right thereby resulting in all actions taken by AIA Services' Board of Directors during that period of time being unauthorized and thus a breach of the fiduciary duties of the Controlling AIA Defendants.

121.    In December 2009, Donna Taylor filed suit against AIA Services to exercise her unequivocal right to appoint her designee, Patrick Moran, to the Board of Directors of AIA Services and to appoint a receiver for AIA Services. The Hawley Troxell Defendants once again appeared in that lawsuit and successfully opposed Donna Taylor's designee being appointed to the Board of Directors or a receiver being appointed by improperly seeking a stay in the lawsuit.

122.    Had the Hawley Troxell Defendants joined Donna Taylor in having a receiver appointed for AIA Services, which the Hawley Troxell Defendants should have done in light of the countless intentional torts committed against AIA by the Controlling AIA Defendants, there is no doubt that they could have stopped the Controlling AIA Defendants from carrying out their ongoing fraud, intentional breaches of fiduciary duties and their destruction of AIA. At a minimum, the Hawley Troxell Defendants' acts and/or omissions in this regard was a substantial factor of the improper transactions, unlawful acts, and the cause of millions of dollars of damages to AIA.

123.    This lawsuit was filed by Plaintiff on August 11, 2010, and subsequently stayed at the request of the Controlling AIA Defendants and the Hawley Troxell Defendants. During that stay, inappropriate and unlawful transactions continued to occur.

124.    The Controlling AIA Defendants continued to utilize AIA's funds, assets, labor, trade secrets and borrowing ability to unlawfully assist CropUSA and other entities owned by the Controlling AIA Defendants.

THIRD AMENDED COMPLAINT - 31

125.    In March 2012, the Controlling AIA Defendants, improperly terminated AIA Services' ESOP and paid those shareholders three cents per share for their hard-earned common shares. At no time prior to or after the termination of the ESOP did the Controlling AIA Defendants disclose the facts pertaining to the malfeasance and torts existing at that time (as described in this Third Amended Complaint or otherwise) to those shareholders. (*See* Dkt. 67-30-33, 34.)  AIA Services was separately barred from purchasing or redeeming the common shares held in the ESOP.

126.    However, the Controlling AIA Defendants knew that AIA Services' amended articles of incorporation barred all stock redemptions, including any purchases of shares held by the ESOP, until the Series A Preferred Shares were all fully redeemed and the Series C Preferred Shares had been paid the over $1,000,000 in dividends owed. The repurchase of the ESOP shares for three cents per share was illegal, ultra vires and improper.

127.    Effective March 23, 2012, Beck and Cashman purportedly entered into an agreement with John to sell their purported common shares in AIA Services, which such shares had never been properly or lawfully issued in the first place. The agreement provided that Idaho law applied and, upon information and belief, Beck and Cashman entered into that agreement in connection with the failed effort to effectuate a reverse stock split to eliminate the minority shareholders.

128.    In 2012, the Controlling AIA Defendants improperly sought to effectuate a reverse stock split and to only pay AIA Services' minority common shareholders ten cents per share to repurchase those common shares (including Plaintiff's shares) without disclosing any facts and without offering full and fair compensation for the value of the shares. (*See* Dkt. 66-3, 67-48, 67-

THIRD AMENDED COMPLAINT - 32

6-ER-1319

48.) The notice to the shareholders was signed by Duclos and the improper and unlawful reverse stock split was approved by Beck, John and Connie. (*Id.*)

129.    Fourteen shareholders objected to the alleged reverse stock split. (*See* Dkt. 67-41.) The ill-conceived reverse stock split violated AIA Services' amended articles of incorporation and the Controlling AIA Defendants did not comply with Idaho Code, including, by failing to provide the form for the shareholders to state the value that they believed should be paid for their common shares thereby further establishing the true improper purpose of the failed reverse stock split. The reverse stock split was not pursued for any proper business purpose.

130.    In response to the fourteen shareholder objections and notices of demands for payment, the Controlling AIA Defendants, without regard to the fact that they would expend tens of thousands of dollars more in funds litigating the issue rather than simply paying the shareholders the true fair value of their shares, had AIA Services file suit against the fourteen shareholders. (*See* Dkt. 83-15.) Judge Carl Kerrick dismissed the lawsuit, and further noted that it was disingenuous to seek a reverse stock split until this lawsuit was resolved. (*See* Dkt. 86-1.) Judge Kerrick later awarded attorneys' fees and costs to the shareholder defendants. That judgment in favor of those fourteen shareholders has still never been paid by the Controlling AIA Defendants or AIA, and the Controlling AIA Defendants should be required to pay that judgment on behalf of AIA.

131.    The failed reverse stock split drained AIA of significant and unnecessary attorneys' fees and costs (fees and costs which could have been paid to those shareholders or for other AIA obligations) and constituted a waste of AIA's assets. This purported reverse stock split was approved and/or acquiesced in by the Controlling AIA Defendants, which was a breach of their fiduciary duties. Upon information and belief, the Hawley Troxell Defendants were aware of the scheme to effectuate the reverse stock split to eliminate AIA Services' innocent minority

THIRD AMENDED COMPLAINT - 33

shareholders, which would in turn eliminate common shareholder standing for this lawsuit.

132. From 2009 through 2016, the Controlling AIA Defendants continued loaning money to, or allowed money to be lent to, Pacific Empire Radio Corporation in an amount exceeding $1,600,000 by year-end 2015 when that corporation had no ability to repay the sums owed and it benefitted John and Connie (who owned shares in that corporation at certain relevant times) as those were funds they would not have to personally provide to Pacific Empire Radio Corporation. In 2015 and 2016, the IRS filed liens against Pacific Empire Radio Corporation in excess of $500,000 for the non-payment of employee withholding taxes, yet the Controlling AIA Defendants permitted AIA Services to lend over $1,600,000 to Pacific Empire Radio Corporation.

133. From 1999 through 2012, the Controlling AIA Defendants concealed their ownership interests in other entities from AIA, which were derived from and/or funded by AIA, including, without limitation, CropUSA, CropUSA Insurance Services, LLC, and Pacific Empire Holdings Corp.

134. From 1995 through 2016, John received over $2,700,000 in cash salary, compensation, benefits and property from AIA. This amount does not include any compensation, payments or other improper distributions he may have received from CropUSA and other entities funded or launched using AIA. At a minimum, John should be required to disgorge the over $2,000,000 that he received from AIA from 1999 through 2016 and other compensation, funds and benefits received from AIA since 1999, which John received while acting as a faithless fiduciary and while improperly competing against AIA through CropUSA and other entities (including Pacific Empire Holdings Corp.).

///

///

THIRD AMENDED COMPLAINT - 34

**6-ER-1321**

**J.** **The Controlling AIA Defendants, with GemCap Aiding and Abetting Them, Illegally Had AIA Guarantee Loans Made to CropUSA by GemCap, Concealed the Guarantees from AIA, Illegally Entered into Settlement Agreements with GemCap, Concealed the Settlement Agreements from AIA, and Unlawfully Transferred Property to GemCap Thereby Damaging AIA.**

135.    While the instant lawsuit was pending, the Controlling AIA Defendants sought additional funding for CropUSA. GemCap agreed to make the loan to CropUSA in Idaho for the purpose of operating its business in Idaho. On or about November 23, 2011, the Controlling AIA Defendants obtained a $5,000,000 line-of-credit from GemCap for CropUSA, which was subsequently amended on April 1, 2012, July 18, 2012, and February 4, 2013 to be a $10,000,000 line-of-credit (the original loan and all subsequent modifications and amendments are collectively the "GemCap Loan").

136.    On November 23, 2011, the Controlling AIA Defendants, with the substantial assistance from GemCap, had AIA Services and AIA Insurance guarantee $1,113,930 of the GemCap Loan. In connection with that guarantee, John, Beck and Connie executed a board resolution for AIA Services purportedly authorizing that guarantee, even though they all had conflicts of interest that prevented them from authorizing the guarantee, AIA was separately barred from guaranteeing the loans, they did not obtain consent from Donna Taylor for the guarantee, and Donna Taylor's designee on AIA Services' Board of Directors was not provided notice of the GemCap Loan. On October 1, 2012, the Controlling AIA Defendants had AIA purportedly guaranteed the entire $10,000,000 GemCap Loan (the 2011 $1,113,930 limited guarantee executed in 2011 and the $10,000,000 unlimited guarantee executed in 2012 are collectively referred to as the "Guarantees"). Even though AIA purportedly executed the Guarantees, AIA could not borrow funds from the GemCap Loan and AIA obtained no benefit whatsoever.

THIRD AMENDED COMPLAINT - 35

**6-ER-1322**

137.     Upon information and belief, GemCap was aware of the existence of this lawsuit, or should have been aware of its existence, at the time of the GemCap Loan and AIA's Guarantees (which asserted claims based on other unlawful guarantees and alleged substantial other misconduct, including claims against the assets GemCap was purportedly accepting from AIA and CropUSA). Upon information and belief, GemCap was aware or should have been aware, that AIA Services' board of directors was not fully and properly seated (including that the Controlling AIA Defendants were not honoring Donna Taylor's unequivocal right to appoint a director) and that AIA's officers were not properly elected. Upon information and belief, GemCap knew, or should have known, that AIA Services was not conducting the required annual shareholder meetings and was not lawfully complying with fundamental corporate governance procedures.

138.     When GemCap accepted the first of the Guarantees from AIA, GemCap requested and was provided with an Officer's Certificate, signed by John and Duclos, that attached copies of AIA Services' amended articles of incorporation and bylaws (both of which contained provisions barring the Guarantees). As a result, GemCap was aware, or should have been aware, that AIA, and its purported officers, were not authorized to execute the Guarantees or pledge any of its assets to GemCap. AIA received no consideration for entry into the Guarantees and most of the GemCap Loan's indebtedness was already owed as of the date of the unlimited Guarantee executed on October 1, 2012.

139.     In connection with the GemCap Loan and AIA's Guarantees of that loan, GemCap requested, and was provided with, copies of AIA Services' amended articles of incorporation and restated bylaws, which expressly barred the Guarantees because, *inter alia*, the GemCap Loan was not for a wholly-owned subsidiary of AIA Services and the Loan implicated conflicts of interest

THIRD AMENDED COMPLAINT - 36

provisions that pertained to the Controlling AIA Defendants. As a result, GemCap was fully aware, or should have been fully aware, that AIA was not authorized to execute the Guarantees or to perform under the Guarantees.

140.    The Guarantees were signed by John Taylor, as the purported President of AIA Services and the purported President of AIA Insurance. GemCap was aware, or should have been aware with the exercise of reasonable diligence, that John Taylor had no authority to execute the Guarantees on behalf of AIA Services or AIA Insurance, and that, under the circumstances, the Guarantees were barred by AIA Services' amended articles of incorporation and AIA's bylaws. The Controlling AIA Defendants all had knowledge of the Guarantees and the fact that they were barred, and they never provided notice of the Guarantees or obtained shareholder approval from them (including, without limitation, approval from Donna Taylor, who was the sole Series A Preferred Shareholder of AIA Services). The Guarantees are illegal and/or ultra vires because they violated AIA Services' amended articles of incorporation, AIA's bylaws and numerous Idaho Code sections.

141.    On December 20, 2012, GemCap filed a UCC financing statement with the Idaho Secretary of State stating that AIA Services and AIA Insurance had pledged "All of each of Debtor's right, title and interest, whether now existing or hereafter acquired, in and to all assets of such Debtor, wherever located, whether tangible or intangible, and the proceeds and products thereof" ("Financing Statement"). The Financing Statement was not properly authorized or disclosed to AIA's shareholders, and it violated AIA Services' amended articles of incorporation and AIA's bylaws.

142.    Under the terms of the GemCap Loan, CropUSA could borrow up to $10,000,000. Upon information and belief, CropUSA owed GemCap $8,676,288.39, plus interest, attorneys'

THIRD AMENDED COMPLAINT - 37

fees and costs, as of July 26, 2013. Under the terms of the hard-money GemCap Loan, interest accrued at 18.5% per annum and 24% upon a default.

143.    According to a document later filed in 2014 in federal court in California, from April 15, 2013 through April 19, 2013, GemCap's agent traveled to Idaho to conduct a purported audit of CropUSA, AIA, and other entities at AIA's headquarters in Lewiston, Idaho.  John was present at the purported audit. Upon information and belief, GemCap's agent discovered facts that demonstrated that AIA and other entities owned by the Controlling AIA Defendants were engaging in improper transactions. This audit further reveals that the Hawley Troxell Defendants provided further legal work for CropUSA (despite the allegations and claims in this lawsuit). Upon information and belief, GemCap's agent traveled to Idaho to conduct other audits of CropUSA and AIA in Lewiston, Idaho. GemCap and the Controlling AIA Defendants never disclosed or provided the results of any of the audits to disinterested constituents at AIA or to AIA Services' minority shareholders.

144.    Upon information and belief, Gemcap provided CropUSA and other parties a notice of default through a notice dated July 16, 2013. Upon information and belief, GemCap provided a purported notice of default and demand for payment to AIA Services and AIA Insurance of the $8,676,288.39 owed by CropUSA through a notice dated July 29, 2013.

145.    GemCap, CropUSA and the Controlling AIA Defendants failed to disclose to properly elected and unconflicted directors of AIA, the Plaintiff, or AIA Services' other innocent minority common shareholders the GemCap Loan (including its terms), AIA's Guarantees (including their terms), and the subsequent notices of default of the GemCap Loan.

146.    On July 30, 2013, GemCap filed suit against CropUSA, John and others for the default of the GemCap Loan. GemCap asserted claims for breach of contract, fraud, conversion

THIRD AMENDED COMPLAINT - 38

and other claims. The Controlling AIA Defendants and GemCap did not provide any notice of this lawsuit to AIA Services' shareholders nor did they take any action to proceed in the best interests of AIA.

147.    After certain of AIA Services' shareholders learned of the GemCap lawsuit in California, GemCap was advised that AIA's Guarantees and the Settlement Agreements were unauthorized and illegal and that AIA was not being properly operated. Nevertheless, GemCap sought to collect from AIA based on the unauthorize and illegal Guarantees. At this point in time, GemCap had further actual knowledge of the unauthorized and illegal Guarantees and that AIA was not being operated properly (including that the Controlling AIA Defendants were breaching fiduciary duties owed to AIA), assuming that it was not aware of these facts prior to accepting AIA's Guarantees. As a result, GemCap was aware that AIA's Guarantees had been improperly and unlawfully executed.

148.    Despite complaints from AIA Services' minority shareholders and even though GemCap, AIA, CropUSA and the Controlling AIA Defendants knew that AIA was barred from executing the Guarantees and entering into any settlement agreement that required the payment of any funds or transfer of any assets from AIA. GemCap and AIA, purportedly on behalf of John, purportedly entered into a purported settlement and a written settlement agreement sometime after January 9, 2015 (collectively the "Settlement Agreement" or "Settlement Agreements").  The Settlement Agreements were concealed from AIA and its shareholders by the Controlling AIA Defendants and GemCap, and further constitute a conspiracy to defraud AIA. AIA received no consideration for the Settlement Agreements.

149.    Under the terms of the Settlement Agreements, AIA Services and AIA Insurance were require to transfer certain real property to GemCap and judgments would be entered against

THIRD AMENDED COMPLAINT - 39

them in the amount of $12,126,584.61, which included $3,986,368.78 in interest, penalties and costs. The Settlement Agreements were barred by AIA Services' amended articles of incorporation and AIA's bylaws for the same reasons that the Guarantees were barred, and it was a breach of John's fiduciary duties owed to AIA when he executed the Settlement Agreement (which GemCap was fully aware). In addition, the Settlement Agreements illegally provided that AIA would not file for bankruptcy protection and that malpractice claims would be assigned to GemCap. The Settlement Agreements are illegal and/or ultra vires because they violated AIA Services' amended articles of incorporation, AIA's bylaws, numerous Idaho Code sections, and were the product of intentional breaches of John's fiduciary duties owed to AIA.

150.    Under the terms of the Settlement Agreements, GemCap required John and/or certain other Controlling AIA Defendants to continue to improperly and unlawfully operate AIA in the manner that AIA had been operated in the past. The Controlling AIA Defendants have continued to improperly and unlawfully operate AIA since that time by and through their direct or indirect participation, lack of action, acquiescence and covering up of the improper and unlawful operation of AIA, which further resulted in GemCap substantially assisting and acquiescing in the Controlling AIA Defendants' breaches of fiduciary duties, fraud and other malfeasance by and through the continued improper operation of AIA, including, without limitation, allowing the Controlling AIA Defendants to operate AIA without having shareholder meetings, without having proper boards of directors, and in violation of AIA's amended articles of incorporation and bylaws.

151.    Upon information and belief, the Controlling AIA Defendants were aware of the GemCap litigation and Settlement Agreements, but they and GemCap continued to aid and abet John by allowing him to unlawfully enter into the Settlement Agreements and to improperly operate AIA. The Controlling AIA Defendants and GemCap, assisted, acquiesced and assisted in

THIRD AMENDED COMPLAINT - 40

covering up the transactions.

152.    According to the financial statements for AIA for 2015 (which were belatedly provided to AIA Services' shareholders in August 2016 after many demands),[2] AIA disclosed the Guarantees and Settlement Agreements for the first time to AIA Services' shareholders. However, John inaccurately stated that the "Company admitted no liability, but entered into settlement discussions and reached a confidential settlement agreement in late 2014…".  However, John failed to disclose to AIA Services' shareholders that he had agreed to allow judgments in the amount of $12,126,584.61 to be unlawfully and inappropriately entered against AIA and that any judgment against him would be delayed (i.e., he once again placed his interests above the interests of AIA, even assuming that the Settlement Agreement was legal and authorized).

153.    The real property located at 111 Main Street, Lewiston, Idaho (AIA Services' former headquarters) was ultimately transferred to GemCap and sold. As with the Guarantees and Settlement Agreements, the transfer of AIA Services' former headquarters to GemCap was not disclosed or authorized by AIA Services' shareholders.  According to recently provided 2015 financial statements for AIA (which were provided in August 2016), John disclosed for the first time that the real property located at 111 Main Street, Lewiston, Idaho (AIA Services' headquarters) was purportedly transferred to GemCap as a reduction of amounts allegedly owed to CropUSA, when AIA owed nothing to CropUSA and CropUSA actually owed AIA.  Upon information and belief, AIA Services' headquarters had a replacement value exceeding $7,000,000.

---

[2] Plaintiff is not alleging in this Third Amended Complaint that the applicable financial statements prepared for AIA or CropUSA are accurate. To the contrary, Plaintiff is alleging that certain financial statements were fraudulently prepared and/or approved by the Controlling AIA Defendants.

THIRD AMENDED COMPLAINT - 41

**154.** As a result of the Guarantees and Settlement Agreements, AIA paid sums for CropUSA and other entities, incurred and/or paid substantial attorneys' fees and costs, and/or were damaged. Once again, John placed his interests and the interests of the other Controlling AIA Defendants above the interests of AIA by improperly stipulating to judgments against AIA in excess of $12,000,000, but no judgment was entered against him even though he personally guaranteed the GemCap Loan, too. To the extent that the Guarantees and/or Settlement Agreements are not declared illegal or ultra vires and Plaintiff recovers all damages, the Controlling AIA Defendants are liable for all such damages not recovered and they are separately liable for any other damages caused by the ultra vires acts.

**155.** GemCap knew that John had no apparent or actual authority to execute the Guarantees and Settlement Agreements on behalf of AIA, which is further supported by the fact that GemCap's attorneys were specifically advised that the Guarantees and Settlement Agreements were not authorized. GemCap knew that, by making the GemCap Loan, accepting the Guarantees and entering in the Settlement Agreements, it would be aiding and abetting and conspiring with the Controlling AIA Defendants and CropUSA by providing improper funding to the Controlling AIA Defendants and CropUSA and by assisting them in engaging in unauthorized, intra vires, ultra vires and/or illegal conduct.

**156.** GemCap knew that the Controlling AIA Defendants breached their fiduciary duties owed to AIA, and/or aiding and abetting others in those breaches, by entering into the Guarantees and Settlement Agreements (and requiring AIA's assets and/or funds to be paid to GemCap or others because of GemCap (including attorneys)) and participating in, and covering up, the Controlling AIA Defendants' breaches of fiduciary duties against AIA. GemCap has aided and abetted one or more of the Controlling AIA Defendants in breaching their fiduciary duties and in

THIRD AMENDED COMPLAINT - 42

the commission of fraud against AIA. GemCap has also aided and abetted the Controlling AIA Defendants by allowing them to maintain control over AIA when GemCap knew that they were not operating AIA in the best interests of AIA, and by concealing and covering up the Controlling AIA Defendants' breaches of fiduciary duties and fraud.

