**Consolidated Case Nos. 25-3552 and 25-3800**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,

**Plaintiff-Appellant**,

v.

R. JOHN TAYLOR, an individual, CONNIE TAYLOR HENDERSON, an individual, JAMES BECK, an individual, MICHAEL W. CASHMAN, SR., an individual, CROP USA INSURANCE AGENCY, INC., an Idaho corporation, CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company, AIA SERVICES CORPORATION, an Idaho corporation, AND AIA INSURANCE, INC., an Idaho corporation,

**Defendants-Appellees**,

and

Reed J. Taylor, an individual,

**Third-Party Defendant-Appellee.**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO,
CHIEF DISTRICT COURT JUDGE DAVID C. NYE, PRESIDING

**APPELLANT'S EXCERPTS OF THE RECORD – VOLUME - 7**

| | |
|---|---|
| Roderick C. Bond | Andrew Schwam |
| Roderick Bond Law Office, PLLC | Andrew Schwam Law Firm |
| 10900 NE 4th St., Suite 2300 | 705 SW Fountain St. |
| Bellevue, WA  98004 | Pullman, WA  99163-2128 |
| Tel: (425) 591-6903 | Tel: (208) 874-3684 |
| Email: rod@roderickbond.com | Email: amschwam@turbonet.com |
| Attorney for Appellant | Attorney for Appellant |

ORIGINAL

TODD M LANDER (BAR NO. 173031)
todd.lander@ffslaw.com
TRACY R. DAUB (BAR NO. 239013)
tracy.daub@ffslaw.com
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1900
Los Angeles, California 90067
Telephone: (310) 255-6100
Facsimile: (310) 255-6200

SANFORD L. MICHELMAN,
(BAR NO. 179702)
(smichelman@mrllp.com)
MONA Z. HANNA (BAR NO. 131439)
(mhanna@mrllp.com)
MICHELMAN & ROBINSON, LLP
15760 Ventura Boulevard, 5th Floor
Encino, CA 91436
Telephone: (818) 783-5530
Facsimile: (818) 783-5507

Attorneys for GEMCAP LENDING I, LLC

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FILED
CLERK, U.S. DISTRICT COURT

JUL 30 2013

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

GEMCAP LENDING I, LLC, a
Delaware limited liability company,

Plaintiff,

vs.

CROP USA INSURANCE AGENCY,
INC., an Idaho corporation; CROPUSA
INSURANCE SERVICES, LLC, an
Idaho limited liability company; CROP
USA, LLC, a limited liability company
of unknown origin; AIA INSURANCE,
INC., an Idaho corporation; AIA
SERVICES CORPORATION, an Idaho
corporation; R. JOHN TAYLOR a/k/a
RAY JOHNSON TAYLOR a/k/a R.
JOHNSON TAYLOR a/k/a
RAYMOND J. TAYLOR, an
individual; REINSURANCE
PARTNERS, LLC, an Idaho limited
liability company; GREEN LEAF
REINSURANCE PARTNERS, LLC, a
Delaware limited liability company;

Case No. CV13-5504 SJO (MANx)

COMPLAINT FOR:
(1) BREACH OF LOAN
    AGREEMENT;
(2) BREACH OF IMPLIED
    COVENANT OF GOOD FAITH
    AND FAIR DEALING;
(3) FRAUD;
(4) MONEY HAD AND
    RECEIVED; AND
(5) BREACH OF CONTRACT;
(6) FRAUD;
(7) CONVERSION;
(8) DECLARATORY RELIEF;
(9) UNFAIR BUSINESS
    PRACTICES

Clerk, US District Court 4612
JUL 30

1999446.1 24093-800

1
COMPLAINT

Exhibit A

WESKAN AGENCY, LLC, a Kansas limited liability company; SOUND INSURANCE AGENCY, an Idaho assumed business name; PACIFIC EMPIRE RADIO CORPORATION, an Idaho corporation; RANDOLPH LAMBERJACK, an individual; JOLEE DUCLOS, an individual; BRYAN FREEMAN, an individual; and HILLCREST AIRCRAFT COMPANY, an Idaho corporation; CGB DIVERSIFIED SERVICES, INC. dba DIVERSIFIED CROP INSURANCE SERVICES, a Louisiana Corporation,

Defendants.

Plaintiff GEMCAP LENDING I, LLC, complains of Defendants 17TH STATE STREET PARTNERS, LLC, CROP USA INSURANCE AGENCY, INC., CROPUSA INSURANCE SERVICES, LLC, AIA INSURANCE, INC., AIA SERVICES CORPORATION, R. JOHN TAYLOR a/k/a RAY JOHNSON TAYLOR a/k/a R. JOHNSON TAYLOR a/k/a Raymond J. Taylor, REINSURANCE PARTNERS, LLC, GREEN LEAF REINSURANCE PARTNERS, LLC, GREEN LEAF RE INSURANCE COMPANY, WESKAN AGENCY, LLC, SOUND INSURANCE AGENCY, PACIFIC EMPIRE RADIO CORPORATION, RANDOLPH LAMBERJACK, JOLEE DUCLOS, BRYAN FREEMAN, HILLCREST AIRCRAFT COMPANY, LINDA JONES, FRANCIS WILSON, and CGB DIVERSIFIED SERVICES, INC. dba DIVERSIFIED CROP INSURANCE SERVICES as follows:

## THE PARTIES

1.     Plaintiff Gemcap Lending I, LLC ("GemCap"), is, and at all times relevant was, a Delaware limited liability company with its principle place of business in Malibu, California.  All members of GemCap are domiciled in California.  GemCap, therefore, is a citizen of California.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

2

COMPLAINT

Exhibit - A

7-ER-1429

2. Defendant R. John Taylor a/k/a Ray Johnson Taylor a/k/a R. Johnson Taylor a/k/a/ Raymond J. Taylor ("Taylor") is an individual domiciled in Idaho. Taylor, therefore, is a citizen of Idaho.

3. Defendant Randolph Lamberjack ("Lamberjack") is an individual domiciled in Indiana. Lamberjack, therefore is a citizen of Indiana.

4. Defendant JoLee Duclos ("Duclos") is an individual domiciled in Washington. Duclos, therefore, is a citizen of Washington.

5. Defendant Bryan Freeman ("Freeman") is an individual domiciled in Idaho. Freeman, therefore, is a citizen of Idaho.

6. Defendant Hillcrest Aircraft Company ("Hillcrest") is an Idaho corporation with its principal place of business in Lewiston, Idaho. Hillcrest, therefore, is a citizen of Idaho and GemCap is informed and believes that it has conducted and is conducting business in the state of California and within this judicial district.

7. Defendants Linda Jones ("Jones") and Francis Wilson ("Wilson") are officers and agents of Hillcrest, and are citizens of Idaho.

8. Defendant Crop USA Insurance Agency, Inc. ("Crop"), is, and at all relevant times was, an Idaho corporation with its principal place of business in Idaho and is, therefore, a citizen of Idaho. GemCap is informed and believes that Crop has done, and is doing, business in the state of California and within this judicial district.

9. Defendant CropUSA Insurance Services, LLC ("Crop Services"), is and at all relevant times was, an Idaho limited liability company. Taylor and Lamberjack are the sole members of Crop Services. Crop Services is, therefore, a citizen of Idaho and Indiana. GemCap is informed and believes that Crop Services has done, and is doing, business in the state of California and within this judicial district. Crop and Crop Services are occasionally referred to collectively as "Crop."

10. Defendant AIA Insurance, Inc. ("AIA Insurance"), is and at all relevant times was, an Idaho corporation with its principal place of business in Idaho and is,

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

3

COMPLAINT

therefore, a citizen of Idaho. GemCap is informed and believes that AIA Insurance has done, and is doing, business in the state of California and within this judicial district.

11. Defendant AIA Services Corporation ("AIA") is the assumed name of AIA Insurance, a citizen of Idaho. AIA is, therefore, a citizen of Idaho. GemCap is informed and believes that AIA has done, and is doing, business in the state of California and within this judicial district.

12. Defendant Reinsurance Partners, LLC ("Reinsurance Partners"), is an Idaho limited liability company. GemCap alleges on information and belief that all members of Reinsurance Partners are domiciled in Idaho and, therefore, Reinsurance Partners is a citizen of Idaho. GemCap is informed and believes that Reinsurance Partners has done, and is doing, business in the state of California and within this judicial district.

13. Defendant Green Leaf Reinsurance Partners, LLC ("Green Leaf"), is a Delaware limited liability company. GemCap alleges on information and belief that all members of Green Leaf are domiciled in Idaho and, therefore, Green Leaf is a citizen of Idaho and Delaware. GemCap is informed and believes that Green Leaf has done, and is doing, business in the state of California and within this judicial district.

14. Defendant Green Leaf Re Insurance Company ("Green Leaf Insurance") is, on information and belief, a corporation domiciled in the state of Idaho. GemCap is informed and believes that Green Leaf Insurance has done, and is doing, business in the state of California and within this judicial district.

15. Defendant Weskan Agency, LLC ("Weskan"), a/k/a 17th State Street Partners, LLC, is a Kansas limited liability company. GemCap alleges on information and belief that all members of Weskan are domiciled in Idaho or Kansas and, therefore, Weskan is a citizen of Idaho and Kansas. GemCap is informed and

1999446.1 24093-800

4

COMPLAINT

Exhibit A

7-ER-1431

believes that Weskan has done, and is doing, business in the state of California and within this judicial district.

16. Defendant Sound Insurance Agency ("Sound") is, on information and believe, a corporation organized and existing under the laws of the state of Idaho, and is owned by Taylor. Sound, therefore, is a citizen of Idaho. GemCap is informed and believes that Sound has done, and is doing, business in the state of California and within this judicial district.

17. Defendant Pacific Empire Radio Corporation ("PERC") is an Idaho corporation with its principal place of business in Idaho and, therefore, is a citizen of Idaho. GemCap is informed and believes that PERC has done, and is doing, business in the state of California and within this judicial district.

18. Defendant CGB Diversified Services, Inc. dba Diversified Crop Insurance Services ("Diversified") is a Louisiana Corporation with its principal place of business on Illinois and, therefore, is a citizen of both states. Diversified is registered to do business in the State of California and has a designated agent for service located in the State of California and within this judicial district. GemCap is informed and believes that Diversified has regularly conducted, and is regularly conducting, business in the State of California and within this judicial district.

19. GemCap is informed and believes, and based thereon alleges, that each of the Defendants named herein was the agent, servant or employee of each of the other Defendants, and was acting within and pursuant to such agency, authority and employment. Each of the Defendants is responsible for the losses, damage, and harm suffered by GemCap alleged herein.

20. GemCap is informed and believes, and based thereon alleges, that each of the Defendants named herein conspired and agreed among themselves to do the acts complained of herein and were, in doing the acts complained of herein, acting pursuant to said conspiracy, and that each Defendant sued herein is jointly and severally responsible and liable to GemCap for the damages alleged herein.

1999446.1 24093-800

5

COMPLAINT

**Exhibit - A**

**7-ER-1432**

## JURISDICTION AND VENUE

21. GemCap is a citizen of Delaware and California. Each of the Defendants is a citizen of Idaho, Kansas, Delaware, Washington, Indiana, Illinois or Louisiana.

22. The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

23. The transaction giving rise to this action was negotiated and consummated in Santa Monica and Malibu, California.

24. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) and (c)(1) because there is complete diversity between plaintiff and defendant, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests or costs.

## GENERAL ALLEGATIONS

### GemCap's Business

25. GemCap is a family-run asset based commercial lender that has established a thriving niche serving small and mid-size businesses in need of funding unavailable from larger and traditional lending institutions. Formed in 2008, GemCap has built a reputation for integrity, diligence, and fair play among borrowers, and has consequently seen dramatic growth in its loan portfolio in the past five years.

26. The basic business blueprint is straightforward. GemCap receives over $1 billion in loan requests annually, many from distressed companies that cannot turn to or rely upon conventional funding. The company then assesses the asset base of each prospective borrower to determine if sufficient tangible and recoverable assets – typically taking the form of equipment, inventory and accounts receivable – exist to secure the requested loan and make GemCap whole in the event of a default. If so, and the borrower otherwise qualifies, appropriate funding and security terms are negotiated.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

6

COMPLAINT

27. Once a loan is approved, GemCap typically funds on a revolving basis subject to a specified limit, a structure under which the borrower must demonstrate that its asset base and liquidity warrant continued lending. More specifically, borrowers must accompany each request for funding with a borrowing base certificate delineating the available inventory, accounts receivable and other loan security, and establishing that the borrower is entitled to receive funding in the requested amount. These certificates are essential for GemCap, given that they are the central instrument in the funding process and are relied upon in making lending decisions. Where GemCap funds a request based on a certificate exaggerating the borrower's attachable asset base and/or otherwise misrepresenting the financial picture such that the borrower is not eligible to receive the funding it has requested, the result is an over-advance – i.e., the borrower has been funded in an amount exceeding its eligibility. GemCap engages in ongoing due diligence concerning certificates and the borrower's representations in them – by, among other things, routinely auditing the borrower's certificates and financial circumstances – in order to avoid over-advances. But some inevitably occur, and GemCap's loan documents invariably require that they be re-paid immediately. Where they are not, GemCap then pursues its rights against the pledged security or, when necessary, initiates litigation. By virtue of the transparency of its business practices, the comprehensiveness of the security it obtains as part of its loan agreements, and its willingness to work with borrowers toward constructive resolutions of disputes, litigation has been rare for GemCap. As explained below, however, it is necessary in this case.

**Crop USA, And The Federal Crop Insurance Program**

28. Crop is a Lewiston, Idaho based managing general insurance agency specializing in crop insurance marketed to established independent insurance agents in twelve western states. Crop insurance in the United States is federally subsidized, and subject to a byzantine regulatory regime regulating premiums and available

1999446.1 24093-800

7

COMPLAINT

**Exhibit A**

**7-ER-1434**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

commissions based on a series of risk factors. The federal Risk Management Agency ("RMA") administers the program as authorized by the Federal Crop Insurance Corporation ("FCIC"), and RMA is responsible for determining premium rates and capping commissions. The Government does not issue insurance itself, which is instead sold and serviced by private insurance companies. But the Government subsidizes a portion of the premium, and a segment of the administrative and operating costs (called "A&O") of the insurers. It likewise reinsurers the carriers by absorbing losses occurring when policy payments exceed collected premiums. The result is a system where the Government partially underwrites a private insurance market, ensuring that farms throughout the country can obtain comprehensive insurance for the crops.

29. Crop is not an insurance company, but acts as a general agent for Diversified concerning the sale of Diversified policies in accordance with the terms of a July 2011 Sales-Agent-Company Agreement between the two companies. That agreement provided for Crop to facilitate the sale of Diversified crop insurance policies, a responsibility it undertook by contracting with other third party insurance agents to solicit and sell the policies to the insureds. Crop was, under the resulting structure, entitled as the general agent to receive commissions on the issued policies, though a percentage of those commissions were ultimately distributed to the selling agents with whom Crop contracted. Thus, Crop's role in the system is to collect premiums and to ensure Crop's agents confirm policyholders make the premium payments from the sale of policies and distribute appropriate commissions to the selling agents, charging a fee for doing so. The transaction of business through Crop serves to pool the premiums of high volumes of independent agents, creating a larger block of policies that increases leverage on the carriers and gives rise to more favorable rates.

30. Taylor, Crop's president and principal, approached GemCap in 2011 seeking funding. He explained the nature of Crop's business, the premiums it held

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

8



COMPLAINT

# Exhibit - A

under management, and why it needed funding. More particularly, he represented in September 2011 to Richard Ellis – GemCap's co-president – and Ramsey Naber – a GemCap employee – that, because of the peculiarities of the crop insurance system, premiums and commissions were paid in intervals over the course of the year and not on an ongoing basis. As a result, Crop's primary source of revenue was paid intermittently, and the business needed loan funds to operate its daily operations during the period between those intermittent payments – in other words, for working capital. GemCap is informed and believes, and on that basis alleges, that Taylor's representations were false. The true facts were that Taylor was overstretched financially and needed money largely to fund several other entities, both related and unrelated to Crop, and to service his personal obligations. These included without limitation Weskan, AIA Insurance, AIA and PERC. Indeed, and as alleged before, GemCap has recently become aware that Taylor and Crop transferred GemCap loan proceeds – advanced under the terms of the loan agreement among the parties and subject to specific use restrictions within those documents – to each and all of these entities for purposes having nothing whatever to do with the crop insurance business that was the pretext Taylor and Crop offered to induce GemCap into agreeing to the loan arrangement. When coupled with Taylor's misappropriation of loan funds to pay purely personal expenses, as alleged below, it's clear that Taylor defrauded GemCap from the outset.

**The Crop USA Loan**

31. GemCap was unaware of Taylor's fraudulent intent in 2011, of course, having instead received representations and assurances that any loan proceeds would be used for permissible purposes related to Crop's business. On the strength of those representations, and independent due diligence, GemCap agreed to provide a revolving loan facility to Crop and Crop Services, with an initial credit limit of $5,000,000. That limit was later increased incrementally – prior to GemCap

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

9

COMPLAINT

**Exhibit A**

**7-ER-1436**

becoming aware of the misrepresentations and breaches of agreement set forth in this Complaint – to the present credit limit of $10,000,000.

**The Loan Agreement**

32. The parties entered into a loan agreement dated November 23, 2011, by and between GemCap, as lender, and Crop and Crop Services, joint and severally, as borrowers. The parties later executed, on February 4, 2013, an Amended and Restated Loan and Security Agreement Amending and Restating the Loan and Security Agreement Originally Dated November 23, 2011, and the original and amended agreements are collectively referred to as the "Loan Agreement". A true and correct copy of the Loan Agreement is attached to this Complaint as Exhibit "1" and is incorporated herein as though set forth in full.

33. The Loan Agreement provides for a revolving credit facility to Crop and Crop Services in the maximum principal amount of $10,000,000.00, and contains several provisions relevant to this Complaint: (1) Section 14.9 provides that the laws of the State of California shall govern the Loan Agreement; (2) Section 2.3 provides that "Borrower shall use the proceeds of the Loans solely for the purposes set forth in Section 1(d) the Loan Agreement Schedule."; (3) Section 11 of the Loan Agreement specifies the events constituting a default, including the specification in Section 11.3 that a default occurs upon "Borrower's failure to perform or observe any covenant, term or condition of this Agreement or in any other Loan Document"; and (4) Section 12.5 of the Loan Agreement provides for attorneys' fees in the event of the Borrower's default as follows: "Borrower shall be liable for all costs, charges, and expenses, including attorney's fees and disbursements, incurred by Lender by reason of the occurrence of any Event of Default or the exercise of Lender's remedies with respect thereto, each of which shall be repayable by Borrower on demand with interest at the Default Interest Rate, and added to the Obligations."

34. The Loan Agreement also provides that, as collateral for the loan, GemCap maintains a first priority security interest in and lien upon "all now owned

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

10

COMPLAINT

**Exhibit "A"**

**7-ER-1437**

and hereafter acquired property and assets of Borrower and the Proceeds and Products thereof." That pledge of security, at Section 5.1 of the Loan Agreement, delineates the full scope of assets and property comprising the collateral and, for purposes of this action, indisputably includes all commissions, premiums and other amounts Crop and Crop Services are paid as part of their insurance business and which they hold for themselves or for distribution to agents or other third parties.

35. To ensure against any uncertainty or ambiguity concerning its right to attach the pledged collateral, GemCap required Crop to notify Diversified , the insurance company issuing the policies Crop managed, of the funding arrangement with GemCap and of GemCap's security interest in all of Crop's property, including commissions. That notice, provided by way of a November 21, 2011 letter that Diversified countersigned, noted that in "connection with the Financing, CropUSA has, among other things, granted GemCap a security interest in and to any and all property of CropUSA, including, without limitation, all payments, proceeds and other sums to which CropUSA is entitled under the Agreement [i.e., the sales agency agreement between Diversified and Crop under which the latter manage policy premiums and commissions derived from policies the former underwrites], such grant of security interest in the payments under the Agreement is referred to herein as the 'Pledge of Commissions.' The letter went on to request that "Diversified acknowledge the Pledge of Commissions and agree that such Pledge of Commissions does not constitute a default by CropUSA under the Agreement, and acknowledge its receipt of the notice directing payments under the Agreement in the attached letter." A true and correct copy of the November 21, 2011 letter is attached to this Complaint as Exhibit "2." There was, in other words, no uncertainty as to the scope of GemCap's security rights or whether those rights impaired any obligations Crop held to Diversified. They did not.

36. GemCap is an express and acknowledged third-party beneficiary to CropUSA's pledge of commissions.

1999446.1 24093-800

11

COMPLAINT



FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

37. To further ensure GemCap's rights to the pledged collateral, Crop irrevocably appointed GemCap as attorney-in-fact. That appointment, at Section 13.3 of the Loan Agreement, provides that, *inter alia*, "as its true and lawful attorney-in-fact, with full irrevocable power and authority in its [Crop] place and stead and in its name or otherwise, from time to time in Lender's [GemCap] discretion, at Borrowers sole [Crop] cost and expense, to take any and all appropriate action . . . which the Lender may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including without limiting the generality of the foregoing . . . after or during the continuation of an Event of Default . . . take or bring, in the name of the Lender or Borrower, all steps, actions suits or proceedings deemed by Lender necessary or desirable to effect collection of or other realization upon the Collateral . . . ." (*Id.*, ¶ 13.3(a)(C)(ii)(D)).

38. In addition, Crop appointed GemCap additional limited powers at its attorney-in-fact, as set forth in the special power of attorney the parties entered into on November 22, 2011 (the "Special POA"). Among other things, the Special POA provides "upon the occurrence of an Event of Default, to file any claims or take any action or institute any proceeding that GemCap may in its good faith sole discretion deem necessary or desirable for the collection of any of the Collateral or otherwise enforce the rights of GemCap with respect to any of the Collateral." (*Id.*, ¶ (c)). A true and correct copy of the Special POA is attached to this Complaint as Exhibit "3" and is incorporated herein as though set forth in full.

**The Loan Agreement Schedule**

39. The Loan Agreement was accompanied by a Loan Schedule, initially executed November 23, 2011 with a later Amended and Restated Loan Agreement Schedule being entered into in conjunction with the Amended and Restated Loan Agreement (the "Schedule"). A true and correct copy of the Loan Agreement Schedule is attached to this Complaint as Exhibit "4" and is incorporated herein as though set forth in full.

1999446.1 24093-800

12

COMPLAINT

40.     The Schedule, at Section 1(c)(v), prescribes the specific manner in which Crop and/or Crop Services could request funding and requires the submission of a borrowing base certificate (the "Borrowing Certificate") substantiating the request and demonstrating Crop's entitlement to the amount:

"(v)     **Borrowing Procedures.** Whenever Borrower desires an Advance, Borrower will notify Lender by delivery of a borrowing certificate certified by a Responsible Officer ("Borrowing Certificate") no later than two (2) Business Days prior to the date of the proposed Advance, setting forth in reasonable detail, as of the date set forth on the Borrowing Certificate, (A) a schedule of Eligible Crop Insurance Contract Receivables setting forth the calculation of the Eligible Crop Insurance Contract Receivables on which such Advance is to be based and a calculation of the Advance requested in connection therewith; and (B) a schedule of the aggregate amount of funds in the Crop account on which such Advance is based, which Borrowing Certificate shall in all respects be subject to the Lender's review and approval."

41.     This requirement stands at the core of the Loan Agreement and Crop and Crop Services' contractual obligations.  Simply put, GemCap loans on the basis of the Borrowing Certificates, and where an inaccurate Borrowing Certificate is submitted it runs the risk of advancing funds that a borrower is not entitled to receive, creating an overadvance.  And where an over-advance occurs, paragraph 1(c)(iv) of the Schedule requires that it be repaid immediately.

42.     Beyond that, the Schedule restricts the permissible use of proceeds to a small set of activities related to the crop insurance business:

(i) payment of funds to Reinsurance Partners, LLC for the purpose of funding its investment in Green Leaf Reinsurance Partners, LLC, (ii) working capital purposes of Weskan Agency, LLC, (iii) payment of the Annual Line Fee (as set forth in Section 3(c) of this Loan Agreement Schedule, (iv) payment of an investment bank fee to GVC Financial Services, LLC, (v) payment of any other out-of-

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800                                      13
                                                    COMPLAINT

**Exhibit - A**

**7-ER-1440**

pocket costs, fees and expenses incurred by Borrower in connection with the Revolving Loans and (vi) working capital purposes of Borrower."[1]

43. The Schedule additionally required, at Section 7(b)(iii), Crop to provide monthly financial statements to GemCap – certified by the Chief Financial Officer – within thirty days after the close of each month. That, coupled with a similar obligation to furnish quarterly financial statements and other books and records on a continuing basis, was intended to allow GemCap to monitor the company's financial progress. As alleged below, Crop and Crop Services have breached all these cited provisions, and have did so repeatedly.[2]

**The Loan Agreement Guarantors**

44. The Loan Agreement, and Crop and Crop Services' obligations under it, is subject to several personal guarantees. To start, Taylor personally guaranteed the loan from GemCap to Crop and Crop Services in a Secured Continuing Guarantee dated November 23, 2011, as Amended and Restated Secured Continuing Guarantee dated February 4, 2013 (the "Taylor Guarantee"). The Taylor Guarantee, a true and correct copy of the Taylor Guarantee is attached to this Complaint as Exhibit "5" and incorporated herein as though set forth in full, provides that:

> "Whether or not suit be instituted, Guarantor agrees to reimburse Lender on demand for all attorneys' fees and all other costs and expenses incurred by Lender in enforcing this Guarantee, or arising out of or relating in any way to this Guarantee, or in enforcing any of the Indebtedness against Borrower, Guarantor, or any other person, or in connection with any property of any kind securing all or any part of the Indebtedness. Without limiting the

---

[1] Green Leaf is a "reinsurance" company that Crop created in 2012 and of which Gemcap was aware. Given that Green Leaf was related to Crop's insurance business, the funding of it was permissible under the Schedule but strictly limited to $125,000 capitalization which was to remain, unspent, in a capital account.

[2] The Loan Agreement package also included a Secured Revolving Note dated November 23, 2011, and Amended and Restated on April 1, 2012, July 18, 2012 and February 4, 2013 (the "Note"). A true and correct copy of the Note is attached as Exhibit "7" to this Complaint.

14

COMPLAINT

**Exhibit A**

**7-ER-1441**

generality of the foregoing, and in addition thereto, Guarantor shall reimburse Lender on demand for all attorneys' fees and costs Lender incurs in any way relating to Guarantor, Borrower or the Indebtedness, in order to: (i) obtain legal advice; (ii) enforce or seek to enforce any of its rights; (iii) commence, intervene in, respond to, or defend any action or proceeding, (iv) file, prosecute or defend any claim or cause of action in any action or proceeding (including without limitation any probate claim, bankruptcy claim, third-party claim, secured creditor claim, reclamation complaint, and complaint for relief from any stay under the Bankruptcy Code (Title 11, United States Code) or otherwise; (v) protect, obtain possession of, sell, lease, dispose of or otherwise enforce any security interest in or lien on any property of any kind securing any or all of the Borrower's or Guarantor's affairs. In the event either Lender or Guarantor files any lawsuit against the other predicated on a breach of this Guarantee, the prevailing party in such action shall be entitled to recover it attorneys' fees and costs of suit from the non-prevailing party."

45. AIA and AIA Insurance likewise entered into a guarantee, this one a Secured Continuing Guarantee in favor of GemCap with respect to the Loan Agreement (the "AIA Guarantee"). The AIA Guarantee rendered AIA and AIA Insurance liable for the joint and several obligations of Crop at the time payment is demanded by GemCap, including any and all attorneys' fees, court costs, and collection charges incurred in endeavoring to collect or enforce any of the AIA Guarantee and any other expense of, for or incidental to collection thereof. A true and correct copy of the AIA Guarantee is attached as Exhibit "6" to this Complaint.

**GemCap Discovers Misleading Erroneous Borrowing Certificates, Resulting Overadvances, And The Rampant And Fraudulent Misuse Of Loan Funds**

46. GemCap, as alleged above, routinely examines borrower asset and inventory bases, and part of its continuing due diligence on all revolving loan facilities. It did so in April of this year retaining a field examiner to audit Crop's collateral's flow, including reviewing documentation Crop provided in its Borrowing Certificates, scheduling its bank accounts and examining other financial data. GemCap was, at the time, sensitive to the potential misuse of loan funds because that Taylor had acknowledged doing just that in 2012. Specifically,

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

15

COMPLAINT

GemCap became aware in September 2012 that Taylor had diverted loan proceeds to PERC the previous month – on August 7, 15 and 31, respectively – in contravention of the use restrictions in the Schedule. GemCap immediately informed Taylor of the discovery and that this use of funds was impermissible and would not be tolerated, at which point Taylor conceded that the transfers constituted an event of default and were prohibited under the Loan Agreement and Schedule. As a consequence, GemCap and Crop/Crop Services entered into an amendment to the Loan Agreement dated October 1, 2012, which required Crop and Crop Services to pay GemCap a $10,000 fee in connection with the admitted misuse of funds.

47.    The April 2013 examination proceeded against that contextual backdrop, and it revealed inaccuracies in Borrowing Certificates Crop had submitted to GemCap – and on which funds were advanced – the seriousness of which far exceeded the misuse of funds uncovered the prior August. In fact, these erroneous Borrowing Certificates resulted in a massive overadvance which has yet to be resolved. Specifically, the field examiner found that while available commissions were capped by the RMA at 62% of the "A&O" expenses – that term is identified at paragraph 26, above – Crop's Borrowing Certificates represented commission payments on the basis of an 80% cap rate. The result was an overadvance of roughly $2 million. Beyond that, the inspector concluded that Crop did not exercise cash dominion over its book, an equally disturbing finding that resulted in an additional and substantial overadvance.

48.    In all, Crop submitted multiple false Borrowing Certificates, some which Taylor signed personally, and all of which contributed to the overadvance, which presently total in excess of $5.7 million (the "Overadvance"). These are funds to which Crop was not entitled under the Loan Agreement, and is a direct result of the inaccurate information and representations in its Borrowing Certificates.



**Exhibit "A"**

**7-ER-1443**

49.     The Overadvance is, as already alleged, due and owing immediately under the terms of the Schedule, and GemCap has repeatedly demanded that immediate repayment.  Those demands have proven to be fool's errands, despite GemCap exercising extraordinary patience with Taylor, Crop and the litany of incestuous entities that improperly received loan funds.  GemCap initially confronted Taylor and Crop with the auditor's findings during a meeting in Lewiston at the end of April.  Taylor did not deny the accuracy of the information, but sought GemCap's indulgence while he purportedly attempted to raise the funds necessary to repay the outstanding amounts.  GemCap was, for its part, mystified as to where all the money went – approximately $12.7 million has been funded to date under the Loan Agreement – and, in a telephone conversation at the end of April, co-founders Richard Ellis and David Ellis asked Taylor how the loan proceeds had been spent.  Taylor responded that he had used the money to "fund our business."

50.     GemCap found that claim difficult to understand, and promptly began inspecting additional material concerning Taylor's and Crop's business, and the use of the loan funds.  What it discovered was breathtaking in its scope.  Taylor has used GemCap's loan funds for a slew of personal expenses and indulgences, none of which relate in any way to Crop's business.  For example, and based on the results of GemCap's preliminary and ongoing investigation, Taylor and Crop – the two are legally indistinguishable at this point – have misappropriated loan funds to: (1) pay Taylor's personal mortgages and other loans; (2) fund PERC, a radio station in which Taylor and defendants Hillcrest and Lamberjack maintain an ownership interest; (3) fund various other businesses that Taylor and other defendants maintain ownership interest in whole or in part, but which have nothing to do with Crop's business; (4) pay other personal expenses of Taylors; and (5) cover legal and other expenses that are either personal to Taylor or were incurred by entities owned by Taylor and other defendants by unrelated to Crop's insurance activities.  These activities are contrary to the terms of the Loan Agreement and the Schedule, and

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

17

COMPLAINT

**Exhibit - A**

**7-ER-1444**

constitute breaches of the Crop and Crop Services' obligations under both documents. More ominously, the recent discovery of Taylor's rampant misuse of the loan proceeds confirms that his representations to GemCap in inducing the loan were knowingly false, and that his intent was to take the proceeds to pay his personal debts and otherwise operate his various other businesses in Idaho having no connection to Crop or Crop Services.

51. GemCap has made repeated demands for payment of the Overadvance, and for all other amounts due under the Loan Agreement. The Defendants have failed and refused to do so, however, despite GemCap's demands and extensive attempts to resolve the issue informally. Facing the Defendants' intransigence and refusal to comply with their contractual obligations, GemCap had no choice but to issue, on July 16, 2013, a Notice of Default under the Loan Agreement and related documents. On July 29, 2013, after Crop failed to cure the defaults, GemCap issued a Notice of Acceleration, exercising its right to demand immediate payment of all outstanding obligation to GemCap. Crop has refused to make the demanded payment. As a result, GemCap is left with no option but to initiate this litigation. A true and correct copy of the July 16, 2013 Notice of Default and the July 29 Notice of Acceleration are attached to this Complaint as Exhibit "8" and Exhibit "9," respectively.

**All Of The Business Entity Defendants Are Alter Egos Of The Individual Defendants**

52. As alleged above, many companies and individuals received proceeds of the GemCap loan to Crop, which was unauthorized by the Loan Agreement. Each of those entities and the individuals who own and/or operate those entities are liable for the damages incurred by Crop.

53. The facts are such that an adherence to the fiction of the separate existence of each of the defendant corporate entities would, under the particular circumstances, sanction a fraud or promote injustice.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

18



COMPLAINT

### Crop USA Insurance Agency, Inc.

54. Crop Agency is owned by Taylor, Crop LLC, Lamberjack, Duclos, and Freeman.

55. Taylor and Duclos are officers of Crop Agency.

56. Crop Agency is not only influenced by Taylor, Crop LLC, Lamberjack, Duclos, and Freeman, but there is such a unity of interest and ownership that the individuality, or separateness, of those individuals and Crop Agency has ceased.

### CropUSA Insurance Services, LLC

57. Taylor and Lamberjack are the sole members of Crop Services.

58. Taylor is the managing member of Crop Services.

59. Crop Services is not only influenced by Taylor and Lamberjack, but there is such a unity of interest and ownership that the individuality, or separateness, of those individuals and Crop Services has ceased.

### Crop USA, LLC

60. On information and belief, GemCap alleges that Taylor is the managing member of Crop LLC.

61. Crop LLC is not only influenced by Taylor, but there is such a unity of interest and ownership that the individuality, or separateness, of those individuals and Crop LLC has ceased.

### 17 State Street Partners, LLC

62. Taylor and his son are the sole members of 17 State.

63. 17 State is not only influenced by Taylor, but there is such a unity of interest and ownership that the individuality, or separateness, of Taylor and 17 State has ceased.

### AIA Services Corporation

64. AIA is owned by Taylor and Duclos, who also serve as officers.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

19

COMPLAINT

Exhibit – A

65. AIA is not only influenced by Taylor and Duclos, but there is such a unity of interest and ownership that the individuality, or separateness, of those individuals and AIA Services has ceased.

**AIA Insurance, Inc.**

66. AIA Insurance is owned by Taylor, Duclos, and Freeman, who also serve as officers.

67. AIA Insurance is not only influenced by Taylor, Duclos, and Freeman, but there is such a unity of interest and ownership that the individuality, or separateness, of those individuals and AIA Insurance has ceased.

**Pacific Empire Radio Corp.**

68. PERC is owned by Taylor, Hillcrest. and Lamberjack.

69. PERC is not only influenced by Taylor, Hillcrest and Lamberjack, but there is such a unity of interest and ownership that the individuality, or separateness, of those individuals and PERC has ceased.

**Weskan Agency, LLC**

70. Taylor and Lamberjack are the sole members of Weskan.

71. Weskan is not only influenced by Taylor and Lamberjack, but there is such a unity of interest and ownership that the individuality, or separateness, of those individuals and Weskan has ceased.

**Sound Insurance Agency**

72. Sound is an assumed business name used by its sole owner, Taylor.

73. Sound is not only influenced by Taylor, but there is such a unity of interest and ownership that the individuality, or separateness, of Taylor and Sound has ceased.

**Green Leaf RE Insurance Partners, LLC**

74. Crop Agency is the managing member of Green Leaf.

75. Green Leaf is not only influenced by Crop Agency and Crop Agency's owners Taylor, Crop LLC, Lamberjack, Duclos, but there is such a unity of interest

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

20

COMPLAINT

**Exhibit - A**

and ownership that the individuality, or separateness, of Crop Agency and its owners and Green Leaf has ceased.

### Green Leaf RE Insurance Company

76.     Taylor sits on the board of directors for Green Leaf Company.

77.     Green Leaf Company is not only influenced by Taylor, but there is such a unity of interest and ownership that the individuality, or separateness, of Taylor and Green Leaf Company has ceased.

### Reinsurance Partners, LLC

78.     Taylor is the sole member of Reinsurance.

79.     Reinsurance is not only influenced by Taylor, but there is such a unity of interest and ownership that the individuality, or separateness, of Taylor and Reinsurance has ceased.

### Hillcrest Aircraft Company

80.     Jones and Wilson are executive officers of Hillcrest.

81.     Hillcrest is not only influenced by Jones and Wilson, but there is such a unity of interest and ownership that the individuality, or separateness, of Jones, Wilson and Hillcrest has ceased.

### FIRST CLAIM FOR RELIEF

**(Breach of Loan Agreement Against All Defendants, Except Diversified)**

82.     GemCap restates and realleges paragraphs 1 through 82 herein.

83.     GemCap entered into the Loan Agreement with Crop (Exhibit 1).

84.     GemCap discharged all of its obligations, or substantially all of its obligations, that the Loan Agreement required of GemCap to do except for those obligations GemCap was excused from having to discharge.

85.     Crop breached the Loan Agreement by, among other things and without limitation:

      a.     Failing to maintain the  amount of certified cash on hand as required by the Loan Agreement and Schedule;

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

21

COMPLAINT

Exhibit A

b.      Failing to provide accurate Borrowing Certificates resulting in the Overadvance of approximately $5,700,000.00;

c.      Using loan proceeds for unauthorized purposes, including funding Taylor's other companies and business interests, including paying down Taylor's personal mortgage; and

d.      Otherwise failing to repay amounts due under the Loan Agreement and the Note, despite demand from GemCap.

86.      As a direct and proximate result of Crop's breach of the Loan Agreement and Schedule, GemCap has incurred not less than $8.7 million in damages and will continue to incur damages in an amount to be proven at trial, in addition to incidental and consequential damages and attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

### (Breach of Implied Covenant of Good Faith and Fair Dealing Against All Defendants, Except Diversified)

87.      GemCap restates and realleges paragraphs 1 through 87 herein.

88.      In every contract or agreement there is an implied promise of good faith and fair dealing.  This means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. Crop violated the duty to act fairly and in good faith.

89.      All conditions required for Crop's performance of the Loan Agreement have occurred.

90.      Crop unfairly interfered with GemCap's right to receive the benefits of the Loan Agreement and Schedule by breaching the terms of the Loan Agreement as alleged above, such that the Overadvance has occurred.

91.      GemCap was harmed by Crop's conduct and has incurred and will continue to incur damages in an amount to be proven at trial, but at least $9.6 million, in addition to attorneys' fees and costs.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

22

COMPLAINT

## THIRD CLAIM FOR RELIEF

### (Fraud Against All Defendants, Except Diversified)

92.     GemCap restates and realleges paragraphs 1 through 96 herein.

93.     Crop and Taylor represented to GemCap, both in negotiating the Loan Agreement and in subsequent Borrowing Certificates, that all of GemCap's requirements to lend had been met.  Specifically, Taylor represented to Richard Ellis and Ramsey Naber of GemCap, in September 2011, that Crop needed the prospective funds, and would use those funds, as working capital for Crop's insurance business.

94.     Those representations were false, however.  The true facts were that Taylor was overstretched financially and needed money largely to fund several other entities, both related and unrelated to Crop, and to service his personal obligations.  These included without limitation Weskan, AIA Insurance, AIA  and PERC.  Indeed, and as alleged before, GemCap has recently become aware that Taylor and Crop transferred GemCap loan proceeds – advanced under the terms of the loan agreement among the parties and subject to specific use restrictions within those documents – to each and all of these entities for purposes having nothing whatever to do with the crop insurance business that was the pretext Taylor and Crop offered to induce GemCap into agreeing to the loan arrangement.

95.     Crop and Taylor knew those representations to GemCap were false, and nevertheless made them for the purpose of inducing GemCap to keep lending Crop funds.  It worked.  GemCap relied upon the statements and the contents of financial documents and Borrowing Certificates provided by Crop and Taylor to determine whether or not to loan Crop addition money.

96.     As a direct and proximate result of Crop's and Taylor's fraudulent actions, GemCap was damaged in that it advanced funds to Crop and Taylor in an amount of approximately $12,700,000.00, and otherwise funded under the Loan Agreement despite the fact that defendants were ineligible to receive further

1999446.1 24093-800

23

COMPLAINT



advances. Had GemCap known the true facts at the time of the misrepresentations alleged above, it would not have entered into the Loan Agreement, nor would it have funded any amounts to the Defendants.

97. As a direct and proximate result of Crop's and Taylor's fraudulent actions, GemCap has suffered general damages in an amount to be proven at trial, but not less than $8,700,000.

98. In performing the acts alleged herein, Crop and Taylor acted fraudulently, despicably and in willful and conscious disregard of GemCap's rights, thereby justifying an award of punitive and exemplary damages against Crop and Taylor.

## FOURTH CLAIM FOR RELIEF

### (Money Had And Received Against All Defendants, Except Diversified)

99. GemCap restates and realleges paragraphs 1 through 103 herein.

100. GemCap has overadvanced the defendants, and each of them, not less than $8,700,000.00 as a result of the defendants' actions and misrepresentations.

101. Defendants, and each of them, are therefore indebted to GemCap in the sum of not less than $8,700,000.00 for money had and received by each of the defendants for the use of GemCap.

## FIFTH CLAIM FOR RELIEF

### (Breach of Contract Against Diversified)

102. GemCap restates and realleges paragraphs 1 through 103 herein.

103. GemCap entered into the Loan Agreement with Crop (Exhibit 1).

104. As a condition precedent to the loan, Crop notified Diversified that it pledged as security to GemCap all payments and proceeds payable to Crop by Diversified and directed Diversified to pay or deposit such monies into a specified bank account.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

24

COMPLAINT

105.  Diversified countersigned Crop's notice to Diversified, agreeing to be bound by its terms, including depositing said monies into the specified account, constituting a valid and binding contract (the "Payments Contract").

106.  Crop discharged all of its obligations, or substantially all of its obligations, in connection with the agreement between Crop and Diversified underlying the Payments Contract, except for those obligations that Crop was excused from having to discharge.

107.  Diversified breached the Payments Contract by refusing to direct payments owed to Crop to the specified bank account.

108.  As a direct and proximate result of Diversfied's breach of the Payments Contract, GemCap has incurred damages and will continue to incur damages in an amount to be proven at trial, but in excess of the jurisdictional minimum.

109.  GemCap was an express and acknowledged third-party beneficiary to the Payments Contract, according GemCap the power and authority to enforce the Payments Contract.  GemCap also has the power and authority to enforce the Payments Contract as Crop's general and special attorney-in-fact because that contract directly relates to and involves the collateral for the Loan Agreement and there has been a event of default.

## SIXTH  CLAIM FOR RELIEF

### (Fraud Against Diversified)

110.  GemCap restates and realleges paragraphs 1 through 111 herein.

111.  By acknowledging, agreeing to, and countersigning Crop's notice to Diversified regarding Crop's pledge as security to GemCap all payments and proceeds payable to Crop by Diversified and agreeing to direct such payments and/or proceeds into a specified bank account, which notice expressly referred to GemCap and which countersigned notice Diversified knew would be presented to GemCap, Diversified represented to GemCap that it would direct the specified payments and/or proceeds to the specified account.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

25

COMPLAINT

Exhibit - A

7-ER-1452

112.    Those representations were false, however.  The true facts were that Diversified would circumvent Crop by making payments and/or proceeds owed to Crop directly to Crop's subagents, rather than to the specified account.  Indeed, that is precisely what Diversified has done and continues to do.

113.    Diversified knew its representations to GemCap were false, and nevertheless made them for the purpose of inducing GemCap to keep lending Crop funds.  It worked.  GemCap relied upon Diversified's statements and loaned Crop money.

114.    As a direct and proximate result of Diversified's fraudulent actions, GemCap was damaged in that it advanced Crop approximately $12,700,000.00, and otherwise funded under the Loan Agreement despite the fact that Diversified never intended to direct payments to the account specified by Crop.  Had GemCap known the true facts at the time of the misrepresentations alleged above, it would not have entered into the Loan Agreement, nor would it have funded any amounts to the Defendants.

115.    As a direct and proximate result of Diversified's fraudulent actions, GemCap has suffered general damages in an amount to be proven at trial, but not less than $8,700,000.

116.    In performing the acts alleged herein, Diversified acted fraudulently, despicably and in willful and conscious disregard of GemCap's rights, thereby justifying an award of punitive and exemplary damages against Diversified.

### SEVENTH CLAIM FOR RELIEF

**(Conversion Against Diversified)**

117.    GemCap restates and realleges paragraphs 1 through 118 herein.

118.    By the terms of the Loan Agreement, GemCap had a right to possess the payments and/or proceeds that Diversified was obligated to deposit in the above-specified back account.

1999446.1 24093-800

26

COMPLAINT

Exhibit - A

7-ER-1453

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

119.    Diversified wrongfully disposed of those payments and/or proceeds by refusing to deposit them in the specified bank account and, instead, paying those payments and/or proceeds directly to Crop's subagents.

120.    As a direct and proximate of Diversified's actions, GemCap has been damaged in amount to be proven at trial, but in excess of the jurisdictional minimum.

121.    In performing the acts alleged herein, Diversified acted fraudulently, despicably and in willful and conscious disregard of GemCap's rights, thereby justifying an award of punitive and exemplary damages against Diversified.

### EIGHTH CLAIM FOR RELIEF

**(Declaratory Relief Against Diversified)**

122.    GemCap restates and realleges paragraphs 1 through 123 herein.

123.    Under the Payments Contract, Diversified is required to deposit into the above-specified account certain payments and/or proceeds owed to Crop, which payments or proceeds GemCap has a security interest it under the Loan Agreement.

124.    Diversified has refused to comply with the terms of the Payments Contract and contends that it is not obligated to deposit said payments and/or proceeds into the specified account.

125.    Accordingly, an actual controversy exists between Diversified and GemCap.

126.    GemCap accordingly desires a judicial determination that Diversified is required to deposit any and all payments and/or proceeds owed to Crop into the above-specified account.

127.    A judicial declaration is necessary and appropriate at this time so that the GemCap may be certain of its security interest in those payments and/or proceeds and so that any required deposits are made in accordance with the Payments Contract.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

27

COMPLAINT

**Exhibit - A**

**7-ER-1454**

## NINTH CLAIM FOR RELIEF

### (Unfair Business Practices Against All Defendants)

128. GemCap restates and realleges paragraphs 1 through 129 herein.

129. California Business and Professions Code § 17200 provides:

> As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

130. Defendants have engaged in unfair business acts and practices within the meaning of California Business and Professional Code § 17200. As alleged above, these unfair business acts and practices include, but are not limited to: (1) Crop's, Taylor's, and Diversified's misrepresentations to GemCap; (2) Crop's and Taylor's misuse and misappropriation of loan funds; and (3) Diversified's wrongful refusal to deposit certain payments and/or proceeds owed to Crop, an in which GemCap has a security interest, into Crop's bank account.

131. As a direct, proximate and foreseeable result of Defendants' wrongful conduct, including the misrepresentations, misuse of loan funds and refusal to comply with certain obligations, GemCap has been damaged in an amount to be proven at trial. GemCap is entitled to relief, including full restitution and/or disgorgement of any funds and benefits that may be obtained by Defendants as a result of such unfair business acts and practices.

132. California Business and Professions Code § 17203 provides in pertinent part:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

28

COMPLAINT

Exhibit "A"

133. Pursuant to California Business and Professions Code § 17203, GemCap also seeks an order of this Court for a temporary restraining order, preliminary injunction and permanent injunction: (1) freezing all accounts in the name of Crop, Crop Services, and Taylor; (2) enjoining and prohibiting Diversified from circumventing Crop and making payments directly to Crop's subagents; (3) directing Diversified to deposit any and all payments and/or proceeds owed to Crop into the Crop's bank account specified in the Payments Contract; (4) enjoining and prohibiting Crop, Crop Services and Taylor from withdrawing, transferring, or otherwise dissipating any amounts in any of the subject accounts; (5) freezing all accounts in the name of AIA, AIA Insurance, Reinsurance Partners, Green Leaf, Green Leaf Insurance, Weskan, Sound, PERC and Hillcrest, and enjoining and prohibiting any of the Defendants from withdrawing, transferring, or otherwise dissipating any amounts in any of the subject accounts; (6) enjoining and prohibiting the transfer of any funds or other assets by and between any of the Defendants; (7) enjoining and prohibiting any of the Defendants from taking any steps to frustrate, impair or prevent GemCap from attaching or sizing any of the pledged security under the Loan Agreement and its related documents, including without limitation any steps that could prevent the payment of commissions under the crop insurance program that Crop and Crop Services pledged and which GemCap is entitled to seize in partial satisfaction of the Defendants' obligations under the Loan Agreement and related documents; and (8) enjoining and prohibiting any of the Defendants from taking any steps that could or will impair GemCap's rights under the Loan Agreement and related documents, including without limitation its right to the pledged security.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

29

COMPLAINT

**Exhibit "A"**

**PRAYER FOR RELIEF**

WHEREFORE, GemCap prays for judgment as follows:

**On the First Claim For Breach of Contract:**

1. For general, incidental and consequential damages according to proof, but at least $8,700,000;

2. For attorneys' fees and costs as allowed by law;

**On the Second Claim For Breach of Covenant of Good Faith And Fair Dealing:**

3. For damages according to proof, but at least $8,700,000;

4. For attorneys' fees and costs as allowed by law;

**On the Third Claim for Fraud:**

6. For damages according to proof, but at least $8,700,000;

7. For punitive and exemplary damages according to proof;

**On the Fourth Claim for Money Had and Received:**

8. For damages in the amount of at least $8,700,000;

**On the Fifth Claim for Breach of Contract:**

9. For damages according to proof;

**On the Sixth Claim for Fraud:**

10. For damages according to proof, but at least $8,700,000;

11. For punitive and exemplary damages according to proof;

**On the Seventh Claim for Conversion:**

12. For damages according to proof;

13. For punitive and exemplary damages according to proof;

**On the Eighth Claim for Declaratory Relief:**

14. For a judicial declaration that Diversified is required to deposit any and all payments and/or proceeds owed to Crop under the Payments Contract into the bank account specified in that contract.

**On the Ninth Claim for Unfair Business Practices:**

15. For restitution and disgorgement of any funds and benefits that may be

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

30

COMPLAINT

Exhibit A

obtained by Defendants as a result of such unfair business acts and practices;

16. For a temporary restraining order, preliminary injunction and permanent injunction: (1) freezing all accounts in the name of Crop, Crop Services, and Taylor; (2) enjoining and prohibiting Diversified from circumventing Crop and making payments directly to Crop's subagents; (3) directing Diversified to deposit any and all payments and/or proceeds owed to Crop into the Crop's bank account specified in the Payments Contract; (4) enjoining and prohibiting Crop, Crop Services and Taylor from withdrawing, transferring, or otherwise dissipating any amounts in any of the subject accounts; (5) freezing all accounts in the name of AIA, AIA Insurance, Reinsurance Partners, Green Leaf, Green Leaf Insurance, Weskan, Sound, PERC and Hillcrest, and enjoining and prohibiting any of the Defendants from withdrawing, transferring, or otherwise dissipating any amounts in any of the subject accounts; (6) enjoining and prohibiting the transfer of any funds or other assets by and between any of the Defendants; (7) enjoining and prohibiting any of the Defendants from taking any steps to frustrate, impair or prevent GemCap from attaching or sizing any of the pledged security under the Loan Agreement and its related documents, including without limitation any steps that could prevent the payment of commissions under the crop insurance program that Crop and Crop Services pledged and which GemCap is entitled to seize in partial satisfaction of the Defendants' obligations under the Loan Agreement and related documents; and (8) enjoining and prohibiting any of the Defendants from taking any steps that could or will impair GemCap's rights under the Loan Agreement and related documents, including without limitation its right to the pledged security.

**On All Causes of Action:**

17. For a temporary restraining order, preliminary injunction and permanent injunction;

18. For prejudgment and postjudgment interest as allowed by law;

31

COMPLAINT

Exhibit "A"

7-ER-1458

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

19. For costs of suit incurred herein; and

20. For such other relief as the Court may deem just and proper.

DATED: July 30, 2013        FREEMAN, FREEMAN & SMILEY, LLP

By: _____
    TODD M LANDER
    TRACY R. DAUB
    Attorneys for GEMCAP LENDING I, LLC

## JURY TRIAL DEMAND

Plaintiff GemCap Lending, I, LLC hereby demands trial by jury.

DATED: July 30, 2013        FREEMAN, FREEMAN & SMILEY, LLP

By: _____
    TODD M LANDER
    TRACY R. DAUB
    Attorneys for GEMCAP LENDING I, LLC

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

32

COMPLAINT

**Exhibit - A**

**7-ER-1459**

**EXHIBIT 1**

# Exhibit - A

EXECUTION

## AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

**AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT**, dated as of February 4, 2013, by and among CROP USA INSURANCE AGENCY, INC., an Idaho corporation ("**Crop USA**") and CROPUSA INSURANCE SERVICES, LLC, an Idaho limited liability company ("**Crop Services**"), jointly and severally, on the one hand (each, individually, and collectively, "**Borrower**"), and GEMCAP LENDING I, LLC, a Delaware limited liability company with offices at 1401 Ocean Avenue, Suite 305, Santa Monica, CA 90401, on the other hand (together with its successors and assigns, the "**Lender**").

### RECITALS:

**WHEREAS**, on November 23, 2011, Crop USA, Crop Services and Lender entered into that certain Loan and Security Agreement and the documents made in connection therewith, pursuant to which Lender established a credit facility for Crop USA and Crop Services, and Crop USA and Crop Services pledged certain assets to Lender as security for the obligations of Crop USA and Crop Services;

**WHEREAS**, Borrower and Lender desire to amend and restate the Original Loan Agreement as set forth herein, so that the parties will, among other modifications, provide for a revolving credit facility to Borrower in the maximum principal amount of Ten Million Dollars ($10,000,000), and provide for a pledge by Borrower and certain affiliates of Borrower of additional security for such credit facility;

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants and agreements herein contained and other good and valuable consideration, Lender and Borrower mutually covenant, warrant and agree as follows:

### SECTION 1. DEFINITIONS AND RULES OF INTERPRETATION AND CONSTRUCTION

**Specific Terms Defined.** Capitalized terms used herein and not otherwise defined have the following meanings:

**1.1** "**A&O Subsidy Payments**" means the administrative and operations subsidy amounts owing to DCIS as described in the DCIS Agreement that are owing to Borrower by DCIS pursuant to the terms of the DCIS Agreement.

**1.2** "**Account Debtor**" or "**account debtor**" has the meaning ascribed to such term in the UCC.

**1.3** "**Accounts**" or "**accounts**" means "**accounts**" as defined in the UCC, and, in addition, any and all obligations of any kind at any time due and/or owing to Borrower, whether now existing or hereafter arising, and all rights of Borrower to receive payment or any other consideration including, without limitation, Crop Insurance Contract Receivables, invoices, contract rights, accounts receivable, general intangibles, choses-in-action, notes, drafts, acceptances, instruments and all other debts, obligations and liabilities in whatever form owing to Borrower from any Person, Governmental Authority or any other entity, all security therefor, and all of Borrower's rights to receive payments for

{00171621.DOC; 1}

goods sold (whether delivered, undelivered, in transit or returned) or services rendered, which may be represented thereby, or with respect thereto, including, but not limited to, all rights as an unpaid vendor (including stoppage in transit, replevin or reclamation), and all additional amounts due from any Account Debtor, whether or not invoiced, together with all Proceeds and products of any and all of the foregoing.

1.4     "ACH" has the meaning set forth in Section 2.5 hereof.

1.5     [RESERVED]

1.6     [RESERVED]

1.7     "Advance" has the meaning as set forth in Section 1(c)(ii) of the Loan Agreement Schedule.

1.8     "Advance Commissions" means the advance commission amounts owing to Borrower as set forth in the DCIS Agreement pursuant to the terms of the DCIS Agreement.

1.9     [RESERVED]

1.10    "Affiliate" means, with respect to any Person, (a) any other Person that, directly or indirectly, controls, is controlled by, or is under common control with such Person, including any Subsidiary, or (b) any other Person who is a director, manager or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above. For the purposes of this definition, control of a Person shall mean the power (direct or indirect) to direct or cause the direction of the management or the policies of such Person, whether through the ownership of any voting securities, by contract or otherwise.

1.11    "Agreement" means this Amended and Restated Loan and Security Agreement (including the Amended and Restated Loan Agreement Schedule, all Exhibits annexed hereto and the Borrower's Disclosure Schedule) as originally executed or, if amended, modified, supplemented, renewed or extended from time to time, as so amended, modified, supplemented, renewed or extended.

1.12    Availability" means, as of any date of determination, the lesser of (i) the Borrowing Base (as set forth in the most recently delivered Borrowing Certificate), and (ii) the Maximum Credit.

1.13    "Balance Sheet" means the balance sheets of Borrower dated as of the Balance Sheet Date.

1.14    "Balance Sheet Date" means September 30, 2011.

1.15    "Bankruptcy Code" means the United States Bankruptcy Code, as now existing or hereafter amended.

1.16    "Borrower" has the meaning set forth in the introductory paragraph hereof.

{00171621.DOC; 1}

2

# Exhibit - A

## 7-ER-1462

 **1.17** **"Borrower's Disclosure Schedule"** means the disclosure schedule prepared by Borrower that is being delivered to Lender concurrently herewith.

 **1.18** **"Borrower's Premises"** means the property leased by the Borrower located at 111 Main Street, Lewiston, Idaho 83051.

 **1.19** **"Borrowing Base"** shall be calculated at any time as the sum of (A) the product obtained by multiplying the outstanding amount of all Eligible Crop Insurance Contract Receivables by eighty percent (80%), provided that such percentage is subject to adjustment by Lender as Lender deems necessary, plus (B) the product obtained by multiplying the Crop USA Savings Account amount by one hundred percent (100%).

 **1.20** **"Borrowing Certificate"** has the meaning as set forth in <u>Section 1(c)(v) of the Loan Agreement Schedule</u>.

 **1.21** **"Business"** means the selling of Crop Insurance.

 **1.22** **"Business Day"** means any day other than a Saturday, Sunday or any other day on which banks located in the State of California are authorized or required to close under applicable banking laws.

 **1.23** **"Capital Assets"** means, in accordance with GAAP, fixed assets, both tangible (such as land, buildings, fixtures, machinery and equipment) and intangible (such as patents, copyrights, trademarks, franchises and goodwill).

 **1.24** **"Change of Control"** has the meaning as set forth in Section 10.1 hereof.

 **1.25** **"Chattel Paper"** has the meaning ascribed to such term in the UCC.

 **1.26** **"Closing Date"** means the date of this Agreement.

 **1.27** **"Collateral"** has the meaning as set forth in Section 5.1 hereof.

 **1.28** **Intentionally omitted**

 **1.29** **"Collection Account"** has the meaning set forth in <u>Section 1(c)(vi) of the Loan Agreement Schedule</u>.

 **1.30** **"Collection Days"** means a period equal to the greater of (i) two (2) Business Days after the deposit of Collections into the Collection Account, or (ii) such longer period as may be required by the financial institution with whom the Collection Account is maintained, in either event for which interest may be charged on the aggregate amount of such deposits at the Interest Rate or, if applicable, the Default Interest Rate.

 **1.31** **"Collections"** means all amounts received in connection with Crop Insurance Contract Receivables, all other amounts owing to Borrower under or pursuant to any Sales Agent Agreement and all other amounts remitted by an Account Debtor of Borrower or any Person in respect of the Collateral, or amounts otherwise owing to Borrower by any Person in respect of the Collateral.

{00171621.DOC; 1}

3

**Exhibit - A**

**7-ER-1463**

1.32    "**Commercial Tort Claims**" has the meaning ascribed to such term in the UCC.

1.33    "**Crop Insurance**" means federal crop insurance for an agricultural commodity authorized by the Federal Crop Insurance Act and approved by the FCIC that is sold and serviced consistent with the Federal Crop Insurance Act or FCIC regulations.

1.34    "**Crop Insurance Contract Receivables**" means, all of the right, title and interest of Borrower in and to, collectively, (i) any and all amounts, whether administrative and operations subsidy amounts, commissions, advances, advance commissions or otherwise, whether payable now or in the future, under the DCIS Agreement (as reported on the DCIS System), and/or any other Sales Agent Agreement and (ii) any indemnity or other compensatory or punitive payments or damage awards made in lieu of or with respect to lost amounts or commissions otherwise payable under a Sales Agent Agreement.

1.35    "**Crop Insurance Contractor Waivers**" means the agreements executed by DCIS and delivered to Lender, containing, among other things, consents by DCIS to the transactions contemplated herein and the exercise by Lender of its rights and remedies with respect to the Crop Insurance Contract Receivables as contemplated herein.

1.36    "**Crop Services**" has the meaning set forth in the introductory paragraph hereof.

1.37    "**Crop USA**" has the meaning set forth in the introductory paragraph hereof.

1.38    "**Crop USA Savings Account**" means that certain U.S. Bank, National Association account no. ▮▮▮▮▮, holding an original principal amount of no less than One Million Fifteen Thousand Two Hundred Sixty-Two Dollars ($1,015,262) ("**Account**"), in the name of Crop USA, together with all substitutions or replacements thereof, all additions to, income, interest and dividends thereon and all Proceeds thereof, which account is subject to the Deposit Account Control Agreement – Crop USA Savings Account and the Pledge Agreement as security for the Obligations.

1.39    "**DCIS**" means Diversified Crop Insurance Services.

1.40    "**DCIS Agreement**" means the Diversified Crop Insurance Services Sales Agent – Company Agreement dated July 21, 2011 between Crop USA and DCIS, as the same may be amended, restated, modified or supplemented from time to time.

1.41    "**DCIS System**" means software package for the electronic processing system used by DCIS. All Multiple Peril and hail insurance policy information is input and maintained using this system. Policy information is transmitted to the FCIC by DCIS on a daily basis. The processing system also integrates the functions of claims, mapping and document management.

1.42    "**Default Interest Rate**" has the meaning set forth in <u>Section 3(b) of the Loan Agreement Schedule</u>.

1.43    "**Deposit Account Control Agreement – Crop USA Savings Account**" means the Deposit Account Control Agreement in the form of **Exhibit 1.43(a)** annexed hereto.

{00171621.DOC; 1}

4

**Exhibit - A**

EX 1 PG 36

**7-ER-1464**

**1.44** **"Deposit Account Control Agreement – Operating Account"** means the Blocked Account Control Agreement in the form of **Exhibit 1.43(b)** annexed hereto.

**1.45** **"Deposit Account Control Agreement – Receivables Collection Account"** means the Blocked Account Control Agreements in the form of **Exhibit 1.43(c)** annexed hereto.

**1.46** **"Deposit Accounts"** has the meaning ascribed to such term in the UCC.

**1.47** **"Document" or "document"** has the meaning ascribed to such term in the UCC.

**1.48** **"Eligible Crop Insurance Contract Receivables"** means Crop Insurance Contract Receivables consisting of A&O Subsidy Payments and Advance Commissions that are due and payable to Borrower within twelve (12) months of the date of any calculation (as reported by the DCIS System or any similar reporting system approved by Lender), net of any returns, discounts, claims, credits and allowances given or claimed, and otherwise satisfactory to Lender in its sole discretion.

**1.49** **"Environment"** means all air, surface water, groundwater or land, including, without limitation, land surface or subsurface, including, without limitation, all fish, wildlife, biota and all other natural resources.

**1.50** **"Environmental Law"** or **"Environmental Laws"** means all federal, state and local laws, statutes, ordinances and regulations now or hereafter in effect, and in each case as amended or supplemented from time to time, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation).

**1.51** **"Environmental Liabilities and Costs"** means, as to any Person, all liabilities, obligations, responsibilities, remedial actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any other Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, including any Environmental Law, permit, order or agreement with any Governmental Authority or other Person, and which arise from any environmental, health or safety conditions, or a Release or conditions that are reasonably likely to result in a Release, and result from the past, present or future operations of such Person or any of its Affiliates.

**1.52** **"Environmental Lien"** means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

**1.53** **"ERISA"** means the Employee Retirement Income Security Act of 1974, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

**1.54** **"Equipment"** means "equipment", as such term is defined in the UCC, now owned or hereafter acquired by Borrower, wherever located, and shall include, without limitation, the machinery and equipment set forth on <u>Section 1.54 to the Borrower's Disclosure Schedule</u> annexed hereto, and all

{00171621.DOC; 1}

5

**Exhibit - A**

EX 1 PG 37

**7-ER-1465**

other equipment, machinery, furniture, Fixtures, computer equipment, telephone equipment, molds, tools, dies, partitions, tooling, transportation equipment, all other tangible assets used in connection with the manufacture, sale or lease of goods or rendition of services, and Borrower's interests in any leased equipment, and all repairs, modifications, alterations, additions, controls and operating accessories thereof or thereto, and all substitutions and replacements therefor.

1.55    "**Equity Interests**" means, with respect to any Person, any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, membership interests, units, participations or other equivalents of or interest in (regardless of how designated) equity of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC (or any successor thereto) under the 1934 Act).

1.56    "**Event of Default**" means the occurrence or existence of any event or condition described in Section 11 of this Agreement.

1.57    "**FCIC**" means the Federal Crop Insurance Corporation, a wholly-owned government corporation of the United States Department of Agriculture.

1.58    "**Federal Crop Insurance Act**" means the Federal Crop Insurance Act, as amended, and Section 536 of the Agricultural Research, Extension and Education Reform Act of 1998, as amended.

1.59    "**Financial Statements**" has the meaning as set forth in Section 8.9 hereof.

1.60    "**Financing Statements**" means the Uniform Commercial Code UCC-1 Financing Statements to be filed with applicable Governmental Authorities of each State or Commonwealth or political subdivisions thereof pursuant to which Lender shall perfect its security interest in the Collateral.

1.61    "**Full Minimum Draw Period**" means the period commencing on the Closing Date and ending on November 23, 2014.

1.62    "**Fiscal Year**" means that twelve (12) month period commencing on January 1 and ending on December 31.

1.63    "**Fixtures**" has the meaning ascribed to such term in the UCC.

1.64    "**GAAP**" means generally accepted accounting principles in effect in the United States of America at the time of any determination, and which are applied on a consistent basis. All accounting terms used in this Agreement which are not expressly defined in this Agreement shall have the meanings given to those terms by GAAP, unless the context of this Agreement otherwise requires.

1.65    "**General Intangibles**" has the meaning ascribed to such term in the UCC.

1.66    [RESERVED]

1.67    "**Goods**" has the meaning ascribed to such term in the UCC.

{00171621.DOC; 1}

6

**Exhibit - A**

**EX 1 PG 38**

**7-ER-1466**

1.68    "Governmental Authority" or "Governmental Authorities" means any federal, state, county or municipal governmental agency, board, commission, officer, official or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

1.69    "Guarantees" means (i) the Amended and Restated Secured Continuing Guarantee of the Guarantor (Individual) dated February 4, 2013, made by Guarantor (Individual) for the benefit of Lender and the Membership Interest Pledge Agreement dated February 4, 2012, made by Guarantor (Individual) to the Lender and (ii) the Amended and Restated Secured Continuing Guarantee dated October 5, 2012, made by Guarantors (Corporate) for the benefit of Lender and the Security Agreement dated October 1, 2012, made by Guarantors (Corporate) to the Lender.

1.70    "Guarantors (Corporate)" means AIA Insurance, Inc., an Idaho corporation and an Affiliate of Borrower, and AIA Services Corporation, an Idaho corporation and an Affiliate of Borrower.

1.71    "Guarantor (Individual)" means R. John Taylor a/k/a Ray Johnson Taylor a/k/a R. Johnson Taylor.

1.72    "Indebtedness" means, with respect to any Person, all of the obligations of such Person which, in accordance with GAAP, should be classified upon such Person's balance sheet as liabilities, or to which reference should be made by footnotes thereto, including without limitation, with respect to Borrower, in any event and whether or not so classified:

(a)    all debt and similar monetary obligations of Borrower, whether direct or indirect;

(b)    all obligations of Borrower arising or incurred under or in respect of any guaranties (whether direct or indirect) by Borrower of the Indebtedness of any other Person; and

(c)    all obligations of Borrower arising or incurred under or in respect of any Lien upon or in any property owned by Borrower that secured Indebtedness of another Person, even though Borrower has not assumed or become liable for the payment of such Indebtedness.

1.73    "Intellectual Property" means all of the following intellectual property used in the conduct of the business of Borrower: (a) inventions, processes, techniques, discoveries, developments and related improvements, whether or not patentable; (b) United States patents, patent applications, divisionals, continuations, reissues, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, of any such patents or patent applications, and any foreign or international equivalent of any of the foregoing; (c) unregistered, United States registered or pending trademark, trade dress, service mark, service name, trade name, brand name, logo, domain name, or business symbol and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith; (d) work specifications, software (including object and source code listing) and artwork; (e) technical, scientific and other know-how and information, trade secrets, methods, processes, practices, formulas, designs, assembly procedures, specifications owned or used by Borrower; (f) copyrights; (g) work for hire; (h) customer and mailing lists; and (i) any and all rights of the Borrower to the name "CROP USA" or CROPUSA," or any derivation thereof, and Borrower's entire customer list and database and all assets used or useful by Borrower in the conduct of its business over the internet or in any electronic medium, including any websites or domain names owned by Borrower.

{00171621.DOC; 1}

7

**Exhibit - A**

**7-ER-1467**

1.74    "**Interest Rate**" means the Revolving Loan Interest Rate set forth in <u>Section 3(a) of the Loan Agreement Schedule</u>.

1.75    "**Instruments**" has the meaning ascribed to such term in the UCC

1.76    "**Inventory**" means "inventory," as such term is defined in the UCC, now owned or hereafter acquired by Borrower, wherever located, and, in any event, shall include, without limitation, all raw materials, work-in-process, finished and semi-finished Inventory including, without limitation, all materials, parts, components and supplies relating to the manufacture or assembly thereof, packaging and shipping supplies relating thereto, and all other inventory, merchandise, goods and other personal property now or hereafter owned by Borrower, which are held for sale, exchange or lease or are furnished or are to be furnished under a contract of service or an exchange arrangement or which constitute raw materials, work-in-process or materials used or consumed or to be used or consumed in Borrower's business, or the processing, packaging, delivery or shipping of the same, and all finished goods and the products of the foregoing, whatever form and wherever located; and all names or marks affixed to or to be affixed thereto for purposes of selling same by the seller, manufacturer, lessor or licensor thereof and all right, title and interest of Borrower therein and thereto.

1.77    "**Investment Property**" has the meaning ascribed to such term in the UCC.

1.78    "**Lender**" has the meaning set forth in the introductory paragraph hereof.

1.79    "**Letter-of-Credit Rights**" means "letter-of-credit rights" as such term is defined in the UCC, including rights to payment or performance under a letter of credit, whether or not the beneficiary thereof has demanded or is entitled to demand payment or performance.

1.80    "**Lien**" or "lien" means any mortgage, deed of trust, pledge, security interest, hypothecation, assignment, lien (statutory or other, including, without limitation, liens imposed by any Governmental Authority, whether arising under PACA, if applicable, or otherwise), charge or other encumbrance of any kind or nature whatsoever (including, without limitation, pursuant to any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable law of any jurisdiction to evidence any of the foregoing) on personal or real property or fixtures.

1.81    "**Loans**" or "**Revolving Loans**" means the principal amount(s) advanced to the Borrower as set forth in this Agreement and the Note(s).

1.81A   "**Loan Agreement Schedule**" means the Amended and Restated Loan Agreement Schedule, dated of even date herewith, signed by Borrower and delivered together with this Agreement, which Loan Agreement Schedule is incorporated herein by reference.

1.82    "**Loan Documents**" means this Agreement and any and all other agreements, notes, documents, mortgages, financing statements, guaranties, intercreditor agreements, subordination agreements, certificates and instruments executed and/or delivered by Borrower or any other Person to Lender pursuant to and in connection with the Loans and this Agreement, as the same may be amended, restated, modified, supplemented, renewed or extended from time to time, including, without limitation, the Note, the Guarantees, the Membership Interest Pledge Agreement, the

{00171621.DOC; 1}

8

**Exhibit - A**

**7-ER-1468**

Deposit Account Control Agreement – Crop USA Savings Account, the Deposit Account Control Agreements – Operating Accounts, the Deposit Account Control Agreement – Receivables Collection Account, the Crop Insurance Contractor Waivers, the Deposit Account Control Agreement, the Power of Attorney and the Pledge Agreement.

1.83    "**Material Adverse Effect**" means a material adverse effect on (a) the Business, assets, liabilities, financial condition, results of operations or business prospects of Borrower, (b) the Borrower's rights under the DCIS Agreement, (c) the Crop Insurance Contract Receivables or Borrower's right to receive A&O Subsidy Payments, Advance Commissions or other commissions payments in connection therewith (d) the ability of Borrower or any Guarantor to perform its obligations under any Loan Document to which it is a party, (e) the value of the Collateral or the rights of Lender therein, (f) the validity or enforceability of any of the Loan Documents, (g) the rights and remedies of Lender under any of such Loan Documents, or (h) the timely payment of the principal of or interest on the Loans or other amounts payable in connection therewith. All determinations of materiality shall be made by the Lender in its reasonable judgment.

1.84    "**Material Contract**" means any contract or other arrangement (other than Loan Documents), whether written or oral, to which Borrower is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto could have a Material Adverse Effect, including the DCIS Agreement, any other Sales Agent Agreement and the other agreements set forth in Section 1.84 of the Borrower's Disclosure Schedule.

1.85    "**Maturity Date**" means the earlier of (i) November 23, 2014, or (ii) the date Lender may exercise any of its remedies pursuant to the terms hereof.

1.86    "**Maximum Credit**" means, subject to Availability, Ten Million Dollars ($10,000,000).

1.87    "**Membership Interest Pledge Agreement**" means the Membership Interest Pledge Agreement, of even date herewith, between Guarantor (Individual) and Lender.

1.88    "**Minimum Draw Fee**" means the difference between (a) the amount of interest Lender would have received on Five Million Dollars ($5,000,000) of Revolving Loans outstanding for one year minus (b) the amount of interest actually received by Lender during the Full Minimum Draw Period.

1.89    "**1934 Act**" means the Securities Exchange Act of 1934, as amended.

1.90    "**Note**" or "**Revolving Loan Note**" means the Third Amended and Restated Secured Revolving Note annexed hereto as **Exhibit 1.89**.

1.91    "**Obligations**" means all obligations, liabilities and indebtedness of every kind, nature and description owing by Borrower to Lender pursuant to the Loan Documents, including, without limitation, principal, interest, repurchase obligations, charges, fees, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, whether now existing or hereafter arising, whether arising before, during or after the Term or after the commencement of any case with respect to Borrower under the United States Bankruptcy Code or any similar statute (including, without limitation, the payment of interest and other amounts which would accrue and become due but for the commencement of such case), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured.

{00171621.DOC; 1}

9

**Exhibit - A**

**7-ER-1469**

EX 1 PG 41

**1.92** "**Organizational Documents**" means, in the case of a corporation, its Articles of Incorporation, Certificate of Incorporation and By-Laws; in the case of a general partnership, its Articles of Partnership and any partnership agreement; in the case of a limited partnership, its Articles of Limited Partnership and any partnership agreement; in the case of a limited liability company, its Articles of Organization and Operating Agreement or Regulations, if any; in the case of a limited liability partnership, its Articles of Limited Liability Partnership; or alternatively, in each case, the legal equivalent thereof in the jurisdiction of its organization, together with all other formation or governing documents, schedules, exhibits, amendments, addendums, modifications, replacements, additions, or restatements of the foregoing, which are in effect.

**1.93** "**Original Loan Agreement**" means the Loan and Security Agreement dated November 23, 2011, as amended prior to the date hereof, between Crop Services and CROPUSA, jointly and severally, as Borrower, and Lender.

**1.94** "**Overadvance**" has the meaning as set forth in Section 1(c)(iv) of the Loan Agreement Schedule.

**1.95** "**Payment Intangibles**" has the meaning ascribed to such term in the UCC.

**1.96** "**Permitted Encumbrances**" means the following: (a) Liens granted to Lender or its Affiliates; (b) purchase money security interests in favor of equipment vendors upon any Capital Assets hereafter acquired (including, without limitation, capitalized or finance leases); provided, that, (i) no such purchase money security interest or other Lien (or capitalized or finance lease, as the case may be) with respect to specific future Capital Assets shall extend to or cover any other property, other than the specific Capital Assets so acquired, and the proceeds thereof, (ii) such mortgage, Lien or security interest secures only the cost or obligation to pay the purchase price of such specific Capital Assets only (or the obligations under the capitalized or finance lease), (iii) the principal amount secured thereby shall not exceed one hundred (100%) percent of the lesser of the cost or the fair market value (at the time of the acquisition of the Capital Assets) of the Capital Assets so acquired, and (iv) such purchase money security interest is preapproved in writing by Lender; (c) Liens incurred in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, relating to employees, securing sums (i) not overdue or (ii) being diligently contested in good faith provided that adequate reserves with respect thereto are maintained on the books of Borrower in conformity with GAAP; and (d) Liens for taxes (i) not yet due or (ii) being diligently contested in good faith by appropriate proceedings, provided that adequate reserves with respect thereto are maintained on the books of Borrower in conformity with GAAP, and which have no effect on the priority of Liens in favor of Lender or the value of the assets in which Lender has a Lien.

**1.97** "**Person**" or "**person**" means, as applicable, any individual, sole proprietorship, partnership, corporation, limited liability company, limited liability partnership, business trust, unincorporated association, joint stock corporation, trust, joint venture or other entity or any government or any agency or instrumentality or political subdivision thereof.

**1.98** "**Pledge Agreement**" means the Pledge Agreement in the form of **Exhibit 1.96** annexed hereto.

**Exhibit - A**

**7-ER-1470**

**1.99** **"Power of Attorney"** means the Special Power of Attorney in the form of **Exhibit 1.97** annexed hereto.

**1.100** **"Proceeds"** has the meaning ascribed to such term in the UCC and shall also include, but not be limited to, (a) any and all proceeds of any and all insurance policies (including, without limitation, life insurance, casualty insurance, business interruption insurance and credit insurance), indemnity, warranty or guaranty payable to Borrower from time to time with respect to any of the Collateral or otherwise, (b) any and all payments (in any form whatsoever) made or due and payable to Borrower from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau or agency or any other Person (whether or not acting under color of Governmental Authority) and (c) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

**1.101** **"Promissory Note"** has the meaning ascribed to such term in the UCC.

**1.102** **"Release"** means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of a Hazardous Substance into the Environment.

**1.103** **"Reserves"** means, as of any date of determination, such amounts as Lender may from time to time establish and revise in good faith reducing the amount of the Revolving Loan Commitment (a) to reflect events, conditions, contingencies or risks which, as determined by Lender in good faith, do or may adversely affect either (i) the Collateral or any other property which is security for the Obligations or its value, (ii) the assets, Business or prospects of Borrower, (iii) the security interests and other rights of Lender in the Collateral (including the enforceability, perfection and priority thereof), or (iv) Borrower's ability to perform its Obligations under the Loan Documents; or (b) in respect of any state of facts which Lender determines in good faith constitutes an Event of Default or may, with notice or passage of time or both, constitute an Event of Default.

**1.104** **"Responsible Officer"** means the Chief Executive Officer of Borrower.

**1.105** **"Revolving Loan Commitment"** means the difference between (i) Availability and (ii) the sum of the Reserves plus outstanding Obligations.

**1.106** **"Revolving Loan Prepayment Fee"** has the meaning set forth in <u>Section 4(b) of the Loan Agreement Schedule</u>.

**1.107** **"Revolving Loans"** has the meaning as set forth in <u>Section 1(c)(i) of the Loan Agreement Schedule</u>.

**1.108** **"Sales Agent Agreement"** means the DCIS Agreement and any other agreement pursuant to which Borrower sells Crop Insurance.

**1.109** **"Sales Agent Agreement Counterparty"** has the meaning as set forth in Section 5.4(i).

**1.110** **"SEC"** means the United States Securities and Exchange Commission.

**1.111** **"Securities"** has the meaning ascribed to such term in the UCC.

{00171621.DOC; 1}

11

1.112    "**Software**" has the meaning ascribed to such term in the UCC.

1.113    "**Subsidiary**" means, as to any Person, a corporation, limited liability company or other entity with respect to which more than fifty (50%) percent of the outstanding Equity Interests of each class having voting power is at the time owned by such Person or by one or more Subsidiaries of such Person or by such Person.

1.114    "**Tangible Chattel Paper**" has the meaning ascribed to such term in the UCC.

1.115    "**Tax**" has the meaning set forth in Section 8.12(c).

1.116    "**Tax Deduction**" has the meaning set forth in Section 8.12(c).

1.117    "**Term**" has the meaning set forth in Section 4.1.

1.118    "**UCC**" means the Uniform Commercial Code as presently enacted in California (or any successor legislation thereto), and as the same may be amended from time to time, and the state counterparts thereof as may be enacted in such states or jurisdictions where any of the Collateral is located or held.

1.119    **Rules of Interpretation and Construction.** In this Agreement unless the context otherwise requires:

(a)    All terms used herein which are defined in the UCC shall have the meanings given therein unless otherwise defined in this Agreement;

(b)    Sections mentioned by number only are the respective Sections of this Agreement as so numbered;

(c)    Words importing a particular gender shall mean and include the other gender and words importing the singular number mean and include the plural number and vice versa;

(d)    Words importing persons shall mean and include firms, associations, partnerships (including limited partnerships), societies, trusts, corporations, limited liability companies or other legal entities, including public or governmental bodies, as well as natural persons;

(e)    Each reference in this Agreement to a particular person shall be deemed to include a reference to such person's successors and permitted assigns;

(f)    Any headings preceding the texts of any Section of this Agreement, and any table of contents or marginal notes appended to copies hereof are intended, solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect;

(g)    If any clause, provision or section of this Agreement shall be ruled invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any of the remaining provisions thereof;

{00171621.DOC; 1}

12

# Exhibit - A

7-ER-1472

(h)  The terms "herein", "hereunder", "hereby", "hereto", and any similar terms as used in this Agreement refer to this Agreement; the term "heretofore" means before the date of execution of this Agreement; and the term "hereafter" shall mean after the date of execution of this Agreement;

(i)  If any clause, provision or section of this Agreement shall be determined to be apparently contrary to or conflicting with any other clause, provision or section of this Agreement, then the clause, provision or section containing the more specific provisions shall control and govern with respect to such apparent conflict;

(j)  Unless otherwise specified, (i) all accounting terms used herein or in any Loan Document shall be interpreted in accordance with GAAP, (ii) all accounting determinations and computations hereunder or thereunder shall be made in accordance with GAAP and (iii) all financial statements required to be delivered hereunder or thereunder shall be prepared in accordance with GAAP;

(k)  An Event of Default that occurs shall exist or continue or be continuing unless such Event of Default is waived by Lender in accordance with the terms of this Agreement;

(l)  The word "and" when used from time to time herein shall mean "or" or "and/or" if such meaning is expansive of the rights or interests of Lender in the given context;

(m)  All references herein and in the other Loan Documents to times of day shall refer to Los Angeles, California time, unless otherwise specified to the contrary; and

(n)  No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by reason of such party or his or its counsel having, or being deemed to have, structured or drafted such provision.

## SECTION 2. LOANS

**2.1  Loans.** The terms and provisions of <u>Section 1(c) of the Loan Agreement Schedule</u> are incorporated herein by reference and made a part hereof.

**2.2  Maximum Credit.** The aggregate principal amount of the Loans shall not exceed the amount of the Maximum Credit.

**2.3  Use of Proceeds.** Borrower shall use the proceeds of the Loans solely for the purposes set forth in <u>Section 1(d) the Loan Agreement Schedule</u>.

**2.4  Repayment.** Borrower shall repay the Loans and other Obligations in accordance with this Agreement and the Note(s).

**2.5  ACH.** In order to satisfy Borrower's payment of amounts due under the Loans and all fees, expenses and charges with respect thereto that are due and payable under this Agreement or any other Loan Document, Borrower hereby irrevocably authorizes the Lender to initiate manual and automatic electronic (debit and credit) entries through the Automated Clearing House or other appropriate electronic payment system ("ACH") to all deposit accounts maintained by Borrower,

{00171621.DOC; 1}

13

**Exhibit - A**

EX 1 PG 45

**7-ER-1473**

wherever located. At the request of the Lender, Borrower shall complete, execute and deliver to the institution set forth below (with a copy to the Lender) any ACH agreement, voided check, information and/or direction letter reasonably necessary to so instruct Borrower's depository institution. Borrower (i) shall maintain in all respects this ACH arrangement; (ii) shall not change depository institutions without Lender's prior written consent, and if consent is received, shall immediately execute similar ACH instruction(s), and (iii) waives any and all claims for loss or damage arising out of debits or credits to/from the depository institution, whether made properly or in error. Borrower has so communicated with and instructed the institution(s) set forth in Section 1(e) of the Loan Agreement Schedule.

## SECTION 3. INTEREST, FEES AND CHARGES

**3.1 Interest.** Interest on the Loans shall accrue as set forth in Sections 3(a) and 3(b) of the Loan Agreement Schedule.

**3.2 Fees.** Borrower shall pay Lender, or Lender's designee, the fees set forth in Section 3(c) of the Loan Agreement Schedule. Such fees, other than the audit fees referenced therein, shall be deemed fully earned on the date hereof, shall be paid from Loan proceeds, and not be subject to rebate or proration for any reason.

**3.3 Fees and Expenses.** Borrower shall pay, on Lender's demand, all costs, expenses, filing fees and taxes payable in connection with the preparation, execution, delivery, recording, administration, collection, liquidation, defense and enforcement of the Loan Documents, Lender's rights in the Collateral, and all other existing and future agreements or documents contemplated herein or related hereto, including any amendments, waivers, supplements or consents which may now or hereafter be made or entered into in respect hereof, or in any way involving claims or defenses asserted by Lender or claims or defenses against Lender asserted by Borrower or any third party directly or indirectly arising out of or related to the relationship between Borrower and Lender, including, but not limited to the following, whether incurred before, during or after the Term or after the commencement of any case with respect to Borrower under the United States Bankruptcy Code or any similar or successor statute: (a) all costs and expenses of filing or recording (including UCC Financing Statement and mortgage filing fees); (b) all title insurance and other insurance premiums, appraisal fees, fees incurred in connection with any environmental report and audit, survey and search fees and charges; (c) all fees relating to the wire transfer of loan proceeds and other funds and fees for returned checks; and (d) all costs, fees and disbursements of counsel to Lender. If any fees, costs or charges payable to Lender hereunder are not paid when due, such amounts shall be added to the principal amount of the Revolving Loans and accrue interest at the Default Interest Rate until paid.

**3.4 Savings Clause.** It is intended that the Interest Rate and the Default Interest Rate shall never exceed the maximum rate, if any, which may be legally charged in the State of California for loans made to corporations (the "**Maximum Rate**"). If the provisions for interest contained in the Note(s) would result in a rate higher than the Maximum Rate, the interest shall nevertheless be limited to the Maximum Rate and any amounts which may be paid toward interest in excess of the Maximum Rate shall be applied to the reduction of principal, or, at the option of Lender, returned to the Borrower.

{00171621.DOC; 1}

14

# Exhibit - A

EX 1 PG 46

# 7-ER-1474

## SECTION 4. TERM.

**4.1    Term.** This Agreement shall continue until all Obligations shall have been indefeasibly paid in full (the "**Term**").

**4.2    Early Termination; Loan Prepayment Fees.**

(a)    Lender shall have the right to terminate this Agreement at any time upon or after the occurrence of an Event of Default.

(b)    Borrower may prepay the Loans as set forth in Section 4 of the Loan Agreement Schedule.

## SECTION 5. COLLATERAL.

**5.1    Security Interests in Borrower's Assets.** As collateral security for the payment and performance of the Obligations, Borrower hereby grants and conveys to Lender a first priority continuing security interest in and Lien upon all now owned and hereafter acquired property and assets of Borrower and the Proceeds and products thereof (which property, assets and Proceeds, together with all other collateral security for the Obligations now or hereafter granted to or otherwise acquired by Lender, are referred to herein collectively as the "**Collateral**"), including, without limitation, all property of Borrower now or hereafter held or possessed by Lender, and including the following:

(a)    Accounts;

(b)    Chattel Paper;

(c)    Commercial Tort Claims;

(d)    Deposit Accounts;

(e)    Documents;

(f)    Electronic Chattel Paper;

(g)    Equipment;

(h)    Fixtures;

(i)    General Intangibles (including, without limitation the website domain names set forth on Section 8.21 to the Borrower's Disclosure Schedule;

(j)    Goods;

(k)    Instruments;

(l)    Inventory;

(m)    Investment Property;

{00171621.DOC; 1}

15

**Exhibit - A**

**EX 1 PG 47**

**7-ER-1475**

    (n)    Letter-of-Credit Rights;

    (o)    Payment Intangibles;

    (p)    Promissory Notes;

    (q)    Software;

    (r)    Tangible Chattel Paper;

    (s)    Securities (whether certificated or uncertificated);

    (t)    warehouse receipts;

    (u)    cash monies;

    (v)    tax and duty refunds;

    (w)    Intellectual Property;

    (x)    All present and future books and records relating to any of the above including, without limitation, all present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any Account Debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of Borrower with respect to any of the foregoing maintained with or by any other Person);

    (y)    The Additional Collateral set forth in <u>Section 5(a) of the Loan Agreement Schedule</u>; and

    (z)    Any and all products and Proceeds of the foregoing in any form including, without limitation, all insurance claims, warranty claims and proceeds and claims against third parties for loss or destruction of or damage to any or the foregoing.

    **5.2**    **Financing Statements.**  Borrower hereby authorizes Lender to file Financing Statements with respect to the Collateral in form acceptable to Lender and its counsel, and hereby ratify any actions taken by Lender prior to the date hereof to file such Financing Statements. Borrower shall, at all times, do, make, execute, deliver and record, register or file all Financing Statements and other instruments, acts, pledges, leasehold or other mortgages, amendments, modifications, assignments and transfers (or cause the same to be done), and will deliver to Lender such instruments and/or documentation evidencing items of Collateral, as may be requested by Lender to better secure or perfect Lender's security interest in the Collateral or any Lien with respect thereto. Borrower acknowledges that it is not authorized to file any Financing Statement or amendment or termination statement with respect to any Financing Statement without the prior written consent of Lender and agrees that it will not do so without the prior written consent of Lender. In addition, Borrower hereby authorizes Lender to record the Liens in favor of the Lender in the U.S. Patent and Trademark Office and the U.S. Copyright Office,

{00171621.DOC; 1}

Exhibit - A

EX 1 PG 48

7-ER-1476

as applicable, and the taking of any actions required under the laws of jurisdictions outside the United States with respect to Intellectual Property included in the Collateral.

**5.3** **License Grant.** The terms of <u>Section 5(b) of the Loan Agreement Schedule</u> are incorporated herein by reference and made a part hereof.

**5.4** **Representations, Warranties and Covenants Concerning the Collateral.** Borrower covenants, represents and warrants (each of which such representations and warranties shall survive execution and delivery of this Agreement and shall be deemed repeated upon the making of each request for a Revolving Loan and made as of the time of each and every Revolving Loan hereunder) and covenants as follows:

(a) (i) All of the Collateral owned by it is owned by it free and clear of all Liens (including any claim of infringement) except those in Lender's favor and Permitted Encumbrances and (ii) none of the Collateral is subject to any agreement prohibiting the granting of a Lien or requiring notice of or consent to the granting of a Lien.

(b) It shall not encumber, mortgage, pledge, assign or grant any Lien upon any Collateral or any other assets to anyone other than the Lender and except for Permitted Encumbrances.

(c) The Liens granted pursuant to this Agreement, upon the filing of Financing Statements in respect of Borrower in favor of the Lender in the applicable filing office of the state of organization of Borrower, the recording of the Liens in favor of the Lender in the U.S. Patent and Trademark Office and the U.S. Copyright Office, as applicable, and the taking of any actions required under the laws of jurisdictions outside the United States with respect to Intellectual Property included in the Collateral which is created under such laws, constitute valid perfected first priority security interests in all of the Collateral in favor of the Lender, as security for the prompt and complete payment and performance of the Obligations, enforceable in accordance with the terms hereof.

(d) No security agreement, mortgage, deed of trust, financing statement, equivalent security or Lien instrument or continuation statement covering all or any part of the Collateral is or will be on file or of record in any public office, except those relating to Permitted Encumbrances.

(e) It shall not dispose of any of the Collateral whether by sale, lease or otherwise.

(f) It shall defend the right, title and interest of the Lender in and to the Collateral against the claims and demands of all Persons whomsoever, and take such actions, including (i) all actions necessary to grant the Lender "control" of any Investment Property, Deposit Accounts, Letter-of-Credit Rights or Electronic Chattel Paper owned by it, with any agreements establishing control to be in form and substance satisfactory to the Lender, (ii) the prompt (but in no event later than three (3) Business Days following the Lender's request therefor) delivery to the Lender of all original Instruments, Chattel Paper, negotiable Documents and certificated Securities owned by it (in each case, accompanied by stock powers, allonges or other instruments of transfer executed in blank), (iii) notification to third parties of the Lender's interest in Collateral at the Lender's request, and (iv) the institution of litigation against third parties as shall be prudent in order to protect and preserve its and/or the Lender's interests in the Collateral.

{00171621.DOC; 1}

17

**Exhibit - A**

**7-ER-1477**

(g)     It shall promptly, and in any event within three (3) Business Days after the same is acquired by it, notify the Lender of any Commercial Tort Claim acquired by it and, unless otherwise consented to by the Lender, it shall enter into a supplement to this Agreement granting to the Lender a Lien in such Commercial Tort Claim for the benefit of Lender.

(h)     It shall perform in a reasonable time all other steps requested by the Lender to create and maintain in the Lender's favor a valid perfected first Lien in all Collateral.

(i)     It shall notify the Lender promptly, and in any event within three (3) Business Days after obtaining knowledge thereof (i) of any material delay in its performance of any of its obligations to  DCIS or any other counterparty to a Sales Agent Agreement (a  "**Sales Agent Agreement Counterparty**"); (ii) of any assertion by any Sales Agent Agreement Counterparty of any material claims, offsets or counterclaims; (iii) of any allowances, credits and/or monies granted by it to any Sales Agent Agreement Counterparty; (iv) of all material adverse information relating to the financial condition of any Sales Agent Agreement Counterparty; and (v) of any loss, damage or destruction of any of the Collateral .

(j)     Section 5.4(j) of the Borrower's Disclosure Schedule contains a true and complete list of all Equipment owned by Borrower. Borrower owns no Equipment other than as set forth in such Section 5.4(j). It shall keep and maintain its Equipment in good operating condition, except for ordinary wear and tear. It shall not permit any such items to become a fixture to real estate or accessions to other personal property.

(k)     Section 5.4(k) of the Borrower's Disclosure Schedule lists all banks and other financial institutions at which it maintains deposits and/or other accounts, and such Schedule correctly identifies the name, address and telephone number of each such depository, the name in which the account is held, a description of the purpose of the account, and the complete account number. It shall not establish any depository or other bank account with any financial institution (other than the accounts set forth on Section 5.4(k) of the Borrower's Disclosure Schedule) without providing Lender with written notification thereof and providing similar information related thereto.

(l)     On the date hereof, its exact legal name (as indicated in the public record of its jurisdiction of organization), jurisdiction of organization, organizational identification number, if any, from the jurisdiction of organization, and the location of its chief executive office and all other offices or locations out of which it conducts business or operations, are specified on Section 5.4(l) of the Borrower's Disclosure Schedule. It has furnished to the Lender its Organizational Documents and long-form good standing certificate as of a date which is within thirty (30) days of the date hereof. It is organized solely under the law of the jurisdiction so specified and has not filed any certificates of domestication, transfer or continuance in any other jurisdiction. Except as otherwise indicated on Section 5.4(l) of the Borrower's Disclosure Schedule, the jurisdiction of its organization of formation is required to maintain a public record showing it to have been organized or formed. Except as specified on Section 5.4(l) of the Borrower's Disclosure Schedule, it has not changed its name, jurisdiction of organization, chief executive office or sole place of business or its corporate or company structure in any way (e.g., by merger, consolidation, change in form or otherwise) within the last five years and has not within the last five years become bound (whether as a result of merger or otherwise) as a grantor under a security agreement entered into by another Person, which has not heretofore been terminated.

{00171621.DOC; 1}

18

**Exhibit - A**

**7-ER-1478**

(m)     Borrower shall maintain and keep all of its books and records concerning the Collateral at its executive offices listed in <u>Section 5.4(I) of the Borrower's Disclosure Schedule</u>.

(n)     It will not, except with Lender's prior written consent and delivery to the Lender of all additional financing statements and other documents requested by the Lender to maintain the validity, perfection and priority of the security interests provided for herein: (i) change its jurisdiction of organization or the location of its chief executive office from that referred to in <u>Section 5.4(I) of the Borrower's Disclosure Schedule</u>; or (ii) change its name, identity or organizational structure.

(o)     Except pursuant to the terms hereof, none of the Collateral is subject to any prohibition against encumbering, pledging, hypothecating or assigning the same or requires notice or consent to Borrower's doing of the same.

(p)     (i) all Accounts represent complete bona fide transactions which, except for adjustments to allowances and operating commissions under Sales Agent Agreements with respect to A&O Subsidy Payments and Advance Commissions, require no further act under any circumstances on its part to make such Accounts payable by any Sales Agent Agreement Counterparty, and (ii) except for adjustments to allowances and operating commissions under Sales Agent Agreements with respect to A&O Subsidy Payments and Advance Commissions, no Account is subject to any present, future contingent offsets or counterclaims.. It has not made, nor will it make, any agreement with any Sales Agent Agreement Counterparty for any extension of time for the payment of any Account, any compromise or settlement for less than the full amount thereof, any release of any Sales Agent Agreement Counterparty from liability therefor, or any deduction therefrom except a discount or allowance for prompt or early payment allowed by it in the ordinary course of its business consistent with historical practice and as previously disclosed to the Lender in writing.

(q)     The additional representations, warranties and covenants set forth in <u>Section 5(c) of the Loan Agreement Schedule</u> are incorporated herein by reference and made a part hereof.

### SECTION 6. CONDITIONS TO LOANS.

The obligation of Lender to make the Loans shall be subject to the satisfaction or waiver by Lender, prior thereto or concurrently therewith, of each of the following conditions precedent:

6.1     **Loan Documents.** Each of the Loan Documents shall have been duly and properly authorized, executed and delivered by Borrower and the other parties thereto and shall be in full force and effect as of the date hereof.

6.2     **Representations and Warranties.** Each of the representations and warranties made by or on behalf of Borrower to Lender in this Agreement and in other Loan Documents shall be true and correct in all material respects as of the date hereof, provided that any such representation or warranty that is qualified by materiality shall be true and correct in all respects as of the date hereof.

6.3     **Certified Copies of Formation Documents.** Lender shall have received from Borrower, certified by a duly authorized officer to be true and complete on and as of a date which is not more than ten (10) Business Days prior to the date hereof, a copy of each of the Organizational Documents of Borrower in effect on such date of certification.

{00171621.DOC; 1}

19

# Exhibit - A

## 7-ER-1479

6.4    **Proof of Action.** Lender shall have received from Borrower a copy, certified by a duly authorized officer to be true and complete on and as of the date which is not more than ten (10) Business Days prior to the date hereof, of the records of all corporate or company action taken by Borrower to authorize (a) its execution and delivery of each of the Loan Documents to which it is or is to become a party as contemplated or required by this Agreement, (b) its performance of all of its agreements and obligations under each of such documents, and (c) the incurring of the Obligations contemplated by this Agreement.

6.5    **Legal Opinion.** Lender shall have received a written legal opinion, addressed to Lender, dated the date hereof, from counsel for Borrower. Such legal opinion shall be acceptable to Lender and its counsel.

6.6    **Collateral.** Lender shall have obtained a first priority, perfected security interest in the Collateral of Borrower.

6.7    **Insurance.** Lender shall have received evidence of insurance, additional insured and loss payee endorsements required hereunder and under the other Loan Documents, in form and substance satisfactory to Lender, and certificates of insurance policies and/or endorsements naming Lender as additional insured and loss payee.

6.8    **Validity of Collateral Representation.** Lender shall have received a statement by the appropriate officers of Borrower which shall represent and certify the validity of the Collateral.

6.9    **ACH Agreement.** Lender shall have received from Borrower an agreement executed by Borrower which irrevocably authorizes Lender to initiate manual and automatic electronic (debit and credit) entries through the Automated Clearing House or other appropriate electronic payment system to all deposit accounts maintained by Borrower, wherever located.

6.10    **IRS Form 4506.** Lender shall have received from Borrower an executed Form 4506 to be submitted to the Internal Revenue Service which shall grant Lender access to Borrower's tax returns.

6.11    **IRS Form W-9.** Lender shall have received from Borrower an executed Form W-9 to be submitted to the Internal Revenue Service which shall allow Lender to verify Borrower's tax identification number(s).

6.12    **Pay Proceeds Letter.** Borrower shall have delivered to Lender a pay proceeds letter with respect to the disbursement of the proceeds of the initial Loans in form and substance satisfactory to Lender, which letter shall provide for, among other things, the payment or reimbursement of all costs and expenses incurred by Lender in connection with this Agreement and the other Loan Documents.

6.13    **No Event of Default.** No event shall have occurred on or prior to the date of each Loan by Lender hereunder and be continuing on the date of each such Loan by Lender hereunder, and no condition shall exist on the date of each Loan by Lender hereunder, which constitutes an Event of Default or which would, with notice or the lapse of time, or both, constitute an Event of Default under this Agreement or any other Loan Document; and, Lender shall have received a certification from a Responsible Officer with respect to the foregoing in form and substance satisfactory to Lender.

{00171621.DOC; 1}

# Exhibit - A

## 7-ER-1480

**6.14    Additional Deliveries.** Borrower shall have delivered to Lender such other documents and instruments reasonably requested by Lender, including, without limitation, the documents set forth on <u>Section 6 of the Loan Agreement Schedule</u>.

### SECTION 7.  CONDITIONS TO MAKING ALL LOANS.

If it is contemplated in this Agreement that more than one advance will be made by Lender under Section 2.1 hereof, the obligations of Lender to make all Loans hereunder shall be subject to the satisfaction or waiver by Lender, prior thereto or concurrently therewith, of each of the conditions set forth in Section 6, and, in addition, the following conditions precedent:

**7.1    Applications and Compliance.** The application for such Loans shall have been made by Borrower to Lender in accordance with the applicable provisions of this Agreement and in compliance with all provisions of this Agreement.

**7.2    Representations and Warranties.** Each of the representations and warranties made by or on behalf of Borrower to Lender in this Agreement or in other Loan Documents shall have been true and correct in all material respects when made (provided that any such representation or warranty that is qualified as to materiality shall be true and correct in all respects), shall, for all purposes of this Agreement, be deemed to be repeated on and as of the date of each Loan by Lender hereunder and shall be true and correct in all respects on and as of each such date, except to the extent that any of such representations and warranties relate, by the express terms thereof, solely to a date prior to the date of each Loan by Lender hereunder, and Lender shall have received a certification from a Responsible Officer of Borrower with respect to the foregoing in form and substance satisfactory to Lender.

**7.3    Performance, etc.** Borrower shall have duly and properly performed, complied with and observed each of its covenants, agreements and obligations contained in this Agreement and in any other Loan Documents on the date of each Loan by Lender hereunder, and Lender shall have received a certification from a Responsible Officer with respect to the foregoing in form and substance satisfactory to Lender.  No event shall have occurred on or prior to the date of each Loan by Lender hereunder and be continuing on the date of each Loan by Lender hereunder, and no condition shall exist on the date of each Loan by Lender hereunder, which constitutes an Event of Default or which would, with notice or the lapse of time, or both, constitute an Event of Default under this Agreement or any other Loan Document, and Lender shall have received a certification from a Responsible Officer with respect to the foregoing in form and substance satisfactory to Lender.

### SECTION 8.  REPRESENTATIONS AND WARRANTIES.

Each Borrower hereby represents and warrants to Lender, knowing and intending that Lender shall rely thereon in making the Loans contemplated hereby (each of which representations and warranties shall be continuing unless expressly made in relation only to a specific date), that:

**8.1    Existence:**

(a)    Borrower (i) is a corporation or limited liability company duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, (ii) is in good standing in all other jurisdictions in which it is required to be qualified to do

{00171621.DOC; 1}

21

business as a foreign corporation or limited liability company, (iii) has all requisite corporate power and authority and full legal right to own or to hold under lease its properties and to carry on the business as presently engaged and (iv) Borrower has been issued all required federal, state and local licenses, certificates or permits necessary, required or appropriate to the operation of its business.

(b) Borrower has corporate power and authority and has full legal rights to enter into each of the Loan Documents to which it is a party, and to perform, observe and comply with all of its agreements and obligations under each of such documents.

**8.2 No Violation, etc.** The execution and delivery by Borrower of the Loan Documents to which Borrower is a party, the performance by Borrower of all of its agreements and obligations under each of such documents, and the incurring by Borrower of all of the Obligations contemplated by this Agreement, have been duly authorized by all necessary corporate or company actions on the part of Borrower and, if required, its shareholders, and do not and will not (a) contravene any provision of Borrower's charter, organizational documents, bylaws, operating agreement, or other governing documents or this Agreement (each as from time to time in effect), (b) conflict with, or result in a breach of the terms, conditions, or provisions of, or constitute a default under, or result in the creation of any Lien upon any of the property of Borrower under, any agreement, mortgage or other instrument to which Borrower is or may become a party, (c) violate or contravene any provision of any law, regulation, order, ruling or interpretation thereunder or any decree, order or judgment or any court or governmental or regulatory authority, bureau, agency or official (all as from time to time in effect and applicable to such entity), (d) other than waivers required from Borrower's landlords, require any waivers, consents or approvals by any third party, including any creditors or trustees for creditors of Borrower, or (e) require any approval, consent, order, authorization, or license by, or giving notice to, or taking any other action with respect to, any Governmental Authority.

**8.3 Binding Effect of Documents, etc.** Borrower has duly executed and delivered each of the Loan Documents to which Borrower is a party, and each of the Loan Documents is valid, binding and in full force and effect. The agreements and obligations of Borrower as contained in each of the Loan Documents constitute, or upon execution and delivery thereof will constitute, legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, subject, as to the enforcement of remedies only, to limitations imposed by federal and state laws regarding bankruptcy, insolvency, reorganization, moratorium and other laws affecting creditors' rights and remedies generally, and by general principles of law and equity.

**8.4 No Events of Default.**

(a) No Event of Default has occurred and is continuing and no event has occurred and is continuing and no condition exists that would, with notice or the lapse of time, or both, constitute an Event of Default.

(b) Borrower is not in default under any Material Contract to which Borrower is a party or by which Borrower or any property of Borrower is bound.

(c) Borrower's execution, delivery and performance of and compliance with this Agreement and the other Loan Documents will not, with or without the passage of time or giving of notice, result in any material violation of law, or be in conflict with or constitute a default under any

{00171621.DOC; 1}

22

term or provision, or result in the creation of any Lien upon any of Borrower's properties or assets or the suspension, revocation, impairment, forfeiture or nonrenewal, of any permit, license, authorization or approval applicable to Borrower, or any of its businesses or operations or any of its assets or properties.

**8.5    No Governmental Consent Necessary.** No consent or approval of, giving of notice to, registration with or taking of any other action in respect of, any Governmental Authority is required with respect to the execution, delivery and performance by Borrower of this Agreement and the other Loan Documents to which it is a party.

**8.6    No Proceedings.** There are no actions, suits, or proceedings pending or, to the best of Borrower's knowledge, threatened against or affecting Borrower in any court or before any Governmental Authority which, if adversely determined, would have an adverse effect on the ability of Borrower to perform its obligations under this Agreement or the other Loan Documents to which it is a party.

**8.7    No Violations of Laws.** Borrower has conducted, and is conducting, its Business, so as to comply in all material respects with all applicable federal, state, county and municipal statutes and regulations. Neither Borrower nor any officer, director, manager, member or shareholder of Borrower is charged with, or so far as is known by Borrower, is under investigation with respect to, any violation of any such statutes, regulations or orders, which could have a Material Adverse Effect.

**8.8    Use of Proceeds of the Loans.** Proceeds from the Loans shall be used only for those purposes set forth in this Agreement. No part of the proceeds of the Loans shall be used, directly or indirectly, for the purpose of purchasing or carrying any margin stock or for the purpose of purchasing or carrying or trading in any stock under such circumstances as to involve Borrower in a violation of any statute or regulation. In particular, without limitation of the foregoing, no part of the proceeds from the Loans is intended to be used to acquire any publicly-held stock of any kind.

**8.9    Financial Statements; Indebtedness.**

(a)    The balance sheet of Borrower as of December 31, 2011, and the related statement of operations, stockholders' equity and cash flows (together with the related notes) for the year ended December 31, 2011, and the balance sheet of each Borrower and the related statement of operations, stockholders' or members' equity and cash flows (together with the related notes) for the month ended November 30, 2012 (collectively, the "**Financial Statements**") fairly present, as of the date thereof, the financial position of Borrower, and the results of its operations, cash flows and stockholders' equity in all material aspects.

(b)    Except as shown on the most recent Financial Statements, (i) neither Borrower has any Indebtedness as of the date hereof which would adversely affect the financial condition of either Borrower or the Collateral, and (ii) neither Borrower has any liabilities, contingent or otherwise, except those which, individually or in the aggregate, are not material to the financial condition or operating results of Borrower.

**8.10    Changes in Financial Condition.** Since the Balance Sheet Date, there has been no material adverse change and no material adverse development in the business, properties, operations,

{00171621.DOC; 1}

23

Exhibit - A

7-ER-1483

EX 1 PG 55

condition (financial or otherwise), results of operations or prospects of either Borrower. Since the Balance Sheet Date, Borrower has not (i) declared or paid any dividends, (ii) sold any assets, individually or in the aggregate, outside of the ordinary course of business, (iii) had capital expenditures outside of the ordinary course of business, (iv) engaged in any transaction with any Affiliate or (v) engaged in any other transaction outside of the ordinary course of business.

**8.11    Equipment.**  Borrower shall keep its Equipment in good order and repair, and in running and marketable condition, ordinary wear and tear excepted.

**8.12    Taxes and Assessments.**

(a)    Borrower has paid and discharged when due all taxes, assessments and other governmental charges which may lawfully be levied or assessed upon its income and profits, or upon all or any portion of any property belonging to it, whether real, personal or mixed, to the extent that such taxes, assessment and other charges have become due. Borrower has filed all tax returns, federal, state and local, and all related information, required to be filed by it.

(b)    Borrower shall make all payments to be made by it hereunder without any Tax Deduction (as defined below), unless a Tax Deduction is required by law. If Borrower is aware that it must make a Tax Deduction (or that there is a change in the rate or the basis of a Tax Deduction), it shall promptly notify Lender. If a Tax Deduction is required by law to be made by Borrower, the amount of the payment due from Borrower shall be increased to an amount which (after making the Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required. If Borrower is required to make a Tax Deduction, Borrower shall make the minimum Tax Deduction allowed by law and shall make any payment required in connection with that Tax Deduction within the time allowed by law. Within thirty (30) days of making either a Tax Deduction or a payment required in connection with a Tax Deduction, Borrower shall deliver to Lender evidence satisfactory to Lender that the Tax Deduction has been made or (as applicable) the appropriate payment has been paid to the relevant taxing authority.

(c).    "**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under a Loan Document. "**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature, including any income, franchise, stamp, documentary, excise or property tax, charge or levy (in each case, including any related penalty or interest).

**8.13    ERISA.**  Borrower is in compliance in all material respects with the applicable provisions of ERISA and all regulations issued thereunder by the United States Treasury Department, the Department of Labor and the Pension Benefit Guaranty Corporation.

**8.14    Environmental Matters.**

(a)    Borrower has duly complied with, and its facilities, business assets, property, leaseholds and equipment are in compliance in all respects with, the provisions of all Environmental Laws.

(b)    Borrower has been issued all required federal, state and local licenses, certificates or permits required under Environmental Laws for the operation of its business.

{00171621.DOC; 1}

24

**Exhibit - A**

**EX 1 PG 56**

**7-ER-1484**

**8.15    United States Anti-Terrorism Laws; Holding Company Status.**

(a)    In this Section 8.15:

"**Anti-Terrorism Law**" means each of: (i) Executive Order No. 13224 of September 23, 2001   Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism (the "**Executive Order**"); (ii) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (commonly known as the USA Patriot Act); (iii) the Money Laundering Control Act of 1986, Public Law 99-570; and (iv) any similar law enacted in the United States of America subsequent to December 31, 2004.

"**holding company**" has the meaning given to it in the United States Public Utility Holding Company Act of 1935, and any successor legislation and rules and regulations promulgated thereunder.

"**investment company**" has the meaning given to it in the United States Investment Company Act of 1940.

"**public utility**" has the meaning given to it in the United States Federal Power Act of 1920.

"**Restricted Party**" means any person listed: (i) in the Annex to the Executive Order; (ii) on the Specially Designated Nationals and Blocked Persons list maintained by the Office of Foreign Assets Control of the United States Department of the Treasury; or (iii) in any successor list to either of the foregoing.

(b)    Borrower is not (i) a holding company or subject to regulation under the United States Public Utility Holding Company Act of 1935; (ii) a public utility or subject to regulation under the United States Federal Power Act of 1920; (iii) required to be registered as an investment company or subject to regulation under the United States Investment Company Act of 1940; or (iv) subject to regulation under any United States Federal or State law or regulation that limits its ability to incur or guarantee indebtedness.

(c)    To the best of Borrower's knowledge, Borrower (i) is not, and is not controlled by, a Restricted Party; (ii) has not received funds or other property from a Restricted Party; and (iii) is not in breach of and is not the subject of any action or investigation under any Anti-Terrorism Law.

(d)    Borrower has taken reasonable measures to ensure compliance with the Anti-Terrorism Laws.

**8.16    Customers and Vendors.**  There are no disputes with any customers, suppliers, manufacturers, vendors and independent contractors of Borrower in excess of $5,000 in the aggregate with any such party.

{00171621.DOC; 1}

**Exhibit - A**

**8.17 Representations, Warranties and Covenants Concerning the Collateral.** The representations and warranties of Borrower set forth in Section 5.4 hereof are incorporated in this Section 8.17 by reference.

**8.18 Books and Records.** Borrower maintains its chief executive office and its books and records related to its Accounts, Inventory and all other Collateral at its address set forth in <u>Section 5.4(l) of Borrower's Disclosure Schedule</u>.

**8.19 Ownership and Control.** All of the issued and outstanding Equity Interests of Borrower are duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens, and such Equity Interests were issued in compliance with all applicable state and federal laws concerning the issuance of securities. As of the date hereof, there are no pre-emptive or other outstanding rights, options, warrants, conversion rights or other similar agreements or understandings for the purchase or acquisition of any Equity Interests of Borrower. All of the issued and outstanding Equity Interests of Borrower are owned beneficially and of record according to the percentages set forth in <u>Section 8.19 of the Borrower's Disclosure Schedule</u>.

**8.20 Changes.** Since the date of the Balance Sheet, except as disclosed in <u>Section 8.20 of Borrower's Disclosure Schedule</u>, with respect to Borrower, there has not been:

(a) any change in its business, assets, liabilities, condition (financial or otherwise), properties, operations or prospects, which, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect;

(b) any resignation or termination of any of its officers, key employees or groups of employees;

(c) any material change, except in the ordinary course of business, in its contingent obligations by way of guaranty, endorsement, indemnity, warranty or otherwise;

(d) any damage, destruction or loss, whether or not covered by insurance, which has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(e) any waiver by it of a valuable right or of a material debt owed to it;

(f) any direct or indirect material loans made by it to any of its stockholders, managers, employees, officers or directors, other than advances made in the ordinary course of business;

(g) any material change in any compensation arrangement or agreement with any employee, manager, officer, director or equity holder;

(h) any declaration or payment of any dividend or other distribution of its assets;

(i) any labor organization activity related to it;

{00171621.DOC; 1}

26

**Exhibit - A**

**7-ER-1486**

(j)     any debt, obligation or liability incurred, assumed or guaranteed by it, except those for immaterial amounts and for current liabilities incurred in the ordinary course of business;

(k)     any sale, assignment, transfer, abandonment or other disposition of any Collateral other than Inventory in the ordinary course of business;

(l)     any change in any Material Contract to which it is a party or by which it is bound which, either individually or in the aggregate, has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(m)     any other event or condition of any character that, either individually or in the aggregate, has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; or

(n)     any arrangement or commitment by it to do any of the acts described in subsection (a) through (m) of this Section 8.20.

### 8.21   Intellectual Property.

(a)     Except for Permitted Encumbrances, (1) Borrower holds all Intellectual Property that it owns free and clear of all Liens and restrictions on use or transfer, whether or not recorded, and has sole title to and ownership of or has the full, exclusive (subject to the rights of its licensees) right to use in its field of business such Intellectual Property; and Borrower holds all Intellectual Property that it uses but does not own under valid licenses or sub-licenses from others; (2) the use of the Intellectual Property by Borrower does not, to the knowledge of Borrower, violate or infringe on the rights of any other Person; (3) Borrower has not received any notice of any conflict between the asserted rights of others and Borrower with respect to any Intellectual Property; (4) Borrower has used its commercially reasonable best efforts to protect its rights in and to all Intellectual Property; (5) Borrower is in compliance with all material terms and conditions of its agreements relating to the Intellectual Property; (6) Borrower is not, and since the Balance Sheet Date has not been, a defendant in any action, suit, investigation or proceeding relating to infringement or misappropriation by Borrower of any Intellectual Property nor has Borrower been notified of any alleged claim of infringement or misappropriation by Borrower of any Intellectual Property; (7) to the knowledge of Borrower, none of the products or services Borrower is researching, developing, proposes to research and develop, make, have made, use, or sell, infringes or misappropriates any Intellectual Property right of any third party; (8) none of the trademarks and service marks used by Borrower, to the knowledge of Borrower, infringes the trademark or service mark rights of any third party; and (9) to Borrower's knowledge, none of the material processes and formulae, research and development results and other know-how relating to Borrower's business, the value of which to Borrower is contingent upon maintenance of the confidentiality thereof, has been disclosed to any Person other than Persons bound by written confidentiality agreements.

(b)     Section 8.21 of Borrower's Disclosure Schedule sets forth a true and complete list of (i) all Intellectual Property owned or claimed by Borrower, together with any and all registration or application numbers for any Intellectual Property filed or issued by any Intellectual Property registry (and in the case of any and all domain names registered by or on behalf of Borrower, the name of the registrar(s) thereof) and (ii) all Intellectual Property licenses which are either material to the business of Borrower or relate to any material portion of Borrower's Inventory, including licenses for standard

{00171621.DOC; 1}

27

software having a replacement value of more than $10,000. None of such Intellectual Property licenses are reasonably likely to be construed as an assignment of the licensed Intellectual Property to Borrower. Borrower shall update such Section 8.21 of the Borrower's Disclosure Schedule upon each new claim, use, registration or application of or for Intellectual Property by Borrower, and upon Borrower becoming the licensee under any license described in the foregoing clause (b)(ii).

8.22 **Employees.** Borrower has no collective bargaining agreements with any of its employees. There is no labor union organizing activity pending or, to Borrower's knowledge, threatened with respect to Borrower. Except as set forth in Section 8.22 of the Borrower's Disclosure Schedule, Borrower is not a party to or bound by any currently effective deferred compensation arrangement, bonus plan, incentive plan, profit sharing plan, retirement agreement or other employee compensation plan or agreement. To Borrower's knowledge, no employee of Borrower, nor any consultant with whom Borrower has contracted, is in violation of any material term of any employment contract or any other contract relating to the right of any such individual to be employed by, or to contract with, Borrower or to receive any benefits; and, to Borrower's knowledge, the continued employment by Borrower of its present employees, and the performance of Borrower's contracts with its independent contractors, will not result in any such violation. Except for employees who have a current effective employment agreement with Borrower, as set forth in Section 8.22 of the Borrower's Disclosure Schedule, no employee of Borrower has been granted the right to continued employment by Borrower or to any material compensation following termination of employment with Borrower. Borrower is not aware that any officer, director, manager, partner, key employee or group of employees intends to terminate his, her or their employment with Borrower, nor does Borrower have a present intention to terminate any of the same.

8.23 **Tax Status.** Borrower (i) has made or filed all federal and state income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject, (ii) has paid all taxes and other governmental assessments and charges that are shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and for which it has set aside on its books a provision in the amount of such taxes being contested in good faith and (iii) has set aside on its books provisions reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply. There are no unpaid taxes payable by Borrower claimed to be due by the taxing authority of any jurisdiction, and the officers of the Borrower know of no basis for any such claim.

8.24 **Representations and Warranties: True, Accurate and Complete.** None of the representations, certificates, reports, warranties or statements now or hereafter made or delivered to Lender pursuant hereto or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances in which they are made, not misleading.

8.25 **Fees; Brokers; Finders.** There are no fees, commissions or other compensation due to any third party acting on behalf of or at the direction of Borrower in connection with the Loan Documents, except as set forth on Section 8.25 of the Borrower's Disclosure Schedule. All negotiations relative to the Loan Documents, and the transactions contemplated thereby, have been carried on by the Borrower with the Lender without the intervention of any other person or entity acting on behalf of the Borrower, and in such manner as not to give rise to any claim against the Borrower or the Lender for

{00171621.DOC; 1}

28

Exhibit - A

EX 1 PG 60

7-ER-1488

any finder's fee, brokerage commission or like payment due to any third party acting on behalf of or at the direction of Borrower, and if any such fee, commission or payment is payable, it shall be the sole responsibility of the Borrower and the Borrower shall pay, and indemnify the Lender for, the same.

### SECTION 9. AFFIRMATIVE COVENANTS.

Until the indefeasible payment and satisfaction in full of all Obligations and the termination of this Agreement, Borrower hereby covenants and agrees as follows:

**9.1** **Notify Lender.** Borrower shall promptly, and in any event within three (3) Business Days, inform Lender (a) if any one or more of the representations and warranties made by Borrower in this Agreement or in any document related hereto shall no longer be entirely true, accurate and complete in any respect, (b) of all material adverse information relating to the financial condition of Borrower; (c) of any material return of goods; (d) of any loss, damage or destruction of any of the Collateral; (e) the occurrence of an Event of Default or a Material Adverse Effect; and (f) of any other events or occurrences set forth in Section 7(a) of the Loan Agreement Schedule.

**9.2** **Change in Ownership, Directors, Managers or Officers.** Borrower shall promptly notify Lender of any changes in Borrower's managers, directors and/or officers and in the ownership of Borrower.

**9.3** **Pay Taxes and Liabilities; Comply with Agreement.** Borrower shall promptly pay, when due, or otherwise discharge, all Indebtedness, sums and liabilities of any kind now or hereafter owing by Borrower to its employees as wages or salaries or to Lender and Governmental Authorities however created, incurred, evidenced, acquired, arising or payable, including, without limitation, the Obligations, income taxes, excise taxes, sales and use taxes, license fees, and all other taxes with respect to any of the Collateral, or any wages or salaries paid by Borrower or otherwise, unless the validity of which are being contested in good faith by Borrower by appropriate proceedings, provided that Borrower shall have maintained reasonably adequate reserves and accrued the estimated liability on Borrower's balance sheet for the payment of same.

**9.4** **Observe Covenants, etc.** Borrower shall observe, perform and comply with the covenants, terms and conditions of this Agreement and the other Loan Documents.

**9.5** **Maintain Corporate Existence and Qualifications.** Borrower shall maintain and preserve in full force and effect, its corporate existence and rights, franchises, licenses and qualifications necessary to continue its business, and comply with all applicable statutes, rules and regulations pertaining to the operation, conduct and maintenance of its existence and business including, without limitation, all federal, state and local laws relating to benefit plans, environmental safety, or health matters, and hazardous or liquid waste or chemicals or other liquids (including use, sale, transport and disposal thereof).

**9.6** **Financial Reports and Other Information.** Borrower shall deliver or cause to be delivered to Lender:

(a) **Reports.** The financial reports and other information set forth on Section 7(b) of the Loan Agreement Schedule, on the dates set forth therein. The Borrower shall further comply with all its covenants set forth therein.

{00171621.DOC; 1}

29

# Exhibit - A

**EX 1 PG 61**

(b)     **Notice of Litigation; Judgments, Environmental, Health or Safety Complaints.**

(i)     Immediately after commencement thereof, notice in writing of all litigation and of all proceedings before any Governmental Authority affecting the Borrower or any of its assets;

(ii)     Within three (3) Business Days thereafter, written notice to Lender of the entry of any judgment or the institution of any lawsuit or of other legal or equitable proceedings or the assertion of any crossclaim or counterclaim seeking monetary damages from Borrower in an amount exceeding $25,000; and

(iii)     Within three (3) Business Days thereafter, notice or copies if written of all claims, complaints, orders, citations or notices, whether formal or informal, written or oral, from a governmental body or private person or entity, relating to air emissions, water discharge, noise emission, solid or liquid waste disposal, hazardous waste or materials, or any other environmental, health or safety matter, which adversely effect Borrower. Such notices shall include, among other information, the name of the party who filed the claim, the potential amount of the claim, and the nature of the claim.

(c)     **Other Information.** Upon demand,

(i)     Certificates of insurance for all policies of insurance to be maintained by Borrower pursuant hereto;

(ii)     All information received by Borrower affecting the financial status or condition of any Account Debtor or the payment of any Account, including but not limited to, invoices, original orders, shipping and delivery receipts; and

(iii)     An estoppel certificate executed by an authorized officer of Borrower indicating that there then exists no Event of Default and no event which, with the giving of notice or lapse of time, or both, would constitute an Event of Default.

(d)     **Additional Information.** From time to time, such other information as Lender may reasonably request, including financial projections and cash flow analysis.

9.7     **Comply with Laws.** Borrower shall comply with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority, compliance with which is necessary to maintain its corporate existence or the conduct of its business or non-compliance with which would adversely affect in any respect its ability to perform its obligations or any security given to secure its obligations.

9.8     **Insurance Required.**

(a)     Borrower shall cause to be maintained, in full force and effect on all property of Borrower including, without limitation, all Inventory and Equipment, insurance in such amounts against such risks as is reasonably satisfactory to Lender, including, but without limitation, business interruption, liability, fire, boiler, theft, burglary, pilferage, vandalism, malicious mischief, loss in

{00171621.DOC; 1}

30

**Exhibit - A**

EX 1 PG 62

**7-ER-1490**

transit, and hazard insurance and, if as of the date hereof, any of the leased real property of Borrower is in an area that has been identified by the Secretary of Housing and Urban Development as having special flood or mudslide hazards, and on which the sale of flood insurance has been made available under the National Flood Insurance Act of 1968, then Borrower shall maintain flood insurance. Said policy or policies shall:

      (i)     Be in a form and with insurers which are satisfactory to Lender;

      (ii)     Be for such risks, and for such insured values as Lender or its assigns may reasonably require in order to replace the property in the event of actual or constructive total loss;

      (iii)     Designate Lender as additional insured and loss payee as Lender's interest may from time to time appear;

      (iv)     Contain a "breach of warranty clause" whereby the insurer agrees that a breach of the insuring conditions or any negligence by Borrower or any other person shall not invalidate the insurance as to Lender and its assignee;

      (v)     Provide that they may not be canceled or altered without thirty (30) days prior written notice to Lender; and

      (vi)     Upon demand, be delivered to Lender.

      (b)     Borrower shall obtain such additional insurance as Lender may reasonably require.

      (c)     Borrower shall, in the event of loss or damage, forthwith notify Lender and file proofs of loss with the appropriate insurer. Borrower hereby authorizes Lender to endorse any checks or drafts constituting insurance proceeds.

      (d)     Borrower shall forthwith upon receipt of insurance proceeds endorse and deliver the same to Lender.

      (e)     In no event shall Lender be required either to (i) ascertain the existence of or examine any insurance policy or (ii) advise Borrower in the event such insurance coverage shall not comply with the requirements of this Agreement.

      **9.9**     **Condition of Collateral; No Liens.** Borrower shall maintain all Collateral in good condition and repair at all times, and preserve it against any loss, damage, or destruction of any nature whatsoever relating to said Collateral or its use, and keep said Collateral free and clear of any Liens, except for the Permitted Encumbrances, and shall not permit Collateral to become a fixture to real estate or accessions to other personal property.

      **9.10**     **Payment of Proceeds.** Borrower shall forthwith upon receipt of all proceeds of Collateral, pay such proceeds (insurance or otherwise) up to the amount of the then-outstanding

# Exhibit - A

EX 1 PG 63

**7-ER-1491**

Obligations over to Lender for application against the Obligations in such order and manner as Lender may elect.

**9.11    Records.** Borrower shall at all times keep accurate and complete records of its operations, of the Collateral and the status of each Account, which records shall be maintained at its executive offices as set forth on Section 5.4(l) of Borrower's Disclosure Schedule.

**9.12    Delivery of Documents.** If any proceeds of Accounts shall include, or any of the Accounts shall be evidenced by, notes, trade acceptances or instruments or documents, or if any Inventory is covered by documents of title or chattel paper, whether or not negotiable, then Borrower waives protest regardless of the form of the endorsement. If Borrower fails to endorse any instrument or document, Lender is authorized to endorse it on Borrower's behalf.

**9.13    United States Contracts.** Section 7(c) of the Loan Agreement Schedule is hereby incorporated by reference and made a part hereof.

**9.14    Name Changes; Location Changes.**

(a)    Borrower shall promptly notify Lender if Borrower is known by or conducting business under any names other than those set forth in this Agreement.

(b)    Borrower shall deliver not less than thirty (30) Business Days prior written notice to Lender if Borrower intends to conduct any of its business or operations at or out of offices or locations other than those set forth in this Agreement, or if it changes the location of its chief executive office or the address at which it maintains its books and records.

**9.15    Further Assurances.** Borrower shall at any time or from time to time upon request of Lender take such steps and execute and deliver such Financing Statements and other documents all in the form of substance satisfactory to Lender relating to the creation, validity or perfection of the security interests provided for herein, under the UCC or which are reasonably necessary to effectuate the purposes and provisions of this Agreement. Borrower shall defend the right, title and interest of Lender in and to the Collateral against the claims and demands of all Persons whomsoever, and take such actions, including (i) all actions necessary to grant Lender "control" of any Investment Property, Deposit Accounts, Letter-of-Credit Rights or Electronic Chattel Paper owned by it, with any agreements establishing control to be in form and substance satisfactory to Lender, (ii) the prompt (but in no event later than three (3) Business Days following Lender's request therefor) delivery to Lender of all original Instruments, Chattel Paper, negotiable Documents and certificated Securities owned by it (in each case, accompanied by stock powers, allonges or other instruments of transfer executed in blank), (iii) notification of Lender's interest in Collateral at Lender's request, and (iv) the institution of litigation against third parties as shall be prudent in order to protect and preserve Borrower's and/or Lender's respective and several interests in the Collateral.

**9.16    Indemnification.** Borrower shall indemnify, protect, defend and save harmless Lender, as well as Lender's directors, officers, trustees, employees, agents, attorneys, members and shareholders (hereinafter referred to collectively as the "**Indemnified Parties**" and individually as an "**Indemnified Party**") from and against (a) any and all losses, damages, expenses or liabilities of any kind or nature and from any suits, claims or demands, by third parties (including, without limitation, claims of brokers and finders), including reasonable counsel fees incurred in investigating or defending such claim,

{00171621.DOC; 1}

32

**Exhibit - A**

**7-ER-1492**

suffered by any of them and caused by, relating to, arising out of, resulting from, or in any way connected with the Loans, the transactions contemplated herein and the Loan Documents, and (b) any and all losses, damages, expenses or liabilities sustained by Lender in connection with any Environmental Liabilities and Costs. In case any action shall be brought against an Indemnified Party based upon any of the above and in respect to which indemnity may be sought against Borrower, the Indemnified Party against whom such action was brought shall promptly notify Borrower in writing, and Borrower shall assume the defense thereof, including the employment of counsel selected by Borrower and reasonably satisfactory to the Indemnified Party, the payment of all costs and expenses and the right to negotiate and consent to settlement. Upon reasonable determination made by the Indemnified Party, the Indemnified Party shall have the right to employ separate counsel in any such action and to participate in the defense thereof; provided, however, that the Indemnified Party shall pay the costs and expenses incurred in connection with the employment of separate counsel. Borrower shall not be liable for any settlement of any such action effected without its consent, but if settled with Borrower's consent, or if there be a final judgment for the claimant in any such action, Borrower agrees to indemnify and save harmless said Indemnified Party against whom such action was brought from and against any loss or liability by reason of such settlement or judgment, except as otherwise provided above. The provisions of this Section shall survive the termination of this Agreement and the final repayment of the Obligations.

   **9.17    Additional Covenants.** The terms and provisions of <u>Section 7(d) of the Loan Agreement Schedule</u> are incorporated herein by reference and made a part hereof.

## SECTION 10. NEGATIVE COVENANTS.

   Until payment and satisfaction in full of all Obligations and the termination of this Agreement, Borrower hereby covenants and agrees as follows:

   **10.1    Change of Control; No Creation of Subsidiaries.** Borrower will not consolidate with, merge with, or acquire the stock or a material portion of the assets of any person, firm, joint venture, partnership, corporation, or other entity, whether by merger, consolidation, purchase of stock or otherwise if any such action results in a Change of Control (as defined below). Borrower will not create or permit to exist any Subsidiary unless such new Subsidiary is a wholly-owned Subsidiary and is designated by Lender as either a co-borrower or guarantor hereunder and such Subsidiary shall have entered into all such documentation required by Lender, including, without limitation, to grant to Lender a first priority perfected security interest in substantially all of such Subsidiary's assets to secure the Obligations. In addition, Borrower will not acquire a material portion of the assets of any entity in a manner that is not addressed by the foregoing provisions of this Section 10.1 if such action would impair Lender's rights hereunder or in the Collateral.

A **"Change of Control"** shall be deemed to have occurred if:

   (i)    any "Person," which shall mean a "person" as such term is used in Sections 13(d) and 14(d) of the 1934 Act, or group of Persons (other than Persons that are holders of voting securities of the Borrower as of the date of the execution of this Agreement) is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, of securities of Borrower representing 50% or more of the combined voting power of Borrower's then outstanding voting securities;

{00171621.DOC; 1}

33

(ii)    individuals, who at the Closing Date constitute the Board of Directors or the managers of Borrower, and any new director or manager whose election by the Board of Directors or managers of Borrower, or whose nomination for election by Borrower's equity holders, was approved by a vote of at least one-half (1/2) of the directors or managers then in office (other than in connection with a contested election), cease for any reason to constitute at least a majority of the Board of Directors or managers of Borrower;

(iii)    the stockholders or members of Borrower approve (I) a plan of complete liquidation of Borrower or (II) the sale or other disposition by Borrower of all or substantially all of Borrower's assets; or

(iv)    a merger or consolidation of Borrower with any other entity is consummated, other than:

(A)    a merger or consolidation which results in the voting securities of Borrower outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 50% of the combined voting power of the surviving entity's outstanding voting securities immediately after such merger or consolidation; or

(B)    a merger or consolidation which would result in the directors or managers of Borrower (who were directors or managers immediately prior thereto) continuing to constitute more than 50% of all directors or managers of the surviving entity immediately after such merger or consolidation.

In this paragraph (iv), "surviving entity" shall mean only an entity in which all of Borrower's equity holders immediately before such merger or consolidation (determined without taking into account any equity holders properly exercising appraisal or similar rights) become equity holders by the terms of such merger or consolidation, and the phrase "directors or managers of Borrower (who were directors or managers immediately prior thereto)" shall include only individuals who were directors or managers of Borrower at the Closing Date.

**10.2    Disposition of Assets or Collateral.** Borrower will not sell, lease, transfer, convey, or otherwise dispose of any or all of its assets or Collateral, other than the disposition or transfer in the ordinary course of business.

**10.3    Other Liens.** Borrower will not incur, create or permit to exist any Lien on any of its property or assets, whether now owned or hereafter acquired, except for (a) those Liens in favor of Lender created by this Agreement and the other Loan Documents; and (b) the Permitted Encumbrances.

**10.4    Other Liabilities.** Borrower will not incur, create, assume, or permit to exist, any Indebtedness or liability on account of either borrowed money or the deferred purchase price of property, except (i) Obligations to Lender, (ii) debt expressly subordinated to Borrower's

{00171621.DOC; 1}

34

Indebtedness to Lender pursuant to a subordination agreement in form and substance satisfactory to Lender or (iii) Indebtedness incurred in connection with any of the Permitted Encumbrances.

**10.5    Intentionally Omitted.**

**10.6    Loans.**  Borrower will not make any loans to any Person, other than (a) advances to employees of Borrower in the ordinary course of business, with outstanding advances to any employee not to exceed $1,000 at any time and (b) commission advances made by Borrower to Borrower's sub-agents pursuant to the terms of their contracts and attached commission schedules, provided that such advances shall not at any time exceed, in the aggregate, fifty percent (50%) of final commissions scheduled to be paid to sub-agents.

**10.7    Guaranties.**  Borrower will not assume, guaranty, endorse, contingently agree to purchase or otherwise become liable upon the obligation of any Person, except by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

**10.8    Transfers of Notes or Accounts.**  Borrower will not sell, assign, transfer, discount or otherwise dispose of any Accounts or any promissory note payable to Borrower, with or without recourse.

**10.9    Dividends.**  Borrower will not declare or pay any cash dividend, make any distribution on, redeem, retire or otherwise acquire directly or indirectly, any of its Equity Interests without the prior written consent of Lender. Notwithstanding the foregoing, on not less than thirty (30) days prior written notice to Lender, and provided that no event of Default has occurred and is then continuing, Crop Services may make cash distributions to its members as and when required to enable the members to make estimated tax payments attributable to their respective distributive shares of net profits, if any.

**10.10    Payments to Affiliates.**  Except as set forth in Section 10.10 of the Borrower's Disclosure Schedule, or as otherwise approved by Lender in writing in advance, Borrower shall not make any payments of cash or other property to any Affiliate.

**10.11    Modification of Documents.**  Borrower will not change, alter or modify, or permit any change, alteration or modification of its Organizational Documents in any manner that might adversely affect Lender's rights hereunder as a secured lender or its Collateral without Lender's prior written consent.

**10.12    Change Business or Name.**  Borrower will not engage in any business other than the Business, or change its names as it appears in the official filings of its state of organization.

**10.13    Settlements.**  Other than in the ordinary course of its business, Borrower will not compromise, settle or adjust any claims in any amount relating to any of the Collateral, without the prior written consent of Lender.

### SECTION 11. EVENTS OF DEFAULT.

The occurrence of any of the following shall constitute an event of default (hereinafter referred to as an "**Event of Default**"):

{00171621.DOC; 1}

35

**Exhibit - A**

EX 1 PG 67

**7-ER-1495**

**11.1** **Failure to Pay.** The failure by Borrower to pay, when due, (a) any payment of principal, interest or other charges due and owing to Lender pursuant to any obligations of Borrower to Lender including, without limitation, those Obligations arising pursuant to this Agreement or any Loan Document, or under any other agreement for the payment of monies then due and payable to Lender, or (b) any taxes due to any Governmental Authority.

**11.2** **Failure of Insurance.** Failure of one or more of the insurance policies required hereunder to remain in full force and effect; failure on the part of Borrower to pay or cause to be paid all premiums when due on the insurance policies pursuant to this Agreement; failure on the part of Borrower to take such other action as may be requested by Lender in order to keep said policies of insurance in full force and effect until all Obligations have been indefeasibly paid in full; and failure on the part of Borrower to execute any and all documentation required by the insurance companies issuing said policies to effectuate said assignments.

**11.3** **Failure to Perform.** Borrower's failure to perform or observe any covenant, term or condition of this Agreement or in any other Loan Document.

**11.4** **Cross Default.** Borrower's default under any agreement or contract with a third party which default would result in a liability to Borrower in excess of $25,000.

**11.5** **False Representation or Warranty.** Borrower shall have made any statement, representation or warranty in this Agreement or in any other Loan Document to which Borrower is a party or in a certificate executed by Borrower incident to this Agreement, which is at any time found to have been false in any material respect at the time such representation or warranty was made.

**11.6** **Liquidation, Voluntary Bankruptcy, Dissolution, Assignment to Creditors.** Any resolution shall be passed or any action (including a meeting of creditors) shall be taken by Borrower for the termination, winding up, liquidation or dissolution of Borrower, or Borrower shall make an assignment for the benefit of creditors, or Borrower shall file a petition in voluntary liquidation or bankruptcy, or Borrower shall file a petition or answer or consent seeking, or consenting to, the reorganization of Borrower or the readjustment of any of the indebtedness of Borrower under any applicable insolvency or bankruptcy laws now or hereafter existing (including the United States Bankruptcy Code), or Borrower shall consent to the appointment of any receiver, administrator, liquidator, custodian or trustee of all or any part of the property or assets of Borrower or any corporate or company action shall be taken by Borrower for the purposes of effecting any of the foregoing.

**11.7** **Involuntary Petition Against Borrower.** Any petition or application for any relief is filed against Borrower under applicable insolvency or bankruptcy laws now or hereafter existing (including the United States Bankruptcy Code) or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity), and is not dismissed or stayed within thirty (30) days of the filing thereof.

**11.8** **Judgments; Levies.** Judgments or attachments aggregating in excess of $10,000 at any given time are obtained against Borrower which remain unstayed for a period of ten (10) days or are enforced.

{00171621.DOC; 1}

36

**Exhibit - A**

**EX 1 PG 68**

**7-ER-1496**

**11.9   Change in Condition.** There occurs any event or a change in the condition or affairs, financial or otherwise, of Borrower which, in the reasonable opinion of Lender, impairs Lender's security or the ability of Borrower to discharge its obligations hereunder or any other Loan Document or which impairs the rights of Lender in Borrower's Collateral.

**11.10   Environmental Claims.** Lender determines that any Environmental Liabilities and Costs or Environmental Lien with respect to Borrower will have a potentially adverse effect on the financial condition of Borrower or on the Collateral.

**11.11   Failure to Notify.** If at any time Borrower fail to provide Lender immediately with notice or copies, if written, of all complaints, orders, citations or notices with respect to environmental, health or safety complaints.

**11.12   Failure to Deliver Documentation.** Borrower shall fail to obtain and deliver to Lender any other documentation required to be signed or obtained as part of this Agreement, or shall have failed to take any reasonable action requested by Lender to perfect, protect, preserve and maintain the security interests and Lien on the Collateral provided for herein.

**11.13   Change of Control.** Borrower undergoes a Change of Control.

**11.14   Dissolution; Maintenance of Existence.** Borrower is dissolved, or either Borrower fails to maintain its corporate existence in good standing, or the usual business of Borrower ceases or is suspended in any respect.

**11.15   Indictment.** The indictment of Borrower or any director or Responsible Officer of either Borrower under any criminal statute, or commencement of criminal or civil proceedings against either Borrower, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture of any portion of the property of either Borrower.

**11.16   Tax Liens.** The filing of a Lien for any unpaid taxes filed by any Governmental Authority against Borrower or any of its assets.

**11.17   Challenge to Validity of Loan Documents.** Borrower attempts to terminate, or challenges the validity of, or its liability under, this Agreement or any other Loan Document, or any proceeding shall be brought to challenge the validity, binding effect of Loan Document, or any Loan Document ceases to be a valid, binding and enforceable obligation of either Borrower.

**11.18   Claims Against Lender.** The filing of a motion by the Borrower seeking to challenge the Lender's Liens under the Loan Documents or otherwise commencing any cause of action against the Lender.

**11.19   Other Events of Default.** Any events and/or occurrences set forth on Section 9 of the Loan Agreement Schedule.

{00171621.DOC; 1}

37

**Exhibit - A**

**7-ER-1497**

## SECTION 12.REMEDIES.

**12.1    Acceleration; Other Remedies.** Upon the occurrence and during the continuation of an Event of Default:

(a)    Lender shall have all rights and remedies provided in this Agreement, any of the other Loan Documents, the UCC or other applicable law, all of which rights and remedies may be exercised without notice to Borrower, all such notices being hereby waived, except such notice as is expressly provided for hereunder or is not waivable under applicable law. All rights and remedies of Lender are cumulative and not exclusive and are enforceable, in Lender's discretion, alternatively, successively, or concurrently on any one or more occasions and in any order Lender may determine. Without limiting the foregoing, Lender may (i) accelerate the payment of all Obligations and demand immediate payment thereof to Lender, (ii) with or without judicial process or the aid or assistance of others, enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral or complete processing, manufacturing and repair of all or any portion of the Collateral, (iii) require Borrower, at Borrower's expense, to assemble and make available to Lender any part or all of the Collateral at any place and time designated by Lender, (iv) collect, foreclose, receive, appropriate, setoff and realize upon any and all Collateral, (v) notify Account Debtors or other obligors to make payment directly to Lender, or notify bailees as to the disposition of Collateral, (vi) extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Accounts or other Collateral which includes a monetary obligation and discharge or release the Account Debtor or other obligor, without affecting any of the Obligations, and (vii) sell, lease, transfer, assign, deliver or otherwise dispose of any and all Collateral (including, without limitation, entering into contracts with respect thereto, by public or private sales at any exchange, broker's board, any office of Lender or elsewhere) at such prices or terms as Lender may deem reasonable, for cash, upon credit or for future delivery, with Lender having the right to purchase the whole or any part of the Collateral at any such public sale, all of the foregoing being free from any right or equity of redemption of Borrower, which right or equity of redemption is hereby expressly waived and released by Borrower. If any of the Collateral or other security for the Obligations is sold or leased by Lender upon credit terms or for future delivery, the Obligations shall not be reduced as a result thereof until payment therefor is finally collected by Lender. If notice of disposition of Collateral is required by law, ten (10) days prior notice by Lender to Borrower designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and Borrower waives any other notice. In the event Lender institutes an action to recover any Collateral or seeks recovery of any Collateral by way of prejudgment remedy, Borrower waives the posting of any bond which might otherwise be required.

(b)    Lender may apply the proceeds of Collateral actually received by Lender from any sale, lease, foreclosure or other disposition of the Collateral to payment of any of the Obligations, in whole or in part (including attorneys' fees and legal expenses incurred by Lender with respect thereto or otherwise chargeable to Borrower) and in such order as Lender may elect, whether or not then due. Borrower shall remain liable to Lender for the payment on demand of any deficiency together with interest at the Default Interest Rate and all costs and expenses of collection or enforcement, including reasonable attorneys' fees and legal expenses.

{00171621.DOC; 1}

38

**Exhibit - A**

EX 1 PG 70

(c)      Lender may, at its option, cure any default by Borrower under any agreement with a third party or pay or bond on appeal any judgment entered against Borrower, discharge taxes and Liens at any time levied on or existing with respect to the Collateral, and pay any amount, incur any expense or perform any act which, in Lender's sole judgment, is necessary or appropriate to preserve, protect, insure, maintain, or realize upon the Collateral.  Such amounts paid by Lender shall be repayable by Borrower on demand and added to the Obligations, with interest payable thereon at the Default Interest Rate. Lender shall be under no obligation to effect such cure, payment, bonding or discharge, and shall not, by doing so, be deemed to have assumed any obligation or liability of Borrower.

(d)      Lender and Lender's agents shall have the right to utilize any of Borrower's customer lists, registered names, trade names or trademarks to publicly advertise the sell, lease, transfer, assign, deliver or otherwise dispose of any and all Collateral and Borrower will be deemed to have waived and voided any confidentiality agreements by and between Borrower and Lender.

**12.2      Set-off.** Lender shall have the right, immediately and without notice of other action, to set-off against any of Borrower's liabilities to Lender any money or other liability owed by Lender or any Affiliate of Lender (and such Affiliate of Lender is hereby authorized to effect such set-off) in any capacity to Borrower, whether or not due, and Lender or such Affiliate shall be deemed to have exercised such right of set-off and to have made a charge against any such money or other liability immediately upon the occurrence of such Event of Default even though the actual book entries may be made at a time subsequent thereto. The right of set-off granted hereunder shall be effective irrespective of whether Lender shall have made demand under or in connection with the Loans. None of the rights of Lender described in this Section are intended to diminish or limit in any way Lender's or Affiliates of Lender's common-law set-off rights.

**12.3      Costs and Expenses.** Borrower shall be liable for all costs, charges and expenses, including attorney's fees and disbursements, incurred by Lender by reason of the occurrence of any Event of Default or the exercise of Lender's remedies with respect thereto, each of which shall be repayable by Borrower on demand with interest at the Default Interest Rate, and added to the Obligations.

**12.4      No Marshalling.** Lender shall be under no obligation whatsoever to proceed first against any of the Collateral or other property which is security for the Obligations before proceeding against any other of the Collateral. It is expressly understood and agreed that all of the Collateral or other property which is security for the Obligations stands as equal security for all Obligations, and that Lender shall have the right to proceed against any or all of the Collateral or other property which is security for the Obligations in any order, or simultaneously, as in its sole and absolute discretion it shall determine. It is further understood and agreed that Lender shall have the right, as it in its sole and absolute discretion shall determine, to sell any or all of the Collateral or other property which is security for the Obligations in any order or simultaneously, as Lender shall determine in its sole and absolute discretion.

**12.5      No Implied Waivers; Rights Cumulative.** No delay on the part of Lender in exercising any right, remedy, power or privilege hereunder or under any other Loan Document or provided by statute or at law or in equity or otherwise shall impair, prejudice or constitute a waiver of any such right, remedy, power or privilege or be construed as a waiver of any Event of Default or as an

{00171621.DOC; 1}

**Exhibit - A**

**7-ER-1499**

acquiescence therein. No right, remedy, power or privilege conferred on or reserved to Lender hereunder or under any other Loan Document or otherwise is intended to be exclusive of any other right, remedy, power or privilege. Each and every right, remedy, power or privilege conferred on or reserved to Lender under this Agreement or under any of the other Loan Documents or otherwise shall be cumulative and in addition to each and every other right, remedy, power or privilege so conferred on or reserved to Lender and may be exercised by Lender at such time or times and in such order and manner as Lender shall (in its sole and complete discretion) deem expedient.

## SECTION 13. OTHER RIGHTS OF LENDER.

**13.1    Collections.** Borrower hereby authorizes Lender to, and Lender shall make such arrangements as it shall deem necessary or appropriate to, collect the Accounts and any other monetary obligations included in, or proceeds of, the Collateral at any time whether or not an Event of Default has occurred. Borrower shall, at Borrower's expense and in the manner requested by Lender from time to time, direct that remittances and all other proceeds of accounts and other Collateral up to the amount of the then-current Obligations shall be (a) remitted in kind to Lender, (b) sent to a post office box designated by and/or in the name of Lender, or in the name of Borrower, but as to which access is limited to Lender and/or (c) deposited into a bank account maintained in the name of Lender and/or a blocked bank account under arrangements with the depository bank under which all funds deposited to such blocked bank account are required to be transferred solely to Lender. In connection therewith, Borrower shall execute such post office box and/or blocked bank account agreements as Lender shall specify.

**13.2    Repayment of Obligations.** All Obligations shall be payable at Lender's office set forth below or at a bank or such other place as Lender may expressly designate from time to time for purposes of this Section. Lender shall apply all proceeds of Accounts or other Collateral received by Lender and all other payments in respect of the Obligations to the Loans whether or not then due or to any other Obligations then due, in whatever order or manner Lender shall determine.

**13.3    Lender Appointed Attorney-in-Fact.**

(a)    Borrower hereby irrevocably constitutes and appoints Lender, with full power of substitution, as its true and lawful attorney-in-fact, with full irrevocable power and authority in its place and stead and in its name or otherwise, from time to time in Lender's discretion, at Borrower's sole cost and expense, to take any and all appropriate action and to execute and deliver any and all documents and instruments which Lender may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including, without limiting the generality of the foregoing, (i) at any time any of the Obligations are outstanding, (A) to transmit to Account Debtors, other obligors or any bailees notice of the interest of Lender in the Collateral or request from Account Debtors or such other obligors or bailees at any time, in the name of Borrower or Lender or any designee of Lender, information concerning the Collateral and any amounts owing with respect thereto; (B) to execute in the name of Borrower and file against Borrower in favor of Lender Financing Statements or amendments with respect to the Collateral, or record a copy or an excerpt hereof in the United States Copyright Office or the United States Patent and Trademark Office and to take all other steps as are necessary in the reasonable opinion of Lender under applicable law to perfect the security interests granted herein; and (C) to pay or discharge taxes, Liens, security interests or other encumbrances levied or placed on or threatened against the Collateral; and (ii) after and during the continuation of an Event of Default, (A) to

{00171621.DOC; 1}

40

## Exhibit - A

receive, take, endorse, assign, deliver, accept and deposit, in the name of Lender or Borrower, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof, (B) to notify Account Debtors or other obligors to make payment directly to Lender, or notify bailees as to the disposition of Collateral, (C) to change the address for delivery of mail to Borrower and to receive and open mail addressed to Borrower, (D) take or bring, in the name of Lender or Borrower, all steps, actions, suits or proceedings deemed by Lender necessary or desirable to effect collection of or other realization upon the Collateral; (E) to obtain and adjust insurance required pursuant to this Agreement and to pay all or any part of the premiums therefor and the costs thereof, and (F) to extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Accounts or other Collateral which includes a monetary obligation and discharge or release the Account Debtor or other obligor, without affecting any of the Obligations.

(b) Borrower hereby ratifies, to the extent permitted by law, all that Lender shall lawfully and in good faith do or cause to be done by virtue of and in compliance with this Agreement. The powers of attorney granted pursuant to this Agreement are each a power coupled with an interest and shall be irrevocable until the Obligations are paid indefeasibly in full.

**13.4 Release of Lender.** Borrower hereby releases and exculpates Lender, its officers, partners, members, directors, employees, agents, representatives and designees, from any liability arising from any acts or occurrence under this Agreement or in furtherance thereof, whether as attorney-in-fact or otherwise, whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for gross negligence or willful misconduct as determined by a final and non-appealable order from a court of competent jurisdiction. In no event will Lender have any liability to Borrower for lost profits or other special or consequential damages.

**13.5 Uniform Commercial Code.** At all times prior and subsequent to an Event of Default hereinafter, Lender shall be entitled to all the rights and remedies of a secured party under the UCC with respect to all Collateral.

**13.6 Preservation of Collateral.** At all times prior and subsequent to an Event of Default hereinafter, Lender may (but without any obligation to do so) take any and all action which in its sole and absolute discretion is necessary and proper to preserve its interest in the Collateral consisting of Accounts, including without limitation the payment of debts of Borrower which might, in Lender's sole and absolute discretion, impair the Collateral or Lender's security interest therein, and the sums so expended by Lender shall be secured by the Collateral, shall be added to the amount of the Obligations due Lender and shall be payable on demand with interest at the rate applicable to the Loans set forth in Section 3.1 hereof from the date expended by Lender until repaid by Borrower. After written notice by Lender to Borrower and automatically, without notice, after an Event of Default, Borrower shall not, without the prior written consent of Lender in each instance, (a) grant any extension of time of payment of any Accounts, (b) compromise or settle any Accounts for less than the full amount thereof, (c) release in whole or in part any Account Debtor or other person liable for the payment of any of the Accounts or any such other Collateral, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Accounts.

**13.7 Lender's Right to Cure.** In the event Borrower shall fail to perform any of its Obligations hereunder or under any other Loan Document, then Lender, in addition to all of its rights

**Exhibit - A**

**7-ER-1501**

and remedies hereunder, may perform the same, but shall not be obligated to do so, at the cost and expense of Borrower. Such costs and expenses shall be added to the amount of the Obligations due Lender, and Borrower shall promptly reimburse Lender for such amounts together with interest at the Default Interest Rate from the date such sums are expended until repaid by Borrower.

**13.8 Inspection of Collateral.** From time to time as requested by Lender, Lender or its designee shall have access, (a) prior to an Event of Default, at the sole expense of Borrower, during reasonable business hours to all of the premises where Collateral is located for the purpose of inspecting the Collateral and to all of Borrower's Collateral, inclusive of books and records, and Borrower shall permit Lender or Lender's designees to make copies of such books and records or extracts therefrom as Lender may request, and (b) on or after an Event of Default, at the sole expense of Borrower, at any time, to all of the premises where Collateral is located for the purposes of inspecting, disposing and realizing upon the Collateral, and all Borrower's books and records, and Borrower shall permit Lender or its designee to make such copies of such books and records or extracts therefrom as Lender may request. Without expense to Lender, Lender may use such of Borrower's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of Accounts and realization on other Collateral as Lender, in its sole discretion, deems appropriate. Borrower hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Lender at Borrower's expense all financial information, books and records, work papers, management reports and other information in its possession regarding Borrower.

## SECTION 14. PROVISIONS OF GENERAL APPLICATION.

**14.1 Waivers.** Borrower waives demand, presentment, notice of dishonor protest and notice of protest of any instrument of Borrower or others which may be included in the Collateral.

**14.2 Survival.** All covenants, agreements, representations and warranties made by Borrower herein or in any other Loan Document or in any certificate, report or instrument contemplated hereby shall survive any independent investigation made by Lender and the execution and delivery of this Agreement, and such certificates, reports or instruments and shall continue so long as any Obligations are outstanding and unsatisfied, applicable statutes of limitations to the contrary notwithstanding.

**14.3 Notices.** All notices, requests and demands to or upon the respective parties hereto shall be in writing and either (a) delivered by registered or certified mail, (b) delivered by hand, or (c) delivered by national overnight courier service with next Business Day delivery, and shall be deemed to have been duly given or made (i) upon the earlier of actual receipt and three (3) Business Days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid, (ii) one (1) Business Day after deposit with a national overnight courier with all charges prepaid, or (iii) when hand-delivered upon receipt by the receiving party. All notices, requests and demands are to be given or made to the respective parties at the addresses set forth on Section 11 of the Loan Agreement Schedule (or to such other addresses as either party may designate by notice in accordance with the provisions of Section 11 of the Loan Agreement Schedule).

**14.4 Amendments; Waiver of Defaults.** The terms of this Agreement shall not be amended, waived, altered, modified, supplemented or terminated in any manner whatsoever except by a written instrument signed by Lender and Borrower. Any default or Event of Default by Borrower may only be

{00171621.DOC; 1}

42

**Exhibit - A**

**EX 1 PG 74**

**7-ER-1502**

waived by a written instrument specifically describing such default or Event of Default and signed by the Lender.

**14.5    Binding on Successors.**

(a)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided, however, that Borrower may not assign any of its rights or obligations under this Agreement or the other Loan Documents to any Person without the prior written consent of Lender.

(b)    Lender may assign any or all of the Obligations together with any or all of the security therefor to any Person and any such assignee shall succeed to all of Lender's rights with respect thereto. Lender shall notify Borrower of any such assignment. Upon such assignment, Lender shall have no further obligations under the Loan Documents. Lender may from time to time sell or otherwise grant participations in any of the Obligations and the holder of any such participation shall, subject to the terms of any agreement between Lender and such holder, be entitled to the same benefits as Lender with respect to any security for the Obligations in which such holder is a participant.

**14.6    Invalidity.** Any provision of this Agreement which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**14.7    Publicity.** Borrower hereby authorizes Lender to make appropriate announcements of the financial arrangement entered into by and between Borrower and Lender, including, without limitation, announcements which are commonly known as tombstones, in such publications and to such selected parties as Lender shall in its sole and absolute discretion deem appropriate, or as required by applicable law.

**14.8    Section or Paragraph Headings.** Section and paragraph headings are for convenience only and shall not be construed as part of this Agreement.

**14.9    APPLICABLE LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, THE LAWS OF WHICH THE BORROWER HEREBY EXPRESSLY ELECTS TO APPLY TO THIS AGREEMENT, WITHOUT GIVING EFFECT TO PROVISIONS FOR CHOICE OF LAW THEREUNDER. THE BORROWER AGREES THAT ANY ACTION OR PROCEEDING BROUGHT TO ENFORCE OR ARISING OUT OF THIS AGREEMENT SHALL BE COMMENCED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT.**

**14.10    WAIVER OF JURY TRIAL.    TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER HEREBY WAIVES ANY AND ALL RIGHTS THAT IT MAY NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN BORROWER, LENDER OR ITS SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY**

{00171621.DOC; 1}

43

CONNECTED WITH THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL. IT IS INTENDED THAT SAID WAIVER SHALL APPLY TO ANY AND ALL DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDINGS BETWEEN BORROWER AND LENDER. BORROWER WAIVES ALL RIGHTS TO INTERPOSE ANY CLAIMS, DEDUCTIONS, SETOFFS OR COUNTERCLAIMS OF ANY KIND, NATURE OR DESCRIPTION IN ANY ACTION OR PROCEEDING INSTITUTED BY LENDER WITH RESPECT TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS, THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, EXCEPT COMPULSORY COUNTERCLAIMS.

14.11 CONSENT TO JURISDICTION. BORROWER HEREBY (a) IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF CALIFORNIA, LOS ANGELES COUNTY WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, AND (b) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE OR FORUM NON CONVENIENS WITH RESPECT THERETO. IN ANY SUCH ACTION OR PROCEEDING, BORROWER WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT OR OTHER PROCESS AND PAPERS THEREIN AND AGREES THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER AT ITS OFFICES SET FORTH HEREIN OR OTHER ADDRESS THEREOF OF WHICH LENDER HAS RECEIVED NOTICE AS PROVIDED IN THIS AGREEMENT. NOTWITHSTANDING THE FOREGOING, BORROWER CONSENTS TO THE COMMENCEMENT BY LENDER OF ANY SUIT, ACTION OR PROCEEDING IN ANY OTHER JURISDICTION TO ENFORCE LENDER'S RIGHTS AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING.

14.12 **Entire Agreement.** This Agreement, the other Loan Documents, any supplements or amendments hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith contains the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written. In the event of any inconsistency between the terms of this Agreement and any schedule or exhibit hereto, the terms of this Agreement shall govern.

14.13 **Counterparts.** This Agreement may be executed in counterparts and by facsimile or other electronic signatures, each of which when so executed, shall be deemed an original, but all of which shall constitute but one and the same instrument.

14.14 **Joint and Several Obligations.** If more than one Person is a Borrower hereunder, the provisions of <u>Section 12 of the Loan Agreement Schedule</u> shall apply.

{00171621.DOC; 1}

44

Exhibit - A

EX 1 PG 76

7-ER-1504

**14.15 Amendment and Restatement.** This Agreement is given in substitution for, and amends and restates in its entirety, and as so amended and restated supersedes, the Original Loan Agreement. This Agreement is not in payment, novation, satisfaction or cancellation of the Original Loan Agreement, or of the indebtedness evidenced and secured thereby, and such indebtedness is hereby ratified and confirmed by Borrower, as amended hereby.

Borrower acknowledges and agrees that each of the Loan Documents shall remain in full force and effect and Borrower hereby ratifies and confirms the terms and provisions set forth therein. No novation of any Loan Document is intended or shall occur by or as a result of this Agreement.

The execution and delivery of this Agreement shall not impair the Liens of Lender under the Original Loan Agreement, and no part of such Liens shall be disturbed, impaired, extinguished, cancelled, rejected, surrendered, terminated, or discharged by the execution and delivery of this Agreement or any further instruments securing any other Indebtedness of Borrower to Lender.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

{00171621.DOC; 1}

45

**Exhibit - A**

**7-ER-1505**

EXECUTION

**IN WITNESS WHEREOF,** this Amended and Restated Loan and Security Agreement has been duly executed as of the day and year first above written.

**BORROWER:**

**CROP USA INSURANCE AGENCY, INC.**

By:
Name:
Title:

**CROPUSA INSURANCE SERVICES, LLC**

By:
Name:
Title:

**LENDER:**

**GEMCAP LENDING I, LLC**

By:
Name:
Title:

[SIGNATURE PAGE OF AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT]

{00171621.DOC, 1}

**Exhibit - A**

EXHIBIT 2

# Exhibit - A

 **CropUSA**
Insurance

111 Main Street • P.O. Box 538
Lewiston, ID 83501
800-635-1519
208-799-9000
208-746-8159 fax
www.CropUSAinsurance.com

November 21, 2011

Diversified Crop Insurance Services
1608 B West Lafayette
Jacksonville, IL 62650

Re:  Pledge of commissions payable to CropUSA Insurance Agency, Inc.
("CropUSA") under the Sales Agency – Company Agreement between CropUSA
and Diversified Crop Insurance Services ("Diversified") effective as of July 21,
2011 ("the Agreement").

Gentlemen:

This letter confirms that CropUSA has entered into a financing arrangement (the
"Financing") on or about November 22, 2011, between CropUSA and GemCap Lending
I, LLC ("GemCap"). In connection with the Financing, CropUSA has, among other
things, granted GemCap a security interest in and to any and all property of CropUSA,
including, without limitation, all payments, proceeds and other sums to which CropUSA
is entitled under the Agreement, such grant of security interest in the payments under
the Agreement is referred to herein as the "Pledge of Commissions".

We request that Diversified acknowledge the Pledge of Commissions and agree that
such Pledge of Commissions does not constitute a default by CropUSA under the
Agreement, and acknowledge its receipt of the notice directing payments under the
Agreement in the attached letter.

If Diversified agrees with the understandings and agreements contained in this letter,
please sign below and return this letter to CropUSA, Attn: John Taylor. This letter may
be executed in counterparts, and signatures transmitted via facsimile or electronic mail
shall be deemed original signatures. Thank you.

Very truly yours,                                    Acknowledged and agreed to:

CropUSA Insurance Agency, Inc.              Diversified Crop Insurance Services

By: _____              By: _____
       R. John Taylor                                          Deborah Scott
Its: President                                          Its: Accounting Manager

**Exhibit - A**                                    **EX 2 PG 79**

**7-ER-1508**

EXHIBIT 3

# Exhibit - A

## SPECIAL POWER OF ATTORNEY

STATE OF ___Idaho___ )
                                    )    ss.:
COUNTY OF ___Nez Perce___ )

KNOW ALL MEN BY THESE PRESENTS, that each of **CROP USA INSURANCE AGENCY, INC.**, an Idaho corporation, and **CROPUSA INSURANCE SERVICES, LLC**, an Idaho limited liability company (each, individually, a "**CROP USA ENTITY**" and collectively, the "**CROP USA ENTITIES**"), hereby appoints and constitutes **GEMCAP LENDING I, LLC** ("**GEMCAP**") and each of its affiliates, its true and lawful attorney, with full power of substitution and with full power and authority to perform the following acts on behalf of such CROP USA ENTITY:

(a) upon the occurrence and during the continuation of an Event of Default, to exercise any and all rights of such CROP USA ENTITY in, to and under any and all Collateral, including, without limitation, any and all agreements included in Collateral, and to ask for, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(b) upon the occurrence and during the continuation of an Event of Default, to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (a) above;

(c) upon the occurrence and during the continuation of an Event of Default, to file any claims or take any action or institute any proceedings that GEMCAP may in its good faith sole discretion deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of GEMCAP with respect to any of the Collateral;

(d) to pay or discharge taxes or liens levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by GEMCAP in its reasonable commercial judgment, any such payments made by GEMCAP to become joint and several obligations of the CROP USA ENTITIES to GEMCAP, due and payable immediately without demand;

(e) upon the occurrence and during the continuation of an Event of Default, to sign and endorse any invoices, drafts against such CROP USA ENTITY, assignments, verifications, notices and other documents relating to the Collateral; and

(f) upon the occurrence and during the continuation of an Event of Default, to prepare, file and sign such CROP USA ENTITY's name on an assignment document in form acceptable to GEMCAP in its sole discretion necessary or desirable to transfer ownership of the Collateral to GEMCAP or an assignee or transferee of GEMCAP.

1

**Exhibit - A**

This Power of Attorney is made pursuant to a Loan and Security Agreement, dated as of November 23, 2011 (the "**Loan Agreement**") between GEMCAP as lender and the CROP USA ENTITIES, jointly and severally, as borrower, and is subject to the terms and provisions thereof. Capitalized terms used and not defined herein have the meanings given to them in the Loan Agreement. This Special Power of Attorney, being coupled with an interest, is irrevocable until GEMCAP confirms in writing that all Obligations are indefeasibly paid in full.

Date: November 23, 2011

CROP USA INSURANCE AGENCY, INC.

By: _____
Name: R John Taylor
Title: Pres

CROPUSA INSURANCE SERVICES, LLC.

By: _____
Name: R John Taylor
Title: Manager

[SIGNATURE PAGE TO SPECIAL POWER OF ATTORNEY]

2

**Exhibit - A**

EX 3 PG 81

**7-ER-1511**

ACKNOWLEDGMENT

STATE OF IDAHO

COUNTY OF ___Nez Perce___

On this __25th__ day of ___November___, in the year ___2011___, before me, ___Diane R Whisner___, a Notary Public, personally appeared ___P. John Taylor___, known or identified to me (or proved to me on the oath of) to be the president, or vice president, or secretary or assistant secretary of the corporation that executed the above instrument or the person who executed the instrument on behalf of said corporation and acknowledged to me that such corporation executed the same.

(Seal)

_____

Notary Public

Printed Name: ___Diane R. Whisner___

Commission Expires:

___10-4-2013___

-------------------------------------------------------------------------------

STATE OF IDAHO

COUNTY OF ___Nez Perce___

On this __25th__ day of ___November___, in the year ___2011___, before me, ___Diane R Whisner___, a Notary Public, personally appeared ___P. John Taylor___, known or identified to me (or proved to me on the oath of) to be the president, or vice president, or secretary or assistant secretary of the corporation that executed the above instrument or the person who executed the instrument on behalf of said corporation and acknowledged to me that such corporation executed the same.

(Seal)

_____

Notary Public

Printed Name: ___Diane R. Whisner___

Commission Expires:

___10-4-2013___

3

**Exhibit - A**

EX 3 PG 82

**7-ER-1512**

EXHIBIT 4

# Exhibit - A

EXECUTION

AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT DATED
FEBRUARY 4, 2013 ("**LOAN AGREEMENT**"), AMONG CROP USA INSURANCE
AGENCY, INC. AND CROPUSA INSURANCE SERVICES, LLC,
JOINTLY AND SEVERALLY, AS BORROWER AND
GEMCAP LENDING I, LLC AS LENDER

AMENDED AND RESTATED LOAN AGREEMENT SCHEDULE

### 1. LOAN DETAILS

**(a) Borrower:** CROP USA INSURANCE AGENCY, INC. and CROPUSA
INSURANCE SERVICES, LLC, jointly and severally, each with a principal place of
business located at 111 Main Street, Lewiston, Idaho 83501.

**(b) Intentionally Omitted.**

**(c) Revolving Loans.**

(i)   **Revolving Loan Amount.** Lender may, subject to the terms and conditions
contained herein and the satisfaction of the closing and funding conditions set forth herein,
make revolving loans to Borrower ("**Revolving Loans**") prior to the Maturity Date in
amounts requested by Borrower from time to time, but not more than twelve (12) times each
month, provided that the requested Revolving Loan would not cause the outstanding
Revolving Loans to exceed the Revolving Loan Commitment existing immediately prior to
the making of the requested Revolving Loan. Subject to the terms and conditions hereof,
Borrower may borrow, repay and reborrow Revolving Loans, as set forth in this Agreement.

(ii)   **Advances.** Revolving Loans may be drawn in tranches of not less than
Twenty Five Thousand Dollars ($25,000) (each drawing, an "**Advance**" and collectively,
the "**Advances**"). The obligation of Borrower to repay the Revolving Loans shall be
evidenced by the Revolving Loan Note.

(iii)   **Repayment of Principal.** The principal amount of the Revolving Loans
shall be payable on the Maturity Date.

(iv)   **Overadvances.** Notwithstanding any provision herein to the contrary,
Borrower shall repay the Revolving Loans immediately at any time and from time to time in
an amount by which the outstanding balance of the Revolving Loans exceeds the Revolving
Loan Commitment, as determined by Lender (an "**Overadvance**").

(v)   **Borrowing Procedures.** Whenever Borrower desires an Advance,
Borrower will notify Lender by delivery of a borrowing certificate certified by a
Responsible Officer ("**Borrowing Certificate**") no later than two (2) Business Days prior to
the date of the proposed Advance, setting forth in reasonable detail, as of the date set forth
on the Borrowing Certificate, (A) a schedule of Eligible Crop Insurance Contract
Receivables setting forth the calculation of the Eligible Crop Insurance Contract
Receivables on which such Advance is to be based and a calculation of the Advance

{00171999.DOC; 1}

**Exhibit - A**

**7-ER-1514**

requested in connection therewith and (B) a schedule of the aggregate amount of funds in the Crop USA Savings Account on which such Advance is to be based, which Borrowing Certificate shall in all respects be subject to Lender's review and approval. In addition, Borrower shall furnish Lender with a Borrowing Certificate weekly on each Tuesday during the Term setting forth such information, irrespective of whether Borrower has then requested an Advance. Lender shall be entitled to rely on any facsimile or electronic transmission of a Borrowing Certificate given by a person who Lender reasonably believes to be a Responsible Officer, and Borrower shall indemnify and hold Lender harmless for any damages or loss suffered by Lender as a result of such reliance. The funding of each Advance shall be made in accordance with the applicable Borrowing Certificate as approved by Lender.

(vi)     **Collections.** All Collections shall be directed to Lender and deposited in an account at a financial institution selected by Lender (the "**Collection Account**"). Borrower shall cause all Collections to be sent directly to Lender's address set forth in this Agreement or in accordance with wire instructions as provided by Lender pursuant to a written instruction approved by Lender and delivered to all Account Debtors, which instruction may not be modified or terminated without Lender's prior written consent in each case. Once instituted, such payment system shall remain in effect unless Lender directs otherwise. Borrower shall bear all risk of loss of any funds deposited into such account except to the extent such loss is caused by the gross negligence or the willful misconduct of Lender. In connection therewith, Borrower shall execute such lockbox and/or bank account agreements as Lender shall specify from time to time. Any Collections or other Collateral proceeds received by Borrower from any source whatsoever shall be held in trust for the benefit of Lender and immediately remitted to Lender in kind. In the event that Borrower receives any Collections that should have been sent to the Collection Account, Borrower shall, promptly upon receipt and in any event within one Business Day of receipt, forward such Collections directly to Lender, in the form received, and promptly notify Lender of such event. Until so forwarded, such Collections shall be held in trust for the benefit of Lender.

(vii)    **Intentionally Omitted.**

(viii)   **Application of Collections.** Subject to charges for Collections Days, all amounts deposited into the Collection Account will, for the purposes of calculating the Borrowing Base and interest, be credited to the aggregate outstanding amount of the Revolving Loans on the date of deposit in the Collection Account. No checks, drafts or other instruments received by Lender shall constitute final payment to Lender unless and until such instruments have actually been collected.

(ix)     **Revolving Loan Fees and Expenses.** All payments of interest, fees, costs, expenses and other charges provided for in this Agreement or any other Loan Document that have not been paid to Lender on the due dates thereof, and any chargeback on an Eligible Crop Insurance Contract Receivable against which an Advance was made, shall be added to the principal amount of the Revolving Loans, and shall bear interest at the Default Interest Rate.

(x)      **Application of Collections and Proceeds of Collateral:**

{00171999.DOC; 1}                                                                                          2

**Exhibit - A**

A.     So long as no Event of Default shall have occurred and remain outstanding, Lender agrees to apply all Collections as follows: first, to Overadvances; second, to all fees, costs and expenses; third, to accrued and unpaid interest; fourth, to matured and unpaid Obligations; and fifth, the principal amount of the Revolving Loans.

B.     If an Event of Default shall have occurred and be continuing, Lender may apply Collections, any other proceeds of Collateral and all other payments received by Lender to the payment of the Obligations in such manner and in such order as Lender may elect in its sole discretion.

C.     In addition to the foregoing application of Collections, in order to satisfy Borrower's payment of amounts due under the Revolving Loans and all fees, expenses and charges with respect thereto that are due and payable under this Agreement or any other Loan Document, Borrower hereby irrevocably authorizes the Lender to initiate manual and automatic electronic (debit and credit) entries through ACH to all deposit accounts maintained by Borrower, wherever located, in accordance with Section 2.5 of the Loan Agreement.

(xi)     **Reserves.**  Without limiting any other rights and remedies of Lender hereunder or under the other Loan Documents, the Revolving Loan Commitment shall be subject to Lender's continuing right, in its sole discretion in good faith, from time to time, to withhold a Reserve from the Revolving Loan Commitment to reflect, among other things, conditions, contingencies or risks that may affect the Collateral or the financial condition of the Company.

(xii)     **Minimum Draw.**  During the Full Minimum Draw Period, Borrower shall maintain an outstanding amount of at least Five Million Dollars ($5,000,000) of Revolving Loans at all times, provided, however, that if the outstanding Revolving Loans at any time during the Full Minimum Draw Period do not equal or exceed Five Million Dollars ($5,000,000), Borrower shall pay to Lender the Minimum Draw Fee. The Minimum Draw Fee is intended to compensate Lender for committing and deploying funds for Borrower's Loans pursuant to the Agreement and for Lender's loss of investment of such funds in connection with Borrower's failure to borrow such funds, and is not intended as a penalty.

**(d)     Use of Proceeds:** (i) payment of funds to Reinsurance Partners, LLC for the purpose of funding its investment in Green Leaf Reinsurance Partners LLC, (ii) working capital purposes of Weskan Agency, LLC, (iii) payment of the Annual Line Fee (as set forth in Section 3(c) of this Loan Agreement Schedule), (iv) payment of an investment bank fee to GVC Financial Services, LLC, (v) payment of any other out-of-pocket costs, fees and expenses incurred by Borrower in connection with the Revolving Loans and (vi) working capital purposes of Borrower.

**(e) Financial Institution(s):**

Bank Name: US Bank
Address: 615 6th Street

{00171999.DOC; 1}

3

Clarkston, WA 99403
ABA#: 125000105
Account # ███████
Phone: 208 762 0247
Fax: _____
Reference: _____
Contact Person: Marian Pelsma

**2. Intentionally Omitted.**

**3. <u>INTEREST, FEES AND CHARGES</u>**

**(a) Interest.** Interest on the unpaid principal balance of Revolving Loans, including interest charges for Collection Days, shall be computed on the basis of the actual number of days elapsed and a year of 360 days and shall accrue on the unpaid principal balance of Advances at the rate of Eighteen and One Half Percent (18.5%) per annum (the **"Revolving Loan Interest Rate"**). All accrued interest on the Revolving Loans, including interest charges for Collection Days, shall be due and payable in arrears monthly on the first Business Day of each month.

**(b)     Default Interest.** Following and during the continuation of an Event of Default, interest on the unpaid principal balance of the Term Loan and the Revolving Loans shall accrue at a rate equal to Twenty Four Percent (24%) per annum (the **"Default Interest Rate"**).

**(c)  Fees and Expenses.** Borrower shall pay to Lender the following fees:

**Annual Line Fee:**

A fee equal to one percent (1%) of the Maximum Credit shall be due and payable on each of the Closing Date and on each anniversary thereof.

**Loan Administration Fee and Funding Fee:**

Five Hundred Dollars ($500) per month, payable in arrears on the first Business Day of each month.

**Audit Fees:**

Eight Hundred Fifty Dollars ($850) per person, per day, plus out-of-pocket expenses.

**4. <u>PREPAYMENT TERMS</u>**

**(a)     Intentionally Omitted.**

{00171999.DOC; 1}                                                                                                    4

# Exhibit - A

## 7-ER-1517

**(b)** **Revolving Loan Prepayment.** Borrower may voluntarily prepay the entire unpaid principal sum of the Revolving Loans without premium or penalty, provided, however, that, (i) such prepayment is no less than the amount of the then-outstanding aggregate principal sum of all Revolving Loans and all accrued and unpaid interest thereon, (ii) as part of such prepayment, Borrower shall pay Lender all other amounts due to Lender pursuant to the Note, this Agreement and other Loan Documents, including, without limitation, any Minimum Draw Fee and (iii) in the event Borrower makes such prepayment on or before November 23, 2014, then Borrower shall pay to Lender an amount equal to (1) the product of (A) the average daily principal balance of all Revolving Loans from January 1, 2013 through the date of prepayment, multiplied by (B) the daily Interest Rate, multiplied by (C) one thousand eighty (1,080), minus (2) the amount of interest indefeasibly received by Lender on account of all Revolving Loans through the date of prepayment (the "**Revolving Loan Prepayment Fee**"). The Revolving Loan Prepayment Fee is intended to compensate Lender for committing and deploying funds for Borrower's Loans pursuant to the Agreement and for Lender's loss of investment of such funds in connection with such early termination, and is not intended as a penalty.

**(c)** **Fees and Acceleration.** The Revolving Loan Prepayment Fee and the Minimum Draw Fee also shall be due and payable by Borrower to Lender if Lender accelerates the payment of the Obligations on or before November 23, 2014 due to the occurrence of an Event of Default.

**5.** **ADDITIONAL TERMS CONCERNING COLLATERAL**

**(a) Additional Collateral.** The "Account Collateral" set forth in the Pledge Agreement shall be a part of the "Collateral" under the Loan Agreement.

**(b) Intellectual Property.**

Borrower hereby grants to Lender an irrevocable, exclusive, worldwide license without payment of royalty or other compensation to Borrower, upon the occurrence and during the continuance of an Event of Default, to use or otherwise exploit in any manner as to which authorization of the holder of such Intellectual Property would be required, and to license or sublicense such rights in to and under, any Intellectual Property now or hereafter owned by or licensed to Borrower, and wherever the same may be located, including in such license access to all media in which any of such Intellectual Property may be recorded or stored and to all software and hardware used for the compilation or printout thereof, and represents, promises and agrees that any such license or sublicense is not and will not be in conflict with the contractual, proprietary or commercial rights of any third Person and subject, in the case of trademarks and service marks, to sufficient rights to quality control and inspection in favor of Borrower to avoid the risk of invalidation of said trademarks and service marks. The foregoing license will terminate on the indefeasible payment in full of all Obligations; provided, however, that any license, sublicense, or other rights granted by Lender pursuant to such license during its term shall remain in effect in accordance with its terms. Notwithstanding the foregoing, the foregoing grant of license shall not apply to use or exploitation of Borrower's risk

{00171999.DOC; 1}

5

**Exhibit - A**

**7-ER-1518**

assessment software, to the extent that such grant is expressly prohibited under the terms of that software's license.

**(c)     Representations, Warranties and Covenants.**  In addition to the representations, warranties and covenants set forth in the Loan Agreement, the Borrower represents, warrant and covenants to Lender that:

(i)     Borrower has been represented by the law firm of Quarles & Brady LLP in connection with the negotiation, execution and delivery of the Loan Documents and the consummation of the financing contemplated herein on the Closing Date.

(ii)     Borrower shall take the following protective actions to prevent destruction of the Collateral and records pertaining to the Collateral:  (i) if Borrower maintains its Collateral records on a manual system such records shall be kept in a fire proof cabinet or on no less than a monthly basis, a record of all Crop Insurance Contract Receivables, Sales Agent Agreements and all other matters relating to the Collateral shall be placed in an offsite safety deposit box (and Lender shall have access to such safety deposit box at all times); or (ii) if the Collateral records are computerized, Borrower shall create a "back-up" of the computerized information and upon the request of Lender, provide Lender with a copy of such "back-up" information.

(iii)     Any of Lender's officers, employees or agents shall have the right, at any time or times hereafter, in Lender's name or in the name of a nominee of Lender, to verify the validity, amount or any other matter relating to Collections by mail, telephone, facsimile or otherwise and to sign Borrower's name on any verification of Collections and notices thereof to ADM, DCIS or other Persons.

(iv)     Borrower is not a party to any other Sales Agent Agreement other than the ADM Agreement and the DCIS Agreement.  Borrower will inform Lender within three (3) days' of its entry into any other Sales Agent Agreement.  Borrower shall do all acts and execute all documents and instruments required by Lender to grant a security interest to Lender in, and to collaterally assign to Lender, all of Borrower's rights to receive payment under any such Sales Agent Agreement.

(v)     There are no Material Contacts other than those set forth on Section 1.84 of the Borrower's Disclosure Schedule.  Neither Borrower nor any of its Affiliates is in breach of or in default under any Material Contract, which default, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.  Nothing has occurred and no condition exists that would permit any other party thereto to terminate any Material Contract.  Borrower has not received any notice or, to the knowledge of Borrower, any threat of termination of any Material Contract.  No other party to a Material Contract is in material of or in material default under a Material Contract.  All Material Contracts are valid and binding on Borrower, and on each other party thereto, and are in full force and effect.

{00171999.DOC; 1}                                                                                           6

(vi)　Borrower shall use commercially reasonable efforts to comply with all terms and conditions of and fulfill all of its obligations under all Material Contracts. Borrower shall not amend or terminate any such Material Contract or issue any consents or other approvals under any such Material Contract in a manner which would materially adversely affect Lender's rights hereunder without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed, and Borrower shall give immediate notice to Lender of any Person's breach, termination and threatened or pending breach or termination of any Material Contract. Borrower shall use commercially reasonable efforts to take all actions necessary to enforce its rights under any such Material Contract (subject to consultation with and reasonable direction and approval of Lender, which approval shall not be unreasonable withheld, conditioned or delayed) and perform all of its obligations under any such Material Contract. In the event Borrower fails to take such action, Borrower hereby appoints Lender and any officer thereof, its agent-in-fact to take such actions and exercise and enforce all such rights. Borrower will amend Section 1. 84 of the Borrower's Disclosure Schedule upon any termination or addition of a Material Contract.

(vii)　Unless Lender notifies Borrower in writing that Lender suspends any one or more of the following requirements, Borrower shall (A) promptly upon Borrower's learning thereof, inform Lender, in writing, of any material delay in Borrower's performance of any of its obligations to ADM and/or DCIS pursuant to the ADM Agreement or the DCIS Agreement, as applicable, and of any assertion of any material claims, offsets or counterclaims by ADM or DCIS pursuant to the ADM Agreement or the DCIS Agreement, as applicable, and of any allowances, credits and/or other monies granted by Borrower to ADM or DCIS pursuant to the ADM Agreement or the DCIS Agreement, as applicable, outside of the ordinary course of Borrower's business, and (B) not permit or agree to any extension, compromise or settlement with respect to Collections which constitute, in the aggregate, more than five percent (5%) of all Collections then owing to Borrower.

(viii)　Lender shall have the right, now and at any time or times hereafter, at its option, without notice thereof to Borrower (A) to notify ADM and DCIS that the Crop Insurance Contract Receivables have been assigned to Lender and the Lender has a security interest therein; (B) to direct ADM and DCIS to make all Collections due from it to Borrower directly to Lender; and (C) from and after the occurrence of any Event of Default, without notice to Borrower, to enforce payment of and collect, by legal proceedings or otherwise, the Crop Insurance Contract Receivables in the name of the Lender and Borrower.

(ix)　As of the date hereof, and immediately prior to and after giving effect to the issuance of each Revolving Loan hereunder and the use of the proceeds thereof, (A) the fair value of the Borrower's assets is greater than the amount of its liabilities (including disputed, contingent and unliquidated liabilities) as such value is established and liabilities evaluated as required under the Section 548 of the Bankruptcy Code, (B) the present fair saleable value of the Borrower's assets is not less than the amount that will be required to pay the probable liability on its debts as they become absolute and matured, (C) the Borrower is able to realize upon its assets and pay its debts and

**Exhibit - A**

other liabilities (including disputed, contingent and unliquidated liabilities) as they mature in the normal course of business, (D) the Borrower does not intend to, and does not believe that it will, incur debts or liabilities beyond its ability to pay as such debts and liabilities mature, and (E) the Borrower is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which its property would constitute unreasonably small capital.

## 6.     ADDITIONAL CLOSING CONDITIONS

The effectiveness of the Loan Agreement shall be subject to the receipt by the Lender of each of the following:

(a)     an original of the Third Amended and Restated Secured Revolving Note in the form annexed hereto as Exhibit 6(a), duly authorized, executed and delivered by Borrower;

(b)     a reaffirmation of the Guarantee made by Guarantors (Corporate), in the form annexed hereto as Exhibit 6(b), duly executed and delivered by Guarantors (Corporate);

(c)     an original of the Amended and Restated Secured Continuing Guarantee and Security Agreement in the form of Exhibit 6(c) annexed hereto duly authorized, executed and delivered by the Guarantor (Individual);

(d)     an original of the Membership Interest Pledge Agreement in the form of Exhibit 6(d) annexed hereto duly authorized, executed and delivered by the Guarantor (Individual);

(e)     an officer's certificate of the Guarantors (Corporate) in the form of Exhibit 6(e) annexed hereto duly executed and delivered by an officer of the Guarantors (Corporate); and

(f)     payment by wire transfer of an amount equal to one percent of Two Million Dollars ($2,000,000), prorated for the portion of the year commencing on the date hereof and ending on November 23, 2013, for payment of the Annual Line Fee due on account of the increase in Maximum Credit as of the date hereof.

## 7.     ADDITIONAL AFFIRMATIVE COVENANTS

**(a) Notify Lender.** In addition to the events and occurrences set forth in Section 9.1 of the Loan Agreement, Borrower shall inform Lender within three (3) Business Days of any event or circumstance that, to its knowledge, would cause Lender to consider any then existing Eligible Crop Insurance Contract Receivable as no longer constituting an Eligible Crop Insurance Contract Receivable.

**(b) Financial Reports and Other Information.**

{00171999.DOC; 1}                                                                                          8

# Exhibit - A

EX 4 PG 90

# 7-ER-1521

(i) Annual Financial Statements. Annual financial statements of Borrower, certified by its Chief Financial Officer and reviewed by an outside accounting firm acceptable to Lender, as soon as available, but in any event within ninety (90) days after the end of Borrower's Fiscal Year during the Term. Such financial statements shall (A) fairly present the financial position of each Borrower as of the dates thereof and the results of its operations, cash flows and stockholders' equity for each of the periods then ended in all material aspects; and (B) be prepared in accordance with GAAP.

(ii) Quarterly Financial Statements. Quarterly financial statements of the Borrower, as soon as available but in any event no later than forty-five (45) days after the close of each calendar quarter, the unaudited balance sheet and the related statement of income of the Borrower, prepared in accordance with GAAP, subject to year-end review adjustments, together with such other information with respect to the business of Borrower as Lender may request.

(iii) Monthly Financial Statements. Not later than thirty (30) days after the end of each calendar month, the unaudited balance sheets and the related statements of income of Borrower, certified by its Chief Financial Officer, subject to year-end review adjustments, with an aging schedule for all accounts receivable and accounts payable, together with such other information with respect to the business of Borrower as Lender may request.

(iv) Monthly Crop Insurance Reports. As soon as available, and in any event within ten (10) days after the end of each month, (A) a monthly policy report, with reporting segregated by policy, crop year, state and insured in a form acceptable to Lender; (B) a nonrenewal report in a form acceptable to Lender; (C) a report which sets forth an analysis of the due dates for Crop Insurance Contracts Receivables in a form acceptable to Lender and (D) a report which sets forth the monthly insurance loss claims in a form acceptable to Lender.

(v) Semi-Annual Crop Insurance Reports. Borrower shall deliver to Lender projections for spring and fall, Crop Insurance sales, a projected operating budget, cash projections for Crop Insurance sales by state and projected Crop Insurance Contract Receivables and payments due, together with such other schedules and reports as the lender may required, such projections and reports to be provided on March 1 and August 1 of each year during the Term.

(vi) Borrowing Certificates. Weekly, and more frequently if so requested by Lender, a Borrowing Certificate in accordance with Section 1(c)(v) of the Loan Agreement Schedule. Simultaneously with delivery of the Borrowing Certificates, a weekly report which details FCIC premium submissions, rejections and resolutions for the immediately preceding week, in a form acceptable to Lender.

(vii) Other Weekly Reports. Weekly aging schedule for all accounts receivable and accounts payable, and inventory schedules, in such form as Lender may request.

{00171999.DOC; 1}

9

**Exhibit - A**

EX 4 PG 91

**7-ER-1522**

(viii) Items Upon Demand. Upon demand, assignments, in form acceptable to Lender, of all Accounts, and of the monies due or to become due on specific contracts relating to the same.

(ix) Processing Systems. Borrower shall permit Lender to access, on a daily basis, the processing systems maintained by ADM, DCIS or Affiliates of the foregoing in order for Lender to monitor Crop Insurance sales and Crop Insurance Contract Receivables. Borrower shall cooperate with Lender to establish this access, which shall also include Borrower's internal computer system. The processing system for ADM is referred to as "Aeros" and the processing system for DCIS is referred to as Crop Insurance Advantage ("CIA").

(c) **United States Contracts.** If any of the Accounts arise out of contracts with the United States or any of its departments, agencies or instrumentalities, Borrower will notify Lender and, if requested by Lender, execute any necessary instruments in order that all monies due or to become due under such contract shall be assigned to Lender and proper notice of the assignment given under the Federal Assignment of Claims Act.

(d) **Intentionally Omitted.**

9. **ADDITIONAL EVENTS OF DEFAULT**

The occurrence of any of the following shall also constitute an "Event of Default":

(a) **Reduction in Equity Ownership Interests.** R. John Taylor ceases to own of record and beneficially not less than (i) Fifty-one Percent (51%) of the issued and outstanding voting equity interests of each of Crop USA and Crop Services and (ii) one hundred percent (100%) of the issued and outstanding voting equity interests of Partners.

(b) **Default under Material Contract.** Any default by Borrower under a Material Contract.

(c) **Death of Guarantor.** The death or incompetency of Guarantor.

10. **Intentionally Omitted.**

11. **NOTICES**

Notices under the Loan Agreement shall be given to each party at the following addresses in accordance with Section 14.3 thereof:

{00171999.DOC; 1}                                                          10

**Exhibit - A**                                                   EX 4 PG 92

**7-ER-1523**

If to Borrower:

Crop USA Insurance Agency, Inc.
111 Main Street
Lewiston, Idaho 83501
Attn: R. John Taylor, Chief Executive Officer

With a copy to:

Quarles & Brady LLP
300 North LaSalle Street
Suite 4000
Chicago, IL 60654
Attn: James Gatziolis

If to Lender:

GemCap Lending I, LLC
24955 Coast Highway
Suite A202
Malibu, CA 90265
Attention: Richard Ellis

With a copy to:

Cohen Tauber Spievack & Wagner P.C.
420 Lexington Avenue, Suite 2400
New York, NY 10170
Attention: Robert A. Boghosian

Notwithstanding the foregoing, that parties expressly acknowledge and agree that foregoing provisions of notice by Lender to Borrower's counsel is an accommodation only, and that Lender shall have fulfilled its notice obligation hereunder if notice shall have been received by Borrower at the address set forth above, irrespective of whether such notice is received by Borrower's counsel.

12.    **JOINT AND SEVERAL OBLIGATIONS**

If more than one Person is a Borrower hereunder, the following shall apply:

(a)    All Obligations, covenants and liabilities of Borrower hereunder shall be the joint and several Obligations, covenants and liabilities of each Borrower. All representations and warranties of Borrower hereunder shall be deemed made by each Borrower with respect to such Borrower. The Borrower shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability

{00171999.DOC; 1}                                                          11

# Exhibit - A

## 7-ER-1524

on the part of the Borrower shall in no way be affected by the failure of Lender to pursue or preserve its rights against any Borrower or the release by Lender of any Collateral now or thereafter acquired from any Borrower.

(b)     Each Borrower expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which such Borrower may now or hereafter have against any other Borrower or against any other Person directly or contingently liable for the Obligations until all Obligations have been indefeasibly paid in full as determined by Lender.

(c)     Each Borrower represents and warrants to Lender that (i) the Borrowers have one or more common or affiliated shareholders, directors and officers, (ii) the businesses and corporate activities of each Borrower are closely related to, and substantially benefit, the business and corporate activities of the other, (iii) each Borrower will receive a substantial economic benefit from entering into this Agreement and will receive a substantial economic benefit from the application of the Loan hereunder, in each case, whether or not such amount is used directly by such Borrower and (iv) the Loans made hereunder are for the exclusive and indivisible benefit of the Borrower as though, for purposes of this Agreement, the Borrowers constituted a single entity.

**BORROWER:**

CROP USA INSURANCE AGENCY, INC.

By: _____
Name: _____
Title: _____

CROPUSA INSURANCE SERVICES, LLC

By: _____
Name: _____
Title: _____

{00171999.DOC; 1}

12

EXHIBIT 5

# Exhibit - A

EXECUTION

## AMENDED AND RESTATED SECURED CONTINUING GUARANTEE

THIS AMENDED AND RESTATED CONTINUING GUARANTEE (this "Guarantee") is executed by RAY JOHNSON TAYLOR, a/k/a R. JOHN TAYLOR, a/k/a R. Johnson Taylor, an individual ("Guarantor"), in favor of GEMCAP LENDING I, LLC (hereinafter called "Lender"), with a principal place of business at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265, with respect to the joint and several Indebtedness of CROP USA INSURANCE AGENCY, INC. and CROPUSA INSURANCE SERVICES, LLC (together, "Borrowers").

1.    **Continuing Guarantee.** For valuable consideration, Guarantor hereby unconditionally guarantees and promises to promptly pay to Lender, at the address indicated above or at such other address as Lender may direct, in lawful money of the United States, all Indebtedness of Borrower to Lender when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. The liability of Guarantor under this Guaranty is not limited as to the principal amount of the Indebtedness guaranteed and includes, without limitation, liability for all interest, fees, indemnities and other costs and expenses relating to or arising out of the Indebtedness. In giving this Guarantee, Guarantor hereby acknowledges that this Guarantee is a guaranty of payment (and not of collection), and that the liability of Guarantor hereunder is present, absolute, unconditional, continuing, primary, direct and independent of the obligations of Borrower to Lender. Lender shall not be required to pursue any other remedies including, without limitation, its remedies against Borrower under any Loan Documents evidencing Indebtedness of Borrower, before pursuing Lender's rights and remedies against Guarantor under this Guarantee.

2.    **Definitions.**

(a)    "Indebtedness" shall mean: (a) any and all debts, duties, obligations and liabilities of Borrower to Lender, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Lender by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Lender for its own account or as agent for another or others, whether Borrower may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable and regardless of whether recovery thereon is discharged in any bankruptcy, insolvency or other proceeding, including without limitation, any of the same that arise from or in connection with Lender's acquisition of a security interest or other interest in any property of Borrower; and (b) any and all attorneys' fees, court costs, and collection charges incurred in endeavoring to collect or enforce any of the foregoing against Borrower, Guarantor, or any other person liable thereon (whether or not suit be brought) and any other expense of, for or incidental to collection thereof. Guarantor hereby acknowledges and agrees that acceptance by Lender of this Guarantee shall not constitute a commitment of any kind by Lender to permit Borrower to incur Indebtedness to Lender.

(c)    "Loan Documents" shall mean loan agreements between Borrower and Lender and promissory notes from Borrower in favor of Lender evidencing or relating to any of the Indebtedness, and deeds of trust, mortgages, security agreements, other agreements, documents, and instruments executed by Borrower in connection with such loan agreements and promissory notes, as such loan agreements, promissory notes, security agreements, other agreements, documents and instruments are now in effect and as hereafter amended, restated, renewed or superseded.

3.    [INTENTIONALLY LEFT BLANK]

4.    **Rights of Lender.** Guarantor hereby consents and agrees that, without notice to or by Guarantor and without affecting or impairing in any way the obligations or liability of Guarantor hereunder, Lender may, from time to time before or after revocation of this Guarantee, do any one or more of the following in Lender's sole and absolute discretion: (a) renew, compromise, extend, accelerate, or otherwise change the time for payment or

{00171624.DOC; 1}                                                                                                    1

## Exhibit - A

EX 5 PG 95

## 7-ER-1527

EXECUTION

accept partial payments of, compromise or settle, renew, discharge the performance of, refuse to enforce or release all or any parties to, any or all of the Indebtedness, or otherwise change the terms of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon; (b) grant any other indulgence to Borrower or any other person in respect of any or all of the Indebtedness or any other matter; (c) accept, release, waive, surrender, enforce, exchange, modify, impair, or extend the time for the performance, discharge, or payment of, any and all property of any kind securing any or all of the Indebtedness, Guarantor's obligations hereunder or any guaranty of any or all of the Indebtedness or on which Lender at any time may have a lien, or refuse to enforce its rights or make any compromise or settlement or agreement therefore in respect of any or all of such property; (d) substitute or add, or take any action or omit to take any action that results in the release of, any one or more endorsers or guarantor of all or part of the Indebtedness, including without limitation one or more parties to this Guarantee, regardless of any destruction or impairment of any right of contribution or other right of Guarantor; (e) amend, alter or change in any respect whatsoever any term or provision of the Loan Documents relating to any or all of the Indebtedness, including the rate of interest thereon; (f) apply to the Indebtedness, any sums received from Borrower, any other guarantor, endorser, or cosigner, or from the disposition of any collateral or security to any indebtedness whatsoever owing from such person or secured by such collateral or security, in such manner and order as Lender determines in its sole discretion, and regardless of whether such indebtedness is part of the Indebtedness, is secured, or is due and payable; and (g) apply any sums received from Guarantor or from the disposition of any collateral or security securing the obligations of Guarantor, to any of the Indebtedness in such manner and order as Lender determines in its sole discretion, regardless of whether or not such Indebtedness is secured or is due and payable. Guarantor consents and agrees that Lender shall be under no obligation to marshal any assets in favor of Guarantor, or against or in payment of any or all of the Indebtedness. Guarantor further consents and agrees that Lender shall have no duties or responsibilities whatsoever with respect to any property securing any or all of the Indebtedness or Guarantor's obligations hereunder. Without limiting the generality of the foregoing, Lender shall have no obligation to monitor, verify audit, examine, or obtain or maintain any insurance with respect to, any property securing any or all of the Indebtedness or Guarantor's obligations hereunder.

5. **Guaranty to be Absolute**. Guarantor agrees that until the Indebtedness has been indefeasibly paid in full and any commitments of Lender or facilities provided by Lender with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner or to any extent vary the risks of Guarantor under this Guaranty or that, but for this paragraph, might discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty. Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Lender described in the immediately preceding paragraph of this Guaranty. It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional. In the event any payment with respect to any or all of the Indebtedness by any person is repaid or returned by Lender because of any claim that such payment constituted a preferential transfer or fraudulent conveyance or for any other reason whatsoever, the liability of Guarantor hereunder shall not be discharged or reduced by reason of such payment and Guarantor shall be and remain fully liable therefor. Lender shall have full authority in its sole discretion to compromise or settle any such claim, and any amounts received by Lender that are paid, repaid or returned as a part of such compromise or settlement, and the foregoing shall not discharge or reduce the liability of Guarantor hereunder and Guarantor shall be and remain fully liable therefore.

6. **Waiver of Subrogation**. Until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Lender with respect to the Indebtedness have been terminated, Guarantor waives any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise) including, without limitation, any claim or right of subrogation under the Bankruptcy Code (Title 11, United States Code) or any successor statute, arising from the existence or performance of this Guaranty, and Guarantor waives any right to enforce any remedy which Lender now has or may hereafter have against Borrower, and waives any benefit of, and any right to participate in, any security now or hereafter held by Lender.

7. **Waivers**. Guarantor hereby waives: (a) all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of intent to accelerate, notices of

Exhibit - A

7-ER-1528

EX 5 PG 96

EXECUTION

acceleration, notices of any suit or any other action against Borrower or any other person, any other notices to any party liable on any Loan Document (including Guarantor), notices of acceptance of this Guarantee, and notices of the existence, creation, or incurring of new or additional Indebtedness, and all other notices and demands to which Guarantor might be entitled, including without limitation, all of the following: (i) the amount of the Indebtedness from time to time outstanding; (ii) any foreclosure sale or other disposition of any property which secures any or all of the Indebtedness or which secures the obligations of any other guarantor of any or all of the Indebtedness; (iii) any adverse change in Borrower's financial position; (iv) any other fact that might increase Guarantor's risk; (v) any default, partial payment or non-payment of all or any part of the Indebtedness; (vi) the occurrence of any of the other Events of Default (as hereinafter defined); and (vii) any and all agreements and arrangements between Lender and Borrower and any changes, modifications, or extensions thereof, and any revocation, modification or release of any guaranty of any or all of the Indebtedness by any person; (b) any right to require Lender to institute suit against, or to exhaust its rights and remedies against, Borrower or any other person, or to proceed against any property of any kind that secures all or any part of the Indebtedness, or to exercise any right of offset or other right with respect to any reserves, credits or deposit accounts held by or maintained with Lender or any indebtedness of Lender to Borrower, or to exercise any other right or power, or pursue any other remedy Lender may have; (c) any defense arising by reason of any disability or other defense of Borrower or any other guarantor or any endorser, co-maker or other person, or by reason of the cessation from any cause whatsoever of any liability of Borrower or any other guarantor or any endorser, co-maker or other person, with respect to all or any part of the Indebtedness, or by reason of any act or omission of Lender or others that directly or indirectly results in the discharge or release of Borrower or any other guarantor or any other person or any Indebtedness or any security therefore, whether by operation of law or otherwise; (d) all rights of subrogation, reimbursement, and indemnity whatsoever, and all rights of recourse to or with respect to any assets or property of Borrower or any collateral or security for any or all of the Indebtedness; (e) any defense arising by reason of any failure of Lender to obtain, perfect, maintain or keep in force any security interest in, or lien or encumbrance upon, any property of Borrower or any other person; (f) any defense based upon failure of Lender to give Guarantor notice of any sale or other disposition of any property securing any or all of the Indebtedness or Guarantor's obligations hereunder, or any defects in any such notice that may be given, or failure of Lender to comply with any provision of applicable law in enforcing any security interest in or lien upon any property securing any or all of the Indebtedness or Guarantor's obligations hereunder, including, but not limited to, any failure by Lender to dispose of any property securing any or all of the Indebtedness or Guarantor's obligations hereunder in a commercially reasonable manner; and (g) any defense based upon arising out of any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, liquidation or dissolution proceeding commenced by or against Borrower or any other guarantor or any endorser, co-maker or other person, including without limitation any discharge of, or bar against collecting, any of the Indebtedness (including without limitation any interest thereon), in or as a result of any such proceeding.

8.  **Waiver of Other Rights and Defenses.**

    (a)     Guarantor waives any rights and defenses that are or may become available to Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code.

    (b)     Guarantor waives all rights and defenses that Guarantor may have because any of the Indebtedness is secured by real property. This means, among other things: (i) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower; and (ii) if Lender forecloses on any real property collateral pledged by Borrower: (1) the amount of the Indebtedness may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (2) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because any of the Indebtedness is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

{00171624.DOC; 1}

3

# Exhibit - A

EX 5 PG 97

**7-ER-1529**

EXECUTION

(c)     Guarantor waives any right or defense it may have at law or equity, including California Code of Civil Procedure Section 580a, to a fair market value hearing or action to determine a deficiency judgment after a foreclosure.

. . (d)     Guarantor agrees to withhold the exercise of any and all subrogation and reimbursement rights against Borrower, against any other person, and against any collateral or security for the Indebtedness, including any such rights pursuant to Sections 2847 and 2848 of the California Civil Code, until the Indebtedness has been indefeasibly paid and satisfied in full, all obligations owed to Lender under the Loan Documents have been fully performed, and Lender has released, transferred or disposed of all of its right, title and interest in such collateral or security.

9.     **Acceleration.**  The obligations of the Guarantor hereunder to pay any or all of the Indebtedness shall, at the option of Lender, immediately become due and payable, without notice, and without regard to the expressed maturity of any of the Indebtedness, in the event: (a) a breach by Borrower of any term, covenant, condition, representation or warranty in any of the Loan Documents, or any statement, report, or certificate made or delivered to Lender by Borrower or Guarantor, or any of their respective officers, partners, employees, or agents, is incorrect, false, untrue, or misleading when given in any material respect; or (b) Borrower or Guarantor shall fail to pay when due all or any part of the Indebtedness; or (c) Guarantor shall fail to pay or perform when due any indebtedness or obligation of Guarantor to Lender, whether under this Guarantee or any other instrument, document, or agreement heretofore or hereafter entered into; or (d) any event shall occur which results in the acceleration of the maturity of any indebtedness of Borrower or Guarantor to others; or (e) Borrower or Guarantor shall fail promptly to perform or comply with any term or condition of any agreement with any third party which does or may result in a material adverse effect on the business of Borrower or Guarantor; or (f) there shall be made or exist any levy, assessment, attachment, seizure, lien, or encumbrance for any cause or reason whatsoever upon all or any part of the property of Borrower or Guarantor; or (g) there shall occur the liquidation, dissolution, termination of existence, insolvency, or business failure of Borrower or Guarantor, or the appointment of a receiver, trustee or custodian for Borrower, Guarantor or all or any part of the property of either of them, or the assignment for the benefit of creditors by Borrower or Guarantor, or the commencement of any proceeding by or against Borrower or Guarantor under any reorganization, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, now or hereafter in effect; or (h)Borrower or Guarantor shall conceal, remove or permit to be concealed or removed any part of its property, with intent to hinder, delay or defraud its creditors, or make or suffer any transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law, or shall make any transfer of its property to or for the benefit of any creditor at a time when other creditors similarly situated have not been paid; or (i) Guarantor shall revoke this Guarantee.  All of the foregoing is hereinafter referred to as "Events of Default". .

10.     **Right to Attachment Remedy.**  Guarantor agrees that, notwithstanding the existence of any property securing any or all of the Indebtedness or securing Guarantor's obligations under this Guarantee, Lender shall have all of the rights of a creditor of Guarantor, including without limitation the right to obtain a temporary protective order and writ of attachment against Guarantor with respect to any sums due under this Guarantee. Guarantor further agrees that in the event any property secures the obligations of Guarantor under this Guarantee, to the extent that Lender, in its sole and absolute discretion, determines prior to the disposition of such property that the amount to be realized by Lender therefrom may be less than the indebtedness of Guarantor under this Guarantee, Lender shall have all the rights of an unsecured creditor against Guarantor, including without limitation the right of Lender, prior to the disposition of said property, to obtain a temporary protective order and writ of attachment against Guarantor.  Guarantor waives the benefit of Section 483.010(b) of the California Code of Civil Procedure and of any and all other statutes and rules of law now or hereafter in effect requiring Lender to first resort to or exhaust all such collateral before seeking or obtaining any attachment remedy against Guarantor. Lender shall have no liability to Guarantor as a result thereof, whether or not the actual deficiency realized by Lender is less than the anticipated deficiency on the basis, which Lender obtains a temporary protective order or writ of attachment.

11.     **Subordination.**  Any and all rights of Guarantor under any and all debts, liabilities and obligations owing

{00171624.DOC; 1}                                                                                                                          4

**Exhibit - A**

**7-ER-1530**

EXECUTION

from Borrower to Guarantor, including any security for and guaranties of any such obligations, whether now existing or hereafter arising, are hereby subordinated in right of payment to the prior payment in full of all of the Indebtedness. No payment in respect of any such subordinated obligations shall at any time be made to or accepted by Guarantor if at any time such payment any Indebtedness is outstanding. Borrower and any assignee, trustee in bankruptcy, receiver, or any other person having custody or control over any or all of Borrower's property are hereby authorized and directed to pay to Lender the entire balance of the Indebtedness before making any payments whatsoever to Guarantor, whether as a creditor, shareholder, or otherwise; and insofar as may be necessary for that purpose, Guarantor hereby assigns and transfers to Lender all rights to any and all debts, liabilities and obligations owing from Borrower to Guarantor, including any security for any guaranties of any such obligations, whether now existing or hereafter arising, including without limitation any payments, dividends or distributions out of the business or assets of Borrower. Any amounts received by Guarantor in violation of the foregoing provisions shall be received and held in trust for the benefit of Lender and shall forthwith be paid over to Lender to be applied to the Indebtedness in such order and sequence as Lender shall in its sole discretion determine. Guarantor hereby expressly waives any right to set-off or assert against Lender any counterclaim that Guarantor may have against Borrower.

12. **Revocation.** This is a continuing guaranty relating to all of the Indebtedness, including Indebtedness arising under successive transactions that from time to time continue the Indebtedness or renew it after it has been satisfied. The obligations of Guarantor hereunder may be terminated only as to future transactions and only by giving written notice thereof to Lender in accordance with Paragraph 23 herein. No such revocation shall be effective until the third business day following the date of actual receipt thereof by Lender. Notwithstanding such revocation, this Guarantee and all consents, waivers and other provision hereof shall continue in full force and effect as to any and all Indebtedness that is outstanding on the effective date of revocation and all extensions, renewals and modifications of said Indebtedness including without limitation amendments, extensions, renewals and modifications that are evidenced by new or additional instruments, documents or agreements executed after revocation.

13. **Independent Liability.** Guarantor hereby agrees that one or more successive or concurrent actions may be brought hereon against Guarantor, in the same action in which Borrower may be sued or in separate actions, as often as deemed advisable by Lender. The liability of Guarantor hereunder is exclusive and independent of any other guaranty of any or all of the Indebtedness whether executed by Guarantor or by any other guarantor. The liability of Guarantor hereunder shall not be affected, revoked, impaired, or reduced by any one or more of the following: (a) the fact that the Indebtedness exceeds the maximum amount of Guarantor's liability, if any, specified herein or elsewhere (and no agreement specifying a maximum amount of Guarantor's liability shall be enforceable unless set forth in a writing signed by Lender or set forth in this Guarantee); or (b) any direction as to the application of payment by Borrower or by any other party; or (c) any other continuing or restrictive guaranty or undertaking or any limitation on the liability of any other guarantor (whether under this Guarantee or under any other guaranty agreement); or (d) any payment on or reduction of any other guaranty or undertaking; or (e) any revocation, amendment, modification or release of any such other guaranty or undertaking; or (f) any dissolution or termination of, or increase, decrease, or change in membership or stock ownership of Guarantor. Guarantor hereby expressly represents that it was not induced to give this Guarantee by the fact that there are or may be other guarantors either under this Guarantee or otherwise, and Guarantor agrees that any release of any one or more of such other guarantors shall not release Guarantor from its obligations hereunder either in full or to any lesser extent. If Guarantor is a married person, Guarantor hereby expressly agrees that recourse may be had against his or her separate property for all of his or her obligations hereunder.

14. **Remedies Cumulative; No Waiver.** Lender shall have the right to seek recourse against Guarantor to the full extent provided for herein or in any other instrument or agreement evidencing obligations of Guarantor to Lender. No election in one form of action or proceeding, or against any party, or on any obligation, shall constitute a waiver of Lender's right to proceed in any other form of action or proceeding or against any other party. The failure of Lender to enforce any of the provisions of this Guarantee at any time or for any period of time shall not be construed to be a waiver of any such provision or the right thereafter to enforce the same. All remedies hereunder shall be cumulative and shall be in addition to all rights, powers and remedies given to Lender by law or under other instrument or agreement.

{00171624.DOC; 1}

5

# Exhibit - A

EXECUTION

**15.** **Financial Condition of Borrower.** Guarantor is fully aware of the financial condition of Borrower and is executing and delivering this Guarantee at Borrower's request and based solely upon its own independent investigation of all matters pertinent hereto and is not relying in any manner upon any representation or statement of Lender with respect thereto. Guarantor represents and warrants that it is in a position to obtain, and Guarantor hereby assumes full responsibility for obtaining, any additional information concerning Borrower's financial condition and any other matter pertinent hereto as Guarantor may desire, and Guarantor is not relying upon or expecting Lender to furnish to him any information now or hereafter in Lender's possession concerning the same or any other matter. By executing this Guarantee, Guarantor knowingly accepts the full range of risks encompassed within a contract of continuing guaranty, which risks Guarantor acknowledges include without limitation the possibility that Borrower will incur additional Indebtedness for which Guarantor will be liable hereunder after Borrower's financial condition or ability to pay such Indebtedness has deteriorated and/or after bankruptcy or insolvency proceedings have been commenced by or against Borrower.

**16.** **Reports and Financial Statements of Guarantor.** Guarantor shall, at its sole cost and expense, at any time and from time to time, prepare or cause to be prepared, and provide to Lender upon Lender's request: (a) such financial statements and reports concerning Guarantor for such periods of time as Lender may designate (which financial statements shall, if requested by Lender, be audited by certified public accountants acceptable to Lender); (b) any other information concerning Guarantor's business, financial condition or affairs as Lender may request; and (c) copies of any and all foreign, federal, state and local tax returns and reports of or relating to Guarantor as Lender may from time to time request. Guarantor hereby intentionally and knowingly waives any and all rights and privileges it may have not to divulge or deliver said tax returns, reports and other information that are requested by Lender hereunder or in any litigation in which Lender may be involved relating directly or indirectly to Borrower or to Guarantor. Guarantor further agrees immediately to give written notice to Lender of any adverse change in Guarantor's financial condition and of any condition or event that constitutes any Events of Default under this Guarantee.

**17.** **Representations and Warranties.** Guarantor hereby represents and warrants that: (a) it is in Guarantor's direct interest to assist Borrower in procuring credit, because Borrower (i) is fully or partially owned by Guarantor, (ii) is an affiliate of Guarantor, furnishes goods or services to Guarantor, (iii) purchases or acquires goods or services from Guarantor, and/or (iv) otherwise has a direct or indirect corporate or business relationship with Guarantor; (b) this Guarantee has been duly and validly authorized, executed and delivered and constitutes the binding obligation of Guarantor, enforceable in accordance with its terms; and (c) the execution and delivery of this Guarantee does not violate or constitute a default under any order, judgment, decree, instrument or agreement to which Guarantor is a party or by which its property is affected or bound.

**18.** **Integration; Amendment and Restatement.** This Guarantee and the Pledge Agreement referred to below, together with the other Loan Documents to which Guarantor is a party, are the only agreements between Guarantor and Lender with respect to the subject matter hereof, and all representations, warranties, agreements, or undertakings heretofore or contemporaneously made, which are not set forth herein or therein, are superseded hereby. This Guarantee (i) is being delivered pursuant to the Amended and Restated Loan Agreement of even date herewith, and (ii) amends and restates in its entirety, and as so amended and restated supersedes, that certain Continuing Guarantee dated November 23, 2011, by Guarantor in favor of Lender.

**19.** **Amendment.** The terms and provisions hereof may not be waived, altered, modified, or amended except in a writing executed by Guarantor and a duly authorized officer of Lender.

**20.** **Costs.** Whether or not suit be instituted, Guarantor agrees to reimburse Lender on demand for all attorneys' fees and all other costs and expenses incurred by Lender in enforcing this Guarantee, or arising out of or relating in any way to this Guarantee, or in enforcing any of the Indebtedness against Borrower, Guarantor, or any other person, or in connection with any property of any kind securing all or any part of the Indebtedness. Without limiting the generality of the foregoing, and in addition thereto, Guarantor shall reimburse Lender on demand for all attorneys' fees and costs Lender incurs in any way relating to Guarantor, Borrower or the Indebtedness, in order to: (i) obtain legal advice; (ii) enforce or seek to enforce any of its rights; (iii) commence,

{00171624.DOC; 1}

6

**Exhibit - A**

EX 5 PG 100

**7-ER-1532**

EXECUTION

intervene in, respond to, or defend any action or proceeding; (iv) file, prosecute or defend any claim or cause of action in any action or proceeding (including without limitation any probate claim, bankruptcy claim, third-party claim, secured creditor claim, reclamation complaint, and complaint for relief from any stay under the Bankruptcy Code (Title 11, United States Code) or otherwise); (v) protect, obtain possession of, sell, lease, dispose of or otherwise enforce any security interest in or lien on any property of any kind securing any or all of the Indebtedness or Guarantor's obligations hereunder; or (vi) represent Lender in any litigation with respect to Borrower's or Guarantor's affairs. In the event either Lender or Guarantor files any lawsuit against the other predicated on a breach of this Guarantee, the prevailing party in such action shall be entitled to recover its attorneys' fees and costs of suit from the non-prevailing party.

21.  **Successors and Assigns.** All rights, benefits and privileges hereunder shall inure to the benefit of and be enforceable by Lender and its successors and assigns and shall be binding upon Guarantor and its heirs, executors, administrators, personal representatives, successors and permitted assigns, provided that none of the obligations of Guarantor hereunder shall be assigned without the prior written consent of Lender. Neither the death of Guarantor nor notice thereof to Lender shall terminate this Guarantee as to its estate, and notwithstanding the death of Guarantor or notice thereof to Lender, this Guarantee shall continue in full force and effect with respect to all Indebtedness, including without limitation, Indebtedness incurred or created after the death of Guarantor and notice thereof to Lender.

22.  **Security for Guarantee.** This is the Secured Guarantee referred to, and secured by the Membership Interest Pledge Agreement, of even date herewith, between Guarantor and Lender ("Pledge Agreement"), the terms of which are incorporated herein by reference, and the Lender is entitled to the benefits thereof.

23.  **Notices.** Any notice that a party shall be required or shall desire to give to the other hereunder shall be in writing and either (a) delivered by registered or certified mail, (b) delivered by hand, or (c) delivered by national overnight courier service with next business day delivery, and shall be deemed to have been duly given or made (i) three (3) business days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid, (ii) one (1) business day after deposit with a national overnight courier with next business day delivery with all charges prepaid, or (iii) when hand-delivered. All notices, requests and demands are to be given or made to the respective parties at the following addresses (or to such other addresses as either party may designate by notice in accordance with the provisions of this paragraph):

| | |
|---|---|
| If to Guarantor: | R. John Taylor |
| | ▮▮▮▮▮▮▮▮▮▮ |
| | Lewiston, Idaho 83501 |
| With a copy to: | Quarles & Brady LLP<br>300 North LaSalle Street<br>Suite 4000<br>Chicago, IL 60654<br>Attn: James Gatziolis |
| If to Lender: | GemCap Lending I, LLC<br>24955 Pacific Coast Highway<br>Suite A202<br>Malibu, CA 90265<br>Attention: David Ellis |
| With a copy to: | Cohen Tauber Spievack & Wagner P.C.<br>420 Lexington Avenue, Suite 2400<br>New York, NY 10170<br>Attention: Robert A. Boghosian |

24.  **Construction; Severability; Headings.** If more than one person has executed this Guarantee or such

{00171624.DOC; 1}                                                                                                    7

# Exhibit - A

EX 5 PG 101

**7-ER-1533**

EXECUTION

other person has executed a separate guaranty document in favor of Lender in respect of the Indebtedness, the term "Guarantor" as used herein and in such other guaranty document shall be deemed to refer to all and any one or more of such persons and their obligations hereunder or under such other guaranty document shall be joint and several. Without limiting the generality of the foregoing, if more than one person has executed this Guarantee or such other person has executed a separate guaranty document in favor of Lender, this Guarantee and such other guaranty document shall in all respects be interpreted as though each person signing this Guarantee or such other guaranty document had signed a separate guaranty document, and reference herein to "other guarantors" or words of similar effect shall include without limitation other persons signing this Guarantee or such other guaranty document. As used in this Guarantee, the term "property" is used in its most comprehensive sense and shall mean all property of every kind and nature whatsoever, including without limitation real property, personal property, mixed property, tangible property and intangible property. Words used herein in the masculine gender shall include the neuter and feminine gender, words used herein in the neuter gender shall include the masculine and feminine gender, words used herein in the singular shall include the plural and words used in the plural shall include the singular, wherever the context so reasonably requires. If any provisions of this Guarantee or the application thereof to any party or circumstance are held invalid, void, inoperative or unenforceable, the remainder of this Guarantee and the application of such provision to other parties or circumstances shall not be affected thereby, the provisions of this Guarantee being severable in any such instance. The headings in this Guarantee are inserted for convenience only and shall not be considered for the purpose of determining the meaning or of any provision hereof.

25.    **Additional Lender Rights.** Lender, in its sole and absolute discretion, may:

    (a)    bring suit against Guarantor;

    (b)    compromise or settle with Guarantor for such consideration as Lender may deem proper;

    (c)    release the party named as a Guarantor in this Guaranty from liability; and

    (d)    otherwise deal with Guarantor in any manner, and no such action shall impair the rights of Lender to collect from Guarantor any amount guaranteed by Guarantor under this Guarantee.

26.    **APPLICABLE LAW. THIS GUARANTEE SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, THE LAWS OF WHICH THE GUARANTOR HEREBY EXPRESSLY ELECTS TO APPLY TO THIS GUARANTEE, WITHOUT GIVING EFFECT TO PROVISIONS FOR CHOICE OF LAW THEREUNDER. THE GUARANTOR AGREES THAT ANY ACTION OR PROCEEDING BROUGHT TO ENFORCE OR ARISING OUT OF THIS GUARANTEE SHALL BE COMMENCED IN ACCORDANCE WITH THE PROVISIONS OF THIS GUARANTEE.**

27.    **WAIVER OF JURY TRIAL. TO THE EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR HEREBY WAIVES ANY AND ALL RIGHTS THAT THE GUARANTOR MAY NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN GUARANTOR, LENDER OR THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY CONNECTED WITH THIS GUARANTEE. IT IS INTENDED THAT SAID WAIVER SHALL APPLY TO ANY AND ALL DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDINGS BETWEEN GUARANTOR AND LENDER. GUARANTOR WAIVES ALL RIGHTS TO INTERPOSE ANY CLAIMS, DEDUCTIONS, SETOFFS OR COUNTERCLAIMS OF ANY KIND, NATURE OR DESCRIPTION IN ANY ACTION OR PROCEEDING INSTITUTED BY LENDER WITH RESPECT TO THIS GUARANTEE OR ANY MATTER ARISING HEREFROM OR RELATING HERETO, EXCEPT COMPULSORY COUNTERCLAIMS.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

{00171624.DOC: 1}

8

**Exhibit - A**

CTSW DRAFT 1/23/13

28. <u>CONSENT TO JURISDICTION.</u> GUARANTOR HEREBY (a) IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF CALIFORNIA, LOS ANGELES COUNTY WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS GUARANTEE OR ANY MATTER ARISING HEREFROM OR RELATING HERETO, AND (b) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE OR FORUM NON CONVENIENS WITH RESPECT THERETO. IN ANY SUCH ACTION OR PROCEEDING, GUARANTOR WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT OR OTHER PROCESS AND PAPERS THEREIN AND AGREES THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO GUARANTOR AT ITS ADDRESS SET FORTH HEREIN OR OTHER ADDRESS OF WHICH LENDER HAS RECEIVED NOTICE AS PROVIDED IN THIS GUARANTEE. NOTWITHSTANDING THE FOREGOING, GUARANTOR CONSENTS TO THE COMMENCEMENT BY LENDER OF ANY SUIT, ACTION OR PROCEEDING IN ANY OTHER JURISDICTION IN WHICH BORROWER, GUARANTOR OR ANY PORTION OF THE LENDER'S COLLATERAL IS LOCATED TO ENFORCE LENDER'S RIGHTS, AND GUARANTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING.

IN WITNESS WHEREOF, the undersigned has executed this Guarantee on February 7, 2013.

GUARANTOR:

RAY JOHNSON TAYLOR A/K/A R. JOHN TAYLOR A/K/A R. JOHNSON TAYLOR

Address ████████████████████████

████████ Quiston ID 83501

SSN: ████████████████

[SIGNATURE PAGE 1 OF 2 – AMENDED AND RESTATED SECURED CONTINUING GUARANTEE]

{00171624.DOC, 1}

**Exhibit - A**

EX 5 PG 103

7-ER-1535

CTSW DRAFT 1/23/13

STATE OF IDAHO

COUNTY OF Nez Perce

On this 7th day of February , in the year 2013 , before me, Diane A. Whisner , a Notary Public, personally appeared R. John Taylor , known or identified to me (or proved to me on the oath of) to be a the person whose name is subscribed to the within instrument, and acknowledged to me that such person executed the same.

(Seal)

_Diane R Whisner_

Notary Public

Printed Name: Diane R. Whisner

Commission Expires: 10-4-2013

---

[SIGNATURE PAGE 2 OF 2 – AMENDED AND RESTATED SECURED CONTINUING GUARANTEE]

{00171624.DOC; 1}

**Exhibit - A**

## CONTINUING GUARANTEE

THIS CONTINUING GUARANTEE (this "Guarantee") is executed by the undersigned (hereinafter called "Guarantor") in favor of GemCap Lending I, LLC (hereinafter called "Lender"), with a principal place of business at 1401 Ocean Avenue, Suite 305, Santa Monica, California 90401, with respect to the joint and several Indebtedness of CROP USA INSURANCE AGENCY, INC. and CROPUSA INSURANCE SERVICES, LLC (together, "Borrower").

1.   **Continuing Guarantee.**      For valuable consideration, Guarantor hereby unconditionally guarantees and promises to pay on demand to Lender, at the address indicated above, or at such other address as Lender may direct, in lawful money of the United States, and to perform for the benefit of Lender, all Indebtedness of Borrower now or hereafter owing to or held by Lender. As used herein, the term "Indebtedness" is used in its most comprehensive sense and shall mean and include without limitation:  (a) any and all debts, duties, obligations, liabilities, representations, warranties and guaranties of Borrower or any one or more of them, heretofore, now, or hereafter made, incurred, or created, whether directly to Lender or acquired by Lender by assignment or otherwise, or held by Lender on behalf of others, however arising, whether voluntary or involuntary, due or not due, absolute or contingent, liquidated or unliquidated, certain or uncertain, determined or undetermined, monetary or non monetary, written or oral, and whether Borrower may be liable thereon individually or jointly with others, and regardless of whether recovery thereon is discharged in any bankruptcy, insolvency or other proceeding, including without limitation any of the same that arise from or in connection with Lender's acquisition of a security interest or other interest in any property of Borrower, or in any other manner; and (b) any and all amendments, modifications, renewals and extensions of any or all of the foregoing, including without limitation amendments, modifications, renewals and extensions that are evidenced by any new or additional instrument, document or agreement;  and (c) any and all attorneys' fees, court costs, and collection charges incurred in endeavoring to collect or enforce any of the foregoing against Borrower, Guarantor, or any other person liable thereon (whether or not suit be brought) and any other expense of, for or incidental to collection thereof. As used herein, the term "Borrower" shall include any successor to the business and assets of Borrower, and shall also include Borrower in its capacity as a debtor or debtor in possession under the federal Bankruptcy Code, and any trustee, custodian or receiver for Borrower or any of its assets, should Borrower hereafter become the subject of any bankruptcy or insolvency proceeding, voluntary or involuntary; and all indebtedness, liabilities and obligations incurred by any such person shall be included in the Indebtedness guaranteed hereby. Guarantor hereby acknowledges and agrees that acceptance by Lender of this guaranty shall not constitute a commitment of any kind by Lender to permit Borrower to incur Indebtedness to Lender. All sums due under this Guarantee shall bear interest from the date due until the date paid at the highest rate charged with respect to any of the Indebtedness. In giving this Guarantee, Guarantor hereby acknowledges that this Guarantee is a guarantee of payment (and not of collection), and that the liability of Guarantor hereunder is present, absolute, unconditional, continuing, primary, direct and independent of the obligations of Borrower. Lender shall not be required to pursue any other remedies before invoking the benefits of this Guarantee, including, without limitation, its remedies against Borrower under any agreement or instrument evidencing Indebtedness of Borrower.

2.   **Waivers.**      Guarantor hereby waives:  (a) presentment for payment, notice of dishonor, demand, protest, and notice thereof as to any instrument, and all other notices and demands to which Guarantor might be entitled, including without limitation notice of all of the following: the acceptance hereof; the creation, existence, or acquisition of any Indebtedness; the amount of the Indebtedness from time to time outstanding; any foreclosure sale or other disposition of any property which secures any or all of the Indebtedness or which secures the obligations of any other guarantor of any or all of the Indebtedness; any adverse change in Borrower's financial position; any other fact that might increase Guarantor's risk; any default, partial payment or non-payment of all or any part of the Indebtedness; the occurrence of any other Event of Default (as hereinafter defined); any and all agreements and arrangements between Lender and Borrower and any changes, modifications, or extensions thereof, and any revocation, modification or release of any guaranty of any or all of the Indebtedness by any person; (b) any right to require Lender to institute suit against, or to exhaust its rights and remedies against, Borrower or any other person, or to proceed against any property of any kind that secures all or any part of the

1

## Exhibit - A

## 7-ER-1537

Indebtedness, or to exercise any right of offset or other right with respect to any reserves, credits or deposit accounts held by or maintained with Lender or any indebtedness of Lender to Borrower, or to exercise any other right or power, or pursue any other remedy Lender may have; (c) any defense arising by reason of any disability or other defense of Borrower or any other guarantor or any endorser, co-maker or other person, or by reason of the cessation from any cause whatsoever of any liability of Borrower or any other guarantor or any endorser, co-maker or other person, with respect to all or any part of the Indebtedness, or by reason of any act or omission of Lender or others that directly or indirectly results in the discharge or release of Borrower or Guarantor or any other person or any Indebtedness or any security therefore, whether by operation of law or otherwise, (d) all rights of subrogation, reimbursement, and indemnity whatsoever, and all rights of recourse to or with respect to any assets or property of Borrower or any collateral or security for any or all of the Indebtedness; (e) any defense arising by reason of any failure of Lender to obtain, perfect, maintain or keep in force any security interest in, or lien or encumbrance upon, any property of Borrower or any other person, (f) any defense based upon failure of Lender to give Guarantor notice of any sale or other disposition of any property securing any or all of the Indebtedness, or any defects in any such notice that may be given, or failure of Lender to comply with any provision of applicable law in enforcing any security interest in or lien upon any property securing any or all of the Indebtedness including, but not limited to, any failure by Lender to dispose of any property securing any or all of the Indebtedness in a commercially reasonable manner; and (g) any defense based upon or arising out of any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, liquidation or dissolution proceeding commenced by or against Borrower or Guarantor or any endorser, co-maker or other person, including without limitation any discharge of, or bar against collecting, any of the Indebtedness (including without limitation any interest thereon), in or as a result of any such proceeding. Until all of the Indebtedness has been paid, performed, and discharged in full, nothing shall discharge or satisfy the liability of Guarantor hereunder except the full performance and payment of all of the Indebtedness. In the event any payment with respect to any or all of the Indebtedness by any person is repaid or returned by Lender for any reason whatsoever (including, without limitation, the insolvency, bankruptcy, liquidation or reorganization of any party or because of any claim that such payment constituted a preferential transfer or fraudulent conveyance), the liability of Guarantor hereunder shall not be discharged or reduced by reason of such payment and Guarantor shall be and remain fully liable therefor. Lender shall have full authority in its sole discretion to compromise or settle any such claim, and any amounts received by Lender that are paid, repaid or returned as a part of such compromise or settlement shall not discharge or reduce the liability of Guarantor hereunder and Guarantor shall be and remain fully liable therefore.

3.      **Consents.**      Guarantor hereby consents and agrees that, without notice to or by Guarantor and without affecting or impairing in any way the obligations or liability of Guarantor hereunder, Lender may, from time to time before or after revocation of this Guarantee, do any one or more of the following in Lender's sole and absolute discretion: (a) accelerate, accept partial payments of, compromise or settle, renew, extend the time for the payment, discharge, or performance of, refuse to enforce, and release all or any parties to, any or all of the Indebtedness; (b) grant any other indulgence to Borrower or any other person in respect of any or all of the Indebtedness or any other matter; (c) accept, release, waive, surrender, enforce, exchange, modify, impair, or extend the time for the performance, discharge, or payment of, any and all property of any kind securing any or all of the Indebtedness or any guaranty of any or all of the Indebtedness, or on which Lender at any time may have a lien, or refuse to enforce its rights or make any compromise or settlement or agreement therefor in respect of any or all of such property; (d) substitute or add, or take any action or omit to take any action that results in the release of, any one or more endorsers or guarantor of all or part of the Indebtedness, including without limitation one or more parties to this Guarantee, regardless of any destruction or impairment of any right of contribution or other right of Guarantor; (e) amend, alter or change in any respect whatsoever any term or provision relating to any or all of the Indebtedness, including the rate of interest thereon, (f) apply any sums received from Borrower, any other guarantor, endorser, or cosigner, or from the disposition of any collateral or security, to any indebtedness whatsoever owing from such person or secured by such collateral or security, in such manner and order as Lender determines in its sole discretion, and regardless of whether such indebtedness is part of the Indebtedness, is secured, or is due and payable; (g) apply any sums received from Guarantor or from the disposition of any collateral or security securing the obligations of Guarantor, to any of the Indebtedness in such manner and order as Lender determines in its sole discretion, regardless of whether or not such Indebtedness is secured or is due and payable. Guarantor consents and agrees that Lender shall be under no obligation to marshal any assets in favor of Guarantor, or against or in payment of any or all of the Indebtedness. Guarantor further consents and agrees that

{00128955.DOC; 1}                                                                                                              2

Lender shall have no duties or responsibilities whatsoever with respect to any property securing any or all of the Indebtedness. Without limiting the generality of the foregoing, Lender shall have no obligation to monitor, verify audit, examine, or obtain or maintain any insurance with respect to, any property securing any or all of the Indebtedness.

4.      **Exercise of Rights and Remedies.**      Guarantor consents and agrees that, without notice to or by Guarantor and without affecting or impairing in any way the obligations or liability of Guarantor hereunder, Lender may, from time to time before or after revocation of this Guarantee, exercise any right or remedy it may have with respect to any or all of the Indebtedness or any property securing any or all of the Indebtedness or any guaranty therefor, including without limitation judicial foreclosure, non judicial foreclosure, exercise of a power of sale, and taking a deed, assignment or transfer in lieu of foreclosure as to any such property, and Guarantor expressly waives any defense based upon the exercise of any such right or remedy, notwithstanding the effect thereof upon any of Guarantor's rights, including without limitation, any destruction of Guarantor's right of subrogation against Borrower and any destruction of Guarantor's right of contribution or other right against any other guarantor of any or all of the Indebtedness or against any other person, whether by operation of Sections 580d or 726 of the California Code of Civil Procedure, or any similar or comparable provisions of the laws of any other jurisdiction, or any other statutes or rules of law now or hereafter in effect, or otherwise. Without limiting the generality of the foregoing, Guarantor understands and agrees that, in the event Lender in its sole discretion forecloses any trust deed now or hereafter securing any or all of the Indebtedness, by non judicial foreclosure, Guarantor will remain liable to Lender for any deficiency, even though Guarantor will lose his right of subrogation against Borrower, and even though Guarantor will be unable to recover from Borrower the amount of the deficiency for which Guarantor is liable, and even though Guarantor would have retained his right of subrogation against Borrower if Lender had foreclosed said trust deed by judicial foreclosure as opposed to non judicial foreclosure.

5.      **Acceleration.**      Notwithstanding the terms of all or any part of the Indebtedness, the obligations of the Guarantor hereunder to pay and perform all of the Indebtedness shall, at the option of Lender, immediately become due and payable, without notice, and without regard to the expressed maturity of any of the Indebtedness, in the event: (a) any warranty, representation, statement, report, or certificate made or delivered to Lender by Borrower or Guarantor, or any of their respective officers, partners, employees, or agents, is incorrect, false, untrue, or misleading when given in any material respect; or (b) Borrower or Guarantor shall fail to pay or perform when due all or any part of the Indebtedness; or (c) Guarantor shall fail to pay or perform when due any indebtedness or obligation of Guarantor to Lender, whether under this Guarantee or any other instrument, document, or agreement heretofore or hereafter entered into; or (d) any event shall occur which results in the acceleration of the maturity of any indebtedness of Borrower or Guarantor to others; or (e) Borrower or Guarantor shall fail promptly to perform or comply with any term or condition of any agreement with any third party which does or may result in a material adverse effect on the business of Borrower or Guarantor; or (f) there shall be made or exist any levy, assessment, attachment, seizure, lien, or encumbrance for any cause or reason whatsoever upon all or any part of the property of Borrower or Guarantor (unless discharged by payment, release or bond not more than twenty (20) days after such event has occurred); or (g) there shall occur the liquidation, dissolution, termination of existence, insolvency, or business failure of Borrower or Guarantor, or the appointment of a receiver, trustee or custodian for Borrower, Guarantor or all or any part of the property of either of them, or the assignment for the benefit of creditors by Borrower or Guarantor, or the commencement of any proceeding by or against Borrower or Guarantor under any reorganization, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, now or hereafter in effect; or (h) Borrower or Guarantor shall be deceased or declared incompetent by any court or a guardian or conserver shall be appointed for either of them or for the property of either of them; or (i) Borrower or Guarantor shall conceal, remove or permit to be concealed or removed any part of its property, with intent to hinder, delay or defraud its creditors, or make or suffer any transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law, or shall make any transfer of its property to or for the benefit of any creditor at a time when other creditors similarly situated have not been paid; or (j) Guarantor shall revoke this Guarantee. Each of the foregoing is hereinafter referred to as an "Event of Default".

6.      **Right to Attachment Remedy.**      Guarantor agrees that, notwithstanding the existence of any

{00128955.DOC; 1}

3

**Exhibit - A**

**EX 5 PG 107**

**7-ER-1539**

property securing any or all of the Indebtedness, Lender shall have all of the rights of a creditor of Guarantor, including without limitation the right to obtain a temporary protective order and writ of attachment against Guarantor with respect to any sums due under this Guarantee. Guarantor further agrees that in the event any property secures the obligations of Guarantor under this Guarantee, to the extent that Lender, in its sole and absolute discretion, determines prior to the disposition of such property that the amount to be realized by Lender therefrom may be less than the indebtedness of Guarantor under this Guarantee, Lender shall have all the rights of an unsecured creditor against Guarantor, including without limitation the right of Lender, prior to the disposition of said property, to obtain a temporary protective order and writ of attachment against Guarantor. Guarantor waives the benefit of Section 483.010(b) of the California Code of Civil procedure and of any and all other statutes and rules of law now or hereafter in effect requiring Lender to first resort to or exhaust all such collateral before seeking or obtaining any attachment remedy against Guarantor. Lender shall have no liability to Guarantor as a result thereof, whether or not the actual deficiency realized by Lender is less than the anticipated deficiency on the basis, which Lender obtains a temporary protective order or writ of attachment.

7.      **Subordination.**      Any and all rights of Guarantor under any and all debts, liabilities and obligations owing from Borrower to Guarantor, including any security for and guaranties of any such obligations, whether now existing or hereafter arising, are hereby subordinated in right of payment to the prior payment in full of all of the Indebtedness. No payment in respect of any such subordinated obligations shall at any time be made to or accepted by Guarantor if at any time such payment any Indebtedness is outstanding. If any Event of Default has occurred, Borrower and any assignee, trustee in bankruptcy, receiver, or any other person having custody or control over any or all of Borrower's property are hereby authorized and directed to pay to Lender the entire balance of the Indebtedness before making any payments whatsoever to Guarantor, whether as a creditor, shareholder, or otherwise; and insofar as may be necessary for that purpose, Guarantor hereby assigns and transfers to Lender all rights to any and all debts, liabilities and obligations owing from Borrower to Guarantor, including any security for any guaranties of any such obligations, whether now existing or hereafter arising, including without limitation any payments, dividends or distributions out of the business or assets of Borrower. Any amounts received by Guarantor in violation of the foregoing provisions shall be received and held in trust for the benefit of Lender and shall forthwith be paid over to Lender to be applied to the Indebtedness in such order and sequence as Lender shall in its sole discretion determine. Guarantor hereby expressly waives any right to set-off or assert against Lender any counterclaim that Guarantor may have against Borrower.

8.      **Revocation.**      This is a continuing guaranty relating to all of the Indebtedness, including Indebtedness arising under successive transactions that from time to time continue the Indebtedness or renew it after it has been satisfied. The obligations of Guarantor hereunder may be terminated only as to future transactions and only by giving written notice thereof to Lender at its address above by registered first-class U.S. mail, postage prepaid, return receipt requested. No such revocation shall be effective until the third business day following the date of actual receipt thereof by Lender. Notwithstanding such revocation, this Guarantee and all consents, waivers and other provision hereof shall continue in full force and effect as to any and all Indebtedness that is outstanding on the effective date of revocation and all extensions, renewals and modifications of said Indebtedness including without limitation amendments, extensions, renewals and modifications that are evidenced by new or additional instruments, documents or agreements executed after revocation.

9.      **Independent Liability.**      Guarantor hereby agrees that one or more successive or concurrent actions may be brought hereon against Guarantor, in the same action in which Borrower may be sued or in separate actions, as often as deemed advisable by Lender. The liability of Guarantor hereunder is exclusive and independent of any other guaranty of any or all of the Indebtedness whether executed by Guarantor or by any other guarantor. The liability of Guarantor hereunder shall not be affected, revoked, impaired, or reduced by any one or more of the following: (a) the fact that the Indebtedness exceeds the maximum amount of Guarantor's liability, if any, specified herein or elsewhere (and no agreement specifying a maximum amount of Guarantor's liability shall be enforceable unless set forth in a writing signed by Lender or set forth in this Guarantee); or (b) any direction as to the application of payment by Borrower or by any other party; or (c) any other continuing or restrictive guaranty or undertaking or any limitation on the liability of any other guarantor (whether under this Guarantee or under any other agreement); or (d) any payment on or reduction of any such other guaranty or undertaking; or (e) any revocation, amendment, modification or release of any such other guaranty or

{00128955.DOC; 1}

4

undertaking; or (f) any dissolution or termination of, or increase, decrease, or change in membership or stock ownership of Guarantor. Guarantor hereby expressly represents that he was not induced to give this Guarantee by the fact that there are or may be other guarantors either under this Guarantee or otherwise, and Guarantor agrees that any release of any one or more of such other guarantors shall not release Guarantor from his obligations hereunder either in full or to any lesser extent. If Guarantor is a married person, Guarantor hereby expressly agrees that recourse may be had against his separate property for all of his obligations hereunder.

10.    **Remedies Cumulative; No Waiver.**    Lender shall have the right to seek recourse against Guarantor to the full extent provided for herein or in any other instrument or agreement evidencing obligations of Guarantor to Lender. No election in one form of action or proceeding, or against any party, or on any obligation, shall constitute a waiver of Lender's right to proceed in any other form of action or proceeding or against any other party. The failure of Lender to enforce any of the provisions of this Guarantee at any time or for any period of time shall not be construed to be a waiver of any such provision or the right thereafter to enforce the same. All remedies hereunder shall be cumulative and shall be in addition to all rights, powers and remedies given to Lender by law or under other instrument or agreement.

11.    **Financial Condition of Borrower.**    Guarantor is fully aware of the financial condition of Borrower and is executing and delivering this Guarantee at Borrower's request and based solely upon his own independent investigation of all matters pertinent hereto and is not relying in any manner upon any representation or statement of Lender with respect thereto. Guarantor represents and warrants that he is in a position to obtain, and Guarantor hereby assumes full responsibility for obtaining, any additional information concerning Borrower's financial condition and any other matter pertinent hereto as Guarantor may desire, and Guarantor is not relying upon or expecting Lender to furnish to him any information now or hereafter in Lender's possession concerning the same or any other matter. By executing this Guarantee, Guarantor knowingly accepts the full range of risks encompassed within a contract of continuing guaranty, which risks Guarantor acknowledges include without limitation the possibility that Borrower will incur additional Indebtedness for which Guarantor will be liable hereunder after Borrower's financial condition or ability to pay such Indebtedness has deteriorated and/or after bankruptcy or insolvency proceedings have been commenced by or against Borrower.

12.    **Reports and Financial Statements of Guarantor.**    Guarantor shall, at his sole cost and expense, at any time and from time to time, prepare or cause to be prepared, and provide to Lender upon Lender's request: (a) such financial statements and reports concerning Guarantor for such periods of time as Lender may designate (which financial statements shall, if requested by Lender, be audited by certified public accountants acceptable to Lender); (b) any other information concerning Guarantor's business, financial condition or affairs as Lender may request; and (c) copies of any and all foreign, federal, state and local tax returns and reports of or relating to Guarantor as Lender may from time to time request. Guarantor hereby intentionally and knowingly waives any and all rights and privileges he may have not to divulge or deliver said tax returns, reports and other information that are requested by Lender hereunder or in any litigation in which Lender may be involved relating directly or indirectly to Borrower or to Guarantor. Guarantor further agrees immediately to give written notice to Lender of any adverse change in Guarantor's financial condition and of any condition or event that constitutes an Event of Default under this Guarantee.

13.    **Representations and Warranties.**    Guarantor hereby represents and warrants that: (a) it is in Guarantor's direct interest to assist Borrower in procuring credit, because Borrower is an affiliate of Guarantor, furnishes goods or services to Guarantor, purchases or acquires goods or services from Guarantor, and/or otherwise has a direct or indirect corporate or business relationship with Guarantor; (b) this Guarantee has been duly and validly authorized, executed and delivered and constitutes the binding obligation of Guarantor, enforceable in accordance with its terms; (c) the execution and delivery of this Guarantee does not violate or constitute a default under any order, judgment, decree, instrument or agreement to which Guarantor is a party or by which he or his property are affected or bound; and (d) Guarantor has been represented by the law firm of Quarles & Brady LLP in connection with the negotiation, execution and delivery of this Guarantee.

14.    **Entire Agreement.**    This Guarantee is the entire and only agreement between Guarantor and Lender with respect to the guaranty of the Indebtedness of Borrower by Guarantor, and all representations, warranties,

{00128955.DOC; 1}

5

## Exhibit - A

**7-ER-1541**

agreements, or undertakings heretofore or contemporaneously made, which are not set forth herein, are superseded hereby.

15.     Amendment.   The terms and provisions hereof may not be waived, altered, modified, or amended except in a writing executed by Guarantor and a duly authorized officer of Lender.

16.     Costs.  Whether or not suit be instituted, Guarantor agrees to reimburse Lender on demand for all attorneys' fees and all other costs and expenses incurred by Lender in enforcing this Guarantee, or arising out of or relating in any way to this Guarantee, or in enforcing any of the Indebtedness against Borrower, Guarantor, or any other person, or in connection with any property of any kind securing all or any part of the Indebtedness. Without limiting the generality of the foregoing, and in addition thereto, Guarantor shall reimburse Lender on demand for all attorneys' fees and costs Lender incurs in any way relating to Guarantor, Borrower or the Indebtedness, in order to: obtain legal advice; enforce or seek to enforce any of its rights; commence, intervene in, respond to, or defend any action or proceeding; file, prosecute or defend any claim or cause of action in any action or proceeding (including without limitation any probate claim, bankruptcy claim, third-party claim, secured creditor claim, reclamation complaint, and complaint for relief from any stay under the Bankruptcy Code or otherwise); protect, obtain possession of, sell, lease, dispose of or otherwise enforce any security interest in or lien on any property of any kind securing any or all of the Indebtedness; or represent Lender in any litigation with respect to Borrower's or Guarantor's affairs.  In the event either Lender or Guarantor files any lawsuit against the other predicated on a breach of this Guarantee, the prevailing party in such action shall be entitled to recover its attorneys' fees and costs of suit from the non-prevailing party.

17.     Successors and Assigns.     All rights, benefits and privileges hereunder shall inure to the benefit of and be enforceable by Lender and its successors and assigns and shall be binding upon Guarantor and his heirs, executors, administrators, personal representatives, successors and permitted assigns, provided that none of the obligations of Guarantor hereunder shall be assigned without the prior written consent of Lender.  Neither the death of Guarantor nor notice thereof to Lender shall terminate this Guarantee as to his estate, and notwithstanding the death of Guarantor or notice thereof to Lender, this Guarantee shall continue in full force and effect with respect to all Indebtedness, including without limitation, Indebtedness incurred or created after the death of Guarantor and notice thereof to Lender.

18.     Notices.     Any notice that a party shall be required or shall desire to give to the other hereunder (except for notice of revocation, which shall be governed by Paragraph 8 of this Guarantee) shall be given by personal delivery or by depositing the same in the United States mail, first class postage pre-paid, addressed to Lender at its addresses set forth in the heading of this Guarantee and to Guarantor at his address set forth next to his signature hereon, and such notices shall be deemed duly given on the date of personal delivery or three days after the date of mailing as aforesaid.  Lender and Guarantor may change their address for purposes of receiving notices hereunder by giving written notice thereof to the other party in accordance herewith.  Guarantor shall give Lender immediate written notice of any change in his address.

19.     Construction; Severability.     If more than one person has executed this Guarantee, the term "Guarantor" as used herein shall be deemed to refer to all and any one or more of such persons and their obligations hereunder shall be joint and several.  Without limiting the generality of the foregoing, if more than one person has executed this Guarantee, this Guarantee shall in all respects be interpreted as though each person signing this Guarantee had signed a separate Guarantee, and reference herein to "other guarantors" or words of similar effect shall include without limitation other persons signing this Guarantee.  As used in this Guarantee, the term "property" is used in its most comprehensive sense and shall mean all property of every kind and nature whatsoever, including without limitation real property, personal property, mixed property, tangible property and intangible property.  Words used herein in the masculine gender shall include the neuter and feminine gender, words used herein in the neuter gender shall include the masculine and feminine gender, words used herein in the singular shall include the plural and words used in the plural shall include the singular, wherever the context so reasonably requires.  If any provisions of this Guarantee or the application thereof to any party or circumstance are held invalid, void, inoperative or unenforceable, the remainder of this Guarantee and the application of such provision to other parties or circumstances shall not be affected thereby, the provisions of this Guarantee being

{00128955.DOC: 1}                                                                                                                    6

# Exhibit - A

## 7-ER-1542

severable in any such instance.

20.    APPLICABLE LAW.    THIS GUARANTEE SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, THE LAWS OF WHICH THE GUARANTOR HEREBY EXPRESSLY ELECTS TO APPLY TO THIS GUARANTEE, WITHOUT GIVING EFFECT TO PROVISIONS FOR CHOICE OF LAW THEREUNDER. THE GUARANTOR AGREES THAT ANY ACTION OR PROCEEDING BROUGHT TO ENFORCE OR ARISING OUT OF THIS GUARANTEE SHALL BE COMMENCED IN ACCORDANCE WITH THE PROVISIONS OF THIS GUARANTEE.

21.    WAIVER OF JURY TRIAL. GUARANTOR HEREBY WAIVES ANY AND ALL RIGHTS THAT IT MAY NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN GUARANTOR, LENDER OR THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY CONNECTED WITH THIS GUARANTEE. IT IS INTENDED THAT SAID WAIVER SHALL APPLY TO ANY AND ALL DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDINGS BETWEEN GUARANTOR AND LENDER. GUARANTOR WAIVES ALL RIGHTS TO INTERPOSE ANY CLAIMS, DEDUCTIONS, SETOFFS OR COUNTERCLAIMS OF ANY KIND, NATURE OR DESCRIPTION IN ANY ACTION OR PROCEEDING INSTITUTED BY LENDER WITH RESPECT TO THIS GUARANTEE OR ANY MATTER ARISING HEREFROM OR RELATING HERETO, EXCEPT COMPULSORY COUNTERCLAIMS.

22.    CONSENT TO JURISDICTION. GUARANTOR HEREBY (a) IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF CALIFORNIA, LOS ANGELES COUNTY WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS GUARANTEE OR ANY MATTER ARISING HEREFROM OR RELATING HERETO, AND (b) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE OR FORUM NON CONVENIENS WITH RESPECT THERETO. IN ANY SUCH ACTION OR PROCEEDING, GUARANTOR WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT OR OTHER PROCESS AND PAPERS THEREIN AND AGREES THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO GUARANTOR AT ITS OFFICES SET FORTH HEREIN OR OTHER ADDRESS OF WHICH LENDER HAS RECEIVED NOTICE AS PROVIDED IN THIS GUARANTEE. NOTWITHSTANDING THE FOREGOING, GUARANTOR CONSENTS TO THE COMMENCEMENT BY LENDER OF ANY SUIT, ACTION OR PROCEEDING IN ANY OTHER JURISDICTION TO ENFORCE ITS RIGHTS AND GUARANTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING.

[SIGNATURE PAGE FOLLOWS]

{00128955.DOC. 1}

IN WITNESS WHEREOF, the undersigned have executed this Continuing Guarantee on November 23, 2011.

GUARANTOR:

R. JOHN TAYLOR

Address: ████████████ Lewiston, ID 83501

SSN: ████████████

..................................................................................

STATE OF ___Idaho___ )
                                    )ss.
COUNTY OF ___Nez Perce___ )

On this 23rd day of ___November___ 2011, before me, the subscriber, a Notary Public in and for said State and County, personally appeared ___R. John Taylor___ , the ___President___ ___Manager___ of ___CropUSA Insurance Agency, Inc.___ ___CropUSA Insurance Services, Inc.___, known or identified to me to be the person whose name is subscribed to the within instrument, and in due form of law acknowledged that he/she is authorized on behalf of said company to execute all documents pertaining hereto and acknowledged to me that he/she executed the same as his/her voluntary act and deed on behalf of said company.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my seal in said State and County on the day and year last above written.

| Notary Seal | |
|---|---|
| DIANE R. WHISNER NOTARY PUBLIC STATE OF IDAHO | ___Diane R. Whisner___ |
| | (Signature of Notary) |
| | Residing at: ___Lewiston___ |
| | My Commission Expires: ___10·4·2013___ |

{00128955.DOC; 1}

**EXHIBIT 6**

# Exhibit - A

**7-ER-1545**

## SECURITY AGREEMENT - GUARANTEE

THIS SECURITY AGREEMENT - GUARANTEE (this "**Security Agreement**"), made and entered into as of the 1st day of October, 2012 by each of **AIA SERVICES CORPORATION**, an Idaho corporation having a principal place of business at 111 Main St. Lewiston, Idaho 83501 and **AIA INSURANCE, INC.**, an Idaho corporation having a principal place of business at 111 Main St. Lewiston, Idaho 83501 (each, individually, and collectively, "**Debtor**"), on a joint and several basis, and **GEMCAP LENDING I, LLC**, a Delaware limited liability company (the "**Secured Party**"), having its principal place of business at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265.

## WITNESSETH:

**WHEREAS,** the Secured Party has entered into a certain Loan and Security Agreement, dated November 23, 2011 (as amended through the date hereof, the "**Loan Agreement**"), with CROP USA INSURANCE AGENCY, INC. and CROPUSA INSURANCE SERVICES, LLC, jointly and severally (together, "**Borrowers**"), pursuant to which the Secured Party has made a loan and extend other financial accommodations to or for the benefit of Borrowers under and subject to the terms of the Loan Agreement;

**WHEREAS,** an Event of Default has occurred under the Loan Agreement, as set forth in Amendment No. 3 and Forbearance, dated October 1, 2012 ("**Amendment No. 3**") to the Loan Agreement, and as an inducement to the Secured Party to enter into Amendment No. 3 and forbear from exercising Secured Party's rights and remedies with respect to such Event of Default and as a condition thereto, the Debtor has agreed to execute an Amended and Restated Secured Continuing Guarantee, of even date herewith (the "**Secured Guarantee**"), for the benefit of Secured Party, pursuant to which Debtor, jointly and severally, guarantees the obligations of Borrowers to Secured Party;

**WHEREAS,** pursuant to the Secured Guarantee, the Debtor has agreed to enter into this Security Agreement to grant the Secured Party the security interests contemplated in this Security Agreement as security for the prompt and full payment and performance of the indebtedness and obligations of the Debtor under the Secured Guarantee, and such other indebtedness and obligations as more fully set forth herein; and

**WHEREAS,** the Secured Party is not willing to enter into Amendment No. 3 unless and until the Debtor enters into this Security Agreement upon the terms and conditions hereinafter set forth;

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants contained herein, and intending to be legally bound hereby, the Debtor and the Secured Party hereby covenant and agree as follows:

{00159562.DOC; 3}

- 1 -

## Exhibit - A

7-ER-1546

Case 2:13-cv-05104-SJO-JC Document 229-37 Filed 06/30/17 Page 95 of 74 Page ID #:120

# ARTICLE I

## DEFINITIONS

**Section 1.01  Definitions.** Unless otherwise defined herein, terms defined in the Loan Agreement are used herein as therein defined, and the following terms shall have the following meanings (such meanings being equally applicable to both the singular and plural forms of the terms defined):

"**Accounts**" shall mean any "account," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all accounts receivable, book debts and other forms of payment obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments) now owned or hereafter received or acquired by or belonging or owing to the Debtor (whether held in the name of the Debtor or any division thereof or in any applicable trade name or trade style) whether arising out of property that has been or is to be sold, leased, licensed, assigned or otherwise disposed of, or out of services rendered or to be rendered by the Debtor or from any other transaction, whether or not the same involves the sale of goods or services by the Debtor (including, without limitation, any such obligation that might be characterized as an account or contract right under the UCC), and all of the Debtor's rights in, to and under all purchase orders or receipts now owned or hereafter acquired by it for goods or services sold or rendered by the Debtor (or by any Person from whom the Debtor acquired such rights), and all of the Debtor's rights to any goods represented by any of the foregoing (including, without limitation, unpaid seller's rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods) and choses in action and causes of action (whether arising in contract, tort or otherwise and whether or not currently in litigation) and all other debts, obligations and liabilities in whatever form owing to the Debtor, documents of title, warehouse receipts, leases, investment accounts, deposit accounts, Cash, contract rights, insurance policies, dividends, distributions, judgments, covenants, licenses, franchises, warranties, indemnities, partnership and joint venture interests, and other rights, including all rights to the payment of monies due or to become due to the Debtor, under all contracts for the sale, lease, license or assignment of goods or the performance of services or both by the Debtor (whether or not yet earned by performance on the part of the Debtor or in connection with any other transaction), now in existence or hereafter occurring, including, without limitation, the right to receive the proceeds of said purchase orders and contracts, and all collateral security and guarantees of any kind given by any Person with respect to any of the foregoing.

"**Cash**" shall mean cash or cash equivalents now owned or hereafter acquired by the Debtor.

"**Chattel Paper**" shall mean any "chattel paper," "Tangible Chattel Paper" and "Electronic Chattel Paper," as such terms are defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

{00159562.DOC; 3}

- 2 -

"**Commercial Tort Claims**" shall mean any "commercial tort claim," as such term is defined in the UCC, now owned or hereafter acquired by Debtor, or in which the Debtor now has or hereafter acquires any rights.

"**Contracts**" shall mean all contracts, undertakings, or other agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which the Debtor may now or hereafter have any right, title or interest, including, without limitation, with respect to an Account and any agreement relating to the terms of payment or the terms of performance of such Account.

"**Copyrights**" shall mean all of the following now or hereafter acquired by the Debtor: (i) all copyrights, registrations and applications therefor; (ii) all renewals and extensions thereof; (iii) all income, royalties, damages and payments now and hereafter due or payable or both with respect thereto, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (iv) all rights to sue for past, present and future infringements or misappropriations thereof; and (v) all other rights corresponding thereto throughout the world.

"**Deposit Accounts**" shall mean any "deposit account," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

"**Documents**" shall mean any "documents," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor or in which the Debtor now has or hereafter acquires any rights.

"**Equipment**" shall mean any "equipment," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all machinery, equipment, furnishings, fixtures, vehicles and computers and other electronic data processing and other office equipment now owned or hereafter acquired by the Debtor and any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"**Fixtures**" shall mean any "fixtures," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor.

"**General Intangibles**" shall mean any "general intangibles," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all right, title and interest that the Debtor may now or hereafter have in or under any Contract, in or to any partnerships, joint ventures and similar entities and rights to distribution of income therefrom, all tax refunds, tax refund claims, customer lists, Payment Intangibles, Copyrights, Trademarks, Trademark licenses, Patents, Patent licenses, rights in intellectual property, permits, Trade Secrets, proprietary or confidential information, inventions (whether patented or patentable or not) and technical information, procedures, designs, knowledge, know-how, software, computer programs, computer records and discs, computer

{00159562.DOC; 3}

- 3. -

Exhibit - A

EX 6 PG 115

7-ER-1548

data, databases, data, skill, expertise, experience, processes, models, drawings, materials and records, now owned or hereafter acquired by the Debtor, and the goodwill and rights of indemnification related thereto and associated therewith.

"**Goods**" shall mean any "goods," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, wherever located.

"**Instruments**" shall mean any "instrument," as such term is defined the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights, including promissory notes, but not including instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"**Inventory**" shall mean any "inventory," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all inventory, merchandise, goods and other personal property now owned or hereafter acquired by the Debtor that are held for sale or lease, or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process or materials used or consumed or to be used or consumed in the Debtor's business, or the processing, packaging, delivery or shipping of the same, and all finished goods.

"**Investment Property**" shall mean any "investment property," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all securities, securities accounts and security entitlements.

"**Letter of Credit Rights**" shall mean any "letter of credit right," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

"**Lien**" means any mortgage, deed of trust, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature, including, but not limited to, any conditional sale or title retention arrangement, and any assignment, deposit arrangement or lease intended as, or having the effect of, security.

"**Patents**" shall mean all of the following now or hereafter owned by the Debtor, if any: (i) all patents and patent applications; (ii) all inventions and improvements described and claimed therein; (iii) all reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof; (iv) all income, royalties, damages and payments now and hereafter due and/or payable to the Debtor with respect thereto, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (v) all rights to sue for past, present and future infringements or misappropriations thereof; and (vi) all other rights corresponding thereto throughout the world.

"**Payment Intangible**" means any "payment intangible," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

{00159562.DOC; 3}                                          - 4 -

**Exhibit - A**

**EX 6 PG 116**

**7-ER-1549**

"**Permitted Liens**" shall mean: (i) Liens in favor of the Secured Party; (ii) Liens arising from taxes, assessments, charges, levies or claims that are not yet due or that remain payable without penalty or to the extent permitted to remain unpaid under the Security Agreement; (iii) deposits or pledges to secure workmen's compensation, unemployment insurance, old age benefits or other social security obligations, or in connection with or to secure the performance of bids, tenders, trade contracts or leases, or to secure statutory obligations, or stay, surety or appeal bonds, or other pledges or deposits of like nature and all in the ordinary course of business; (iv) mechanics', carriers', workmen's, repairmen's or similar liens arising in the ordinary course of business in respect of obligations which are not overdue, or deposits made to obtain the release of such mechanics', carriers', workmen's, repairmen's or similar liens which are being contested in good faith by appropriate proceedings and with respect to which the Debtor has created reserves which are determined to be adequate by the application of GAAP consistently applied, and (v) liens in favor of third parties in effect on the date hereof.

"**Person**" shall mean any individual, corporation, joint venture, general or limited partnership, limited liability company, trust, association, unincorporated organization or other business entity.

"**Proceeds**" shall mean "proceeds," as such term is defined in the UCC and, in any event, shall include, without limitation, (i) any and all proceeds of any insurance, indemnity or warranty payable to the Debtor from time to time with respect to any of the Collateral; (ii) any and all payments (in any form whatsoever) made or due and payable to the Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority); (iii) any claim of the Debtor against third parties (A) for past, present or future infringement of any Patent or Patent license, or (B) for past, present or future infringement or dilution of any Trademark or Trademark license or for injury to the goodwill associated with any Trademark, Trademark registration or Trademark licensed under any Trademark license; and (iv) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"**Promissory Notes**" shall mean any "promissory notes," as such term is defined in the UCC.

"**Secured Obligations**" shall mean all indebtedness and obligations of the Debtor to the Secured Party under the Secured Guarantee and hereunder, now existing or hereafter incurred, and the payment of amounts that would become due from the Debtor to the Secured Party but for the operation of the automatic stay provisions of Section 362 of the Bankruptcy Code, 11 U.S.C. § 362.

"**Securities**" shall mean any "securities," as such term is defined in the UCC (whether certificated or uncertificated).

"**Software**" shall mean any "software," as such term is defined in the UCC.

{00159562.DOC; 3}

- 5 -

**Exhibit - A**

"**Supporting Obligation**" means any "supporting obligation," as such term is defined in the UCC.

"**Trademarks**" shall mean all of the following, now owned or hereafter acquired by the Debtor: (i) all trademarks (including service marks and trade names, whether registered or at common law), registrations and applications therefor, and the entire product lines and goodwill of the Debtor's business connected therewith and symbolized thereby; (ii) all renewals thereof; (iii) all income, royalties, damages and payments now and hereafter due or payable or both with respect thereto, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (iv) all rights to sue for past, present and future infringements or misappropriations thereof; and (v) all other rights corresponding thereto throughout the world.

"**Trade Secrets**" shall mean all of the following, now owned or hereafter acquired by the Debtor: (i) trade secrets; (ii) income, royalties, damages and payments now and hereafter due and/or payable to the Debtor with respect to trade secrets, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (iii) rights to sue for past, present and future infringements or misappropriations of trade secrets; and (iv) all other rights corresponding to trade secrets throughout the world.

"**State**" shall mean the State of California.

"**UCC**" shall mean the Uniform Commercial Code presently enacted in the State, *provided, however,* in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of the Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

## ARTICLE II

### SECURITY INTEREST

**Section 2.01  Grant of Security Interest.**

(a)      As security for the prompt and full payment and performance of the Secured Obligations, the Debtor hereby assigns and pledges, and hereby creates and grants, to the Secured Party a continuing lien on and security interest in and to all property and assets now owned or hereafter arising or acquired by the Debtor, wheresoever located, and all right, title and interest of the Debtor therein (collectively, the "**Collateral**"), including, without limitation, the following:

{00159562.DOC; 3}                                    - 6 -

(i) All Accounts, Chattel Paper (including Tangible Chattel Paper and Electronic Chattel Paper), Documents, Instruments, Promissory Notes, Commercial Tort Claims and Contracts;

(ii) All Inventory;

(iii) All Equipment and all Fixtures;

(iv) All General Intangibles (including Payment Intangibles), Software, Trademarks, Patents, Copyrights and Trade Secrets;

(v) All Cash, Deposit Accounts, Letter of Credit Rights, Supporting Obligations, Securities and Investment Property;

(vi) All other Goods and personal property of the Debtor, whether tangible or intangible, now owned or hereafter acquired by the Debtor, wheresoever located; and

(vii) All Proceeds and products relating to each of the foregoing.

(b) The Collateral includes all of the items described above in paragraph (a), whether now owned or hereafter at any time arising or acquired by the Debtor and wherever located, and includes all replacements, additions, accessions, substitutions, repairs, guaranties and securities therefor, Proceeds and products relating thereto or therefrom, and all documents, records (including, but not limited to, manual records, computer runs, print-outs, tapes, disks, software, programs, source codes and other computer prepared information and equipment of any kind), ledger sheets and files of the Debtor relating thereto. Proceeds hereunder include any insurance now or hereafter payable by reason of loss or damage to any item of Collateral or any proceeds thereof, and all unearned refund premiums and dividends which may become payable under such policies of insurance and loss payments under such policies, which shall reduce the unearned premiums.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES

**Section 3.01 Debtor's Representations.** The Debtor represents and warrants to the Secured Party as follows:

(a) The Debtor is (or to the extent that this Security Agreement states that the Collateral is to be acquired after the date hereof, will be) the sole owner of its Collateral, and the liens and security interests granted hereby to the Secured Party in the Collateral which can be perfected by the filing of UCC financing statements will be perfected liens and security interests upon the filing of such financing statements;

{00159562.DOC; 3}

- 7 -

Exhibit -- A

EX 6 PG 119

7-ER-1552

(b)      Schedule 1 attached hereto (the "**Disclosure Schedule**") contains a complete list of, among other items, (i) the current and former corporate and fictitious names utilized by Debtor, (ii) the chief executive offices of the Debtor, (iii) the office where Debtor keeps its records concerning the Collateral, (iv) each place of business of the Debtor, (v) as to Inventory, a complete list of each location where Inventory is located, and (vi) as to Equipment, a complete list of each location where Equipment is located. All information contained in the Disclosure Schedule is true, complete and correct and the Debtor hereby acknowledges and agrees that the Secured Party and its legal counsel may fully rely upon the information contained therein as representations and warranties of the Debtor, the falsity of which may constitute a Default (as hereinafter defined);

(c)      Except as otherwise disclosed to the Secured Party, the Debtor has exclusive possession and control of all its Inventory and Equipment, and the Debtor has not and will not allow any of its contractors, processors or suppliers to have possession or control of any Inventory and Equipment;

(d)      No consent, authorization, approval or other action by, and no notice to or filing with, any governmental authority is required for (i) the grant by the Debtor of the Liens granted hereby or for the execution, delivery or performance of this Security Agreement by the Debtor; (ii) the perfection or maintenance of the Liens created hereby which may be perfected by the filing of financing statements; or (iii) the exercise by the Secured Party of any of its rights and remedies hereunder, except for the filing of financing statements necessary to perfect or continue the perfection of the security interests granted by this Security Agreement;

(e)      This Security Agreement creates a valid security interest in the Collateral, and the filing of the financing statements in the jurisdictions listed in the Disclosure Schedule perfects those security interests in such Collateral which can be perfected by the filing of financing statements; and

(f)      Neither the execution and delivery of this Security Agreement by the Debtor, the consummation of the transactions herein contemplated or the fulfillment of the terms hereof will (i) result in a breach of any of the terms or provisions of, or constitute a default under, or constitute an event which, with notice or lapse of time or both, will result in a breach of, or constitute a default under, the organizational documents of Debtor, any agreement, indenture, mortgage, deed of trust, equipment lease, instrument or other document to which the Debtor is a party; or (ii) conflict with any law, except to the extent that any such breach, default, event or conflict would not have a material adverse effect on the business, operations or financial condition of the Debtor.

(g)      Debtor is organized and incorporated under the laws of the State of Idaho.

(h)      The execution, delivery and performance of this Security Agreement and the Secured Guarantee have been duly authorized by Debtor, each of which are and shall be binding on and enforceable against Debtor in accordance with their terms, and do not and shall not contravene any other instrument or agreement binding on Debtor.

**Exhibit - A**

# ARTICLE IV

## COVENANTS OF THE DEBTOR

**Section 4.01   Debtor's Covenants.**  The Debtor covenants and agrees to perform each of the covenants set forth below in this Article IV:

(a)     The Debtor will defend the Collateral against all claims and demands of all Persons at any time claiming the same or any interest therein;

(b)     The Debtor will not change the location of its chief executive offices or the offices where it keeps records concerning Accounts from the locations set forth in the Disclosure Schedule, except with thirty (30) days' prior written notice to the Secured Party, nor will the Debtor move, or permit to be moved, the Collateral or any portion thereof to any location other than those set forth in the Disclosure Schedule;

(c)     The Debtor will not voluntarily or involuntarily change its name, identity or corporate structure without the prior written consent of the Secured Party;

(d)     The Debtor will, promptly upon request by the Secured Party, procure or execute and deliver any document (including, without limitation, mortgagee or landlord waivers with respect to any and all Inventory which is a part of the Collateral), give any notices, execute and file any financing statements, mortgages or other documents, all in form and substance satisfactory to the Secured Party, mark any Chattel Paper, deliver any Chattel Paper or Instruments to the Secured Party and take any other actions which are necessary or, in the reasonable judgment of the Secured Party, desirable to perfect or continue the perfection and priority of the Secured Party's liens on and security interests in the Collateral, to protect the Collateral against the rights, claims or interests of any Person other than the Secured Party or to effect the purposes of this Security Agreement, and will pay all reasonable costs and expenses incurred in connection therewith;

(e)     The Debtor will not, without the prior written consent of the Secured Party, in any way hypothecate or create or permit to exist any Lien on or other interest in the Collateral except Permitted Liens and those created by this Security Agreement;

(f)     The Debtor will pay and discharge all taxes, assessments and governmental charges or levies against the Collateral prior to delinquency thereof, except taxes, assessments or charges subject to good faith dispute for which the Debtor has created adequate reserves on its books, and will keep the Collateral free of all unpaid charges whatsoever where the failure to make any of such payments could result in a material adverse effect on the business, operations or financial condition of the Debtor;

(g)     The Debtor will at all times be in compliance with all laws pertaining to the use or ownership of the Collateral; at the Debtor's own expense, the Debtor will keep the Collateral in good condition and maintain same in accordance with industry specifications and requirements;

{00159562.DOC; 3}                                           - 9 -

(h)     The Debtor will cause the Collateral to be kept insured at its own expense under one or more policies with such companies, in such amounts and against such risks and liabilities as is ordinarily maintained by companies engaged in the same or similar businesses and similarly situated and as are satisfactory to the Secured Party in its sole discretion. Such policies shall include loss payable endorsements or such other mortgagee indemnity clauses in favor of the Secured Party as the Secured Party shall direct and shall name the Secured Party as an additional insured. No such policy shall be subject to reduction or cancellation without thirty (30) days' prior written notice to the Secured Party and an original of such policy shall be delivered to the Secured Party.

(i)     The Debtor will, upon the Secured Party's request, deliver to the Secured Party records and schedules which show the status, condition and location of all its Inventory and Equipment. The Secured Party shall have the right to review and verify such records, schedules, notices and financial information, and the Debtor will reimburse the Secured Party for all costs incurred thereby;

(j)     The Debtor authorizes the Secured Party to file UCC financing statements, in form and substance satisfactory to the Secured Party, to assure the protection, perfection and enforcement of the Liens in the Collateral in favor of the Secured Party, and the Debtor will pay all filing fees and taxes related thereto. The Debtor hereby irrevocably appoints the Secured Party, its agents and employees, as attorney-in-fact for the Debtor to execute, deliver, file and record any such financing statements in the name of the Debtor at any time and, as applicable, under the rules of the UCC;

(k)     The Debtor will permit the Secured Party to enter into and upon any premises where any of the Collateral or records with respect thereto are located for the purpose of inspecting the same, making copies of records, observing the use of any part of the Collateral or otherwise protecting its security interest in the Collateral; and

(l)     The Secured Party shall have the right at any time to make any payments and do any other acts the Secured Party may deem reasonably necessary to protect its security interest in the Collateral, including, without limitation, the right to pay, purchase, contest or compromise any Lien which is prior to or superior to the liens and security interests granted hereunder, except Permitted Liens, and appear in and defend any action or proceeding purporting to affect its security interest in the Collateral, and in exercising any such powers or authority, the right to pay all reasonable costs and expenses incurred in connection therewith, including reasonable attorneys' fees. The Debtor will reimburse the Secured Party for all such payments made and expenses incurred, which amounts shall be secured under this Security Agreement, and agree that the Debtor shall be bound by any payment made or act taken by the Secured Party hereunder. The Secured Party shall have no obligation to make any of the foregoing payments or perform any of the foregoing acts.

{00159562.DOC; 3}                                                      - 10 -

**Exhibit - A**                                    EX 6 PG 122

**7-ER-1555**

## ARTICLE V

## AUTHORITY OF SECURED PARTY

**Section 5.01  Attorney-In-Fact.**  The Debtor hereby irrevocably constitutes and appoints the Secured Party, and any agent thereof, with full power of substitution, as its true and lawful attorney-in-fact, with full irrevocable power and authority in the name of the Debtor or in its own name to take any and all action and to execute any and all documents and instruments which the Secured Party, at any time and from time to time, deems necessary or desirable to accomplish the purposes of this Security Agreement and, without limiting the generality of the foregoing, the Debtor hereby gives the Secured Party the power and right on behalf of the Debtor and in its own name to do any of the following, at any time and from time to time, without notice to or the consent of the Debtor:

(a)  to demand, sue for, collect, or receive in the name of the Debtor or in its own name, any money or property at any time payable or receivable on account of or in exchange for any of the Collateral and, in connection therewith, endorse checks, notes, drafts, acceptances, money orders, documents of title or any other instruments for the payment of money under the Collateral or any policy of insurance;

(b)  to pay or discharge taxes, Liens, security interests, or other encumbrances levied or placed on or threatened against the Collateral;

(c)  to send requests for verification to account debtors and other obligors;

(d)  (i) to direct the account debtors and any other parties liable for any payment under any of the Collateral to make payment of any and all monies due and to become due thereunder directly to the Secured Party or as the Secured Party shall direct; (ii) to receive payment of and receipt for any and all monies, claims and other amounts due and to become due at any time in respect of or arising out of any Collateral; (iii) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against the Debtor, assignments, proxies, stock powers, verifications and notices in connection with an account and other documents relating to the Collateral; (iv) to commence and prosecute any suit, action or proceeding at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (v) to defend any suit, action or proceeding brought against the Debtor with respect to any Collateral; (vi) to settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as the Secured Party may deem appropriate; (vii) to exchange any of the Collateral for other property upon any merger, consolidation, reorganization, recapitalization or other readjustment of the issue thereof and, in connection therewith, deposit any of the Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms as the Secured Party may determine; (viii) to add or release any guarantor, endorser, surety or other party to any of the Collateral; (ix) to renew, extend or otherwise change the terms and conditions of any of the Collateral; (x) to insure and to make, settle, compromise or adjust claims

{00159562.DOC; 3}                                    - 11 -

under any insurance policy covering any of the Collateral; and (xi) to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Secured Party were the absolute owner thereof for all purposes, and to do, at the Secured Party's option and the Debtor's' expense, at any time or from time to time, all acts and things which the Secured Party deems necessary to protect, preserve or realize upon the Collateral and the Secured Party's security interest therein.

This power of attorney is a power coupled with an interest and shall be irrevocable. The Secured Party shall be under no duty to exercise or withhold the exercise of any of the rights, power, privileges and options expressly or implicitly granted to the Secured Party in this Security Agreement, and shall not be liable for any failure to do so or any delay in doing so. The Secured Party shall not be liable for any act or omission or error of judgment or any notice of act or law in its individual capacity, or in its capacity as attorney-in-fact, except acts or omissions resulting from its willful misconduct or gross negligence. This power of attorney is conferred on the Secured Party to protect, preserve and realize upon its lien and security interest in the Collateral. The Secured Party shall not be responsible for any decline in the value of the Collateral and shall not be required to take any steps to preserve rights against prior parties or to protect, preserve or maintain any security interest given to secure the Collateral.

## ARTICLE VI

### [INTENTIONALLY OMITTED]

## ARTICLE VII

### DEFAULTS AND REMEDIES

**Section 7.01 Defaults.** The occurrence of any one or more of the following events or conditions shall constitute a default under this Security Agreement (a "**Default**"):

(a)     The occurrence of an Event of Default under the Secured Guarantee or the Loan Agreement.

(b)     The Debtor fails to make any payment or perform any obligation or covenant required to be performed by Debtor in accordance with the terms and conditions of this Security Agreement.

(c)     The Debtor makes or has made or furnishes or has furnished any warranty, representation or statement to the Secured Party in connection with this Security Agreement, or any other agreement to which the Debtor and the Secured Party are parties, which is or was false or misleading in any material respect when made or furnished.

{00159562.DOC; 3}                                     - 12 -

**Exhibit - A**                                     **EX 6 PG 124**

**7-ER-1557**

**Section 7.02   Remedies.** Upon the occurrence of a Default, the Secured Party may, at its option, without notice to or demand upon the Debtor, do any one or more of the following:

(a)   Declare all of the Secured Obligations immediately due and payable.

(b)   Exercise any or all of the rights and remedies provided for by the UCC of the state or states having jurisdiction with respect to all or any portion of the Collateral from time to time, specifically including, without limitation, the right to recover reasonable attorneys' fees and other expenses incurred by the Secured Party in the enforcement of this Security Agreement or in connection with the Debtor's redemption of the Collateral.

(c)   Require the Debtor to assemble the Collateral or any part thereof and make it available at one or more places as the Secured Party may designate, and to deliver possession of the Collateral or any part thereof to the Secured Party, who shall have full right to enter upon any or all of the Debtor's premises and property to exercise the Secured Party's rights hereunder.

(d)   Use, manage, operate and control the Collateral and the Debtor's business and property to preserve the Collateral or its value, including, without limitation, the right to take possession of all of the Debtor's premises and property, to exclude the Debtor and any third parties, whether or not claiming under the Debtor, from such premises and property, to make repairs, replacements, alterations, additions and improvements to the Collateral and to dispose of all or any portion of the Collateral in the ordinary course of the Debtor's business.

(e)   Use, in connection with any assembly, use or disposition of the Collateral, any Trademark, Trade Secret, trade name, trade style, copyright, Patent or technical knowledge or process used or utilized by the Debtor.

(f)   Enforce one or more remedies hereunder, successively or concurrently, and such action shall not operate to estop or prevent the Secured Party from pursuing any other or further remedy which it may have, and any repossession or retaking or sale of the Collateral pursuant to the terms hereof shall not operate to release the Debtor until full and final payment of any deficiency has been made in cash. The Debtor shall reimburse the Secured Party upon demand for, or the Secured Party may apply any proceeds of the Collateral to, the costs and expenses (including reasonable attorneys' fees, transfer taxes and any other charges) incurred by the Secured Party in connection with any sale, disposition or retention of any Collateral hereunder.

(g)   In connection with any public or private sale under the applicable UCC, the Secured Party shall give the Debtor at least ten (10) days' prior written notice of the time and place of any public sale of the Collateral or of the time after which any private sale or other intended disposition thereof is to be made, which shall be deemed to be reasonable notice of such sale or other disposition. Such notice may be mailed to the Debtor at the address set forth in this Security Agreement for delivery of notices.

{00159562.DOC; 3}                           - 13 -

**Exhibit - A**                                    EX 6 PG 125

**7-ER-1558**

(h)    Proceed by an action or actions at law or in equity to recover the Secured Obligations or to foreclose under this Security Agreement and sell the Collateral, or any portion thereof, pursuant to a judgment or decree of a court or courts of competent jurisdiction.

(i)    In the event the Secured Party recovers possession of all or any part of the Collateral pursuant to a writ of possession or other judicial process, whether prejudgment or otherwise, the Secured Party may thereafter retain, sell or otherwise dispose of such collateral in accordance with this Security Agreement or the applicable UCC, and following such retention, sale or other disposition, the Secured Party may voluntarily dismiss without prejudice the judicial action in which such writ of possession or other judicial process was issued. The Debtor hereby consents to the voluntary dismissal by the Secured Party of such judicial action, and the Debtor further consents to the exoneration of any bond which the Secured Party filed in such action.

## ARTICLE VIII

### MISCELLANEOUS PROVISIONS

**Section 8.01    Notices.**  Any notice or consent required or permitted by this Security Agreement shall be in writing and shall be delivered in the manner and to the addresses specified in the first paragraph hereof.  All notices shall be deemed effective upon receipt.

**Section 8.02    Headings.**  The various headings in this Security Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Security Agreement or any provision hereof.

**Section 8.03    Amendments.**  This Security Agreement or any provision hereof may be changed, waived or terminated only by a statement in writing signed by the party against which such change, waiver or termination is sought to be enforced.

**Section 8.04    No Waiver.**  No delay in enforcing or failure to enforce any right under this Security Agreement shall constitute a waiver by the Secured Party of such right. No waiver by the Secured Party of any default hereunder shall be effective unless in writing, nor shall any waiver operate as a waiver of any other default or of the same default on a future occasion.

**Section 8.05    TIME OF THE ESSENCE.  TIME IS OF THE ESSENCE IN EACH PROVISION OF THIS SECURITY AGREEMENT OF WHICH TIME IS AN ELEMENT.**

**Section 8.06    Binding Agreement.**  All rights of the Secured Party hereunder shall inure to the benefit of its successors and assigns.  The Debtor shall not assign any of its interest under this Security Agreement without the prior written consent of the Secured Party.  Any purported

## Exhibit - A

**7-ER-1559**

assignment inconsistent with this provision shall, at the option of the Secured Party, be null and void.

**Section 8.07   Entire Security Agreement.** This Security Agreement and the Secured Guarantee are intended by the parties as a final expression of their agreement and are intended as a complete and exclusive statement of the terms and conditions thereof.  Acceptance of or acquiescence in a course of performance rendered under this Security Agreement shall not be relevant to determine the meaning of this Security Agreement even though the accepting or acquiescing party had knowledge of the nature of the performance and opportunity for objection.

**Section 8.08   Attorneys' Fees.** In any action or proceeding brought to enforce any provision of this Security Agreement, or to seek damages for a breach of any provision hereof, or where any provision hereof is asserted as a defense, the Debtor shall pay the Secured Party's reasonable attorneys' fees in addition to any other remedy available under this Security Agreement.

**Section 8.09   Severability.** If any provision of this Security Agreement should be found to be invalid or unenforceable, all of the other provisions shall nonetheless remain in full force and effect to the maximum extent permitted by law.

**Section 8.10   Survival of Provisions.** All representations, warranties and covenants of the Debtor contained herein shall survive the execution and delivery of this Security Agreement, and terminate only upon full and final payment and performance of the Secured Obligations.

**Section 8.11.  Setoff.** The Secured Party shall have the right, at any time after the occurrence of a Default, to set off any indebtedness or obligation of the Debtor to the Secured Party against any indebtedness or obligation of the Secured Party to the Debtor, without notice to or demand upon the Debtor and whether or not any such indebtedness or obligations are liquidated or mature at the time of such offset.  The Secured Party's right of offset hereunder shall be in addition to and not in limitation of any other rights or remedies which may exist in favor of the Secured Party.

**Section 8.12   Authority of the Secured Party.** The Secured Party shall have and be entitled to exercise all powers hereunder which are specifically delegated to the Secured Party by the terms hereof, together with such powers as are reasonably incident thereto.  The Secured Party may perform any of its duties hereunder or in connection with the Collateral by or through agents or employees and shall be entitled to retain counsel to act in reliance upon the advice of counsel concerning all such matters.  Neither the Secured Party nor any director, officer, employee, attorney or agent of the Secured Party shall be liable to the Debtor for any action taken or omitted to be taken by it or them hereunder, except for its or their own gross negligence or willful misconduct; nor shall the Secured Party be responsible for the validity, effectiveness or sufficiency hereof or of any document or security furnished pursuant hereto.  The Secured Party shall be entitled to rely on any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons.  The Debtor agrees to indemnify and hold harmless the Secured Party and/or any such other person from and against any and all costs, expenses (including reasonable attorneys' fees), claims or liability

{00159562.DOC; 3}                                    - 15 -

incurred by the Secured Party or such other persons hereunder unless such claim or liability shall be due to willful misconduct or gross negligence on the part of the Secured Party or such other person.

Section 8.13   Termination of Security Agreement.   This Security Agreement shall continue in force so long as any portion of the Secured Obligations remains unpaid and until the Secured Guarantee is terminated.   If the Secured Party receives any payment or payments on account of the Secured Obligations, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, as amended, or any other state or federal law, common law or equitable doctrine, then, to the extent of any sum not finally retained by the Secured Party, the Debtor's obligations to the Secured Party shall be reinstated and this Security Agreement, and any security therefor, shall remain in full force and effect (or be reinstated) until payment shall have been made to the Secured Party, notwithstanding termination of this Security Agreement or the cancellation of any note, instrument or agreement evidencing the Secured Obligations, and such payment shall be due on demand by the Secured Party.   If any proceeding seeking such repayment is pending or, in the Secured Party's sole judgment, threatened, this Security Agreement and any security therefor shall remain in full force and effect, notwithstanding that the Debtor may not otherwise be obligated to the Secured Party.

Section 8.14   Counterparts.   This Security Agreement may be executed by fax or other electronic signature and in one or more counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same agreement.

Section 8.15   Joint and Several Liability.   The obligations of Debtor (and each party named as a Debtor in this Security Agreement) shall be joint and several. Each reference to "Debtor" herein shall be deemed a reference to each of AIA Insurance, Inc. and AIA Services Corporation. Lender, in its sole and absolute discretion, may:

(a)   bring suit against Debtor, or any one or more of the parties named as a Debtor in this Security Agreement, jointly and severally, or against any one or more of them;

(b)   compromise or settle with Debtor, or any one or more of the parties named as a Debtor in this Security Agreement, for such consideration as Lender may deem proper;

(c)   release one or more of the parties named as a Debtor in this Security Agreement from liability; and

(d)   otherwise deal with Debtor or any one or more of the parties named as Debtor in this Security Agreement, in any manner, and no such action shall impair the rights of Lender in this Security Agreement to collect from Debtor, or any one or more of the parties named as a Debtor in this Security Agreement, any amount

{00159562.DOC; 3}                                         - 16 -

EX 6 PG 128

guaranteed by a Debtor, or any one or more of the parties named as a Debtor, in the Secured Guarantee.

Section 8.16. APPLICABLE LAW; WAIVER OF JURY TRIAL; CONSENT TO, JURISDICTION

(a)    APPLICABLE LAW.  THIS SECURITY AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, THE LAWS OF WHICH DEBTOR HEREBY EXPRESSLY ELECTS TO APPLY TO THIS SECURITY AGREEMENT, WITHOUT GIVING EFFECT TO PROVISIONS FOR CHOICE OF LAW THEREUNDER.   DEBTOR AGREES THAT ANY ACTION OR PROCEEDING BROUGHT TO ENFORCE OR ARISING OUT OF THIS SECURITY AGREEMENT SHALL BE COMMENCED IN ACCORDANCE WITH THE PROVISIONS OF THIS SECURITY AGREEMENT.

(b)    WAIVER OF JURY TRIAL. TO THE EXTENT PERMITTED BY APPLICABLE LAW, DEBTOR HEREBY WAIVES ANY AND ALL RIGHTS THAT IT MAY NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN DEBTOR, SECURED PARTY, OR THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY CONNECTED WITH THIS SECURITY AGREEMENT, THE OTHER FACTORING DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL.   IT IS INTENDED THAT SAID WAIVER SHALL APPLY TO ANY AND ALL DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDINGS BETWEEN DEBTOR AND SECURED PARTY. DEBTOR WAIVES ALL RIGHTS TO INTERPOSE ANY CLAIMS, DEDUCTIONS, SETOFFS OR COUNTERCLAIMS OF ANY KIND, NATURE OR DESCRIPTION IN ANY ACTION OR PROCEEDING INSTITUTED BY SECURED PARTY WITH RESPECT TO THIS SECURITY AGREEMENT, THE OTHER FACTORING DOCUMENTS, THE OBLIGATIONS, THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, EXCEPT COMPULSORY COUNTERCLAIMS.

(c)    CONSENT TO JURISDICTION. DEBTOR HEREBY (i) IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF CALIFORNIA, LOS ANGELES COUNTY WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING OUT OF THIS SECURITY AGREEMENT, THE OTHER FACTORING DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, AND (ii) WAIVES ANY OBJECTION BASED ON VENUE OR FORUM NON CONVENIENS WITH RESPECT THERETO. IN ANY SUCH ACTION OR PROCEEDING, DEBTOR WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT OR OTHER PROCESS AND PAPERS THEREIN AND AGREES THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO DEBTOR

{00159562.DOC; 3}                                - 17 -

**Exhibit - A**

**7-ER-1562**

AT ITS OFFICES SET FORTH HEREIN OR OTHER ADDRESS THEREOF OF WHICH SECURED PARTY HAS RECEIVED NOTICE AS PROVIDED IN THIS SECURITY AGREEMENT. NOTWITHSTANDING THE FOREGOING, DEBTOR CONSENTS TO THE COMMENCEMENT BY LENDER OF ANY SUIT, ACTION OR PROCEEDING IN ANY OTHER JURISDICTION TO ENFORCE ITS RIGHTS IN AND TO THE COLLATERAL AND DEBTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING.

[SIGNATURE PAGE FOLLOWS]

**Exhibit - A**

**IN WITNESS WHEREOF,** the parties hereto have caused this Security Agreement - Guarantee to be executed by their duly authorized officers as of the day and year first above written.

AIA SERVICES CORPORATION

By: _____

Name:  R. John Taylor

Title:    President


AIA INSURANCE INC.

By: _____

Name:  R. John Taylor

Title:    President


AGREED:

GEMCAP LENDING I, LLC

By: _____

Name: _____  RICHARD ELLIS

Title: _____  MANAGER

**Exhibit - A**

**EX 6 PG 131**

**7-ER-1564**

## SCHEDULE 1 TO SECURITY AGREEMENT

Current Names Used By Debtor:

AIA Services Corporation

AIA Insurance, Inc.

Any Assumed or Fictitious Names Debtor Has Used in Past Five (5) Years or Any Other Corporate Name Used in Past Five (5) Years:

No fictitious or other corporate names used in past five (5) years.

Location of Chief Executive Offices of Debtor:

111 Main Street, Lewiston, ID 83501

Offices Where Debtor Keeps Records Concerning Inventory, Accounts, Contracts and Other Property:

111 Main Street, Lewiston, ID 83501

Places of Business of Debtor:

111 Main Street, Lewiston, ID 83501

{00159562.DOC; 3}

- 1 -

## Exhibit - A

7-ER-1565

EXHIBIT 7

**Exhibit - A**

**7-ER-1566**

EXECUTION

## THIRD AMENDED AND RESTATED SECURED REVOLVING NOTE

Up to $10,000,000

Original Date: November 23, 2011
Amended and Restated as of April 1, 2012
Further Amended and Restated as of July 18, 2012,
Further Amended and Restated as of February 4, 2013

FOR VALUE RECEIVED, **CROP USA INSURANCE AGENCY, INC.,** an Idaho corporation, and **CROPUSA INSURANCE SERVICES, LLC,** an Idaho limited liability company, each with its principal place of business located at 111 Main Street, Lewiston, ID 83501 (each, individually, and collectively, **"Borrower"**), jointly and severally promise to pay to the order of **GEMCAP LENDING I, LLC,** a Delaware limited liability company with offices at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265 (together with its successors and assigns, **"Lender"**), on or before November 23, 2014, the principal sum of up to Ten Million Dollars ($10,000,000) in accordance with this Third Amended and Restated Secured Revolving Note (this **"Note"**) and the Amended and Restated Loan and Security Agreement, of even date herewith, entered into by and between Borrower and Lender (as amended from time to time, the **"Agreement"**). Capitalized terms used herein and not defined herein have the meanings given to them in the Agreement.

INTEREST; AMORTIZATION; DUE DATE: Interest on the unpaid principal balance of Revolving Loans, including interest charges for Collection Days, shall be computed on the basis of the actual number of days elapsed and a year of 360 days and shall accrue on the unpaid principal balance of Advances at the rate of Eighteen and One Half Percent (18.5%) per annum (the **"Revolving Loan Interest Rate"**).

All accrued interest on the Loans, including interest charges for Collection Days, shall be payable by Borrower in arrears (x) prior to the Maturity Date, on the first Business Day of each calendar month, commencing January 1, 2012, (y) in full on the Maturity Date and (z) on demand after the Maturity Date. Following and during the continuation of an Event of Default, interest on the unpaid principal balance hereunder shall accrue at a rate per annum equal to Twenty Four Percent (24%).

Subject to the prepayment provisions hereof, Borrower may borrow, repay and reborrow Loans, as set forth in the Agreement.

The entire principal balance of this Note then outstanding, plus any accrued and unpaid interest thereon, together with all penalties and late payment fees, if any, shall be due and payable on the Maturity Date pursuant to the terms of the Agreement. Borrower may voluntarily prepay the entire unpaid principal sum of the Revolving Loans without premium or penalty, provided, however, that, (i) such prepayment is no less than the amount of the then-outstanding aggregate principal sum of all Revolving Loans and all accrued and unpaid interest thereon, (ii) as part of such prepayment, Borrower shall pay Lender all other amounts due to Lender pursuant to this Note, the Agreement and other Loan Documents, including, without limitation, any Minimum Draw Fee, and (iii) in the event Borrower makes such prepayment on or before November 23, 2014, then Borrower shall pay to Lender an amount equal to the Revolving Loan Prepayment Fee. The Revolving Loan

{00171623.DOC; 1}

Prepayment Fee is intended to compensate Lender for committing and deploying funds for Borrower's Loans pursuant to the Agreement and for Lender's loss of investment of such funds in connection with such early termination, and is not intended as a penalty. The Revolving Loan Prepayment and the Minimum Draw Fee also shall be due and payable by Borrower to Lender if Lender accelerates the payment of the Obligations on or before November 23, 2014 due to the occurrence of an Event of Default.

PAYMENT AND COLLECTION: In order to satisfy Borrower's payment of amounts due under the Loans and all fees, expenses and charges with respect thereto that are due and payable under this Note, the Agreement or any other Loan Document, Borrower hereby irrevocably authorizes Lender to initiate manual and automatic electronic (debit and credit) entries through the Automated Clearing House or other appropriate electronic payment system ("ACH") to all deposit accounts maintained by Borrower, wherever located. At the request of Lender, Borrower shall complete, execute and deliver to the institution set forth below (with a copy to the Lender) an ACH agreement, voided check, information and/or direction letter reasonably necessary to so instruct Borrower's depository institution. Borrower (i) shall maintain in all respects this ACH arrangement; (ii) shall not change depository institutions without Lender's prior written consent, and if consent is received, shall immediately execute similar ACH instruction(s), and (iii) waive any and all claims for loss or damage arising out of debits or credits to/from the depository institution, whether made properly or in error. Borrower has communicated with and instructed the institution set forth below:

Bank Name:  US Bank
Address:    615 6th Street
            Clarkston, WA 99403
ABA#:       125000105
Account #   ████████████
Phone:      208 762 0247
Fax:        _____
Reference:  _____
Contact Person: Marian Pelsma

MAXIMUM RATE OF INTEREST: It is intended that the rates of interest herein shall never exceed the maximum rate, if any, which may be legally charged on the Loans evidenced by this Note (the "Maximum Rate"), and if the provisions for interest contained in this Note would result in a rate higher than the Maximum Rate, interest shall nevertheless be limited to the Maximum Rate and any amounts which may be paid toward interest in excess of the Maximum Rate shall be applied to the reduction of principal, or, at the option of Lender, returned to Borrower.

PLACE OF PAYMENT: All payments hereon shall be made, and all notices to the Lender required or authorized hereby shall be given, at the office of Lender at the address designated in the Agreement, or to such other place as Lender may from time to time direct by written notice to Borrower.

APPLICATION OF PAYMENTS: All payments received hereunder shall be applied in accordance with the provisions of the Agreement.

2

{00171623.DOC; 1}

**Exhibit - A**

EX 7 PG 134

**7-ER-1568**

PAYMENT AND COLLECTION: All amounts payable hereunder are payable by check or wire transfer in immediately available funds to the account number specified by Lender, in lawful money of the United States. At Lender's option, Lender may charge the Borrower's account for the interest accrued hereunder. Borrower agrees to perform and comply with each of the covenants, conditions, provisions and agreements contained in every instrument now evidencing or securing the indebtedness evidenced hereby.

SECURITY: This Note is issued pursuant to the Agreement and is secured by a pledge of the Collateral as described in the Loan Documents. Borrower hereby acknowledges, admits and agrees that Borrower's obligations under this Note are full recourse obligations of Borrower to which Borrower pledges its full faith and credit.

DEFAULTS; REMEDIES: Upon the happening of an Event of Default, the Lender shall have all of the rights and remedies set forth in the Agreement.

The failure to exercise any of the rights and remedies set forth in the Agreement shall not constitute a waiver of the right to exercise the same or any other option at any subsequent time in respect of the same event or any other event. The acceptance by Lender of any payment which is less than payment in full of all amounts due and payable at the time of such payment shall not constitute a waiver of the right to exercise any of the foregoing rights and remedies at that time or at any subsequent time or nullify any prior exercise of any such rights and remedies without the express consent of Lender, except as and to the extent otherwise provided by law.

WAIVERS: Borrower waives diligence, presentment, protest and demand and also notice of protest, demand, dishonor and nonpayment of this Note.

TERMINOLOGY: Any reference herein to Lender shall be deemed to include and apply to every subsequent holder of this Note.

AGREEMENT: Reference is made to the Agreement for provisions as to the Loans, rates of interest, Collateral, acceleration and release matters. If there is any conflict between the terms of this Note and the terms of the Agreement, the terms of the Agreement shall control.

APPLICABLE LAW: THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, THE LAWS OF WHICH BORROWER HEREBY EXPRESSLY ELECTS TO APPLY TO THIS NOTE, WITHOUT GIVING EFFECT TO PROVISIONS FOR CHOICE OF LAW THEREUNDER. BORROWER AGREES THAT ANY ACTION OR PROCEEDING BROUGHT TO ENFORCE OR ARISING OUT OF THIS NOTE SHALL BE COMMENCED IN ACCORDANCE WITH THE PROVISIONS OF THIS NOTE.

WAIVER OF JURY TRIAL. TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER HEREBY WAIVES ANY AND ALL RIGHTS THAT IT MAY NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES

3

{00171623.DOC; 1}

ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN BORROWER AND LENDER OR THEIR SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY CONNECTED WITH THIS NOTE, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL. IT IS INTENDED THAT SAID WAIVER SHALL APPLY TO ANY AND ALL DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDINGS BETWEEN BORROWER AND LENDER. BORROWER WAIVES ALL RIGHTS TO INTERPOSE ANY CLAIMS, DEDUCTIONS, SETOFFS OR COUNTERCLAIMS OF ANY KIND, NATURE OR DESCRIPTION IN ANY ACTION OR PROCEEDING INSTITUTED BY LENDER WITH RESPECT TO THIS NOTE, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS, THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, EXCEPT COMPULSORY COUNTERCLAIMS.

CONSENT TO JURISDICTION. BORROWER HEREBY (a) IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF CALIFORNIA, LOS ANGELES COUNTY, WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING OUT OF THIS NOTE, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, AND (b) WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS WITH RESPECT THERETO. IN ANY SUCH ACTION OR PROCEEDING, BORROWER WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT OR OTHER PROCESS AND PAPERS THEREIN AND AGREES THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER AT ITS OFFICES SET FORTH IN THE AGREEMENT OR OTHER ADDRESS THEREOF OF WHICH LENDER HAS RECEIVED NOTICE AS PROVIDED IN THE AGREEMENT. NOTWITHSTANDING THE FOREGOING, BORROWER CONSENTS TO THE COMMENCEMENT BY LENDER OF ANY ACTION OR PROCEEDING IN ANY OTHER JURISDICTION TO ENFORCE ITS RIGHTS AND WAIVES ANY OBJECTION WHICH BORROWER MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH ACTION OR PROCEEDING.

ASSIGNMENT: Lender reserves the right to sell, assign, transfer, negotiate, or grant participation interests in all or any part of this Note, or any interest in Lender's rights and benefits hereunder.

LOST NOTE: In the event of the loss, theft, destruction or mutilation of this Note, upon request of Lender and submission of evidence reasonably satisfactory to the Borrower of such loss, theft, destruction or mutilation, and, in the case of any such loss, theft, or destruction, upon delivery of a bond or indemnity reasonably satisfactory to Borrower, or in the case of any such mutilation, upon surrender and cancellation of this Note, Borrower will issue a new Note of like tenor as the lost, stolen, destroyed or mutilated Note.

4

{00171623.DOC; 1}

# Exhibit - A

EX 7 PG 136

**7-ER-1570**

EXHIBIT 8

# Exhibit - A



24955 PCH
Suite A202
Malibu, California
90265

310.593.9073

July 16, 2013

**VIA EMAIL AND OVERNIGHT DELIVERY SERVICE**

Crop USA Insurance Agency, Inc., and
CropUSA Insurance Services, LLC
111 Main St. Lewiston, ID 83051
Attn: R. John Taylor

AIA Services Corporation and
AIA Insurance, Inc.
111 Main St. Lewiston, ID 83051
Attn: R. John Taylor

R. John Taylor

Lewiston, ID 83501

*Re: Notice of Default Under (i) Amended And Restated Loan and Security Agreement by and between GemCap Lending I, LLC, as lender, and Crop USA Insurance Agency, Inc., and CropUSA Insurance Services, LLC, as joint as several borrowers, dated February 4, 2013, (ii) Amended And Restated Loan Agreement Schedule by Crop USA Insurance Agency, Inc. and CropUSA Insurance Services, LLC, and (iii) Third Amended And Restated Secured Revolving Note by Crop USA Insurance Agency, Inc. and CropUSA Insurance Services, LLC, dated February 4, 2013*

Gentlemen:

This letter constitutes a formal notice of default (the "Notice of Default") under and in accordance with the loan documents identified above, and a reservation of the rights of GemCap Lending I, LLC ("GemCap") in connection with the exercise of all rights and remedies GemCap, as lender, maintains under any and all of the Loan Documents. This Notice of Default relates to the breaches and defaults of Crop USA Insurance Agency, Inc. and CropUSA Insurance Services, LLC as joint and several borrowers (collectively "Crop") under: (1) that certain Loan and Security Agreement by and between GemCap and Crop dated November 23, 2011, and as amended and restated by that certain Amended and Restated Loan and Security Agreement dated February 4, 2013 (collectively the "Agreement"); (2) that certain Loan Agreement Schedule, as modified by that certain Amended and Restated Loan Agreement Schedule (the "Schedule"); and (3) that certain Secured Revolving Note dated November 23, 2011, as modified by that certain Amended and

{00189519.DOCX; 1}1

**Exhibit - A**

**EX 8 PG 137**

Restated Revolving Note dated April 1, 2012, as further modified by that certain Further Amended and Restated Revolving Note dated July 18, 2012, and as finally modified by that certain Third Amended and Restated Secured Revolving Note dated February 4, 2013 (the "Note" and together with the Schedule and the Agreement, collectively, the "Loan Documents"). Crop, as the borrower under the Loan Documents, is obligated to comply with the terms and conditions prescribed by the Loan Documents. In addition, AIA Services Corporation, AIA Insurance, Inc., and R. John Taylor, (collectively, the "Guarantors") each of which have signed guaranty documents and are the guarantors of the obligations of Crop to GemCap under the Loan Documents, are liable and obligated to GemCap for repayment and performance of Crop's obligations to GemCap under the terms of, and in the time demanded in, the Loan Documents.

GemCap is actively investigating Crop's conduct concerning the loan, and it has yet to complete that investigation. While GemCap continues its investigation into the matter, GemCap has discovered facts plainly demonstrating that Crop is in violation of, and has breached its obligations under, the Loan Documents and thus is in default. GemCap is aware of, among other things and without limitation, several events of default, including the following:

• GemCap discovered several weeks ago that, due to erroneous information in borrowing certificates that Crop presented to GemCap, and on the strength of which GemCap funded requested advances in accordance with the Agreement, GemCap over-advanced Crop approximately $5,735,126.75. Paragraph 1 (c)(iv) of the Schedule requires Crop to repay GemCap any over-advanced amounts immediately. GemCap has repeatedly demanded that this over-advance be immediately repaid, and in accord with Crop's contractual obligations. Crop has not denied its obligation to repay these amounts immediately, and has repeatedly suggested ways in which it could or would raise the funds necessary to do so. However, Crop has failed to do so, in contravention of its obligations, and GemCap's rights, under the Loan Documents.

• Crop has failed to make other payments required under the Loan Documents; and

• GemCap has recently discovered that Crop has extensively used funds advanced under the Loan Documents for purposes that are not permitted under Paragraph 1(d) of the Schedule.

• Crop has misrepresented material facts, before, during and after the consummation of the initial loan, on which GemCap

{00189519.DOCX; 1}2

## Exhibit - A

EX 8 PG 138

**7-ER-1573**

detrimentally relied in making the loan, and Crop has otherwise engaged in conduct in violation of the Loan Documents.

Since the discovery of the over-advance and the other breaches of the Loan Documents, GemCap and Crop have engaged in ongoing discourse regarding the situation. We have, as noted, consistently demanded throughout these discussions repayment of the over-advance and amelioration of the other breaches. Crop has, in response, (i) acknowledged its repayment obligations to GemCap, (ii) acknowledged that Crop must come into compliance with the Loan Documents as to all breaches, and (iii) repeatedly asked for GemCap's indulgence as Crop attempts to raise the funds necessary to do so. Despite that, the over-advance remains wholly outstanding and the other breaches continue without resolution. Accordingly, GemCap has no alternative but to issue this Notice of Default to Crop and each of the guarantors, which we do by way of this letter.

The information provided above should not be considered, and is not, exhaustive, and GemCap's investigation is ongoing. Additionally, GemCap hereby reserves all its rights in connection with the Loan Agreements, including without limitation its right to accelerate and demand immediate repayment of all outstanding amounts due and owing under the Loan Agreements, GemCap's security interest rights to pledged collateral, and to pursue all rights and remedies against Crop and each of the Guarantors. Nothing in this letter should be considered a waiver of those rights.

We look forward to discussing the situation in person in California on July 19, 2013 with Mr. Taylor and Mr. Gatziolis.

Very truly yours,

GEMCAP LENDING I, LLC

By: _____

Name: Richard Ellis

Title: Co-President

cc: via email  Robert A. Boghosian, Esq. at rboghosian@ctswlaw.com
cc: James Gatziolis, Esq. at james.gatziolis@quarles.com

{00189519.DOCX; 1}3

# Exhibit - A

**EXHIBIT 9**

# Exhibit - A



**24955 PCH**
**Suite A202**
**Malibu, California**
**90265**

310.593.9073

July 29, 2013

**VIA EMAIL AND OVERNIGHT COURIER – jtaylor@cropusainsurance.com**
Crop USA Insurance Agency, Inc. and
CropUSA Insurance Services, LLC
111 Main Street
Lewiston, ID 83501
Attn: R. John Taylor

Re: Amended and Restated Loan and Security Agreement dated as of February 4, 2013 (as may be amended from time to time, the "Loan Agreement"), between Crop USA Insurance Agency, Inc. and CropUSA Insurance Services, LLC (jointly and severally the "Borrower") and GEMCAP LENDING I, LLC (the "Lender")

Dear Mr. Taylor:

This letter is issued in connection with the Loan Agreement referenced above. All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Loan Agreement.

As you are aware, the Borrower has failed to comply with and is in breach of certain representations, warranties, covenants and conditions set forth in the Loan Agreement, including, but not limited to, the following: (i) Section 2.3; (ii) Section 2.4; (iii) Section 5.4(i); (iv) Section 6.2; (v) Section 8.8; (vi) Section 8.10; (vii) Section 8.17; (viii) Section 8.24; (ix) Section 9.1; (x) Section 9.4; (xi) Section 9.10; and (xii) Section 10.10. The foregoing breaches arise from Borrower's (i) false representations and warranties and misleading statements inducing the Lender to make Loans, (ii) creating inaccurate Borrowing Certificates, (iii) failure to direct Collections to the Collection Account, (iv) use of Loan proceeds in violation of the Loan Documents, and (v) failure to pay Lender. In addition, Events of Default as described in Sections 11.1, 11.3, 11.5, and 11.9 of the Loan Agreement have occurred (such Events of Default are referred to as the "Specified Events of Default").

The enumeration of the foregoing Specified Events of Default is not in any way intended and shall not under any circumstances be construed to be an exclusive listing of Events of Default that have occurred and remain currently outstanding and unwaived as of the date hereof.

1

**Exhibit - A**

**7-ER-1576**

This is notice that the Specified Events of Default exist and remain outstanding. Borrower is hereby further notified that Lender has elected to and hereby does exercise certain of Lender's rights and remedies under Section 12.1(a) of the Loan Agreement as follows: (i) accelerate the payment of all Obligations and demand immediate payment thereof to Lender; and (ii) require Borrower, at Borrower's expense, to assemble and make available to Lender all of the Collateral at any place and time designated by Lender. Demand is hereby made that all outstanding Obligations owed by Borrower to Lender be paid in full to Lender no later than 5:00 p.m. Pacific on July 29, 2013. As of July 26, 2013, the amount due to Lender is $8,676,288.39 plus interest accruing from and after July 26, 2013 at a per diem rate of $5,784.19, plus fees, costs and expenses (including attorneys' fees), plus any other amounts chargeable under the Loan Documents.

Furthermore, please be advised that, on account of the foregoing Specified Events of Default, effective as of July 16, 2013, interest on the unpaid principal balance of the Loans shall accrue at the Default Interest Rate of twenty-four percent (24%) per annum.

Lender hereby expressly reserves and preserves all other rights and/or remedies available to Lender under the Loan Agreement and the other Loan Documents and otherwise available to Lender at law and in equity as a consequence of the occurrence and continuance of the Specified Events of Default. Lender may choose to exercise any or all of such rights and remedies at any time in the future, in any order and without first exercising any one or another particular such right or remedy, all its sole, complete and absolute direction without any further written notice to Borrower or any Guarantor (except to the extent any such notice is expressly required under the Loan Agreement), and nothing contained in this letter is in any way intended nor shall under any circumstances be construed to be a waiver of or agreement to be obligated to forbear with respect to any of the Specified Events of Default.

Neither this letter, nor any delay or inaction by Lender in the exercise of such rights and remedies, nor any discussions by Lender with Borrower regarding the status or resolution of the Specified Events of Default shall constitute (i) a modification or an alteration of the terms, conditions or covenants of the Loan Agreement or any of the other Loan Documents, all

2

**Exhibit - A**

EX 9 PG 141

**7-ER-1577**

of which remain in full force and effect, or (ii) a waiver of or agreement to be obligated to forbear with respect to the Specified Events of Default or a waiver or release of or limitation upon any of the rights and remedies available to Lender under the Loan Agreement and the other Loan Documents or otherwise available to Lender at law or in equity arising and/or exercisable as a result of the occurrence and continuance of the Specified Events of Default, or (iii) any course of conduct or dealing relating to the foregoing.

Very truly yours,

GEMCAP LENDING I, LLC

By: _____

Name: Richard Ellis

Title: Co-President

cc: via e-mail and overnight courier  James Gatziolis, Esq. at
Quarles & Brady LLP, 300 North LaSalle Street – Suite 4000,
Chicago, IL 60654 and james.gatziolis@quarles.com

via email  Robert A. Boghosian, Esq. at rboghosian@ctswlaw.com

3

**Exhibit - A**

**7-ER-1578**



24955 PCH
Suite A202
Malibu, California 90265

310.593.9041

July 29, 2013

**VIA EMAIL AND OVERNIGHT COURIER – jtaylor@cropusainsurance.com**

AIA Services Corporation and
AIA Insurance, Inc.
111 Main Street
Lewiston, ID 83501
Attn: R. John Taylor

RE:    Demand for Payment – Amended and Restated Secured Continuing
        <u>Guarantee dated October 5, 2012</u>

Mr. Taylor:

       Reference is made to the Amended and Restated Secured Continuing Guarantee dated October 5, 2012 (the "Guarantee") executed and delivered by AIA Services Corporation and AIA Insurance, Inc., as joint and several guarantors (collectively, the "Guarantor"), in favor of GemCap Lending I, LLC (the "Lender"). Capitalized terms used but not defined herein have the meanings given to them in the Guarantee.

       Enclosed herewith for your reference is a copy of the letter dated July 29, 2013 (the "Default and Acceleration Letter") from Lender to Crop USA Insurance Agency, Inc., an Idaho corporation, and CropUSA Insurance Services, LLC, an Idaho limited liability company (jointly and severally the "Borrower"), pursuant to the Amended and Restated Loan and Security Agreement, dated as of February 4, 2013, between Lender and Borrower (the "Loan Agreement").

       This letter together with the attached Default and Acceleration Letter shall constitute notice under the Guarantee that Guarantor must pay $8,676,288.39, plus interest accruing from and after July 26, 2013 at a per diem rate of $5,784.19, plus fees, costs and expenses (including attorneys' fees), plus any other amounts chargeable under the Loan Documents by the close of business on July 29, 2013.

# Exhibit - A

The foregoing is without prejudice to Lender's rights under the Loan Agreement and the other Loan Documents, including, without limitation, the Guarantee, and applicable law, all of which rights are hereby expressly reserved.

In furtherance and not in limitation of the foregoing, no delay on the part of Lender in exercising any right, remedy, power or privilege under any of the Loan Documents (including, without limitation the Guarantee) or provided by statute or at law or in equity or otherwise against the Borrower or the Guarantor shall impair, prejudice or constitute a waiver of any such right, remedy, power or privilege, or be construed as a waiver of any Event of Default or as an acquiescence therein.

Very truly yours,

GEMCAP LENDING V, LLC

By: _____

Name: Richard Ellis

Title: Co-President

cc:   via e-mail and overnight courier    James Gatziolis, Esq. at
      Quarles & Brady LLP, 300 North LaSalle Street – Suite 4000, Chicago, IL
      60654 and james.gatziolis@quarles.com

      via email    Robert A. Boghosian, Esq. at rboghosian@ctswlaw.com

Enclosure

# Exhibit - A

# 7-ER-1580



**24955 PCH**
**Suite A202**
**Malibu, California 90265**

310.593.9041

July 29, 2013

<u>**VIA EMAIL AND OVERNIGHT COURIER – jtaylor@cropusainsurance.com**</u>

R. John Taylor

Lewiston, ID 83501

RE:     Demand for Payment – Amended and Restated Secured Continuing
           <u>Guarantee dated February 7, 2013</u>

Mr. Taylor:

Reference is made to the Amended and Restated Secured Continuing Guarantee dated February 7, 2013 (the "Guarantee") executed and delivered by you (the "Guarantor"), in favor of GemCap Lending I, LLC (the "Lender"). Capitalized terms used but not defined herein have the meanings given to them in the Guarantee.

Enclosed herewith for your reference is a copy of the letter dated July 29, 2013, (the "Default and Acceleration Letter") from Lender to Crop USA Insurance Agency, Inc., an Idaho corporation, and CropUSA Insurance Services, LLC, an Idaho limited liability company (jointly and severally the "Borrower"), pursuant to the Amended and Restated Loan and Security Agreement, dated as of February 4, 2013, between Lender and Borrower (the "Loan Agreement").

This letter together with the attached Default and Acceleration Letter shall constitute notice under the Guarantee that Guarantor must pay $8,676,288.39, plus interest accruing from and after July 26, 2013 at a per diem rate of $5,784.19, plus fees, costs and expenses (including attorneys' fees), plus any other amounts chargeable under the Loan Documents by the close of business on July 29, 2013.

The foregoing is without prejudice to Lender's rights under the Loan Agreement and the other Loan Documents, including, without limitation, the Guarantee, and applicable law, all of which rights are hereby expressly reserved.

In furtherance and not in limitation of the foregoing, no delay on the part of Lender in exercising any right, remedy, power or privilege under any of the

# Exhibit - A

**EX 9 PG 145**

Loan Documents (including, without limitation the Guarantee) or provided by statute or at law or in equity or otherwise against the Borrower or the Guarantor shall impair, prejudice or constitute a waiver of any such right, remedy, power or privilege, or be construed as a waiver of any Event of Default or as an acquiescence therein.

Very truly yours,

GEMCAP LENDING I, LLC

By: _____

Name: Richard Ellis

Title: Co-President

cc: via e-mail and overnight courier    James Gatziolis, Esq. at
Quarles & Brady LLP, 300 North LaSalle Street – Suite 4000, Chicago, IL
60654 and james.gatziolis@quarles.com

via email    Robert A. Boghosian, Esq. at rboghosian@ctswlaw.com

Enclosure

**Exhibit - A**

**7-ER-1582**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge S. James Otero and the assigned discovery Magistrate Judge is Margaret A. Nagle.

The case number on all documents filed with the Court should read as follows:

## CV13- 5504 SJO (MANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=========================================================

#### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| ☒ **Western Division** | ☐ **Southern Division** | ☐ **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)          NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

## Exhibit - A

## 7-ER-1583

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )
GEMCAP LENDING I, LLC

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Todd M. Lander (Bar No. 173031
Tracy R. Daub (Bar No. 239013)
FREEMAN FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1900, Los Angeles CA 90067
(310) 255-6100

**DEFENDANTS** ( Check box if you are representing yourself ☐ )
CROP USA INSURANCE AGENCY, INC.; CROPUSA INSURANCE SERVICES, LLC; CROP USA, LLC; AIA INSURANCE, INC.; AIA SERVICES CORPORATION; R. JOHN TAYLOR a/k/a RAY JOHNSON TAYLOR a/k/a R. JOHNSON TAYLOR a/k/a RAYMOND J. TAYLOR; REINSURANCE PARTNERS, LLC; GREEN LEAF REINSURANCE PARTNERS, LLC; WESKAN AGENCY, LLC; SOUND INSURANCE AGENCY; PACIFIC EMPIRE RADIO CORPORATION; RANDOLPH LAMBERJACK; JOLEE DUCLOS; BRYAN FREEMAN; LINDA JONES; FRANCIS WILSON; HILLCREST AIRCRAFT COMPANY; CGB DIVERSIFIED SERVICES, INC. dba DIVERSIFIED CROP INSURANCE SERVICES

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi- District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No ☒ **MONEY DEMANDED IN COMPLAINT:** $ t,t12.70

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
(1) Breach of Loan Agreement; (2) Breach of Implied Covenant of Good Faith and Fair Dealing; (3) Fraud; (4) Money Had and Received; (5) Breach of Contract; (6) Fraud; (7) Conversion; (8) Declaratory Relief; (9) Unfair Business Practices

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|

CV13- 5504

CV-71 (02/13)

**Exhibit - A**

Page 1 of 2

Case 2:13Case:D15-55004-SJO0404RC0D5 Document 1322007/16/13 06/30/15 Page 159 3age4 of 593 Page ID #:158

- [ ] 375 False Claims Act
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce/ICC Rates/Etc.
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced & Corrupt Org.
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Info. Act
- [ ] 896 Arbitration
- [ ] 899 Admin. Procedures Act/Review of Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loan (Excl. Vet.)
- [ ] 153 Recovery of Overpayment of Vet. Benefits
- [ ] 160 Stockholders' Suits
- [x] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment

- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Fed. Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury-Med Malpratice
- [ ] 365 Personal Injury-Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

Application
- [ ] 465 Other Immigration Actions

**TORTS**
**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accomodations
- [ ] 445 American with Disabilities-Employment
- [ ] 446 American with Disabilities-Other
- [ ] 448 Education

lien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

**Other:**
- [ ] 540 Mandamus/Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Ret. Inc. Security Act

- [ ] 830 Patent
- [ ] 840 Trademark

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405 (g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405 (g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS-Third Party 26 USC 7609

FOR OFFICE USE ONLY: Case Number: _____

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

CV-71 (02/13)

**Exhibit - A**

Page 1 of 2

Case 2:13-cv-05524-GAF-JEM Document 1-1 Filed 07/30/13 Page 2 of 2 Page ID #:159

**CIVIL COVER SHEET**

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Nez Perce County, Idaho; Asotin County, Washington; Boone County, Indiana; Morgan County, Illinois |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
**Note**: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _____   DATE: July 30, 2013

Todd M. Lander

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).
Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

CV-71 (02/13)                    CIVIL COVER SHEET                    Page 2 of 2

American LegalNet, Inc.
www.FormsWorkFlow.com

# Exhibit - A

# 7-ER-1586

## IN THE IOWA DISTRICT COURT IN AND FOR POLK COUNTY

| | |
|---|---|
| **CHURCH CROP INSURANCE SERVICES, INC.,**<br><br>    **Plaintiff,**<br><br>    v.<br><br>**GEMCAP LENDING I, LLC,**<br><br>    **Third Party Interpleader Defendant** | **Case No.: EQCE077193**<br><br>**RULING AND ORDER** |

This case came on for trial to the court May 3-4, 2017.  Plaintiff, Church Crop Insurance Services, Inc., was represented by Jacqueline Church.  GemCap Lending I, LLC was represented by William Adams and Larry Brock.

This is an interpleader action.  Church Crop and GemCap each claim entitlement to funds deposited with the court by a dismissed party.  Church Crop asserts it is entitled to the funds because they are owed commissions earned in 2013 selling crop insurance policies to farmers for a company called Crop USA.  GemCap Lending asserts it has a superior right to the funds because it has a perfected security interest in the funds as collateral for loans it made to Crop USA, and that Crop USA defaulted on the loans.

### Statement of the Case

Church Crop Insurance filed the petition in this case in October 2014.  Church Crop sued two groups of entities involved in the sale of crop insurance: 1) CGB Diversified Services, Inc. ("Diversified'), and 2) Crop USA Insurance Agency, Inc. and two related Crop USA entities ("Crop USA").  Church Crop alleged it is an insurance agent selling crop insurance, and that it was owed commissions for the 2013 crop year.

On October 19, 2014, the district court entered a temporary injunction enjoining defendants from distributing or transferring any 2013 federal crop insurance commissions or

-1-



**Exhibit - E**
**7-ER-1587**

compensation owed to Crop USA based on policies sold by Church Crop Insurance.  On November 13, 2014, Church Crop Insurance filed an amended petition for declaratory judgment. The amended petition names the same defendants, Diversified and Crop USA.  It seeks a declaratory judgment that its rights to the 2013 crop insurance commissions are superior to that of Crop USA.

The Crop USA defendants defaulted in this litigation.  On April 18, 2015, a default judgment was entered against Crop USA and in favor of Church Crop Insurance for $627,136.62.

On July 20, 2015, Diversified filed a motion for leave to file a counterclaim, third-party claim, and cross-claim for interpleader.  This motion states that GemCap Lending had filed a lawsuit in U.S District Court in California, making claim to the funds claimed by Church Crop Insurance in this case.  Diversified asked to deposit funds with the court from the 2013 crop year, and asked the court to determine whether Church Crop, GemCap Lending, or Crop USA were entitled to the funds.  The court granted the motion, and Diversified filed its petition for interpleader on August 21, 2015.  Thus GemCap Lending is a third party defendant in the interpleader action.[1]

On January 11, 2016, the district court granted Diversified's motion to deposit funds with the clerk of court.  The order states that GemCap Lending received notice and did not object to the request.  The court found that Diversified was a disinterested stakeholder in the funds in question, which total $545,767.31.

These funds are now on deposit with the Polk County Clerk of Court, and both Church Crop Insurance and GemCap Lending make claim to them.

On March 25, 2016, Church Crop filed a motion to file an amended petition.  The motion to amend was granted on May 2, 2016.  The amended petition makes claims against GemCap for

---

[1] GemCap initially resisted being named a defendant, arguing lack of personal jurisdiction.  Subsequently GemCap filed an answer, thus consenting to personal jurisdiction in this court.

-2-

**Exhibit - E**
**7-ER-1588**

1) declaratory judgment that its rights to the 2013 insurance commissions are superior to GemCap's rights; 2) conversion; 3) fraudulent transfer; 4) tortious interference with contract; 5) interference with prospective business advantage; 6) unjust enrichment; and 7) constructive trust. That was the posture of the case at the time of trial in May 2017.  In its post-trial brief, Church Crop asked the court to limit its ruling to Count 1 – declaratory judgment on interpleader.  Thus GemCap is entitled to judgment on Counts 2-7 of Church Crop's amended petition.

**Findings of Fact**

**Introduction.**

This case involves federal crop insurance sales and commissions.  Sale of crop insurance is subsidized and heavily regulated by the federal government.  *See, Steffen N. Johnson, "A Regulatory 'Waste Land': Defining a Justified Federal Role in Crop Insurance,* 72 N.D. L. Rev. 505 (1996).  The federal government subsidizes premium payments for farmers to purchase crop insurance, and controls the amounts of premiums to be charged and commissions that can be earned.

There are several layers of entities involved in the distribution of federal crop insurance subsidies.  During the trial an illustrative diagram was on display for the court, which is helpful in understanding the terms used and the relationships of the entities involved in the sale of crop insurance.  It is replicated below:

| |
|---|
| FCIC – Federal Crop Insurance Corporation |
| RMA – Risk Management Agency |
| AIP – Authorized Insurance Providers |
| MGA – Managing General Agent   (Diversified) |
| GA – General Agent  (Crop USA) |
| ISA - Independent Sales Agent (Church Crop Insurance) |

-3-

# Exhibit - E
## 7-ER-1589

Case: 25-3552, 01/20/2026, DktEntry: 23.8, Page 164 of 238

Case 1:10-cv-00404-CWD   Document 229-7   Filed 06/30/17   Page 4 of 14
E-FILED 2017 JUN 21 11:09 AM POLK - CLERK OF DISTRICT COURT

Payments called administrative and operational subsidies, or A & O subsidies, are funneled down through the various governmental entities and insurance agents. The General Agent (Crop USA) is entitled to keep a portion of the fee. The General Agent then pays the Independent Sales Agent (Church Crop) commissions based on policies sold to farmers, in accordance with formulas established by the federal government.

In this case, Crop USA borrowed millions of dollars from GemCap Lending, and pledged all its "property and assets" as collateral. Ex. D, pp. 14-15. Crop USA defaulted on its loan to GemCap Lending. GemCap claims it is entitled to the funds on deposit with the court pursuant to loan documents and its UCC filings. Church Crop claims the funds are its commissions, and that it is entitled to the funds. Church Crop argues Crop USA lacked the legal authority to borrow against the commissions owed to Church Crop.

There is one main issue here: whether Crop USA had sufficient "rights" in the commissions owed to Church Crop to pledge them as collateral for the GemCap loan. This requires an examination of the contract between Diversified and Crop USA, and the contract between Crop USA and Church Crop.

**The Diversified-Crop USA Agreement.**

Crop USA is an Idaho company that acted as a General Agent for the sale of crop insurance. For the time period relevant to this case, Crop USA did not directly sell insurance to farmers and was not licensed to do so.

In 2011, Crop USA entered into a "Sales Agent-Company Agreement" with Diversified Crop Insurance Services. Ex. R. This agreement appoints Crop USA as an agent to sell crop insurance for Diversified. It recognizes that insureds' premiums and Crop USA's commissions are subsidized with federal funds. Ex. R, p. 3, § III(4). It requires the parties to comply with federal statutes, regulations, and FCIC procedures. *Id*. Crop USA's commissions are set forth in an addendum to the agreement. Ex. R, p. 5, § VII(4); Addendum to Ex. R. The addendum

-4-

**Exhibit - E**
**7-ER-1590**

E-FILED 2017 JUN 21 11:09 AM POLK - CLERK OF DISTRICT COURT

states, "We agree to pay your agency 80% of the A & O we receive from RMA as defined above."  Ex. R, Addendum.  There is an additional five percent for processing.  Ex. R, Processing Addendum.  The addendum also states, in part, "Agency Commission shall be calculated as a percentage of the total collected base premium subject to the caps imposed by the FCIC . . ."  Ex. R, Addendum.

The agreement between Crop USA and Diversified prohibits Crop USA from arranging for premium financing:  "Agency [Crop USA] may not arrange for premium financing for any policies or premiums produced for Company [Diversified] under this Agreement without prior written notice to Company."  Ex. R, p. 5, §  VII(1).  This contract does not specifically prohibit financing based on commissions as opposed to premiums.

Crop USA's president was a man named John Taylor, who was later determined to have improperly spent the loan proceeds on personal expenses and business expenses unrelated to crop insurance payments to Independent Sales Agents.

**Church Crop-Crop USA agreement.**

Church Crop Insurance is a family-owned company in Iowa that is licensed to sell multi-peril crop insurance (MCPI) to farmers.  Church Crop has been in the crop insurance business for approximately 40 years.  Its president is licensed to sell crop insurance in 13 states.  Crop USA is not licensed to sell crop insurance to farmers, thus it contracts with Independent Sales Agents such as Church Crop to do so.

In September 2010, Church Crop Insurance contracted with Crop USA to sell crop insurance policies issued by Diversified.  Ex. 1, § I(A); Ex. 4.  The contract states that Crop USA will pay commissions to Church Crop Insurance "on premiums received by the Insurer [Diversified] and recorded by us on coverage issued from applications procured by [Church Crop Insurance] in accordance with the attached Commission Schedule …."  Ex. 1, § II(A).  The Commission Schedules are set forth in Exhibits 2 and 3.  They state that "[b]ase commissions

**Exhibit - E**
**7-ER-1591**

E-FILED 2017 JUN 21 11:09 AM POLK - CLERK OF DISTRICT COURT

earned by the agent [Church Crop Insurance] on buy-up MCPI policies, issued by the insurer, are calculated on the Base Premium …." Ex. 2. The schedule sets forth the percentages that comprise the base commissions on various crop insurance plans. *Id.* Commission rates are prescribed by the FCIC. This contract remained in effect during the 2013 crop year.

Under the contracts described above, Crop USA receives payments from Diversified, keeps a percentage of the payment, and remits commission payments to Church Crop Insurance under their separate contract, based on policies sold by Church Crop.

Although Diversified did not contract directly with Church Crop, Diversified kept track of all expected commissions owed to Church Crop each year for sales of MCPI policies. *See* Exs. 7, 8, 10, and 11. Diversified kept a detailed record of each policy sold by Church Crop, which included the premium, the A & O rate in percentages, the capped A & O rate, and the commission rates and commissions earned. *Id*. These recaps were required by the federal crop insurance program. The recaps were issued by Diversified, and are captioned "Church Crop Insurance Services, Inc. (Crop USA)." *See* Ex. 7, 8, 9, 11.

### The GemCap Loan to Crop USA

GemCap is a Delaware corporation with its principal place of business in the Bay Area of San Francisco. Its two principals are twin brothers Richard and David Ellis. It is an asset-based lender that services businesses in need of funding unavailable from conventional or traditional lenders. (GemCap Answer, ¶ 24) [2]

In 2011, John Taylor, president of Crop USA, approached GemCap for a loan. He described it as a working capital loan to enable Crop USA to make payments to its independent agents such as Church Crop, which might be due before it received the funds from Diversified under its contract with Diversified. GemCap had no experience with crop insurance and its complicated structure under federal law, but Taylor provided information that he had borrowed

---

[2] Richard Ellis testified the name "GemCap" is derived from abbreviations of "gemello," the Italian word for twin, and "capital."

-6-

**Exhibit - E**
**7-ER-1592**

from other lenders in the past. The loan Crop USA had immediately prior to the GemCap loan was capped at $3 million, and Taylor wanted a higher line of credit.

GemCap reviewed the contract between Diversified and Crop USA and concluded it did not prohibit Crop USA from pledging all monies received from Diversified as collateral for the loan. In addition, Diversified signed off on Crop USA's pledge of a security interest in all payments and proceeds to which Crop USA was entitled under its agreement with Diversified. Ex. K. Crop USA did not disclose its contracts with Independent Sales Agents, and GemCap apparently did not review any of Crop USA's sales agent agreements, including the agreement with Church Crop. *See* Ex. H, p. 3 ("material contracts" included only contracts with Managing General Agents, not with Independent Sales Agents).

GemCap obtained a legal opinion from a Chicago law firm, Quarles & Brady, which served as special counsel to Crop USA. Ex. U. The opinion concluded that the loan agreement creates a valid security interest in the pledged commissions. *Id*. The opinion assumes that the borrower, Crop USA, has rights or title to the collateral, and that Crop USA has rights in the property. *Id*, pp. 2, 3. The law firm did not review the contract between Crop USA and Church Crop (or any other independent agent) before issuing the opinion. *See* Ex. U, pp. 1-2. GemCap has now sued this law firm over the validity of the legal opinion.

GemCap decided to loan money to Crop USA. The initial loan was capped at $5 million. GemCap filed a UCC financing statement on "[a]ny and all property now owned or hereafter acquired by" Crop USA. Ex. X. GemCap also set up a Blocked Account Agreement with Crop USA. *See* Exs. L, S. All payments from Diversified to Crop USA were deposited in the account and "swept" daily by GemCap.

In August 2012, GemCap noticed that Crop USA was transferring significant loan proceeds to other businesses owned by Taylor and not using the funds to pay Independent Sales Agents for their crop insurance commissions. Ex. 17, p. 2. GemCap met with Taylor and they

-7-

**Exhibit - E**
**7-ER-1593**

agreed the transfers were a default under the loan agreement.  *Id.*  GemCap imposed a $10,000 penalty for the default.  Nevertheless, in October 2012, GemCap increased the line of credit from $5 million to $8 million, and in February 2013 increased it to $10 million.

By the summer of 2013, GemCap realized that John Taylor had misappropriated the loan funds, and did not have the ability to repay the loans.

**California Litigation**

In July 2013, GemCap filed suit in U.S. District Court for the Central District of California alleging fraud and breach of contract.  *See* Ex. 16.  GemCap sued Taylor, Crop USA, other businesses owned by Taylor, and Diversified. In August 2013, the court in that case issued a preliminary injunction prohibiting Diversified from distributing any funds potentially owed to Crop USA, its agents or subagents until the court could determine lawful recipients of the funds. Ex. 17, p. 3.  Diversified was later dismissed from that litigation on summary judgment.  *See* Ex. 17.

On September 15, 2014, GemCap settled with Crop USA and Taylor for $12 million. Taylor and Crop USA agreed to assist GemCap in recovering on its judgment.[3]  Following this settlement, GemCap repeatedly asked the U.S. District Court to order release of the enjoined funds to it.  *See* Exs. 17, 18.  The Court denied all requests.  *Id.*  (The petition in the instant case was filed October 3, 2014, and on October 19, 2014, Judge Hanson issued a temporary injunction prohibiting distribution of any monies owed to Church Crop.)

In May 2015, GemCap attempted to extinguish junior claims to the loan funds by holding a foreclosure sale for funds at issue in the California case. Ex. 17.  However, the U.S. District Court invalidated the purported foreclosure sale, finding it was not "commercially reasonable" as required by California law.  *See* Ex. 17, pp. 6-10.  Among the reasons cited by the court was that subagents such as Church Crop had not been notified of the sale.  *Id.,* p. 9.  The U.S. District

---

[3] The settlement is confidential; however a copy was filed with the Iowa District Court.  Judge Robert Hanson ordered that it be sealed.  (May 2, 2016 Order).  The facts set forth herein concerning the settlement are from testimony presented at trial.

-8-

**Exhibit - E**
**7-ER-1594**

Court referred to this procedure as a "so-called Foreclosure Sale." *Id.*, p. 6.  The court noted that GemCap sold the security interest in the Crop USA loan to itself for $150,000 in a ten-minute foreclosure sale held in New York City.  *See Id.,* p. 7.  In March 2015, the U.S. District Court in California dissolved the preliminary injunction, describing GemCap's arguments to claim the funds as "disingenuous."  Ex. 18, p. 6.

Additional facts will be set forth in the discussion below.

**Discussion and Analysis**

*Interpleader.*  This is an action in interpleader pursuant to Iowa Rule of Civil Procedure 1.251.  In the first phase of an interpleader action, a person or entity who may be exposed to multiple claims may bring all claimants to a single case where the claims can be decided.  *Id., See C.F. Sales, Inc. v. Amfert, Inc.,* 344 N.W.2d 543 (Iowa 1983); *Kelly, Shuttleworth & McManus v Cent. Nat'l Bank & Trust Co.,* 248 N.W. 9 (Iowa 1933).   Thus Diversified was allowed to deposit the funds it held for Church Crop's 2013 commissions from Crop USA with the court.  Diversified was determined to be a disinterested stakeholder and does not make a claim to said funds.  It has been dismissed from this action.

In the second stage of an interpleader action, the claimants litigate their respective claims to the deposited funds.  *See* 7 Fed. Prac. & Proc. Civ., § 1714, *Practice in Interpleader Actions* (2017).  Each claimant has the burden to establish the right to the funds by a preponderance of the evidence.  *Id.*

*Rights in the collateral.*  The parties agree on the analytical framework the court should use in this case.  The loan agreements between GemCap and Crop USA are to be interpreted under the laws of the State of California according to their terms.  See Ex. D, p. 43, ¶ 14.9.  (*See* Church Crop Post-Trial Brief, p. 4). [4]

---

[4] The agreement between Church Crop and Crop USA is to be interpreted under the laws of the State of Idaho according to its terms.  Ex. 1, p. 3, §  VI(C).   There is no real dispute concerning construction of that contract.

**Exhibit - E**
**7-ER-1595**

It is undisputed that Church Crop is entitled to payment from Crop USA for commissions earned for the 2013 crop year.  This is established pursuant to the contract between Church Crop and Crop USA (Ex. 1), and by Church Crop's default judgment against Crop USA in this case for $627,136.62.

The real question is whether Crop USA could legally pledge as security all payments received from Diversified, which included the commissions owed to Church Crop, under the California Uniform Commercial Code.

The parties both point to the California Commercial Code as governing law.  Attachment of a security interest occurs when: 1) the secured party has possession of the collateral pursuant to an agreement, or the debtor has signed a security agreement describing the collateral, 2) the secured party has given value, and 3) the debtor has rights in the collateral.  Cal. Com. Code, § 9203.  The second step in the analysis is whether the security interest is perfected.  Cal. Com. Code § 9301, *et seq*.  *See Bank of the West v. Commercial Credit Fin. Services, Inc.,* 852 F.2d 1162, 1166 (9th Cir 1988) (discussing California Commercial Code).  Perfection requires attachment and filing a financing statement.  *Id.; New West Fruit Corp. v. Coastal Berry Corp.,* 1 Cal App. 4th 92, 97 (Cal. Ct. App 1991).    The purpose of requiring filing a financing statement is to alert potential creditors that collateral against which they are contemplating making a loan is already encumbered.  *Bank of the West,* 852 F.2d at 1172.  Again, there is no dispute that GemCap filed a financing statement.  *See* Ex. X.

The dispute between the parties is whether Crop USA had "rights in the collateral" within the meaning of California UCC Section 9203.  The UCC does not define this term.  However, mere possession of collateral by a debtor is not sufficient to constitute "rights in the collateral" within the meaning of the California UCC.  *Oxford St. Prop., LLC v. Rehab. Assoc., LLC* 141 Cal. Rptr. 3d 704, 713 (Cal Ct. App. 2012).  "Further, comment 6 to section 9203 provides 'in accordance with basic personal property conveyancing principles, the baseline rule is that a

-10-

## Exhibit - E
## 7-ER-1596

security interest attaches only to whatever rights a debtor may have, broad or limited as those rights may be.'" *Id.,* (citation omitted). *See also Mother Lode Bank v. General Motors Acceptance Corp.,* 120 Cal. Rptr. 429 (Cal. Ct. App. 1975) (car dealer who had repossessed vehicles but did not have title to the vehicles did not have "rights in the collateral" and could not convey security interest in them).

Church Crop argues that Crop USA could not grant a security interest in the portion of payments it received from Diversified that represent commissions owed to Church Crop. GemCap argues that Crop USA could do so.

The court concludes that Church Crop has proven by a preponderance of the evidence that Crop USA lacked "rights" in the commissions owed to Church Crop within the meaning of the California UCC. Crop USA entered into the contract with Church Crop. In their 2010 agreement, Crop USA contracted to pay Church Crop commissions based on the commission schedules. Ex. 1, § II(A); Exs. 2, 3. This agreement states that Crop USA would pay Church Crop commissions "on premiums received by the Insurer [Diversified] and recorded by us [Crop USA] on coverage issued from applications procured by [Church Crop] . . ." Ex. 1, § 11(A). This explicitly recognizes that Crop USA acted as an intermediary which would pass on to Church Crop commissions based on premiums received by Diversified. The parties to the crop insurance arrangement recognized this, which is evidenced by Diversified keeping a detailed account of all commissions owed to Church Crop under its contract with Crop USA (even though there was not a direct contractual arrangement between Diversified and Church Crop). *See* Exs. 7-11.

GemCap also recognized this arrangement in its complaint filed in U.S. District Court in California, where it alleged, "Crop [USA] was, under the resulting structure, entitled as the general agent to receive commissions on the issued policies, though a percentage of those commissions were ultimately distributed to the selling agents with whom Crop [USA]

-11-

# Exhibit - E
## 7-ER-1597

contracted.  *Thus, Crop [USA]'s role in the system is to collect premiums and to ensure Crop [USA]'s agents confirm policyholders make the premium payments from the sale of policies and distribute appropriate commissions to the selling agents, charging a fee for doing so."*  Ex. 16, p. 8 (emphasis added).

GemCap points out that it obtained a legal opinion from a law firm which concluded Crop USA could pledge its entire income stream from Diversified.  However, that legal opinion does not state that the lawyers reviewed the independent sales agent agreement with Church Crop (or any other agent).  The contracts with Independent Sales Agents are an integral part of the federal crop insurance structure.  In addition, the legal opinion assumes that Crop USA had sufficient rights in the collateral to pledge it as security.  If that assumption is invalid, the legal opinion does not stand up.  Indeed, GemCap has sued the law firm which issued the opinion, presumably claiming the opinion lacks validity.

GemCap argues that John Taylor had arranged for similar loans prior to its loan arrangement with GemCap.  This provides scant assurance to the court that the practice is a sound one.  Larry Church, who has been involved with the sale of crop insurance for 37 years, had never heard of the practice and doubted its need given the income stream from premium payments.  GemCap alleged in its lawsuit against Crop USA and Taylor that, "Taylor's representations were false," and "it's clear Taylor defrauded GemCap from the outset."  Ex. 16, p. 9.

Crop USA could only pledge a security interest in property to which it had "rights" under the California UCC.  Mere possession is insufficient to establish a debtor's rights in property.  The court recognizes that the agreement between Diversified and Crop USA prohibits a pledge of premiums as security for a loan, while being silent as to a pledge of commissions.  The court also recognizes that Diversified consented to Crop USA pledging commissions as security for the loan.  However, this does not answer the question whether Crop USA had sufficient rights in

-12-

**Exhibit - E**
**7-ER-1598**

Church Crop's commissions to pledge them as security as required by the California UCC. Indeed, Diversified was required to keep detailed records of all commissions owed to Church Crop, even though it was not in a direct contractual relationship with Church Crop. Diversified's records list Church Crop Insurance as the primary party, with Crop USA listed in parentheses. This is a strong indication that Diversified recognized that Church was entitled to its commissions under the Federal Crop Insurance program. The court is persuaded that Crop USA could not pledge the commissions owed to Church Crop as security for the loan because it did not have rights to those commissions. GemCap could have examined the contract between Crop USA and Church Crop in determining whether Crop USA could pledge Church Crop's commissions as security for the loan. It would have been advisable to do so, especially given the highly regulated and complex crop insurance industry. The contracts and relationships between the MGAs, GAs, and ISAs are interrelated. Instead GemCap looked only "upstream" in the series of contracts.

For the reasons stated above, the court concludes that the funds deposited with the Clerk of Court should be paid to Church Crop Insurance.

IT IS ORDERED that plaintiff Church Crop Insurance Services, Inc. is entitled to declaratory judgment, and it is entitled to the funds on deposit with the clerk of court. The clerk of court shall release the funds in the amount of $545,767.31 to plaintiff, Church Crop Insurance Services, Inc.

IT IS FURTHER ORDERED that Counts 2 – 7 of the amended petition filed March 25, 2016 are dismissed with prejudice.

Costs are taxed to Third Party Interpleader Defendant, GemCap Lending I, LLC.

-13-

**Exhibit - E**
**7-ER-1599**

Case 1:10-cv-00404-CWD   Document 229-7   Filed 06/30/17   Page 14 of 14
E-FILED  2017 JUN 21 11:09 AM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

**Type:**           OTHER ORDER

**Case Number**      **Case Title**
EQCE077193        CHURCH CROP INS SERVICES VS CGB DIVERSIFIED ET AL

So Ordered

Eliza Ovrom, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2017-06-21 11:09:25      page 14 of 14

# Exhibit - E
## 7-ER-1600

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiffs

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>       Plaintiff,<br><br>   v.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>       Defendants. | Civil No. 1:10-cv-00404-CWD<br><br>PLAINTIFFS DALE L. MIESEN AMENDED MEMORANDUM OF LAW IN OPPOSITION TO GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT **[Dkt. 220]** |

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO GEMCAP
LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT - i

## TABLE OF CONTENTS

I.  INTRODUCTION .......................................................................................................... 1

II.  CERTAIN PERTINENT FACTS APPLICABLE TO GEMCAP'S MOTION ................. 2

III.  ARGUMENT AND AUTHORITIES ........................................................................ 7

A.  The Standard Applicable to a Motion to Dismiss Under Rule 12(b)(6). ................................ 7

B.  The Standard Applicable to a Statutes of Limitations Defense Asserted Rule 12(b)(6). ........ 8

C.  This Court Should Take Judicial Notice of Some of Its Own Records, Certain Records
in Other Courts and Certain Public Records. ........................................................................ 9

D.  None of Dale Miesen's Causes of Action Are Time Barred Under Idaho Law. .................... 9
   1.  Plaintiff's Action Against GemCap Was Commenced When He Filed His Motion
       To Amend on November 4, 2016 Because GemCap Was Already a Party to this
       Lawsuit. ...................................................................................................................... 9
   2.  Plaintiff's Claims Are NOT Time Barred. ................................................................. 10
   3.  Plaintiff's Aiding and Abetting Fraud Claims Are NOT Time Barred. ......................... 13
   4.  Plaintiff's Aiding and Abetting Breach of Fiduciary Duties Claims are NOT Time
       Barred. ........................................................................................................................ 14
   5.  Count Eight Is NOT Time Barred Because that Claim Is Based on the Written
       Settlement Agreement and Guarantees. ..................................................................... 15
   6.  Plaintiff's Consumer Protection Act Is NOT Time Barred. ......................................... 15
   7.  Plaintiff's Declaratory Judgment Relief Is NOT Time Barred. .................................... 16
   8.  The Adverse Dominion Doctrine Tolls Plaintiff's Claims. ........................................... 16

E.  The Allegations that GemCap "Should Have Known" Were Not Asserted to Support
Plaintiff's Aiding and Abetting Claims. .............................................................................. 17

F.  If this Court Finds that the Third Amended Complaint Fails to State a Claim as to
Any of the Causes of Action Asserted Against GemCap, Leave to Amend Is Warranted. .. 18

IV.  CONCLUSION .......................................................................................................... 18

CERTIFICATE OF SERVICE .......................................................................................... 19

Plaintiff Dale L. Miesen ("<u>Plaintiff</u>" or "<u>Miesen</u>") submits this Memorandum of Law in Opposition to GemCap Lending I, LLC's ("<u>GemCap</u>") Motion to Dismiss Third Amended Complaint ("<u>Motion</u>") (Dkt. 220):

## I.   <u>INTRODUCTION</u>

GemCap is a hard-money lender from California who lent $8,700,000 to CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC (collectively "<u>CropUSA</u>") at the hard-money rate of 18.5% interest (24% upon default). After CropUSA failed to pay, GemCap sought to obtain money and assets from AIA Services Corporation and AIA Insurance, Inc. (collectively "<u>AIA</u>") via a Guarantee that was allegedly made in 2012 that was never disclosed to Plaintiff. Not surprising, the Plaintiff took legal action against GemCap. Now, the thrust of GemCap's Motion is that it disingenuously argues that Plaintiff's claims against it are time barred under Rule 12(b)(6). There is good reason why courts disfavor Rule 12(b)(6) motions to dismiss based on statutes of limitations, and GemCap's disingenuous Motion perfectly illustrates why.

Indeed, GemCap's motion reeks of desperation because it knows that it has pushed the envelope too far. GemCap knew the Settlement Agreement and Guarantees were never authorized or ever disclosed to AIA's shareholders or disinterested constituents of AIA. Yet, rather than demand disclosure as would any good-faith lender, GemCap chose the illegal route of working with certain of the other defendants to actively conceal the facts. The fact that GemCap avoids these issues and the merits of Plaintiff's claims is telling. Since Plaintiff could not have discovered *all* of the facts necessary for his claims (and he still hasn't because GemCap's agents have not been deposed nor has it produced any documents), GemCap has failed to prove when the Plaintiff discovered the *limited* facts he possesses, and Plaintiff's causes of action are all well-within the statutes of limitations, GemCap's motion is without merit and should be denied.

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 1

## II.   CERTAIN PERTINENT FACTS APPLICABLE TO GEMCAP'S MOTION[1]

The pertinent facts alleged against GemCap in the Third Amended Complaint (which must be construed in Plaintiff's favor) and those in public records and court filings are as follows:[2]

> On or about November 23, 2011 [the precise signing dates are unknown], the Controlling AIA Defendants obtained a $5,000,000 line-of-credit from GemCap for CropUSA, which was subsequently amended on April 1, 2012, July 18, 2012, and February 4, 2013 to be a $10,000,000 line-of-credit (the original loan and all subsequent modifications and amendments are collectively the "GemCap Loan").

(Dkt. 211 at 39 ¶ 135; *see also* Dkt. 229-8 at 9-17.)

> On October 1, 2012, the Controlling AIA Defendants had AIA purportedly guaranteed the entire $10,000,000 GemCap Loan (the 2011 $1,113,930 limited guarantee executed in 2011 and the $10,000,000 unlimited guarantee executed in 2012 are collectively referred to as the "Guarantees"). Even though AIA purportedly executed the Guarantees, AIA could not borrow funds from the GemCap Loan and AIA obtained no benefit whatsoever.

(Dkt. 211 at 39 ¶ 136.)  The GemCap Loan and Guarantees were concealed from Plaintiff. (*E.g.,* Dkt. 211 at 41 ¶ 141, at 42 ¶ 145, at 51 ¶ 164(r), at 55 ¶ 164(qq), at 70 ¶ 214.)

> On December 20, 2012, GemCap filed a UCC financing statement with the Idaho Secretary of State stating that AIA Services and AIA Insurance had pledged "All of each of Debtor's right, title and interest, whether now existing or hereafter acquired, in and to all assets of such Debtor, wherever located, whether tangible or intangible, and the proceeds and products thereof" ("Financing Statement"). The Financing Statement was not properly authorized or disclosed to AIA's shareholders, and it violated AIA Services' amended articles of incorporation and AIA's bylaws.

(Dkt. 211 at 41 ¶ 141; *see also* Dkt. 229-4.) In addition, the Financing Statement did not contain any further detailed information to place the Plaintiff on notice that AIA had guaranteed loans for

---

[1] When Plaintiff cites to Docket Numbers filed in this lawsuit or other lawsuits, Plaintiff will cite to the page numbers indicated on the filing stamp at the top of the page (i.e., the page number indicated in the window in the tool bar in Adobe Acrobat).

[2] These facts are taken from the allegations in the Third Amended Complaint (must be accepted as true and liberally constructed in Plaintiff's favor) and documents which may be properly judicially noticed by this Court under Rule 12(b)(6), as discussed in Sections A-C below.

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 2

CropUSA or that any sums were owed on such guarantees.[3] (Dkt. 229-4.)

> Upon information and belief, Gemcap provided CropUSA and other parties a notice of default through a notice dated July 16, 2013. Upon information and belief, GemCap provided a purported notice of default and demand for payment to AIA Services and AIA Insurance of the $8,676,288.39 owed by CropUSA through a notice dated July 29, 2013.

(Dkt. 211 at 42 ¶ 144.) On July 30, 2013, GemCap filed suit against John Taylor, AIA, CropUSA and others for the non-payment of an alleged $8,676,288.39. (Dkt. 229-2-3.) The above allegations, obtained from GemCap's complaint filed on July 30, 2013, provided the first and only possibility that any sums that *may* allegedly be owed by AIA on July 16, 2013 or that there was an actual controversy over which AIA or the Plaintiff could file suit regarding the Guarantees. (*Id.*)

> [To reiterate,] GemCap, CropUSA and the Controlling AIA Defendants **failed to disclose** to properly elected and unconflicted directors of AIA, the Plaintiff, or AIA Services' other innocent minority common shareholders the GemCap Loan (including its terms), AIA's Guarantees (including their terms), and the subsequent notices of default of the GemCap Loan.

(Dkt. 211 at 42 ¶ 145 (emphasis added).)

However, on May 9, 2014, the AIA Defendants and their former attorneys here, David Risley and Doug Siddoway, represented in another lawsuit that there was no harm to AIA:

> John Taylor personally guaranteed the loan. Gemcap alleges that AIA did, too, but that allegation is disputed. In any event, Gemcap has not pursued the AIA guaranty (or the Taylor guaranty for that matter). If the California court ultimately determines that AIA guaranteed the CropUSA loan and the lender pursues the remedies that are available to it under the guaranty, then AIA will have incurred a prohibited indebtedness under subsection 4.2.9(c) [of the amended articles of

---

[3] Of course, GemCap did not file a copy of the Financing Statement for obvious reasons—it knew that the Financing Statement failed to disclose the Guarantees or whether any sums were owed. (Dkt. 229-4.) Instead, GemCap disingenuously argues that the Financing Statement contained all necessary information to place the Plaintiff on notice. (Dkt. 220-1 at 6, 12-14.) Indeed, the Financing Statement actually benefitted AIA to the extent that it prevented the AIA Defendants from diverting and misappropriating more assets.

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 3

incorporation]."[4]

(Dkt. 229-5 at 8.) On July 21, 2014, the Plaintiff and two other shareholders filed a protective suit against GemCap (there was still no proof of damage). (Dkt. 220-5.) However, GemCap successfully argued that the claims should be dismissed because they were not asserted derivatively, Dkt. 229-6, and the district court dismissed them *without* prejudice. (Dkt. 220-6.)

> GemCap and AIA, purportedly on behalf of John, purportedly entered into a purported settlement and a written settlement agreement sometime after January 9, 2015 [the precise signing date is unknown] (collectively the "Settlement Agreement" or "Settlement Agreements"). The Settlement Agreements **were concealed** from AIA and its shareholders by the Controlling AIA Defendants and GemCap, and further constitute a conspiracy to defraud AIA.

(Dkt. 211 at 43 ¶ 148 (emphasis added).) The Settlement Agreement confirms that it was singed after January 9, 2015 because it states that: "commencing on September 15, 2014 *pursuant to the Court's ruling of January 9, 2015*." (Dkt. 128 at 28 (emphasis added).)

> [In addition,] [u]nder the terms of the Settlement Agreements, AIA Services and AIA Insurance were require to transfer certain real property to GemCap and judgments would be entered against them in the amount of $12,126,584.61, which included $3,986,368.78 in interest, penalties and costs. The Settlement Agreements were barred by AIA Services' amended articles of incorporation and AIA's bylaws for the same reasons that the Guarantees were barred, and it was a breach of John's fiduciary duties owed to AIA when he executed the Settlement Agreement (which GemCap was fully aware). In addition, the Settlement Agreements illegally provided that AIA would not file for bankruptcy protection and that malpractice claims would be assigned to GemCap. The Settlement Agreements are illegal and/or ultra vires because they violated AIA Services' amended articles of incorporation, AIA's bylaws, numerous Idaho Code sections, and were the product of intentional breaches of John's fiduciary duties owed to AIA.

(Dkt. 211 at 43 ¶ 149; *see also* Dkt. 128 at 21-48.)

---

[4] These facts, standing alone, would stop anyone from filing suit as the representations came from two members of the Idaho State Bar. While those representations turned out to be false (whether they were made intentionally is unknown), they nevertheless create a disputed question of fact regarding whether Plaintiff, or any other reasonable person, would have sufficient facts to file suit against GemCap.

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 4

> After certain of AIA Services' shareholders learned of the GemCap lawsuit in California, GemCap was advised that AIA's Guarantees and the Settlement Agreements were unauthorized and illegal and that AIA was not being properly operated. Nevertheless, GemCap sought to collect from AIA based on the unauthorize and illegal Guarantees. At this point in time, **GemCap had further actual knowledge** of the unauthorized and illegal Guarantees and that AIA was not being operated properly (**including that the Controlling AIA Defendants were breaching fiduciary duties owed to AIA**), assuming that it was not aware of these facts prior to accepting AIA's Guarantees.

(Dkt. 211 at 43 ¶ 147 (emphasis added).)

> According to the financial statements for AIA for 2015 (which were belatedly provided to AIA Services' shareholders in August 2016 after many demands), AIA disclosed the Guarantees and Settlement Agreements for the first time to AIA Services' shareholders. However, John inaccurately stated that the "Company admitted no liability, but entered into settlement discussions and reached a confidential settlement agreement in late 2014…" However, John failed to disclose to AIA Services' shareholders that he had agreed to allow judgments in the amount of $12,126,584.61 to be unlawfully and inappropriately entered against AIA and that any judgment against him would be delayed (i.e., he once again placed his interests above the interests of AIA, even assuming that the Settlement Agreement was legal and authorized).

(Dkt. 211 at 45 ¶ 152.)

> The real property located at 111 Main Street, Lewiston, Idaho (AIA Services' former headquarters) was ultimately transferred to GemCap and sold. As with the Guarantees and Settlement Agreements, **the transfer of AIA Services' former headquarters to GemCap was not disclosed or authorized by AIA Services' shareholders.** According to recently provided 2015 financial statements for AIA (which were provided in August 2016), John disclosed for the first time that the real property located at 111 Main Street, Lewiston, Idaho (AIA Services' headquarters) was purportedly transferred to GemCap as a reduction of amounts allegedly owed to CropUSA, when AIA owed nothing to CropUSA and CropUSA actually owed AIA. Upon information and belief, AIA Services' headquarters had a replacement value exceeding $7,000,000.

(Dkt. 211 at 45 ¶ 153 (emphasis added).)

The Third Amended Complaint also contained a number of other specific allegations regarding GemCap, none of which supports the argument that the Plaintiff's claims are time barred or that Plaintiff has inadequately pleaded aiding and abetting. (Dkt. 211 at 39-47 ¶¶ 135-156.)

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 5

On July 18, 2016, GemCap moved to intervene in the instant lawsuit to seal the Settlement Agreement. (Dkt. 141.) On October 31, 2016, this Court granted the motion to intervene and GemCap formally became a party to this lawsuit (albeit for a limited reason). (Dkt. 178.)

On November 4, 2106, Plaintiff moved to amend and supplement his complaint, and attached the proposed Third Amended Complaint. (Dkt. 182.) GemCap's attorneys—the same attorneys who represent it as the present time—were served with notice of, and copies of, Plaintiff's motion to amend and the proposed Third Amended Complaint. (Dkt. 182.) On April 21, 2017, this Court granted Plaintiff's motion to amend and directed him to file the Third Amended Complaint in the same form as previously attached to his motion to amend. (Dkt. 210 at 37.) On April 24, 2017, Plaintiff filed the Third Amended Complaint in the same form and substance as the proposed amended complaint. (Dkt. 211; *see also* Dkt. 182-3.) On May 5, 2017, Plaintiff effectuated service upon GemCap. (Dkt. 213 at 2.) GemCap's motion followed.[5] (Dkt. 220.)

---

[5] GemCap seeks to improperly interject the failed efforts of Plaintiff and two other shareholders to directly have the Guarantees and Settlement Agreement declared illegal or unenforceable and Donna Taylor's failed effort to intervene in the California federal court action. (Dkt. 220-1 at 8-9.) In *Durant v. GemCap Lending I, LLC, et al.*, GemCap asserted the plaintiffs' claims should be dismissed because they did not have standing since their claims were asserted directly, and not derivatively, Dkt. 229-6 at 6-7, and the district court agreed and dismissed the claims "WITHOUT PREJUDICE" (i.e., res judicata and collateral estoppel does not apply). (Dkt. 220-6 at 7 (emphasis in original).) In *GemCap Lending I, LLC v. CropUSA Insurance Agency, et al.*, Donna Taylor was late in intervening because she could not afford an attorney in California, although the undersigned belatedly (unfortunately) found an attorney licensed in California willing to help (the denial of intervention is not res judicata). (Dkt. 220-9.) Ironically, these facts simply demonstrate the need for this Court to resolve the claims and issues, and further establishes that GemCap knowingly and intentionally aided and abetted John Taylor and others in the commission of torts against AIA. Notably, the Plaintiff is not alone. For example (only one), GemCap also (albeit unsuccessfully) sought to unlawfully take $545,767.31 in commissions from another innocent party. (Dkt. 229-7.) GemCap has absolutely no scruples when it comes to the rights of other people (including the Plaintiff here) and it does not hesitate in using its heavy-handed tactics.

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 6

### III.   ARGUMENT AND AUTHORITIES[6]

#### A.  The Standard Applicable to a Motion to Dismiss Under Rule 12(b)(6).

> To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"
>
> The Supreme Court has identified two "working principles" that underlie this dismissal standard. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." When a court is considering a motion to dismiss under Rule 12(b)(6), it must "'consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice.'"

*Abbott v. Rosenthal*, 2 F. Supp.3d 1139, 1143-1144 (D. Idaho 2014) (citations omitted).

More specifically as to matters outside of the complaint, a court may also consider documents not physically attached to the complaint "if the documents' authenticity…is not contested and the plaintiff's complaint necessarily relies on them" and it may take judicial notice of "matters of public record." *Lee v. City of Los Angeles*, 250 F.3d 668, 688-689 (9th Cir. 2001); *see also* **Fed. R. Evid. 201**. A court may also take judicial notice of its own records. *Id.*; *Desfosses v. Noridian Healthcare Solutions, LLC*, 2015 WL 1196018 at *1 n.1 (D. Idaho 2015) (citing Fed.

---

[6] Although GemCap does not address the issue in its Motion, "[t]he applicable statute of limitations rule in this diversity action is that of the State of Idaho." *Owens v. White*, 380 F.2d 310, 313 (9th Cir. 1967). GemCap agrees. (Dkt. 220-1 at 9-17.) To that end, this Court must predict how the Idaho Supreme Court would rule on any unsettled areas of law. *Owens*, 380 F.2d at 313.

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 7

R. Evid. 201(b)).

**B.   The Standard Applicable to a Statutes of Limitations Defense Asserted Rule 12(b)(6).**

"The statute of limitations is an affirmative defense and the defendant has the burden of establishing the elements necessary to establish the defense." ***Stuard v. Jorgenson***, 150 Idaho 701, 704, 249 P.3d 1156, 1159 (2011). "A plaintiff is not required to negate an affirmative defense, such as the statute of limitations, in his complaint." ***Clark v. City of Braidwood***, 318 F.3d 764, 767 (7th Cir. 2003). "Motions to dismiss complaints on the basis of statutes of limitation are generally viewed with disfavor." ***Singleton v. Foster***, 98 Idaho 149, 151, 559 P.2d 765, 767 (1977).

More specifically, the statute of limitations "is rarely a good reason to dismiss under Rule 12(b)(6)," ***Reiser v. Residential Funding Corp.***, 380 F.3d 1027, 1030 (7th Cir. 2004), because "the question is only whether there is *any* set of facts that if proven would establish a defense to the statute of limitations." ***Clark***, 318 F.3d at 768 (quoting *Early v. Bankers Life and Casualty Co.*, 959 F.2d 75, 80 (7th Cir. 1992)). A Rule 12(b)(6) challenge "which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time barred," except for the "relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint." ***Goodman v. Praxair, Inc.***, 494 F.3d 458, 464 (4th Cir. 2007); *accord **Von Saher v. Norton Simon Museum of Art at Pasadena***, 592 F.3d 954, 969 (9th Cir. 2010) ("A claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations only when the running of the statute is apparent on the face of the complaint. [A] complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim.").

///

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 8

**C. This Court Should Take Judicial Notice of Some of Its Own Records, Certain Records in Other Courts and Certain Public Records.**

Pursuant to the authorities in Section B, Plaintiff requests that this Court take judicial notice of the documents attached to the Declaration of Roderick C. Bond (Dkt. 229-1—8), together with certain of this Court's records and other documents cited to, or quoted, in this Memorandum.

**D. None of Dale Miesen's Causes of Action Are Time Barred Under Idaho Law.**

After applying the Rule 12(b)(6) standards articulated in Sections A-B and considering the records and filings which may be judicially noticed, GemCap's Motion fails under its own weight:

**1. Plaintiff's Action Against GemCap Was Commenced When He Filed His Motion To Amend on November 4, 2016 Because GemCap Was Already a Party to this Lawsuit.**

GemCap argues that Plaintiff's claims against it were commenced when the Third Amended Complaint was filed on April 24, 2017. (Dkt. 220-1 at 10.) GemCap is incorrect—as it well knows—Plaintiff's action against GemCap was commenced when he filed his motion to amend because GemCap was served with the proposed Third Amended Complaint.[7]

Under Idaho law, when a new party is added to a lawsuit, the issue of whether an action is commenced upon the filing of a motion to amend or upon the filing of the amended complaint hinges upon whether the new defendant received notice of the proposed amended complaint at the time of filing the motion to amend and whether the amended complaint was identical to the proposed one. *Compare* **English v. Taylor**, 160 Idaho 737, 742-745, 378 P.3d 1036, 1041-1044 (2016) *with* **Terra-West, Inc. v. Idaho Mut. Trust, LLC**, 150 Idaho 393, 395-401, 247 P.3d 620, 622-628 (2010) (citing *Moore v. State*, 999 F.2d 1125, 1131 (7th Cir. 1993) ("As a party has no control over when a court renders its decision regarding the proposed amended complaint, the

---

[7] The record suggests that GemCap and the AIA Defendants intentionally delayed responding to the derivative demand letter and delayed this action for the purpose of seeking to bail GemCap out on statute of limitation grounds.

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 9

7-ER-1612

submission of a motion for leave to amend, properly accompanied by the proposed amended complaint that provides notice of the substance of those amendments, tolls the statute of limitations, even though technically the amended complaint will not be filed until the court rules on the motion.")).

Here, *Terra West* controls and dictates that Plaintiff's action against GemCap was commenced when he filed his motion to amend on November 4, 2016. (Dkt. 182.)

**First**, when Plaintiff filed his motion to amend on November 4, 2016, GemCap was served with a copy of the motion and the proposed Third Amended Complaint (notably, GemCap is also still represented by the same attorneys). (Dkt. 182.)

**Second**, GemCap has already been a party to this lawsuit since October 31, 2016 (albeit in a limited one). (*E.g.*, Dkt. 178 at 7-11, 14.) Indeed, on more than one occasion, plaintiff made clear that the naming of GemCap as a defendant was imminent. (*E.g.*, Dkt. 156 at 8.)

**Third**, the Third Amended Complaint filed on April 24, 2017 is identical to the proposed Third Amended Complaint. (*Compare* Dkt. 211 *with* Dkt. 182-2.) Consequently, GemCap's reliance on *English* is misplaced. (Dkt. 220-1 at 10.)

As such, Plaintiff's action against GemCap was commenced when the motion to amend was filed on November 4, 2016. *Compare* ***English***, 160 Idaho at 742-745 *with* ***Terra-West, Inc.***, 150 Idaho at 395-401. Having established that November 4, 2016 is the operative commencement date for purposes of the statute of limitations. Plaintiff will address each of GemCap's arguments.

**2. Plaintiff's Claims Are NOT Time Barred.**

GemCap argues generally that Plaintiff's claims are time barred for a number of vague and unsupported reasons. (Dkt. 220-1 at 11-14.) These arguments are unavailing.

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 10

**First**, GemCap fails to meet its burden to even state which statute of limitations applies. (*Id.*) Because Plaintiff is challenging and seeking declaratory relief from written instruments (the Settlement Agreement and, if necessary, the Guarantees), the five-year statute of limitations for contracts applies. **I.C. § 5-216**. Assuming GemCap's arguments have merit—that it was essentially in breach the date of the Guarantees—Plaintiff's claims are not time barred because he commenced this action on November 4, 2016—which was within five-years of the November 23, 2011 signing date of the first Guarantee. (Dkt. 229-8 at 19-17.) Contrary to GemCap's arguments, Plaintiff does not need the discovery rule for these claims. (Dkt. 220-1 at 12-14.)

**Second**, GemCap ignores one crucial and dispositive fact. (*Id.*) The Settlement Agreement, Dkt. 128 at 21-48, is the only operative agreement between AIA and GemCap. Since that Settlement Agreement was not signed until sometime after "the [California Federal] Court's ruling of January 9, 2015" (Dkt. 128 at 27 ¶ viii.) and Plaintiff commenced this action against GemCap on November 4, 2016, then all of Plaintiff's claims are **not** time barred under any possible statute of limitations. Thus, the Settlement Agreement is a substitute for all the prior Guarantees and any other undisclosed agreement—and now the only known written instrument now at issue—GemCap cannot argue that it was defrauded by entering into the Settlement Agreement. *See **Bruce v. Oberbillig***, 46 Idaho 387, 268 P. 35 (1928); ***Cougar Bay Co., Inc. v. Bristol***, 100 Idaho 380, 383-384, 597 P.2d 1070, 1073-1074 (1979); **RESTATEMENT (SECOND) OF CONTRACTS § 279** (1981). The Guarantees have been discharged by and through the Settlement Agreement. (Dkt. 229-3 at 34-53; Dkt. 229-8 at 9-17, Dkt. 128 at 21-48.)

In other words, GemCap is the cause of its present dilemma. While GemCap may ultimately decide to assert a counterclaim to enforce the Guarantees (which would be futile), *e.g.,* Dkt. 156 at 8-16, then it would be the party seeking relief—not the Plaintiff—and the statute of

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 11

limitations would no longer apply to the Plaintiff. Thus, GemCap's argument that the Plaintiff's claims accrued when the Guarantees were entered into is without merit and fails.

**Third**, GemCap argues that AIA's shareholders were allegedly placed on notice because they had the right to access the corporate records and the UCC Financing Statement that was filed. (Dkt. 220-1 at 11-14.) These arguments fail. The Financing Statement was filed on December 20, 2012, and it states only that AIA had pledged assets to GemCap as security. (Dkt. 229-4.) It states nothing about the Guarantees nor does it state that AIA owed any money. (*Id*.)

As GemCap is well aware, AIA shareholders (including Plaintiff) have been demanding to inspect records for years to no avail. (*E.g.,* Dkt. 128 at 9 ¶ 13, at 49-57.) As discussed in detail in Section D(3) below, there are, at a minimum, genuine issues of material fact regarding Plaintiff's due diligence and when he discovered the fraud (which he still has not discovered even a sliver of the facts). These are issues for the jury.

**Fourth**, GemCap ignores that, until it provided a notice of default to CropUSA and/or AIA, Dkt. 229-3 at 60-70, and they failed to cure (pay), there was no dispute or cause of action that existed. ***ABC Agra, LLC v. Critical Access Group, Inc.***, 156 Idaho 781, 783-784, 331 P.3d 523, 525-526 (2014). Until that time, any claims were purely hypothetical and AIA's liability, if any, was purely contingent. (Dkt. 229-8 at 9-17; Dkt. 229-3 at 34-53.)

**Fifth**, GemCap ignores that injury is required before any of Plaintiff's claims are ripe (other than his declaratory judgment claims. The allegations and the facts before this Court establish that AIA was not damaged until it purportedly entered into the Settlement Agreement. (Dkt. 128 at 21-48.) At that time, AIA was damaged. Until then, it damages were hypothetical. "[I]t is axiomatic that a party has no right to sue for damages until actual injury occurs." ***Chicoine v. Bignall***, 122 Idaho 482, 483, 835 P.2d 1293, 1294 (1992). GemCap's allegations of default and

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 12

the prior Guarantees never damaged AIA—it was the Settlement Agreement. Based on this fact alone, Plaintiff could not establish all of the elements of any of his causes of action (other than declaratory judgment relief) and thus GemCap's entire Motion as to the statute of limitations fails on this basis.

### 3. Plaintiff's Aiding and Abetting Fraud Claims Are NOT Time Barred.

GemCap argues that Plaintiff's aiding and abetting fraud claims are time barred because he should have discovered the fraud. (Dkt. 220-1 at 14.)

Under Idaho law, it is settled that "[t]he cause of action … [of fraud and constructive fraud] are not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." **Idaho Code § 5-218(4)**; *Doe v. Boy Scouts of America*, 159 Idaho 103, 110-11, 356 P.3d 1049, 1056-57 (2015) (holding that the discovery rule applies to constructive fraud). "Actual knowledge of the fraud can be inferred if the aggrieved party could have discovered the fraud by reasonable diligence, although the Court will hesitate to infer such knowledge." *DBSI/TRI v. Bender*, 130 Idaho 796, 807, 948 P.2d 151, 162 (1997).

> If there is conflicting evidence as to when a fact was known or reasonably should have been known, **it is a question of fact**…'Ordinarily, **what constitutes [the exercise of] reasonable diligence to discover fraud so as to affect the time when the statute of limitations begins to run is a question of fact for the jury**.... Of course, where only one conclusion can be drawn from the evidence, the question of reasonable diligence to discover fraud may be decided by the court as a matter of law.'

*Kawai Farms, Inc. v. Longstreet*, 121 Idaho 610, 826 P.2d 1322 (1992) (emphasis added).

While GemCap's motion illustrates why such motions under Rule 12(b)(6) are disfavored, there are, at a minimum, genuine issues of material fact as to when the Plaintiff discovered all of the facts and whether he engaged in sufficient due diligence. What is clear from this record is that the Plaintiff, through counsel, has sought to inspect AIA's records (to no avail). (Dkt. 128 at 9 ¶

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 13

13, at 49-57.) Plaintiff attended the one and only shareholder meeting held in many years and sought answers to many questions to no avail and to assert other rights. (*E.g*., Dkt. 65; Dkt. 67-44; Dkt. 67-49.) And, the AIA Defendants former attorneys falsely represented that GemCap was not enforcing the Guarantees. (Dkt. 229-5 at 8.)

Ironically, even GemCap's Co-President's 2014 testimony suggests that the fraud did not began until later (assuming he was truthful). (Dkt. 229-8.) That said, the allegations in the Third Amended (Dkt. 211) and the facts before this Court establish that a long-term and intense concealment has taken place and Plaintiff has exercised more than sufficient due diligence, but has yet to discovery the truth. There is one certainty—discovery will reveal some interesting facts. But the issue of discovery is one for the jury. Moreover, Plaintiff's claims as to the Settlement Agreement, which was the clear product of fraud, are well-within the three-year time period even without the discovery rule. (Dkt. 128 at 21-48.) And the Third Amended Complaint alleges numerous distinct claims against GemCap. (Dkt. at 39-47 ¶¶ 135-156, at 70-71 ¶ 216-219.) Lastly, as noted in Section D(2) above, neither Plaintiff nor AIA incurred any damages until that Settlement Agreement and thus the claims did not become ripe until then.

### 4. Plaintiff's Aiding and Abetting Breach of Fiduciary Duties Claims are NOT Time Barred.

GemCap argues that Plaintiff's aiding and abetting breach of fiduciary duty claims are time barred. (Dkt. 220-1 at 15.) GemCap's arguments are again without merit.

The statute of limitations for aiding and abetting is the same as the underlying tort. *American Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal.App.4th 1451 (2014) As with aiding and abetting fraud, the Third Amended Complaint alleges numerous distinct causes of action for breach of fiduciary duties against GemCap. (Dkt. 211 at 39-47 ¶¶ 135-156, at 64 ¶¶ 192-194.) There are numerous questions of fact as to when each of the distinct aiding

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 14

and abetting breach of fiduciary duty claims accrued over the course of many months. (*Id.*) This case is not analogous to ***Jones v. Runft, Leroy, Coffin & Matthews, Chartered***, 125 Idaho 607, 873 P.2d 861 (1994). (Dkt. 220-1 at 15.) As noted in Section D(2) above, there was no damage until the Settlement Agreement was entered into. (Dkt. 128 at 21-48.) There are no damages for entering into the Guarantees and the four-year statute of limitation prevents any of the Plaintiff's claims from being time barred. **I.C. § 5-224**. Since Plaintiff's action was commenced on November 4, 2016, all of the aiding and abetting breach of fiduciary duty claims are not time barred for four-years before that time. Contrary to GemCap's arguments, it was not the entry into the Guarantees that damaged AIA—those were contingent obligations of unknown amounts—it was the entry into the Settlement Agreement. (Dkt. 128 at 21-48.

> **5. Count Eight Is NOT Time Barred Because that Claim Is Based on the Written Settlement Agreement and Guarantees.**

GemCap argues that the declaratory (statutory) relief requested is time barred. (Dkt. 220-1 at 15-16.) This argument fails for the same reasons discussed in Section D(2) above. That relief is based on the written Settlement Agreement and, to the extent applicable, the written Guarantees. (Dkt. 128 at 21-48; Dkt. 229-3 at 34-53; Dkt. 229-8 at 9-17.) Thus, Plaintiff's claims are subject to the five-year statute of limitations for written agreements. **I.C. § 5-216**.

> **6. Plaintiff's Consumer Protection Act Is NOT Time Barred.**

GemCap argues that Plaintiff's Consumer Protection ("CPA") Claim is barred by the statute of limitations. (Dkt. 220-1 at 16-17.) GemCap's arguments are, once again, without merit.

**First**, as discussed in Section D(2) above, GemCap ignores the fact that the Settlement Agreement is the operative written instrument, and that agreement superseded and was a substitute for all prior agreements and the prior Guarantees. (Dkt. 128 at 33 ¶ 23.) The Guarantees are meaningless. ***Bristol***, 100 Idaho at 383-384. The fact that GemCap also unlawfully entered

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 15

**7-ER-1617**

into the two prior Guarantees or any other prior agreements is simply proof of repetitive unfair and deceptive business practices.[8] Because the Settlement Agreement was not signed until sometime after "the [California Federal] Court's ruling of January 9, 2015" (Dkt. 128 at 27 ¶ viii.) and Plaintiff's action was commenced on November 4, 2016, Plaintiff's CPA claims are not time barred because they were brought within two years. **I.C. § 48-619**.

### 7.  Plaintiff's Declaratory Judgment Relief Is NOT Time Barred.

GemCap argues that Plaintiff's declaratory relief is time barred. (Dkt. 220-1 at 17.) This disingenuous argument is a repeat of prior ones. Plaintiff's declaratory relief against GemCap is based on written agreements—primarily the Settlement Agreement and, to the extent necessary, the Guarantees. (Dkt. 128 at 21-48; Dkt. 229-3 at 34-53; Dkt. 229-8 at 9-17.) Thus, the five-year statute of limitations applies. **I.C. § 5-216**.

### 8.  The Adverse Dominion Doctrine Tolls Plaintiff's Claims.

Based on the unique circumstances of this case, GemCap should also be considered as one of the corporate insiders for purposes of the adverse dominion doctrine. *F.D.I.C. v. Jackson*, 133 F.3d 694 (9th Cir. 1998). By and through the Settlement Agreement and its control over AIA, GemCap is no different than one of the guilty corporate insiders, based upon all of the facts and circumstances as alleged in the Third Amended Complaint (Dkt. 211) and as submitted through judicial notice elsewhere in this Memorandum. Under these circumstances, tolling should apply.

///

///

---

[8] Plaintiff is not alone. GemCap recently tried to unlawfully seize commissions that it was not entitled to receive from an agent of CropUSA. (Dkt. 229-7.) As with AIA, it is difficult to believe that GemCap did not know that it had no security interest in the agent's commissions. (*Id.*) Discovery will likely reveal much.

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 16

E. **The Allegations that GemCap "Should Have Known" Were Not Asserted to Support Plaintiff's Aiding and Abetting Claims.**

GemCap makes a hyper-technical argument that Plaintiff's aiding and abetting claims against it should be separately dismissed "to the extent that they rely on constructive knowledge" and allegations that GemCap "knew or should have known" are insufficient. (Dkt. 220-1, p. 17-18.) GemCap ignores the law and the operative allegations in the Third Amended Complaint.

**First**, Plaintiff's aiding and abetting claims do not expressly rely upon allegations that GemCap "knew or should have known" about the breaches of fiduciary duty or fraud. (*E.g.*, Dkt. 211 at 40 ¶ 137.) The allegations contained within Plaintiff's aiding and abetting causes of action do not even mention "should have known" and Plaintiff specifically alleges knowledge, intent, assistance, active concealment, active covering up, participation and other allegations to support the claims. (*E.g.,* Dkt. 211, at 42-43, ¶¶ 155-156, at 46-47 ¶¶ 155-156, at 64 ¶ 193, at 70 ¶ 217.)

**Second**, while Plaintiff concedes that the law is unsettled, Plaintiff's allegations that GemCap aided and abetting because it "knew or should have known" (*id.*; Dkt. 211 at 40 ¶ 137) are also sufficient to support aiding and abetting claims under the minimal standard under Idaho law. *See Helgeson v. Powell*, 54 Idaho 667, 682, 34 P.2d 957, 963 (1934); *Highland Enterprises, Inc. v. Barker*, 133 Idaho 330, 986 P.2d 996 (1999). *Compare, E.g., Heit v. Weitzen*, 402 F.2d 909, 914 (2nd Cir. 1968) ("The charge that defendants 'knew or should have known' adequately alleges actual knowledge of the falsity of the statements, and, alternatively, negligence or lack of diligence in failing to ascertain the true facts.") *with In re Sharp Intern. Corp.*, 281 B.R. 506, 514 (Bankr. E.D.N.Y. 2002) (allegations that "the defendant 'knew or recklessly disregarded,' or 'knew or should have known' of the primary wrongdoing insufficient to plead actual knowledge").

**Third**, as a practical matter, Plaintiff's allegations that GemCap "knew or should have known were primarily directed at defeating any apparent authority defenses GemCap may try to

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 17

assert. *See Middlekauff v. Lake Cascade, Inc.*, 110 Idaho 909, 914, 719 P.2d 1169, 1171 (1986).

**F.  If this Court Finds that the Third Amended Complaint Fails to State a Claim as to Any of the Causes of Action Asserted Against GemCap, Leave to Amend Is Warranted.**

Dismissal without leave to amend is proper "only if it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Grogan v. Health Officer of Cty. of Riverside*, 221 F.3d 1348 (9th Cir. 2000) (quotation marks and citation omitted).

At this still early stage of this lawsuit, if this Court finds Plaintiff fails to state a claim as to any cause of action (including because a claim is time barred) or requested relief, this Court should grant the Plaintiff leave to amend to correct any technical pleading deficiencies.

## IV.  CONCLUSION

For the reasons stated above, this Court should deny GemCap's Motion to Dismiss Third Amended Complaint. (Dkt. 220.) Plaintiff's action was commenced against GemCap on November 4, 2016 and all of Plaintiff's claims are within the applicable statute of limitations. GemCap's separate challenge to Plaintiff's aiding and abetting claims also fails because those claims are more than adequately pleaded. In the alternative, leave to amend should be granted.

DATED:  This 30th day of June, 2017.

RODERICK BOND LAW OFFICE, PLLC


By:    /s/ Roderick C. Bond
           Roderick C. Bond
           Attorney for Plaintiff Dale L. Miesen

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 18

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 30th day of June, 2017, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:    jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:    jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:    lci@elamburke.com, nlp@elamburke.com

Steven P Wieland:   steven.wieland@mwsrose.com, rebekah.tway@mwsrose.com

Alyson Anne Foster:   aaf@aswblaw.com, cme@aswblaw.com, kkp@aswblaw.com, lmk@aswblaw.com, mar@aswblaw.com, tie@aswblaw.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

*/s/ Roderick C. Bond*
Roderick C. Bond

PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO GEMCAP'S MOTION TO DISMISS - 19

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

Donna Taylor )
) Case No. 1:10–cv–00404–CWD
                          Plaintiff, )
)
)
)
vs. )  **NOTICE OF ASSIGNMENT TO A**
)  **UNITED STATES MAGISTRATE**
)  **JUDGE AND CONSENT FORM**
)
Hawley Troxell Ennis & Hawley LLP )
)
                          Defendant )
)
)

In accordance with District of Idaho General Order No. 237, you are notified that the above entitled action has been assigned to a United States Magistrate Judge to conduct all proceedings in this case, including trial and entry of final judgment.

Exercise of this jurisdiction by a United States Magistrate Judge is, however, permitted only if all parties file a written consent form, a copy of which is part of this notice. You may also, without adverse consequences, request immediate reassignment to a District Judge. No Judge will be informed of a party's response to this notification, unless all parties have consented to the assignment of the matter to a United States Magistrate Judge. All parties are requested to return this form within 60 days of receipt to the Clerk of Court. Any party deciding to proceed before a United States Magistrate Judge should sign the consent to proceed form and return it to the Clerk of Court by e–mailing the same in .pdf format to the following address: consents@id.uscourts.gov. If you are a pro se litigant, you should mail this form to the following address: U.S. District Court, 550 W. Fort St. Room 400, Boise, ID 83724. The parties may submit a joint consent, similar to a stipulation, before or after receiving this Notice.

An appeal from a judgment entered by a United States Magistrate Judge will be directly to the United States Court of Appeals for the Ninth Circuit in the same manner as an appeal from any other judgment of this District Court. 28 U.S.C. § 636(c); Fed.R.Civ.P. 73.

### CONSENT TO THE EXERCISE OF JURISDICTION
### BY A UNITED STATES MAGISTRATE JUDGE

In accordance with provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and District of Idaho General Order No. 237, the undersigned party to this case consents to have a United States Magistrate Judge conduct any and all proceedings in this case, including the trial, and order the entry of a final judgment.

Party Represented                Signature                              Date

Crop USA Insurance                                                      6/26/17
Services, LLC

**7-ER-1622**

### THE CONSENT PROCESS: WHAT IS IT?

In accordance with 28 U.S.C. § 636(c), FRCP 73, and Local Rule 73.1, a Magistrate Judge is available to preside over all aspects of this case, including the jurisdictional authority to:

- Schedule, hear, and decide all dispositive and non–dispositive matters;
- Schedule, hear, and decide all interlocutory matters;
- Conduct jury or non–jury trials;
- Enter final orders and judgment; and
- Decide all post–trial motions.

Appeals from any final order or judgment entered by a Magistrate Judge are directly to the United States Court of Appeals for the Ninth Circuit. See 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c). However, a Magistrate Judge's exercise of this jurisdiction is permitted only if all parties voluntarily consent.

### How Does It Benefit Me?

Speedy trial rights in felony criminal cases require the District's two District Judges to give priority to trying those cases, sometimes requiring that civil trial dates be moved. Magistrate Judges do not preside over felony criminal trials. As a result, a Magistrate Judge's trial docket is generally less crowded than those of the District Judges.

Magistrate Judges usually are able to provide earlier and firmer dates for both hearings and trials than might otherwise be possible by a District Judge. Because this District is very busy and the criminal docket is growing rapidly, consenting to proceed before a Magistrate Judge often means your civil case will be resolved more quickly than if before a District Judge.

Additionally, even if parties do not consent, the District Judge to whom the matter is assigned may nonetheless refer all pre–trial proceedings to a Magistrate Judge pursuant to 28 U.S.C. § 636(b), FRCP 73, and Local Rule 72.1. For any dispositive matters so referred, the Magistrate Judge will enter a Report and Recommendation for the District Judge's consideration. At that point, the review process by a District Judge generally takes 60 days. Thus, by consenting to Magistrate Judge jurisdiction at the outset, the parties also can avoid the delays and expense of this review process, while still preserving their appeal rights.

### How Do I Consent?

After the case is filed, the Clerk of the Court will send the appropriate notice and consent form as provided by the General Order. The consent form affords each party an initial opportunity to consent to having a Magistrate Judge assume complete jurisdiction over the case, including trial and entry of judgment. Each party should make a decision whether to consent to or decline Magistrate Judge jurisdiction as soon as possible. The parties may also file a joint consent, similar to a stipulation, at any time.

You may, without adverse substantive consequences, withhold your consent, which would preclude Magistrate Judge jurisdiction. If any party withholds consent, the identity of the parties consenting and/or withholding consent will not be communicated to any Judge.

---

1. This insert is for information purposes only and is not intended to supersede the applicable rules, including General Order No. 237, addressing the consent process.

Alyson A. Foster
aaf@aswblaw.com
Idaho Bar No. 9719
ANDERSEN SCHWARTZMAN WOODARD BRAILSFORD PLLC
101 S. Capitol Blvd., Suite 1600
Boise, ID 83702
Telephone: 208.342.4411
Facsimile:  208.342.4455

*Attorneys for GemCap Lending I, LLC*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,<br><br>    Plaintiff,<br><br>v.<br><br>CONNIE TAYLOR HENDERSON, an individual, et al.,<br><br>    Defendants. | Case No. 1:10-cv-00404-CWD<br><br>**REPLY IN SUPPORT OF GEMCAP LENDING I, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 220)** |

**7-ER-1624**

GemCap Lending I, LLC ("GemCap") submits this reply brief in support of its Motion to Dismiss Third Amended Complaint (Dkt. 220) (the "Motion") in response to Plaintiffs Dale L. Miesen Memorandum of Law in Opposition to GemCap Lending I, LLC's Motion to Dismiss Third Amended Complaint (Dkt 229) (the "Opposition"). GemCap will address each of Plaintiff's arguments in turn.

## 1. Legal Standard for Motions to Dismiss Based on the Statute of Limitations (Argument B, Opp. at 8)

Plaintiff incorrectly asserts that motions to dismiss based on the statute of limitations are disfavored. (Opp. at 8.) The Ninth Circuit does not blanketly disfavor such motions, and Plaintiff offers no legal authority to suggest it does. Rather, in the Ninth Circuit, a motion to dismiss based on statute of limitations will be granted when the complaint demonstrates that "the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Von Saher v. Norton Simon Museum of Art*, 592 F.3d 954, 969 (9th Cir. 2010). That is the case here.

## 2. Judicial Notice (Argument C, Opp. at 9)

Plaintiff correctly observes that the Court may take judicial notice of documents on which the complaint relies, absent contested authenticity, as well as matters of public record. (Opp. at 7.) Plaintiff does not contest the authenticity of any documents submitted by GemCap.

Nor does GemCap contest the authenticity of any documents submitted by Plaintiff. However, one of those documents is not relevant to any issue raised by GemCap's Motion or Plaintiff's Opposition: the Ruling and Order dated June 21, 2017, in *Church Crop Insurance Services, Inc. v. GemCap Lending I, LLC*, No. EQCE077193 (Dist. Ct. Iowa, Polk County). (Dkt. 229-7.) That decision addressed priority rights in certain funds held by CGB Diversified, Inc. and owed to one of GemCap's borrowers. (*Id.*) None of the issues in that case relate to Plaintiff's claims against GemCap. GemCap therefore requests the Court not consider that document.

REPLY IN SUPPORT OF GEMCAP LENDING I, LLC'S
MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 220)                    1

3.     **Commencement of Action Against GemCap (Argument D.1, Opp. at 9-10)**

Plaintiff argues that, under *Terra-West, Inc. v. Idaho Mut. Trust, LLC*, 150 Idaho 393, 247 P.3d 620 (2010), Plaintiff commenced his action against GemCap for statute of limitations purposes when he filed his motion for leave to file a third amended complaint on November 4, 2016 (Dkt. 182). (Dkt. 229 at 9-10.) He argues that, because GemCap had made a limited appearance at that time and received a copy of Plaintiff's Proposed Third Amended Complaint upon the filing of that motion, under *Terra-West*, the action against GemCap commenced that date. In so arguing, however, Plaintiff seeks to extend *Terra-West* beyond its scope.

In *Terra-West*, the Idaho Supreme Court held that, in a foreclosure action based on a mechanic's lien, the filing of a motion to amend the complaint against an existing party was sufficient to "commence" proceedings to enforce the lien within six months after the claim was filed within the meaning of the mechanic's lien statute, Idaho Code § 45-510. In so holding, the Court aimed "to apply a meaning of 'commence proceedings' that is consistent with the spirit and policy of Idaho's mechanic's lien statute. 150 Idaho at 398, 247 P.3d at 625. The Court also analogized to federal cases (outside Idaho and the Ninth Circuit) holding that, when a party is already in a lawsuit and receives notice of the amended claims when the motion to amend is filed, "[t]he more efficient procedural route of moving the court for leave to file the amended complaint gives effect to the objects of the mechanic's lien statute and avoids any unnecessary and inefficient procedural maneuvering." 150 Idaho at 401, 247 P.3d at 628. Because Terra-West had already been a party to the lawsuit, the filing of the motion to amend was sufficient to "commence proceedings" under the mechanic's lien statute.

Two years later, in *DaPron v. Verska*, No. 1:12-CV-00246-EJL, 2012 WL 7682658, at *5 (D. Idaho Sept. 18, 2012), *report and recommendation adopted*, No. 1:12-CV-00246-EJL, 2013 WL 959335 (D. Idaho Mar. 12, 2013), the plaintiff moved to amend its complaint to substitute

REPLY IN SUPPORT OF GEMCAP LENDING I, LLC'S
MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 220)                    2

one party, Theken, for its corporate grandparent, Integra. *Id.* at \*3. Theken argued that the action against it "commenced" on the date plaintiff sought to amend the complaint, relying in part on *Terra-West*. This Court rejected the argument. This Court noted that the *Terra-West* decision was premised in relevant part "on the policy underlying the mechanic's lien statute . . . that such claims are to be liberally construed in favor of the lien claimants." *Id.* \*5. The Court concluded that *Terra-West* was limited to the specific context of the mechanic's lien statute. The District Court agreed. 2013 WL 959335 at \*3 ("This Court agrees the **Terra–West** decision was specifically limited to the question of does the filing of a motion to amend the complaint (instead of the date the amended complaint is actually filed) 'commence' proceedings under Idaho's Mechanics Lien Statute.").

The Idaho Supreme Court next addressed *Terra-West* in *English v. Taylor*, 160 Idaho 737, 378 P.3d 1036 (2016), which involved the precise issue here: when an amended complaint "commences" an action under I.R.C.P. 3(a) for statute of limitations purposes. The plaintiff in *English* had filed a motion to amend its complaint to add a new party before the statute ran, but the motion was not granted until after the statute had expired. 160 Idaho at 741, 378 P.3d at 1040. The plaintiff argued that, under *Terra-West*, the action was "commenced" when the motion to amend was filed, and that the proposed new defendant had notice of the claims from the prelitigation screening panel conducted in medical malpractice cases. The Court rejected the plaintiff's argument. The Court distinguished *Terra-West* on the basis that, in *Terra-West*, the plaintiff did not seek to add a new party but rather to amend a claim against an existing one. In so reasoning, the Court observed that an existing party receives notice of the claims when it receives the motion to amend, thereby satisfying some of the purposes of the statute of limitations, and that the plaintiff should not be punished by the passage of time before the motion

is granted. 160 Idaho at 743-44, 378 P.3d at 1042-43.

Critically, however, the Court recognized that the holding of *Terra-West* was "that the filing of the motion to amend the complaint commenced proceedings *pursuant to Idaho's mechanic's lien statute*." 160 Idaho at 743, 378 P.3d at 1042 (emphasis added). The Court did not reject *Terra-West*'s reliance on the policies underlying mechanic's lien statutes, and did not extend *Terra-West* beyond that context.

It is also unclear whether the Idaho Supreme Court would extend *Terra-West* if it were presented with a live dispute and fulsome arguments and analysis. For example, here, Plaintiff argues that a party's receipt of a proposed complaint against him in pending litigation suffices to commence an action for purposes of the statute of limitations. But notice is not the only purpose served by statutes of limitations. For example, putative plaintiffs frequently send defendants copies of complaints before they are filed; this does not trigger "commencement" for statute of limitations purposes, even though the defendant is on notice of the plaintiff's precise claims. Conversely, in Idaho, the filing of a complaint, not service of the defendant, "commences" an action for statute of limitations purposes—even if the defendant does not have notice of the claims. In all events, the Idaho Supreme Court ultimately may (or may not) extend *Terra-West* and reconcile these issues; but it has not yet been asked to, and it has not done so.

Existing Idaho law is that, except for where the mechanic's lien statute is implicated, a motion to amend a complaint does not "commence" a proceeding against a third party for purposes of the statute of limitations. Plaintiff filed his motion to amend on November 4, 2016, and his third amended complaint adding GemCap as a party on April 24, 2017. Under *English v. Taylor*, the action against GemCap was commenced on April 24, 2017.

**4.      Accrual of Claims (Argument D.2, Opp. at 10-13)**

First, Plaintiff incorrectly argues that all of his claims are not subject to the statute of

REPLY IN SUPPORT OF GEMCAP LENDING I, LLC'S
MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 220)                                    4

limitations for actions brought on a written agreement. (Dkt. 229 at 11.) Under *Doe v. Boy Scouts of America*, 159 Idaho 103, 356 P.3d 1049 (2015), the substance, not the form, of a plaintiff's allegations determine the applicable statute of limitations. Here, none of Plaintiff's claims seek relief under a contract or rests in any way on a contract theory: he asserts torts and statutory violations, and the Idaho legislature has prescribed specific statutes for such claims.

Second, Plaintiff argues that the Settlement Agreement is the "only operative agreement between AIA and GemCap," that it is "a substitute for all the prior Guarantees and any other undisclosed agreement," and that the Guarantees "have been discharged by and through the Settlement Agreement." (Dkt. 229 at 11.) In so arguing, Plaintiff is either waiving his claims regarding the Guarantees, or is asserting that all of his claims accrued when the Settlement Agreement was entered. If the latter, that is incorrect. Plaintiff's Third Amended Complaint alleges that GemCap (and the AIA Entities) acted wrongfully when it entered the Guarantees, and that the Guarantees should be declared illegal. (Dkt. 211 ¶¶ 135-156.) If Plaintiff is still pursuing those claims, they accrued when the Guarantees were entered or discovered (depending on the claim at issue), as explained in the Motion to Dismiss at pp. 11-14. Indeed, Counsel for Plaintiff tried to bring claims alleging that the guarantees were illegal even before the settlement agreement was reached: on February 27, 2014, in *Taylor v. AIA Services Corp., et al.*, No. CV-2013-0001075 (2d Dist. Idaho)[1]), and on July 21, 2014, in *Durant v. GemCap Lending I, LLC*, No. CV14-01444 (2d Dist. Idaho) (*see* Dkt. 220-5).

Third, Plaintiff incorrectly argues that the shareholders were not put on notice of the

---

[1] *See* Supplemental Declaration of Alyson A. Foster, Ex. 1 (Plaintiff Donna J. Taylor's Motion to Amend and Supplement Complaint), filed herewith. GemCap only recently learned of this pleading and does not know whether or how that case was resolved, but is in the process of obtaining the case file and will update the Court if appropriate.

REPLY IN SUPPORT OF GEMCAP LENDING I, LLC'S
MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 220)                           5

guarantees when GemCap filed the UCC Financing Agreement on December 20, 2012. (Dkt. 229 at 12.) That statement, however, states explicitly that the AIA Entities had become debtors to GemCap, and pledged all of their "right, title and interest, whether now existing or hereafter acquired, in and to all assets of such Debtor." (Dkt. 229-4.) That is precisely the agreement that Plaintiff alleges was unlawful. Under Idaho law, this document put the shareholders of constructive notice for statute of limitations purposes. (*See* Dkt. 220 at 12.)

Fourth and fifth, Plaintiff incorrectly argues that his claims were not ripe until GemCap provided a notice of default to CropUSA and/or AIA, or, alternatively, until the Settlement Agreement was entered; prior to those dates, all damages were "hypothetical" or "contingent." This conflicts with Plaintiff's allegations and claims. Plaintiff alleges and claims that the Guarantees were illegal upon entry, and he seeks a declaration of such illegality. Those claims were ripe as soon as the Guarantees were entered.

In sum, as demonstrated in the Motion to Dismiss, the operative dates for claim accrual, as alleged in the Third Amended Complaint, are: Guarantee 1—11/23/2011; Guarantee 2—10/1/2012; Constructive Notice (UCC Financing Statement)—12/20/2012.

5.      **Count Two: Aiding and Abetting Fraud (Argument D.3, Opp. at 13-14)**

Under the applicable three-year statute of limitations, triggered by the discovery rule, these claims expired three years after 12/20/2012, i.e., 12/20/2015. (Dkt. 220 at 14.) Plaintiff contests he did not have actual notice until much later, but under Idaho law, the statute is triggered by constructive notice. Accordingly, this claim must be dismissed.

6.      **Count Five: Aiding and Abetting Breach of Fiduciary Duties (Argument D.4, Opp. at 14-15)**

Under the four-year statute of limitations, to which the discovery rule does not apply, these claims expired four years after 11/23/2011 and 10/1/2012, i.e., 11/23/2015 and 10/1/2016.

REPLY IN SUPPORT OF GEMCAP LENDING I, LLC'S
MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 220)                    6

(Dkt. 220 at 15.) Accordingly, this claim must be dismissed.

**7.      Count Eight:  Statutory Relief (Argument D.5, Opp. at 15)**

Plaintiff incorrectly argues that Count 8 is "based on written agreements—primarily the Settlement Agreement and, to the extent necessary, the Guarantees"—and thus are subject to the five-year statute of limitations for claims based on contracts, I.C. § 5-216. (Dkt. 229 at 16.) This argument should be rejected.

In determining the applicable statute of limitations, "courts must focus on the substance, rather than the form of a plaintiff's allegations." *Doe v. Boy Scouts of America*, 159 Idaho 103, 356 P.3d 1049 (2015). In conducting this inquiry, "the focus in Idaho is not on the remedy sought or the type of damages, but on the source of damages." *Id.* n.3.

First, contrary to Plaintiff's argument, Count 8 is not a claim based on contract. Count 8 does not seek relief based on contract terms; it seeks to declare contracts void based on Idaho statutory law. Although Idaho courts have not analyzed what statute of limitations applies to a claim to declare a contract illegal/ultra vires, courts in other jurisdictions generally apply the statute of limitations implicated by the *basis* for the claim of illegality.[2] This approach is consistent with *Doe*.

Here, this Court already has analyzed Count 8 and construed it to present an "alternative cause of action to [Plaintiff's] breach of fiduciary duty and fraud claims." (Dkt. 210 at 31.) Based on that construction of Count 8, GemCap argued in its Motion that Count 8 is subject to

---

[2] *See, e.g.*, *Robinson v. Quicken Loans Inc.*, 988 F. Supp. 2d 615, 627 (S.D.W. Va. 2013) ("The statute of limitations for contract claims under § 55-2-6 does not apply to Plaintiff's illegal loan claim under § 31-17-8(m)(8) because the illegal loan claim sounds in tort—not contract—law."); *Miller v. Pac. Shore Funding*, 224 F. Supp. 2d 977, 985 (D. Md. 2002), *aff'd*, 92 F. App'x 933 (4th Cir. 2004); *In re Horowitz' Will*, 114 N.Y.S.2d 700, 706 (1952); *cf. Riverside Syndicate, Inc. v. Munroe*, 10 N.Y.3d 18, 24, 882 N.E.2d 875, 878 (2008) (an action to declare a contract illegal or void "is not one 'upon a contractual obligation or liability,' but one to declare that no valid contractual obligations ever existed").

the same analysis as Counts 2 and 5.

But if the Court's (and GemCap's) construction was incorrect, then, applying the Idaho Supreme Court's reasoning in *Doe*, the source of damages sought in Count 8 is Idaho Code § 30-29-304.[3] Count 8 is styled "Statutory Relief (Including for Ultra Vires)," and explicitly seeks declaratory and monetary relief available "under applicable Idaho Code, including, but not limited to, . . . § 30-29-304" because the guarantees and settlement agreements were "ultra vires." (Dkt. 211 ¶¶ 229.) The allegations of this Count do not clearly allege the reason these contracts were ultra vires or otherwise in violation of the Idaho Code, but Section J of the Third Amended Complaint, which sets forth the specific factual allegations against GemCap, alleges that these contracts were illegal because they violated or conflicted with corporate governing documents and thus were "ultra vires" acts of the corporation that may be enjoined under Idaho Code § 30-29-304. (Dkt. 211 ¶¶ 135-156.)

Section 30-29-304 specifically provides that, when a corporation act is invalid because the corporation acted without power, a proceeding may be brought (i) by a shareholder against the corporation to enjoin the act; (ii) by the corporation derivatively against a director, officer, employee, or agent of the corporation; or (iii) by the attorney general. I.C. § 30-29-304(1)-(2). If a shareholder brings the action, the court

> may enjoin or set aside the act, if equitable and if all affected persons are parties to the proceeding, and may award damages for loss, other than anticipated profits, suffered by the corporation or another party because of enjoining the unauthorized act.

I.C. § 30-29-304(3). It thus seems most likely that, if Count 8 is something other than an alternative to prior Counts, it is a claim for violation of this code section. If this is true, then the applicable statute of limitations is Idaho Code 5-218, "Statutory Liabilities et al." That statute of

---

[3] Plaintiff also alleges a violation of § 30-1-304, but that is simply the prior code location of § 30-29-304. *See* Idaho Uniform Bus. Org. Code, S.L. 2015, ch. 243, § 1, eff. July 1, 2015.

REPLY IN SUPPORT OF GEMCAP LENDING I, LLC'S
MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 220)          8

limitations is three years. I.C. § 5-218(1).

8.      **Count Ten: Idaho Consumer Protection Act (Argument D.6, Opp. at 15-16)**

Plaintiff agrees the applicable statute of limitations is two years, but argues the Settlement Agreement was entered January 2015. The Third Amended Complaint alleges, however, and the Settlement Agreement (Dkt. 128, pp. 21-48) confirms, that the Settlement Agreement was entered September 15, 2014. Plaintiff argues, but did not allege, that it was signed after January 9, 2015; the document itself does not indicate this. At most, the document itself suggests that it may have been amended after September 15, 2014, but there is no allegation or indication that a new agreement was reached. Thus, Plaintiff's claim regarding the Settlement Agreement accrued on September 15, 2014. Because the Third Amended Complaint was filed on April 24, 2017, the statute of limitations bars this claim. (This is true even if the action against GemCap commenced on November 4, 2016.)

9.      **Count Seven: Declaratory Judgment (Argument D.7, Opp. at 16)**

Because this Count only seeks a declaration that the Guarantees and Settlement Agreement are illegal (Dkt. 211 ¶ 226(f)) based on the legal theories asserted in other counts, dismissal of the other Counts against GemCap requires dismissal of this one.

10.     **Adverse Domination (Argument D.8, Opp. at 16)**

Plaintiff incorrectly argues that any statute of limitations should be tolled by the adverse domination theory because, he argues, GemCap is a "controlling entity" of the AIA Entities. However, adverse domination does not apply to this case. Adverse domination is an equitable doctrine, embraced by some other jurisdictions, that tolls a statute of limitations for claims against an entity that the entity's controlling officer or director wrongfully concealed. *Klein v. Capital One Fin. Corp.*, No. 4:10-CV-00629-EJL, 2011 WL 3270438, at *7 (D. Idaho July 29, 2011). Idaho has never applied the adverse domination theory. In the one case to address the

REPLY IN SUPPORT OF GEMCAP LENDING I, LLC'S
MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 220)                    9

doctrine, this Court held that Idaho courts would *not* apply the doctrine to claims brought under the Idaho Uniform Fraudulent Transfers Act. *Id.* Here, there is no allegation whatsoever that GemCap is a controlling entity of the AIA Entities. The doctrine does not apply.

**11.    "Should Have Known" Allegations Against GemCap (Argument E., Opp. at 17-18)**

Plaintiff agrees that his claims do not rely upon "should have known" allegations, but argues that the law is "unsettled" and thus those allegations could support his claims. The law is not unsettled (*see* Dkt. 220 at 18), and the cases upon which he relies do not suggest otherwise.[4]

**12.    Leave to Amend (Argument F, Opp. at 18)**

Plaintiff's counsel has now attempted to bring these claims four times: *Durant v. GemCap*, *Taylor v. AIA Services*, *GemCap v. CropUSA*, and the Third Amended Complaint. At this stage, no further amendments are warranted.

**CONCLUSION**

For the foregoing reasons, the Third Amended Complaint against GemCap should be dismissed.

DATED this 20th day of July, 2017.

> **ANDERSEN SCHWARTZMAN WOODARD BRAILSFORD PLLC**
>
>
>     _____/s/ *Alyson A. Foster*_____
>     Alyson A. Foster
>     Counsel for GemCap Lending I, LLC

---

[4] *Helgeson v. Powell*, 54 Idaho 667, 682, 34 P.2d 957, 963 (1934) (addressing liability of officers acting under color of law); "should have known" standard for law enforcement); *Highland Enterprises, Inc. v. Barker*, 133 Idaho 330, 986 P.2d 996 (1999) (affirming that jury could conclude from evidence that defendants could be found liable of aiding and abetting tortious activity because they worked together to stop construction).

REPLY IN SUPPORT OF GEMCAP LENDING I, LLC'S
MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 220)                10

**7-ER-1634**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 20th day of July 2017, I filed the above-referenced document electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | | |
|---|---|---|
| James D LaRue<br><br>jdl@elamburke.com,<br>sd@elamburke.com | Jeffrey A Thomson<br><br>jat@elamburke.com,<br>nlp@elamburke.com | Loren C Ipsen<br><br>lci@elamburke.com,<br>nlp@elamburke.com |
| Shawnee S Perdue<br><br>sperdue@wielandperdue.com,<br>admin@wielandperdue.com,<br>tmooney@wielandperdue.com | Steven P Wieland<br><br>swieland@wielandperdue.com,<br>admin@wielandperdue.com,<br>tmooney@wielandperdue.com | Roderick Cyr Bond<br><br>rod@roderickbond.com |

AND I FURTHER CERTIFY that on July 21, 2017, I shall serve the document on the following non-CM/ECF Registered Participants in the manner indicated: Via first class mail, postage prepaid addressed as follows:

| AIA Insurance, Inc. | AIA Services Corporation |
|---|---|
| PO BOX 538<br>LEWISTON, ID 83501 | PO BOX 538<br>LEWISTON, ID 83501 |

*/s/ Alyson A. Foster*
Alyson A. Foster
Counsel for GemCap Lending I, LLC

REPLY IN SUPPORT OF GEMCAP LENDING I, LLC'S
MOTION TO DISMISS THIRD AMENDED COMPLAINT (DKT 220)                    11

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Third-Party Defendant Reed J. Taylor

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>v.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>Defendants.<br><br>and | Civil No. 1:10-cv-00404-CWD<br><br>FIRST AMENDED ANSWER TO THIRD-PARTY COMPLAINT **[Dkt. 218]** AND COUNTERCLAIMS AGAINST THIRD-PARTY PLAINTIFFS CONNIE TAYLOR HENDERSON, JAMES BECK AND R. JOHN TAYLOR UNDER ERISA<br><br>DEMAND FOR JURY TRIAL |

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - i

7-ER-1636

CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; R. JOHN TAYLOR, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual, Defendants/Third-Party Plaintiffs,

v.

REED TAYLOR, an individual, Third-Party Defendant/Counterclaimant,

v.

CONNIE TAYLOR HENDERSON, an individual; R. JOHN TAYLOR, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual, and UNKNOWN BONDING COMPANY, an unknown entity that issued the unknown fidelity ERISA Bond, Counterdefendants.

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - ii

**7-ER-1637**

## TABLE OF CONTENTS

I.      ANSWER TO PRELIMINARY STATEMENT ............................................................ 1

II.     ANSWER TO JURISDICTION ................................................................................. 1

III.    ANSWER TO VENUE ............................................................................................. 2

IV.     ANSWER TO PARTIES ........................................................................................... 2

V.      ANSWER TO GENERAL ALLEGATIONS ............................................................ 3

VI.     ANSWER TO COUNT I .......................................................................................... 4

VII.    ANSWER TO COUNT II .......................................................................................... 6

VIII.   ANSWER TO DEMAND FOR JURY TRIAL ........................................................ 7

IX.     ANSWER TO PRAYER FOR RELIEF .................................................................... 7

X.      AFFIRMATIVE DEFENSES TO THIRD-PARTY COMPLAINT ............................ 7

XI.     COUNTERCLAIMS ................................................................................................. 9

XII.    JURISDICTION FOR COUNTERCLAIMS ............................................................ 10

XIII.   VENUE FOR COUNTERCLAIMS ......................................................................... 10

XIV.    PARTIES FOR COUNTERCLAIMS ....................................................................... 10

XV.     FACTS FOR COUNTERCLAIMS .......................................................................... 12

XVI.    CLASS ACTION ALLEGATIONS ......................................................................... 18

XVII.   COUNT I—BREACH OF FIDUCIARY DUTIES ................................................... 20

XVIII.  COUNT II—PROHIBITED TRANSACTIONS ....................................................... 22

XIX.    COUNT III—REPLACEMENT OF TRUSTEE ....................................................... 22

7-ER-1639

XX. COUNT IV—OTHER ERISA RELIEF ............................................................. 23

XXI. JURY DEMAND ....................................................................................... 23

XXII. PRAYER FOR RELIEF.............................................................................. 23

CERTIFICATE OF SERVICE ................................................................................ 25

The Third-Party Defendant Reed J. Taylor ("Reed Taylor") submits this First Amended Answer to the Third-Party Complaint (Dkt. 218) filed by the Third-Party Plaintiffs CropUSA Insurance Agency, Inc. ("CropUSA"), Connie Taylor Henderson ("Connie"), JoLee Duclos ("Duclos"), R. John Taylor ("John"), Michael W. Cashman Sr. ("Cashman"), and James Beck ("Beck") (collectively the "Third-Party Plaintiffs") as follows (and to the extent that any allegations are not specifically admitted or denied below (including as to any headings), Reed Taylor denies those allegations) and asserts the following counterclaims:

## I.      ANSWER TO PRELIMINARY STATEMENT

1.      Answering Paragraph 1, Reed Taylor admits that AIA Insurance, Inc. ("AIA Insurance") is a wholly owned subsidiary of AIA Services Corporation ("AIA Services") and denies that the Third-Party Plaintiffs are entitled to any claims of contribution or indemnity from Reed Taylor.

2.      Answering Paragraph 2, Reed Taylor denies that the Third-Party Plaintiffs are entitled to seek contribution or indemnity claims against Reed Taylor and that they should take nothing from their Third-Party Complaint.

3.      The allegations asserted in Paragraph 3 are not directed to Reed Taylor and therefore he denies such allegations.

## II.      ANSWER TO JURISDICTION

4.      Answering Paragraph 4, Reed Taylor denies all allegations that call for legal conclusions and denies all remaining allegations.

5.      The allegations asserted in Paragraph 5 call for legal conclusions and Reed Taylor denies all such allegations and denies all remaining allegations.

///

///

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 1

### III.   ANSWER TO VENUE

**6.**     The allegations asserted in Paragraph 6 call for legal conclusions and Reed Taylor denies all such allegations and denies all remaining allegations.

**7.**     The allegations asserted in Paragraph 7 call for legal conclusions and Reed Taylor denies all such allegations and denies all remaining allegations.

**8.**     The allegations asserted in Paragraph 8 call for legal conclusions and Reed Taylor denies all such allegations and denies all remaining allegations.

### IV.   ANSWER TO PARTIES

**9.**     Answering Paragraph 9, Reed Taylor admits that John has served as an officer and director of AIA Services and AIA Insurance at various times. To the extent that the Third-Party Plaintiffs assert that John was properly elected as an officer or director of AIA Services and AIA Insurance at all relevant times, Reed Taylor denies all such allegations. Reed Taylor has no personal knowledge of whether John is presently serving as the president of AIA Services and AIA Insurance and therefore denies all such allegations.

**10.**     Answering Paragraph 10, Reed Taylor admits that Duclos served as an officer and/or a director of AIA Services and/or AIA Insurance at various times. Reed Taylor has no personal knowledge of whether Duclos is presently a resident of Idaho and therefore denies such allegations.

**11.**     Answering Paragraph 11, Reed Taylor admits that Connie served as a director of AIA Services and/or AIA Insurance at various times. Reed Taylor has no personal knowledge of whether Connie is presently a resident of Washington and therefore denies such allegations.

**12.**     Answering Paragraph 12, Reed Taylor admits that Beck served as a director of AIA Services and/or AIA Insurance at various times. Reed Taylor has no personal knowledge of whether Beck is presently a resident of Minnesota and therefore denies such allegations.

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 2

**13.** Answering Paragraph 13, Reed Taylor admits that Cashman served as a director of AIA Services and/or AIA Insurance at various times. Reed Taylor has no personal knowledge of whether Cashman is presently a resident of Minnesota and therefore denies such allegations.

**14.** Answering Paragraph 14, Reed Taylor admits that CropUSA is an Idaho corporation.

**15.** Answering Paragraph 15, Reed Taylor admits that he was formerly an officer and director of AIA Services and AIA Insurance and that he participated in certain advisory board meetings for CropUSA.

### V.   ANSWER TO GENERAL ALLEGATIONS

**16.** Answering Paragraph 16, Reed Taylor admits that he served as a director of AIA Services from 1983 until sometime around 2000.

**17.** Answering Paragraph 17, Reed Taylor has no way of knowing what entity that the Third-Party Plaintiffs were referring to when they allege he was an officer of and therefore denies all such allegations.

**18.** Answering Paragraph 18, Reed Taylor denies the allegations contained in that paragraph.

**19.** The allegations in Paragraph 19 are not directed to Reed Taylor and therefore no response is necessary.

**20.** The allegations in Paragraph 20 are not directed to Reed Taylor and therefore no response is necessary.

**21.** The allegations in Paragraph 21 are not directed to Reed Taylor and therefore no response is necessary. Since the Third-Party Plaintiffs do not admit or deny any allegations in the Third Amended Complaint (attached as Exhibit A to the Third-Party Complaint) and the Third-Party Plaintiffs do not direct any allegations contained within that Third Amended Complaint to

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 3

Reed Taylor, there is no response required by Reed Taylor.

22.     The allegations in Paragraph 22 are not directed to Reed Taylor and therefore no response is necessary.

## VI.     ANSWER TO COUNT I

23.     Answering Paragraph 23, Reed Taylor incorporates by reference herein his answers to Paragraphs 1 through 22.

24.     The allegations in Paragraph 24 are not directed to Reed Taylor and therefore no response is necessary.

25.     The allegations in Paragraph 25 call for legal conclusions and therefore no response is necessary and Reed Taylor denies such allegations for that reason.

26.     The allegations in Paragraph 26 call for legal conclusions and therefore no response is necessary and Reed Taylor denies such allegations for that same reason.

27.     The allegations in Paragraph 27 are not directed to Reed Taylor and therefore no response is necessary.

28.     The allegations in Paragraph 28 call for legal conclusions and therefore no response is necessary and Reed Taylor denies such allegations for that same reason.

29.     The allegations in Paragraph 29 are vague (including as to what corporation Reed Taylor was allegedly an officer or director of) and therefore Reed Taylor denies all such allegations.

30.     Answering Paragraph 30, Reed Taylor denies all such allegations.

31.     The allegations in Paragraph 31 are not directed to Reed Taylor and therefore no response is necessary.

32.     The allegations in Paragraph 32 are not directed to Reed Taylor and therefore no response is necessary.

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 4

33.     Answering Paragraph 33, Reed Taylor denies all such allegations.

34.     Answering Paragraph 34, Reed Taylor admits that he attended certain (but not all) director meetings and participated in managing certain of AIA Services and/or AIA Insurance's marketing and sales efforts. The term "Corporate Fiduciary" is vague and improperly defined and therefore Reed Taylor denies all remaining allegations.

35.     Answering Paragraph 35, Reed Taylor admits that from 2000 through June 17, 2009 he was a secured creditor in AIA Services and that he was aware that AIA Services pursued a crop insurance sales program and that certain of the Third-Party Plaintiffs requested that Reed Taylor consent to that business being operated by an independent company, but that he never provided the necessary consent (as John Taylor has testified to on numerous occasions). Reed Taylor assisted without compensation to sell crop insurance for the benefit of AIA Services. The term "Corporate Fiduciary" is vague and improperly defined and therefore Reed Taylor denies all remaining allegations.

36.     Answering Paragraph 36, Reed Taylor incorporates by reference herein his answer in Paragraph 35 above.

37.     Answering Paragraph 37, Reed Taylor incorporates by reference herein his answer in Paragraph 35 above.

38.     Answering Paragraph 38, Reed Taylor denies all such allegations, except that Reed Taylor had knowledge that John was to be paid for a limited time under the terms of his Executive Officer's Agreement. However, John never sought or obtained board approval by AIA Services board of directors while Reed Taylor was present for approval of any additional compensation. In fact, John has improperly paid himself (for the benefit of himself and for Connie for a portion of the time) over $4,259,639 in compensation from AIA Services, AIA Insurance and CropUSA from

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 5

1995 through 2013.

**39.** Answering Paragraph 39, Reed Taylor denies all such allegations. The term "Corporate Fiduciary" is vague and improperly defined and therefore Reed Taylor denies all remaining allegations.

**40.** Answering Paragraph 40, Reed Taylor denies all such allegations. The term "Corporate Fiduciary" is vague and improperly defined and therefore Reed Taylor denies all remaining allegations. For example, John recently testified that when AIA Insurance received $1,510,827.49 from Trustmark, John "hid" the receipt of those funds from Reed Taylor and diverted them to CropUSA.

**41.** Answering Paragraph 41, Reed Taylor denies all such allegations.

### VII.   ANSWER TO COUNT II

**42.** Answering Paragraph 42, Reed Taylor incorporates by reference herein his answers to Paragraphs 1 through 41.

**43.** The allegations in Paragraph 43 are not directed to Reed Taylor and therefore no response is necessary.

**44.** The allegations in Paragraph 44 are not directed to Reed Taylor and therefore no response is necessary.

**45.** The allegations in Paragraph 45 are not directed to Reed Taylor and therefore no response is necessary.

**46.** The allegations in Paragraph 46 are not directed to Reed Taylor and therefore no response is necessary.

**47.** Answering Paragraph 47, Reed Taylor denies all such allegations.

**48.** Answering Paragraph 48, Reed Taylor denies all such allegations.

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 6

**49.** The allegations in Paragraph 49 are not directed to Reed Taylor and therefore no response is necessary.

**50.** Answering Paragraph 50, Reed Taylor denies all such allegations.

**51.** Answering Paragraph 51, Reed Taylor denies all such allegations.

**52.** Answering Paragraph 52, Reed Taylor denies all such allegations.

### VIII.   ANSWER TO DEMAND FOR JURY TRIAL

**53.** Answering Paragraph 53, Reed Taylor denies all such allegations.

### IX.   ANSWER TO PRAYER FOR RELIEF

**54.** Answering Paragraphs A through C in the Third-Party Plaintiffs' Prayer for Relief, Reed Taylor denies that the Third-Party Plaintiffs are entitled to any relief and further asserts that they should take nothing from their Third-Party Complaint and that it be dismissed with prejudice.

### X.   AFFIRMATIVE DEFENSES TO THIRD-PARTY COMPLAINT

Reed Taylor asserts the following affirmative defenses (most of which are based on the assumption that the Third-Party Plaintiffs have a viable indemnification or contribution claim against Reed Taylor, which he maintains they do not, and an assumption that they may prevail, which Reed Taylor maintains they will not):

**1.** The Third-Party Complaint fails to state a claim upon which relief may be granted.

**2.** The Third-Party Plaintiffs have no right of contribution or indemnity against Reed Taylor under any provision or factual basis under I.C. § 6-801, *et seq*.

**3.** The Third-Party Plaintiffs' claims are barred by collateral estoppel/res judicata, e.g., the Idaho Supreme Court has already held that Reed Taylor does not have to pay back any of the money or assets that he was paid for his illegal stock redemption in 1995 (an agreement that John, Beck and Cashman requested that Reed Taylor enter into so that they could obtain operational and financial control over AIA Services).

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 7

**7-ER-1646**

4. The Third-Party Plaintiffs are barred from seeking any indemnity or contribution claims based on their unclean hands.

5. The Third-Party Plaintiffs lack standing to bring indemnity and contribution claims and such claims, even if viable, are premature and not ripe.

6. The Third-Party Plaintiffs' claims are barred by estoppel, equitable estoppel, and/or quasi-estoppel.

7. The Third-Party Plaintiffs' claims are barred by their failure to mitigate damages.

8. The Third-Party Plaintiffs have failed to join necessary parties.

9. The acts and omissions leading to the Third-Party Plaintiffs' claims and damages (if any) were proximately caused by their own acts and/or omissions or the fault of non-parties.

10. The Third-Party Plaintiffs' claims are barred by supervening causes based on Reed Taylor's efforts and/or demands (and Donna Taylor's as well) to require full disclosure and to make AIA Services and AIA Insurance whole and the Third-Party Defendants refused to do so.

11. The Third-Party Plaintiffs' claims are barred by waiver and laches.

12. The Third-Party Plaintiffs' claims are barred by supervening events (including the chain of causation was broken) and/or the proximate cause of others.

13. The fault of the Third-Party Plaintiffs is greater than the fault of Reed Taylor, or the Third-Party Plaintiffs fault constitutes all of the fault.

14. The Third-Party Plaintiffs' claims are barred by applicable provisions under the bylaws (including indemnification provisions), articles of incorporation (including exculpatory provisions) or other applicable provisions under the Idaho Business Corporation Act, common corporate law and/or authorities.

///

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 8

15. To the extent that the Third-Party Plaintiffs are asserting allegations seeking relief to which AIA Services or AIA Insurance are entitled to, such allegations and relief fail because AIA Services and AIA Insurance owns them, and the Third-Party Plaintiffs have not asserted a derivative demand upon AIA Services or AIA Insurance.

16. Reed Taylor is protected by the business judgment rule under the Idaho Business Corporation Act (e.g., I.C. § 30-29-830, *et seq.*) and AIA Services' amended articles of incorporation.

17. Offset (assuming that they have a viable indemnity or contribution claim).

18. As to certain transactions that the Third-Party Plaintiff's allege against Reed Taylor, he asserts that he was represented by attorneys from Cairncross & Hemplemann for the redemption of his shares and the restricting of those obligations in 1996 and he relied upon their advice. In addition, Reed Taylor relied on the advice provided in the form of representations and opinions in an August 15, 1995 opinion letter provided to him by Richard A. Riley, Robert Turnbow and their law firm. (*See* Dkt. 67-7.) Further, the negotiations for the redemption of his shares were handled by an independent committee on the board of AIA Services. Finally, unlike many of the transactions hidden by John, Connie, Beck and Cashman, AIA Services' shareholders had full knowledge of the transaction to redeem Reed Taylor's shares in 1995.

19. The Third-Party Plaintiffs have failed to prove that they have paid more than their share of any damages and thus are not entitled to contribution from Reed Taylor (assuming that they had a viable indemnity or contribution claim).

## XI.   COUNTERCLAIMS

Reed Taylor, through his attorney, alleges the following against R. John Taylor ("John"), Connie Taylor Henderson ("Connie"), James Beck ("Beck"), and the unknown bonding company that provided a $1,000,000 fidelity bond for AIA Services' 401(k) Profit Sharing Plan:

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 9

## XII.    JURISDICTION FOR COUNTERCLAIMS

1.    Reed Taylor's counterclaims are governed by 28 U.S.C.A. § 1001, *et seq.* ("ERISA") and thus this Court has jurisdiction, including as provided under 29 U.S.C.A. §§ 1132(e)-(f).

## XIII.    VENUE FOR COUNTERCLAIMS

2.    Venue is appropriate in this Court pursuant to 29 U.S.C.A. § 1132(e).

## XIV.    PARTIES FOR COUNTERCLAIMS

3.    The AIA Services Corporation 401(k) Profit Sharing Plan ("Plan") is an Employee Income Security Retirement Program as provided under 28 U.S.C.A. § 1001, *et seq.*

4.    Upon information and belief, under the terms of the Plan, AIA Services is the Plan Administrator and the Plan Sponsor, as provided under 28 U.S.C.A. § 1001, *et seq.*

5.    During all relevant times, Reed Taylor is a participant and/or beneficiary under the Plan as provided under 28 U.S.C.A. § 1001, *et seq.* Upon information and belief, Reed Taylor is entitled to certain payment benefits under the Plan (based on his age) which have not been provided in accordance with the Plan.

6.    John is an individual and the trustee of the Plan. John is an attorney and accountant by training and thus he is well-versed in legal and accounting issues. John is a resident of Idaho. During all relevant times, John was the President and a director of AIA Services.

7.    Connie is an individual who has also served on the board of directors of AIA Services since 2007. Connie is a practicing attorney who has even pursued lawsuits against an attorney for breaches of fiduciary duty and thus she is well-versed in legal issues.

8.    Beck is an individual who has also served on the board of directors of AIA Services since 2007.

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 10

9.      Upon information and belief, John has been the sole trustee of the Plan since he was appointed through an AIA Services' board meeting held by John, Beck and Connie on November 4, 2009. During all relevant times, as a result of John being the trustee of the Plan, John was a "party in interest" as provided under 28 U.S.C.A. § 1002, *et seq*.

10.      During all relevant times, John, Connie and Beck, through their direct or indirect ownership of over 50% of the common shares of CropUSA Insurance Agency, Inc. ("CropUSA") were, along with CropUSA, a "party in interest" as provided under 28 U.S.C.A. § 1002, *et seq*.

11.      During all relevant times, John and Connie, through their direct and indirect ownership of over 50% of the common shares of AIA Services, were, along with AIA Services, a "party in interest" as provided under 28 U.S.C.A. § 1002, *et seq*.

12.      During all relevant times, John and Connie, through their direct and indirect ownership of over 50% of the common shares of Pacific Empire Radio Corporation ("PERC"), were, along with PERC, a "party in interest" as provided under 28 U.S.C.A. § 1002, *et seq*.

13.      Upon information and belief and during all relevant times, under the terms of the Plan, the board of directors of AIA Services controls appointing, removing and maintaining of the trustee of the Plan and the governing body of the Plan. During all relevant times, John, Connie, and Beck were the sole directors of AIA Services. As a result, in addition to any other fiduciary duties and during all relevant times, John, Connie and Beck were *de facto* fiduciaries under ERISA and therefore liable under 28 U.S.C.A. § 1001, *et seq*.

14.      Upon information and belief, the Plan has a $1,000,000 ERISA fidelity bond ("Bond"). Despite repeated requests, counsel for Connie, John and Beck have refused to provide the name of that bonding company and the bond number. Consequently, Reed Taylor will refer to the bonding company as the Unknown Bonding Company. Reed Taylor has named the Unknown

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 11

Bonding Company as a nominal party solely to obtain payment of the ERISA Bond.

## XV.   FACTS FOR COUNTERCLAIMS

15.     Through John, the Plan acquired and was issued 92,500 Series C Preferred Shares in AIA Services. Under the terms of AIA Services' amended articles of incorporation, the Plan's Series C Preferred Shares had a face value of $10 per share ($925,000) and were entitled to receive dividends, whether paid or at least accrued, quarterly on the Series C Preferred Shares at the rate of 10% interest per annum. (*See* Dkt. 67-3 at 12 §§ 4.3.3-4.3.4.)

16.     Upon information and belief, no dividends have been paid on the Plan's Series C Preferred Shares since in or around 1998. In violation of John's fiduciary duties, he has failed to declare or set aside the funds necessary to pay the accrued dividends, let alone setting aside the funds, owed to the Plan. Upon information and belief, constitute more than $1,500,000 of unpaid dividends owed to the Plan, which have detrimentally impacted the value of the assets in the Plan.

17.     Upon information and belief, since at least 2009 and during all relevant times, the Plan was the sole Series C Preferred shareholder in AIA Services. Under the terms of AIA Services' amended articles of incorporation, the Series C Preferred Shares are entitled to elect one director for AIA Services to look after the interests of the Series C Preferred shareholders. (*See* Dkt. 67-3 at 12 § 4.3.2.) Upon information and belief, John, Connie and Beck have failed to ever ensure that the Plan had a director appointed to look after the Plan's interests, as required under AIA Services' amended articles of incorporation.

18.     Had an independent director been appointed for AIA Services on behalf of the Plan as required under the amended articles of incorporation, there is no way that director would have approved any of the transactions or malfeasance that occurred which have destroyed the value of the Series C Shares held in the Plan and otherwise impacted the value of the Plan, examples of

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 12

which are discussed below. That director would have been the only director without a conflict of interest, since John, Beck and Connie had conflicts

19.     In 2007, Reed Taylor filed suit against AIA Services, Connie, Beck, John and others for various torts and malfeasance that he discovered through counsel and expert witnesses. (*See* Dkt. 83-1.) In 2008, Reed Taylor also served a formal derivative demand upon the board of directors of AIA Services demanding that action be taken for the torts and malfeasance. (*See* Dkt. 67-19.) As a result, when Beck and Connie were appointed to the board of directors of AIA Services, they were well-aware that John had engaged in a many improper transactions, yet they exercised and breached their *de facto* fiduciary duties by allowing him to be a trustee of the Plan and to continue serving as a trustee of the Plan.

20.     On or about November 4, 2009, John, Connie and Beck exercised and breached their *de facto* fiduciary duties under ERISA by appointing John as the sole trustee of the Plan and waiving the 30-day notice period.  Reed Taylor had no knowledge of these facts until documents were recently produced by GemCap Lending I, LLC ("GemCap") in this lawsuit (within the last 30 days).

21.     From 2009 through the present time, John, Connie and Beck had AIA Services loan over $1,700,000 to PERC, which was an entity incapable of paying its debts, let alone pay them on time. These loans were made with funds that could have, and should have, been paid to the Plan for the cumulated dividends that had accrued and to voluntarily redeem some of those shares. Reed Taylor had no knowledge of these loans until more recently from other sources. These loans were improperly made with the full knowledge of John, Connie and Beck. These loans would have never been approved by the Plan's independent director, had one been appointed by John, Connie and Beck as required. These loans would never have been approved by an independent trustee properly

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 13

discharging his or her duties under ERISA.

22.     From 2008 through 2014 alone, John breached his fiduciary duties as trustee of the Plan by paying himself over $1,700,000 in compensation from AIA and CropUSA—all the while not a single dividend had been paid or a single Series C Share had been redeemed in the Plan. Reed Taylor had no knowledge of the fact that John had been paid over $1,700,000 ($541,345 from AIA) until he recently learned these facts in the past 60 days from discovery in other lawsuits. This compensation would have never been approved by the Plan's independent director, had one been appointed by John, Connie and Beck as required. This compensation would have never been approved by an independent trustee properly discharging his or her fiduciary duties under ERISA.

23.     Upon information and belief, in or around November 2011, John, Connie and Beck signed a board resolution authorizing AIA Services to guarantee $1,113,930 of a $5,000,000 loan for CropUSA and CropUSA Insurance Services, LLC (another entity owned more than 50% by John and a "party in interest" under ERISA). This guarantee was barred by numerous provisions of AIA Services' amended articles of incorporation (e.g., not a guarantee for wholly owned subsidiary, a conflict of interest transaction, AIA's asset levels would not be maintained, the loan improperly required a pledge of AIA's assets, etc.) (*See* Dkt. 67-3 at 5-11; Dkt. 67-4 at 23.) John, Connie and Beck signed the unauthorized board resolution for that improper and unlawful guarantee. (*See* Dkt. 220-4.) This guarantee would have never been approved by the Plan's independent director, had one been appointed by John, Connie and Beck as required. This guarantee would never have been approved by an independent trustee properly discharging his or her duties under ERISA.  Reed Taylor did not learn of this guarantee until after GemCap filed a lawsuit against John and others in 2013.

///

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 14

24.      Upon information and belief, in or around October 2012, John, Connie and Beck signed a board resolution authorizing AIA Services and AIA Insurance to guarantee all of what would later be a $10,000,000 loan for CropUSA and CropUSA Insurance Services, LLC (another entity owned more than 50% by John and a "party in interest" under ERISA). This guarantee was barred by numerous provisions of AIA Services' amended articles of incorporation (e.g., not a guarantee for wholly owned subsidiary, a conflict of interest transaction, AIA's asset levels would not be maintained, the loan improperly required a pledge of AIA's assets, etc.) and AIA Services' bylaws (*See, e.g.,* Dkt. 67-3 at 5-11; Dkt. 67-4 at 23.) John, Connie and Beck signed the unauthorized board resolution for that improper and unlawful guarantee. This guarantee would have never been approved by the Plan's independent director, had one been appointed by John, Connie and Beck as required. This guarantee would never have been approved by an independent trustee properly discharging his or her duties under ERISA.  Reed Taylor did not learn of this guarantee until after GemCap filed a lawsuit against John and others in 2013.

25.      Sometime in September 2014, John agreed to settle the litigation with GemCap, which later resulted in a written Settlement Agreement that was not signed until sometime in 2015. (*See* 128 at 21-57.) This Settlement Agreement violated AIA Services' amended articles of incorporation and restated bylaws, including, without limitation, provisions restricting debts, the transfer of assets, conflicts of interest among the parties or directors, etc. Under the terms of this Settlement Agreement, AIA Services transferred its ownership interest in its former headquarters to GemCap for partial payment on the over $12,000,000 debt created by the Settlement Agreement. AIA Services' interest in its former headquarters was worth millions of dollars and income from renting or selling that asset could have been used to pay the accrued cumulative dividends for the Series C Preferred Shares held in the Plan. This Settlement Agreement would have never been

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 15

**7-ER-1654**

approved by the Plan's independent director, had one been appointed by John, Connie and Beck as required. This Settlement Agreement would never have been approved by an independent trustee properly discharging his or her duties under ERISA.  Reed Taylor did not learn of this guarantee until after it was filed in a lawsuit against John and others in December 2015.

26.      Upon information and belief, John, Connie and Beck have engaged in numerous transactions between the Plan and persons and/or entities who were a "party in interest" as provided under as provided under 28 U.S.C.A. § 1002, *et seq*. Upon information and belief, Reed Taylor alleges that, upon the conducting discovery, he will be able to identify numerous "party in interest" transactions involving the Plan which were prohibited as provided under 29 U.S.C.A. § 1106. For example, when GemCap recently produced documents in this lawsuit in the last 30 days, Reed Taylor learned that over the course of less than two months John had the Plan write checks to CropUSA, a party in interest under ERISA, exceeding $200,000. Such transactions were prohibited transactions as provided under 29 U.S.C.A. § 1106. These transactions would have never been approved by an independent trustee properly discharging his or her fiduciary duties under ERISA.

27.      John, Connie and Beck also engaged in further transactions in violations of fiduciary duties under ERISA as described in Dale Miesen's Third Amended Complaint, which is incorporated by reference herein. (*See* Dkt. 211.) Reed Taylor was lied to and was not involved in those transactions (he was a secured creditor of AIA Services from 1995 through June 17, 2009 when the Idaho district court ruled his redemption was illegal). John, Beck, Cashman and Connie knew that Reed Taylor, as a secured creditor, would have been required to consent to the spin off of CropUSA and thereby given an ownership interest in that entity, but, as John has testified, Reed Taylor never consented. As depicted by some of the emails sent between John, Beck and Cashman,

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 16

thee evidence is undisputed that Reed Taylor was not involved in their malfeasance and did not consent to it. (*See, e.g.,* Dkt. 67-33; Dkt. 67-48; Dkt. 67-49; Dkt. 67-54; Dkt. 67-55.)

28. Upon information and belief, John has dealt with Plan assets for his own interest and/or for his own account and engaged in other prohibited conduct (including transferring real property to the Plan) under 29 U.S.C.A. § 1106. Reed Taylor had no knowledge of these transactions.

29. Despite Reed Taylor's demands and the demands of his counsel over the years, John, Connie and Beck have refused to comply with ERISA or otherwise take any action for the benefit of the participants and beneficiaries of the Plan as to the Series C Preferred Shares in AIA Services, which are held in the Plan.

30. In violation of 28 U.S.C.A. § 1002, *et seq.*, John, Beck and Connie have failed to ensure that reports and information required by ERISA were provided to Reed Taylor or other Plan participants and/or beneficiaries, despite repeated demands by Reed Taylor and his counsel. John, Beck, and Connie have failed to ensure that John provides the proper annual required information to the Plan participants and/or beneficiaries as required by ERISA or otherwise ensure that John properly discharged his fiduciary duties under ERISA.

31. Upon information and belief, in addition to the transactions discussed above, John has concealed numerous transactions from Reed Taylor and other Plan participants and beneficiaries, including, other examples of self-dealing and engaging in prohibited transactions under ERISA.

32. The proceeds from the transactions described above could have and should have been used to pay all of the cumulative dividends owed on the Series C Preferred Shares held in the Plan and used to pay for redeeming those shares, rather than being used for the purposes mentioned

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 17

above and there was more than sufficient funds and assets available to do so.

33.    Based on the acts and omissions of John, Beck and Connie, the $925,000 face value of the Series C Preferred Shares and the over $1,500,000 in unpaid dividends owed to the Plan and Plan participants and beneficiaries for those Series C Shares have been destroyed (including the beneficial interests of those Series C Preferred Shares allocated to Reed Taylor). Upon information and belief, Reed Taylor's share of these damages exceeds $500,000. The Plan and the Plan participants and beneficiaries (other than those excluded below) should be made whole for the losses caused by John, Beck and Connie.

### XVI.   <u>CLASS ACTION ALLEGATIONS</u>

34.    Reed Taylor re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this First Amended Answer and Counterclaims to the extent necessary to support this cause of action.

35.    Pursuant to Fed. R. Civ. P. 23, Reed Taylor brings a class counterclaim on his own behalf and on behalf of the Plan and all Plan participants similarly situated ("<u>Class Members</u>" or "<u>Class</u>").

36.    Reed Taylor proposes the following class definition: (a) All participants in the AIA Insurance 401(k) plan from January 1, 2007 to the present except for John, JoLee Duclos and Bryan Freeman (three parties who served as directors and officers of CropUSA and actively assisted John in the malfeasance described above and in Dale Miesen's Third Amended Complaint, who Reed Taylor presumes would opt out anyway).

37.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.  It is believed that the class is comprised of approximately 32 individuals who live in numerous states throughout the country. It is also believed that those 32 individuals would

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 18

never take legal action on their own.  Courts have permitted class actions to proceed with less than 30 individuals under ERISA. *See, e.g., Novella v. Westchester County*, 443 F.Supp.2d 540 (S.D. N.Y. 2006).

38.     The questions of law and fact are the same for all of the class members, namely, whether John, Beck and Connie breached their fiduciary duties (including *de facto* fiduciary duties) in the administration of the Plan.

39.     Reed Taylor's claims are typical of the class, namely, that he is and has been a participant in the Plan during the time at issue.

40.     Reed Taylor will adequately represent and protect the interests of the Class because he has retained competent counsel and none of his interests in the litigation are antagonistic to the other members of the class. While the Third-Party Plaintiffs have falsely alleged that Reed Taylor was in someway involved in their extensive malfeasance, they were forced to admit that Reed Taylor had nothing to do with AIA Services or AIA Insurance after he filed suit against them in 2007. As a result, it is impossible for Beck, John and Connie to assert that Reed Taylor was somehow involved in the transactions described herein and the malfeasance and breached fiduciary duties under ERISA.

41.     A class action for John, Connie and Beck's violations of ERISA is maintainable under Fed. R. Civ. P. 23(b)(1)(A) in that the prosecution of separate actions by class members would create a risk of inconsistent adjudications establishing incompatible standards of conduct for Beck, Connie and John and there is only one ERISA fidelity bond.  A class action for John, Connie and Beck's violations of ERISA is maintainable under Fed. R. Civ. P. 23(b)(1)(B) in that adjudications with respect to individual members would as a practical matter be dispositive of the interests of the other members or would substantially impair their ability to protect their interests

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 19

prosecution of separate actions by individual members of the class against John, Connie and Beck. A class action for John, Connie and Beck's violations of ERISA is also maintainable under Fed. R. Civ. P. 23(b)(1)(B)(2) in that John, Connie and Beck have acted or refused to act on ground that apply generally to the class such that final injunctive and declaratory relief is appropriate respecting the class as a whole. Alternatively, a class action for John, Connie and Beck's violations of ERISA is also maintainable under Fed. R. Civ. P. 23(b)(3) in that questions of law and fact common to all members of the class predominate over questions affecting only individual members of the class because the members of the class were harmed by the same practices of John, Connie and Beck, and a class action is the superior method to adjudicate this controversy. Upon information and belief, there are no other pending class actions concerning these issues and there is no other party willing to pursue and adjudicate these claims.

### XVII.    <u>COUNT I—BREACH OF FIDUCIARY DUTIES</u>

**42.** Reed Taylor re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this First Amended Answer and Counterclaims to the extent necessary to support this cause of action.

**43.** During all relevant times, John was a trustee and a fiduciary under ERISA and he owed fiduciary duties to the Plan and the Plan participants and/or beneficiaries (including Reed Taylor). During all relevant times, John, Beck and Connie were *de facto* fiduciaries under ERISA because they controlled the appointing, retaining and removing trustees of the Plan and thus they owed fiduciary duties to the Plan and the Plan participants and/or beneficiaries.

**44.** John intentionally breached his fiduciary duties, responsibilities and/or obligations owed to the Plan and the Plan participants and beneficiaries (including Reed Taylor) under ERISA (including § 502(a)(2)-(3)), including, without limitation, by engaging in self-dealing and the

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 20

conduct described in the above and below paragraphs. John's conduct, including, without limitation, the conduct described above and below, further constitutes fraudulent and dishonest conduct under ERISA in violation of his fiduciary duties, responsibilities and obligations owed to the Plan and the Plan participants and beneficiaries (including Reed Taylor). If Reed Taylor discovers other additional examples of improper, dishonest and fraudulent conduct (and prohibited transactions) at such time as he is permitted to obtain documents and other information through discovery, he will present that evidence to support additional breaches of fiduciary duties.

45.     John further breached his fiduciary duties and other obligations owed to the Plan and the Plan participants and beneficiaries (including Reed Taylor) for his failed exercise of prudence and other care in dealing with the Series C Preferred Shares held by the Plan and by not partially redeeming some or more of those shares over the years.

46.     Beck, Connie and John (in addition to John's fiduciary duties as trustee) breached their fiduciary duties owed to the Plan and the Plan participants and beneficiaries (including Reed Taylor) by appointing John as trustee, failing to remove John as trustee, and retaining John as trustee when they had actual and constructive knowledge that John was not properly discharging his fiduciary duties as trustee of the Plan and when he had a proven track record of engaging in transactions that have harmed the Plan (either directly or indirectly through transactions that have impacted the value of the Series C Preferred Shares in the Plan and the payment of the dividends to the Plan). Beck and Connie Taylor were aware or should have been aware of breaches of fiduciary duties by John (e.g., they had actual or constructive knowledge) with respect to decisions impacting the value of the assets of the Plan, failed to take measures to prevent such breaches, failed to monitor John's improper and unlawful actions as trustee, and/or participated in John's improper acts and omissions (e.g., the breaches of fiduciary duties).

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 21

47.    John, Connie and Beck have also aided and abetted one another in the breaches of the other's fiduciary duties, responsibilities and other obligations under ERISA as described above (John, Connie and Beck are all co-fiduciaries under ERISA).

48.    As a direct and/or proximate result in John, Connie and Beck's breaches of fiduciary duties, responsibilities and obligations under ERISA (including violating 29 U.S.C.A. § 1104 and engaging in prohibited transactions under 29 U.S.C.A. § 1106), the Plan and the Plan participants and beneficiaries (including Reed Taylor) have been damaged and Reed Taylor is requesting damages sufficient to make the Plan and/or the Plan participants and beneficiaries whole, including, without limitation, all damages for paying all unpaid dividends and the face value of the Series C Preferred Shares held in the Plan and such other damages and relief as may be requested at or before trial under ERISA, including as provided under 29 USC § 1109.

## XVIII.    COUNT II—PROHIBITED TRANSACTIONS

49.    Reed Taylor re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this First Amended Answer and Counterclaims to the extent necessary to support this cause of action.

50.    John, Beck and Connie are parties in interest under ERISA and they have engaged in prohibited transactions under 29 U.S.C.A. § 1106, including, without limitation, for the knowing participation in the prohibited transactions described in the paragraphs above and for the knowing participation in additional transactions that are anticipated to be discovered by Reed Taylor through discovery.

## XIX.    COUNT III—REPLACEMENT OF TRUSTEE

51.    Reed Taylor re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this First Amended Answer and Counterclaims to the extent

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 22

7-ER-1661

necessary to support this cause of action.

52.     Based on John's intentional and numerous intentional breaches of his fiduciary duties under ERISA (as described in part above), the Court permanently remove John as a trustee of the Plan as provided under 29 U.S.C.A. § 1109(a).

## XX.     COUNT IV—OTHER ERISA RELIEF

53.     Reed Taylor re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this First Amended Answer and Counterclaims to the extent necessary to support this cause of action.

54.     Reed Taylor requests such other relief as may be available and/or proven at trial or summary judgment as may be available under 28 U.S.C.A. § 1001, *et seq*. and/or ERISA case law (including penalties or other damages, injunctive relief, an accounting and damages for failing to meet obligations to Reed Taylor and/or other participants or beneficiaries under the Plan).

## XXI.     JURY DEMAND

1.     Reed Taylor, through his attorney, hereby demands a trial by jury of no less than the maximum number of jurors permitted on all causes of action against him for which a jury trial is allowed by law.

## XXII.     PRAYER FOR RELIEF

Wherefore, Reed Taylor prays for the following relief (individually and/or on behalf of the Class):

1.     That the Third-Party Complaint be dismissed with prejudice;

2.     That he be awarded the attorneys' fees and costs incurred in defending against the Third-Party Complaint, including under I.C. § 12-121, Fed. R. Civ. P. 11 (for harassing and unfounded indemnity and contribution claims) and/or any other applicable statute, contract, bylaws

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 23

or authority;

3.      For damages and equitable relief as provided under 29 U.S.C.A. § 1132(g) to make the Plan whole and/or to recover damages or to alternatively make whole or award damages to the Plan participants and beneficiaries (including Reed Taylor).

4.      For a finding from this Court that John, Beck and Cashman intentionally breached their fiduciary duties under ERISA and that the damages awarded in this action are non-dischargeable in bankruptcy;

5.      For a TRO, preliminary injunction, permanent injunction and/or other injunctive relief under ERISA for the Plan and/or the Plan participants and beneficiaries (including Reed Taylor);

6.      For an award of fees and costs under 29 U.S.C.A. § 1132(g)(2)(D) to the Plan and/or the Plan participants and beneficiaries (including Reed Taylor); and

7.      That the Court order such other or further relief as may be requested and/or just (including the award of penalties or other damages as provided under ERISA).

DATED:  This 31st day of October 2017.

RODERICK BOND LAW OFFICE, PLLC


By:    _/s/ Roderick C. Bond_____
          Roderick C. Bond
          Attorney for Plaintiff

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 24

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on the 31st day of October 2017, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D. LaRue:   jdl@elamburke.com, sd@elamburke.com

Jeffrey A. Thomson:    jat@elamburke.com, nlp@elamburke.com

Loren C. Ipsen:    lci@elamburke.com, nlp@elamburke.com

Alyson Anne Foster:   aaf@aswblaw.com, cme@aswblaw.com, kkp@aswblaw.com, lmk@aswblaw.com, mar@aswblaw.com, tie@aswblaw.com

Martin J. Martelle    attorney@martellelaw.com

Vanessa A. Mooney vanessa@martellelaw.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

_____
          */s/ Roderick C. Bond*
          Roderick C. Bond

1ST AMENDED ANSWER TO THIRD-PARTY COMPLAINT AND COUNTERCLAIMS - 25