**Consolidated Case Nos. 25-3552 and 25-3800**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,

**Plaintiff-Appellant**,

v.

R. JOHN TAYLOR, an individual, CONNIE TAYLOR HENDERSON, an individual, JAMES BECK, an individual, MICHAEL W. CASHMAN, SR., an individual, CROP USA INSURANCE AGENCY, INC., an Idaho corporation, CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company, AIA SERVICES CORPORATION, an Idaho corporation, AND AIA INSURANCE, INC., an Idaho corporation,

**Defendants-Appellees**,

and

Reed J. Taylor, an individual,

**Third-Party Defendant-Appellee.**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO,
CHIEF DISTRICT COURT JUDGE DAVID C. NYE, PRESIDING

---

**APPELLANT'S EXCERPTS OF THE RECORD – VOLUME - 10**

---

Roderick C. Bond
Roderick Bond Law Office, PLLC
10900 NE 4th St., Suite 2300
Bellevue, WA  98004
Tel: (425) 591-6903
Email: rod@roderickbond.com
Attorney for Appellant

Andrew Schwam
Andrew Schwam Law Firm
705 SW Fountain St.
Pullman, WA  99163-2128
Tel: (208) 874-3684
Email: amschwam@turbonet.com
Attorney for Appellant

Jeffrey A. Thomson ISB #3380
jat@elamburke.com
Loren C. Ipsen ISB #1767
lci@elamburke.com
Joyce A. Hemmer ISB #7202
jah@elamburke.com
ELAM & BURKE, P.A.
251 East Front Street, Suite 300
P.O. Box 1539
Boise, Idaho 83701
Telephone:  (208) 343-5454
Facsimile:  (208) 384-5844

Attorneys for Defendants Hawley Troxell Ennis & Hawley LLP,
Gary D. Babbitt, D. John Ashby and Richard A. Riley

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, et al.<br><br>Defendants. | Case No.  1:10-cv-00404-DCN<br><br>MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS |

Defendants Hawley Troxell Ennis & Hawley LLP, Gary D. Babbitt, D. John Ashby, and

Richard A. Riley (collectively, "HT Defendants"), by and through their counsel of record, Elam

& Burke, P.A., submit a Memorandum in Support of their Motion to Dismiss All Claims for

Failure to Satisfy Mandatory Derivative Demand Requirements as follows:

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO
DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND
REQUIREMENTS - 1

**10-ER-2237**

## I.   INTRODUCTION

This is a shareholder derivative action in which the shareholder plaintiff, Dale Miesen, purports to bring civil claims belonging to AIA Services Corporation and AIA Insurance, Inc. (the "AIA Corporations" or "AIA"). In addition to legal malpractice and tort claims that Miesen has filed against the HT Defendants, who provided legal services to the AIA Corporations as outside counsel, Miesen brings claims against AIA's current and former directors (the "Controlling AIA Defendants") for alleged mismanagement and self-dealing, another corporation ("CropUSA") for alleged conversion of AIA's assets, and a lender/creditor ("GemCap") for alleged wrongdoing in connection with a loan, guarantee and money judgment obtained against AIA.

As a prerequisite to filing each of his derivative claims, Miesen is required to have made a legally sufficient demand upon the boards of the AIA Corporations to take "suitable action" pursuant to Idaho Code § 30-1-742 / § 30-29-742.[1] Miesen must also satisfy Fed. R. Civ. P. 23.1's enhanced pleading requirements for each of his claims. Miesen failed to meet these requirements. The derivative demand letters on which he relies are legally insufficient under the applicable substantive state law, and Miesen has not (and cannot now) satisfy Rule 23.1's requirement to establish through allegations pled with particularity that he made a sufficient pre-suit demand to the AIA Corporations' boards of directors with respect to each of his claims against the HT Defendants. Because Miesen failed to satisfy the mandatory prerequisites to filing his derivative claims, he lacks statutory standing and his claims against the HT Defendants should be dismissed. In fact, for these same reasons, the Ninth Circuit recently affirmed dismissal of Miesen's claims against another attorney who had represented the AIA Corporations

---

[1] Idaho Code § 30-1-742 was in effect when the complaint in this case was filed on August 11, 2010. The requirements for making a derivative demand were recodified as Idaho Code § 30-29-742 on July 1, 2015.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 2

**10-ER-2238**

in matters relating to this lawsuit. *See* Dkt. 1022-1 (*Miesen v. Munding*, 822 F. App'x 546 (9th Cir. 2020), appeal pending, No. 20-857 (docketed Dec. 29, 2020)). As more fully explained below, the HT Defendants request an order dismissing all claims against them with prejudice.

## II.   LEGAL STANDARD

This motion is made pursuant to Fed. R. Civ. P. 12(c) because the pleadings have closed. "Analysis under Rule 12(c) is 'substantially identical' to analysis under Rule 12(b)(6) because, under both rules, 'a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy.'" *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (internal citation omitted). Dismissal for insufficiency of a complaint is proper under Fed. R. Civ. P. 12(b)(6) if the complaint on its face fails to state a claim because it lacks either a cognizable legal theory or facts sufficient to support a cognizable legal claim. *See Johnson v. Riverside Healthcare Sys. LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008); *see also N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 583 (9th Cir. 1983).

"[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009), citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *see also Blankenship v. McDevitt*, No. 214CV00281EJLREB, 2015 WL 4944395, at *2 (D. Idaho Aug. 19, 2015) (stating that "[o]n a motion for judgment on the pleadings, the pleading standards established by *Iqbal* and *Twombly* apply"). Although the Court must accept as true the well-pleaded factual allegations in a complaint, the Court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *St. Clare v. Gilead Scis., Inc.*, 536 F. 3d 1049, 1055 (9th Cir. 2008). "It is also improper for a

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 3

**10-ER-2239**

court to assume the [plaintiff] can prove facts that [she] has not alleged." *Sivilli v. Wright Med. Tech., Inc.*, 2019 WL 3803808 at *1 (S.D. Cal. Aug. 2019), citing *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

## III.   ARGUMENT

**A.   To discourage shareholder abuse of the derivative suit process, Idaho Code § 30-1-742 and Fed. R. Civ. P. 23.1 establish stringent and mandatory pre-suit demand and pleading requirements.**

"A derivative action is an extraordinary process where courts permit 'a shareholder to step into the corporation's shoes and to seek in its right the restitution he could not demand in his own.'" *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1012 (9th Cir. 2010). "Because of the fear that shareholder derivative suits could subvert the basic principle of management control over corporate operations, courts have generally characterized shareholder derivative suits as 'a remedy of last resort.'" *Kayes*, 51 F.3d at 1463. The U.S. Supreme Court has explained that:

> before the shareholder is permitted in his own name, to initiate and conduct a litigation which usually belongs to the corporation, he should show, to the satisfaction of the court, that he has exhausted all the means within his reach to obtain within the corporation itself, the redress of his grievances, or action in conformity to his wishes. He must make an earnest, not a simulated effort, with the managing body of the corporation, to induce remedial action on their part, and this must be made apparent to the Court.

*Hawes v. Oakland*, 104 U.S. 450, 460–61 (1882).

"The demand requirement is designed to promote the basic principle of corporate governance that the board of directors, and not individual shareholders, manages the affairs of the corporation." *Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008) (internal quotes omitted); *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 & 101 (1991) (stating: "The purpose of the demand requirement is to 'affor[d] the directors an opportunity to exercise their reasonable business judgment'" and "to protect the directors' prerogative to take over the litigation or to oppose it" (internal citations omitted)). State and federal courts have recognized

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 4

that the demand requirement is designed to prevent shareholders from abusing the derivative suit process. *See, e.g., Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 542 & 530 (1984) (stating "derivative actions brought by minority stockholders could, if unconstrained, undermine the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders"); *see also Orrock v. Appleton*, 147 Idaho 613, 213 P.3d 398 (2009).

In addition, Fed. R. Civ. P. 23.1(b) establishes heightened pleading requirements for shareholders such as Miesen who bring a derivative action to enforce a purported right of a corporation:

> (b) The complaint must be verified and must:
> (1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;
> (2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and
> (3) state with particularity:
> (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and
> (B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1(b). "Pursuant to Rule 23.1, a putative derivative plaintiff can initiate a derivative action only if he or she makes an adequate demand on the Board under applicable state law." *Potter*, 546 F.3d at 1055. "[T]he function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of 'substance,' not 'procedure,'" and, therefore, Rule 23.1 does not replace the demand requirements of state law or relieve a plaintiff of the obligation to comply with the demand requirements established by applicable state law. *Kamen*, 500 U.S. at 96-97.

Under Idaho law, "a shareholder may not commence a derivative proceeding until he makes a written demand upon the corporation to take suitable action at least ninety days prior to

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 5

the commencement of the action." *Mannos v. Moss*, 143 Idaho 927, 933-34, 155 P.3d 1166, 1172-73 (2007). Specifically, Idaho Code § 30-1-742 (2010-2015) / § 30-29-742 (2015-2019) provided that:

> No shareholder may commence a derivative proceeding until:
> (1) A written demand has been made upon the corporation to take suitable action; and
> (2) Ninety (90) days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the ninety (90) day period.

"[T]he legislative intent in enacting Idaho Code § 30–1–742 was 'to no longer recognize 'futility' as an exception to the requirement of demand as a condition preceding the institution of a shareholder's derivative action.'" *Mannos*, 143 Idaho at 934, 155 P.3d at 1173. The shareholder's demand effort must be "earnest and sincere, and not a feigned or simulated, effort to induce the directors to take remedial action." *McCann v. McCann*, 138 Idaho 228, 235, 61 P. 3d 585, 592 (2002) (internal quotation omitted). For example, demands to merely "take action" are insufficient. *Id.*

> Statements should be presented to the directors showing the wrong complained of, accompanied by sufficient responsible data which will enable the directors to determine whether litigation could be engaged in with some hope of success. The shareholder must state facts, not mere general charges and conclusions.

> The demand should give the directors a fair opportunity to initiate the action which the shareholder wants to undertake, and name the potential defendants, as well as the shareholder making the demand.

*Id.* (internal citation omitted).

"Because the law has historically been particularly wary of allowing *shareholders* to sue on their *corporation's* behalf," shareholder derivative actions must strictly comply with the demand and pleading requirements of Rule 23.1. *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (emphasis original); *see also Potter*, 546 F.3d at 1058 (noting "strict compliance

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 6

**10-ER-2242**

with Rule 23.1 and the applicable substantive law is necessary before a derivative suit can wrest control of an issue from the board of directors"); *see also Quinn*, 620 F.3d at 1012 ("Because of the extraordinary nature of a shareholder derivative suit, Rule 23.1 establishes stringent conditions for bringing such a suit.").

A written derivative demand is mandatory, and failure to comply with pre-suit demand requirements necessitates dismissal of a derivative action. *See Mannos*, 143 Idaho at 933-34, 155 P.3d at 1172-73; *see also McCann*, 138 Idaho at 237, 61 P.3d at 594 (affirming dismissal of the plaintiff's derivative claims because "the derivative action failed to conform to the requirements of the statute"); *Orrock*, 147 Idaho at 619, 213 P.3d at 404 (dismissing derivative action for failing to plead required elements with particularity); *Kugler v. Nelson*, 160 Idaho 408, 415, 374 P.3d 571, 578 (2016) (affirming dismissal based on failure to satisfy derivative pleading requirements). A derivative action in which the plaintiff failed to comply with the pre-suit demand requirements should be dismissed with prejudice because amendment cannot cure the defects that arise from the fact that the plaintiff failed to make a sufficient written derivative demand as a legal prerequisite to filing the action. *Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 991 (9th Cir. 1999) (superseded by statute on other grounds).

Further, a legally sufficient pre-suit demand is a necessary component of a plaintiff's statutory standing to pursue a derivative action under state law, such as Idaho Code § 30-1-742. *Potter*, 546 F.3d at 1056. "[D]ismissal for lack of statutory standing is properly viewed as a dismissal for failure to state a claim ...." *Simmonds v. Credit Suisse Sec. (USA) LLC*, 638 F.3d 1072, 1087 (9th Cir. 2011), vacated on other grounds. "Although dismissals for failure to state a claim are reviewed *de novo*, [a] district court's determination that [the plaintiff] did not comply

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 7

with Rule 23.1 or [state] law regarding the demand ... is reviewed for abuse of discretion." *Potter*, 546 F.3d at 1056.

**B.      All of the demand letters upon which Miesen relies in his attempt to satisfy his derivative demand and pleading requirements are legally insufficient.**

In an attempt to meet the applicable demand and pleadings requirements, Miesen relies upon a series of demand letters issued over the course of eight years that are interspersed among the four complaints that have been filed in this case. The written demands and the pleadings relevant to this motion are these:

| July | 21 | 2008 | **Demand by Donna Taylor (and Reed Taylor) to boards** | **Dkt. 23-9** |
|---|---|---|---|---|
| Aug. | 11 | 2010 | Complaint (Plaintiffs D. Taylor and Miesen) | Dkt. 1 |
| Nov. | 22 | 2010 | First Amended Complaint (Miesen dropped as a plaintiff) | Dkt. 23 |
| **April** | **3** | **2012** | **Demand email from Mr. Bond to attorneys** | **Dkt. 67-23** |
| **July** | **16** | **2012** | **Demands purportedly submitted at a shareholder meeting** | **Dkt. 67-42** |
| June | 13 | 2016 | **Demand from Mr. Bond on behalf of Miesen** (This demand was ruled insufficient in *Miesen v. Munding*) | **Dkt. 148-2** |
| June | 20 | 2016 | Second Amended Complaint (Miesen rejoined as a plaintiff) | Dkt. 137 |
| **Aug.** | **23** | **2016** | **Demand "substantially similar" to the 06/13/2016 demand** | NA |
| April | 24 | 2017 | Third Amended Complaint (D. Taylor dropped as a plaintiff) | Dkt. 211 |

Significantly, in the related and parallel derivative case of *Miesen v. Munding*, the Ninth Circuit very recently found that Miesen's June 13, 2016, demand letter[2] was legally insufficient and affirmed the dismissal of Miesen's action. *See* Dkt. 1022-1. In that case, Miesen (through Mr. Bond) derivatively sued John Munding (an attorney who represented AIA in *GemCap v. AIA*, C.D. Cal. Case No. 13-05504-SJO-MAN) for legal malpractice, aiding and abetting, and other claims similar to those asserted against the HT Defendants in this case.[3] The proceedings in

---

[2] *Miesen v. Munding* involved the same June 13, 2016, demand letter that Miesen relies upon in this case. *See* Dkts. 148-2 & 211 at ¶ 179; *see also Miesen v. Munding*, E.D. Wash. Case No. 2:18-CV-270-RMP, Dkt. 8-13 (copy of the June 13, 2016, letter); *Miesen v. Munding*, 9th Cir. Case No. 19-35255, Dkt. 19 at 7 (Munding's brief describing the June 13, 2016, letter); *Porter v. Ollison*, 620 F.3d 952, 954-955 (9th Cir. 2010) (permitting a court to take judicial notice of dockets and the existence of filings in other courts, such as the docket in *Miesen v. Munding*).

[3] *Compare Miesen v. Munding*, E.D. Wash. Case No. 2:18-CV-270-RMP Dkts. 1 & 10 *and* Dkt. 211 at ¶¶ 135-56.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 8

and settlement of *GemCap v. AIA* also form the basis of some of Miesen's claims in this case against the HT Defendants. *See, inter alia,* Dkt. 211, ¶¶ 146-50.[4]

The June 13, 2016, demand letter that the Ninth Circuit deemed insufficient to support Miesen's derivative claims against AIA's former attorney in *Miesen v. Munding* – which Miesen also relies upon in this case against the HT Defendants – contains demands for the AIA Corporations' boards to "pursue all possible claims":

(a) for "all possible tort claims (including, without limitation, aiding and abetting in the commission of torts against AIA), contract claims, declaratory relief, injunctive relief and punitive damages based on all acts, omissions, concealments, and failure to disclose" (E.D. Wash. Case No. 2:18-cv-270-RMP[5] Dkts. 10 at 39 & 8-13 at 2; *see also* Dkt. 148-2 at 2);

(b) "for all damages relating to all payments made directly or indirectly from AIA to the attorneys and law firm[] of ... Crumb & Munding ... and any other law firm (including for declaratory relief that no further sums are owed by AIA to any of the foregoing and that any fee agreements or conflict waivers are void), as such payments should never have been made, were never authorized by AIA, were not properly incurred or necessary for AIA, were never authorized by AIA's shareholders after full disclosure was made, and involved the attorneys and law firms taking action or performing work not in the best interests of AIA and/or in violation of the duty of loyalty owed to AIA" (E.D. Wash. Dkts. 10 at 39-40 & 8-13 at 5-6; *see also* Dkt. 148-2 at 5-6);

(c) for disgorgement of attorney fees for representing AIA "based on conflicts of interest, breached fiduciary duties (including the duty of loyalty), and malpractice" (E.D. Wash. Dkts. 10 at 40 & 8-13 at 6; *see also* Dkt. 148-2 at 6);

---

[4] Also, Donna Taylor (through Mr. Bond) had sought unsuccessfully to intervene in *GemCap v. AIA.*
[5] Filings in the district court case of *Miesen v. Munding* will be referred to hereinafter as "E.D. Wash. Dkt. __."

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 9

(d) "for participating and/or allowing AIA to be improperly utilized to fund the defense and prosecution of lawsuits which were not in AIA's best interests, but were instead pursued based on the interests of the Controlling AIA Defendants" (*id.*);

(e) "for malpractice, breach of fiduciary duties and to disgorge all attorneys' fees, costs and expenses paid to them directly or indirectly by AIA for the California Lawsuit as Mr. Munding intentionally violated his duties owed to AIA, including, without limitation, his duties of loyalty owed to AIA and by taking direction and action benefitting other defendants (including John [Taylor]'s) and placing their interests in front of AIA and by representing CropUSA, AIA and other parties when there were conflicts of interest in doing so" (*id.*);

(f) "for improperly failing to assert that the guarantees and settlement agreements entered into by AIA were not authorized and were thus illegal or ultra-vires and by allowing AIA to enter into them in the first place" (*id.*);

(g) because "Munding places his interest in earning fees ahead of AIA's interests" (*id.*); and

(h) "to recover any attorneys' fees and costs incurred in any lawsuit or litigation directly or indirectly involving AIA" (*id.*).

The Ninth Circuit found that these demands "failed to describe with particularity the claims for relief Miesen sought or the factual bases for those claims," and that "the generic, conclusory language" he used in the letter "cannot have been expected to provide the boards with enough information to take 'suitable action.'" Dkt. 1022-1 at *5. The court explained that:

> [w]ithout knowing the factual bases for the claims the boards could not determine the likelihood of the lawsuit's success and would have had difficulty weighing factors lie the expenses involved in litigation or whether litigation would further the AIA Entities' general business interests. These are considerations the boards were entitled to make.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 10

*Id.* Therefore, the Ninth Circuit held that Miesen's derivative claims against Munding were properly dismissed for Miesen's failure to satisfy Rule 23.1's mandate to plead with particularity his pre-suit efforts to obtain board action and his failure "to establish that this demand was 'adequate' under applicable state law." Dkt. 1022-1 at *4. As illustrated below, the same deficiencies that were fatal to Miesen's derivative claims in *Miesen v. Munding* plague each of the demand letters Miesen relies upon in this case.

> **1.     The July 21, 2008, demand letter is legally insufficient and all claims that rely upon it should be dismissed.**

In an attempt to satisfy the written demand prerequisite to filing this derivative action, Miesen relies on a July 21, 2008, demand letter that attorney Michael Bissell delivered to the AIA Corporations' boards of directors on behalf of shareholder Donna Taylor (as well as on behalf of Reed Taylor, who claimed to be a creditor and was not a shareholder). *See* Dkt. 1 ¶¶ 5.1 & 5.9 (referring to the July 21, 2008, demand letter, but failing to attach it); *see also* Dkt. 211 ¶ 172 (reasserting Miesen's reliance on the July 21, 2008, demand letter). However, the July 21, 2008, demand letter contains merely a list of vague labels and conclusions, devoid of description of any factual basis that would support taking legal action against the HT Defendants. *See* Dkt. 23-9. It is even more bereft of facts, and even more generic and conclusory, than the letter the Ninth Circuit found to be insufficient in *Miesen v. Munding*. The July 21, 2008, letter demands that the boards "initiate legal action" to "recover all applicable damages" and obtain the disgorgement of all compensation, fees and costs paid by the AIA Corporations for unspecified and factually unsupported allegations of violating the "applicable Rules of Professional Conduct, malpractice, breach of fiduciary duties, and aiding and abetting." Dkt. 23-9. It then offers a vague and unelaborated list of labels and conclusions, such as: "[t]aking action against the best

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 11

interests of AIA Services and/or AIA Insurance" and "assisting in the commission of fraud and/or illegal activities." *See* Dkt. 23-9 for the full list of 44 labels and conclusions.

The conclusory allegations in the July 21, 2008, letter are asserted collectively against three separate law firms (Hawley Troxell Ennis & Hawley, Clements Brown & McNichols, and Quarles & Brady), "any other firms which have wrongfully represented the entities," John Taylor, Michael Cashman, James Beck, Connie Taylor, Crop USA, and "all other responsible parties." *Id.* The letter fails to ascribe any of the 27 alleged causes of action to any particular law firm or lawyer, and fails to even identify a lawyer who was purportedly liable or describe how they were allegedly involved. *See* Dkt. 23-9; *see also McCann*, 138 Idaho at 235, 61 P. 3d at 592 (stating a derivative demand letter should "name the potential defendants").

The letter's vague, ambiguous and conclusory assertions also fail to describe any factual basis for filing a legal action against the HT Defendants or any of its lawyers, such as the factual circumstances surrounding the claims, facts showing acts or omissions that are redressable under the legal theories asserted, how the alleged conduct was wrongful, when any of the alleged misconduct occurred, or how and in what amount the AIA Corporations were allegedly damaged, if at all. *Id.* The failure to describe how or why the HT Defendants would or could possibly be liable for the claims listed in the July 21, 2008, demand letter is fatal to Miesen's ability to establish a legally sufficient pre-suit derivative demand. Like the insufficient demand letter in *Miesen v. Munding*, the July 21, 2008, letter "cannot have been expected to provide the boards with enough information to take 'suitable' action," and "[w]ithout knowing the factual bases for the claims, the boards could not determine the likelihood of the lawsuit's success and would have had difficulty weighing factors like the expenses involved in litigation or whether litigation would further the AIA Entities' general business interests." Dkt. 1022-1 at *5.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 12

Accordingly, all of the claims against the HT Defendants that relied upon the July 21, 2008, demand letter, including all of the claims asserted in the original Complaint, must be dismissed.

> **2.** **Miesen failed to make legally sufficient derivative demands regarding claims that arose after July 21, 2008, and/or were not raised in the July 21, 2008, demand letter.**

Claims that arise after a derivative demand letter is issued are nonetheless "subject to the statutory demand and waiting period requirements," and the claims must "be presented to the directors in a subsequent written demand requesting action be taken on those items" before they can be asserted in a derivative lawsuit. *McCann*, 138 Idaho at 235, 61 P.3d at 592. The failure to make a sufficient pre-suit derivative demand regarding a particular claim cannot be cured after that claim has already been asserted in the derivative lawsuit. As the Idaho Supreme Court has noted, a derivative demand made after the subject claim has been filed is "inconsequential because Idaho Code § 30–1–742 requires the demand be made ninety days before the commencement of the derivative action." *Mannos*, 143 Idaho at 934, 155 P.3d at 1173. Further, "the filing of a derivative complaint is not a sufficient demand." *McCann, supra.*

> **a.** **No pre-suit demand was made with respect to claims asserted in the Complaint (Dkt. 1) filed August 11, 2010, that allegedly arose after the July 21, 2008, derivative demand letter.**

The original Complaint alleged that "[a]ll of the claims made in this lawsuit were reasonably contemplated by the derivative demand letter" dated July 21, 2008. Dkt. 1 ¶ 5.8; Dkt. 23-9. However, the Complaint filed on August 11, 2010, asserted claims that, according to its own allegations, arose after the July 21, 2008, demand letter. Claims alleged in the Complaint without a prerequisite demand pertain to and are not necessarily limited to the following issues: (a) the August 29, 2008, sale of CropUSA's assets to Hudson, including claims that the HT Defendants were improperly representing AIA, CropUSA and the Controlling AIA Defendants

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 13

during that time and wrongfully allowed it to occur, allegedly causing at least $10 million in damages to AIA for CropUSA's alleged misappropriation of the sale proceeds and $120,000 for John Taylor's consulting contract with Hudson, *see* Dkt. 1 ¶¶ 3.39, 4.39-4.45; **(b)** alleged misuse of $800,000 in settlement proceeds, *see* Dkt. 1 ¶ 4.46; **(c)** money paid by Hudson to CropUSA in connection with a 2010 contract with Growers National that allegedly "rightfully belonged to AIA," *see* Dkt. 1 ¶ 4.47; **(d)** other alleged misconduct by the HT Defendants between July 21, 2008, and the filing of this action on August 11, 2010, such the HT Defendants' work relating to the *Reed Taylor* case. *See* Dkt. 1 ¶¶ 6.14-6.31, 6.41-6.43, 6.63-6.70.

### b. The subsequent demand dated April 3, 2012, was a not a legally sufficient derivative demand.

Miesen's Second Amended Complaint ("SAC") filed on June 20, 2016, alleges Miesen complied with the pre-suit derivative demand requirements by means of an email from Mr. Bond dated April 3, 2012 (as well as the July 21, 2008, letter discussed above). *See* Dkt. 137 ¶ 146. Even assuming for the sake of argument that the information Mr. Bond provided in the body of his April 3, 2012, email sufficiently described the action he was demanding and the information that supported it, Mr. Bond's April 3, 2012, email did not constitute a derivative demand at all because it was not addressed to the boards of directors. *See* Dkt. 67-33. Mr. Bond sent the email only to attorneys David Risley, John Ashby, Gary Babbitt, and James LaRue (who was counsel for the HT Defendants). *See* Dkt. 67-33. The Supreme Court has squarely held that a letter delivered to a corporation's attorneys is "not sufficient to constitute a written demand pursuant to I.C. § 30-1-742." *McCann*, 138 Idaho at 235, 61 P.3d at 592. Mr. Bond's April 3, 2012, email was not a legally sufficient derivative demand and the claims that were asserted in the SAC in reliance upon the April 3, 2012, email should be dismissed, including the claim regarding $400,000 on deposit in the court registry in the *Reed Taylor* case. *See* Dkt. 137 ¶¶ 134(ii), 146.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 14

c.      **The shareholder statements purportedly delivered to the boards on July 16, 2012, were not legally sufficient derivative demands as to any claims asserted against the HT Defendants.**

Miesen's reliance on the shareholder statements purportedly delivered to the boards on July 16, 2012, is misplaced with respect to the claims asserted in this action against the HT Defendants. *See* Dkt. 137 ¶ 147. The only possible hint of any claims against the HT Defendants in those statements relate to demands to unseat the Controlling AIA Defendants and appoint Paul Durant as director/President so he could authorize pursuit of the derivative claims in the First Amended Complaint in this case. Dkt. 67-42 ¶¶ 1, 3, 4. To the extent that this could be construed as a demand to take action against the HT Defendants, it is a nullity because the demand was made *after* the claims were filed. *See Mannos*, 143 Idaho at 934, 155 P.3d at 1173 (stating post-complaint demands are ineffectual). One of the demands also states that the boards should investigate all of the AIA Corporations' transactions and take any action that may be deemed appropriate, including potentially reporting issues to state bar associations, but this type of demand for an investigation is far too unfocused, vague and factually unsupported to constitute a demand to take suitable action against the HT Defendants. *See* Dkt. 67-42 ¶¶ 2, 5-15; *see also McCann*, 138 Idaho at 235, 61 P. 3d at 592 (demands to "take action" are insufficient). Likewise, no other demands stated in the July 16, 2012, shareholder statements describe or sufficiently demand any remedial action to take against the HT Defendants, and they therefore are not effective derivative demands for the reasons the Ninth Circuit explained in *Miesen v. Munding*. *See* Dkt. 1022-1.

Because the shareholder statements that were purportedly submitted to the boards on July 16, 2012, are not legally sufficient derivative demands, any claims asserted by Miesen against the HT Defendants that rely upon them to satisfy the requirements of Idaho Code

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 15

§ 30-1-742 and Rule 23.1 should be dismissed. These include but are not necessarily limited to claims relating to the following issues: **(a)** The attempted reverse stock split in 2012, *see* Dkts. 67-42 ¶ 5; 137 ¶¶ 126-129, 149; 211 ¶¶ 127-31.[6] **(b)** The alleged failure to allow Donna Taylor to appoint Mr. Durant to the board, including claims that the HT Defendants harmed the corporations by allowing the Controlling AIA Defendants to remain in control, *see* Dkts. 67-42 ¶¶ 1-3, 7, 12; 137 ¶¶ 134(y), 159-61; 211 ¶¶ 164(y), 193-94. **(c)** AIA's payment of legal expenses for the Controlling AIA Defendants, *see* Dkts. 67-42 ¶ 6; 137 ¶ 134(v); 211 ¶¶ 164(v), 224, 226, 229. **(d)** Shares issued to John Taylor and/or Connie Taylor Henderson, *see* Dkts. 67-42 ¶ 8; 137 ¶ 110, 134(f), 197(d); 211 ¶¶ 127, 164(f), 191. **(e)** The alleged failure to pay accrued dividends to 401K plan participants, *see* Dkts. 67-42 ¶ 9; 137 ¶¶ 32, 134(kk); 211 ¶¶ 35, 164(kk). **(f)** Termination of the ESOP and payments for the shares, *see* Dkts. 67-42 ¶ 10; 137 ¶¶ 124-25, 197(c); 211 ¶¶ 125-26, 226(c). **(g)** Reimbursement of compensation paid to the Controlling AIA Defendants, *see* Dkts. 67-42 ¶ 13; 137 ¶¶ 133, 157, 201; 211 ¶¶ 134, 159, 191, 226(l), 233(f), 244. **(h)** CropUSA's $15 million line of credit and AIA Insurance's guarantee of the loan (also known in this litigation as the GemCap loan), *see* Dkt. 137 ¶¶ 68, 96-98, 178-179.

    **d.**    **No pre-suit demand was made with respect to certain transactions and claims asserted in the SAC (Dkt. 137) filed June 20, 2016.**

Miesen alleged claims in the SAC that were never raised as topics requiring redress on behalf of AIA in any of the pre-suit derivative demands he has pled, including claims relating to the following issues: **(a)** Tolling agreements entered in 2007 and 2008, *see* Dkt. 137 ¶¶ 102-06. **(b)** AIA's opposition to Mr. Moran's appointment as director and receiver in December 2009,

---

[6] Notably, when Miesen asserted claims relating to the reverse stock split in the SAC, he accused a different law firm, Randall & Danskin, of facilitating the attempt. *See* Dkt. 137 ¶ 128. And when Mr. Bond raised the issue of the reverse stock split in his June 13, 2016, demand letter, he blamed other attorneys, Randall & Danskin and Doug Siddoway. *See* Dkt. 148-2 ¶ 21. The insufficiency of the June 13, 2016, demand letter as to the claims against the HT Defendants is further addressed in § III.B.2.e., *infra*.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 16

*see* Dkt. 137 ¶¶ 120-22, 134. Miesen alleges that the HT Defendants are liable for damages stemming from the "decimation of AIA, which occurred after 2009," because they should have joined, rather than opposed, Donna Taylor's effort to appoint a receiver for AIA. *Id.* at 121-22. This claim is not only conceptually absurd,[7] but also none of the demands Miesen relies upon between 2009 and the filing of the SAC on June 20, 2016, assert a pre-suit demand regarding the receivership, the appointment of Moran to the board, or any damages allegedly stemming from those events. *See* Dkts. 67-33, 67-42, 148-2.[8] **(c)** Funds transferred or loaned to Pacific Empire Radio Corp. ("PERC"). Miesen's SAC alleges that AIA improperly made loans to or monetary investments in PERC commencing in 2009. *See* Dkt. 13 ¶¶ 93, 131. Neither of the two purported written demands issued between 2009 and 90 days before the SAC was filed on June 20, 2016, assert a pre-suit demand regarding PERC. *See* Dkts. 67-33; 67-42. The June 13, 2016, letter mentions claims regarding PERC, but not against the HT Defendants, and in any event the letter is ineffective and insufficient as to the PERC claims asserted in the SAC because the requisite 90 days did not elapse between the demand and the pleading. *See* Dkts. 137, 148-2 ¶¶ 12-13.

> **e.      The June 13, 2016, demand letter Miesen relies upon in his Third Amended Complaint (Dkt. 211) filed April 24, 2017, is insufficient for the same reasons stated in *Miesen v. Munding*.**

The June 13, 2016, demand letter that Miesen relies upon for claims in this case is the same letter that the Ninth Circuit held to be legally insufficient in *Miesen v. Munding*. *See* Dkt.

---

[7] It is untenable under proximate cause principles to allege that the HT Defendants are responsible for all alleged harm that befell AIA after the HT Defendants opposed Donna Taylor's action to appoint a receiver simply because the alleged wrongdoers were allowed to stay on the board of directors. What is more, Miesen has admitted that on January 4, 2012—more than four years before Donna and Miesen filed the SAC alleging wrongdoing in connection with the receivership action—Donna (through Mr. Bond, who was also Miesen's attorney) "*voluntarily dismissed …* her action to appoint a receiver for AIA Services" purportedly because the Idaho Supreme Court's ruling that Reed Taylor's stock redemption agreement, under which Reed claimed AIA owed him millions of dollars, was illegal and unenforceable meant that AIA was "no longer insolvent." Dkt. 63 at 11 (emphasis added).

[8] The June 13, 2016, demand letter (Dkt. 148-2) is included in this analysis since it predates the filing of the SAC on June 20, 2016. *See* Dkt. 137. However, the June 13, 2016, demand letter is an ineffective and insufficient demand as to any claims asserted in the SAC because 90 days had not elapsed between the demand and the filing of the SAC as required by Idaho Code § 30-29-742.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 17

1022-1; *compare* Dkt. 148-2 *and* E.D. Wash. Dkt. 8-13. As to any claims asserted in Miesen's Third Amended Complaint against the HT Defendants, the June 13, 2016, demand letter is legally insufficient for the reasons explained in *Miesen v. Munding,* as further explained below.

The June 13, 2016, demand letter mentions Hawley Troxell in only two paragraphs—paragraph 11 and paragraph 16. *See* Dkt. 148-2 at 5. Miesen quoted Paragraph 16 *verbatim* in the body of his Amended Complaint in *Miesen v. Munding* to try to satisfy the derivative demand pleading requirements (*see* E.D. Wash. Dkt. 10 at 39-40), and the Ninth Circuit expressly found Paragraph 16 does not state a legally sufficient derivative demand. Paragraph 11's assertions regarding Hawley Troxell are even less detailed than Paragraph 22's allegations regarding Munding, which Miesen also quoted *verbatim* in his Amended Complaint against Munding (*see id.*), and which the Ninth Circuit also found to be legally insufficient. The remainder of the demands in the June 13, 2016, letter (Dkt. 148-2) contain no reasonably apparent demand for action against the HT Defendants[9] and, as the Ninth Circuit expressly recognized, the remaining paragraphs of the letter "are no more specific ... than the excerpts [Miesen] included in the Amended Complaint" against Munding. Dkt. 1022-1 at *6 (denying leave to amend to incorporate the entire demand letter because it did not cure the deficiencies).

As found by the Ninth Circuit in *Miesen v. Munding*, the June 13, 2016, demand letter is not a legally sufficient derivative demand. All claims against the HT Defendants that rely upon the June 13, 2016, letter to satisfy the derivative demand prerequisites and pleading requirements must be dismissed, including but not necessarily limited to any claims for damages against the HT Defendants relating to the GemCap loan, loan guarantee, default, litigation or settlement.

---

[9] Notably, the June 13, 2016, demand letter ambiguously and insufficiently asserts claims should be brought against "Combined Defendants," which "may include or may not include Hawley Troxell." Dkt. 148-2 at 2.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 18

**C.** **Satisfying the requirements for making and pleading a sufficient derivative demand is Miesen's affirmative and mandatory obligation, and he cannot shift his burden to the boards or to the defendants based on their alleged knowledge or failure to request more information.**

Miesen has previously argued that he was excused from strictly complying with the derivative demand requirements because the boards knew or should have known the basis of the claims without having to be told in the demand letter and/or that the boards could have sought clarification. This is not a valid argument. Strict compliance with the stringent pre-suit demand requirements is required, and the Ninth Circuit has explained that a board is "entitled to receive a valid demand and [is] not required to piece together by inference the disparate events that, if taken together, might have been sufficient to require corporate action." *Potter*, 546 F.3d at 1058; *see also Quinn*, 620 F.3d at 1012. Information that a board allegedly knew but was not stated in the demand letter is not a relevant issue to consider when determining whether a shareholder has attained statutory standing to maintain derivative claims by making a legally sufficient pre-suit demand, nor is it relevant to the determination of whether the plaintiff has met Rule 23.1's pleading requirements. Likewise, whether the board sought clarification in response to the demand letter is not a relevant factor. Allowing a plaintiff to maintain a derivative action based on the board's alleged knowledge about the claims or failure to seek clarification in response to a demand letter, instead of on the sufficiency of the demand, would negate Idaho Code § 30-1-742.

## IV.   CONCLUSION

Miesen failed to make or plead any legally sufficient derivative demand before he filed his claims against the HT Defendants as required by I.C. § 30-1-742 and Fed. R. Civ. P. 23.1. He lacks statutory standing, and his Third Amended Complaint fails to state claims against the HT Defendants upon which relief may be granted. The HT Defendants respectfully request that the Court enter an order dismissing all claims against them with prejudice.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 19

**10-ER-2255**

DATED this _____ day of January, 2021.

ELAM & BURKE, P.A.

By:_____
Loren C. Ipsen, Of the Firm
Joyce A. Hemmer, Of the Firm
Attorneys for Defendants Hawley Troxell
Ennis & Hawley LLP, Gary D. Babbitt,
D. John Ashby, and Richard A. Riley

## CERTIFICATE OF SERVICE

I hereby certify that on this _____ day of January, 2021, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons via email:

| | |
|---|---|
| Roderick C. Bond<br>rod@roderickbond.com<br>*Attorney for Plaintiff* | Daniel L. Glynn<br>dglynn@idalaw.com<br>*Attorneys for Michael W. Cashman, Sr., R. John Taylor, James Beck, Connie Taylor Henderson, Crop USA Insurance Services, LLC and Crop USA Insurance Agency, Inc.* |
| Alyson A. Foster<br>alyson@dempseyfoster.com<br>William E. Adams<br>bill@weadamslaw.com<br>*Attorneys for Intervenor GemCap Lending I, LLC* | Michael S. Bissell<br>mbissell@campbell-bissell.com<br>Tyler S. Waite<br>twaite@campbell-bissell.com<br>*Attorneys for Reed J. Taylor* |

_____
Loren C. Ipsen

4847-2282-2358, v. 2

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS - 20

Jeffrey A. Thomson ISB #3380
jat@elamburke.com
Loren C. Ipsen ISB #1767
lci@elamburke.com
Joyce A. Hemmer ISB #7202
jah@elamburke.com
ELAM & BURKE, P.A.
251 East Front Street, Suite 300
P.O. Box 1539
Boise, Idaho 83701
Telephone:  (208) 343-5454
Facsimile:  (208) 384-5844

Attorneys for Defendants Hawley Troxell Ennis & Hawley LLP,
Gary D. Babbitt, D. John Ashby and Richard A. Riley

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, et al.<br><br>Defendants. | Case No.  1:10-cv-00404-DCN<br><br>MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT |

## I.      INTRODUCTION

The latest iteration of Richard McDermott's expert witness report, produced on November 1, 2020, is **653 pages** long, having swelled to more than three times the length of the original 181-page report dated August 5, 2019. *See* Declaration of Loren Ipsen ("Ipsen Decl."), Exh. A ("McDermott Report"). Substantively, Mr. McDermott's report is a sprawling, repetitive collection of unreliable, unhelpful, unfairly prejudicial, speculative, inappropriate and inadmissible opinions offered by a lawyer who has taken on the role of advocate and co-counsel

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO
EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 1

for Miesen and who hopes to vouch for, argue, and summarize Miesen's claims from the witness stand under the guise of purported expert opinions. The HT Defendants ask the Court to exclude Mr. McDermott's testimony at trial.

## II.  LEGAL STANDARD

Under Fed. R. Evid. 104(a): "The court must decide any preliminary question about whether a witness is qualified … or evidence is admissible." Fed. R. Evid. 104(a). It is Miesen's burden to prove by a preponderance of the evidence that Mr. McDermott's opinions are admissible. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Courts have "broad discretion in deciding whether to admit or exclude expert testimony." *United States v. Christophe*, 833 F.2d 1296, 1300 (9th Cir. 1987).

Under Fed. R. Evid. 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" only if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

In deciding the admissibility of expert testimony, the Court serves an important gatekeeping function "to ensure that the testimony is reliable and will help the trier of fact." *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997); *see also Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 & 158 (1999) (determining reliability "in light of the particular facts and circumstances"). "The judge is 'supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043–44 (9th Cir. 2014) (internal quotations omitted). In other words, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 2

his testimony has substance such that it would be helpful to a jury." *Id.* (internal quotations omitted). The Court's gatekeeping obligation applies equally to scientific and non-scientific evidence. *See Kumho Tire,* 526 U.S. at 147-49; F.R.E. 702 advisory committee's note (a non-scientific opinion "should receive the same degree of scrutiny for reliability" as a purported scientist's opinion).

In *Daubert,* the Supreme Court listed a number of factors that a district court may consider in assessing the reliability of an expert opinion.[1] None of those factors are dispositive; some may not apply in a given context; and other factors not listed in *Daubert* may be relevant to whether an expert's testimony is sufficiently reliable and helpful. For example, the court may consider whether an expert "developed their opinions expressly for purposes of testifying," versus developing them naturally while engaged in their expertise. *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1317 (9th Cir. 1995). Another proper consideration is whether the witness's opinion accounts for obvious alternative explanations or major variables. *See Claar v. Burlington N.R.R.,* 29 F.3d 499 (9th Cir. 1994). The court may also consider "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion." F.R.E. 702 advisory committee's note, citing *Gen. Elec. Co. v. Joiner,* 522 U.S. at 146. Similarly, if an expert claims to apply an accepted method but renders opinions that other experts in the field do not share, "the district court should be wary that the method has not been faithfully applied." *Lust v. Merrell Dow Pharms., Inc.,* 89 F.3d 594, 598 (9th Cir. 1996).

> [T]he trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of

---

[1] The *Daubert* factors include: "(1) whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community." F.R.E. 702 advisory committee's note.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 3

the case [and] "any step that renders the analysis unreliable ... renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."

F.R.E. 702 advisory committee's note.

Expert testimony that has only "scant basis in the record" or "rests on unsupported assumptions and unsound extrapolation" should be excluded. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988); *see also Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) (stating that opinions based on "unsubstantiated and undocumented information" are not reliable and are inadmissible under *Daubert* and Rule 702). Where "unwarranted theories of law or assumptions of fact guide the expert ..., the evaluation will be set aside." *United States v. Honolulu Plantation Co.*, 182 F.2d 172, 178 (9th Cir. 1950). Further, an expert opinion is inadmissible if it "is connected to existing data only by the *ipse dixit* of the expert" or if the Court concludes "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." F.R.E. 702 advisory committee's note. Expert testimony "may not include unsupported speculation and subjective beliefs." *Greenawalt v. Sun City W. Fire Dist.*, 23 F. App'x 650, 652 (9th Cir. 2001); *see also Diviero*, 114 F.3d at 853 (same). And a party may not introduce a speculative or conjectural assertion "simply by finding an expert who is willing to assume its correctness." *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856–57 (9th Cir. 2019) (internal citations omitted).

Courts have cautioned that expert testimony can be "powerful and quite misleading." *Daubert*, 509 U.S. at 595. Therefore, a court "weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than over lay witnesses," *id.*

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 4

**10-ER-2260**

(internal citation omitted), and the Court is "not required to admit expert testimony every time a party is able to make the threshold *Daubert* showing." *United States v. Hicks*, 103 F.3d 837, 847 (9th Cir. 1996). Expert testimony may be excluded under Fed. R. Evid. 403, which provides that the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See also Hicks*, 103 F.3d at 847 (stating the court may exclude testimony that would "not materially assist the trier of fact, or [would] be better served through cross-examination or a comprehensive jury instruction").

## III.   ARGUMENT

### A. Mr. McDermott should be excluded as an expert witness because he has assumed the role of an advocate, and his opinions are unreliable and inadmissible.

"An expert's role is to assist the trier of fact by providing information and explanations; the expert's role is not to be an advocate." *Haldiman v. Cont'l Cas. Co.*, No. CV-13-736, 2014 WL 12670637, at *8 (D. Ariz. Aug. 26, 2014), aff'd, 666 F. App'x 612 (9th Cir. 2016).

> Attorneys are advocates, charged with selflessly serving their client's interests. Expert witnesses, on the other hand, are employed to assist the parties in their pretrial preparation, and if called to testify, to give their unbiased opinion in order to assist the trier of fact in understanding the relevant evidence.

*Stencel v. Fairchild Corp.*, 174 F. Supp. 2d 1080, 1085–86 (C.D. Cal. 2001). "When expert witnesses become partisans, objectivity is sacrificed to the need to win." *Cacciola v. Selco Balers, Inc.*, 127 F.Supp.2d 175, 184 (E.D.N.Y. 2001) (internal citation omitted).[2]

In *Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003), the court excluded an expert witness because the role the witness played in the case crossed the line from expert to advocate.

---

[2] This is especially true when the expert witness's compensation is contingent on the success of the claims. *See* Memorandum in Support of the Hawley Troxell Defendants' Motion to Exclude Plaintiff's Expert Witness Richard McDermott Re: Expert Contingency Fee, § III.A.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 5

The *Lippe* court noted that the expert, who (like Mr. McDermott) was a law professor, "carried out the traditional functions of a lawyer" in the case, such as providing legal advice and helping to anticipate, identify, evaluate and/or develop legal theories, legal arguments, facts necessary to support claims, defenses to the claims, responses to the defenses, and witness cross-examination topics. *Id.* at 584. The court found it would be improper to allow the witness to testify because:

> He functioned not just as an expert witness providing information, but he carried on the traditional functions of a lawyer-advocate.... [He] saw himself as "counsel" to plaintiffs' lawyers and he acted in a completely partisan manner. It would be most inappropriate to permit him now to testify as an expert witness about the very matters he helped develop as a lawyer-advocate.

*Id.* at 688.

The *Lippe* court also noted that these circumstances compounded another significant admissibility problem with the expert's intended testimony – that "he would be giving, in essence, a summation from the witness stand." *Id.* The court explained that:

> [The expert's] report and deposition testimony make clear [that he] was going to do his best to persuade the jury that the 'business purpose' of the transactions in question was an improper one – that defendants' "real purpose," their true motivation, in engaging in the transactions was to hide the assets from asbestos creditors. Plaintiffs envisioned that [the expert] would testify to and summarize the relevant facts (as to which he had no personal knowledge) and then opine—or, more accurately, argue—that defendants were intending to defraud asbestos claimants by engaging in fraudulent transactions. But this is what a lawyer does in his or her summation to the jury. This is not the function of an expert witness. [The expert's] views as to the credibility of defendants' witnesses and defendants' "real" motivations are simply not relevant.

*Id.* The *Lippe* court rejected the plaintiffs' attempt to salvage allegedly proper portions of the expert's opinions (which were set forth in his 129-page report, as well as his deposition testimony) because the court did not believe the expert would or could restrict his trial testimony to permissible areas. *Id.* The court reasoned that, given the expert witness's role in the case and the focus and substance of the opinions he disclosed, the court did not believe that the expert could "now sanitize from any testimony his views as to defendants' motivations and the

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 6

credibility of their witnesses" or "testify with the detachment and independence that one would expect from an expert witness offering views as a professional." *Id.*

The court in *GST Telecom., Inc. v. Irwin*, 192 F.R.D. 109, 110 (S.D.N.Y. 2000), reached a similar result. That case (like the present case) involved the business judgment of a corporate board and claims of legal malpractice asserted against corporate attorneys "for failing to overrule the Board of Directors, whom the lawyers served, by failing to restrain the votes and directions of the Board." *Id.* After noting that such claims against the corporate attorneys were misguided, and that the plaintiffs' experts "furnish[ed] assumptions and conclusions disregarding the authority and supremacy of the Board in order to opine malpractice of the attorneys,"[3] the court excluded the testimony of the plaintiffs' experts for invading the province of the court and jury and failing to meet the admissibility requirements of Rule 702. The court explained:

> It is evident that the contentious advocacy of the experts – illustrated by conclusions on the credibility of explanations regarding the business judgment of the board of directors, its officers and attorneys, in clearly expressed, biased viewpoints – do little to aid the triers of fact on the underlying transactions.

*Id.* at 110. The court further observed that:

> A fair reading and appraisal of the animated assessments of the experts suggests it would be virtually impossible for them to put aside their expressed previous judgments and render judgment simply on the corporate and professional conduct involved and its credibility and conformity with standards described by them. Testimony from an expert, predicated on "subjective belief" and "unsupported [factual] speculation" violates the Supreme Court's directions for expert testimony in *Daubert* ....

*Id.* at 111.

Like the experts in *Lippe* and *GST Telecom.*, Mr. McDermott should not be allowed to testify as an expert at trial because he has assumed the role of an advocate, in reality functioning

---

[3] Similarly, in this case, McDermott's opinions against the HT Defendants are based on arguments that they breached their duties to AIA by failing to control or remove the directors, despite clear Idaho law stating that the attorney-client relationship "'is one of agency' in which the client is the principal and the attorney is the agent." *Taylor v. McNichols*, 149 Idaho 826, 844, 243 P.3d 642, 660 (2010) (internal citations omitted).

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 7

as Mr. Bond's co-counsel and litigation strategy consultant. Mr. McDermott has been instrumental to Miesen and Mr. Bond in identifying and developing legal arguments and theories, anticipating and preparing rebuttals to defenses, and dealing with evidentiary issues. Tellingly, Mr. McDermott directly advocated for Miesen through the declarations he has filed in this case, and his report is written as a legal advocacy memorandum embodying the entire theory, basis, and strategy of Miesen's claims, complete with legal arguments and opinions touching upon all aspects of this litigation, including interpretation of allegedly applicable law, viability of claims, damage theories and availability of remedies (some of which are not even alleged in Miesen's complaint), discovery matters, evidentiary issues, burdens of proof, rebuttal of defenses, witness credibility and legal conclusions. Mr. McDermott intends to offer an improper and unreliable narrative of subjective, partisanship-skewed assessments of witnesses and evidence and legal conclusions couched as expert opinions. Any legitimate expert witness testimony he might offer is so badly tainted by advocacy that it cannot be "sanitized" (using the *Lippe* court's term) for jury consumption. Under *Daubert/Kumho Tire* and Rules 702 and 403, Mr. McDermott should not be permitted to offer his opinions to the jury. These issues are further explained below.

**a. Mr. McDermott functions and views himself as an advocate in this litigation.**

It appears that Mr. McDermott first became involved in litigation relating to issues raised in this case when Miesen's counsel Mr. Bond, who was then representing Reed Taylor, retained Mr. McDermott in August 2012 as an expert witness regarding third party opinion practice in *Reed Taylor v. Richard Riley, et al.*, Ada County Case No. CV-OC-2009-18868. *See* Ipsen Decl. ¶ 7. Since then, Mr. Bond has retained Mr. McDermott in at least three more cases, including this one, involving AIA's shareholders or creditors. *Id.* In this case, Mr. McDermott's opinions have

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 8

ballooned to cover all claims against all defendants, including directors, outside counsel, and a lender/creditor, even though he lacks experience in the relevant fields. *See, inter alia,* Ipsen Decl., Exh. B ("McDermott Depo") at 6:18-30:4; 35:16-40:17; 334:7-338:5; 360:24-361:8 (stating his "specialized knowledge" is his "knowledge as a lawyer in drawing inferences and conclusions from a set of facts," *i.e.*, his ability to draw legal conclusions that are inadmissible).[4]

What Mr. McDermott lacks in any apparent qualification to render the range of opinions he has disclosed, he seems to be making up for in eagerness to assist Mr. Bond, to whom Mr. McDermott has shown surprising professional devotion. In his deposition, Mr. McDermott testified to having unflinching trust in Mr. Bond. He said, "I have no reason to doubt any statement that comes from Rod Bond." McDermott Depo at 456:2-470:24-25; *see also* McDermott Report at n. 1965 (stating he is "certain" that Mr. Bond has given him all of the information he needs to express his opinions). Mr. McDermott explained that his relationship with Mr. Bond is "as trustworthy a relationship as I could imagine having with someone." *Id.* at 58:11-12. In fact, Mr. McDermott describes his relationship with Mr. Bond as "so satisfactory and of such a – of such a quality, [that Mr. McDermott] had no need to be concerned about retainers or sending periodic bills or anything," which has resulted in the accrual of a six-figure expert witness contingency fee generated over the course of fifteen months that has not been billed to or paid by Mr. Bond. McDermott Depo at 57:24-58:2; 62:5-10. (Mr. McDermott's self-described "unofficial" and "unorthodox" financial relationship with Mr. Bond is discussed in more detail in the HT Defendants' Motion to Exclude Plaintiff's Expert Witness Richard McDermott Re: Expert Contingency Fee.) Mr. McDermott even took an opportunity during his

---

[4] *See Kaufman v. Pfizer Pharm., Inc.*, No. 1:02-CV-22692, 2011 WL 7659333, at *9 (S.D. Fla. Aug. 4, 2011) (excluding expert's opinions as unreliable where the expert "generally takes a collection of facts, imputes [defendants'] motive and knowledge to those facts, and draws unsupported conclusions" unrelated to her experience); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F.Supp.2d 461, 469 (S.D.N.Y. 2005) (expert may not testify "for the purpose of constructing a factual narrative based upon record evidence").

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 9

deposition to compliment Mr. Bond's performance in this and related cases, stating that under the circumstances he believes Mr. Bond is doing "extremely well" in his litigation efforts,[5] McDermott Depo at 529:23-532:3, and that this lawsuit would not have been necessary if the HT Defendants had been "as diligent and conscientious as Mr. Bond." McDermott Report at 629.

In addition to viewing Mr. Bond as a close and trusted colleague, Mr. McDermott has directly and significantly assisted Mr. Bond in the prosecution of this action, taking an active advocacy role in developing pleadings, discovery and arguments to the Court on procedural and discovery motions. For example, Mr. McDermott's unusually deep involvement in discovery includes traveling from his home in New York to Chicago and also to Boise in 2019 to personally attend four depositions with Mr. Bond. *See* Ipsen Decl., Exh. C; *see also* Dkt. 812-2. Mr. McDermott has also reviewed all motions and other filings in this case as the matter has progressed. *See* Dkt. 403-2 ¶ 22; Dkt. 783-2 ¶ 40; *see also* McDermott Report at § III(a) (listing information reviewed). He personally engaged in the prosecution of the case by filing a number of so-called declarations that were, in substance, actually supplemental legal briefs that contained recitations of the case's procedural history, citations to authority, legal arguments, requests for relief from the Court, and other elements appropriate only for legal advocacy and briefing, and inappropriate for expert testimony. *See* Dkts. 194-6; 403-2; 419-16; 493-2; 758-2; 783-2; 829-1; 838-3. Examples include the following:

*Example 1:* Mr. McDermott assisted Mr. Bond's effort to obtain the Court's leave to file the Third Amended Complaint ("TAC") by submitting a declaration to ensure "the Court understands that the causes of action and damages at issue in this lawsuit are substantiated." Dkt.

---

[5] McDermott vouches for Mr. Bond's ethics and ability, seemingly unconcerned that the Idaho Supreme Court concluded in 2012 that Mr. Bond pursued a lawsuit against Hawley Troxell "frivolously, unreasonably, and without foundation," filed conclusory claims with insufficient factual allegations that also demonstrated "an often-incorrect understanding of the law," "ignored well-established Idaho precedent," and pursued an appeal "spuriously and without foundation, for harassment purposes only." *Taylor*, 149 Idaho at 844 & 848, 243 P.3d at 660 & 664.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 10

194-6 ¶ 24. To that end, Mr. McDermott argued that the letters Miesen relies upon for statutory standing satisfy Idaho Code § 30-1-742's derivative demand prerequisites to filing suit, accused John Taylor of making disingenuous arguments, inferred that John Taylor knew the basis for the claims listed in the derivative demand letters because he was involved in the alleged misconduct, stated that the Controlling AIA Defendants acted in bad faith and had conflicts of interest that rendered the business judgment defense inapplicable in this case, and opined that the length of the TAC was appropriate and necessary to cover the relevant history and claims. Dkt. 194-6 ¶¶ 21-23. As in *Lippe* and *GST Telecom.*, these declarations are inappropriate contentious advocacy and animated assessments relating to credibility and motivations of witness. These are arguments properly asserted by litigation counsel, not an expert witness.

*Example 2:* Mr. McDermott supported Mr. Bond's motion to continue the HT Defendants' motion for summary judgment. Dkt. 403-2. In his declaration, he stated he was familiar with the parties' discovery disputes regarding privilege, presumed to instruct the Court that the "attorney-client privilege is generally always waived" when a client sues an attorney, and argued it would be "unfair" to deny Miesen access to AIA's attorney-client communications. Dkt. 403-2 ¶ 26.

*Example 3:* Mr. McDermott supported Mr. Bond's effort to compel discovery by filing a declaration in which he argued that John Taylor could not assert privilege and work product protections, the Controlling AIA Defendants' knowledge could not be imputed to AIA due to alleged conflicts of interest and therefore as a matter of law AIA had not discovered allegedly unlawful activities and fraud, he needed additional discovery to "rebut certain affirmative defenses asserted by the defendants," the conflict waiver and joint defense agreements (which were reviewed *in camera* and approved by Judge Brudie in the *Reed Taylor* case) "are void and

of no legal force or effect," it was "grossly unfair" for GemCap to have information while denying it to Miesen, and the Defendants committed fraud, conspired with or aided and abetted each other, breached duties, and acted unlawfully. Dkt. 419-16 ¶¶ 34-40, 44 & 47 (footnotes omitted); *see also id.* at n. 1. He also "reserve[d] the right" to raise the crime/fraud exception to privilege, opined regarding the scope of John Taylor's privilege waiver, and made a myriad of other conclusory arguments regarding his interpretation of the law and AIA's governing documents, all with the goal of persuading the Court to adopt Miesen's position on a discovery motion addressing privilege and work product protections. *Id.* Mr. McDermott's role here was clearly as an advocate and is in no manner helpful to the trier of fact.

*Example 4:* Mr. McDermott opposed the HT Defendants' motion to modify Discovery Master Order No. 1 regarding categorical privilege logs, arguing that such logs are inappropriate because they do not provide sufficient information to allow Mr. McDermott to assess "whether privilege applies or has been waived" and "whether any disputed documents should be submitted to the Discovery Master or the Court for an *in camera* review." Dkt. 493-2 ¶ 4.

*Example 5:* In a declaration supporting Miesen's motion to modify the scheduling order to extend his rebuttal expert opinion disclosure deadline, Mr. McDermott took an adversarial stance and argued the procedural history of discovery. *See* Dkt. 758-2 ¶ 4.

*Example 6:* Mr. McDermott submitted a 50-page legal brief masquerading as a declaration to support Miesen's motion to compel. It contains a procedural history of this case, citations to legal authority, and legal arguments regarding his views on the fairness of privilege application, general counsel's scope of representation, the case of *Taylor v. Bell*, 185 Wash. App. 270, 340 P.3d 951 (2014), the adverse interest exception, selective and subject matter waivers of privilege, prejudice to Miesen, etc. Dkt. 783-2 ¶¶ 44-52, 54, 61 & 72-73.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 12

**10-ER-2268**

Mr. McDermott's declarations even directly petitioned the Court for procedural concessions and discovery orders as if he were plaintiff's counsel. *See* Dkt. 403-2 ¶ 29 (asking for a continuance of other witnesses' depositions so he could personally attend them); Dkt. 783-2 ¶ 77 (asking for additional time to prepare his report); Dkt. 829-1 ¶ 8 (same).

Mr. McDermott has also expressly stated his belief that his role in this case is to secure relief for Miesen. Mr. McDermott declared he needed to receive additional information in discovery "*[i]n order for me and Mr. Miesen to fully and fairly present his claims.*" Dkt. 783-2 ¶ 60 (emphasis added). Mr. McDermott saw it as his purpose to make AIA whole through successful prosecution of Miesen's claims. He declared that "[t]he successful prosecution of Miesen's claims in this Lawsuit is critical to making the AIA Corporations partially whole," and "Miesen's claims in this Lawsuit are the last hope of those former employees of ever receiving any payment for their retirement funds and the innocent common shareholders of ever receiving any dividends or distributions for their common shares." Dkt. 783-2 ¶ 56; *see also* Dkt. 783-2 ¶ 56 (similarly arguing that the Court should compel Defendants to produce documents "so that [Miesen] and I are able to fully and fairly consider the information … in an effort to make the AIA Corporations whole, especially when those corporations have been decimated"). In another declaration in support of a motion to compel, Mr. McDermott vouched that "Miesen's claims are meritorious (i.e., are colorable), not being pursued for any improper or unlawful purposes, and fully supported by the evidence and authorities." Dkt. 783-2 ¶ 55. He testified in his deposition that "[t]he opinions that I'm giving overall are quite favorable to AIA corporations, which they deserve." McDermott Depo at 296:5-7. Mr. McDermott also revealed that he sees himself as a type of legal consultant or advisor to Mr. Bond with respect to how to prosecute this action. For example, he declared that he had "consulted with Roderick Bond, including as to matters relative

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 13

to the discovery disputes," and that he was submitting the declaration "to further substantiate the Plaintiff's claims for purposes of showing good cause" for the Court to grant Miesen's motion to compel. Dkt. 419-16 ¶¶ 24-25.

Mr. McDermott's role as an advocate and as *de facto* co-counsel for Miesen in this litigation is further illustrated in his expert witness report. Mr. McDermott claims to have worked full-time for 15 months (between August 2019 and November 2020) working on this case and developing his opinions, including more than two weeks spent with Mr. Bond in person to work on the report together. McDermott Depo at 61:23-62:17; Change Sheet re: 304:9. Ultimately, Mr. Bond and Mr. McDermott co-wrote the 653-page report, with Mr. Bond having typed as much as half of it. McDermott Depo at 305:11-18. Mr. Bond's heavy involvement in the report is not surprising given that the tone, style and phraseology bear a remarkable resemblance to Mr. Bond's briefing. In any event, Mr. McDermott signed the report and adopted it as his own opinions. *See* McDermott Report; McDermott Depo at 344:19-20 (stating "[t]he opinions that I express are set forth in my report"); *see also id.* at 30:5-18; 31:7-8; 71:18-19; 94:14; 258:16; 290:15-16; 312:22-24; 318:19-21; 326:1-10; 329:22-23; 339:1-4 (testifying, when asked about his opinions, that the report "speaks for itself"). In the report, Mr. McDermott fails to restrict himself to proper subjects of expert witness opinion, and instead has approached the report as an attorney-advocate by laying out a roadmap of how he believes this litigation should be conducted by the parties and the Court, followed by his subjective interpretation of the evidence and his legal conclusions that the Defendants breached their duties and are liable for Miesen's alleged damages. *See* McDermott Report. His report comments on virtually every legal and evidentiary issue likely to unfold before and during trial, including his opinions regarding the law the Court should apply and its interpretation, the merit and viability of claims and defenses, interpretation

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 14

of evidence, legal issues such as statute of limitations tolling, the conduct of discovery in this case, legal conclusions the jury should reach, and widespread witness credibility assessments (which are further discussed in the following section of this Memorandum). This report is a legal memorandum prepared by an advocate, not the report of an expert witness assisting the jury.

### b. If permitted to testify, Mr. McDermott will give an improper summation of Miesen's claims, akin to a closing argument, from the witness stand.

Mr. McDermott's partisanship has often been on prominent display through his results-oriented approach and his propensity to indulge in and rely upon speculation and his own witness credibility assessments that unfairly frame the Defendants in a poor light.

### i. Mr. McDermott has employed a partisan, results-oriented approach to the development and expression of his opinions.

The first opinion Mr. McDermott disclosed in this case more than four years ago was the hyperbolic statement that "[i]n all my years of practice and experience, I have never seen such wide-spread corporate malfeasance and inappropriate conduct as was committed by the defendants in this lawsuit and/or covered up by them ...." Dkt. 194-6 ¶ 21. Since making that statement, he has consistently demonstrated that he does not view the case objectively and, instead, seeks to support his preconceived notions of liability. For example, he stated his belief that evidence he had not obtained and had never reviewed would "likely further support," "likely confirm," "likely establish" and "likely reveal" information supporting the claims against the HT Defendants. Dkt. 403-2 ¶ 28.a.-k. Similarly, he later argued in a declaration that he needed to review privileged and work product documents "in order to further establish" how the HT Defendants had breached their duties and committed torts. Dkt. 783-2 ¶ 59. In the same breath that Mr. McDermott stated he needed access to certain information to enable him to "develop, formulate, and articulate definitive opinions" regarding Miesen's claims, he incorporated all 181 paragraphs of factual *allegations* set forth in Miesen's Third Amended Complaint "*as support*

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 15

*for [his] opinions.*" Dkt. 419-16 ¶¶ 31-32 (emphasis added). Given that this is the way Mr. McDermott chose to operate as a purported expert witness, it was not surprising when he later engaged in speculation and drew improper inferences to reach the ill-conceived opinion that because the HT Defendants asserted privilege and work product protections, it appeared to be a "foregone conclusion" that the documents are "problematic" for their defenses, and that if the HT Defendants "have nothing to hide, they would have readily disclosed all of the privilege and work product information to Miesen because they would want him and this Court to know that they had nothing to hide." Dkt. 783-2 at 62-63; *see also id.* at ¶ 61 (similarly speculating that the HT Defendants would have disclosed privileged billing records if they "truly believed that there was a limited scope of representation or that they had not served as general counsel," and their continued withholding "suggests that they are concealing relevant information that does not support the existence of an alleged limited scope of representation").[6]

### ii. Mr. McDermott's improper assumptions and assessments regarding the parties' intent, motive, knowledge, state of mind and credibility should be excluded, along with any opinions tainted by them.

"Courts routinely exclude as impermissible expert testimony as to intent, motive, or state of mind." *Siring v. Or. State Bd. of Higher Educ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013).

> Expert testimony as to intent, motive, or state of mind offers no more than the drawing of an inference from the facts of the case. The jury is sufficiently capable of drawing its own inferences regarding intent, motive, or state of mind from the evidence, and permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful to the jury.

*Id.* (citing additional cases); *see also United States v. Idaho Cty. Light & Power Coop. Ass'n, Inc.*, No. 3:17-CV-00391-CWD, 2020 WL 1105091, at *13 (D. Idaho Mar. 6, 2020) (citing D. Nev. case that held expert's opinion would not assist the trier of facts to determine defendants'

---

[6] Not only is this opinion improper intent testimony and an inadmissible comment on an assertion of privilege, but McDermott fails to account for the court's order defining the HT Defendants' permissible disclosures. *See* Dkt. 466.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 16

intent); *Oracle Am., Inc. v. HP Enter. Co.*, No. 16-CV-01393-JST, 2018 WL 6511146, at *3 (N.D. Cal. Dec. 11, 2018) (an expert "may not opine about why any person in this case took or did not take a particular action or made or did not make a particular decision"); *Lippe*, 288 B.R. at 687 (stating an expert's opinions are irrelevant and inadmissible under Rule 702 if he "is offering a personal evaluation of the testimony and credibility of others or the motivations of the parties"); *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 565 (11th Cir. 1998) (excluding expert's "characterizations of documentary evidence as reflective of collusion, and his characterizations of particular bids as 'signals,'" because the jury was capable of determining whether to draw such conclusions without expert assistance).

Expert witnesses may not comment on the credibility of witnesses or offer expert opinions that are entrenched in or based upon their own assessments of witness credibility.

> [E]expert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony. The credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial.

*United States v. Scop*, 846 F.2d 135, 142 (2d Cir.), on reh'g, 856 F.2d 5 (2d Cir. 1988); *see also United States v. Rahm*, 993 F.2d 1405, 1413 (9th Cir. 1993) (stating "expert testimony to bolster or impugn the credibility of a witness is properly excluded"). In *Scop*, the court affirmed the exclusion of an expert witness who revealed on cross-examination that his "opinions were based on his positive assessment of the trustworthiness and accuracy of the testimony of the government's witnesses." *Id.* The *Scop* court explained its decision as follows:

> Our objection to testimony on credibility is not limited, however, to the prejudicial effect such testimony may have on the jury. Rather, we believe that such testimony not only should be excluded as overly prejudicial but also renders inadmissible any secondary opinion based upon it. Our holding, therefore, is that witness A may not offer an opinion as to relevant facts based on A's assessment of the trustworthiness or accuracy of witness B where B's credibility is an issue to be determined by the trier of fact. Were we to rule otherwise, triers of fact would be called upon either to evaluate opinion testimony in

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO
EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 17

ignorance of an important foundation for that opinion or to hear testimony that is otherwise inadmissible and highly prejudicial.

*Id.* Although an expert may base their opinion on inadmissible evidence, Fed. R. Evid. 703 "in no way purports to allow witnesses to assess the trustworthiness or accuracy of testimony given in the same case or to offer opinions based on such an assessment." *Id.*

Similarly, the Ninth Circuit has held that witness credibility is an issue for the jury, and expert testimony may not "improperly buttress" or "bolster" another witness's credibility. *United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985), overruled on other grounds by *United States v. Morales*, 108 F.3d 1031, 1035 n. 1 (9th Cir.1997). The *Binder* court excluded expert testimony where "[t]he jury in effect was impermissibly being asked to accept an expert's determination that ... particular witnesses were truthful." *Id.*; *see also United States v. Ravel*, 930 F.2d 721, 726 (9th Cir. 1991) (excluding expert testimony regarding the reasonableness of the defendant's subjective belief because it would confuse rather than help the jury); *United States v. Antone*, 412 F. App'x 10, 11 (9th Cir. 2011) (excluding expert testimony regarding false confessions that was reliable under *Daubert*, but risked usurping the jury's determination of witness credibility).

Mr. McDermott's descriptions of the "facts" of the case and the bases and contents of his opinions are replete with his personal assessments of the parties' intent, knowledge, state of mind, motives, and credibility. Presented here are merely a few of Mr. McDermott's numerous improper opinions.[7] *Example 1:* Mr. McDermott stated "there is a serious question as to [Mr. Riley's] credibility." McDermott Report at 608. *Example 2:* Mr. McDermott stated "there is no doubt that [the HT Defendants'] primary concern was John Taylor, whose interests they were most concerned in protecting." McDermott Report at n. 1689. *Example 3:* Mr. McDermott stated the HT Defendants' "engagement letters and certain other communications were nothing more

---

[7] Please see Ipsen Decl. ¶ 8, for additional examples.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 18

than a futile and ineffective effort to limit their responsibilities after the fact and disingenuously communicating with boards." McDermott Report at 628. *Example 4:* In contrast, Mr. McDermott opines favorably about the motives and credibility of witnesses he views as friendly to Miesen's case, stating for example that "Moran is an ethical attorney." McDermott Report at 566.

As illustrated by this record, Mr. McDermott, a lawyer and law professor who presumably should know the rules of evidence applicable to his testimony, has demonstrated time and again in his reports, deposition testimony, and declarations that he is incapable of following basic and vitally important evidentiary rules. Given the prevalence of his improper intent and credibility assessments and the confidence he places in his own ability to determine the "true facts,"[8] he is seemingly unable to recognize an improper attribution of motive, intent, credibility, or similar speculation and improper basis for his opinions, versus a proper assumption for an expert. Mr. McDermott's approach has consistently been one of partisanship and contentious advocacy unsuitable for an expert, and his determinations regarding witness credibility/truthfulness and the believability of evidence go to the root and substance of his opinions, which in turn address core issues pertaining to liability and damages in this litigation. His improper assessments and speculation are so intertwined with his opinions that he would not possibly be able to set aside and ignore those foundations of his testimony when he steps onto the witness stand at trial. Under these circumstances, a ruling prohibiting Mr. McDermott from offering inadmissible testimony at trial would be wholly ineffective. It further begs the question of what, after excluding his improper interpretations of evidence and the opinions based on those improper foundations, would be left for Mr. McDermott to testify about at trial? Like the

---

[8] McDermott has no personal knowledge of the facts of this case (McDermott Depo at 123:4-124:9), but he has adopted the allegations of Miesen's complaint as truth and views his own report as a thorough and accurate factual authority. *See* McDermott Depo at 274:8-277:19; *see also* McDermott Report at 567 (stating Miesen's claims against the HT Defendants "do not rest [on] any 'assumption,' but are grounded on the factual predicates therefor as detailed extensively in this Report").

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 19

expert's opinions that were excluded in *Lippe* and *GST Telecom.*, Mr. McDermott's opinions cannot be sufficiently scrubbed of his improper and partisan assessments, witness credibility determinations, and subjective beliefs regarding the evidence to render his testimony helpful to the jury. Nothing short of excluding Mr. McDermott as a witness will adequately protect the trial process and the defendants in this case.

## IV.   CONCLUSION

Mr. McDermott has stepped far beyond the bounds of acceptable expert witness testimony, and his opinions are inextricably rooted in and intertwined with his role as a zealous advocate for Miesen's case. Allowing Mr. McDermott to testify would be the equivalent of putting plaintiff's counsel on the witness stand. Mr. McDermott should not be allowed to don the robe of an expert, sit in the witness chair, and advocate to the jury by arguing, summarizing, and endorsing Miesen's theories of the case. That role is reserved for counsel in closing argument, and the integrity and fairness of a jury trial hinges on confining unabashed advocacy to attorney-presented closing argument. When an expert becomes essentially no more than a mouthpiece for plaintiff's counsel, witness exclusion is warranted, if not required. In this case, it is especially important that the Court prevent Mr. McDermott's testimony from serving as a proxy for plaintiff's counsel's arguments because plaintiff's counsel here, Mr. Bond, has been the driving force behind more than a decade of litigation relating to the AIA Corporations and years ago proclaimed himself to be a "star witness" against the HT Defendants with respect to claims he is now pursuing against them in this case.[9] For the reasons stated above, the HT Defendants respectfully request that the Court exclude Mr. McDermott's testimony from trial.

---

[9] As counsel for Reed Taylor in the underling *Reed Taylor* case, Mr. Bond accused the HT Defendants (his opposing counsel at the time) of the same wrongdoing Miesen eventually alleged in this case, including conflicts of interest, ethical breaches, aiding and abetting, and failing to take action against the Controlling AIA Defendants. When Mr. Bond was threatening to file a motion to disqualify the HT Defendants as defense counsel in the *Reed Taylor* case,

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 20

DATED this ___ day of January, 2021.

ELAM & BURKE, P.A.

By:_____
Loren C. Ipsen, Of the Firm
Joyce A. Hemmer, Of the Firm
Attorneys for Defendants Hawley Troxell
Ennis & Hawley LLP, Gary D. Babbitt,
D. John Ashby, and Richard A. Riley

## CERTIFICATE OF SERVICE

I hereby certify that on this ___ day of January, 2021, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons via email:

| | |
|---|---|
| Roderick C. Bond<br>rod@roderickbond.com<br>*Attorney for Plaintiff* | Daniel L. Glynn<br>dglynn@idalaw.com<br>*Attorneys for Michael W. Cashman, Sr., R. John Taylor, James Beck, Connie Taylor Henderson, Crop USA Insurance Services, LLC and Crop USA Insurance Agency, Inc.* |
| Alyson A. Foster<br>alyson@dempseyfoster.com<br>William E. Adams<br>bill@weadamslaw.com<br>*Attorneys for Intervenor GemCap Lending I, LLC* | Michael S. Bissell<br>mbissell@campbell-bissell.com<br>Tyler S. Waite<br>twaite@campbell-bissell.com<br>*Attorneys for Reed J. Taylor* |

_____
Loren C. Ipsen

Mr. Bond proclaimed that he would be a "star witness" against the HT Defendants as to those claims. Ipsen Decl., Exh. D. After losing his motion to disqualify the HT Defendants in the *Reed Taylor* case – the judge found "no violation of the ethical rules, the attorneys and law firms having acted within those rules by fully informing their clients regarding possible conflicts of interest, having obtained written waivers of those conflicts and having preserved any and all claims that may exist between the various Defendants," Ipsen Decl., Exh. E – Mr. Bond continued his misguided crusade against the HT Defendants in *Reed Taylor v. Gary Babbitt, et al.*, Nez Perce County Case No. CV-2008-1765 (the HT Defendants won their motion to dismiss and the appeal; fees and costs were assessed against Reed Taylor), *Reed Taylor v. Richard Riley, et al.*, Ada County Case No. CV-OC-2009-18868 (the HT Defendants won summary judgment and the appeal; fees and costs were assessed against Reed Taylor), and then again when he appeared in this case as counsel for Miesen.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO
EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 21

Jeffrey A. Thomson ISB #3380
jat@elamburke.com
Loren C. Ipsen ISB #1767
lci@elamburke.com
Joyce A. Hemmer ISB #7202
jah@elamburke.com
ELAM & BURKE, P.A.
251 East Front Street, Suite 300
P.O. Box 1539
Boise, Idaho 83701
Telephone:  (208) 343-5454
Facsimile:  (208) 384-5844

Attorneys for Defendants Hawley Troxell Ennis & Hawley LLP,
Gary D. Babbitt, D. John Ashby and Richard A. Riley

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, et al.<br><br>Defendants. | Case No.  1:10-cv-00404-DCN<br><br>DECLARATION OF LOREN C. IPSEN IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT |

I, Loren C. Ipsen, declare:

1.       I am one of the attorneys of record in this action for Defendants Hawley Troxell Ennis & Hawley LLP ("Hawley Troxell"), an Idaho limited liability partnership, Gary D. Babbitt, D. John Ashby, and Richard A. Riley (collectively referred to as the "Hawley Troxell Defendants").  I am over 18 years of age and competent to testify in court.

DECLARATION OF LOREN C. IPSEN IN SUPPORT OF THE HAWLEY TROXELL
DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD
MCDERMOTT - 1

2.      Attached hereto as **Exhibit A** is a true and correct copy of the November 1, 2020, report of Richard McDermott, omitting the exhibits thereto.

3.      Attached hereto as **Exhibit B** are true and correct excerpts from the transcript of Richard McDermott's deposition taken on November 5, 6 & 20, 2020, along with his Change Sheet.

4.      Attached hereto as **Exhibit C** are true and correct excerpts from deposition transcripts showing Richard McDermott's attendance in person at the depositions of Richard Riley, John Ashby, Charles Harper and James Gatziolis.

5.      Attached hereto as **Exhibit D** is a true and correct copy of an email from Mr. Bond dated July 17, 2008.

6.      Attached hereto as **Exhibit E** is a true and correct copy of Judge Brudie's order in the *Reed Taylor* case.

7.      Roderick Bond retained Richard McDermott for his opinion letter practice experience in three other cases relating to the AIA Corporations: *Donna Taylor v. R. John Taylor and AIA Services Corp. et al.*, Nez Perce County Consolidated Case Nos. CV-08-1150 & CV-13-1075; *Reed Taylor v. Richard A. Riley, et al.*, Ada County Case No. CV-OC-2009-18868; and *Reed Taylor v. Scott Bell, et al.*, King County (Washington) Case No. 12-2-10803-0-SEA.

8.      Below is a non-exhaustive list of opinions Mr. McDermott offered in his November 1, 2020, report (hereinafter "McDermott Report"):[1]

      a)      The officers and directors acted in bad faith. McDermott Report at 57.

---

[1] The citations to and descriptions of McDermott's opinions in this declaration are intended for illustrative purposes and to support the HT Defendants' motions to exclude Mr. McDermott as an expert witness, and they are in no way an endorsement of or agreement with McDermott's opinions described herein.

DECLARATION OF LOREN C. IPSEN IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 2

b)      John Taylor intentionally breached his duties of loyalty. McDermott Report at 104.

c)      "It is simply impossible to believe that Riley could not remember the restrictions contained with AIA Services' Amended Articles of Incorporation that also applied to its wholly owned subsidiary AIA Insurance." McDermott Report at 107.

d)      John Taylor "was incapable of accurately representing the facts based on what I have learned." McDermott Report at 119 (also stating John Taylor testified falsely about why he and others decided not to make CropUSA a subsidiary of AIA, which McDermott determined was false based on his interpretation of statements in the business plans and board meeting minutes he has reviewed).

e)      Reed Taylor's claims should be given "more credibility." McDermott Report at n. 1664.

f)      "Attorney Moran was an eminently qualified, ethical attorney who was willing to participate on the board at Donna Taylor's request... ." McDermott Report at 210.

g)      "[T]here can be no excuse by any of the Defendants that they believed any of the Controlling AIA Defendants were properly discharging their fiduciary duties, that they had any authority to act for the AIA Corporations or that the AIA Corporations were being operated lawfully and properly; the evidence proves otherwise." McDermott Report at 293.

h)      "I was presented with no credible evidence that Reed Taylor approved of making CropUSA a separate entity without any ownership by the AIA Corporations or any of the many related transactions (including the 2004 Series C Preferred Share purchase from CropUSA). I note that no credible or admissible evidence or information of wrongdoing on the part of Reed Taylor was provided in response to Miesen's interrogatories and requests for

DECLARATION OF LOREN C. IPSEN IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 3

10-ER-2280

production propounded upon the Controlling AIA Defendants. Rather, in my opinion, Reed Taylor was lied to and strung along for reasons separate and apart from Miesen and other AIA Services' Disinterested Shareholders (Reed Taylor was a secured creditor and not a shareholder of AIA Services). I find it unbelievable that Reed Taylor would consent to CropUSA being an independent company without him or the AIA Corporations owning at least the majority of CropUSA when AIA Services did not make its final payment on Reed Taylor's $1.5 million Down Payment Promissory Note until mid-2001 and his $6 million Promissory Note remained unpaid." McDermott Report at 308 (footnote omitted).

i)      "Upon my review of the documents, deposition transcripts and other evidence, I have not seen any credible efforts by the Controlling AIA Defendants, or Hawley Troxell Defendants, to properly review and ensure compliance with AIA Services' Amended Articles of Incorporation or the AIA Corporations' bylaws ...." McDermott Report at 309.

j)      "Cashman allegedly resigned as a Director of AIA Services on March 27, 2001 because AIA Services was unable to review its D&O Policy. ... However, I believe that he resigned because of the plan to take CropUSA." McDermott Report at n. 1403.

k)      "Mr. Pinkerton is less than ethical." McDermott Report at n. 1368.

l)      "While Attorney Bond would not divulge any information regarding his communications with Reed and Donna Taylor regarding his representation of them, he assured me that he complies with the Rules of Professional Conduct for all of his representation agreements, including by addressing all potential and actual conflicts of interest. I have no reason to believe that Mr. Bond did not comply with his duties to Reed Taylor and Donna Taylor. Indeed, in my interaction with Mr. Bond, he has been very ethical, honest, conscientious, and

DECLARATION OF LOREN C. IPSEN IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 4

**10-ER-2281**

thorough in his work. I would not hesitate to retain him for a legal dispute if I needed an attorney." McDermott Report at 395.

m)      Riley engaged in a "charade ... to sweep under the rug the Hawley Troxell Defendants' breached duties of care." McDermott Report at 469.

n)      "If the Hawley Troxell Defendants had ethically and independently looked at themselves and the Controlling AIA Defendants in the mirror, they would readily concluded that Attorney Moran and a receiver were precisely what the disabled AIA Corporations needed." McDermott Report at n. 1755.

o)      "I continue to believe and opine that the Hawley Troxell Defendants placed their interests in earning fees and protecting the interests of the Controlling AIA Defendants above the interests of the AIA Corporations in having unconflicted and independent representation as described in this Report thereby once again breaching their duties of loyalty and care owed to the AIA Corporations." McDermott Report at 524-25.

p)      The HT Defendants did not seek the petition for court appointed inquiry in good faith and it "was yet another disingenuous act to make [sic] to try to make it appear as though they were truly representing the best interests of the AIA Corporations" McDermott Report at 542-43.

q)      "Riley alleged that the matter was erroneously established under John Taylor's name, which is difficult to believe ...." McDermott Report at 545.

r)      "[I]it is clear that the goal of the Hawley Troxell Defendants was to disregard the rights and interests of the AIA Corporations and to engage in a course of conduct of breaching their duties of care and loyalty owed to the AIA Corporations by protecting the

DECLARATION OF LOREN C. IPSEN IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 5

interests of the Controlling AIA Defendants and Crop USA and shielding those Defendants' acts of intentional malfeasance ...." McDermott Report at 550.

s)     The HT Defendants intentionally avoided having independent counsel appointed, engineered improper standstill and tolling agreements, and suggested the reverse stock split in order to prevent claims against them for malpractice, breaches of fiduciary duties, conversion and other claims "from seeing the light of day." McDermott Report at 550.

t)     The "very reason" for the standstill and tolling agreements was to conceal "the myriad breaches of the duties of loyalty and care that the Controlling AIA Defendants committed against the AIA Corporations." McDermott Report at 548; *see also id.* at 463 (stating the agreements were designed to allow the Controlling AIA Defendants to stay in control).

u)     The HT Defendants misled Judge Brudie and McDermott's interpretation of records in this case contradict Mr. Babbitt's affidavit. McDermott Report at 554-55.

v)     The HT Defendants put their own interests ahead of the AIA corporations' interests when they opposed the receiver and obtained a stay of proceedings in the *Reed Taylor* case, and "[t]he self-serving cautioning by the Hawley Troxell Defendants about risks and 'strong recommendation' to obtain independent counsel were essentially window dressing." McDermott Report at 563; *see also id.* at n. 1969 (the petition for court appointed inquiry was "nothing more than 'window dressing'").

w)     "It appears ... the Hawley Troxell Defendants were willing to go to any length to have their actions and those of the Controlling AIA Defendants shielded from any type of out-side scrutiny." McDermott Report at 566.

DECLARATION OF LOREN C. IPSEN IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 6

x) "The Hawley Troxell Defendants merely wanted to keep the Controlling AIA Defendants in control so that no claims or action would be taken against the Controlling AIA Defendants or the Hawley Troxell Defendants." McDermott Report at 566.

y) "[I]t is beyond ironic that the Hawley Troxell Defendants suddenly became concerned about Mr. Moran's ability to perform his fiduciary duties as a Director of AIA Services. Even if he had been representing Reed Taylor while acting as a board member, Moran would have been infinitely more loyal to the AIA Corporations than the Controlling AIA Defendants because of the common interests of Reed Taylor and the AIA Corporations." McDermott Report at 566 (footnote omitted).

z) "As stated earlier in this Report, Moran is an ethical attorney who was willing to participate on the board at Donna Taylor's request. Donna Taylor's instructions to attorney Moran were to disregard her, act neutrally and look after the interests of the minority shareholders. It is difficult to imagine a more striking example of the application of a double standard." McDermott Report at 566.

aa) "[N]o director acting in good faith and with the requisite qualities of integrity, competence and prudence would have permitted the many transactions which severely harmed the AIA Corporations." McDermott Report at 567.

bb) McDermott has "meticulously verified" Reed Taylor's allegations. McDermott Report at 569.

cc) The HT Defendants' denial of the allegations of Reed Taylor's complaints "simply proves" that the HT Defendants "chose to represent the interests of the Controlling AIA Defendants rather than the interests of the AIA Corporations. Apparently, the Hawley Troxell Defendants pursued this course of conduct to earn the significant fees and protect their interests

DECLARATION OF LOREN C. IPSEN IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 7

(including to protect themselves from being sued for negligently preparing the Lancelot Legal Opinion for the unauthorized guarantee of the $15 million Lancelot Loan). There could be no other reason." McDermott Report at 569.

dd)     "The continuation of the misconduct of the Controlling AIA Defendants was not only foreseeable, under the circumstances, it was as certain to occur as night follows day." McDermott Report at 570.

ee)     "It is more probable than not that one or more of the Hawley Troxell Defendants who authored the Lancelot Loan Opinion would have been involved in, or at least aware of, that dialog." McDermott Report at 608.

ff)     Riley "intentionally concealed his alleged factual basis and legal reasoning from Reed Taylor until *after* Judge Brudie had ruled that the Stock Redemption Agreement was illegal." McDermott Report at 609 (emphasis original).

gg)     "Riley's lack of candor also misled Judge Brudie." McDermott Report at 609.

hh)     It is "unlikely" that the HT Defendants did not know about the conduct of the Controlling AIA Defendants before Reed Taylor "spelled it out in meticulous detail in the complaints." McDermott Report at 626.

ii)     Commenting on the version of the facts that he believes and endorses, McDermott stated, "you can't make this stuff up." McDermott Report at 627 (internal quotations omitted).

jj)     "Had the Hawley Troxell Defendants truly believed that those billing records supported their defense that they were not general counsel, I have no doubt that they

DECLARATION OF LOREN C. IPSEN IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 8

would have voluntarily produced them for their defense as they did for "selected" other privileged and work product documents." McDermott Report at n. 1968.

kk)    The efforts of the HT Defendants to disqualify Mr. Bond were "bordering on an obsession." McDermott Report at 628.

ll)    If the HT Defendants "truly believed that [the unredacted] billing records supported their defense that they were not general counsel, I have no doubt that they would have voluntarily produced them for their defense...." McDermott Report at n. 1968.

mm)    Based on merely being told (presumably by Mr. Bond) that attorney Jim Gatziolis "turned white like a ghost" when Mr. Moran told him AIA's articles of incorporation prohibited the Lancelot Loan, McDermott drew the inference that Mr. Gatziolis' firm and the HT Defendants "both apparently had a vested interest in trying to sweep under the carpet their negligence." McDermott Report at n. 1705.

nn)    Opining about what Mr. Riley knew to conclude that the HT Defendants "may have held back" the illegality defense. McDermott Report at n. 1766.

oo)    The HT Defendants gave certain advice with an intent " to paper over more of their breached duties of care." McDermott Report at 580-81.

pp)    "[T]he Hawley Troxell Defendants did not ask Mr. Remele to express an opinion on the Hawley Troxell Defendants' suggested reverse stock split because no favorable opinion could be given." McDermott Report at 581.

qq)    Mr. Riley made deposition changes with the intent to create a basis for Mr. Remele's opinions regarding Reed Taylor's "creditor claim." McDermott Report at 587.

rr)    Accusing the HT Defendants of "disingenuously communicating" with the AIA Defendants. McDermott Report at 627.

DECLARATION OF LOREN C. IPSEN IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 9

9.      After entry of the order at Dkt. 1001, Mr. Bond informed me in an email dated

September 28, 2020, that he had chosen not to depose the HT Defendants' expert witnesses.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF IDAHO THAT THE FOREGOING IS TRUE AND CORRECT.

*2021. 01. 29 Boise, Idaho*
Date and City and State Signed

Loren C. Ipsen

## CERTIFICATE OF SERVICE

I hereby certify that on this ___29___ day of January, 2021, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons via email:

| | |
|---|---|
| Roderick C. Bond<br>rod@roderickbond.com<br>*Attorney for Plaintiff* | Daniel L. Glynn<br>dglynn@idalaw.com<br>*Attorneys for Michael W. Cashman, Sr., R. John Taylor, James Beck, Connie Taylor Henderson, Crop USA Insurance Services, LLC and Crop USA Insurance Agency, Inc.* |
| Alyson A. Foster<br>alyson@dempseyfoster.com<br>William E. Adams<br>bill@weadamslaw.com<br>*Attorneys for Intervenor GemCap Lending I, LLC* | Michael S. Bissell<br>mbissell@campbell-bissell.com<br>Tyler S. Waite<br>twaite@campbell-bissell.com<br>*Attorneys for Reed J. Taylor* |
| David R. Lombardi<br>drl@givenspursley.com<br>*Discovery Master* | |

Loren C. Ipsen

DECLARATION OF LOREN C. IPSEN IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 10

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

DALE L. MIESEN, an individual)
who is a shareholder and who )
is also bringing this action )
on behalf of and/or in the   )      Case No. 1:10-CV-00404-DCN-CWD
right of AIA Services         )
Corporation and its wholly    )
owned subsidiary AIA          )
Insurance, Inc.,              )
                             )
          Plaintiff,          )
                             )
vs.                           ) REMOTE DEPOSITION OF RICHARD T. McDERMOTT
                             )
                             )           VOLUME I
CONNIE TAYLOR HENDERSON, an   )
Individual; JOLEE K. DUCLOS,  )        (PAGES 1-577)
An individual; HAWLEY TROXELL )
ENNIS & HAWLEY, LLP, an Idaho )      November 5 - 6, 2020
Limited liability partnership )
GARY D. BABBITT, an           )
Individual; D. JOHN ASHBY, an )
Individual; RICHARD A. RILEY, )
An individual; MICHAEL W.     )
CASHMAN SR., an individual;   )
JAMES BECK, an individual;    )
R. JOHN TAYLOR, an individual )
CROP USA INSURANCE AGENCY,    )
INC., an Idaho corporation;   )
AIA SERVICES CORPORATION, an  )
Idaho corporation; AIA        )
INSURANCE, INC.; an Idaho     )
Corporation; CROP USA         )
INSURANCE SERVICES, LLC; an   )
Idaho limited liability       )
Company; and GEMCAP LENDING   )
I, LLC, a Delaware limited    )
Liability company,            )
                             )
          Defendants,         )
                             )
And all related actions.      )
                             )
                             )
_____) Reported by:
                             ) Andrea J. Wecker, CSR #716, RDR, CRR, CRC

Associated Reporting & Video                                1
(208) 343-4004

EXHIBIT B

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

**Page 2**

REMOTE DEPOSITION OF RICHARD T. McDERMOTT
VOLUME I

BE IT REMEMBERED that Volume I of the remote deposition of RICHARD T. McDERMOTT was taken via videoconference by the Defendants before Associated Reporting & Video, Andrea J. Wecker, Court Reporter and Notary Public in and for the County of Ada, State of Idaho, on Thursday and Friday, the 5th and 6th days of November, 2020 in the above-entitled matter.

APPEARANCES (Remotely):

For the Plaintiff:  RODERICK BOND LAW OFFICE.
By: Roderick C. Bond, Esq.
601 108th Avenue Northeast
Suite 1900
Bellevue, Washington 98004
Telephone: (425) 591-6903
Facsimile: (425) 321-0343
rod@roderickbond.com

For the Defendants, Crop USA, James Beck, Michael W. Cashman Sr., Connie Taylor Henderson, and R. John Taylor:
JONES WILLIAMS FUHRMAN GOURLEY
By: Daniel Loras Glynn, Esq.
225 North 9th Street
Suite 820
Boise, Idaho 83702
Telephone: (208) 331-1170
Facsimile: (208) 331-1529
dglynn@idalaw.com

**Page 3**

APPEARANCES (Contd.)
For the Defendants, Hawley Troxell Ennis & Hawley, Richard A. Riley, D. John Ashby, and Gary D. Babbitt:

BYRNES KELLER CROMWELL
By: Bradley S. Keller, Esq.
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522
bkeller@byrneskeller.com

For the Defendant, GemCap Lending I, LLC:

GEMCAP SOLUTIONS
By: William E. Adams, Esq.
24955 Pacific Coast Highway
Suite A202
Malibu, CA 90265
Telephone: (424) 216-5457
wadams@gemcapsolutions.com

Also Present:     Loren C. Ipsen
Joyce A. Hemmer
Craig Meadows
Jack R. Little
Richard Ellis
David Ellis
Richard A. Riley

**Page 4**

I N D E X
E X A M I N A T I O N

RICHARD T. McDERMOTT                    PAGE

By: Mr. Keller.................................6
Mr. Adams................................301
Mr. Glynn................................470

E X H I B I T S
NO.
1. 2/7/2001 Letter to R. John Taylor from
Hawley Troxell (9 pages)

3. 5/7/2004 Letter to R. John Taylor from
Hawley Troxell (3 pages)
6. 11/1/2007 Amended Engagement Agreement
(9 pages)

8. 6/16/2008 Hawley Troxell Invoice No. 205287
(3 pages)
10. 3/28/2007 AIA Services Special Meeting
Minutes (1 page)

17. Typewritten Chronology of Events
(4 pages)
59. 4/27/2000 Lewiston Tribune Article
(2 pages)

60. State of Idaho v. Roderick C. Bond
Criminal Complaint (3 pages)
61. 12/2/1991 Idaho Transportation Department
Motor Vehicle Investigation (2 pages)

62. In Re: Bond, Roderick C. Complaint for
Nondischargeability (20 pages)

**Page 5**

EXHIBITS (Contd.)
63. 2/2/2015 GemCap v. Crop USA Civil Minutes
(8 pages)

64. Book Excerpt, Section 4.11 Corporate or
Entity Power (2 pages)
65. Book Excerpt, Section 4.12 Due Authorization,
Execution, and Delivery (2 pages)

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

**Page 6**

PROCEEDINGS

RICHARD T. McDERMOTT, a witness having been first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

(Deposition exhibits were marked prior to the beginning of the deposition)

EXAMINATION

BY MR. KELLER:

Q.   Could you state your name and your address, please.

A.   My name is Richard T. McDermott, and my current address is 4 Meher, M-E-H-E-R, Circle, Woodstock, New York, 12498.

Q.   Professor, will you --

You are a lawyer?

A.   I am still a lawyer, Mr. Keller.

Q.   Are you licensed in New York?

A.   Yes, I am.

Q.   Were you an actual practicing lawyer?

A.   Yes, I was.

Q.   Are you currently a practicing lawyer?

**Page 7**

A.   Yes.

Q.   In your practice as a lawyer, have you ever represented an Idaho closely-held entity; that is, an entity incorporated under Idaho law?

MR. BOND: Object to the form.

THE WITNESS: I have not represented a closely-held company incorporated under Idaho law. I have represented many closely-held corporations.

Q.   (BY MR. KELLER) I'm sorry if my question was unclear, Professor. I was very specifically asking about closely-held entities incorporated under Idaho law.

Have you ever represented such an entity?

MR. BOND: Object to the form.

THE WITNESS: No. No.

Q.   (BY MR. KELLER) Thank you, sir.

Have you ever in your practice of law as a practicing lawyer provided legal advice to a closely-held entity incorporated under Idaho law?

MR. BOND: Object to the form.

THE WITNESS: How do we define "closely"?

Q.   (BY MR. KELLER) Not publicly traded.

A.   I represented the controlling shareholder of an Idaho corporation who acquired

**Page 8**

the remaining residual equity interest.

Q.   What company was that?

MR. BOND: Object to the form.

THE WITNESS: It was a company called Golconda Corporation.

Q.   (BY MR. KELLER) Is that a company that had been acquired by Cerro Corp, C-E-R-R-O?

A.   That is correct.

Q.   Did you represent Cerro Corp in connection with the tender offer for Golconda?

MR. BOND: Object to the form.

THE WITNESS: I guess my answer, yes or no, is not privileged, so the answer is yes.

Q.   (BY MR. KELLER) In connection with that transaction, there were no issues under a private contract under Idaho law. It was all dealing with federal securities law, right?

MR. BOND: Object to the form.

THE WITNESS: I think that would be subject to attorney/client privilege.

Q.   (BY MR. KELLER) Are you sure? Because you answered the question when you were asked it in the deposition in another case.

A.   Mr. Keller, if you are referring to statements that I've made in a declaration or a

**Page 9**

deposition, I need to see the context in which the statement was made.

Q.   I just want to make sure, you're going to assert the privilege for that answer right now? And the question is whether your engagement for Cerro Corp, was that a public tender governed by federal securities laws rather than a private contract under Idaho law?

MR. BOND: Object to the form.

THE WITNESS: The answer to that question is yes.

Q.   (BY MR. KELLER) Thank you, sir.

A.   Mr. Keller, it's not my privilege, of course. I'm just concerned about speaking about clients or former clients without the clients' consent. That's my only concern.

Q.   In connection with the work that you did on behalf of a controlling shareholder of Golconda, was there any litigation over that?

MR. BOND: Object to the form.

THE WITNESS: Not that I recall.

Q.   (BY MR. KELLER) Was it a controlling shareholder who was buying out the remaining equity owners in the company?

MR. BOND: Object to the form.

Richard T. McDermott (Volume I)                                    November 5 - 6, 2020

Page 10

THE WITNESS: Yes. The controlling shareholder had acquired the shares in a tender offer subject to the '34 Act.

Q. (BY MR. KELLER) Was that transaction essentially controlled by the '34 Act?

MR. BOND: Object to the form.

THE WITNESS: It was a mutual -- mutually-agreed transaction, but --

I would say yeah. The answer --

Can you repeat that question, Mr. Keller, just so I --

Q. (BY MR. KELLER) The question was: Was that transaction essentially controlled by the 1934 Securities Act?

A. Yes.

MR. BOND: Same objection.

THE WITNESS: Oh, sorry, Rod.

Yes.

MR. BOND: Please, Dick, give me a second to --

THE WITNESS: I'm sorry.

Q. (BY MR. KELLER) In your practice as a practicing attorney, have you ever handled any prior business transactions that were controlled by Idaho law?

Page 11

MR. BOND: Object to the form.

THE WITNESS: Other than the Cerro Golconda transaction, I don't recall any others.

Q. (BY MR. KELLER) And when you say "the Cerro Golconda transaction," are you talking about the public tender offer that Cerro made for Golconda?

MR. BOND: Object to the form.

THE WITNESS: Yes, in part.

Q. (BY MR. KELLER) Okay. What is your professional prior experience as a practicing lawyer providing corporate governance advice to an Idaho company?

MR. BOND: Object to the form.

THE WITNESS: I don't recall giving any corporate governance advice to an Idaho corporation other than in connection with the second step acquisition of Golconda by Cerro.

Q. (BY MR. KELLER) In that transaction, were you providing advice to the company or to the controlling shareholder or both?

MR. BOND: Object to the form.

THE WITNESS: My client was the --

My primary client was, of course, the controlling shareholder. I was working in

Page 12

conjunction with an attorney representing Golconda Corporation.

Q. (BY MR. KELLER) Again, I apologize if my question was unclear.

I asked you who your client was. Was your client the corporation and were you advising the corporation in that transaction regarding corporate governance matters?

MR. BOND: Object to the form.

THE WITNESS: My client in the transaction was Cerro Corporation, who had become the controlling shareholder as a result of the '34 Act tender offer.

Q. (BY MR. KELLER) So were you representing the controlling shareholder or were you representing the entity?

MR. BOND: Object to the form.

THE WITNESS: I was representing the controlling shareholder, Cerro Corporation.

Q. (BY MR. KELLER) Thank you, sir.

Was the entity represented by separate counsel?

MR. BOND: Object to the form.

THE WITNESS: Yes, and we worked closely together.

Page 13

Q. (BY MR. KELLER) The fact that you worked closely together didn't make you counsel for the entity. You still remained counsel for the controlling shareholder, right?

MR. BOND: Object to the form.

THE WITNESS: That is correct.

Q. (BY MR. KELLER) Thank you, sir.

As a practicing lawyer, do you have any prior experience litigating a case in the Idaho courts?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Have you ever been licensed to practice law in any state other than New York?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Prior to your involvement with Mr. Bond, had you had any prior experience as a practicing lawyer with issues concerning the standard of care of a reasonably prudent Idaho attorney?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Prior to working with

Richard T. McDermott (Volume I)                                    November 5 - 6, 2020

Page 14

Mr. Bond, had you had any prior experience as a practicing attorney concerning standard of care issues involved in Idaho cases defending against creditor claims?

MR. BOND: Object to the form.

THE WITNESS: Could you repeat the question, Mr. Keller, please?

MR. KELLER: Andrea, would you mind.

(Record read by reporter.)

MR. BOND: Same objection.

THE WITNESS: No.

Q. (BY MR. KELLER) Prior to working with Mr. Bond as a practicing attorney, had you had any prior experience working with issues involving the standard of care of Idaho lawyers involved in prosecuting or defending shareholder derivative cases governed by Idaho law?

MR. BOND: Object to the form.

THE WITNESS: No, but I found nothing that indicates that Idaho is substantially different than any other jurisdiction --

Q. (BY MR. KELLER) I'm sorry --

A. -- in that respect.

Q. And I apologize, Professor. If you could just answer my question, it would be helpful.

Page 15

And I apologize --

A. Mr. Keller --

Q. Excuse me. Don't interrupt me, sir. I apologize if it was unclear. The question is very straightforward.

Prior to working with Mr. Bond, had you had any prior experience as a practicing lawyer working on standard of care issues involving cases prosecuting or defending shareholder derivative claims where the case was governed by Idaho law?

MR. BOND: Same objection and harassing the witness, asking the same question.

Go ahead.

THE WITNESS: Mr. Keller, obviously you're entitled to ask your questions. I'm trying to give you as complete an answer as I can.

My answer is no.

Q. (BY MR. KELLER) Thank you, sir.

Prior to working with Mr. Bond, had you on any occasion in your professional practice as a lawyer had a need to look into the Idaho Rules of Professional Conduct?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Have you received any

Page 16

honors or awards for any work done in the area of legal ethics or the Rules of Professional Responsibility governing lawyers?

MR. BOND: Object to the form.

THE WITNESS: Not as such.

Q. (BY MR. KELLER) Are you familiar with the phrase "the law of lawyering"?

A. Yes.

Q. What does it mean to you?

A. It means the legal principles that are applicable to the conduct of lawyers while they are engaged in the practice of law.

Q. Have you ever received any honors or awards for any work or activities of yours in the area of the law of lawyering?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Have you ever received any honors or awards for any work done in the area concerning the standard of care for lawyers defending shareholder derivative claims?

MR. BOND: Object to the form.

THE WITNESS: Did I receive any honors in that respect, Mr. Keller?

Q. (BY MR. KELLER) Honors or awards, sir.

Page 17

MR. BOND: Same objection.

THE WITNESS: No.

Q. (BY MR. KELLER) Are you thinking, Professor?

A. I answered no.

Q. Oh, I'm sorry. I missed your answer. Thank you.

Have you received any honors or awards for any work done in the area of the standard of care regarding attorneys defending predator claims on behalf of a corporation?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Have you received any honors or awards for any of your work or activities in the area of fiduciary duties owed by directors?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Have you received any honors or awards for any work on your part in connection with attorneys' advice to boards of directors in closely-held companies?

MR. BOND: Object to the form.

THE WITNESS: Again, honors or awards, Mr. Keller?

**Associated Reporting & Video**
**(208) 343-4004**

**14 to 17**

**10-ER-2292**

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

Page 18

Q. (BY MR. KELLER) Yes, sir.

A. No.

MR. BOND: Same objection.

Q. (BY MR. KELLER) Have you ever been a speaker at any CLE or professional industry meetings about issues concerning attorney ethics or the Rules of Professional Responsibility?

MR. BOND: Object to the form.

THE WITNESS: Yes, insofar as they relate to the rules applicable to the rendering of and receipt of third-party legal opinions.

Q. (BY MR. KELLER) Other than with respect to the receipt of third-party legal opinions, have you ever been a speaker at any CLE where the focus of your talk concerned attorney ethics and the rules of responsibility governing attorneys?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Have you ever been a speaker at any CLE or professional gatherings where the focus of any presentation you gave concerned the law of lawyering?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Have you ever been a

Page 19

speaker at any CLE or professional meetings where the focus of the presentation concerned the standard of care governing attorneys providing legal services to closely-held entities?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Have you ever given any speeches or talks at any CLEs or professional organizations where the focus of your presentation concerned the fiduciary duties owed by directors?

MR. BOND: Object to the form.

THE WITNESS: Mr. Keller, I have done so in --

Could you please repeat the question?

Q. (BY MR. KELLER) The question is concerning the focus of the presentation.

A. Correct.

Q. Have you ever been a speaker at any CLEs or professional organization meetings where the focus of your presentation concerned the fiduciary duties owed by directors?

MR. BOND: Object to the form.

THE WITNESS: Not to professional organizations or in a CLE context.

Q. (BY MR. KELLER) Have you ever been a

Page 20

speaker at any CLEs or professional organizations where the focus of your presentation concerned advising boards of directors in closely-held corporations?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) New York State Bar Association has a committee on professional ethics, correct?

A. I believe so, yes.

Q. Have you ever served on it?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Have you ever even attended one of their meetings?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Do you agree that the Idaho Rules of Professional Conduct by themselves do not establish a standard of care for attorneys?

MR. BOND: Object to the form.

THE WITNESS: I'm not aware of any judicial decision saying that, Mr. Keller.

Q. (BY MR. KELLER) Do you agree that a violation of an Idaho Rule of Professional Conduct

Page 21

of itself does not create a presumption that any legal duty has been breached?

MR. BOND: Object to the form. Calls for a legal conclusion.

Go ahead.

THE WITNESS: That is a question that is difficult, if not impossible, to answer in isolation.

I mean, that is a very -- that --

An issue like that can be a very factually intensive issue, Mr. Keller.

Q. (BY MR. KELLER) Well, let me try it one more time, and if your answer is the same, that's fine.

Do you agree that the violation of a rule of professional conduct should not itself give rise to a cause of action against a lawyer and it should not create any presumption that a legal duty has been breached?

MR. BOND: Object to the form.

THE WITNESS: I will stay with my prior answer, Mr. Keller.

Q. (BY MR. KELLER) One of the things I asked you to have available to you for this deposition were the Rules of Professional Conduct

**Associated Reporting & Video**                    **18 to 21**
**(208) 343-4004**

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

**Page 22**

that were --

A. Yes.

Q. Do you have that?

A. Yes.

Q. Why don't you put those right next to you.

A. Just a minute. It's a little more complicated than that. I wish I --

By the way, Mr. Keller, I just wanted to say that the only reason that we're doing this by Zoom --

Q. Professor McDermott, can we just go forward with the deposition? Could you take out the Rules of Professional Responsibility, please.

A. Yes, but I think patience has to be a watch word here today since we're on Zoom. But I will do that, Mr. Keller.

Q. I want you to turn to Comment No. 20 right in the beginning of the rules in the preamble.

(Discussion held off the record.)

THE WITNESS: All right, Mr. Keller. I'm there.

Q. (BY MR. KELLER) All right. Are you at No. 20 in the preamble to the Idaho Rules of

**Page 23**

Professional Conduct that were in effect during the time that Hawley Troxell was representing AIA?

A. I'm getting there.

19, 20.

Q. Okay.

A. Yes.

Q. Why don't you read the first sentence to us.

A. "Violation of a rule should not itself give rise to a cause of action against a lawyer, nor should any presumption in such a case that a legal duty has been breached."

Q. Do you agree with that?

A. I think it's consistent with what my answer was. "Should not itself."

Q. I'm sorry, sir, if my question was unclear.

Do you agree with that --

A. Your question was not unclear.

Q. Do you agree with that statement, Professor?

A. Yes.

Q. All right. Now, if you skip the next sentence, there's a sentence that says, "They are."

Do you see that?

**Page 24**

A. Yes.

Q. Could you read that sentence to us.

A. "They are not designed to be a basis for civil liability."

Q. And the "they" is referring to what, sir?

MR. BOND: Object to the form.

THE WITNESS: The rules.

Q. (BY MR. KELLER) The Rules of Professional Responsibility, right?

A. Correct.

Q. Thank you.

Have you ever been qualified by any Court in any jurisdiction to give expert opinions on attorney ethics or the law of lawyering?

MR. BOND: Object to the form.

THE WITNESS: I have been qualified as an expert in cases where those issues existed.

Q. (BY MR. KELLER) Have you ever been qualified by any Court in any jurisdiction for you to give expert opinions on attorney ethics or the law of lawyering?

MR. BOND: Object to the form.

THE WITNESS: Not as such.

Q. (BY MR. KELLER) Thank you, sir.

**Page 25**

Do you have any prior experience serving as a director of a company that markets or sells health or group health insurance policies?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Do you have any prior experience serving as a director of a company that markets or sells life insurance?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Do you have any prior experience serving as a director of a company that markets or sells crop insurance?

MR. BOND: Object --

THE WITNESS: No.

Q. (BY MR. KELLER) Do you have any prior experience serving as a director of a company that markets or sells any insurance product?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Do you have any prior experience as a practicing attorney advising the board of directors of a company whose major line of business is marketing or selling health, individual, or group insurance policies?

**Richard T. McDermott (Volume I)**    **November 5 - 6, 2020**

Page 26

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Do you have any prior experience as a practicing attorney advising boards of directors of a company whose major line of business is marketing or selling life insurance?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Do you have any prior experience as a practicing attorney advising a board of directors of a company whose major line of business is marketing or selling crop insurance?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Do you have any prior experience as a practicing attorney advising boards of directors of a company whose major line of business is marketing or selling insurance products?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) As a practicing attorney, do you have any prior experience determining state insurance regulatory requirements for marketing or selling crop insurance?

Page 27

MR. BOND: Object to the form.

THE WITNESS: Could you --

Mr. Keller, just so I'm clear, could you just repeat the lead-in to your question? "Do you have any" --

Q. (BY MR. KELLER) As a practicing attorney, have you had any prior experience determining state insurance regulatory requirements for marketing or selling crop insurance?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) As a practicing attorney, have you had any prior experience determining any state insurance financial regulatory requirements for marketing or selling crop insurance?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) I'm going to broaden the question just a little bit, Professor.

Have you had any prior experience before this case in any capacity concerning determining state insurance regulatory requirements for marketing and selling crop insurance?

MR. BOND: Object to the form. Also vague

Page 28

and ambiguous.

Go ahead.

THE WITNESS: No.

And, Mr. Keller, I'd prefer that you refer to me as "Mr. McDermott" rather than "professor." I'm — not that I'm all ashamed to be a professor. I'm an adjunct at Fordham. But my primary career for 40 years has been as a practicing lawyer.

Q. (BY MR. KELLER) Prior to your engagement by Mr. Bond, had you had any prior experience that involved determining any state insurance financial regulatory requirements for marketing or selling crop insurance?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Prior to the last couple of months in the work that you did for Mr. Bond, had you had any prior experience as a practicing attorney or otherwise regarding determining the financial requirements necessary to be eligible to be a managing general agent for an insurer that has a standard reinsurance agreement with the Risk Management Agency?

MR. BOND: Object to the form.

Page 29

THE WITNESS: I would just -- if I could, Mr. Keller, amend the question slightly. You said the last two months or several months.

Is that the time period that you're interested in?

Q. (BY MR. KELLER) I said prior to the last several months.

A. So --

Q. Let me start over.

A. My only concern, Mr. Keller, is that I believe I have been involved in that issue for more than just the past several months. That's my only hesitation.

Q. All right. I'll rephrase the question then, sir.

Prior to your engagement by Mr. Bond, had you had any prior experience as a practicing attorney or otherwise that involved trying to determine the financial requirements for a company to be eligible to be a managing general agent for an insurer that has a standard reinsurance agreement with the Federal Risk Management Agency?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) Do you have any prior

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

Page 30

experience running or managing an insurance agency of any kind?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) We're going to get to this in a little more detail, and this may be -- I'll try and be fair, but I want to see if I can just summarize one aspect of your opinions.

Is it your opinion, sir, that Hawley Troxell should have advised AIA to pursue claims against John Taylor?

MR. BOND: Object to the form.

THE WITNESS: Mr. Keller, the opinions I've expressed in my reports speak for themselves. So I'm hesitant to make a statement like that in a vacuum.

Q. (BY MR. KELLER) Well, I think --

A. I think it speaks for itself.

Q. I'm sorry. If that's how you're going to answer all the questions today, Professor, it's going to be a real short deposition because I don't have to look at a 600-page report. You're a witness. You're either going to testify to your opinions today or you're not. So let's go on.

Is one of your opinions that Hawley

Page 31

Troxell should have advised AIA to pursue claims against John Taylor?

MR. BOND: Object to the form.

THE WITNESS: Well, Mr. Keller, I don't know if it's going to be a long day or a short day, but let me try it this way.

Bearing in mind what I said before about what my report — that my report speaks for itself.

Q. (BY MR. KELLER) I'm going to ask it one more time.

Is one of your opinions that Hawley Troxell should have advised AIA to pursue claims against John Taylor?

MR. BOND: Object to the form.

THE WITNESS: Hawley Troxell, in my opinion, as stated in my report, had several options that they could have taken under the circumstances.

Q. (BY MR. KELLER) Is it your opinion that the standard of care and the fiduciary duties of loyalty required that Hawley Troxell advise AIA to pursue claims against John Taylor?

MR. BOND: Object to the form.

THE WITNESS: Hawley Troxell had a number of options examining the allegations in Reed Taylor against AIA Services themselves and deciding for

Page 32

themselves what advice to give the AIA corporations.

They could have -- they could have suggested that an independent investigation be conducted by somebody not previously affiliated with the AIA corporations or John Taylor or the other controlling AIA defendants.

So that's why I'm hesitant just to -- just to sit here and say, "Oh, they should have advised them to sue John Taylor." It's much more complicated than that.

Q. (BY MR. KELLER) Okay. Is it your opinion that one of the options that Hawley Troxell -- that the standard of care and duties of loyalty required Hawley Troxell to consider is advising AIA to pursue claims against John Taylor?

A. Under the circumstances of this case and the allegations that were made in Reed Taylor against AIA Services, that was an option they could have taken.

Q. I understand it was an option, but I'm --

All right. Is it your opinion in this case that the standard of care required that Hawley Troxell consider as one of the options advising AIA

Page 33

to also pursue claims against other board members and controlling shareholders besides John Taylor?

MR. BOND: Object to the form.

THE WITNESS: Could you read that back, please.

Q. (BY MR. KELLER) Is it also your opinion that the standard of care and the duties of loyalty required that one of the options Hawley Troxell should have advised AIA about was to pursue claims against AIA board members and shareholders other than John Taylor?

MR. BOND: Object to the form.

THE WITNESS: It's my opinion that Hawley Troxell should have advised AIA to either have an independent investigation made of all of the misconduct that was alleged in the various complaints in Reed Taylor against AIA Services or, in discharge of its fiduciary duty of utmost loyalty to the AIA corporations, to have done that work themselves and then rendered an opinion to AIA as to what course of action the facts developed revealed and suggested.

Q. (BY MR. KELLER) Does that include advising AIA to pursue claims against other board members?

**Associated Reporting & Video**                        **30 to 33**
**(208) 343-4004**

**10-ER-2296**

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

Page 34

A. If and to the extent an investigation by Hawley Troxell revealed the existence of viable causes of action, that was an option that Hawley Troxell could and should have presented to the AIA corporations.

The problem, of course, is that by reason of the adverse interest exception, there was nobody to be listening to such advice on behalf of the AIA corporations.

Q. Sir, are you opining in this case that had such an investigation been done or had the other option of just advising the company been done, that the company would have pursued claims against John Taylor and the other directors?

MR. BOND: Object to the form.

THE WITNESS: Pardon me?

MR. BOND: Sorry. I said object to the form.

Go ahead.

THE WITNESS: Oh, okay.

I'm sorry. I hate to do this, Mr. Keller, but I don't want to lose my train of thought. Would you mind once more?

Q. (BY MR. KELLER) I'll see if I can ask a simpler question for you.

Are you giving an opinion in this case

Page 35

that --

A. Hello?

Q. -- that if a claim had been pursued --

A. Hello?

Q. Can you hear me, Professor?

A. It went off.

Q. Can you hear me?

A. Am I on?

(Discussion held off the record.)

Q. (BY MR. KELLER) Are you giving any opinions in this case that if a lawsuit had been brought against John Taylor and certain other board members on behalf of AIA back in 2007 to 2010, that the company would have prevailed on its claims?

A. Yes.

Q. Okay. As a practicing lawyer, how many cases did you pursue to verdict as a first-chair lawyer representing a company suing its own directors for alleged self-dealing or conflicted transactions?

MR. BOND: Object to the form.

THE WITNESS: None.

Q. (BY MR. KELLER) As a practicing lawyer, how many cases did you pursue to verdict as a second-chair lawyer on behalf of a company suing

Page 36

its own officers or directors for alleged self-dealing or conflicted transactions?

MR. BOND: Object to the form.

THE WITNESS: None.

Q. (BY MR. KELLER) As a practicing lawyer, how many cases were you involved in where you were even sitting at counsel table where the case was pursued to verdict and involved claims where the company was suing its own officers and directors for alleged self-dealing or conflicted transactions?

MR. BOND: Object to the form.

THE WITNESS: None.

Q. (BY MR. KELLER) Slightly different question: As a practicing lawyer, how many cases did you defend through to verdict as a first-chair lawyer defending officers and directors in claims brought by the entity for alleged self-dealing or conflicted transactions?

MR. BOND: Object to the form.

THE WITNESS: None.

Q. (BY MR. KELLER) As a practicing lawyer, how many cases did you participate in as a second-chair lawyer that went to verdict where you were defending officers and directors accused of

Page 37

alleged self-dealing or conflicted transactions?

MR. BOND: Object to the form.

THE WITNESS: None.

Q. (BY MR. KELLER) As a practicing lawyer, how many cases did you participate in where you were even sitting at counsel table through the trial that were pursued to verdict where you were defending corporate officers and directors from claims by the entity for alleged self-dealing or conflicted transactions?

MR. BOND: Object to the form.

THE WITNESS: None.

Q. (BY MR. KELLER) Slightly different question, sir: As a practicing lawyer, how many cases were you involved in where you were representing an entity pursuing claims on behalf of the company against officers and directors for alleged self-dealing and conflicted transactions where the company prevailed on summary judgment?

MR. BOND: Object to the form.

THE WITNESS: None.

Q. (BY MR. KELLER) As a practicing lawyer, how many cases did you participate in where you were defending corporate officers and directors where the case was resolved unfavorably for the

**10-ER-2297**

Richard T. McDermott (Volume I)                November 5 - 6, 2020

**Page 38**

officers and directors on summary judgment?

MR. BOND: Object to the form.

THE WITNESS: None.

Sorry, Rod.

None.

Q. (BY MR. KELLER) As a practicing lawyer, what prior experience did you have as lead counsel pursuing a claim in court on behalf of a company suing its officers and directors for alleged self-dealing or conflicted transactions?

MR. BOND: Object to the form.

THE WITNESS: None.

Q. (BY MR. KELLER) As a practicing lawyer, did you have any prior experience where you were serving as second-chair counsel in a case that was in court where you were representing a company suing its officers and directors for alleged self-dealing or conflicted transactions?

MR. BOND: Object to the form.

THE WITNESS: None.

Q. (BY MR. KELLER) Sir, how many cases of any kind have you actually tried to verdict where the trial lasted longer than two days?

A. None.

Q. How many cases have you actually -- of

**Page 39**

any kind have you actually tried to verdict where the trial lasted longer than one day?

A. None.

Q. At any time in your practicing professional career, have you tried a case to verdict?

MR. BOND: Object to the form.

THE WITNESS: Yes.

Sorry.

Yes.

Q. (BY MR. KELLER) At any time in your professional career, have you tried a case to verdict where you were the first-chair lawyer?

MR. BOND: Object to the form.

THE WITNESS: Yes.

Q. (BY MR. KELLER) On how many occasions?

A. One.

Q. What kind of case was it?

A. It was a case involving allegations that house paint made by the defendant manufacturer was defective.

Q. Product liability case?

A. The injuries claimed were commercial, not personal.

Q. Okay. Were you representing the

**Page 40**

plaintiff or the defendant?

A. The defendant.

Q. How many years ago was that?

MR. BOND: Object to the form.

THE WITNESS: When was that?

40 or so, 45.

Q. (BY MR. KELLER) Okay. Fair to say that that case did not involve any issues concerning directors' or officers' responsibilities?

MR. BOND: Object to the form.

THE WITNESS: That is fair to say.

Q. (BY MR. KELLER) Fair to say that that case had absolutely nothing to do with any alleged fiduciary duties on the part of officers or attorneys?

MR. BOND: Object to the form.

THE WITNESS: That's correct.

Q. (BY MR. KELLER) Now, you did once get sued by a former officer of a corporate client, right?

MR. BOND: Object to the form.

THE WITNESS: I personally?

Q. (BY MR. KELLER) Yes.

A. What, as a partner in a law firm?

Q. No. Well, maybe both.

**Page 41**

But didn't you get sued once by a former officer of a client?

MR. BOND: Object to the form.

THE WITNESS: I don't know what you --

In a capacity other than as a partner in my law firm?

Q. (BY MR. KELLER) Well, did you get sued in your capacity as a partner in your law firm?

A. Well, we have -- you know, every time, you know, the --

If a malpractice suit is brought, all of the partners are named defendants. So, Mr. Keller, I need a little more information to answer that question.

Q. Sure.

A. That question comes as quite a surprise to me, so --

Q. My question to you is: Did you personally get named as a defendant in a case where you were alleged to have done something inappropriate and the plaintiff was a former officer of a corporate client?

MR. BOND: Object to the form.

THE WITNESS: I have no recollection of that at all.

**10-ER-2298**

**Richard T. McDermott (Volume I)**   **November 5 - 6, 2020**

**Page 54**

MR. BOND: Object to the form. The case is still pending.

Q. (BY MR. KELLER) Are you able to give me any guesstimate as to what your fees and charges have been for that case to date?

A. No.

Q. None at all? You can't even ballpark it for me?

MR. BOND: Do the best you can, Dick.

THE WITNESS: 25,000 or thereabouts or --

Q. (BY MR. KELLER) Thank you. That's helpful.

A. 25 or 50. I'm not sure, Mr. Keller. You know, I don't have an accounting department to deal with here.

Q. Is 25 to 50 the best -- just ballpark guess?

A. Yeah. Yes.

Q. Okay.

A. But understood that it's subject to verification.

Q. And understanding that I'm just looking for ballpark guesstimates, are you able to give me any ballpark guesstimate for that Reed Taylor versus Eberle Berlin case?

**Page 55**

A. I thought Mr. Bond is --

MR. BOND: I can get the information at the next break.

Q. (BY MR. KELLER) In this case, you've been serving as an expert witness working with Mr. Bond since approximately when?

A. Since approximately 2017.

Q. Okay. About when in 2017?

MR. BOND: Object to the form.

THE WITNESS: It was --

The first work I did that I recall was in connection with a declaration that I submitted in support of Miesen's motion to serve his third amended complaint.

Q. (BY MR. KELLER) Okay. Mr. Bond sent me something yesterday that was a chart that added up to about $115,000, and it's called "Total of Requested Payments to Date."

Is that an accurate summary of the payments that you have requested from Mr. Bond to date?

A. It is.

Q. One of the questions I had when I got it was: Do you keep time records and submit bills?

A. I keep time records, and I do submit

**Page 56**

bills. I don't do it, as we would say, in the normal course of business such as when I was back at a law firm. I don't have a -- I don't have a billing clerk. I don't have an accounting department knocking on the door saying, "McDermott, get your bills out."

I have had occasion to request payment from Mr. Bond for this or that particular reason, but I've never had any difficulties whatsoever with Mr. Bond paying me what -- an amount that was satisfactory to me.

So it's a -- sort of a -- it's, you know, an unofficial, if you will, unorthodox, if you will, way of proceeding.

Q. I'm trying to understand exactly how it proceeds. How does it work? Periodically you pick up the phone or send him an e-mail that says, "Hey, I'd like to get X dollars from you"?

MR. BOND: Object to the form.

THE WITNESS: Well, I'm going to answer that this way, Mr. Keller: Or vice versa.

Q. (BY MR. KELLER) By "vice versa," what do you mean? He picks up the phone and calls you and says --

A. I don't know if I want to get into

**Page 57**

conversations between the two of us, but --

Q. Why don't you just answer my questions, sir.

A. He'd say, "Dick, it's been some time since you've sent me a bill. Why don't you, you know, send me a bill."

Q. Okay. And then what do you do? You just send him a bill for rounded-out amounts?

A. Yes, on LawPay.

Q. Okay. Because one of the things I noticed is in this schedule I got, with one exception, they're all just even amounts. Here's $5,000 in mid-October. Another $5,000 in mid-September.

Is that how it works? "Send me 5,000," or, "Hey, Dick, I haven't gotten a bill from you."

A. Look, Mr. Keller, just let me back up a second.

When I started working with Rod in the Eberle Berlin case, as any reasonable person would, I think, in the beginning, I had a retainer up front, right, that I would use up -- burn off, if you will -- and then submit bills.

Because that relationship was so satisfactory and of such a -- of such a quality, I

Richard T. McDermott (Volume I)                          November 5 - 6, 2020

Page 58

had no need to be concerned about retainers or sending periodic bills or anything.

You know, at my stage of life, you know, I'm quite comfortable, except for the fact that there are family needs that have arisen among my children, and so on occasion, I have asked for a fee from Mr. Bond with regard to a tuition payment for a grandchild or something like that.

But it's never been -- it's -- it's about --

It's as trustworthy a relationship as I could imagine having with someone.

Q.  Thank you.  That's all helpful information.

What I'm trying to ask you, though, sir, is:  How does the billing work?  Is it when you feel like it's time for a payment, you pick up the phone and you say, "Hey, Rod, pay me $5,000," or he feels like he hasn't paid you for a while, he says, "Dick, I haven't paid you for a while.

"Oh, okay.  Send me $5,000."

Is that how it goes?

A.  Well, bear in mind that I do keep -- I do keep little notebooks with my time.  I -- you know, I haven't added up the time, but, you know --

Page 59

But I'm perfectly -- I'm perfectly comfortable with the notion that when this is over, that whatever I conclude my fee should be --

And let me say this too, Mr. Keller, as long as we're discussing this.  My hourly rates are set forth in the beginning of my report.  And as any lawyer does in any law firm, I have to look not only at the number of hours that I spent but, if you will, the quality of those hours.

And to the extent that I need extra time because I -- although I've gained a great deal of familiarity with the computer and the electronic world, as we've seen here already today, I'm not a legend in my own time when it comes to technology.

So consequently, there are going to be a number of instances where I may have recorded an hour's work, but it doesn't necessarily reflect the value of the 350 hours [sic] that is my fee.

Does that help?

Q.  Not really, but you started on a thought that I wanted you to finish.

You said, "When this is over, whatever I conclude my fee should be," and then you went off to something else.

Could you complete that thought?

Page 60

A.  I would render a bill for that amount, excuse me, and expect -- and know I will be paid.

Q.  But you say, "When this is over," at that time you'll render a fee for what you think is an appropriate amount?

Is that what you're saying?

A.  Yeah.  Taking into account the amounts I've already been paid, yes.

Q.  What else will it take into account?

A.  That's it.  My hours.

Q.  Now, I was told that you'd been working virtually full-time on finalizing your report these last few weeks.

Is that true?

A.  No doubt.

Q.  Like, for how long have you been just burning the candle working full time?

A.  Well, let me say this, that the -- the burning the candle work really began in connection with the submission of my first report in April of 2019.

It then accelerated into my second report in October of 2019, and then my third report of February 21st, 2020.  And the reason for that is because my -- the due dates of my report preceded

Page 61

the completion or even the conduct of substantial discovery.

And so I was in the position of having to almost seriatim submit supplemental expert reports.  And it really isn't until now when, to the best of my knowledge, the discovery is complete, that I was able to do the type of job on that report that needed to be done.

And I'm sure even now there are typos, there are this, there are that.  It's been -- it's been a tremendous amount of work.

In fact, I will go so far as to say, Mr. Keller, I have trouble remembering even in my very active legal career where the time and the extent that have gone into this report is -- is similar to something else I've done.

I've worked very, very hard during my career, but cases and transactions haven't taken up the amount of time that this one has.

Q.  I'll take responsibility maybe for having asked a bad question.  Pretty focused question, though, I'm trying to ask you, sir.

For how long, as we sit here today -- going back in time, for how long have you been burning the candle essentially working full time on

Richard T. McDermott (Volume I)

November 5 - 6, 2020

**Page 62**

this case?

MR. BOND: Object to the form.

Go ahead.

THE WITNESS: Since before August of 2019.

Q. (BY MR. KELLER) So from August of 2019, at least, until today, you have been working full time on this case?

MR. BOND: Object to the form.

THE WITNESS: That's correct, with the exception of Christmas and Thanksgiving. Yes.

Q. (BY MR. KELLER) Well, even when I work full time, I get some holidays too.

A. Yes.

Q. And I want to be sure, when we're talking full time, we're talking, like, 35 hours a week, right?

A. Absolutely.

MR. BOND: Object to the form.

Q. (BY MR. KELLER) Okay.

THE WITNESS: Sorry, Rod.

Q. (BY MR. KELLER) Now, do you have that summary --

And what's your hourly rate?

A. $350 per hour and 400 hours -- $400 per hour for testimony, which I understand you will be

**Page 63**

paying me for this?

Q. So at $350 an hour for a 35-hour week, what does that work out to? About $10,000 a week?

A. I haven't done the math.

Q. Do it in your head.

A. I'm not going to do that, Mr. Keller.

MR. BOND: Object.

Q. (BY MR. KELLER) You can't ballpark estimate $350 an hour on a 35-hour week at being at around $10,000? You're not capable of doing that?

A. I'm not going to --

MR. BOND: Object to the form.

Q. (BY MR. KELLER) You're not comfortable doing that kind of an estimate, right?

MR. BOND: Object to the form.

THE WITNESS: Okay. Yes. $10,000.

Q. (BY MR. KELLER) So it would be your testimony that if you were to charge on an hourly basis, your fees would be about $10,000 a week since at least August of 2019, correct?

A. That's a big if.

MR. BOND: Object to the form.

Please wait, Dick. Give me a second to object.

Object to the form, and it misstates his

**Page 64**

testimony.

Go ahead.

THE WITNESS: It's a big if because I wouldn't charge him $350 an hour for every hour.

Q. (BY MR. KELLER) Since August of 2019, we're talking, like, over 70 weeks, right?

A. Yes.

Q. And if you were charging 350 -- if you were charging $10,000 a week, that would be over $700,000, right?

A. Yes.

Q. But you haven't charged him $700,000. So far, he's only paid 114 -- or about $115,000.

A. Correct.

Q. Now, in looking at this chart that I was given, it looks like the most recent payment that you received was $5,000 in mid-October; about three weeks ago, right?

A. Yes.

Q. Prior to that, the next prior payment was about a month before that for $5,000, right?

A. Yes.

Q. Between September and October, at four weeks in a month, you would have had about $40,000 worth of time, right?

**Page 65**

MR. BOND: Object to the form.

THE WITNESS: At 350 an hour.

Q. (BY MR. KELLER) Correct. So you're really not charging $350 an hour in this case, are you, sir?

MR. BOND: Object to the form.

THE WITNESS: I never said I was, as a practical matter.

Q. (BY MR. KELLER) If you figure it out, on an hourly basis, it's a small fraction of that, isn't it?

MR. BOND: Object to the form.

THE WITNESS: As I said, Mr. Keller, I have every confidence that whatever bill I render Mr. Bond at the conclusion of this matter will be paid.

Q. (BY MR. KELLER) Again, that's very helpful information, but it's really not what I asked at all, and I think you know that.

If you were to do the math, on an hourly basis, what you've actually been charging so far is a small fraction of $350 an hour, isn't it?

MR. BOND: Object to the form. Misstates whether he reduces hours or not as well.

THE WITNESS: Right.

**10-ER-2301**

Richard T. McDermott (Volume I)                                    November 5 - 6, 2020

**Page 66**

Q. (BY MR. KELLER) What's the answer, sir?

A. And the word "charged."

Q. I don't know why we're having so much difficulty communicating here, sir.

You charged $5,000 in mid-October for all of your time up to -- for that prior month, right?

A. No.

Q. Oh --

MR. BOND: Why don't you ask him why he hasn't charged, Brad.

MR. KELLER: Mr. Bond, could you be quiet, please. You are not supposed to be speaking. You know that. You're a good enough lawyer to know when you're not supposed to be talking, so please be quiet.

Q. (BY MR. KELLER) Professor McDermott, I'm trying to understand. I'm looking at a chart that I was given for what you were paid. It says $5,000 as of mid-October.

What was that for?

A. That was a -- a partial payment, as all these are, for the work I'm doing on the case.

Q. When you say "a partial payment," does that mean there's going to potentially be more

**Page 67**

payment for the same work later?

A. No.

Q. No? Okay. So it's not a partial payment. It is the whole payment that you're going to get for the work?

A. Let me put it this way.

MR. BOND: Object to the form.

Go ahead, Dick.

THE WITNESS: I would say that as of now, my -- the amount of work that I put in is probably worth another $100,000 on this case, Mr. Keller.

Q. (BY MR. KELLER) Okay. So are you, in a sense --

Do you ever hear the expression "work in process"?

A. Yes, I have.

Q. Do you have that 100,000 work in process that you haven't yet billed for that you're going to be billing?

A. That would be my estimate.

Q. That's very helpful.

Okay. So if we take your $100,000 of your work in process and the 115 that you've already been paid, your charge for your services for fees to date in this case are going to end up

**Page 68**

being around a quarter million dollars, right?

MR. BOND: Object to the form.

Go ahead.

THE WITNESS: That's -- that's correct.

Q. (BY MR. KELLER) Okay.

A. So it's $100,000 more than Mr. Remele so far.

Q. Are you proud of it?

A. Or --

Q. What does that have to do with my question?

A. Can you --

I thought it supplemented the answer, Mr. Keller.

Q. Can you explain to me how you thought that was responsive to my question?

MR. BOND: Brad, now come on. Let's not get combative. Let's move on.

Q. (BY MR. KELLER) Professor, how is that responsive?

MR. BOND: Object to the form.

THE WITNESS: Could you read the question back?

Q. (BY MR. KELLER) Let's move on.

A. Uh-huh.

**Page 69**

Q. Okay. So to summarize, about 25 to $50,000 in Donna Taylor, another sum that we don't know in Reed Taylor versus Eberle, and a quarter million dollars in this case.

Any other expert services at the request of Mr. Bond?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. KELLER) All right. So can you and I both agree that we're dealing with a number north of $300,000 to date --

MR. BOND: Object to the form.

Q. (BY MR. KELLER) -- in fees?

MR. BOND: Object to form. What --

Q. (BY MR. KELLER) In fees that Mr. Bond has paid you for serving as an expert witness.

MR. BOND: Object to the form.

THE WITNESS: Yes.

Q. (BY MR. KELLER) You made some comment before about you've got grandchildren, and maybe they got a tuition payment or something.

What were you talking about?

MR. BOND: Object to the form.

THE WITNESS: I was trying to explain the reason for these seriatim payments that I received

**Richard T. McDermott (Volume I)**    **November 5 - 6, 2020**

Page 70

from Mr. Bond.

Q. (BY MR. KELLER) Are --

A. The reason I ask for them.

Q. Oh. So like maybe you've got a grandchild who needed a tuition payment, so you go, "Okay. I'm owed for some time. I'll get some money from Rod Bond"?

A. What was that? Could you repeat that question, Mr. Keller?

Q. I'm just trying to understand your answer.

Are you saying, "I've got a grandchild. I've got a tuition payment at college. I need some money to do that. I'll get ahold of Rod Bond. He owes me some money for expert work. I'll get a check from him"? That kind of thing?

MR. BOND: Object to the form.

THE WITNESS: That has occurred.

Q. (BY MR. KELLER) Yeah. Okay. On more than one occasion?

MR. BOND: Object to the form.

THE WITNESS: As often or not, it's the other way -- it comes the other way from Mr. Bond.

Q. (BY MR. KELLER) I'm sorry. My question was: Has it happened on more than one occasion?

Page 71

MR. BOND: Object to the form.

THE WITNESS: Not that I recall.

Q. (BY MR. KELLER) Okay. All right. I wanted to ask you a little bit generally about officer and director conflicts of interest.

The concept of an interested director, is part of the issue there: Does the director or officer stand to personally financially benefit directly or indirectly from the transaction?

MR. BOND: Object to the form.

THE WITNESS: That, Mr. Keller, is – You know, in my opinion, Mr. Keller, the facts of a particular case are always 90 percent of the law. So I'm -- I'm uncomfortable with answering questions about sort of Black Letter Law questions.

The facts of this case, I think, speak for themselves, and my report speaks for itself.

Q. (BY MR. KELLER) Well, there are facts, and then there are principles of law, right?

A. Correct.

Q. And what lawyers do is try and analyze facts and apply those general principles of law to those facts, right?

Page 72

MR. BOND: Object to the form.

THE WITNESS: Correct.

Q. (BY MR. KELLER) And that's where an attorney's judgment and skill and experience comes in, in how they analyze how the law applies to a particular set of facts, right?

MR. BOND: Object to the form.

THE WITNESS: Correct.

Q. (BY MR. KELLER) In fact, that's the hallmark of an attorney's judgment, right?

MR. BOND: Object to the form.

THE WITNESS: Correct.

Q. (BY MR. KELLER) Now, again, I want to ask you about some of the general principles of law a little bit.

The notion of a director or officer being interested, part of the issue there is: Does that director or officer stand to personally financially benefit directly or indirectly from the transaction being considered?

MR. BOND: Object to the form.

Go ahead.

THE WITNESS: There may be form --

Yes, but there may be forms other than financial benefit.

Page 73

Q. (BY MR. KELLER) Fair enough. Fair enough.

But one thing you have to look at and consider is: Does the director stand to financially -- personally financially benefit directly or indirectly?

MR. BOND: Object to the form.

Q. (BY MR. KELLER) That's one of the things you look at, right?

MR. BOND: Same objection. Sorry, Brad.

THE WITNESS: Yes.

Q. (BY MR. KELLER) That potential to have a personal financial benefit, is the concern there that it can cloud one's judgment?

MR. BOND: Object to the form.

THE WITNESS: Personal financial benefit could influence a person's judgment.

Q. (BY MR. KELLER) That's part of the reason --

Is that part of the reason for the rule, that one of the concerns is if the director or officer has a personal financial benefit that they stand to gain, it can cloud the exercise of their judgment which is supposed to be exercised in the

**10-ER-2303**

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

Page 94

600-some-odd-page report for a detail?

MR. BOND: Object to the form.

Go ahead.

THE WITNESS: When the time comes for the trial in this case, I will be fully prepared to testify to the extent called upon.

This report, the last version as you know, Mr. Keller, was completed Monday of this week. And to ask me to sit here today and to be able to recite chapter and verse, particular dates, to me is -- it's unreasonable under the circumstances.

A lot -- a tremendous amount of work has gone into this report, and it speaks for itself.

Q. (BY MR. KELLER) Well, maybe I asked a bad question because I'm not asking you to cite chapter and verse, and I'm not asking you to give me specific dates.

I asked you: Generally, can you give me the approximate period of time during which you believe Reed Taylor was participating in some fashion without regard to degree on the advisory board or committee of Crop USA?

MR. BOND: Object to the form.

Q. (BY MR. KELLER) Can you answer that

Page 95

question or not?

A. It was sometime around -- from 2000 to 2002.

Q. Okay.

A. I'm not going to go any further than that without consulting this report, Mr. Keller.

Q. And that was very helpful. Thank you. If you could put an equal effort into the future questions, I'd appreciate it.

MR. BOND: Brad.

THE WITNESS: If you could put it --

MR. BOND: Dick, Dick.

Q. (BY MR. KELLER) Let's go to page 68, if we could.

MR. BOND: And then, Brad, I myself am going to need a bathroom break here in a minute, so when you're done with a certain question or something, if we could take another break.

Q. (BY MR. KELLER) Are you on page 68?

A. I am.

Q. And this is in paragraph 47. You're talking here about the concept of aider and abettor on general principles of law.

Do you see that?

A. Yes.

Page 96

Q. You have a cite from a case where you say, "Courts have held that a failure to act constitutes substantial assistance when, as alleged here, there is a duty to act." And that quote is from In Re: National Century Financial Enterprises.

Do you see that?

A. What footnote is that?

Yeah. Wait, what --

Q. I think it's footnote number 195 and 196.

A. Right. And it's in the text in paragraph 47?

Q. Correct.

A. "Courts have held that a failure to act constitutes substantial assistance when" --

Yes. Okay. Uh-huh.

Q. Did you read that case?

A. Yes.

Q. Okay. So you're familiar with the --

You were when you wrote the report or at some point, you were familiar with the facts of that case, right?

A. I must have been.

Q. Do you remember that in that case, the person -- the entity was alleged to be the --

Page 97

having failed to act was somebody that had been accused of bribing the stock promoters?

MR. BOND: Object to the form.

THE WITNESS: I'm not -- I'm not going to discuss the details of the case without the decision in front of me, Mr. Keller.

Q. (BY MR. KELLER) Do you remember in that case, the party that was accused of being the substantial participant was the one that had actually put together the entire syndication of the fraudulent investment?

MR. BOND: Object to the form.

THE WITNESS: Same answer.

Q. (BY MR. KELLER) Do you even remember that that was a case under the federal securities laws?

MR. BOND: Object to the form.

THE WITNESS: Same answer.

Q. (BY MR. KELLER) Do you remember that that was a case under the federal securities laws?

A. Mr. Keller, I'm perfectly happy to discuss the case when I have the decision in front of me.

Q. Without regard to the case, there was a period of time in American jurisprudence where

10-ER-2304

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

---

**Page 122**

THE WITNESS: Except for --

Sorry.

MR. BOND: Object to the form.

Go ahead.

THE WITNESS: Except for the fact that if we go back to the -- to the guarantee.

Q. (BY MR. KELLER) But having a guarantor to pay your fee is different than who your client is. That's why I'm asking the question the way I --

We're going to talk about the guarantee. I promise you we'll get there, okay? My question is really simple. I want to put a finer point on this, if I'm right.

The first time that you have any evidence of Hawley Troxell or any of its attorneys doing any work for either Crop or AIA is in early February of 2001 when Hawley Troxell was engaged by Crop, correct?

MR. BOND: Object to the form. Misstates the testimony -- the history.

Go ahead.

THE WITNESS: Mr. Keller, I guess I'd have to answer that subject to what I may have in my report.

---

**Page 123**

Q. (BY MR. KELLER) Well, what is your answer subject to what I have in my report?

A. I don't recall any right now.

Q. Okay. I actually meant to ask this before in a more general thing.

When I asked you about some of the facts that are involved in this case, you have no personal firsthand knowledge of any of the actual facts, do you?

MR. BOND: Object to the form. Lack of foundation.

Go ahead.

THE WITNESS: I mean, I know what I know, Mr. Keller, from reading the thousands -- hundreds of thousands of documents. But by "firsthand," you mean personal observation and participation?

Q. (BY MR. KELLER) You're a lawyer, sir. You know what "personal firsthand knowledge" means. It's exactly what it means. An observation at the time in the events and circumstances as they were happening.

You have no personal knowledge of the facts, right?

A. That's why I asked you --

I am a lawyer, I know what it means, and

---

**Page 124**

that's why I asked you the question back.

I don't have any firsthand personal contemporary knowledge.

Q. Okay. In fact, you don't have any personal firsthand knowledge of the facts at all, right?

MR. BOND: Object to the form.

THE WITNESS: By "firsthand," just meaning personal participation.

Q. (BY MR. KELLER) So let's go back to page 75 in your fourth report. At the bottom there, you are talking about this engagement by Crop.

A. Now, unfortunately, I'm looking at you. Not that that's that unfortunate, but I need to get back to my report.

(Discussion held off the record.)

THE WITNESS: I have it, Mr. Keller.

Q. (BY MR. KELLER) You render an opinion there that the Hawley Troxell defendants did not obtain a conflict waiver for this representation from the AIA corporations, right?

A. Right.

Q. As of that point in time, Hawley Troxell had no open files for any of the AIA entities,

---

**Page 125**

correct?

MR. BOND: Object to the form.

Go ahead.

THE WITNESS: Not that I'm aware of.

Q. (BY MR. KELLER) Okay. And as of that point in time, Hawley Troxell had never had any matters where it had been engaged by AIA, correct?

MR. BOND: Object to the form.

THE WITNESS: Not that I recall.

Q. (BY MR. KELLER) Okay.

A. And subject to what might be in my report that I don't recall right now.

Q. And then you go on to say, "Nor did they obtain a proper conflict waiver for AIA Insurance to pay the fees and costs incurred by Crop."

That's referring to the guarantee that you wanted to talk about before, right?

A. That -- that is correct.

Q. Okay. And in --

A. And in a --

Go ahead. Sorry.

Q. And is what you are referring to the fact that in the engagement in February of 2001 when Crop engaged Hawley Troxell to work on this Reg D securities offering, it also requested that

---

**Associated Reporting & Video**
**(208) 343-4004**

**122 to 125**

**10-ER-2305**

Richard T. McDermott (Volume I)                          November 5 - 6, 2020

**Page 258**

THE WITNESS: That's correct. I don't.

Q. (BY MR. KELLER) All you know is that the last billing entry in the matter showing any effort being expended is mid-July of 2012, before the $30,000 payment, fair?

MR. BOND: Object to the form.

THE WITNESS: I don't know how long it was understood that Crop USA would -- would be picking up the tab for some of AIA's legal payment obligations or not. I just don't know enough about it.

Q. (BY MR. KELLER) But you know enough about it to be opining that somebody committed an ethical violation, right?

A. That's --

My opinions speak for themselves.

Q. Yes, they do.

Okay. Let's go to page 85.

A. Okay.

Q. And let's go to paragraph 85.

A. Okay.

Q. Do you see you have there in the paragraph, it's just a quote from Idaho Rule of Professional Responsibility 1.13, subpart B?

A. Yes.

**Page 259**

Q. It says, "If a lawyer for an organization knows."

It uses the word "knows," right?

A. That's the word that appears.

Q. It doesn't use the word "suspects." It says "knows," right?

MR. BOND: Object to the form.

THE WITNESS: That's the word that appears.

Q. (BY MR. KELLER) Knowing something is different than suspecting, right?

MR. BOND: Object to the form.

THE WITNESS: There's various types of knowledge. There's actual, there's constructive, should have known.

Q. (BY MR. KELLER) Well, "should have known" doesn't cut it here, does it?

MR. BOND: Object to the form.

THE WITNESS: The word here is "knows."

Q. (BY MR. KELLER) And that word is defined in the Rules of Professional Responsibility, isn't it?

MR. BOND: Object to the form.

THE WITNESS: Let's see.

Q. (BY MR. KELLER) Look at Rule 1.0, subpart F.

**Page 260**

A. Let me get there. Let me get there.

Do I do a search for "knows"? Where did you say it is?

Q. 1.0, subpart F.

A. Just a second.

Q. It's on page 3 of what I'm looking at. I'm guessing I have the same thing as you do.

A. All right. Thanks. Just let me get there.

Okay. Here are the definitions. We have --

What's the sub -- subsection, Mr. Keller?

Q. F, as in Frank.

A. Knowingly knows or -- knows. "Denotes actual knowledge of the facts in question."

Q. Okay. So in the exercise of reasonable care, "should have known" is different than the word "knows" as used in the rules, right?

A. But look at the second sentence of the definition.

Q. We're going to get to it. Now answer my question.

Actual knowledge is different than in the exercise of reasonable care, "should have

**Page 261**

known," isn't it?

MR. BOND: Object to the form.

THE WITNESS: Actual conscious awareness is different from "should have known."

Q. (BY MR. KELLER) Okay.

A. But has nothing to do with what may or may not be inferred.

Q. Actual knowledge is different than "should have known," isn't it, sir?

MR. BOND: Object to the form.

THE WITNESS: I thought I just answered that question.

Q. (BY MR. KELLER) Indulge me because you keep adding words.

Actual knowledge is different than "should have known."

Isn't that correct?

MR. BOND: Object to the form.

THE WITNESS: Yes.

Q. (BY MR. KELLER) It goes on to say that a person's knowledge may be inferred from circumstances, right?

A. Yes, it does.

Q. But it doesn't say that "should have known" isn't, right?

10-ER-2306

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

Page 274

Q. (BY MR. KELLER) What bases, ethics issues, support your opinion that Mr. Bond wasn't arguing in front of Judge Brudie?

MR. BOND: Object to the form.

THE WITNESS: There are similarities, but I'm not comfortable in saying there are none or they're identical or they're in addition. I'm sorry.

Q. (BY MR. KELLER) Okay. Whatever it was that was argued, you're aware, are you not, that the engagement letters and the standstill and the tolling agreement and the joint defense agreement were all submitted to Judge Brudie in camera.

You're aware of that, right?

MR. BOND: Object to the form.

THE WITNESS: I'm aware of that.

Q. (BY MR. KELLER) And you are opining in this case that things like the standstill agreement, the joint defense agreement, the engagement, these were all ethical violations and breaches of fiduciary duty on the part of Hawley Troxell, right?

MR. BOND: Object to the form.

THE WITNESS: That's correct.

Q. (BY MR. KELLER) And Judge Brudie, after looking at those same documents, he wrote in his

Page 275

opinion that he was very confident that the ethical issues and conflicts had appropriately been addressed, didn't he?

MR. BOND: Object to the form.

THE WITNESS: Based on the submissions and the evidence and the facts that he had before them -- him.

Q. (BY MR. KELLER) Okay. And what do you have --

This is why I ask the question.

What do you have that's new and different that he didn't have?

MR. BOND: Object to the form.

THE WITNESS: Well, number one, we have a total lack of corporate governance. Number two, we have -- there are substantive demonstrable conduct that the controlling AIA defendants engaged in and that the Hawley Troxell defendants rendered substantial assistance with respect to.

Q. (BY MR. KELLER) Well, and that's --

A. Judge Brudie did not have those facts.

Q. Well, Judge Brudie had all of Reed Taylor's allegations, didn't he?

MR. BOND: Object to the form.

THE WITNESS: I believe he did.

Page 276

Q. (BY MR. KELLER) Okay. I'm going to be colloquial again here.

Is it your opinion that Judge Brudie got it wrong?

MR. BOND: Object to the form.

THE WITNESS: Judge Brudie did not have all of the facts that -- that I -- that I am looking at, by far.

Q. (BY MR. KELLER) But he did look at the exact same engagement letters that you're looking at, and you're opining that they're inadequate disclosures in those engagement letters, right?

MR. BOND: Object to the form.

THE WITNESS: Yes.

Q. (BY MR. KELLER) He didn't see any problem with them, did he?

MR. BOND: Object to the form.

THE WITNESS: Again, I have -- I have --

Judge Brudie is an excellent judge. He was not presented with all of the facts. In some respects, he may have even been misled.

Q. (BY MR. KELLER) Let's focus on the disqualification motion.

Other than what you call a total lack of corporate governance and what you call substantial

Page 277

demonstrative conduct by AIA's controlling shareholders, anything else that you believe that you have that he didn't have?

MR. BOND: Object to the form. The report speaks for itself.

Go ahead.

THE WITNESS: Judge Brudie did not have my report.

Q. (BY MR. KELLER) Neither did anyone else, right?

A. But the facts existed then.

Q. But your reports, those aren't facts. You have no personal firsthand knowledge. Those are your opinions, right?

MR. BOND: Object to the form. Misstates the report.

Go ahead.

THE WITNESS: The opinions are based on facts.

Q. (BY MR. KELLER) Next question for you: Are you aware of any case in the history of American jurisprudence where there was a disqualification motion filed, it was denied, and attorneys' fees were later ordered disgorged?

MR. BOND: Object to the form.

10-ER-2307

Case 1:10-cv-00404-DCN-CWD   Document 1070-2   Filed 01/29/21   Page 21 of 41

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

Page 290

THE WITNESS: Hawley Troxell --

The definition of an affiliate, let's go to it. It's in 4.2.10.

Q. (BY MR. KELLER) Okay. What's your answer?

A. In the circumstances of this case, the Hawley Troxell defendants, in some respects, allowed them to be controlled by John Taylor and AIA.

Q. So are you opining in this case that Hawley Troxell is an affiliate within the meaning of that definition in the articles of incorporation?

MR. BOND: Object to the form.

THE WITNESS: My -- the opinions in my report speak for itself.

Q. (BY MR. KELLER) No, they don't, sir. That's why I get to take your deposition.

Are you opining that Hawley Troxell falls within the definition of "affiliates" as that term is defined in the articles of incorporation?

MR. BOND: Object to the form.

THE WITNESS: With respect to the litigation decisions, they allowed themselves to be controlled by John Taylor and, thus, fall within the ambit of

Page 291

the definition of "affiliate" to that extent.

Q. (BY MR. KELLER) Very good.

So is it your opinion then that the engagement letters that Hawley Troxell entered into with AIA ran afoul of subpart G in 4.2.9?

MR. BOND: Object to the form.

THE WITNESS: Yes.

Q. (BY MR. KELLER) Okay. While you've got subpart G in front of you, it specifically provides that corporate officers and directors can receive up to $400,000 in compensation, doesn't it?

A. Let me see that. Sorry. I was --

Let me get there, Mr. Keller.

They carved out -- let's see, iii, Compensation. By way of salary, bonus paid to directors or officers, an amount to any one individual not greater than 400,000 or the total compensation paid in the calendar year 1986 when this was first put in.

Yes.

So your question was?

Q. The articles of incorporation specifically carve out and you do not need -- and you are allowed to -- the company was allowed to pay compensation of up to $400,000 a year to its

Page 292

officers and directors or whatever their salary was in 1986, whichever is less, right?

MR. BOND: Object to the form.

THE WITNESS: And that assumes that they are validly elected directors and officers.

Q. (BY MR. KELLER) It's not just directors and officers, though. Isn't it also the salary and bonus that's paid to any individual?

MR. BOND: Object to the form.

THE WITNESS: Let me look.

"By way of salary or bonus paid to directors or officers of the corporation, an amount as to any one individual," that's director or officer, "not greater than 400,000 or the total compensation paid in 1986."

"Any one individual" refers to directors and officers.

Q. (BY MR. KELLER) Okay. Was John Taylor's salary and bonus that he received, was it more or less --

You know, I misspoke. What it says is not greater than the greater of 400,000 or what they were receiving in 1986.

Do you see that?

A. Yes.

Page 293

Q. So 400 is the cap, right?

A. Yes.

Q. Okay. Was John Taylor's annual compensation under that cap every year?

MR. BOND: Object to the form.

THE WITNESS: I would have to check that, but --

I'd have to check that, Mr. Keller.

Q. (BY MR. KELLER) It's in your report.

A. But he wasn't a director or officer.

Q. What about Beck and Henderson? To the extent that they received compensation for being a director, was it well under the figures that are articulated here in the articles?

MR. BOND: Object to the form.

THE WITNESS: The mathematical numbers are substantially less than the numbers mentioned in the articles.

Q. (BY MR. KELLER) Are you giving an opinion in this case, sir, that the standstill and tolling agreements violated the articles of incorporation?

MR. BOND: Object to the form.

THE WITNESS: Yes.

Q. (BY MR. KELLER) Are you giving an

**10-ER-2308**

Richard T. McDermott (Volume I)                                    November 5 - 6, 2020

**Page 294**

opinion in this case, sir, that the standstill and tolling agreements are and were void and unenforceable?

MR. BOND: Object to the form.

THE WITNESS: Yes.

Q. (BY MR. KELLER) Does that mean that there was no tolling agreement in place?

MR. BOND: Object to the form.

THE WITNESS: They were not authorized.

Q. (BY MR. KELLER) Does that mean that there was no tolling agreement that was effective?

MR. BOND: Object to the form, if I didn't.

THE WITNESS: The agreements were never authorized by the corporations. The individuals who signed the tolling agreements did so for themselves. They agreed to extend it, so they may well be bound.

Q. (BY MR. KELLER) So it's a one-way unenforceability?

A. No.

Q. You're the one that wrote in your report that when something is void -- something that violates the articles of incorporation is void and unenforceable.

Isn't that what you wrote?

**Page 295**

A. Yes.

Q. If it's void and unenforceable, then it's unenforceable, right?

MR. BOND: Object to the form.

THE WITNESS: Yes.

Q. (BY MR. KELLER) And according to your opinion, there is no tolling agreement between the signatories of that agreement, right?

MR. BOND: Object to the form.

THE WITNESS: They were void and unenforceable.

Q. (BY MR. KELLER) And there is no tolling between the signatories, right?

MR. BOND: Object to the form.

THE WITNESS: Not by reason of those agreements.

Q. (BY MR. KELLER) Okay. So those agreements themselves do not provide -- in your opinion, because they're void and unenforceable, they do not provide a basis for the tolling of the statute of limitations on behalf of the company on its claims against the individual, right?

MR. BOND: Object to the form.

THE WITNESS: They're unauthorized, void, and not enforceable.

**Page 296**

Q. (BY MR. KELLER) This opinion you're giving is really not very helpful to the company, is it, sir?

MR. BOND: Object to the form.

THE WITNESS: The opinions that I'm giving overall are quite favorable to AIA corporations, which they deserve.

Q. (BY MR. KELLER) But you know, sir, I didn't ask you about your other opinions. I asked you what we've just been talking about, which is the tolling agreement.

For you to be opining that the tolling agreement is not enforceable, that's not a good thing for AIA potentially, right?

MR. BOND: Object to the form.

THE WITNESS: Nobody was able --

Because they were -- because they were concealed, nobody was able to take advantage of the tolling agreements anyway.

Q. (BY MR. KELLER) Let's just talk about the tolling agreements, sir.

Are you and I in agreement that because that tolling agreement is void and unenforceable, the company cannot rely on it as a basis for tolling the statute of limitations against the

**Page 297**

individual directors who signed?

MR. BOND: Object to the form. Calls for a legal conclusion.

Go ahead.

THE WITNESS: There are other grounds for tolling a statute of limitations.

Q. (BY MR. KELLER) Not what I'm asking you, Professor. I get it. I'm asking you about the tolling agreement itself.

Based on your view that it's void and unenforceable, are you and I in agreement that if it's void and unenforceable, the company cannot rely on that agreement as a basis for tolling the statute of limitations of the claims being asserted in this case?

MR. BOND: Object to the form. Calls for a legal conclusion.

THE WITNESS: It can't rely on -- within the four corners of those agreements.

Q. (BY MR. KELLER) Okay. Now, a shareholder bringing a shareholder derivative case owes fiduciary duties to the entity, don't they?

MR. BOND: Object to the form.

THE WITNESS: A shareholder bringing a derivative suit on behalf of the corporation owes a

Case 1:10-cv-00404-DCN-CWD   Document 1070-2   Filed 01/29/21   Page 23 of 41

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

Page 302

A.  No, I do not.

Q.  It's 349,417 words.  Now, just a fun fact.  Do you know how many words are in Crime and Punishment?

A.  No, I do not.

Q.  211,591.

The closest work of literary renown that I could find would be Anna Karenina, which was 349,853 words.  That gives you a sense of comparable work.  And I ask about this because I'm curious about how you were able to prepare a work of such breadth.

When I started practicing law, Mr. McDermott, I worked for senior partners that were using a device called a Dictabelt.

Do you remember the Dictabelt?

MR. BOND:  Object to the form.

THE WITNESS:  I do.

Q.  (BY MR. ADAMS) Did you use a Dictabelt to prepare this report?

A.  No.

Q.  Okay.  Well, time went on, and the Dictabelt sort of became obsolete, and it was replaced with something called a Dictaphone.

Did you ever use a Dictaphone, sir?

Page 303

A.  Yes.

Q.  Okay.  Did you use a Dictaphone in the preparation of this report?

A.  No.

Q.  The Dictaphone was later replaced with speech recognition software on computers, companies like Dragon.

Did you use any speech recognition software in the preparation of this report?

A.  No.

Q.  Okay.  Did you dictate portions of this report at all?

MR. BOND:  Object to the form.

THE WITNESS:  To a device or a stenographer?

Q.  (BY MR. ADAMS) Either.

A.  Neither of those two.

Q.  Okay.  Did you physically type this report yourself?

MR. BOND:  Object to the form.

THE WITNESS:  In substantial part, yes.

Q.  (BY MR. ADAMS) Okay.  By "substantial," can you tell me by percentage how much of it you physically typed yourself?

MR. BOND:  Object to the form.

THE WITNESS:  It's hard to recall how much I

Page 304

typed myself and how much was typed by Mr. Bond in almost incalculable telephone conversations.

Q.  (BY MR. ADAMS) I see.

So you had a number of phone calls with him, and he would type the document?

MR. BOND:  Object to the form.

THE WITNESS:  He would -- he would type the parts that I hadn't typed or we would be revising what we had both typed.

Q.  (BY MR. ADAMS) Okay.  Now, can you estimate for me by percentage how much of this report you personally typed?

MR. BOND:  Object to the form.

THE WITNESS:  Substantial part.  It's hard to answer that question with any degree of precision.

Q.  (BY MR. ADAMS) Well --

A.  I can't say.

Q.  I'm not requiring precision on this one, Mr. McDermott.  I'm looking for a general ballpark figure.

Did you do half of it?

MR. BOND:  Object to the form.  Asked and answered.

Go ahead.

MR. ADAMS:  Well, it was asked.

Page 305

MR. BOND:  He said "a substantial part."  So you just don't like his answer, apparently.

MR. ADAMS:  Well, I don't understand his answer.

Q.  (BY MR. ADAMS) What does "substantial" mean to you, Mr. McDermott?  More than 50 percent?

MR. BOND:  Object to the form.

THE WITNESS:  The question, Mr. Adams, is what did I physically type or what did I compose and write?

Q.  (BY MR. ADAMS) The question, Mr. McDermott, is:  What percentage, in a ballpark fashion, of this report did you physically type yourself?

MR. BOND:  Object to the form.

THE WITNESS:  "Substantially" means approximately 50 percent or two-thirds.  It's hard to be any more precise than that.

Q.  (BY MR. ADAMS) Thank you, sir.

A.  I did a lot of typing, Mr. Adams.

Q.  Okay.  Yesterday, when we were going through various exhibits, you mentioned in passing that the computer that you're using to conduct this Zoom deposition was not yours, correct?

A.  That is correct.

Richard T. McDermott (Volume I)                           November 5 - 6, 2020

Page 310

MR. BOND: Object to the form.

THE WITNESS: Yes.

Q. (BY MR. ADAMS) Have you ever been qualified as an expert witness in any trial?

A. No.

MR. BOND: Object.

Q. (BY MR. ADAMS) Okay. So let's turn to your report, Professor. Specifically to page 631. Please let me know when you have that page handy.

A. I'm there.

Q. Okay. Specifically, I'm looking at Section 13.

A. Yes.

Q. Funnily enough, this has to do with opinions that you have about GemCap. Section 13 is new to this report, correct?

MR. BOND: Object to the form.

THE WITNESS: Primarily, yes.

Q. (BY MR. ADAMS) This section was not contained in your report that you prepared in February of this year, correct?

MR. BOND: Object to the form. The report speaks for itself.

Page 311

THE WITNESS: Just a minute.

Q. (BY MR. ADAMS) So that we're clear, Professor, I'm awaiting your response to my question.

A. I'm going through my red-line. The reason I'm looking is I believe there was one paragraph in there already.

Q. Okay. But --

A. Let me get there, Mr. Adams, please.

Q. Take your time. While you're looking, Professor, can you tell me what the term "incalculable" means?

MR. BOND: Object to the form.

THE WITNESS: Difficult to quantify.

Q. (BY MR. ADAMS) In other words, so numerous that you couldn't put a number on it?

MR. BOND: Object to the form.

THE WITNESS: Difficult to quantify. Mr. Adams, I --

MR. BOND: Dick, if you want to type into the PDF --

THE WITNESS: I've got it.

MR. BOND: -- 658 --

THE WITNESS: I've got it. I'm on 664, and you're --

Page 312

MR. BOND: No. 658 is where the GemCap opinions start. Is that what you're --

THE WITNESS: No. I'm going to the -- to Section --

MR. BOND: 658 of the PDF document, Dick. 643 of the page number gets you the start of the GemCap opinions.

THE WITNESS: Yes, and I'm past there, and I'm at Section D, Improper Use of Sealing Settlement Agreements, Court Filings, and Transcripts to Conceal Facts.

Q. (BY MR. ADAMS) Okay. And that was in your previous report?

MR. BOND: Object to the form.

THE WITNESS: That -- that is correct, and it is -- Yes, it was in my previous report.

Q. (BY MR. ADAMS) Now, apart from that, would it be fair to say that the remainder of Section 13 of your current report dated November 1st is new?

MR. BOND: Object to the form. The report speaks for itself.

THE WITNESS: It speaks for itself, Mr. Adams.

Page 313

Q. (BY MR. ADAMS) Okay. Thank you for that, Professor. Your first opinion is that GemCap was aware that AIA Services' limited guarantee of the GemCap loan --

A. Where are we, Mr. Adams?

Q. We are Section 13, 1A.

MR. BOND: Page 643 at the bottom.

THE WITNESS: Oh, of the -- of the unmarked?

MR. BOND: Oh, sorry. I'm talking off -- I'm giving him bad advice. Sorry.

THE WITNESS: Mr. Adams is working from the unmarked.

MR. BOND: Yeah, I apologize. Here I'm trying to be helpful, and I'm being a --

THE WITNESS: See, I've got to get back there because I had to go to the red-line to determine -- because I had remembered -- I knew that there was one section that was not changed in 13.

Q. (BY MR. ADAMS) I was operating from page 631 of your final report.

A. Okay. Let me get there. I have to go back to my final report. Just a minute.

MR. BOND: Dick, if you need to take a minute to look at the red-line to see the changes, you

Associated Reporting & Video                                310 to 313
(208) 343-4004

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

Page 318

THE WITNESS: It's also --

My entire report, all 600-plus pages, contains innumerable, if not incalculable, statements of fact. That's -- my -- my opinions are predicated on the facts as I understand them and as I have delineated them in this report.

Q. (BY MR. ADAMS) Okay. Well, let's do this, Professor. You have cited at page 631 under sub 1, sub 2, and sub 3 certain information that was available to GemCap.

Do you see that?

A. I, ii, and iii?

Q. Yes, sir. All within the body of that paragraph at the bottom half of page 631.

A. Correct.

Q. Okay. So are these the facts upon which you have based your opinion about GemCap's awareness?

MR. BOND: Object to the form. The report speaks for itself.

THE WITNESS: The report speaks for itself.

Q. (BY MR. ADAMS) Okay. Have you read the docket of this lawsuit, sir?

MR. BOND: Object to the form.

THE WITNESS: Yes.

Page 319

Q. (BY MR. ADAMS) Have you read Donna Taylor's first amended complaint?

MR. BOND: Object to the form.

THE WITNESS: Yes.

Q. (BY MR. ADAMS) Has there been any judicial determination that the GemCap loan was prohibited by AIA's amended articles of incorporation?

MR. BOND: Object to the form.

THE WITNESS: Not yet.

Q. (BY MR. ADAMS) Has there been any allegation as to whether or not the GemCap loan was prohibited in Ms. Taylor's first amended complaint?

MR. BOND: Object to the form.

THE WITNESS: I'd have to study the complaint.

Q. (BY MR. ADAMS) Okay. Do you know when GemCap was added to the complaint, sir?

MR. BOND: Object to the form.

THE WITNESS: In this lawsuit?

Q. (BY MR. ADAMS) Yes, sir. That's what sub 1 has to do with, the docket in this lawsuit.

A. One minute.

MR. BOND: Object to the form.

THE WITNESS: I'd have to go to the docket

Page 320

for the date.

Q. (BY MR. ADAMS) Okay. Would it surprise you to learn that GemCap was added to this litigation in the year 2017?

MR. BOND: Object to the form.

THE WITNESS: No, it does not.

Q. (BY MR. ADAMS) Okay. Are you aware generally, Professor, as to whether or not there was any allegations in this lawsuit pertaining to the issue of the GemCap loan and any prohibitions on it prior to 2017?

MR. BOND: Object to the form. The docket speaks for itself.

THE WITNESS: I'd have to look at the docket and the pleadings.

Q. (BY MR. ADAMS) Okay. You just can't say as you sit here?

A. I'd have to look at the docket and the pleadings.

Q. Let's move then on to the Reed Taylor versus AIA Services.

You reviewed the docket of that case in rendering your determination that GemCap was aware that the guarantee was prohibited, correct?

MR. BOND: Object to the form.

Page 321

Q. (BY MR. ADAMS) That would be ii of your report, Professor.

A. I agree. Just a minute. I agree with where it is. Excuse me.

GemCap obtained copies of i, ii, and iii. They obtained a copy of the docket.

Q. Okay. And in the docket of Reed Taylor versus AIA Services, are you aware of any judicial finding of fact that the GemCap amended guarantee was prohibited under AIA Services' amended articles of incorporation?

MR. BOND: Object to the form.

THE WITNESS: Judicial determination with respect to that issue, Mr. Adams?

Q. (BY MR. ADAMS) Yes. And let me see if I can forge this distinction. I thought we sort of went over this with Mr. Keller yesterday, but let's see if we can get to a common understanding.

You're familiar with the Federal Rules of Civil Procedure?

MR. BOND: Object to the form.

THE WITNESS: Yes.

Q. (BY MR. ADAMS) Are you familiar, sir, with FRCP Rule 8?

A. Yes.

**Associated Reporting & Video**
**(208) 343-4004**

318 to 321

**10-ER-2312**

Richard T. McDermott (Volume I)                                November 5 - 6, 2020

**Page 326**

MR. BOND: Object to the form. The report speaks for itself.

THE WITNESS: Is there a question pending, Mr. Adams?

Q. (BY MR. ADAMS) Yes. I asked a question. Mr. Bond objected. Did you answer it? If you did, I didn't hear it.

MR. BOND: Same objections.

THE WITNESS: My report speaks for itself, Mr. Adams.

Q. (BY MR. ADAMS) Ah. Thank you, Professor.

Now, you're offering an opinion under subsection B of Section 13 related to the limited guarantee of the GemCap loan, correct?

A. Let me get there.

Q. Take your time.

A. I'm trying to find the beginning of B.

Q. It's the third sentence from the bottom on page 631 of your final report.

A. One second.

Q. Take your time.

A. Okay. B.

On Section B?

Q. Yes, sir.

**Page 327**

A. On page 649 at the bottom?

Q. No, no, sir. On page 631. And B immediately follows A, the section that we've just been discussing, sir. So look at page 631.

Do you have that, sir?

A. Just a second. Almost there.

631 at the bottom?

Q. Yes, sir. Start from the bottom where it states --

A. I am -- I am there.

Q. Count up one, two, three.

MR. BOND: Objection. Harassing.

THE WITNESS: Oh, that Section B. I'm sorry. I misunderstood. I thought you were referring to a different section of my report.

MR. BOND: Were you on the wrong page before for the earlier questions, Dick?

THE WITNESS: No.

MR. BOND: Okay.

THE WITNESS: I went to B now.

MR. BOND: Never mind.

Sorry. Go ahead, Bill. I'm sorry.

MR. ADAMS: Thank you, Mr. Bond.

Q. (BY MR. ADAMS) So why don't you take a look at your opinion in subsection B on page 631,

**Page 328**

continuing on to page 632, and then I have some questions.

A. I've finished reading B.

Q. Okay. It's your intention to offer expert witness opinion testimony as to the legality of the guarantee for the GemCap loan?

MR. BOND: Object to the form.

THE WITNESS: I've expressed an opinion here in this section that it was illegal.

Q. (BY MR. ADAMS) Have you reviewed the docket for this case to determine what count of the third amended complaint relates to the illegality of the limited guarantee, sir?

MR. BOND: Object to the form.

THE WITNESS: I'm familiar with the third amended complaint, obviously, but I'd have to look at it now specifically to answer that question.

Q. (BY MR. ADAMS) Well, do you know generally whether or not the legality of the guarantee agreement is at issue in this case?

MR. BOND: Object to the form.

THE WITNESS: Yes, it is at issue.

Q. (BY MR. ADAMS) Okay. Would that be Count 7 of the --

A. I'd have to go there, Mr. Adams. I'm

**Page 329**

sorry.

Q. Are you aware that Judge Dale has issued an order holding that the allegations of illegality as to the guarantee agreement are time barred in this litigation?

MR. BOND: Object to the form.

THE WITNESS: I know -- I know that Judge Dale has rendered a decision. I'd have to look at it to answer your question.

Q. (BY MR. ADAMS) Okay. Do you know based on that decision, without knowing the specifics, whether or not the issue of the legality of the guarantee agreement is at issue in this case?

MR. BOND: Object to the form.

THE WITNESS: I'd have to look at the decision.

Q. (BY MR. ADAMS) Okay. But as you sit here, you can't tell me one way or the other, correct?

MR. BOND: Object to the form. Calls for a legal conclusion.

THE WITNESS: I think the opinions expressed in this report speak for themselves, Mr. Adams.

Q. (BY MR. ADAMS) Okay. And you have nothing to add to what you've already put into your

Richard T. McDermott (Volume I)                                November 5 - 6, 2020

Page 334

permanently revoke Star Energy?

A. I have no knowledge whatsoever of Nevada's laws in that respect --

Q. Okay.

A. -- or in other --

Q. Thank you very much.

Would you turn to page 23 of your report, paragraph 21.

A. Yes.

Q. At the second sentence of paragraph 21, you state, "I have experience advising borrowers in asset-based loans."

Do you see that?

A. I do.

Q. This is the only reference that I've seen in your report as to your experience with asset-based loans.

Can you tell me how many borrowers you advised on asset-based loans?

MR. BOND: Object to the form. Speculation.

THE WITNESS: There may have been several. When I drafted this, I had one in particular. But I believe that there was more than one.

Q. (BY MR. ADAMS) Which is the one in particular that you had in mind, Professor?

Page 335

A. Pardon me?

Q. What was the one client that you had in mind when you prepared this report?

MR. BOND: Object to the form.

THE WITNESS: I -- if I can finish my answer before, I had one in mind. I can think of others.

The name of the borrower --

Well, there is -- there --

The names are -- there's an -- there was a company named Prague Shoe, and there was a company called Laguna Swimwear that was an asset-based acquisition buyout. And Prague Shoe, as the name suggests, was a shoe store that distributed shoe products manufactured by a German client of ours.

Q. (BY MR. ADAMS) What year did you provide advice to Prague Shoe?

MR. BOND: Object to the form.

THE WITNESS: I don't recall the exact year. It was somewhere in the late 1990s.

Q. (BY MR. ADAMS) And when did you provide advice to Laguna Swimwear regarding asset-based loans?

MR. BOND: Object to the form.

THE WITNESS: In 1977. Maybe '76 or '78.

Page 336

I'm not -- I'm not real clear on that.

Q. (BY MR. ADAMS) It would be fair to say it was over 40 years ago?

MR. BOND: Object to the form.

THE WITNESS: Laguna Swimwear?

Q. (BY MR. ADAMS) Yes, Laguna Swimwear.

A. Was 43 years ago --

Q. Okay.

A. -- this December.

Q. It's fair to say that you've never represented an asset-based lender?

MR. BOND: Object to the form.

THE WITNESS: I don't recall doing any work for an asset-based lender as I sit here now.

Q. (BY MR. ADAMS) Okay. And you've never served as an expert witness relating to an asset-based lender, true?

MR. BOND: Object to the form.

THE WITNESS: That is correct.

Q. (BY MR. ADAMS) Okay. Now, you also reference that you were the author of Chapter 3 of legal opinions on corporate matters in the treatise "Legal Opinion Letters: A Comprehensive Guide to Opinion Practice," 3rd edition.

Is that correct?

Page 337

A. Yes.

Q. And Chapter 3 related to corporate matters?

A. Legal opinions in connection with corporate transactions, yes.

Q. Do you know if that treatise contains a chapter relating to legal opinion letters as it relates to lenders?

A. I'd have to -- I'd have to examine the book to give you a definitive answer on that.

Q. You just can't say as you sit here?

MR. BOND: Object to the form.

THE WITNESS: I'd have to examine the treatise to see what its title is, what its contents are.

Q. (BY MR. ADAMS) Do you know if the contents of that publication on the portions that you authored relate to legal opinion letters as it relates to lenders?

MR. BOND: Object to the form.

THE WITNESS: Sorry. Could you repeat that question?

Q. (BY MR. ADAMS) Sure.

Do you know if Chapter 3 covers legal opinion letters for lenders?

**Associated Reporting & Video**
**(208) 343-4004**

334 to 337

**10-ER-2314**

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

---

**Page 338**

MR. BOND: Object to the form.

THE WITNESS: I'd have to study Chapter 3 to see specifically whether it relates to --

Q. (BY MR. ADAMS) Would you --

A. -- opinion lenders to lenders.

Q. Would you have any reason as you sit here today, sir, to disagree with any positions in the treatise that you participated in as it relates to legal opinion letters for lenders?

MR. BOND: Object to the form.

THE WITNESS: Are you referring to a chapter other than Chapter 3?

Q. (BY MR. ADAMS) Yes.

A. And the question is again?

Q. Do you have any reason to disagree with any portions of the publication that you contributed to?

A. I -- I'd have to study that chapter before I could answer that question.

MR. BOND: Object to the form late. Sorry.

Q. (BY MR. ADAMS) In this case, Professor, are you offering any opinions as to whether or not the GemCap loan with Crop USA was in any way invalid or unenforceable?

MR. BOND: Object to the form.

---

**Page 339**

THE WITNESS: My opinions speak for -- my report speaks for itself, and I have a number of opinions in there. I'll be happy to discuss specific ones.

Q. (BY MR. ADAMS) Okay. Are you offering a legal opinion as to whether or not the GemCap loan with Crop USA was valid or invalid, legal or illegal?

MR. BOND: Object to the form.

THE WITNESS: I want to go to the specific opinions that relate to the GemCap loan before I answer that in a vacuum.

Q. (BY MR. ADAMS) Why don't you take your time.

A. I'd be happy if you would like me to discuss a particular opinion in here. Otherwise, I will have to scroll through and see what they all are.

Q. All right, Professor. Let me represent to you that I don't think that you've offered any opinions in this expert report as it relates to the GemCap loan with Crop USA.

It appears to me -- and this is why I'm seeking your clarification since you're the author, whether you are confining your opinions to the

---

**Page 340**

guarantee agreement with the AIA entities or whether you're intending to offer opinions as to the underlying loan with Crop USA.

MR. BOND: Object to the form.

THE WITNESS: The opinions that I express relate directly to the legal efficacy of the respective guarantees. However, the entire GemCap Crop USA loan is -- that question is subject to a number of opinions that I have expressed in my report relating to the propriety of what occurred with respect to Crop USA.

Q. (BY MR. ADAMS) Can you point any of those opinions out to me?

A. I'll have to go through my report.

Q. Take your time.

A. Just a second.

One section which deals with that subject in my report is Section XE that begins on page 108 of the clean version.

Q. And specifically where, sir?

A. The issue that's discussed is the propriety of the manner in which Crop USA was taken from the AIA corporations.

Q. And that is your legal opinion as to the legality of the GemCap loan with Crop USA?

---

**Page 341**

MR. BOND: Object to the form.

THE WITNESS: The way your question on that subject was phrased I interpreted as if I needed to -- I needed to say that with respect to transactions in which Crop USA is involved, the validity and the efficacy of those are all subject to the fact that Crop USA was wrongfully taken from the AIA corporations.

Q. (BY MR. ADAMS) Okay. And you understand, Professor, that in civil litigation, the mechanics of challenging the legal efficacy would be done through allegations in a complaint filed in court, right?

MR. BOND: Object to the form.

THE WITNESS: I'm talking about the contents of my report here --

Q. (BY MR. ADAMS) Well --

A. -- not -- not --

Q. -- the content --

A. -- not a particular pleading that may or may not exist.

Q. Well, actually, what we're trying to focus on is your legal opinions as to whether or not the GemCap loan with Crop USA is valid or invalid, legal or illegal.

---

**10-ER-2315**

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

Page 342

MR. BOND: Object to the form.

Q. (BY MR. ADAMS) My question is pretty simple, Professor. Are you intending to offer expert opinions at the time of trial on that issue?

MR. BOND: Object to the form.

THE WITNESS: My report speaks for itself with respect to the opinions I express.

Q. (BY MR. ADAMS) Okay. Your report says nothing about whether or not the GemCap Crop USA loan is legal or illegal.

MR. BOND: Object to the form. Argumentative.

Q. (BY MR. ADAMS) So unless you can point me to a provision in your report, I take it that you have no opinions on that subject.

Would that be fair, sir?

MR. BOND: Object to the form.

Q. (BY MR. ADAMS) This is your opportunity to tell me.

MR. BOND: Object to the form. Argumentative.

THE WITNESS: In my report, I express opinions to the effect that Crop USA was wrongfully taken from the AIA corporations --

Q. (BY MR. ADAMS) In your report --

Page 343

A. -- and operated for that reason in contravention of applicable law.

Q. Professor, in your report, you offer no legal opinion as to the validity of the loan between GemCap on the one hand and Crop USA on the other.

Isn't that true?

MR. BOND: Object to the form. Argumentative.

Go ahead.

THE WITNESS: My report speaks for itself and --

Q. (BY MR. ADAMS) Do you know one way or the other whether your report contains such an opinion?

MR. BOND: Object to the form. Argumentative.

THE WITNESS: My report speaks for itself.

Q. (BY MR. ADAMS) Okay. I'm not asking you about your report. I'm asking about what you know, sir.

A. No. You asked me --

Q. Do you know --

MR. BOND: Object to the form.

Q. (BY MR. ADAMS) I'm asking you whether

Page 344

you have any knowledge as to whether or not the report that you continue to say speaks for itself offers any opinions on the enforceability of a loan between GemCap and Crop USA.

MR. BOND: Object to the form. Argumentative.

THE WITNESS: Mr. Adams, my -- my concern here is that because of the circumstances under which Crop USA existed at the time of the -- of the GemCap loan and otherwise, any transaction which it entered into is subject to the legal effects of it having been wrongfully taken from the AIA corporations.

Q. (BY MR. ADAMS) And consequently, you are intending to opine on whether or not the GemCap loan is enforceable as it relates to Crop USA?

MR. BOND: Object to the form. Argumentative.

THE WITNESS: The opinions that I express are set forth in my report, and I thought I just said that because Crop USA was wrongfully taken from the AIA corporations -- and, I might add, as stated in this report -- the manner in which Crop USA was funded and utilized assets of the AIA corporations, any transaction that Crop USA entered into, GemCap

Page 345

loan or otherwise, is subject to that legal status or illegal status.

Q. (BY MR. ADAMS) Are you offering any opinions, Professor, on whether or not the personal guarantee of John Taylor is valid and enforceable?

MR. BOND: Object to the form.

THE WITNESS: I'd have to look through my report. I don't believe I express an opinion on the efficacy of John Taylor's guarantee directly, but I would have to go through my report and the opinions to see if any of the opinions I express touch upon or deal with that subject.

Q. (BY MR. ADAMS) How long would it take you to do that, Professor?

MR. BOND: Object to the form.

THE WITNESS: I'm not sure.

Q. (BY MR. ADAMS) Okay. Well, then, why don't we just move on.

A. Mr. Adams, I think --

MR. BOND: Why don't we take a break right now. It's been an hour, and I think it's a good time to take a break.

THE WITNESS: Good.

MR. ADAMS: Okay.

(Break taken from 9:37 a.m. MST to 9:50 a.m. MST)

Richard T. McDermott (Volume I)                                November 5 - 6, 2020

Page 358

to mislead anyone looking at the books."

And then he was asked about whether he agreed with Judge Brudie's statement in the fraudulent conveyance case where Judge Brudie said he didn't think he could trust any documents that came from AIA. Ellis answered -- and I think his exact words were, "Although -- although I may not have heard it directly, instead somebody may have told me, quote, it has the ring of truth."

So I don't view this as any kind of a broadside against Mr. Ellis.

Q.  (BY MR. ADAMS) Okay.  And you are not challenging whether or not loan proceeds from GemCap were used for the operational benefit of AIA, correct?

MR. BOND:  Object to the form.  Lack of foundation.

THE WITNESS:  Indeed, I am challenging that.

Q.  (BY MR. ADAMS) Okay.  And it's based on your independent review of the financial ledgers, sir?

MR. BOND:  Object to the form.

THE WITNESS:  It is -- it is based on a number of factors, including the manner in which John Taylor operated these companies as his

Page 359

personal piggybank.

Q.  (BY MR. ADAMS) Okay.  So I want to be clear here, Professor.  You're intending to offer an opinion of the financial statements of this company to the purpose of establishing that no GemCap loans provided any benefit to the AIA entities during the course of the loan?

MR. BOND:  Object to the form.

THE WITNESS:  The financial statements are apparently so misleading that neither I nor anybody else can reasonably conclude that just because the money was funneled through the AIA corporations in some cases, that they benefited somehow financially or otherwise from the GemCap loan.

Q.  (BY MR. ADAMS) Is it then your opinion, Professor, that AIA received zero benefit from the GemCap loan proceeds?

MR. BOND:  Object to the form.

THE WITNESS:  Well, the heading of this Section B is "No benefit to the AIA Corporations."

Q.  (BY MR. ADAMS) I'm sorry.  Did I ask you what the title was of this portion of the report?

MR. BOND:  Objection.  Argumentative.

THE WITNESS:  You asked me whether I thought that there was any benefit received by the AIA

Page 360

corporations from the GemCap loan.

Q.  (BY MR. ADAMS) You know what?  It may be a bad connection, Professor, but that is not the question I asked you, and I am going to ask it again so that we have it very clear, okay?

A.  Yep.

Q.  Are you offering an opinion that none of the GemCap loan proceeds were used for any benefit of the AIA entities?  Yes or no.

MR. BOND:  Object to the form.  Argumentative.

Go ahead.

THE WITNESS:  I haven't seen any evidence of any benefit.

Q.  (BY MR. ADAMS) Okay.  And you didn't serve as a loan manager for this loan, did you?

MR. BOND:  Object to the form.

THE WITNESS:  No, I did not.

Q.  (BY MR. ADAMS) You have no experience as an asset-based lender, correct?

MR. BOND:  Object to the form.

THE WITNESS:  That is equally true, Mr. Adams, yes.

Q.  (BY MR. ADAMS) So the benefit that you bring to the court on this is your specialized

Page 361

knowledge based on your analysis of the facts, correct?

MR. BOND:  Object to the form.  Misstates the report.

Go ahead.

THE WITNESS:  Okay.  My knowledge as a lawyer in drawing inferences and conclusions from a set of facts, yes.

Q.  (BY MR. ADAMS) And are you saying that you were unable to discern from the financial reports one way or the other whether or not AIA had received any operational benefit from the GemCap loans?

MR. BOND:  Object to the form.  The report speaks for itself.

Go ahead.

THE WITNESS:  I would say that what I've found is that there is no benefit.

Q.  (BY MR. ADAMS) And what --

A.  I haven't found a benefit, Mr. Adams.

Q.  Okay.  You haven't found it yet because you can't find any facts that support a benefit?

MR. BOND:  Object to the form.  Argumentative.

THE WITNESS:  I haven't found any -- any

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

Page 454

MR. BOND: Object to the form.

THE WITNESS: The source -- the source is always -- generally always a relevant inquiry.

Q. (BY MR. ADAMS) Okay. Now, you've worked with Mr. Bond for some time at this point, correct?

MR. BOND: Object to the form.

THE WITNESS: Correct.

Q. (BY MR. ADAMS) Do you know, Professor, as of November 22nd, 2011, how many cases Mr. Bond had successfully prosecuted against AIA, Crop USA, or John Taylor?

MR. BOND: Object to the form.

THE WITNESS: In what year, Mr. Adams? By what year? Did you say 2011?

Q. (BY MR. ADAMS) Yes. Prior to the placement of the GemCap loan.

I'm assuming that your opinions as to awareness relate to the state of mind of the lender prior to the placement of the loan, correct?

A. Correct.

MR. BOND: Object to the form.

Q. (BY MR. ADAMS) So I want you to place yourself at a point in time where the loan has not yet been placed, the lender is in due diligence, they've got a litigation search report, and they're

Page 455

evaluating what to do with it.

My question is: Do you know as of November 2011 how many cases Mr. Bond had successfully prosecuted against AIA, Crop USA, or John Taylor?

MR. BOND: Object to the form.

THE WITNESS: None that I'm aware of.

Q. (BY MR. ADAMS) Okay. Do you know how many suits he had filed as of November 2011?

MR. BOND: Object to the form.

THE WITNESS: The number four or five comes to mind. I'd have to go into my report to look, but a number in that range.

Q. (BY MR. ADAMS) Are you aware, Professor, of any lawsuits as of November 2011 in which Mr. Bond had been a party?

MR. BOND: Object to the form.

THE WITNESS: Had been a party?

Q. (BY MR. ADAMS) Correct, as opposed to a lawyer.

A. No.

MR. ADAMS: Exhibit 60, please.

(Discussion held off the record.)

Q. (BY MR. ADAMS) Do you have Exhibit 60, sir?

Page 456

A. I see it in front of me.

Q. Were you ever advised, Professor, that Mr. Bond was a criminal defendant in a case alleging criminal fraud?

MR. BOND: In a case that was dismissed by the prosecutor.

Object. Argumentative and misleading.

THE WITNESS: I was not. I don't recall being aware of this.

Q. (BY MR. ADAMS) Were you aware that Mr. Bond had been charged with a criminal count of grand theft by false promise?

MR. BOND: Object to the form. Again, the charges were dismissed, and you're misleading the witness. They were voluntarily dismissed by the prosecutor.

MR. ADAMS: I'm not talking about the disposition. I'm talking about the allegations.

Q. (BY MR. ADAMS) Would it be fair, Professor, for GemCap to rely upon the accuracy of the allegations brought forth by the prosecuting attorney of Nez Perce County, Idaho?

MR. BOND: Object to the form. Irrelevant. Arguing and harassing.

THE WITNESS: Why would GemCap be making an

Page 457

inquiry about Mr. Bond in your hypothetical?

Q. (BY MR. ADAMS) In my hypothetical, you have stated that it's important for GemCap to evaluate allegations in a complaint, and you have cited specific dockets of lawsuits brought by Mr. Bond that GemCap should have used to make its determination on the placement of this loan.

We've already established that the maker of those allegations is a relevant factor in evaluating the weight of those allegations, and I'm asking you, sir: Would it also be relevant for GemCap to evaluate the fact that the lawyer bringing those allegations was a defendant in a criminal action alleging grand theft?

MR. BOND: Yeah. Object to the form, and the attorney for the defendant -- for the plaintiff -- for the allegation is irrelevant.

Q. (BY MR. ADAMS) You can answer, Professor.

A. Would GemCap --

Could you repeat it? I want to make sure I get it straight, Mr. Adams.

MR. ADAMS: Madam Court Reporter, could you please read the witness the last question.

(Record read by reporter.)

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

Page 458

MR. BOND: Object to the form.

THE WITNESS: Go ahead.

MR. BOND: Object to the form. Argumentative and improper.

Go ahead.

THE WITNESS: First of all, it's not the lawyer that is making the allegations. It's the lawyer's client that is making the allegations.

Q. (BY MR. ADAMS) But the client is making the allegation through a document prepared by a lawyer, correct?

MR. BOND: Object to the form.

THE WITNESS: Correct.

Q. (BY MR. ADAMS) And the lawyer in this instance was also a party to a criminal action where he was alleged of engaging in grand theft and fraud; criminal fraud, correct?

MR. BOND: Objection. An allegation that was dismissed shortly thereafter and was never at issue at the time of the allegations for this lawsuit.

You're harassing.

MR. KELLER: Excuse me, but I'm going to object to Mr. Bond coaching the witness.

MR. BOND: You can object all you want.

THE WITNESS: I'm not --

Page 459

He's not doing any coaching.

MR. KELLER: Excuse me. I want to object to coaching and speaking objections. They're completely improper.

MR. BOND: It's something you do all the time, Mr. Keller, so --

MR. ADAMS: Can we get back to my question, Professor.

THE WITNESS: In addressing the credibility of, in your example -- in this example, Roderick C. Bond, in addition to looking at this criminal complaint, equally relevant is the disposition thereof.

Q. (BY MR. ADAMS) Okay. So in this instance, the allegations against Mr. Bond would not be as important as the allegations in the docket that you say GemCap should have been aware of with respect to the governing documents for AIA?

A. That does not follow --

MR. BOND: Object to the form.

THE WITNESS: -- from what I just said.

Q. (BY MR. ADAMS) I didn't think it did.

MR. BOND: Object to the form.

Q. (BY MR. ADAMS) What about if Mr. Bond had been a defendant in a civil fraud case, sir?

Page 460

Would that have any bearing upon GemCap's evaluation as to the merit of the truth and accuracy of the allegations in the various complaints?

A. Again, we skipped over -- we skipped over very quickly the disposition in the -- in the criminal complaint against Rod Bond.

Q. No, we didn't skip over it, sir. We skipped over the fact that you don't want to answer my question.

A. No. We skip -- we --

I -- I'm perfectly willing to answer your question, Mr. Adams, but --

Q. Right.

A. We have --

Q. What was the disposition of the criminal proceedings, sir?

A. It was -- according to what Mr. Bond just said --

Q. In his speaking objection?

A. What he just said was that it was dismissed promptly by the prosecutor himself.

Q. Promptly? I didn't hear "promptly." Did you hear "promptly"?

What year was it dismissed, sir?

Page 461

A. I don't know.

Q. What year was it filed? Professor?

A. What year was it filed?

Q. What year was the --

MR. BOND: Yeah, yeah, yeah. What year was it filed? Let's look at that.

Q. (BY MR. ADAMS) What year was the criminal complaint filed, Professor?

A. 1994.

Q. And how long was it pending in the criminal courts?

A. How would I know?

Q. I don't know, sir. But you said the disposition of this and its prompt dismissal would be a factor --

A. Maybe I misunderstood. I have not seen this document before.

Q. Okay. Well --

A. And I may have misunderstood what Mr. Bond said before.

Q. Okay.

A. I have not discussed this with him. I have had no knowledge of it.

MR. BOND: This line of questioning, Bill, is

**Associated Reporting & Video**           **458 to 461**
**(208) 343-4004**

Page 462

totally inappropriate, and I'll --
You know, this is just out of line.
You're putting me on trial for something that your clients have done? This is wholly improper. So --
MR. ADAMS: Exhibit 61, please.
THE WITNESS: 61.
**Q. (BY MR. ADAMS) Take as much time as you need to, Professor, but my question is going to be: Would it be relevant for GemCap to evaluate the Idaho Transportation Department's investigation of title fraud against Mr. Bond in evaluating the allegations in the dockets in the litigation search at the time it made its loan decision?**
MR. BOND: Objection. Improper, argumentative, and object to the form. And irrelevant. It has nothing to do with the allegations made by Reed and Donna Taylor. Absolutely nothing --
MR. ADAMS: Your objections are preserved, Mr. Bond. Your objections are preserved.
THE WITNESS: Okay. I read this.
**Q. (BY MR. ADAMS) Is this the first time you've seen this?**
A. Yes.
**Q. Would it be appropriate for GemCap to**

Page 463

**evaluate the allegations of the Idaho Transportation Department against Mr. Bond for claims of title fraud in connection with evaluating the merits of the allegations in the lawsuits that he had filed against AIA at the time of making a loan decision?**
MR. BOND: And unfortunately, I'm objecting again because these documents were never produced in discovery and, therefore, were not in GemCap's possession anyway, as you well know.
Object to the form.
Go ahead.
Irrelevant too.
THE WITNESS: We're talking about allegations that were made by Mr. Bond's client in a lawsuit commenced in 2007. This Idaho Transportation Department --
What do I call it? Proceeding? Whatever it is.
-- investigation, I guess --
**Q. (BY MR. ADAMS) It's a criminal investigation for title fraud.**
A. -- occurred in 1991, some eight -- 15 years prior.
I don't know anything about the ultimate

Page 464

disposition of this, but I can't see the relevance or the connection between this document and the credibility of the allegations that Reed Taylor was making in AIA Services Corporation and the allegations that Donna Taylor was making in her lawsuits against AIA Services and John Taylor.
**Q. Okay.**
A. I don't see a -- I don't see any connection.
MR. ADAMS: Exhibit 62.
**Q. (BY MR. ADAMS) Have you seen Exhibit 62 before, Professor?**
A. Just one moment, Mr. Adams. Exhibit 62.
MR. BOND: Object to the form.
**Q. (BY MR. ADAMS) Have you seen Exhibit 62 before, Professor?**
A. No.
**Q. Would it be appropriate for GemCap to evaluate a complaint for fraud against Mr. Bond in his bankruptcy proceeding for a non-dischargeable judgment in evaluating the weight and credibility to the allegations that he prepared in the lawsuits that you say GemCap should have been aware of at the time of placing the loan?**
MR. BOND: Object to the form.

Page 465

THE WITNESS: I'm going to go through this, Mr. Adams --
**Q. (BY MR. ADAMS) Please do.**
A. -- to be able to answer your question.
**Q. Pay particular attention to page 9.**
MR. BOND: And the fact that the guy that -- is in prison that -- behind it.
THE WITNESS: Okay. It's a Chapter 7 liquidation.
MR. KELLER: You're testifying again.
MR. BOND: Yeah.
**Q. (BY MR. ADAMS) How are you coming along there, Professor?**
A. I'm on Roman -- I'm on page 12.
**Q. Okay. So you've gotten through Count 7?**
A. Yes. I'm up to Count 10.
**Q. Okay.**
MR. BOND: Are you going to give him the document this was dismissed too, Bill, or are you going to hide that from him as well?
MR. ADAMS: I'm not hiding anything. If you think it would help, I have lots of these documents.
MR. BOND: Yeah, I'm sure you do. Put me on trial. That's -- when -- when -- you know,

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

Page 466

ridiculous.

MR. ADAMS: I wouldn't be the first.

THE WITNESS: I've read this, Mr. Adams.

Q. (BY MR. ADAMS) And I take it you haven't seen it before?

MR. BOND: Object to the form.

THE WITNESS: That's correct. I have not.

Q. (BY MR. ADAMS) Do you have my question in mind?

MR. BOND: Object to the form.

THE WITNESS: Could you ask it again or ask Andrea to read it back, one or the other?

MR. ADAMS: Andrea, could you please read him the question that was pending when he started to review Exhibit 62.

(Record read by reporter.)

MR. BOND: Object to the form.

THE WITNESS: Mr. Keller, do we know the disposition of this matter?

Q. (BY MR. ADAMS) I don't know if Mr. Keller does. Are you referring --

A. I mean Mr. --

I'm sorry, Mr. Adams. I'm sorry.

Q. Would the disposition be relevant to your answer?

Page 467

A. Yes.

Q. Let me then ask you this: Would the disposition of the lawsuits in the dockets in the lien and litigation search that GemCap received also be relevant or is it significant only in the allegations?

MR. BOND: Object to the form.

THE WITNESS: Let me answer it this way.

The allegations in this bankruptcy matter relating to a discharge, apparently, made -- what is it? --six, seven, 13 years prior to the allegations that Reed Taylor, represented by Rod Bond, were making in January of 2007.

I don't see -- I don't see the relevance. I don't see why one would reasonably conclude, as you seem to be suggesting, that there was absolutely nothing to those allegations.

Q. (BY MR. ADAMS) Let me help you, Professor. And I'm going to need you to harken back to yesterday when you said, "There are circumstances under which allegations are to be taken more seriously than others. It requires making a judgment as to the probability of being accurate and truthful." And you said that in relation to allegations in a complaint.

Page 468

Do you remember that, sir?

MR. BOND: Object to the form.

THE WITNESS: I do.

Q. (BY MR. ADAMS) Would you agree with me that Exhibit 60 constitutes serious allegations?

MR. BOND: Object to the form.

THE WITNESS: The allegations are serious.

Q. (BY MR. ADAMS) Okay. And --

A. But -- but they're not necessarily relevant to the accuracy of Reed Taylor's allegations in Reed Taylor against AIA Services.

Q. So it would not be --

A. And I don't know anything about this matter at all, and as distinguished from somebody reading the allegations in Reed Taylor against AIA Services, I -- I --

Q. One last hypothetical for you, Professor, and then I think I'm done.

I want you to assume the following facts: That five lawsuits have been filed by a lawyer that come up on a litigation search in connection with the placement of a loan. The lender makes inquiry of the borrower and says, "What's this about?" and the borrower says, "The lawyer that's brought this is on a jihad, and by

Page 469

the way, he's a criminal and a fraud."

Would it be appropriate for the lender to evaluate Exhibits 60, 61, and 62 in connection with evaluating whether or not to proceed with the loan?

MR. BOND: Object to the form. Harassing. Argumentative.

Go ahead.

Irrelevant.

THE WITNESS: I don't know --

Are you referring to the Gatziolis --

Could you repeat the question, please?

Q. (BY MR. ADAMS) You know what?

A. I've read the jihad memorandum.

Q. I'm going to withdraw it, Professor.

MR. ADAMS: Thank you very much for your time and your opinions.

MR. BOND: Okay. We'll take a break now. We're going to take a ten-minute break.

THE WITNESS: Okay.

(Break taken from 1:44 p.m. MST to 1:58 p.m. MST)

///
///
///
///

**Associated Reporting & Video**        **466 to 469**
**(208) 343-4004**

**10-ER-2321**

Richard T. McDermott (Volume I)                                    November 5 - 6, 2020

Page 470

EXAMINATION

BY MR. GLYNN:

Q. I apologize, Professor McDermott. There's probably one person that may rival your skills on Zoom, and that's probably me, so we'll -- I'm trying to get better at it, but, you know, we're struggling through.

Is "Mr. McDermott" okay rather than "Professor McDermott"?

A. I prefer Mr., but I'm not ashamed of being an adjunct.

Q. Okay. All right.

Mr. McDermott, during this break, did you talk with Rod Bond?

A. Yes.

Q. Okay. And what did you talk about?

A. He reminded me that some time ago, he had told me of the matters that I was just looking at. I had never seen the documents before, but he -- he reminded me that some time ago, he had disclosed that to me. And I have no reason -- although I don't have a -- a recollection of it, I have no reason to doubt that.

Indeed, I have no reason to doubt any statement that comes from Rod Bond.

Page 471

Q. Okay.

A. I've been -- I've been working with and in many cases evaluating lawyers for a long, long time with regard to their legal skills, their ethics, and their integrity. And working very closely with Mr. Bond, I have never seen a scintilla of anything other than the highest standards.

I have never been asked, insisted, or anything else to render an opinion that I wasn't 1,000 percent comfortable with. I was -- never put my name on a document that I was not 1,000 percent comfortable with, notwithstanding my propensity for typographical errors and the like.

So that's about all I have to say about it other than, as I said, I did ask him whether these allegations preceded his going to law school. They preceded his going to undergraduate and law school, and he subsequently admitted to the University of Washington Law School and then obviously admitted to the respective bars of Washington and Idaho.

And finally, I fail to see a relevant connection between those documents and the allegations in Reed Taylor against AIA Services,

Page 472

et al.

That's what we -- that's the substance of our conversation.

Q. Sounds like you're quite the advocate for Mr. Bond.

MR. BOND: Object to the form.

THE WITNESS: I don't --

As I said at the outset of my report, Mr. Glynn, I'm here to call balls and strikes. I call them as I see them. If I had one notion that there was something wrong with what has gone on or what is going on, I wouldn't be here on Zoom or otherwise.

Q. (BY MR. GLYNN) So we'll talk about your long affiliation with Mr. Bond in a bit here, but let's try and lighten the mood a bit.

Let me just ask: Yankee or Met?

A. Yankee.

Q. I want to go back a little bit before we talk about the most current iteration of the report, the report that was delivered on Monday.

On or about October 22nd, we were advised -- and by "we" -- well, I'll narrow it. I was advised by Mr. Bond that you had had some computer issues and you had lost much of your work,

Page 473

and that's what was -- encompassed the delay of several weeks of getting the final report to us until just on Monday.

Is that an accurate statement?

MR. BOND: Object to the form.

THE WITNESS: I lost it -- I lost the entire GemCap section, which had to be re-created, and I lost a couple of insert riders in other sections that I had.

And there's nothing more frustrating than have -- as I'm sure you know, than to have to rewrite something that you've already composed, and it is absolutely pluperfect before, and now I've got to match it.

Q. (BY MR. GLYNN) That file that you lost, is it on the laptop that you're currently doing this Zoom conference with?

MR. BOND: Object to the form.

THE WITNESS: No.

Q. (BY MR. GLYNN) Was that file on a different laptop?

MR. BOND: Object to the form.

THE WITNESS: My work was on a different laptop.

Q. (BY MR. GLYNN) And is that laptop now

Richard T. McDermott (Volume I)                                    November 5 - 6, 2020

**Page 526**

the 45.

Q. (BY MR. GLYNN) All right. And that makes him a serial litigator?

MR. BOND: Object to the form.

THE WITNESS: The test is not whether John Taylor is a plaintiff, necessarily, in a lawsuit, but whether his conduct or misconduct or acting as I characterized his behavior in this report as a law unto himself, that conduct results in the spawning of this litigation.

So even though he's not a plaintiff, he falls into the category of a serial litigator, in my opinion.

Q. (BY MR. GLYNN) You said a "test." Is there a test for serial litigation?

MR. BOND: Object to the form.

THE WITNESS: It is a -- it is a -- it is an adjective that occurred to me as I was going through the chart. If not constant, often.

Q. (BY MR. GLYNN) Okay.

A. The man -- and I've seen him. He's very comfortable in a courtroom. I observed him in the case in Lewiston before Mr. Bond and Mr. Miesen and I were asked to leave that day.

But he appears to be very, very

**Page 527**

comfortable in a courtroom. That doesn't in and of itself make him a serial litigator, but he -- he has been involved --

45 lawsuits that one is involved in clearly falls within that definition to me.

Q. Okay. Of the 45 litigations that are identified in Exhibit D, how many of those litigations was Rod Bond either the plaintiff's attorney or the defendant's attorney?

MR. BOND: Object to the form.

THE WITNESS: One --

I count six, Mr. Glynn.

Q. (BY MR. GLYNN) I counted more than six, but --

A. All right. Maybe we'll go through.

Q. Would you agree with me that it could be at least ten?

MR. BOND: Object to the form.

THE WITNESS: I have --

All right. Let me see. Let's go by the numbers then, Mr. Glynn. The suit number on the left-hand margin.

Q. (BY MR. GLYNN) Okay. Go ahead and count out loud which ones you think --

A. My first one, Mr. Glynn, is Item

**Page 528**

Number 6.

MR. BOND: Item Number 6?

THE WITNESS: Suit Number 6, Number 6.

MR. BOND: Are you saying 7 or 6?

THE WITNESS: Oh, oh, sorry, sorry. 7. 7.

Q. (BY MR. GLYNN) Okay. So Number 7.

A. 9, 10, 11, 12, 13, 14.

MR. BOND: 14?

THE WITNESS: No. I mean, the --

I'm sorry.

MR. BOND: What numbers are you looking at, Dick?

THE WITNESS: All right. Okay. The numbers that I'm looking at --

Okay. Item Number 15, Item Number 13, Item Number 12, Item Number 11, Item Number 10, Item Number 9, Item Number 7.

That's it.

Q. (BY MR. GLYNN) What about Item Number 19?

A. Oh, I'm sorry. I must have missed that. Excuse me.

Q. What about Item Number 23?

MR. BOND: Object to the form.

THE WITNESS: I thought I included that. I

**Page 529**

am tired, you see. I apologize.

Q. (BY MR. GLYNN) What about Item Number 25?

A. Yes.

MR. BOND: Object to the form.

THE WITNESS: Yes.

Q. (BY MR. GLYNN) Now, I might have missed it in the listings --

Well, sorry. What about Number 37?

MR. BOND: Object to the form.

THE WITNESS: Yes. That's right.

Q. (BY MR. GLYNN) Okay. Now, somewhat related to these litigations, are you aware that Mr. Bond has also attempted to sue John Munding?

MR. BOND: Object to the form.

THE WITNESS: Yes.

Q. (BY MR. GLYNN) Okay. And you talked with Mr. Adams about Mr. Munding this morning, didn't you?

A. Yes.

Q. So you're aware of Mr. Munding, right?

A. I'm aware of Mr. Munding, yes.

Q. Okay. So using the numbers that you just identified, plus Mr. Munding, that's 13 lawsuits all where Mr. Bond was the plaintiff's

**10-ER-2323**

Richard T. McDermott (Volume I)　　　　　　　　November 5 - 6, 2020

**Page 530**

counsel, correct?

MR. BOND: 13 lawsuits that wouldn't have been filed if your clients would have complied with the law and --

MR. GLYNN: Mr. Bond, again, I'm going to tell you to be quiet. You know what the rule is. You tried to get an order from Judge Dale to say the very same thing. Be quiet or object to form.

MR. KELLER: Really inappropriate.

MR. BOND: Object to the form.

MR. KELLER: Really, really inappropriate.

MR. BOND: Object to the form. Object to the form.

MR. KELLER: We are in federal court. Behave.

MR. BOND: Yeah. You and -- and Adams and all you guys smirking there in the background all the time, you know, when McDermott's testifying, that's --

MR. GLYNN: Rod, I don't want my time spent with you --

MR. BOND: Go ahead. I objected to form. Go ahead.

MR. GLYNN: All right.

Q. (BY MR. GLYNN) So that's 13 lawsuits.

**Page 531**

Now, would you also agree with me, because you talked about it this morning, that that number of lawsuits does not include cases in which Mr. Bond attempted to intervene or otherwise appear in actions to which he didn't represent the plaintiff or the defendant?

Would you agree it doesn't include those cases?

A. Yes, such as the California litigation?

Q. Correct.

MR. BOND: Object to the form.

Q. (BY MR. GLYNN) All right. Speaking of baseball, how is Mr. Bond's batting average in those 14 cases?

MR. BOND: Object to the form. I'll put my batting average against yours any day, Mr. Glynn.

MR. GLYNN: Mr. Bond, I'm going to ask you one last time and then I'm going to shut the deposition down and take it in front of the judge.

MR. BOND: Same objection.

Go ahead, Dick.

THE WITNESS: How is Mr. Bond's batting average?

Q. (BY MR. GLYNN) Yeah. You're calling balls and strikes.

**Page 532**

How is he doing?

A. I think under the circumstances, he's doing extremely well.

Q. That's 13-plus litigations over a 13-, 14-year period, correct?

A. I didn't compute the time period, but I'll assume that's correct, yes.

Q. Okay. Is that a serial litigator, according to your definition?

MR. BOND: Object to the form. I am a lawyer. Geez.

THE WITNESS: He's not a party. He's a --

All right. Sorry.

MR. BOND: Object to the form. I'm sorry. God. It just --

THE WITNESS: Mr. Glynn, the distinction is that John Taylor is a party. Mr. Bond is an attorney representing a client.

Q. (BY MR. GLYNN) So the difference is Mr. Bond is able to find people to sue John Taylor, and John Taylor is the one that gets sued?

That's the difference in the serial litigator test?

MR. BOND: Object to the form. Argumentative and harassing.

**Page 533**

MR. GLYNN: Object --

THE WITNESS: That is such an inappropriate question.

Q. (BY MR. GLYNN) I'm just asking. It's your test, your word, "serial litigator."

I want to know what that means.

MR. BOND: He explained to you what it meant a long time ago. Object to the form.

MR. GLYNN: And I sure hope Mr. McDermott's answer is, "I explained it to you a long time ago," like other times you've given him what the answer should be.

MR. BOND: Whatever.

Q. (BY MR. GLYNN) Mr. McDermott --

A. Yes, sir.

Q. -- I only have limited time, and so I don't know -- I already know I'm not going to get through all the questions I want to get to, so let me jump around to some general questions.

Your report, in a general sense, seeks to cast blame as to the current state of affairs of AIA Services upon a number of people.

Your report identifies my clients; Jim Beck, Michael Cashman, John Taylor, Connie Henderson. You call them "the controlling

Case 1:10-cv-00404-DCN-CWD   Document 1070-2   Filed 01/29/21   Page 38 of 41



# ASSOCIATED REPORTING & VIDEO
## ——— *Next-Level Litigation Support* ———

The Owyhee
1109 Main Street
Suite 220
Boise, Idaho 83702

Phone: (208) 343-4004
Facsimile: (208) 343-4002
production@arvboise.com
arvboise.com

## DEPOSITION CHANGE SHEET
Type or print in blue/black ink
Make changes to your testimony only
Please return original change sheet & notarized verification page to our office

| Page# | Line# | Reads NOW | SHOULD read | Reason for change |
|---|---|---|---|---|
| 44 | 8 | "So, no" | So, no, not through a law firm | Clarification |
| 45 | 11 | "Yes" | I have done so in my individual capacity, but not as a member of a law firm. | Clarification |
| 47 | 2 | "No." | No, I believe directors are covered by the Corporation's GCL policy. | Clarification |
| 59 | 2 | "when this is over," | when I have completed the supplements to my Report before trial. | Clarification |
| 59 | 18 | "value of the 350 hours [sic] that is my fee" | amount which will be billed to Mr. Bond because I make reductions to my bills based on efficiency. | Clarification |
| 76 | 10 | "approximately yes" | approximately yes with regard to expert witness fees. | Misstatement |
| 80 | 2 | "credible and true" | credible and true such as here where there is documentary evidence to support them. | Clarification |
| 93 | 13 | "That's correct" | That's correct because I want to be as precise as possible. | Clarification |
| 95 | 3 | "2002" | 2005 | Misstatement |
| 129 | 23 | "guarantee was called" | guarantee was called but I believe AIA paid the fees. | Clarification |
| 142 | 23 | "It entailed " | It ultimately entailed | Clarification |
| 143 | 4-7 | Delete lines 4 through 7 | After Eberle Berlin withdrew, Hawley Troxell became defense counsel | Misstatement |
| 143 | 22 | "late 2006" | 2007 | Misstatement |
| 151 | 24 | "liquidated" | liquidation | Misstatement |
| 152 | 10 | "their representing liquidator" | their representing the AIA Corporations in the liquidation matter | Misstatement |
| 188 | 9 | "Mr. Bond's representation of Reed Taylor." | Mr. Bond's representation of Reed Taylor, but I can't imagine a plaintiff's lawyer asserting defenses | Clarification |

| 192 | 11 | "ridual" | residual | Transcription error |
|---|---|---|---|---|
| 192 | 23 | . . . "[sic] | Should be eliminated | Transcription error |
| 192 | 23 | "treatment" | treatise | Misstatement |
| 192 | 15 | "No." | No, but not all of the privileged communications have been produced. | Clarification |
| 198 | 16-17 | "I have not expressed an opinion on that in my report. I don't say that here." | "I have expressed an opinion on that in my report. I say that here." | Misstatement |
| 200 | 18 | "No" | No, so long as they withdraw from the Reed Taylor case. | Clarification |
| 201 | 2 | "No." | No, assuming they had withdrawn. | Clarification |
| 202 | 15 | Self-defense, yes" | Self defense, yes, assuming they had withdrawn. | Clarification |
| 204 | 17 | "I have not been" | Prior to this case, I have not been | Clarification |
| 236 | 2-3 | " any financing that AIA Insurance guaranteed" | any financing other than what I just referred to. | Clarification |
| 247 | 11 | "of AIA Insurance" | of AIA Services | Misstatement |
| 249 | 25 | "February 7" | February 7 and again in March 2007. | Clarification |
| 250 | 9 | "amended complaint" | amended and second amended complaint | Clarification |
| 250 | 24 | "that" | that, but the question of the advancement of fees was an issue throughout the law suit that Hawley Troxell did not properly address. | Clarification |
| 252 | 19 | "or not" | or not, but they should have | Clarification |
| 271 | 6 | "No wait" | No wait ,2008 | Clarification |
| 285 | 24 | "Series C" | Series A | Misstatement |
| 304 | 9 | "typed" | typed. We also met for a over a week twice when he typed content for me. | Clairification |
| 307 | 16 | "in all likelihood, yes" | Seeing that you are continuing to engage in age disparagement, in all likelihood, yes | Clarification |
| 308 | 3 | "experience." | experience supervising litigation, formulating strategy and rendering advice to clients. | Clarification |
| 309 | 20 | "That's correct" | That's correct, but I reviewed, edited and provided input for many others. | Clarification |
| 310 | 20 | "Primarily, yes" | Primarily, yes but the substance of Section 13 has been in Sections I and X and part of XII of each of the versions of my Report | Clarification |
| 317 | 12 | "knowledge." | knowledge, but when I refer to a party having knowledge I mean that the party had actual knowledge through documents and/or such knowledge through testimony. | Clarification |

| 331 | 2 | "or I didn't tell Mr. Keller" | nor did I tell Mr. Keller | Transcription error |
|---|---|---|---|---|
| 332 | 8 | "No." | No, not in the capacity as a lawyer, but as a director I did. | Clarification |
| 351 | 13 | "It appears that" | According to Gem Cap, it appears that | Clarification |
| 359 | 12 | "was funneled" | may have been funneled | Clarification |
| 362 | 25 | "was funneled" | may have been funneled | Clarification |
| 363 | 7-8 | "The report states for itself.[sic]" | "The report speaks for itself." | Transcription error |
| 365 | 4-5 | "The mere fact that John Taylor passed those funds through the AIA Corporations . . . " | The mere fact that John Taylor may have passed some of those funds through the AIA Corporations. . . | Misstatement |
| 382 | 1 | "was apprised" | was subsequently apprised | Clarification |
| 385 | 5 | "may have believed" | may have inexplicably believed | Clarification |
| 388 | 20 | "report rises" | report regarding Munding's appearance | Clarification |
| 402 | 17 | "Mr. Munding" | Mr. Munding, other than my testimony and what I have stated in my Report | Misstatement |
| 410 | 9 | "Mr. Bonds" | Mr. Guin's | Misstatement |
| 411 | 8 | "Correct" | Correct, but John Guin was the counsel before the trial court | Clarification |
| 428 | 11 | "obtaining" | obtaining and reviewing | Clarification |
| 428 | 21 | "are the" | those are some of | Clarification |
| 431 | 9-10 | "That is correct Mr. Keller[sic]" | That is correct Mr. Adams | Misstatement |
| 432 | 13 | "seen that" | seen that but shareholder approval was required here | Clarification |
| 447 | 22 | "in these opinions, Quarles & Brady" | not these opinions, and | Clarification |
| 456 | 8-9 | "I don't recall being aware of this." | I was advised of this some years ago. | Clarification |
| 461 | 23-24 | "I have not discussed this with him. I have no knowledge of it." | I was advised of this some years ago. | Clarification |
| 466 | 18 | "Mr. Keller, do we know the " | Mr. Adams do we know the | Misstatement |
| 481 | 12 | "Either Lexis or Westlaw, Mr .Glynn. I'm not sure which." | The Fordham law Library people taught me how to use Lexis and Westlaw. | Clarification |
| 484 | 23 | "I retired from Clifford Chance in 1994." | I retired from Clifford Chance in 2004. | Misstatement |
| 493 | 21 | "Not off the top of my head" | The US Department of Agriculture | Clarification |
| 494 | 24 | "to sell crop insurance" | to have a standard reinsurance agreement | Misstatement |
| 498 | 22 | "on Sunday night" | prior to October 26 | Misstatement |
| 499 | 23 | "Over the weekend" | prior to October 26 | Misstatement |
| 501 | 8 | "Yes. I was looking at the " | No, I did that work prior to my submission of Section X of my Report on October 26. | Misstatement |
| 510 | 15 | "an agent license" | an agent licensed | Transcription error |
| 538 | 19 | "Yes" | Yes, based solely on the illegality of the transaction. | Clarification |
| 511 | 10 | "were license" | were licensed | Transcription error |

**10-ER-2327**

| 550 | 18 | "legally infirm" | legally infirm such as violating Section 30-1-6 | Clarification |
|---|---|---|---|---|
| 564 | 10 | "in which he did so, yes" | in which he did so, yes,  but it was  because he would not be held personally liable for his misconduct. | Clarification |
|  |  |  | I have not treated the completion of this Change Sheet as a "take home exam." Nor I have I reviewed any documents or my Report in connection with its preparation. I have simply read the questions and my answers, set forth certain necessary clarifications, corrected certain misstatements, explained certain misunderstandings and noted transcription errors. |  |

Name (Deponent) RICHARD T. McDERMOTT   Signat _____ Date 10/31/20
(VOLUME I)

*Combine with ORIGINAL/NOTARIZED verification page and return to Associated. Thanks!

**10-ER-2328**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; and GEMCAP LENDING I, LLC, a Delaware limited liability company, <br><br> Defendants, <br><br> and <br><br> CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company; CROP USA INSURANCE AGENCY, | Case No. 1:10-cv-00404-DCN <br><br> **ORDER STAYING DISPOSITIVE MOTION BRIEFING (DKTS. 1059, 1064, 1067, 1071, 1073, 1074, 1075, 1076, 1077, 1078, AND 1086), DENYING AS MOOT PRIOR DISPOSTIVE MOTIONS (DKTS. 437, 548, 554, 556, 566, AND 576), AND DENYING WITH LEAVE TO REFILE (DKTS. 1082, 1086)** |

ORDER-1

**10-ER-2329**

INC., an Idaho corporation; CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; R. JOHN TAYLOR, an individual; MICHAEL CASHMAN SR., an individual; JAMES BECK, an individual,

>> Defendants/Third-Party Plaintiffs,

vs.

REED TAYLOR, an individual,

>> Third-Party Defendant.

This case has an extensive record. The initial complaint was filed on August 11, 2010, and since that time there has been nearly 1100 filings in the case docket. Currently pending before the Court are 2018 and 2019 motions to dismiss, motions for summary judgment, and motions to strike  motions to dismiss. *See* Dkts. 437, 548, 554, 556, 566, and 576. Since that time, extensive discovery has been undertaken. Pending motions to exclude expert testimony were filed in April 2020. *See* Dkts. 907, 908, 947, 975, and 976. Fact discovery concluded on September 30, 2020, expert discovery concluded on October 30, 2020, and dispositive motions were due January 29, 2021. Dkts. 1024, 1066.

On January 29, 2021, Dale Miesen filed a motion for entry of default (Dkt. 1059), D. John Ashby, Gary D Babbitt, Hawley Troxell Ennis & Hawley LLP, Richard A Riley filed a motion to dismiss and motion for summary judgment (Dkts. 1067, 1077), James Beck, Michael W Cashman, Sr, Crop USA Insurance Agency, Inc, CropUSA Insurance Services, LLC, Connie Taylor Henderson, R. John Taylor filed a motion for summary

ORDER-2

**10-ER-2330**

judgment (Dkt. 1071), Reed J. Taylor filed two motion for summary judgment (Dkts. 1073, 1074, and 1076), GemCap Lending I, LLC filed a motion to dismiss, and a motion for renewed summary judgment (Dkts. 1075, 1086).

Given the extensive case developments in the past few years, the Court finds judicial efficiency is best served by only reviewing the recently filed dispositive motions, as prior legal and factual arguments may be moot. Fed. R. Civ . P. 1.  However, the Court has two concerns. First, the Court is concerned that its rulings on the pending motions to exclude expert testimony will affect the legal or factual arguments in the dispositive briefing. Second, the Court is concerned that the dispositive briefings may refer back to and rely on arguments made in the now moot legal briefing. The Court has no intention of going on a rabbit chase through exhibits, motions, and other documents filed over the past ten years to piece together the evidence and legal arguments the parties are now relying on to make their dispositive cases. To that effect, the Court will not review documents, exhibits, and so on that the parties attempt to incorporate into their dispositive motions.[1] The intent of this Order is to make clear that all old and stale dispositive motions are denied as moot, and all pending evidentiary motions will be decided prior to further briefing or ruling on recent dispositive motions. To address those concerns and intents, IT IS HEREBY ORDERED:

1.      The prior motions to dismiss (Dkt. 548, 554), motion for summary judgment

---

[1] Parties have utilized this incorporation approach throughout the case, which has led to time-consuming review by the Court to determine exactly which legal arguments and factual evidence is being presented in the motion at hand as well as to what is often, in effect, overlength briefing. Should the parties wish to reference materials filed in the past they should do so by attaching them as exhibits to the current motion. Parties are also cautioned to comply with local rules and briefing page limits.

ORDER-3

(Dkt. 437), motions to strike the motions to dismiss (Dkts. 556, 576), and motion for extension of time to respond to the prior motion to dismiss (Dkt. 566) are DENIED as MOOT.

2. All briefing on Dkts. 1059, 1062, 1064, 1067, 1071, 1073, 1074, 1075, 1076, 1077, 1078, and 1086 is STAYED until the Court orders briefing to recommence.

3. GemCap Lending's Motion to Supplement Dkt. 437's Motion for Summary Judgment (Dkt. 1082), and Renewed Motion for Summary Judgment (Dkt. 1086) are DENIED, as the Court will not refer back to prior motions for summary judgment. Instead, GemCap Lending is GRANTED leave to file a new motion for summary judgment at the time the Court lifts its stay. The Court will notify GemCap Lending of the new briefing due date when the Court lifts the stay.

4. Briefing on the other pending motions, Dkts. 1056, 1068, 1069, 1084, and 1085, is not stayed and shall proceed through its regular course.

5. Plaintiff's status request (Dkt. 1088) is DENIED as MOOT. A briefing schedule will be issued when the Court issues its Order lifting the stay on briefing.

DATED: February 1, 2021

_____

David C. Nye
Chief U.S. District Court Judge

ORDER-4

**10-ER-2332**

DANIEL LORAS GLYNN, ISB #5113
JONES ♦ WILLIAMS ♦ FUHRMAN ♦ GOURLEY, P.A.
The 9th & Idaho Center
225 N. 9th Street, Suite 820
PO Box 1097
Boise, ID 83701
Telephone:  (208) 331-1170
Facsimile:  (208) 331-1529
dglynn@idalaw.com

Attorneys for James Beck, Michael Cashman, Connie Henderson, John Taylor, Crop USA Insurance Agency, Inc., and Crop USA Insurance Services, LLC

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>    Plaintiff,<br>vs.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY, LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation; CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>    Defendants. | Case No. 1:10-CV-404-DCN-CWD<br><br>**JOINDER OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO OBJECTION TO THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [DKT. 1067]** |

**JOINDER OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO OBJECTION TO THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [DKT. 1067]**
  - 1

In accordance with District Local Rule Civ. 7.1, the Defendants James Beck, Michael Cashman, Connie Henderson, R. John Taylor, Crop USA Insurance Agency, Inc., and Crop USA Insurance Services, LLC hereby give notice of their joinder to Joinder Of the Hawley Troxell Defendants' Motion to Dismiss All Claims for Failure to Satisfy Mandatory Derivative Demand Requirements as filed by Elam & Burke on January 29, 2021[Dkt. 1067].

DATED This 1st day of February, 2021.

JONES ♦ WILLIAMS ♦ FUHRMAN ♦ GOURLEY, P.A.


 /s/   Daniel Loras Glynn
DANIEL LORAS GLYNN

Attorneys for Defendants James Beck, Michael Cashman, Connie Henderson, John Taylor, Crop USA Insurance Agency, Inc., and Crop USA Insurance Services, LLC

**JOINDER OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO OBJECTION TO THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [DKT. 1067] - 2**

10-ER-2334

10-ER-2335

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 1st day of February, 2021, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF System which sent a Notice of Electronic Filing to the following persons:

| | |
|---|---|
| Roderick Cyr Bond | rod@roderickbond.com |
| Michael S. Bissell | mbissell@campbell-bissell.com |
| Tyler S. Waite | twaite@campbell-bissell.com |
| Jeffrey A. Thomson | jat@elamburke.com |
| Loren C. Ipsen | lci@elamburke.com |
| Joyce A. Hemmer | JAH@ElamBurke.com |
| Bradley S. Keller | bkeller@bryneskeller.com |
| William E. Adams | bill@weadamslaw.com |
| Alyson Anne Foster | alyson@dempseyfoster.com |

　　/s/ Daniel Loras Glynn
Daniel Loras Glynn

**JOINDER OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO OBJECTION TO THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [DKT. 1067] - 3**

DANIEL LORAS GLYNN, ISB #5113
JONES ♦ WILLIAMS ♦ FUHRMAN ♦ GOURLEY, P.A.
The 9th & Idaho Center
225 N. 9th Street, Suite 820
PO Box 1097
Boise, ID 83701
Telephone:  (208) 331-1170
Facsimile:  (208) 331-1529
dglynn@idalaw.com
Attorneys for James Beck, Michael Cashman, Connie Henderson, John Taylor, Crop USA
Insurance Agency, Inc., and Crop USA Insurance Services, LLC

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>    Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY, LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation; CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>    Defendants. | Case No. 1:10-CV-404-DCN-CWD<br><br>**RESPONSE OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO APPLICATION FOR AN ADVANCE OF EXPENSES FROM AIA SERVICES AND AIA INSURANCE PURSUANT TO I.C. 30-1-854 AND 30-1-856 [DKT. 1057]** |

**RESPONSE OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO APPLICATION FOR AN ADVANCE OF EXPENSES FROM AIA SERVICES AND AIA INSURANCE PURSUANT TO I.C. 30-1-854 AND 30-1-856 [DKT. 1057]  - 1**

Defendant James Beck, Michael Cashman, Connie Henderson, R. John Taylor, Crop USA Insurance Agency, Inc., and Crop USA Insurance Services, LLC submit this Response to Application for an Advance of Expenses from AIA Services and AIA Insurance Pursuant To I.C. 30-1-854 And 30-1-856 [Dkt. 1057] as filed by the Third-Party Defendant Reed Taylor.

After having spent five years in litigation against the Defendants AIA Services Corporation ("AIA Services") and AIA Insurance, Inc. ("AIA Insurance") (collectively "the AIA Entities") as well as its current and former directors James Beck, Connie Henderson, and R. John Taylor which placed at issue the very same assertions of misconduct from the years 1997 forward that are presented in the Third Amended Complaint ("TAC") (Dkt. 182-2), Reed Taylor now requests the very same AIA Entities advance his legal fees and costs in defending him <u>against</u> those same claims he <u>once and still asserts</u>.  Not only does Reed Taylor make application for the expenses incurred in defending the claims he asserts against the AIA Entities and its past and current directors, but demands that the AIA Entities do so while he actively <u>opposes</u> the defensive efforts of the AIA Services directors (Messrs. Beck, Cashman, and John Taylor) who were on the board with him as the challenged decisions were made and <u>joins</u> in nearly every motion of the Plaintiff against the AIA Entities and its current and former directors.  The indemnification provisions at issue do not permit advancement of expenses to a former director in this circumstance.

Moreover, even if applicable, the AIA Entities indemnification provisions do not justify an advancement of expenses for the defense of claims asserted based on Reed Taylor's participation with CropUSA, a separate and distinct entity from the AIA Entities nor do the indemnification provisions permit the advancement of expenses for Reed Taylor's liability for actions and events

**RESPONSE OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO APPLICATION FOR AN ADVANCE OF EXPENSES FROM AIA SERVICES AND AIA INSURANCE PURSUANT TO I.C. 30-1-854 AND 30-1-856 [DKT. 1057]  - 2**

occurring after his resignation from the board of directors for AIA Services. Finally, under no construction of the indemnification provisions can a claim for advancement be made based on the unsupported assertion of attorney fees incurred.

Accordingly, Reed Taylor's Application for an advance of expenses pursuant to Idaho Code 30-1-854 and Idaho 30-1-856 must be denied.

## ARGUMENT

**A.      The AIA Entities' Obligation to Indemnify Do Not Apply to Claims by a Director Against the AIA Entities and Their Directors.**

There is no doubt that Reed Taylor finds himself in a very precarious position in these proceedings.  After having asserted, essentially, a strict liability of the AIA Entities' then directors for any and all acts of alleged misconduct that occurred during (and after) their terms of directorship at AIA Services, Reed Taylor now finds himself being answerable to his responsibility for any and all acts of alleged misconduct that occurred during his term as a director of AIA Services from 1995 through 2001.[1]

To be clear, as was the case during the defense of Reed Taylor's first assertion of these claims against the AIA Entities and their former and current directors, it remains the position Messrs. Beck, Cashman and John Taylor as well as Mrs. Henderson in these proceedings that no misconduct occurred during the period time of time from 1995 through 2001.  Unfortunately for Reed Taylor in the context of seeking to an advancement of expenses from the AIA Entities, he did not then, and still does not now, defend the actions of AIA Services and its directors from 1995

---

[1] While Reed Taylor's counsel asserts that his understanding of the Plaintiff's claims is that there is no assertion of liability for conduct occurring prior to 1997 and for acts that accrued prior to 1999, as demonstrated herein the TAC repeatedly alleges conduct occurring from 1995 forward.

**RESPONSE OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO APPLICATION FOR AN ADVANCE OF EXPENSES FROM AIA SERVICES AND AIA INSURANCE PURSUANT TO I.C. 30-1-854 AND 30-1-856 [DKT. 1057]  - 3**

through 2001.  Thus, it is now Reed Taylor who must perform the necessary litigatory gymnastics required to distance himself from his prior asserted claims being pressed by his allegedly former legal counsel, Roderick Cyr Bond. However, in this effort Reed Taylor can find no ground upon which to assert his standing.

At the outset it must be noted that Reed Taylor seeks to blithely dismiss the allegations of the TAC in a single sentence. (Dkt. 1057 at 3.)  However, there can be little doubt the TAC asserts alleged acts of misconduct, and hence asserts liability for, the actions of AIA Services <u>during</u> Reed Taylor's tenure as a member of the Board of Directors for AIA Services from 1995 through 2001. For example, the TAC alleges improprieties in 1995 regarding AIA Services' amendment of its articles of incorporation to allow issuance of series C Preferred Shares. (TAC ¶ 32-36.)  The TAC also alleges that the AIA Entities improperly paid John Taylor pursuant to an executive officer agreement starting in 1999 based on the assertion that his right to compensation expired in 1998. (TAC, ¶ 37-38, 88, 134.) In addition, the TAC alleges that "from 1999" the AIA Services directors improperly "served from time to time on purported 'advisory board' of CropUSA which made the decisions on behalf of AIA and CropUSA" and that this "advisory board" was intentionally concealed from AIA Services' shareholders (TAC, ¶ 43-44, 68.) As it concerns CropUSA and crop insurance specifically, the TAC alleges that these efforts began in 1999 and John Taylor's participation was in violation of the non-compete provisions of his executive officer agreement. (TAC, ¶ 46, 47, 49, 51, 57.) Noteworthy as to the present Application, the TAC alleges "CropUSA held its purported annual shareholder's meeting <u>on January 10, 2001</u>. <u>By this time</u>, the illegal "spin off" of CropUSA had been accomplished …" (TAC, ¶ 52.) This act was furthered by the execution

**RESPONSE OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO APPLICATION FOR AN ADVANCE OF EXPENSES FROM AIA SERVICES AND AIA INSURANCE PURSUANT TO I.C. 30-1-854 AND 30-1-856 [DKT. 1057]  - 4**

of a Master Marketing Agreement between CropUSA and the AIA Entities in January 2001 which the TAC alleges was also improper. (TAC, ¶ 58-60.) Moreover, the TAC alleges that "beginning in 1999" CropUSA was improperly funded and operated with AIA's assets. (TAC, ¶ 66.)

In addition to the foregoing issues, the TAC seeks to hold AIA Services directors liable for the failure to hold annual shareholder meetings, the failure to notice and/or obtain proper shareholder approval for the foregoing transactions, failing to comply with AIA Services' bylaws/ articles in regard to these transactions, and failing to comply with applicable corporate governance. (TAC, ¶ 164(b).) In fact, the TAC identification of the purported "laundry list of unlawful acts, self-dealing, malfeasance and intentional torts" asserts that these acts began in 1995. (TAC, ¶ 164.) In this regard, it should not be overlooked that it is contended in these proceedings that the absence of shareholder meetings results in the conclusion that there has not been a properly constituted board of directors since at least 1999.[2] With regard to this laundry list of improprieties that occurred during Reed Taylor's tenure as director of AIA Services from 1995 through 2001, Reed Taylor says nothing. His silence is not altogether surprising, as discussed below, given that he has engaged, with the aid of Mr. Bond, in a pattern of asserting these claims against AIA Services and his fellow directors at every opportunity while simultaneously seeking to obscure the fact of his directorship, and hence, participation in these actions.

Thus it should also be not surprising given his own assertion of these claims on his behalf by his counsel Mr. Bond that the TAC presented by Mr. Bond identifies as parties defendant the

---

[2] Affidavit of Counsel in Response to Application for an Advance of Expenses from AIA Services and AIA Insurance Pursuant to I.C. 30-1-854 AND 30-1-856 [Dkt. 1057], Exhibit "A" at pages 753-756.

**RESPONSE OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO APPLICATION FOR AN ADVANCE OF EXPENSES FROM AIA SERVICES AND AIA INSURANCE PURSUANT TO I.C. 30-1-854 AND 30-1-856 [DKT. 1057]  - 5**

members of AIA Services board of directors save one notable exception – Reed Taylor, an AIA Services Board of Director member since 1995, an individual seated there starting in 1997 as the designee of the AIA Services Series A Preferred shareholder Donna Taylor, and Mr. Bond's client[3] at the time of the filing of this action.[4]  While this fact is noteworthy, what is even more noteworthy is that the current purported plaintiff in this case is not the originator of these claims against AIA Services and its then board of directors.  Each and every of these allegations has its origins in Reed Taylor's assertion of these claims against AIA Services and Messrs. Beck and John Taylor as well as Mrs. Henderson.

As Mr. Bond himself went into painstaking detail to point out during a four-day examination of John Taylor, these vary same allegations were alleged in the Fifth Amended Complaint filed by Reed Taylor in the Second Judicial District Court for the State of Idaho ("Reed

[3] In another perplexing argument of Plaintiff in these proceedings, Plaintiff takes the position that the Defendant Hawley Troxell Ennis & Hawley, PA remains the counsel for AIA Services as it never filed a motion to withdraw in the Reed Taylor Case. While an argument of dubious merit given the closed status of the Reed Taylor Case, it should be noted that contrary to Mr. Bond's own interruptive and false assertion in the course of a deposition of Plaintiff's expert Richard McDermott, the docket in the Reed Taylor case has no filed notice of withdrawal or substitution of counsel, let alone order of same, by Mr. Bond as counsel for Reed Taylor in that case. (Affidavit of Counsel in Response to Application for an Advance of Expenses from AIA Services and AIA Insurance Pursuant to I.C. 30-1-854 AND 30-1-856 [Dkt. 1057], Exhibit "A" at pages 714-716.)

[4] It must also be noted that it is Plaintiff's apparent position in this proceeding that liability for the actions of AIA Services and its directors continues even after a director resigns from the AIA Services board of directors.  For example, in the specific context of Mr. Cashman who, like Reed Taylor, resigned from the AIA Services board of directors in 2001, Plaintiff has asserted that he is nonetheless liable for the conduct of AIA Services and John Taylor for events occurring after 2001 ostensibly because his one-time participation enabled future misconduct after his departure. (Affidavit of Counsel in Response to Application for an Advance of Expenses from AIA Services and AIA Insurance Pursuant to I.C. 30-1-854 AND 30-1-856 [Dkt. 1057], Exhibit "A" at pages 596 & 638.) By this same logic therefor, Reed Taylor remains liable for conduct occurring after his resignation as well.

**RESPONSE OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO APPLICATION FOR AN ADVANCE OF EXPENSES FROM AIA SERVICES AND AIA INSURANCE PURSUANT TO I.C. 30-1-854 AND 30-1-856 [DKT. 1057]  - 6**

Taylor Case"). (*See* Affidavit of Counsel in Support of Motion for Summary Judgment [Dkt. 1071-3], Exhibit "A"; Affidavit of R. John Taylor in Support of Motion for Summary Judgment [Dkt. 1072], Exhibit "O.") In an ominously worded allegation of particular relevance here, Reed Taylor's Fifth Amended Complaint warns AIA Services and its then identified defendant directors (Messrs Beck and John Taylor as well as Mrs. Henderson) "by and through this paragraph, the Defendants should be placed on notice that Reed intends to recover every dollar of funds, assets, services, loans, barters and the like that were taken, utilized and/or transferred from AIA Services and/or AIA Insurance through fraud, constructive fraud, breaches of fiduciary duties, fraudulent conveyances, and any other causes of action set forth below." (Reed Taylor's Fifth Amended Complaint, ¶ 2.51.)

Once properly placed in context, Reed Taylor's lack of entitlement to the advancement of expenses by AIA Services to purportedly defend himself against the very claims he avowed to prosecute to recovery against AIA Services and its directors is clear. Putting aside the evident disingenuity of asserting the validity of these claims against AIA Services and its directors only to turn around and demand AIA Services advance to him the expenses of defending against those claims, this exact situation is addressed, and prohibited, by the very indemnification provisions upon which Reed Taylor relies.

Article XI of the New Restate By-Laws of AIA Services Corporation provide:

The corporation shall indemnify the directors and executive officers of the corporation or another enterprise to the full extent permitted by the Idaho Business Corporation Act …provided, further, that the corporation shall not be required to indemnify any director or executive officer in connection with any proceeding (or part thereof) initiated by such person or any proceeding by such person against the corporation or its directors, officers, employees or other agents unless (a) such

**RESPONSE OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO APPLICATION FOR AN ADVANCE OF EXPENSES FROM AIA SERVICES AND AIA INSURANCE PURSUANT TO I.C. 30-1-854 AND 30-1-856 [DKT. 1057] - 7**

indemnification is expressly required by law; (b) the proceeding was authorized by the Board of Directors of the corporation or (c) such indemnification is provided by the corporation under the Idaho Business Corporation Act.

(Dkt. 1056-4).[5]

While ostensibly this proceeding is not one initiated by Reed Taylor in that he is not the named Plaintiff there can be little doubt that this is a proceeding, or a part of, those brought by him against AIA Services and its directors (except himself).   Given the identical nature of the allegations and matters at issue in the TAC with those asserted in Reed Taylor's Fifth Amended Complaint in the Reed Taylor Case against the same named Defendants by the same attorney, there can be no dispute the indemnification provisions prohibit the advancement requested by Reed Taylor. "Because corporate documents are equivalent to contracts among the members of the association, the normal rules governing the interpretation of contracts apply."  *Twin Lakes Vill. Prop. Ass'n, Inc. v. Crowley*, 124 Idaho 132, 135, 857 P.2d 611, 614 (1993). As the objective in interpreting contracts is to ascertain and give effect to the intent of the parties, "[t]he intent of the parties should, if possible, be ascertained from the language of the documents." *Id.  See Gentile v. SinglePoint Fin., Inc.*, 788 A.2d 111, 113 (Del. 2001) (stating "[a]ny agreement on the part of a corporation to provide advancement rights should be construed according to its terms."). *See also,* Model Bus. Corp. Act § 8.50 Official Comment 6 (2016) ("proceeding" is intended to be interpreted broadly to address new and unexpected actions).

---

[5] Article XI of the Bylaws of A.I.A., Inc. is substantially similar with no material difference to the quoted language. (Dkt.  1056-3)

**RESPONSE OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO APPLICATION FOR AN ADVANCE OF EXPENSES FROM AIA SERVICES AND AIA INSURANCE PURSUANT TO I.C. 30-1-854 AND 30-1-856 [DKT. 1057]  - 8**

Idaho's Business Corporation Act is based on the Model Business Corporation Act ("MBCA") and as such the comments of its drafters are particularly relevant to Reed Taylor's present request.  *See e.g., Wagner v. Wagner*, 160 Idaho 294, 298, 371 P.3d 807, 811 (2016) (recognizing that while the legislature did not adopt the comments to the MBCA, the comments do provide guidance in their interpretation.)  As recognized in the introductory comments to the subject provision, the MBCA seeks to strike a balance of important public policies.  Thus, such clauses are not intended to be construed so as to violate a "basic tenant of public policy" and therefore "a director who intentionally inflicts harm on the corporation should not expect to receive assistance from the corporation for legal or other expenses..." Model Bus. Corp. Act SubChapter 8E Introductory Comment 1 (2016).

It would be one thing if Reed Taylor were to take a position in these proceedings that these alleged acts which occurred during his watch as a director of AIA Services were not improper, were not concealed, or any other basis for the defense of these claims. However, rather than defend these actions, and in fulfillment of his warning that he would not cease in his efforts to recover against the identified Defendants, Reed Taylor has actually taken a decidedly aggressive position against the identified Defendants, including AIA Services.[6]  As a review of the docket demonstrates, Reed Taylor has filed joinders to motions against the identified Defendants and filed

---

[6] Any doubt that AIA Services is a defendant against whom claims are being pressed is removed by the Plaintiff's sudden, and certainly suspect, decision to seek the default of the AIA Entities. (*See* Dkt. 1059, 1061, & 1092.) However, even in this regard, Reed Taylor has been noticeably silent and not joined in the efforts of the Defendants to prevent the assertion of claims against the nominal corporate defendant in these derivative proceedings.

**RESPONSE OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO APPLICATION FOR AN ADVANCE OF EXPENSES FROM AIA SERVICES AND AIA INSURANCE PURSUANT TO I.C. 30-1-854 AND 30-1-856 [DKT. 1057]  - 9**

joinders in support of the efforts of Plaintiff as against the identified Defendants on no less than thirteen times. (*See,* Dkt. 530, 684, 728, 732, 913, 918, 938, 971, 1002, 1005, 1009, 1010, & 1017.)

In short, Reed Taylor has asserted claims, and continues to support these claims, against AIA Services and the directors of AIA Services with regard to acts occurring during the very time period in which he was a director of AIA Services. Now that his counsel in Reed Taylor Case has taken up the mantle that Reed Taylor himself vowed never to relinquish, Reed Taylor makes the demand upon the very entity against whom he unsuccessfully prosecuted those claims to advance him the expenses of defending against own claims. This position finds no support in the indemnity provisions themselves and hence provides to him no basis under Idaho Code 30-1-854 and Idaho Code 30-1-856.

**B.      Reed Taylor Is Not Entitled to Indemnity for Any Claims Related to His Participation in the "Advisory Board" to CropUSA or CropUSA's Operations.**

Another issue glossed over by Reed Taylor's Motion is the fact that the TAC seeks to impose liability not just on the basis of the actions alleged to have been taken by the directors of AIA Services, but the actions undertaken by individuals that the Complaint identifies as having participated in the activities of the "advisory board" to CropUSA. Whether or not Reed Taylor is willing to admit participation in any fashion with regard to this "advisory board" is not germane to the present motion as that issue will be one to be tried substantively. *See Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 509 (Del. 2005) (recognizing that the scope of an advancement hearing "is limited to determining the issue of entitlement according to the corporation's advancement provisions and not to issues regarding the movant's alleged conduct in the underlying litigation.")

**RESPONSE OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO APPLICATION FOR AN ADVANCE OF EXPENSES FROM AIA SERVICES AND AIA INSURANCE PURSUANT TO I.C. 30-1-854 AND 30-1-856 [DKT. 1057]  - 10**

What is germane to the present motion is that to the extent that the indemnification provisions of the AIA Services by-laws provide a basis for the advancement of the funds, AIA Services obligations of indemnification are only applicable to defense of actions taken by its directors and officers in the scope of their duties as directors and officers. As the TAC seeks to impose liability for not only participation in the "advisory board" but also the business decisions pertaining to CropUSA itself, any defense by Reed Taylor of those claims cannot be subject to a claim for advancement of expenses from AIA Services.

Likewise, and Plaintiff's apparent position notwithstanding (*see* footnote 3), any liability for events occurring <u>after</u> his resignation from the board of directors for AIA Services is not the proper subject for a claim of advancement of expenses by AIA Services.  This would also be true with regard any of the fees and costs that Reed Taylor has incurred, or will incur, in support of his claims against counterclaims (Dkt. 276.). *See Confederate Motors, Inc. v. Terny*, 859 F. Supp. 2d 181, 191 (D. Mass. 2012) (holding that while defendant is entitled to advancement of his reasonable legal fees in defense of the claims brought against him as a director, where claims against him and counterclaims asserted by him are not related to his status as a director, such claims raise separate factual and legal issues for which he is not entitled to advancement.). *See also*, *Allergia, Inc. v. Bouboulis*, 229 F. Supp. 3d 1150, 1159 (S.D. Cal. 2017) (denial of advancement of expenses where defendant was not sued "by reason of the fact" that he was an agent and/or officer and were not performed in connection with his corporate functions.)

**RESPONSE OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO APPLICATION FOR AN ADVANCE OF EXPENSES FROM AIA SERVICES AND AIA INSURANCE PURSUANT TO I.C. 30-1-854 AND 30-1-856 [DKT. 1057]  - 11**

**10-ER-2346**

**C.      Reed Taylor Has Failed to Sustain His Burden as to the Reasonableness of The Request for Advancement of Expenses.**

One significant question raised, and a matter wholly unaddressed, by Reed Taylor's Application for Advancement of Fees is what, exactly, he is seeking. Rather, Reed Taylor's supporting memorandum obliquely states, "to the extent it is material, Reed Taylor is a resident of Washington and his fees to date exceed $75,000."  (Dkt. 1057 at page 5. *See also,* Dkt. 1056-8, ¶ 2.) This is clearly insufficient to support an award of expenses.

The corporation's obligation to pay expenses is subject to a reasonableness requirement. *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 823 (Del. 1992). "A reasonableness inquiry *is* appropriate even if the indemnification agreement does not expressly condition advancement on the reasonableness of the request."  *Kaung v. Cole Nat'l Corp.*, No. CIV.A. 163-N, 2004 WL 1921249, at *4 (Del. Ch. Aug. 27, 2004), and *aff'd in part, rev'd in part sub nom. Kaung v. Cole Nat. Corp.*, 884 A.2d 500 (Del. 2005) (*emphasis in original).*

Accordingly, a party seeking advancement of expenses "must demonstrate that those fees and expenses are reasonable [and] are necessary in connection with his defense …" *Qantel Corp. v. Niemuller*, 771 F. Supp. 1372, 1374 (S.D.N.Y. 1991). *See also Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1229 (10th Cir. 2009) (party seeking advancement of fees carries the burden of establishing the reasonableness of the fees).

To the extent that Reed Taylor is seeking a blanket order of $75,000, the request is wholly deficient and should be summarily rejected on that basis alone.  Rather, any request for advancement of fees and expenses should be support by Application to this Court like any other request for attorney fees and costs, *i.e.* with true and correct copies of unredacted billing statements

**RESPONSE OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO APPLICATION FOR AN ADVANCE OF EXPENSES FROM AIA SERVICES AND AIA INSURANCE PURSUANT TO I.C. 30-1-854 AND 30-1-856 [DKT. 1057]  - 12**

and testimonial support of the reasonableness of the fees as well as the relation of those expenses to the basis for the claim sought.

<div align="center"><b>CONCLUSION</b></div>

For the reasons stated, Reed Taylor's Application for an Advance of Expenses from AIA Services and AIA Insurance Pursuant To I.C. 30-1-854 And 30-1-856 [Dkt. 1057] should be denied.

DATED This 11th day of February, 2021.

JONES ♦ WILLIAMS ♦ FUHRMAN ♦ GOURLEY, P.A.

 /s/   Daniel Loras Glynn
DANIEL LORAS GLYNN

Attorneys for Defendants James Beck, Michael Cashman, Connie Henderson, John Taylor, Crop USA Insurance Agency, Inc., and Crop USA Insurance Services, LLC

**RESPONSE OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO APPLICATION FOR AN ADVANCE OF EXPENSES FROM AIA SERVICES AND AIA INSURANCE PURSUANT TO I.C. 30-1-854 AND 30-1-856 [DKT. 1057]  - 13**

<div align="center"><b>10-ER-2348</b></div>

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of February, 2021, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF System which sent a Notice of Electronic Filing to the following persons:

| | |
|---|---|
| Roderick Cyr Bond | rod@roderickbond.com |
| Michael S. Bissell | mbissell@campbell-bissell.com |
| Tyler S. Waite | twaite@campbell-bissell.com |
| Jeffrey A. Thomson | jat@elamburke.com |
| Loren C. Ipsen | lci@elamburke.com |
| Joyce A. Hemmer | JAH@ElamBurke.com |
| Bradley S. Keller | bkeller@bryneskeller.com |
| William E. Adams | bill@weadamslaw.com |
| Alyson Anne Foster | alyson@dempseyfoster.com |

　/s/ Daniel Loras Glynn
Daniel Loras Glynn

**RESPONSE OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO APPLICATION FOR AN ADVANCE OF EXPENSES FROM AIA SERVICES AND AIA INSURANCE PURSUANT TO I.C. 30-1-854 AND 30-1-856 [DKT. 1057]  - 14**

**10-ER-2349**

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for the Plaintiff Dale L. Miesen

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>v.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 1:10-cv-00404-DCN-CWD<br><br>PLAINTIFF DALE L. MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT **[Dkt. 1068]** |

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- i

CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; R. JOHN TAYLOR, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual,

      Defendants/Third-Party Plaintiffs,

    **v.**

REED TAYLOR, an individual,

      Third-Party Defendant.

REED TAYLOR, an individual,

      Third-Party Defendant/ Counterclaimant,

    **v.**

CONNIE TAYLOR HENDERSON, an individual; R. JOHN TAYLOR, an individual; JAMES BECK, an individual, and UNKNOWN BONDING COMPANY, an unknown entity that issued the unknown fidelity ERISA Bond,

      Counterdefendants.

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- ii

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   ARGUMENT ...................................................................................................... 2

    A.   Legal Standard. ......................................................................................... 2

    B.   Professor McDermott's Deposition Transcripts Are Inadmissible Based on the Hawley Troxell Defendants' Refusal to Allow Miesen to Cross Examine Him. ........................................................................................................... 2

    C.   The Motion to Should Denied Because the Hawley Troxell Defendants Did Not Meet and Confer and the Issues Raised Can Be Addressed at the Time of Trial. .......................................................................................................... 4

    D.   This Court Should Exclude the Unsupported Allegations Re: Professor McDermott and Loren Ipsen's Lack of Personal Knowledge. .............................. 5

    E.   This Court Should Not Consider the Matters in the Hawley Troxell Defendants' Improper Circumvention of the Page Limits. ...................................... 6

    F.   Professor McDermott Is Eminently Qualified, He Not an Advocate or Partisan, and His Report and Opinions Are Supported, Reliable and Admissible. .................................................................................................. 6

        1.   Professor McDermott Is Eminently Qualified to Serve as an Expert Witness. ........................................................................................... 6

        2.   Professor McDermott's Opinions Are Relevant and Reliable. .................. 8

        3.   Professor McDermott Is NOT an Advocate or a Partisan ........................ 11

        4.   Professor McDermott Does NOT View Himself as an Advocate in this Lawsuit. ................................................................................... 16

        5.   Professor McDermott Will Not Provide an Improper Summation. .......... 18

        6.   Professor McDermott Is Not Partisan or Results Oriented. ..................... 18

        7.   Professor McDermott Need Not Testify as to Certain Matters for His Opinions. ......................................................................................... 19

III.  CONCLUSION .................................................................................................. 20

CERTIFICATE OF SERVICE ....................................................................................... 21

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- iii

**10-ER-2352**

Miesen responds to the Hawley Troxell Defendants' motion to exclude (Dkt. 1068):

## I.     INTRODUCTION

Miesen is pursuing double derivative action on behalf of the AIA Corporations and direct action for the ultimate benefit of *bona fide* creditors of the AIA Corporations (not GemCap), over thirty former employees and preferred shareholders owed millions of dollars for their shares or interests in the 401(k) Plan (who presently stand to receive nothing for their retirement in the 401(k)), and over 50 common shareholders (including certain shareholders in the ESOP, which was improperly terminated for only one-cent per share). (2/19/21 Miesen Decl. ¶¶ 8-14, Ex. A-G.)

Before this Court is the Hawley Troxell Defendants' motion requesting the wholesale exclusion of Professor McDermott[1] as an expert witness, which is based primarily on misconstrued and non-existing facts or other matters more properly the subject of a motion in limine at trial. (Dkt. 1068-1.) They primarily argue, while completely disregarding the egregious facts of this case and without challenging a single one of Professor McDermott's primary opinions on any legitimate basis, that he should be entirely excluded as an expert witness because is allegedly an advocate and partisan—when those unsupported allegations are false. (Dkt. 1068-1 at 5-21.) The remaining issues are more properly the subject of a meet and confer and, if necessary, a motion in limine at trial—not a motion to entirely exclude Professor McDermott as an expert witness.

In sum, the Hawley Troxell Defendants' motion is another example of their unsupported and desperate attempts to shoot the messengers in an effort to avoid having to address their egregious acts and the merits of Miesen's claims. The motion to exclude Professor McDermott as an expert witness is unsupported by the facts and without merit. The motion should be denied.

---

[1] Mr. McDermott prefers to not be referred to as "Professor McDermott" because he was a was a partner and full-time practitioner at the multi-national law firms for over 35 years. (2/19/21 McDermott Decl. Ex. 1, p. 28-29.) Nevertheless, Miesen will refer to him as "Professor McDermott" out of respect. Miesen means no disrespect.

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 1

## II.   ARGUMENT[2]

### A.  Legal Standard.

While the Hawley Troxell Defendants state some of the general legal standards relative to the admission of expert testimony (Dkt. 1068-1 at 2-5), Miesen will supplement the standard and provide other applicable standards and authorities in this response.

"In diversity jurisdiction cases, such as this one, [courts] 'apply the substantive law of the forum in which the court is located, including the forum's choice of law rules.'" *First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1153 (9th Cir. 2015) (citations omitted). But "federal procedural law" applies. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996).

Under Idaho law, expert testimony is required for legal malpractice claims unless within laymen's knowledge.[3] *Greenfield v. Smith*, 162 Idaho 246, 252, 395 P.3d 1279, 1285 (2017).

This Court should not consider new arguments and related evidence in the Hawley Troxell Defendant's reply. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 515 (D. Idaho 2013).

### B.  Professor McDermott's Deposition Transcripts Are Inadmissible Based on the Hawley Troxell Defendants' Refusal to Allow Miesen to Cross Examine Him.

"[A]n an objection may be made…to the admission of any deposition testimony that would be inadmissible if the witness were present and testifying." Fed. R. Civ. P. 32(b).

At a hearing or trial, all or part of a deposition may be used against a party on these conditions:
  (A) the party was present or represented at the taking of the deposition or had reasonable notice of it;
  (B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and
  (C) the use is allowed by Rule 32(a)(2) through (8).

---

[2] The declarations relied upon by this response were filed with Miesen's response to the motion to exclude Professor McDermott for allegedly being a contingent fee expert witness. (Dkt. 1096.)

[3] While Miesen's malpractice claims in this lawsuit primarily involve those requiring expert testimony, certain claims and issues are within the ability of laymen to determine.

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 2

Fed. R. Civ. P. 32(a)(1). "Former Rule 32(a) applied '[a]t the trial or upon the hearing of a motion or an interlocutory proceeding.' The amended rule describes the same events as 'a hearing or trial.'" Fed. R. Civ. P. 32(a) advisory committee's notes (2007 amendment).

Under Fed. R. Civ. Pr. 32(a)(1)(A), courts have stated that "notice is adequate if the party being deposed had sufficient opportunity to decide whether to attend the deposition *and cross-examine the deponent*." *Tabbert v. Howmedica Osteonics*, No. 2:15-CV-00039-SMJ, 2017 WL 10311420k, at \*4 (E.D. Wash. Sept. 29, 2017) (citing *In re Freedman*, 431 B.R. 245, 255 (Bankr. S.D. Fla. 2010), aff'd, 427 F. App'x 813 (11th Cir. 2011) ("Rule 32 allows the use of transcripts at trial if the party against whom it is offered had the opportunity to cross-examine the witness…")) (emphasis added); *Jackson v. United Artists Theatre Circuit, Inc.*, 278 F.R.D. 586, 596 (D. Nev. 2011) (noting the transcript would not have been admissible since there was no opportunity to cross examine); *Designing Health, Inc. v. Erasmus*, Nos. CV 98–4758 LGB (CWx), CV 99–9088 LGB (CWx), 2003 WL 25902463, at \*4 (C.D. Cal. May 1, 2003) ("The Court exercised its discretion to exclude the deposition…because [the] deposition was never concluded and Plaintiffs did not have an opportunity to cross examine [the witness]."); *Pillsbury Co. v. Conboy*, 459 U.S. 248, 259 (1983) ("…there remains the right of cross examination…"); *cf. Televisa, S.A. de C.V. v. Univision Commc'ns, Inc.*, 635 F.Supp.2d 1106, 1109 (2009) (admitting unavailable witness deposition transcript because the other party "had a full and fair opportunity to cross-examine" the witness). At a deposition, "[t]he examination and cross-examination of a deponent proceed as they would at trial…" Fed. R. Civ. P. 30(c)(1). Under Fed. R. Civ. P. 32(a)(1)(B), since hearsay is generally "not admissible," Fed. R. Evid. 802, admissibility is governed by Fed. R. Evid. 804:

> The Exceptions. The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
> (1) Former Testimony. Testimony that:

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 3

(A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and (B) is now offered against a party who had--or, in a civil case, whose predecessor in interest had--***an opportunity and similar motive to develop it by direct, cross-, or redirect examination***.

Fed. R. Evid. 804(b)(1) (emphasis added).

Here, based on the authorities cited and/or quoted above, Miesen objects to the admissibility of the transcripts from Professor McDermott's three-day deposition, including those relied upon by the Hawley Troxell Defendants (Dkt. 1070-2), because Miesen's counsel was not provided with an opportunity, let alone the required full and fair opportunity, to cross-examine Professor McDermott at his three-day deposition. (2/19/21 Bond Decl. ¶¶ 3-8, Ex. A (574:20-575:8), Ex. B (807:15-811:12), Ex. C-J; 2/19/21 Miesen Decl. ¶¶ 5-6.) Defense counsel did not adhere to the agreement for the third day of deposition (which Miesen voluntarily agreed to do). A more detailed argument for this issue is contained within Section B of Miesen's response to the other motion. (*See* Dkt. 1096.) Thus, the deposition transcripts for all three days should be excluded for this motion, other motions and at trial. Without waiving these objections, Miesen will rely on portions of the transcripts in his response below.

### C. The Motion to Should Denied Because the Hawley Troxell Defendants Did Not Meet and Confer and the Issues Raised Can Be Addressed at the Time of Trial.

***First***, this Court should deny the motion because the Hawley Troxell Defendants did not seek to resolve any of the matters in dispute or inquire with Miesen's counsel. (2/19/21 Bond Decl. ¶ 13.) *See* Loc. Rule 83.8(4) (Counsel is required to "[m]ak[e] good faith efforts to resolve by agreement any disputes."); *cf. Halbert v. County of San Diego*, No. 07cv1607-L(WVG), 2011 WL 13356067 (S.D. Cal. June 27, 2011) ("Because Defendants did not comply with the requirement to meet and confer prior to filing motions in limine, their motion is DENIED.").

***Second***, the Hawley Troxell Defendant's motion should be denied because it is a disguised

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 4

motion in limine, which this Court can address at trial. *Britton v. Dallas Airmotive, Inc.*, Not Reported in Fed. Supp., 2011 WL 13196592, at \*10 (D. Idaho May 20, 2011) ("The Court will reserve any decision regarding their qualifications to testify as an expert…and the scope of any such testimony if and until it is presented at trial."). This will also provide counsel the opportunity to address any issues of concern before this Court is forced to wade through a 653-page report, particularly since the vast majority of the facts, opinions, are unchallenged. Aside from the unsupported (false) allegation that Professor McDermott is an advocate and partisan, a significant number of issues could be rendered moot by simply having Professor McDermott remove certain words from his report (despite the fact that he has lived through some of the malfeasance through his role in other lawsuits since 2012). (2/19/21 Bond Decl. ¶ 13.)

### D. This Court Should Exclude the Unsupported Allegations Re: Professor McDermott and Loren Ipsen's Lack of Personal Knowledge.

This Court should exclude the Hawley Troxell Defendants' unsupported allegations of Professor McDermott or his report being an advocate, partisan, unqualified, unreliable, unhelpful, inappropriate, prejudicial, and inadmissible. (Dkt. 1068-1 at 1-2, 5-21.) Local Rule 7.1(b) (2) (moving party must submit "documentary evidence and other supporting materials…"); Local Rule 7(e)(1). On this basis, this Court should summarily deny the Hawley Troxell Defendants' motion. *Id*.; *Wade v. U.S. Office of Comptroller & Currency*, No. 2:13–cv–758 KJM AC, 2013 WL 3716702, at \*3 (E.D. Cal. July 13, 2013) (the "motion…is factually sparse, conclusory, and confusing. The motion will therefore also be denied for absence of a legal or factual basis.").

This Court should also exclude Loren Ipsen's self-serving testimony that "Roderick Bond retained Richard McDermott for his opinion letter practice experience in three other cases relating to the AIA Corporations…" (Dkt. 1070 at 2 ¶ 7.) Mr. Ipsen only has personal knowledge of a portion of one of those cases, *Reed Taylor v. Taylor*, and he never served as counsel for any party

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 5

in *Reed Taylor v. Bell* or *Donna Taylor v. Taylor*. Thus, he has no personal knowledge of the latter two cases or *Reed Taylor v. Riley* after Mr. Riley was dismissed on res judicata. Fed. R. Evid. 600. In addition, he is incorrect. While *Reed Taylor v. Riley* and *Reed Taylor v. Bell* were both legal malpractice cases, they both involved the collectability defense and the "case within the case" and *Donna Taylor v. Taylor* did not even involve any legal opinions, but was focused on corporate malfeasance. (2/19/21 Bond Decl. ¶ 9 n.10; 2/19/21 McDermott Decl. ¶¶ 4-8, Ex. 2-4.)

### E. This Court Should Not Consider the Matters in the Hawley Troxell Defendants' Improper Circumvention of the Page Limits.

"No memorandum…in support of or in opposition to a motion may exceed twenty (20) pages…without express leave of the Court…" Loc. Rule 7.1(a)(2); *see King County v. Rasmussen*, 299 F.3d 1077, 1082 (9th Cir. 2002) ("Declarations, which are supposed to 'set forth facts as would be admissible in evidence,' should not be used to make an end-run around the page limitations…").

Here, paragraph 7 of Mr. Ipsen's declaration contains over seven pages of partial quotes to Professor McDermott's Report (44 different items), paraphrases of other portions of his report (some of which are inaccurate or misleading), arguments and general references to numerous additional pages in his report, which the Hawley Troxell Defendants then improperly rely upon in a footnote without seeking leave to exceed the twenty-page limit. (Dkts. 1068-1 at 18 n.7; 1070 at 2-9 ¶ 7.) In addition, they included improper arguments in footnote 9, which also exceeded the page limits. (Dkt. 1068-1 at 20-21 n.9.) This Court should exclude those matters. Without waiving these objections, Miesen will nevertheless address the matters below.

### F. Professor McDermott Is Eminently Qualified, He Not an Advocate or Partisan, and His Report and Opinions Are Supported, Reliable and Admissible.

#### 1. Professor McDermott Is Eminently Qualified to Serve as an Expert Witness.

Before addressing the merits, the Hawley Troxell Defendants make a passing statement that "McDermott lacks any apparent qualification to render the range of opinions he had

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 6

disclosed." (Dkt. 1068-1 at 9.) Professor McDermott is eminently qualified to serve as an expert.

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion…" Fed. R. Evid. 702.  Licensure is not required to be qualified as a legal malpractice expert.[4] *Taylor v. Bell*, 185 Wash. App. 270, 286, 340 P. 951, 960 (Wash. Ct. App. 2014), *review denied*, 183 Wn.2d 1012, 352 P.3d 188 (2015).

In *Taylor*, the expert witness, the same Professor McDermott here, was excluded by the trial court because he was not licensed to practice law in Washington. 340 P. at 957. The Washington Court of Appeals reversed and held that "he is eminently qualified to testify as an expert." *Id.* at 960. (2/19/21 McDermott Decl. ¶ 6, Ex. 2-3.) That lawsuit involved malpractice claims and other litigation matters, including the "case within the case,"[5] collectability,[6] and violations of the Rules of Professional Conduct. (*Id.*; 2/19/21 Bond Decl. ¶ 9 n.1.)

Here, Professor McDermott is "eminently qualified to testify as an expert" in this matter. *Taylor*, 340 P. at 960. His qualifications include, without limitation, that: (a) he has been licensed to practice law in New York since 1967; (b) he was a practitioner and partner at multi-national law firms in New York for over 35 years; (c) he has over 35 years of experience as a practicing lawyer in all aspects of corporate law and litigation, including, without limitation, addressing conflicts of

---

[4] The Hawley Troxell Defendants' two legal malpractice expert witnesses are not licensed in Idaho either. (Dkts. 783-4 at 1, 783-6 at 13.) They are licensed in Minnesota and Colorado. *Id.*

[5] As Professor McDermott noted, "*See, e.g.,* 4 Ronald E. Mallen, *Legal Malpractice* § 37:94 (2019 ed.) ('If the attorney's error allegedly impaired the plaintiff's cause of action or defense, the plaintiff is said to have a multiple burden of proof. This means that the plaintiff must establish not only the attorney's negligence but also that there should have been a better result in the underlying lawsuit or matter. The objective of the trial-within-a-trial concept is to determine causation, i.e. whether the attorney's negligence caused injury, which means that the plaintiff has the burden of proving two cases in one lawsuit.') (footnotes omitted)." (2/19/21 McDermott Decl. Ex. 1, p. 97 n.282.) In other words, part of Reed Taylor's burden, if *Reed Taylor v. Bell* went to trial, would have been to prove that he would have prevailed upon the contract and tort claims asserted in his Fifth Amended Complaint. (*Id.* at ¶ 6, Ex. 2.)

[6] *See, e.g., Schmidt v. Coogan*, 181 Wash.2d 661, 335 P.3d 424 (2014). One of Reed Taylor's positions in that lawsuit was that he would have been paid the over $8,000,000 owed to him because this lawsuit would have successfully recovered the funds necessary to pay him. (2/19/21 McDermott Decl. ¶ 6, Ex. 2.) This is one of the reasons that Professor McDermott is even more qualified to be an expert in this lawsuit—he has been involved in these matters for many years and his opinions regarding the improper conduct have always been consistent. *Id.*

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 7

interest, engagement letters, limited scopes of representation, pleadings and motion preparation and revisions, litigation strategy, litigation and trial decisions, claim development, corporate governance, fee disputes, law firm management, associate supervision and related matters;[7] (d) he has been an adjunct law professor for over 20 years and teaches a law school course in corporate transactions, finance and litigation; (e) he is the author of a law school case book on the legal aspects of corporate finance and the author of two chapters of a treatise addressing legal opinions; (f) he has served as a special master mediating cases for the New York State Supreme Court Appellate Division since 2009; (g) he has served on the respected TriBar Opinion Committee for over 29 years; (h) he has served as an outside director on various boards of directors; and (i) he has served as an expert witness in three related cases involving many of the same overlapping facts, *Reed Taylor v. Bell*, *Reed Taylor v. Riley* and *Donna Taylor v. Taylor.* (2/19/21 McDermott Decl. ¶¶ 2, 4-8, Ex. 1, p. 28-34, Ex. 2-4.) Thus, he is "eminently qualified" to provide reliable opinions in this matter consistent with his report. (*Id*. at Ex. 1.) *Taylor*, 340 P. at 957.

### 2. Professor McDermott's Opinions Are Relevant and Reliable.

The Hawley Troxell Defendants also argue that Professor McDermott's opinions are unreliable. (Dkt. 1068-1 at 1, 5, 8-9, 18.) Professor McDermott's opinions are relevant and reliable.

Expert testimony in a legal malpractice action "does not lend itself to the scientific and technical concerns expressed by *Daubert*." *Tokio Marine & Nichido Fire Ins. Co. v. Calabrese*, No. CV 07–2514(JS)(AKT), 2011 WL 5976076, at *12 (E.D.N.Y. Nov. 28, 2011); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-52 (1999); Fed. R. Evid. 702. The Supreme Court has held

---

[7] This lawsuit does not involve malpractice as to discrete trial "judgment calls" or whether a complaint was adequately prepared. Thus, the fact that Professor McDermott has, on his own, only prepared a limited number of complaints and tried a limited number of cases is irrelevant. Moreover, he was actively involved in all aspects of litigation over his entire career even though he was not the lead or sole trial attorney in the lawsuit. He was involved in all aspects of his corporate clients' legal matters. (2/19/21 McDermott Decl. ¶ 3, Ex. 1, p. 28-34.)

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 8

that "[expert] testimony is admissible only if it is both relevant and reliable." 526 U.S. at 141.

> Although the Court has not been able to find any cases that articulate a complete set of factors specific to the testimony of attorney experts, courts have relied on a variety of measures to assess reliability of attorney expert testimony: (1) whether the expert identified the materials relied upon and personally examined the file underlying the case; (2) whether the expert sufficiently explained why he or she reached an opinion; (3) whether the expert cited other sources relied upon by attorneys such as applicable statutes, treatises, or publications by professional organizations; or (4) whether the expert demonstrated that his opinion is accepted by his peers. This is a non-exhaustive annotation of various tests relied upon in different courts, and thus the expert testimony need not satisfy all of these criteria to be deemed reliable.

*McDevitt v. Guenther*, 522 F.Supp.2d 1272, 1291-92 (2007) (citations omitted).

*First*, Idaho law requires expert testimony, unless the issue can be addressed by laymen. *Greenfield*, 162 Idaho at 252. Professor McDermott's opinions are clearly relevant to Miesen's claims (Dkt. 211; 2/19/21 McDermott Decl. Ex. 1), including the primary and rebuttal opinions offered against the Hawley Troxell Defendants in Section XII. (*Id*. at p. 429-640.)

*Second*, while Miesen will not wade through all of the opinions that meet the last measure quoted above regarding the opinions being accepted by his peers, Professor McDermott's opinions and report meets the first three measures quoted above and his peers have readily accepted opinions regarding attorneys breaching the standard of care by representing parties with conflicts of interest (which is one of the primary issues in this lawsuit as to the Hawley Troxell Defendants). (*Id*. at Ex. 1.) He was provided and has personally reviewed the entire files of the underlying cases at issue (including *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services*) and the

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 9

transactions at issue—many of them are listed by bates number in his report.[8] (*Id*. at p. 22-26; *see generally id*. at p. 34-661.) He also sufficiently explained his opinions and relied upon statutes, treatises, cases, and other applicable authorities to support his opinions. *Id*. Thus, he meets the next two measures. Significantly, the Hawley Troxell Defendants' two expert witnesses do not assert or opine that Professor McDermott has not met any of these standards. (Dkts. 783-4, 783-6.)

*Third*, other than baseless allegations of being an advocate or partisan, the Hawley Troxell Defendants have not "called sufficiently into question" Professor McDermott's opinion's "factual basis, data, principles, methods, or their application" to provide this Court with a viable reason to "determine whether the [opinions] ha[ve] 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire*, 526 U.S. at 148. (*See* Dkt. 1068-1 at 1-21.) Professor McDermott has offered approximately 103 pages of primary opinions against the Hawley Troxell Defendants. (2/19/21 McDermott Decl. Ex. 1, p. 429-532.) After including the objections to portions of the report improperly stated in Mr. Ipsen's declaration (Dkt. 1070 ¶ 8) and those cited in their motion (Dkt. 1068-1 at 9-10, 18-19), the Hawley Troxell Defendants have only objected to three minor discrete items out of the 103 pages of primary opinions, and they do not challenge a single complete opinion or the basis for any of his opinions, and his opinions are not impacted even if all of the objections were well taken. (*Id*.; 2/19/21 McDermott Decl. ¶ 37, Ex. 1 (p. 429-532), Ex. 5.[9]) In fact, the bulk of their objections are to his rebuttal opinions. (*Id*. at Ex. 1, p. 532-

---

[8] The Hawley Troxell Defendants' two experts were not even provided with, nor did they review, all of the files for the underlying cases. (Dkts. 783-4 at 4-5, 783-6 at 64-116.) It is difficult to imagine how Mr. Remele could purport to provide expert opinions when he was not provided the files and all of the court filings in the lawsuits prior to the time that he rendered his opinions. But it is even more perplexing that he also states in his report that "I have not been retained to opine on the legitimacy of John Taylor's actions." (Dkt. 783-6 at 29 n.16.) If anyone qualifies as an advocate or a partisan in this lawsuit, it is Mr. Remele. He will apparently say anything requested without even being provided with and reviewing all of the relevant documents and without addressing John Taylor (who purported to make all of the litigation decisions and was involved in all of the malfeasance. (2/19/21 McDermott Decl. Ex. 1.)

[9] Exhibit 5 to Professor McDermott's declaration contains a separate version of his report, which has been bookmarked with the Hawley Troxell Defendants' objections and each have been highlighted for the Court.

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 10

628, Ex. 5.) They do not allege that he failed to reliably apply the legal "principles and methods to the facts of the case," Fed. R. Evid. 702(d), nor do they allege there are any other deficiencies in his opinions that warrant his wholesale exclusion as an expert. Because they have failed to provide sufficient information or basis to challenge his primary opinions (or his other opinions), this Court should summarily deny the motion to exclude.  At most, there could be some minor issues that this Court could instruct Professor McDermott to not testify about or mention at trial. But they have failed to provide a basis to exclude his opinions.

Accordingly, Professor McDermott's opinions and his report are relevant and admissible, and the Hawley Troxell Defendants have failed to sufficiently challenge any of his opinions. At most, their objections would simply result in an order in limine for him to not testify regarding certain matters such as intent or credibility, but those issues do not impact his opinions.

### 3.  Professor McDermott Is NOT an Advocate or a Partisan.

The Hawley Troxell Defendants nakedly argue Professor McDermott should be excluded as an expert witness because they allege (falsely) that he is an advocate and a partisan.[10] (Dkt. 1068-1 at 5-21.) Their arguments are without merit and the cited cases do not apply here.

The Hawley Troxell Defendants rely on five inapposite cases and provide no evidence to support their arguments. *In Haldiman v. Cont'l Cas. Co.*, No. CV-13-736, 2014 WL 12670637, at *8 (D. Ariz. Aug. 26, 2014), the defendant moved to exclude the expert because he "formerly served as Plaintiff's attorney and his testimony does not meet the requirements of Rule 702." 2014 WL 12670637, at *7. The court excluded the expert noting that his opinions consisted mainly of "statements of law and legal conclusions." *Id*. at *9. That case does not apply here.

---

[10] The Hawley Troxell Defendants also argue that Professor McDermott is a contingent fee expert witness. (Dkt. 1068-1 at 5 n.2.) They are wrong. (2/19/21 Bond Decl. ¶¶ 9-12; 2/19/21 McDermott Decl. ¶¶ 18-21; Dkt. 1096.)

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 11

In *Stencel v. Fairchild Corp.*, 174 F.Supp.2d 1080 (C.D. Cal. 2001), the court denied the plaintiff's motion to disqualify the expert witness for the defendant because the plaintiff had a prior confidential relationship with a different expert witness at the same law firm. *Id*. at 1081-86. In reaching its decision, the court stated in passing the statement quoted by the Hawley Troxell Defendants that "[a]ttorneys are advocates…" *Id*. at 1085-86. (Dkt. 1068-1 at 5.) That case does not apply here. There is no motion to disqualify Professor McDermott.

In *Cacciola v. Selco Balers, Inc.*, 127 F.Supp.2d 175 (E.D.N.Y. 2001), the court excluded an engineering expert because he had no experience with the baler machine at issue and had never bothered to even inspect the machine. *Id*. at 181. The court stated in passing the quote provided in the Hawley Troxell Defendants' motion. *Id*. at 184. (Dkt. 1068-1 at 5.) That case does not apply.

In *Lippe v. Bairnco Corp.*, 288 B.R. 678 (Bankr. S.D.N.Y. 2003), a law professor was excluded as an expert because: (a) his opinions were based a single, conclusory statement about the business purpose for certain transactions being improper and their true motivations were to defraud asbestos claimants by engaging in fraudulent transactions; (b) he also had an engagement letter stating that he was acting as "counsel;" (c) he performed functions of a lawyer by developing arguments and theories, anticipating and preparing responses to defendants' defenses, and preparing lines of cross examination;  (d) he saw himself as "counsel" to the plaintiffs' lawyers; (e) the plaintiffs refused for over a year to work with defense counsel to agree on areas of permissible testimony for the expert; (f) the court did not believe that the expert was capable of limiting his testimony at trial to permissible areas; (g) the judge believed he could not testify with the "detachment and independent" necessary because he was "counsel and legal advisor" for the plaintiffs; and (h) the court stated that the plaintiffs had "gone to far, for they seek to call as a witness someone who has acted as their attorney, with" duties to zealously represent his clients.

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 12

**10-ER-2364**

*Id*. at 683-89. None of these issues apply here.

In *GST Telecom, Inc. v. Irwin*, 192 F.R.D. 109 (S.D.N.Y. 2000), a case that has never been cited by a single court in the Ninth Circuit, the court's decision contains little explanation of precisely what opinions were at issue beyond a general description that the case involved "the business judgment of the Board of Directors in several telecommunications transactions" and attorneys representing them. *Id*. at 110. The court excluded the expert by reasoning:

> The plaintiffs' summary judgment papers reveal that they have misconstrued the substance of this case as liability of the corporate attorneys for failing to overrule the Board of Directors, whom the lawyers served, by failing to restrain the votes and directions of the Board. Plaintiffs charge this as malpractice on the part of the attorneys. The experts fall in line with the plaintiffs; they furnish assumptions and conclusions disregarding the authority and supremacy of the Board in order to opine malpractice of the attorneys. The matters involved are more properly left to the judge and the triers of fact in this case.

*Id*. at 110. While that case is vague and it is impossible to determine precisely what the expert's opinions stated, that case does not apply because the business judgment rule is not an issue here.[11]

Here, the cases discussed above are distinguishable and inapposite as to Professor McDermott's testimony, opinions and report, including for the following reasons: **(a)** he has <u>never</u> acted as counsel for Miesen or his counsel; **(b)** he has <u>never</u> prepared any pleadings, developed arguments and theories, prepared cross-examination questions, prepared responses to the defendants' defenses, or engaged in any other activities as an attorney for Miesen or his counsel; **(c)** he has <u>never</u> entered into any engagement letters or agreements (oral or written) agreeing to be counsel for Miesen or his counsel; **(d)** he has <u>never</u> entered into any contingent fee payment agreements or arrangements for his report, opinions and testimony; **(e)** he has <u>never</u> acted as an

---

[11] Moreover, during the Hawley Troxell Defendants' representation of the AIA Corporations, there were <u>no</u> duly elected or fully seated boards of directors, <u>no</u> duly appointed officers, <u>no</u> full disclosure provided to shareholders, <u>no</u> annual shareholder meetings, <u>no</u> proper disclosure and resolution of any of the conflicts of interest, and <u>no</u> proper corporate governance. (2/19/21 McDermott Decl. Ex. 1, p. 56-428.)

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 13

advocate or partisan for Miesen and he has simply calls "balls and strikes." For example, he opined that the tolling agreements prepared by the Hawley Troxell Defendants were improper and not enforceable even though that was not in Miesen's best interests; **(f)** he has been asked to provide opinions and testimony within certain areas and did not provide any opinions or testimony that he did not believe were substantiated and supported by the evidence; **(g)** while the Hawley Troxell Defendants complain about some discrete portions of his report or testimony, they do not challenge his primary opinions or the principles and methodology used (and neither do their expert witnesses). In fact, the Hawley Troxell Defendants' key legal malpractice expert, Mr. Remele, was never even provided with all of the documents for the underlying cases and stated: "I have not been retained to opine on the legitimacy of John Taylor's actions." (Dkt. 783-6 at 29 n.16.) If anyone is guilty of being an advocate or partisan, it is Mr. Remele because no credible expert would opine on an underlying case without being provided and reviewing the files and addressing the key player involved in everything, John Taylor, who also claims to have made all of the litigation decisions; **(h)** his report and opinions do <u>not</u> involve any business judgment issues and the transactions and issues addressed by him involve serious conflicts of interest and corporate malfeasance, including, without limitation, the wide-spread and ongoing failure to comply with bylaws and articles (including the requirement to hold annual shareholder meetings as there has only been one confirmed annual meeting for AIA Services since 1999), the failure to properly elect directors and appoint preferred shareholder directors, and the AIA Corporations have never lawfully or properly performed corporate governance during the Hawley Troxell Defendants' representation as detailed in his report (and they have no evidence to prove otherwise); **(i)** the Hawley Troxell Defendants have never complained about his opinions in the past and they did not bother to reach out to Miesen's counsel prior to filing the motion—a review of his report shows

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 14

the factual and legal predicates, along with his opinions, have no legitimate basis for objection. There has been an effort to "cherry pick" and misconstrue a number of innocuous items in an over 650 page report in an effort to discredit and exclude his largely unobjectionable report; **(j)** even if some or all of the Hawley Troxell Defendants' specific objections as to any statements or opinions were well taken, they could be removed from his report and have no impact on Professor McDermott's opinions; **(k)** his experience serving as an expert in three related cases provides more credibility to his opinions because the lawsuits all involve overlapping facts and issues, his opinions have been consistent, and he has been involved for over eight years; and **(l)** if directed by this Court in an order in limine or other order, he would testify at trial within any constraints or limitations directed by the Court and there is no evidence that he would not comply with any such order. (2/19/21 McDermott Decl. ¶¶ 2-40, Ex. 1-5; 2/19/21 Bond Decl. ¶¶ 2-40, Ex. A-B; 2/19/21 Miesen Decl. ¶ 7; Dkts. 783-4, 783-6.)

Moreover, the only credible and legitimate evidence proves that Professor McDermott is entirely objective and independent. Even though Professor McDermott was aware that Miesen sought to enforce tolling agreements signed by John Taylor and others, he independently and objectively stated his opinions that the agreements were not enforceable. (2/19/21 Bond Decl. ¶ 14; 2/19/21 McDermott Decl. ¶ 31.) When Mr. Keller asked if the standstill and tolling agreements violated the articles and whether they were void an enforceable, Professor McDermott testified: "Yes" and that "[t]hey were not authorized," and "[t]hey are void and unenforceable." (2/19/21 Bond Decl., Ex. A (293:24, 294:5, 294:9, 295:10-11).) Mr. Keller then asked Professor McDermott about the fiduciary duties owed by a shareholder in derivative actions and asked: "How is in the best interest of AIA for Mr. Miesen to be calling an expert witness who is opinion…" but technical difficulties resulted in the deposition terminating before the question could be answered. (*Id.*

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 15

**10-ER-2367**

(299:20-25).)  However, the line of questioned confirmed that Professor McDermott is objectively "calling balls and strikes" and that Mr. Keller was trying to improperly imply that he had done something wrong by doing so. (*Id*. (293:19-299:25); 2/19/21 McDermott Decl. ¶ 31.) After defense counsel attacked Miesen's counsel, Mr. Glynn proceeded to try to bate Professor McDermott: "Sounds like you're quite the advocate for Mr. Bond" to which Professor McDermott replied "I'm here to call balls and strikes. I call them as I see them." [12](*Id*. (472:4-10).)

Therefore, there is <u>no</u> evidence that Professor McDermott is being an advocate or partisan, and there is no basis to entirely exclude him as an expert witness. If any portion of his testimony, report or opinions are objectionable, those issues can be addressed in a motion in limine if the parties are unable to reach an agreement as to any discrete objections or an order by this Court.

In reality, the Hawley Troxell Defendants are simply improperly seeking to improperly impact Miesen's meritorious claims without any legitimate basis, and *further* harm the *bona fide* creditors and stakeholders owed millions of dollars—who will likely never be paid absent this lawsuit being successful. (2/19/21 Miesen Decl. ¶¶ 8-14, Ex. A-G; 2/19/21 McDermott Decl. Ex. 1.) Nevertheless, Miesen will further address the Hawley Troxell Defendants other arguments.

### 4.   Professor McDermott Does NOT View Himself as an Advocate in this Lawsuit.

The Hawley Troxell Defendants argue that Professor McDermott views himself as advocate by misconstruing the facts. (Dkt. 1068-1 at 8-15.) Their arguments are without merit.

*First*, the Hawley Troxell Defendants' arguments fail for the reasons stated in Section F(3).

*Second*, As discussed in Section D above, Mr. Ipsen has no personal knowledge of Professor McDermott's involvement in two of the related underlying cases and Ipsen was only

---

[12] The deposition transcripts reveal that defense counsel expended more time personally attacking Professor McDermott and Miesen's counsel than they expended questioning him about the basis, analysis and facts regarding his hundreds of pages of primary opinions.

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 16

counsel in *Reed Taylor v. Riley* for part of the case. (2/19/21 McDermott Decl. ¶¶ 4-8, Ex. 2-4; 2/19/21 Bond Decl. ¶ 9 & n.1.) Professor McDermott's involvement as an expert in those three cases simply makes him more reliable because the cases involve many overlapping facts and similar claims, and his opinions have always been consistent. *Id*. **Third**, Professor McDermott is qualified as discussed in Section F(1). (Dkt. 1068-1 at 9.) **Fourth**, he is "certain" that all of the information was provided because, unlike Hawley Troxell's experts, Miesen's counsel provided him with *all* of the documents in discovery and search software to independently review all of the documents. (2/19/21 McDermott Decl. ¶ 21.) **Fifth**, as to Professor McDermott's complements of Miesen's counsel, the issue arose because defense counsel continued improperly attack Miesen's counsel. (*Id*. at ¶¶ 12, 23.) In addition, the allegations regarding any contingent fee arrangement are false.[13] (*Id*. at ¶¶18-21.) **Sixth**, any allegations as to "inferences" is not based on any opinions and, like the other objections to his over 650-page report, the matter is irrelevant to his opinions, as confirmed by the fact that they do not challenge the methodology or facts supporting a single opinion. (*Id*. at ¶ 37.)  **Seventh**, he has <u>never</u> been involved in being an attorney or advocate, nor has he directly and significantly assisted Mr. Bond in the prosecution of this action, taking an active advocacy role in developing pleadings, discovery and arguments to the Court on procedural and discovery motions." (Dkt. 1068-1 at 10; 2/19/21 Bond Decl. ¶¶ 14-15; 2/19/21 McDermott Decl. ¶¶ 25-26.) A review of his declarations will confirm that they were appropriate and related to his work as an expert witness. (*Id*.; Dkt. 1068-1 (citing to a number of his declarations).) **Eighth**, Professor McDermott's declarations submitted in motions were solely in his role as an expert and

---

[13] The Hawley Troxell Defendants disregard the critical ruling in *Taylor v. McNichols* (Dkt. 1068-1 at 10 n.5), which is that the Court stated that Reed Taylor's aiding and abetting claims had been adequately pleaded, but must await the resolution of the underlying action. *Taylor v. McNichols*, 149 Idaho 826, 843, 243 P.3d 642, 659 (2010). While Reed Taylor was not able to pursue those claims because his redemption was illegal, the Hawley Troxell Defendants continued to aid and abet as seen in the undisputed facts in Professor McDermott's report, and this suit is about Miesen.

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 17

most of the testimony and opinions contained in those declarations will not even be relevant for trial. (Dkt. 1068-1 at 10-13.) A review of those declarations and the context in which they were submitted proves they were expert work. (2/19/21 McDermott Decl. ¶¶ 22-39.) The Hawley Troxell Defendants have improperly mischaracterized those declarations and their purpose. ***Ninth***, Professor McDermott has either personally typed over half the report and dictated the content to Miesen's counsel to type over countless telephone conversations and weeks of meetings the contents of his report. (*Id*. at ¶ 25 & n.28.) The report was McDermott's work. (*Id*.; 2/19/21 Bond Decl. ¶ 15.) There is nothing inappropriate about that procedure as stated in *Accentra Inc. v. Staples, Inc.*, NO.: CV 07-5862 ABC (RZx), 2010 WL 11459205, at *4 (C.D. Cal. Oct. 7, 2010).

### 5.   Professor McDermott Will Not Provide an Improper Summation.

The Hawley Troxell Defendants argue, without any authority or evidence, that Professor McDermott will not properly testify. (Dkt. 1068-1 at 15.)  This unsupported argument should be rejected. *See* Section D. There is no evidence that Professor McDermott will not properly testify.

### 6.   Professor McDermott Is Not Partisan or Results Oriented.

The Hawley Troxell Defendants allege his 2017 testimony that he had "never seen such wide-spread corporate malfeasance and inappropriate conduct…" means that he is partisan and cannot be objective. (Dkt. 1068-1 at 15-16.) However, they disregard two very important facts. ***First***, when Professor McDermott was first retained by Miesen's counsel as an expert in this lawsuit, he already had five years of experience under his belt reviewing tens of thousands of pages of documents relating to the malfeasance and improper conduct at the AIA Corporations through his role as expert in three other cases. (2/19/21 McDermott Decl. ¶¶ 4-8, Ex. 2-4.) That experience merely adds credibility and reliability to his opinions and report. ***Second***, conveniently absent from the Hawley Troxell Defendants' entire motion is a discussion about the egregious facts a stated in

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 18

his report—not a single denial. (*Id*. Ex. 1.) In fact, the Hawley Troxell Defendants do not deny any of the improper conduct, nor can they. They just try to shoot the messengers.

**7.    Professor McDermott Need Not Testify as to Certain Matters for His Opinions.**

The Hawley Troxell Defendants argue that Professor McDermott should not be able to testify as to intent, motive, knowledge, state of mind and credibility, and that "any opinions" tainted by those matters. (Dkt. 1068-1 at 16-21.) These innocuous matters are easily resolved.

*First*, Miesen does not disagree that experts should not generally testify regarding the matters raised by the Hawley Troxell Defendants. Professor McDermott has not stated that he would testify as to those matters. Had the Hawley Troxell Defendants inquired with Miesen's counsel on some of their concerns, he would have taken the issue up with Professor McDermott. *See* Section C (2/19/21 Bond Decl. ¶ 13.) But as with everything in this lawsuit, they desire to waste the court and counsel's time. *Second*, Professor McDermott can testify without mentioning any of those issues and none of his opinions rely upon those matters. (2/19/21 McDermott Decl. ¶ 37, Ex. 5.) In other words, even if this Court ruled that he could not testify as to any of the matters raised by the Hawley Troxell Defendants, it would not impact any of his opinions. *Id*. Significantly, Professor McDermott has provided another version of his report with bookmarks and highlights to the specific objections asserted in Mr. Ipsen's declaration and the motion. (*Id*. at Ex. 5.) Most importantly, a review of the bookmarked and highlighted objections demonstrates that they are largely innocuous when placed in context and only three of the objections pertain to Professor McDermott's over 103 pages of primary opinions offered against the Hawley Troxell Defendants. *Id*. And an expert report is not admissible as evidence anyway. In sum, these are matters that are more properly the subject of a motion in limine at trial, if counsel is unable to reach a resolution. *Third*, some of the objection are taken out of context. (Dkt. 1068-1 at 18-19.) For example,

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 19

Professor McDermott did not opine as to Riley's credibility. He merely stated in passing in response to Mr. Lidstone's opinion that credibility was an issue. (2/19/21 McDermott Decl. ¶ 33.) As to his statement about Moran, Professor McDermott interviewed Moran more than once at length and he has experience evaluating attorneys from his prior management roles at multi-national law firms. (*Id*. at ¶ 36.) **Fourth**, they fail to connect the dots as to how any of the objection impact Professor McDermott's opinions. (Dkt. 1068-1 at 16-21.) They nakedly allege that he has failed to follow rules of evidence, but they fail to explain precisely which ones and how. (Dkt. 1068-1 at 19.) **Fifth**, the Hawley Troxell Defendants argue that he "has adopted allegations of Miesen's complaint," but they ignore the fact the evidence cited in his report is evidence and not the complaint. (Dkt. 1068-1 at 19 n.8; 2/19/21 McDermott Decl. Ex. 1, p. 56-321.) Nor do they provide a single concrete example of single fact in his report that he got wrong. **Sixth**, they incorrectly argue that Miesen's counsel is on a "crusade" against the Hawley Troxell Defendants and again disregard the egregious facts. (2/19/21 Bond Decl. ¶ 16.) While it is true that Riley avoided liability in *Reed Taylor v. Riley* solely based on res judicata by the Idaho Supreme Court (not on the merits), Judge Greenwood was spot on when he had previously denied Riley's motion by stating: "What Mr. Riley did, nor did not do, while drafting the 1995 opinion letter has nothing to do with him helping John Taylor and AIA commit torts in 2007." (2/19/21 Bond Decl. Ex. M, p. 7.) While Judge Brudie previously ruled against Reed Taylor, he has since discovered the truth: "I have had a lot of experience working with AIA and their financial records, and I don't know if I can trust any of them…" (2/19/21 McDermott Decl. Ex. 1, p. 289 ¶ 8.)

### III.   <u>CONCLUSION</u>

This Court should deny the motion, and enter an order excluding McDermott's deposition transcripts from consideration in all motions (including this one) and at trial.

MIESEN'S RESPONSE TO THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM RICHARD MCDERMOTT **[Dkt. 1068]**- 20

DATED:  This 19th day of February 2021.

RODERICK BOND LAW OFFICE, PLLC


By:   */s/ Roderick C. Bond*
          Roderick C. Bond
          Attorney for the Plaintiff Dale L. Miesen


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 19th day of February 2021, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Jeffrey A. Thomson:    jat@elamburke.com
Loren C. Ipsen:    lci@elamburke.com
Joyce A. Hemmer:    jah@elamburke.com
Bradley S. Keller:    bkeller@byrneskeller.com
Alyson A. Foster:   alyson@dempseyfoster.com
William E. Adams:  bill@weadamslaw.com
Tyler S. Waite:        twaite@campbell-bissell.com
Michael S. Bissell:    mbissell@campbell-bissell.com
David R. Lombardi:    drl@givenspursley.com
Daniel L. Glynn:    dglynn@idalaw.com


          */s/ Roderick C. Bond*
          Roderick C. Bond

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for the Plaintiff Dale L. Miesen

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>        Plaintiff,<br><br>      **v.**<br><br>HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; and GEMCAP LENDING I, LLC, a Delaware limited liability company;<br><br>        Defendants. | Case No. 1:10-cv-00404-DCN-CWD<br><br>DECLARATION OF DALE L. MIESEN |

DECLARATION OF DALE L. MIESEN - i

**10-ER-2374**

CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; R. JOHN TAYLOR, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual,

Defendants/Third-Party Plaintiffs,

v.

REED TAYLOR, an individual,

Third-Party Defendant.

REED TAYLOR, an individual,

Third-Party Defendant/ Counterclaimant,

v.

CONNIE TAYLOR HENDERSON, an individual; R. JOHN TAYLOR, an individual; JAMES BECK, an individual, and UNKNOWN BONDING COMPANY, an unknown entity that issued the unknown fidelity ERISA Bond,

Counterdefendants.

DECLARATION OF DALE L. MIESEN - ii

I, Dale L. Miesen, declare:

1.     I am a citizen of the United States, over the age of eighteen, and competent to testify in court, including as to matters in this Declaration. This Declaration is based on my personal knowledge.

2.     Without waiving any attorney-client privilege or work-product, I am providing the information in Paragraphs 3 and 4 to this Court, which was my understanding long before the Hawley Troxell Defendants filed their motion to exclude Professor McDermott as a witness.

3.     I was aware and approved Mr. Bond's firm retaining Professor McDermott as one of my expert witnesses in this lawsuit. I approved the retaining of all experts and all costs advanced for this lawsuit. I approved and was aware that all payments to Professor McDermott and the liability for paying him would be the sole responsibility of Mr. Bond's firm, but that I would be ultimately responsible for paying Mr. Bond's firm back for all sums that it paid to Professor McDermott (as I am ultimately responsible to pay Mr. Bond's firm for costs advanced for other expenses approved by me for this lawsuit regardless of whether I win or lose). I was aware and approved of Mr. Bond's firm paying Professor McDermott $350 per hour for work on his report and $400 per hour for trial testimony as stated in his report, plus reimbursement of all out-of-pocket expenses. I was aware and approved, from day one, that Professor McDermott would be paid certain payments as he requested and that he would submit his final bill when the work on his report was substantially complete and that he would be paid in full prior to the time of trial, after deducting payments must be made prior to the time of trial as stated in his report. I was aware and approved that most of these payments were made by Mr. Bond's firm after Professor McDermott submitted a "bill" through Law Pay and through the checks written by Mr. Bond's firm. I am aware and have approved of Mr. Bond's firm paying Professor McDermott a total of $119,775 in

DECLARATION OF DALE L. MIESEN - 1

10-ER-2377

payments requested by Professor McDermott through the date of this declaration (Professor McDermott requested, and Mr. Bond's firm paid, another $5,000 payment after his deposition). I am not aware of any payments requested by Professor McDermott that were not timely paid by Mr. Bond's firm. I was aware and approved that Professor McDermott was going to discount the number of hours that he charged for his services to ensure that the fee was fair through one bill being provided after the work on his report was substantially complete, and that Professor McDermott would not change interest on any accrued balances that would be reflected in his final bill. There have never been any agreements to pay Professor McDermott on a contingent fee basis or based on the outcome of this lawsuit. There are no agreements to pay Professor McDermott anything other than the hourly rates that he charges and reimbursement of his out-of-pocket expenses. It has always been my understanding, including through conversations with Professor McDermott, that he would be paid by the hour and reimbursed for out-of-pocket costs (or that Mr. Bond's firm would directly pay certain out-of-pocket costs such as travel expenses). I would add that none of the defendants bothered to ask me at any of my depositions whether Professor McDermott was being paid on a contingent fee basis. I would have told them "no" had they asked me. My other expert, Mr. Hile, is also being paid by the hour for his work. There is no agreement to pay him through a contingent fee. There is also no agreement to pay either Professor McDermott or Mr. Hile any bonuses. Rather, they both will only be paid by the hour.

4. I am aware that Mr. Bond's firm has advanced over $350,000 in out-of-pocket costs and expenses for prosecuting my claims in this lawsuit, which excludes any sums that will be owed to Professor McDermott after he sends his statement to Mr. Bond's firm and excludes any interest

DECLARATION OF DALE L. MIESEN - 2

owed by me to his firm on the amount owed by me).[1] Other than the $26,066.14 (plus any interest) that I have been billed by the discovery master and a recent bill for $120.75 and two other recent invoices that Mr. Bond's firm will be paying in the normal course of business.  Mr. Bond's firm has paid all sums due for all costs incurred or advanced for this lawsuit (including over $45,000 in deposition costs paid to court reports and videographers). I am not aware of any costs that have been billed and have not been paid by Mr. Bond's firm or me (I have paid some minor costs). I am not aware of any unpaid invoices or bills. While Mr. Bond voluntarily advanced $20,088.90 to pay part of the payments that I owed to the discovery master, his firm never agreed to assume responsibility for paying those sums and I understand that I am the only one responsible for paying the discovery master.[2] While I understand that this lawsuit has been a heavy financial burden on Mr. Bond's firm (which is why he would not pay the balance due to the discovery master for me or advance the fees that the Hawley Troxell Defendants demanded to depose their expert witnesses), I have no reason to believe that Mr. Bond's firm will not pay Professor McDermott in full after he submits his bill for his work prior to trial. I believe that the defendants are trying, and have been trying, to influence to their benefit and/or end this lawsuit by driving up the costs of litigation. They have already succeeded in their goals in terms of discovery. Regardless, I am seeking to retain co-counsel to assist Mr. Bond at trial. Without waiving privilege or work product, I have already had offers to assist Mr. Bond, including to reimburse him for one-half of his costs and pay one-half of all costs going forward. As a result, even if Mr. Bond is unable to pay (which

---

[1] The Hawley Troxell Defendants incorrectly argue that Mr. Bond's firm has only incurred over $250,000 in costs in this lawsuit by relying on testimony provided approximately one year ago. To my knowledge, they have never contacted Mr. Bond to inquire whether his firm had advanced more costs and expenses since that time, nor have they contacted Mr. Bond to inquire whether his firm was going to pay Professor McDermott in full.

[2] As this Court is aware, I opposed the appointment of a discovery master because I did not have the funds to pay one. The discovery master still billed me the majority of the fees, $46,155.04, and only charged the Hawley Troxell Defendants $23,810.14, GemCap $25,106.54, Mr. Glynn's clients $21,127.84 and Reed Taylor $2,901.14. I also note that GemCap has not paid $7,641 and Mr. Glynn's clients have not paid $6,476.14.

DECLARATION OF DALE L. MIESEN - 3

I doubt), I have other options to ensure Professor McDermott is paid in full prior to trial as required.

5.      I have attended in person or through electronic means to most of the depositions taken in this lawsuit. I listened to the entire three-day deposition taken of Professor McDermott in November 2020. Without waiving privilege as to the discussions between me and Mr. Bond, I was aware that Mr. Bond had many questions to ask Professor McDermott to clarify his answers to many questions. I also listened to conversations both on and off the record at the deposition. At the end of the second day of deposition time, the parties agreed to continue the deposition and that Mr. Bond would be permitted to have time to question Professor McDermott after the defendants' lawyers were done questioning him. Mr. Bond was not offered or permitted any time to question Professor McDermott on the first two days of deposition time. I agreed to voluntarily permit Professor McDermott to be deposed again for a third day based on the representations that Mr. Bond would be able to have sufficient time to question him after the defendants' lawyers were done. After Mr. Glynn emailed stating that he would need two to three hours of time and that Mr. Keller would need about two hours, I agreed to voluntarily have Professor McDermott deposed based on the understanding that Mr. Bond would have at least two hours to question Professor McDermott.

6.      Professor McDermott's third day of deposition proceeded as planned. I listened and watched the entire deposition on Zoom (as I did the first two days). After the defendants' lawyers exceeded their five hours of time by about fifty minutes, Mr. Bond advised the defendants' lawyers that there was insufficient time for him to question Professor McDermott and stated that the deposition would need to be held on one more day to allow time for everyone to finish questioning Professor McDermott. Mr. Bond stated that Professor McDermott would not agree to be deposed for more than seven hours. At that time, Mr. Keller offered to allow Mr. Bond to have the

DECLARATION OF DALE L. MIESEN - 4

remaining approximately one hour left to start his questioning of Professor McDermott, but Mr. Keller refused to state that he was done asking questions. When pressed by Mr. Bond, Mr. Keller refused to state that he was done questioning Professor McDermott. Mr. Bond again stated that there was insufficient time for him to question Professor McDermott as had been represented and that the defendants' lawyers had gone over their agreed time. While the defendants' lawyers stated that they objected to stopping the deposition, they never stated that they would take the position that Mr. Bond would not be permitted to question Professor McDermott or that his deposition had been concluded. The first time those allegations happened were in their email responses to Mr. Bond's email inquiring on scheduling the final day of Professor McDermott's deposition (Mr. Bond forwards all communications to me and I review them). After Mr. Bond emailed them back stating that he objected to the admissibility of Professor McDermott's deposition transcripts because he was not provided an opportunity to question him. Mr. Bond blind carbon copies me on all communications and, apparently the defendants' lawyers never emailed Mr. Bond back because Mr. Bond never forwarded any such emails to me. Had I known that the defendants' lawyers were going to take the position that Professor McDermott's deposition was over, that they were not going to deal in good faith to complete it, and that they were not going to allow Mr. Bond to question Professor McDermott, I would have instructed Mr. Bond to use the remaining time on the third day even though he would not likely have time to complete his questioning. I incorrectly believed that the defendants' lawyers would deal with us in good faith as we had done for them. They did not.  I would also add that the defendants' lawyers never asked Professor McDermott a single direct question about whether he was being paid contingent fee at any of the three days of deposition time.

DECLARATION OF DALE L. MIESEN - 5

7.      I have never retained Professor McDermott to be my attorney or act as my lawyer in this lawsuit. In my conversations with Professor McDermott, he has always been gathering information or providing other functions as my expert witness in this lawsuit. His declarations submitted in this case for discovery were solely for the purpose of obtaining as much information as he could so that he could properly prepare his opinions. He was not involved in preparing or presenting the Third Amended Complaint or any claims asserted in that complaint. The discussions regarding my claims and legal theories have only been discussed between me and Mr. Bond. Professor McDermott has not been involved in my discussions with Mr. Bond on developing claims and legal theories and he has not been involved in any other function as a lawyer for me. He has only been retained to act as my expert witness and he has only acted in that capacity during all of my interactions with him. He has not been asked to prepare any opinions that he did not independently believe were appropriate. He has not represented my interests in this lawsuit other than acting as one of my expert witnesses. Without waiving attorney-client privilege or work product protections, the emails and communications regarding the preparation and editing of all legal filings have only been between me and Mr. Bond. I have attended all deposition in person or via telephone or Zoom. Professor McDermott was never provided with copies of Mr. Bond's detailed deposition question outlines and he was not involved in preparing them or selecting the exhibits for the depositions. He merely attended certain depositions to gather information for his opinions. To the extent that he provided any input on a few limited issues at the depositions, he limited the issue to providing a few questions on information that he wanted to consider for the preparation of his opinions and report. In my experience with Professor McDermott, he is very straightforward and offers opinions that he believes are correct regardless of my views at the time. For example, he offered opinions that the tolling agreements were improper and not enforceable

DECLARATION OF DALE L. MIESEN - 6

even though he was aware that I would be seeking to enforce those agreements to oppose statute of limitations arguments. In addition, Professor McDermott's interviews with me have been limited to ascertaining information that he sought for his opinions. For example, he has inquired with me on several occasions to confirm that no disclosures or shareholder meetings had taken place (we have been demanding for years that corporate governance be properly observed, including holding annual shareholder meets, but our demands go unaddressed).

8.      It is important for this Court to know that this lawsuit is not just about me, as described in more detail in the following paragraphs. There are many creditors and stakeholders (share owners and 401k Participants) who have been cheated by John Taylor and the people who have assisted him.

9.      There are legitimate creditors (not GemCap) who must be paid. Attached as *__Exhibit A__* are the consolidated financial statements for AIA Services and AIA Insurance dated December 31, 2019 and December 31, 2018, which show some creditors who are owed (John Taylor has refused to properly answer interrogatories stating exactly who is owed and how much so it is impossible for me to know all of the creditors and whether they are legitimate creditors). As an initial matter, despite having concealed the guarantees and subsequent settlement agreement with GemCap, the financial statements still do not mention any aspect of the over $12,000,000 that GemCap claims is owed by AIA Services and AIA Insurance as indicated in the settlement agreement that we were only able to lawfully obtain after it was filed by someone else in a different lawsuit, which is filed under Docket 128 in this lawsuit. This is consistent with everything that I have seen involving John Taylor and the AIA Corporations. I would have never believed that John Taylor could be so devious and dishonest until I began to learn of the issues after Reed Taylor filed suit. In addition, Exhibit A demonstrates that there is nothing left other than the apparent worthless

DECLARATION OF DALE L. MIESEN - 7

10-ER-2383

loans made to Pacific Empire Radio, which is another entity John Taylor owns shares in and none of the $1,566,828 indicated as being owed was ever fully disclosed to, or authorized by, the shareholders (a substantial amount of the loans to Pacific Empire Radio were made while the Hawley Troxell Defendants were representing the AIA Corporations. The $1,566,828 that John Taylor claims is owed to AIA Services does not include interest (John Taylor testified that he stopped according interest many years ago) and I have information the amount owed is more. This Court should also be aware that Pacific Empire Radio has been unable to timely pay its bills during all times that AIA Services lent money to it, parties had been sued for over $6,000,000 for unpaid loans (including John Taylor) and it had tax liens for not paying employee taxes for many years. This is but one example of the improper transactions that have occurred and been concealed from me and many other shareholders.

10.    In addition, there are legitimate creditors who have not been paid. For example, AIA Insurance has never paid all of the former policyholders owed $425,116 (as represented under the entry "ULIC settlement payable" on page 2 in Exhibit A), plus accrued interest and any penalties (Texas law requires both and John Taylor testified that the former policyholders not paid live in Texas), for their share of a settlement agreement in 2008 because John Taylor and the others improperly used those funds for other purposes (which they have done on countless occasions for their own benefit or the benefit of entities that they partially own or control). Attached as *__Exhibit B__* is a true and correct copy of the settlement agreement dated August 2008 (the signatures show that the agreement was signed on different dates in August by the parties). As reflected in Part III of the Agreement (relevant pages are book marked), AIA Insurance was required to pay the sums owed or send the money to the state in which the former policyholder last resided if they could not be located. The settlement agreement in the lawsuit with the state of Idaho did not authorize John

DECLARATION OF DALE L. MIESEN - 8

Taylor or the other defendants to use those funds for any other purpose and they were required to pay them to the state where the former policyholders lived if they were unable to locate them (John Taylor testified that they were all from Texas and Texas has a criminal statute that required the funds to be timely paid and the report timely made to the state). The $425,116 owed was due to be paid while the Hawley Troxell Defendants were actively representing AIA Services and AIA Insurance in 2008 (including for the entry into the settlement agreement in Exhibit B.)

11.	By way of another example, Donna Taylor, who is the sole lawful holder of Series A Preferred Shares,[3] claims to be owed over $1,000,000 for the sums owed to her, interest and attorneys' fees, depending on the amount of interest and the fees and costs awarded to her (she was awarded attorneys' fees and costs on her last appeal and we have been provided with no information that those fees and costs were ever paid). Donna Taylor was required to be paid by contract on or before December 2003. This was not done and, instead of paying her, John Taylor and others have spent the money that could have gone towards paying her to instead defend against her lawsuits, including paying their own fees and costs with money from the AIA Corporations when shareholders never approved those payments (nor have we been provided with disclosures for them). Donna Taylor has payment priority over all other shareholders.

12.	AIA Services' 401(k) Plan holds 92,500 Series C Preferred Shares in AIA Services, which have the next highest payment priority. The dividends accumulate whether they are declared or not on the Series C Preferred Shares. Rather than pay Donna Taylor or pay the accumulated dividends owed and redeem the Series C Preferred Shares to eliminate any further dividends, John Taylor and others used the money for other purposes, including making the improper loans to Pacific Empire Radio as discussed above.  Despite discovery requests (including interrogatories)

---

[3] John Taylor claims to have issued Series A Preferred Shares to himself in order to be able to outvote Donna Taylor someday, but I am challenging the issuance of those shares in this lawsuit.

DECLARATION OF DALE L. MIESEN - 9

requesting the number of Series C Preferred Shares allocated to each participant in AIA Services' 401(k) Plan, John Taylor has refused to provide the information. Attached as ***Exhibit C*** is a true and correct redacted copy of the Statement for the AIA Services Corporation 401(k) Profit Sharing Plan from January 1, 2010 to December 31, 2010. Exhibit C has been redacted to remove certain personal information. I obtained Exhibit C from GemCap in discovery (John Taylor failed to produce Exhibit A to GemCap), which was produced in another lawsuit involving John Taylor and GemCap. Exhibit C shows a total dollar amount for each participant's allocations of Series C Shares (although Exhibit C does not show the number of shares or the correct valuation). According to John Taylor's testimony and documents I have reviewed in discovery, no dividends had been declared or paid on the Series C Preferred Shares held in AIA Services' 401(k) Plan since March 31, 1998. In pursuing this derivative action, I am trying to ascertain what is owed to the many former employees who are participants in the Plan. As a result, it was necessary to ascertain the number of shares allocated to each participant by determining the percentage ownership each of them had as of January 1, 2020 and then I was able to compute the number of shares allocated to them by multiplying the percentage ownership by the 92,500 Series A Preferred Shares held in the Plan. Attached as ***Exhibit D*** is a true and correct copy of a spreadsheet prepared to ascertain the allocations of Series C Preferred Shares for each participant in AIA Services 401(k) Plan using the mathematic computations described above and the total principal and accumulated dividends owed to each participant as of March 31, 2021 (while I included John Taylor in my calculations to demonstrate that I am correct, he is not entitled to anything). Once I was able to determine the number of shares allocated to each participant, I would then compute the accumulated dividends owed to each of them at the rate of 10% per annum for each $10 stated value Series C Preferred Share. This Court should also know that John Taylor previously had one of the Hawley Troxell

DECLARATION OF DALE L. MIESEN - 10

**10-ER-2385**

Defendants' expert witnesses, Mr. Pinkerton, value these shares at $0 without considering the improper conduct that has occurred. In this lawsuit, Mr. Pinkerton is now seeking to assist in offering opinions to try to ensure that the former employees in Exhibit D are not paid their retirement. While Exhibit D includes the shares held by John Taylor, my position in this lawsuit is that he is not entitled to be paid based on his conduct, but I included him in the calculations to demonstrate that they are accurate. I also understand that Reed Taylor received some mandatory payments after the date of the statement in Exhibit C. As a result, any sums owed to him would be reduced by those payments.

13.     I faced a similar problem with the ESOP that was terminated in 2012 for one cent per share shortly before John Taylor, Beck and Henderson sought to effectuate a reverse stock split upon the minority shareholders (including me) to eliminate us for ten cents per share (the reverse stock split that Judge Kerrick ruled should not have been pursued when he dismissed the lawsuit that they pursued through AIA Services against me and other shareholders). Attached as ***Exhibit E*** is a true and correct copy of the ESOP reconciliation for the payments made for the redemption of the common shares for the ESOP. Because I was able to ascertain by comparing the stock ledgers and the payments to determine the number of shares, I was able to determine that dividing each payment in Exhibit E by one cent per share would provide the number of common shares allocated to each participant in AIA Services' ESOP. Once again, I included John Taylor in my calculations so that I could confirm the numbers were correct, but he is not entitled to any common shares (I note that he even cashed his check). Attached as ***Exhibit F*** is a true and correct copy of a spreadsheet prepared to determine the number of common shares allocated to each participant in the ESOP.  I also indicate with a check mark next to certain participant's names to indicate whether they cashed the check. Many did not. I am assuming that if I am successful in this lawsuit, the

DECLARATION OF DALE L. MIESEN - 11

Court can reduce any final payment to the participants that cashed their checks by the amount of their check. However, these issues, along with distributions for the Series C Preferred Shares held in the AIA Services' 401(k) Plan will need to be addressed after trial. As with the retirement issue, my position is that John Taylor is not entitled to any shares based on his self-serving conduct, but I included him in my calculations to demonstrate that they are accurate.

14.     Finally, there many shareholders who have a stake in the outcome of this lawsuit. Attached as *Exhibit G* is a true and correct copy of a shareholder list for the common shareholders in AIA Services, which produced by John Taylor's counsel Mr. Glynn in this lawsuit and indicates the number of shares John Taylor claims were held by each shareholder from 2011 through June 30, 2019. John Taylor had 475,000 common shares issued to him in connection with his Executive Officer's Agreement which I am seeking to have canceled because he never timely exercised his options, and his compensation should also be disgorged. In addition, John Taylor allegedly acquired 3543,659 additional common shares in 2012 from other shareholders (including Beck and Cashman) when those shares were not properly issued or paid for. As a result, I am not taking the position that Exhibit G is accurate as to the number of shares held by John Taylor and certain other holders. Exhibit G also shows the 85,600.45 common shares held by the ESOP before it was improperly terminated for one-cent per share, which I discussed above. However, Exhibit G is accurate as to most shareholders based on the information that I have been able to obtain.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF IDAHO THAT THE FOREGOING IS TRUE AND CORRECT.

*February 19, 2021, Midway, Utah*                   */s/ Dale L. Miesen*
Date and City and State Signed                   Patrick M. Moran

DECLARATION OF DALE L. MIESEN - 12

10-ER-2387

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 19th day of February 2021, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Jeffrey A. Thomson:   jat@elamburke.com
Loren C. Ipsen:   lci@elamburke.com
Joyce A. Hemmer:   jah@elamburke.com
Bradley S. Keller:   bkeller@byrneskeller.com
Alyson A. Foster:   alyson@dempseyfoster.com
William E. Adams:  bill@weadamslaw.com
Tyler S. Waite:   twaite@campbell-bissell.com
Michael S. Bissell:   mbissell@campbell-bissell.com
David R. Lombardi:   drl@givenspursley.com
Daniel L. Glynn:   dglynn@idalaw.com

*/s/ Roderick C. Bond*
Roderick C. Bond

DECLARATION OF DALE L. MIESEN - 13

**10-ER-2388**

## Series C Preferred Share Allocations to Participants in AIA Services' 401(k) Plan

| | |
|---|---|
| So-Called Value of the 92,500 Series C Preferred Shares Held in AIA Services' 401(k) Plan as of 1/1/2010* | $1,205,275.00 |
| Principal Owed on 92,500 Series C Preferred Shares Held in AIA Services' 401(k) Plan ($10 Per Share)** | $925,000.00 |
| Amount of Accumulated Dividends Per Year (2.5% per quarter) on the 92,500 Series C Preferred Shares | $92,500.00 |
| Accumulative Dividends on the 92,500 Series C Preferred Shares From 3/31/1998 through 3/31/2021 | $2,127,500.00 |
| | |
| **Total of $10 Par Value (Principal) Plus Accumulated Dividends Owed through 3/31/2021** | **$3,145,000.00** |
| **Total Owed Per Series C Share ($10 Per Share Principal Plus Accumulated Dividends through 3/31/2021** | **$34.00** |

| Employee/Participant Name | Date of Hire | Statement Value Allocated as of 1/1/2010*** | Percentage Ownership as of 1/1/2010 | Number of Shares Allocated as of 1/1/2010 | True Value of Allocated Shares as of 3/31/2021 |
|---|---|---|---|---|---|
| Abel, Teresa | 4/9/2001 | $65.98 | 0.0055% | 5.0637 | $172.17 |
| Ausman, Susan | 6/29/1987 | $6,616.99 | 0.5490% | 507.8273 | $17,266.13 |
| Ball, Caroline | 3/25/1991 | $7,310.35 | 0.6065% | 561.0399 | $19,075.36 |
| Bennett, Diane | 6/16/1986 | $20,520.53 | 1.7026% | 1,574.8680 | $53,545.51 |
| Cleveland, Cori | 7/27/1992 | $7,760.07 | 0.6438% | 595.5541 | $20,248.84 |
| Cline, Robert | 9/1/1981 | $58,879.46 | 4.8851% | 4,518.7613 | $153,637.88 |
| Clipson, Richard | 10/1/2006 | $6,037.64 | 0.5009% | 463.3645 | $15,754.39 |
| Courtney, Shane | 8/1/1992 | $4,317.07 | 0.3582% | 331.3177 | $11,264.80 |
| Deeney, Dawna | 6/24/1992 | $3,508.80 | 0.2911% | 269.2863 | $9,155.73 |
| Duclos, JoLee | 6/11/1990 | $11,741.28 | 0.9742% | 901.0959 | $30,637.26 |
| Ferriss, Linda | 5/13/1991 | $8,854.42 | 0.7346% | 679.5411 | $23,104.40 |
| Freeman, Bryan | 8/16/1982 | $97,154.40 | 8.0608% | 7,456.2087 | $253,511.10 |
| Gibbons, Cathy | 3/25/1991 | $10,583.28 | 0.8781% | 812.2241 | $27,615.62 |
| Harwick (Ellis), Krista | 10/20/1997 | $1,596.76 | 0.1325% | 122.5449 | $4,166.53 |

DLM - 119792

**Exhibit - D, p. 1**
**10-ER-2389**

| | | | | | |
|---|---|---|---|---|---|
| Henderson, Shelly | 9/27/1982 | $27,687.94 | 2.2972% | 2,124.9378 | $72,247.89 |
| Hermann, Traci | 6/21/1982 | $17,080.77 | 1.4172% | 1,310.8803 | $44,569.93 |
| Hostetler, Lee Ann | 5/18/1976 | $82,862.31 | 6.8750% | 6,359.3484 | $216,217.85 |
| Jeppsen, James | 8/17/1992 | $430.29 | 0.0357% | 33.0230 | $1,122.78 |
| Johnson, Frank | 8/6/1990 | $7,091.14 | 0.5883% | 544.2164 | $18,503.36 |
| Jones, Michael | 6/24/2002 | $766.48 | 0.0636% | 58.8243 | $2,000.02 |
| Kime, Nancy | 11/16/1987 | $4,254.85 | 0.3530% | 326.5426 | $11,102.45 |
| Light, Kerry | 2/24/2000 | $1,350.45 | 0.1120% | 103.6416 | $3,523.81 |
| Mason, Kristine | 4/16/1992 | $1,127.75 | 0.0936% | 86.5503 | $2,942.71 |
| McFarland, Stephanie | 2/11/1991 | $2,794.01 | 0.2318% | 214.4290 | $7,290.59 |
| Nordhagen, Mary | 7/1/1987 | $13,040.88 | 1.0820% | 1,000.8350 | $34,028.39 |
| Peer, Donna | 1/28/1991 | $5,995.12 | 0.4974% | 460.1013 | $15,643.44 |
| Ravary, Carol | 11/3/1982 | $28,650.24 | 2.3771% | 2,198.7905 | $74,758.88 |
| Reisdorph (Broncheau), Pam | 7/1/1982 | $19,574.12 | 1.6240% | 1,502.2348 | $51,075.98 |
| Roberts, Dan | 5/1/1996 | $2,512.62 | 0.2085% | 192.8335 | $6,556.34 |
| Sarbacher, Darlene | 4/12/1982 | $67,630.76 | 5.6112% | 5,190.3883 | $176,473.20 |
| Taylor, Jay | 5/14/1990 | $500.08 | 0.0415% | 38.3791 | $1,304.89 |
| Taylor, John | 11/1/1976 | $351,006.39 | 29.1225% | 26,938.3262 | $915,903.09 |
| Taylor, Jud | 3/16/2005 | $5,200.60 | 0.4315% | 399.1251 | $13,570.25 |
| Taylor, Reed | 1/1/1970 | $269,420.95 | 22.3535% | 20,676.9724 | $703,017.06 |
| Valliant, Carol | 12/5/1983 | $36,286.82 | 3.0107% | 2,784.8672 | $94,685.49 |
| Whisner, Diane | 4/21/1986 | $15,063.40 | 1.2498% | 1,156.0553 | $39,305.88 |
| | | | | | |
| **Total** | | **$1,205,275.00** | **100.0000%** | **92,500.0000** | **$3,145,000.00** |
| | | | | | |
| | | | | | |
| | | | | | |
| * Per AIA Services Corporation 401(k) Profit Sharing Plan Statement Dated January 1, 2010 to December 31, 2010 (GEM000347). | | | | | |
| ** Per AIA Services' amended articles of incorporation (DLM - 0033059-60). | | | | | |
| *** Per AIA Services Corporation 401(k) Profit Sharing Plan Statement Dated January 1, 2010 to December 31, 2010 (GEM000338-46). | | | | | |

DLM - 119793

**Exhibit - D, p. 2**
**10-ER-2390**

## ESOP PARTICIPANTS AT TIME OF TERMINATION IN 2012

| Employee/Participant Name | Shares | Amount of Check | Price Per Share | Check Cashed |
|---|---|---|---|---|
| | | | | |
| Arnold, Sheri | 819.99 | $7.94 | $0.01 | |
| Arnzen, Judy | 366.62 | $3.55 | $0.01 | X |
| Ausman, Susan | 2,065.47 | $20.00 | $0.01 | X |
| Baily, Jeff | 524.63 | $5.08 | $0.01 | |
| Bennett, Diane | 2,353.61 | $22.79 | $0.01 | X |
| Cleveland, Cori | 763.19 | $7.39 | $0.01 | X |
| Cline, Robert | 4,078.28 | $39.49 | $0.01 | |
| Courtney, Shane | 893.32 | $8.65 | $0.01 | X |
| Duclos, JoLee (deceased) | 2,456.88 | $23.79 | $0.01 | |
| Ferris, Linda | 1,104.00 | $10.69 | $0.01 | |
| Ferwalt, Chris | 554.58 | $5.37 | $0.01 | X |
| Freeman, Bryan | 4,429.41 | $42.89 | $0.01 | |
| Gilbert, Denise | 814.83 | $7.89 | $0.01 | |
| Hairston, Diane | 673.34 | $6.52 | $0.01 | |
| Hughes, Janet | 638.23 | $6.18 | $0.01 | |
| Manfield, Daren (deceased) | 999.69 | $9.68 | $0.01 | X |
| McFarland, Stephanie | 1,140.14 | $11.04 | $0.01 | X |
| Peer, Donna | 1,183.52 | $11.46 | $0.01 | X |
| Peters, Brian | 2,289.58 | $22.17 | $0.01 | |
| Ravary, Carol | 2,296.81 | $22.24 | $0.01 | X |
| Roberts, Dan | 132.19 | $1.28 | $0.01 | |
| Sarbacher, Darlene | 2,795.62 | $27.07 | $0.01 | |
| Sherry, Mark | 3,347.10 | $32.41 | $0.01 | X |
| Spickler, Dan (deceased) | 6,092.11 | $58.99 | $0.01 | X |
| Taylor, John | 18,346.57 | $177.65 | $0.01 | X |
| Taylor, Jud | 1,402.46 | $13.58 | $0.01 | X |
| Taylor, Reed | 16,929.65 | $163.93 | $0.01 | |
| Valliant, Carol | 2,925.74 | $28.33 | $0.01 | X |
| Whisner, Diane | 3,182.89 | $30.82 | $0.01 | |
| | | | | |
| **Total** | **85,600.45** | **$828.87** | | |

DLM - 119791

**Exhibit - F, p. 1**
**10-ER-2391**

**AIA Services Corporation**
11,000,000 common stock authorized
200,000 Class A Preferred authorized
500,000 Class C Preferred authorized

| | 12/31/2011 | 3/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 6/30/2019 |
|---|---|---|---|---|---|---|---|---|---|
| **Preferred Class A** | | | | | | | | | |
| Donna Taylor | 7,110 | 7,110 | 7,110 | 7,110 | 7,110 | 7,110 | 44,000 | 44,000 | 44,000 |
| R John Taylor | | | | | | 7,500 | 15,000 | 22,500 | 23,250 |
| | 7,110 | 7,110 | 7,110 | 7,110 | 14,610 | 59,000 | 66,500 | 67,250 | |
| | | | | | | | | | |
| **Preferred Class C** | | | | | | | | | |
| AIA Services Profit Share Plan | 92,500 | 92,500 | 92,500 | 92,500 | 92,500 | 92,500 | 92,500 | 92,500 | 92,500 |
| AIA Insurance Inc. | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 |
| | 297,500 | 297,500 | 297,500 | 297,500 | 297,500 | 297,500 | 297,500 | 297,500 | 297,500 |
| | | | | | | | | | |
| Corrine Beck | 101,090.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Michael W. Cashman | 202,179.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Michael W. Cashman Sr. IRA | 15,146.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Michael W. Cashman Jr. | 5,049.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Distribution Services, Inc. | 10,097.00 | 10,097.00 | 10,097.00 | 10,097.00 | 10,097.00 | 10,097.00 | 10,097.00 | 10,097.00 | 10,097.00 |
| Paul D. Durant | 7,360.50 | 7,360.50 | 7,360.50 | 7,360.50 | 7,360.50 | 7,360.50 | 7,360.50 | 7,360.50 | 7,360.50 |
| Employee Stock Ownership Plan & Trust | 85,600.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Chris W. Ferwalt | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 |
| Carlton Kent Gray | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 |
| Raymond R. Heilman | 53,706.00 | 53,706.00 | 53,706.00 | 53,706.00 | 53,706.00 | 53,706.00 | 53,706.00 | 53,706.00 | 53,706.00 |
| Raymond R. Heilman - Profit Share | 36,034.50 | 36,034.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| LeeAnn Hostetler | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 |
| Bruce E. Knutson | 15,146.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Clifford Latimer | 2,366.00 | 2,366.00 | 2,366.00 | 2,366.00 | 2,366.00 | 2,366.00 | 2,366.00 | 2,366.00 | 2,366.00 |
| Jerry A. Legg | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 |
| Dale L. Miesen | 45,000.00 | 45,000.00 | 45,000.00 | 45,000.00 | 45,000.00 | 45,000.00 | 45,000.00 | 45,000.00 | 45,000.00 |
| Heather Miesen Living Trust | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 |
| Jennifer May Miesen Living Trust | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 |
| Robert L. Miesen Living Trust | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 | 4,446.00 |
| Dale L. Miesen & Jonathan Eckburg Brown Jr. JT | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 |
| Charles B. Rapp | 5,049.00 | 5,049.00 | 5,049.00 | 5,049.00 | 5,049.00 | 5,049.00 | 5,049.00 | 5,049.00 | 5,049.00 |
| Sally J. Reed | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 |
| Bobette N. Ruddell | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 |
| Bruce Sweeney - deceased | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 |
| Jay R. Taylor - deceased | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 |
| Jud R. Taylor | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 |
| R. John Taylor | 1,034,834.50 | 1,378,494.50 | 1,414,529.00 | 1,414,529.00 | 1,414,529.00 | 1,414,529.00 | 1,414,529.00 | 1,414,529.00 | 1,414,529.00 |
| Sara J. Taylor - deceased | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 | 18,593.00 |
| Daryl R. Verdoorn | 5,049.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Alton D. Woodworth - deceased | 18,681.00 | 18,681.00 | 18,681.00 | 18,681.00 | 18,681.00 | 18,681.00 | 18,681.00 | 18,681.00 | 18,681.00 |
| Kay Hanchett | 788.28 | 788.28 | 788.28 | 788.28 | 788.28 | 788.28 | 788.28 | 788.28 | 788.28 |
| Kimberly McDowell Ells | 148.64 | 148.64 | 148.64 | 148.64 | 148.64 | 148.64 | 148.64 | 148.64 | 148.64 |
| Kristine Mason | 901.94 | 901.94 | 901.94 | 901.94 | 901.94 | 901.94 | 901.94 | 901.94 | 901.94 |
| Sue Willmon | 207.06 | 207.06 | 207.06 | 207.06 | 207.06 | 207.06 | 207.06 | 207.06 | 207.06 |
| | 1,733,368.87 | 1,647,769.42 | 1,647,769.42 | 1,647,769.42 | 1,647,769.42 | 1,647,769.42 | 1,647,769.42 | 1,647,769.42 | 1,647,769.42 |

AIAS_0001740

**Exhibit - G, p. 1**

**10-ER-2392**