**Consolidated Case Nos. 25-3552 and 25-3800**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,

**Plaintiff-Appellant**,

v.

R. JOHN TAYLOR, an individual, CONNIE TAYLOR HENDERSON, an individual, JAMES BECK, an individual, MICHAEL W. CASHMAN, SR., an individual, CROP USA INSURANCE AGENCY, INC., an Idaho corporation, CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company, AIA SERVICES CORPORATION, an Idaho corporation, AND AIA INSURANCE, INC., an Idaho corporation,

**Defendants-Appellees**,

and

Reed J. Taylor, an individual,

**Third-Party Defendant-Appellee.**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO,
CHIEF DISTRICT COURT JUDGE DAVID C. NYE, PRESIDING

**APPELLANT'S EXCERPTS OF THE RECORD – VOLUME - 11**

| | |
|---|---|
| Roderick C. Bond | Andrew Schwam |
| Roderick Bond Law Office, PLLC | Andrew Schwam Law Firm |
| 10900 NE 4th St., Suite 2300 | 705 SW Fountain St. |
| Bellevue, WA 98004 | Pullman, WA 99163-2128 |
| Tel: (425) 591-6903 | Tel: (208) 874-3684 |
| Email: rod@roderickbond.com | Email: amschwam@turbonet.com |
| Attorney for Appellant | Attorney for Appellant |

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for the Plaintiff Dale L. Miesen

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>**v.**<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 1:10-cv-00404-DCN-CWD<br><br>DECLARATION OF RICHARD T. McDERMOTT |

DECLARATION OF RICHARD T. MCDERMOTT - 1

CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; R. JOHN TAYLOR, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual,

        Defendants/Third-Party Plaintiffs,

    **v.**

REED TAYLOR, an individual,

        Third-Party Defendant.

REED TAYLOR, an individual,

        Third-Party Defendant/ Counterclaimant,

    **v.**

CONNIE TAYLOR HENDERSON, an individual; R. JOHN TAYLOR, an individual; JAMES BECK, an individual, and UNKNOWN BONDING COMPANY, an unknown entity that issued the unknown fidelity ERISA Bond,

        Counterdefendants.

DECLARATION OF RICHARD T. MCDERMOTT - 2

**11-ER-2395**

I, Richard T. McDermott, declare:

1.      I am over the age of eighteen and am competent to testify in court, including as to the matters set forth in this declaration This declaration, as well as my attached Expert Report, is based on personal knowledge, education, training, and experience. This declaration is being submitted in opposition to the Hawley Troxell Defendants' two motions to exclude my testimony in the instant case, one claiming I will be paid a contingent fee (Dkt. 1069), and the other that I am acting as an advocate for the plaintiff herein rather than as an expert witness (Dkt. 1068). Both of those assertions are demonstrably wrong.

2.      A true and correct copy of my Expert Report dated November 1, 2020, together with its Exhibits is attached as **Exhibit 1**. Although there is a myriad of typos which I will correct and the cases referred to in footnotes 2027 and 2028 should be reversed, and I am working on a minor update to it based on recent information obtained in discovery,[1] I incorporate by reference herein my Expert Report in Exhibit 1, together with the attached Exhibits A-H thereto, as part of my sworn testimony in this declaration. The defined terms used in my Expert Report have the same meanings in this declaration. The statement regarding my compensation in Section V in my Expert Report in Exhibit 1 has been in each version of my Expert Report.

3.      My Education, Qualifications and Experience are set forth in Section VII of my Expert Report in Exhibit 1. As a point of clarification and because the defendants appear to question my litigation experience, I began my legal career as a litigator and over time transitioned to focus on transactional work and became responsible for corporate clients' matters generally.

---

[1] For example, Judge Brudie's recent order in *GemCap v. AIA Services* will reduce the amount of damages set forth in Damage Item Number 36.

DECLARATION OF RICHARD T. MCDERMOTT - 3

However, as indicated in my Expert Report, I continued to be involved in all aspects of litigation involving my corporate clients, including conduct of trials. Although I was not the lead trial lawyer in those cases, I was actively involved in all aspects of the litigation as indicated in my Expert Report. Miesen's legal malpractice and related claims in the instant lawsuit do not involve allegations of malpractice involving the conduct of a trial—none of the underlying cases went to trial.

4.      In August 2012, I was retained by Mr. Bond's law firm to be an expert witness for the plaintiff in *Reed Taylor* v. *Riley.* I had been recommended to Mr. Bond by John Sterba, Jr, the Editor of the treatise entitled Legal Opinion Letters A Comprehensive Guide to Opinion Practice. I co-authored Chapters 1 and 2 of that Treatise with Mr. Sterba and authored Chapter 3: Legal Opinions On Corporate Matters. Subsequently, I was also retained by Mr. Bond's law firm to be an expert witness in *Reed Taylor v. Bell*, *Donna Taylor v. Taylor* and, because of my previous work and my resulting familiarity with a number of the facts and issues presented in the instant case, in 2017, I was retained by Mr. Bond's law firm as an expert witness in this direct and double derivative action, which is brought on behalf of AIA Services and its wholly owned subsidiary, AIA Insurance. In each of those cases, I was paid based on my hourly rate only.

5.      In *Reed Taylor v. Riley*, Mr. Bond's law firm retained me to be an expert witness for Reed Taylor. It was agreed that I would be paid at an hourly rate only. My work concentrated on rendering opinions relating to Eberle Berlin's negligently prepared Legal Opinion delivered to Reed Taylor in connection with the redemption of his common shares in AIA Services pursuant to the 1995 Stock Redemption Agreement. However, my work also involved reviewing the pleadings and filings in *Reed Taylor v. AIA Services* because the illegality defense was adjudicated in that lawsuit. As a result, I gained knowledge of facts relevant to Miesen's claims in this lawsuit because

DECLARATION OF RICHARD T. MCDERMOTT - 4

Reed Taylor had also alleged significant malfeasance. Although Reed Taylor ultimately resolved his claims with Eberle Berlin and the Estate of Turnbow pursuant to a confidential settlement agreement and he lost his claims against Mr. Riley based on res judicata, I nevertheless was paid only my hourly rate for all of my work.

6.     In *Reed Taylor v. Bell*, Mr. Bond's law firm retained me to be an expert witness for Reed Taylor. It was agreed that I would be paid at my hourly rate only. My work concentrated on rendering opinions relating to Mr. Bell's negligence in representing Reed Taylor in connection with the illegal 1995 redemption of his common shares in AIA Services, as well as to violations of the Rules of Professional Conduct as to certain matters. However, my work also involved opinions relating to the "case within the case" and collectability. These issues involved, *inter alia*, my rendering of opinions that Reed Taylor would have succeeded in his tort claims against John Taylor and others had his redemption not been illegal, as well as the success of this lawsuit because Reed Taylor asserted that he would have been entitled to the portion of any proceeds derived from this lawsuit sufficient to pay the over $8,000,000 owed to him. As a result, I became intimately familiar with, *inter alia*, the claims, pleadings and filings in *Reed Taylor v. AIA Services* and in this lawsuit. Attached as **Exhibit 2** is a true and correct copy of Reed Taylor's Fifth Amended Complaint, which contains a number of the causes of action that would have been litigated in the "case within the case." Attached as **Exhibit 3** is a true and correct copy of my declaration dated March 11, 2013, which was filed in *Reed Taylor v. Bell*.[2] In my declaration, I rendered opinions involving the breach of the standard of care, proximate cause and violations of the Rules of Professional Conduct. The trial court initially excluded me as an expert witness because I was not licensed to practice law in the state of Washington. However, the Washington Court of Appeals

---

[2] I attached one of my affidavits filed in *Reed Taylor v. Riley* to my declaration in order to ensure that the trial court was aware of my opinions in *Reed Taylor v. Riley* and to demonstrate my opinions were consistent.

DECLARATION OF RICHARD T. MCDERMOTT - 5

reversed and held that I was "eminently qualified" as an expert witness. Although Reed Taylor ultimately resolved his claims pursuant to a confidential settlement agreement, I nevertheless was paid only my hourly rate for all of my work.

7.      In *Donna Taylor v. Taylor*, Mr. Bond's law firm retained me to be an expert witness for Donna Taylor, who is the Series A Preferred Shareholder in AIA Services. It was agreed that I would be paid at my hourly rate only. My work concentrated on, *inter alia*, rendering opinions involving some of the same corporate malfeasance at issue in this lawsuit. As a result, I became intimately familiar with, *inter alia*, the claims, pleadings and filings in *Donna Taylor v. Taylor*. Attached as **Exhibit 4** is a true and correct copy of my declaration dated May 22, 2015, which was filed in *Donna Taylor v. Taylor*. These consolidated lawsuits are presently stayed by agreement of the parties pending the outcome of the instant lawsuit. I was paid only my hourly rate for all of my work and have been paid in full.

8.      My opinions in this lawsuit and those rendered in the three lawsuits discussed above are entirely consistent and involve many of the same facts. My work and experience in those three lawsuits have been of great benefit to preparing and rendering of my opinions in this lawsuit.

9.      Mr. Ipsen is incorrect when he states that I was retained for my "opinion letter practice experience in three other cases relating to the AIA Corporations..."[3] As stated above when I generally discuss my work in each lawsuit, *Reed Taylor v. Bell* and *Donna Taylor v. Taylor* involved many other issues and opinions.

10.     On November 1, 2020, I submitted the current version of my Expert Report which, owing to the number and complexity of the factual and legal issues in this case, consists of 563 pages with 2,033 footnotes, plus exhibits. Because of the convoluted discovery schedule in this

---

[3] Dkt. 1070, p. 2.

DECLARATION OF RICHARD T. MCDERMOTT - 6

case, which required the submission of my Expert Report by various dates prior to the completion of critical discovery and depositions, I was required to submit *seriatim* versions thereof on August 12, 2019, October 17, 2019, February 21, 2020, and November 1, 2020. The Hawley Troxell Defendants, however, open their memorandum in support of motion (Dkt. 1068) by disingenuously stating "[t]he latest iteration of Richard McDermott's expert witness report produced on November 1, 2020 is **653 pages** long, having swelled to more than three times the length of the original 181-page report dated August 5, 2019."[4] As just one example, I was not able to ascertain precisely what decisions were made by the purported boards of the AIA Corporations until John Taylor finally testified at the end of July 2020 that the only decisions were those very limited ones reflected in board meeting minutes or board resolutions. This information should have been provided to me years ago, which prevented me from completing my work and opinions.

11.     After I worked literally night and day to complete my Expert Report, the defendants insisted that my deposition be taken four days later, in fourteen hours of testimony on November 5 and 6, respectively. After Miesen voluntarily agreed to make me available for further testimony, they took a third day of testimony on November 20. Because of the continuing spread of the coronavirus disease, at my insistence the deposition was taken on Zoom. I testified alone in my home.

12.     During the deposition, it quickly became clear that the defendants' principal strategy was to attack me and Mr. Bond personally and thus try to obfuscate the substance and weight of my testimony and the opinions expressed in my Expert Report, which remain essentially unrefuted on the merits. As I have stated, both in my Expert Report (e.g., p. 27) and during my

---

[4] Dkt. 1068-1 p.1 (Emphasis in original). Because this case involves over a twenty-year history, as well as a myriad of factual and legal issues, I insisted that my Report be complete and fully supported with citations to documents, testimony and legal authorities after the critical discovery was completed. It turned out that it took 653 pages to do that.

DECLARATION OF RICHARD T. MCDERMOTT - 7

testimony,[5] I am here to call balls and strikes. When I express an opinion that the Hawley Troxell Defendants disapprove of, it's characterized as "partisan" or "results oriented" or me being an "advocate." When they don't like my answer to a deposition question, it is "unresponsive.".

13.    Some of the attacks on me took the form of what can only be described as blatant Age Shaming. (I was born in 1940 and have been blessed with good health.) I continue to be professionally active and engaged, including acting as a Special Master at the Appellate Division of the Supreme Court of the State of New York, teaching my Class in Corporate Transactions Finance and Litigation at the Fordham University School of Law, writing Supplements to my nationally adopted casebook,[6] being a member of the nationally recognized TriBar Legal Opinion Committee, serving on the board of directors of two business corporations, as well as on the board of directors of the charitable foundation of my former law firm, Clifford Chance, and other engagements involving the practice of law.[7]

14.    Among the questions I was asked was whether I had prepared my Expert Report using a Dictabelt, a device for recording dictation that was utilized in the 1950's and 60's), and whether I had tried a case during the Nixon administration. The behavior of the defendants' counsel, however, has had no effect on my professional approach to my engagement in this case or on my objective expression of the opinions in my Expert Report. My opinions in this lawsuit and the other three lawsuits discussed above have always been independent and objective. I have never been asked by Mr. Bond to render opinions regarding any matter which I could not independently and objectively render. Moreover, Mr. Bond has consistently advised me that he

---

[5] 11/5/20 Richard McDermott Depo. Transcript, p. 535 (the transcript of my 11/5, 11/6 and 11/20/20 Deposition is hereinafter cited as "Depo. Transcript").

[6] *Legal Aspects Of Corporate Finance* (Carolina Academic Press, 5th ed. 2013).

[7] Some of my professional activities were acknowledged by the Court in *Taylor v. Bell*, 185 Wash. App. 270, 286, 340 P. 951, 960 (Wash. Ct. App. 2014), r*eview denied*, 183 Wn.2d 1012, 352 P.3d 188 (2015).

DECLARATION OF RICHARD T. MCDERMOTT - 8

will not accept any opinions from me with which I do not independently and objectively believe to be accurate, nor would I render any such opinions.

15.     As discussed below, in their motion,[8] the Hawley Troxell Defendants claim that I am acting as an advocate for Miesen instead of as an expert witness, to which I respond in detail below. In point of fact, there were a number of times during the deposition when I had to become an advocate *for myself* in order to respond to personal attacks. One of the most blatant ones occurred when Mr. Keller, who was apparently displeased when I responded unequivocally to his question about the amount of my expert fee which had accrued, but had not yet been billed to Mr. Bond, in effect accused me of cheating during the deposition by receiving email and text messages from Mr. Bond containing answers to the questions Mr. Keller was then asking me. The testimony in the transcript on pages 726 and 727 are illustrative of the pejorative tone of the entire deposition.[9] As an expert witness, I have been asked pointed and indeed confrontational questions in other depositions, but the conduct of both Mr. Keller and Mr. Adams exceeded the bounds of proper searching and penetrating cross examination.

16.     Another tactic of those lawyers was to try to distract me by their constant smirking, rolling their eyes, gesturing, and otherwise demeaning me when I experienced difficulty downloading exhibits which they were remotely "handing" me and then questioning me about. I am not a "professional" expert witness. I had no prior experience in testifying over Zoom, much less contemporaneously retrieving and downloading exhibits and quickly locating specific language in those multi page documents.

---

[8] Dkt. 1068.
[9] Depo. Transcript, pp. 726-727.

DECLARATION OF RICHARD T. MCDERMOTT - 9

17.      As stated above, the Hawley Troxell Defendants have made two motions to exclude me from being an expert witness.[10] They are addressed below.

18.      In one motion,[11] they claim that I am being compensated on a contingency basis. The assertion that my fee arrangement with Mr. Bond's law firm is a "de facto, if not explicit, contingency fee agreement"[12] is totally false. On pages 9-10 of my Expert Report, I state that "I was retained by Roderick Bond Law Office, PLLC and am compensated solely by Roderick Bond Law Office, PLLC. I charge $350 per hour for my work preparing this Report and $400 for testifying at trial, plus reimbursement of-pocket expenses and travel costs. All sums owed to me up through the time of trial are required to be paid in full prior to the time that I appear and testify at trial. I also reserve the right to require advance deposits if I am not being timely paid. I have never had to request any deposits from Roderick Bond Law Office, PLLC." This statement has been in each version of my Report. I have no financial interest in the outcome of this case.

19.      I testified to the same effect in my deposition.[13] At one point, Mr. Keller tried to suggest that, because of the extraordinary amount of time I have spent on this case, I am charging Mr. Bond's law firm substantially less than $350 per hour.  However, I had already testified that, just as any responsible billing partner in a law firm would do (and something I always did when preparing bills to clients as well as in preparing my bills to Mr. Bond's law firm in other cases), I consider not only the number of hours which have been recorded, but also the quality of those hours. The Hawley Troxell Defendants purport to have difficulty understanding the difference

---

[10] Dkts. 1068, 1069.

[11] Dkt. 1069.

[12] Dkt. 1069-1, p. 2.

[13] After reviewing the transcript, I clarified that by using the words" when this is over" I meant "when I have completed the supplements to my Report before trial." Neither Mr. Keller nor any other defense counsel directly asked me whether Mr. Bond and I have any type of contingent agreement, understanding or arrangement. If they had I would have denied it. I have been an attorney in good standing for over fifty-three years and am not about to commit perjury or make a misrepresentation to a Court.

DECLARATION OF RICHARD T. MCDERMOTT - 10

between recorded hours and billable hours.[14] (Indeed, at one point, they assert that I have "logged enough hours to have earned more than $700,000 in expert witness fees . . ."[15]) The difference between recorded and billable hours is particularly relevant here because, *inter alia*, as a member of my generation, I am not as proficient or efficient in the use of a computer in typing and editing documents and retrieving case documents as I would like to be.[16] Mr. Bond has spent significant time assisting me with computer issues, typing portions of my Expert Report as dictated to him, and teaching me how to use document search software. The Hawley Troxell Defendants inexplicably find fault with the notion that my bill to Mr. Bond's law firm which, as I testified will be rendered prior to trial and "based on [my] subjective estimation of the value of [my] work,"[17] something responsible lawyers regularly do, and I am required to do under Idaho Rule of Professional Conduct 1.5(a).[18]

20.     I have always provided services to Mr. Bond's law firm based on my hourly rate. The Hawley Troxell Defendants also claim that my arrangement with Mr. Bond is based on some form of contingency arrangement or understanding because I do not send regular monthly bills to Mr. Bond. Instead, my agreement with his law firm, which was developed in part over the course of my prior work with Mr. Bond, is to send one statement at the completion of the work on my Expert Report. In this case, as stated in my Expert Report, my statement will be rendered to Mr. Bond's law firm prior to the commencement of the trial and the balance due is to be paid prior to trial. In the interim, I receive periodic payments from Mr. Bond's law firm (some of which were

---

[14] I also testified that there is a difference between just thinking about a case and actually recording time on it. Depo. Transcript, p. 720.

[15] Dkt. 1069-1, p. 12.

[16] Depo. Transcript, p. 59. I also clarified the transcript to change the phrase "value of the 350 hours (sic) that is my fee" to read "amount which will be billed to Mr. Bond because I make reductions to my bills based on efficiency."

[17] Dkt. 1069-1, p. 2. Of course such a fee would be unreasonable, and thus prohibited by RPC 1.5(a).

[18] Indeed, I reduced the time charged to the Hawley Troxell Defendants for my depositions.

DECLARATION OF RICHARD T. MCDERMOTT - 11

suggested by Mr. Bond) which are to be credited against my statement for the completed work. Accordingly, I do not "charge" Mr. Bond's law firm for work prior to the submission of my bill. Nor do those payments reflect the actual amount of the work I have performed up to that time. (Many of the Hawley Troxell Defendants' assertions in their two motions are based on their nitpicking my testimony; however, Mr. Bond was deprived by the defendants' counsel of the opportunity to ask me questions for the purpose of clarifying any my testimony or asking me any follow up questions.) In the instant case, I have received $119,775 from Mr. Bond's law firm to date (Mr. Bond's law firm paid me an additional $5,000 after my deposition). I testified that, after adjusting my recorded hours to reflect the quality and actual value[19] of my work, I intend to bill Mr. Bond approximately $119,000 more for the work I have done to date (after crediting him the $114,775 which had been paid through the date of my deposition). Since I have already received $119,775 from Mr. Bond's firm, I expect that the net amount of my statement will be approximately $114,000 (subject to changes once I have completed any future supplements to my Expert Report and have prepared my bill and submitted it to Mr. Bond's law firm for review).[20] Based on my prior work with Mr. Bond's law firm, I have no doubt that Mr. Bond will pay me the amount set forth in the bill I will submit to him prior to trial. His firm has always timely paid me in full for my work. The predicate for my hourly fee arrangement with Mr. Bond's law firm is the trust and confidence I have in him as a result of my prior experience in working with him as an expert in the other cases to which I referred above. In short, the fee understanding that I have with Mr. Bond's law firm bears no relationship to one for a contingent fee arrangement; and in no sense have Mr. Bond's law firm and I "abandoned" the fee arrangement described in my Expert Report

---

[19] As stated above, a principal reason for the diminution in value of my billable hours is that I am not proficient or efficient in the use of a computer in typing, editing and retrieving case documents.

[20] Depo. Transcript, pp.7-8. It may be more depending on the work I do subsequent to my deposition.

DECLARATION OF RICHARD T. MCDERMOTT - 12

as claimed by the Hawley Troxell Defendants. Mr. Bond's law firm is obligated to pay me irrespective of the ultimate result of this case.

21.     As discussed above, Mr. Bond's law firm has always paid me timely. However, I prepared my opinions and my Expert Report in Exhibit 1 before I would know whether Mr. Bond's law firm will pay me in full for my work as I believe he will. As such, it is impossible for my analysis and opinions to be influenced by any failure to pay me or me having a financial interest in this lawsuit.

22.      In their other motion,[21] the Hawley Troxell Defendants seek to exclude my testimony by claiming that I am acting as an advocate or partisan in this case.

23.     They assert, without any reference to the context of my testimony, that I have shown "a surprising professional devotion" to and have "unflinching trust" in Mr. Bond, apparently because I said that I had no reason to doubt his character. The context of that testimony was that William Adams questioned me about thirty-year-old court proceedings involving Mr. Bond, presumably to shake my confidence in him. It was in that context that, based on more than eight years of working with Mr. Bond as well as more than forty years of working with and evaluating lawyers (including selecting partners to become partners in major law firms) that, in response to a question by Mr. Glynn, I expressed my unqualified confidence in Mr. Bond's integrity.[22]

24.     The apparent purpose of that line of questioning was revealed by Mr. Glynn's next "question," which turned out to be a precursor to the motion:[23] "Sounds like you're quite the advocate for Mr. Bond."[24] I responded as follows: "As I said at the outset of my report, Mr. Glynn,

---

[21] Dkt. 1068.
[22] Depo. Transcript, pp. 470-472.
[23] Dkt. 1068.
[24] Depo. Transcript, p. 472.

DECLARATION OF RICHARD T. MCDERMOTT - 13

I'm here to call balls and strikes. I call them as I see them. If I had one notion that here was something wrong with what has gone on or what is going on, I wouldn't be here on Zoom or otherwise."[25]

26. The Hawley Troxell Defendants' claim that I am an "advocate" or "partisan" is also based on the directly conflicting contentions that, on the one hand, I "directly and significantly assisted Mr. Bond in the prosecution of this action, taking an active advocacy role in developing pleadings, discovery and arguments to the Court on procedural and discovery motions;"[26] yet, on the other hand they suggest that I didn't write my own Expert Report: "Mr. Bond's heavy involvement is not surprising given that the tone, style and phraseology bear a remarkable resemblance to Mr. Bond's briefing."[27] Neither of those assertions is true. I did my own work[28] and am proud of my work product, except for the typographical errors I failed to catch and for which I apologize. To reiterate, my Expert Report was type written by me and as dictated to Mr. Bond by me. Moreover, I always review and revise as necessary my Expert Report. It is my work.

26. The Hawley Troxell Defendants also complain that I traveled to Chicago and Boise to attend depositions.[29] I also listened to depositions. My purpose in doing so was to obtain relevant information for my Expert Report concerning this case and the persons about whom I would be expressing opinions, and thus enable my Report to assist the trier of the facts of this case to understand the evidence.[30] Mr. Bond did not provide me with his deposition outlines, questions or any other work product. On a few occasions, I provided Mr. Bond with a few questions regarding

---

[25] *Id.*

[26] Dkt. 1068-1, p. 10.

[27] Dkt. 1068-1, p.14. In fact, in drafting my Report I tried to reduce the use of words which might appear to be legal pedantry such as hereto, herein and heretofore.

[28] I typed a substantial part of my report, but because I am limited to the "hunt and peck" method Mr. Bond did a great deal of the typing the language that I dictated to him during both our countless telephone and personal conferences.

[29] Dkt. 1068-1, p.10.

[30] Mr. Bond paid for my travel expenses reimbursed me for my out of pocket costs.

DECLARATION OF RICHARD T. MCDERMOTT - 14

information that I wanted for the work on my Expert Report. As a result of listening to the depositions and obtaining information, I was able to determine certain opinions that I would render and certain ones that I would not render. It was for the same reason that I submitted a declaration to Judge Dale[31] explaining my need for further discovery of information which was being withheld under claims of privilege; I was not taking sides in the litigation. I wanted to be provided with as much information as possible so that I was able to thoroughly and accurately render opinions (or not render opinions).  I have made no decisions regarding the conduct of the prosecution of the claims in this case. I never served as counsel to Mr. Bond or Miesen, nor was I engaged to serve as a consultant to Mr. Bond in any lawsuit. Contrary to the assertions of the Hawley Troxell Defendants,[32] I never provided legal advice or helped "to anticipate, identify, evaluate, and/or develop legal theories, legal arguments, facts necessary to support claims, defenses to the claims responses to the defenses and witness cross- examination topics." My role has been exclusively to be an independent and objective expert witness.

27.     Moreover, my knowledge of the established legal principles which I applied to render my opinions based the facts of this case were not devised for the purpose of preparing my Expert Report or testifying in this case. My knowledge and expertise regarding those principles were gleaned over the course of my fifty plus career in the law and were utilized to present my unbiased opinions on the conduct which occurred in this case. I did not create the facts. The facts speak for themselves. Other than attack me for certain of the statements in my Expert Report and deposition testimony, they do not dispute my understanding of the facts, my methodology or the opinions that I have rendered based on those facts and methodology.

---

[31] Dkt. 783-2.
[32] Dkt. 1068-1, p. 6.

DECLARATION OF RICHARD T. MCDERMOTT - 15

28.     The Hawley Troxell Defendants claim that I have "shown surprising professional devotion" to Mr. Bond, for stating that Mr. Bond is conscientious, and fault me for stating in my Expert Report that I am "certain" Mr. Bond has given me all of the necessary information.[33]  My statements regarding Mr. Bond are based on my experience interacting him for over eight years. I do not make the statements because I am biased. I make the statements because they are true. I am certain that Mr. Bond has provided me with all of the information because, unlike the experts witnesses for the Hawley Troxell Defendants who were provided only select documents prior to rendering their opinions, Mr. Bond has provided me with all of the documents produced by all parties in discovery in this lawsuit and he has taught me how to use document search software so that I am able to independently, objectively and properly render opinions. He insisted that my work be independent and objective, and he provided with the information and tools with which to do that.

29.     The Hawley Troxell Defendants claim that certain of my declarations were improper.[34] As I stated above, by the time that Mr. Bond's law firm retained me as an expert in this lawsuit, I had already reviewed tens of thousands of pages of documents which revealed the extent of the misconduct of the defendants, although I had not rendered any formal opinions in this lawsuit with respect thereto (I had rendered opinions in the other lawsuits discussed above). Consequently, I was in position to inform the Court that the claims were substantiated. I was also asked to offer the testimony at the request of Miesen's counsel for the purpose of obtaining information in my role as an expert witness. The same is equally true for my other declarations.[35] I submitted a declaration requesting additional time for Miesen to respond to their motion for

---

[33] Dkt. 1068-1, p. 9-10.
[34] Dkt. 1068-1, pp. 10-11.
[35] Dkt. 1068-1, pp. 11-13.

DECLARATION OF RICHARD T. MCDERMOTT - 16

**11-ER-2409**

summary judgment because I needed the time and the discovery to prepare and render the opinions

expresses in my Expert Report. With respect to my declarations submitted in support of motions

to compel, I simply wanted and needed the information to properly prepare the opinions expressed

my Expert Report. Indeed, privileged information and work product continues be withheld from

me. As an expert in a legal malpractice action, I wanted to be provided and review all privileged

and work product information as any conscientious lawyer would want to review in connection

with preparing and expressing opinions. The same is true for the privilege and work product logs.

30.     The Hawley Troxell Defendants take out of context my declaration testimony

submitted to the court for discovery motions and extensions arguing that I am an advocate.[36] Again,

this untrue.  Moreover, on page 13 of their memorandum, the Hawley Troxell Defendants purport

to quote from my declaration in Dkt. 783-2, but materially misstate my testimony by stating that I

said in paragraph 60 that I needed additional information " [*i*]n order for me and Mr. Miesen to

*fully and fairly present his claims*."[37] In my declaration there is not a period after the word

"claims." Instead, the sentence in paragraph 60 actually reads as follows:

> In order for me and Mr. Miesen to fully and fairly present his claims (including his
> claims against the Hawley Troxell Defendants and the Controlling AIA Defendants),
> to fully prepare and complete my primary opinions and to prepare and complete my
> rebuttal opinions to the Remele Report, Lidstone Report and Pinkerton Report, it is
> imperative that we be provided with and the opportunity to review *all* of the
> Withheld Privileged and Work Product Documents pertaining to what was said and
> done by the Hawley Troxell Defendants, including for all workand communications
> referenced in the Unredacted Billing Records, including for the 2006Lancelot Legal
> Opinion, *Reed Taylor v. AIA Services*, *Donna Taylor v. AIA Services*, *AIA Servicesv.
> Durant*, and the other matters in the Hawley Troxell Defendants' Unredacted Billing
> Records. [38]

---

[36] Dkt. 1068-1, pp. 10-13.
[37] Dkt. 1068-1, p. 13. (Emphasis in original).
[38] Dkt. 783-2, pp. 28-29.

DECLARATION OF RICHARD T. MCDERMOTT - 17

Likewise, on page 15 of their memorandum, the Hawley Troxell Defendants cite to paragraph 28 of my declaration in Dkt. 403-2 as support for their claim that I do not view the case objectively. That is not true. Paragraph 28 of Dkt. 403-2 makes clear that I need the information sought by Miesen to "*consider* and prepare complete and detailed opinions."[39] On page 15 of their memorandum the Hawley Troxell Defendants mischaracterize the statements in paragraphs 31 and 32 in another of my declarations, Dkt. 419-16, by seeking to create the impression that I simply rely on allegations in Miesen's third amended complaint to support my opinions.[40] Nothing could be further from the truth. Those paragraphs actually read as follows:

> **31.** Since this declaration is not being submitted for summary judgment purposes or as a formal expert witness disclosure and this Court appears to desire brevity for purposes of the motion to compel, I will not include a recitation of the facts and the legal authorities further supporting my opinions below (though my opinions are supported by facts and legal authorities and I may specifically address certain authorities below). Nevertheless, I incorporate by reference the factual allegations asserted in Paragraphs 4-184 of the Third Amended Complaint as support for my opinions and requests for information below (I note that there are some typos in the Third Amended Complaint, though they are not material, but the facts alleged are otherwise generally correct based on my review of the documents and information). Dkt. 211 at ¶¶ 4-184. As a result, I am attaching the Third Amended Complaint as Exhibit A to this Declaration.
>
> \*     \*     \*
>
> **32.** While it is not my practice to testify against fellow attorneys, I have made exceptions when I agreed to testify in this lawsuit and previously in related lawsuits based on the egregious facts and circumstances. By providing the testimony and opinions set forth below, I am, of course, not seeking to address issues of law that are to be decided by this Court; rather I am, seeking to provide this Court with information sufficient to establish that the Plaintiff's claims are "colorable" in order to establish good cause and to demonstrate that I need access to the privileged information and work product relating to that privileged information in order to enable me to develop, formulate, and articulate definitive opinions with respect to such matters.[41]

---

[39] (Emphasis supplied).
[40] Dkt. 1068-1, pp.15-16.
[41] Dkt. 419-16, pp.10-11.

DECLARATION OF RICHARD T. MCDERMOTT - 18

31.     A prime example of my objectively "calling them as I see them" in this case was my response to a question as to whether the tolling agreements which purported to suspend the running of the statute of limitations against the Controlling AIA Defendants were enforceable by AIA Services against those defendants. I testified that "They're unauthorized, void and not enforceable."[42] Mr. Keller stated, "For you to be opining that the tolling agreement is not enforceable, that's not a good thing for AIA potentially, right?"[43] Mr. Keller followed up by asking "Based on your view that it's void and unenforceable, are you and I in agreement that if it's void and unenforceable, are you and I in agreement that if it's void and unenforceable the company cannot rely on that agreement as a basis for tolling the statute of limitations of the claims being asserted in this case?" I answered, "It can't rely on –within the four corners of those agreements."[44] Mr. Keller then questioned how it is "in the best interest of AIA for Mr. Miesen to be calling an expert witness" who is opining that the tolling agreements are unenforceable.[45] Accordingly, my testimony in that respect was hardly that of an advocate for Miesen. Again, I was simply calling balls and strikes.

32.     The Hawley Troxell Defendants claim that I improperly used the terms "likely" and "truly" in declaration testimony submitted in support of my request to be provided with all of the information to enable me to do my work.[46] I will not be testifying or offering opinions at trial regarding those matters. That testimony was being presented for the purpose of doing my job to gather all of the information possible to prepare and render my opinions. Under applicable law, the use of those terms was necessary to establish that Miesen's claims are "colorable" in order to

---

[42] Depo. Transcript, 295.
[43] Depo. Transcript, p. 296.
[44] Depo. Transcript, p. 297.
[45] Depo. Transcript, p. 299. At that point Mr. Keller's questioning was halted by what he described as technical difficulties and the day's testimony ended. There were no other questions on that subject.
[46] Dkt. 168-1, p. 15-16.

DECLARATION OF RICHARD T. MCDERMOTT - 19

establish good cause for the disclosure of the information. They do not pertain to the opinions expressed in my Expert Report.

33.     The Hawley Troxell Defendants assert that I opined as to Riley's credibility.[47] What I actually said on page 608 was that in my opinion, based on my work in [previous cases] there is a serious question as to his credibility." Thereafter, I refer to specific facts that support that statement, see pages 608-611 of my Expert Report. The context of my statement is also important. The statement was in reference to the statement of the Hawley Troxell Defendants' expert, Mr. Lidstone, that there is no indication that Riley was aware of a document he had been fully familiar with and had worked closely on. Mr. Riley's state of mind on this subject was thus at issue. I found it necessary to respond in order to not concede an issue. In addition, my reference to Mr. Riley having an issue with credibility was based on my experience in over eight years of work whereby I was able to observe Mr. Riley's testimony and positions "evolve." While I referenced "credible" or "credibility" a few times in my Expert Report, none of my opinions are based or depend upon those statements. I would not testify, or offer any opinions, regarding the credibility of any witness. That would be an issue for Miesen to present to the jury.

34.     In the same vein, the Hawley Troxell Defendants complain about the statement in my Expert Report that in *Reed Taylor v. AIA Services* they were primarily concerned with protecting the interests of John Taylor.[48] Again, my statement is supported by specific facts. For example, the Hawley Troxell Defendants opened a new billing matter for John Taylor and for months billed him for their work in *Reed Taylor v. AIA Services;* they signed a memorandum seeking to dismiss claims asserted against John Taylor, the signature line stated they were

---

[47] Dkt. 1068-1, p. 18.
[48] *Id.*

DECLARATION OF RICHARD T. MCDERMOTT - 20

representing John Taylor, and they moved for judgment on the pleadings to dismiss claims against him.

35.     Likewise, my statement that the Hawley Troxell Defendants' engagement letters and other communications were simply *ex post facto* efforts to limit their responsibilities[49] is fully supported by the facts as my Expert Report demonstrates. The evidence is undisputed that the Hawley Troxell Defendants undertook their representation of the AIA Corporations without seeking or obtaining approval from any independent directors or from the shareholders. Instead, the looked the directors owning shares in CropUSA to approve a representation of the AIA Corporations when they had adverse interests as discussed in my Expert Report.

36.     My statement that "Moran is an ethical attorney"[50] is based on firsthand knowledge that I obtained during my interviews of him as well as my vast experience in evaluating lawyers in my prior management role at my each of my prior law firms, as discussed above. I have not seen any evidence in this lawsuit to indicate otherwise. However, that issue is immaterial to any of my opinions.

37.     Also fully factually supported in various Sections of my Expert Report are each of the 44 statements in the declaration of Loren Ipsen.[51] Attached, for the Court's convenience, as **Exhibit 5** is a true and correct copy of my Expert Report, which has been book marked and highlighted in yellow as to the objectionable statements contained in my Expert Report as asserted in Mr. Ipsen's declaration and in the Hawley Troxell Defendants' motion. Nearly all of the objections do not involve any of my primary opinions. There are only three minor objections to my over 103 pages of primary opinions regarding the Hawley Troxell Defendants. While I stand

---

[49] Dkt. 1068-1, pp. 18-19.
[50] Dkt. 1068-1, p. 19.
[51] Dkt.1070, pp. 2-9.

DECLARATION OF RICHARD T. MCDERMOTT - 21

behind those statements and opinions for the reasons stated in my Expert Report and this declaration, I could remove or slightly modify every one of them and my opinions would not be affected if they were removed or modified. I could remove any and all references in my Expert Report or deposition testimony as to any alleged matters of intent, credibility, credible evidence, motive, knowledge, state of mind, inferences, or any other objection raised by the Hawley Troxell Defendants and my opinions would not be affected. In addition, if this Court were to enter an order in limine to direct me to limit my testimony based on those objected statements or opinions, I would, of course, comply with this Court's order.

38.     I didn't invent the facts of this case, nor did I endeavor to read the minds of the defendants. None of those statements is based on speculation. I learned the facts of this case through years of painstaking review (or skimming where appropriate} of tens of thousands of documents and testimony transcripts in this and other cases in which I have been an expert witness on behalf of Mr. Bond's clients. Indeed, from the time that I was retained by Mr. Bond's law firm to be an expert in *Reed Taylor v. Riley* through the present time, there has not been a single annual shareholder meeting held for AIA Services, despite demands by shareholders including Miesen. In addition, despite the allegations of improper corporate governance and malfeasance alleged in several lawsuits, nothing has changed. I have literally watched these events unfold. I insisted upon and was given full access to all information in Mr. Bond's possession pertaining to this case. Unlike the Hawley Troxell Defendants experts, I was not given only selected documents, and I was not spoon fed any information or opinions (*see* pages 526 and 593 of my Expert Report). Nor was I instructed not to opine on principal issues in this lawsuit as was Mr. Remele in the case of John Taylor, a major wrongdoer, (see, e.g., page 29, footnote 16 of Mr. Remele's Report dated October 18, 2019). To the contrary, there were no restrictions on the expression of my opinions,

DECLARATION OF RICHARD T. MCDERMOTT - 22

including opinions contrary to the interests of Reed Taylor; nor was I asked to render an opinion I was not comfortable in giving, including one that was not supported by the facts as I understand them.

39. The Hawley Troxell Defendants claim that I am relying on the truth of th allegations in the Third Amended Complaint for my Expert Report.[52] This is the same mischaracterization that is referred to in paragraph 30 above and is also refuted by paragraphs 31 and 32 of my declaration in Dkt. 419-16. Moreover, I did not testify that I have "no personal knowledge of the facts of this case."[53] Instead, I testified that I had no "first hand personal contemporary knowledge," and "[b]y first hand," just meaning personal participation."[54]

40. I also asked to express specific opinions relative to Reed Taylor, Mr. Bond and Mr. Bissell because the defendants have consistently attacked them. While I understand from Mr. Bond that he will be seeking a motion in limine to prevent the defendants from making the allegations at trial regarding Mr. Bond and Mr. Bissell, my opinions were disclosed in an abundance of caution. In addition, Mr. Bond obtained written consent for me to evaluate and offer any opinions regarding Reed Taylor, whether positive or negative. No restrictions were placed upon me with respect Reed Taylor. As is the case with all of my opinions, I independently and objectively prepared and express my opinions as to those individuals.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF IDAHO THAT THE FOREGOING IS TRUE AND CORRECT.

*February 19, 2021, New York, New York*          */s/ Richard T. McDermott*
Date and City and State Signed          Richard T. McDermott

---

[52] Dkt. 1068-1, p. 19 n.8.
[53] Dkt. 1068-1, p. 19 n.8.
[54] Depo. Transcript, p. 124.

DECLARATION OF RICHARD T. MCDERMOTT - 23

**11-ER-2416**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 19th day of February 2021, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Jeffrey A. Thomson:    jat@elamburke.com
Loren C. Ipsen:    lci@elamburke.com
Joyce A. Hemmer:    jah@elamburke.com
Bradley S. Keller:    bkeller@byrneskeller.com
Alyson A. Foster:    alyson@dempseyfoster.com
William E. Adams:    bill@weadamslaw.com
Tyler S. Waite:    twaite@campbell-bissell.com
Michael S. Bissell:    mbissell@campbell-bissell.com
David R. Lombardi:    drl@givenspursley.com
Daniel L. Glynn:    dglynn@idalaw.com

                                        /s/ Roderick C. Bond
                                        Roderick C. Bond

DECLARATION OF RICHARD T. MCDERMOTT - 24

# EXPERT WITNESS REPORT

# OF

# RICHARD T. McDERMOTT

## TABLE OF CONTENTS

I.      SUMMARY OF OPINIONS ................................................2

II.      EXHIBITS USED TO SUMMARIZE OR SUPPORT OPINIONS...11

III.      INFORMATION PROVIDED AND CONSIDERED ......................13

IV.      COMPENSATION..................................................................17

V.      EXPERT TESTIMONY IN PAST FOUR YEARS...........................17

VI.      CITATIONS TO EVIDENCE AND AUTHORITIES ......................18

VII.      EDUCATION, QUALIFICATIONS AND EXPERIENCE...............19

VIII.      PUBLICATIONS AUTHORED IN THE PAST TEN YEARS .........25

IX.      GLOSSARY OF TERMS ...................................................25

     A.      Terms Used for the Parties to this Lawsuit. .......................26

     B.      Terms Used for Groups of Defendants. ..............................28

     C.      Terms Used for Non-Parties and Other Matters. ...............29

     D.      Terms Used for Various Lawsuits.......................................41

X.      FACTUAL, LEGAL BASIS AND REASONS FOR OPINIONS .....47

     A.      An Overview of the Parties, Claims, the Duties Owed and the Legal Principles...................................................................48

     B.      1976-1986 – The Founding and Incorporation of AIA Insurance and AIA Services and the Overarching Legal Principles. ..................92

     C.      1987-1994 – The Restructuring of the AIA Corporations in Connection with Reed and Donna Taylor's Divorce and the Restrictions Under Idaho Law and the AIA Corporations' Articles of Incorporation and Bylaws...............................................97

     D.      1995-1997 – The Illegal Stock Redemption Transaction Involving Reed Taylor and the Ultra Vires Transaction Involving Donna

Exhibit - 1, p. 2

11-ER-2419

Taylor—and Riley's Involvement in the Illegal and Ultra Vires Acts...........................................................................................102

E.   1998-2003 – The Idea for Crop Insurance Is Born at the AIA Corporations and then Later Stolen by the Controlling AIA Defendants.......................................................................................108

F.   2004-2005 – The AIA Corporations' Unlawful Funding of CropUSA Accelerates. ...................................................................128

G.   2006 – AIA Insurance's Unauthorized Guarantee of the $15 Million Lancelot Loan Guarantee and Improper Hawley Troxell Opinion Letter Provided for the Transaction—and Once Again Riley Was Involved in the Transaction.............................................140

H.   2007 – Reed Taylor Files Suit, the Hawley Troxell Defendants Commence Representing John Taylor, the AIA Corporations and CropUSA, Substantial Evidence of Past Malfeasance Against the AIA Corporations Is Revealed, and the Malfeasance and Improper Corporate Governance Continue........................................................146

I.   2008 – The Parties Engage in Unnecessary Heavy Litigation and Discovery in *Reed Taylor v. AIA Services*, the Hawley Troxell Defendants Obtain Purported Agreements to Also Jointly Represent CropUSA, the AIA Corporations' Assets Are Sold to Hudson, Donna Taylor Files Suit in *Donna Taylor v. Taylor*, and the Malfeasance and Improper Corporate Governance Continue.....177

J.   2009 – The Redemption of Reed Taylor's Shares Is Ruled Illegal, Donna Taylor Files Suit in *Donna Taylor v. AIA Services* to Have a Receiver Appointed and to Honor Her Board Designee, and the Improper Corporate Governance and Malfeasance Continue...........199

K.   2010 – The Hawley Troxell Defendants Successfully Prevent Donna Taylor from Having a Receiver Appointed and Having Her Board Designee Appointed Thereby Permitting the Malfeasance to Continue, Donna Taylor and Miesen File this Lawsuit, the Hawley Troxell Defendants Ignore the Malfeasance and Improper Corporate Governance, and the Malfeasance Continues. .................211

Exhibit - 1, p. 3

11-ER-2420

L.    2011 – The Hawley Troxell Defendants Successfully Obtain a Stay of this Lawsuit Thereby Permitting the Malfeasance to Continue, the Controlling AIA Defendants Have AIA Services Unlawfully Guarantee the GemCap Loan, and the Malfeasance and Improper Corporate Governance Continue. ...............................218

M.    2012 – The Hawley Troxell Defendants' Suggested Reverse Stock Split Is Attempted, Donna Taylor Moves to Lift the Stay in this Lawsuit, AIA Services Files Suit in *AIA Services v. Durant* to Force the Stock Split to Be Effectuated, the AIA Corporations Unlawfully Guarantee the Increased GemCap Loan, and the Malfeasance and Improper Corporate Governance Continue...........224

N.    2013 – The Controlling AIA Defendants Permit the GemCap Loan to Be Increased to $10 Million Thereby Increasing the AIA Corporations' Amended Guarantee of the GemCap Loan to $10 Million, Judge Kerrick Dismisses *AIA Services v. Durant* Thereby Invalidating the Reverse Stock Split, Donna Taylor Appeals the Denial of the Motion to Lift Stay, Donna Taylor Files Her Second of the Consolidated Lawsuits in *Donna Taylor v. John Taylor*, GemCap Files Suit in *GemCap v. CropUSA*, and the Malfeasance and Improper Corporate Governance Continue. ...............................237

O.    2014 – Miesen Files Suit Against GemCap to Invalidate the AIA Corporations' Amended Guarantee of the GemCap Loan in *Durant v. GemCap*, GemCap Files Suit Against Quarles & Brady, GemCap and John Taylor Unlawfully Sign the GemCap Settlement Agreement, and the Malfeasance and Improper Corporate Governance Continue....................................................247

P.    2015 – Donna Taylor Unsuccessfully Moves to Intervene in *GemCap v. CropUSA*, the Ninth Circuit Court of Appeals Reverses the Order Staying this Lawsuit and the Malfeasance and Improper Corporate Governance Continue.....................................258

Q.    2016 – John Taylor and GemCap Sell AIA Services' Headquarters, GemCap Files Suit in *GemCap v. AIA Services*, and the Malfeasance and Improper Corporate Governance Continue.....266

R.    2017 – The Denial of Donna Taylor's Intervention as Untimely Is Affirmed, GemCap Is Named as a Defendant in this Lawsuit,

GemCap's Lawsuit Against Quarles & Brady Is Dismissed, the Controlling AIA Defendants File Their Respondents' Brief in Donna *Taylor v. Taylor* and Ironically Assert Violations of AIA Services' Amended Articles of Incorporation as Defenses, and the Malfeasance and Improper Corporate Governance Continue...........275

S.     2018 – GemCap Files Suit on Behalf of Weskan (Another Entity Partially Owned by John Taylor), the Idaho Supreme Court Reverses in Favor of Donna Taylor in *Donna Taylor v. Taylor*, John Taylor Has AIA Services Accrue $75,000 of Alleged Compensation for Himself When AIA Services Had Only $122,000 in Total Revenues in 2018, and the Malfeasance and Improper Corporate Governance Continue......................................277

T.     2019 – GemCap's Action Against Diversified (*Weskan v. Diversified*) Is Remanded to State Court, the Hawley Troxell Defendants Continue Taking Action Against Their Clients the AIA Corporations, Riley Admits that the AIA Corporations' Board of Directors Were Not Independent to Approve Any Conflict Waivers or Representation Agreements, and the Malfeasance and Corporate Governance Continue...........................280

U.     2020 – The Malfeasance and Improper Corporate Governance Continue, and the Rule 30(b)(6) Depositions of the AIA Corporations Establish that the Only Decisions Made by the Purported Boards of Directors for the AIA Corporations and the Only Shareholder Meetings that Occurred Were Those Reflected in the Written Meeting Minutes and Resolutions Produced in Discovery.....................................................................................293

V.     The AIA Corporations Have No Knowledge About What Has Transpired and No Knowledge or Facts May Be Imputed Upon Them Under the Adverse Interest Exception...................................311

XI.   ADDITIONAL OPINIONS PRIMARILY ON THE CONTROLLING AIA DEFENDANTS, BUT NOT LIMITED TO THEM ..........................312

A.     The Fiduciary Duties Owed by The Controlling AIA Defendants as Directors, Officers and Controlling Shareholders of the AIA Corporations, Their Countless Breaches Thereof, Their Mockery

Exhibit - 1, p. 5

11-ER-2422

of Corporate Governance and the Wide-Spread Corporate Malfeasance.................................................................314

B.      The Business Judgment Rule Not Applicable..................................360

C.      The Exculpatory Provisions Under the AIA Corporations' Amended Articles of Incorporation Are Not Applicable to the Controlling AIA Defendants' Conduct. ...........................................361

D.      John Taylor's Education and Experience as a Lawyer, an Accountant and as a Director of a Publicly Traded Company.........363

E.      Adverse Interest Exception. ............................................................364

F.      Henderson and Beck........................................................................366

G.      Cashman. ........................................................................................367

H.      Henderson, Beck and Cashman as Members of the Control Group. 368

I.       John Taylor's 1995 Executive Officer's Agreement, Compensation, Debts and Transactions. .........................................368

J.       CropUSA Corporate Opportunity and Asset Sale to Hudson and the Related Corporate Opportunity of the Growers National Contract. .........................................................................................370

K.      Purchase by AIA Insurance of Series C Shares from Crop USA. ....378

L.      Uncollectable Loans to Pacific Empire Radio. ...............................381

M.      GemCap Guarantees, Settlement Agreement and Related Litigation. .......................................................................................384

N.      Failure to Accept the Series A Shareholder's Board Designees and the Opposition to Donna Taylor's Declaratory Relief and Appointment of Receiver. ...............................................................392

O.      Attempted Reverse Stock Split and Series A Preferred Stock Redemption. ....................................................................................396

P.      Improper Advancement and Payment of Legal Fees and Costs. ......400

**Exhibit - 1, p. 6**

Q. The Controlling AIA Defendants Damaged the AIA Corporations. 407

R. The Controlling AIA Defendants Have No Viable Advice of Counsel Defense for Any of Their Acts and Omissions. ..................415

S. Improper Use of Sealing of Settlement Agreements, Court Filings and Transcripts to Conceal Facts from the AIA Corporations and AIA Services' Disinterested Shareholders. .....................................417

T. Reed Taylor Indemnity Demand. ......................................................418

XII. ADDITIONAL OPINIONS PRIMARILY ON THE HAWLEY TROXELL DEFENDANTS, BUT NOT LIMITED TO THEM ...............420

A. The Duties of the Hawley Troxell Defendants to the AIA Corporations, and the Breaches Thereof. .........................................421

B. Enhanced Scrutiny. ............................................................................451

C. Absence of Litigation Privilege. .......................................................459

D. Standstill and Tolling Agreements. ...................................................460

E. Representation Agreements. ..............................................................465

F. Joint Defense Agreements. ................................................................480

G. Fiduciary and *Garner* Privilege Exceptions. ....................................482

H. Representation of Crop USA. ............................................................482

I. Failure to Investigate and Scope of Representation. .........................485

J. Purchase by AIA Insurance of Series C Shares from Crop USA. ....489

K. Failure to Redeem the Series C Shares in the AIA Services' 401(k) Plan. ........................................................................................490

L. Additional Tainted Litigation Decisions and Disgorgement. ...........491

M. Instigation of Attempted Reverse Split. ............................................498

N. Advancement of the Litigation Fees for John Taylor, Henderson, Beck, Cashman, Duclos, Freeman and Others. ................................500

Exhibit - 1, p. 7

11-ER-2424

O.      $800,000 Settlement Funds and $424,116 Owed to Former Policyholders ...................................................................503

P.      Funds Released from the Court Registry. .......................................505

Q.      Loans to Pacific Empire Radio.......................................................506

R.      Series A Preferred Shares...............................................................507

S.      The Corporate Governance Failures, the Failure to Appoint a Receiver and Donna Taylor's Board Designee; and the GemCap Guarantees and Settlement Agreement. ...........................................510

T.      Hudson Transaction and Other Damages........................................514

U.      Mishandling of the Illegality Defense and Failure to Investigate Riley ...............................................................................................517

V.      Substantial Assistance in Controlling AIA Defendants' Breaching the Duties of Good Faith and Loyalty..............................................520

W.      Disregard of the AIA Corporations and the AIA Disinterested Shareholders. .................................................................................522

X.      General Response to the Three Expert Witness Reports Submitted by the Hawley Troxell Defendants. ................................................523

Y.      Rebuttal to Mr. Remele's Report and Opinions.............................525

Z.      Rebuttal to Mr. Lidstone's Report and Opinions...........................592

AA.     Rebuttal to Mr. Pinkerton's Report and Opinions. ........................614

BB.     Mr. Pinkerton's Rebuttal Report. ..................................................624

CC.     Rebuttal to Mr. Remele's Supplemental Report. ...........................625

DD.     Roderick Bond and Michael Bissell................................................628

XIII.  ADDITIONAL OPINIONS PRIMARILY ON GEMCAP, BUT NOT LIMITED TO GEMCAP.............................................................................631

A.      Apparent Authority Does Not Apply Here Because Everyone, Including GemCap, Was Aware that AIA Services' Limited

**Exhibit - 1, p. 8**

**11-ER-2425**

11-ER-2426

Guarantee of the GemCap Loan, the AIA Corporations' Amended Guarantee of the GemCap Loan and the GemCap Settlement Agreement Were Not Authorized and Exceeded the Power of the AIA Corporations. ................................................................633

B.  No Benefit to the AIA Corporations. ................................................649

C.  GemCap's Substantial Assistance in Controlling AIA Defendants' Defendants' Duties of Good Faith and Loyalty. ...............................651

D.  Improper Use of Sealing of Settlement Agreements, Court Filings and Transcripts to Conceal Facts from the AIA Corporations and AIA Services' Disinterested Shareholders. .......................................652

XIV.  SUPPLEMENTATION ....................................................................653

XV.  CONCLUSION AND TRIAL TESTIMONY .................................653

Exhibit - 1, p. 9

# RICHARD T. McDERMOTT
## 46 EAST 91st STREET
## New York, N.Y. 10128

November 1, 2020

Roderick C. Bond
Roderick Bond Law Office, PLLC
601 108th Ave NE, Suite 1900
Bellevue, WA 98004

Re:   *Dale L. Miesen v. Hawley Troxell Ennis & Hawley, LLP, et al.*
       U.S. District Court Case No. l:10-cv-00404-DCN-CWD

Dear Mr. Bond:

Thank you for retaining me as an expert witness for the above-referenced lawsuit.

You have asked me to prepare and deliver an Expert Witness Report detailing my opinions, together with my education, qualifications, experience, and certain facts and authorities supporting my opinions. My Report which is set forth below, has been consistently delayed by discovery disputes, ongoing discovery and the recent depositions. I have also reviewed and addressed in my Report the opinions submitted by the three expert witnesses retained by the Hawley Troxell Defendants and I will address any other ones which may arise in the future that fall within areas of my knowledge, experience, education or expertise. I will be attending trial and listening to all of the testimony elicited, and I will be prepared to testify as to any applicable matters at trial.

Based on the number of parties and the complexity of this lawsuit, I include headings and subheadings in this Report, together with a table of contents. In addition, I include an explanation of my citations and a glossary for the terms that I will be utilizing in this Report. Please remember those defined terms when reviewing this Report and refer back to them when necessary. It may be helpful to separately print the pages containing the Glossary of Terms so that you can have them readily available as you review this Report. Please also note that, as in the past, I have many opinions contained within Section X of this Report. To avoid any

**Exhibit - 1, p. 10**

**11-ER-2427**

confusion, I have provided further clarification in this Report. In addition, any citations, facts, analysis and opinions contained within any footnotes in this Report are equally important as the other content of this Report. Finally, my citations to the same document may be different from time to time because the same documents have been bates-stamped with different bates codes, contain no bates-stamps at all, or have been filed in this Lawsuit.

## I.   SUMMARY OF OPINIONS

The law provides shareholders of Idaho corporations with the assurances that those acting as directors and officers[1] of their corporations[2] will do so by exercising their utmost in informed business judgment and will place the welfare of those corporations above any personal and financial interests. The cornerstone of those assurances is a set of common sense duties owed by directors and officers, which include the duty to act with due care, in good faith, with undivided loyalty, and in a manner they reasonably believe to be in the best interests of the corporation. Equally vital to the protection of the interests of those corporations are the duties the law imposes upon lawyers[3] who advise and represent those corporations, namely, to exercise due care and to act with complete fairness, good faith, honor, loyalty and fidelity to their corporate clients.

For the reasons discussed throughout this Report, the system did not fail the AIA Corporations or AIA Services' Disinterested Shareholders; instead, the numerous flagrant and continued breaches of the duties of good faith and loyalty owed by the Controlling AIA Defendants as purported directors, officers and controlling shareholders of the AIA Corporations, and the duties of care owed by the Hawley Troxell Defendants, as the lawyers advising and representing the AIA Corporations during the critical times in 2007 and thereafter, and the subsequent intentional wrongful acts of GemCap from 2011 and thereafter substantially assisting in the breach of the duties of good faith and loyalty owed by the Controlling AIA Defendants to the AIA Corporations, were each, sometimes at differing times one

---

[1] *I.e.,* John Taylor and the other Controlling AIA Defendants.
[2] *I.e.,* the AIA Corporations.
[3] *I.e.,* the Hawley Troxell Defendants.

Exhibit - 1, p. 11

11-ER-2428

of the proximate causes, or a substantial factor thereof, of Miesen's forty Damage Items sustained by the AIA Corporations as discussed in this Report.[4]

Moreover, specifically, having reviewed thousands of pages of documents and thousands of pages of deposition transcripts and exhibits, the liability of all of the Defendants involves their improper activities with one person, John Taylor. While the number of defendants involved in this Lawsuit and the improper conduct stated in this Report has increased over time, there is one common thread which all roads lead back to—John Taylor. Rather than avoid John Taylor's improper and unauthorized acts and omissions, the Defendants embraced and enabled him. John Taylor's improper, unauthorized, self-interested, and egregious conduct is tied to the liability of the other Controlling AIA Defendants, the Hawley Troxell Defendants and GemCap—John Taylor played a substantial role in everything at issue in this Lawsuit. Purporting to act on behalf of the AIA Corporations, John Taylor, who is an accountant, attorney and director of the publicly traded Avista Corp., intentionally breached his duties of loyalty and good faith by being intimately involved in: (a) all aspects of the improper and complete abandonment of corporate governance, including the complete disregard for the AIA Corporations' articles of incorporation and bylaws, and the requirement to hold annual and special shareholder meetings to comply with the governing documents and Idaho law;[5] (b) the retention of lawyers and the making of improper and unauthorized transactional and litigation decisions; (c) the improper accounting, misleading and incomplete financial statements, and complete failure to properly address a single conflict of interest or related-party transaction; (d) the preparation and entry into improper agreements providing no benefit and giving away trade secrets and other assets; (e) the unlawful taking of millions of dollars of various assets and money belonging to the AIA Corporations; (f) the millions of dollars of improper loan guarantees provided for other entities owned, at least in part, by him; (g) the millions of dollars

---

[4] *See, e.g.,* Miesen's Fourth Amended Objections, Answers and Responses to the Hawley Troxell Defendants' First Set of Interrogatories and Second Set of Requests for Production dated September 17, 2020 (together the Exhibit A attached thereto, which was subsequently substituted with a revised spreadsheet to reflect some minor revisions on September 30, 2020, DLM – 107484-659, which is attached hereto as Exhibit A). Miesen incorporated by reference this information into his answers regarding damages provided to other defendants.

[5] Examples of the numerous provisions under AIA Services' Amended Articles of Incorporation and the AIA Corporations bylaws which have been intentionally violated or were never sought to be complied with are reflected in Exhibit H attached hereto. John Taylor also has a problem in failing to ensure that entities that he owns or partially owns comply with their legal and contractual obligations, he is a serial litigator, and he has directly or indirectly caused the filing of at least 45 lawsuits and legal filings, as reflected in Exhibit D attached hereto.

Page - 3

in improper loans made to him and other entities owned, at least in part, by him; (h) the complete disregard of his duties and obligations owed to the AIA Services' 401(k) Plan and the Series C Preferred Shares held in that Plan; and (i) the complete disregard for the rights and obligations owed to the AIA Services' Disinterested Shareholders and preferred shareholders of the AIA Corporations. Accordingly, it is not surprising that Miesen, a minority common shareholder of AIA Services, has pursued claims seeking millions of dollars in damages in an effort to make the AIA Corporations whole and it is surprising that the Defendants engaged in improper corporate governance, transactions, guarantees and agreements after the improper activities were raised by Reed Taylor and Donna Taylor in 2007 and thereafter.

Based upon the above facts alone,[6] it is easy to see why the Hawley Troxell Defendants' primary expert witness, Mr. Remele, quickly distanced himself from John Taylor and fatally qualified all of his opinions with the statement that "I have not been retained to opine on the legitimacy of John Taylor's actions."[7] This is because Mr. Remele *quickly* recognized, as did I, that John Taylor's conduct is undefendable. Yet, Mr. Remele goes on to allege that the Hawley Troxell Defendants could rely on transactional and litigation decisions made by John Taylor when he disavowed any consideration of John Taylor's conduct. Since John Taylor's conduct is undefendable, then so are the conduct of the other Controlling AIA Defendants, the Hawley Troxell Defendants and GemCap—because Miesen's claims and damages against them are intertwined with, and tied directly to, John Taylor's improper acts and omissions. Since John Taylor had no authority to waive conflicts of interest or make litigation decisions based on his own conflicts, the lack of proper corporate governance and his long and proven track record of proceeding in a manner against the best interests of the AIA Corporations and their shareholders, the actions of the Hawley Troxell Defendants are equally undefendable. In that same footnote to his report, Mr. Remele also correctly stated "it is my opinion that it was in the best interest of the AIA entities, as well as Crop USA, to retain independent, outside, competent counsel to defend against Reed Taylor's claims."[8] I whole heartedly agree with Mr. Remele's opinion in that regard. The problem was that the AIA Corporations never retained, independent, outside, competent counsel—they retained the conflicted Hawley Troxell Defendants, who did the bidding of the Controlling AIA Defendants for that

---

[6] Mr. Remele was provided with a fraction of the documents produced in discovery and at issue in this Lawsuit. I would be curious what Mr. Remele's opinions would be had he been provided and reviewed the same documents that I have been provided and reviewed.

[7] 10/18/2019 Remele Report, p. 29 n.16.

[8] 10/18/2019 Remele Report, p. 29 n.16.

Exhibit - 1, p. 13

11-ER-2430

lawsuit, other lawsuits and other matters—all to the detriment of the AIA Corporations. The Hawley Troxell Defendants could have prevented Miesen's damages in this Lawsuit had they properly discharged their duties of care, good faith and loyalty owed to the AIA Corporations. Instead, they breached those duties thereby being one of the proximate causes of Miesen's forty Damage Items, as did the Controlling AIA Defendants in their roles as purported directors, officers and/or controlling shareholders.

While GemCap was late to the misconduct, it disregarded the litigation reports that it obtained containing substantiated allegations regarding prior unauthorized and prohibited loan guarantees and intentionally proceeded to enter into guarantees, the Settlement Agreement and property transactions with the AIA Corporations, and engaged in litigation with them based on the same guarantees and Settlement Agreement that GemCap knew were unauthorized, improper and illegal, including, because they were prohibited by AIA Services' Amended Articles of Incorporation and the AIA Corporations' bylaws (not to mention common sense). Because GemCap intentionally engaged in numerous ultra vires and unauthorized transactions with the AIA Corporations, and substantially assisted John Taylor and the other Controlling AIA Defendants breach their respective duties of good faith and loyalty owed to the AIA Corporations, including by substantially assisting John Taylor in maintaining control and thereby engage in malfeasance and the concealment of facts, GemCap is also one of the proximate causes of Miesen's forty Damage Items.

This is a double derivative and direct shareholder action brought by Miesen, who is one of AIA Services' Disinterested Shareholders.[9] While this Lawsuit is quite complex in many ways and directly or indirectly involves a number of other lawsuits and legal proceedings, after reviewing and/or considering tens of thousands of pages of documents (including filings from other lawsuits) and many deposition transcripts, I was easily able to conclude that the Hawley Troxell Defendants and Controlling AIA Defendants breached their duties of care and fiduciary obligations, including their duties of good faith and loyalty, owed to the AIA Corporations on numerous occasions and the Controlling AIA Defendants also breached their fiduciary duties owed to the AIA Services' Disinterested Shareholders on numerous occasions. In addition, the Controlling AIA Defendants have all intentionally

_____

[9] Please note that I define the relevant terms and certain lawsuits discussed in this Report in Section IX below. Other lawsuits and legal matters are listed in the attached Exhibit D. When reviewing this Report, I recommend separately printing out the defined terms in Section IX for quick reference.

engaged in numerous improper, unapproved, unauthorized, unlawful, illegal, ultra vires and/or intra vires (but not properly authorized) acts involving the AIA Corporations, including all contracts involving CropUSA, all engagement letters and conflict waivers involving the Hawley Troxell Defendants, all guarantees and settlements involving GemCap, paying unapproved and excessive compensation, engaging in transactions involving the Controlling AIA Defendants or entities that they partially own or control, and failing to properly account and allocate for expenses and advances with the foregoing. Moreover, the Controlling AIA Defendants, the Hawley Troxell Defendants and GemCap, during certain times, have disregarded or intentionally violated the restrictions under AIA Services' Amended Articles of Incorporation, AIA Services' New Restated Bylaws and AIA Insurance's Bylaws, and they have failed to provide the required notice or obtain the required shareholder approval from AIA Services' Disinterested Shareholders for any of the transactions at issue in this Lawsuit. There has been a long-term improper and unlawful course of conduct by the Defendants (at least negligent as to the Hawley Troxell Defendants). Since 1999, nearly $40,000,000 in revenues have been received by the AIA Corporations which were derived primarily from so called "run off" commissions, related administrative fees and bonuses attributable to the renewal commissions for still active policies. Instead of expending those funds for proper corporate purposes of the AIA Corporations, as discussed in this Report, John Taylor and the other Controlling AIA Defendants wasted those funds on a number of extraneous expenditures, loans and improper compensation, none of which benefitted the AIA Corporations, including but not limited to: (i) over $2,650,000 in known legal fees and costs, which were unauthorized or for matters directly attributable to the misconduct of John Taylor,[10] the Controlling AIA Defendants and others;[11] (ii) at least $3,043,705.45 in purported "compensation" paid to John Taylor when he was improperly competing with the AIA Corporations and failed to devote all of his time to them as required in violation of duties of loyalty; (iii) $1,510,693 in an unapproved and unauthorized purchase of AIA Services' Series C Shares from CropUSA; (iv) at least $2,264,359.92 in known unapproved loans to the insolvent Pacific Empire Radio Corporation partially owned during those loans by John Taylor and Henderson, which even John Taylor acknowledges will not be repaid; and (v) at least $863,617.20 in compensation paid

---

[10] These are attorneys' fees and costs paid by the AIA Corporations. Other parties directly or indirectly involved in the lawsuits have expended in excess of ten million dollars in attorneys' fees and costs (GemCap alone claims to have spent over $8,000,000).

[11] Indeed, since 1996, there have been at least forty-five lawsuits and other legal filings caused directly or indirectly by the acts or omissions of John Taylor (or entities he partially owns) and/or other Defendants herein. *See* Exhibit D attached hereto.

**Exhibit - 1, p. 15**

**11-ER-2432**

to employees of the AIA Corporations who were competing with the AIA Corporations by working for CropUSA at the direction of John Taylor. In short, John Taylor and the other Controlling AIA Defendants used the AIA Corporations as their personal piggy bank, and otherwise consistently placed their interests above the interests and legal rights of the AIA Corporations and AIA Services' Disinterested Shareholders. As a result, the AIA Corporations have been financially devastated. Since providing the prior versions of this Report, there has been no information that has led to me reconsider my prior summary of opinions. Instead, the information obtained and reinforced those opinions and has led to additional opinions. To reiterate, for all of the reasons stated in this Report:

I have concluded and opine, *inter alia*, that: (a) the Hawley Troxell Defendants, whose top three billers from 2007 through 2012 (Ashby, Babbitt and Riley, respectively) billed a collective 3,555.25 hours purportedly representing the AIA Corporations, have breached their duties of care and duties of loyalty owed to the AIA Corporations in *Reed Taylor v. AIA Services*, *Donna Taylor v. AIA Services*, in related matters, and in acting as general counsel for the AIA Corporations by failing to act in the best interests of the AIA Corporations (including the all-important duty of undivided loyalty) thereby being one of the proximate causes of the damages requested by Miesen; (b) at a minimum for the Hawley Troxell Defendants, they breached their duties of care and duties of loyalty owed to the AIA Corporations by representing the interests of the Controlling AIA Defendants and in earning significant fees and costs. They never saw the big picture and were focused solely on "beating" Reed and Donna Taylor instead of representing the interests of the AIA Corporations as discussed in this Report, never rendered advice of the type and quality that a firm of the reputed stature of Hawley Troxell would have rendered under the same or similar circumstances, ignored the fact that the AIA Corporations, and not the Controlling AIA Defendants, were their clients, negligently or intentionally substantially assisted the Controlling AIA Defendants in breaching their fiduciary duties and failed to exercise due care in connection with these and a number of related matters, thereby being one of the proximate causes of the damages claimed by Miesen; (c) at worst for the Hawley Troxell Defendants, they engaged in a course of conduct intentionally violating their fiduciary duties (including the duties of loyalty) owed to the AIA Corporations by placing the interests of the Controlling AIA Defendants above the interests of the AIA Corporations' interests and by substantially assisting the Controlling AIA Defendants in breaching their fiduciary duties and committing fraud against the AIA Corporations and AIA Services' Disinterested Shareholders, thereby being one of the proximate causes of the damages requested by Miesen; (d) the Hawley

Exhibit - 1, p. 16

11-ER-2433

Troxell Defendants should be required to disgorge all compensation for intentionally violating their fiduciary duties owed to the AIA Corporations by acting with conscious disloyalty to them and for violating numerous Rules of Professional Conduct (particularly as to conflicts of interest and obtaining Informed Consent from the highest authority, e.g., shareholders); (e) the Hawley Troxell Defendants' engagement letters and conflict waivers are void because they were never properly obtained, ultra-vires or intra vires (but not properly authorized) and the product of numerous violations of the Rules of Professional Conduct; and (f) after considering the evidence and the long-term course of intentional conduct (including while lawsuits were pending), the Hawley Troxell Defendants' conduct towards the AIA Corporations and AIA Services' Disinterested Shareholders was oppressive and they intentionally failed to insist upon the necessary disclosures to, and assisted the Controlling AIA Defendants in concealing facts from the AIA Corporations and AIA Services' Disinterested Shareholders and/or outrageous for the reasons stated in this Report. Nothing in the Reports submitted by the Hawley Troxell Defendants' experts, the Unredacted Billing Records, or the recent discovery has caused me to change any of my analysis and opinions; in fact, their opinions (including Mr. Remele's telling refusal to consider or evaluate John Taylor's conduct in his opinions); the Unredacted Billing Records and the other more recent discovery reinforce my opinions.

I have also concluded and opine, *inter alia*, that: (a) the Controlling AIA Defendants, including John Taylor through his elevated duties acting as directors and officers, have intentionally breached their fiduciary duties of good faith and loyalty and acted in bad faith as to all of the transactions and compensation at issue in this Lawsuit, thereby being one of the proximate causes of the damages requested by Miesen; (b) the Controlling AIA Defendants have intentionally engaged in long-term course of conduct of placing their interests above the interests of the AIA Corporations and AIA Services' Disinterested Shareholders and have concealed facts and transactions for many years thereby being one of the proximate causes of the damages requested by Miesen; (c) the Controlling AIA Defendants have acted in bad faith and intentionally breached their duties of loyalty owed to the AIA Corporations and AIA Services' Disinterested Shareholders by intentionally

Page - 8

refusing to comply with fundamental corporate governance procedures,[12] including, *inter alia*, by intentionally engaging in ultra vires and unauthorized acts, failing to hold annual shareholder meetings, failing to make proper disclosures to shareholders, failing to honor Donna Taylor's board designee to be appointed to the board of AIA Services, and failing to have a disinterested director make decisions or have the shareholders vote for the decision, thereby being one of the proximate causes of the damages requested by Miesen; (d) to the extent that any of the Controlling AIA Defendants did not owe fiduciary duties to the AIA Corporations and AIA Services' Disinterested Shareholders or the breached fiduciary duties involve those of other Controlling AIA Defendants, those individuals substantially assisted the other Controlling AIA Defendants in breaching their duties of loyalty and acting in bad faith thereby being one of the proximate causes the damages requested by Miesen; (e) the Controlling AIA Defendants were faithless fiduciaries and should be required to disgorge all compensation (including the $3,043,705.45 in W-2 compensation and 1099 income paid to John Taylor since 1999); (f) John Taylor's and Connie Taylor's conduct and intentional breaches of their duties of good faith and loyalty owed to the AIA Corporations are even more egregious since they were both attorneys licensed to practice law in Idaho during all relevant times (which separately prevents them from relying on the advice of others as to any legal issues); (g) the Controlling AIA Defendants are not entitled to protection under any of the exculpatory provisions under the AIA Corporations' amended articles of incorporation because they acted in bad faith and intentionally breached their duties of loyalty owed to the AIA Corporations and AIA Services' Disinterested Shareholders; (h) the Controlling AIA Defendants were not entitled to rely on any of the Legal Opinions provided for the GemCap Loan or the Lancelot Loan because they were not addressees of such Legal Opinions nor were they permitted to rely upon such Legal Opinions; (i) based on the adverse interest exception, the AIA Corporations still have not discovered the facts and none of the knowledge of the Controlling AIA Defendants may be imputed upon the AIA Corporations (this applies to the Hawley Troxell Defendants as well); and (j) after considering the evidence and the long-term course of intentional conduct (including while lawsuits were pending), the Controlling AIA Defendants' conduct towards the AIA Corporations and AIA Services' Disinterested Shareholders was oppressive,

---

[12] John Taylor testified that while Beck and Henderson were directors AIA Services held "one or two" board meetings a year and "Almost all of them dealing with legal issues," and "As CEO of the Company, I would make all business decisions for the companies." 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 359. Instead of reviewing the Bylaws to determine whether board approval was needed, he "operated consistently with the – the operations for the last 20 years since the 1990s*." Id*. at 359-60.

Page - 9

Exhibit - 1, p. 18

fraudulent (they intentionally concealed facts from, and failed to make necessary disclosures to, disinterested constituents and AIA Services' Disinterested Shareholders), malicious and/or outrageous for the reasons stated in this Report.

Finally, I have concluded and opine, *inter alia*, that: (a) GemCap was aware that AIA Services' Limited Guarantee of the GemCap Loan, the AIA Corporation' Amended Guarantee of the GemCap Loan and that the GemCap Settlement Agreement were all prohibited by AIA Services' Amended Articles of Incorporation and the AIA Corporations' bylaws and were never properly authorized (GemCap obtained copies of AIA Services' Amended Articles of Incorporation and information in litigation reports, including (i) a copy of the docket in this Lawsuit; (ii) a copy of Donna Taylor's First Amended Complaint in this Lawsuit, which included allegations regarding unlawful guarantees of loans in violation of AIA Services' Amended Articles of Incorporation and intentional breaches of fiduciary duties (as well as allegations that CropUSA was unlawfully taken and funded by the AIA Corporations); (iii) a copy of the docket in *Reed Taylor v. AIA Services*; and (iv) a copy of Reed Taylor's Fifth Amended Complaint in *Reed Taylor v. AIA Services*, which included numerous allegations regarding unlawful guarantees in violation of AIA Services' Amended Articles of Incorporation and the Controlling AIA Defendants' intentional breaches of fiduciary duties, including allegations that CropUSA was unlawfully taken from, and funded by, the AIA Corporations, and other information contained in litigation reports), but GemCap nevertheless proceeded with the guarantees hoping to make significant profits from charging an exorbitant interest rate for the GemCap Loan and later proceeded with the GemCap Settlement Agreement when GemCap was aware that shareholders were asserting any such settlement was prohibited, unapproved, and unauthorized; (b) AIA Services' Limited Guarantee of the GemCap Loan, the AIA Corporation' Amended Guarantee of the GemCap Loan and the GemCap Settlement Agreement were unapproved, unauthorized, illegal, ultra vires and/or intra vires (but unauthorized), the AIA Corporations received no benefit and the AIA Corporations should be entitled to recover the real property transferred and later sold; (c) the AIA Corporations received no consideration for AIA Services' Limited Guarantee of the GemCap Loan, the AIA Corporation' Amended Guarantee of the GemCap Loan and the GemCap Settlement Agreement; (d) since GemCap had actual knowledge of the Controlling AIA Defendants' fiduciary duties, GemCap intentionally substantially assisted them in breaching their duties of good faith and loyalty, and by concealing facts, by accepting and/or entering into AIA Services' Limited Guarantee of the GemCap Loan, the AIA Corporation' Amended Guarantee of the GemCap Loan and the GemCap

Exhibit - 1, p. 19

11-ER-2436

Settlement Agreement thereby being one of the proximate causes of the damages requested by Miesen;[13] (e) GemCap could not reasonably rely on any Legal Opinions provided as to the validity, power, authority and enforceability of AIA Services' Limited Guarantee of the GemCap Loan, the AIA Corporations' Amended Guarantee of the GemCap Loan and the GemCap Settlement Agreement for all of the reasons stated in this Report; (f) GemCap could not rely on an apparent authority as a defense to the unauthorized AIA Services' Limited Guarantee of the GemCap Loan, the AIA Corporations' Amended Guarantee of the GemCap Loan and the GemCap Settlement Agreement because GemCap was aware, or should have been aware if it or its attorneys were reasonably prudent, that they were unauthorized and prohibited for all of the reasons stated in this Report; and (g) after considering the evidence and the long-term course of intentional conduct (including while this Lawsuit and *Durant v. GemCap* were pending), GemCap's conduct towards the AIA Corporations and AIA Services' Disinterested Shareholders was intentional, oppressive and fraudulent—they intentionally assisted the Controlling AIA Defendants in concealing facts from AIA Services' Disinterested Shareholders and substantially assisted John Taylor in having the AIA Corporations enter into the unauthorized and unlawful GemCap Settlement Agreement and transfer three parcels of real property to GemCap that sold for over $1,000,000, among the other Damage Item Numbers that GemCap is one of the proximate causes of, which actions were malicious and/or outrageous for the reasons stated in this Report.

## II.   <u>EXHIBITS USED TO SUMMARIZE OR SUPPORT OPINIONS</u>

I may use any of the documents produced by any party in discovery and/or any documents cited to, or referred to, in this Report as exhibits to support or summarize my opinions. I may also rely on portions of the video-taped depositions (either transcripts or the actual video) or oral argument transcripts or videos (including the transcript and/or video of the oral argument before the Ninth Circuit Court of Appeals and on appeal in *Donna Taylor v. Taylor*).

I will rely on the limited written board and shareholder meeting resolutions and minutes, and notices and meeting minutes for shareholders' meetings, from January 1, 1999 though the present time to present my opinions. In addition, I will utilize

---

[13] While GemCap's substantial assistance of John Taylor and the other Controlling AIA Defendants ties them to other damages sought by Miesen, Damage Item Numbers 15, 16, 17, 25 and 36 are the primary Damage Item Numbers GemCap has been one of proximate causes of.

Exhibit - 1, p. 20

11-ER-2437

the following as exhibits at trial (or a slightly modified form of any of them):[14] **(A)** Miesen's damages spreadsheets in the attached Exhibit A hereto, including as may be supplemented or amended in the future by Miesen; **(B)** charts of all shareholder and board meeting minutes and resolutions for the AIA Corporations as listed in the attached Exhibit B hereto (including as may be modified), which comprise all of the purported board and shareholder decisions for the AIA Corporations from January 1, 1999 through the present time (I am not conceding that any of the decisions were properly approved or the necessary information disclosed, but merely that they are the only ones that exist). After that chart, I have also included a chart of certain relevant documents and information regarding certain corporate governance dating back to 1989 (I used Miesen's summary for this part). I have shaded in light gray the notices, meetings minutes, resolutions and other activities that occurred from 2007 through 2012 when the Hawley Troxell Defendants were actively representing the AIA Corporations in lawsuits and other matters, and as general counsel; yet they did nothing to ensure proper corporate governance took place nor did they insist on it as they should have done as a condition of their representation; **(C)** the chart of conflicted directors, officers, managers, shareholders, participants, and owners set forth in the attached Exhibit C hereto, which may be modified as more information becomes available; **(D)** the chart of lawsuit and other legal filings that one or more of the defendants and/or entities that they partially own or control attached hereto as Exhibit D, which further establish additional conflicts of interest based on the person and/or entity's involvement in the legal proceeding and/or interests in such legal proceeding (this list separately demonstrates the voluminous litigation and legal proceeding caused directly or indirectly by John Taylor and/or the other Controlling AIA Defendants); **(E)** the chart of alleged board meetings and board resolutions (decisions without a meeting) occurring for each year for the AIA Corporations since 1999 as stated in the attached Exhibit E hereto (which I am not conceding are valid or proper), which is incorporated by reference herein. I have shaded in light gray the years that the Hawley Troxell Defendants were actively representing the AIA Corporations in lawsuits and other matters, and as general counsel; yet they did nothing to require proper corporate governance (which was at issue in four different lawsuits); **(F)** the charts of the number of alleged annual and special shareholder meetings, the number of annual and special board and shareholder meetings, and the number of written consents in lieu of shareholder meetings for the AIA Corporations by year since 1999 as stated in Exhibit F

---

[14] Attorney Bond assisted me in preparing the Exhibits set forth in this paragraph (other than Exhibit A, which was provided by Miesen) and I utilized certain tables produced by Miesen and used by Larry Hile (Mr. Bond obtained permission from Mr. Hile to use and modify his chart). I formatted the Exhibits to be the same as related ones, but in 14-point font.

attached hereto (I am not conceding that all of the alleged meetings for AIA Insurance occurred or that the meetings that were held were properly held (the special meeting held in 2007 was improperly held and the sole meeting held in 2012 for AIA Services was improper) or that any board action was proper, which charts are attached hereto as Exhibit F and incorporated by reference herein. I have again shaded in light gray the years that the Hawley Troxell Defendants were actively representing the AIA Corporations in lawsuits and other matters; yet they did nothing to stop the improper conduct and the failure to hold annual or special shareholder meetings or obtain proper board resolutions; **(G)** a chart attached as Exhibit G hereto of the top three billing attorneys at Hawley Troxell from 2007 through 2012 with a total number of hours for those three billing attorneys (note that there were many other billing attorneys and staff, and most of the time was billed from 2007 through 2009); and **(H)** a chart attached as Exhibit H hereto of certain relevant restrictions and requirements under AIA Service' Amended Articles of Incorporation and the AIA Corporations' bylaws, which have been disregarded, violated and/or improperly addressed over the years, including during the Hawley Troxell Defendants' active representation of the AIA Corporations in 2007 through 2012.[15]

I will also prepare and utilize time-lines, charts and/or summaries, including, without limitation, charts or summaries showing the obligations and restrictions under the AIA Corporations' articles of incorporation and bylaws, compensation, billing attorneys and the hours billed each year, and for the issues pertaining to my opinions with cross references to Miesen's Damage Item Numbers.

I will supplement this portion of this Report once the determination has been made as to any further exhibits and any video clips that I may rely upon at the time of trial.

## III.   INFORMATION PROVIDED AND CONSIDERED

In connection with the preparation of this Report and the rendering of my opinions at the time of trial, I have been provided with and considered the following:

(a) dockets, pleadings, documents, motions (including responses and replies), orders, declarations, affidavits and other filings in this Lawsuit (including for the appeal), together with the discovery responses, certain communications, disclosures

---

[15] For example, as discussed below, Idaho law is clear that any action taken in violation of a corporation's bylaws is void. That same principle applies to violations of articles.

Exhibit - 1, p. 22

11-ER-2439

and documents produced in this Lawsuit (including the articles of incorporation, bylaws, board resolutions, shareholder meeting notices and minutes, financial records, communications, privilege waiver disclosures and related privileged documents, the documents produced/obtained in discovery, and the deposition transcripts and exhibits to such depositions). I have read the deposition transcripts, and reviewed the exhibits, for all of the depositions taken in this Lawsuit (except for the depositions of Larry Hile and Patrick Moran, which I will review as soon as I am able);

(b) dockets, pleadings, documents, motions (including responses and replies), orders, declarations, affidavits and other filings in *Reed Taylor v. AIA Services* (including for the two appeals), together with the discovery responses, certain communications and documents produced/obtained in discovery in *Reed Taylor v. AIA Services* (including the hearing transcripts, deposition transcripts and exhibits to such depositions);

(c) dockets, pleadings, documents, motions (including responses and replies), orders, declarations, affidavits and other filings in *Reed Taylor v. Riley* (including for the two appeals), together with the discovery responses, certain communications and documents produced/obtained in discovery in *Reed Taylor v. Riley* (including the hearing transcripts, deposition transcripts and exhibits to such depositions);

(d) dockets, pleadings, documents, motions (including responses and replies), orders, declarations, affidavits and other filings in *Reed Taylor v. Bell* (including for the appeal), together with the discovery responses, certain communications and documents produced/obtained in discovery in *Reed Taylor v. Bell* (including the hearing transcripts, deposition transcripts and exhibits to such depositions);

(e) dockets, pleadings, documents, motions (including responses and replies), orders, declarations, affidavits and other filings in *Donna Taylor v. Taylor* (including for the appeal), together with the discovery responses, certain communications and documents produced/obtained in discovery in *Donna Taylor v. Taylor* (including the hearing transcripts, deposition transcripts and exhibits to such depositions);

(f) dockets, pleadings, documents, motions (including responses and replies), orders, declarations, affidavits and other filings in *AIA Services v. Durant*, together with the discovery responses, certain communications and documents

Exhibit - 1, p. 23

11-ER-2440

produced/obtained in discovery in *AIA Services v. Durant* (including the hearing transcripts);

(g) dockets, pleadings, documents, motions (including responses and replies), orders, declarations, affidavits and other filings in *Donna Taylor v. AIA Services*, together with certain communications and documents involving *Donna Taylor v. AIA Services*;

(h) dockets, pleadings, documents, filings, orders, declarations, affidavits and other matters filed in *GemCap v. CropUSA* (including for the two appeals), together with the discovery responses, certain communications and documents produced/obtained in discovery in *GemCap v. CropUSA* (including the hearing transcripts, deposition transcripts and exhibits to such depositions);

(i) dockets, pleadings, documents, motions (including responses and replies), orders, declarations, affidavits and other filings in *GemCap v. Quarles & Brady* (including for the appeal), together with the discovery responses, certain communications and documents produced/obtained in discovery in *GemCap v. Quarles & Brady* (including the hearing transcripts, deposition transcripts and exhibits to such depositions);

(j) dockets, pleadings, documents, motions (including responses and replies), orders, declarations, affidavits and other filings in *Durant v. GemCap*, together with the discovery responses, certain communications and documents produced/obtained in discovery in *Durant v. GemCap* (including the hearing transcripts);

(k) filings and dockets in lawsuits (including Odyssey Portal dockets and PACER dockets), including in John Taylor/Henderson's divorce action and those identified and defined in Section IX(D);

(l) public records such as documents filed with a state's secretary of state (articles, annual reports, etc.), recorded property deeds, SEC filings, Idaho State Bar online records, and news articles for the parties and entities at issue in this Lawsuit;

(m) the Idaho Rules of Civil Procedure, the Nez Perce County Local Rules, and the Idaho Bar Commission Rules (including those applicable in 2007 through the present time);

**Exhibit - 1, p. 24**

**11-ER-2441**

(n) the 1986, 2004 and 2014 Idaho Rules of Professional Conduct, together with the Preamble and Comments thereto;

(o) the Idaho Business Corporation Act (as amended in 1997, 2015 and 2019) in effect from 1995 through the present time;

(p) cases from Idaho, other states and federal courts (including those specifically cited or quoted in this Report), applicable Federal Rules of Civil Procedure and applicable Federal Rules of Evidence;

(q) treatises and practice materials (including the Restatements, Fletchers, Legal Malpractice, Am.Jur, C.J.S., O'Neal & Thompson's Oppression of Minority Shareholders, and the Law of Corporate Officers and Directors), law review articles, Black's Law Dictionary, the TriBar Opinion Reports, Glazer & Fitzgibbon on Legal Opinions, and the books and materials that I have authored;

(r) annual reports, articles of incorporation or formation (including amendments and restatements thereto), and other filings relating thereto for AIA Services, AIA Insurance, CropUSA, CropUSA Insurance Services and other entities controlled or owned (at least in part) by John Taylor (*see* Exhibit C attached hereto), which I also independently obtained directly from the Idaho Secretary of State to confirm that I was working with all of the correct documents;

(s) the affidavits, declarations and deposition testimony from Paul Pederson in *Reed Taylor v. AIA Services*, *Donna Taylor v. Taylor*, and *Reed Taylor v. Bell*;

(t) information provided by Miesen, Donna Taylor (also in *Donna Taylor v. Taylor*), Legg, Durant and Reed Taylor (including information previously provided in *Reed Taylor v. Bell* and *Reed Taylor v. Riley*);

(u) any additional documents and information, including in any of the above categories, that I obtain after the date of this Report (e.g., future filings in the above-referenced cases and this Lawsuit); and

(v) Since documents and information continue to be withheld from Miesen in discovery, I will be considering additional information and supplementing this Report as more information becomes available to me.

**Exhibit - 1, p. 25**

**11-ER-2442**

For purposes of clarity and consistent with the above categories of documents, I have been provided with the same documents contained within the Dropbox link provided by Miesen's counsel Attorney Bond.[16] In addition, I have been provided with all of filings of this lawsuit (1047 primary docket entries as of October 21 , 2020), the discovery responses and privilege logs produced by the parties and Miesen, and deposition transcripts (including change sheets) and exhibits, which I also have considered and relied upon in this Report.

## IV.   COMPENSATION

I was retained by Roderick Bond Law Office, PLLC and am compensated solely by Roderick Bond Law Office, PLLC. I charge $350 per hour for my work preparing this Report and $400 for testifying at trial, plus reimbursement of all out-of-pocket expenses and travel costs. All sums owed to me up through the time of trial are required to be paid in full prior to the time that I appear and testify at trial. I also reserve the right to require advance deposits if I am not being timely paid. I have never had to request any deposits from Roderick Bond Law Office, PLLC.

If I am required to work on responding to any discovery requests propounded by any of the Defendants, I will charge $350 per hour for that work. If I am deposed, I will charge $400 per hour for my time for preparing and testifying at the deposition. I will require an advance payment no later than the morning of the deposition for the total of my preparation time and estimated deposition time. I would refund the difference between the estimated payment for my time and my actual time to the extent that it is less than estimated. I reserve the right to increase my hourly rates.

## V.   EXPERT TESTIMONY IN PAST FOUR YEARS

I have not testified as an expert witness at any trial in the past four years (I normally do not believe in testifying against fellow attorneys). However, over the last four years, I have testified by deposition in the following lawsuits: (a) *Reed Taylor v. Bell*, King County Superior Court Case No. 12-2-10803-0-SEA (deposition taken on December 5, 2016); and (b) *Donna Taylor v. R. John Taylor*, Consolidated Nez Perce District Court Case Nos. CV-08-1150 and CV-13-1075 (deposition taken on

---

[16] I have not read in their entirety every document provided to me. In some instances, I simply opened the file, quickly skimmed the file and recognized that it was not relevant to my analysis or opinions. This list of documents will be continued to be updated, if necessary, with future supplements to this Report, which will be forthcoming based on the pending discovery and motion for contempt that I understand will be filed in the future.

April 24, 2015). Over the past four years, I have also testified through declarations in the two foregoing cases and in *Reed Taylor v. Riley*, Ada County District Court Case No. CV-OC-09-18868. In each of the above-referenced cases, I was retained and paid by Roderick Bond Law Office, PLLC, and not by Reed Taylor. While I have been retained as an expert by Roderick Bond Law Office, PLLC to provide expert testimony for Reed Taylor and Donna Taylor in the above-referenced cases, I am not preparing this Report with any bias for, or against, Reed Taylor or Donna Taylor; rather, I am providing this Report based on the facts and evidence relative to the torts and damages inflicted upon the AIA Corporations and, to the extent applicable, AIA Services' minority shareholders as a whole. Simply stated, I am calling "balls and strikes."

## VI.  CITATIONS TO EVIDENCE AND AUTHORITIES

In this Report, I may provide citations to supporting evidence or authorities. However, when I do cite to any evidence or authority, I am not stating or implying that such evidence or authority is the only support for any statement or analysis. In addition, the lack of any citations does not mean that there is no support for the statement or analysis. To the contrary, each of my statements and analysis in this Report is supported by authority and/or evidence even when I do not provide any such citations.

When I cite to "Dkt." or "Dkts." In this Report, I am citing to document(s) filed in the record in this Lawsuit. When I cite to any particular pages in documents that have been filed in this Lawsuit, I will cite to the blue, file-stamped page numbers at the top of each page.

When I elect to cite to bates stamped documents in this Report, I will cite to at least one bates stamp code and number (although some documents have multiple bates codes and numbers or have been produced multiple times by different parties affixing additional bates stamp codes and numbers). Notably, the documents bate stamped with "AIA" or "Crop" bates codes mean that the documents were produced in *Reed Taylor v. AIA Services* and, thus, those documents were in the Hawley Troxell Defendants' possession during *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services*.

In all other instances, I will provide sufficient information for you to determine the evidence or authority cited. Since this Report is lengthy, I will also cite to the full

Page - 18

case citations and other citations so that you do not need to find the prior citation to determine the full citation of the case or other authority.

Since there is no evidence as to certain matters, I may not cite to any evidence to support a particular contention in this Report. For example, if I state that there were no shareholder meetings held for AIA Services from 2013 through the present time (which I do), I will not cite to any evidence because there is no documentary evidence to support my determination since there were never any shareholder meetings held during that period of time. In other words, there are no notices to shareholders of any meetings or shareholder meeting minutes because such meetings never occurred from 2013 through the present time. By way of another example, I may not cite to a particular document as support for a factual statement simply because my review of thousands of pages of documents supports my factual statement.

When I cite to any particular Section or Sections in this Report, I am also relying on the cited or quoted supporting evidence in the cited to Section(s). If I cite to a particular Section, I am citing to and relying upon all of the sub-paragraphs in that Section, together with the evidence and authorities cited in that Section.

## VII.  EDUCATION, QUALIFICATIONS AND EXPERIENCE

1.     In 1962, I received a B.A. from Marquette University. In 1966, I obtained a J.D. from Fordham University School of Law.

2.     In 1967, I was admitted to practice law in the State of New York. I am presently in good standing and licensed to practice law in the State of New York. I have been admitted to practice law in New York for over 52 years. I have also been admitted to practice in the United States District Court for the Southern District of New York and the United States Court of Appeals for the Second Circuit. I am also a member of the New York State Bar Association Securities Regulation Committee.

3.     From 1966 through 1990, I was an Associate and Partner with the law firm of Alexander & Green/Walter Conston Alexander & Green (the firms combined). From 1990 through 2004, I was a Partner of Rogers & Wells/Clifford Chance LLP (the firms merged in 2000). While at that firm, I chaired the Legal Personnel Committee, and was responsible for the training, development, evaluation and advancement of associate attorneys and counsel, as well as being

Exhibit - 1, p. 28

11-ER-2445

involved in the partner selection process. I was also a member of the Executive or Administrative Committee of each of the firms of which I was a partner.

4.      From 2000 through the present time, I have been an Adjunct Professor at Fordham University School of Law. From 1980 through 1998, I was an Adjunct Professor at New York University School of Law. I presently teach a Course in Corporate Transactions: Finance And Litigation which covers such matters as a corporation's issuance of debt and equity securities, mergers and acquisitions and distributions to holders of equity securities as well as the various legal challenges which have been made with respect thereto. My course also covers such matters as the ethical and legal responsibilities of lawyers advising corporations.

5.      In 1988, I was a visiting lecturer at Monash University in Melbourne, Australia and the University of Adelaide, Australia, Corporate and Business Law Centre.

6.      In 1999, I co-lectured with former Delaware Chancellor William Allen and James Fuld, author of *Legal Opinions in Business Transactions - An Attempt to Bring Some Order Out of Some Chaos*, 28 Bus. Law. 915 (1973), on the Law and Business of Investment Banking at the New York University Center for Law and Business.

7.      From 2009 through the present time, I have served as a Special Master for the New York State Supreme Court Appellate Division, First Department. Through my mediation experience, I have gained additional knowledge and experience regarding litigation and claims.

8.      In 2018 and 2019, I was a Lecturer in Business Law and Practice at the Program For Students in the Master Program in International Business Law, Centro De Estudios Garrigues of Spain.

9.      In 2019, I was a Lecturer in Corporate Finance Transactions for the Europa Institute, of Leiden University, Germany.

10.     In 2019, I made a Presentation to the Working Group on Legal Opinions Foundation's Fall Seminar on the duties of counsel for the recipient of a third party legal opinion.

Exhibit - 1, p. 29

11-ER-2446

11.     I am the author of Legal Aspects of Corporate Finance (5th ed. 2013) and a 2018 Supplement thereto which is published by Carolina Academic Press. It is my understanding that the book has been used at over twenty different law schools. I have authored other articles and materials (including a Teacher's Manual for Legal Aspects of Corporate Finance).

12.     I am the co-author of Chapters 1 and 2 (Introduction and Elements of Opinion Letters, respectively) and author of Chapter 3 (Legal Opinions on Corporate Matters) of the Treatise: LEGAL OPINION LETTERS A Comprehensive Guide to Opinion Practice (Third Edition).

13.     I have been a member of the TriBar Opinion Committee for 29 years. The TriBar Opinion Committee is a nationally recognized committee that publishes Reports on various aspects of legal opinion practice.

14.     I have practiced corporation and securities law for more than 35 years. I have represented domestic and international acquiring and acquired clients in mergers and acquisition transactions involving acquisition amounts from less than $1 million to more than $1 billion. Included in that work was the participation in and supervision of others with respect to pre-transaction due diligence and the rendering of reports pertaining to pre-transaction due diligence.

15.     I have extensive experience in the area of corporate governance of both privately held and publicly traded corporations (including Fortune 500 companies), providing legal advice to boards of directors in matters involving significant transactions, corporate governance questions, derivative and class action shareholder suits, the payment of directors' expenses (including attorneys' fees), as well as the fiduciary duties of directors, officers and controlling shareholders and related matters. I also have extensive experience with the preparation of: (a) proxy statements; (b) Reports to the Securities and Exchange Commission; (c) reports to shareholders; (d) disclosures to shareholders; (e) notices of shareholder meetings, shareholder meeting minutes and shareholder resolutions; and (f) notices of board meetings, board meeting minutes and board resolutions. My firms and I have acted as general counsel for a number of corporate clients, and I am aware of what the work of a law firm general counsel entails, and the duties and responsibilities attendant thereto. My experience also includes investigating and determining what licenses clients need to obtain to conduct business and the compliance with the rules, regulations, statutes and laws regarding such businesses.

Exhibit - 1, p. 30

**11-ER-2447**

16. I have extensive experience in the preparation of lawyers' responses to auditors' requests for information, and was responsible for my firm's establishment of procedures for compliance with the ABA Statement of Policy Regarding Lawyers' Responses to Auditors' Requests for Information when the Statement of Policy was adopted.

17. I have experience advising the boards of directors of corporations in transactions, including, the board of directors of Fortune 500 companies. I also have extensive experience in providing advice to officers, boards of directors, shareholders (minority and majority shareholders) for corporations, including as to matters involving anticipated or actual litigation.

18. I also have experience in personally serving on boards of directors. Both as a lawyer and board member I have experience in establishing and maintaining proper corporate governance procedures, ratifying corporate actions, reviewing and analyzing financial statements, and addressing executive compensation matters (including employment agreements, stock option plans as well as bonus and profit sharing plans and pension plans), and questioning and conferring with CFOs. My financial statement and corporate tax experience include such matters as determining the proper accounting, tax and antitrust regulatory treatment of acquisition transactions, the appropriate asset and good will allocation of the consideration paid for the business in asset, merger and stock transactions and various related matters. The Second Chapter of my casebook referred to in paragraph 10 above is entitled Valuation Of The Corporate Enterprise- Purpose and Methodology.

19. I also have extensive experience in drafting, reviewing and interpreting: (a) certificates/articles of incorporation, bylaws, shareholder agreements, notices to shareholders, shareholder resolutions, notices to board members and board resolutions; and (b) ensuring that shareholder resolutions and board resolutions comply with a corporation's certificate/articles of incorporation, bylaws, and applicable restrictions under statutory and common law.

20. I have extensive experience in domestic and international corporate finance, mergers and acquisitions, tender offers, strategic alliances and bankruptcy reorganizations.

21.     I have advised bank creditors with respect issues regarding lender liability and related matters. I have experience advising borrowers in asset based loans.

22.     My experience in corporate law also includes, purchases and redemptions by a corporation of its own shares (and formulating and evaluating proposals therefor) from both substantial shareholders and the investing public in issuer tender offers and open market transactions, strategic alliances, going private transactions, bankruptcy reorganizations, the legal and equitable theories of piercing the corporate veil and alter-ego (as well as taking appropriate corporate action to prevent such claims), and other general corporate matters.

23.     I have experience addressing attorney-client privilege and work product issues for corporations, as well as matters pertaining to attorney and director conflict of interest issues.

24.     I have extensive experience in transactions as an opinion giver and as counsel for opinion recipients. I have prepared, delivered, or approved over 100 legal opinion letters in my career. My opinion experience includes preparing, reviewing, revising approving and delivering opinion letters, as well as determining conducting the required and necessary factual and legal investigations to support various opinions. I also served on the Committee that approved opinion letters at my former law firms. I have vast experience in determining the necessity for including qualifications, assumptions, exceptions and reasoning in opinion letters, as well as the ramifications of not inserting certain qualifications, assumptions and exceptions in opinion letters. I am familiar with the standard of care necessary for providing the required disclosures and reasoning to ensure that an opinion letter is not misleading.

25.     I also have extensive experience in representing my firm's corporate clients in all aspects of litigation matters, including, by way of illustration and without limitation, the following: (a) preparing engagement letters and addressing conflicts of interest and other ethical issues for civil matters; (b) conducting the preparatory factual and legal research supporting the various claims; (c) drafting complaints; (d) reviewing and analyzing the defendants' answers and defenses raised therein; (e) working on discovery matters, including motions for a protective order; (f) preparing and participating in successful settlement discussions; (g) preparing affidavits and memorandums of law in connection with, numerous motions relating to the pleadings, discovery matters (e.g. motions to compel and for

Page - 23

**11-ER-2449**

protective orders), summary judgment and pretrial orders; (h) researching and preparing trial briefs and supplemental trial briefs, as well as memorandums of law relating to motions made during trial; (i) preparing proposed jury instructions and special verdict questions; (j) preparing appellate briefs (including before the United States Supreme Court); (k) interviewing witnesses and marshaling the facts; (l) preparing for and participating in trials; and (m) litigating stockholder's appraisal proceedings relating to a public company merger and stockholder derivative class actions alleging corporate waste, conflicts of interest, non-disclosure and breach of fiduciary duty by directors and officers.

26.     I have experience rendering opinions on behalf of my firm to the board of directors of a corporation, whose directors had been sued, as to the propriety of the corporation advancing to its affected directors, officers and employees the expenses of defending shareholder actions in advance of the final resolution of those actions.

27.     I have extensive experience in working with corporations as a senior advisor with respect to threatened or pending derivative actions, including reviewing demand letters, conducting examinations of the relevant facts and law and advising corporations as to the appropriate response or action as well as the need for the retention of separate counsel for various directors and officers.

28.     I have experience reviewing, interpreting and applying the applicable rules of professional conduct. I have experience in providing informed consent to clients to narrow or limit the scope of representation. I also have experience determining whether a limited scope of representation is permissible under the circumstances of the matter to which I am providing legal representation to a client.

29.     I have extensive experience representing multi-national corporations and clients with business interests, transactions and litigation in other states.

30.     I have experience in reviewing and approving billing records for attorneys' fees and resolving fee disputes, in my former roles and experience at my prior law firms.

31.     As a member of my Firm's Executive Committee, I called upon to participate in the resolution of a myriad of questions regarding conflicts of interest, duties and responsibilities of lawyers, disclosure to stockholders and the propriety of the Firm accepting various engagements.

Page - 24

32.     My litigation and advisory practice have formed the basis for my work as a Special Master for the New York State Supreme Court Appellate Division, First Department. My mediation approach includes an evaluation of the factual and legal strengths and weaknesses of the litigants' respective positions. In that regard, in addition to the challenged decision of the trial court, I review the submissions made therein, transcripts of arguments before the trial court, the respective appellate briefs and other relevant documents and filings to evaluate the merits of the parties' respective positions. I have experience in similar procedures in connection with my private mediation and arbitration work.

33.     I have experience in preparing appellate briefs, making oral arguments on appeals, and successfully obtaining reversals.

## VIII.   PUBLICATIONS AUTHORED IN THE PAST TEN YEARS

1.     I am the author of Legal Aspects of Corporate Finance (5th ed. 2013) and a 2018 Supplement thereto which is published by Carolina Academic Press (and prior editions and supplements). It is my understanding that the book has been used at over twenty different law schools. I have authored other materials (including a Teacher's Manual for Legal Aspects of Corporate Finance).

2.     I am the co-author of Chapters 1 and 2 (Introduction and Elements of Opinion Letters, respectively) and author of Chapter 3 (Legal Opinions on Corporate Matters) of the Treatise: LEGAL OPINION LETTERS A Comprehensive Guide to Opinion Practice (Third Edition).

3.     I have been a member of the TriBar Opinion Committee for 29 years. The TriBar Opinion Committee is a nationally recognized committee that publishes Reports on various aspects of legal opinion practice. Although I was not listed as an author of any of the Reports, I was actively involved the preparation of the Reports which were published while I have served on the Committee. Thus, I am disclosing my involvement in those Reports.

## IX.   GLOSSARY OF TERMS

In this Report, I will utilize the terms defined below (including any information and citations provided in the definitions). These terms and the definitions are incorporated by reference into each Section of this Report.

Page - 25

### A.   <u>Terms Used for the Parties to this Lawsuit.</u>

In this Report, I define the parties as follows:

"AIA Insurance" means the defendant AIA Insurance, Inc., an Idaho corporation, which was incorporated with the Idaho Secretary of State on January 31, 1977 (File Number 176426).[17] AIA Insurance has been a wholly owned subsidiary of AIA Services during all relevant times for this Lawsuit (since August 1995).

"AIA Services" means the defendant AIA Services Corporation, an Idaho corporation, which was incorporated with the Idaho Secretary of State on December 20, 1983 (File Number 234046).[18] AIA Services was originally incorporated under the name "AIA Insurance Corporation" but its name was changed to AIA Services on October 14, 1986. AIA Services is a closely held corporation.[19]

"Ashby" means the defendant D. John Ashby. Ashby is an attorney with Hawley Troxell.

"Authorized" or "authorize" or "authorizing" means a matter properly presented to (including with full disclosure), and purportedly approved by, a board of directors, an officer, similar body or shareholders. In my analysis and opinions in this Report, I can substitute this definition, in part or in full where appropriate, in lieu of using "authorized" or "authorizing" or "authorize". When I use the term "unauthorized", I mean the opposite.

"Babbitt" means the defendant Gary D. Babbitt. Babbitt was an attorney with Hawley Troxell.

"Beck" means the defendant James W. Beck. Beck initially acquired Series C Preferred Shares in AIA Services in 1995 and then later purportedly exchanged those shares for common shares in CropUSA. He was also later issued common shares in AIA Services, which he purportedly later sold to John Taylor in 2012. Beck was an active participant on the plan to take CropUSA from the AIA Corporations and to use their funds, assets, trade secrets and employees to fund

---

[17] DLM – 0033100-66.
[18] DLM – 0032941-33095.
[19] AIAPROD00294166.

Exhibit - 1, p. 35

11-ER-2452

CropUSA. To the extent of his wife Corrine Beck's involvement as a defendant in *Reed Taylor v. AIA Services*, she is included in this definition.

"Cashman" means the defendant Michael W. Cashman. Cashman initially acquired Series C Preferred Shares in AIA Services in 1995 and then later purportedly exchanged those shares for common shares in CropUSA. He was also later issued common shares in AIA Services, which he purportedly later sold to John Taylor in 2012. Cashman was an active participant on the plan to take CropUSA from the AIA Corporations and to use their funds, assets, trade secrets and employees to fund CropUSA.

"CropUSA" or "AIA Crop Insurance" mean the defendant Crop USA Insurance Agency, Inc., an Idaho corporation, which was incorporated under the name of "AIA Crop Insurance, Inc." with the Idaho Secretary of State on November 18, 1999 (File Number 401170).[20] On November 20, 2000, AIA Crop Insurance, Inc.'s name was changed to "Crop USA Insurance Agency, Inc."

"CropUSA Insurance Services" means CropUSA Insurance Services, LLC, an Idaho limited liability company, which was formed with Idaho Secretary of State on March 30, 2009 (File Number 258098).[21] CropUSA Insurance Services was owned 70% by John Taylor and 30% by Lamberjack until his recent death.

"Duclos" means the defendant JoLee Duclos. While Duclos passed away during the pendency of this Lawsuit, she was nevertheless jointly involved with John Taylor in various acts and omissions described in this Report.

"GemCap" means the defendant GemCap Lending I, LLC, a Delaware limited liability company. GemCap is a "hard money" lender. Contrary to the Ellis brothers' testimony, GemCap is hardly a family run company. MOF II Holdings LLC, a multi-billion-dollar hedge fund, is the majority owner of GemCap. From my review of the documents and evidence, GemCap is an unscrupulous lender.

"Hawley Troxell" means the defendant Hawley Troxell Ennis & Hawley, LLP., an Idaho limited liability partnership. Hawley Troxell also includes all acts and omissions committed by any of its attorneys for which it is vicariously liable. For example, while Ashby, Babbitt and Riley were the primary billing attorneys in *Reed Taylor v. AIA Services*, there were a number of other attorneys who also worked on

---

[20] DLM – 0033170-99.
[21] DLM – 0033322-33.

Page - 27

that case as seen from the Unredacted Billing Records, applicable lawsuit filings, and limited privileged documents produced in this Lawsuit.

"Henderson" means the defendant Connie Taylor Henderson, who was formally known as Connie Wright Taylor and is John Taylor's former wife. Henderson was been an attorney licensed to practice law in Idaho and Washington during all relevant times.

"John Taylor" means the defendant R. John Taylor, who is the brother of Reed Taylor. Reed Taylor hired John Taylor to work at what would later become AIA Insurance in 1974. John Taylor has been in control of the AIA Corporations (with the assistance of the other Controlling AIA Defendants since when he orchestrated the redemption of Reed Taylor's majority interest in 1995. John Taylor has been an attorney licensed to practice law in Idaho during all relevant times.

"Meadows" means Craig L. Meadows, a senior partner in Hawley Troxell who performed a supervisory role with respect to *Reed Taylor v. AIA Services*, *Donna Taylor v. AIA Services*, other Hawley Troxell litigation matters and related issues.

"Miesen" means the plaintiff Dale L. Miesen. Miesen was a former Vice-President of AIA Service and he has been a long-term common shareholder of AIA Services. Miesen is one of the AIA Services' Disinterested Shareholders.

"Reed Taylor" means the third-party defendant Reed J. Taylor, who is the brother of John Taylor.

"Riley" means the defendant Richard A. Riley. Riley is an attorney at Hawley Troxell. Before joining Hawley Troxell in 1999, Riley was an attorney at Eberle Berlin.

### B. <u>Terms Used for Groups of Defendants.</u>

In this Report, using the terms for the parties set forth in the preceding Section, I define certain groups of defendants in this Lawsuit as follows:

"AIA Corporations" means AIA Services and/or AIA Insurance.

"Controlling AIA Defendants" means John Taylor, Beck, Cashman, Duclos and/or Henderson. Because Duclos has been voluntarily dismissed from this Lawsuit as a

result of her death, my analysis and opinions below referring to the "Controlling AIA Defendants" remain directed at her for conflicts and for establishing liability and substantial assistance as to the remaining Controlling AIA Defendants, the Hawley Troxell Defendants and GemCap (all of whom interacted with Duclos).

"CropUSA Entities" means CropUSA and/or CropUSA Insurance Services.

"Hawley Troxell Defendants" means the Babbitt, Ashby, Riley, other unnamed defendants who were attorneys at Hawley Troxell (including Patrick Collins, who is deceased) and/or Hawley Troxell and provided legal services (over fifteen different attorneys billed time on *Reed Taylor v. AIA Services* alone).

"Defendants" mean collectively, or any one or more of the Controlling AIA Defendants, Hawley Troxell Defendants and/or the CropUSA Entities.

## C.   Terms Used for Non-Parties and Other Matters.

In this Report, I define a number of non-parties and other matters as follows (I provide additional information and citations to evidence to provide further support and details regarding the defined terms):

"AIA Corporations' Amended Guarantee of the GemCap Loan" means the Amended and Restated Continuing Guarantee signed on October 5, 2012[22] and the Security Agreement – Guarantee signed on October 1, 2012,[23] as allegedly reaffirmed in 2013. This guarantee and security agreement increased the amount the AIA Corporations were obligated to pay to the full amount of the GemCap Loan. This guarantee was never properly authorized and violated the Guarantee Prohibition provision under AIA Services' Amended Articles of Incorporation.

"AIA Disinterested Shareholders" or "AIA Services' Disinterested Shareholders" or "AIA's Disinterested Shareholders" or "AIA Services' minority shareholders" means Miesen and the other disinterested minority shareholders of AIA Services.[24] Donna Taylor (to the extent applicable in her capacity as a Series A Preferred Shareholder and as the Personal Representative of the Estate of Sara Taylor, who held common shares in AIA Services), Durant and Legg are also included in these definitions. In addition, since no conflicts of interest were ever properly addressed

---

[22] Dkt. 439-1.
[23] Dkt. 439-2.
[24] AIAPROD00248297.

by AIA Insurance's purported board of directors for any transaction from January 1, 1999 through the present time, AIA Services' shareholders would have been required to approve the transaction or board action because AIA Services' purported board of directors, and John Taylor, had conflicts of interest preventing them from voting AIA Services' shares in AIA Insurance.

"AIA Insurance's Guarantee of the Lancelot Loan" means AIA Insurance's guarantee of the Loan and Security Agreement between CropUSA as borrower and Lancelot Investor's Fund L.P. dated October 27, 2006.[25]

"AIA Insurance's Bylaws" means the bylaws adopted for AIA Insurance on January 5, 1988 (AIA Insurance was formerly known as AIA, Inc.).[26]

"AIA Insurance's Two Condos" means Units 1 and 2, Dahmen Building Condominiums, 2020 Main Street, Lewiston, Idaho, which were subsequently transferred to GemCap and sold to Alexander Investors, LLC. Those two transfers and subsequent sales would have never occurred if the AIA Corporations' had not improperly guaranteed the GemCap Loan.

"AIA's Parking Lot" means the parking lot that John Taylor and Henderson acquired for $8,000 from Camas Prairie RailNet, Inc.[27] At least $6,500 of the purchase price was paid for by AIA Insurance's line-of-credit.[28] This parking lot should have been purchased by one of the AIA Corporations, which is why I refer to it as "AIA's Parking Lot". It was later transferred to John Taylor and Henderson's son, Jordan Taylor, and sold for $50,000.

"AIA Services' 401(k) Plan" means the AIA Services Corporation 401(k) Profit Sharing Plan. John Taylor is presently the Trustee. AIA Services' 401(k) Plan holds 92,500 Series C Preferred Shares that have a face value of $920,000, plus all accumulated and undeclared dividends for approximately twenty years.[29] John Taylor recently stated the shares were worthless. Miesen seeks to make the innocent plan participants whole (i.e., not John Taylor as he holds some of the shares and has done nothing but harm the plan participants).

---

[25] AIA001157-214; AIA0002858-67.

[26] *RJT-AIA 1057-79.*

[27] DLM – 0002802-05.

[28] DLM – 0002805.

[29] *E.g.*, Dkt. 152-5, p. 10 n.6.

"AIA Services' Amended Articles of Incorporation" mean the May 6, 1996 Amended and Restated Articles of Incorporation for AIA Services.[30]

"AIA Services' ESOP" means the AIA Services Employee Stock Ownership Plan, which was terminated in 2012 before the Failed Reverse Stock Split and the participants paid pennies per share. Miesen is seeking to have those shares restored as part of the relief requested in this Lawsuit.

"AIA Services' Headquarters" or "AIA Services' Former Headquarters" means the real property located at 111 Main Street, Lewiston, Idaho and also known as the Lewis/Clark Plaza, which had served as the headquarters for the AIA Corporations for years.

"AIA Services' Limited Guarantee of the GemCap Loan" means the Limited Continuing Guarantee between AIA Services and GemCap dated November 23, 2011, which was limited to $1,113,930 (which happened to be the amount of money that John Taylor alleged the AIA Corporations owed to CropUSA).[31] This guarantee was never properly authorized and violated the Guarantee Prohibition provision under AIA Services' Amended Articles of Incorporation.

"AIA Services' New Restated Bylaws" means the New Restated Bylaws for AIA Services made effective on April 10, 1989 and ratified at the board meeting held on May 5, 1989,[32] as subsequently amended at the board meeting held on November 17, 1995 (only to change that the date of the annual shareholder meeting could be discretionary, but must be held so that no more than 18 months could transpire between annual meetings).[33] While John Taylor alleges that he amended the bylaws in 2016 to include a provision to award fees and costs if a derivative proceeding is not substantially successful (yet another example of John Taylor being on both sides of a transaction with conflicts that prohibited him from amending the bylaws), those amendments have no impact on my opinions in this Report because the pertinent provisions in the bylaws remain unchanged.

"aiding and abetting" or "aid and abet" or "aided and abetted" means substantially assisted, participated in, counseled, covered up, acquiesced and/or encouraged. Where I use these terms in this Report, this definition can be substituted in place of

---

[30] DLM – 0033049-65.
[31] RJT – 036170-78.
[32] Dkt. 576-12.
[33] AIA0025533.

Exhibit - 1, p. 40

11-ER-2457

those terms. In other words, I can and may produce an identical version of this Report with the foregoing definition replacing those two terms where used. If there is duplication, the duplicated term or terms may be removed or disregarded.

"breach" or "breached" or "failed to discharge" or "failure to discharge" or related terms mean the failure to exercise the degree of care, skill, prudence and/or knowledge that a reasonably prudent attorney would exercise under the same or similar circumstances when I am referring to the conduct of an attorney, including the Hawley Troxell Defendants and John Taylor when he purportedly represented the AIA Corporations in *Durant v. GemCap*. For example, this definition can be substituted for when I opine that the Hawley Troxell Defendants "breached their duties of care" or similar wording.

"breached their fiduciary duties" or "breach of fiduciary duties" or "fiduciary duties" or any combination of the foregoing terms means the breaches of the duties of loyalty, good faith, care, obedience and/or confidence. Where I use these terms in this Report, this definition can be substituted in place of those terms. In other words, I can and may produce an identical version of this Report with the foregoing definition replacing those two terms where used. If there is duplication, the duplicated term or terms may be removed or disregarded.

"Brown" means Charles A. Brown, an attorney who represented the AIA Services' 401(k) Plan in *Reed Taylor v AIA Services*.

"Confirmed In Writing" means, "when used in reference to the [I]nformed [C]onsent of a person, [I]nformed [C]onsent that is given in writing by the person or a writing that a lawyer promptly transmits to the person confirming an oral [I]nformed Consent… If it is not feasible to obtain or transmit the writing at the time the person gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter," as provided under RPC 1.0(e) (2004). The 2014 Idaho Rules of Professional Conduct use the identical definition for "Confirmed in writing."[34] The 1986 Rules of Professional Conduct do not define "Confirmed in writing." Based on my education, training, knowledge, skill, and experience, I use this same definition for "Confirming In Writing" as set forth in the 2004 and 2014 Idaho Rules of Professional Conduct for all matters in this Report even if it had not been defined by the Idaho Rules of Professional Conduct and/or if any references to the Idaho Rules of Conduct could not be submitted to the jury.

---

[34] RPC 1.0(b) (2014).

"damages" or "damaged" when used in my analysis and opinions in this Report mean the items of damages outlined in Miesen's answers to interrogatories, including as supplemented in the future as detailed in Miesen's interrogatory answers and in the Damage Item Numbers in Exhibit A attached hereto, and as further addressed in Mr. Hile's Report, including as supplemented in the future. I will supplement this Report if I do not agree with any of the items of damages or amounts thereof as stated in any of Miesen's future supplements to his answers to interrogatories on damages or as addressed in Mr. Hile's future Reports. In addition, the items listed by Miesen for the Hawley Troxell Defendants also apply to the Controlling AIA Defendants and *vice versa* because damages may be caused by more than one defendant. However, "damaged" or "damages" as to GemCap mean the discrete damage items pertaining to GemCap, which have been addressed in part in Miesen's answer to GemCap's interrogatory on damages and as supplemented in the future and as also may be addressed in Mr. Hile's Reports (including as supplemented), and based on GemCap substantially assisting the Controlling AIA Defendants in breaching their fiduciary duties, among other torts. Again, if I do not agree with any damage items or amounts included in Miesen's future supplements or Mr. Hile's future supplements, I will supplement this Report accordingly. To the extent that I reference specific damage items below, I am not intending to limit any damages. In fact, I have ascertained certain damage issues not addressed by Miesen or Mr. Hile. If any amounts of damages that I specifically address in this Report change, I will supplement this Report accordingly.

"Damage Item Number" means as defined by "Item Number" and related defined terms below.

"December 22, 2009 AIA Engagement Letter" means the Engagement Letter dated December 22, 2009, which was signed by John Taylor on an unknown date, to purportedly authorize the Hawley Troxell Defendants to act as counsel for the AIA Corporations in *Donna Taylor v. AIA Services*.[35]

"Donna Taylor" means the former co-plaintiff in this Lawsuit, Donna J. Taylor, who is the ex-wife of Reed Taylor. Donna Taylor was, and remains, the sole lawful Series A Preferred Shareholder in AIA Services, which were originally issued to her in connection with her divorce from Reed Taylor (Donna Taylor presently holds 41,651.25 Series A Preferred Shares with a face value of $416,512.50, plus accrued interest since the last payment was made to her on May 30, 2008, according to AIA

---

[35] HTEH000196-209.

Exhibit - 1, p. 42

11-ER-2459

Services' May 31, 2008 financial statements and Judge Brudie's ruling in *Donna Taylor v. Taylor*).

"Durant" means Paul D. Durant. Durant was a former Vice-President of AIA Services and he is a common shareholder of AIA Services.[36] In addition, Mr. Durant was formerly the President of AIA Services' former subsidiary, The Universe Life Insurance Company. Mr. Durant is one of the AIA Services' Disinterested Shareholders.

"duty of loyalty" or "duties of loyalty" includes the fiduciary duty of loyalty and the fiduciary duty of obedience.

"Eberle Berlin" means the law firm of Eberle, Berlin, Kading, Turnbow & McKlveen Chartered (including as that name may have been modified from time to time). Riley worked at Eberle Berlin for years before moving to Hawley Troxell in 1999.

"February 25, 2008 Amended AIA Engagement Letter" means the Amended Engagement Agreement that was dated February 22, 2008, which was allegedly dated effective back to November 1, 2007 and not signed until February 25, 2008, to purportedly authorize the Hawley Troxell Defendants to formally act as counsel for the AIA Corporations and CropUSA in *Reed Taylor v. AIA Services* (although they clearly represented the interests of the Controlling AIA Defendants throughout the lawsuit).[37]

"February 25, 2008 CropUSA Engagement Letter" means the Engagement Letter that was dated February 22, 2008, which was allegedly dated effective back to November 1, 2007 and not signed until February 25, 2008, to purportedly authorize the Hawley Troxell Defendants to act as counsel for CropUSA and the AIA Corporations in *Reed Taylor v. AIA Services*.[38]

"Freeman" means Bryan Freeman. Freeman was a former director and officer for CropUSA and the AIA Corporations, and he owned common shares in CropUSA. Like the other Controlling AIA Defendants, Freeman had conflicts of interest by way of, *inter alia*, his dual roles at CropUSA and the AIA Corporations, through his

---

[36] *E.g.*, Dkts. 152-4 & 312-6.
[37] HTEH000039-47.
[38] HTEH000048-58.

Exhibit - 1, p. 43

11-ER-2460

ownership interest in CropUSA and his interests in not pursuing claims against himself or the Controlling AIA Defendants.

"GemCap Loan" means the revolving $5,000,000 line-of-credit and related agreements between GemCap and the CropUSA Entities on November 23, 2011, as amended on April 1, 2012 (increased to $5,485,000), as amended on July 18, 2012 (increased to $8,000,000), as amended on October 5, 2012, and as amended on February 4, 2013 (increased to $10,000,000).[39]

"GemCap Settlement Agreement" or "Settlement Agreement" mean the Settlement Agreement and Release of Claims dated effective September 15, 2014.[40] This Agreement was not signed until sometime on or after January 9, 2015 because it references "the Court's ruling on January 9, 2015."[41] This definition also includes any prior or subsequent alleged settlements between GemCap and any or both of the AIA Corporations (including the so-called Binding Term Sheet referenced in Judge Otero's Order filed on September 15, 2014 in *GemCap v. CropUSA*).

"Green Leaf Alliance" means Green Leaf Alliance, Inc., an Idaho non-profit corporation, which was incorporated with the Idaho Secretary of State on August 11, 2011 (File Number 579689). Green Leaf Alliance, Inc. was originally incorporated under the name of "Green Leaf Cooperative Insurance Agency, Inc.", but its name was changed on February 6, 2012.

"Green Leaf Re Insurance" means Green Leaf Re Insurance Company, a Montana corporation, which was incorporated with the Montana Secretary of State on October 4, 2012 (File Number D230426).

"Growers National" means Growers National Cooperative Insurance Agency, Inc., an Idaho non-profit corporation, which was incorporated with the Idaho Secretary of State on November 2, 2000 (File Number 415789). Growers National was formed and funded by AIA. Growers Nation is an insurance agency established to allow the members to receive dividends from the payments of crop insurance premiums. Growers National was formed in connection with AIA Crop Insurance (CropUSA) as a sales tool to sell more crop insurance policies. Growers National is frequently referred to in accounting documents and other documents as "GNCIA".

---

[39] *E.g.*, Dkt. 439-1, 440-2, pp. 60-63.
[40] Dkt. 128, pp. 21-48.
[41] Dkt. 128, p. 27.

Exhibit - 1, p. 44

11-ER-2461

"Guarantee Prohibition" means Section 4.2.9(c) and the definitions in Section 4.2.10 in AIA Services' Amended Articles of Incorporation and the pertinent terms as defined under Section 4.2.10,[42] which prohibited AIA Services and in effect any Subsidiary (as defined therein) from guaranteeing an obligation of any Person (as defined therein) other than a Subsidiary (as defined therein) without the consent of the holders of a majority of the outstanding shares of Series A Preferred Stock (who was Donna Taylor at relevant times).[43] The exceptions under subsection (c) of Section 4.2.9 that permit guaranteeing certain obligations or incurring certain indebtedness do not apply when I use this defined term. When I am using this defined term, I am not stating or opining that other provisions under Section 4.2.9 were not violated.

"Hile Report" means the Report regarding Miesen's damage claims dated October 8, 2020 submitted by Larry M. Hile on that date, and any subsequent versions of his report.

"Hudson Transaction" means the August 29, 2008 sale by Crop USA of "its"[44] crop insurance business to Hudson Insurance Company ("Hudson Insurance")

"Informed Consent" "denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct" as provided under RPC 1.0(e) (2004). The 2014 Idaho Rules of Professional Conduct use the identical definition for "Informed consent."[45] The 1986 Rules of Professional Conduct do not define "Informed Consent." Based on my education, training, knowledge, skill, and experience, I use this same definition for "Informed Consent" as set forth in the 2004 and 2014 Idaho Rules of Professional Conduct for all matters in this Report even if it had not been defined by the Idaho Rules of Professional Conduct and/or if any references to the Idaho Rules of Conduct could not be submitted to the jury.

---

[42] DLM – 0033053-55, 0033057-58.

[43] DLM – 0033053-58.

[44] One of Miesen's claims is that Crop USA and its crop insurance business were stolen from AIA Services by the Controlling AIA Defendants, that various assets of AIA Insurance were also wrongfully transferred to Crop USA and that expenses of Crop USA were wrongfully paid for by the AIA Corporations.

[45] RPC 1.0(e) (2014).

Exhibit - 1, p. 45

11-ER-2462

"Item Number" or "Damages Item Number" or "Damage Item Number" refers to the specific damage item numbers as provided by Miesen in the attached Exhibit A. If I refer to "Item Numbers" or "Damage Items", I mean the specific item numbers stated or, if no specific number is stated, all of the damage item numbers in Exhibit A and Miesen's Fourth Amended Answers to the Hawley Troxell Defendants' First Set of Interrogatories and Second Set of Requests for Production, which has been incorporated by reference into Miesen's amended answers provided to the Controlling AIA Defendants and GemCap.

"John Taylor's Executive Officer's Agreement" means the Executive Officer's Agreement between AIA Services and John Taylor dated August 1, 1995.[46]

"Joint Defense Agreements" or "Joint Defense Agreement" means: (a) the Joint Defense Agreement effective as of May 17, 2007;[47] (b) the Amended Joint Defense Agreement dated as of November 1, 2007 (but not signed until February 25, 2008);[48] and (c) Addendum to Amendment to Amended Joint Defense Agreement effective as of July 24, 2008 (it is unclear when that Addendum was signed).[49]

"Jud Taylor" means Jud R. Taylor, who is Reed Taylor and Donna Taylor's son, a Series C Preferred Shareholder through AIA Services' 401(k) Plan, and a common shareholder of AIA Services.

"Jordan Taylor" means John Taylor and Henderson's son, Jordan E. Taylor. Jordan Taylor is an attorney licensed to practice law in Washington.

"Lancelot" means Lancelot Investor's Fund L.P. Lancelot provided a $15,000,000 line-of-credit to CropUSA that was improperly guaranteed by AIA Insurance. Gregory Bell, the individual who operated Lancelot and signed the loan documents, was later charged criminally and he pled guilty to wire fraud. He was also sued civilly, which included allegations that he was operating a Ponzi Scheme. Lancelot is also referred to as "Surge" in various communications and documents.

"Lancelot Loan" means the Loan and Security Agreement for the $15,000,000 line-of-credit between CropUSA as borrower and Lancelot Investor's Fund L.P. dated

---

[46] Dkt. 390-10.
[47] HTEH000033-38.
[48] HTEH000087-97.
[49] HTEH000108-116.

Exhibit - 1, p. 46

11-ER-2463

October 27, 2006.[50] The Lancelot Loan is also referred to as the "Surge" Loan in various communications and documents.

"Lancelot Loan Opinion" or "Lancelot Legal Opinion" or "Lancelot Opinion" mean the Legal Opinion dated October 27, 2006 delivered by the Hawley Troxell Defendants in connection with the Loan and Security Agreement between CropUSA and Lancelot Investor's Fund L.P. dated October 27, 2006, (the Lancelot Loan) and AIA Insurance's Guaranty of the Lancelot Loan, as well as a guaranty by John Taylor.[51]

"Legal Opinion" or "Legal Opinions" means a third-party closing legal opinion(s) for a transaction. A Legal Opinion may only be relied upon by the addressee or other permitted party and only addresses documents and legal issues as of the date of the Legal Opinion. There are a number of Legal Opinions at issue in this Lawsuit.[52]

"Legg" means Jerry Legg, who was a former Vice-President of AIA Services and is a common shareholder of AIA Services. Mr. Legg is one of the AIA Services' Disinterested Shareholders.[53]

"May 2, 2007 AIA Engagement Letter" means Engagement Letter between Hawley Troxell and the AIA Corporations dated May 1, 2007, which was not allegedly signed by John Taylor until May 2, 2007, to purportedly authorize the Hawley Troxell Defendants to formally act as counsel for the AIA Corporations in *Reed Taylor v. AIA Services* (they had previously provided legal services to John Taylor as early as February 2007 and clearly represented the interest of the Controlling AIA Defendants throughout the lawsuit).[54]

"McNabb" means Marcus B. McNabb. Mr. McNabb was a former Vice President/Controller/CFO for CropUSA and the AIA Corporations. Like many of the CFOs before him, his tenure was short lived.

"Mr. Lidstone" means "Herrick K. Lidstone, Jr.", who is one of Hawley Troxell's legal malpractice expert witnesses.

---

[50] AIA001157-214.

[51] Dkts. 1-10, 390-28.

[52] Dkts. 1-10, 390-28, 439-5, 439-6 & 439-7; QBMIESEN000005404-13.

[53] *E.g.*, Dkts. 64 & 312-7.

[54] HTEH000001-09.

"Mr. Pinkerton" means "Keith A. Pinkerton", who is Hawley Troxell's accounting/valuation expert witness.

"Mr. Remele" means "Lewis A. Remele, Jr.", who is one of Hawley Troxell's legal malpractice expert witnesses.

"Pacific Empire Radio" means Pacific Empire Radio Corporation, an Idaho corporation, which was incorporated with the Idaho Secretary of State on November 13, 2001 (File Number 430954).

"Pacific Empire Holdings" means Pacific Empire Holdings Corporation, an Idaho corporation, which was incorporated with the Idaho Secretary of State on November 18, 1999 (File Number 401165). Articles of Dissolution were filed on January 2, 2019.

"Petersen" means Kent A. Petersen. Mr. Petersen was the former President and a Director of CropUSA, and also worked for the AIA Corporations.[55]

"Quarles & Brady" means law firm of Quarles & Brady LLP. James Gatziolis and Charles Harper were attorneys at that firm who, along with the Hawley Troxell Defendants, represented CropUSA in *Reed Taylor v. AIA Services*. Mr. Gatziolis and Quarles & Brady first represented CropUSA in connection with the Lancelot Loan.

"resolution" or "resolutions" means a written resolution(s) or a written consent(s) or any other written document purporting to be a resolution or consent in lieu of a meeting.

"Reinsurance Partners" means Reinsurance Partners, LLC, an Idaho limited liability company, which was formed with the Idaho Secretary of State on September 19, 2012 (File Number 360903).

"RPC" or "RPCs" or "Rule of Professional Conduct" or "Rules of Professional Conduct" mean one or more of Idaho Rules of Professional Conduct. Since the Idaho Rules of Professional Conduct were revised on two different occasions over the course of the conduct referenced in this Report effectively July 1, 2004 and July

---

[55] CROP000838-54; CROP000819-27.

Exhibit - 1, p. 48

11-ER-2465

1, 2014, I will include a reference to the year of the applicable RPC when I cite or quote to any Rule of Professional Conduct.

"Series A Preferred Shares" means the Series A Preferred Shares issued by AIA Services Corporation. Donna Taylor is the sole legal owner of Series A Preferred Shares (John Taylor claims to own some, but those shares were never properly issued). Donna Taylor presently holds over 41,000 Series A Preferred Shares. The Series A Preferred Shares have the highest payment priority and are entitled to appoint a director to the board of AIA Services. Donna Taylor's efforts to appoint directors have been improperly thwarted for years.

"Series C Preferred Shares" means the Series C Preferred Shares issued by AIA Services Corporation. The Series C Preferred Shares have the next highest payment priority after the Series A Preferred Shares. 92,500 of the Series C Preferred Shares are held by the AIA Services 401(k) Plan and no dividends have been declared or paid for approximately twenty years.

"Standstill and Tolling Agreements" means: (a) the Standstill and Tolling Agreements entered into in 2007 involving John Taylor, Duclos and Freeman;[56] and (b) the Amended and Restated Standstill and Tolling Agreements entered into in 2008 involving CropUSA, John Taylor, Duclos, Freeman, Henderson and Beck.[57]

"Unredacted Billing Records" mean the Hawley Troxell Defendants 'unredacted billing records produced to Miesen by the AIA Controlling Defendants on December 27, 2019, consisting of over 550 pages and covering eleven years of work.[58]

"Van Idour" or "Attorney Van Idour" means the attorney Robert Van Idour. Van Idour's office was previously rented from AIA Insurance and his focus was primarily on criminal law. Van Idour signed the two Legal Opinions delivered to GemCap in 2011 and 2013 (although the content was prepared by Attorney Gatziolis).[59] Van Idour was paid by John Taylor for the Legal Opinions by crediting the rent that he owed AIA Insurance. The two Legal Opinions signed by him were substantively prepared by James Gatziolis and were Van Idour's first two Legal Opinions.

---

[56] HTEH000025-32.
[57] HTEH000098-107.
[58] Dkts. 783-24–27.
[59] Dkts. 439-5, 439-7.

"Weskan" means Weskan Agency, LLC, which was an entity that John Taylor formed to acquire a crop insurance business in Kansas. This is yet another example of any entity that received funds and assistance from the AIA Corporations.

"17 State Street Partners" means 17 State Street Partners LLC, an Idaho limited liability company, which was formed with the Idaho Secretary of State on June 26, 2006 (File Number 167806). A Statement of Dissolution was filed on March 21, 2016. This entity was formed by John Taylor and it held AIA's Parking Lot as one of its assets until it was transferred to John Taylor's son, Jordan Taylor.

"1995 Letter Agreements" mean the letter agreements with Donna Taylor to shorten the amortization period and increase the interest rate for the redemption of her Series A Preferred Shares in AIA Services dated January 11, 1995, March 22, 1995, July 18, 1995 and August 10, 1995.[60] These letters also evidence Donna Taylor providing consent to AIA Services in order to allow it to redeem Reed Taylor's shares in 1995 because that redemption would have violated restrictions in AIA Services' articles of incorporation and Donna Taylor's consent was thus required.

### D. Terms Used for Various Lawsuits.

There are a number of lawsuits that are directly or indirectly relevant to this Lawsuit—all of which directly or indirectly involve misconduct by the Controlling AIA Defendants and certain attorneys. I define certain of those lawsuits as follows and I include a citation to the most recent complaint (I may cite to the record in this Lawsuit if the applicable complaint has been filed):

"*AIA Services v. Durant*" means *AIA Services Corp. v. Paul D. Durant, et al.*, Nez Perce County (Idaho) District Court Case No. CV-12-01483.[61] This is the lawsuit that John Taylor, Henderson and Beck filed through AIA Services in an improper effort to eliminate AIA Services' Disinterested Shareholders in 2012. Judge Kerrick dismissed this lawsuit and awarded attorney's fees and costs to the defendant common shareholders.

"*AmericanWest Bank v. Bolland*" means *AmericanWest Bank v. Mark L. Bolland, et al.*, Nez Perce County (Idaho) District Court Case No. CV-10-01826.[62] This is a

---

[60] DLM – 0003457-70.
[61] Dkt. 83-15 (Amended Complaint).
[62] RJT – 087406-50.

Exhibit - 1, p. 50

11-ER-2467

lawsuit filed against John Taylor and other individuals for their guarantee of an over $5,500,000 debt owed by Pacific Empire Radio Corporation in 2010. This lawsuit was later settled for less than the sum owed and demonstrates that Pacific Empire Radio was not an appropriate debtor for the AIA Corporations to lend money to (assuming such loans were not prohibited by AIA Services' Amended Articles of Incorporation and had been otherwise properly authorized).

"*Broadcast Music v. Pacific Empire Radio*" means *Broadcast Music, Inc. v. Pacific Empire Radio Corporation, et al.*, Nez Perce County (Idaho) District Court Case No. CV-16-01933.[63] This lawsuit, an application to confirm an arbitration award, resulted in a presently unpaid judgment of $210,673.24 from a confirmation of an arbitration award against Pacific Empire Radio and further demonstrates that Pacific Empire Radio was not an appropriate debtor for the AIA Corporations to lend money to (assuming such loans were not prohibited by AIA Services' Amended Articles of Incorporation and had been otherwise properly authorized).

"*Church Crop Insurance v. Diversified*" means *Church Crop Insurance Services, Inc. v. CGB Diversified Crop Insurance Services, et al.*, Polk County (Iowa) District Court Case No. EQCE077193.[64] GemCap was later named as a third-party interpleader defendant in this lawsuit.[65] Church prevailed at the trial court, but GemCap was able to obtain a reversal on appeal. This lawsuit is still pending.

"*Donna Taylor v. AIA Services*" means *Donna Taylor v. AIA Services Corp.*, Nez Perce County District Court Case No. CV-09-02470.[66] This was the lawsuit that Donna Taylor filed to seek, *inter alia*, enforcement of her right to appoint a director of AIA Services and to have a receiver appointed for AIA Services. The Hawley Troxell Defendants appeared as counsel for the AIA Corporations and successfully prevented Donna Taylor from obtaining any relief and staying that lawsuit when the AIA Corporations' best interests would have been served by granting Donna Taylor's requested relief. Donna Taylor voluntarily dismissed (without prejudice) *Donna Taylor v. AIA Services* in 2012 prior to moving to lift the stay in this Lawsuit.

---

[63] DLM – 0039084-96.

[64] QBM I ESEN000002894-913.

[65] Dkt. 449-33.

[66] Dkt. 84-7 (First Amended Complaint).

Exhibit - 1, p. 51

11-ER-2468

"*Donna Taylor v. Riley*" means *Donna J. Taylor v. Richard A. Riley*, U.S. District Court in Idaho Case No. 1:17-cv-255.[67] This was the lawsuit Donna Taylor filed after her 1995 Letter Agreements were ruled to be unenforceable (including two of them signed by Riley). Donna Taylor agreed to dismiss this lawsuit because she feared that she would be taking inconsistent positions as those on her appeal in *Donna Taylor v. Taylor*. Donna Taylor's decision to voluntarily dismiss this lawsuit turned out to be the right one because the Idaho Supreme Court held that the 1995 Letter Agreements were enforceable.[68]

"*Donna Taylor v. Taylor*" means the two lawsuits filed by Donna Taylor for contract and tort claims relating to the redemption of her Series A Preferred Shares, which were consolidated and entitled *Donna J. Taylor v. R. John Taylor, et al.*, Consolidated Nez Perce District Court Case Nos. CV-08-1150 and CV-13-1075.[69] The first lawsuit was brought against John Taylor and Henderson, while the second lawsuit was also brought against AIA Services, Beck and Cashman. Prior to the filing of the second lawsuit and the consolidation of the two lawsuits on August 13, 2013, this term refers to Donna Taylor's initial lawsuit filed only against John Taylor and Henderson, Case No. CV-08-1150.

"*Durant v. GemCap*" means the lawsuit filed by Paul Durant, Donna Taylor and Dale Miesen asserting direct claims against GemCap, CropUSA, CropUSA Services and the AIA Corporations regarding the guarantees and any settlement entitled *Durant, et al. v. GemCap Lending I, LLC, et al.*, Nez Perce County District Court Case No. CV-14-01444.[70] Upon GemCap and the AIA Corporations' request (John Taylor purportedly represented their interests), Judge Brudie dismissed this lawsuit without prejudice based on the assertion that the case should have been brought as a derivative lawsuit. No final judgment has been entered. Based on this ruling, Miesen served derivative demands and named GemCap as a defendant in this Lawsuit.

"*GemCap v. AIA Services*" means *GemCap Lending I, LLC v. AIA Services Corp.*, et al., Nez Perce County District Court Case No. CV-16-02207.[71] This is the lawsuit that GemCap filed against John Taylor, AIA Services and the AIA Services' 401(k) Plan alleging fraudulent conveyances.

---

[67] Dkt. 390-37 (the Complaint, which was later replaced by the First Amended Complaint).

[68] *Taylor v. Taylor*, 163 Idaho 910, 422 P.3d 1116 (2018).

[69] Dkts. 84-5, 390-40 & 390-41.

[70] Dkt. 440-15.

[71] Dkt. 449-39.

"*GemCap v. CropUSA*" means *GemCap Lending I, LLC v. CropUSA Insurance Agency, Inc., et al.*, U.S. District Court, Central District of California, Western Division, Case No. 2:13-cv-05504-SJO-MAN.[72] This is the lawsuit that GemCap filed against the CropUSA Entities, the AIA Corporations, John Taylor and other defendants, which later resulted in the GemCap Settlement Agreement at issue in this Lawsuit and the reason that GemCap was named as a defendant. This lawsuit is still pending, and no final judgment has been entered.

"*GemCap v. Diversified I*" means *CropUSA Insurance Agency, Inc., by and through GemCap Lending I, LLC v. CGB Diversified Services, Inc.*, in U.S. District Court, Central District of Illinois, Case No. 3:18-cv-03219.[73] This lawsuit was filed by GemCap and then later voluntarily dismissed without prejudice.

"*GemCap v. Diversified II*" means *CropUSA Insurance Agency, Inc., by and through GemCap Lending I, LLC v. CGB Diversified Services, Inc.*, in the Circuit Court of the Seventh Judicial Circuit, Morgan County, Illinois, Case No. 2020L5.[74] This lawsuit was dismissed shortly after it was filed on res judicata grounds and other reasons. However, GemCap has appealed.

"*GemCap v. Quarles & Brady*" means *GemCap Lending I, LLC v. Quarles & Brady, et al.*, U.S. District Court, Central District of California, Western Division, Case No. 2:14-cv-07937-RSWL-E.[75] This is the lawsuit that GemCap filed against the attorneys who represented John Taylor and the CropUSA Entities for the GemCap Loan. This lawsuit was dismissed on summary judgment and that decision was recently affirmed by Ninth Circuit Court of Appeals. The United States Supreme Court denied certiorari on March 23, 2020.

"*GemCap v. John Taylor*" means *GemCap Lending I, LLC v. R. John Taylor*, U.S. District Court, Central District of California, Western Division, Case No. 2:19-cv-08008-SVW-JC.[76] This lawsuit was the newest one filed against John Taylor by GemCap.

---

[72] Dkts. 440-1 & 440-2.

[73] Dkt. 563-19.

[74] DLM – 104224-331.

[75] Dkt. 323-1.

[76] DLM – 0085869-84.

**11-ER-2470**

**Exhibit - 1, p. 53**

"*GemCap v. Scottsdale*" means GemCap Lending I, LLC v. Scottsdale Indemnity Co., U.S. District Court, Central District of California, Case No. 2:15-cv-09942-CAS.[77] This was the lawsuit that GemCap filed in an attempt to recover money from CropUSA's E&O policy. This lawsuit was later dismissed by stipulation.

"Lawsuit" means the instant lawsuit, *Dale L. Miesen v. Hawley Troxell Ennis & Hawley, LLP, et al.*, U.S. District Court Idaho Case No. 1:10-cv-00404-DCN-CWD.[78] This Lawsuit was originally filed by Donna Taylor and Miesen in August 2010,[79] but it was stayed at the request of the Defendants. Attorney Bond appeared as counsel for Donna Taylor in 2012 and unsuccessfully moved to lift the stay. Donna Taylor appealed and the Ninth Circuit reversed.[80] Attorney Bond was then substituted in as counsel for Miesen. After Donna Taylor and Miesen moved to amend to name Duclos and Henderson as defendants, the Defendants moved to dismiss for lack of diversity jurisdiction based on Donna Taylor being a resident of Washington state. As a result, Donna Taylor moved to be voluntarily dismissed.

"*Reed Taylor v. AIA Services*" means *Reed Taylor v. AIA Services Corp., et al.*, Nez Perce County District Court Case No. CV-07-00208.[81] This was the lawsuit filed by Reed Taylor that exposed much of the corporate malfeasance and fraud that is before this Court in this Lawsuit. Reed Taylor's claims were dismissed in part as a result of the district court's decision ruling the 1995 redemption of his shares was illegal and Reed Taylor's remaining claims were dismissed after the Idaho Supreme Court affirmed the illegality ruling on appeal.

"*Reed Taylor v. Babbitt*" means *Reed Taylor v. Babbitt, et al.*, Nez Perce County District Court Case No. CV-08-01765.[82] This is one of two lawsuits that Reed Taylor filed against attorneys representing parties in *Reed Taylor v. AIA Services*. This lawsuit was later consolidated on appeal with *Reed Taylor v. McNichols* (defined below). While this lawsuit was dismissed and fees were awarded before the trial court and on appeal, the Idaho Supreme Court held that the aiding and abetting claims must await the outcome of the appeal in *Reed Taylor v. AIA Services*. Since the Idaho Supreme Court affirmed the illegality of the 1995

---

[77] Dkt. 153-4.
[78] Dkt. 211.
[79] Dkt. 1.
[80] Dkt. 105.
[81] Dkt. 389-16.
[82] Dkt. 390-29.

Exhibit - 1, p. 54

11-ER-2471

redemption transaction, Reed Taylor's aiding and abetting claims were rendered moot.

"*Reed Taylor v. Bell*" means *Reed Taylor v. Bell, et al.*, King County Superior Court Case No. 12-2-10803-0-SEA.[83] This was the legal malpractice lawsuit that Reed Taylor filed against the attorneys that represented him for the illegal 1995 redemption transaction. The parties confidentially resolved their differences.

"*Reed Taylor v. McNichols*" means *Reed Taylor v. McNichols, et al.*, Nez Perce County District Court Case No. CV-08-01763.[84] This is one of two lawsuits that Reed Taylor filed against attorneys representing parties in *Reed Taylor v. AIA Services*. This lawsuit was later consolidated on appeal with *Reed Taylor v. Babbitt* (defined above). While this lawsuit was dismissed and fees were awarded before the trial court and on appeal, the Idaho Supreme Court held that the aiding and abetting claims must await the outcome of the appeal in *Reed Taylor v. AIA Services*. Since the Idaho Supreme Court affirmed the illegality of the 1995 redemption transaction, Reed Taylor's aiding and abetting claims were rendered moot.

"*Reed Taylor v. Riley*" means *Reed Taylor v. Riley, et al.*, Ada County District Court Case No. CV-OC-09-18868.[85] This was the legal malpractice lawsuit that Reed Taylor filed against Richard Riley, Robert Turnbow, Eberle Berlin and Hawley Troxell as a result of the 2009 decision that Reed Taylor's 1995 redemption transaction was illegal. While Turnbow, Eberle Berlin and Reed Taylor confidentially resolved their differences, Riley was able to escape liability based on res judicata.

"*Weskan v. Diversified*" means *Weskan Agency, LLC v. CGB Diversified Crop Insurance Services, et al.*, Nez Perce County District Court Case No. CV35-18-1278. This lawsuit was originally filed in Nez Perce County District Court, removed to U.S. District Court in Idaho and then later remanded back to Nez Perce County District Court.[86]

"*Zions Bank v. 17 State Street*" means Zions First National Bank v. 17 State Street Partners LLC, et al., Nez Perce County District Court Case No. CV-15-02084.[87]

---

[83] Dkt. 275-19.

[84] Dkt. 83-8.

[85] Dkt. 390-32.

[86] Dkts. 449-38 & 449-40.

[87] Dkt. 449-36.

Exhibit - 1, p. 55

11-ER-2472

Zions Bank filed this lawsuit against John Taylor and others (including GemCap). This was the lawsuit that Miesen and other shareholders obtained a copy of the GemCap Settlement Agreement after it was filed by Attorney Siddoway (because neither GemCap nor John Taylor ever voluntarily disclosed the GemCap Settlement Agreement).

In addition to the above lawsuits, there are additional lawsuits and legal filings at issue in this Lawsuit and relevant to my opinions in this Report. A list of the lawsuits and legal filings is provided in Exhibit D, which is attached hereto and provides a chronological listing and description of certain known relevant lawsuits and legal filings since 1996.

## X.   FACTUAL, LEGAL BASIS AND REASONS FOR OPINIONS

While I normally do not testify against my fellow attorneys, I have made an exception in this Lawsuit and related lawsuits based on the egregious conduct by the attorneys involved. This Lawsuit involves much more than mere negligent acts or omissions. The legal obligations owed to, and rights of, the AIA Corporations and AIA Services' Disinterested shareholders have been intentionally violated many times.

When I cite to any authority, evidence or portions of the record as support below, I am not taking the position that the authority, evidence or portion of the record is the only support for the statement or factual assertion, nor am I intending to be exhaustive; rather, I am simply providing some support for certain statements or quotes in my discretion. If I do not cite to any evidence, documents or authorities, this does not mean that such support does not exist. To the contrary, all of my statements are supported by evidence or the lack of evidence (e.g., the failure to hold shareholder meetings, the failure to appoint Donna Taylor's designee to the board of AIA Services, or the failure to seek shareholder approval). The factual statements, application of facts to the law, reasoning, analysis, conclusions, and my opinions are all supported by the facts and legal authorities that I have considered, irrespective of whether I cite to any particular documents or authorities (and I will not keep repeating authority for various issues). Because the footnotes provide citations to information and authorities, the footnotes are equally important and should be considered. Please carefully review all footnotes.

In addition to utilizing and relying on the definitions provided in the Glossary of Terms in Section IX above (which are incorporated by reference herein) and the

documents and authorities that I have been provided and considered, I am also relying on the following facts, assumptions, legal authorities, analysis and reasons for my opinions and my opinions set forth below:

### A. An Overview of the Parties, Claims, the Duties Owed and the Legal Principles.

1. Miesen is a former Vice-President of AIA Services and a long-time common shareholder of AIA Services.[88] Miesen directly holds 45,000 common shares in his name and 13,656 common shares held in Trusts previously established for his children in which he is named as the Trustee.[89] These shares constitute less than five percent of the issued and outstanding shares of common stock of AIA Services. Miesen has held the foregoing common shares from around 1988 through the present time.[90] Miesen has never received a dividend or distribution on the 58,656 common shares (other than a 3 for 1 stock split in 1995), which merely gave all shareholders two additional shares for each share they held, i.e., there was no benefit).[91]

2. "'A stockholder's derivative action is an action brought by one or more stockholders of a corporation to enforce a corporate right or remedy a wrong to the corporation in cases where the corporation, because it is controlled by the wrongdoers or for other reasons fails and refuses to take appropriate action for its own protection….'"[92] "Shareholders of a parent or holding company, including minority shareholders, have standing to maintain a 'double derivative' action to enforce a cause of action belonging to a subsidiary company."[93]

3. This Lawsuit is a double derivative action brought by Miesen as a common shareholder of AIA Services on behalf of AIA Services and its wholly owned subsidiary AIA Insurance.[94] In addition, Miesen is also directly pursuing

---

[88] Dkt. 312-10, p. 4 ¶ 5.

[89] AIAS_0001740.

[90] Dkt. 312-10, p. 4 ¶ 5.

[91] Dkt. 312-10, p. 3 ¶ 3.

[92] *McCann v. McCann*, 138 Idaho 228, 233, 61 P.3d 585, 590 (2002).

[93] 13 Fletcher Cyc. Corp. § 5977 (2018 ed.) (footnotes omitted); *Haberman v. Wash. Public Power Supply System*, 109 Wash.2d 107, 147-149, 744 P.2d 1032, 1060-1061 (1987).

[94] I.C. § 30-1-740 (1997), *et seq.*; I.C. § 30-29-740 (2015), *et seq.*; I.C. § 30-29-740 (2019), *et seq.*13 Fletcher Cyc. Corp. § 5977 (2018 ed.) (footnotes omitted); *Haberman v. Washington Public Power Supply System*, 109 Wash.2d 107, 147-149, 744 P.2d 1032, 1060-1061 (1987); Dkt. 211, p. 6 ¶ 5.

**11-ER-2474**

claims to the extent required.[95] For example, to the extent that Miesen can only challenge any ultra vires acts in his individual capacity (an allegation made by GemCap), he is pursuing such claims in his individual capacity as a shareholder of AIA Services, including to have the GemCap Settlement Agreement set aside and to recover damages as provided under I.C. § 30-1-304 and/or I.C. 30-29-304.

4.      Although Miesen is pursuing claims on behalf of the AIA Corporations,[96] they are named as nominal defendants because each "corporation should be aligned as a defendant whenever management is antagonistic toward the interests of the plaintiff."[97] The AIA Corporations are also named as defendants by reason of Miesen seeking to enjoin and set aside the numerous ultra vires transactions, guarantees[98] and agreements (including the GemCap Settlement Agreement).[99] There were countless ultra vires transactions, agreements and guarantees as discussed in this Report. Those transactions, agreements and guarantees may also be set aside under common law based on the Controlling AIA Defendants' breaches of their duties of loyalty and good faith.[100]

5.      As established by John Taylor's recent Rule 30(b)(6) testimony, the only decisions made by the alleged board of directors of the AIA Corporations or their shareholders are those reflected in the written resolutions, consents and board meeting minutes produced in discovery. Attached hereto as Exhibit B is a list and description of the written minutes and resolutions produced in discovery in this Lawsuit, which comprise the limited alleged decisions of the boards and

---

[95] Dkt. 211, pp. 1, 5-6 ¶ 4, 72-75.

[96] Dkt. 211.

[97] 13 Fletcher Cyc. Corp. § 5997 (2018 ed.); *Smith v. Sperling*, 354 U.S. 91, 77 S.Ct. 1112 (1957).

[98] While Judge Dale dismissed Miesen's claims to set aside AIA Services' Limited Guarantee of the GemCap Loan and the AIA Corporations' Guarantee of the GemCap Loan based on statute of limitations (and it appears irrelevant because the Settlement Agreement discharged the guarantees), evidence regarding those guarantees is relevant to show GemCap's knowledge that those guarantees were never prohibited and never properly authorized.

[99] I.C. § 30-1-304 (1997); I.C. § 30-29-304 (2015); I.C. § 30-29-304 (2019).

[100] *Carsanaro v. Bloodhound Tech., Inc.*, 65 A.3d 618, 648-54 (Del. 2013) (abrogated on other grounds)

Exhibit - 1, p. 58

11-ER-2475

shareholders of the AIA Corporations.[101] In the light of John Taylor and Henderson being attorneys licensed to practice law, together with the Hawley Troxell Defendants being intimately involved in corporate governance matters (including litigation decisions) in 2007 and thereafter, the lack of proper corporate governance for the AIA Corporations, including by not properly electing and seating the boards of directors and appointing the officers for the AIA Corporations through annual meetings and regularly holding board meetings and special shareholder meetings as needed with full disclosure, is inexcusable.

6.      Miesen's double derivative claims, as presently pleaded in the Third Amended Complaint[102] on behalf of AIA Services (which is a closely held corporation)[103] and its wholly owned subsidiary AIA Insurance, include, but are not limited to: (a) breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, fraud, aiding and abetting fraud, declaratory relief (including for ultra-vires acts), and waste against the Controlling AIA Defendants; (b) breaches of contract against John Taylor (including for breaching the non-compete and non-solicitation provisions in his Executive Officer's Agreement); (c) legal malpractice, breaches of fiduciary duties, violations of the Rules of Professional Conduct, aiding and abetting in breaches of fiduciary duties, aiding and abetting in fraud, and declaratory relief (including for ultra vires acts and violations of the Rules of Professional Conduct) against the Hawley Troxell Defendants; and (d) aiding and abetting in the breaches of fiduciary duties and declaratory relief (including for ultra vires acts) against GemCap.

7.      As directors, officers and/or controlling shareholders, the Controlling AIA Defendants owed fiduciary duties to the AIA Corporations and AIA Services' minority shareholders during relevant periods of time, which form the basis of many of Miesen's claims against them in this Lawsuit.

---

[101] It is possible that neither Miesen, his counsel nor I have not found every board resolution or meeting minutes because they have never been produced in an orderly fashion or in a minute book or other proper filing system. However, if there are minutes or resolutions that I have not found or have not been produced, it would not change my analysis or opinions because the alleged board members all had conflicts of interest, which required shareholder approval. I have confirmed in conversations with Miesen and others that there were no other notices of annual or special shareholder meetings, which is consistent with John Taylor's recent Rule 30(b)(6) testimony.

[102] I understand that Miesen is working on a Fourth Amended Complaint to include a prayer for relief for punitive damages.

[103] AIAS_0001740.

Page - 50

8.      "In this diversity action, the federal district court must apply the substantive law of the forum state, [Idaho]."[104]

9.      "To establish a claim for breach of fiduciary duty, plaintiff must establish that defendants owed plaintiff a fiduciary duty and that the fiduciary duty was breached."[105]

10.      The Idaho Business Corporation Act applies to the internal affairs of Idaho corporations, including the conduct of officers and directors.[106] The Idaho Supreme Court looks to the ABA Comments for guidance when interpreting the Idaho Business Corporation Act.[107] Consequently, Miesen's claims and requested relief involve the Idaho Business Corporation Act because he is derivatively asserting claims for torts committed against the AIA Corporations.

11.      "The corporation owns the corporate property but acts through its directors. The shareholders choose the corporation's directors, and the directors choose the corporation's officers."[108] As it pertains to Miesen's claims for the acts and omissions occurring since January 1, 1999 through the present time (as confirmed through John Taylor's Rule 30(b)(6) testimony,[109] the directors of the AIA Corporations were never properly elected and the officers of the AIA Corporations were therefore never properly appointed. To make matters worse, the failure to hold annual shareholder meetings to elect directors (as also required by the bylaws) and to hold annual board meetings to appoint officers (as also required by the bylaws) took place during the Hawley Troxell Defendants' purported representation of the AIA Corporations from 2007 and thereafter (e.g., *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services* both directly involved the corporate governance of the AIA Corporations). Indeed, the AIA Corporations never had a properly elected board of directors and fully seated board of directors (e.g., Donna Taylor's board designee) for Donna Taylor or Miesen to have served derivative demands upon in 2008 and thereafter—the corporate governance was wholly inadequate and improper.

---

[104] *Kabatoff v. Safeco Ins. Co. of America*, 627 F.2d 207, 209 (9th Cir. 1980) (citations omitted).
[105] *Tolley v. THI Co.*, 140 Idaho 253, 261, 92 P.3d 503, 511 (2004).
[106] 9 Fletcher Cyc. Corp. § 4223.50 (Westlaw 2018). *See also* Cal. Corp. Code § 2116; *In re Flashcom, Inc.*, 308 B.R. 485, 490 (Bankr. C.D. Cal. 2004).
[107] *Wagner v. Wagner*, 160 Idaho 294, 298, 371 P.3d 807, 811 (2016).
[108] 2 Fletcher Cyc. Corp. § 505 (Westlaw 2020) (footnotes and citations omitted).
[109] *See generally* 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript.

Page - 51

Exhibit - 1, p. 60

11-ER-2477

12.    "In Idaho a director has a fiduciary responsibility to both the corporation and to shareholders."[110] "[That] the directors of a closely held corporation owe a fiduciary duty to the minority shareholders is well recognized.'"[111] Majority or controlling shareholders also owe fiduciary duties to the corporation and its minority shareholders.[112]

13.    "Each member of the board of directors, when discharging the duties of a director, shall act: (a) In good faith; and (b) In a manner the director reasonably believes to be in the best interests of the corporation."[113] "The members of the board of directors or a committee of the board, when becoming informed in connection with their decision-making function or devoting attention to their oversight function, shall discharge their duties with the care that a person in a like position would reasonably believe appropriate under similar circumstances."[114]

14.    "Under most statutes, the directors are entrusted with the control and management of the business of the corporation. This empowers the directors to do whatever is necessary to manage the ordinary business of the corporation, subject to any express restrictions in the charter, bylaws, or the general law."[115] "A corporation does not act through its individual directors, but rather through its board of directors as a whole. An individual director has no authority to take action on behalf of the corporation without the consent of the board of directors."[116] Moreover, "[i]t has long been the general rule that the authority of a board of directors to manage a corporation's affairs extends to control of the corporation's litigation—including decisions regarding its initiation, defense, abandonment, and

---

[110] *Weatherby v. Weatherby Lumber Co.*, 94 Idaho 504, 506, 492 P.2d 43, 45 (1972).

[111] *Jenkins v. Jenkins*, 138 Idaho 424, 428, 64 P.3d 953, 957 (2003) (citation omitted).

[112] *McCann v. McCann*, 152 Idaho 809, 815-17, 275 P.3d 824, 830-32 (2012); *Crosby v. Beam*, 47 Ohio St.3d 105, 108-09, 548 N.E.2d 217, 220-21 (Ohio 1989); *Jones v. H. F. Ahmanson & Co.*, 1 Cal.3d 93, 108-15, 460 P.2d 464, 471-76 (Cal. 1969).

[113] I.C. § 30-1-830(1) (1997); I.C. § 30-29-830(1) (2015); I.C. § 30-29-830(a)-(b) (2019).

[114] I.C. § 30-1-830(2) (1997); I.C. § 30-29-830(2) (2015); I.C. § 30-29-830(c) (2019).

[115] 2 Fletcher Cyc. Corp. § 505 (Westlaw 2020) (footnotes and citations omitted).

[116] 2 Fletcher Cyc. Corp. § 505 (Westlaw 2020) (footnotes and citations omitted).

settlement."[117] A director has no defense that he or she was inactive or did nothing.[118]

15.   "Each officer has the authority and shall perform the duties set forth in the bylaws or, to the extent consistent with the bylaws, the duties prescribed by the board of directors or by direction of an officer authorized by the board of directors to prescribe the duties of other officers."[119] "An officer, when performing in such capacity, shall act: (a) In good faith; (b) With the care that a person in a like position would reasonably exercise under similar circumstances; and (c) In a manner the officer reasonably believes to be in the best interests of the corporation."[120]

16.   "As fiduciaries, corporate directors are bound to exercise the utmost good faith in managing the corporation."[121] "A corporate director is a fiduciary to the corporation and must discharge the accompanying responsibilities in good faith and with reasonable diligence and skill."[122] "Directors of corporations act in a fiduciary capacity. They hold the corporate property in trust, and any attempt on their part to divert the use of such property to their personal profit or interest is a violation of the trust imposed by virtue of the office."[123] "Directors owe[] a duty of loyalty."[124] "A fiduciary's duty of candor is encompassed within the duty of loyalty. The duty of candor requires corporate fiduciaries to disclose all material

---

[117] *Chun v. Board of Trustees*, 87 Hawaii 152, 163, 952 P.2d 1215, 1226 (Haw. 1998) (citations omitted).
[118] *Davis v. Ben O'Callaghan Co.*, 139 Ga App 22, 23-24, 227 SE2d 837, 839-40 (Ga. Ct. App. 1976) ("This contention that he was an 'inactive director' is an admission that he breached a duty as a corporate director. In *Boddy v. Theiling*, 129 Ga.App. 273(2), 199 S.E.2d 379, this court held that directors may not be mere ornaments and figureheads but must carry out their responsibilities of obedience to the law and loyalty as a fiduciary with the diligence of an ordinarily prudent man. This 'do-nothing' defense is not legally sufficient to warrant a verdict in his behalf.") (affirmed in part and reversed in part on other grounds by *Davis v. Ben O'Callaghan Co.*, 238 Ga. 218 (1977)).
[119] I.C. § 30-1-841 (1997); I.C. § 30-29-841 (2015); I.C. § 30-29-841 (2019) (amended by substituting "functions" in the place of "duties").
[120] I.C. § 30-1-842(1) (1997); I.C. § 30-29-842(1) (2015); I.C. § 30-29-842(a) (2015) (this section was also amended to include additional duties and obligations under a new subsection (b)).
[121] *Steelman v. Mallory*, 110 Idaho 510, 513, 716 P.2d 1282, 1285 (1986) (citations omitted).
[122] *Smith v. Great Basin Grain Co.*, 98 Idaho 266, 278, 561 P.2d 1299, 1311 (1977) (citation omitted); *McLeod v. Lewis-Clark Hotel Co.*, 66 Idaho 584, 589-90, 164 P.2d 195, 197-98 (1945) (same, but also holding that both directors and officers owe such duties and adding "'which ordinarily prudent men would exercise under similar circumstances in like positions'").
[123] *Ryan v. Old Veteran Mining Co.*, 37 Idaho 625, 218 P. 381, 384 (1923).
[124] *Weatherhead v. Griffin*, 123 Idaho 697, 704, 851 P.2d 993, 1000 (Ct. App. 1992).

Exhibit - 1, p. 62

11-ER-2479

information relevant to corporate decisions from which they may derive a personal benefit."[125] "'[C]orporate directors are fiduciaries, and may not appropriate corporate assets or opportunities for their own gain. Close scrutiny is given to all corporate actions in which the directors have a financial interest.'"[126] A "breach of loyalty" is defined as "An act that is detrimental to the interests of someone to whom a fiduciary duty is owed; esp., an act that furthers the actor's own interests or those of a competitor of the beneficiary."[127]

> '[I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if, in such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired.'

> 'In short, there is demanded of the officer or director of a corporation that he furnish to it his undivided loyalty; if there is presented to him a business opportunity which is within the scope of its own activities and of present or potential advantage to it, the law will not permit him to seize the opportunity for himself; if he does so, the corporation may elect to claim all of the benefits of the transaction.'[128]

17.    "Three broad duties stem from the fiduciary status of corporate directors; namely, the duties of obedience, loyalty, and due care. The duty of obedience requires a director to avoid committing ultra vires acts, i.e., acts beyond the scope of the powers of a corporation as defined by its charter or the laws of the state of incorporation."[129] There are numerous ways a party can be interested or

---

[125] *Seidman v. Office of Thrift Supervision (In re Seidman)*, 37 F.3d 911, 935 n.34 (3d Cir.1994).
[126] *Stephan v. Hoops Const. Co.*, 115 Idaho 894, 896, 771 P.2d 912, 914 (1989) (citation omitted).
[127] Black's Law Dictionary (11th ed. 2019).
[128] *Melgard v. Moscow Idaho Seed Co.*, 73 Idaho 265, 271, 251 P.2d 546, 550 (1952).
[129] *Gearhart Industries, Inc. v. Smith Intern., Inc.*, 741 F.2d 707, 719 (5th Cir. 1984) (citation omitted).

conflicted. For example, the Fifth Circuit Court of Appeals addressed a few fact patterns establishing when a director is interested or has a conflict: "The duty of loyalty dictates that a director must act in good faith and must not allow his personal interests to prevail over the interests of the corporation. Whether a director is 'interested' is a question of fact. A director is considered 'interested" if he or she (1) makes a personal profit from a transaction by dealing with the corporation or usurps a corporate opportunity…; (2) buys or sells assets of the corporation…; (3) transacts business in his director's capacity with a second corporation of which he is also a director or significantly financially associated…; or (4) transacts business in his director's capacity with a family member."[130]

18.    "[W]here the transaction involves self-dealing on the part of the fiduciary, it is clear that the burden is on the fiduciary to prove the fairness of the transaction. The fiduciary bears the burden of proving their good faith in entering into the transaction as well as the inherent fairness to the corporation. For example, where a director or officer loans money to a corporation, the burden is imposed upon the director or officer to show by a preponderance of the evidence that they acted bona fide, and that the corporation got the benefit of the director's or officer's act. This rule of law is not meant to prevent directors or officers of a corporation from dealing with it, but to prevent them from claiming to have done so when they had not, as well as to prevent overreaching by officers and directors."[131]

19.    "Where all the directors of one corporation are financially interested in a second corporation, it is impossible to comply with a statute authorizing a contract between two corporations with common or interested directors in the event of authorization by noninterested directors."[132]

20.    "A corporation may always have the transaction set aside, or defend against its enforcement, if it is unfair or entered into in bad faith by the officer adversely interested. Regardless of whether an interested officer contracts or deals with themselves as the representative of the corporation, or with other officers who represent the corporation, in no case can the transaction be upheld where attacked by the corporation or, in a proper case, by its shareholders, unless the transaction is shown to be fair, above board, and entered into in good faith, provided the transaction has not been expressly or implicitly ratified and the right to attack the

---

[130] *Gearhart Industries, Inc. v. Smith Intern., Inc.*, 741 F.2d 707, 719-20 (5th Cir. 1984) (citations omitted).

[131] 3 Fletcher Cyc. Corp. § 921 (Westlaw 2018) (footnotes and citations omitted).

[132] 3 Fletcher Cyc. Corp. § 921 (Westlaw 2018) (footnote and citations omitted).

transaction has not been lost by laches…The modern rule is that transactions between corporations with common directors may be avoided only if unfair, and the directors who would sustain the challenged transaction have the burden of overcoming the presumption against the validity of the transaction by showing its fairness…Factors that may be useful in assessing fairness include whether the corporation received full value in the transaction, whether the transaction was in the corporate interest, whether the corporation needed and was able to finance the transaction, whether the interested director or officer siphoned off corporate gain, and whether there was full disclosure."[133] There was never any full disclosure for any of the transactions, agreements and acts at issue in this Lawsuit and they were not fair to the AIA Corporations. The Controlling AIA Defendants have presented no evidence that any transaction, agreement or act was fair to the AIA Corporations.

21.    When a person is both an officer and a director of a corporation, he or she is held to an even higher than normal and demanding standards.[134]

22.    "As such fiduciary, director, and [President] of the [AIA Corporations], it was [John Taylor's] duty to devote his time, skill, knowledge, and judgment to the welfare of the [AIA Corporations], and to avoid any engagements, activities, or dealings which would render his personal interests antagonistic to those of [the AIA Corporations]."[135] These same duties were owed by Beck, Henderson, Freeman, and Duclos during their respective purported tenures as directors and/or officers of the AIA Corporations, and John Taylor, Henderson, Beck and Cashman as the controlling shareholders of the AIA Corporations.

23.    The majority or controlling shareholders' "dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein."[136] There is no doubt that John Taylor, Henderson, Beck and Cashman improperly exerted their majority control over the AIA Corporations to the detriment of the AIA Corporations and their shareholders (including AIA Services as AIA Insurance's sole shareholder).

---

[133] 3 Fletcher Cyc. Corp. § 919 (Westlaw 2018) (footnotes and citations omitted).

[134] *Hall v. Staha*, 858 S.W.2d 672, 676 (Ark. 1993).

[135] *Melgard v. Moscow Idaho Seed Co.*, 73 Idaho 265, 271, 251 P.2d 546, 549-50 (1952).

[136] *Jones v. H. F. Ahmanson & Co.*, 1 Cal.3d 93, 108, 460 P.2d 464, 471 (Cal. 1969) (citation omitted).

24.    "[A] majority shareholder who is negotiating a purchase of a minority shareholder's stock owes a fiduciary duty to the minority shareholder, if the parties are dealing on unequal terms."[137]

25.    "However, the 'business judgment rule' immunizes the good faith acts of directors when the directors are acting within the powers of the corporation and within the exercise of their honest business judgment."[138] "The burden of proving bad faith rests on the plaintiff."[139] This Lawsuit does not involve any "business judgment rule" defenses because the acts and omissions of the directors and officers were in bad faith and constituted intentional breaches of the duties of loyalty of by the Controlling AIA Defendants.

26.    "[U]nder Idaho law the general rule is that an agent who breaches his fiduciary duties forfeits his entire compensation."[140] As discussed in this Report, the Controlling AIA Defendants, and other officers, were not entitled to any compensation from January 1, 1999 through the present time.[141]

27.    John Taylor is named as a defendant because, *inter alia*: (a) he has acted as director, the President and one of the majority/controlling shareholders of AIA Services from at least 1995 through the present time (he has also acted as the sole director since at least October 19, 2015, according to the annual reports);[142] and (b) he has acted a director and the President of AIA Insurance (AIA Services' wholly owned subsidiary) from at least 1995 through the present time (he has also acted as the sole director since January 29, 2016).[143] Thus, from 1995 through the present time, John Taylor owed fiduciary duties to the AIA Corporations and AIA Services' minority shareholders.

---

[137] *Hines v. Hines*,129 Idaho 847, 850-51, 934 P.2d 20, 23-24 (1997) (citations omitted).

[138] *Steelman v. Mallory*, 110 Idaho 510, 513, 716 P.2d 1282, 1285 (1986) (citations omitted).

[139] *Steelman v. Mallory*, 110 Idaho 510, 513, 716 P.2d 1282, 1285 (1986) (citation omitted).

[140] *Rockefeller v. Grabow*, 136 Idaho 637, 643, 39 P.3d 577, 583 (2001).

[141] *See* Damage Item Numbers 18, 35, 40 in Exhibit A attached hereto. This principle of law is separate and distinct from John Taylor's obligations under his Executive Officer's Agreement. In addition, no compensation was properly disclosed or approved for any of the AIA Corporations' officers and management from 1999 through the present time. The Hawley Troxell Defendants breached their duties of care and loyalty by allowing the improper compensation issue to go unaddressed.

[142] DLM – 0033041, 0033066-7, 0033069-84, 0033087-88, 0033090-95; AIAPROD00146373; AIAS_0001740.

[143] DLM – 0033141-66.

**11-ER-2483**

28.     During the relevant times that John Taylor owed fiduciary duties, he also served as an officer, director and/or manager and held material ownership interests and/or controlled other entities such as CropUSA,[144] CropUSA Insurance Services,[145] Pacific Empire Radio (it obtained over $1.5 million in unauthorized loans),[146] Pacific Empire Holdings,[147] 17 State Street Partners,[148] Reinsurance Partners,[149] Green Leaf Re Insurance,[150] Green Leaf Alliance,[151] and other entities that he partially owned and/or controlled. John Taylor was also aware that the AIA Corporations' funds, assets, trade secrets, employees and creditworthiness were being improperly utilized for other entities, including CropUSA, CropUSA Insurance Services and Pacific Empire Radio (which guarantees and loans were prohibited by restrictions under Section 4.2.9. of AIA Services' Amended Articles of Incorporation).[152] John Taylor also had a material interest in limiting his liability and preventing any of the AIA Corporations from pursuing claims against him or the other Controlling AIA Defendants and to maximize the value of his common shares in CropUSA and to keep the AIA Corporations' money flowing to Pacific Empire Radio, which constitutes a separate conflict of interest for John Taylor as a director and officer of the AIA Corporations and as one of the majority/controlling shareholders of AIA Services. As a result, John Taylor had conflicts of interest when he engaged in any transactions involving the AIA Corporations and the foregoing entities and/or in any way utilized the AIA Corporations' assets, trade secrets, employees or creditworthiness with the foregoing entities (or competed in any way with the AIA Corporations through such entities) and such transactions were separately prohibited under the restrictions in Section 4.2.9 of AIA Services' Amended Articles of Incorporation),[153] which resulted in ultra vires acts and John Taylor breaching his duties of loyalty owed to the AIA Corporations for all of such acts and transactions. However, those conflicts are not the only ones. John Taylor has consistently placed his interests above the interests of the AIA Corporations and he had a material interest in not having the AIA Corporations pursue any claims

---

[144] AIAPROD00074876-78; AIAPROD00310924; DLM – 0033175-98.

[145] GC0743093; DLM – 0033323-33.

[146] GC0771107; DLM – 0033208, 0033212-28; AIAPROD00294298-311; RJT – 090251-56, 090269-72.

[147] DLM – 0033236-58; AIA0000176814; GC0084562; RJT – 036425.

[148] DLM – 0033263-72; RJT – 024308-10; Dkt. 67-16, pp. 170, 186-87.

[149] C0743586-87; GC0743493-95.

[150] C0743586-87; GC0743493-95.

[151] DLM – 0033281-89.

[152] 6/3/2015 Beck Transcript, pp. 22-23, 60, 71-72; DLM – 0033053-56.

[153] DLM – 0033053-56.

Exhibit - 1, p. 67

11-ER-2484

against him or any of the other Controlling AIA Defendants and to conceal those claims from the AIA Corporations, disinterested constituents of AIA Services and its minority shareholders, which he did in violation of his duties of loyalty owed to the AIA Corporations and AIA Services' minority shareholders. John Taylor's acts and omissions in this regard are fully supported by the documentary evidence and lack thereof (e.g., no disclosures to shareholders and no proper corporate governance), and as further discussed in this Report.

29.     John Taylor was also the sole Trustee of AIA Services' 401(k) Plan from 1996 through 1997, the Co-Trustee from January 1998 through August 7, 2008, and sole Trustee from November 2009 through the present time.[154] As purported Trustee, John Taylor owed fiduciary duties to the participants of the AIA Services' 401(k) Plan holding Series C Preferred Shares, which have never been redeemed nor any dividends paid for twenty years. John Taylor recently valued the 92,500 Series C Preferred Shares held in the 401(k) Plan as being worthless.

30.     Notably, John Taylor was also licensed to practice law in Idaho during all relevant times and remains so to this day.[155] As a result, John Taylor, as an attorney and in his elevated fiduciary as a director and officer of the AIA Corporations, has no excuse for what he has done (including by failing to follow fundamental corporate governance procedures and by engaging in self-dealing and conflicts of interest transactions and failing to make full and fair disclosure of any transaction or corporate action) and/or failed to do, as discussed in this Report.

31.     Henderson, John Taylor's former wife, is named as a defendant because, *inter alia*: (a) she has acted as director of AIA Services from April 30, 2007 through at least the date that she provided email notice of her intent to resign from that board on September 12, 2014;[156] (b) she was one of the majority/controlling shareholders in AIA Services from at least 1995 until she relinquished her community ownership interest in the common shares in AIA Services to John Taylor when their divorce was finalized on January 5, 2018;[157] and (c) she has acted a director of AIA Insurance (AIA Services' wholly owned subsidiary) from April 30, 2007 through at least the date that she provided email notice of her intent to resign from that board on September 12, 2014.[158] Thus,

---

[154] AIA00162; AIA0027457; AIAPROD00172397.
[155] https://isb.idaho.gov/licensing-mcle/attorney-roster-search/, last visited on October 20, 2020.
[156] AIAPROD00171187; DLM – 0033080-88; AIAPROD00171548.
[157] RJT – 039311; GC0644669; Dkt. 66-3, pp. 4-5.
[158] AIAPROD00171187; DLM – 0033154-60; AIAPROD00171548.

Exhibit - 1, p. 68

11-ER-2485

during these periods of times, Henderson owed fiduciary duties to the AIA Corporations and AIA Services' minority shareholders.

32.     During the relevant times that Henderson owed fiduciary duties, she also served as a director and/or held material community ownership interests in CropUSA,[159] Pacific Empire Radio (it obtained over $1.5 million in unauthorized loans),[160] Pacific Empire Holdings,[161] a half interest in the value of AIA's Parking Lot that she quitclaimed to 17 State Street Partners (but did not give up right to one-half the value),[162] and other community property held in John Taylor's name. Henderson was also aware that the AIA Corporations' funds, assets, trade secrets, employees and creditworthiness were being improperly utilized for other entities, including CropUSA, CropUSA Insurance Services and Pacific Empire Radio (which such guarantees and loans were prohibited by restrictions under Section 4.2.9. of AIA Services' Amended Articles of Incorporation).[163] Since Henderson had filed for divorce in 2005, she also had a material interest in limiting her liability and John Taylor's liability and preventing any of the AIA Corporations from pursuing claims against her, John Taylor or the other Controlling AIA Defendants and to maximize the value of the undivided community property (including the value of the shares in AIA Services and CropUSA) and to keep the AIA Corporations' money flowing to Pacific Empire Radio,[164] which constitutes a separate conflict of interest for Henderson as to any decision made as a director of the AIA Corporations and as one of the majority/controlling shareholders of AIA Services. As a result, Henderson had conflicts of interest when she engaged in any transactions, or permitted such transactions to occur, involving the AIA Corporations and the forgoing entities and/or in any way utilized (or permitted to be utilized) the AIA Corporations' assets, trade secrets, employees or creditworthiness with the foregoing entities (or competed in any way with the AIA Corporations through such entities) and such transactions were separately prohibited under the restrictions in Section 4.2.9 of AIA Services' Amended Articles of Incorporation),[165] which resulted in ultra vires acts and Henderson breaching her duties of loyalty owed to the AIA Corporations for all of such acts and transactions. However, those conflicts are not the only ones. Henderson has consistently placed

---

[159] RJT – 039311; GC0644669; AIAPROD00074876-78; AIAPROD00310924.

[160] GC0771107; DLM – 0033208, 0033212-28; AIAPROD00294298-311; RJT – 090251-56, 090269-72; DLM – 0033053-56.

[161] DLM – 0033236-58; AIA0000176814; GC0084562; RJT – 036425.

[162] RJT – 024308-10; Dkt. 67-16, pp. 170, 186-87.

[163] 6/3/2015 Beck Transcript, pp. 22-23, 60, 71-72; DLM – 0033053-56.

[164] RJT – 039311; GC0644669.

[165] DLM – 0033053-56.

Exhibit - 1, p. 69

11-ER-2486

her interests above the interests of the AIA Corporations and she had a material interest in not having the AIA Corporations pursue any claims against John Taylor, herself or any of the other Controlling AIA Defendants and to conceal those claims from the AIA Corporations, the disinterested constituents of AIA Services and its minority shareholders, which she did in violation of her duties of loyalty owed to the AIA Corporations and AIA Services' minority shareholders. Henderson's acts and omissions in this regard are fully supported by the documentary evidence and lack thereof (e.g., no disclosures to shareholders and no proper corporate governance), and as further discussed in this Report.

33.     Notably, Henderson was also licensed to practice law in Idaho during all relevant times and remains so to this day.[166] As a result, Henderson has no excuse for what she has done (including by failing to follow fundamental corporate governance procedures and by engaging in self-dealing and conflicts of interest transactions) and/or failed to do, as discussed in this Report.

34.     Beck is named as a defendant because, *inter alia*: (a) he has acted as director of AIA Services from mid-1995 through sometime on or before the 2001 annual report was signed on January 8, 2002 and again April 30, 2007 through sometime on or before the 2015 annual report was filed on October 19, 2015 (assuming that report is accurate);[167] (b) he was one of the majority/controlling shareholders in AIA Services from at least 1995 until he purportedly sold his wife's common shares in AIA Services to John Taylor on or about March 23, 2012 (Beck originally held Series C Preferred Shares, which were transferred to his wife's name, and then later acquired common shares in his wife's name in 2000);[168] and (c) he has acted a director of AIA Insurance (AIA Services' wholly owned subsidiary) from April 30, 2007 through sometime on or before the 2015 annual report was filed on January 29, 2016 (assuming that report is accurate).[169] Thus, during these periods of times, Beck owed fiduciary duties to the AIA Corporations and AIA Services' minority shareholders.

35.     During the relevant times that Beck owed fiduciary duties, he held a material ownership interest in CropUSA.[170] Beck was also aware that the AIA Corporations' funds, assets, trade secrets, employees and creditworthiness were

---

[166] https://isb.idaho.gov/licensing-mcle/attorney-roster-search/, last visited on October 20, 2020.
[167] AIAPROD00171187; DLM – 0033041, 0033066-73, 0033080-89.
[168] AIA0024617; AIAPROD00090549; AIA0024039; RJT – 089850-58; AIAPROD00294166.
[169] AIAPROD00171187; DLM – 0033154-62.
[170] AIAPROD00074876-78; AIAPROD00310924.

**Exhibit - 1, p. 70**

**11-ER-2487**

being improperly utilized for other entities, including CropUSA, CropUSA Insurance Services and Pacific Empire Radio (which utilization, guarantees and loans were prohibited by the restrictions under Section 4.2.9 of AIA Services' Amended Articles of Incorporation).[171] Beck had a material interest in limiting his liability and preventing any of the AIA Corporations from pursuing claims against him or the other Controlling AIA Defendants and to maximize the value of his common shares in CropUSA, which constitutes a separate conflict of interest for Beck as to any decision made as a director of the AIA Corporations and as one of the majority/controlling shareholders of AIA Services. As a result, Beck had conflicts of interest when he engaged in any transactions, or permitted such transactions to occur, involving the AIA Corporations and CropUSA or any entity partially or wholly owned by John Taylor and/or in any way utilized (or permitted to be utilized) the AIA Corporations' assets, trade secrets, employees or creditworthiness with the foregoing entities (or competed in any way with the AIA Corporations through such entities) and such transactions were separately prohibited under the restrictions in Section 4.2.9 of AIA Services' Amended Articles of Incorporation),[172] which resulted in ultra vires acts and Beck breaching his duties of loyalty owed to the AIA Corporations for all of such acts and transactions. However, those conflicts are not the only ones. Beck has consistently placed his interests above the interests of the AIA Corporations and he had a material interest in not having the AIA Corporations pursue any claims against himself or any of the other Controlling AIA Defendants and to conceal those claims from the AIA Corporations, the disinterested constituents of AIA Services and its minority shareholders, which he did in violation of his duties of loyalty owed to the AIA Corporations and AIA Services' minority shareholders. Beck's acts and omissions in this regard are fully supported by the documentary evidence and lack thereof (e.g., no disclosures to shareholders and no proper corporate governance), and as further discussed in this Report.

36.     Cashman is named as a defendant because, *inter alia*: (a) he has acted as director of AIA Services from mid-1995 until on or about March 27, 2001;[173] and (b) he was one of the majority/controlling shareholders in AIA Services from at least 1995 until he purportedly sold his common shares in AIA Services to John Taylor on or about March 23, 2012;[174] Thus, during these periods of times,

---

[171] 6/3/2015 Beck Depo. Transcript, pp. 22-23, 60, 71-72; DLM – 0033053-56.

[172] DLM – 0033053-56.

[173] DLM – 0033041, 0033066-73; HT-AIA-EML 0003681; 6/12/2020 Michael Cashman Depo. Transcript, p. 140.

[174] AIA0024617; AIAPROD00090549; AIA0024039; RJT – 089850-58; AIAPROD00294166.

Cashman owed fiduciary duties to the AIA Corporations and AIA Services' minority shareholders.

37.     During the relevant times that Cashman owed fiduciary duties, he held a material ownership interest in CropUSA.[175] Cashman was also aware that the AIA Corporations' funds, assets, employees and creditworthiness were being improperly utilized for other entities, including CropUSA (which guarantees and loans were prohibited by restrictions under Section 4.2.9 of AIA Services' Amended Articles of Incorporation).[176] Cashman had a material interest in limiting his liability and preventing any of the AIA Corporations from pursuing claims against him or the other Controlling AIA Defendants and to maximize the value of his common shares in CropUSA, which constitutes a separate conflict of interest for Cashman as one of the majority/controlling shareholders of AIA Services. As a result, Cashman had conflicts of interest when he engaged in any transactions, or permitted such transactions to occur, involving the AIA Corporations and CropUSA or any entity partially or wholly owned by John Taylor and/or in any way utilized (or permitted to be utilized) the AIA Corporations' assets, trade secrets, employees or creditworthiness with the foregoing entities (or competed in any way with the AIA Corporations through such entities) and such transactions were separately prohibited under the restrictions in Section 4.2.9 of AIA Services' Amended Articles of Incorporation),[177] which resulted in unauthorized and ultra vires acts and Cashman breaching his duties of loyalty owed to the AIA Corporations for all of such acts and transactions. However, those conflicts are not the only ones. Cashman has consistently placed his interests above the interests of the AIA Corporations and he had a material interest in not having the AIA Corporations pursue any claims against himself or any of the other Controlling AIA Defendants and to conceal those claims from the AIA Corporations, the disinterested constituents of AIA Services and its minority shareholders, which he did in violation of his duties of loyalty owed to the AIA Corporations and AIA Services' minority shareholders. Cashman's acts and omissions in this regard are fully supported by the documentary evidence and lack thereof (e.g., no disclosures to shareholders and no proper corporate governance), and as further discussed in this Report.

38.     To the extent that the advisory board/committee of CropUSA constitutes a de facto or other director relationship on behalf of the AIA Corporations (Attorney Gatziolis would later state in a 2007 email to Attorney

---

[175] AIAPROD00074876-78; AIAPROD00310924.
[176] 6/2/2015 Cashman Depo. Transcript, pp. 2445-45; DLM – 0033053-56.
[177] DLM – 0033069-93; RJT – 039623.

Exhibit - 1, p. 72

11-ER-2489

Bond that the advisory board is informally making the decisions for the AIA Corporations),[178] Beck, Cashman and John Taylor owed additional fiduciary duties to the AIA Corporations and they breached their duties of loyalty for taking action against the best interests of the AIA Corporations and by improperly utilizing their funds, assets, trade secrets, employees and creditworthiness for the benefit of CropUSA.

39.     Duclos was previously named as a defendant because, *inter alia*: (a) she acted as director of AIA Services from sometime on or before the 2001 annual report was signed on January 8, 2002 until she resigned on February 22, 2007 and as secretary of AIA Services from approximately 1999 until May 26, 2016;[179] and (b) as director of AIA Insurance from sometime on or before the 1999 annual report was signed on January 24, 1999 until she resigned on February 22, 2007 and as secretary of AIA Insurance from sometime on or before the 1998 annual report was signed on October 14, 1998 until May 26, 2016.[180] Thus, during these periods of times, Duclos owed fiduciary duties to the AIA Corporations and AIA Services' minority shareholders. While Duclos was voluntarily dismissed because she died,[181] she remains relevant and will be addressed in this Report and included as one of the Controlling AIA Defendants. In addition, based on the voluminous number of documents and communications reviewed, Duclos was intimately involved in the corporate governance of the AIA Corporations and other entities with conflicts of interest and she served as the secretary of many of the entities.[182]

40.     During the relevant times that Duclos owed fiduciary duties, she held shares in CropUSA,[183] served as secretary and/or as a director of CropUSA,[184] served as secretary for other entities partially owned by John Taylor (Pacific Empire Radio and Pacific Empire Holdings),[185] and she was aware that the AIA Corporations' funds, assets, employees and creditworthiness were being improperly utilized for other entities, including CropUSA, Pacific Empire Radio, Pacific Empire Communications (which, guarantees and loans were prohibited by restrictions under Section 4.2.9. of AIA Services' Amended Articles of

---

[178] For example, at a September 12, 2006 Advisory Board Meeting, John Taylor reported on the status of "the AIA lawsuit with the State of Idaho." CROP002328.

[179] AIAPROD00171187; DLM – 0033041, 0033066-73, 0033080-89; AIAPROD00172583.

[180] DLM – 0033144-; RJT – 039624; AIAPROD00171605.

[181] Dkt. 670.

[182] *See, e.g.,* Exhibits C-D.

[183] AIAPROD00074876-78; AIAPROD00310924.

[184] DLM – 0033175-95.

[185] Dkt. 67-15, pp. 14; DLM – 0033209-24.

Page - 64

Incorporation).[186] Duclos had a material interest in limiting her liability and preventing any of the AIA Corporations from pursuing claims against her or the other Controlling AIA Defendants and to maximize the value of her common shares in CropUSA, which constitutes a separate conflict of interest for Duclos as a director and/or the secretary of the AIA Corporations. As a result, Duclos had conflicts of interest when she engaged in any transactions, or permitted such transactions to occur, involving the AIA Corporations and CropUSA or any entity partially or wholly owned by John Taylor and/or in any way utilized (or permitted to be utilized) the AIA Corporations' assets, trade secrets, employees or creditworthiness with the foregoing entities (or competed in any way with the AIA Corporations through such entities) and such transactions were separately prohibited under the restrictions in Section 4.2.9 of AIA Services' Amended Articles of Incorporation),[187] which resulted in ultra vires acts and Duclos breaching her duties of loyalty owed to the AIA Corporations for all of such acts and transactions. However, those conflicts are not the only ones. Duclos has consistently placed her interests above the interests of the AIA Corporations and she had a material interest in not having the AIA Corporations pursue any claims against herself or any of the other Controlling AIA Defendants and to conceal those claims from the AIA Corporations, the disinterested constituents of AIA Services and its minority shareholders, which she did in violation of her duties of loyalty owed to the AIA Corporations and AIA Services' minority shareholders. Duclos' acts and omissions in this regard are fully supported by the documentary evidence and lack thereof (e.g., no disclosures to shareholders and no proper corporate governance), and as further discussed in this Report.

41.     As confirmed by John Taylor's recent Rule 30(b)(6) testimony in July 2020, the only purported board or shareholder decisions are those reflected in the minimal written meeting minutes and resolutions produced in discovery for the AIA Corporations as listed in the attached Exhibit B, which is incorporated by reference herein. I have reviewed tens of thousands of pages of documents in attempting to locate all of the board meeting minutes and resolutions because they were never produced in an orderly or organized manner. I also understand that Attorney Bond attempted to locate all of the meeting minutes and resolutions. We believe the list in Exhibit B is accurate, but there is no way to be certain because Attorney Bond does not control the documents. Therefore, I am assuming that Exhibit B captures all of the alleged board and shareholder meeting minutes and resolutions for the AIA Corporations from January 1, 1999 through the present time. If I locate any other

---

[186] Dkt. 67-15, pp. 130-32, 166; DLM – 0033053-56.
[187] DLM – 0033069-93; RJT - 039623.

Exhibit - 1, p. 74

meeting minutes or resolutions, I will supplement Exhibit B and this Report. However, because I am certain that there were no other special or annual shareholder meetings that properly disclosed and approved any transactions, payments, agreements, guarantees or other matters, the existence of any other alleged board meeting minutes or resolutions for the AIA Corporations would not change the result of my analysis or opinions in this Report.

42.     In addition to the entities and conflicts specifically addressed above, the Controlling AIA Defendants also had conflicts of interest by way of their ownership and/or management positions in the various entities set forth in the attached Exhibit C, which is incorporated by reference herein. If dates were not available when a person resigned or was removed as a director or officer, I used the date that the person was disclosed as being removed as a director or officer in the next annual report. Likewise, if dates were not available as to when a person was appointed as a director or officer, I used the date that the person was first disclosed as being a director or officer in an annual report. For example, Mr. Beck could not recall when he resigned as a director for AIA Services the first time or when he resigned as a director for the AIA Corporations. I used the information contained in the annual reports for Mr. Beck in the manner stated above.

43.     The Controlling AIA Defendants also had conflicts of interest by way of being a named party and/or through their ownership and/or management positions in the entities involving in the lawsuits and legal proceedings described in the attached Exhibit D, which is incorporated by reference herein.

44.     "An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a willful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned."[188]

45.     "Fraud may be established by silence where the defendant had a duty to speak."[189] "A duty to disclose exists…if there is a fiduciary or other similar relation of trust and confidence between the two parties."[190] "In its generic sense constructive fraud comprises all acts, omissions and concealments involving a

---

[188] Restatement (Second) of Agency § 469 (1958). *See* Restatement (Third) Of Agency § 8.01 cmt. d(2) (2006).
[189] *G & M Farms v. Funk Irrigation Co.*, 119 Idaho 514, 521, 808 P.2d 851, 858 (1991).
[190] *James v. Mercea*, 152 Idaho 914, 918, 277 P.3d 361, 365 (2012) (citation omitted).

Exhibit - 1, p. 75

11-ER-2492

breach of legal or equitable duty, trust or confidence and resulting in damage to another. Constructive fraud usually arises from a breach of duty where a relation of trust and confidence exists; such relationship may be said to exist whenever trust or confidence is reposed by one person in the integrity and fidelity of another."[191] It is undisputed that the Controlling AIA Defendants have concealed facts and claims from the AIA Corporations, their disinterested constituents and AIA Services' minority shareholders.

46.   "A claim for aiding and abetting a tort requires proof that (1) the primary tortfeasor has committed a tort causing injury to the plaintiff; (2) the defendant knew the primary tortfeasor breached a duty; (3) the defendant substantially assisted or encouraged[192] the primary tortfeasor in the breach; and (4) a causal relationship exists between the assistance or encouragement and the [tortfeasor's] breach."[193]

> The law seems to be well settled that, where several people actively participate in any manner in the commission of a tort, not only the actual actor or assailant is liable but all others who aid, abet, counsel or encourage the wrongdoer by words, gestures, looks or signs are equally liable with him to the injured person.[194]

47.   Some "courts have required actual knowledge of the underlying tortious conduct. A plaintiff, however, need not allege that the aider and abettor had actual knowledge 'of all of the details of the primary party's scheme. [I]t is enough for the aider and abettor to have a general awareness of [his] role in the other's tortious conduct for liability to attach.'….[C]ourts have held that a failure to act constitutes substantial assistance when, as alleged here, there is a duty to act."[195]

---

[191] *McGhee v. McGhee*, 82 Idaho 367, 371, 353 P.2d 760, 762 (1960) (citation omitted).

[192] "Encourage" means "[t]o instigate; to incite to action; to embolden; to help." Black's Law Dictionary (11th ed. 2019).

[193] *Security Title Agency, Inc. v. Pope*, 219 Ariz. 480, 491, 200 P.3d 977, 988 (Ariz. Ct. App. 2008) (citation omitted); *Highland Enterprises, Inc. v. Barker*, 133 Idaho 330, 342, 986 P.2d 996, 1008 (1999); Restatement (Second) of Torts § 876 (1979); 3 Fletcher Cyc. Corp. § 1001.50 (Westlaw 2018) "

[194] *Todd v. Sullivan Const. LLC*, 146 Idaho 118, 125, 191 P.3d 196, 203 (2008) (citations omitted).

[195] *In re Nat'l Cen. Fin. Enterprises, Inc.*, 604 F.Supp.2d 1128, 1155-56 (S.D. Ohio 2009) (citations omitted).

**11-ER-2493**

Exhibit - 1, p. 76

"[S]ubstantial assistance" can be shown when a party is "concealing" the unlawful conduct of another party.[196]

48.     The Controlling AIA Defendants' acts and omissions (including concealments) meet the standards necessary for aiding and abetting, as I will discuss in more detail below in this Report.

49.     The Hawley Troxell Defendants are named as defendants because, *inter alia*: (a) they owed duties of care and fiduciary duties to the AIA Corporations;[197] and (b) they have aided and abetted in the Controlling AIA Defendants' breaches of fiduciary duties and fraudulent conduct (including by substantially assisting on concealing and covering up such conduct).[198] As attorneys for the AIA Corporations, the Hawley Troxell Defendants (which includes other unnamed Hawley Troxell attorneys) owed duties of care and fiduciary duties to the AIA Corporations. In addition, the Hawley Troxell Defendants had obligations under the Rules of Professional Conduct. The Hawley Troxell Defendants breached their duties of care, fiduciary duties (including duties of loyalty), and the Rules of Professional Conduct, as I will address below.

50.     The Hawley Troxell Defendants' acts, omissions and conduct are governed by the Idaho Rules of Professional Conduct because they are attorneys in Idaho and the lawsuits at issue were in Idaho. Effective July 1, 2004, the Idaho Rules of Professional Conduct were revised and adopted. The 2004 Idaho Rules of Professional Conduct applied until they were subsequently revised and adopted effective on July 1, 2014. The 2004 Idaho Rules of Professional Conduct and the

---

[196] *In re Nat'l Cen. Fin. Enterprises, Inc.*, 604 F.Supp.2d 1128, 1155-56 (S.D. Ohio 2009) (citations omitted).

[197] *See generally* Dkts. 449-82–88; HTEH00001-181, 000196-209, 000212-14, 000218-275, 000288-93.

[198] "Legal authorities, however, virtually are unanimous in expressing the proposition that one who knowingly aids another in the breach of a fiduciary duty is liable to the one harmed thereby. That principle readily extends to lawyers. None of those authorities even implies that liability for participants in the breach of fiduciary is confined to those who *themselves* owe such duty." *Granewich v. Harding*, 329 Or. 47, 56, 985 P.2d 788, 793 (1990) (Emphasis in original; footnotes omitted). *Cf. Reynolds v. Schrock*, 341 Or. 338, 344, 142 P.3d 1062, 1065 (2006). "However, the *Greenwich* opinion specifically noted that the defendant lawyer in that case represented the *corporation,* not the other defendants (the majority shareholders) and that the plaintiff had alleged that the lawyer's actions had fallen 'outside the scope of any legitimate employment on behalf of the corporation.'"

Comments[199] thereto apply to the vast majority of the Hawley Troxell Defendants' acts and omissions in this Lawsuit.[200]

51.     Since the Idaho Rules of Professional Conduct "do establish standards of conduct by lawyers, a lawyer's violation of a [RPC] may be evidence of breach of the applicable standard of conduct."[201] While the Preamble also notes that the Rules of Professional Conduct "are not designed to be a basis for civil liability"[202] and Idaho law has not addressed the issue, courts and commentaries uniformly agree that the violation of the Rules of Professional Conduct may result in such court remedies as voiding agreements and disgorging the money paid to a lawyer for legal work.[203] On September 10, 2019, the Idaho Supreme Court expressly adopted "section 37 of the Restatement (Third) of the Law Governing Lawyers" and the factors addressed below.[204] However, disgorgement and the voiding of agreements based on violations of a RPC were not addressed, nor were they rejected, by the Idaho Supreme Court when it more recently addressed disgorgement.[205] Rather, it appears that the parties never raised the issues since the Idaho Supreme Court did not discuss them.[206]

52.     The Terminology and the Comments thereto contained within the 2004 and 2014 Rules of Professional Conduct are set forth under RPC 1.0.[207] "The Commentary accompanying each Rule explains and illustrates the meaning and purpose of the Rule. The Preamble and this note on Scope provide general orientation. The Comments are intended as guides to interpretation, but the text of each Rule is authoritative."[208]

---

[199] "The Commentary accompanying each Rule explains and illustrates the meaning and purpose of the Rule. The Preamble and this note on Scope provide general orientation. The Comments are intended as guides to interpretation, but the text of each Rule is authoritative." Idaho Rules of Professional Conduct, Preamble cmt. 21 (2004).

[200] "Violation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached….Nevertheless, since the Rules do establish standards of conduct by lawyers, a lawyer's violation of a Rule may be evidence of breach of the applicable standard of conduct." Idaho Rules of Professional Conduct, Preamble cmt. 20 (2004).

[201] Preamble cmt. 20.

[202] Preamble cmt. 20.

[203] Restatement (Third) of the Law Governing Lawyers § 37 (2000).

[204] *Parkinson v. Bevis*, 165 Idaho 599, 607, 448 P.3d 1027, 1035 (2019).

[205] *See generally Parkinson v. Bevis*, 165 Idaho 599, 448 P.3d 1027 (2019).

[206] *See generally Parkinson v. Bevis*, 165 Idaho 599, 448 P.3d 1027 (2019).

[207] RPC 1.0 (2004); RPC 1.0 (2014).

[208] Preamble cmt. 21.

Exhibit - 1, p. 78

11-ER-2495

53.     The Idaho Rules of Professional Conduct state that an Idaho lawyer is "an officer of the legal system" and "a lawyer's conduct should conform to the requirements of the law, ***both*** in professional service to clients and in the lawyer's business and personal affairs."[209]

54.     "[T]he scope of an attorney's contractual duty to a client is defined by the purposes for which the attorney is retained."[210]

55.     "A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent."[211] "All agreements concerning a lawyer's representation of a client must accord with the Rules of Professional Conduct and other law."[212] "When the client's course of action has already begun and is continuing, the lawyer's responsibility is especially delicate… A lawyer may not continue assisting a client in conduct that the lawyer originally supposed was legally proper but then discovers is criminal or fraudulent. The lawyer must, therefore, withdraw from the representation of the client in the matter. See Rule 1.16(a). In some cases, withdrawal alone might be insufficient. It may be necessary for the lawyer to give notice of the fact of withdrawal and to disaffirm any opinion, document, affirmation or the like. In extreme cases, substantive law may require a lawyer to disclose."[213]

56.     An attorney's representation of another party may also be implied from the facts and circumstances and a relationship concludes when a matter has concluded or the attorney has withdrawn.

> If the attorney agrees to provide assistance, or engages in conduct that could reasonably be construed as so agreeing, then there is an attorney-client relationship. The scope of the representation depends upon what the attorney has agreed to do. If the client consults with the attorney, the relationship terminates upon the completion of the consultation unless the attorney agrees to continue the relationship or to undertake a specific matter for the client. If the attorney agrees to undertake a specific matter, the relationship terminates when that matter has been

---

[209] Preamble cmt. 5 (Emphasis supplied).
[210] *Johnson v. Jones*, 103 Idaho 702, 704, 652 P.2d 650, 652 (1982).
[211] RPC 1.2(c) (2004).
[212] RPC 1.2 cmt. 9 (2004).
[213] RPC 1.2 cmt. 11 (2004).

Exhibit - 1, p. 79

11-ER-2496

resolved. If the attorney agrees to handle any matters the client may have, the relationship continues until the attorney or client terminates the relationship.

There are also circumstances in which the existence of an attorney-client relationship can exist based upon the attorney's failure to clarify whom the attorney is representing where, under the circumstances, one of the parties could reasonably believe that the attorney is representing that person's interests. Thus, the attorney-client relationship also exists if the attorney has represented the client in a variety of matters over a period of time and the attorney is asked to perform services in connection with a matter in which the client is involved, unless the attorney clearly informs the client that the attorney is not representing the client with respect to that matter. Likewise, where an attorney has represented a closely held business entity and then provides legal services for a transaction involving that entity and its owners where their interests are adverse, the attorney must clearly inform all involved who is the attorney's client and inform the others to seek independent legal advice.[214]

57.    "In order to establish a claim for legal malpractice the plaintiff must show: '(a) the existence of an attorney-client relationship; (b) the existence of a duty on the part of the lawyer; (c) a breach of duty by the lawyer (i.e., the lawyer's conduct fell below the standard of care); and (d) the lawyer's deficient performance proximately caused damages.'"[215] Legal malpractice and other claims may be asserted derivatively by a shareholder.[216]

58.    The "duties" owed include "competent and diligent representation, as well as adequate communication."[217]

---

[214] *Berry v. McFarland*, 153 Idaho 5, 9-10, 278 P.3d 407, 411-12 (2012).

[215] *Greenfield v. Smith*, 162 Idaho 246, 252, 395 P.3d 1279, 1285 (2017) (citation omitted).

[216] *Haberman v. Washington Public Power Supply System*, 109 Wash.2d 107, 147-149, 744 P.2d 1032, 1060-1061 (1987) (shareholder may assert double derivative legal malpractice claims).

[217] *Stephen v. Sallaz & Gatewood, Chtd.*, 150 Idaho 521, 526, 248 P.3d 1256, 1261 (2011) (citing RPC 1.1, 1.3, and 1.4).

Exhibit - 1, p. 80

11-ER-2497

59.     An attorney is liable for malpractice "by failing to investigate, inform and advise" the client.[218] Moreover, when an attorney undertakes to represent a client, the representation "implicitly included assistance with" all matters necessary relating to the representation.[219]

60.     Attorneys also owe fiduciary duties to their client. "The relationship of client and attorney is one of trust, binding an attorney to the utmost good faith in dealing with his client. In the discharge of that trust, an attorney must act with complete fairness, honor, honesty, loyalty, and fidelity in all his dealings with his client. An attorney is held to strict accountability for the performance and observance of those professional duties and for a breach or violation thereof, the client may hold the attorney liable or accountable."[220]

61.     Notwithstanding whether or not an attorney owed fiduciary duties or duties of care to a particular party or for a particular issue, an attorney may assume duties, including duties of care and the fiduciary duties of care and loyalty, by voluntarily undertaking a duty to act on one's behalf.[221]

62.     As recently explained by the Idaho Supreme Court, "[b]reach of fiduciary duty, even when based on attorney misconduct, differs from a legal malpractice claim. 'To establish a claim for breach of fiduciary duty, [a] plaintiff must establish that defendant owed plaintiff a fiduciary duty and that the fiduciary duty was breached.' One way in which these claims are different is in the relief that a plaintiff can recover. A breach of fiduciary duty claim is an equitable claim for which a defendant may have to disgorge compensation received during the time the breach occurred, even if the plaintiff cannot show actual damages."[222]

63.     In addition, the Idaho Supreme Court recently "distinguish[ed] the claims presented [in *Parkinson*] from those in *Bishop* by noting that breach of fiduciary duty when the client seeks *only equitable remedies*, is an equitable claim that a client may state independently from a claim for malpractice, even when the

---

[218] *Stephen v. Sallaz & Gatewood, Chtd.*, 150 Idaho 521, 525, 248 P.3d 1256, 1260 (2011) (affirming attorney malpractice for failing to properly value assets in a divorce action, which the court held was "implicitly included in the representation).

[219] *Stephen v. Sallaz & Gatewood, Chtd.*, 150 Idaho 521, 526, 248 P.3d 1256, 1261 (2011).

[220] *Beal v. Mars Larsen Ranch Corp., Inc.*, 99 Idaho 662, 667–68, 586 P.2d 1378, 1383–84 (1978) (citation omitted).

[221] *Taylor v. Riley*, 157 Idaho 323, 339, 336 P.3d 256, 272 (2014); *Jones v. Runft, Leroy, Coffin & Matthews, Chtd.*, 125 Idaho 607, 611-13, 873 P.2d 861, 865-68 (1994).

[222] *Parkinson v. Bevis*, 165 Idaho 599, 605, 448 P.3d 1027, 1033 (2019) (citation omitted).

Page - 72

breach was accomplished by potentially negligent acts."[223] "Thus, a lawyer can violate his fiduciary duty, causing damage to his client, resulting in a legal malpractice claim; but he can also cause no damage, in which case an equitable remedy like Parkinson seeks may be recoverable as well… In *Rockefeller I*, we also relied on the Texas case of *Burrow v. Arce*, which sets forth several factors to consider in any forfeiture analysis: 'the gravity and timing of the violation, its willfulness, its effect on the value of the [agent's] work for the [principal], and other threatened or actual harm to the [principal] and the adequacy of other remedies.' These criteria are apt in cases involving any dispute over the breach of a fiduciary duty, and courts should apply these considerations when exercising their discretion as to these equitable remedies, even in cases involving the attorney-client relationship."[224] The Idaho Supreme Court "agree[d] with, and now adopt[ed], the Restatement's approach in section 37 as we have stated it. The sanction of fee forfeiture is available when an attorney violates his duty to his client in a serious way. The criteria listed in section 37 are to be used to determine whether the trial court may order forfeiture of all or a portion of an attorney's fee as an appropriate equitable remedy in these circumstances. To reiterate, those factors are (1) the extent of the misconduct, (2) whether the breach involved knowing violation or conscious disloyalty to a client, (3) whether forfeiture is proportionate to the seriousness of the offense, and (4) the adequacy of other remedies…The primary purpose of an equitable remedy of forfeiture is to protect the relationship between a principal and her agent by discouraging the agent's disloyalty."[225]

64.    "To the extent that legal malpractice plaintiffs seek both damages and fee disgorgement, the principles articulated in this decision would apply to the equitable portion of the claim. But, if the breach of fiduciary duty claim includes a claim for damages, that claim is appropriately subsumed by the legal malpractice claim."[226] In this Lawsuit, Miesen seeks damages and disgorgement from the Hawley Troxell Defendants.

65.    While at Eberle Berlin, Riley assisted in preparing the 1987, 1995 (both of them), and 1996 amended articles of incorporation for AIA Services.[227] In connection with Riley's work at Eberle Berlin, he also worked on the redemption of

---

[223] *Parkinson v. Bevis*, 165 Idaho 599, 606, 448 P.3d 1027, 1034 (2019) (citation omitted).

[224] *Parkinson v. Bevis*, 165 Idaho 599, 607, 448 P.3d 1027, 1035 (2019) (citations omitted).

[225] *Parkinson v. Bevis*, 165 Idaho 599, 607, 448 P.3d 1027, 1035 (2019).

[226] *Parkinson v. Bevis*, 165 Idaho 599, 608, 448 P.3d 1027, 1036 (2019).

[227] 7/1/2019 Riley Depo. Transcript, pp. 41, 77-78.

Exhibit - 1, p. 82

11-ER-2499

Reed Taylor's shares and the modification of Donna Taylor's redemption terms in 1995 and 1996.[228] As a result, Riley was aware, or should have been aware, at all relevant times of the restrictions in AIA Services' Amended Articles of Incorporation during all future representation of the AIA Corporations and CropUSA. In addition, these transactions and Riley's subsequent representation of the AIA Corporations (discussed below) confirm that Riley had on ongoing attorney-client relationship with the AIA Corporations and he never terminated that attorney-client relationship with them.

66.     On February 7, 2001, the Hawley Troxell Defendants agreed in writing to represent CropUSA for a Reg D[229] offering, which was approved by Hawley Troxell's board signed by John Taylor and Duclos and represented that AIA Insurance was "affiliate and equity owner of CropUSA…and hereby guarantees prompt payment…of the legal fees payable by CropUSA pursuant to this agreement."[230] If the engagement letter meant that CropUSA was subsidiary of AIA Insurance or AIA Services, then the guarantee of the payment of fees and costs would not have been prohibited by AIA Services' articles of incorporation or AIA Insurance's Bylaws (as to conflicts of interest and guarantees), although the letter contains insufficient Informed Consent for the Hawley Troxell Defendants to have obtained authorization for CropUSA's fees and costs to be paid by AIA Insurance. If, on the other hand, CropUSA was not a subsidiary of AIA Insurance, the guarantee was prohibited by Section 4.2.9 of AIA Services' Amended Articles of Incorporation and AIA Insurance's Bylaws (including as to conflicts of interest and the guarantee of obligations for others). This also confirms that Riley was aware that CropUSA was not independent. Yet the Hawley Troxell Defendants placed their interests in seeking payment of part of the fees billed in the form of CropUSA shares above the interests of the AIA Corporations' interests. On May 16, 2001, John Taylor also emailed Riley about a proposal that he was trying to get Reed Taylor to agree to, which confirmed that Riley knew that the AIA Corporations were involved in the proposed transaction and that the terms were not consistent with the AIA Corporations and CropUSA being distinct and separate corporations (it makes no sense why would CropUSA guarantee the sums owed to Reed Taylor and Donna Taylor if it was truly independently operated and funded).[231] As John

---

[228] DLM – 0003457-80; RJT – 026616-711.

[229] Although the engagement letter referred to a SEC Regulation D private offering, Riley prepared a public offering Form 1A Offering Statement under SEC Regulation A. *See* Section XII of this Report.

[230] HTEH000182-90.

[231] RJT – 011694-96, 026719.

Exhibit - 1, p. 83

Taylor later testified, Reed Taylor never agreed to any restructuring of the debt owed by AIA Services and Riley should have known this fact (assuming that he did not know).[232] In any event, the Hawley Troxell Defendants did not obtain a conflict waiver for this representation from the AIA Corporations nor did they obtain a proper conflict waiver for AIA Insurance to pay the fees and costs incurred by CropUSA. The Hawley Troxell Defendants' work on this matter continued into 2006 and no conflict waivers were sought or obtained from the AIA Corporations.[233]

67.     On March 28, 2004, the Hawley Troxell Defendants agreed in writing to represent CropUSA with respect to the preparation of a Reg D private placement memorandum.[234] According to the billing records, the Hawley Troxell Defendants' representation on that matter commenced on May 3, 2004 and the last billing entry was on April 4, 2005.[235] Thus, the Hawley Troxell Defendants' representation of CropUSA in this matter overlapped with their representation of the AIA Corporations for the matter described in the following paragraph.

68.     On May 17, 2004, the Hawley Troxell Defendants agreed in writing to represent the AIA Corporations in the ULIC liquidator's lawsuit.[236] According to the billing records, the Hawley Troxell Defendants' representation commenced on March 30, 2004 and the last billing entry was on October 1, 2007 (and the matter was active in August through December of 2006).[237] At a minimum, during that period of time, the Hawley Troxell Defendants owed duties of care and fiduciary duties to the AIA Corporations. The same holds true for the other representation provided by the Hawley Troxell Defendants for CropUSA.

69.     On September 17, 2006, certain of the Hawley Troxell Defendants agreed to represent CropUSA for the preparation of a third-party closing opinion letter for a $15 million line-of-credit.[238] According to the billing records, the Hawley Troxell Defendants' representation on that matter commenced on September 18, 2006 and the last billing entry was on October 27, 2006.[239] During this period of time, the Hawley Troxell Defendants were also representing the AIA

---

[232] RJT – 026722-38.

[233] Dkts. 449-87, pp. 4-9, 31-55.

[234] HTEH000191-92.

[235] Dkt. 449-88, pp. 33-45.

[236] HTEH000172-74.

[237] Dkt. 449-82, pp. 29-56.

[238] HTEH000278-80; Dkt. 1-10.

[239] Dkt. 449-88, pp. 64.

Exhibit - 1, p. 84

11-ER-2501

Corporations (as discussed above). No conflict waiver was sought or obtained by the Hawley Troxell Defendants from the AIA Corporations (nor would one have been valid) to authorize them to breach their duties of loyalty owed to the AIA Corporations by assisting CropUSA in obtaining a $15 million line-of-credit that was guaranteed by AIA Insurance when such guarantee was prohibited by AIA Services' Amended Articles of Incorporation and AIA Insurance's Bylaws.

70.     In November 2006 and early 2007, the Hawley Troxell Defendants represented John Taylor (client number 43369, matter number 0001) when, according to John Taylor's email, "Twin River [Bank] proposed a reverse merger to squeeze Reed, me, and one other shareholder out of the Bank or force us into the holding company. The effective date of the reverse merger was 12/29. Reed needs to send a letter demanding notification of the effective date of the merger and request more money. Tell him my attorney is sending one on Monday, but he can't represent him to…Below is a copy of our required pre-shareholder meeting notice of objection" (which such email was also carbon copied to Riley).[240] The Hawley Troxell Defendants' categorical privilege log confirms that they represented John Taylor and describes an "Engagement Letter [dated] January 8, 2007."[241] The Hawley Troxell Defendants' representation of John Taylor's interests continued for years thereafter.

71.     Commencing on February 7, 2007, at a time that John Taylor was a personal client as stated in the preceding paragraph, although the Hawley Troxell Defendants did not file a formal notice of appearance, they began representing John Taylor and/or the AIA Corporations in *Reed Taylor v. AIA Services* (client number 43369, matter number 0002) (the billing statements were only in John Taylor's name and the last billing entry for this matter was on April 30, 2007).[242] However, I have not seen an engagement letter, fee agreement or termination letter for this representation. In fact, as I will discuss below, the Hawley Troxell Defendants never stopped representing the interests of John Taylor in *Reed Taylor v. AIA Services* or *Donna Taylor v. AIA Services*, and consistently placed his interests above the interests of the AIA Corporations' interests. Riley's March 23, 2007 Memorandum to Attorney McNichols (which was carbon copied to Babbitt) confirms that John Taylor was their client (including with the recommendation that Attorney McNichols be the lead counsel when he was representing the person involved in the malfeasance) and that Riley's analysis regarding conflicts of interest

---

[240] DLM – 0033567.
[241] 8/30/2018 HTEH Categorical Privilege Log, pp. 64-66, 70.
[242] Dkt. 449-82, pp. 62-79; Dkt. 783-22, p. 4.

was wrong (he incorrectly states that the conflicts of interest are only potential when they were actual concurrent conflicts of interest).[243] Indeed, Riley's Memorandum applied equally to the Hawley Troxell Defendants when they undertook to represent CropUSA.

72.     Commencing on May 1, 2007 (it was signed on May 2, 2007),[244] the Hawley Troxell Defendants formally agreed in writing to represent the AIA Corporations in *Reed Taylor v. AIA Services* (after obtaining a purported conflict waiver from CropUSA),[245] and they later also agreed to represent CropUSA in that same year (although the AIA Corporations and CropUSA had conflicts of interest that prevented the Hawley Troxell Defendants from undertaking the joint representation of the AIA Corporations and CropUSA). There were no conflict waivers sought or obtained to address the prior or joint representation of John Taylor, AIA Insurance's unauthorized guarantee of the Lancelot Loan and the Hawley Troxell Defendants' liability if that guarantee had been challenged (which it should have been by the Hawley Troxell Defendants if they were truly representing the interests of the AIA Corporations after that issue was specifically raised in *Reed Taylor v. AIA Services*), or any other conflicts of interest (including for the payment of fees, the conflicts associated with taking directions[246] from John Taylor[247] when he was responsible for taking the AIA Corporations' funds, assets and trade secrets, and the conflicts between AIA Services and AIA Insurance since the latter was pledged to Reed Taylor). Because AIA Insurance was pledged as collateral to Reed Taylor, the Hawley Troxell Defendants could not possibly represent the interests of AIA Services and AIA Insurance and believe that confidentiality would be maintained. In addition, there was no limited scope of representation and one would have been unreasonable under the circumstances, as

---

[243] HTEH000283-87.

[244] HTEH000001-9.

[245] HTEH000010-14.

[246] John Taylor has testified as follows; And you made the litigation decisions in the Reed Taylor verses AIA Services lawsuit, correct? He answered, "I did." 7/23-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 427-28.

[247] *See, e.g.,* the billing entry: "10/22/07 Richard Riley…TELEPHONE CONFERENCE WITH JOHN TAYLOR, I.DUELOSE (sic), M. MCNICHOLS AND COUNSEL RE REPRESENTATION OF CROP USA AND FURTHER STRATEGY" FB 0690 (solid caps in original); the billing entry: "11/19/08 Richard Riley…Conference with G. Babbit (sic) re litigation management plan; telephone conference with G. Babbit (sic) and J. Taylor re litigation management plan…" FB 0773; and the billing entry: "4/29/08 John Ashby…REVIEW MEMO FROM J. TAYLOR RE DISCOVERY ISSUES…" FB 0734 (Solid caps in original).

Exhibit - 1, p. 86

11-ER-2503

discussed below in this Report.[248] According to the billing records, Hawley Troxell commenced representing the AIA Corporations on May 1, 2007 and the last billing entry provided was on July 11, 2012 (but there is no final judgment and there are still claims pending).[249] Thus, the Hawley Troxell Defendants owed duties of care and fiduciary duties to the AIA Corporations from the time they commenced representing the AIA Corporation (but not later than May 2, 2007) through the present time because *Reed Taylor v. AIA Services* has not concluded and the Hawley Troxell Defendants have not withdrawn.

73.     Commencing in 2001 and then again on May 22, 2007 (while *Reed Taylor v. AIA Services* was pending and Reed Taylor was asserting that CropUSA belonged to the AIA Corporations), the Hawley Troxell Defendants represented CropUSA for a stock option plan (there was no engagement letter provided for this work in 2007).[250] This work continued until August 24, 2007.[251] The Hawley Troxell Defendants did not seek or obtain any conflict waivers from the AIA Corporations to represent CropUSA to prepare a stock option plan, and this work was being performed during the time in which Reed Taylor was asserting that CropUSA belonged to the AIA Corporations.[252] In other words, instead of taking action to recover CropUSA, the Hawley Troxell Defendants were assisting the Controlling AIA Defendants in transferring ownership to others.

74.     Commencing in 2007 but not confirmed in writing until February 25, 2008, the Hawley Troxell Defendants also began jointly representing CropUSA as well as the AIA Corporations in *Reed Taylor v. AIA Services*.[253] In other words, the Hawley Troxell Defendants were representing CropUSA months before the written alleged "Amended Engagement Agreement" with the AIA Corporations signed by John Taylor on February 25, 2008 (assuming that date is accurate) and the first "Engagement Letter" with CropUSA signed by John Taylor, Duclos and Petersen on February 25, 2008 (assuming that date is accurate).[254] The Hawley Troxell Defendants failed to seek or obtain the proper conflict waivers for the joint representation of CropUSA nor would have any such conflict waivers been appropriate or enforceable based on the facts and circumstances (including the

---

[248] HTEH000001-9.

[249] Dkt. 449-83, pp. 5-85; Dkt. 449-84, pp. 1-82; Dkt. 449-86, pp. 1-77; *See generally* DLM – 0007285-19427.

[250] Dkt. 449-88, pp. 1-16.

[251] Dkt. 449-88, p. 15.

[252] *E.g.*, DLM – 0009229 ¶ 2.46.

[253] HTEH000039-107.

[254] HTEH000039-47

**Exhibit - 1, p. 87**

**11-ER-2504**

undisputed facts regarding the improper and unauthorized transactions between the AIA Corporations and CropUSA such as the $1.5 million transferred in 2004).

75.     On May 15, 2008, while *Reed Taylor v. AIA Services* was pending, the Hawley Troxell Defendants agreed in writing to represent AIA Insurance regarding a settlement of the ULIC receiver case, which resulted in only one monthly billing statement.[255] This work led to AIA Insurance receiving funds, which were later improperly used by the Controlling AIA Defendants. No conflict waiver was obtained from AIA Services or Reed Taylor (AIA Insurance was pledged to Reed Taylor at that time).

76.     On December 22, 2009, the Hawley Troxell Defendants formally agreed in writing to represent AIA Services in *Donna Taylor v. AIA Services* (although they began representing AIA Services on December 1, 2009 according to their billing records).[256] Thus, the Hawley Troxell Defendants owed duties of care and fiduciary duties to AIA Services from the time they commenced representing AIA Services (but not later than December 22, 2009) through January 4, 2012 (when Donna Taylor voluntarily dismissed that lawsuit).[257] The Hawley Troxell Defendants should have supported the appointment of a receiver and the appointment of Donna Taylor's board designee.

77.     Based upon the evidence I have reviewed (including the facts and evidence discussed above and disclosed in discovery), the Hawley Troxell Defendants had an attorney-client relationship with the AIA Corporations that commenced no later than 2001 (but possibly as early as 1999 (this would be an issue for the jury)) and with Riley back to at least 1995, which was never terminated by the Hawley Troxell Defendants or the AIA Corporations even though certain matters were completed from time to time (i.e., while the representation on a certain matter may have terminated, the attorney-client relationship did not). As a result, the Hawley Troxell Defendants and Riley owed duties and fiduciary duties, including duties of loyalty, to the AIA Corporations during those respective periods of time.

78.     Based on the evidence that I have reviewed (including the facts and evidence discussed above and disclosed in discovery), the Hawley Troxell Defendants had an attorney-client relationship with CropUSA that commenced no

---

[255] HTEH000175-81; Dkt. 449-82, pp. 58-60.
[256] HTEH000196-209; Dkt. 449-87, p. 64.
[257] Dkt. 67-29.

Exhibit - 1, p. 88

11-ER-2505

later than 2001, which was never terminated by the Hawley Troxell Defendants or CropUSA even though certain matters were completed from time to time (i.e., while the representation on a certain matter may have terminated, the attorney-client relationship did not). As a result, the Hawley Troxell Defendants owed duties of care and fiduciary duties, including duties of loyalty, to CropUSA during this period of time.

79.     Since the Hawley Troxell Defendants had ongoing attorney-client relationships with the AIA Corporations and CropUSA during the periods of time discussed in the preceding two paragraphs, there were concurrent conflicts of interest between the AIA Corporations and CropUSA as to, *inter alia*: (a) the Hawley Troxell Defendants' representation of CropUSA to provide a Legal Opinion for the Lancelot Loan constituted a violation of the Hawley Troxell Defendants' duties of loyalty owed to the AIA Corporations because AIA Insurance's guarantee of that loan was prohibited, *inter alia*, by AIA Services' Amended Articles of Incorporation, AIA Services' New Restated Bylaws, and AIA Insurance's Bylaws;[258] (b) the Hawley Troxell Defendants' representation of John Taylor, CropUSA and the AIA Corporations in *Reed Taylor v. AIA Services* constituted a violation of the Hawley Troxell Defendants' duties of loyalty owed to the AIA Corporations because the Controlling AIA Defendants and CropUSA had unlawfully utilized the AIA Corporations' funds, assets, trade secrets, corporate opportunities, and creditworthiness for CropUSA (including for the improper loan guarantee for the Lancelot Loan) and that the AIA Corporations should have been suing and not assisting CropUSA; and (c) placing the interests of CropUSA above the interests of the AIA Corporations by opposing the appointment of a receiver and the appointment of Donna Taylor's board designee in violation of their duties of loyalty owed to the AIA Corporations. The Hawley Troxell Defendants never sought or obtained conflict waivers from the AIA Corporations for these concurrent conflicts of interest. The same holds true for the concurrent conflicts of interest between the Hawley Troxell Defendants' client John Taylor and the AIA Corporations and separately based on the Hawley Troxell Defendants' failure to treat John Taylor as a client for addressing concurrent conflicts of interest because he was improperly making all of the litigation decisions on behalf of the AIA Corporations (assuming that John Taylor was not a client, which he was).[259] Notably, Ashby later conceded that the conflicts of interest were concurrent, "Given the nature of [Reed Taylor's] claims against the individual defendants, conflict of

---

[258] Dkt. 1-10.

[259] *E.g.*, Dkt. 67-10, pp. 87-88; Dkt. 67-11, pp. 63-64, 75-76, 87, 96, 108; Dkt. 67-12, pp. 54-55.

interests existed between [the] AIA [Corporations] and the other defendants at the inception of [*Reed Taylor v. AIA Services*]"[260]

80.     The Hawley Troxell Defendants consistently improperly accepted payments from other parties when they never obtained the necessary consents.[261] For example, in *Reed Taylor v. AIA Services*, CropUSA paid fees and costs for the AIA Corporations,[262] the AIA Corporations paid fees and costs for John Taylor,[263] John Taylor paid fees and costs for the AIA Corporations and CropUSA,[264] and AIA Services paid fees and costs for AIA Insurance (and *vice versa*).[265] This is also significant because AIA Insurance was pledged to Reed Taylor as collateral.[266] By way of another example, AIA Insurance paid fees and costs owed by CropUSA.[267] There is no doubt that John Taylor was the "real" client and he had influence over the Hawley Troxell Defendants that resulted in their failure to represent the best interests of the AIA Corporations, which is confirmed by how the fees and costs were paid to Hawley Troxell. This evidence also confirms that the Hawley Troxell Defendants were aware that the AIA Corporations were improperly funding CropUSA (assuming that CropUSA should not have been a subsidiary of the AIA Corporations).

81.     "[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by the personal interests of the lawyer…"[268]

---

[260] HTEH000259.

[261] *See generally* Dkts. 449-82–88.

[262] GEM038340. This $30,000 payment was made after Hawley Troxell printed their billing records in 2012. I am assuming that this $30,000 payment was for sums owed for *Reed Taylor v. AIA Services*. If not, then CropUSA did not pay any of the fees and costs for that case, even though the Hawley Troxell Defendants represented CropUSA and signed every pleading, filing (except one motion to enlarge time) and discovery responses as attorneys for CropUSA.

[263] Dkt. 449-82, p. 61.

[264] Dkt. 449-83, pp. 1-2.

[265] Dkts. 449-83, pp. 1-4, 449-85, pp. 1-2.

[266] RJT – 038904-09, 1026691-706.

[267] Dkt. 449-87, pp. 10, 12, 20.

[268] RPC 1.7(a) (2004).

Exhibit - 1, p. 90

11-ER-2507

82.   "Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent, confirmed in writing."[269]

> [1] Loyalty and independent judgment are essential elements in the lawyer's relationship to a client. Concurrent conflicts of interest can arise from the lawyer's responsibilities to another client, a former client or a third person or from the lawyer's own interests…
>
> [2] Resolution of a conflict of interest problem under this Rule requires the lawyer to: 1) clearly identify the client or clients; 2) determine whether a conflict of interest exists; 3) decide whether the representation may be undertaken despite the existence of a conflict, i.e., whether the conflict is consentable; and 4) if so, consult with the clients affected under paragraph (a) and obtain their informed consent, confirmed in writing. The clients affected under paragraph (a) include both of the clients referred to in paragraph (a)(1) and the one or more clients whose representation might be materially limited under paragraph (a)(2).
>
> [3] A conflict of interest may exist before representation is undertaken, in which event the representation must be declined, unless the lawyer obtains the informed consent of each client under the conditions of paragraph (b). To determine whether a conflict of interest exists, a lawyer should adopt reasonable procedures, appropriate for the size and type of firm and practice, to determine in both litigation and non-litigation matters the persons and issues involved. See also Comment to Rule 5.1. Ignorance caused by a failure to institute such procedures will not excuse a lawyer's violation of this Rule. As to whether a client-lawyer relationship exists or, having once been established, is continuing, see Comment to Rule 1.3 and Scope.

---

[269] RPC 1.7(b) (2004).

Exhibit - 1, p. 91

11-ER-2508

[4] If a conflict arises after representation has been undertaken, the lawyer ordinarily must withdraw from the representation, unless the lawyer has obtained the informed consent of the client under the conditions of paragraph (b). See Rule 1.16. Where more than one client is involved, whether the lawyer may continue to represent any of the clients is determined both by the lawyer's ability to comply with duties owed to the former client and by the lawyer's ability to represent adequately the remaining client or clients, given the lawyer's duties to the former client.

\*          \*          \*

[8] Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests.

\*          \*          \*

[10] The lawyer's own interests should not be permitted to have an adverse effect on representation of a client. For example, if the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice.

\*          \*          \*

[13] A lawyer may be paid from a source other than the client, including a co-client, if the client is informed of that fact and consents and the arrangement does not compromise the lawyer's duty of loyalty or independent judgment to the client. See Rule 1.8(f). If acceptance of the payment from any other source presents a significant risk that the lawyer's representation of the client will be materially limited by the lawyer's own interest in accommodating the person paying the lawyer's fee or by the lawyer's responsibilities to a payer who is also a co-client, then the lawyer must comply with the requirements of paragraph (b) before accepting the representation, including determining whether the conflict is consentable and, if so, that the client has adequate information about the material risks of the representation.

[14] Ordinarily, clients may consent to representation notwithstanding a conflict. However, as indicated in paragraph (b), some conflicts are nonconsentable, meaning that the lawyer involved cannot properly ask

Page - 83

Exhibit - 1, p. 92

for such agreement or provide representation on the basis of the client's consent. When the lawyer is representing more than one client, the question of consentability must be resolved as to each client.

[15] Consentability is typically determined by considering whether the interests of the clients will be adequately protected if the clients are permitted to give their informed consent to representation burdened by a conflict of interest. Thus, under paragraph (b)(1), representation is prohibited if in the circumstances the lawyer cannot reasonably conclude that the lawyer will be able to provide competent and diligent representation. See Rule 1.1 (competence) and Rule 1.3 (diligence).

*          *          *

[18] Informed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client. See Rule 1.0(e) (informed consent). The information required depends on the nature of the conflict and the nature of the risks involved. When representation of multiple clients in a single matter is undertaken, the information must include the implications of the common representation, including possible effects on loyalty, confidentiality and the attorney-client privilege and the advantages and risks involved.

*          *          *

[20] Paragraph (b) requires the lawyer to obtain the informed consent of the client, confirmed in writing. Such a writing may consist of a document executed by the client or one that the lawyer promptly records and transmits to the client following an oral consent. See Rule 1.0(b). See also Rule 1.0(n) (writing includes electronic transmission). If it is not feasible to obtain or transmit the writing at the time the client gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter. See Rule 1.0(b). The requirement of a writing does not supplant the need in most cases for the lawyer to talk with the client, to explain the risks and advantages, if any, of representation burdened with a conflict of interest, as well as reasonably available alternatives, and to afford the client a reasonable opportunity to consider the risks and alternatives and to raise questions and concerns. Rather, the writing is required in order to impress upon clients the seriousness of the decision the client is being

Page - 84

Exhibit - 1, p. 93

asked to make and to avoid disputes or ambiguities that might later occur in the absence of a writing.[270]

83.     "A lawyer shall not accept compensation for representing a client from one other than the client unless: (1) the client gives informed consent; (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and (3) information relating to representation of a client is protected as required by Rule 1.6."[271]

84.     "A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents."[272]

85.     "If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law that reasonably might be imputed to the organization, and that is likely to result in substantial injury to the organization, then the lawyer shall proceed as is reasonably necessary in the best interest of the organization. Unless the lawyer reasonably believes that it is not necessary in the best interest of the organization to do so, the lawyer shall refer the matter to higher authority in the organization, including, if warranted by the circumstances, to the highest authority that can act on behalf of the organization as determined by applicable law."[273]

86.     "In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing."[274]

87.     "A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the

---

[270] RPC 1.7 cmts. (2004).
[271] RPC 1.8(f) (2004).
[272] RPC 1.13(a) (2004).
[273] RPC 1.13(b) (2004).
[274] RPC 1.13(f) (2004).

Exhibit - 1, p. 94

11-ER-2511

organization other than the individual who is to be represented, or by the shareholders."[275]

88.    "An organizational client is a legal entity, but it cannot act except through its officers, directors, employees, shareholders and other constituents. Officers, directors, employees and shareholders are the constituents of the corporate organizational client."[276]

89.    Applying the facts and the applicable authorities and Rules of Professional Conduct (including those Rules and Comments quoted above), there were numerous conflicts of interest that were not addressed or consented to by the AIA Corporations, including conflicts of interest between the Hawley Troxell Defendants and the AIA Corporations based on providing the Legal Opinion for the Lancelot Loan (the Hawley Troxell Defendants had interests in having the Lancelot Loan paid off rather than taking action to extricate AIA Insurance from the prohibited and unauthorized guarantee of the Lancelot Loan and taking action to recover some of the assets or compensation for the AIA Corporations). In addition, entering into any Joint Defense Agreements or Tolling Agreements were not in the AIA Corporations' best interests, nor were they properly authorized.

90.    In sum, for the reasons stated above and below, the Hawley Troxell Defendants' acts and omissions did nothing but enable John Taylor and the other Controlling AIA Defendants to continue to engage in improper transactions and corporate governance, while allowing them to conceal and cover up their past and ongoing breaches of duties of loyalty. The Hawley Troxell Defendants intentionally breached their duties of loyalty owed to the AIA Corporations by placing the interests of John Taylor, the other Controlling AIA Defendants, CropUSA and their own (including as to the Lancelot Loan) above the interests of the AIA Corporations, which further constitute violations of the Rules of Professional Conduct.

91.    "Attorney fee agreements that violate the Rules of Professional Conduct are against public policy and are unenforceable."[277]

---

[275] RPC 1.13(g) (2004).

[276] RPC 1.13 cmt. 1 (2004).

[277] *Cotton v. Kronenberg*, 111 Wn.App. 258, 269, 44 P.3d 878, 884 (2002).

92.     "Disgorgement of fees is a reasonable way to discipline specific breaches of professional responsibility, and to deter future misconduct of similar type. 'Such an order is within the inherent power of the trial court.'"[278]

93.     "A lawyer engaging in clear and serious violation of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter."[279] "A lawyer is not entitled to be paid for services rendered in violation of the lawyer's duty to a client or for services needed to alleviate the consequences of the lawyer's misconduct."[280]

94.     "In a legal malpractice case arising out of representation in a civil matter, the plaintiff must be able to demonstrate 'some chance of success' in the underlying case. When a defendant-attorney files a motion for summary judgment, the plaintiff ordinarily has an obligation to provide expert affidavits that explain how the lawyer's conduct fell below the standard of care and how the conduct proximately caused damages. The reason for this rule is that laypeople sitting on a jury usually do not have the knowledge or experience necessary to determine the standard of care that applies to an attorney or how the attorney's performance of that duty may or may not harm a client."[281] There is no doubt in my mind that the AIA Corporations would have been successful in pursuing the claims against the Controlling AIA Defendants and other parties (including those to extricate AIA Insurance from the improper guarantee of the Lancelot Loan).

95.     When I opine that the Hawley Troxell Defendants were one of the proximate causes of the damages incurred by the AIA Corporations by failing to pursue claims against John Taylor, other Controlling AIA Defendants, other defendants and non-parties such as Lancelot, I am specifically opining that the claims would have been successful. Those successful claims would have included the applicable claims asserted by Reed Taylor in his Fifth Amended Complaint in *Reed Taylor v. AIA Services* (the breach of fiduciary duty claims and other torts that the AIA Corporations could have been substituted in place of Reed Taylor) and the claims asserted by Miesen in this Lawsuit (including the applicable claims in the Third Amended Complaint and any subsequently pleaded complaints). As to non-parties such as Lancelot, the AIA Corporations would have been able to have AIA

---

[278] *Behnke v. Ahrens*, 172 Wn. App. 281, 298, 294 P.3d 729, 738 (2012); *Eriks v. Denver*, 118 Wn.2d 451, 458-61, 824 P.2d 1207, 1211-13 (1992).

[279] Restatement (Third) of the Law Governing Lawyers § 37 (2000).

[280] Restatement (Third) of the Law Governing Lawyers § 37 cmt. a (2000).

[281] *Greenfield v. Smith*, 162 Idaho 246, 252, 395 P.3d 1279, 1285 (2017) (citations omitted).

Insurance's Guarantee of the Lancelot Loan declared void because it was ultra vires and/or illegal for the same reasons stated in this Report and that CropUSA's assets that were sold (or at least 70% of them) were assets had been converted assets belonging to the AIA Corporations and the Controlling AIA Defendants and Hawley Troxell Defendants breached their fiduciary duties and duties of care by allowing the sale to close and/or the funds to be paid to anyone other than the AIA Corporations. These claims and others will be addressed and then the jury will be given jury instructions to decide all of these claims in the "case within the case" scenario.[282] There is no doubt in my mind that the AIA Corporations would have been successful in asserting all such applicable claims.

96.    In addition, Idaho recognizes that attorneys may be held liable for aiding and abetting in breaches of fiduciary duty and fraud.[283] "When a lawyer advises or assists a client in acts that subject the client to civil liability to others, those others may seek to hold the lawyer liable along with or instead of the client."[284]

97.    "[T]he "but for" test may be employed when there is a single possible cause, but when there are multiple possible causes of the plaintiff's injury a "substantial factor" instruction must be given instead."[285] I have considered the "but for" and "substantial factor" tests in rendering my opinions on proximate causation below (e.g., the substantial factor test applies to most of the conduct at issue in this Lawsuit). While the Hawley Troxell Defendants may have not been the sole cause of certain damages (e.g., transactions that they allegedly were not involved in), they were a substantial factor of such damages and other damages proximately flowing therefrom because the transactions were at issue in *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services* (a disinterested Receiver would have pursued the

---

[282] *See, e.g.*, 4 Ronald E. Mallen, *Legal Malpractice* § 37:94 (2019 ed.) ("If the attorney's error allegedly impaired the plaintiff's cause of action or defense, the plaintiff is said to have a multiple burden of proof. This means that the plaintiff must establish not only the attorney's negligence but also that there should have been a better result in the underlying lawsuit or matter. The objective of the trial-within-a-trial concept is to determine causation, i.e. whether the attorney's negligence caused injury, which means that the plaintiff has the burden of proving two cases in one lawsuit.") (footnotes omitted).

[283] *Taylor v. McNichols*, 149 Idaho 826, 843, 243 P.3d 642, 659 (2010).

[284] Restatement (Third) of the Law Governing Lawyers § 56 cmt. c (2000); *Chalpin v. Snyder*, 220 Ariz. 413, 424, 207 P.3d 666, 677 (Ariz. Ct. App. 2008).

[285] *Newberry v. Martens*, 142 Idaho 284, 288, 127 P.3d 187, 191 (2005); IDJI 2.30.1; IDJI 2.30.2. *See also Knutson v. Foster*, 25 Cal.App.5th 1075, 1093-94, 236 Cal.Rptr.3d 473, 486 (Cal. Ct. App. 2018).

Exhibit - 1, p. 97

11-ER-2514

claims against the Hawley Troxell Defendants and the other defendants and prevented the subsequent improper and unauthorized transactions that occurred thereafter). When I opine that the Hawley Troxell Defendants are liable for damages sought by Miesen, I mean the damages requested in the Third Amended Complaint and as itemized in his answers to interrogatories.

98.     Hawley Troxell is liable for all acts and omissions committed by Ashby, Babbitt, Riley and other attorneys at Hawley Troxell because an entity is "liable under Idaho law for the conduct of its employees acting within the course and scope of their employment."[286] There is no evidence that any of the Hawley Troxell Defendants were not acting within the scope of their employment with Hawley Troxell.

99.     When I address certain of Miesen's damages based on the fair market value of the sale of assets and property as to any of Miesen's damage items below, the value of the assets and property was established by willing buyers and willing sellers.[287]

100.    GemCap is named as a defendant because, *inter alia*: (a) it unlawfully entered into the GemCap Settlement Agreement[288] with the AIA Corporations when they were prohibited from doing so because it violated numerous provisions under Section 4.2.9 of AIA Services' Amended Articles of Incorporation (including by becoming obligated for the CropUSA Entities' indebtedness, the transfer of assets, conflicts of interest transactions, and the violation of the financial covenants required to be maintained),[289] AIA Services' Restated Bylaws (including based on conflicts of interest under Section 4.14 (John Taylor had conflicts that prohibited him from entering into the GemCap Settlement Agreement),[290] AIA Insurance's Bylaws (including based on conflicts of interest under Section 4.14 (same

---

[286] *Finholt v. Cresto*, 143 Idaho 894, 897, 155 P.3d 695, 698 (2007); Restatement (Third) of the Law Governing Lawyers § 58 (2000).

[287] *Ada County Highway Dist. By and Through Silva v. Magwire*, 104 Idaho 656, 659, 662 P.2d 237, 240 (1983) ("Fair market value is the amount which would be agreed upon by a willing buyer and a willing seller"); IDJI 9.12 ("When I use the term 'value' or the phrase 'fair market value' or 'actual cash value' in these instructions as to any item of property, I mean the amount of money that a willing buyer would pay and a willing seller would accept for the item in question in an open marketplace, in the item's condition as it existed immediately prior to the occurrence in question.").

[288] Dkt. 128, pp. 21-48.

[289] DLM – 0033053-57.

[290] AIA0002563-85.

Exhibit - 1, p. 98

11-ER-2515

conflicts)),[291] and based on John Taylor's lack of authority because he never sought shareholder approval and based on his conflicts of interest (including, in seeking to reduce his exposure under his personal guarantee, placing his interests in having the AIA Corporations help satisfy the indebtedness to GemCap above the interests of the AIA Corporations in being extricated from any liability to GemCap)—all of which GemCap was aware of at the time of the GemCap Settlement Agreement (including based on Miesen filing suit against GemCap in *Durant v. GemCap* and Attorney Bond's prior email communications confirming the lack of authority); and (b) GemCap has aided and abetted the Controlling AIA Defendants' in the commission of torts against the AIA Corporations and AIA Services' minority shareholders (including by aiding and abetting John Taylor in the breach of his duties of loyalty) by, *inter alia*, participating in litigation against the AIA Corporations (thereby damaging them by the fees and costs paid to Munding), the unlawful entry into the GemCap Settlement Agreement, and the unlawful transfer of property to GemCap, along with all damages proximately caused, such as the improper payments to Henderson, money paid to Jordan Taylor ($50,000 for the sale of AIA's Parking Lot), and other improper transactions occurring at the AIA Corporations.[292]

101.   In addition to seeking relief under I.C. § 30-1-304 and/or I.C. § 29-304 (to set aside the GemCap Settlement Agreement and recovering damages for the AIA Corporations), GemCap's liability for aiding and abetting is based on the same or substantially same authorities discussed above.

102.   Based on the unique facts and circumstances of this Lawsuit, including: (a) the failure to properly elect directors for the AIA Corporations by properly and timely held annual shareholder meetings by not seating all of the board members as required (including by not properly seating Donna Taylor's board designee), (b) the acts of the so-called advisory board of CropUSA by Beck, Cashman and John Taylor, (c) the failure to properly appoint officers through the required annual board meetings, (d) the lack of any limited scope of representation of the AI Corporations, and (e) the essentially incapacitated status of the AIA Corporations based on the facts and conduct as discussed in this Report, the Controlling AIA Defendants and the Hawley Troxell Defendants have assumed duties of care and fiduciary duties to the AIA Corporations and their

---

[291] *RJT-AIA 1057-79.*

[292] *E.g.*, GC0771914-31.

shareholders,[293] including as to the Controlling AIA Defendants as de facto directors and officers.[294]

103.   Based on the conduct and omissions of the Controlling AIA Defendant, their fiduciary responsibilities as trustees of the corporations property and the breaches thereof, the Hawley Troxel Defendants could have, and should have sought the imposition of a constructive trust for the assets belonging to the AIA Corporations, including, without limitation, the books of business and assets sold to Hudson, the $120,000 non-compete compensation paid in connection with that transaction, the contractual and commission rights to Growers National, the sale of Pacific Empire Holdings' book of business (Sound Insurance), AIA's Parking Lot, and other assets as discussed in this Report and Exhibit A attached hereto.[295]

104.   Under Idaho law, a receiver may be appointed "[i]n the case where a corporation has been dissolved, or is insolvent, or in imminent danger of insolvency, or has forfeited its corporate rights…[and] [i]n all other cases where receivers have heretofore been appointed by the usages of courts of equity.[296] Under Idaho law, [t]he receiver has, under the control of the court, power to bring and defend actions in his own name, as receiver; to take and keep possession of the property, to receive rents, collect debts, to compound for and compromise the same, to make transfers, and generally to do such acts respecting the property as the court

---

[293] *E.g., Taylor v. Riley,* 157 Idaho 323, 336 P.3d 256 (2014) ("There is no reason why the same rule should not apply to attorneys."); *Jones v. Runft, Leroy, Coffin & Matthews, Chartered*, 125 Idaho 607, 611-12, 873 P.2d 861 (1994) ("[A]n assumed duty…results from a voluntary undertaking" and the determination of such a duty is a question of fact); *Featherston v. Allstate Ins. Co.*, 125 Idaho 840, 843, 875 P.2d 937, 940 (1994) ("If one voluntarily undertakes to perform an act, having no prior duty to do so, the duty arises to perform the act in a non-negligent manner.").

[294] 2 Fletcher Cyc. Corp. § 386 (2018); 2 Fletcher Cyc. Corp. § 390 (2018).

[295] *See Snider v. Arnold*, 153 Idaho 641, 643-44, 289 P.3d 43, 45-46 (2012) ("Imposition of a constructive trust is an equitable remedy and does not require that the holder of legal title intend to create a trust interest in another. Indeed, a constructive trust arises from the legal title holder's wrongful actions and not from any intent to create a trust. A party seeking to impose a constructive trust must prove the facts alleged to give rise to the trust by clear and convincing evidence. Whether a party presented sufficient evidence to meet the clear and convincing standard is a finding of fact that this Court will uphold if substantial and competent evidence supports it.").

[296] I.C. § 8-601(5) & (6).

Exhibit - 1, p. 100

11-ER-2517

may authorize."[297] Idaho has no requirement for particular qualifications other than a party not be "interested in an action."[298]

105.    I am offering opinions as to punitive damages against the Defendants. "In any action seeking recovery of punitive damages, the claimant must prove, by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted."[299] Claims for breaches of fiduciary duties and aiding and abetting may support punitive damages.[300]

106.    For all of the reasons stated above and below, I am of the firm conviction that the Defendants' conduct has been oppressive, fraudulent, and outrageous and the Controlling AIA Defendants' conduct was also malicious. The Defendants have also engaged in ongoing oppressive conduct towards the AIA Corporations and AIA Services' minority shareholders.

107.    In the following paragraphs, I will chronologically provide some of the additional pertinent facts and analysis.

## B.    1976-1986 – The Founding and Incorporation of AIA Insurance and AIA Services and the Overarching Legal Principles.

1.      Reed Taylor and Donna Taylor founded the sole proprietorship known as Agriculture Insurance Administrators, which focused on selling health insurance products to farmers.[301]

2.      On December 1, 1976, Reed Taylor hired his brother John Taylor to work for at the business.[302] Reed Taylor and Donna Taylor would later regret ever hiring John Taylor.

---

[297] I.C. § 8-605.

[298] I.C. § 8-603.

[299] I.C. § 6-1604(1). *See In re Doe*, 157 Idaho 694, 700, 339 P.3d 755, 760 (2014) ("Clear and convincing evidence is evidence that indicates the thing to be proved is highly probable or reasonably certain").

[300] *Rockefeller v. Grabow*, 136 Idaho 637, 647, 39 P.3d 577, 588 (2002); *Security Title Agency, Inc. v. Pope*, 219 Ariz. 480, 498, 200 P.3d 977, 995 (Ariz. Ct. App. 2008).

[301] AIA0026066; DLM – 0006321 ¶¶ 2-3.

[302] AIA0026066.

Exhibit - 1, p. 101

11-ER-2518

3.      On January 31, 1977, AIA Insurance (f/k/a AIA, Inc.) was incorporated by Reed Taylor with the Idaho Secretary of State (it was owned primarily by him and Donna Taylor, along with their children).[303] The articles of incorporation were subsequently amended a number of times (including to change the name to AIA Insurance twice).[304]

4.      On July 12, 1983, Donna Taylor filed for divorce against Reed Taylor.[305]

5.      On December 20, 1983, AIA Services' original articles of incorporation were filed with the Idaho Secretary of State (it was originally called AIA Insurance Corporation, but its name was later changed to AIA Services).[306] The articles of incorporation were subsequently amended and restated a number of times.[307] AIA Services was formed as a holding company. AIA Services was never licensed to sell any insurance products; instead, those business activities were always conducted through its subsidiaries.[308]

6.      Because AIA Services and AIA Insurance are Idaho corporations, the directors, officers and shareholders are obligated to comply with the articles of incorporation and amendments thereto.

> The internal affairs doctrine is a conflict of laws principle recognizing that only one state should have the authority to regulate a corporation's internal affairs, because otherwise, a corporation might be faced with conflicting demands...The internal affairs doctrine provides that internal matters of corporate governance are governed by the law of the state of incorporation.
>
> *          *          *
>
> By providing certainty and predictability, the internal affairs doctrine protects the justified expectations of the parties with interests in the corporation. It has been said that internal affairs include those matters that are peculiar to the relationships among or between the corporation and its officers, directors and shareholders.[309]

---

[303] DLM – 0033100-09; Dkt. 67-1, pp. 3, 30-34.

[304] DLM – 0033110-40.

[305] Dkt. 67-2, p. 11 ¶ 2.

[306] DLM – 0000130-33.

[307] *See generally* DLM – 0032945-3089.

[308] DLM – 109688-722.

[309] 9 Fletcher Cyc. Corp. § 4223.50 (Westlaw 2018) (Footnotes omitted).

7.     A corporation's articles of incorporation are in effect the constitution of the corporation and must be complied with by the corporation and its directors, officers and shareholders.[310]

8.     Under Idaho law, "All corporate powers shall be exercised by or under the authority of…its board of directors, *subject to any limitation set forth in the articles of incorporation*."[311]

9.     Under Idaho law, "*The articles of incorporation may set forth*…Provisions not inconsistent with the law regarding…Managing the business and regulating the affairs of the corporation…Defining, *limiting and regulating the powers of the corporation, its board of directors, and shareholders*…"[312]

10.     Under Idaho law, "Every corporation incorporated under this chapter has the purpose of engaging in any lawful business *unless a more limited purpose is set forth in the articles of incorporation*."[313]

11.     Under Idaho law, "*Unless its articles of incorporation provide otherwise*, every corporation…has the same powers as an individual to do all things necessary…to make contracts and guarantees…"[314]

12.     "*The bylaws of a corporation may contain any provision for managing the business and regulating the affairs of the corporation* that is not inconsistent with law or the articles of incorporation."[315]

13.     "Actions taken in violation of a corporation's bylaws are void."[316] "A bylaw may expressly authorize contracts between officers and their corporations.

---

[310] *Hill v. Small*, 228 Ga. 31, 32, 183 S.E.2d 752, 753 (Ga. 1971) ("'A corporation has only the power conferred upon it by its charter…[t]he charter of a corporation is in effect its constitution. Its powers in its control by stockholders and management by its officers are to be found in its charter. Its grants of power and exemptions must be strictly construed…'"). *Cf. Kemmer v. Newman*, 161 Idaho 463, 466, 387 P.3d 131, 134 (2016).
[311] I.C. § 30-1-801(2) (1997) (Emphasis supplied); I.C. § 30-29-801(2) (2015).
[312] I.C. § 30-1-202(2)(b)(ii)-(iii) (1997) (Emphasis supplied); I.C. § 30-29-202(2)(b)(ii)-(iii) (2015).
[313] I.C. § 30-1-301(1) (1997) (Emphasis supplied); I.C. § 30-29-301(1) (2015).
[314] I.C. § 30-1-302(7) (1997) (Emphasis supplied); I.C. § 30-29-302(7) (2015).
[315] I.C. § 30-1-206(2) (1997) (Emphasis supplied); I.C. § 30-29-206(2) (2015).
[316] *Kemmer v. Newman*, 161 Idaho 463, 466, 387 P.3d 131, 134 (2016).

Such bylaw provisions, however, do not foreclose a court from scrutinizing such contracts concerning their fairness."[317]

14.     "An ultra vires act is an act that is '[u]nauthorized; beyond the scope of power allowed or granted by a corporate charter or by law.'"[318]

15.     Miesen is challenging the AIA Corporations' power to act, which is authorized:

> (a) In a proceeding by a shareholder against the corporation to enjoin the act;
> (b) In a proceeding by the corporation, directly, derivatively or through a receiver, trustee or other legal representative, against an incumbent or former director, officer, employee or agent of the corporation; or
> (c) In a proceeding by the attorney general under section 30-1-1430, Idaho Code.
> (3) In a shareholder's proceeding under subsection (2)(a) of this section to enjoin an unauthorized corporate act, the court may enjoin or set aside the act, if equitable and if all affected persons are parties to the proceeding, and may award damages for loss, other than anticipated profits, suffered by the corporation or another party because of enjoining the unauthorized act.[319]

16.     The AIA Corporations' articles of incorporation and bylaws are construed under contract principles.[320] "The objective in interpreting contracts is to ascertain and give effect to the intent of the parties…The intent of the parties should, if possible, be ascertained from the language of the documents."[321]

17.     If there is a conflict between the AIA Corporations' articles of incorporation (including the duly authorized subsequent amendments and restatements thereto) and their bylaws (including the duly authorized subsequent amendments and restatements thereto) during the applicable time periods at issue in

---

[317] 3 Fletcher Cyc. Corp. § 915.30 (Westlaw 2018) (footnotes omitted).

[318] *Taylor v. Taylor*, 163 Idaho 910, 918, 422 P.3d 1116, 1124 (2018) (citations omitted).

[319] I.C. § 30-1-304(2)-(3) (1997); I.C. § 30-29-304(2)-(3) (2015).

[320] *Twin Lakes Village Property Ass'n, Inc. v. Crowley*, 124 Idaho 132, 135, 857 P.2d 611, 614 (1993) ("Because corporate documents are equivalent to contracts among the members of the association, the normal rules governing the interpretation of contracts apply.") (citations omitted).

[321] *Twin Lakes Village Property Ass'n, Inc. v. Crowley*, 124 Idaho 132, 135, 857 P.2d 611, 614 (1993) (citations omitted).

Exhibit - 1, p. 104

11-ER-2521

this Report, the articles of incorporation (including the duly authorized subsequent amendments and restatements thereto) control or the applicable bylaw provision is void.[322]

18.     If there are any conflicts between the AIA Corporations' articles of incorporation (including the duly authorized subsequent amendments and restatements thereto) or bylaws (including the duly authorized subsequent amendments and restatements thereto) and any applicable Idaho Code sections during the applicable time periods at issue in this Report, the applicable Idaho Code section controls.[323]

19.     Moreover, the restrictions under AIA Services' Amended Articles of Incorporation cannot be waived and any violation may be subsequently challenged at any time, including involving a series of transactions dating back nearly two decades, as recently confirmed by the Idaho Supreme Court in *Donna Taylor v. Taylor* on July 27, 2018.[324] In that case, the Controlling AIA Defendants (John Taylor, Beck, Cashman, Henderson) and AIA Services challenged Donna Taylor's 1995 Letter Agreements and the 1996 Series A Preferred Shareholder Agreement, and the Court held that the 1996 Series A Preferred Shareholder Agreement was illegal and unenforceable and that the 1995 Letter Agreements were ultra vires because they provided that Donna Taylor would be paid a higher interest rate and shorter amortization period than those reflected in AIA Services' Amended Articles of Incorporation (although the Court enforced the 1995 Letter Agreements because AIA Services obtained a benefit, unlike any of the acts, transactions, agreements, loans or guarantees addressed in this Report). In that case, the Court also noted that

---

[322] I.C. § 30-1-27 (1995); I.C. § 30-1-206(2) (1997); I.C. § 30-29-206(2) (2015); *Primate and Bishops' Synod of Russian Orthodox Church Outside Russia v. Russian Orthodox Church of Holy Resurrection, Inc.*, 35 Mass. App. Ct. 194, 200, 617 N.E.2d 1031, 1035 (1993), *judgment aff'd*, 418 Mass. 1001, 636 N.E.2d 211 (1994); *Sabre Farms, Inc. v. Jordan*, 78 Or.App. 323, 331, 717 P.2d 156, 161 (Or. App. 1986) ("A bylaw of a corporation may not conflict with the articles of incorporation and, if a conflict exists, the bylaw is void.") (opinion supplemented on the issue of the award of attorneys' fees (citation omitted)).

[323] I.C. § 30-1-27 (1995); I.C. § 30-1-54(h) (1995); I.C. § 30-1-202(2)(b) (1997); I.C. § 30-1-206(2) (1997); I.C. § 30-29-202(b)(2) (2015); I.C. § 30-29-206(2) (2015); *Baldwin County Elec. Membership Corp. v. Lee*, 804 So. 2d 1087, 1090 (Ala. 2001) ("Thus, where the articles of incorporation or the bylaws conflict with the statute, the statute controls.") (citations omitted); *State ex rel McElhinney v. All-Iowa Agricultural Ass'n*, 242 Iowa 860, 865, 48 N.W.2d 281, 284 (Iowa 1951) ("Articles of incorporation may not clothe the society with powers not authorized by law. In case of conflict in this regard between the statute and the articles the statute governs.") (citations omitted); 18 Am. Jur. 2d Corporations § 16 (Westlaw 2019).

[324] *Taylor v. Taylor*, 163 Idaho 910, 422 P.3d 1116 (2018).

Exhibit - 1, p. 105

11-ER-2522

Donna Taylor's permission had actually been requested, and obtained, to violate the restrictions under AIA Services' Amended Articles of Incorporation as provided in Section 4.2.12 to effectuate the revised terms of her redemption; however, the Court ruled that AIA Services' shareholders were also required to approve of the transactions and that Donna Taylor's consent was not sufficient and AIA Services' Amended Articles of Incorporation had not been amended to authorize the higher interest rate and shorter amortization period.[325] With respect to the acts, transactions, guarantees, agreements, loans, or other matters discussed below in this Report which form the basis for Miesen's claims and damages based on failing to comply with and thus violating AIA Services' Amended Articles of Incorporation, Donna Taylor's consent was never sought or obtained nor did AIA Services' shareholders approve of them through a proper shareholder vote.

**C.   1987-1994 – The Restructuring of the AIA Corporations in Connection with Reed and Donna Taylor's Divorce and the Restrictions Under Idaho Law and the AIA Corporations' Articles of Incorporation and Bylaws.**

1.      On December 14, 1987, Reed Taylor and Donna Taylor entered into a Property Settlement Agreement.[326] Reed Taylor was represented by attorneys from Eberle Berlin, including Riley (who signed the Stipulation and Order and the Consent Judgment and Decree of Divorce).[327] Under the terms of the Property Settlement Agreement, Reed Taylor and Donna Taylor agreed to contribute their significant ownership interests in various entities, including their 97% ownership of AIA Insurance (their children owned the remaining 3%), in exchange for the issuance of 200,000 Series A Preferred Shares to Donna Taylor and the issuance of 39,000 common shares in AIA Services to Reed Taylor.[328]

2.      The Property Settlement Agreement also provided that AIA Services would amend its articles of incorporation to include provisions and restrictions pertaining to the Series A Preferred Shares.[329] Riley was involved in preparing the

---

[325] These are yet additional examples of Riley's countless breaches of his duties of care owed to the AIA Corporations because he was the attorney representing AIA Services for the Donna Taylor transactions in 1995 and 1996 thereby being one of the proximate causes of AIA Services to expend significant sums of money litigating with Donna Taylor over the issues.

[326] Dkt. 67-1.

[327] Dkt. 67-2, pp. 1, 5-6 & 9.

[328] Dkt. 67-1, pp. 3, 30-34.

[329] *See generally* Dkt. 67-1.

Exhibit - 1, p. 106

11-ER-2523

amended articles of incorporation.[330] As a result, Riley was acutely aware of the many restrictions under Article Fourth of the amended articles of incorporation, which included restrictions prohibiting the AIA Corporations from guaranteeing loans, becoming obligated for the debts of others, pledging assets, engaging in conflict of interest transactions with insiders and affiliates, and breaching certain financial covenants regarding net worth and long term debt.[331] One of the critical provisions is the Guarantee Prohibition (which remains in place to this day and has been intentionally violated and/or disregarded by GemCap, the Controlling AIA Defendants and the Hawley Troxell Defendants):

> [AIA Services] will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume, guaranty or otherwise become or remain directly liable with respect to, any Indebtedness, except…[listing a number of exceptions which do not apply to any of the guarantees or material Indebtedness at issue in this Lawsuit].[332]

3.      The above quoted provision in AIA Services' Amended Articles of Incorporation[333] prohibited the AIA Corporations from: (a) entering into the GemCap Settlement Agreement, guaranteeing the GemCap Loan, or entering to AIA Services' Limited Guarantee of the GemCap Loan and the AIA Corporations' Amended Guarantee of the GemCap Loan; (b) guaranteeing the Lancelot Loan or entering into AIA Insurance's Guarantee of the Lancelot Loan; (c) guaranteeing any other debts or obligations of CropUSA (including the payment of attorneys' fees to Hawley Troxell); (d) guaranteeing, advancing or paying any attorneys' fees and costs to any of the Controlling AIA Defendants; and (e) guaranteeing or incurring any other Indebtedness for any Person or corporation not a Subsidiary of AIA Services. The above referenced transactions were ultra vires and/or intra vires but never properly authorized, and Donna Taylor was never asked to consent to any of the transactions nor did she (other than for the redemption of Reed Taylor's shares in 1995).

4.      In addition to numerous financial restrictions that prohibited the AIA Corporations from engaging in certain transactions, AIA Services' amended articles of incorporation also contain a prohibition on conflict of interest transactions (which remains in place to this day and have been intentionally violated and/or

---

[330] 7/1/2019 Riley Depo. Transcript, p. 41.
[331] DLM – 0032952-58.
[332] DLM – 0032953-55 § 4.2.9(c).
[333] DLM – 0033053 § 4.2.9(c).

Page - 98

Exhibit - 1, p. 107

11-ER-2524

disregarded by GemCap, the Controlling AIA Defendants and the Hawley Troxell Defendants):

> (g) Transactions with Shareholders and Affiliates. The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease, loan or exchange of any properly or the rendering of any service) with any director or officer or any holder of equity securities of the corporation, or with any Affiliate of the corporation or of such director, officer or holder, on terms that are less favorable to the corporation or that Subsidiary, as the case may be, than those which might be obtained at the time from Persons who are not such a director, officer, holder or Affiliate; provided that the foregoing restriction shall not apply to…[listing a number of exceptions that do not apply here].[334]

5.      Based on the Controlling AIA Defendants and Freeman's conflicts of interest, the above quoted provision in AIA Services' Amended Articles of Incorporation[335] prohibited the AIA Corporations from: (a) entering into the GemCap Settlement Agreement, guaranteeing the GemCap Loan, or entering to AIA Services' Limited Guarantee of the GemCap Loan and the AIA Corporations' Amended Guarantee of the GemCap Loan; (b) guaranteeing the Lancelot Loan or entering into AIA Insurance's Guarantee of the Lancelot Loan; (c) guaranteeing any other debts or obligations for CropUSA (including the payment of attorneys' fees to Hawley Troxell); (d) guaranteeing, advancing or paying any attorneys' fees and costs to any of the Controlling AIA Defendants; (e) guaranteeing or incurring any other Indebtedness for any Person or corporation not a Subsidiary of AIA Services; (f) entering into any representation agreements, engagement letters, conflict waivers, joint defense agreements or any other agreement with Hawley Troxell or any other law firm; and (g) entering into any agreements with CropUSA, including any Management Agreements, Master Marketing Agreement, Administrative Agreements or any other agreement. The above referenced transactions were ultra vires and/or intra vires but never properly authorized, and Donna Taylor was never asked to consent to any of the transactions nor did she (other than for the redemption of Reed Taylor's shares in 1995).

---

[334] DLM – 0032955 § 4.2.9(c).

[335] DLM – 0033056 § 4.2.9(g).

Page - 99

Exhibit - 1, p. 108

11-ER-2525

6.      On January 5, 1988, the Certificates of Exchange for both AIA Services and AIA Insurance were filed with the Idaho Secretary of State in connection with Reed Taylor and Donna Taylor's divorce.[336] If an attorney reviewed AIA Insurance's articles of exchange prior to a transaction (which any prudent attorney would do),[337] those filings would provide notice to any prudent attorney to review the articles of incorporation and all amendments thereto for AIA Insurance's parent corporation AIA Services. In other words, Attorney Collins of Hawley Troxell or any other attorney (including Riley) should have been able to readily determine that AIA Insurance was also governed and restricted by the amended articles of incorporation of AIA Services.

7.      Upon the finalization of Reed Taylor and Donna Taylor's divorce, Donna Taylor was issued 200,000 Series A Preferred Shares and she was the sole legal Series A Preferred Shareholder from that time to the present time (John Taylor would later improperly issue Series A Preferred Shares to himself acting on both sides of the transaction, which was a classic conflict of interest and violation of the conflict of interest provisions in AIA Services' Amended Articles of Incorporation and AIA Services New Restated Bylaws).[338]

On January 5, 1988, the board of directors of AIA Insurance (f/k/a AIA, Inc.) adopted AIA Insurance's Bylaws.[339] AIA Insurance's Bylaws remain applicable to this day (John Taylor's alleged 2016 amendment to include a provision requiring a derivative plaintiff to pay fees and costs if not substantially successful was never properly authorized or adopted and John Taylor was, once again, on both sides of the transaction).[340] However, even if those amendments were authorized, the other applicable provisions (including regarding conflicts of interest) remained applicable. As noted above, AIA Insurance's Bylaws cannot be violated and any contract entered into in violation of them is void. In this Lawsuit, all of the agreements

---

[336] DLM – 0032962-76, 0033111-18.

[337] Riley testified that, in preparing the Lancelot Loan Opinion, Patrick Collins obtained only the then current articles of AIA Insurance and not the entire filing history, 3/3/2020 Riley Depo. Transcript, p. 588, which Riley erroneously referred to as "standard practice." *Id.* That is what led to the Reed Taylor stock redemption agreement Legal Opinion fiasco. *See* Section XII.

[338] *E.g.*, AIA0002043; AIA0024874.

[339] *RJT-AIA 1057-79.*

[340] AIAPROD00307942-61. John Taylor admitted that the purpose of his purported amendment was to protect *himself* as an "innocent shareholder." 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 221-22.

Exhibit - 1, p. 109

11-ER-2526

between AIA Insurance and the Hawley Troxell (including all engagement letters and conflict waivers), GemCap, CropUSA, John Taylor and/or the Controlling AIA Defendants are void for violating the conflict of interest provision (Section 4.14) in AIA Insurance's Bylaws.

8.      Effective April 10, 1989 and ratified at the board meeting held on May 5, 1989,[341] AIA Services' New Restated Bylaws were adopted and approved.[342] Other than some minor subsequent amendments and John Taylor's unauthorized attempt to amend the Restated Bylaws effective May 26, 2016 (discussed later in this Report), AIA Services' New Restated Bylaws remain applicable to this day (John Taylor's alleged 2016 amendment to include a provision requiring a derivative plaintiff to pay fees and costs if not substantially successful was never properly authorized or adopted and John Taylor was, once again, on both sides of the transaction).[343] However, even if those amendments were authorized, the other applicable provisions (including regarding conflicts of interest) remained applicable. As noted above, AIA Services' New Restated Bylaws cannot be violated and any contract entered into in violation of them is void. In this Lawsuit, all of the agreements between AIA Services and the Hawley Troxell (including all engagement letters and conflict waivers), GemCap, CropUSA, John Taylor and/or the Controlling AIA Defendants are void for violating the conflict of interest provision (Section 4.14) in AIA Services' Bylaws.

9.      On December 2, 1993, Donna Taylor exercised her right of the mandatory redemption of her 200,000 Series A Preferred Shares.[344] AIA Services elected to redeem Donna Taylor's Series A Preferred Shares by making payments over a fifteen year amortization schedule, plus interest at 1-1/2% below the First Interstate Bank of Idaho, N.A. prime rate (adjusted quarterly), as authorized under the amended articles of incorporation then in effect for AIA Services.[345] AIA Services began redeeming Donna Taylor's Series A Preferred Shares.[346]

---

[341] AIA0002563.

[342] AIA0002563-85.

[343] AIAPROD00308828-52.

[344] RJT – 002209.

[345] DLM – 0032950-52; RJT – 002209.

[346] RJT – 002209.

Exhibit - 1, p. 110

11-ER-2527

D.  **1995-1997 – The Illegal Stock Redemption Transaction Involving Reed Taylor and the Ultra Vires Transaction Involving Donna Taylor—and Riley's Involvement in the Illegal and Ultra Vires Acts.**

1.      In late 1994 and early 1995, John Taylor and certain other investors desired to have AIA Services redeem Reed Taylor's majority ownership interest in the common shares of AIA Services in order to obtain control over AIA Services and to try to take the company public.[347]

2.      In connection with the redemption of Reed Taylor's shares, AIA Services entered into the 1995 Letter Agreements with Donna Taylor because it needed to obtain consent from Donna Taylor because the transaction would violate numerous provisions of AIA Services' Amended Articles of Incorporation (and two of those Letter Agreements were signed by Riley, who was representing AIA Services, which confirms again his knowledge of the restrictions).[348] The 1995 Letter Agreements were ultra vires the moment they were signed because Riley failed to amend the articles of incorporation to reflect the new redemption terms, but the Idaho Supreme Court nevertheless later enforced the 1995 Letter Agreements.[349] John Taylor, an attorney, was on the boards of the AIA Corporations at the time of this ultra vires transaction.

3.      On June 1, 1995, AIA Services completed its Private Placement Memorandum in connection with raising the funds to redeem Reed Taylor's shares.[350] The PPM confirmed, *inter alia*, that AIA Services was "an insurance holding company," its subsidiaries had a "total career agency force of over 300 licensed agents as to December 1, 1994," its principal business is marking insurance products and services to a captive market of over 450,000 ranchers and farmers, many of whom are member of the agricultural associations ('Associations')," its "current products include group health and life insurance, individual life insurance, long term care insurance and college funding programs," it "has established relationships with over 30 state and regional Associations including the National Association of Wheat Growers ('NAWG'), American Soybean Association ('ASA') and the National Contract Poultry Growers Association," and [d]uring 1994, approximately 17,000 Association members participated in group health programs

---

[347] Dkt. 390-10, p. 1; AIAPROD00172379; 1/29/2008 John Taylor Depo. Transcript, p. 399.
[348] DLM – 0003457-70.
[349] *Taylor v. Taylor*, 163 Idaho 910, 422 P.3d 1116 (2018).
[350] AIA0002297-341.

Exhibit - 1, p. 111

11-ER-2528

either marketed and/or administered by the Company."[351] The PPM also noted how AIA Services' "revenues are materially dependent upon AIA Insurance as the agent and administrator of several trusts including the Grain Growers, Soybean Growers and Poultry Growers Trusts."[352] This is precisely why later CropUSA needed access to the AIA Corporations' relationships with the associations and their trade secrets involving the personal information collected for years on the same farmers and ranchers that had been purchasing insurance products from AIA Services' subsidiaries for years, which could be utilized to market and sell crop insurance.

4.      On June 30, 1995, Beck, Cashman, and Campanaro entered into an Investment Agreement and related agreements with AIA Services pertaining to their desire to purchase Series C Preferred Shares in AIA Services, which was signed by John Taylor on behalf of AIA Services.[353] In addition, John Taylor, Beck, Cashman and Campanaro entered into a Voting Agreement to ensure that they remained on the board of AIA Services and in control of the company.[354] As a condition of their obligation to close their investment in Series C Shares, Beck, Cashman and Campanaro had the right to approve the terms of Reed Taylor's redemption and obtain Donna Taylor's consent for the transaction (as required by AIA Services' amended articles of incorporation) in the form and substance acceptable to them.[355] Beck and Cashman were also required to guarantee a $1,000,000 loan for AIA Services, but they never did.[356]

5.      In connection with the transaction to redeem Reed Taylor's shares, AIA Services' articles of incorporation were amended and restated twice on April 11, 1995 and August 3, 1995, respectively.[357] The restrictions regarding the Series A Preferred Shares remained substantively unchanged (Article Fourth was renumbered in the April 11, 1995 amendments). Riley was involved in preparing both amendments.[358]

6.      Riley represented the AIA Corporations and the transaction was illegal the moment the ink was dried, as would later be confirmed by Judge Brudie and the

---

[351] AIA0002302; *see also* AIA0002317-19.
[352] AIA0002309.
[353] RJT – 024582-686.
[354] RJT – 024683-86.
[355] RJT – 024591.
[356] RJT – 024585.
[357] DLM – 0033011-48.
[358] 7/1/2019 Riley Depo. Transcript, pp. 77-78; DLM – 0033011-48.

Exhibit - 1, p. 112

11-ER-2529

Idaho Supreme Court.[359] John Taylor, an attorney, was on the boards of the AIA Corporations at the time of this illegal transaction.

7.      On August 1, 1995 (in connection with the redemption of Reed Taylor's shares), John Taylor entered into an Executive Officer's Agreement with AIA Services, which contained provisions prohibiting him from competing against the AIA Corporations or soliciting their employees.[360] The Agreement was signed by John Taylor for himself and for AIA Services.[361] His compensation was set for the first three years but was required to be revisited and determined by the board of directors after that initial period. I have seen no board meeting minutes or resolutions setting or approving John Taylor's annual salary since that time. Yet, John Taylor has paid himself salary or other compensation of at least $3,043,705.45 since 1999 (this excludes the amounts allegedly owed for the accrual of his salary and the additional compensation that he received from CropUSA).[362] In all of the thousands of pages of documents and thousands of pages of deposition transcripts that I have reviewed, I have not found any evidence that supports paying John Taylor any compensation for his alleged work. The only material instance that I have found where John Taylor could arguably have proceeded in the best interests of the AIA Corporations was when he asserted the illegality defense in *Reed Taylor v. AIA Services*. However, in my opinion, he asserted that defense for his own self-interests to avoid personal liability to Reed Taylor for the various tort claims asserted against him and not for the best interests of the AIA Corporations or their shareholders. In my opinion, based on John Taylor's conduct described in this Report (e.g., numerous self-interested transactions, working and competing through CropUSA and other entities and other intentional breaches of the duties of loyalty), John Taylor should not have received any compensation from the AIA Corporations.[363] The same holds true for the compensation paid for certain management and/or officers[364] of the AIA Corporations who were also being paid as management and/or officers because they were competing against the AIA Corporations thereby breaching their duties of loyalty,[365] which the Controlling AIA Defendants improperly allowed or approved.

---

[359] *Taylor v. AIA Services Corp.*, 151 Idaho 552, 261 P.3d 829 (2011).

[360] Dkt. 390-10.

[361] Dkt. 390-10, p. 9.

[362] *See* Damage Item Number 18 in the attached Exhibit A hereto.

[363] "[U]nder Idaho law the general rule is that an agent who breaches his fiduciary duties forfeits his entire compensation." *Rockefeller v. Grabow*, 136 Idaho 637, 643, 39 P.3d 577, 583 (2001).

[364] As discussed in this Report, Duclos also served as a director of the AIA Corporations for a number of years.

[365] *See* Damage Item Number 35 in the attached Exhibit A hereto.

Exhibit - 1, p. 113

11-ER-2530

8.      In connection with the closing of the redemption of Reed Taylor's shares, Mr. Riley and his former law firm Eberle Berlin prepared and delivered a Legal Opinion to Reed Taylor, which opined as to a number of issues (including Reed Taylor's right to enforce his contractual rights as a creditor).[366] The Legal Opinion acknowledged that Eberle Berlin, Riley and Attorney Turnbow had "acted as general counsel for [AIA Services]".[367] Based on the evidence that I have seen, Riley acted as general counsel for AIA Services and AIA Insurance when he was employed by Eberle Berlin,[368] and he and Hawley Troxell subsequently acted as general counsel for the AIA Corporations and CropUSA for many years (as confirmed by John Taylor and as discussed below).

9.      John Taylor's Executive Officer's Agreement confirms that "AIA proposes to purchase the Common Stock of Reed J. Taylor, majority shareholder of AIA, so that [John Taylor] and Richard W. Campanaro, will obtain operational and financial control of AIA."[369] Based on the information that I have reviewed to date, there is no doubt that, from 1995 through the present time, John Taylor exerted that "operational and financial control" over AIA Services. Finally, John Taylor's Executive Officer's Agreement granted him the right to purchase 475,000 common shares in AIA Services for "$.01 per share at any time during the ten year period following the effective date."[370]

10.      John Taylor's Executive Officer's Agreement was drafted by Riley.[371] As a result, Riley can hardly deny that he did had knowledge of the terms and restrictions under that Agreement, including the non-compete and non-solicitation provisions that prohibited John Taylor from competing against the AIA Corporations through CropUSA or any other entity selling insurance products such as Pacific Empire Holdings.

---

[366] RJT – 089249-63.

[367] RJT – 089249.

[368] In his March 3, 2020 deposition, in response to a question that "there is no dispute that you and other attorneys at Eberle Berlin were general counsel for AIA Services and its subsidiaries in 1995 and 1996," Riley finally answered "I would consider that we were general counsel." 3/3/2020 Riley Depo. Transcript, p. 320. Riley also acknowledged that he had "several engagement letters [for AIA Services] that were dated March 1, 1999, the date he joined Hawley Troxell. *Id.* at 322.

[369] Dkt. 390-10, p. 1.

[370] Dkt. 390-10, p. 7.

[371] Dkt. 390-1, p. 7-8 § 16.

Exhibit - 1, p. 114

11-ER-2531

11.     John Taylor has intentionally violated the non-compete and non-solicitation provisions in his Executive Officer's Agreement, and the common law obligations to not compete against his employer, by competing against the AIA Corporations and transferring their employees to CropUSA.

12.     Through the present time, there are no board meeting minutes or resolutions showing that John Taylor's salary was ever approved after the first three-year term.

13.     On August 16, 1995, in connection with their right to approve the terms of the redemption of Reed Taylor's shares as a condition of investing and the revised terms of Donna Taylor's redemption, Beck, Cashman and Campanaro closed the purchase of $1,500,000 Series C Preferred Shares by purchasing 33,333, 66,667 and 50,000 shares, respectively.[372] Campanaro's 50,000 Series C Shares were purchased with a loan from Beck and Cashman, and those shares were subsequently transferred to Beck and Cashman after Campanaro was fired in 1996. Cashman also purchased 15,000 additional Series C Preferred Shares later that year as did certain other individuals associated with them to reach a grand total among them of 200,000 Series C Preferred Shares (each had a face value of $10, with a mandatory cumulative dividend of 2.5% per quarter).[373] John Taylor, Beck and Cashman would maintain control of the AIA Corporations ever since (with the former having the most control). It was no coincidence that Beck and Cashman were involved in, and approved, the plan to make CropUSA an independent company—they were part of the control group—as evidenced by their participation in advisory board and management decisions for CropUSA and the AIA Corporations as demonstrated by the many communications and documents, some of which are cited and/or discussed in this Report. While Beck, Cashman and certain other Series C Shareholders were later issued common shares in AIA Services, those shares were issued without them ever paying the required option price.[374]

14.     On November 17, 1995, AIA Services held a board meeting, which approved, *inter alia*, an amendment to AIA Services' New Restated Bylaws:

> The Bylaws of the corporation regarding dates for shareholder and director meetings were reviewed. **Upon proper motion and second,**

---

[372] AIA0018493.

[373] AIA0018493.

[374] AIA0023951 (the ledger notes that there are receivables for the purchase price of the shares).

Exhibit - 1, p. 115

11-ER-2532

**the board approved amendment of the bylaws to eliminate the scheduled meeting date and change the language to make the dates more discretionary.** It was noted that no more than 18 months could transpire between annual meetings.

The board members concurred that it would be helpful if meeting dates were established further in advance.[375]

15.     Despite the requirement to hold *annual* shareholder meetings for AIA Services every year and that in no event may more than eighteen months transpire between annual shareholder meetings, John Taylor and the other Controlling AIA Defendants (with the assistance of the Hawley Troxell Defendants during relevant times) has held only one *special* shareholder meeting (which was a purported attempt to authorize AIA Services to pay the legal fees for certain of the Controlling AIA Defendants) and one annual shareholder meeting in over fifteen years.[376] The last "*annua*l" shareholder meeting was purportedly conducted in connection with the failed reverse stock split in 2012.

16.     On May 8, 1996, AIA Services amended its articles of incorporation to include changes regarding the Series C Shares.[377] The restrictions for the Series A Shares remained unchanged. The May 8, 1996 amended and restated articles of incorporation remained unchanged after this date and are referred to in this Report as AIA Services' Amended Articles of Incorporation.[378] Once again, Riley was involved in preparing these amendments.[379] It is simply impossible to believe that Riley could not remember the restrictions contained with AIA Services' Amended Articles of Incorporation that also applied to its wholly owned subsidiary AIA Insurance.

---

[375] AIA0025533 (Emphasis in original).

[376] As AIA Services' designee, John Taylor, acknowledged that the annual meeting requirement "was not complied with by the corporation." 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 241.

[377] DLM – 0033049-65.

[378] *See* Section IX(C), which defines "AIA Services' Amended Articles of Incorporation". These are the articles that apply from this date through the present time (though none of the restrictions under Section 4.2.9 were changed).

[379] 7/1/2019 Riley Depo. Transcript, pp. 77-78.

Exhibit - 1, p. 116

11-ER-2533

**E.** **1998-2003 – The Idea for Crop Insurance Is Born at the AIA Corporations and then Later Stolen by the Controlling AIA Defendants.**

1. On April 30, 1998, AIA Services' board of directors held a board meeting wherein, *inter alia*, a "crop/hail [insurance] program was discussed."[380]

2. On November 19, 1999, AIA Crop Insurance, Inc. (CropUSA) was incorporated with the Idaho Secretary of State.[381] The filing listed John Taylor, Duclos and Paul Schrette as being the initial directors.[382]

3. According to the annual report filed with the Idaho Secretary of State dated November 24, 1999, John Taylor, Duclos, Bruce Sweeney, Cashman, Beck, David Larson and Reed Taylor were listed as being directors of AIA Services.[383] The annual report for AIA Insurance dated November 24, 1999 stated that John Taylor, Duclos, and Paul Schrette were directors.[384] Because Mr. Schrette was a director for both AIA Insurance and CropUSA during relevant times, he would not have qualified as an independent director for purposes of approving any conflicts of interest or transactions. Because Reed Taylor and John Taylor have both testified that Reed Taylor never consented to the ownership change to CropUSA, there can be no argument that Reed Taylor approved the transactions as an independent director. For these same reasons, Reed Taylor cannot be said to have been involved in the plan to take CropUSA from AIA Services because he never would agree to the plan. The obvious reason that the Controlling AIA Defendants were seeking Reed Taylor's consent was because AIA Insurance and all of the commissions and related receivables, among other things, were pledged to him as security for his redemption obligations and CropUSA was an asset of the AIA Corporations.[385]

4. As of December 31, 1999, AIA Services' Audited Consolidated Financial Statements indicated that it had total assets of $4,104,033, total liabilities of $10,160,890 ($3,640,399 in liabilities excluding Reed Taylor's illegal debt), total revenues of $6,347,276, a net loss of $798,799 (which includes the significant interest paid to Reed Taylor that year), and owed $986,598 to Donna Taylor for her

---

[380] Dkt. 278-14, p. 3.
[381] DLM – 0033170-72.
[382] DLM – 0033171.
[383] DLM – 0033069.
[384] DLM – 0033145.
[385] RJT – 089290-363.

**Exhibit - 1, p. 117**

**11-ER-2534**

Series A Preferred Shares.[386]As of December 31, 1999, AIA Insurance's Audited Financial Statements indicated that it had total assets of $5,395,472, total liabilities of $3,258,805, total revenues of $6,341,499 and a net loss of $5,061.[387] No financial statements have been produced for CropUSA for 1999 and it had no revenues for 1999.

5.   On January 11, 2000, AIA Crop Insurance, Inc. (CropUSA) purportedly held its first meeting of shareholders where the minutes state, *inter alia*, "John Taylor represents 1,000 shares of the stock of the corporation."[388] A board meeting was purportedly held that same day wherein John Taylor, Duclos and Schrette were appointed as directors and John Taylor, Duclos, Jay Taylor and Schrette were purportedly appointed as officers.[389]

6.   On April 4, 2000, BDO Seidman issued its last auditor's report for AIA Services' consolidated financial statements for the year ending on December 31, 1999, and they were the last financial statements of AIA Services to be audited.[390] The auditors confirmed that "[a]s discussed in Note 1 to the consolidated financial statements, the Company discontinued its insurance operations effective October 1, 1995 and effective December 4, 1998, all assets and liabilities were placed into a liquidating trust under the control of the Department of Insurance of the State of Idaho."[391] The notes to the financial statements explained how "[t]he insurance underwriting operations are contained within the Company's wholly-owned subsidiary, The Universe Life Insurance Company (Universe) and Universe's wholly-owned subsidiary, Great Fidelity Life Insurance Company (Great Fidelity). Effective October 1, 1995, the Company adopted a plan of disposable of its insurance underwriting operations. (See Note 1 for further discussion.)."[392] Note 1 explained "The Liquidation Order also fixes the rights and liabilities of creditors, policyholders, shareholders and all other persons interested in Universe as of December 4, 1998. Accordingly, the assets and liabilities of Universe are no longer included with the consolidated financial statements of [AIA] Services at December 31, 1998."[393] These notes are consistent with the Order

---

[386] AIA002874979.

[387] AIA000329-45.

[388] Dkt. 1-2.

[389] Dkt. 1-3, p. 1.

[390] AIA0028749-79.

[391] AIA0028751.

[392] AIA0028758.

[393] AIA0028763-64.

Exhibit - 1, p. 118

11-ER-2535

Granting Petition for Rehabilitation previously entered on December 4, 1998,[394] which provided in pertinent part that "all of Universe's assets and liabilities are transferred to the liquidating trust"[395]. . . [and] [t]hat all the rights liabilities of Universe and of its creditors, shareholders, and all other persons interested in Universe's estate become fixed as of the date of entry of the Order…"[396] In other words, contrary to John Taylor's recent testimony that CropUSA could not be a subsidiary of the AIA Corporations based on alleged potential liability from the Universe and the liquidation proceedings, AIA Services' liability as the shareholder of the Universe was fixed and eliminated by the liquidation proceedings and there was no potential liability other than litigation expenses involving claims for the trusts or litigation subsequently filed by the liquidator against the AIA Corporations for allegedly failing to comply with the lease agreement with Washington Bank Properties. In fact, AIA Insurance helped obtain a $2,400,000 settlement for policyholders in 2008 (which included the $800,000 fee that AIA Insurance obtained for assisting in prosecuting the claims)[397] and also obtained the ownership of the mortgage for the sale of AIA Services' former headquarters through a settlement in 2007.[398] Consequently, the AIA Corporations benefited from the liquidation and there is no evidence of any potential liability other than those described above. Indeed, the two settlements obtained may very well be the only benefit that John Taylor or the other Controlling AIA Defendants obtained for the AIA Corporations; however, they improperly used and transferred the net proceeds from both settlements as stated in this Report.[399]

7.      On September 28, 2000, AIA Services' board of directors held a meeting wherein, *inter alia*, "Reed Taylor explained the joint effort we are discussing with the Texas Peanut Growers Association to sell crop insurance," there was a discussion of creating a new company for the purpose of selling crop insurance and a committee was established to explore the issue (which was comprised of Reed Taylor, Beck and Bruce Sweeney).[400] There are numerous purported minutes of advisory board/committee of CropUSA held for many years in the record, and the board membership changed as well; they also discussed matters

---

[394] AIAPROD00052468-85.

[395] AIAPROD00052470.

[396] AIAPROD00052480.

[397] AIAPROD00301923-2061.

[398] AIA0027144-88.

[399] Certain attorneys' fees and costs were paid.

[400] Dkt. 278-19, pp. 3-4.

Exhibit - 1, p. 119

11-ER-2536

involving the AIA Corporations (the Controlling AIA Defendants also allege that Reed Taylor was involved in their plan by relying on these minutes).[401]

8.      On October 6, 2000, one of the so-called advisory board meetings was held at which the parties discussed creating a new company[402] and "[t]transferring things between AIA and newco will be a little tricky because there is a 'change of control' issue that has to be resolved."[403] John Taylor, Duclos, Beck, Reed Taylor other AIA persons were noted to be present. As discussed below, a new company was never formed. These "advisory board" meeting minutes, like others, provide information on some but not all of the decisions made regarding CropUSA (Beck, Cashman and Duclos were later issued additional common shares in CropUSA for serving on this "advisory board").

9.      On November 2, 2000, Growers National was incorporated as an agency to market crop insurance in connection with the AIA Corporations' new crop insurance business.[404] Growers National's organizational and start-up expenses were paid by the AIA Corporations,[405] but the Controlling AIA Defendants later improperly transferred the right to sell crop insurance through Growers National to CropUSA as seen from the January 1, 2001 Agency and Development Agreement and related agreements (CropUSA later obtained a settlement of $430,000, which should have belonged to the AIA Corporations and should have been recovered for them).[406]

10.      On November 20, 2000, AIA Crop Insurance, Inc. filed an amendment to its articles of incorporation with the Idaho Secretary of State changing its name to CropUSA.[407] The amended articles, which were attested by Duclos and signed by Paul Schrette, indicate that "one (1)" share voted for the amendment and zero (0)

---

[401] *See generally* Dkts. 278-11–278-42. There were other advisory board/committee meetings held after 2005 through it appears that the Hawley Troxell Defendants did not file them because Reed Taylor did not participate in any of those meetings.

[402] Reed Taylor suggested the name Etaber as he had previously done at a prior board meeting held for AIA Services.

[403] Crop002244.

[404] DLM – 0033294-97. *See also* Crop002249 (an advisory board meeting minutes confirming "[t]he cooperative Articles have been drawn up and need to be filed with the Secretary of State").

[405] *E.g.,* 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 484.

[406] RJT – 016617-21; AIAPROD00300706-58; AIAPROD00076586-87; AIAPROD00234569; AIAPROD00012794-98; CROP0000923.

[407] DLM – 0033173-74.

Exhibit - 1, p. 120

shares voted against it.[408] The issuance and vote of "one" share is consistent with AIA Crop Insurance (CropUSA) being a wholly owned subsidiary of one of the AIA Corporations.

11.     In a 2000 AIA Business Plan, John Taylor represented "[t]he Crop Insurance Reform Act of 1996 has sparked an explosive opportunity in crop insurance. AIA, through its new subsidiary, AIA Crop Insurance, Inc., will begin providing a line of multi-peril crop insurance at the request of the farm associations…AIA will place the business with Great American Insurance Group…"[409] In that same Business Plan, it was represented that "AIA is becoming licensed as a crop insurance agency through a subsidiary, AIA Crop Insurance, Inc., on a national basis…AIA will also begin a crop insurance program through National Growers and Stockman's Association for nursery growers on the West Coast."[410] In a December 6, 2000 letter to Cashman, John Taylor stated, *inter alia*, that "Management of AIA is working with legal representation to establish the ground rules for ownership of Crop USA. AIA will *retain* a substantial piece of the ownership."[411]

12.     On December 31, 2000, AIA Services' shareholder list indicated that it purportedly issued 452,240 common shares in AIA Services to all of the holders of the Series C Preferred Shares, including the AIA Services 401(k) Plan.[412] While the common shares issued to the AIA Services' 401(k) Plan were taken back for unknown reasons, the $46,350.77 total purchase price for the other common shares issued to Beck (101,090), Cashman (including his pension plan) (217,325), Michael Cashman Jr. (5,049), Distribution Services, Inc. (10,097), Bruce Knutson (15,146), Charles Rapp (5,049) and Daryl Verdoorn (5,049) were never paid for and thus should have never been issued (most of those shares were subsequently acquired by John Taylor in 2012 for ten cents per share).[413] The shares transferred to, and presently held by, John Taylor were never properly issued.

---

[408] DLM – 0033173-74.

[409] Dkt. 67-66, p. 3.

[410] Dkt. 67-66, p. 4. Riley has testified that he was provided with a Business Plan which became the basis for his 2001 Regulation A offering statement. 3/3/2020 Riley Depo. Transcript, p. 552.

[411] AIAPROD0074585 (Emphasis supplied). Cashman testified that he did not "have any reason to dispute the accuracy of this letter." 6/29/2020 Cashman Depo. Transcript, p. 129. It is unclear who the "legal representation" was, although Riley has testified that while at Hawley Troxell, he "had several engagement letters that are dated March 1, 1999." *Id*. at 322.

[412] AIA0024039. John Taylor later allegedly acquired 338,610 of those shares for ten cent per share in 2012. RJT – 089850-58; AIAPROD00294166.

[413] AIA0024860.

Exhibit - 1, p. 121

11-ER-2538

13. As of December 31, 2000, AIA Services' Unaudited Consolidated Financial Statements indicated that it had total assets of $2,764,103, total liabilities of $9,906,444 ($3,873,362 in liabilities excluding Reed Taylor's illegal debt), total revenues of $5,105,973, a net loss of $218,308 (which includes the significant interest paid to Reed Taylor that year), and owed Donna Taylor $773,006 for her Series A Preferred Shares.[414] As of December 31, 2000, AIA Insurance's Audited Financial Statements indicated that it had total assets of $6,001,935, total liabilities of $3,551,613, total revenues of $5,103,442, and net income of $313,655.[415] No financial statements have been produced for CropUSA for 2000 and it had no revenues for 2000.

14. On January 1, 2001, AIA Insurance and CropUSA purportedly entered into a Management Agreement, which provided an unfair allocation of expenses (and no allocation for certain expenses) and provided no profit, consideration, mark-up, interest or benefit for the AIA Corporations.[416] There are no board or shareholder meeting minutes or resolutions for the AIA Corporations that approved this this Agreement. This Agreement was never properly authorized and violated the conflict of interest provisions in AIA Services' Amended Articles of Incorporation (Sections 4.2.9(c) and (g)) and AIA Insurance's Bylaws (Section 4.14), and constituted an intentional breach of fiduciary duties by the Controlling AIA Defendants (including in concealing this Agreement from the AIA Corporations and AIA's Disinterested Shareholders). There was no independent determination made that this Agreement was fair, and it was not fair to the AIA Corporations.

15. On January 10, 2001, CropUSA's board of directors purportedly held a meeting wherein, *inter alia*, "[t]he Directors discussed the necessity for additional funding to operate the corporation. ***AIA Services Corporation has declined to continue to operate the company as a subsidiary of AIA and wants the Company to be independent***. As part of the negotiations with AIA, ***the Directors believe it would be in the best interest of the company that Crop USA offer to purchase the Series C Preferred stock currently outstanding of AIA as set forth in a Master Marketing Agreement with AIA. The Directors authorized the officers to continue negotiations on Crop USA's purchase of AIA Services Corporation's outstanding***

---

[414] AIA000049-74.

[415] AIA000312-29.

[416] Dkt. 390-17.

Exhibit - 1, p. 122

11-ER-2539

*Series C Preferred stock*."[417] This action was never properly authorized and required extensive disclosures and shareholder approval by AIA Services' shareholders, which was never obtained. This constituted an intentional breach of John Taylor's fiduciary duties owed to the AIA Corporations and AIA's Disinterested Shareholders. Notwithstanding these purported board of directors meeting minutes, the AIA Corporations' records show that they received the commissions from Great American for crop insurance for 2001.[418] This suggests that the meeting minutes were back dated (as Duclos testified the board meeting minutes for the repurchase of the Series C Preferred Shares from CropUSA were back-dated).

16.     On January 10, 2001, AIA Insurance and CropUSA purportedly entered into a Master Marketing Agreement, which provided an unfair allocation of expenses (and no allocation for certain expenses) and provided no profit, consideration, mark-up, interest or benefit for the AIA Corporations.[419] There are no board or shareholder meeting minutes or resolutions for the AIA Corporations that approved this this Agreement. This Agreement was never properly authorized and violated the conflict of interest provisions in AIA Services' Amended Articles of Incorporation (Sections 4.2.9(c) and (g)) and AIA Insurance's Bylaws (Section 4.14), and constituted an intentional breach of fiduciary duties by the Controlling AIA Defendants (including in concealing this Agreement from the AIA Corporations and AIA's Disinterested Shareholders). For these same reasons, no purported allocations of employee time,[420] expenses or other costs (or any future agreements, e.g., the January 1, 2009 Administrative Agreement) were properly disclosed, discussed, approved or authorized, and further constituted the AIA Controlling Defendants breaching their fiduciary duties of good faith and loyalty owed to the AIA Corporations and their shareholders. There was no independent determination made that any of these agreements were fair, and they were not fair to the AIA Corporations for the reasons stated above.

17.     On January 22, 2001, CropUSA was licensed in the state of Idaho as Resident Producer[421] agency to sell property and casualty insurance, i.e., crop insurance (to obtain the license, CropUSA simply needed to fill out a simple

---

[417] Dkt. 1-4, p. 1 (Emphasis supplied).
[418] AIA0022173.
[419] Dkt. 390-16.
[420] *E.g.*, RJT – 024206.
[421] *See* I.C. § 41-1008.

Page - 114

application and have an agent licensed to sell property and casualty insurance).[422] CropUSA's only agents licensed to sell property and casualty insurance as of January 22, 2001 were Marcy P. Nordhagen[423] and Jay R. Taylor,[424] who were a long-term employee and agent of AIA Insurance, respectively. Contrary to John Taylor's allegations, CropUSA was never a licensed Managing General Agency in the State of Idaho,[425] according to public records requests.[426] There are no financial restrictions imposed upon an entity licenses to sell property and casualty insurance agency, i.e., sell crop insurance. The only financial restrictions or requirements that I was able to ascertain are those associated with obtaining a Standard Reinsurance Agreement (SRA) with the Risk Management Agency (RMA).[427] Thus, AIA Insurance or CropUSA, as a subsidiary of AIA Services, could have just as easily obtained a Resident Producer license to allow its licensed agents to sell crop insurance. John Taylor's recent Rule 30(b)(6) testimony that AIA Insurance or CropUSA, as a subsidiary of AIA Insurance, did not have the financial wherewithal to sell crop insurance is unsupported and wrong. In fact, as discussed below, John Taylor represented (falsely) to Donna Taylor and Miesen that AIA was creating CropUSA and then later John Taylor also represented (falsely based on John Taylor's recent testimony that regulatory issues prevented AIA from selling crop insurance) that the sole reason CropUSA would not be a subsidiary of AIA Services was so that CropUSA could offer stock options to agents. While I can understand that a lay person such as Miesen or Donna Taylor would not understand John Taylor's statement, from a lawyer's perspective, his representation was nonsense. There would have been nothing to prevent AIA Services from owning CropUSA as a subsidiary and still allow CropUSA to offer stock options to agents or sell shares to investors to raise capital thereby diluting AIA Services' ownership to less than 100%. In an abundance of caution, I recently spoke with Jud Taylor, a former agent for CropUSA who is presently licensed to sell crop insurance through a different entity named Exclusive Crop Insurance Services, and confirmed that my analysis was correct.[428] Accordingly, any argument or position that AIA Services or AIA

---

[422] DLM – 0056203-04.

[423] Ms. Nordhagen was a long-term employee of AIA Insurance. *See, e.g.,* AIAPROD00110809.

[424] Jay Taylor was a long-term agent of AIA Insurance. *See, e.g.,* AIA0025641.

[425] *See* I.C. §§ 41-1502-1503.

[426] DLM – 0056203-14; DLM – 109688-722.

[427] *See, e.g.,* 7 C.F.R. §§ 400.161-400.169.

[428] Jud Taylor also confirmed that since 2012 he has received not received a notice of any AIA Services' shareholder meeting or any request to sign a written shareholder's consent; neither has he received a request to ask Donna Taylor to consent to any transaction for which her consent would be required as the owner of a majority of the Series A Preferred Shares under AIA Services' Amended Articles of Incorporation.

Page - 115

Exhibit - 1, p. 124

11-ER-2541

Insurance could not have owed CropUSA as a subsidiary or sold crop insurance based on any alleged regulatory issues are a red herring under any possible scenario or analysis.

18. On February 7, 2001, the Hawley Troxell Defendants agreed in writing to represent CropUSA for a Reg D offering, which was approved by Hawley Troxell's board[429] signed by John Taylor and Duclos and represented that AIA Insurance was "affiliate and equity owner of CropUSA…and hereby guarantees prompt payment…of the legal fees payable by CropUSA pursuant to this agreement."[430] In other words, Riley knew, or easily could have known by asking questions, that CropUSA was being improperly funded by the AIA Corporations if it truly were not a subsidiary. The Hawley Troxell Defendants' work on this matter continued into 2006 and no conflict waivers were sought or obtained from the AIA Corporations.[431]

19. On February 27, 2001, Donna Taylor agreed to defer five months of her redemption payments so that CropUSA could be launched:

> **AIA is developing a new crop insurance program through a new company called CropUSA**. We will be filing a Form D stock registration for the agencies who join with CropUSA.
>
> **The costs of putting the CropUSA program together in Texas have been paid. AIA now needs to launch in five new territories next Month**.
>
> AIA requests it be allowed to defer the stock redemption payments to you for the next five months. Even though redemption is deferred, AIA will continue to accrue the interest on the interest payments not made.[432]

20. On March 27, 2001, Cashman wrote an email to John Taylor stating: "John, attached please find my letter of resignation. I have sent the original to you via USPS this afternoon."[433] In my opinion, the timing of Cashman's resignation

---

[429] *See* Section XII of this Report.
[430] HTEH000182-90.
[431] Dkts. 449-87, pp. 4-9, 31-55.
[432] Dkt. 1-5, p. 1 (Emphasis supplied).
[433] HT-AIA-EML 0003681.

**Exhibit - 1, p. 125**

**11-ER-2542**

from the board of AIA Services was hardly coincidental—it was linked directly with the Controlling AIA Defendants' plan to take CropUSA. My opinion was not difficult to reach based on the information that I have reviewed (including as discussed in this Report) based on another email Cashman sent to John Taylor one minute before his resignation email wherein he stated his "list of items we agreed need immediate attention: John to get Reed's agreement to new structure and ownership…Get agreement from John Taylor, Reed Taylor and Preferred C shareholders to convert common stock ownership in Crop USA…Mike, Jim and Bruce resign as Directors of AIA…"[434] This email confirms that Cashman had no concern or interest for the AIA Corporations or their shareholders in order to implement the plan to take CropUSA and that Reed Taylor's consent was needed because he was a secured creditor of AIA Services—there would be no other reason to seek Reed Taylor's consent and the email mentions nothing about Reed Taylor resigning from the board of AIA Services as part of the plan.[435] In another undated email during this period of time, John Taylor stated to Cashman: "I have made the changes as we discussed. Please review" (the subject line of the email stated: "Final agrrement (sic) with Reed as modified").[436] This email further confirms that Cashman was intimately involved in the plan to take CropUSA.

21.     According to the annual report filed with the Idaho Secretary of State dated May 5, 2011, John Taylor, Duclos and Paul Schrette were listed as the directors of CropUSA.[437] These individuals were also officers and directors of the AIA Corporations.

22.     On May 16, 2001, John Taylor also emailed Riley about a proposal that he was trying to get Reed Taylor to agree to, which confirmed that Riley knew that the AIA Corporations were involved in the proposed transaction and that the terms were not consistent with the AIA Corporations and CropUSA being distinct and separate corporations (it makes no sense why would CropUSA guarantee the sums owed to Reed Taylor and Donna Taylor if it was truly independently operated and funded).[438] As John Taylor later testified, Reed Taylor never agreed to any

---

[434] HT-AIA-EML 0003680.

[435] Reed Taylor was advised that the resignations were based on AIA Services not having D & O Insurance. Like other information given to Reed Taylor, in my opinion, the resignations of Cashman, Beck and Sweeney from the board of AIA Services were linked directly to taking CropUSA from AIA Services.

[436] HT-AIA-EML 0003889.

[437] DLM – 0033175.

[438] RJT – 011694-96, 026719.

Exhibit - 1, p. 126

restructuring of the debt owed by AIA Services and Riley should have known this fact (assuming that he did not know).[439]

23.    On June 18, 2001, the Controlling AIA Defendants, through John Taylor, continued implementing his plan to unlawfully usurp CropUSA from the AIA Corporations when he wrote the Series C Preferred Shareholders (Cashman and Beck and their friends who purchased those shares in 1995):

> I have enclosed the proxy for the annual meeting of AIA Services Corporation. In addition, you will find an offer from Crop USA to exchange your AIA Services Series C Preferred stock for common stock of Crop USA.
>
> Over the last few years, AIA's management and directors have been looking for ways to create an exit strategy for your investment in AIA. We had originally planned to take AIA public, but it is unlikely in the foreseeable future. Market conditions may change, but there can be no assurance for a public market.
>
> With CropUSA, we believe there is a better opportunity for a clearly defined exit strategy. Once the company reaches its goal of $100 million in crop insurance premiums, management believes that Crop USA will have the potential to be acquired or become fully tradable.
>
> AIA has been working on a project and market strategy referred to as Crop USA. CropUSA was created by AIA. as a property and casualty insurance agency which markets crop insurance to members of sponsoring agricultural associations, such as the wheat growers, soybean growers, etc. that are already affiliated with AIA. CropUSA also manages the Growers National Cooperative Insurance Agency (GNCIA), an insurance buying cooperative owned by farmers. Crop USA is designed to give farmers more competitive pricing and the agents of Crop USA a more precise target market.
>
> *          *          *
>
> CropUSA is offering all Series C Preferred shareholders the opportunity to exchange your Series C Preferred stock for common stock in Crop USA. For each $10 par value Series C Preferred share of AIA Services Corporation, CropUSA will exchange 10.66 shares of

---

[439] RJT – 026722-38.

its common stock. Individuals who hold a majority of the Series C Preferred stock have agreed to the exchange. The form 1-A prospectus assumes that all Series C Preferred shareholders will accept the exchange offer. If you decide not to accept, we will modify the registration appropriately.[440]

24.   John Taylor's June 18, 2001 letter was never provided to AIA Services' Disinterested Shareholders nor was notice of the unlawful taking of CropUSA ever submitted to AIA Services' common shareholders or ever approved by them. Likewise, the Series C Preferred Shares held in the 401(k) Plan were not provided the opportunity to exchange those shares into CropUSA common shares.

25.   On the same day that John Taylor was implementing the plan to improperly take ownership of CropUSA (June 18, 2001), John Taylor also wrote a letter to Miesen after he had inquired on certain matters about which John Taylor was incapable of accurately representing the facts based on what I have learned. For example, John Taylor represented to Miesen that "[w]e decided not to make Crop USA a subsidiary of AIA because of the necessity under the Crop USA business model to provide stock options for its agents."[441] John Taylor most recent Rule 30(b)(6) testimony is that the AIA Corporations were financially unable to operate CropUSA. Both representations were false. In fact, as stated in this Report, the AIA Corporations had represented in business plans and CropUSA represented in board meeting minutes that CropUSA was a subsidiary of AIA. John Taylor also represented that "[t]here is a management agreement between the parties that will provide AIA with significant management revenues over the next few years."[442] The AIA Corporations generated no revenues from the so-called administrative agreements between CropUSA and the AIA Corporations, which provided no mark up, interest or other compensation. In fact, while the AIA Corporations guaranteed numerous loans for CropUSA, there is no evidence that they were ever compensated with any payments that were revenues nor were they issued any shares of stock in CropUSA such as John Taylor and others received for guaranteeing loans; rather, the AIA Corporations were merely repaid for certain limited transactions that were recorded (many were not because many expenses such as rent and other expenses were never allocated in the early years).

---

[440] Dkt. 67-56, pp. 1-2.
[441] DLM – 105709.
[442] DLM – 105709.

26.     On July 24, 2001, Riley prepared the Draft SEC Form 1-A for CropUSA in effect confirming that the arrangements between CropUSA and the AIA Corporations were improper and that CropUSA was improperly utilizing AIA Insurance's trade secrets by disclosing, *inter alia*, that:

> CropUSA will attempt to persuade AIA Insurance's national and affiliated state association clients to join the Co-op and endorse CropUSA's marketing efforts. These AIA Insurance clients consist of the groups of associations discussed below.[443]
>
> \*          \*          \*
>
> **Dependence on AIA Insurance, Inc.** CropUSA's revenues are materially dependent upon the status of AIA Insurance as the agent and administrator of several Trusts formed by the agricultural grower associations listed on page 10 of this Offering Circular. See "The Company"…The loss of these positions as agent and administrator of these Trust could have a material adverse effect upon the Company's Business. See "Description of Business – Background".
>
> ***CropUSA is also dependent upon AIA Insurance for administration and management of its business affairs, including salary, commissions, and other administrative matters***. See "Related Party Transactions – CropUSA – AIA Management Agreement". ***If AIA Insurance should discontinue these functions for CropUSA, the Company would have to hire employees to perform these tasks and outsource them***.[444]
>
> **Related Party Transactions**…AIA Insurance is a wholly owned subsidiary of AIA Services Corporation. As privately held companies, the agreements, and contracts between CropUSA and AIA Insurance for management, administration, and ***access to AIA Insurance's association clients were not negotiated at arms' length; and these agreements may involve conflicts of interest***. See "Related Party Transactions."[445]

The Draft SEC Form 1-A confirms that Riley was aware of the improper conduct and conflicts of interest occurring at the AIA Corporations. Further, this explains

---

[443] AIAPROD00139303.

[444] AIAPROD00139310 (Bold emphasis in original and bold italicized emphasis supplied).

[445] AIAPROD00139310 (Bold emphasis in original and bold italicized emphasis supplied).

Exhibit - 1, p. 129

11-ER-2546

why Riley only submitted some "select" pages of his Draft SEC Form 1-A which omitted the above material when he submitted his Declaration in this Lawsuit on May 31, 2018.[446] Neither the Draft SEC Form 1-A nor the information contained therein was disclosed by the Hawley Troxell Defendants or the Controlling AIA Defendants at this time or any other time to disinterested constituents of the AIA Corporations or the AIA Disinterested Shareholders (including when issues regarding the ownership and funding of CropUSA arose years later in *Reed Taylor v. AIA Services*). The Hawley Troxell Defendants also never disclosed this work in their representation agreements in *Reed Taylor v. AIA Services* or *Donna Taylor v. AIA Services*, which was improper and additional evidence that they were truly representing the interests of the Controlling AIA Defendants.

27.     There are also various meeting minutes supporting the conclusion that CropUSA and Growers Nation Cooperative Insurance Agency were both formed, funded and essentially as a part of AIA. For example, on August 13, 2001, a meeting was held for the Grain Growers Membership and Insurance Trust (GGMIT),[447] which was the same GGMIT that the AIA Corporations had marketed and sold health, life and other insurance products through for years.[448] The meeting minutes indicate that the [g]uests present were John Taylor, Paul Schrette, JoLee Duclos, Jay Taylor, and Andy Anderson representing AIA Insurance"[449] and there is no reference of anyone at the meeting purporting to represent CropUSA; yet there were discussions about selling crop insurance and the "Co-op" (i.e., Growers National Cooperative).[450] It is also notable that three of the GGMIT directors present at that meeting, Mick Majors, Keith Kinzer and Bob Beakley, would also subsequently become directors of Growers National.[451] On September 10, 2001, a meeting was held for the American Soybean Association Membership & Insurance Trust (ASAMIT).[452] The meeting minutes indicate that "[o]ther guests present were John Taylor, Paul Schrette, and JoLee Duclos representing AIA Insurance"[453] and again there is no reference of anyone at the meeting purporting to represent CropUSA; yet there were discussions about selling crop insurance and Growers National.[454] It is also notable that one of the ASAMIT directors present at that

---

[446] Dkt. 390-19.
[447] AIA0025641-43.
[448] *See, e.g.,* AIA0002302.
[449] AIA0025641.
[450] AIA0025641-43.
[451] DLM – 0033299-300.
[452] AIA0025639-40.
[453] AIA0025639.
[454] AIA0025639-40.

Exhibit - 1, p. 130

11-ER-2547

meeting, John McClendon, would also subsequently become a director of Growers National.[455] These meetings confirm that as late as the above dates AIA Insurance was still pursuing crop insurance and that Growers National was not only formed and funded by the AIA Corporations, but it was also comprised of the same people and organizations who had contracts with the AIA Corporations, which further confirms that the contractual rights to the commissions and contract with Growers National rightfully belonged to the AIA Corporations, as did the $430,000 settlement that CropUSA obtained from Growers Nation for those rights in 2010.[456]

28.     On November 20, 2001 (as if unlawfully taking CropUSA from the AIA Corporations was not enough), John Taylor and Henderson entered into an agreement to purchase AIA's Parking Lot (AIA Insurance was renting the parking lot) from Camas Prairie RailNet for $8,000.[457] John Taylor had AIA Insurance pay at least $6,500 of the purchase price from its line-of-credit.[458] This was a corporate opportunity belonging to the AIA Corporations and they had the financial resources to pay the $8,000 purchase price for AIA's Parking Lot. John Taylor placed his interests above the interests of the AIA Corporations for this purchase in breach of his undivided duty of loyalty owed to the AIA Corporations. There are no board meeting minutes authorizing this transaction and it was never disclosed to, or approved by, AIA Services' Disinterested shareholders. When Henderson later became a director for the AIA Corporations, she was guilty of the same acts as John Taylor (assuming that Henderson had not been aware of the purchase of AIA's Parking Lot—if she had been aware at the time, she is just as guilty as John Taylor).[459]

29.     While John Taylor and Henderson's purchase agreement to acquire AIA's Parking Lot was disclosed by the Hawley Troxell Defendants to Reed Taylor by producing the documents to him, they never disclosed these documents to any independent directors of the AIA Corporations or AIA Services' Disinterested Shareholders.

30.     Notwithstanding the allegations that CropUSA was a distinct and separate corporation in 2001, the December 31, 2001 internal accounting

---

[455] DLM – 0033299.

[456] *See* Damage Item Number 34 in Exhibit A attached hereto.

[457] DLM – 0002802-04.

[458] DLM – 0002805.

[459] *E.g.*, *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 588-89, 328 N.E.2d 505, 513 (1975).

Exhibit - 1, p. 131

workpapers for AIA Insurance show the crop insurance commissions were received by AIA Insurance for 2001.[460]

31.     On November 13, 2001, CropUSA became a licensed Resident Producer agency to sell Disability (Health) and Life insurance policies.[461] In other words, CropUSA also became licensed to compete directly against the AIA Corporations in selling health and life insurance. Jay Taylor, a long-term agent of AIA Insurance was the only CropUSA agent at that time to sell health and life insurance products.[462] Notably, Jay Taylor would subsequently be stated as owning "13.5%" of the common stock of CropUSA in its tax returns filed for the 2002 and 2003 tax years.[463] However, while there is an unsigned Subscription Agreement for Jay Taylor to acquire 1,000,000 shares of common stock in CropUSA,[464] Jay Taylor was never listed as a shareholder of CropUSA in any of the stock legers[465] produced in any of the lawsuits.[466] In addition, the draft Subscription Agreement, like the draft Subscription Agreement that Reed Taylor would never sign or agree to,[467] stated that obvious in the recitals: "[i]t is vital to the success of Crop USA that AIA Insurance, Inc. continue to assist with the operations and provide working capital to Crop USA."[468]

32.     As of December 31, 2001, AIA Services' Unaudited Consolidated Financial Statements indicated that it had total assets of $2,764,103, total liabilities of $9,567,609 ($3,223,056 in liabilities excluding Reed Taylor's illegal debt), total revenues of $4,724,888, a net loss of $238,684 (which includes the significant interest paid to Reed Taylor that year), and owed Donna Taylor $735,713 for her Series A Preferred Shares.[469] As of December 31, 2001, AIA Insurance's Audited Financial Statements indicated that it had total assets of $4,623,833, total liabilities of $2,896,632, total revenues of $4,724,888, and net income of $354,730.[470] AIA Insurance's Financial Statements never included the liability for Reed Taylor's

---

[460] AIA0022173.

[461] DLM – 0056203-04.

[462] DLM – 0056213.

[463] AIA000943; AIA000947.

[464] RJT 0000528-33.

[465] *E.g.,* CROP000911; AIA0000173640.

[466] At his recent deposition, John Taylor testified: "If his name is not in the stock ledger, he's not a shareholder." 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 604-05.

[467] AIAPROD00192481-86.

[468] RJT 0000528.

[469] AIA000049-74.

[470] AIA000294-311.

Exhibit - 1, p. 132

redemption nor was it ever liable for that debt (which disproves another allegation of John Taylor's that AIA Insurance could not have sold crop insurance based on AIA Services' losses and deficits flowing from the Universe issues and Reed Taylor's illegal redemption).[471] While no financial statements have been produced for CropUSA for the year ending December 31, 2001, an Unaudited Financial Statement was produced for the quarter ending on March 31, 2001 (apparently in draft form in part at least as to the accompanying notes), which indicated that it had no cash or cash equivalents, total asset of $100,164, total liabilities of $132,050, total revenues of $80,750 in revenues, total expenses of $147,636, and a loss of $66,886.[472] According to the 1099 issued by the company CropUSA was placing insurance through Great American (which AIA Insurance could have done0 in 2001 (it had no Standard Reinsurance Agreement (SRA) and would not obtain one until 2004), CropUSA was paid $126,978.39 in commissions for 2001.[473]

33.     As of December 31, 2001, the 93,435 common shares in AIA Services that had been issued to the AIA Services 401(k) Plan in 2000, which were also shown as being issued on the December 31, 2001 shareholder list, were removed from the shareholder list with no explanation.[474] John Taylor appears to have either improperly issued the shares to the other Series C Preferred Shareholders or decided to not issue the shares to the AIA Services' 401(k) Plan to prevent dilution of his and Henderson's interest in AIA Services.

34.     According to the annual report filed with the Idaho Secretary of State dated January 8, 2002, John Taylor, Duclos and Paul Schrette were listed as the directors of AIA Services.[475] There was never a meeting held to have them appointed (no meeting minutes have been produced). Reed Taylor, Beck, Cashman and certain other former directors were not listed.

35.     On January 10, 2002, a purported stock ledger was created for CropUSA.[476] The ledger shows John Taylor, Reed Taylor and the former Series C Preferred Shareholders who had invested in AIA Services in 1995 as holding a substantial number of shares in CropUSA (e.g., Beck and Cashman). The Series C Preferred Shares held in the AIA Services' 401(k) Plan were not permitted to be

---

[471] RJT – 089184-234.

[472] AIAPROD00065721-37.

[473] CROP000914-16.

[474] AIA0023941; AIA0024037; AIA0024039.

[475] DLM – 0033073.

[476] CROP000911.

Exhibit - 1, p. 133

11-ER-2550

exchanged.[477] In other words, only the outside investors were allowed to convert their Series C Preferred Shares into CropUSA common shares. These facts were never disclosed to, or approved by, AIA Services' shareholders.

36.     According to the annual report filed with the Idaho Secretary of State dated February 5, 2003, John Taylor, Duclos and Freeman were listed as the sole directors for AIA Services.[478]

37.     On February 27, 2002, Riley and Hawley Troxell confirmed another engagement with CropUSA to "prepare a cross-indemnity agreement among personal guarantors of CropUSA's PBM Loan" (Private Bank of Minnesota loan).[479] Once again, the Hawley Troxell Defendants were involved in CropUSA matters.

38.     On June 12, 2002, the CropUSA stock ledger was modified to show Duclos and Freeman as purported shareholders; there were also new common shares issued to Cashman, John Taylor, Beck and others thereby confirming the conflicts of interests between the Controlling AIA Defendants and the AIA Corporations because CropUSA had been unlawfully taken from the AIA Corporations.[480]

39.     On September 5, 2002, Beck wrote a Memo (one of several he prepared) to John Taylor regarding CropUSA and Growers National matters, including requesting detailed information regarding each draw from a loan (this suggest that Beck had reasons to believe at this time that John Taylor was not properly using the funds).[481]

40.     As of December 31, 2002, AIA Services' Unaudited Consolidated Financial Statements indicated that it had total assets of $2,301,730, total liabilities of $2,353,670 (which does not include Reed Taylor's illegal debt), total revenues of $3,595,0402, net income of $96,575 (which includes the significant interest paid to Reed Taylor that year), and owed Donna Taylor $735,713 for her Series A Preferred Shares.[482] As of December 31, 2002, AIA Insurance's Audited Financial

---

[477] CROP000911.
[478] DLM – 0033148.
[479] HTEH000191-92.
[480] AIAPROD00111346.
[481] AIAPROD00074369.
[482] AIA000016-20.

Exhibit - 1, p. 134

Statements indicated that it had total assets of $3,203,537, total liabilities of $2,102,955, total revenues of $3,595,042, and net income of $451,233.[483] As of December 31, 2002, CropUSA's Audited Financial Statements indicated that it had total assets of $400,992, total liabilities of $423,703, total revenues of $595,729 and a net loss of $72,144.[484] These are the first full-year financial statements produced for CropUSA. As

41.    On February 23, 2003, Cashman wrote a letter directly to the RMA advising it that he was a major shareholder in CropUSA, a guarantor of its line-of-credit with Private Bank of Minnesota and that" "I have been associated with the management of CropUSA since 1996 and was instrumental in the development of CropUSA. The long-term success of CropUSA is important to me and I am financially committed to the company."[485] Once again, this confirms Cashman's involvement.[486]

42.    On March 31, 2003, Duclos emailed Cashman, Beck, and others stating "[h]here are notes from today's conference call.[487] There are numerous emails such as this one exchanged among John Taylor, Duclos, Cashman and Beck relative to CropUSA and AIA matters, which confirms their involvement in the operations of the companies as reflected in the various meetings held for the so-called advisory board. I have not seen Reed Taylor being included in a single one of these emails. This suggests to me that Reed Taylor was being permitted to attend certain advisory board meetings to simply keep him at "bay" because of his status as a secured creditor of AIA Services.

43.    On June 1, 2003, AIA Insurance and CropUSA purportedly entered into an Administrative Agreement[488] with an attached Addendum A that appears to be back-dated to June 1, 2003,[489] which both provided an unfair allocation of expenses (and no allocation for certain expenses) and provided no profit, consideration, mark-up, interest or benefit for the AIA Corporations. There are no

---

[483] AIA000276-93.

[484] CROP000334-46.

[485] AIAPROD00129609.

[486] It is notable that, while Cashman and Beck were required to guarantee a $1,000,000 loan for the AIA Corporations in their 1995 Investment Agreement with AIA Services, they never guaranteed as single loan for the AIA Corporations. Instead, they placed their interests ahead of the AIA Corporations by taking CropUSA and guaranteeing loans for it.

[487] AIA0000172693.

[488] Dkt. 390-18, pp. 1-5.

[489] Dkt. 390-18, pp. 6-7.

Exhibit - 1, p. 135

11-ER-2552

board or shareholder meeting minutes or resolutions for the AIA Corporations that approved this this Agreement. This Agreement was never properly authorized and violated the indebtedness and conflict of interest provisions in AIA Services' Amended Articles of Incorporation (Sections 4.2.9(c) and (g)) and AIA Insurance's Bylaws (Section 4.14), and constituted an intentional breach of fiduciary duties by the Controlling AIA Defendants (including in concealing this Agreement from the AIA Corporations and AIA's Disinterested Shareholders). There was no independent determination made that this Agreement was fair, and it was not fair to the AIA Corporations. This Agreement and the attached Addendum A purported to replace the Management Agreement dated January 1, 2001, which I addressed above. An unapproved and unauthorized agreement cannot replace a prior unapproved and unauthorized agreement.

44.     As of December 31, 2003, AIA Services' Unaudited Consolidated Financial Statements indicated that it had total assets of $1,882,255, total liabilities of $1,260,431 (which does not include Reed Taylor's illegal debt), total revenues of $3,704,175, net income of $338,071 (which includes the significant interest paid to Reed Taylor that year), and owed Donna Taylor $735,713 for her Series A Preferred Shares.[490] Instead of having fully redeemed Donna Taylor's shares prior to December 3, 2003, AIA Services was in arrears to her by $735,713, plus any accrued interest. As of December 31, 2003, AIA Insurance's Audited Financial Statements indicated that it had total assets of $1,881,055, total liabilities of $1,108,312, total revenues of $3,704,175, and net income of $750,012.[491] As of December 31, 2003, CropUSA's Audited Financial Statements indicated that it had total assets of $344,615, total liabilities of $701,055, total revenues of $244,509, and a net loss of $344,853.[492]

45.     While it appears that there may have been purported notices of an AIA Services' shareholder meeting on June 18, 2001[493] and May 19, 2003,[494] there were no properly held annual or special shareholder meetings held for AIA Services in 2001, 2002 or 2003 to elect directors (there is no evidence that any meetings occurred or that the directors were duly elected for 2003) or to authorize any transactions because full disclosure was never provided in these years or anytime thereafter to the AIA Disinterested Shareholders (e.g., particularly in light of the

---

[490] AIA000016-20.
[491] AIA000258-75.
[492] CROP000321-33.
[493] DLM – 105711-14.
[494] AIA0001132-36.

Exhibit - 1, p. 136

11-ER-2553

matters involving CropUSA that occurred in those years which were never disclosed to the AIA Disinterested Shareholders). In addition, Donna Taylor's designee was not seated on the board of AIA Services as required. Accordingly, none of the transactions or corporate decisions involving the AIA Corporations were authorized for 2001 through 2003. Since no written shareholder meeting minutes have been produced to my knowledge for any meetings occurring in 2001 through 2003, the meetings must not have occurred based on John Taylor's recent Rule 30(b)(6) testimony because no meeting minutes for 2001 or 2003 have been produced.[495]

### F. 2004-2005 – The AIA Corporations' Unlawful Funding of CropUSA Accelerates.

1. On March 18, 2004, Beck emailed John Taylor, Cashman and Peterson regarding his "thoughts on the potential equity raise for CROP USA."[496] Again, this email confirms Beck and Cashman's involvement in CropUSA.

2. On March 24, 2004, the Hawley Troxell Defendants agreed in writing to represent CropUSA with respect to the preparation of a Reg D private placement memorandum.[497] According to the billing records, the Hawley Troxell Defendants' representation on that matter commenced on May 3, 2004 and the last billing entry was on April 4, 2005.[498] Thus, the Hawley Troxell Defendants' representation of CropUSA in this matter overlapped with their representation of the AIA Corporations. The Hawley Troxell Defendants did not seek or obtain any conflict waivers.

3. On May 27, 2004, John Taylor wrote to Donna Taylor stating, *inter alia*, "[o]ne of the *reasons I have been out of town so much the last month is that we were meeting with various individuals to add to our capital so AIA can redirect its efforts from health insurance to crop insurance…We, of course, are continuing to minimize our costs at AIA to get CropUSA off the ground* and to maintain payments to you and Reed…If it is alright with you, *we will begin to increase your payments in June and will increase them again as soon as CropUSA is funded. We believe we can move it up to the $20,000 per month*

---

[495] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 48-49.
[496] AIA0000230596.
[497] HTEH000191-92.
[498] Dkt. 449-88, pp. 33-45.

**Exhibit - 1, p. 137**

**11-ER-2554**

*range at the time CropUSA's funding is complete later this summer*."[499] Thus, John Taylor was representing to Donna Taylor that CropUSA was part of the AIA Corporations. Predictably, when AIA Insurance received the $1,510,693 bonus as discussed below, John Taylor did not disclose the receipt of those funds to Donna Taylor or fully redeem her Series A Preferred Shares, which were required to have been fully redeemed in December 2003. This letter, as with other numerous documents, was in the possession of the Hawley Troxell Defendants during Reed *Taylor v. AIA Services*, but they did nothing to assist the AIA Corporations with respect to the unlawfully taken CropUSA or the improper allocations and use of the AIA Corporations' funds, employees, trade secrets and other assets (including the $1,510,693 unlawfully transferred to CropUSA as discussed below).

4.     On July 15, 2004, Riley completed a Private Placement Memorandum for CropUSA.[500] In that Private Placement Memorandum, Riley represented substantially the same information as he previously included in 2001, *inter alia*, that:

> **Dependence on AIA Insurance, Inc.** *CropUSA's revenues are materially dependent upon the status of AIA Insurance as the Agent of Record and Administrator of several Trusts formed by the agricultural grower associations listed on page 22 of this Memorandum*. See "Growers National Cooperative."…*The loss of these positions would have a material adverse effect upon CropUSA's business*. See "Marketing Plan."[501]
>
> *CropUSA is also dependent upon AIA Insurance for administration and management of its business affairs, including salary, commissions, and other administrative matters*. See "Ownership and Affiliates—CropUSA—AIA Management Agreement." *If AIA Insurance should discontinue these functions for CropUSA, the Company would have to hire employees to perform these tasks and outsource them*.[502]
>
> **Related Party Transactions**…AIA Insurance, Inc. is a wholly owned subsidiary of AIA Services Corporation. As privately held companies,

---

[499] RJT – 024340-41 (Emphasis supplied).
[500] CROP000147-76; Dkt. 390-20.
[501] CROP000178-79 (Bold emphasis in original and bold italicized emphasis supplied).
[502] CROP000179 (Emphasis supplied).

Exhibit - 1, p. 138

11-ER-2555

> *the agreements, and contracts between CropUSA and AIA for management, administration, and access to AIA's association clients were not negotiated at arms' length; and these agreements may involve conflicts of interest*. See "Ownership and Affiliates— CropUSA—AIA Management Agreement."[503]

The Private Placement Memorandum in effect confirms that Riley was aware of the improper conduct and conflicts of interest occurring at the AIA Corporations. Further, this explains why Riley only submitted some "select" pages of his Private Placement Memorandum which omitted the above material when he submitted his Declaration in this Lawsuit on May 31, 2018.[504] Neither the Private Placement Memorandum nor the information contained therein was disclosed by the Hawley Troxell Defendants or the Controlling AIA Defendants at this time or any other time to disinterested constituents of the AIA Corporations or the AIA Disinterested Shareholders (including when issues regarding the ownership and funding of CropUSA arose years later in *Reed Taylor v. AIA Services*). The Hawley Troxell Defendants also never disclosed this work in their representation agreements in *Reed Taylor v. AIA Services* or *Donna Taylor v. AIA Services*, which was improper and additional evidence that they were truly representing the interests of the Controlling AIA Defendants.

5.    On July 30, 2004, Roger Solomon from Trustmark, the company that issued AIA Insurance's health insurance policies at the time, emailed John Taylor stating "[w]e have finished our Accrued Rating Credit Exhibits and calculated [AIA Insurance's] bonus. The exhibits will be mailed out on Monday, along with a check for [$1,510,693].[505] It looks like [AIA Insurance] won the lottery."[506]

6.    On August 3, 2004, John Taylor emailed Roger Solomon stating "Thank you. I received the fed ex today. You're a fine gentleman."[507]

7.    On August 4, 2004, rather than deposit that payment into AIA Insurance's normal bank account, John Taylor opened a new bank account at a

---

[503] CROP000179 (Bold emphasis in original and bold italicized emphasis supplied).

[504] Dkt. 390-20.

[505] The Hawley Troxell Defendants went to the trouble of redacting the $1,510,693 amount of the bonus to apparently keep that information from Reed Taylor and others. However, the AIA Corporations' records prove that the redacted amount was $1,510,693. Dkt. 67-59.

[506] AIA0000214720.

[507] AIA0000214720.

different bank (AmericanWest Bank) using his home address and deposited the $1,510,693 into that account, which had the following information on the first bank statement:

> AIA Insurance Inc.
> Crop USA
> 2020 Broadview Dr.
> Lewiston, ID 83501[508]

8.      There is no bona fide business reason (nor reasonable explanation) why two allegedly separate and distinct corporations, AIA Insurance and CropUSA, would have a joint bank account if they were truly separate and distinct entities. In addition, there was no bona fide business reason (nor reasonable explanation) for John Taylor to have provided his home address for the bank statements instead of the business address used by the AIA Corporations.[509] As recently confirmed through John Taylor's Rule 30(b)(6) testimony, there are no meeting minutes or resolutions authorizing the opening of this new bank account or the deposit of AIA Insurance's $1,510,693 into that account, which was separately required by Section 6.3 of AIA Insurance's Bylaws.[510] However, even if such board approval had been obtained, it would have been improper based on the conflicts of interest that John Taylor, Duclos and Freeman possessed at that time (including, without limitation, the fact that all three of them owned shares in CropUSA).

9.      John Taylor would later brazenly testify that "I put [the $1,510,693] into a different account so I could keep it confidential."[511] When asked whether John Taylor did that "[s]o Reed [Taylor] wouldn't know that $1.5 million had come into a company that was behind on its payments [to him]," John Taylor responded by testifying "Yes. Yes."[512] In addition to hiding the money from Reed Taylor, John Taylor hid the receipt of the $1,510,693 from the AIA Corporations and AIA

---

[508] AIA0002081. The statements continued to be sent to John Taylor's home address and the address for the statements was not changed to AIA Insurance's Post Office Box 538, in Lewiston ID until the July 5, 2006 statement. AIA0002058.

[509] AIA0002081.

[510] "All funds of the corporation not otherwise employed shall be deposited from time to time to the credit of the corporation in such bank, trust companies or other depositories as the Board of Directors may select." *RJT-AIA* 1070-71. No such authorization was obtained to open a new account with CropUSA at AmericanWest Bank and deposit AIA Insurance's $1,510,693 payment into that account.

[511] Dkt. 312-5, p. 7.

[512] Dkt. 312-5, p. 7.

**Exhibit - 1, p. 140**

**11-ER-2557**

Services' minority shareholders (under the adverse interest doctrine, the AIA Corporations never learned of the receipt of the $1,510,693 through the knowledge of John Taylor based on his conflicts of interest and intentional breaches of fiduciary duties owed to the AIA Corporations, including the duty of loyalty).

10.     On August 26, 2004, the same $1,510,693 of the $1,510,693[513] Trustmark payment deposited in the "secret account" discussed above were used to repurchase the 205,000 Series C Preferred Shares allegedly held by CropUSA.[514] This transaction was a bad faith and intentional breach of the Controlling AIA Defendants' fiduciary duties (including the duty of loyalty) owed to the AIA Corporations and AIA's Disinterested Shareholders and violated the conflicts of interest provisions in AIA Services' Amended Articles of Incorporation and AIA Insurance's Bylaws.

11.     On October 5, 2004, John Taylor emailed McNabb stating "The basic transaction is AIA Services is redeeming the AIAS preferred stock that [CropUSA] owns. The Services preferred stock is to be cancelled. The original deposit was a year end bonus check from Trustmark, deposited to [] the new Crop (Am[erican] West) bank account in contemplation of the preferred redemption transaction."[515] This email, and the absence of any other minutes or resolutions, confirms that the purported Board of Directors Consent in Lieu of Meeting dated August 26, 2004 was back-dated because, as late as October 5, 2004, John Taylor confirmed in writing to Mr. McNabb that the transaction was a redemption and cancelation of the Series C Preferred Shares, as discussed in more detail below.[516]

12.     On October 8, 2004, McNabb emailed John Taylor asking him a number of questions on some accounting "entries that [he] need[ed] [John Taylor's] help on" regarding the $1,510,693 that had been paid to AIA Insurance by Trustmark:[517]

---

[513] In the prior version of my Report, I inadvertently included $134.49 in accrued interest as being including in the amount received from Trustmark. The Trustmark check was for $1,510,693. AIA0002081. Thus, CropUSA purportedly sold the 205,000 Series C Preferred Shares for precisely the same amount of the check received from Trustmark. This fact alone makes the transaction highly suspect even without considering any of the other facts.

[514] Dkts. 1-6, 1-7, 1-8.

[515] Dkt. 67-59, p. 3.

[516] Duclos also confirms that the resolution was prepared in 2005. 4/29/2008 Duclos Depo. Transcript, pp. 125-127.

[517] Dkt. 67-59, p. 3.

Exhibit - 1, p. 141

I also noticed that we recorded an entry to show cash moving from CropUSA to AIA for $674,269.14. Did you plan on physically moving this money from American West Bank, or did you have something else in mind?

\*                \*                \*

Last question for now…I am assuming that the bank account at American West only has your name on it, and you are the only signer. Do you want us to contact the bank and have the recon sent here, or do you have something else in mind?

This should help us keep the books on Crop[USA], AIA [Insurance] and AIA Services straight, and get September closed. I have contacted [Duclos] to get the shareholder's listing for the newly issued Preferred [C] stock from Crop[USA].[518]

In my review of the thousands of pages of documents in this Lawsuit (including certain accounting records), I have been unable to locate a transfer or payment of $674,269.14 from CropUSA to the AIA Corporations.

13.  On October 9, 2004, John Taylor responded to McNabb's October 8, 2004 email by ignoring most of McNabb's questions, but John Taylor confirmed "We need to make additional journal entries on Crop[USA] to clear this up. ***The basic transaction is AIA Services is redeeming the [AIA Services] preferred [C] stock that Crop[USA] owns. The [AIA] Services preferred [C] stock is to be cancelled***."[519] John Taylor confirmed that the intent of the "repurchase" was to redeem the Series C Preferred Shares in AIA Services and cancel them, which separately constituted violations of the restrictions for the Series A Preferred Shares and the Series C Preferred Shares (required shares to be purchased equally from all holders) under AIA Services' Amended Articles of Incorporation. In addition, even if the 2004 Series C Preferred Shares Transaction was authorized, John Taylor placed his interests above the interests of the participants of the AIA Services' 401(k) Plan by not redeeming or repurchasing any of those shares. John Taylor later admitted the 2004 Series C Preferred Shares Transaction was entered into for the purpose of providing badly needed capital to CropUSA.

---

[518] Dkt. 67-59, p. 3.

[519] Dkt. 67-59, p. 3 (Emphasis supplied). When John Taylor was recently deposed, he denied ever stating that the 2004 Series C Preferred Share transaction would be a redemption by AIA Services. 1/26-28/2020 John Taylor Depo. Transcript, p. 449.

**Exhibit - 1, p. 142**

**11-ER-2559**

14.     At the time of the 2004 Series C Preferred Shares Transaction, AIA Services was arrears in its payment obligations to Donna Taylor for her Series A Preferred Shares (which had higher priority than the Series C Preferred Shares) and Donna Taylor's Series A Preferred Shares should have been redeemed or the $1,510,693 should have been used for legitimate business purposes for the AIA Corporations.

15.     John Taylor, Duclos and Freeman (the purported directors of the AIA Corporations at the time of the 2004 Series C Preferred Shares Transaction) acted in bad faith and breached their duties of loyalty owed to the AIA Corporations and AIA Services' shareholders by entering into, consenting to, and concealing the 2004 Series C Preferred Shares Transaction. The other Controlling AIA Defendants substantially assisted in carrying out the 2004 Series C Preferred Shares Transaction and concealing that transaction from the AIA Corporations and AIA's Disinterested Shareholders.

16.     On November 15, 2004, CropUSA and Petersen entered into a purported Officer's Agreement wherein it provided, *inter alia*, that Petersen would compensated by CropUSA and AIA, that Petersen could not compete against AIA Insurance and that "Petersen and AIA [Insurance] have previously agreed on a stock plan whereby CropUSA will covey 400,000 shares of stock to Petersen…"[520] This Agreement further establishes that Petersen was not independent when he later purportedly signed representation agreements on behalf of CropUSA with the Hawley Troxell Defendants in 2007 and 2008 (as discussed below).[521]

17.     On December 2, 2004, CropUSA was finally able to secure a Standard Reinsurance Agreement (SRA) with Austin Mutual Insurance Company for the 2005 crop insurance year.[522] There can be no doubt that the $1,510,693 that CropUSA received from AIA Insurance was critical to CropUSA obtaining the SRA.

18.     On December 24, 2004, Beck sent a Memo to John Taylor, Cashman and Peterson regarding the property subject to the mortgages contributed to CropUSA with a purported value of $2,000,000 as discussed below.[523]

---

[520] CROP000838-54; CROP000819-27.
[521] HTEH000014, 57.
[522] AIAPROD00090819-20; HTEH000210.
[523] AIAPROD00090825-33.

Exhibit - 1, p. 143

19. On December 29, 2004, the CropUSA stock ledger was modified to show shares being issued to two entities (the entities that contributed mortgages to CropUSA) and to "John Taylor, Trustee for AIA interests."[524] The ledger also shows the shares previously contemplated to be issued to Reed Taylor had he agreed to CropUSA becoming a separate company were in effect never issued according to John Taylor; those shares were instead issued to "John Taylor, Trustee for AIA interests."[525] These entries confirm John Taylor's 2008 testimony (discussed below) that Reed Taylor never agreed to the CropUSA transaction and John Taylor appears to have issued the shares for "AIA interests" to make it appear in that time frame that he was giving the AIA Corporations some ownership interest (he testified in 2008 that the shares were for the AIA Disinterested Shareholders to participate upon a sale or merger). The stock ledger for 2006, however, show that John Taylor re-issued the 1,000,000 common shares that had previously been issued for "AIA interests" in his name increasing his and Henderson's ownership interest to 4,000,000 common shares thereby eliminating any alleged ownership or participation by AIA Services' minority shareholders.[526] This is yet another example of John Taylor's self-dealing and breaches of his fiduciary duties of loyalty owed to the AIA Corporations and AIA Services' Disinterested Shareholders.

20. As of December 31, 2004, AIA Services' Unaudited Consolidated Financial Statements indicated that it had total assets of $1,251,754, total liabilities of $1,256,120 (which does not include Reed Taylor's illegal debt), total revenues of $3,856,856, net income of $594,045 (which includes the significant interest paid to Reed Taylor that year), and owed Donna Taylor $689,846 for her Series A Preferred Shares (which should have been redeemed by December 3, 2003 assuming none of the required $100,000 additional semi-annual payments were required because the Series A Preferred Shareholder Agreement was illegal).[527] As of December 31, 2004, AIA Insurance's Audited Financial Statements indicated that it had total assets of $2,405,825, total liabilities of $1,163,516, total revenues of $3,856,856, and net income of $1,063,520.[528] As of December 31, 2004, CropUSA's Audited Financial Statements indicated that it had total assets of

---

[524] CROP000120.
[525] CROP000120.
[526] AIAPROD00074876.
[527] AIA000011-15.
[528] DLM – 105770-87.

Exhibit - 1, p. 144

$3,560,000,[529] total liabilities of $978,000, total revenues of $103,000, and a net loss of $550,000.[530]

21.  On February 16, 2005, Beck sent an email to John Taylor, Cashman and Petersen capturing the subject matter of a telephone conference that they had regarding CropUSA:

Thanks for your time on the phone today. *[Cashman] and I are so convinced that Crop USA is a winner that anything standing in the way of a good result will be a crime*. Having said that, the following is an attempt at a summation of our conversation and what needs to be done:

1. Everyone on the sales and home office team will work as best they can between now and March 15 to sell and process as much crop insurance business as possible without being combative or disruptive concerning Reed [Taylor], his associates and their activities.
2. On March 16, a meeting will be held with Reed Taylor to confront the consequences of his actions, including his constant undermining of company policies and procedures, usurping of authority, disrupting agents and prospective agents, and overall [e]ffect on morale and productivity.
3. [Reed Taylor's] activities have proved to be very disruptive and they have the potential to ruin our relationships with Austin Mutual, the RMA, re-insurers, associations, employees, and regulators.
4. *John Taylor will engage an attorney to represent Crop USA to make certain that any steps taken with Reed [Taylor] will fall within legal limits and options will be explored where we have any vulnerability*.
5. *John Taylor will reduce to writing any areas of vulnerability with regard to moving ahead with Crop USA and not including Reed*

---

[529] CropUSA's assets jumped significantly because it received the improper $1,510,693 payment from AIA Insurance, and it acquired receivables for two mortgages in the amount of $2,000,000 in exchange for issuing 2,000,000 new common shares of CropUSA. If those two transactions were omitted, CropUSA would have had less than $50,000 in assets.
[530] CROP000308-20.

*[Taylor] in any part of the transaction. Since Reed has no interest in Crop USA, John will examine what effect, if any, [Reed Taylor's] taking over of AIA [Insurance] would have*.

6. *In attempting to reach an agreement with Reed [Taylor], it may be necessary to give Reed [Taylor] AIA [Insurance]. John [Taylor] and the Board are prepared to deal with this eventuality by cutting all ties to Reed [Taylor].*

7. Although we explained to Adrian Johnson that we will be hiring a new Sales Manager and asking Reed [Taylor] to leave, [Reed Taylor's] latest outbursts have called into question the need to re-educate Adrian on the potential problems and for him to accept the challenge. It is imperative that the Reed [Taylor] situation be dealt with on March 16 and an agreement must be made to remove Reed [Taylor] from having any influence whatsoever*. Should Reed [Taylor] decide not to step aside, then he must be given AIA [Insurance] and Crop USA will survive on its own*.

8. I must have this assurance in writing before I talk with Adrian and bring him up to speed. An acknowledgement via return e-mail is fine.

9. I will be awarded 100,000 shares of Crop USA for putting together the real estate equity.

10. [Cashman] and John [Taylor] will correspond on the terms and conditions of the dilution issue.

*Please let me know if I have captured the subject matter discussed*.[531]

22.    The above email confirms that the Controlling AIA Defendants were focused on Reed Taylor because he was a secured creditor of AIA Services and it also confirms that the Controlling AIA Defendants intentionally placed their interests in funding and owning CropUSA above the interests of the AIA Corporations and AIA's Disinterested Shareholders, thereby intentionally breaching their fiduciary duties of loyalty. This email, like other vast quantities of documentary evidence, was available to the Hawley Troxell Defendants in *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services*. Yet, the Hawley Troxell Defendants intentionally represented the interests of the Controlling AIA Defendants rather than the best interests of the AIA Corporations after this email was produced in *Reed Taylor v. AIA Services*.

---

[531] Dkt. 67-54 (Emphasis added).

23.     On March 31, 2005, the CropUSA stock ledger was updated to reflect the additional shares to be issued as outlined in Beck's February 25, 2005 email and reflects the common shares issued to the advisory board members.[532]

24.     On May 29, 2005, Beck sent another Memo to John Taylor, Cashman, Duclos, and Peterson regarding a "Line of Credit for Crop USA."[533]

25.     On August 1, 2005, John Taylor purportedly exercised the option to purchase the 475,000 common shares in AIA Services and instructed Duclos to deduct the $4,750 purchase price from his "unpaid payroll account."[534] AIA Services' stock ledger shows the 475,000 common shares were issued to John Taylor in 2005.[535] John Taylor was not entitled to these 475,000 common shares because, *inter alia*, he had breached his fiduciary duties of good faith and loyalty, and the Executive Officer's Agreement, by competing against the AIA Corporations by selling insurance products through CropUSA, Pacific Empire Radio (Sound Insurance) and Pacific Empire Holdings, by soliciting AIA's employees and by intentionally breaching his duties of loyalty owed to the AIA Corporations as described in this Report. In addition, I note that John Taylors exercise of the options was untimely (it needed to be exercised within ten years of the "effective date" of Reed Taylor's Stock Redemption Agreement (July 22, 1995).[536]

26.     On October 3, 2005, Henderson filed for divorce against John Taylor in Clearwater County District Court under Case No CV-05-417.[537] Henderson filed the divorce in Clearwater County even though they both resided in Nez Perce County, Idaho.

27.     On December 16, 2005, John Taylor and Henderson were divorced through an Interlocutory Decree of Divorce, which only divided certain of the community assets, but not their community interests in the common shares in AIA Services, CropUSA, Pacific Empire Radio, Pacific Empire Holdings or other entities.[538] However, Henderson and John Taylor would not finalize the division of

---

[532] AIAPROD00085364.

[533] AIAPROD00090817-18.

[534] AIA0023638-54.

[535] AIA0024874.

[536] RJT – 089244; RJT – 089184.

[537] RJT – 025497-99.

[538] RJT – 025500-04.

Exhibit - 1, p. 147

their community property (including the community interest in the shares in AIA Services and CropUSA) and debts until 2018 (which establishes the ongoing conflicts of interest involving their efforts to maximize community property value and minimize liabilities, including those to the AIA Corporations.

28. As of December 31, 2005, AIA Services' Unaudited Consolidated Financial Statements indicated that it had total assets of $1,166,725, total liabilities of $1,080,355 (which does not include Reed Taylor's illegal debt), total revenues of $2,012,553, a net loss of $150,721 (which includes the significant interest paid to Reed Taylor that year), and owed Donna Taylor $604,955 for her Series A Preferred Shares.[539] As of December 31, 2005, AIA Insurance's Audited Financial Statements indicated that it had total assets of $2,368,520, total liabilities of $886,551, total revenues of $2,012,553, and net income of $239,660.[540] As of December 31, 2005, CropUSA's Audited Financial Statements indicated that it had total assets of $3,930,595, total liabilities of $2,665,225, total revenues of $780,160, and a net loss of $1,331,735.[541]

29. As demonstrated from the financial statement information provided in Sections X(E)-(F), the financial condition, revenues and net profits of AIA Insurance far exceeded the financial condition, revenues and net profits for CropUSA from 1999 through 2005. There is simply no credible argument that AIA Insurance could not have been licensed to sell crop insurance or that it could not have also obtained an SRA if its $1,510,693 i had not been unlawfully transferred to CropUSA, especially if the business had been operated prudently and conservatively. Moreover, an SRA was not required to be a healthy and profitable crop insurance seller, as confirmed by Jud Taylor.

30. There were no annual or special shareholder meetings held for AIA Services in 2005 or 2006 to properly elect directors or authorize any transactions (despite the numerous shareholders' demands). In addition, Donna Taylor's designee, Attorney Moran, was not seated on the board of AIA Services as required. Therefore, none of the transactions or corporate decisions involving the AIA Corporations were authorized for 2005 and 2006

---

[539] AIA000006-10.
[540] AIA000229-43.
[541] AIAPROD00065932-47.

Exhibit - 1, p. 148

**G.** **2006 – AIA Insurance's Unauthorized Guarantee of the $15 Million Lancelot Loan Guarantee and Improper Hawley Troxell Opinion Letter Provided for the Transaction—and Once Again Riley Was Involved in the Transaction.**

1.     On January 18, 2006, Henderson filed an Amended Complaint in a different lawsuit brought by Reed Taylor, John Taylor and Dallan Taylor against another attorney Thomas Maile, IV.[542] This Amended Complaint confirms that Henderson was specifically addressing conflicts of interest and breach of fiduciary duty claims in her law practice approximately one year before she would become a director and fiduciary of the AIA Corporations. This lawsuit had been pending since January 23, 2004. In addition, this lawsuit was pending while Henderson had Clark and Feeney later appear as counsel for her in *Reed Taylor v. AIA Services* and subsequently took action against their own client Reed Taylor (which confirmed that Henderson has no concern about the legal rights or obligations owed to others (as will be addressed in more detail in this Report).[543]

2.     On February 14, 2006, Duclos emailed Beck, Cashman, Freeman, John Taylor, Adrian Johnson and Randy Lamberjack (the latter two being newer shareholders of CropUSA) stating: "[t]he conference call will remain at 8:30 PST on Monday so we have ample time for discussion. Attached are some background documents for your review."[544] Again, as confirmed by the numerous emails between them, this confirms the involvement of the Controlling AIA Defendants in CropUSA operational matters. As stated elsewhere in this Report, I have not located any such communications involving Reed Taylor.

3.     On March 20, 2006, Duclos emailed Beck, Cashman, John Taylor Adrian Johnson and Randy Lamberjack stating "Zions Bank of Lewiston, Idaho, is offering CropUSA a $1.5M revolving line of credit" and discussing stock options that would be awarded for those investors who co-signed for the loan.[545] Again, Reed Taylor was not involved in this communication or the loan. It is also notable that the AIA Corporations ultimately guaranteed this loan for CropUSA (in violation of numerous provisions under AIA Services' Amended Articles of

---

[542] DLM – 0033537-39.

[543] *Taylor v. Maile*, 142 Idaho 253, 255, 127 P.3d 156, 158 (2005). While the appeal was argued by Henderson's former partner Paul (Tom) Clark, Henderson had been an attorney on that case since the lawsuit was filed according to Reed Taylor.

[544] There was no bates stamp on this document.

[545] AIAPROD00075493.

Exhibit - 1, p. 149

11-ER-2566

Incorporation and the AIA Corporations' bylaws as discussed in this Report as to other guarantees), yet the AIA Corporations received no stock awards for the guarantees.[546]

4.     On June 30, 2006, Stephanie McFarland (another employee of CropUSA and AIA) emailed Beck, Cashman, Randy Lamberjack and Adrian Johnson advising them that "The RMA notified CropUSA today that its Plan for the 2007 crop year has been approved…"[547]

5.     On July 5, 2006, Beck emailed John Taylor and Cashman regarding various matters relating to the Lancelot Loan (a/k/a Surge):

> In reading the Term Sheet provided by Surge Capital a few things jumped out at me:
>
> 1. Purpose: Has the subject of buying AIA [Services] been discussed and agreed upon? The Purpose description is very vague regarding general corporate purposes.
> 2. Guarantors: Since AIA Insurance is a guarantor, how does Reed Taylor enter into the discussion and what obligations do we have with Reed?
> 3. Interest Rate: 15% is street pricing and there is no mention of Stock Options. I assume there are no trailers on the interest rate.
> 4. Liquidation Damages: Very onerous damage formula. Any middle ground on this issue?
> 5. Corporate Governance: Outside Special Director. Depending on pre-approved expenses by Crop USA or other controls as well as the agenda of the Outside Director, these guys can be expensive and outrageous
> 6. Investment Banking Fee: None was defined in my document on page 8, but your Borrowing Base Certificate calculations talks about $875,000. Yikes! Does this include estimated expenses, initial $50,000 deposit and all other anticipated fees?
> 7. Who provides the funding for Surge Capital?
> 8. What is the real likelihood of closing?[548]

---

[546] AIAPROD0009053-40; AIAPROD00090531-35; AIA0026677-78.

[547] There is no bates stamp on this document.

[548] Dkt. 67-55.

**Exhibit - 1, p. 150**

**11-ER-2567**

6.      Beck's July 5, 2006 email[549] confirms that he, John Taylor and Cashman were focused on the obligations owed to Reed Taylor because he was a secured creditor of AIA Services. However, this email also confirms that John Taylor, Beck and Cashman were not concerned whatsoever about the best interests of the AIA Corporations or AIA Services' minority shareholders. Once again, this email was produced by the Hawley Troxell Defendants in R*eed Taylor v. AIA Services*, yet they ignored it and the other evidence that established the self-dealing and improper conduct that had occurred for the benefit of CropUSA and the Controlling AIA Defendants.

7.      On July 6, 2006, John Taylor and Henderson stipulated to vacate a status conference for their divorce. In that Stipulation, they acknowledged that they were "both licensed Idaho attorneys acting pro se…[and that they] are in the process of negotiation and believe a resolution is likely."[550]

8.      On August 2, 2006, Duclos emailed Cashman, Beck and others stating that "[a]attached are my notes from the recent Advisory Board conference call. Let me know if I missed anything."[551] Like many others,[552] Reed Taylor was not included in this email.

9.      On August 23, 2006 and August 24, 2006, John Taylor and Henderson quitclaimed AIA's Parking Lot to 17 State Street Partners, respectively.[553]

10.     On September 17, 2006, Riley received an email from Attorney Gatziolis regarding his providing a Legal Opinion for the Lancelot Loan (a/k/a Surge Capital loan) and Hawley Troxell agreed to represent CropUSA for the preparation of a Legal Opinion for the Lancelot Loan (a $15 million line-of-credit), which was improperly guaranteed by AIA Insurance (Duclos purportedly signed the guarantee for AIA Insurance).[554]

11.     On October 27, 2006, CropUSA entered into the Lancelot Loan (the $15,000,000 line-of-credit), which was guaranteed by John Taylor and purportedly

---

[549] Dkt. 67-55.

[550] DLM – 0033545.

[551] This email had no bates stamp number.

[552] *See, e.g.,* the emails discussed above; *see also* DLM – 0033551.

[553] Nez Perce County Recorder, Instrument Nos. 734740-41.

[554] HTEH000278-80; Dkt. 1-10; RJT – 089566-623; AIA0002858-67.

Exhibit - 1, p. 151

11-ER-2568

by AIA Insurance.[555] Beck, Cashman and John Taylor also pledged $500,000 as security for the loan.[556] AIA Insurance's Guarantee of the Lancelot Loan was prohibited under the Guarantee Prohibition provision (Section 4.2.9(c)), the net worth financial covenant (Section 4.2.9(h)), and conflicts of interest provision (Section 4.2.9(g)) under AIA Services' Amended Articles of Incorporation, Sections 4.14 and 14.1 of AIA Services' New Restated Bylaws, and Sections 4.14 and 14.1 of AIA Insurance's Bylaws. Moreover, the poor business decisions made by John Taylor, and his spendthrift ways are confirmed by two items for this loan: (a) CropUSA paid lender fees to GVC Financial for $600,000 and Surge Capital for $225,000 ($825,000 in total initial loan fees)[557] and (b) the exorbitant interest rates for the loan were 15% per annum for borrowing base loan advances, 22.5% per annum for all net premium loan advances, and 30% per annum for all over advance loan advances.[558] Before the loan was acquired by Hudson in 2008, over three million dollars of the loan was for net premium advances and over advance loan advances trigger the 22.5% and 30% interest rates on those draws (over $1,000,000 for each category), according to the information contained on the Request for Advance forms submitted to Lancelot.[559] Having spoken with Jud Taylor (who operates a successful crop insurance agency), he has confirmed that CropUSA's spending habits made no sense. In addition, to these issues, CropUSA opened another office, paying rent and other expenses, when it was completely unnecessary and apparently so that John Taylor could "rub shoulders" with the bigger player crop insurance companies in Overland Park, Kansas. This is confirmed when CropUSA never re-opened an office there after Hudson acquired the lease and office space in connection with the 2008 transaction.

12.     On October 27, 2006, John Taylor, Duclos and Freeman purportedly executed a board resolution for AIA Insurance for AIA Insurance's Guarantee of the Lancelot Loan.[560] That board resolution was not authorized and John Taylor, Duclos and Freeman had conflicts of interest by way of their relationships and ownership in CropUSA and the AIA Corporations (e.g., they all served as directors for CropUSA and the AIA Corporations). Notably, Gregory Bell of Lancelot (who

---

[555] AIA001157-1212; AIA0002858-67.

[556] AIAPROD00191897-908.

[557] AIAPROD00086155.

[558] AIAPROD00025025.

[559] *See, e.g.,* AIAPROD00132744-47.

[560] AIA0003078-80; RJT – 024413-15.

Page - 143

**Exhibit - 1, p. 152**

**11-ER-2569**

signed the documents) later pled guilty to wire fraud and was charged with operating a Ponzi Scheme.[561]

13.    On October 31, 2006, Duclos emailed Cashman, Beck, Randy Lamberjack and Adrian Johnson advising them that "The Surge financial package officially closed on October 30! Today was check and double check day – all wire made it, all CDs are secured, etc. etc…."[562] This email, once again, confirms the involvement of Beck and Cashman in CropUSA matters. Reed Taylor was not included in this email.

14.    According to the billing records, the Hawley Troxell Defendants' representation on the Lancelot Loan matter commenced on September 18, 2006 and the last billing entry was on October 27, 2006.[563] During this period of time, the Hawley Troxell Defendants were also representing the AIA Corporations. No conflict waiver was sought or obtained by the Hawley Troxell Defendants from the AIA Corporations (nor would one have been valid) to authorize them to breach their duties of loyalty owed to the AIA Corporations by assisting CropUSA in obtaining a $15 million line-of-credit that was guaranteed by AIA Insurance when AIA Insurance's Guarantee of the Lancelot Loan was prohibited by Sections 4.2.9(c) (the Guarantee Prohibition) and 4.2.9(g) of AIA Services' Amended Articles of Incorporation and Sections 4.14 and 14.1 of AIA Insurance's Bylaws. Nevertheless, the Hawley Troxell Defendants delivered a Legal Opinion to Lancelot opining that AIA Insurance's Guarantee of the Lancelot Loan was authorized as well as related opinions.[564] In 2008, Attorney Collins (who is now deceased) attempted to justify providing the Legal Opinion and admitted that "[b]ecause AIA Services Corporation was not a party to the [Lancelot Loan] transaction, the [L]egal [O]pinion sought by [Lancelot] did not seek any legal opinions regarding AIA Services Corporation and, therefore, I did not review the articles of incorporation of AIA Services in preparing the opinion."[565] Attorney Collins should have reviewed AIA Services' Amended Articles of Incorporation and he was negligent for failing to do so (assuming Riley had not advised Attorney Collins that AIA Insurance's Guarantee of the GemCap Loan was not prohibited by the Guarantee Prohibition provision under AIA Services' Amended Articles of Incorporation). In addition,

---

[561] RJT – 026435-46 (the unsigned criminal plea agreement).

[562] There is no bates number on this email.

[563] Dkt. 449-88, pp. 64

[564] Dkts. 390-28; 1-10.

[565] Dkt. 390-26, p. 3 ¶¶ 4-5.

Exhibit - 1, p. 153

Quarles & Brady also delivered a Legal Opinion to Lancelot.[566] Thus, the Hawley Troxell Defendants and Quarles & Brady's had vested interests in ensuring that the Lancelot Loan was satisfied rather than taking any action to extricate AIA Insurance from its unauthorized guarantee of the Lancelot Loan or to assert claims against Lancelot or Hudson in 2008 to recover monetary damages or the assets being sold by CropUSA that belonged to the AIA Corporations.

15.     No consent was sought or obtained for AIA Insurance's Guarantee of the Lancelot Loan from an independent director of the AIA Corporations (either board), the Series A Preferred Shareholder Donna Taylor (the sole holder of the Series A Preferred Shares) or from the common shareholders of AIA Services.

16.     By December 2006, the Controlling AIA Defendants' actions (including the siphoning off the money and assets of the AIA Corporations to fund CropUSA and other businesses) led to Donna Taylor's Series A Preferred Shares not being timely redeemed on or before December 3, 2003 and Reed Taylor's $6,000,000 Promissory Note not being timely paid on or before August 1, 2005.

17.     Effective December 1, 2006 (it was not signed until after Reed Taylor would later file suit on January 29, 2007), Donna Taylor and Reed Taylor entered into a Subordination Agreement whereby Donna Taylor subordinated the sums owed to her for the Series A Preferred Shares in favor of Reed Taylor.[567] That Subordination Agreement was illegal the moment it was signed because Reed Taylor's 1995 and 1996 Stock Redemption Agreements were illegal and Donna Taylor's 1996 Series A Preferred Shareholder Agreement was illegal—all three of them being agreements that Riley had blessed as counsel for AIA Services.

18.     On December 12, 2006, Reed Taylor provided written notice to AIA Services that it was in default for failing to pay the $6,000,000 Promissory Note (it was due by August 1, 2005) and of the terms of the Amended and Restated Stock Pledge Agreement and the Amended and Restated Security Agreement.[568] Those Agreements were illegal the moment it was signed because of the 1995 illegality of the redemption of Reed Taylor's shares. A copy of the notice of default letter was indicated to have been provided to Riley at Eberle Berlin. I have no knowledge of whether Eberle Berlin forwarded the letter to Riley and I am assuming that the letter was forwarded to him.

---

[566] Dkt. 390-27.
[567] RJT 0000747-49; DLM – 0005206 ¶ 5.
[568] RJT – 025176-78.

Exhibit - 1, p. 154

19. As of December 31, 2006, AIA Services' Unaudited Consolidated Financial Statements indicated that it had total assets of $1,402,792, total liabilities of $1,177,803 (which does not include Reed Taylor's illegal debt), total revenues of $2,012,553, a net loss of $150,721 (which includes the significant interest paid to Reed Taylor that year), and owed Donna Taylor $536,059 for her Series A Preferred Shares (which had still not been redeemed as required by December 2003).[569] In other words, AIA Services was not in compliance with the financial covenant of Section 4.2.9(h) without engaging in any additional transactions to deplete assets or incur debts (the $15,000,000 Lancelot Loan was also a violation of this covenant in addition to Section 4.2.9(c)). As of December 31, 2006, AIA Insurance's Audited Financial Statements indicated that it had total assets of $2,558,829, total liabilities of $846,428, total revenues of $1,568,770, and net income of $230,432.[570] As of December 31, 2006, CropUSA's Audited Financial Statements indicated that it had total assets of $5,146,479, total liabilities of $6,219,955, total revenues of $2,504,810, and a net loss of $1,988,417.[571]

20. There were no annual or special shareholder meetings held for AIA Services in 2006 to properly elect directors or authorize any transactions. In addition, Donna Taylor's designee was not seated on the board of AIA Services as required. Therefore, none of the transactions or corporate decisions involving the AIA Corporations were authorized for 2006.

**H. <u>2007 – Reed Taylor Files Suit, the Hawley Troxell Defendants Commence Representing John Taylor, the AIA Corporations and CropUSA, Substantial Evidence of Past Malfeasance Against the AIA Corporations Is Revealed, and the Malfeasance and Improper Corporate Governance Continue.</u>**

1. On January 8, 2007, Riley prepared a Client Intake Form for the work that he and Hawley Troxell were providing for John Taylor.[572] There is no question that Hawley Troxell attorneys, including Riley, were acting as John Taylor's personal counsel.

---

[569] RJT – 036392-95.

[570] AIAPROD00068382-95.

[571] RJT – 068660-74.

[572] DLM – 105823-26.

**Exhibit - 1, p. 155**

**11-ER-2572**

2.      On January 19, 2007, Henderson emailed confirming in no uncertain terms her asserted claim to one-half ownership in the common shares held in John Taylor's name in CropUSA and AIA Services thereby establishing some of her conflicts of interest:

> I'd like to confirm our conversation of this afternoon, in which I advised you that I still own an undivided one-half interest with John Taylor in all shares of AIA [Insurance], AIA Services, and [CropUSA]. My approval is required prior to entering into any agreement which would impact those shares.[573]

3.      Henderson's January 19, 2007 email was also consistent with her having a vested interest in preventing John Taylor from being liable to Reed Taylor or to the AIA Corporations because any such liability prior to their divorce would likely result in Henderson being partially or jointly liable (or at least subject her interests in community assets), which also establishes one of Henderson's ongoing conflicts of interest.

4.      On January 25, 2007, Gatziolis emailed John Taylor addressing a number of issues regarding Reed Taylor, including, *inter alia*, by stating "I assume that it is not likely that the corporation would accept any action by Reed [Taylor] as long as [John Taylor] and Jolee are in control."[574] This statement goes to the heart of Miesen's claims against the Defendants—John Taylor and the other Controlling AIA Defendants were improperly controlling the AIA Corporations to their detriment and the detriment of the minority shareholders of AIA Services. That improper and unlawful control has endured to this day.

5.      On January 26, 2007, Attorney Gatziolis wrote an email to Reed Taylor's counsel (Attorney Bond) confirming that the Controlling AIA Defendants were improperly calling the shots for the AIA Corporations:

> We have received your most recent term sheet. The (advisory) board of CropUSA has determined to deliberate in person to adequately consider all of the elements of your proposal and to completely consider the alternatives. The meeting will take place on Monday. You will not receive a response to the last proposal until the board has met.

---

[573] RJT – 025514.

[574] Dkt. 583-21, p. 1.

Exhibit - 1, p. 156

11-ER-2573

The board has unofficially directed the activities of AIA, Inc. as well so it is most appropriate for them to consider your proposal.[575]

6.      On January 29, 2007, Reed Taylor filed his complaint against AIA Services, AIA Insurance and John Taylor in *Reed Taylor v. AIA Services*.[576] The complaint alleged causes of action for breaches of contract and constructive trust (to recover assets).[577]

7.      While Gatziolis and other Quarles & Brady attorneys continued providing legal services after Reed Taylor filed his complaint in *Reed Taylor v. AIA Services*,[578] neither Gatziolis nor any other Quarles & Brady attorney ever appeared as counsel for the AIA Corporations and they only later formally appeared as counsel in December 2007 for CropUSA through a limited admission motion brought by the Hawley Troxell Defendants.

8.      Hawley Troxell and Quarles & Brady both had a vested improper interest in keeping Reed Taylor or any other party from disturbing or challenging AIA Insurance's Guarantee of the Lancelot Loan because both Quarles & Brady and Hawley Troxell had delivered incorrect Legal Opinions to Lancelot because AIA Insurance was prohibited under AIA Services' Amended Articles of Incorporation, AIA Services' New Restated Bylaws and AIA Insurance's Bylaws under the circumstances, from guaranteeing the $15 million Lancelot Loan (including because CropUSA was not a subsidiary of AIA Services and the conflicts of interest that prevented that guarantee).[579]

9.      On February 5, 2007, Reed Taylor filed his First Amended Complaint.[580] The First Amended Complaint named three new defendants (Henderson, Duclos and Freeman), asserted additional facts involving improper transactions, asserted eight new causes of action (fraudulent transfers, misrepresentations/fraud, conversion, alter-ego,[581] equitable indemnification,

---

[575] RJT – 025010.

[576] RJT – 038904-09.

[577] RJT – 038907-08.

[578] Dkt. 583-20.

[579] Dkts. 390-27 & 390-28.

[580] RJT – 038913-28.

[581] I.C. § 30-1-622 cmt. (repealed) ("Shareholders may also possibly become liable for corporate obligations by their voluntary actions or by other conduct under the old common law doctrine of 'piercing the corporate veil'").

Page - 148

account stated/moneys due, unjust enrichment and director liability), and requested additional prayers for relief (including injunctive relief).[582]

10.     On February 7, 2007, the Hawley Troxell Defendants commenced billing time for legal services to "R. JOHN TAYLOR" in a matter entitled "REED TAYLOR VS. R. JOHN TAYLOR ET AL" and was assigned the "FILE NO.: 43369-0002."[583] This information confirms that *John Taylor* was Hawley Troxell's client—not the AIA Corporations—at this point in time. Hawley Troxell's billing statements contained the following information confirming who the Hawley Troxell Defendants represented (which was identical on the March, April and May statements):

> MR. R. JOHN TAYLOR
> ONE LEWIS CLARK PLAZA
> 111 MAIN STREET
> P.O. BOX 538
> LEWISTON, ID 83501-0538[584]

11.     In the Hawley Troxell Defendants' February 7, 2007 billing entry, Riley "reviewed Reed's Complaint," had a "conference with [Attorney] Chandler," reviewed and sent emails to Duclos and had a telephone call with Attorney McNichols.[585] While I was subsequently provided all of Hawley Troxell's Unredacted Billing Records, I will be unable to incorporate all of the pertinent billing entries into this Report. Consequently, I incorporate them all by reference herein in chronological order. I will address some of the entries below; however, the entries addressed are not necessarily of any more significance than other entries omitted. In addition, there are other significant billing entries that I do not address in this Section X, but I instead address them in my additional opinions in Sections XI-XII below.

12.     On February 7, 2007, Attorney McNichols' billing entries indicate that Riley emailed him and that he had "an extended telephone conference with" Riley.[586] The subject matters of that email and telephone call are unknown.

---

[582] RJT – 038941-42.
[583] Dkt. 449-82, pp. 62-63.
[584] Dkt. 449-82, pp. 62-63, 67-68, 74-75.
[585] Dkt. 449-82, p. 63.
[586] AIAPROD00300482.

Exhibit - 1, p. 158

11-ER-2575

13.     On February 14, 2007, Henderson wrote to Attorney Bond asking for Reed Taylor's consent to allow Clark and Feeney to continue representing Reed Taylor in *Taylor v. Maile*.[587] In that letter, Henderson specifically discussed RPC 1.7 and RPC 4.2, with the former being implicated in *Reed Taylor v AIA Services* and other lawsuits. On that same day, Henderson and Attorney Bond exchanged emails regarding Henderson's insistence that Clark and Feeney represent her in *Reed Taylor v. AIA Services* when Clark and Feeney (including Tom Clark and Henderson) were Reed Taylor's attorneys in *Taylor v. Maile*.[588] I agree with Attorney Bond that Henderson was prohibited from having any attorney from Clark and Feeney represent her in *Reed Taylor v. AIA Services* and take action against their undivided duty of loyalty owed to their client Reed Taylor.[589]

14.     On February 15, 2007, in *Reed Taylor v. AIA Services*, Attorney Gittins appeared as counsel for Duclos and Freeman.[590]

15.     On February 21, 2007, John Taylor and Henderson filed a Stipulation to Vacate Status Conference in their divorce action pending in Clearwater County District Court (notably, Clearwater County was not the proper venue for the divorce action and thus there had to be a reason that they filed their divorce action there).[591] In that Stipulation, John Taylor and Henderson represented that the divorce "involves the ownership of the parties' shares of stock in AIA Services Corp., which is one of the major assets remaining to be addressed in this action."[592] While John Taylor and Henderson tried to downplay the nature of Reed Taylor's claims by asserting such claims lacked "any merit," they represented that Reed Taylor "seeks a personal judgment against both [Henderson] and John Taylor, raising the potential of a debt that would have to be taken into consideration in the property division."[593]

16.     John Taylor and Henderson's Stipulation *confirmed* the obvious fact that John Taylor and Henderson had conflicts of interest that prevented either of them from acting independently as a director or officer of AIA Services or AIA Insurance because, *inter alia*, their interests in maximizing the value of their shares in AIA Services and minimizing or eliminating any debts associated with John

---

[587] RJT 00001539-40.

[588] RJT – 043275-80 (423, pp. 5-10).

[589] RJT – 043278. *See, e.g.,* Comment 6 to RPC 1.7 ("Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent.").

[590] RJT – 038932-33.

[591] DLM – 0033575-76.

[592] DLM – 0033575.

[593] DLM – 0033576.

Taylor's improper acts and omissions (including as a director and officer of the AIA Corporations for the malfeasance detailed in Reed Taylor's various complaints and as asserted in other filings) were not aligned with the AIA Corporations' interests of recovering all of the money, property and damages associated with the malfeasance and requiring John Taylor and Connie Taylor to pay Reed Taylor in full or in part based on John Taylor's past (and future) acts of unlawfully utilizing the funds, assets and corporate opportunities owned by the AIA Corporations, thereby leaving AIA Services unable to pay Reed Taylor or have funds available to distribute to its shareholders (through dividends or stock redemptions). These conflicts of interest would remain at issue through the date of John Taylor and Henderson's final divorce decree on January 5, 2018, and remain at issue today because they continue to have the same conflicts of interest since John Taylor does not have the funds or resources to pay all debts or damages that flow from John Taylor and Connie Taylor's interests, acts and omissions pertaining to their ownership in common shares in AIA Services, CropUSA, Pacific Empire Radio and other entities described in this Report. These conflicts were not the only ones fatally plaguing Henderson and John Taylor (as discussed later in this Report).

17.     On February 22, 2007, Duclos and Freeman both resigned from the boards of directors of AIA Services and AIA Insurance.[594] At this time, John Taylor was the sole purported director for the boards of AIA Services and AIA Insurance until he would later improperly appoint Henderson and Beck on April 30, 2007.[595] Because of John Taylor's conflicts of interest (as addressed in this Report), he was not authorized to appoint anyone to the boards of the AIA Corporations.

18.     On February 23, 2007, Attorney McNichols appeared as counsel for the AIA Corporations and John Taylor by filing a motion to extend the time to respond to Reed Taylor's First Amended Complaint.[596]

19.     On February 25, 2007, Attorney Cressman appeared as co-counsel for Reed Taylor and Attorney Bond also appeared through a limited admission motion filed by Attorney Cannon.[597]

---

[594] RJT – 039621-24.
[595] RJT – 025016.
[596] RJT – 038941-42.
[597] RJT – 038945-52.

Exhibit - 1, p. 160

11-ER-2577

20.     On February 26, 2007, Attorney Hally appeared as counsel for Henderson in *Reed Taylor v. AIA Services*.[598]

21.     On February 27, 2007, Attorney McNichols' billing records included the following entries:

> [T]elephone conference with Dick Riley…extended telephone conference with Dick Riley, Gary Babbitt and John Ashby regarding possible application for writ of prohibition and motion and legal authorities to court…memorandum regarding Hawley Troxell preparation of motion to reconsider order shortening time for hearing, to decline to rule on motion for lack of jurisdiction and if he does decline to rule for lack of jurisdiction to stay action pending judicial review…telephone conference with Gary Babbitt….[599]

22.     On February 27, 2007, the Hawley Troxell Defendants' billing records included entries from Riley, Babbitt and Ashby regarding researching (including Ashby conducting legal research) and reviewing Reed Taylor's Complaint, the pleadings, preliminary injunction briefing and exhibits.[600] Riley, Ashby and Babbitt also had a telephone conference with Attorney McNichols and they collectively billed for 14.8 hours of time on February 27, 2007.[601]

23.     On February 28, 2007, Attorney McNichols' billing entries show that he had a "telephone conference with John Taylor and John Ashby of Hawley Troxell" and another "telephone conference with Gary Babbitt and John Ashby."[602] The subject matters of those two telephone calls are unknown (although they occurred on a day that Attorney McNichols was working on various filings for *Reed Taylor v. AIA Services*).[603]

24.     On February 28, 2007, the Hawley Troxell Defendants' billing records included eight hours of collective billing entries by: (a) Riley reviewing and commenting on a draft motion, reviewing and commenting a revised draft, emailing comments to counsel and a conference with Ashby; (b) Babbitt working "on

---

[598] RJT – 038953-54. As noted in the Glossary, Henderson's last name was previously Taylor.
[599] AIAPROD00300485-6.
[600] Dkt. 449-82, p. 63.
[601] Dkt. 449-82, p. 63.
[602] AIAPROD00300486-7.
[603] AIAPROD00300486-7.

Exhibit - 1, p. 161

11-ER-2578

briefing and drafting" and a telephone conference with Attorney McNichols; and (c) Ashby conducting "legal research" and "draft motion".[604]

25.    On February 28, 2007, Henderson confirmed in an Affidavit that she was, in fact, a joint owner with John Taylor in shares in AIA Services and CropUSA thereby confirming her conflicts of interest:

> John Taylor and I jointly own 1,034,835 shares of AIA Services Corp., which is the sole shareholder in AIA Insurance, Inc. Our combined interest in AIA Services Corp. is appraised at approximately $900,000, We also jointly own a substantial share of CropUSA, a separate corporation with offices also located at Lewis Clark Plaza. The approximate value of our interest in that corporation is over $600,000.
>
> [Reed Taylor] has not provided sufficient time to allow me to defend my interests in this matter.[605]

26.    For the month of February, although the Hawley Troxell Defendants had not formally appeared as counsel for John Taylor, they collectively billed 25.2 hours of time representing John Taylor and his interests in *Reed Taylor v. AIA Services*.[606]

27.    On March 1, 2007, a hearing was held on for the preliminary injunctions sought by Reed Taylor and the Defendants. The transcript of this hearing provides more evidence of John Taylor's misconduct and the failure to properly operate the AIA Corporations (including John Taylor's admissions that the AIA Corporations could have sold crop insurance).[607]

28.    Meanwhile, effective March 1, 2007 (the agreement was signed at the end of the month), rather than having CropUSA rent space and sign a lease with AIA Services to be a tenant in AIA Services' Headquarters, CropUSA rented office space from 17 State Street (John Taylor's entity) in the building across the street from AIA Services' Headquarters thereby confirming yet another example of John

---

[604] Dkt. 449-82, p. 64.
[605] RJT – 025510, RJT – 025512.
[606] Dkt. 449-82, p. 64.
[607] RJT – 018326-380.

Exhibit - 1, p. 162

Taylor's self-dealing.[608] This transaction was never disclosed or approved by any disinterested directors for the AIA Corporations, nor was it ever disclosed or submitted or approved by AIA Services' shareholders. This is another example of John Taylor's self-dealing—even while a lawsuit was pending.

29.     On March 5, 2007, Reed Taylor moved for a preliminary injunction seeking to enforce his vote of the shares of AIA Insurance which had been pledged to him as collateral.[609]

30.     On March 6, 2007, Attorney McNichols emailed Ashby, according to Attorney McNichols' billing records.[610] The subject matter of that email is unknown.

31.     On March 13, 2007, Riley emailed Duclos regarding his prior legal work relative to the redemption of Reed Taylor shares:

> Jolee: I'm pretty sure that, in negotiating the deal with Reed, Eberle Berlin (and I) represented AIA Services and AIA Insurance and that Reed had separate counsel (somebody in Seattle?). Is my recollection correct? Dick[611]

32.     In addition, the bottom of Riley's March 13, 2007 email to Duclos contained the handwritten notes "3/16 Call [Attorney] McNichols."[612] The subject matters of that email and telephone call are unknown.

33.     On March 16, 2007, John Taylor wrote to the common shareholders of AIA Services requesting that they approve the advancement and payment of the attorneys' fees and costs for himself, Duclos and Freeman.[613] John Taylor did not address any of the allegations in the First Amended Complaint or disclose any of the self-dealing or other malfeasance that John Taylor, Duclos and Freeman had been involved in—all to the detriment of the AIA Corporations. In addition, the letter and the proposed shareholder vote did not reference or address the advancement of money for paying attorneys' fees and costs for John Taylor, Duclos

---

[608] AIAPROD00277755-62.
[609] DLM – 0007747-50.
[610] AIAPROD00300488.
[611] HTEH000415.
[612] HTEH000415.
[613] RJT – 024883.

Exhibit - 1, p. 163

11-ER-2580

and Freeman for their role as directors of AIA Insurance, which was equally important because most of AIA Services' revenues were derived from funds that it received from AIA Insurance.[614] The information provided was misleading.

34.     John Taylor never wrote to the sole holder of the Series A Preferred Share, Donna Taylor, nor did he ask for her to consent to any violations of AIA Services' Amended Articles of Incorporation in order to advance the attorneys' fees and costs for himself, Beck, Duclos, Henderson and Freeman.

35.     On March 20, 2007, Attorney McNichols had an "extended telephone conference with Dick Riley," according to Attorney McNichols' billing records.[615] The subject matter of that telephone call is unknown.

36.     On March 22, 2007, Reed Taylor filed his Second Amended Complaint.[616] The Second Amended Complaint added six paragraphs of additional factual allegations, a new cause of action (Enforcement of Rights), and additional prayers for relief (including eleven new subparagraphs requesting specific injunctive relief).[617]

37.     On March 22, 2007, Attorney McNichols had a "telephone conference with Gary Babbitt and John Ashby," according to Attorney McNichols' billing records.[618] The subject matter of that telephone call is unknown.

38.     On March 23, 2007, Attorney McNichols prepared "correspondence to Gary Babbitt regarding research" and he had an "extended telephone conference with Gary Babbitt and John Ashby," according to Attorney McNichols' billing records.[619] The subject matters of that research and telephone call are unknown.

39.     On March 23, 2007, Riley wrote a memorandum to Attorney McNichols advising him that he should not represent the AIA Corporations and John Taylor.[620] This memorandum is evidence of the Hawley Troxell Defendants' representation and concern over John Taylor.

---

[614] RJT – 024883.
[615] AIAPROD00300490.
[616] RJT – 039459-83.
[617] RJT – 039459-83.
[618] AIAPROD00300491.
[619] AIAPROD00300491.
[620] HTEH000283-87.

40.     On that same day (March 23, 2007), John Taylor sent an email to John Maselli of Surge Capital stating "The members of the Board of our Advisory Bd have now approved the purchase of the Sound Block of business…"[621] The bock of business was created through Sound Insurance (Pacific Empire Radio) competing against the AIA Corporations selling health, home and other insurance products.[622]

41.     The analysis in Riley's Memorandum dated March 23, 2007, which was prepared for Attorney McNichols, the attorney then representing the AIA Corporations and John Taylor at that time, applied equally to—and even more so— to the Hawley Troxell Defendants' subsequent representation of the AIA Corporations and CropUSA:

> ***Instead, the potential for conflicts of interest lies in the possibility of claims by the corporations (or, in the case of [AIA] Services, derivative claims by Its minority shareholders) against John [Taylor] for breach of fiduciary duty / self-dealing***. For example, [Attorney McNichols] may well need to advise John concerning such claims, as to which the corporations would be directly adverse. If [Attorney McNichols] is jointly representing both John and the corporations, these communications would not be protected by attorney-client privilege; and [Attorney McNichols] could not preserve the confidentiality of this advice but rather would be required to share the information with the corporations.
>
> \*          \*          \*
>
> These considerations strongly suggest[] that [Attorney McNichols] cannot represent both John and the two corporations.
>
> Further, if Reed [Taylor] prevails on his allegations that Services has defaulted on the note, joint representation by a single lawyer increases exposure to "piercing the veil" or "alter ego" claims that [John Taylor's] limited liability as a shareholder should be ignored, even if [Reed Taylor's] breach of fiduciary duty / self-dealing claims are meritless. From [John Taylor's] perspective, it is important to preserve the independence of the corporations and to avoid the possibility that [Attorney McNichols] could be disqualified from further representation of any defendant in the future.

---

[621] AIA0000142939; HT-AIA-EML 0076319.

[622] *See* Damage Item Number 39 in the Exhibit A attached hereto.

Page - 156

Exhibit - 1, p. 165

Under these circumstances, we conclude that [Attorney McNichols] could not reasonably believe that he could provide competent and diligent representation to both John [Taylor] and the two corporate defendants, as would be required by Rule 1.7(b) for joint representation of all three defendants [John Taylor and the AIA Corporations].[623]

42.     As to the portion of Riley's memorandum that is bolded and emphasized in the preceding paragraph, the AIA Corporations had claims against John Taylor and so did any shareholder willing to provide a demand and pursue a derivative action. There were present concurrent conflicts of interest relating to John Taylor—not just potential future conflicts of interest. Riley's memorandum also confirms that the Hawley Troxell Defendants were involved in "general counsel" types of work because there is no other reasonable explanation why Riley would be providing the memorandum to Attorney McNichols.

43.     Riley's memorandum to Attorney McNichols applied even more so to Riley, Babbitt, Ashby and Hawley Troxell when they later agreed to represent CropUSA—they were aware of more facts regarding the malfeasance and unlawful transfers involving CropUSA, Reed Taylor had asserted tort claims and alter ego/piercing the corporate veil theories against CropUSA, and the Hawley Troxell Defendants were aware of the 2006 Opinion Letter for the Lancelot Loan, which improperly stated AIA Insurance's guarantee was proper.[624]

44.     On March 27, 2007, Attorney McNichols had an "extended telephone conference with Dick Riley," according to Attorney McNichols' billing records.[625] The subject matter of that telephone call is unknown.

45.     On March 28, 2007 (at 9:00 a.m.), a purported special meeting of shareholders of AIA Services was held in connection with John Taylor, Duclos and Freeman's effort to obtain shareholder approval to advance attorneys' fees and costs for their defense in *Reed Taylor v. AIA Services* pursuant to "Idaho Code Section 30-1-853(3)(b)."[626] The purported minutes show that John Taylor and Duclos were the only parties present in person and that John Taylor "abstained from voting his

---

[623] HTEH000285-87 (Emphasis supplied).
[624] HTEH000285-87.
[625] AIAPROD00300492.
[626] AIAPROD00171853.

1,034,834.5 shares."[627] "There being no further business, the meeting was adjourned at 9:10 a.m."[628] The shareholders were not provided with any of the pleadings or facts relative to the conduct and omissions of John Taylor, Duclos or Freeman, including any of the conduct and omissions stated in this Report. The proxy omitted the necessary information for the shareholders to make an informed decision on the proposed request to advance fees and costs. Indeed, Miesen testified that he requested additional information prior to voting and did not receive any further information. Therefore, Miesen did not vote his shares at that meeting. Upon my review of the facts and documents that I have been provided in connection with preparing this Report, the proxy was materially misleading and no reasonable and informed disinterested shareholder would have voted to approve the advancement of fees or costs for John Taylor, Duclos or Freeman.[629] Notwithstanding this request and vote, no approval was ever sought or obtained to advance fees and costs for John Taylor, Duclos and Freeman's acts or omissions as directors and officers of AIA Insurance. Nor was any approval or vote sought or obtained, by the alleged boards of directors of the AIA Corporations or their shareholders, to approve the advancement of fees and costs for Beck and Henderson in *Reed Taylor v. AIA Services* or any other lawsuit. The same is true for John Taylor, Duclos and Freeman for any other lawsuit (other than the improper alleged approval by Beck and Henderson, which was invalid based on their conflicts of interest as stated in Section X(I) below). In sum, there are no shareholder or board meeting minutes or resolutions properly addressing the advancement of fees and costs for any lawsuit or legal matter.

46.    On March 28, 2007, Reed Taylor filed a motion seeking to prevent AIA Insurance from paying any of the attorneys' fees and costs for John Taylor, Duclos and Freeman.[630] While that motion was brought by Reed Taylor as a secured creditor of AIA Insurance (not as a shareholder), Reed Taylor asserted that John Taylor, Duclos and Freeman were not entitled to indemnification:

> John Taylor, Bryan Freeman and JoLee Duclos are all shareholders of
> Crop USA Insurance Agency, Inc. All of them are benefiting from the

---

[627] AIAPROD00171853. There is no dispute that John Taylor was not entitled to vote his shares at that meeting.

[628] AIAPROD00171853.

[629] While it appears that Henderson and Beck sought to piggy-back on the vote to allegedly approve the advancement of John Taylor, Freeman and Duclos' fees and costs for their defense in the *Reed Taylor v. AIA Services*, the so-called proxy merely requested approval for advancing fees and costs only for John Taylor, Freeman and Duclos, not for Henderson and Beck.

[630] RJT – 039604-24.

Exhibit - 1, p. 167

11-ER-2584

resources, funds and assets of AIA Insurance which have been improperly and unlawfully utilized to the detriment of Reed Taylor. These Defendants are not entitled to indemnification for their actions and are not entitled to have their attorneys' fees and costs paid with AIA Insurance funds.[631]

47.    The issue of the proper, if any, advancement of attorneys' fees and costs by the AIA Corporations was at issue in *Reed Taylor v. AIA Serves*. Based on Reed Taylor's motion,[632] any current or future attorneys representing the AIA Corporations were put on notice of the obligation to address the propriety of advancing attorneys' fees and costs when there was undisputed evidence of self-dealing and malfeasance to the detriment of the AIA Corporations.

48.    On March 28, 2007, Attorney McNichols' billing entries indicate that he exchanged emails with Riley and had a "telephone conference with John Taylor and Dick Riley."[633] The subject matters of those emails and that telephone call are unknown.

49.    On March 28, 2007, Attorney McNichols filed a motion to withdraw as counsel for AIA Services and AIA Insurance.[634] Attorney McNichols based his withdrawal on "a possible future conflict."[635] While I agree with Attorney McNichols that he needed to withdraw as counsel for the AIA Corporations (and commend him for doing so), I do not agree with him that there were no conflicts of interest, but it appears that Attorney McNichols relied on Riley's incorrect analysis that he provided to Attorney McNichols on March 23, 2007.[636] Riley failed to address the substantial conflicts of interest that existed between John Taylor and the AIA Corporations—John Taylor had unlawfully transferred and/or utilized millions of dollars in funds and assets belonging to the AIA Corporations.[637]

50.    On March 29, 2007, Attorney McNichols' billing records included the following entries:

---

[631] RJT – 039611.
[632] RJT – 039604-24.
[633] AIAPROD00300492.
[634] RJT – 039659-60.
[635] RJT – 039659-60.
[636] HTEH000285-87.
[637] HTEH000285-87.

Exhibit - 1, p. 168

e-mail from Dick Riley; e-mail to John Ashby regarding memorandum in opposition to motion for audit…telephone conference with Dick Riley; conference telephone call Dick Riley and John Taylor….[638]

51.    On March 31, 2007, Attorney McNichols' billing records included the entries: "review Dick Riley memorandum regarding need for separate representation of Connie Taylor" and an "e-mail to John Ashby regarding objections to request for protection of documents."[639]

52.    For the month of March, although the Hawley Troxell Defendants had not formally appeared as counsel for John Taylor, they collectively billed 39.5 hours of time representing John Taylor and his interests in *Reed Taylor v. AIA Services*.[640]

53.    On April 2, 2007, Attorney McNichols' billing records indicate that he reviewed an email from Ashby.[641] The subject matter of that email is unknown.

54.    On April 5, 2007, the Hawley Troxell Defendants' records show that AIA Insurance (the record shows "AIA INC," which was AIA Insurance's former name) paid Hawley Troxell $4,420 for the legal services provided for John Taylor as evidence on the March 8, 2007 billing statement.[642]

55.    On April 9, 2007, Attorney McNichols' billing entries included: "review John Ashby memorandum regarding deposit in court…voice mail to Dick Riley; phone conference with Dick Riley…telephone conference with John Ashby regarding pending motions, requests for production of documents and appearance by Hawley Troxell."[643] The subject matter of those calls and the memorandum is limited to the description provided.

56.    On April 12, 2007, Attorney McNichols' billing records included a reference to an "e-mail to Dick Riley regarding meeting in Boise."[644] The subject matter of that meeting is unknown.

---

[638] AIAPROD00300492.

[639] AIAPROD00300493.

[640] Dkt. 449-82, p. 72.

[641] AIAPROD00300476.

[642] Dkt. 449-82, pp. 62-63, 66.

[643] AIAPROD00300476-77.

[644] AIAPROD00300477.

Exhibit - 1, p. 169

11-ER-2586

57.     On April 17, 2007, the CropUSA's board of directors purportedly authorized a $1 million loan to AIA Services to fund the advancement of attorneys' fees and costs for John Taylor, Henderson, Duclos and Freeman.[645]

58.     On April 17, 2007, the Hawley Troxell Defendants prepared draft engagement and conflict waiver letters to the boards of the AIA Corporations and CropUSA and to John Taylor.[646] This work was billed to John Taylor but was paid for by the AIA Corporations.

59.     On April 18, 2007, Attorney McNichols' billing entries included: "Boise meeting with Dick Riley, Gary Babbitt and John Ashby of Hawley Troxell."[647] The subject matter of that meeting is unknown.

60.     On April 18, 2007, Riley has a "Telephone conference with [Attorney] Gittins re service of [Henderson] and [] Beck as directors."[648] In other words, Riley was well aware that John Taylor was going to appoint Beck and Henderson to the boards of directors of the AIA Corporations almost two weeks before that appointment occurred. But Riley did nothing to stop John Taylor from appointing the interested and seriously conflicted Beck and Henderson to the boards of directors of the AIA Corporations.

61.     On April 19, 2007, Attorney McNichols' billing entries included: "voice mail from Gary Babbitt; voice mail to Gary Babbitt; e-mails to and from Gary Babbitt."[649] The subject matters of those voice mails and emails are unknown.

62.     On April 19, 2007, Babbitt wrote to John Taylor's other Attorney, McNichols, regarding the proposed Joint Defense Agreement[650] stating that there were only "potential conflicts of interest between John [Taylor] and the [AIA Corporations]…"[651] This statement was incorrect. John Taylor had concurrent conflicts of interest with AIA Corporations. While entering to a common interest or joint defense may have been appropriate to address certain Reed Taylor's contract

---

[645] AIAPROD00279526-7.

[646] HTEH000417-53, 000465-73.

[647] AIAPROD00300478.

[648] 3/26/2019 HTEH Itemized Privilege Log, p. 23.

[649] AIAPROD00300478.

[650] HTEH000015-19.

[651] HTEH000018.

claims, it was inappropriate and against the best interests of the AIA Corporations to enter into any common interest or joint defense agreement with John Taylor regarding claims involving his malfeasance and misconduct against the AIA Corporations and the AIA Disinterested Shareholders. The same issues and conflicts applied to Freeman and Duclos in Babbitt's letter to them.[652]

63.     On April 20, 2007, Attorney McNichols' billing entries included: "telephone conference with Gary Babbitt…extended telephone conference with John Taylor and Gary Babbitt."[653]

64.     On April 23, 2007, Attorney McNichols' billing entries for that day stated:

> e-mail from Gary Babbitt; voice mail to Gary Babbitt; review Hawley Troxel letter dated April 18, 2007 to the Boards of Directors of AIA Services Corporation and AIA Insurance Inc.; review Hawley Troxell April 19, 2007 letter to R. John Taylor, c/o MEM; review Stand Still and Tolling Agreement; review Hawley Troxell letter of April 18, 2007 to JoLee Duclos and Bryan Freeman; review Hawley Troxell letter of April 18, 2007 to the Board of Crop USA Insurance Agency, Inc.; review Joint Defense Agreement; memorandum; telephone conference with Gary Babbitt; e-email to John Taylor.[654]

65.     On April 24, 2007, Attorney McNichols' billing entries included: "telephone conference with Gary Babbitt and Dick Riley regarding new directors for Services."[655] Beyond the description provided, the subject matter of that telephone conference and the matters discussed are unknown.

66.     On April 25, 2007, Attorney McNichols' billing entries included: "review e-mail from Gary Babbitt regarding Jim Beck e-mail…telephone conference with Gary Babbitt."[656] The subject matters of those emails and the telephone conference are unknown.

---

[652] HTEH000020-24.

[653] AIAPROD00300478.

[654] AIAPROD00300478-79.

[655] AIAPROD00300479.

[656] AIAPROD00300479.

Exhibit - 1, p. 171

11-ER-2588

67.    On April 27, 2007, Attorney McNichols' billing entries included: "telephone conference with Dick Riley."[657]

68.    On April 30, 2007, Attorney McNichols' billing entry stated: "telephone conference with Gary Babbitt."[658]

69.    On April 30, 2007, there was a purported joint meeting held by the boards of directors of AIA Services and AIA Insurance.[659] At that meeting, John Taylor purportedly appointed Henderson and Beck to serve on the boards of directors of the AIA Corporations."[660] Then, Beck and Henderson, who had conflicts of interest by way of their direct and community property ownership interests in CropUSA, purported to approve retaining the Hawley Troxell Defendants and the payment of compensation for their so-called service on the boards of directors.[661] The pertinent portion of the minutes for the so-called April 30, 2007 meeting state:

> The special directors meeting of the Corporation was called to order by R. John Taylor. On the call were: John Taylor, [Henderson], [] Beck and [] Duclos.
>
> John Taylor appointed [Henderson] and [] Beck to serve on the Boards of AIA Services Corporation and AIA Insurance, Inc. until the next annual meeting of the Boards of Directors.
>
> A joint retainer agreement and a joint defense agreement proposed by the law firm of Hawley Troxell were reviewed and discussed. [] Beck moved to accept both agreements. [Henderson] seconded the motion. John Taylor abstained from the vote, while the other two directors voted affirmatively. Defendants will sign tolling agreements in conjunction with the joint defense agreement.

---

[657] AIAPROD00300479.

[658] AIAPROD00300479.

[659] RJT – 025016.

[660] RJT – 025016. Beck and Henderson would continuously purportedly serve as directors of AIA Services and AIA Insurance from April 30, 2007 until they resigned from both boards in September 2014 for Henderson and sometime later for Beck.

[661] RJT – 025016.

Page - 163

Exhibit - 1, p. 172

11-ER-2589

The Board determined that current agreements should be reviewed to see if they need to be modified/memorialized to reflect their current status. A bullet point list will be presented at the next meeting.

Payment of fees to the Board was discussed. [] Beck moved and [Henderson] seconded that the board members would be paid $5,000 and receive 5,000 shares of stock in AIA Services Corporation for each quarter of service[662] (Headings omitted).[663]

70.     While the Hawley Troxell Defendants "insisted that a full Board of Directors be in place before Hawley Troxell would accept representation in [*Reed Taylor v. AIA Services*],"[664] they did not insist on: (a) the appointment of at least one independent director for the AIA Corporations; (b) the appointment of an independent director by the Series C Preferred Shares[665] held in the AIA Services 401(k) Plan (John Taylor had a separate conflict of interest as the so-called trustee of the 401(k) Plan); (c) the appointment of the director by the Series A Preferred Shareholder, Donna Taylor; and/or (d) an annual shareholder meeting requiring full disclosure to the shareholders and a vote of disinterested shareholders (let alone for the proper election of directors at an annual shareholder meeting).[666]

71.     The $5,000 compensation and stock compensation purportedly agreed to at the so-called April 30, 2007 board meeting[667] was never properly authorized based on John Taylor, Henderson and Beck's conflicts of interest (as further discussed in this Report) and was separately excessive. From this point forward, Henderson and Beck should have never been paid any compensation for allegedly serving on the purported boards of directors because Henderson and Beck

---

[662] In 1999, when the AIA Corporations' revenues and business prospects were substantially better, AIA Services compensated its directors $1,000 per quarter with no stock award. AIAPROD00164663. The deteriorating financial condition of the AIA Corporations, a comparison of directors' fees previously paid by the AIA Corporations in the 1990s when their revenues were substantially higher and those paid by successful companies of comparable size, and the continuing breaches of the duties of loyalty and due care by John Taylor, Beck and Cashman further establish that all such fees must be disgorged, and, further, that the Hawley Troxell Defendants should not have permitted these acts of corporate waste.
[663] RJT – 025016.
[664] RJT – 039818 ¶ 5.
[665] In contrast, the 1998 shareholders' meeting minutes reflect that Cashman was elected a director of AIA Services by the holders of a majority of the Series C Preferred Shares. AIPROD00171950.
[666] RJT – 039818-19 ¶¶ 5-7.
[667] RJT – 025016.

Exhibit - 1, p. 173

intentionally breached their duties of loyalty owed to the AIA Corporations throughout their tenure on the boards.

72.     As seen from the billing records and entries addressed and/or quoted in the above paragraphs, the Hawley Troxell Defendants were actively involved in representing John Taylor in *Reed Taylor v. AIA Services* from February 2007 through April 2007.

73.     The withdrawal of Attorney McNichols, the conflicts interest pointed out by Riley and the Hawley Troxell Defendants' knowledge of other facts relating to the AIA Corporations and CropUSA (including AIA Insurance's Guarantee of the Lancelot Loan) should have resulted in their realizing the necessity for them re-assess their intention to represent the AIA Corporations in *Reed Taylor v. AIA Services.* The Hawley Troxell Defendants should not have represented any party in *Reed Taylor v. AIA Services.*

74.     For the month of April, although the Hawley Troxell Defendants had not formally appeared as counsel for John Taylor, they collectively billed 47.2 hours of time representing John Taylor and his interests in *Reed Taylor v. AIA Services*.[668]

75.     On May 2, 2007, the AIA Corporations purportedly retained Hawley the Troxell Defendants to represent them in *Reed Taylor v. AIA Services* through the May 1, 2007 Engagement Letter (which was dated May 1, 2007, but not signed until May 2, 2007).[669] The May 2, 2007 Engagement Letter purported to address only certain *potential* conflicts of interest and it was signed by John Taylor purportedly on behalf of the AIA Corporations on May 2, 2007.[670] The May 2, 2007 Engagement Letter did not address nor seek to waive any of the concurrent conflicts of interest between the AIA Corporations and John Taylor or CropUSA.[671] The May 1, 2007 Letter that the Hawley Troxell Defendants sent to CropUSA to purportedly obtain potential conflict waivers also did not address any of the concurrent conflicts of interest between the AIA Corporations and CropUSA (this letter was prepared by the Hawley Troxell Defendants, not Quarles & Brady).[672]

---

[668] Dkt. 449-82.
[669] HTEH000001-9.
[670] HTEH000001-9.
[671] HTEH000001-9.
[672] HTEH000010-14.

76. On May 2, 2007, John Taylor, Duclos and Freeman entered into a Standstill and Tolling Agreements with the AIA Corporations (the one for John Taylor was signed by John Taylor personally and on behalf of the AIA Corporations and the one for Duclos and Freeman was not signed by anyone on behalf of the AIA Corporations).[673] The Standstill and Tolling Agreements contained a provision noting the board of directors was purportedly required to investigate John Taylor, Duclos and Freeman's self-dealing and breaches of duties of loyalty, but it was unreasonable to expect that such an investigation would ever occur so long as the Controlling AIA Defendants were in control of the AIA Corporations.[674] Based on the documents that I have reviewed and the various lawsuits, it appears that no such investigations occurred, which is precisely what I would have expected.

77. The May 2, 2007 Engagement Letter and the Standstill and Tolling Agreements were never properly authorized because Beck, Henderson and John Taylor had conflicts of interest that prevented them from authorizing the Agreements under AIA Services' Amended Articles of Incorporation (Section 4.2.9(g)), AIA Services' New Restated Bylaws (Section 4.14) and AIA Insurance's Bylaws (Section 4.14).[675] Under RPC 1.13, the highest authority that could have authorized the May 2, 2007 Engagement Letter and the Standstill and Tolling Agreements was a duly appointed independent director or AIA Services' shareholders, but an independent director was never appointed and shareholder approval was never sought or obtained. These same problems would plague the Hawley Troxell Defendants for the agreements and waivers obtained in 2008 and thereafter. Moreover, the Hawley Troxell Defendants never obtained Informed Consent from the AIA Corporations to allow each corporation's fees to be paid by the other, which was even more serious in light of the fact that AIA Insurance was pledged as collateral to Reed Taylor.

78. The May 2, 2007 Engagement Letter confirmed the Hawley Troxell Defendants' broad scope of representation:

---

[673] HTEH000025-28, 000029-32.

[674] Riley has testified that it seemed unlikely that the Controlling AIA Defendants would investigate themselves. *See* Section XII of this Report.

[675] Riley has admitted that the Hawley Troxell Defendants did not do any work to insure that AIA Services' Amended Articles of Incorporation, AIA Services' New Restated Bylaws or AIA Insurance's Bylaws were complied with in connection with the entering into of those Agreements. 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, pp. 175-79.

The scope of our engagement for this matter is to advise the two corporate defendants in connection with above entitled litigation brought by Reed J. Taylor. As indicated above, this representation will be undertaken pursuant to the terms and conditions of a Joint Defense Agreement.[676]

79. The scope of representation was not limited and required the Hawley Troxell Defendants to address all matters that might arise in *Reed Taylor v. AIA Services*.[677] Even if the Hawley Troxell Defendants' scope of representation had been limited as they would later allege, such limitation would have been unreasonable based on the facts and circumstances (and undisputed malfeasance), as addressed in this Report.

80. The Hawley Troxell Defendants should never have conditioned their representation or agreed to represent the AIA Corporations under the terms of the Joint Defense Agreement[678] or any common interest agreement based on the facts and circumstances and the conflicts of interest that I address in this Report (other than the limited possible exception of any legal issues involving the illegality defense or the defense of Reed Taylor's contract claims). On March 3, 2020, Riley testified concerning the Joint Defense Agreements as follows:

Q. But that's not my question. My question was: The practical effect of the joint defense agreement that you conditioned the representation of the AIA corporations on was Mr. Miesen is not entitled to see any of the communications between Hawley Troxell attorneys, John Taylor's attorneys, or other defendants unless there's a court order that gives him that ability?

---

[676] HTEH000007 § A.

[677] HTEH000007 § A.

[678] Riley has testified that "I'm not sure if anybody had objected and didn't want to enter it, but we would have required that as a condition. 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, p. 44. Later, in that deposition Riley stated: "Those were the terms under which we were willing to enter into the engagement. If they had not been agreed to, we would not have entertained the – we would not have entered into the engagement." *Id.* at 169. RPC 1.2(c) requires that a client give informed consent to a limited scope of representation. In order to obtain such consent, under RPC 1.0 (e) the lawyer must communicate "reasonably available alternatives to the proposed course of conduct," which the Hawley Troxell Defendants failed to do, nor did they provide the AIA Corporations with information "of the risks associated with proceeding in the manner that Hawley Troxell proposed . . ." 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, p. 167.

Exhibit - 1, p. 176

11-ER-2593

A. It's my understanding that the applicable rules of evidence provide for that privilege.

Q. And, again, that wasn't my question.

A. I think it was, but I think I – my answer is my answer.

Q. When you were preparing those agreements, did you ever consider whether a shareholder like Mr. Miesen, who might pursue a derivative lawsuit, would want to see the communications that involve Reed's allegations of malfeasance to use in a derivative lawsuit against the responsible parties?

A. It was not a derivative lawsuit, and it was not -- other than the prospect that there might be derivative claims that could arise out of Reed's allegations of wrongdoing by the insiders, we took care of that problem by having them separately represented by their own counsel and by insisting on tolling agreements to preserve those claims for somebody else to make while we defended against Reed's creditor claims against AIA.

Q. (BY MR. BOND) How did you proceed to make sure that shareholders such as Dale Miesen would have knowledge of the tolling agreements?

A. We, as counsel for AIA, corporate entity, dealt with the board of directors. There was no -- we were not engaged to represent shareholders. We were not engaged to pursue derivative claims. We had -- there was nothing under the law, the Idaho Business Corporation Act, the common law, or the articles of incorporation of AIA Services or its bylaws that would trigger any need to make disclosures to shareholders.[679]

---

[679] 3/3/2020 Riley Depo. Transcript, pp. 376-77. It is difficult to imagine a more glaring example of circular reasoning, according to Riley, the idea was to preserve claims for shareholders who would never know about them because no disclosure was ever made to them of the existence of, or the terms of, any tolling agreements.

Exhibit - 1, p. 177

11-ER-2594

81.     It is nonsensical that the Hawley Troxell Defendants would have a Joint Defense Agreement in 2007 or later in 2008 with the Controlling AIA Defendants and CropUSA to defend against claims relating to the foregoing parties' unlawful taking of the AIA Corporations' funds, assets, trade secrets, creditworthiness and other assets—the AIA Corporations should have been demanding the return of CropUSA and the unlawfully misappropriated assets or asserting claims against those parties. I have never heard of an attorney agreeing to represent two defendant clients who have conflicts of interest with the other defendants only if all of the defendants agree to enter into joint defense agreements as a condition to the attorney agreeing to represent the two defendant clients. Contrary to Riley's recent deposition testimony, Standstill and Tolling Agreements are not a substitute for investigating and addressing the concurrent conflicts of interest between the AIA Corporations and CropUSA, John Taylor, Duclos, Freeman, Henderson and Beck (the latter two parties subsequently executed the 2008 Amended and Restated Joint Standstill and Tolling Agreement).[680]

82.     The May 2, 2007 Engagement Letter specifically referred to Babbitt, Riley and Ashby's hourly rates[681] and those three attorneys would be the top three billing attorneys from Hawley Troxell in *Reed Taylor v. AIA Services*.

83.     On May 2, 2007 (in connection with the May 1, 2007 Engagement Letter), John Taylor, Duclos and Freeman executed a Standstill and Tolling Agreement, which the Hawley Troxell Defendants alleged was a condition of their agreement to represent the AIA Corporations.[682]

84.     However, the Hawley Troxell Defendants did not require a tolling agreement to be executed by CropUSA or Cashman at this time, which undermines Riley's July 1, 2019 deposition testimony that the tolling agreements somehow alleviated the obligations to address the conflicts of interests between the AIA Corporations, the Controlling AIA Defendants and CropUSA.

85.     The representation agreements were never disclosed to any independent directors of the AIA Corporations nor were they ever disclosed or approved by AIA Services' shareholders (or disinterested common shareholders since the conflicts of interest would have prevented John Taylor and other interested parties from voting at any such shareholder meeting). The Hawley

---

[680] HTEH000087-97.
[681] HTEH000007 § B.
[682] HTEH000025-28.

**Exhibit - 1, p. 178**

**11-ER-2595**

Troxell Defendants and the Controlling AIA Defendants never disclosed the existence or terms of the May 2, 2007 Engagement Letter, the Standstill and Tolling Agreements or the Joint Defense Agreements to disinterested shareholders or an independent director, as required by RPC 1.13 based on the Controlling AIA Defendants' conflicts of interest.

86.     The Hawley Troxell Defendants knew, or should have known, that John Taylor, Duclos and Freeman would never investigate themselves and the terms of the Standstill and Tolling Agreements acknowledging such duties were self-serving to help the Hawley Troxell Defendants justify in their minds that their representation was appropriate.[683]

87.     Commencing on May 1, 2007, the Hawley Troxell Defendants began billing their time to "AIA Services Corporation" under a new matter entitled "REED J. TAYLOR VS. AIA SERVICES CORPORATION ET AL."[684] Prior to this time, the Hawley Troxell Defendants had been billing their time to "MR. R. JOHN TAYLOR" under a matter entitled "REED TAYLOR VS. JOHN TAYLOR ET AL." and a newly assigned "FILE NO.: 40005-0006."[685] Hawley Troxell's billing statements contained the following information confirming that apparently AIA Services (rather than John Taylor) was now their client:

> AIA SERVICES CORPORATION
> ATTN: R. JOHN TAYLOR
> ONE LEWIS CLARK PLAZA
> 111 MAIN STREET
> P.O. BOX 538
> LEWISTON, ID 83501[686]

88.     From the time that Babbitt, Ashby and Hawley Troxell formally appeared as counsel for the AIA Corporations and later also as counsel for CropUSA, I.R.C.P. 11(a)(1) provided in pertinent part (this Rule applied when Quarles & Brady later appeared through Hawley Troxell):

> Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one (1) licensed attorney of record

---

[683] HTEH000025 § 1.4.
[684] Dkt. 449-85, p. 3.
[685] Dkt. 449-84, p. 62-63.
[686] Dkt. 449-83, p. 5.

Exhibit - 1, p. 179

of the state of Idaho, in the attorney's individual name, whose address shall be stated before the same may be filed.…The signature of an attorney or party constitutes a certificate that the attorney or party has read the pleading, motion or other paper; that to the best of the signer's knowledge, information, and belief after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.[687]

89.     Although Ashby, Babbitt, and Hawley Troxell had not formally appeared as counsel until May 2, 2007 (and Riley never formally appeared as counsel), the Hawley Troxell Defendants were actively working on *Reed Taylor v. AIA Services* as seen by Attorney McNichols' billing records and the Hawley Troxell Defendants' billing records.[688] From May 2, 2007 through the last filing in the case in 2012, Babbitt or Ashby signed every pleading and paper filed for the AIA Corporations and CropUSA (except for one motion to enlarge time, which was signed by Harper).

90.     On May 11, 2007, the Hawley Troxell Defendants filed a Memorandum in support of enlarging time for the AIA Corporations to file a responsive pleading. In Babbitt's Affidavit in support of that motion dated May 11, 2007, Babbitt testified that "John Ashby, an associate with Hawley Troxell, and I have been working diligently to get up to speed on this case, ***to investigate the allegations in the complaint***, to prepare discovery responses, and to respond to the multiple pending issues."[689] This confirms that the Hawley Troxell Defendants were required to investigate the claims.

91.     On May 17, 2007, the AIA Corporations, John Taylor, Freeman and Duclos purportedly entered into a Joint Defense Agreement.[690] As explained in this Report, it was improper to have the AIA Corporations enter into a Joint Defense Agreement with John Taylor, Duclos and Freeman, who were the parties involved in unlawfully funding and operating CropUSA with the AIA Corporations' funds,

---

[687] I.R.C.P. 11(a)(1). The rule was subsequently amended, but the material terms remain unchanged.
[688] AIAPROD00300481-94; AIAPROD00300476-80; Dkt. 449-82, pp. 62-80.
[689] DLM – 0008203 ¶ 15 (Emphasis supplied).
[690] HTEH000033-38.

Exhibit - 1, p. 180

11-ER-2597

assets, employees, office space, trade secrets, credit worthiness and other assets. Because John Taylor, Duclos, Freeman, Beck and Henderson had conflicts of interest based on their ownership of CropUSA common shares and were involved in the corporate malfeasance (or covering it up) against the AIA Corporations, none of them could authorize the Joint Defense Agreement. The entry into the Joint Defense Agreement was a violation of AIA Services' Amended Articles of Incorporation (Section 4.2.9(g) as to conflicts of interest involving affiliates), AIA Services' New Restated Bylaws (Section 4.14 as to conflicts of interest) and AIA Insurance's Bylaws (Section 4.14 as to conflicts of interest). Since AIA Services' shareholders and Donna Taylor never consented to the Joint Defense Agreement, the Agreement was unauthorized, ultra vires and/or intra vires (but unauthorized). The Joint Defense Agreement also violated Beck, Henderson and John Taylor's duties of loyalty owed to the AIA Corporations.

92.     On May 22, 2007, the Hawley Troxell Defendants (allegedly only as counsel for the AIA Corporations) moved to dismiss Reed Taylor's Second Amended Complaint. While the Hawley Troxell Defendants had only appeared as counsel for the AIA Corporations, they moved to dismiss claims on behalf of *all* of the "Defendants," including claims and relief that did not even involve the AIA Corporations and the successful prosecution of which would have benefitted the AIA Corporations (e.g., alter-ego, constructive trust, director liability, unjust enrichment, fraud and conversion)—claims that could have benefitted the AIA Corporations by requiring John Taylor and others to pay the sums owed to Reed Taylor.[691] However, the signature page and the signature of Ashby in the Memorandum of Law independently confirms that the Hawley Troxell Defendants continued representing the interests of John Taylor (as they did throughout *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services*):

HAWLEY TROXELL ENNIS & HAWLEY LLP


By s/
 D. John Ashby ISB No. 7228
 Attorneys for Defendants AIA Services
 Corporation, AIA Insurance, Inc. *and*

---

[691] DLM – 0008265-87.

Exhibit - 1, p. 181

11-ER-2598

### *R. John Taylor*[692]

93.     On May 29, 2007, Attorney McNichols (on behalf of John Taylor) filed a joinder to the Hawley Troxell Defendants' Motion to Dismiss the Second Amended Complaint. There were no additional arguments or authorities provided and that Joinder stated, "John Taylor joins in the Motion to Dismiss filed by AIA Services Corporation and AIA Insurance, Inc., and joins in and adopts the supporting memorandum."[693]

94.     On June 4, 2007, the Hawley Troxell Defendants records show that AIA Services paid $8,152 and $8,485, respectively, for the legal work that they had provided to John Taylor as evidenced by the April 4, 2007 and May 17, 2007 billing records.[694]

95.     On June 21, 2007, the Hawley Troxell Defendants filed an opposition to Reed Taylor's motion to amend arguing that, *inter alia*, Reed Taylor's alter ego, constructive trust and director liability causes of action "fail because they are not causes of action at all"[695] and that the "proposed amended complaint should be rejected as futile because it fails to state any claims against [Henderson] and Beck that arose after the individuals were appointed to the Board of Directors of AIA Services and AIA Insurance…If [Reed Taylor] wishes to amend his Complaint to add claims against [Henderson] and [] Beck as members of the Board of Directors, then [Reed Taylor] should be required to set forth the allegations of what actions those individuals have taken over the past two months that subject them to person liability."[696] Once again, the Hawley Troxell Defendants are representing the interests of the Controlling AIA Defendants in violation of the duties of loyalty owed to the AIA Corporations.

---

[692] DLM – 0008286 (Emphasis supplied). In Hawley Troxell's March 4, 2020 Rule 30(b)(6) Deposition, Ashby attempted to explain this away as a mistake. 3/4/2020 Ashby 30(b)(6) Depo. Transcript, pp. 70-71. However, Ashby's actions representing John Taylor's interests seeking to dismiss claims asserted against him speak louder than his words. The Unredacted Billing Records, pleadings and other court filings confirmed in no uncertain terms that the Hawley Troxell Defendants were representing the interests of John Taylor in *Reed Taylor v. AIA Services*, *Donna Taylor v. Taylor*, *Donna Taylor v. AIA Services* and the other matters.

[693] DLM – 0008420.

[694] Dkt. 449-82, pp. 66-68, 74-75.

[695] DLM – 0008787.

[696] DLM – 0008791-92.

96.     On June 26, 2007, Duclos emailed Cashman, Beck, Randy Lamberjack, and Adrian Johnson to schedule a "CropUSA Board meeting" and to update them on matters regarding the status of *Reed Taylor v. AIA Services*.[697] This email suggests that the advisory board members were, in fact, the board members of CropUSA.

97.     On August 14, 2007, Reed Taylor filed his Fourth Amended Complaint.[698] The Fourth Amended Complaint added CropUSA as a defendant and additional claims and allegations. As this time, the Hawley Troxell Defendants did not seek a conflict waiver or obtain Informed Consent to represent CropUSA.

98.     On August 20, 2007, the AIA Corporations and John Taylor submitted a joint response to Reed Taylor's Second Set of Requests for Production and Interrogatories.[699] This document was signed by Ashby on behalf of Babbitt and Attorney McNichols and Ashby signed the certificate of service. In light of the fact that John Taylor was purportedly being represented only by Attorney McNichols and in light of Reed Taylor's extensive allegations of malfeasance against John Taylor, it was inappropriate for the Hawley Troxell Defendants to prepare and sign joint responses to Reed Taylor's discovery requests. This is another example of evidence showing that the Hawley Troxell Defendants were not independently representing the interests of the AIA Corporations and were truly representing the interests of John Taylor (as they had when they first started working on *Reed Taylor v. AIA Services* in February 2007).

99.     On September 20, 2007 (after Reed Taylor moved to amend his complaint to file the Fifth Amended Complaint), the Hawley Troxell Defendants opposed naming Cashman as a defendant because serving on "an 'advisory board' does not state a claim that subjects him to personal liability for the actions of the corporations….He is not a proper defendant in this litigation and he should be removed from the proposed Fifth Amended Complaint."[700] This confirms, once again, that the Hawley Troxell Defendants were representing the interests of the Controlling AIA Defendants. While the Hawley Troxell Defendants took the position against the best interests of the AIA Corporations when they asserted that Cashman should not be named as a defendant, the Hawley Troxell Defendants never required Cashman to sign a tolling agreement. This wholly undermines the

---

[697] AIA0000132318.
[698] RJT – 040831-63.
[699] DLM – 0030484-517.
[700] RJT – 041076-77.

Hawley Troxell Defendants' allegations that they were obtaining tolling agreements for any legitimate purposes.

100.   On September 27, 2007, AIA Services purportedly executed a $500,000 Promissory Note and ancillary documents purportedly pledging its ownership in the mortgage securing AIA Services' Headquarters for a loan from CropUSA to AIA Services to provide funding to pay attorney fees in *Reed Taylor v. AIA Services*.[701] The documents were prepared by the Hawley Troxell Defendants (which includes Attorney Collins in that definition; he was the primary attorney preparing the instruments). They did not seek or obtain Informed Consent Confirmed in Writing to act on both sides of that transaction, which would have been ineffective in any event because the loan violated AIA Services' Amended Articles of Incorporation and AIA Services' New Restated Bylaws, including the conflict of interest provisions contained therein. The Hawley Troxell Defendants breached their duties of loyalty owed to the AIA Corporations by preparing these instruments and representing both sides of the transaction. Under these circumstances, an attorney cannot simply be a "scrivener" for a transaction as later alleged by Attorney Collins.[702]

101.   On November 11, 2007, the Hawley Troxell Defendants formally appeared as counsel for CropUSA in *Reed Taylor v. AIA Services*.[703] However, the Hawley Troxell Defendants did not seek or obtain Informed Consent Confirmed in Writing to also represent CropUSA as required by RPC 1.7. Thus, the Hawley Troxell Defendants violated RPC 1.7 by appearing for CropUSA. Indeed, it would not be until February 25, 2008 before the Hawley Troxell Defendants would seek to obtain any form of written representation agreement from CropUSA or the AIA Corporations as to the conflicts of interest, but neither agreement addressed the concurrent conflicts of interest between CropUSA and the AIA Corporations.[704]

102.   On November 11, 2007, the Hawley Troxell Defendants also filed a motion for limited admission of Attorney Gatziolis and Attorney Harper to assist in representing CropUSA.[705] On December 27, 2008, Judge Brudie granted the Hawley Troxell Defendants' motion for limited admission of Attorney Gatziolis

---

[701] *E.g.*, Dkts. 390-24, 390-25; AIA0027179-88.

[702] Dkt. 390-26, p. 3 ¶ 6.

[703] DLM – 0009663-65.

[704] HTEH000039-47.

[705] DLM – 0009666-69.

Exhibit - 1, p. 184

and Attorney Harper from the law firm of Quarles & Brady.[706] That order did not relieve the Hawley Troxell Defendants' of their obligations to appear at all hearings for CropUSA and to sign all pleadings and papers for CropUSA. There is no agreement between the Hawley Troxell Defendants and Quarles & Brady regarding limiting the role or work of the Hawley Troxell Defendants and the record demonstrates that the Hawley Troxell Defendants were taking the lead on all issues, including, without limitation, later obtaining various representation agreements, Joint Defense Agreements and Standstill and Tolling Agreements. There is no evidence to support the Hawley Troxell Defendants' position that they had a limited role to act solely as "local counsel" for CropUSA.

103.   On November 29, 2007, Judge Brudie granted Reed Taylor's Motion to Amend in part, but he declined to permit Cashman from being named as a defendant thereby accepting the Hawley Troxell Defendants' positions protecting the interests of the Controlling AIA Defendants.[707] As noted in this Report, the Hawley Troxell Defendants never required Cashman to sign a Standstill and Tolling Agreement.

104.   On December 28, 2007, Babbitt signed and served CropUSA's Responses to Reed Taylor's First Set of Requests for Production and First Set of Interrogatories and the Notice of Compliance (no attorney from Quarles & Brady signed them).[708] This confirms that the Hawley Troxell Defendants were doing the work, not Quarles & Brady.

105.   As of December 31, 2007, AIA Services' Unaudited Consolidated Financial Statements indicated that it had total assets of $2,260,670, total liabilities of $2,343,967 (which does not include Reed Taylor's illegal debt), total revenues of $2,021,514, a net loss of $447,579 (which includes the significant interest paid to Reed Taylor that year), and owed Donna Taylor $457,775 for her Series A Preferred Shares (which had still not been redeemed as required by December 2003).[709] As of December 31, 2007, AIA Insurance's Audited Financial Statements indicated that it had total assets of $2,956,007, total liabilities of $1,171,725, total revenues of $1,149,367, and net income of $71,881.[710] This was the last year that AIA Insurance's Financial Statements were audited. As of December 31, 2007,

---

[706] DLM – 0010379-82.

[707] RJT – 041072-79; RJT – 041398-408.

[708] DLM – 0031830-93.

[709] RJT – 036392-95.

[710] AIA_19INSP_0081875-87.

Exhibit - 1, p. 185

11-ER-2602

CropUSA's Audited Financial Statements indicated that it had total assets of $5,538,844, total liabilities of $11,727,760, total revenues of $7,941,561, and a net loss of $3,758,440.[711]

106.   There were no annual or special shareholder meetings held for AIA Services in 2007 (other than the so-called special shareholder meeting held in March 2007 to purportedly approve advancing funds to pay the fees and costs for John Taylor, Duclos and Freeman). In addition, Donna Taylor's designee was not seated on the board of AIA Services as required. Therefore, none of the transactions or corporate decisions involving the AIA Corporations were authorized for 2007.

I.   **2008 – The Parties Engage in Unnecessary Heavy Litigation and Discovery in *Reed Taylor v. AIA Services*, the Hawley Troxell Defendants Obtain Purported Agreements to Also Jointly Represent CropUSA, the AIA Corporations' Assets Are Sold to Hudson, Donna Taylor Files Suit in *Donna Taylor v. Taylor*, and the Malfeasance and Improper Corporate Governance Continue.**

1.   On January 3, 2008, Ashby signed and served CropUSA's Supplemental Responses to Reed Taylor's First Set of Requests for Production and First Set of Interrogatories (no attorney from Quarles & Brady signed them).[712] The answers to the Interrogatories were verified by John Taylor. This confirms that the Hawley Troxell Defendants were handling discovery matters for CropUSA with the assistance of the conflicted John Taylor.

2.   On January 28-30, 2008, John Taylor was deposed in his individual capacity in *Reed Taylor v. AIA Services*. In that deposition, John Taylor's testimony and the exhibits thereto confirmed that he improperly made the decisions for the AIA Corporations (including litigation decisions), that he was improperly operating the AIA Corporations, that he had engaged in many improper transactions constituting malfeasance against the AIA Corporations and that he was not acting in the best interests of the AIA Corporations but was instead placing his and CropUSA's interests above the interests of the AIA Corporations and the AIA Disinterested Shareholders.[713] This deposition alone should have made the Hawley Troxell Defendants terminate all representation of CropUSA and cease representing the interests of the Controlling AIA Defendants. Instead, they continued providing

---

[711] AIAPROD00066243-60.

[712] DLM – 0031898-967.

[713] Dkts. 67-10, 67-11, 67-12 (the three days of transcripts); RJT – 024150-462 (the exhibits).

Exhibit - 1, p. 186

11-ER-2603

substantial assistance to John Taylor and the other Controlling AIA Defendants, as well as representing CropUSA.

3. On February 1, 2008, in *Reed Taylor v. AIA Services*, Reed Taylor filed his Fifth Amended Complaint.[714] The Fifth Amended Complaint included additional claims and allegations of malfeasance and breaches of fiduciary duties of loyalty. The allegations were supported by documentary evidence that the Hawley Troxell Defendants had in their possession.

4. Sometime after Reed Taylor's Fifth Amended Complaint was filed on February 1, 2008, Riley conducted a "[c]omparison of [the] 5th Amended Complaint with prior versions of complaint, with handwritten notes…"[715] This is but one of example of evidence demonstrating that Riley was involved in *Reed Taylor v. AIA Services* more than merely allegedly addressing representation agreements and conflicts.

5. On February 8, 2008, in *Reed Taylor v. AIA Services*, Judge Brudie granted Reed Taylor's motion for partial summary judgment on the default of the $6,000,000 Promissory Note.[716] While this motion was another example of the wasted fees and costs because the illegality defense had not yet been asserted, this opinion and order also appears to be one of the reasons that the Hawley Troxell Defendants began working on additional representation agreements relative to CropUSA being named as a defendant.

6. On February 21, 2008, the Hawley Troxell Defendants filed the AIA Corporations' Answer to the Fifth Amended Complaint and asserted Counterclaims against Reed Taylor, which was signed by Babbitt.[717] Many of the denials were improper and it is clear from the denials that the Hawley Troxell Defendants were improperly focused upon representing the interests of the Controlling AIA Defendants and CropUSA in violation of their duties of loyalty owed to the AIA Corporations.

7. On February 21, 2008, the Hawley Troxell Defendants filed CropUSA's Answer to the Fifth Amended Complaint and asserted Counterclaims against Reed Taylor, which was signed exclusively by Babbitt and not by any

---

[714] DLM – 0010406-51.
[715] 3/26/2019 HTEH Itemized Privilege Log, p. 44.
[716] DLM – 0010452-68.
[717] DLM – 0010519-44.

attorneys from Quarles & Brady (the first page also listed the Hawley Troxell Defendants as counsel for AIA Service, AIA Insurance and CropUSA).[718] This legal work, as with other legal work, was performed for CropUSA before the Hawley Troxell Defendants had entered into a representation agreement or addressed any conflicts of interest, which is improper because addressing potential or concurrent conflicts of interest after a representation has commenced is problematic, especially when independent counsel is not involved. Again, as with the Answer to the Fifth Amended Complaint filed by the AIA Corporations, many allegations were improperly denied. This Answer further confirmed that the Hawley Troxell Defendants were focused on representing the interests of the Controlling AIA Defendants and CropUSA in violation of their duties of loyalty owed to the AIA Corporations.

8.      The Answers filed on behalf of the AIA Corporations and CropUSA by the Hawley Troxell were virtually identical in content and the admissions and denials were essentially the same, which makes no sense because certain allegations do not apply to the AIA Corporations and CropUSA and other allegations apply to other defendants.[719] These two Answers confirmed what had been taking place since the Hawley Troxell Defendants first appeared as counsel in *Reed Taylor v. AIA Services*—that the Hawley Troxell Defendants were representing the interests of the Controlling AIA Defendants and CropUSA, not the interests of the AIA Corporations.

9.      On February 22, 2008 (almost three and one-half months after the Hawley Troxell Defendants appeared as counsel for CropUSA in *Reed Taylor v. AIA Services*), Babbitt sent substantially the same letters to the AIA Corporations' purported boards of directors,[720] CropUSA's purported board of directors,[721] John Taylor and his Attorney McNichols,[722] Beck and Henderson and their Attorney Hally,[723] and Duclos and Freeman and their Attorney Gittins[724] asking for all of them to sign purported conflict waivers back-dated to November 1, 2007 (which was before the Hawley Troxell Defendants first appeared as counsel for CropUSA on November 11, 2007). These letters were drafted by the Hawley Troxell

---

[718] DLM – 0010502-18.

[719] *Compare* DLM – 0010502-18 *with* DLM – 0010519-44.

[720] HTEH000039-47.

[721] HTEH000048-58.

[722] HTEH000059-67.

[723] HTEH000076-86.

[724] HTEH000068-75.

Exhibit - 1, p. 188

Defendants. The letters did not address any of the conflicts of interest between the AIA Corporations and the Controlling AIA Defendants, including, without limitation, because the Controlling AIA Defendants had unlawfully taken CropUSA and funded it from the AIA Corporations; they should have required the return of CropUSA and the funds and assets unlawfully taken or the Hawley Troxell Defendants should have asserted such claims against CropUSA and the Controlling AIA Defendants.

10.     On February 25, 2008, the Hawley Troxell Defendants obtained the signed February 25, 2008 Amended AIA Engagement Letter from the AIA Corporations (which was signed by John Taylor)[725] and the initial Engagement Letter from CropUSA (signed by John Taylor, Duclos and Petersen).[726] Once again, the Hawley Troxell Defendants did not disclose the Lancelot Loan work for CropUSA, Riley's prior work assisting in the taking of CropUSA from the AIA Corporations, or disclose or address any of the serious conflicts of interest between the AIA Corporations and CropUSA (including those based on the unlawful taking and funding of CropUSA from the AIA Corporations and the fact that the AIA Corporations should have been pursuing claims against CropUSA). The February 25, 2008 Amended AIA Engagement Letter violated AIA Services' Amended Articles of Incorporation (Section 4.2.9(g)), AIA Services New Restated Bylaws (Section 4.14) and AIA Insurance's Bylaws (Section 4.14) because the Controlling AIA Defendants had conflicts of interest that preventing them from authorizing the February 25, 2008 Amended AIA Engagement Letter and any of the conflict waivers contained within that letter (Riley later agreed that "in retrospect", the boards were not independent).[727] In addition, the Hawley Troxell Defendants failed to obtain Informed Consent to allow the fees and costs to be paid by the AIA Corporations or CropUSA for one another. The Hawley Troxell Defendants and the Controlling AIA Defendants breached their duties of loyalty owed to the AIA Corporations by purportedly authorizing and/or permitting entry into the February 25, 2008 Amended AIA Engagement Letter and the joint representation of the AIA Corporations and CropUSA.

11.     For the same reasons explained above (including my analysis with respect to the May 2, 2007 AIA Engagement Letters and Joint Defense Agreement), the February 25, 2008 Amended AIA Engagement Letter and the Amended Joint

---

[725] HTEH000039-47.
[726] HTEH000048-58.
[727] Riley later attempted to recant that admission.

Exhibit - 1, p. 189

Defense Agreement[728] (defined in Section IX(C) herein as the Joint Defense Agreement) violated RPC 1.7 and RPC 1.13 and were unauthorized[729] because the Controlling AIA Defendants' conflicts of interest prevented them from authorizing the agreements and doing so violated AIA Services' Amended Articles of Incorporation, AIA Services' New Restated Bylaws, and AIA Insurance's Bylaws.

12. Based on the documentary and testimonial evidence pertaining to CropUSA being unlawfully taken from and funded by the AIA Corporations (which was available to the Hawley Troxell Defendants at the time of the February 25, 2008 Amended AIA Engagement Letter), there were, *inter alia*, concurrent conflicts of interest between the AIA Corporations and CropUSA because the AIA Corporations' interests were to recover CropUSA, recover the funds and assets transferred to CropUSA and the Controlling AIA Defendants, and to cease the improper funding of CropUSA. The Hawley Troxell Defendants failed to address these and other concurrent conflicts of interest, which conflicts were, in any event, not waivable by the AIA Corporations based on the extensive malfeasance committed against them.

13. On February 26, 2008, Attorney Gatziolis wrote a letter to Babbitt returning the signed "Joint Defense Agreement,"[730] which confirmed again that the Hawley Troxell Defendants were taking the lead role in the defense of *Reed Taylor v. AIA Services*.

14. On April 16, 2008, Henderson and Beck raised the illegality defense for the very first time when they asserted the defense in their Motion for Partial Summary Judgment (although they asserted the incorrect Idaho Code section 30-1-46 rather than 30-1-6).[731] The information relied upon for the illegality defense had been readily available to all of the defendants in *Reed Taylor v. AIA Services* since Reed Taylor had filed his Complaint.

15. On April 18, 2008, Henderson also filed a separate Affidavit in *Reed Taylor v. AIA Services* conceding that she was fully aware of her "fiduciary dut[ies] as board members" of the AIA Corporations.[732] This confirms the obvious fact that

---

[728] HTEH000087-97.
[729] And were separately ultra vires contracts.
[730] HTEH000353.
[731] RJT – 042688-806.
[732] RJT – 025516.

**Exhibit - 1, p. 190**

**11-ER-2607**

Henderson has no excuse for any of her conduct as a director of the AIA Corporations, especially when she is also an attorney.

16.    On April 21, 2008, the Hawley Troxell Defendants, as counsel for the AIA Corporations and CropUSA (as indicated on the first page), moved to amend the Answer for the AIA Corporations to assert the illegality defense through a Second Amended Answer to Reed Taylor's Fifth Amended Complaint.[733] This was the first date that the Hawley Troxell Defendants asserted the illegality defense. Assuming that the AIA Corporations had standing to assert the defense (which they did not under *La Voy Supply Co. v. Young*, 84 Idaho 120, 127, 369 P.2d 45 (1962)),[734] there is no reason why the Hawley Troxell Defendants should have not identified and asserted the illegality defense at the time that they first appeared for the AIA Corporations on May 2, 2007 (particularly since they had been already working on the lawsuit for John Taylor[735] months before that time).[736]

17.    On or about April 24, 2008, Cashman provided a receipt for reimbursement for the purchase of a laptop computer and software installation.[737] I am assuming that this reimbursement was based on the work that Cashman was performing for CropUSA (as discussed below). Cashman was still a shareholder of AIA Services and a member of the Controlling AIA Defendants' control group.

18.    On April 29, 2008, in *Reed Taylor v. AIA Services*, Duclos was deposed and her testimony confirmed that she had not been acting in the best interests of the AIA Corporations.[738]

19.    As a result, a year of intensive litigation and discovery had been a complete waste of time and money because the Hawley Troxell Defendants had negligently failed to identify and assert the illegality defense (even if identified for

---

[733] RJT – 042912-16; RJT – 042917-58.

[734] Judge Brudie found that none of the defendants had standing to challenge the legality of Reed Taylor's redemption. The Idaho Supreme Court clarified on appeal that the issue was not one of standing and ruled that John Taylor and Henderson could assert the violation of I.C. § 30-1-6 as a defense because they were minority shareholders of AIA Services at the time of the redemption. *Taylor v. AIA Services,* 151 Idaho 552, 564, 261 P.3d 829, 841 (2011).

[735] Riley also later testified that the time spent by the Hawley Troxell Defendants for the first several months before formally appearing as counsel was "parked" in a John Taylor matter until they formally opened a matter for AIA Services months later.

[736] *E.g.*, FB 0636.

[737] AIAPROD00033203.

[738] Dkt. 67-15.

other defendants to assert the defense) or they intentionally concealed that defense. Under either scenario, the AIA Corporations needlessly incurred over $800,000 in attorneys' fees and costs in *Reed Taylor v. AIA Services.*

20.     On May 8, 2008, Judge Brudie denied the AIA Corporations' motion for reconsideration of the February 8, 2008[739] ruling finding that AIA Services was in default of the $6,000,000 Promissory Note.[740] As explained above, the litigation of all of these issues was a complete waste of time and money since the illegality defense should have been identified and asserted at the onset of the litigation. Moreover, the defense asserted by the Hawley Troxell Defendants regarding the Subordination Agreement between Reed Taylor and Donna Taylor established that defense was separately a complete waste of time and money. As Judge Brudie noted, "Under the theory asserted by the Defendant, AIA could prevent Reed Taylor from ever having a legal remedy for non-payment of the $6 million Note by leaving as little as one cent unpaid on the debt owed to Donna Taylor. Such an interpretation would result in a legal absurdity."[741] The defenses regarding waiver and oral modification based on some uncertain premium levels obtained by the AIA Corporation and CropUSA were also separately wasteful and further established Reed Taylor's assertion that CropUSA truly belonged to the AIA Corporations because there is no rationale reason why CropUSA would be responsible for the over $6,000,000 debt to Reed Taylor if it were truly a separate and distinct corporation from the AIA Corporations (which also further confirms the conflicts of interest plaguing the Hawley Troxell Defendants' joint representation of the AIA Corporations and CropUSA (and failure to take action in the best interests of the AIA Corporations), and John Taylor, Henderson and Beck's conflicts of based on their ownership in CropUSA and the AIA Entities and their participation of the improper transactions between the AIA Corporations and CropUSA as discussed in this Report and/or covering up the facts of those improper transactions).

21.     On May 9, 2008, Reed Taylor filed a Response in opposition to the Motion that the Hawley Troxell Defendants had filed to seek permission to amend AIA Services' answer to assert the illegality defense.[742] Reed Taylor pointed out that the AIA Corporations were prohibited from challenging the legality of the redemption of his shares (citing *La Voy Supply Co. v. Young*, 84 Idaho 120, 369 P.2d 45 (1962) (the same case Riley had allegedly relied upon in 1995 to determine

---

[739] RJT – 042069-85.

[740] RJT – 043117-39.

[741] RJT – 043129.

[742] RJT – 043062-65.

Page - 183

Exhibit - 1, p. 192

11-ER-2609

that the AIA Corporations could not challenge the stock redemption)).[743] Reed Taylor also pointed out Riley's conflict of interest involving his opinion letter provided to Reed Taylor for the 1995 transaction).[744]

22.     On May 22, 2008, the AIA Corporations (through the Hawley Troxell Defendants) filed a Motion for Permissive Appeal Pursuant to I.A.R. 12(C) with the Idaho Supreme Court.[745] This appeal was a waste of attorneys' fees based on the illegality defense having finally been asserted on April 2008.

23.     The Hawley Troxell Defendants allege that Henderson's faxed document relating to *Taylor* v. *Maile* is protected by "Attorney-client communication; Work Product,"[746] but the Hawley Troxell Defendants were never attorneys of record for any party in *Taylor v. Maile*. This privilege log entry demonstrates that the Hawley Troxell Defendants had been actually representing the interests of Henderson in *Reed Taylor v. AIA Services* because there would be no other reason to withhold that faxed document from Miesen on the basis of privilege or work product,[747] as further supported by another entry on "7/7" that referenced Riley's notes regarding "Representation of John and Reed Taylor by [Henderson] i[n] [*Taylor v. Maile*]."[748] This is consistent with how the Hawley Troxell Defendants represented the AIA Corporations—they were truly representing the interests of John Taylor, Henderson, Beck, Cashman, Duclos and Freeman.

24.     On June 2, 2008, in *Donna Taylor v. Taylor*, Donna Taylor filed her complaint against John Taylor asserting, *inter alia*, that he had diverted over a million dollars from the AIA Corporations and paid himself excessive compensation when he had represented to Donna Taylor that CropUSA was being developed by the AIA Corporations.[749] On October 28, 2008, this complaint was amended to assert additional allegations of malfeasance and tort claims against John Taylor and also named Henderson as a defendant.[750] These undisputable allegations and claims provided the Hawley Troxell Defendants with notice of additional

---

[743] RJT – 043063.

[744] RJT – 043063 n.1; Dkt. 67-7.

[745] DLM – 0019428-805.

[746] 3/26/2019 HTEH Itemized Privilege Log, p. 4

[747] 3/26/2019 HTEH Itemized Privilege Log, p. 4

[748] 3/26/2019 HTEH Itemized Privilege Log, p. 44.

[749] Dkt. 390-39.

[750] Dkt. 84-5.

Exhibit - 1, p. 193

11-ER-2610

conflicts of interest of John Taylor and Henderson and additional reasons why the Joint Defense Agreements were improper and unauthorized.

25.     On June 4, 2008 (two days after Donna Taylor filed suit in *Donna Taylor v. Taylor*), Ashby's billing entry stated: "REVIEW COMPLAINT FILED BY D. TAYLOR AGAINST J. TAYLOR."[751]

26.     On June 10, 2008, one of Ashby's billing entry stated: "WORK ON D. TAYLOR LAWSUIT AND ISSUES OF CONTINUING PAYMENTS TO D. TAYLOR."[752] Again, as noted above, instead of properly advising the AIA Corporations to pay Donna Taylor and eliminate the needless payment of fees and costs, the Hawley Troxell Defendants were working to support the Controlling AIA Defendants' improper efforts to avoid paying Donna Taylor.

27.     On June 12, 2008, in *Reed Taylor v. AIA Services*, the Idaho Supreme Court denied AIA Services, AIA Insurance and CropUSA's Motion for Permissive Appeal.[753] This permissive appeal is just one of many examples of further wasted attorneys' fees and costs paid to the Hawley Troxell Defendants based on the mishandling of the illegality defense.

28.     On June 17, 2008, Riley's billing entry stated: "CONFERENCE WITH G. BABBITT, T. CHANDLER AND R. THOMAS RE OBLIGATIONS OF ESOP TRUSTEES TO RAISE CLAIM THAT REED'S REDEMPTION AGREEMENT WAS VOID AND RE APPOINTMENT OF SPECIAL TRUSTEES TO REPLACE CONFLICTED TRUSTEES."[754] This entry establishes that the Hawley Troxell Defendants had the idea of having AIA Services' 401(k) Plan intervene in *Reed Taylor v. AIA Services* and that they were aware the current trustees, John Taylor and Duclos, had conflicts of interest. This work, as were the many other billing entries relating to the ESOP/401(k) Plan and intervention, was unnecessary and wasteful because the 401(k) Plan could not challenge the legality of Reed Taylor's redemption, as Judge Brudie and the Idaho Supreme Court would later confirm. There would be many additional wasteful billing entries on these issues, but yet acknowledging the conflicts of interest John Taylor and Duclos had as trustees of AIA Services' 401(k) Plan.

---

[751] FB 0971 (Solid caps in original).

[752] FB 0971 (Solid caps in original).

[753] DLM – 0020049-50.

[754] FB 0972 (Sold caps in original).

Exhibit - 1, p. 194

11-ER-2611

29.     On January 19, 2008, Ashby's billing entries included: "LEGAL RESEARCH RE STATUTE OF LIMITATIONS AS APPLIED TO D. TAYLOR'S CLAIMS FOR FRAUDULENT TRANSFER AND BREACH OF FIDUCIARY DUTY."[755] These billing entries confirm Ashby is working on substantive matters for John Taylor's defense to Donna Taylor's fraud and breach of fiduciary duty claims in *Donna Taylor v. Taylor*, which further confirms, as do many other billing entries, that the Hawley Troxell Defendants were not limited in their scope of representation and they were actively working to defend John Taylor's interests.

30.     On June 24, 2008, John Taylor (purportedly on behalf of AIA Services) wrote to Donna Taylor advising her that AIA Services "will no longer redeem your Series A Preferred Stock."[756] Through the day of this Report, AIA Services has never made any additional payments to Donna Taylor, even though she had payment priority over all other shareholders and despite the over $2.2 million in face value of promissory notes evidencing improper loans to PERC.

31.     On June 25, 2008, Ashby's billing entry stated: "AFFIRMATIVE DEFENSES TO D. TAYLOR LAWSUIT; ANALYSIS AND LEGAL RESEARCH RE WETHER THE CORPORATION CAN ADVANCE COSTS OF LITIGATION RE D. TAYLOR LAWSUIT."[757] This billing entry alone, not to mention others, establishes the Hawley Troxell Defendants were not operating under a limited scope of representation in Reed Taylor v. AIA Services and were acting in a role as general counsel. The Hawley Troxell Defendants never appeared as counsel in *Donna Taylor v. Taylor*, but they were conducting legal research regarding the lawsuit.

32.     On June 26, 2008, Ashby's billing entry stated: "LEGAL RESEARCH RE ADVANCING COSTS OF LITIGATION AND CONFERENCE WITH COUNSEL RE THE SAME; LEGAL RESEARCH RE DEFENSES TO D. TAYLOR LAWSUIT…"[758] Ashby's work here confirms that the Hawley Troxell Defendants were addressing, and breaching their duties of care, regarding the issue of the advancement of costs by the AIA Corporations to the Controlling AIA Defendants, which was never properly addressed or approved by the AIA Corporations as to advancing attorneys' fees and costs for any party in any lawsuit from 2007 and thereafter, and again the issue of defending against the claims

---

[755] FB 0973 (Solid caps in original).
[756] DLM – 0003488.
[757] FB 0975 (Solid caps in original).
[758] FB 0975 (Solid caps in original).

brought by Donna Taylor or the related issue of simply properly paying her as had been required under the written 1995 Letter Agreements[759] by December 2003.

33.    On July 3, 2008, Hudson Insurance sent a letter to CropUSA regarding issues involving the Standard Reinsurance Agreement (SRA) for 2008, including by stating how the RMA was concerned about CropUSA's $6.2 million accumulated deficit and ability to operate.[760] This letter confirmed Cashman's ongoing involvement in CropUSA through the discussions held at Cashman's office and the letter was carbon copied to Cashman. This letter references the financial problems that led to the sale of the book of business to Hudson because of the Controlling AIA Defendants and most specifically John Taylor's problems with running a financial responsible company. For example, John Taylor was paying himself and others compensation as if CropUSA were a profitable company. As seen from the year-end financial information provided in prior sections of this Report, CropUSA lost money every year and had no business paying excessive compensation. For example, in 2006, John Taylor received $191,268 in 1099 compensation from CropUSA, which lost $1,988,417 that year.[761] Indeed, more recently, John Taylor continues to accrue salary of $75,000 per year from the AIA Corporations when they only have approximately $100,000 of total revenues.

34.    On July 21, 2008, Reed Taylor and Donna Taylor made a comprehensive written derivative demand upon the boards of directors of the AIA Corporations[762] to take legal action against CropUSA, the Controlling AIA Defendants, their attorneys and other parties.[763]

35.    The July 21, 2008 demand letter provided more than sufficient information for the purported boards of directors of the AIA Corporations to take action, but the problem remained that Controlling AIA Defendants would never

---

[759] The 1996 Series A Preferred Shareholder Agreement also required Donna Taylor to be paid even sooner than December 2003 (the agreement required additional $100,000 payments to be made semi-annually to Donna Taylor after Reed Taylor's Down Payment Note had been paid off in mid-2001. DLM – 0003474.

[760] AIAPROD00001845-46.

[761] *See* page 89 of the Exhibit A attached hereto; RJT – 068665.

[762] I.C. § 30-1-742.

[763] Dkt. 23-9.

Exhibit - 1, p. 196

take action against themselves or their attorneys, the Hawley Troxell Defendants.[764] We know this for certain. Over ten years later, the Controlling AIA Defendants have still never taken any action on behalf of the AIA Corporations to recover the millions of dollars in unlawfully taken funds and assets.

36.     The clear language of I.C. § 30-1-742 does not require more than one shareholder to make the derivative demand upon the AIA Corporations.[765] As a result, Miesen was not required to make a separate demand as to the issues raised in the July 21, 2008 demand letter or any other demands provided by any other shareholders of AIA Services.

37.     The alleged board of directors of the AIA Corporations did not respond to Attorney Bissell with respect to the July 21, 2008 demand letter nor did the purported directors seek additional information.[766] The purported boards of directors of the AIA Corporations did not reject the July 21, 2008 demand letter. Based on John Taylor's recent Rule 30(b)(6) testimony and the limited written board and shareholder meeting minutes and resolutions involving the AIA Corporations, I can confirm that the purported boards were not properly elected or fully seated (including with the director designated by the Series A Preferred Shares or the director designated by the Series C Preferred Shares. In other words, there were no directors to make a written demand upon.

38.     On July 21, 2008, Hawley Troxell served notices of depositions of Reed Taylor and Donna Taylor, which were both signed exclusively by Babbitt on

---

[764] "Section 742 specifies only that the demand shall be in writing. The demand should, however, set forth the facts concerning share ownership and be sufficiently specific to apprise the corporation of the action sought to be taken and the grounds for that action so that the demand can be evaluated. *See Allison v. General Motors Corp.*, 604 F. Supp. 1106, 1117 (D. Del. 1985). Detailed pleading is not required since the corporation can contact the shareholder for clarification if there are any questions. In keeping with the spirit of this section, the specificity of the demand should not become a new source of dilatory motions." I.C. § 30-1-742 cmt. The Hawley Troxell Defendants treated the information in the demand letter as sufficient notice. In referring to the July 2008 demand letter, Henderson testified that "what they said was that because we were also named as parties, we needed to try to get someone independent to do the investigation." 9/10/2020 Connie Henderson Depo. Transcript, p. 125.

[765] "It should be noted that the shareholder bringing suit does not necessarily have to be the person making the demand. Only one demand need be made in order for the corporation to consider whether to take corrective action." I.C. § 30-1-742 cmt.

[766] "Detailed pleading is not required since the corporation can contact the shareholder for clarification if there are any questions." I.C. § 30-1-742 cmt.

Page - 188

Exhibit - 1, p. 197

11-ER-2614

behalf of the AIA Corporations and CropUSA (Quarles & Brady was not even listed as counsel on the first pages).[767]

39.    On July 22, 2008, Babbitt wrote to the purported directors of the AIA Corporations regarding Reed Taylor and Donna Taylor's derivative demand letter.[768] Rather than focus on the representing the interests of the AIA Corporations by demanding that an independent director be appointed and/or to make the required disclosures to the AIA Disinterested Shareholders so that authority could be obtained to take proper action, once again, there is little question that the self-serving language used in this letter was in fact window dressing to be used as a purported shield in the event of subsequent scrutiny of the conduct of the Hawley Troxell Defendants because they were not in fact proceeding in the best interests of the AIA Corporations.[769] The next day Riley began the Hawley Troxell Defendants' "shoot the messenger" campaign by investigating the spurious claim that Reed Taylor's attorney, Roderick Bond, had "fail[ed] to satisfy requirements for admission in Idaho pro hac vice."[770] Rather than show concern about the merits of Reed Taylor and Donna Taylor's derivative demand, the Hawley Troxell Defendants and Controlling AIA Defendants were concerned about everything but the interests of the AIA Corporations.

40.    On July 29, 2008, LeMaster Daniels, the auditors for CropUSA and the prior auditors for AIA Insurance,[771] delivered a "Report to the Board of Directors" of CropUSA noting the problematic accounting issues involving CropUSA, which also apply to the AIA Corporations because CropUSA had been engaged in, and continued to be engaged in, numerous related party transactions, guarantees and

---

[767] DLM – 0032169-72; DLM – 0032173-76.

[768] HTEH000262-75.

[769] The Unredacted Billing Records indicate that the Hawley Troxell Defendants spent their time researching the grounds for rejecting derivative claims rather than investigating the merits thereof. *E.g.,* FB 0751-52.

[770] FB 0749.The Hawley Troxell Defendants went so far in their vendetta as to actually move for, at the AIA Corporations' expense, reconsideration of Mr. Bond's *pro hac vice* admission, another waste of time and money. *E.g.,* FB 0755,57. The vendetta was later transformed into an unauthorized practice of law investigation: "Review initial correspondence with R. Bond for evidence of unauthorized practice of law." FB 0753, and the disqualification of Michael Bissell. FB – 0759. Again, rather than focusing on properly representing the AIA Corporations, the Hawley Troxell Defendants were seeking to shoot the messenger.

[771] AIA Insurance's financial statements were last audited for the year ending December 31, 2007. AIA- 19INSP- 0081875-87. AIA Services financial statements were last audited in the year ending December 31, 1999. AIA0028749-79.

Exhibit - 1, p. 198

11-ER-2615

purported agreements with the AIA Corporations.[772] The Report's findings including one on related party transactions (otherwise known as conflicts of interest transactions from a corporate governance perspective):

### Related-Party Transactions

The Company at any given time has various related-party transactions outstanding with related companies as well as individual owners These transactions are very complicated in nature. In addition there has been little documented evidence to support each transaction. Board approval for the transactions is often not documented and when it is approved it has generally been after the transaction has taken place. Given the need for high level of transparency in transactions that involve related parties the Company needs to establish specific policies and procedures that govern all related-party transactions. The transactions need to be clearly documented and approval of these transactions should take place before the transactions are entered into. In addition all transactions that are entered into for long-term period should be constructed in business fashion with market terms.[773]

41.     Despite the above findings and the other findings in LeMaster Daniel's Report, CropUSA and the AIA Corporations never implemented related-party policies or controls nor did they properly obtain approval for any of them before they occurred—let alone after they occurred. LeMaster Daniels subsequently issued at least one other Report[774] with the same deficiencies on January 19, 2010.[775] These issues were also highlighted in Mr. Hile's Report wherein he observed and opined that no related party transactions involving the AIA Corporations, including the numerous transactions in Miesen's damages spreadsheet (Exhibit A hereto) and so called administrative agreements, were ever properly disclosed, reviewed or approved by the appropriate directors or shareholders of the AIA Corporations.[776] I

---

[772] AIAPROD00066114-34.

[773] AIAPROD00066124 (Emphasis in original).

[774] It is impossible to know whether similar reports were issued in other years for CropUSA or AIA Insurance because Miesen is at the mercy of only receiving the documents that the Controlling AIA Defendants have elected to produce.

[775] AIAPROD00066390-404.

[776] DLM – 107813-8057.

Exhibit - 1, p. 199

11-ER-2616

agree with Mr. Hile's observations and opinions regarding the failure to properly disclose, review and approve any related-party transactions, agreements, guarantees and other matters involving the AIA Corporations and CropUSA and any of the Controlling AIA Defendants or any entities that is partially owned or controlled by any one or more of them, including for the items specifically discussed in this Report. Moreover, since there are no board or shareholder meeting minutes or resolutions properly disclosing, reviewing and approving any transaction, loans, guarantees, fee and cost advancements involving the AIA Corporations, I can say that none of them were approved or properly ratified by AIA Services' shareholders, including the transactions that comprise the forty items of damages outlined by Miesen.[777]

42.     On July 31, 2008, Babbitt supplemented his letter sent ten days earlier by writing a new letter to the purported boards of directors of the AIA Corporations regarding Reed Taylor and Donna Taylor's July 21, 2008 letter.[778] Once again, this letter is addressed to the very people involved in committing the malfeasance against the AIA Corporations and/or assisting in covering up or concealing that malfeasance from disinterested constituents of the AIA Corporations and the AIA Disinterested Shareholders. The matters raised in this letter, as with all of the other material matters involving the Hawley Troxell Defendants' representation of the AIA Corporations and CropUSA, should have been disclosed to the AIA Disinterested Shareholders and approval sought from them as to the course of action as contemplated by RPC 1.13. Again, there is little question that the self-serving language used in this letter was in fact window dressing to be used as a purported shield in the event of subsequent scrutiny of the conduct of the Hawley Troxell Defendants because they were not in fact proceeding in the best interests of the AIA Corporations.

43.     On August 6, 2008, Riley emailed John Taylor and Duclos regarding the $800,000 that AIA Insurance received from the ULIC liquidator's settlement of trust claims:

---

[777] *See, e.g.,* Miesen's Fourth Amended Objections, Answers and Responses to the Hawley Troxell Defendants' First Set of Interrogatories and Second Set of Requests for Production dated September 17, 2020 (together the Exhibit A attached thereto, which was subsequently substituted with a revised spreadsheet to reflect some minor revisions on September 30, 2020, DLM – 107484-659, which is attached hereto as Exhibit A).
[778] HTEH000288-91.

There may be some validity in the admonition received from [Attorney] Bond in the email below. Based on the court's finding of default by AIA Services under the note payable to Reed [Taylor] and the possibility that, as a legal matter, Reed [Taylor] is currently the beneficial owner of the AIA Insurance, Inc. stock and is entitled to elect the Board and control the disposition of those funds, any disposition of the retention funds by AIA Insurance to [AIA] Services or other recipients (other than to satisfy any indemnification obligation under the trust claims settlement agreement) will undoubtedly give rise to a potentially viable claim by Reed [Taylor] for malfeasance by the current directors and officers of AIA Insurance.

As defense counsel representing AIA Insurance, Inc. in [*Reed Taylor v. AIA Services*], we recommend that the amount of the retention be set aside by AIA Insurance, Inc. and, during the pendency of Reed's suit, not used for any purpose except to satisfy the indemnity obligation under the settlement agreement.

We urge the directors to consider this Issue at tomorrow's board meeting of the AIA Insurance, Inc. directors. We also suggest that the directors consult with their separate counsels on this matter.

Jolee, please circulate this email to the directors in advance of tomorrow's meeting. Thanks. Dick[779]

This email confirmed that Riley and the other Hawley Troxell Defendants were aware that the issue of the propriety of advancing fees and costs had not been decided and that they were aware that Reed Taylor had only previously challenged the advancement of fees and costs based on AIA Insurance being pledged to him as collateral. Despite the ongoing malfeasance and additional support for such malfeasance, the Hawley Troxell Defendants never took action in the AIA Corporations' best interests by either obtaining the necessary independent opinions to cease such advances or by ensuring that full disclosure was made to AIA Services' shareholders and a new proper vote taken, including for Beck and Henderson, who were not included in the March 2007 improper special shareholder meeting.

---

[779] HTEH000260.

Page - 192

Exhibit - 1, p. 201

11-ER-2618

44.   On August 7, 2008, a meeting was held of the AIA boards and, once again, the minutes reflect that nothing was done in the best interests of the AIA Corporations.[780] While the purported boards allegedly considered matters relating to the derivative demand made by Reed Taylor and Donna Taylor and the receipt of the $800,000 settlement, John Taylor, Beck and Henderson took no action in the best interests of the AIA Corporations. The minutes also claimed that no one else would agree to serve on the boards as an independent director to address the derivative demand. There was no apparent effort to find or appoint another director (including Donna Taylor's board designee) or to submit the matters to AIA Services' Disinterested Shareholders to authorize a proper course of action. This failure to act is consistent with John Taylor, Beck and Henderson's practice, as assisted by the Hawley Troxell Defendants, of taking action to ensure no disinterested person or shareholders is allowed to decide anything. Finally, Beck and Henderson considered, and purportedly approved, the advancement of John Taylor's attorneys' fees and costs for his defense in *Donna Taylor v. Taylor* (the first lawsuit).[781] There are no additional meeting minutes or resolutions that discuss or address Beck and Henderson's conflicts of interest. Specifically, Beck and Henderson had, *inter alia*, conflicts of interest by way of their ownership and roles in CropUSA and Henderson by way of her divorce action with John Taylor since her interests were to not have the community liable for paying any fees or costs for John Taylor's defense or to pay any judgment, which neither of them addressed as required under the law[782] and the AIA Corporations' Bylaws (Section 4.14), which both required the matter to be fully disclosed and submitted to the shareholders of AIA Services for approval (the former requiring John Taylor, Beck and Henderson to be excluded from any shareholder vote). This alleged board approval was improper, in bad faith and it failed to comply with I.C. § 30-1-853 and Section 4.14 of the AIA Corporations' bylaws.

45.   On August 7, 2008, Riley wrote to Attorney Gatziolis seeking a signature from him for the Amended Joint Defense Agreement.[783] This confirms that the Hawley Troxell Defendants were the lead attorneys for the AIA Corporations and CropUSA for the Amended Joint Defense Agreement, which is consistent with the Hawley Troxell Defendants' representation over the course of *Reed Taylor v. AIA Services*.

---

[780] AIA0027457-60.

[781] AIA0027457.

[782] I.C. § 30-1-853 (1997).

[783] HTEH000371.

46. On August 11, 2008, Hudson, Lancelot, CropUSA and AIA Insurance entered into an Assignment Agreement to facilitate Hudson's acquisition of the Lancelot Loan from Lancelot.[784] This Agreement was in the Hawley Troxell Defendants' possession because they produced a copy of it to Reed Taylor.[785] AIA Insurance received no consideration and the Hawley Troxell Defendants did not take any action for the benefit of the AIA Corporations. Instead, the Hawley Troxell Defendants placed their interests in having AIA Insurance's Guarantee of the Lancelot Loan extinguished above the interests of the AIA Corporations in recovering any assets or payments.

47. On August 14, 2008, allegedly on behalf of the AIA Corporations, the Hawley Troxell Defendants filed a so-called Petition for Court Appointed Independent Inquiry Pursuant to I.C. § 3-1-743 and I.C. § 30-1-744 and For Grant of Pending Motion to Stay Proceedings.[786] The Hawley Troxell Defendants breached their duties of loyalty by never following through with obtaining the appointment of an independent panel.

48. On August 15, 2008, Attorney Risley appeared as counsel for Henderson and Beck in *Reed Taylor v. AIA Services* (Risley would later form his own law firm Risley Law Office).[787] There is no information regarding whether Risley obtained proper Informed Consent and related conflict waivers for his joint representation of Beck and Henderson, but these issues are immaterial to my opinions in this Report.

49. On August 18, 2008, Reed Taylor filed suit against Babbitt, Ashby, Riley, Attorney Collins, Hawley Troxell and McNichols asserting, *inter alia*, claims for aiding and abetting and he sought recovery for himself.[788] Notwithstanding the filing of these two lawsuits, the Hawley Troxell Defendants and Controlling AIA Defendants continued to fail to comply with AIA Services' Amended Articles of Incorporation, AIA Services' New Restated Bylaws, AIA Insurance's Bylaws and proper corporate governance practices (including as to any decisions regarding litigation or responses to derivative demands).

---

[784] AIA0027473

[785] Indeed, Riley read the Assignment Agreement prior to the Hudson transaction.

[786] DLM – 0011741-47.

[787] DLM – 0011767-70.

[788] Dkts 83-8, 83-9.

50.     On August 21, 2008 (after receiving notice of the proposed sale to Hudson by the Hawley Troxell Defendants), in *Reed Taylor v. AIA Services*, Attorney Bissell delivered a letter to Babbitt and Ashby regarding the Hudson Transaction asserting, *inter alia*, that "since CropUSA is in fact an asset of the AIA [Corporations] since it was unlawfully formed, funded and operated with their assets, I trust that you and your respective clients will act in the best interests of AIA."[789] The Hawley Troxell Defendants ignored this demand.

51.     On August 29, 2008 (despite Attorney Bissell's demand letter dated August 21, 2008), Hudson, CropUSA, AIA Insurance and John Taylor entered into an Asset Purchase Agreement and ancillary agreements relating to the sale of the majority of CropUSA's book of business to Hudson for $11,588,245 (the purchase price also included additional consideration and substantial reimbursements of expenses for the following year).[790] Consistent with John Taylor's past practices, he negotiated a Consulting Agreement with Hudson as part of the transaction that required payments to be made to him in the amount of $10,000 per month for one year.[791] Although over 70% of CropUSA's book of business was traced to AIA Insurance's agents and millions of dollars of the AIA Corporations' funds,[792] employees, trade secrets and other assets had been invested in that book of business, the AIA Corporations received no consideration for the sale and the Hawley Troxell Defendants and Controlling AIA Defendants allowed that sale to proceed without taking any action in the best interests of the AIA Corporations to stop the sale, seize the assets (or a portion thereof) and/or obtain payment for the AIA Corporations thereby breaching their duties of care and loyalty owed to the AIA Corporations. Moreover, the $120,000 in consulting fees that John Taylor negotiated for himself should have also been paid to the AIA Corporations and John Taylor breached his duties of loyalty owed to the AIA Corporations for these payments and he was substantially assisted by the other Controlling AIA Defendants and the Hawley Troxell Defendants in that regard.

52.     On September 4, 2008, in *Reed Taylor v. AIA Services*, Reed Taylor moved to disqualify Hawley Troxell, Quarles & Brady and Attorney McNichols.[793] That motion was not pursed on behalf of, or in the perspective of, the AIA Corporations or AIA Services' Disinterested Shareholders.

---

[789] GC0006948.

[790] Crop002329-471; AIA0027461-69.

[791] Crop002417-20.

[792] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 769.

[793] DLM – 0012334-71.

Exhibit - 1, p. 204

11-ER-2621

53. On September 4, 2008, Babbitt emailed other defense counsel requesting permission to submit the Tolling Agreements *in camera* to Judge Brudie in an effort to avoid disqualification.[794] Notably, Babbitt felt it was appropriate to place the interests of the Hawley Troxell Defendants in avoiding disqualification above the interests of disinterested constituents and AIA Services' minority shareholders from being advised as to the existence and terms of any Tolling Agreements, which was consistent with what has transpired.

54. On September 5, 2008, the Hawley Troxell Defendants moved to enlarge the time to respond to Reed Taylor's Motion to Disqualify.[795] The motion was brought on behalf of the AIA Corporations and CropUSA, which further unequivocally proves that the Hawley Troxell Defendants were also representing CropUSA.

55. On September 8, 2008, Babbitt wrote to the AIA Corporations' purported boards of directors regarding the July 21, 2008 derivative demand and Reed Taylor's lawsuit against the Hawley Troxell Defendants.[796] There is little question that the self-serving language used in this letter was in fact window dressing to be used as a purported shield in the event of subsequent scrutiny of the conduct of the Hawley Troxell Defendants because they were not in fact proceeding in the best interests of the AIA Corporations. The Controlling AIA Defendants would never take action to investigate or assert claims against themselves so long as they were in control of the AIA Corporations, which the Hawley Troxell Defendants were fully aware of. Donna Taylor's derivative demand created a new conflict of interest between the AIA Corporations and the Controlling AIA Defendants and CropUSA because their interests were diametrically opposed. The Hawley Troxell Defendants breached their duties of care and loyalty owed to the AIA Corporations by failing to address those conflicts of interest and by failing to proceed in the best interests of the AIA Corporations with respect to the matters raised in the July 21, 2008 derivative demand, irrespective of the other conflicts of interest involving Reed Taylor (e.g., AIA Insurance was pledged to him as collateral for the payment of his unpaid $6,000,000 Promissory Note).

56. On October 6, 2008, Ashby sent a Memorandum to address two different approaches regarding the disclosure of the representation agreements in

---

[794] HTEH000569.
[795] DLM – 0012571-77.
[796] HTEH000212-14.

Exhibit - 1, p. 205

response to Reed Taylor's motion to disqualify, which also confirmed that the Hawley Troxell Defendants were taking the lead role in purportedly representing the AIA Corporations and CropUSA.[797]

> The second approach involves waiver of attorney-client privilege as to the representation agreements and requires the clients' informed consent to waive the privilege. ***Once the representation agreements are disclosed, plaintiff could then challenge the adequacy of disclosure of the material risks and reasonably available alternatives and question whether the clients' conflict waivers at the inception of the case were informed consents as defined by Rule 1.0(e)***.[798]

57.    In Ashby's October 6, 2008 Memorandum, he recognized the problems with the prior so-called conflict waivers that the Hawley Troxell Defendants had allegedly obtained and that they had not obtained the required Informed Consent in any of the representation documents.[799]

58.    On October 27, 2008, Babbitt wrote a Memorandum to the purported boards of directors of the AIA Corporations regarding an "[a]genda for discussion with outside litigation counsel."[800] That Memorandum addressed, *inter alia*, the "[s]tatus of unwinding the $1.5M cash purchase of AIA Services Series C stock by AIA Insurance from CropUSA."[801] This Memorandum establishes that the Hawley Troxell Defendants were aware that the $1.5 million 2004 Series C Preferred Shares purchase from CropUSA was unlawful because there would have been no other reason to discuss "unwinding" the purchase. I agree that the transaction should have been unwound. That purchase was unlawful because, *inter alia*, it violated the conflict of interest with affiliates provisions under AIA Services' Amended Articles Incorporation (Section 4.2.9(g)), AIA Services' New Restated Bylaws (Section 4.14) and AIA Insurance's Bylaws (Section 4.14).

59.    On December 8, 2008, in *Reed Taylor v. AIA Services*, Judge Brudie entered an order denying Reed Taylor's motions to disqualify. The decision was based solely as to Reed Taylor's positions and arguments as a non-shareholder.

---

[797] HTEH000570-71.
[798] HTEH000571 (Emphasis supplied).
[799] HTEH000570-71.
[800] HTEH000292-93.
[801] HTEH000293.

Exhibit - 1, p. 206

60.     On December 12, 2008, in *Donna Taylor v. Taylor*, John Taylor was deposed. At that deposition, when asked what his "understanding of a fiduciary duty to mean," John Taylor responded "[t]o, in the overall decision process, to make sure the corporation's interests are given the highest priority."[802] John Taylor also testified that, as a fiduciary, a board member is required "[t]o carry out activities of the company in [the shareholders'] overall best interest."[803] But John Taylor failed to comply with his understanding of fiduciary duties owed to the AIA Corporations, as detailed in this Report. While John Taylor also testified that his Executive Officer's Agreement was "still in effect,"[804] John Taylor did not bother to comply with the terms regarding not competing with the AIA Corporations or requiring that a proper board of directors determine his salary.

61.     As of December 31, 2008, AIA Services' Unaudited Consolidated Financial Statements indicated that it had total assets of $3,512,687, total liabilities of $3,854,397 (which does not include Reed Taylor's illegal debt), total revenues of $766,262, a net loss of $150,271 (which includes the significant interest paid to Reed Taylor that year), and owed Donna Taylor $416,512 for her Series A Preferred Shares (which had still not been redeemed as required by December 2003 and the last payment was made on May 30, 2008 and no payments have been made since).[805] As of December 31, 2008, AIA Insurance's Audited Financial Statements indicated that it had total assets of $2,956,007, total liabilities of $1,171,725, total revenues of $1,149,367, and net income of $71,881.[806] As of December 31, 2008, CropUSA's Audited Financial Statements indicated that it had total assets of $2,091,840, total liabilities of $195,627, total revenues of $10,326,140, and a net income of $7,860,129 (the only year that CropUSA made a net income, which was the result of the sale of the book of business and other assets to Hudson.[807]

62.     By the close of business on December 31, 2008, no annual shareholder meeting was held for AIA Services to elect directors, to otherwise provide disclosure or to seek shareholder approval regarding any of the matters set forth in this Report. The failure to do so were breaches of the duties of loyalty and care owed by the Controlling AIA Defendants to the AIA Corporations and AIA Services' minority shareholders (as it would be for every year a shareholder

---

[802] RJT – 087895, p. 42.
[803] RJT – 087895, p. 43.
[804] RJT – 087895, p. 45.
[805] RJT – 036396-400.
[806] AIA_19INSP_0081875-87.
[807] AIAPROD00066243-60.

Exhibit - 1, p. 207

11-ER-2624

meeting was not held and full disclosures were not made as to all transactions and corporate decisions), and the Hawley Troxell Defendants substantially assisted the Controlling AIA Defendants in refusing to properly hold shareholder meetings and make the required disclosures to the shareholders of AIA Services (including as to the substantial malfeasance and improper transactions that had occurred), as they had previously done in 2007 and would do in subsequent years.

63.     There were no annual or special shareholder meetings held for AIA Services in 2008 to properly elect directors or authorize any transactions (despite Donna Taylor's demand and allegations made in lawsuits). In addition, Donna Taylor's designee was not seated on the board of AIA Services as required. Therefore, none of the transactions or corporate decisions involving the AIA Corporations were authorized for 2008.

**J.   2009 – The Redemption of Reed Taylor's Shares Is Ruled Illegal, Donna Taylor Files Suit in *Donna Taylor v. AIA Services* to Have a Receiver Appointed and to Honor Her Board Designee, and the Improper Corporate Governance and Malfeasance Continue.**

1.     Effective January 1, 2009, the AIA Corporations and CropUSA purportedly entered into a new "Administrative Agreement" for the so-called payments and allocations of expenses and labor, which provided an unfair allocation of expenses (and no allocation for certain expenses) and provided no profit, consideration, mark-up, interest or benefit for the AIA Corporations.[808] This Administrative Agreement purportedly replaced the 2003 Administrative Agreement and it was purportedly signed by John Taylor in his alleged capacity as President of the AIA Services and CropUSA, but was not signed by AIA Insurance.[809] As I stated above, an unapproved and unauthorized agreement cannot replace a prior unapproved and unauthorized agreement. There are no board or shareholder meeting minutes or resolutions for the AIA Corporations that approved this this Agreement. This Agreement was never properly authorized nor was it an arms-length transaction, and it separately violated AIA Services' Amended Articles of Incorporation (Sections 4.2.9(c) and (g)), AIA Services' New Restated Bylaws (Section 4.14) and AIA Insurance's Bylaws (Section 4.14). This Agreement was never disclosed to AIA Services' shareholders, and it was discovered by Miesen's counsel after it was filed in *GemCap v. Quarles & Brady*. This is one of many

---

[808] GC0747799-801.
[809] GC0747799-801.

Exhibit - 1, p. 208

examples of how Miesen and his counsel have been forced to obtain information from other sources because the Controlling AIA Defendants intentionally failed to provide full disclosure to the AIA Disinterested Shareholders or the AIA Corporations as discussed in Section X(V) below.

2.      On January 20, 2009, the Hawley Troxell Defendants (purportedly on behalf of the AIA Services) made a settlement offer to Reed Taylor.[810] The offer placed Henderson's interest above other minority shareholders by facilitating the purchase of her interest in John Taylor's common shares for $400,000 and other terms to resolve all claims in *Reed Taylor v. AIA Services*.[811] The Hawley Troxell Defendants participated in this improper settlement offer knowing that many other minority shareholders had received nothing for their investment and were not receiving proper disclosures.

3.      On January 26, 2009, John Taylor moved for a protective order to determine what discovery was necessary for the pending motions for summary judgment re the illegality defense, determine the sequencing of pending motions and to stay general discovery.[812] In that Motion, John Taylor asserted, *inter alia*, "If the Court rules in favor of Connie Taylor, Jim Beck or the 401(k) Profit Sharing Plan, the Promissory Note sued upon by [Reed Taylor] will be unenforceable."[813]

4.      On January 29, 2009, the Hawley Troxell Defendants also moved for a protective order[814] arguing, *inter alia*, "[t]his motion, if granted, would declare the Promissory Note held by Reed J. Taylor void and moot all other claims of Reed J. Taylor in this case."[815] This motion confirmed the obvious—that the Hawley Troxell Defendants should have identified and coordinated the assertion of the illegality defense at the onset of the litigation in *Reed Taylor v. AIA Services*, which would have prevented hundreds of thousands of dollars in defense costs from being incurred by the AIA Corporations, including defense costs that were being improperly advanced for the Controlling AIA Defendants and Freeman.

5.      The Motions for Protective Orders filed by the Hawley Troxell Defendants and John Taylor confirmed the obvious—that any efforts by the Hawley

---

[810] RJT – 001887-88.

[811] RJT – 001887-88.

[812] DLM – 0014086-89

[813] DLM – 0014087.

[814] DLM – 0014090-94.

[815] DLM – 0014091.

Troxell Defendants to assert the illegality defense on behalf of the AIA Corporations was duplicative and wasteful, irrespective of the fact that it was separately wasteful because the AIA Corporations lacked standing to challenge Reed Taylor's redemption transaction.[816]

6.      On January 30, 2009, in *Reed Taylor v. AIA Services*, Judge Brudie granted the motions for protective order and stayed general discovery (other than allowing the depositions of Henderson and Beck to be taken), which ended Reed Taylor's ability to monitor and discover facts relative to the ongoing malfeasance and mismanagement (including as to corporate governance) of the AIA Corporations.[817] This order confirms that the Hawley Troxell Defendants should have discovered the illegality defense sooner (indeed, when they were representing John Taylor in early 2007) and had John Taylor and Henderson asserted the defense in early 2007, which would have saved over $1,000,000 in attorneys' fees and costs for the AIA Corporations.

7.      On February 2-3, 2009, in *Reed Taylor v. AIA Services*, Beck was deposed and his testimony confirms that he was not taking action in the best interests of the AIA Corporations.[818]

8.      On February 5, 2009, in *Reed Taylor v. AIA Services*, Henderson was deposed and her testimony confirms that she was not acting in the best interests of the AIA Corporations.[819]

9.      On April 6, 2009, based on the illegality defense being asserted in *Reed Taylor v. AIA Services*, Babbitt wrote to the purported boards of directors of the AIA Corporations seeking to obtain conflict waivers pertaining to Riley having been one of the attorneys that prepared the incorrect Legal Opinion delivered to Reed Taylor in connection with the redemption of his shares in 1995. While the conflicts of interest sought to be waived do not pertain to the malfeasance involving CropUSA and the Controlling AIA Defendants, the conflict waivers obtained were unauthorized for the same reasons that I describe above in this Report because none of the Controlling AIA Defendants were authorized to act for the AIA Corporations (this purported conflict waiver was also not signed thereby raising an issue in that regard). I do, however, agree that the Hawley Troxell Defendants had conflicts of

---

[816] *La Voy Supply Co. v. Young*, 84 Idaho 120, 127, 369 P.2d 45 (1962).
[817] DLM – 0014167-70.
[818] Dkts. 67-13, 67-14.
[819] Dkt. 67-16.

**Exhibit - 1, p. 210**

**11-ER-2627**

interest with respect to the matters raised and other related matters (e.g., the duty to disclose facts to others regarding Riley's belief that Reed Taylor's redemption was legal).

10. On April 9, 2009, in *Reed Taylor v. AIA Services*, Reed Taylor filed a detailed Statement of Facts in Opposition to the Motions for Partial Summary Judgment, which provided more details and supporting evidence of examples of the extensive malfeasance.[820]

11. On April 9, 2009, in *Reed Taylor v. AIA Services*, Reed Taylor also filed the affidavit of his accounting expert, Paul Pederson, who specifically detailed a number of the improper transactions that had occurred at the AIA Corporations, which such opinions were never disputed and provided further evidence of malfeasance to the Hawley Troxell Defendants.[821] Notably, Babbitt admitted that "every action this firm takes on behalf of our Clients could be the subject of additional damage claims against us by Reed Taylor."[822] This same logic applies to the damages inflicted upon the AIA Corporations proximately caused by the Hawley Troxell Defendants. As to the allegation that "Hawley Troxell cannot undertake primary representation of CropUSA at this time," the evidence establishes that the Hawley Troxell Defendants had always undertaken the primary representation of CropUSA in violation of their duties of care and duties of loyalty owed to the AIA Corporations. Thus, beyond the obvious fact that the Hawley Troxell Defendants' primary focus in that letter was to be paid, once again, there is little question that the self-serving language used in this letter was in fact window dressing to be used as a purported shield in the event of subsequent scrutiny of the conduct of the Hawley Troxell Defendants because they were not in fact proceeding in the best interests of the AIA Corporations.

12. On April 14, 2009, Babbitt again wrote to the purported boards of directors of the AIA Corporations and CropUSA.[823] In that letter, Babbitt is implicitly requesting that the AIA Corporations use a portion of the $800,000 settlement to pay the fees and costs owed to the Hawley Troxell Defendants (the same $800,000 that Riley previously stated should not be used because the funds belonged to AIA Insurance, which was pledged as collateral to Reed Taylor).

---

[820] DLM – 0017560-619.
[821] DLM – 0017698-719.
[822] HTEH000244.
[823] HTEH000242-45.

Exhibit - 1, p. 211

13.     On April 22, 2009, John Taylor, Beck and Henderson purportedly held a board of directors meeting for AIA Services apparently solely for the purpose of considering and documenting the rejection of a settlement offer made by Reed Taylor, but no action was taken in the best interests of the AIA Corporations (which is consistent with how John Taylor, Beck and Henderson have acted throughout their tenures on the boards of directors).[824]

14.     On June 17, 2009, Judge Brudie ruled "The Motion for Partial Summary Judgment filed by Defendants Connie Taylor, James Beck and Corrine Beck is hereby GRANTED."[825] This confirmed that the Hawley Troxell Defendants' time and efforts were a complete waste of money because Judge Brudie never granted partial summary judgment for any of the Hawley Troxell Defendants' clients, the AIA Corporations and CropUSA. Judge Brudie found that the 1995 Stock Redemption Agreement was an illegal and unenforceable contract and refused to grant Reed Taylor any relief.[826] Specifically, Judge Brudie held:

> In 1995, the earned surplus of AIA was in the negative and there has been no evidence presented to the Court that there was an affirmative vote of the majority of shareholders that capital surplus could be looked to for the redemption of Reed Taylor's shares. Therefore, the 1995 stock redemption
> agreement was entered in violation of Idaho code, making the agreement illegal and unenforceable. Following the law in Idaho, the Court must apply the illegality doctrine, denying enforcement of the contract and leaving the parties where the Court finds them.[827]

15.     Judge Brudie further held that:

> [Reed Taylor] relies heavily on an August 15, 1995 opinion letter from Richard Riley, an attorney then with the Boise law firm of Eberle, Berlin, Kading, Turnbow and McKlveen, Chartered, who acted as general counsel for AIA in connection with the stock redemption agreement between AIA and Reed Taylor. In his letter, attorney Riley offered the opinion that the stock redemption agreement "did not conflict with or violate…law, rule or regulation,

---

[824] AIAPROD00308698.
[825] RJT – 049902 (Emphasis in original).
[826] RJT – 049889-903.
[827] RJT – 049902.

**Exhibit - 1, p. 212**

**11-ER-2629**

without making specific reference to or discussing I.C. § 30-1-6… By this ruling today, the Court finds the attorney opinion incorrect."[828]

16.    Finally, Judge Brudie also found that "[t]here is no question that all parties, including Plaintiff, either ignored or failed to consider I.C. § 30-1-6."[829]

17.    Despite Riley's undisclosed belief that the Stock Redemption Agreement was legal for a number of reasons (including some of the reasons specifically asserted by Reed Taylor), none of the Hawley Troxell Defendants (including Riley) came forward to disclose those facts to Judge Brudie in violation of their duties of candor.[830]

18.    As a result of Judge Brudie's illegality ruling and the fact that the Hawley Troxell Defendants never proceeded in accordance with the best interests of the AIA Corporations, all of the money paid to the Hawley Troxell Defendants through the date of the illegality decision and thereafter was unnecessary. In fact, the illegality defense should have been easily found and asserted at the time that Riley, Babbitt and Ashby first commenced working on the case in February 2007 (especially since Riley represented AIA Services for the illegal transaction), which would have also prevented virtually all of the attorneys' fees and costs incurred in discovery as well. In addition, Riley should have placed the interests of the AIA Corporations above his own by teaming up with Eberle Berlin to negotiate a settlement with Reed Taylor for Riley's negligently prepared 1995 Opinion Letter, which could have ended the litigation with Reed Taylor.

19.    On September 4, 2009, Judge Brudie entered a Rule 54(b) Judgment dismissing some of Reed Taylor's claims (this was the only judgment entered in *Reed Taylor v. AIA Services*).[831] On September 8, 2009, Reed Taylor filed a notice of appeal.[832]

20.    In several months in the latter half of 2009, John Taylor used his credit cards to pay at total of $100,000 in payments to Hawley Troxell (five different payments of $20,000) for legal services provided in *Taylor v. AIA Services* (AIA

---

[828] RJT – 049900 n.15.
[829] RJT – 049901.
[830] RPC 3.3 (2004).
[831] DLM – 0018594-97.
[832] DLM – 0018601-43.

Services was apparently making payments to John to pay back the money).[833] No written consent (let alone Informed Consent) was obtained by the Hawley Troxell Defendants from the AIA Corporations to permit payments of fees and costs to be paid by John Taylor or any other party on behalf of the AIA Corporations.[834]

21. On November 4, 2009, John Taylor, Beck and Henderson purportedly held another board of directors meeting for AIA Services wherein they discussed: (a) "outstanding litigation involving the parties" and unstated "general corporate matters;" (b) Beck and Henderson waived the 30 day notice requirement to appoint John Taylor as the sole Trustee of the 401(k) Plan (confirming that they were not interested in protecting the interests of the plan participants since John Taylor had a track record of harming the value of the Series C Preferred Shares and utilizing funds from the plan); (c) approved borrowing $500,000 from Syringa Bank (which would result in depleting more net assets from the AIA Corporations); and (d) the litigation with Grower National Co-Op, which involved claims brought by CropUSA against that entity (which later led to a settlement for CropUSA that should have been paid to the AIA Corporations because they had founded and funded Growers National as well).[835] These meeting minutes confirmed that John Taylor, Beck and Henderson were not addressing any matters in the best interests of the AIA Corporations, AIA Services' minority shareholders or the innocent 401(k) Plan participants.

22. On November 23, 2009, in *Donna Taylor v. AIA Services*, Donna Taylor filed a Verified Complaint/Petition against AIA Services for the appointment of a receiver for the AIA Corporations and to require her board designee to be appointed to the board of directors as required by AIA Services' Amended Articles of Incorporation.[836] This was the Hawley Troxell Defendants' opportunity to properly discharge their duties of care and duties of loyalty owed to the AIA Corporations by joining in Donna Taylor's Petition. Instead, they chose to continue representing the interests of the Controlling AIA Defendants and CropUSA by opposing the relief requested thereby breaching their duties of care and loyalty owed to the AIA Corporations. Likewise, the Controlling AIA Defendants breached their duties of loyalty by opposing the relief requested by Donna Taylor.

---

[833] AIAPROD00308018.
[834] HTEH000001-9; HTEH000039-47.
[835] AIAPROD00172397.
[836] Dkt. 12-15, pp. 7-22.

Exhibit - 1, p. 214

11-ER-2631

23.     On December 11, 2009, in *Donna Taylor v. AIA Services*, the Hawley Troxell Defendants filed a notice of appearance for AIA Services before they had obtained a representation agreement.[837] By undertaking this representation, the Hawley Troxell Defendants and Controlling AIA Defendants' interests were adverse to the interests of AIA Services in having a receiver appointed and/or Donna Taylor's board designee appointed (who would have been the only director not involved in the malfeasance or covering up the malfeasance).

24.     On December 14, 2009, in *Donna Taylor v. AIA Services*, AIA Services (by and through the Hawley Troxell Defendants) moved to dismiss Donna Taylor's complaint asserting, *inter alia*, a receiver could not be appointed because Donna Taylor did not assert a substantive cause of action and she was not a real party in interest.[838] Once again, the Hawley Troxell Defendants were protecting the interests of the Controlling AIA Defendants and CropUSA rather than proceeding in the best interests of AIA Services, which would have been to appoint a receiver and remove the Controlling AIA Defendants as directors and officers of the AIA Corporations.

25.     On December 22, 2009, in *Donna Taylor v. AIA Services*, Donna Taylor filed a motion for preliminary injunction seeking to require AIA Services to appoint her designee on the board of AIA Services as required under AIA Services' Amended Articles of Incorporation.[839]

26.     On December 22, 2009, the Hawley Troxell Defendants purportedly entered into the December 22, 2009 AIA Engagement Letter with AIA Services.[840] That agreement was never properly authorized and violated Section 4.14 of AIA Services' New Restated Bylaws because the AIA Corporations' purported officers and directors had conflicts of interest that prevented any of them from entering into the agreement. The December 22, 2009 Engagement Letter did not seek, nor obtain, Informed Consent to have CropUSA pay the fees and costs charged by the Hawley Troxell Defendants. Yet, CropUSA appears to be the only party that paid for the fees and costs when it issued a check to the Hawley Troxell Defendants for $30,000 in 2012.[841] Based upon John Taylor's recent Rule 30(b)(6) deposition testimony as discussed in this Report, the purported boards of directors of AIA Services never

---

[837] DLM – 0033880-82.
[838] DLM – 0033883-4149.
[839] DLM – 0034211-16.
[840] HTEH000196-209.
[841] AIA_ 19INSP 0035028-29.

**Exhibit - 1, p. 215**

**11-ER-2632**

approved or authorized the entry into the December 22, 2009 AIA Engagement Letter nor did they waive any of the conflicts of interest addressed in that letter and the many conflicts that were not addressed in that letter as stated in this Report.

27.     On December 23, 2009, Babbitt wrote to Attorney Bond in response to the latter's email to Babbitt and Ashby of December 21, 2009[842] regarding Donna Taylor's designation of Attorney Moran to serve on the board of AIA Services.[843] Ironically, Babbitt asserted that Donna Taylor's director must know that "the law is clear that the new director will have fiduciary duties to the corporation and all of its shareholders, not just to the shareholder who elected that director. Those fiduciary duties include the duties of loyalty and confidentiality, which impose restrictions on the director…" In other words, Babbitt was asserting that Donna Taylor's board designee must comply with fiduciary duties owed to the AIA Corporations and AIA Services' shareholders, but the Controlling AIA Defendants were not obligated to do the same based on what had transpired previously. Babbitt also claimed that "AIA Services has no right (or obligation) to *appoint* Donna Taylor or her designee to the AIA Services' board of directors. Rather, as the holder of the outstanding Series A Preferred Shares, Donna has the right to *elect* a director. That right must be exercised through the process for election of directors established by the Idaho Business Corporation Act."[844] He ignored the clear and unambiguous terms of Section 4.2.8 of AIA Services' Amended Articles of Incorporation granting Donna Taylor the right to designate a director, irrespective of whether it is accomplished through a "vote" or other procedure, since she was the sole Series A Preferred Shareholder.[845] In addition, Section 4.4 of AIA Services' Articles of Incorporation provides in pertinent part as follows: "Holders of Common Stock of the corporation shall be entitled to elect all of the directors of the corporation other than the director appointed by the holders of the Series A Preferred Stock and the director elected by

---

[842] E&B-HTEH002910-11.

[843] DLM – 0034217-18.

[844] DLM – 0034217 (Emphasis supplied). The Hawley Troxell Defendants' hyper technical approach to Donna Taylor's attempt to exercise her rights as the Series A Preferred shareholder stands in stark contrast to their failure to insist that the AIA Corporations comply with the most basic corporate governance practices.

[845] The Unredacted Billing Records (FB 0811) contain no time entries for the preparation of Babbitt's letter; nor do they contain entries for either Ashby or Riley even though Ashby forwarded Bond's email to Riley. There are only two time entries for *Reed Taylor v. AIA Services* in December 2009 (one each for David Brown and Kyle Millard) and no time entries whatsoever from December 17, 2009 to March 16, 2010, which raises a question as to the completeness of the Unredacted Billing Records.

Exhibit - 1, p. 216

11-ER-2633

the holders of the Series C Preferred Stock."[846] Indeed, there was precedent for Donna Taylor's designating a director to be appointed by the AIA Services' board. The minutes of a July 13, 1994 special board meeting of AIA Services recite that "the Preferred Shareholder has requested that Cumer L. Green be appointed to fill the vacancy caused by the resignation of Travis E. Reed" and the board proceeded to appoint Mr. Green to fill that vacancy, its resolution stating "RESOLVED, that Cumer L. Green shall be *appointed* as the director for the Preferred Shareholder and shall serve until the next duly held annual meeting of the shareholders of AIA Services."[847] What is incorrect about that resolution, however, is that the term of an AIA Services' director designated by Donna Taylor is not delineated by the holding of an annual shareholders' meeting.[848] Instead, such a director serves at the pleasure of Donna Taylor.[849]

28.    On December 28, 2009, in response to Babbitt's letter five days earlier wherein he invited Donna Taylor to submit a written and signed consent appointing a director, Donna Taylor signed a notarized written consent voting her Series A Preferred Shares confirmation her appointment of Attorney Moran to the board of directors of AIA Services.[850] However, Attorney Moran's appointment to the board of directors of AIA Services was never honored.

29.    On December 29, 2009, the Hawley Troxell Defendants filed a response to Donna Taylor's motion for preliminary injunction asserting, *inter alia*, that Donna Taylor's designee's "qualification[s] to serve as an AIA Services director will be considered by the Board."[851] Once again, Babbitt implies that Attorney Moran was not qualified because he had previously represented Reed Taylor for several months even though the Controlling AIA Defendants were not qualified to serve as officers or directors based on their history of misconduct and intentional breaches of fiduciary duties. This demonstrates the Hawley Troxell Defendants' double standard as to the corporate governance of the AIA Corporations. Rather than welcoming a qualified director who would have been able to stop the malfeasance occurring at the AIA Corporations, the Hawley Troxell

---

[846] DLM – 0033063.

[847] AIA0029382 (Emphasis supplied).

[848] A holder of Series A Shares is not even entitled to receive notice of annual or special meetings of stockholders by virtue of Section 4.2.8 of AIA Services' Amended Articles of Incorporation. Accordingly, Donna Taylor does not participate in stockholders' meetings.

[849] Under Section 4.6 of AIA Services' New Restated Bylaws, only Donna Taylor can remove a director designated by her.

[850] RJT – 087939-40.

[851] DLM – 0034259-72.

Exhibit - 1, p. 217

11-ER-2634

Defendants opposed the designee so that the Controlling AIA Defendants would remain in control.

30.     On December 31, 2009, Babbitt wrote to Attorney Bond regarding Donna Taylor's designee of Attorney Moran as her appointed director for AIA Services.[852] Ironically, once again, Babbitt alleged that Attorney Moran had conflicts of interest (an Order of the Coif graduate of the University of Washington Law School and an established corporate and tax lawyer, Moran had represented[853] Reed Taylor for two months in transactional work related to settlement negotiations in an effort to prevent the commencement of *Reed Taylor* v. *AIA Services* –he "did not represent Reed Taylor in that lawsuit or in any other litigation"[854]) that allegedly preventing him from acting—yet Babbitt was allowing the Controlling AIA Defendants, with undisputable conflicts of interest involving serious malfeasance and fraud, to continue operating the AIA Corporations when they had been disregarding their conflicts from day one. In a letter dated December 31, 2009[855], which was obviously intended to continue the Hawley Troxell Defendants' slow walking of Moran's appointment, Babbitt asked a series of additional questions ostensibly expressing his purported concern as to whether Moran could fulfil his fiduciary responsibilities to AIA Services—all of which applied ten-fold to the Controlling AIA Defendants. Babbitt also stated that "there is a question" as to whether "Donna Taylor has exercised her voting right in compliance with her covenant of good faith implied in the Company's agreement to issue her the Series A Preferred Stock" and that "AIA Services needs further information."[856] Finally, Babbitt stated that AIA Services "does not waive any right" to "contest [Attorney] Moran's qualification to serve as a director…" Again, there are no limitations under Section 4.2.8 of AIA Services' Amended Articles of Incorporation limiting whom

---

[852] DLM – 0034294-97.

[853] There was precedent for a lawyer who is representing Donna Taylor to serve as her designee on the AIA Services' Board of Directors, even when that lawyer was asserting claims against AIA Services and conducting discovery (AIA 19NSP 0004232); *a fortiori*, Attorney Moran was qualified to be seated on the AIA Services' Board, notwithstanding his brief stint of transactional work for Reed Taylor.

[854] DLM- 107803.Henderson mischaracterized Moran's role in her recent testimony when she was asked whether conditions had been placed on herself, John Taylor as being qualified to serve on AIA Services' Board and answered as follows: "No, but we hadn't represented Reed in - - in the initial lawsuit. Mr. Moran was involved." 9/10/2020 Connie Henderson Depo. Transcript, p. 102.

[855] DLM – 0034294.

[856] DLM – 0034294. This notion was conjured up by Riley and Chandler; it had no legal support because the concept of an implied covenant of good faith and fair dealing does not affect Donna Taylor's choice of a director.

Page - 209

Donna Taylor could appoint[857] and Attorney Moran was an eminently qualified, ethical attorney who was willing to participate on the board at Donna Taylor's request (Donna Taylor's instructions to Attorney Moran were to disregard her, act neutrally and look after the interests of the minority shareholders).[858] Moreover, if anyone was not qualified to serve as a director of the AIA Corporations, it was John Taylor, Beck and Henderson. Babbitt's actions were themselves in violation of the Hawley Troxell Defendants' fiduciary duties owed to the AIA Corporations.

31.     There were no annual or special shareholder meetings held for AIA Services in 2009 to properly elect directors or authorize any transactions (despite the numerous shareholders' demands and allegations made in various lawsuits). In addition, Donna Taylor's designee, Attorney Moran, was not seated on the board of

---

[857] Moreover, Section 4.6 of AIA Services' New Restated Bylaws provide that only the holders of the Series A Preferred Shares can remove a director appointed by such holders.

[858] Moran had already retained Mark R. Beatty an attorney with expertise in corporate governance and related matters to advise him in his capacity as an independent director. DLM – 107804. If Moran had been seated on the AIA Services' Board in timely fashion in December 2009, the looting of the AIA Corporations would have been stopped, claims would have been asserted by or on behalf of the AIA Corporations, and monetary damages could have been recovered from the Controlling AIA Defendants and the Hawley Troxell Defendants for their wrongdoing including, but not limited to, such matters as John Taylor's and Henderson's November 21, 2001purchase of AIA's parking lot; the August 26, 2004 purchase of 205,000 Series C Preferred Shares from CropUSA for $1,510,693; the October 27, 2008 Hudson Transaction in which $11,588,245 in assets wrongfully taken from the AIA Corporations were sold to Hudson; the wasteful "compensation" received by John Taylor and the more than $800,000 in legal fees paid to the Hawley Troxell Defendants by reason of their mishandling of the illegality defense in *Reed Taylor v. AIA Services*. In addition, subsequent wrongdoing of John Taylor, Beck, Henderson and Cashman including, without limitation, the GemCap Loan and the GemCap Settlement Agreement would not have occurred. After more than six months of not being seated on the Board, on July 7, 2010, Moran confirmed to Babbitt that he had never been accepted to the Board (DLM – 0034492). "Nevertheless, Mr. Moran stood ready to act as a director of AIA Services had any representatives or the Hawley Troxell Defendants advised him that his designation would be honored without any limitations or qualifications." DLM – 107805. Moran continued to be Donna Taylor's designee until July 15, 2012 when she designated Durant, who was also highly qualified to serve as a director of AIA Services, but also was never seated. *See* Section XI of this Report. Like Moran, if Durant had been seated, claims would have been asserted by or on behalf of the AIA Corporations for the misconduct of the Controlling AIA Defendants, the Hawley Troxell Defendants and damages recovered. In addition, subsequent wrongdoing of John Taylor, Beck, Henderson and Cashman including, without limitation, the AIA Corporations' Amended Guarantee of the GemCap Loan and the GemCap Settlement Agreement would not have occurred. In this connection, John Taylor testified that it was the Hawley Troxell Defendants who advised John Taylor not to appoint Durant. 2/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 248, 252.

Exhibit - 1, p. 219

11-ER-2636

AIA Services as required. Therefore, none of the transactions or corporate decisions (including litigation decisions) involving the AIA Corporations were authorized for 2009.

**K.** **2010 – The Hawley Troxell Defendants Successfully Prevent Donna Taylor from Having a Receiver Appointed and Having Her Board Designee Appointed Thereby Permitting the Malfeasance to Continue, Donna Taylor and Miesen File this Lawsuit, the Hawley Troxell Defendants Ignore the Malfeasance and Improper Corporate Governance, and the Malfeasance Continues.**

1.       On January 1, 2010 (three days after Donna Taylor appointed Mr. Moran as her board designee to AIA Services' board, including to stop improper loans), Mark Bolland, the purported President of Pacific Empire Radio, signed a $680,365.85 Promissory Note in favor of AIA Services; the terms of loan favored Pacific Empire Radio.[859] John Taylor was on both sides of this transaction, which was a conflict of interest in his role as the purported director and President of the AIA Corporations. This loan was never authorized by the AIA Corporations[860] and violated AIA Services' Amended Articles of Incorporation and AIA Services' New Restated Bylaws, as was the case with all of the loans to Pacific Empire Radio from the AIA Corporations. For the same reasons and because the loan was not in the best interests of the AIA Corporations or the AIA Disinterested Shareholders, this loan and the other loans to Pacific Empire Radio also constituted the breaches of the duties of good faith and loyalty owed by John Taylor, Beck and Henderson as directors of the AIA Corporations.[861] This loan was due upon demand, the sale of any of PERC's radio stations, or June 30, 2010, whichever occurred first.

---

[859] RJT – 090254-56.

[860] Beck testified that he questioned the loans, told John Taylor they should cease and has never seen a board resolution authorizing loans to Pacific Empire Radio. 7/1/2020 Beck Depo. Transcript, pp. 211-13, 217-18. John Taylor recalled "some conversation with Beck about the subject" (7/28/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 75) and acknowledged that interest on the loans has not even accrued since 2011. *Id.* at 143. There is no evidence that any of the four loans have been repaid. *Id.* at 158-59. The loans are not due until at least May 2022, and there is no assurance that they will be paid since John Taylor testified that "I do not believe [Pacific Empire Radio] would be able to pay them in full at that time. *Id.* at 1052.

[861] John Taylor testified that the Pacific Empire Radio loans allowed the AIA Corporations to "preserve our investment [i.e. prior loans]" in Pacific Empire Radio. *Id.* at 164. In the vernacular, the AIA Corporations were throwing good money after bad.

2.      On February 5, 2010, in *Donna Taylor v. AIA Services*, Donna Taylor filed her Verified First Amended Complaint, which included causes of action to appoint a receiver for the AIA Corporations, breach of contract for failing to redeem her Series A Preferred Shares, failure to appoint her designated director to the board of AIA Services, and to require the compliance with AIA Services' Amended Articles of Incorporation and AIA Services' New Restated Bylaws.[862] Again, rather than seek to perform all of the lawful conduct requested by Donna Taylor, the Hawley Troxell Defendants and Controlling AIA Defendants opposed Donna Taylor.

3.      On February 11, 2010, in *Donna Taylor v. AIA Services*, the Hawley Troxell Defendants filed a motion to dismiss Donna Taylor's First Amended Petition/Complaint and renewed their prior motion to stay.[863] The Hawley Troxell Defendants breached their duties of care and loyalty owed to the AIA Corporations by bringing this motion and subsequently persuading the court to stay *Donna Taylor v. AIA Services*.

4.      On March 1, 2010, in *Donna Taylor v. AIA Services*, Judge Kerrick entered an order denying the Hawley Troxell Defendants' motion to dismiss (which was purportedly brought on behalf of AIA Services) but granted their motion to stay.[864] That order staying the case, requested by the Hawley Troxell Defendants, would seal the AIA Corporations' fate. In addition, the order sealed the fate for Mr. Moran's appointment as a director of AIA Services. Had the Hawley Troxell Defendants supported a receiver or the appointment of Mr. Moran, particularly when the alleged boards of directors of the AIA Corporations never properly addressed or approved the course of action taken, either would have prevented the improper transactions and litigation decisions that would follow, as discussed in this Report and as seen in Miesen's forty Items of Damages.

5.      On April 14, 2010, the purported directors of AIA Services (John Taylor, Beck and Henderson) held a purported board meeting for AIA Services.[865] This was the first purported board meeting held since the last one held on November 4, 2009.[866] While the Hawley Troxell Defendants had advised Mr. Moran that Donna Taylor's designation of him to the board would be honored, Mr.

---

[862] Dkt. 84-7.
[863] DLM – 0034437-43.
[864] DLM – 0034444-58.
[865] AIAPROD00172398.
[866] AIAPROD00172397.

Exhibit - 1, p. 221

11-ER-2638

Moran never received notice of this meeting and did not attend it.[867] This was the first meeting held since Donna Taylor had filed her declaratory relief action seeking the appointment of a receiver, requiring the AIA Corporations to comply with their articles of incorporation and bylaws (including to hold annual shareholder meetings), and preventing any further improper loans, guarantees and other transactions, which had been filed on November 23, 2009.[868] In other words, there was never any board meetings or resolutions approving or authorizing the Hawley Troxell Defendants to purportedly represent the AIA Corporations in *Donna Taylor v. AIA Services* nor was their December 22, 2009 AIA Engagement Letter[869] and conflict waiver approved as requested and required.

6.      On May 5, 2010, in *Reed Taylor v. AIA Services*, Reed Taylor filed his Appellant's Brief with the Idaho Supreme Court, which reiterated some of the significant malfeasance regarding CropUSA and the Controlling AIA Defendants.[870]

7.      On May 28, 2010, Babbitt wrote to the purported boards of directors of the AIA Corporations and CropUSA.[871] Assuming that this letter was signed (the copy provided was not signed), the conflict waivers obtained were unauthorized for the same reasons that I describe above in this Report because none of the Controlling AIA Defendants were authorized to act for the AIA Corporations based on their conflicts of interest (e.g., the waivers violated AIA Services' Amended Articles of Incorporation, AIA Services' New Restated Bylaws and AIA Insurance's Bylaws). Once again, there is little question that the self-serving language used in this letter was in fact window dressing to be used as a purported shield in the event of subsequent scrutiny of the conduct of the Hawley Troxell Defendants because they were not in fact proceeding in the best interests of the AIA Corporations.

8.      The May 28, 2010 letter also revealed a change in the language used by the Hawley Troxell Defendants to purportedly seek to obtain conflict waivers by stating, *inter alia*, that "the Board and each of the Directors has approved Hawley Troxell's continued representation of AIA Services Corporation, AIA Insurance,

---

[867] I am advised by Roderick Bond that Mr. Moran confirmed that he was not provided notice of this meeting or asked to attend.
[868] DLM – 0033863-78.
[869] HTEH000196-209.
[870] DLM – 0018742-816.
[871] HTEH000246-53.

Exhibit - 1, p. 222

11-ER-2639

Inc. and *(as local counsel) [for] CropUSA*.[872] Indeed, when the Hawley Troxell Defendants purportedly entered into the February 25, 2008 Amended AIA Engagement Letter and the February 25, 2008 Engagement Letter with CropUSA in order to continue improperly jointly represent the AIA Corporations and CropUSA, the language was identical for CropUSA and the AIA Corporations: "…represent CropUSA jointly with [AIA] Services and [AIA] Insurance…"[873] In fact, the Hawley Troxell Defendants were the lead attorneys representing CropUSA throughout the entire litigation. None of the letters discussed above were ever properly approved by the boards of directors of the AIA Corporations because there are no written meeting minutes or resolutions addressing any of them. Indeed, other than the original alleged retention of the Hawley Troxell Defendants on April 30, 2007,[874] no other letters or agreements were ever properly approved by the purported boards of directors of the AIA Corporations nor did the boards of directors ever approve a resolution or decision delegating authority to John Taylor or any other person to make litigation decisions for the AIA Corporations.

9.      On June 17, 2010, Attorney Bond emailed Ashby stating, "On another note, my client, Donna Taylor, requests that financial information on AIA Services be provided to her on a regular basis. Can you see to it that the information is provided?"[875] No information was provided as requested.

10.      On June 24, 2010, CropUSA and Growers National entered into a settlement agreement wherein Growers National agreed to pay CropUSA $430,000.[876] Those funds should have been paid to the AIA Corporations since they had formed and funded Growers National and the contract should have been with the AIA Corporations. Ironically, Henderson was one of the attorneys purportedly representing CropUSA for this litigation, but she placed her interests in CropUSA above the interests of the AIA Corporations in obtaining the $430,000. This is another example of John Taylor and the Controlling AIA Defendants placing their interests in CropUSA above the interests of the AIA Corporations in violation of their duties of loyalty owed to the AIA Corporations.

---

[872] HTEH000252 (Emphasis supplied).
[873] HTEH000047, 000056.
[874] AIAPROD00171187.
[875] Dkt. 67-26.
[876] AIAPROD00012794-98.

11.     On July 7, 2010, Mr. Moran wrote to Babbitt advising him that he would not be joining the board of directors of AIA Services.[877] Mr. Moran stated, *inter alia*:

> In your letter, you also raised a number of different and potentially important issues. You, however, failed to address the threshold and critical issue: Was I qualified to be a director of AIA Services Corporation? As you are aware, Idaho Code Section 30-1-802 simply provides as follows: articles of incorporation or bylaws may prescribe qualifications for directors.
>
> AIA's Articles of Incorporation grant the holders of a majority of the Series A Preferred Stock the right to appoint one director to the AIA Board. See Section 4.2.8 of the Articles of Incorporation. No one at AIA, its shareholders, or the Board are granted any approval or consent rights with respect to that appointment.
>
> In reviewing AIA's Articles of Incorporation (available through the website of the Idaho Secretary of State) and AIA's Bylaws, my counsel found no provisions imposing any specific qualifications on directors. As a result, it is my opinion, and the opinion of my counsel and Ms. Taylor's counsel, that I was duly qualified to be a director of AIA.
>
> Nonetheless, you objected and refused my appointment to the AIA Board.
>
> Frankly, I find it ironic that you have made multiple objections regarding my "potential" conflict of interest when there so clearly exists irreconcilable, direct conflicts of interest with all of the other unelected "purported" board members and your firm.[878]

12.     I agree with Mr. Moran's statements contained in the above quoted letter. There were no qualifications or conditions on Donna Taylor's right to appoint

---

[877] DLM – 0034492-93.

[878] DLM – 0034493. I am advised by Roderick Bond that, at Mr. Moran's deposition, he also testified that he would have readily joined the board of AIA Services after this time had he been asked to do so with none of the prior conditions Babbitt was seeking to impose.

Exhibit - 1, p. 224

11-ER-2641

a director under AIA Services Amended Articles of Incorporation.[879] If Babbitt truly had concerns with certain litigation issues (which were unfounded upon my review of the documents and Mr. Moran's limited prior role representing Reed Taylor for settlement negotiations), Mr. Moran should have still been permitted to be seated as a director and attend all meetings, even if he excused himself or was excused for any portion of the meeting. John Taylor, Beck and Henderson's conflicts of interest and track record of not meeting their duties of care, good faith and loyalty owed to the AIA Corporations were very egregious and Mr. Moran would have and could have brought badly needed independence to the board of directors. The Hawley Troxell Defendants' efforts to keep intact the conflicted John Taylor, Beck and Henderson as the sole purported directors and to prevent Mr. Moran from being a director of AIA Services, with the substantial assistance and acquiescence of the Controlling AIA Defendants, were breaches of the duties of care, good faith and loyalty owed to the AIA Corporations by the Controlling AIA Defendants and the Hawley Troxell Defendants. Moreover, since Reed Taylor[880] and Donna Taylor both had a vested interest at that time in ensuring that the AIA Corporations were legally and properly operated, they were fully aligned in seeing the AIA Corporations safeguarded and properly operated. Having spoken with Mr. Moran if his appointment to the board had been honored, he would have prevented all of the improper transactions and litigation decisions occurring after being designated on December 28, 2009.

---

[879] In addition, as I explained above, AIA Services' Restated Bylaws provided: "The holders of the corporation's Stated Value Preferred Stock being entitled to elect one (1) director by the provisions of the Articles of Incorporation, the provisions of this Section 4.6 shall apply, in respect to the removal of the director so elected, to the vote of the holders of the outstanding shares of Stated Value Preferred Stock and not to the vote of the outstanding shares as a whole." A1A0002569. In other words, only Donna Taylor could remove Mr. Moran as a director. Moreover, she had the power to appoint Mr. Moran or anyone else, even if the individual had a conflict of interest. Indeed, Donna Taylor had previously appointed her attorney, Cumer Green, in 1994 and Mr. Green was representing Donna Taylor in legal disputes against AIA Services, as confirmed by the January 11, 1995 Letter Agreement. AIA0029382; RJT – 088955-57. In my review of the meeting minutes, Cumer Green was never asked to leave any board meetings or abstain from voting on any matter (he voluntarily abstained from voting on certain matters). No one, including Babbitt, had any right to determine who Donna Taylor designated to the board of AIA Services and only she had a right to remove her designee. The Series A director served at the pleasure of Donna Taylor.

[880] Although Reed Taylor's redemption rights had been ruled unenforceable and Judge Brudie had left him where he found him (e.g., he could keep the money that he had been paid), Reed Taylor had appealed that decision to the Idaho Supreme Court.

Exhibit - 1, p. 225

11-ER-2642

13.     On July 20, 2010, in *Reed Taylor v. AIA Services*, the defendants filed a Joint Respondent's Brief with the Idaho Supreme Court.[881] The Hawley Troxell Defendants signed the brief on behalf of the AIA Corporations and CropUSA (Quarles & Brady did not sign the brief). In that brief, the defendants ignored the significant malfeasance and suddenly decided to take the positions that proper corporate governance was required for the AIA Corporations (e.g., that the disclosures to shareholders were inadequate, the shareholder resolutions were inadequate and the shareholders were never asked to approve the use of capital surplus). Ironically, the corporate governance at issue involved matters that had been disclosed to and voted upon by the shareholders as distinguished from all of the corporate governance matters at issue in this Lawsuit. Indeed, one of their arguments was that I.C. § 30-1-6 was adopted to "protect minority shareholders from corporate insiders….[and] that "the minority shareholders [were being] harmed by Reed Taylor's attempt to take for himself all of the assets of AIA Services."[882] Nevertheless, the Hawley Troxell Defendants and Controlling AIA Defendants never took any action for the benefit of the AIA Disinterested Shareholders (other than John Taylor and Henderson's successful assertion of the illegality defense).

14.     On August 11, 2010, Miesen and Donna Taylor filed their Complaint in this Lawsuit.[883] Attached to the Complaint were numerous documents that further supported the allegations in the Complaint, including purported board resolutions and Hawley Troxell's incorrect 2006 Lancelot Legal Opinion.[884] The allegations in the Complaint included extensive corporate malfeasance and unauthorized guarantees. AIA Services' shareholders never authorized the advancement of any fees or costs for the Controlling AIA Defendants or any other defendant in this Lawsuit; all such advances were unauthorized.

15.     On August 23, 2010, in *AmericanWest Bank v. Bolland*, AmericanWest Bank filed suit against John Taylor and others for guaranteeing an over $5,000,000 loan for Pacific Empire Radio.[885] This lawsuit confirmed that Pacific Empire Radio was unable to pay its debts when they were due and that the AIA Corporations should have never lent any money to Pacific Empire Radio (assuming proper board and shareholder authorization had been obtained to do).

---

[881] DLM – 0018817-872.

[882] DLM - 0018840, 0018848.

[883] Dkt. 1.

[884] Dkts. 1-2–1-11.

[885] RJT – 087406-50.

16.     On September 3, 2010, the Idaho Supreme Court issued its opinions for Reed Taylor's appeal of the dismissal of his claims against certain of the Hawley Troxell Defendants. While the Idaho Supreme Court awarded fees and costs against Reed Taylor for allegedly being spurious and harassing, the Court ruled that Reed Taylor's aiding and abetting claims were adequately pleaded, but the prosecution of those claims must await the resolution of his claims in *Reed Taylor v. AIA Services*.[886] While this ruling squarely placed the Hawley Troxell Defendants on notice regarding Reed Taylor's aiding and abetting claims, it also placed them squarely on notice for aiding and abetting claims that could be asserted by the AIA Corporations or their shareholders against them. Indeed, by the time of this opinion was issued, Donna Taylor and Dale Miesen had already filed their complaint in this Lawsuit.[887]

17.     There were no annual or special shareholder meetings held for AIA Services in 2010 to properly elect directors or authorize any transactions (despite the numerous shareholders' demands and allegations made in various lawsuits). In addition, Donna Taylor's designee, Attorney Moran, was not seated on the board of AIA Services as required. Therefore, none of the transactions or corporate decisions (including litigation decisions) involving the AIA Corporations were authorized for 2010.

**L.   2011 – The Hawley Troxell Defendants Successfully Obtain a Stay of this Lawsuit Thereby Permitting the Malfeasance to Continue, the Controlling AIA Defendants Have AIA Services Unlawfully Guarantee the GemCap Loan, and the Malfeasance and Improper Corporate Governance Continue.**

1.     On May 1, 2011, John Taylor prepared a financial statement that valued his and Henderson's common shares in AIA Services at $1,471,312 and that valuation was before the Idaho Supreme Court's subsequent opinion issued four months later affirming the illegality of Reed Taylor's redemption.[888] John Taylor's valuation is at odds to the ten cents per share that he would offer to pay the AIA Disinterested Shareholders approximately one year later.

---

[886] *Taylor v. McNichols*, 149 Idaho 826, 843-849, 243, P.3d 642, 659-665 (2010).
[887] Dkt. 1.
[888] GC0337057.

**Exhibit - 1, p. 227**

**11-ER-2644**

2. On June 29, 2011, Magistrate Judge Boyle (who is now deceased) granted the Hawley Troxell Defendants, Controlling AIA Defendants and the AIA Corporations' motions and stayed this Lawsuit.[889] The Controlling AIA Defendants and the Hawley Troxell Defendants breached their duties of loyalty owed to the AIA Corporations by requesting and obtaining that stay based on the documented acts of malfeasance by the Controlling AIA Defendants.

3. On September 7, 2011, in *Reed Taylor v. AIA Services*, the Idaho Supreme Court issued its opinion and affirmed Judge Brudie's illegality decision in all material respects.[890] The Court found that John Taylor and Connie Taylor were the only parties able to assert successfully assert the illegality defense because they were the only parties who were minority shareholders at the time, and thus affirmed Judge Brudie.

4. On September 7, 2011, Ashby's billing entry stated: "Review Idaho Supreme Court decision and analyze its implications for the remaining claims in the various AIA cases."[891] Ashby confirmed the broad scope of representation and general counsel type of role Hawley Troxell was serving by this billing entry. At this time, there was only one other case that Hawley Troxell attorneys had formally appeared on, *Donna Taylor v. AIA Services*; yet Ashby was researching how the Supreme Court's decision would impact other cases (plural).

5. On September 20, 2011 (less than two weeks after the Idaho Supreme Court affirmed the illegality of the redemption of Reed Taylor's shares), Kurt Luchs, the purported President of Pacific Empire Radio, signed a $787,599.07 Promissory Note in favor of AIA Services and the terms of loan favored Pacific Empire Radio.[892] John Taylor was on both sides of this transaction, which was a conflict of interest in his role as the purported director and President of the AIA Corporations. This loan was never authorized by the AIA Corporations and violated AIA Services' Amended Articles of Incorporation and AIA Services' New Restated Bylaws, as was the case with all of the loans to Pacific Empire Radio from the AIA Corporations. For the same reasons and because the loan was not in the best interests of the AIA Corporations or the AIA Disinterested Shareholders, this loan and the other loans to Pacific Empire Radio also constituted the breaches of the duties of loyalty owed by John Taylor, Beck and Henderson as directors of the AIA

---

[889] Dkt. 46.

[890] *Taylor v. AIA Services Corp.*, 151 Idaho 552, 261 P.3d 829 (2011).

[891] FB 0816.

[892] RJT – 090254-56.

**Exhibit - 1, p. 228**

**11-ER-2645**

Corporations since the loan was not in the best interests of the AIA Corporations, as were the other Pacific Empire loans or advances made during the time that they served on the boards.

6.     On September 20, 2011, Ashby's billing entry stated: "Telephone conference with J. Taylor and counsel re strategy for moving forward with R. Taylor v. AIA litigation and other related cases."[893] Once again, Ashby is discussing work on other "cases" with a plural—meaning the Hawley Troxell Defendants continue to work on cases that they have not ever appeared as counsel, which is consistent with the work of general counsel.

7.     On October 12, 2011, in *Reed Taylor v. AIA Services*, the Hawley Troxell Defendants moved to dismiss Reed Taylor's remaining claims on behalf of all defendants and to release the $600,000 in security held in the court registry ($410,000 of that security was in the form of a cash deposit).[894] Pursing these motions were in the best interests of the Controlling AIA Defendants and CropUSA, but not in the best interests of the AIA Corporations. These motions further confirm that the Hawley Troxell Defendants were placing the interests of the Controlling AIA Defendants and CropUSA above the interests of their other two clients, the AIA Corporations.

8.     On October 22, 2011, in *AmericanWest Bank v. Bolland*, it was reported that a stipulation was filed wherein John Taylor and other parties would agree to pay certain sums less than the total amount owed by Pacific Empire Radio to resolve the lawsuit.[895] It is unknown whether any funds from the AIA Corporations were used to pay the settlements, but the AIA Corporations had provided loans to Pacific Empire Radio around this period of time. The claims against the guarantors were resolved for less than the full amount owed, thereby confirming that the loans should not have been made to Pacific Empire Radio by the AIA Corporations.

9.     On November 10, 2011, AIA Insurance, through Aimee Gordon, wrote to a participant in the AIA Services' ESOP, Jud Taylor, regarding his right to put his ESOP shares to AIA Services for two cents per share.[896] No financial information was provided. This confirms additional breaches of fiduciary duties of

---

[893] FB 0816.

[894] DLM – 0019110-19; DLM – 0019120-28.

[895] DLM – 0034515-16; DLM – 0047946.

[896] DLM – 0072771-73.

loyalty by the Controlling AIA Defendants as to the applicable AIA Services' ESOP stock purchases.

10.     On November 22, 2011, in *Reed Taylor v. AIA Services*, Judge Brudie granted the motion to release the bond held as security in the court registry, as requested by the Hawley Troxell Defendants.[897]

11.     On November 23, 2011 (despite having knowledge that Miesen and Donna Taylor were claiming CropUSA was unlawfully taken from and funded by the AIA Corporations as discussed below), GemCap entered into a Loan and Security Agreement with the CropUSA Entities for a $5,000,000 line-of-credit, which was fully guaranteed by John Taylor and purportedly partially guaranteed by AIA Services as discussed in this Report.[898] The GemCap Loan and AIA Services' Limited Guarantee, along with the subsequently executed AIA Corporations' Amended Guarantee and GemCap Settlement Agreement, could have been prevented had the Hawley Troxell Defendants properly discharged their duties of care and duties of loyalty owed to the AIA Corporations.

12.     On that same day, AIA Services purportedly entered into the AIA Services' Limited Guarantee of the GemCap Loan (purporting to guarantee $1,113,930 of the CropUSA Entities' $5 million GemCap Loan),[899] notwithstanding GemCap's transactional attorneys (Attorney Boghosian) having previously obtained the search results for litigation and judgments, which resulted in GemCap being provided with the following information: (a) a copy of the docket in this Lawsuit; (b) a copy of Donna Taylor's First Amended Complaint in this Lawsuit,[900] which included allegations regarding unlawful guarantees of loans in violation of AIA Services' Amended Articles of Incorporation and intentional breaches of fiduciary duties (as well as allegations that CropUSA was unlawfully taken and funded by the AIA Corporations); and (c) a copy of the docket in *Reed Taylor v. AIA Services*; and (d) a copy of Reed Taylor's Fifth Amended Complaint in *Reed Taylor v. AIA Services*, which included numerous allegations regarding unlawful guarantees in violation of AIA Services' Amended Articles of Incorporation and intentional breaches of fiduciary duties (as well as allegations that CropUSA was unlawfully

---

[897] DLM – 0019242-45.

[898] *E.g.*, GC0006230-75.

[899] RJT – 036170-78.

[900] Dkt. 23.

Exhibit - 1, p. 230

taken and funded by the AIA Corporations).[901] AIA Services' received no consideration for the guarantee, as confirmed by Attorney Gatziolis.[902] That guarantee was never disclosed or authorized in violation of Sections 4.2.9(c) and 4.2.9(g) of AIA Services' Amended Articles of Incorporation and Sections 4.14 and 14.1 of AIA Services' New Restated Bylaws and AIA Insurance's Bylaws. Neither the Controlling AIA Defendants nor GemCap disclosed to, or sought consent from, the AIA Disinterested Shareholders or the Series A Preferred Shareholder, Donna Taylor, for AIA Services' Limited Guarantee of the GemCap Loan. Thus, AIA Services' Limited Guarantee of the GemCap Loan, the AIA Corporations' Amended Guarantee of the GemCap Loan and the 2013 reaffirmation were never authorized and were illegal, ultra vires, and intra vires (but unauthorized), as was the subsequent GemCap Settlement Agreement.

13. In connection with the GemCap Loan and AIA Services' Limited Guarantee of the GemCap Loan, John Taylor executed the Certificate of Chief Executive Officer of AIA Services, which included a copy of AIA Services' Amended Articles of Incorporation and AIA Services' New Restated Bylaws attached, thereby confirming that GemCap was fully aware of the restrictions in AIA Services' Amended Articles of Incorporation and AIA Services New Restated Bylaws prohibiting AIA Services' Limited Guarantee and the subsequently executed AIA Corporations' Amended Guarantee.[903] John Taylor, Beck and Henderson signed the purported board resolution for AIA Services' Limited Guarantee of the GemCap Loan, which violated the Guarantee Prohibition (Section 4.2.9(c)) and the conflicts of interest with affiliates provision (Section 4.2.9(g)) of AIA Services' Amended Articles of Incorporation.[904] AIA Services' Limited Guarantee of the GemCap Loan and the execution of this board resolution also violated the conflict of interest provisions (Section 4.14) and the guarantee provision (Section 14.1) in AIA Services' New Restated Bylaws. By failing to honor Donna Taylor's board designee Durant, the guarantee and the board resolution were never properly disclosed or authorized. Prior to executing the board resolution and AIA Services' Limited Guarantee of the GemCap Loan, no notice was provided to Donna Taylor or the AIA Disinterested Shareholders, they were

---

[901] Dkt. 563-25 (some of the relevant allegations regarding unauthorized guarantees are bookmarked in this document).

[902] 6/11/19 Gatziolis Depo. Transcript, pp. 170-71. Beck also testified that he knew of no benefit AIA Services received by making the guarantee (7/1/2020 Beck Depo. Transcript, p. 187), and that he was aware that the AIA Corporations were not authorized to use any of the loan proceeds. *Id*. at 296.

[903] AIAPROD00318646-77.

[904] Dkt. 220-4.

never asked to consent or authorize AIA Services' Limited Guarantee of the GemCap Loan, no shareholder meeting was held for the guarantee, no shareholder vote was taken for the guarantee and Donna Taylor's consent was never obtained for the guarantee. John Taylor, Beck and Henderson breached their fiduciary duties (including their duties of loyalty) owed to AIA Services and the AIA Disinterested Shareholders by signing this board resolution and allowing AIA Services' Limited Guarantee of the GemCap Loan. GemCap substantially assisted John Taylor, Beck and Henderson because, *inter alia*, it was aware that this Lawsuit and other lawsuits had been filed asserting unlawful guarantees and breaches of fiduciary duties associated with such acts.

14.    In connection with the GemCap Loan and alleged AIA Services' Limited Guarantee of the GemCap Loan, Quarles & Brady and Attorney Van Idour delivered Legal Opinions to GemCap dated November 23, 2011[905] and November 23, 2011,[906] respectively. Attorney Van Idour had never prepared a Legal Opinion for a transaction and he never communicated directly with GemCap's representatives or its attorneys to discuss customary practice with respect to the Legal Opinion or negotiate the content of that Legal Opinion—all of which is contrary to and not in compliance with Legal Opinion customary practice (his 2013 Legal Opinion to GemCap would be his second Legal Opinion). The substantive opinions in Van Idour's Legal Opinion were prepared by Attorney Gatziolis. The Quarles & Brady Legal Opinion excluded coverage of Idaho law. Based on these facts, the information that GemCap had in its possession and its attorneys' failure to comply with customary practice, it could not reasonably rely on the Legal Opinions provided by Van Idour or Quarles & Brady for AIA Services' Limited Guarantee of the GemCap Loan (or the subsequent AIA Corporations' Amended Guarantee of the GemCap Loan or the affirmation of that guarantee in 2013.[907]

15.    Accordingly, GemCap was aware, or failed to exercise prudence to become aware, that AIA Services' Limited Guarantee of the GemCap Loan was unauthorized because it was prohibited by the Guarantee Prohibition provision under AIA Services' Amended Articles of Incorporation and Sections 4.14 and 14.1 of AIA Services New Restated Bylaws (the conflict of interest and guarantee prohibition provision), and was never authorized by a properly seated board of directors (including Donna Taylor's designee) or AIA Services' shareholders. Nevertheless, GemCap intentionally proceeded with accepting AIA Services'

---

[905] Dkt. 439-6, pp. 2-10.
[906] Dkt. 439-5, pp. 2-6.
[907] Dkts. 439-5, 439-6.

Page - 223

**Exhibit - 1, p. 232**

**11-ER-2649**

Limited Guarantee of the GemCap Loan. For these same reasons, GemCap could not reasonably rely on any representations and warranties provided to it as to power, authority, enforceability and related issues pertaining to AIA Services' Limited Guarantee of the GemCap Loan.

16.     Consequently, as to the power, authority, enforceability and related Legal Opinions provided to GemCap for AIA Services' Limited Guarantee of the GemCap Loan, GemCap "ha[d] no right to rely on [the Quarles & Brady Legal Opinion[908] or the Van Idour Legal Opinion[909] because] reliance [was] unreasonable under the circumstances [and/]or the opinion[s] [were] known by [GemCap] to be false."[910]

17.     On December 28, 2011, in *Reed Taylor v. AIA Services*, Judge Brudie granted the Hawley Troxell Defendants' request to have Reed Taylor's remaining causes of action dismissed and to deny his motion to amend.[911]

18.     There were no annual or special shareholder meetings held for AIA Services in 2011 to properly elect directors or authorize any transactions (despite the shareholders' demands and allegations made in various lawsuits). In addition, Donna Taylor's designee, Attorney Moran, was not seated on the board of AIA Services as required. Therefore, none of the transactions or corporate decisions (including litigation decisions) involving the AIA Corporations were authorized for 2011.

**M.   2012 – The Hawley Troxell Defendants' Suggested Reverse Stock Split Is Attempted, Donna Taylor Moves to Lift the Stay in this Lawsuit, AIA Services Files Suit in *AIA Services v. Durant* to Force the Stock Split to Be Effectuated, the AIA Corporations Unlawfully Guarantee the Increased GemCap Loan, and the Malfeasance and Improper Corporate Governance Continue.**

1.     On January 4, 2012, Donna Taylor filed a notice of voluntary dismissal in *Donna Taylor v. AIA Services*.[912] This voluntary dismissal opened the door for

---

[908] Dkt. 439-6.
[909] Dkt. 439-5.
[910] Third-Party "Closing" Opinions: A Report of the TriBar Opinion Committee, 53 Bus. Law. 591, 604 (1998).
[911] DLM – 0019246-53.
[912] Dkt. 67-29.

Exhibit - 1, p. 233

11-ER-2650

Donna Taylor and Miesen to lift the stay in this Lawsuit. However, the Hawley Troxell Defendants would once again place their interests ahead of the interests of the AIA Corporations and oppose lifting the stay, as discussed below.

2. On March 18, 2012, Attorney Bond appeared as counsel for Donna Taylor in this Lawsuit.[913]

3. On March 23, 2012 (or purportedly effective that date), John Taylor purportedly purchased 338,610 common shares in AIA Services from Beck, Cashman and other former holders of Series C Preferred Shares for ten cents per share.[914]

4. On March 30, 2012, John Taylor wrote the ESOP participants advising them that, "[e]ffective December 31, 2011," AIA Services "discontinued and terminated the ESOP Plan."[915]

5. On April 3, 2012, Attorney Bond (on behalf of AIA Services' minority common shareholders Miesen, Donna Taylor, Hostetler, Hanchett, Legg and Ruddell), provided a written demand to Babbitt and Ashby (as counsel for the boards of the AIA Corporations) stating:

> Demand is hereby made to the board of directors of AIA Services and AIA Insurance to; (1) cease all efforts to withdraw the $400,000 in the court registry in *Taylor v. AIA Services*; (2) cease paying any attorneys' fees or costs for John Taylor, Michael Cashman, and James Beck; (3) secure the mortgage of the Lewis Clark Hotel; (4) cease all compensation to the foregoing individuals; (5) hold annual shareholder meetings; (6) comply with all applicable Bylaws and Articles of Incorporation of the corporations; and (7) make full disclosure to all shareholders of all of the inappropriate and illegal transactions which have occurred over the years. Obviously, complying with the Bylaws, Articles of Incorporation and Idaho law results in the present purported board members being conflicted from taking any action whatsoever, including withdrawing the $400,000 held in the court registry or taking any other funds or assets from the corporations.

---

[913] Dkt. 58.
[914] RJT – 089850-58; AIAPROD00294166.
[915] Dkt. 67-30.

Exhibit - 1, p. 234

11-ER-2651

\*       \*       \*

You are directed to ensure that your clients and the Boards of AIA Services and AIA Insurance receive this demand and that appropriate action is taken, including electing and naming nonconflicted board members for both corporations. Time is of the essence.[916]

6.     On April 3, 2012, Donna Taylor's counsel also emailed Attorney Risley and Attorney LaRue requesting "to inspect records and/or to be provided with the names and addresses of all shareholders in AIA Services and all persons who were participants in AIA Services' ESOP Plan."[917] Donna Taylor was denied her right to inspect records and the requested information was never provided in violation of I.C. §§ 30-1-1602 and 30-1-1603, which also constituted a crime under I.C. § 18-1907.

7.     Attorney Bond received no response from the AIA Corporations' purported boards of directors to the shareholders' April 3, 2012 derivative demand[918] and the Hawley Troxell Defendants and Controlling AIA Defendants pressed forward with their plans to get the $400,000 in cash released from the court registry. They would also implement and seek to carry out the plan to effectuate an improper reverse stock split that, *inter alia*, violated various restrictions in AIA Services' Amended Articles of Incorporation.

8.     On April 4, 2012, in *Reed Taylor v. AIA Services*, Reed Taylor objected to the release of the $400,000 in cash held in the court registry and asserted that the funds should be held subject to further court order in this Lawsuit and submitted a copy of another written demand for the boards of directors to take action to protect those funds.[919] Once again, it is noteworthy that Reed Taylor, the former creditor of AIA Services by way of the illegality ruling, puts forth more effort to protect the AIA Corporations than the Hawley Troxell Defendants or the Controlling AIA Defendants, all of whom owed fiduciary duties and duties of care to the AIA Corporations.

---

[916] Dkt. 67-33. This demand was also copied to counsel for Beck, Henderson, John Taylor and the Hawley Troxell Defendants.
[917] Dkt. 67-34.
[918] Dkt. 67-33.
[919] DLM – 0019254-59.

Exhibit - 1, p. 235

11-ER-2652

9.     On April 4, 2012, Attorney Gaffney associated with Attorney Bond as counsel for Donna Taylor in this Lawsuit.[920]

10.    On April 18, 2012, in *Reed Taylor v. AIA Services*, Donna Taylor moved to intervene to protect the funds held in the court registry by asserting, *inter alia*, "that none of the named defendants in this action have a right to withdraw or possess the $400,000, plus accrued interest."[921]

11.    On April 20, 2012, Attorney LaRue (one of the attorneys for the Hawley Troxell Defendants' counsel in this Lawsuit) had "[c]ommunications with [one of the Hawley Troxell Defendants] relating to role as litigation counsel and working with client to substitute/withdraw following completion of hearing on release of security [in *Reed Taylor v AIA Services*]."[922]

12.    On April 30, 2012, Ashby wrote to the so-called boards of directors of the AIA Corporations (John Taylor, Beck and Henderson) to address a number of problems plaguing the Hawley Troxell Defendants through a number of self-serving statements.[923] This letter was nothing more than a weak effort of trying to paper over the Hawley Troxell Defendants' unresolved conflicts of interest by providing self-serving statements to the very people involved in the malfeasance described in this Report and/or in covering up such malfeasance. Notably, Ashby admitted (whether intentionally or accidently) something that had plagued the Hawley Troxell Defendants from day one in *Reed Taylor v. AIA Services* and in *Donna Taylor v. AIA Services*:

> Given the nature of [Reed Taylor's] claims against the individual defendants, **conflict of interests existed between [the] AIA [Corporations] and the other defendants at the inception of [*Reed Taylor v. AIA Services*]**…[924]

13.    Ashby's April 30, 2012 letter also advised the Controlling AIA Defendants of a course of action that could eliminate derivative standing in this Lawsuit, i.e., by redeeming Donna Taylor's remaining Series A Preferred Shares

---

[920] Dkt. 61.

[921] DLM – 0019274-84.

[922] Riley/HTEH Billing Records for Fee Request in *Taylor v. Riley*, p. 24.

[923] HTEH000254-59.

[924] HTEH000259 (Emphasis supplied).

Exhibit - 1, p. 236

11-ER-2653

and by effectuating an unlawful reverse stock split.[925] Notably, Ashby's letter did not advise the Controlling AIA Defendants not to undertake the illegal course of conduct of effectuating a reverse stock split and neither he nor any other of the Hawley Troxell Defendants took any action to take the matter to the highest authority at AIA Services (AIA Services' shareholders or Donna Taylor's board designee Durant) or otherwise attempt to prevent the unlawful conduct. Instead, they implicitly sanctioned the unlawful conduct as being permissible by not taking any action and following John Taylor's instructions as discussed below.

14. On May 3, 2012 (consistent with Ashby's April 30, 2012 letter), John Taylor emailed Ashby and other attorneys stating, *inter alia*:

> [Henderson] and I have met again to refine our strategy in this case and the related matters in light of the recent letter from Hawley Troxell. This will be the strategy.
>
> 1. HTEH will continue to represent AIA Services in the Reed Taylor v. AIA et al. case and they will not take any action or make any motions at this time. We will wait for the judge's decision. I envision that we will ask to dismiss this case in due course.
>
> 2. Quarles and Brady will be AIA Services's (sic) general counsel for all matters. They will affiliate with local counsel as needed. Denny Davis of Witherspoon Kelly's Couer d'Alene office,[926] will assist them and provide local counsel as needed for Idaho matters.
>
>    QB/WK will assist and advise AIA Services and its Board on requirements for notices to shareholders; provide required information; and prepare the documents for a reverse stock split of 53000:1. [followed by a lengthy redacted discussion of over a page and one-half that presumably contains more proof of improper plans and/or conduct].[927]

---

[925] HTEH000257-59.

[926] Mr. Davis was never retained for the unlawful reverse stock split. Presumably he recognized that the reverse stock split was unauthorized and/or the Controlling AIA Defendants were not properly operating AIA Services. Instead, Attorney Siddoway was retained and he assisted in preparing the materially misleading proxy for the reverse stock split.

[927] HTEH000619-21. *Cf.* RPC 1.6 (b)(5) which permits a lawyer to reveal information relation to a client which the lawyer reasonably believes necessary to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client.

15.    In response to that email, the Hawley Troxell Defendants again failed to take any corrective action in the best interests of the AIA Corporations or the AIA Disinterested Shareholders. By failing to act and/or by failing to demand that such unlawful conduct not occur, the Hawley Troxell Defendants in effect endorsed the course of action with respect to the reverse stock split and efforts to eliminate derivative standing in this Lawsuit.

16.    On May 16, 2012, in *Donna Taylor v. AIA Services*, the Hawley Troxell Defendants sent an invoice to AIA Services.[928] Notably, in what appears to be John Taylor's handwriting is a statement "We will dispute all charges by Dick Riley."[929] It appears that John Taylor had recognized the wasted and excessive fees charged and paid to the Hawley Troxell Defendants.

17.    On May 17, 2012, Judge Brudie granted the Hawley Troxell Defendants' requests by denying Donna Taylor's Motion to Intervene in *Reed Taylor v. AIA Services* and releasing the $400,000 held in the court's registry.[930] The result was to place the $400,000 in the hands of the Controlling AIA Defendants thereby ensuring that those funds would never be used for the best interests of the AIA Corporations. Those funds are now gone.

18.    On July 3, 2012, John Taylor sent a notice of shareholder meeting (the first in approximately ten years),[931] a Proxy Statement for Annual Meeting of Shareholders and certain Idaho Code sections relating to reverse stock splits,[932] AIA Services' purported Consolidated Financial Statements for the period of March 31, 2012 and December 31, 2011,[933] and a letter to AIA Services' common shareholders[934] advising them, *inter alia*, that:

> We will seek out opportunities to provide new and innovative products for farmers, and make the changes we need to make in order to move forward…

---

[928] AIAPROD00306039-43.
[929] AIAPROD00306039.
[930] RJT – 050973-75.
[931] Dkt. 66-3, p. 1.
[932] Dkt. 66-3, pp. 2-18.
[933] Dkt. 66-5.
[934] Dkt. 67-52, pp. 1-2.

Exhibit - 1, p. 238

11-ER-2655

In order to facilitate these future plans and to allow us to reorganize as a partnership, we are asking our shareholders to approve an amendment to the company's articles of incorporation, which, if approved, will result in a reverse split of our outstanding common stock and the cash buyout of the outstanding shares of common stock owned beneficially or of record by our minority shareholders at the price of $0.10 per share, which we believe is their current full value.[935]

19.     As shareholder Lee Ann Hostetler testified, certain documents were made available to shareholders on a website for to download and review: "(1) [Attorney] Rousso's Motion to Withdraw as counsel in this case; (2) copies of the two financial statements attached as Exhibit E; (3) the Idaho Supreme Court's decision in *Taylor v. AIA Services, et al.*; (4) the First Amended Complaint in this [Lawsuit] (without any of the exhibits that I was provided by my attorney [(Attorney Bond)]; (5) Donna Taylor's Notice of Voluntary Dismissal Without Prejudice in *Donna Taylor v. AIA Services*; (6) Plaintiff Reed Taylor's Amended Motion and Memorandum of Law in Support of Motion to Amend and Supplement Complaint in *Taylor v. AIA Services, et al.*; (7) Opinion and Order on Plaintiff's Amended Motion to Amend and Supplement Complaint and Defendants' Motion for Judgment on the Pleadings in *Taylor v. AIA Services, et al.*; and (8) the Order Staying this [Lawsuit]. No other documents were provided. I do not see the relevance to any of the documents listed above, except for being evidence that our shares are worth more than ten cents per share and that John Taylor, Connie Taylor Henderson and James Beck should not be running AIA Services or be permitted to be on its board of directors."[936] I agree with Ms. Hostetler that the documents provided and the means by which they were provided were inadequate and misleading, including based on all of the malfeasance discussed in this Report. Notably, the Controlling AIA Defendants did not even disclose that Attorney Bond had appeared as Donna Taylor's counsel in this Lawsuit, but only provided information relative to Attorney Rousso withdrawing, thereby falsely implying that this Lawsuit had no merit because Attorney Rousso was withdrawing. I recently spoke with Ms. Hostetler who stated that since 2012 she has not received a notice of an AIA Services' shareholders' meeting or a request to sign a written consent of shareholders. Neither has she received an AIA Services' 401(k) Plan statement since the last one which showed that her interest in the Plan had a zero value.

---

[935] Dkt. 67-52, p. 1; Dkt. 66-2 (the first page of the letter).
[936] Dkt. 66, pp. 3-4 ¶ 7.

20. The Proxy Statement prepared and provided to shareholders for the reverse stock split was materially misleading and failed to disclose the significant malfeasance that had occurred and continued to occur at the AIA Corporations through the Controlling AIA Defendants.[937]

21. However, assuming John Taylor, Beck and Henderson were duly elected to the board of directors of AIA Services and their decision did not involve conflicts of interest (which it did), the reverse stock split was not proper or authorized because the Series A Preferred Shares had not been fully redeemed (AIA Services was in arrears in its payment obligations to Donna Taylor) and the over $1,000,000 in accumulated dividends owed to the Series C Preferred Shares held in AIA Services' 401(k) Plan had not been declared and paid in violation of AIA Services' Amended Articles of Incorporation. The real intent, however, of the so-called reverse stock split was to squeeze out the disinterested minority shareholders for ten cents per share and eliminate the derivative standing of all of the disinterested minority shareholders of AIA Services, as confirmed by Ashby's April 30, 2012 letter.[938] The reverse stock split was separately unauthorized because John Taylor, Henderson and Beck had conflicts of interest that prevented them from authorizing the reverse stock split (e.g., there were claims asserted against them in this Lawsuit and *Donna Taylor v. AIA Services*).[939]

22. On July 11, 2012, Ashby's billing entry stated: "Lengthy telephone conference with D. Risley re potential motions in D. Taylor v. J. Taylor action and implications to R. Taylor v. AIA action."[940] Ashby was engaged in more general counsel work because the Hawley Troxell Defendants were not attorneys in *Donna Taylor v. Taylor* and there would be no reason for him to have discussions about motions in that lawsuit. Once again, rather than discussing the logical and proper approach of fully redeeming Donna Taylor's shares, Ashby was discussing motion practice in *Donna Taylor v. Taylor*.

23. On July 16, 2012, AIA Services held a shareholder meeting to purportedly elect directors for AIA Services and to effectuate the unlawful reverse stock split.[941] John Taylor refused to answer any questions regarding CropUSA or

---

[937] Dkt. 66-3, pp. 2-18.
[938] HTEH000257-59.
[939] *E.g.*, Dkt. 23.
[940] FB 0820.
[941] DLM – 0007225-47; HTEH000619-21.

Exhibit - 1, p. 240

provide a legitimate business purpose for the reverse stock split.[942] Prior to the meeting and any shareholder vote, fourteen demands for payment of fair value[943] and derivative demands[944] were served on AIA Services demanding, *inter alia*, to take action against the Controlling AIA Defendants and to seat Donna Taylor's board designee, Durant. There were no responses to these derivative demands and Donna Taylor's designee, Durant, has never been seated to the board of directors of AIA Services as required.

24.     On July 17, 2012, AIA Services' purportedly filed an amendment to its articles of incorporation to effectuate the unlawful reverse stock split, which was signed by John Taylor.[945]

25.     On July 25, 2012, in *Reed Taylor v. AIA Services*, the court clerk indicated that the case was closed, but there are counterclaims pending, no final judgment as been entered (in fact, no judgment has been entered since the Rule 54(b) Judgment entered September 2009), and there has been no order dismissing the case for failure to prosecute the remaining claims.[946] Thus, the Hawley Troxell Defendants remain counsel of record for the AIA Corporations and continue to owe them fiduciary duties to this day (including the undivided duty of loyalty).

26.     On September 12, 2012, in *AIA Services v. Durant*, the defendant shareholders filed a motion to dismiss asserting, *inter alia*, that the reverse stock split was prohibited by AIA Services' Amended Articles of Incorporation and that it was being pursued solely to eliminate derivative standing in this Lawsuit.[947] Despite these assertions, the Controlling AIA Defendants proceeded to litigate the issues to seek a court order to effectuate the reverse stock split. The attorneys' fees and costs paid to Attorney Siddoway and his firm Randall Danskin were never authorized and a waste of the AIA Corporations' funds.

27.     On October 5, 2012, GemCap and the CropUSA Entities entered into Amendment No. 3 of the GemCap Loan.[948] This amendment required the CropUSA

---

[942] DLM – 0007225-47.
[943] Dkt. 67-41.
[944] Dkt. 67-42.
[945] DLM – 0033085-86.
[946] DLM – 0019382-427.
[947] Dkt. 84-9.
[948] AIAPROD00285390-94.

Exhibit - 1, p. 241

11-ER-2658

Entities to pay a $10,000 fee because of allegedly using proceeds for the GemCap Loan to, *inter alia*:

> A.     On or about August 7, 2012 and August 15, 2012 and August 31, 2012, [the CropUSA Entities] transferred proceeds of the Loans to **Pacific Empire Radio**, a Idaho corporation ("**Pacific**") and AIA Services Corp., an Idaho corporation ("**AIA Corp.**"), in violation of Section 2.3 of the Existing Loan Agreement, Section 1(d) of the Loan Agreement Schedule and Section 10.10 of the Existing Loan Agreement.

> B.     The [CropUSA Entities'] transfers of proceeds of the Loans to Pacific and AIA Corp. are in violation of the express provisions of the Loan Agreement and constitute Events of Default under Section 11.3 of the Existing Loan Agreement (the "Specified Events of Default").

> C.     As a consequence of the Specified Events of Default, [GemCap] is entitled to exercise all rights and remedies available to it under the Existing Loan Agreement and the other Loan Documents, and otherwise, including, without limitation, the right to charge interest at the Default Interest Rate, to declare all Loans and other Obligations to be immediately due and payable, and/or to take possession of all or any portion of the Collateral.[949]

This confirmed that GemCap was aware of the improper commingling of funds and improper operation of the CropUSA Entities and the AIA Corporations, but GemCap chose to continue its relationship and would subsequently increase the GemCap Loan to $10,000,000 four months later.

28.     In connection with Amendment No. 3 of the GemCap Loan, the AIA Corporations allegedly executed the AIA Corporations' Amended Guarantee of the GemCap Loan, which was purportedly signed by John Taylor for both corporations,[950] despite GemCap's attorneys at Cohen Tauber having earlier obtained UCC, judgment, litigation and bankruptcy searches regarding the AIA Corporations.[951] These new searches provided updated information to GemCap

---

[949] AIAPROD00285390 (Emphasis in original).
[950] Dkts. 439-1, 439-2.
[951] GC0768242-288.

Exhibit - 1, p. 242

since the original searches it obtained on October 4, 2011.[952] In the new searches, GemCap was provided with a copy of the docket in this Lawsuit showing that Donna Taylor had moved to lift the stay (GemCap was previously provided with a copy of Donna Taylor's First Amended Complaint, which contained, *inter alia*, numerous allegations of unauthorized loan guarantees by the AIA Corporations and intentional breaches of fiduciary duties).[953] As recently confirmed in John Taylor's Rule 30(b)(6) testimony, there were no board resolutions authorizing the new guarantee by AIA Insurance (it had not previously been a party to AIA Services' Limited Guarantee) or the increase of AIA Services' alleged guarantee from $1,113,930 to the entire balance of the GemCap Loan, and John Taylor was aware, and allegedly advised GemCap, that the AIA Corporations' Amended Guarantees of the GemCap Loan violated Section 4.2.9(c) (the Guarantee Prohibition) of AIA Services' Amended Articles of Incorporation and the AIA Corporations' bylaws. In fact, there were no board or shareholder resolutions for the AIA Corporations addressing any GemCap loan or guarantee issues in 2012—let alone authorizing or approving any of the transactions or agreements involving the AIA Corporations.[954] The AIA Corporations received no consideration for the guarantee, as confirmed by Attorney Gatziolis.[955] The pledge of all of the AIA Corporations' assets and the December 20, 2012 UCC filing to reflect the pledge of "all assets" were also never authorized by the board of directors of the AIA Corporations.[956] Even if board resolutions did exist, the AIA Corporations' Amended Guarantee of the GemCap Loan and any pledges of assets were unauthorized because the AIA Corporations' Amended Guarantee of the GemCap Loan and the pledging of any assets violated Section 4.2.9(c) (the Guarantee Prohibition) and Section 4.2.9(g) (the conflict of interest with affiliates provision) of AIA Services' Amended Articles of Incorporation and the same provisions in AIA Services' New Restated Bylaws (Sections 4.14 and 14.1) and AIA Insurance's Bylaws (Sections 4.14 and 14.1). GemCap did not obtain any Legal Opinions from Quarles & Brady or Attorney Van Idour for the AIA Corporations' Amended Guarantee of the GemCap Loan.

29.     Accordingly, GemCap was aware, or failed to exercise prudence to become aware, that the AIA Corporations' Amended Guarantee of the GemCap

---

[952] Dkt. 563-25.

[953] GC0768285-86.

[954] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 89-90. While GemCap denies that John Taylor advised it that the AIA Corporations' Amended Guarantee of the GemCap Loan violated AIA Services' Amended Articles of Incorporation, the issue is a red herring because GemCap was aware of the Guarantee Prohibition as stated in this Report.

[955] 6/11/19 Gatziolis Depo. Transcript, pp. 170-71.

[956] Dkt. 439-8.

Exhibit - 1, p. 243

11-ER-2660

Loan was unauthorized because it was prohibited by the Guarantee Prohibition provision (Section 4.2.9(c)) and conflict of interest provision involving affiliates (Section 4.2.9(g)) under AIA Services' Amended Articles of Incorporation and Sections 4.14 and 14.1 of AIA Services' New Restated Bylaws and AIA Insurance's Bylaws (the conflict of interest and guarantee prohibition provision), and was never authorized by a properly seated board of directors (including Donna Taylor's designee) or AIA Services' shareholders. Nevertheless, GemCap intentionally proceeded with accepting the AIA Corporations' Amended Guarantee of the GemCap Loan.

30.    Because GemCap did not seek or obtain any Legal Opinions from Quarles & Brady and Attorney Van Idour for the 2012 AIA Corporations' Amended Guarantee of the GemCap Loan, their prior November 23, 2011 Legal Opinions[957] and subsequent February 2013 Legal Opinions[958] did not opine as to the AIA Corporations' Amended Guarantee of the GemCap Loan because "[a]n opinion letter to a third-party does not require updating after its delivery, unless it specifies otherwise. By custom, the opinion giver provides a professional judgment at a specific time, ordinarily to facilitate a closing, and has no continuing responsibility to the non-client opinion recipient."[959]

31.    On September 23, 2012, John Taylor and others completed the Confidential Private Placement Memorandum for Green Leaf Reinsurance Partners in an effort to raise capital for a new crop insurance captive reinsurance business that involved CropUSA.[960] In that Memorandum, John Taylor disclosed the obvious; that CropUSA's role as a defendant in this Lawsuit could result in an award of substantial damages:

> Pending litigation against Crop USA could subject it to significant monetary damages. See the subsection entitled "Involvement in Certain Legal Proceedings" on page 59 for a description of the legal proceedings against Crop USA. Crop USA has limited capital resources. There can be no assurance that an adverse outcome in this suit or others that may occur in the future would not have a material

---

[957] Dkts. 439-5, 439-6.

[958] Dkt. 439-7; QBMIESEN000005404-13.

[959] Third-Party "Closing" Opinions: A Report of the TriBar Opinion Committee, 53 Bus. Law. 591, 597 (1998).

[960] AIAPROD00045479-581.

adverse effect on Crop USA operations and comprise its ability to fulfill its obligations as Manager.[961]

32.     On November 16, 2012, according to the billing records in *Taylor v. Riley*, Attorney LaRue "[r]eview[ed] communication from [one of the Hawley Troxell Defendants] re: declaratory judgment action" and had a "[c]ommunication with attorney Risley relating to declaratory judgment case pending in Nez Perce County."[962] The references to the declaratory judgment action in both billing entries were to *AIA Services v. Durant* since that was the only declaratory judgment lawsuit pending at the time. Those billing entries confirm that the Hawley Troxell Defendants were monitoring the plan that they had previously suggested to eliminate derivative standing in this Lawsuit through an unlawful reverse stock split.

33.     On December 31, 2012, John Taylor, acting as Chairman and CEO of Pacific Empire Radio, signed on behalf of that corporation a $457,650 Promissory Note payable to AIA Services; the terms of loan favored Pacific Empire Radio.[963] John Taylor was on both sides of this transaction, which was a conflict of interest in his role as the purported director and President of the AIA Corporations. This loan was never authorized by the AIA Corporations and violated AIA Services' Amended Articles of Incorporation and AIA Services' New Restated Bylaws, as with all of the loans to Pacific Empire Radio from the AIA Corporations. For the same reasons and because the loan was not in the best interests of the AIA Corporations or the AIA Disinterested Shareholders, this loan and the other loans and advances to Pacific Empire Radio also constituted breaches of the duties of loyalty owed by John Taylor, Beck and Henderson as directors of the AIA Corporations.

34.     According to a Counterclaim filed by the United States of America, Pacific Empire Radio had not timely or fully paid the taxes due on employee wages in the amounts of over $65,000 for the period ending December 31, 2012 and for an amount averaging over $30,000 for eight quarters thereafter.[964] Thus, irrespective of the fact that John Taylor, Beck and Henderson were prohibited from having the AIA Corporations loan any funds to Pacific Empire Radio, these tax assessments, which have not been fully paid to this day, demonstrate self-dealing in favor of John

---

[961] AIAPROD00045512.
[962] Riley/HTEH Billing Records for Fee Request in *Taylor v. Riley*, p. 73.
[963] AIAPROD00294298-311.
[964] DLM – 0059101-16.

Exhibit - 1, p. 245

Taylor and Henderson as part owners of Pacific Empire Radio at the time that many of the loans and advances were made and constituted breaches of John Taylor, Henderson and Beck's fiduciary duties of loyalty owed to the AIA Corporations.

35.    Other than the so-called shareholder meeting held on July 16, 2012 (which was not conducted with the proper disclosures, proxies or conducted properly (e.g., in bad faith) for purposes of attempting to effectuate the unlawful reverse stock split, there were no special shareholder meetings held for AIA Services in 2012 to authorize any transactions (despite the numerous shareholders' demands and allegations made in various lawsuits). In addition, Donna Taylor's designee, Durant, was not seated on the board of AIA Services as required. Therefore, none of the transactions or corporate decisions (including litigation decisions) involving the AIA Corporations were authorized for 2012.

N.    **2013 – The Controlling AIA Defendants Permit the GemCap Loan to Be Increased to $10 Million Thereby Increasing the AIA Corporations' Amended Guarantee of the GemCap Loan to $10 Million, Judge Kerrick Dismisses *AIA Services v. Durant* Thereby Invalidating the Reverse Stock Split, Donna Taylor Appeals the Denial of the Motion to Lift Stay, Donna Taylor Files Her Second of the Consolidated Lawsuits in *Donna Taylor v. John Taylor*, GemCap Files Suit in *GemCap v. CropUSA*, and the Malfeasance and Improper Corporate Governance Continue.**

1.    On January 30, 2013, GemCap's attorney, Adam Stein, emailed Attorney Gatziolis stating: "Attached are the line/suits/judgment1 search results for the Crop USA and AIA entities, along with partial results for John Taylor…We are fine from the UCC standpoint. Could you please let me know the status of existing suits?"[965] This email confirms that GemCap's counsel was inquiring about the status of lawsuits in connection with its due diligence for the GemCap Loan and the AIA Corporations' Amended Guarantee of the GemCap Loan (as ultimately allegedly reaffirmed below). Based on this evidence and the other information that I have reviewed, there is no doubt that GemCap was aware of the Guarantee Prohibition under AIA Services' Amended Articles of Incorporation and other improper corporate governance issues (including the unlawful and improper reverse stock split) and GemCap simply chose to take the risks and accept the AIA Corporations' Amended Guarantee of the GemCap Loan, as it subsequently did in

---

[965] QB014900.

**Exhibit - 1, p. 246**

**11-ER-2663**

2014 when it entered into the GemCap Settlement Agreement despite having been sued and advised that the Settlement Agreement was unauthorized and improper.

2. On February 4, 2013, GemCap and the CropUSA Entities entered into the Amended and Restated Loan and Security Agreement, thereby increasing the GemCap Loan to a $10,000,000 line-of-credit.[966] As before, the AIA Corporations were not entitled to draw from the GemCap Loan or use any proceeds from that Loan and thus they obtained no benefit whatsoever from the GemCap Loan or the AIA Corporations' Amended Guarantee of the GemCap Loan. GemCap also had John Taylor sign a "Reaffirmation and Ratification of Guarantee" for the alleged AIA Corporations' Amended Guarantee of the GemCap Loan (the foregoing is defined to include the 2013 alleged reaffirmation),[967] but this so-called reaffirmation and ratification could not retroactively ratify or authorize the AIA Corporations' Amended Guarantee of the GemCap Loan in October 2012 after the fact and that guarantee remained unauthorized, ultra vires, illegal and/or intra vires (but unauthorized), particularly when Henderson recently testified that she was not even advised that the board resolutions purporting to authorize the AIA Corporations' Amended Guarantee of the GemCap Loan purportedly authorized the AIA Corporations to guarantee the entire $10,000,000 loan and that she believed the guarantee was limited to the original $1,113,930 set forth in the original AIA Services' Limited Guarantee of the GemCap Loan.[968] John Taylor's guarantee was also amended and restated.[969]

3. In connection with the amended GemCap Loan, John Taylor, Beck and Henderson signed a purported board resolution for the alleged increase of the indebtedness owed under the AIA Corporations' Amended Guarantee of the GemCap Loan, both of which violated the Guarantee Prohibition (Section 4.2.9(c)) and the conflict of interest provision involving transactions with affiliates (Section 4.2.9(g)) of AIA Services' Amended Articles of Incorporation.[970] The reaffirmation of AIA Corporations' Amended Guarantee of the GemCap Loan and the execution of this board resolution also violated the conflict of interest provisions (Section 4.14) and the guarantee provision (Section 14.1) in AIA Services' New Restated Bylaws and AIA Insurance's Bylaws. By failing to honor Donna Taylor's board

---

[966] *E.g.*, Dkt. 439-1 (Amended and Restated Loan and Security Agreement); AIAPROD00311890-95 (Third Amended and Restated Secured Revolving Note).
[967] AIAPROD00272033-34.
[968] 9/9/2020 Henderson Depo. Transcript, pp. 230, 287-88.
[969] Dkt. 440-2, pp. 20-29.
[970] Dkt. 439-4, pp. 11-13.

Exhibit - 1, p. 247

11-ER-2664

designee Durant, the reaffirmation of the guarantee and the board resolution were never properly disclosed or authorized. The AIA Corporations received no consideration. Prior to executing the board resolution and the AIA Corporations' Amended Guarantee of the GemCap Loan, no notice was provided to Donna Taylor and the AIA Disinterested Shareholders, they were never asked to consent or authorize AIA Services' Limited Guarantee of the GemCap Loan, no shareholder meeting was held for the guarantee, no shareholder vote was taken for the guarantee and Donna Taylor's consent was never obtained for the guarantee. John Taylor, Beck and Henderson breached their fiduciary duties (including their duties of loyalty) owed to AIA Services and the AIA Disinterested Shareholders by signing this board resolution and allowing the AIA Corporations' Amended Guarantee of the GemCap Loan. GemCap substantially assisted John Taylor, Beck and Henderson, since it was aware that this Lawsuit and other lawsuits had been filed asserting unlawful guarantees and breaches of fiduciary duties associated with such acts.

4.      In connection with the 2013 amendment to the GemCap Loan and the so-called reaffirmation of the AIA Corporations' Amended Guarantee of the GemCap Loan, Quarles & Brady and Attorney Van Idour delivered Legal Opinions to GemCap dated February 4, 2013[971] and February 7, 2013,[972] respectively. This was Attorney Van Idour's second Legal Opinion prepared for a transaction. Again, he never communicated directly with GemCap's representatives or its attorneys to discuss customary practice with respect to the Legal Opinion or negotiate the content of that Legal Opinion—all of which is contrary to and not in compliance with Legal Opinion customary practice. The substantive opinions in Van Idour's Legal Opinion were prepared by Attorney Gatziolis. The Quarles & Brady Legal Opinion excluded coverage of Idaho law. Based on these facts, the information that GemCap had in its possession and its failure to comply with customary practice, it could not reasonably rely on the Legal Opinions provided by Van Idour or Quarles & Brady for AIA Corporations' Amended Guarantee of the GemCap Loan or the reaffirmation of that Guarantee.

5.      Accordingly, GemCap was aware, or failed to exercise prudence to become aware, that the AIA Corporations' Amended Guarantee of the GemCap Loan and reaffirmation of that Guarantee were unauthorized because both were prohibited by the Guarantee Prohibition provision under AIA Services' Amended Articles of Incorporation and Sections 4.14 and 14.1 of AIA Services New Restated

---

[971] QBMIESEN000005404-13.

[972] Dkt. 439-7, pp. 2-6.

Exhibit - 1, p. 248

11-ER-2665

Bylaws (the conflict of interest and guarantee prohibition provision), and were never authorized by a properly seated board of directors (including Donna Taylor's designee) or AIA Services' shareholders. Nevertheless, GemCap intentionally proceeded with accepting the AIA Corporations' Amended Guarantee of the GemCap Loan and the so-called reaffirmation of that Guarantee. For these same reasons, GemCap could not reasonably rely on any representations and warranties provided as to power, authority, enforceability and related issues pertaining to the AIA Corporations' Amended Guarantee of the GemCap Loan and the reaffirmation of that Guarantee, nor could GemCap rely on any such representations or warranties contained in the subsequently executed GemCap Settlement Agreement.

6.      Consequently, as to the power, authority, enforceability and related Legal Opinions provided to GemCap for the so-called reaffirmation of AIA Corporations' Amended Guarantee of the GemCap Loan, GemCap "ha[d] no right to rely on [the Quarles & Brady Legal Opinion[973] or the Van Idour Legal Opinion[974] because] reliance [was] unreasonable under the circumstances [and/]or the opinion[s] [were] known by [GemCap] to be false."[975]

7.      On February 11, 2013, Donna Taylor delivered a letter to AIA Services demanding that the balance owed on her Series A Preferred Shares be paid in full.[976] The balance was not paid and no payments have been made to Donna Taylor since May 2008.

8.      On April 29, 2013, Judge Kerrick issued his decision dismissing AIA Services' claims pertaining to the improper reverse stock split at issue in *AIA Services v. Durant*.[977] Judge Kerrick ruled that "there is nothing in the record which supports AIA Services assertion that a determination should be made on [the issue of the illegality of the 1996 Series A Preferred Shareholder Agreement] prior to the resolution of the claims in the pending federal action [(this Lawsuit)]."[978] Judge Kerrick also found that "it appears [AIA Services] is rushing to a new forum to seek resolutions that are appropriately addressed in currently pending lawsuits [(*Donna Taylor v. Taylor* and this Lawsuit)]."[979] Judge Kerrick also ruled that "because the

---

[973] QBMIESEN000005404-13.

[974] Dkt. 439-7.

[975] Third-Party "Closing" Opinions: A Report of the TriBar Opinion Committee, 53 Bus. Law. 591, 604 (1998).

[976] Dkt. 390-40, p. 5 ¶ 30.

[977] Dkt. 86-1.

[978] Dkt. 86-1, p. 7.

[979] Dkt. 86-1, p. 8.

**Exhibit - 1, p. 249**

**11-ER-2666**

process of determining the value of the Series C Stock and the Common Stock are inextricably intertwined with that of determining the value of the Series A Preferred Stock, it is appropriate to dismiss these claims as well."[980] Judge Kerrick rejected AIA Services' argument that the fourteen common shareholders of AIA Services (including Miesen) "are delaying the appraisal process so they can litigate their claims in other courtrooms. Specifically AIA [Services] points to the presently stayed federal case mentioned above [(this Lawsuit)]. [AIA Services] argument is disingenuous however, when considering that the federal lawsuit was filed well in advance to the corporate actions which gave rise to [*AIA Services v. Durant*]."[981] Judge Kerrick ruled that the fourteen shareholders had complied with the notice requirements to seek an appraisal of the value of their common shares.[982] Finally, Judge Kerrick ruled that he "need not make a determination regarding whether the reverse stock split is illegal at this time. However, [the fourteen common shareholders'] motion for summary judgment is granted with respect to these claims."[983] Judge Kerrick ordered that "[the fourteen common shareholders'] motion for summary judgment is granted. The claims presented cannot be adjudicated until matters are settled in other pending lawsuits. Consequently, [AIA Services'] cross motion for summary judgment is denied."[984] AIA Services never moved to reconsider this decision and it never appealed after a final judgment was subsequently entered. There is no doubt that the reverse stock split was improper and unlawfully pursued to eliminate the derivative standing in this Lawsuit, as previously improperly suggested by the Hawley Troxell Defendants and when they never took action to stop the unlawful reverse stock split or advise the highest authority of AIA Services.

9. On May 17, 2013, Attorney Siddoway's billing entries stated that he "Reviewed [emails] from [Attorney] Risley and [Attorney] LaRue re the effect of Judge Kerrick's dismissal of the declaratory judgment action on the federal preemption issue.[985] This billing entry confirmed that the purpose of the reverse stock split was for the improper and unlawful purpose of intentionally disregarding the legal rights and obligations of the AIA

---

[980] Dkt. 86-1, p. 8.
[981] Dkt. 86-1, p. 10.
[982] Dkt. 86-1, pp. 9-11.
[983] Dkt. 86-1, pp. 12-13.
[984] Dkt. 86-1, p. 14.
[985] Dkt. 562-25, p. 1.

Exhibit - 1, p. 250

Corporations and at the same time seeking to eliminate Miesen and Donna Taylor's derivative standing in this Lawsuit.[986]

10.     On May 17, 2013, U.S. Magistrate Judge Boyle denied Donna Taylor's Motion to Lift the Stay in this Lawsuit.[987] The practical effect of this order was that the Hawley Troxell Defendants had successfully taken action against the best interests of the AIA Corporations—which was to have the stay lifted to recover the millions of dollars in damages.

11.     On May 23, 2013, in *Donna Taylor v. Taylor*, Donna Taylor filed her complaint in the second of the consolidated lawsuits, which asserted, *inter alia*, claims against certain of the Controlling AIA Defendants (John Taylor, Beck, Cashman and Henderson) for breaches of fiduciary duties, fraud and provided many examples of undisputable malfeasance committed by the Controlling AIA Defendants.[988] This lawsuit was consolidated with Donna Taylor's original 2008 lawsuit against John Taylor and Henderson.[989] No shareholder approval was obtained from the AIA Corporations to advance any of the defense costs for this lawsuit or the 2008 lawsuit; all such advances were unauthorized.

12.     On May 31, 2013, John Taylor represented in his personal financial statements that he and Henderson's community ownership interest in common shares in AIA Services were valued at $500,000 and their common shares in CropUSA were valued at $10,000,000 (owned directly and indirectly through CropUSA Insurance Services).[990] John Taylor also stated that he personally guaranteed a loan with "GemCap Capital Partners LLC" for CropUSA with a balance of $8,689,379,[991] but that loan was with GemCap Lending I, LLC.

13.     On June 14, 2013, Donna Taylor moved for reconsideration of the order denying the motion to lift the stay or, in the alternative, to bifurcate claims in an effort to have the stay lifted in this Lawsuit.[992]

---

[986] Dkt. 562-25, p. 1.
[987] Dkt. 88.
[988] Dkt. 390-40.
[989] Dkts. 84-5, 390-39, 390-41.
[990] GC0740886-87.
[991] GC0740887.
[992] Dkt. 89.

Exhibit - 1, p. 251

14.     On June 27, 2013, the Hawley Troxell Defendants and CropUSA and the AIA Corporations (through their purported counsel Attorney Siddoway) opposed the motion for reconsideration to lift the stay thereby breaching their duties of loyalty owed to the AIA Corporations because their interests were not served by staying this Lawsuit.[993]

15.     On July 1, 2013, Cashman, Beck and John Taylor filed a joinder opposing Donna Taylor's motion for reconsideration of the denial of her motion to lift the stay thereby resulting in John Taylor, Beck and Henderson breaching their fiduciary duties of loyalty owed to the AIA Corporations because their interests were not served by staying this Lawsuit (while Henderson was not a party to this Lawsuit, she was a purported director).[994] Moreover, John Taylor, Beck and Henderson should not have been involved in or made any of the AIA Corporations' litigation decisions in this Lawsuit or the other lawsuits pending during their respective tenures on the boards of directors of the AIA Corporations.

16.     On July 16, 2013, GemCap allegedly provided notice of default to the CropUSA Entities, AIA Corporations and John Taylor.[995]

17.     On July 29, 2013, GemCap allegedly provided further notices of, *inter alia*, acceleration of the outstanding balance on the GemCap Loan.[996]

18.     On July 30, 2013, GemCap filed suit in *GemCap v. CropUSA* against John Taylor, the CropUSA Entities, the AIA Corporations and other parties asserting, *inter alia*, claims for breaches of contract, fraud, conversion and unfair business practices.[997] The Complaint also asserted breach of contract claims against the AIA Corporations and John Taylor for the guarantees of the GemCap Loan, which caused an immediate conflict of interest between John Taylor and the AIA Corporations because they should have been attempting to extricate themselves from the guarantees. Notably, John Taylor never sought or obtained permission from AIA Services' common or preferred shareholders to have the AIA Corporations advance any of his attorneys' fees or costs or those incurred by Duclos, Freeman or any other defendant; all such advances were unauthorized.

---

[993] Dkts. 90-91.
[994] Dkt. 92.
[995] Dkt. 440-2, p. 65-66.
[996] Dkt. 440-2, p. 69-75.
[997] Dkts. 440-1, 440-2.

Exhibit - 1, p. 252

11-ER-2669

19.     Sometime around this period of time, GemCap "analyzed the books and records" from "November 2011 through May 2013" and determined that John Taylor had transferred and used millions of dollars of the GemCap Loan advances to himself ($438,532), Pacific Empire Radio ($243,009), 17 State Street Partners ($47,330), Weskan Agency ($594,843), and other entities.[998] While this is consistent with John Taylor's long history of self-dealing and corporate malfeasance, GemCap should not have been surprised since it previously caught John Taylor improperly using loan proceeds in 2012. In any event, GemCap was not a good faith lender for the GemCap Loan and the AIA Corporations' guarantees of that loan.

20.     On August 19, 2013, Attorney Bond emailed Attorney Munding (the attorney purportedly representing the interests of the AIA Corporations in *GemCap v. CropUSA*) advising him, *inter alia*:

> I represent 14 shareholders of AIA Services. I understand that you are involved in litigation in federal court in California. I have reviewed the Complaint in that lawsuit and the documents attached to that Complaint. I note that John Taylor signed loan guaranties on behalf of AIA Services and AIA Insurance. Those guarantees were illegal, as confirmed by the attached complete set of articles of incorporation of AIA Services. Please note on page 49 of the attached Articles. Specifically, covenant 4.2.9, which bars AIA Services or its subsidiary AIA Insurance from guaranteeing the loans subject to the California lawsuit. Thus, our position is that AIA Services and AIA Insurance's loan guarantees are illegal and unenforceable.
>
> As you can see, I am trying to protect my clients' interests, which include Donna Taylor, the Series A Preferred Shareholder who did not consent to those guarantees nor has she been provided her board seat, despite repeated demands.[999]

21.     On August 21, 2013, Attorney Bond emailed Attorney Lander (one of GemCap's attorneys) forwarding him a copy of the August 19, 2013 email to

---

[998] GC0769752. The document notes that $193,500 was allegedly transferred to AIA Insurance and $154,900 to AIA Services. If true, those funds were not used for any legitimate business purpose and it appears that they were just funneled to John Taylor and other parties (including possibly paying expenses for CropUSA as shown in the check registers in 2013).
[999] DLM – 0000011.

Exhibit - 1, p. 253

11-ER-2670

Attorney Munding (which advised the guarantees were prohibited) and further stating "Below is the email that I sent to John Munding. Attached are AIA Services' Articles of Incorporation. Please note that AIA Insurance is a wholly owned subsidiary of AIA Services."[1000] Attorney Bond also forwarded Attorney Lander the First Amended Complaint (which alleged unlawful guarantees) and other documents filed in this Lawsuit.[1001]

22.     On August 29, 2013, in *GemCap v. CropUSA*, Attorney Munding appeared as counsel for all of the defendants (other than Diversified).[1002] Neither Munding nor John Taylor requested consent from AIA Services' common and preferred shareholders to represent the AIA Corporations and the other defendants. Attorney Munding was never authorized to represent the AIA Corporations.

23.     On September 6, 2013, Attorney Bond emailed Attorney Lander (GemCap's attorney) stating in clear terms that "To add to my last email, my clients' position is that there can be no resolution to that case without my clients' consent.'[1003] That same day, Attorney Bond also emailed Attorney Lander:

> I haven't heard back from you. I do want to reiterate that AIA Services and AIA Insurance's guarantees are illegal and unenforceable. I have also reviewed the Complaint and the loan documents attached to the Complaint. It appears to me that Gemcap is not a good faith, bona fide lender and had knowledge of my clients' prior claims to the very assets that it accepted as security and which Gemcap is now seeking to seize.[1004]

24.     On October 1, 2013, in *AIA Services v. Durant*, Judge Kerrick entered an amended judgment to reflect the $10,107.72 in attorneys' fees and costs awarded to Miesen and the other shareholder defendants.[1005]

25.     On October 9, 2013, U.S. Magistrate Judge Boyle denied Donna Taylor's motion for reconsideration to lift the stay, or alternatively, to bifurcate to

---

[1000] DLM – 0000013-14.
[1001] DLM – 0000015.
[1002] DLM – 0048484-503.
[1003] DLM – 0000016.
[1004] DLM – 0000017.
[1005] DLM – 0035876-87.

Exhibit - 1, p. 254

11-ER-2671

lift the stay in this Lawsuit.[1006] Donna Taylor timely appealed this decision and the prior decision refusing to lift the stay.[1007]

26.  On November 13, 2013, in *GemCap v. CropUSA*, Attorney Munding filed an Answer on behalf of all of the defendants (including the AIA Corporations).[1008] No defenses were asserted to invalidate AIA Services' Limited Guarantee of the GemCap Loan or the AIA Corporations' Amended Guarantee of the GemCap Loan. Thus, the legal issues of the enforceability of those guarantees and the authority to enter into those guarantees were never litigated.

27.  On December 31, 2013, John Taylor, acting as Chairman and CEO of Pacific Empire Radio, signed on behalf of that corporation a $310,245 Promissory Note payable to AIA Services and the terms of loan favored Pacific Empire Radio.[1009] John Taylor was on both sides of this transaction, which was a conflict of interest in his role as the purported director and President of the AIA Corporations. This loan was never authorized by the AIA Corporations and violated AIA Services' Amended Articles of Incorporation and AIA Services' New Restated Bylaws, as with all of the loans to Pacific Empire Radio from the AIA Corporations. For the same reasons and because the loan was not in the best interests of the AIA Corporations or the AIA Disinterested Shareholders, this loan and the other loans and advances to Pacific Empire Radio also constituted the breaches of the duties of loyalty owed by John Taylor, Beck and Henderson as directors of the AIA Corporations.

28.  There were no annual or special shareholder meetings held for AIA Services in 2013 to properly elect directors or authorize any transactions (despite the numerous shareholders' demands and allegations made in various lawsuits). In addition, Donna Taylor's designee, Durant, was not seated on the board of AIA Services as required. Therefore, none of the transactions or corporate decisions (including litigation decisions) involving the AIA Corporations were authorized for 2013.

---

[1006] Dkt. 95.
[1007] Dkt. 96.
[1008] Dkt. 440-3.
[1009] RJT – 090269-71.

Exhibit - 1, p. 255

11-ER-2672

**O.** **2014 – Miesen Files Suit Against GemCap to Invalidate the AIA Corporations' Amended Guarantee of the GemCap Loan in *Durant v. GemCap*, GemCap Files Suit Against Quarles & Brady, GemCap and John Taylor Unlawfully Sign the GemCap Settlement Agreement, and the Malfeasance and Improper Corporate Governance Continue.**

1. On March 19, 2014, Attorney Bond emailed Attorney Bernstein (another one of GemCap's attorneys in *GemCap v. CropUSA*) providing him with a copy of AIA Services' Amended Articles of Incorporation and stating "Attached are more documents, including the applicable restrictions in AIA's articles of incorporation."[1010]

2. On March 26, 2014, Donna Taylor, Durant, Legg and other shareholders, through their attorney Bond, delivered a written request to inspect records.[1011] No inspection of records was permitted in violation of the Idaho Business Corporation Act and Idaho Criminal Code (as discussed elsewhere in this Report).

3. On March 30, 2014, Attorney Bond again emailed Attorney Lander (one of GemCap's attorneys) advising him that:

> I just wanted to be clear that my clients do not consent to any assets or money being pledged or paid directly or indirectly from AIA Services or AIA Insurance to resolve any of the claims in the Gemcap litigation. As we have discussed, AIA Services and AIA Insurance's guarantee is illegal. I just wanted to be clear on this in light of any mediation which may occur in April or any settlement. Further, one of my clients, Donna Taylor, has the right to appoint a person to the board of AIA Services and that right has been denied and ignored by John Taylor and others at AIA. This separately bars any resolution, pledge or payment as she or her representative would have never authorized the guarantees nor authorize any settlement.[1012]

4. On April 3, 2014, in violation of I.C. §§ 30-1-1602 and 30-1-1603, Attorney Siddoway wrote a letter to Attorney Bond advising that the inspection and

---

[1010] DLM – 0000018.
[1011] DLM – 0035955-57.
[1012] DLM – 0000021.

Page - 247

**Exhibit - 1, p. 256**

**11-ER-2673**

copying of records would not be permitted.[1013] The refusal to allow inspection of AIA Services' records was a crime, which occurred numerous times under the Controlling AIA Defendants' watch and later when only John Taylor served as the sole director.[1014] Thus, each of the refusals to inspect records violated the Idaho Business Corporation Act and Idaho Criminal Code Section 18-1907.

5.     On April 11, 2014, Attorney Bond emailed Attorney Munding (the attorney purportedly representing the AIA Corporations in *GemCap v. CropUSA*) and Attorney Bernstein (one of the attorneys representing GemCap in *GemCap v. CropUSA*) advising them:

> As you know, I have represented a number of common and preferred shareholders in AIA Services. As I have advised you both, AIA Services and AIA Insurance's guarantees and pledges of assets to secure Gemcap's $8.7 million loan to CropUSA violate AIA Services' amended articles of incorporation, among other things, and is illegal and unenforceable.
>
> I understand that your respective clients may be mediating next week to resolve the California case. Please be advised that legal action will be taken next week to invalidate the guarantees and seek other relief. As I am sure that you are both aware and as I have advised you both, the guarantees and pledged assets violate AIA Services' amended articles of incorporation (among other things) and there is no good faith defense that can be asserted by any of your respective clients in that regard. As you know, an illegal contract cannot be resolved or settled for anything other than Gemcap agreeing to release AIA Services and AIA Insurance as that would be giving legal effect to the original illegal transaction. Gemcap's remedies, if any, lie against John Taylor and other parties involved in the illegal transaction, not against AIA Services or AIA Insurance. Under no circumstances may any funds or assets be paid directly or indirectly from AIA Services or AIA Insurance for any sums owed on the $8.7 million loan or to resolve any claims in the California litigation. In addition, legal action will be taken to prevent any payments or settlements involving any direct or indirect payments from AIA Services or AIA Insurance and, if necessary, to unwind or rescind any obligations or payments made

---

[1013] DLM – 0035959-61.
[1014] I.C. § 18-1907.

Page - 248

directly or indirectly by or through AIA Services or AIA Insurance. I would remind you both that my client, Donna Taylor, is required to have her designee on the board of AIA Services in order for any board action to be lawful, which is an unqualified obligation under AIA Services' amended articles of incorporation. I don't need to remind either of you that I have a number of clients who are very upset at what has transpired and continues to transpire.[1015]

6.      On April 17, 2014, Reed Taylor (through Attorney Gaffney, who was co-counsel with Attorney Bond for Reed Taylor in *Taylor v. Riley*), wrote to the attorneys representing the Hawley Troxell Defendants in this Lawsuit and the attorneys representing Eberle Berlin offering to settle Reed Taylor's claims in *Taylor v. Riley* for $6,000,000.[1016]

7.      On May 1, 2014, the attorneys representing the Hawley Troxell Defendants in this Lawsuit and the attorneys representing Eberle Berlin rejected Reed Taylor's settlement offer and counter offered to settle the claims in *this* Lawsuit *and* Reed Taylor's claims in *Reed Taylor v. Riley* through the payment of $1,000,000 (without specifically allocating any sums between the lawsuits).[1017] The Hawley Troxell Defendants did not seek to obtain a settlement offer for the AIA Corporations thereby once again placing their interests above the interests of the AIA Corporations (they were still counsel of record for the AIA Corporations in *Reed Taylor v. AIA Services* and they had not moved to withdraw). This $1,000,000 settlement offer also demonstrates that the Hawley Troxell Defendants were concerned about this Lawsuit.

8.      On May 8, 2014, Donna Taylor testified that "[s]ince at least 2009, I have been repeatedly demanding my board seat through by attorney Roderick Bond. AIA Services, John Taylor, Connie Taylor Henderson, James Beck and Michael Cashman Sr. have refused to honor the obligation to appoint my designees, Patrick Moran and Paul Durant, to the board as is my right under AIA Services amended articles of incorporation."[1018]

9.      On May 9, 2014 in *Donna Taylor v. Taylor*, then counsel for the defendants (Attorney Risley and Attorney Siddoway, both of whom were

---

[1015] DLM – 0000024.
[1016] DLM – 0035965.
[1017] DLM – 0035966-67.
[1018] DLM – 0005207.

Exhibit - 1, p. 258

previously counsel for the defendants in that lawsuit and in this Lawsuit) asserted the following regarding the AIA Corporations' Amended Guarantee of the GemCap Loan:

> The California loan guarantee. [Donna Taylor] claims [the AIA Corporations have] guaranteed the repayment of an $8. 7 million loan from a California lender in violation of one or more of the protective covenants in Section 4.2.9(c) of its articles. She does not bother to explain which of the covenants [the AIA Corporations] supposedly violated, only that they were violated.
>
> The loan in question, a revolving credit facility by and between [GemCap], as lender, and CropUSA…and CropUSA Insurance Services…as borrowers, is the subject of pending litigation in the United States District Court for the Central District of California, Western Division, *Gemcap Lending I, LLC v. CropUSA Insurance Agency, Inc. et al*. (Case No. CV13-SS04 SJO) [(*GemCap v. CropUSA*)]. John Taylor personally guaranteed the loan. [GemCap] alleges that [the AIA Corporations] did, too, but that allegation is disputed. In any event, [GemCap] has not pursued the [AIA Corporations] guaranty (or the [John] Taylor guaranty for that matter).
>
> ***If the California court ultimately determines that [the AIA Corporations] guaranteed the CropUSA loan and the lender pursues the remedies that are available to it under the guaranty, then [the AIA Corporations] will have incurred a prohibited indebtedness under Section 4.2.9(c)***. Unless and until that occurs, there has been no violation of the protective provision.[1019]

10.     While I do not agree with Attorney Risley and Attorney Siddoway's assertion that the AIA Corporations' Amended Guarantee of the GemCap Loan was only prohibited if GemCap pursued enforcing the guarantee and if the Court determined the AIA Corporations guaranteed the GemCap relief, I agree with them that the AIA Corporations' Amended Guarantee of the GemCap Loan and AIA Services' Limited Guarantee of the GemCap Loan were prohibited under Section 4.2.9(c) of AIA Services' amended articles of incorporation, among other provisions, and were also prohibited under the conflict of interest and guarantee

---

[1019] Dkt. 153-3, p. 8 (Emphasis supplied).

Exhibit - 1, p. 259

11-ER-2676

provisions under AIA Services' New Restated Bylaws and AIA Insurance's Bylaws.

11. On May 9, 2014, in *Donna Taylor v. Taylor*, John Taylor submitted a declaration through which he testified, *inter alia*, the defense of Reed Taylor v. AIA Services "alone cost AIA more than $2,240,135.10 in attorneys' fees" and [i]t also deprived AIA of the ability to continue to use its long-time attorneys, Hawley Troxell Ennis and Hawley…"[1020] His testimony supports Miesen's damages, including the Damage Item Numbers 4, 6, 7, 8, 9, 31 and 32,[1021] and that the Hawley Troxell Defendants were also general counsel for the AIA Corporations.[1022]

12. On May 15, 2014, Attorney Gaffney (on behalf of Reed Taylor) responded to the counter settlement offer made in *Taylor v. Riley* by asserting, *inter alia*, that any settlement of this Lawsuit cannot be intertwined with the claims in *Reed Taylor v. Riley*.[1023] It appears that the Hawley Troxell Defendants may have been trying to create a conflict of interest or show that Reed Taylor and Donna Taylor were colluding, but that effort failed.

13. On June 4, 2014, in *GemCap v. CropUSA*, John Taylor was deposed as the Rule 30(b)(6) designee for AIA Services and he testified, *inter alia*, that: (a) he, Henderson and Beck were the sole acting directors of AIA Services and Donna Taylor was still the sole Series A Preferred Shareholder, which confirmed that the purported board was not honoring her appointment of Durant as a director in violation of Section 4.2.8 of AIA Services' Amended Articles of Incorporation);[1024] (b) he decides when to call a board meeting "[w]hen it's necessary" and AIA Services' has "one to two or three" board meetings "per year" (which demonstrates the board was not properly functioning assuming that it was properly seated);[1025] (c) AIA Services' annual shareholder meetings are conducted "not very often" (which

---

[1020] DLM – 0036058.

[1021] *See* Exhibit A attached hereto.

[1022] There is no dispute that Riley was general counsel for the AIA Corporations when he was an attorney at Eberle Berlin, as confirmed in the Legal Opinion that he prepared for Reed Taylor in 1995. RJT – 089249. It logically follows that Riley and Hawley Troxell continued the general counsel role when he promptly solicited AIA's business when he joined Hawley Troxell. No communications have been produced stating otherwise until the self-serving ones provided during *Reed Taylor v. AIA Services*, which were contrary to the work being performed as stated in this Report and as seen in the Unredacted Billing Records.

[1023] DLM – 0036062-61.

[1024] GC0743606.

[1025] GC0743606-07, 0743623.

Exhibit - 1, p. 260

confirmed that AIA Services was not observing the required corporate governance procedures);[1026] (d) he would only "involve the board if there is a major decision" (which confirms that Beck and Henderson were improperly giving John Taylor free reign despite his long track record of corporate malfeasance);[1027] (e) he was President and Treasurer of AIA Services, while Duclos served as Secretary (and AIA Services had no employees);[1028] and (f) he did not dispute that AIA Services had allegedly entered into a security agreement with GemCap (the AIA Corporations' Amended Guarantee of the GemCap Loan), which was in bad faith and in violation of his duties of loyalty owed to AIA Services because he should have asserted AIA Services was not bound by that unauthorized Agreement).[1029]

14.     On June 5, 2014, GemCap deposed John Taylor as the Rule 30(b)(6) deponent for AIA Insurance. At that deposition, John Taylor testified, *inter alia*, that: (a) AIA Insurance had made over $1,000,000 in loans to Pacific Empire Radio and the board of directors of AIA Insurance had made a "[b]oard decision to "defer receiving any payments on the Pacific Empire Radio Loan of one point two million until the million or so is paid back to [Washington Trust Bank],[1030] which constituted yet another example of John Taylor and Henderson placing their interests in their ownership of Pacific Empire Radio above the interests of the AIA Corporations in obtaining repayment of the over $1.2 million in loans that should have never been made in the first place (i.e., John Taylor, Henderson and Beck violated their duties of loyalty and acted in bad with respect to the loans to Pacific Empire Radio); (b) AIA Insurance employed Henderson's law firm to represent it sometimes (yet another example of Henderson impermissibly being on both sides of a transaction);[1031] and (c) AIA Insurance made an number of payments to Pacific Empire Radio and for other entities partially owned or controlled by John Taylor, but those payments were not derived from GemCap loan proceeds.[1032] None of the loans to Pacific Empire Radio were properly authorized and those loans violated AIA Services' Amended Articles of Incorporation, AIA Services' New Restated Bylaws and AIA Insurance's Bylaws (including based on conflict of interest). John Taylor, Henderson and Beck violated their fiduciary duties of loyalty and acted in bad faith for all of the loans or "investments" in Pacific Empire Radio. In sum, John

---

[1026] GC0743622-23.
[1027] GC0743623-24.
[1028] GC0743607.
[1029] GC0743616.
[1030] GC0743654-58.
[1031] GC0743659-60.
[1032] GC0743664-67.

Exhibit - 1, p. 261

11-ER-2678

Taylor's testimony confirmed that he was not representing the best interests of AIA Insurance and was in fact harming it.[1033]

15.     On July 2, 2014, John Taylor executed a Quitclaim Deed transferring AIA's Parking Lot from 17 State Street Partners (an entity partially owned by John Taylor and his son Jordan Taylor) to his son Jordan Taylor.[1034] The stated consideration for that transfer was "the sum of ONE DOLLAR ($1.00) and other good and valuable considerations."[1035] Accordingly, it appears that Jordan Taylor paid nothing. This transfer constituted yet another breach of John Taylor's duty of loyalty owed to the AIA Corporations since he should have been quitclaiming the ownership interest in AIA's Parking Lot to the AIA Corporations. Jordan Taylor would later sell AIA's Parking Lot for $50,000 in 2016. As purported directors for the AIA Corporations, John Taylor, Henderson and Beck owed fiduciary duties to require AIA's Parking Lot to be transferred to one of the AIA Corporations and not to Jordan Taylor, which constituted breaches of their duties of loyalty owed to the AIA Corporations.

16.     On July 3, 2014, in *GemCap v. CropUSA*, the trial court permitted John Taylor to retain separate counsel (based on conflicts of interest).[1036] Nevertheless, John Taylor continued making the decisions regarding the AIA Corporations which continued to be represented by Attorney Munding.

17.     On July 21, 2014, in *Durant v. GemCap*, Miesen, Durant and Donna Taylor filed a Verified Complaint against GemCap, AIA Services and AIA Insurance.[1037] The Complaint asserted that AIA Services' Limited Guarantee of the GemCap Loan, the AIA Corporations' Amended Guarantee of the GemCap Loan and any settlement agreement are unlawful, unauthorized, illegal and void.[1038] The Verified Complaint asserted that "John Taylor has no authority to execute the Guarantee on behalf of AIA Services or AIA Insurance."[1039] The Verified Complaint also asserted that any "settlement agreements pertaining to Gem[C]ap and AIA Services and/or AIA Insurance are unlawful, illegal, void and unenforceable."[1040]

---

[1033] GC0743635-744.

[1034] DLM – 0036174-75 (Nez Perce County Recorder, Instrument No. 822968).

[1035] DLM – 0036174-75 (Nez Perce County Recorder, Instrument No. 822968).

[1036] Dkt. 306-1.

[1037] Dkt. 440-15, pp. 2-52.

[1038] Dkt. 440-15, pp. 2-52.

[1039] Dkt. 440-15, p. 4 ¶ 14.

[1040] Dkt. 440-15, p. 10 ¶ 37.

18.     On July 22, 2014, Attorney Bond emailed Attorney Bernstein (one of GemCap's attorneys in *GemCap v. CropUSA*) providing him with a courtesy copy of the Complaint filed in *Durant v. GemCap* and asserting:

> Gemcap's registered agent will be served today with the attached summons and complaint. Nevertheless, I wanted to provide you with courtesy copies. There is no question in my mind that Gemcap and its attorneys knew the guarantee was unlawful. As I previously indicated, if Gemcap has any proposals to resolve this matter, please let me know. I must say that I do feel confident that we will have the Guarantee ruled to be illegal and unenforceable, so it seems to me that we should explore the idea of saving attorneys' fees and costs.[1041]

19.     On July 22, 2014, Attorney Bond also emailed Attorney Munding (the attorney purportedly representing the AIA Corporations in *GemCap v. CropUSA*) providing him with a courtesy copy of the Complaint filed in *Durant v. GemCap* and asserting:

> Attached is a courtesy copy of the complaint filed yesterday and served on AIA Services and AIA Insurance. I can tell you that my clients are not happy that they are doing your job. If you have any suggestions on how to resolve this case before everyone incurs unnecessary attorneys' fees and costs, please let me know. Frankly, I will never understand how you have taken direction from John Taylor or any of the others regarding the purported representation of AIA Services and AIA Insurance.[1042]

20.     On July 29, 2014, AIA Services' purported board of directors (John Taylor, Henderson and Beck) held a board meeting with Attorney Siddoway and Duclos present. The meeting minutes noted discussions of "[t]he GemCap lawsuit" and an acknowledgement that the "reverse stock split was never implemented" so "[AIA Services should] take steps to unwind the reverse stock split" and "[t]he GemCap lawsuit [*GemCap v. CropUSA*] was discussed.[1043] Accordingly, John Taylor, Henderson and Beck waited over one year from when Judge Kerrick's decision dismissing the lawsuit seeking to enforce the unlawful reverse stock split

---

[1041] DLM – 0000029.
[1042] DLM – 0000030.
[1043] AIAPROD00308701.

(*AIA Services v. Durant*) to "unwind" their 2012 unlawful act of amending the articles of incorporation to reflect the fifty three thousand to one reverse stock split.[1044] John Taylor, Beck and Henderson also discussed that "[t]he ESOP was discussed and it was noted that the administration costs were eating up any profit."[1045] It appears that they recognized that terminating AIA Services' ESOP and paying those shareholders pennies for their shares was problematic (they were also aware that redeeming the common shares held in AIA Services' ESOP violated AIA Services' Amended Articles of Incorporation) and they were looking for an excuse to terminate AIA Services' ESOP rather than treating those shareholders fairly. In addition, the statement in the minutes was inaccurate because an ESOP does not make "profits"—an ESOP holds stock.

21.     On August 15, 2014 (consistent with the minutes of the purported board of directors meeting held on July 29, 2014), AIA Services' filed an amendment to its articles of incorporation to "unwind" the 2012 amendment unlawfully adopted in an effort to effectuate the reverse stock split.[1046] The filing of this amendment was the only proper conduct that I have seen purportedly authorized by John Taylor, Beck and Cashman other than seeking to have Reed Taylor's redemption declared illegal in *Reed Taylor v. AIA Services* (although the latter was done primarily or exclusively to relieve them of their potential personal liability to Reed Taylor).

22.     On August 18, 2014, Attorney Munding, who was purportedly representing the interests of the AIA Corporations in *GemCap v. Crop USA*, filed a trial memorandum wherein he failed to assert any of the viable defenses that the AIA Corporations had to any alleged liability to GemCap, including, *inter alia*, that AIA Services' Limited Guarantee of the GemCap Loan and the AIA Corporations' Amended Guarantee of the GemCap Loan were illegal, ultra vires, unauthorized and unenforceable for violating AIA Services' Amended Articles of Incorporation, AIA Services' New Restated Bylaws and AIA Insurance's Bylaws.[1047] This confirmed that Attorney Munding and John Taylor were proceeding contrary to the best interests of the AIA Corporations in violation of their respective duties of loyalty owed to them.

---

[1044] DLM – 0033085-86, 0033089.
[1045] AIAPROD00308701.
[1046] AIAPROD00308701; DLM – 0033089.
[1047] AIAPROD00319462-83.

Exhibit - 1, p. 264

11-ER-2681

23.     On September 11, 2014, a Memorandum of Agreement was recorded wherein AIA Services' allegedly assigned and transferred an undivided 10% interest to the AIA Services' 401(k) Plan "for the benefit of R. John Taylor" in the Note and Deed of Trust securing AIA Services' Headquarters, which was signed by John Taylor on behalf of AIA Services and as Trustee of AIA Services' 401(k) Plan.[1048] This transfer was never properly authorized by AIA Services or AIA Services' shareholders and constituted violations of AIA Services' Amended Articles of Incorporation (including Section 4.2.9(g) because the transfer involved conflicts of interest involving transactions with affiliates) and AIA Services' New Restated Bylaws (including Section 4.14 because the transfer involved conflicts of interest). John Taylor breached his fiduciary duties of loyalty owed to AIA Services and the AIA Disinterested Shareholders by executing this instrument, and Beck and Henderson also breached their duties of loyalty for allowing it to occur. This transaction is another example of John Taylor's self-dealing.

24.     On September 12, 2014, Henderson emailed John Taylor and submitted her written resignation from the boards of the AIA Corporations stating, "Please accept my resignation from the AIA BOD."[1049] While Henderson also advised John Taylor that she was "willing to consult on the legal issues if you feel it would be helpful,"[1050] to this date, the evidence establishes that Henderson proceeded in the interests of her and John Taylor rather than in the bests interest of the AIA Corporations (as discussed in this Report). Beck was carbon copied on Henderson's email.[1051]

25.     While Beck testified that he did "not recall the dates and tenure…on the board of AIA Services" (he erroneously used "AIA Services" as the entity in both of his answers to the applicable interrogatories),[1052] Beck also stated that he provided his resignation from the boards in writing but did not recall the date.[1053] However, the AIA Corporations' annual reports listed Beck as being a director of AIA Services as of October 20, 2014[1054] and as being a director of AIA Insurance as of November 17, 2014.[1055]

---

[1048] Nez Perce County Recorder, Instrument No. 824666.
[1049] AIAPROD00171548.
[1050] AIAPROD00171548.
[1051] AIAPROD00171548.
[1052] pp. 4-5.
[1053] pp. 8-9.
[1054] DLM – 0033090.
[1055] DLM – 0033161.

26.     On September 15, 2014, the AIA Corporations (purportedly through John Taylor), the CropUSA Entities and other defendants agreed to settle GemCap's claims in *GemCap v. CropUSA*.[1056] The settlement or its terms were never disclosed to the AIA Corporations or AIA Services' Disinterested Shareholders, including Miesen. According to the order, "Counsel advises the Court that the parties have entered into a confidential written settlement. The Court is provided a copy of the agreement. The Court marks the confidential settlement agreement as exhibit A and places said document under seal. Counsel places the general terms of the settlement agreement on the record without covering the settlement agreement in detail."[1057] The terms of that settlement agreement were never disclosed to AIA Services Disinterested Shareholders and no shareholder approval was sought or obtained. That agreement was never duly authorized based on my understanding of the terms of the agreement as later reflected in the GemCap Settlement Agreement.[1058] The sealing of that settlement agreement represented the beginning of an ongoing effort to improperly conceal facts from the AIA Corporations and AIA Services' Disinterested Shareholders by GemCap, John Taylor and other Controlling AIA Defendants.

27.     On October 14, 2014, in *GemCap v. Quarles & Brady*, GemCap filed suit against Quarles & Brady, Attorney Gatziolis and others (Does 1-10) in connection with the Legal Opinions and other matters involving the GemCap Loan asserting claims for malpractice, intentional misrepresentation, and negligent misrepresentation.[1059] Notably, since Miesen, Durant and Donna Taylor had filed suit in *Durant v. GemCap* asserting AIA Services' Amended Guarantee of the GemCap Loan and any settlement agreement were unauthorized and illegal, the fact that there are no allegations or claims involving the validity or enforceability AIA Corporations' Amended Guarantees of the GemCap Loans provides evidence that GemCap was fully aware that the guarantees were not authorized prior to entering into the GemCap Loan.

28.     On October 20, 2014, according to the Annual Report filed with the Idaho Secretary of State, Beck was still listed as a Director of AIA Services, John

---

[1056] DLM – 0050359-60.
[1057] DLM – 0050359.
[1058] Dkt. 128, pp. 21-48.
[1059] *E.g.*, RJT – 088050-108 (only Exhibit 1 to the Complaint was attached to this bates stamped document, but I have reviewed Exhibits 2-4 as well).

Exhibit - 1, p. 266

11-ER-2683

Taylor as a Director and President, and Duclos as Secretary. Henderson was no longer listed as a director.[1060]

29.    On November 17, 2014, according to the Annual Report filed with the Idaho Secretary of State, Beck was still listed as a director of AIA Insurance, John Taylor was listed as a Director and President, and Duclos as Secretary. Henderson was no longer listed as a director.[1061]

30.    There were no annual or special shareholder meetings held for AIA Services in 2014 to properly elect directors or authorize any transactions (despite the numerous shareholders' demands and allegations made in various lawsuits). In addition, Donna Taylor's designee, Durant, was not seated on the board of AIA Services as required. Therefore, none of the transactions or corporate decisions (including litigation decisions) involving the AIA Corporations were authorized for 2014.

P.    **2015 – Donna Taylor Unsuccessfully Moves to Intervene in _GemCap v. CropUSA_, the Ninth Circuit Court of Appeals Reverses the Order Staying this Lawsuit and the Malfeasance and Improper Corporate Governance Continue.**

1.    On January 8, 2015, in _GemCap v. AIA Services_, Donna Taylor moved to intervene to assert that AIA Services' Limited Guarantee of the GemCap Loan, the AIA Corporations' Amended Guarantee of the GemCap Loan and the GemCap Settlement Agreement were illegal, unauthorized, ultra vires and unenforceable.[1062]

2.    On January 9, 2015 (or sometime thereafter), GemCap, the AIA Corporations, the CropUSA Entities, John Taylor and other entities John Taylor controls entered into a new Settlement Agreement that superseded the prior one.[1063] John Taylor's purported authorization and execution of the GemCap Settlement Agreement and any other settlement agreements with GemCap (including the prior Binding Term Sheet) violated the Guarantee Prohibition (Section 4.2.9(c)), the conflicts of interest with affiliates provision (Section 4.2.9(g)), the sale of assets provision because a material asset, AIA Services' Headquarters, was transferred to GemCap (Section 4.2.9(e), and the financial covenants provisions (Section 4.2.9(h)

---

[1060] DLM – 0037089.
[1061] DLM – 0037096.
[1062] Dkts. 440-21, 440-22.
[1063] Dkt. 128, pp. 21-48.

Page - 258

**Exhibit - 1, p. 267**

**11-ER-2684**

(Consolidated Net Worth), Section 4.2.9(j) (Debt/Equity Ratio), and Section 4.2.9(k) (Debt Service Coverage)) of AIA Services' Amended Articles of Incorporation. The execution of the GemCap Settlement Agreement and any other settlement agreements with GemCap also violated the conflict of interest provisions (Section 4.14) and the guarantee provision (Section 14.1) in AIA Services' New Restated Bylaws and AIA Insurance's Bylaws. By failing to honor Donna Taylor's board designee Durant, the GemCap Settlement Agreement and any other settlement agreements with GemCap were never properly disclosed or authorized.

3.      While the GemCap Settlement Agreement stated "Each party represents and warrants that the undersigned has the authority to act on behalf of and bind it and all who may claim through it to the terms and conditions of this Agreement,"[1064] the Assignment Agreement I, which was attached to the GemCap Settlement Agreement, states "[the] authority [to transfer and assign AIA Services' Headquarters] has been challenged by certain shareholders of AIA in two separate derivative suits filed by certain shareholders and in a third pending consolidated case filed by Donna Taylor."[1065] In addition, in GemCap's Complaint in *GemCap v. CropUSA*, GemCap's prior assertions that John Taylor "defrauded GemCap from the outset" are incompatible with any reasonable belief that John Taylor had any authority to act on behalf of the AIA Corporations.[1066]

4.      Prior to executing and entering into the GemCap Settlement Agreement and any prior settlement agreements with GemCap, no notice was provided to Donna Taylor or any of the AIA Disinterested Shareholders, they were never asked to consent or authorize the GemCap Settlement Agreement or any other settlement agreement with GemCap, no shareholder meeting was held for such settlements, no shareholder vote was taken for such settlements and Donna Taylor's consent was never obtained for such settlements. John Taylor breached his fiduciary duties (including their duties of loyalty) owed to AIA Services and the AIA Disinterested Shareholders by signing and allowing the GemCap Settlement Agreement or any other settlement agreement with GemCap. Since Beck was a director when the initial GemCap Settlement Agreement was purportedly entered

---

[1064] Dkt. 128, p. 30 § 12.

[1065] Dkt. 128, p. 36 § 2. This statement is incorrect as to Donna Taylor allegedly challenging the authorization in *Donna Taylor v. AIA Services*. In those lawsuits, Donna Taylor was merely asserting that the Controlling AIA Defendants should be liable for the sums owed for her Series A Preferred Shares based on AIA Services' inability to pay (which included the transfer of AIA Services' Headquarters and the entry into the GemCap Settlement Agreement). Donna Taylor never asserted any causes of action seeking to invalidate the GemCap Loan in those lawsuits.

[1066] Dkt. 440-1, p. 10 ¶ 30.

into in September 2014, Beck breached his duties of loyalty owed to the AIA Corporations by authorizing or permitting John Taylor to allegedly enter into the GemCap Settlement Agreement. Beck and Henderson are also responsible the GemCap Settlement Agreement and any other settlement agreement with GemCap because they signed the purported board resolutions for AIA Services' Limited Guarantee of the GemCap Loan and the AIA Corporations' Amended Guarantee of the GemCap Loan. GemCap substantially assisted John Taylor, Beck and Henderson since it was aware that this Lawsuit and other lawsuits (including *Durant v. GemCap*, which was filed to stop such settlements) had been filed asserting unlawful guarantees and breaches of fiduciary duties associated with such acts and because Attorney Bond had emailed GemCap's attorneys numerous times advising them of the unauthorized guarantees and settlement. Lastly, had the Hawley Troxell Defendants properly discharged their duties of care and duties of loyalty owed to the AIA Corporations for their representation in *Reed Taylor v. AIA Services* and Donna *Taylor v. AIA Services*, the guarantees and GemCap Settlement would never had occurred (including because a receiver would have been appointed for AIA Services). The negotiation and entry into the GemCap Settlement Agreement was an improper and unauthorized collusive effort between GemCap and John Taylor.

5.     In addition, since GemCap did not obtain Legal Opinions from Quarles & Brady or Van Idour for the GemCap Settlement Agreement, their prior November 2011 and subsequent February 2013 Legal Opinions do not opine as to the legality, authority or enforceability of the GemCap Settlement Agreement because "[a]n opinion letter to a third-party does not require updating after its delivery, unless it specifies otherwise. By custom, the opinion giver provides a professional judgment at a specific time, ordinarily to facilitate a closing, and has no continuing responsibility to the non-client opinion recipient."[1067] The fact that the Legal Opinions provided for the GemCap Loan do not apply or opine as to matters involving the GemCap Settlement Agreement was also confirmed by Attorney Gatziolis at his 2019 deposition.[1068]

6.     Even if GemCap had obtained Legal Opinions for the GemCap Settlement Agreement and/or the Legal Opinions provided for the GemCap Settlement Agreement, GemCap's recourse, if any, is against its own attorneys or the opinion givers Quarles & Brady and Van Idour (assuming that GemCap could

---

[1067] Third-Party "Closing" Opinions: A Report of the TriBar Opinion Committee, 53 Bus. Law. 591, 597 (1998).

[1068] Dkt. 654-2, pp. 17-18 (pp. 209-10).

have reasonably relied on any Legal Opinions relating to the agreements and guarantees pertaining to the AIA Corporations, which it could not have for Legal Opinions pertaining to the AIA Corporations).

7.　On January 16, 2015, in *GemCap v. CropUSA*, GemCap and Attorney Munding on behalf of the CropUSA Entities and the AIA Corporations filed an opposition to Donna Taylor's motion to intervene, which did not address the merits of Donna Taylor's defenses (e.g., they focused on Donna Taylor's motion being untimely and never addressed the lack of authority or illegality issues).[1069]

8.　On January 20, 2015, Henderson filed a verified Request for Retention in her divorce action with John Taylor (it had still not been resolved after nearly ten years) wherein she testified that, *inter alia*, "[i]t has not been possible to divide the property which the parties still own jointly due to a plethora of lawsuits.[1070] The outcome of the lawsuits may have a drastic impact on the value of the property and also relate to potential debt which must be taken into consideration in any division." Henderson's testimony confirms the conflicts of interest that have plagued her and John Taylor regarding the division of assets and debts in their divorce action since it was filed in 2005—they had a vested interest in maximizing the value of their assets (including the value of shares in AIA Services, CropUSA and Pacific Empire Radio) and limiting or minimizing any money, damages or other relief that could be obtained from them by the AIA Corporations or AIA Services' Disinterested shareholders (including Miesen). Their interests were not aligned with the AIA Corporations' interests in recovering all of the money, damages and relief possible from John Taylor and Henderson.

9.　On February 5, 2015, in *GemCap v. CropUSA*, Judge Otero entered an order denying Donna Taylor's Motion to Intervene.[1071] Judge Otero explained the intent of his ruling (i.e., that his order is not a bar to challenging the legality and enforceability of the Settlement Agreement in other lawsuits):

> [Donna Taylor] has already instituted the Idaho Action to enforce
> these claims…and will more than likely be able to pursue them once
> the Idaho court learns that this Court is not the proper forum for
> [Donna Taylor] to raise such issues. Thus, the argument that [Donna

---

[1069] DLM – 0051060-68.
[1070] DLM – 0037120-21.
[1071] Dkt. 440-23.

Page - 261

**Exhibit - 1, p. 270**

**11-ER-2687**

Taylor] will be unable to preserve her rights if she is not permitted to intervene is unpersuasive.

           \*           \*           \*

[Donna Taylor] may seek relief in an alternative forum by requesting that the Idaho court lift the stay in the Idaho Action in light of this Order.

Accordingly, [Donna Taylor's] Motion to Intervene is DENIED.[1072]

10.     Accordingly, Judge Otero knew that the GemCap Settlement Agreement would be challenged in Idaho and believed Idaho was the proper forum to challenge it.

11.     On February 12, 2015, an order was entered retaining John Taylor and Henderson's divorce action.[1073] However, a final resolution of this divorce would not occur until almost three years later.

12.     On March 30, 2015, in *Durant v. GemCap*, Judge Brudie entered an order granting Miesen, Durant and Donna Taylor's motion to lift the stay and granted GemCap's motion to dismiss (which John Taylor had improperly joined in purportedly on behalf of the AIA Corporations). Judge Brudie accepted the defendants' arguments that the claims must be brought derivatively on behalf of the AIA Corporations (and not as direct claims).[1074] While the docket indicates that the case was "closed" on March 30, 2015,[1075] there is no order dismissing the case for lack of prosecution and no final judgment has been entered (let alone any judgments). As a result, *Durant v. GemCap* is still pending and John Taylor has continued to owe duties of loyalty and care to the AIA Corporations as their purported attorney (although he was never truly authorized to represent them). Since John Taylor has never withdrawn as attorney for the AIA Corporations nor has a new attorney been substituted in his place, he continued to owe fiduciary duties to the AIA Corporations as their purported attorney (in addition to fiduciary duties owed as a purported officer and director of the AIA Corporations) through the present time, including his undivided duties of loyalty owed to the AIA Corporations through the present time, which he continues to breach by taking action contrary to the best interests of the AIA Corporations as described in this

---

[1072] Dkt. 440-23, pp. 8-9.
[1073] DLM – 0037259.
[1074] DLM – 0037375-82.
[1075] DLM – 0047704.

Page - 262

Exhibit - 1, p. 271

11-ER-2688

Report (including by seeking to enforce the GemCap Settlement Agreement when he should be seeking to extricate the AIA Corporations from that Agreement). Consequently, John Taylor has continued to breach his fiduciary duties of loyalty and care owed to the AIA Corporations as their purported director, officer *and* attorney regarding all settlement agreements with GemCap and any related activities (including carrying out the terms of the GemCap Settlement Agreement).

13.     On April 2, 2015, in *GemCap v. CropUSA*, a stipulation was filed for the entry of a judgment against the AIA Corporations.[1076] No authorization was sought or obtained from AIA Services' shareholders or Series A Preferred Shareholder, Donna Taylor. This stipulation was not authorized by the AIA Corporations (and violated the conflicts of interest provisions and others AIA Services' Amended Articles of Incorporation, AIA Services' New Restated Bylaws and AIA Insurance's Bylaws since John Taylor had no authority based on his conflicts of interest; the entry of a judgment separately violated the financial covenant provisions). Consequently, John Taylor breached his duties of loyalty owed to the AIA Corporations by permitting the stipulation to be signed and filed.

14.     On April 12, 2015, in *GemCap v. CropUSA*, the trial court granted and entered a stipulated judgment against the AIA Corporations for $12,126,534.61.[1077] This judgment was not a final judgment and there has never been a final judgment entered in that lawsuit. Notably, the judgment did not dismiss any claims or defenses belonging to the AIA Corporations, as also confirmed in the GemCap Settlement Agreement. On that same day, a substantially similar judgment was also entered against the CropUSA Entities.[1078]

15.     On April 14, 2015, in *GemCap v. CropUSA*, the trial court dismissed GemCap's claims against John Taylor without prejudice.[1079] As when John Taylor placed his interests above the interests of the AIA Corporation by deferring entry of judgment against himself in the GemCap Settlement Agreement, this dismissal without prejudice is consistent with John Taylor's acts of breaching his duties of loyalty owed to the AIA Corporations.

16.     On May 26, 2015, in *GemCap v. CropUSA*, the trial court entered an order clarifying that the case remained open by stating "Dismissal of the Remaining

---

[1076] Dkt. 440-6.
[1077] Dkt. 440-7.
[1078] Dkt. 306-8.
[1079] Dkts. 440-9, 306-6.

Defendants accounts for all defendants in this litigation except for [GemCap's] remaining claims against John Taylor…"[1080] This confirms that there is no final judgment in that lawsuit.

17.     On June 2, 2015, in *Donna Taylor v. Taylor*, Cashman's deposition was taken wherein he testified, "If you had a choice to pay [Donna Taylor] $400,000 or go fight them in court for all the legal fees, yeah, it doesn't make sense to me.[1081] I agree with Cashman that it made no sense to spend any attorneys' fees and costs litigating against Donna Taylor when there was no viable dispute that she was owed over $400,000 and AIA Services had been obligated to fully redeem her Series A Preferred Shares on or before December 3, 2003. The Hawley Troxell Defendants had further enabled the Controlling AIA Defendants in prior years by supporting the arguments to continue wasting money litigating over the issues.

18.     On December 7, 2015, the Ninth Circuit Court of Appeals held oral argument on Donna Taylor's appeal of Judge Boyle's May 17, 2013 Order refusing to lift the stay in this Lawsuit.[1082] Notably, at that oral argument, Attorney Thomson, the attorney for the Hawley Troxell Defendants who was the sole attorney to appear and argue for all of the defendants in this Lawsuit, again took positions against the Hawley Troxell Defendants' clients, the AIA Corporations, asserting that this Lawsuit would be resolved by Reed Taylor's legal malpractice related claims in *Reed Taylor v. Riley* (pertaining to the illegal redemption of his shares in AIA Services) when Attorney Thomson knew that the claims and damages in this Lawsuit would never be resolved in *Reed Taylor v. Riley*. By taking that position, Mr. Thomson and the Hawley Troxell Defendants were again taking positions contrary to the best interest of their clients the AIA Corporations and they were once again seeking to sweep this case under the carpet by keeping the stay intact.

19.     On December 7, 2015, in *GemCap v. CropUSA*, GemCap filed its Answering Brief opposing Donna Taylor's efforts to obtain a reversal of the denial of her motion to intervene to have the Settlement Agreement declared illegal and/or unenforceable.

20.     On December 7, 2015, in *GemCap v. CropUSA*, the AIA Corporations and the CropUSA Entities purportedly filed a Joinder to GemCap's Answering

---

[1080] Dkt. 306-9, p. 3.
[1081] 6/2/2015 Cashman Depo. Transcript, p. 193.
[1082] Dkt. 88.

Page - 264