**Consolidated Case Nos. 25-3552 and 25-3800**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,

**Plaintiff-Appellant**,

v.

R. JOHN TAYLOR, an individual, CONNIE TAYLOR HENDERSON, an individual, JAMES BECK, an individual, MICHAEL W. CASHMAN, SR., an individual, CROP USA INSURANCE AGENCY, INC., an Idaho corporation, CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company, AIA SERVICES CORPORATION, an Idaho corporation, AND AIA INSURANCE, INC., an Idaho corporation,

**Defendants-Appellees**,

and

Reed J. Taylor, an individual,

**Third-Party Defendant-Appellee.**

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO, CHIEF DISTRICT COURT JUDGE DAVID C. NYE, PRESIDING

**APPELLANT'S EXCERPTS OF THE RECORD – VOLUME - 12**

| | |
|---|---|
| Roderick C. Bond | Andrew Schwam |
| Roderick Bond Law Office, PLLC | Andrew Schwam Law Firm |
| 10900 NE 4th St., Suite 2300 | 705 SW Fountain St. |
| Bellevue, WA 98004 | Pullman, WA 99163-2128 |
| Tel: (425) 591-6903 | Tel: (208) 874-3684 |
| Email: rod@roderickbond.com | Email: amschwam@turbonet.com |
| Attorney for Appellant | Attorney for Appellant |

Brief: "Defendant-Appellees Crop USA Insurance Agency, Inc., Crop USA Insurance Services, AIA Insurance, Inc., and AIA Services Corporation adopt Defendant – Appellee GemCap Lending I, LLC's Answering Brief in its entirety." On December 8, 2015, John Taylor filed a Joinder to GemCap's Answering Brief: "Defendant-Appellee R. John Taylor adopts Defendant – Appellee GemCap Lending I, LLC's Answering Brief in its entirety." The filing of these Joinders were breaches of John Taylor's duties of loyalty owed to the AIA Corporations because he should have been supporting Donna Taylor's efforts to intervene and to have the Settlement Agreement declared illegal and/or unenforceable. In addition, once again, John Taylor breached his duties of loyalty owed to the AIA Corporations by placing his interests in seeking to enforce the Settlement Agreement (to have the AIA Corporations assist in pay the sums owed and to defer entry of judgment against him) above the best interests of the AIA Corporations to have the Settlement Agreement declared illegal or unenforceable. Attorney Munding breached his duties of loyalty owed to the AIA Corporations by apparently placing his interests in earning fees above the best interests of the AIA Corporations. No one was representing the interests of the AIA Corporations.

21.     On December 30, 2015, the Ninth Circuit Court of Appeals reversed Magistrate Judge Boyle's order denying Donna Taylor's motion to lift the stay in this Lawsuit.[1083] The Ninth Circuit correctly observed that this is a "derivative suit against AIA Services Corporation…its subsidiaries, certain of its board members, AIA Services' law firm Hawley Troxell Ennis & Hawley, LLP…and certain Hawley Troxell attorneys including Richard Riley, arising from alleged corporate malfeasance and attorney malpractice."[1084] The Ninth Circuit also correctly noted that the "claims here revolve around post-1995 malfeasance by certain AIA Services directors since they took over Reed Taylor's majority stake."[1085]

22.     From 1999 through December 31, 2015, John Taylor received $2,212,142 in disclosed compensation from the AIA Corporations, excluding any so-called accrued salary (according to AIA Services' tax returns).[1086] From 2006 through December 31, 2013, John Taylor received $1,067,133 in disclosed compensation from CropUSA (according to CropUSA's tax returns).[1087] From 2010 through December 31, 2012, John Taylor received $544,464 in disclosed

---

[1083] Dkt. 105.
[1084] Dkt. 105, p. 2.
[1085] Dkt. 105, pp. 3-4.
[1086] DLM – 0037119.
[1087] DLM – 0037119.

Exhibit - 1, p. 274

12-ER-2692

distributions from CropUSA Insurance Services (according to CropUSA Insurance Services tax returns).[1088] John Taylor's total disclosed compensation for all three entities during those periods of time was $3,748,738. During these same periods of time, AIA Services' Disinterested Shareholders received nothing. None of John Taylor's $2,212,142 in compensation from the AIA Corporations was authorized by AIA Services' board of directors or AIA Services' shareholders, as required.

23.     As of December 31, 2015, AIA Services' purported financial statements indicated that Pacific Empire Radio owed at least $1,611,745 to AIA Services in the form of an alleged "Investment" (e.g., little or none of the lent funds had been paid back), but the distinction is without a difference because any loans to or investments in Pacific Empire Radio constituted the violations of Beck, Henderson and John Taylor's duties of loyalty owed to the AIA Corporations because no funds should ever have been lent, advanced or invested in Pacific Empire Radio, and John Taylor and Henderson were on both sides of those transactions as major shareholders of Pacific Empire Radio.[1089] To the extent any additional funds were lent or invested in Pacific Empire Radio after Henderson and Beck resigned from the boards of the AIA Corporations, John Taylor breached his duties of loyalty by making such loans, advances or investments.

24.     There were no annual or special shareholder meetings held for AIA Services in 2015 to properly elect directors or authorize any transactions (despite the numerous shareholders' demands and allegations made in various lawsuits). In addition, Donna Taylor's designee, Durant, was not seated on the board of AIA Services as required. Therefore, none of the transactions or corporate decisions (including litigation decisions) involving the AIA Corporations were authorized for 2015.

Q.  **2016 – John Taylor and GemCap Sell AIA Services' Headquarters, GemCap Files Suit in *GemCap v. AIA Services*, and the Malfeasance and Improper Corporate Governance Continue.**

1.     On January 8, 2016, two Deeds of Trust were recorded purportedly granted by AIA Insurance secured by the Dahman Condominium Units 1 and 2 in favor of Henderson for an alleged $48,000 Promissory Note dated April 1, 2015, which were both purportedly signed by John Taylor on behalf of AIA Insurance.[1090]

---

[1088] DLM – 0037119.
[1089] AIAS_0000178.
[1090] L.T. – 1963-75.

The $48,000 owed was purportedly incurred by Henderson paying certain fees and costs to Attorney Siddoway (Randal Danskin) and Attorney Weiland and Attorney Purdue (Arkoosh Perdue and Weiland Perdue).[1091] Both Deeds of Trust were back dated to April 1, 2015 for unknown reasons.[1092] The alleged $48,000 debt was never authorized by the AIA Corporations and neither was entry into the two Deeds of Trust because those transactions violated, *inter alia*, the conflict of interest provisions in AIA Services' Amended Articles of Incorporation (Section 4.2.9(g)), AIA Services' New Restated Bylaws (Section 4.14) and AIA Insurance's Bylaws (Section 4.14). These transactions are additional examples of John Taylor and Henderson placing their interests above the interests of the AIA Corporations and engaging in self-dealing. In addition, I have not seen any agreements or conflict waivers that permitted Henderson to pay any fees or costs on behalf of any other party in any lawsuit, which would constitute violations of RPC 1.8(f). The $44,900, plus accrued interest of $2,148.07, later paid to Henderson when the properties were sold should be disgorged by her.[1093] At a minimum, Henderson was aiding and abetting John Taylor in the breaches of his fiduciary duties of loyalty owed to the AIA Corporations by substantially assisting and encouraging this transaction.

2.      On January 11, 2016, GemCap entered into a Memorandum of Agreement with Alexander Investors regarding the sale of AIA Services' Headquarters and the two condominiums previously owned by AIA Insurance (the Agreement excluded AIA's Parking Lot because it had been previously transferred to John Taylor and Henderson's son, Jordan Taylor).[1094]

3.      On January 26, 2016, a Sherriff's Deed was recorded for AIA Services' Headquarters.[1095] In that Deed, GemCap and the AIA Services' 401(k) Plan are listed for the first time as the owners of AIA Services' Headquarters. Specifically, GemCap is indicated as owning 67% of AIA Services' Headquarters and AIA Services' 401(k) Plan is indicated as owning 33%.[1096] The transfer of the ownership interests to GemCap and AIA Services' 401(k) Plan were never authorized by AIA Services' duly elected directors (including Donna Taylor's

---

[1091] L.T. – 1950- 62.

[1092] L.T. – 1963, 1967.

[1093] While Henderson was no longer a so-called member of the board of directors of the AIA Corporations (she never properly discharged her duties at any time other than to assert the illegality defense to have Reed Taylor's debt eliminated), she continued owing fiduciary duties as one of the majority/controlling shareholders of AIA Services.

[1094] L.T. – 1715-19.

[1095] Nez Perce County Recorder, Instrument No. 836893.

[1096] Nez Perce County Recorder, Instrument No. 836893, p. 1.

Exhibit - 1, p. 276

12-ER-2694

designee Durant). Nor were these transactions authorized by a board resolution or by AIA Services' shareholders. These transfers violated AIA Services' Amended Articles of Incorporation (e.g., a prohibited transfer or conveyance of a material asset in violation of Section 4.2.9(e) and a conflict of interest with affiliate transaction in violation of 4.2.9(g)) and AIA Services' New Restated Bylaws (e.g., a conflict of interest in violation of Section 4.14). I am assuming that the transfer of the ownership interest to GemCap was based on the GemCap Settlement Agreement, which Agreement was also unauthorized for the same reasons and others addressed in this Report.

4.      On March 7, 2016, Attorney Bond emailed Attorney Adams (one of GemCap's attorneys in *GemCap v. CropUSA*) advising him that GemCap was guilty of "aiding and abetting", that "You even acknowledge in the settlement agreement that it is being challenged and you never even bothered to seek or obtain compliance with any of the AIA Entities Bylaws or amended articles of incorporation."[1097] Apparently nothing would stop GemCap from disregarding the legal rights and obligations owed to the AIA Corporations and the AIA's Disinterested Shareholders, as discussed in this Report.

5.      On March 23, 2016, Attorney Bond was substituted in as counsel for Miesen in this Lawsuit.[1098] Prior to this date, Miesen had been represented by Attorney Rousso.[1099]

6.      Purportedly effective May 26, 2016, John Taylor allegedly amended AIA Services and AIA Insurance's bylaws to include a provision providing that Miesen or any other shareholder instituting a derivative action would be required to pay attorneys' fees and costs if they did not substantially prevail.[1100] Based on John Taylor's conflicts of interest and his refusal to appoint Donna Taylor's designee Durant to the board of AIA Services, these amendments could have only been approved and adopted by the shareholders or by an independent director (assuming the provisions were appropriate).[1101] John Taylor's conflicts of interest included

---

[1097] DLM – 0000043.

[1098] Dkt. 122.

[1099] Dkt. 1, p. 1.

[1100] AIAPROD00307942-61; AIAPROD00308828-52.

[1101] The purported May 26, 2016 amendments to the AIA Services New Restated Bylaws also included a provision purportedly changing the annual shareholders' meeting date and eliminating the requirement adopted on November 17, 1995 that no more than 18 months could transpire between annual meetings. 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 538-39.

Exhibit - 1, p. 277

12-ER-2695

being a named defendant in this Lawsuit years before the amendments and for all of the other reasons stated in this Report.

7.      On April 22, 2016, Attorney Bond wrote another letter on behalf of numerous shareholders (including Miesen) to the purported board of directors of AIA Services (apparently comprised solely of John Taylor) requesting inspection of documents as authorized and required under the Idaho Business Corporation Act.[1102] However, John Taylor refused to allow the shareholders to inspect records and the requested information was never provided in violation of I.C. §§ 30-1-1602 and 30-1-1603, which further constituted a violation of I.C. § 18-1907.

8.      On July 18, 2016, John Taylor purportedly prepared the AIA Services' December 31, 2015 and December 31, 2014 financial statements (the bottom of the first page indicates "July 18, 2016").[1103] These statements confirmed over $400,000 was still owed to the policy holders pursuant to the ULIC settlement and failed to provide the required disclosure to shareholders (assuming the financial statements were provided to all shareholders). This was a breach of John Taylor's duties of loyalty owed to the AIA Corporations.

9.      On August 29, 2016, when GemCap deposed John Taylor in *GemCap v. CropUSA*, he testified, *inter alia*, that: (a) he was still paid $75,000 per year by AIA Services, which was accrued (more unauthorized compensation);[1104] (b) he allegedly transferred $75,000 from the account payable to him in exchange for 7,500 Series A Preferred Shares in May 2016 and admitted something that he had been doing for years—that he negotiated the purchase of the Series A Preferred Shares for AIA Services and for himself—he was improperly on both sides of the transaction, which is yet another classic example of a conflict of interest and John Taylor's breaches of his duties of loyalty owed to the AIA Corporations and AIA Services' minority shareholders;[1105] (c) he held 27,793 of the Series C Preferred Shares held in AIA Services' 401(k) Plan;[1106] (d) he directly owned "13.89%" of Pacific Empire Radio and "a little over [10%] of Pacific Empire Radio in [his] 401(k) plan;"[1107] and (e) after this Lawsuit was filed, the E&O carrier "obviously didn't pay anything" after the claim was submitted (confirming the conduct

---

[1102] Dkt. 128, pp. 48-57.
[1103] AIAS_0000177-88.
[1104] GC0748379-80.
[1105] GC0748382.
[1106] GC0748383.
[1107] GC0748400.

Exhibit - 1, p. 278

12-ER-2696

exceeded negligence).[1108] Like all of John Taylor's other deposition testimony that I have reviewed, this transcript confirms that John Taylor acts for his own benefit rather than in the best interests of the AIA Corporations and AIA Services' Disinterested Shareholders.[1109]

10.     On August 29, 2016, at the same deposition of John Taylor addressed in the preceding paragraph, John Taylor voluntarily testified regarding the Hawley Troxell Defendants acting as general counsel for the AIA Corporations and CropUSA as confirmed in the following dialogue (which is contrary to the testimony and positions of the Hawley Troxell Defendants and their expert Mr. Remele):

Q. In 2006, October 27, 2006, Quarles & Brady did an opinion letter with the Surge loan. Do you recall that?
A. I recall there was an opinion, yes.
Q. And it's to Lancelot Investors Fund and then AGM, LLC. Do you recall, that for $15 million revolving loan?
A. I believe so, yes.
Q. And it says on Quarles & Brady's letterhead, we have served as special counsel to CropUSA Insurance Agency, an Idaho corporation, quote, the borrower; AIA Insurance, Inc., an Idaho corporation, the corporate guarantor; and R. John Taylor -- Taylor in connection with a $15 million revolving loan.
Q. Do you know what is meant by "special counsel"?
A. For this purpose?
A. Yes.
A. For this -- for this purpose, I believe it meant for this transaction.
Q. Okay. Just solely the transaction?
A. (Witness nods head.)
Q. Did you ever hear Jim Gatziolis refer to -- refer to its clients affiliated with you, meaning Crop, AIA, et cetera, as special counsel, other than this letter?
A. No, I don't think so.
Q. Okay.
A. Special as -- in Idaho -- I know that the attorneys often use that in Idaho because -- to differentiate from a general counsel, which has -- which is like a -- your attorneys -- helps you with the minutes and all

---

[1108] GC0748464-65.
[1109] GC0748347-612.

Exhibit - 1, p. 279

12-ER-2697

that kind of stuff, the general attorney that you use all the time. ***Hawley Troxell, for example,*** *was our general counsel for years*. Q. Okay.[1110]

11.   The above quoted testimony and in particular the italicized and bold emphasis above (which, as the testimony demonstrates, was voluntarily provided by John Taylor), who himself has been an attorney licensed to practice law in Idaho since 1976 according to the records of the Idaho State Bar Association, is contrary to and clearly disputes and rebuts the Hawley Troxell Defendants' positions and testimony that they were never general counsel for the AIA Corporations or CropUSA. Based on my review of all of the documents and the Unredacted Billing Records produced by the Controlling AIA Defendants (but not by the Hawley Troxell Defendants), I agree with John Taylor that the Hawley Troxell Defendants acted as general counsel for the AIA Corporations and CropUSA for many years and that, according to John Taylor, they were not replaced as general counsel for the AIA Corporations until John Taylor emailed them advising them that they would no longer be general counsel and that he intended on designating Quarles & Brady as general counsel. Although I concede that I do not agree with John Taylor on many issues, I do agree with him as to the Hawley Troxell Defendants being general counsel for the AIA Corporations and CropUSA for many years, and the evidence that I have been able to review thus far, including the Unredacted Billing Records, fully supports my conclusion and opinion. Finally, it is abundantly clear that the above testimony was voluntarily provided by John Taylor.

12.   On September 8, 2016, in *Donna Taylor v. Taylor*, Judge Brudie entered a Rule 54(b) judgment following his prior decision on reconsideration ruling, *inter alia*, that Donna Taylor held 7,110 Series A Preferred Shares and dismissed her claims based on the 1995 Letter Agreements and the 1996 illegal Series A Preferred Shareholder Agreement (another illegal Agreement drafted and/or approved by Riley).[1111] This decision did not impact the duties and requirements regarding the appointment of Donna Taylor's designee, Durant, to the board of AIA Services because Donna Taylor was the only lawful holder of Series A Preferred Shares (any shares purportedly issued to John Taylor were never duly authorized by AIA Services). Donna Taylor subsequently timely appealed to the Idaho Supreme Court (an appeal that proved to be successful thereby restoring her

---

[1110] GC0748428-29 (Emphasis supplied).
[1111] Dkt. 390-42.

ownership of over 41,000 Series A Preferred Shares and resulted in an award of fees and costs to her).[1112]

13.    On September 15, 2016, in anticipation of closing the sale of AIA Services' Headquarters and AIA Insurance's two condominiums, Attorney Adams (one of GemCap's attorneys) emailed Land Title providing wire instructions for the sale of the two condominiums and stating the remaining funds should be held in "escrow until we sort out with [John] Taylor [on] an allocation."[1113] This proposed sale and escrow agreement was never authorized by the AIA Corporations, as GemCap and John Taylor were well aware.

14.    On September 19, 2016, GemCap and John Taylor (purportedly on behalf of the AIA Services' 401(k) Plan), agreed to sell AIA Services' Headquarters and AIA Insurance's two condos (Dahmen Building Condominiums Unit Nos. 1 and 2).[1114] AIA Services' Headquarters was sold for $946,119.69.[1115] There was a dispute over the payment of the net proceeds from the sale of AIA Services' Headquarters (part ownership was previously transferred to AIA Services' 401(k) Plan in part for John Taylor's personal benefit), but the parties purportedly later agreed to allow $455,154.46 of the remaining proceeds to be released to GemCap.[1116] Henderson was paid $47,048.07 out of the closing of the sale of Condominium Unit No. 2.[1117] Attorney Siddoway's firm (Randall Danskin) also received payment of $81,000, which I am unable to state was proper or authorized as much of what he did was not for the benefit of the AIA Corporations (to the extent that any of the $81,000 was paid for his work for the illegal reverse stock split or his work in *AIA Services v Durant*, he should not have been paid anything).[1118] In connection with the closings and based on the obvious legal issues regarding the ownership of the properties and the various lawsuits (including this Lawsuit), Alexander Investors, LLC required GemCap to execute a Hold Harmless and Indemnification Agreement personally guaranteed by David Ellis and Richard Ellis, the Co-Presidents of GemCap.[1119] This further confirms to willingness of GemCap to disregard the rights of the AIA Corporations and the AIA Disinterested Shareholders. These closings constituted the breaches of John Taylor's and

---

[1112] *Taylor v. Taylor*, 163 Idaho 910, 422 P.3d 1116 (2018).

[1113] L.T. – 2056-57.

[1114] L.T. – 0940-41, 1753-54, 2058-59.

[1115] L.T. – 0940.

[1116] L.T. 2169, 0942.

[1117] L.T. – 2058.

[1118] L.T. – 0901-03, 0940.

[1119] GC0771756-60.

Henderson's duties of loyalty owed to the AIA Corporations and AIA's Disinterested Shareholders, which GemCap was fully aware of based on its knowledge of the various lawsuits and the allegations of breaches of fiduciary duties at issue in such lawsuits (including this Lawsuit).

15.     In connection with the closings on September 19, 2016, Jordan Taylor executed a Quitclaim Deed transferring AIA's Parking Lot to Alexander Investors, LLC for $50,000 thereby establishing the damages for the minimum value of AIA's Parking Lot in this Lawsuit (the Real Estate Purchase and Sale Agreement was dated January 11, 2016).[1120] AIA's Parking Lot should never have been acquired by John Taylor and Henderson, nor should it have been quitclaimed by them to 17 State Street Partners in 2016 (they breached their duties of loyalty owed to the AIA Corporations in doing so and by failing to quitclaim AIA's Parking Lot to AIA Services or AIA Insurance).

16.     On October 11, 2016, in *Broadcast Music v. Pacific Empire Radio*, Broadcast Music filed an Application to Confirm an Arbitration Award of $200,402.42 against Pacific Empire Radio for unpaid license fees, attorney fees, costs and interest.[1121] On December 16, 2006, a judgment was quickly entered confirming that award and was later amended to reflect an award of fees and costs. These amounts were not simply due in 2016, but had been outstanding since at least 2014 according to the Application, which further confirms the breaches of duties of loyalty owed by John Taylor, Beck and Henderson in permitting any of the AIA Corporations' funds to be lent to Pacific Empire Radio when it was not creditworthy and the loans were separately prohibited by AIA Services' Amended Articles of Incorporation, AIA Services' New Restated Bylaws and AIA Insurance's Bylaws, as discussed in this Report. The recent docket does not reflect any filings that the judgment against PERC has been satisfied.[1122]

17.     On October 7, 2016, John Taylor purportedly signed AIA Services' 2015 federal tax returns.[1123] These returns, like others dating back nearly twenty years, confirm that John Taylor continued to pay himself compensation that was never authorized by the board of directors of the AIA Corporations. None of John Taylor's compensation from the AIA Corporations has been authorized since at least 1999.

---

[1120] L.T. – 0895-900.
[1121] DLM – 0039084-96.
[1122] DLM – 108152-60.
[1123] AIAS_0000189-209.

Exhibit - 1, p. 282

12-ER-2700

18.     On November 17, 2016, in *GemCap v. AIA Services*, GemCap filed a complaint against AIA Services, the AIA Services' 401(k) Plan, and John Taylor asserting fraudulent conveyance claims relating to the sale proceeds from AIA Services' Headquarters.[1124] GemCap's allegations of fraud against John Taylor in that lawsuit, like its allegations of fraud against John Taylor in *GemCap v. CropUSA*, are diametrically opposed to GemCap's positions that it relied on John Taylor's authority to act for the AIA Corporations for the GemCap Settlement Agreement.

19.     As of December 31, 2016, AIA Services' purported financial statements indicated that Pacific Empire Radio owed at least $1,627,973 to the AIA Corporations in the form of an alleged "Investment" (e.g., none of the lent funds have been paid back), but the distinction is without a difference because any loans to or investments in Pacific Empire Radio constituted violations of Beck, Henderson and John Taylor's duties of loyalty owed to the AIA Corporations because no funds should have ever been lent, advanced or invested in Pacific Empire Radio, and John Taylor and Henderson were on both sides of those transactions as major shareholders of Pacific Empire Radio.[1125] To the extent any additional funds were lent or invested in Pacific Empire Radio after Henderson and Beck resigned from the boards of the AIA Corporations, John Taylor breached his duties of loyalty by making such loans, advances or investments.

20.     There were no annual or special shareholder meetings held for AIA Services in 2016 to properly elect directors or authorize any transactions (despite the numerous shareholders' demands and allegations made in various lawsuits). In addition, Donna Taylor's designee, Durant, was not seated on the board of AIA Services as required. Therefore, none of the transactions or corporate decisions (including litigation decisions) involving the AIA Corporations were authorized for 2016.

---

[1124] Dkt. 449-37.
[1125] AIAS_0000034.

**R.** **2017 – The Denial of Donna Taylor's Intervention as Untimely Is Affirmed, GemCap Is Named as a Defendant in this Lawsuit, GemCap's Lawsuit Against Quarles & Brady Is Dismissed, the Controlling AIA Defendants File Their Respondents' Brief in Donna *Taylor v. Taylor* and Ironically Assert Violations of AIA Services' Amended Articles of Incorporation as Defenses, and the Malfeasance and Improper Corporate Governance Continue.**

1.      On February 15, 2017, in *GemCap v. CropUSA*, the Ninth Circuit Court of Appeals issued its opinion affirming the trial court's ruling that Donna Taylor's intervention was untimely, thereby confirming that GemCap is a required defendant in this Lawsuit.[1126]

2.      On April 24, 2017, Miesen filed his Third Amended Complaint in this Lawsuit.[1127] The Third Amended Complaint named GemCap as a defendant asserting, *inter alia*, that the GemCap Settlement Agreement was unauthorized, illegal, unenforceable and void and that GemCap aided and abetted the Controlling AIA Defendants in breaching their fiduciary duties owed to the AIA Corporations.[1128]

3.      On September 13, 2017, in *GemCap v. Quarles & Brady*, the trial court dismissed all of GemCap's causes of action against Quarles & Brady.[1129] The trial court's decision confirmed, *inter alia*, that GemCap was aware of *Reed Taylor v. AIA Services* and this Lawsuit when it agreed extend credit to the CropUSA Entities in the GemCap Loan, GemCap "had actual knowledge of the litigation", and "it was unreasonable for [GemCap] to rely on its interpretation of the Opinion Letters due to the notice it had to the contrary."[1130] For the same and similar reasons and other reasons discussed in this Report, GemCap could not rely upon the alleged authority of John Taylor, Henderson, Beck or Duclos to authorize AIA Services' Limited Guarantee of the GemCap Loan, the AIA Corporations' Amended Guarantee of the GemCap Loan, or the subsequent settlements (including the GemCap Settlement Agreement).[1131]

---

[1126] Dkt. 440-16.
[1127] Dkt. 211.
[1128] *See generally* Dkt. 211, pp. 39-48, 64-76.
[1129] *GemCap Lending, LLC v. Quarles & Brady, LLP*, 269 F.Supp.3d 1007 (C.D. Cal. 2017). GemCap appealed this decision to the Ninth Circuit Court of Appeals.
[1130] *GemCap Lending, LLC v. Quarles & Brady, LLP*, 269 F.Supp.3d 1007, 1037-39 (C.D. Cal. 2017).
[1131] Dkt. 128, pp. 21-48.

4.       On October 3, 2017, in *Donna Taylor v. Taylor*, John Taylor, Beck, Cashman, Henderson and AIA Services (through Attorney Martelle) filed their Respondents' and Cross-Appellants' Brief.[1132] In that brief, they asserted, *inter alia*, that (a) "under both the law and the express terms of the 1987 Articles, Donna is entitled to redemption of her remaining 7,110 shares only from 'legally available funds' to the extent such redemption shall not violate the Idaho Business Corporations Act restrictions on [AIA Services'] redemption of its own shares;[1133] (b) John Taylor and Henderson "supplied the court with uncontroverted evidence that [AIA Services'] shareholders had not voted to amend the interest rate for the redemption of [Donna Taylor's] shares contained in [AIA Services'] 1987 Articles;[1134] (c) "Under I.C. § 30-1-1003 (recodified as I.C. § 30-29-1003), once a corporation has issued shares, any amendment to the corporations Articles of Incorporation must be first adopted by the board of directors, and then (with minor exceptions not applicable in the present case) the amendment must be submitted to the shareholders for their approval. I.C. § 30-29-1003;"[1135] (d) "Duclos declared, under oath, that there was neither record of shareholders authorizing the use of capital surplus to redeem [Donna Taylor's] shares nor was there record of shareholder authorization to increase the amount of interest paid to [Donna Taylor] over the amortization period to prime plus ¼% from prime less 1½%;"[1136] (e) while the notice and shareholder vote in 1995 addressed the higher interest rate to be paid to Donna Taylor for the redemption of her Series A Preferred Shares, AIA Services failed to obtain the additional financing (i.e., although shareholders were actually provided notice and voted on the issue, the vote was contingent upon AIA Services obtaining additional financing);[1137] (f) "Amendments to a corporation's Articles of Incorporation must be approved by both the corporation's board and shareholders. Because AIA shareholders did not approve any amendments to [Donna Taylor's] redemption terms, the District Court was correct in holding that [Donna Taylor's] redemption terms are contained in the 1987 Articles;"[1138] (g) Section 4.12 of AIA Services' Amended Articles of Incorporation "***does not confer any powers on Donna [Taylor] to alter the Articles unilaterally; it only prohibits AIA Services from changing, altering, or revoking the rights and preferences conferred on***

---

[1132] DLM – 0007030-77.
[1133] DLM – 0007041.
[1134] DLM – 0007043.
[1135] DLM – 0007053-54, 0007058-59.
[1136] DLM – 0007056.
[1137] DLM – 0007057.
[1138] DLM – 0007059.

Exhibit - 1, p. 285

12-ER-2703

*Donna [Taylor] without her consent. The language in the Articles is clear; it does not grant Donna [Taylor] unilateral authority to modify the redemption terms without shareholder approval*;"[1139] (h) the "1995 Letter Agreements are illegal because they violated I.C. § 30-1-1003 (repealed) and I.C. § 30-1-6 (repealed), the governing law at various times at issue;"[1140] and (i) "[Donna Taylor's] lawyer is pursuing a shareholder derivative action in Idaho federal court. That is the appropriate vehicle for [Donna Taylor's] fiduciary duty claims."[1141] This briefing confirms that the Controlling AIA Defendants were well aware of AIA Services' Amended Articles of Incorporation, but that they only seek to enforce the provisions when it is in their interests. Moreover, the Controlling AIA Defendants' arguments that the 1995 Letter Agreements were illegal because the higher interest rate was unauthorized by AIA Services' Amended Articles of Incorporation apply even more so to them as to the prohibited transactions and corporate governance at issue in this Lawsuit.

5.      On October 23, 2017, JoLee Duclos passed away.[1142]

6.      There were no annual or special shareholder meetings held for AIA Services in 2017 to properly elect directors or authorize any transactions (despite the numerous shareholders' demands and allegations made in various lawsuits). In addition, Donna Taylor's designee, Durant, was not seated on the board of AIA Services as required. Therefore, none of the transactions or corporate decisions (including litigation decisions) involving the AIA Corporations were authorized for 2017.

**S.   2018 – GemCap Files Suit on Behalf of Weskan (Another Entity Partially Owned by John Taylor), the Idaho Supreme Court Reverses in Favor of Donna Taylor in *Donna Taylor v. Taylor*, John Taylor Has AIA Services Accrue $75,000 of Alleged Compensation for Himself When AIA Services Had Only $122,000 in Total Revenues in 2018, and the Malfeasance and Improper Corporate Governance Continue.**

1.      On July 11, 2018, Weskan, an entity owed by John Taylor, by and through Attorney Foster filed a complaint against Diversified and CropUSA in Nez

---

[1139] DLM – 0007059 (Emphasis supplied).
[1140] DLM – 0007060.
[1141] DLM – 0007069 n.10.
[1142] DLM – 0042039.

Exhibit - 1, p. 286

12-ER-2704

12-ER-2705

Perce County District Court.[1143] The lead attorney, Attorney Foster, is also the lead attorney for GemCap in this Lawsuit.

2. On July 27, 2018, in *Donna Taylor v. Taylor*, the Idaho Supreme Court issued its opinion (which was later amended) wherein it held, *inter alia*, that Donna Taylor's 1995 Letter Agreements were ultra vires acts, but the agreements would be enforced because AIA Services had never raised the ultra vires defense and that defense would not have prevailed because AIA Services received a benefit under the agreements.[1144] The decision in that case does not support or assist any of the Defendants in defending against the ultra vires acts at issue in this Lawsuit because the applicable acts at issue in this Lawsuit were expressly prohibited by AIA Services' Amended Articles of Incorporation, AIA Services' New Restated Bylaws and/or AIA Insurance's Bylaws and the AIA Corporations received no benefit (including as ultra vires acts involving any agreements between the AIA Corporations and the CropUSA Entities, any agreements or matters involving any of the Controlling AIA Defendants, any loans or transactions with Pacific Empire Radio, any agreements or conflict waivers between the AIA Corporations and the Hawley Troxell Defendants, AIA Insurance's Guarantee of the Lancelot Loan, AIA Services' Limited Guarantee of the GemCap Loan, the AIA Corporations' Amended Guarantee of the GemCap Loan, and the GemCap Settlement Agreement).

3. On August 30, 2018, the Hawley Troxell Defendants produced a categorical privilege log, which further supports the long history of their ongoing representation of CropUSA, the AIA Corporations and John Taylor, which created conflicts of interest among those clients.[1145]

4. On September 7, 2018, in *Donna Taylor v. Taylor*, the Idaho Supreme Court awarded Donna Taylor $24,919.89 in attorney's fees and $2,988 in costs to be paid by AIA Services, John Taylor, Henderson, Beck and Cashman.[1146]

5. On September 20, 2018, in *Donna Taylor v. Taylor*, John Taylor, Henderson, Beck and Cashman once again placed their interests above the interests

---

[1143] DLM – 0045998-6026.
[1144] *Taylor v. Taylor*, 163 Idaho 910, 422 P.3d 1116 (2018).
[1145] 8/30/2018 HTEH Categorical Privilege Log.
[1146] DLM – 0046060-61.

Exhibit - 1, p. 287

of AIA Services by asking the Idaho Supreme Court to award the $24,919.89 in attorney's fees and $2,988 in costs only against AIA Services.[1147]

6.      On October 11, 2018, in *Donna Taylor v. Taylor*, the Idaho Supreme Court granted John Taylor, Beck, Cashman and Henderson's motion and entered an amended order stating that *only* AIA Services would be liable for the $24,919.89 in fees awarded to Donna Taylor.[1148] AIA Services should have never been liable for the $24,919.89 in fees, plus accrued interest, because Donna Taylor should have been paid many years earlier but for the acts and omissions of the Hawley Troxell Defendants and/or the Controlling AIA Defendants. Separately, John Taylor breached his duties of loyalty owed to AIA Services and its shareholders by placing his interests above the best interests of AIA Services by and through successfully asserting that only AIA Services should be liable for the $24,919.89.

7.      On October 12, 2018, John Taylor purportedly signed AIA Services' 2017 tax return.[1149] The tax return indicated that John Taylor had "accrued officer salary due" in the amount of $75,000 for the year and that his "Officers'/key man life insurance premiums were paid in the amount of $1,227.[1150] The total alleged accrued salary purportedly owed to John Taylor was indicated to be $695,429 (an increase of $74,732 from the prior year).[1151] The tax return also indicated that AIA Services' had purportedly incurred $77,544 in legal and professional fees and $14,975 in "accrued interest to shareholders."[1152] The payments and accruals of legal fees, interest (to the extent such interest is for John Taylor or another one of the Controlling AIA Defendants), accrued salary and life insurance were never properly authorized by AIA Services' board of directors because John Taylor had conflicts of interest that prevented him from approving these expenditures (or any others) because he was allegedly the only board member according to the Annual Report filed with the Idaho Secretary of State and he did not have Durant (Donna Taylor's board designee) approve such expenditures. In addition, John Taylor was not entitled to any compensation or benefits because he was consistently intentionally breaching his duties of loyalty owed to the AIA Corporations from the inception of CropUSA in 1999 through the present time and he was acting as a faithless fiduciary for the AIA Corporations during this period of time. Moreover,

---

[1147] DLM – 0046062-67.
[1148] DLM – 0046068-69.
[1149] AIAS_0000158-75.
[1150] AIAS_0000168.
[1151] AIAS_0000165.
[1152] AIAS_0000168.

Exhibit - 1, p. 288

the accrual of $75,000 in wages for John Taylor was wholly improper in light of the fact that AIA Services only had $122,895 in total revenues and net income of $15,282 in 2017,[1153] but consistent with John Taylor's long track record of placing his interests above the interests of the AIA Corporations and AIA Services' minority shareholders by paying compensation that was excessive and that he did not deserve.

8.      On December 6, 2018, in *GemCap v. AIA Services*, a hearing was held on various motions.[1154] At that hearing, in response to argument by Attorney Martelle (a former attorney for John Taylor and other defendants in this Lawsuit), Judge Brudie stated "[w]ell, I don't know if you want to do that, Mr. Martelle. I have had a lot of experience working with AIA and their financial records, and I don't know if I can trust any of them, but go ahead."[1155] Judge Brudie also noted that he had been dealing with such matters since "2007."[1156] Judge Brudie's statement is consistent with my experience and knowledge of matters involving the AIA Corporations.

9.      There were no annual or special shareholder meetings held for AIA Services in 2018 to properly elect directors or authorize any transactions (despite the numerous shareholders' demands and allegations made in various lawsuits). In addition, Donna Taylor's designee, Durant, was not seated to the board of AIA Services as required. Therefore, none of the transactions or corporate decisions (including litigation decisions) involving the AIA Corporations were authorized for 2018.

**T.   2019 – GemCap's Action Against Diversified (*Weskan v. Diversified*) Is Remanded to State Court, the Hawley Troxell Defendants Continue Taking Action Against Their Clients the AIA Corporations, Riley Admits that the AIA Corporations' Board of Directors Were Not Independent to Approve Any Conflict Waivers or Representation Agreements, and the Malfeasance and Corporate Governance Continue.**

1.      On January 8, 2019, Attorney Glynn purportedly appeared as counsel for the AIA Corporations.[1157]

---

[1153] AIAS_0000158.
[1154] DLM – 0085224-92.
[1155] DLM – 0085255.
[1156] DLM – 0085275.
[1157] Dkt. 515.

**Exhibit - 1, p. 289**

**12-ER-2707**

2.     On March 19, 2019, in *Weskan v. Diversified*, Judge Nye entered an order remanding that case back to Nez Perce County District Court.[1158] In that order, Judge Nye made findings regarding John Taylor's alleged authority for CropUSA that apply to John Taylor's lack of authority regarding the AIA Corporations: "The record does not refer to any organizational documents such as shareholder agreements, bylaws, or operating agreements that would define Mr. Taylor's control in each organization. Although both parties direct the Court to conflicting state and federal rules presuming a corporate officer's level of control, the Court cannot apply the rules without first examining the organizational documents."[1159] I agree with Judge Nye. Under the AIA Services' Amended Articles of Incorporation, AIA Services' New Restated Bylaws and AIA Insurance's Bylaws, John Taylor had no authority to do anything on behalf of the AIA Corporations based on the facts and circumstances, including no authority to bind the AIA Corporations to any contract or settlement agreement at issue in this Lawsuit.

3.     On March 26, 2019, the Hawley Troxell Defendants produced an itemized Privilege Log, which again confirms the ongoing attorney-client relationships between them and CropUSA, John Taylor and the AIA Corporations and the conflicts of interest among those clients (including as to the Hawley Troxell Defendants' representation of John Taylor prior to appearing for the AIA Corporations in *Reed Taylor v. AIA Services*).[1160]

4.     On April 1, 2019, Attorney Glynn substituted in as counsel for Henderson, Beck, Cashman, John Taylor and the CropUSA Entities.[1161] Prior to his appearance, there was a revolving door of attorneys purportedly representing the AIA Corporations.[1162]

5.     I understand that Attorney Bond exchanged numerous emails with Attorney Glynn regarding Attorney Glynn's improper joint representation of the AIA Corporations and his other clients (Beck, Henderson, Cashman, John Taylor,

---

[1158] *Weskan Agency, LLC v. CGB Diversified Services, Inc.*, No. 2:18-cv-00356-DCN, 2019 WL 1450527, at *3 (D. Idaho Mar. 19, 2019); DLM – 0046092-102.

[1159] *Weskan Agency, LLC v. CGB Diversified Services, Inc.*, No. 2:18-cv-00356-DCN, 2019 WL 1450527, at *3 (D. Idaho Mar. 19, 2019); DLM – 0046092-102.

[1160] 3/26/2019 HTEH Itemized Privilege Log.

[1161] Dkt. 545.

[1162] *See, e.g.*, Dkts. 87, 109, 110, 292-1, 371.

Exhibit - 1, p. 290

12-ER-2708

and the CropUSA Entities). For example, there were numerous communications that resulted in Attorney Glynn properly deciding to withdraw as counsel for the AIA Corporations because it was impossible for him to properly represent the AIA Corporations and his other clients in this Lawsuit.[1163] Those emails followed an earlier threat by Attorney Glynn to seek and obtain shareholder approval from AIA Services' shareholders to purportedly authorize his joint representation of the AIA Corporations and his other clients (Beck, Cashman, Henderson, John Taylor and the CropUSA Entities).[1164] Notably, Attorney Glynn recognized that the circumstances warranted taking the improper joint representation directly to the shareholders of AIA Services because John Taylor had conflicts of interest that prevented him from making any such corporate decisions on behalf of the AIA Corporations.

6.      On May 8, 2019 (consistent with Miesen's proposal to not move to disqualify Attorney Glynn entirely from this Lawsuit so long as he withdraws as counsel for the AIA Corporations),[1165] Attorney Glynn moved to withdraw as counsel for the AIA Corporations.[1166]

7.      On May 28, 2019, the Hawley Troxell Defendants filed a response in opposition to Miesen's motion to strike or convert GemCap's motion to dismiss wherein they asserted that the Court has no jurisdiction to challenge the GemCap Settlement Agreement.[1167] The Hawley Troxell Defendants have never explained why they are supporting the enforcement of the GemCap Settlement Agreement when that Agreement results in more liability to the Hawley Troxell Defendants. They could have prevented AIA Services' Limited Guarantee of the GemCap Loan, the AIA Corporations Amended Guarantee of the GemCap Loan and the GemCap Settlement Agreement had they properly discharged their duties in *Reed Taylor v. AIA Services* by requiring the AIA Corporations to adhere to proper corporate governance as a condition of their representation. They also should have supported Donna Taylor's request for the appointment of a receiver and/or the appointment of her board designee, Attorney Moran, in *Donna Taylor v. AIA Services*. In addition, since *Reed Taylor v. AIA Services* remains pending because there is no final judgment and counterclaims are still pending, the Hawley Troxell Defendants violated their duties of loyalty owed to the AIA Corporations by taking positions

---

[1163] *E.g.*, DLM – 089590-610; DLM – 089611-24; DLM – 089625-28; DLM – 089629-30.
[1164] DLM - 089589.
[1165] DLM – 089629-30.
[1166] Dkts. 557, 557-1.
[1167] Dkt. 572.

**Exhibit - 1, p. 291**

**12-ER-2709**

adverse to them by asserting the GemCap Settlement Agreement should be enforced.

8.      On June 13, 2019, John Taylor purportedly purchased another 1,000 Series A Preferred Shares.[1168] This alleged purchase was not approved by any independent director for AIA Services, Donna Taylor's director or AIA Services' shareholders. Assuming that AIA Services' Amended Articles of Incorporation authorized the issuance of additional Series A Preferred Shares (the intent was to issue 200,000 Series A Preferred Shares to Donna Taylor and then facilitate the payment or conversion of those shares to common shares), John Taylor breached his duties of loyalty and good faith owed to AIA Services and its minority shareholders by negotiating and acquiring the Series A Preferred Shares while acting on both sides of the transaction.

9.      On June 30, 2019, AIA Services' stock ledger showed Donna Taylor holding 44,000 Series A Preferred Shares, John Taylor purportedly holding 23,250 Series A Preferred Shares, AIA Services' 401(k) Plan holding 92,500 Series C Preferred Shares, AIA Insurance holding 205,000 Series C Preferred Shares and various other common shareholders.[1169] There is no evidence that any of the Series A Preferred shares were ever validly issued to John Taylor and those shares should

---

[1168] AIAS_0001738-39.
[1169] AIAS_0001740.

be canceled.[1170] While John Taylor produced a single board resolution purporting to authorize the issuance of 7,500 Series A Preferred Shares to him on May 26, 2016,[1171] he was improperly acting on both sides of the transaction by purporting to approve the issuance of the shares on behalf of AIA Services and on behalf of himself individually as the alleged purchaser of the 7,500 Series A Preferred Shares, which was a breach of his duties of good faith and loyalty owed to AIA Services and a separate violation of Section 4.14 of AIA Services' New Restated Bylaws and Section 4.2.9(g) of AIA Services' Amended Articles of Incorporation based on the irreconcilable conflicts of interest.

10.   On July 1, 2019, Riley was deposed in this Lawsuit wherein he testified, *inter alia*, that (a) his role was "[p]rimarily dealing with the initial questions of conflicts of interest, of waivers of conflicts, tolling agreements, [and] joint defense agreement;"[1172] (b)"we avoided delving into the existence of any

---

[1170] On July 28, 2020, John Taylor testified as a Rule 30(b)(6) designee that he owned "Somewhere around 30,000 shares." 7/28/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 170. Any purported issuance or transfer of Series A Preferred Shares to John Taylor is invalid and a legal nullity. First, there are no resolutions authorizing the issuance or transfer of such shares, and, as stated in Section XI of this Report, John Taylor has testified that there has been no board action not reflected in resolutions or other documents. Second, as stated in Section XII of this Report, all of the 200,000 authorized shares of Series A Shares were issued to Donna Taylor pursuant to a Property Settlement Agreement which reorganized AIA Insurance and implemented the financial terms of her divorce from Reed Taylor. Not only do the Series A Shares not provide for the reissue of such shares to anyone else subsequent to redemption, the redemption terms themselves establish that the exclusive purpose of the issuance of the shares was to compensate Donna Taylor for the securities and property she contributed in the reorganization. When John Taylor was asked whether "it was the intent of amending the articles of incorporation in 1987…to issue the 200,000 series A shares to Donna Taylor," he answered "Correct." 2/ 28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 717. In Section 4.2.3(b), of AIA Services' Articles of Incorporation, unless the shares have previously been redeemed, Donna Taylor is given the right to require the redemption of her shares "at any time after September 14, 1993," with the payment terms varying if redemption occurs before or after that date. John Taylor was first purportedly issued Series A Shares to himself twenty- three years later in 2016 (*see* Section X(Q)) of this Report). Moreover, even if reissuance were permitted. because he is an affiliate and a purported director of AIA Services, Donna Taylor's consent to it would be required under Section 4.2.9(g) of AIA Services' Amended Articles of Incorporation. Not surprisingly, it appears that John Taylor has again been erroneously advised on this matter by Riley and the other Hawley Troxell Defendants. FB 0810-11. This also militates against the notion that the Hawley Troxell Defendants had a limited scope of representation, i.e. reissuance of Series A Preferred Shares has nothing to do with defending a creditor suit.

[1171] AIAPROD00172499.

[1172] 7/1/2019 Riley Depo. Transcript, p. 49.

Exhibit - 1, p. 293

12-ER-2711

actual or apparent or possible conflicts of interest by getting tolling agreements from every one of those people to preserve any potential claims;"[1173] (b) "in retrospect," there were no independent directors of the AIA Corporations to authorize the representation agreements and conflict waivers with the Hawley Troxell Defendants;[1174] (c) John Taylor's appointment of Beck and Henderson to the boards of the AIA Corporations "were the best we could do under the circumstances."[1175] The "best we could do" does not comply with the RPC; what was needed, as discussed many times in this Report, was the highest authority of the AIA Corporations, a director designated by Donna Taylor or, if there were no such designation, an otherwise independent director or a majority of the AIA Disinterested Shareholders. Riley's testimony confirmed that none of the potential and concurrent conflicts of interest that existed between the AIA Corporations and CropUSA and/or the Controlling AIA Defendants were ever properly addressed. Those issues could not be deferred or side-stepped by having certain parties enter into tolling agreements, especially when the tolling agreements and the terms thereof were never disclosed to disinterested constituents of the AIA Corporations or the AIA Disinterested Shareholders. I acknowledge Riley's concessions that Beck, Henderson and John Taylor were not independent directors, from which it follows that the May 2, 2007 AIA Engagement Letter, the February 25, 2008 Amended AIA Engagement Letter, the Joint Defense Agreement and any other conflict waivers or litigation decisions were never properly authorized as discussed in this Report. As to Riley's testimony that Henderson and Beck "were the best they could do," the Hawley Troxell Defendants and the Controlling AIA Defendants did not ask anyone else to serve on the boards of the AIA Corporations and they later resisted Donna Taylor's designee Attorney Moran; nor did the Hawley Troxell Defendants require disclosures and approval by the AIA Services' shareholders (which is contemplated under RPC 1.13).

11.     In his Report, which I rebut in Section XII of this Report, Mr. Remele relies on the substantive and material changes that Riley has attempted to make to his deposition testimony.[1176] I was surprised that Mr. Remele relied on those purported changes because I had wholly disregarded them for being untimely.[1177]

---

[1173] 7/1/2019 Riley Depo. Transcript, pp. 169-71, 238.

[1174] *E.g.*, 7/1/2019 Riley Depo. Transcript, pp. 223-24, 232-33, 239, 250, 254, 277, 293. Riley later attempted to recant that admission.

[1175] 7/1/2019 Riley Depo. Transcript, p. 171.

[1176] Riley's purported changes were prepared with the assistance of his counsel in this Lawsuit who also typed them up. 3/3/2020 Riley Depo. Transcript, p. 343.

[1177] 8/30/2019 Deposition Change Sheets. I am advised that Riley was provided the transcript on or about July 17, 2019.

Riley's deposition transcript was sent for his review on or about July 17, 2019. Rather than promptly make any changes before this Report was delivered as any prudent attorney being sued for malpractice would want to do in order to appear ethical and credible (assuming the changes were proper), Riley made those changes only after the delivery of my first two Reports and after I had quoted to and relied upon his testimony. Specifically, on August 30, 2019, Riley untimely submitted eleven pages of so called "changes" to his deposition testimony of July 1, 2019.[1178] Riley also verified his deposition and change sheets under oath by writing an "X" to indicate "Corrections Made."[1179] Moreover, with the assistance of his counsel, Riley made substantive and material changes to his testimony on issues that were, by no coincidence, overarching topics in Mr. Remele's Report, including, by changing his testimony conceding that in "retrospect" the boards of directors of the AIA Corporations had conflicts of interest, to now saying they were not conflicted because the so-called limited scope of representation in *Reed Taylor v. AIA Services* was limited to Reed Taylor's "creditor claims", and that he was suddenly aware of AIA Services' Restated Bylaws and had considered them in connection with the advancement of litigation expenses.[1180] It was not until I reviewed the Remele Report that it appeared obvious that Riley's counsel assisted in changing testimony was in coordination with Mr. Remele's work on his opinions and statements contained in the Remele Report produced on October 18, 2019. Usually opinions are based on actual facts, but here "facts" are being created to support opinions, putting the cart before the horse. An informative list of many of Riley's original deposition answers and his subsequent substantive changes is set forth in Miesen's successful motion to depose Riley again.[1181]

12.    On September 10, 2019, the Idaho Supreme Court issued its opinion in *Parkinson v. Bevis*, which held that a party may seek damages against an attorney solely for disgorgement and further confirmed that attorneys may also be liable for other damages caused by breaches of fiduciary duties even though such claims are

---

[1178] 8/30/2019 Deposition Change Sheets.

[1179] 8/30/2019 Verification Page.

[1180] 8/30/2019 Deposition Change Sheets. On March 3, 2020, Riley testified that the changes were made with the assistance of his counsel (3/3/2020 Riley Depo. Transcript, p. 343); his counsel objected, and Riley did not answer, when he was asked whether his counsel had talked to Mr. Remele before the changes were made. *Id*. at p. 343-44. Later in the deposition, Riley stated "I reread the deposition. I made notes. I penciled out some potential changes, reviewed them with Counsel, and this is what we came up with." In response the question "we'" meaning you and Counsel, correct? Riley answered "Yes." *Id*. at p. 432.

[1181] Dkt. 759-1.

Exhibit - 1, p. 295

subsumed into legal malpractice claims.[1182] I have also included a supplemental discussion of *Parkinson* in my analysis in Section X(A) above. None of the Hawley Troxell Defendants' experts has addressed the *Parkinson* decision.

13.    On September 11, 2019, in *GemCap v. Quarles & Brady*, the Ninth Circuit Court of Appeals affirmed the trial court's summary judgment dismissal of all of GemCap's claims.[1183] The United States Supreme Court denied certiorari on March 23, 2020. Notably, as with all of the claims asserted by GemCap, the Ninth Circuit did not mention the legality or authority of the AIA Services' Limited Guarantee of the GemCap Loan, AIA Corporations' Amended Guarantee of the GemCap Loan or the GemCap Settlement Agreement (all of which had been raised by Miesen or Donna Taylor before summary judgment was granted in *GemCap v. Quarles & Brady*). This is because GemCap was fully aware that the AIA Corporations had no power or authority to entered into any of those instruments (as further confirmed by the fact that GemCap never questioned any witnesses in any depositions produced to date regarding the AIA Corporations' lack of power and authority to enter into any of those instruments).

14.    On September 12, 2019, in this Lawsuit, Judge Nye formally granted Attorney Glynn's motion to withdraw as counsel for the AIA Corporations.[1184] During the time that Attorney Glynn purportedly represented the AIA Corporations, I did not see any evidence that he was ever representing the best interests of the AIA Corporations. Rather, Attorney Glynn appeared to represent the interests of John Taylor and the other Controlling AIA Defendants.

15.    On September 16, 2019, in *GemCap v. John Taylor*, GemCap filed yet another lawsuit against John Taylor, asserting claims for fraud, false promise, concealing and negligent misrepresentations.[1185] As mentioned in the Complaint, this lawsuit was brought to assert the fraud claims that GemCap had reserved under the terms of the GemCap Settlement Agreement after John Taylor allegedly defaulted on the terms of the GemCap Settlement Agreement.[1186] While I am not in a position to opine as to the merits of GemCap's claims, I note that the allegations provide yet additional examples of more alleged acts of fraud committed by John

---

[1182] *Parkinson v. Bevis*, 165 Idaho 599, 448 P.3d 1027 (2019).

[1183] DLM – 0086301-06.

[1184] Dkt. 691. The prior order did not include the required information, as Attorney Glynn later pointed out when he sought to obtain the formal order. Dkt. 670, pp. 8-9.

[1185] DLM – 0085869-84.

[1186] Dkt. 128, p. 29.

Exhibit - 1, p. 296

12-ER-2714

Taylor, which is consistent with John Taylor's acts of fraud of which I am aware (as addressed in part in this Report).

16.     On October 3, 2019, in *GemCap v. Quarles & Brady*, the Ninth Circuit Court of Appeals issued its mandate.[1187] Accordingly, the dismissal of GemCap's claims against Quarles & Brady in that lawsuit is final. I watched the video for the oral argument for that appeal. During the time of that lawsuit through the conclusion of the appeal, GemCap never asserted any claims or allegations against Quarles & Brady that its Legal Opinions were incorrect or that it had otherwise misled GemCap regarding the AIA Corporations' lack of power and authority to enter into the AIA Services' Limited Guarantee of the GemCap Loan or the AIA Corporations' Amended Guarantee of the GemCap Loan. This confirms that GemCap was aware that the AIA Corporations lacked the power and authority to guarantee the GemCap Loan and to subsequently enter into the GemCap Settlement Agreement.

17.     On October 4, 2019, in *GemCap v. CropUSA*, GemCap filed a stipulation for the entry of a judgment against John Taylor for $12,126,534.61, plus accrued interest since September 15, 2014.[1188] According to GemCap, the judgment should be entered because John Taylor has defaulted on the terms of the GemCap Settlement Agreement. Based on the fact that the requested judgment is $12,126,534.61, it appears, and I am assuming, that GemCap has not recovered sufficient funds to reduce the principal amount of the judgment since September 15, 2014. Irrespective of whether or not the judgment is entered as requested or at some other time in the future, this further evidences why the Hawley Troxell Defendants breached their duties of care and fiduciary duties by not asserting crossclaims in *Reed Taylor v. AIA Services* (including claims for breaches of fiduciary duties and other claims applicable to the AIA Corporations as asserted by Reed Taylor in his Fifth Amended Complaint and/or certain of Miesen's claims asserted in his Third Amended Complaint in this lawsuit); such claims would have been successful a decade ago (including for the reasons stated in this Report) when John Taylor had substantial assets and earnings (including through his lucrative position as a director of Avista Corp.)[1189] that could have been executed upon and/or garnished to satisfy the judgment that would have been obtained in *Reed Taylor v. AIA Services*. In addition, the excessive compensation paid to John Taylor directly or indirectly

---

[1187] DLM – 0086307.

[1188] DLM – 0085854-56, 0085857-58.

[1189] *E.g.*, DLM – 0081560-626.

Exhibit - 1, p. 297

through the AIA Corporations would have ceased.[1190] Since it appears that John Taylor presently does not own any real property and it appears he is facing a pending requirement to retire from the board of directors of Avista Corp. (a board that I am unable to understand why he has been permitted to continue serving on), a judgment against John Taylor in this Lawsuit appears to be uncollectable and the Hawley Troxell Defendants were one of the proximate causes of this by failing to take action over a decade ago when a multi-million-dollar judgment would have been collectable against John Taylor.[1191] Likewise, Miesen has lost over a decade of garnishment and asset execution upon the other Controlling AIA Defendants and CropUSA appears to be worth nothing and have no business prospects whatsoever (I also note that CropUSA also no longer has any crop insurance licenses and its reputation has also been forever tarnished). In addition, this requested judgment further evidences why the Hawley Troxell Defendants breached their duties of care and fiduciary duties by not stipulating to, or supporting, the appointment of a receiver in *Donna Taylor v. AIA Services* to prevent the ongoing malfeasance, breached obligations and duties, and torts committed against the AIA Corporations. GemCap's request for a judgment also confirms that there is no final judgment in *GemCap v. CropUSA*.

18.    On October 7, 2019, in *GemCap v. CropUSA*, John Taylor filed a response objecting to the entry of the judgment against him for $12,126,534.61.[1192] According to John Taylor, judgment should not be entered. Once again, these filings also confirm that there is no final judgment and no Rule 54(b) judgments have been obtained.

19.    On October 11, 2019, in *GemCap v. AIA Services*, the parties filed witness lists, exhibit lists and stipulated facts for the trial commencing on October 15, 2019, and none of the parties disclosed any documents, witnesses or positions to indicate that AIA Corporations' power and authority to enter into the GemCap Settlement Agreement was being challenged.[1193] The Stipulated Facts was signed by Attorney Foster and Attorney Adams, who was admitted to practice in Idaho for that lawsuit through a *pro hac vice* admission, both of whom were counsel for

---

[1190] *E.g.*, DLM – 0037119.

[1191] I recognize that the intentional breaches of fiduciary duties and other intentional torts at issue in this Lawsuit are likely non-dischargeable if John Taylor files for bankruptcy protection. *E.g.*, 11 U.S.C.A. § 523.

[1192] DLM – 0085859-63, 0085864-66.

[1193] DLM – 0085780-88, 0085789-91, 0085813-17, 0085818-21, 0085842-51.

**Exhibit - 1, p. 298**

**12-ER-2716**

GemCap.[1194] I note that Attorney Adams has signed other filings for GemCap along with Attorney Foster, which further demonstrates how the Hawley Troxell Defendants were acting as the lead counsel for CropUSA in Reed Taylor v. AIA Services because they were the sole signatories on every pleading and paper filed for CropUSA, except one motion to enlarge time (as discussed in Section X(I) above). John Taylor is once again breaching his fiduciary duty of loyalty owed to the AIA Corporations by placing his interests ahead of the interests of the AIA Corporations by seeking to defend the two unauthorized transfers of interests in AIA Services' Headquarters to the AIA Services' 401(k) Plan (including one transfer that was exclusively for John Taylor's benefit). Those transfers were also further examples of John Taylor's self-dealing.

20.     On October 15, 2019, in *GemCap v. AIA Services*, the first day of the trial was held. I had traveled to Lewiston, Idaho to listen to the testimony and evidence for that lawsuit in order to further support my opinions and to prepare additional opinions to the extent new information was obtained. Prior to that trial, Mr. Bond emailed Judge Brudie's legal assistant to inquire as to whether or not the trial proceedings would be sealed and he was advised that no motion had been filed to do so. At the commencement of the trial proceedings, the purported counsel for AIA Services[1195] and AIA Services' 401(k), Attorney Glynn, requested that Judge Brudie seal the proceedings and exclude Attorney Bond, Miesen and me from the courtroom for the trial and Attorney Foster (GemCap's attorney) joined in the request. Judge Brudie denied their request to exclude us from viewing the trial. The conduct in that lawsuit once again confirms the ongoing improper efforts by GemCap and John Taylor to conceal facts and evidence from Miesen and AIA Services' Disinterested Shareholders. Because GemCap, AIA Services, AIA Services' 401(k) Plan and John Taylor had complained that trial witnesses were belatedly disclosed and had filed motions in limine to exclude those witnesses, they

---

[1194] DLM – 0085850.

[1195] Attorney Glynn was purportedly acting as counsel for AIA Services and AIA Services' 401(k) Plan (for reasons only known to him). I say "purported" because I have seen no information or evidence that Attorney Glynn has ever truly represented the best interests of AIA Services or AIA Insurance (including during the brief period of time when he previously purportedly acted as counsel for the AIA Corporations in this Lawsuit).

Exhibit - 1, p. 299

12-ER-2717

agreed to vacate the trial and have it rescheduled in the near future. Consequently, I was not able to obtain any further testimony or evidence at that time.[1196]

21.    On October 18, 2019, the Hawley Troxell Defendants identified for the first time their three expert witnesses and produced Mr. Lidstone's Report,[1197] Mr. Remele's Report[1198] and Mr. Pinkerton's Report.[1199] I have thoroughly read and reviewed all three Reports, and my rebuttals are set forth in Sections X-XII. Unlike Mr. Remele, I did not assign review of any evidence or analysis to any associates or law clerks. It appears that Mr. Lidstone never reviewed my entire Report based on my review of his billing records. With the exception of approximately three items addressed in Mr. Pinkerton's Report (his Report consists largely of his "legal opinions" which he unqualified to express), there is nothing contained within any of the three Reports changes any of my opinions and, in fact, reinforces the analysis, the opinions contained within my analysis and my opinions contained within all three versions of my prior Reports (for all of the reasons stated in my analysis, the opinions contained within my analysis and my other opinions). Whether the court or a jury may agree on the specific dollar amount of any or all of Mr. Miesen's damage items is irrelevant as to whether or not the Hawley Troxell Defendants breached their duties of loyalty and care owed to the AIA Corporations thereby being one of the proximate causes of the damages itemized by Mr. Miesen, as I have opined. As of the date of this Report, neither Mr. Remele nor Mr. Lidstone has submitted any further reports, despite the extensive discovery that has taken place since the time of their original reports and Miesen's submission of the October 2019 and February 2020 versions of my reports.

22.    None of the other defendants in this Lawsuit have disclosed any expert witnesses and no other reports were produced by any defendants other than the Hawley Troxell Defendants.

23.    On December 6, 2019, the Hawley Troxell Defendants finally uploaded all of the documents that they had provided to Mr. Lidstone after Miesen

---

[1196] On July 1, 2020, Judge Brudie found that the transfers in question "were made with the intent to defraud" and "were accomplished at the whim of [John] Taylor and only [John] Taylor . . ." DLM – 105924.

[1197] 10/17/2019 Mr. Lidstone Report.
[1198] 10/18/2019 Mr. Remele Report.
[1199] 10/18/2019 Mr. Pinkerton Report.

subpoenaed the documents (they refused to produce them in response to Miesen's requests for production).[1200].

24.     On December 9, 2019, the Hawley Troxell Defendants finally uploaded all of the documents that they had provided to Mr. Remele after Miesen subpoenaed the documents (they refused to produce them in response to Miesen's requests for production).[1201]

25.     On December 17, 2019, the Hawley Troxell Defendants finally uploaded all of the documents that they had provided to Mr. Pinkerton after Miesen subpoenaed the documents (they refused to produce them in response to Miesen's requests for production).

26.     There were no annual or special shareholder meetings held for AIA Services in 2019 to properly elect directors or authorize any transactions (despite the numerous shareholders' demands and allegations made in various lawsuits). In addition, Donna Taylor's designee, Durant, was not seated to the board of AIA Services as required. Therefore, none of the transactions or corporate decisions (including litigation decisions) involving the AIA Corporations were authorized for 2019.

27.     From the time that the Hawley Troxell Defendants formally appeared as counsel for the AIA Corporations in *Reed Taylor v. AIA Services* and later as counsel for *AIA Services in Donna Taylor v. AIA Services*, the Hawley Troxell Defendants intentionally failed to require disclosure of any facts relative to their representation and the tortious conduct committed by the Controlling AIA Defendants to any disinterested constituents of the AIA Corporations or the AIA Disinterested Shareholders in violation of their duties of care and fiduciary duties of loyalty and good faith owed to the AIA Corporations and have acted in a manner contrary to the best interests of the AIA Corporations. Had they properly discharged their duties, millions of dollars in damages inflicted upon the AIA Corporations could have been prevented.

28.     As seen from the all of the information in the documents provided to me (listed in Section III) and the lawsuits defined and discussed in this Report (including the undisputable allegations and claims of malfeasance committed by the Controlling AIA Defendants against the AIA Corporations), there was an ongoing

---

[1200] Dkt. 758-5.
[1201] Dkt. 758-6.

course of tortious conduct (including fraudulent concealment), ultra vires acts and other improper conduct by the Controlling AIA Defendants in violation of their fiduciary duties owed to the AIA Corporations and the AIA Disinterested Shareholders, which was known to all of the Defendants. Thus, there can be no excuse by any of the Defendants that they believed any of the Controlling AIA Defendants were properly discharging their fiduciary duties, that they had any authority to act for the AIA Corporations or that the AIA Corporations were being operated lawfully and properly; the evidence proves otherwise. The Hawley Troxell Defendants, GemCap and the Controlling AIA Defendants substantially assisted the other Controlling AIA Defendants in breaching their duties of loyalty owed to the AIA Corporations by participating in the tortious conduct, assisting in covering up the tortious conduct and/or by concealing the tortious conduct from disinterested constituents of the AIA Corporations (who are unaware to this day of the tortious conduct based on the adverse interest exception) and the AIA Disinterested Shareholders.

**U.** **2020 – The Malfeasance and Improper Corporate Governance Continue, and the Rule 30(b)(6) Depositions of the AIA Corporations Establish that the Only Decisions Made by the Purported Boards of Directors for the AIA Corporations and the Only Shareholder Meetings that Occurred Were Those Reflected in the Written Meeting Minutes and Resolutions Produced in Discovery.**

1.      On January 7, 2020, Donna Taylor was deposed. Donna Taylor testified that she owns over 40,000 shares of AIA Services' Series A Preferred Stock for which she had not been paid the redemption price plus interest, that she was aware of and, had highlighted on her copy, the provisions in AIA Services' Amended Articles of Incorporation which gives her the unqualified right to designate a member of the board of directors of AIA Services and also prohibits the AIA Corporations from incurring certain indebtedness and other transactions without her consent. She further testified that she had appointed two persons, Patrick Moran and Paul Durant, to serve as directors of AIA Services who have not

Exhibit - 1, p. 302

been allowed to serve as directors of AIA Services[1202]; and that she did not consent to any guarantees with GemCap, which, she also testified, were not a good thing for the AIA Corporations, nor was she asked to do provide any such consent. Donna Taylor also testified that she did not consent to the GemCap Settlement Agreement, and that she had been defrauded thereby because it had been concealed from her and that since 1997 no one at AIA Services has asked her to consent to any of the numerous violations of AIA Services' Amended Articles of Incorporation. She also testified that she tried to intervene in *GemCap* v. *Crop USA* and had also been a plaintiff *in Durant v. GemCap;* and that GemCap had opposed her efforts to have the legality of the AIA Corporations' Amended Guarantee of the GemCap Loan and the GemCap Settlement Agreement determined by a court.[1203] Finally, Donna Taylor also testified that Reed Taylor was never involved in this Lawsuit.

2.      On January 23, 2020, Reed Taylor's deposition in this Lawsuit was taken. In that deposition, Reed Taylor testified that as of August 15, 1995 Richard Riley was general counsel for AIA Services and was also general counsel for the AIA Services' subsidiaries. He also testified that, during the pendency of *Reed Taylor v. AIA Services*, he was suing on his own behalf as a secured creditor of AIA Services and not on behalf of the shareholders of AIA Services. Reed Taylor further testified that, during the pendency of *Reed Taylor v. AIA Services*, Riley concealed from Reed Taylor and the Court that he believed[1204] his opinions as to the validity of the stock redemption agreement were correct and the transaction was legal, as well as the existence of a purported research file establishing the same; and that it wasn't until nearly three months after Judge Brudie's dismissal of Reed Taylor's remaining claims that Riley finally asserted that his 1995 opinion letter was correct. With respect to CropUSA, Reed Taylor testified that he never agreed to its spinoff from AIA Services. and that CropUSA had been badly mismanaged, including by

---

[1202] I recently spoke with Donna Taylor and she confirmed that Moran was her designee until 2012 when she designated Durant, and that Durant remains her designee. She has not received any notice of a meeting of the shareholders of AIA Services, nor has she received a request to consent to any transaction for which her consent would be required as the owner of a majority of the Series A Preferred Shares under AIA Services' Amended Articles of Incorporation. I also spoke with Durant who said he remains ready to become a member of the board of directors of AIA Services, but has not received any notice of an AIA Services board meeting or even an acknowledgement of his designation as a director. Durant has also not received any further notices of an AIA Services' shareholders' meeting or a request to sign a shareholder's written consent. I also recently spoke with Miesen and he has not received any further notices of AIA Services' shareholder meetings.

[1203] *See generally* 1/7/2020 Donna Taylor Depo. Transcript.

[1204] Whether Riley actually had such a belief is questionable. *See* Section XII.

Page - 294

the payment to John Taylor and others of excessive salaries and other wasteful uses of borrowed funds; that had it been operate prudently and the book of business had not been sold to Hudson Insurance Crop USA would have been in the top ten or twenty companies that sell crop insurance, and have a value of between a half and three quarters of a billion dollars.

3.      On January 30, 2020, the AIA Corporations failed to timely answer Miesen's Second Set of Interrogatories and Requests for Production of Documents and Requests for Admission, thereby admitting all of Miesen's Requests for Admission, including that the Hawley Troxell Defendants had served as general counsel for the AIA Corporations (*See, e.g.,* Request for Admission Nos. 69-70).[1205] While John Taylor belatedly sought to provide Responses to the Requests for Admission after Miesen obtained an order compelling the AIA Corporations to provide answers and responses to the Interrogatories and Requests for Production,[1206] he never sought and obtained permission from the court to provide belated responses to Miesen's Requests for Admission as required under Fed. R. Civ. P. 36(a)(3). Without a court order stating otherwise, Miesen's Requests for Admission to the AIA Corporations have been admitted for failing to timely respond.

4.      On February 7, 2020, Miesen submitted the Hile Report addressing Miesen's damage claims.[1207] Because Mr. Miesen subsequently provided Excel spreadsheets detailing and calculating his damages as seen in the Exhibit A attached hereto, I no longer need to rely on Mr. Hile to provide the accurate calculations for Miesen's damages.

5.      On February 11-12, 2020, in *GemCap v. AIA Services*, a trial was held. AIA Services' counsel, Mr. Glynn, never raised as a defense the issue of the unenforceability of the Settlement Agreement or that the two interests in AIA Services' former headquarters were never properly transferred nor ever approved by AIA Services' board of directors or shareholders, as confirmed by the trial

---

[1205] Dtks. 867-3 & 867-4.
[1206] Dkt. 1003.
[1207] DLM – 105306-51.

Exhibit - 1, p. 304

transcripts and trial briefing.[1208] To the extent that any defendant in this lawsuit may assert otherwise, the interests of Miesen, other AIA Services' Disinterested Shareholders and AIA Services were not represented by Mr. Glynn or any of his clients in *GemCap v. AIA Services*, as confirmed by my review of the filings and transcripts from that lawsuit.

6.      On February 21, 2020, I, along with Larry Hile and Patrick Moran, submitted reports and a disclosure, respectively. As noted above, I no longer need to rely on Mr. Hile's calculations, nor any of Mr. Moran's calculations, because Miesen has provided them in detailed spreadsheets. Unfortunately, the review of the recently provided scanned documents (which were provided by the vendor in 2020) continued, discovery continued and the critical depositions of the Rule 30(b)(6) designees for the AIA Corporations had not taken place, which prevented me from substantially completing my Report.

7.      On February 26-28, 2020, John Taylor was deposed in his individual capacity and as the Rule 30(b)(6) Designee for the AIA Corporations and CropUSA Entities. Although Miesen provided virtually all of his deposition exhibits to John Taylor days prior to the deposition, John Taylor did not review any of the documents and he admitted that he did nothing to prepare for the Rule 30(b)(6) depositions, contrary to the requirements of Fed. R. Civ. P. 30(b). As a result, Miesen moved to again depose John Taylor and the Rule 30(b)(6) deponents.[1209] John Taylor's failure to be prepared and provide the necessary testimony, particularly regarding the board decisions and shareholder meeting actions taken from January 1, 1999 through the present time, continued to delay my work on my completion of opinions that I was formulating and some of the new opinions that I would formulate in this Report.

8.      On March 6, 2020, Mr. Pinkerton submitted his rebuttal report. Despite discovery being ongoing and the additional information provided by Miesen (including his detailed spreadsheets on damages), Mr. Pinkerton has not submitted any further version of his reports.

---

[1208] 2/10-12/2020 Trial Transcripts; DLM – 093992-4017 (Defendants' Written Closing Argument). Mr. Glynn is well aware of these issues because he also serves as counsel for John Taylor and numerous other defendants in this Lawsuit wherein Miesen asserted AIA Services' Limited Guarantee of the GemCap Loan, the AIA Corporations' Amended Guarantee of the GemCap Loan, and the Settlement Agreement were unauthorized, illegal and unenforceable. *See generally* Dkt. 211.

[1209] Dkt. 914.

Exhibit - 1, p. 305

12-ER-2723

9.     On March 26, 2020, GemCap and California's Department of Business Oversight entered into a Consent Order wherein GemCap was fined $10,000 for failing to maintain the required minimum net worth and to provide other required information and fees.[1210] Based on the conduct of GemCap and its representatives that I have seen in this Lawsuit, I was not surprised to learn that GemCap has been violating lender regulations in California.

10.     Because, as stated elsewhere in this Section X, Riley had made substantive changes to his July 1, 2019 deposition testimony, he was ordered to appear for a second, seven-hour day of examination.[1211] As stated elsewhere in this Report, including Section XII, Riley's March 3, 2020 attempts to change his testimony and to recant his July1, 2019 admission that "in retrospect" John Taylor, Beck and Henderson were not independent directors of the AIA Corporations and in my opinion have no factual or legal support, particularly when the Idaho Code section that Riley had in his alleged research file was not the Idaho Code in existence in 2007 through 2009.[1212]

11.     On March 4, 2020, Ashby testified in this Lawsuit as a Rule 30(b)(6) Designee for Hawley Troxell on a number of matters discussed elsewhere in this Report. For example, in spite of the numerous hours he spent on this Lawsuit, Ashby could not remember who came up with the illegality defense, or why the Hawley Troxell Defendants didn't assert that defense at the commencement of this Lawsuit.[1213] He also couldn't recall why the Hawley Troxell Defendants were doing legal research regarding a possible statute of limitations defense for John Taylor in *Donna Taylor* v. *Taylor*.[1214] As stated in Section XII, in trying to justify the Hawley Troxell Defendants' moving to dismiss Reed Taylor's alter ego claims seeking to hold the Controlling AIA Defendants liable for the obligations of AIA Services, Ashby testified that he thought those claims were being asserted by Reed Taylor

---

[1210] DLM – 104335-43.

[1211] Dkt. 799.

[1212] The Idaho Code sections Riley relied upon were those ones adopted in 2015.

[1213] 3/4/2020 Ashby Rule 30(b)(6) Depo. Transcript, pp. 25-26.

[1214] *Id.* at 51, 53.

Exhibit - 1, p. 306

12-ER-2724

a*gainst* the AIA Corporations [1215] and that even Reed Taylor's breach of fiduciary claims were asserted against the AIA Corporations[1216] neither of which makes any sense. Also, Ashby didn't know why the Hawley Troxell Defendants set up the matter entitled Reed Taylor v. John Taylor, et. al. Moreover, he testified that the Hawley Troxell Defendants did not prepare a report on any investigation of the conduct of the Controlling AIA Defendants.[1217] Other portions of Ashby's testimony are discussed in Section XII of this Report.

12.     On March 5, 2020, Riley testified in this Lawsuit as a Hawley Troxell Rule 30(b)(6) Designee and provided further unconvincing and disjointed testimony, including that concerning his attempt to recant his July 1, 2019 admission that Beck and Henderson were not independent directors and the Hawley Troxell Defendants' failure to condition their representation of the AIA Corporations on notice of the Standstill and Tolling Agreements being provided to the AIA Disinterested Shareholders as well as other maters which are discussed in Section XII of this Report.

13.     On May 27, 2020, Reed Taylor wrote to the purported registered agent of the AIA Corporations (John Taylor) demanding indemnification under the AIA Corporations' Bylaws for litigation costs incurred through being named as a third-party defendant in this Lawsuit.[1218] Since Reed Taylor was named as a third-party defendant by the Controlling AIA Defendants and to the extent that Reed Taylor prevails on a request for indemnification, the Controlling AIA Defendants should be responsible for paying those fees and costs because they have failed to properly operate the AIA Corporations in accordance with proper corporate governance procedures and they are the cause of Reed Taylor being named as a third-party defendant in this Lawsuit.

14.     On July 1, 2020, Beck's deposition was taken in this Lawsuit. Overall, Beck displayed the same cavalier approach to his testimony as he did with respect

---

[1215] *Id.* at 64-67. That testimony is not supported by the information contained in the pleadings and court filings. Even Riley understood at the time that John Taylor was exposed to personal liability for certain obligations of AIA Services. In his March 27,2007 Memorandum to Mike McNichols, Riley stated: "Further, if Reed prevails on his allegations that [AIA] Services has defaulted on the note, joint representation by a single lawyer increases exposure to 'piercing the veil' or 'alter ego' claims that John's limited liability as a shareholder should be ignored, even if Reed's breach of fiduciary duty/ self-dealing claims are meritless." HTEH000286.
[1216] *Id.* at 127-28.
[1217] *Id.* at 230-31.
[1218] REED 002422-23.

to his duties as a director of the AIA Corporations. For example, Beck answered: "I don't recall" approximately 86 times, "I can't recall" 5 times, "I don't remember" 43 times, "I can't remember" 17 times, and "I have no recollection" 195 times. Beck testified that he did not have an understanding of a director's duties of care or good faith.[1219] Nor did he know where any of the $20 million that Crop USA borrowed went.[1220]

15.     On July 1, 2020, in *GemCap v. AIA Services*, Judge Brudie entered his Findings of Fact and Conclusions of Law for the bench trial held on February 10-12, 2020.[1221] I have reviewed the transcripts from that trial and the post-trial briefing of the parties. While CropUSA was not a subsidiary of AIA Services or AIA Insurance at the time in question, it was notable that Judge Brudie believed CropUSA was a "subsidiary of AIA which specialized in crop insurance."[1222] Judge also noted how the two transfers of interests in the property from AIA Services to the AIA Services' 401(k) Plan were "entities…controlled exclusively by [John] Taylor and the [purported] authorization for the transfers came from [John] Taylor alone."[1223] Judge Brudie also found that "[w]hile it does appear that adequate consideration was paid for the transfers, the time, [John] Taylor's less than prompt disclosures and recording of the transfers, along with the fact these transfers were accomplished at the whim of [John] Taylor and only [John] Taylor provides an inferred of fraud."[1224] Ultimately, Judge Brudie ruled that "both transfers to be unlawful pursuant to I.C. § 55-913(1)(a)."[1225] While in my opinion GemCap should not receive any of the proceeds from the sale of the AIA Corporations' properties, Judge Brudie's overall findings are not inconsistent with my analysis regarding John Taylor—he is incapable of ever making full and fair disclosure for, or obtaining proper approval for, any transaction involving the AIA Corporations.

16.     On July 2, 2020, because, as stated above, John Taylor's answers at his February 2020 deposition as the Rule 30(b)(6) Designee for the AIA Corporations and CropUSA Entities were evasive and incomplete, the Discovery Master and Judge Dale ordered[1226] that he reappear for a second one. As discussed in a number

---

[1219] 7/1/2020 Beck Depo. Transcript, p. 29.

[1220] *Id.* at 95.

[1221] DLM – 105915-26.

[1222] DLM – 105916.

[1223] DLM – 105923.

[1224] DLM – 105924-25.

[1225] DLM – 105925.

[1226] Dkt. 995.

Exhibit - 1, p. 308

12-ER-2726

of Sections of this Report, his testimony was a text-book example of corporate malfeasance and utter disregard for the AIA Corporations, AIA Services' Disinterested Shareholders, and the rule of law. John Taylor's failure to be prepared or answer questions with the appropriate detail and disclosure confirm my independent review of the documents and records produced in discovery in this Lawsuit—I have been forced to "go fishing" for virtually any document that I am looking for to address matters in this Report.

17.     On July 15, 2020, in *GemCap v. AIA Services*, GemCap filed a Motion and Memorandum of Costs requesting $434,323.50 in attorneys' fees and paralegal fees, plus $32,048.99 in costs against AIA Services, AIA Services' 401(k) Plan and John Taylor.[1227] To the extent that any fees or costs are awarded against AIA Services, such fees and/or costs are damages Miesen is claiming because AIA Services should have never been involved in any litigation or obligations to GemCap for the reasons stated in this Report (*See* Damage Item Number 36 in Exhibit A attached hereto). While Messrs. Glynn and Martelle filed an Objection opposing the award of fees and costs,[1228] as of the date of this Report, Judge Brudie has not entered a ruling. I will supplement this Report at such time as Judge Brudie rules.

18.     On July 28-31, 2020, John Taylor was deposed again as the Rule 30(b)(6) Deponents for the AIA corporations and CropUSA Entities. At that deposition, John Taylor testified, *inter alia*, that the only decisions made by the board of directors for the AIA Corporations and their shareholders are reflected in the written meeting minutes and resolutions produced in discovery.[1229] Consequently, the limited decisions made by the purported unelected boards of directors for the AIA Corporations are contained within the limited meeting minutes and resolutions produced in discovery.[1230] As a result, John Taylor's July 2020 testimony that all board decisions (alleged) for the AIA Corporations were limited to the decisions reflected in the written meeting minutes and resolutions produced in discovery established that the purported boards of the AIA Corporations were not properly functioning in accordance with their duties of good faith and loyalty, and

---

[1227] DLM – 105996-6212.

[1228] DLM – 106213-30.

[1229] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 48-52, 435-41.

[1230] Consistent with John Taylor's testimony (surprisingly), John Taylor, Henderson, Beck and Cashman provided no information in response to Miesen's interrogatories requesting them to provide detailed information regarding any oral board decisions, which is because there were none.

Exhibit - 1, p. 309

12-ER-2727

that there were few purported board decisions at all (indeed, for example, there were no purported board decision for AIA Services in 2001, 2003, 2004, 2005, 2015, 2017 or thereafter). John Taylor also testified that he does not hold annual shareholder meeting, in violation of the AIA Corporations' bylaws and Idaho law, because of the ongoing litigation, which, contrary to his assertion, is no defense for failing to comply with the bylaws and law and the ongoing litigation was a significant reason why it was necessary to hold annual shareholder meetings and to hold more special shareholder meetings. Again, John Taylor's testimony was a text-book example of corporate malfeasance and utter disregard for the AIA Corporations, AIA Services' Disinterested Shareholders, and the rule of law. Frankly, it is unbelievable that John Taylor, an attorney, accountant and member of the board of the publicly traded Avista Corporation, would flagrantly and intentionally engage in the behavior discussed in this Report—let alone that the Hawley Troxell Defendants, the other Controlling AIA Defendants and/or GemCap would substantially assist John Taylor in engaging in the behavior discussed in this Report and by assisting him in concealing and covering up the behavior.

19.    John Taylor's recent Rule 30(b)(6) deposition also revealed another example of the inaccuracy of John Taylor's past testimony and the "legal absurdity"[1231] of the arguments that he had alleged for years regarding the subordination agreement between Reed and Donna Taylor dated effective December 1, 2006.[1232] While the issue the Controlling AIA Defendants and Hawley Troxell Defendants arguments regarding the December 1, 2006 subordination agreement between Reed and Donna Taylor has no significant relevance to this Lawsuit other than the defendants' efforts to interject the issue into the case (which makes no legal sense), John Taylor finally conceded that the subordination agreement, which he had falsely testified was kept secret for "years" and testified it

---

[1231] When Judge Brudie denied the motion for reconsideration of the default of Reed Taylor's $6M Note in *Reed Taylor v. AIA Services* (another example of the many wasteful motions brought by the Hawley Troxell Defendants), Judge Brudie ruled that "[u]nder the theory asserted by [AIA Services], AIA could prevent Reed Taylor from ever having a legal remedy for non-payment of the $6 million Note by leaving as little as one cent unpaid on the debt owed to Donna Taylor. Such an interpretation would result in a legal absurdity." DLM – 0011512 (footnote omitted). I quoted "legal absurdity" from Judge Brudie's opinion. As noted above, Judge Brudie also subsequently stated years later that he could not trust any document generated by AIA. I agree with Judge Brudie on that issue as well.

[1232] RJT 0000747-49. Because Reed Taylor's Stock Redemption Agreement was illegal and unenforceable the moment it was signed on July 22, 1995, the 2006 subordination agreement was also illegal and unenforceable the motion it was signed because it was tainted with, and tied to, the illegal redemption obligations owed to Reed Taylor.

Exhibit - 1, p. 310

12-ER-2728

was possible that Riley came up with the idea, was not so secret after all (contrary to numerous sworn deposition and affidavit testimony that the subordination agreement was "clandestine" or "secret" after Attorney Bond showed him Reed Taylor's affidavit filing a copy of the subordination agreement days after it was signed in 2007 (it was back-dated effective December 1, 2006).[1233] This issue, like many others (e.g., not holding annual shareholder meeting because of the pending litigation, not seeking approval from Donna Taylor before violating provisions in AIA Services' Amended Articles of Incorporation, etc., under the guidance of the Hawley Troxell Defendants, demonstrates the ludicrous unfounded positions taken by John Taylor. It is also separately notably that AIA Services never complied with the subordination agreement because it continued paying Reed and Donna until mid-2008 when it stopped paying them both—the arguments regarding that agreement are ridiculous.

20.     On August 27-28, 2020, GemCap's Rule 30(b)(6) Deponent (Richard Ellis) was deposed. At that deposition, Mr. Ellis testified, *inter alia*, that GemCap did not review any of the documents that it obtained in the litigation search conducted before entry into AIA Services' Limited Guarantee of the GemCap Loan (including Reed Taylor's Fifth Amended Complaint and Donna Taylor's First Amended Complaint in this Lawsuit—both of which alleged unlawful loan guarantees in violation of AIA Services' Amended Articles of Incorporation) and that GemCap essentially conducted no due diligence on any matters other than issues regarding the collateral.[1234] It is not believable that neither GemCap, nor any of its attorneys Adam Stein or Robert Boghosian, reviewed fundamental documents such as the complaints mentioned above and the AIA Corporations' articles of incorporation and bylaws—any one of which readily revealed that AIA Services' Limited Guarantee of the GemCap Loan and the subsequent AIA Corporations' Amended Guarantees of the GemCap loan were unauthorized, improper and/or illegal, and that GemCap would be substantially assisting the Controlling AIA Defendants in breaching their duties of loyalty owed to the AIA Corporations by entering into those guarantees. Mr. Ellis had no viable explanation why GemCap entered into the Settlement Agreement with the AIA Corporations when it knew that the Settlement Agreement was not authorized and that Miesen, Durant and Donna Taylor had filed suit months earlier to prevent such an agreement (the complaint and the motion for summary judgment filed by them provided a simple road map for some of the reasons the Settlement Agreement was unauthorized). Mr.

---

[1233] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 784-89, 972-80.

[1234] *See generally* 8/27-28/2020 Richard Ellis Rule 30(b)(6) Depo. Transcript.

Ellis admitted that he was aware that the directors and officers of the AIA Corporations owed fiduciary duties.

21.     On August 31, 2020, GemCap entered into an Amended Consent Order with the California Commissioner of Business Oversight.[1235] In that Order, the Commissioner accepted GemCap's voluntary surrender of its "CFL license to the Department on August 14, 2020."[1236] Based on the information contained in the Amended Consent Order and the original Consent Order dated March 25, 2020,[1237] GemCap had failed to comply with a number of licensing requirements, including, failing to maintain the required minimum net worth and failing to provide the fees, forms, fingerprints and other information required for David Ellis and Brook Bulger Taube, which also resulted in a fine of $10,000 being assessed against GemCap, among other things. This confirms that GemCap's unlawful activities have also involved other matters such as lender regulations in California (in addition to the unlawful conduct involving the AIA Corporations as stated in this Report). Notably, although GemCap surrendered its license to lend money, to this day, GemCap's website represents that it is still in business and that "*All Loans made or arranged pursuant to a California Finance Lenders Law License*,"[1238] when GemCap has no valid California Finance Lender License.[1239] GemCap, like John Taylor, has a serious problem accurately representing facts. However, GemCap's website was modified to reflect that Richard Ellis and David Ellis are the sole remaining employees of GemCap.[1240]

22.     On September 10, 2020, Henderson, who is an attorney licensed to practice law in Idaho (like John Taylor), was deposed. At that deposition, Henderson testified, *inter alia*, that she did not review the restrictive covenants under AIA Services' Amended Articles of Incorporation prior to signing the resolution for AIA Services' Limited Guarantee of the GemCap Loan; she had no knowledge that the AIA Corporations' Amended Guarantee of the GemCap Loan included a guarantee of the full $10 million line-of-credit and that John Taylor never advises her of those facts; that she allegedly relied on Jim Gatziolis' advice in connection with signing the two board resolutions for guarantees to GemCap when she never personally spoke to Jim Gatziolis; AIA Services held one annual

---

[1235] DLM – 106303-11.

[1236] DLM – 106306-07.

[1237] DLM – 104335-43.

[1238] http://www.gemcapsolutions.com/loans (Emphasis in original); DLM – 107450.

[1239] https://docqnet.dfpi.ca.gov/LicenseSearch/LicenseDetails/; DLM – 107449.

[1240] http://www.gemcapsolutions.com/contact-us; DLM – 107422.

shareholder meeting during her over six years of purported service on the boards of the AIA Corporations (despite the bylaws requiring annual meetings); she didn't know whether she ever reviewed the bylaws in connection with any specific board decision; she never suggested that an independent trustee be appointed for the 401(k) Plan; she never objected to over $2 million in loans to PERC when the dividends had not been declared and paid on the Series C Preferred Shares in the 401(k) Plan; none of the four PERC promissory notes were authorized by her (although she was aware of the loans); and there were no discussions at any board meetings regarding the conflicts of interest associated with her and John being part owners of PERC, which was the recipient of loans from the AIA Corporations.[1241] In essence, a review of Henderson's testimony confirms that she did nothing to properly discharge her duties of care, good faith and loyalty owed to the AIA Corporations and their shareholders during her tenure on the boards of the AIA Corporations.

23.   On September 17, 2020, Miesen supplemented discovery and provided additional information regarding his claims and damages.[1242] The Exhibit A damages spreadsheets attached to Mr. Miesen's formal amended answers to the defendants' discovery requests were substantially the same as previously provided versions of those spreadsheets, which were provided to defense counsel and me (i.e., it was, for the most part, consistent with prior versions). As stated in this Report, none of the transactions and monetary payments set forth in Miesen's forty Items of Damages were ever properly disclosed to or approved by the AIA Corporations' alleged directors or shareholders. As to Miesen's Damage Item Number 38, which lists the AIA Corporations' revenues from 1999 through 2018 (the 2019 information was not provided to Miesen), Miesen is claiming that the burden is on the Controlling AIA Defendants to provide an accurate accounting for all expenditures and prove that the particular transactions were lawful payments, each payment was fair based on the conflicts of interest discussed in this Report, each payment was fair because there was never any independent approvals of any payments (fairness includes the many unsupported allocations of expenses among the AIA Corporations and CropUSA, PERC or other entities and the many unallocated expenses), and whether any of the payments or transactions were approved or authorized involving the particular entities and persons (including

---

[1241] 9/10/2020 Connie Henderson Depo. Transcript, pp. 98-99, 135, 137-38, 174, 178-80, 211-13, 230, 280, 325.
[1242] *See, e.g.,* Miesen's Fourth Amended Objections, Answers and Responses to the Hawley Troxell Defendants' First Set of Interrogatories and Second Set of Requests for Production dated September 17, 2020 (together the Exhibit A attached thereto).

Exhibit - 1, p. 313

12-ER-2731

payments of compensation, advances for the payments of fees and costs and other payments). By way of another example, among the thousands of pages of documents that I have reviewed is a so-called "CropUSA Intercompany Analysis" for 2004 (the same year that the over $1.5 million payment was received from Trustmark).[1243] That Analysis shows that checks issued by CropUSA to other parties, including CropUSA itself, were accounted for as if the payments were made to the AIA Corporations, which is consistent with Mr. Hile's Report where he stated that it is impossible to determine where the money went. While Miesen provided a total of each year's revenues (he has not included 2019's revenues because the information has not been provided), he is not claiming $39,577,697 in damages for the years 1999 through 2018. He is merely asserting that the burden is on the Controlling AIA Defendants, along with the Hawley Troxell Defendants and GemCap where applicable, to provide an accounting and prove that the transactions were appropriate and fair. To the extent that no proper accounting and proof that the transactions and payments were fair, those items are damages. Miesen also correctly points out that he is not seeking duplicative damages. For example, if Miesen prevailed on his damage claim in Damage Item Number 3 for the improper 2004 purchase of Series C Shares for $1,510,693 from CropUSA, then the $1,510,693 would be deducted from the $39,577,697 in damages Miesen is seeking in Damage Item Number 38. Likewise, if the "entry [recorded] to show cash moving from Crop USA to AIA for $674,269.14" was fictitious and the money was never moved to AIA as the former CFO McNabb has inquired with John Taylor about[1244] as supported by the records I have reviewed, the $674,269.14 would be additional damages on top of the $1,510,693 as discussed below. Lastly, what makes matters worse is that the Hawley Troxell Defendants either chose not to look at the records that I have reviewed thereby breaching their duties of care or they intentionally chose not to do so in the interest of protecting the Controlling AIA Defendants thereby breaching their duties of loyalty owed to the AIA Corporations. Accordingly, I completely understand Miesen's theories for Damage Item Number 38.

24.     On September 18, 2020, Miesen was deposed. While Mr. Miesen was understandably confused over certain complex legal issues such as whether certain claims were direct or derivative in various complaints, Miesen's testimony did not

---

[1243] AIA0022662-64.

[1244] As I discussed in Section X(F) above, McNabb stated in an email to John Taylor (to which John Taylor never squarely addressed) "I also noticed that we recorded an entry to show case moving from Crop USA to AIA for $674,269.14. Did you plan on physically moving this money from American West Bank, or did you have something else in mind?" AIAPROD00135785

undermine or contradict any of my analysis or opinions in this Report.[1245] Admittedly, I was surprised as to the number of questions involving Miesen's acquisition of his common shares in AIA Services over two decades ago.

25.     On October 8, 2020, Mr. Hile delivered his revised report.[1246] Mr. Hile's report contained a clever chart showing some of the conflicts of interest. With permission from Mr. Hile, I have taken his chart and modified it to include some entities that he had not included in the chart. I am relying on the chart for my opinions and it is attached hereto as Exhibit C. Upon my review of Mr. Hile's opinions, his observations and opinions are consistent with my own, especially as to the lack of proper corporate governance concerning the many related-party transactions, which constitute conflicts of interest in my analysis and opinions.

26.     On October 23, 2020, John Taylor submitted a change sheet that materially changed his answers regarding when interest stopped accruing on the PERC loans (he now claims it was December 31, 2012 instead of November 20, 2011) and he also changed his answers as to dates that he allegedly spoke with representatives from GemCap. With respect to the former, the best evidence remains the unpaid four promissory notes discussed above, and the subsequent known advances made after the dates of the four promissory notes.[1247]

27.     As of the date of this Report, there have been no annual or special shareholder meetings held for AIA Services in 2020 to properly elect directors or authorize any transactions (despite the numerous shareholders' demands and allegations made in various lawsuits). In addition, Donna Taylor's designee, Durant, was not seated to the board of AIA Services as required. Therefore, none of the transactions or corporate decisions at issue in this Lawsuit (including litigation decisions) involving the AIA Corporations have been properly disclosed and approved or authorized through the date of this Report.

28.     From 1999 through the present time, neither the Controlling AIA Defendants nor the Hawley Troxell Defendants have taken any action to correct the unauthorized and concealed financial misconduct committed against the AIA Corporations (including the failure to disclose the transactions and malfeasance involving CropUSA and the other acts and/or omissions by the Controlling AIA Defendants and/or any entities with respect to which they have an ownership

---

[1245] *See generally* 9/18/2020 Dale Miesen Depo. Transcript.
[1246] DLM – 107813-8057.
[1247] *See* Damage Item Number 13 in Exhibit A attached hereto.

interest or control as stated in this Report). The failure to comply with the bedrock principles of making full and fair disclosure of all material facts and transactions to AIA Services' shareholders, to lawfully operate the AIA Corporations, and to permit AIA Services' shareholders to inspect the records of the AIA Corporations subjects the Controlling AIA Defendants and any other guilty party to civil liability and constitutes crimes under Idaho law.[1248]

29.     I am advised that there are also a number of ongoing and unresolved discovery disputes that will be addressed by Miesen in a future motion for contempt. If I obtain information from the foregoing, I will be, to the extent necessary, supplementing this Report as to my primary opinions and my rebuttal opinions.

30.     As of the date of this Report, Messrs. Lidstone, Remele and Pinkerton have not supplemented their Reports since they were produced on October 18, 2019. If they do, I will supplement my Report to address any matters raised or addressed by them to the extent that I deem it necessary.

31.     As a final matter, the scope of my work was not limited based on prior work serving as an expert witness for Reed Taylor. While I saw no conflict of interest serving as Miesen's expert in this Lawsuit based on my prior work for Roderick Bond Law Office, PLLC in *Reed Taylor v. Riley* and *Reed Taylor v. Bell* because I had found no evidence that Reed Taylor had consented to, or was involved in, any plan to improperly make CropUSA an independent company without obtaining all necessary approvals (including his approval as a secured

---

[1248] *E.g.*, I.C. § 18-1904 ("Every director of any stock corporation who concurs in any vote or act of the directors of such corporation …"); I.C. § 18-1905 ("Every director, officer or agent of any corporation or joint stock association who knowingly receives or possesses himself of any property of such corporation or association otherwise than in payment of a just demand, and who, with intent to defraud, omits to make, or to cause or direct to be made, a full and true entry thereof in the books or accounts of such corporation or association…"); I.C. § 18-1906 ("Every director, officer or agent of any corporation or joint stock association who knowingly concurs in making or publishing any written report, exhibit or statement of its affairs or pecuniary condition, containing any material statement which is false, is guilty of a misdemeanor."); I.C. § 18-1907 ("Every officer or agent of any corporation having or keeping an office within this state who has in his custody or control any book, paper or document of such corporation and who refuses to give to a stockholder or member of such corporation, lawfully demanding, during office hours, to inspect or take a copy of the same, or any part thereof, a reasonable opportunity so to do, is guilty of a misdemeanor.").

creditor at that time),[1249] I requested and obtained Reed Taylor's consent, through his counsel Attorney Bissell, to act as Miesen's expert witness in this Lawsuit prior to commencing work on my first Report. I was instructed to formulate my opinions by independently calling "balls and strikes." Consistent with my work and opinions in *Reed Taylor v. Bell* and *Reed Taylor v. Riley*, I was presented with no credible evidence that Reed Taylor approved of making CropUSA a separate entity without any ownership by the AIA Corporations or any of the many related transactions (including the 2004 Series C Preferred Share purchase from CropUSA).[1250] I note that no credible or admissible evidence or information of wrongdoing on the part of Reed Taylor was provided in response to Miesen's interrogatories and requests for production propounded upon the Controlling AIA Defendants. Rather, in my opinion, Reed Taylor was lied to and strung along for reasons separate and apart from Miesen and other AIA Services' Disinterested Shareholders (Reed Taylor was a secured creditor and not a shareholder of AIA Services). I find it unbelievable that Reed Taylor would consent to CropUSA being an independent company without him or the AIA Corporations owning at least the majority of CropUSA when AIA Services did not make its final payment on Reed Taylor's $1.5 million Down Payment Promissory Note until mid-2001 and his $6 million Promissory Note remained unpaid. Moreover, Reed Taylor was never paid any compensation for any work that he performed for CropUSA and he was never issued any common shares in connection with his role on any advisory board for CropUSA (other advisory board members were issued shares of common stock as compensation for their participation on the advisory board). Therefore I have not included any opinions as to Reed Taylor.[1251] I am not providing this information to assist Reed Taylor; instead, I am providing this information to explain why I did not include Reed Taylor in my opinions as to the Controlling AIA Defendants. If any further information becomes available, I will supplement my analysis and opinions in this

---

[1249] John Taylor and Reed Taylor have both testified that Reed Taylor would never agree to the proposed terms to make CropUSA an independent company. Reed Taylor testified that he continued to assist CropUSA with the belief that its success would assist AIA Services' in paying his redemption obligations and to make AIA Services successful for other stakeholders, and that he would have never agreed to make CropUSA independent from the AIA Corporations without shareholder approval.

[1250] For example, John Taylor testified that he hid the $1.5 million payment from Trustmark from Reed Taylor. *See* Section X(F).

[1251] While I note that Reed Taylor was the majority shareholder of AIA Services at the time of his redemption in 1995 and that the transaction was illegal, Reed Taylor was entitled to keep the payments that he did receive for his redemption when Judge Brudie and the Idaho Supreme Court left him where they found him.

**Exhibit - 1, p. 317**

**12-ER-2735**

regard. I have not spoken with Reed Taylor, Mike Bissell or any other attorney for Reed Taylor in connection with my opinions in this Report.[1252]

32.     Since being named as defendants in this Lawsuit (some were named as defendants at different times), the Controlling AIA Defendants have consistently used the same attorneys and law firms to provide their representation in this Lawsuit. While it appears to me that Cashman was more clever than the other defendants in that he appeared to keep his written communications and emails to a minimum, Cashman has maintained his membership in the Controlling AIA Defendants group and continues to be represented by the same attorney, now Mr. Glynn. Moreover, like the other Controlling AIA Defendants, Cashman has never taken any action to make disclosures to AIA Services' shareholders or take any other action to stop the conduct. These facts confirm to me his involvement in many of the acts and omissions stated in this Report and his culpability.

33.     Upon my review of the documents, deposition transcripts and other evidence, I have not seen any credible efforts by the Controlling AIA Defendants, or Hawley Troxell Defendants, to properly review and ensure compliance with AIA Services' Amended Articles of Incorporation or the AIA Corporations' bylaws,[1253] rather than substantially assist the Controlling AIA Defendants in improperly having their fees and costs advanced, the Hawley Troxell Defendants should have rendered an opinion that fees and costs should not have been advanced if they were not going to refer that issue to independent counsel. Indeed, the AIA Corporations' bylaws required annual shareholder meetings and even these fundamental corporate governance procedures were not followed. These actions alone constitute the Controlling AIA Defendants and Hawley Troxell Defendants breach of their duties of care, good faith, and loyalty owed to the AIA Corporations and their shareholders, and further constitutes the substantial assistance of one another in breaching the other's duties of care, good faith and loyalty owed to the AIA Corporations and their shareholders. Moreover, the Controlling AIA Defendants

---

[1252] It should be pointed out that Reed Taylor and Donna Taylor's actions years ago are what led to the disclosure of the malfeasance to AIA Services' shareholders, including Miesen.

[1253] The Controlling AIA Defendants and Hawley Troxell Defendants were involved, whether before or after the vote, in the improper effort to obtain shareholder consent to advance attorneys' fees and costs for John Taylor, Freeman and Duclos in *Reed Taylor v. AIA Services*, which was ineffective because the proxy statement was misleading, and the August 2008 improper approval by Beck and Henderson of the advancement of fees and costs for John Taylor in *Donna Taylor v. Taylor*, when any independent director or attorney would have never approved such advances and would have instead opined that no fees or costs should be advanced for any of the Controlling AIA Defendants or the entities that are partially or wholly owned by any of them.

**Exhibit - 1, p. 318**

**12-ER-2736**

sought to enforce AIA Services' Amended Articles of Incorporation with respect to the interest rate paid to Donna Taylor for the redemption of her shares,[1254] but they failed to review and properly comply with the amended articles of incorporation for any other transactions, guarantees or other matters since they obtained Donna Taylor's consent in 1996 to restructure Reed Taylor's obligations.[1255] The flagrant and intentional failures by the Controlling AIA Defendants to refuse to comply with the AIA Corporations' articles of incorporation and bylaws has been outrageous and oppressive, and pursued solely for their own interests.

34.     I have reviewed various documents, Idaho code, regulations and statutes regarding property and casualty licensing, crop insurance, and related matters, including, without limitation, information on Standard Reinsurance Agreements (SRA), Managing General Agency or Managing General Agent (MGA), the Risk Management Agency (RMA), and various records for CropUSA, the AIA Corporations and other entities.

35.     Before addressing my additional opinions in Sections XI-XIII below, I wanted to point out that my work on this Report has been very difficult because discovery has progressed slowly over time, the documents produced by the defendants were not in an orderly fashion when they control the various records, and the answers provided by the Controlling AIA Defendants and AIA Corporations in discovery are inadequate and appear to be intentionally geared to "hiding the ball." For example, as stated above, it was not until July 2020 that I obtained confirmation that the only decisions for the alleged board of directors of the AIA Corporations were the decisions reflected in written meeting minutes and resolutions produced in discovery in the various lawsuits. However, the AIA Corporations' alleged board meeting minutes and alleged board resolutions[1256] have never been produced in an organized and complete manner. Instead, I have spent countless hours searching hundreds of thousands of pages of documents to attempt to locate all of the applicable alleged board meeting minutes and alleged board resolutions when these documents could have been easily produced in an orderly and organized fashion.

---

[1254] *E.g.*, DLM – 0042048-95.
[1255] DLM – 0003474-75.
[1256] Unanimous written board consents are the same as unanimous written board resolutions. Consent is simply a different label for a resolution and *vice versa.*

Exhibit - 1, p. 319

12-ER-2737

## V.  The AIA Corporations Have No Knowledge About What Has Transpired and No Knowledge or Facts May Be Imputed Upon Them Under the Adverse Interest Exception.

1.  Based on the intentional tortious conduct of the Controlling AIA Defendants in their operation of the AIA Corporations from 1999 through the present time (as described in part in this Report), the Controlling AIA Defendants had interests adverse to the AIA Corporations thereby resulting in none of their knowledge being imputed to the AIA Corporations, and thus those corporations have no knowledge of any of the acts, conduct, litigation decisions, conflict waivers, contracts or other corporate governance matters at issue in this Lawsuit.[1257] This applies to all of the transactions, financial or other support (e.g., personnel or office space), loans, use of trade secrets, advances or any other arrangements between the AIA Corporations and any entity partially owned or controlled by John Taylor, which includes, without limitation, CropUSA, CropUSA Insurance Services, Pacific Empire Radio, Pacific Empire Holdings, Sound Insurance, Green Leaf Alliance, Reinsurance Partners, Weskan, 17 State Street Partners and the other entities listed in the attached Exhibit C hereto; such actions were never authorized and knowledge thereof cannot be imputed to the AIA Corporations. The lack of knowledge of the AIA Corporations included during all periods of time in which the Hawley Troxell Defendants have purported to represent the AIA Corporations (or either of them).

2.  As stated above, the substantial factor test applies to Miesen's claims and my opinions. As to my opinions in this Report, including the ones for each of the three categories of defendants below, and based on the facts and circumstances stated in this Report, there is no one defendant who is the exclusive cause of the transactions and harm listed in Miesen's forty categories of damages because certain defendant(s) were either directly involved in the acts and/or omissions causing the harm to the AIA Corporations or the other defendants substantially

---

[1257] *E.g., In re Bill Johnson's Restaurants, Inc.*, 255 F.Supp.3d 927, 934 (D. Ariz. 2017) ("If the shareholders, at the time the dividend transactions, 'were acting in a manner adverse to the interests of the corporation, the so-called 'adverse interest exception' applies, with the result that the actions of the agents are not imputed to the corporation.'"); *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 771-772 (4th Cir. 1995) ("[T]he adverse interest exception permits a principal to avoid imputation when the agent's interests are sufficiently adverse to the principal's interests."); *Ray v. Karris*, 780 F.2d 636, 642 (7th Cir. 1985) ("Generally the 'knowledge' of the corporate entity will turn on whether a disinterested majority of the shareholders or directors, depending on the state law requirements for the particular transaction, ratified the securities transference after full disclosure.").

assisted in carrying out the transaction or harm or by covering up and/or concealing the transaction or harm at some point in time or by separately causing the transaction or harm. It is by no accident that the defendants are all aligned against Miesen and the other AIA Disinterested Shareholders in this Lawsuit.

## XI.   ADDITIONAL OPINIONS PRIMARILY ON THE CONTROLLING AIA DEFENDANTS, BUT NOT LIMITED TO THEM

Based upon my education, training, knowledge, and experience, together with the authorities, facts, documents, and data that I have reviewed, considered, assumed, relied upon, and disclosed in this Report (including the exhibits described in Section II and attached hereto), I hereby express the opinions in Sections I, II and X of this Report (which I incorporate by reference herein), the opinions in Sections XII and XIII (which I incorporate by reference herein to the extent that those opinions are applicable), the opinions previously filed in my declarations with this Court, and the following opinions as to the Controlling AIA Defendants:

I opine, *inter alia*, that: (a) the Controlling AIA Defendants, including John Taylor through his elevated duties acting as directors and officers, have intentionally breached their fiduciary duties of good faith and loyalty and acted in bad faith as to all of the transactions and compensation at issue in this Lawsuit, thereby being one of the proximate causes of the damages requested by Miesen; (b) the Controlling AIA Defendants have intentionally engaged in long-term course of conduct of placing their interests above the interests of the AIA Corporations and AIA Services' Disinterested Shareholders and have concealed facts and transactions for many years thereby being one of the proximate causes of the damages requested by Miesen; (c) the Controlling AIA Defendants have acted in bad faith and intentionally breached their duties of loyalty owed to the AIA Corporations and AIA Services' Disinterested Shareholders by intentionally refusing to comply with fundamental corporate governance procedures,[1258] including, *inter alia*, by intentionally engaging in ultra vires and unauthorized acts, failing to hold annual shareholder meetings, failing to make proper disclosures to shareholders, failing to honor Donna Taylor's board designee to be appointed to the board of AIA Services,

---

[1258] John Taylor testified that while Beck and Henderson were directors AIA Services held "one or two" board meetings a year and "Almost all of them dealing with legal issues," and "As CEO of the Company, I would make all business decisions for the companies." 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 359. Instead of reviewing the Bylaws to determine whether board approval was needed, he "operated consistently with the – the operations for the last 20 years since the 1990s." *Id*. at 359-60.

and failing to have a disinterested director make decisions or have the shareholders vote for the decision, thereby being one of the proximate causes of the damages requested by Miesen; (d) to the extent that any of the Controlling AIA Defendants did not owe fiduciary duties to the AIA Corporations and AIA Services' Disinterested Shareholders or the breached fiduciary duties involve those of other Controlling AIA Defendants, those individuals substantially assisted the other Controlling AIA Defendants in breaching their duties of loyalty and acting in bad faith thereby being one of the proximate causes the damages requested by Miesen; (e) the Controlling AIA Defendants were faithless fiduciaries and should be required to disgorge all compensation (including the $3,043,705.45 in W-2 compensation and 1099 income paid to John Taylor since 1999); (f) John Taylor's and Connie Taylor's conduct and intentional breaches of their duties of good faith and loyalty owed to the AIA Corporations are even more egregious since they were both attorneys licensed to practice law in Idaho during all relevant times (which separately prevents them from relying on the advice of others as to any legal issues); (g) the Controlling AIA Defendants are not entitled to protection under any of the exculpatory provisions under the AIA Corporations' amended articles of incorporation because they acted in bad faith and intentionally breached their duties of loyalty owed to the AIA Corporations and AIA Services' Disinterested Shareholders; (h) the Controlling AIA Defendants were not entitled to rely on any of the Legal Opinions provided for the GemCap Loan or the Lancelot Loan because they were not addressees of such Legal Opinions nor were they permitted to rely upon such Legal Opinions; (i) based on the adverse interest exception, the AIA Corporations still have not discovered the facts and none of the knowledge of the Controlling AIA Defendants may be imputed upon the AIA Corporations (this applies to the Hawley Troxell Defendants as well); and (j) after considering the evidence and the long-term course of intentional conduct (including while lawsuits were pending), the Controlling AIA Defendants' conduct towards the AIA Corporations and AIA Services' Disinterested Shareholders was oppressive, fraudulent (they intentionally concealed facts from, and failed to make necessary disclosures to, disinterested constituents and AIA Services' Disinterested Shareholders), malicious and/or outrageous for the reasons stated in this Report.

In addition, I also render the following opinions:

Exhibit - 1, p. 322

12-ER-2740

**A.** **The Fiduciary Duties Owed by The Controlling AIA Defendants as Directors, Officers and Controlling Shareholders of the AIA Corporations, Their Countless Breaches Thereof, Their Mockery of Corporate Governance and the Wide-Spread Corporate Malfeasance.**

1.      Having established in Section X of this Report that the Controlling AIA Defendants owed fiduciary duties for acting as directors, officers and controlling shareholders of the AIA Corporations, the breaches of the duties of care (e.g., act in bad faith), loyalty[1259] and good faith by the Controlling AIA Defendants have been flagrant and repetitive over the course of many years and have been one of the causes of decimating the AIA Corporations inflicting the forty Damage Items Numbers in the attached Exhibit A hereto. However, the specific roles and duties owed vary among the Controlling AIA Defendants. I will recap below the role and time span of the duties owed by each member of the Controlling AIA Defendants in turn; however, it should be noted that, even to this day, the Controlling AIA Defendants (except for Duclos, who died) remain in the same control group, are represented by the same attorney, and have refused to make full and fair disclosure, let alone any, or take any action to stop John Taylor. Instead, they, like the Hawley Troxell Defendants, have enabled and acquiesced in John Taylor's improper and unauthorized known actions and omissions discussed, including as discussed in this Report.

2.      From January 1, 1999 through the present time, John Taylor has owed elevated[1260] fiduciary duties to the AIA Corporations and their shareholders through his roles as directors, officers (the president of both at all times and later others) and as one of the majority and controlling shareholders of AIA Services. From August 4, 2014 (when he entered his notice of appearance on behalf of the AIA Corporations)[1261] through the present time (there is no final judgment), John Taylor

---

[1259] In addition to the duties of good faith and loyalty owed under Idaho statutory and common law, the directors of the AIA Corporations also owed those duties, and the requirement to comply with them, under Section 4.11 of the AIA Corporations' bylaws. Their breaches of Section 4.11 for the acts and omissions discussed in this Report separately result in all such transactions and corporate action being void under Idaho law, as I will discuss below with respect to the requirement of annual shareholder meetings.

[1260] While John owed elevated fiduciary duties because he purported to serve as an officer and director of both AIA Corporations, it is notable that, as discussed in this Report, John Taylor was also a licensed lawyer, accountant and member of the board of directors of the publicly traded Avista Corp., which has extensive policies and procedures to prevent improper related party transactions. Nevertheless, John Taylor proceeded consistently in his self-interests.

[1261] DLM – 0036228-30.

also owed fiduciary duties of loyalty, care and good faith and duties of care to the AIA Corporations by purporting to act as their counsel in *Durant v. GemCap*. There are no board or shareholder meeting minutes or resolutions, nor have I seen any facts obtained in discovery in this Lawsuit, that demonstrate that John Taylor ever properly disclosed and addressed his conflicts of interest discussed in this Report (*see also* Exhibits C-D attached hereto),[1262] or acted in good faith and with complete loyalty to the AIA Corporations. To the contrary, John Taylor has intentionally and flagrantly breached all of the foregoing duties for the reasons stated in this Report thereby being one of the proximate causes of Miesen's forty Damage Items (*see* Exhibit A attached hereto).

3.      From January 1, 1999[1263] through when she relinquished her community interest when her final divorce decree was entered on January 5, 2018,[1264] Henderson owed fiduciary duties to AIA Services and its shareholders as one of the of the majority and controlling shareholders of the AIA Corporations. From April 30, 2007 through the date that she resigned from the boards on September 12, 2014,[1265] Henderson owed fiduciary duties to the AIA Corporations and their shareholders as a director of the AIA Corporations. There are no board or shareholder meeting minutes or resolutions, nor have I seen any facts obtained in discovery in this Lawsuit, that demonstrate that Henderson ever properly disclosed and addressed her conflicts of interest discussed in this Report (*see also* Exhibits C-D attached hereto), or acted in good faith and with complete loyalty to the AIA Corporations and their shareholders. To the contrary, Henderson has intentionally and flagrantly breached all of the foregoing duties for the reasons stated in this Report thereby being one of the proximate causes of Miesen's forty Damage Items (*see* Exhibit A attached hereto).

---

[1262] *See* Exhibits C-D attached hereto and Section X of this Report.

[1263] It is expected that Henderson will argue that she was not involved in the management of the AIA Corporations prior to serving as a director. While it is impossible to know her activities, the issue is moot because she served as a director and learned of, or should have learned of, had she acted in good faith and with loyalty, the malfeasance and improper transactions discussed in this Report.

[1264] After refusing to finalize her divorce with John Taylor for years since the interlocutory decree was entered in 2005, Henderson finally finalized her divorce with John Taylor on January 5, 2018 therein relinquishing her community property and other ownership interests in AIA Services, CropUSA, PERC, Pacific Empire Holdings and other entities. DLM – 0081528-30. While Henderson obtained indemnification from John Taylor as part of the final divorce, that is not likely worth the paper the decree is printed on.

[1265] AIAPROD00171548.

Exhibit - 1, p. 324

12-ER-2742

4.  From January 1, 1999 through the time that his common shares in AIA Services were sold to John Taylor on or after March 23, 2012, Beck owed fiduciary duties to AIA Services as one of the majority and controlling shareholders of AIA Services. From January 1, 1999 through the date that he resigned in approximately March 2001 or sometime thereafter,[1266] Beck owed fiduciary duties to AIA Services and its shareholders as a director of AIA Services. From April 30, 2007 through the date that he resigned from the boards sometime in 2015,[1267] Beck owed fiduciary duties to the AIA Corporations and their shareholders as a director of the AIA Corporations. There are no board or shareholder meeting minutes or resolutions, nor have I seen any facts obtained in discovery in this Lawsuit, that demonstrate that Beck ever properly disclosed and addressed his conflicts of interest discussed in this Report (*see also* Exhibits C-D attached hereto), or acted in good faith and with complete loyalty to the AIA Corporations and their shareholders. To the contrary, Beck has intentionally and flagrantly breached all of the foregoing duties for the reasons stated in this Report thereby being one of the proximate causes of Miesen's forty Damage Items (*see* Exhibit A attached hereto).

5.  From January 1, 1999 through the time that his common shares in AIA Services were sold to John Taylor on or after March 23, 2012,[1268] Cashman owed fiduciary duties to AIA Services as one of the majority and controlling shareholders of AIA Services. From January 1, 1999 through the date that he resigned on March 27, 2001,[1269] Cashman owed fiduciary duties to AIA Services and its shareholders as a director of AIA Services. There are no board or shareholder meeting minutes or resolutions, nor have I seen any facts obtained in discovery in this Lawsuit, that demonstrate that Cashman ever properly disclosed and addressed his conflicts of interest discussed in this Report (*see also* Exhibits C-D attached hereto), or acted in good faith and with complete loyalty to the AIA Corporations and their shareholders. To the contrary, Cashman has intentionally and flagrantly breached all of the foregoing duties for the reasons stated in this Report thereby being one of the proximate causes of Miesen's forty Damage Items (*see* Exhibit A attached hereto).

---

[1266] Beck cannot recall when he resigned from the board of AIA Services. I am assuming that it was sometime in late March or thereafter based on the date of Cashman's resignation email.
[1267] Beck cannot recall when he resigned as a director. Despite John Taylor's testimony that he allowed Beck to back-date his resignation (something John Taylor had no authority to do), Beck is listed as a director of AIA Services until the annual report dated October 15, 2015 (DLM – 0033091) and as a director of AIA Insurance until the annual report dated January 29, 2016.
[1268] DLM – 0034523-32.
[1269] Beck cannot recall when he resigned from the board of AIA Services. I am assuming that it was sometime in late March or thereafter based on the date of Cashman's resignation email.

Exhibit - 1, p. 325

12-ER-2743

6.      From January 1, 1999 until she resigned as secretary and was purportedly replaced by John Taylor on or about May 26, 2016,[1270] Duclos owed fiduciary duties to the AIA Corporations and their shareholders as the secretary of the AIA Corporations. From January 1, 1999 through the date that she resigned on February 22, 2007,[1271] Duclos owed fiduciary duties to AIA Insurance and its shareholder as a director of AIA Insurance. From no later than the annual report dated January 8, 2002 through the date that she resigned on February 22, 2007,[1272] Duclos owed fiduciary duties to AIA Services and its shareholders as a director of AIA Services. For the years that Duclos served as an officer and director of the AIA Corporations, she owed elevated fiduciary duties. There are no board or shareholder meeting minutes or resolutions, nor have I seen any facts obtained in discovery in this Lawsuit, that demonstrate that Duclos ever properly disclosed and addressed her conflicts of interest discussed in this Report (*see also* Exhibits C-D attached hereto), or acted in good faith and with complete loyalty to the AIA Corporations and their shareholders. Duclos has intentionally and flagrantly breached all of the foregoing duties for the reasons stated in this Report. While Duclos died during the pendency of this Lawsuit, her breaches and conflicts of interest are nevertheless relevant to establish that the other Controlling AIA Defendants substantially assisted her in breaching her duties of good faith and loyalty owed to the AIA Corporations and their shareholders thereby being one of the proximate causes of Miesen's forty Damage Items (*see* Exhibit A attached hereto). I will now address more specific issues and breaches below.

7.      Before I address specific shareholder and board meeting issues, the numerous transactions and corporate action amounting to corporate waste is dispositive as to many transactions and corporate action. As discussed in Sections X-XII of this Report, John Taylor's recent Rule 30(b)(6) deposition testimony that the only board or shareholder decisions are those reflected in written meeting minutes or resolutions has confirmed that the limited written shareholder and board decisions conclusively establish that each of the Controlling AIA Defendants (two of whom, John Taylor and Henderson, are Idaho lawyers having the obligations set forth above as well as those imposed by the applicable law discussed in Section X), during their respective tenures on the boards of the AIA Corporations as discussed above, breached their duties of loyalty, good faith and due care owed to the AIA Corporations and the AIA Corporations' shareholders. The bedrock principle of

---

[1270] AIAPROD00172583; AIAPROD00171605.
[1271] RJT – 039624.
[1272] RJT – 039623.

Exhibit - 1, p. 326

corporate law that directors are fiduciaries and serve as trustees for the corporations and their assets is a universally accepted one, and that those duties may not be breached for transactions or corporate action involving waste without full disclosure and unanimous approval from *all* shareholders:

> It is, however, well established that, 'Directors of a corporation occupy a position of trust and confidence, and are considered in the law as standing in a fiduciary relation toward the stockholders and as trustees for them. The directors of a corporation are not permitted to use their position of trust and confidence to further their private interests, nor to become parties to contracts concerning corporate affairs intrusted to their management which conflict with a free and impartial discharge of their duties toward the stockholders. Any participation by them in contracts dealing with matters of corporate interest which is antagonistic to their free and impartial discharge of official duties is denounced by the law, *unless all of the stockholders with full knowledge assent therto.*'[1273]

8.  The above principles apply here. Based upon the documents and information that I have reviewed for this Report and my review of Miesen's forty Damage Items, I am of the opinion that Miesen's Damage Item Numbers 3-4, 6-26, 28-33, and 35-38 in the Exhibit A attached hereto[1274] are transactions that constitute corporate waste, which require unanimous shareholder approval by AIA Services' shareholders. Because Miesen and other shareholders would have never consented to the transactions or corporate action involving Damage Item Number 3-4, 6-26, 28-33 and 35-38,[1275] those transactions could never have been approved. Accordingly, the Controlling AIA Defendants have breached their duties of good faith and loyalty owed to the AIA Corporations and their shareholders by allowing those transactions and corporate actions occur thereby being one of the proximate

---

[1273] *Stoiber v. Miller Brewing Co.*, 257 Wis. 13, 16, 42 N.W.2d 144, 147 (1950) (Emphasis supplied).

[1274] As further summarized in Miesen's Fourth Amended Answers to the Hawley Troxell Defendants' First Set of Interrogatories and Second Set of Requests for Production.

[1275] As discussed above, there most certainly are many expenditures and payments made by the AIA Corporations in Damage Item Number 38 which were appropriately made and do not constitute corporate waste. The question, remains, which expenditures and payments. This is why Miesen has asserted an accounting claim and why, in my opinion, based on the serious conflicts of interest involving all of the Controlling AIA Defendants and the failure to disclose countless transactions, they must provide an accounting for each and every transaction, with supporting documentation, to establish the expenditure or payment was appropriate and fair.

Page - 318

causes of Miesen's damages for those Damage Item Numbers. Of those Damage Item Numbers, only Damage Item Numbers 6 and 8 were disclosed to the shareholders of AIA Services in the one and only special shareholder meeting held since the mid-1990s after Reed Taylor sold his majority interest, and the proxy for that meeting was insufficient and misleading because no disclosure was made to AIA Services' shareholders of the nature of Reed Taylor's malfeasance claims or the extensive improper, concealed and unauthorized transactions occurring prior to that shareholder meeting on March 28, 2007, as I address in this Report.

9.      As stated earlier in this Report, the Controlling AIA Defendants' duties of loyalty owed to the AIA Corporations and their shareholders require full disclosure and shareholder approval, including to properly hold annual shareholder meetings to properly elect directors each year, who in turn properly appoint officers at the annual meeting of directors. Rather than follow these simple and required procedures, the Controlling AIA Defendants have made a mockery of fundamental corporate governance principles and by failing to properly hold annual shareholder and annual board meetings, which was one of the causes of the damages described below to be sustained by the AIA Corporations, and went unhindered, undetected and unredressed.[1276] The Controlling AIA Defendants have breached their duties of good faith and loyalty by failing to simply hold annual shareholder meetings in order to properly elect directors, who in turn, would properly hold annual board meetings appoint officers. The duty of loyalty includes the duty of obedience to comply with the law and the AIA Corporations' articles of incorporation and bylaws, which the Controlling AIA Defendants have refused to do even after Miesen and others filed lawsuits raising the improper corporate governance and failure to even hold annual shareholder meetings as discussed in this Report. By way of example, although the AIA Services' New Restated Bylaws require that not more than 18 months may transpire between annual meetings of shareholders, no

---

[1276] As discussed in Section XII of this Report, the Hawley Troxell Defendants' failure to insist upon compliance with the AIA Corporations' articles of incorporation and bylaws, and other legal requirements as to proper corporate governance a condition of their representation or in their role as general counsel was also one of the proximate causes of Miesen's damages, because such noncompliance resulted in the improper corporate governance was one of the causes of Miesen's damages. Instead, they provided substantial assistance to, and enabled, the Controlling AIA Defendant to remain in office and control only to continue their wrong doing thereby resulting in the AIA Corporations from preventing and obtaining redress for Miesen's damages those individuals proximately caused the AIA Corporations, as discussed in Sections X-XII.

Page - 319

such meetings were held for more than twenty years.[1277] If there is anything that I have learned from my work on this Lawsuit and in this Report, John Taylor has some of the most unbelievable answers to deposition questions and he generally will never squarely answer a question. When questioned with regard to the issue of annual shareholder meetings, John Taylor blandly testified as follows:

> Q. Can you point me to any provisions in the bylaws or the articles of incorporation for AIA Services that authorizes there are not to be shareholder meetings every year?
> A. The articles or bylaws, I can't remember which one it was, generally prescribes shareholder meetings. We made a decision not to hold those - - the last because of this litigation.
> Q. Isn't litigation a reason to have more shareholder meetings than not have any at all?
> A. I believe I explained before the decision was based upon the fact that you represent most of the minority shareholders.[1278]

---

[1277] It is noteworthy that, in amending the AIA Services' New Restated Bylaws on November 17, 1995 (AIA 0025531) to provide that annual shareholder meetings must be held not later than within 18 months of each other, AIA Services elected to bind itself to a *more stringent* requirement than that imposed by the previous Bylaw provision, yet it was entirely ignored thereafter and to this day. As set forth in this Section XI of this Report, the proxy statement for first the purported "annual" meeting held in many years on July 16, 2012 was materially misleading because it failed to disclose any of the misconduct, the conflicts of interest or the purpose of the reverse stock split, thus rendering that alleged meeting a nullity in terms of corporate governance. John Taylor testified that "I know of no other shareholders meetings that have been held other than those we have provided to you." 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 51. As discussed below, there is no evidence that there has been an annual meeting of shareholders since July 23, 1998. Although Idaho Code section 30-1-701(3) provides that "[t]he failure to hold an annual meeting [of shareholders] at the time stated in or fixed in accordance with a corporation's bylaws does not affect the validity of any corporate action," as discussed below under the heading "Failure to hold Directors' Meetings," and in Sections X and XI of this Report, no properly and valid *corporate* action has been taken by the AIA Corporations in more than twenty years. Moreover, Henderson has testified that the Hawley Troxell Defendants advised AIA Services *not* to hold annual shareholders' meetings (9/10/2020 Connie Henderson Depo. transcript, pp. 97-98); this advice was a breach of their duties of care and loyalty owed to the AIA Corporations and was also the providing of substantial assistance to the Controlling AIA Defendants in their breaches of the duties of good faith and loyalty, which inflicted substantial damages upon the AIA Corporations as discussed in this Report (including Section XII).

[1278] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 473-74.

Exhibit - 1, p. 329

12-ER-2747

10.     In other words, John Taylor believes that the Controlling AIA Defendants can unilaterally refuse to hold annual shareholder meetings because they are being sued for their malfeasance and improper conduct, including as described in detail in this Report. As seen from Exhibit D attached hereto, the Controlling AIA Defendants, in particular John Taylor, and the entities that they partially own are serial litigators which have depleted millions of dollars in shareholder value, just as they are serial malfeasance artists. Many of the lawsuits and legal proceedings in Exhibit D can be traced directly or indirectly to John Taylor's failure to ensure that he or entities he controls comply with their legal and contractual obligations, as aided by the other Controlling AIA Defendants.[1279] In addition, it is unclear what John Taylor meant by "this" litigation. In point of fact, there was no litigation of the type John Taylor was referring to until the commencement of *Reed Taylor* v. *AIA Services* in January 2007 and the lawsuits that followed, but there is no evidence that a shareholder meeting had been held for AIA Services since July 23, 1998 (which was shortly before CropUSA was formed). Moreover, the existence of pending litigation does not excuse a failure of a corporation to hold required annual shareholders' meetings. Indeed, the dissemination of a proxy statement affords the corporation an opportunity (and obligation) to make full disclosure to its shareholders of such matters as litigation regarding the misconduct of the corporation its directors and officers because such information is obviously material to the stockholders' decision as to whether or not to vote for a particular person as a director of the corporation.

11.     Indeed, it is highly probable that, if disclosure of the allegations asserted by Reed Taylor against the Controlling AIA Defendants in *Reed Taylor* v. *AIA Services* had been made to the AIA Disinterested Shareholders, through a derivative action or otherwise, they would have ceased the improper and unauthorized conduct because the very nature of full disclosure would have included statements that the transactions should not have been approved. In turn,

---

[1279] With respect to failing to comply with legal and contractual obligations as being the cause of all of the GemCap related lawsuits, I am referring to John Taylor in his individual capacity as a guarantor of the GemCap Loan and on behalf of the CropUSA Entities, who were the borrowers. The AIA Corporations never owed any legal or contractual obligations to GemCap and they should have never been involved in the GemCap Loan or subsequent litigation.

Exhibit - 1, p. 330

12-ER-2748

the AIA Corporations, with proper and duly elected directors[1280] and appointed officers, would have prevented, halted, rescinded and obtained redress for, the misconduct of the Controlling AIA Defendants. As a result, those shareholders could have caused the AIA Corporations to avoid the economic harm inflicted upon them by the Controlling AIA Defendants, including, without limitation, the payment to John Taylor of more than $3,000,000 in so called "compensation," the misappropriation of CropUSA, the misappropriation of the $1,510,693 bonus payment from Trust mark, the improper guarantee of the Lancelot Loan, the failure to protect the AIA Corporations' interest in the assets sold in the Hudson Transaction, the GemCap Loan and the more than $2,000,000 in loans to Pacific Empire Radio, among other damages.[1281] In any event, the Controlling AIA Defendants, breached their duties of care, good faith and loyalty by failing to hold annual shareholder meetings as required and provide full disclosure of the numerous improper transactions, corporate actions and excessive compensation discussed in this Report, which would have never been unanimously approved by the shareholders.

12.     The failure to hold annual shareholder meetings for AIA Services as required by Section 3.2 of AIA Services' New Restated Bylaws, as modified, and properly for AIA Insurance as Required by Section 3.2 of AIA Insurance's Bylaws means that no decisions or corporate actions were proper, approved or authorized for the AIA Corporations since January 1, 1999, which constitute additional breaches of the duties of good faith and loyalty owed by the Controlling AIA Defendants. As stated above, the minutes of the July 23, 1998 AIA Services' shareholders' meeting[1282] indicate that John Taylor, Beck and two other persons,

---

[1280] This would include contacting Donna Taylor to ensure that her director is named and appointed to the board and ensuring that the director for the Series C Preferred Shares held in AIA Services' 401(k) Plan was properly named and appointed. The proper appointment of these two directors alone could have prevent much of Miesen's damages, assuming the AIA Services' 401(k) Plan voted to appoint an independent director, which John Taylor breached his duties of loyalty owed to the Plan by not doing as did Beck and Henderson by appointing and allowing John Taylor to continue to serve as a trustee of the AIA Services 401(k) Plan (which is like letting the fox in the hen house).

[1281] See Exhibit A attached hereto. As discussed in Section XII, those damages could have been prevented or recovered if the Hawley Troxell Defendants had insisted that the improper conduct discussed in this Report cease and the AIA Corporations pursue such claims themselves, and/or a Donna Taylor designee be appointed to the board of AIA Services who, in the exercise of such director's fiduciary duties also would have so insisted. To compound their misconduct, the Hawley Troxell Defendants also resisted the appointment of a receiver who would have done the same.

[1282] AIAPROD00171950.

Page - 322

Exhibit - 1, p. 331

12-ER-2749

Bruce Sweeney and David Larson (both of whom later resigned) were elected by the common stock holders; Reed Taylor was elected by the common stock holders and was also appointed as the designee of Donna Taylor.[1283] Cashman was elected by the holders of the Series C Preferred Shares. However, Beck, Cashman and Reed Taylor resigned from AIA Services' board sometime in 2001, leaving John Taylor as the only director who had been ostensibly elected by the AIA Services' common shareholders. Thereafter he purported to appoint two additional AIA Services' directors,[1284] even though John Taylor already had conflicts of interests that prevented him from appointing anyone but wholly independent directors, which he never did since 1999 thereby breaching his duties of loyalty and good faith owed to the AIA Corporations. In addition, none of John Taylor's "appointments," including his 2007 so-called appointment of Beck and Henderson, were valid or proper because, pursuant to the November 17, 1995 amendment to the AIA Services' New Restated Bylaws discussed above, John Taylor's term as a director ended on January 23, 2000, eighteen months after the last annual shareholders' meeting. Although Section 4.3 of AIA Services' New Restated Bylaws allows incumbent directors to fill vacancies caused by a resignation, and Section 4.2 thereof provides that "Each director shall serve until the next annual meeting of stockholders and his successor is duly elected and qualified, or until his death, resignation or removal,"[1285] that latter section must be read in conjunction with the November 17, 1995 bylaw amendment which, as stated above, requires that "no more than 18 months could transpire between annual meetings"[1286] and Justice Burdick's holding that "Actions taken in violation of a corporation's bylaws are void."[1287] Moreover, those purported "appointments" were an integral part of, and inseparable from, John Taylor's conflicted transactions discussed in this Report and as outlined in Exhibits C-D attached hereto (the claims asserted against John Taylor created additional conflicts), which he never addressed when appointing any directors and resulted in a continuation of the ongoing improper corporate governance thereby being a proximate cause of damages of the AIA Corporations (*see* Exhibit A attached hereto), and thus were themselves transactions and actions subject to Section 4.14

---

[1283] AIA Services was also obligated to appoint Reed Taylor to the board under Section 4.10 of the illegal Amended and Restated Stock Pledge Agreement. RJT – 089331.

[1284] John Taylor's purported "appointees" to AIA Services' board were Paul Schrette (who was subsequently replaced by John Taylor's appointment of Brian Freeman within a year) and Duclos, as well as Beck and Henderson on April 30, 2007, after Duclos and Freeman "resigned" on or about February 22, 2007, shortly after *Reed Taylor v. AIA Services* was commenced on January 29, 2007.

[1285] AIA0002568.

[1286] AIA0025533.

[1287] *Kemmer v. Newman,* 161 Idaho 463, 466, 387 P.3d 131, 134 (2016).

Page - 323

**Exhibit - 1, p. 332**

**12-ER-2750**

of AIA Services' New Restated Bylaws requiring full disclosure and shareholder approval and Section 4.2.9(g) of AIA Services' Amended Articles of Incorporation requiring the approval of Donna Taylor because the transactions were not fair or beneficial to the AIA Corporations and no reasonably prudent director or officer would have authorized any of transactions, including those discussed in Section X (*see also* Exhibit A attached hereto).

13.     Accordingly, based on the documents I have reviewed, in my opinion, AIA Services has not had a properly constituted board of directors since January 23, 1999. Likewise, any actions AIA Services purportedly took during that same period with regard to the vote of its shares held in its wholly owned subsidiary AIA Insurance such as electing directors or any actions taken by AIA Insurance or such directors were improper and a nullity because AIA Services never properly approved or authorized anyone as a proxy to vote its shares in AIA Insurance to for a proper election of AIA Insurance's directors or any action taken by them, including appointing officers because those actions would have required shareholder approval by AIA Services' shareholders based on the conflicts of interest discussed in this Report (*see also* Exhibits C-D attached hereto). While Section 6.4 of AIA Services' New Restated Bylaws allow the president or vice-president to vote shares in the absence of a board authorization,[1288] since that date, neither AIA Services nor AIA Insurance has had any duly elected officers as required by Section 5.1 of AIA Services' New Restated Bylaws and Section 5.1 of AIA Insurance's Bylaws. Moreover, because of the conflicts of interest of the Controlling AIA Defendants by reason of the improper conduct and other conflicts discussed in this Report (*see also* Exhibits C-D attached hereto), the authorization of a proxy to vote the shares of AIA Insurance, whether at an annual meeting or a special meeting, would have required a vote from the shareholders of AIA Services to resolve the conflicts of interest. Lastly, there has not been any shareholder meetings held for AIA Insurance since 2006 and for AIA Services' since the improper one held in July 2012. For the reasons stated above, the Controlling AIA Defendants breached their duties of good faith and loyalty owed to the AIA Corporations by failing to properly elect directors for AIA Services or AIA

---

[1288] As discussed below, there are not a single board meeting or resolution that addressed or approved of the vote of AIA Services' shares in AIA Insurance. Indeed, from 1995 until Judge Brudie ruled that Reed Taylor's redemption obligations were illegal, the voting of AIA Insurance's shares created additional conflicts of interest because all of the shares in AIA Insurance were pledged to Reed Taylor. The Controlling AIA Defendants and the Hawley Troxell Defendants breached their duties of good faith and loyalty by never addressing these issues.

Insurance, and consequently to failing to have properly elected boards of director duly appoint any officers for the AIA Corporations since at least January 1, 1999.

14. However, the fact that the Controlling AIA Defendants were never properly or duly elected or appointed as directors or appointed as officers of the AIA Corporations for the reasons discussed above and in this Report, has no impact on the fiduciary duties owed. If the Controlling AIA Defendants are found to have never been duly elected or appointed as directors or officers of the AIA Corporations from January 1, 1999 through the present time, they still voluntarily acted in the capacity of directors and officers and owed fiduciary duties for those roles. In addition, the fiduciary duties owed as the majority and controlling shareholder group remains the same as discussed above. Specifically, the Controlling AIA Defendants owe fiduciary duties as de facto directors and officers as discussed in Section X(A)-(B). In addition, the Controlling AIA Defendants also assumed duties to the AIA Corporations and their shareholders by their conduct. Under any scenario, the transactions, agreements, payments, compensation and corporate action that the Controlling AIA Defendants engaged in was never duly disclosed, approved or authorized by an independent director or AIA Services' shareholders as required. Moreover, if there are no authorized officers or directors, everything would need to be disclosed and approved by AIA Services shareholders, which was never done. Irrespective of the source of the duties of care, good faith and loyalty owed to the AIA Corporations and their shareholders by the Controlling AIA Defendants, they breached those duties as described in this Report thereby being one of the proximate causes of Miesen's forty Damage Items (*see* the attached Exhibit A hereto).

15. The issue of my being provided with all of the applicable board decisions for the AIA Corporations has been a moving target since the commencement of my work on this Lawsuit. As discussed in this Report, the shareholder and board meeting minutes and resolutions have not been maintained or produced to Miesen in an orderly or organized fashion such as a minute book, which is critical, thereby resulting in the officers breaching their duties of care. In my experience, corporations maintain these documents in an orderly and organized fashion. This has caused significant delays in my work and created extreme hardship because I have spent untold hours searching through tens of thousands of pages of documents attempting to locate all of the shareholder and board meeting minutes and resolutions, and related documents such as notices and disclosures, and awaiting proper answers to interrogatories to learn if there were any oral meeting and decisions not reduced to writing. However, there was recently a significant

Page - 325

**Exhibit - 1, p. 334**

breakthrough. When John Taylor was questioned about the whether there were any oral board meetings, John Taylor's remarkable Rule 30(b)(6) testimony also included the following:

> Q. And so as we sit here today, for the AIA corporations, meaning AIA Services and AIA Insurance, there are no board decisions for those companies from January 1st, 1999, to the present time that are not reflected in board resolutions or board meeting minutes that have been produced to us in this lawsuit, correct?
> A. I believe all of the decisions by the board have been provided to you, and you should have all of them.
> Q. Okay. And as we sit here today, you're not aware of any oral decisions by the board of directors of AIA Services or AIA Insurance that have not been reduced in writing and produced to us, correct?
> A. No. I don't know that. I can't answer that question.
> Q. What's that?
> A. I can't answer that question.
> Q. Okay. But you're not aware of any decisions that have not been - -
> A. No.
> Q. - - by the board of directors of AIA Services or AIA Insurance that have not been reduced in writing through a resolution or board meeting minutes and produced to us, correct?
> A. Not that I know of today.[1289]

16.     Since that deposition occurred on July 28-31, 2020, there have been no other board or shareholder meeting minutes or resolutions produced or disclosed in this Lawsuit (including through the production of any additional minutes or resolutions or the supplemental interrogatory answers). Based on the foregoing testimony and as discussed in this Report, even assuming that there were properly elected, fully seated and duly constituted boards of the AIA Corporations (which as stated above was not the case), the transactions and corporate actions and the resulting damages being addressed by Miesen were never properly and fully disclosed, approved (including by an independent director or by shareholders,

---

[1289] 2/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 441; *see also* pp. 435-40.

Exhibit - 1, p. 335

12-ER-2753

including the Series A Preferred Shareholder Donna Taylor),[1290] or properly authorized as confirmed by the limited shareholder and board meeting minutes and resolutions in existence from January 1, 1999 through the present time (*see* Exhibit B attached hereto). While Miesen has limited his claims to events dating back to when CropUSA was formed in January 1, 1999, there are very few purported written board or shareholder meeting minutes and resolutions for the AIA Corporations as a whole, and even less for AIA Services, and the notices and communications to shareholders were wholly inadequate and infrequent (intentionally for many years).

17.     I have attached certain Exhibits to this Report to further illustrate the inadequate and improper corporate governance of the AIA Corporations by the Controlling AIA Defendants and the Hawley Troxell Defendants (including as general counsel as discussed in this Report). For example, in the Exhibit B attached hereto, pages 1-3 of Exhibit B contain a chart of all known shareholder and board meeting minutes and resolutions from January 1, 1999 through the present time. On pages 1-3 of Exhibit E attached hereto, there is a chart of the number of alleged board decisions reflected in meeting minutes and resolutions for AIA Services and AIA Insurance for each year since 1999. On pages 1-2 of Exhibit F attached hereto, there is a chart of the number of annual shareholder meetings allegedly held for each year since 1999 for AIA Services and AIA Insurance (one for AIA Services and eight for AIA Insurance). On pages 3-4 of Exhibit F, there is a chart of the number of special shareholder meeting held each year for AIA Services and AIA Insurance since 1999 (one for AIA Services and none for AIA Insurance). On pages 5-6 of Exhibit F, there is a chart of the number of consents and resolutions in lieu of shareholder meetings for AIA Services and AIA Insurance since 1999 (there were none). On pages 7-8 of Exhibit F, there is a chart showing the number of annual board meetings held for AIA Services and AIA Insurance since 1999 (there were none for AIA Services and eight for AIA Insurance). On pages 9-10 of Exhibit F, there is a chart showing the number of special board meetings held for AIA Services and AIA Insurance since 1999. (there were eight held for AIA Services and seven for AIA Insurance). On pages 11-12 of Exhibit F, there is a chart showing the number of written resolutions/consents in lieu of board meetings for AIA Services and AIA Insurance since 1999 (there were nine for AIA Services and

---

[1290] As established by the Controlling AIA Defendants' conflicts as set forth in the Exhibits C-D attached hereto, the Controlling AIA Defendants, in particular John Taylor, had conflicts of interest regarding their ownership and management in other entities and in lawsuits and legal matters (including the advancement of fees and costs), which were never properly disclosed, addressed and approved by the an independent director or AIA Services' shareholders.

Exhibit - 1, p. 336

12-ER-2754

eleven for AIA Insurance). When the foregoing charts are viewed, they confirm the wholly inadequate number of shareholder and board meetings held for the AIA Corporations, which is all the more egregious since John Taylor and Henderson are lawyers and Miesen's complaint in this lawsuit, filed on August 11, 2010, alleged "the boards intentionally refused to hold annual shareholder meetings or otherwise take steps to give information and notice to disinterested shareholders of AIA."[1291] Those allegations followed ones lodged by Donna Taylor in *Donna Taylor v. AIA Services*, including in her complaint for declaratory relief filed on November 23, 2009, which alleged "[u]nder the terms of AIA Services and AIA Insurance's Amended Bylaws, the corporations' boards of directors are required to hold annual shareholder meetings to elect board members. AIA Services and AIA Insurance have not held annual shareholder meetings to elect directors in over five years."[1292] Those allegations followed ones made by Reed Taylor in *Reed Taylor v. AIA Services*, including in his Fifth Amended Complaint filed on February 1, 2008, which alleged AIA Services' corporate form should be pierced because, *inter alia*, "the lack of proper corporate governance."[1293] With the back drop of the supported allegations in lawsuits regarding improper corporate governance asserted in this Lawsuit dating back to 2010 and at least two other lawsuits dating back to 2009 and 2008, respectively,[1294] the Controlling AIA Defendants intentionally acted in bad faith and with intentionally disloyal by continuing to refuse to hold annual shareholder meetings and engage in proper corporate governance for the AIA Corporations.

18.     Having confirmed that the alleged board decisions made by the AIA Corporations, whether in minutes or resolutions, are limited exclusively to the

---

[1291] Dkt. 1, p. 22.

[1292] DLM – 0033865.

[1293] DLM – 0010431.

[1294] The Hawley Troxell Defendants were involved in those two lawsuits and another one filed by Donna Taylor in June 2008, which also alleged improper corporate governance as to certain transactions. Yet, the Hawley Troxell Defendants, as counsel addressing the matters in 2007 and for years thereafter and as general counsel for the AIA Corporations, breached their duties of care and loyalty by turning a blind eye to the improper corporate governance and they, in fact, never even requested a board resolution or meeting minutes to confirm whether the purported boards had delegated any decision making power for litigation decisions to anyone. The Controlling AIA Defendants also breached their duties of good faith and loyalty by not properly addressing those matters and they had conflicts of interest that prevented them from making any litigation decisions in the lawsuits in which they were personally named or directly involved transactions or improper corporate action relating to other entities (e.g., CropUSA and PERC) that they partially owed and/or managed.

written minutes and resolutions produced in discovery, the few[1295] alleged annual[1296] and special meetings that purportedly occurred over a twenty-year period are:

- April 21, 1999. AIA Services' Board meeting, various matters discussed.[1297]

- May 11, 1999. Annual meeting of Shareholder of AIA Insurance.[1298]

- May 11, 1999. Annual Meeting of Directors of AIA Insurance.[1299]

- May 9, 2000. Annual meeting of AIA Insurance's Shareholders.[1300]

- May 9, 2000. Annual meeting of AIA Insurance's Directors.[1301]

- September 28, 2000. AIA Services' Board meeting; various matters discussed.[1302]

---

[1295] The (for the reasons stated above) twelve AIA Insurance shareholder and board meetings listed are reflected in unsigned minutes and refer to pro forma, actions of a wholly owned subsidiary, such as the election of directors and officers. The purported, boilerplate "ratifications" of business transactions in those minutes are improper, because in effect they are ratifying their own conduct. In my opinion, the AIA Insurance alleged annual board and shareholder meeting minutes were prepared when AIA Insurance was being audited and, in my opinion on more probable than not basis, the annual board and shareholder meetings for AIA Insurance never occurred. Although there are probably many closely held corporations for which regularly held board meetings may not be necessary, the boards of entities such as the AIA Corporations with their myriad of legal difficulties from at least 2007 onward should have been meeting as often as monthly or when necessary to address important legal or financial issues.

[1296] Section 4.7(a) of the AIA Services' New Restated Bylaws requires that annual meeting of directors be held "immediately after the annual meeting of stockholders." (AIA0002569). Because this provision was not complied with, under the reasoning of *Kammer v. Newman* (note 1009*, supra*), actions, such as purporting to hold Board meetings without compliance with Section 4.7 (a) are void.

[1297] AIA 0025604-05.

[1298] AIA0025614.

[1299] AIA0025611.

[1300] AIA0025611.

[1301] AIA0025612.

[1302] AIA 0025606-08.

Page - 329

Exhibit - 1, p. 338

12-ER-2756

- January 2, 2002. Purported "majority directors' consent" designating a name to be used by AIA Insurance in Texas.[1303]

- May 7, 2002. AIA Insurance's Annual Shareholder's meeting.[1304]

- May 7, 2002. Annual Meeting of Directors' of AIA Insurance.[1305]

- August 5, 2002. AIA Insurance's Directors' Meeting, appointing a new Treasurer.[1306]

- May 6, 2003. AIA Insurance's Annual Shareholder's meeting.[1307]

- May 6, 2003. AIA Insurance's Annual Directors' meeting.[1308]

- May 4, 2004. AIA Insurance's Annual Shareholder's meeting.[1309]

- May 4, 2004. AIA Insurance's Annual Directors' meeting.[1310]

- July 20, 2004. AIA Insurance Board Meeting to appoint a new Treasurer.[1311]

- August 26, 2004. The 2004 purchase by AIA Insurance of 204,000 shares of Series C Shares from CropUSA for $ 1,510,693.'[1312]

- May 3, 2005. AIA Insurance's Annual Shareholder's meeting.[1313]

---

[1303] AIAPROD00171147-48. (Under Section 4.9 of AIA Insurance's Articles of Incorporation, such a consent must be signed by all of the Directors.)
[1304] AIA0001017.
[1305] AIA0001016.
[1306] AIA0001015.
[1307] AIA0001014.
[1308] AIA0001013.
[1309] AIA0001012.
[1310] AIA0001011.
[1311] AIA0001010.
[1312] AIA0027502. This was the amount surreptitiously taken by John Taylor from AIA Insurance and placed in a bank account in his name and bearing his home address and then transferred to CropUSA. In addition to this purported resolution being invalid for the reasons stated in this Report, Duclos previously confirmed that some of the limited ones produced were back-dated. *See* Section X(F).
[1313] AIA 0001008.

Exhibit - 1, p. 339

12-ER-2757

- <u>May 3, 2005</u>. AIA Insurance's Annual Board meeting.[1314]

- <u>April 4, 2006</u>. Zions First National Bank form of corporate resolution purporting to authorize an AIA Services' guarantee of a loan to Crop USA signed only by John Taylor and Duclos, not Freeman; in violation of the Guarantee Prohibition.[1315]

- <u>May 9, 2006</u>. AIA Insurance's Annual Shareholder's meeting.[1316]

- <u>May 9, 2006</u>. AIA Insurance's Annual Board meeting.[1317]

- <u>September 19, 2006</u>. Written Consent Purportedly Authorizing AIA Insurance's Guaranty of the Lancelot Loan.[1318]'

- <u>October 3, 2006</u>. AIA Insurance Board meeting to appoint a new treasurer.[1319]

- <u>October 27, 2007</u>. AIA Insurance Unanimous Consent Purportedly Authorizing AIA Insurance's Guarantee of the Lancelot Loan (identical to the one on September 19, 2006).[1320]

---

[1314] AIA0001007.

[1315] AIA0026677-78. (Section 4.9 of AIA Services' New Restated Bylaws require that a written consent be signed by all directors.)

[1316] AIA0001006.

[1317] AIA0001006.

[1318] AIAPROD000861123-24. It appears that a second, identical, written consent was signed by AIA Insurance's "directors" on October 27, 2006 (AIAPROD00309058). For the reasons stated in this Report, including the discussion immediately above, both Lancelot Loan resolutions were legal nullities because the AIA Insurance's purported directors were not elected by its sole shareholder, AIA Services' owing to the fact that there was no AIA Services board of directors to elect the AIA Insurance directors. In addition to their being no duly elected directors of AIA Insurance, as stated in this Report, including Section XII, AIA Insurance's purported guarantee was prohibited under the Guarantee Prohibition provision (Section 4.2.9(c)) and the conflicts of interest with affiliates provision (Section 4.2.9(g)) under AIA Services' Amended Articles of Incorporation, as well as Sections 4.14 and 14.1 of AIA Services' New Restated Bylaws, and Sections 4.14 and 14.1 of AIA Insurance's Bylaws.[1318]

[1319] AIA0001004

[1320] AIAPROD00309057-59.

Exhibit - 1, p. 340

- April 30, 2007. Purported appointment of Beck and Henderson as directors, and AIA Services' and AIA Insurance's approval of the May 2, 2007 AIA Engagement Letter, including purported conflict waivers and related agreements, and the payment of $5,000 and 5,000 common shares per quarter to purportedly serve on the boards of the AIA Corporations.[1321]

- July 22, 2008. AIA Services' and AIA Insurance's written consent regarding "directions" to attorneys to seek to stay of *Reed Taylor v. AIA Services* and file a Section 30-1-744 Petition.[1322]

- August 7, 2008. AIA Services and AIA Insurance joint board meeting purportedly to authorize the (i) the advancement of funds to John Taylor for his defense in *Donna Taylor v. Taylor,* (ii) execution of a consent to the transfer of the Lancelot Loan to Hudson, (iii) considering the July 21, 2008 demand letter of Reed Taylor and Donna Taylor and filing of a Section 30-1-744 Petition with respect to the same, (iv) service by Duclos as sole trustee under the AIA Services' 401(k) plan, and (v) continuation of the defense of *Reed Taylor v. AIA Services.*[1323]

- April 22, 2009. AIA Services' rejection of Reed Taylor's settlement offer.[1324]

- November 4, 2009. AIA Services' borrowing $500,000 from Syringa Bank.[1325]

---

[1321] AIAPROD00171187. Since as stated above John Taylor was no longer an elected director of AIA Services, he could not legally appoint Beck and Henderson to the Boards of the AIA Corporations. Moreover, the May 2, 2007 Engagement Letter, and the various Standstill and Tolling Agreements which Beck and Henderson purported to vote for were therefore unauthorized. Indeed, by virtue of the adverse interest exception the AIA Corporations were not even aware of these purported meetings or any other relevant matter as discussed in this Report (including Section X(V)). Moreover, Beck and Henderson had conflicts of interest as discussed this Report that prevented them from fixing their compensation to purportedly serve on the boards of the AIA Corporations, which was separately excessive based on their improper corporate governance and self-interested actions as discussed in this Report.

[1322] AIAPROD0027457-60; AIAPROD00171193-94. For the reasons stated in this this Report the "directors" had no authority to give any such "directions."

[1323] AIA0027457-60. This "meeting "was also a legal nullity.

[1324] AIAPROD00308698. See notes 1036 and 1037 immediately above.

[1325] AIAPROD00172397.

- April 14, 2010. Discussion of *Reed Taylor v. AIA Services* and status of other stayed litigation and buy-out of "investor shareholders" which would require "full disclosure."[1326] (The special treatment of so called "investor shareholders" is indicative of the disdain with which John Taylor, Beck and Henderson viewed the AIA Services' minority shareholders, and their propensity to discriminate against them by, in this instance, not considering full disclosure to them and a buy-out of their shares.)

- November 21, 2011. AIA Services' written consent of John Taylor, Beck and Henderson to the illegal AIA Services' Limited Guarantee of the GemCap Loan.[1327]

- July 2, 2012. AIA Services' purported authorization and approval of illegal reverse stock split.[1328]

- February 4, 2013. AIA Services' and AA Insurance's purported authorization of the AIA Corporations' Amended Guarantee of the GemCap Loan.[1329]

- July 29, 2014. AIA Services' Board rejects offer of Donna Taylor and authorizes unwinding of illegal reverse stock split.[1330]

- August 25, 2016. AIA Services' purported restatement of AIA Services' 401(k) Plan and retention of John Taylor as Trustee.[1331]

- May 26, 2016. AIA Insurance's purported written consent authorization appointing John Taylor as secretary (he was already acting as president).[1332]

---

[1326] AIAPROD

[1327] AIAPROD00172399-401.In addition to being unauthorized, AIA Services' Limited Guarantee of the GemCap Loan violated the Guarantee Prohibition for the reasons stated in, e.g., Sections XL, XI. and XIII of this Report.

[1328] AIAS_00011594-95. *See, e.g*., Section XI of this Report.

[1329] AIAPROD172406-08. See Sections X l, XI M and XIII of this Report.

[1330] AIAPROD00308701.

[1331] DLM – 0079639. For the reasons stated in this Report (including this Section XI), this "meeting" was also improper and a nullity.

[1332] AIAPROD00171605.

Exhibit - 1, p. 342

12-ER-2760

- May 26, 2016. AIA Insurance's purported written consent authorization the amendment of the bylaws to include a purported provision for the award of fees and costs in intracompany suits.[1333]

- May 26, 2016. AIA Services purported written consent authorization the amendment of the bylaws to include a purported provision for the award of fees and costs in intracompany suits.[1334]

- May 26, 2016. AIA Services' purported written consent authorization appointing John Taylor as secretary (he was already acting as president).[1335]

- May 26, 2016. AIA Services' purported written consent authorization for AIA Services to issue 7,500 Series A Preferred Shares to John Taylor.[1336]

- September 13, 2016. AIA Insurance's authorization of transfer of Kettenburg Building to GemCap.[1337]

19.    As seen from the references to the limited number of the above minutes and resolutions, based on the number of improper transactions and corporate action since 1999 and the serious lawsuits with supported allegations of wrongdoing and improper corporate governance which have been pending since

---

[1333] AIAPROD00171576-77. This was also a nullity because John Taylor had conflicts of interest since he had been named as a defendant in this Lawsuit since August 2010 (among others).
[1334] AIAPROD00172497. This was also a nullity because John Taylor had conflict of interests since he had been named as a defendant in this Lawsuit since August 2010 (among others).
[1335] AIAPROD00172583.
[1336] AIAPROD00172499. This was also a nullity because John Taylor had conflicts of interest because he was on both sides of this transaction and AIA Services' Amended Articles of Incorporation contemplated that the Series A Preferred Shares would only be issued to Donna Taylor and they were never properly amended to provide for the issuance of additional Series A Preferred Shares (including the price or redemption mechanism). For these same reasons and because John Taylor was not entitled to any compensation from the AIA Corporation (he allegedly purchased certain Series A Preferred Shares in exchange for salary allegedly owed), none of the Series A Preferred Shares issued to John Taylor were properly disclosed, approved and authorized (even assuming the articles permitted the issuance of the shares). In addition, John Taylor recently testified that he has been acquiring the Series A Preferred Shares so that he would be the majority holder of those shares to control the vote, which was separately improper and demonstrates that John Taylor and the other Controlling AIA Defendants only attempt to observe proper corporate formalities when it suits their personal self-interests. Based on the foregoing, John Taylor breached his duties of loyalty and good faith owed to AIA Services.
[1337] L.T. – 1219.

2007, the Controlling AIA Defendants, particularly with their knowledge of the improper transactions described in this Report and the claims in lawsuits regarding the improper transactions, breached their duties of good faith and loyalty owed to the AIA Corporations as directors, officers and/or majority or controlling shareholders by not properly and regularly holding board meetings and shareholder meetings for the AIA Corporations to effectuate proper corporate governance and to properly address and approve transactions and litigation decisions discussed in this Report thereby being one of the proximate causes of the damages inflicted upon the AIA Corporations and their shareholders (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto and other damages addressed in this Report).

20.     Setting aside the issue regarding the fact that none of the above meeting minutes or resolutions were properly approved for the reasons stated in this Report, the failure to hold regular proper annual board meetings and proper special board meetings for the AIA Corporations in light of the acts and omission of the Controlling AIA Defendants was also a mockery of corporate governance. Under Idaho Code section 30-1-801(2) "[a]ll corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed by or under the direction of its board of directors. " Nearly identical language is contained in Section 4.4 of AIA Services' New Restated Bylaws[1338] and Section 4.4 of AIA Insurance's Bylaws.[1339] The effect of those charter and bylaw provisions is that "[g]overnance power resides in the board of directors, not in the individual directors who constitute the board. Thus it matters whether a majority of the directors find themselves discussing business at a company picnic or at a formal board meeting. At the picnic, they are powerless to act with respect to the corporation's affairs; in the board room, they have all the power created by the firm's constitutional documents."[1340] The following has also been stated with respect to the necessity for board meetings, which is common sense: "Meetings represent more than a mere technicality; they are a substantive protection. A proper meeting should be informative and should encourage the free exchange of ideas so that a corporation's directors – through their, active, meaningful participation – may keep themselves fully informed and in compliance with their fiduciary duty of

---

[1338] AIA0002569.

[1339] *RJT-AIA 1062*.

[1340] William T. Allen & Reiner Kraakman, Commentaries and Cases on the Law of Business Organization, 97 (5th ed. 2016)

**Exhibit - 1, p. 344**

**12-ER-2762**

care."[1341] Based on the extensive number of improper transactions, loans, guarantees, agreements, compensation, litigation, and other corporate actions involving the Controlling AIA Defendants, their failure to properly hold and make full disclosure at annual shareholder and board meetings and to properly hold and make full disclosure at the many special board meetings required to address all of those transactions, loans, guarantees, agreements, compensation, litigation, and other corporate actions were breaches of their duties of good faith and loyalty (which includes all of the purported representation agreements and alleged conflict waivers involving the Hawley Troxell Defendants, whether written or oral). In addition, based on the conflicts of interest discussed in this Report, the Controlling AIA Defendants also breached their duties of good faith and loyalty by not electing or having appointed independent directors[1342] to address the conflicts of interest and improper corporate actions discussed in this Report because none of them were independent as to any of the issues in this Lawsuit.

21.     Having reviewed all of the limited meeting minutes and resolutions for the AIA Corporations pitifully representing over twenty years of so-called corporate governance, there were no properly held board meetings or resolutions obtained for the AIA Corporations from 1999 through the present time that properly disclosed, reviewed, approved and authorized any of the improper, self-dealing and conflicts of interest for the transactions, loans, guarantees, agreements, compensation,

---

[1341] *Fogel v. U.S. Energy Systems, Inc*., 2007 WL 4438978 *3 (Del. Ch. 2007). The court also noted that, as is the case with the AIA Corporations, properly elected directors, can also act by unanimous written consent. See AIA Services' New Restated Bylaws sec. 4.9; AIA Insurance's Bylaws sec. 4.9.

[1342] This excludes the required appointments of Donna Taylor's board designee as the Series A Preferred Shareholder and the designee for the Series C Preferred Shares held in the AIA Services' 401(k) Plan, the appointment of which would also have provided badly needed independence.

Exhibit - 1, p. 345

12-ER-2763

litigation, and other corporate actions at issue in this Lawsuit involving any of the Defendants.[1343]

22.     As discussed in this Report, virtually all of the purported actions that John Taylor and/or the other Controlling AIA Defendants took, or matters or transactions they engaged in, were not even purportedly approved or authorized by the AIA Corporations' respective supposed directors and officers even if they had been duly elected and appointed (which, as stated in this Report, they were not). Having recently established through John Taylor's recent Rule 30(b)(6) deposition testimony that only board or shareholder meetings or resolutions are those reflected in the written meeting minutes and resolutions produced in discovery, and despite John Taylor and Henderson being attorneys and John Taylor being an accountant and long-term member of the board of Avista Corp.,[1344] there are no alleged board or shareholder meeting minutes or resolutions for the AIA Insurance or AIA Services which:[1345]

- approved or purported to authorize the fixing of any compensation to John Taylor, the other officers who had competed against the AIA Corporations through their ownership and/or employment with CropUSA, or the fix the amount of John Taylor's compensation under his 1995 Executive Officer's Agreement subsequent to the first three years of that Agreement (*see* Damage Item Numbers 13, 35, and 40 in Exhibit A attached hereto);

---

[1343] These actions damaged the AIA Corporations as indicated by the Damage Item Number(s) stated for each action (although not the sole cause of the damages as discussed in this Report). There was only one exception where John Taylor, Beck and Henderson came close to properly addressing conflicts of interest. At the joint board meeting held for the AIA Corporations on August 7, 2008, John Taylor, Beck, Henderson and the Hawley Troxell Defendants properly recognized the significant conflicts of interest that pertain to Reed Taylor and Donna Taylors' derivative demands in July 2008. At that meeting, the purported board voted to seek a court appointed inquiry to investigate the allegations made by Reed Taylor and Donna Taylor. However, the proper conduct abruptly ended there. Rather than propose names of truly independent and qualified persons to conduct the investigation, the Controlling AIA Defendants and Hawley Troxell Defendants proposed two persons with direct ties to Henderson and Mike McNichols. Most importantly, the so-called court appointed inquiry was abandoned and neve legitimately pursued. It is noteworthy that no investigation was needed based on the obvious and egregious acts and omission discussed in this Report.

[1344] *See* Sections X and X(E) of this Report.

[1345] I will not address the conflicts of interest and other corporate governance matters that prevented the Controlling AIA Defendants from approving these transactions and corporate actions because there was no approval at all.

Page - 337

Exhibit - 1, p. 346

12-ER-2764

- approved or purported to approve the issuance of common shares in AIA Services to certain Series C Preferred Shareholders in 2000, including issuing those shares without requiring payment (*see* Damage Item Number 40 in Exhibit A attached hereto);[1346]

- approved or purported to authorize the execution of the Management Agreement dated January 1, 2001 between AIA Insurance and CropUSA or any transactions under that agreement (*see* Damage Item Numbers 20 and 38 in Exhibit A attached hereto);

- approved or purported to authorize the transfer of, or utilize the corporate opportunity of, the exclusive Agency and Development Agreement between Growers National and CropUSA dated January 1, 2001 (*see* Damage Item Number 34 in Exhibit A attached hereto);[1347]

- approved or purported to authorize the execution of the Master Marketing Agreement dated January 10, 2001 between AIA Insurance and CropUSA or any transactions under that agreement (*see* Damage Item Numbers 20 and 38 in Exhibit A attached hereto);

- approved or purported to authorize, as erroneously stated in a purported January 10, 2001 CropUSA board meeting, AIA Services' alleged decision to not to continue to operate CropUSA as a subsidiary (*see* Damage Item Numbers 1-2 in Exhibit A attached hereto);

- approved or purported to authorize AIA Services' subsidiary, CropUSA, to issue shares of its common stock pursuant to a June 12, 2001 exchange offer made to certain holders of Series C Preferred Shares, the issuance of John Taylor's initial common shares in CropUSA, or the payment for John Taylor's common shares through accounting entries on the books of the AIA

---

[1346] AIA0023951.

[1347] AIAPROD00300706-11. As discussed in the Report and as reflected in the accounting documents, the AIA Corporations founded and funded Growers Nation and established that Co-Op through their long-term contracts with the Associations (e.g., GGMIT) for insurance products sold by the AIA Corporations to farmers and ranchers.

Corporations.[1348] This is another example of preferential treatment being wrongfully given to so called "investor shareholders." (*see* Damage Item Numbers 1-2, 20, 38 in Exhibit A attached hereto; *see also* Damage Item Numbers 1-40);

- approved or purported to authorize the rejection of the opportunity to purchase AIA's Parking Lot, which John Taylor and Henderson surreptitiously purchased using the AIA Corporations' funds to pay most of the purchase price, on or about November 20, 2001 or any of the subsequent payments made to John Taylor for renting AIA's Parking Lot (*see* Damage Item Number 17 in Exhibit A attached hereto);[1349]

- approved or purported to authorize the execution of the Administrative Agreement dated June 1, 2003 between AIA Insurance and CropUSA and the Addendum A attached thereto, or any transactions under those agreements (*see* Damage Item Numbers 20 and 38 in Exhibit A attached hereto);

- approved or purported to authorize the 2004 purchase by AIA Insurance of the 205,000 Series C Preferred Shares held by CropUSA for $1,510,693 prior to, or contemporaneously with, the transaction, and Duclos confirmed that the so-called resolution dated August 26, 2004 purporting to authorize the transaction[1350] was not prepared until the following year in connection with the audit of AIA Insurance's 2004 financial statements in 2005 (*see* Damage Item Number 3 in Exhibit A attached hereto);[1351]

- approved or purported to authorize by AIA Services the 2004 purchase by AIA Insurance of the 205,000 Series C Preferred Shares held by CropUSA for $1,510,693 or the opening of a new bank account with AmericanWest Bank in the name of AIA Insurance and CropUSA (and any other new bank

---

[1348] As stated in Section XI of this Report, if AIA Services' had determined after appropriate corporate action to have CropUSA distribute shares of its common stock, it should have been in the form of a spin off to the holders of AIA Services Common Stock; if holders of Series C shares were to participate, AIA Services' 401 (k) Plan should have been included in the exchange as well, subject to legal requirements applicable to the Plan's portfolio.

[1349] When John Taylor was deposed in *Reed Taylor v. AIA Services*, he was asked whether his improper purchase of the parking lot was good for him: "Was it good for John Taylor"" and he responded "Sure." 1/20/2008 John Taylor Depo. Transcript, pp. 393-94.

[1350] AIA0027502.

[1351] 4/29/2008 Duclos Depo. Transcript, pp. 125-127.

Exhibit - 1, p. 348

12-ER-2766

accounts)[1352] to deposit those $1,510,693 funds, which listed John Taylor's home address for the account owner[1353] and on the statements (*see* Damage Item Number 3 in Exhibit A attached hereto);

- approved or purported to approve the issuance of 475,000 common shares in AIA Services to John Taylor after he untimely provided notice of exercising his option on August 1, 2005 and without approval to issue those shares in the light of his intentional and ongoing breaches of his Executive Officer's Agreement or to permit the purchase of the shares by debiting John Taylor's internal account[1354] with the AIA Corporations rather than tendering the required case payment as required (*see* Damage Item Number 40 in Exhibit A attached hereto);

- approved or purported to approve the loss of the corporate opportunity of the insurance business of Pacific Empire Holdings (a/k/a the Sound Insurance business) or the competition by Sound Insurance with the AIA Corporations because Sound Insurance also sold health policies and there was no reason the insurance policies that it sold should not have been sold by AIA Insurance (*see* Damage Item Number 39 in Exhibit A attached hereto);

- approved or purported to authorize the execution of the Promissory Note and related agreements dated September 28, 2007 between AIA Services and CropUSA, which was improperly prepared by the Hawley Troxell

---

[1352] Although the deposit of corporate funds only into proper corporate bank accounts is a common sense part of the duties of loyalty and good faith owed to the AIA Corporations, Section 6.3 of the AIA Corporations' bylaws separately required board approval to open any new bank accounts. The events that took place regarding the $1,510,693 being deposited into a new secret account are precisely the type of misconduct that the bylaws sought to prevent—unscrupulous officers and directors (i.e., John Taylor) absconding with money belonging to the corporation (i.e., AIA Insurance). Based on the information provided, it is impossible to know if there were other checks belonging to the AIA Corporations that John Taylor or any of the other Controlling AIA Defendants may have deposited into their bank accounts or other secret accounts, and if so, the amount of the check(s) and the dates. *See* Damages Item Number 38 in Exhibit A attached hereto.

[1353] The account holder was oddly listed as both AIA Insurance and CropUSA.

[1354] Even if the debiting of this account was permitted, John Taylor was not entitled to any compensation from the AIA Corporations and none had been approved by the boards of the AIA Corporations as discussed in this Report.

Page - 340

Exhibit - 1, p. 349

Defendants acting as counsel on both sides of the transaction (*see* Damage Item Numbers 4 and 6-9 in Exhibit A attached hereto);[1355]

- approved or purported to authorize the purported litigation decisions, except for alleged decisions regarding the July 2008 derivative demand letter, in *Reed Taylor v. AIA Services* or the other transactional work performed by the Hawley Troxell Defendants, including the representation for the 2008 settlement with the trusts (*see* Damage Item Numbers 4 and 6-9 in Exhibit A attached hereto);

- approved or purported to authorize the execution by AIA Services and AIA Insurance of the February 25, 2008 Amended Engagement Letter, including purported conflict waivers, which was purportedly back dated to November 1, 2007 (*see* Damage Item Number 4 in Exhibit A attached hereto; *see also* Damage Item Numbers 1-40 proximately caused thereby);[1356]

- approved or purported to authorize the execution of the 2008 Amended and Restated Tolling Agreements in *Reed Taylor v. AIA Services* authored by the Hawley Troxell Defendants in 2008 (*see* Damage Item Numbers 1-40);

- approved or purported to authorize the cessation of all payments to Donna Taylor for her Series A Preferred Shares (which were required to have been redeemed no later than December 3, 2003), AIA Services' decisions to oppose Donna Taylor, thereby incurring significant fees and costs and an award of fees and costs against it by the Idaho Supreme Court, and the fees and costs incurred by Donna Taylor (*see* Damage Item Number 14 in Exhibit A attached hereto);

- approved or purported to authorize the execution of the $2,400,000 Settlement and Release Agreement in August 2008 between AIA Insurance,

---

[1355] The Hawley Troxell Defendants separately breached their duties of care and loyalty owed to the AIA Corporations by providing legal services for this transaction and certain lawsuits. This loan, and the security pledged under it, violated AIA Services' Amended Articles of Incorporation (including Section 4.2.9(g)) and Sections 4.4, 4.14, and 5.2(b) of AIA Services' New Rested Bylaws.

[1356] Inexplicably, the letter states "the Amended Joint Defense Agreement should be approved by the Boards of Directors of each of the corporate defendants, with the individual defendant directors abstaining from participating or voting on the issue." (HTEH000045). There were no "directors" who had not been defendants since August 2007, when Beck and Henderson were made parties to *Reed Taylor v. AIA Services* along with the other purported director, John Taylor.

Exhibit - 1, p. 350

12-ER-2768

the state of Idaho, the Trusts and NOLHGA or the use of the remaining unpaid $425,115 settlement proceeds that did not belong to the AIA Corporations (*see* Damage Item Numbers 10 and 11 in Exhibit A attached hereto);

- approved or purported to authorize the execution of the Administrative Agreement dated January 1, 2009 between AIA Insurance and CropUSA or any transactions under that agreement (*see* Damage Item Numbers 20 and 38 in Exhibit A attached hereto);

- approved or purported to authorize the April 6, 2009 conflict of interest acknowledgement in, or any other conflicts of interest with the Hawley Troxell Defendants other than the limited ones addressed in the May 2, 2007 Engagement Letter (which were improper and ineffective as discussed in this Report) in relation to the assertion of the illegality defense sent by the Hawley Troxell Defendants to the "boards" of the AIA Corporations (*see* Damage Item Number 4 in Exhibit A attached hereto);

- approved or purported to authorize the execution of the December 22, 2009 Hawley Troxell Engagement Letter relating to *Donna Taylor v. AIA Services* or any litigation decisions in that lawsuit, including opposing the appointment of a receiver, Donna Taylor's board designee or the entry of an injunction requiring the AIA Corporations to be properly operated and comply with their articles and bylaws (*see* Damage Item Number 4 in Exhibit A attached hereto; *see also* Damage Item Numbers 1-40 proximately caused thereby);

- approved or purported to authorize any loans, advances, providing of alleged services (or the compensation paid therefore) between the AIA Corporations and PERC or the non-payment or non-accrual of any interest and related subordination provisions,[1357] including, without limitation, the January 10, 2010 promissory note for $680,365.85, the September 20, 2011 promissory note for $787,599.06, the December 31, 2012 promissory note for $457,650,

---

[1357] Despite evidence that Beck and Henderson did not believe the loans to PERC were appropriate, they failed to take any action to prevent further loans or transactions or recover the loans previously made. For example, Henderson testified that the Pacific Empire Radio loans weren't "something that was presented at a meeting and I voted on, but I did become aware of that" and that "there were never any [board] discussions." 9/10/2020 Connie Henderson Depo. Transcript, p. 175, 280.

the December 31, 2013 promissory note for $310,245 and the subsequent advances and transactions (*see* Damage Item Number 13 in Exhibit A attached hereto);

- approved or purported to authorize AIA Services' alleged April 10, 2010 Assignment purporting to transfer a 23% interest in AIA Services' Former Headquarters to the AIA Services' 401(k) Plan and the subsequent February 29, 2014 transfer of 10% to the AIA Services' 401(k) Plan for the benefit of John Taylor, or the subsequent recording of either instrument (*see* Damage Item Numbers 15-16 in Exhibit A attached hereto; *see also* the damages for fees and costs advanced for the defense of that lawsuit as discussed below);[1358]

- approved or purported to authorize the AIA Corporation's Amended Guarantee of the GemCap Loan (the Amended and Restated Secured Continuing Guarantee signed on October 5, 2012 and the Security Agreement – Guarantee signed October 1, 2012) or the security interests purportedly granted in the new unlimited guarantee and security agreement, nor was the purported February 4, 2013 board resolution reaffirming the AIA Services' Limited Guarantee of the GemCap Loan approval or purported authorization for the AIA Corporations' Amended Guarantee of the GemCap Loan or any obligations beyond the original $1,113,930 (*see* Damage Item Numbers 15-17, 25 and 36 in Exhibit A attached hereto; *see also* Damage Item Numbers 1-40);[1359]

- approved or purported to authorize the release of the $413,992.05 in funds and accrued interest held in the court's registry in *Reed Taylor v. AIA*

---

[1358] As Judge Brudie recently noted, both of these instruments were recorded well after they were signed and John Taylor improperly acted on both sides of the transaction, which separately constitute breaches of his duties of loyalty and good faith owed to the AIA Corporations.

[1359] Initially, I was of the belief that it was possible that the February 4, 2013 resolution contained errors when it stated to purportedly only authorize the original "limited Continuing Guarantee." However, Henderson's recent deposition testimony that she was not advised of the unlimited nature of the guarantee or the existence of the AIA Corporations' Amended Guarantee of the GemCap Loan or that the February 4, 2013 board resolution was purporting to authorize an "unlimited guarantee" actually confirms that, while no guarantee of the GemCap Loan was permitted, all guarantees purportedly authorized by the boards of the AIA Corporations for the GemCap Loan were always limited to $1,113,930. 9/10/2020 Henderson Depo. Transcript, p. 230. There could be no error when Henderson understood the guarantee to be limited and the terms of the resolution stated that the guarantee was limited. *See* Section XIII.

Page - 343

Exhibit - 1, p. 352

12-ER-2770

*Services* in 2012 and the subsequent use of those funds (*see* Damage Item Number 12 in Exhibit A attached hereto);

- approved or purported to authorize the retention of counsel, waiving any conflicts of interest, the filing of the lawsuit on July 26, 2012, the payment of fees and costs, or any litigation decisions in *AIA Services v. Durant* (*see* Damage Item Number 30 in Exhibit A attached hereto);

- approved or purported to authorize the execution of the October 5, 2012 AIA Corporations' Amended Guarantee of the GemCap Loan, which subsequently led to damages by way of the attorneys' fees and costs paid to Munding's firm and the GemCap Settlement Agreement (*see* Damage Item Numbers 15-17, 25 and 36 in Exhibit A attached hereto);[1360]

- approved or purported to authorize John Taylor to appear as counsel for the AIA Corporations in the defense of *GemCap v. AIA Services* on August 7, 2014 or any litigation decisions regarding that lawsuit (*see* Damage Item Numbers 15-17, 25 and 36 in Exhibit A attached hereto);[1361]

- approved or purported to authorize the entry into the settlement and subsequent execution of the September 15, 2014 GemCap Settlement Agreement, the transfer and sale of AIA Services' Former Headquarters and AIA Insurance's Two Condos and the subsequent litigation in *GemCap v. AIA Services* (*see* Damage Item Numbers 15-17, 25 and 36 in Exhibit A attached hereto; *see also* Damage Item Numbers 1-40);

- approved or purported to authorize the advancement or payment of any fees or costs for the Controlling AIA Defendants or the AIA Corporations for lawsuits initiated or defended by or through any of the Controlling AIA

---

[1360] This guarantee and security agreement increased the amount the AIA Corporations were obligated to pay to the full amount of the GemCap Loan. This guarantee was never properly authorized and violated the Guarantee Prohibition provision and Sections 4.2.9(h)-(k) under AIA Services' Amended Articles of Incorporation.

[1361] In addition to breaching his fiduciary duties of good faith and loyalty by opposing the relief requested by Miesen, Durant and Donna Taylor in that lawsuit (as did Beck and Henderson), John Taylor separately intentionally breached his duties of care, duties of good faith and duties of loyalty owed to the AIA Corporations by failing to represent their interests and obtain the relief requested in that lawsuit, thereby being one of the additional proximate causes of Miesen's damages for this issue.

Page - 344

Defendants,[1362] except for the March 2007 improper shareholder vote sought to for AIA Services[1363] to advance fees and costs, and the improper so-called August 2008 approval by Beck and Henderson to advance fees and costs for John Taylor[1364] in Donna Taylor's first lawsuit in *Donna Taylor v. Taylor* (*see* Damage Item Numbers 4, 6-9, 21-26 and 29-32 in Exhibit A attached hereto);

- approved or purported to authorize the so called reissuances of approximately 30,000 Series A Shares to John Taylor since December 31, 2016, except for the $7,500 shares purportedly issued through a resolution on May 26, 2016, which was improper and a nullity as discussed in the Report (*see* Damage Item Number 40 in Exhibit A attached hereto);[1365]

- approved or purported to authorize the use of, or diversion of, the prioritization of AIA Corporations' funds for other improper purposes discussed in this Section XI(A) and in this Report, rather than using those funds for appropriate purposes such declaring and paying the dividends owed on the Series C Preferred Shares held in AIA Services' 401(k) Plan and fully redeeming the Series A Preferred Shares held by Donna Taylor when those shares had priority and the AIA Corporations were in "runoff" mode (*see* Damage Item Numbers 4 and 14 in Exhibit A attached hereto);

- approved or purported to authorize the non-payment of, not charging interest for, purportedly applying the debt to Reed Taylor's $6M Note, the collection of, and any other matters relating to John Taylor's $307,271 debt owed to the AIA Corporations (*see* Damage Item Number 307 in Exhibit A attached hereto);

---

[1362] These payments include the unauthorized payments of fees and costs to James Grow, Daniel Glynn, Doug Siddoway and David Risley for improperly purportedly representing the interests of the AIA Corporations in this Lawsuit and others.

[1363] The request did not seek approval for advancing fee and costs based on John Taylor, Duclos and Freeman's acts and omissions as directors and officer of AIA Insurance. The request was only made to AIA Services.

[1364] There was no purported authorization to advance John Taylor's fees and costs in Donna Taylor's second lawsuit filed in 2013 nor was there any to advance fees and costs for Henderson, Beck or Cashman for either of the consolidated lawsuits in *Donna Taylor v. Taylor*.

[1365] The issuance of shares of an Idaho corporation must be authorized by the board of directors or the shareholders if the articles of incorporation so provide. *See* Idaho Code section 30-1-621. Moreover, any such purported reissuance would be a conflicted transaction prohibited by the AIA Services' Articles of Incorporation and AIA Services' New Restated Bylaws.

- approved or purported to authorize the consideration or rejection of any derivative demand letters at issue in this Lawsuit made by Miesen, Donna Taylor or any other shareholders (i.e., John Taylor's letter dated September 12, 2016 was not a response by the boards of the AIA Corporations);[1366]

- approved or purported to authorize the retention of counsel for the AIA Corporations in any lawsuit or transaction and/or for that counsel to represent the interests of one or more of the Controlling AIA Defendants (or approve of the conflicts of interest in doing so) in lieu of properly representing the interests of the AIA Corporations (*see* Damage Item Numbers 4, 14, 22-26, 30, 36 in Exhibit A attached hereto; *see also* Damage Item Numbers 1-39);

- approved or purported to authorize the retention of counsel for AIA Services in *GemCap v. AIA Services* and John Taylor should be responsible for the payment of all fees and costs for his fraudulent conveyance actions founds by Judge Brudie (*see* Damage Item Number 36 in Exhibit A attached hereto);[1367]

- approved or purported to authorize the redemption of any other shares by AIA Services or the termination of AIA Services' ESOP or the redemption of the common shares held in the ESOP (*see* Damage Item Number 38 in

---

[1366] The Controlling AIA Defendants had conflicts of interest that prevented any of them, including John Taylor, from considering or addressing the derivative demand letters based on the conflicts of interest stated in this Report (*see also* Exhibits C-D attached hereto). John Taylor breached his fiduciary duties of loyalty and good faith by purportedly acting to reject Miesen's two 2016 demand letters by and though John Taylor's letter dated September 12, 2016 and any other actions taken by him regarding those demand letters and the prior demand letters submitted by Miesen and other shareholders (including Donna Taylor). Beck, Henderson and John Taylor also separately breached their duties of loyalty and good faith by never following through with the alleged petition for a court appointed inquiry and by not seeking truly independent persons to undertake the inquiry. Moreover, I have reviewed all of the demand letters provided by Miesen, Donna Taylor and other shareholders. Indeed, based on the extensive malfeasance and the concealments of information, the derivative demand letters were more than adequate and I, as a director, would have voted to take legal action asserting the same claims that Miesen is asserting. The Controlling AIA Defendants, and the Hawley Troxell Defendants, during their critical representation of the AIA Corporations commencing in 2007, were well aware of the conduct, transactions and claims being requested and they were in a superior position of having all of the documents and information available to them to confirm the malfeasance and improper transactions discussed in this Report.

[1367] GemCap's request for fees and costs is pending.

Exhibit A attached hereto) (*see* Damage Item Number 38 in Exhibit A attached hereto);

- approved or purported to authorize the purchase or sale of any stock or securities in entities partially owned by John Taylor, including Pacific Empire Communications (*see* Damage Item Number 38 in Exhibit A attached hereto);

- approved or purported to authorize paying $4,263 to Mr. Pinkerton's firm on March 14, 2019 to supposedly appraise the Series C Preferred Shares held in the AIA Services' 401(k) Plan, which was the payment of an obligation of the AIA Services' 401(k) Plan and not an obligation of the AIA Corporations (*see* Damage Item Number 33 in Exhibit A attached hereto);[1368]

- approved or purported to authorize, after full disclosure and after addressing the Controlling AIA Defendants' conflicts of interest discussed in this Lawsuit (*see also* Exhibits C-D attached hereto), any of the improper and related-party transactions, the competition by other entities, and other improper transactions and decisions not to act in the best interests of the AIA Corporations for the issues and damages at issue in this Lawsuit or the establishment of any committees, including litigation committees, of the board to resolve any conflicts (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto);

- approved or purported to authorize the unknown and undisclosed payments to various parties and entities involving conflicts of interest, improper

---

[1368] As discussed in this Report, Mr. Pinkerton is less than ethical. First, he improperly valued the Series C Preferred Shares held in the 401(k) Plan at $0 after purportedly considering the unauthorized PERC loans and the GemCap Settlement Agreement (among other documents). Mr. Pinkerton should have immediately spotted the improper transactions like Mr. Hile and I quickly ascertained (including the improper classification of the PERC loans as an "investment" when they were loans and that the PERC loans and GemCap Settlement should have never been entered into based on the restrictions under AIA Services' Amended Articles of Incorporation and the AIA Corporations' bylaws. Instead, in my opinion, Mr. Pinkerton was preparing a valuation of $0 at the request of John Taylor. If that were not enough, Mr. Pinkerton subsequently became an expert witness for the Hawley Troxell Defendants wherein he is taking positions to prevent Miesen from recovering for the benefit of the Series C Preferred Shares in the AIA Services' 401(k) Plan. It is clear from his report that he is again simply offering the opinions that he was asked to offer rather than rolling up his sleeves and actually looking at what transpired.

Page - 347

transactions and other allocations between or among any parties and the AIA Corporations (*see* Damage Item Number 38 in Exhibit A attached hereto);

- approved or purported to authorize John Taylor's resignations and appointments as trustee of the AIA Services' 401(k) Plan after properly addressing John Taylor's conflicts of interest and history of improperly placing his self-interests above the interests of the 401(k) Plan and making improper loans from the AIA Services' 401(k) Plan and unauthorized transactions with that 401(k) Plan (which appear to be criminal acts by John Taylor as well) (*see* Damage Item Numbers 16 and 38 in Exhibit A attached hereto);

- approved or purported to authorize the proper appointment of any officers, including John Taylor as purported president, from January 1999 to the present time for AIA Services (other than the purported appointment of John Taylor as secretary on May 26, 2016) and from after the last purported appointments on May 9, 2006 for AIA Insurance (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto);

- approved or purported to authorize any board action by AIA Services' board of directors after obtaining a waiver, or having provided notice to, the directors for the Series A Preferred Shares and Series C Preferred Shares (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto);

- approved or purported to authorize the purchase of any vehicles from John Taylor or pay any credit card, loans or other expenses for John Taylor or Henderson (including approving or authorizing any loans from them), including to her law firm (*see* Damage Item Numbers 18, 28-29, 37 and 38 in Exhibit A attached hereto);

- approved or purported to authorize selling or disposing of the vehicles owned by the AIA Corporations (*see* Damage Item Number 38 attached hereto);[1369]

- approved or purported to authorize the submission to the AIA Services' shareholders for approval of any of the improper transactions, conflicts of interest transactions, transactions violating AIA Services' Amended Articles

---

[1369] John Taylor recently testified that he allegedly purchased one vehicle from AIA Insurance and disposed of another one. 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 1096-99.

Page - 348

of Incorporation and/or the AIA Corporations' bylaws (including Section 4.14) and guarantees, agreements, and other transactions discussed in this Report, most of which constitute corporate waste and required unanimous shareholder approval as discussed above (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto);

- approved or purported to authorize the inter-company loans, advances or services (including labor), or the fixing or approval and fairness of any specific amounts or repayment terms, between the AIA Corporations and any of the Controlling AIA Defendants and/or any entities that any of them partially own or manage, including CropUSA (*see* Damage Item Number 38 in Exhibit A attached hereto)

- approved or purported to authorize any board action by the AIA Corporations by disclosing and addressing the specific applicable restrictions under AIA Services' Amended Articles of Incorporation and the Controlling AIA Defendants' conflicts of interest stated in this Report, which applied to both AIA Services and AIA Insurance (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto);

- approved or purported to approve and implement a related-party transaction policy[1370] for the AIA Corporations, despite John Taylor and Henderson[1371] both being attorneys and John Taylor serving on the board of the publicly traded Avista for many years with full knowledge of related-party transactions and policies implemented to prevent them and the ongoing serial improper related-party transactions (*see* Damage Item Numbers 3-4, 6-38, 40 in Exhibit A attached hereto);

- approved or purported to authorize any alleged loans obtained by John Taylor or the acquisition of any real property from him or his entities, including

---

[1370] Such a policy would have prevented the numerous and substantial related-party transactions which were generally never approved and never approved by an independent director or after proper disclosure to shareholders since 1999.

[1371] I note from my review of Henderson's deposition transcript that she acts as though the legal issues "above her pay grade". However, Henderson herself has actually sued an attorney, Mr. Maile, wherein she asserted aiding and abetting breaches of fiduciary duty claims against him before she commenced serving on the AIA Corporations' boards (ironically, Henderson alleged that Maile breached his duties of loyalty). Henderson, a lawyer well-versed in the law, is not innocent and she has substantially assisted John Taylor since 2007 and has done nothing to stop his improper and unlawful conduct discussed in this Report.

Page - 349

12-ER-2776

fixing the agreed value of any real or personal property or the terms of any loans (*see* Damage Item Numbers 18 and 38 in Exhibit A attached hereto);[1372]

- approved or purported to authorize the delegation of any authority to John Taylor, as purported president of the AIA Corporations, or any other officers or specific persons to act on behalf of the AIA Corporations, including to delegate authority to approve or authorize any of the bullet point items discussed above (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto).[1373]

23.     The Controlling AIA Defendants have breached their duties of good faith and loyalty owed to the AIA Corporations and their shareholders on numerous occasions over the course of many years by failing to properly disclose, address, approve and authorize the transactions and corporate actions discussed in the bullet points above, and most importantly by failing to prevent them or take action to prevent further ones or seek redress for past ones, thereby being one of the proximate causes of the damages for the bullet point items (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto). To reiterate, the Controlling AIA Defendants breached their duties of good faith and loyalty by engaging in the unapproved and unauthorized transactions discussed in the above bullet points and in this Report thereby being one of the proximate causes of Miesen's damages in Exhibit A attached hereto. During the time when certain controlling AIA Defendants were directors of the AIA Corporations, they separately breached their duties of good faith and loyalty for the transactions occurring during their tenure on the boards of the AIA Corporations because they were directly or indirectly involved in the transactions or recipients through entities that they partially own thereby being one of the proximate causes of Miesen's damages corresponding to the time they served on the boards; they also substantially assisted one another in concealing many of the transactions and by continuing them and/or failing to take

---

[1372] John Taylor testified that he transferred real property to AIA Insurance at GemCap's direction, which, such as the Kettenbaugh building, was foreclosed upon shortly thereafter. 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 274-76. The notes to AIA Services' financial statements for December 31, 2015 state: "[d]uring 2013, real estate, formerly owned by the majority shareholder was transferred to the company at book value of $820,668, including assumption of mortgages to Banks of $393,863." AIAS_0000183. An action as subsequently filed against John Taylor and others to foreclose on certain property. These transactions were improper.
[1373] This excludes the purported authority specifically delegated or contemplated by some of the limited resolutions and meeting minutes produced in discovery (*see* Exhibit B attached hereto), which were separately improper and not properly approved for other reasons stated in this Report.

Page - 350

appropriate action. The transactions and corporate actions discussed above, and the failure to take any action to recover the damages listed, constitute breaches of the fiduciary duties of good faith and loyalty owed by the Controlling AIA Defendants thereby being one of the proximate causes of Miesen's damages—those damages could have been prevented and action taken to recover the sums owed for previously unauthorized transactions, which the Hawley Troxell Defendants also share in the blame. Notably, the conduct that has occurred since 2007 was entirely foreseeable to the Hawley Troxell Defendants and the other Controlling AIA Defendants based on the proven track record of improper and unauthorized transactions, loans and guarantees. Moreover, after the Controlling AIA Defendants and Hawley Troxell Defendants became aware of many of the transactions and corporate action discussed above, they breached their respective duties of loyalty and good faith by failing to take action to prevent future ones or recover those damages thereby being one of the proximate causes of Miesen's forty Damage Items.

24.     Even if board meeting minutes or resolutions existed to purportedly approve and authorize the transactions and corporate actions discussed in this Report, the Controlling AIA Defendants' conflicts of interest discussed in this Report and as shown in Exhibits C-D attached hereto demonstrate that the corporate action was not, and could have not been, properly approved and authorized because, *inter alia*, as discussed in this Report, Sections 4.14 of the AIA Corporations bylaws regarding conflicts of interest could only have been properly complied with by making full disclosure to AIA Services' shareholders and obtaining shareholder approval as discussed in this Report and Donna Taylor's consent to a violation of Section 4.2.9(g) because none of the transactions and corporate actions at issue in this Lawsuit would have been agreed to by any reasonable, prudent or independent director. Indeed, from 1999 through the present time, there was not a single proper written disclosure provided to the AIA Corporations' shareholder to properly disclose, address and approve any of the Controlling AIA Defendants' conflicts of interest discussed in this Report; nor was there any board meeting minutes or resolutions properly disclosing, addressing and approving any of those conflicts of interest as they pertained to any of the transactions and corporate action discussed in this Report.[1374] Against that background, it is abundantly clear that the Controlling AIA Defendants serially breached their duties of loyalty, good faith and care by, *inter alia*, engaging in the numerous intentional, illegal, unauthorized,

---

[1374] Some limited conflicts of interest were touched upon, but never fully disclosed or properly addressed, for the improper March 2007 special shareholder meeting for AIA Services and the August 7, 2008 joint board meeting for the AIA Corporations.

interested, conflicted and unfair transactions and corporate actions discussed in this Report, which provided no benefit whatsoever to the AIA Corporations, as well as the conduct and litigation decisions in *Reed Taylor v. AIA Services*, *Donna Taylor v. Taylor*, *AIA Services v. Durant*, *Donna Taylor v. AIA Services*, *Durant v. GemCap*, *GemCap v. AIA Services*, and *GemCap v. CropUSA* and as also referred to below, from which the Controlling AIA Defendants received a financial benefit and/or harmed the AIA Corporations, including through the use of the AIA Corporations as the means to pay the defense costs for the Controlling AIA Defendants and others in the foregoing lawsuits. Those breaches of the duties of loyalty, good faith and care thereby being one of the proximate causes of Miesen's forty Damage Items, included based on the following:

- repeated violations by John Taylor (and the acquiescence thereof by the other Controlling AIA Defendants) of the common law fiduciary duties to act solely for the interests of his employer the AIA Corporations and to comply with the non-compete and other provisions of his 1995 Executive Officer's Agreement, as well as the other AIA Controlling Defendants' refusal to terminate John Taylor's employment and affiliation with the AIA Corporations and prevent him from having any access to their bank accounts, assets or trade secrets (many of the known improper acts are detailed in this Report). Likewise, Duclos, Freeman and other employees were prohibited from competing against the AIA Corporations under the common law. Despite their obligations to focus all of their efforts towards the business interests of the AIA Corporations, the Controlling AIA Defendants improperly competed with the AIA Corporations through the operation and ownership of CropUSA and other entities (*see* Damage Item Numbers 18, 35 and 40 in Exhibit A attached hereto);

- usurpation of the AIA Corporations' business opportunities and funding them with money and assets from the AIA Corporations, including the then promisingly lucrative opportunity presented by recently passed federal legislation to engage in crop insurance and related businesses (and failing to take action to recover the assets sold to Hudson or payment thereof), the forming and operation of other competing insurance businesses (e.g., Sound Insurance and Pacific Empire Holdings), taking AIA's Parking Lot and subsequently increasing the rent payable by the AIA Corporations, wrongfully taking the contract and commissions with Growers National, and wrongfully taking tenants of the AIA Corporations (*see* Damage Item Numbers 1-2, 17, 20, 34, 38-39 in Exhibit A attached hereto);

Exhibit - 1, p. 361

12-ER-2779

- misappropriation of the AIA Corporations' ownership of AIA Crop Insurance, Inc. (CropUSA) and the subsequent funding and operation thereof and other entities by utilizing funds, office space, trade secrets, relationships with the various agriculture associations, other assets and personnel of the AIA Corporations as discussed in this Report; in this respect, for example, John Taylor admitted in a 2007 deposition that CropUSA was funded at least in part "By AIA Services or AIA Insurance" (*see* Damage Item Numbers 1-2, 17, 20, 34 and 38 in Exhibit A attached hereto);

- purchasing with $6,500 of AIA Insurance's line-of-credit for $8,000 a parking lot leased and maintained by the AIA Corporations and then subsequently quadrupling the annual rent from $3,500 to $15,000 the AIA Corporations were required to pay (this conduct provides but one example of how the attorneys John Taylor and Henderson would go to any length to treat the AIA Corporations' assets as their own personal property) (*see* Damage Item Number 17 in Exhibit A attached hereto);

- utilization (with no benefit to the AIA Corporations) in August 2004 of $1,510,693 of a commission bonus payment to cause the AIA Corporations to purchase, at a time when AIA Services was in arrears in required redemption payments to Donna Taylor, the Series C Preferred Shares of AIA Services from CropUSA. (According to John Taylor, the purchase was originally made by AIA Services as a redemption but then he later indicated that the purchase was by AIA Insurance.)[1375] This permitted the misappropriated CropUSA to receive $1,510,693 of AIA Insurance's cash and also recognize an additional paid in capital gain of $1,488,843 (according to financial statements). That accounting gain occurred because CropUSA had been carrying the Series C shares on its financial statements at a value of only $21,850 (to carry out the scheme, John Taylor surreptitiously deposited those commission funds in a new account, without board approval, with the name "AIA Insurance Inc. Crop USA" and utilizing his home address for the statements); the AIA Controlling Defendants' conduct (including for concealing and covering up the improper transaction) one of the proximate causes of the sum of, at the least, the $1,510,693 paid to CropUSA. In

---

[1375] As recently as February of this year, until he caught himself, John Taylor testified that the transaction was a redemption. 2/24-26/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 449. This is because he originally intended the transaction to be redemption as confirmed by his email to AIA Insurance's former CFO Marcus McNabb as discussed in Section X(F).

addition, as stated above, this payment was made when AIA Services was in arrears in its payments to Donna Taylor, as she should have been paid off first (*see* Damage Item Numbers 3 and 14 in Exhibit A attached hereto);

- delivery to Lancelot of a Guarantee by AIA Insurance of the obligations of Crop USA to Lancelot under a Loan and Security Agreement dated October 27, 2006 in violation of (i) the Guarantee Prohibition in AIA Services' Amended Articles of Incorporation which prohibited AIA Services and in effect any Subsidiary (as defined therein) from guaranteeing an obligation of anyone other than a Subsidiary without the consent of the holders of a majority of the outstanding shares of Series A Preferred Stock and (ii) the AIA Insurance's Bylaws, with which John Taylor and Henderson (she became aware of this guarantee approximately six months after the fact), as attorneys, were fully familiar and which later culminated in the Hudson Transaction and the resulting proximately caused damages of the book of business that was sold (Hudson is still operating the business) of at least seventy percent of the $11,588,245 in assets which were sold in effect to satisfy the Crop USA borrowing from Lancelot and the illegal guarantee thereof by AIA Insurance or such other amount as a jury may value the business. The AIA Corporations should have taken action to have AIA Insurance's guarantee declared unenforceable and taken action to recover the assets and the $120,000 consulting fees which should have been paid to them (*see* Damage Item Numbers 1-2 in Exhibit A attached hereto);

- millions of dollars in illegal redemption payments to Reed Taylor and other repurchases for hundreds of thousands of dollars of common stock by AIA Services at a time when the Series A Preferred Stock had not been fully redeemed and full cumulative dividends had not been paid on the Series C Preferred Stock, all in violation of AIA Services' Amended Articles of Incorporation, thus proximately damaging the AIA Corporations for the amount of those share purchases and also improperly benefiting John Taylor and Henderson by increasing their equity ownership interest in AIA Services (*see* Damage Item Numbers 5, 14 and 27 in Exhibit A attached hereto) (*see* Damage Item Number 38 in Exhibit A attached hereto);

- making of over $2,000,000 in loans and advances by the AIA Corporations to a company unable to pay its debts and hardly credit worthy, Pacific Empire Radio, in which John Taylor and Henderson had a substantial stock interest and from which they otherwise personally benefitted, resulting in

Exhibit - 1, p. 363

12-ER-2781

proximately caused damages in the amount of such loans (these loans separately violated the conflict of interest provisions in AIA Services' Amended Articles of Incorporation (and the financial covenants because the promissory notes are essentially worthless), AIA Services' New Restated Bylaws and AIA Insurance's Bylaws (*see* Damage Item Number 13 in Exhibit A attached hereto);

- failure to insure that the AIA Corporations complied with applicable corporate governance requirements and procedures, including compliance with AIA Services' Amended Articles of Incorporation,[1376] AIA Services' New Restated Bylaws, AIA Insurance's Bylaws and the holding of annual and other necessary shareholders' and directors' meetings, maintaining complete and accurate corporate records and providing appropriate disclosure to the AIA Disinterested Shareholders (including as discussed above), thus allowing the misfeasance of the Controlling AIA Defendants to go undetected, as well as causing the AIA Corporations to purportedly conduct its affairs pursuant to unauthorized and null and void purported "agreements" such as the Master Marketing, Administrative Agreements and any other "allocation" agreements with CropUSA and other contracts or arrangements with which the Controlling AIA Defendants were affiliated (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto);

- as discussed elsewhere in this Report, the repeated failure to ensure that directors were appointed for the Series A Shares and Series C Shares and the repeated refusals to honor the designation of an AIA Services board member by Donna Taylor, Attorney Moran in 2009 and Durant in 2012, pursuant to the clear and unqualified terms of her Series A Preferred Stock set forth in Section 4.2.8 of AIA Services' Amended Articles of Incorporation, which would have prevented Miesen's damages after those points in time and would

---

[1376] These include the requirement to appoint Donna Taylor's board designee to the board of AIA Services, the Guarantee Prohibition, the transactions with affiliates prohibition under Section 4.2.9(g), and the financial covenants and sale of business and assets covenants in Sections 4.2.9(e), (h), (j) and (k). There was no effort to comply with any of them. The only effort was made when the Controlling AIA Defendants were seeking to prevent Donna Taylor from being paid by arguing that the higher interest rate and shorter amortization period, which were fully disclosed to shareholders in 1995 and approved by Donna Taylor, resulted in Donna Taylor's redemption obligations in the 1995 Letter Agreements being invalid. Their arguments illustrate how they are very capable of reviewing the articles when it suits their self-interests and only when it suits their self-interests. They conduct has been oppressive and outrageous.

Page - 355

have resulted in recoveries for the AIA Corporations pursuing claims on their behalf (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto);

- as also discussed below in Section XII, the making by John Taylor, and to the extent any of the other Controlling AIA Defendants were involved, of virtually all the litigation decisions regarding the response of the AIA Corporations to the allegations in *Reed Taylor v. AIA Services*, *Donna Taylor v. AIA Services*, *AIA Services v. Durant*, *Donna Taylor v. Taylor*, *Durant v. GemCap*, *GemCap v. AIA Services*, *GemCap v. CropUSA*, other lawsuits,[1377] and this Lawsuit of the misconduct committed by John Taylor and other Controlling AIA Defendants' misconduct against the AIA Corporations and the AIA Disinterested Shareholders, as well as all decisions regarding the conduct of that litigation generally (John Taylor's litigation decisions were uniformly contrary to the interests of the AIA Corporations); John Taylor's litigation decisions[1378] had the effect of not only precluding the AIA Corporations from pursuing claims against the Controlling AIA Defendants, but also being unable to prevent or halt continuing wrongs to the AIA Corporations and wasting their resources litigating in some instances (e.g., paying more in fees to oppose Donna Taylor rather than paying her); thereby being one of the proximate causes of the damages to the AIA Corporations, including as described elsewhere in this Report. The Controlling AIA Defendants also improperly permitted fees and costs to be advanced for other lawsuits and matters, including involving CropUSA and personal matters for John Taylor and Henderson (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto);

- John Taylor's appointment of Henderson and Beck to the boards of the AIA Corporations on April 30, 2007 was another product of John Taylor's conflicts of interest. Based on his conflicts of interest as discussed in this Report and the failure to have held annual shareholder meetings for AIA Services for years, the shareholders, not John Taylor (who was not properly elected himself), should have voted to determine the members of the board of directors. Moreover, since John Taylor, Beck and Henderson all had serious conflicts of interest as discussed in this Report, the approval of the purported board compensation for Beck and Henderson should have been approved by

---

[1377] *See* Exhibit D attached hereto.

[1378] John Taylor has testified as follows; "And you made the litigation decisions in the Reed Taylor verses AIA Services lawsuit, correct? He answered, "I did." 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 427-28.

AIA Services' shareholders and only after full disclosure of the facts in this Report and those facts unknown to me or Miesen (*see* Damage Item Number 19 in Exhibit A attached hereto);

- as explained in this Report, the Controlling AIA Defendants' failure to male full disclosure of all facts to AIA Services' shareholders and to disclose and address their conflicts of interest and improper corporate governance (including litigation decisions and decisions to not pursue litigation) through proper shareholder meetings (particularly since most of Miesen's damages constitute corporate waste requiring unanimous shareholder approval) were one of the proximate causes of Miesen's forty Damage Items in Exhibit A; and

- adoption of a May 26, 2016 purported amendment to AIA Services' New Restated Bylaws adding a Section 11.11 relating to reimbursement of the Corporation's attorney's fees in derivative or similar actions,[1379] and the adoption of a May 26, 2016 purported amendment to AIA Insurance's Bylaws adding a Section 11.11 relating to reimbursement of the Corporation's attorney's fees in derivative or similar actions.[1380] Like many other corporate actions, John Taylor unilaterally purported to adopt these two bylaw amendments simply through two written resolutions. Neither of those resolutions discussed or resolved John Taylor's serious conflicts of interest discussed in this Report, including the fact that he was a named defendant in this Lawsuit since 2016 thereby having a distinct conflict of interest on that issue alone. John Taylor breached his duties of loyalty and good faith by purporting to adopt these two resolutions and amending the AIA Corporations' bylaws for his self-interests and to attempt to increase the risk of Miesen and other shareholders in an effort to improperly impact their decisions to file and maintain derivative suits.

25.    Each intentional act of misconduct by the Controlling AIA Defendants, and in many instances their failure to act, as described in this Report constituted a breach of the duties of loyalty and good faith owed to the AIA Corporations and their shareholders because, *inter alia*, in engaging in that conduct, the Controlling

---

[1379] AIAPROP00307958. By virtue of the conflict of interest provisions in those bylaws such an amendment would have had to have been authorized by an independent director or by the AIA Disinterested Shareholders.

[1380] AIAPROP00307958. Moreover, in fact no Section 11.11 is contained in the purported amended AIA Insurance's Bylaws

Page - 357

AIA Defendants for many years intentionally and consistently placed their personal interests, benefit and financial gain above the interests of the AIA Corporations and the AIA Disinterested Shareholders, including their interests in entities partially or wholly owned or controlled by one or more of them,[1381] thereby being one of the proximate causes of the damages to the AIA Corporations by causing, failing to prevent, and failing to recover the damages requested by Miesen in the Damage Items in Exhibit A attached hereto. Many examples of the specific acts of the same misconduct of the Controlling AIA Defendant are described throughout this Report. All such conduct proximately damaged the AIA Corporations because the transactions and acts could have been prevented and damages recovered as described in this Report (including Sections XII-XIII).

26.    Upon my review of thousands of pages of documents and based on my work for this Report, I am of the opinion that none of the transactions and corporate action being challenged by Miesen were fair to the AIA Corporations or provided them with any benefit. In order for the Defendants to try to show that each transaction or corporate action was fair and appropriate, they will need to fully disclose all facts and show how each transaction or corporate action was fair to the AIA Corporations. In my opinion, they will not be able to do so with contemporaneously existing supporting evidence for millions of dollars of the total revenues expended by the AIA Corporations since 1999 (*see* Damage Item Number 38 in Exhibit A attached hereto). As a lawyer or a director of the AIA Corporations, I would never have engaged in, or approved, the improper corporate governance and improper transactions discussed in this Report which have been one of the proximate causes of the damages inflicted upon the AIA Corporations and their shareholders (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto).

27.    As stated in this Report, the additional information that I have obtained through discovery has reinforced my prior opinions and provided important information to express other opinions. To reiterate, as I have previously stated in a Declaration filed on January 5, 2017 in this case: "In all my years of practice and experience, I have never seen such wide-spread corporate malfeasance and inappropriate conduct as was committed by the defendants in this lawsuit and/or covered up by them as demonstrated by the documents that I have reviewed as described in this Report. While the defendants John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, Sr., JoLee Duclos and CropUSA Insurance Agency, complain about the length of Dale Miesen's Proposed Third Amended Complaint in this lawsuit, I believe that the length of that complaint is

---

[1381] *See* the names of some of the known entities in ExHibit C attached hereto.

Exhibit - 1, p. 367

12-ER-2785

necessary to cover the substantial history of facts and the claims at issue in this lawsuit."[1382] To this day and despite demands by Miesen and other shareholders, the Controlling AIA Defendants continue to fail to comply with fundamental corporate governance procedures and fail to operate the AIA Corporations for the benefit of the corporations and their shareholders. Indeed, with the little remaining funds that are being generated by the AIA Corporations, the Controlling AIA Defendants use those funds to fund their litigation costs, at least in part, and to pay other expenses for their benefit. Moreover, the Controlling AIA Defendants have refused to hold a single shareholder meeting since their failed effort to eliminate Miesen and other shareholders through the failed reverse stock split in 2012. Having reviewed substantially more documents and deposition transcripts since the last version of my Report, the conduct continues to become even more egregious. As result of my intensive work and careful study in the more than three years since that filing of my declaration testimony quoted above, nothing has come to my attention that would lead me to reconsider that statement. To the contrary my continued examination of the facts has only confirmed its accuracy. The malfeasance of the Controlling AIA Defendants in this Lawsuit as described in this Report stands alone.

28.    In my experience solely as a director and if I had been a director of the AIA Corporations since January 1, 1999 through the present time, I would have never permitted the improper corporate governance, improper transactions or improper corporate actions to occur as stated in this Section XI(A) and this Report. I would have ensured that timely annual shareholder meetings occurred, that special shareholder meetings were held, that annual board meetings were held, that special board meetings were regularly held, voted against all of the improper actions, voted to have John Taylor, Duclos, Freeman and other competing officers terminated, voted to not pay John Taylor or the other competing officer a single penny, voted not to advance any litigation fees or expense for any of what the Controlling AIA Defendants did and failed to do, voted against guaranteeing any loans to CropUSA (including the ones with GemCap), voted against the GemCap Settlement Agreement, voted to prepare and implement a related-party policy to prevent the transactions discussed in this Report from occurring, voted to not recommend Henderson, Beck, Duclos or Freeman be nominated as directors, and voted against all of the improper corporate transactions and actions described in this Report. I would have voted for the AIA Corporations to take legal actions as requested in the 2008, 2012 and 2016 derivative demand letters or to allow Miesen or other shareholder to pursue them and allow the AIA Corporations to obtain the proceeds

---

[1382] Dkt. 194-6, p. 6 ¶ 21.

Exhibit - 1, p. 368

12-ER-2786

of any recovery.[1383] In short, I would have done exactly the opposite of the Controlling AIA Defendants.[1384] The Controlling AIA Defendants intentionally breached their duties of good faith and loyalty in their capacities as directors during their respective tenures as directors for the reasons stated in this Report thereby being one of the proximate causes of Miesen's forty Damage Items; they also knowingly, intentionally and in bad baith breached their duties of care for those same reasons.

### B. The Business Judgment Rule Not Applicable.

1. Although the business judgment rule creates a presumption that good faith actions of directors should not be second guessed, none of the above actions of the Controlling AIA Defendants (or the many other similar ones, including those addressed in this Report) are protected from judicial scrutiny by the business judgment rule because they were intentionally taken in bad faith and/or for their own financial interests, to the detriment of the AIA Corporations and the AIA Disinterested Shareholders.[1385] In addition, Miesen's claims involve intentional breaches of the duties of loyalty owed by the Controlling AIA Defendants which are not protected by the business judgment rule and any exculpatory provisions. As discussed in the various Sections of this Report, including Sections X, XI and XII,

---

[1383] In my opinion, the 2008, 2012 and 2016 derivative demand letters were easily understood in the light of the Controlling AIA Defendants having been directly involved in the improper conduct as discussed in this Report. Any alleged response that the AIA Corporations made, specifically John Taylor's 2016 response letter, was never approved or authorized by the board and the excuses stated in his letter were baseless. The derivative demand letters at issue in this Lawsuit do not involve discrete nuances involving the business judgment rule and, again, the Controlling AIA Defendants were directly involved in the misconduct and had superior knowledge, or access to additional information, unlike Miesen, Donna Taylor or other shareholders.

[1384] With the exception of certain limited actions such as asserting the illegality defense and limited other actions such as resolving the litigation with the state of Idaho. However, in my opinion, based on the over $2,000,000 in fees and costs expended opposing Reed Taylor and the extensive improper transactions, guarantees and settlements occurring after that time, in my opinion, amazingly the AIA Corporations would have been better served by reasonably settling with Reed Taylor since one of the conditions that he had placed on settlement was that the AIA Corporations and CropUSA must be properly operated.

[1385] The Unredacted Billing Records show that Riley was trying to create a paper trail of business judgment rule protection: "8/13/08 Thomas B. Chandler…Work with R. Riley re scope of minutes documenting business judgment rule compliance, and alternative methods to document." FB 0755. As stated in this Sections X and XI, the Controlling AIA Defendants acted with knowledge that their conduct was legally improper.

Page - 360

**Exhibit - 1, p. 369**

**12-ER-2787**

the Controlling AIA Defendants' established pattern of conduct bears no relation to directors "who acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company" [1386] and are therefore entitled to the business judgment rule presumption. The same is true for the Controlling AIA Defendants' conduct as officers and majority or controlling shareholders of the AIA Corporations.

## C.   The Exculpatory Provisions Under the AIA Corporations' Amended Articles of Incorporation Are Not Applicable to the Controlling AIA Defendants' Conduct.

1.      Based upon the facts and my analysis and opinions in this Report, the exculpatory provisions under the AIA Corporations' amended articles of incorporation do not protect any of the Controlling AIA Defendants because they have acted in bad faith, in a disloyal manner and for their self-interests while failing to discharge their duties of good faith and loyalty owed to the AIA Corporations and their shareholders as stated in this Report. Article Eleventh of the AIA Services' Amended Articles of Incorporation provides that:

> A director of this corporation shall not be personally liable to this corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (a) for any breach of the director's duty of loyalty to this corporation or its shareholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Idaho Code § 30-1-48, or (d) for any transaction from which the director derived an improper personal benefit. If the Idaho Business Corporation Act is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of this corporation shall be eliminated or limited to the fullest extent permitted by the Idaho Business Corporation Act, as so amended. Any repeal or modification of this Article Eleventh by the shareholders of the corporation shall not adversely affect any right or protection of a director of the corporation existing at the time of such repeal or modification.[1387]

---

[1386] *Aronson v. Lewis*, 280 A.2d 805, 812 (Del. Sup. Ct. 1984).
[1387] DLM – 0033065.

Exhibit - 1, p. 370
12-ER-2788

2.      Article Twelfth of AIA Insurance's Amended Articles of Incorporation contains the same provision. Since my prior Report, there have been no further amendments to AIA Services or AIA Insurance's articles of incorporation to broaden the protections under the exculpatory provisions or to include officers or majority and/or controlling shareholders. Moreover, even assuming that some of John Taylor's conduct was limited to breaches of the duty of care, he has owed elevated fiduciary duties as an officer of the AIA Corporations and he is not entitled to rely on the exculpatory provisions as a defense for any his violations of his duties of care as an officer. The same holds true for Duclos.

3.      In addition, Idaho Code sections 30-1-202(2)(b) & (d) (those Code sections remained unchanged in 2015 and 2019) did not, under the circumstances here existing, permit an Idaho corporation such as the AIA Corporations to authorize corporate action "further eliminating or limiting" such liability. Stated differently, under these circumstances, Idaho Code did not provide greater protection for acts or omissions of the Controlling AIA Defendants as directors or officers of the AIA Corporations.

4.      As described in detail in this Report,[1388] the numerous breaches of fiduciary duties by the AIA Controlling Defendants (including the duties of loyalty, good faith, and care) were both intentional and for the purpose of enhancing their own personal financial benefit (e.g., in bad faith), a far cry from ordinary negligence, and the Controlling AIA Defendants have no protection under the exculpatory provisions for their conduct as majority and controlling shareholders or their conduct as officers of the AIA Corporations. Accordingly, in my opinion, from January 1, 1999 to the present time, Article Eleventh of AIA Services' Amended Articles of Incorporation and Article Twelfth of AIA Insurance's Amended Articles of Incorporation have no application to the conduct of the Controlling AIA Defendants during the periods of time that they acted as directors, officers and/or majority or controlling shareholders of the AIA Corporations, and thus they cannot rely on the exculpatory provisions as a defense because their conduct does not fall within that of the breach of due care or related business judgment duties.[1389]

---

[1388] *See* Sections X-XIII of this Report.
[1389] *See, e. g., Chaffin v. GNI Group, Inc.* 1999 WL 721569 (Del. Ch. 1999).

### D. John Taylor's Education and Experience as a Lawyer, an Accountant and as a Director of a Publicly Traded Company.

1.      The conduct of John Taylor described in this Report is particularly inexcusable because since 1985 he has been a licensed lawyer, obtained an degree in accounting and is a member of the Board of Directors of Avista Corporation, a publicly traded corporation which has reportedly adopted generally accepted corporate governance procedures such as maintaining a Related Party Transaction Policy to regulate conflict of interest transactions involving Board members. The corporate governance principles adopted by the publicly traded Avista Corporation are identical to those that the law imposes on directors and officers of a closely held corporation such as the AIA Corporations.[1390] When John Taylor was asked at his Rule 30(b)(6) deposition whether the AIA Corporations had adopted a related-party policy, he refused to directly answer the question (like many questions) and merely stated "any payment of time of an employee done for an affiliated company must be recorded, tracked, and allocated back to the appropriate company and adjustments made."[1391] Upon my review of the accounting records, the expenses and costs were not properly allocated. For example, Miesen has identified certain allocated expenses on AIA's books that were never actually allocated to CropUSA, as detailed in Damage Item Number 20. By way of another example, I have not seen any employee records where the employee accurately notes time expended for one entity or the other, and the records that I have reviewed show that the allocations were randomly determined by percentages without any supporting basis, while other expenses were not allocated for many years, including, without limitation, rent and John Taylor's compensation.[1392]

2.      Moreover, John Taylor, who is a member of the Idaho State Bar since 1976 and holds a degree in accounting with knowledge of "the rules of accounting,"[1393] and at times acted as a lawyer for the AIA Corporations (including specifically as the AIA Corporations' lawyer in *Durant v. GemCap*), was fully on notice of the provisions of AIA Services' Amended Articles of Incorporation, AIA Insurance's Amended Articles of Incorporation, AIA Services' New Restated

---

[1390] *E.g.*, RJT – 024313-28.

[1391] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 1034.

[1392] I have not seen a single document demonstrating that the allocation of John Taylor's compensation was performed based on actual time expended working among the various entities that he partially funded and operated with the assistance of the AIA Corporations' money and employees. *See, e.g.,* Exhibits A and C attached hereto.

[1393] 2/24-26/2020 John Taylor Depo. Transcript, p. 35.

Exhibit - 1, p. 372

12-ER-2790

Bylaws and AIA Insurance's Bylaws as well as his obligations and duties to the AIA Corporations and the AIA Disinterested Shareholders, but utterly failed to honor any of them or otherwise ensure proper corporate governance and accounting for the AIA Corporations. I have personally reviewed many accounting records for the AIA Corporations and my observations are consistent with those of Mr. Hile's.[1394] Indeed, as discussed in Section X(I) and after AIA Insurance had stopped auditing its financial statements after the final audit for 2007,[1395] CropUSA's auditors issued two known reports[1396] in 2008[1397] and 2010[1398] advising the board of CropUSA that the company was not properly addressing or approving related-party transactions, that the board rarely approved the related party transactions and, in the rare instances when the approvals were purportedly obtained from the board, they were provided long after the transaction. With John Taylor's having received those two reports, his knowledge of legal and accounting affairs, and the Controlling AIA Defendants' continuation of the improper corporate governance, John Taylor's conduct described in this Report was even more astounding and egregious. Henderson, who has also been an attorney during all relevant times, also has no excuse. As attorneys, John Taylor and Henderson know how to research the law and comply with the law. They simply intentionally chose not to do either, thereby breaching their duties of loyalty and good faith owed to the AIA Corporations and being one of the proximate causes of Miesen's damages, as discussed in this Report.

### E.   Adverse Interest Exception.

1.      Generally, the knowledge of a director or officer of a corporation is imputed to that corporation, but that principle does not apply to the facts here as to the AIA Corporations. By reason of the misconduct of the Controlling AIA Defendants as described throughout this Report, including, without limitation, the misappropriation and improper funding of CropUSA, the Hudson Transaction, the more than $3,000,000 in "compensation" paid by the AIA Corporations to John Taylor, the Lancelot Loan, the AIA Services' Limited Guarantee of the GemCap

---

[1394] DLM – 107813-8057.

[1395] Ironically or intentionally, AIA Services' financial statement were not audited after 1999—the year that CropUSA was formed. AIA0028749-79. In addition, there is no doubt in my mind that AIA Insurance's auditors were misled for the audits conducted from 1999 through 2007.

[1396] There were two reports issued by LeMaster & Daniels, who quit as CropUSA's auditors shortly after the last one, which were produced in discovery. There may have been others not produced in discovery.

[1397] AIAPROD00066114-34.

[1398] AIAPROD00066375-89

Page - 364

Exhibit - 1, p. 373

12-ER-2791

Loan and the AIA Corporations' Amended Guarantee of the GemCap Loan, all of which was entirely adverse to the AIA Corporations and from which the AIA Corporations received no benefit, the knowledge of the Controlling AIA Defendants was not imputed to the AIA Corporations because there were no independent directors, officers or shareholders involved in, or aware of, any of such transactions and corporate actions as described in this Report. Such non-imputation is known as the adverse interest exception.[1399] It is applicable to all aspects of this Lawsuit because the Controlling AIA Defendants have consistently placed their interests ahead of the interests of the AIA Corporations and they have consistently taken action diametrically opposed to the interests of the AIA Corporations as also discussed Report. Consequently, the AIA Corporations were at all times oblivious to the actions of the Controlling AIA Defendants and to any of the transactions or litigation to which either of the AIA Corporations was purportedly a party.[1400] Moreover, any person, firm or corporation, such as the Hawley Troxell Defendants or GemCap, who knew or under the circumstances should have known, of such misconduct on the part of the Controlling AIA Defendants was not entitled to rely on the general rule that the knowledge of an officer or director of a corporation is imputed to such corporation. Neither the Hawley Troxell Defendants nor GemCap could have relied on any claimed "apparent authority" of any of the Controlling AIA Defendants because each of them had actual knowledge of such misconduct on the part of the Controlling AIA Defendants. Based on the limited written board meeting minutes and resolutions as discussed in Section XI(A) above and the conflicts of interest and intentional harm inflicted upon the AIA Corporations described in this Report, the adverse interest exception is even more applicable than at the time of my last Report (if that is possible). Accordingly, because within the AIA Corporations only the Controlling AIA Defendants, and not an independent director or the AIA Disinterested Shareholders, knew of the misconduct, it is my opinion that none of the Controlling AIA Defendants' wrongful conduct or transactions was authorized or approved by the AIA Corporations.

---

[1399] *See, e.g.,* Sections X(V) & XII(Y) of this Report.

[1400] The condition of the AIA Corporations was analogous to that of a client with diminished capacity, and the Hawley Troxell Defendants should have taken the necessary protective action prescribed by RPC 1.14 which in this context would have been to insist that decisions be made by the AIA Corporations' highest authority, an independent director or a majority of the AIA Disinterested Shareholders. Ashby has testified on behalf of the Hawley Troxell Defendants that he doesn't know what an independent director is. 3/ 4/2020 Ashby Rule 30(b)(6) Depo. Transcript, p. 187.

Exhibit - 1, p. 374

12-ER-2792

### F.   Henderson and Beck.

1.      I have discussed Henderson and Beck in more detail in Section XI(A) above. However, Henderson and Beck were purportedly named as directors of both AIA Corporations by John Taylor on April 30, 2007, and purported to serve in that capacity until Henderson resigned on September 12, 2014 (days before the initial alleged GemCap Settlement Agreement) and Beck sometime thereafter.[1401] While breaching their respective duties as directors by engaging in the misconduct described above, each received $5,000 per quarter, compensation that was wholly inappropriate given the financial condition of the AIA Corporations, and under the circumstances should be disgorged. They were also given the right to acquire 5,000 shares of common stock of AIA Services for less than book value, a violation of Section 4.2.9(a) of the AIA Services' Amended Articles of Incorporation and such rights should be rescinded. In addition, despite the filing of the various lawsuits discussed in this Report, Henderson and Beck continued to be aligned with and have failed to take any action or otherwise to stop the actions taken by John Taylor and the other Controlling AIA Defendants discussed in this Report. As explained in this Report, Beck and Henderson had conflicts of interest that prevented them from fixing their own compensation and John Taylor was also unable to do so based on his conflicts and improper appointment of them to board in 2007. In any event, all compensation and costs paid to Beck and Henderson was improper by reason of placing their interests and the interests of other Controlling AIA Defendants and CropUSA above the interests of the AIA Corporations as discussed in this Report. Moreover, as also discussed in this Report, Henderson and Beck were one of the proximate causes of Miesen's forty Damages Items. They could have stopped John Taylor before or after they resigned as directors, but they chose not to do so, and continue to cooperate with him.

2.      Indeed, Henderson and Beck, two directors, could have and should have outvoted John Taylor to ensure compliance with proper corporate governance and to cease all of the improper transactions, loans, guarantees and compensation, together with taken proper legal action, as discussed in this Report, but they utterly failed to do so in breach of their duties of loyalty and good faith owed to the AIA Corporations and their shareholders thereby being one of the causes of the damages to the AIA Corporations and their shareholders (see Damage Item Numbers 1-40 in Exhibit A attached hereto). Moreover, they should have voted to remove John

---

[1401] Beck attempted to backdate his resignation to September 12, 2014 which is not permissible under Idaho Code section 30-1-807 or AIA Services' New Restated Bylaws (*see* sections 4.2 and 4.5).

**Exhibit - 1, p. 375**

**12-ER-2793**

Taylor as an officer of the AIA Corporations and prohibited him from having any access to the AIA Corporations funds and assets thereby breaching their duties of loyalty and good faith and being one of the proximate causes of the damages.[1402]

### G. Cashman.

1.      I have addressed Cashman in more detail in Section XI(A). However, to reiterate, as the single largest Series C Preferred Shareholder until 2001, the second largest common shareholder of AIA Services until 2012, and a six year Director of AIA Services acting in concert with John Taylor, Henderson and Beck, during and subsequent to being a Director[1403], Cashman intentionally breached the controlling shareholder duties of loyalty and good faith he owed as a member of a controlling shareholder group to the AIA Corporations and the AIA Disinterested Shareholders by, *inter alia*, placing his interests and the interests of CropUSA above the interests of the AIA Corporations and the AIA Disinterested Shareholders (as also further described in this Report). It is settled law that "majority shareholders, either singly or acting in concert to accomplish a joint purpose, have a fiduciary responsibility to the minority and to the corporation."[1404] In addition, despite the filing of the various lawsuits discussed in this Report, Cashman has continued to be aligned with and has failed to take any action or to stop the actions taken by John Taylor and the other Controlling AIA Defendants discussed in this Report. In my opinion, Cashman was smarter than the other Controlling AIA Defendants in that he limited his written communications to them in order to attempt to disguise the appearance of his involvement. However, Cashman continues to be a member of the control group, including by being represented by

---

[1402] It is noteworthy that Henderson, despite acting as a purported director of the AIA Corporations, also breached her duties of loyalty and good faith owed to the AIA Corporations by appearing as counsel and representing John Taylor for a period of time in *Donna Taylor v. Taylor*, including by filing a motion for summary judgment, which was not in the best interests of AIA Services. Henderson should have been taking action as a director to require John Taylor to pay Donna Taylor, which would have been in the best interests of AIA Services. Moreover, Henderson never raised or addressed this conflict of interest at any board meeting. In my opinion, Henderson desired to assist John Taylor in that lawsuit in order to protect her interests in the undivided community property. This conduct is consistent with her conduct during her tenure as a director.

[1403] Cashman allegedly resigned as a Director of AIA Services on March 27, 2001 because AIA Services was unable to review its D&O Policy. 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 792. However, I believe that he resigned because of the plan to take CropUSA.

[1404] *Jones v. H.F. Ahmanson & Co.*, 460 P.2d 464, 471 (Cal. 1969) (Traynor, J). This is equally true of John Taylor, Beck and Henderson.

Exhibit - 1, p. 376

12-ER-2794

the same attorney in this Lawsuit as the other Controlling AIA Defendants, and he has failed to take any independent action to disclose facts to the AIA Corporations' shareholders or publicly take any action against any of the other Controlling AIA Defendants. As discussed in this Report, Cashman's conduct has been one of the proximate causes of Miesen's forty Damages Items. Like Henderson and Beck, Cashman could have stopped John Taylor, but he chose not to do so, and he continues to cooperate with John Taylor. *See also* Section XI(A).

### H.  Henderson, Beck and Cashman as Members of the Control Group.

1.  For the reasons stated in this Report and based upon all of the information that I have reviewed, Henderson, Beck and Cashman, along with John Taylor, have controlled the AIA Corporations since Reed Taylor sold his shares in 1995. In addition to committing their own breaches of their respective duties to the AIA Corporations and the AIA Disinterested Shareholders as directors, and providing substantial assistance to John Taylor in the form of enabling his commission of many breaches of duty, Henderson, Beck and Cashman intentionally failed to use properly their respective board and control positions to prevent the misconduct of John Taylor as discussed in this Report, and, under the circumstances, Henderson and Beck should have removed him from office. Accordingly, Henderson, Beck and Cashman have breached their duties of good faith and loyalty owed to the AIA Corporations by not ensuring that the AIA Corporations were properly operated and governed as stated in this Report and by substantially assisting in the wrongful actions of John Taylor which they intentionally chose to do by allowing him to remain in control of the AIA Corporations thereby being one of the proximate causes of the damages of Miesen's forty Damage Items. *See also* Section XI(A).

### I.  John Taylor's 1995 Executive Officer's Agreement, Compensation, Debts and Transactions.

1.  As discussed in Sections X and XI(A), the Controlling AIA Defendants breached their duties of loyalty and good faith by permitting John Taylor to be paid compensation, benefits, loans, options, other payments, the non-payment of interest on loans, and the issuance of shares thereby being one of the proximate causes of the damages to the AIA Corporations and their shareholders (*see* Damage Item Numbers 18, 28, 37-38, 40 in Exhibit A attached hereto); John Taylor consistently and intentionally acted in his self-interest and against the interests of the AIA Corporations.

**Exhibit - 1, p. 377**

**12-ER-2795**

2.　　As noted in this Report, there were never any board determinations or authorization of compensation, advances, loans or benefits for John Taylor, including generally or under the terms of his Executive Officer's Agreement. *See* Section X(A). In contemplation of the redemption of Reed Taylor's shares of common stock, AIA Services and John Taylor entered into an Executive Officer's Agreement, effective August 1, 1995. The Agreement was for an initial three-year term and evergreen from year to year thereafter unless terminated by either party.[1405] John Taylor's salary was to be $250,000 per annum for the initial three-year term under the Agreement.[1406] Although in subsequent years his salary was to be determined by the AIA Services so called "Board of Directors,"[1407] there never was any subsequent approval of his compensation as discussed in Section XI(A) and thus his compensation was never duly authorized under that agreement or otherwise[1408] from at least January 1, 1999 to the present time. He was also required under the common law and that Agreement to "devote his entire time and efforts to AIA's business and affairs" and not to "engage in any other business activity for remuneration or compensation without AIA's written consent." For the reasons stated in Section XI(A), no such consent was or could have been obtained and, as also discussed elsewhere in this Report, that provision was flagrantly breached, as were the Agreement's non-compete and non-solicitation provisions.[1409] The Agreement also granted John Taylor an option to purchase 475,000 share of AIA Services common stock at $.01 per share which he exercised; those shares were never properly or timely issued and he did not devote all of his time and efforts for the AIA Corporations and thus he did not earn the options. Indeed, after reviewing and/or considering tens of thousands of pages of documents, I have yet to see any benefit conferred by John Taylor upon the AIA Corporations other than his assertion of the illegality defense in *Reed Taylor v. AIA Services* (eliminating the meritorious tort claims that Reed Taylor had against him), which I believe John Taylor merely asserted in the interests of the Controlling AIA Defendants and CropUSA because there has been no benefit conferred upon the AIA Disinterested Shareholders since the illegality ruling as was represented to the courts would occur.

---

[1405] RJT – 089238.

[1406] RJT – 089239.

[1407] RJT – 089239.

[1408] Section 4.5 of the AIA Corporations' bylaws also requires officer compensation to be fixed by the boards of the AIA Corporations. As discussed in Section XI(A), there was not a single board meeting resolution or minutes that discussed or fixed John Taylor's compensation.

[1409] Riley drafted the Agreement, but never endeavored to confirm compliance therewith.

Exhibit - 1, p. 378

12-ER-2796

3. From 1999 through 2017 (all of the information for 2019 and 2020 has not been provided), the AIA Corporations paid John Taylor at least of $3,043,705.45 (excluding any salary accrual John Taylor is claiming which is in excess of $500,000 according to AIA Services' tax returns) to which he is not entitled for the reasons stated in this Report, which has proximately cause damages to the AIA Corporations, including, but not limited to, that amount and any accrual that he is claiming; those payments and accruals were improper because he repeatedly acted as a faithless fiduciary and solely for the his interests and the interests of the Controlling AIA Defendants. To the extent that John Taylor acquired any Series A Preferred Shares with any of his accrued salary, he is not entitled to those shares for the same reasons stated above and in this Report. In addition, the issuance to him of the 475,000 shares for $.01 per share upon his exercise of the Agreement's stock option is further compensation that John Taylor did not earn or deserve as stated in this Report. If I were a director of the AIA Corporations, I would not have voted to approve or authorize any compensation, the accrual of any salary, the issuance of any stock through options or the issuance of any Series A Preferred Shares in lieu of, or in exchange for, alleged accrued salary. Moreover, in recent years, John Taylor has accrued or paid salary to himself of $75,000 when the AIA Corporations' total revenues stood at approximately $100,000, which is outrageous. In my opinion, as a director and/or an attorney, John Taylor has conferred no benefit to the AIA Corporations since 1999 and he has been a detriment to them for the reasons stated in this Report, and his compensation in the form of cash, salary accrual, stock, benefits, and any other form of renumeration should have been $0 and no stock issued—in short, he has, with the assistance of the other Defendants, decimated the AIA Corporations.

## J. CropUSA Corporate Opportunity and Asset Sale to Hudson and the Related Corporate Opportunity of the Growers National Contract.

1. The Controlling AIA Defendants breached their duties of loyalty and good faith by improperly taking CropUSA and failing to place the interests of the AIA Corporations ahead of their own to recover the assets sold to Hudson, the so-called consulting fees paid and the value of the contract and commissions with Growers National (*see* Damage Item Numbers 1-2 and 34).

2. Owing to the passage of federal legislation in 1996, the AIA Corporations were presented with an opportunity to engage in a federal crop insurance program to be marketed to farmers by private industry. As early as April

Page - 370

**Exhibit - 1, p. 379**

**12-ER-2797**

30, 1998, the AIA Services Board was discussing "[t]he possibility of a non-agent crop/hail program."[1410] Accordingly, on November 17, 1999, "AIA Crop Insurance, Inc." was incorporated under the laws of Idaho. In a letter to the U.S. Department of Agriculture dated March 14, 2000, AIA Insurance had told the Department that "Many of the growers have asked the associations to expand product lines to include crop insurance programs. In fact, AIA receives more requests for crop insurance than for any other product except affordable health insurance."[1411] At a September 28, 2000 AIA Services Board meeting, "Reed Taylor explained the joint effort *we* are discussing with the Texas Peanut Grower Association to sell crop insurance.[1412] As described below and in this Report, John Taylor proceeded to make a number of statements and representations that an AIA Services' subsidiary was engaged in the development of the a crop insurance business; for example, in 2001, he requested temporary forbearance from Donna Taylor with respect to her Series A redemption rights in order that AIA Services could utilize its cash to develop the crop insurance business.[1413] On November 13, 2000, the name of "AIA Crop Insurance, Inc." was changed to "CropUSA Insurance Agency, Inc." (CropUSA). While there had been extensive negotiations with Reed Taylor for him to consent to CropUSA being a separate company and have common shares issued to him because he was the secured creditor of AIA Services, no deal was ever reached with Reed Taylor to implement the plan. However, the Controlling AIA Defendants elected to press forward without making Reed Taylor a part owner.

3.     Shortly thereafter, at a purported Board meeting of CropUSA dated January 10, 2011,[1414] it was simply stated that AIA Services had determined not to engage in the crop insurance business and to discontinue having CropUSA as a subsidiary. Assuming the accuracy of that statement (for which there is no evidence), since CropUSA was going to engage in the crop insurance business (and because the crop insurance business was a promising corporate opportunity and an asset belonging to the AIA Corporations[1415] *all* of the holders of common stock of AIA Services would have been entitled to receive their pro rata share of the

---

[1410] AIA0025599.

[1411] RJT – 024306.

[1412] AIA0025607 (Emphasis supplied).

[1413] RJT – 024343-44.

[1414] AIAPROD00292896-97.

[1415] CropUSA was receiving commission revenues as early as 2001(7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 602-03) and, in John Taylor's view, "[i]t was tremendously successful (*Id*. at 831). Apparently owing to waste and mismanagement, 2008 was the only year it made a profit. *See Id*. at 777-81.

ownership of CropUSA if AIA Services were not to retain ownership thereof.[1416] It is, however, highly probable that CropUSA could have been operated as a successful AIA Services subsidiary, as discussed in this Report.[1417] Instead, John Taylor was issued common stock of CropUSA by debiting his internal account at AIA and Beck, Cashman and their associates exchanged their Series C Preferred Shares for CropUSA common stock (the AIA Services' 401(k) Plan was left out). The AIA Corporations retained no equity interest in Crop USA (although at one time there were 1,000,000 shares issued in John Taylor's name for "AIA's interests," but those shares were later transferred to John Taylor. Nevertheless, as stated above and elsewhere in this Report, the AIA Corporations' cash, trade secrets, office space, other assets and personnel were wrongfully diverted to Crop USA, which at that point was owned primarily by the Controlling AIA Defendants.

4.      The above described conduct of the AIA Controlling Defendants and as stated in this Report, which was for their financial benefit and conferred no benefit whatsoever to the AIA Corporations, not only constituted a usurpation of an AIA Corporations' corporate opportunity, but also renders them liable for their intentional breaches of duties of loyalty owed to the AIA Corporations and the AIA Disinterested Shareholders and further constituted misappropriation, conversion and corporate waste. The Hawley Troxell Defendants' breached their duties of care and loyalty by failing to take action and by substantially assisted in that wrongful conduct in performing work on behalf of CropUSA and failing to take action during *Reed Taylor v. AIA Services* to recover the assets of CropUSA belonging to the AIA Corporations. As a direct result, the AIA Corporations were proximately damaged by the true value of the funds, trade secrets, office space, other assets and personnel

---

[1416] This would have been accomplished by a dividend spinoff to all of the holders of common stock of AIA Services.

[1417] Although John Taylor testified that CropUSA could not have been operated as a subsidiary because: "AIA could not get a license. AIA was not licensed as property and casualty (sic). AIA had an $8 million deficit. AIA could not be a managing agent for crop insurance." 2/24-26/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 224; *see also* pp. 739- 743. This is untrue for a number of reasons discussed in this Report, including that there were no financial restrictions that prevented the AIA Corporations from selling crop insurance and AIA Insurance's financial condition and history of being a profitable company with deep ties to farmers and ranchers, were more than sufficient for the operation of a crop insurance business.

Exhibit - 1, p. 381

12-ER-2799

utilized for CropUSA[1418] and the value of the book of business sold to Hudson for $11,588,245 or the net gain on the sale of $10,406,000.00 (of which at least 70% of either amount was traced directly to agents of the AIA Corporations such as Larry Whitehead and Andy Anderson)[1419] or such other alternative value that the jury may prescribe therefore (any of which I opine are viable and appropriate alternatives),[1420] which had been held in a constructive trust for the benefit of the AIA Corporations.[1421] Miesen has provided four alternative damage scenarios, which I believe are appropriate (*see* Damage Item Number 1 in Exhibit A attached hereto) and the facts demonstrate that the Controlling AIA Defendants and the Hawley Troxell Defendants breached their duties of care, good faith and loyalty owed to the AIA Corporations and their shareholders by not taking action to recover CropUSA and its assets and are thus each one of the proximate causes of those damages for the reasons stated in this Report.

5.      With respect to any argument that the AIA Corporations should have to deduct the approximately $8,000,000 in money owed on the Lancelot Loan[1422]

---

[1418] The true amount of expenses paid for CropUSA and money advanced to CropUSA is contained within Miesen's Damage Item Numbers 20 and 38 (e.g., many expenses were never allocated or reimbursed, it is impossible to determine where the funds went, and the Controlling AIA Defendants had conflicts of interest that require them to prove the amounts advanced and allocated and the fairness of each transaction, including the allocation percentages contained with the administrative agreements, as stated in this Report).

[1419] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 769.

[1420] *See* alternatives for Damage Item Number 1 in the attached Exhibit A.

[1421] "A constructive trust arises when 'legal title to property has been obtained through actual fraud, misrepresentations, concealments, taking advantage of one's necessities, or under circumstances otherwise rendering it unconscionable for the holder of legal title to retain beneficial interest in property.' Imposition of a constructive trust is an equitable remedy and does not require that the holder of legal title intend to create a trust interest in another. Indeed, a constructive trust arises from the legal title holder's wrongful actions and not from any intent to create a trust. A party seeking to impose a constructive trust must prove the facts alleged to give rise to the trust by clear and convincing evidence. Whether a party presented sufficient evidence to meet the clear and convincing standard is a finding of fact that this Court will uphold if substantial and competent evidence supports it." *Snider v. Arnold*, 153 Idaho 641, 643-44, 289 P.3d 43, 45-46 (2012).

[1422] Of the over $8,000,000 owed on the Lancelot Loan, an unbelievable $825,000 was paid to two loan brokers who arranged the hard money loan (GVC Financial and Surge Capital). AIAPROD00086155. Another $50,000 of the borrowed money was used to pay Quarles & Brady and other funds to presumably pay Hawley Troxell. *Id.* These facts, coupled with the interest rates on the loan as discussed in Section X(G) and elsewhere in this Report, demonstrate how John Taylor and the Controlling AIA Defendants were spending like "drunken sailors." As noted in Section X, I confirmed this from other sources as well.

Exhibit - 1, p. 382

12-ER-2800

from any damages, the defense is not applicable here. As to AIA Insurance's liability for having improperly guaranteed the $15 million Lancelot Loan in violation of Sections 4.2.9(c),[1423] (g), (h), (j) and (k) of AIA Services' Amended Articles of Incorporation and Section 14.1 of AIA Insurance's Bylaws, the guarantee was prohibited, unauthorized and ultra vires for the reasons stated in this Report (including, without limitation, for violating AIA Services' Amended Articles of Incorporation and bylaws, AIA Insurance received no benefit and AIA Insurance received no consideration). The Controlling AIA Defendants and Hawley Troxell Defendants should have asserted claims to the assets being sold and required the Controlling AIA Defendants to pay the debt on the Lancelot Loan. If any of them refused, AIA Insurance should have filed suit against Lancelot to have the guarantee declared unenforceable, which would have been successful, and any liabilities associated with such a ruling would be for the Controlling AIA Defendants to pay and Hawley Troxell for having given the improper and incorrect Legal Opinion on the Lancelot Loan. Moreover, the taking and funding of CropUSA is no different than someone stealing another person's car, taking out a loan against the car and then selling the car. All of the proceeds from the sale belong to the rightful owner. The rightful owner is not required to pay the loan. This analogy applies here. In addition, there appears little dispute that the Lancelot Loan was placed into default because Lancelot liquidated the $1.5 million in CDs that John Taylor, Beck, Cashman and others had posted a partial collateral for the Lancelot Loan (another conflict of interest for them that was never addressed), as confirmed by the assumed liabilities schedule of the sale agreement with Hudson.[1424] Those $1.5 million in funds, plus the accrued interest required to be paid on the funds, is another example of the Controlling AIA Defendants, in particular Beck, Cashman and John Taylor, placing their interests ahead of the interest of the AIA Corporations thereby breaching their duties of good faith and loyalty because the $1.5 million should have been paid to the AIA Corporations. For the same reasons, the $120,000 on consulting fees paid as part of the sale of the assets to Hudson also should have been paid to the AIA Corporations. While John Taylor has testified that the $120,000 was paid to CropUSA and not him, it is a distinction without a difference. The CropUSA assets and the $120,000 belonged to the AIA Corporations. In the alternative, the value of CropUSA was established through the sale price to Hudson and thus the $11,588,245 and Growers National being valued at the value of the $430,000 settlement consideration.

---

[1423] This section is defined as the "Guarantee Prohibition" provision in this Report.
[1424] Crop002361.

Exhibit - 1, p. 383

12-ER-2801

6.      There appears to be an effort by the Defendants to set up a defense to these Items of Damages by alleging (falsely) that the AIA Corporations could not have been licensed to sell crop insurance or be a Managing General Agency ("MGA"). At John Taylor's February 2020 deposition, he testified that CropUSA could not have been operated as a subsidiary because: "AIA could not get a license. AIA was not licensed [for] property and casualty [insurance]. AIA had an $8 million deficit. AIA could not be a managing agent for crop insurance."[1425] When examined by the Hawley Troxell Defendants' attorney at the February 2020 deposition, John Taylor provided additional convoluted and unsupported testimony in an effort to support his testimony above, which appeared to me to be an concerted effort to create the false appearance that AIA Insurance or CropUSA, as a subsidiary of AIA Services or AIA Insurance, could not have been licensed to sell crop insurance because of the deficit on AIA Services' books pertaining to the charge offs associated with the Universe and allegedly not having assets of 5% of net premium to be a Managing General Agency (MGA).[1426]

7.      The arguments that there were regulatory or financial impediments to AIA Services selling crop insurance through CropUSA as a subsidiary or AIA Insurance and John Taylor's testimony for those argument is unsupported by the evidence and facts. The notion that the AIA Insurance or CropUSA, as a subsidiary of AIA Services or AIA Insurance, could not have obtained property and casualty licenses, a Standard Reinsurance Agreement (SRA) with the Risk Management Agency (RMA) or otherwise sold crop insurance policies is unsupported by the evidence. As a preliminary matter, AIA Services would have never sought to be licensed to underwrite or sell property and casualty insurance because it was never licensed as an insurance underwriter or agency of any type with the state of Idaho, as confirmed by public records. The evidence shows that AIA Services was purely a holding company for the operating subsidiaries that underwrote (the Universe Life Insurance Company) and sold (AIA Insurance) insurance products to farmers and ranchers. As a result, the notion that AIA Services' large operating deficit caused by the disposing of the Universe and redeeming Reed Taylor's shares or the millions of dollars owed to Reed Taylor would have impacted the ability to sell crop insurance is ludicrous. As seen from AIA Insurance's financial statements, an operating subsidiary does not include the parent corporation's debts or deficits on its financial statements unless the subsidiary is also liable. AIA Insurance was not liable for Reed Taylor's debt and it did not include Reed Taylor's debt on its financial statements. Accordingly, CropUSA could have been operated as a subsidiary of

---

[1425] 2/24-26/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 224.
[1426] 2/24-26/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 739-743.

AIA Services without any concerns of AIA Services' debts, just as AIA Insurance has been operated for decades.

8.      Moreover, there was no barrier to prevent AIA Insurance from becoming licensed to sell crop insurance or to obtain a Standard Reinsurance Agreement (SRA).[1427] If CropUSA could obtain one, AIA Insurance was better positioned to obtain one. AIA Insurance, or CropUSA as a subsidiary of AIA Services or AIA Insurance, could have had AIA Insurance's employees and agents, Mary Nordhagen and Jay Taylor, obtain property casual licenses in 2001, just as they did for CropUSA according to public records, and then AIA Insurance or CropUSA could have filled out a simple application with the state of Idaho and been licensed to sell crop insurance, just as CropUSA actually did.[1428] Upon my review of CropUSA's financial statements and historical operating results and the applicable Idaho Code sections and 7 C.F.R. §§ 400.161-400.169, CropUSA was worse off financially than AIA Insurance and it had no history of revenues and profits like AIA Insurance. AIA Insurance had a history of financial profits and activities dating back to the 1970s, unlike CropUSA, which had a history of losses, nothing but losses and virtually no assets, in part, to John Taylor's mismanagement of CropUSA (which I have separately confirmed and discuss in part in this Report). In my opinion, the only reasons that CropUSA was able to secure an SRA was through AIA Insurance's long-term relationships with various growers associations which led to the formation of Growers National, the improper transfer of $1,510,693 to CropUSA from AIA Insurance in August 2004, and the contribution of $2,000,000 worth of mortgages to CropUSA in exchange for the issuance of 2,000,000 new common shares.[1429] Absent receiving those assets and without AIA

---

[1427] The notion that obtaining an SRA was part and parcel with selling crop insurance is wrong. As discussed in Section X(E)-(F), CropUSA did not even obtain an SRA until December 2004 for the 2005 crop insurance year, but it had been selling crop insurance since 2001. Likewise, CropUSA continued to sell crop insurance after it lost its SRA in 2008 and it was never able to ever secure an SRA again. Thus, the issue of financial or regulatory matters preventing the AIA Corporations from selling crop insurance is simply untrue.

[1428] Contrary to John Taylor's testimony, according to my review of the public records, CropUSA was never licensed as a Managing General Agency (MGA) under Idaho law. To the extent that it provided insurance services under some other definition of MGA, AIA Insurance could have done precisely what CropUSA did or CropUSA could have done what it did as a subsidiary of AIA Services.

[1429] John Taylor even concocted a way to make money for himself from that transaction. He arranged to purchase the mortgages from CropUSA for a discount and then later realize the full sums owed when they were paid off (this was the conflicted director transaction referenced in the Hawley Troxell billing records). This is wholly consistent with John Taylor's historical track record of placing his interests in front of shareholders.

Page - 376

**Exhibit - 1, p. 385**

**12-ER-2803**

Insurance's assistance, there is no way that CropUSA could have obtained an SRA for the same reasons that it lost it in 2008 based on its fiscal irresponsibility and high interest loans. Indeed, other than the profit made from the sale of the assets to Hudson in 2008, CropUSA lost money every year of its existence based in part on the fiscal irresponsibility of John Taylor and other Controlling AIA Defendants as discussed in this Report and independently confirmed through Jud Taylor. In short, AIA Insurance, or CropUSA as a subsidiary of AIA Services or AIA Insurance, could have easily been licensed as an agency to sell crop insurance.[1430]

9.      In my opinion, CropUSA was taken from AIA Services for the same reason that John Taylor described in his 2001 letter to the select Series C Preferred Shareholders—as an "exit strategy."[1431] This is why they needed Reed Taylor's consent—because AIA Insurance's shares and commissions—which were being used to fund CropUSA, were pledged to Reed Taylor. When Reed Taylor would not agree to their plan, the Controlling AIA Defendants strung him along until they thought that CropUSA could survive without AIA. In my opinion, John Taylor and the other Controlling AIA Defendants wanted CropUSA to be a separate entity so that they could profit from it and so that Reed Taylor's debt could not get in the way of them making money from CropUSA as an "exit strategy" from their investment in AIA Services. In my opinion, there were no financial or regulatory issues that prevented AIA Services from owning CropUSA as a subsidiary or for AIA Insurance to sell crop insurance and obtain an SRA. In my opinion, John Taylor's regulatory and financial excuses are simply that—more excuses for his improper conduct. In my opinion, CropUSA, as a subsidiary of AIA Services, could have used the same $1,510,693 in funds from AIA Insurance and even sold shares for the $2,000,000 in mortgages to also obtain the SRA. AIA Services would have still been the majority and controlling shareholder.

10.     With respect to a related matter, like forming and funding CropUSA, the AIA Corporations formed and funded Growers National and the endorsement and contract was improperly placed in CropUSA's name in breach of the Controlling AIA Defendants' duties of loyalty and good faith owed to the AIA Corporations and their shareholders thereby being one of the proximate causes of the damages for the $430,000 settlement obtained from Hudson in 2010 (*see*

---

[1430] Growers Nation also easily became a licensed property and casualty insurance agency.
[1431] AIA0001080. That same day, John Taylor sent Miesen a letter misrepresenting to him that CropUSA would not be a subsidiary so it could offer options to its agents and that AIA would receive significant revenues from AIA. Neither was true. DLM – 105709-10.

Exhibit - 1, p. 386

**12-ER-2804**

Damage Item Number 34).[1432] As stated above, the AIA Corporations' accounting records prove that Growers National was formed and funded by them.[1433] Yet, the contract with Growers National ended up improperly being with CropUSA without any consideration being paid to the AIA Corporations and without shareholder approval.[1434] *See, e.g.,* Exhibit B attached hereto. Moreover, John Taylor and Duclos were intimately involved in CropUSA and Growers Nation, and they were on both sides of the transaction in violation of their duties of loyalty and good faith owed to the AIA Corporations.

11.     After CropUSA sold its assets to Hudson in 2008, a dispute arose regarding the contract between CropUSA and Growers National, which resulted in CropUSA, who was represented by Henderson, filing a lawsuit against Growers National.[1435] Henderson, who was also a director of the AIA Corporations and was aware that the ownership of Growers National contract belonged with the AIA Corporations, breached her duties of loyalty and good faith owed to the AIA Corporations by representing the interests of CropUSA to obtain the $430,000 settlement for CropUSA when the settlement proceeds should have been paid to the AIA Corporations. Indeed, Henderson, along with John Taylor and Beck, had "[d]iscussions [] regarding litigation with Growers National Co-op" at an AIA Services' board meeting held on November 4, 2009,[1436] which was only a few months before Henderson filed suit for CropUSA, and proves the issue was even discussed by the purported directors. John Taylor, Beck and Henderson breached their duties of loyalty and good faith owed to the AIA Corporations by not paying the $430,000 to the AIA Corporations thereby being one of the proximate causes of the $430,000 in Damage Item Number 34.[1437]

### K.   Purchase by AIA Insurance of Series C Shares from Crop USA.

1.     As discussed in this Report, the Controlling AIA Defendants improperly engineered the $1,510,693 Series C Share transaction in 2004 and the

---

[1432] AIAPROD00012794-800.

[1433] CROP000923.

[1434] AIAPROD00300706-58.

[1435] DLM – 0034408-11.

[1436] AIAPROD00172397.

[1437] The Hawley Troxell Defendants were another one of the causes of these damages; they breached their duties of care, good faith and loyalty by not ensuring that the $430,000 was paid to the AIA Corporations, including, without limitation, by not properly addressing this issue in *Reed Taylor v. AIA Services* and by opposing the appointment of a receiver for the AIA Corporations.

Page - 378

subsequent failure to recover those funds, which as described above, was the essence of the Controlling AIA Defendants' self-dealing, the intentional breaches of duties of loyalty and unauthorized use of the funds for CropUSA without obtaining proper board or shareholder approval before the transaction occurred because the only alleged board decision addressing this transaction was the back-dated board resolution dated August 26, 2004 thereby being one of the proximate causes of the damages to the AIA Corporations and their shareholders in Damage Item Number 3.[1438] Accordingly, the transaction was never properly disclosed and approved by AIA Services' shareholders, who would have been the shareholders to properly approve the transaction because John Taylor, Duclos and Freeman were the same directors for AIA Services and AIA Insurance and therefore their conflicts of interested prevented them from authorizing anyone as a proxy to vote the shares (*see* Damages Item Number 3 in Exhibit A attached hereto).

2.      There was no effort undertaken by the Controlling AIA Defendants to properly disclose and approve the $1,510,693 transaction by AIA Services' shareholders or a properly elected, seated and disinterested board of directors of AIA Insurance or AIA Services. Funds needed by the AIA Corporations to discharge obligations such as, for example, using the funds to build a viable business (e.g., AIA was running off commissions from old health policies at that time), the redemption of the Series A Preferred Stock (which AIA Services was required to do) or to pay the accumulated dividends on the 92,500 Series C Shares held in AIA Services' 401(k) Plan, were instead siphoned off to CropUSA to provide it with the AIA Corporations' cash for its badly needed funding and to also enhance its balance sheet in order to obtain a Standard Reinsurance Agreement (SRA), all to the benefit of the Controlling AIA Defendants and to the detriment of the AIA Corporations. CropUSA's own purported Board minutes acknowledge that "the marketability of the shares to third party would be problematic"[1439] the translation being that the shares were close to worthless at that time. There can be no doubt that the Controlling AIA Defendants breached their duties of loyalty and good faith owed to the AIA Corporations and their shareholders by transferring the $1,510,693 to CropUSA, covering up the transaction as a stock purchase by AIA Insurance, failing to obtain the proper board and shareholder approvals for the transaction, and covering up the transaction for years including before the transaction occurred, thereby being one of the proximate causes of the damages to the AIA Corporations and their shareholders (*see* Damage Item Number 3 in Exhibit A attached hereto). *See also* Section XI(A). Finally, because John Taylor,

---

[1438] AIA0027502.
[1439] Dkt. 1-6.

Exhibit - 1, p. 388

12-ER-2806

Duclos and Freeman were also the same three directors for CropUSA (and part owners of CropUSA) and AIA Services, their conflicts of interest required them to address them only through full disclosure and the votes of AIA Services' shareholders because John Taylor, Duclos and Freeman's conflicts of interest prevented them from authorizing the vote or AIA Insurance's shares to approve the conflicts and John Taylor as president of both AIA Corporations also could not vote the shares either.[1440]

3.      In a related matter, Miesen also seeks $4,263 in damages[1441] for the unauthorized payment by AIA Insurance at the direction of John Taylor, acting in the conflicted role as a purported officer and director of the AIA Corporations and as the purported sole purported trustee of the AIA Services' 401(k) Plan,[1442] to Coles Reinstein, the firm of one of the Hawley Troxell Defendants' present expert witnesses Mr. Pinkerton, to appraise the 92,500 Series C Preferred Shares held in AIA Services' 401(k) Plan (*see* Damages Item Number 33 in Exhibit A attached hereto). Ultimately, Mr. Pinkerton opined that the "Series C preferred shares are so deeply negative…[and] to conclude that the FMV of each of these shares is therefore $0.00."[1443] As recently confirmed from John Taylor's Rule 30(b)(6) deposition, there are no board meeting minutes or resolutions approving or authorizing AIA Insurance to pay a debt of the AIA Services' 401(k) Plan in the amount of $4,263 to Mr. Pinkerton's firm, and John Taylor breached his duties of loyalty and good faith, as a trustee and a purported officer and director of the AIA Corporations, by failing to obtain proper authorization to make that payment or properly address his conflicts of interest as stated throughout this Report, including him being one of the direct causes of the AIA Corporations' financial predicament, having improperly made advances and entered into the four promissory notes with PERC and the other improper conduct discussed in this Report. *See also* Section XI(A). More specifically, John Taylor, acting simultaneously as a director of the AIA Corporations, the President of the AIA Corporations and as the sole Trustee of AIA Services' 401(k) Plan had serious conflicts of interest based on his engaging in

---

[1440] Sections 4.14 under the AIA Corporations' bylaws required the conflicts to be resolved by submitting the transaction to AIA Services' shareholders. Moreover, as discussed in Section XI(A), the transaction constituted corporate waste and required unanimous shareholder approval.

[1441] *See* Damage Item Number 33 in Exhibit A attached hereto.

[1442] I use the term "purported here, like I do elsewhere in this Report, because I have seen no evidence that John Taylor has properly discharged his duties of good faith and loyalty owed to the participants of AIA Services' 401(k) Plan. Instead, I have seen him writing checks from the 401(k) Plan to CropUSA and AIA to use to fund his inappropriate transactions and endeavors. 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 828, 1113-14, Ex. 269, 295.

[1443] AIAS_0001543 (red font emphasis in original).

the countless improper transactions, agreements, payments and improper compensation discussed in this Report, which have had a direct role in depleting the assets and value of the AIA Corporations and required him to provide full and fair disclosure to AIA Services' shareholders to obtain approval to have AIA Insurance pay Mr. Pinkerton's firm to provide an appraisal that was not based on the facts or full disclosure; however, John Taylor failed to do so in violation of his duties of good faith and loyalty owed to the AIA Corporations and their shareholders.

4.      This raises a related issue that I raised in the last version of my Report. Mr. Pinkerton referred to an "AIA's investment in PERC" presumably based on John Taylor's improper classifications of the loans and Mr. Pinkerton's failure to conduct due diligence to determine the "investment" was truly a number of promissory notes and other advances made by the AIA Corporations or that the GemCap Settlement Agreement was not properly authorized and he presumably did not take the time to review the allegations in the various lawsuits because he would have readily concluded that he should not get involved in providing the appraisals requested by John Taylor based on the facts and circumstances. I also previously noted how Mr. Pinkerton failed to provide full disclosure regarding his past work for John Taylor providing appraisals and performing other work (he made partial disclosure that he had performed the appraisals), but not that he worked with John Taylor to appraise the shares at $0. In my opinion, John Taylor wanted the appraisal to be $0. It is also noteworthy that Mr. Pinkerton never sought and obtained a conflict waiver before agreeing to be an expert witness for the Hawley Troxell Defendants to provide testimony in order to try to help ensure that his improper appraisal of $0 would come to fruition, which is against the interests of the AIA Corporations and the AIA Services' 401(k) Plan (or at least the innocent participants who want to be paid their retirement).[1444] Mr. Pinkerton's bare-bones disclosure was no better than some of the few attempts John Taylor has made "disclosure," which amounts to no disclosure at all.

## L.   Uncollectable Loans to Pacific Empire Radio.

1.      The Controlling AIA Defendants breached their duties of loyalty and good faith by making, or permitting and failings to require repayment of, loans and advances to PERC in the form of advances evidenced by four promissory notes and additional advances made after the last note for a total of $2,264,359.02 and any

---

[1444] John Taylor testified that he did not recall a request by Mr. Pinkerton to obtain a conflict waiver. 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 1137.

other unknown advances or payments made on PERC's behalf (*see* Damages Item Numbers 13 and 38 in Exhibit A attached hereto).[1445] Between January 1, 2010 and December 31, 2013, Pacific Empire Radio, which was unable to timely and fully pay its debts as they become due and was an entity in which John Taylor and Henderson had a substantial stock interest,[1446] was the recipient of over $2,000,000 in loans from the AIA Corporations as evidenced by the four promissory notes.[1447] According to John Taylor's recent testimony, those loans will not be repaid prior to May 2022 and no repayment schedule has been established,[1448] and there is no reasonable prospect that the loans will ever be repaid, particularly based on PERC's untenable financial condition discussed in this Report,[1449] which were separate and distinct reasons the Controlling AIA Defendants breached their duties of good faith and loyalty owed to the AIA Corporations by permitting the loans to be made, failing to take action to stop the loans and failing to take action to recover the

---

[1445] John Taylor has still not produced the financial statements and all accounting records (including vendor files) for the AIA Corporations for the entire 2019 or 2020. Therefore, it is impossible to know whether additional advances have been made. If evidence of additional advances is produced, I will supplement this Report to address them or modify the damages. In addition, as with the other Damage Items addressed in this Report, I am using the base damage numbers for this Report, excluding interest. The accrued prejudgment interest and per diem on the loans to PERC are also included in Exhibit A.

[1446] John Taylor has testified that he is a "large shareholder" of Pacific Empire Radio, as well as the CEO and sole board member, 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 354-55, and that he made the decisions to make the loans. Even without that testimony, the evidence is conclusive that John Taylor is a major shareholder of PERC and controls PERC, which creates yet another conflict of interest for him. Henderson was a co-owner of some of John Taylor's shares in PERC until she relinquished her ownership interests in January 2018. *See* Section X(S). Accordingly, Henderson, like John Taylor, had a conflict of interest as to PERC transactions dating back to the formation of PERC. *See, e.g.,* AIA0023914. Those conflicts of interest were never disclosed or addressed in any board or shareholder meeting in breach of the Controlling AIA Defendants' duties of loyalty and good faith owed to the AIA Corporations and their shareholders.

[1447] The first note of $680,365.85 was dated January 1, 2010. Donna Taylor had designated Patrick Moran as her director on December 28, 2009. DLM – 104153-54. Attorney Moran would have never consented to the any of the PERC loans, among other transactions.

[1448] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 71.

[1449] PERC's financial problems and insolvency are undisputed. For example, PERC has at least one unpaid judgment for over $200,000, plus accrued interest, and a $584,659.24 IRS Tax Lien for failing to pay employment taxes dating back to December 31, 2012. DLM – 0040233-34; DLM – 0079617. On August 23, 2010, AmericanWest Bank filed suit against John Taylor and other individuals for over $5,500,000, plus interest, owed for a loan PERC had defaulted on.

Page - 382

**Exhibit - 1, p. 391**

**12-ER-2809**

money loaned.[1450] Indeed, some of the loans were in the form of direct payments by the AIA Corporations to a bank creditor of Pacific Empire Radio.[1451] These transactions were not only violations of AIA Services' Amended Articles of Incorporation, AIA Services' New Restated Bylaws and AIA Insurance's Bylaws, they also were a classic case of corporate waste – a corporation desperate for cash makes loans to an insolvent company partially owned by a controlling insider. *See* Section XI(A).

2.      Indeed, John Taylor recently testified that he made the decisions to make the loans to PERC without regard to the past due payments owed to Donna Taylor as the Series A Preferred Shareholder with payment priority or the payment of the mandatory cumulative dividends owed to the AIA Services' 401(k) Plan. The Controlling AIA Defendants also breached their duties of loyalty and good faith by not using the funds lent to PERC to fully redeem Donna Taylor's Series A Preferred Shares and to redeem and pay the cumulative and unpaid dividends on the Series C Preferred Shares held in the AIA Services' 401(k) Plan or setting those funds aside thereby being one of the proximate cause of the accrued interest, award of fees and costs on appeal and the fees and costs Donna Taylor has incurred in *Donna Taylor v. AIA Services* (*see* Damage Items Numbers 5 and 14).

3.      The AIA Corporations' other two purported Board members, Beck and Henderson, recently testified that they knew about the improper loans to PERC, but they did nothing to stop them or recover the funds lent in breach of their duties of loyalty and good faith owed the AIA Corporations and their shareholders. Moreover, John Taylor also recently testified that "we – I elected not to include interest – accrued interest as of 9/20/2011"[1452] allegedly because "I can't include it as income and it is – nor is it deductible by PERC" without providing a specific accounting rule.[1453] Neither of those reasons were appropriate reasons to stop

---

[1450] The Defendants are free to fight over who should obtain ownership of the four promissory notes and subsequent advances and attempt to collect on the debts. Those issues are not the problem of the AIA Corporations.

[1451] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 73.

[1452] John Taylor recently changed that testimony to "December 31, 2012" for unknown reasons. However, I have not found any bona fide evidence supporting his testimony. I have found no evidence of interest being accrued for the PERC loans. I also note that John Taylor has improperly credited payments of "services" by PERC employees to the principal amount owed by PERC when those payments, even if supported and legitimate, should be applied to interest first and not to reduce the amount owed. These are additional breaches of the duties of loyalty and good faith.

[1453] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 143-44, 164-65.

Exhibit - 1, p. 392

12-ER-2810

accruing interest on the PERC Loans or reporting the total principal and accrued interest owed to AIA Services' shareholders, even if any accounting rules prevented the AIA Corporations including the interest as revenues and preventing PERC from deducting the interest. In addition, the AIA Corporations' accounting records indicate so-called payments by PERC in the form of alleged labor provided by PERC's employees, which alleged work and payments were never properly disclosed or approved by AIA Services' shareholders or any independent directors.[1454] Those alleged payments are shown as being deducted from principal instead of being applied first to interest, which even under John Taylor's testimony would have been deductible by PERC and includable as income by the AIA Corporations. Presumably in response to allegations from Donna Taylor, Miesen and other shareholders, John Taylor improperly changed the classification of the loans to PERC from "Due from PERC"[1455] on the 2011 AIA Services' financial statements to "Investment in affiliate" [1456] on the 2012 financial statements. It appears that John Taylor may also have changed the classification so that he would not have to include a reserve for the debt on the liabilities section of the financial statements because the PERC debt is not collectible. It doesn't matter the label that is placed on the loans. They were all improper, as were any other unknown advances or payments made on PERC's behalf.

4.      Consequently, the Controlling AIA Defendants breached their fiduciary duties of loyalty by making those loans and failing to recover those funds thereby being one of the proximate causes of the damages to the AIA Corporations. Had the Controlling AIA Defendants (other than John Taylor) taken action to prevent such loans to Pacific Empire Radio and any other entity controlled or partially owned by John Taylor, those improper loans and the damages caused thereby would have been prevented. This is equally true as to all of John Taylor's misconduct as further described in this Report. The loans and advances made to PERC are one of the reasons why I would terminate John Taylor if I were a director of the AIA Corporations and why he is not entitled to any compensation. As a director, I would never have authorized or approved any loans to PERC.

### M.  GemCap Guarantees, Settlement Agreement and Related Litigation.

1.      The Controlling AIA Defendants breached their duties of loyalty and good faith by purporting to authorize and/or allow the entry into the AIA Services'

---

[1454] AIAPROD00299199.
[1455] Dkt. 152-4, p. 3.
[1456] DLM – 0000251.

Limited Guarantee of the GemCap Loan in 2011, the AIA Corporations' Amended Guarantee of the GemCap Loan in 2012, the reaffirmation of AIA Services' Limited Guarantee in 2013, the fees and costs paid to Munding in *GemCap v. CropUSA*, the GemCap Settlement Agreement, and the subsequent litigation in *GemCap v. AIA Services* thereby being one of the proximate causes of the damages to the AIA Corporations and their shareholders, including through the subsequent transfer and sale of AIA Services' Former Headquarters, AIA Insurance's Two Condos and AIA's Parking Lot[1457] (*see* Damage Item Numbers 15-17, 25, 36).[1458] There are no board or shareholder meeting minutes or resolutions wherein the Controlling AIA Defendants disclosed, addressed or approved the numerous conflicts of interest and violations of AIA Services' Amended Articles of Incorporation and the AIA Corporations' bylaws as to a single matter involving any transactions and litigation involving GemCap. This conduct was intentional and egregious.

2.      The Controlling AIA Defendants, again placing their interests in CropUSA ahead of the interests of the AIA Corporations, wrongfully caused AIA Services to deliver, for the benefit of Crop USA, to GemCap what purported to be (i) an AIA Services' Limited Guarantee of the GemCap Loan of $1,113,930 and (ii) the AIA Corporations' Amended Guarantee of the GemCap Loan, both of which were in non-compliance with and violated the Guarantee Prohibition, the financial covenants in Sections 4.2.9(h), (j), and (k) based on the AIA Corporation's present assets, liabilities and the sums owed to Donna Taylor (irrespective of whether the sums owed to her were those indicated on the financial statements or the correct amount of $416,512 as confirmed by the Idaho Supreme Court's opinion in July

---

[1457] AIA's Parking Lot was previously quitclaimed to Jordan Taylor, who is the son of John Taylor and Henderson, and he sold it for $50,000 in connection with GemCap's sale of the other properties. Despite demands by Miesen's counsel Attorney Bond for Jordan Taylor to pay the $50,000 sale proceeds for which he paid no consideration, Jordan Taylor has refused. As they say, the apple does not fall far from the tree.

[1458] As discussed in Section XI(A) and XIII, Henderson recently confirmed that the February 4, 2013 board resolution for the AIA Corporations only purported to authorize AIA Services' Limited Guarantee of the GemCap Loan, which limited the guarantee to $1,113,930. RJT – 036170.

2018(RJT – 089731)),[1459] and the improper transactions and conflicts with affiliates provision in Section 4.2.9(g) of AIA Services' Amended Articles of Incorporation and Section 4.14 (the guarantee prohibition provision) and Section 4.14 (conflict of interest provisions) in AIA Services' New Restated Bylaws and AIA Insurance's Bylaws addressed in this Report, including the conflicts of interest through the management and ownership of the Controlling AIA Defendants in CropUSA and the AIA Corporations and those corporations receiving nothing for the entry into the guarantees.[1460] By signing the two board resolutions for AIA Services' Limited Guarantee of the GemCap Loan and the AIA Corporations' Amended Guarantee of the GemCap Loan without shareholder approval from AIA Services' shareholders and the Series A Preferred Shareholder Donna Taylor or otherwise complying with the articles and bylaws and by failing to take action to prevent the AIA Corporations from having any liability to GemCap through guarantees or otherwise,[1461] John Taylor, Beck and Henderson intentionally acted in bad faith and intentionally breached their duties of loyalty owed to the AIA Corporations and

---

[1459] RJT – 002789-90 (according to AIA Services' financial statements for December 31, 2010, it had a net worth of $18,893, net income of $140,671, and owed Donna Taylor $80,008); RJT – 002789-90 (according to AIA Services' financial statements for December 31, 2011, it had a net worth of $120,079, net income of $99,813, and owed Donna Taylor $81,395); AIAPROD00172257-59 (according to AIA Services' financial statements for December 31, 2012, it had a net worth of $220,982, net income of $97,716, and owed Donna Taylor $81,395); AIAPROD00172257-59 (according to AIA Services' financial statements for December 31, 2013, it had a net worth of $25,402, net income of $59,149, and owed Donna Taylor $419,286). Thus, all three financial covenants were violated for all three purported guarantees.

[1460] Although he asserted that AIA Services' Limited Guarantee of the GemCap Loan was authorized, John Taylor could not point to a section of the Guarantee Prohibition which authorized AIA Services' Limited Guarantee of the GemCap Loan. 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 84. He purported to rely on criminal attorney Van Idour's bartered 2011 Legal Opinion to GemCap. *Id.* at 86. *See, e.g.*, Section X(L) of this Report. However, neither John Taylor, Beck nor Henderson obtained written consent to rely on either of Van Idour's GemCap Legal Opinions. *Id.* at 1130, or either of Quarles & Brady's GemCap Legal Opinions. *Id.* at 1131; nor did they obtain permission to rely on the Lancelot Loan Legal Opinion or Quarles & Brady's Lancelot Loan Legal Opinion. *Id.* at 1130-31. In my opinion, the Controlling AIA Defendants could not rely, and it was also unreasonable for any of them to allegedly rely, upon Quarles & Brady and Van Idour's Legal Opinions delivered in 2011 or 2013 for any transactions with GemCap. *See* Sections X(L), (N), X(R) and XIII.

[1461] As discussed in Section XI(A) and XIII, the 2013 board resolution only purported to authorize and reaffirm AIA Services' Limited Guarantee of the GemCap Loan and not the AIA Corporations' Amended Guarantee of the GemCap Loan, as confirmed by Henderson's testimony. However, this does not change the analysis that the Controlling AIA Defendants breached their duties of loyalty and good faith owed to the AIA Corporations and were one of the causes for the damages.

Exhibit - 1, p. 395

12-ER-2813

AIA Corporations shareholders thereby being one of the proximate causes of damages to the AIA Corporations and their shareholders, including, but not limited to, the amounts owed under the GemCap Settlement Agreement, the damages associated with AIA Services' Former Headquarters and AIA Insurance's two Condominiums being transferred to GemCap and sold, the attorneys' fees and costs paid by the AIA Corporations for the defense of *GemCap v. CropUSA*, the damages, attorneys' fees and costs incurred and any ordered to be paid in *GemCap v. AIA Services*, and any other damages evidenced at the time of trial (including, without limitation, if GemCap seeks and obtains payment of any settlement or judgment that Miesen obtains in this Lawsuit).[1462]

> Q. Okay. And you had testified earlier that you thought that the AIA Services limited guarantee in 2011 was authorized because AIA Services allegedly owed that amount of money to Crop USA. So now in 2012, how could AIA Services or AIA Insurance guarantee the GemCap loan under Section 4.2.9, subsection C of Exhibit 5? Point me to the provision.
> A. The - -  AIA was - -  We were presented with the option at the last minute to either sign the payments for - -  to increase it to an unlimited guarantee or the loan would not be given at the very last minute. And so I executed the loan.
> Q. And so you would agree with me that the 2012 guarantee was prohibited under Section 4.2.9, subsection C, of AIA Services' amended articles of incorporation for 1996 that we've looked at in Exhibit 5, correct?
> Q. What's that?
> A. Yes, and that was communicated to GemCap by both myself and

---

[1462] As stated in this Report, the Hawley Troxell Defendants also breached their duties of care and loyalty owed to the AIA Corporations by not requiring the Controlling AIA Defendants to properly and legal operate the AIA Corporations and by opposing Donna Taylor's requests to have a receiver appointed, Mr. Moran appointed to the board, and injunctive relief preventing the AIA Corporations from entering into any improper transactions and loan guarantees, which constitute an additional proximate cause of Miesen's damages regarding the GemCap Settlement Agreement and the damages stated above.

Exhibit - 1, p. 396

12-ER-2814

Mr. Gatziolis, our attorney in Chicago, and the reply was, "Sign it or file bankruptcy."[1463]

3.      John Taylor's concession that the AIA Corporations' Amended Guarantee of the GemCap Loan violated the Guarantee Prohibition of AIA Services' Amended Guarantee of the GemCap Loan confirmed what was already obvious to any rational and reasonable person (even Miesen, a lay person, could read and understand the Guarantee Prohibition). Indeed, two of the lawyers John Taylor hired to represent the interests of the Controlling AIA Defendants in *Donna Taylor v. Taylor* conceded the obvious in a filing in that lawsuit on May 9, 2014 wherein they asserted: "If the California court ultimately determines that [the AIA Corporations] guaranteed the CropUSA loan and the lender pursues the remedies that are available to it under the guaranty, then [the AIA Corporations] will have incurred a prohibited indebtedness under Section 4.2.9(c)."[1464] While I disagree with the coyness of the timing of the violation in that concession, I do agree with their concession that AIA Services' Limited Guarantee of the GemCap Loan and the AIA Corporations' Amended Guarantee of the GemCap Loan (as entered in 2012 or allegedly reaffirmed in 2013) were prohibited by Section 4.2.9(c) of AIA Services' Amended Articles of Incorporation (defined and referred to in Section IX(C) and this Report as the "Guarantee Prohibition").

4.      Moreover, even Henderson, an attorney who disingenuously testified that reviewing AIA Services' Amended Articles of Incorporation was allegedly "above her pay grade," confirmed in an email to Duclos that any improper guarantees would be made an issue by Donna Taylor: "We have to assume that Donna will scrutinize this closely."[1465] Indeed, the Controlling AIA Defendants had been previously sued by Reed Taylor and Donna Taylor and Miesen in this Lawsuit, all three of which complaints alleged improper and unauthorized loan guarantees were being provided for CropUSA.[1466] The argument that any purported director "didn't know" the guarantees were prohibited is unsupported because Henderson, Beck and Cashman had already been sued for prior improper loan

---

[1463] 7/8-312/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 888-89. Henderson insists that in signing the AIA Corporations' Amended Guarantee of the GemCap Loan she relied on Gatziolis' advice although she never communicated with him directly. 9/10/2020 Connie Henderson Depo. Transcript, p. 242. She also said she learned about Gatziolis' sign it or else statement "at some point later." *Id.* at 235.

[1464] DLM – 0005207.

[1465] AIAPROD00240139

[1466] GemCap was also aware of these allegations and lawsuits as discussed in Section XIII.

guarantees in this Lawsuit over a year before the first guarantee with GemCap.[1467] There can be no doubt that John Taylor, Beck and Henderson intentionally and flagrantly permitted, and failed to take any action to prevent, the AIA Corporations' improper and unauthorized guarantees of the GemCap Loan in breach of their duties of good faith and loyalty owed to the AIA Corporations.

5.     The Controlling AIA Defendants also breached their duties of good faith and loyalty by failing to take action to prevent enforcement of AIA Services' Limited Guarantee of the GemCap Loan and the AIA Corporation's Amended Guarantee of the GemCap Loan. Following CropUSA's default of Gem Cap Loan in 2013, GemCap filed suit asserting claims of fraud, conversion, breach of contract and other claims against John Taylor, the CropUSA Entities, other defendants and the AIA Corporations (the latter to improperly attempt to enforce the AIA Corporations' Amended Guarantee of the GemCap Loan as purportedly affirmed in 2013). Rather than retain independent counsel to represent the interests of the AIA Corporations in *GemCap v. CropUSA*, the Controlling AIA Defendants improperly permitted Attorney Munding to purportedly represent the interests of all of the defendants in that lawsuit wherein he failed to assert any defenses regarding the improper guarantees.[1468] As discussed in Section XI(A), there was no proper approval or authorization by the boards or shareholders to retain Munding, waive the obvious conflicts of interest as discussed in this Report, or delegate any authority to John Taylor to make any of the improper litigation decisions in *GemCap v. CropUSA* or *Durant v. GemCap* discussed in this Report.[1469] John Taylor, Beck and Henderson even "discussed" the "GemCap lawsuit" at a board meeting held on July 29, 2014 (which was eight days after Miesen, Durant and Donna Taylor had filed suit in Idaho on July 21, 2014 to have the guarantees declared unenforceable and prevent any improper settlement)[1470] and they nevertheless intentionally failed to take action to ensure the AIA Corporations were not liable (Henderson received confirmation by this time that GemCap was seeking to enforce the entire over $8,000,000 owed through the AIA Corporations' Amended Guarantee of the GemCap loan) thereby breaching their duties of good

---

[1467] Dkt. 1.

[1468] DLM – 0048484-503.

[1469] Beck, Henderson and John Taylor also breached their duties of loyalty and good faith by not joining in Durant, Miesen and Donna Taylor's efforts to have Judge Brudie declare the guarantees unenforceable thereby being one of the proximate causes of the AIA Corporations' damages. As discussed in this Report, John Taylor also breached his duties of care, good faith and loyalty owed to the AIA Corporations in his role as the purported attorney for the AIA Corporations in *Durant v. GemCap*, and by failing to address any of his serious and unwaivable conflicts of interest.

[1470] AIAPROD00308701; DLM – 0036176-226.

faith and loyalty owed to the AIA Corporations thereby being one of the proximate causes of the damages.

6.     Although as stated above, he believed the AIA Corporations' Amended Guarantee of the GemCap Loan was prohibited by reason of the Guarantee Prohibition, John Taylor, acting in concert with Beck and Henderson and in exchange for preferential treatment of a delay in the entry of a judgment against him and postponement of the claims for misrepresentation which GemCap had asserted against him, caused the GemCap Settlement Agreement[1471] to be purportedly signed by the AIA Corporations. While Henderson purportedly resigned as a director days before the GemCap Settlement Agreement, she breached her duties of good faith and loyalty owed to the AIA Corporations by failing to take any action and her prior improper actions were one of the causes of any settlement.

7.     By reason of the actions taken against the AIA Corporations as being adverse to the Controlling AIA Defendants as discussed in this Report, those Corporations never became parties to or were even aware of that purported Settlement Agreement and thus could never have approved or authorized entry into the Settlement Agreement or the prior guarantees. Moreover, GemCap was fully aware[1472] of the illegality and unauthorized nature of the GemCap Settlement Agreement which purported to impose a more than $12,000,000 liability on the AIA Corporations, which GemCap claims has swelled to a balance of over $25,000,000. The terms of the GemCap Settlement Agreement also required the AIA Corporations to transfer to GemCap their interests in AIA Services' Former Headquarters, which also constituted the violation of the sale of the material asset provision of AIA Services' Amended Articles of Incorporation (Section 4.2.9(e)).

8.     By reason of the Guarantee Prohibition, the conflict of interest provision involving affiliates (Section 4.2.9(g)) and the financial covenant provisions (Sections 4.2.9(h), (j), and (k)),[1473] none of which were complied with, the GemCap Settlement Agreement violated AIA Services' Amended Articles of

---

[1471] Needless to say, John Taylor could not identify an exception to the Guarantee Prohibition that authorized the AIA Corporations' entry into the GemCap Settlement Agreement. *Id.* at 95-96.
[1472] John Taylor testified that he had advised GemCap that the AIA Corporations' Amended Guarantee of the GemCap Loan, upon which the GemCap Settlement was based, would violate AIA Services' Amended Articles of Incorporation. *Id.* at 94.
[1473] AIAS_0000178-79 (according to AIA Services' financial statements for December 31, 2014, it had a net worth of $154,784, a net loss of $91,299, and owed Donna Taylor $419,286); AIAS_0000178-79 (according to AIA Services' financial statements for December 31, 2015, it had a net worth of $33,060, a net loss of $116,62, and owed Donna Taylor $82,239).

Exhibit - 1, p. 399

12-ER-2817

Incorporation and also violated the conflicts of interest provisions in AIA Services' New Restated Bylaws and AIA Insurance's Bylaws, with which John Taylor and Henderson, as attorneys, were fully familiar. Moreover, the AIA Corporations' purported boards never approved or authorized the GemCap Settlement Agreement, nor did the AIA Corporations' shareholders. By causing the AIA Corporations to (a) guarantee the obligations of CropUSA under the GemCap Loan, (b) fail to take action to prevent the AIA Corporations from being liable (including by having Munding or independent counsel assert the guarantees were prohibited, unauthorized and ultra vires), and (c) enter into the GemCap Settlement Agreement, the Controlling AIA Defendants breached their duties of care, good faith and loyalty to the AIA Corporations. Indeed, the GemCap Settlement Agreement's Assignment Agreement 1 specifically calls the parties' attention to this matter when it states that the authority to transfer the AIA Services' Former Headquarters[1474] "has been challenged by certain shareholders of AIA in two separate derivative suits filed by certain shareholders and in a third pending consolidated case filed by Donna Taylor."[1475] Even this did not deter the Controlling AIA Defendants, GemCap or those acting on its behalf from proceeding to consummate the purported Settlement Agreement. Moreover, the Controlling AIA Defendants have failed to take any action whatsoever to extricate the AIA Corporations from the GemCap Settlement Agreement and instead permitted interests in three properties to be transferred and sold for the benefit of GemCap. Finally, one of the proximate causes of the Controlling AIA Defendants' breaches of their duties of good faith and loyalty was that the GemCap Settlement Agreement subsequently led to the litigation, incurring of attorneys' fees and costs, ruling in GemCap's favor regarding the 23% and 10% interests in AIA Services' Former Headquarters improperly transferred to the AIA Services' 401(k) Plan, and a potential fee and cost award against AIA Services in that lawsuit. All of these events were foreseeable by the Controlling AIA Defendants.[1476] To this day, the Controlling AIA Defendants have never properly disclosed all of the facts relative to the AIA

---

[1474] I have personally seen AIA Services' Former Headquarters when I traveled to Lewiston to listen to the first scheduled trial in *GemCap v. AIA Services* (which was continued). It was noteworthy how comfortable John Taylor appeared in the courtroom, presumably based on the numerous lawsuits and court appearances he has made over the years.

[1475] Dkt. 128, p. 36.

[1476] As discussed in Section XII, the Hawley Troxell Defendants could have prevented the guarantees, GemCap Settlement Agreement and the subsequent damages from the lawsuits had they complied with their duties of care, good faith and loyalty owed to the AIA Corporations by not opposing Donna Taylor's appointment of Attorney Moran to the board, by having a receiver appointed, and by not enabling the Controlling AIA Defendants thereby being one of the proximate causes of the damages sustained and addressed in this Section.

Page - 391

Corporations' guarantees, the GemCap Settlement Agreement or any of the subsequent litigation. Indeed, John Taylor has improperly made misleading statements in the notes to AIA Services' financial statements regarding the litigation and GemCap Settlement Agreement by stating: "[AIA Services] admitted no liability, but entered into settlement discussions and reached a confidential settlement agreement in late 2014, which was approved by the Federal Court in 2015."[1477] For the reasons stated in this Report, John Taylor had no authority to enter into the Settlement Agreement and he has continued to mislead and conceal facts regarding GemCap and the GemCap Settlement Agreement from the AIA Disinterested Shareholders. To reiterate, John Taylor's conduct with regard to the transactions with GemCap and GemCap Settlement Agreement constitutes the flagrant and intentional conduct of placing his interests ahead of the interests of the AIA Corporations, as he and the other Controlling AIA Defendants have consistently done, in violation of the duties of good faith and loyalty owed to the AIA Corporations and their shareholders.

**N.** **Failure to Accept the Series A Shareholder's Board Designees and the Opposition to Donna Taylor's Declaratory Relief and Appointment of Receiver.**

1.      The Controlling AIA Defendants breached their duties of loyalty and good faith by refusing to honor Donna Taylor's appointment of her two designees to the board of AIA Services, Attorney Moran in December 2009 and Durant in July 2012, opposing Donna Taylor's request for a receiver (who would have successfully taken legal action to recover the damages for the improper conduct in this Report and prevented the improper transactions after his or her appointment), and opposing Donna Taylor's request for an injunction requiring compliance with the AIA Corporations' articles of incorporation and bylaws and preventing the various improper transactions thereby being one of the proximate causes of the damages to the AIA Corporations and their shareholders (*see* Damage Item Numbers 1-40). Once again, the Controlling AIA Defendants placed their self-interests ahead of the interests of the AIA Corporations and their shareholders in opposing the relief that would have saved the AIA Corporations from being decimated.

2.      The Controlling AIA Defendants breaches of the duty of loyalty and good faith regarding Donna Taylor's appointments of Attorney Moran and Durant

---

[1477] AIAS_0000188.

Exhibit - 1, p. 401

**12-ER-2819**

are confirmed by their failure to comply with easily understood provisions in AIA Services' Amended Articles of Incorporation and AIA Services' New Restated Bylaws. There was no basis to assert that Attorney Moran or Durant were not qualified because there are no qualifications required to be the Series A Preferred Stock director of AIA Services. Under Section 4.2.8 of the AIA Services' Amended Articles of Incorporation, "the holders of a majority of the shares of the Series A Preferred Stock shall have the right, voting separately as a class, to elect one director to the board of directors of the corporation."[1478] The Controlling AIA Defendants have consistently improperly refused to honor Donna Taylor's designations Paul Durant and Patrick Moran, or to properly ensure that the Series A Preferred Stock director was seated and participated in board meetings, in violation of their duties of loyalty and good faith.[1479] Had there been an AIA Services director who was independent of the Controlling AIA Defendants, which would have occurred if Paul Durant and Patrick Moran would have been appointed as requested by Donna Taylor, the self-dealing transactions, improper corporate actions, unauthorized corporate actions, illegal conduct and other harm discussed in this Report would not have been occurred or been carried out and/or gone undetected and unredressed because claims would have been asserted against the Controlling Defendants and other wrongdoers as discussed in this Report.[1480]

3.    The Controlling AIA Defendants and the Hawley Troxell Defendants placed their self-interests ahead of the AIA Corporations' best interests and simply did not want their actions subjected to any type of outside scrutiny or independent

---

[1478] DLM – 0033053.

[1479] Ironically, two of the Series A Holder's designees, Moran and Durant, were objected to on the grounds that they might not have been able to fulfill their fiduciary duties as directors. For the reasons set forth in this Report, the Controlling AIA Defendants were hardly in a position to make those assertions and there was no basis to allege that Moran or Durant had conflicts of interest simply because of any prior relations or their appointment by Donna Taylor. Moreover, Durant had been the President of Universe Life Insurance Company, the former subsidiary of AIA Services and had attended AIA Services' board meetings. *E.g.* AIA0025535. Moran is was an established corporate and tax lawyer who assisted Reed Taylor in negotiations with AIA Services, but never appeared as counsel for Reed Taylor. Moran was ideal because he had gained knowledge of the improper and unauthorized conduct through his work attempting to negotiate a settlement for Reed Taylor and he had obtained consent from Reed Taylor to act as Donna Taylor's director. Moran's instructions from Donna Taylor were to discharge his directorial duties as if he had been elected by the common shareholders of AIA Services. *See* Section X(J).

[1480] John Taylor, Beck, Cashman, and Henderson had millions of dollars in assets and the ability to be garnished for many years, as confirmed by the information in discovery. Thus, judgments would have been collectible and, equally important, improper transactions and conduct would have been prevented.

Exhibit - 1, p. 402

12-ER-2820

review, including from an independent director appointed by Donna Taylor or a receiver—either of whom would have never authorized their actions. As a consequence, the few purported actions the so called "boards" ostensibly took, as discussed in this Report, were improper, unapproved, unauthorized, and illegal.[1481] Indeed, the Hawley Troxell Defendants themselves (very) belatedly[1482] recognized the consequences of Donna Taylor's designee not being seated on the AIA Services' Board of Directors: "We believe that Donna is entitled to Board representation and that AIA and perhaps its directors personally, will likely be held liable for attorney fees and costs incurred by Donna in obtaining court order compelling AIA to seat her. In light of Donna's right to appoint a director and her lawsuit demanding Board representation, we require as a condition to our engagement that three (3) days notice of the meeting be given to Donna in accordance with Services' bylaws. This condition to our representation is necessary because of the general rule that action taken at a meeting in the absence of a director who did not receive notice of the meeting is invalid."[1483] The Controlling AIA Defendants and the Hawley Troxell Defendants simply breached their duties of loyalty and good faith by not honoring Donna Taylor's appointment of Moran and the subsequent appointment of Durant,[1484] which would have prevented the conduct from occurring after their appointments and led to the recovery of assets or damages for prior harmful acts discussed in this Report (the same holds true for the failure to

---

[1481] *Cf. e.g., Marine Services Unlimited v. Rakes*, 323 Ark.757, 763 918 S.W.2d 132, 134 (1996). *Stone v. Amrican Lacquer Solvents Co.,* 463 Pa. 417, 422345 A. 174, 176-77 (1975).

[1482] *See also* Sections X(A) and XII of this Report.

[1483] HTEH000203-4.

[1484] There is no basis for John Taylor's allegation that Durant had a conflict of interest because John Taylor had AIA Services sue Durant in *AIA Services v. Durant*. Durant, like the other shareholders, properly objected to the improper reverse stock split, which AIA Services could not implement under any circumstances based on John Taylor's concession that he was going to pay the consideration for the shares since AIA Services was unable to do so. As to Durant being a plaintiff in Durant v. GemCap, the actions taken by him, Miesen and Donna Taylor were consistent with the actions that any prudent and independent director of AIA Services would have taken, which was to have the obligations under any guarantees or settlement with GemCap prevented and declared unenforceable. The Controlling AIA Defendants, not Moran and Durant, were the ones with the irreconcilable conflicts of interest for the reasons stated in this Report. *See also* Exhibits C-D attached hereto.

Exhibit - 1, p. 403

12-ER-2821

support the appointment of a badly needed receiver).[1485] These actions were harmful to the AIA Corporations and the conduct that occurred thereafter was entirely foreseeable, including the improper transactions and litigation involving GemCap, thereby resulting in one of the proximate causes of the damages to the AIA Corporations and their shareholders (see Damage Item Numbers 1-40 in Exhibit A attached hereto).

4.      While I have not had the opportunity to review the deposition transcripts of Moran or Hile, I was advised by Attorney Bond that questions were asked about any alleged conflicts regarding his representation of Reed and Donna Taylor when the receiver action was filed by Donna Taylor and when she appointed Moran to the board.[1486] There is no doubt in my mind that Reed Taylor and Donna Taylor's interests were fully aligned in having Moran appointed as a director and/or a receiver appointed for the AIA Corporations. Reed Taylor and Donna Taylor, like any other rational and prudent person, simply wanted the AIA Corporations to be properly and lawfully operated in the best interests of the AIA Corporations and their shareholders, which would ultimately be beneficial to Reed Taylor (as a creditor if his obligations were enforced or as a participant in the AIA Services' 401(k) Plan) and Donna Taylor (as the Series A Preferred Shareholder who had not been timely and properly paid as required by December 2003). If I were a director of AIA Services, I would have supported and ensured that Moran and Durant were seated on the board of AIA Services as required. If I were a director of the AIA Corporations, I would have voted for the appointment of a receiver for the AIA Corporations. Either of these actions would have prevented further damages to the AIA Corporations and led to the recovery, through claims or otherwise, of assets, money or damages for past conduct discussed in this Report.

---

[1485] At the time that Durant was appointed in July 2012, the work performed by the Hawley Troxell Defendants was not shown in the Unredacted Billing Records and I am thus unable to offer opinions as to their role, if any, in opposing the appointment of Durant. However, the Hawley Troxell Defendants had already enabled the Controlling AIA Defendants by successfully opposing the appointment of Moran in *Donna Taylor v. AIA Services* thereby breaching their duties of care and being one of the proximate causes of Durant not being seated on the board and the damages incurred by the AIA Corporations (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto).

[1486] While Attorney Bond would not divulge any information regarding his communications with Reed and Donna Taylor regarding his representation of them, he assured me that he complies with the Rules of Professional Conduct for all of his representation agreements, including by addressing all potential and actual conflicts of interest. I have no reason to believe that Mr. Bond did not comply with his duties to Reed Taylor and Donna Taylor. Indeed, in my interaction with Mr. Bond, he has been very ethical, honest, conscientious, and thorough in his work. I would not hesitate to retain him for a legal dispute if I needed an attorney.

5.      Attorney Moran stated in his disclosure/report that, if his appointment as director would have been honored, he would have been a director simply in his role as a director and not as an attorney and would thus have requested a report from counsel to rely upon to address how best to proceed.[1487] Indeed, Mr. Moran had already retained competent counsel to advise him in his role as director. However, he was never permitted to proceed based on the improper actions taken by the Controlling AIA Defendants and the Hawley Troxell Defendants to prevent Moran from ever being seated as a director (despite Babbitt's disingenuous statements that Moran was a director). As I discussed in this Report, I quickly determined that the conduct at issue in this Lawsuit was highly irregular, improper, unauthorized and not in the best interests of the AIA Corporations (although I did not fully understand the intimate details such as the number of board and shareholder meetings the Controlling AIA Defendants were maintaining occurred and how the board purportedly addressed the issues that I have raised in this Report). If Moran or any other director would have requested an independent report to address the improper conduct, corporate malfeasance and other matters (including litigation matters), the report would have readily reached the same conclusions as I have in this Report.[1488] If Moran or any other independent director such as Durant had taken action consistent with my conclusions and what I have observed, the improper conduct described in this Report could have been prevented and legal action successfully taken to obtain payment or to recover damages through collectible judgments against the named defendants in this Lawsuit, and others if necessary, for the past improper conduct discussed in this Report.

**O.  Attempted Reverse Stock Split and Series A Preferred Stock Redemption.**

1.      The Controlling AIA Defendants breached their duties of loyalty and good faith by purporting to authorize AIA Services to pursue an improper and unauthorized reverse stock split and subsequently filed suit in *AIA Services v. Durant* thereby being one of the proximate causes of the damages to the AIA Corporations and their shareholders (*see* Damage Item Number 30 in Exhibit A

---

[1487] DLM – 107799-812. I agree with Moran with respect to obtaining a report from an attorney.
[1488] I recognize the report or reports provided would have been far less detailed and much shorter. The conclusions, however, would have been the same.

**Exhibit - 1, p. 405**

**12-ER-2823**

attached hereto).[1489] Those actions were taken in an improper and unlawful effort to eliminate Miesen and other shareholders for ten cents per share without providing full disclosure or offering fair compensation to the AIA Disinterested Shareholders and to improperly eliminate Miesen's and other shareholders' derivative standing in this Lawsuit and increase John Taylor and Henderson's ownership in AIA Services, which were taken in their self-interests and against the interests of the AIA Corporations thereby breaching their duties of good faith and loyalty owed to the AIA Corporations and their shareholders.

2.      By a letter dated July 3, 2012 from John Taylor, the Controlling AIA Defendants caused AIA Services to disseminate to the AIA Disinterested Shareholders a Proxy Statement for an "Annual" Meeting of Shareholders of AIA Services to be held on July 16, 2012 (this was the first "Annual" Meeting for approximately ten years, and the last one to be held through the date of this Report). The Proxy Statement said that there were two items of business to be conducted at the meeting (a) the election of John Taylor, Beck and Henderson as Directors and (b), in accordance with a plan conceived and/or acquiesced, in my opinion, by the Hawley Troxell Defendants (as discussed below), a proposal to amend the Articles of Incorporation of AIA Services to undertake a reverse stock split, the effect of which would have been to cancel the shares of AIA Common Stock owned by all of the AIA Disinterested Shareholders and to pay them ten cents for each cancelled share. The shares of the Controlling AIA Defendants and those acting in concert with them would have been unaffected and would have continued to be outstanding. As had been suggested by the Ashby Letter discussed below, the combined effect of the "reverse split" and a subsequently attempted redemption of all of the outstanding shares of Series A Preferred Stock held by Donna Taylor would have been to cancel the instant derivative suit and allow the Defendants to escape the consequences of the legal wrongs they committed against the AIA Corporations and the AIA Disinterested Shareholders. The effect of the reverse split would have been (had it not been prevented by *AIA Services v. Durant*) to continue the Standstill and Tolling Agreements' hindrance and prevention of the AIA Disinterested Shareholders in asserting on behalf of the AIA Corporations their meritorious claims against the AIA Controlling Defendants and the Hawley Troxell Defendants as described in this Report. Had the Hawley Troxell Defendants' conceived reverse split not failed to survive judicial scrutiny and had their suggested redemption the Series A Preferred Shares been successful, there would have been no AIA

---

[1489] To the extent applicable, the Controlling AIA Defendants are also one of the proximate causes for the $10,107.72 judgment, plus accrued interest, entered in favor of the defendants in *AIA Services v. Durant*. DLM – 0035873-75.

Exhibit - 1, p. 406

12-ER-2824

Disinterested Shareholder to continue the case. The Controlling AIA Defendants' misconduct would have been effectively swept under the rug. Instead of disclosing the true reason for the reverse split, the Proxy Statement said:

> ***Purpose of the Amendment.*** The amendment is one component of the Company's overall plan to simplify its capital structure, the other being the eventual elimination of all of the outstanding Series A preferred stock. The amendment accomplishes this purpose by reducing the number of outstanding shares of common stock through a reverse stock split, and by then redeeming, for cash, the outstanding shares held by those shareholders who would otherwise hold fractional shares. The Company believes a simplified capital structure will better enable it to attract financing on favorable terms so that it can successfully compete in the changing and challenging farm insurance mark
>
> ***Board of Directors' Recommendation.*** The board of directors of the Company has adopted the amendment to the Company's articles of incorporation and recommends its approval by the shareholders at the Annual Meeting. The board of directors considered a number of factors in reaching these decisions, not the least of which were the dramatic changes in the insurance markets in which the Company does business or proposes to do business, its possible need for significant financing in order to pursue profitable business opportunities in these markets, the difficulties and expenses associated with the Company's complicated capital structure, and the advantages of simplifying its capital structure and possibly reorganizing itself as a partnership.[1490]

3.     Because the Proxy Statement fails to disclose the true reason for the reverse split, the Proxy Statement was materially false and misleading, and constituted a breach of the duty of full disclosure and the duty of loyalty owed by the Controlling AIA Defendants to the AIA Disinterested Shareholders and further proximately damaged the AIA Corporations by the attorney fees and costs incurred in connection with preparing the documents for the reverse stock split and the subsequent litigation in *AIA Services v. Durant*. Moreover, John Taylor, Henderson and Beck breached their duties of loyalty and good faith owed to the AIA Corporations and the AIA Disinterested Shareholders by purporting to authorize the reverse stock split and the subsequent litigation thereby being one of the proximate

---

[1490] Dkt. 67-52, p. 8 (Emphasis in original).

causes, along with the Hawley Troxell Defendants, of the damages to the AIA Corporations and the AIA Disinterested Shareholders.

4.      The purported reverse split also violated Section 4.3.3 of AIA Services' Amended Articles of Incorporation because it would have effected an acquisition by AIA Services of shares of its Common Stock at a time when all dividends on the Series C Preferred Shares and all redemption payments to the holder of the Series A Preferred Shares had not been made, which was why John Taylor testified that he was going to pay the consideration to the shareholders to effectuate the reverse stock split. In addition, Beck, Henderson and John Taylor violated the conflict of interest provisions in AIA Services' New Restated Bylaws and AIA Insurance's Bylaws by failing to address their conflicts of interest discussed in this Report. There was only one board meeting addressing the alleged approval of the improper reverse stock split and there were no other resolutions involving the board or the shareholders addressing any conflicts of interest. The board meeting minutes make no mention of the conflicts of interest or violations of AIA Services' Amended Articles of Incorporation and the AIA Corporations' bylaws.[1491] John Taylor, Beck and Henderson's "recommend[ation]" that the reverse stock split be implemented through the amendment of AIA Services' Amended Articles of Incorporation was improper and a breach of their duties of loyalty and good faith.

5.      After the reverse stock split proposal was purportedly approved by the holders of a majority of the outstanding shares of common stock of AIA Services (counting the 59 percent stock interest held by John Taylor and shares held by other Controlling AIA Defendants), AIA Services proceeded to the next step in the Hawley Troxell Defendants' conceived plan, the redemption of Donna Taylor's Series A Preferred Shares. Both elements of the scheme, which in Ashby's words was designed to "minimize or moot derivative claims on behalf of the common shareholders" failed when the Court dismissed on summary judgment AIA Services' declaratory judgment action which sought, *inter alia*, judicial determinations that the reverse split and redemption did not violate applicable law and were otherwise proper. The Court also awarded $10,107.72 in attorney fees and costs to the minority shareholders whom the insiders of the AIA Corporations had sued,[1492] which AIA Services has never paid and was separately caused by the Controlling AIA Defendants and Hawley Troxell Defendants. Ironically, when John Taylor himself was the victim of a reverse split squeeze out with respect to which

---

[1491] AIAS_0001594-95.
[1492] DLM – 0035873-75.

Exhibit - 1, p. 408

12-ER-2826

he submitted, with the assistance of Riley, an objection to its terms. The Hawley Troxell Defendants should have specifically advised the Controlling AIA Defendants that the reverse stock split was improper and should not be pursued. Instead, the Hawley Troxell Defendants breached their duties of care, good faith and loyalty owed to the AIA Corporations thereby being one of the proximate causes of the damages to the AIA Corporations and the fees and costs awarded in *AIA Services v. Durant*, plus accrued interest.[1493]

## P.   Improper Advancement and Payment of Legal Fees and Costs.

1.     The Controlling AIA Defendants have improperly, and without obtaining proper approval or authorization, have breached their duties of loyalty and good faith by having the AIA Corporations pay millions of dollars in attorneys' fees and costs for various lawsuits and legal matters thereby being one of the proximate causes of the damages to the AIA Corporations and their shareholders for the reasons stated in this Report (*see* Damage Item Numbers 4, 6-9, 14, 21-26, 30-32). They are also separately not entitled to have any fees or costs advance nor are they entitled to be indemnified under the AIA Corporations' bylaws or the Idaho Code based on their conduct and omissions as discussed in this Report. Indeed, if using millions of dollars of the AIA Corporations' money and assets to improperly form and fund the Controlling AIA Defendants' businesses and the millions of dollars in compensation and other improper uses of the AIA Corporations' money were not enough, the Controlling AIA Defendants have also used the AIA Corporations as their personally "piggy bank" to improperly fund their litigation fees and costs. It is also worthy to note that John Taylor is a serial litigator who, along with entities that he partially owns, appears unable to comply with many legal or contractual obligations resulting in the filing of at least forty-two lawsuits, an over $500,000 IRS Tax Lien against PERC and two foreign judgment registration actions.[1494] *See* Exhibit D attached hereto.

---

[1493] GemCap subsequently paid the award of fees and costs, plus interest, when it improperly sold AIA Services' Former Headquarters (another improper transaction that could have been prevented by the Hawley Troxell Defendants. To the extent GemCap seeks to recover that payment from the AIA Corporations because it is required to pay the damages to Miesen, the Controlling AIA Defendants and Hawley Troxell Defendants are the proximate causes of those damages.
[1494] When I attended the first scheduled trial date in *GemCap v. AIA Services*, John Taylor appeared right at home in the courtroom, while his attorneys appeared anxious for the commencement of the trial. John Taylor is also an expert at hardly ever properly answering questions at depositions. Attorney Bond had to ask many questions repeatedly.

Page - 400

2.      Idaho Code section 30-1-851(1)(a) (which remained unchanged in 2015 and substantially unchanged in 2019) provides for indemnification in the form of reimbursement of legal expenses of directors of Idaho corporations who were sued in that capacity and whose conduct complies with the applicable standards; indemnification is available if the director "conducted himself in good faith" and "He reasonably believed that his conduct was…in the best interests of the corporation, and…in all cases his conduct was at least not opposed to the best interests of the corporation…" The statute reflects a public policy to protect innocent directors from the financial consequences of defending themselves in suits brought against them and encourages qualified persons to serve as directors of business corporations. Because defense lawyers are paid as a case goes forward, Idaho Code section 30-1-853(1) permits a corporation to advance funds to a director for the payment of legal fees and expenses "before final disposition of a preceding." In such a case the director must state in writing that he has met the required standard of conduct and also must promise to repay the advance if it is determined that he has not met such standard.

3.      For the reasons described in Section X and this Section XI, such written statements by the Controlling AIA Defendants could not and should not have been relied upon by the AIA Corporations, and the Hawley Troxell Defendants should have so advised the AIA Corporations to not advance any fees or costs for John Taylor, Henderson, Beck, Freeman, or Duclos in *Reed Taylor v. AIA Services* or John Taylor in *Donna Taylor v. Taylor* thereby breaching their duties of care, good faith and loyalty owed to the AIA Corporations and thus being one of the proximate causes of the damages for advancing and paying fees and costs. In addition, such an advance of funds was a "less favorable" transaction because no corporation would advance fees for insiders guilty of intentionally breaching their fiduciary duties and because such advances were an interest free loan of unspecified duration under Section 4.2.9(g) of AIA Services' Amended Articles, such a transaction cannot take place without "the consent of the holders of a majority of the outstanding shares of Series A Preferred Stock," which consent was never sought or obtained and thus the advances violated those provisions. Under Section 4.14(c) of AIA Services' New Restated Bylaws, such a transaction must be "fair and reasonable to the corporation" and the director's interest is disclosed to the corporation; again, neither requirement was met. Idaho Code section 30-1-853(3)(b), on which the Controlling AIA Defendants relied, requires that where, as in *Reed Taylor v. AIA Services*, *Donna Taylor v. Taylor* and the other lawsuits, there are no disinterested directors to authorize the same, such an advancement of

Page - 401

expenses must be authorized by a corporation's disinterested shareholders. As discussed in Section XI(A), no proper board or shareholder consents were obtained.

4.       Although an authorization for the advancement of fees to John Taylor, Duclos and Bryan Freeman was purportedly obtained in connection with *Reed Taylor v. AIA Service* at a Special Meeting of Shareholders held on March 28, 2007, for the reasons stated below such purported authorization was not properly approved or authorized, and no request was even made to advance fees or costs for their roles as officers and directors of AIA Insurance. Moreover, shareholder approval was never properly sought or obtained to advance fees and costs for any of the Controlling AIA Defendants for the other lawsuits (e.g., *Donna Taylor v. Taylor* (both lawsuits), *GemCap v. CropUSA*, *GemCap v. AIA Services*, and this Lawsuit). Such failures constitute the breach of the duties of loyalty and good faith owed to the AIA Corporations by the Controlling AIA Defendants thereby being one of the proximate causing of the AIA Corporations' damages, including the advances of such fees and costs (and no such consent was obtained for Henderson and Beck in *Reed Taylor v. AIA Services* thereby proximately causing those damages).

5.       AIA Services did not obtain the informed consent of a majority of the AIA Disinterested Shareholders who were solicited to vote by proxy to authorize the advancement of expenses to John Taylor, Duclos and Freeman; because, in seeking shareholder authorization, the directors of AIA Services were under a duty to disclose fully and fairly all material information within the Board's control, the AIA Disinterested Shareholders were entitled to receive full disclosure of all of the material facts and circumstances, including an accurate description of the allegations contained in the then operative *Reed Taylor v. AIA Services* First Amended Complaint; including allegations of the misconduct of John Taylor, Duclos and Freeman described above. In addition, the description should have stated that it was qualified in its entirety by reference to the then operative First Amended Complaint which should have been physically attached to the Proxy Statement and no disclosure was made of the improper transactions, loans, guarantees or other corporate action discussed in this Report. Moreover, because as a matter of law such disclosure cannot contain a misstatement of a material fact or fail to state a material fact necessary in order to make the statements made therein not misleading, other relevant and material information such as the separation of CropUSA from AIA Services and the purported guarantee by AIA Insurance of the

Exhibit - 1, p. 411

12-ER-2829

Lancelot Loan was also required to have been disclosed.[1495] John Taylor testified[1496] that he didn't provide the shareholders with a copy of the complaint because of its voluminous size and because of "the outrageous allegations in the complaint" which in my opinion is simply another way of saying he didn't want to disclose that information to the shareholders. I have reviewed the allegations in the First through Fourth Amended Complaints filed by Reed Taylor with respect to improper transactions and corporate governance and have reviewed documents in this Lawsuit that fully support Reed Taylor's allegations. Such information was material to the question as to whether a shareholder should vote to authorize AIA Services to advance litigation expenses to John Taylor, Duclos and Freeman. Instead of complying with foregoing disclosure requirements, John Taylor merely sent a self-serving one-page letter dated March 16, 2007 to the AIA Disinterested Shareholders which in pertinent part stated:

> "[Reed Taylor] has filed suit in the 2nd District Court of Idaho against the Company, AIA Insurance, Inc. directors, JoLee Duclos, Bryan Freeman and me. The former majority shareholder alleges that the company is in default of its obligations to him, *that the directors have thwarted his efforts to allow him to legally take control of AIA Insurance, Inc., and for other acts that have allegedly diminished the assets of AIA insurance to his detriment.*"[1497]

The italicized language did not come close to informing the AIA Disinterested Shareholders of the misconduct of the Controlling AIA Defendants with respect to which legal fees advances were being sought.[1498]

---

[1495] On behalf of AIA Services, John Taylor testified that he assumed that Riley and Babbitt prepared the documents for that shareholders' meeting. 3/29/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 240. Later he said he didn't know if it was Hawley Troxell or the litigator Michael McNichols, although he was sure that Hawley Troxel was aware of this issue at that time. 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 743. Oddly, the Unredacted Billing Records show no time entries whatsoever for the first twelve days of March 2007 with respect to the *Reed Taylor vs. John Taylor et. al.* matter (43369-0002). The same is true of the redacted version produced by the Hawley Troxell Defendants. Moreover, because the Hawley Troxell Defendants knew that McNichols was conflicted by reason of Riley's memorandum to McNichols (HTEH 000285), they should have made certain that full disclosure was being made to the AIA Services' shareholders.

[1496] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 744.

[1497] RJT 0000801 (Emphasis supplied).

[1498] John Taylor has testified that he did not provide the AIA Disinterested Shareholders with any information about Reed Taylor other than what was contained in the letter and that he did not find it necessary to "advise the shareholders of the personal claims against [him]."

6.      In the final paragraph of the letter, John Taylor asked the shareholders to telephone him if they would like a copy of the complaint, which hardly complied with the applicable disclosure requirements.[1499] Rather than offer to take a phone call, John Taylor should have properly discharged his duties of loyalty and good faith (which includes disclosure) and provided the shareholders with the documentary information that they needed to make an informed decision, but he breached his fiduciary duties by failing to do so.

7.      The Controlling AIA Defendants also failed to obtain the consent of the AIA Disinterested Shareholders for AIA Services' causing its wholly owned subsidiary AIA Insurance to advance funds for the defense of the Controlling AIA Defendants in the Reed Taylor case, notwithstanding that substantially all of the funds for such advances originated from AIA Insurance. In addition, in September 2007 AIA Services borrowed $500,000 from CropUSA and in connection therewith granted to CropUSA a security interest in AIA Services' Former Headquarters. This was a violation of the negative covenant set forth in Section 4.9.2(c)(2) of AIA Services' Amended Articles of Incorporation and the conflict of interest provision in AIA Services' New Restated Bylaws, and another breach of the Controlling AIA Defendants' duties of loyalty and care. The Hawley Troxell Defendants represented AIA Services and CropUSA in the illegal and unauthorized transaction and benefitted therefrom by having their legal fees paid from the proceeds of the invalid loan.

8.      Although also required under AIA Services' Amended Articles of Incorporation and AIA Services' New Restated Bylaws governing conflict of interest transactions, no shareholder authorization for the advancement of legal fees to Henderson and Beck in *Reed Taylor v. AIA Services* was sought or obtained.[1500] Nevertheless, those fees were also paid on their behalf by the AIA Corporations to the attorneys representing Henderson and Beck. Likewise, no such authorization

---

[1499] Judge Brudie's statement in denying a preliminary injunction preventing the advancement of fees is by no means a determination that the advancement authorization was lawful: "The Court's record in the above-entitled matter reflects I.C. § 30-1-853 has been met by Defendants John Taylor, Bryan Freeman and JoLee Duclos. Therefore, the Court will not order AIA Services Corporation to refrain from paying legal expenses reasonably incurred by the Defendants." (Emphasis supplied). The underlying facts detailed in this Report were of course not part of that record. As Riley himself stated "while the Court refused to enjoin the advance of defense costs under Idaho Code section 30-1-853, he did not sanction it either."

[1500] *See* the discussion Riley's recent testimony and the Idaho law applicable to the advancement of legal fees to directors in Section XII of this Report.

was properly sought or obtained for the advancement to Henderson, Cashman, Beck, Duclos or John Taylor of legal fees in other lawsuits or this Lawsuit (as also discussed above). The so-called August 7, 2008 approval by Beck and Henderson for the advancement of fees and costs for John Taylor in Donna Taylor's first lawsuit in *Donna Taylor v. Taylor* was improper[1501] because Beck and Henderson had conflicts of interest as discussed in this Report that prevented them from approving the advancement of fees and costs for John Taylor; those conflicts were never discussed and addressed in those meeting minutes nor have any other meeting minutes or resolutions otherwise properly addressing the issue.

9.      Having now identified all of the relevant shareholder and board meeting minutes and resolutions for the AIA Corporations based John Taylor's recent Rule 30(b)(6) deposition testimony, it is clear that the Controlling AIA Defendants breached their duties of good faith and loyalty owed to the AIA Corporations because there was never proper approval obtained to advance the fees and costs for any of the lawsuits. *See, e.g.,* Exhibit D attached hereto. The only other minutes or resolutions of shareholder or board meetings addressing the advancement of any fees and costs, other than the improper one in March 2007 discussed above, for any of the Controlling AIA Defendants is referenced in the August 7, 2008 joint board meeting minutes for the AIA Corporations.[1502]

10.      In sum, the Controlling AIA Defendants failed to properly seek and obtain proper approval to have the AIA Corporations advance attorneys' fees and costs for their defense or any other party's defense in *Reed Taylor v. AIA Services*, *Donna Taylor v. Taylor*, *GemCap v. AIA Services*, *GemCap v. CropUSA*, the Reed Taylor subpoena litigation in *Reed Taylor v. Riley* and *Reed Taylor v. Bell*, this Lawsuit or any other legal matter thereby breaching their duties of good faith and loyalty resulting in being one of the proximate causes of the damages paid to the

---

[1501] AIA0027457. While John Taylor purportedly "removed himself from the call," Beck and Henderson also needed to remove themselves from the call. For example, Henderson had a vested interest in John Taylor avoiding liability and having to pay fees and costs in *Donna Taylor v. Taylor* to enhance the chances of her getting more money or property in her divorce with John Taylor. Beck and Henderson also both had interests in CropUSA and Donna Taylor was alleging breaches of John Taylor's fiduciary duties on 2004 regarding purchasing the 205,000 Series C Preferred Shares from CropUSA when those funds should have been paid to Donna Taylor, which implicated Beck and Henderson's ownership interests in CropUSA (including for other reasons stated in this Report). None of these irreconcilable conflicts were ever properly disclosed and addressed by the Controlling AIA Defendants or the Hawley Troxell Defendants during the lawsuits in breach of their duties of care, good faith and loyalty owed to the AIA Corporations.
[1502] AIA0027457-60.

**Exhibit - 1, p. 414**

**12-ER-2832**

various attorneys and law firms (*see* Damage Item Numbers 4, 6-9, 14, 21-26, 30-32). The Hawley Troxell Defendant breaches of their duties of care, good faith and loyalty owed to the AIA Corporations regarding failing to properly address the fee and cost advancement issues in March 2007 or in August 2008 for the so-called board approval by Beck and Henderson, who had conflicts of interest as discussed in this Report and could not approve of, the advancement of fees and cost to John Taylor in *Donna Taylor v. Taylor*[1503] by not properly submitting the matters to AIA Services' shareholders (AIA Services' shareholders would have also been required to approve a shareholder vote for AIA Insurance based on the boards' conflicts of interest discussed in this Report) and by further enabling the Controlling AIA Defendants to not properly seek shareholder consents for other advancements thereby being one of the proximate causes of the AIA Corporations' damages.

11.     As a director, no prudent and independent director would have accepted a statement that the Controlling AIA Defendants had acted in good faith for any of the transactions and claims, and would have refused to advance any fees or costs to any of the Controlling AIA Defendants or other involved parties (including Freeman), requested a determination be made by independent counsel that no fees or costs should be advanced based on the conduct discussed in the Report, or to attempt to effectuate the improper reverse stock split. The millions of dollars that was paid and/or advanced for the foregoing lawsuits and other matters were never properly approved or authorized by the directors of the AIA Corporations or AIA Services' shareholders, including, the fees and costs paid for *AIA Services v. Durant*. *See* Section XI(A). To reiterate, no proper authorization was ever obtained to pay any attorneys' fees and costs to any attorney or law firm representing the Controlling AIA Defendants, the AIA Corporations or any other person or entity since at least 2007 and all of those fees and costs were proximately caused by the failure to obtain such authorization, which would have never been provided by an independent officer or director.

12.     Based upon the facts set forth in this Report and the separate opinions expressed above, it is my opinion that the Controlling AIA Defendants flagrantly breached many of the fiduciary duties (including their duties of loyalty) that they owed to the AIA Corporations and the AIA Disinterested Shareholders, and the Controlling AIA Defendants substantially each other in the above described misconduct and the conduct on the part of John Taylor, thereby also being one of the proximate causes of damages to the AIA Corporations, as well as any other

---

[1503] The Hawley Troxell Defendants' billing records confirm that they were working on these issues.

Exhibit - 1, p. 415

12-ER-2833

losses with respect to which the conduct of the Controlling AIA Defendants was a substantial factor.

## Q.  The Controlling AIA Defendants Damaged the AIA Corporations.

1.     As already explained in this Report, the Controlling AIA Defendants have breached their duties of care, loyalty and good faith owed to the AIA Corporations thereby being one of the proximate causes of the damages to the AIA Corporations and their shareholders (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto). To reiterate, the Controlling AIA Defendants' failure as directors, officer and majority and controlling shareholders to exercise the essential qualities of integrity, competence and prudence and their breaches of their duties of loyalty, good faith and due care in bad faith owed to the AIA Corporations and their shareholders as discussed in Sections X-XIII of this Report were one of the proximate causes of substantial damages to the AIA Corporations in Exhibit A, including the following base damages:[1504] (a) $1,510,693 for the improper and unauthorized purchase by AIA Insurance in August 2004 of the Series C shares from Crop USA in Damage Item Number 3; (b) $11,588,245 representing the proceeds of the illegal sale by CropUSA in August 2008 to Hudson Insurance of assets belonging to the AIA Corporations or one of the other three alternative damage claims in Damage Item Number 1;[1505] (c) $120,000 in "consulting fees" paid in 2008-2009 to John Taylor or CropUSA for "consulting" services in violation of the common law preventing competition, his Executive Officer's Agreement and duties of loyalty owed to the AIA Corporations as an officer, director and majority shareholder in Damage Item Number 2; (d) the unpaid cumulative dividends from January 1, 2009 on the Series C Preferred Stock held by AIA Services' 401(k) Plan in Damage Item Number 5;[1506] (e) $425,116 in settlement funds, plus interest and penalties, which should have been paid to former policy holders, which John Taylor diverted[1507] for illegal purposes in Damage Item Number 10; (f) $800,000 in settlement funds received by AIA Insurance in 2008,

---

[1504] The damages in Miesen's spreadsheets include interest calculations. Those interest calculations, with the exception of Damage Item Number 38 because the total damages are unknown, are liquidated claims and may be computed with mathematical certainty, as confirmed by Miesen's use of an Excel spreadsheet and the proper formula used therein.

[1505] Based on the documents and other evidence I have reviewed, there is no doubt that the assets that were sold to Hudson Insurance belonged to the AIA Corporations.

[1506] This assumes, for the purposes of this presentation only, that John Taylor is entitled to the benefits of the Series C shares held for his account in the AIA Services' 401(k) Plan.

[1507] Those funds were not set aside and separately held; John Taylor acknowledged that the money was spent. 7/28/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 123-24.

Exhibit - 1, p. 416

12-ER-2834

which the Controlling AIA Defendants wrongfully diverted for their use in Damage Item Number 11;[1508] (g) $2,264,359.92 in loans that, from January 1, 2010 through the present time, John Taylor caused the AIA Corporations to make to the non-credit worthy Pacific Empire Radio of which John Taylor was the Chairman and CEO and has a substantial ownership interest in Damage Item Number 13;[1509] (h) $1,067,188.91 comprised of the accrued interest on the principal $416,512 owed to Donna Taylor for the redemption of her Series A shares, plus the $27,907.89 in court awarded fees and costs which AIA Services is required to pay, plus the legal fees the AIA Corporations paid and Donna Taylor has incurred pursuing her claims in Damage Item Number 14;[1510] (i) $187,027.16 for the legal fees and costs paid to attorneys representing John Taylor in *Reed Taylor v. AIA Services* in Damage Item Number 6;[1511] (j) $361,131.28 in costs and fees paid to attorneys representing Henderson, Beck and Corrine Beck in *Reed Taylor v. AIA Services* in Damages Item Number 7; (k) $99,710.30 in costs and fees paid to attorneys representing

---

[1508] I am assuming that the $75,000 in holdback funds were paid to AIA Insurance. Otherwise, the $800,000 should be reduced by $75,000 and the interest adjusted accordingly. *See* AIAPROD00301930 ("…of which seventy five-thousand ($75,000)…will be held back for a one year period…").

[1509] $2,235,859.99 is the aggregate amount of the four promissory notes PERC delivered to the AIA Corporations; there is no evidence that any of those notes have been paid and additional advances have more recently been discovered as shows in Exhibit A. These damages may be higher because financial information continues to be withheld for 2019 and 2020. Moreover, numerous transactions showing payments for alleged services provided by PERC to the AIA Corporations were never properly supported or approved by AIA Services' shareholders based on John Taylor, Beck and Henderson's conflicts of interest and the conflicts of the other Controlling AIA Defendants as stated in this Report.

[1510] As stated in Sections X and XII, the Hawley Troxell Defendants should have insisted, and ensured as part of their duties of care, that Donna Taylor be timely and fully paid for the redemption of her Series A shares; instead, they breached their duties of care and encouraged and enabled John Taylor and the other Controlling AIA Defendants to cause the AIA Corporations to spend more on legal fees resisting Dona Taylor's claim than it would have cost to pay her the amounts to which she was entitled.

[1511] By reason of the Controlling AIA Defendants pervasive conflicts of interest and the lack of corporate governance compliance, as well as the adverse interest exception, none of legal fee payments by the AIA Corporations were authorized. The amount of the fees set forth above is preliminary and will be revised as discovery proceeds. By reason of the Controlling AIA Defendants' intentional acts of misconduct, of which the Hawley Troxell Defendants were well aware, and as stated in Sections XI and XII of this Report, the legal fees of the Controlling AIA Defendants should not have been advanced and, by reason of their fiduciary and due care duties owed to the AIA Corporations, the Hawley Troxell Defendants should never have permitted the AIA Corporations to do so in *Reed Taylor v. AIA Services, Donna Taylor v. AIA Services*, *Donna Taylor v. Taylor* or this Lawsuit.

Duclos and Freeman in *Reed Taylor v. AIA Services* in Damage Item Number 8; (l) $193,258.77 in fees and costs paid to attorneys representing the AIA Services' 401(k) Plan in Damages Item Number 9;[1512] (m) $413,972.05 for the misuse of the court registry funds in Damage Item Number 12; (n) $430,000 which Growers National agreed to pay CropUSA, but should have been paid to the AIA Corporations because they had formed and funded Growers National and the contract should have been with the AIA Corporations in Damage Item Number 34; (o) at least $3,043,705.45 in totally undeserved and unapproved "compensation" paid by the AIA Corporations to John Taylor from 1999 through 2017 (and any other compensation after that time), a faithless officer and director, plus any director fees or expense reimbursements, together with the return of the 475,000 shares of AIA Services common stock he unlawfully acquired through the purported exercise of stock options (assuming his exercise was timely), the return of the common shares that he acquired in 2012, which were never paid for, as well as the $863,617.20 in compensation paid to other competing officers in Damage Item Numbers 18, 35 and 40; (p) $946,119.69 the sales price of the AIA Corporations' headquarters building, together with the $104,257 sale price of each of the two condos that were also sold, making a total damage amount of $1,154,634.72 in Damage Item Number 14;[1513] (q) $123,749.89 for the $50,000 sale price of the parking lot utilized by the AIA Corporations which John Taylor and Henderson purchased on November 20, 2001 for $8,000 using AIA Insurance's credit and the improper and unauthorized rent charged until 2007 in Damage Item Number 17; (r) $163,480.74 for improper directors' fees and costs reimbursements received by Henderson and Beck in Damage Item Number 19; (s) $1,007,786.72 in fees and costs the Hawley Troxell Defendants received without proper approval from the AIA Corporations for *Reed Taylor v. AIA Services, Donna Taylor* v. *AIA Services,* and related matters during that period of time in Damage Item Number 3; (t) the fees and costs paid to attorneys representing the Controlling AIA Defendants and other parties in *Reed Taylor v. AIA Services*, *Donna Taylor v. Taylor*, *AIA Services v. Durant*, *GemCap v. CropUSA*, *GemCap v. AIA Services*, this Lawsuit, and as any fees and costs paid to them for any other lawsuits and matters in Damage Item

---

[1512] I have not been able to locate or review accounting documents showing that the AIA Corporations paid or reimbursed these fees. However, based on John Taylor's declaration filed in *Donna Taylor v. Taylor* stating that over $2,200,000 had been paid fighting Reed Taylor, these fees and costs must have been ultimately paid or reimbursed by the AIA Corporations or John Taylor was lying (again).

[1513] As stated in Section XII of this Report, the headquarters building was sold at a "fire sale" and the loss sustained by the AIA Corporations thus exceeded the sales price. As with the other items of damages, this is subject to review and confirmation.

**Exhibit - 1, p. 418**

**12-ER-2836**

Numbers 21-26, 29-32;[1514] and (u) the other damages sought by Miesen addressed elsewhere in this Report as detailed in Exhibit A.

2.      With respect to the GemCap Settlement Agreement, GemCap is asserting that the AIA Corporations owe $20,130,701.01 in Damage Item Number 15. Although Miesen is challenging the validity of all of those instruments, and is not conceding that any of them are in any way binding on or enforceable against the AIA Corporations, there can be no assurance that Miesen will be successful (it is my opinion that he should be) and by reason their breaches of their duties to the AIA Corporations listed above, the Controlling AIA Defendants are liable for any damages sustained by the AIA Corporations by reason of their execution of the AIA Services Limited Guarantee of the GemCap Loan, the AIA Corporations' Amended Guarantee of the GemCap Loan or the GemCap Settlement Agreement (which would have never occurred but for the guarantees).

3.      With respect to the $425,116 addressed above for Damage Item Number 10, Miesen is seeking to recover these damages for the benefit of the AIA Corporations' creditors, which would be the policyholders or the applicable state in which the respective policyholders reside or the state of Idaho. At John Taylor's recent Rule 30(b)(6) Deposition, John Taylor testified that the $425,116 need only be paid "at the end of the policy period, we either have to give this money to the State of Texas, and if not them, to [NOLHGA] – come back to [NOLGHA]. So it's ultimately [NOLHGA]'s responsibility."[1515] Like his nonchalant explanations for not properly holding annual shareholder meetings or properly submitting matters for shareholder approval, John Taylor takes a position that is unsupported by, and contrary to, the clear terms of the August 2008 settlement agreement.[1516] That agreement requires AIA Insurance to:

> make payments to the SBA Certificate Holders for whom it has current addresses within seven (7) months after receipt of the funds from the Liquidator and shall provide a report to NOLHGA, the Liquidator, and the Court concerning its efforts…***If AIA is unable to***

---

[1514] The payment of these fees and costs was never properly approved or authorized by the AIA Corporations.

[1515] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 1028. The deposition transcript erroneously refers to "NOLGHA" as "NOVA". Thus, I have corrected the acronym in my quotes.

[1516] As I have stated in this Report, John Taylor has a serious problem in complying with contractual and legal obligations, as seen from the forty-five different lawsuits and legal filings that can be directly or indirectly traced to him. *See* Exhibit D.

Exhibit - 1, p. 419

12-ER-2837

*locate any SBA Certificate Holder(s), the SBA Certificate Holder Net Distribution applicable to each such SBA Certificate Holder shall escheat to the state pursuant to the laws of the state of the last known address of each SBA Certificate Holder or, if such state has no escheat laws, pursuant to the State of Idaho*…AIA shall either complete its efforts to make payments to SBA Certificate Holders or make a good faith effort to escheat such funds due to SBA Certificate Holders within two (2) years after receipt of the funds form the Liquidator and shall provide a full written report to NOLGHA, the Liquidator and the Court confirming that all funds have either (i) been distributed to SBA Certificate Holders or have been escheated to the appropriate State as required by this Agreement or (ii) if funds have not been escheated because a state has refused to accept funds because the applicable time period to escheat funds has not run, AIA will include in the report the date by which such funds will be escheated to said state(s) and will confirm its commitment to escheat such funds on said date.[1517]

4.      The above-quoted terms could not be clearer. AIA Insurance was required to complete the distribution of the funds to the former policyholders, the state of Texas (assuming John Taylor's testimony is accurate),[1518] or the state of Idaho almost ten years ago. The Controlling AIA Defendants simply failed to comply with AIA Insurance's contractual obligations in breach of their duties of good faith and loyalty owed to the AIA Corporations, including for the reasons discussed below.

5.      Upon my review of the docket for the Universe Liquidation action, I was unable to locate a filing after August 2008 that indicates a report was filed by AIA Insurance as required.[1519] This appears to be breach number one. The agreement also required the funds to be distributed to the former policyholders or escheated almost ten years go. Breach number two. There are no terms in the settlement agreement which authorize AIA Insurance to use any of the funds required to be paid or escheated. As indicated on AIA Services' financial statements, there has never been $425,116 reserved as required, nor have the AIA

---

[1517] AIAPROD00301933-34 (Emphasis supplied).

[1518] I have not been able to locate any records produced in discovery that definitively proves that the unpaid former policyholders are all residents of Texas. However, I will assume that Texas law applies in part of my analysis.

[1519] DLM – 108234-37.

Page - 411

Exhibit - 1, p. 420

12-ER-2838

Corporations had $425,116 in cash for years. Breach number three. Moreover, as discussed in Section XI(A), there is not a single board resolution or meeting minutes that purports to address, approve or authorize, the use of the $425,116 funds that did not belong to the AIA Corporations and no board authorization would have been proper in any event. The funds did not belong to the AIA Corporations, but they are now liable for the payment of the $425,116, plus any accrued interest and penalties.

6.     The Controlling AIA Defendants have also breached their duties of loyalty and good faith by failing to timely submit a report and the funds to the state of Texas or the state of Idaho. Based on John Taylor's testimony, Texas escheat laws would be the first to apply. Since I have been unable to locate a report submitted to Texas for the $425,116, I will assume that one was not submitted. Under Texas law, "[e]each holder who on March 1 holds property that is presumed to be abandoned…shall file a report of that property on or before the following July 1."[1520] The funds must also be submitted within that time.[1521] The failure to timely submit a report and deliver the funds subjects AIA Insurance to a 5% penalty for failing to timely file the report and a 5% penalty for failing to timely submit the funds.[1522] AIA Insurance is also required to pay 10% interest.[1523] If no report has been filed with Texas, the statute of limitations has not run.[1524] It is worth noting that the Controlling AIA Defendants' failure to properly and timely submit the report and the $425,116 constitutes a misdemeanor criminal act under Texas law.[1525] If the Controlling AIA Defendants or a court determines that Texas law or another state's law did not apply, then Idaho law applies to the escheat funds under the terms of the agreement. Under Idaho law, the "report must be filed no later than November 1 of each year as of June 30 next preceding."[1526] Interest accrues at 12% per annum from the date that the funds should have been paid, plus an annual

---

[1520] Tex. Prop.Code Ann. § 74.101(a).

[1521] Tex. Prop.Code Ann. § 74.301.

[1522] Tex. Prop.Code Ann. § 74.706(a).

[1523] Tex. Prop.Code Ann. § 74.705. For the reasons stated herein, if the court finds that Texas law applies, Miesen's damages should be adjusted to reflect the 10% penalty and 10% interest, in lieu of the 12% interest Miesen is requesting.

[1524] Tex. Prop.Code Ann. § 74.7021(b). If a report was submitted, the statute of limitations is seven years from the date of the report.

[1525] Tex. Prop.Code Ann. § 74.710 ("A holder commits an offense if the holder willfully violates this chapter, including: (1) failing to file a report in accordance with this chapter; (2) failing to pay or deliver property in accordance with this chapter…").

[1526] I.C. § 14-517(4).

Page - 412

Exhibit - 1, p. 421

12-ER-2839

penalty of 5% if the failure was based on negligence.[1527] "A holder who willfully refuses after written demand by the administrator or pay or deliver property as required under this chapter shall be guilty of a misdemeanor…"[1528] However, it appears that Idaho has a seven-year statute of limitations for the administrator to commence an action from the date that the report was due.[1529] Based on the foregoing, in my opinion, AIA Insurance, through the Controlling AIA Defendants (or at least John Taylor) have intentionally failed to comply with the obligations under the settlement agreement by timely submitting the $425,116 to the state of Texas, or Idaho if no other state law applies, and have committed a misdemeanor by not intentionally not properly submitting a report and the funds by the prescribed times thereby breaching their duties of loyalty and good faith owed to the AIA Corporations and being one of the proximate causes of the damages.[1530] The Controlling AIA Defendants further breached their duties of loyalty and good faith by diverting the $425,116 and improperly using the funds when the funds did not belong to the AIA Corporations. The misuse of those funds is a poster child example of John Taylor's and the other Controlling AIA Defendants' propensity to wrongfully appropriate other people's money for their own use. In addition, the Hawley Troxell Defendants breached their duties of care, good faith and loyalty by not ensuring that the agreement contained an express provision requiring the an independent administrator be responsible for administering and submitting the funds to the respective states thereby being one of the proximate causes of the AIA Corporations' damages. For similar reasons, as discussed in Section XII, the Hawley Troxell Defendants breached their duties of care, good faith and loyalty by not including a contractual provision in the settlement agreement, and through their failures described in this Report as litigation and general counsel, that required the $800,000 settlement funds be safeguarded or deposited with a court based on the conduct of the Controlling AIA Defendants, thereby being one of the proximate

---

[1527] I.C. § 14-533(1)-(2). Thus, Miesen's damage calculations are increased by another 5% per annum if Idaho law applies.

[1528] I.C. § 14-533(1)-(3). I did not exhaustively research this issue. I presume that Idaho, like many states, has exceptions to statutes of limitations involving misconduct.

[1529] I.C. § 14-529(3).

[1530] Upon my review of the AIA Corporations' records, they have significant experience in submitting the required reports and funds as there are many references to abandoned funds in the workpapers.

Page - 413

Exhibit - 1, p. 422

12-ER-2840

causes of those damages.[1531] The conduct and damages that occurred, including the others described in this Report, were entirely foreseeable to the Hawley Troxell Defendants because the improper activities and corporate governance of the Controlling AIA Defendants was a long-term pattern of conduct that continued to accelerate while the Hawley Troxell Defendants were actively representing the AIA Corporations in 2007 through 2012.

7.       There have been a number of questions asked regarding certain payments or advances that John Taylor received as simply being credited and debited to his internal accounts with the AIA Corporations, which are improper for reasons addressed by Mr. Hile. The argument that John Taylor simply received money that he was entitled to receive through his salary account or otherwise is a distinction without a difference. In the end, John Taylor has been paid millions of dollars in advances and compensation since 1999, which he as not entitled to, or authorized to, receive as discussed in this Report. As but one example, John Taylor, through the use of euphemistically named "due to/due from" accounts on the books of the AIA Corporations reflecting some of his "personal transactions with AIA Services and Insurance used the AIA Corporations as his personal piggy bank. The "due-to and due-from accounts" were also used to facilitate John Taylor' usurpation of the parking lot purchase corporate opportunity belonging to the AIA Corporations and subsequent rental payments.[1532] Based on my review of the deposition transcripts, John Taylor and the Hawley Troxell Defendants appear to take the position that the $73,749.89 in known rent paid[1533] to John Taylor through 2007 for AIA's Parking Lot was never really paid because the rental payments were applied as credits (payments) on John Taylor's improper accounts with the AIA Corporations. This is a distinction without a difference. It does not matter if some of the payments for rent were included on a "due to/due from" account or accrued salary account for John Taylor. The improper payments were made to John Taylor

---

[1531] There is a related issue regarding the $800,000 settlement funds. Under the terms of the fee agreement with counsel, the Greener Burke Shoemaker law firm was apparently entitled to a blend of hourly and contingent fee for their work on that lawsuit. AIA_191NSP_0107499-500. While the Controlling AIA Defendants never sought or obtained proper board approval for the contingent fee arrangement (which also required AIA to pay monthly fees as well of approximately $147,981.17) thereby resulting in them being the proximate cause of the $118,418.83 paid to the Greener law firm from the $800,000 settlement proceeds. If the Court finds that the $118,418.83 in funds paid to the Greener law firm was appropriate and authorized, then Miesen's damages should be reduced by $118,418.83 to represent the funds paid to the law firm and adjust his interest calculations accordingly.

[1532] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 1045-48.

[1533] See Damage Item Number 17 in Exhibit A hereto.

or he received credit for them as to other sums that he did disclose as being owed to the AIA Corporations.

8.      In addition to the CropUSA and Growers National opportunities and assets unlawfully taken from the AIA Corporations as discussed in Section XI(J), the Controlling AIA Defendants also breached their duties of loyalty and good faith by allowing Pacific Empire Holdings to compete against the AIA Corporations, through its business named Sound Insurance, by selling insurance products such as health, home and related products thereby being one of the proximate causes of the damages to the AIA Corporations and their shareholders for the $240,000 sale price of the book of business when it was sold in 2007 (*see* Damage Item Number 39).[1534] While I have not been able to locate numerous accounting records showing that Sound Insurance was funded by the AIA Corporations, such as was done for CropUSA and Growers National, during that period of time (there are more recent payments), the value of the business is established by the sale price of $240,000. PEHC was a willing seller and CropUSA was a willing buyer; that $240,000 should have been paid to the AIA Corporations.

### R.   The Controlling AIA Defendants Have No Viable Advice of Counsel Defense for Any of Their Acts and Omissions.

1.      The Controlling AIA Defendants have asserted an advice of counsel defense in this Lawsuit. As I have discussed in Sections X and XIII, there was no basis for the Controlling AIA Defendants to rely on the advice of any lawyer, including through Quarles & Brady[1535] and Attorney Van Idour's[1536] Legal Opinions provided to GemCap in 2011 and 2013, respectively, nor could they rely on the Quarles & Brady[1537] and Hawley Troxell Legal[1538] Opinions provided to

---

[1534] The Purchase and Sale Agreement was apparently approved on March 21, 2007, but the agreement was back-dated effective to November 1, 2006. AIAPROD00076351; AIAPROD00298184-246.

[1535] STEIN000718-26; STEIN001828-37.

[1536] AIAPROD00311427-31; AIAPROD00311598-602. These two Legal Opinions were Van Idour's first two Legal Opinions and the contents were prepared by Attorney Gatziolis. Van Idour was primarily a criminal law attorney who traded rent money owed to the AIA Corporations for signing the two Legal Opinions.

[1537] AIA0003114-22.

[1538] AIA001536-44.

**Exhibit - 1, p. 424**

**12-ER-2842**

Lancelot in 2006.[1539] First, none of the Controlling AIA Defendants obtained permission to rely on the Legal Opinions Provided to GemCap or Lancelot and they may not rely upon those Legal Opinions. Second, the Controlling AIA Defendants knew, or should have known with reasonable diligence, that, *inter alia*, the Legal Opinions referenced above were wrong because AIA Services' Amended Articles of Incorporation flatly prohibited the guarantees under the Guarantee Prohibition provision (Section 4.2.9(c)). For further explanations why reliance was improper and unreasonable under the facts and circumstances, the reasons are stated elsewhere in this Report. *See* Sections X(G), X(L), X(N)-(O), XII, and XIII. However, even if the Controlling AIA Defendants or anyone else had obtained permission to rely upon the above-referenced Legal Opinions, their sole remedy would be to pursue claims against the opinions givers and their law firms for the negligently prepared Legal Opinions (all of the Legal Opinions were incorrect in terms of the AIA Corporations being permitted or authorized to guarantee the Lancelot Loan or the GemCap Loan).[1540] Moreover, Henderson stated that she purportedly relied upon the Quarles & Brady and Van Idour Legal Opinions when she never spoke to either lawyer. For these reasons and the fact that no Legal Opinions were delivered in connection with any settlement or the GemCap Settlement Agreement, none of the Defendants can rely upon any of the 2006, 2011, or 2013 Legal Opinions referenced above as a basis for advice to enter into the unauthorized and improper GemCap Settlement Agreement and the advice contained within those Legal Opinions would have been unreasonably relied upon for the same reasons. It is worthy of noting that Van Idour's practice has been focuses on criminal law and he never represented the AIA Corporations for any other matters, which are additional reasons why the Controlling AIA Defendants could not reasonably rely on any of Van Idour's advice or Legal Opinion for the GemCap Loans (his two Legal Opinions were the first and only ones that he has ever provided).[1541]

---

[1539] In my opinion, it appears that subsequent opinion givers, Quarles & Brady and Van Idour, may have agreed to provide the Legal Opinions because Hawley Troxell had in 2006 (erroneously and negligently as discussed in Section XII).

[1540] *See Taylor v. Riley*, 157 Idaho 323, 336 P.3d 256 (2014) (holding that a non-client may pursue negligence claims against an opinion giver); *Taylor v. AIA Services Corp.*, 151 Idaho 552, 261 P.3d 829 (2011) (refusing to enforce Reed Taylor's 1995 illegal stock redemption obligations based on his reliance on Riley and Eberle Berlin's incorrect Legal Opinion). GemCap is in the same position. *See* Section XIII.

[1541] According to the Lewiston Tribune, Van Idour was recently sued for malpractice for his work as a criminal public defender.

Exhibit - 1, p. 425

12-ER-2843

2.      Because the Controlling AIA Defendant have failed to provide any specific information regarding any other legal advice that they relied upon other than vague and unsupported assertions, I will be prepared at the time of trial to address any specific advice that they may purport to rely upon as a defense. I will supplement my opinion if more information becomes available. However, even without having the benefit of knowing if there will be further or additional information provided, the advice would be unreasonable for the reasons stated in this Report, including, without limitation, based on supported allegations asserted in numerous lawsuits which provided actual notice of the improper acts and omissions discussed in this Report.

**S.   Improper Use of Sealing of Settlement Agreements, Court Filings and Transcripts to Conceal Facts from the AIA Corporations and AIA Services' Disinterested Shareholders.**

1.      The Controlling AIA Defendants are misusing the sealing of the Gem Cap Settlement Agreement in *GemCap v. Crop USA* and *GemCap v. AIA Services* as a shield to conceal relevant facts from Meissen and me, and to prevent us from utilizing the GemCap Settlement Agreement and information pertaining to that Agreement to which we already have legal and proper access. For example, on October 15, 2019, the AIA Controlling Defendants attempted to prevent us from observing the trial that was scheduled to begin in *GemCap v. AIA Services*, but were overruled by Judge Brudie. Our purpose in attending the trial was to acquire information and gather facts about the GemCap Settlement Agreement and related matters pertinent to Miesen's claims against the Controlling AIA Defendants and GemCap. John Taylor is breaching his fiduciary duties of loyalty owed to the AIA Corporations by concealing facts through sealing records, and refusing to provide them to Miesen or otherwise provide full disclosure to the AIA Corporations and AIA Services' Disinterested Shareholders.[1542]

---

[1542] To this day, John Taylor has never disclosed the terms of the GemCap Settlement Agreement to AIA Services' Disinterested Shareholders nor did he ever properly seek shareholder approval as discussed in this Report. Indeed, to this day, the AIA Corporations still have no knowledge of the GemCap Settlement Agreement by reason of the adverse interest exception (as discussed above).

**Exhibit - 1, p. 426**

**12-ER-2844**

**T.   <u>Reed Taylor Indemnity Demand.</u>**

1.      John Taylor and Henderson[1543] breached their duties of loyalty and good faith owed to the AIA Corporations and their shareholders by naming Reed Taylor as a third-party defendant in this Lawsuit solely for purposes of seeking to disqualify Miesen's counsel and to be vindictive towards Reed Taylor because he has brought to light their malfeasance, misconduct and concealments discussed in this Report thereby being one of the proximate causes of any fees and costs that the AIA Corporations are obligated to advance for Reed Taylor. Because this is a new damage claim, it is not included in Miesen's forty Damage Item Numbers in Exhibit A attached hereto. However, I am addressing these damages now at the request of Miesen.

2.      Recently, Reed Taylor's counsel produced documents indicating that he had made three written demands and requests for indemnification and the advancement of attorney's fees and costs.[1544] Miesen has not had an opportunity to address these issues in his Damage Items. To the extent that the AIA Corporations are required to advance fees and costs to Reed Taylor or indemnify him or both, there is no doubt in my mind that Reed Taylor was brought into this action by the Controlling AIA Defendants, possibly with the urging by the Hawley Troxell Defendants, for the disingenuous effort to disqualify Miesen's counsel, Attorney Bond,[1545] and therefore dispose of this Lawsuit because Miesen would no longer have counsel. If Reed Taylor were truly involved in the alleged malfeasance as is vaguely alleged in the Controlling AIA Defendants' Third-Party Complaint,[1546] he should have been joined as a defendant shortly after this Lawsuit was filed in August 2010.[1547] In my opinion, John Taylor and Henderson have also spearheaded naming Reed Taylor as a defendant because they place their interests in being

---

[1543] Henderson's fiduciary duties as a majority shareholder ended on January 5, 2018, but she was already involved in naming Reed Taylor as a third-party defendant. DLM – 0081528-30. While John Taylor agreed to indemnify Henderson in that decree, the issue is for them, and not Miesen, to resolve amongst themselves after reimbursing the AIA Corporations.

[1544] REED 002422-23; REED 002424-27.

[1545] *See* Dkts. 275, 278.

[1546] Dkt. 218.

[1547] *See* Fed. R. Civ. P. 19-21.

**Exhibit - 1, p. 427**

**12-ER-2845**

vindictive towards Reed Taylor ahead of the interests of the AIA Corporations and their shareholders.[1548]

3.      Moreover, the Controlling AIA Defendants substantially assisted John Taylor in breaching his duties of good faith and loyalty because they were knowing participants in the improper plan to name Reed Taylor as a defendant in an effort to create a conflict and disqualify Attorney Bond; rather than take any action in the best interests of the AIA Corporations.[1549] My opinions are further supported by the failure of the Controlling AIA Defendants to provide any concrete evidence of wrongdoing against Reed Taylor in this Lawsuit in response to Miesen's interrogatories propounded on the Controlling AIA Defendants. In sum, the AIA Corporations should not be saddled with any debts or payment obligations to indemnify or advance expenses to Reed Taylor for naming him as a third-party defendant in this Lawsuit.[1550] Had the Hawley Troxell Defendants properly discharged their duties of care and loyalty in 2007 through 2010, these damages would have also been prevented because the AIA Corporations would have been properly operated as discussed in this Report thereby making them one of the proximate causes of these damages. As discussed in this Report, rather than insist that the Controlling AIA Defendants properly conduct corporate governance and properly manage the AIA Corporations, the Hawley Troxell Defendants have breached their duties of care and loyalty by enabling John Taylor and the other Controlling AIA Defendants thereby separately being one of the proximate causes of any damages incurred in paying or indemnifying Reed Taylor and the other damages to the AIA Corporations and their shareholders (*see* Damage Item Numbers 1-40).

---

[1548] For example, John Taylor and Henderson were constantly monitoring Reed Taylor's malpractice lawsuits in *Reed Taylor v. Riley* and *Reed Taylor v. Bell*. The Controlling AIA Defendants had no potential liability in those lawsuits, yet they assisted the defendants in opposing Reed Taylor obtaining any damages for the illegal redemption of his shares in 1995. Indeed, John Taylor was even going to purportedly act as an expert witness against Reed Taylor in *Reed Taylor v. Riley*.

[1549] On July 26, 2007, Marty Martelle's billing entry stated, *inter alia*: "[clients] have belief that case can be resolved by recusing atty…" AIA_191NSP 0013797.

[1550] On October 23, 2020 (one day after Reed Taylor produced his demands for advancement of costs and indemnity), Mr. Bond emailed Mr. Bissell for the purpose of inquiring on the approximate amount of fees and costs incurred and Mr. Bissell stated that Reed Taylor had incurred over $200,000 in attorneys' fees and costs in this Lawsuit. DLM – 109878-79.

Exhibit - 1, p. 428

12-ER-2846

## XII. ADDITIONAL OPINIONS PRIMARILY ON THE HAWLEY TROXELL DEFENDANTS, BUT NOT LIMITED TO THEM

Based upon my education, training, knowledge, and experience, together with the authorities, facts, documents, and data that I have reviewed, considered, assumed, relied upon, and disclosed in this Report (including the exhibits described in Section II and attached hereto), I hereby express the opinions in Sections I, II and X of this Report (which I incorporate by reference herein), the opinions in Sections XI and XIII (which I incorporate by reference herein to the extent that those opinions are applicable), the opinions previously filed in my declarations with this Court, and the following opinions as to the Hawley Troxell Defendants:

I opine, *inter alia*, that: (a) the Hawley Troxell Defendants, whose top three billers from 2007 through 2012 (Ashby, Babbitt and Riley, respectively) billed a collective 3,555.25 hours purportedly representing the AIA Corporations, have breached their duties of care and duties of loyalty owed to the AIA Corporations in *Reed Taylor v. AIA Services*, *Donna Taylor v. AIA Services*, in related matters, and in acting as general counsel for the AIA Corporations by failing to act in the best interests of the AIA Corporations (including the all-important duty of undivided loyalty) thereby being one of the proximate causes of the damages requested by Miesen; (b) at a minimum for the Hawley Troxell Defendants, they breached their duties of care and duties of loyalty owed to the AIA Corporations by representing the interests of the Controlling AIA Defendants and in earning significant fees and costs. They never saw the big picture and were focused solely on "beating" Reed and Donna Taylor instead of representing the interests of the AIA Corporations as discussed in this Report, never rendered advice of the type and quality that a firm of the reputed stature of Hawley Troxell would have rendered under the same or similar circumstances, ignored the fact that the AIA Corporations, and not the Controlling AIA Defendants, were their clients, negligently or intentionally substantially assisted the Controlling AIA Defendants in breaching their fiduciary duties and failed to exercise due care in connection with these and a number of related matters, thereby being one of the proximate causes of the damages claimed by Miesen; (c) at worst for the Hawley Troxell Defendants, they engaged in a course of conduct intentionally violating their fiduciary duties (including the duties of loyalty) owed to the AIA Corporations by placing the interests of the Controlling AIA Defendants above the interests of the AIA Corporations' interests and by substantially assisting the Controlling AIA Defendants in breaching their fiduciary duties and committing fraud against the AIA Corporations and AIA Services' Disinterested Shareholders, thereby being one of the proximate causes of the damages requested by Miesen; (d)

Page - 420

the Hawley Troxell Defendants should be required to disgorge all compensation for intentionally violating their fiduciary duties owed to the AIA Corporations by acting with conscious disloyalty to them and for violating numerous Rules of Professional Conduct (particularly as to conflicts of interest and obtaining Informed Consent from the highest authority, e.g., shareholders); (e) the Hawley Troxell Defendants' engagement letters and conflict waivers are void because they were never properly obtained, ultra-vires or intra vires (but not properly authorized) and the product of numerous violations of the Rules of Professional Conduct; and (f) after considering the evidence and the long-term course of intentional conduct (including while lawsuits were pending), the Hawley Troxell Defendants' conduct towards the AIA Corporations and AIA Services' Disinterested Shareholders was oppressive and they intentionally failed to insist upon the necessary disclosures to, and assisted the Controlling AIA Defendants in concealing facts from the AIA Corporations and AIA Services' Disinterested Shareholders and/or outrageous for the reasons stated in this Report. Nothing in the Reports submitted by the Hawley Troxell Defendants' experts, the Unredacted Billing Records, or the recent discovery has caused me to change any of my analysis and opinions; in fact, their opinions (including Mr. Remele's telling refusal to consider or evaluate John Taylor's conduct in his opinions); the Unredacted Billing Records and the other more recent discovery reinforce my opinions.[1551]

In addition, I also render the following additional opinions:[1552]

### A. The Duties of the Hawley Troxell Defendants to the AIA Corporations, and the Breaches Thereof.

1.    Having established in Sections X-XI the mockery of corporate governance that took place at the AIA Corporations at the hands of the Controlling

---

[1551] The length of this Report was necessary to thoroughly and properly address some of the pertinent facts, analysis and the many issues. I am surprised at what little documentation and analysis are contained in the reports submitted by Messrs. Remele and Lidstone; they have not been provided with, nor have they reviewed, the information necessary to offer informed opinions.

[1552] While I refer to the "Controlling AIA Defendants" in this Report, I would like to clarify that I am primarily referring to the conduct of John Taylor because he was the primary controlling person over the AIA Corporation (although the other Controlling AIA Defendants, Beck, Henderson, Duclos and Cashman were also intimately involved and were defendants in lawsuits thus they have no excuse). He appears to have been calling most of the shots in the lawsuits and other legal and accounting matters. To reiterate, John Taylor is also a lawyer and an accountant, which makes his behavior and the Hawley Troxell Defendants' behavior all the more egregious.

Page - 421

AIA Defendants, in part, under the guard of the Hawley Troxell Defendants from at least 2007 through 2012 as discussed in this Report (*see, e.g.,* Sections X and XI(A),[1553] the Hawley Troxell Defendants breached their duties of care,[1554] good faith and loyalty owed to the AIA Corporations and their shareholders[1555] for all of the reasons discussed in this Report, thereby being one of the proximate causes of the damages to the AIA Corporations and their shareholders (*see* Damage Item Numbers 1-40[1556] in Exhibit A attached hereto; *see also* Exhibits B-H for further supporting details and information). Had the Hawley Troxell Defendants properly discharged their duties of care, good faith and loyalty, much of the damages inflicted upon the AIA Corporations could have been prevented and proper actions could have been taken by the Hawley Troxell Defendants, including by supporting the appointment of a receiver or the proper appointment of Moran to AIA Services' board, to recover those damages already sustained as discussed in this Report, thereby the Hawley Troxell Defendants being one of the proximate causes of the damages in this Lawsuit.

     2.     Indeed, as discussion in Sections X and XI(A) and this Report, there were no properly elected boards or appointed officers to make any decisions regarding any representation agreement or legal matter, and no conflicts of interest

---

[1553] Indeed, from 2007 through 2012, there were no annual shareholder meetings, no annual board meetings, and only one special shareholder meeting (albeit improper) held for the AIA Corporations. *See* Exhibits B, E-F attached hereto.

[1554] Which includes the non-compliance with numerous Rules of Professional Conduct. *See* Section X(A) and this Section XII.

[1555] I acknowledge that a lawyer generally only owes a duty to its corporation. However, based on the unique circumstances of this Lawsuit and since the AIA Corporations are closely held, it is possible that the court could rule the Hawley Troxell Defendants also owe duties to AIA Services' shareholders. If so, my opinions also apply to their breaching duties owed to Miesen and damages.

[1556] As with the Controlling AIA Defendants and GemCap, Miesen is not maintaining that all of the AIA Corporations' $39,577,697 in revenues from January 1, 1999 through December 31, 2018 are damages. The jury will need to make that determination. Upon my review of the accounting records, I have seen many legitimate business expenses that have been paid. The problem, however, is what person or entity ultimately benefitted and were there any allocations of expenses that were allocated fairly or whether the AIA Corporations benefitted from other expenses, etc. I also acknowledge that the Hawley Troxell Defendants were not as intimately involved in the earlier years of Damage Item Number 38. There is no doubt, however, that the Hawley Troxell Defendants are one of the proximate causes of a portion of those damages from early 2007 and thereafter, and those portions that could have been paid back or recovered for prior years, because of their breached duties of care, good faith and loyalty, together with their substantial assistance of the Controlling AIA Defendants in maintaining their control and by enabling them.

**Exhibit - 1, p. 431**

**12-ER-2849**

pertaining to the Controlling AIA Defendants or the Hawley Troxell Defendants were ever fully disclosed or properly addressed, thereby resulting in the AIA Corporations being a disabled client unable to speak, receive information or make any decisions; the Hawley Troxell Defendants failed to properly discharge duties of care, good faith and loyalty owed to their disabled clients the AIA Corporations or otherwise proceed in their best interests, together with failing to properly disclose and address the conflicts of interest, as discussed in this Report, thereby being one of the proximate causes of the AIA Corporations' damages. Based on the foregoing, the Hawley Troxell Defendants further breached their duties of care, good faith and loyalty owed to the AIA Corporations by allowing the Controlling AIA Defendants' improper conduct to go unchecked because it was entirely foreseeable that the Controlling AIA Defendants would continue to use their control for their compensation, to fund their legal expenses, to fund their entities and to continue engaging improper transactions (including loan guarantees) and corporate governance thereby being one of the proximate causes of the AIA Corporations' damages.

3.     Moreover, because privileged (including so-called common interest privileged communications between the Hawley Troxell Defendants and the Controlling AIA Defendants in the underlying lawsuits) and work product information pertaining to the disabled AIA Corporations continues to be withheld and not voluntarily produced to Miesen by the Hawley Troxell Defendants or the Controlling AIA Defendants, I find it separately incredulous that any of the Hawley Troxell Defendants would argue that "we have done nothing wrong" and "we just took instructions from our clients."[1557] For the reasons stated in this Report, those arguments are not viable excuses. In short, the Hawley Troxell Defendants breached their duties of care, good faith and loyalty by forgetting that the AIA Corporations, and not any of the Controlling AIA Defendants, were their clients to whom they owed undivided duties of loyalty and by failing to obtain proper decisions from unconflicted and duly elected and authorized representatives, thereby being one of the proximate causes of the damages to the AIA Corporations in Exhibit A attached hereto; instead, they negligently took directions from the Controlling AIA Defendants (primarily John Taylor), whose interests were diametrically opposed to the best interest of the AIA Corporations. In addition, the Hawley Troxell Defendants breached their duties of care by permitting Riley to lead the work, to determine the terms of, and prepare, the representation agreements for both lawsuits

_____

[1557] After the Controlling AIA Defendants produced the Unredacted Billing Records, I was able to confirm significant previously undisclosed discrete work performed by the Hawley Troxell Defendants as discussed in this Report.

Page - 423

(including the engagement letters, tolling agreements and joint defense agreements) when he had no experience addressing those complex matters and because he lacked independence through his work for CropUSA and John Taylor which a prudent and independent attorney would have readily concluded that the Hawley Troxell Defendants' course of action was not appropriate for the reasons stated in this Report, thereby being one of the proximate causes of the AIA Corporations' damages.

4.      To reiterate, the duties breached by the Hawley Troxell Defendants are well-settled and commonly known by lawyers. Under Idaho case law, general common law principles and the Idaho Rules of Professional Conduct, the Hawley Troxell Defendants owed duties of care and fiduciary duties of good faith and loyalty and the strictest accountability to the interests of their clients, the AIA Corporations.[1558] As the Idaho Supreme Court has stated in this respect: "The relationship of client and attorney is one of trust, binding an attorney to the utmost good faith in dealing with his client. In the discharge of that trust, an attorney must act with complete fairness, honor, honesty, loyalty, and fidelity in all his dealings with his client. An attorney is held to strict accountability for the performance and observance of those professional duties and for a breach or violation thereof, the client may hold the attorney liable or accountable."[1559] The Hawley Troxell Defendants failed to perform those duties of care, good faith and loyalty, as explained in Section X and this Section XII, and are one of the proximate causes of the AIA Corporations' damages. The following Rule 30(b)(6) Hawley Troxell deposition testimony evidences examples of the Hawley Troxell Defendants' reliance on Riley's misunderstanding of addressed conflicts of interest and his negligent "head in the sand" approach in failing to properly understand and address the significant issues in breach of their duties of care, good faith, loyalty and fidelity, particularly in the light of verified and verifiable allegations of egregious wrongdoing to their corporate clients (as discussed in this Report):

> Q.  First of all, identify under Scope of Engagement for me where the terms "limited scope of representation" are mentioned.

---

[1558] Henderson testified that "[we] had attorneys that were advising us every step of the way," and that "attorneys" "specifically include the Hawley Troxell Defendants for the period of time that they were representing the AIA Corporations." 9/10/2020 Connie Henderson Depo. Transcript, p. 210.

[1559] *Beal v. Mars Larsen Ranch Corp.*, 99 Idaho 662, 667–68, 586 P.2d 1378, 1383–84 (1978). *See also Parkinson v. Bevis*, 165 Idaho 599, 605, 448 P.3d 1027, 1033 (2019). In keeping with the conduct of the Hawley Troxell Defendants, Riley testified that he doesn't know if a lawyer owes fiduciary duties to a client. 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, pp. 97-99.

Exhibit - 1, p. 433

12-ER-2851

MR. IPSEN:  Object to form.

THE WITNESS:  The engagement arrangement consists of the three-legged stool we talked about…[describing other agreement but never identifying any terms mentioning a limited scope of representation].[1560]

* * *

Q. Right. And AIA Insurance and AIA Services weren't obligated to enter into any joint defense agreements, correct?

A. I don't know what you mean by "obligated." You mean just outside of these agreements --

Q. Correct.

A. -- or are you talking about just in general?

Q. Correct.

A. They had the power and authority to hire counsel and enter into whatever agreements they wanted.[1561]

* * *

Q.  And as part of -- and as part of Hawley Troxell obtaining informed consent for Exhibit 46 [(the May 2, 2007 AIA Engagement Letter)], did Hawley Troxell provide alternative options for the AIA corporations?

A. I'm not aware of alternative options. This is what we proposed…[1562]

* * *

---

[1560] 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, p. 60. There were no terms limiting the scope of representation in the May 2, 2007 Engagement Letter. HTEH000007.

[1561] 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, p. 155. Riley's statement was incorrect and provides an example of his negligence. The AIA Corporations could not "enter into whatever agreements they wanted." As discussed in this Report, the power and authority of the AIA Corporations to enter into any agreement was subject to the restrictions and obligations under AIA Services' Amended Articles of Incorporation and the AIA Corporations' bylaws (including Section 4.14 regarding properly addressing conflicts of interest), which Riley negligently failed to address as discussed in this Report. Riley's incorrect statement has been confirmed as to other agreements that he was involved in preparing and approving for AIA Services, e.g., the illegal 1995 and 1996 redemption agreements with Reed Taylor and the ultra vires 1995 Letter Agreements and illegal 1996 Series A Preferred Shareholder Agreement with Donna Taylor. The agreements are also subject to the RPCs and the undivided duties of loyalty owed to a corporate client, which are additional issues that Riley negligently failed to address as discussed in this Report.

[1562] 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, p. 157. This, of course, is contrary to the requirement of properly seeking and obtaining Informed Consent from a client.

Page - 425

Q. One of the options AIA Services had was to retain counsel and direct the counsel to file claims against John Taylor, James Beck, Connie Taylor Henderson, and Michael Cashman, correct?

A. That was not the purpose of the representation. What they were looking for was defense against Reed Taylor's secured creditor claims. They were not looking to us or anybody else to sue their management.[1563]

* * *

Q. Okay. How many lawsuits have you been involved in as an attorney where you've represented the corporation and directors -- or excuse me, the corporations and you had a tolling agreement with the directors of the corporations?

A. I'm not a litigator. This is the only situation that I've been involved in that has this complicated of an arrangement.

Q. So prior to the 2007 agreements, you had never prepared agreements, such as Exhibit 46 and the tolling agreement and the joint defense agreement, involving a fact pattern similar to what you were facing in 2007, correct?

A. I have never prepared agreements in a fact pattern similar to this.

Q. Have you prepared any -- other than IRS matters, have you prepared any tolling agreements other than for Reed Taylor versus AIA Services?

A. I don't recall. I'm not a litigator, so it isn't something I would be in particular doing every day.

Q. But you took the lead on drafting all of the agreements, correct?

A. I did.

Q. Okay. And how many Joint Defense Agreements had you prepared as an attorney before the one you prepared for Reed Taylor versus AIA Services?

A. None.[1564]

* * *

Q. (BY MR. BOND) Okay. So what was the risk that caused the tolling agreements, the necessity for the tolling agreements?

---

[1563] 3/5/2020 Riley 30(b)(6) Depo. Transcript, p. 171. As discussed in Section XI(A), "they" were never properly elected as directors or officers, nor were any of their conflicts ever properly disclosed or addressed. This is because the Controlling AIA Defendants had no vested interest in pursuing claims against themselves, but the AIA Corporations' best interests were to pursue those claims.

[1564] 3/5/2020 Riley 30(b)(6) Depo. Transcript, p. 159-60.

A. It wasn't a risk. It was the fact that Reed Taylor was making allegations against the individuals that in future might[1565] give rise to a claim by the corporations or their shareholders, its shareholders…[1566]
* * *
Q.  So all the terms in this agreement [the 2008 Amended and Restated Standstill and Tolling Agreement] were all reached in November of 2007?
A. Orally, yes.
…
Q. So do you know if it was to the individuals or to their counsel [to whom the terms of the oral amended tolling agreement were allegedly orally told to]?
A. I was not party to any particular conversations or communications, so I can't answer your question.
Q. Who would have been party to those communications?
A. I'd be guessing.[1567]

5.      The excerpts quoted above from Riley's deposition, alone, confirm that Riley was in over his head and disregarding the misconduct of the Controlling AIA Defendants and the best interests of the AIA Corporations through the representation agreements and structure that he created in breach of his duties of care, good faith an loyalty owed to the AIA Corporations. The excerpts also demonstrate why Meadows or any of the other many Hawley Troxell attorneys who billed time working for the AIA Corporations in 2007 and thereafter, or another Hawley Troxell attorney, did not immediately get involved in the representation and take corrective action to address the various issues described in this Report, thereby breaching their duties of care owed to the AIA Corporations and being one of the proximate causes of the forty Damage Items; those attorneys could have and should have also stopped the misconduct. In my opinion, at that point in time, the Controlling AIA Defendants would have proceeded as recommended or required by the Hawley Troxell Defendants; instead, the Controlling AIA Defendants were enabled by the Hawley Troxell Defendants and the misconduct, improper corporate

---

[1565] Another incorrect statement by Riley. Reed Taylor's allegations, which were supported by documents and facts, supported the asserting of claims against the Controlling AIA Defendants. There was no "might" or "maybe" as confirmed by the facts and analysis in this Report.
[1566] 3/5/2020 Riley 30(b)(6) Depo. Transcript, p. 163-64.
[1567] 3/5/2020 Riley 30(b)(6) Depo. Transcript, p. 186. In it difficult to imagine how Riley could believe that the terms of the 2008 Amended Standstill and Tolling Agreement were orally agreed to by the parties several month earlier in November 2007 when he had no knowledge of what information was conveyed and by whom at Hawley Troxell the information was conveyed.

Exhibit - 1, p. 436

12-ER-2854

governance and unauthorized transactions accelerated, including the over $2,000,000 improperly lent to PERC and the subsequent unapproved and unauthorized guarantees of the GemCap Loan and subsequent Settlement Agreement.

6.     In addition to those fiduciary duties of good faith and loyalty owed in their representation of the AIA Corporations, the Hawley Troxell Defendants were required to exercise that degree of care which reasonably prudent attorneys would have exercised under the same or similar circumstances, which they also failed to do. The Hawley Troxell Defendants' failure to exercise that degree of care thereby breaching their duties of care in connection with their representation of the AIA Corporations, as explained in Sections X-XII, resulted in them being one of the proximate causes of the AIA Corporations for the damages. Their breached duties of care, taken separately for each of the transactions and issues addressed in this Report and/or collectively, were one of the proximate causes of the damages to the AIA Corporations (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto).

7.     Based upon my review of the Unredacted Billing Records and other documents and deposition transcripts which have been made available to me in discovery, the Hawley Troxell Defendants' legal representation of the AIA enterprise began at least as early as February 7, 2001.[1568] The engagement of Riley for the proposed CropUSA stock offering marked the resumption of Riley's representation[1569] of the AIA enterprise of which CropUSA was a part until it was misappropriated by the Controlling AIA Defendants.[1570] The Unredacted Billing Records confirm that the Hawley Troxell Defendants were providing legal services for virtually all aspects of the AIA Corporations' businesses and litigation, including by performing work in lawsuits that the Hawley Troxell Defendants had

---

[1568] HTEH000182.

[1569] Riley's former the law firm of Eberle Berlin was general counsel to AIA Services; for example, in the legal opinion dated August 15, 1995, he delivered in connection with the redemption of Reed Taylor's shares, Riley states "We have acted as general counsel for the Company in connection with the transactions contemplated by the Agreement." RJT089249; *see* Section XII of this Report. When Riley brought the AIA Corporations and Crop USA to Hawley Troxell in 2001, he told Craig Storti "Attached is a proposed engagement letter to CropUSA Insurance, an affiliate of my long-time former (Eberle Berlin) client, AIA Insurance. Over the course of about ten years, AIA paid Eberle Berlin about $1 million in fees on a variety of matters." HTEH000553.

[1570] *E.g.* The February 7, 2001 Hawley Troxell engagement letter represented that AIA Insurance was "an affiliate and equity owner of CropUSA." HTEH000188.

Exhibit - 1, p. 437

12-ER-2855

not appeared as counsel.[1571] In my opinion, for the reasons expressed in this Report, including those set forth in this Section XII, the Hawley Troxell Defendants, through Riley and the work that they performed, assumed and undertook the duties of care, good faith and loyalty attendant to their status and position of general counsel to the AIA Corporations, no later than 2007 based on the additional matters and work performed.[1572] As a result, culminating in *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services*, the Hawley Troxell Defendants had the role of general counsel for the AIA Corporation by no later than 2007, which is consistent with John Taylor's testimony that "***Hawley Troxell, for example, was our general counsel for years***."[1573] This logically follows Riley's prior undisputed role as general counsel for the AIA Corporations in 1995 and prior to that time. Among the actions that lawyers, including the Hawley Troxell Defendants, performing their fiduciary and due care duties in that context from 2007 and thereafter would have taken would have been a prompt review and evaluation of the AIA Corporations' corporate governance compliance, which would have led to the Hawley Troxell Defendants' discovery of the insiders' conflicts of interest, the lack of corporate governance compliance and the failure of the Controlling AIA Defendants to comply with the Articles of Incorporation and Bylaws of the AIA Corporations. Among other matters from 2007 and thereafter (*see, e.g., Sections X-X(A)*), lawyers in that position, including the Hawley Troxell Defendants, properly

---

[1571] For example, as discussed in this Report, the Hawley Troxell Defendants were billing for work in *Donna Taylor v. AIA Services* when they never formally appeared as counsel for that lawsuit and Riley prepared a memorandum to Mike McNichols regarding his conflicts of interest (which contained some advice the Hawley Troxell Defendants negligently failed to follow themselves) before they had formally appeared as counsel for the AIA Corporations in *Reed Taylor v. AIA Services* (they also were working on that lawsuit as early as February 2007 despite Babbitt's subsequent representations to Judge Brudie that he needed additional time to get up to speed to represent the AIA Corporations after he formally appeared as counsel).

[1572] *See* Section XII(Y) of this Report.

[1573] GC0748429 (Emphasis supplied). After Mr. Remele tried to refute my opinion that Hawley Troxell had acted as the AIA Corporations' general counsel and in response the above testimony of John Taylor appeared in my February 21, 2020 Report, John Taylor attempted to change his tune. He apparently was so eager to do so that when asked in a February 2020 deposition: "And with respect to *Eberle Berlin and Mr. Riley*, they were the AIA corporations' general counsel in 1995 and '96 in connection with the Reed Taylor redemption, correct, "he answered "I don't believe *Hawley Troxell* was ever our general counsel." 2/24-26/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 380 (Emphasis supplied). He was later asked, "is it your testimony that Hawley Troxell was never general counsel for the AIA corporations, correct?" He then evasively responded "I don't believe we ever appointed Hawley Troxell as our general counsel." Attorney Bond then asked "My question wasn't whether you appointed them. My question is did Hawley Troxell ever act as outside general counsel for the AIA Corporations?" to which John Taylor even more evasively responded: I don't know what they did in that matter." *Id.* at pp. 381-82.

Page - 429

discharging their duties of care would have insisted upon the holding of annual meetings of shareholders, preceded by full written disclosure to those shareholders of all material information, and action taken to remove John Taylor and the Controlling AIA Defendants from being involved in any management or corporate decisions for the AIA Corporations.[1574] In addition, by reason of Riley's prior extensive involvement in the legal affairs of the AIA Corporations,[1575] by 2007, he was aware of and/or had notice of Section 4.2.8 of AIA Services Amended Articles of Incorporation,[1576] which granted to Donna Taylor, as the sole holder of shares of Series A Preferred Stock of AIA Services, the right "to elect one director to the board of directors of the corporation." There was, therefore, an existing mechanism in place for an independent director who, in evaluating conflicted transactions and other actions, could have acted as the AIA Corporations' "Highest Authority" for the purposes of compliance with RCP 1.13. and other matters.[1577] In my opinion, based on my experience as a director of a successful privately held corporation, such a director, exercising the essential qualities of integrity, competence and prudence would not have allowed the Controlling AIA Defendants to carry out the illegal transactions described in Sections X and XI of this Report. Instead, as discussed in Section XII(A), the Hawley Troxell Defendants resisted Donna

---

[1574] No annual meeting of the shareholders of AIA Services was held until the one held on July 3, 2012 which related to the failed reverse stock split suggested by the Hawley Troxell Defendants. That meeting was preceded by a materially false and misleading proxy statement. (*see* Section XII(M) of this Report).

[1575] *See, e.g.,* Sections XII(D)-(F) of this Report.

[1576] DLM –0033049-65.

[1577] Instead of insisting that the Controlling AIA Defendants honor Donna Taylor's right to elect a director of AIA Services and comply with the AIA Services Amended Articles of Incorporation, the Unredacted Billing Records reveal that the Hawley Troxell Defendants spent hours resisting her exercise of that right, including considering whether previously redeemed Series A Preferred Stock could be reissued, apparently to John Taylor for the purpose of eliminating the voting rights of Donna Taylor. FB 0810-11. I have not been allowed to examine documents relating to that work which the Hawley Troxell Defendants are withholding, including a memorandum apparently prepared by Babbitt so that I can confirm the purpose of that work and the advice given.

Taylor's attempts to exercise her right to elect a director,[1578] with the result that, because there was no independent, non-conflicted board member, the Controlling AIA Defendants were able to continue to wrongfully cause the AIA Corporations to carry out the unauthorized and damaging transactions described throughout this Report, including Sections X and XI, and causing the damages referred to below in this Section XII(A) below[1579] and elsewhere in Sections X and XI of this Report.

8.      As described above in Section X and in this Section XII, the Hawley Troxell Defendants breached their fiduciary and due care duties in connection with, among other matters, their representation of the AIA Corporations in *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services*. For example, the Unredacted Billing Records clearly demonstrate that from the time the *Reed Taylor* suit was commenced on January 29, 2007 until the Hawley Troxell Defendants purportedly began representing the AIA Corporations on or about May 2, 2007 they had opened

---

[1578] Under Section 4.2.8 of the AIA Services' Amended Articles of Incorporation, neither AIA Services, its board of directors nor its shareholders have the right to approve or consent to Donna Taylor's exercise of her election right. Moreover, under Section 4.6 of AIA Services' New Restated Bylaws, only Donna Taylor as the holder of all of the outstanding shares of the Series A Preferred Shares can remove a director elected by her. In this respect, Idaho Code section 30-1-802 provides that "the articles of incorporation or bylaws may prescribe qualifications for directors." Under the circumstances, the Hawley Troxell Defendants were required to insist that a Donna Taylor designee be seated on the Board of AIA Services no later than when they became involved in *Reed Taylor v. AIA Services*. (See Section XI N of this Report.) Indeed, there was at all relevant times a "built in" RPC 1.13 (b) "Highest Authority" who, as discussed in this Section XII of this Report, could have prevented future misconduct by the Controlling AIA Defendants and caused the AIA Corporations to seek and obtain monetary redress from them.

[1579] In further breach of their duties to the AIA Corporations, the Hawley Troxell Defendants also failed to insist that the AIA Services director elected by the holder of a majority of the Series C shares pursuant to Section 4.3.2 of the AIA Services' Amended Articles of Incorporation not be John Taylor, the conflicted, purported trustee of the AIA Services' 401(k) Plan holding Series C Preferred Stock. Again, in my opinion, based on my experience as a director, an independent director would have followed proper advice had it been forthcoming from the Hawley Troxell Defendants, and prevented the misconduct of the Controlling AIA Defendants and/or exposed that conduct which already had occurred and would have caused the AIA Corporations to seek monetary damages from the Controlling AIA Defendants. . Accordingly, this was a far cry from an instance in which the client "would have ignored [the attorney's advice no matter how competently provided…" *Smith* v. *O'Donnell*, 288 S.W.3d 417, 422 (Tex. 2009). It is also plausible that, because of Hawley Troxell's apparent status and prestige, John Taylor would have accepted and followed advice to cease his wrongdoing, make restitution and practice proper corporate governance principles.

Exhibit - 1, p. 440

12-ER-2858

a separate billing matter (numbered 42269-2)[1580] for the representation of John Taylor in the *Reed Taylo*r case and were recording time which reflected the extensive and substantive work they in fact were doing in representing John Taylor.[1581] The Hawley Troxell Defendants' work on behalf of John Taylor also

---

[1580] REM – 6455 (this is a part of a redacted memorandum apparently from Riley that Mr. Remele has been furnished). In that memorandum, Riley apparently states that the matter was incorrectly established for John Taylor and that it should be been established for the AIA Corporations. However, the client number (43369) is the same client number that appears in another Hawley Troxell John Taylor personal matter, the Twin River National Bank reverse stock split proposal in which Riley represented John Taylor. Twin River was matter number 0001 and Reed Taylor v. AIA was matter number 2. Ashby, who was working *on Reed Taylor v. AIA Services* practically from day one, testified as the Hawley Troxell Rule 30(b)(6) deponent on March 4, 2020 that he doesn't know why the John Taylor litigation matter was set up. 3/4/2020 Ashby Rule 30(b)(6) Depo. Transcript, pp. 120-21.

[1581] *E.g.,* "03/22/07 JASH REVIEW REDEMPTION AGREEMENT AND OTHER APPLICABLE AGREEMENTS RE ISSUE OF WHETHER REED TAYLOR HOLDS SHARES ENTITLING HIM TO SHAREHOLDER STATUS FOR STANDING PURPOSES." FB 0643;3/30/07; "03/30/07 JASH REVIEW SECOND AMENDED COMPLAINTFOR PURPOSES OF ANALYZING CAUSESOF ACTION THAT ARE SUBJECT TO A MOTION TO DISMISS AND FOR PURPOSES OF PREPARING AMENDED COUNTERCLAIM; LEGAL RESEARCH RE RIGHT OF SET-OFF AND ARGUMENT THAT MONEYS OWED TO REED TAYLOR SHOULD BE DEPOSITED WITH THE COURT RATHER THAN PAID TO REED TAYLOR" FB 0645; "04/09/07 JASH LEGAL RESEARCH RE A PLEDGEE'S RIGHT TO BRING A DERIVATIVE ACTION" FB 0648; "04/10/07 JASH REVIEW STOCK REDEMPTION AGREEMENT AND RELATED AMENDED AGREEMENTS; LEGAL RESEARCH RE PLEDGEE'S RIGHTS IN DERIVATIVE ACTIONS CONFERENCE WITH R. RILEY RE UPCOMING MOTIONS; TELEPHONE CONFERENCE WITH J. TAYLOR RE RULE 67 MEMORANDUM." FB 0649 (Solid caps in original). These billing entries contradict the statement, apparently made by Riley in the redacted memorandum, that "we did not provide any services with respect to John in particular, and the file was used only to park our time assisting McNichols until we completed the laborious process of drafting and obtaining authorization and execution of the engagement and conflict waivers to enable us to substitute as counsel for the corporations." REM – 6456. Moreover, as discussed below in this Section XII(E), the failure of the Hawley Troxell Defendants to disclose these facts to the highest authority of the AIA Corporations and to obtain Informed Consent regarding the same (together with other reasons) rendered the Representation Agreements null and void.

continued after their purported representation of the AIA Defendants began,[1582] as well as their work on behalf of the other Controlling AIA Defendants.[1583] By reason of the allegations in, for example, Reed Taylor's second amended complaint[1584] (as well as the prior complaints), which the Unredacted Billing Records reveal the Hawley Troxell Defendants reviewed as early as March 13, 2007,[1585] the Hawley Troxell Defendants were aware of the allegations of misconduct against John Taylor and the other AIA Controlling Defendants at the commencement of the Hawley Troxell Defendants' purported representation of the AIA Corporations in *Reed Taylor v. AIA Services.* Those facts presented the Hawley Troxell Defendants with, *inter alia,* two serious and substantial issues that had to be addressed in light of the fiduciary and due care duties they owed to the AIA Corporations as described above.

---

[1582] *E.g.,* "5/8/07 John Ashby LEGAL RESEARCH RE DIRECTOR LIABILITY CAUSE OF ACTION; DRAFT PORTION OF MOTION TO DISMISS RE CONSTRUCTIVE TRUST AND DIRECTOR LIABILITY CAUSE OF ACTION" FB 0659; "5/31/07 John Ashby LEGAL RESEARCH RE DIRECTOR LIABILITY." FB 0664; "8/24/07 Richard Riley CONFERENCE WITH G. BABBITT AND TELEPHONE CONFERENCE WITH J. TAYLOR RE UNPAID DIVIDENDS AND REDEMPTION PROCE OF SERIES C STOCK;TELEPHONE CALL FROM G. BABBITT RE TRUSTMARK PROFIT SHARING AGREEMENT" FB 0679; "10/8/07 Richard Riley CONFERENCE WITH G. BABBITT RE STANDING REED'S LACK OF STANDING TO RAISE BREACH OF SERIES A STOCK COVENANT FOR SUBSIDIAIRIES NOT TO GUARANTTEE DEBT WITHOUT DONNA'S CONSENT." FB 0687 (Solid caps in original).

[1583] For example, the Unredacted Billing Records show that the Hawley Troxell Defendants actually prepared John Taylor for his deposition in *Reed Taylor v. AIA Services* and were working with John Taylor's ostensible counsel, FB 0708. There are many other examples, including their opposition to the addition of Henderson and Beck as parties to *Reed Taylor* v. *AIA Services* E.g. DLM 008791-92;"6/19/07 John Ashby WORK ON MEMORANDUM IN OPPOSITION TO MOTION TO AMEND COMPLAINT; LEGAL RESEARCH RE DENIAL OF MOTION TO AMEND WHERE PROPOSED COMPLAINT ADDS NEW DEFENDANTS WITHOUT MAKING ANY SPECIFIC ALLEGATIONS AGAINST NEW DEFENDANTS." FB 0669 (Solid caps in original). Of course, the ostensible counsel for Henderson "incorporate[d] the arguments contained within AIA Services Corporation and AIA Insurance Inc's Opposition to Plaintiff Reed Taylor's Motion to Amend…" DLM 008794-95. Needless to say, John Taylor's attorney of record also joined in the Hawley Troxell Defendants' opposition. DLM 0008799. Indeed, each time Reed Taylor proposed to amend his complaint to include additional substantive allegations of director misconduct which had severely damaged their clients, the knee jerk reaction of the Hawley Troxell Defendants was to oppose the amendment or seek to dismiss the complaint and thus sweep those allegations under the rug. E.g., FB 0659;0667-70;0683; and 9455.

[1584] RJT – 039464-65.

[1585] *E.g.,* FB 0641.

**Exhibit - 1, p. 442**

**12-ER-2860**

9.      *First,* to even begin to represent the AIA Corporations in *Reed Taylor v. Services,* it was necessary under the RPC's for the Hawley Troxell Defendants to obtain the Informed Consent of the AIA Corporations.[1586] Under the RPC, Informed Consent means an agreement by a person such as the AIA Corporations to a proposed course of conduct after the lawyer has communicated adequate information to those Corporations.[1587] As stated elsewhere in this Report,[1588] by reason of the adverse interest exception[1589] which is applicable here because of the Controlling AIA Defendants' pervasive misconduct, no knowledge of these or any other matters could have been communicated to the AIA Corporations through those Defendants. There was, however, an already existing structure that would have imparted relevant and important knowledge to the AIA Corporations, including the misconduct of the Controlling AIA Defendants as described in this Report and the remedies available to the AIA Corporations to address and seek monetary damages for that misconduct. Section 4.2.8 of AIA Services' Amended Articles of Incorporation provides that "the holders of a majority of the shares of Series A Preferred Stock [at all times Donna Taylor] shall have the right, voting separately as a class, to elect one director to the board of directors of the corporation."[1590] Under the circumstances, as stated in Section XII(A) above, the Hawley Troxell Defendants' fiduciary and due care duties to the AIA Corporations required them to insist, *on their own accord*, that a Donna Taylor designee or an otherwise independent person become an AIA Services' board member. Instead, as the Unredacted Billing Records demonstrate, when Donna Taylor subsequently attempted to exercise her right elect a director, the Hawley Troxell Defendant successfully resisted those attempts in breach of their duties of care and loyalty

---

[1586] The AIA Corporations would have had to provide Informed Consent to waive the conflict created by the Hawley Troxell Defendants' legal work on behalf of John Taylor in *Reed Taylor;* John Taylor would also have had to waive the conflict created by reason of the fact that, in a proper representation of the AIA Corporations in *Reed Taylor,* the Hawley Troxell Defendants would be investigating the allegations of John Taylor's misconduct and advising the AIA Corporations to assert cross claims against him. The same is equally true of the other Controlling AIA Defendants.

[1587] RPC 1.0(e).

[1588] *See, e.g.,* Sections X(V) and XI.

[1589] *See, e.g.,* Section XI.

[1590] DLM 0033400.

Exhibit - 1, p. 443

owed to the AIA Corporations.[1591] If there had been a legitimate concern about the objectivity of a Donna Taylor designee (which there was no reasonable basis for),[1592] the Hawley Troxell Defendants could have suggested that a different person be elected by Donna Taylor, even though Donna Taylor's right was unconditional as stated above. Moreover, these same issues applied to the Series C Preferred Shares held in the AIA Services' 401(k) Plan, which 401(k) Plan was also entitled to elect a director as the holder of Series C Preferred Shares.[1593] This was not done and constituted a separate breach of the duty of care and loyalty owed the AIA Corporations.[1594]

---

[1591] *E.g.,* 9/28/09 Richard Riley "Draft detailed response to R. Bond's email re Donna Taylor's board seat; review file memos re D. Taylor's designated board representative; review AIA Services 5/03 shareholder meeting agenda; telephone call to J. Duclos re same; telephone conference with G. Babbitt re response to R. Bond's demand for D. Taylor board representation; draft preliminary response to R. Bond's e-mail. FB 0808; 12/31/09 Thomas B. Chandler "Review letter to counsel for D. Taylor re questions about qualifications and conflicts for director appointed by D. Taylor; work with R. Riley refocus on conflict issues and additional concerns about actions of director; further work with R. Riley re ability of corporation to challenge a conflicted director and alternative to focus on grant of right to D. Taylor to appoint director and implied covenant of good faith in selection, qualifying and appointing director." FB1046.

[1592] For example, in the case of Donna Taylor's designation of Patrick Moran, Mr. Bond advised him that "As we discussed, Donna wants your appointment and discharge of your duties as if you didn't even know Donna and you were elected by the common shareholders. This is very important because we want you 100% neutral. This will be helpful if Donna requests that you act as a receiver. We don't want any conflicts of interest period." DLM – 0034404.

[1593] In contrast, when the investor group owned Series C Preferred Shares, they elected Cashman a director. *See* Section X(H).

[1594] When he was asked why he didn't "have the Series C shares held in the 401 (k) plan designate a separate director for AIA Services to look after the 401 (k) plan's interests," John Taylor simply said "I didn't think it was necessary." He also didn't ask the plan participants or anyone else if they would be willing to serve. 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 467-68. This is another example of where it was imperative that the Hawley Troxell Defendants insist upon compliance with the AIA Corporations' charter documents. As stated in Section XII(A) of this Report, had they done so, the malfeasance of the Controlling AIA Defendants would have been halted and monetary redress for their prior misconduct obtained.

Exhibit - 1, p. 444

10.     *Second*, assuming such Informed Consent were obtained,[1595] in addition to defending against Reed Taylor's claims under the stock redemption agreement and related agreements,[1596] the facts and the Unredacted Billing Records confirm that the Hawley Troxell Defendants' fiduciary and due care duties required a full investigation of not only Reed Taylor's allegations of misconduct on the part of John Taylor[1597] and the other AIA Controlling Defendants[1598], but also any *other* such claims which would have come to the Hawley Troxell Defendants' attention[1599] had they or an independent counsel a conducted an internal

---

[1595] In my opinion, lawyers in the conflicted position of the Hawley Troxell Defendants should not have attempted to replace McNichols and obtain the engagement to represent the AIA Corporations in *Reed Taylor* because they had the same client conflict that he had, namely representing both John Taylor and the AIA Corporations. The evidence shows that it is more probable than not that the Hawley Troxell Defendants undertook that engagement for the more than $1 million in fees they ultimately received as well as to cover up their own wrong doing, including but not limited to aiding and abetting the misappropriation of Crop USA and the wrongful transfer to it of AIA Insurance's crop insurance business and cash and other assets of the AIA Corporations. The "cover up" aspect of the engagement decision is consistent with the Hawley Troxell Defendants' design of the Standstill and Tolling Agreements and their suggested, but failed, reverse stock split, all of which had the effect of shielding the misconduct of all of the Defendants' actions from the scrutiny of, for example, the AIA Disinterested Shareholders.

[1596] As stated below in this Section XII(U), the Hawley Troxell Defendants should have made short shrift of Reed Taylor's stock redemption agreement claims and not caused the AIA Corporations to incur hundreds of thousands of dollars in unnecessary legal costs asserting such legally ineffective defenses as oral modification and waiver (which the court rejected in awarding summary judgment to Reed Taylor), such malpractice proximately caused direct damages to the AIA Corporations for those amounts.

[1597] As stated in Section XI of this Report, the misconduct of John Taylor included repeated violations of the non-compete and other provisions of his 1995 Executive Officer's Agreement (which was drafted by Riley) and his common law duties not to compete.

[1598] Riley has acknowledged that the Hawley Troxell Defendants believed the Controlling AIA Defendants had a duty to investigate Reed Taylor's allegations against them. See 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, p. 189, but they did not insist that an investigation be made.

[1599] John Taylor testified that the Hawley Troxell Defendants were provided all of the documents and information they requested and would have provided any additional documents they might have requested. 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 772.

Page - 436

**Exhibit - 1, p. 445**

**12-ER-2863**

investigation[1600] of the misconduct of the Controlling AIA Defendants and the damages to the AIA Corporations caused by that misconduct; and, as a result of that investigation, cross claims would have been asserted against the Controlling AIA

---

[1600] "Internal investigations often start with allegations of wrongdoing which may come from…a shareholder and, must be conducted when, as in *Reed Taylor v. AIA Services*, "the alleged misconduct involves senior management or board members…" Mark Oakes and Tara Tune, *Effective Corporate Investigations,* 45 *WTR Brief* 32, pp. 1-2 (American Bar Association 2016). Although in my opinion the Hawley Troxell Defendants were required to advise the AIA Corporations that an investigation was required, the investigation should not have been conducted by the Hawley Troxell Defendants themselves, since: "[w]here an internal investigation is significant, a company should consider whether to hire a firm other than its regular outside counsel. In the view of some regulators, longstanding outside counsel may be incentivized to avoid passing judgment on management. Also, the company's regular outside counsel may have been involved, directly or tangentially, with the subject matter of the investigation."45 *WTR Brief* 32, at p. 4. The Hawley Troxell Defendants should have advised the AIA Corporations to have the investigation conducted by independent counsel in my opinion. In addition to not insisting upon an internal investigation, the Hawley Troxell Defendants went so far in their defense of the Controlling AIA Defendants that they spent hours (e.g. FB 0662-63; FB 0668-69) in opposing Reed Taylor's motion for an audit of the AIA Corporations which also would have revealed the Controlling AIA Defendants 'extensive misconduct and the damages to those Corporations proximately caused thereby. Indeed, it appears that in March 2007, while the Hawley Troxell Defendants were representing John Taylor, but prior to the time they appeared for the AIA Corporations, Ashby wrote the Defendants' Memorandum in opposition to Reed Taylor's motion to compel an audit of the AIA Corporations. FB0644. Not surprisingly, after the Hawley Troxell Defendants appeared as attorneys of record for the AIA Corporations, they "join[ed] fully in the prior briefing, incorporate[ed] that briefing by reference, reiterate[ed] a few of the key reasons why the Order to compel Audit should be denied, and address[ed] a few new issues." DLM - 0008251. The Hawley Troxell Defendants' principal objection to an audit seemed to be that "Plaintiff appears to be on a mission to uncover evidence that John Taylor is siphoning funds away from AIA" (DLM 0008253) which indeed turned out to be the case. As attorneys for the AIA Corporations, it was the fiduciary duty of the Hawley Troxell Defendants to advise them to assert causes of actions against, and recover damages from, John Taylor and the other Controlling AIA Defendants for that misconduct, which would have been successful. *Cf. Schaffer v. Terrydale Mgmt. Corp.*, 648 S.W. 595, 605 (Mo. Ct. App. 1983) ("Once the attorney and client relationship begins, the attorney sustains a trust relation to the client as that which obtains between a trustee and cestui que trust, a guardian and ward, or a principal and agent."). The Hawley Troxell Defendants nevertheless succeeded in preventing an audit. DLM 0009193.

Exhibit - 1, p. 446

12-ER-2864

Defendants in the *Reed Taylor* action.[1601] Instead, for example, the Hawley Troxell Defendants simply had the AIA Corporations deny the allegations in the fifth amended complaint.[1602] The disdain with which the Hawley Troxell Defendants viewed Reed Taylor's allegations of misconduct on the part of the Controlling AIA Defendants and the substantial harm inflicted upon their corporate clients is exemplified by the following entry from the Unredacted Billing Records; "CONTINUED EXTENSIVE RESEARCH ON FIDUCIARY DUTY OF LENDER/CREDITOR TO BORROWER AND POSSIBLE NEGLIGENCE CLAIM AGAINST A LENDER WHO MESSES WITH BUSINESS AND EQUITABLE SUBORDINATION OUTSIDE BANKRUPTCY . . ."[1603] That attitude and the Hawley Troxell Defendants' flagrant disregard of the fiduciary duties they owed to the AIA Corporations is also exemplified by Riley's March 3, 2020 testimony that "we insisted there be tolling agreements so that we could - - *without being sucked up into all those ancillary issues* – that we could defend against Reed's creditor claims."[1604] Incredibly, even in the face of Reed Taylor's allegations of corporate mismanagement and breaches of fiduciary duty, the Hawley Troxell Defendants did not provide advice to AIA Services regarding corporate

---

[1601] *See* Rule 13(g) Idaho Rules Civ. Proc. 2007. The issue here is not that the Hawley Troxell Defendants advised the Controlling AIA Defendants with respect to all of the various the transactions and matters complained of in *Reed Taylor v. AIA Services.* Instead the allegations concerning the Controlling AIA Defendants' misconduct provided a road map for such an investigation. On the subject of such an investigation, however, Riley testified that "we set up the representation so that we would not have to investigate..." 3/03/2020 Riley Depo. Transcript, p. 624. That is erroneous. The Representation Agreements do not provide for a limited scope of representation and even if they did, the limitation would have been unreasonable within the meaning of RPC 1.2 (c). Moreover, by reason of the adverse interest exception, the AIA Corporations were unaware of the retention of the Hawley Troxell Defendants much less the terms thereof. *See* Section X of this Report. That the Hawley Troxell Defendants adopted a "once over lightly" approach is evidenced by John Taylor's testimony concerning the AIA Corporations' board action: [w]e discussed the allegations and concluded they were false and inaccurate [who's we] [m]embers of our board with our attorneys. 2/24-26/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 530. Overarching all of these matters is the fundamental principle that lawyers owe fiduciary duties of good faith and loyalty to their clients which include duties prevent the infliction of harm upon a corporate by its insiders. *See, e.g.* RPC 1.13.

[1602] DLM – 0010519 *et seq*.

[1603] FB 0683.

[1604] 3/03/2020 Riley Depo. Transcript, p. 402 (Emphasis supplied).

governance matters.[1605] As the Hawley Troxell's Rule 30(b)(6) designee, Riley further exemplified the Firm's cavalier attitude when he testified that "our role was to defend the two AIA Entities against Reed Taylor's creditor claims. Once that case was over, the statutes of limitation would begin to run, and whoever was interested in pursuing any of those claims, such as yourself and Mr. Miesen, were free to do so."[1606] The fact that *Reed Taylor v AIA Services* was not a derivative action did not diminish or otherwise affect the duties and obligations of the Hawley Troxell Defendants in these critical respects. At that point in time, a monetary judgment in favor of the AIA Corporations against John Taylor and the other Controlling AIA Defendants would have been collectable, and such claims would have been timely made. As a result, the AIA Corporations sustained damages by reason of the Hawley Troxell Defendants' failure to timely pursue those claims in *Reed Taylor v. AIA Services* or otherwise take action as demonstrated by the conduct that could have been prevented and the damages recovered or prevented as described in this Report thereby proximately causing damages to the AIA Corporations. Moreover, although it was also made to appear that John Taylor and the other Controlling AIA Defendants were not clients of the Hawley Troxell Defendants, subsequent to their being engaged to represent the AIA Corporations the Hawley Troxell Defendants continued to act on behalf of and substantially assist John Taylor[1607] and the other Controlling AIA Defendants, as the Unredacted

---

[1605] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 725-26. Under the circumstances, the Hawley Troxell Defendants' duty of care required them to conduct the same investigation and review of the AIA Corporations 'shareholder meetings and board actions as set forth in Section XI of this Report and then insist that not only the many deficiencies be corrected, but also that all future actions of the AIA Corporations be carried out with meticulous compliance with applicable law and the AIA Corporations' articles of incorporation and bylaws.

[1606] 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, p. 48.

[1607] For example, within a week of the commencement by Donna Taylor of *Taylor v. Taylor*, Ashby was working on the case and meeting with Babbitt and McNichols about it. (FB 0740). Shortly thereafter, Riley (FB 0743) was reviewing John Taylor's expense request for the suit (which is also yet another example of his general counsel work) and Ashby was researching "DEFENSES TO D. TAYLOR LAWSUIT (FB 0744), including a statute of limitations defense (FB 0742). It is difficult to imagine more striking examples of the Hawley Troxell Defendants' placing the interests of John Taylor above all else.

Exhibit - 1, p. 448

12-ER-2866

Billing Records[1608] and court filings in *Reed Taylor v. AIA Services* demonstrate. In short, the Hawley Troxell Defendants' mandate was to (a) defend the AIA Corporations on the merits; and (b) prosecute any claims those corporations had against any of the other parties to that litigation, as well as Cashman who should have been a party (rather than opposing him becoming a party as they successfully prevented). As demonstrated by the facts set forth in this Report, the Hawley Troxell Defendants utterly failed to fulfill that mandate thereby breaching both their duties of care and their fiduciary duties of loyalty owed to the AIA Corporations, and proximately causing them to be damaged as described in this Report, including paragraph 8 of this Section XII(A).

11.    As described in Section XI above and below in this Section XII of this Report, and as now becoming increasingly more apparent from the entries in the Unredacted Billing Records, the Hawley Troxell Defendants also breached their fiduciary and due care duties to the AIA Corporations by (i) abandoning the Petition which they filed, for a Court Appointed Inquiry as to the propriety of a derivative action pursuant to Idaho Code section 30-1-744(6);[1609] (ii) obtaining a stay of *Donna Taylor v. AIA Services*; (iii) opposing the appointment of a receiver in *Donna Taylor v. AIA Services*; and (iv) having them and their counsel obtain a multi-year stay of this Lawsuit (during that stay, the improper and unauthorized

---

[1608] *E.g.,* "05/08/07 JASH LEGAL RESEARCH RE CONSTRUCTIVE TRUST CAUSE OF ACTION; LEGAL RESEARCH RE DIRECTOR LIABILITY CAUSE OF ACTION; DRAF T PORTION OF MOTION TO DISMISS RE CONSTRUCTIVE TRUST AND DIRECTOR LIABILITY CAUSES OF ACTION; MEETING WITH J. TAYLOR AND G. BABBITT RE FACTUAL BACKGROUND OF CASE AND PLAN FOR GOING FORWARD." FB 0833; "JASH 9/18/07 LEGAL RESEARCH RE PERSONAL LIABILITY OF AN ADVISORY BOARD; 5/31/07 JASH LEGAL RESEARCH OF DIRECTOR LIABILITYFB 0839; "9/18/07 JASH DRAFT OPPOSITION TO MOTION TO FILE FIFTH AMENDED COMPLAINT"; FB 0872; "GDB 12/05/07 TELEPHONE CONFERENCE WITH J. TAYLOR AND J. DUCLOS; ADD DEFENSES TO ANSWERS…" FB 0904 (Solid caps in original). It is further noteworthy that Ashby was researching the constructive trust theory that the Hawley Troxell Defendants should have been using to recover assets, money and property belonging to the AIA Corporations, including the assets sold to Hudson, AIA's Parking Lot, John Taylor's unauthorized compensation, etc.

[1609] Ashby acknowledged the true purpose of the Petition: "The derivative suit was *deferred* by Services moving in the Underlying Action for the appointment of an independent panel to examine the derivative claims." HTEH000197 (Emphasis supplied). If the Petition had not been abandoned, in my opinion, based on the facts and circumstances described in this Report, including Sections X, XI and XII, an independent Panel would have found that, "the maintenance of the of the derivative proceeding…" would have been in the best interests of the AIA Corporations.

transactions and corporate governance continued). Like the Standstill and Tolling Agreements (and the Hawley Troxell suggested reverse stock split), each of those actions was inimical to the interests of the AIA Corporations, prevented them from recovering money damages from the Controlling AIA Defendants for their various acts of wrongdoing listed in paragraph 8 below and described elsewhere in this Report, including Sections X and this XII, and therefore in my opinion constituted flagrant breaches of the Hawley Troxell Defendants' fiduciary and due care duties described in this Report, including in paragraphs 1and 2 of this Section XII, such as their duties of fairness, honor, honesty and loyalty.[1610] With reference to their opposing the appointment of a receiver, at first blush that appears to be inexplicable because a receiver would have been the last opportunity for someone acting on behalf of the AIA Corporations to prevent, rectify and seek redress for the misconduct of the Controlling AIA Defendants as described in this Report. However, now that I have had an opportunity to review the Unredacted Billing Records and see the extent to which, in each step of the way, the Hawley Troxell Defendants were in fact acting on behalf of the Controlling AIA Defendants and against the interests of the AIA Corporations, it is clear why the Hawley Troxell Defendants resisted the receiver—they were concerned about their own exposure and placed their interests above the interests of the AIA Corporations thereby breaching their duties and proximately causing damages to the AIA Corporations.

12.     For the reasons set forth in Sections X-XII, the Hawley Troxell Defendants were one of the proximate causes of the monetary damages to the AIA Corporations (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto) as a consequence of their failures and breached duties of care, good faith and loyalty, including, without limitation, the following: (i) insist upon the seating of a board member designated by Donna Taylor or an otherwise independent director; (ii) investigate Reed Taylor's claims against the Controlling AIA Defendants (and such other claims which would have come to their attention during a properly conducted internal investigation by qualified counsel) and require the assets and money to be repaid or repatriated to the AIA Corporations; (iii) have the AIA Corporations timely assert in *Reed Taylor* v. *AIA Services* all available cross claims against John

---

[1610] As discussed elsewhere in this Report, including Section XII(Y) of this Report, Ashby also acknowledged that: "if a receiver is appointed as requested in the Donna Lawsuit, the receiver could terminate this firm's representation of Services in this lawsuit and could file suits against the "Responsible Individuals" *and this firm.* (Emphasis supplied). The receiver would have been pursuant to Idaho Code section 8-601 (5 of the Idaho Code (a corporation insolvent or in imminent danger thereof ) and would have been acting pursuant to the authority the receiver would have had under Idaho Code section 8-605.

Page - 441

Taylor and the other Controlling AIA Defendants at a time when they could have responded in damages; (iv) pursue their petition for a court appointed inquiry; and (v) welcome the appointment of a receiver for the disabled AIA Corporations.

13.    Consequently, the Hawley Troxell Defendants were one of the proximate causes of the AIA Corporations' monetary harm and damages[1611] and which, in addition to the other items of damage discussed in this Section XII and itemized in Exhibit A, would have been recovered by the AIA Corporations from the Controlling AIA Defendants or the Controlling AIA Defendants' misconduct would have been prevented or appropriate action taken as discussed in this Report[1612] and the damages not sustained:[1613] (a) $1,510,693 for the unauthorized and improper purchase by AIA Insurance in August 2004 of the Series C shares from Crop USA (Damage Item Number 3 in Exhibit A attached hereto); (b) $11,588,245 or one of the other three alternatives representing the proceeds of the illegal sale by CropUSA in August 2008 to Hudson Insurance of assets belonging to the AIA Corporations (had the Hawley Troxell Defendants not delivered the erroneous and negligently prepared Lancelot Loan Opinion, the Lancelot Loan would not have been made (Damage Item Number 1 in Exhibit A attached hereto); (c) $120,000 in "consulting fees" paid in 2008-2009 to John Taylor for competing against the AIA Corporations in violation of his common law duties and Executive Officer's Agreement and when those funds belonged to the AIA Corporations (Damage Item Number 3 in Exhibit A attached hereto);(d) $1,063,750[1614] for unpaid cumulative dividends on the Series C Preferred Stock held by AIA Services' 401(k) Plan from January 1, 2009, which was the latest those shares should have

---

[1611] The dollar amounts damages set are subject to revision based on the failure of the Defendants to produce all available information. For example, as of the date of this Report, the Controlling AIA Defendants had not produced any financial statements or tax returns for 2019 or thereafter, nor have they ever produced the documentation and support to explain where the AIA Corporations' revenues were spent. *See* Damage Item Number 38 in Exhibit A attached hereto.

[1612] In addition to my legal background, as an experienced director of a privately held corporation for many years, neither I nor any reasonably acting director would have allowed the described actions to occur, or, if they had already taken place, would have insisted that the AIA Corporations seek legal redress from the wrongdoers and recover monetary damages. If I were appointed as a receiver, I would have likewise acted consistent with this Report.

[1613] The following damages do not include references to prejudgment interest, other than the interest damages relating to Donna Taylor. The prejudgment interest calculations and the supporting documents are also contained in Exhibit A attached hereto, which I separately opine are appropriate, warranted and ascertainable with mathematical certainty except for Damage Item Number 38.

[1614] This assumes, for the purposes of this presentation only, that John Taylor is entitled to the benefits of the Series C shares held for his account in the AIA Services' 401(k) Plan.

Exhibit - 1, p. 451

12-ER-2869

been redeemed, resulting from the failure of the Hawley Troxell Defendants to insist on the redemption of those Series C shares which was one of the proximate causes of the dividends which have accrued since January 1, 1999 (Damage Item Number 5 in Exhibit A attached hereto); (e) $425,116 in settlement funds, plus any interest and penalties mandated by Texas law as discussed in Section XI, which should have been paid to former policy holders or deposited with the state of Texas, but which the Hawley Troxell Defendants allowed the Controlling AIA Defendants to divert for illegal purposes (Damage Item Number 10 in Exhibit A attached hereto); (f) $800,000 in settlement funds received by AIA Insurance in 2008 which the Hawley Troxell Defendants not only also allowed John Taylor to wrongfully divert, but also suggested that such funds be used to pay the Hawley Troxell Defendants (Damage Item Number 11 in Exhibit A attached hereto);[1615] (g) $2,264,359.92 in known loans and advances[1616] that the Controlling AIA Defendants permitted to be made by the AIA Corporations to the non-credit worthy Pacific Empire Radio of which John Taylor was the Chairman, CEO and has a substantial ownership interest and of which Henderson was also a director for a period of time and a shareholder until January 2018 (Damage Item Number 13 in

---

[1615] An April 14, 2009 letter from Babbitt to the "Boards" of the AIA Corporations begins as follows: "We are uncertain how much of the $800,000 received in connection with settlement of the growers trust claims against The Universe Life Insurance Company has been expended. It appears that neither of the two AIA entities nor CropUSA has sufficient liquid assets to pay the outstanding invoices for attorney fees and costs incurred by Hawley Troxell Ennis & Hawley LLP in defense against Reed Taylor's claims in the lawsuit pending in the Second District Court for Nez Perce County ("Lawsuit"). The unpaid invoices for fees and costs through February 2009 exceed $125,000 for AIA (following receipt of the most recent payment at the end of March) and $1,000 for Crop USA. The AIA bill for March time exceeds $28,000. John indicated that AIA will be unable to pay more than $20,000 per month which, as discussed below, is unlikely to cover even the additional fees that could be incurred within the next few months and will not put a dent in the unpaid bills." HTEH000523. *See also, e.g.,* Section X(J) of this Report; Damage Item Number 4 in Exhibit A attached hereto. Implicit in Babbitt's letter is the fact that the Hawley Troxell Defendants were aware that, as he later testified, John Taylor's notion of reserving funds to pay the policy holders was to spend the money for any purpose he wished and simply to note the AIA Corporations' assumed liability to those holders "in the accounts payable by the corporation." 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 1026. He further testified: [w]hen it is appropriate the payment will be made *or to the extent it can be* by the corporation. *Id.* at 1027 (Emphasis supplied). As discussed in Section XI(Q), if the court determines that the contingent fee should have been paid (the purported fee agreement stated that the fees would be blended hourly and contingent fee), these damages should be reduced by the $118,418.83 paid to the Greener law firm and the interest calculations adjusted accordingly.
[1616] As noted above, information continues to be withheld and the sums may be greater.

Exhibit A attached hereto);[1617] (h) $1,067,188.91, the amount owed in accrued interest to Donna Taylor for the redemption of her Series A share, $27,907.89 in court awarded fees and costs which AIA Services is required to pay on appeal, plus the legal fees the AIA Corporations paid in resisting Donna Taylor's redemption claim and that she incurred (Damage Item Number 14 in Exhibit A attached hereto); [1618] (i) $187,027.16 for the improper advancement of legal fees and costs paid to attorneys representing to John Taylor in *Reed Taylor v. AIA Services* (Damage Item Number 6 in Exhibit A attached hereto); (j) $361,131.28 in costs and fees improperly advanced to attorneys representing Henderson, Beck and Corrine Beck in *Reed Taylor v. AIA Services* (Damage Item Number 7 in Exhibit A attached hereto);[1619] (k) $99,710.30 in costs and fees improperly advanced to attorneys

---

[1617] These improper loans commenced occurring during the Hawley Troxell Defendant's representation and $2,235,859.99 is the aggregate amount of the four promissory notes Pacific Empire Radio delivered to the AIA Corporations; it is unclear from their financial statements or accounting records as to whether any of those four notes were paid in whole or in part and, as discussed in this Report, John Taylor has improperly credited payment for "services," failed to accrue interest and improperly entered accounting entries to credit the "services" and other adjustments to the principal amount owed instead of applying any payments first to interest. Other advances were made after the last promissory note as shown in Damage Item Number 13 in Exhibit A.

[1618] As stated in Sections X and XII, the Hawley Troxell Defendants should have insisted that Donna Taylor be timely paid for the redemption of her Series A shares and taken action to properly do so; instead, they breached their duties of care and encouraged and enabled John Taylor and the other Controlling AIA Defendants to cause the AIA Corporations to spend more on legal fees resisting Dona Taylor's claim than it would have cost to pay her the amounts to which she was entitled.

[1619] The amount of the fees is preliminary and will be revised as discovery proceeds. By reason of the Controlling AIA Defendants' intentional acts of misconduct, of which the Hawley Troxell Defendants were well aware, and as stated in Sections XI and XII(N) of this Report, the legal fees of the Controlling AIA Defendants should not have been advanced and, by reason of their fiduciary and due care duties owed to the AIA Corporations, the Hawley Troxell Defendants should never have permitted the AIA Corporations to do so in *Reed Taylor v. AIA Services, Donna Taylor v. AIA Services*, *Donna Taylor v. Taylor or this Lawsuit*. Moreover, as discussed in Section XII, Riley, having failed to exercise his duties of care by having AIA Services sign the illegal 1996 Series A Preferred Shareholder Agreement and the ultra-vires 1995 Letter Agreements, and to fail to amend AIA Services' Amended Articles of Incorporation to clearly state that capital surplus was authorized to redeem Donna Taylor's shares and modify the amortization period and interest rate in accordance with the terms agreed to by AIA Services. *See Taylor* v. *Taylor*, 163 Idaho 910, 918, 422 P.3d 1116, 1124 (2018). Consequently, Riley is also one of the proximate causes for the legal fees and expenses incurred and to be incurred by AIA Services in that litigation, which is still pending and based on the Idaho Supreme Court's opinion there is no dispute that Donna Taylor should have been paid according to the terms of the 1995 Letter Agreements.

**Exhibit - 1, p. 453**

**12-ER-2871**

representing Duclos and Freeman in *Reed Taylor v. AIA Services* (Damage Item Number 8 in Exhibit A attached hereto); (l) $193,258.77 in fees and costs paid to Brown for purportedly representing the AIA Services' 401(k) Plan (Damage Item Number 9 in Exhibit A attached hereto);[1620] (m) $394,630 for the illegal payments made to Reed Taylor in 2007 and 2008 for failing to promptly identify the violation of Idaho Code section 30-1-6 and having John Taylor assert that defense (Damage Item Number 27 in Exhibit A attached hereto);[1621] (n) $413,972.05 representing the principal $410,000, plus accrued interest received, caused by the failure of the Hawley Troxell Defendants to ensure that the court registry funds were preserved for proper business purposes of the AIA Corporations such as payments to creditors and preferred shareholders (Damage Item Number 12 in Exhibit A attached hereto); (o) $430,000 which Growers National agreed to pay CropUSA, but should have been paid to the AIA Corporations since they had formed and funded Growers National and the contract should have been with the AIA Corporations (Damage Item Number 34 in Exhibit A attached hereto); (p) at least $3,043,705.45 paid from 1999 through 2017 (we have not been provided the information for 2019 or thereafter) in totally undeserved "compensation" paid by the AIA Corporations to John Taylor, a faithless employee plus any director fees or expense reimbursements, together with the cancelation of the 475,000 shares of AIA Services common stock he unlawfully acquired through the exercise of stock options (assuming his exercise was timely), and the 343,659 common shares he later acquired in 2012 from Beck, Cashman and others which were not properly issued or paid for (*see* Damage Item

---

[1620] I was unable to find checks or bank entries to confirm that the AIA Corporations paid those fees or reimbursed the AIA Services' 401(k) Plan. However, John Taylor's declaration testimony in *Donna Taylor v. Taylor* specifically states that the defense of Reed Taylor v. AIA Services caused the AIA Corporations to pay over $2.2 million in fees and costs for that lawsuit. It is impossible to add up the fees and costs paid for that lawsuit in Exhibit A and not include the fees and costs paid to Charles Brown to reach anywhere near $2.2. million. Thus, I am of the opinion that the fees and costs paid to Charles Brown must have been paid by the AIA Corporations (assuming John Taylor's testimony is true, which I concede is difficult to do) and because AIA Services transferred an interest in AIA Services' Former Headquarters stated to be worth over $200,000 in 2010.

[1621] This would have been a viable common interest between the AIA Corporations and John Taylor, and would have also saved the AIA Corporations over a million dollars of fees and costs paid to the Hawley Troxell Defendants and advanced for the other defendants, which the Hawley Troxell Defendants were separately one of the proximate causes of by their breached duties of care (*see* Damage Item Numbers 4, 6-9).

Page - 445

Numbers 18 and 40 in Exhibit A attached hereto);[1622] (q) $946,119.69 the sales price of the AIA Corporations' headquarters building together with $104,257, the sale price of each of the two condos that were also sold, making a total damage amount of $1,154,634.72 which would have never been transferred or sold because the guarantees of the GemCap Loan would have never occurred (Damage Item Number 16 in Exhibit A attached hereto);[1623] (r) $123,749.89 which is the $50,000 value of the corporate opportunity of AIA's Parking Lot as established through sale price of the parking lot utilized by the AIA Corporations which John Taylor and Henderson purchased on November 20, 2001 for $8,000 using $6,500 of AIA Insurance's credit and the improper and unauthorized rent paid to John Taylor (Damage Item Number 17 in Exhibit A attached hereto); (s) $163,480.74 for the improper and unauthorized directors' fees and expense reimbursements received by Henderson and Beck (Damage Item Number 19 in Exhibit A attached hereto); (t) the unauthorized and improper costs and attorneys' paid by the AIA Corporations in *Donna Taylor v. Taylor*, *AIA Services v. Durant*, *GemCap v. CropUSA*, *GemCap v. AIA Services*, this Lawsuit and other lawsuits and matters, including the failed reverse stock split which the Hawley Troxell Defendants failed to advise the Controlling AIA Defendants was not permitted for the reasons stated in this Report and in the defendants' motions to dismiss that lawsuit (Damage Item Numbers 4, 6-9, 21-26, 29-32);[1624] (u) $240,000 for the value of the 2007 sale of Sound Insurance's book of business to CropUSA (it was back-dated to 2006) which sale price established the value of the corporate opportunity since Sound Insurance competed against AIA selling health insurance, home insurance and other insurance products which AIA Services would have just as easily sold as discussed in this Report and occurred while the Hawley Troxell Defendants were negligently failing to protect the interests of the AIA Corporations (Damage Item Number 39 in

---

[1622] There is a second alternative for compensation paid to John Taylor since 2007. While the Hawley Troxell Defendants breached their duties of care by not requiring John Taylor to repay his prior compensation and prevent any further compensation be paid to him because he was intentionally breaching his duties of loyalty by competing against the AIA Corporations and improperly taking their assets, they could have at least stopped any further payments to him from 2007 and thereafter thereby being one of the proximate causes of the damages for the alternative damage claim under Damage Item Number 18.

[1623] As stated in Section XII(AA) of this Report, the headquarters building was sold at a 'fire sale" and the loss sustained by the AIA Corporations thus exceeded the sales price. As with the other items of damages, this is subject to review and confirmation.

[1624] As I have consistently stated in this Report, the Hawley Troxell Defendants were by no means the only proximate cause for these damages, but they were one of the causes.

Exhibit - 1, p. 455

12-ER-2873

Exhibit A attached hereto);[1625] (v) $863,617.20 in compensation paid to other purported officers of the AIA Corporations who were also working for CropUSA and providing services for other entities John Taylor partially owns, *see, e.g.,* Exhibit C attached hereto, when they should not have been paid any compensation for competing against the AIA Corporations and failing to devote their full-time efforts to those corporations (Damage Item Number 35 in Exhibit A attached hereto); (w) the millions of dollars of value of unallocated, improperly allocated or allocated by never paid expenses, labor, trade secrets, compensation, loan, rent and other services or monies provided by the AIA Corporations which were improperly utilized by the Controlling AIA Defendants or entities that they purportedly partially owned, *e.g.,* CropUSA and the entities listed in Exhibit C attached hereto, because the Hawley Troxell Defendants failed to properly discharge their duties of care by preventing those transactions, requiring that the moneys be itemized and paid and/or by failing to take legal action in the best interests of the disabled AIA Corporations (Damage Item Numbers 20, 28, 33 and 38[1626] in Exhibit A attached hereto); (x) $307,271 for the unpaid loans owed by John Taylor to the AIA Corporations which was placed back onto the AIA Corporations' books after Reed Taylor pointed out that the loan had been improperly paid by applying the $307,271 to Reed Taylor's $6M note, which should have been required to be promptly paid based on the misconduct (Damage Item Number 37 in Exhibit A attached hereto); and (y) while Miesen is vigorously opposing any relief be given to GemCap in this Lawsuit and the Settlement Agreement was unauthorized, improper and unenforceable, the Hawley Troxell Defendants are also one of the proximate causes of the fees and costs paid by the AIA Corporations, any sums owed and paid to GemCap, the property transferred and sold and/or any sums that may be required to be paid to GemCap (including any judgment or fee and cost award in *GemCap v. AIA Services*) because these damages could have been prevented had the Hawley Troxell Defendants properly discharged their duties of care, including by properly

---

[1625] While there are many accounting entries post-2007 wherein the AIA Corporations were paying salaries and other expenses for Sound Insurance, I acknowledge that, unlike CropUSA, I was not able to locate many accounting entries showing that Sound Insurance was funded in the early years by the AIA Corporations. However, although it is impossible from the books and records to determine the extent of the AIA Corporations' financial assistance (there is no doubt John Taylor and Duclos were providing services for Sound), the $240,000 sale price nevertheless provides a valuation for the business.

[1626] As stated in this Report, I am not asserting that all of the AIA Corporations' revenues are damages. Certain expenses were appropriately paid. Many others were not. The burden is the Defendants to provide an accounting and establish the fairness of the transactions and that they were properly authorized.

Page - 447

obtaining a receiver for their disabled clients the AIA Corporations (Damage Item Numbers 15-16, 25, 30, and 36 in Exhibit A attached hereto).[1627]

14.     In addition to the Damage Items discussed above, if, as their fiduciary and due care duties required, the Hawley Troxell Defendants had (i) insisted upon the seating of a board member designated by Donna Taylor; (ii) investigated Reed Taylor's claims (and such other claims which would have come to their attention during a properly conducted internal investigation by counsel); (iii) the AIA Corporations assert in *Reed Taylor* v. *AIA Services* all available cross claims against John Taylor and the other Controlling AIA Defendants at a time when they could have responded in damages; (iv) pursued their petition for a court appointed inquiry (v) welcomed the appointment of a receiver for the AIA Corporations (instead, as stated above, of vigorously resisting the appointment of a receiver; and (vi) not had their counsel obtain a 4 1/2 year stay of this Lawsuit, the AIA Corporations would never have executed the AIA Services Limited Guarantee of the GemCap Loan, the AIA Corporations' Amended Guarantee of the GemCap Loan or the GemCap Settlement Agreement and AIA Services' former headquarters would never have been transferred to GemCap or the AIA Services' 401(k) Plan[1628] and later sold. With respect to the GemCap Settlement Agreement, GemCap is alleging that $20,130,701.01 is purportedly owed which, if owed, was one of the proximate damages caused in part by the Hawley Troxell Defendants. Although Miesen challenging the validity of the GemCap Settlement Agreement, and is not conceding that any of them are in any way binding on or enforceable against the AIA Corporations, there can be no assurance that Miesen will be successful (it is my opinion that he should be) and by reason their breaches of their duties of care and loyalty owed to the AIA Corporations, the Hawley Troxell Defendants are one of the proximate causes of the damages sustained by the AIA Corporations by reason of their execution of the AIA Services Limited Guarantee of the GemCap Loan, the AIA Corporations' Amended Guarantee of the GemCap Loan or the

---

[1627] John Taylor has taken the position that he paid that loan back when he transferred certain fund and/or properties to AIA Insurance after CropUSA defaulted on the GemCap Loan. However, there is no proof that the loan was repaid, and no interest was paid as should have been required. In addition, property John Taylor transferred subsequently was subject to foreclosure proceedings and certain funds he may have lent to AIA were never authorized as discussed in Sections X-XI. These transactions were more self-interested ones by John Taylor which were enabled by the Hawley Troxell Defendants' prior failures to properly discharge their duties which would have also not enabled John Taylor to continue his misconduct.

[1628] As stated above in Section X(T), the two transfers of the of interests in AIA Services Headquarters to the AIA Services' 401(k) Plan (including the ten percent interest transfer that was exclusively for John Taylor's benefit) were unauthorized and further examples of his self-dealing.

**Exhibit - 1, p. 457**

**12-ER-2875**

GemCap Settlement Agreement. Inexplicably, counsel for Hawley Troxell in this Lawsuit continue to take the position that the AIA Corporations should be held liable to GemCap under the Settlement Agreement.[1629] To the extent that the actions of the Hawley Troxell Defendants or their counsel in support of GemCap's efforts to enforce the Settlement Agreement are successful, Miesen will seek to hold them liable for such additional violations of their fiduciary duties to the AIA Corporations of complete fairness, honor, honesty, loyalty, and fidelity, as well as their duty of due care.

15.     In my opinion, the breaches by the Hawley Troxell Defendants, of their fiduciary duties of complete fairness, honor, honesty, loyalty, and fidelity, as the Unredacted Billing Records now make clear, were grossly negligent and/or knowing[1630] violations of those duties as well as conscious disloyalty to the AIA Corporations, and under Idaho law, as articulated by the Supreme Court's decision in *Parkinson v. Bevis*,[1631] the Hawley Troxell Defendants must forfeit all of the fees and costs they received from the AIA Corporations for *Reed Taylor v. AIA Services* and *Donna Taylor* v. *AIA Services,* as well as any fees and costs paid to them for any other matters during that period in the total amount of $1,007,786.72.[1632] The Hawley Troxell Defendants' negligence and disloyalty to the AIA Corporations included not only their failure to withdraw as counsel when they were sued by Reed Taylor, but also their continuing to substantially assisting and enabling the Controlling AIA Defendants to continue their misconduct. Separately, Miesen is entitled to recover on behalf of the AIA Corporations the more than $800,000 in fees represented by unnecessary time charges attributable to the Hawley Troxell Defendants' mishandling of the illegality defense, as well as the $193,258.77 paid to Brown.[1633] In addition, to causing the AIA Corporations' paying unnecessary legal fees, the Hawley Troxell Defendants' mishandling of the illegality defense also caused the AIA Defendants to make unnecessary stock redemption payments to Reed Taylor of $394,630 (which included the payments for the salaries for his two

---

[1629] *E.g.,* Dkt. 572.

[1630] E.g., 4/1/08 Loren Messerly "RESEARCH ON OUTSIDE COUNSEL AND LIABILITY FOR NOT BRINGING CLAIMS AGAINST DIRECTORS"; 4/2/08 Loren Messerly "EXTENSIVE RESEARCH ON OUTSIDECOUNSEL AND POTENTIAL LIABILITY WHEN TRYING TO REPRESENT BOTH CORPORATION AND DIRECTORS". FB 0726. (Solid Caps in original).

[1631] 165 Idaho 599, 448 P.3d 1027 (2019); *Parkinson* is also discussed in Section X(T) of this Report.

[1632] These amounts will also be confirmed prior to trial.

[1633] *See* Section XII(U) of this Report.

employees) in 2007 through April 2008.[1634] While the AIA Corporations wisely stopped paying Reed Taylor in mid-April 2008 when the illegality defense was finally discovered, those payments should have been stopped immediately when the Hawley Troxell Defendants commenced work on *Reed Taylor v. AIA Services* in January 2007.

16.     In my opinion, based on, *inter alia*, the information contained in the Unredacted Billing Records and the other matters which have recently come to my attention through a review of the additional documents which have been produced, if the Hawley Troxell Defendants had taken the actions and rendered the advice which their fiduciary and due care duties required, and had the Controlling AIA Defendants ignored and failed to accept and follow that advice, those same duties required the Hawley Troxell Defendants to withdraw from representing the AIA Corporations pursuant to RPC 1.16. Moreover, in my opinion, if the Hawley Troxell Defendants had so withdrawn and had the Controlling AIA Defendants selected other counsel to represent the AIA Corporations in the *Reed Taylor* case, that counsel would have been required by their own fiduciary and due care duties to determine from the Hawley Troxell Defendants precisely why they withdrew from the representation. After receiving the true answer, or if such newly selected counsel did not obtain a satisfactory answer, in my opinion, based on my experience, such newly selected counsel would not have accepted the engagement. Consequently, the failure of the Hawley Troxell Defendants to withdraw from the representation of the AIA Corporations was one of the proximate causes of the damages sustained by them, as set forth in this Report.

17.     More than fifteen different Hawley Troxell lawyers worked on matters pertaining to *Reed Taylor v AIA Services* and *Donna Taylor v. AIA Services* and other matters from 2007 through 2012, with their top three billers Ashby, Babbitt and Riley each billing 1,741.00 hours, 1,454.33 hours, and 553.78 hours, respectively, during that period of time. *See* Exhibit G attached hereto. It is nearly impossible to imagine that the serial breaches of the Hawley Troxell Defendants' duties of care, good faith and loyalty did not occur to at least one of them and that corrective action was not promptly taken by the firm thereby resulting in additional breaches of the Hawley Troxell Defendants' duties of care, good faith and loyalty as discussed in this Report, and also thereby resulting in additional reasons why the

---

[1634] RJT – 019006. Not one cent would have been paid to Reed Taylor under the 1995 Stock Redemption Agreement if Riley had not overlooked, misconstrued or misunderstood Idaho Code section 30-1-6.

Exhibit - 1, p. 459

Hawley Troxell Defendants are one of the proximate causes of the damages to the AIA Corporations (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto).

## B.  Enhanced Scrutiny.

1.  The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty owed to the disabled AIA Corporations because the misconduct and improper corporate governance, or should I say lack thereof entirely, were not issues that happened to transpire only after the Hawley Troxell Defendants' extensive work has commenced in early 2007; instead, these issues existed and should have been identified and properly addressed immediately in early 2007 as described in this Report (*see* Sections X-XII), and the failure to, ensure proper corporate governance, or only represent the AIA Corporations if the Controlling AIA Defendants ensured that all accounting and corporate governance were properly and lawfully conducted resulted in the Hawley Troxell Defendants being one of the proximate causes of the damages to the AIA Corporations (see Damage Item Numbers 1-40). It was readily apparent that John Taylor was improperly making the decisions for the AIA Corporations long before he showed up in Hawley Troxell's waiting room in early 2007. Indeed, less than three monthly earlier, John Taylor, through Duclos, reached out to Riley to have him prepare a Legal Opinion for a hard money $15,000,000 line-of-credit for CropUSA, which was improperly guaranteed by AIA Insurance in violation of numerous provisions under Section 4.2.9 of AIA Services' Amended Articles of Incorporation[1635] and Sections 4.14 (conflicts of interest) and 14.1 (prohibition of guarantees) as discussed in this Report. Based on the allegations in Reed Taylor's complaints, including allegations of corporate malfeasance and alter-ego, Riley should have immediately requested and obtained historical corporate governance records, e.g., the corporate minute book that did not exist because there were no proper records to place in the minute book. The Hawley Troxell Defendants breached their duties of care because they should have promptly ascertained that the AIA Corporations' accounting and corporate governance had material deficiencies with the latter being non-existent and John Taylor was improperly leading the corporate governance in

---

[1635] Specifically, AIA Insurance's guarantee was in violation of the Guarantee Prohibition (Section 4.2.9(c)), the financial covenants provisions because none of them permitted incurring Indebtedness of $15,000,000 (Sections 4.2.9(h), (j) and (k)), and the conflict of interest provision with affiliates because the guarantee was with CropUSA (an Affiliate) and AIA Insurance received nothing for the guarantee and no reasonable person would have approved it). *See* Sections X(F)-(G).

Exhibit - 1, p. 460

12-ER-2878

his self-interests and intentionally not disclosing or properly addressing conflicts of interest.

2.      Because the Hawley Troxell Defendants should have been immediately placed on notice of the improper corporate governance and the evidence of John Taylor's self-dealing, they had a duty to be particularly vigilant in acting as the attorneys in the best interests of the AIA Corporations which were being controlled by John Taylor. A reading of his January 2008 deposition testimony in *Reed Taylor v AIA Services* reveals that, notwithstanding that he is a lawyer and despite the Hawley Troxell Defendants' representation of the AIA Corporations, John Taylor is nevertheless a person who thinks that he is a law unto himself and not subject to legal constraints applicable to others, such conduct continues to this day and was further enabled and substantially assisted by the Hawley Troxell Defendants' breached duties of care, good faith and loyalty.[1636] The following are but a few examples of excerpts from the January 2008 deposition:

> Q. Have you advised [the AIA Disinterested Shareholders] of the personal claims against you?
> A. I have -- I don't believe so.
> Q. Do you think that that would be appropriate to advise the shareholders of the personal claims against you?
> A. No.
> Q. Why not?
> A. It's not -- I didn't think it's appropriate.
> Q. Do you think it's appropriate for you to make decisions pertaining to the lawsuit on behalf of the corporations when you're personally being sued in this action?
> A. I do.
> Q. And why is that?
> A. Because I'm the chief executive officer of both corporations.
> Q. And do you own shares in both corporations?
> A. I do.
> Q. And, you don't think there's a conflict of interest between AIA's interest and CropUSA's interest?
> A. I do not.
> Q. And why is that?
> A. I just, I don't believe there is.[1637]

---

[1636] Even Mr. Remele quickly determined that he would not address John Taylor's conduct.
[1637] Dkt. 67-11, pp. 75-76.

\* \* \*

Q. Did you seek advice from counsel before appointing Jim Beck and Connie Taylor to the board of AIA Services or AIA Insurance?

A. Yes.

Q. And, did you think there was a conflict of interest with you appointing Jim Beck and Connie Taylor to the board of AIA Services and AIA Insurance?

A. No.

Q. And what's the basis for your opinion?

A. I just didn't think there was a conflict.

Q. Does Jim Beck own shares in CropUSA?

A. Yes, he does.

Q. And did he own shares in CropUSA at the time he was appointed to the board of AIA Services and AIA Insurance?

A. I'm sure he did.

Q. Does that make Jim Beck an interested party?

A. I don't know if it does or not.

Q. Does that make Jim Beck an interested director?

A. I don't know if it does or not.[1638]

\* \* \*

Q. And do you own shares in both corporations?

A. I do.

Q. And, you don't think there's a conflict of interest between AIA's interest and CropUSA's interest?

A. I do not.

Q. And why is that?

A. I just, I don't believe there is.

Q. Please tell me your, the basis of your opinion.

A. I think that both of them are being sued by Reed Taylor, and we have obligation to defend the corporations. I have an obligation for each corporation to defend.[1639]

\* \* \*

Q. What -- why, why did AIA Insurance purchase the [Series C Preferred Shares] and not AIA Services?

A. I don't know.

Q. Who would know?

A. I don't know who would know.

---

[1638] Dkt. 67-11, p. 88.

[1639] Dkt. 67-11, p. 76.

Q. Who would make the decision?
A. I made the decision.
Q. Would the board make the decision?
A. No.
Q. That wouldn't be an appropriate decision for the board?
A. Not in this case, no.
Q. Why not in this case?
A. Because I made the decision.[1640]
* * *
Q. Did you comply with the articles of incorporation of AIA Services and AIA Insurance when AIA purchased the preferred C shares from Crop USA?
A. I believe I did.
Q. Did you comply with the bylaws of AIA Services and AIA Insurance when AIA Insurance purchased the preferred C shares from Crop USA?
A. I believe I did.
Q. Did you seek advice from counsel?
A. No, I did not.
Q. Why not?
A. I didn't think it was appropriate.[1641]

3.      It is noteworthy that the above testimony occurred after the Hawley Troxell Defendants had been representing the AIA Corporation for nearly one year; it confirmed to the Hawley Troxell Defendants that nothing had changed and provided further notice to them of John Taylor's improper corporate governance and misconduct. Indeed, the continuing nature of John Taylor's disdain for the rule of law and compliance with applicable proper corporate governance and his duties of loyalty and good faith is evidenced by Judge Brudie's July 1, 2020 ruling in *GemCap Lending 1, LLC* v. *AIA Services Corporation* that Taylor committed

---

[1640] Dkt. 67-11, pp. 20-21.
[1641] Dkt. 67-11, pp. 35-36.

intentional fraudulent conveyances:[1642] "In analyzing all of the relevant factors in this matter the Court finds GemCap has met its burden to show the transfers were made with the intent to defraud. While it does appear adequate consideration was paid for the transfers, the timing, Taylor's less than prompt disclosures and recording of the transfers, along with the fact that these transfers were accomplished at the whim of Taylor and only Taylor provides an inference of fraud. Taylor's explanation for the circumstances surrounding the transfers as well as the "accountings" provided in support do little to alleviate this inference but rather appear to be part of greater attempt to obfuscate a creditor in its attempts to collect on a judgment. Therefore this Court finds both transfers to be unlawful pursuant to I.C. § 55-913(1)(a)."[1643]

4.      John Taylor's July 2020 Rule 30(b)(6) deposition testimony provides a number of additional illustrations. For example, John Taylor stated that annual meetings of shareholders required by AIA Services New Restated Bylaws [1644] can be dispensed with simply because this Lawsuit is pending, notwithstanding that there were shareholder demands therefor.[1645] There were no annual shareholder meetings from 2007 through 2012 when the Hawley Troxell Defendants were actively representing the AIA Corporations. *See* Sections X and XI(A). With respect to the AIA Corporations and their being deprived of their indirect ownership of the crop insurance business without their consent, John Taylor imperiously stated "It was not a decision the AIA shareholders would make. They were not involved in that decision."[1646] He also demonstrated his propensity for legal anarchy by characterizing the efforts of Donna Taylor and Reed Taylor to enforce their legal rights under the 1995 Stock Redemption Agreement, the AIA Services' Amended Articles of Incorporation and the 1995 Letter Agreements, respectively, as "looting"

---

[1642] I am not opining that GemCap was defrauded by the AIA Corporations. Indeed, the opposite has occurred. This ruling in *GemCap v. AIA Services* should not have occurred because the AIA Corporations should have never guaranteed the GemCap Loan and the GemCap Settlement Agreement was also unauthorized, improper, ultra vires and illegal (including through containing provisions unlawfully assigning legal malpractice claims and unlawfully purporting to prevent the AIA Corporations from filing bankruptcy). All of these events could have and should have been prevented by the Hawley Troxell Defendants.

[1643] DLM – 105924-25.

[1644] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 18.

[1645] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 19.

[1646] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 502. *See* Section XII(J).

Exhibit - 1, p. 464

12-ER-2882

the company.[1647] Instead, as discussed in this Report, including Sections XI(A) and XII(Y), it was John Taylor who was consistently looting the AIA Corporations. Henderson has even testified that John Taylor deceived her and (presumably) Beck as to the actual, unlimited scope of the AIA Corporations' Amended Guarantee of the GemCap Loan. [1648] It is clear that more than a decade of working with the Hawley Troxell Defendants and more than twice as long with Riley, did little, if anything, to foster a respect for the law on the part of John Taylor. For understandable reasons even the Hawley Troxell Defendants' expert avoided evaluating his conduct.[1649]

5. More than ninety years ago, Chief Judge Benjamin Cardozo of the New York Court of Appeals articulated what became a nationally adopted[1650] standard by which the conduct of a person such as a purported director and officer in the position of John Taylor should be measured: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of honor the most sensitive, is the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the

---

[1647] *Id.* at 244. Although it hardly constituted an intentional act of "looting," the stockholders and board approved 1995 Stock Redemption Agreement was later found to be illegal owing to Riley's malpractice in delivering to Reed Taylor a legal opinion that the Agreement was legal, valid and enforceable. *See, e.g.,* Section XII(U) of the Report; and Riley participated in the preparation of those Articles and Letter Agreements. Moreover, John Taylor conveniently omits that he was the driving force behind redeeming Reed Taylor's shares (he even bragged in testimony that he bought his brother out) which resulted in the modifications of Donna Taylor's redemption terms and how, unlike his misconduct described in this Report, the Donna Taylor and Reed Taylor transactions were fully disclosed to AIA Services' shareholders and shareholder meetings were held to address the transactions, albeit Riley breached his duties of care by failing to properly and legally authorize those transactions thereby being one of the proximate causes of damages to the AIA Corporations (*see, e.g.,* Damage Item Number 38). Indeed, as with Riley's representation of the AIA Corporations in 2007 and thereafter, it appears that he was merely representing the interests of John Taylor in 1995 and 1996 for the Reed Taylor transactions (Riley raised no alarms or issue with respect to AIA Services incurring a $7.5 million debt to redeem shares in 1995 when it insurance subsidiary the Universe was in serious trouble.

[1648] 9/10/2020 Henderson Depo. Transcript, pp. 234-35. Concealment by a director of material information from fellow directors breaches a duty of disclosure owed to them. *Mills Acq. Co. v. Macmillan,* 559 A.2d 1261, 1281 (1989).

[1649] *See, e.g.,* Section XII(Y) of this Report.

[1650] *E.g., Security Nat'l Bank v. Peters, Writer & Christensen, Inc.*, 569 P.2d 875 (Colo. Ct. Ap. 1977) (Applying the Cardozo standard to directors).

Exhibit - 1, p. 465

**12-ER-2883**

'disintegrating erosion' of particular exceptions…Only thus has the level of conduct of fiduciaries been kept at a level higher than that trodden by the crowd.[1651]. In my opinion, the Cardozo standard for fiduciaries is equally applicable to the conduct of the Hawley Troxell Defendants themselves.[1652]

6.      Clients such as John Taylor,[1653] are trouble and if they are to be accepted at all, must be carefully monitored which the Hawley Troxell Defendants failed to do. Indeed, the Unredacted Billing Records reveal that the Hawley Troxell Defendants began representing John Taylor in *Reed Taylor v. AIA Services* on February 7, 2007 in a matter entitled "REED TAYLOR VS. JOHN TAYLOR ET AL," and further reveal that throughout the case the primary purpose was the representation and protection of John Taylor, notwithstanding that on or about May 2, 2007 they purportedly began representing the AIA Corporations in that same litigation. The Hawley Troxell Defendants failed in their duties of care owed to the AIA Corporations to make John Taylor aware of the necessity of adherence to applicable law, the principles of corporate governance, and the duties attendant thereto; such clients need to be reminded of, for example, the admonition of Justice Brandeis in his work *Other People's Money* that: "Sunlight is said to be the best of disinfectants…" A lawyer exercising that degree of care which a reasonably prudent lawyer would have exercised under the same or similar circumstances, (if he had accepted the engagement at all), would have been acutely aware of the risks involved and at least kept a close eye on John Taylor[1654] and the other AIA Controlling Defendants, something which the Hawley Troxell Defendants, who the Unredacted Billing Records reveal had, as their primary interest, collecting over a million dollars in fees and covering up the misconduct of the AIA Defendants as well as their own, thereby, as stated in Sections X and XII, failed to do, thus breaching their duties of care, good faith and loyalty owed to the AIA Corporations and thereby being one of the proximate causes of the AIA Corporations to sustain millions of dollars in damages.

---

[1651] *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928).

[1652] *Beal v. Mars Larsen Ranch Corp., Inc.*, 99 Idaho 662, 667–68, 586 P.2d 1378, 1383–84 (1978) (citation omitted).

[1653] While the AIA Corporations were supposedly the clients of the Hawley Troxell Defendants, they represented John Taylor's interests (ahead of the interests of the AIA Corporations) and he was purportedly acting as the president of both AIA Corporations.

[1654] Based on the evidence that I have seen and as discussed in this Report, John Taylor should have been barred from serving as an officer or a director of the AIA Corporations; instead, the Hawley Troxell Defendants gave him free range and enabled him.

Exhibit - 1, p. 466

12-ER-2884

7.      In the light of the red flags regarding the conduct of John Taylor and the other Controlling AIA Defendants, the Hawley Troxell Defendants have no basis to assert that they merely acted upon instructions from the AIA Corporations and thus they have not breached their duties of care, good faith or loyalty. Having more recently ascertained the universe of documents evidencing the only board and shareholder decisions since January 1, 1999, there were no proper and approved decisions made by the AIA Corporations regard any litigation decisions, or any corporate action for that matter, and the limited decisions purportedly made were never properly approved, as discussed in this Report. Over the course of the Hawley Troxell Defendants' five years of active litigation and general counsel work for the AIA Corporations from 2007 through 2012 (which included Ashby, Babbitt and Riley each billing an astounding total of 1,741.00 hours, 1,454.33 hours, and 553.78 hours during that period of time, respectively (*see* Exhibit G attached hereto), there were no board or shareholder meeting resolutions or meeting minutes of the AIA Corporations' purporting to: (i) delegate authority by the AIA Corporations' board of directors to John Taylor or any other officer to make any litigation decisions, (ii) properly disclose and address a single conflict of interest, including the Controlling AIA Defendants' numerous conflicts of interest discussed in this Report, (iii) properly address and ensure compliance with AIA Services' Amended Articles of Incorporation or the AIA Corporations' bylaws, or (iv) provide full disclosure to AIA Services' shareholders and obtain the proper consents for any corporate actions, including litigation decisions. *See* Sections X and XI; Exhibits B-H attached hereto. Based on these reasons alone, the Hawley Troxell Defendants breached their duties of care, good faith and loyalty owed to the AIA Corporations for their work as general counsel and in the lawsuits[1655] thereby being one of the proximate causes of the AIA Corporations' damages (*see* Damage Item Number 1-40 in Exhibit A attached hereto; *see also* Section X-XI). Had the Hawley Troxell Defendants properly discharged their duties of care, good faith and loyalty as discussed in this Report, the improper conduct and damages would have been prevented from 2007 and thereafter and would have resulted in recovering money,

---

[1655] According to the Hawley Troxell Defendants' Unredacted Billing Records, they performed legal services for the AIA Corporations on all matters consistent with that of general counsel and for the litigation and related matters in *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services*, and worked on many issues in *Donna Taylor v. Taylor* (including negligently performed work to justify stopping payments to Donna Taylor, defending against her bona fide claims and improperly advancing fees and costs for John Taylor).

Page - 458

assets and/or collectible judgments against the Controlling AIA Defendants.[1656] From 2007 through 2012, John Taylor and the other Controlling AIA Defendants could have been "reeled in" by the Hawley Troxell Defendants; instead they breached their duties of care, good faith and loyalty by enabling them.[1657]

## C. <u>Absence of Litigation Privilege.</u>

1.     None of the Hawley Troxell Defendants' breached duties of care, good faith or loyalty, or the damages that they are one of the proximate causes of, are protected by Idaho's litigation privilege. The Hawley Troxell Defendants have raised the litigation privilege as a defense in this Lawsuit. The Hawley Troxell Defendants are not being sued by "the opponent of their client in a in a current or former lawsuit," nor does this case arise "out of the attorney's legitimate representation of that client." Instead, the instant derivative suit is brought on behalf of the clients of the Hawley Troxell Defendants, the AIA Corporations, to which the Hawley Troxell Defendants owed the various duties described in this Report which were breached, thereby being one of the proximate causes of the damages to the

---

[1656] While the Hawley Troxell Defendants have not raised collectability as a defense so no discovery was conducted on the issue, the judgments that could have been obtained during the Hawley Troxell Defendants' representation would have been collectible. For example, in 2016, Beck testified that since 2009 that his net assets "[p]ossibly exceeded $5 million," which could have been executed upon. 12/8/2016 Beck Depo. Transcript, p. 125. John Taylor had a home, shares in Avista, property and other assets that could have been executed upon as shown in his 2005 financial statement. RJT – 015866-68. As seen from the public records available on Avista Corp., John Taylor has made over $2,000,000 in compensation for serving as a director of Avista (although I cannot fathom why Avista permit John Taylor to serve on its board, but the existence of the various lawsuits since 2007 has not deterred Avista in allowing him to continue to serve, presumably because John Taylor has never made full disclosure to that board, also), which could have been garnished. Cashman previously sold shares in a company that went public (he actually invested $1,000,000 in cash in AIA) and he lives in a valuable home, which could have been executed upon. Henderson is a practicing attorney who claims to handle difficult medical malpractice cases, and she could have been garnished. Moreover, if the AIA Corporation do not escape the unauthorized debt in the GemCap Settlement Agreement, any funds or assets that Miesen may recover in this Lawsuit which are paid to GemCap also establish collectible amounts.
[1657] For example, had the Hawley Troxell Defendants admitted that AIA Insurance's Guarantee of the Lancelot was improper and prohibited, that the guarantee and Hawley Troxell's incorrect Legal Opinion should have never occurred, and that the Controlling AIA Defendants should never have the AIA Corporations guarantee any loans for CropUSA, the improper guarantees would have stopped. Instead, the Hawley Troxell Defendants enabled John Taylor and the other Controlling AIA Defendants, thereby breaching their duties of care, good faith and loyalty owed to the AIA Corporations. The same holds true for proper corporate governance, full disclosure to shareholders and the other improper conduct in this Lawsuit.

Exhibit - 1, p. 468

12-ER-2886

AIA Corporations. Accordingly, litigation privilege has no application to and does not shield from scrutiny the litigation conduct of the Hawley Troxell Defendants in *Reed Taylor v. AIA Services, Donna Taylor v. Taylor, Donna Taylor v. AIA Services* or any other matters (including as general counsel for the AIA Corporations). Indeed, based on the utter lack of proper corporate governance as discussed in this Report, even if Miesen had been in litigation against the AIA Corporations for the above lawsuits, the litigation privilege would still not apply based on the facts and circumstances here.

## D.   Standstill and Tolling Agreements.

1.     The Hawley Troxell Defendants breached their duties of care, good faith an loyalty owed to the disabled AIA Corporations by entering into the Standstill and Tolling Agreements with the Controlling AIA Defendants and Freeman because they knew, and could foresee, that those individuals would never investigate themselves or ever have the AIA Corporations assert claims against themselves, and if they were permitted to improperly continue managing and controlling the AIA Corporations that the improper and unauthorized transactions and corporate governance would continue (which has been confirmed some seventeen years later), thereby being one of the proximate causes of the AIA Corporations' damages (*see* Damage Item Numbers 1-40).

2.     Specifically, far from conferring any benefit upon the AIA Corporations, the purported Standstill And Tolling Agreements provided to purportedly justify the Hawley Troxell Defendants' representation of the AIA Corporations and subsequently CropUSA only served to permit John Taylor and the other Controlling AIA Defendants to continue their misconduct during the pendency of *Reed Taylor v. AIA Services* and beyond. There was never a reasonable prospect that John Taylor himself would, in the self-serving words of those Agreements, in effect cause the purported Boards to "investigate the allegations of

Exhibit - 1, p. 469

**12-ER-2887**

self-dealing/breach of fiduciary duty of loyalty…"[1658] While tolling the statute of limitations might appear to have been a benefit to the AIA Corporations (although there is no evidence of any benefit and it appears that a judgment will be entered against John Taylor in favor of GemCap for over $12,000,000 thereby resulting in him being unable to pay any significant judgment in this Lawsuit as discussed above), prohibiting them from suing the Controlling AIA Defendants during the pendency of *Reed Taylor v. AIA Services* did not benefit the AIA Corporations. Nor can it reasonably be said that the tolling provisions were intended to benefit the AIA Disinterested Shareholders who were never informed[1659] of the existence or the provisions of the Standstill and Tolling Agreements. [1660] Indeed, those agreements were not unauthorized just as the other agreements and corporate action taking place during the Hawley Troxell Defendants' representation of the AIA Corporations. *See* Section XI(A). At Riley's Rule 30(b)(6) deposition, he was asked: "why did you not condition the representation [of the AIA Corporations] on notice being provided to the shareholders of the existence of these tolling agreements" to which he gave the following convoluted answer: I'll reiterate the

---

[1658] HTEH000029 ¶ 1.4; HTEH000029 ¶ 1.4; HTEH000099 ¶ 1.5. In defending the Hawley Troxell Defendants' so called "three- legged stool" representation structure in his March 3,2020 deposition, Riley stood logic on its head when he stated, in a non sequitur response to a question as to whether he had any reason to believe that a John Taylor controlled AIA Services would ever assert claims against himself and other insiders, "I think I've testified previously that it seemed unlikely that they would sue themselves, but that doesn't mean that they weren't obligated to." 3/3/2020 Riley Depo. Transcript, p. 400. Because the Standstill and Tolling Agreements were never disclosed to the AIA Disinterested Shareholders it was nonsense for Riley to state "we required tolling agreements to preserve for future dealing any potential derivative claims that - - or direct claims the corporation might have against its management*." Id*.

[1659] Ashby, as one of Hawley Troxell's Rule 30(b)(6) designees, acknowledged that neither Miesen nor any of the other AIA Disinterested Shareholders had knowledge of those Agreements (3/4/2020 Ashby Rule 30(b)(6) Depo. Transcript, p. 305) and that he didn't know how Miesen "would find that out." *Id.* Not a model of consistency, Ashby also indicated that Miesen benefited from the Agreements because "he's here now" even though neither Miesen nor Attorney Bond saw the Agreements prior to the commencement of this Lawsuit. The day before Riley gave similarly convoluted testimony, saying that by insisting on tolling agreements the Hawley Troxell Defendants preserved derivative claims that "could arise out of Reed's allegations of wrong doing by the insiders;" but when asked how did he "make sure that shareholders such as Dale Miesen would have knowledge of the tolling agreements" Riley answered with the non sequitur "we were not engaged to pursue derivative claims." 3/3/2020 Riley Depo. Transcript, p. 376-77.

[1660] An October 6, 2008 Memorandum from Ashby to Defense counsel explains why there was no such disclosure: "Once the representation agreements [which refer to the Standstill and Tolling Agreements] are disclosed, plaintiff could then challenge the adequacy of disclosure of the material risks and reasonably available alternatives and question whether the clients' conflict waivers at the inception of the case were informed consents as defined by Rule 1.0(e)."

Exhibit - 1, p. 470

answer that I previously gave, that the shareholders are not – under statute, they have no role in the retention of counsel to defend creditor claims against the corporation[1661] Later in that same deposition, there was the following colloquy:

> Q. Hawley Troxell attorneys could have conditioned their representation on notice being provided to AIA's shareholders of the proposed engagement and the -- that the engagement would involve a joint defense agreement and a tolling agreement in accordance with 30-1-863, correct?
> A. No.
> Q. Why is that?
> A. Well, we could have conditioned our engagement on an infinite number of things. There was no reason to condition it upon disclosure to the shareholders because approval of engagement of defense counsel for a corporation does not require any kind of disclosure to shareholders. It's within the powers and authority vested in the board of directors to engage defense counsel and there's, as I said before, neither statutory nor governing document provisions that would necessitate submission of the engagement issue to shareholders.[1662]

3.      It is difficult to imagine a more glaring example of a lawyer myopically placing form over substance.[1663] As stated above, the simple fact is that the true reason for the tolling agreements was to avoid dealing with the numerous conflicts of interest issues indefinitely—which conflicts of interest were unwaivable (e.g., none of the conflicts of interest were waivable between the AIA Corporations and CropUSA). The Hawley Troxell Defendants further breached their fiduciary duties of loyalty owed to the AIA Corporations by conditioning their representation

---

[1661] 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, p. 49.

[1662] 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, pp. 66-67.

[1663] For example, Riley also testified in his Rule 30(b)(6) Deposition that the notion of the Hawley Troxell Defendants conditioning their representation of the AIA Corporations on AIA Services holding annual shareholder meetings making proper disclosure to shareholders "just never came up on the radar screen because it was not something that's needed in order to enter into an engagement agreement." 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, pp. 67-68.

Page - 462

on such Standstill and Tolling Agreements.[1664] Moreover, it is inconceivable that the Controlling AIA Defendants would ever investigate their own conduct or have the AIA Corporations assert any claims against them, which further confirms the impropriety of such Standstill and Tolling Agreements. It has now become abundantly clear that the Standstill and Tolling Agreements were nothing more than an improper mechanism to allow the Controlling AIA Defendants to remain in control of the AIA Corporations and a precursor of the Hawley Troxell Defendants' suggested reverse stock split discussed in Section XII(M). The purpose and effect of each device was to ensure that an AIA Disinterested Shareholder such as Miesen would in effect be precluded from discovering the facts and asserting meritorious claims for breaches of the duties of care and loyalty by the Controlling AIA Defendants, among other claims (including constructive fraud and corporate waste). Either the applicable statute of limitations would have expired or a pending derivative suit would have failed because there would have been no shareholder who would have standing to maintain a derivative action or learn of the existence or terms of the Standstill and Tolling Agreements or the facts regarding the claims that were tolled.

4.        Even assuming that the entry into the Standstill and Tolling Agreements were not a breach of the duties of care, good faith and loyalty owed to the AIA Corporations because they were entered into in connection with the impermissible representation undertaken by the Hawley Troxell Defendants as discussed in this Report, a review of the terms of the Standstill and Tolling Agreements, including the effective dates of the tolling, the individuals who were not parties to the Agreements, the lack of required disclosure of any of the terms to AIA Services' shareholders and the termination provisions, leads me to separately opine that the Hawley Troxell Defendants breached their duties under any possible scenario based on the facts discussed in this Report, thereby being one of the

---

[1664] It is noteworthy that Reed Taylor was the founder of AIA Insurance and Riley had represented him both individually and through AIA Services and its subsidiaries for many years. I have not seen any evidence, nor allegations, that the conduct described in this Report occurred before Reed Taylor sold his majority interest in AIA Services in 1995. Yet, Riley entirely discounted all of the allegations being made by the founder, former CEO and former majority shareholder of AIA Services. To the contrary, those facts should have given Reed Taylor's allegations more credibility and a simple review of a few accounting and the lack of corporate governance records would have quickly reviewed that Reed Taylor's were meritorious while John Taylor's denials were without support. Riley could have still properly represented AIA Services opposing Reed Taylor in his efforts to be paid for his redemption obligations and simultaneously listened to the allegations he was making and investigated them to take proper action as the attorney for the AIA Corporations. Riley negligently failed to do either.

Exhibit - 1, p. 472

proximate causes of the damages to the AIA Corporations, which would also include any damages that may be attributable to any lost claims against the Controlling AIA Defendants. My opinions are also supported by the following: (a) Cashman was never required to sign a tolling agreement since it was clear that he was involved in the improper transactions and corporate actions involving CropUSA and other matters (including permitting John Taylor to continue to be compensated when he was competing against the AIA Corporations), (b) Riley's testimony that a party must be named as a defendant in a lawsuit in order to justify requiring them to sign a tolling agreement was another breach of those duties because tolling agreements should be utilized to capture all possible wrongdoers irrespective of whether that person was named as a defendant,[1665] (c) the effective dates of the tolling agreements should have been back-dated effective as far back as possible to capture all of the wrongdoing as far back as possible based on the allegations raised by Reed Taylor, included improper conduct dating back to at least 1999, (d) the Agreements should have been approved by shareholders and notice provided to them of the pertinent terms and termination mechanisms[1666] so that shareholders such as Miesen would become aware of the agreements and determine

---

[1665] Even under Riley's flawed analysis, Cashman should have been required to sign a tolling agreement. Cashman was named as a defendant by Reed Taylor, but the Hawley Troxell Defendants improperly successfully opposed Reed Taylor's motion to amend to name Cashman. This is also another example of the Hawley Troxell Defendants' improper representation of the Controlling AIA Defendants' interests. The Hawley Troxell Defendants should not have responded to Reed Taylor's allegations regarding naming Cashman and he should have been required to retain his own counsel. These are more examples of the Hawley Troxell Defendants' breaches of their duties of care, good faith and loyalty owed to the AIA Corporations.

[1666] Certain Defendants are already taking the position that the Amended Standstill and Tolling Agreements terminated when the district court simply closed *Reed Taylor v. AIA Services* after the Hawley Troxell Defendants obtained the last court order releasing the funds posted for the preliminary injunction against Reed Taylor. This is another reason why the terms of the Agreements are improper. There was no way for Miesen or any other shareholders to learn of the positions taken by the Defendants regarding the termination of those Agreements until the depositions taken in this Lawsuit because no disclosure was ever made to the shareholders or Reed Taylor and Donna Taylor's counsel. The utterly baseless argument stated by Riley that Reed Taylor or Donna Taylor's counsel assumed a duty to disclose the terms of the tolling agreements is preposterous when the terms were never disclosed to them either. Moreover, while all of Reed Taylor's claims have been dismissed in *Reed Taylor v. AIA Services*, the defendants have counterclaims that remain pending and there is no final judgment. Accordingly, the tolling agreements have not terminated.

whether to approve them and whether to use them to file suit,[1667] and (e) the provisions regarding termination should have been modified to notice being provided to independent parties and not on the termination of the lawsuit in *Reed Taylor v. AIA Services*.[1668] The entry into the Amended Standstill and Tolling Agreements were simply a negligent mechanism to seal the fate of the AIA Corporations,[1669] thereby being one of the causes of the damages to the AIA Corporations (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto).

## E.   Representation Agreements.

1.      The Hawley Troxell Defendants also breached their duties of care, good faith an loyalty owed to the disabled AIA Corporations by entering into the representation agreements because they knew, and could foresee, that the Controlling AIA Defendants would use those agreement to improperly continue managing and controlling the AIA Corporations without proper corporate governance and to protect their interests in other entities, compensation and the advancement of fees and costs for their legal fees (which has been confirmed some seventeen years later), thereby being one of the proximate causes of the AIA Corporations' damages (*see* Damage Item Numbers 1-40)

2.      There are two primary representation agreements between the Hawley Troxell Defendants and the AIA Corporations, the May 2, 2007 AIA Engagement

---

[1667] There were no independent directors or officers who could approve and authorize the tolling of claims. The approvals must have come from shareholders. A proper disclosure to the shareholders of the reasons for the Amended and Standstill Tolling Agreements would have required full disclosure of the allegations and possible claims against the Controlling AIA Defendants. No reasonable shareholder would have approved those agreements after receiving full disclosure.

[1668] If one of the Controlling AIA Defendants provide written notice to one of the other Controlling AIA Defendants or anyone else in their control group, the notice will be like providing no notice to anyone, which is also analogous to the Hawley Troxell Defendants' engagement letters, letters and emails sent to the Controlling AIA Defendants—those communications never made it to anyone proceeding in the best interests of the AIA Corporations and were the equivalent of no communications at all. *See* Sections X(T) and XII.

[1669] It was also foreseeable that one or more of the Controlling AIA Defendants would die or become insolvent in the future based on the continuously accelerating misconduct occurring at the AIA Corporations. Both occurred. Duclos died and John Taylor now appears insolvent unless GemCap is able to obtain a reversal of the dismissal of *GemCap v. Diversified II* and obtain a significant settlement or judgment, which appears unlikely since most cases are affirmed on appeal and because that was GemCap's third lawsuit against Diversified.

Exhibit - 1, p. 474

12-ER-2892

Letter[1670] and the February 25, 2008 Amended AIA Engagement Letter and some purported subsequent modifications to those agreements.[1671] As a preliminary matter and as explained above, both of these agreements, and any of the alleged modifications, were never properly approved or authorized and were, in fact, prohibited by AIA Services' Amended Articles of Incorporation (Section 4.2.9(g)), AIA Services' New Restated Bylaws (Section 4.14) and AIA Insurance's Bylaws (Section 4.14) because the Controlling AIA Defendants had conflicts of interests that prevented them from authorizing any of those agreement or any other agreements or conflict waivers with the Hawley Troxell Defendants. There was only one purported board meeting held for the AIA Corporations to address any representation agreement with the Hawley Troxell Defendants that purported to authorize any of the representation agreements or the limited conflict waivers sought by the Hawley Troxell Defendants, which was held by unelected and improperly acting directors and officers as discussed in Section XI(A). That meeting, which involved John Taylor, Beck and Henderson as the purported directors and was held on April 30, 2007, vaguely purportedly approved the May 2, 2007 Engagement Letter and related agreements without addressing or resolving John Taylor, Beck and Henderson's significant conflicts of interest involving their self-interests to protect their collective ownership interests in CropUSA (which involved many acts of misconduct and improper corporate action as discussed in this Report) and Henderson's self-interests in preventing a judgment to be entered against John Taylor which would impact the value of the undivided community property at issue in her pending divorce with John Taylor.

3.      No independent or reasonable third-party, or prudent attorney, would have approved the AIA Corporations to enter into the May 2, 2007 Engagement Letter, February 25, 2008 Amended AIA Engagement Letter, the related Standstill and Tolling Agreements and Joint Defense Agreements, the December 22, 2009 Engagement Letter or any other agreement or conflict waiver based on the misconduct and improper corporate governance discussed in this Report (including

---

[1670] HTEH000001-9.
[1671] HTEH000039-47.

Page - 466

Exhibit - 1, p. 475

12-ER-2893

Sections X-XII).[1672] Moreover, the AIA Disinterested Shareholders were never provided with disclosure of any of the above-referenced representation agreements and related agreements, nor did they approve any of them.[1673]

4.      The rational for the representation agreements provided by Riley is dubious and merely confirms the breaches of his duties of care. In his March 3, 2020 Deposition, Riley, in explaining his representation structure, stated that it can be analogized "to a three legged stool."[1674] Under his analysis, however, that stool collapses of its own weight. Riley's May 2, 2007 AIA Engagement Letter inexplicably states that "John, Bryan, JoLee and the two corporations have common interests in defending against Reed's allegations by, for example, seeking an adjudication that: (i) Reed has no standing (not being a shareholder) to bring what are essentially derivative claims against John for breach of his fiduciary duties as a director/officer of the two corporations."[1675] In my opinion, there is no sensible reason why it would have been in the interests of the AIA Corporations to resist those claims of wrongdoing which proximately caused substantial damages to them. In addition, the Letter acknowledged that "[t]here is a concurrent conflict of interest between John and the two corporations if these defendants successfully defend Reed's allegations on this point without the corporations having independently investigated the allegations [that John Taylor breached fiduciary duties to the AIA Corporations] and concluded that they have no merit."[1676] Yet, there was no mention of the concurrent conflict that existed between John Taylor and the AIA Corporations regarding that same conduct separate and apart from any issues involving Reed Taylor, which would have led any attorney properly discharging his duty of care to conclude that the AIA Corporations should each have independent

---

[1672] Nor would they have approved the outrageous compensation paid to John Taylor or the directors' fees and costs paid to Beck and Henderson. None of those individuals failed to discharge their duties of loyalty and good faith as required. Moreover, the $5,000 per quarter was separately outrageous based the failure to comply with corporate governance, the limited number of board and shareholder meetings actually held (*see* Exhibits B, E-F attached hereto), and the fact that AIA Services was in arears to its obligations to Donna Taylor, the Series C Preferred Stock held in the AIA Services' 401(k) Plan and its business prospects were, at best, bleak based on the improper conduct. The $5,000 per quarter and 5,000 shares of common stock to be awarded per quarter were simply more examples of self-dealing (Beck and Henderson have recognized their problems by testifying that they are not seeking payment for any unpaid fees or the unawarded common stock).

[1673] If properly provided with the facts of the misconduct described in this Report, no reasonable shareholder would have ever approved the agreements.

[1674] 3/03/2020 Richard Riley Depo. Transcript, pp. 397-400.

[1675] HTEH 00000-6.

[1676] HTEH 00000-6.

**Exhibit - 1, p. 476**

**12-ER-2894**

counsel and should not be disregarding John Taylor's misconduct or kicking the can down the road through tolling agreements reasonably foreseeing that the Controlling AIA Defendants would never investigate themselves or assert claims against themselves.

5.      There was only one issue that the AIA Corporations may have had a common interest with John Taylor. AIA Services should have had John Taylor, who was essentially their client anyway as discussed in this Report, assert the iron clad illegality defense against Reed Taylor's stock redemption as soon as *Reed Taylor v. AIA Services* was commenced to get the AIA Corporations out of the bad deal that John Taylor, Beck and Cashman had got them into back in 1995 (with the negligent assistance from Riley).[1677] The defense was ultimately successful, but no such investigation was ever conducted. Accordingly, under the terms of Riley's May 2, 2007 Engagement Letter itself, John Taylor and the AIA Corporations had numerous concurrent conflicts of interest as discussed in this Report, not, as the Letter asserted, any matter "common interest" other than the assertion of the illegality defense.[1678]

6.      Moreover, Riley's "stool" had John Taylor acknowledging "the independent duty of the corporations' boards to investigate the allegations self-dealing / breach of fiduciary duty of loyalty,"[1679] yet Riley himself undercut that part of his "structure" in testifying that "it seemed unlikely that they would sue themselves, but that doesn't mean that they weren't obligated to."[1680] The Representation Agreements (which according to Riley contained all of the information relative to informed consent fell far short of the requirements of the RPC's;[1681] for example, rather than providing "reasonably available alternatives," a requirement for obtaining Informed consent to a limited scope of representation under the definition of "Informed Consent" and RPC 1.2. In his Rule 30(b)(6) testimony, Riley, after unpersuasively attempting to explain away why various alternatives were not proposed to the AIA Corporation, stated: "Those were the terms under which we were willing to enter into the engagement. If they had not been agreed to, we would not have entertained the - - we would not have entered

---

[1677] *See* Section XII(U) of this Report.

[1678] As I state elsewhere in this Report, although incredible to believe, the AIA Corporations would have been better off settling with Reed Taylor and combining the CropUSA and AIA Corporations as offered because Reed Taylor included conditions that the companies be operated legally and properly.

[1679] *See* Section XII(U) of this Report.

[1680] 3/03/2020 Richard Riley Depo. Transcript, p 400.

[1681] 3/3/2020 Riley Depo. Transcript, pp. 647-48.

**Exhibit - 1, p. 477**

**12-ER-2895**

into the engagement."[1682] Simply stated, in my opinion, Riley's "three legged stool" was a form over substance charade which had the effect of protecting John Taylor and the other AIA Controlling Defendants; and to sweep under the rug the Hawley Troxell Defendants' breached duties of care in connection with issuing the incorrect Lancelot Legal Opinion. All such agreements, together any alleged modifications, were not duly approved or authorized by the AIA Corporations' board of directors or AIA Services' shareholders as required. As I will address below, for the same reasons, the Hawley Troxell Defendants violated RPC 1.13 because the Controlling AIA Defendants were not the highest authority of the AIA Corporations based on their conflicts of interest and documented malfeasance against the AIA Corporations, their failure to be properly elected or appointed, and their ownership in entities that received significant unauthorized funding from the AIA Corporations (including CropUSA and Pacific Empire Radio). This conduct also constitutes the Hawley Troxell Defendants' breaches of their duties of care, good faith and loyalty owed to the AIA Corporations, thereby being one of the proximate causes of the AIA Corporations' damages. For the same reasons, all of the agreements and purported waivers with the Hawley Troxell Defendants were ultra vires.

7.      Assuming that the Controlling AIA Defendants could have authorized the May 2, 2007 AIA Engagement Letter, the February 25, 2008 Amended AIA Engagement Letter or any other agreement or conflict waiver purportedly obtained by the Hawley Troxell Defendants (including any alleged modifications), those agreements also separately violate the Rules of Professional Conduct, as discussed in this Report, and should be voided because they were never duly authorized by the AIA Corporations' boards of directors or AIA Services' shareholders. Because the representation agreements were never duly approved or authorized by the AIA Corporations' boards of directors or shareholders for any of Hawley Troxell Defendants' representation agreement, any alleged modifications were also never duly approved or authorized nor were any alleged limited scopes of representation (whether allegedly limited by actual terms or through Riley's alleged "three legged stool"). *See* Sections X and X(A); Exhibits B, E-F attached hereto. None of these agreements complied with the RPC as discussed in this Report.

8.      There are other issues with the representation agreements which were breaches of the Hawley Troxell Defendants' duties of care, good faith and loyalty, as well as the Rules of Professional Conduct. First, the Hawley Troxell Defendants

---

[1682] 3/05/2020 Richard Riley Rule 30(b)(6) Depo. Transcript, p. 169. *See also* Section X(H) of this Report.

Exhibit - 1, p. 478

12-ER-2896

failed to disclose or obtain Informed Consent Confirmed in Writing from the AIA Corporations regarding the Hawley Troxell Defendants' prior representation of CropUSA for the Lancelot Loan wherein they provided a Legal Opinion for AIA Insurance's Guarantee of the Lancelot Loan when that guarantee was unauthorized because it violated Section 4.2.9(c) (the Guarantee Prohibition), Sections 4.2.9(h), (j) and (k) (the financial covenants) of AIA Services' Amended Articles of Incorporation[1683] and Sections 4.14 and 14.1 of AIA Insurance's Bylaws. Instead the Hawley Troxell Defendants placed their interests above those of the AIA Corporations because the Hawley Troxell Defendants had a vested interest in not challenging the validity or enforceability of AIA Insurance's Guarantee of the GemCap Loan because the successful challenge to that guarantee would have exposed Hawley Troxell to liability for the erroneous Legal Opinion for that $15 million line-of-credit.[1684] Indeed, Reed Taylor's Second Amended Complaint (which was filed before the Hawley Troxell Defendants were engaged by the AIA Corporations) alleged that the certain of the Controlling AIA Defendants had been "loaning money to a non-wholly owned subsidiaries (including guaranteeing the $15 Million revolving line-of-credit for CropUSA."[1685] Thus, the Hawley Troxell Defendants were fully aware that Reed Taylor was challenging improper corporate governance that included the Lancelot Loan. Consequently, the Hawley Troxell Defendants' violated RPC 1.7, among others, and breached their duties of loyalty and good faith owed to the AIA Corporations.

9. Second, assuming that the Hawley Troxell Defendants first represented CropUSA when they filed their notice of appearance on November 7, 2007, the Hawley Troxell Defendants separately violated RPC 1.7, among others stated in this Report, when they commenced representing CropUSA and failed to seek or obtain Informed Consent Confirmed in Writing from the AIA Corporations prior to the commencement of the representation. The Hawley Troxell Defendants attempted to obfuscate their failures by seeking to back date a purported conflict waiver that was later sought through the February 25, 2008 Amended AIA Engagement Letter, which stated that it was back dated "Effective" on November 1, 2007, but it was not signed until February 25, 2008—nearly four months after the Hawley Troxell Defendants appeared as counsel for CropUSA. Moreover, as discussed in this Report, the February 25, 2008 Amended AIA Engagement Letter was never properly approved or authorized by the boards of the AIA Corporations even

---

[1683] *See* Sections X(F)-(H) (discussions regarding the Lancelot Loan and the financial condition of the AIA Corporations).
[1684] Dkt. 1-10.
[1685] DLM – 0007848.

assuming they were properly elected and fully seated (including with the Series A Preferred Stock director).

10.    Third, the Hawley Troxell Defendants commenced preparing their representation agreements (as seen from the privilege log) for the AIA Corporations while they were still representing John Taylor in *Reed Taylor v. AIA Services* (they had been advising John Taylor shortly after the lawsuit had been filed through April 30, 2007)[1686] and yet they did not seek or obtain Informed Consent Confirmed in Writing by the AIA Corporations, another violation of RPC 1.7, among others. This, once again, confirms that John Taylor was the "actual" client of the Hawley Troxell Defendants in *Reed Taylor v. AIA Services*, as further confirmed by their course of conduct.

11.    Fourth, in a hairsplitting analysis of the Idaho Rules of Professional Conduct, each of their letters skirts the text and intent of RPC 1.7 and 1.9 by making such statements as "it is conceivable that conflicts of interest *could* arise between AIA and either John or CropUSA."[1687] The circular reasoning behind the entire representation structure was revealed in Riley's July 1, 2019 deposition testimony when he stated:

> As I said before, we avoided delving into the existence of any actual or apparent or possible conflicts by getting tolling agreements from every one of those people to preserve any potential claims that might arise.[1688]

---

[1686] Dkt. 449-82, p. 79. Although the Hawley Troxell Defendants never formally appeared as counsel for John Taylor, there is no dispute that they represented his interests, including formally through filing a motion to dismiss and motion for judgment on the pleadings (the former was even signed by Ashby as an attorney for John Taylor).

[1687] HTEH000011 (Emphasis supplied).

[1688] 7/1/2019 Riley Depo. Transcript, pp. 170-71. Another reason why the terms of the Standstill and Tolling Agreements were harmful to the AIA Corporations was that they could have allowed a party such as John Taylor to assert defenses of res judicata and collateral estoppel to claims against him based, for example, on the theories of alter ego and piercing the corporate veil, claims that were contemplated by Riley in his Memorandum to McNichols "Further, if Reed prevails on his allegations that Services has defaulted on the note, joint representation by a single lawyer increases exposure to 'piercing the veil' or 'alter ego' claims that John's limited liability as a shareholder should be ignored, even if Reed's breach of fiduciary duty / self-dealing claims are meritless." HTEH000286.

Exhibit - 1, p. 480

12-ER-2898

Proper Informed Consent was never sought or obtained for all of the potential and concurrent conflicts of interest in any of the representation agreements in *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services*, or alleged modifications thereto, applicable to the acts, omissions and facts creating concurrent conflicts of interest between the AIA Corporations, CropUSA, John Taylor and the other Controlling AIA Defendants as further described in this Report. This was never done for any or all of the potential and concurrent conflicts of interest described in this Report. *See* Exhibits B-C, and H attached hereto.

12. Riley's testimony confirms that he had no intention of ever seeking to obtain any Informed Consent Confirmed in Writing from the AIA Corporations to deal with the concurrent conflicts of interest that existed and the new ones that emerged subsequently (e.g., the Hawley Troxell Defendants were working on a stock option plan to issue additional shares in CropUSA when they should have been demanding return of the ownership to the AIA Corporation). In addition, John Taylor is referred to as a "former" client. John Taylor was, however, an active, not a "former," client of Hawley Troxell to which Rule 1.9 might have applied in other circumstances. As shown by the Unredacted Billing Records, the Hawley Troxell Defendants had been advising John Taylor with regard to matters in *Reed Taylor v. AIA Services* at least since the suit was commenced on January 29, 2007, and extended to provided legal services for his defense in *Donna Taylor v. Taylor* (a lawsuit in which the Hawley Troxell Defendants never formally appeared as counsel and AIA Services was not even a defendant of in 2008).[1689] John Taylor was a present client whose interests were materially adverse to those of the AIA Corporations and, contrary to the May 2, 2007 AIA Engagement Letter, it was a substantially related matter. The existing conflicts of interest between the AIA Corporations and John Taylor and others were literally obvious to the Hawley Troxell Defendants as they have since acknowledged. For example, Ashby's Letter, written on April 30, 2012, admitted that "Given the nature of Reed's claims against the individual defendants, conflicts of interest *existed* between AIA and the other defendants at the inception of [*Reed Taylor v. AIA Services*]."[1690] Likewise, on July 1 of 2019 Riley testified as follows:

---

[1689] This work is also consistent with the work of Hawley Troxell as general counsel for the AIA Corporations. In addition, when viewing the collective work performed by the Hawley Troxell Defendants, there is no doubt that there primary concern was John Taylor, whose interests they were most concerned in protecting.

[1690] HTEH000259 (Emphasis supplied).

**Exhibit - 1, p. 481**

**12-ER-2899**

12-ER-2900

[Mr. Bond] In your view, Connie Taylor Henderson and James Beck did not have conflicts of interest. Is that what you are telling me?
[Mr. Riley] They were not being sued at the time, so they were the best we could do under the circumstances.
[Mr. Bond] Did you make a determination whether James Beck and Connie Taylor Henderson had a conflict of interest or not?]
[Mr. Riley] No, we did not.
[Mr. Bond] So when you stated that in your view, they were independent directors, that the sole basis for that at the time was because they were not being sued yet, correct?
[Mr. Riley] I don't know if it's the sole basis or not. It was a basis.
[Mr. Riley] All of these documents were approved by the then-constituted boards of directors of AIA Services and AIA Insurance.
[Mr. Bond] Who were not independent directors, though, correct?

Exhibit - 1, p. 482

**12-ER-2900**

[Mr. Riley] In retrospect, that would appear to be the case.[1691]

13.     Fifth, because of the adverse interest exception, the Hawley Troxell Defendants never obtained the consent, informed or otherwise, of the AIA Corporations to the arrangements set forth in the May 2, 2007 AIA Engagement Letter and the February 25, 2008 Amended AIA Engagement Letter, nor did those corporations become actual parties thereto. In any event, the May 2, 2007 AIA Engagement Letter and the February 25, 2008 Amended AIA Engagement Letter themselves violated the strictures of RPC 1.7 regarding the representation of clients adverse to each other because the Hawley Troxell Defendants failed to obtain the Informed Consent Confirmed in Writing required by RPC 1.7 because CropUSA was in fact a client of the Hawley Troxell Defendants during all relevant times. In

---

[1691] 7/1/2019 Riley Depo. Transcript, pp. 170-71 (objections omitted). In his March 3, 2020 deposition, Riley attempted to extricate himself from his admission of Beck's, and Henderson's 's non-independence by coming up with a new theory: that they were "qualified directors" within the meaning of Section 4 of Idaho Code section 30-1-862 which states that a "qualified director means, with respect to a director's conflicting interest transaction, any director who does not have either: (a) A conflicting interest respecting the transaction; or (b) A familial, financial, professional or employment relationship with a second director who does have a conflicting interest respecting the transaction, which relationship would, in the circumstances, reasonably be expected to exert an influence on the first director's judgment when voting on the transaction (3/03/2020 Riley Depo. Transcript, pp. 394-99). Riley's last minute (he did not review Section 30-1-862 in 2007 [Riley Rule 30(b)(6) Depo. Transcript, p. 154]) reliance upon Section 30-1-862 and his newly minted position that Beck and Henderson were qualified directors within the meaning of that statute are based on the erroneous premise that the Hawley Troxell Defendants' scope of representation and fiduciary duties were limited to defending the AIA Corporations from Reed Taylor's so called "creditor claim." Riley continues to ignore the unavoidable conclusion that Reed Taylor's allegations of egregious misconduct on the part of the Controlling AIA Defendants cried out for the assertion of claims and the recovery of monetary damages against those individuals by or on behalf of the AIA Corporations; it is indisputable that the Controlling AIA Defendants had "conflicting interests " with respect to those matters. By no stretch of the imagination were Beck and Henderson "qualified directors". In his March 5, 2020 deposition as a Hawley Troxell Rule 30(b)(6) designee, Riley did not recall whether he reviewed AIA Services' Amended Articles of Incorporation or AIA Services' New Restated Bylaws in connection with the testimony changes he filed on August 30, 2019 (*Id.* at 30). John Taylor, Beck and Henderson were clearly conflicted within the meaning of those charter documents of AIA Services (as were the other Controlling AIA Defendants). Moreover, when Riley was asked if he had considered whether Beck and Henderson were statutorily "qualified" directors in connection with the February 25, 2008 Amended AIA Engagement Letter or the February 25, 2008 CropUSA Engagement Letter, he answered "I haven't considered that," "I'm not prepared to offer an opinion on it," and " I'm not going to answer your question" (*Id.* at 33-34). Riley also conceded that he did not even perform the conflicting director analysis until more recently, in breach of his duties of care. Accordingly, Riley's prior admission of non-independence still stands.

Exhibit - 1, p. 483

12-ER-2901

order to have obtained such Informed Consent (assuming it was possible to do so, which the conflicts were not waivable based on the serious documented malfeasance involving CropUSA lead me to conclude no conflicts of interest could be waived), RPC 1.0(e) requires that the lawyer "communicate adequate information and explanation about the material risks and reasonably available alternatives to the proposed course of conduct" to the client, information that the text of the May 2, 2007 AIA Engagement Letter and the February 25, 2008 Amended AIA Engagement Letter did not adequately provide. Finally, as provided in RPC 1.13(b), in the instant circumstances in order to comply with RPC 1.7 and 1.9, the Hawley Troxell Defendants would have had to obtain such Informed Consent and Confirmed in Writing from AIA Services' "highest authority," that could have acted on its behalf, namely the AIA Disinterested Shareholders. It never did. This was a violation of RPC 1.7 and 1.13. Another deficiency in the May 2, 2007 AIA Engagement Letter and the February 25, 2008 Amended AIA Engagement Letter was, in stating that Riley had represented the AIA Corporations in the stock redemption transaction, the Representation Agreements failed to disclose to the AIA Corporations that Riley authored a legal opinion letter addressed to Reed Taylor stating that the stock redemption transaction was valid under Idaho law. Had such disclosure been made at the outset, a prospective client would likely have concluded that it should not retain a defense counsel with a vested interest in not asserting that the transaction was legally infirm for one reason or another.[1692] As stated below in Section XII(U), a timely assertion of illegality would have saved the AIA Corporations over a million dollars in unnecessary defense costs paid to the Hawley Troxell Defendants and improperly advanced for other defendants. These same problems were fatal to the December 22, 2009 AIA Engagement Letter as well. No proper Informed Consent was obtained and authorized by any independent director of AIA Services or by its shareholders, nor were any conflicts of interest properly disclosed and addressed for any of the Engagement Letters.

14.	Sixth, there was a concurrent conflict of interest in that the shares of AIA Insurance, together with the right to vote the shares was pledged to Reed Taylor as security for the payment of his $6 Million Note. Reed Taylor had already voted the shares of AIA Insurance to take control prior to the time that the Hawley Troxell Defendants agreed to represent the AIA Corporation. Had Reed Taylor

---

[1692] It was not until April 16, 2009, after the illegality defense was raised in *Reed Taylor v. AIA Services* and a malpractice suit against Riley was imminent, that the Hawley Troxell Defendants finally disclosed to the AIA Corporations (and Crop USA) some of the conflicts of interest associated with the Legal Opinion authored by Riley.

Page - 475

taken control of AIA Insurance, he would have been entitled to obtain the privileged information held by the Hawley Troxell Defendants. While Reed Taylor's voting right was extinguished by the illegality defense over two years later, this issue was a concurrent conflict of interest for which the Hawley Troxell Defendants never sought Informed Consent in violation of RPC 1.7, among others discussed in this Report. AIA Insurance required independent counsel to protect its interests until its rightful owner was determined. Had this been done, the transactions and improper conduct involving AIA Insurance could have been prevented and led to the Hawley Troxell Defendants properly discharging their duties of care for AIA Services.

15.     Seventh, based on any one or more of the reasons stated in the preceding paragraphs, the May 2, 2007 AIA Engagement Letter, the February 25, 2008 Amended AIA Engagement Letter, and other agreements and purported conflict waivers should be voided and set side (including based on the relief under I.C. § 30-1-304), as should the December 22, 2009 AIA Engagement Letter for *Donna Taylor v. AIA Services*.[1693] Those agreements were never properly disclosed, approved or authorized by the AIA Corporations' boards of directors or shareholders and they received no benefit from them.

16.     Eighth, the consequence of the numerous conflicts of interest was readily apparent to the Hawley Troxell Defendants. Nearly every important litigation decision that the Hawley Troxell Defendants carried out for John Taylor had the effect of protecting the interests of John Taylor, the other Controlling AIA Defendants and the Hawley Troxell Defendants to the detriment of the AIA Corporations. Indeed, John Taylor has testified that he made the decisions *in Reed Taylor v. AIA Services*, which again highlighted the problem to the Hawley Troxell Defendants.[1694] In addition to those matters discussed elsewhere in this Report, a striking example of the Hawley Troxell Defendants' negligent mindset was their decision to seek dismissal of Reed Taylor's Second Amended Complaint on behalf of not only the AIA Corporations but also the Controlling AIA Defendants. Indeed, their Memorandum in support was submitted as "Attorneys for Defendants AIA Services Corporation, AIA insurance, Inc and R. John Taylor."[1695] The Second Amended Complaint they sought to have dismissed on John Taylor's behalf included such verified allegations as:

---

[1693] HTEH000196-209.
[1694] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, pp. 427-28.
[1695] DLM – 0008286.

John has used AIA Services and AIA as his personal source of funds and/or assets, including, without limitation, acts in which John has transferred assets to their name; taken advances that John never paid back; transferred assets and/ or to other entities partially owned or controlled by John; entered into transactions which constitute a violation of AIA Services' Articles of Incorporation; made transfers and/or entered into transactions which benefited John and/or any one or more of the other Defendants; and provided services for entities partially owned by John and/or any one or more of the other Defendants without such actions being arms-length transactions. The above acts occurred when John, Duclos, and Freeman were directors and/or officers of AIA Services and AIA Insurance. All of the above acts occurred during times in which AIA Services was not current with payments to Reed under the Promissory Note, in Default of other provisions, and insolvent.[1696]

17.     The Hawley Troxell Defendants also opposed Reed Taylor's deepening insolvency and conspiracy claims against the individual defendants and opposed naming Cashman as a defendant, without first obtaining any representation agreement from him or the AIA Corporations, nor did they obtain a tolling agreement from him.[1697] Indeed, the Hawley Troxell Defendants, who purported to only be counsel for the AIA Corporations at that time, stated in the conclusion of the Response that: "[Reed Taylor] should not be permitted to add Michael Cashman as a defendant to the Fifth Amended Complaint."[1698] The examples provided above or a few of the more glaring ones, although the Unredacted Billing Records and other filings further support the fact that the Hawley Troxell Defendants were actually representing the interests of the Controlling AIA Defendants thereby breaching their duties of care, good faith an loyalty owed to the AIA Corporations.

18.     Allegations such as these cried out for an investigation, evaluation and the pursuit of crossclaims by the Hawley Troxell Defendants for the aggrieved AIA Corporations, not a dismissal of such claims. The causes of action that could have been derived therefrom and asserted as crossclaims against the Controlling AIA Defendants, CropUSA and others were valuable assets of the AIA Corporations. When I state "valuable assets," I mean that it is my opinion (as I stated earlier in this Report when I opined that the pursuit of such crossclaims would have been

---

[1696] DLM – 0007851 ¶ 2.28.
[1697] DLM – 0009455-62.
[1698] DLM – 0009460.

successful) that crossclaims should have been asserted by the AIA Corporations in *Reed Taylor v. AIA Services* against the AIA Controlling Defendants and CropUSA based upon their flagrant misconduct and malfeasance, including but not limited to, intentional breaches of fiduciary duty, misappropriation of assets, and other claims applicable to the AIA Corporations as asserted by Reed Taylor in his Fifth Amended Complaint and certain of Miesen's claims asserted in his Third Amended Complaint in this Lawsuit would have been sustained, and substantial monetary damages recovered by the AIA Corporations from the Controlling AIA Defendants (including the damages requested by Miesen). Recent developments have reinforced my conclusion and confirmed that the failure of the Hawley Troxell Defendants to pursue those crossclaims has been one of the proximate causes of substantial financial harm to their clients, the AIA Corporations.

19.     The Hawley Troxell Defendants' breached duties of care, good faith and loyalty also led to future acts and harm which was entirely foreseeable to them and which could have been prevented by them years earlier. Indeed, to make matters worse, they more recently breached their duties of care, good faith and loyalty through their recent actions (instead, as still being counsel of record to the AIA Corporations in *Reed Taylor v AIA Services* and still owing their two clients undivided duties of loyalty, of joining Miesen to assert the GemCap Settlement Agreement was unauthorized and unenforceable which would have been in the best interests of the AIA Corporations). Specifically, on October 7, 2019, in *GemCap v. CropUSA*, GemCap filed a stipulation for the entry of a judgment against John Taylor for $12,126,534.61, plus accrued interest since September 15, 2014. GemCap asserts that the judgment should be entered because John Taylor has defaulted on the terms of the GemCap Settlement Agreement. Based on the fact that the requested judgment is $12,126,534.61, it appears, and thus I am assuming, that GemCap has not recovered sufficient funds to reduce the principal amount of the judgment since September 15, 2014. This further demonstrates that, as stated above, the Hawley Troxell Defendants breached their duties of care, good faith and loyalty by failing to have the AIA Corporations by timely and properly taking action and asserting claims in 2007 or thereafter to prevent the conduct as discussed in this Report. As also stated above, such claims against the Controlling AIA Defendants would have been successful and collectible a decade ago (when John Taylor had substantial assets and earnings including through his lucrative position as a director of Avista) and the judgments could have been executed upon and/or garnished to satisfy a judgment that would have been obtained from such crossclaims against John Taylor in *Reed Taylor v. AIA Services* or any litigation that would have been initiated by a receiver. Since it appears that John Taylor presently does not own any

Page - 478

significant assets (he maintains his present homes in his new wife's name, presumable to avoid creditors) and that he is facing a pending requirement to retire from the board of directors of Avista (a board that I am unable to understand why he has been permitted to continue serving on), a judgment against John Taylor in this lawsuit appears to be uncollectable, unless his "luck" changes. This also applies to JoLee Duclos as a result of her recent death. The Hawley Troxell Defendants' were also one of the proximate causes of the loss of a judgment against Duclos by failing to take timely action over a decade ago when a multi-million-dollar judgment would have been collectable against John Taylor and other sums collectable against JoLee Duclos because her estate had no assets.[1699] Moreover, these recent developments further demonstrate that the Hawley Troxell Defendants also breached their duties of care and fiduciary duties by not stipulating to, or supporting, the appointment of a receiver in *Donna Taylor v. AIA Services* to prevent the ongoing malfeasance, breached obligations and duties, and torts being committed against the AIA Corporations and which also would have resulted in the receiver instigating legal action against the Controlling AIA Defendants, CropUSA and others.

20.     In sum, the Hawley Troxell Defendants breached their duties of loyalty, good faith and care owed to the AIA Corporations by in effect representing the Controlling AIA Defendants in *Reed Taylor v. AIA Services, Donna Taylor v. AIA Services* and other transactional and litigation matters discussed in this Report thereby being one of the proximate causes to the AIA Corporations' damages (*see* Damage Item Numbers 1-40); the resulting future damages were entirely foreseeable by them based on the past conduct discussed in this Report, including as to matters involving GemCap.

21.     Finally, the Hawley Troxell Defendants improperly permitted AIA Services and AIA Insurance to pay one another's fees and those for CropUSA, John Taylor to pay some of the AIA Corporations' fees, and the AIA Corporations to pay John Taylor's fees for the 2007 representation of him, and to have CropUSA pay AIA Services' fees in *Donna Taylor v. AIA Services*, without seeking or obtaining Informed Consent from the AIA Corporations, John Taylor or CropUSA in violation of RPC 1.7 and RPC 1.8(f). None of the representation agreements from either *Reed Taylor v. AIA Services* or *Donna Taylor v. AIA Services* contained the

---

[1699] Dkt. 316-2, p. 3. Indeed, Duclos previously owned an interest in farm property in Washington, which could have been subsequently executed upon and was worth hundreds of thousands of dollars according to Jud Taylor.

Exhibit - 1, p. 488

12-ER-2906

required Informed Consent under RPC 1.7, RPC 1.7 cmt. 13 or RPC 1.8(f).[1700] These violations are particularly noteworthy because it demonstrates John Taylor's influence and control over the AIA Corporations and further confirms the efforts to protect the Controlling AIA Defendants and CropUSA's interests. Indeed, it appears that the only payment received by the Hawley Troxell Defendants for their purported work in *Donna Taylor v. AIA Services* was the form of a check from CropUSA—the entity that they had been successfully protecting rather than the interests of the AIA Corporations as discussed in this Report.[1701] Consequently, the Hawley Troxell Defendants' further breached their duties of loyalty, good faith and care owed to the AIA Corporations thereby being one of the proximate causes of their damages. To be clear, as to Miesen's disgorgement claim, the Hawley Troxell Defendants are sole proximate cause of those damages (*see* Damage Item Number 4), as discussed in more detail below.

## F.  Joint Defense Agreements.

1.      As with the Standstill and Tolling Agreements, the Hawley Troxell Defendants breached their duties of care, good faith an loyalty owed to the AIA Corporations by entering into the Joint Defense Agreements with the Controlling AIA Defendants and Freeman because they knew, and could foresee, that those individuals had no legitimate common interests with the disabled AIA Corporations and the agreements would improperly assist the Controlling AIA Defendants in maintaining their improper control over the AIA Corporations; and, even if certain common interests did exist, there should have been no common interest or joint defense agreements to shield any communications from shareholders seeking to vindicate the rights of the disabled AIA Corporations, thereby being one of the proximate causes of the AIA Corporations' damages (*see* Damage Item Numbers 1-40). Aside from improperly assisting the Controlling AIA Defendants in maintaining their death grip on the AIA Corporations, the foreseeable reason why the Joint Defense Agreements were improper is playing out in this Lawsuit when the Controlling AIA Defendants and the Hawley Troxell Defendants' themselves are refusing to produce communications based on those improper Joint Defense Agreements. The collective use of the Joint Defense Agreements and the Standstill and Tolling Agreements was to improperly protect from disclosure to shareholders the communications involving the wrongdoing and to ensure that no redress is sought for the wrongdoing in breach of the Hawley Troxell Defendants' duties of

---

[1700] HTEH000001-09; HTEH000039-47; HTEH000048-58; HTEH000196-209.
[1701] AIA_ 19INSP 0035028-29.

care, good faith and loyalty, as confirmed by the former continuing to be used to this day to protect communications involving the Controlling AIA Defendants and the Hawley Troxell Defendants improper conduct.

2.      The entry by Hawley Troxell Defendants into the Joint Defense Agreements was also contrary to their duties of loyalty and care owed to the AIA Corporations, including insofar as those duties relate to the breach of fiduciary duty and other non-contract enforcement aspects of *Reed Taylor v. AIA Services*. With regard to the fiduciary duty claims it was by no means, in the words of the Joint Defense Agreements "reasonable and necessary that the Parties Counsel work together in the defense and prosecution of the defense in the Action…"[1702] The AIA Corporations and the Controlling AIA Defendants should have been and were adverse with regard to those issues from the start. As the two criminal cases cited in those Joint Defense Agreements state, a joint defense privilege "does not apply to situations where there is no common interest to be promoted by a joint consultation, and the parties meet on a purely adversary basis," *United States v. McPartlin*, 595 F.2d 1321,1336 (7th Cir. 1979), but does apply "where actual or prospective co-defendants in a criminal case, and their attorneys, confer on matters of mutual interest concerning the case." *Hunydee v. United States*, 355 F.2d 183,184 (9th Cir. 1965).

3.      There was no reasonable basis for such cooperation with respect to the breach of fiduciary duty aspects of *Reed Taylor v. AIA Services* and the Hawley Troxell Defendants breached duties of loyalty owed to the AIA Corporations by entering into Joint Defense Agreements with the parties accused of the malfeasance, the Controlling AIA Defendants. Indeed, those breaches of fiduciary duties and other tort claims should have been the subject of cross claims against the Controlling AIA Defendants by the Hawley Troxell Defendants on behalf of the AIA Corporations.

4.      Moreover, it was a concurrent conflict of interest to enter into Joint Defense Agreements with the Controlling AIA Defendants as they were the wrongdoers. This was a violation of RPC 1.7, among others. For the reasons set forth above, the Joint Defense Agreements are contrary to the provisions of the Rules of Professional Conduct based on the facts and circumstances herein, void and ultra vires (the Joint Defense Agreements violated Section 4.2.9(g) of AIA Services' Amended Articles of Incorporation and Section 4.14 of AIA Services'

---

[1702] HTEH000033 ¶ 1.4; HTEH000088 ¶ 1.4.

Page - 481

New Restated Bylaws and AIA Insurance's Bylaws because the Controlling AIA Defendants all had conflicts of interest).[1703]

5.       In sum, it was clearly evident and foreseeable when the Hawley Troxell Defendants engineered and prepared the Joint Defense Agreements that communications with the Controlling AIA Defendants would be shielded from disclosure in subsequent litigation, e.g., this Lawsuit, for the purpose of pursuing claims against them and when counsel for the AIA Corporations should have been pursuing claims against the Controlling AIA Defendants rather than working with them. The Hawley Troxell Defendants breached their duties of care and loyalty owed to the AIA Corporations by engineering, preparing and entering into such agreements—attorneys representing a corporation do not work with insiders who have engaged in unlawful conduct—they pursue claims against such wrongdoers.

### G.  Fiduciary and *Garner* Privilege Exceptions.

1.       The focus of my opinions with respect to seeking and obtaining privilege appear to be partly moot based on the court's rulings. While my opinions for this issue is contained within this Section XII(G), they also apply to the disabled AIA Corporations and the Controlling AIA Defendants because they controlling the privileged and work product information held by the Hawley Troxell Defendants, except for any privileged or work product information that the Hawley Troxell Defendants voluntarily elect to produce for their defense. Miesen focuses his efforts to obtain all of the privileged information on certain fiduciary duty and related sections under the Idaho Rules of Evidence. Rather than discuss those opinions and the reasons therefore herein, I incorporate by reference herein my entire declaration dated January 6, 2020 and the exhibits attached thereto.[1704] I understand that Miesen will be revisiting these issues and/or appealing them. Thus, I am not withdrawing my opinions. As stated herein, my opinions also apply to the Controlling AIA Defendants and AIA Corporations.

### H.  Representation of Crop USA.

1.       As I have already stated in this Report, the Hawley Troxell Defendants breached their duties of care, good faith and loyalty owed to the AIA Corporations

---

[1703] As noted above, the Joint Defense Agreements were the first ones Riley had ever prepared. Riley 3/5/2020 Rule 30(b)(6) Depo. Transcript, p. 159-60.

[1704] *See* Dkts. 783-2, 783-3, 783-4, 783-5 and 783-6.

Exhibit - 1, p. 491

12-ER-2909

by representing CropUSA's interests in the lawsuits and other matters in 2007 and thereafter, and subsequently formally representing CropUSA in Reed *Taylor v. AIA Services*, thereby being one of the proximate causes of the AIA Corporations' damages (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto).

2.    The Hawley Troxell Defendants also breached their duties of care and loyalty owed to the AIA Corporations by undertaking, when it was named as a Defendant in *Reed Taylor v. AIA Services*, the representation of Crop USA, a party indisputably adverse to and in direct conflict with the Hawley Troxell Defendants' clients, the AIA Corporations, by reason of its knowingly receiving and utilizing cash, trade secrets, office space, personnel and other assets which had been wrongfully taken from the AIA Corporations. To attempt to justify the representation of Crop USA, the Hawley Troxell Defendants purported to designate themselves so called "local counsel" to Crop USA, working under Quarles & Brady to whom the Hawley Troxell Defendants repeatedly referred to in the representation agreements as "general counsel," a designation the Quarles & Brady attorneys have denied.[1705] RPC 1.7 draws no such distinction, nor does it even mention the term "local counsel," much less provide an exception therefor. In any event, the Quarles & Brady lawyers have testified that they never saw, much less prepared or approved, any of the representation agreements referring to them as "general counsel" of Crop USA.[1706] Nor, with one exception,[1707] did the Quarles & Brady attorneys sign a single court filing in *Reed Taylor v. AIA Services* along with the Hawley Troxell Defendants, even though a *pro hac vice* admitted attorney could have also signed the filing along with the licensed Idaho attorney,[1708] which would have been necessarily been required had the representation had been limited as the

---

[1705] Because Quarles & Brady also provided a negligently prepared Legal Opinion with Hawley Troxell for the Lancelot Loan, Quarles & Brady and the Hawley Troxell Defendants both apparently had a vested interest in trying to sweep under the carpet their negligence regarding AIA Insurance's Guarantee of the Lancelot Loan (which was unauthorized for numerous reasons stated in this Report). While I have not had an opportunity to review Patrick Moran's deposition transcript, I am advised that he testified to the effect that Jim Gatziolis, the Quarles & Brady attorney involved in the preparation of Quarles & Brady's incorrect Legal Opinion for the Lancelot Loan, "turned white like a ghost" when Moran pointed out that AIA Services' Amended Articles of Incorporation prohibited the loan (the Guarantee Prohibition).

[1706] It appears that Riley may have sent a copy of the representation agreement to James Gatziolis. HTEH000299.

[1707] Quarles & Brady attorney Charles Harper signed a notice of hearing and a motion seeking an extension of time, which was not permitted under the rules. DLM – 0012587-95.

[1708] Which is frequently done. *See, e.g.,* DLM – 106301 (the signature page of GemCap's Reply in Support of GemCap's Motion for Attorney Fees and Costs in *GemCap v. AIA Services*, which was signed by Alyson Foster as Idaho counsel and William Adams as *pro hac vice* counsel).

Hawley Troxell Defendants allege. The Hawley Troxell Defendants played the lead role in the defense of its clients' adversary (CropUSA), drafting court filings, signing pleadings (without the designation "local counsel") and making court appearances on Crop USA's behalf. Indeed, Hawley Troxell was the only signer on behalf of Crop USA of all of the discovery documents, motions and responses thereto (other than a single motion to enlarge time signed by Charles Harper). This is a far cry from acting only in a limited fashion as "local counsel'' and, because of the verified allegations and the documentary evidence and deposition testimony of the harm that Crop USA inflicted on the AIA Corporations (which was in the Hawley Troxell Defendants' possession), constitutes yet an another breach of the Hawley Troxell duties of due care and undivided loyalty owed to the AIA Corporations. Indeed, under then-existing I.R.C.P. 11, the Hawley Troxell Defendants were certifying with every signed pleading and paper that "to the best of the signer's knowledge, information, and belief after reasonable inquiry it is well grounded in fact…" Moreover, except for one $30,000 payment that appears to have been paid by CropUSA, they permitted the AIA Corporations to pay to Hawley Troxell its legal fees for its representation of CropUSA as reflected in the Unredacted Billing Records which, as stated above, was in direct conflict with the AIA Corporations and should have been treated as its adversary, and *vice versa*.

3.     Moreover, the Hawley Troxell Defendants had conflicts that prevented them from representing CropUSA and the AIA Corporations for the same reasons that Riley stated in his Memorandum to Attorney McNichols as to why he could not represent John Taylor and the AIA Corporations.[1709] The Hawley Troxell Defendants refused to take their own advice. Riley's memo also failed to recognize or address the "hot potato" doctrine, which prohibits an attorney from dropping one client to retain another in the same lawsuit which is precisely how Riley negligently recommended McNichols to proceed. In that same Memorandum, Riley actually noted how the boards "should also address the indemnification/expense advancement issues," which was another matter Riley and the Hawley Troxell Defendants negligently failed to address as discussed in this Report, and they could not expect McNichols to have addressed the issue since they advised McNichols that he "could not reasonably believe that he could provide competent and diligent

---

[1709] HTEH000283-87.

**Exhibit - 1, p. 493**

**12-ER-2911**

representation to both John and the [AIA Corporations], as would be required by Rule 1.7(b) for joint representation of all three defendants."[1710]

## I.   Failure to Investigate and Scope of Representation.

1.    The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty by failing to properly investigate (or closing their eyes to the misconduct) and by purporting to limit their scope of representation of the disabled AIA Corporations, thereby being one of the proximate causes of the damages to the AIA Corporations (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto). Even if the Hawley Troxell Defendants had purportedly limited their scope of representation as alleged, the limited scope, as alleged by them in *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services*, would have been unreasonable and impermissibly limited their scope of representation for all of the reasons stated in this Report, including based on the serious misconduct and conflicts of interest pertaining to the Controlling AIA Defendants and CropUSA, which were separately never addressed as discussed in this Report (*see also, e.g.,* Exhibits C-D attached hereto). Moreover, a review of the limited board and shareholder meeting resolutions and minutes confirms that there was no proper approval or authorization requested or obtained from the AIA Corporations to limit the Hawley Troxell Defendants' scope of representation. Indeed, the only purported board action that addressed any of the representation agreements or otherwise addressed any issues that could arguably apply to a limited scope of representation was the April 30, 2007 board meeting wherein the issues was not even discussed or addressed in the minutes. The board simply purportedly approved (improperly) the agreements to retain the Hawley Troxell Defendants.

2.    Moreover, in *Reed Taylor v. AIA Services*, the scope of representation was never limited. The vast nature and extent of the misconduct being committed by the Controlling AIA Defendants against the AIA Corporations was revealed to the Hawley Troxell Defendants during the various stages of the pendency of *Reed Taylor v. AIA Services*. Nevertheless, notwithstanding that the May 2, 2007 AIA Engagement Letter broadly stated that "The scope of our engagement for this matter is to *advise* the two corporate defendants in connection with above entitled

---

[1710] HTEH000287. The advice in this Memorandum is also consistent with general counsel advice. Why would Riley be asked to provide McNichols, who was a competent attorney, with advice regarding how he should proceed representing the AIA Corporations? The reason is because, as John Taylor testified voluntarily in 2016, Hawley Troxell had been the long-term general counsel for the AIA Corporations.

litigation brought by Reed J. Taylor."[1711] There was not a single term in that Engagement Letter stating that the scope of representation would be purportedly limited in any way. As stated above in Section XII(A) of this Report, they appear to have made no effort to investigate or otherwise determine the accuracy of the verified (or easily verifiable) allegations of misconduct and misfeasance against the AIA Corporations by the Controlling AIA Defendants. This failure allowed such conduct to continue unabated. By letter dated April 6, 2009, they referred to "the limited scope of our representation of the AIA entities as defense counsel," but without endeavoring to obtain the consent of the AIA Corporations with respect thereto. Indeed, no board approval was sought or obtained. *See also* Section XI(A). In any event, any purported limitation on the duty of the Hawley Troxell Defendants to conduct such an investigation on behalf of the AIA Corporations would have constituted an unreasonable scope of representation in violation of Rule 1.2(c), which states:

> A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances *and* the client gives informed consent (Emphasis supplied).

3. Neither of those requirements were met—the Hawley Troxell Defendants did not obtain Informed Consent nor would any such limited scope of representation have been reasonable under the facts and circumstances in *Reed Taylor v. AIA Services* or *Donna Taylor v. AIA Services*, including for the reasons described in this Report. In any event, by reason of the adverse interest exception and the complete mockery of the corporate governance at the AIA Corporations, the Hawley Troxell Defendants would have failed to obtain their clients' Informed Consent to any limited scope of representation or indeed to even represent them at all, assuming *arguendo* that it would have been permitted by RPC 1.2 and RPC 1.7, among others, because their communications never involved any duly elected, authorized or unconflicted officers or directors who had any authority to consider or approve a limited scope of representation. The boards of the AIA Corporations failed to even purport to authorize a specific officer to have the delegated authority to approve retention agreements or to make any litigation decisions. *See* Section XI(A).

---

[1711] HTEH000007 ¶ A (Emphasis supplied); HTEH000045 ("We refer you to the other terms of engagement set forth in our May 1, 2007 letter, which continue to apply to [] our representation in defense of the Action…").

**Exhibit - 1, p. 495**

**12-ER-2913**

4.      As discussed above, the December 22, 2009 AIA Engagement Letter for *Donna Taylor v. AIA Services* was also never properly approved or authorized by any officers or directors of AIA Services. That letter, unlike the two Engagement Letter for *Reed Taylor v. AIA Services*, was telling in that it showed the Hawley Troxell Defendants were able to include the terms ""LIMITED SCOPE OF ENGAGEMENT FOR THIS MATTER" under the "ENGAGEMENT" portion of the letter.[1712] This letter proves that there was no limited scope of representation in the May 2, 2007 AIA Engagement Letter or the February 22, 2008 Amended AIA Engagement Letter because those two agreements contained no such terms. The December 22, 2009 Engagement Letter also recognized the obvious: "We believe it prudent for [AIA] Services to identify new counsel for the purpose of defending the Donna Lawsuit, to be ready if Hawley Troxell must withdraw in the future."[1713] They also showed their general counsel duties by stating "we also believe that we are morally and ethically obligated by our duty of loyalty to our existing client[1714] to make sure that Services is not defaulted by Donna in this newest receiver case."[1715] The Hawley Troxell Defendants also confirmed their blinded and disjointed view that Reed Taylor was behind Donna Taylor's receiver action and that Reed Taylor was the enemy—they were so focused on beating Reed Taylor, Donna Taylor and their counsel that they negligently forgot whom they represented and the best interests of their client AIA Services. Indeed, the Hawley Troxell Defendants recognized their untenable position and that they were in over the head, once again, when the letter also asserted "[d]epending on the outcome of these motions [motions to dismiss and the concern over one to disqualify them] and the circumstances existing at those times, Hawley Troxell will need to re-evaluate our continued representation of [AIA] Services."[1716] What is clear, however, is that any

---

[1712] HTEH00020l. Riley negligently prepared this letter as well. 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, p. 232. The Hawley Troxell Defendants breached their duties of care, good faith and loyalty by not removing Riley from all AIA related cases and work. He was simply a "loose cannon." Based on my law firm management experience, it is my opinion that a law firm exercising ordinary care would have immediately conducted such an investigation in order to ascertain whether a lateral partner such as Riley was what is colloquially referred to as a "loose cannon." Upon the conclusion of such an investigation, a law firm exercising ordinary care ordinarily appoints another partner to supervise, or act as "keeper" for, the partner about whom there is concern. As a direct result of the Hawley Troxell Defendants' failure to take such steps, Riley and John Taylor (*see* Section XII(B)) continued to be a lethal combination for the AIA Corporations.

[1713] HTEH00020l.

[1714] It is possible that the Hawley Troxell Defendants were referring to their existing client as being John Taylor, particularly based on the course of action that they undertook.

[1715] HTEH00020l.

[1716] HTEH000202.

Exhibit - 1, p. 496

12-ER-2914

scope of representation that purports undertake a course of action representing a corporation, here AIA Services, that involved opposing injunctive relief requiring fundamental corporate governance that ensured complying with AIA Services' Amended Articles of Incorporation, complying with the AIA Corporations' bylaws, requiring annual shareholder meetings, preventing improper transactions and loan guarantees and to otherwise ensure that the AIA Corporations were properly and lawfully operated[1717] was, and will always be, an unreasonable limited scope of representation.

5.      Moreover, based on the serial history of misconduct and improper corporate governance (or total lack thereof), taking action to oppose the appointment of a receiver[1718] for the Hawley Troxell Defendants' disabled client, AIA Services and its subsidiary AIA Insurance, was also an unreasonable scope of representation under the facts and circumstances discussed in this Report. The only proper scope of representation was to support the appointment of a receiver and requiring compliance with the AIA Corporations' articles of incorporation and bylaws and to prevent the improper transactions, guarantees and corporate actions that had been plaguing the AIA Corporations for years. The next best alternative would have been to allow Donna Taylor to have taken a default against AIA Services, which, ironically, the Hawley Troxell Defendants took action to prevent. Based on the conduct described in this Section XII(I), the Hawley Troxell Defendants also breached their duties of care, good faith and loyalty, thereby being one of the cause of damages to the AIA Corporations (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto; *see also* Exhibits B-H attached hereto).

---

[1717] When asked at Riley's Rule 30(b)(6) deposition whether he was aware of any reasons to oppose the injunctive relief requested, Riley testified: "I'm not presently aware of any other reasons." 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, p. 234. There were no viable reasons to oppose the injunctive relief requested by Donna Taylor. Even assuming Moran actually had a conflict of interest (as falsely alleged by Hawley Troxell), he would have still brought badly needed independence to an non-functioning and improperly seated board.

[1718] When asked at Riley's Rule 30(b)(6) deposition whether Hawley Troxell conveyed to the persons improperly operating AIA Services the benefits of having a receiver appointed, Riley testified: "I did not. And I don't know whether anybody else would have." 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, p. 235. The benefit was obvious to AIA Services and the AIA Disinterested Shareholders—to get the Controlling AIA Defendants removed from control and stop their improper and unauthorized conduct described in this Report. The only determinant of appointing a receiver would be to the Controlling AIA Defendants.

Exhibit - 1, p. 497

12-ER-2915

**J.   Purchase by AIA Insurance of Series C Shares from Crop USA.**

1.      The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty by failing to either require the Controlling AIA Defendants to repay the $1,510,693 or take legal action against them for the benefit of the disabled AIA Corporations (or have an receiver appointed or Moran appointed to the board to do the work for them), thereby being one of the proximate causes of the damages to the AIA Corporations (see Damage Item Number 3 in Exhibit A attached hereto).

2.      As stated elsewhere in this Report, the 2004 Series C Preferred Share transaction was a textbook example of the Controlling AIA Defendants' self-dealing and absconding with money that did not belong to them, which were clear breaches of their duties of good faith and loyalty owed to the AIA Corporations.[1719] Hawley Troxell appeared to recognize this when, in an October 27, 2008 Memorandum to the AIA Corporations' Boards, Babbitt referred to the "Status of unwinding $1,510,693 cash purchase of AIA Series C Stock by AIA Insurance from Crop USA." This memo also proves that the issue was being addressed by the Hawley Troxell Defendants because there would be no other reason to discuss the status of "unwinding" the improper purchase, but they breached their duties of care by ensuring that the transaction was not unwound.

3.      Moreover, the records for this transaction, discussed in more detail in Section X(F), were readily available and, in fact, produced by the Hawley Troxell Defendants to Reed Taylor in *Reed Taylor v. AIA Services*. Those records showed the "secret" bank account improperly opened with the names of AIA Insurance and CropUSA without any board or shareholder approval (and without notice to AIA Services' shareholders). As discussed in Section X(F), Duclos admitted that the purported board resolution by AIA Insurance was not even prepared or signed until the following year in 2005, which confirms the transaction was never contemporaneously approved and authorized as required. Moreover, the Hawley Troxell Defendants breached their duties of care by not readily concluding that the board resolution was not proper or effective because of the series conflicts of

---

[1719] I am using the term "Controlling AIA Defendants" in the manner defined in Section IX(B). Henderson's involvement at the time of the transaction would have been through her majority ownership with John Taylor in AIA Services' common shares and the fact that statements were being delivered to their home in Lewiston, Idaho from AmericanWest Bank showing the improper bank account and deposit. However, Henderson had full knowledge of this transaction when she commenced serving as a director in 2007.

interest of the Controlling AIA Defendants.[1720] The Hawley Troxell Defendants had more than an obligation to discuss "unwinding" that transaction—they needed to insist upon unwinding it and all of the other improper transactions discussed in this Report. Accordingly, the Hawley Troxell Defendants' breached their duties of care, good faith and loyalty, thereby being one of proximate causes of those damages to the AIA Corporations.

### K.   Failure to Redeem the Series C Shares in the AIA Services' 401(k) Plan.

1.      The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty owed to the disabled AIA Corporations by failing to ensure that the Series C Preferred Shares were properly redeemed, and the accumulated dividends paid, not later than January 1, 2009 thereby being one of the proximate causes of the accumulated and unpaid dividends that have accumulated since that time (*see* Damage Item Number 5 in Exhibit A attached hereto).

2.      An additional fallout from the Hawley Troxell Defendants, including as general counsel, was the failure of AIA Services to redeem the Series C Shares. Had the Hawley Troxell Defendants properly discharged their duties of care, good faith and loyalty and insisted on, or taken action to ensure, on the part of the AIA Corporations and the Controlling AIA Defendants, the 92,500 Series C Preferred Shares held by the 401(k) Plan could and should have been redeemed on or before January 1, 2009 and thus there would not have been any unpaid cumulative dividends on those shares. Instead, the Hawley Troxell Defendants breached their duty of care and loyalty owed to the AIA Corporations by allowing this misconduct on the part of John Taylor and the other Controlling AIA Defendants thereby being one of the proximate of the damages to the AIA Corporations. Indeed, the numerous innocent participants in the AIA Services' 401(k) Plan deserved to have those shares redeemed and the accumulated dividends paid; instead, the Hawley Troxell Defendants were so focused on litigating against Reed Taylor and Donna Taylor that they forgot that it was in the best interests of their client, AIA Services, to redeem the shares and pay the dividends, which would have prevented the accumulated dividends since that time. Moreover, since the AIA Services' 401(k) Plan involved ERISA matters and there was already evidence that the AIA

---

[1720] Indeed, the purported board resolution for AIA Insurance and the one for CropUSA were signed by the same three individuals, namely, John Taylor, Freeman and Duclos. Those facts, along with the fact that all three individuals were shareholders of CropUSA and officers for both CropUSA and the AIA Corporations established the obvious conflict without having to, as Riley put it, "delve" into the details of the other misconduct.

Services' 401(k) Plan was being mismanaged by John Taylor, the Hawley Troxell Defendants should have separately insisted that the matter be taken to AIA Services' shareholders. Instead, the Hawley Troxell Defendants' again "buried their heads in the sand" and focused solely on representing the interests of the AIA Corporations.

### L.   Additional Tainted Litigation Decisions and Disgorgement.

1.      There are additional reasons that the Hawley Troxell Defendants' breached their duties of care, good faith and loyalty owed to the disabled AIA Corporations, thereby being one of the proximate causes of the damages to the AIA Corporations (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto). However, as to Miesen's request for the Hawley Troxell Defendants to disgorge the $1,007,786.72 fees and costs paid to them, plus interest, they are the only proximate cause under that theory (*see* Damage Item Number 4 in Exhibit A attached hereto).

2.      In addition to attempting to have the allegations of insider misconduct against their own clients dismissed, as discussed this Report, there were a number of other litigation decisions where the Hawley Troxell Defendants failed to protect and represent the interests of the AIA Corporations over the course of the representation in *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services*. Examples include, without limitation:

(a) their opposing the addition of Cashman as a defendant in *Reed Taylor v. AIA Services*[1721] even though verified allegations stated that he, *inter alia*, was an active participant in and beneficiary of a number of the illegal transactions which seriously harmed the AIA Corporations.[1722] As a controlling shareholder of AIA Services, Cashman owes fiduciary duties to AIA Services and its shareholders, as does John Taylor in that capacity, among others. Instead of resisting the naming of Cashman, a lawyer representing the interests of the AIA Corporations would have welcomed the

---

[1721] DLM - 0009459-460. Needless to say, the Controlling AIA Defendants adopted the arguments advanced by the Hawley Troxell Defendants. DLM 0009482.This is another example of the Hawley Troxell Defendants and the Controlling AIA Defendants acting in lockstep. As discussed in Section XII(H) of this Report, there was information available to the Hawley Troxell Defendants which they should have presented to Judge Brudie in opposition to any effort by Cashman to resist being added as a defendant.

[1722] John Taylor, the purported president of AIA Services joined in "AIA Services'" opposition on his own behalf and specifically adopted the Hawley Troxell submission.

Exhibit - 1, p. 500

12-ER-2918

addition of another person from whom those corporations could have obtained legal redress. Moreover, the Hawley Troxell Defendants did not even see to it that Cashman signed a tolling agreement; indeed, he was never asked to do so.[1723]

(b) their counseling AIA Services to oppose the appointment of a receiver for AIA Services which Donna Taylor sought in *Donna Taylor v. AIA Services;* had a receiver been appointed, the Controlling AIA Defendants' many acts of misconduct against the AIA Corporations would never have occurred or would have been redressed (including the GemCap Loan and the GemCap Settlement Agreement); the Hawley Troxell Defendants should have welcomed the appointment of a receiver; indeed, had the Hawley Troxell Defendants not aided and abetted John Taylor and the other defendants in *Reed Taylor v. AIA Services*, and had they properly discharged their duties of care and duties of loyalty owed to the AIA Corporations in *Reed Taylor v. AIA Services* (including by completing the "unwinding" of the transaction as stated in Babbitt's Memorandum, which was a concession the transaction was improper) and acted in AIA Services' best interests by joining Donna Taylor in having a receiver appointed for AIA Services in *Donna Taylor v. AIA Services* (or the appointment of her board designee),[1724] the funds and assets taken or utilized could have been prevented and/or recovered as well as all other damages which were proximately caused from that conduct (which are extensive);

(c) the conduct of the Hawley Troxell Defendants in connection with the Petition they themselves filed on behalf of AIA Services for a Court Appointed Inquiry as to the propriety of the instant derivative action pursuant to Idaho Code section 30-1-744(6) and a stay of the instant derivative action; they later abandoned the Petition without explanation; it appears that the Petition was at best halfhearted, as is evidenced by the fact that the two Panel nominees of Hawley Troxell were a judge for whom Henderson clerked in 1991-1993 (Judge Reinhardt[1725] and another judge who quickly acknowledged that he would probably recuse himself based upon the

---

[1723] 6/29/2020 Cashman Dep. Transcript, p. 177.

[1724] Instead, as soon as Ashby had been told by Riley of the receiver action, and as he was initially reviewing Donna Taylor's complaint, he began to "analyze defenses to the new D. Taylor lawsuit." FB 0811. Riley went even further and started considering "counterclaims against D. Taylor…" *Id*. Riley was blinded.

[1725] 9/10/2020 Connie Henderson Depo. Transcript, p. 24.

Exhibit - 1, p. 501

12-ER-2919

appearance of a conflict of interest.[1726] If the Petition had not been abandoned, an independent Panel would have found that, as the applicable statute prescribes, "the maintenance of the of the derivative proceeding…" is in the best interests of the AIA Corporations based on the facts and circumstances;

(d) their counsel obtaining a stay of this Lawsuit which was brought *on behalf of and for the benefit of* the AIA Corporations and the AIA Disinterested Shareholders. Owing to the resistance of the Hawley Troxell Defendants, the stay lasted for over four years from June 29, 2011 until Attorney Bond succeeded in having the stay order reversed by the United States Court of Appeals for the Ninth Circuit on December 30, 2015 and this action on behalf of the AIA Corporations was finally allowed to proceed. By halting the prosecution of this Lawsuit for four years, the Hawley Troxell Defendants further enabled John Taylor and the other Controlling AIA Defendants to continue to breach their duties to the AIA Corporations thereby proximately causing damages to them;

(e) their incessant objections and sweeping resistance to Miesen's attempts on behalf of the AIA Corporations to obtain discovery documents in the instant action (on the grounds of "attorney client privilege" instead of availing themselves of the safeguard in Rule 1.6 (b)(5) which permits a lawyer to reveal attorney client information without the client's consent in order: "to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding

---

[1726] I am advised by Roderick Bond that Judge Schilling had a close relationship with Mike McNichols. Judge Schilling had previously clerked for Mike McNichols' father, the Hon. Ray McNichols, a former U.S. District Court Judge, and that he kept a picture of Judge McNichols in his office.

concerning the lawyer's representation of a client)[1727] suggests that the voluminous documents being withheld do not exonerate them;[1728] and

(f) finally, and inexplicably, after the Idaho Supreme Court's decision in *Reed Taylor* v *AIA Services* determining that the redemption of by AIA Services of Reed Taylor's shares of Common Stock was illegal, the Hawley Troxell Defendants made a motion in the District Court purportedly, but inexplicably,[1729] "on behalf" of the AIA Corporations, for Judgment on the Pleadings dismissing " all remaining causes of action in Reed Taylor's Complaint," that is, not only the claims against their own clients, but also those against the Controlling AIA Defendants who were alleged to have injured the Hawley Troxell clients; the causes of action Hawley Troxell sought to have dismissed were those alleging: (i) fraudulent transfers of the AIA Corporations' assets, (ii) alter ego claims seeking to hold the Controlling

---

[1727] Judge Dale in this Lawsuit has ordered that "pursuant to IRPC Rule 1.6(b)(5) and IRPC 1.6(b)(6) the Hawley Troxell Defendants may produce documents and reveal information relating to their prior representation of their former clients to the extent the Hawley Troxell Defendants reasonably believe necessary (i) to establish a defense to plaintiff Miesen's derivative civil claims against the Hawley Troxell defendants based upon conduct in which the former clients were involved and (ii) to respond to plaintiff Miesen's allegations in this derivative action concerning the Hawley Troxell Defendants 'representation of their former clients, and (iii) to comply with this order." There is little question that the purpose is to "kick the can down the road" and avoid detection of misconduct as long as possible

[1728] Moreover, some of the information that has been disclosed is actually adverse to the Hawley Troxell Defendants and, based upon the facts that I am aware of, do not support either their positions or the opinions of their experts; in any event, Rule 502(d)(3) of the Idaho Rules of Evidence specifically provides that "There is no privilege under this rule:…Breach of duty by a lawyer or client. As to a communication relevant to an issue of breach of duty by the lawyer to the lawyer's client or by the client to the client's lawyer."

[1729] The ink on the Idaho Supreme Court's affirmance of Judge Brudie's illegality decision was hardly dry when Ashby began work on having the remaining claims against the Controlling AIA Defendants dismissed. FB 0816. The Hawley Troxell Defendants' Memorandum In Support Of Motion For Judgment On the Pleadings stated: [T]he complaint asserts that certain Defendants 'are personally liable for all relevant breached fiduciary duties, deepening insolvency, wrongful acts, improper acts, omissions, overreaching transactions, fraud, civil conspiracy, faithless fiduciary activities, loans, advances, improper loan guarantees and/or fraudulent conveyances which occurred during their tenure as a member of the board of directors of AIA Service [sic], Crop USA and/or AIA Insurance.' Complaint 9.2. Given that all substantive causes of action have been or should be dismissed, the director liability case of action should be dismissed as well." DLM 0019115. It is impossible to imagine how the Hawley Troxell Defendants could have been so intentionally and cavalierly oblivious to the harm to their clients which had been caused by the misconduct of the Controlling AIA Defendants.

AIA Defendants personally liable,(iii) director liability, (iv) breach of fiduciary duties and (iv) civil conspiracy. Instead of having those claims dismissed, a reasonably prudent lawyer would have wanted them investigated and preserved. Thus, the Hawley Troxell Defendants breached their duties of care and loyalty thereby proximately causing damages to the AIA Corporations.

3.     In both the *Reed Taylor v AIA Services* and *Donna Taylor v. AIA Services*, Hawley Troxell violated the Rules of Professional Conduct (as discussed in this Report) and breached their duties of loyalty owed to the AIA Corporation (as discussed in this Report) and was proximate cause of, and should return, the fee and costs payments of $1,007,786.72 paid to it by the AIA Corporations for all matters during that period of time, assuming this was the total amount paid, which includes small amounts paid to other matters during that period of time (*see* Damage Item Number 4 in Exhibit A attached hereto).[1730] In addition to the reasons specifically stated in this Section XI(A), additional reasons and factual details supporting the Hawley Troxell Defendants paying back the fees and costs paid to them by the AIA Corporations has been painstakingly detailed in Sections X-XII and further demonstrated by Exhibits A-G attached hereto.

4.     In my opinion, applying the *Parkinson* criteria set forth earlier in this Report to the Hawley Troxell Defendants' numerous acts of conscious disloyalty to the AIA Corporations[1731], the disgorgement should be ordered of all of the fees and costs paid by the AIA Corporations, or on their behalf, to Hawley Troxell. The Hawley Troxell Defendants' conscious disloyalty is evidenced by, *inter alia,* the Hawley Troxell Defendants' failure to: (i) address and obtain required consents to the conflicts of interest which they themselves admit existed since the inception of *Reed Taylor v. AIA Service* and which conflict waivers were in any event unobtainable under the circumstances as addressed in this Report; that failure resulted in the Hawley Troxell Defendants in effect representing John Taylor, Beck, Cashman, Henderson and CropUSA—parties entirely adverse to the interests of the

---

[1730] Another example of the manner in which Hawley Troxell Defendants exhibited deference to John Taylor rather than the AIA Corporations was the inclusion in their January 20, 2009 settlement proposal in *Reed Taylor* v *AIA Services* of special treatment for Connie Henderson in the form of a purchase of her community interest in AIA Services Common Stock for $400,0000, a benefit they did not propose for any of the AIA Disinterested Shareholders.

[1731] Another prime example of such "conscious disloyalty" is the Hawley Troxell Defendants' essentially "take it or leave it" mistreatment of the AIA Corporations in connection with their insistence that they sign Representation Agreements that were contrary to their interests. *See, e.g.,* Sections XII(E)-(U) of this Report. There are other examples throughout Sections X-XII.

Page - 495

AIA Corporations; (ii) their failure to have AIA Services honor the designation by Donna Taylor as Series A Shareholder of a Director who would have prevented much of the misconduct of the Controlling AIA Defendants; and (iii) their failure to have the AIA Corporations assert the above described cross claims against the AIA Controlling Defendants and CropUSA; as also stated above, those cross claims would at that time have resulted in collectable judgments against the AIA Controlling Defendants in significant amounts. The Hawley Troxell Defendants' conscious disloyalty to their clients is further demonstrated by the series of litigation decisions they made in *Reed Taylor v. AIA Services* which, as also discussed above in this Report, were entirely adverse to the AIA Corporations. These litigation decisions include, but are not limited to: (i) the Hawley Troxell Defendants' opposition to the appointment of a receiver who would have prevented further misconduct and malfeasance and would have pursued viable claims against the Controlling AIA Defendants, CropUSA, the Hawley Troxell Defendants and other non-parties as discussed in this Report; (ii) the Hawley Troxell Defendants' failure to challenge AIA Insurance's Guarantee of the Lancelot Loan because such a challenge would have exposed their negligently prepared and erroneous legal opinion on the enforceability of AIA Insurance's Guarantee of the Lancelot Loan; (iii) the Hawley Troxell Defendants' resisting the addition of Cashman as a defendant in *Reed Taylor v. AIA Services* and then failing to have him sign a tolling agreement after he was requested to be made a defendant in that action; (iv) after the Idaho Supreme Court's illegality decision in *Reed Taylor v. AIA Services*, the Hawley Troxell Defendants having *all* the remaining causes of action against the AIA Controlling Defendants and CropUSA *dismissed*, instead of having the AIA Corporations pursue those meritorious and valuable claims as cross claims (which would have been successful); and (v) the Hawley Troxell Defendants generally proceeded contrary to the best interests of the AIA Corporations in *Reed Taylor v. AIA Services*, *Donna Taylor v. AIA Services* and this Lawsuit (including obtaining a stay, opposing lifting the stay and asserting that the unlawful GemCap Settlement Agreement should be enforced). With reference to the other *Parkinson* criteria, under the instant circumstances, disgorgement is clearly proportionate to the seriousness of the Hawley Troxell Defendants' offenses. Moreover, under the circumstances the existence of other remedies against them does not militate against the granting of disgorgement of all of the fees and costs paid to Hawley Troxell by the AIA Corporations or on their behalf, as evidenced by their acts and omissions discussed in this Report.

5.     In addition to the above and in light of my review of the Unredacted Billing Records, my opinion that the disgorgement of all fees and costs paid the

Hawley Troxell Defendants is even more warranted and appropriate based on their knowing violations of duties and conscious disloyalty to the AIA Corporations, including for the reasons stated in Section XII(A) above and elsewhere in this Report.

6.      On November 23, 2009, Donna Taylor filed a Verified Complaint/Petition seeking to obtain the appointment of a receiver and for injunctive relief requiring the AIA Corporations to comply with their articles of incorporation (including appointing her designee to the board of AIA Services) and bylaws, and to enjoin any further improper loans, guarantees or other transactions.[1732] Having carefully reviewed the only decisions by the alleged boards of directors of the AIA Corporations as reflected in the limited written resolutions and meeting minutes,[1733] there are no resolutions or meeting minutes and thus no alleged board decisions regarding *Donna Taylor v. AIA Services*.[1734] I am of the opinion that the Hawley Troxell Defendants breached their duties of care, good faith and loyalty owed to the AIA Corporations by failing to represent the interests of the AIA Corporations in *Donna Taylor v. AIA Services*, including by taking directions from any of the Controlling AIA Defendants, thereby being one of proximate causes the forty Damage Items in Exhibit A attached hereto. In fact, there was not a single board meeting or resolution that discussed Beck, Henderson, Duclos and John Taylor's conflicts of interest, including in being approved or authorized to make any litigation decisions regarding *Donna Taylor v. AIA Services*,[1735] let alone to retain or approve retaining the Hawley Troxell Defendants as counsel for the AIA Corporations as reflected in the December 22, 2009 AIA Engagement Letter, which was an agreement that was separately improper and a breach of the duties of care by waiting to allegedly address certain conflicts of interest[1736] well after the representation had begun and failing to address the many other conflicts addressed in this Report (*see also* Exhibits C-D and H attached

---

[1732] DLM – 0033863-78.

[1733] *See* Exhibit A attached hereto.

[1734] On April 14, 2010, the only alleged board meeting minutes, which reflected the only alleged board decisions since Donna Taylor's filed Petition/Complaint, did not address a single matter relating to *Donna Taylor v. AIA Services*. Notably, this meeting occurred after Judge Kerrick had entered an order staying the lawsuit and denying Donna Taylor's request for injunctive relief at the request of the Hawley Troxell Defendants, which were separate breaches of their duties of care and duties of loyalty owed to the AIA Corporations. DLM – 0034444-58. Again, there are no alleged board decisions addressing a single matter relating to *Donna Taylor v. AIA Services*.

[1735] Or any other person purporting to be an alleged officer for the AIA Corporations.

[1736] The letter did not discuss or address most of the conflicts of interest stated in this Report.

Exhibit - 1, p. 506

12-ER-2924

hereto).[1737] It is perplexing to me why the Hawley Troxell Defendants so desperately opposed the AIA Corporations engaging in proper and fundamental corporate governance, let alone opposing Donna Taylor's fundamental request that the AIA Corporations comply with their articles of incorporation and bylaws. The fact that there was never a board meeting or resolution purporting to address the retention of the Hawley Troxell Defendants, state which officer or director would be authorized to make litigation decisions (the Controlling AIA Defendants were conflicted and could not), or to address any of the conflicts of interest (including the Hawley Troxell Defendants' problems with their representation in *Reed Taylor v. AIA Services* as stated in this Report) constitute a breach of the Hawley Troxell Defendants' duties of care owed to the AIA Corporations.

## M.  Instigation of Attempted Reverse Split.

1.     The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty by failing to advise the disabled AIA Corporations that any effort to attempt to effectuate the improper reverse stock split should not be undertaken under the circumstances and instead merely advising that they would not represent the AIA Corporations for that matter, thereby being one of the proximate causes of the damages relating to that improper reverse stock split (*see* Damage Item Number 30[1738] in Exhibit A attached hereto).

2.     Another of the actions of the Hawley Troxell Defendants was the pointed suggestion in the Ashby Letter (while purporting to disclaim responsibility therefor) that the derivative claims in the instant suit could simply be erased by AIA Services carrying out, as the Ashby Letter described it, "a proposal to conduct a reverse stock split to eliminate minority common shareholders."[1739] The Hawley

---

[1737] HTEH000196-209.

[1738] That portion of Damage Item Number 30 attributable to the fees and costs paid to Randall Danskin for the transactional work for the improper reverse stock split and the fees and costs paid to that firm for litigating *AIA Services v. Durant*. In addition, as discussed in Section XI, if the fees and costs GemCap paid that were awarded to the shareholder defendants in that lawsuit are required to be repaid or an offset is provided, that amount are additional damages the Hawley Troxell Defendants are one of the proximate causes of.

[1739] HTEH000254-59. As stated in Sections XI(N)-(O), it is ironic that in 2007 while *Reed Taylor* v. *AIA Services* was pending, Riley was representing John Taylor in his objection to a reverse split squeeze out by a corporation in which he was a shareholder. Ashby's letter also disingenuously tries to confirm an alleged limited scope of representation that never existed, although he did actually admit the obvious; that there were irreconcilable conflicts of interest back in 2007 (which were never addressed or approved).

Troxell Defendants' reverse stock split/preferred stock redemption "suggestion" (which is discussed in detail above) was accepted four days later by John Taylor.[1740] The purported corporate action by the AIA Services' "board" in furtherance thereof was taken on July 2, 2012, and the false and misleading Proxy Statement also described above was disseminated to the AIA Disinterested Shareholders a day later (the Proxy Statement failed to disclose the purpose of the reverse stock split was to eliminate derivative standing of shareholders to pursue claims (including in this Lawsuit) and the documents and information provided failed to provide any legitimate disclosure of the serious misconduct and improper transactions described in this Report). The Hawley Troxell Defendants never advised "AIA Services that it was improper to pursue the reverse stock split and that it should not do so."[1741] In my opinion, the Hawley Troxell Defendants remained silent and thus active in the implementation of its suggested project by failing to respond. Fortunately for the AIA Services Disinterested Shareholders, however, AIA Services was prevented from carrying out the plan by a court order obtained by Attorney Bond on behalf of the AIA Disinterested Shareholders. I agree with Attorney Bond's filings that the reverse stock split was improper and violated AIA Services' Amended Articles of Incorporation, which is why John Taylor testified that he planned to use his own money to improperly implement it. If Miesen and the other shareholders had not prevailed in that lawsuit and the plan fully implemented, this Lawsuit would not have continued, as there would not have been, as required, a shareholder who was such both at the time of the wrongful conduct and throughout the pendency of the suit. Under Idaho Code section 30-1-741, a derivative suit would have had to be dismissed if the plaintiff therein (such as Miesen in this Lawsuit) had ceased to be a shareholder or a representative thereof. The Defendants would thus have escaped the consequences of their improper conduct and actions, all of which would have been swept under the rug. This also further proves the fallacy of the Hawley Troxell Defendants' position that the tolling agreements were in place to ensure shareholders could seek redress; their intent to ensure that no redress was ever sought or obtained for the benefit of the AIA Corporations was confirmed by their own actions. Nothing in Ashby's letter mentioned anything about ensuring that the

---

[1740] HTEH000619-21 (the bulk of the memo attached to that email has never been produced and presumably contains more damning information). The version produced by the Hawley Troxell Defendants of the May 3, 2012 two page email from John Taylor and Henderson confirming going forward "in light of the recent letter from Hawley Troxell" with a 53,000 to one reverse split has one third of its first page and all of its second page blacked out which raises the inference that the deleted contents are not helpful to them.

[1741] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 737. It appears that another law firm declined to represent AIA Services for the reverse stock split; at that point Douglas Siddoway of the Randall Danskin firm was retained for that purpose. *Id.* at 741.

Page - 499

Exhibit - 1, p. 508

12-ER-2926

AIA Disinterested Shareholders would be able to use the tolling agreements to seek redress; that is because that was never the intent of the tolling agreements. The Hawley Troxell Defendants breached their duties of loyalty and good faith by their actions, and they were still counsel for the AIA Corporations at the time of John Taylor's email and owed the AIA Corporations an undivided duty of loyalty, which was breached and the reverse stock split plan was never disclosed to anyone, including the shareholders.

3.　Transactions initiated by controlling shareholders that eliminate minority common stock interests such as reverse splits or cash mergers without a valid business purpose are subjected to close judicial scrutiny and are held to be a breach of fiduciary duty. The Controlling AIA Defendants and the Hawley Troxell Defendants breached their duties of good faith and loyalty by seeking to implement the unauthorized and improper reverse stock split. To compound that already wrongful conduct by doing so for the purpose of eliminating causes of action that belong to the corporation (and in this case constituted the only valuable assets of AIA Services) is so obviously illegal that I wouldn't bother including it in one my law school exams. As a result, the Hawley Troxell Defendants breached their duties of care and loyalty owed to the AIA Corporations when they did not take action to prevent the reverse stock split and require appropriate disclosures, thereby proximately causing damages to the AIA Corporations (including the wasted fees and costs paid to Randall Danskin and its attorney Doug Siddoway).

## N.　Advancement of the Litigation Fees for John Taylor, Henderson, Beck, Cashman, Duclos, Freeman and Others.

1.　The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty owed to the disabled AIA Corporations (including as general counsel) by failing to advise the AIA Corporations that fees and costs should not be advanced or paid for any of the Controlling AIA Defendants in accordance with the AIA Corporations' bylaws and they separately breached those same duties by failing to properly disclose and obtain the necessary approval to advance fees and costs from AIA Services' shareholders, thereby being one of the proximate causes of the damages to the AIA Corporations (*see* Damage Item Numbers 6-9, 31-32 in Exhibit A attached hereto).

2.　Under the circumstances prese here, Idaho Code sections 30-1-853 and 30-29-853 did not require the AIA Corporations to advance any fees or costs for John Taylor, Freeman, Duclos (or any other parties) in *Reed Taylor v. AIA*

**Exhibit - 1, p. 509**

**12-ER-2927**

*Services*, *Donna Taylor v. Taylor*, *GemCap v. AIA Services*, *GemCap v. CropUSA*, and this Lawsuit; and there was not a shred of evidence that the Controlling AIA Defendants had acted in good faith or in the best interests of the AIA Corporations—instead, they consistently placed their interests above the interests of the AIA Corporations (as they continue to do to this day). Those Code sections also require shareholder approval by non-interested shareholders if conflicts of interest exist. Moreover, Section 4.2.9(g) of AIA Services' Amended Articles of Incorporation and Section 4.14 of AIA Services' New Restated Bylaws and AIA Insurance's Bylaws were not complied with for the same reasons discussed elsewhere in this Report because no conflicts of interest were properly disclosed and addressed in any board or shareholder meeting minutes or resolutions. *See also* Exhibits C-D (lists establishing conflicts of interest as to ownership and management positions and as to lawsuits). No conflicts of interest were ever properly addressed or resolved under Idaho Code sections 30-1-853 or 30-29-853, nor under the AIA Corporations' bylaws and AIA Services' Amended Articles of Incorporation.

3.       Indeed, as stated elsewhere in this Report, the only Proxy Statement provided to the AIA Services' shareholders was to purportedly authorize advances of fees and costs for John Taylor, Freeman and Duclos in *Reed Taylor v. AIA Services* in March 2007 was materially misleading because no disclosure was made as to Reed Taylor's malfeasance claims or any of the Controlling AIA Defendants' improper and unauthorized transactions and corporate action discussed in this Report (including Section XI), and John Taylor failed to provide copies of the pending complaints or an explanation as to any of the allegations of malfeasance and improper corporate governance contained in those complaints, many of which were true. The true facts, which were not disclosed to the shareholders, did not support the payment or advancement of any fees or costs to the recipients because they had intentionally acted against the interests of the AIA Corporations. Instead, as stated elsewhere in this Report, the AIA Corporations should have been pursuing legal action against the Controlling AIA Defendants and the Hawley Troxell Defendants should have either made the determination that fees and costs should not be advanced or they should have required the AIA Corporations to retain independent counsel to make that determination. Under either option, the result would have been the same—that fees and costs should not be advanced for any of the Controlling AIA Defendants in any lawsuit based on their misconduct as described in this Report. In addition, the request was not made to authorize the advancement of fees and costs for Beck, Corine Beck or Henderson and the advancement only pertained to AIA Services. In addition, as discussed elsewhere,

Exhibit - 1, p. 510

12-ER-2929

the Hawley Troxell Defendants wrote Attorney McNichols a Memorandum stating that he had a conflict of interest and they subsequently billed time to address the issue of the advancement of fees and costs; however, they breached their duties of care, good faith and loyalty by failing to properly address the advancement of fees and advise the AIA Corporations not to advance any fees or costs. Alternatively, the Hawley Troxell Defendants failed to ensure that the advancement of fees and costs was properly sought and obtained by disinterested shareholder vote (none of the Controlling AIA Defendants were conflict free), thereby breaching their duties of care, good faith and loyalty.

4.      In addition, the purported approval by Henderson and Beck for the advancement of John Taylor's attorneys' fees and costs in *Donna Taylor v. Taylor* was never duly authorized[1742] because Beck and Henderson had conflicts of interest that prevented them from voting to authorize the advancement of fees and costs for John Taylor as discussed in this Report (including through their ownership in CropUSA and actions taken to protect that ownership interests from being recovered by the AIA Corporation). Moreover, there was not a shred of evidence that John Taylor had acted in good faith or in the best interests of the AIA Corporations. Had he done so, Donna Taylor would have been paid in full years earlier and *Donna Taylor v. Taylor* would have never been filed. The approval for the advancement of John Taylor's fees and costs for *Donna Taylor v. Taylor* could only be approved by AIA Services' shareholders, which was never done.

5.      Accordingly, the Hawley Troxell Defendants should have proceeded in the best interests of the AIA Corporations and taken action to prevent the advancement or payment of any fees or costs for John Taylor, Henderson, Cashman, Beck, Corrine Beck, Duclos, and Freeman. Had the Hawley Troxell Defendants properly discharged the duties of care, good faith and loyalty that they owed to the AIA Corporations, the hundreds of thousands of dollars in payments improperly advancing fees and costs would have been prevented. The Hawley Troxell Defendants' breaches of duties of care, good faith and loyalty was one of the proximate causes of those damages; and their negligent conduct further enabled the Controlling AIA Defendants to improperly continue advancing costs for other lawsuits, including this Lawsuit, which was foreseeable based on the track record of improper corporate governance (*see* Damage Item Numbers 21-26, 29-30).

---

[1742] *See* Section XII(Y).

Page - 502

Exhibit - 1, p. 511

### O.  $800,000 Settlement Funds and $424,116 Owed to Former Policyholders

1.  The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty owed to the disabled AIA Corporations by failing to properly protect AIA Insurance's $800,000[1743] share of the settlement proceeds and the other $1,600,000 proceeds required to be paid to former policyholders or the states in which they last resided ($425,116 of which was never paid as required) after having confirmed knowledge of the Controlling AIA Defendants' track record of improperly using AIA Insurance's funds and diverting money that did not belong to the Controlling AIA Defendants, thereby being one of the proximate causes of the damages to the AIA Corporations (*see* Damage Item Numbers 10-11 in Exhibit A attached hereto).[1744]

2.  John Taylor and the other Controlling AIA Defendants diverted AIA Insurance's $800,000 portion and $425,116 in funds not belonging to them obtained from a settlement for trust litigation in 2008 by AIA Insurance in *In re Universe Liquidation*. Another Hawley Troxell attorney was counsel of record for AIA Services and AIA Insurance in that lawsuit and Riley negotiated the settlement terms. The total settlement was $2,400,000, of which AIA Insurance was entitled to receive one-third (or $800,000) and AIA Insurance was obligated to pay the remaining $1,600,000 to the former policyholders or the states in which they last resided as discussed in detail in Section XI(Q). Rather than repeat my recitation of the agreement terms, the applicable escheat laws and related matters, I incorporate Section XI(Q) herein. I will address these matters without citing to sources because I have already done so in Section XI(Q). Moreover, these issues were also being asserted and addressed by Reed Taylor in *Reed Taylor v. AIA Services*. Ironically, John Taylor baldly asserted that Reed Taylor would be unable to administer and distribute the settlement funds in opposition to Reed Taylor's motion to obtain control of AIA Insurance. As with all of the other misconduct, it would be John Taylor spearheading it. John Taylor intentionally failed to properly pay the $425,116 as required. Even the unsophisticated Reed Taylor predicted this

---

[1743] As stated in this Report, a portion of the $800,000 was required to be paid to the Greener law firm because John Taylor entered into a blended hourly and contingent fee agreement. However, the agreement was never authorized by the boards or shareholders. If the Court finds that the $118,418.83 in funds paid to the Greener law firm was appropriate and authorized, then Miesen's damages should be reduced by $118,418.83 and adjust his interest calculations accordingly.

[1744] The damages include any penalties and interest as discussed in Section XI(Q).

**Exhibit - 1, p. 512**

**12-ER-2930**

result.[1745] Moreover, as seen by AIA Services' financial statements, there has not been $425,116 in funds, or even close to that amount, indicated on its financial statements for many years.

3.      The Hawley Troxell Defendants had confirmation that the Controlling AIA Defendants would improperly use the $800,000 without any approval from a proper board of directors or AIA Services' shareholders. Indeed, the Hawley Troxell Defendants were suggesting that the $800,000 be used to pay the fees and costs owed to them. The Hawley Troxell Defendants also had confirmation that the Controlling AIA Defendants had a proven track record of using funds that do not belong to them. As attorneys practicing in Idaho and knowing that the settlement agreement contained a provision that Idaho escheat laws may apply, they also were aware that it was a criminal act in Idaho to not timely pay any escheat funds and file the required report. The $1,600,000 settlement funds were required to be distributed or escheated over ten years ago. While no reports indicating the status of the settlement funds have been produced in discovery, I independently reviewed the docket in the lawsuit that no report was filed with the court as required in the settlement agreement, thereby being another breach of the duties of care by the Hawley Troxell Defendants. As I explained in Section XI(Q), John Taylor's excuse for not paying the $425,116 to either the state of Texas or the state of Idaho if the last known addresses could not be found is simply a bad excuse for stating that he absconded with more money that did not belong to him. The Hawley Troxell Defendants could have, and should have, safeguarded the $800,000 for its client AIA Insurance and prepared the settlement agreement so that a third-party administered the funds because they could foresee that the funds would not be properly paid.

4.      To reiterate, the Hawley Troxell Defendants' assisted the AIA Corporations in connection with the settlement, which was also at issue in *Reed Taylor v. AIA Services*, and not only did they fail to insure that the Controlling AIA Defendants made such payments and otherwise protect the $800,000, but also impliedly encouraged the AIA Corporations to use those funds to pay their invoices for legal services (Babbitt impliedly suggested some of the money could have been used to pay Hawley Troxell in his April 14, 2009 letter). The Hawley Troxell Defendants breached their duties of care and loyalty owed to the AIA Corporations

---

[1745] All of the specific transactions and damages discussed in this Section XII were either directly an issue or indirectly an issue in *Reed Taylor v. AIA Services* and/or *Donna Taylor v. AIA Services* and within the responsibility of the Hawley Troxell Defendants.

Exhibit - 1, p. 513

12-ER-2931

(including as general counsel), thereby being one of the proximate causes of the damages for the improperly used funds.

## P.   Funds Released from the Court Registry.

1.   The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty owed to the disabled AIA Corporations by assisting the Controlling AIA Defendants, who had not held an annual shareholder meeting to properly elect directors since the Hawley Troxell Defendants had first been retained by them to purportedly represent the AIA Corporations, in having the $413,972.05 in funds held in the court registry in *Reed Taylor v. AIA Services* to be released into the hands of the Controlling AIA Defendants, thereby being one of the proximate causes of the damages to the AIA Corporations (see Damage Item Number 10 in Exhibit A attached hereto).

2.   In obtaining orders releasing $413,972.05[1746] of funds held by the court to the AIA Corporations, the Hawley Troxell Defendants failed to ensure that those funds were preserved for proper business purposes of the AIA Corporations such as payments to creditors and preferred shareholders; instead, the Hawley Troxell Defendants breached their duties of care and loyalty by allowing those proceeds to be placed in the hands of the AIA Controlling Defendants, thus allowing their misconduct to continue. Moreover, before those funds were released, Donna Taylor moved to intervene in the lawsuit to secure the funds in the court registry. Rather than opposing Donna Taylor's intervention (successfully) for the benefit of the Controlling AIA Defendants, the Hawley Troxell Defendants should have welcomed Donna Taylor's intervention to safeguard the funds.[1747] At the very least, the Hawley Troxell Defendants should have recognized and advised the court that Donna Taylor was entitled to be paid the $413,972.05 because her payments were in arrears and she held priority over all other shareholders; instead, they proceeded to place the settlement proceeds directly into the hands of the very people that would assure the fund were diverted, the Controlling AIA Defendants. The Hawley Troxell Defendants breached their duties of care, good faith and loyalty owed to the

---

[1746] Since my last Report, Miesen was able to locate interest that had been paid on some of the funds while held in the court.

[1747] Like the $2,400,000 settlement funds, Reed Taylor also objected to the release of the funds and asked that they continue to be held until this Lawsuit was resolved. Once again, it was the Controlling AIA Defendants and the Hawley Troxell Defendants who breached their duties by allowing these funds to be absconded by the Controlling AIA Defendants.

Exhibit - 1, p. 514

12-ER-2932

AIA Corporations regarding the $413,972.05, thereby being one of the proximate causes of those damages.

## Q.  Loans to Pacific Empire Radio.

1.      The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty owed to the disabled AIA Corporations by assisting the Controlling AIA Defendants (including as general counsel), who had a proven track record of improperly lending money to entities that they owned, by blindly allowing them to continue making improper loans to PERC, thereby being one of the proximate causes of the damages to the AIA Corporations (*see* Damage Item Number 10 in Exhibit A attached hereto).

2.      As with other matters, Reed Taylor was alleging improper loans were being made to PERC in *Reed Taylor v. AIA Services* and so was Donna Taylor in *Donna Taylor v. AIA Services*. Despite representing the AIA Corporations in two separate lawsuits in which two separate plaintiffs were alleging claims relative to improper loans, the Hawley Troxell Defendants breached their duties of care, good faith and loyalty owed to the AIA Corporations by allowing the loans in the form of four promissory notes and additional advances totaling $2,264,359.92, thereby being one of the proximate causes of the damages to the AIA Corporations (see Damage Item Number 13 in Exhibit A attached hereto). Whether merely properly discharging their duties in the course of the two lawsuits or as general counsel, these loans and the improper corporate governance should have ceased; but instead the Hawley Troxell Defendants allowed the Controlling AIA Defendants to continue making improper loans. Indeed, the first promissory note of $680,365.85 was signed three days after Donna Taylor appointed Moran to the board of AIA Services and less than two months after she had filed suit to stop those improper loans, including through filing a preliminary injunction that the Hawley Troxell Defendants successfully opposed; they also opposed her request to appoint Moran who recently testified that he would have never permitted those loans as a director.[1748]

3.      The Controlling AIA Defendants' conduct with regard to this matter (which is discussed under the heading uncollectable loans to Pacific Empire Radio above and in Section X of this Report), like so many of their other acts of misfeasance, could have been prevented by the Hawley Troxell Defendants had

---

[1748] I was advised by Attorney Bond of that part of Moran's testimony.

they discharged their duties of care and loyalty owed to the AIA Corporations. For example, they should have insisted that the Controlling AIA Defendants properly operate the AIA Corporations as condition of any representation, which would have resulted in none of the Controlling AIA Defendants having access or control over the AIA Corporations' funds and assets, that Donna Taylor's director designee be seated on the Board or a receiver to be appointed, thus ensuring that the insider misconduct would cease and no further funds improperly lent when such loans were prohibited by AIA Services' Amended Articles of Incorporation. By way of another example, rather than research how to prevent paying Donna Taylor, they could have advised the Controlling AIA Defendants that the funds must be used for appropriate purposes. The Hawley Troxell Defendants' breached their duties of care and loyalty owed to the AIA Corporations, thereby being one of the proximate causes of the AIA Corporations' to sustain damages of the amount of those unpaid loans and advances.[1749]

## R.   Series A Preferred Shares.

1.      The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty owed to the disabled AIA Corporations by assisting the Controlling AIA Defendants (including as general counsel), who had a proven track record of disregarding the preferred shareholders' rights and priorities, by failing to require and ensure that Donna Taylor's Series A Preferred Shares were fully redeemed and by failing to advise the AIA Corporations that they were wasting attorneys' fees and costs (including those improperly advanced) in opposing paying

---

[1749] As with all of the misconduct, the Hawley Troxell Defendants could have also threatened to withdraw if the AIA Corporations were not operated legally and properly in a manner described in this Report. They have not produced a single communication threatening to withdraw or take the matter to shareholders or the court if the Controlling AIA Defendants' conduct did not stop, thereby breaching their duties of care, good faith and loyalty, and thereby being one of the proximate causes of the damages to the AIA Corporations. I cannot over emphasis enough the extent in which I believe that the Hawley Troxell Defendants enabled John Taylor and the other Controlling AIA Defendants by failing to ever look after the best interests of the AIA Corporations. In my opinion, had they demanded that John Taylor or the other Controlling AIA Defendants stop the improper and unauthorized conduct described in this Report or they would take the matter to the courts through a noisy withdrawal and notify shareholders, the Controlling AIA Defendants would have stopped their unlawful activities and conduct based on the well-recognized stature of Hawley Troxell being one of the largest, oldest and most respected law firms in Idaho, thereby separately being one of the proximate causes of the damages to the AIA Corporations (see Damage Item Numbers 1-40 in Exhibit A attached hereto). As general counsel, they breached their duties of care, good faith and loyalty, thereby being of the proximate causes of those damages.

Exhibit - 1, p. 516

12-ER-2934

Donna Taylor, thereby being one of the proximate causes of the damages to the AIA Corporations of the accrued interest, fees and costs totaling $1,067,188.91 that AIA Services is now required to pay Donna Taylor (*see* Damage Item Numbers 14 in Exhibit A attached hereto).

2.      Based on the breached duties of care and loyalty discussed in this Report, Donna Taylor has been owed mandatory redemption payments in the principal amount of $416,512 on her remaining shares of Series A Preferred Shares since 2008. The Controlling AIA Defendants, instead of causing AIA Services to perform its obligation to her, have continued to assert a series of baseless claims in purported defense, with the assistance of the Hawley Troxell Defendants as proven by their billing records, of its failure to perform that contractual obligation, necessitating extensive discovery and motion practice as well as an appeal to the Idaho Supreme Court (in which she prevailed). It noteworthy that Riley's negligence regarding the 1995 Letter Agreements was one of the causes of the baseless defenses against Donna Taylor. [1750] Again, the Hawley Troxell Defendants breached their duties of care and loyalty by allowing the AIA Controlling AIA Defendants to use funds for other purposes when they should have paid Donna Taylor, who had the highest payment priority over any other shareholder and should have been paid by December 2003. Moreover, the Hawley Troxell Defendants have substantially assisted the Controlling AIA Defendants in that conduct by working to prevent Donna Taylor from being paid (as confirmed by the Unredacted Billing Records) and, in breach of their own duties to the AIA Corporations, encouraged and counseled the Controlling AIA Defendants to expend more in legal fees than it would have cost to simply pay Donna Taylor that to which she is entitled.

---

[1750] This act of malpractice caused the AIA Corporations to incur tens of thousands of dollars in legal expenses and costs, including by reason of requiring Donna Taylor to successfully appeal a decision of Judge Brudie who had held, *inter alia*, that the 1995 Letter Agreements were illegal because they were not authorized by the shareholders. The Idaho Supreme Court held that the 1995 Letter Agreements were ultra vires because they "purported to authorize the redemption of Donna's shares at an interest rate higher than that set forth in the articles of incorporation without shareholder approval." *Taylor* v. *Taylor*, 163 Idaho 910, 918, 422 P.3d 1116, 1124 (2018). The Court also held, however, that the doctrine of ultra vires did not apply because it was not raised in the court below, and, even if it had been raised, it would not apply because AIA Services benefited from the Letter Agreements. Incredibly, even after the Court's decision, when asked why the AIA Services' Articles of Incorporation weren't amended to reflect the changed redemption terms, Riley said "I guess I would say it wasn't necessary, that it was – there was no reason that they couldn't agree between themselves how to modify their payment terms (3/3/2020 Riley Depo. Transcript, p. 589), and "It was not on my radar screen to even consider the articles." *Id.*at 590. Had Riley simply properly amended the articles of incorporation to reflect the higher interest rate and shorter amortization period, the baseless defenses could have been prevented.

Consequently, the Hawley Troxell Defendants breached their duties of care, good faith and loyalty owed to the AIA Corporations, thereby being one of the proximate causes of the damages of the accrued interest and the attorneys' fees and costs paid and advanced for *Donna Taylor v. Taylor*, which they should have prevented and their conduct has proximately caused, including recovery for the additional interest unpaid redemption payments owed to Donna Taylor and attorneys' fees and costs.

3.  Since Ashby reviewed Donna Taylor's Complaint in *Donna Taylor v. Taylor* two days after it was filed and continued to work on the matter thereafter (including identifying affirmative defenses for John Taylor),[1751] there can be no dispute that as of this date that the Hawley Troxell Defendants were working on matters relative to Donna Taylor and that they were aware that Donna Taylor, like Reed Taylor, had alleged with accuracy that the Controlling AIA Defendants had improperly diverted the $1,510,693 received from Trustmark in 2004, there was no viable excuse for the diversion of the funds and that the Controlling AIA Defendants should have been immediately required to repay the money or at least be required to pay Donna Taylor the $416,512 in principal,[1752] plus accrued interest since the last payment to her on May 30, 2008,[1753] to fully redeem her Series A Preferred Shares, which would have been in the best interests of the AIA Corporations; the Hawley Troxell Defendants breached their duties of care and loyalty by failing to do so. Instead, the Hawley Troxell Defendants enabled the Controlling AIA Defendants to engage in an improper effort to avoid paying Donna Taylor, which further proximately caused the AIA Corporations to incur hundreds of thousands of dollars in attorneys' fees and costs defending the two consolidated cases in *Donna Taylor v. Taylor* (including the fees paid to the Hawley Troxell Defendants). The Hawley Troxell Defendants' acts, together with the acts of the Controlling AIA Defendants (they should have simply paid Donna Taylor), were the cause of Miesen's damages in Item Number 15 (the accrued interest, and fees and costs incurred by Donna Taylor) and the fees and costs paid as reflected in other item numbers.

---

[1751] FB 0971-72.
[1752] AIA0027669.
[1753] DLM – 0003383.

Page - 509

**S.** **The Corporate Governance Failures, the Failure to Appoint a Receiver and Donna Taylor's Board Designee; and the GemCap Guarantees and Settlement Agreement.**

1.      The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty owed to the disabled AIA Corporations (including as general counsel) by permitting the Controlling AIA Defendants, who had a proven track record of improper corporate governance and misconduct described in this Report, to improperly remain in control and by preventing the appointment of a receiver or Donna Taylor's independent director Moran and injunctive relief that could have prevented millions of dollars in damages, thereby being one of the proximate causes of the damages to the AIA Corporations (*see* Damage Item Numbers 1-40 in Exhibit A attached hereto).

2.      As discussed in Sections X, XI(A) and this Section XII, the AIA Corporations were the equivalent of disabled clients on life support; Donna Taylor's request for a receiver and/or to have Moran appointed to the board of AIA Services should have been welcomed with open arms by the Hawley Troxell Defendants, either of those options would have provided them a graceful way out of their untenable predicament of blindly backing the Controlling AIA Defendants. Moreover, having a preliminary and permanent injunction entered to require the AIA Corporations to comply with their amended articles of incorporation and bylaws and further requiring them to refrain from entering into improper transactions, loaning money or guaranteeing loans, paying excessive compensation and other improper conduct would have provided the disabled AIA Corporations with an epinephrine drip. Instead, the Hawley Troxell Defendants pulled the plug on the respirators for the AIA Corporations; forever sealing their demise and destruction. The Hawley Troxell Defendants had those three graceful and honorable ways to aid their disabled clients the AIA Corporations and they breached their duties of care, good faith and loyalty owed to the AIA Corporations by choosing neither option and instead permitting them to be held hostage by the AIA Controlling Defendants, thereby being one of the proximate causes of the damages to the AIA Corporations(*see* Damage Item Numbers 1-40 in Exhibit A attached hereto).

3.      More specifically, under the facts and circumstances set forth throughout this Report (including the failure to comply with fundamental corporate governance procedures and by providing full disclosure to the AIA Corporations and their shareholders), the disabled AIA Corporations needed, and qualified for, a

court of equity to step in and appoint a receiver; instead of acting in the best interests of the AIA Corporations, the Hawley Troxell Defendants chose to continue enabling the Controlling AIA Defendants. If the AIA Corporations had properly supported the appointment of a receiver (including Attorney Patrick Moran), then, at a minimum, the forty items of damages could have been prevented from December 2009 and thereafter, and legal action could have been taken to recover the earlier damages. A review of the payments in Exhibit A provides detailed information regarding the payments that could have been ceased and the loans not made to PERC. The Hawley Troxell Defendants breached their duties of care owed to the AIA Corporations by their actions representing the interests of the Controlling AIA Defendants and opposing the appointment of a receiver[1754] and Donna Taylor's request for injunctive relief[1755] in *Donna Taylor v. AIA Services*, thereby being one of the proximate causes of the damages for all transactions and acts occurring after December 1, 2009 and for the damages occurring prior to that time because a prudent receiver or director would have taken legal action against the Controlling AIA Defendants to recover damages occurring prior to December 1, 2009 and ceased all of the improper transactions after being appointed.

4.      Moreover, as discussed above, there are no board or shareholder meeting resolutions or minutes for the AIA Corporations that discuss or authorized

---

[1754] Upon my review of the records and the facts, from 2009 to the present time, the AIA Corporations, based on the acts and omissions of the Controlling AIA Defendants, were unable to pay all of their obligations in full and timely manner and thus they were in imminent danger of insolvency. For example, in 2009, the AIA Corporations were not fully and timely paying property taxes, legal bills to various law firms, the sums owed to the former policyholders or to the states of their last residency or the state of Idaho as required under the 2008 settlement agreement, the $5,000 in purported compensation due to Beck and Henderson for allegedly serving on the boards of the AIA Corporations, and the obligations to Donna Taylor for the redemption of her Series A Preferred Shares. Based on the conduct and improper corporate governance described in this Report, a court of equity, Judge Kerrick, would have also appointed a receiver if the Hawley Troxell Defendants had been properly representing the interests of the AIA Corporations by supporting that appointment. A prudent receiver would have prevented the misconduct and taken the actions to recover funds and damages as described in this Complaint.
[1755] Donna Taylor also sought a preliminary injunction that the Hawley Troxel Defendants breached their duties of care, good faith and loyalty opposing that motion. The Hawley Troxell Defendants breached their duties of care and loyalty every step of the way in Donna Taylor v. AIA Services, including by opposing the appointment of Moran to the board and disingenuously seeking to improperly impose conditions to prevent him from acting as a director. If the Hawley Troxell Defendants had ethically and independently looked at themselves and the Controlling AIA Defendants in the mirror, they would readily concluded that Attorney Moran and a receiver were precisely what the disabled AIA Corporations needed.

Exhibit - 1, p. 520

the Hawley Troxell Defendants to undertake the positions of opposing the appointment of a receiver, opposing the appointment of Moran or opposing an injunction requiring the AIA Corporations to comply with their articles of incorporation and bylaws, and not engage in any improper transactions, loan guarantees, loans or other improper activities, which was a further breach of the Hawley Troxell Defendants' duties of care owed to the AIA Corporations. Indeed, the lack of any proper board or shareholder meetings confirmed the remedy the disabled AIA Corporations so badly needed; a receiver or independent director, or both. The fact that, in January 2012, Donna Taylor ultimately voluntarily dismissed her claims in *Donna Taylor v. AIA Services* is irrelevant because the harm could and should have been prevented years earlier by the appointment of a receiver and/or an injunction requiring the AIA Corporations to comply with their articles of incorporation, bylaws and prevent improper transactions, guarantees and loans.[1756] Donna Taylor had needed to voluntarily dismiss that lawsuit in order to get the stay lifted in this Lawsuit. Moreover, the Hawley Troxell Defendants and the Controlling AIA Defendants substantially assisted each other in breaching their duties of good faith and loyalty owed to the AIA Corporations, thereby separately being one of the proximate causes of the AIA Corporations' damages.

5.      To reiterate, the Hawley Troxell Defendants' breached their duties of care, good faith and loyalty owed to the disabled AIA Corporations. Had the Hawley Troxell Defendants properly discharged their duties of care, good faith and loyalty while representing the AIA Corporations in *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services* (including supporting the appointment of a receiver and/or the appointment of Donna Taylor's board designee and by not opposing Donna Taylor's Motion for a Preliminary Injunction requiring the AIA Corporations to comply with their articles of incorporation and bylaws, and to cease all improper transactions) and as general counsel for the AIA Corporations, the improper conduct described in this Report would have ceased, moneys and assets would have been returned or legal action taken and the AIA Corporations would have never entered into the guarantees with GemCap or the GemCap Settlement

---

[1756] For the same reasons stated above, the Controlling AIA Defendants also breached their duties of loyalty and good faith owed to the AIA Corporations, with the negligent or intentional substantial assistance from the Hawley Troxell Defendants, thereby also being one of the proximate causes of the damages to the AIA Corporations.

Exhibit - 1, p. 521

12-ER-2939

Agreement because no reasonably prudent director or receiver would have allowed them.[1757]

6.      Moreover, the Hawley Troxell Defendants breached their duties of care, good faith, and loyalty and substantially assisting in the misconduct of the Controlling AIA Defendants as stated in this Report. For example, had Hawley Troxell not counseled the AIA Corporations to oppose Donna Taylor's action for the appointment of a receiver or the appointment of Moran as a director, or had it not abandoned its Petition for a Court Appointed Inquiry[1758] which would have readily revealed the wide-spread misconduct discussed in this Report, the acts of misfeasance and intentional breaches of duties of loyalty by the Controlling AIA Defendants, including entering into the GemCap Loan transaction and the resulting Settlement Agreement, would never have occurred. Although, for the reasons stated in Sections X and XI(M), Miesen maintains that the AIA Corporations are not bound by the purported GemCap Loan guarantees and the Settlement Agreement, inexplicably, counsel for Hawley Troxell in this Lawsuit is taking the position that, notwithstanding the above, the Hawley Troxell clients,[1759] the AIA Corporations, should be held liable under the Settlement Agreement thereby resulting in the Hawley Troxell Defendants' breaches of their duties of care, good faith and loyalty

---

[1757] That the Hawley Troxell Defendants may not have been directly involved the AIA Corporations with respect to the GemCap Loan, the AIA Services' Limited Guarantee of the GemCap Loan, AIA Corporations' Amended Guarantee of the GemCap Loan or the GemCap Settlement Agreement does not affect their culpability for the damages sustained by the AIA Corporations as one of the proximate causes of those transactions because they would have been prevented by the appointment of a receiver or Moran as an independent director. As Moran has already stated in his disclosure/report, he would have followed legal advice and no reasonably prudent receiver would have permitted any of the conduct at issue in this Report to have occurred.

[1758] It is noteworthy that the Hawley Troxell Defendants abandoned the petition for a court appointed inquiry after they were able to have Reed Taylor's complaint against them dismissed and his redemption transaction (which Riley had blessed) declared illegal. Then, when Donna Taylor moved to intervene in Reed Taylor v. AIA Services to protect the $413,972.05 held in the court registry, the Hawley Troxell Defendants opposed that motion and never used the opportunity to pursue the court appointed inquiry, both actions constituted breaches of the Hawley Troxell Defendants' duties of care, good faith and loyalty owed to the AIA Corporations; they should have demanded the funds be held for Donna Taylor and taken action to properly represent their disabled clients the AIA Corporations.

[1759] As discussed in this Report, the Hawley Troxell Defendants have never withdrawn as counsel for the AIA Corporations in *Reed Taylor v. AIA Services* and there is no final judgment in that lawsuit.

Exhibit - 1, p. 522

12-ER-2940

owed to the AIA Corporations.[1760] Hawley Troxell's pattern of taking positions adverse to the AIA Corporations therefore continues unabated. To the extent that Hawley Troxell's position turns out to be correct (which is highly improbable at best) the Firm should be held liable to the AIA Corporations for any payments required by them under the GemCap Settlement Agreement. For the same reasons, the AIA Corporations are entitled to recover the greater of the $946,119.69 sales price of AIA Services' Headquarters or its established higher value and the sales price for AIA Insurance's two condos, which were sold because of the unauthorized and improper GemCap Loan and subsequent GemCap Settlement Agreement—all of which, as stated above, could have been prevented by the Hawley Troxell Defendants.

### T.   <u>Hudson Transaction and Other Damages</u>

1.     The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty by failing to take the necessary action to recover, and prevent the taking of, the value of the corporate opportunities improperly taken and funded by the disabled AIA Corporations (including as general counsel), thereby being one of the proximate causes of the damages to the AIA Corporations (*see* Damage Item Numbers 1-2, 17, 34 and 39).

2.     Based on all of the facts and circumstances in this Report (including the breached duties of care and loyalty owed by the Hawley Troxell Defendants), the Hawley Troxell Defendants breached their duties of care and loyalty owed to the AIA Corporations by not demanding that the sale proceeds from the Hudson Transaction be paid to them and by failing to assert claims to recover to recover the value of the sale and thereby have been one of the proximate causes of the damages. Specifically, had the Hawley Troxell Defendants properly represented the AIA Corporations, they would have not permitted the Hudson sale to occur or would have at least sought to obtain payment for the AIA Corporations for the assets sold, but they failed to do so thereby breaching their duties owed to the AIA Corporations and proximately causing all or part of the $11,588,245 in Hudson sale

---

[1760] It is worthy to note, however, that the Hawley Troxell Defendants' actions in this Lawsuit that the alleged stipulated judgment against the AIA Corporations in *GemCap v. CropUSA* (a stipulation that Munding had no authority to approve or sign for the reasons stated in Section XI(A)) cannot be collaterally attacked are consistent with their actions taken in 2007 and 2008 wherein they refused to admit that AIA Insurance's Guarantee of the Lancelot Loan was a prohibited and ultra vires action).

Exhibit - 1, p. 523

12-ER-2941

proceeds[1761] to be diverted from the AIA Corporations without their receiving any benefit or payment. The gross sale price, net gain on the sale, or seventy percent of either alternatives are all proper measures of damages.[1762] As addressed in more detail in Section XI(J), the CropUSA business should have been owed by the AIA Corporations, they extensively funded them and the hard money loan that comprised of much wasted money belonged to the Controlling AIA Defendants who were involved in the Lancelot Loan, which the Hawley Troxell Defendants provided the incorrect Lancelot Legal Opinion[1763] at the request of John Taylor. For these same reasons, the $120,000 consulting payments also belonged to the AIA Corporations. Based upon my review of thousands of pages of documents and other sources disclosed in this Report, there is no way that CropUSA would have even come into existence but for the AIA Corporations. The argument that CropUSA could not have been a subsidiary of the AIA Corporations or sold crop insurance is also addressed in more detail in Sections X and XII(J), which I incorporate by reference herein. Likewise, had the Hawley Troxell Defendants discharged their duties at the onset of *Reed Taylor v. AIA Services* and/or as general counsel of the AIA Corporations, CropUSA could have been recovered as a subsidiary of the AIA Corporations and the wasteful transactions and compensation ceased, which could have resulted in the value of the Hudson book of business belonging to the AIA

---

[1761] Miesen has four viable alternative theories for the damages pertaining to the sale of the assets to Hudson as detailed in Damage Item Number 1 in Exhibit A attached hereto. In my opinion, all four alternatives are viable damage alternatives for the breached duties of care, good faith and loyalty owed by the Hawley Troxell Defendants to the AIA Corporations.

[1762] As discussed in Section XI(J), John Taylor admitted that 70% of CropUSA's book of business sold to Hudson could be traced directly to AIA Insurance's agents, which supports the alternative values. I have confirmed the agents and these issues with Jud Taylor, who is a successful crop insurance agent. He also confirmed my information for my opinions as I disclosed in Section X and in Section XI(J).

[1763] The AIA Corporations sustained damages of at least $11,588,245, as a result of the Hudson Transaction (which, in my opinion, would not have occurred if the Hawley Troxell Defendants had concluded, as they should have, that AIA Insurance did not have the power and authority to execute AIA Insurance's Guarantee of the Lancelot Loan and had communicated that fact to Quarles & Brady who acted as counsel to CropUSA, AIA Insurance and John Taylor in connection with the Lancelot Loan). The Lancelot Loan Opinion was negligently prepared, and wrong the day it was delivered. *See, e.g.*, Section XII(Z) of this Report) Moreover, when Patrick Collins and a number of the Hawley Troxell Defendants knew the opinion was wrong they were required to notify both the AIA Corporations and Lancelot that the Lancelot Loan Opinion could no longer be relied upon. At that time $7,469,850.72 of the $15,000,000 Lancelot Loan had been drawn down. The Hawley Troxell Defendants placed their interests of not being sued by Lancelot for their negligently prepared Legal Opinion above the interest of the AIA Corporations' interests in having the Guarantee of the Lancelot Loan set aside and recovering the sale price of their assets being sold to Hudson.

Exhibit - 1, p. 524

Corporations thereby being one of the proximate causes of the AIA Corporations for that value (e.g., Reed Taylor testified that CropUSA could be worth as much as $750,000,000 today).

3.    Moreover, AIA Insurance's Guarantee of the Lancelot Loan was also unauthorized, unapproved and ultra-vires as discussed in this Report, including for violating the Guarantee Prohibitions under AIA Services' Amended Articles of Incorporation.[1764] Thus that guarantee was no impediment to the AIA Corporations recovering the assets that rightfully belonged to them. Instead, the Hawley Troxell Defendants placed their interests in obtaining a discharge of AIA Insurance's unauthorized guarantee of the Lancelot Loan above the AIA Corporations' interests, as discussed above, in breach of their duties of care, good faith and loyalty. Indeed, CropUSA (through its assignee GemCap) has asserted in pleadings that the book of business built up after the sale of assets to Hudson was "valued in the tens of millions of dollars."[1765] This further confirms the value of the CropUSA opportunity at being reasonably valued at $10,000,000 as a fifth alternative valuation. This issue was raised in *Reed Taylor v. AIA Services* and, despite receiving a letter from Attorney Bissell, the Hawley Troxell Defendants did nothing. Moreover, similar communications and demands were made by Reed Taylor's counsel regarding AIA Insurance's Guarantee of the Lancelot Loan and the Hawley Troxell Defendants did nothing.

4.    The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty owed to the disabled AIA Corporations (including as general counsel) by failing to take action to recover the contractual rights, or value thereof, of the contract between CropUSA and Growers National (*see* Damage Item Number 34 in Exhibit A attached hereto). The issue of the Growers National contract arose and was disregarded by the Hawley Troxell Defendants. In 2010 (while the Hawley Troxell Defendants were purportedly representing the AIA Corporations), CropUSA obtained a $430,000 from Growers Nation for the contractual rights (including commissions) and those funds should have also been recovered for the benefit of the AIA Corporations. More details and opinions regarding this misappropriated asset are contained in Sections X and X(Q) of this Report. This issue was also raised in *Reed Taylor v. AIA Services*.

---

[1764] If anyone tried to enforce AIA Insurance's Guarantee of the Lancelot Loan, the Hawley Troxell Defendants should have taken legal action for the disabled AIA Corporations against Lancelot to have the guarantee declared unenforceable for the reasons discuss in this Report.
[1765] DLM – 104225.

Exhibit - 1, p. 525

12-ER-2943

5.      The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty owed to the disabled AIA Corporations (including as general counsel) by failing to take action to recover the value of the Sound Insurance book of business that was formed competing against the AIA Corporations, including by improperly selling health insurance and related products in direct competition with AIA, thereby being one of the proximate causes of the $240,000 in damages to the AIA Corporations (*see* Damage Item Number 39 in Exhibit A attached hereto). However, I note that, as discussed above, I have not yet been able to locate numerous costs and expenses paid for Sound Insurance prior to the sale in 2007 (the sale was backdated to 2006). This sale was also directly at issue in *Reed Taylor v. AIA Services* and the Hawley Troxell Defendants did nothing.

6.      The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty owed to the disabled AIA Corporations (including as general counsel) by failing to take action to recover AIA's Parking Lot, which had been improperly purchased when the opportunity and parking lot belonged to the AIA Corporations (John Taylor used AIA's line-of-credit to pay the bulk of the purchase price) and the subsequent improper and outrageous increases in rent which was never authorized and should have never been paid, thereby being one of the proximate causes of the $123,749.89 in damages to the AIA Corporations, which is comprised of $50,000 for the sale price of the parking lot and the remainder in the improper rent (*see* Damage Item Number 17 in Exhibit A attached hereto). These issues were also raised in *Reed Taylor v. AIA Services* and the Hawley Troxell Defendants did nothing.

## U.   <u>Mishandling of the Illegality Defense and Failure to Investigate Riley</u>

1.      The Hawley Troxell Defendants also breached their duties of care, good faith and loyalty owed to the AIA Corporations (including as general counsel) by failing to the AIA Corporations by not promptly identifying and have John Taylor assert, the violation of Idaho Code section 30-1-6 to assert the "iron clad" illegality defense in *Reed Taylor v. AIA Services*, thereby being one of the proximate causes of the $394,630 in funds paid to Reed Taylor in 2007 and 2008

Exhibit - 1, p. 526

12-ER-2944

and the increased litigation costs (*see, e.g.,* Damage Item Numbers 27 in Exhibit A attached hereto; *see also* Damage Items Numbers 4, 6-10).[1766]

2.      It was *only after* the expenditure by the AIA Corporations of thousands of dollars in what turned out to be unnecessary *Reed Taylor v. AIA Services* defense costs (including the briefing and oral argument in connection with Judge Brudie granting, in a detailed sixteen page decision,[1767] Reed Taylor's motion for partial summary judgment enforcing the stock redemption note) that someone outside of the Hawley Troxell defense team discovered that the then applicable Idaho Code section 30-1-6 provided that the redemption by AIA Services of Reed Taylor's shares of Common Stock required either the existence of sufficient earned surplus or shareholder or Articles' authorization of the use of capital surplus, neither of which were present.

3.      As the Hawley Troxell Defendants themselves admitted in a Memorandum written by Ashby[1768] and revised and reviewed by Riley,[1769] "AIA's motion [for summary judgment] is *very simple*: Idaho 30-1-6, in1995 and 1996, provides that a corporation may redeem its shares only to the extent of unreserved and unrestricted earned surplus. The *only* relevant fact material to AIA's motion is the *undeniable fact* that, at the time of both the 1995 Stock Redemption Agreement and the 1996 Stock Redemption Restructure Agreement (the agreement on which Reed Taylor has brought his lawsuit), AIA Services did not have any earned surplus whatsoever, let alone sufficient earned surplus to redeem Reed Taylor's shares in AIA Services for $7.5 million." [1770] Although under *LaVoy Supply Co. v. Young,* AIA Services itself could not have asserted what turned out to be an effective defense, had the Hawley Troxell Defendants exercised ordinary care with respect to

---

[1766] Because the fee and costs damage claims are duplicative, they are only necessary if Miesen does not prevail under other theories. In my opinion, if the illegality defense would have been properly and timely asserted in early 2007, the AIA Corporations would have saved at least $1,300,000 in fees and costs paid to the Hawley Troxell Defendants and those improperly advanced to the attorneys representing the Controlling AIA Defendants and Corrine Beck, which were separately caused by the Hawley Troxell Defendants' breaches of duties of care, good faith and loyalty. Indeed, Riley was an experienced business attorney who was involved in the redemption of Reed Taylor's shares and his absurd analysis for not obtaining capital surplus approval. Thus, it appears that the Hawley Troxell Defendants may have held back the defense.
[1767] Judge Brudie roundly rejected the Hawley Troxell Defendants' specious oral modification and waiver arguments. DLM – 0010452; 0011502
[1768] FB 0785-89.
[1769] FB 0789.
[1770] DLM 0015027-28. (Emphasis supplied.)

Exhibit - 1, p. 527

12-ER-2945

the matter and looked beyond is oral modification defense and at the statute itself, another defendant could have raised the illegality defense at the very outset of the case, prior to extensive discovery and other activity.[1771] Indeed, as soon as the statutory violation finally came to light, Henderson and Beck promptly moved for partial summary judgment on the illegality issue and for a stay of discovery pending the decision on that partial summary judgment motion. Notably, in seeking the protective order, Babbitt admitted "There is presently pending a Motion for Partial Summary Judgment filed by Connie Taylor and Jim Beck which raises the legality of the 1996 Stock Redemption Restructure Agreement. This motion, if granted, would declare the Promissory Note held by Reed J. Taylor void and moot all other claims of Reed J. Taylor in this case."[1772] In words Babbitt used in a different but related context, most of the extensive previous discovery had been a "a waste of time and money."[1773]

4.     The Hawley Troxell Defendants' misconduct was compounded when they caused the AIA Corporations and the AIA Services' 401(k) Plan at a cost of $193,258.77 to retain Brown to represent the Plan in its intervention in the *Reed Taylor v. AIA Services* and its assertion of the illegality defense which was wholly unnecessary and constituted yet another act of malpractice against the AIA Corporations.[1774] As Judge Brudie found "The 401(k) Plan, by its own admission, was not a stockholder until March 1996 when AIA exchanged $565,000.00 of 401(k) Plan funds for AIA Preferred Stock. The Plan therefor is without standing to assert an illegality defense to an agreement entered into before the Plan was a shareholder." Because it negligently failed to raise the illegality issue in a timely fashion, and caused the retention of Brown, the Hawley Troxell Defendants must reimburse the AIA Corporations for the wasteful expenditure for unnecessary legal fees. All of this was continued fallout from Riley's original negligence when he delivered the erroneous legal opinion letter to Reed Taylor in 1995 stating that the

---

[1771] Ashby testified on behalf of the Hawley Troxell Defendants that he did not know why the Hawley Troxell Defendants didn't assert the illegality defense when they first started working on the case. 3/4/2020 Ashby Rule 30(b)(6) Depo. Transcript, p. 26.

[1772] DLM – 0014058. Babbitt added "All facts which are *irrelevan*t to the [illegality motions] have been produced. The issue of legality of the 1996 Stock Redemption Restructure Agreement focus exclusively on the Idaho Statute in effect in 1995 and 1996 and financial statements of AIA, all of which have been produced..." DLM – 0014058-59.

[1773] DLM – 0014059.

[1774] While John Taylor subsequently testified that the AIA Corporations did not pay Brown, there is no possible way that the AIA Corporations incurred "more than $2,240,13.10 in fees" (DLM – 0036058) in *Reed Taylor v. AIA Services* without included the fees and costs paid to Brown.

Exhibit - 1, p. 528

stock redemption transaction complied with Idaho law. Had the Hawley Troxell Defendants identified timely the illegality defense, enabling John Taylor and Henderson to have litigated the illegality defense immediately, and advised that the AIA Services' 401(k) Plan not intervene in *Reed Taylor v. AIA Services*, it would have saved the AIA Corporations well over $800,000 in fees and costs,[1775] damages which were proximately caused by the Hawley Troxell Defendants by at least $800,000 (this is conservative and gives every benefit of the doubt to the Hawley Troxell Defendants) or as much as over $900,000, along with at least $500,000 that would have not needed to be improperly advanced to the attorneys representing the other defendants. While John Taylor recently testified that the AIA Corporations did not pay Brown, there is no possible way that the AIA Corporations incurred "more than $2,240,13.10 in fees"[1776] in *Reed Taylor v. AIA Services* without included the fees and costs paid to Brown.

5.      In sum, Riley and the other Hawley Troxell Defendants botched the illegality defense; they breached their duties of care by failing to identify the defense and have their client John Taylor assert the defense at the outset of the litigation in *Reed Taylor v. AIA Services*, which would have saved the AIA Corporations the $94,630 in payments made to Reed Taylor in 2007 and 2008[1777] and at least $1,400,000 in attorneys' fees and costs paid to Hawley Troxell and the attorneys representing the other defendants, thereby being one of the proximate causes of those damages. The fees and costs expended in the countless motions and in discovery would also have been prevented.

## V.   Substantial Assistance in Controlling AIA Defendants' Breaching the Duties of Good Faith and Loyalty.

1.      Based upon all of my work and as discussed in Sections X-XII, the Hawley Troxell Defendants have also separately substantially assisted the Controlling AIA Defendants in covering up their breaches of duties of good faith and loyalty and have substantially assisted them in breaching those same duties by

---

[1775] This assumes that the AIA Corporations would have properly obtained approval to advance the remaining portion of fees and costs to John Taylor's attorney to assert the defense.

[1776] DLM – 0036058.

[1777] A motion to deposit in the court registry could have been promptly filed at the outset of the litigation, just like the Hawley Troxell Defendants filed almost one and one-half years later.

engaging the conduct described in this Report, thereby being one of the proximate causes of the damages to the AIA Corporations (*see* Damage Item Numbers 1-40).

2.       The conduct of the Hawley Troxell Defendants in *Reed Taylor v. AIA Services* constituted two sets of legal wrongs. Two separate duties to the AIA Corporations were breached by substantially the same conduct. In addition to breaching their own duties of care owed to the disabled AIA Corporations as set forth above, the conduct of the Hawley Troxell Defendants, as counselors, also provided substantial assistance to the Controlling AIA Defendants in their serial breaches of their duties of loyalty and good faith owed to the AIA Corporations and the AIA Disinterested Shareholders, thereby also being one of the proximate causes of the damages to the AIA Corporations. Since 2007, the Hawley Troxell Defendants have sat back and watched the Controlling AIA Defendants decimate the AIA Corporations and it was entirely foreseeable—indeed, certain—that this would occur if they failed to take action and/or make full disclosure to shareholders and/or independent directors.

3.       Rather than take action to disclose matters to an independent director or a receiver, the Hawley Troxell Defendants opposed the appointment of either. This is not a case of a lawyer's zealous representation of a client harming a third party - far from it. The harm the Hawley Troxell Defendants substantially assisted was inflicted upon the AIA Corporations, their own clients. That substantial assistance took the form of, for example, acquiescence in such Defendants' flagrant disregard of customary principles of corporate governance such as adherence to the Corporations' Articles of Incorporation and Bylaws, holding meetings of shareholders and boards of directors as well as compliance with applicable laws. Moreover, Hawley Troxell not only looked the other way as the Controlling AIA Defendants breached their duties of good faith and loyalty owed to the disabled AIA Corporations continued unabated, they also performed legal work that had the effect of facilitating those breaches; such as, for example, the cover up of misappropriation of Crop USA, other improper transactions and the unauthorized guarantee of the Lancelot Loan during *Reed Taylor v. AIA Services* and thereafter, as well as conducting the *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services* litigation in such a way that enabled the Controlling AIA Defendants to avoid responsibility for their intentional breaches of their duties of good faith and loyalty owed to the disabled AIA Corporations and to ensure that they remained in control to continue engaging in that conduct.

Page - 521

Exhibit - 1, p. 530

4.      Indeed, the Joint Defense Agreements and Amended Standstill and Tolling Agreements were prepared to ensure that the conduct would be concealed and the Hawley Troxell Defendants had no intention of the improper conduct ever seeing the light of day because they knew that the Controlling AIA Defendants would never investigate themselves or have the AIA Corporations assert claims against themselves; those agreements substantially assisted in ensuring that result. Moreover, as discussed above, the Hawley Troxell Defendants then assisted in implementing the reverse stock split in an effort to ensure that their conduct would remain concealed. For all of the reasons stated in this Report, the Hawley Troxell Defendants' have substantially assisted the Controlling AIA Defendants in breaching their duties of loyalty and good faith and by assisting them in concealing the transactions and conduct thereby proximately caused damages to the AIA Corporations.

## W.   Disregard of the AIA Corporations and the AIA Disinterested Shareholders.

1.      The descriptions in this Report of the conduct of the Hawley Troxell Defendants reveals on their part little, if any, regard for the rights of and duties owed to the AIA Corporations and the AIA Disinterested Shareholders. For example, the affirmative defenses in their answer to the third amended complaint include unsupported assertions that Miesen, an investor in AIA Services, has unclean hands and that he is somehow conspiring with Reed Taylor, serious charges to say the least, and one would expect that parties making such verified allegations would have facts and evidence to support them. Ashby testified with regard to this matter, establishing that he had no evidence. To this day, the Hawley Troxell Defendants have failed to discharge their duties of care and loyalty owed to the AIA Corporations, irrespective of the additional lawsuits filed, including this Lawsuit. In any event, in my opinion, Miesen does not have unclean hands and is the real party in interest and not a surrogate for anyone else. Contrary to the Controlling AIA Defendants, Miesen has been proceeding in the best interest of the AIA Corporations. Miesen is seeking to extricate the AIA Corporations from the illegal, concealed, unapproved and unauthorized GemCap Settlement Agreement. The Hawley Troxell Defendants are in no position to judge Miesen and they have no viable basis to do so.

2.      Speaking of unclean hands, the Hawley Troxell Defendants have taken the untenable position in this Lawsuit against their clients the AIA Corporations that the GemCap Settlement Agreement and judgment against the AIA

**Exhibit - 1, p. 531**

**12-ER-2949**

Corporations is enforceable and that GemCap is the real party in interest—this merely confirms, once again, that the Hawley Troxell Defendants proceed against the interests of the AIA Corporations for their own interests and those of the Controlling AIA Defendants (who want the GemCap Settlement Agreement enforced) thereby breaching their duties of care, good faith and loyalty owed to the AIA Corporations.[1778] The same holds true for the Hawley Troxell Defendants' involvement in the effort to effectuate the improper reverse stock split; they did not advise the Controlling AIA Defendants to not proceed with that reverse stock split because it would be unfair and was not authorized by AIA Services' Amended Articles Incorporation. To the contrary, they provided John Taylor with the road map of what to do to terminate this Lawsuit and essentially stated that they would not do the dirty work for them. This conduct is either intentional or the Hawley Troxell Defendants' are so blinded by their egos and desire to defeat Miesen, his counsel or anyone else asserting claims against the Controlling AIA Defendants and/or claims for the AIA Corporations that they are unable to recognize and proceed in the best interests of the AIA Corporations. Instead, they have proceeded in the best interests of the Controlling AIA Defendants thereby breaching their duties of care, good faith and loyalty owed to the AIA Corporations and thereby being one of the proximate causes of the damages to the AIA Corporations.

## X. <u>General Response to the Three Expert Witness Reports Submitted by the Hawley Troxell Defendants.</u>

1.      I have thoroughly reviewed and analyzed all four reports submitted by Messrs. Remele, Lidstone and Pinkerton (two reports). None of them have supplemented or revised their reports to reflect the significant discovery since the time of their last reports. Accordingly, I have not made any material changes to my rebuttals to their reports. However, my opinions in Sections X-XIII this Report, together with the attached Exhibits A-G, constitute additional rebuttals to their reports. I have also included additional information regarding my qualifications and experience with financial matters in response to the Pinkerton Reports and the detailed calculations and documentary support for Miesen's damages in Exhibit A attached hereto. I have also reviewed and considered new documents, information (including the Unredacted Billing Records and the documents produced in response to subpoenas Miesen served on the Hawley Troxell Defendants' experts) and authorities since my last Report which I have relied upon in preparing my rebuttal opinions in this Report, some of which are identified in this Report.

---

[1778] Dkt. 572.

Exhibit - 1, p. 532

12-ER-2950

2.      Unless otherwise indicated, when I refer to "Report" in my rebuttals below, I am referring to the Sections in this Report.

3.      There is nothing in the Lidstone Report, the Remele Report or the Pinkerton Reports that has changed my analysis and opinions. In a Declaration I previously submitted in this Lawsuit on July 2, 2019, I stated the following:

> While this case may appear quite to be complex and, indeed, is quite complex in various aspects, the general theme of what has transpired is quite simple with respect to the Hawley Troxell Defendants. By analogy, in my opinion, the Hawley Troxell Defendants' representation of AIA Services, AIA Insurance and CropUSA Insurance Agency in Reed Taylor v. AIA Services and accepting litigation decisions or purported conflict waivers from John Taylor or any of the other conflicted insiders, would be no different than an attorney agreeing to represent a bank and the bank president when that bank president participated in stealing the bank's money (or agreeing to represent only the bank and allowing that same president to make the decisions for the litigation) in a lawsuit brought by a customer seeking to recover his funds that were stolen by the president of the bank. The attorney, and a lawfully operated bank, would of course want to be taking legal action against the president and working with the customer to seek recovery of the stolen funds. Applying this analogy here, the Hawley Troxell Defendants should have been seeking on behalf of AIA Services or AIA Insurance to recover their money, property, and other assets from CropUSA Insurance Agency, John Taylor and the other responsible Controlling AIA Defendants rather than representing them all or allowing any of them to make litigation decisions for AIA Services or AIA Insurance.[1779]

4.      I continue to believe and opine that the forgoing is an apt analogy of the improper conduct and obvious breaches of the duties of care and loyalty owed to the AIA Corporations by engaging in the conduct described in this Report and as demonstrated by the documentary and other evidence that I have reviewed. I continue to believe and opine that the Hawley Troxell Defendants placed their interests in earning fees and protecting the interests of the Controlling AIA Defendants above the interests of the AIA Corporations in having unconflicted and

---

[1779] Dkt. 403-2, pp. 9-10.

independent representation as described in this Report thereby once again breaching their duties of loyalty and care owed to the AIA Corporations. Nothing in the Reports submitted by Messrs. Lidstone, Remele and Pinkerton has caused me to change my opinions, which are set forth in Sections I, X,[1780] XI, XII and XIII and in Exhibits A-H attached hereto of this Report and the prior versions of my Reports, and those Sections of my prior Reports are incorporated by reference herein in response to Messrs. Lidstone, Remele and Pinkerton's Reports. Finally, if I do not specifically address any statements or opinions offered by Messrs. Lidstone, Remele or Pinkerton, I am not conceding the issue or necessarily agreeing with any of them. In fact, the analysis and opinions contained within Section X of this Report defeats much of what Messrs. Liston and Remele state in their Reports. Based on my review of their Reports and the scant information that they were provided, in my opinion, they have not even been provided with the requisite information to fully address the matters at issue in this Lawsuit.

## Y.  __Rebuttal to Mr. Remele's Report and Opinions.__

The Hawley Troxell Defendants submitted the Report and opinions of Mr. Remele to respond to my initial preliminary opinions. Having carefully reviewed the Remele Report and based upon my education, training, knowledge, and experience, together with the authorities, facts, documents, analysis, and data that I have reviewed, considered, assumed, relied upon, and disclosed in this Report, I hereby incorporate by reference herein my prior analysis and opinions (including those expressed in Sections I, X, XI, XII, and XIII) to rebut the Remele Report and I express the following additional rebuttal opinions:

1.      Because Mr. Remele has not provided a supplemental or revised report, I have not significantly modified any of my opinions. If Mr. Remele does submit a revised or supplemental report, I will address any new opinions or analysis. I first express the following opinions which are of general applicability to the Remele Report. I qualify this statement, and related ones in this Report which I do not have time to modify, by noting that I was provided with a copy of a supplemental report from Mr. Remele dated October 30, 2020, but I have not had an opportunity to review it. I will therefore supplement this Report after I am able to review it and respond.

---

[1780] As I have repeatedly stated, there are many discrete opinions contained within Section X, which stand on their own.

**Exhibit - 1, p. 534**

**12-ER-2952**

2.      One wouldn't know it from reading the Remele Report, but the case against the Hawley Troxell Defendants is really about the proper role of a lawyer in representing corporate clients which have been severely harmed by the egregious misconduct of those corporations' directors, officers and controlling shareholders—the Controlling AIA Defendants and Freeman. The Hawley Troxell Defendants didn't live up to that role because they enabled and provided substantial assistance to those disloyal insiders and then covered up their own misconduct by pretending to represent the interests of the AIA Corporations when in fact, by any objective standard, they were representing the interests of, and taking direction from, John Taylor and/or the other Controlling AIA Defendants.

3.      The Remele Report views this Lawsuit from the prospective of a lawyer with a narrow, defense orientation who apparently has not been called upon to exercise professional judgment in connection with significant corporate governance matters by, for example, giving litigation advice that a corporate client's insiders don't want to hear because it is adverse to their personal interests. The AIA Corporations needed a law firm that was as effective in the board room as in the court room. The Hawley Troxell Defendants were neither, thereby breaching their duties of care and their fiduciary duties owed to the AIA Corporations and proximately causing damages to them as described in this Report. Like the Hawley Troxell Defendants, Mr. Remele erroneously equates the AIA Corporations with their purported "Boards of Directors" when under the applicable authorities their true clients were (and are) those legal entities themselves, not the insiders—the Controlling AIA Defendants.

4.      Although its general themes are not complex, this is a factually intensive case which cannot be viewed from 20,000 feet. Mr. Remele's opinions on the propriety of the conduct of the Hawley Troxell Defendants do not address the detailed and specific facts and documents upon which the opinions expressed in my 263-page August 12 Report are based. Instead, it appears that Mr. Remele has been spoon fed selective information by the Hawley Troxell Defendants and he expresses his opinions either in a vacuum or with unsupported and erroneous, often unstated, assumptions (many of which are refuted by my analysis and opinions in Sections I, X, XI and XII of this Report). For example, Mr. Remele apparently rendered his opinions on such matters as scope of representation, non assumption of duties, and non-general counsel without even examining the Unredacted Billing Records or the other privileged and work product information.

5.      A true understanding of the breadth of the Hawley Troxell Defendants' engagement and a correspondingly wider prospective generally, together with the requisite judgment and experience, are required for a proper evaluation of the conduct and complicity of the Hawley Troxell Defendants, as well as an objective determination as to whether they complied with applicable requirements and standards of care and duties of loyalty (including the applicable Rules of Professional Conduct) as described in Sections I, X, XI and XII of this Report. Mr. Remele's pejorative choice of words also reveals a defense lawyer's orientation and perspective. For example, he consistently refers to my opinions as "allegations," and, when he disagrees with one of my conclusions, states that, instead of expressing those opinions, I "argue," "misrepresent" or even "distort the law and the facts." Unsurprisingly, the Remele Report, other than general denials of breaches, is devoid of any analysis of the nature and extent of a lawyer's fiduciary duties owed to a corporate client (including the all-important duty of loyalty) or the application of those principles to the specific facts of this Lawsuit.

**Reoccurring Errors in the Remele Report**.

6.      The principal predicate for many of the statements made and conclusions expressed in the Remele Report is that the Hawley Troxell Defendants were entitled to rely upon the actions taken and decisions made by the "boards" of the AIA Corporations as being valid and thus, presumably, made, as the applicable Idaho statute puts it, "in good faith" and "in a manner the director reasonably believes to be in the best interests of the corporation." Yet in footnote 16 on page 29 of his Report, Mr. Remele states "I have not been retained to opine on the legitimacy of John Taylor's actions." He thereby tries to rely on what, in TriBar Committee legal opinion parlance is referred to as "unreliable information"[1781] and removes what should be the very cornerstone and essential predicate of his numerous (and redundant) opinions that the Hawley Troxell Defendants' reliance on the decisions and directives of those "boards "was somehow appropriate." Accordingly, Mr. Remele's beliefs as to the legality and propriety of the "boards'" actions and the right of the Hawley Troxell Defendants to rely thereon are based on an unsupported and erroneous assumption, have no basis in fact and thus no relevance or probative value to this Lawsuit. Mr. Remele's failure to address the "legitimacy of John Taylor's actions" wholly undermines all of his opinions. In my opinion, Mr. Remele did not address, in his words, the "legitimacy of John Taylor's actions" because that would have resulted in Mr. Remele's being unable to reach

---

[1781] "If the opinion preparers identify information as 'unreliable,' they must find other information to establish the facts." Section 2.1.4 of the 1998 TriBar Report, 53 Bus. Law. 591, 610 (1998).

Exhibit - 1, p. 536

**12-ER-2954**

the conclusions and opinions expressed in his Report. I agree with Mr. Remele, however, when he states in that same footnote that "it is my opinion that it was in the best interest of the AIA entities, as well as Crop USA, to retain independent, outside competent counsel to defend against Reed Taylor's creditor claim." The only problem is that the AIA Corporations never had independent counsel. For all of the reasons stated in this Report, the AIA Corporations did not obtain counsel with any of those attributes. They had conflicted counsel, the Hawley Troxell Defendants, who were representing the interests of the Controlling AIA Defendants and CropUSA rather than the interests of the AIA Corporations. Moreover, if such counsel had been retained, among other matters, CropUSA would have been advised to cease and desist from its wrongful conduct.

7.      Another erroneous theme that appears numerous times throughout the Remele Report is that the Hawley Troxell Defendants are somehow absolved from responsibility because they were not "serving as outside general counsel" or as "general counsel" to the AIA Corporations.[1782] Those statements infer that, if the Hawley Troxell Defendants had been general counsel, their duties and responsibilities would have been as inclusive as I have opined. As a preliminary matter, Mr. Remele's assertion is a red herring. The Hawley Troxell Defendants representation of the AIA Corporations in *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services* included most of the issues raised by Miesen in this Lawsuit. While the Hawley Troxell Defendants have for years asserted in self-serving statements and after-the-fact testimony that they were never general counsel for the

---

[1782] The erroneous notion that the Hawley Troxell Defendants were not general counsel also forms the basis for Mr. Remele's opinion that they did not aid or abet the Controlling AIA Defendants' breaches of fiduciary duties. *E.g.*, Remele Report, pp. 6-7. The inference to be drawn from Mr. Remele's repeated denials that the Hawley Troxell Defendants were general counsel to the AIA Corporations is that, if they were, they would have had the duties and responsibilities he asserts they do not have. The Hawley Troxell Defendants have the duties and responsibilities as I opined in this Report by reason of their being general counsel and also because of the broad scope of representation contained in the Engagement Letters, namely "to advise the two corporate defendants in connection with above entitled litigtion brought by Reed J. Taylor."

Page - 528

AIA Corporations,[1783] Mr. Remele provides no factual or legal support for that conclusion. There is, however, explicit testimony described below in this paragraph and documentary evidence that compels the opposite conclusion. Based upon my review to date of the Unredacted Billing Records, it appears that during the relevant time frame the Hawley Troxell Defendants were engaged in at least the following matters for the AIA Corporations or Crop USA:

- Insurance Regulatory Matters;

- Trust Claims Settlement Matters;

- Insurance Agency Agreement Matters;

- Indemnification and Advancement of Fees to Directors;

- Composition of Boards of Directors;

- Employee and Independent Contractor Matters;

- Preparation of Equity Incentive Plan for Crop USA, including Qualified and Non-Qualified Stock Option Plans, Restricted Stock Plan Employee Stock Purchase Plan, Necessity for Shareholder Approval thereof, Independent Committee Requirements and Compliance with Sections 162(m) and 409A of the Internal Revenue Code, as well issues under the Securities Exchange Act of 1934 and the Rules and Regulations of the Securities and Exchange Commission thereunder;

- Investment Advisory Matters Pertaining to Health Saving Account Administration;

---

[1783] For example, on May 31, 2018, Riley stated in a declaration that "Hawley Troxell did not at any time serve as general counsel for AIA Services, AIA Insurance or CropUSA." Dkt. 390, p. 14. In their April 30, 2012 letter, the Hawley Troxell Defendants stated "nor could we both defend AIA against Reed's claims and also advise AIA as general counsel concerning potential claims by AIA against the individual defendants or CropUSA. Accordingly, we agreed to a limited engagement as litigation counsel for AIA, conditioned upon agreement by each of the individual defendants and CropUSA to toll the statutes of limitation applicable to the allegations made against those individuals and CropUSA." HTEH000254. To borrow a phrase, the Hawley Troxell Defendants and Mr. Remele "doth protest too much." William Shakespeare, *Hamlet*, Act III, Scene II. (1603).

Page - 529

- Federal and State Securities Law Matters;

- Advice Regarding Legality of Reissuance of Series A Preferred Stock of AIA Services;[1784]

- Shareholder Meeting and Proxy Holder Voting Rights Matters;

- Executive Employment Agreement Matters;

- 2009 Alleged Recommended Redemption of Donna Taylor's Series A Preferred Stock;

- Secured Lending Arrangements;

- Sale/Leaseback Transaction;

- Creditors' Rights and Bankruptcy Law Advice;[1785]

- Issues Pertaining to the AIA Services' 401(k) Plan;

- Examination and interpretation of Articles of Incorporation and Bylaws;

- Consideration of Duties of Outside Counsel to Shareholders;

- Consideration of Liability of Law Firm for Not Bringing Claims Against Directors;

---

[1784] E.g., "10/20/09 Richard Riley…Review G. Babbitt e-mail re statutes pertaining to reacquired Series A preferred shares; research statutory default status of redeemed shares; review and respond to G. Babbitt's proposed advice memorandum to J. Taylor re reissuance of Series A preferred." FB 0810. "11/3/09 Richard Riley…Telephone conference and e-mail from G. Babbitt re re-issuance of Series preferred stock; review AIA Services Articles of Incorporation; e-mail to and telephone conferences with G. Babbitt re same." "Gary D. Babbitt…Telephone conference with J. Taylor (2); work on Series A Stock." FB 0811.

[1785] There appear to be at least twenty-four references to bankruptcy matters in the Unredacted Billing Records, including items such as coordination with bankruptcy counsel, a classic general counsel function.

Exhibit - 1, p. 539

12-ER-2957

- Potential Liability of Outside Counsel When Trying to Represent Both Corporation and Directors and Fiduciary Duty to Client;

- General Post Illegality Decision Actions to be Taken by AIA Services, including Carrying Out of Reverse Stock Split;

  Consideration of Legal Impediments to Seating of Designated Board Member;
- Consideration of Directors' Fiduciary Duties to Shareholders.

- Litigation Matters Other Than *Reed Taylor* v. *AIA Services*;[1786]

8.      The Unredacted Billing Records and above work description demonstrate that from not later than 2007 through on about May 3, 2012 (when they were replaced as general counsel by Quarles & Brady), the Hawley Troxell Defendants were intimately involved in all of the significant corporate, commercial and litigation matters of the AIA Corporations and CropUSA, which is wholly consistent with the role of general counsel.[1787] During my legal career, I have been a partner in law firms that acted as general counsel for a number of corporate clients. The variety and scope of the matters in which the Hawley Troxell Defendants were engaged on behalf of the AIA Corporations exceed that of many of my firms' general counsel engagements. Accordingly, in my opinion, the Hawley Troxell Defendants were general counsel to the AIA Corporations.[1788] While not

---

[1786] These include *Donna Taylor v. AIA Services* (seeking the appointment of a receiver for the AIA Corporations; the filing of a Petition for Court Appointed Independent Inquiry Pursuant to I.C. § 3-1-743 and I.C. § 30-1-744 (relating to shareholders' demand letters); and *Donna Taylor* v. *John Taylor* (seeking to enforce her rights as a Series A Preferred Stock holder).

[1787] It is also noteworthy that in an agreement such as the Tolling Agreement effective on October 1, 2008 between AIA Services' 401(k) Plan and AIA Services it is provided that notices to AIA Services are to be given to Babbitt. Acting as a contractual notice recipient is yet another indicia of a law firm that is acting as general counsel.

[1788] The standard, form book coverage limitation language used by the Hawley Troxell Defendants in their responses to auditors' requests for information (i.e., "While this firm represents the Company on a regular basis, our engagement has been limited to specific matters as to which we were consulted by the Company. We do not exercise internal supervision of the Company's legal affairs and, therefore. this response is necessarily limited to those matters as to which we have been specifically engaged and to which we have devoted substantive attention in the form of legal consultation or representation as of December 31, 2006 and during the period from that date until the date of this letter" (HTEH000700) does not militate against the Hawley Troxell Defendants being general counsel to the AIA Corporations or otherwise affect my analysis.

**Exhibit - 1, p. 540**

**12-ER-2958**

necessary to conclude that the Hawley Troxell Defendants had previously acted as general counsel for the AIA Corporation, my opinion also happens to be further supported and confirmed by John Taylor's deposition testimony taken on August 29, 2016: "***Hawley Troxell, for example, was our general counsel for years***."[1789] I actually agree with John Taylor on this issue.

 On page 9 of his Report, Mr. Remele describes that broad swath of legal work as "limited engagements to provide discrete legal advice to the AIA entities." That assessment is inconsistent with John Taylor's 2016 testimony and with the facts. It is obvious that the Hawley Troxell Defendants had not provided Mr. Remele with the Unredacted Billing Records. In a deposition taken on August 29, 2016, discussed in Section X(Q) of this Report, John Taylor voluntarily testified that "Hawley Troxell, for example, was our general counsel for years."[1790] Although Mr. Remele was apparently provided with that transcript, he makes no reference to it. Although in my opinion his overall conduct does not reflect well on his career, John Taylor's testimony appears to be based on his extensive experience as a lawyer, businessman and director of a publicly traded company Avista. It is also consistent with the historical record. Riley's former the law firm of Eberle Berlin was general counsel to AIA Services.[1791] A law firm's status as general counsel does not depend upon a formal designation as such. Instead, a firm "that represents a client in all or most of the client's legal matters…" is that client's general counsel.[1792] The nature and extent of their engagements set forth above confirm that the Hawley Troxell Defendants were general counsel to the AIA Corporations during all relevant times, including during the *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services* lawsuits. The symbiotic relationship between the Hawley Troxell Defendants and the AIA Corporations is, for example, demonstrated by Riley testifying that the appointments of Henderson and Beck to the Boards of the AIA Corporations "were the best **we** could do under the circumstances."[1793] Another such example is the general counsel role work Riley, a corporate partner, performed in dealing with

---

[1789] GC0748429 (Emphasis supplied).

[1790] GC0748429. Also, in a declaration in *Donna Taylor v. AIA Services* dated May 9, 2014, John Taylor stated that the defense of the *Reed Taylor* suit "deprived AIA of the ability to use its long term attorneys, Hawley Troxell Ennis and Hawley…" DLM – 0036058.

[1791] *E.g.,* In the legal opinion dated August 15,1995 he delivered in connection with the redemption of Reed Taylor's shares, Riley states "We have acted as general counsel for the Company in connection with the transactions contemplated by the Agreement." RJT089249.

[1792] Black's Law Dictionary counsel (11th ed. 2019).

[1793] *E.g.,* 7/1/2019 Riley Depo. Transcript, p. 170 (Emphasis supplied). While Riley improperly and untimely subsequently changed his answer on August 30, 2019, his original answer is consistent with the facts.

such issues as conflicts of interest, waivers of conflicts, tolling agreements, joint defense agreements, corporate matters, securities matters, litigation supervision and director and officer indemnification. The Hawley Troxell Defendants' structuring of a January 20, 2009 proposed "global settlement,"[1794] providing, *inter alia*, for not only a settlement of the *Reed Taylor* case, but also the resolution of such corporate matters as a reversal of the AIA Insurance's 2004 illegal acquisition of Series C Preferred Shares, the cancellation of Crop USA's security interest in AIA Services' Headquarters, a purchase of Henderson's community interest in AIA Services common stock[1795] and the cancellation of one half of the outstanding shares of such common stock held by John Taylor also establishes that the Hawley Troxell Defendants were general counsel to the AIA Corporations, had an unlimited scope of representation and were not merely defending a "creditor claim" as Mr. Remele states. Other AIA Corporations' matters consistent with the Hawley Troxell Defendants' role as general counsel to the AIA Corporations include: Riley advising McNichols regarding conflicts involving McNichols' representation of the AIA Corporations in *Reed Taylor;* Riley reviewing AIA Services' New Restated Bylaws "in analyzing the Board of Directors' right to litigation expense advances;" and Babbitt counseling the "Boards" regarding the unwinding of the AIA Insurance's illegal acquisition of the Series C Preferred Shares, as well as the other corporate matters listed above, and described in this Report and the evidence produced in this Lawsuit.[1796] Any purported limited scope (which in my opinion never existed) was in any event abandoned by the Hawley Troxell Defendants. For example, in his March 5, 2020 Deposition as a Hawley Troxell designee, Riley acknowledged that the Hawley Troxell Defendants' filing of a Petition[1797] under Idaho Code section 30-1-744(6) for the appointment of a panel to determine whether the maintenance of a derivative proceeding was in the best interests of the AIA Corporations exceeded their alleged limited scope of representation:

> Q. Okay. And then -- so you don't disagree with me, then, Hawley Troxell attorneys were seeking a petition to address Reed and Donna Taylor's derivative demands, correct?
> A. Yes, that's true.

---

[1794] DLM – 0033772.

[1795] Again, the intention of the Controlling AIA Defendants and the Hawley Troxell Defendants was to benefit the insiders without affording an equal opportunity to the AIA Disinterested Shareholders to sell their shares to AIA Services.

[1796] It is also the case that the AIA Corporations relied on Riley for daily, routine matters such as a "quick review" of one-page communications to CropUSA shareholders. *E.g.,* HTEH000276.

[1797] Dkt. 67-20.

Exhibit - 1, p. 542

12-ER-2960

Q. Is there any scope of representation -- this falls outside of the scope of representation of defending against Reed Taylor's creditor claims, correct?

A. That may be true. I hadn't thought about it, but that may be true.

Q. And we talked a little bit ago about when Donna Taylor intervened and Hawley Troxell attorneys opposed that intervention. That work, opposing Donna Taylor's intervention, is outside of the scope of representation, as you've described, of Reed Taylor's creditor claims defense.

A. I'm not familiar with Donna's intervention. · I'm not prepared to comment on it…

* * *

Q. Okay. So you agree with me that Donna Taylor, the series A preferred shareholder, had payment priority over anyone else, correct?

A. Yes.

Q. Okay. And so why would Hawley Troxell attorneys oppose Donna Taylor just seeking to have the money to satisfy her debt that hadn't been paid for over ten years?

A. Because our client asked us to.

Q. And who was your client?

A. AIA.

Q. Which AIA?

A. I am assuming AIA Services since that's the entity in which she was a shareholder.

Q. And so when you say your "client" told you to do what you did, you're referring to the representatives, meaning John Taylor, JoLee Duclos, Connie Taylor Henderson, James Beck -- one or more of those group of individuals?

A. Whoever was on the board in April of 2012, yes.[1798]

9.      Having been a partner in firms which served as general counsel to a number of corporate clients, in my opinion, Riley's pervasive involvement as billing and responsible attorney in what appears, from the Unredacted Billing Records and other documents I have been able to review so far, to be nearly all of the AIA Corporations' legal affairs, can lead to no other reasonable conclusion than the Hawley Troxell Defendants were the AIA Corporations' general counsel during all relevant times. The broad array of engagements handled by the Hawley Troxell Defendants are not matters that would be handled by a special litigation counsel as

---

[1798] 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript, p. 139.

Exhibit - 1, p. 543

12-ER-2961

the Hawley Troxell Defendants claim, and Mr. Remele opines, that they were—the Hawley Troxell Defendants were directly and intimately involved in all aspects of the legal affairs and corporate governance matters of the AIA Corporations as evidenced by the Unredacted Billing Records and other documents available to date. Accordingly, the Hawley Troxell Defendants assumed the duty of acting of acting as the *de facto* general counsel to the AIA Corporations. without a limited scope of representation.[1799] Moreover, I do not need the Unredacted Billing Records in order to opine that the Hawley Troxell Defendants had acted as general counsel for the AIA Corporations. John Taylor, who has directed the legal activities at the AIA Corporations for decades, and who is also an attorney, testified in 2016 and confirmed what I believe to be the obvious: "***Hawley Troxell, for example, was our general counsel for years***."[1800]

10.    Moreover, the Hawley Troxell Defendants replaced a general counsel and were in turn replaced by the naming by John Taylor on May 3, 2012 of a new a general counsel for AIA Services, Quarles & Brady. The words "general counsel" appear 17 times in the Remele Report. That notion did not, however, originate with Mr. Remele. The Hawley Troxell Defendants '"not general counsel defense" was conjured up years ago as a self-serving position to be later asserted as a defense by the Hawley Troxell Defendants. For example, in Ashby's letter of April 30, 2012, which is referred to on page 49 of the Remele Report, Ashby makes the following after-the-fact and self-serving statement disavowing the Hawley Troxell Defendants being "general counsel" and taking a new position on the clear and unambiguous terms of the scope of representation in the written representation agreements:

> "This firm could not represent in the litigation both AIA, on the one hand and on the other hand the corporations' directors/officers and CropUSA; nor could we both defend AIA against Reed's claims and also advise AIA as general counsel concerning potential claims by AIA against the individual defendants or CropUSA.[1801] Accordingly, we agreed to a limited engagement as litigation counsel for AIA, conditioned upon agreement by each of the individual defendants and

---

[1799] *Cf. Taylor v. Riley*, 157 Idaho 323, 339, 336 P.3d 256, 272 (2014); *Jones v. Runft, Leroy, Coffin & Matthews, Chtd.*, 125 Idaho 607, 611-13, 873 P.2d 861, 865-68 (1994).

[1800] GC0748429 (Emphasis supplied).

[1801] On March 3, 2020, Riley testified that "we never had occasion to say that we weren't their [the AIA Corporations] general counsel" (Tr. p. 324), which flies in the face of Ashby's purported disclaimer, which was essentially provided to no one under the adverse interest exception discussed in Section X(V).

**Exhibit - 1, p. 544**

**12-ER-2962**

CropUSA to toll the statutes of limitation applicable to the allegations made against those individuals and CropUSA."[1802]

Notably, the obvious reason for Ashby's self-serving April 30, 2012 letter appears to have resulted from Donna Taylor's Motion to Intervene filed twelve days earlier on April 18, 2012 in *Reed Taylor v. AIA Services* seeking to have the court protect the $400,000 held in the court registry in that lawsuit (to keep the Controlling AIA Defendants from getting those funds)[1803] and an email that he and Babbitt received from Attorney Bond six days earlier:

Under your attentive watch as counsel for AIA Services there has never been a shareholder meeting to elect directors for AIA Services. Since the corporation is operated by its duly authorized board of directors and there is no such duly elected and authorized board of directors for AIA Services, please advise me under what authority you are acting? The last I checked, I have yet to see either of you require or ensure that full disclosure is made to all shareholders of all of the malfeasance and wrongdoing at AIA. Maybe you can enlighten me by providing some proof that you are authorized to represent AIA or should you just change the pleadings to say that you represent John Taylor? I would go with the latter."[1804]

In response to Miesen's subpoena to Mr. Remele, I received many additional documents that I have not had time to fully review and consider. However, I was able to locate at least one more document further establishing that the Hawley Troxell Defendants were indeed general counsel to the AIA Corporations. For example, in beginning my review of the documents disclosed in response to the subpoena duces tecum served upon Mr. Remele, I came across a previously undisclosed, redacted, copy of what is called a "Redacted memo re timeline of representation."[1805] It appears that this redacted memo was authored by Riley. The unredacted pages of the document describe a number of matters in which the Hawley Troxell Defendants represented AIA Services and Crop USA. In my opinion, even the unredacted information contained in that document contradicts Mr. Remele's numerous statements in his Report that the duties and

---

[1802] HTEH000254.

[1803] DLM – 0019274-84.

[1804] TFBB011001.

[1805] REM – 6452-56.

Exhibit - 1, p. 545

12-ER-2963

responsibilities of the Hawley Troxell Defendants to the AIA Corporations were diminished because they were not general counsel to those Corporations.[1806] As Mr. Bond has stated to the Court in Miesen's December 18, 2019 motion to amend the case management orders regarding expert Report deadlines,[1807] it is imperative that I be provided with the entire document in order to see what additional information has been redacted so that I may have that information to include in my Rebuttal of Mr. Remele's statements and opinions and also fully and fairly express additional opinions.

11.     With reference to the Hawley Troxell Defendants' alternative allegation of a limited scope of representation, contrary to Ashby's statement quoted above and all of the evidence (including as described in Sections X, XI and XII of this Report), nether the AIA Corporations nor the Hawley Troxell Defendants agreed to any "limited engagement as litigation counsel."[1808] Instead, the Hawley Troxell Defendants agreed, in the May 2, 2007 AIA Engagement Letter under the bold heading "SCOPE OF ENGAGEMENT FOR THIS MATTER" to "*advise* the two corporate defendants in connection with above entitled litigation

---

[1806] The Hawley Troxell sent several contemporaneous self-serving emails to the effect that they were not general counsel; e.g. HTEH000604.Also In paragraph 12 of a Declaration in support of a motion for summary judgment in this Lawsuit, Riley stated:

> "Since I joined Hawley Troxell on March 1, 1999, neither I nor any other Hawley Troxell attorney has at any time served as general counsel for AIA Services, AIA Insurance or CropUSA or exercised internal supervision of the legal, tax or business affairs of AIA Services or AIA Insurance (sometimes collectively referenced herein as the 'AIA Entities') or CropUSA."

The email and Declaration statements are self-serving and, when compared to the true facts, not credible. Indeed, on page 67 in the transcript of his deposition in this Lawsuit on July1, 2019. Riley couldn't wait to testify, without being asked, that the Hawley Troxell Defendants were not general counsel.

[1807] Dkt. 758.

[1808] Another document given to Mr. Remele and just produced by the Hawley Troxell Defendants, Riley's alteration of his July 1, 2019 testimony, reveals that the claim that the Hawley Troxell Defendants were only "litigation counsel" has now morphed into the assertion that they were only defending the AIA entities against Reed Taylor's "creditor claim" which is contrary to the facts. For example, the Hawley Troxell Defendants "represented" the AIA Corporations in opposing the appointment of a receiver *in Donna Taylor v. AIA Services*, in its halfhearted Petition for Court Appointed Independent Inquiry Pursuant to I.C. § 3-1-743 and I.C. § 30-1-744, and they worked on *Donna Taylor v. John Taylor* (FB 1050) none of them involve defending a "creditor claim."

Page - 537

brought by Reed J. Taylor."[1809] That undertaking by its very nature included the giving of advice concerning the assertion of cross claims by the AIA Corporations against the Controlling AIA Defendants, joinders of additional defendants and third-party claims or commencing other actions Moreover, a limited scope of representation of the type suggested by Mr. Remele would, for the reasons discussed below and in Sections X, XI and XII of this Report, under the circumstances of this Lawsuit, have been unreasonable under RPC 1.2(c)[1810] and invalid in any event.

12.     Finally, the Remele Report contains a number of broad generalizations and straw man examples that collapse of their own weight when viewed in the light of the specific facts of this Lawsuit and the true scope and nature of the Hawley Troxell Defendants' engagement. One example, appearing on page 9 of the Remele Report, reads as follows:

"The theory being pursued in this case would impose a duty upon outside litigation counsel to be aware of and regulate the conduct of a corporate client without ever having been retained to serve as outside general counsel for that client and without ever being retained to give legal advice on the myriad of topics raised by Plaintiff's expert. Imposing such a duty is contrary to the Idaho Rules of Professional Conduct, case law, and the realities of the private practice of law. Moreover, imposing such a duty would result in a circumstance where any lawyer, retained by any corporate entity, would become the de facto insurer or guarantor of all conduct that occurs within the corporate client even where the lawyer has not been retained to provide outside general counsel services to the company and would greatly expand and alter the standard of care for counsel retained to represent entities in litigation."

These sweeping generalizations and similar broadsides in the Remele Report do not address and indeed are inconsistent with the specific facts of this Lawsuit, including

---

[1809] HTEH000007 (Emphasis supplied). The next sentence reads as follows: As indicated above, this representation will be undertaken pursuant to the terms and conditions of a Joint Defense Agreement with other defendants." The Joint Defense Agreement contains a fiduciary out which permits the AIA Corporations to terminate it in writing without prior notice. The Standstill and Tolling Agreements are in effect terminable upon 30 days' notice.

[1810] "Although this Rule affords the lawyer and client substantial latitude to limit the representation, the limitation must be reasonable under the circumstances." RPC 1.2 cmt. 7.

not only, for example, that the complaints in *Reed Taylor* spelled out in meticulous detail the numerous breaches of the duties of care and loyalty of the Controlling AIA Defendants described and analyzed in this Report, but also the broad scope of the representation letters, namely to *advise* the AIA Corporations regarding those allegations. Mr. Remele's sweeping statements therefore have no applicability in law or fact to either this Lawsuit, *Reed Taylor v. AIA Services* or *Donna Taylor v. AIA Services*.

13.     I have organized the remainder of this portion of my Rebuttal Opinions according to the section and paragraph headings in the Remele Report, together with their respective page numbers in that Report. Mr. Remele's "Opinions and Factual Basis For Those Opinions" are set forth in Section VII of the Remele Report which is contained on pages 17 thru 62 of his Report. In responding to Section VII, I am also responding to and rebutting the opinions set forth in his Section I. Summary of Opinions. I have also included additional opinions in Sections X-XIII which are also responsive in further rebutting Mr. Remele's opinions.

Mr. Remele's Allegation that Hawley Troxell Did Not Breach Its Duties to the AIA Corporations, or to Crop USA, By Being Retained By, and Taking Direction From, the Board of Directors of Those Entities in Relation to *Reed Taylor v. AIA Services*.

14.     Paragraph A(i)-(iii) (pp. 17-19). The Remele Report nakedly states that the Boards of Directors of the AIA Corporations were "the duly authorized constituents" of those corporations. However, the recent testimony of John Taylor concerning the pervasive absence of shareholder meetings and board resolutions adopted by the Controlling AIA Defendants there were no such authorized constituents who could have given "direction" to the Hawley Troxell Defendants as they would have known had they not failed to investigate the AIA Corporations' failure to comply with commonly accepted corporate governance procedures. Moreover, as stated above in this Report, each and every opinion expressed by Mr. Remele regarding the actions, conduct, decisions, authority or legitimacy of the "boards" of the AIA Corporations is rendered meaningless, without substance and irrelevant by reason of his footnote 16 on page 29 of the Remele Report that "I have not been retained to opine on the legitimacy of John Taylor's actions." In point of fact, John Taylor was effectively the "boards," and any purported "board" action was his action. It is abundantly clear why Mr. Remele was not retained to opine on the legitimacy of John Taylor's actions, as no favorable opinion could be given. Mr. Remele acknowledges in this Section that under RPC 1.13 and

Page - 539

**Exhibit - 1, p. 548**

**12-ER-2966**

Comment1thereunder shareholders as well as directors are constituents of a business corporation, but opines that state *statutory* provisions alone determine whether constituents are duly authorized. That is incorrect. Whether directors are so authorized is determined by the facts and applicable case law as well as corporate statutes, and here the Controlling AIA Defendants' total disregard of corporate governance principles (and procedures, including the failure to hold meetings of shareholders and directors) together with their documented malfeasance and pervasive conflicts of interest (as described in e.g. Sections X and XI of this Report), precluded them from being authorized, let alone duly authorized. In addition, John Taylor's recent Rule 30(b)(6) testimony (e.g., conscious disregard of the law, the existence of so called "to and from" accounts, utter lack of corporate governance, etc.,) also reveals that the AIA Corporations were in effect clients with "diminished capacity" and thus under RPC 1.14 (b) the Hawley Troxell Defendants could not take "direction" from their purported "boards" and were required to take "reasonably necessary protective action, including consulting with individuals that have the ability to take action to protect the client . ." Here such individuals included the AIA Disinterested Shareholders. In addition, there are a number of instances in which the uncoerced, fully informed majority of the minority shareholders functions as a corporation's "highest authority" (such as, for example, when those in control of the corporation have a vested interest in a particular matter) even though as a statutory matter only a majority vote of all the shareholders is required.[1811] Moreover, a "highest authority" other than the shareholders would have been available had the Hawley Troxell Defendants insured that a Director designated by Donna Taylor be appointed to the AIA Services Board of Directors or, if there were no such designation sought to have another shareholder such as Miesen act as an independent director. However, during the active litigation in *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services* (2007-2011), the Hawley Troxell Defendants failed to insist upon the holding of proper annual shareholder meetings (including as a condition of their representation) and failed to insist upon the submission of a single matter to shareholder vote (possibly other than, as described in this Report, the illegal and invalid March 28, 2007 Shareholder Meeting which purportedly "authorized" the advancement of legal fees for John Taylor, Duclos and Freeman) until the unlawful

---

[1811] *See, e.g., Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 642-43 (Del. 2014); *Cf.* Restatement (Third) of the Law Governing Lawyers § 96 (2000) Comment B. A "constituent" of an organization within the meaning of the Section has the same meaning as in Rule 1.13 of the ABA Model Rules of Professional Conduct (1983). A constituent includes an officer, director, or employee of the organization. A shareholder of a stock corporation or a member of a membership corporation is also a constituent within the meaning of this Section, as under Rule 1.13."

reverse stock split in 2012 (to the extent that the Hawley Troxell Defendants were involved in that latter shareholder meeting). By reason of both their general counsel status and their broad scope of representation as well as the ubiquitous "director" conflicts as described in this Report, the Hawley Troxell Defendants should have insisted upon annual shareholder meetings and full disclosure to the AIA Disinterested Shareholders, and further insisted that Donna Taylor be asked to designate an AIA Services Board member, Reed Taylor's right to appoint a director be honored or that if there were no such designation, another shareholder, who was not involved in any of the malfeasance, be asked to serve as a director (Miesen would have gladly served as a such a director).

15.    Paragraph A(iii) Footnote 5 (p. 18). Mr. Remele relies on Riley's conveniently changed deposition testimony discussed in Section X(T) above to once again mischaracterize the *Reed Taylor* suit as only involving a "creditor claim" and continues to ignore Reed Taylor's meritorious claims of misconduct asserted against the Controlling AIA Defendants which involved the fundamental corporate governance, corporate malfeasance, accounting issues, and other matters far exceeding a mere "creditor" action. A review of the pleadings, motion practice, discovery, correspondence, deposition transcripts, Unredacted Billing Records and related information establishes that *Reed Taylor v. AIA Services* was not simply a "creditor" lawsuit and that the Hawley Troxell Defendants were in fact addressing corporate governance and improper transactions, among other subjects, consistent with their unlimited scope of representation. The Hawley Troxell Defendants' voluntary assumption of additional duties of care and loyalty by addressing those matters, imposed upon them the duties of care and the fiduciary duties of loyalty and care[1812] even assuming that their scope of representation was limited as alleged.[1813]

---

[1812] *Taylor v. Riley*, 557 Idaho 323, 339, 336 P.3d 256, 272 (2014). *Jones v. Runft, Leroy,Coffin & Matthews, Chtd.*, 125 Idaho 607, 611-613, 873 P.2d 861, 865-68 (1994).
[1813] For example, the Hawley Troxell Defendants were addressing "insider transaction issues" FB 0678, "unpaid dividends and redemption price of Series C Shares" FB 0679 and "personal liability of an advisory board." FB 0682.

Exhibit - 1, p. 550

12-ER-2968

16.     Among the many reasons why the Hawley Troxell Defendants' engagement was not limited to only defending a so-called creditor suit[1814], and evidence of the Hawley Troxell Defendants' voluntary assumption of additional duties of care and loyalty by addressing the matters assuming that their scope of representation was limited as alleged, is the fact that as stated above in August 2008 they petitioned[1815]on behalf of the AIA Corporations for a court appointed inquiry to determine whether the maintenance of a derivative action on behalf of those corporations was in their best interests. That petition resulted from the AIA Corporations' receipt of a detailed derivative suit demand letter dated July 21, 2008[1816] on behalf of Donna Taylor, the sole Series A Preferred Stockholder of AIA Services, and Reed Taylor. [1817] That letter listed the various acts of misconduct of the Controlling AIA Defendants and the Hawley Troxell Defendants that are the subject of this Lawsuit and this Report. The filing of that petition by the Hawley Troxell Defendants is yet another demonstration that their engagement in matters pertaining to the *Reed Taylor* litigation extended far beyond the defense of a creditor's suit. In that petition, the Hawley Troxell Defendants, once again, showed their true colors by suggesting the appointment of two persons who had prior contacts/relationships with the parties and/or their counsel and they specifically mentioned that the petition was being sought in part to address the derivative claims;[1818] they should have been suggesting the appointment of a person or persons qualified in matters relating to corporate malfeasance and claims against the responsible parties for such conduct (including attorneys, e.g., the Hawley Troxell Defendants). Moreover, the Hawley Troxell Defendants never noted up the Petition for a Court Appointed Inquiry for hearing and they wholly abandoned it after prevailing on Reed Taylor's motions to disqualify (which further demonstrates that the petition was never sought in good faith and was yet another disingenuous act to

---

[1814] The Unredacted Billing Records reveal that the Hawley Troxell Defendants were trying to shoehorn the litigation into being only a "creditor suit." "9/30/08 Nicole Pantera…Research model business corporation act statutes and case law regarding creditor/shareholder status, and whether R. Taylor or his ex-wife could be deemed creditors of the corporation even though all their rights and obligations derive from their status as shareholders; review MBCA annotated; review draft briefing; review BCA current and prior provisions; search Lois Law; search Westlaw. 10/1/08…Continue to research whether R. Taylor and D. Taylor could be considered creditors of AIA under the present circumstances; review case law under MBCA; prepare memorandum for briefing" FB 0765.

[1815] DLM – 0011741-47.

[1816] GCO747727.

[1817] As discussed elsewhere in this Report, the Hawley Troxell Defendants abandoned the Petition without explanation after halfhearted involvement.

[1818] DLM – 0012463-70, 0012688-93.

Exhibit - 1, p. 551

12-ER-2969

make to try to make it appear as though they were truly representing the best interests of the AIA Corporations).That petition alone offered the Hawley Troxell Defendants a way out of the legal morass that they had gotten themselves into (and exacerbated)and would have provided a badly needed independent review of the corporate malfeasance and unlawful conduct described throughout this Report.

17.     Another example of the broad scope of their engagement, or evidence of the Hawley Troxell Defendants' voluntary assumption of additional duties of care and loyalty by addressing the matters (assuming that their scope of representation was limited as claimed), was the Hawley Troxell Defendants' opposition on behalf of AIA Services to Donna Taylor's motion in April 2012 to intervene in *Reed Taylor v AIA Service*s and to oppose the release of $400,000 held in the court's registry to the Controlling AIA Defendants. Once again, the Hawley Troxell Defendants acted against the best interests of the AIA Corporations when they successfully opposed the motion[1819](the $400,000 could have paid the bulk of the money owed to Donna Taylor and the significant attorneys' fees incurred to that time, thereby eliminating the significant amount of interest that has accrued on the redemption of her Series A Preferred Shares or provided working capital (assuming the AIA Corporations been properly operated) thereby proximately damaging the AIA Corporations.[1820] In the same vein as the derivative suit petition matter discussed immediately above, this further demonstrates the unlimited scope of the Hawley Troxell Defendants' representation of the AIA Corporations. For the reasons set forth below, the recent and improper disclosure of Riley's untimely attempt to alter his July 1, 2019 testimony on August 30, 2019, two weeks after the first two versions of this Report had been delivered reveals that the basis for Mr. Remele's statements in his footnote 5 on page 18 and his opinions, statements and assertions elsewhere in his Report are dubious because Riley's testimony changes were simply a belated attempt to assist Mr. Remele by providing him with "facts" to purportedly support his opinions.

18.     The purpose of Riley's attempt on August 30, 2019 (again after the first two versions of this Report were delivered and prior to Mr. Remele's October 18, 2019 Report) to materially and substantively alter the transcript of his July 1, 2019 Deposition by making substantive changes to a number of his answers to questions admitting, among other matters, the conflicts of interest of the AIA Services so-called "directors" and that agreements were not duly authorized by any independent directors is obvious. Instead of the answers he originally gave, namely

---

[1819] DLM – 0019353-61.
[1820] DLM – 0019274-84.

Page - 543

that (i) in retrospect those directors were conflicted and (ii) since Henderson and Beck were not being sued at the time of their so called appointment by John Taylor "they were the best we could do under the circumstances," which obviously could not serve as a basis for Mr. Remele's opinions, Riley has attempted to change his answers to say that those persons "did not have conflicting interests with respect to defending the AIA entities against Reed Taylor's creditor claims."[1821] This mischaracterization by Riley of *Reed Taylor v. AIA Services* as only involving "creditor claims" and thus to magically render the Controlling AIA Defendants non-conflicted, is obviously intended to provide a manufactured, after-the-fact predicate for Mr. Remele's opinions because it goes hand in glove with a theme (albeit an erroneous one) which appears as a material foundation of those opinions, not only in this footnote 5, but also throughout the Remele Report. Riley's new answers also appear to be an attempt to reduce the Hawley Troxell Defendants' broad scope of representation from, as stated in the May 2, 2007 AIA Engagement Letter, "to advise the two corporate defendants in connection with the above entitled action brought by Reed J. Taylor"[1822] to merely defending a collection suit. It also appears to be a case of what in this context the courts call "tactical timing" which is not permissible, and I understand from Mr. Bond that Miesen will be moving strike Riley's purported "deposition changes" as being a "sham." In any event, Mr. Remele's opinions are of course no better than the "facts" upon which they are based. (Usually opinions are based on facts,[1823] but here "facts" are being created to support opinions.)

19.     Paragraph A(iv) (p. 19). Mr. Remele states that, even if the Controlling AIA Defendants were conflicted, RPC 1.13 would not require any submission to AIA Services' "highest authority" because such Defendants were not engaged in a matter related to the Hawley Troxell Defendants' representation. However, their misconduct was directly and substantially related to the Hawley Troxell Defendants' representation of the AIA Corporations, namely, to advise and represent those corporations in connection with *Reed Taylor v. AIA Services*, a broad scope of representation which clearly included the critical and easily answered question as to whether possible claims should have been asserted against

---

[1821] The "creditor claim" qualification is contrary to Babbitt's sworn statement of August 14, 2008 in which he stated "there are no independent directors serving on the [AIA Corporations'] boards of directors; and the corporations are therefore unable to appoint independent directors to conduct a good faith reasonable inquiry as contemplated by Idaho Code section 30-1-744(2)(a) or (b)." DLM – 0011750.

[1822] HTEH000007.

[1823] "Legal opinions typically involve the application of law to facts."1998 TriBar Report, Section 2.1.1 53 Bus. Law. at 608.

the Controlling AIA Defendants and the assertion of those claims. Mr. Remele's positions are also disregard the fact that the Hawley Troxell Defendants specifically addressed a number of matters involving the corporate governance of the AIA Corporations and having nothing to do with the so called 'creditor claims, including the filing of a Petition for Court Appointed Independent Inquiry Pursuant to I.C. § 3-1-743 and I.C. § 30-1-744 and For Grant of Pending Motion to Stay Proceedings and successfully opposing Donna Taylor's 2009 lawsuit to have a receiver appointed (which also would have prevented the AIA Corporations from incurring a substantial amount of the damages they have sustained. Moreover, the Unredacted Billing Records disclosed by the AIA Controlling Defendants are replete with entries for legal work on research on corporate governance, fiduciary duty and related matters and not just "creditor suit" issues. For example, Riley's billing entry of 10/21/08 states in part "Conference with G. Babbitt re proposed amended complaint, settlement offer recommendation, *corporation' claims against individual directors/officers if R. Taylor's Note is void."*[1824]

20.    Paragraph A(v) Footnote 6 (p. 20). Contrary to Mr. Remele's baseless charge, I did not "misrepresent" the Riley memo to McNichols. That memorandum was written at a time when the Hawley Troxell Defendants were recording billing entries in a matter entitled "REED TAYLOR VS. R. JOHN TAYLOR ET AL and assigned the" FILE NO.: 43369-0002."[1825] In the redacted[1826] memorandum that it appears Riley provided to Mr. Remele, Riley alleged that the matter was erroneously established under John Taylor's name, which is difficult to believe because opening a matter, together with reviewing and sending several months of billing statements with John Taylor's name on them, are deliberate actions that could hardly be "erroneous" for several months. This is yet another instance of "facts" being created to support "opinions" of the Hawley Troxell Defendants' experts. In fact, John Taylor testified that "I believe that Hawley Troxell represented AIA Services from day one *and included me as an individual or as a named part of the suit. Later,* I got my separate representation from Mr. McNichols. But the – it was continuous from the very beginning."[1827] In obviously discussing the posture of the case from the standpoint of the Hawley Troxell Defendants' client, John Taylor, who had been represented personally by the Hawley Troxell

---

[1824] FB 0768 (Emphasis supplied).

[1825] Dkt. 449-82, pp. 62-63.

[1826] Riley testified that "the powers that be decided" that the memorandum should be scrubbed before it was given to Mr. Remele. 3/3/2020 Riley Depo. Transcript, p. 651.

[1827] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 426 (Emphasis supplied).

**Exhibit - 1, p. 554**

**12-ER-2972**

Defendants not only in the past but also contemporaneously.[1828] Riley states in his memorandum to McNichols "John and the two corporations have common interests in defending against Reed's allegations by, for example, seeking adjudication that: (i) Reed has no standing (not being a shareholder) to bring what are essentially derivative claims against John for breach of his fiduciary duties as a director/officer of the two corporations…"[1829]

21.  Paragraphs A(vi) Footnote 7 (pp. 19-20). Mr. Remele's characterization of the May 2, 2007 AIA Engagement Letter as relating only to creditor claim[1830] flies in the face of the Letter's express provision that the Hawley Troxell Defendants' scope of representation was "to advise the two corporate defendants in connection with above entitled litigation brought by Reed J. Taylor." Indeed, the term "creditor claim" does not appear in the May 2, 2007 Engagement Letter. It is difficult to comprehend how Mr. Remele could be expressing opinions that the Hawley Troxell Defendants had a limited scope of representation without examining the Unredacted Billing Records, which are essential to a determination as to the existence of a limited scope. *Taylor v. Bell* mentioned above [1831]provides a prime example of the importance of being able to examine the Unredacted Billing Records and other documents in order to express an opinion as to whether a law firm had a limited scope of representation. In *Bell*, the defendant law firm's alleged limited scope of representation defense was not established because the firm's billing records, and the internal firm memoranda, showed that in fact the work done by the lawyers went beyond the alleged limited scope of representation. One example of those documents was an internal law firm memorandum which, the court said, "indicates that [the law firm] was working on an issue that it now claims was exempted from the scope of representation by agreement" The court said although a "lawyer was permitted to 'limit the objectives of the representation if the client consents after consultation'… We begin by examining what was said and done by the parties..." in order to determine whether the scope of representation was limited. In this Lawsuit, the issue should also be resolved by "what was said and done by the parties," namely the broad language used in the May 2, 2007 Engagement Letter and incorporated into the February 25, 2008 Amended AIA

---

[1828] 7/28-31/2020 John Taylor Rule 30(b)(6) Depo. Transcript, p. 443. The engagement letter for the Twin River National Bank reverse stock split matter was signed on January 8, 2007, only three weeks before the Hawley Troxell began work on behalf of John Taylor in *Reed Taylor v. AIA Service*s.

[1829] HTEH000285.

[1830] See the discussion of Riley's changed testimony above.

[1831] 185 Wash. App. 270, 289, 340 P.3d 951, 961-62 (Wash. Ct. App. 2014), *review denied*, 183 Wn.2d 1012, 352 P.3d 188 (2015).

Engagement Letter and the legal work actually performed by the Hawley Troxell Defendants as reflected in the billing records and other documents. Mr. Remele's opinion that there was a limited scope is not based on "what was said and done" and is therefore meaningless.[1832]

22.    In this context, as explained elsewhere in this Report a claimed limited scope purporting to absolve the Hawley Troxell Defendants from their duty of investigating and demanding the assertion of cross claims against the controlling AIA Defendants regarding the self-dealing and breach of fiduciary duty allegations in Reed Taylor's complaint would not have been, in the words of RPC 1.2(c) "reasonable under the circumstances and thus a nullity. " This is particularly true here because of the necessity to have asserted alter ego claims against the John Taylor and the other Controlling AIA Defendants.[1833] In addition, for the reasons stated in Section XII(E) of this Report, the Standstill and Tolling Agreements were of no benefit to the AIA Corporations and the Hawley Troxell Defendants breached their duties of care and loyalty owed to the AIA Corporations by suggesting, preparing and requiring the execution of those Agreements. Instead, they were to extreme detriment of the AIA Corporations; as stated in Section XII(D) of this Report:

> "While tolling the statute of limitations might have been a benefit to the
> AIA Corporations (although there is no evidence of any benefit and it

---

[1832] Examples of the importance of the Unredacted Billing Records include the 2/07/08 entry of Ashby: "LEGAL RESEARCH RE OUTSIDE COUNSEL'S DUTIES TO SHAREHOLDERS; CONFERENCE WITH COUNSEL RE SAME" FB 0921 and the following April 2008 entries of Loren Messerly: "RESEARCH ON OUTSIDE COUNSEL AND LIABILITY FOR NOT BRINGING CLAIMS AGAINST DIRECTORS" and "EXTENSIVE RESEARCH ON OUTSIDECOUNSEL AND POTENTIAL LIABILITY WHEN TRYING TO REPRESENT BOTH CORPORATION AND DIRECTORS. RESEARCH SCOPE OF REPRESENTATION AND FIDUCIARY DUTY TO CLIENT." FB 0726 (Solid capital letters in original).

[1833] Alter ego liability was an issue considered by the Hawley Troxell Defendants: "5/4/07 John Ashby…LEGAL RESEARCH RE 'ALTER EGO'AS A SEPARATE AND DISTINCT CAUSEOF ACTION." FB 0659. (Solid caps in original). Inexplicably, at the Hawley Troxell Defendants' Rule 30(b)(6) deposition on March 4, 2020, Ashby testified that he thought Reed Taylor's alter ego claim was being asserted *against* the AIA Corporations (3/4/2020 Ashby Rule 30(b)(6) Depo. Transcript, p. 65) and that he didn't know that it would have been a benefit to the AIA Corporations to have certain of the Controlling AIA Defendants liable for paying the stock redemption indebtedness to Reed Taylor. *Id.* at 66-67. In the same vein, and equally unfathomable, Ashby thought that Reed Taylor's allegations of breaches of fiduciary duties by certain of the Controlling AIA Defendants were asserted *against* the AIA Corporations. *Id*. at p. 129.

appears that a judgment will be entered against John Taylor in favor of GemCap for over $12,000,000, thereby resulting in him being unable to pay any significant judgment in this Lawsuit as discussed above), prohibiting them from suing the Controlling AIA Defendants during the pendency of *Reed Taylor v. AIA Services* did not benefit the AIA Corporations. Nor can it reasonably be said that the tolling provisions were intended to benefit the AIA Disinterested Shareholders who were never informed of the existence or the provisions of the Standstill and Tolling Agreements."

Contrary to Mr. Remele's statement, the "very reason" for the Standstill and Tolling Agreements was, like the Hawley Troxell Defendants' suggested Reverse Split, to insure that, as turned out to be the case, the myriad breaches of the duties of loyalty and care that the Controlling AIA Defendants committed against the AIA Corporations were never disclosed to the AIA Disinterested Shareholders and went unredressed.

23.    Paragraph A(vii) (p. 21). The Remele report fails to state that one of the matters that was not disclosed in the May 2, 2007 AIA Engagement Letter was that Riley had authored a Legal Opinion confirming the legality and enforceability of the 1995 Stock Redemption Agreement, related documents and the $6,000,000 promissory note issued to Reed Taylor. In my opinion, as a presently acting active Board member, that information would have been critical to a decision by a properly functioning Board of Directors to select lawyers to, among other assignments, assert defenses against Reed Taylor's claims under that same Stock Redemption Agreement and related documents. What was also required to be disclosed to a properly functioning board of directors or a highest authority constituent of the AIA Corporations, e.g. an independent director or the AIA Disinterested Shareholders, was, as revealed by the Unredacted Billing Records, that the Hawley Troxell Defendants were contemporaneously providing legal services to John Taylor in *Reed Taylor v. AIA Services*. The fact that the Hawley Troxell Defendants did not address or disclose the 1995 Legal Opinion Riley had delivered to Reed Taylor until well after the representation of the AIA Corporations had been undertaken for over a year and after the Hawley Troxell Defendants also appeared as counsel for CropUSA and after the representation was, at best, in an extremely delicate state, is an admission that they failed to timely address the issue and then only tried to do so after the representation had already commenced and at a time in which the AIA Corporations should not have engaged Riley as one of their attorneys in *Reed Taylor v. AIA Services*. Indeed, in my opinion as a presently

Page - 548

**Exhibit - 1, p. 557**

**12-ER-2975**

active board member and based on my legal experience, independent and unconflicted directors with the requisite qualities of integrity, competence and prudence and independent counsel would have specifically addressed the issue of asserting claims against Riley and others for having AIA Services enter into the illegal transaction for the redemption of Reed Taylor's shares in the first place, which subsequently led to the AIA Services incurring unnecessary substantial attorneys' fees and costs litigating the stock redemption agreement without asserting the illegality defense as described in this Report.

24.   Paragraph A(vii) Footnote 8 (p. 21). In seeking those purported conflict waivers, upon which Mr. Remele relies, the Hawley Troxell Defendants did indeed, as I stated in Section X(A) and elsewhere in this Report (*see also* Exhibit C attached hereto), fail to address the prior or joint representation of John Taylor, AIA Insurance's unauthorized guarantee of the obligations of Crop USA under the Lancelot Loan and the Hawley Troxell Defendants' liability exposure if that guarantee had been challenged. Although Mr. Remele says that I misrepresent the documentary evidence, the purported waivers did not *address* the Lancelot Loan or the Hawley Troxell Defendants' exposure if the AIA Insurance Guarantee had been challenged; there was simply a general statement that the Hawley Troxell Defendants had previously provided services to John Taylor and Crop USA. In any event those purported conflict waivers were a legal nullity for, among others, the reasons set forth in Section XII(E) of this Report, which are ignored by Mr. Remele throughout his Report.[1834]

25.   Paragraph A(viii) Footnote 9 (p. 22). Contrary to Mr. Remele's unsupported opinion, until a court determined otherwise, under the Amended and Restated Stock Pledge Agreement dated as of July 1, 1996, upon the default in the payment of the $6,000,000 stock redemption Promissory Note, all voting rights with respect to the outstanding shares of AIA Insurance were vested and transferred to Reed Taylor, and upon such default he duly voted those shares to assume control of AIA Insurance in 2007. Indeed, Reed Taylor obtained partial summary judgment on the default of the $6,000,000 Promissory Note on February 8, 2008.[1835] This confirmed the voting rights, and therefor Reed Taylor's 2007 vote of the shares replacing AIA Insurance's board of directors and officers was authorized, thereby cementing the Hawley Troxell Defendants' conflict of interest. At that point and until the illegality decision, a conflict of interest existed which, in the absence of

---

[1834] As stated above Mr. Remele tries to avoid confronting these crucial issues by not addressing the conduct of John Taylor. (*See* footnote 16 on page 29 of the Remele Report.)
[1835] DLM – 0010452-68.

effective waivers (which could not have reasonably obtained under the circumstances based on, among other things, the need to protect each corporation's confidential information ), cried out for the retention of independent counsel to represent AIA Insurance. No reasonably prudent attorney would have wanted to risk having all privileged information transferred to Reed Taylor by operation of law by reason of his assumption/transfer of AIA Insurance (he had the right to transfer the stock and ownership of AIA Insurance to himself). However, it is clear that the goal of the Hawley Troxell Defendants was to disregard the rights and interests of the AIA Corporations and to engage in a course of conduct of breaching their duties of care and loyalty owed to the AIA Corporations by protecting the interests of the Controlling AIA Defendants and Crop USA and shielding those Defendants' acts of intentional malfeasance as described in Sections X and XI of this Report. The obtaining of truly independent counsel for AIA Insurance would have resulted in that corporation asserting claims for malpractice (breaches of the standard of care), breaches of fiduciary duties of care and loyalty, conversion and other claims against the Hawley Troxell Defendants, the Controlling AIA Defendants and CropUSA (which claims in my opinion would have been successful). Accordingly, the Hawley Troxell Defendants engaged in the representation in an effort to keep such claims from seeing the light of day, just as they did when they engineered the improper Standstill and Tolling Agreements and later suggested the reverse stock split. Among the matters that are, to use Mr. Remele's words, "incongruous", is that in 1995 Riley had delivered to Reed Taylor a third party Legal Opinion confirming the legality and enforceability of the predecessor stock pledge agreement which contained pledgee voting rights and transfer provisions identical to those discussed above in the 1996 Agreement.[1836]

26.    Paragraph A(viii) Footnote 10 (pp. 22-23). The Hawley Troxell Defendants' conditioning their representation of the AIA Corporations on their entering into the Joint Defense Agreement was a breach of the duties of due care and loyalty for a number of reasons, none of which are addressed by Mr. Remele, who confines himself to three unsupported and conclusory "opinions." That Agreement was unauthorized; the Controlling AIA Defendants' pervasive conflicts of interest precluded them from acting on behalf of the AIA Corporations in this context. Those conflicts of interest included those based on their ownership of CropUSA common shares and their involvement in the corporate malfeasance as

---

[1836] In paragraph 2 of his legal opinion, Riley opined that "the Transaction Documents constitute the valid and binding obligation of Company and its Subsidiaries enforceable against them in accordance with their respective terms…The term Transaction Documents included the Stock Pledge Agreement dated as of July 22, 1995. RJT - 0000830.

described in this Report, including Sections X and XII, (or covering it up the same) against the AIA Corporations, and therefor none of them could authorize the Joint Defense Agreement. In addition, the entry into the Joint Defense Agreement was a violation of AIA Services' Amended Articles of Incorporation (Section 4.2.9(g) as to conflicts of interest), AIA Services' New Restated Bylaws (Section 4.14 as to conflicts of interest) and AIA Insurance's Bylaws (Section 4.14 as to conflicts of interest). Since neither an independent director, the AIA Disinterested Shareholders nor Donna Taylor consented to the Joint Defense Agreement, the Agreement was unauthorized, ultra vires and/or intra vires (but unauthorized). The Joint Defense Agreement also violated Beck, Henderson and John Taylor's duties of loyalty owed to the AIA Corporations. It is inconceivable that the Hawley Troxell Defendants would have allowed in 2007 or later in 2008, a Joint Defense Agreement with the Controlling AIA Defendants and CropUSA to defend against claims relating to the foregoing parties' unlawful taking of the AIA Corporations' funds, assets, trade secrets, creditworthiness and other assets. Instead, the AIA Corporations should have been demanding the return of CropUSA and the unlawfully misappropriated assets and asserting claims and obtaining money judgments against those parties for that wrongdoing.

27.    Finally, with reference to Mr. Remele's statement at the end of his footnote 10 on pages 22-23 that "Hawley Troxell did not broaden the scope of its investigation to incorporate an investigation into those matters" the fact is that the Hawley Troxell Defendants' status as general counsel as discussed above, and its Engagement Letters' broad scope of representation included from the outset the conducting of such an investigation and if appropriate the assertion of cross claims against the Controlling AIA Defendants. The true terms of the representation and the overall duties and responsibilities of the Hawley Troxell Defendants never changed. Indeed, Babbitt testified prior to filing a responsive pleading after the Hawley Troxell Defendants first appeared on behalf of the AIA Corporations that he needed additional time "to investigate the allegations in the complaint…"[1837] In their accompanying Memorandum, the Hawley Troxell Defendants told the court that they needed "time to investigate the allegations in the complaint, analyze the legal issues before the Court, and prepare appropriate responses.[1838] Instead, they had the AIA Corporations deny many of Reed Taylor's allegations regarding the improper transactions and malfeasance in his complaints (including those in the later Fifth Amended Complaint) as discussed in this Report (even though the facts

---

[1837] DLM – 0008203.
[1838] DLM – 0008197.

Exhibit - 1, p. 560

were not in accord with the denials in the Answers prepared by the Hawley Troxel Defendants for the AIA Corporations and CropUSA).

28.    Paragraph A(ix) (pp. 23-24). Contrary to Mr. Remele statements, which do not address the opinions I expressed in Sections I, X and XI of this Report, the May 2, 2007 Engagement Letter and the Standstill and Tolling Agreements were never properly authorized because Beck, Henderson and John Taylor had conflicts of interest that prevented them from authorizing the Agreements under AIA Services' Amended Articles of Incorporation (Section 4.2.9(g)), AIA Services' New Restated Bylaws (Section 4.14) and AIA Insurance's Bylaws (Section 4.14).Again, as stated above in this Report, each and every opinion expressed by Mr. Remele regarding the actions, conduct, decisions, authority or legitimacy of the "boards" of the AIA Corporations is rendered meaningless, without substance and irrelevant by reason of his footnote 16 on page 29 of the Remele Report that "I have not been retained to opine on the legitimacy of John Taylor's actions." In point of fact, John Taylor was effectively the "boards," and any purported "board" action was his action. It is abundantly clear why Mr. Remele was not retained to opine on the legitimacy of John Taylor's actions, as no favorable opinion could be given. Under RPC 1.13, the highest authority that could have authorized the May 2, 2007 Engagement Letter and the Standstill and Tolling Agreements was a duly appointed independent director or AIA Services' Disinterested Shareholders, but an independent director was never appointed and shareholder approval was never sought or obtained. Neither the Standstill Agreement nor the Tolling Agreement were of any benefit to the AIA Corporations. The Standstill Agreement prevented the AIA Corporations from asserting cross claims against the Controlling AIA Defendants at a time when the AIA Corporations would have obtained collectable judgments in significant amounts against those individuals. Likewise, in this context the secret Tolling Agreements were of no benefit to the AIA Corporations or the AIA Disinterested Shareholders. Any action by the AIA Services "board" did not constitute compliance with RPC 1.13 because such purported 'board' was not the AIA corporations' highest authority, which under the circumstances would have been a director designated by Donna Taylor as the sole Series A Preferred Stockholder, an otherwise independent director or the AIA Disinterested Shareholders.

29.    Paragraph A(x) (p. 24). As I opined in Sections X and XII in this Report (which Mr. Remele does not address) concerning the Hawley Troxel Defendants' representation of Crop USA in *Reed Taylor v. AIA Services*, the true facts reveal, *inter alia*, that the Hawley Troxell Defendants by no means acted in a

Exhibit - 1, p. 561

limited local counsel role, with Quarles & Brady acting as general counsel (*see, e.g.,* Section XII(H) of this Report). Indeed, the latter firm's lawyers never saw the Hawley Troxell Defendants' prepared representation agreements referring to Quarles & Brady as general counsel and denied under oath that Quarles & Brady was general counsel; they only signed one *Reed Taylor* court filing, although as stated in this Report Riley may have sent them copies. Moreover, the Hawley Troxell Defendants played the lead role in the defense of Crop USA, (a prime adversary of their own clients because it stole assets of the AIA Corporations) when instead those lawyers should have been asserting cross claims against Crop USA and the Controlling AIA Defendants. As is the case throughout his Report, none of these specific facts are addressed by Mr. Remele, including how the Hawley Troxell Defendants signed almost every pleading and paper filed with the court on behalf of CropUSA (including its answers).

30.     Paragraph A(x) Footnote 12 (p. 24). For the same reasons set forth in Section XII(D) of this Report that the Hawley Troxell Defendants' purported engagement letters with the AIA Corporations violated the RPC, the self-serving statements of the Hawley Troxell Defendants and the obtaining of unauthorized purported "waivers" did not constitute compliance with the RPC's.

31.     Paragraph A(x) Footnote 13 (p. 24). Apparently, in an abandonment of its Crop USA "local counsel" defense, the Hawley Troxell Defendants are now claiming that, even if the Hawley Troxell Defendants were primary counsel for Crop USA rather than local counsel, their conduct was still somehow appropriate. For the reasons set forth in this Report, including Section XII(H), that representation was a flagrant violation of both the RPC's. and the Hawley Troxell Defendants' fiduciary duties to the AIA Corporations.

32.     Paragraph A(xi) (pp. 24-25). Once again, for all the reasons stated in this Report, there was no such limited scope of representation, nor, under the RPC's, could there have been any such limitation. In addition, Mr. Remele fails to mention that the Hawley Troxell Defendants abandoned their Petition without explanation, and, as stated in Section XII(L) of this Report, their Panel nominations were obviously not made in good faith. Rather than seek a panel that would be qualified to independently investigate the malfeasance and improper corporate governance, which would have led to claims against the Hawley Troxell Defendants, they sought to appoint a Panel that had prior relationships with the defendants and/or their counsel in violation of the duties of loyalty owed to the AIA Corporations.

Exhibit - 1, p. 562

12-ER-2980

33.    Paragraph A(xii) (p. 25). A stated in Section XII(U). of this Report it was only after the expenditure of thousands of dollars of unnecessary defense costs that apparently someone outside the Hawley Troxell Defendants' defense team discovered that the redemption of Reed Taylor's shares violated the then applicable Idaho Section 30-1-6.[1839] The Remele Report erroneously states that the illegality defense was "initiated by John Taylor and Hawley Troxell via nearly simultaneous submissions of motions..." The Hawley Troxell Defendants did not raise the issue until an outsider suggested it. Moreover, contrary to Mr. Remele, the belated assertion of the illegality defense did not excuse or justify their abandonment of their Petition for a Court Appointed Inquiry, which is unrelated to the illegality issue.

34.    Paragraph A(xiii) (p. 25-26). Judge Brudie's opinion is not applicable to this Lawsuit or binding upon Miesen. The disqualification motion in Reed Taylor v. AIA Services was not pursued on behalf of, or from the prospective of, the AIA Corporations or the AIA Disinterested Shareholders. Judge Brudie's denial of the motion was based solely a rejection of Reed Taylor's arguments as a non-shareholder of AIA Services; in addition, the court considered the motion untimely. Moreover, Judge Brudie was not informed of a number of the relevant facts. For example, at one point in the opinion, he states:

"In compliance with the Idaho Rules of Professional Conduct, the respective attorneys and law firms first fully informed their potential clients on the issues of conflicts and future claims, obtained written waivers from their clients and required their clients to execute agreements that preserve any and all claims that now exist or may arise as a result of this litigation."[1840]

35.    Judge Brudie was misled by the Hawley Troxell Defendants. For example, in his affidavit in opposition to the disqualification motion, Babbitt states:

"Hawley Troxell has not ever undertaken the representation of any of the individual Defendants in this litigation. Each of the individual

---

[1839] Based on a review of the Unredacted Billing Records, it is likely that the outsider was James Gatziolis.
[1840] Dkt. 389-13.

Exhibit - 1, p. 563

Defendants has at all times been represented by his/her own independent counsel in this litigation."[1841]

36.    As stated above, the Unredacted Billing Records this Lawsuit now reveal that, contrary to Babbitt's representation to the Judge Brudie, from February 7, 2007 to the date they were retained by the AIA Corporations, the Hawley Troxell Defendants were in fact recording time and sending invoices reflecting their work *on behalf of John Taylor* in the *Reed Taylor v. AIA Services*[1842] and they continued to take direction from John Taylor throughout *Reed Taylor v. AIA Services* and *Donna Taylor v. AIA Services*. Moreover, Judge Brudie's disqualification decision has no res judicata or collateral estoppel effect on Miesen who is not in privity with Reed Taylor, who, as a factual matter was not looking after Miesen's interests since he was asserting only claims for his sole benefit and, as a legal matter, could not adequately represent Miesen's interests because Reed Taylor was not a shareholder, director or officer of the AIA Corporations (although Reed Taylor made a settlement demand requiring money and assets be transferred to him and that the Controlling AIA Defendants obtain proper shareholder approval and clean up the AIA Services' 401(k) plan, among other matters ).[1843] Accordingly, it is my opinion that Judge Brudie's disqualification decision in Reed Taylor is not binding upon Miesen and has no precedential value in, or relevance to, this Lawsuit. Once again, Mr. Remele is mistaken.

37.    Paragraph A(xiv) (pp. 26-27). For the reasons stated in this Report, including Sections X and XII(E), the self-serving provisions of the Engagement Letters which Mr. Remele emphasizes were executed by John Taylor, whom he describes as "the Chief Executive Officer of both AIA Entities", did not reduce or

---

[1841] Dkt. 389-11.

[1842] *E.g.,* FB 0636 *et. seq.* For example, a March 22, 2007 billing entry states: "WORK WITH R. RILEY RE FACTUAL BACKGROUND OF CLAIM AND RELATIONS BETWEEN CLAIMANT, SHAREHOLDERS, COMPANIES AND DIRECTORS; WORKWITH R. RILEY, G. BABBITT AND J. ASHBY RE IDENTIFICATION OFCONFLICT OF INTEREST ISSUES RELATING TO REPRESENTATION OF J. TAYLOR AND AIA SERVICES, POSSIBLE FUTURE CLAIMS BETWEEN COMPANY AND J. TAYLOR, ROLE OTHER SHAREHOLDERS, INCLUDING EMPLOYEESTOCK OWNERSHIP PLAN (ESOP)/POSSIBLE DEFENSES TO CLAIMS, AND COURSE OF ACTION." FB 0642-0643 (Solid Caps in original).

[1843] *Cf. Sanders Confectionary Prods. V. Heller Financial, Inc.*, 973 F.2d 474,481-82 (1992). Indeed, even if Reed Taylor had been suing as a shareholder, Miesen would not be bound by Judge Brudie's ruling: "a suit brought in a shareholders individual capacity does not preclude a subsequent derivative proceeding."13 Fletcher Cyclopedia of the Law of Corporations, sec. 6043.

Exhibit - 1, p. 564

12-ER-2982

otherwise affect the obligations of the Hawley Troxell Defendants or their liability for the breach thereof. Again, as stated above in this Section XII(Y), each and every opinion expressed by Mr. Remele regarding the actions, conduct, decisions, authority or legitimacy of the "boards" of the AIA Corporations is rendered meaningless, without substance and irrelevant by reason of his footnote 16 on page 29 of the Remele Report that "I have not been retained to opine on the legitimacy of John Taylor's actions." In point of fact, John Taylor was effectively the "boards," and any purported "board" action was his action. It is abundantly clear why Mr. Remele was not retained to opine on the legitimacy of John Taylor's actions, as no favorable opinion could be given.

Mr. Remele's Baseless Allegation that the Adverse Interest Exception Does Not Apply to This Case.

38.     Paragraph 1(i) (pp. 27-28). The applicability of the Adverse Interest Exception requires a fact-based analysis as to whether the Controlling AIA Defendants abandoned the interests of the AIA Corporations and acted entirely for their own interests. The Remele Report does not touch upon those critical factual issues. As stated above, Mr. Remele's "opinions" on the propriety of the conduct of the Hawley Troxell Defendants do not address the detailed and specific facts and documents upon which the opinions expressed in my 263-page August 12 Report are based. Instead, he expresses his opinions either in a vacuum or with unsupported and erroneous, often unstated, assumptions (many of which are refuted by my analysis and opinions in Sections I, X, XI and XII of this Report). Even though he has four associates and two law clerks helping him (as stated in the immediately preceding paragraph and elsewhere in this Section XII) in footnote 16 to his Report (p. 29), Mr. Remele states "I have not been retained to opine on the legitimacy of John Taylor's actions." John Taylor's misconduct is a critical factor in a determination as to whether the adverse interest applies to this Lawsuit, and it is inconceivable that Mr. Remele would opine that the adverse interest exception does not apply without examining John Taylor's misconduct.[1844] The Remele Report does not refer to even one of the plethora of cases supporting the applicability of the Adverse Interest Exception to the instant facts. (*See, e.g.,* Section X(V) of this Report). Instead he cites one authority, the 9th Circuit *China Cast* securities law case[1845] which held that, for Rule 12(b)(6), purposes, in an action by a defrauded stockholder the corporate defendant could not invoke the adverse interest exception

---

[1844] Since Mr. Remele didn't examine John Taylor's misconduct, it is obvious that he also failed to examine the misconduct of the other Controlling AIA Defendants.

[1845] 809 F.3d 471 (9th Cir. 2015).

in a fraud on the public market securities law case, a factual setting which couldn't be further removed from this Lawsuit which is brought on behalf of the injured AIA Corporations. In short, the adverse interest exception applies where, as here, there has been "outright theft or looting or embezzlement…where the fraud is committed *against* a corporation rather than on its behalf."[1846]

39.     In response to any argument that the AIA Corporations somehow benefitted from any of the Controlling AIA Defendants' misconduct, the following observation from a 7th Circuit adverse interest exception case brought by a Liquidator on behalf of an injured insurance corporation is particularly apt:

> "More colloquially put, if defendants' position were accepted, the possession of such friends as [the Controlling AIA Defendants] would certainly obviate the need for enemies."[1847]

40.      Paragraph 1(ii) (pp. 28-29). Once again, the Remele Report erroneously refers to Reed Taylor's allegations as only a "creditor claim," and, in his hear no evil, speak no evil mode, continues to fail to address the extensive allegations of egregious misconduct on the part of the Controlling AIA Defendants. As I opine in Section XII of this Report, the Hawley Troxell Defendants are entitled to no credit for being told by an outsider that the Stock Redemption Agreement was unenforceable. Moreover, what Miesen knew or didn't know is irrelevant. [1848] From 1999 to the day of this Report Miesen has not been an officer, director or agent of the AIA Corporations As a minority shareholder (owning approximately five percent of the outstanding shares of Common Stock of AIA Services) his knowledge is not imputed to the AIA Corporations.

41.     Paragraph 1(i) Footnote 15 (p. 28). Mr. Remele's description of the reach and applicability of Section 4.2.9(g) of AIA Services Amended Articles of Incorporation is incorrect. In discussing 4.2.9 (g), he omits the crucial words "directly or indirectly" and treats the provision as if there must be a transaction to which the director or officer is a direct party. He ignores the obvious and established purpose and intent of this broad and all-inclusive provision, which is to provide the maximum amount of protection and related veto power to Donna

---

[1846] *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 466-67, 938 N.E. 2d 941, 952 (2010). (Emphasis in original).
[1847] *Schact v. Brown*, 711 F.2d 1343,1348 (7th Cir. 1983).
[1848] Miesen's knowledge of the factual details of this Lawsuit is primarily attributable to information he obtained in discovery.

Exhibit - 1, p. 566

12-ER-2984

Taylor, the holder of the Series A Preferred Stock. Accordingly, it is not necessary that the director or officer be a party to the prohibited transaction, only that he or she benefit therefrom. Among the benefits the May 2, 2007 AIA Engagement Letter and the February 25, 2008 Amended AIA Engagement Letter provided to the Controlling AIA Directors were the provisions which had the effect of the Hawley Troxell Defendants purportedly being allowed to ignore the rights of their corporate clients by not pursuing claims against those same persons on behalf of the AIA Corporations. Not only are those terms less favorable to those Corporations, they are of no benefit to it whatsoever. Indeed, they are to their extreme detriment. Moreover, the Hawley Troxell Defendants were an Affiliate (as defined in Section 4.2.10 of those Articles) of John Taylor, a purported director of the corporation, who, as stated in Section X of this Report in the context those Letters, had (and in fact exercised) the power to direct the litigation policies of the Hawley Troxell Defendants with respect to *Reed Taylor v. AIA Services* as well as the related litigation.[1849]

42.　　Equally erroneous is Mr. Remele's misreading of Section 4.14 of the Bylaws of AIA Services and AIA Insurance. He misses the point that the words "in which one or more of its directors are directors or officers or are financially interested" qualifies both "contract or other transaction" and "any other corporation, firm, association or entity," as evidenced by the repeated use of the phrase "such relationship or interest." The Controlling AIA Defendants were clearly "financially interested" in the Engagement Letters which had the effect of insulating them from liability for the breaches of fiduciary duty alleged in *Reed Taylor v. AIA Services*. It is difficult to imagine that there are many matters in which those persons would have had a greater financial interest.

43.　　Lastly, applying an intent and purpose based analysis to interpreting the meaning of the AIA Corporations By laws, it would have made no sense for the AIA Corporations or their respective shareholders to have intended to adopt a By law that permitted conduct causing the injurious consequences produced by the Engagement Letters.

44.　　Paragraph 1(ii) Footnote. 16 (p. 29). In preceding Sections of this Rebuttal Report, I have expressed the opinion to the effect that Mr. Remele's failure to express an opinion as to "the legitimacy of John Taylor's actions" renders every

---

[1849] *See, e.g.,* 3/5/2020 Riley Rule 30(b)(6) Depo. Transcript p. 139 (where Riley answered "Because our client asked us to" when asked why the Hawley Troxell Defendants opposed Donna Taylor's efforts to receive her Series A redemption payments).

Exhibit - 1, p. 567

one of his "opinions" regarding the conduct of the Hawley Troxell Defendants and their purported reliance on the Boards of the AIA Corporations meaningless and without substance. It is clear why Mr. Remele has "not been retained" to opine on those matters, as no favorable opinion regarding the same could be given.

45.    Paragraph 1(ii) Footnote 17 (p. 29). Nowhere in this Report is there a suggestion that the AIA Corporations should not have retained counsel to defend against Reed Taylor's Stock Redemption Agreement. In my opinion the Hawley Troxell Defendants should not have been retained for that purpose because one of its partners had erroneously and negligently rendered a third party legal opinion that the Agreement did not violate applicable Idaho law. As stated above it was for this reason that the Hawley Troxell Defendants wasted substantial amounts of time and money unsuccessfully defending the AIA Corporations on irrelevant grounds. It was only after other counsel read the applicable Idaho statute, Section 30-1-6, that the Hawley Troxell Defendants finally had AIA Services assert the defense. Mr. Remele's statement that a bankruptcy of the AIA corporations would have caused "significant harm to its disinterested shareholders" again reflects his lack of an understanding of the egregious facts of this Lawsuit.[1850] The AIA Disinterested Shareholders' loss of their entire investment was caused by the John Taylor and the other AIA Controlling Defendants, aided and abetted by the Hawley Troxell Defendants. The AIA Corporations and the AIA Disinterested Shareholders could have been much better off if the AIA Corporations had been reorganized in a bankruptcy proceeding. The Controlling AIA Defendants could have been removed from office, claims of the type asserted by Miesen could have been asserted and reduced to monetary judgments against them at a time when, for example such a judgment could have been enforced against John Taylor, the validity of the Stock Redemption Agreement could have been challenged without AIA Services having to spend hundreds of thousands of dollars on unnecessary legal fees, bona fide creditors could have been paid and provision made for distributions to equity holders.

Mr. Remele's Allegation that the Hawley Troxell Properly Defined the Scope of their Engagement in Reed Taylor v. AIA Services.

46.    Paragraph 2(i) (p. 30). Again, the Remele Report misstates the express terms of the May 2, 2007 Engagement Letter. It did not "limit the scope of [The

---

[1850] A stated elsewhere in this Report, that lack of understanding was made possible by Mr. Remele being able to avoid examining the conduct of John Taylor, since he hadn't been "retained to opine on the legitimacy of John Taylor's actions." Remele Report, p. 29 n.16.

Hawley Troxell Defendants'] representation to defending Reed Taylor's creditor claim." Instead, the Hawley Troxell Defendants undertook to "advise the two corporate defendants in connection with litigation brought by Reed J. Taylor." The express terms of undertaking were not qualified or limited. Moreover, any such limitation would have been unreasonable and thus in violation of RPC 1.2 (c), even if informed consent were obtained; which it wasn't (*See* Section XII of this Report). For the reasons discussed above, the Standstill and Tolling Agreements were of no benefit to, and indeed were to the detriment of, the AIA Corporations. Moreover, it has now become abundantly clear that the Standstill and Tolling Agreements were nothing more than a precursor of the Hawley Troxell suggested reverse stock split. The purpose and effect of each device was to ensure that an AIA Disinterested Shareholder such as Miesen would in effect be precluded from asserting meritorious claims for breaches of the duties of care and loyalty by the Controlling AIA Defendants. Either the applicable statute of limitations would have expired or a pending derivative suit would have failed because there would have been no shareholder who would have had standing to maintain a derivative action.

47.     Paragraph 2(ii) (pp. 30-31). The *Future Lawn* case is entirely distinguishable because it was not decided under the Model Rules of Professional Conduct from which RPC 1.2(c) is derived. Moreover, as stated in this Report, e.g. Section XII(E)-(F), the May 2, 2007 Engagement Letter and the February 25, 2008 Amended Engagement Letter and the Joint Defense Agreements were not and could not have been authorized by the Controlling AIA Defendants nor were those Agreements in the best interests of the AIA Corporations, as further confirmed by what has transpired since 2007 and 2008—the AIA Corporations have been destroyed.

48.     Paragraph 2(iii) (p. 31). The *Lerner* case is also distinguishable because, unlike this Lawsuit, the limited scope of representation in that case was clearly set forth in an agreement which was also authorized by the client. Here, we have neither as discussed in this Report.

49.     Paragraph 2(iv) (p. 31). Mr. Remele cites *Bishop v. Owens* for the proposition that "the scope of an attorney's contractual duty is defined by the purposes for which the attorney is retained." He then erroneously states that the Hawley Troxell Defendants were retained to "defend the AIA entities and Crop USA (as local counsel) …" In fact, as stated many times in this Report, the Hawley Troxell Defendants were retained "to advise the two corporate defendants in connection with litigation brought by Reed J. Taylor" and under *Bishop* that was

Page - 560

**12-ER-2987**

their duty to the AIA Corporations. Under the circumstances, an acknowledgement by the Controlling AIA Defendants that they had a duty to investigate themselves was worthless, and could not relieve The Hawley Troxell Defendants from that contractual obligation and their fiduciary obligation to the AIA Corporations, which included investigating the misconduct of the Controlling AIA Defendants. and insisting on the assertion by the AIA Corporations of cross claims against those Defendants.

50. Paragraph 2(v) (p. 32). For the reasons set forth many times herein and elsewhere in this Report, Mr. Remele's opinion that the Hawley Troxell Defendants properly limited their scope of representation is not supported by the facts, the applicable law or the RPC. In fact, there is no evidence that the Hawley Troxell Defendants actually provided the required information to obtain Informed Consent, which any reasonable director or officer exercising the requisite qualities of integrity, competence and prudence would have rejected any limited scope of representation, let alone entering into a so-called joint defense arrangement with the Controlling AIA Defendants (the very people who unlawfully misappropriated assets, funds and trade secrets from the AIA Corporations, among other things, as described in this Report). Moreover, the Engagement Letters were unauthorized because the Controlling AIA Defendants' conflicts of interest prevented them from authorizing the same and for the reasons discussed in this Report doing so violated AIA Services' Amended Articles of Incorporation, AIA Services' New Restated Bylaws, and AIA Insurance's Bylaws. In addition, by reason of the adverse interest exception the Hawley Troxell Defendants never obtained Informed Consent from the AIA Corporations.

Mr. Remele's Allegation that the Judgmental Immunity Doctrine Prevents Hawley Troxell From Exposure to Liability Based Upon Its Representation of the AIA Entities and Crop USA.

51. Paragraph 3(i) (p. 32). In my opinion, the judgmental immunity doctrine has no application to this Lawsuit. For the reasons set forth throughout this Report, the Hawley Troxell Defendants did not act as careful and prudent lawyers, and there is no "unsettled legal principle" applicable to their misconduct and breached duties of loyalty and care. Instead, as explained in this Report, they utterly failed to exercise due care and repeatedly ignored the interests of the AIA Corporations. (*See, e.g.,* Sections X and XII of this Report). Again, Mr. Remele fails to explain how the principles articulated in *Sun Valley* could possibly be

**Exhibit - 1, p. 570**

**12-ER-2988**

applicable to the facts of this Lawsuit and the misconduct of the Hawley Troxell Defendants.

52.    Paragraph 3(ii) (p. 33). For the reasons state in this Section XII, Judge Brudie's disqualification decision has no binding effect on Miesen and no precedential value in this Lawsuit. Miesen was not a party and the issue was never addressed in the context of a legal malpractice action. Claim and issue preclusion does not apply to Miesen's claims.

Mr. Remele's Allegation that the Practical Implications of Miesen's Position Could Destroy the Attorney Client Relationship.

53.    Paragraph 4(i) (p. 33). Again, the Hawley Troxell Defendants' scope of representation was not limited to exclude their duty to investigate the conduct of the Controlling AIA Defendants and Crop USA, nor would such a limited scope have been reasonable under the circumstances. They were not retained just to defend a lawsuit, but to *advise* the AIA Corporations in connection with the Reed Taylor litigation which under the circumstances include the investigation of, and assertion of cross claims against, the AIA Controlling Defendants. Mr. Remele seems confused. I have not suggested that there was a duty to investigate *the AIA Corporations,* which were innocent victims of the Controlling AIA Defendants, CropUSA and the Hawley Troxell Defendants. There were no "practical dynamics of the attorney-client relationship" which reduced the contractual obligations and fiduciary duties of the Hawley Troxell Defendants to the AIA Corporations.

54.    Paragraph 4(ii) (p. 34). Nowhere in any of the Engagement Letters is there a specific provision or statement that the Hawley Troxell Defendants would not perform an investigation of Reed Taylor's allegations; their contractual obligation and duties were "to advise the two corporate defendants in connection with litigation brought by Reed J. Taylor," which were unlimited and unconditional. The Hawley Troxell Defendants should have advised the AIA Corporations to promptly terminate the Standstill and Tolling Agreements (assuming that they truly believed that they were appropriate at the time of entry). In addition, the Hawley Troxell Defendants' role as general counsel to the AIA Corporations required that work. In sum, the evidence (including the Unredacted Billing Records) confirm that the scope of representation was not limited and, even if it were, the Hawley Troxell Defendants assumed the additional unlimited duties based on the work that they were performing.

Page - 562

Mr. Remele's Allegation that the Hawley Troxell Did Not Breach its Duties to AIA Services by Being Retained By, and taking Direction From, the Board of Directors of AIA Services as Related to *Donna Taylor v. AIA Services.*

55.     Paragraph B(i) (pp. 34-35). As stated in Sections X, XI and XII of this Report under the circumstances, the Hawley Troxell Defendants could not, as Mr. Remele states, "take direction" from the purported "Board" of AIA Services, which was riddled with conflicts of interest and was not a functioning Board because of a complete failure on the part of the Controlling AIA Defendants to comply with proper corporate governance procedures. The Controlling AIA Defendants were looking after their own interests and not those of the AIA Corporations. Again, although Mr. Remele opines that the Hawley Troxell Defendants could take direction from the John Taylor dominated "boards," as I have stated several times above he also says that "I have not been retained to opine on the legitimacy of John Taylor's actions"; thus Mr. Remele cannot express a substantive or meaningful opinion as to whether in fact the Hawley Troxell Defendants were permitted to take direction from John Taylor because they were not authorized to do so.

56.     Paragraph B(i)-(iv) (pp. 34-37). The self-serving cautioning by the Hawley Troxell Defendants about risks and "strong recommendation" to obtain independent counsel were essentially window dressing. As stated in this Report (Sections X(J) and XII(L) in my opinion the actions of the Hawley Troxell Defendants in opposing the appointment of a Receiver and obtaining a stay of the action allowed the Controlling AIA Defendants to continue to commit many of their acts of misconduct and prevented them from being redressed by the AIA Corporations The December 22, 2009 AIA Engagement Letter nearly acknowledges this when it states; "Further, if a receiver is appointed as requested in the Donna Lawsuit, the receiver could terminate this firm's representation of Services in this lawsuit and could file suits against the "Responsible Individuals" and this "firm."[1851] To reiterate, the Hawley Troxell Defendants placed their own interests, and the interests of the Controlling AIA Defendants and CropUSA, ahead of the interests of the AIA Corporations by opposing the receiver and obtaining the stay, thereby breaching their duties of care and loyalty owed to those corporations.

57.     Paragraph B(i) Footnote 19 (p. 34). Mr. Remele represents that "John Taylor, Chief Executive Officer of AIA Services, retained Hawley Troxell to act on its behalf." This representation is wholly undermined by Mr. Remele's admission in footnote 16 on page 29 of his Report that he was not "retained to opine on the

---

[1851] HTEH000197.

Exhibit - 1, p. 572

12-ER-2990