K. **John Unlawfully Transfers Certain Real Property to AIA and Requires AIA to Pay the Liabilities on the Property and He Alleges that AIA Owes Him $545,563 in Accrued Salary.**

157.    Subsequent to the GemCap Loan and according to AIA Services' purported 2015 financial statements (which were belatedly provided in August 2016 after many demands), John allegedly executed quitclaim deeds purportedly transferring certain real property, held in the name of other entities John controls, to AIA with a purported book value of $820,668, and AIA was improperly required to assume a purported $393,863 in debts on the real property. These real property transfers and assumptions of debts were unauthorized and ultra vires. Upon information and belief, GemCap was involved in these real property transfers and assumption of debts, and GemCap knew that such transfers were aiding and abetting John and other Controlling AIA Defendants in the breach of their fiduciary duties owed to AIA.

158.    Even if authorized, the determination of the $820,668 purported book value of such real property was not authorized and John and the Controlling AIA Defendants had conflicts of interest that prevented any of them from making any determination of value or authorizing the alleged transfers or assumption of debts. AIA's proper Board of Directors did not authorize the transactions nor did AIA Services' shareholders.

159.    According to the same recently provided financial statements for AIA for 2015, John alleges that AIA owes him $545,563 in alleged accrued salary as of December 31, 2015, but AIA owes John nothing and he is not entitled to any compensation because he has been a faithless

THIRD AMENDED COMPLAINT - 43

fiduciary of AIA.  Upon information and belief, at least one of the parcels of real property has already been transferred or lost as a result of foreclosure proceedings for less than the purported book value.  AIA seeks to rescind the real property transfers and assumption of debts.

**L. John Unlawfully Amends AIA Services and AIA Insurance's Bylaws and Issues Himself Series A Preferred Shares in AIA Services.**

160.    According to the recently provided financial statements for AIA for 2015 (which were belatedly provided in 2016 after many demands), sometime in 2016, John purportedly purchased 7,500 Series A Preferred Shares in AIA Services, but those shares were improperly issued and were never authorized by a properly seated and unconflicted Board of Directors of AIA Services, as required. In addition, AIA Services' amended articles of incorporation authorized the Series A Preferred Shares to only be issued to Donna Taylor in connection with the prior restructuring of AIA Services, and not to issue more Series A Preferred Shares to John.

161.    It is unclear why John improperly issued the 7,500 Series A Preferred Shares in AIA Services when those shares were not purchased or issued for any legitimate business purposes, they were never properly authorized by AIA Services' Board of Directors or shareholders, and John had conflicts of interest that prevented him from purchasing or issuing those shares on behalf of the Board of Directors of AIA Services even if the shares were authorized to be issued under AIA Services' amended articles of incorporation (which they were not).

162.    According to the same recently provided financial statements for AIA for 2015 and the letter accompanying those financial statements, John allegedly amended the bylaws of AIA Services and AIA Insurance to provide for an award of attorneys' fees and costs for "intracompany suits" if a "claiming party does not obtain a favorable judgment on the merits of the claim." These purported amendments were never adopted for a legitimate purpose, John had conflicts of interest that prevented him from adopting the provision, and the provisions are unenforceable.

THIRD AMENDED COMPLAINT - 44

163. According to the same recently provided financial statements for AIA for 2015, the Controlling AIA Defendants have spent over $400,000 litigating against Donna Taylor in an effort to not pay her the just over $400,000 in principal owed on her Series A Preferred Shares. This further demonstrates the breached fiduciary duties and corporate waste occurring at AIA by and through the Controlling AIA Defendants because AIA Services should have simply paid Donna Taylor the $400,000 instead of spending that money to fight her.

**M.** **There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants**

164. Since acquiring operational control of AIA Services in 1995, the Controlling AIA Defendants have engaged in repeated acts of faithless self-dealing, transactions detrimental to AIA, committed intentional torts (including fraud and breaches of fiduciary duties), breached their fiduciary duties (including their duties of loyalty), concealed, conspired to commit intentional torts, aided and abetted in the commission of intentional torts and to cover up those torts, to the detriment of AIA in Idaho, including, but not limited to, the following intentional acts:

(a) Controlling AIA's Board of Directors and/or the decisions made by AIA's Board of Directors and intentionally refusing to act in the best interests of AIA;

(b) Violating AIA Services' restated bylaws, including but not limited to, failing to hold annual shareholder meetings, failing to provide notice or obtain proper shareholder approval for certain transactions, failing to comply with conflicts of interest provision in the bylaws and articles of incorporation which restricted many of the unlawful or improper transactions described in this Third Amended Complaint, and failing to properly comply with applicable corporate governance;

(c) Violating AIA's amended articles of incorporation thereby allowing substantial funds and assets to be depleted from AIA and obligating AIA to be liable for loans or guarantees which were barred by those amended articles of incorporation;

THIRD AMENDED COMPLAINT - 45

(d) Diverting corporate opportunities belonging to AIA, including CropUSA and Pacific Empire Holdings Corp. (a/k/a Sound Insurance);

(e) Unlawfully conveying, encumbering, utilizing, and/or pledging AIA's assets to themselves or other entities;

(f) Inappropriately redeeming, acquiring and/or issuing shares of stock and/or making payments on put options in AIA Services, including but not limited to, issuing shares to the Controlling AIA Defendants;

(g) Inappropriately paying dividends and failing to pay dividends;

(h) Engaging in transactions and actions in direct conflict of interest with their duties owed to AIA and failing to comply with conflict of interest provisions in AIA's bylaws and the law;

(i) Guaranteeing loans for CropUSA and failing to guarantee loans for AIA;

(j) Paying excessive compensation to officers and directors, including but not limited to, paying John $250,000 per year to purportedly act as CEO and President of AIA Services after his contractual entitlement to such salary had expired, when John had conflicts of interest that barred him from determining his pay, and he had represented that he would not take salary in certain year(s);

(k) Wasting AIA's assets and making improper payments, including by paying Connie and Beck $20,000 per year to purportedly serve on the Boards of Directors of AIA and paying John compensation when he was doing nothing for the benefit of AIA;

(l) Divulging and/or utilizing AIA's trade secrets for the benefit of themselves and other entities, including CropUSA (including, without limitation, AIA's agency force and customer lists);

(m) Soliciting and transferring AIA employees to work for CropUSA;

THIRD AMENDED COMPLAINT - 46

(n) Engaging in acts and/or decisions without making full disclosure and without obtaining the required approval of AIA Services' shareholders resulting in none of the transactions and acts referenced in this Third Amended Complaint (and any that may be at issue at or before trial) being properly ratified by AIA Services, AIA Insurance or their shareholders;

(o) Engaging in millions of dollars of transactions that resulted in AIA conveying benefits without the receipt of any consideration, without being repaid and/or without being paid any mark-up or profit;

(p) Forming and operating entities in direct competition with AIA in the insurance marketplace, including without limitation, CropUSA and Pacific Empire Holdings Corp.;

(q) Making false representations, concealing facts, and omitting material facts from AIA, including, without limitation, regarding share values, items in AIA's financial statements (including notes), assets and debts in AIA's financial statements, the true value of funds and assets (including employees and trade secrets) utilized for other entities (including CropUSA), and that AIA was being operated for the benefit of the corporation;

(r) Concealing and failing to disclose material facts to AIA pertaining to loans, transfers, and utilization of assets, including without limitation, concealing or omitting material facts, including all of the necessary facts related to virtually each and every transaction described in this Third Amended Complaint;

(s) Making false representations to AIA, including without limitation, making and certifying false and misleading financial statements to AIA and representing that AIA was being properly operated when it was instead being used to fund the lifestyle, payments and other businesses owned or partially owned by the Controlling AIA Defendants;

THIRD AMENDED COMPLAINT - 47

(t) Inappropriately loaning AIA's funds, or guaranteeing loans, to themselves and to other entities under their control in violation of AIA's amended articles of incorporation, bylaws and fiduciary duties;

(u) Paying tens of thousands of dollars in yearly fees to purportedly serve on the Board of Directors of AIA and other compensation and benefits, when such amounts were excessive and they were violating their fiduciary duties owed to AIA and they were all acting as faithless fiduciaries;

(v) Paying attorneys' fees and costs in various legal proceedings on behalf of the Controlling AIA Defendants and others when it was clear that they had intentionally failed to act in good faith, were not entitled to indemnification or to have attorneys' fees and costs advanced on their behalf, and by failing to obtain security for repayment of said funds;

(x) Acquiring a parking lot with AIA funds and charging AIA, and making AIA pay excessive rent for use of the parking lot (John increased the rent to $15,000 per year) even though AIA did not actually use the parking lot. Later, upon information and belief, the parking lot was transferred to Jordan Taylor, John and Connie's son (who is also a lawyer), for no consideration so he could sell it for $50,000;

(y) Failing to seat the full and required Board of Directors for AIA Services and thus there was never a required quorum for AIA Services' Board to take any action and further resulting in all purported actions being unauthorized, including, without limitation, by failing to honor Donna Taylor's appointment of Patrick Moran and Paul Durant to AIA Services' Board of Directors;

(z) Improperly purchasing and transferring shares held by AIA or which should have been held by AIA to themselves, including without limitation shares in Pacific Empire Radio Corp., Pacific Empire Communications Corp., and Pacific Empire Holdings Corp. (this entity was formed

THIRD AMENDED COMPLAINT - 48

with AIA's assets by John, improperly competed against AIA, and was later sold for $240,000);

(aa) Allowing John to profit from CropUSA's sale of assets to Hudson Insurance by improperly allowing him to retain a monthly fee of $10,000 per month when those funds should have gone to AIA;

(bb) Failing to take appropriate legal action in the interests of AIA, including by failing to bar John from being an officer and director of AIA and failing to claw back CropUSA as a subsidiary of AIA and properly operate CropUSA (which would have resulted in CropUSA being worth millions of dollars);

(cc) Removing tenants from an AIA owned building to another building owned personally by John and/or other Controlling AIA Defendants;

(dd) Improperly subsidizing CropUSA and other entities with AIA's funds, labor and assets, failing to properly allocate expenses to CropUSA and failing to have other expenses paid back at all (which have already been identified as being approximately $500,000 as of 2008 after Plaintiff's expert was able to identify certain transactions that were actually accounted for);

(ee) Selling and/or transferring assets and or/contracts belonging to AIA to others (including the contract with Growers National);

(ff) Improperly paying numerous law firms other than the Hawley Troxell Defendants hundreds of thousands of dollars representing AIA and the Controlling AIA Defendants in litigation caused by their own intentional acts and torts and when the Controlling AIA Defendants had not acted in good faith or complied with their duties of loyalty to AIA;

(gg) Paying more of AIA's funds to litigate disputes (including with Donna Taylor in the Idaho state courts) than it would have taken to simply pay the money owed;

THIRD AMENDED COMPLAINT - 49

(hh) Failing to obtain security, failing to charge interest, and failing to collect on loans of at least $307,000 made to John;

(ii) Removing the $400,000 held in the court registry and the over $200,000 in a bank account in *Taylor v. AIA Services*, and allowing the Controlling AIA Defendants to utilize those funds when the Hawley Troxell Defendants should have ensured that those funds were kept from them;

(jj) Expending significant sums on the illegal repurchase of common shares in AIA Services, which also resulted in increasing the ownership interest of the Controlling AIA Defendants;

(kk) Allowing AIA to engage in the transactions identified in this Third Amended Complaint when no dividends had been declared or paid on the Series C Preferred Shares held in the AIA Services 401(k) Plan and those shares now have accrued dividends owed of over $1,000,000;

(ll) Wasting AIA's funds and assets (and CropUSA's) on needlessly rented office space, unneeded employees and other wasted expenditures;

(mm) Allowing Connie to represent CropUSA in litigation involving Growers National in conflict with her duties of loyalty as a director of AIA, which such litigation resulted in approximately $500,000 being transferred to CropUSA for Growers National, even though AIA created Growers National (she separately aided and abetted in CropUSA's receipt of these funds);

(nn) Allowing John to make decisions for the management and operation of AIA when he had conflicts of interest and a long-standing track record of diverting money, labor, credit, trade secrets and other assets to CropUSA and other entities that he partially or wholly owned;

THIRD AMENDED COMPLAINT - 50

6-ER-1337

(oo) Engaging in numerous illegal, ultra vires, and intra vires acts and transactions for, or in the name of, AIA, including, without limitation, entering into the Guarantees for the $10,000,000 GemCap Loan, and later transferring property worth over $1,000,000 to GemCap;

(pp) Engaging in countless improper transactions in Idaho for the benefit of themselves, CropUSA and/or other entities partially or wholly owned by the Controlling AIA Defendants (including the other transactions and allegations set forth in this Third Amended Complaint);

(qq) Organized, operated, controlled, and conducted CropUSA as their instrumentality, agency and/or conduit to the detriment of AIA, and they have further operated CropUSA improperly without complying with proper corporate governance procedures and as a means to defraud AIA.

The Controlling AIA Defendants, CropUSA, GemCap and/or the Hawley Troxell Defendants have assisted one another and others in committing the intentional acts and torts against AIA described in this paragraph and concealing, or covering up, the facts and the intentional torts committed against AIA, including those specifically referenced in this paragraph and elsewhere in this Third Amended Complaint. The Hawley Troxell Defendants continued to conceal facts from AIA and to aid and abet the Controlling AIA Defendants and CropUSA even after any representation may have terminated when they owed the duty to AIA to not do so.

165.    At all relevant times, John was CEO, President and director of AIA Services, AIA Insurance and CropUSA and a shareholder of AIA Services at the time of all of the improper transactions with CropUSA and other improper acts identified in this Third Amended Complaint (which were also conflicts of interest), and he improperly benefited from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

THIRD AMENDED COMPLAINT - 51

In 2016, John became the sole purported director, secretary and president of AIA Services, AIA Insurance and CropUSA Insurance Agency, Inc.

166.    At all relevant times, John also owned interests in other entities who improperly benefitted directly or indirectly from AIA and CropUSA (including Green Leaf Alliance, Green Leaf Re, Reinsurance Partners and Pacific Empire Radio Corp.), which were additional conflicts of interest and proof of self-dealing. The Controlling AIA Defendants were aware of these facts.

167.    During certain relevant times, the Controlling AIA Defendants were all purported shareholders of CropUSA and either majority shareholders (as a group) or officers of AIA Services at the time of the improper transactions and malfeasance identified in this Third Amended Complaint (which were also conflicts of interest), and they improperly benefited, directly or indirectly, from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

168.    As a result of the acts and omissions set forth and/or contemplated above and other acts and/or omissions which will be established at or before trial, the Controlling AIA Defendants, CropUSA, GemCap and the Hawley Troxell Defendants have committed numerous torts against AIA in Idaho thereby proximately causing AIA to incur millions of dollars in damages. Indeed, had the Hawley Troxell Defendants simply sought on behalf of AIA to immediately bar John from serving as a director and officer of AIA Services and ensured that AIA was properly operated and its assets and CropUSA properly marshalled, the GemCap Guarantees and Settlement Agreement would never had occurred and AIA would not have been damaged by millions of dollars.

169.    Because discovery has not yet commenced, Plaintiff expects to obtain additional evidence in discovery and to conduct further investigation, which will further support the causes

THIRD AMENDED COMPLAINT - 52

of action and relief requested below.

170.    Due to the fact that the Controlling AIA Defendants have had complete control over AIA during all relevant times and have never asserted, nor would they ever assert, claims against themselves or others on behalf of AIA, the adverse dominion doctrine bars the assertion of statute of limitations defenses to all claims and relief requested in this Third Amended Complaint. *Freeland v. Enosis Corp.,* 540 F.3d 721 (7th Cir. 2008).

### V.    CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 AND FEDERAL RULE OF CIVIL PROCEDURE 23.1

171.    As a prerequisite to filing this lawsuit under Idaho Code §§ 30-1-742, 30-29-742, and Federal Rule of Civil Procedure 23.1, Plaintiff has been a common shareholder of AIA Services during all relevant times to the transactions at issue and the claims asserted in this Third Amended Complaint.

172.    On July 21, 2008, Donna Taylor, another shareholder of AIA Services, served a written derivative demand letter on the Boards of Directors of AIA Services and AIA Insurance. (Dkt. 23-9 and 67-19.)  In accordance with the then-applicable I.C. § 30-1-742, the Plaintiff was not required to make another demand under I.C. § 30-1-742 because that statute does not require every shareholder filing suit to serve a separate demand, as confirmed by the comment: "It should be noted that the shareholder bringing suit does not necessarily have to be the person making the demand. Only one demand need be made in order for the corporation to consider whether to take corrective action."

173.    On July 23, 2008, the Hawley Troxell Defendants filed a Motion for Stay of Proceedings in *Taylor v. AIA Services* and asserted that the stay was necessary so that AIA Services and AIA Insurance could conduct an inquiry into the demands made by Donna Taylor in her letter dated July 21, 2008 (Donna Taylor was not a party to that lawsuit, however).

THIRD AMENDED COMPLAINT - 53

174. On August 14, 2008, in *Taylor v. AIA Services*, the Hawley Troxell Defendants filed a purported petition for a court appointed independent inquiry on behalf of AIA when they had no intention of following through with the inquiry. (*See* Dkt. 67-20.)

175. On September 4, 2008, Reed Taylor supported the appointment of independent investigators. However, Reed Taylor objected to the investigators proposed by the Hawley Troxell Defendants, who were purportedly representing AIA, and the Controlling AIA Defendants. (*See* Dkt. 67-21.) Reed Taylor believed totally independent people should be appointed.

176. Although the parties had filed briefing with respect to the appointment of independent investigators in *Taylor v. AIA Services*, the Hawley Troxell Defendants never noted the motion for a hearing and the court never ruled on the request, and they intentionally abandoned the appointment of an independent inquiry. The Hawley Troxell Defendants and Controlling AIA Defendants have never conducted a further investigation of the demands made in Donna Taylor's derivative demand letter of July 21, 2008. No action was ever taken by AIA or AIA's Boards of Directors.

177. On April 3, 2012, Plaintiff, along with other shareholders, made another written demand on the Boards of Directors of AIA Services and AIA Insurance, which included demands to keep the $400,000 cash held in the Court registry in *Taylor v. AIA Services* to comply with AIA's amended articles of incorporation, to comply with AIA's bylaws, provide full disclosure, and to protect certain other assets. (Dkt. 67-33.) This particular demand was copied directly to Babbitt and Ashby, so they had full knowledge of it. This demand, like all the others, was ignored. (*See* Dkt. 67, p. 11 ¶ 29.)

178. On July 16, 2012, while the instant case was stayed, the Plaintiff, along with over ten other shareholders of AIA Services, served additional written derivative demands upon the

THIRD AMENDED COMPLAINT - 54

Boards of Directors of AIA Services and AIA Insurance. (Dkt. 67-42.) The demands requested, among other things, that AIA pursue this lawsuit with all claims as of July 16, 2012 and future claims, including punitive damages, which also provided AIA and the Board of Directors yet another opportunity to address the demands previously made by Donna Taylor in 2008 (although Plaintiff was under no obligation to do so).

179. On June 13, 2016, in accordance with I.C. § 30-29-742, Plaintiff, along with other shareholders of AIA Services, served yet another detailed derivative demand upon the Boards of Directors of AIA Services and AIA Insurance. (*See* Dkt. 148-2.) Plaintiff demanded, *inter alia*, that additional claims be asserted against the previously named defendants (including for more recent torts and damages) and to assert claims against GemCap and CropUSA Insurance Services. AIA failed to respond to this demand within ninety days.

180. On August 23, 2016, in accordance with I.C. § 30-29-742, Plaintiff, along with other shareholders of AIA Services, served a substantially similar demand previously provided (Dkt. 148-2) in which Plaintiff demanded further action be taken, including, without limitation, to seek, *inter alia*, further claims and damages since the last derivative demand, to seek damages against GemCap for selling AIA's property, to void the improperly and allegedly amended bylaws of AIA Services and AIA Insurance, and to rescind the Series A Preferred Shares that John improperly issued to himself. The August 23, 2016 demand was made by Plaintiff as a shareholder and as a creditor of AIA Services. AIA's purported Board of Directors, through John, responded to this demand in writing, rejected the demand, belatedly rejected the prior June 13, 2016 demand (after ninety days had already expired), and refused to have AIA pursue the claims.

181. In addition, Plaintiff has made additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance, but no action has ever been taken by the

THIRD AMENDED COMPLAINT - 55

purported Boards of Directors.

182.    Over ninety days have elapsed since the written derivative demands set forth above were made to AIA and its Boards of Directors, and no action has been taken by AIA whatsoever, and all of Plaintiff's claims and requested relief asserted in this lawsuit flow from those derivative demands.  AIA and its purported Boards of Directors never asked for any additional information or specificity regarding the derivative demands.

183.    As the second largest common shareholder of AIA Services (who traded a book of insurance business worth approximately $500,000 to AIA Services in exchange for his common shares), the Plaintiff fairly represents the interest of AIA and their shareholders (including the preferred shareholders, 401(k) Plan shareholders, and former ESOP shareholders) and lawful creditors (to the extent that AIA Services is deemed to be insolvent). Plaintiff has never received a return on his investment in AIA Services. Plaintiff is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist, but instead to only pursue *bona fide* claims on behalf of, for the benefit of, AIA and their innocent shareholders.

184.    Plaintiff is pursuing this derivative action to make AIA whole and recover the millions of dollars in damages inflicted upon it by the defendants. Upon obtaining judgment, the funds will allow AIA to continue to operate as a going concern or, alternatively, to be dissolved with the funds used to pay lawful creditors and the remaining funds to be distributed to the Series A Preferred Shareholders, the Series C Preferred Shareholders and then to the common shareholders.

## VI.    COUNT I—BREACH OF FIDUCIARY DUTIES
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

185.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause

THIRD AMENDED COMPLAINT - 56

of action.

186.     As members, or purported members, of the Board of Directors for AIA Services and/or AIA Insurance, the Controlling AIA Defendants, who have each served as a director of AIA Services during certain relevant times, owed fiduciary duties to AIA, including, without limitation, duties of good faith and to act in the best interests of AIA. Beck, Cashman and John continued to also serve on the board of directors of AIA Services through a so-called "advisory board," which controlled AIA and CropUSA. As corporate officers of AIA, John, as President and CEO, and Duclos, as Secretary, owed fiduciary duties to AIA, which were further elevated during the times in which they both served as directors of AIA, too (which is from 1995 to the present time for John).  During certain relevant times, Beck, Cashman, John and Connie owed fiduciary duties to AIA because they were the majority shareholders of AIA Services, including, without limitation, to use their majority control of AIA in a fair, just and equitable manner. The Controlling AIA Defendants had conflicts of interest by and through their positions as officers, directors and/or shareholders of AIA Services and CropUSA.

187.     As attorneys for AIA, the Hawley Troxell Defendants owed fiduciary duties to AIA (including the undivided duty of loyalty). If not authorized to act as attorneys for AIA, the Hawley Troxell Defendants acted with apparent authority as agents and owed fiduciary duties as a result of that agency relationship. The Hawley Troxell Defendants had conflicts of interest when they undertook to represent AIA and CropUSA, and when they improperly proceeded in the manner directed by any one or more of the Controlling AIA Defendants, thereby improperly representing the interests of the Controlling AIA Defendants, instead of the best interests of AIA. The Hawley Troxell Defendants were never retained to represent AIA and CropUSA by disinterested and unconflicted officers and directors of AIA. The Hawley Troxell Defendants placed their self-

THIRD AMENDED COMPLAINT - 57

interests in earning in excess of $1,000,000 in fees in various lawsuits ahead of, and in direct conflict with, AIA's interests in having undivided and unconflicted representation. The Hawley Troxell Defendants knew that they were improperly retained to purportedly represent CropUSA and AIA when AIA's litigation decisions were being made by, and AIA improperly operated by, disinterested and unconflicted officers and directors who were also placing their self-interests ahead of AIA's interests, as more full discussed throughout this Third Amended Complaint.

188.    Based on any and/or all of the acts and/or omissions set forth in this Third Amended Complaint and/or those facts proven at or before the time of trial (including conflicts of interest that prevent the Controlling AIA Defendants to use the business judgment rule as a defense), the Controlling AIA Defendants and the Hawley Troxell Defendants breached their fiduciary duties owed to AIA, including, without limitation, breaching their undivided duties of loyalty, care, good faith, trust and confidence owed to AIA and/or engaging in collusive acts and behavior against AIA. In addition, Beck, Cashman, John and Connie have further breached their fiduciary duties owed to AIA as to the controlling majority shareholders of AIA Services by and through, *inter alia*, using their control of AIA in an unjust, unfair and inequitable manner to benefit themselves and other entities that they partially own or control to the detriment of AIA and Plaintiff.

189.    The Hawley Troxell Defendants have separately breached their fiduciary duties as matter of law by violating the Rules of Professional Conduct, including, without limitation, when they: (a) simultaneously represented AIA and CropUSA; (b) failed to proceed in the best interests of AIA; (c) failed to obtain information consent from authorized, unconflicted and disinterred constituents of AIA; (d) placed their interests in earning over $1,000,000 in attorneys' fees over the interests of AIA; (e) prepared and/or entered into Agreements and/or Amended Agreements involving AIA, CropUSA and/or the Controlling AIA Defendants that were not in the best interest

THIRD AMENDED COMPLAINT - 58

of AIA and without requiring AIA to obtain independent counsel; and (f) assisting the Controlling AIA Defendants in the commission and/or covering up of fraud (including by failing to require full disclosure to AIA and AIA Services' shareholders). In addition, Riley was previously aware that CropUSA was derived from AIA (the other Hawley Troxell Defendants became aware in *Taylor v. AIA Services*) and they were further aware of the restrictions in AIA Services' amended articles of incorporation and bylaws when Riley had been aware of them, and assisted in preparing them. The Hawley Troxell Defendants have further breached their fiduciary duties as a matter of law for the violations of the Rules of Professional Conduct dealing with loyalty to a client and conflicts of interest, which separately requires disgorgement of all compensation (the over $1,000,000 in attorneys' fees and costs paid to it by and/or on behalf of AIA).

190.    As a direct and/or proximate cause of the Controlling AIA Defendants' and the Hawley Troxell Defendants' breaches of their fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

191.    In addition, each of the Controlling AIA Defendants and the Hawley Troxell Defendants is a "faithless fiduciary" as defined by law and is therefore required to disgorge all compensation and consideration received from AIA and/or CropUSA, irrespective of if they prove that they acted in AIA's interests as to any other issues. The disgorgements sought are in addition to liability caused by the breaches of fiduciary duty. In the case of the Hawley Troxell Defendants, the disgorgement includes all fees and costs received for or paid on behalf of AIA and/or CropUSA. In the case of the faithless Controlling AIA Defendants, the disgorgement includes all salary, bonuses, benefits, warrants, stock options, or stock received from AIA.

///

///

THIRD AMENDED COMPLAINT - 59

## VII.    COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES
### (Against the Controlling AIA Defendants, the Hawley Troxell Defendants, CropUSA, and GemCap)

192.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

193.    During certain relevant times, the Hawley Troxell Defendants, the Controlling AIA Defendants, CropUSA and/or GemCap: (a) had knowledge of the other defendants' acts and/or omissions constituting the breaches of fiduciary duties owed to AIA (including duties of loyalty, good faith and proceeding in the best interests of AIA) as further described in this Third Amended Complaint and/or proven at the time of trial; (b) knew that such acts and/or omissions by other defendants constituted breaches of fiduciary duties owed to AIA; (c) substantially participated in such breaches of fiduciary duties owed to AIA; (d) did not disapprove or seek ratification or disclosure of such breaches of fiduciary duties owed to AIA; (e) took no steps to prevent such breaches of fiduciary duties owed to AIA; and/or (f) assisted in the concealment, and covering up, of such breaches of fiduciary duties owed to AIA.

194.    As a direct and/or proximate cause of the Hawley Troxell Defendants, the Controlling AIA Defendants, CropUSA and GemCap's aiding and abetting of one another and/or others in the breaches of fiduciary duties owed by other defendants to AIA, AIA has been damaged in the amount to be proven at or before trial. As aiders and abettors, the defendants are jointly and severally liable for the underlying tort committed by one or more defendants.

## VIII.    COUNT III—LEGAL MALPRACTICE
### (Against the Hawley Troxell Defendants)

195.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause

THIRD AMENDED COMPLAINT - 60

**6-ER-1347**

of action.

196. The Hawley Troxell Defendants owed duties to AIA, including, without limitation, duties of care, good faith and loyalty.

197. The Hawley Troxell Defendants have breached their duties of care, good faith and loyalty owed to AIA, including, without limitation, the breached duties attributable to the acts and omissions described in this Third Amended Complaint. The Hawley Troxell Defendants have further breached their duties of good faith, care and loyalty owed to AIA by improperly simultaneously representing AIA and CropUSA, together with directly and/or indirectly improperly representing the interests of the Controlling AIA Defendants.

198. AIA suffered damages as a direct, foreseeable and/or proximate result of the breaches of duty and the acts of the Hawley Troxell Defendants, including, without limitation, those acts described in this Third Amended Complaint and/or proven at the time of trial (including damages and the lost profits associated with CropUSA). At a minimum, the Hawley Troxell Defendants were also a substantial factor in the harm and damages inflicted upon AIA, including, without limitation, inflicting millions of dollars of damages against AIA by the Controlling AIA Defendants and the failure of CropUSA to be a profitable and valuable subsidiary of AIA today. Had the Hawley Troxell Defendants properly discharged their duties, the Controlling AIA Defendants would never have significantly damaged AIA, and it and CropUSA would be profitable today (and CropUSA a valuable subsidiary of AIA). In addition and/or alternative, millions of dollars of AIA's funds, assets, trade secrets, labor and other valuable consideration would have been recovered and/or not unlawfully transferred and/or utilized by CropUSA, the Controlling AIA Defendants and/or other entities that they own.

THIRD AMENDED COMPLAINT - 61

**199.**     As a direct and/or proximate cause of such acts and/or omissions, the Hawley Troxell Defendants are liable to AIA for damages in the amount to be proven at or before the time of trial.

### IX.     COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ CONSTRUCTIVE FRAUD
### (Against the Controlling AIA Defendants, CropUSA and GemCap)

**200.**     Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

**201.**     The acts, omissions, decisions, contracts, transactions, allocations, investments, and/or other business dealings of the Controlling AIA Defendants that were purportedly entered into on behalf of AIA were not disclosed or approved by fully seated and disinterested Boards of Directors of AIA and, therefore, AIA had no knowledge of any such acts, omissions, decisions, contracts, transactions, allocations, investments, and/or malfeasance.

**202.**     The Controlling AIA Defendants are liable to AIA for fraud because: **(a)** they made representations of material fact to AIA and AIA Services' innocent minority shareholders as asserted throughout this Third Amended Complaint, including but not limited to: (i) representations that CropUSA was being operated for the benefit of AIA, (ii) representations that AIA was being properly operated (including that the Boards of Directors had properly authorized certain transactions when Donna Taylor's designee was not on the Board of AIA Services and the provisions in the amended articles of incorporation and bylaws had not been complied with), (iii) representations that the information on AIA's financial statements was true (John separately certified to auditors and others that the information contained on certain of AIA's financial

THIRD AMENDED COMPLAINT - 62

statements was true and correct), (iv) representations that expenses, compensation, and/or loans between AIA and other entities or parties were properly entered into and accounted for (i.e., there are hundreds of thousands of dollars, if not millions of dollars, in funds and other assets used by CropUSA which were derived from AIA and never accounted for), (v) representations that they had the authority to act on behalf of AIA when they did not (including failing to disclose conflicts of interest that prevented them from acting on behalf of AIA); and (vi) other representations referenced in this Third Amended Complaint and/or proven at or before trial since discovery has not begun; **(b)** such representations were false; **(c)** such representations were material and AIA would never have entered into or approved any of the acts, conduct or transactions if AIA had been provided with full disclosure and the true representations); **(d)** they knew such representations were false; **(e)** they intended that there be reliance by AIA on such representations; **(f)** AIA was ignorant of the falsity of such representations; **(g)** AIA relied on such representations; **(h)** AIA's reliance was justified; and **(i)** injury resulted to AIA.

203.    Constructive fraud is identical to fraud, except that the Plaintiff need not prove the Controlling AIA Defendants' knowledge of the fraud and their intent that AIA rely on the representations.

204.    The Controlling AIA Defendants owed duties to AIA during certain relevant times as majority shareholders, board members and/or officers of AIA. In addition to making false representations, the Controlling AIA Defendants also concealed information from AIA and its innocent minority shareholders with knowledge that the concealed information was material and that the concealment would cause AIA to suffer otherwise avoidable damages, including without limitation, information contained in this Third Amended Complaint. The Controlling AIA Defendants' failure to disclose a fact to AIA and AIA Services' innocent minority shareholders

THIRD AMENDED COMPLAINT - 63

**6-ER-1350**

where one has a duty to disclose is the legal equivalent of representing the non-existence of the fact. Where facts are fraudulently concealed, Plaintiff need not show reliance as there is nothing other than silence upon which to rely.

205.   The Controlling AIA Defendants represented to AIA Services that CropUSA was a wholly-owned subsidiary of AIA Services. Simultaneously, the Controlling AIA Defendants adopted the position, not disclosed to AIA or its innocent minority shareholders, that CropUSA was an independent entity with John as its alleged sole shareholder and subsequently failed to disclose that CropUSA was not a separate entity. These representations were false, the Controlling AIA Defendants knew of their falsity, the Controlling AIA Defendants intended that there be reliance, there was justifiable reliance by AIA and AIA Services' innocent minority shareholders, and AIA was damaged as a result.

206.   By operating CropUSA as an independent entity, and by using CropUSA as a vehicle for misappropriating and converting corporate assets, the Controlling AIA Defendants committed ongoing fraud that has persisted through the date of this Third Amended Complaint.

207.   The Controlling AIA Defendants also made misrepresentations to AIA and AIA Services' innocent minority shareholders in the form of false, misleading and fraudulent financial statements (which such financial statements also failed to disclose numerous improper and unlawful transactions and their ownership interests in CropUSA and other entities), upon which AIA and AIA Services' innocent minority shareholders reasonably relied, with that reliance being the proximate cause of AIA's damages.

208.   When the Controlling AIA Defendants transferred more than $1.5 million to CropUSA in 2004, they concealed the fact of this transaction from AIA and AIA Services' innocent minority shareholders and AIA was damaged by this concealment.

THIRD AMENDED COMPLAINT - 64

209.    When the Controlling AIA Defendants transferred AIA corporate assets, including funds, employees, goodwill and trade secrets to CropUSA and other entities and were subsidizing CropUSA and other entities, they concealed these facts from AIA and AIA Services' innocent minority shareholders. AIA suffered damages by these concealments.

210.    When the Controlling AIA Defendants had AIA pay certain of CropUSA's corporate expenses and unfairly used AIA's employees, trade secrets and facilities for CropUSA, they concealed these facts from AIA.  AIA suffered damages as a result of these concealments.

211.    When the Controlling AIA Defendants pledged the mortgage obtained by AIA from the state of Idaho to CropUSA so that CropUSA could borrow money to pay the attorney's fees of the Hawley Troxell Defendants to facilitate covering up the AIA Defendants' fraud, they concealed these facts from AIA.  AIA suffered damages as a result of these concealments.

212.    When the Controlling AIA Defendants had AIA Insurance guarantee CropUSA's $15 million line of credit and later sold over $10,000,000 in assets derived from AIA to Hudson Insurance, they concealed the fact of this guarantee and asset sale from AIA.

213.    When the Controlling AIA Defendants finally disclosed their ownership interests in CropUSA, CropUSA Insurance Services, LLC and other entities in AIA Services' financial statements in July 2012[3] (*See* Dkt. 67-38), they continued to conceal how they obtained their ownership interest in those entities (and in the case of CropUSA that the ownership interest came from AIA) and many transactions and purported loans between the entities and AIA (loans and guarantees made by AIA which were prohibited by AIA Services' amended articles of incorporation and restated bylaws).

---

[3] While the financial statements were dated as of year-end 2011, they were not provided to AIA or its shareholders until July 2012 in connection with the failed ill-conceived reverse stock split.

THIRD AMENDED COMPLAINT - 65

214. The Controlling AIA Defendants, CropUSA and GemCap concealed from AIA that they had AIA unlawfully and improperly enter into the Guarantees, Settlement Agreements and related agreements and instruments, together with unlawfully transferring property and making payments under those unlawful agreements and instruments.

215. As a direct and/or proximate cause of the Controlling AIA Defendants' fraudulent acts, AIA has been damaged in an amount to be proven at or before trial, and the ongoing fraud bars the Controlling AIA Defendants from asserting statute of limitations defenses. To the extent that the Hawley Troxell Defendants seek to assert the statute of limitations as a defense, they too are barred from doing so through their fraudulent concealment of facts from AIA.

## X.    COUNT V—AIDING AND ABETTING AND CONSIPIRACY OF FRAUD
**(Against the Controlling AIA Defendants, CropUSA, GemCap and the Hawley Troxell Defendants)**

216. Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

217. During certain relevant times, the Hawley Troxell Defendants, the Controlling AIA Defendants, CropUSA and/or GemCap: (a) had knowledge of the other defendants' acts and/or omissions constituting fraud upon AIA (including fraudulent concealment) as further described in this Third Amended Complaint and/or proven at the time of trial; (b) knew that such acts and/or omissions by other defendants constituted fraud upon AIA; (c) substantially participated in such fraud upon AIA; (d) did not disapprove or seek ratification or disclosure of such fraud upon AIA; (e) took no steps to prevent such fraud upon AIA; and/or (f) assisted in the concealment, and covering up, of such fraud upon AIA.

218. In addition, through various agreements and actions, the Controlling AIA Defendants, CropUSA and/or GemCap: (a) conspired to defraud AIA and were members of the

THIRD AMENDED COMPLAINT - 66

**6-ER-1353**

conspiracy at relevant times; (b) provided a substantial act and/or a substantial effect in furtherance of the conspiracy against AIA in Idaho; (c) are attributable to the acts of one another; and (d) engaged in a pattern of behavior and/or agreements to accomplish unlawful objectives and/or to accomplish a lawful objectives in an unlawful manner.

219.  As a direct and/or proximate cause of the Hawley Troxell Defendants, the Controlling AIA Defendants, CropUSA and/or GemCap's aiding and abetting of one another and/or others in the commission of fraud upon AIA, AIA has been damaged in the amount to be proven at or before trial.

## XI.   COUNT VI—BREACH OF CONTRACT
### (Against the Controlling AIA Defendants)

220.  Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

221.  On August 1, 1995, John and AIA Services entered into an Executive Officer's Agreement. (*See* Dkt. 67-8.) The Executive Officer's Agreement contains contractual provisions preventing John from doing certain acts. For example, Section 9 of the Executive Officer's Agreement sets forth express covenants not to compete. Subsection A of the covenants prohibits John from soliciting AIA customers or otherwise diverting the business of AIA customers. Subsection B prohibits John from participating in any insurance business that underwrites, markets or administers insurance products for commodity associations. Subsection C prohibits John from soliciting AIA Services employees for other employment.  Subsection D of the covenants bars John from divulging or exploiting trade secrets belonging to AIA.

222.  John has breached his contractual obligations owed to AIA, including, without limitation, by forming CropUSA as anything other than a wholly-owned subsidiary of AIA,

THIRD AMENDED COMPLAINT - 67

competing against AIA with CropUSA and other entities (including Pacific Empire Holdings and CropUSA Insurance Services, LLC). John has breached all four subsections of Section 9 of the Executive Officer's Agreement.

223.     As a direct and/or proximate cause of John's breaches of the Executive Officer's Agreement, AIA has been damaged in an amount to be proven at or before trial. Such breaches also constitute the breaches of his fiduciary duties owed to AIA.

224.     Upon information and belief, certain and/or all of the Controlling AIA Defendants entered into agreements with AIA regarding the payment of certain of their attorneys' fees and costs in litigation, which such agreements were never properly presented to or approved by disinterested shareholders. Upon information and belief, such agreements required the Controlling AIA Defendants to pay back the funds advanced for their defense if it was determined that they did not act in good faith or in accordance with other required standards.  Certain and/or all of the Controlling AIA Defendants breached their contracts when they failed to discharge their duties in good faith and failed to comply with all applicable standards. As a direct and/or proximate cause of such breaches, AIA has been damaged and is entitled to be paid back for all attorneys' fees and costs advanced or paid, directly or indirectly, by AIA, plus prejudgment interest.

## XII.     COUNT VII—DECLARATORY JUDGMENT
### (Against the Controlling AIA Defendants, the Hawley Troxell Defendants, CropUSA and GemCap)

225.     Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

226.     Plaintiff seeks a declaratory judgment against Controlling AIA Defendants, Hawley Troxell Defendants, CropUSA, and GemCap, including, without limitation, for the following relief: (a) for a full accounting with supporting documentation of all of AIA's funds, assets, loans

THIRD AMENDED COMPLAINT - 68

**6-ER-1355**

and other transactions from 1999 through the present time; (b) requiring the Controlling AIA Defendants to comply with AIA's amended articles of incorporation, bylaws and the Idaho Business Corporation Act; (c) rescinding the purchases of the shares held by the ESOP and/or ensuring that those shareholders receive fair value for their shares; (d) rescinding and/or declaring void the common shares issued to John through his Executive Officer's Agreement; (e) voiding any purported common interest or joint defense agreements, jurisdiction consent agreements and any other improper agreement pertaining to AIA Services and/or AIA Insurance; (f) declaring illegal, at a minimum as to AIA Services and AIA Insurance, the Guarantees and Settlement Agreements entered into in favor of GemCap; (g) declaring as illegal and/or setting aside any agreements between AIA Services and/or AIA Insurance and CropUSA; (h) setting aside, rescinding and/or voiding any transfers of real property or other purported asset to AIA from John (John executed quitclaim deeds to AIA for certain properties held in the names of others, did not properly value the properties, and required AIA to assume the liabilities for those properties without proper board or shareholder approval); (i) settling aside, voiding or rescinding recent purported amendments to AIA Services and AIA Insurance's bylaws, which were adopted without shareholder approval and for improper purposes (including because John had conflicts of interest); (j) setting aside, voiding and/or rescinding the 7,500 Series A Preferred Shares purportedly issued to John, including, because a proper board never authorized the issuance of those shares, the shares were not issued for legitimate purposes, and the articles of incorporation were not amended to authorize the issuance of any Series A Preferred Shares to anyone other than Donna Taylor; (k) setting aside, rescinding and/or voiding any contracts, agreements, guarantees, financing statements and/or other instruments that were illegal, intra vires, ultra vires (including transfers of real or personal property); (l) setting aside, voiding and/or rescinding the 475,000 common shares

THIRD AMENDED COMPLAINT - 69

purportedly issued to John and/or Connie under John's Executive Officer's Agreement (which he breached countless times) and because he is a faithless fiduciary and is not entitled to any compensation; (m) rescinding the common shares issued originally to Beck, Cashman and the other Series C Preferred Shareholders, which were later transferred to John; (n) for a determination that the Controlling AIA Defendants did not act in good faith and were not entitled to have any attorneys' fees or costs paid or advanced for them by AIA; and (o) such other declaratory relief as may be requested at or before trial (including any declaratory relief related to any other acts and/or omissions described in this Third Amended Complaint or as may be contemplated by any cause of action).

227.    Plaintiff seeks a declaratory judgment against the Hawley Troxell Defendants, including, without limitation, for the following relief: (a) that the representation agreement, fee agreements and any related agreements entered into with them and AIA be declared void (including, without limitation, because such agreements violated the applicable Rules of Professional Conduct); (b) any agreements or accounts regarding any sums owed by AIA, if any, be declared void; and (c) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this Third Amended Complaint).

## XIII.    COUNT VIII—STATUTORY RELIEF (INCLUDING FOR ULTRA VIRES)
### (Against All Defendants)

228.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

229.    Plaintiff seeks all damages, equitable relief, injunctive relief and other relief available against the Defendants under applicable Idaho Code, including, but not limited to I.C. §§

THIRD AMENDED COMPLAINT - 70

6-ER-1357

30-1-304 and 30-29-304: (a) if this Court does not find the Guarantees and/or Settlement Agreements illegal as to AIA Services and AIA Insurance, Plaintiff requests a judgment that the Guarantees and/or Settlement Agreements are ultra vires and this Court should set aside the Guarantees, Settlement Agreements and related instruments (including Financing Statements and deeds) and enjoin AIA Services and AIA Insurance from complying with the Guarantees, Settlement Agreements and related instruments; (b) award damages to AIA Services and AIA Insurance for damages and losses already sustained from the Guarantees and Settlement Agreements (including attorneys' fees and costs); (c) award AIA Services and AIA Insurance anticipated lost profits and other losses, including, the lost profits and damages attributable to the money received by GemCap for the sale of AIA Services' former headquarters in Lewiston, Idaho (approximately $1,000,000) and any other damages and lost profits relating to that property and any other damage claim, and enjoin the transfer of any funds to GemCap; (d) setting aside and/or enjoining any other transfers, payments, obligations, notes, contracts, agreements, guarantees, and instruments (including deeds) which were ultra vires (including the payment of attorneys' fees and costs for any of the defendants); and (e) award all damages and relief (including setting aside any agreements) pertaining to all ultra vires acts involving AIA Services and/or AIA Insurance.

230.    To the extent that there is no cause of action under this Count VIII, then the allegations in this Count VIII are incorporated by reference to support other causes of action and relief in this Third Amended Complaint (including in Count VII and the prayer for relief below).

### XIV.    COUNT IX—CORPORATE WASTE/EXCESSIVE COMPENSATION
### (Against the Controlling AIA Defendants)

231.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

THIRD AMENDED COMPLAINT - 71

232.     The Controlling AIA Defendants have been officers and/or controlled AIA's Boards of Directors from 1995 through certain relevant times.  The Controlling AIA Defendants have lacked independence and have not acted in good faith, including, without limitation, by committing the intentional acts and/or omissions described in this Third Amended Complaint.

233.     The Controlling AIA Defendants' waste and excessive compensation, includes, without limitation: (a) the payment of excessive and unnecessary compensation to officers and employees; (b) the waste of corporate assets during the course of managing and/or operating AIA, including, without limitation, by paying themselves excessive compensation (and practically speaking, any compensation at all based on their acts and omissions) and using millions of dollars of AIA's funds, assets, employees and property for improper and unnecessary purposes; (c) diverting millions of dollars of AIA's assets and funds to benefit CropUSA, themselves, and other entities they partially or wholly own, including Pacific Empire Radio Corp., CropUSA Insurance Services, LLC, and Pacific Empire Holdings Corp. (a/k/a Sound Insurance); (d) destroying AIA's agency force and causing them to transfer to CropUSA and ultimately Hudson Insurance and other entities; (e) diverting CropUSA's business from AIA and running that business improperly by renting needless office space, employing unnecessary persons (including high-paying executives who did nothing for the business), entering into unnecessary high-interest loans, and engaging in other improper and unnecessary transactions (some of which AIA received no consideration); and (f) impairing and destroying AIA's businesses, including CropUSA. In addition, notwithstanding the fact that the Controlling AIA Defendants are not entitled to retain any of their compensation or benefits as a faithless fiduciary, it was separately corporate waste to pay them in the first place as they have done nothing to benefit AIA.

THIRD AMENDED COMPLAINT - 72

**234.** The other transactions and malfeasance described in this Third Amended Complaint also constitute corporate waste, and none of those transactions and malfeasance were properly disclosed to all of AIA Services' shareholders nor was any authorization from them ever sought or obtained.

**235.** The Controlling AIA Defendants are liable to AIA for damages caused by paying excessive compensation and otherwise diverting, wasting and needlessly depleting AIA's funds and assets for their own benefit and with disregard for AIA.

**236.** As a direct and/or proximate cause of the Controlling AIA Defendants' waste and excessive compensation, AIA has been damaged in the amount to be proven at or before trial.

## XV.    COUNT X—VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT
### (Against GemCap)

**237.** Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

**238.** GemCap is defined as a "Person" under I.C. § 48-602(1).  GemCap knowingly had AIA enter into the written Settlement Agreements and related agreements and instruments when the transactions were one-sided in favor of GemCap and the transactions were a pattern of conduct that would outrage and offend the public conscience as provided under I.C. § 48-603C. Such unconscionable conduct includes knowingly and intentionally violating AIA Services' amended articles of incorporation, AIA's bylaws and Idaho Code sections, together with contractual provisions which violate the law and public policy without regard to AIA or their innocent minority shareholders.

**239.** As described in this Third Amended Complaint and/or as proven at or before trial, GemCap engaged in misleading, false and deceptive practices when it entered into and negotiated

THIRD AMENDED COMPLAINT - 73

the one-sided written Settlement Agreement when it knew that AIA Services' shareholders were challenging the Guarantees and they had never been presented with the facts nor were they even asked to authorize the Settlement Agreement and related agreements and instruments, including, without limitation, through illegal provisions in the Settlement Agreement barring AIA from seeking bankruptcy protection and unlawfully requiring legal malpractice claims to be assigned. The Settlement Agreements and the prior Guarantees were all entered into with GemCap.

240.    GemCap's acts and/or practices, as described above and in this Third Amended Complaint and/or as proven at or before trial, are misleading, deceptive, and unconscionable methods, acts and practices in the conduct of trade and commerce in violation of the Idaho Consumer Protection Act, I.C. § 48-602, *et seq*. Based on the ongoing flagrant violations that commenced with the original Guarantee and continued through the unlimited Guarantee and the subsequently written Settlement Agreement, the Guarantees and Settlement Agreements should be voided and GemCap should be ordered to pay punitive damages of three times the damages inflicted upon AIA, which now stand at over $1,000,000 by way of the property transferred via the written Settlement Agreement.

241.    As a direct and/or proximate cause of GemCap's violations of the Idaho Consumer Protection Act, AIA has been damaged in the amount to be proven at or before trial, including for the approximately $1,000,000 in cash proceeds unconscionably obtained by GemCap in 2016 for the sale of AIA Services' former headquarters, and all other damages incurred by AIA, and this Court should award punitive damages for all such damages.

### XVI.    COUNT XI—ACCOUNT STATED
**(Against John)**

242.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause

THIRD AMENDED COMPLAINT - 74

of action.

243. John established an account by borrowing $307,000 from AIA for his personal use. John subsequently confirmed the amount of the debt by "correcting" a purported accounting "error" when he had previously extinguished the $307,000 debt by improperly crediting the payment of Reed Taylor's $6 million promissory note after the issue arose in *Taylor v. AIA Services* so that AIA's books show that AIA is creditor and John is debtor for $307,000, i.e., the correction was only made because Reed Taylor demanded it and he was suing AIA Services for repayment of the $6 million promissory note.

244. Upon information and belief, John has not paid any portion of this debt and the entire balance remains due and payable to AIA. John is liable to AIA for $307,000 on the account stated and/or such other amount as may be presently owed, plus prejudgment interest from the date the obligation was incurred. If John has since paid back the $307,000 or any part of the sums he owes, then Plaintiff still seeks the balance owed and prejudgment interest for the benefit of AIA, including, because John has been a faithless fiduciary who is not entitled to any interest-free loans from AIA.

## XVII.   JURY DEMAND

1. Plaintiff, through the signature of his attorney below, hereby demands a trial by jury of no less than the maximum number of jurors permitted on all causes of action for which a jury trial is allowed by law.

## XVIII.   PRAYER FOR RELIEF

Wherefore, Plaintiff prays for the following relief:

1. For a judgment against the defendants, jointly and severally and/or individually, for all damages in an amount to be proven for each defendant at or before trial, including, without limitation, consequential damages, incidental damages, lost profits, lost business opportunities,

THIRD AMENDED COMPLAINT - 75

unlawful distributions, corporate waste, and all other damages, plus prejudgment interest;

2.      For a judgment or order requiring the Hawley Troxell Defendants for all damages and ordering them to disgorge all attorneys' fees and costs paid to them by AIA Services, AIA Insurance, CropUSA and by any other party on behalf of those entities in the amount to be proven at the time of trial, plus prejudgment interest;

3.      For a judgment or order requiring the Controlling AIA Defendants to disgorge all compensation received from AIA or CropUSA since 1999 for being faithless fiduciaries and breaching their fiduciary duties, including, without limitation, all stock, cash, benefits, and other cash and non-cash compensation, attorneys' fees and costs (i.e., Connie received payments for attorneys' fees and costs from AIA or from CropUSA in violation of her duties to AIA) and that John is owed no compensation by AIA;

4.      For judgment against GemCap, AIA, John and CropUSA declaring that AIA's Guarantees, the Settlement Agreements and all related agreements and instruments illegal, ultra vires, intra vires, void and/or unenforceable and awarding AIA damages;

5.      For judgment against John in the amount to be proven at the time of trial, plus prejudgment interest;

6.      For judgments against the Controlling AIA Defendants, jointly and severally, as the alter-ego of CropUSA and/or to pierce its corporate veil, for all damages incurred by AIA and attributable in whole or in part to CropUSA;

7.      For judgments against any one or more of the defendants and for any and all damages and relief available under Idaho Code (including, without limitation, I.C. §§ 30-29-304, 30-29-833 (and their predecessors), 48-608, and the common law;

THIRD AMENDED COMPLAINT - 76

6-ER-1364

8.     For a preliminary and/or permanent injunction and/or declaratory relief against AIA enjoining them from complying with the unauthorized, improper, intra vires, and ultra vires transactions and agreements relating in any way to AIA, including, without limitation, the Guarantees, Settlement Agreements, and all agreements and instruments related to the foregoing (including from transferring any money or property and from distributing the proceeds of any property or asset sales); to set aside and void such agreements and instruments; and award damages;

9.     For declaratory judgment requiring the reissuance of the common shares in AIA Services to the ESOP participants and voiding and/or rescinding John's alleged purchase of 7,500 Series A Preferred Shares in AIA Services and the 475,000 common shares in AIA Services improperly issued to him under his Executive Officer's Agreement that he violated on countless occasions;

10.     For a declaratory judgment requiring AIA Services to reissue the common shares formerly held by the innocent ESOP participants because the Controlling AIA Defendants' improperly terminated the ESOP;

11.     For an order requiring that all funds recovered as a result of this litigation, minus fees, costs and bona fide debts, be deposited with the Court registry and distributed only after court order, and that no funds recovered from this litigation be paid to, or for the benefit of, the Controlling AIA Defendants;

12.     To the extent that GemCap is deemed to be owed any money as a creditor, for a judgment declaring any such rights or judgments to be inferior to AIA and AIA Services' innocent minority shareholders (including those holding shares through the ESOP and 401(k) Plan), under an equitable subordination theory or such other theory Plaintiff may assert at or before trial;

THIRD AMENDED COMPLAINT - 77

6-ER-1364

13.     For a declaratory judgment for the relief specified in this Third Amended Complaint and any other declaratory relief requested at or before trial, including, without limitation, setting aside obligations, notes, guarantees, settlement agreements, agreements, contracts, transfers of assets, amendments to AIA's bylaws, and repurchase or the issuance of shares;

14.     For an award of the attorneys' fees and costs incurred in this action as allowed by statute, contract, or recognized grounds of equity, including, under I.C. § 12-121; and

15.     For any such further relief or remedy, including preliminary and/or permanent injunctive relief, equitable subordination, or other relief Plaintiff may request and/or as this Court may find just and equitable.

DATED:  This 24th day of April, 2017.

RODERICK BOND LAW OFFICE, PLLC


By:     /s/ Roderick C. Bond
             Roderick C. Bond
             Attorney for Plaintiff

THIRD AMENDED COMPLAINT - 78

**6-ER-1365**

## VERIFICATION OF DALE L. MIESEN

STATE OF TEXAS            )
                          ) ss.
COUNTY OF TARRANT         )

I, Dale L. Miesen, being first duly sworn on oath, depose and say:

I am the Plaintiff in the above-entitled action. I have read the contents of this Third Amended Complaint, know the contents of this Third Amended Complaint, and believe that the facts set forth in this Third Amended Complaint are true and accurate to the best of my knowledge and belief.

_____
Dale L. Miesen

SUBSCRIBED AND SWORN to before me this 24th day of April, 2017.

Teri C Hyman
Notary Public,
State of Texas
Expires: 09/15/2019

_____
Notary Public for Texas
Residing at: 1800 Norwood Hurst, TX 76054
My commission expires: 9-15-19

THIRD AMENDED COMPLAINT - 79

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 24th day of April, 2017, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:   jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:   jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:   lci@elamburke.com, nlp@elamburke.com

Steven P Wieland:  steven.wieland@mwsrose.com, rebekah.tway@mwsrose.com

Alyson Anne Foster:   aaf@aswblaw.com, cme@aswblaw.com, kkp@aswblaw.com, lmk@aswblaw.com, mar@aswblaw.com, tie@aswblaw.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

_/s/ Roderick C. Bond_
Roderick C. Bond

THIRD AMENDED COMPLAINT - 80

**6-ER-1367**

Steve Wieland, ISB No. 8282
Jaren Wieland, ISB No. 8265
MOONEY WIELAND SMITH & ROSE PLLC
405 South 8th Street, Suite 295
Boise, Idaho 83702
p: 208.401.9219
f: 208.401.9218
steven.wieland@mwsrose.com
jaren.wieland@mwsrose.com

*Attorneys for Defendants Connie Taylor Henderson,*
*JoLee Duclos, R. John Taylor, Michael W. Cashman Sr.,*
*James Beck, and Crop USA Insurance Agency, Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| **Dale Miesen**, an individual, a shareholder bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> **Connie Taylor Henderson**, an individual; **et al.**, <br><br> Defendants. | Case No. 1:10-CV-00404-CWD <br><br> **Answer to Third Amended Complaint [Doc. 211]** |

Defendants Connie Taylor Henderson, JoLee Duclos, R. John Taylor, Michael W. Cashman Sr., James Beck (the "**Director Defendants**"), and Crop USA Insurance Agency, Inc. and Crop USA Insurance Services, LLC (collectively "**Crop USA**"), through their undersigned counsel, answer the Third Amended Complaint as follows. The Director Defendants and Crop USA are referred to as "**Defendants**" collectively. All allegations

Answer to Third Amended Complaint [Doc. 211]                    Page 1 of 29

not specifically and expressly admitted are denied. In answering the allegations contained in the Third Amended Complaint, Defendants do not intend to speak for, or to affirm or deny the validity of allegations directed toward the conduct of, any other parties.

## I.   STATEMENT OF JURISDICTION

1.   Defendants admit Paragraph 1.

2.   Regarding Paragraph 2, Defendants admit only that personal jurisdiction exists, but deny the remainder.

## II.   STATEMENT OF VENUE

3.   Regarding Paragraph 3, Defendants admit only that venue is proper, but deny the remainder.

4.   Regarding Paragraph 4, Defendants are without sufficient knowledge to form a belief as to Plaintiff's domicile. Defendants admit that Plaintiff is a common shareholder of AIA Services Corporation ("**AIA Services**"). Defendants deny the remainder.

5.   Paragraph 5 states no allegations requiring a response. To the extent a response is required, Defendants deny.

6.   Defendants admit Paragraph 6.

7.   Defendants admit Paragraph 7.

8.   Paragraph 8 states no allegations requiring a response. To the extent a response is required, Defendants deny.

9.   Defendants admit Paragraph 9.

10.   Defendants admit Paragraph 10.

11.   Paragraph 11 states no allegations requiring a response. To the extent a response is required, Defendants deny.

12.     Regarding Paragraph 12, Defendants admit that R. John Taylor ("**John Taylor**") is a resident of Lewiston; that he serves and previously has served as president and as a director for AIA Services, AIA Insurance, Inc. ("**AIA Insurance**"), and Crop USA; and that he is a common shareholder of AIA Services and Crop USA. Defendants deny the remainder.

13.     Regarding Paragraph 13, Defendants admit that Mr. Beck is a resident of Minnesota; that he has served as a director of AIA Services and AIA Insurance; that he has been a shareholder of AIA Services; and that he has been a common shareholder of Crop USA. Defendants deny the remainder.

14.     Regarding Paragraph 14, Defendants admit that Mr. Cashman is a resident of the state of Minnesota; that he has served as a director of AIA Services; that he has been a shareholder of AIA Services; and that he has been a common shareholder of Crop USA. Defendants deny the remainder.

15.     Regarding Paragraph 15, Defendants admit that Ms. Henderson is a resident of the state of Washington; and that she has served as a director of AIA Services and AIA Insurance. Defendants deny that Ms. Henderson has ever been a shareholder of AIA Services and, further, deny the remainder of Paragraph 15.

16.     Regarding Paragraph 16, Defendants admit that Ms. Duclos is a resident of the state of Idaho; that she has served as secretary of AIA Services, AIA Insurance, and Crop USA; and that she has served as a director of AIA Services, AIA Insurance, and Crop USA. Defendants deny the remainder.

17.     Defendants deny Paragraph 17.

18. Regarding Paragraph 18, Defendants admit that Mr. Babbitt has represented AIA Services and AIA Insurance. Defendants lack sufficient knowledge to form a belief as to the remainder.

19. Regarding Paragraph 19, Defendants admit that Mr. Riley is a resident of the state of Idaho and has represented AIA Services, AIA Insurance, and Crop USA. Defendants lack sufficient knowledge to form a belief as to the remainder.

20. Regarding Paragraph 20, Defendants admit that Mr. Ashby is a resident of the state of Idaho and has represented AIA Services and AIA Insurance. Defendants lack sufficient knowledge to form a belief as to the remainder.

21. Regarding Paragraph 21, Defendants admit that Hawley Troxell Ennis & Hawley LLP is a citizen of the state of Idaho. Defendants lack sufficient knowledge to form a belief as to the remainder.

22. Defendants lack sufficient knowledge to form a belief as to Paragraph 22.

23. Regarding Paragraph 23, Defendants admit that Defendant GemCap Lending I, LLC ("**GemCap**") is a Delaware limited liability company. Defendants lack sufficient knowledge to form a belief as to the remainder.

24. Regarding Paragraph 24, Defendants admit that Donna Taylor is and has been a Series A Preferred Shareholder of AIA Services. Defendants deny the remainder.

### III. FACTS

25. Regarding Paragraph 25, Defendants admit that AIA Services was formed in 1983 and deny the remainder.

26. Regarding Paragraph 26, Defendants admit only that AIA Services had the right to market health insurance to agricultural association members. Defendants deny the remainder.

Answer to Third Amended Complaint [Doc. 211]                    Page 4 of 29

27. Regarding Paragraph 27, Defendants admit that Donna Taylor and Reed Taylor were issued Series A Preferred Shares in AIA Services in 1987 and that Donna Taylor received 200,000 shares in 1988. Defendants deny the remainder.

28. Regarding Paragraph 28, the allegations are too vague for Defendants to form a belief. To the extent a response is required, Defendants admit only that the AIA Services articles of incorporation and amendments speak for themselves and deny the remainder.

29. Regarding Paragraph 29, Defendants admit only that all AIA Services articles of incorporation and amendments thereto speak for themselves and deny the remainder.

30. Defendants deny Paragraph 30.

31. Defendants deny Paragraph 31.

32. Defendants deny Paragraph 32.

33. Regarding Paragraph 33, Defendants admit that Mr. Beck and Mr. Cashman acquired Series C Preferred Shares in AIA Services. Defendants deny the remainder.

34. Regarding Paragraph 34, the allegations are too vague for Defendants to form a belief. To the extent a response is required, Defendants admit only that the AIA Services articles of incorporation and amendments speak for themselves and deny the remainder.

35. Regarding Paragraph 35, Defendants lack sufficient knowledge to form a belief as to the knowledge of the Hawley Troxell Defendants. Defendants admit only that the AIA Services articles of incorporation and amendments speak for themselves and deny the remainder.

36.     Regarding paragraph 36, Defendants admit only that John Taylor was the majority shareholder following the redemption of Reed Taylor's common shares. Defendants admit that Mr. Beck and Cashman attended board and shareholder meetings for AIA services in person and via telephone. Defendants deny the remainder.

37.     Regarding Paragraph 37, Defendants admit only that John Taylor entered into an Executive Officer's Agreement with AIA Services and that the document speaks for itself. Defendants deny the remainder.

38.     Defendants deny Paragraph 38.

39.     Regarding Paragraph 39, Defendants admit only that AIA Insurance became a wholly-owned subsidiary of AIA Services in 1995. Defendants deny the remainder.

40.     Regarding Paragraph 40, Defendants admit only that AIA Insurance has been a wholly-owned subsidiary of AIA Services since 1995.

41.     Regarding Paragraph 41, Defendants lack sufficient knowledge to form a belief.

42.     Regarding Paragraph 42, Defendants admit only that the Director Defendants have served at various times on the board of directors for AIA Services, AIA Insurance, and/or Crop USA, and that John Taylor has served as President of AIA Services and Ms. Duclos has served as Secretary. Defendants deny the remainder.

43.     Regarding Paragraph 43, Defendants admit only that certain of the Director Defendants have served on an advisory board for Crop USA at various times from 1999 to present and that meetings of the advisory board were conducted in person and via telephone in Idaho. Defendants deny the remainder.

44.     Defendants deny Paragraph 44.

45.     Regarding Paragraph 45, Defendants admit the first and second sentence. Regarding the third sentence, Defendants admit only that the AIA Services board of directors discussed selling crop insurance. Defendants deny the remainder.

46.     Defendants deny Paragraph 46.

47.     Regarding Paragraph 47, any minutes from a January 11, 2000, meeting of the shareholders of Crop USA f/k/a AIA Crop Insurance, Inc., speak for themselves. Defendants deny the remainder.

48.     Defendants deny Paragraph 48.

49.     Regarding Paragraph 49, Defendants admit only that AIA Crop Insurance, Inc. changed its name to Crop USA Insurance Agency, Inc. effective November 13, 2000. Defendants deny the remainder.

50.     Defendants deny Paragraph 50.

51.     Regarding Paragraph 51, Defendants lack sufficient knowledge to form a belief as to the second sentence. Defendants deny the remainder.

52.     Regarding Paragraph 52, Defendants admit only that the meeting minutes for the Crop USA shareholder meeting held on January 10, 2001, speak for themselves. Defendants deny the remainder.

53.     Regarding Paragraph 53, Defendants respond only that the meeting minutes for the Crop USA shareholder meeting held on January 10, 2001, speak for themselves. Defendants deny the remainder.

54.     Defendants deny Paragraph 54.

55.     Defendants deny Paragraph 55.

56.     Defendants deny Paragraph 56.

57.     Defendants deny Paragraph 57.

58.     Regarding Paragraph 58, Defendants respond that the January 10, 2001, meeting minutes speak for themselves. Defendants deny the remainder.

59.     Regarding Paragraph 59, Defendants respond that the January 10, 2001, meeting minutes speak for themselves. Defendants deny the remainder.

60.     Defendants deny Paragraph 60.

61.     Regarding Paragraph 61, Defendants admit only that John Taylor and Ms. Henderson purchased a parking lot in or about 2001. Defendants deny the remainder.

62.     Regarding Paragraph 62, Defendants lack sufficient knowledge to form a belief.

63.     Regarding Paragraph 63, Defendants lack sufficient knowledge to form a belief.

64.     Regarding Paragraph 64, Defendants lack sufficient knowledge to form a belief.

65.     Regarding Paragraph 65, Defendants lack sufficient knowledge to form a belief.

66.     Defendants deny Paragraph 66.

67.     Defendants deny Paragraph 67.

68.     Regarding Paragraph 68, Defendants admit only that Mr. Beck, Mr. Cashman, and John Taylor have served on the Crop USA advisory board. Defendants deny the remainder.

69.     Regarding Paragraph 69, Defendants admit only that Crop USA entered into a Memorandum of Understanding in or about 2002 and that such document speaks for itself. Defendants deny the remainder.

70.     Defendants deny Paragraph 70.

71.     Regarding Paragraph 71, Defendants admit only that Crop USA attempted to raise capital via a private placement in or about 2004, and that, upon information and belief, a PPM related to such offering was drafted by certain of the Hawley Troxell Defendants. Defendants deny the remainder.

72.     Defendants deny Paragraph 72.

73.     Defendants deny Paragraph 73.

74.     Defendants deny Paragraph 74.

75.     Regarding Paragraph 75, Defendants admit only that AIA Insurance and/or AIA Services received a payment of $1,510,693.00 from Trustmark and that John Taylor deposited the funds into an account. Defendants deny the remainder.

76.     Defendants deny Paragraph 76.

77.     Defendants deny Paragraph 77.

78.     Regarding Paragraph 78, Defendants admit only that a Consent in Lieu of Meeting, dated August 26, 2004, was created. Defendants deny the remainder.

79.     Defendants deny Paragraph 79.

80.     Defendants deny Paragraph 80.

81.     Defendants deny Paragraph 81.

82.     Regarding Paragraph 82, Defendants admit only that a Consent in Lieu of Meeting, dated August 26, 2004, was created. Defendants deny the remainder.

83.     Regarding Paragraph 83, Defendants lack sufficient knowledge to form a belief.

84.     Regarding Paragraph 84, Defendants lack sufficient knowledge to form a belief.

85. Regarding Paragraph 85, Defendants lack sufficient knowledge to form a belief.

86. Regarding Paragraph 86, Defendants admit only that the February 16, 2005, email speaks for itself. Defendants deny the remainder.

87. Defendants deny Paragraph 87.

88. Defendants deny Paragraph 88.

89. Defendants deny Paragraph 89.

90. Defendants deny Paragraph 90.

91. Defendants deny Paragraph 91.

92. Defendants deny Paragraph 92.

93. Defendants deny Paragraph 93.

94. Regarding Paragraph 94, Defendants admit only that AIA Services acquired an indebtedness for approximately $1.5 million for the amount owed by Washington Bank Properties secured by a mortgage on the real property where AIA Services's principal office was located and that such indebtedness was held in the name of AIA Services. Defendants lack sufficient knowledge to form a belief as to the involvement of the Hawley Troxell Defendants as alleged in Paragraph 94. Defendants deny the remainder.

95. Defendants deny the first sentence of Paragraph 95. Defendants lack sufficient knowledge to form a belief as to the second sentence. Defendants deny the third sentence.

96. With regard to Paragraph 96, Defendants admit that Hawley Troxell drafted an opinion letter regarding a line of credit to Crop USA. Defendants deny the remainder.

Answer to Third Amended Complaint [Doc. 211]                      Page 10 of 29

97.     Defendants deny Paragraph 97.

98.     Regarding Paragraph 98, Defendants lack sufficient knowledge to form a belief as to the first sentence. Defendants deny the remainder.

99.     Regarding Paragraph 99, Defendants admit only that Hawley Troxell represented AIA Services, AIA Insurance and Crop USA in the *Taylor v. AIA Services, et al.* litigation. Defendants lack sufficient knowledge to form a belief as to the remainder.

100.    Regarding Paragraph 100, Defendants lack sufficient knowledge to form a belief.

101.    Defendants deny Paragraph 101.

102.    Regarding Paragraph 102, Defendants admit only that Ms. Henderson and Mr. Beck were appointed to the boards of directors for AIA Services and AIA Insurance and that the boards of directors for AIA Services and AIA Insurance approved the payment of $5,000 per quarter as well as the payment of common stock. Defendants further admit that Mr. Beck and Ms. Henderson attended AIA Services and AIA Insurance board meetings in person or via telephone. Defendants deny the remainder.

103.    Regarding Paragraph 103, Defendants admit only that certain tolling agreements in connection with litigation involving AIA Services and/or AIA Insurance have been entered into. Defendants lack sufficient knowledge to form a belief as to the remainder.

104.    Regarding Paragraph 104, Defendants lack sufficient knowledge to form a belief.

105.    Defendants deny Paragraph 105.

106.    Regarding Paragraph 106, Defendants lack sufficient knowledge to form a belief.

107.    Defendants deny Paragraph 107.

108.    Regarding Paragraph 108, as to the first sentence, Defendants admit only that Reed Taylor refused to accept settlement offers stemming from the *Taylor v. AIA Services, et al.* litigation. Defendants deny the remainder of the first sentence and the remainder of Paragraph 108.

109.    Regarding Paragraph 109, Defendants admit only that, during the *Taylor v. AIA Services, et al.* litigation, Ms. Henderson and Mr. Beck argued that redemption of Reed Taylor's shares was illegal and that declaring such agreement void would benefit AIA Services's minority shareholders. Defendants deny the remainder.

110.    Defendants deny Paragraph 110.

111.    Regarding Paragraph 111, Defendants lack sufficient knowledge to form a belief.

112.    Regarding Paragraph 112, Defendants admit only that AIA Services incurred over $1 million defending unfounded lawsuits pursued by Reed Taylor. Defendants deny the remainder.

113.    Regarding Paragraph 113, Defendants admit only that AIA Services did not report a $6 million gain when purported indebtedness to Reed Taylor was extinguished. Defendants deny that such decision was improper or could possibly create liability for AIA Services or its subsidiaries. Defendants deny the remainder.

114.    Regarding Paragraph 114, Defendants deny that AIA has been decimated because of the acts of the Director Defendants. Defendants lack sufficient knowledge to form a belief as to the remainder.

115.    Defendants deny Paragraph 115.

116.    Regarding Paragraph 116, Defendants admit only that Crop USA sold a book of crop insurance business to Hudson Insurance. Defendants deny the remainder.

117.    Defendants deny Paragraph 117.

118.    Defendants deny Paragraph 118.

119.    Regarding Paragraph 119, Defendants admit only that unfounded litigation brought by Reed Taylor, Donna Taylor, and others has forced AIA Services to spend over $2,000,000 in legal fees.

120.    Defendants deny Paragraph 120.

121.    Regarding Paragraph 121, Defendants admit only that Donna Taylor sued AIA Services in December 2009 and that her efforts to have Mr. Moran placed on the board of directors were thwarted. Defendants deny the remainder.

122.    Regarding Paragraph 122, Defendants lack sufficient knowledge to form a belief.

123.    Regarding Paragraph 123, Defendants admit the first sentence but deny the second sentence.

124.    Defendants deny Paragraph 124.

125.    Regarding Paragraph 125, Defendants admit only that the AIA Services ESOP was terminated in or about March 2012, and that shareholders were compensated $0.03 per common share. Defendants deny the remainder.

126.    Defendants deny Paragraph 126.

127.    Regarding Paragraph 127, Defendants admit only that John Taylor entered into an agreement with Mr. Beck and Mr. Cashman to buy their common shares in AIA Services in or about March 2012. Defendants deny the remainder.

128.    Defendants deny Paragraph 128.

129.     Regarding Paragraph 129, Defendants admit only that some shareholders objected to the proposed reverse stock split. Defendants deny the remainder.

130.     Regarding Paragraph 130, Defendants admit only that the court documents filed in the lawsuit relating to the reverse stock split speak for themselves. Defendants deny the remainder.

131.     Regarding Paragraph 131, Defendants lack sufficient knowledge to form a belief as to the final sentence. Defendants deny the remainder.

132.     Defendants deny Paragraph 132.

133.     Defendants deny Paragraph 133.

134.     Defendants deny Paragraph 134.

135.     Regarding Paragraph 135, Defendants admit only that Crop USA obtained a line of credit with GemCap for up to $10 million between 2011 and 2013. Defendants deny the remainder.

136.     Regarding Paragraph 136, Defendants admit only that AIA Services guaranteed $1,113,930.00 of the GemCap loan to Crop USA and that such guarantee was expanded to include the rest of the line of credit. Defendants deny the remainder.

137.     Regarding Paragraph 137, Defendants lack sufficient knowledge to form a belief.

138.     Regarding Paragraph 138, Defendants lack sufficient knowledge to form a belief as to the first two sentences. Defendants deny the remainder.

139.     Regarding Paragraph 139, Defendants deny the first sentence but lack sufficient knowledge to form a belief as to the second sentence. Defendants deny the remainder.

140.   Regarding Paragraph 140, Defendants admit only that guarantees relating to the GemCap loan were signed by John Taylor as president of AIA Services and AIA Insurance. Defendants deny the remainder.

141.   Regarding Paragraph 141, Defendants admit only that GemCap filed a UCC Financing Statement on or about December 20, 2012, and that such Financing Statement speaks for itself. Defendants deny the remainder.

142.   Defendants deny Paragraph 142.

143.   Regarding Paragraph 143, Defendants admit only that GemCap audited AIA Services. Defendants lack sufficient knowledge to form a belief as to information known by or discovered by GemCap. Defendants deny the remainder.

144.   Regarding Paragraph 144, Defendants admit only that GemCap sent Crop USA and other parties a notice of default dated July 16, 2013 and that GemCap sent Crop USA a notice of default dated July 29, 2013, but that such documents speak for themselves. Defendants deny the remainder.

145.   Defendants deny Paragraph 145.

146.   Regarding Paragraph 146, Defendants admit only that GemCap filed a lawsuit against CropUSA and the loan guarantors and that the court documents associated with such litigation speak for themselves.

147.   Regarding Paragraph 147, Defendants lack sufficient knowledge to form a belief.

148.   Regarding Paragraph 148, Defendants admit that the parties to the GemCap litigation in California entered into a Settlement Agreement, the terms of which are confidential. Defendants deny the remainder.

149.    Regarding Paragraph 149, Defendants respond that the terms of the Settlement Agreement are confidential. Defendants deny the remainder.

150.    Regarding Paragraph 150, Defendants respond that the terms of the Settlement Agreement are confidential. Defendants deny the remainder.

151.    Defendants deny Paragraph 151.

152.    Regarding Paragraph 152, Defendants respond that the AIA Services Consolidated Financial Statement for 2015 speaks for itself. Defendants deny the remainder.

153.    Regarding Paragraph 153, Defendants respond that the AIA Services Consolidated Financial Statement for 2015 speaks for itself. Defendants deny the remainder.

154.    Defendants deny Paragraph 154.

155.    Regarding Paragraph 155, Defendants lack sufficient knowledge to form a belief.

156.    Regarding Paragraph 156, Defendants lack sufficient knowledge to form a belief as to the first sentence. Defendants deny the remainder.

157.    Regarding Paragraph 157, Defendants admit only that John Taylor gratuitously transferred real property to AIA Services with a book value of $820,668, with associated encumbrances of $393,863. Defendants deny the remainder.

158.    Defendants deny Paragraph 158.

159.    Regarding Paragraph 159, Defendants respond that the AIA Services Consolidated Financial Statement for 2015 speaks for itself. Defendants deny the remainder.

160. Regarding Paragraph 160, Defendants admit only that John Taylor purchased 7,500 Series A Preferred Shares in 2016. Defendants deny the remainder.

161. Defendants deny Paragraph 161.

162. Regarding Paragraph 162, Defendants admit only that the AIA Services and AIA Insurance Bylaws have been amended to permit attorney fees in certain intracompany suits, and that such amendments speak for themselves. Defendants deny the remainder.

163. Regarding Paragraph 163, Defendants admit only that Plaintiff's counsel has pursued unsuccessful litigation against AIA Services for which AIA Services has been forced to spend over $400,000 on attorney fees. Defendants deny the remainder.

164. Defendants deny Paragraph 164.

165. Regarding Paragraph 165, Defendants admit only that John Taylor has been CEO, president, and/or director of AIA Services, AIA Insurance, and/or Crop USA, and that John Taylor has been a shareholder of AIA Services.

166. Defendants deny Paragraph 166.

167. Regarding Paragraph 167, Defendants admit only that certain of the Director Defendants have been shareholders of Crop USA and/or officers of AIA Services. Defendants deny the remainder.

168. Defendants deny Paragraph 168.

169. Defendants deny Paragraph 169.

170. Paragraph 170 contains legal conclusions to which no response is necessary. To the extent a response to Paragraph 170 is required, Defendants deny.

171. Regarding Paragraph 171, Defendants admit only that Plaintiff has been a common shareholder of AIA Services. Defendants deny the remainder.

**6-ER-1384**

172.    Regarding Paragraph 172, Defendants admit only that a derivative demand letter dated July 21, 2008, was served upon the boards of directors for AIA Services and AIA Insurance. The remainder of Paragraph 172 contains legal conclusions to which no response is necessary. To the extent a response to Paragraph 172 is required, Defendants deny.

173.    Regarding Paragraph 173, Defendants admit only that the court documents filed in the *Taylor v. AIA Services, et al.* litigation speak for themselves. Defendants deny the remainder.

174.    Regarding Paragraph 174, Defendants admit only that the court documents filed in the *Taylor v. AIA Services, et al.* litigation speak for themselves. Defendants deny the remainder.

175.    Regarding Paragraph 175, Defendants lack sufficient knowledge to form a belief.

176.    Regarding Paragraph 176, Defendants admit only that the court documents filed in the *Taylor v. AIA Services, et al.* litigation speak for themselves. Defendants deny the remainder.

177.    Regarding Paragraph 177, Defendants admit only that Plaintiff's counsel sent an email containing various demands to certain attorneys on or about April 3, 2012, and that such email speaks for itself. Defendants lack sufficient knowledge regarding allegations as to knowledge of Mr. Babbitt and Mr. Ashby. Defendants deny the remainder.

178.    Regarding Paragraph 178, Defendants admit only that the boards of directors of AIA Services and AIA Insurance received documents entitled "Shareholder

Demand" in July 2012, but that such documents speak for themselves. Defendants deny the remainder.

179.    Regarding Paragraph 179, Defendants admit only that the boards of directors of AIA Services and AIA Insurance received a letter from Plaintiff's counsel, dated June 13, 2016, but that such letter speaks for itself. Defendants deny the remainder.

180.    Regarding Paragraph 180, Defendants admit only that the boards of directors of AIA Services and AIA Insurance received a letter from Plaintiff's counsel, dated August 23, 2016, and that the boards of directors responded via letter, but that all such documents speak for themselves. Defendants deny the remainder.

181.    Defendants deny Paragraph 181.

182.    Regarding Paragraph 182, Defendants admit only that over ninety days have elapsed since the receipt of the documents referenced in Paragraphs 177–80, but deny the remainder.

183.    Defendants deny Paragraph 183.

184.    Defendants deny Paragraph 184.

### IV.    COUNT I – BREACH OF FIDUCIARY DUTIES
**(Against John Taylor, Mr. Beck, Mr. Cashman, Ms. Henderson, and Ms. Duclos)**

185.    Paragraph 185 does not contain any allegations that require a response. To the extent a response is required, Defendants deny.

186.    Regarding Paragraph 186, Defendants admit only that the Director Defendants owed fiduciary duties to AIA Services only to the extent required by law in the course of serving as a director and/or officer. Defendants deny the remainder.

187.    Regarding Paragraph 187, Defendants lack sufficient knowledge to form a belief.

188.    Defendants deny Paragraph 188.

Answer to Third Amended Complaint [Doc. 211]                    Page 19 of 29

189.    Regarding Paragraph 189, Defendants lack sufficient knowledge to form a belief.

190.    Defendants deny Paragraph 190.

191.    Defendants deny Paragraph 191.

### V.    COUNT II – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against John Taylor, Mr. Beck, Mr. Cashman, Ms. Henderson, Ms. Duclos, and Crop USA)

192.    Paragraph 192 does not contain any allegations that require a response. To the extent a response is required, Defendants deny.

193.    Defendants deny Paragraph 193.

194.    Defendants deny Paragraph 194.

### VI.    COUNT III – LEGAL MALPRACTICE

195.    Paragraph 195 does not contain any allegations that require a response. To the extent a response is required, Defendants deny.

196.    Defendants admit that the Hawley Troxell Defendants owed duties of care, good faith, and loyalty to AIA Services and AIA Insurance to the extent the Hawley Troxell Defendants were retained as counsel for those entities. Defendants deny the remainder.

197.    Regarding Paragraph 197, Defendants lack sufficient knowledge to form a belief.

198.    Regarding Paragraph 198, Defendants lack sufficient knowledge to form a belief.

199.    Regarding Paragraph 199, Defendants lack sufficient knowledge to form a belief.

## VII.  COUNT IV – FRAUD / FRAUDULENT CONCEALMENT / CONSTRUCTIVE FRAUD
### (Against John Taylor, Mr. Beck, Mr. Cashman, Ms. Henderson, Ms. Duclos, and Crop USA)

200.    Paragraph 200 does not contain any allegations that require a response. To the extent a response is required, Defendants deny.

201.    Defendants deny Paragraph 201.

202.    Defendants deny Paragraph 202.

203.    Paragraph 203 states only legal conclusions wo which no response is required. To the extent a response is required, Defendants deny.

204.    Regarding Paragraph 204, Defendants admit only that the Director Defendants owed fiduciary duties to AIA Services only to the extent required by law in the course of serving as a director and/or officer. The remainder of the allegations state legal conclusions to which no responses are required. To the extent responses are required, Defendants deny the remainder.

205.    Defendants deny Paragraph 205.

206.    Defendants deny Paragraph 206.

207.    Defendants deny Paragraph 207.

208.    Defendants deny Paragraph 208.

209.    Defendants deny Paragraph 209.

210.    Defendants deny Paragraph 210.

211.    Defendants deny Paragraph 211.

212.    Defendants deny Paragraph 212.

213.    Defendants deny Paragraph 213.

214.    Defendants deny Paragraph 214.

215.    Defendants deny Paragraph 215.

Answer to Third Amended Complaint [Doc. 211]                    Page 21 of 29

## VIII.  COUNT V – AIDING AND ABETTING AND CONSPIRACY OF FRAUD
### (Against John Taylor, Mr. Beck, Mr. Cashman, Ms. Henderson, Ms. Duclos, and Crop USA)

216.    Paragraph 216 does not contain any allegations that require a response. To the extent a response is required, Defendants deny.

217.    Regarding Paragraph 217, Defendants lack sufficient knowledge to form a belief as to knowledge of other parties. Defendants deny the remainder.

218.    Defendants deny Paragraph 218.

219.    Defendants deny Paragraph 219.

## IX.   COUNT VI – BREACH OF CONTRACT
### (Against John Taylor, Mr. Beck, Mr. Cashman, Ms. Henderson, and Ms. Duclos)

220.    Paragraph 220 does not contain any allegations that require a response. To the extent a response is required, Defendants deny.

221.    Regarding Paragraph 221, Defendants admit only that John Taylor and AIA Services entered into an Executive Officer's Agreement, but that such document speaks for itself. Defendants deny the remainder.

222.    Defendants deny Paragraph 222.

223.    Defendants deny Paragraph 223.

224.    Defendants deny Paragraph 224.

## X.   COUNT VII - DECLARATORY JUDGMENT
### (Against John Taylor, Mr. Beck, Mr. Cashman, Ms. Henderson, Ms. Duclos, and Crop USA)

225.    Paragraph 225 does not contain any allegations that require a response. To the extent a response is required, Defendants deny.

226.    Paragraph 226 does not any allegations that require a response. To the extent a response is required, Defendants deny.

227.    Paragraph 227 does not any allegations that require a response. To the extent a response is required, Defendants deny.

### XI.    COUNT VIII – STATUTORY RELIEF
**(Against John Taylor, Mr. Beck, Mr. Cashman, Ms. Henderson, Ms. Duclos, and Crop USA)**

228.    Paragraph 228 does not any allegations that require a response. To the extent a response is required, Defendants deny.

229.    Paragraph 229 does not any allegations that require a response. To the extent a response is required, Defendants deny.

230.    Paragraph 230 does not any allegations that require a response. To the extent a response is required, Defendants deny.

### XII.    COUNT IX – CORPORATE WASTE / EXCESSIVE COMPENSATION
**(Against John Taylor, Mr. Beck, Mr. Cashman, Ms. Henderson, and Ms. Duclos)**

231.    Paragraph 231 does not any allegations that require a response. To the extent a response is required, Defendants deny.

232.    Regarding Paragraph 232, Defendants admit only that certain Director Defendants have served as directors and/or officers of AIA Services and AIA Insurance. Defendants deny the remainder.

233.    Defendants deny Paragraph 233.

234.    Defendants deny Paragraph 234.

235.    Defendants deny Paragraph 235.

236.    Defendants deny Paragraph 236.

### XIII.    COUNT X - VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT

237.    Paragraph 237 does not any allegations that require a response. To the extent a response is required, Defendants deny.

**6-ER-1390**

238.    Regarding Paragraph 238, Defendants lack sufficient knowledge to form a belief.

239.    Regarding Paragraph 239, Defendants lack sufficient knowledge to form a belief.

240.    Paragraph 240 states legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge to form a belief.

241.    Regarding Paragraph 241, Defendants lack sufficient knowledge to form a belief.

## XIV.  COUNT XI – ACCOUNT STATED
### (Against John Taylor)

242.    Paragraph 242 does not any allegations that require a response. To the extent a response is required, Defendants deny.

243.    Defendants deny Paragraph 243.

244.    Defendants deny Paragraph 244.

## XV.  JURY DEMAND

This Paragraph does not state any allegations that require a response. To the extent a response is required, Defendants deny.

## XVI.  PLAINTIFF'S PRAYER FOR RELIEF

This Section does not state any allegations that require a response. To the extent a response is required, Defendants deny that Plaintiff is entitled to any of the relief requested.

**6-ER-1391**

## XVII. DEFENSES

Defendants raise the following defenses in response to the allegations set forth in the Third Amended Complaint. These defenses are listed without prejudice to Defendants' rights to identify and raise new defenses as information is uncovered.

1.      **Failure to State a Claim.** Count VIII of the Third Amended Complaint does not state a claim for which relief can be granted because the relevant statute does not create a cause of action. Further, all claims against the Director Defendants for actions not taken in their capacities as fiduciaries of the company are not cognizable as a matter of law.

2.      **Statute of Limitations**.

A.      *Against Directors and Shareholders.* Claims stated in the Third Amended Complaint against the Director Defendants in their capacity as directors, officers, or shareholders occurring more than 3 years prior to the date upon which the claims were filed, are barred by the statutes of limitations, I.C. §§ 5-218, 5-237;

B.      *Against Directors for Unlawful Distributions.* Claims stated in the Third Amended Complaint against the Director Defendants in their capacity as directors relating to unlawful distributions occurring more than 2 years prior to the date upon which the claims were filed, are barred by the statute of limitations, I.C. § 30-29-833 and its predecessors.

C.      *Against Director Defendants for Fraud, Constructive Fraud, and Fraudulent Concealment.* Counts IV and V for fraud and fraud-related claims accruing more than 3 years prior to the date upon which the claims were filed, are barred by the statute of limitations, I.C. § 5-218.

**6-ER-1392**

C.      *Against Director Defendants for Breach of Written Contract.* Count VI for breach of written contract and Count XI for account stated for claims accruing more than 5 years prior to the date upon which the claims were filed, are barred by the applicable statute of limitations, I.C. § 5-216.

D.      *Against Director Defendants for Breach of Oral Contract.* Count VI for breach of oral contract for claims accruing more than 4 years prior to the date upon which the claims were filed, are barred by the applicable statute of limitations, I.C. § 5-217.

E.      *Against Defendants for Statutory Relief.* Count VIII for relief under the Idaho Code for claims accruing more than 3 or 4 years prior to the date upon which the claims were filed, are barred by the applicable statute of limitations, I.C. §§ 5-218 or -224.

F.      *All Claims.* All claims, whether or not described above, are barred by the applicable statute of limitations.

3.      **Business Judgment Rule.** All decisions made by Director Defendants in their capacity as directors, officers, or other fiduciaries, were permitted under the Business Judgment Rule, I.C. §§ 30-29-830, -842, and other applicable law.

4.      **Laches.** Plaintiff was, or with reasonable diligence should have been, aware of transactions occurring prior to his filing claims as to those transactions. Plaintiff gave no indication he would attempt to enforce the rights stated in the Third Amended Complaint and Plaintiff's delay in enforcing his rights has prejudiced Defendants by permitting transactions to continue or to be consummated. Plaintiff's claims are therefore barred by the doctrine of laches.

5.      **Exculpation.** Director Defendants are not liable for breach of any duty to any shareholder or AIA Services or AIA Insurance by reason of the exculpatory clauses in the Amended and Restated Articles of Incorporation of AIA Services, as amended, the New Restated Bylaws of AIA Services Corporation, as amended, the Articles of Incorporation of AIA Insurance, as amended, the Amended and Restated Bylaws of AIA Insurance, as amended, and other applicable governing documents.

6.      **No Actual Injury.** Plaintiff cannot allege any actual injury because, regardless of the actions of Defendants, AIA Services would be insolvent and incapable of redeeming its shares or issuing dividends or other forms of distribution.

7.      **Standing.** Plaintiff lacks standing to pursue any derivative claims against Defendants because AIA Services is insolvent and any recovery would inure to the benefit of the company's creditors. Plaintiff also lacks standing to pursue claims that are direct, rather than derivative, because they are personal to other specific shareholders.

8.      **Real Party in Interest.** Plaintiff is not the real party interest; any claims asserted by Plaintiff belong to the creditors of AIA Services.

9.      **Res Judicata.** Plaintiff's claims have been, or should have been, asserted in other litigation, including without limitation: *Taylor v. Taylor, et al.*, Nez Perce County, Idaho Consolidated Case Nos. CV-08-1150 and CV-13-1075; and *Durant et al. v. GemCap Lending I, LLC, et al.*, Nez Perce County Idaho Case No. CV-14-1444.

10.     **Advice of Advisors.** Plaintiff's claims are barred because Defendants acted in reasonable reliance on the advice of expert advisors, including without limitation legal counsel to Defendants and/or to AIA Services, accounting and auditing professionals, and other professionals within their areas of expertise.

### XVIII. ATTORNEY FEES AGAINST PLAINTIFF

The New Restated Bylaws of AIA Services, as amended effective May 26, 2016, mandate attorney fees against a corporate constituent who alleges direct or derivative claims against another corporate constituent and fails to "obtain a judgment on the merits of a Claim that substantially achieves, in substance and amount, the full remedy sought." Under this provision, the Director Defendants are entitled to an award of their reasonable attorney fees incurred in defending this action because Plaintiff will not prevail on substantially all his claims for relief. Defendants estimate they have incurred attorney fees of $250,000 thus far in defending this action. Defendants request an award of all attorney fees incurred in defending this action when Plaintiff fails to prevail on substantially all his claims for relief.

### XIX.  PRAYER FOR RELIEF

WHEREFORE, Defendants pray for relief as follows:

1.      That Plaintiff's Third Amended Complaint be dismissed with prejudice in its entirety and no relief be granted to Plaintiff;

2.      That Defendants be awarded costs and reasonable attorney fees against Plaintiff pursuant to I.C. §§ 12-120(3), 12-121, and the Bylaws of AIA Services; and

3.      For such other relief as the Court deems just.

Dated May 8, 2017.

MOONEY WIELAND SMITH & ROSE PLLC

/s/ *Steve Wieland*

Steve Wieland, ISB No. 8282
Jaren Wieland, ISB No. 8265
Attorneys for Defendants R. John Taylor,
Michael W. Cashman Sr., James Beck,
Connie Taylor Henderson, JoLee Duclos, and
Crop USA Insurance Agency, Inc.

6-ER-1396

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2017, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

| | |
|---|---|
| **Roderick Cyr Bond**<br>rod@roderickbond.com<br>*Attorney for Plaintiff Dale Miesen* | **Loren C. Ipsen**<br>lci@elamburke.com<br><br>**James D. LaRue**<br>jdl@elamburke.com |
| **Alyson Anne Foster**<br>aaf@aswblaw.com<br>*Attorney for Intervenor GemCap Lending I LLC* | **Jeffrey A. Thomson**<br>jat@elamburke.com<br><br>*Attorneys for Hawley Troxell Defendants* |

I further certify that on such date I served the foregoing on the following non-CM/ECF registered participants by email as follows:

| | |
|---|---|
| **AIA Services Corporation**<br>P.O. Box 538<br>Lewiston, ID  83501<br>johntaylor@greenleafalliance.com | **AIA Insurance, Inc.**<br>P.O. Box 538<br>Lewiston, ID  830501<br>johntaylor@greenleafalliance.com |

/s/ *Steve Wieland*

Steve Wieland, ISB No. 8282
Jaren Wieland, ISB No. 8265

**6-ER-1397**

Steve Wieland, ISB No. 8282
Jaren Wieland, ISB No. 8265
MOONEY WIELAND SMITH & ROSE PLLC
405 South 8th Street, Suite 295
Boise, Idaho 83702
p: 208.401.9219
f: 208.401.9218
steven.wieland@mwsrose.com
jaren.wieland@mwsrose.com

*Attorneys for Defendants Connie Taylor Henderson,*
*JoLee Duclos, R. John Taylor, Michael W. Cashman Sr.,*
*James Beck, and Crop USA Insurance Agency, Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| **Dale Miesen**, an individual bringing suit in the right of AIA Services Corporation,<br><br>     Plaintiff,<br>    vs.<br><br>**AIA Insurance, Inc.**, an Idaho corporation; **AIA Services Corporation**, an Idaho corporation; **Hawley Troxell Ennis & Hawley LLP**, an Idaho limited liability partnership; **Gary D. Babbitt**, an individual; **D. John Ashby**, an individual; **Richard A. Riley**, an individual; **GemCap Lending I, LLC**, a Delaware limited liability company;<br><br>     Defendants,<br>   and<br><br>**Crop USA Insurance Agency, Inc.,** an Idaho corporation; **Connie Taylor Henderson**, an individual; **JoLee Duclos,** an individual; **R. John Taylor,** an individual; **Michael W. Cashman Sr.,** an individual; **James Beck,** an individual,<br><br>     Defendants/Third-Party Plaintiffs,<br>    vs.<br><br> **Reed Taylor**, an individual,<br><br>     Third-Party Defendant. | Case No. 1:10-CV-00404-CWD<br><br>**Third-Party Complaint**<br><br>JURY TRIAL DEMANDED |

Third-Party Complaint                                          Page 1 of 9

**6-ER-1398**

## I.   PRELIMINARY STATEMENT

1.     This is a claim for contribution against Reed Taylor pursuant to Idaho common law and I.C. § 6-801 *et seq.* for liability arising from management of AIA Services Corporation and its wholly-owned subsidiary, AIA Insurance, Inc. (collectively "**AIA**"), while Reed Taylor served as an officer, director, or other fiduciary of AIA.

2.     Defendants/Third-Party Plaintiffs Crop USA Insurance Agency, Inc. ("**Crop USA**"), Connie Henderson, JoLee Duclos, R. John Taylor, Michael Cashman, and James Beck (collectively the "**Defendants/Third-Party Plaintiffs**" or "**Defendants**") seek contribution and indemnity for Reed Taylor's proportionate share of liability for claims arising from Defendants' conduct in operating or conducting business with AIA.

3.     Nothing herein is an admission of wrongdoing by any of the Defendants or of the veracity of any claims or allegations asserted by Plaintiff.

## II.   JURISDICTION

4.     This Court has subject-matter jurisdiction over Ms. Henderson's, Mr. Cashman's, and Mr. Beck's claims under 28 U.S.C. § 1332 because those Defendants/Third-Party Plaintiffs are not citizens of Idaho, Reed Taylor is an Idaho citizen, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

5.     This Court has subject-matter jurisdiction over Defendants/Third-Party Plaintiffs' claims under 28 U.S.C. § 1367(a) because Defendants/Third-Party Plaintiffs' claims are so related to Plaintiff's claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

## III.   VENUE

6.     Venue is proper in this district under the doctrine of ancillary venue.

Third-Party Complaint                                                                                            Page 2 of 9

7.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Third-Party Defendant Reed Taylor resides in the State of Idaho.

8.     Venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district under 28 U.S.C. § 1391(b)(2).

## IV.  PARTIES

9.     John Taylor is an Idaho citizen who has served as an officer and/or director of AIA at various times. John Taylor is currently the president of AIA.

10.    Ms. Duclos is an Idaho citizen who has served as an officer and/or director of AIA at various times.

11.    Ms. Henderson is a Washington citizen who has served as a director of AIA at various times.

12.    Mr. Beck is a Minnesota citizen who served as a director of AIA at various times.

13.    Mr. Cashman is a Minnesota citizen who served as a director of AIA at various times.

14.    Crop USA is an Idaho corporation.

15.    Reed Taylor is an Idaho citizen who has served as an officer and director of AIA, as well as a member of the Crop USA advisory board.

## V.  GENERAL ALLEGATIONS

16.    Except for short intervals, Reed Taylor served as an AIA Services director from founding of the company in or about 1983 until early 2001.

17.    Reed Taylor served as an officer at various times until he redeemed his shares in 1995.

Third-Party Complaint                                                              Page 3 of 9

**6-ER-1400**

18.     Reed Taylor served on a Crop USA advisory board from 1999 to 2007.

19.     Plaintiff alleges the Crop USA advisory board "exercised actual control over Crop USA and AIA."

20.     Plaintiff has asserted various claims for breach of fiduciary duty; aiding and abetting breach of fiduciary duty; fraud; aiding and abetting fraud; and corporate waste against Defendants.

21.     Plaintiff's Third Amended Complaint [Doc. 211] is attached hereto as **Exhibit A**. All allegations contained within Exhibit A are incorporated as if set forth fully herein, without any admission as to their veracity.

22.     Plaintiff's claims include alleged misconduct by AIA's officers and directors from 1995 to present.

### VI.   COUNT 1
#### CONTRIBUTION FOR FIDUCIARY-DUTY CLAIMS
#### (By John Taylor, Ms. Duclos, Mr. Beck, and Mr. Cashman)

23.     Defendants repeat and reallege Paragraphs 1 through 22 as if set forth fully herein.

24.     In Counts I, II, and IX of the Third Amended Complaint, Plaintiff alleges numerous breaches of fiduciary duty on the part of John Taylor, Ms. Duclos, Mr. Beck, and Mr. Cashman (the "**Director Defendants**").

25.     When Reed Taylor served as an officer of AIA, he owed fiduciary duties to AIA pursuant to Idaho law, including the duty of care and the duty of loyalty.

26.     When Reed Taylor served as a director of AIA, he owed fiduciary duties to AIA pursuant to Idaho law, including the duty of care and the duty of loyalty.

**6-ER-1401**

27.     Plaintiff alleges that a Crop USA advisory board "exercised actual control over CropUSA and AIA."

28.     If the Court determines that the Crop USA advisory board members owed fiduciary duties to AIA, then Reed Taylor owed such fiduciary duties during his tenure on the Crop USA advisory board.

29.     During his tenure as an officer, director, and Crop USA advisory board member ("**Corporate Fiduciary**"), Reed Taylor accepted millions of dollars in illegal stock redemption payments from AIA.

30.     By accepting illegal redemption payments and pursuing unfounded litigation against AIA, Reed Taylor and his attorneys caused AIA to incur millions of dollars in legal fees.

31.     Plaintiff alleges that the Director Defendants breached their fiduciary duties by authorizing the illegal redemption deal and defending AIA from Reed Taylor's lawsuits.

32.     Plaintiff alleges that writing off Reed Taylor's unpaid but illegal redemption obligation also created a $6 million dollar gain for AIA that could potentially be taxable.

33.     Reed Taylor caused, participated in, acquiesced in, and ratified his illegal redemption agreement, the illegal redemption payments, the unfounded lawsuits against AIA during his tenure as a Corporate Fiduciary.

34.     During his tenure as a Corporate Fiduciary, Reed Taylor attended director meetings and participated in managing AIA's affairs.

35.     During his tenure as a Corporate Fiduciary, Reed Taylor participated in, acquiesced in, and ratified AIA's plan to pursue a venture to sell crop insurance by partnering with Crop USA.

36.     During his tenure as a Corporate Fiduciary, Reed Taylor assisted AIA in locating and identifying agents, underwriters, and agricultural associations to further the crop-insurance venture with Crop USA.

37.     During his tenure as a Corporate Fiduciary, Reed Taylor participated in, acquiesced in, and ratified the exchange of Mr. Beck's and Mr. Cashman's AIA Services Series C Preferred Shares for stock in Crop USA.

38.     During his tenure as a Corporate Fiduciary, Reed Taylor participated in, acquiesced in, and ratified John Taylor's compensation.

39.     During his tenure as a Corporate Fiduciary, Reed Taylor participated in, acquiesced in, and ratified allocations of expenses and sharing of resources between AIA and Crop USA.

40.     During his tenure as a Corporate Fiduciary, Reed Taylor participated in, acquiesced in, and ratified other transactions that may come to light during discovery for which Defendants/Third-Party Plaintiffs are liable in tort for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and/or fraud.

41.     To the extent Director Defendants are found liable in tort for breaches of their fiduciary duties under Counts I, II, or IX of the Third Amended Complaint for conduct in which Reed Taylor participated, acquiesced, or ratified during his tenure as a Corporate Fiduciary, Reed Taylor is jointly liable for contribution of his proportionate share of the liability.

Third-Party Complaint                                                     Page 6 of 9

### VII.  COUNT 2
### CONTRIBUTION FOR FRAUD CLAIMS
### (All Defendants/Third-Party Plaintiffs)

42.     Defendants/Third-Party Plaintiffs repeat and reallege Paragraphs 1 through 41 as if set forth fully herein.

43.     In Counts IV and V of the Third Amended Complaint, Plaintiff accuses Defendants/Third-Party Plaintiffs of fraud, constructive fraud, and aiding and abetting fraud for failing to disclose numerous transactions to AIA shareholders.

44.     The Third Amended Complaint alleges that "[b]eginning in 1999 and continuing through the time CropUSA ceased operating, CropUSA was funded and operated with assets improperly transferred from AIA."

45.     The Third Amended Complaint alleges that John Taylor renamed AIA Crop Insurance as Crop USA in November 2000 to conceal Crop USA's existence from AIA's shareholders.

46.     The Third Amended Complaint alleges that John Taylor "set forth his plans to exploit the assets of AIA for the benefit of Crop USA" during a January 10, 2001, meeting of the Crop USA board of directors.

47.     While John Taylor was purportedly formulating and pursuing his alleged plan to exploit AIA and conceal that exploitation from AIA's shareholders, Reed Taylor was an AIA Services director and also a member of the Crop USA advisory board.

48.     Reed Taylor failed to advise AIA's shareholders of the alleged activity in Paragraphs 44 through 47 while he owed a fiduciary duty to do so, if the Court determines such activity was indeed illegal.

49.     The Third Amended Complaint alleges that John Taylor illegally transferred $1.5 million from AIA Insurance to Crop USA in 2004.

**6-ER-1404**

50.     The $1.5 million transfer occurred while Reed Taylor was a member of the Crop USA advisory board.

51.     Reed Taylor did not advise AIA's shareholders of the $1.5 million transfer, which failure would be a breach of his duties as an advisory board member if the Court determines fiduciary duties applied to Reed Taylor by virtue of his advisory board membership and that the transfer was illegal.

52.     To the extent Defendants are held liable for fraud, constructive fraud, or aiding and abetting fraud under Counts IV and V of the Third Amended Complaint for misrepresentations or concealments involving Reed Taylor's misrepresentations or concealments, Reed Taylor is liable for contribution for his proportionate share of the liability.

## VIII.  DEMAND FOR JURY TRIAL

53.     Pursuant to Fed. R. Civ. P. 38 and Dist. Idaho Loc. Civ. R. 38.1, Defendants/Third-Party Plaintiffs hereby demand a jury trial on all issues so triable.

## IX.  PRAYER

WHEREFORE, Defendants/Third-Party Plaintiffs respectfully request that the Court enter judgment as follows:

A.     On Counts 1 and 2, awarding damages in favor of Defendants/Third-Party Plaintiffs in the amount of any judgment entered against Defendants/Third-Party Plaintiffs on Plaintiff's claims against Defendants/Third-Party Plaintiffs under Counts I, II, IV, V, and IX of the Third Amended Complaint.

B.     Awarding Defendants/Third-Party Plaintiffs their reasonable costs and expenses.

**6-ER-1405**

C.     Granting such other and further relief as the Court deems just and proper.


Dated May 23, 2017.

MOONEY WIELAND SMITH & ROSE PLLC

/s/ *Steve Wieland*

Steve Wieland, ISB No. 8282
Jaren Wieland, ISB No. 8265
Attorneys for Defendants R. John Taylor,
Michael W. Cashman Sr., James Beck,
Connie Taylor Henderson, JoLee Duclos, and
Crop USA Insurance Agency, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2017, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

| | |
|---|---|
| **Roderick Cyr Bond**<br>rod@roderickbond.com<br>*Attorney for Plaintiff Dale Miesen* | **Loren C. Ipsen**<br>lci@elamburke.com<br><br>**James D. LaRue**<br>jdl@elamburke.com |
| **Alyson Anne Foster**<br>aaf@aswblaw.com<br>*Attorney for Intervenor GemCap Lending I LLC* | **Jeffrey A. Thomson**<br>jat@elamburke.com<br><br>*Attorneys for Hawley Troxell Defendants* |

I further certify that on such date I served the foregoing on the following non-CM/ECF registered participants by email as follows:

| | |
|---|---|
| **AIA Services Corporation**<br>P.O. Box 538<br>Lewiston, ID  83501<br>johntaylor@greenleafalliance.com | **AIA Insurance, Inc.**<br>P.O. Box 538<br>Lewiston, ID  830501<br>johntaylor@greenleafalliance.com |

/s/ *Steve Wieland*

Steve Wieland, ISB No. 8282
Jaren Wieland, ISB No. 8265
Attorney for Defendants R. John Taylor, Michael W. Cashman Sr., James Beck, Connie Taylor Henderson, JoLee Duclos, and Crop USA Insurance Agency, Inc.

**6-ER-1407**

Alyson A. Foster
aaf@aswblaw.com
Idaho Bar No. 9719
ANDERSEN SCHWARTZMAN WOODARD BRAILSFORD PLLC
101 S. Capitol Blvd., Suite 1600
Boise, ID 83702
Telephone: 208.342.4411
Facsimile:  208.342.4455

*Attorneys for GemCap Lending I, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,<br><br>    Plaintiff,<br><br>v.<br><br>CONNIE TAYLOR HENDERSON, an individual, et al.,<br><br>    Defendants. | Case No. 1:10-cv-00404-CWD<br><br>**MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 211)** |

GemCap Lending I, LLC ("GemCap"), through its counsel Andersen Schwartzman

Woodard Brailsford, PLLC, hereby submits this Memorandum in Support of its Motion to

Dismiss the Third Amended Complaint (Dkt. 211).

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS
THIRD AMENDED COMPLAINT (DKT 211) - 1

**6-ER-1408**

## INTRODUCTION

Plaintiff Dale Miesen, derivatively for AIA Services Corporation ("AIA Services") and its subsidiary AIA Insurance Inc. ("AIA Insurance") (together, the "AIA Entities"), first filed this lawsuit in 2010 to seek relief for a multitude of alleged wrongs by R. John Taylor ("Taylor"), the "Hawley Troxell Defendants," and others committed against the AIA Entities. The original complaint (Dkt. 1) challenged Taylor's and other "Controlling Defendants'" engagement in acts of self-dealing, transactions detrimental to the AIA Entities, acts taken without proper authorization and not in the best interests of the AIA Entities, improper diversions of assets and resources to another Taylor-run entity, CropUSA Insurance Agency, Inc. ("CropUSA"), and numerous intentional torts that harmed the AIA Entities and their shareholders. Pertinent to this motion, Plaintiff also complained that the Controlling Defendants had committed the AIA Entities to Guarantees of loans for CropUSA "even though the Guarantees were barred by AIA's articles of incorporation and bylaws." (Dkt. 1 ¶ 4.13.) Thus, since at least 2010, Plaintiff has known or believed that Taylor and other Controlling Defendants misused, mismanaged, and "looted" the AIA Entities, including by committing the AIA Entities to loan Guarantees "barred" by the AIA governance documents.

In this third iteration of the Complaint, Plaintiff contends that Taylor again committed the AIA Entities to Guarantees for loans to CropUSA that were "barred" by the AIA governance documents. Specifically, Plaintiff challenges two Guarantees that the AIA Entities, through Taylor and others, provided as security for over $10 million in loans GemCap extended to CropUSA. As Plaintiff concedes, GemCap obtained written corporate assurances from Taylor and other AIA officers when GemCap provided those loans and obtained those Guarantees. And,

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS
THIRD AMENDED COMPLAINT (DKT 211) - 2

**6-ER-1409**

compliant with Idaho law, GemCap filed a UCC Statement on December 10, 2012, with the Idaho Secretary of State that put the public on notice of the Guarantees.

When CropUSA defaulted on the loans and the AIA Entities did not honor the Guarantees, GemCap filed a lawsuit against Taylor, the AIA Entities, and others to collect the over $10 million owed. *GemCap Lending I, LLC v. CropUSA Insurance Agency, Inc.*, No. CV 13-05504 SJO (MANx). The parties reached a Settlement Agreement on September 15, 2014. (Dkt. 128, Ex. B, sealed per Court Order at Dkt.178).

Since GemCap filed that lawsuit, AIA shareholders have repeatedly brought claims against GemCap, in different courts, based on the Guarantees. Each attempt has been unsuccessful. Now, the shareholders seek again to bring claims and obtain relief from GemCap, even though GemCap was an innocent lender who has now spent many years trying to collect the $10 million it is owed. As demonstrated below, Plaintiff's claims at this point are barred by the applicable statutes of limitations and the Third Amended Complaint must be dismissed as against GemCap.

### FACTUAL ALLEGATIONS[1]

Plaintiff Miesen is a shareholder and brings this derivative action on behalf of the AIA Entities. (¶ 5.) Miesen seeks relief for allegedly wrongful conduct committed by the individuals who allegedly control those entities: R. John Taylor, Connie Taylor Henderson, Jolee K. Duclos, Michael W. Cashman Sr., and James Beck (the "Controlling AIA Defendants"). Generally speaking, Miesen alleges that the Controlling AIA Defendants harmed the AIA Entities, over a period of several years, by improperly using AIA assets for the benefit of entities and persons other than the AIA Entities. For example:

---

[1] "¶" references are to the Third Amended Complaint (Dkt. 211).

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 211) - 3

- From 1999 to 2012, Taylor improperly paid himself millions of dollars from AIA even though he "intentionally and repeatedly violated the non-compete and non-solicitation provisions of his Executive Officer's Agreement." (¶ 38.)

- Taylor wrongfully held himself out as the sole owner/shareholder of AIA's subsidiary CropUSA, used that power to enter CropUSA into transactions or agreements AIA had not authorized, and diverted profits from CropUSA to his own pocket. (¶¶ 45-60.)

- The Controlling Entities transferred AIA assets to CropUSA and operated CropUSA using AIA's funds, assets, and labor, without authorization. (¶¶ 74-81, 87-88.)

- Taylor and/or other Controlling Defendants repeatedly used AIA's funds and resources for non-approved activities that benefitted them but not AIA. (¶¶ 89, 91-98, 115-118, 150-167.)

- The Controlling AIA Defendants retained Hawley Troxell to defend AIA in various lawsuits, despite Hawley Troxell's conflicts of interest, and to AIA's detriment. (¶¶ 99-118.)

- The Controlling AIA Defendants entered unauthorized loan agreement, Guarantee agreements, and a Settlement Agreement with GemCap. (¶¶ 135-156.)

- Taylor transferred real properties and associated debt to AIA. (¶¶ 157-58.)

Miesen also bring claims against a law firm, Hawley Troxell Ennis & Hawley LLP, and various individual attorneys based on their provision of services to AIA and/or CropUSA. (¶¶ 96, 99-122.)

## A.  **Factual Allegations Against GemCap**

With respect to GemCap, the only specific allegations of GemCap's conduct involve the loans GemCap issued to CropUSA, the Guarantees the AIA Entities provided for those loans, and the Settlement Agreement GemCap entered with the AIA Entities after GemCap was forced to sue for default. (¶¶ 133-141.) Specifically, Plaintiff alleges that GemCap made loans (gave lines of credit) of $1,113,930.00 on November 23, 2011, and of $10,000,000.00 on October 1, 2012, to CropUSA (together, the "GemCap Loan"). (¶ 133.) GemCap then entered security

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 211) - 4

agreements with the AIA Entities on November 23, 2011 (for $1,113,930.00) and on October 1, 2012 ($10,000,000.00). (¶ 136.)

Plaintiff alleges that AIA provided GemCap with an Officer's Certificate signed by Taylor as President, Duclos as Secretary, and Aimee M. Gordon as Treasurer, certifying that each of them was "duly elected or appointed and duly qualified and acting as an officer of Corporation" and "shall have the power and authority to bind the Corporation. (¶ 138; Ex. 1, *Declaration of Alyson A. Foster* (Foster Dec.) at Ex. 1 thereto.)[2] The Officer's Certificate appended the AIA Services Certificate of Incorporation, Bylaws, and Consent Resolution of the Board of Directors authorizing the Guarantees. (*Id.*) Likewise, the Consent Resolution of the Directors fully authorized the transaction, and was signed by three directors—Taylor, Connie Taylor, and Beck. (Foster Dec., Ex. 2.)

The Officer's Certificate also stated that "[t]here are no actions, suits or proceedings pending or threatened against of affecting the Corporation . . . ." (Foster Dec., Ex. 1 at 2, ¶ 7.) Plaintiff nonetheless alleges that, at the time GemCap entered these Guarantees, Plaintiff already had brought *this* lawsuit and GemCap knew or should have known of it. (¶ 137.) Plaintiff specifically alleges that, as a result of this lawsuit, GemCap "was aware or should have been aware" that the AIA "board of directors was not fully and properly seated," "that AIA's officers were not properly seated," and "that AIA Services was not conducting the required annual shareholder meetings and was not lawfully complying with fundamental corporate governance procedures." (¶ 137.)

_____

[2] Documents on which a complaint relies may be introduced and considered at the Rule 12 stage without converting the motion to one for summary judgment under Rule 56. *Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1007 (9th Cir. 2015).

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 211) - 5

Plaintiff alleges that GemCap knew or should have known "with the exercise of reasonable diligence" that Taylor e Guarantees were invalid under AIA Services' governing documents provided with the Officer's Certificate. (¶¶ 139-140.) Plaintiff alleges that the Articles of Incorporation and bylaws expressly barred the Guarantees "because, *inter alia*, the GemCap Loan was not for a wholly-owned subsidiary of AIA Services and the Loan implicated conflicts of interest provisions that pertained to the Controlling Defendants." (*Id.*) Plaintiff does not allege which provisions of the Articles of Incorporation and Bylaws contain such proscriptions or how GemCap knew they applied "in the circumstances." (*Id.*)

Plaintiff alleges that GemCap filed a UCC financing statement with the Idaho Secretary of State on December 20, 2012. (¶ 141.) The statement stated that the AIA Entities had pledged "All of each of Debtor's right, title and interest, whether now existing or hereafter acquired, in and to all assets of such Debtor, wherever located, whether tangible or intangible, and the proceeds and products therefor." (*Id.*) Plaintiff alleges that the statement was not properly authorized or disclosed to AIA's shareholders, and that it violated AIA Services' governing documents. (*Id.*)

Finally, Plaintiff alleges that, in the Settlement Agreement, "GemCap required John [Taylor] and/or certain other Controlling AIA Defendants to continue to improperly and unlawfully operate AIA in the manner that AIA had been operated in the past." (¶ 150.) However, a review of the terms of the Settlement Agreement reveal this allegation is false and must be disregarded. (*See* Dkt. 128 Ex. 2, sealed.)[3]

---

[3] The court need not accept as true allegations that contradict facts that may be judicially noticed by the court, *see Mullis v. United States Bankruptcy Court*, 828 F.2d 1385, 1388 (9th Cir.1987), and may consider documents that are referred to in the complaint whose authenticity no party questions, *see Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir.1994). *See Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 211) - 6

B.      **Legal Claims Against GemCap**

The Third Amended Complaint sets forth seven claims, within six counts, against GemCap: aiding and abetting breach of fiduciary duties (Count 2); fraud (Count 4); aiding and abetting fraud (Count 5); conspiracy of fraud (Count 5); declaratory judgment (count 7); statutory relief (Count 8); and the Idaho Consumer Protection Act (Count 10). (Dkt. 211.) On April 21, 2017, the Court dismissed the fraud portion of Count 4 on the ground that the proposed third amended complaint fails to allege either that GemCap either made material misrepresentations to AIA or its shareholders, or that GemCap owed any fiduciary duty to AIA or its shareholders that could support a claim for constructive fraud. (Order at 28, Dkt. 29.) The Court also dismissed Count 5 (conspiracy to commit fraud) on the grounds that, "with regard to GemCap, . . . the proposed third amended complaint fails to sufficiently allege a plan to defraud AIA and its shareholders." (*Id.* at 30.) The remaining claims are stated as follows.

- **Counts 2, 4.** The Aiding and Abetting claims (breaches of fiduciary duty and fraud) allege that GemCap knew of the other defendants' breaches of fiduciary duties or fraud, "substantially participated" in such activities, "did not disapprove or seek ratification or disclosure of such" activities, "took no steps to prevent such" activities, and/or "assisted in the concealment, and covering up, of such" activities. (¶¶ 193, 217.)

- **Count 7**. With respect to GemCap, the Declaratory Judgment claim seeks a judgment that the Guarantees and Settlement Agreement are illegal. (¶ 226(f).) This Count does not set forth a specific cause of action, and simply articulates a request for declaratory relief.

---

In addition, Plaintiff alleges that GemCap wrongfully failed to disclose information to AIA or its shareholders. *See, e.g.* ¶¶ 145 (failed to provide notice of Guarantees and notices of default, 146 (failed to inform AIA shareholders of lawsuit filed against AIA), 148 (concealed the Settlement Agreement from AIA shareholders), 151 ("covered up" transactions). However, the Court already has ruled that GemCap had no fiduciary duty to AIA or its shareholders that arguably would have required such disclosures. *See* Memorandum Decision and Order, 4/21/17, at 29 (Dkt. 210).

- **Count 8**. The claim for Statutory Relief seeks a declaration that the Guarantees, Settlement Agreement, and related agreements are ultra vires and should be set aside under "applicable Idaho Code, including, but not limited to I.C. §§ 30-1-304 and 30-29-304." (¶ 229.)

- **Count 10**. The Idaho Consumer Protection Act alleges that GemCap engaged in misleading, false, deceptive, and unconscionable methods, acts and practices, in violation of the ICPA, when it entered the Guarantees and the Settlement Agreement because those agreements were one-sided, unauthorized by the corporate governing documents, and "knowingly and intentionally violating AIA Services' amended articles of incorporation, AIA's bylaws and Idaho Code sections, together with contractual provisions which violate the law and public policy without regard to AIA or their innocent minority shareholders." (¶¶ 238-40.)

## C.     **Plaintiff's Prior Lawsuits Against GemCap**

Plaintiff has attempted twice before to bring claims against GemCap based on the Guarantees and Settlement Agreement. On July 21, 2014, Miesen filed a complaint in the District Court for the Second Judicial District of the State of Idaho in an action styled *Durant v. GemCap Lending I, LLC*, No. CV14-01444. (*See* Foster Dec., Ex. 3, Verified Complaint for Declaratory Relief and Injunctive Relief.)[4] In that case, Miesen brought direct (non-derivative) claims seeking a declaration—as he does here—that the Guarantees and all related documents were barred by the AIA governing documents and illegal, and that any assets transferred to GemCap should be returned to AIA Services and AIA Insurance. (*Id.* ¶ 37.) On March 30, 2015, the court dismissed the complaint without prejudice because Miesen had failed to bring the claims as derivative claims on behalf of AIA entities. (Foster Dec. Ex. 4.)

On January 8, 2015, another shareholder (represented by Miesen's counsel), Donna J. Taylor, moved to intervene in the Federal California Action for the purpose of challenging the legality of the Guarantees and the Settlement Agreement for the same reasons asserted here. (Foster Dec. Ex. 5.) The district court denied the motion as untimely, as she had known of the

---

[4] The Court may take notice of pleadings in another proceedings. *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866, n.1 (9th Cir. 2004).

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 211) - 8

**6-ER-1415**

lawsuit since at least August 2013 yet waited until four months after the matter had settled before seeking to intervene. (Foster Dec. Ex. 6 at 5.) On February 15, 2017, the U.S. Court of Appeals for the Ninth Circuit upheld this decision. (Foster Dec. Ex. 7.) That court held that "the decision to delay intervention until after the parties had reached a Settlement Agreement 'weigh[s] heavily against intervention.'" (*Id.* at 3.) The court also concluded that it was reasonable for the district court to conclude that prejudice would result if Taylor were permitted to contest the terms of the parties' settlement." (*Id.*)

**ARGUMENT**

**I.      Legal Standards**

In reviewing a Rule 12(b)(6) motion, a court must construe the complaint in the light most favorable to the plaintiff and must accept all well-pleaded factual allegations as true. *See Cahill v. Liberty Mutual Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996). A complaint fails to state a claim for relief under Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure if the factual assertions in the complaint, taken as true, are insufficient for the reviewing court plausibly "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In other words, although the Rules "do[ ] not require detailed factual allegations, . . . [they] demand [ ] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (internal quotation marks omitted). If the facts pleaded are "merely consistent with a defendant's liability," the complaint has not stated a claim for relief that is plausible on its face. *Id.* (internal quotation marks omitted). *See Vanzant v. Wilcox*, No. 1:15-CV-00118-EJL, 2016 WL 81225, at *3 (D. Idaho Jan. 6, 2016)

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 211) - 9

**6-ER-1416**

In considering a motion to dismiss, the Court may take judicial notice "of the records of state agencies and other undisputed matters of public record" without transforming the motions to dismiss into motions for summary judgment. *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866, n.1 (9th Cir. 2004); F.R.E. 201. The Court also may examine documents referred to in the complaint, although not attached thereto, without transforming the motion to dismiss into a motion for summary judgment. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Biondo v. Kootenai Hosp. Dist.*, No. 1:17-CV-00039-BLW, 2017 WL 2198186, at *2 (D. Idaho May 18, 2017).

## II.    All Claims Are Barred by the Statutes of Limitations

The Third Amended Complaint was filed on April 24, 2017. (Dkt. 211.) Under Idaho law, the filing of a complaint commences an action for purposes of the statute of limitations. *English v. Taylor*, 160 Idaho 737, 745, 378 P.3d 1036, 1044 (2016), *reh'g denied* (Sept. 13, 2016) (holding that, "in the context of amended complaints that seek to add new parties to an existing cause of action, it is the filing of the amended complaint itself that commences proceedings against the new parties, *not* the filing of the motion to amend"); I.C. 5-201 ("Civil actions can only be commenced within the periods prescribed in this chapter after the cause of action shall have accrued . . . ."); F.R.C.P. 3 ("A civil action is commenced by filing a complaint with the court."). "[W]hen a cause of action accrues may be a question of fact or law. If no disputed issues of material fact exist, when a cause of action accrues is a question of law for determination by this Court." *C & G., Inc. v. Canyon Hwy. Dist. No. 4,* 139 Idaho 140, 142, 75 P.3d 194, 196 (2003) (citation omitted).

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS
THIRD AMENDED COMPLAINT (DKT 211) - 10

A.     The Claims Accrued When GemCap Entered the Guarantees

Under Idaho law, a claim accrues, for statute of limitations purposes, as soon as one party may sue another. *In re Beach*, 447 B.R. 313, 319 (Bankr. D. Idaho 2011) (citing *Singleton v. Pichon*, 635 P.2d 254, 256 (Idaho 1981)). Here, the claims against GemCap are predicated on GemCap's entry and attempted enforcement of Guarantees it knew had not been authorized by the AIA shareholders. Indeed, the only *specific* factual allegations with respect to GemCap, however, are that GemCap entered Guarantees it knew or should have known violated AIA's governing documents, and then proceeded to attempt to collect under those Guarantees, including by entering the (court-approved) Settlement Agreement. All of this conduct, however, commenced when GemCap entered the Guarantees on November 23, 2011, and October 1, 2012. (¶ 136.) As of those dates, AIA—the real party in interest—was able to bring a claim against GemCap for its alleged aiding and abetting of the Controlling AIA Defendants' wrongful conduct at that time.

Moreover, for those claims for which the discovery rule may delay claim accrual, both AIA and all of its shareholders were put on notice as soon as the Guarantees were entered.[5] AIA,

---

[5] In other jurisdictions, plaintiff shareholders filing derivative actions often argue that, where the discovery rule applies, a claim cannot accrue until they as disinterested parties—and not the interested corporate directors—had knowledge of the wrongdoing. This is the "adverse domination" theory of claim accrual. *Compare F.D.I.C. v. Jackson*, 133 F.3d 694, 699 (9th Cir. 1998) (predicting Arizona law would apply doctrine of adverse domination to toll statute of limitations for actions seeking to hold corporate directors liable for gross negligence) *with USACM Liquidating Trust v. Deloitte & Touche*, 754 F.3d 645, 649 (9th Cir. 2014) (predicting Nevada law would not apply doctrine of adverse domination because Nevada law imputes wrongful actors' conduct to the corporation). No Idaho court has ruled on this doctrine, and it is unclear how an Idaho court would rule in the context of tort claims based on fraudulent and intentional conduct. *See, e.g.*, *Klein v. Capital One Fin. Corp.*, No. 4:10-CV-00629-EJL, 2011 WL 3270438, at *8 (D. Idaho July 29, 2011) (rejecting adverse domination theory for claims brought under the Idaho Uniform Fraudulent Transfers Act). In all events, the result here is the same because the shareholders received notice of the Guarantees, and thus of GemCap's allegedly wrongful conduct, at the same time, or very shortly after, AIA itself did.

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 211) - 11

through its board of directors, had this knowledge because AIA itself entered the agreements and was familiar with its own governing documents. AIA's shareholders, including Plaintiff, were put on notice of the Guarantees because, under Idaho law, all shareholders have the right to access and review corporate accounting records. *See* I.C. § 30-29-1602(2)(b). *Cf. Nancy Lee Mines, Inc. v. Harrison*, 95 Idaho 546, 548, 511 P.2d 828, 830 (1973) (notice of assessments/sale were mailed to shareholders, and also shareholders had the right to examine corporate records). And, in all events, the shareholders were put on notice of the Guarantees when GemCap filed the Financing Statement with the Idaho Secretary of State on December 20, 2012. Under Idaho law, where information is available in public records, that knowledge is imputed for purposes of claim accrual. *Hayden Lake Fire Protection Dist. v. Alcorn*, 141 Idaho 388, 111 P.3d 73 (2005), *overruled on other grounds by Farber v. Idaho State Ins. Fund*, 152 Idaho 495, 272 P.3d 467 (2012). In *Hayden Lake*, insured entities brought a lawsuit against the State Insurance Fund and the state challenging practices related to management of its surplus and dividends and certain real estate investments. The insured entities argued that the discovery rule should apply to breach of contract claims. The Court rejected their argument. The court reasoned that, under the Idaho Public Records Law, "[e]very person has a right to examine and take a copy of any public record of this state and there is a presumption that all public records in Idaho are open at all reasonable times for inspection except as otherwise expressly provided by statute." I.C. § 74-102(1) (then numbered § 9-338). Thus, the plaintiff "cannot claim the benefit of a discovery rule simply because it did not know all of the facts" until after the transactions had occurred because "[t]he information was available since the inception of the leases." *Id.* (citing *Chapin v. Stewart*, 71 Idaho 306, 310, 230 P.2d 998, 1001 (1951)). *Cf. Masters v. Boston Scientific Corp.*, 404 Fed. Appx. 127, 128 (9th Cir. 2010) (under Massachusetts law, discovery rule does not toll statute of

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 211) - 12

**6-ER-1419**

limitations where examination of public records would have revealed the factual basis for the cause of action).

In reaching its decision, the Idaho Supreme Court relied on its early decision in *Chapin v. Stewart*, 71 Idaho 306, 310, 230 P.2d 998, 1001 (1951). In *Chapin*, the Idaho Supreme Court held that, although the appellants did not have actual knowledge of their interest in certain real property, "they had the means of acquiring that knowledge" because the deeds were recorded with the county recorder of Ada County. The court reasoned that, under Idaho law, the general rule "is that the recording of an instrument affecting the title to real property constitutes constructive notice to all parties interested, of the contents, and the estate claimed thereby." *Id.* The court concluded that the appellant's failure to obtain the information could not protect him from the legal imputation of knowledge:

> When one by his own carelessness or negligence fails to acquire knowledge that is within his reach, and such information is upon the proper records which impart constructive notice, the person cannot protect himself behind the plea that he did not know facts of which the law imputes knowledge to him and thus suspend the running of the statute.

71 Idaho at 311, 230 P.2d at 1001.

Here, as in *Chapin* and *Hayden Lake*, Plaintiff had the right to examine the UCC financing statement that GemCap filed with the Idaho Secretary of State. Indeed, the very purpose of these financing statements is to put the public on notice of the lender's interests in collateral. *See In re Robert B. Lee Enterprises, Inc.*, 980 F.2d 606, 609 (9th Cir. 1980) (purpose of filing a financing statement is to give constructive notice to the public of a lender's interests in collateral); *see also In re Hodge Forest Industries, Inc.*, 59 B.R. 801, 803 (Bankr. D. Idaho 1986), 59 B.R. 801, 803 (Bankr. D. Idaho 1986); *In re Fuell*, 2007 WL 4404643, at *4 (Bankr. D. Idaho Dec. 13, 2007). Plaintiff's failure to avail himself of this public record does not toll the

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 211) - 13

statute of limitations, which accrued as soon as AIA (or Plaintiff) could have brought a claim. Thus, at the latest, Plaintiff could have brought a claim on December 20, 2012.[6]

> B.      Aiding and Abetting Fraud (Count 2) Claim Is Barred By a Three-Year Statute of Limitations

Claims seeking relief for fraud must be brought within three (3) years of the date the cause of action accrued. I.C. 5-218(4). A fraud cause of action does not accrue "until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." *Id.* "Discovery" here "means the point in time when the plaintiff had actual or constructive knowledge of the facts constituting the fraud." *Doe v. Boy Scouts of Am.*, 159 Idaho 103, 111, 356 P.3d 1049, 1057 (2015).

As demonstrated above, Plaintiff (both Miesen and AIA) knew or should have known that GemCap (allegedly) aided and abetted the Controlling AIA Defendants' fraud when GemCap entered the Guarantees. At the latest, Plaintiff (Miesen) had constructive knowledge of GemCap's alleged wrongdoing when GemCap filed the UCC Financing Statement on December 20, 2012.[7] Accordingly, all claims against GemCap predicated upon fraud expired at the latest on December 20, 2015. These claims are barred by the statute of limitations and must be dismissed.

---

[6] Indeed, by this point, Plaintiff had been challenging Taylor's alleged malfeasance in this lawsuit for years and already believed that Taylor had wrongfully committed the AIA Entities to Guarantees for loans made to CropUSA. (Dkt. 1 ¶ 4.13.) Plaintiff was thus not an "innocent" shareholder without suspicion of AIA's Board of Directors or motive to review corporate records or research public records.

[7] Certainly, Plaintiff had actual knowledge by August 30, 2013 at the latest. *See GemCap Lending I, LLC v. Crop USA Insurance Agency Inc.*, No. 13-05504 SJO (MANx) (C.D. Cal. Feb. 2, 2015) (Foster Dec. Ex. 6) at 5 (intervening shareholder alleged facts that her counsel, undersigned counsel here, knew of the allegedly illegal Guarantees by August 30, 2013). Thus, Plaintiff's fraud claim against GemCap expired at the latest on August 30, 2016—eight months before this Third Amended Complaint was filed.

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 211) - 14

C.      Aiding and Abetting Breach of Fiduciary Duty (Count 5) Is Barred By a Four-Year Statute of Limitations

Claims for breach of fiduciary duty are governed by Idaho's catchall limitations statute, I.C. § 5-224, and must be brought within four (4) years. *Jones v. Runft, Leroy, Coffin & Matthews, Chartered*, 125 Idaho 607, 614, 873 P.2d 861, 868 (1994). In Idaho, "a claim for breach of fiduciary duty is a negligence action in which the duty to act is created by the relationship between the parties." *Id.* The claim accrues when the first act of negligence occurs. *Id.*

In *Jones v. Runft*, the plaintiff lender alleging that the escrow company improperly disbursed loan proceeds, and sued both the escrow company and the law firm that instructed it to disburse the proceeds. 125 Idaho at 611, 873 P.2d at 865. The Idaho Supreme Court held that Idaho's catchall four-year statute of limitations applied to the claim, and that the "first act of negligence" occurred at or before the disbursement of the loan proceeds.

Here, as in *Jones v. Runft*, the first act of negligence (that implicated GemCap) was the act that caused the alleged damage to AIA: Taylor's commitment of AIA to allegedly illegal Guarantees. Plaintiff alleges that GemCap's acceptance of the Guarantees was wrongful and "aided and abetted" the Controlling AIA Defendants' breach of their fiduciary duties to AIA. Thus, the cause of action based on breach of fiduciary duty accrued at (or before) the Guarantees were executed. Accordingly, claims based on the first guarantee, entered November 23, 2011, expired on November 23, 2015; and claims based on the second guarantee, entered October 1, 2012, expired on October 1, 2016.

D.      Count Eight is Derivative of the Other Claims and Thus Also Is Barred

In Counts Eight, Plaintiff asserts a claim for statutory relief under "applicable Idaho Code," and specifies only I.C. §§ 30-1-304 and 30-29-304. Section 30-1-304 was repealed.

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 211) - 15

Section 30-29-304 provides that a shareholder may proceed against a corporation to enjoin any act of the corporation as invalid because "the corporation lacks or lacked power to act." I.C. § 30-29-304. This statute does not create a cause of action, but rather dictates a mechanism for challenging a corporate act that is otherwise unlawful under the Idaho Code or governing corporate documents—i.e., unlawful under other authority that sets forth or limits the corporation's power. I.C. § 30-29-302-303. Plaintiff's other counts assert such claims. Accordingly, Count Eight appears derivative of the counts addressed above and thus must be dismissed as well.

E.  Idaho Consumer Protection Act (Count 10) Is Barred By a Two-Year Statute of Limitations

Count Ten alleges that GemCap violated the Idaho Consumer Protection Act, I.C. § 48-602 *et seq.*, ("ICPA") by entering into a Settlement Agreement with AIA that was "one-sided in favor of GemCap," that violated AIA governing documents and (unspecified) Idaho Code sections, and "when it knew that AIA Services' shareholders were challenging the Guarantees" at issue in the underlying litigation being settled. (¶¶ 238-240.) Plaintiff also alleges that GemCap violated the ICPA when it entered the Guarantees. (¶ 240.) Plaintiff alleges that this conduct constituted misleading, deceptive, and unconscionable methods, acts and practices in violation of the ICPA. (¶ 240.)

Count Ten should be dismissed because it is barred by the two-year statute of limitations that applies to claims brought under the Idaho Consumer Protection Act: "No private action may be brought under this act more than two (2) years after the cause of action accrues." I.C. § 48-619; *see In re Beach*, 447 B.R. 313, 319 (Bankr. D. Idaho 2011). A cause of action is created by Idaho Code § 48-608(1):

> Any person who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 211) - 16

> employment by another person of a method, act or practice declared unlawful by this chapter, ... may bring an action to recover actual damages or one thousand dollars ($1,000), whichever is greater....

I.C. § 48-608(1).

Analyzing this statute in *In re Beach*, the Idaho Supreme Court held that, under this statute, an "accrued" claim under the ICAPA arises after a person purchases services and thereby suffers an ascertainable loss that results from a practice declared unlawful by the ICPA. *Id.* The Court explicitly rejected the fraud standard for accrual—which incorporates the discovery rule—and held that the cause of action accrues once the transaction is completed. *Id.* (claim that loan document violated the ICPA accrued when the loan document was executed). *Id.* Thus, the ICPA does not contain a discovery rule.

Here, Plaintiff's claims accrued when GemCap entered the Guarantees and the Settlement Agreement. The claim based on the first Guarantee (entered November 23, 2011) expired on November 23, 2013; the claim based on the second Guarantee (entered October 1, 2012) expired on October 1, 2014; and the claim based on the Settlement Agreement (entered September 15, 2014) expired on September 15, 2016. Because the Third Amended Complaint was filed on April 24, 2017, these claims are barred.

### F.   Resultantly, Count Seven Should Be Dismissed

Finally, Count Seven (Declaratory Judgment) does not allege new legal theories of liability, and instead seeks a declaratory judgment for relief based on the other counts. (¶¶ 236-227). Because those counts must be dismissed, Count VII should as well.

### III.   Both Aiding and Abetting Claims Also Must be Dismissed For Failure to State a Claim To the Extent They Rely on Constructive Knowledge

Both Aiding and Abetting claims (Counts 2 and 5) also must be dismissed to the extent they rely on constructive knowledge. In these claims, Plaintiff alleges that GemCap is liable for

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 211) - 17

aiding and abetting the Controlling AIA Defendants' wrongful conduct (fraud and breaches of fiduciary duty) because it knew or *should have known* that such conduct was wrongful. (*E.g.* ¶¶ 137-140). As this Court has held, aiding and abetting claims require actual knowledge of the wrongful conduct at issue. (Order at 30 n.16, Dkt. 210 (a claim for aiding and abetting requires that the wrongdoer "knowingly participated in in the underlying tort")); *cf. Todd v. Sullivan Const. LLC*, 146 Idaho 118, 125, 191 P.3d 196, 203 (2008) ("The law seems to be well settled that, where several people actively participate in any manner in the commission of a tort, not only the actual actor or assailant is liable but all others who aid, abet, counsel or encourage the wrongdoer by words, gestures, looks or signs are equally liable with him to the injured person."). Accordingly, all aiding and abetting claims predicated on constructive knowledge must be dismissed.

**CONCLUSION**

For the foregoing reasons, the Third Amended Complaint against GemCap should be dismissed.

DATED this 26th day of May, 2017.

> **ANDERSEN SCHWARTZMAN WOODARD BRAILSFORD PLLC**
>
> _/s/ *Alyson A. Foster*_
> Alyson A. Foster
> Counsel for GemCap Lending I, LLC

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS
THIRD AMENDED COMPLAINT (DKT 211) - 18

**6-ER-1425**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 26th day of May 2017, I filed the above-referenced document electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| James D LaRue<br><br>jdl@elamburke.com,<br>sd@elamburke.com | Jeffrey A Thomson<br><br>jat@elamburke.com,<br>nlp@elamburke.com | Loren C Ipsen<br><br>lci@elamburke.com,<br>nlp@elamburke.com |
|---|---|---|
| Shawnee S Perdue<br><br>sperdue@wielandperdue.com,<br>admin@wielandperdue.com,<br>tmooney@wielandperdue.com | Steven P Wieland<br><br>swieland@wielandperdue.com,<br>admin@wielandperdue.com,<br>tmooney@wielandperdue.com | Roderick Cyr Bond<br><br>rod@roderickbond.com |

AND I FURTHER CERTIFY that on May 30, 2017, I shall serve the document on the following non-CM/ECF Registered Participants in the manner indicated: Via first class mail, postage prepaid addressed as follows:

| AIA Insurance, Inc.<br><br>PO BOX 538<br>LEWISTON, ID 83501 | AIA Services Corporation<br><br>PO BOX 538<br>LEWISTON, ID 83501 |
|---|---|

/s/ Alyson A. Foster
Alyson A. Foster
Counsel for GemCap Lending I, LLC

MEMORANDUM IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 211) - 19