**Consolidated Case Nos. 25-3552 and 25-3800**

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,

**Plaintiff-Appellant**,

v.

R. JOHN TAYLOR, an individual, CONNIE TAYLOR HENDERSON, an individual, JAMES BECK, an individual, MICHAEL W. CASHMAN, SR., an individual, CROP USA INSURANCE AGENCY, INC., an Idaho corporation, CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company, AIA SERVICES CORPORATION, an Idaho corporation, AND AIA INSURANCE, INC., an Idaho corporation,

**Defendants-Appellees**,

and

Reed J. Taylor, an individual,

**Third-Party Defendant-Appellee.**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO,
CHIEF DISTRICT COURT JUDGE DAVID C. NYE, PRESIDING

**APPELLANT'S EXCERPTS OF THE RECORD – VOLUME - 14**

Roderick C. Bond
Roderick Bond Law Office, PLLC
10900 NE 4th St., Suite 2300
Bellevue, WA  98004
Tel: (425) 591-6903
Email: rod@roderickbond.com
Attorney for Appellant

Andrew Schwam
Andrew Schwam Law Firm
705 SW Fountain St.
Pullman, WA  99163-2128
Tel: (208) 874-3684
Email: amschwam@turbonet.com
Attorney for Appellant

## List of All Known Shareholder and Board Meeting Minutes and Resolutions for the AIA Corporations from January 1, 1999 to the Present Time

| Date | Description of Minutes or Resolution | Bates Stamp Numbers |
|---|---|---|
| 1999-4-21 | AIA Services' Board of Directors Meeting Minutes | AIA0025604-05 |
| 1999-5-11 | AIA Insurance's Minutes of Annual Shareholder Meeting | AIA0025614 |
| 1999-5-11 | AIA Insurance's Minutes of Annual Board Meeting | AIA0025615 |
| 1999-12-16 | AIA Insurance's Minutes of Annual Board Meeting | AIA0025613 |
| 2000-5-9 | AIA Insurance's Minutes of Annual Shareholder Meeting | AIA0025611 |
| 2000-5-9 | AIA Insurance's Board Meeting Minutes | AIA0025612 |
| 2000-9-28 | AIA Services' Board Meeting Minutes | AIA0025606-08 |
| 2001-5-8 | AIA Insurance's Annual Shareholder Meeting Minutes | AIA0025609 |
| 2001-5-8 | AIA Insurance's Annual Board Meeting Minutes | AIA0025610 |
| 2002-1-2 | AIA Insurance's Consent in Lieu of Meeting (a so-called "Majority" consent) | AIAPROD00171147-48 |
| 2002-5-7 | AIA Insurance's Annual Shareholder Meeting Minutes | AIA0001017 |
| 2002-5-7 | AIA Insurance's Annual Board Meeting Minutes | AIA0001016 |
| 2002-8-5 | AIA Insurance's Special Board Meeting Minutes | AIA0001015 |
| 2003-5-6 | AIA Insurance's Annual Shareholder Meeting Minutes | AIA0001014 |
| 2003-5-6 | AIA Insurance's Annual Board Meeting Minutes | AIA0001013 |
| 2004-5-4 | AIA Insurance's Annual Shareholder Meeting Minutes | AIA0001012 |
| 2004-5-4 | AIA Insurance's Annual Board Meeting Minutes | AIA0001011 |
| 2004-7-20 | AIA Insurance's Board Meeting Minutes | AIA0001010 |

- 1 -

| Date | Description of Minutes or Resolution | Bates Stamp Numbers |
|---|---|---|
| 2004-8-26 | AIA Insurance's Board Consent re alleged purchase of Series C Shares | AIA0027502 |
| 2005-5-3 | AIA Insurance's Annual Shareholder Meeting Minutes | AIA0001008 |
| 2005-5-3 | AIA Insurance's Board Meeting Minutes | AIA0001007 |
| 2006-4-20 | AIA Insurance's Corporate Resolution for Guarantee of CropUSA's $2,000,000 loan with Zions First National Bank | AIA0026677-78 |
| 2006-4-20 | AIA Services' Corporate Resolution for Guarantee of CropUSA's $2,000,000 loan with Zions First National Bank | AIA0026679-80 |
| 2006-5-9 | AIA Insurance's Annual Shareholder Meeting Minutes | AIA0001006 |
| 2006-5-9 | AIA Insurance's Board Meeting Minutes | AIA0001005 |
| 2006-9-19 | AIA Insurance's Board Resolution re Guarantee of Lancelot Loan to CropUSA | AIAPROD00086123-24 |
| 2006-10-3 | AIA Insurance's Meeting Minutes for Special Meeting | AIA0001004 |
| 2006-10-27 | AIA Insurance's Unanimous Consent in Lieu of Special Meeting for Lancelot Loan Guarantee | AIAPROD00309057-59 |
| 2007-3-28 | AIA Services' Meeting Minutes of Special Meeting of Shareholders re Advancing Fees and Costs for John Taylor, Freeman and Duclos by AIA Services | AIAPROD00171853 |
| 2007-4-30 | AIA Services and AIA Insurance's Joint Board Meeting Minutes (appointing James Beck and Connie Taylor Henderson to AIA's boards) | AIAPROD00171187 |
| 2008-7-22 | AIA Insurance's Consent Resolution in Lieu of Special Meeting of Directors | AIAPROD00171193-94 |
| 2008-7-22 | AIA Services' Consent Resolution in Lieu of Special Meeting of Directors | AIAPROD00171855-56 |
| 2008-8-7 | AIA Insurance and AIA Services' Joint Board of Directors Meeting Minutes | AIA0027457-60 |
| 2009-4-22 | AIA Services' Special Meeting of Board of Directors Minutes | AIAPROD00308698 |
| 2009-11-4 | AIA Services' Special Meeting of Board of Directors Minutes | AIAPROD00172397 |

Exhibit - B          Exhibit - 1, p. 840

**14-ER-3260**

| Date | Description of Minutes or Resolution | Bates Stamp Numbers |
|---|---|---|
| 2010-4-14 | AIA Services' Special Meeting of Board of Directors Minutes | AIAPROD00172398 |
| 2011-11-21 | AIA Services' Board Resolution for the GemCap limited guarantee | AIAPROD00172399-401 |
| 2012-7-2 | AIA Services' Board of Directors Minutes and Resolutions regarding Reverse Stock Split | AIAS_0001594-95 |
| 2012-7-16 | AIA Services' Shareholder Meeting transcript held for the alleged 2012 annual meeting and reverse stock split | DLM – 0035523-45 |
| 2013-2-4 | AIA Services and AIA Insurance Board of Directors Consent Resolution to GemCap Guarantee | AIAPROD00172406-08 |
| 2014-7-29 | AIA Services Board of Directors Meeting Minutes | AIAPROD00308701 |
| 2014-9-12 | Connie Henderson's resignation from AIA Services and AIA Insurance's Boards of Directors | AIAPROD00171548 |
| 2016-5-26 | AIA Insurance's Board Consent re Appointing John Taylor as Secretary | AIAPROD00171605 |
| 2016-5-26 | AIA Insurance's Board Consent re Amending Bylaws | AIAPROD00171576-77 |
| 2016-5-26 | AIA Services' Board Consent re Appointing John Taylor as Secretary | AIAPROD00172583 |
| 2016-5-26 | AIA Services' Board Consent re Issuing Series A Preferred Shares to John Taylor | AIAPROD00172499 |
| 2016-5-26 | AIA Services' Board Consent re Amending Bylaws | AIAPROD00172497-98 |
| 2016-8-25 | AIA Services' Consent Action re 401(k) Plan | DLM – 0079639 |
| 2016-9-13 | AIA Insurance's Board Consent re certain GemCap transactions | L.T. - 1219 |

Exhibit - B        Exhibit - 1, p. 841

**14-ER-3261**

**List of Select and Certain Corporate Governance Documents and
Information for the AIA Corporations**
**(The List Is Complete Only for Known Information and Documents Provided
From January 1, 1999 Through the Present Time)**

| Date | Description | Bates Stamp Numbers |
|---|---|---|
| 1989-2-1 | AIA Services' Notice of Special Shareholder Meeting, Proxy, Amended Articles of Incorporation (including to authorize the use of capital surplus to redeem shares) and Option Plan | DLM – 105050-63 |
| 1994-7-13 | AIA Services' Consent Resolution re Donna's board designee | AIA0029382 |
| 1994-8 | AIA Services' Consent Resolution appointing Spickler to the Board | AIA0029315 |
| 1995-9-23 | AIA Services' Board of Directors Meeting Minutes | AIA0028559-62 |
| 1995-1-12 | AIA Services' Board of Directors Meeting Minutes and Consent Resolutions | AIA0025224-29 |
| 1995-2-9 | AIA Services' Notice, Disclosure and Proxy for Special Meeting of Shareholders | DLM – 105318-418 |
| 1995-3-7 | AIA Services' Board of Directors Meeting Minutes and Consent Resolutions | AIA0025230-51 |
| 1995-3-7 | AIA Services' Minutes of Special Shareholders Meeting | AIAPROD00172378-79 |
| 1995-7-18 | AIA Services' Board of Directors Meeting Minutes and Consent Resolutions | AIA0025505-22 |
| 1995-7-18 | AIA Services' Minutes of Special Shareholder Meeting and Proxies | AIA0025482-504 |
| 1995-7-28 | AIA Services' Notice of Annual Shareholder Meeting | DLM - 105465 |
| 1995-8-16 | AIA Services' Board of Directors Meeting Minutes and Consent Resolution (including appointing Beck and Cashman to the Board of AIA Services) | AIA0025523-29 |
| 1995-11-17 | AIA Services' Board of Directors Meeting Minutes (including modification of Bylaws for annual shareholder meetings on page 3 (AIA0025533)) | AIA0025531-34 |
| 1995-12-1 | AIA Services' Notice and Proxy for Special Shareholder Meeting | DLM – 105481-93 |

Exhibit - B          Exhibit - 1, p. 842
**14-ER-3262**

| Date | Description | Bates Stamp Numbers |
|---|---|---|
| 1995-12-14 | AIA Services' Minutes of Special Shareholders Meeting, Resolutions and Proxies | AIA0025536-78 |
| 1996-2-2 | AIA Services' Board of Directors Meeting Minutes | AIA0025579-80 |
| 1996-2-26 | AIA Services' Consent in Lieu of Special Meeting of Directors re: terminating and filing suit against Campanaro and appointing John as CEO | AIA0025581-89 |
| 1996-5-7 | AIA Services' Board of Directors Meeting Minutes | AIA0025590-92 |
| 1996-10-25 | AIA Services' Board of Directors Meeting Minutes | AIA0025593-94 |
| 1997-5-13 | AIA Insurance's Minutes of Annual Shareholder Meeting | AIA0025621 |
| 1997-5-13 | AIA Insurance's Board of Director Meeting Minutes for Annual Meeting | AIA0025622 |
| 1997-6-24 | AIA Services' Board of Directors Meeting Minutes | AIA0025627-28 |
| 1998-3-10 | AIA Services' Board of Directors Meeting Minutes | AIA0025595-97 |
| 1998-4-30 | AIA Services' Board of Directors Meeting Minutes | AIA0025598-600 |
| 1998-5-12 | AIA Insurance's Minutes of Annual Shareholder Meeting | AIA0025623 |
| 1998-5-12 | AIA Insurance's Board of Director Meeting Minutes for Annual Meeting | AIA0025624 |
| 1998-7-8 | AIA Services' Notice of Annual Shareholder Meeting and Proxy | DLM – 105573-75 |
| 1998-7-23 | AIA Services' Annual Shareholder Meeting Minutes | AIAPROD00171950 |
| 1998-10-14 | AIA Insurance's Annual Report lists John Taylor, Daniel Spickler and Paul Durant as Directors | DLM - 0033144 |
| 1998-10-29 | AIA Services' Board of Directors Meeting Minutes | AIA0025601-03 |
| 1998-11-3 | AIA Insurance's Minutes of Annual Shareholder Meeting | AIA0025626 |
| 1998-11-3 | AIA Insurance's Board Meeting Minutes | AIA0025625 |
| 1999-1-24 | AIA Insurance's Annual Report lists John Taylor, JoLee Duclos and Paul Schrette as Directors | DLM - 0033145 |

- 5 -

Exhibit - B          Exhibit - 1, p. 843

**14-ER-3263**

| Date | Description | Bates Stamp Numbers |
|---|---|---|
| 1999-4-21 | AIA Services' Board of Directors Meeting Minutes | AIA0025604-05 |
| 1999-5-11 | AIA Insurance's Minutes of Annual Shareholder Meeting | AIA0025614 |
| 1999-5-11 | AIA Insurance's Minutes of Annual Board Meeting | AIA0025615 |
| 1999-12-16 | AIA Insurance's Minutes of Annual Board Meeting | AIA0025613 |
| 2000-5-9 | AIA Insurance's Minutes of Annual Shareholder Meeting | AIA0025611 |
| 2000-5-9 | AIA Insurance's Board Meeting Minutes | AIA0025612 |
| 2000-9-28 | AIA Services' Board Meeting Minutes | AIA0025606-08 |
| 2001-2-26 | AIA Insurance's Annual Report lists John Taylor, JoLee Duclos and Paul Schrette as Directors | DLM - 0033146 |
| 2001-3-26 | AIA Services' Annual Report lists John Taylor, Reed Taylor, James Beck, Michael Cashman and Bruce Sweeney as Directors | DLM - 0033072 |
| 2001-5-8 | AIA Insurance's Annual Shareholder Meeting Minutes | AIA0025609 |
| 2001-5-8 | AIA Insurance's Annual Board Meeting Minutes | AIA0025610 |
| 2001-6-18 | AIA Services' Notice and Proxy for Annual Shareholder Meeting | DLM – 105711-14 |
| 2001-11-19 | AIA Insurance's Annual Report lists John Taylor, JoLee Duclos and Paul Schrette as Directors | DLM - 0033147 |
| 2002-1-2 | AIA Insurance's Consent in Lieu of Meeting (a so-called "Majority" consent) | AIAPROD00171147-48 |
| 2002-1-8 | AIA Services' Annual Report lists John Taylor, JoLee Duclos and Paul Schrette as Directors | DLM - 0033073 |
| 2002-5-7 | AIA Insurance's Annual Shareholder Meeting Minutes | AIA0001017 |
| 2002-5-7 | AIA Insurance's Annual Board Meeting Minutes | AIA0001016 |
| 2002-8-5 | AIA Insurance's Special Board Meeting Minutes | AIA0001015 |
| 2003-2-5 | AIA Services' Annual Report lists John Taylor, JoLee Duclos and Bryan Freeman as Directors | DLM - 0033074 |

Exhibit - B          Exhibit - 1, p. 844
**14-ER-3264**

| Date | Description | Bates Stamp Numbers |
|---|---|---|
| 2003-2-5 | AIA Insurance's Annual Report lists John Taylor, JoLee Duclos and Bryan Freeman as Directors | DLM - 0033148 |
| 2003-5-5 | AIA Services' Notice and Agenda of Annual Shareholder Meeting and Proxies | AIA0001132-37 |
| 2003-5-6 | AIA Insurance's Annual Shareholder Meeting Minutes | AIA0001014 |
| 2003-5-6 | AIA Insurance's Annual Board Meeting Minutes | AIA0001013 |
| 2004-5-4 | AIA Insurance's Annual Shareholder Meeting Minutes | AIA0001012 |
| 2004-5-4 | AIA Insurance's Annual Board Meeting Minutes | AIA0001011 |
| 2004-7-20 | AIA Insurance's Board Meeting Minutes | AIA0001010 |
| 2004-8-26 | AIA Insurance's Board Consent re alleged purchase of Series C Shares | AIA0027502 |
| 2005-5-3 | AIA Insurance's Annual Shareholder Meeting Minutes | AIA0001008 |
| 2005-5-3 | AIA Insurance's Board Meeting Minutes | AIA0001007 |
| 2006-4-20 | AIA Insurance's Corporate Resolution for Guarantee of CropUSA's $2,000,000 loan with Zions First National Bank | AIA0026677-78 |
| 2006-4-20 | AIA Services' Corporate Resolution for Guarantee of CropUSA's $2,000,000 loan with Zions First National Bank | AIA0026679-80 |
| 2006-5-9 | AIA Insurance's Annual Shareholder Meeting Minutes | AIA0001006 |
| 2006-5-9 | AIA Insurance's Board Meeting Minutes | AIA0001005 |
| 2006-9-19 | AIA Insurance's Board Resolution re Guarantee of Lancelot Loan to CropUSA | AIAPROD00086123-24 |
| 2006-10-3 | AIA Insurance's Meeting Minutes for Special Meeting | AIA0001004 |
| 2006-10-27 | AIA Insurance's Unanimous Consent in Lieu of Special Meeting for Lancelot Loan Guarantee | AIAPROD00309057-59 |

Exhibit - B          Exhibit - 1, p. 845
**14-ER-3265**

| Date | Description | Bates Stamp Numbers |
|---|---|---|
| 2007 | HTEH and the AIA Corporations produce to Reed Taylor a list of AIA Services and AIA Insurance's Officers and Directors from 2002 through 2007 | AIA0001000-01 |
| 2007-2-22 | JoLee Duclos' letter resigning from AIA Services' board of directors | RJT - 039623 |
| 2007-2-22 | JoLee Duclos' letter resigning from AIA Insurance's board of directors | RJT - 039624 |
| 2007-2-22 | Bryan Freeman's letter resigning from AIA Services' board of directors | RJT - 039622 |
| 2007-2-22 | Bryan Freeman's letter resigning from AIA Insurance's board of directors | RJT - 039621 |
| 2007-3-16 | AIA Services' Notice of Special Shareholder Meeting re Advancing Fees and Costs by AIA Services for John Taylor, Freeman and Duclos | AIA0001138 |
| 2007-3-16 | Proxy Sent to AIA Services' Shareholders for Special Shareholder Meeting for Advancing Fees and Costs | AIA0001135 |
| 2007-3-16 | John Taylor's Letter to AIA Services' Shareholders re Special Meeting for Advancing Fees and Costs | RJT 0000801 |
| 2007-3-28 | AIA Services' Meeting Minutes of Special Meeting of Shareholders re Advancing Fees and Costs for John Taylor, Freeman and Duclos by AIA Services | AIAPROD00171853 |
| 2007-4-30 | AIA Services and AIA Insurance's Joint Board Meeting Minutes (appointing James Beck and Connie Taylor Henderson to AIA's boards) | AIAPROD00171187 |
| 2008-7-22 | AIA Insurance's Consent Resolution in Lieu of Special Meeting of Directors | AIAPROD00171193-94 |
| 2008-7-22 | AIA Services' Consent Resolution in Lieu of Special Meeting of Directors | AIAPROD00171855-56 |
| 2008-8-7 | AIA Insurance and AIA Services' Joint Board of Directors Meeting Minutes | AIA0027457-60 |
| 2009-4-22 | AIA Services' Special Meeting of Board of Directors Minutes | AIAPROD00308698 |
| 2009-11-4 | AIA Services' Special Meeting of Board of Directors Minutes | AIAPROD00172397 |
| 2010-4-14 | AIA Services' Special Meeting of Board of Directors Minutes | AIAPROD00172398 |

- 8 -

| Date | Description | Bates Stamp Numbers |
|---|---|---|
| 2011-11-21 | AIA Services' Board Resolution for the GemCap limited guarantee | AIAPROD00172399-401 |
| 2012-7-2 | AIA Services' Board of Directors Minutes and Resolutions regarding Reverse Stock Split | AIAS_0001594-95 |
| 2012-7-3 | AIA Services' letter, notice of shareholder meeting, proxy and financial statements re reverse stock split and annual meeting | DLM – 0035346-89 |
| 2012-7-16 | AIA Services' Shareholder Meeting transcript held for the alleged 2012 annual meeting and reverse stock split | DLM – 0035523-45 |
| 2013-2-4 | AIA Services and AIA Insurance Board of Directors Consent Resolution to GemCap Guarantee | AIAPROD00172406-08 |
| 2014-7-29 | AIA Services Board of Directors Meeting Minutes | AIAPROD00308701 |
| 2014-9-12 | Connie Henderson's resignation from AIA Services and AIA Insurance's Boards of Directors | AIAPROD00171548 |
| 2014-10-20 | AIA Services' Annual Report lists John Taylor and James Beck as Directors | DLM - 0033090 |
| 2014-11-17 | AIA Insurance's Annual Report lists John Taylor and James Beck as Directors | DLM - 0033161 |
| 2015-10-19 | AIA Services' Annual Report lists John Taylor as the sole Director | DLM - 0033091 |
| 2016-1-29 | AIA Insurance's Annual Report lists John Taylor as the sole Director | DLM - 0033162 |
| 2016-5-26 | AIA Insurance's Board Consent re Appointing John Taylor as Secretary | AIAPROD00171605 |
| 2016-5-26 | AIA Insurance's Board Consent re Amending Bylaws | AIAPROD00171576-77 |
| 2016-5-26 | AIA Services' Board Consent re Appointing John Taylor as Secretary | AIAPROD00172583 |
| 2016-5-26 | AIA Services' Board Consent re Issuing Series A Preferred Shares to John Taylor | AIAPROD00172499 |
| 2016-5-26 | AIA Services' Board Consent re Amending Bylaws | AIAPROD00172497-98 |
| 2016-8-25 | AIA Services' Consent Action re 401(k) Plan | DLM – 0079639 |
| 2016-9-13 | AIA Insurance's Board Consent re certain GemCap transactions | L.T. - 1219 |

Exhibit - B          Exhibit - 1, p. 847

**14-ER-3267**

**Facts Establishing Conflicts of Interest for Matters,
Transactions and/or Decisions Involving the AIA Corporations**

| Relevant Entity | Date Formed | Relevant Owners/ Shareholders | Relevant Management Since January 1, 1999[1] |
|---|---|---|---|
| AIA Services Corporation | 12/20/83 | John Taylor, Connie Taylor Henderson (until final divorce on 1/5/18), Michael Cashman Sr. (until 3/23/12), James Beck (until 3/23/12)[2] | **Directors:** John Taylor, JoLee Duclos (1/8/02-2/22/07), Bryan Freeman (1/8/02-2/22/07), James Beck (4/30/07-10/19/15), Connie Taylor Henderson (4/30/07-9/12/14) **Officers:** John Taylor (President; Secretary 5/26/16-present), JoLee Duclos (Secretary until 5/26/16), Bryan Freeman (V.P. dates unknown) |
| AIA Insurance, Inc. | 1/31/77 | AIA Services | **Directors:** John Taylor, JoLee Duclos (1/24/99-2/22/07), Bryan Freeman (5/7/02-2/22/07), James Beck (4/30/07-1/29/16), Connie Taylor Henderson (4/30/07-9/12/14) **Officers:** John Taylor (President; Treasurer 12/12/12-present; Secretary 6/26/16-present), JoLee Duclos (Secretary until 5/26/16), Bryan Freeman (V.P. 5/7/02-unknown) |
| CropUSA Insurance Agency, Inc. | 11/18/99 | John Taylor, Connie Taylor Henderson (until final divorce on 1/5/18), James Beck (1/10/02-present),[3] Michael Cashman Sr. (1/10/02-present), | **Directors:** John Taylor, JoLee Duclos (until 9/19/14), Bryan Freeman (9/9/02-9/17/07) **Officers:** John Taylor (President until 3/5/01 & 9/9/02-present; Treasurer 11/30/12-present; Secretary 5/26/16-present), JoLee Duclos (Secretary until 5/26/16), |

---

[1] By listing dates that persons served as directors or officers of the AIA Corporations, there is no concession that the directors or officers were duly and properly elected or appointed.

[2] While the Series C Preferred Shares issued in 1995 were in the name of Mr. Beck, the subsequently issued common shares that were issued in 2000 and purchased by John Taylor in 2012 were in Mr. Beck's wife's name, Corrine Beck. AIAPROD00137773.

[3] Mr. Beck's shares were held in the name of his wife, Corrine Beck. CROP000911.

1

**Exhibit - C**      **Exhibit - 1, p. 848**

**14-ER-3268**

### Facts Establishing Conflicts of Interest for Matters, Transactions and/or Decisions Involving the AIA Corporations

| Relevant Entity | Date Formed | Relevant Owners/ Shareholders | Relevant Management Since January 1, 1999[1] |
|---|---|---|---|
| | | JoLee Duclos (1/10/02-present), Bryan Freeman (12/20/02-present) | Bryan Freeman (V.P. 9/9/03-unknown) |
| CropUSA Insurance Services, LLC | 3/30/09[4] | John Taylor | **Manager:** John Taylor |
| Pacific Empire Radio Corporation | 11/13/01 | John Taylor, Connie Taylor Henderson (until final divorce in 1/5/18) | **Directors:** John Taylor, Connie Taylor Henderson (until 12/12/11) **Officers:** John Taylor (President 1/6/14-present; Secretary 9/28/16-present), Connie Taylor Henderson (Secretary until 11/4/03), JoLee Duclos (Assistant Secretary until 11/4/03; Secretary 11/4/03-9/28/16) |
| Pacific Empire Holdings Corporation | 11/18/99[5] | John Taylor, Connie Taylor Henderson (until final divorce on 1/5/18) | **Directors:** John Taylor, Connie Taylor Henderson (until 12/12/11) **Officers:** John Taylor (President 9/30/16-present; Secretary 9/26/17-present), Connie Taylor Henderson (Secretary until 9/12/03), JoLee Duclos (Assistant Secretary until 9/12/02; Secretary 9/12/03-9/26/17) |
| Pacific Empire Communications Corporation | 9/1/1995[6] | John Taylor, Connie Taylor Henderson (until final divorce on 1/5/18) | **Directors:** John Taylor, Connie Taylor Henderson (until 1/6/12) **Officers:** Connie Taylor Henderson (Secretary 10/11/97-9/26/02), JoLee Duclos (Ass. Secretary 9/25/00-9/5/03; Secretary 9/6/03-present) |

[4] Administratively dissolved on June 4, 2020.
[5] Articles of Dissolution were filed on December 2, 2019.
[6] Administratively dissolved on December 17, 2013.

2

Exhibit - C          Exhibit - 1, p. 849
14-ER-3269

### Facts Establishing Conflicts of Interest for Matters, Transactions and/or Decisions Involving the AIA Corporations

| Relevant Entity | Date Formed | Relevant Owners/ Shareholders | Relevant Management Since January 1, 1999[1] |
|---|---|---|---|
| 17 State Street Partners LLC | 6/26/06[7] | John Taylor, Jordan Taylor (John and Connie's son) | **Manager:** John Taylor |
| Radio Leasing LLC | 9/21/99[8] | John Taylor, Connie Taylor Henderson (until final divorce on 1/5/18) | **Manager:** John Taylor |
| Radio Leasing II LLC | 12/3/04[9] | John Taylor, Connie Taylor Henderson (until final divorce on 1/5/18) | **Manager:** John Taylor |
| Reinsurance Partners, LLC | 9/12/12 | John Taylor | **Manager:** John Taylor |
| Green Leaf Alliance, Inc. | 8/11/11 | Unknown | **Directors:** John Taylor, JoLee Duclos (until 6/21/16), Bryan Freeman (until 11/6/15) **Officers:** John Taylor (President; Secretary 6/21/16-present), JoLee Duclos (Secretary until 6/21/16) |
| Green Leaf Re Insurance Company | 10/4/12 | Green Leaf Reinsurance Partners, LLC and Alliance Holdings, LLC | **Directors:** John Taylor **Officers:** John Taylor (President), Bryan Freeman (V.P.), JoLee Duclos (Secretary) |
| Green Leaf Reinsurance Partners, LLC | Unknown | Reinsurance Partners, LLC | **Manager:** John Taylor |
| Growers National Cooperative Insurance Agency, Inc. | 11/2/00 | Unknown | **Directors:** John Taylor (until 10/18/00), JoLee Duclos (until 9/9/02) **Officers:** John Taylor (President until 9/67/06), JoLee Duclos (Secretary until 9/27/06 & |

---

[7] Articles of Dissolution were filed on March 21, 2016.

[8] Administratively dissolved on December 8, 2006.

[9] Administratively dissolved on March 10, 2014.

Exhibit - C          Exhibit - 1, p. 850
14-ER-3270

**Facts Establishing Conflicts of Interest for Matters,
Transactions and/or Decisions Involving the AIA Corporations**

| Relevant Entity | Date Formed | Relevant Owners/ Shareholders | Relevant Management Since January 1, 1999[1] |
|---|---|---|---|
| | | | 9/16/09-10/18/10; Assistant Secretary 9/27/06-9/16/09) |
| Weskan Agency, LLC | 8/9/2010[10] | John Taylor | **Manager:** John Taylor |
| AIA Services Corporation 401(k) Plan (CropUSA and AIA Insurance were also Participating Employers) | 2/1/1978 | **Participants:** John Taylor, JoLee Duclos, Bryan Freeman, Aimee Gordon, Cori Cleveland | **Co-Trustees:** John Taylor (1/98 until 8/5/2008), JoLee Duclos (7/99 until 8/5/08) **Sole Trustees:** JoLee Duclos (8/5/09 until 11/4/09), John Taylor (11/4/09-present) |
| CropUSA Financial, LLC | 6/13/2005[11] | John Taylor, Connie Taylor Henderson (until final divorce on 1/5/18) | **Manager:** John Taylor |
| The Lewis Clark Plaza Company, LLC | 1/23/2014[12] | John Taylor | **Manager:** John Taylor |
| Alliance Holding(s) Company, LLC (a/k/a Alliance Holdings or Alliance Holding Co LLC) | Unknown | Unknown | **Manager:** John Taylor |

---

[10] Administratively Dissolved on May 15, 2020.

[11] Administratively Dissolved on September 20, 2012.

[12] Administratively Dissolved on January 23, 2014.

Exhibit - C          Exhibit - 1, p. 851
14-ER-3271

| No. | Filing Date/State | End Date | Known Lawsuits and Legal Filings Directly or Indirectly Involving John Taylor, Other Defendants, and/or Entities Partially Owned by John Taylor/Other Defendants Since 1996 | Bates Nos. for Initial Complaint/Filing |
|---|---|---|---|---|
| 1 | 2-27-1996 (Idaho) | 3-25-1997 | *AIA Services v. Campanaro* (filed by AIA Services against Richard Campanaro (the former CEO of AIA Services brought in by John Taylor) for declaratory relief for to determine his status as an employee and any options for allegedly breaching his employment contract and fiduciary duties after he was terminated by AIA) | RJT – 024182-88 |
| 2 | 3-4-1996 (Idaho) | 6-7-2013 | *In re Matter of The Liquidation of The Universe Life Insurance Co.* (filed by Mary Hartung, the Director of the Idaho Dept. of Insurance, as a rehabilitation for the Universe Life Insurance Co., AIA Services' former underwriting subsidiary, for having insufficient capital and it was subsequently converted to a liquidation proceeding) | AIAPROD00078474-77 |
| 3 | 3-11-2002 (Idaho) | 6-8-2007 | *In re Matter of The Liquidation of The Universe Life Insurance Co., Mary Hartung v. AIA Services* (filed in by Mary Hartung against AIA Services and AIA Insurance for damages flowing from allegedly violating the lease with Washington Bank Properties) | AIAPROD00027066-122 |
| 4 | 3-3-2003 (Idaho) | 2-9-2005 | *AON Consulting v. AIA Insurance* (filed by AON Consulting against AIA Insurance for failing to pay $52,924.59, plus accrued interest, in consulting fees) | DLM – 108262-63 |
| 5 | 1-23-2004 (Idaho) | 11-19-2012 | *Taylor v. Maile* (filed by John Taylor, Reed Taylor and Dallan Taylor against Thomas Maile (an attorney), his wife and Berkshire Investments for damages allegedly involving property that was purchased from a trust in which the Taylors were beneficiaries, which included claims of aiding and abetting of breaches of fiduciary duties) | DLM – 108267-74 |
| 6 | 10-3-2005 (Idaho) | 1-5-2018 | *Connie Taylor v. John Taylor* (divorce action filed by Connie Henderson against John Taylor, which did not be finalized to divide their community property ownership in AIA Services, PEHC, PERC and CropUSA until the final decree entered on January 5, 2018) | DLM – 0033508-10 |

- 1 -

**Exhibit - D**
**14-ER-3272**

**Exhibit - 1, p. 852**

| No. | Filing Date/State | End Date | <u>Known</u> Lawsuits and Legal Filings Directly or Indirectly Involving John Taylor, Other Defendants, and/or Entities Partially Owned by John Taylor/Other Defendants Since 1996 | Bates Nos. for Initial Complaint/Filing |
|---|---|---|---|---|
| 7 | 1-29-2007 (Idaho) | Pending[1] | *Reed Taylor v. AIA Services* (filed by Reed Taylor against AIA Services, AIA Insurance and John Taylor, and later against Duclos, Freeman, Henderson, Beck, Cashman, and CropUSA, for damages flowing from the unpaid $6 million in principal and over $2 million in interest, due on August 1, 2005 for the 1995 redemption of his common shares in AIA Services) | DLM – 0007287-92 |
| 8 | 12-31-2007 (Idaho) | 2-28-2011 | *Berkshire Investments v. Taylor* (filed by Berkshire Investments, LLC, Thomas Maile, IV, and his wife against Connie Henderson, Dallan Taylor, John Taylor and Clark and Feeney to set aside the judgment in *Taylor v. Maile* and related claims) | DLM – 108407-39 |
| 9 | 6-2-2008 (Idaho) | Pending | *Donna Taylor v. Taylor* (first of the two consolidated lawsuits filed by Donna Taylor against John Taylor, Jane Doe and later Connie Henderson to recover damages flowing from the failure to timely and fully redeem her Series A Preferred Shares, which were required to have been fully redeemed no later than 12-3-2003) | DLM – 0002991-94 |
| 10 | 8-18-2008 (Idaho) | 12-23-2008 | *Reed Taylor v. Babbitt* (this lawsuit was filed by Reed Taylor against Gary Babbitt, John Ashby, Richard Riley, Patrick Collins, and Hawley Troxell for various creditor related claims and aiding and abetting John Taylor and other Controlling AIA Defendants) | TFBB004516-41 |
| 11 | 8-18-2008 (Idaho) | 12-23-2008 | *Reed Taylor v. McNichols* (this lawsuit was filed by Reed Taylor against McNichols and Clements Brown for various creditor related claims and aiding and abetting John Taylor and other Controlling AIA Defendants) | TFBB004542-64 |

---

[1] The last filing was an order disbursing the $10,000 in remaining funds posted as security for the preliminary injunction against Reed Taylor on July 20, 2012. While Reed Taylor's claims were dismissed and the case is indicated as being "closed," certain defendants have counterclaims pending and a final judgment has not been entered.

- 2 -

**Exhibit - D**
**14-ER-3273**

**Exhibit - 1, p. 853**

| No. | Filing Date/State | End Date | Known Lawsuits and Legal Filings Directly or Indirectly Involving John Taylor, Other Defendants, and/or Entities Partially Owned by John Taylor/Other Defendants Since 1996 | Bates Nos. for Initial Complaint/Filing |
|---|---|---|---|---|
| 12 | 10-1-2009 (Idaho) | 10-9-2015 | *Reed Taylor v. Riley* (this lawsuit was filed by Reed Taylor against Richard Riley, Robert Turnbow, Eberle Berlin and Hawley Troxell for damages involving the incorrect legal opinion for the illegal 1995 redemption of his common shares in AIA Services) | DLM – 0072799-824 |
| 13 | 11-23-2009 (Idaho) | 1-4-2012[2] | *Donna Taylor v. AIA Services* (this lawsuit was filed by Donna Taylor against AIA Services seeking the appointment of a receiver and to require the AIA Corporations to comply with their articles and bylaws, and prevent other improper transactions) | DLM – 0033863-78 |
| 14 | 1-7-2010 (Idaho) | 7-6-2010 | *CropUSA v. Growers National* (this lawsuit was filed by CropUSA against Growers National Cooperative Insurance Agency (Connie Henderson was CropUSA's attorney) for declaratory relief re CropUSA as the agent for GNCIA and to pay commissions) | DLM – 0034408-11 |
| 15 | 8-11-2010 (Idaho) | Pending | *This Lawsuit (Miesen v. Hawley Troxell)* (filed by Donna Taylor and Dale Miesen against various parties and other parties being subsequently named, including John Taylor, James Beck, Michael Cashman, Gary Babbitt, John Ashby, Richard Riley, Hawley Troxell and GemCap, asserting many tort claims) | Docket 1 |
| 16 | 8-23-2010 (Idaho) | 12-16-2011 | *AmericanWest Bank v. Bolland* (filed by AmericanWest Bank against the Bollands, John Taylor and other defendants for their guarantees of $5,592,223.19 in principal, plus accrued interest of $150,426.87, for a loan to PERC, which was in default. John Taylor and other defendants asserted counterclaims and third-party claims against PERC) | DLM – 0072726-70 |

---

[2] Donna Taylor voluntarily dismissed this lawsuit without prejudice so that she could seek to have the stay lifted in this Lawsuit. While Donna Taylor was forced to appeal to the Ninth Circuit Court of Appeals, she was ultimately successful in having the stay lifted in this Lawsuit. After that ruling, Mr. Miesen also retained Roderick Bond to represent him in this Lawsuit, and Donna Taylor was subsequently voluntarily dismissed without prejudice leaving Mr. Miesen as the sole plaintiff.

- 3 -

**Exhibit - D**      **Exhibit - 1, p. 854**

**14-ER-3274**

| No. | Filing Date/State | End Date | <u>Known</u> Lawsuits and Legal Filings Directly or Indirectly Involving John Taylor, Other Defendants, and/or Entities Partially Owned by John Taylor/Other Defendants Since 1996 | Bates Nos. for Initial Complaint/Filing |
|---|---|---|---|---|
| 17 | 7-29-2011 (Idaho) | 1-18-2013 | *Pacific Empire Radio v. Broadcast Manager* (filed by Pacific Empire Radio against Broadcast Manager and Chaparral Broadcasting for declaratory relief alleging that agreements between BMI and Chaparral are void as to PERC) | DLM – 108748-838 |
| 18 | 9-23-2011 (Idaho) | 7-30-2015 | *AIA Services v. Washington Bank Properties* (filed by AIA Services against Washington Bank Properties to foreclose on the mortgage on AIA Services' former headquarters) | QBCROP10458-74 |
| 19 | 3-28-2012 (Wash.) | 1-2-2018 | *Reed Taylor v. Bell* (this lawsuit was filed by Reed Taylor against Scott Bell, Frank Taylor and Cairncross & Hempelmann for damages flowing from their representation of Reed Taylor for the illegal 1995 redemption of his common shares in AIA Services) | RJT – 065188-203 |
| 20 | 5-7-2012 (Wash.) | 5-17-2016 | *Washington Bank Properties v. AIA Services* (filed by Washington Bank Properties against AIA Services for alleged breaches of the lease of AIA's former headquarters) | DLM – 109059-86 |
| 21 | 8-26-2012 (Idaho) | 5-16-2013 | *AIA Services v. Durant* (filed by AIA Services against Paul Durant, Dale Miesen, Jerry Legg, Donna Taylor, Reed Taylor and other shareholders of AIA Services in an improper effort to force the implementation of the unlawful reverse stock split) | DLM – 0035546-600 |
| 22 | 3-7-2013 (Idaho) | 5-18-2016 | *AIA Insurance v. Washington Bank Properties* (filed by AIA Insurance against Washington Bank Properties for unjust enrichment and declaratory relief involving the lease agreement and payments of rent and taxes under that lease) | AIAS_0031654-59 |
| 23 | 5-24-2013 (Idaho) | Pending | *Donna Taylor v. AIA Services* (the 2nd of the two consolidated lawsuits filed by Donna Taylor against AIA Services, John Taylor, Connie Henderson, Michael Cashman and James Beck to recover damages for the failure to timely and fully redeem her 41,651 remaining Series A Preferred Shares, which should have been redeemed by 12-3-2003) | DLM – 0002866-80 |

- 4 -

**Exhibit - D**

**Exhibit - 1, p. 855**

**14-ER-3275**

| No. | Filing Date/State | End Date | Known Lawsuits and Legal Filings Directly or Indirectly Involving John Taylor, Other Defendants, and/or Entities Partially Owned by John Taylor/Other Defendants Since 1996 | Bates Nos. for Initial Complaint/Filing |
|---|---|---|---|---|
| 24 | 7-30-2013 (Cal.) | Pending | *GemCap v. CropUSA* (filed by GemCap against the CropUSA Entities, John Taylor, the AIA Corporations, PERC, Sound Insurance, Reinsurance Partners, Green Leaf Reinsurance Partners, CDG Diversified, JoLee Duclos, Bryan Freeman and others for claims for the unpaid $10 million loan to the CropUSA Entities and the AIA Corporations' unlawful guarantees, which Donna Taylor unsuccessfully attempted to intervene to have the guarantees and the Settlement Agreement set aside on 1-8-2015 ) | DLM – 0048057-215 |
| 25 | 7-21-2014 (Idaho) | Pending[3] | *Durant v. GemCap* (filed by Paul Durant, Donna Taylor and Dale Miesen against GemCap and the AIA Corporations to set aside the unlawful guarantees and prevent any unlawful settlement with the AIA Corporations) | DLM – 0036176-226 |
| 26 | 10-14-2014 (Cal.) | 9-13-2017 | *GemCap v. Quarles & Brady* (filed by GemCap against Quarles & Brady and James Gatziolis for the legal opinion and other claims from the $10 million loan to CropUSA) | DLM – 0051602-92 |
| 27 | 11-13-2014 (Iowa) | 6-21-2020 | *Church Crop Insurance v. Diversified* (filed by Church Crop Insurance against CGB Diversified Services and the CropUSA Entities, subsequently involving GemCap as a party, for declaratory relief regarding unpaid commissions held by Diversified) | QBMIESEN000002894-919[4] |
| 28 | 3-4-2015 (Missouri) | 3-1-2018 | *Missouri Crop v. Diversified* (filed by Missouri Crop and Matthew Burgher against CGB Diversified Services and the CropUSA Entities, subsequently involving GemCap as a party, for claims resulting from unpaid commissions held by Diversified) | DLM – 0086365-71 |

[3] The last filing was an order dismissing the case without prejudice. There is no final judgment.

[4] A Petition and Application for *Ex Parte* Temporary Injunctions was previously filed on October 3, 2014.

**Exhibit - D**

**14-ER-3276**

**Exhibit - 1, p. 856**

| No. | Filing Date/State | End Date | <u>Known</u> Lawsuits and Legal Filings Directly or Indirectly Involving John Taylor, Other Defendants, and/or Entities Partially Owned by John Taylor/Other Defendants Since 1996 | Bates Nos. for Initial Complaint/Filing |
|---|---|---|---|---|
| 29 | 11-9-2015 (Idaho) | 11-10-2016 | *Zion's Bank v. 17 State Street* (filed by Zion's First National Bank against 17 State Street Partners, John Taylor, AIA Insurance, GemCap and Randall/Danskin for the foreclosure of two properties transferred to AIA Insurance from 17 State Street Partners) | DLM – 0038506-38 |
| 30 | 11-24-2015 (Cal.) | 6-28-2018 | *GemCap v. Scottsdale* (filed by GemCap against Scottsdale Indemnity Company for damages allegedly flowing from an insurance agents and brokers policy issued to CropUSA (the claims were assigned to GemCap in the unlawful Settlement Agreement)) | DLM – 0057051-94 |
| 31 | 1-13-2016 (Idaho) | Pending | IRS files a $540,434.21 Tax Lien against PERC (for failing to pay employment taxes for numerous quarters dated back to the December 31, 2012 quarterly tax payments) | DLM - 0079617 |
| 32 | 5-31-2016 (Idaho) | Withdrawn | GemCap Registered Judgments in State Court in Idaho (filed by GemCap to improperly register the two non-final judgments against the AIA Corporations and CropUSA Entities, which were obtained by the unlawful GemCap Settlement Agreement) | DLM – 0079627-37 |
| 33 | 7-27-2016 (Idaho) | 8-29-2016[5] | *U.S.A. v. Pacific Empire Radio* (filed by the Federal Communications Commission against PERC for failing to pay a $25,000 penalty that had been assessed on February 7, 2014) | DLM – 109111-18 |
| 34 | 10-11-2016 (Idaho) | 12-6-2016 | *Broadcast Music v. Pacific Empire Radio* (filed by Broadcast Music to confirm a $200,402.42 arbitration award entered in favor of Broadcast Music, subsequently increased to $210,673.24 after fees and costs were awarded, which PERC has never paid) | DLM – 0039084-96 |

[5] This lawsuit was voluntarily dismissed because the matter "was resolved." Presumably, PERC finally paid the $25,000 fine.

**Exhibit - D**                                    **Exhibit - 1, p. 857**
**14-ER-3277**

| No. | Filing Date/State | End Date | Known Lawsuits and Legal Filings Directly or Indirectly Involving John Taylor, Other Defendants, and/or Entities Partially Owned by John Taylor/Other Defendants Since 1996 | Bates Nos. for Initial Complaint/Filing |
|---|---|---|---|---|
| 35 | 11-17-2016 (Idaho) | Pending[6] | *GemCap v. AIA Services* (filed by GemCap against John Taylor (individually and as Trustee of the 401(k) Plan), AIA Services' 401(k) Plan and AIA Services for alleged fraudulent conveyances by John Taylor) | DLM – 0057708-29 |
| 36 | 11-21-2016 (Idaho) | Pending | *In re AIA Services, AIA Insurance, CropUSA, 401(k) Plan and John Taylor's Petitions to Quash Foreign Subpoenas Issued by Reed Taylor* (filed by the Petitioners to prevent Reed Taylor from obtaining documents needed for his malpractice claims in *Reed Taylor v. Bell*) | DLM – 0079649-74, DLM – 0079681-80251, & DLM – 0080304-869 |
| 37 | 6-10-2017 (Idaho) | 9-18-2017[7] | *Donna Taylor v. Riley* (filed by Donna Taylor against Richard Riley for representations and duties owed in the March 22, 1995 Letter Agreement signed by him relating to AIA Services' failure to timely and fully redeem her Series A Shares by 12-3-2003) | DLM – 109121-42 |
| 38 | 10-2-2017 (Idaho) | Pending | *John Taylor v. U.S.A. (IRS)* (filed by John Taylor to challenge taxes, penalties and interest assessed personally against him for PERC's unpaid employment taxes owed for several years dating back to the quarter ending December 31, 2012) | DLM – 0059089-96 |
| 39 | 2-23-2018 (Idaho) | 6-21-2019 | *In Re Bankruptcy of Bolland* (adversary action filed by the Trustee, Hillen, against John Taylor to determine the ownership of a building held by Pacific Empire Holdings Corp., which had previously been owed by John Taylor and Bolland) | DLM – 0086308-14 |

[6] Judge Brudie ruled that John Taylor's two transfers of interests in AIA Services' former headquarters to the AIA Services' 401(k) Plan (one for the exclusive benefit of John Taylor) "were made with the intent to defraud." DLM – 105924. GemCap's request for attorneys' fees and costs is pending. No final judgment has been entered.

[7] Donna Taylor stipulated to the dismissal of this lawsuit without implicating res judicata so that she would not take inconsistent positions regarding the enforceability of her 1995 Letter Agreements because her attorney, Roderick Bond, believed that she would prevail on her pending appeal to the Idaho Supreme Court. Donna Taylor's decision turned out to be the correct one because she substantially prevailed on that appeal when the Supreme Court ruled her 1995 Letter Agreements were enforceable.

**Exhibit - D**

**14-ER-3278**

**Exhibit - 1, p. 858**

| No. | Filing Date/State | End Date | <u>Known</u> Lawsuits and Legal Filings Directly or Indirectly Involving John Taylor, Other Defendants, and/or Entities Partially Owned by John Taylor/Other Defendants Since 1996 | Bates Nos. for Initial Complaint/Filing |
|---|---|---|---|---|
| 40 | 7-11-2018 (Idaho) | Pending | *Weskan v. Diversified* (filed by GemCap, through Weskan Agency, against CGB Diversified Services and CropUSA for damages relating to alleged unpaid commissions held by Diversified, which such claims were assigned to GemCap through the unlawful GemCap Settlement Agreement) | DLM – 0045998-26 |
| 41 | 8-21-2018 (Wash.) | 3-28-2019[8] | *Miesen v. Munding* (filed by Dale Miesen against John Munding, his wife, unknown attorneys and Munding's two law firms for malpractice after purportedly representing the AIA Corporations (improperly with other defendants) in *GemCap v. CropUSA* and the subsequent GemCap Settlement Agreement entered into in that lawsuit, including failing to set aside the AIA Corporations' obligations under that unlawful Agreement) | DLM – 0059089-169 |
| 42 | 9-5-2018 (Illinois) | 5-28-2019[9] | *GemCap through CropUSA v. Diversified I* (filed by GemCap, through CropUSA, against CGB Diversified Services for claims allegedly involving the crop insurance policies once placed with Diversified through CropUSA, which were assigned to GemCap through the unlawful GemCap Settlement Agreement) | DLM – 0082452-72 |
| 43 | 9-16-2019 (Cal.) | 6-5-2020[10] | *GemCap v. John Taylor* (filed by GemCap against John Taylor for claims involving the alleged breaches of various terms of the unlawful GemCap Settlement Agreement) | DLM – 0085869-84 |

---

[8] The dismissal was without prejudice.

[9] This dismissal was without prejudice, apparently because diversity jurisdiction did not exist (after an inquiry from the court to provide proof of diversity jurisdiction).

[10] This lawsuit was voluntarily dismissed without prejudice by GemCap and John Taylor based on the pending litigation GemCap was pursuing against Diversified.

**Exhibit - D**
**14-ER-3279**

**Exhibit - 1, p. 859**

| No. | Filing Date/State | End Date | Known Lawsuits and Legal Filings Directly or Indirectly Involving John Taylor, Other Defendants, and/or Entities Partially Owned by John Taylor/Other Defendants Since 1996 | Bates Nos. for Initial Complaint/Filing |
|---|---|---|---|---|
| 44 | 10-8-2019 (Idaho) | Pending[11] | GemCap Registered Judgments in Federal Court in Idaho (filed by GemCap to improperly register the two non-final judgments against the AIA Corporations and CropUSA Entities entered by the unlawful Settlement Agreement in *GemCap v. CropUSA*) | DLM – 109149-49, DLM – 109153-55 |
| 45 | 3-6-2020 (Illinois) | 8-3-2020[12] | *GemCap through CropUSA v. Diversified II* (the second lawsuit filed by GemCap, through CropUSA, against CGB Diversified Services for claims allegedly involving the crop insurance policies once placed with Diversified through CropUSA, which were assigned to GemCap through the unlawful GemCap Settlement Agreement) | DLM – 104224-331 |

[11] The court has retained jurisdiction over the claims against John Taylor and the Settlement Agreement. There is no final judgment, and no judgment has been certified as final under Rule 54(b). Moreover, GemCap never filed a motion requesting a court order showing good cause to allow the foreign registration of the non-final judgment against the AIA Corporations in Idaho as required by 28 U.S.C.A. § 1963 ("…when ordered by the court that entered the judgment for good cause shown.").

[12] GemCap has appealed the dismissal of this lawsuit, which was one of the lawsuits pursued for its "collection efforts."

- 9 -

**Exhibit - D**
**14-ER-3280**

**Exhibit - 1, p. 860**

**<u>Number of Alleged Board Decisions in Meetings and Resolutions</u>**
**<u>for the AIA Corporations by Year</u>**
**<u>From January 1, 1999 to the Present</u>**

| Year | AIA Services Corporation | AIA Insurance, Inc. |
|------|--------------------------|---------------------|
| 1999 | 1 | 2 |
| 2000 | 1 | 1 |
| 2001 | 0 | 1 |
| 2002 | 0 | 3 |
| 2003 | 0 | 1 |
| 2004 | 0 | 3 |
| 2005 | 0 | 1 |
| 2006 | 0 | 5 |
| 2007 | 1 | 1 |
| 2008 | 2 | 2 |
| 2009 | 2 | 0 |
| 2010 | 1 | 0 |
| 2011 | 1 | 1 |
| 2012 | 1 | 0 |
| 2013 | 1 | 1 |
| 2014 | 1 | 0 |
| 2015 | 0 | 0 |
| 2016 | 4 | 3 |

**Exhibit - E**          **Exhibit - 1, p. 861**
**14-ER-3281**

Case 1:10-cv-00404-DCN-CWD   Document 1099-1   Filed 02/20/21   Page 862 of 879

14-ER-3282

| Year | AIA Services Corporation | AIA Insurance, Inc. |
|------|--------------------------|---------------------|
| 2017 | 0 | 0 |
| 2018 | 0 | 0 |
| 2019 | 0 | 0 |
| 2020 | 0 | 0 |

**Exhibit - E**          **Exhibit - 1, p. 862**

**14-ER-3282**

### Number of Alleged Annual Shareholder Meetings
### for AIA Services and AIA Insurance by Year
### From January 1, 1999 to the Present

| Year | AIA Services Corporation | AIA Insurance, Inc. |
|------|--------------------------|---------------------|
| 1999 | 0 | 1 |
| 2000 | 0 | 1 |
| 2001 | 0 | 1 |
| 2002 | 0 | 1 |
| 2003 | 0 | 1 |
| 2004 | 0 | 1 |
| 2005 | 0 | 1 |
| 2006 | 0 | 1 |
| 2007 | 0 | 0 |
| 2008 | 0 | 0 |
| 2009 | 0 | 0 |
| 2010 | 0 | 0 |
| 2011 | 0 | 0 |
| 2012 | 1 | 0 |
| 2013 | 0 | 0 |
| 2014 | 0 | 0 |
| 2015 | 0 | 0 |
| 2016 | 0 | 0 |

- 1 -

**Exhibit - F**          **Exhibit - 1, p. 863**
**14-ER-3283**

| Year | AIA Services Corporation | AIA Insurance, Inc. |
|------|--------------------------|---------------------|
| 2017 | 0 | 0 |
| 2018 | 0 | 0 |
| 2019 | 0 | 0 |
| 2020 | 0 | 0 |

**Exhibit - F**          **Exhibit - 1, p. 864**
**14-ER-3284**

**Number of Alleged Special Shareholder Meetings
for AIA Services and AIA Insurance by Year
From January 1, 1999 to the Present**

| Year | AIA Services Corporation | AIA Insurance, Inc. |
|------|--------------------------|---------------------|
| 1999 | 0 | 0 |
| 2000 | 0 | 0 |
| 2001 | 0 | 0 |
| 2002 | 0 | 0 |
| 2003 | 0 | 0 |
| 2004 | 0 | 0 |
| 2005 | 0 | 0 |
| 2006 | 0 | 0 |
| 2007 | 1 | 0 |
| 2008 | 0 | 0 |
| 2009 | 0 | 0 |
| 2010 | 0 | 0 |
| 2011 | 0 | 0 |
| 2012 | 0 | 0 |
| 2013 | 0 | 0 |
| 2014 | 0 | 0 |
| 2015 | 0 | 0 |
| 2016 | 0 | 0 |

**Exhibit - F**          **Exhibit - 1, p. 865**

**14-ER-3285**

Case 1:10-cv-00404-DCN-CWD   Document 1099-1   Filed 02/20/21   Page 866 of 879

| Year | AIA Services Corporation | AIA Insurance, Inc. |
|------|--------------------------|---------------------|
| 2017 | 0 | 0 |
| 2018 | 0 | 0 |
| 2019 | 0 | 0 |
| 2020 | 0 | 0 |

**Exhibit - F**          **Exhibit - 1, p. 866**

**14-ER-3286**

**Number of Written Shareholder Consents in Lieu of Shareholder
Meetings for AIA Services and AIA Insurance by Year
From January 1, 1999 to the Present**

| Year | AIA Services Corporation | AIA Insurance, Inc. |
|------|--------------------------|---------------------|
| 1999 | 0 | 0 |
| 2000 | 0 | 0 |
| 2001 | 0 | 0 |
| 2002 | 0 | 0 |
| 2003 | 0 | 0 |
| 2004 | 0 | 0 |
| 2005 | 0 | 0 |
| 2006 | 0 | 0 |
| 2007 | 0 | 0 |
| 2008 | 0 | 0 |
| 2009 | 0 | 0 |
| 2010 | 0 | 0 |
| 2011 | 0 | 0 |
| 2012 | 0 | 0 |
| 2013 | 0 | 0 |
| 2014 | 0 | 0 |
| 2015 | 0 | 0 |
| 2016 | 0 | 0 |

**Exhibit - F**          **Exhibit - 1, p. 867**

**14-ER-3287**

| Year | AIA Services Corporation | AIA Insurance, Inc. |
|------|--------------------------|---------------------|
| 2017 | 0 | 0 |
| 2018 | 0 | 0 |
| 2019 | 0 | 0 |
| 2020 | 0 | 0 |

- 6 -

**Exhibit - F**          **Exhibit - 1, p. 868**
**14-ER-3288**

**Number of Alleged Annual Board Meetings (Including to Appoint
Officers) for AIA Services and AIA Insurance by Year
From January 1, 1999 to the Present**

| Year | AIA Services Corporation | AIA Insurance, Inc. |
|---|---|---|
| 1999 | 0 | 1 |
| 2000 | 0 | 1 |
| 2001 | 0 | 1 |
| 2002 | 0 | 1 |
| 2003 | 0 | 1 |
| 2004 | 0 | 1 |
| 2005 | 0 | 1 |
| 2006 | 0 | 1 |
| 2007 | 0 | 0 |
| 2008 | 0 | 0 |
| 2009 | 0 | 0 |
| 2010 | 0 | 0 |
| 2011 | 0 | 0 |
| 2012 | 0 | 0 |
| 2013 | 0 | 0 |
| 2014 | 0 | 0 |
| 2015 | 0 | 0 |
| 2016 | 0 | 0 |

**Exhibit - F**          **Exhibit - 1, p. 869**

**14-ER-3289**

**14-ER-3290**

| Year | AIA Services Corporation | AIA Insurance, Inc. |
|------|--------------------------|---------------------|
| 2017 | 0 | 0 |
| 2018 | 0 | 0 |
| 2019 | 0 | 0 |
| 2020 | 0 | 0 |

**Exhibit - F**          **Exhibit - 1, p. 870**

**Number of Alleged Special Board Meetings
for AIA Services and AIA Insurance by Year
From January 1, 1999 to the Present**

| Year | AIA Services Corporation | AIA Insurance, Inc. |
|------|--------------------------|---------------------|
| 1999 | 1 | 0 |
| 2000 | 1 | 0 |
| 2001 | 0 | 1 |
| 2002 | 0 | 1 |
| 2003 | 0 | 0 |
| 2004 | 0 | 1 |
| 2005 | 0 | 0 |
| 2006 | 0 | 1 |
| 2007 | 1 | 1 |
| 2008 | 1 | 1 |
| 2009 | 1 | 1 |
| 2010 | 1 | 0 |
| 2011 | 0 | 0 |
| 2012 | 1 | 0 |
| 2013 | 0 | 0 |
| 2014 | 1 | 0 |
| 2015 | 0 | 0 |
| 2016 | 0 | 0 |

**Exhibit - F**          **Exhibit - 1, p. 871**
**14-ER-3291**

**14-ER-3292**

| Year | AIA Services Corporation | AIA Insurance, Inc. |
|------|--------------------------|---------------------|
| 2017 | 0 | 0 |
| 2018 | 0 | 0 |
| 2019 | 0 | 0 |
| 2020 | 0 | 0 |

- 10 -

**Exhibit - F**          **Exhibit - 1, p. 872**

## Number of Alleged Written Board Resolutions/Consents in Lieu of Board Meetings for AIA Services and AIA Insurance by Year From January 1, 1999 to the Present

| Year | AIA Services Corporation | AIA Insurance, Inc. |
|------|--------------------------|---------------------|
| 1999 | 0 | 0 |
| 2000 | 0 | 0 |
| 2001 | 0 | 0 |
| 2002 | 1 | 1 |
| 2003 | 0 | 0 |
| 2004 | 0 | 1 |
| 2005 | 0 | 0 |
| 2006 | 1 | 3 |
| 2007 | 0 | 0 |
| 2008 | 1 | 1 |
| 2009 | 0 | 0 |
| 2010 | 0 | 0 |
| 2011 | 1 | 1 |
| 2012 | 0 | 0 |
| 2013 | 1 | 1 |
| 2014 | 0 | 0 |
| 2015 | 0 | 0 |
| 2016 | 4 | 3 |

- 11 -

**Exhibit - F**          **Exhibit - 1, p. 873**

**14-ER-3293**

| Year | AIA Services Corporation | AIA Insurance, Inc. |
|------|--------------------------|---------------------|
| 2017 | 0 | 0 |
| 2018 | 0 | 0 |
| 2019 | 0 | 0 |
| 2020 | 0 | 0 |

- 12 -

**14-ER-3294**

Case 1:10-cv-00404-DCN-CWD   Document 1099-1   Filed 02/20/21   Page 875 of 879

**Number of Hours Indicated on Bills for Work Performed for the AIA Corporations by the Top Three Billing Attorneys at Hawley Troxell From 2007 through 2012**

| Hawley Troxell Billing Attorney | Total Hours Billed From 2007-2012 |
|---|---|
| D. John Ashby (Ashby) | 1,741.00 |
| Gary D. Babbitt (Babbitt) | 1,454.33 |
| Richard A. Riley (Riley) | 553.78 |
| **Total Hours for Top Three Billers (2007-2012)** | **3,555.25** |

- 1 -

**Exhibit - G**    **Exhibit - 1, p. 875**

**14-ER-3295**

**List of Certain Restrictions and Requirements of the
AIA Services' Articles of Incorporation and the AIA Corporations' Bylaws
Which Have Been Intentionally Violated or Improperly Addressed**

| Corporate Action Requirement or Restriction | Provision(s) Under AIA Services' Articles of Incorporation | Provision(s) Under AIA Services' New Restated Bylaws | Provision(s) Under AIA Insurance's Bylaws |
|---|---|---|---|
| Requirement for Annual Common Shareholder Meetings Every Year, Including to Elect Directors | N/A | Section 3.2 (as Modified by the 11/17/95 Board Meeting) | Section 3.2 |
| Requirement for Annual Board Meetings Every Year, Including to Appoint Officers | N/A | Section 4.7(a) | Section 4.7(a) |
| Requirement for Appointment of a Director of AIA Services by the Series A Preferred Shares | Section 4.2.8 Section 4.4 | Section 4.6 (Series A Shares May Only Remove) | N/A |
| Requirement for Appointment of a Director of AIA Services by the Series C Preferred Shares | Section 4.3.2 Section 4.4 | Section 4.6 (Series C Shares May Only Remove) | N/A |
| Restrictions Preventing Officers and Directors from Engaging in Improper "Affiliate" Transactions | Section 4.2.9(g) | Section 4.14 | Section 4.14 |
| Prohibitions of Loans, Guarantees or Indebtedness to Other Parties, Entities or Insiders by AIA Services or AIA Insurance | Section 4.2.9(c) | Section 14.1 | Section 14.1 |
| Prohibition from Selling, Transferring, Convey, or Transferring Any Material Property, Asset or Business by AIA Services or AIA Insurance | Section 4.2.9(e) | N/A | N/A |
| Requirement that AIA Services Have a Consolidated Net Worth of Not Less than Number of Series A Shares Multiplied by $10 | Section 4.2.9(h) | N/A | N/A |
| Requirement of Consolidated Long-Term Debt to Net Worth Cannot Exceed Ratio of 3.6 to 1.0 | Section 4.2.9(j) | N/A | N/A |

1

| Corporate Action Requirement or Restriction | Provision(s) Under AIA Services' Articles of Incorporation | Provision(s) Under AIA Services' New Restated Bylaws | Provision(s) Under AIA Insurance's Bylaws |
|---|---|---|---|
| Requirement of No Indebtedness if Consolidated Net Income Plus Depreciation and Amortization Divided by Current Maturities of Long-Term Debt Is, or New Debt Would Cause Ratio of Less than .8 to 1.0 | Section 4.2.9(k) | N/A | N/A |
| Requirement that Approval of the Series A Shares to Violate any Covenants of Section 4.2.9 | Section 4.2.12 | N/A | N/A |
| Requirement of Cumulative Dividends of 10% Per Year for Series C Preferred Shares | Section 4.3.3 | N/A | N/A |
| Requirement that No Dividends May Be Declared or Paid on the Series C Shares if Payments to Series A Shares Are in Arrears | Section 4.3.3 | N/A | N/A |
| Requirement If Any Series C Preferred Shares Are Redeemed, They Must Be Redeemed Pro Rata Among All Series C Holders | Section 4.3.5(b) | N/A | N/A |
| Requirement Upon Any Liquidation, Dissolution or Winding Up that Series A Shares Paid First, Series C Shares Paid Second and Common Shares Last | Section 4.2.7 Section 4.3.4 Section 4.4 | N/A | N/A |
| Requirement of Qualifications for a Director | N/A | N/A | N/A |
| Requirement that a Director Serve Only Until Next Annual Meeting | N/A | Section 4.2 | Section 4.2 |
| Requirement that a Newly Appointed Director Only Serve Remaining Term of Predecessor | N/A | Section 4.3 | Section 4.3 |
| | | | |

2

**Exhibit - H**          **Exhibit - 1, p. 877**
**14-ER-3297**

| Corporate Action Requirement or Restriction | Provision(s) Under AIA Services' Articles of Incorporation | Provision(s) Under AIA Services' New Restated Bylaws | Provision(s) Under AIA Insurance's Bylaws |
|---|---|---|---|
| Requirement that All Corporate Powers Under Authority of Board, Except as Provided Under Idaho Law or as Limited by Articles of Incorporation | N/A | Section 4.4 | Section 4.4 |
| Requirement that Action Taken by Board Without a Meeting Must Be Signed by All Board Members | N/A | Section 4.9 | Section 4.9 |
| Requirement that Directors Serve in Good Faith, In the Best Interests of the Company and With Prudence | N/A | Section 4.11 | Section 4.11 |
| Requirement that Officers Serve at the Pleasure of the Board | N/A | Section 5.2(a) | Section 5.2(a) |
| Requirement that President Obtain Board Approval to Sign Certificates, Deeds, Mortgages, Bonds, Contracts or Other Instruments, Unless the Board Has Expressly Delegated the Powers | N/A | Section 5.2(b) | Section 5.2(b) |
| Requirement that Compensation of Officers Be Fixed by the Board | N/A | Section 5.5 | Section 5.5 |
| Requirement that All Loans and Indebtedness Must Be Authorized by Resolution of the Board | N/A | Section 6.2 | Section 6.2 |
| Requirement that All Funds Be Deposited in An Account Selected by the Board | N/A | Section 6.3 | Section 6.3 |
| Requirement that Shares Held by Corporation Be Voted by Person Authorized by Board or President or Vice President If No Authorization Is Provided | N/A | Section 6.4 | Section 6.4 |

3

| Corporate Action Requirement or Restriction | Provision(s) Under AIA Services' Articles of Incorporation | Provision(s) Under AIA Services' New Restated Bylaws | Provision(s) Under AIA Insurance's Bylaws |
|---|---|---|---|
| Requirements to Indemnify or Advance Costs of Directors and Officers in Certain Circumstances | N/A | Sections 11.1-11.10 | Sections 11.1-11.10 |
| Requirement that a Decision Be by Majority Vote of Shareholders | N/A | Section 3.5 | Section 3.5 |
| Requirement that Any Action Taken by Shareholders without a Meeting Must Be Through a Unanimous Written Consent | N/A | Section 3.15 | Section 3.15 |
| Restriction that Bylaws May Only Be Altered, Amended or Repealed by Board of Directors | N/A | Section 13.1 | Section 13.1 |

4

The Hon. Dean S. Lum
Opposing Party and Cross-Moving Party: Plaintiff
Hearing Date: March 22, 2013 at 9:00 a.m.
With Oral Argument

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

REED TAYLOR,

    Plaintiff,

v.

SCOTT BELL and JANE DOE BELL, and their marital community; FRANK TAYLOR and JANE DOE TAYLOR, and their marital community; CAIRNCROSS & HEMPELMANN, a Professional Service Corporation,

    Defendants.

CASE NO. 12-2-10803-0 SEA

EXPERT WITNESS
DECLARATION OF RICHARD T. McDERMOTT

I, Richard T. McDermott, declare:

  1. I am over the age of eighteen, have personal knowledge of the facts set forth in this Declaration, competent to testify in court and was recently retained to provide expert testimony in this lawsuit.

  2. In 1962, I received a B.A. from Marquette University. In 1966, I obtained a L.L.B. from Fordham University School of Law.

  3. In 1967, I was admitted to practice law in the State of New York. I am presently a member in good standing and licensed to practice law in the State of New York. I have been admitted to practice law in New York for over 45 years.

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 1

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 1**

**14-ER-3300**

4.      I am a member of the New York State Bar Association Securities Regulation Committee.

5.      From 1966 through 1990, I was an Associate and Partner with the law firm of Alexander & Green/Walter Conston Alexander & Green (the firms combined). From 1990 through 2004, I was a Partner of Rogers & Wells/Clifford Chance LLP (the firms merged in 2000).  While at that firm, I chaired the Legal Personnel Committee, and was responsible for the training, development, evaluation and advancement of associate attorneys and counsel, as well as being involved in the partner selection process. While at these firms, I was also a member of various executive and administrative committees.

6.      From 2000 through the present time, I have been an Adjunct Professor at Fordham University School of Law. From 1980 through 1998, I was an Adjunct Professor at New York University School of Law. In both positions, I taught law school classes on the Legal Aspects of Corporate Finance, and covered such subjects as debentures, indentures, preferred stock, convertible securities, dividends, stock repurchases, and third-party opinions in corporate transactions.

7.      I am the co-author of Chapters 1 and 2 (Introduction and Elements of Opinion Letters, respectively) and author of Chapter 3 (Legal Opinions on Corporate Matters) of the Treatise: *LEGAL OPINION LETTERS A Comprehensive Guide to Opinion Practice* (Third Edition).

8.      I have been a member of the TriBar Opinion Committee for 23 years.  The TriBar Opinion Committee is a nationally recognized committee that publishes Reports on various aspects of opinion practice. I was a member of the TriBar Opinion Committee when the TriBar Opinion Committee published the Report entitled "*Third-Party 'Closing' Opinions*

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 2

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 2**

in 1998 cited on pages 4 and 23 of the Defendants' Motion for Summary Judgment dated February 22, 2013.[1]

9.      I am the author of *Legal Aspects of Corporate Finance* (4th ed. 2006) and 2010-2012 Supplements thereto, which is published by LexisNexis Matthew Bender. It is my understanding that the book has been used at approximately 22 law schools. I have completed the Fifth Edition of that book, which is at the publisher and will be available in or about May, 2013. *Legal Aspects of Corporate Finance* includes chapters addressing redemptions and repurchases of securities, acquisitions and investments, investment banking, debt and equity securities, valuing the corporation, debt securities, preferred stock, convertible securities, distributions, stock splits, repurchases by a corporation of its own shares, dividends and various other aspects of corporate finance.

10.      I have authored other articles and materials (including a Teacher's Manual for *Legal Aspects of Corporate Finance*).

11.      In 1988, I was a visiting lecturer at Monash University in Melbourne, Australia and the University of Adelaide, Australia, Corporate and Business Law Centre. In 1999, I co-lectured with former Delaware Chancellor William Allen and James Fuld, author of *Legal Opinions in Business Transactions - An Attempt to Bring Some Order Out of Some Chaos*, 28 Bus. Law. 915 (1973), on the Law and Business of Investment Banking at the New York University Center for Law and Business.

12.      From 2009 through the present time, I have served as a Special Master for the New York State Supreme Court Appellate Division, First Department.

---

[1] The defendants omit relevant portions of the TriBar Report on page 4 and quote to another portion on page 23 for a proposition that Reed Taylor is doing an "end-run" around the liability of the opinion giver to assert claims against the defendants in this lawsuit. As addressed in my opinions below, there is no basis for the defendants to assert that the opinion letter extinguishes their liability.

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 3

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 3**

**14-ER-3302**

13.     I have practiced corporation and securities law for more than 35 years. I have represented domestic and international acquiring and acquired clients in mergers and acquisition transactions involving acquisition amounts from less than $1 Million to more than $1 billion. Included in that work was the participation in and supervision of others with respect to pre-transaction due diligence and the rendering of reports pertaining to pre-transaction due diligence.

14.     My experience in corporate law, includes, but is not limited to: domestic and international corporate finance, mergers and acquisitions, tender offers, purchases and redemptions by a corporation of its own shares (and formulating and evaluating proposals therefor) from both substantial shareholders and the investing public in issuer tender offers and open market transactions, strategic alliances, going private transactions, bankruptcy reorganizations and other general corporate matters.

15.     I have represented corporate clients in consensual restructuring of indebtedness, spin-offs, bankruptcy reorganizations involving the issuance of preferred shares to holders of debt instruments, realignments and the creation of strategic alliances, complex commercial agreements and other corporate matters.

16.     I have extensive experience in the area of corporate governance, including, without limitation, the preparation of: proxy statements, Reports to the Securities and Exchange Commission, reports to shareholders, disclosures to shareholders, notices of shareholder meetings, shareholder resolutions, notices of board meetings, and board resolutions.

17.     I also have extensive experience in reviewing and interpreting certificates/articles of incorporation, bylaws, shareholder agreements, notices to shareholders,

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 4

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 4**

**14-ER-3303**

shareholder resolutions, notices to board members and board resolutions. I have extensive experience in ensuring that shareholder resolutions and board resolutions comply with a corporation's articles of incorporation, bylaws, and applicable restrictions under statutory and common law.

18.     I have extensive experience both as an opinion giver and as counsel for opinion recipients. I have prepared, delivered, or approved over 100 opinion letters in my career. I also served on the Committee that approved opinion letters at my former law firms.

19.     I have experience reviewing, interpreting and applying the applicable rules of professional conduct. I have experience in providing informed consent to clients to narrow or limit the scope of representation. I also have experience determining whether a limited scope of representation is permissible under the circumstances of the matter to which I am providing legal representation to a client.

20.     I have extensive experience representing multi-national corporations and clients with business interests or transactions in other states.

21.     I was retained by Reed Taylor's counsel and have provided testimony and opinions by Affidavit in *Taylor v. Riley, et al.*, Ada County District Court Case No. CV-OC-2009-18868 ("*Taylor v. Riley*"). Attached as ***Exhibit A*** is a true and correct copy of my Affidavit dated August 29, 2012, which was submitted in *Taylor v. Riley, et al.* When I executed my attached Affidavit, I had not been retained as an expert witness for this lawsuit. As of the date of this Declaration, I have not been deposed in *Taylor v. Riley*.

22.     Prior to becoming an expert in *Taylor v. Riley*, I never acted as an expert witness or testified against other attorneys. I was an expert in *Kenneth E. Raine v. Paramount Pictures Corp.* Case No. 97 Civ. 3553 U.S.D.C. S.D. N.Y.). At the time of executing this

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 5

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 5**

**14-ER-3304**

Affidavit, this would be the second case that I have been retained as an expert to testify against attorneys. It is not my general practice to testify against my fellow attorneys, but I have made exceptions for *Taylor v. Riley* and this lawsuit.

23.    I have consulted with Winston V. Beard of Beard St. Clair Gaffney PA in Idaho Falls, Idaho, who is an attorney licensed to practice law in Idaho and Washington with experience acting as counsel for opinion recipients in Idaho. I consulted with Mr. Beard as to the local standard of care for acting as counsel for an opinion recipient in Idaho.

24.    In preparation for my testimony and to formulate my opinions in this Declaration, I have skimmed the following documents and reviewed in detail the pertinent documents contained in the following: (a) the Cairncross & Hempelmann files for Reed J. Taylor (which includes, without limitation, the Fee Agreement, billing records, memorandums, letters, agreements, legal research, Articles of Amendment to the Articles of Incorporation of AIA Services, legal research and communications); (b) thousands of pages of documents in *Taylor v. AIA Services*, Case No. CV-07-00208 ("*Taylor v. AIA Services*") and *Taylor v. Riley*, including, without limitation, complaints, amended complaints, answers, amended answers, discovery responses and answers, pleadings, motions, responses, replies, affidavits and exhibits thereto, court orders, deposition transcripts and exhibits thereto, hearing exhibits, court decisions and billing records (I have not been provided with billing records for Reed Taylor in *Taylor v. Riley*); (c) AIA Services Corporation ("AIA Services")'s complete Articles of Incorporation and all amendments and restatements thereto, as certified by the Idaho Secretary of State on February 11, 2013; (d) AIA Services' Restated Bylaws; (e) all notices of board meetings, board meeting minutes, board meeting resolutions, shareholder meeting notices, shareholder meeting disclosures, shareholder meeting resolutions,

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 6

Exhibit - 3, p. 6

14-ER-3305

shareholder meeting proxies and shareholder meeting minutes, draft Articles of Amendment to the Articles of Incorporation of AIA Services in 1995 and 1996 produced in discovery to Mr. Reed Taylor in *Taylor v. AIA Services*.; (f) Judge Greenwood's decisions on various summary judgment motions in *Taylor v. Riley* and Judge Brudie's decisions granting summary judgment on the illegality of the redemption and his denial of Reed Taylor's motion for reconsideration in *Taylor v. AIA Services*; (g) the Stock Redemption Agreement, Stock Pledge Agreement, Security Agreement, $6M Note and related agreements and instruments executed in 1995 for the purchase of Reed Taylor's shares in AIA Services; (h) the Stock Redemption Restructure Agreement, Amended and Restated Stock Pledge Agreement, Amended and Restated Security Agreement and related agreements and instruments executed in 1996 for the restricting of the terms of the purchase of Mr. Reed Taylor's shares in AIA Services; (i) the August 15, 1995 opinion letter addressed to Reed J. Taylor from Eberle Berlin (referred to in this Declaration as "opinion letter"); (j) the transcript and exhibits of the depositions taken of Reed J. Taylor in *Taylor v. Riley* and this lawsuit; (k) the transcript and the exhibits of the deposition of Scott Bell taken in *Taylor v. Riley*;[2] (l) the Declaration of Scott Bell dated February 22, 2013; (m) the Declaration of Gregory J. Hollon dated February 22, 2013 and exhibits attached thereto; (n) Defendants' Motion for Summary Judgment dated February 22, 2013; (o) the Declaration of Annette Strauser dated February 20, 2013; (p) the Complaint in this lawsuit; (q) the Defendants' Answer in this lawsuit; (r) the defendants' answers to Reed Taylor's First Interrogatories and Requests for Production; (s) Reed Taylor's answers to the defendants First Interrogatories and Requests for Production; and (t) Reed Taylor's Motion to Amend and Supplement Complaint with the attached proposed First

---

[2] Mr. Bell has not been deposed in this lawsuit.

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 7

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 7**

Amended Complaint.

25.     I have reviewed the applicable Rules and Comments in the Idaho Rules of Professional Conduct effective November 1, 1986 (including IRPC 1.1, 1.2, 1.3, 1.4, 1.5, 1.8, 1.16, 5.1, 5.2, 5.5, and 8.5) and the Idaho Rules of Professional Conduct effective July 1, 2004. I have reviewed the Washington Rules of Professional Conduct existing in 1995 and 1996 (including RPC 5.5) (although Washington had not adopted the Comments in 1995 and 1996, like Idaho had in 1986). I have also reviewed a number of authorities and decisions, including, without limitation: I.C. § 30-1-6 (1995); I.C. § 30-1-2 (1995); I.C. § 30-1-46 (1995); the TriBar Reports; Sections of the Restatement (Third) of the Law Governing Lawyers; *Taylor v. AIA Services Corp.*, 151 Idaho 552, 261 P.3d 829 (2011); I.C. § 3-104; I.C. § 3-420; *Idaho State Bar v. Meservy*, 335 P.2d 62 (Idaho 1959); *In re Matthews*, 57 Idaho 75, 83 (Idaho 1938).

**Facts, data and assumptions supporting my opinions**

26.     I am relying upon the following facts, data and assumptions for formulating my opinions in this Declaration.

27.     When I refer to the "defendants" in these facts and in my opinions, I am referring to Scott Bell, W. Frank Taylor, Dawson Taylor and William Carleton, who were the attorneys billing time to Reed Taylor prior to the closing of the purchase of his shares. I am also referring to J. Thomas Richardson and William Murphy as to any of my opinions regarding general representation or post-closing matters because they were providing representation of Mr. Taylor in 1996. I am also including the law firm of Cairncross & Hempelmann P.S. in the definition of "defendants" since the foregoing individuals were acting on its behalf and it collected the fees and costs for representing Reed Taylor. The

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 8

Exhibit - 3, p. 8

individual defendants were residents of the state of Washington in 1995 and 1996, while Cairncross' office was located in Seattle, Washington in 1995 and 1996.

28. Reed Taylor was an Idaho resident in 1995 and 1996. He has never resided in Washington. He does not own any property in Washington and did not own any property in Washington in 1995 or 1996. Reed Taylor had no contacts with Washington. Reed Taylor was the founder of AIA Services. Reed Taylor has a high school education, but no college degree.

29. AIA Services is an Idaho corporation. AIA Services was an insurance holding company based in Lewiston, Idaho in 1995 and 1996 (and is still based there today) and it had several operating subsidiaries, including AIA Insurance, Inc. AIA Services did not have an office in the state of Washington in 1995 or 1996.

30. The six attorneys who billed time to Reed Taylor in 1995 and 1996 were not licensed to practice law in the state of Idaho in 1995 or 1996. Cairncross did not have an office in Idaho in 1995 or 1996. The defendants did not seek or obtain Idaho counsel for Reed Taylor.

31. Idaho had statutory and common law prohibiting the unauthorized practice of law, which included preparing legal documents and instruments and providing any advice thereto. *See* I.C. § 3-104; I.C. § 3-420; *Idaho State Bar v. Meservy*, 335 P.2d 62 (Idaho 1959); *In re Matthews*, 57 Idaho 75, 83 (Idaho 1938). The foregoing authorities existed in 1995 and 1996.

32. In 1995, AIA Services, by and through Reed Taylor's brother R. John Taylor and other investors, sought to purchase Reed Taylor's majority interest in the company through a share repurchase in order to obtain operational and financial control over the company.

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 9

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

Exhibit - 3, p. 9

14-ER-3308

33. In 1995, Reed Taylor was the majority common shareholder of AIA Services and held 613,493.5 shares of common stock (approximately 63%).

34. Reed Taylor was advised by the Board of Directors of AIA Services to seek and obtain separate and independent counsel to represent him in the sale of his shares back to the company.

35. Reed Taylor was referred to the defendants by Ernie Dantini. On or about March 29, 1995, Reed Taylor signed a Fee Agreement with the defendants. That agreement broadly stated the scope of representation of Reed Taylor was "in the matter of the sale of his stock in AIA Services, as well as for any additional matters undertaken by the Firm at the Client's request." There were no other written agreements or letters modifying the scope of the representation of Reed Taylor.

36. The Fee Agreement was not signed by anyone at Cairncross, but it nevertheless confirms in writing the defendants' broad scope of representation of Reed Taylor.

37. Over the course of the defendants' representation of Reed Taylor, they provided him with a number of memorandums and letters. None of those memorandums or letters mentioned any limited scope of representation. Although several memorandums addressed issues pertaining to the opinion letter, not one of those memorandums ever mentioned that the defendants were relying on the opinion letter or that their scope of representation was limited based upon the opinion letter.

38. There is no evidence that the defendants ever sought or obtained separate and independent Idaho counsel for Reed Taylor to approve any limitation of liability or changed limited scope of representation.

39. The defendants communicated often with Mr. Dantini, who had referred Reed

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 10

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 10**

Taylor to the defendants. This fact supports Mr. Bell's affidavit testimony in *Taylor v. AIA Services* that Reed Taylor had limited legal and financial knowledge.

40. The defendants never disclosed in writing to Reed Taylor that they were prohibited under Idaho law from representing him.

41. The defendants never disclosed in writing to Reed Taylor that they were not able to make any determination whether any Idaho laws had been violated or were unable to determine the enforceability of the agreements.

42. The parties agreed that the consideration for the purchase of Reed Taylor's shares was agreed to be $1.5 Million cash at closing, a $6 Million Note due in 10 years, and other consideration. Reed Taylor was to be given security interests in the commissions of AIA Services and the stock of all of its operating subsidiaries. The total value of the transaction exceeded $8.5 Million.

43. On June 15, 1995, Dawson Taylor's billing entry noted: "Analysis re need for shareholder meeting."

44. The defendants prepared the initial drafts of the agreements and instruments for the purchase of Reed Taylor's shares. Generally, it is customary practice that the purchaser prepares the initial drafts of the agreements. Those initial drafts stated that Washington law would govern. AIA Services counsel promptly responded to defendants through a memorandum that Idaho law would apply.

45. After the defendants delivered an initial draft of the Stock Redemption Agreement and related agreements and instruments to AIA Services' counsel, the Stock Redemption Agreement was revised to include a provision stating: "Shareholder covenants and agrees to vote his Shares in favor of ratification of this Agreement and all other

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 11

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 11**

**14-ER-3310**

transactions…Upon satisfaction of such conditions, this Agreement shall be a legal, valid and binding obligation of Company."

46.     The agreements were edited and revised. In July 1995, the parties had agreed upon most of the terms of the written agreements.

47.     Under Section 2.5(j) of the Stock Redemption Agreement, AIA Services was required to have its counsel deliver an opinion to Reed Taylor prior to closing. This was but one of several conditions of closing.

48.     On July 18, 1995, the Board of Directors of AIA Services approved the general terms of the purchase of Reed Taylor's shares.

49.     On July 18, 1995, AIA Services held a shareholder meeting, but no resolution was submitted to the shareholders to approve the use of capital surplus to purchase Reed Taylor's shares as authorized by I.C. § 30-1-6. The proxies provided to shareholders did not even include the notice or vote to ratify the Stock Redemption Agreement and related agreements and instruments. Although the shareholders were provided a notice of the general terms of the purchase of Reed Taylor's shares, they were not asked to vote on any of the agreements, to approve the purchase under I.C. § 30-1-6, or to authorize the use of capital surplus to purchase the shares under I.C. § 30-1-6.

50.     On July 22, 1995 (or the effective date of July 22, 1995), the defendants advised Reed Taylor to execute the Stock Redemption Agreement, Security Agreement, Stock Pledge Agreement and related agreements.

51.     In the negotiation for the content of the opinion letter, counsel for AIA Services initially refused to deliver certain opinions, but later agreed to give those opinions.

52.     The final opinion letter was dated August 15, 1995, but was not delivered to

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 12

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 12**

**14-ER-3311**

Reed Taylor until on or about August 17, 1995.

53.   The final opinion letter was addressed only to Reed Taylor. The terms of the opinion letter stated that it was only for Reed Taylor to rely upon. The opinion letter was not addressed to any of the defendants and it did not authorize them to rely upon it.

54.   The opinion letter was either correct or incorrect and it could not make the transaction to purchase Reed Taylor's shares legal. The defendants, as counsel for the majority shareholder, could have and should have insisted that actions be taken that would have made the transaction, the Stock Redemption Agreement and related agreements and instruments legal and enforceable in accordance with their terms.

55.   In addition to the requirement that the opinion letter be provided to Reed Taylor at closing, Section 2.5(m) of the Stock Redemption Agreement required AIA Services to deliver "Such other documents and instruments as Shareholder or his counsel may reasonably require to effectuate or evidence the transactions contemplated thereby."

56.   Under Section 4.14 of AIA Services' Restated Bylaws, Reed Taylor, as an interested director, was authorized to vote his shares in favor of an interested transaction.

57.   Prior to closing, Reed Taylor was the majority shareholder. In his capacity as the majority shareholder, Reed Taylor could have voted and adopted a shareholder resolution authorizing the use of capital surplus to purchase his shares. From March 1995, through August 17, 1995, the defendants had countless opportunities to ensure that a shareholder resolution was presented and adopted by AIA Services' shareholders.

58.   Prior to closing, the Articles of Amendment to the Articles of Incorporation of AIA Services Corporation were filed on April 11, 1995 and August 3, 1995, respectively. Both of these Articles of Amendment to the Articles of Incorporation of AIA Services

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 13

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 13**

**14-ER-3312**

Corporation superseded and replaced all prior amendments. The defendants did not confirm or request that AIA Services include a provision authorizing the use of capital surplus to purchase Reed Taylor's shares in any of those amendments.

59. Prior to the filing of the Articles of Amendment to the Articles of Incorporation of AIA Services Corporation on April 11, 1995 and August 3, 1995, respectively, the Articles of Amendment to the Articles of Incorporation of AIA Services specifically authorized the use of capital surplus to purchase shares as permitted by I.C. § 30-1-6. The March 8, 1989 Articles of Amendment to the Articles of Incorporation of AIA Services, and specifically Article Twelfth, were superseded and replaced at the same time Reed Taylor was being represented by the defendants. The March 8, 1989 Articles of Amendment to the Articles of Incorporation of AIA Services was in the defendants' files. In addition, the language contained in Article Twelfth of the March 8, 1989 Articles of Amendment to the Articles of Incorporation of AIA Services provided the defendants with the precise language they could have and should have used to authorize the transaction: "The corporation shall have the right to purchase its own shares, whether direct or indirect, to the extent of unreserved and unrestricted earned surplus therefor and to the extent of unreserved and unrestricted capital surplus available therefor."

60. The purchase of Reed Taylor's shares was closed on or about August 17, 1995. I am assuming that August 17, 1995 was the date of closing based upon communications that I reviewed wherein Mr. Riley indicated on August 16, 1995 that closing would be "tomorrow."

61. At the time of closing the purchase of Reed Taylor's shares, AIA Services had no earned surplus.

62. At the time of closing of the purchase of Reed Taylor's shares, AIA Services'

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 14

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 14**

**14-ER-3313**

shareholders had not voted on or approved the use of capital surplus to purchase Mr. Taylor's shares as permitted by I.C. § 30-1-6.

63.     After closing, Reed Taylor's 613,493.5 shares of common stock were canceled and he ceased to be an owner of those common shares in AIA Services.

64.     The defendants were paid $96,065.39 for representing Reed Taylor in 1995 and 1996. This representation included over 100 different billing days by six different attorneys at Cairncross. From March 1995 through August 15, 1995, the defendants' billing statements include, but are not limited to, the following quotations from their billing entries (each paragraph represents a different page from the statements):

...Analysis re collateral issues...Meeting with R. Taylor, E. Dantini re structure of stock sale, AIA Services reorganization; analysis re same.

...Analysis re: letter of intent...Review corporate documents and agreement...Review letter of intent and corporate documents...Telephone conference with D. Riley re fairness of merger; Analysis re same...Legal research re imputed interest issues, tax effect of taking zero-coupon security as collateral for AIA obligation...Telephone conferences with R. Riley, R. Taylor, E. Dantini re counterproposal from B. Sweeney;

...Telephone conferences with R. Taylor, E. Dantini re redemption...Analysis re transaction and documentation...Analysis and review of definitive documents...Review and analysis of letters of intent to background documents...Telephone conferences with D. Riley, R. Taylor, E. Dantini, J. Taylor, R. Campanaro re redemption agreement...Create several drafts of letter of intent...

...Research re UCC Article 9 perfection of security interest and priority issues. Research re UCC Articles 8, 9 and perfection of security interest.  Legal research re UCC Articles 8 and 9 and perfection of security interest in bonds.

Legal research re perfection of interest in earned commissions and priority issues...Draft memo re UCC Article 9 perfection and priority issues for security interest in accounts; legal research re same...Analysis re Security Agreement...Analysis re recent amendments to RCW 62A.8; Analysis re effect of changes on bond pledge.

Analysis re transaction status, purchase price allocation...Analysis re optimal

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 15

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

Exhibit - 3, p. 15

checklist...Analysis re same [all transaction documents and schedules]...

...Analysis re Assumption Agreement.

Analysis re purchase price allocations for tax purposes at closing.  Analysis re revised closing documents...Telephone conference with E. Dantini, R. Taylor re purchase price allocation, treatment of tangible personal property, tax strategy re transfer of tangible property to foundation, valuation strategy for airplanes...Review and analysis re remaining closing issues...

65.     The defendants have asserted that they "papered" the transaction. Assuming that such a term even exists in the legal profession to describe a scope of legal representation, the defendants' billing records do not support that their representation was limited to "papering" the transaction, as confirmed by the above billing records.

66.     AIA Services soon defaulted on its obligations and the defendants represented Reed Taylor asserting those defaults, threatening litigation and restructuring the obligations.

67.     The defendants negotiated and finalized the restructured obligations by and through the Stock Redemption Restructure Agreement, Amended and Restated Stock Pledge Agreement, Amended and Restated Security Agreement and related amended agreements and instruments.

68.     As part of the restructuring, AIA Services agreed to pay Reed Taylor's attorneys' fees and costs, it re-set the $1.5 Million Down Payment note and gave other additional consideration.

69.     After the restructuring in 1996, AIA Services timely paid the required payments to Reed Taylor for many years and it paid off the $1.5 Million Down Payment Note. AIA Services made substantial interest payments to Reed Taylor on the $6M Note, however, the $6 million in principal was never paid on that $6M Note.

70.     On January 29, 2007, Reed Taylor filed suit in *Taylor v. AIA Services* to collect

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 17

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 16**

**14-ER-3315**

the sums due to him on the $6M Note, to enforce other contractual obligations and assert claims flowing from or relating to the security interests granted to him and sums owed to him.

71.    On February 8, 2008, the district court granted Reed Taylor's Motion for Partial Summary Judgment on the default of the $6M Note.

72.    On April 16, 2008, the defendants first asserted the illegality defense in *Taylor v. AIA Services*. At that time, the defense was based upon an alleged violation of I.C. § 30-1-46.

73.    Prior to the defendants asserting the illegality defense on April 16, 2008, there were never any allegations of illegality asserted in *Taylor v. AIA Services*. In fact, AIA Services had moved to dismiss Reed Taylor's unjust enrichment claim in 2007 because it asserted that Reed Taylor had valid contractual rights to pursue his claims, and, therefore, an unjust enrichment claim was improper. The district court agreed and dismissed that claim in 2007.[3]

74.    On February 12, 2009, the defendants in *Taylor v. AIA Services* asserted, for the very first time, that the purchase of Reed Taylor's shares violated I.C. § 30-1-6, and, consequently, the Stock Redemption Agreement was illegal and unenforceable.

75.    After repeated requests for assistance by Reed Taylor's counsel, Scott Bell finally agreed to execute an affidavit in support of Reed Taylor in *Taylor v. AIA Services*, but only if Reed Taylor paid Mr. Bell for his time. Reed Taylor paid Mr. Bell and he executed an Affidavit on May 12, 2009. In that Affidavit, Mr. Bell testified that he represented Reed Taylor to "negotiate, draft agreements, and close the redemption of [Reed Taylor's] shares in

---

[3] After the Idaho Supreme Court affirmed the illegality of the Stock Redemption Agreement, Reed Taylor again asserted an unjust enrichment claim, but the district court denied his motion to amend to assert the claim. The district court, like the Idaho Supreme Court, focused on the fact that Reed Taylor was the majority shareholder.

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 18

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 17**

**14-ER-3316**

AIA Services Corporation." In that Affidavit, Mr. Bell also testified that "Reed Taylor held little knowledge in accounting, law or the financial affairs of the company."

76.     In his Affidavit dated May 12, 2009, Mr. Bell also testified that "[b]ecause of Reed Taylor's membership on the board of directors of AIA Services Corporation, he and my firm supported the establishment of an independent committee of the board of directors to negotiate and approve the terms of the redemption of Reed Taylor's shares." He also testified that "[d]uring the course of my firm's representation of Reed Taylor, my firm determined that, as a condition to the redemption, AIA Services Corporation's outside counsel should deliver to Reed Taylor a written legal opinion regarding certain legal matters surrounding the redemption...In my experience, a written legal opinion in these circumstances is appropriate and normal."

77.     On June 17, 2009, the district court ruled that AIA Services had no earned surplus and the shareholders had not approved the use of capital surplus to purchase Reed Taylor's shares as provided in I.C. § 30-1-6. The district court also rejected a number of legal theories that Reed Taylor asserted to attempt to enforce the Stock Redemption Agreement, irrespective of it being illegal.

78.     Reed Taylor moved for reconsideration. On August 13, 2009, the district court denied Reed Taylor's motion for reconsideration, rejected other arguments that he had asserted to persuade the court to enforce the Stock Redemption Agreement and specifically addressed the defendants' representation of Reed Taylor:

> Reed Taylor was represented by a Washington attorney throughout the negotiations for, and entry into, the stock redemption agreement. As such, Reed Taylor was not in an inferior position or at a disadvantage as he had independent legal counsel to advise him regarding the statutory requirements for corporate redemption of shares.

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 19

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

Exhibit - 3, p. 18

14-ER-3317

79.   Reed Taylor appealed the district court's rulings that the Stock Redemption Agreement was illegal and unenforceable. Reed Taylor also appealed the district court's refusal to enforce the agreements on a number of legal theories. On September 7, 2011, the Idaho Supreme Court affirmed the district court in all material respects, and, like the district court, found the Stock Redemption Agreement[4] to be illegal and unenforceable and left Reed Taylor where it found him:

> [W]e affirm the district court's finding that AIA Services had insufficient earned surplus at the time it entered into the Stock Redemption Agreement...
>
> AIA Services' shareholders did not authorize the use of capital surplus to redeem Reed Taylor's shares...
>
> Because AIA Services had no earned surplus and was not authorized to use capital surplus when it agreed to purchase Reed Taylor's shares, the Stock Redemption Agreement violated the earned and capital surplus limitations of I.C. § 30-1-6...[and] is thereby prohibited by law and illegal.

In addition, the Idaho Supreme Court specifically noted that "it appears that none of the parties recognized the potential violation of I.C. § 30-1-6."

80.   On remand, Reed Taylor asserted yet additional legal theories to attempt to persuade the district court to award him damages or to allow him to recover his attorneys' fees and costs based upon severing all other terms from the Stock Redemption Agreement. The district court refused to grant Reed Taylor any relief.

81.   Based upon the illegality of the Stock Redemption Agreement and Stock Redemption Restructure Agreement, Reed Taylor lost all of his contractual rights, security interests and claims to obtain payment of the $6,000,000 in principal and accrued interest owed to him under the $6M Note.

---

[4] In the Idaho Supreme Court's opinion, "Stock Redemption Agreement" was defined to include both the original 1995 Stock Redemption Agreement and the 1996 Stock Redemption Restructure Agreement.

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 20

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 19**

82.     As a result of litigation derived solely from the sale of his shares to AIA Services and the agreements and instruments relating thereto, Reed Taylor has paid $1,187,856.19 in attorneys' fees, expert fees and costs for his attorneys and for the attorneys' fees and costs to others. Although I have been provided the documentation for the $1,187,856.19, I have not independently calculated that number so I am assuming that it is correct.

83.     I.C. § 30-1-6 existed in 1995 and 1996 during the defendants' representation of Reed Taylor.  Although I.C. § 30-1-6 was later repealed in 1997, the new statutes contained a savings provision that required any violation in 1995 or 1996 of I.C. § 30-1-6 to be governed by I.C. § 30-1-6, instead of the new statute, I.C. § 30-1-640.

84.     When he was deposed in *Taylor v. Riley*, Scott Bell testified that in 1995 he "was aware that every state has its statute restricting the use of its capital of its redeemed shares." Despite his knowledge that every state had restrictions on share purchases, when Scott Bell was questioned whether "anyone at Cairncross had independently looked into what restrictions may or may not apply in Idaho on redemption of stock", he stated: "No." Mr. Bell also testified that he would have sought and obtained an opinion letter regardless of whether he was licensed to practice law in Idaho.

85.     When I testified by Affidavit in *Taylor v. Riley* (*see* foot note 2 on page 9 of the attached Exhibit A), I testified that: "[t]he obligations and duties owed by Riley, Turnbow and Eberle Berlin to Reed Taylor through the preparation and delivery of the Opinion Letter have nothing to do with any alleged negligent acts of Scott Bell or any other attorney at his firm." When I testified to the foregoing, the reason that I used the word "alleged" to modify "negligent acts" is because I had not been retained at that time to provide expert testimony in

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 21

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 20**

this lawsuit or to render any opinions as to the breached duties or negligent acts of the defendants. Since I have recently been retained to provide expert testimony for this lawsuit, I will now take the opportunity to address the conduct of the defendants in the opinions expressed below.

86.     The defendants have asserted that their scope of representation was limited to negotiating the terms of the purchase of Reed Taylor's shares, "papering" the transaction and obtaining the opinion letter for Reed Taylor.

**Opinions**

Based upon my knowledge, education and experience, together with the authorities, facts and data that I have reviewed, assumed, relied upon, and disclosed above, I make the following opinions:

87.     The practice of law in Idaho includes, but is not limited to, drafting agreements and providing advice relative to those agreements. The defendants, who were not licensed to practice law in Idaho, were prohibited from and obligated to decline or withdraw from representing Reed Taylor, an Idaho resident, in 1995 and 1996 for the sale of his shares in AIA Services, an Idaho corporation, including, without limitation, representation pertaining to the negotiation, drafting and closing of the sale. After the defendants agreed to represent Reed Taylor, they were obligated to terminate their representation of him because there initial representation and ongoing representation was prohibited. Moreover, the defendants were separately prohibited in Washington from practicing law in Idaho because they were not licensed to practice law in Idaho.

88.     The defendants' scope of representation of Reed Taylor was not limited in any way by the written terms of the Fee Agreement and those written terms confirm that there

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 22

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

Exhibit - 3, p. 21

**14-ER-3320**

were no other oral agreements or arrangements. There are no documents, agreements or written communications in the defendants' files to support any alleged new limited scope of representation, including, but not limited to, Mr. Bell's testimony that he was retained to only negotiate and "paper" the transaction. The defendants' billing records demonstrate that they were providing an unlimited scope of representation as to all matters relative to the sale of Reed Taylor's shares, including, without limitation, by providing legal research, evaluating tax issues, analyzing the need for a shareholder meeting, analyzing UCC and security interest issues and the various other tasks confirmed by their billing statements. The defendants' billing statements are consistent with the unlimited scope of representation as to the "matter of the sale of his stock in AIA Services" as confirmed in the Fee Agreement.

89. For the same reasons discussed in ¶87 that prohibited the defendants from representing Reed Taylor in the first place and required them to withdraw or terminate their representation, the defendants were prohibited from entering into any oral or written agreement to limit their scope of representation of Reed Taylor.

90. Assuming that the defendants' had obtained informed consent to a limited scope of representation to only negotiate, "paper" the transaction, and obtain an opinion letter from AIA Services' counsel for Reed Taylor, the limited scope of representation would be unreasonable and impermissible for each of the following independent reasons:

a. The defendants had already agreed to represent Reed Taylor with no limited scope of representation "in the matter of the sale of his stock in AIA Services, as well as for any additional matters undertaken by the Firm at the Client's request." In order for the defendants to limit the scope of representation after they had already commenced representation, they would have been required to ensure that Reed Taylor

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 23

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 22**

**14-ER-3321**

retained separate and independent counsel to approve a new limited scope of representation that, according to the defendants, purports to also limit their liability for malpractice.

b.      Since Reed Taylor was in the distinct position of being the majority shareholder of AIA Services who was receiving a pledge of all or substantially all of AIA Services' assets in exchange for relinquishing his majority interest in the company, the defendants' purported limited scope of representation would be unreasonable and, thus, prohibited because Reed Taylor would not have been adequately represented.

c.      The opinion letter could not make the transaction legal; the obtaining of an opinion letter is only a part of exercising the degree of care, skill and knowledge that a reasonably prudent attorney would exercise under the same or similar circumstances for the representation of Reed Taylor in a transaction of the magnitude of the one with AIA Services. The defendants failed to exercise the required degree of care, skill and knowledge owed to Reed Taylor by purportedly relying solely upon the opinion letter for compliance with Idaho law and the legality of the transaction.

d.      The defendants were not entitled to rely upon the opinion letter because they were not addressees thereof and the opinion letter expressly stated that it was only for Reed Taylor's benefit and use. For the defendants to assert their present position, the defendants should have required that they be included as addressees in the opinion letter and that the opinion include terms stating that they were entitled to rely on the opinions expressed in the opinion letter.

e.      The defendants failed to seek and obtain an opinion letter for the 1996

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 24

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 23**

**14-ER-3322**

restructuring and the execution of the Stock Redemption Restructure Agreement, Amended and Restated Security Agreement, Amended and Restated Stock Pledge Agreement and related agreements. The defendants' failure to obtain a new opinion letter in 1996 is wholly inconsistent with their position that the August 15, 1995 opinion letter somehow made their representation of Reed Taylor permissible in 1996, particularly since the opinions in the opinion letter speak as of the date of the opinion letter.[5]

91.     The defendants failed to exercise the degree of care, skill and knowledge that a reasonably prudent attorney would exercise under the same or similar circumstances would have exercised to ensure that the articles of incorporation were amended to approve capital surplus or a shareholder resolution was obtained to use capital surplus—or both—before and during the drafting of the Stock Redemption Agreement and the related agreements and instruments or the later restructuring of those agreements and instruments in 1996. From the commencement of the defendants' representation of Mr. Taylor on March 29, 1995, through the closing of the transaction to sell his shares in AIA Services on August 17, 1995, the defendants had approximately 3½ months to ensure that the proper shareholder resolution or amendment to the articles of incorporation was presented and adopted by AIA Services' shareholders, but they failed to failed to exercise the required degree of care, skill and knowledge that a reasonably prudent attorney would have exercised in same or similar circumstances. As counsel for Reed Taylor, the majority shareholder and Chairman of the Board of Directors, the defendants could have had Reed Taylor call any necessary special

---

[5] My opinion in this regard is directed solely at the defendants' position that the opinion letter somehow made their representation permissible. As far as the finding of illegality, it is true that the Stock Redemption Agreement was either illegal or legal in 1995 and the subsequent restructuring of the purchase obligations is irrelevant because the 1996 restructured and amended agreements were illegal for the same reason as is the 1995 Stock Redemption Agreement.

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 25

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 24**

**14-ER-3323**

board or shareholder meetings required to present and adopt the required resolution or amendment to the articles of incorporation necessary to comply with I.C. § 30-1-6.

92.     Based upon the defendants' representation being prohibited, the $96,065.39 in fees and costs paid to the defendants for representing Reed Taylor was unreasonable and outrageous. Moreover, assuming that the defendants' were able to seek and obtain a limited scope of representation to only negotiate and "paper" the transaction, the $96,065.39 in fees and costs paid to the defendants for representing Reed Taylor were unreasonable.

93.     Assuming that the defendants had obtained a limited scope of representation to only negotiate, "paper" the transaction and obtain an opinion letter from AIA Services' counsel for Reed Taylor, Section 2.5(m) of the Stock Redemption Agreement required the delivery of documents acceptable to the defendants, and, thus, even that hypothetical limited scope of representation would include exercising the degree of care, skill and knowledge that a reasonably prudent attorney would have exercised under the same or similar circumstances to ensure that all necessary documents were provided to confirm that all necessary corporate action had been taken; but the defendants failed to exercise the required degree of care, skill and knowledge owed to Reed Taylor when they waived the conditions for closing and instructed him to close the transaction without obtaining documents establishing that the shareholders had authorized the use of capital surplus in compliance with I.C. § 30-1-6.

94.     Based upon Mr. Bell's admitted knowledge in 1995 that "every state has its statute restricting the use of its capital of its redeemed shares", the defendants having had in their files a copy of the prior Articles of Amendment to the Articles of Incorporation of AIA Services filed on March 9, 1989 (that had previously authorized the use of capital surplus) notwithstanding that new Articles of Amendment to the Articles of Incorporation of AIA

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 26

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 25**

**14-ER-3324**

Services were filed on April 11, 1995 and on August 3, 1995, respectively, without including the terms authorizing the use of capital surplus as permitted by I.C. § 30-1-6 during the defendants' representation of Reed Taylor; the defendants failed to ensure compliance with the statutory restrictions of I.C. § 30-1-6 prior to closing; this constitutes reckless conduct and a demonstrated lack of even slight diligence and care when they failed to ensure compliance with I.C. § 30-1-6 in 1995 and again in 1996. Moreover, the defendants' acts and omissions demonstrate a complete lack of slight diligence and care in the representation of Reed Taylor when they failed to ensure compliance with I.C. § 30-1-6 prior to closing or when the transaction was restructured in 1996.

95.     As a result of the defendants' failure to ensure compliance with I.C. § 30-1-6 (as discussed in my opinions above), Reed Taylor lost his contractual rights, security interests and related claims derived from the sale of his shares in 1995 and the restructuring of the obligations in 1996. Moreover, Reed Taylor would not have been required to file suit or be involved in any of the lawsuits resulting in the $1,187,856.19 in attorneys' fees, expert fees and costs paid by him, but for the defendants' failure to ensure compliance with I.C. § 30-1-6. As mentioned above, the defendants could have and should have insisted that actions be taken which would have made the transaction legal and resulted in the Stock Redemption Agreement, Stock Pledge Agreement, Security Agreement, Stock Redemption Restructure Agreement, $6M Note, Amended and Restated Security Agreement, and Amended and Restated Stock Pledge Agreement being valid and enforceable in accordance with their terms.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

_3/11/18 New York, New York_     _Richard T. McDermott_
DATE AND PLACE SIGNED          RICHARD T. McDERMOTT

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 27

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 26**

**14-ER-3325**

## CERTIFICATE OF SERVICE

I, Roderick Bond, declare that under penalties of perjury under the laws of the state of Washington that, on the date indicated below, I served a true and correct copy of the foregoing on the following party(ies) via the method(s) indicated below:

| | **Via:** |
|---|---|
| Gregory J. Hollon | ( ) U.S. Mail, Postage Prepaid |
| Avi Lipman | ( ) Hand Delivered |
| McNaul Ebel Nawrot & Helgren PLLC | ( ) Overnight Mail |
| 600 University Street, Suite 2700 | ( ) Facsimile |
| Seattle, WA  98101-3143 | (**X**) Email (pdf attachment)(by Agreement) |

Dated this 11th day of March, 2013.


_/s/ Roderick C. Bond_
Roderick C. Bond

EXPERT WITNESS DECLARATION
OF RICHARD T. McDERMOTT - 28

RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343

**Exhibit - 3, p. 27**

**14-ER-3326**

MICHAEL D. GAFFNEY, ISB No. 3558
BEARD ST. CLAIR GAFFNEY PA
2105 Coronado St.
Idaho Falls, ID  83404-7495
Tel: (208) 557-5203
Fax: (208) 529-9732
Email: gaffney@beardstclair.com

RODERICK C. BOND, ISB No. 8082
RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA  98004
Tel: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com

Attorneys for Plaintiff Reed J. Taylor


IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE STATE OF
IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| REED J. TAYLOR, an individual;<br><br>Plaintiff,<br><br>v.<br><br>RICHARD A. RILEY, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; SHARON CUMMINGS, Personal Representative of the Estate of Robert M. Turnbow; and EBERLE, BERLIN, KADING, TURNBOW & McKLVEEN, CHARTERED, an Idaho corporation;<br><br>Defendants. | Case No.:  CV-OC-2009-18868<br><br>EXPERT WITNESS AFFIDAVIT OF RICHARD T. McDERMOTT |


EXPERT WITNESS AFFIDAVIT OF RICHARD T. McDERMOTT - 1

**Exhibit - 3, p. 28**

**14-ER-3327**

STATE OF NEW YORK       )
                        ) ss:
COUNTY OF ULSTER       )

I, Richard T. McDermott, being first duly sworn on oath, deposes and says:

1.     I am over the age of eighteen years, competent to testify in court, and make this Affidavit upon my personal knowledge, experience and education.

2.     In 1962, I received a B.A. from Marquette University. In 1966, I obtained a J.D. from Fordham University School of Law.

3.     In 1967, I was admitted to practice law in the State of New York. I am presently in good standing and licensed to practice law in the State of New York. I have been admitted to practice law in New York for over 45 years.

4.     I am a member of the New York State Bar Association Securities Regulation Committee.

5.     From 1966 through 1990, I was an Associate and Partner with the law firm of Alexander & Green/Walter Conston Alexander & Green (the firms combined). From 1990 through 2004, I was a Partner of Rogers & Wells/Clifford Chance LLP (the firms merged in 2000).  While at that firm, I chaired the Legal Personnel Committee, and was responsible for the training, development, evaluation and advancement of associate attorneys and counsel, as well as being involved in the partner selection process.

6.     From 2000 through the present time, I have been an Adjunct Professor at Fordham University School of Law. From 1980 through 1998, I was an Adjunct Professor at New York University School of Law.  In both positions, I taught law school classes on the Legal

EXPERT WITNESS AFFIDAVIT OF RICHARD T. McDERMOTT - 2

Aspects of Corporate Finance, and covered such subjects as debentures, indentures, preferred stock, convertible securities, dividends and stock repurchases as well as third party opinions in corporate transactions.

7. I am the co-author of Chapters 1 and 2 (Introduction and Elements of Opinion Letters, respectively) and author of Chapter 3 (Legal Opinions on Corporate Matters) of the Treatise: *LEGAL OPINION LETTERS A Comprehensive Guide to Opinion Practice* (Third Edition).

8. I have been a member of the TriBar Opinion Committee for twenty-two years. The TriBar Opinion Committee is a nationally recognized committee that publishes Reports on various aspects of opinion practice.

9. I am the author of *Legal Aspects of Corporate Finance* (4th ed. 2006) and 2010-2012 Supplements thereto, which is published by LexisNexis Matthew Bender; it is my understanding that the book has been used at twenty-two law schools. I am presently working on the Fifth Edition of that book, which is expected to be published early in 2013.

10. I have authored other articles and materials (including a Teacher's Manual for *Legal Aspects of Corporate Finance*).

11. In 1988, I was a visiting lecturer at Monash University in Melbourne, Australia and the University of Adelaide, Australia, Corporate and Business Law Centre. In 1999, I co-lectured with former Delaware Chancellor William Allen and James Fuld, author of *Legal Opinions In Business Transactions - An Attempt to Bring Some Order Out of Some Chaos*, 28 Bus. Law. 915 (1973), on the Law and Business of Investment Banking at the New York

EXPERT WITNESS AFFIDAVIT OF RICHARD T. McDERMOTT - 3

University Center for Law and Business.

12.     From 2009 through the present time, I have served as a Special Master for the New York State Supreme Court Appellate Division, First Department.

13.     I have extensive experience in domestic and international corporate finance, mergers and acquisitions, tender offers, strategic alliances, bankruptcy reorganizations and other corporate matters. I have experience in the preparation of Proxy Statements and Reports to shareholders and the preparation of reports filed with the Securities and Exchange Commission.

14.     I have prepared, delivered or approved over 100 opinion letters in my career. I also served on the Committee that approved opinion letters at my prior law firm.

15.     I have never acted as an expert witness in a case against an attorney or a law firm.

16.     I have consulted with Winston V. Beard, an attorney licensed to practice in Idaho with experience preparing and delivering opinion letters, regarding the standard of care in Idaho for attorneys preparing opinion letters.

17.     I have reviewed the deposition transcripts of Richard A. Riley and Stanley Tharp, together with the exhibits thereto. I have reviewed certain Affidavits of Reed Taylor and Scott Bell.  I have reviewed certain pleadings and papers filed in this action and the underlying action, including, without limitation, the recent affidavits of Richard Riley, D. John Ashby, Julianne Hall and Loren Ispsen, together with the exhibits thereto, and the Memorandums filed by the defendants in support of their pending motions for summary judgment. I have also reviewed the Stock Redemption Agreement, $6 Million Promissory Note, Security Agreement, Stock Pledge Agreement, shareholder and board meeting minutes, amended articles of incorporation

EXPERT WITNESS AFFIDAVIT OF RICHARD T. McDERMOTT - 4

(including both versions filed in 1995), and other documents provided to me by Reed Taylor's counsel.

18.     I have reviewed the applicable Rules and Commentaries in the Idaho Rules of Professional Conduct effective November 1, 1986 and July 1, 2004 (in both versions, Idaho acknowledges that a duty may or may not be owed by an attorney providing an evaluation to a third party. *See* RPC 2.3 and Comments thereto.)  I have also reviewed a number of authorities and decisions, including, without limitation, I.C. § 30-1-6 (1995); I.C. § 30-1-2 (1995); I.C. § 30-1-46 (1995); the TriBar Reports;  the Restatement of the Law Governing Lawyers;  *Prudential Ins. Co. of America v. Dewey, Ballantine, Bushby, Palmer and Wood*, 80 N.Y.2d 377, 605 N.E. 2d 318 (1992);  *Taylor v. AIA Services Corp.*, 151 Idaho 552, 261 P.3d 829 (2011);  *Taylor v. McNichols*, 149 Idaho 826, 243 P.3d 642 (2010).

19.     I have read Judge Brudie's decisions finding the redemption illegal and denying Mr. Taylor's motion for reconsideration in the underlying case. I have also reviewed Judge Greenwood's decision finding that Mr. Riley and Mr. Turnbow owed Reed Taylor a duty of care.

20.     I have reviewed the Opinion Letter prepared and delivered to Reed Taylor by the defendants in this action, together with the attached exceptions and Certificates of Corporate Status. The Opinion Letter acknowledges, without exception, that Riley, Turnbow and Eberle Berlin were general counsel for AIA Services Corporation. The Opinion Letter is addressed to Reed Taylor and specifically invited his reliance by limiting him as the only party who may rely upon the Opinion Letter. The Opinion Letter contains several opinions customary in transactions such as the stock redemption, including, without limitation, that AIA Services Corporation had

EXPERT WITNESS AFFIDAVIT OF RICHARD T. McDERMOTT - 5

14-ER-3332

the power and authority to enter into the Stock Redemption Agreement, that all necessary actions had been taken by shareholders and that the Stock Redemption Agreement constitutes the valid and binding obligation of AIA Services Corporation, enforceable in accordance with its terms.

21.     My opinions set forth below are based upon Riley, Turnbow and Eberle, Berlin, Kading, Turnbow & McKlveen, Chartered ("Eberle Berlin") not being attorneys for Reed Taylor in connection with the Stock Redemption Agreement and related matters, although I have reviewed documents and testimony that indicate there was, at a minimum, a past joint and concurrent attorney-client relationship between Rilely, Turnbow and other attorney(s) at Eberle Berlin and Reed Taylor and AIA Services Corporation.

22.     Based upon my knowledge, education and/or experience, together with the authorities and information I have reviewed, assumed and disclosed above, I make the following opinions:

a.     Courts in the United States have routinely imposed liability against attorneys for preparing and delivering incorrect opinion letters to third-parties.  Generally, these claims are based on some form of negligence.

b.     As determined by Judge Brudie and affirmed by the Idaho Supreme Court, the Opinion Letter was materially incorrect since, among other things: (1) the Stock Redemption Agreement violated Idaho law (specifically I.C. § 30-1-6); (2) AIA Services Corporation did not have the corporate power or authority to enter into the Stock Redemption Agreement; (3) all necessary corporate action was not taken by AIA Services Corporation and its shareholders to authorize the  execution  delivery or performance by AIA Services Corporation of the Stock

EXPERT WITNESS AFFIDAVIT OF RICHARD T. McDERMOTT - 6

**Exhibit - 3, p. 33**

**14-ER-3332**

Redemption Agreement; and (4) the Stock Redemption Agreement did <u>not</u> constitute the valid and binding obligation of AIA Services Corporation enforceable against it in accordance with its terms.

        c.     As general counsel for AIA Services Corporation, Riley, Turnbow and Eberle Berlin were in a position to see to it that all applicable legal requirements were complied with for the redemption of Reed Taylor's shares of Common Stock of AIA Services Corporation.

        d.     As general counsel for AIA Services Corporation, Riley, Turnbow and Eberle Berlin had two opportunities, prior to closing, to have the shareholders of AIA Services Corporation authorize an amendment to the articles of incorporation to authorize the redemption of Reed Taylor's shares by authorizing the use of capital surplus as permitted by I.C. § 30-1-6. As general counsel for AIA Services Corporation, Riley, Turnbow and Eberle Berlin had two opportunities, prior to closing, to have the shareholders vote on shareholder resolutions authorizing the redemption of Reed Taylor's shares and the use of capital surplus as permitted by I.C. § 30-1-6.

        e.     The defendants' assert arguments pertaining to the restructuring of the redemption obligations to Reed Taylor in 1996 and the alleged subordination of the payment of the $6 Million Note to the redemption of Donna Taylor's Series A Preferred Shares in AIA Services Corporation. These arguments are irrelevant. The relevant inquiry is whether the opinions rendered in the Opinion Letter were accurate when the transaction to redeem Reed Taylor's shares was closed. Since the transaction was not carried out in compliance with I.C. § 30-1-6 (1995), any subsequent restructuring or modification of the agreements and any

EXPERT WITNESS AFFIDAVIT OF RICHARD T. McDERMOTT - 7

subordination issues are irrelevant because the original transaction was illegal. In addition, the defendants' assertions that the redemption of Reed Taylor's shares was legal because certain payments were subordinate to payments to Donna Taylor is not supported by any provision in I.C. § 30-1-6 or I.C. § 30-1-2.[1] When the Opinion Letter was delivered at the time of closing, the redemption of Reed Taylor's shares was either legal or not. In addition, the 1996 restructure did not affect the $6 Million Promissory Note or the security interests relating thereto (which were rendered unenforceable by Judge Brudie's ruling and as affirmed by the Idaho Supreme Court). The Opinion Letter remains in full force and effect.

f.      Mr. Riley and Mr. Turnbow, as the Opinion Letter preparers, and Eberle Berlin, as the signatory of the Opinion Letter, owed and/or assumed a duty of care to Reed Taylor to prepare and deliver the Opinion Letter in a non-negligent manner, which was to prepare and deliver the Opinion Letter exercising the degree of care and skill that a reasonably prudent opinion preparer would exercise under the same or similar circumstances. Mr. Riley, Mr. Turnbow and Eberle Berlin breached their duties owed to Reed Taylor when they failed to exercise that required degree of care and skill thereby delivering to him an incorrect Opinion Letter. There are no disclosures, assumptions, qualifications or exceptions in the Opinion Letter that insulate Mr. Riley, Mr. Turnbow or Eberle Berlin from any of the incorrect opinions or their

---

[1] Under AIA Services Corporation's Articles of Amendment to the Articles of Incorporation filed on April 11, 1995 and August 3, 1995, respectively, AIA Services Corporation was authorized to redeem Donna Taylor's shares using "legally available funds" and "only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares." *See* Article Fourth, Section 4.2.3. Donna Taylor's shares were only redeemed as payments were made to her, unlike Reed Taylor's redemption in which his shares were canceled and payments, instruments and security interests were granted to him at the time of the redemption. There are no provisions in AIA Services Corporation's Amendment of Amendment to the Articles of Incorporation authorizing the redemption of Reed Taylor's shares.

EXPERT WITNESS AFFIDAVIT OF RICHARD T. McDERMOTT - 8

failure to prepare and deliver the Opinion Letter in a non-negligent manner.  Indeed, if the Opinion Letter had disclosed that it was based on the so-called "fair value" test or some other analysis to which Mr. Riley has testified to justify the compliance with I.C. § 30-1-6 (1995), rather than the plain language of that statute, a reasonable opinion recipient would have insisted on a shareholder vote to permit the use of capital surplus and thus avoid any ambiguity or uncertainty with respect to the legality of the Stock Redemption Agreement.[2]

g.       Reed Taylor has testified that he would not have permitted his shares to be redeemed if the Opinion Letter had not been provided. Scott Bell testified that he would have advised Reed Taylor not to sell his shares if the Opinion Letter had not been provided.  Both Reed Taylor and Scott Bell's testimony is consistent with Section 2.5(j) of the Stock Redemption Agreement, which required the Opinion Letter to be delivered to Reed Taylor as a condition of closing the redemption transaction. As a result, Reed Taylor was proximately damaged when Judge Brudie held that the Stock Redemption Agreement was illegal and unenforceable, which rendered the $6 Million Promissory Note, plus accrued interest, and the security interests granted to Reed Taylor as void and unenforceable obligations (which  opinion was affirmed by the Idaho Supreme Court).

h.       I am not aware of any other instance in which an opinion giver's law firm has in effect disavowed his previously rendered third-party opinions. This was done here by Mr. Riley's law firm asserting in a judicial proceeding that the Stock Redemption Agreement is

---

[2] The obligations and duties owed by Riley, Turnbow and Eberle Berlin to Reed Taylor through the preparation and delivery of the Opinion Letter have nothing to do with any alleged negligent acts of Scott Bell or any other attorney at his firm.

EXPERT WITNESS AFFIDAVIT OF RICHARD T. McDERMOTT - 9

unenforceable and illegal, notwithstanding the opinions stating the direct opposite. Moreover, the opinion givers ignored requests to assist the recipient of the opinion, Reed Taylor, in defending the Stock Redemption Agreement against the charge of illegality and enforcing it in accordance with its terms.

DATED:  This 29th day of August, 2012.

_____
Richard T. McDermott

SUBSCRIBED AND SWORN to before me this 29th day of August, 2012.

_____
Notary Public for New York
Residing at: Ellenville, NY
My commission expires: _____

MARIE BALOGH
NOTARY PUBLIC, State of New York
No. 01BA5076592
Qualified in Ulster County
Commission Expires April 21, 2015

EXPERT WITNESS AFFIDAVIT OF RICHARD T. McDERMOTT - 10

**Exhibit - 3, p. 37**

**14-ER-3336**

RODERICK C. BOND, ISB No. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave NE, Suite 1900
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiff

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE
STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| DONNA J. TAYLOR;<br><br>Plaintiff,<br><br>v.<br><br>R. JOHN TAYLOR; and CONNIE TAYLOR;<br><br>Defendants.<br><br>and<br><br>DONNA J. TAYLOR,<br><br>Plaintiff,<br><br>v.<br><br>AIA SERVICES CORPORATION, an Idaho corporation; R. JOHN TAYLOR; CONNIE TAYLOR HENDERSON; JAMES BECK; and MICHAEL W. CASHMAN, SR.,<br><br>Defendants. | Consolidated Case Nos.: CV-08-01150<br>CV-13-0001075<br><br>EXPERT WITNESS DECLARATION OF RICHARD T. McDERMOTT |

DECLARATION OF RICHARD T. McDERMOTT - 1

**Exhibit - 3, p. 1**

**14-ER-3337**

I, Richard T. McDermott, declare:

1.      I am over the age of eighteen and am competent to testify in court, including as to the matters set forth in this declaration. This declaration and my opinions herein are based on personal knowledge, education, training, and experience.

2.      In 1962, I received a B.A. from Marquette University. In 1966, I obtained a J.D. from Fordham University School of Law.

3.      In 1967, I was admitted to practice law in the State of New York. I am presently in good standing and licensed to practice law in the State of New York. I have been admitted to practice law in New York for over 47 years.

4.      I am a member of the New York State Bar Association Securities Regulation Committee.

5.      From 1966 through 1990, I was an Associate and Partner with the law firm of Alexander & Green/Walter Conston Alexander & Green (the firms combined). From 1990 through 2004, I was a Partner of Rogers & Wells/Clifford Chance LLP (the firms merged in 2000).  While at that firm, I chaired the Legal Personnel Committee, and was responsible for the training, development, evaluation and advancement of associate attorneys and counsel, as well as being involved in the partner selection process.

6.      From 2000 through the present time, I have been an Adjunct Professor at Fordham University School of Law. From 1980 through 1998, I was an Adjunct Professor at New York University School of Law.  In both positions, I taught law school classes on the Legal Aspects of Corporate Finance, and covered such subjects as debentures, indentures, preferred stock, convertible securities, dividends and stock repurchases as well as third party opinions in corporate transactions.

DECLARATION OF RICHARD T. McDERMOTT - 2

**Exhibit - 3, p. 2**

**14-ER-3338**

7.      I am the co-author of Chapters 1 and 2 (Introduction and Elements of Opinion Letters, respectively) and author of Chapter 3 (Legal Opinions on Corporate Matters) of the Treatise: *LEGAL OPINION LETTERS A Comprehensive Guide to Opinion Practice* (Third Edition).

8.      I have been a member of the TriBar Opinion Committee for 25 years. The TriBar Opinion Committee is a nationally recognized committee that publishes Reports on various aspects of opinion practice.

9.      I am the author of *Legal Aspects of Corporate Finance* (5th ed. 2013), which is published by LexisNexis Matthew Bender; it is my understanding that the book and its various editions have been used at twenty-two law schools.

10.     I have authored other articles and materials (including a Teacher's Manual for *Legal Aspects of Corporate Finance*).

11.     In 1988, I was a visiting lecturer at Monash University in Melbourne, Australia and the University of Adelaide, Australia, Corporate and Business Law Centre. In 1999, I co-lectured with former Delaware Chancellor William Allen and James Fuld, author of *Legal Opinions In Business Transactions - An Attempt to Bring Some Order Out of Some Chaos*, 28 Bus. Law. 915 (1973), on the Law and Business of Investment Banking at the New York University Center for Law and Business.

12.     From 2009 through the present time, I have served as a Special Master for the New York State Supreme Court Appellate Division, First Department.

13.     I have extensive experience in the area of corporate governance of privately held and publically traded corporations (including Fortune 500 companies) providing legal advice to Boards of Directors for matters involving significant transactions, corporate

DECLARATION OF RICHARD T. McDERMOTT - 3

**Exhibit - 3, p. 3**

governance, derivative and class action shareholder suits, the payment of directors' expenses (including attorneys' fees), and related matters. I also have extensive experience with the preparation of: proxy statements, Reports to the Securities and Exchange Commission, reports to shareholders, disclosures to shareholders, notices of shareholder meetings, shareholder resolutions, notices of board meetings, and board resolutions. I also have extensive experience in reviewing and interpreting certificates/articles of incorporation, bylaws, shareholder agreements, notices to shareholders, shareholder resolutions, notices to board members and board resolutions; and ensuring that shareholder resolutions and board resolutions comply with a corporation's articles of incorporation, bylaws, and applicable restrictions under statutory and common law.

14.    I have extensive experience in domestic and international corporate finance, mergers and acquisitions, tender offers, strategic alliances, bankruptcy reorganizations and other corporate matters. I have experience in the preparation of Proxy Statements and Reports to shareholders and the preparation of reports filed with the Securities and Exchange Commission.

15.    I have prepared, delivered or approved over 100 opinion letters in my career. I also served on the Committee that approved opinion letters at my prior law firms. My experience includes, but is not limited to, preparing, revising, reviewing, approving and delivering opinion letters and conducting the necessary and required investigations to support certain opinions in such opinion letters. I also have vast experience in qualifications, assumptions, exceptions and reasoning in opinion letters, together with the ramifications for not inserting certain qualifications, assumptions and exceptions in opinion letters. I am familiar with the standard of care necessary for providing the required

DECLARATION OF RICHARD T. McDERMOTT - 4

**Exhibit - 3, p. 4**

disclosures and reasoning to ensure that an opinion letter is not misleading.

16.     My experience in corporate law includes, but is not limited to: domestic and international corporate finance, mergers and acquisitions, purchases and redemptions by a corporation of its own shares (and formulating and evaluating proposals therefor) from both substantial shareholders and the investing public in issuer tender offers and open market transactions, strategic alliances, going private transactions, bankruptcy reorganizations, the legal and equitable theories of piercing the corporate veil and alter-ego (along with taking appropriate corporate action to prevent such claims), and other general corporate matters.

17.     I have experience representing the boards of directors of corporations in transactions, including, the board of directors of Fortune 500 companies.

18.     I have practiced corporation and securities law for more than 35 years. I have represented domestic and international acquiring and acquired clients in mergers and acquisition transactions involving acquisition amounts from less than $1 million to more than $1 billion. Included in that work was the participation in and supervision of others with respect to pre-transaction due diligence and the rendering of reports pertaining to pre-transaction due diligence.

**Facts, Data and Assumptions Relied Upon for My Opinions**

19.     In formulating and rendering my opinions in this Declaration, I am relying on various facts, data and assumptions, including, without limitation, those expressly stated below.

20.     Since my deposition in this case, I have again reviewed numerous documents that were produced in these consolidated lawsuits and that were filed or

DECLARATION OF RICHARD T. McDERMOTT - 5

Exhibit - 3, p. 5

originated from *Reed Taylor v. AIA Services, et al.*, *Reed Taylor v. Riley, et al.* (which involves many documents originally produced in *Reed Taylor v. AIA Services, et al.*), *Gemcap Lending I, LLC v. CropUSA Insurance Agency, Inc.*, *Gemcap Lending I, LLC v. Quarles & Brady, et al.*, *AIA Services v. Durant, et al.*, *AmericanWest Bank v. Bolland, et al.*, and Donna's derivative lawsuit in United States District Court in Idaho. I have also reviewed declarations filed in these consolidated lawsuits (including Donna Taylor and Paul Durant's declarations and affidavits) and various other filings and motions. I have reviewed Judge Brudie's decisions in these actions.

21.    I have reviewed the applicable Idaho Rules of Professional Conduct (which applied in 1995 and thereafter) and a number of authorities, appellate court decisions and Idaho Code Sections, including, without limitation: (a) I.C. § 30-1-6 (1995); (b) I.C. § 30-1-2 (1995); (c) I.C. § 30-1-46 (1995); (d) I.C. § 30-1-640; (e) Idaho Code Sections on corporate governance; (f) *Taylor v. AIA Services Corp.*, 151 Idaho 552, 261 P.3d 829 (2011); and (g) numerous cases and authorities on alter-ego, piercing the corporation's veil, breach of fiduciary duties and aiding and abetting in the breach of fiduciary duties.

22.    I have reviewed AIA Services' articles of incorporation and all subsequent amendments and restatements thereto. I have reviewed AIA Services' Restated Bylaws, which have been in effect since April 10, 1989.

23.    I will refer to AIA Services Corporation as "AIA Services" in this Declaration. I will refer to R. John Taylor ("John"), James Beck ("Beck"), Michael W. Cashman ("Cashman"), and Connie Taylor Henderson ("Connie") as the "Individual Defendants" in this Declaration. I will refer to Donna J. Taylor as "Donna" in this Declaration.

DECLARATION OF RICHARD T. McDERMOTT - 6

24. My opinions in this Declaration are based exclusively on Donna's direct claims against AIA Services and the Individual Defendants. She is pursuing derivative claims on behalf of AIA Services and AIA Insurance against certain of the Individual Defendants and others in United States District Court in Idaho. That case is presently stayed pending the outcome of *Reed Taylor v. Riley, et al.*, although I understand the stay is on appeal. It would not be possible for Donna to assert both direct claims against AIA Services and others in these consolidated lawsuits and at the same time assert derivative claims on behalf of AIA Services. My opinions pertain solely to the damages and sums owed as to Donna's Series A Preferred Shares in AIA Services. My opinions are not offered to claw back the millions of dollars utilized from AIA Services and AIA Insurance.

25. AIA Services is a closely held Idaho corporation. From 1995 through the present time, AIA Services' primary subsidiary and operating company that was responsible for virtually all of AIA Services' income was AIA Insurance, Inc. (formerly known as AIA, Inc.). AIA Services has the following shares outstanding: (a) Series A Preferred Shares (with the highest payment priority); (b) Series C Preferred Shares (with the second highest payment priority); and (c) common shares (with the lowest payment priority).

26. Donna's original 200,000 Series A Preferred Shares were issued to her in or about December 1987 in connection with her divorce with Reed Taylor. The Series A Preferred Shares have a stated value of $10 per share. In order to issue those shares, Reed Taylor and Donna contributed numerous assets to AIA Services which were valued at millions of dollars (including their 97% interest in AIA, Inc., which later changed its name to AIA Insurance, Inc.) Donna and Reed's children owned the other 3% of AIA, Inc., which

DECLARATION OF RICHARD T. McDERMOTT - 7

**Exhibit - 3, p. 7**

**14-ER-3343**

was also contributed to AIA Services.

27.     In connection with the issuance of the Series A Preferred Shares to Donna in the divorce proceedings, AIA Services and its shareholders agreed to adopt the Article Fourth provisions for the Series A Preferred Shares, which were adopted to protect Donna and provide for the mandatory redemption of her shares at her election.

28.     Donna exercised her right to require the mandatory redemption of her Series A Preferred Shares effective on or about December 2, 1993. AIA Services elected to pay Donna over time instead of a lump sum payment as provided in the amended articles of incorporation. The payment terms required Donna's Series A Preferred Shares to be redeemed over a 15-year amortization period with interest accruing at prime minus $1\frac{1}{2}\%$. AIA Services commenced making payments to Donna. With each payment, accrued interest was paid and the remaining payment was applied to redeem her Series A Preferred Shares. When Donna exercised her mandatory redemption right in 1993, AIA Services' amended articles of incorporation authorized the use of capital surplus as permitted by I.C. § 30-1-6.

29.     In late 1994 and early 1995, AIA Services, through John, Beck, Cashman and other shareholders, desired to redeem Reed Taylor's common shares in order to obtain operational and financial control over AIA Services to commence a new business plan and attempt to effectuate a public offering of stock or the sale of the company. In order to repurchase Reed Taylor's shares, AIA Services needed Donna's consent because the redemption of Reed Taylor's shares would violate the provisions under the amended article of incorporation adopted to protect Donna's interests as a Series A Preferred Shareholder.

DECLARATION OF RICHARD T. McDERMOTT - 8

**Exhibit - 3, p. 8**

30. In connection with Beck and Cashman's investment in AIA Services by and through their purchase of Series C Preferred Shares,[1] they entered into an Investment Agreement with AIA Services. That agreement provided that Beck and Cashman were not obligated to purchase Series C Preferred Shares (they were going to purchase at least $1,500,000 Series C Preferred Shares) unless and until Reed Taylor's common shares were redeemed in full under terms acceptable to Beck and Cashman and consent was obtained from Donna for the redemption in the form acceptable to them. Also, under the terms of the Investment Agreement, Beck and Cashman were required to guarantee a $1,000,000 loan for AIA Services. Finally, under the terms of the Investment Agreement, Beck, Cashman and John agreed to enter into a Voting Agreement that would ensure that they remained on the board of directors of AIA Services. The Investment Agreement was executed by the parties (by John on behalf of AIA Services). The Voting Agreement was also executed by the parties (including John).

31. On January 11, 1995, AIA Services obtained Donna's consent to the repurchase of 500,000 of Reed Taylor's common shares. The January 11, 1995 letter agreement required AIA Services to accelerate the redemption of Donna's Series A Preferred Shares by redeeming them over a 10-year period of amortization (10 years from December 2, 1993) and increased the interest rate payable to her to prime plus ¼% (the rate was previously prime minus 1½% under the amended articles of incorporation). The letter agreement provided that these terms would apply irrespective of whether or not

---

[1] Richard Campanaro was also involved and a party to the Investment Agreement, but he purchased his Series C Preferred Shares in AIA Services with funds lent to him from Beck and Cashman. I understand that after there was a falling out between Campanaro and AIA Services shortly after his investment in 1995, his Series C Preferred Shares were transferred to Beck and Cashman in 1996.

DECLARATION OF RICHARD T. McDERMOTT - 9

**Exhibit - 3, p. 9**

sufficient funds were raised for the redemption of Reed Taylor's shares.

32.     When AIA Services and Donna executed the January 11, 1995 letter agreement, AIA Services' amended articles of incorporation authorized the use of capital surplus to redeem Donna's Series A Preferred Shares as permitted by I.C. § 30-1-6.

33.     On March 22, 1995, Richard Riley, one of AIA Services' attorneys' and one of Reed Taylor's divorce attorneys, confirmed in writing to Cumer Green, Donna's attorney, that Donna's Series A Preferred Shares would be redeemed in 10 years from December 2, 1993, specifically, 107 more payments commencing on February 1, 1995. When the March 22, 1995 letter agreement was signed, AIA Services' amended articles of incorporation authorized the use of capital surplus to redeem Donna's shares as permitted by I.C. § 30-1-6.

34.     On April 11, 1995, AIA Services amended its articles of incorporation and thereby removed the March 8, 1989 amendment that had authorized the use of capital surplus. While this amendment proved to be fatal to the redemption of Reed Taylor's shares, Donna's redemption terms set forth in the January 11, 1995 letter agreement, as subsequently confirmed by the March 22, 1995 letter agreement, had already been authorized prior to the April 11, 1995 amendment.

35.     On July 18, 1995, AIA Services agreed to pay Donna an additional $100,000 for her attorneys' fees and to split equally between her and Reed Taylor all proceeds from the sale of Series C Preferred Shares over $1,500,000. In 1995, AIA Services raised $2,000,000 from Series C Preferred Share sales, but it never paid any additional sums to Donna other than the $100,000 payment for her attorneys' fees.

DECLARATION OF RICHARD T. McDERMOTT - 10

**Exhibit - 3, p. 10**

**14-ER-3346**

36. On August 10, 1995, Richard Riley, AIA Services' attorney, wrote a letter to Cumer Green, Donna's attorney, confirming that she had consented to the transactions on behalf of Beck and Cashman as provided in the Investment Agreement.

37. Beck and Cashman became Series C Preferred Shareholders on August 16, 1995, according to AIA Service' stock ledgers. I am assuming that Beck and Cashman approved the terms of Reed Taylor's redemption and the consent provided by Donna because they purchased their Series C Preferred Shares in AIA Services prior to the close of the redemption of Reed Taylor's shares.

38. On or about August 17, 1995, the transaction to redeem Reed Taylor's common shares was closed and Reed Taylor's common shares in AIA Services were canceled effective July 22, 1995 (the date of the Stock Redemption Agreement).

39. John's Executive Officer's Agreement dated August 1, 1995 confirms that Reed Taylor's shares were redeemed so that John and Beck and Cashman (through their co-investor Campanaro) could obtain financial and operational control over AIA Services.

40. After the redemption transaction with Reed Taylor closed, Beck and Cashman never guaranteed the $1,000,000 loan and AIA Services has never taken action to this day to require them to guarantee a $1,000,000 loan for AIA Services.

41. Upon the closing of the redemption of Reed Taylor's common shares, John became the majority shareholder in AIA Services. Although not listed as an owner of John's common shares, Connie was specifically noted as having a community interest in John's common shares in the notice provided to the shareholders in connection with the failed 2012 reverse stock split. In addition, Connie testified in *Reed Taylor v. AIA Services, et al.*, regarding her community ownership of John's common shares and she is listed as a

DECLARATION OF RICHARD T. McDERMOTT - 11

one-half owner of John's common shares in AIA Services' tax returns recently produced through the order of the discovery master.

42. In 1996, AIA Services defaulted on its obligations to Reed Taylor. Consequently, AIA Services and Reed Taylor restructured his obligations. In order to restructure its obligations in the form and substance to Reed Taylor, AIA Services needed Donna to consent to allowing Reed Taylor's interest payments on his $6M Note to not be subordinate to the payment obligations to Donna (under the terms of the 1995 letter agreements, AIA Services could not pay interest payments to Reed Taylor on the $6M Note if it was in default of its payment obligations to Donna; and the principal due on the $6M Note was subordinate to the payments on Donna's shares). Donna agreed on the condition that AIA Services would agree to pay her an additional $100,000 every six months after Reed Taylor's $1.5 Million Down Payment Note was paid in full. The $1.5 Million Down Payment Note was paid in full in May 2001, but AIA Services never made any of the required $100,000 payments to Donna.

43. Since repurchasing Reed Taylor's common shares in 1995, the documents produced in discovery in *Reed Taylor v. AIA Services* (including the emails, board meeting minutes, letters (including those regarding the Series C Preferred Shareholders' purported exchange of shares for shares in CropUSA Insurance Agency), financial statements and accounting records), demonstrate that Beck, Cashman and John have controlled AIA Services and AIA Insurance, utilized AIA Services and AIA Insurance's assets to fund competing businesses and loaned money to entities that they partial own.

44. In 1999, AIA Services began selling crop insurance through a company called AIA Crop Insurance, Inc. In a 2000 business plan, AIA represented that "AIA,

DECLARATION OF RICHARD T. McDERMOTT - 12

**Exhibit - 3, p. 12**

through its new subsidiary, AIA Crop Insurance, Inc., will begin providing a line of multi-peril crop insurance at the request of the farm associations." In 2000, however, AIA Crop Insurance, Inc.'s name was changed to CropUSA Insurance Agency, Inc.

45. In 2001, Beck, Cashman and John decided to have CropUSA Insurance Agency cease to be a subsidiary of AIA Services and instead become a separate company. AIA Services has received no consideration for the loss of CropUSA Insurance Agency; nor did the preferred or common shareholders of AIA Services authorize a disposition of CropUSA Insurance Agency, Inc. In a 2011 letter to themselves and their friends (who were also Series C Preferred Shareholders), it stated:

> Over the last few years, AIA's management and directors have been looking for ways to create an exit strategy for your investment in AIA. We had originally planned on taking AIA public, but it is unlikely in the foreseeable future…
>
> With Crop USA, we believe there is a better opportunity for a clearly defined exit strategy. Once the company reaches its goal of $100 million in crop insurance premiums, management believes that Crop USA will have a potential to be acquired or become fully traded.
>
> AIA has been working on a project and market strategy referred to as Crop USA. Crop USA was created by AIA as a property and casualty insurance to members of sponsoring agricultural associations, such as the wheat growers, soybean growers, etc. that are already affiliated with AIA…

46. Later, when John was deposed in *Reed Taylor v. AIA Services*, he testified as follows:

> Q. (By Mr. Bond): And, why would, if CropUSA was a separate and distinct company, why would you be looking for an exit strategy for the C Shareholders to convert into CropUSA stock?
>
> A. (By Mr. Taylor): Because at that point in time, it didn't appear that we had an exit strategy for AIA.

DECLARATION OF RICHARD T. McDERMOTT - 13

**Exhibit - 3, p. 13**

**14-ER-3349**

Q. (By Mr. Bond):   At that, in 2001, AIA's prognosis looked relatively bleak, would that be correct?

A. (By Mr. Taylor):   In 2001, AIA's ability to market a proprietary product had ended.

47.   As a result, in 2001, Beck and Cashman exchanged their Series C Preferred Shares of AIA Services for common shares in CropUSA Insurance Agency, Inc. and additional common shares in AIA Services. This exchange opportunity was not offered to the Series C Preferred Shares held in AIA Services' 401(k) Plan nor was the exchange approved or formally properly disclosed to the common shareholders of AIA Services. After the purported share exchange was completed, CropUSA Insurance Agency, Inc. became the holder and owner of the 205,000 Series C Preferred Shares in AIA Services which had been issued to Beck and Cashman group. The minutes for the CropUSA Insurance Agency, Inc. board meeting held on January 10, 2001 in connection with the exchange simply states: "AIA Services Corporation has declined to continue to operate the company as a subsidiary of AIA and wants the Company to be independent." As stated above, neither Donna nor any of the other innocent minority preferred or common shareholders approved AIA Services declining to operate CropUSA Insurance Agency, Inc. as a subsidiary.

48.   In August 2004, AIA Insurance received a payment of $1,510,693 from Trustmark Insurance Company. Instead of depositing the $1,510,693 in AIA Insurance's normal bank account, John Taylor opened a new account entitled "AIA Insurance Inc. CropUSA" with the account address being John Taylor's home address of 2020 Broadview Dr., Lewiston, ID 83501.

DECLARATION OF RICHARD T. McDERMOTT - 14

**Exhibit - 3, p. 14**

**14-ER-3350**

49.     Beck, Cashman and John then caused AIA Insurance allegedly "repurchase" the Preferred C Shares in AIA Services (its parent corporation) from CropUSA Insurance Agency, Inc. for exactly same $1,510,693 which had been received from Trustmark Insurance Company and deposited into a "special account," the statements of which were also mailed to John's home address. CropUSA Insurance Agency, Inc. recognized a profit of $1,489,000 on the alleged sale (even though the auditors called the transaction "additional paid in capital" because of the alleged "commonality of ownership" among AIA Services, AIA Insurance and CropUSA Insurance Agency, Inc., a term without legal significance), the recording of the $1,489,000 means that CropUSA Insurance Agency, Inc. was carrying the shares on its financial statement at a value of only $21,693. CropUSA Insurance Agency, Inc.'s purported board meeting minutes that were drafted months after the alleged transaction admit "the marketability of the [Series C] shares to a third party would be problematic." This $1,510,693 belonged to AIA Insurance and Beck, Cashman and John had no right to use it to have AIA Services' subsidiary AIA Insurance repurchase the Series C Preferred Shares. Also, AIA Services' 401(k) Plan still owns its Series C Preferred Shares, on which there was an excess of $1,000,000 in cumulative unpaid dividends as of December 31, 2011, according to AIA Services' financial statements.

50.     Since repurchasing Reed Taylor's common shares in 1995 through the present time, AIA Services has repurchased over $650,000 in other common shares directly from shareholders or from the ESOP Plan. I have not seen any documents to establish that these redemptions were made in accordance with Idaho Code or the amended articles of incorporation and it appears that the purchases were not in compliance with Idaho Code or

DECLARATION OF RICHARD T. McDERMOTT - 15

**Exhibit - 3, p. 15**

**14-ER-3351**

the amended articles of incorporation.

51.     There are numerous emails by or sent to Beck, Cashman and John relative to CropUSA Insurance Agency, Inc. and AIA Services/AIA Insurance, which show that Beck and Cashman were involved in approving transactions at those companies and are affiliates with John in the majority control group. For example, on February 16, 2005, Beck wrote an email to John and Cashman:

> Mike [Cashman] and I are so convinced that Crop USA is a winner that anything standing in the way of a good result will be a crime…

52.     John, Beck and Cashman's operation of CropUSA Insurance Agency, Inc. as a business competing against AIA Services in the insurance business violated the non-compete restrictions in John's Executive Officer's Agreement, and Beck and Cashman were aware of this agreement and its terms and conditions. That agreement also required John to spend all of his time and efforts for AIA Services, but he failed to do so, again with the knowledge of Beck and Cashman who were fully aware of the agreement's terms.

53.     On December 16, 2005, John and Connie were divorced through an interlocutory divorce decree, however, their shares in AIA Services, CropUSA Insurance Agency Inc., and Pacific Empire Radio Corporation were not divided in that decree.

54.     In 2008, Beck, John and Cashman caused AIA Insurance to guarantee a $15,000,000 loan to CropUSA Insurance Agency, Inc., which was a violation of AIA Services' amended articles of incorporation (which were adopted to protect Donna's investment in the Series A Preferred Shares). CropUSA Insurance Agency, Inc. ultimately sold a block of insurance business for $10,000,000 to pay off that loan and John recently testified (according to Mr. Bond) at his recent deposition that 70% of that block of business could be traced directly to AIA Insurance's agents. In other words, AIA Services/AIA

DECLARATION OF RICHARD T. McDERMOTT - 16

Exhibit - 3, p. 16

Insurance should have received at least $7,000,000 of those insurance sale proceeds. Instead, the funds were diverted to benefit CropUSA Insurance Agency, Inc. in which AIA Services had no ownership interest.

55. After Reed Taylor filed suit against AIA Services in 2007, his attorney received an email from James Gatziolis, an attorney for AIA Services and CropUSA Insurance Agency, Inc., which stated that CropUSA Insurance Agency, Inc.'s advisory board unofficially directed the activities at AIA Services. Beck, Cashman and John were long-time members of that advisory board.

56. On June 17, 2009, Judge Brudie ruled that the redemption of Reed Taylor's shares was illegal and thus further held that the agreements with Reed Taylor and AIA Services were illegal and unenforceable. Because the Series A Preferred Shareholder Agreement was between Donna, Reed Taylor and AIA Services, that agreement is illegal as to those three parties because it is tainted with the illegality from Reed Taylor's redemption.

57. At the recent deposition of Paul Pederson based upon what Mr. Bond advised me, it appears that AIA Services and the Individual Defendants may argue that the over $1.4 million in loans made by AIA Services to Pacific Empire Radio Corp. were appropriate. On August 23, 2010, AmericanWest Bank filed suit against John, Pacific Empire Radio Corp. and other defendants for the non-payment of principal and accrued interest owed under the terms of a promissory note and certain guarantees in the amount of $5,592,223.19, plus accrued interest of $150,426.87 as of July 26, 2010. It is difficult to image a valid reason for AIA Services making loans to a defaulting entity the financial obligations of which had been guaranteed by John, while at the same time AIA Services

DECLARATION OF RICHARD T. McDERMOTT - 17

**Exhibit - 3, p. 17**

**14-ER-3353**

was in breach of its obligations to Donna.

58.     Despite repeated requests in discovery and through formal written requests, AIA Services has refused to provide copies of any shareholder meeting minutes, board resolutions or board meeting minutes since those produced by Hawley Troxell to Donna's counsel in *Reed Taylor v. AIA Services, et al.* I have seen no board meeting minutes, board resolutions, shareholder meeting minutes or shareholder resolutions since that time.

59.     On April 30, 2007, John appointed Connie and Beck to the board of directors of AIA Services and AIA Insurance. At that meeting, Beck, Connie and John agreed that Connie and Beck would be paid $5,000 per quarter to serve on AIA Services' board. Connie and Beck purportedly served on the board of directors of AIA Services until September 2014 (Mr. Bond advised me that John testified at his recent deposition that Beck and Connie resigned from the board in September 2014 and thus I am assuming this is correct).

60.     On December 28, 2009, Donna exercised her right under the amended articles of incorporation and voted her Series A Preferred Shares to appoint Patrick M. Moran to the board of directors of AIA Services. However, AIA Services and the Individual Defendants refused to allow Mr. Moran to be a board member and he never was allowed to participate in any board meeting.

61.     On August 11, 2010, Donna and Dale Miesen filed a derivative complaint on behalf of AIA Services and AIA Insurance against John, Beck, Cashman and other defendants in the United States District Court in Idaho. That lawsuit lists a number of claims pertaining to transactions and other matters that occurred at AIA Services and AIA Insurance. Since Cashman, John and Beck are all named defendants in derivative action,

DECLARATION OF RICHARD T. McDERMOTT - 18

**Exhibit - 3, p. 18**

**14-ER-3354**

they cannot reasonably take the position that they had no knowledge of any of the transactions and, in fact, they were the direct or indirect recipients of the benefit of the transactions by way of their ownership in CropUSA Insurance Agency, Inc.

62. There have been no AIA Services stock ledgers produced since 2007 (those ledgers were again produced in *Reed Taylor v. AIA Services, et al.* Nevertheless, the 2007 ledgers confirm that Beck (through is wife Corrine) and Cashman owned 101,090 and 202,179 common shares in AIA Services, respectively. AIA Services' 1999/2000 stock ledgers show no common shares being held by them, but the 2000/2001 stock ledgers show the common shares indicated above as being owned by them.

63. On November 11, 2011, AIA Services and AIA Insurance guaranteed a $5,000,000 loan to CropUSA Insurance Agency, Inc. and CropUSA Insurance Services LLC in favor of Gemcap Lending I, LLC. John, Beck, and Connie all signed a board resolution authorizing the guarantees (the board resolution has never been produced by the defendants and was obtained from a declaration filed by a representative from Gemcap Lending I, LLC). These guarantees violated AIA Services' amended articles of incorporation. The loan was subsequently modified to $10,000,000 and AIA Services and AIA Insurance guaranteed that $10,000,000 loan, which again, violated AIA Services' amended articles of incorporation.

64. On or about April 2012, John apparently repurchased the common shares held by Beck, Cashman and their friends (Beck had previously testified at his deposition in *Reed Taylor v. AIA Services, et al.* that he served on the board of AIA Services to look after his interests in CropUSA Insurance Agency, Inc. and those of his friends). I am assuming that Beck continued to serve on the board to look after his interests and those of

DECLARATION OF RICHARD T. McDERMOTT - 19

**Exhibit - 3, p. 19**

**14-ER-3355**

his friends because he remained on AIA Services' board of directors until recently resigning in September 2014 (I am assuming that this is when he resigned in September 2014 as Mr. Bond advised me that he discovered this at John's recent deposition).

65.     On July 15, 2012, Donna again exercised her right under the amended articles of incorporation and voted her Series A Preferred Shares to appoint Paul D. Durant to the board of directors of AIA Services. Mr. Durant was a former Vice-President of AIA Services and the former President of the The Universe (AIA Services' former underwriting subsidiary). However, AIA Services and the Individual Defendants have again refused to allow Mr. Durant to be a board member and he has never been allowed to participate in any board meeting.

66.     On July 15, 2012, Paul Durant, Donna and numerous other shareholder demanded that AIA Services take action and properly conduct its business. (*See* Exhibit A to the Declaration of Paul D. Durant dated May 21, 2015). The Individual Defendants did nothing in response to these demands. On that same day, AIA Services held its first annual shareholder meeting in nearly 10 years in an attempt to effectuate a purported reverse stock split. That reverse stock split failed, it was improper and Judge Kerrick dismissed the lawsuit that AIA Services had filed against the innocent minority shareholders who opposed the lawsuit.

67.     On March 26, 2014, Paul Durant, Donna and other shareholders demanded that they be permitted to inspect records in accordance with Idaho Code (including meeting minutes) and that AIA Service prepare statutory financial statements in accordance with Idaho Code. However, AIA Services and the Individual Defendants refused to do so and no information was provided (these requests were separate and distinct from the issues in

DECLARATION OF RICHARD T. McDERMOTT - 20

**Exhibit - 3, p. 20**

these lawsuits).

68.     I have seen stock ledgers indicating that John and Connie were shareholders of Pacific Empire Radio Corp. At John's recent deposition, Mr. Bond advised me that Connie had a community interest in shares of Pacific Empire Radio Corp. I am assuming that she is still a shareholder of Pacific Empire Radio Corp., although it would be irrelevant if she was during any of the loans in question.

69.     AIA Services' 2011/2012 financial statements show that it had made numerous loans to Pacific Empire Radio Corp., an entity partial owned by John and Connie, and AIA Services was thus owed $1,469,880 in 2012 and $754,987 in 2011. These loans were highly improper in light of the fact that Donna had not been paid and there is no way the loans would have been made on the same terms by someone other than one or more of the Individual Defendants, particularly when Pacific Empire Radio Corp. was being sued by AmericanWest Bank for over $5.5 million in 2010 and 2011 and that lawsuit was ultimately resolved for approximately 50 cents on the dollar, which demonstrates a clear indication that Pacific Empire Radio Corp. was not a credit worthy debtor.

70.     In September 2014, AIA Services and AIA Insurance consented to the entry of a judgment against them for over $12,000,000 for the loan to CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC that they guaranteed in favor of Gemcap Lending I, LLC. Those guarantees also violated AIA Services' amended articles of incorporation and even Mr. Siddoway acknowledged in one of his filings that if the guarantee resulted in a judgment it would violate those provisions in the amended articles of incorporation.

DECLARATION OF RICHARD T. McDERMOTT - 21

**Exhibit - 3, p. 21**

**14-ER-3357**

71. According to John's recent deposition testimony (as confirmed by Mr. Bond to me), he testified that AIA Services transferred its ownership interest in the mortgage held on the Lewis/Clark Plaza Building that AIA Services had valued at over $1,000,000.

72. At the present time, John is the sole board of director for AIA Services (according to Mr. Bond as was disclosed at John's recent deposition). John has served on the board of directors of AIA Services from 1995 through the present.

73. John and Connie have both been attorneys licensed to practice in law from before 1995 through the present time. John has also been a member of the board of directors of the publicly traded Avista, so he is well-versed on the procedures necessary for proper corporate governance.

**Opinions**

74. Based upon my knowledge, education and/or experience, together with the authorities and information I have reviewed, assumed and disclosed above, I render the following opinions:

75. Although Connie and Beck are not formally listed as common shareholders on AIA Services' stock ledgers (Corrine Beck and John are listed as common shareholders), Connie and Beck have been beneficial shareholders of AIA Services during the period of times in which their respective present or former spouses held common shares in AIA Services. There is no merit to Connie's contention that she is not a shareholder of AIA Services.

76. From August 15, 1995 through April 2012, Beck and Cashman have either been common shareholders or Series C Preferred Shareholders of AIA Services. From August 17, 1995 through the present time, John has been the majority common shareholder

DECLARATION OF RICHARD T. McDERMOTT - 22

**Exhibit - 3, p. 22**

**14-ER-3358**

of AIA Services and Connie has held a community interest in those shares and she actively asserted her community property interest in the common shares held by John. As a group, John, Beck, Cashman and Connie have thus been the majority controlling shareholders in AIA Services from August 17, 1995 through April 2012 and the Individual Defendants have exerted their collective majority control of AIA Services for their self-interest and to the detriment of Donna, as more fully discussed herein.

77.     From April 2012 through the present time, John and Connie have been the majority controlling shareholders of AIA Services. John and Connie have exerted their collective majority control over AIA Services for their self-interests and to the detriment of Donna, as more fully discussed herein.

78.     As the collective majority controlling shareholder group from 1995 through 2012 (and thereafter for Connie and John), the Individual Defendants owed Donna, a preferred shareholder with payment priority over all other shareholders, fiduciary duties, including, without limitation, duties of due care, loyalty, good faith and fair dealing. The Individual Defendants breached those fiduciary duties owed to Donna by placing their own self-interests in other entities (including CropUSA Insurance Agency, Inc. and Pacific Empire Radio Corp.) over the interests of Donna. The acts and omissions of the Individual Defendants resulted in Donna not being paid as required and rendered AIA Services without the funds to do so.

79.     There has been an active effort by the Individual Defendants to conceal and/or participate in the improper and/or unauthorized transactions detailed in this Declaration, which were effectuated through AIA Services and AIA Insurance. I have not seen any documentation showing that full and fair disclosure has been made to Donna or

DECLARATION OF RICHARD T. McDERMOTT - 23

**Exhibit - 3, p. 23**

**14-ER-3359**

any other innocent minority shareholders regarding these improper and/or unauthorized transactions. Each of the Individual Defendants has aided and abetted the rampant misconduct, which has occurred to the detriment of Donna, by assisting one another and by concealing it. I am at a complete loss to understand why AIA Services is not pursuing claims against the Individual Defendants or asserting a third-party complaint or counterclaims against the Individual Defendants to require them to pay the sums owed to Donna for her Series A Preferred Shares. Had AIA Services taken such action (as it easily could), more than sufficient funds could have been available to pay Donna.

80.     From December 2, 2003 (the date that Donna's Series A Preferred Shares were required to be redeemed in full under the terms of the January 11, 1995 letter agreement (as confirmed in future agreement, irrespective of the enforceability of the Series A Preferred Shareholder Agreement) through the present time, the Individual Defendants have intentionally not paid Donna as required on or before December 2, 2003 or anytime thereafter.

81.     AIA Services and the Individual Defendants have intentionally refused to pay Donna as required to fully redeem her Series A Preferred Shares. They simply chose to divert the funds for other purposes, including, without limitation, funding competing businesses (e.g., CropUSA Insurance Agency, Inc.) and loaning over $1.4 million to Pacific Empire Radio Corp. (an entity partial owned by John and Connie). Again, this is flagrant breach of the Individual Defendants fiduciary duties to Donna as a preferred shareholder of AIA Services with payment priority over all other shareholders.

82.     From the early 2000s through the present time, AIA Services has not followed or complied with fundamental corporate governance principles under AIA

DECLARATION OF RICHARD T. McDERMOTT - 24

**Exhibit - 3, p. 24**

**14-ER-3360**

Services' amended articles of incorporation, Restated Bylaws, the Idaho Code or applicable cause law.   From 1995 through the present time, many other corporate governance principles were either ignored or not complied with by AIA Services, including, but not limited to:

a.   AIA Services has not held annual shareholder meetings as required by the Restated Bylaws and I could find only one annual shareholder meeting that occurred in over the last 10 years.

b.   Since AIA Services and the Individual Defendants have never honored Donna's appointments of Patrick Moran and Paul Durant to the board of directors of AIA Services in 2009 and 2012, respectively, all action taken by the board of directors of AIA Services were unauthorized and thus ultra-virus from such dates through the present time.

c.   AIA Services has improperly lent over $1.4 million to Pacific Empire Radio Corp. when that company has a history of financial problems and not meeting its obligations and when John was a guarantor of its debt. During 2010 and 2011 when over $700,000 of the $1.4 million was lent to Pacific Empire Radio Corp., John, Pacific Empire Radio Corp. and other defendants were being sued for over $5.5 million.

d.   CropUSA Insurance Agency, Inc. was transferred without consideration from being a subsidiary of AIA Services into a separate company owed primarily by John, Connie, Beck and Cashman. AIA Services' shareholders never properly authorized the transaction nor were they ever given proper disclosures of it or the subsequent funding thereof.

e.   There are no board meeting minutes or any evidence that the Individual Defendants or AIA Services have complied with any conflicts of interest provisions under the amended articles of incorporation or Restated Bylaws.

f.   AIA Services and its wholly owned subsidiary AIA Insurance guaranteed a $5,000,000 loan from Gemcap Lending I, LLC to CropUSA Insurance Agency, Inc. and CropUSA Insurance Services LLC, which was subsequently amended and increased to a guarantee of a $10,000,000 loan. These guarantees violated AIA Services' amended articles of incorporation and resulted in a judgment being entered against AIA Services and AIA Insurance for over $12,000,000. As a result, AIA Services transferred its over $1,000,000 mortgage for the Lewis/Clark Plaza to Gemcap Lending I, LLC.

DECLARATION OF RICHARD T. McDERMOTT - 25

**Exhibit - 3, p. 25**

g. The purported repurchase over Series C Preferred Shares from CropUSA Insurance Agency, Inc. of more than $1.5 million violated the AIA Services' amended articles of incorporation. Those funds should have been recovered and now available to pay Donna.

h. The repurchase of over $650,000 in common shares from other AIA Services' shareholders was in violation of AIA Services' amended articles of incorporation and there are no corporate records that demonstrate the appropriate consents or determinations had been obtained or made for those repurchases and Donna did not consent to them.

i. The Individual Defendants have failed to have AIA Services maintain its Consolidated Net Worth to be equal to or above the number of outstanding Series A Preferred Shares held by Donna multiplied by $10 per share in violation of AIA Services' amended articles of incorporation.

j. Donna Taylor did not consent to any of the above transactions or acts, which constitute additional violations of AIA Services' amended articles of incorporation.

83.    Beck and Cashman never guaranteed a $1,000,000 loan for AIA Services as required under the terms of the Investment Agreement. If AIA Services required them to guarantee the loan now, $1,000,000 could be available to pay Donna.

84.    AIA Services has been the instrumentality and alter-ego of Beck, Cashman, John and Connie. By their conduct as described above, they have forfeited the corporate law privilege of limited liability. This is classic case for disregarding the separate corporate existence of AIA Services and imposing liability on the Individual Defendants in order to prevent injustice or inequitable conduct which has resulted in AIA Services present monetary inability to fully redeem Donna's Series A Preferred Shares, plus all accrued interest. Each of them should be liable for the obligations of AIA Services, including those to Donna. The cumulative impact of the transactions noted in this Declaration has resulted in AIA Services' present financial condition and lack of funds to pay Donna for the

DECLARATION OF RICHARD T. McDERMOTT - 26

**Exhibit - 3, p. 26**

**14-ER-3362**

redemption of her Series A Preferred Shares.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF IDAHO THAT THE FOREGOING IS TRUE AND CORRECT.

_5/22/15 at New York, NY_
DATE AND PLACE

RICHARD T. McDERMOTT

## CERTIFICATE OF SERVICE

I, Roderick C. Bond, declare that, on the date indicated below, I served a true and correct copy of the forgoing on the following persons via the methods indicated below:

Douglas J. Siddoway
Randall Danskin
1500 Bank of America Financial Center
601 West Riverside Avenue
Spokane, WA  99201-0626

**Via:**
( ) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(**X**) Email

Shawnee Perdue
Arkoosh Perdue
802 W. Bannock, Suite 204
Boise, ID 83701

**Via:**
( ) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(**X**) Email

Signed this 22nd day of May, 2015, at Lewiston, Idaho

Roderick C. Bond

DECLARATION OF RICHARD T. McDERMOTT - 27

**Exhibit - 3, p. 27**

**14-ER-3363**

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for the Plaintiff Dale L. Miesen

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.; <br><br> Plaintiff, <br><br> **v.** <br><br> HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; and GEMCAP LENDING I, LLC, a Delaware limited liability company; <br><br> Defendants. | Case No. 1:10-cv-00404-DCN-CWD <br><br> DECLARATION OF RODERICK C. BOND |

DECLARATION OF RODERICK C. BOND - i

14-ER-3364

CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; R. JOHN TAYLOR, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual,

       Defendants/Third-Party Plaintiffs,

     **v.**

REED TAYLOR, an individual,

       Third-Party Defendant.

REED TAYLOR, an individual,

       Third-Party Defendant/ Counterclaimant,

     **v.**

CONNIE TAYLOR HENDERSON, an individual; R. JOHN TAYLOR, an individual; JAMES BECK, an individual, and UNKNOWN BONDING COMPANY, an unknown entity that issued the unknown fidelity ERISA Bond,

       Counterdefendants.

DECLARATION OF RODERICK C. BOND - ii

**14-ER-3365**

I, Roderick C. Bond, declare:

1.      I am an attorney for the Plaintiff Dale L. Miesen in this lawsuit. I am a citizen of the United States, over the age of eighteen, and competent to testify in court, including as to matters in this Declaration. This Declaration is based upon my personal knowledge.

2.      Attached as ***Exhibit A*** are true and correct copies of pertinent pages of Professor McDermott's deposition taken on November 5-6, 2020. Attached as ***Exhibit B*** are true and correct copies of pertinent pages of Professor McDermott's deposition taken on November 20, 2020. I am submitting the transcripts in Exhibits A-B in part for purposes of objecting to their admission and in part to address arguments raised by the Hawley Troxell Defendants to the extent this Court finds the transcripts admissible.

3.      Before I address matters raised by the Hawley Troxell Defendants in their motions to exclude Professor McDermott, I will address part of the improper conduct that occurred at Professor McDermott's three-day deposition. Mr. Miesen voluntarily agreed to move the deposition of Professor McDermott until November 5-6, 2020 to provide the defendants additional time to prepare for the deposition. Near the end of the second day of Professor McDermott's deposition taken on November 5-6, 2020, it was clear to everyone that there would not be sufficient time to complete his deposition, including by allowing me sufficient time to cross-examine him (which I needed to do to clarify the record and his testimony regarding numerous matters). As a result, Mr. Miesen agreed to voluntary provide the defendants with an undisclosed amount additional time to depose Professor McDermott. (*See* Exhibit A, p. 574-75.) The parties agreed that I would question Professor McDermott after the defense could had completed their questions, as was stated on the record. (*See* Exhibit A, p. 575:5-8.) While not in the transcript, I also confirmed to defense counsel that I would not discuss with Professor McDermott any questions

DECLARATION OF RODERICK C. BOND - 1

that I might ask him. In the end, over the course of Professor McDermott's two-day deposition, I was not provided with any time to cross-examine him and counsel for the defendants never offered me any cross-examination time during either day.

4.      Having not heard back from defense counsel on scheduling Professor McDermott's continued deposition, on November 10, 2020, I emailed opposing counsel inquiring on scheduling the deposition and agreeing on an amount of time. A true and correct copy of that email is attached as *Exhibit C*. At that time, I advised the parties that estimated that I would need between an hour and one and one-half hours to cross-examine Professor McDermott. On November 11, 2020, Mr. Glynn emailed me back requesting the deposition be scheduled for November 20, 2020. In that email, Mr. Glynn stated that he needed between two and three hours of deposition time, that the Hawley Troxell Defendants needed approximately two hours and that GemCap (like the rest of defense counsel) would reserve time for any follow-up questions to my questions. A true and correct copy of that email is attached as *Exhibit D*. Based on the representations of defense counsel that they needed a total of not more than five hours, we agreed to the request because the time requested would leave approximately two hours for me to cross-examine Professor McDermott (based on the request for five more hours, the number of questions that I had prepared, and the number of exhibits that I wanted to mark, I increased to two hours my estimated required cross-examine time). On that same day and based on Mr. Glynn's representations, I emailed counsel back confirming that their proposal was acceptable. A true and correct copy of that email is attached as *Exhibit E*.

5.      While no subpoena or notice of deposition was ever prepared and served by any of the defense counsel nor was a stipulation entered into to extend expert discovery, the deposition took place on November 20, 2020 as requested, which was also 20 days after the deadline required

DECLARATION OF RODERICK C. BOND - 2

to conduct expert discovery. After approximately 5¾ hours of actual deposition time and excluding time for breaks and lunch (the defense counsel used more time than the four to five hours previously represented, *see* Exhibit D), Mr. Keller had still not finished his questioning of Professor McDermott. As a result, on the break, I inquired with Professor McDermott on a break whether he would agree to be deposed for more than 7 hours so that there would be sufficient time for the questioning to be completed (including my cross-examination of him). Professor McDermott stated that he could not sit for more than seven hours of deposition time that day (it was already 7:00 pm New York time). At that time, it was clear that there would not be sufficient time for Mr. Keller to complete his questioning. In addition, it was clear to me that I would not have sufficient time to conduct my estimated two hours of cross-examination of Professor McDermott (even if I started immediately because Professor McDermott would not agree to sit for more than 7 hours since it was already 7:00 pm New York time).

6.　　　　After having discussions off the record, I stated on the record that the parties had insufficient time to complete the deposition, Mr. Keller was not finished questioning Professor McDermott, and that I needed approximately two hours of cross-examination time. (*See* Exhibit B, p. 807-811.) While Mr. Keller then offered to stop questioning Professor McDermott in order to allow me to have any remaining time to start my cross-examination, Mr. Keller refused to confirm that he was finished questioning Professor McDermott. At that time, I had over twenty pages of hand-written notes with questions and fifteen pages of typed questions and clarifications that I wanted to cross-examine Professor McDermott about and at least 23 documents that I wanted to mark as exhibits for his cross-examination. Most of my notes and questions were merely areas of questioning or "starter" questions. I was also not willing to go out of order in my questioning and allow Mr. Keller to ask additional questions beyond the scope of my cross-examination (he

DECLARATION OF RODERICK C. BOND - 3

would not confirm that he would not ask additional questions). *Id*. Because there was no way that I could complete my cross-examination and the defendants had already exceeded their agreed time by 50 minutes, I advised defense counsel that we needed to schedule one last day for them to complete questioning and to provide me with sufficient time to cross-examine Professor McDermott after they have completed their questions. At that time when I terminated the deposition, defense counsel objected, but none of defense counsel stated off or on the record that they would take the position that Professor McDermott's deposition was over and that I could either take the one hour of time remaining or lose my right to cross-examine Professor McDermott. In addition, none of defense counsel stated on or off the record that they would oppose completing Professor McDermott's deposition on another day. Again, had defense counsel stated on or off the record that their position would be that Professor McDermott's deposition was over and that they would oppose or not agree to additional time for me to complete my cross-examination, I would have taken and used the limited time available to cross-examine Professor McDermott as long as possible. In addition, even if I had used the remaining hour, I would not have been able to complete my cross-examination of Professor McDermott, let alone fully and fairly cross-examine him.

7. Having once again not heard back from the defense counsel regarding scheduling Professor McDermott's deposition (like the last time), on November 11, 2020, I emailed defense counsel to inquiry about scheduling the final day of Professor McDermott's deposition. A true and correct copy of that email is attached as ***Exhibit F***. Attached as ***Exhibit G*** is a true and correct copy of Mr. Adams' response email dated November 30, 2020. Attached as ***Exhibit H*** is a true and correct copy of Mr. Keller's response email dated November 30, 2020. Attached as ***Exhibit I*** is a true and correct copy of Mr. Glynn's response email dated November 30, 2020. As stated in the prior paragraph, this was the first time that defense counsel took the position that Professor

DECLARATION OF RODERICK C. BOND - 4

McDermott's deposition was over and that they would not agree to allow me to have any further time to cross-examine Professor McDermott. While Mr. Keller stated that he thought his position was "apparent from how the deposition ended" (*see* Exhibit H), at the deposition, he never stated that his position or the position of his clients was that the deposition was over and that I would not be provided with any time to cross-examine Professor McDermott.  Consequently, on that same day, I emailed defense counsel and advised them, among other things, that Mr. Miesen's position was that Professor McDermott's deposition transcript was inadmissible because we were never provided with an opportunity to cross-examine him. Attached as ***Exhibit J*** is a true and correct copy of that email. I never received any further emails or communications from defense counsel in response to my email in Exhibit J, and they never offered to allow me to cross-examine Professor McDermott. Unfortunately, this is one of many examples of the unfair and unprofessional treatment by defense counsel that we have endured in this lawsuit. (*See* Exhibit J, p. 1.)

**8.**     The refusal to allow me a full and fair opportunity to cross-examine Professor McDermott has prejudiced Mr. Miesen because I was unable to ask Professor McDermott many questions to make the record clear regarding: (a) his compensation and how his payments were not conditioned on success or the outcome, (b) his qualifications and experience, (c) how he prepared his report, (d) the reasons he reviewed certain motions were for information he needed for his work or if Miesen was citing or quoting him to ensure the citation was acceptable to him, (e) that he was not an advocate or partisan for Miesen or involved in determining the claims, defenses, strategy or other matters relative to this lawsuit other than those matters to which he was offering opinion, (f) to address matters relative to the underlying cases that the Hawley Troxell Defendants represented the AIA Corporations,(g) the preparation of his opinions and the breaches of standard of care, and (h) to address a number of other matters (including issues raised by the Hawley Troxell Defendants

DECLARATION OF RODERICK C. BOND - 5

in their motions to exclude Professor McDermott), including by marking at least 23 documents as exhibits and asking him questions on those exhibits (I had not discussed with Professor McDermott any of my questions or the exhibits that I would mark). As I indicated in Exhibit J, there is no doubt in my mind that defense counsel "strategically" refused to allow me time to cross-examine Professor McDermott to deprive me of Mr. Miesen's right to obtain testimony (including clarification) regarding the very issues being raised by the Hawley Troxell Defendants in their motions to exclude Professor McDermott. They never took the position that that the deposition was closed and that they would not allow me to cross-examine Professor McDermott. Having not received a response to my email regarding the admissibility of his transcripts, I took no further action because no one objected or disputed that position as stated in Exhibit J. Finally, I can confirm that the questions that I would have asked would have included, among other questions, specific questions regarding the matters raised in the Hawley Troxell Defendants' two motions to exclude Professor McDermott. I could see where they were going with their questions, although Professor McDermott clearly did not understand (as it is difficult for most deponents).

9.      I have never retained an expert witness in any case to provide testimony on a contingent fee basis, nor would I do so. Using the cases as they are identified in Professor McDermott's report and without waiving any privilege or work product protections (including under applicable state rules), my firm previously retained Professor McDermott to serve as an expert in *Reed Taylor v. Riley* (a legal malpractice case), *Reed Taylor v. Bell* (a legal malpractice case) and *Donna Taylor v. Taylor* (a corporate malfeasance and failure to pay a preferred shareholder case). In all three of those cases, Professor McDermott was paid hourly and he was not paid contingent fee or any other inducement for his testimony. In all three of those cases, Professor McDermott substantially reduced the number of hours billed to reflect what he believed

DECLARATION OF RODERICK C. BOND - 6

**14-ER-3371**

was a reasonable fee for his services and he was timely paid in full, irrespective of the outcome of the lawsuits (*Donna Taylor v. Taylor* is pending, and Professor McDermott is still one of the experts for Ms. Taylor). In *Reed Taylor v. Riley* (the first case that my firm retained Professor McDermott as an expert), he initially required retainers as would be expected from a lawyer or any other expert with whom my firm had not conducted business with. However, over time, he did not require any further retainers because I ensured that he was timely and fully paid when requested. In fact, Professor McDermott preferred to wait and send bills when he deemed it appropriate. I had no issue with this practice because he was always fair and reasonable in the amount charged and he kept me informed as to estimates of the amount owed. In all three lawsuits, he has been paid in full based on his hourly rates (the parties agreed to stay *Donna Taylor v. Taylor* until this lawsuit was concluded). In all three lawsuits, he has been paid in full for all statements, which were billed by his hourly rate. Because those three lawsuits involved some of the same or similar facts and issues at issue in this lawsuit (this is the first common shareholder lawsuit involving the malfeasance),[1] one could presume that it would be logical and most efficient to seek to retain Professor McDermott as an expert witness in this lawsuit because he had learned so much information and reviewed thousands of pages of documents involving the AIA Corporations. Mr. Miesen authorized me to retain Professor McDermott as an expert for this lawsuit and he agreed

---

[1] *Reed Taylor v. Bell* was a legal malpractice cases that both involved the "case within the case" and defenses of "collectability." In other words, in addition to testimony regarding legal malpractice, Professor McDermott was providing expert testimony as to some of the same type of conduct at issue here because Reed Taylor might have had to prove that the claims in his underlying lawsuit would have been successful and collectible (e.g., present the claims in his Fifth Amended Complaint in *Reed Taylor v. AIA Services* to the jury and present evidence that the lost judgment would have been collectable). In addition, *Reed Taylor v. Bell* also involved violations of the Rules of Professional Conduct and traditional legal malpractice claims. *Donna Taylor v. Taylor* involved primarily corporate malfeasance (some of the same conduct at issue in this lawsuit). In addition, *Reed Taylor v. Bell* was amicably resolved through a confidential settlement agreement, which is why those claims never went to trial. Thus, contrary to paragraph 7 of Loren Ipsen's declaration (Dkt. 1070), those three lawsuits were not simply "opinion letter practice" cases and, in fact, *Donna Taylor v. Taylor* did not even involve any opinion letters. Mr. Ipsen was one of the defense attorneys in *Reed Taylor v. Riley* until Mr. Riley was dismissed. The collectability defense was raised by Eberle Berlin and the Turnbow Estate after Mr. Riley was dismissed on res judicata grounds by the Idaho Supreme Court.

DECLARATION OF RODERICK C. BOND - 7

**14-ER-3372**

to do so.

10. My firm is solely responsible for paying Professor McDermott. He is paid $350 per hour for the work on his report, $400 for trial testimony and reimbursement of all out-of-pocket travel expenses, which is consistent with the disclosure in his report. In addition, Professor McDermott and my firm agreed that he would send his final statement for work performed on his report prior to trial and that he would be paid in full prior to trial, which is again consistent with his disclosure in his report. Professor McDermott and my firm agreed he could request payments from time to time, which would be deemed to be earned when paid, and that those payments would be credited to the final bill he provided to my firm prior to trial. My firm has timely and fully paid Professor McDermott for his requested payments. If my firm had overpaid him, he would refund the amount that was overpaid. If a balance were due, the balance would be paid in full prior to the time of trial.  These terms were agreed to orally. To date, my firm has paid Professor McDermott $119,775 in progress payments. Because he had not sent a formal statement, I prepared a ledger showing the dates and amounts paid to Professor McDermott to provide to defense counsel prior to his deposition so that they had the information as to how much had been directly paid to him (my firm had also paid for certain travel expenses for Professor McDermott, which are not included in the ledger). Attached as *__Exhibit K__* is a true and correct copy of the ledger showing those progress payments, which was provided to defense counsel and was used to question Professor McDermott at his deposition. The progress payments made in Exhibit K were either the result of Professor McDermott requesting them or me calling him and asking to send him some money because I was aware of the significant time that he had incurred in working on his report and related work (including document review, declaration preparation, etc.). Since Exhibit K was produced, Professor McDermott requested another $5,000 progress payment, which was promptly paid.

DECLARATION OF RODERICK C. BOND - 8

Thus, to date, the total amount of the progress payments is $119,775.  There have never been any agreements or inducements offered to Professor McDermott to influence any of his opinions or his report.

11.     Consistent with his testimony, Professor McDermott had informed me that he estimated the net amount owed would be approximately $119,000 more, subject to revision for additional work. I presume that estimate would change after his minor future supplements. Based on my experience and knowledge of Professor McDermott's computer inefficiencies and his work on the case, $235,000 is not an unreasonable fee. However, if he would have charged $700,000 as the Hawley Troxell Defendants allege should have been paid, that fee would have been unreasonable, and I would never have agreed to retain Professor McDermott had he indicated that he would charge $700,000. In fact, the Hawley Troxell Defendants have paid their primary legal malpractice expert, Mr. Remele, was paid $182,169.54 ($13,860 of which is allegedly unbilled), as reflected in the attached ***Exhibit L***, which was provided to me by Mr. Ipsen on February 16, 2021. Exhibit L also reflects that the Hawley Troxell Defendants paid their legal opinion expert $29,012. After Professor McDermott provides his final statement before trial, my firm will pay the balance in full prior to trial as required and per the agreed terms. While I have learned to never predict the future and while I maintain that this lawsuit has been a huge financial burden on my firm, I have no reason to believe that my firm will not pay Professor McDermott in full prior to trial and, if necessary, I will contribute personal funds to my law firm to ensure that he is paid in full. We both had an understanding that the balance needed to be paid prior to trial to ensure that there were no issues at trial.  My firm's ability to pay Professor McDermott is not contingent upon the outcome of this lawsuit. My firm will be required to pay him irrespective of the results at trial. In addition, win or lose, Mr. Miesen remains liable to me for the fees and costs that I have paid

DECLARATION OF RODERICK C. BOND - 9

and will pay to Professor McDermott, and the other costs incurred in this lawsuit which Mr. Miesen is responsible to reimburse my firm (notwithstanding the fact that my firm agreed to advance certain costs in this lawsuit knowing that it may be difficult or impossible to recover any payments from Mr. Miesen if this lawsuit is not successful). Even if my firm did not have sufficient cash on hand to pay Professor McDermott the sums owed, I have personal funds and credit that I could use if necessary. Lastly, as I have previously stated, we have been searching and interviewing attorneys to be co-counsel for Mr. Miesen at trial. Without waiving any privilege or work product, I can represent that, while negotiations and interviewing remaining ongoing, we have already had offers from prospective attorneys to be co-counsel, which included the offer to reimburse my firm for half of the costs paid for this lawsuit and to pay one-half of future costs. In other words, in the worst-case scenario (i.e., if something happened to me or my firm was unable to pay for some reason), Professor McDermott would be paid prior to trial. I would not risk any impact to Mr. Miesen's case by allowing any issues relating to Professor McDermott not being paid in full to be an issue for the jury.

12.     To date, contrary to the Hawley Troxell Defendants' allegations, my firm has now advanced or paid over $350,000 in costs and expenses for this lawsuit (excluding the net amount that will be paid to Professor McDermott when he sends his statement). Other than two recent invoices which will be paid in the ordinary course of business, my firm has paid all outstanding invoices and costs for this lawsuit other than Professor McDermott's unbilled work and the $26,066.14 balance that Miesen owes to the discovery master. While my firm was not obligated to do so (my firm did not commit to advancing all of the costs changed by the discovery master), my firm advanced total payments of $20,088.90 of the fees charged to Miesen by the Discovery Master as reflected in the attached _**Exhibit M**_, which is a spreadsheet emailed to Mr. Ipsen's firm

DECLARATION OF RODERICK C. BOND - 10

by the Discovery Master's office (which I was carbon copied on) on January 29, 2021.[2] Contrary to the Hawley Troxell Defendants' allegations, Mr. Miesen did not depose their expert witnesses because my firm was unwilling to advance those costs (my firm was willing to advance the court reporter costs). I have never represented that my firm had unlimited resources or that my firm had agreed to advance all possible costs. We accurately represented to the court that the Hawley Troxell Defendants should bear the costs of paying their three expert witnesses because Mr. Miesen did not have the funds to pay them. Significantly, however, the Hawley Troxell Defendants previously and successfully took the position that Mr. Miesen should be required to pay their expert witnesses to depose them because my firm had the resources to pay their expert witnesses and, in the present motion, they are taking the inconsistent position that my firm did not have the funds to pay them (which was untrue). In fact, the Hawley Troxell Defendants' counsel never bothered to inquire with me whether my firm had the funds to pay for their expert witness depositions or whether Professor McDermott was being paid as a contingent fee expert witness.

13.     As with the Hawley Troxell Defendants' motion to exclude Professor McDermott based on an alleged contingent fee agreement and my firm allegedly had no ability to pay him (I would have advised them that he was not contingent fee and my firm had the ability to pay or would ensure that he was paid), counsel for the Hawley Troxell Defendants never contacted me to inquire about any of their objections to the statements or opinions contained in Professor McDermott's report. The first time that I heard of them having any issues with Professor McDermott's report or opinions was when they filed their motions to exclude. I would have gladly

---

[2] Based on the significant expenses and costs advanced and the present economic conditions, my firm could simply not continue advancing more costs to pay the discovery master for Miesen, especially in light of the anticipated expenses and costs necessary to see this case through trial. In addition, my firm has never assumed liability to pay the discovery master. Notably, we vehemently opposed the appointment of a discovery master because Miesen did not have the funds to pay, yet Miesen got hit with the majority of the fees charged by the discovery master, as reflected in Exhibit M.

DECLARATION OF RODERICK C. BOND - 11

discussed the items of concern and, where appropriate, I would have taken any issues up with Professor McDermott for his consideration to determine what, if anything, he was willing to revise in his report. Had they contacted me, I would have also readily advised them that Professor McDermott was not acting in any capacity as an attorney or advocate for Mr. Miesen, other than in the capacity of an expert witness, and that he has actually provided opinions that were not in the Miesen's because he was "calling balls and strikes." For example, he has opined that the tolling agreements were not proper and enforceable even though it was clear from Miesen's Third Amended Complaint and our conversations that Miesen would be seeking to enforce the tolling agreements. I will now address some of the unsupported, false and/or misconstrued arguments.

14.     Professor McDermott never acted as an advocate, consultant, counsel or attorney in this lawsuit or any other lawsuit that he has acted as an expert for Mr. Miesen or any of my other past or present clients. He has been only an expert witness. Any declarations that he has prepared and submitted in this matter were for the purpose of Professor McDermott acting in the capacity of an expert witness. His role has been only that of an expert witness and to provide his opinions. For example, even though Professor McDermott was aware that Mr. Miesen would seek to enforce certain standstill and tolling agreements signed by John Taylor and certain other defendants, he rendered opinions that the agreements were not authorized. This is but one example of Professor McDermott rendering the opinions that he prepared and rendered.

15.     Professor McDermott has never assisted in assisting in prosecuting Miesen's claims, preparing pleadings, developing pleadings, discovery requests or motions, arguments to the court, nor did he have any involvement in discovery other than requesting information that he believed that he needed for his report and opinions. I never shared any of my work product for depositions or other case preparation matters with Professor McDermott. He was not involved in

DECLARATION OF RODERICK C. BOND - 12

preparing deposition outlines, selecting the deposition exhibits and I never shared any of my extensive deposition outlines with him. He attended some depositions for the purpose of obtaining information for his report and opinions. On a few occasions, he provided me with questions for information that he wanted to know at a deposition, which I have had most competent expert witnesses also do. However, Professor McDermott is very conscientious about his work. On a few occasions, I have sent to him a filing (either before or after it was filed) to ensure that I had cited or quoted to his declaration or testimony properly and accurately. However, he was not involved in the motions or providing any legal research for the motions. In addition, Professor McDermott either typed or dictated to me type through many phone calls and personal meetings the content of his report.

16.     Contrary to the Hawley Troxell Defendants' motion (Dkt. 1068-1 at 20-21 n.9), I have not been on a "crusade." It appears that they are borrowing from John Taylor's prior allegation that me and my clients were on a "jihad."  Over the years, I have represented over ten shareholders from AIA Services in various lawsuits. If I am guilty of anything, it is representing my clients' interests over the years. The Hawley Troxell Defendants, like John Taylor, disregard the facts of this case, the ongoing malfeasance, and the utter and complete lack of proper corporate governance. While it is true that Mr. Riley was able to avoid liability in *Reed Taylor v. Riley* because the Idaho Supreme Court ruled that res judicata barred his claims. I would note that Judge Greenwood accurately stated what had occurred in his order denying Mr. Riley's motion for summary judgment, which is attached as ***Exhibit N***.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF IDAHO THAT THE FOREGOING IS TRUE AND CORRECT.

| | |
|---|---|
| *February 19, 2021, Eagle, Idaho* | */s/ Roderick C. Bond* |
| Date and City and State Signed | Roderick C. Bond |

DECLARATION OF RODERICK C. BOND - 13

14-ER-3378

**14-ER-3379**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 19th day of February 2021, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Jeffrey A. Thomson:     jat@elamburke.com
Loren C. Ipsen:     lci@elamburke.com
Joyce A. Hemmer:     jah@elamburke.com
Bradley S. Keller:     bkeller@byrneskeller.com
Alyson A. Foster:     alyson@dempseyfoster.com
William E. Adams:     bill@weadamslaw.com
Tyler S. Waite:         twaite@campbell-bissell.com
Michael S. Bissell:     mbissell@campbell-bissell.com
David R. Lombardi:     drl@givenspursley.com
Daniel L. Glynn:     dglynn@idalaw.com

*/s/ Roderick C. Bond*
Roderick C. Bond

DECLARATION OF RODERICK C. BOND - 14

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

DALE L. MIESEN, an individual )
who is a shareholder and who )
is also bringing this action )
on behalf of and/or in the   )       Case No. 1:10-CV-00404-DCN-CWD
right of AIA Services         )
Corporation and its wholly    )
owned subsidiary AIA          )
Insurance, Inc.,              )
                             )
          Plaintiff,          )
                             )
vs.                           ) REMOTE DEPOSITION OF RICHARD T. McDERMOTT
                             )
                             )           VOLUME I
CONNIE TAYLOR HENDERSON, an   )
Individual; JOLEE K. DUCLOS, )          (PAGES 1-577)
An individual; HAWLEY TROXELL )
ENNIS & HAWLEY, LLP, an Idaho )        November 5 - 6, 2020
Limited liability partnership )
GARY D. BABBITT, an           )
Individual; D. JOHN ASHBY, an )
Individual; RICHARD A. RILEY, )
An individual; MICHAEL W.     )
CASHMAN SR., an individual;   )
JAMES BECK, an individual;    )
R. JOHN TAYLOR, an individual )
CROP USA INSURANCE AGENCY,    )
INC., an Idaho corporation;   )
AIA SERVICES CORPORATION, an  )
Idaho corporation; AIA        )
INSURANCE, INC.; an Idaho     )
Corporation; CROP USA         )
INSURANCE SERVICES, LLC; an   )
Idaho limited liability       )
Company; and GEMCAP LENDING   )
I, LLC, a Delaware limited    )
Liability company,            )
                             )
          Defendants,         )
                             )
And all related actions.      )
                             )
                             ) Reported by:
_____) Andrea J. Wecker, CSR #716, RDR, CRR, CRC

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

REMOTE DEPOSITION OF RICHARD T. McDERMOTT

VOLUME I


        BE IT REMEMBERED that Volume I of the remote deposition of RICHARD T. McDERMOTT was taken via videoconference by the Defendants before Associated Reporting & Video, Andrea J. Wecker, Court Reporter and Notary Public in and for the County of Ada, State of Idaho, on Thursday and Friday, the 5th and 6th days of November, 2020 in the above-entitled matter.


APPEARANCES (Remotely):

For the Plaintiff:    RODERICK BOND LAW OFFICE.
                      By:  Roderick C. Bond, Esq.
                      601 108th Avenue Northeast
                      Suite 1900
                      Bellevue, Washington 98004
                      Telephone:  (425) 591-6903
                      Facsimile:  (425) 321-0343
                      rod@roderickbond.com

For the Defendants, Crop USA, James Beck, Michael W.
Cashman Sr., Connie Taylor Henderson, and
R. John Taylor:
                      JONES WILLIAMS FUHRMAN GOURLEY
                      By:  Daniel Loras Glynn, Esq.
                      225 North 9th Street
                      Suite 820
                      Boise, Idaho 83702
                      Telephone:  (208) 331-1170
                      Facsimile:  (208) 331-1529
                      dglynn@idalaw.com

**14-ER-3381**

**Richard T. McDermott (Volume I)**                     **November 5 - 6, 2020**

APPEARANCES (Contd.)

For the Defendants, Hawley Troxell Ennis & Hawley,
Richard A. Riley, D. John Ashby, and Gary D. Babbitt:

                         BYRNES KELLER CROMWELL
                         By:  Bradley S. Keller, Esq.
                         1000 Second Avenue, 38th Floor
                         Seattle, Washington 98104
                         Telephone:  (206) 622-2000
                         Facsimile:  (206) 622-2522
                         bkeller@byrneskeller.com

For the Defendant, GemCap Lending I, LLC:

                         GEMCAP SOLUTIONS
                         By:  William E. Adams, Esq.
                         24955 Pacific Coast Highway
                         Suite A202
                         Malibu, CA 90265
                         Telephone:  (424) 216-5457
                         wadams@gemcapsolutions.com

Also Present:            Loren C. Ipsen
                         Joyce A. Hemmer
                         Craig Meadows
                         Jack R. Little
                         Richard Ellis
                         David Ellis
                         Richard A. Riley

**14-ER-3382**

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

A.    I thought Mr. Bond is --

MR. BOND:  I can get the information at the next break.

Q.    (BY MR. KELLER) In this case, you've been serving as an expert witness working with Mr. Bond since approximately when?

A.    Since approximately 2017.

Q.    Okay.  About when in 2017?

MR. BOND:  Object to the form.

THE WITNESS:  It was --

The first work I did that I recall was in connection with a declaration that I submitted in support of Miesen's motion to serve his third amended complaint.

Q.    (BY MR. KELLER) Okay.  Mr. Bond sent me something yesterday that was a chart that added up to about $115,000, and it's called "Total of Requested Payments to Date."

Is that an accurate summary of the payments that you have requested from Mr. Bond to date?

A.    It is.

Q.    One of the questions I had when I got it was:  Do you keep time records and submit bills?

A.    I keep time records, and I do submit

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

bills.  I don't do it, as we would say, in the normal course of business such as when I was back at a law firm.  I don't have a -- I don't have a billing clerk.  I don't have an accounting department knocking on the door saying, "McDermott, get your bills out."

I have had occasion to request payment from Mr. Bond for this or that particular reason, but I've never had any difficulties whatsoever with Mr. Bond paying me what -- an amount that was satisfactory to me.

So it's a -- sort of a -- it's, you know, an unofficial, if you will, unorthodox, if you will, way of proceeding.

Q.   I'm trying to understand exactly how it proceeds.  How does it work?  Periodically you pick up the phone or send him an e-mail that says, "Hey, I'd like to get X dollars from you"?

MR. BOND:  Object to the form.

THE WITNESS:  Well, I'm going to answer that this way, Mr. Keller:  Or vice versa.

Q.   (BY MR. KELLER) By "vice versa," what do you mean?  He picks up the phone and calls you and says --

A.   I don't know if I want to get into

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

conversations between the two of us, but --

Q.    Why don't you just answer my questions, sir.

A.    He'd say, "Dick, it's been some time since you've sent me a bill.  Why don't you, you know, send me a bill."

Q.    Okay.  And then what do you do?  You just send him a bill for rounded-out amounts?

A.    Yes, on LawPay.

Q.    Okay.  Because one of the things I noticed is in this schedule I got, with one exception, they're all just even amounts.  Here's $5,000 in mid-October.  Another $5,000 in mid-September.

Is that how it works?  "Send me 5,000," or, "Hey, Dick, I haven't gotten a bill from you."

A.    Look, Mr. Keller, just let me back up a second.

When I started working with Rod in the Eberle Berlin case, as any reasonable person would, I think, in the beginning, I had a retainer up front, right, that I would use up -- burn off, if you will -- and then submit bills.

Because that relationship was so satisfactory and of such a -- of such a quality, I

Richard T. McDermott (Volume I)                                November 5 - 6, 2020

had no need to be concerned about retainers or sending periodic bills or anything.

You know, at my stage of life, you know, I'm quite comfortable, except for the fact that there are family needs that have arisen among my children, and so on occasion, I have asked for a fee from Mr. Bond with regard to a tuition payment for a grandchild or something like that.

But it's never been -- it's -- it's about --

It's as trustworthy a relationship as I could imagine having with someone.

Q.    Thank you.  That's all helpful information.

What I'm trying to ask you, though, sir, is:  How does the billing work?  Is it when you feel like it's time for a payment, you pick up the phone and you say, "Hey, Rod, pay me $5,000," or he feels like he hasn't paid you for a while, he says, "Dick, I haven't paid you for a while.

"Oh, okay.  Send me $5,000."

Is that how it goes?

A.    Well, bear in mind that I do keep -- I do keep little notebooks with my time.  I -- you know, I haven't added up the time, but, you know --

Richard T. McDermott (Volume I)            November 5 - 6, 2020

But I'm perfectly -- I'm perfectly comfortable with the notion that when this is over, that whatever I conclude my fee should be --

And let me say this too, Mr. Keller, as long as we're discussing this. My hourly rates are set forth in the beginning of my report. And as any lawyer does in any law firm, I have to look not only at the number of hours that I spent but, if you will, the quality of those hours.

And to the extent that I need extra time because I -- although I've gained a great deal of familiarity with the computer and the electronic world, as we've seen here already today, I'm not a legend in my own time when it comes to technology.

So consequently, there are going to be a number of instances where I may have recorded an hour's work, but it doesn't necessarily reflect the value of the 350 hours [sic] that is my fee.

Does that help?

Q. Not really, but you started on a thought that I wanted you to finish.

You said, "When this is over, whatever I conclude my fee should be," and then you went off to something else.

Could you complete that thought?

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

A.   I would render a bill for that amount, excuse me, and expect -- and know I will be paid.

Q.   But you say, "When this is over," at that time you'll render a fee for what you think is an appropriate amount?

Is that what you're saying?

A.   Yeah.  Taking into account the amounts I've already been paid, yes.

Q.   What else will it take into account?

A.   That's it.  My hours.

Q.   Now, I was told that you'd been working virtually full-time on finalizing your report these last few weeks.

Is that true?

A.   No doubt.

Q.   Like, for how long have you been just burning the candle working full time?

A.   Well, let me say this, that the -- the burning the candle work really began in connection with the submission of my first report in April of 2019.

It then accelerated into my second report in October of 2019, and then my third report of February 21st, 2020.  And the reason for that is because my -- the due dates of my report preceded

Richard T. McDermott (Volume I)                      November 5 - 6, 2020

the completion or even the conduct of substantial discovery.

And so I was in the position of having to almost seriatim submit supplemental expert reports. And it really isn't until now when, to the best of my knowledge, the discovery is complete, that I was able to do the type of job on that report that needed to be done.

And I'm sure even now there are typos, there are this, there are that. It's been -- it's been a tremendous amount of work.

In fact, I will go so far as to say, Mr. Keller, I have trouble remembering even in my very active legal career where the time and the extent that have gone into this report is -- is similar to something else I've done.

I've worked very, very hard during my career, but cases and transactions haven't taken up the amount of time that this one has.

Q. I'll take responsibility maybe for having asked a bad question. Pretty focused question, though, I'm trying to ask you, sir.

For how long, as we sit here today -- going back in time, for how long have you been burning the candle essentially working full time on

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

this case?

MR. BOND:  Object to the form.

Go ahead.

THE WITNESS:  Since before August of 2019.

Q.    (BY MR. KELLER) So from August of 2019, at least, until today, you have been working full time on this case?

MR. BOND:  Object to the form.

THE WITNESS:  That's correct, with the exception of Christmas and Thanksgiving.  Yes.

Q.    (BY MR. KELLER) Well, even when I work full time, I get some holidays too.

A.    Yes.

Q.    And I want to be sure, when we're talking full time, we're talking, like, 35 hours a week, right?

A.    Absolutely.

MR. BOND:  Object to the form.

Q.    (BY MR. KELLER) Okay.

THE WITNESS:  Sorry, Rod.

Q.    (BY MR. KELLER) Now, do you have that summary --

And what's your hourly rate?

A.    $350 per hour and 400 hours -- $400 per hour for testimony, which I understand you will be

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

paying me for this?

Q.   So at $350 an hour for a 35-hour week, what does that work out to?  About $10,000 a week?

A.   I haven't done the math.

Q.   Do it in your head.

A.   I'm not going to do that, Mr. Keller.

MR. BOND:  Object.

Q.   (BY MR. KELLER) You can't ballpark estimate $350 an hour on a 35-hour week at being at around $10,000?  You're not capable of doing that?

A.   I'm not going to --

MR. BOND:  Object to the form.

Q.   (BY MR. KELLER) You're not comfortable doing that kind of an estimate, right?

MR. BOND:  Object to the form.

THE WITNESS:  Okay.  Yes.  $10,000.

Q.   (BY MR. KELLER) So it would be your testimony that if you were to charge on an hourly basis, your fees would be about $10,000 a week since at least August of 2019, correct?

A.   That's a big if.

MR. BOND:  Object to the form.

Please wait, Dick.  Give me a second to object.

Object to the form, and it misstates his

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

testimony.

          Go ahead.

     THE WITNESS:  It's a big if because I wouldn't charge him $350 an hour for every hour.

     Q.   (BY MR. KELLER) Since August of 2019, we're talking, like, over 70 weeks, right?

     A.   Yes.

     Q.   And if you were charging 350 -- if you were charging $10,000 a week, that would be over $700,000, right?

     A.   Yes.

     Q.   But you haven't charged him $700,000. So far, he's only paid 114 -- or about $115,000.

     A.   Correct.

     Q.   Now, in looking at this chart that I was given, it looks like the most recent payment that you received was $5,000 in mid-October; about three weeks ago, right?

     A.   Yes.

     Q.   Prior to that, the next prior payment was about a month before that for $5,000, right?

     A.   Yes.

     Q.   Between September and October, at four weeks in a month, you would have had about $40,000 worth of time, right?

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

MR. BOND:  Object to the form.

THE WITNESS:  At 350 an hour.

Q.    (BY MR. KELLER) Correct.  So you're really not charging $350 an hour in this case, are you, sir?

MR. BOND:  Object to the form.

THE WITNESS:  I never said I was, as a practical matter.

Q.    (BY MR. KELLER) If you figure it out, on an hourly basis, it's a small fraction of that, isn't it?

MR. BOND:  Object to the form.

THE WITNESS:  As I said, Mr. Keller, I have every confidence that whatever bill I render Mr. Bond at the conclusion of this matter will be paid.

Q.    (BY MR. KELLER) Again, that's very helpful information, but it's really not what I asked at all, and I think you know that.

If you were to do the math, on an hourly basis, what you've actually been charging so far is a small fraction of $350 an hour, isn't it?

MR. BOND:  Object to the form.  Misstates whether he reduces hours or not as well.

THE WITNESS:  Right.

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

Q.   (BY MR. KELLER) What's the answer, sir?

A.   And the word "charged."

Q.   I don't know why we're having so much difficulty communicating here, sir.

You charged $5,000 in mid-October for all of your time up to -- for that prior month, right?

A.   No.

Q.   Oh --

MR. BOND:   Why don't you ask him why he hasn't charged, Brad.

MR. KELLER:   Mr. Bond, could you be quiet, please.  You are not supposed to be speaking.  You know that.  You're a good enough lawyer to know when you're not supposed to be talking, so please be quiet.

Q.   (BY MR. KELLER) Professor McDermott, I'm trying to understand.  I'm looking at a chart that I was given for what you were paid.  It says $5,000 as of mid-October.

What was that for?

A.   That was a -- a partial payment, as all these are, for the work I'm doing on the case.

Q.   When you say "a partial payment," does that mean there's going to potentially be more

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

payment for the same work later?

     A.   No.

     Q.   No?  Okay.  So it's not a partial payment.  It is the whole payment that you're going to get for the work?

     A.   Let me put it this way.

     MR. BOND:  Object to the form.

        Go ahead, Dick.

     THE WITNESS:  I would say that as of now, my -- the amount of work that I put in is probably worth another $100,000 on this case, Mr. Keller.

     Q.   (BY MR. KELLER) Okay.  So are you, in a sense --

        Do you ever hear the expression "work in process"?

     A.   Yes, I have.

     Q.   Do you have that 100,000 work in process that you haven't yet billed for that you're going to be billing?

     A.   That would be my estimate.

     Q.   That's very helpful.

        Okay.  So if we take your $100,000 of your work in process and the 115 that you've already been paid, your charge for your services for fees to date in this case are going to end up

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

being around a quarter million dollars, right?

    MR. BOND:  Object to the form.

      Go ahead.

    THE WITNESS:  That's -- that's correct.

    Q.   (BY MR. KELLER) Okay.

    A.   So it's $100,000 more than Mr. Remele so far.

    Q.   Are you proud of it?

    A.   Or --

    Q.   What does that have to do with my question?

    A.   Can you --

      I thought it supplemented the answer, Mr. Keller.

    Q.   Can you explain to me how you thought that was responsive to my question?

    MR. BOND:  Brad, now come on.  Let's not get combative.  Let's move on.

    Q.   (BY MR. KELLER) Professor, how is that responsive?

    MR. BOND:  Object to the form.

    THE WITNESS:  Could you read the question back?

    Q.   (BY MR. KELLER) Let's move on.

    A.   Uh-huh.

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

Q.   So 400 is the cap, right?

A.   Yes.

Q.   Okay.  Was John Taylor's annual compensation under that cap every year?

MR. BOND:  Object to the form.

THE WITNESS:  I would have to check that, but --

I'd have to check that, Mr. Keller.

Q.   (BY MR. KELLER) It's in your report.

A.   But he wasn't a director or officer.

Q.   What about Beck and Henderson?  To the extent that they received compensation for being a director, was it well under the figures that are articulated here in the articles?

MR. BOND:  Object to the form.

THE WITNESS:  The mathematical numbers are substantially less than the numbers mentioned in the articles.

Q.   (BY MR. KELLER) Are you giving an opinion in this case, sir, that the standstill and tolling agreements violated the articles of incorporation?

MR. BOND:  Object to the form.

THE WITNESS:  Yes.

Q.   (BY MR. KELLER) Are you giving an

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

opinion in this case, sir, that the standstill and tolling agreements are and were void and unenforceable?

MR. BOND:  Object to the form.

THE WITNESS:  Yes.

Q.    (BY MR. KELLER) Does that mean that there was no tolling agreement in place?

MR. BOND:  Object to the form.

THE WITNESS:  They were not authorized.

Q.    (BY MR. KELLER) Does that mean that there was no tolling agreement that was effective?

MR. BOND:  Object to the form, if I didn't.

THE WITNESS:  The agreements were never authorized by the corporations.  The individuals who signed the tolling agreements did so for themselves.  They agreed to extend it, so they may well be bound.

Q.    (BY MR. KELLER) So it's a one-way unenforceability?

A.    No.

Q.    You're the one that wrote in your report that when something is void -- something that violates the articles of incorporation is void and unenforceable.

Isn't that what you wrote?

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

A.    Yes.

Q.    If it's void and unenforceable, then it's unenforceable, right?

MR. BOND:  Object to the form.

THE WITNESS:  Yes.

Q.    (BY MR. KELLER) And according to your opinion, there is no tolling agreement between the signatories of that agreement, right?

MR. BOND:  Object to the form.

THE WITNESS:  They were void and unenforceable.

Q.    (BY MR. KELLER) And there is no tolling between the signatories, right?

MR. BOND:  Object to the form.

THE WITNESS:  Not by reason of those agreements.

Q.    (BY MR. KELLER) Okay.  So those agreements themselves do not provide -- in your opinion, because they're void and unenforceable, they do not provide a basis for the tolling of the statute of limitations on behalf of the company on its claims against the individual, right?

MR. BOND:  Object to the form.

THE WITNESS:  They're unauthorized, void, and not enforceable.

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

Q.    (BY MR. KELLER) This opinion you're giving is really not very helpful to the company, is it, sir?

MR. BOND:  Object to the form.

THE WITNESS:  The opinions that I'm giving overall are quite favorable to AIA corporations, which they deserve.

Q.    (BY MR. KELLER) But you know, sir, I didn't ask you about your other opinions.  I asked you what we've just been talking about, which is the tolling agreement.

For you to be opining that the tolling agreement is not enforceable, that's not a good thing for AIA potentially, right?

MR. BOND:  Object to the form.

THE WITNESS:  Nobody was able --

Because they were -- because they were concealed, nobody was able to take advantage of the tolling agreements anyway.

Q.    (BY MR. KELLER) Let's just talk about the tolling agreements, sir.

Are you and I in agreement that because that tolling agreement is void and unenforceable, the company cannot rely on it as a basis for tolling the statute of limitations against the

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

individual directors who signed?

MR. BOND:  Object to the form.  Calls for a legal conclusion.

Go ahead.

THE WITNESS:  There are other grounds for tolling a statute of limitations.

Q.   (BY MR. KELLER) Not what I'm asking you, Professor.  I get it.  I'm asking you about the tolling agreement itself.

Based on your view that it's void and unenforceable, are you and I in agreement that if it's void and unenforceable, the company cannot rely on that agreement as a basis for tolling the statute of limitations of the claims being asserted in this case?

MR. BOND:  Object to the form.  Calls for a legal conclusion.

THE WITNESS:  It can't rely on -- within the four corners of those agreements.

Q.   (BY MR. KELLER) Okay.  Now, a shareholder bringing a shareholder derivative case owes fiduciary duties to the entity, don't they?

MR. BOND:  Object to the form.

THE WITNESS:  A shareholder bringing a derivative suit on behalf of the corporation owes a

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

duty to prosecute the case in a manner consistent with the interests of the corporation.

Q.    (BY MR. KELLER) In fact, in your textbook, you have the case law on greenmail, don't you?

MR. BOND:  Object to the form.

THE WITNESS:  I do.

Q.    (BY MR. KELLER) And in that --

A.    Unocal.

Q.    -- it stands for the proposition that somebody who brings a shareholder derivative case has a fiduciary duty to the entity, and they can't just take some money for themselves to be bought off and go away, right?

A.    T. Boone Pickens did not bring a derivative suit on behalf of Unocal.

Q.    The case that you have in your textbook --

A.    What page?

Q.    -- stands --

Do you have the book in front of you?

A.    I'll get it.

Q.    No, we're not going to take our time.

Do you recall --

A.    What's the name of the case, Mr. Keller?

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

Q.    Do you teach your students in corporate finance that if you bring a shareholder derivative case, that you have a fiduciary duty to the company regarding that case?

MR. BOND:  Object to the form.

THE WITNESS:  I teach my students that if someone is bringing a derivative case on behalf of the corporation, it has to be conducted in the best interest of the corporation, naturally.

Q.    (BY MR. KELLER) And do you --

A.    Whether that rises to the label of fiduciary duty is another question.

I know that the -- that the duty is clear.  The shareholder is suing on behalf of the corporation, which has suffered at the wrongdoing of others, and the corporation is not pursuing the claims itself.  Therefore, they are suing on its behalf and have to act in accordance with the best interest of the corporation, period.

Q.    How is it in the best interest of AIA for Mr. Miesen to be calling an expert witness who is opining that the --

(Technical difficulties.)

(Discussion held off the record.)

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

(The deposition adjourned at 5:42 p.m. MST on
Thursday, November 5, 2020)

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

(The deposition resumed at 8:30 a.m. MST on Friday, November 6, 2020)

EXAMINATION

BY MR. ADAMS:

Q.   My name is Bill Adams.  I represent GemCap Lending I, LLC.  Apart from a brief conversation that we had off the record yesterday, we haven't spoken before, have we?

A.   No, we have not.

Q.   In fairness, I think I saw you in the back of a courtroom in Northern Idaho in late '19 and in the back of a conference room in San Francisco.

But apart from that, we haven't had any discussions of any kind, true?

A.   True.

Q.   Okay.  Well, I have promises to keep today and miles to go before I sleep, so I'm going to try to move through this as absolutely rapidly as I can and then defer to my colleagues to complete the remainder of their questions.

Do you happen to know as you sit here, Mr. McDermott, how many words are in your latest version of your expert witness report?

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

```
                         EXAMINATION

BY MR. GLYNN:

      Q.    I apologize, Professor McDermott.
There's probably one person that may rival your
skills on Zoom, and that's probably me, so we'll --
I'm trying to get better at it, but, you know,
we're struggling through.
            Is "Mr. McDermott" okay rather than
"Professor McDermott"?
      A.    I prefer Mr., but I'm not ashamed of
being an adjunct.
      Q.    Okay.  All right.
            Mr. McDermott, during this break, did
you talk with Rod Bond?
      A.    Yes.
      Q.    Okay.  And what did you talk about?
      A.    He reminded me that some time ago, he
had told me of the matters that I was just looking
at.  I had never seen the documents before, but
he -- he reminded me that some time ago, he had
disclosed that to me.  And I have no reason --
although I don't have a -- a recollection of it, I
have no reason to doubt that.
            Indeed, I have no reason to doubt any
statement that comes from Rod Bond.
```

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

Q.   Okay.

A.   I've been -- I've been working with and in many cases evaluating lawyers for a long, long time with regard to their legal skills, their ethics, and their integrity.  And working very closely with Mr. Bond, I have never seen a scintilla of anything other than the highest standards.

I have never been asked, insisted, or anything else to render an opinion that I wasn't 1,000 percent comfortable with.  I was -- never put my name on a document that I was not 1,000 percent comfortable with, notwithstanding my propensity for typographical errors and the like.

So that's about all I have to say about it other than, as I said, I did ask him whether these allegations preceded his going to law school. They preceded his going to undergraduate and law school, and he subsequently admitted to the University of Washington Law School and then obviously admitted to the respective bars of Washington and Idaho.

And finally, I fail to see a relevant connection between those documents and the allegations in Reed Taylor against AIA Services,

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

et al.

That's what we -- that's the substance of our conversation.

Q.   Sounds like you're quite the advocate for Mr. Bond.

MR. BOND:  Object to the form.

THE WITNESS:  I don't --

As I said at the outset of my report, Mr. Glynn, I'm here to call balls and strikes.  I call them as I see them.  If I had one notion that there was something wrong with what has gone on or what is going on, I wouldn't be here on Zoom or otherwise.

Q.   (BY MR. GLYNN) So we'll talk about your long affiliation with Mr. Bond in a bit here, but let's try and lighten the mood a bit.

Let me just ask:  Yankee or Met?

A.   Yankee.

Q.   I want to go back a little bit before we talk about the most current iteration of the report, the report that was delivered on Monday.

On or about October 22nd, we were advised -- and by "we" -- well, I'll narrow it.  I was advised by Mr. Bond that you had had some computer issues and you had lost much of your work,

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

(Break taken from 5:18 p.m. MST to 5:26 p.m. MST)

Q.   (BY MR. GLYNN) We're back on the record.

A.   Okay.

Q.   Mr. McDermott, as you know, we had a bit of a technical difficulty where unfortunately this time our court reporter got bumped from the room. She's going to read the last question and answer that she got before she got bumped out of the room, and I'm just going to ask you to confirm that the answer that she has on the record was your full and complete answer, okay?

A.   Okay.

MR. GLYNN:  Andrea, can you read back what you have.

(Record read by reporter.)

THE WITNESS:  You want my answer?

MR. BOND:  Yes.

Q.   (BY MR. GLYNN) Yes.

A.   It is essentially a factual question.

MR. GLYNN:  All right.  So we're going to go ahead and at this point in time, if it's okay, I'll just go ahead and say that we've had some discussions about a further continuance of the deposition.

We have not made any agreements about

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

anything other than some additional time is needed. We'll work out the details of that and we'll get together the early part of next week to set that up.

    MR. BOND:  And my questions for him will be completed at the end of the deposition whenever we finish the next time, so everybody agrees to that.

    MR. GLYNN:  Sounds great.  Thank you.

        (The deposition concluded at 5:28 p.m. MST on Friday, November 6th, 2020)

            * * *

        (Signature was requested.)

Richard T. McDermott (Volume I)                          November 5 - 6, 2020

VERIFICATION

STATE OF _____)
                         )  ss.
COUNTY OF _____)

   I, RICHARD T. McDERMOTT, being first duly sworn remotely on my oath, depose and say:

   That I am the witness named in the foregoing deposition taken the 5th and 6th days of November, 2020, Volume I consisting of pages numbered 1 to 575, inclusive; that I have read the said deposition and know the contents thereof; that the questions contained therein were propounded to me; that the answers to said questions were given by me, and that the answers as contained therein (or as corrected by me therein) are true and correct.

        Corrections Made:  Yes_____  No_____


        _____
                RICHARD T. McDERMOTT


   Subscribed and sworn to before me this _____ day of _____, 2020, at _____, Idaho.


                        _____
                        Notary Public for Idaho
                        Residing at_____, Idaho
                        My Commission Expires: _____.

**14-ER-3411**

**Richard T. McDermott (Volume I)**                    **November 5 - 6, 2020**

REPORTER'S CERTIFICATE

STATE OF IDAHO    )
                  )  ss.
COUNTY OF ADA     )

I, ANDREA J. WECKER, Certified Shorthand Reporter and Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn remotely to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 15th day of November, 2020.

_____
ANDREA J. WECKER
CSR, RDR, CRR, CRC and Notary
Public in and for the
State of Idaho.

My Commission Expires:  02-14-23

Richard T. McDermott (Volume I)                    November 5 - 6, 2020

VERIFICATION

STATE OF  NEW YORK  )
                    )  ss.
COUNTY OF  ULSTER   )

I, RICHARD T. McDERMOTT, being first duly sworn remotely on my oath, depose and say:

That I am the witness named in the foregoing deposition taken the 5th and 6th days of November, 2020, Volume I consisting of pages numbered 1 to 575, inclusive; that I have read the said deposition and know the contents thereof; that the questions contained therein were propounded to me; that the answers to said questions were given by me, and that the answers as contained therein (or as corrected by me therein) are true and correct.

Corrections Made: (Yes) ✓    No _____

_____
         RICHARD T. McDERMOTT

Subscribed and sworn to before me this 31st day of DECEMBER, 2020, at KINGSTON , NY.

JOSHUA N. KOPLOVITZ
Notary Public-State of New York
No. 02KO2176970
Qualified in Ulster County
Commission Expires August 31, 2021

Notary Public for Idaho
Residing at KINGSTON , NY
My Commission Expires: 8/31/2024

Associated Reporting & Video                    576
(208) 343-4004

**14-ER-3413**



# ASSOCIATED REPORTING & VIDEO
## ──────── *Next-Level Litigation Support* ────────

The Owyhee
1109 Main Street
Suite 220
Boise, Idaho 83702

Phone: (208) 343-4004
Facsimile: (208) 343-4002
production@arvboise.com
arvboise.com

DEPOSITION CHANGE SHEET

| Page# | Line# | Reads NOW | SHOULD read | Reason for change |
|---|---|---|---|---|
| 44 | 8 | "So, no" | So, no, not through a law firm | Clarification |
| 45 | 11 | "Yes" | I have done so in my individual capacity, but not as a member of a law firm. | Clarification |
| 47 | 2 | "No." | No, I believe directors are covered by the Corporation's GCL policy. | Clarification |
| 59 | 2 | "when this is over," | when I have completed the supplements to my Report before trial. | Clarification |
| 59 | 18 | "value of the 350 hours [sic] that is my fee" | amount which will be billed to Mr. Bond because I make reductions to my bills based on efficiency. | Clarification |
| 76 | 10 | "approximately yes" | approximately yes with regard to expert witness fees. | Misstatement |
| 80 | 2 | "credible and true" | credible and true such as here where there is documentary evidence to support them. | Clarification |
| 93 | 13 | "That's correct" | That's correct because I want to be as precise as possible. | Clarification |
| 95 | 3 | "2002" | 2005 | Misstatement |
| 129 | 23 | "guarantee was called" | guarantee was called but I believe AIA paid the fees. | Clarification |
| 142 | 23 | "It entailed " | It ultimately entailed | Clarification |
| 143 | 4-7 | Delete lines 4 through 7 | After Eberle Berlin withdrew, Hawley Troxell became defense counsel | Misstatement |
| 143 | 22 | "late 2006" | 2007 | Misstatement |
| 151 | 24 | "liquidated" | liquidation | Misstatement |
| 152 | 10 | "their representing liquidator" | their representing the AIA Corporations in the liquidation matter | Misstatement |
| 188 | 9 | "Mr. Bond's representation of Reed Taylor." | Mr. Bond's representation of Reed Taylor, but I can't imagine a plaintiff's lawyer asserting defenses | Clarification |

| 192 | 11 | "residual" | "residual" | Transcription error |
|---|---|---|---|---|
| 192 | 23 | … "[sic] | Should be eliminated | Transcription error |
| 192 | 23 | "treatment" | treatise | Misstatement |
| 192 | 15 | "No." | No, but not all of the privileged communications have been produced. | Clarification |
| 198 | 16-17 | "I have not expressed an opinion on that in my report. I don't say that here." | "I have expressed an opinion on that in my report. I say that here." | Misstatement |
| 200 | 18 | "No" | No, so long as they withdraw from the Reed Taylor case. | Clarification |
| 201 | 2 | "No." | No, assuming they had withdrawn. | Clarification |
| 202 | 15 | Self-defense, yes" | Self defense, yes, assuming they had withdrawn. | Clarification |
| 204 | 17 | "I have not been" | Prior to this case, I have not been | Clarification |
| 236 | 2-3 | " any financing that AIA Insurance guaranteed" | any financing other than what I just referred to. | Clarification |
| 247 | 11 | "of AIA Insurance" | of AIA Services | Misstatement |
| 249 | 25 | "February 7" | February 7 and again in March 2007. | Clarification |
| 250 | 9 | "amended complaint" | amended and second amended complaint | Clarification |
| 250 | 24 | "that" | that, but the question of the advancement of fees was an issue throughout the law suit that Hawley Troxell did not properly address. | Clarification |
| 252 | 19 | "or not" | or not, but they should have | Clarification |
| 271 | 6 | "No wait" | No wait ,2008 | Clarification |
| 285 | 24 | "Series C" | Series A | Misstatement |
| 304 | 9 | "typed" | typed. We also met for a over a week twice when he typed content for me. | Clairification |
| 307 | 16 | "in all likelihood, yes" | Seeing that you are continuing to engage in age disparagement, in all likelihood, yes | Clarification |
| 308 | 3 | "experience." | experience supervising litigation, formulating strategy and rendering advice to clients. | Clarification |
| 309 | 20 | "That's correct" | That's correct, but I reviewed, edited and provided input for many others. | Clarification |
| 310 | 20 | "Primarily, yes" | Primarily, yes but the substance of Section 13 has been in Sections I and X and part of XII of each of the versions of my Report | Clarification |
| 317 | 12 | "knowledge." | knowledge, but when I refer to a party having knowledge I mean that the party had actual knowledge through documents and/or such knowledge through testimony. | Clarification |

| 331 | 2 | or I didn't tell Mr. Keller | nor did I tell Mr. Keller | Transcription error |
|---|---|---|---|---|
| 332 | 8 | "No." | No, not in the capacity as a lawyer, but as a director I did. | Clarification |
| 351 | 13 | "It appears that" | According to Gem Cap, it appears that | Clarification |
| 359 | 12 | "was funneled" | may have been funneled | Clarification |
| 362 | 25 | "was funneled" | may have been funneled | Clarification |
| 363 | 7-8 | "The report states for itself.[sic]" | "The report speaks for itself." | Transcription error |
| 365 | 4-5 | "The mere fact that John Taylor passed those funds through the AIA Corporations . . . " | The mere fact that John Taylor may have passed some of those funds through the AIA Corporations. . . | Misstatement |
| 382 | 1 | "was apprised" | was subsequently apprised | Clarification |
| 385 | 5 | "may have believed" | may have inexplicably believed | Clarification |
| 388 | 20 | "report rises" | report regarding Munding's appearance | Clarification |
| 402 | 17 | "Mr. Munding" | Mr. Munding, other than my testimony and what I have stated in my Report | Misstatement |
| 410 | 9 | "Mr. Bonds" | Mr. Guin's | Misstatement |
| 411 | 8 | "Correct" | Correct, but John Guin was the counsel before the trial court | Clarification |
| 428 | 11 | "obtaining" | obtaining and reviewing | Clarification |
| 428 | 21 | "are the" | those are some of | Clarification |
| 431 | 9-10 | "That is correct Mr. Keller[sic] | That is correct Mr. Adams | Misstatement |
| 432 | 13 | "seen that" | seen that but shareholder approval was required here | Clarification |
| 447 | 22 | "in these opinions, Quarles & Brady" | not these opinions, and | Clarification |
| 456 | 8-9 | "I don't recall being aware of this." | I was advised of this some years ago. | Clarification |
| 461 | 23-24 | "I have not discussed this with him. I have no knowledge of it." | I was advised of this some years ago. | Clarification |
| 466 | 18 | "Mr. Keller, do we know the " | Mr. Adams do we know the | Misstatement |
| 481 | 12 | "Either Lexis or Westlaw, Mr .Glynn. I'm not sure which." | The Fordham law Library people taught me how to use Lexis and Westlaw. | Clarification |
| 484 | 23 | "I retired from Clifford Chance in 1994." | I retired from Clifford Chance in 2004. | Misstatement |
| 493 | 21 | "Not off the  top of my head" | The US Department of Agriculture | Clarification |
| 494 | 24 | "to sell crop insurance" | to have a standard reinsurance agreement | Misstatement |
| 498 | 22 | "on Sunday night" | prior to October 26 | Misstatement |
| 499 | 23 | "Over the weekend" | prior to October 26 | Misstatement |
| 501 | 8 | "Yes. I was looking at the " | No, I did that work prior to my submission of Section X of my Report on October 26. | Misstatement |
| 510 | 15 | "an agent license" | an agent licensed | Transcription error |
| 538 | 19 | "Yes" | Yes, based solely on the illegality of the transaction. | Clarification |
| 511 | 10 | "were license" | were licensed | Transcription error |

14-ER-3416

| 550 | 18 | "legally infirm" | legally infirm such as violating Section 30-1-6 | Clarification |
| 564 | 10 | "in which he did so, yes" | in which he did so, yes, but it was because he would not be held personally liable for his misconduct. | Clarification |
| | | | I have not treated the completion of this Change Sheet as a "take home exam." Nor I have I reviewed any documents or my Report in connection with its preparation. I have simply read the questions and my answers, set forth certain necessary clarifications, corrected certain misstatements, explained certain misunderstandings and noted transcription errors. | |

Name (Deponent) __RICHARD T. McDERMOTT__   Signature _Richard T. McDermott_   Date _10/31/20_
(VOLUME I)

*Compare with ORIGINAL / NOTARIZED verification page and return to Associated. Thanks!

**14-ER-3417**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

DALE L. MIESEN, an individual
who is a shareholder and who
is also bringing this action
on behalf of and/or in the        Case No. 1:10-CV-00404-DCN-CWD
right of AIA Services
Corporation and its wholly
owned subsidiary AIA
Insurance, Inc.,

            Plaintiff,

vs.                               REMOTE DEPOSITION OF RICHARD T. McDERMOTT

                                           VOLUME II
CONNIE TAYLOR HENDERSON, an
Individual; JOLEE K. DUCLOS,           (PAGES 578-813)
An individual; HAWLEY TROXELL
ENNIS & HAWLEY, LLP, an Idaho       November 20, 2020
Limited liability partnership
GARY D. BABBITT, an
Individual; D. JOHN ASHBY, an
Individual; RICHARD A. RILEY,
An individual; MICHAEL W.
CASHMAN SR., an individual;
JAMES BECK, an individual;
R. JOHN TAYLOR, an individual
CROP USA INSURANCE AGENCY,
INC., an Idaho corporation;
AIA SERVICES CORPORATION, an
Idaho corporation; AIA
INSURANCE, INC.; an Idaho
Corporation; CROP USA
INSURANCE SERVICES, LLC; an
Idaho limited liability
Company; and GEMCAP LENDING
I, LLC, a Delaware limited
Liability company,

            Defendants,

And all related actions.

                                  ) Reported by:
_____) Andrea J. Wecker, CSR #716, RDR, CRR, CRC

**Associated Reporting & Video**                    **578**
**(208) 343-4004**

**14-ER-3418**

Richard T. McDermott (Volume II)                    November 20, 2020

REMOTE DEPOSITION OF RICHARD T. McDERMOTT

VOLUME II


     BE IT REMEMBERED that Volume II of the remote
deposition of RICHARD T. McDERMOTT was taken via
videoconference by the Defendants before Associated
Reporting & Video, Andrea J. Wecker, Court Reporter
and Notary Public in and for the County of Ada,
State of Idaho, on Thursday and Friday, the 20th
day of November, 2020 in the above-entitled
matter.


APPEARANCES (Remotely):

For the Plaintiff:    RODERICK BOND LAW OFFICE.
                      By:  Roderick C. Bond, Esq.
                      601 108th Avenue Northeast
                      Suite 1900
                      Bellevue, Washington 98004
                      Telephone:  (425) 591-6903
                      Facsimile:  (425) 321-0343
                      rod@roderickbond.com

For the Defendants, Crop USA, James Beck, Michael W.
Cashman Sr., Connie Taylor Henderson, and
R. John Taylor:
                      JONES WILLIAMS FUHRMAN GOURLEY
                      By:  Daniel Loras Glynn, Esq.
                      225 North 9th Street
                      Suite 820
                      Boise, Idaho 83702
                      Telephone:  (208) 331-1170
                      Facsimile:  (208) 331-1529
                      dglynn@idalaw.com

**Richard T. McDermott (Volume II)**                    **November 20, 2020**

APPEARANCES (Contd.)

For the Defendants, Hawley Troxell Ennis & Hawley,
Richard A. Riley, D. John Ashby, and Gary D. Babbitt:

                          BYRNES KELLER CROMWELL
                          By:  Bradley S. Keller, Esq.
                          1000 Second Avenue, 38th Floor
                          Seattle, Washington 98104
                          Telephone:  (206) 622-2000
                          Facsimile:  (206) 622-2522
                          bkeller@byrneskeller.com

For the Defendant, GemCap Lending I, LLC:

                          GEMCAP SOLUTIONS
                          By:  William E. Adams, Esq.
                          24955 Pacific Coast Highway
                          Suite A202
                          Malibu, CA 90265
                          Telephone:  (424) 216-5457
                          wadams@gemcapsolutions.com

Also Present:             Joyce Hemmer
                          Craig Meadows
                          Jack R. Little
                          Richard Ellis
                          Richard Riley
                          Dale Miesen

**14-ER-3420**

Richard T. McDermott (Volume II)                    November 20, 2020

```
                    I N D E X

              E X A M I N A T I O N

RICHARD T.  McDERMOTT                              PAGE

By:   Mr. Glynn.................................582

      Mr. Keller................................720


                  E X H I B I T S

              (No exhibits marked.)
```

**14-ER-3421**

Richard T. McDermott (Volume II)                    November 20, 2020

CONTINUED EXAMINATION

BY MR. KELLER:

Q.   Mr. McDermott, do you have in front of you the summary of payments to you from Mr. Bond?

MR. BOND:  Mr. McDermott, you're still on mute.

THE WITNESS:  Here I am.

All right.

Q.   (BY MR. KELLER) Do you have in front of you, sir, that summary of payments that we were provided at your last deposition?

A.   I do.

Q.   All right.  And I think you told me at the last deposition, correct me if I'm wrong, but at least since this fall, you've been essentially working full time on this engagement, correct?

MR. BOND:  Object to the form.

THE WITNESS:  Well, Mr. Keller, I've certainly been pretty much thinking about it full time.  I don't have 12 recorded hours each and every day.  I do have the total number of recorded hours that I have on this matter up to the date of our last deposition.

Q.   (BY MR. KELLER) Do you see that the charges between mid -- the payments between

**14-ER-3422**

Richard T. McDermott (Volume II)                    November 20, 2020

mid-September and mid-October was an incremental $5,000?

A.   In what year are we referring to, Mr. Keller?

Q.   2020, sir.

A.   2020.

Yes, I do.

Q.   Okay.  Were you working six or seven hours a day during business days on this matter?

MR. BOND:  Object to the form.

Q.   (BY MR. KELLER) On average?

A.   Let me say again, Mr. Keller, there's a distinction -- or at least I have a distinction between the time I spend thinking about this matter, the number of hours that I record on this matter, and the number of hours for which I will bill for this matter.

Q.   Well, let's try it a different way then, sir.

During the period from mid-September to mid-October, approximately how many hours do you think you were recording on this matter?

MR. BOND:  Object to the form.

THE WITNESS:  Probably recording --

MR. BOND:  Don't speculate if you don't --

Richard T. McDermott (Volume II)                    November 20, 2020

THE WITNESS:  I won't.  I won't.

I don't know.

Q.    (BY MR. KELLER) You're unable to give me any estimate at all as to the amount of time you recorded between mid-September of this year and mid-October of this year.

Is that your testimony under oath, sir?

MR. BOND:  Object to the form.

THE WITNESS:  It's my testimony under oath as I sit here today, yes.

Q.    (BY MR. KELLER) Okay.  How about between mid-October and mid-November?  Can you give me any estimate of the amount of time that you recorded on this case?

MR. BOND:  Object to the form.

THE WITNESS:  I cannot give you an estimate as I sit here today, Mr. Keller, with regard to that time period and my recorded hours during it.

Q.    (BY MR. KELLER) So we're sitting here today and I'm asking you about something that happened between four and six weeks ago, and you're testifying that you are unable to give any estimate whatsoever, correct, sir?

MR. BOND:  Object to the form.

THE WITNESS:  That is correct.

Richard T. McDermott (Volume II)                    November 20, 2020

Q.   (BY MR. KELLER) Very good.

A.   I can tell you the aggregate number of hours that I have on this matter up to the date of our last deposition.  That, I have brought with me.

Q.   **The reason I'm going down this path, sir, is I did a little calculation in my head.  And if you were working essentially full time on this case for a one-month period, it works out to about a net effective hourly rate of $35 per hour at $5,000.  That's at 140 hours.**

**Are you going to be charging me $35 an hour for your time in connection with this deposition?**

MR. BOND:  That's harassing.  Objection on harassing and to the form.  That's ridiculous, Brad.  You're bigger than that.

THE WITNESS:  114,775 is not -- is not the amount of my bill that I will render to Mr. Bond for my work up to the commencement of the deposition of ten days ago.

Q.   **(BY MR. KELLER) I'm sorry if my question was unclear.  Let's try and deal with my question.**

**If you charged $5,000 for a month and you put in 140 hours of time --**

A.   I didn't charge 5,000 for a month.

Richard T. McDermott (Volume II)                    November 20, 2020

Q.   Let me finish, sir.

MR. BOND:  Oh, come on, Brad.

THE WITNESS:  Let me answer, sir.

Q.   (BY MR. KELLER) If you charge $5,000 for a month and you spend 140 hours, it works out to a net effective hourly rate of $35 per hour --

MR. BOND:  Object to the form.

Q.   (BY MR. KELLER) -- doesn't it?

MR. BOND:  Object to the form.

Q.   (BY MR. KELLER) My question to you is: Will you be charging me more than $35 per hour for your time at this --

A.   That's --

Q.   -- deposition?

MR. BOND:  Object to the form.  Misstates his testimony.

Go ahead.

THE WITNESS:  All right.  First of all, this is getting very much akin to the age shaming and the smirking that I had to deal with last time, Mr. Keller, and I don't appreciate it.

Second of all, you keep using the term I charged $5,000, and I did not charge $5,000.  I received $5,000 from Mr. Bond against my total time.  It will be taken into account.

**Richard T. McDermott (Volume II)**                    **November 20, 2020**

So it is ridiculous to say that I charged Mr. Bond $5,000.

Q.   (BY MR. KELLER) So as of April 16th of 2020, the last date that we have on this document we were given, did Mr. Bond owe you a lot of money?

A.   The last --

MR. BOND:  Object to the form.

THE WITNESS:  -- date, Mr. --

MR. BOND:  Go ahead.

THE WITNESS:  The last date on this chart --

You said April?

Q.   (BY MR. KELLER) I said October 16.

A.   It's October.

Q.   As of October 16 of 2020, did you have a lot of time that you had not been paid for that you were planning on billing for?

MR. BOND:  Object to the form.

THE WITNESS:  Yes.

Q.   (BY MR. KELLER) Okay.  Can you give me a sense of scale?

MR. BOND:  Object to the form.

THE WITNESS:  $119,000.

Q.   (BY MR. KELLER) Okay.  So as we sit here today, you intend to bill Mr. Bond for at least $119,000, and in your view, he will owe you that,

Richard T. McDermott (Volume II)                              November 20, 2020

correct?

MR. BOND:  Object to the form.

THE WITNESS:  That is correct.

Q.   (BY MR. KELLER) Thank you, sir.

If I were sitting in your seat now and I were looking at the things that are in front of you, how many computer screens are open?

MR. BOND:  Object to the form.

THE WITNESS:  Two.

Q.   (BY MR. KELLER) Are either of those computer screens open to an application for e-mail?

MR. BOND:  Object to the form.

THE WITNESS:  What, you think I'm getting secret messages, Mr. Keller?

Q.   (BY MR. KELLER) Are either of those screens open to an application for e-mail?

MR. BOND:  Object to the form.

Go ahead.

THE WITNESS:  Let's translate that.  Do I receive e-mail on one of these computers?

Q.   (BY MR. KELLER) Are either of those computer screens open to an application for e-mail?

MR. BOND:  Object to the form.

THE WITNESS:  I receive e-mail on one of the screens.

Richard T. McDermott (Volume II)                    November 20, 2020

Q.    (BY MR. KELLER) Okay.   So on one of the screens, is the application for e-mail open so that you can see an e-mail if it comes in?

A.    No.

Q.    Thank you.

Do you have a cell phone in front of you on any of those surfaces?

A.    No.

Q.    In response to some of Mr. Glynn's --

A.    I don't get smoke signals either, Mr. Keller.

Q.    Anything else you'd like to add, sir?

MR. BOND:  I'm sure he probably does have.

Q.    (BY MR. KELLER) In response to Mr. Glynn's questions, at one point he asked you a question about how many complaints you had prepared regarding certain types of lawsuits, and you said, "Well, does that include counterclaims?"  He said yes, and you said, "Five or six."

Do you remember that?

MR. BOND:  Object to the form.  Misstates --

THE WITNESS:  I recall that.  It was an estimate.

Q.    (BY MR. KELLER) I want to ask you a finer question.

Richard T. McDermott (Volume II)                                November 20, 2020

another hour.

THE WITNESS:  Yep.

MR. BOND:  Can we have a break, please?

THE WITNESS:  Thank you.

MR. BOND:  Or are you in the line?  I mean, are you -- Brad, I don't want to cut you off in the middle of a line of questioning.

MR. KELLER:  No, thank you for asking, but this is fine.

MR. BOND:  Okay.

THE WITNESS:  Okay.

(Break taken from 4:26 p.m. MST to 4:56 p.m. MST)

MR. KELLER:  All right.  Mr. Bond, you wanted to say something.

MR. BOND:  Yes.  We're back on the record. We've discussed off the record trying to reach an agreement on continuing the deposition.  The representations were that there would be two to three hours for Mr. Glynn and two hours for Mr. Keller, no time for Mr. Adams.  And we're now at six hours almost.  And I had represented that I needed two hours, hopefully not that much, but that's what I represented.

And so there's no way I will have time to finish my questions today and no time for Brad

Richard T. McDermott (Volume II)                          November 20, 2020

to finish whatever he's got left, and now I understand Bill Adams has some questions.  And I'm assuming that others may have some questions after I ask some questions.

So based on that, there is no way we can complete this deposition in seven hours.  Again, we're past the five hours that was agreed to to be provided to the other side, to your side, and the witness is not willing to go more than seven hours today.  I inquired with him and he said no.

So based on that, I'm terminating the deposition.  I will make him available to finish this whatever day in the near future next week or the week after that you guys choose.  We're readily available and will be readily available to continue it, and then I can finish my questioning and then whatever Brad has left and the five minutes or ten minutes or whatever Bill stated he needed can be completed as well.

MR. KELLER:  Okay.  And this is Brad Keller. I just want to be absolutely clear on two things.

One, in light of the time constraints, I'm prepared to interrupt and stop my questioning now and pass the witness to Mr. Bond so he could have approximately an hour with him.  He's

14-ER-3431

Richard T. McDermott (Volume II)                    November 20, 2020

declining to do that.

Two, I am absolutely objecting to any continuation of the deposition.

MR. BOND:  Okay.  Let me follow up a question for you.  So you're offering to quit now and just let me do my questioning, and then we're done.

Is that accurate?

MR. KELLER:  I'm offering to pass the witness to you now so you can have an opportunity to examine him.  Whether I would have any ability to come back afterwards later is an issue for another day.

MR. BOND:  Yeah, yeah.  But you had stated off the record that you wanted to pass him to me and let me question him and then you were going to come back and question him again after and continue your questioning.

So I'm trying to ascertain whether you, in fact, have additional time that you need or not.

MR. KELLER:  My position is exactly what I just stated.

MR. BOND:  Which is what?

MR. KELLER:  I'll say it one more time for you.

I'm prepared to interrupt my questioning

Richard T. McDermott (Volume II)                    November 20, 2020

and stop it now and pass this witness to you so you can have him for the better part of the next hour, and whether or not I will get any additional or further time with him is an issue for another day.

MR. BOND:  Okay.  And --

Okay.  And, again, to clarify for the record, it's 7:00 New York time right now.  He's been up and the witness does not want to go longer and we're past the time that we had agreed to go.

So, yes, it's -- it will be terminated, and so you let me know when you want to go again, and we'll continue it.

MR. ADAMS:  This is Bill Adams for GemCap. We object to this early termination of the deposition, and we reserve all rights.

MR. GLYNN:  Daniel Glynn.  I join that sentiment.

Also, Madam Court Reporter, could you put into the record how much time the witness has actually testified today.

THE REPORTER:  I can do that.

MR. BOND:  And how long is that exactly, Andrea?

THE REPORTER:  5 hours and 51 minutes.

MR. BOND:  5 hours and 51 minutes.  Okay.

Richard T. McDermott (Volume II)                    November 20, 2020

MR. ADAMS:  All right.  I guess we're done.

MR. KELLER:  Hang on a second.  It's 5 hours and 51 minutes.  We started at 7:30 a.m. Seattle time.  It's 4:00 p.m.  So that means over the course of 8 1/2 hours, we got 5 hours and 50 minutes of testimony.

Is my math right?

MR. ADAMS:  With some very long delays in responses, as Mr. Bond acknowledged off the record.

MR. KELLER:  Okay.  Everybody have a good weekend.  Enjoy your Thanksgiving.

MR. ADAMS:  Thank you.  You too.

(The deposition adjourned at 5:00 p.m. MST)

* * *

(Signature was requested.)

Richard T. McDermott (Volume II)                        November 20, 2020

VERIFICATION

STATE OF _____)
                         ) ss.
COUNTY OF _____)

    I, RICHARD T. McDERMOTT, being first duly sworn remotely on my oath, depose and say:

    That I am the witness named in the foregoing deposition taken the 20th day of November, 2020, Volume II consisting of pages numbered 578 to 811, inclusive; that I have read the said deposition and know the contents thereof; that the questions contained therein were propounded to me; that the answers to said questions were given by me, and that the answers as contained therein (or as corrected by me therein) are true and correct.

        Corrections Made:  Yes_____  No_____


        _____
             RICHARD T. McDERMOTT


    Subscribed and sworn to before me this _____ day of _____, 2020, at _____, Idaho.


                    _____
                    Notary Public for Idaho
                    Residing at_____, Idaho
                    My Commission Expires: _____.

**Richard T. McDermott (Volume II)**                    **November 20, 2020**

REPORTER'S CERTIFICATE

STATE OF IDAHO    )
                  )  ss.
COUNTY OF ADA     )

I, ANDREA J. WECKER, Certified Shorthand Reporter and Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn remotely to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 3rd day of December, 2020.

_____
ANDREA J. WECKER
CSR, RDR, CRR, CRC and Notary
Public in and for the
State of Idaho.

My Commission Expires:  02-14-23

Richard T. McDermott (Volume II)                    November 20, 2020

VERIFICATION

STATE OF ___NEW YORK___ )
                        ) ss.
COUNTY OF ___ULSTER___ )

I, RICHARD T. McDERMOTT, being first duly sworn remotely on my oath, depose and say:

That I am the witness named in the foregoing deposition taken the 20th day of November, 2020, Volume II consisting of pages numbered 578 to 811, inclusive; that I have read the said deposition and know the contents thereof; that the questions contained therein were propounded to me; that the answers to said questions were given by me, and that the answers as contained therein (or as corrected by me therein) are true and correct.

Corrections Made: Yes __✓__    No _____

x _Richard T. McDermott_____
     RICHARD T. McDERMOTT

Subscribed and sworn to before me this _31st_ day of _DECEMBER_, 2020, at _KINGSTON_ NY, I~~daho~~.

JOSHUA N. KOPLOVITZ
Notary Public-State of New York
No. 02KO2176970
Qualified in Ulster County
Commission Expires August 31, 20_21_

_A. N. Koplovitz_____
Notary Public ~~for Idaho~~ NY
Residing at _WOODSTOCK_, I~~daho~~ NY
My Commission Expires: _8|31|2021_

Associated Reporting & Video                    812
(208) 343-4004

**14-ER-3437**



# ASSOCIATED REPORTING & VIDEO
## Next-Level Litigation Support

The Owyhee
1109 Main Street
Suite 220
Boise, Idaho 83702

Phone: (208) 343-4004
Facsimile: (208) 343-4002
production@arvboise.com
arvboise.com

DEPOSITION CHANGE SHEET

| Page# | Line# | Reads NOW | SHOULD read | Reason for change |
|-------|-------|-----------|-------------|-------------------|
| 589 | 5 | "an agreement" | a court order. | Misstatement |
| 616 | 16 | "acted together" | acting together | Misstatement |
| 626 | 16 | "he did." | he did at the time of the transaction, but he became aware of it and did nothing. | Clarification |
| 627 | 6 | "Beck or Cashman" | Beck or Cashman, but they became aware and did nothing about it. | Clarification |
| 627 | 22 | "matter" | Change to transaction and add at the time of the transaction but became aware of it and did nothing about it. | Clarification |
| 628 | 13 | "However " | However, as stated in my Report, Beck, Cashman and John Taylor also pledged $500,000 as security for the loan. | Clarification |
| 628 | 24 | "directly involved" | directly involved, other than as stated in my Report. | Clarification |
| 633 | 19 | "prior to the time they were made." | prior to the time they were made, however Cashman, Beck and Henderson were well aware that improper loans were being made to PERC as early as 2007 when theirs and others' misconduct was alleged in *Reed Taylor v. AIA Services.* | Clarification |
| 652 | 3 | "What are the duties . . " | which are the duties . . . | Misstatement |
| 652 | 21 | "They are entitled" | They are required . . . | Misstatement |
| 654 | 20 | "committee's" | committee | Misstatement |
| 654 | 23 | "'provided by others in effect'" | 'provided by others' in effect | Misstatement |
| 682 | 2 | "reliance" | reliance if reasonable to do so. | Clarification |
| 690 | 19 | "Sections XI and XII" | Sections X,XI and XII | Clarification |
| 710 | 24 | "stock option agreement" | stock redemption agreement | Misstatement |
| 737 | 3 | "I guess you could say so, yes." | Rogers & Wells was a major national and international law | Clarification |

| Page# | Line# | Reads NOW | SHOULD read | Reason for change |
|---|---|---|---|---|
| | | | firm. My senior partner was William P. Rogers , a former Attorney General of the United States and a former United States Secretary of State. | |
| 739 | 16 | "as a legal opinion expert" | as an expert witness | Clarification. My expert testimony with regard to a number of legal issues, including but not limited to legal opinion practice, was cited with approval by Judge Dwyer. Among such matters were those pertaining to the Washington Rules of Professional Conduct. |
| 743 | 11 | "I don't recall." | Reed Taylor through his counsel, MichaelBissll, consented in writing to my being an expert in the Miesen case. | Clarification |
| 750 | 8-9 | "No, I did not read that order of Judge Brudie." | I did review the order of Judge Brudie. | Misstatement |
| 768 | 20 | "but Deloitte College" | but Beloit College | Transcription error |
| 781 | 5 | "that is" | those are | Misstatement |
| 783 | 25 | "No." | Yes. | Misstatement |
| 788 | 1 | "unrealized depreciation" | unrealized appreciation | Misstatement |
| 799 | 18 | "could" | should | Clarification |
| 805 | 5-6 | "That would have been a result adverse to AIA Services." | That would have been a result adverse to AIA Services solely by reason of the fact that it would have no longer owned AIA Insurance, but it would have been a benefit to AIA Insurance because it would no longer have been mismanaged and looted by John Taylor and others. It is clear that the AIA Corporations would have been better of because transactions such as the GemCap Settlement Agreement would never have occurred. | Clarification |
| | | | I have not treated the completion of this Change Sheet as a "take home exam." Nor I have I reviewed any documents or my Report in connection with its preparation. I have simply read the questions and my answers, set forth certain necessary clarifications, corrected certain misstatements, explained certain misunderstandings and noted | |

transcription errors.

Name (Deponent) __RICHARD T. McDERMOTT__   Signature _Richard T. McDermott_   Date_10/31/20_
(VOLUME II)

*Combine with ORIGINAL/NOTARIZED verification page and return to Associated. Thanks!

**14-ER-3440**

## Roderick Bond Law Office's Payments to Richard McDermott
### (*Miesen v. HTEH, et al.* )

| Date | Vendor | Cost or Expense | Amount |
|------|--------|-----------------|--------|
|  |  |  |  |
| 8/30/2018 | Richard McDermott | Expert Witness Fees and Costs | $20,000.00 |
| 11/16/2018 | Richard McDermott | Expert Witness Fees and Costs | $15,000.00 |
| 1/12/2019 | Richard McDermott | Expert Witness Fees and Costs | $11,775.00 |
| 5/29/2019 | Richard McDermott | Expert Witness Fees and Costs | $5,000.00 |
| 6/19/2019 | Richard McDermott | Expert Witness Fees and Costs | $8,000.00 |
| 7/4/2019 | Richard McDermott | Expert Witness Fees and Costs | $10,000.00 |
| 9/5/2019 | Richard McDermott | Expert Witness Fees and Costs | $10,000.00 |
| 10/22/2019 | Richard McDermott | Expert Witness Fees and Costs | $5,000.00 |
| 12/9/2019 | Richard McDermott | Expert Witness Fees and Costs | $5,000.00 |
| 2/12/2020 | Richard McDermott | Expert Witness Fees and Costs | $10,000.00 |
| 5/9/2020 | Richard McDermott | Expert Witness Fees and Costs | $5,000.00 |
| 9/11/2020 | Richard McDermott | Expert Witness Fees and Costs | $5,000.00 |
| 10/16/2020 | Richard McDermott | Expert Witness Fees and Costs | $5,000.00 |
|  |  |  |  |
|  | **Total of Requested Payments to Date** |  | **$114,775.00** |

Jeffrey A. Thomson ISB #3380
jat@elamburke.com
Loren C. Ipsen ISB #1767
lci@elamburke.com
Joyce A. Hemmer ISB #7202
jah@elamburke.com
ELAM & BURKE, P.A.
251 East Front Street, Suite 300
P.O. Box 1539
Boise, Idaho 83701
Telephone:  (208) 343-5454
Facsimile:  (208) 384-5844

Attorneys for Defendants Hawley Troxell Ennis & Hawley LLP,
Gary D. Babbitt, D. John Ashby and Richard A. Riley

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, et al.<br><br>Defendants. | Case No.  1:10-cv-00404-DCN<br><br>REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT [Dkt. 1068] |

**I.    Mr. McDermott's deposition transcript is properly before the Court.**

As shown by Mr. McDermott's deposition transcript, Dkt. 1100-2 at 807:15-810:17, and further explained in the HT Defendants' Reply regarding Mr. McDermott's contingency fee, Plaintiff had an opportunity to cross-examine Mr. McDermott but, instead, terminated the deposition. The deposition transcript is not subject to exclusion and is properly before the Court.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE
TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT [DKT. 1068] - 1

## II.    Evidentiary motions are not subject to meet and confer prerequisites.

The HT Defendants were not required to meet and confer. The local rule Plaintiff cites does not require it and Rule 37(a)(1) does not apply here. Dkt. 1097 at 4, 14. Plaintiff also misplaces reliance on the *Halbert* case, where the court imposed a meet and confer prerequisite by order.

## III.    The HT Defendants complied with the page limit.

Plaintiff cites a distinguishable case, involving legal argument in a declaration, to argue the HT Defendants used a declaration to circumvent the page limit. Dkt. 1079 at 6. (Notably, Plaintiff previously circumvented the page limit with Mr. McDermott's declaration. Dkt. 783-2.) Mr. Ipsen's declaration contains no argument; only information that could be listed (less conveniently) by page/line references in the 20-page brief. Plaintiff's argument that the brief itself is overlength ignores that page "1" is the caption, and the HT Defendants' briefing is no longer than Plaintiff's.

## IV.    Deciding this motion should not be deferred until trial.

Courts encourage motions such as this as efficient ways to streamline trial proceedings. *Palmerin v. City of Riverside*, 794 F.2d 1409, 1413 (9th Cir. 1986). Plaintiff argues delaying the decision until trial will allow Mr. McDermott to "remove certain words" (he does not say which) from his report, but omitting foundation does not save his testimony, as explained below. Dkt. 1097 at 5. The Court has a sufficient record on which to decide the motion now and, as the Court recognized, a ruling on this motion may impact the summary judgment motions. Dkt. 1089 at 3.

## V.    Mr. McDermott's questionable qualifications may be an issue for another day.

Mr. McDermott's questionable qualifications are notable regarding the breadth of topics in his report and he offers improper and unhelpful opinions that are not based on specialized knowledge, but his qualification as an expert regarding any specific topic is not currently at issue.[1]

---

[1] The HT Defendants reserve the right to later contest Mr. McDermott's qualifications to offer particular opinions, depending how this matter proceeds and the outcome of pending motions.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT [DKT. 1068] - 2

**14-ER-3443**

## VI.     The HT Defendants' motion is supported by law and facts.

Plaintiff's frequent jabs that the methodology, substance and reliability of Mr. McDermott's opinions are unchallenged are clearly baseless in light of Dkt. 1068-1 and this Reply, which show his opinions are unreliable and inadmissible because of his blatant, inappropriate and far-reaching partisanship and advocacy. Dkt. 1097 at 5, 10-11, 14, 17, 18-19, 20, n. 13. The argument that the correctness of Mr. McDermott's "facts" and opinions are unchallenged further ignores the legal standard, under which the court "is not tasked with deciding whether the expert is right or wrong," but whether the opinion is reliable and helpful. Dkt. 1068-1 at 2-5.

## VII.   Mr. McDermott's opinions are not reliable, relevant or helpful.

Plaintiff attempts to divorce the determination of reliability and relevance[2] from partisanship and advocacy, but those issues are intertwined and non-severable. Dkt. 1097 at 8-20. Mr. McDermott's opinions are not reliable and or helpful *because of* his self-demonstrated partisanship and assumption of an advocacy role. *See* Dkt. 1068-1. Further, Plaintiff's strategy to ignore advocacy in the reliability determination by arguing Mr. McDermott's opinions satisfy *other* considerations some courts (not including the Ninth Circuit) have used is obviously flawed. Dkt. 1097 at 8-9. Specifically, Plaintiff relies on the potential reliability factors listed in *McDevitt v. Guenther*, 522 F.Supp.2d 1272, 1291-92 (D. Haw. 2007), but those factors[3] are explicitly "non-exhaustive" and are themselves broad enough to encompass partisanship and advocacy. *Id*. at 1292. Judges have wide latitude in how they assess reliability and the *McDevitt* factors (if they

---

[2] He also argues Mr. McDermott's testimony is relevant because Plaintiff must support his claims with expert testimony, thus confusing concepts of relevance and burden of proof. Dkt. 1097 at 9.
[3] "(1) Whether the expert identified the materials relied upon and personally examined the file underlying the case; (2) … sufficiently explained why he or she reached an opinion; (3) … cited other sources relied upon by attorneys such as applicable statutes, treatises, or publications by professional organizations; or (4) … demonstrated that his opinion is accepted by his peers." *Id*. at 1291-92 (internal citations omitted).

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE
TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT [DKT. 1068] - 3

apply at all) do not exclude other considerations. *Id*. The district that decided *McDevitt* inherently recognized this in a later case, where an attorney expert's opinions were stricken as unreliable because they were inadmissible legal conclusions, i.e., the expert's subjective analysis of the contract at issue and the parties' intent "based on a one-sided review of the record in a way that is favorable to [one party]." *GPF Waikiki Galleria, LLC v. DFS Grp., L.P*., No. CV 07-00293, 2007 WL 3195089 at *5-6 (D.Haw. Oct. 30, 2007). This made him "an advocate, not an expert." *Id*.

Plaintiff's effort to distinguish the HT Defendants' legal support, calling the cases they cite "inapposite," is unconvincing. The HT Defendants cited *Haldiman v. Cont'l Cas. Co.*, CV-13-736, 2014 WL 12670637 (D.Ariz. Aug. 26, 2014) for its recognition that an expert's role is to assist the trier of fact; it is "not to be an advocate." Dkt. 1068-1 at 5. Plaintiff does not dispute this, but instead argues the basis for exclusion in *Haldiman* – that the "opinions consisted mainly of 'statements of law and legal conclusions'" – is not present here.[4] Dkt. 1097 at 11. But Mr. McDermott's report is replete with statements of law and legal conclusions. Huge swaths of it read like legal briefing, with citations to case law and arguments regarding what legal principles apply to everything from claim inception to discovery to trial, such as his assertions regarding the adverse interest exception, disgorgement, and the applicability of the attorney-client privilege. Dkt.

---

[4] Plaintiff's denial that Mr. McDermott's "opinions" are statements of law and legal conclusions implies that he does not understand those terms. Statements of law purport to define the principles of law that apply to the trier of fact's decision. "[I]nstructing the jury as to the applicable law is the … exclusive province of the court." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc*., 523 F.3d 1051, 1058 (9th Cir. 2008) (citations omitted). Legal conclusions apply law to facts and "'merely tell the jury what result to reach.'" *Jenkins v. All Nation Ins. Co*., 852 F.2d 571 (9th Cir. 1988). Notably, the case Plaintiff relies on for the *McDevitt* factors excluded the attorney expert's numerous improper legal conclusions and provided a good explanation of their inadmissibility. *McDevitt*, 522 F.Supp.2d at 1292-94.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE
TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT [DKT. 1068] - 4

1070-1 at 493-95, n. 1257. His so-called "primary opinions" consist almost entirely of legal conclusions that tell the trier of fact how to decide the case,[5] such as the following.

> I opine, *inter alia*, that: … [the HT Defendants] breached their duties of care and duties of loyalty owed to the AIA Corporations by representing the interests of the [directors] and in earning significant fees and costs. [And they] negligently or intentionally substantially assisted the [directors] in breaching their fiduciary duties and failed to exercise due care …

Dkt. 1070-1 at 420; *id.* at 421-523 (continually stating legal conclusions as opinions).

The *Stencel case* distinguishes between the roles of attorneys (advocates) and experts (objective opinion givers), which Plaintiff does not dispute. Dkt. 1068-1 at 5. Plaintiff argues *Stencel* is inapposite because it addressed whether experts, like attorneys, were subject to imputed *disqualification*. Dkt. 1097 at 12. The principles the court used to explain that "experts … perform a very different function in litigation than do lawyers" are germane to this motion to exclude. *Id.*[6]

*Cacciola v. Selco Balers, Inc.*, 127 F.Supp.2d 175 (E.D.N.Y. 2001), recognized partisan experts sacrifice objectivity for the need to win. Dkt. 1068-1 at 5. Plaintiff does not disagree, but instead argues *Cacciola* does not apply because the court excluded an engineer for lack of experience. Dkt. 1097 at 12. Actually, he was excluded because his opinions were "unsubstantiated generalizations, speculative hypotheses and subjective evaluation" that would not help the jury because such opinions are not based on any specialized knowledge or experience. *Cacciola*, 127 F.Supp.2d at 183-84. The court said testimony based on an expert's subjective belief, speculation, and *ipse dixit* is unreliable and inappropriate partisanship, and warned that partisan experts motivated by a desire to win can unjustly "wreak havoc upon the reputation and financial condition

---

[5] *See United States v. Bedford*, 536 F.3d 1148, 1158 (10th Cir. 2008) (holding "legal conclusions drawn by applying the law to the facts" are inadmissible because they are not helpful to the jury).
[6] An expert "is merely a witness with additional knowledge beyond the ken of the layman, who helps the [jury] understand…specialized topics." In contrast, an advocate "characterize[s] and sculpt[s] the facts," such as emphasizing or drawing attention away from certain facts.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT [DKT. 1068] - 5

14-ER-3446

of the defendant." *Id.* at 184. Indeed, Mr. McDermott has dragged the HT Defendants through the mud with his partisan opinions, motivated by his admitted desire for Plaintiff to win.[7]

The HT Defendants cited the cases of *GST Telecom* and *Lippe* because they involved circumstances and expert conduct similar to this case. Dkt. 1068-1 at 5-7. Plaintiff argues *GST Telecom* is inapplicable because it involved the business judgment rule, which Plaintiff contends is not at issue here. Dkt. 1097 at 13, 14. This argument is problematic on several fronts. (i) Plaintiff knows the business judgment rule is "at issue." Mr. McDermott's opinion that AIA's directors acted in bad faith and were intentionally disloyal expressly tries to avoid the presumption. Dkt. 1070-1 at 57, 360-61. (ii) The *GST Telecom* court excluded the experts, not because the business judgment rule was at issue, but because they engaged in "contentious advocacy" shown by their "animated assessments," which were based on subjective beliefs and speculation about the directors' alleged lack of credibility regarding their exercise of business judgment, in order to opine that corporate lawyers committed malpractice by failing to overrule the directors' decisions. Dkt. 1068-1 at 7. There is no meaningful difference between those inadmissible opinions and Mr. McDermott's animated, subjective, speculative assessments regarding the credibility and motivations of AIA's directors, which he then uses as a basis to opine that the HT Defendants committed malpractice by taking direction from AIA's directors and/or failing to control or remove them.[8] *See, e.g.*, Dkt. 1070-1 at 57, 68, 77, 104, 423, 451-52, 463, 492, 497, 492, 626, 628. This is an advocate trying to supplant the jury's function by dictating how the case should be decided.

---

[7] Mr. McDermott also has a financial incentive to win, as set forth in Dkt. 1069-1.

[8] But it is well-established that the attorney-client relationship "'is one of agency' in which the client is the principal and the attorney is the agent." *Taylor v. McNichols*, 149 Idaho 826, 844, 243 P.3d 642,660 (2010) (citations omitted); *see also Weskan Agency, LLC v. CGB Div'd Serv's, Inc.*, 2:18-CV-356-DCN, 2019 WL 1450527 (March 31, 2019) ("the board of directors, not a corporate officer" generally has power/responsibility for a corporation's affairs (citing I.C. § 30-29-801)).

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT [DKT. 1068] - 6

Plaintiff argues *Lippe* is distinguishable because the expert stated a single conclusory opinion that the board's true motivation was to defraud people. Dkt. 1097 at 12. Whether an expert offers one improper opinion or many (as Mr. McDermott), what is relevant is *Lippe*'s recognition that expert advocacy warrants exclusion. Plaintiff also argues *Lippe* does not apply because Mr. McDermott did not engage in the same conduct as the *Lippe* expert. *Id*. at 12-15. The record clearly illustrates he did, as the HT Defendants detail here.

Mr. McDermott functioned as an advocate and co-counsel for Plaintiff by working full-time on this case for at least 15 months (without observing an hourly fee arrangement), reviewing 1000+ filings as this matter progressed, weighing in on and providing support for Plaintiff's legal strategy (such as rebuttal of affirmative defenses), arguing Plaintiff's legal positions to the Court in declarations best characterized as argumentative legal memoranda, openly making it his goal to successfully present Plaintiff's claims and secure recovery for AIA, and submitting a report replete with advocacy and legal conclusions that reads like an attorney's legal brief on issues wholly unrelated to helping the jury understand evidence.[9] See Dkt. 1068-1 at 10-15 for further detail.

The fact that Mr. McDermott views it as his role to "call balls and strikes" does not convey the sense of impartiality that Plaintiff intended; it *supports* that Mr. McDermott is an advocate and partisan. Dkt. 1097 at 14. Continuing the baseball analogy, even umpires have two-strike biases and strike-zone blind spots; ultimately, an umpire's call depends on the information he considers and how it influences his subjective interpretation of the pitch and strike zone. The "balls and strikes" analogy is also particularly inappropriate for an expert to adopt as his anthem since it misconstrues an expert's role. An expert does not decide the law or the facts or whether a claim

---

[9] Plaintiff admits, perhaps misguidedly, that "most of the testimony and opinions contained in [Mr. McDermott's] declarations will not even be relevant for trial," thus acknowledging he assumed a role in this case having nothing to do with the proper function of an expert. Dkt. 1097 at 18.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT [DKT. 1068] - 7

"hits a home run," but is supposed to help jurors understand the evidence so they can decide the case based on their own assessment of the facts, applying the law as the judge instructs. Mr. McDermott's baseball analogy does explain why he argues the law, chose a side, and attempts to pass off legal conclusions as expert opinions; he (wrongly) views that as his role. In a wan attempt to convince the Court that Mr. McDermott is impartial, Plaintiff argues Mr. McDermott stated an opinion against Plaintiff's interests – that agreements tolling the statutory period for AIA's claims against its directors are void. *Id*. at 14-16. However, Mr. McDermott also opined the tolling agreements were not in AIA's best interest in the first place. Dkt. 1070-2 at 293:24-294:5. And he had to opine the agreements were void to maintain consistency with his other opinions that the directors lacked authority to enter agreements on AIA's behalf. Dkt. 1070-1 at 461, n. 1667.

Plaintiff attempts to refute that Mr. McDermott is a partisan, results-oriented advocate by arguing that his retention since 2012 in three other cases with overlapping facts and similar claims, along with the consistency of his opinions throughout, enhances his credibility and reliability. Dkt. 1097 at 15, 17, 18. Plaintiff confuses credibility (a jury question) and reliability (an admissibility issue). Further, this "consistency" argument largely proves the HT Defendants' point. For example, to demonstrate "consistency," Mr. McDermott stated that, in one of the earlier related actions in which Mr. Bond hired him, he rendered the opinion that Plaintiff's claims *in this case* would succeed. Dkt. 1099 ¶ 6.[10] This is a striking admission of goal-oriented opinions and advocacy, especially considering the certainty Mr. McDermott expressed early in this case that discovery he had never seen would "further support" Plaintiff's claims. Dkt. 1068-1 at 15. Consistency also strategically benefits Plaintiff by avoiding creation of new grounds for

---

[10] Mr. McDermott's "case-within-a-case" opinion in this case – that if a receiver or attorney for AIA had earlier pursued the claims Plaintiff asserts in this case, they would have prevailed – is also pure advocacy for how to decide the case. Dkt. 1070 1 at 87-88, 288, 437, 478, 496, 550.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE
TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT [DKT. 1068] - 8

impeachment. Mr. McDermott's opinions undoubtedly promote his prediction and hope for Plaintiff's success.

Plaintiff argues that the objectionable portions of Mr. McDermott's report and testimony are "innocuous," "minor issues" that can be removed/omitted pursuant to an order *in limine* without impacting his opinions. Dkt. 1097 at 10, 11, 15, 19. Focusing only on the location within Mr. McDermott's report of the blatant witness assessments the HT Defendants listed in their moving papers, Plaintiff argues that most inappropriate statements are in the "rebuttal" section of Mr. McDermott's report and, therefore, do not affect his "primary opinions." Dkt. 1097 at 10. However, the many examples of Mr. McDermott's inappropriate witness assessments the HT Defendants identified in their moving papers is a representative sample; it is not, nor was not intended to be, an exhaustive list of all of the improper advocacy, of which inappropriate witness assessments are just one component. Further, the "rebuttal" versus "primary opinion" distinction Plaintiff attempts to draw ignores that the existence of an improper basis (and tainting) of the opinions warrants exclusion, and it does not matter when or where in the litigation process it is revealed. In *United States v. Scop,* 846 F.2d 135, 142, on reh'g, 856 F.2d 5 (2d Cir. 1988), the court excluded an expert after cross-examination revealed his opinions were based on his witness credibility assessments. The *Scop* court also explained why simply removing words from opinions offered at trial is inadequate. Unless opinions that are based on improper assessments are excluded, the jury would have to "evaluate opinion testimony in ignorance of an important foundation for that opinion," or else "hear testimony that is otherwise inadmissible and highly prejudicial." *Id.*

Plaintiff's argument that improper statements can be removed without affecting "primary opinions" is also demonstrably false. Most of the "primary opinions" themselves constitute inadmissible statements of law and legal conclusions, as discussed above. In addition,

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE
TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT [DKT. 1068] - 9

Mr. McDermott's inappropriate witness assessments are obvious foundations for his "primary opinions." A few notable examples are illustrated here; there is insufficient space to describe all correlations. (i) Mr. McDermott's disbelief of Mr. Riley's explanation for why John Taylor's name was on bills for a short time early in the *Reed Taylor* case, and his belief the HT Defendants misrepresented that they never represented individuals in that case, go to the heart of his opinion (another legal conclusion) that the HT Defendants were conflicted and were protecting/promoting John Taylor's interests and aiding/abetting him. Dkt. 1070-1 at 545, 76, 484, 548, 550, 554. (ii) Mr. McDermott's assessment that AIA's directors acted in bad faith and intentionally breached their duties is a basis for "primary opinions" that the HT Defendants breached duties as counsel and aided/abetted the directors by taking their direction. Dkt. 1070-1 at 57, 68, 104, 423, 451-52, 463, 492, 626, 628. (iii) Mr. McDermott's glowing appraisals of Messrs. Bond and Moran, and his contrastingly unfavorable view of the HT Defendants, underlie his "primary opinions" relating to Donna Taylor's action to appoint Mr. Moran as receiver for AIA (including his opinion that Mr. Moran would have pursued and prevailed on the claims Plaintiff asserts here). Dkt. 1070-1 at 210, 395, 422-23, 511, 563, 566.[11] (iv) Mr. McDermott admitted his improper assessments of John Taylor's credibility and motivations underlie *all* of his "primary opinions." According to Mr. McDermott, "all roads lead back to" John Taylor, whose "improper, unauthorized, self-interested, and egregious conduct is tied to the liability of [all] other [defendants]." Dkt. 1070-1 at 3. "Since John Taylor's conduct is undefendable, then so are the conduct of [all defendants] because Miesen's claims and damages against them are intertwined with, and tied directly to, John Taylor's improper acts and omissions." *Id*. at 4.

---

[11] Mr. McDermott tries to convince the Court that his assessment of Mr. Moran is a proper opinion because he interviewed Mr. Moran and has experience evaluating attorneys. Dkt. 1097 at 20.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT [DKT. 1068] - 10

Mr. McDermott's opinions in this case are based on and entrenched in his inappropriate, partisan, and goal-oriented assessments of witnesses and evidence. His opinions are unreliable and he must be excluded.

DATED this __5th__ day of March, 2021.

ELAM & BURKE, P.A.

By:_____ */s/ Loren C. Ipsen*_____
Loren C. Ipsen, Of the Firm
Joyce A. Hemmer, Of the Firm
Attorneys for Defendants Hawley Troxell Ennis & Hawley LLP, Gary D. Babbitt, D. John Ashby, and Richard A. Riley

CERTIFICATE OF SERVICE

I hereby certify that on this __5th__ day of March, 2021, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons via email:

| | |
|---|---|
| Roderick C. Bond<br>rod@roderickbond.com<br>*Attorney for Plaintiff* | Daniel L. Glynn<br>dglynn@idalaw.com<br>*Attorneys for Michael W. Cashman, Sr., R. John Taylor, James Beck, Connie Taylor Henderson, Crop USA Insurance Services, LLC and Crop USA Insurance Agency, Inc.* |
| Alyson A. Foster<br>alyson@dempseyfoster.com<br>William E. Adams<br>bill@weadamslaw.com<br>*Attorneys for Intervenor GemCap Lending I, LLC* | Michael S. Bissell<br>mbissell@campbell-bissell.com<br>Tyler S. Waite<br>twaite@campbell-bissell.com<br>*Attorneys for Reed J. Taylor* |

_____ */s/ Loren C. Ipsen*_____
Loren C. Ipsen

4851-6947-9646, v. 1

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT [DKT. 1068] - 11

**14-ER-3452**

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
10900 N.E. 4th St., Suite 2300
Bellevue, WA  98004
Telephone: (425) 591-6903
Email: rod@roderickbond.com

ANDREW SCHWAM, ISB NO. 1573
ANDREW SCHWAM LAW FIRM
705 SW Fountain Street
Pullman, WA 99163-2128
Telephone: (208) 874-3684
Email: amschwam@turbonet.com

Attorneys for the Plaintiff Dale L. Miesen

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.; <br><br> Plaintiff, <br><br> **v.** <br><br> CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company, <br><br> Defendants. | Case No. 1:10-cv-00404-DCN-CWD <br><br> NOTICE OF ASSOCIATION AND APPEARANCE OF CO-COUNSEL |

NOTICE OF ASSOCIATION AND APPEARANCE OF CO-COUNSEL - i

CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; R. JOHN TAYLOR, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual,

> Defendants/Third-Party Plaintiffs,

> v.

REED TAYLOR, an individual,

> Third-Party Defendant.

REED TAYLOR, an individual,

> Third-Party Defendant/ Counterclaimant,

> v.

CONNIE TAYLOR HENDERSON, an individual; R. JOHN TAYLOR, an individual; JAMES BECK, an individual, and UNKNOWN BONDING COMPANY, an unknown entity that issued the unknown fidelity ERISA Bond,

> Counterdefendants.

NOTICE OF ASSOCIATION AND APPEARANCE OF CO-COUNSEL - ii

Notice is hereby given that Andrew Schwam of Andrew Schwam Law Firm hereby appears and associates as co-counsel with Roderick Bond of Roderick Bond Law Office, PLLC to jointly serve as counsel for the Plaintiff Dale L. Miesen in the above-entitled action. In addition to continuing to serve Roderick Bond, the court and parties are also directed to serve copies of all pleadings, papers, notices, and communications pertaining to the above-entitled lawsuit to Andrew Schwam at:

> Andrew Schwam
> 705 SW Fountain Street
> Pullman, WA 99163-2128
> Telephone: (208) 874-3684
> Email: amschwam@turbonet.com

Pursuant to the prior agreement between counsel for the parties in this lawsuit, Mr. Schwam will also agree to accept service of discovery responses and documents electronically via the above email address.

DATED:  This 26th day of May 2021.

RODERICK BOND LAW OFFICE, PLLC


By:   _/s/ Roderick C. Bond_____
      Roderick C. Bond
      Attorney for the Plaintiff Dale L. Miesen

ANDREW SCHWAM LAW FIRM


By:   _/s/ Andrew Schwam_____
      Andrew Schwam
      Attorney for the Plaintiff Dale L. Miesen

NOTICE OF ASSOCIATION AND APPEARANCE OF CO-COUNSEL - 1

**14-ER-3455**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 26th day of May 2021, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:


Jeffrey A. Thomson:    jat@elamburke.com
Loren C. Ipsen:    lci@elamburke.com
Joyce A. Hemmer:    jah@elamburke.com
Bradley S. Keller:    bkeller@byrneskeller.com
Alyson A. Foster:   alyson@dempseyfoster.com
William E. Adams:   bill@weadamslaw.com
Tyler S. Waite:    twaite@campbell-bissell.com
Michael S. Bissell:    mbissell@campbell-bissell.com
Daniel L. Glynn:    dglynn@idalaw.com
Andrew Schwam:   amschwam@turbonet.com

/s/ Roderick C. Bond
Roderick C. Bond

NOTICE OF ASSOCIATION AND APPEARANCE OF CO-COUNSEL - 2

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
10900 N.E. 4th St., Suite 2300
Bellevue, WA  98004
Telephone: (425) 591-6903
Email: rod@roderickbond.com

ANDREW SCHWAM, ISB NO. 1573
ANDREW SCHWAM LAW FIRM
705 SW Fountain Street
Pullman, WA 99163-2128
Telephone: (208) 874-3684
Email: amschwam@turbonet.com

Attorneys for the Plaintiff Dale L. Miesen

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>**v.**<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 1:10-cv-00404-DCN-CWD<br><br>PLAINTIFF DALE L. MIESEN'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RECONSIDERATION (Dkt. 1112)<br><br>**ORAL ARGUMENT REQUESTED** |

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - i

CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; R. JOHN TAYLOR, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual,

        Defendants/Third-Party Plaintiffs,

      **v.**

REED TAYLOR, an individual,

        Third-Party Defendant.

REED TAYLOR, an individual,

        Third-Party Defendant/ Counterclaimant,

      **v.**

CONNIE TAYLOR HENDERSON, an individual; R. JOHN TAYLOR, an individual; JAMES BECK, an individual, and UNKNOWN BONDING COMPANY, an unknown entity that issued the unknown fidelity ERISA Bond,

        Counterdefendants.

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - ii

**14-ER-3458**

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.   ARGUMENT................................................................................................... 3

A.   Legal Standard for Reconsideration.......................................................... 3

B.   Reconsideration Should Be Granted Because McDermott Is NOT an Advocate, Partisan, Unobjective Expert or Contingent Fee Expert. ........................................................ 3

   1.   The Legal Standards for the Admissibility and Exclusion of McDermott's Expert Testimony.......................................................................... 4

   2.   Opposing Counsel Has Produced NO Evidence that McDermott Has Been Partisan, an Advocate, Biased, Unobjective or Paid on a Contingent Fee Basis................ 6

   3.   Opposing Counsel Failed to Have this Court Apply Correct Legal Standards for the Proper Admission and Exclusion of McDermott's Expert Witness Opinions............ 18

   4.   Opposing Counsel Failed to Provide Evidence that McDermott Was Being Paid on a Contingent Fee Basis. ........................................................... 20

   5.   Miesen Respectfully Requests Oral Argument............................................... 20

III.   CONCLUSION.................................................................................... 20

CERTIFICATE OF SERVICE ....................................................................... 21

## I.  __INTRODUCTION__

Before this Court is Miesen's motion to reconsider the order excluding Miesen's expert witness, Professor McDermott ("McDermott"), for allegedly being an advocate, partisan and a contingent fee expert. (Dkt. 1112).[1] This lawsuit involves not just Miesen, but over 60 other stakeholders such as shareholders, 401(k) plan participants, the Employee Stock Ownership Plan, and *bona fide* creditors. (Dkts. 1098, 1098–1098-7.) Those stakeholders have no chance of recovery without the success of this lawsuit. Based on the following testimony alone, reconsideration is warranted for this Court to change its mind on excluding McDermott.

McDermott stated under oath in his declaration:

> I have made no decisions regarding the conduct of the prosecution of the claims in this case. I never served as counsel to Mr. Bond or Miesen, nor was I engaged to serve as a consultant to Mr. Bond in any lawsuit. Contrary to the assertions of the Hawley Troxell Defendants, I never provided legal advice or helped "to anticipate, identify, evaluate, and/or develop legal theories, legal arguments, facts necessary to support claims, defenses to the claims responses to the defenses and witness cross-examination topics." My role has been exclusively to be an independent and objective expert witness.

(Dkt. 1099 ¶ 26.) McDermott also stated under oath in his declaration:

> In addition, if this Court were to enter an order in limine to direct me to limit my testimony based on those objected statements or opinions, I would, of course, comply with this Court's order.

(Dkt. 1099 ¶ 37.) Opposing counsel has produced no evidence to show that the preceding two under oath statements are false or perjurious. Without such a showing by opposing counsel, there is no legal basis to find McDermott an advocate justifying his exclusion as an expert witness.

While McDermott's opinions are forceful, and rightfully so based on the egregious facts of this lawsuit, his opinions and actions are no different from the routine behavior of expert witnesses.

---

[1] When citing to dockets, Miesen will cite to the blue page numbers at the top of each page.

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 1

For example, let's imagine a physicist employed as an expert witness in a case involving a driver who was speeding more than 70 mph over the speed limit and killed a family of five. That physics expert who would be needed to testify regarding what the impact damages showed about the speed of the defendant's car would routinely tell his employing counsel what information needed to be brought out so that he could render relevant and reliable opinions. It would not be improper for such a physics expert to attend depositions and submit declarations in order to make certain that the information he required would be obtained, if available. In other words, such an expert would routinely suggest questions to the counsel employing him and submit declarations identifying the information necessary for his opinions. Further, it would not be unusual for such an expert to be present at trial (even at counsel table) during the cross-examination of defendant's physics experts and other witnesses so plaintiff's counsel would have expertise available to effectively question defendant's experts and other witnesses. Finally, the physics expert before arriving at his opinions, would naturally form opinions regarding the credibility of information sources and discard any information that he did not find credible because opinions based on what is incredible would of course not be relevant or reliable.

McDermott's behavior cited by opposing counsel in support of their exclusion request does not differ in any meaningful way from the routine behavior of the expert physicist witness in the scenario provided above.

In regard to the contingent fee allegation, McDermott stated under oath in his declaration:

> Based on my prior work with Mr. Bond's law firm, I have no doubt that Mr. Bond will pay me the amount set forth in the bill I will submit to him prior to trial. His firm has always timely paid me in full for my work. The predicate for my hourly fee arrangement with Mr. Bond's law firm is the trust and confidence I have in him as a result of my prior experience in working with him as an expert in the other cases to which I referred above. In short, the fee understanding that I have with Mr. Bond's law firm bears no relationship to one for a contingent fee arrangement; and in no sense have Mr. Bond's law firm and I "abandoned" the fee arrangement described

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 2

in my Expert Report as claimed by the Hawley Troxell Defendants. Mr. Bond's law firm is obligated to pay me irrespective of the ultimate result of this case.

(Dkt. 1099 ¶ 20.) Opposing counsel has produced no evidence that this under oath statement was false or perjurious and thus this expert witness has **NOT** been employed on a contingent fee basis.

Opposing counsel has confused McDermott's strongly held opinions for advocacy. McDermott's report and his various declarations reveal his strongly held positions. The strength of these opinions is understandable in light of the unusual behavior of the Hawley Troxell Defendants. This behavior includes: (1) numerous unaddressed and undisclosed conflicts of interest; (2) failing to represent the interests of the AIA Corporations in lawsuits and transactions resulting in millions of dollars in losses; (3) representing the interests of corporate insiders guilty of looting the AIA Corporations; and (4) willingly overlooking, assisting and concealing from shareholders the wrongful actions of corporate officers, board members and select shareholders who were diverting millions of dollars and funds and assets from the AIA Corporations.

## II.   ARGUMENT

### A.  Legal Standard for Reconsideration.

This request for reconsideration is brought under the standard set out in *City of L.A., Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) where the court stated:

> 'As long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient.'

*Id.* Thus, a district court judge is free to change his mind for sufficient cause shown. *Id.*

### B.  Reconsideration Should Be Granted Because McDermott Is NOT an Advocate, Partisan, Unobjective Expert or Contingent Fee Expert.

For the reasons explained below, this Court should grant reconsideration and deny the Hawley Troxell Defendants' two motions requesting the exclusion of the expert witness, McDermott. (Dkts. 1112, 1068, 1069.)

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 3

1. **The Legal Standards for the Admissibility and Exclusion of McDermott's Expert Testimony.**

There is no disagreement regarding the gatekeeping requirements mandated by the U.S. Supreme Court, the Ninth Circuit Court of Appeals and the Federal Rules of Evidence with respect to the required consideration of qualifications, relevancy and reliability for the admission and exclusion of expert witness opinions, including, that the judge is not a fact finder and liberally favor admission of expert opinions, and issues regarding weighing the evidence, biases, credibility, criticism of methods, and the sufficiency of assumptions are matters for the jury to decide. *See, e.g., Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591-592 (1993); *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315-1322 (9th Cir. 1995) ("*Daubert II*"); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-158 (1999); *U.S. v. Abonce–Barrera*, 257 F.3d 959, 965 (9th Cir. 2001); *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004); *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1196 (9th Cir. 2005); *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1191-1193 (9th Cir. 2007); *Primiano v. Cook*, 598 F.3d 558, 563-568 (9th Cir. 2010); *U.S. v. Lukashov*, 694 F.3d 1107, 1112 (9th Cir. 2012); *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1043-144 (9th Cir. 2014); *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1196-1198 (9th Cir. 2014); *Lewert v. Boiron, Inc.*, 212 F.Supp.3d 917, 928 n.6 (C.D. Cal. 2016); *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1231-1238 (9th Cir. 2017); *Houserman v. Comtech Telecomm. Corp.*, __ F.Supp.3d __, 2020 WL 7695695, at *3 (W.D. Wash. Dec. 28, 2020); Fed. R. Evid. 702-704; The Advisory Committee's Notes and 2000 Amendments Notes to Rule 702; *see also Garrett v. Desa Industries, Inc.*, 705 F.2d 721, 724 (4th Cir. 1983).

In *McDevvitt v. Guenther*, the court set out the factors courts have considered for the admission of legal malpractice expert testimony:

> Although the Court has not been able to find any cases that articulate a complete set of factors specific to the testimony of attorney experts, courts have relied on a

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 4

**14-ER-3463**

variety of measures to assess reliability of attorney expert testimony: (1) whether the expert identified the materials relied upon and personally examined the file underlying the case; (2) whether the expert sufficiently explained why he or she reached an opinion; (3) whether the expert cited other sources relied upon by attorneys such as applicable statutes, treatises, or publications by professional organizations; or (4) whether the expert demonstrated that his opinion is accepted by his peers. This is a non-exhaustive annotation of various tests relied upon in different courts, and thus the expert testimony need not satisfy all of these criteria to be deemed reliable.

*McDevitt v. Guenther*, 522 F.Supp.2d 1272, 1291-92 (D. Haw. 2007); *see Tokio Marine & Nichido Fire Ins. Co. v. Calabrese*, No. CV 07–2514(JS)(AKT), 2011 WL 5976076, at *12 (E.D.N.Y. Nov. 28, 2011) (*Dauber*t factors do not apply to legal malpractice experts). This is exactly what McDermott did in his report and declarations yet opposing counsel faults him for that because somehow it makes him an advocate. (Dkt. 1099-1.) Somehow the factors that support the finding that McDermott's opinions should be admissible have been turned into a claim by opposing counsel that the very factors that are required somehow show that his testimony should be excluded.

There is no dispute that attorney malpractice experts are one of the few experts permitted to discuss the law in their testimony and opinions. *See, e.g., Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988); *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100-101 (1st Cir. 1997); *Middle Market Financial Corp. v. D'Orazio*, No. 96CIV8138SWKHBP, 2002 WL 31108260, at *7 (S.D.N.Y. Sept. 23, 2002); 32 C.J.S. Evidence § 838 (2021); *see also Weber v. Sanborn*, 526 F.Supp.2d 135, 146-147 (D. Mass. 2007) (expert was qualified because he was a law professor).

There is no dispute that expert testimony is required for legal malpractice claims unless within a laymen's knowledge. *Greenfield v. Smith*, 162 Idaho 246, 252, 395 P.3d 1279, 1285 (2017). Thus, McDermott's expert witness testimony is critical and relevant. (Dkts. 211, 1099-1.)

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 5

Finally, there is no dispute regarding the standards to exclude expert testimony and the balancing test that must be applied under Rule 403, including that exclusion should be used sparingly and Rule 403 favors admission. *U.S. v. Gross*, 424 F.Supp.3d 800, 809-810 (C.D. Cal. 2019); *U.S. v. Evans*, 728 F.3d 953, 962-966 (9th Cir. 2013); *U.S. v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995); *Blancha v. Raymark Indus.*, 972 F.2d 507, 516-517 (3d Cir. 1992); Fed. R. Evid. 403; Advisory Committee Notes to Rule 403.

### 2. Opposing Counsel Has Produced NO Evidence that McDermott Has Been Partisan, an Advocate, Biased, Unobjective or Paid on a Contingent Fee Basis.

Opposing counsel has failed to produce evidence warranting the expansion of *Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003) and they also improperly seek to interject the jury issues of credibility, bias and the weighing of evidence involving McDermott's role as an expert. (Dkts. 1112 at 5-13, 1068-1.) In short, contrary to opposing counsel's citations, there is nothing improper about McDermott's submission of expert declarations, participating in pretrial discovery matters, and attending depositions, which are routinely done by experts.

In response to opposing counsel's allegations, Miesen submitted declarations from McDermott and Messrs. Bond and Miesen. (*See generally* Dkts. 1098-1100.) All three persons stated in their declarations, under oath, that opposing counsel's allegations were all false. (*Id.*) McDermott stated under oath in his declaration that:

> The Hawley Troxell Defendants' claim that I am an "advocate" or "partisan" is also based on the directly conflicting contentions that, on the one hand, I "directly and significantly assisted Mr. Bond in the prosecution of this action, taking an active advocacy role in developing pleadings, discovery and arguments to the Court on procedural and discovery motions;" yet, on the other hand they suggest that I didn't write my own Expert Report: "Mr. Bond's heavy involvement is not surprising given that the tone, style and phraseology bear a remarkable resemblance to Mr. Bond's briefing. Neither of those assertions is true.

> I have made no decisions regarding the conduct of the prosecution of the claims in this case. I never served as counsel to Mr. Bond or Miesen, nor was I engaged to serve as a consultant to Mr. Bond in any lawsuit. Contrary to the assertions of the

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 6

Hawley Troxell Defendants, I never provided legal advice or helped "to anticipate, identify, evaluate, and/or develop legal theories, legal arguments, facts necessary to support claims, defenses to the claims responses to the defenses and witness cross-examination topics." My role has been exclusively to be an independent and objective expert witness.

Mr. Bond has provided me with all of the documents produced by all parties in discovery in this lawsuit and he has taught me how to use document search software so that I am able to independently, objectively and properly render opinions. He insisted that my work be independent and objective, and he provided [me] with the information and tools with which to do that.

As is the case with all of my opinions, I independently and objectively prepared and express my opinions as to those individuals.

(Dkt. 1099 ¶¶ 25, 26, 28 & 40 (footnotes omitted).) McDermott's testimony was further corroborated by the sworn testimony of Messrs. Bond and Miesen. (Dkts. 1098 ¶ 7; 1100 ¶ 14.) Thus, the evidence establishes that McDermott was not an advocate, partisan, biased or misleading. (*See generally* Dkt. 1112 at 5-13.)

In *Lippe*, the district court judge gave instructions in the form of an order limiting the expert witness testimony, which the expert witness ignored. The district court judge rightly became annoyed and lost confidence that the so-called expert would follow future orders. *Lippy*, 288 B.R. at 688. Unlike the facts in *Lippe*, this Court has never entered a prior order limiting the scope of McDermott's testimony in his report or admonished McDermott in any way. McDermott stated in his declaration under oath:

I could remove any and all references in my Expert Report or deposition testimony as to any alleged matters of intent, credibility, credible evidence, motive, knowledge, state of mind, inferences, or any other objection raised by the Hawley Troxell Defendants and my opinions would not be affected. In addition, **if this Court were to enter an order in limine to direct me to limit my testimony based on those objected statements or opinions, I would, of course, comply with this Court's order**.

(Dkt. 1099 ¶ 37 (emphasis added).) Opposing counsel have no evidence to support any contention that McDermott would not follow any order of this Court or limit his testimony if required. To the

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 7

14-ER-3466

contrary, McDermott will testify as directed by this Court.

In *Lippe*, the expert witness, Carney, "sent a letter" stating "I am pleased that you have chosen me to serve as *counsel* to your firm in the above referenced litigation" and that he was "rendering legal services." *Lippe*, 288 B.R. at 683 (emphasis in original). During various times at his deposition, the expert "freely acknowledged his job as 'counsel'" and "over the course of his deposition he acknowledged his role as counsel or described himself as 'counsel' or 'legal advisor' numerous times." *Lippe*, 288 B.R. at 684. He "placed the notation 'CONFIDENTIAL— ATTORNEY WORK PRODUCT' on notes he prepared. He provided legal advice, in writing…" *Id* (emphasis in original). There is no similar evidence supporting opposing counsel's contention McDermott acted as an attorney in the case at bar.

Opposing counsel have no evidence to support the contention that "McDermott had to opine that the tolling agreements were void to maintain consistency with his other opinions." (Dkt. 1112 at 10.) Opposing counsel led this Court astray for two reasons. First, McDermott was not required to render an opinion on any matter that he did not wish to address. He could have merely testified that he was not offering opinions on that issue. Second, McDermott stated in his declaration, under oath, that: "my testimony [regarding the tolling agreements] was hardly that of an advocate for Miesen. Again, I was simply calling balls and strikes." (Dkt. 1099 ¶ 31.)

Opposing counsel fail to address and disregard the many examples of McDermott's objectiveness contained within his report. For example, with respect to Miesen's $800,000 damage claim, McDermott stated in his report that:

> I am assuming that the $75,000 in holdback funds were paid to AIA Insurance. Otherwise, the $800,000 should be reduced by $75,000 and the interest adjusted accordingly.

(Dkt. 1099-1 at 417 n. 1508.) As to that same damage item, McDermott also stated in his report:

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 8

> If the Court finds that the $118,418.83 in funds paid to the Greener law firm was appropriate and authorized, then Miesen's damages should be reduced by $118,418.83 to represent the funds paid to the law firm and adjust the interest calculations accordingly.

(Dkt. 1099-1 at 414 n.1531.) These are but a few, of many, examples of McDermott's honesty, objectiveness, independence and fairness. (*See generally* Dkt. 1099-1.) While McDermott has developed some strong opinions against the Hawley Troxell Defendants (*id*. at 429-640) based on the egregious facts at issue in this complex case (*id*. at 80-345), as evidence is submitted on summary judgment and at trial, this Court will see that the substance and strongly worded nature of certain of his opinions was warranted. Opposing counsel avoid these matters because their narrative of the facts is not supported by the evidence, and they did not challenge the accuracy of any facts quoted or cited in McDermott's report or the methodology employed by him. (Dkts. 1068-1, 1106.)

The Ninth Circuit has implicitly rejected the very arguments made by opposing counsel in their efforts to exclude McDermott. The court in *Carlstrom v. U.S.* stated:

> Here, say appellants, 'the only figures available were supplied by hired experts, one group seeking to inflate values to the benefit of the owners, and the other seeking to deflate them to the benefit of the sovereign.' **If this be true, it is a truth applicable to all condemnation cases, and in fact, to all lawsuits involving partisan expert testimony. It would be ideal, of course, if experts were just experts, and not partisans nor advocates**. Perhaps there are better ways to determine values of condemned land, or other factual disputes as to which experts give their opinions, **but the adversary procedure— each side with its experts and occasionally aided by experts of the court's choosing—is as yet the best our law has found**.

*Carlstrom v. U.S.*, 275 F.2d 802, 805 (9th Cir. 1960) (emphasis added).

Opposing counsels' assertion that McDermott has become such an advocate that it justifies preventing him from testifying is in reality an assertion that McDermott lacks the neutral credibility of an unbiased expert to the extent that he should be excluded. But in attacking and disregarding McDermott's sworn declaration testimony (not to mention Messrs. Bond and

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 9

Miesen's testimony), opposing counsel has invited this Court to assume the role of the jury to determine issues of credibility, bias and the weight of the evidence. *City of Pomona*, 750 F.3d at 1043 ("Under *Daubert*…the trial court is 'a gatekeeper, not a fact finder.'"); *Id.* at 1044 ("Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury."); *Lewert*, 212 F.Supp.3d at 928 n.6 (Expert bias "is not a sufficient ground to exclude an expert on a *Daubert* analysis."); *Abonce–Barrera*, 257 F.3d at 965 ("Generally, evidence of bias goes toward the credibility of a witness, not his competency to testify, and credibility is an issue for the jury."); *Bruce*, 376 F.3d at 957 ("[I]t is the exclusive function of the jury to determine the credibility of the witnesses, resolve evidentiary conflicts and draw reasonable inferences from proven facts."). This Court should decline opposing counsel's invitation to reject the unrebutted sworn testimony that rejects their allegations.

Although McDermott has not acted as a consultant to attorney Bond in this matter, contrary to opposing counsel's allegations, Miesen was unable to locate any case law excluding or admonishing an expert witness for assisting counsel in a lawsuit. There are, however, numerous cases discussing experts assisting counsel in aspects of the lawsuit. *See, e.g., Francois v. Colonial Freight Sys., Inc.*, No. 3:06CV434BA, 2007 WL 208532, at *1-2 (S.D. Miss. Jan. 24, 2007) (expert assisted in "responding to and drafting discovery requests" and also opinions, if the party so elected); *B & H Medical, L.L.C. v. ABP Admin., Inc.*, No. 02-73615, 2006 WL 123785, at *3 (E.D. Mich. Jan. 13, 2006) (noting the expert assisted in "discovery efforts" and "assisted in developing a framework and focus for Defendants' approach to this litigation."); *Stencel v. Fairchild Corp.*, 174 F.Supp.2d 1080, 1085-86 (C.D. Cal. 2001) ("Expert witnesses, on the other hand, are employed to assist the parties in their pretrial preparation, and if called to testify, to give their

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 10

unbiased opinion in order to assist the trier of fact in understanding the relevant evidence."); *Beverage Mktg. Corp. v. Ogilvy & Mather Direct Response, Inc.*, 563 F.Supp. 1013, 1014 (S.D.N.Y. 1983) (noting that "an expert could be retained to testify and in addition to advise counsel outside of the subject of his testimony."). Thus, even if McDermott did what he is accused of, it would still not justify excluding him as an expert witness.

Contrary to opposing counsel's allegations and while Miesen was unable to locate any cases excluding or admonishing an expert witness for simply filing declarations for pretrial motions, experts have filed declarations supporting motions to compel, extensions of time, and motions to amend. *See, e.g., Ubiquitous Connectivity, LP v. Central Sec. Group–Nationwide, Inc.*, No. 18-CV-368-JED-CDL, 2021 WL 1970664, at *3 (N.D. Okla. May 17, 2021) (motion to amend); *Wood v. PACCAR, Inc.*, No. 19-cv-1010-LRR, 2020 WL 831142, at *4 (N.D. Iowa Feb. 19, 2020) (extension of time); *Nazar v. Harbor Freight Tools USA Inc.*, No. 2:18-cv-00348-SMJ, 2020 WL 4730986, at *1 n.1 (E.D. Wash. June 8, 2020) (motion to amend); *U.S. v. Matish*, 193 F.Supp.3d 585, 593 (E.D. Va. 2016) (compel); *Fifield v. Schindler Enter., Inc.*, NO. SA-14-CA-574-FB, 2015 WL 11661757, at *6 n.64 (W.D. Texas Feb. 13, 2015) (compel); *Kincaid v. Wells Fargo Sec. LLC*, No. 10-CV-808-JHP-PJC, 2012 WL 13186918, at *1-2 (N.D. Okla. 2012) (compel); *Scott Hutchison v. Parent*, No. 3:12-cv-00320, 2013 WL 12139395, at *2-3 (N.D. Ohio March 1, 2013) (compel).

Contrary to opposing counsel's allegations, there is nothing improper about expert witnesses attending depositions. *See, e.g., U.S. Equal Emp't Opportunity Comm'n v. Scolari Warehouse Mkts., Inc.*, No. 04-0229-DAE-RAM, 2007 WL 9734385, at *3, 5 (D. Nev. Aug. 30, 2007) (Reversing a magistrate court's decision prohibiting an expert from attending a deposition and explaining "Fed. R. Civ. P. 26(c) suggests an 'openness' to discovery proceedings through an

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 11

implicit recognition that parties or non-parties have a right to attend depositions unless a protective order is sought for good cause or a request is made for exclusion."); *Skidmore v. Northwest Engineering Co.*, 90 F.R.D. 75, 76 (S.D. Fla. 1981) (refusing to enter a protective order preventing an expert from attending a deposition and explaining "The presence of experts is allowed despite the general exclusion when their presence is essential to the presentation of the cause. Fed. R. Evid. 615(d). The purpose of that exception is to allow the attendance of experts "needed to advise counsel in the management of the litigation." (citations omitted)); Fed. R. Evid. 615(d) (a party may not exclude "a person whose presence a party shows to be essential to presenting the party's claim or defense").

Contrary to opposing counsel's allegations that McDermott's declarations or report read like a "legal brief," McDermott was required to provide foundation, authorities and other information to support his opinions. (Dkt. 1099-1.) *See McDevitt*, 522 F.Supp.2d at 1291 (explaining that one of the basis in which a legal malpractice expert's opinions are admissible is "whether the expert cited other sources relied upon by attorneys such as applicable statutes, treatises, or publications by professional organizations" (citation omitted)); *Specht*, 853 F.2d at 809; *Nieves-Villanueva*, 133 F.3d at 100-101; 32 C.J.S. Evidence § 838; Fed. R. Civ. P. 26(b)(4)(ii)-(iii) (requiring an expert to identify the facts, data and assumptions relied upon for opinions); Fed. R. Evid. 703.

Opposing counsel provided this Court with discrete partial quotes and incomplete or inaccurate statements taking McDermott's expert witness declaration testimony out of context in order to support their argument that he was an advocate or a partisan. (*See generally* 1068-1 at 10-16, 1112 at 7-9.) In addition to McDermott denying those allegations as discussed above, attorney Bond stated in his declaration under oath:

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 12

14-ER-3472

> Professor McDermott never acted as an advocate, consultant, counsel or attorney in this lawsuit or any other lawsuit that he has acted as an expert for Mr. Miesen or any of my other past or present clients. He has been only an expert witness. **Any declarations that he has prepared and submitted in this matter were for the purpose of Professor McDermott acting in the capacity of an expert witness. His role has been only that of an expert witness and to provide his opinions**.
>
> Professor McDermott has never assisted in assisting in prosecuting Miesen's claims, preparing pleadings, developing pleadings, discovery requests or motions, arguments to the court, nor did he have any involvement in discovery other than requesting information that he believed that he needed for his report and opinions…he was **not** involved in the motions or providing any legal research for the motions.

(Dkt. 1100 ¶¶ 14-15 (emphasis added).)

To reiterate, I, attorney Bond, acted as the only attorney and advocate for Miesen in this lawsuit—not McDermott. McDermott has never acted as an advocate in this lawsuit, including relative to any of the motions to which he submitted a declaration. I, attorney Bond, prepared, signed and filed the motions and related papers. I, attorney Bond, in my role as an advocate, requested that McDermott prepare some declarations in support of the positions that I was taking in regard to the various motions. I, attorney Bond, did this because I, attorney Bond, felt that as an expert witness McDermott had expertise that would permit opinions that would assist the Court in potentially adopting my positions. I, attorney Bond, was sometimes successful and sometimes not, but I, attorney Bond, was the only advocate. I, attorney Bond, in consultation with Miesen, determined what motions to file and when—not McDermott. I, attorney Bond, felt that McDermott's vast experience and knowledge in complex corporate matters could provide the judge or discovery master, as the trier of fact for the motions, valuable experience, information and opinions in the complex lawsuit to assist the judge or the discovery master in making the factual determinations necessary in deciding whether to grant or deny the motions. Fed. R. Evid. 702(a). I, attorney Bond, hoped that the judge or the discovery master, as the trier of fact for the

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 13

**14-ER-3472**

motions, would use McDermott's expertise and opinions to reach the conclusion that was favorable to Miesen, including by providing additional privileged and work product information which could be reviewed and utilized by McDermott. I, attorney Bond, was aware that the judge or discovery master would have the discretion to accept or reject any of McDermott's expertise or opinions. I, attorney Bond, have been the **only** advocate for Miesen.

A review of the entirety, and not just part of a paragraph, of each of McDermott's declarations cited or partially quoted by opposing counsel, confirms that McDermott was offering expertise and opinions, exclusively in the role of an expert witness, to the judge or discovery master at the request of attorney Bond for purposes of supporting a motion or a position taken by Miesen (including Miesen's requests for extensions to the expert witness deadlines)—not as an advocate. (*See, e.g.,* Dkts. 194-6, 403-2, 419-16, 493-2, 758-2, 783-2, 838-3, 1099-1.) The fact that some of his opinions were objectionable to the Hawley Troxell Defendants does not convert McDermott into an advocate. Opposing counsel's remedy was to move to strike any objectionable testimony or opinions offered by McDermott, but they never did. McDermott was never an advocate.

For example, opposing counsel, through partial quotes, faults McDermott for submitting a declaration stating what he opined would "likely" be revealed in privileged and work product information that had been withheld. (Dkts. 1068-1 at 15, 1112 at 8 (quoting Dkt. 403-2 ¶ 28).) In moving for a continuance in order to have time to obtain more information, the Rules in conjunction with case law require the movant to show what additional information is expected to be obtained and how it would be useful in opposing summary judgment. At attorney Bond's request, McDermott submitted a declaration in support of a motion to continue summary judgment under Rule 56(d). (Dkts. 403, 403-2.) Opposing counsel's partial quotes were misleading. McDermott opined in his declaration in conformance with the Rules and case law:

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 14

> **[I]n order to consider and prepare complete and detailed opinions in response to the Hawley Troxell Defendants' pending Motion for Summary Judgment, I need as much of the additional documents and testimony as possible (including the resolution of any privileged disputes and the production of all such documents to the extent that privilege was waived or is deemed to not apply)**. Specifically, based on my present knowledge of those facts and documents that I have learned through the wide-spread litigation detailed above, the resolution of some or all of the pending discovery disputes in favor of Mr. Miesen and the taking of additional depositions after those disputes are resolved will **likely** reveal additional material facts necessary for the preparation and submission of my opinions, including, without limitation, the following information: [the paragraphs following this statement also include statements of what McDermott believed would "likely" be revealed in discovery and how that information would assist in preparing his opinions opposing summary judgment].

(Dkt. 403-2 ¶ 28 (emphasis added).) McDermott's prediction of the likely content of additional documents was just an expert opinion derived from his years of experience and from documents already revealed in the case. This was not advocacy but was the rendering of expert opinions in support of attorney Bond's advocacy. Notably, "likely" is defined as "Apparently true or real; **probable** <the likely outcome>." Black's Law Dictionary (11th ed. 2019) (emphasis added). Because this Court granted Miesen's motion under Rule 56(d) (Dkt. 539), subsequent discovery resulted in the production of substantial privileged information, which were also utilized by McDermott to prepare his report and opinions. (e.g., Dkts. 783-8–783-27, 1099-1.) The documents obtained included, without limitation: (1) copies of engagement letters that did not contain language of a limited scope of representation (one of which was back dated several months), which was contrary to the position taken by opposing counsel (Dkts. 783-10 at 1-10, 783-15 at 9-157; and (2) copies of billing records establishing that the Hawley Troxell Defendants had performed work researching their own potential liability and work consistent with that of general counsel, among many other things, contrary to opposing counsel's positions. (Dkts. 783-24–783-27.) Thus, once again, McDermott's opinions were honest and actually correct, and the privileged and work product documents obtained are cited by docket number or "HTEH" bates stamp number

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 15

throughout McDermott's report as foundation for his opinions. (Dkts. 783-8–783-27, 1099-1.)

By way of another example, opposing counsel faults McDermott (Dkt. 1068-1 at 15-16) because he submitted a declaration stating that he "incorporated nearly all of the paragraphs of the factual allegations set forth in the Third Amended Complaint 'as support for [his] opinions.'" (Dkts. 112 at 9 (quoting Dkt. 419-16 ¶ 31).) A complete reading of the paragraph in question confirms that opposing counsel were being misleading:

> Since this declaration is not being submitted for summary judgment purposes or as a formal expert witness disclosure and this Court appears to desire brevity for purposes of the motion to compel, I will not include a recitation of the facts and the legal authorities further supporting my opinions below (though my opinions are supported by facts and legal authorities and I may specifically address certain authorities below). Nevertheless, I incorporate by reference the factual allegations asserted in Paragraphs 4-184 of the Third Amended Complaint as support for my opinions and requests for information below **(I note that there are some typos in the Third Amended Complaint, though they are not material, but the facts alleged are otherwise generally correct based on my review of the documents and information)**. Dkt. 211 at ¶¶ 4-184. As a result, I am attaching the Third Amended Complaint as Exhibit A to this Declaration.

(Dkt. 419-16 ¶ 31.) This is not advocacy but merely an expert stating the facts from which his opinions arise. *Dorn*, 397 F.3d at 1196.

To reiterate, attorney Bond was the one and only advocate. McDermott was never an advocate, and his declarations were submitted solely at the request of attorney Bond.

Opposing counsel faults the content of McDermott's report. (Dkt. 1112 at 9.) However, the vast majority of his report and, most importantly his opinions, are not objectionable and the substance and form of his opinions have not been meaningfully challenged based on any specific or legitimate basis. (Dkt. 1099-1.)  Moreover, "there may be particular areas of law, such as legal malpractice, where expert testimony on legal matters is admissible where it would normally be excluded." *Nieves-Villanueva*, 133 F.3d at 100-101; *see also Specht*, 853 F.2d at 809; *McDevitt*, 522 F.Supp.2d at 1291 (noting that a legal malpractice expert may base opinions on review of

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 16

documents and consideration of statutes, treatises and other authorities). McDermott's report substantively complies with applicable requirements, including Rule 26(b) and Fed. R. Evid. 702-704. Moreover, McDermott stated in his declaration under oath that:

> In addition, if this Court were to enter an order in limine to direct me to limit my testimony based on those objected statements or opinions, I would, of course, comply with this Court's order.

(Dkt. 1099 ¶ 37.) There is no evidence before this Court that McDermott would not comply with any Court order limiting his testimony.

Opposing counsel argues that McDermott is a contingent fee expert and that "has accrued an unpaid six-figure bill." (Dkt. 1112 at 9.) McDermott stated under oath in his declaration that:

> [M]y agreement with [Mr. Bond's] law firm, which was developed in part over the course of my prior work with Mr. Bond, is to send one statement at the completion of the work on my Expert Report. In this case, as stated in my Expert Report, my statement will be rendered to Mr. Bond's law firm prior to the commencement of the trial and the balance due is to be paid prior to trial. In the interim, I receive periodic payments from Mr. Bond's law firm (some of which were suggested by Mr. Bond) which are to be credited against my statement for the completed work. Accordingly, I do not "charge" Mr. Bond's law firm for work prior to the submission of my bill…In the instant case, I have received $119,775 from Mr. Bond's law firm to date…In short, the fee understanding that I have with Mr. Bond's law firm bears no relationship to one for a contingent fee arrangement; and in no sense have Mr. Bond's law firm and I "abandoned" the fee arrangement described in my Expert Report as claimed by the Hawley Troxell Defendants. Mr. Bond's law firm is obligated to pay me irrespective of the ultimate result of this case.

(Dkt. 1099 ¶ 20.) McDermott's testimony was further corroborated by the sworn testimony of attorney Bond and Miesen. (Dkts. 1098 ¶ 3; 1100 ¶ 9.) Thus, opposing counsel's contention is incorrect that "McDermott has also accrued an unpaid six-figure bill." (Dkt. 1112 at 9.) The fact is that McDermott has already received six-figures in payments and knows that his payment will not depend on the effect of his opinions. The fact that McDermott has not sent a bill does not show that he is operating under a contingent fee basis. In spite of McDermott's under oath testimony, opposing counsel asks the Court to conclude that the absence of a recent bill proves that the fee

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 17

agreement has been changed and is now a contingent fee agreement. There is no basis to form such a conclusion because the unchallenged under oath testimony of McDermott, attorney Bond and Miesen shows that the fee agreement has never been changed and is not a contingent fee agreement. Thus, it is impossible for there to be an unpaid invoice or for him to be a contingent fee expert. (Dkt. 112 at 9, 12-13.)

Opposing counsel faults McDermott for commenting on witness credibility. (Dkt. 1112 at 9.) All experts must form opinions regarding the credibility of the facts they hear because no competent expert should render opinions founded on incredible testimony. Such opinions would be risible. While McDermott's report contains a few examples of statements on credibility, the issue is wholly innocuous in terms of a report over 600 pages long (Dkt. 1099-1) and he stated under oath:

> I could remove any and all references in my Expert Report or deposition testimony as to any alleged matters of intent, credibility, credible evidence, motive, knowledge, state of mind, inferences, or any other objection raised by the Hawley Troxell Defendants and my opinions would not be affected. In addition, **if this Court were to enter an order in limine to direct me to limit my testimony based on those objected statements or opinions, I would, of course, comply with this Court's order**.

(Dkt. 1099 ¶ 37 (emphasis added).)

Accordingly, this Court should reject opposing counsel's unsupported allegations, which McDermott has soundly rejected in his declaration. Consequently, reconsideration is warranted and this Court should change its mind by denying the Hawley Troxell Defendants' motion.

**3. Opposing Counsel Failed to Have this Court Apply Correct Legal Standards for the Proper Admission and Exclusion of McDermott's Expert Witness Opinions.**

Opposing counsel's briefing failed to address the standards required under *Daubert*, its progeny, the Ninth Circuit and other authorities to determine the admissibility of expert testimony, as set forth in the authorities cited in Section B(1) above. *See, E.g., Daubert*, 509 U.S. at 585-597;

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 18

*Kumho Tire*, 526 U.S. at 141-159; *Daubert II*, 43 F.3d at 1315-1319; *Primiano*, 598 F.3d 558, 563-568; *City of Pomona*, 750 F.3d 1043-1049. Opposing counsel failed to follow the process for determining the admissibility of expert testimony. First, opposing counsel failed to address McDermott's qualifications[2] (he is qualified as a legal malpractice expert, legal opinion expert and corporate director expert) and then by failing to conduct the required analysis to determine relevancy and reliability, as previously asserted by Miesen. *Id*. (Dkts. 1112 at 3-13, 1097 at 9-14, 1068-1.)  Opposing counsel failed to address or challenge any of McDermott's opinions or the methodology, foundation, assumption employed by him for any opinions, which would have required addressing the *Daubert* standard. A proper analysis would have necessarily included considering McDermott's qualifications, relevancy and the reliability of each discrete opinion. Instead, opposing counsel improperly jumped to wholesale exclusion. That is not the standard in the Ninth Circuit.

Lastly, while opposing counsel may have some concerns over some innocuous terms or statements in McDermott's report, McDermott's report is not admissible anyway. What is at issue is what testimony McDermott will be permitted to give at trial. It is the substance of his opinions that is critical and the methodology, foundation and assumptions supporting them. McDermott's trial testimony as an expert witness has been excluded without these factors ever being considered.

In addition, opposing counsel failed to identify, address and apply the correct balancing test before seeking to exclude McDermott as an expert witness or any of his opinions, as required by the Ninth Circuit, and as set forth in the authorities cited in Section B(1) above. *See, E.g., Gross*, 424 F.Supp.3d at 809-810; *Evans*, 728 F.3d at 962-966; *Mende*, 43 F.3d at 1302; *Blancha*, 972 F.2d at 516-517.

---

[2] The Court acknowledged that "McDermott is a lawyer and law professor." (Dkt. 1112 at 1.)

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 19

Thus, these are independent reasons for this Court to change its mind. This Court should grant reconsideration and deny the Hawley Troxell Defendants' motion. (Dkts. 1112, 1068.)

### 4. Opposing Counsel Failed to Provide Evidence that McDermott Was Being Paid on a Contingent Fee Basis.

Despite Miesen asserting that McDermott was not being paid on a contingent fee basis (Dkt. 1096), this Court ruled that the issue of whether McDermott should be excluded for allegedly being paid on a contingent fee basis was moot. (Dkt. 1112 at 12-13.) However, as discussed above, contrary to opposing counsel's contentions, McDermott stated in his declaration under oath that:

> **Based on my prior work with Mr. Bond's law firm, I have no doubt that Mr. Bond will pay me the amount set forth in the bill I will submit to him prior to trial. His firm has always timely paid me in full for my work.** The predicate for my hourly fee arrangement with Mr. Bond's law firm is the trust and confidence I have in him as a result of my prior experience in working with him as an expert in the other cases to which I referred above. In short, the fee understanding that I have with Mr. Bond's law firm bears no relationship to one for a contingent fee arrangement; and in no sense have Mr. Bond's law firm and I "abandoned" the fee arrangement described in my Expert Report as claimed by the Hawley Troxell Defendants. **Mr. Bond's law firm is obligated to pay me irrespective of the ultimate result of this case**.

(Dkt. 1099 ¶ 20 (emphasis added).)

Thus, reconsideration is warranted. This Court should deny the Hawley Troxell Defendants' motion in its entirety. (Dkts. 1112 at 12-13; 1069.)

### 5. Miesen Respectfully Requests Oral Argument.

Miesen respectfully requests oral argument. *See* L. Civ. R. 7.1(d). These issues regarding the exclusion of McDermott are critical to Miesen's claims.

### III.   CONCLUSION

For the reasons stated above, this Court should grant reconsideration.

MIESEN'S MEMO. IN SUPPORT OF MOTION FOR RECONSIDERATION - 20

DATED:  This 26ᵗʰ day of May 2021.

RODERICK BOND LAW OFFICE, PLLC


By: ___*/s/ Roderick C. Bond*_____
    Roderick C. Bond
    Attorney for the Plaintiff Dale L. Miesen

ANDREW SCHWAM LAW FIRM


By: ___*/s/ Andrew Schwam*_____
    Andrew Schwam
    Attorney for the Plaintiff Dale L. Miesen


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 26ᵗʰ day of May 2021, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Jeffrey A. Thomson:  jat@elamburke.com
Loren C. Ipsen:  lci@elamburke.com
Joyce A. Hemmer:  jah@elamburke.com
Bradley S. Keller:  bkeller@byrneskeller.com
Alyson A. Foster:  alyson@dempseyfoster.com
William E. Adams:  bill@weadamslaw.com
Tyler S. Waite:  twaite@campbell-bissell.com
Michael S. Bissell:  mbissell@campbell-bissell.com
Daniel L. Glynn:  dglynn@idalaw.com


      */s/ Roderick C. Bond*_____
      Roderick C. Bond

Jeffrey A. Thomson ISB #3380
jat@elamburke.com
Loren C. Ipsen ISB #1767
lci@elamburke.com
Joyce A. Hemmer ISB #7202
jah@elamburke.com
ELAM & BURKE, P.A.
251 East Front Street, Suite 300
P.O. Box 1539
Boise, Idaho 83701
Telephone:  (208) 343-5454
Facsimile:  (208) 384-5844

Attorneys for Defendants Hawley Troxell Ennis & Hawley LLP,
Gary D. Babbitt, D. John Ashby and Richard A. Riley

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, et al.<br><br>Defendants. | Case No. 1:10-cv-00404-DCN<br><br>THE HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND OPPOSITION TO PLAINTIFF'S MOTION REQUESTING ORAL ARGUMENT [DKT. 1116] |

COME NOW Defendants Hawley Troxell Ennis & Hawley LLP, Gary D. Babbitt, D. John

Ashby and Richard A. Riley (collectively the "HT Defendants"), by and through their counsel of

record, Elam & Burke, P.A., and offer the following Memorandum in Opposition to Plaintiff's

Motion for Reconsideration [Dkt. 1115] and Opposition to Plaintiff's Motion Requesting Oral

Argument [Dkt. 1116].

THE HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND OPPOSITION TO
PLAINTIFF'S MOTION REQUESTING ORAL ARGUMENT [DKT. 1116] - 1

## I.   LEGAL STANDARD

Plaintiff argues the Court should reverse its decision excluding Mr. McDermott's "expert" testimony based on the Court's inherent power to "change his mind for sufficient cause shown." Dkt. 1115 at 3. However, Plaintiff ignores (and falls short of meeting) the standards that courts, including this Court, apply regarding the exercise of their inherent power and discretion to reconsider interlocutory orders. This Court has explained the principles it follows with respect to reconsideration in clear detail:

> [A]lthough a court has the power to revisit its own decision for any reason, "as a rule the court should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." Regardless of the standard or rule under which they are brought, "motions for reconsideration are generally disfavored, and may not be used to present new arguments or evidence that could have been raised earlier."

*Dickinson Frozen Foods, Inc. v. FPS Food Process Solutions Corp.*, Case No: 1:17-cv-00519-DCN, 2020 WL 2841517 at *10 Slip Copy (D. Idaho 2020) (internal citations omitted). Therefore, "substantially the same standards as those used to reconsider final orders pursuant to Rule 59(e)" guide the determination of motions for reconsideration. *Id.* Those standards dictate that, "absent highly unusual circumstances, a motion for reconsideration will not be granted 'unless the district court is presented with newly discovered evidence, committed clear error, or there is an intervening change in the controlling law.'" *Id.*, quoting *Thomason v. Moeller*, 2017 WL 3723638 at *1 (D. Idaho 2017); *see also Balla v. Idaho State Bd. of Corr.*, 2014 WL 12614478, at *2 (D. Idaho 2014) (same). As shown below, no such circumstances are present here.

This Court has also recognized that "[t]he 'law of the case' doctrine, as well as public policy, dictate that the efficient operation of the judicial system requires the avoidance of re-arguing questions that have already been decided or evidence that could have been presented." *Dickinson Frozen Foods* at *13. "A motion for reconsideration 'may not be used to raise arguments

THE HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND OPPOSITION TO PLAINTIFF'S MOTION REQUESTING ORAL ARGUMENT [DKT. 1116] - 2

**14-ER-3482**

or present evidence for the first time when they could reasonably have been raised earlier in the litigation.'" *Id.* at \*11 (cleaned up); *see also Creech v. Ramirez*, 2017 WL 1129938, at \*2 (D. Idaho 2017) (same). Similarly, "motions for reconsideration are not occasions for raising arguments for the first time or developing previously undeveloped arguments." *Dickinson Frozen Foods* at \*20. "The motion to reconsider should not be used to ask the court to rethink matters already decided." *Am. Rivers v. NOAA Fisheries*, No. CV-04-00061-RE, 2006 WL 1983178, at \*2 (D. Or. July 14, 2006). "A court's opinions 'are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure.'" *Dickinson Frozen Foods* at \*11 (cleaned up).

## II.     ARGUMENT

### A.     THE COURT SHOULD DECLINE TO RECONSIDER ITS DECISION TO EXCLUDE MR. MCDERMOTT

#### 1.   Plaintiff's Motion for Reconsideration seeks to merely rehash issues the Court has already considered, and it should be denied.

Plaintiff has failed to offer valid justification or support for his Motion for Reconsideration. Plaintiff's motion violates all of the principles this Court previously articulated in *Dickinson Frozen Foods*; indeed, Plaintiff's motion does not assert any "newly discovered evidence," it does not claim (and there has not been) any "intervening change in the controlling law," and it makes no showing of "manifest injustice" or "clear error" in the decision to exclude Mr. McDermott. *See* Dkt. 1115-1. Instead, Plaintiff seeks merely to re-argue matters that this Court already considered and decided and/or matters that Plaintiff could have raised when briefing his opposition to the HT Defendants' underlying motion. Disagreement with the Court's conclusion – which is all that Plaintiff's motion amounts to – does not warrant reconsideration, and the Court should decline Plaintiff's improper invitation to revisit its well-reasoned decision, which was made in the exercise of its exclusive gatekeeping function and broad discretion.

THE HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND OPPOSITION TO
PLAINTIFF'S MOTION REQUESTING ORAL ARGUMENT [DKT. 1116] - 3

Plaintiff appears to try to rehash the legal standard applicable to the admissibility of expert testimony. Plaintiff argues that the HT Defendants' attorneys advanced the wrong legal standard, but then contends that the standards governing expert witness exclusion are not in dispute here. Dkt. 1115-1 at 4-6, 18-20. And Plaintiff argues that the *Daubert* factors do not apply to legal malpractice experts, but then argues that the HT Defendants' "failed to address the standards required under *Daubert*." *Id.* at 5, 18. These confusing and internally inconsistent arguments make it impossible to discern what it is that Plaintiff is really trying to argue. In any event, Plaintiff does not assert any intervening change in the legal standard applicable to the Court's decision to exclude Mr. McDermott, and he is making arguments that were or could have been raised in Plaintiff's response to the HT Defendants' motion to exclude; this does not warrant the Court's reconsideration. *See id.* at 4-6, 18-20. Further, the Court did in fact consider and apply the legal standards applicable to the exercise of its discretion in ruling on the motion. *See* Dkt. 1112 at 2-3. The Court should deny Plaintiff's Motion for Reconsideration on this basis.

Plaintiff argues that the HT Defendants did not offer any evidence to support Mr. McDermott's exclusion based on his improper advocacy. *See* Dkt. 1115-1 at 6-18 (§ II.B.2.). Plaintiff already made that same argument in response to the underlying motion. *See* Dkt. 1097 at 11-16. Equally important, the Court directly addressed and rejected that argument in its Order. Specifically, the Court stated: "Miesen argues that the Hawley Troxell Defendants' allegations are entirely unsupported and should be summarily rejected. The Court disagrees." Dkt. 1112 at 4. The Court then cited a substantial list of Mr. McDermott's own statements and actions – all of which had been discussed in the HT Defendants' motion – that support Mr. McDermott's exclusion, including the following:

THE HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND OPPOSITION TO PLAINTIFF'S MOTION REQUESTING ORAL ARGUMENT [DKT. 1116] - 4

- "Many of McDermott's declarations have been, in substance, supplemental legal briefs that have included legal advocacy rather than expert testimony." Dkt. 1112 at 7 (citing multiple examples). Here, the Court recognized that legal briefing is the role of an attorney advocate, not an expert witness, even in a case alleging legal malpractice.

- "McDermott's declarations even directly petitioned the Court for procedural concessions and discovery orders as if he were Miesen's counsel." *Id.* at 8 (citing multiple examples). Again, the Court recognized that petitioning the Court in the manner employed by Mr. McDermott is the role of an attorney advocate, not an expert witness.

- McDermott "expressly stated that *he* is pursuing Miesen's claims." *Id.* (emphasis original). The Court recognized that Mr. McDermott openly stated his belief that it was his own responsibility to present and prosecute Plaintiff's claims. Again, this is the exclusive role of an attorney advocate, not an expert witness.

- McDermott "prejudged in a very partial manner the evidence before it was even disclosed." *Id.* at 8-9 (citing multiple examples). Similarly, McDermott took the backward approach of incorporating "nearly all the paragraphs of the factual allegations set forth in the Third Amended Complaint 'as support for [his] opinions,'" showing McDermott "is seeking to prove a certain set of allegations true rather than opine on his view of the case from a professional and objective perspective." *Id.* at 9.

- McDermott's report went "beyond an expert report into the realm of legal briefing." *Id.* The Court recognized that page after page of Mr. McDermott's report anticipated legal and evidentiary issues and argued Plaintiff's legal positions regarding those issues.

- "McDermott has also accrued an unpaid six-figure bill, and he has commented on various witness's credibility." *Id.*

THE HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND OPPOSITION TO
PLAINTIFF'S MOTION REQUESTING ORAL ARGUMENT [DKT. 1116] - 5

Further, Plaintiff offers no newly discovered evidence to dispute the record establishing that Mr. McDermott has acted as an advocate. Instead, Plaintiff relies heavily on Mr. McDermott's previously submitted declaration, in which he disclaims advocacy in conclusory fashion. *See* Dkt. 1115-1 at 6-7. The Court's order, again, speaks directly to this issue, stating: "McDermott's construction of his views and how he has acted in this case is not dispositive. The Court is to assess that question." Dkt. 1112 at 11.

Plaintiff tries to distinguish *Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003), by arguing that Mr. McDermott would follow the Court's instructions limiting his testimony, whereas the expert in *Lippe* "ignored" the Court's instructions.[1] *See* Dkt. 1115-1 at 7. Plaintiff's argument entirely mischaracterizes *Lippe*. The *Lippe* court did not exclude the expert because the expert "ignored" an order *in limine*. Rather, the expert's deposition testimony revealed previously undiscovered information about the advocacy role he assumed while he was developing and expressing his expert opinions. *See Lippe*, 288 B.R. at 683-84, 687-88. Based on the additional information gleaned in discovery, the *Lippe* court determined that the expert would not be able to "sanitize" his advocacy from his testimony or "testify with the detachment and independence that one would expect from an expert witness offering views as a professional." *Id.* at 688.

Furthermore, the *Lippe* decision was already extensively addressed in the parties' briefing of the underlying motion to exclude, and the Court expressly found that *Lippe* and other cases supporting the HT Defendants' motion to exclude are "very persuasive." Dkt. 1068-1 at 5-7; Dkt. 1097 at 12-13; Dkt. 1112 at 10. Plaintiff also argues that this case does not involve the same exact facts as *Lippe* and is, therefore, distinguishable. *See* Dkt. 1115-1 at 8. The Court previously

---

[1] Plaintiff makes a similar argument – that he would follow an order in limine – with respect to the many instances of his improper witness credibility assessments. *See* Dkt. 1115-1 at 18.

THE HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND OPPOSITION TO PLAINTIFF'S MOTION REQUESTING ORAL ARGUMENT [DKT. 1116] - 6

considered the circumstances set forth in *Lippe* and other cases cited by the HT Defendants, and the Court found that any distinctions between them and this case are immaterial. Dkt. 1112 at 10. Further, the Court explained that "although the expert in *Lippe* had arguably more compelling reasons to be excluded, the reasons listed [by the Court] for excluding McDermott as an expert witness meet the standard." Dkt. 1112 at n. 3. Plaintiff's attempt to re-argue issues relating to the holding or application of *Lippe* is improper and does not support reconsideration.

Plaintiff also previously made the argument that Mr. McDermott would follow an order *in limine*, and the Court already addressed that argument, stating:

> Even if McDermott were to constrain himself at trial, the damage has been done. He cannot remove the irreversible taint of advocacy from his views or opinions at this point.

Dkt. 1112 at 11; Dkt. 1097 at 15; Dkt. 1115-1 at 7-8 (rearguing Mr. McDermott's declaration, Dkt. 1099 at ¶ 37).

Plaintiff argues the HT Defendants' motion to exclude failed to acknowledge supposed examples of Mr. McDermott's alleged "objectiveness." Dkt. 1115-1 at 8. Plaintiff had the opportunity to call the Court's attention to any such examples of alleged objectivity in his original response to the HT Defendants' motion to exclude. *See* Dkt. 1097. The Court's decision specifically noted the one example that Plaintiff raised in his opposition brief, and the Court found that it was an "isolated example" and "an outlier and does not surmount the pool of data entries listed [in the Court's written decision] to the contrary." Dkt. 1112 at 10. Plaintiff merely supplements his previous argument by pointing to an additional allegedly objective opinion regarding a single damage claim contained in Mr. McDermott's 653-page report, which he had the opportunity to raise when he opposed the HT Defendants' motion to exclude. Dkt. 1115-1 at 8-9. This is not "newly discovered evidence" as that phrase is defined in *Dickinson Frozen Foods* and

THE HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND OPPOSITION TO PLAINTIFF'S MOTION REQUESTING ORAL ARGUMENT [DKT. 1116] - 7

cannot support reconsideration. Further, this single example – a weak example that amounts to nothing more than acknowledgment that Plaintiff cannot recover an item of alleged damage (that amounts to only a small fraction of the total damages he is alleging) if he does not prove the claim – does not warrant reconsideration. It does not surmount the pool of data cited by the Court that provides strong support for the well-reasoned conclusion that Mr. McDermott has acted as an advocate.

Plaintiff argues that *Carlstrom v. United States*, 275 F.2d 802, 805 (9th Cir. 1960), implicitly rejects the idea that Mr. McDermott should be excluded based on the role he assumed as an advocate. *Carlstrom* is inapposite. The portion of the case Plaintiff cites is *dicta*, and the case was decided long before the adoption of the Federal Rules of Evidence and before *Daubert* and its progeny firmly establishing the Court's gatekeeper role upon which the HT Defendants' motion and the Court's ruling are based. *Carlstrom*, decided in 1960, does not represent a change in intervening law, and Plaintiff had the opportunity but failed to raise *Carlstrom* when he filed his response to the motion to exclude. Plaintiff's argument based on *Carlstrom* does not support a motion for reconsideration.

Plaintiff argues (incorrectly) that the HT Defendants' underlying motion simply asserts that Mr. McDermott is biased and invites "this Court to assume the role of the jury to determine issues of credibility, bias and the weight of the evidence." Dkt. 1115-1 at 9-10. Plaintiff had the opportunity to make such an argument in his original response to the motion to exclude, and the Court has already squarely addressed the issue of expert bias and admissibility of expert testimony under the appropriate legal standard, stating in part that:

> It is important to note that "many expert witnesses are biased" and "lack of bias is not required for expert testimony to be admissible." *Lippe*, 288 B.R. at 688. In this case, however, the line of propriety has been crossed. The Court finds good cause to preclude

THE HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND OPPOSITION TO PLAINTIFF'S MOTION REQUESTING ORAL ARGUMENT [DKT. 1116] - 8

McDermott from testifying as an expert witness under Federal Rules of Evidence 403 and 702.

Dkt. 1112 at 12. It is improper for Plaintiff to attempt to rehash the issue in a motion for reconsideration.

Plaintiff argues that certain ways in which Mr. McDermott participated in the prosecution of Miesen's claims were not improper. Dkt. 1115-1 at 10-12. Again, Plaintiff made and/or could have made these arguments when the underlying motion to exclude was pending,[2] and the arguments he offers now are not persuasive and are belied by the record. *Id*. Furthermore, the Court considered and addressed this issue in its decision, explaining:

> Here, numerous pieces of the record bear out that McDermott has assumed the improper role of an advocate masquerading as an expert in this case. Before listing the specific reasons, however, it should be noted that **some of these reasons alone would not suffice to cross the line from dedicated and passionate expert to unobjective and partial advocate. In their totality, though, these points demonstrate that McDermott has indeed crossed that line.**

Dkt. 1112 at 7 (emphasis added).

Plaintiff seeks to rehash his contentions regarding the declaration testimony Mr. Bond and Mr. McDermott previously offered in opposition to the HT Defendants' motion to exclude. *See* Dkt. 1115-1 at 12-13. These arguments simply repeat over and over again the same arguments that Mr. Bond and Mr. McDermott previously raised, *i.e.* their contention that Mr. McDermott did not act as an advocate for Plaintiff. In support of these rehashed arguments, Plaintiff cites portions of Mr. McDermott's declarations and Mr. Bond's representations that were in the record and/or readily available to Plaintiff when the underlying motion to exclude was pending. *See* Dkt. 1115-

---

[2] *See*, e.g., Dkt. 1097 at 17 (arguing McDermott's declarations "submitted in motions were solely in his role as an expert" and were "appropriate and related to his work as an expert witness").

THE HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND OPPOSITION TO PLAINTIFF'S MOTION REQUESTING ORAL ARGUMENT [DKT. 1116] - 9

1 at 13-16. Plaintiff's attempt to re-argue and reiterate these issues is not well-taken under the applicable legal standard.

In summary, Plaintiff offers no newly discovered evidence or legal argument that was unavailable when he briefed his opposition to the underlying motion, and he has not demonstrated any clear error or manifest injustice in the Court's discretionary decision to exclude Mr. McDermott. Plaintiff is simply asking the Court to change its mind because Plaintiff did not like the decision. However, a motion for reconsideration is not appropriate where, as here, it asks the Court to reweigh the same issues and arguments that were or could have been offered in connection with the underlying decision. Further, the arguments Plaintiff now offers to try to support reconsideration are incorrect, inapposite and/or unpersuasive. Plaintiff's attempt to take a second bite at the apple (which he has repeatedly shown a propensity to do through multiple unsuccessful motions for reconsideration of decisions by the Discovery Master and Judge Dale) should be swiftly rejected, and his motion for reconsideration should be denied.

> **2. If the Court declines to reconsider exclusion of Mr. McDermott based on his role as an advocate for Plaintiff, then the motion to exclude Mr. McDermott based on his contingency fee remains moot and the Court need not decide it.**

Plaintiff's motion for reconsideration goes on to argue that the Court should deny the HT Defendants' motion to exclude Mr. McDermott based on his de facto contingency fee. Dkt. 1115-1 at 17-18, 20. That argument is moot if the Court denies Plaintiff's motion to reconsider Mr. McDermott's exclusion based on his role as advocate. If the Court determines that the contingency fee issue is no longer moot, then the motion to exclude Mr. McDermott based on his contingency fee should be decided on the parties' original briefing, and the Court should not consider Plaintiff's current attempt to offer repetitious, supplemental argument after the deadline for filing an opposition to the original motion and in excess of the page limit.

THE HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND OPPOSITION TO PLAINTIFF'S MOTION REQUESTING ORAL ARGUMENT [DKT. 1116] - 10

**14-ER-3490**

**B.    THE COURT SHOULD DENY PLAINTIFF'S REQUEST FOR ORAL ARGUMENT ON HIS MOTION FOR RECONSIDERATION**

The Court decided the underlying motion to exclude Mr. McDermott without oral argument because the Court found "that the facts and legal arguments are adequately presented" in the record and the briefs, and "the decisional process would not be significantly aided by oral argument." Dkt. 1112 at 2. Here, Plaintiff requests oral argument on his motion for reconsideration. Dkt. 1115-1 at 20; Dkt. 1116. However, Plaintiff's motion for reconsideration, which attempts to merely repeat, reiterate and rehash arguments that were or could have been made at the time the underlying motion to exclude was pending, offers nothing that would warrant the Court's reconsideration and nothing that would warrant the expenditure of time and resources to conduct oral argument. Like the underlying motion to exclude, the decisional process on the motion for reconsideration would not be significantly aided by oral argument.

DATED this 16th day of June, 2021.

ELAM & BURKE, P.A.

By:_____
Loren C. Ipsen, Of the Firm
Joyce A. Hemmer, Of the Firm
Attorneys for Defendants Hawley Troxell
Ennis & Hawley LLP, Gary D. Babbitt, D.
John Ashby, and Richard A. Riley

THE HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND OPPOSITION TO PLAINTIFF'S MOTION REQUESTING ORAL ARGUMENT [DKT. 1116] - 11

CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of June, 2021, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons via email:

| | |
|---|---|
| Roderick C. Bond<br>rod@roderickbond.com<br>*Attorney for Plaintiff* | Daniel L. Glynn<br>dglynn@idalaw.com<br>*Attorneys for Michael W. Cashman, Sr., R. John Taylor, James Beck, Connie Taylor Henderson, Crop USA Insurance Services, LLC and Crop USA Insurance Agency, Inc.* |
| Andrew Schwam<br>amschwam@turbonet.com<br>*Attorney for Plaintiff* | Michael S. Bissell<br>mbissell@campbell-bissell.com<br>Tyler S. Waite<br>twaite@campbell-bissell.com<br>*Attorneys for Reed J. Taylor* |
| Alyson A. Foster<br>alyson@dempseyfoster.com<br>William E. Adams<br>bill@weadamslaw.com<br>*Attorneys for GemCap Lending I, LLC* | |

_____
Loren C. Ipsen

4852-9356-7213, v. 1

THE HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND OPPOSITION TO PLAINTIFF'S MOTION REQUESTING ORAL ARGUMENT [DKT. 1116] - 12

DANIEL LORAS GLYNN, ISB #5113
JONES ♦ WILLIAMS ♦ FUHRMAN ♦ GOURLEY, P.A.
The 9th & Idaho Center
225 N. 9th Street, Suite 820
PO Box 1097
Boise, ID 83701
Telephone:  (208) 331-1170
Facsimile:  (208) 331-1529
dglynn@idalaw.com

Attorneys for James Beck, Michael Cashman, Connie Henderson, John Taylor, Crop USA
Insurance Agency, Inc., and Crop USA Insurance Services, LLC

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.; | Case No. 1:10-CV-404-DCN-CWD |
| Plaintiff, | **JOINDER OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR ORAL ARGUMENT [DKT. 1116]** |
| vs. | |
| CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY, LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation; CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company, | |
| Defendants. | |

**JOINDER OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR ORAL ARGUMENT [DKT. 1116] - 1**

## 14-ER-3493

In accordance with District Local Rule Civ. 7.1, the Defendants James Beck, Michael Cashman, Connie Henderson, R. John Taylor, Crop USA Insurance Agency, Inc., and Crop USA Insurance Services, LLC hereby give notice of their joinder to Hawley Troxell Defendants' Memorandum in Opposition to Plaintiff's Motion for Reconsideration [Dkt. 1115] and in Opposition to Plaintiff's Motion for Oral Argument [Dkt. 1116].

DATED This 16th day of June, 2021.

JONES ♦ WILLIAMS ♦ FUHRMAN ♦ GOURLEY, P.A.

/s/   Daniel Loras Glynn

DANIEL LORAS GLYNN
Attorneys for Defendants James Beck, Michael Cashman, Connie Henderson, John Taylor, Crop USA Insurance Agency, Inc., and Crop USA Insurance Services, LLC

**JOINDER OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR ORAL ARGUMENT [DKT. 1116] - 2**

14-ER-3494

14-ER-3495

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th  day of June, 2021, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF System which sent a Notice of Electronic Filing to the following persons:

| | |
|---|---|
| Roderick Cyr Bond | rod@roderickbond.com |
| Michael S. Bissell | mbissell@campbell-bissell.com |
| Tyler S. Waite | twaite@campbell-bissell.com |
| Jeffrey A. Thomson | jat@elamburke.com |
| Loren C. Ipsen | lci@elamburke.com |
| Joyce A. Hemmer | JAH@ElamBurke.com |
| Bradley S. Keller | bkeller@bryneskeller.com |
| William E. Adams | bill@weadamslaw.com |
| Alyson Anne Foster | alyson@dempseyfoster.com |

   /s/ Daniel Loras Glynn
Daniel Loras Glynn

**JOINDER OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO HAWLEY TROXELL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION [DKT. 1115] AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR ORAL ARGUMENT [DKT. 1116] - 3**

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
10900 N.E. 4th St., Suite 2300
Bellevue, WA  98004
Telephone: (425) 591-6903
Email: rod@roderickbond.com

ANDREW SCHWAM, ISB NO. 1573
ANDREW SCHWAM LAW FIRM
705 SW Fountain Street
Pullman, WA 99163-2128
Telephone: (208) 874-3684
Email: amschwam@turbonet.com

Attorneys for the Plaintiff Dale L. Miesen

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>                    Plaintiff,<br><br>          **v.**<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>                    Defendants. | Case No. 1:10-cv-00404-DCN-CWD<br><br>PLAINTIFF DALE L. MIESEN'S REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION AND MOTION FOR ORAL ARGUMENT (Dkts. 1115, 1116)<br><br>**ORAL ARGUMENT REQUESTED** |

MIESEN'S REPLY RE: MOTIONS FOR RECONSIDERATION & ORAL ARGUMENT - i

**14-ER-3496**

CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; R. JOHN TAYLOR, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual,

        Defendants/Third-Party Plaintiffs,

        **v.**

REED TAYLOR, an individual,

        Third-Party Defendant.

REED TAYLOR, an individual,

        Third-Party Defendant/ Counterclaimant,

        **v.**

CONNIE TAYLOR HENDERSON, an individual; R. JOHN TAYLOR, an individual; JAMES BECK, an individual, and UNKNOWN BONDING COMPANY, an unknown entity that issued the unknown fidelity ERISA Bond,

        Counterdefendants.

MIESEN'S REPLY RE: MOTIONS FOR RECONSIDERATION & ORAL ARGUMENT - ii

**14-ER-3497**

**TABLE OF CONTENTS**

I.    INTRODUCTION AND DISPOSITIVE REPLY ................................................................. 1

II.   ADDITIONAL ARGUMENTS ...................................................................................... 6

A.    Miesen Stated the Correct Legal Standard, and Reconsideration Is Warranted Under
      Any Standard. ........................................................................................................... 6

B.    Opposing Counsel Has Produced NO Evidence that McDermott Has Been Partisan,
      an Advocate, Biased, Unobjective or Paid on a Contingent Fee Basis..................... 7

C.    Oral Argument Should Be Granted........................................................................... 8

III.  CONCLUSION........................................................................................................... 8

CERTIFICATE OF SERVICE ............................................................................................. 9

## I.   INTRODUCTION AND DISPOSITIVE REPLY

"A motion to reconsider an interlocutory ruling requires an analysis of two important principles: (1) Error must be corrected; and (2) Judicial efficiency demands forward progress." *Lancaster v. Kordsiemon*, No. 1:15-cv-00239-BLW, 2016 WL 6471428, at \*1 (D. Idaho Oct. 31, 2016). Judge Winmill was right when he favorably quoted Judge Schwartzer, who said, "'The only sensible thing for a trial court to do is to set itself right as soon as possible when convinced that the law of the case is erroneous. There is no need to await reversal**.**'" *Id.* (citation omitted).

The above principles apply to the case at bar. Opposing counsel (attorney Keller apparently did not participate) misled this Court as to the facts and legal basis for entering the order excluding Miesen's critical expert witness, McDermott. The ruling excluding McDermott essentially ends the possibility of resolving this lawsuit short of trial and ensures that this case will see at least two trials. The ruling does not move this case forward; rather, it will ensure that this lawsuit, filed in 2010, will make a second trip to the Ninth Circuit and any resolution will be delayed for years. (Dkt. 105.) This Court should grant reconsideration to prevent this result and years of further delay.

After opposing counsel mischaracterized McDermott's testimony and report by alleging that he was an advocate, partisan and being paid on a contingent fee basis (Dkts. 1068, 1069), Miesen submitted the sworn testimony of McDermott, attorney Bond and Miesen—all of whom denied the misleading allegations under oath. (Dkts. 1098—1100.) McDermott stated under oath:

> …[M]y agreement with [Mr. Bond's] law firm, which was developed in part over the course of my prior work with Mr. Bond, is to send one statement at the completion of the work on my Expert Report. In this case, as stated in my Expert Report, **my statement will be rendered to Mr. Bond's law firm prior to the commencement of the trial and the balance due is to be paid prior to trial.** In the interim, I receive periodic payments from Mr. Bond's law firm (some of which were suggested by Mr. Bond) which are to be credited against my statement for the completed work. Accordingly, I do not "charge" Mr. Bond's law firm for work prior to the submission of my bill…In the instant case, I have received $119,775 from Mr. Bond's law firm to date…In short, the fee understanding that I have with

MIESEN'S REPLY RE: MOTIONS FOR RECONSIDERATION & ORAL ARGUMENT - 1

Mr. Bond's law firm bears no relationship to one for a contingent fee arrangement; and in no sense have Mr. Bond's law firm and I "abandoned" the fee arrangement described in my Expert Report as claimed by the Hawley Troxell Defendants. **Mr. Bond's law firm is obligated to pay me irrespective of the ultimate result of this case.**

**The Hawley Troxell Defendants' claim that I am an "advocate" or "partisan" is also based on the directly conflicting contentions** that, on the one hand, I "directly and significantly assisted Mr. Bond in the prosecution of this action, taking an active advocacy role in developing pleadings, discovery and arguments to the Court on procedural and discovery motions;" yet, on the other hand they suggest that I didn't write my own Expert Report: "Mr. Bond's heavy involvement is not surprising given that the tone, style and phraseology bear a remarkable resemblance to Mr. Bond's briefing. **Neither of those assertions is true…**

**…I have made no decisions regarding the conduct of the prosecution of the claims in this case. I never served as counsel to Mr. Bond or Miesen, nor was I engaged to serve as a consultant to Mr. Bond in any lawsuit. Contrary to the assertions of the Hawley Troxell Defendants, I never provided legal advice or helped "to anticipate, identify, evaluate, and/or develop legal theories, legal arguments, facts necessary to support claims, defenses to the claims responses to the defenses and witness cross-examination topics." My role has been exclusively to be an independent and objective expert witness.**

…Mr. Bond has provided me with all of the documents produced by all parties in discovery in this lawsuit and he has taught me how to use document search software so that I am able to independently, objectively and properly render opinions. He insisted that my work be independent and objective, and he provided [me] with the information and tools with which to do that.

…As is the case with all of my opinions, I independently and objectively prepared and express my opinions as to those individuals.

(Dkt. 1099 ¶¶ 20, 25, 26, 28 & 40 (footnotes omitted) (emphasis added).) Attorney Bond stated

under oath:

**I have never retained an expert witness in any case to provide testimony on a contingent fee basis, nor would I do so…**

**…Professor McDermott and my firm agreed that he would send his final statement for work performed on his report prior to trial and that he would be paid in full prior to trial**, which is again consistent with his disclosure in his report. Professor McDermott and my firm agreed he could request payments from time to time, which would be deemed to be earned when paid, and that those payments would be credited to the final bill he provided to my firm prior to trial.

MIESEN'S REPLY RE: MOTIONS FOR RECONSIDERATION & ORAL ARGUMENT - 2

My firm has timely and fully paid Professor McDermott for his requested payments. If my firm had overpaid him, he would refund the amount that was overpaid. If a balance were due, the balance would be paid in full prior to the time of trial…

**Professor McDermott never acted as an advocate, consultant, counsel or attorney in this lawsuit or any other lawsuit that he has acted as an expert for Mr. Miesen** or any of my other past or present clients. He has been only an expert witness. Any declarations that he has prepared and submitted in this matter were for the purpose of Professor McDermott acting in the capacity of an expert witness. His role has been only that of an expert witness and to provide his opinions…

**Professor McDermott has never assisted in assisting in (sic) prosecuting Miesen's claims, preparing pleadings, developing pleadings, discovery requests or motions, arguments to the court**, nor did he have any involvement in discovery other than requesting information that he believed that he needed for his report and opinions…he was not involved in the motions or providing any legal research for the motions…

(Dkt. 1100 ¶¶ 9-10, 14-15 (emphasis added).) Miesen stated in his declaration under oath:

I was aware and approved Mr. Bond's firm retaining Professor McDermott as one of my expert witnesses in this lawsuit. I approved the retaining of all experts and all costs advanced for this lawsuit. I approved and was aware that all payments to Professor McDermott and the liability for paying him would be the sole responsibility of Mr. Bond's firm…There are no agreements to pay Professor McDermott anything other than the hourly rates that he charges and reimbursement of his out-of-pocket expenses. It has always been my understanding, including through conversations with Professor McDermott, that he would be paid by the hour and reimbursed for out-of-pocket costs (or that Mr. Bond's firm would directly pay certain out-of-pocket costs such as travel expenses). I would add that none of the defendants bothered to ask me at any of my depositions whether Professor McDermott was being paid on a contingent fee basis. I would have told them "no" had they asked me…

I have never retained Professor McDermott to be my attorney or act as my lawyer in this lawsuit. In my conversations with Professor McDermott, he has always been gathering information or providing other functions as my expert witness in this lawsuit. His declarations submitted in this case for discovery were solely for the purpose of obtaining as much information as he could so that he could properly prepare his opinions. He was not involved in preparing or presenting the Third Amended Complaint or any claims asserted in that complaint. **The discussions regarding my claims and legal theories have only been discussed between me and Mr. Bond. Professor McDermott has not been involved in my discussions with Mr. Bond on developing claims and legal theories and he has not been involved in any other function as a lawyer for me.** He has only been retained to act as my expert witness and he has only acted in that capacity during all of my

MIESEN'S REPLY RE: MOTIONS FOR RECONSIDERATION & ORAL ARGUMENT - 3

interactions with him. He has not been asked to prepare any opinions that he did not independently believe were appropriate. He has not represented my interests in this lawsuit other than acting as one of my expert witnesses. Without waiving attorney-client privilege or work product protections, **the emails and communications regarding the preparation and editing of all legal filings have only been between me and Mr. Bond.** I have attended all deposition in person or via telephone or Zoom. Professor McDermott was never provided with copies of Mr. Bond's detailed deposition question outlines and he was not involved in preparing them or selecting the exhibits for the depositions. **He merely attended certain depositions to gather information for his opinions…**

It is important for this Court to know that this lawsuit is not just about me, as described in more detail in the following paragraphs. There are many creditors and stakeholders (share owners and 401k Participants) who have been cheated by John Taylor and the people who have assisted him.

(Dkt. 1098 ¶¶ 3, 7-8 (emphasis added).)  The declarations of McDermott, attorney Bond and Miesen are not conclusory in nature. They each state specific conduct that McDermott did not engage in. The absence of this conduct means that McDermott should not have been considered an advocate. In addition, the under oath factual assertions concerning the fee arrangement with McDermott show that he is not and was never being compensated on any contingent fee basis, and that his testimony at trial will not occur unless he has been fully paid.

There is no evidence that McDermott, attorney Bond or Miesen committed perjury—and opposing counsel implicitly argue that McDermott, attorney Bond and Miesen have committed perjury by advancing their erroneous arguments. The above-quoted sworn testimony by McDermott, attorney Bond and Miesen should have spelled the end of both motions because there was no basis for the *per se* wholesale exclusion of McDermott as an expert. The narrow line of cases relied upon by the Hawley Troxell Defendants and this Court (including *Lippe*) only support the *per se* exclusion of McDermott if: (1) he was also serving as counsel for Miesen; (2) he had previously served as an expert for the defendants; (3) he was unqualified; (4) he only prepared a narrow opinion for matters exclusively for the jury; or (5) he was a contingent fee expert. (Dkts.

MIESEN'S REPLY RE: MOTIONS FOR RECONSIDERATION & ORAL ARGUMENT - 4

1068-1 at 5-15, 1069-1.) McDermott's testimony and the information contained in his detailed report were fatal to any basis supporting his *per se* exclusion as an expert. (Dkt. 1099.)

Instead, opposing counsel doubled down in their reply and continued their legal error by asking this Court to decide questions of credibility, bias, and fact (Dkts. 1105, 1106)—which are all for the jury to decide—not this Court. *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1043-44 (9th Cir. 2014) ("Under *Daubert*…the trial court is 'a gatekeeper, not a fact finder.'…Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury."); *Lewert v. Boiron, Inc.*, 212 F.Supp.3d 917, 928 n.6 (C.D. Cal. 2016) (Expert bias "is not a sufficient ground to exclude an expert on a *Daubert* analysis."); *U.S. v. Abonce–Barrera*, 257 F.3d 959, 965 (9th Cir. 2001) ("Generally, evidence of bias goes toward the credibility of a witness, not his competency to testify, and credibility is an issue for the jury."); *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) ("[I]t is the exclusive function of the jury to determine the credibility of the witnesses, resolve evidentiary conflicts and draw reasonable inferences from proven facts."). In sum, opposing counsel misled this Court as to the facts and the legal standards. (Dkts. 1068-1, 1069-1, 1105, 1106, 1115-1, 1117, 1118.)

Indeed, opposing counsel has only provided McDermott quotes which, at most, total the equivalent of two pages of allegedly objectionable testimony or opinions when McDermott has submitted over 2,690 pages of opinions, testimony and work. This consists of 104 pages of declaration testimony, 1,784 pages of reports and supplemental reports (excluding tables of contents and exhibits), and 811 pages of transcripts of his deposition testimony—over 2,690 pages. The so-called proof offered by opposing counsel amounts, at most, to a tiny fraction, less than one thousandth (1/1000), of McDermott's testimony, opinions and work.

MIESEN'S REPLY RE: MOTIONS FOR RECONSIDERATION & ORAL ARGUMENT - 5

Moreover, as Miesen noted, courts presume experts are "advocates" and "partisans." E.g., *Carlstrom v. U.S.*, 275 F.2d 802, 805 (9th Cir. 1960). This realistic view has not been overruled and has not been affected by the adoption of *Daubert*. Notably, as previously noted by Miesen (Dkt. 1097 at 13 n.8), the Hawley Troxell Defendants' two legal malpractice experts rendered their opinions when they were not even provided with all of the court filings, billing records or other critical documents prior to rendering their opinions. They were closer to being advocates than McDermott because their opinions were based on inadequate information. To the contrary, McDermott was provided and considered all documents produced in discovery or otherwise available. (Dkt. 1099 ¶ 28.)

Based on opposing counsels' erroneous arguments, this Court erred. Thus, reconsideration is required and should be granted to rectify the error caused by opposing counsel. If reconsideration is not granted and McDermott restored as Miesen's expert, this case will be delayed for years and any possibility of settlement thwarted.

## II.   ADDITIONAL ARGUMENTS

While the arguments and evidence in Section I establish that reconsideration should be granted and opposing counsels' motions denied, Miesen will address some discrete issues. Although Miesen has chosen not to address some of opposing counsels' arguments, that does not mean that Miesen concedes the correctness of such arguments; but only that it is not necessary to respond to them.

### A. Miesen Stated the Correct Legal Standard, and Reconsideration Is Warranted Under Any Standard.

Miesen maintains this Court has jurisdiction to revisit any interlocutory order upon good cause shown. (Dkt. 1115-1 at 6.) Opposing counsel argue that a more stringent standard should

MIESEN'S REPLY RE: MOTIONS FOR RECONSIDERATION & ORAL ARGUMENT - 6

apply, but they are mistaken. (Dkts. 1117 at 2-3, 1118.) The proper standard is stated in *American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 513-16 & n.9 (4th Cir. 2003):

> Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment…The ultimate responsibility of the federal courts, at all levels, is to reach the correct judgment under law.

*Id*. at 514-15 (citation omitted). This Court will never be reversed if it chooses to grant reconsideration on its interlocutory evidentiary decision excluding McDermott. In any event, Miesen has met and satisfied any reconsideration standard.

**B.** **Opposing Counsel Has Produced NO Evidence that McDermott Has Been Partisan, an Advocate, Biased, Unobjective or Paid on a Contingent Fee Basis.**

Miesen maintains that the Court applied the wrong legal standards, there was no evidence to overcome the sworn testimony of McDermott, attorney Bond and Miesen that McDermott was not an advocate, partisan or contingent fee expert witness, and that he performed services regularly done by experts and would comply with any order *in limine*. (Dkt. 1115 at 6-21.)

Opposing counsel do not squarely address the sworn testimonial evidence and proper legal standards. (*Compare* Dkt. 1115-1 *with* Dkt. 1117.) This is because applying the correct legal standards to the undisputed sworn testimony does not support the exclusion of McDermott.

Miesen asserts that opposing counsels' practice of quoting out of context creates the opportunity for confusion, misunderstanding and error. (*Compare* Dkt. 1115-1 at 17-19 *with* Dkt. 1117.) This practice has contributed to the need for this motion for reconsideration.

Instead, opposing counsel merely quote statements from this Court's order, which this Court obtained from the argument and testimony taken out of context contained within opposing counsels' briefing. All of which added up to less than one thousandth (1/1000) of McDermott's total output. This type of circular argument does not provide an answer to the arguments and evidence submitted by Miesen.

MIESEN'S REPLY RE: MOTIONS FOR RECONSIDERATION & ORAL ARGUMENT - 7

**C.  Oral Argument Should Be Granted.**

McDermott's exclusion has a devastating effect on Miesen's legal malpractice claims. For such an important decision to be made without the Court having the opportunity to question and challenge counsel invites error and appeal.

### III.    CONCLUSION

Opposing counsels' motions to exclude McDermott amount to a motion *in limine* to exclude evidence at trial. But at this time the Court does not know which of McDermott's many opinions or what portions of the very long report will be brought out at trial testimony. Nor does this Court know what limiting orders, if any, it might issue regarding trial testimony. McDermott has stated under oath that he will follow any such limiting orders. This makes the application of such a draconian measure as witness exclusion premature. McDermott has never been an advocate or a contingent fee expert, and any concerns opposing counsel may have are properly addressed at trial by any appropriate court instructions regarding McDermott's testimony. While Miesen maintains that no magical words are necessary, he has established error under the "good cause," "clear error" and "manifest injustice" standards. The motions for reconsideration and oral argument should be granted. (Dkts. 1115, 1116.)

DATED:  This 30th day of June 2021.

RODERICK BOND LAW OFFICE, PLLC

By:    /s/ Roderick C. Bond
     Roderick C. Bond
     Attorney for the Plaintiff Dale L. Miesen

ANDREW SCHWAM LAW FIRM

By:    /s/ Andrew Schwam
     Andrew Schwam
     Attorney for the Plaintiff Dale L. Miesen

MIESEN'S REPLY RE: MOTIONS FOR RECONSIDERATION & ORAL ARGUMENT - 8

**14-ER-3506**

**14-ER-3507**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 30th day of June 2021, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Jeffrey A. Thomson:    jat@elamburke.com
Loren C. Ipsen:    lci@elamburke.com
Joyce A. Hemmer:    jah@elamburke.com
Bradley S. Keller:    bkeller@byrneskeller.com
Alyson A. Foster:    alyson@dempseyfoster.com
William E. Adams:  bill@weadamslaw.com
Tyler S. Waite:         twaite@campbell-bissell.com
Michael S. Bissell:     mbissell@campbell-bissell.com
Daniel L. Glynn:    dglynn@idalaw.com
Andrew Schwam:  amschwam@turbonet.com


_____/s/ Roderick C. Bond_____
Roderick C. Bond

MIESEN'S REPLY RE: MOTIONS FOR RECONSIDERATION & ORAL ARGUMENT - 9

# Roderick Bond

| | |
|---|---|
| **From:** | ecf@id.uscourts.gov |
| **Sent:** | Thursday, July 15, 2021 4:20 PM |
| **To:** | CourtMail@idd.uscourts.gov |
| **Subject:** | Activity in Case 1:10-cv-00404-DCN-CWD Taylor et al v. Hawley Troxell Ennis & Hawley LLP et al |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**District of Idaho (LIVE) NextGen 1.6**

## Notice of Electronic Filing

The following transaction was entered on 7/15/2021 at 4:20 PM MDT and filed on 7/15/2021

| | |
|---|---|
| **Case Name:** | Taylor et al v. Hawley Troxell Ennis & Hawley LLP et al |
| **Case Number:** | 1:10-cv-00404-DCN-CWD |
| **Filer:** | |
| **Document Number:** | 1122(No document attached) |

**Docket Text:**
**DOCKET ENTRY ORDER: The Court hereby lifts, in part, its previous stay of dispositive briefing. See Dkt. 1089. Specifically, briefing related to Dkts. 1067 and 1075 is now lifted. Plaintiff must file responses to those motions, if any, on or before August 6, 2021. Replies, if any, are due on or before August 20, 2021. Briefing on all other dispositive motions referred to in the Court's previous Order (Dkt. 1089) remains stayed until further notice. Signed by Judge David C. Nye (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (bm)**

**1:10-cv-00404-DCN-CWD Notice has been electronically mailed to:**

Alyson Anne Foster    alyson@dempseyfoster.com, jen@dempseyfoster.com, kristen@dempseyfoster.com

Andrew M Schwam    amschwam@turbonet.com

Bradley S Keller    bkeller@byrneskeller.com, docket@byrneskeller.com, kwolf@byrneskeller.com, mkitamura@byrneskeller.com

Daniel Loras Glynn    dglynn@idalaw.com, kserrano@idalaw.com

David R Lombardi    drl@givenspursley.com, sharoncuslidge@givenspursley.com

1

**14-ER-3508**

David R Risley (Terminated)     david@risleylawoffice.com, judy@risleylawoffice.com

Fanxi Wang     fwang@birdmarella.com, mhicks@birdmarella.com

Jack S Gjording     jgjording@gfidaholaw.com, emulcahy@gfidaholaw.com, ktonkin@gfidaholaw.com

James B King     jking@ecl-law.com

Jeffrey A Thomson     jat@elamburke.com, nlp@elamburke.com

Joyce Ann Hemmer     jah@elamburke.com, dmh@elamburke.com

Lee H Rousso (Terminated)     lee@leerousso.com

Loren C Ipsen     lci@elamburke.com, nlp@elamburke.com

Mark T Drooks     mdrooks@birdmarella.com, mhicks@birdmarella.com

Markus William Louvier     mlouvier@ecl-law.com, byesland@ecl-law.com

Martin J Martelle (Terminated)     attorney@martellelaw.com, vanessa@martellelaw.com

Michael S Bissell     mbissell@campbell-bissell.com, mhayes@campbell-bissell.com

Michael Scott Bissell     mbissell@campbell-bissell.com

Rebecca L Dircks     rdircks@beneschlaw.com, docket@beneschlaw.com, eklopp@beneschlaw.com, kshah@beneschlaw.com

Roderick Cyr Bond     rod@roderickbond.com

Stephen Lee Adams     sadams@gfidaholaw.com, ktonkin@gfidaholaw.com

Steven P Wieland (Terminated)     steven.wieland.service@mooneywieland.com, tyra.mooney@mooneywieland.com

Taylor L Bruun (Terminated)     tlb@dukeevett.com, mse@dukeevett.com

Tyler Scott Waite     twaite@campbell-bissell.com

William E. Adams     wadams@gemcapsolutions.com

**1:10-cv-00404-DCN-CWD Notice will be served by other means to:**

AIA Insurance, Inc.

AIA Services Corporation

Theodore O Creason
DECEASED

2

**14-ER-3509**

Vanessa Ann Mooney
5995 W. State St. Suite A
Boise, ID 83703

3

**14-ER-3510**

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
10900 N.E. 4th St., Suite 2300
Bellevue, WA  98004
Telephone: (425) 591-6903
Email: rod@roderickbond.com

ANDREW SCHWAM, ISB NO. 1573
ANDREW SCHWAM LAW FIRM
705 SW Fountain Street
Pullman, WA 99163-2128
Telephone: (208) 874-3684
Email: amschwam@turbonet.com

Attorneys for the Plaintiff Dale L. Miesen

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>**v.**<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 1:10-cv-00404-DCN-CWD<br><br>PLAINTIFF DALE L. MIESEN'S RESPONSE IN OPPOSITION TO THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS AND THE JOINDER OF DEFENDANTS JAMES BECK, MICHAEL CASHMAN, CONNIE HENDERSON, R. JOHN TAYLOR, CROP USA INSURANCE AGENCY, INC., AND CROP USA INSURANCE SERVICES, LLC TO OBJECTION TO THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS (**Dkts. 1067, 1090**) |

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - i

**14-ER-3511**

CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; R. JOHN TAYLOR, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual,

        Defendants/Third-Party Plaintiffs,

v.

REED TAYLOR, an individual,

        Third-Party Defendant.

REED TAYLOR, an individual,

        Third-Party Defendant/ Counterclaimant,

v.

CONNIE TAYLOR HENDERSON, an individual; R. JOHN TAYLOR, an individual; JAMES BECK, an individual, and UNKNOWN BONDING COMPANY, an unknown entity that issued the unknown fidelity ERISA Bond,

        Counterdefendants.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................... 1

II. ARGUMENT ...................................................................................................... 3

    A. The Rule 12(c) Legal Standard and the Limited Evidence Which May Be Considered. ................................................................................................. 3

    B. This Court Should Not Consider Any Court Decisions or Filings from *Miesen v. Munding*. ............................................................................................... 5

    C. The Motion Must Be Denied Because Judge Boyle and Judge Dale Have Already Denied Past Motions Challenging the Sufficiency of the 2008 and 2016 Derivative Demands............................................................................ 7

    D. The Motion and the Joinders Must Be Denied Because They Violate Judge Dale's Order and this Court's Standing Order Regarding Motions to Dismiss.... 11

    E. Idaho Law Governs the Adequacy of Derivative Demand for Idaho Corporations and Miesen's Five Derivative Demands (305 Pages of Information) Were More than Adequate Under Idaho Law. ............................. 13

        1. The July 21, 2008 Derivative Demand Was Adequate Under Idaho Law. ................................................................................................... 18

        2. The July 3, 2012 Derivative Demand Was Adequate Under Idaho Law. ................................................................................................... 21

        3. The July 2012 Derivative Demands Provided by Fourteen Different Shareholders Were Adequate Under Idaho Law. .................................. 22

        4. The June 13, 2016 and August 23, 2016 Derivative Demands Were Adequate Under Idaho Law. ............................................................... 23

        5. The Defendants Have No Right to Complain Based on the Extensive Ongoing Improper Corporate Governance, Improper Conduct and Concealments, in which the Defendants Were Active Participants.......... 25

    F. Miesen's Third Amended Complaint Complies with Rule 23.1, Which Plays No Role in Determining the Adequacy of Miesen's Derivative Demands Under Idaho Law. ..................................................................................... 27

    G. The Defendants Lack Standing to Challenge the Adequacy of the Derivative Demands. ..................................................................................................... 28

    H. While Miesen Maintains that the Five Demands Are Adequate, Miesen Is Separately Excused from Making Demand Upon the Boards of Directors of the AIA Entities Because There Has Never Been Any Proper Corporate Governance Since 2008. ............................................................................. 29

    I. In any Event, the Motion Has No Impact on Miesen's Direct Claims. ................ 31

    J. If this Court Finds the Third Amended Complaint Fails to Allege Sufficient Facts, Miesen Should Be Provided the Opportunity to Amend His Complaint. .. 32

14-ER-3514

K.    Miesen Respectfully Requests Oral Argument. ..................................................... 32

III.   CONCLUSION ................................................................................................................. 32

CERTIFICATE OF SERVICE ................................................................................................ 33

## I.   <u>INTRODUCTION</u>

Before this Court is the Hawley Troxell Defendants' Motion to Dismiss All Claims for Failure to Satisfy Mandatory Derivative Demand Requirements ("Motion") (Dkt. 1067), which the other defendants (except for GemCap) have joined ("Joinder") (Dkt. 1090). [1]

For the *third* time the Court is being asked to rule that Miesen's derivative demands are not adequate. First, Judge Boyle had to deal with the issue in a motion to dismiss and he denied that part of the motion. (Dkt. 46; App. G.) Then Judge Dale rejected the defendants' opposition to Miesen's Third Amended Complaint challenging the adequacy of his demands, and in a thorough written decision explained why she was denying the motion and why the derivative demands were adequate. (Dkt. 210 at 13-20; App. H at 13-20.) Now a third Judge faces this time and energy consuming request which has been reviewed, ruled on, and denied twice before in this very case.

In Judge Dale's decision she properly applied Idaho law and noted in part that:

The Court finds the demand letters demonstrate an earnest and sincere effort to inform the AIA board of directors of the alleged wrongdoing. To argue that Miesen could have attempted to clarify his allegations is disingenuous, considering AIA itself did not ask for clarifications. Because no follow up was requested by AIA, Miesen was left with no alternative, other than to file suit.
…
Defendants argue generally, without pointing to any specific demand allegation, that all the allegations are insufficient because Miesen included them "by way of example," and because the subject matters of the allegations are too broad for a board to determine what claims to investigate. The Court respectfully disagrees.
…
Because the Defendants fail to point to specific allegations that lack sufficient information, and because the AIA board of directors failed to request from the shareholders clarification on any of the allegations in their response to the demand letters, the Court will not go through the one hundred and two allegations to determine the sufficiency of each one. Upon review of the demand letters, generally, the Court observes that the letters may not include every single fact necessary to support the allegations or provide a precise quantum of damages. However, the allegations (especially those made in the second demand letter) were sufficiently detailed to provide the AIA board of directors the opportunity to make

---

[1] When citing to dockets, Miesen will cite to the blue filed-stamped page numbers at the top of each page.

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 1

14-ER-3516

a good faith investigation into the following claims: breach of fiduciary duty; aiding and abetting breaches of fiduciary duties; fraud; aiding and abetting fraud; conspiracy to commit fraud; and, breach of contract. Therefore, the Court finds the content of Miesen's demand letters constituted a sufficient demand on the AIA board of directors.

(Dkt. 210 at 16, 19-20; App. H at 16, 19-20.) Yet, the defendants do not address Judge Dale's decision or Judge Boyle's order in any of their nineteen pages of briefing.

The Motion and Joinder—should be viewed for what they are—desperate attempts by the defendants[2] to avoid liability for Miesen's meritorious derivative claims and brought in complete disregard of prior court orders. Most importantly, the Motion and Joinder lack merit because the five derivative demands more than complied with Idaho's relaxed standard—the more stringent standards from California, Washington and other jurisdictions do not apply in the instant case.

For the reasons explained below, the Motion and Joinder should be denied because they are: (1) dilatory and improper attempts to circumvent motions for reconsideration; (2) dilatory and improper violations of Judge Dale's order and this Court's standing order on motions to dismiss; (3) improper attempts to persuade this Court to apply the wrong law and legal standard for determining the adequacy of Miesen's more than adequate derivative demands under Idaho law; and (4) improper attempts to avoid liability for a defense in which they lack standing to assert and when the demand requirement should be excused because, under the guidance of the Hawley Troxell Defendants, there has never been a duly elected, fully seated and properly functioning board for AIA Services Corporation and AIA Insurance, Inc. (collectively the "AIA Entities) from the date of the first demand on July 21, 2008 through the present time.

Accordingly, the Motion and Joinder should be denied.

---

[2] When referring to "defendants" in this Response, Miesen is referring to all defendants, except for GemCap.

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 2

14-ER-3516

## II.   ARGUMENT

### A.  The Rule 12(c) Legal Standard and the Limited Evidence Which May Be Considered.[3]

A "Rule 12(c) [motion] is 'functionally identical' to a motion under Rule 12(b)." *Cornejo v. Ocwen Loan Servicing*, LLC, 151 F.Supp.3d 1102, 1106 (E.D. Cal. 2015) (citation omitted).

> **For purposes of the motion, the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false**. Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law. However, judgment on the pleadings is improper when the district court goes beyond the pleadings to resolve an issue; such a proceeding must properly be treated as a motion for summary judgment.

*Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1549 (9th Cir. 1989) (citations omitted) (emphasis added); *see also* Fed. R. Civ. P. 12(d).

> As a general rule, a court may consider only the pleadings and properly attached documents on a Rule 12(b)(6) motion. … [U]nder the "incorporation by reference" doctrine, the court may consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." … [C]ourts may take judicial notice of "matters of public record," but not of facts that may be "subject to reasonable dispute."

*In re Iso Ray, Inc. Sec. Litig.*, 189 F.Supp.3d 1057, 1065-66 (E.D. Wash. 2016); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998-99 (9th Cir. 2018).

"The burden of proving an affirmative defense, however, rests upon the party who advances the affirmative defense." *U.S. Bank Nat. Ass'n N.D. v. CitiMortgage, Inc.*, 157 Idaho 446, 451, 337 P.3d 605, 610 (2014). Applying these standards, the defendants failed to meet the burden of proving the five demands were inadequate under Idaho law. (E.g., Dkt. 193 at 59.)

---

[3] "In diversity jurisdiction cases, such as this one, [courts] 'apply the substantive law of the forum in which the court is located.'" *First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1153 (9th Cir. 2015) (citations omitted). "A federal court applying [Idaho] law must apply the law as it believes the [Idaho] Supreme Court would apply it" and "must predict how the [Idaho] Supreme Court would decide the issue..." *Gravquick A/S v. Trimble Navigation Intern. Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003) (citation omitted).

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 3

As a preliminary matter, the defendants do not properly submit and/or provide authority for any of the evidence that they are requesting this Court to consider in accordance with Rules 12(b)(6) or 12(c). (Dkts. 1067-1, 1090.) While the Hawley Troxell Defendants cite a case for the proposition that courts may take judicial notice of filings in other courts, "such as the docket in *Miesen v. Munding*"[4] (Dkt. 1067-1 at 8 n.2), the defendants did not submit any specific documents or request that this Court take judicial notice of any specific documents or filings anywhere in their memorandum as required by Fed. Evid. R. 201. (Dkts. 1067-1, 1090.) Thus, Miesen objects to considering any of the extraneous documents or court filings, especially from *Miesen v. Munding*.

Nevertheless, without waiving any of Miesen's arguments below as to why the Motion and Joinder should be summarily denied and without conceding that any materials may be considered in violation of Rule 12(d), Miesen asserts that the Court may consider the following documents without violating the standards under Rules 12(b)(6) and 12(c).[5]

First, under the incorporation by reference doctrine and through judicial notice, this Court may consider the following documents because they are referenced and/or cited to in the Third Amended Complaint and their authenticity is not disputed: **(1)** the derivative demand dated July 21, 2008 (attached as Appendix "App." A),  April 3, 2012 (App. B), July 12-15, 2012 which includes the First Amended Complaint incorporated by reference into the demands (App. C), June 16, 2016 which includes the proposed Second Amended Complaint referenced in the demand (App. D), and August 23, 2016 which includes the proposed Second and Third Amended Complaints referenced in the demand (App. E), respectively, and John Taylor's response letter dated September 12, 2016 (App. F) (Dkt. 211 at ¶¶ 172, 177-180); **(2)** AIA Services' Amended

---

[4] GemCap previously filed a third-party complaint against Munding's law firm for contribution and this Court ruled that GemCap may bring those claims at the conclusion of the case at bar. (Dkts. 391, 420.)

[5] Miesen's arguments in Sections C-D are not subject to the standards under Rules 12(b)(6) and 12(c).

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 4

Articles of Incorporation (App. I) (E.g., Dkt. 211 at ¶¶ 28-31, 33-35, 51, 62-64); **(3)** AIA Services' Restated Bylaws (App. J) (E.g., Dkt. 211 at ¶¶ 30-51, 63-64, 70, 85, 93); **(4)** the Idaho State Bar records showing John Taylor and Connie Henderson (judicial notice only) being members since 1976 and 1993, respectively (App. K-L) (E.g., Dkt. 211 at ¶ 12); **(5)** AIA Petition for Court Appointed Inquiry dated August 14, 2008 (App. Q) (E.g., Dkt. 211 at ¶ 174); and **(6)** Reed Taylor's Fifth Amended Complaint filed in *Taylor v. AIA Services, et al.* (App. R) (E.g., Dkt. 211 at ¶ 99).

Second, for convenience of the Court, Miesen attaches: **(1)** Judge Boyle's June 29, 2011 Order Denying in Part and Granting in Part the defendants' motions to dismiss (App. G); **(2)** Judge Dale's April 21, 2017 Decision and Order Granting Miesen's Motion to Amend in Part (App. H); and **(3)** the unpublished district court opinion (App. M) and the unpublished Ninth Circuit opinion in *Miesen v. Munding* (App. N), which Miesen agrees that the Court may judicially notice exclusively to recognize the existence of the two opinions. But Miesen objects to considering those unpublished opinions as authority, controlling authority or as adjudicative facts. *See* Section B. Lastly, for convenience of the Court, Miesen has also attached I.C. § 30-1-742 with the ABA Comments (App. O) and Cal. Corp. Code § 800 (App. P).

To the extent that the Court finds that any of the documents referenced in this Response may not be considered without violating Rules 12(b)(6) and 12(c), this Court should either exclude the documents or convert the Motion to one for summary judgment and provide Miesen with notice and an opportunity to present substantial additional evidence, including deposition transcripts and other material evidence. Fed. R. Civ. P. 12(d).

**B.  <u>This Court Should Not Consider Any Court Decisions or Filings from *Miesen v. Munding*.</u>**

The defendants rely heavily on two unpublished opinions issued by a Washington federal court and the Ninth Circuit in *Miesen v. Munding*. (Dkt. 1067-1 at 2-3, 8-12, 15, 17-18; App. M-N.) Miesen objects to considering anything other than the existence of those two opinions.

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 5

First, Miesen objects because the two unpublished opinions are irrelevant and inadmissible hearsay. Fed. Evid. R. 401-403, 802. Those two unpublished opinions originate out of a Washington federal court (App. M-N) and both opinions do not apply Idaho law; rather they relied on California law and the law of other jurisdictions, unlike Judge Dale's decision which applied Idaho law. (App. H at 13-20.) Moreover, the two derivative demands in *Miesen v. Munding* only referenced Munding or his firm in several paragraphs and they were not referenced in any manner in the proposed amended complaints that were incorporated into the two 2016 derivative demands nor were they named defendants in the case at bar. (App. D-E.) Thus, those two unpublished opinions and any related filings in that lawsuit are inapplicable, irrelevant and inadmissible here.

Second, an unpublished Washington district court decision in *Miesen v. Munding* has no precedential authority and is not binding on this Court. *Hupman v. Cook*, 640 F.2d 497, 501 (4th Cir. 1981); *Starbuck v. City & County of San Francisco*, 556 F.2d 450, 457 n. 13 (9th Cir. 1977). Similarly, the Ninth Circuit's decision in *Miesen v. Munding* is an unpublished disposition and therefore is "not precedent." Ninth Circuit Rule 36-3. Finally, the U.S. Supreme Court's "denial of certiorari 'imports no expression of opinion upon the merits of [*Miesen v. Munding*, 822 Fed. Appx. 546, 548 (9th Cir. 2020), *cert. denied*, 141 S.Ct. 1464 (2021)].'" *Brown v. Allen*, 344 U.S. 443, 456 (1953). Thus, the two opinions are not authority nor are they controlling authority. They are simply two irrelevant unpublished opinions issued from a different lawsuit filed in Washington federal court—which did not apply Idaho law (which is presumably why they are unpublished).

Indeed, the Ninth Circuit and the Washington federal court's unpublished opinions did not cite or address *McCann*, the Comments under I.C. § 30-1-742 or follow Idaho's more relaxed standard for derivative demands. (App. M at 10-16, N at 2-6.) Instead, those courts both relied on the demand standards under California law, e.g., *Potter v. Hughes*, 546 F.3d 1051 (9th Cir. 2008)

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 6

(applying California law to the demand requirement), and other jurisdictions to apply an outlier demand requirement. (*Id*.; App. P.) As discussed in Sections C and E below, the Idaho Supreme Court has rejected the standards applied in *Potter* and *Miesen v. Munding*.

**C.  The Motion Must Be Denied Because Judge Boyle and Judge Dale Have Already Denied Past Motions Challenging the Sufficiency of the 2008 and 2016 Derivative Demands.**

The defendants challenge Miesen's demands for the *third* time. Despite two different judges having rejected challenges to the July 21, 2008, and the two 2016 derivative demands (Dkts. 46, 210; App. G-H), the defendants improperly seek to adjudicated those demands again and without even filing a motion for reconsideration. (Dkts. 1067, 1090.) Yet, the defendants improperly forged ahead with their meritless Motion and Joinder seeking another bite at the apple. They are prohibited from doing so under the "law of the case" doctrine.

> Even interlocutory orders become law of the case…A court's opinions "'are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure.'"
> …
> The "law of the case" doctrine, as well as public policy, dictate that the efficient operation of the judicial system requires the avoidance of re-arguing questions that have already been decided or evidence that could have been presented.

*Dickinson Frozen Foods, Inc. v. FPS Food Process Sol. Corp.*, No: 1:17-cv-00519-DCN, 2020 WL 2841517, at *12-13 (D. Idaho June 1, 2020) (also noting the exceptions to the application of "law of the case" doctrine) (citations omitted).

First, on June 29, 2011 (over ten years ago), Judge Boyle denied the defendants' motions to dismiss challenging the adequacy of the derivative demand dated July 21, 2008 (App. A) when he denied the motions and only granted a stay in the lawsuit. (Dkts. 12, 12-1 at 7-12, 16, 17 at 11-12, 46 (App. G).) While Judge Boyle did not provide any analysis on the demand issue, he nevertheless denied the motions in all respects other than staying the case, which constitutes the express and implicit rejection of the challenges to the adequacy of the July 21, 2008, derivative

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 7

**14-ER-3521**

demand. The defendants do not address the denial of these motions to dismiss or Judge Boyle's order denying them, nor do they assert any exceptions to the "law of the case" doctrine.

Second, on April 21, 2017 (over four years ago), Judge Dale rejected the defendants' challenge to the adequacy of the derivative demands dated June 13, 2016, and August 23, 2016 (App. D-E) when she specifically addressed both demands and correctly applied Idaho law. (Dkt. 210 (App. H).) The challenges to those demands, by two of the attorneys previously representing Mr. Glynn's clients, were made after Judge Dale expressly ordered that any challenges to Miesen's amended complaint must be filed in response to a motion to amend. (Dkts. 178 at 3 n.2, 185 at 3-8.) The Hawley Troxell Defendants did not oppose the filing of the Third Amended Complaint thereby representing to Judge Dale that they found no deficiencies in the derivative demands. (Dkt. 183.) After a hearing was held, Judge Dale properly rejected the challenges to the two 2016 derivative demands. For obvious reasons, the defendants do not address Judge Dale's decision or her correct application of Idaho law when she rejected the defendants' challenges to the two 2016 derivative demands stating:

> "Rule 23.1 is only a procedural requirement empowering federal courts to determine from the pleadings whether the demand requirement has been met." *Stoner v. Walsh*, 772 F. Supp. 790, 795 (S.D.N.Y. 1991). "Because the demand requirement allocates the power of controlling corporate litigation between individual shareholders and directors, the adequacy of the demand…is a creature of state law." *Id.* (citing *Kamen*, 500 U.S. at 98-99). AIA Services Corporation, AIA Insurance Inc., and CropUSA Insurance Agency, Inc. are all Idaho corporations, thus, the Court will look to Idaho law to determine the adequacy of the June 13, 2016, and August 23, 2016 demand letters.
>
> Idaho Code Section 30-29-742 provides that no shareholder may commence a derivative proceeding until:
>
> > (1) A written demand has been made upon the corporation to take suitable action; and
> > (2) Ninety (90) days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless irreparable injury to the corporation

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 8

would result by waiting for the expiration of the ninety (90) day period.

The Idaho statute provides no instruction on how to determine whether the content of the demand is adequate. However, the Idaho Supreme Court in *McCann v. McCann*, 61 P.3d 585, 592 (Idaho 2002), cited to 19 Am. Jur. 2d *Corporations* § 2278, 173–74 (1986) for guidance on determining the adequacy of a demand letter:

> The demand on the directors need not assume a particular form nor need it be made in any special language. However, the stockholder must make an earnest and sincere, and not a feigned or simulated, effort to induce the directors to take remedial action in the corporate name. Statements should be presented to the directors showing the wrong complained of, accompanied by sufficient responsible data which will enable the directors to determine whether litigation could be engaged in with some hope of success. The shareholder must state facts, not mere general charges and conclusions.
>
> The demand should give the directors a fair opportunity to initiate the action which the shareholder wants to undertake, and name the potential defendants, as well as the shareholder making the demand.

Then Judge Dale correctly applying the standard that she applied above went on to say:

> The Court will address Defendants' three arguments separately below.
> …
> Without providing any legal authority, Defendants contend the shareholders' demand letters were not "earnest and sincere" efforts to help the AIA board remedy the shareholders' alleged concerns. Rather than attempt to alert the board to discrete issues for investigation, Defendants argue the demand letters read as if Miesen's counsel viewed the demand requirement as a formality, listing every conceivable claim AIA might consider asserting against any conceivable defendant. In support of this allegation, Defendants point out that, on September 12, 2016, the board informed Miesen's counsel in writing that his demand letters were "too nebulous" to enable the board to investigate the alleged claims. Defendants argue that, rather than attempt to clarify the grounds for his allegations, Miesen's counsel chose to file the motion to amend.
>
> The Court finds the demand letters demonstrate an earnest and sincere effort to inform the AIA board of directors of the alleged wrongdoing. To argue that Miesen could have attempted to clarify his allegations is disingenuous, considering AIA itself did not ask for clarifications. Because no follow up was requested by AIA, Miesen was left with no alternative, other than to file suit.
> …
> Defendants argue generally, without pointing to any specific demand allegation, that all the allegations are insufficient because Miesen included them "by way of example," and because the subject matters of the allegations are too broad for a

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 9

board to determine what claims to investigate. The Court respectfully disagrees.

The demand letter "must state facts, not mere general conclusions." *McCann*, 61 P.3d at 592 (quoting 19 Am. Jur. 2d Corporations § 2278, 173–74 (1986)). "In most instances, the shareholder need not specify his legal theory, every fact in support of that theory, or the precise quantum of damages." *Allison on Behalf of Gen. Motors Corp. v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1117 (D. Del. 1985). "Decisions as to how and on what theory the corporation will pursue wrongdoers are the proper province of the Board of Directors." *Id.*

Because the Defendants fail to point to specific allegations that lack sufficient information, and because the AIA board of directors failed to request from the shareholders clarification on any of the allegations in their response to the demand letters, the Court will not go through the one hundred and two allegations to determine the sufficiency of each one. Upon review of the demand letters, generally, the Court observes that the letters may not include every single fact necessary to support the allegations or provide a precise quantum of damages. However, the allegations (especially those made in the second demand letter) were sufficiently detailed to provide the AIA board of directors the opportunity to make a good faith investigation into the following claims: breach of fiduciary duty; aiding and abetting breaches of fiduciary duties; fraud; aiding and abetting fraud; conspiracy to commit fraud; and, breach of contract. Therefore, the Court finds the content of Miesen's demand letters constituted a sufficient demand on the AIA board of directors.

(App. H at 13-20; Dkt. 210 at 13-20 (footnotes omitted).) Judge Dale's well-reasoned and authoritative decision correctly applying Idaho law to find the two 2016 derivative demands were adequate under Idaho law has not been challenged whatsoever by the defendants—let alone recognized in their improper Motion and Joinder. While the defendants did not raise or address the issue of the adequacy of the two 2012 derivative demands at that time (App. B-C), they had a duty to do so based on Judge Dale's order and they are prohibited from arguing those demands are new evidence now (even if they had moved for reconsideration). (Dkt. 178 at 3 n.2.) *Dickinson Frozen Foods, Inc.*, 2020 WL 2841517, at *13. The Motion and Joinder should be denied.

In sum, the defendants provide no argument or authority as to why they should get three bites at the apple to challenge Miesen's derivative demands or why reconsideration should be granted as to either decision—they failed to even move for reconsideration or explain how Judge

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 10

Boyle or Judge Dale's decisions were erroneous. (Dkts. 1067, 1090.) They provide no argument or authority to escape the application of the "law of the case" doctrine. In reality, "they have lodged a poorly disguised and procedurally improper motion for reconsideration of the Court's orders"—without providing any authority or argument for reconsideration. *Brown v. Wells Fargo Bank, N.A.*, No. CV 16-642-DMG (AGRx), 2018 WL 6819310, at *3 n.5 (C.D. Cal. Dec. 27, 2018). Even if there was a proper motion for reconsideration before the Court, it should decline to reconsider Judge Boyle or Judge Dale's decision because the defendants have "neither presented any newly discovered evidence nor identified an intervening change in the controlling law" (the two unpublished opinions in *Miesen v. Munding* applying the law of other jurisdictions are not authority, let alone new controlling authority as explained in Section B). *Miesen v. Hawley Troxell Ennis & Hawley LLP*, Case No. 1:10-cv-00404, 2021 WL 3112356, at *2 (D. Idaho July 22, 2021).

Accordingly, under the "law of the case" doctrine, the defendants are prohibited from once again challenging the 2008, 2012 and 2016 derivative demands. Two bites at the apple are enough.

**D.** **The Motion and the Joinders Must Be Denied Because They Violate Judge Dale's Order and this Court's Standing Order Regarding Motions to Dismiss.**

The Hawley Troxell Defendants' motion and joinder violates Judge Dale's order. Prior to Miesen moving to amend to file his Third Amended Complaint and after other improper conduct delaying this case and increasing the cost of litigation, Judge Dale entered an order stating:

> The Court would have expected (and expects in the future) grounds for dismissal to have been raised in response to the motion to amend instead of misleading representations that Defendants did not oppose Plaintiffs' motion to amend. The notices of non-opposition were not consistent with Rule 1. See Fed. R. Civ. P. 1. 2015 Comm. Note. ("[D]iscussions of ways to improve the administration of civil justice regularly include pleas to discourage over-use, misuse, and *abuse of procedural tools that increase cost and result in delay*.") (emphasis added).

(Dkt. 178 at 3 n.2.) Judge Dale's order was consistent with Fed. R. Civ. P. 1 and 16, and the "inherent power to provide for the conduct of the proceedings in a derivative action, including the

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 11

power to determine the course of the proceedings." Advisory Committee's Notes to Fed. R. Civ. P. 23.1. Judge Dale's order was also consistent with the intent of derivative demands: "In keeping with the spirit of this section, the specificity of the demand should not become a new source of dilatory motions." Mod. Bus. Corp. Act § 742 cmt. 1 (2002). In sum, if there was going to be a challenge to the threshold issue of the adequacy of the derivative demands, the time to assert that defense was over four years ago. That way, if the demands were deemed deficient, an effort could be made to cure any deficiencies and the parties would not have wasted significant fees and costs litigating.  This was the intent of Judge Dale—to prevent this Motion from being raised years later.

Despite Judge Dale's order and contrary to the clear intent that challenging the adequacy of a derivative demand cannot be "dilatory," the Hawley Troxell Defendants did not oppose the filing of Miesen's Third Amended Complaint by arguing Miesen's derivative demands were insufficient and, instead, they filed a non-opposition. (Dkt. 183.) In other words, they did precisely what Judge Dale ordered them not to do—file a non-opposition when they truly opposed the filing of the amended complaint. (Dkt. 178 at 3 n.2.)  Based on the "misleading representations" by filing a non-opposition, Judge Dale directed them to file their Answer before the Third Amended Complaint was even filed. (Dkts. 190, 193.) Now, over five years after Judge Dale's decision and after hundreds of thousands of dollars in fees and costs have been incurred by Miesen (e.g., Dkt. 1100 ¶ 12), the instant untimely motion was intentionally filed in violation of Judge Dale's order.

But Judge Dale's order is not the only order that the defendants violated by filing their Motion and Joinder. The defendants also violated the Court's standing order.

> Chief Judge Nye expects that counsel, prior to filing a motion to dismiss based upon *Iqbal-Twombley*, will contact opposing counsel, advise them of the perceived shortcomings in the allegations of the complaint, and attempt to reach agreement for the filing of an amended complaint.  If it is still necessary to file a motion to dismiss, the moving party should indicate in their motion that this process has been

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 12

followed and that it is still necessary to file a motion to dismiss.[6]

Despite this Court's standing order, the defendants did not comply prior to filing the Motion and Joinder. (Dkts. 1067, 1067-1, 1090.) While the defendants' briefing cited the *Iqbal-Twombly* standards (Dkt. 1067-1 at 3), they did not comply with this Court's directive before filing their Motion or Joinder, and never contacted Miesen's counsel in over five years prior to filing the Motion. (Dkts. 1067, 1067-1, 1090.) Thus, the defendants violated this Court's order as well.

Accordingly, the untimely motion and joinder should be denied for willfully (bad faith is not required) violating Judge Dale's order *and* this Court's standing order. *See* Fed. R. Civ. P. 16(f)(1)(C) & (2); *U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff*, 768 F.2d 1099, 1104 (9th Cir. 1985) (court properly denied untimely motion filed after the scheduling order cut-off date); *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1035 (9th Cir. 2012) (affirming award of sanctions for violating a court order). Thus, the Court should also strike the defendants' adequacy of demand defenses, and award fees and costs to Miesen, which are particularly appropriate remedies based on the defendants' intentional violations of two court orders and the failure to seek leave of the court before filing the Motion and Joinder. *Id*.

**E. <u>Idaho Law Governs the Adequacy of Derivative Demand for Idaho Corporations and Miesen's Five Derivative Demands (305 Pages of Information) Were More than Adequate Under Idaho Law.</u>**

The defendants cite and quote inapplicable law from other jurisdictions in support of their *third* motion challenging the adequacy of Miesen's five derivative demands. (Dkt. 1067-1 at 1-19.) Their legal and factual challenges are without merit. While Judge Dale accurately stated the relaxed standard for derivative demands under Idaho law and correctly applied Idaho law to determine Miesen's derivative demands were adequate (App. H at 13-20), the five derivative

---

[6] https://www.id.uscourts.gov/district/judges/nye/Motion_Practice.cfm, last visited on August 4, 2021.

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 13

demands (App. A-E) are more than adequate under Idaho's demand standard, which Rule 23.1

plays no role in determining, because Rule 23.1 does not create the demand requirement.

> The derivative form of action permits an individual shareholder to bring "suit to enforce a *corporate* cause of action against officers, directors, and third parties." … To prevent abuse of this remedy, however, equity courts established as a precondition "for the suit" that the shareholder demonstrate "that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions." This requirement is accommodated by Federal Rule of Civil Procedure 23.1, which states in pertinent part:
>
>> "The complaint [in a shareholder derivative action] shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort."
>
> **But although Rule 23.1 clearly _contemplates_ both the demand requirement and the possibility that demand may be excused, it does not _create_ a demand requirement of any particular dimension. On its face, Rule 23.1 speaks only to the adequacy of the shareholder representative's pleadings. Indeed, as a rule of procedure issued pursuant to the Rules Enabling Act, Rule 23.1 cannot be understood to "abridge, enlarge or modify any substantive right."** The purpose of the demand requirement is to "affor[d] the directors an opportunity to exercise their reasonable business judgment and 'waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." … In our view, the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of "substance," not "procedure."
> …
> The purpose of requiring a precomplaint demand is to protect the directors' prerogative to take over the litigation or to oppose it… Thus, the demand requirement implements "the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders."
> …
> **The scope of the demand requirement under state law clearly regulates the allocation of corporate governing powers between the directors and individual shareholders**…**a court that is entertaining a derivative action under that statute must apply the demand [requirement] as it is defined by the law of the State of incorporation**.

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95-97, 101, 108-09 (1991) (citations omitted)

(bold underlined emphasis added). *Kamen* "must be followed by the lower federal courts no matter

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 14

how misguided the judges of those courts may think it to be." *Hutto v. Davis*, 454 U.S. 370, 375 (1982). Because the AIA Entities are incorporated under the laws of the state of Idaho (Dkts. 211 at ¶¶ 6-7; App. I.), this Court must apply Idaho law and Idaho precedent to address the derivative demands at issue in the case at bar. Idaho Code in existence in 2008 through 2016 provided:

> No shareholder may commence a derivative proceeding until:
>
> (1) A written demand has been made upon the corporation to take suitable action; and
> (2) Ninety (90) days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the ninety (90) day period. [7]

I.C. § 30-1-742; I.C. § 30-29-742. [8] The Idaho Supreme Court set forth the required form of a derivative demand, which does <u>not</u> include needing to state the specific causes of action, alleging all facts or quantifying any damages.

> **The demand on the directors need not assume a particular form nor need it be made in any special language. However, the stockholder must make an earnest and sincere, and not a feigned or simulated, effort to induce the directors to take remedial action in the corporate name**. Statements should be presented to the directors showing the wrong complained of, accompanied by sufficient responsible data which will enable the directors to determine whether litigation could be engaged in with some hope of success. The shareholder must state facts, not mere general charges and conclusions.
>
> The demand should give the directors a fair opportunity to initiate the action which the shareholder wants to undertake, and name the potential defendants, as well as the shareholder making the demand.
>
> The shareholder should allow sufficient time for the directors to act upon the demand before initiating the action. The directors' response must be obtained, if possible.

---

[7] "It should be noted that the shareholder bringing suit does not necessarily have to be the person making the demand. Only one demand need be made in order for the corporation to consider whether to take corrective action." Mod. Bus. Corp. Act § 742 cmt. 3 (2002) (App. O at 4). Thus, Miesen was not required to be the shareholder that provided the derivative demand dated July 21, 2008. (App. A.)

[8] "The language of the statute is to be given its plain, obvious and rational meaning. A statute is to be construed as a whole without separating one provision from another. The Court should also construe statutes under the assumption that the legislature knew of all legal precedent and other statutes in existence at the time the statute was passed. *State v. Burnight*, 132 Idaho 654, 659, 978 P.2d 214, 219 (1999) (citations omitted).

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 15

> The shareholder must comply with the reasonable requests of the directors in an effort to resolve the problems before commencing an action. Thus, a shareholder may be required to provide additional information to the directors…

*McCann v. McCann*, 138 Idaho 228, 234-35, 61 P.3d 585, 591-92 (2002) (citations omitted) (emphasis added). Idaho adopted the Model Business Corporation Act Section 742 and the ABA Comments to Section 742 provide in pertinent part: [9]

> Section 742 specifies only that the demand shall be in writing. The demand should, however, set forth the facts concerning share ownership and be sufficiently specific to apprise the corporation of the action sought to be taken and the grounds for that action so that the demand can be evaluated. See Allison on Behalf of Gen. Motors Corp. v. Gen. Motors Corp., 604 F. Supp. 1106, 1117 (D. Del. 1985). **Detailed pleading is not required since the corporation can contact the shareholder for clarification if there are any questions. In keeping with the spirit of this section, the specificity of the demand should not become a new source of dilatory motions**.

> …The [demand] rule is intended "to give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place, and thus to allow the directors the chance to occupy their normal status as conductors of the corporation's affairs." …

Mod. Bus. Corp. Act § 742 cmts. 1 & 4 (2002) (citation omitted) (emphasis added) (App. O at 3).

In sum, unlike California law or the law of other jurisdictions which recognize the futility exception to the demand requirement (App. M-N, P), Idaho law does not require a demand to provide the specific causes of action or provide all of the facts to support such causes of action. The defendants erroneously rely upon the law from California and other jurisdictions to manufacture a demand requirement that does not exist under Idaho law. [10]

---

[9] The Idaho Supreme Court relies on the ABA Comments to interpret the Idaho Business Corporation Act. *Wagner v. Wagner*, 160 Idaho 294, 298, 371 P.3d 807, 811 (2016).

[10] The defendants argue that an abuse of discretion standard will apply on any appeal of the instant case. Miesen disagrees. The interpretation and application of Idaho Code sections 30-1-742 and 30-29-742 are reviewed *de novo. Bright v. Maznik*, 162 Idaho 311, 314, 396 P.3d 1193, 1196 (2017); *see also Unión de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v. UBS Fin. Servs. Inc. of Puerto Rico*, 704 F.3d 155, 161-64 (1st Cir. 2013).

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 16

For example, the defendants rely upon *Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008) six times in their motion. (Dkt. 1067-1 at 4-8, 19.) The Ninth Circuit and Washington federal court's unpublished opinions in *Miesen v. Munding*, which the defendants also rely heavily upon by citing filings 26 times, also relied on *Potter* when they addressed Miesen's demands in *Miesen v. Munding*. (App. M-N.) However, *Potter* involved derivative claims brought under California law, which requires the outlier and extreme demand standard of mandating that the "plaintiff has either informed the corporation or the board in writing of the ultimate facts of each cause of action against each defendant or delivered to the corporation or the board a true copy of the complaint which plaintiff proposes to file." Cal. Corp. Code § 800(b)(2) (App. P). When *Potter* adopted the standard that a demand must contain all facts and list the specific causes of action, the Ninth Circuit cited and relied upon the California Court of Appeals decision in *Shields v. Singleton*, 15 Cal.App.4th 1611, 1618, 19 Cal.Rptr.2d 459, 463 (1993), which applied the demand standard required under California law, specifically Cal. Corp. Code § 800(b)(2). *Id.*; *Potter*, 546 F.3d at 1056; *compare* I.C. §§ 30-1-742 and 30-29-742 *with* Cal. Corp. Code § 800. Simply put, the Ninth Circuit's decisions (including the one in *Miesen v. Munding*) and the other district court decisions (including the one in *Miesen v. Munding*) are inapposite as to whether the demands were "suitable" under *Idaho law*. The outlier requirements in California and other jurisdictions are inapplicable. Thus, the standard for derivative demands under Idaho law, which applies to Miesen's five demands, is dictated by the plain, ordinary and literal meaning of I.C. §§ 30-1-742 and 30-29-742, the ABA Comments thereto, and *McCann*, 138 Idaho at 234-35, 61 P.3d at 591-92.

Applying the above standards to the five derivative demands at issue here (App. A-E) to the claims asserted in Miesen's Third Amended Complaint, which is the only operative complaint, unequivocally establishes that those five demands have exceeded the relaxed derivative demand

standard required under Idaho law which simply requires a shareholder to make "an earnest and sincere, and not a feigned or simulated, effort to induce the directors to take remedial action in the corporate name." *McCann*, 138 Idaho at 235, 61 P.3d at 592. Miesen's five "demand[s] on the directors need not assume a particular form nor need it be made in any special language"—there is no requirement to provide all of the facts, causes of action or quantum of damages. *Id*. Miesen's five derivative demands contain a total of 305 pages of detailed facts, cause of action, damage items and parties to be named as defendants. (App. A-E.) The five demands complied with the requirements under I.C. §§ 30-1-742 and 30-29-742 and Idaho law (including by identifying the shareholder(s) making the demands and by requesting suitable action through detailed information). *Id*. Moreover, there has been no derivative action addressed in a published decision with the egregious facts and claims at issue here. (Dkt. 211; App. A-E.) The defendants have not met the "burden of proving [their] affirmative defense" of the inadequacy of the demands. *U.S. Bank Nat. Ass'n N.D.*, 157 Idaho at 451, 337 P.3d at 610.

To reiterate, this Court is treading old ground on issues previously decided by Judge Dale wherein she properly applied Idaho law to determine Miesen's derivative demands were adequate. (App. H at 13-20.) Rather than address Judge Dale's well-written decision applying Idaho law, the defendants disingenuously focus on decisions applying the law of other jurisdictions. Judge Dale got it right. The defendants have not presented any argument or authority that she was erroneous. While nothing more is necessary to establish compliance with Idaho's demand requirements, Miesen will nevertheless briefly address each demand, once again, in turn.

### 1. The July 21, 2008 Derivative Demand Was Adequate Under Idaho Law.

The July 21, 2008 demand detailed 27 different items of improper conduct and listed numerous causes of action. (App. A; Dkt. 211 at ¶ 172.) The demand specifically requested that legal action be pursued against the Hawley Troxell Defendants, John Taylor, Beck, Cashman,

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 18

Henderson and CropUSA Insurance Agency, Inc. ("CropUSA") for claims such as malpractice, breaches of fiduciary duties, aiding and abetting, breach of contract, fraud, conspiracy, disgorgement of compensation, breach of contract, recovery of attorneys' fees and costs, and violations of the Rules of Professional Conduct—and those parties are the present defendants other than GemCap and CropUSA Insurance Services, LLC. Indeed, most of the causes of action and facts alleged in the Third Amended Complaint can be largely traced to the items in the July 21, 2008 demand—because the improper conduct has continued unabated. (*Compare* App. A and Dkt. 1 *with* Dkt. 211.) "Detailed pleading [was] not required since the corporation can contact the shareholder for clarification if there are any questions." Mod. Bus. Corp. Act § 742 cmt. 1 (2002); (App. O at 3.) There was no response to this demand nor any requests for clarification or additional information. (Dkt. 211 at ¶¶ 176, 182.)

The Hawley Troxell Defendants argue that the July 21, 2008 demand contained "conclusory allegations" and fails to name "any particular law firm or lawyer" to take action against. (Dkt. 1067-1 at 12.)  They are incorrect. The demand specifically states to "take action against the law firms of Hawley Troxell Ennis & Hawley…together with the responsible attorneys of said firms…." (App. A at 1.) The demand also lists the defendant Richard Riley by name and was carbon copied directly to the defendants Ashby and Babbitt (all three names are listed in the demand). (*Id*. at 3 ¶ 26; *Id*. at 4.) In addition, the Hawley Troxell Defendants' arguments are belied by the Petition for Court Appointed Inquiry that they prepared and filed on August 14, 2008 (a Petition that they filed and never pursued). (App. Q.) In that Petition (purportedly filed for the AIA Entities), they asserted, *inter alia*, the inquiry was being sought to "make a determination whether the maintenance of a derivative proceeding against AIA's defense counsel….is in the best interests of the corporations…" (App. Q at 2.) That Petition listed the defendants Ashby, Babbitt and

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 19

Hawley Troxell as defense counsel and was signed by the defendant Babbitt. (*Id*. at 1, 6.) In addition, it is incredulous that the defendants would even argue that Miesen should have known all of the names of the attorneys at Hawley Troxell purporting to represent the AIA Entities when those billing records were concealed from Miesen until almost a decade after this lawsuit was filed. (E.g., Dkt. 211 at ¶¶ 65, 84, 106, 164, 193, 215, 217.)

The Hawley Troxell Defendants argue that no pre-suit demand was made for the CropUSA sale to Hudson, the misuse of funds, the Growers National contract and other alleged items of misconduct allegedly occurring after the July 21, 2008 demand. (Dkt. 1067-1 at 13-14.)  The July 21, 2008 demand, and the subsequent 2012 and 2016 demands, all asserted allegations and requests for claims pertaining to corporate opportunities (e.g., CropUSA and Growers National) and the misuse of funds. The July 21, 2008 demand specifically requests legal action be taken "for violating the corporate opportunity doctrine by permitting CropUSA to become a separate company" and "participating in the misappropriation of assets, opportunities and funds of AIA Services and AIA Insurance…" (App. A at 2 ¶¶ 9, 12.) The content of the 2008 demand more than covers those transactions and Miesen's subsequent demands in 2012 and 2016 also included them again. (App. A-E.) The defendants provide no authority for the argument that a shareholder's demand to recover assets and funds requires the shareholder to submit a new derivative demand each time the wrongdoers and their attorneys commit similar wrongful acts. In our case that would have required a new demand almost every day. That would be nonsensical. In addition, to argue that Miesen should be aware of all of the fraud and malfeasance, when the defendants continued to conceal facts, is without merit. (E.g., Dkt. 211 at ¶¶ 65, 84, 106, 164, 193, 215, 217.)

The Hawley Troxell Defendants disregard the fact that the July 21, 2008 demand was not created in a vacuum. They disregard their long history of involvement in the improper transactions

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 20

and representations. (Dkt. 211 at ¶¶ 4-244.) They disregard the allegations in Reed Taylor's Fifth Amended Complaint (filed in February 2008) and how much of the conduct alleged in that complaint mirrors and provides further support for many of the items in the July 21, 2008 demand. (App. R.) This is precisely why the defendants never requested any additional information or clarification regarding the countless instances of malfeasance and improper conduct—they knew precisely what the shareholders were demanding, and they had superior knowledge than the shareholders and material facts continue to be concealed to this day. This is also why the defendants sought a court appointed inquiry as to the allegations in the July 21, 2008 demand (although they never followed through). (App. Q; Dkt. 211 at ¶¶ 174-176.) After all, if the defendants were unsure of the improper conduct and the names of the responsible parties, there would be no reason to seek a court appointed inquiry. Instead, the defendants would have responded with the very arguments that they are now making.

While the Hawley Troxell Defendants argue that certain transactions and misconduct were allegedly not included in earlier demands and are allegedly a "nullity" (Dkt. 1067-1 at 15), the undisputed fact is that the derivative action was already pending, the five demands more than met Idaho's demand standards, and the Second and Third amended complaints were not filed until well after 90 days elapsed after the 2012 and 2016 demands had been served (with the exception of the August 2016 demand which John Taylor rejected in without any authority as discussed herein). (*Compare* App. A-F *with* Dkts. 1, 23, 137, 211.)

In sum, the Hawley Troxell Defendants renewed challenges to the adequacy of the July 21, 2008 derivative demand are without merit. That demand complies with Idaho law.

### 2.   The July 3, 2012 Derivative Demand Was Adequate Under Idaho Law.

The July 3, 2012 demand was an email addressed to defense counsel and the boards of the AIA Entities and sent to defense counsel with directions to forward to the boards. (App. B.) There

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 21

**14-ER-3535**

is no evidence that defense counsel did not forward the demand as directed consistent with the allegations in the Third Amended Complaint. (Dkt. 211 at ¶ 177.) Those attorneys were representing the defendants in this very lawsuit. In addition, as agents for the AIA Entities, the Hawley Troxell Defendants were duty bound to forward the email demand. In any event, at a minimum, there is a genuine issue of material fact as to whether that demand was forwarded as directed to the purported boards of the AIA Entities. This demand included seven different discrete items, including, demands to hold annual shareholder meetings, to comply with the articles and bylaws, make full disclosure to the shareholders, and other matters. (App. B.) There was no response to this demand nor any requests for clarification or additional information. (Dkt. 211 at ¶ 182.) No amended complaint was filed after ninety days because this lawsuit was stayed. This demand was adequate under Idaho law, and properly formed the basis for additional allegations and causes of action in the Third Amended Complaint.

### 3. The July 2012 Derivative Demands Provided by Fourteen Different Shareholders Were Adequate Under Idaho Law.

The July 2012 demands, made by fourteen different shareholders of AIA Services, specifically requested, *inter alia*, that the AIA Entities "pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case [11] through the date of this demand and for all related acts after the date of this Demand…A copy of said First Amended Complaint is incorporated by reference herein." (App. C at 1 ¶ 4, 4 ¶ 4, 7 ¶ 4, 12 ¶ 4, 15 ¶ 4, 18 ¶ 4, 21 ¶ 4, 24 ¶ 4, 27 ¶ 4, 30 ¶ 4, 33 ¶ 4, 36 ¶ 4, 39 ¶ 4, 42 ¶ 4; *see* App. C at 45-100; Dkt. 23.) Thus, those demands covered all potential claims and conduct occurring after the original demand was made on July 21, 2008 through the date the July 2012 demands were delivered on July 16, 2012

---

[11] The "Federal Court Case" was specifically defined in paragraph 1 of each demand to be the case at bar. (App. A.)

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 22

(Dkt. 211 at ¶ 178) and thereafter for the continuing acts and omissions. There is no way the July 2012 demands, coupled with incorporating the First Amended Complaint (App. C), did not comply with the Idaho standard and even California's more stringent standard applied in *Miesen v. Munding*. (App. M-P.) There was no response to these demands nor any requests for clarification or additional information. (Dkt. 211 at ¶ 182.) Thus, the July 2012 demands adequately covered all acts, omissions and causes of action occurring since the 2008 demand and thereafter (the demands stated they included the same conduct occurring in the future). No amended complaint was filed after ninety days because this lawsuit was stayed at that time. These fourteen detailed and comprehensive demands were adequate under Idaho law, and properly formed the basis for additional allegations and causes of action in the Third Amended Complaint.

The Hawley Troxell Defendants also argue that certain matters were not included within the July 2012 demands. (Dk. 1067-1 at 15.) Their arguments are without merit. As explained above, the July 2012 demands delivered by fourteen shareholders incorporated by reference all of the facts and causes of action set forth in the First Amended Complaint. (App. C.) Those demands specifically requested the "Company" (which is defined to include both AIA Entities) to assert the causes of action contained within the First Amended Complaint against the parties named in that complaint. *Id*. Thus, those demands covered all acts, omissions and causes of action through July 18, 2012 and thereafter as also specifically stated.

### 4. The June 13, 2016 and August 23, 2016 Derivative Demands Were Adequate Under Idaho Law.

The June 13, 2016 and August 23, 2016 derivative demands were largely similar other than two exceptions. (Dkt. 211 at ¶¶ 179-180; App. D-E.) Both demands contain definitions for parties and groups of defendants, e.g., "Combined Defendants" means all of the named parties other than the AIA Entities. (App. D at 2, E at 2.) The June 13, 2016 demand provided comprehensive

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 23

definitions, contained 44 different paragraphs addressed issues and claims, requested numerous cause of action be asserted, incorporated the 52-page proposed Second Amended Complaint as additional support in paragraph 19 and requested legal action for future similar conduct. (App. D.) The August 23, 2016 demand provided the same information with the exception that it contained 58 different paragraphs and requested that all claims set forth and/or contemplated in the 52-page proposed Second Amended Complaint and a prior proposed 54-page proposed Third Amended Complaint (which was never formally filed) as additional support in paragraphs 15 and 32. (App. E.) There was no response within 90 days to the June 13, 2016 demand. (Dkt. 211 at ¶ 179.) Through a letter dated September 12, 2016 (App. F), John Taylor timely responded to the August 23, 2016 demand (Dkt. 211 at ¶ 180), but he did not request any clarifications or additional information for either of the 2016 demands nor was he a duly elected director and the board was not fully seated (e.g., the letter was unauthorized). *See* Section H. (Dkt. 211 at ¶¶ 8, 29, 120-21, 137, 150, 160, 164(y), 182, 201.) Thus, the two 2016 demands adequately covered all acts, omissions and causes of action occurring since the July 2012 demands and for the same conduct thereafter (the demands stated they included the same conduct occurring in the future). There is no way the two 2016 demands, coupled with incorporating the proposed second and third amended complaints (App. D-E), did not comply with the Idaho standard or even California's more stringent standard applied in *Miesen v. Munding*. (App. M-P.) The two unpublished opinions in *Miesen v. Munding* are not authority, controlling authority or even admissible as explained in Section B.

The Hawley Troxell Defendants argue that the June 13, 2016 demand only mentions them in two paragraphs. (Dkt. 1067-1.) They are incorrect. While Miesen referred specifically to them in two paragraphs, they are also included in all of the paragraphs mentioned the "Combined Defendants" and they are specifically referenced countless times in the proposed Second Amended

Complaint which was incorporated into the demand. (App. D.)

Thus, the two 2016 demands were adequate under Idaho law and properly formed the basis for additional allegations and cause of action in the Third Amended Complaint.

> **5. The Defendants Have No Right to Complain Based on the Extensive Ongoing Improper Corporate Governance, Improper Conduct and Concealments, in which the Defendants Were Active Participants.**

Although Idaho has a less-stringent demand standard (presumably in part because it does not recognize demand futility), there are other facts which Miesen asserts that the Idaho Supreme Court would hold weigh in favor of relaxing the standard even more for Miesen or excusing it altogether as discussed in Section H. For example, John Taylor and Connie Henderson, two of the three purported directors of the AIA Entities for the first three demands (App. A-C), have been licensed to practice law in Idaho for decades and the Hawley Troxell Defendants have been directly or indirectly involved in most of the malfeasance or defending against them. (App. K-L; Dkt. 211.) They are "presumed to know the law." *Miller v. Smith*, 7 Idaho 204, 61 P. 824, 827 (1900). There can be no argument that they did not understand the demands or the legal ramifications. Indeed, the failure of the board to respond to any of the demands to seek additional facts or information when two directors were practicing lawyers and directly or indirectly involved in the transactions confirms that John Taylor and Henderson were well aware of what was requested by the demands.

In addition, if the intent of demands is to permit a properly functioning board to address the demands to determine whether the corporation should pursue litigation,[12] that intent is not served in the instant lawsuit. There is no dispute that from 2008 through the present time the defendants have intentionally: (1) not held annual shareholder meetings in violation of the bylaws; (2) not electing directors; (3) not fully seating the board with the director required under the articles

---

[12] Mod. Bus. Corp. Act § 742 cmts. 1-4 (2002) (App. O); *Kamen*, Inc., 500 U.S. at 95-96, 100.

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 25

for the preferred shareholder; (4) not complied with the articles of incorporation (including failing to honor the appointment of the Series A director and by engaging in prohibited transactions); (5) not complying with the bylaws; (6) concealing facts and improper transactions from shareholders and refusing to provide disclosure, and (7) continuing with the foregoing unlawful conduct despite having received five demands by numerous shareholders over the course of over a decade demanding action, much of which the Hawley Troxell Defendants were directly or indirectly involved in. (E.g., Dkt. 211 at ¶¶ 4-244; App. I §§ 4.2.8, 4.2.9, 4.2.12, 4.3.3, 4.3.5; App. J §§ 3.2, 4.2, 4.4, 4.6, 4.7, 4.14, 6.1, 6.2, 14.1.)  It would be an absurd result to allow the defendants to avoid liability for alleging demands were inadequate when fundamental corporate governance and the corresponding Idaho Code sections are being intentionally violated. E.g., I.C. §§ 30-1-801(2), 30-29-801(2), 30-1-202(2)(b)(ii)-(iii), 30-29-202(2)(b)(ii)-(iii), 30-1-301(1), 30-29-301(1), 30-1-302(7), 30-29-302(7), 30-1-1201, 30-29-1201; *Kemmer v. Newman*, 161 Idaho 463, 466, 387 P.3d 131, 134 (2016) ("Actions taken in violation of a corporation's bylaws are void."); *Marine Services Unlimited, Inc. v. Rakes*, 918 S.W.2d 132, 134 (Ark. 1996) ("meeting held without notice to some or any of the directors and in their absence is illegal, and action taken at such a meeting, although by a majority of the directors, is invalid."); *Stone v. American Lacquer Solvents Co.*, 345 A.2d 174, 176-77 (Pa. 1975) ("directors of a corporation may bind a corporation only when they act at a legal meeting of the board"); *Hill v. Small*, 183 S.E.2d 752, 753-54 (Ga. 1971) (articles of incorporation are the corporation's constitution and actions which violate articles are void).

Thus, the challenge to the adequacy of the five demands is being used as an improper shield to meritorious derivative claims which was never the intent of I.C. §§ 30-1-742 and 30-29-742. (Dkt. 211 at ¶¶ 4-244.) The defendants have no right to complain that any demand is allegedly inadequate when material facts and transactions have consistently been concealed and no proper

corporate governance has ever taken place since the first demand in 2008. *Id*. The reason no request has ever been made for additional information is because the defendants have been directly or indirectly involved in the misconduct. *Id*. This is not a strike suit challenging a duly authorized merger transaction. *Id*. Indeed, rather than the Hawley Troxell Defendants acting to stop the rogue management of the AIA Entities, they have accelerated the improper conduct and lack of corporate governance since the first demand in 2008. (*Compare* Dkt. 1 *with* Dkt. 211.)

**F.** **Miesen's Third Amended Complaint Complies with Rule 23.1, Which Plays No Role in Determining the Adequacy of Miesen's Derivative Demands Under Idaho Law.**

The defendants argue that Miesen's Third Amended Complaint does not comply with Rule 23.1 by conflating Rule 23.1 with the demand requirement under Idaho law. (Dkt. 1067-1 at 5-8, 16.) "But although Rule 23.1 clearly *contemplates* both the demand requirement and the possibility that demand may be excused, it does not *create* a demand requirement of any particular dimension. On its face, Rule 23.1 speaks only to the adequacy of the shareholder representative's pleadings." *Kamen*, 500 U.S. at 96 (emphasis in original).

> (b) PLEADING REQUIREMENTS. The complaint must be verified and must:
> (1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;
> (2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and
> (3) state with particularity:
> > (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and
> > (B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1(b).

Here, Miesen's Third Amended Complaint complies with Rule 23.1 because: (1) it is verified by Miesen (Dkt. 211 at 83); (2) Miesen has been a shareholder of AIA Services for decades and during all relevant times (*Id*. at ¶¶ 4, 171-172); (3) Miesen asserted this action was not a

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 27

collusive one (*Id.* at ¶¶ 183-184); (4) Miesen described with particularity the five derivative demands made upon the purported boards of the AIA Entities to obtain the desired actions and how he waited over 90 days after each demand (*Id.* at ¶¶ 171-184); and (5) Miesen asserted that there was no proper corporate governance and intentional violations of the articles and bylaws justifying demand excuse (*Id.* at ¶¶ 4-244). The plain meaning of Rule 23.1 does not require Miesen to plead and prove the adequacy of the five derivative demands required by and interpreted exclusively under Idaho law, which cannot be abridged or modified. *Business Guides, Inc. v. Chromatic Comm'ns. Enters.*, Inc., 498 U.S. 533, 540 (1991) ("'We give the Federal Rules of Civil Procedure their plain meaning.'"); *Kamen*, 500 U.S. at 95-97, 101, 108-09; 28 U.S.C.A. § 2072(b); *Hutto*, 454 U.S. at 375. It would be nonsensical to require Miesen to quote all 305 pages of the five derivative demands in his Third Amended Complaint in order to comply with Rule 23.1. That is not the purpose of the rule. Accordingly, Miesen's Third Amended Complaint more than complies with Rule 23.1's pleading requirements.

**G.  The Defendants Lack Standing to Challenge the Adequacy of the Derivative Demands.**

While the Idaho Supreme Court has yet to address the issue, other courts have held that only the corporation has standing or right to challenge the adequacy of derivative demands. *Colan v. Monumental Corp.*, 524 F.Supp. 1023, 1028 (N.D. Ill. 1981) ("Defendants lack standing to complain of any deficiencies in the demand made by the plaintiff upon [the] directors."); *Abbey v. Computer & Commc'ns Tech. Corp.*, 457 A.2d 368, 374-75 (Del. Ch. 1983); *Prager v. Sylvestri*, 449 F.Supp. 425, 429 (S.D.N.Y.1978).

Here, the AIA Entities are the only parties who may challenge the adequacy of the four derivative demands at issue in the case at bar. (App. A-F.) However, the AIA Entities are not challenging the demands and they are separately in default for being unrepresented. (Dkts. 1059-1, 691.) The defendants, including the Hawley Troxell Defendants, were involved in the improper

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 28

acts and omissions. (Dkt. 211 at ¶¶ 9-244.) The plain meaning of Idaho Code sections 30-1-742 and 30-29-742 provide no basis for any defendant other than the corporations to challenge a derivative demand, especially based upon the facts before this Court. *Id*.; *Burnight*, 132 Idaho at 659, 978 P.2d at 219. The plain meaning of those Code sections does not provide rogue management or third parties with the right to challenge demands.

In addition, since Idaho does not recognize the futility exception (which allows plaintiffs to forego making demands), it makes even more sense that Idaho would only allow standing to corporations. To permit corporate insiders (especially rogue ones) and third parties to challenge derivative demands would defeat the intent of the statute and will lead to inconsistent results in different courts regarding the same demands.

Thus, Miesen asserts that the Idaho Supreme Court would hold that only a corporation has the right to challenge the adequacy of the derivative demands. *Gravquick A/S*, 323 F.3d at 1222.

**H.** **While Miesen Maintains that the Five Demands Are Adequate, Miesen Is Separately Excused from Making Demand Upon the Boards of Directors of the AIA Entities Because There Has Never Been Any Proper Corporate Governance Since 2008.**

While Idaho has rejected the futility exception to the demand requirement (*McCann*, 138 Idaho at 593, 61 P.3d at 236), the Idaho Supreme Court has yet to address whether the demand requirement may also be "'**excused by extraordinary conditions**.'" *Kamen*, 500 U.S. at 96 (emphasis added). "The plain meaning of [I.C. §§ 30-1-742 and 30-29-742] will prevail unless clearly expressed legislative intent is contrary or unless plain meaning leads to absurd results." *Corder v. Idaho Farmway, Inc.*, 133 Idaho 353, 986 P.2d 1019 (1999) (citation omitted).

Here, if there was ever a derivative action where demand should be excused, this is the one. Idaho Code sections 30-1-742 and 30-29-742, the ABA Comments thereto, and *McCann* do not speak to a situation where the corporation is intentionally: (1) not holding annual shareholder meetings (including in violation of the bylaws); (2) not electing directors; (3) not fully seating the

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 29

board with the director required under the articles for the preferred shareholder; (4) not complying with the articles of incorporation (including failing to honor the appointment of the Series A director and by engaging in prohibited transactions); (5) not complying with the bylaws; (6) concealing facts and improper transactions from shareholders and refusing to provide disclosure, and (7) continuing with the foregoing unlawful conduct despite having received five demands by numerous shareholders over the course of over a decade demanding action, much of which the Hawley Troxell Defendants were directly or indirectly involved in. (E.g., Dkt. 211 at ¶¶ 4-244; App. I §§ 4.2.8, 4.2.9, 4.2.12, 4.3.3, 4.3.5; App. J §§ 3.2, 4.2, 4.4, 4.6, 4.7, 4.14, 6.1, 6.2, 14.1.)

It would be an absurd result to allow the defendants to avoid liability by alleging the five demands were inadequate when fundamental corporate governance and the corresponding Idaho Code sections have been and continue to be intentionally violated. E.g., I.C. §§ 30-1-801(2), 30-29-801(2), 30-1-202(2)(b)(ii)-(iii), 30-29-202(2)(b)(ii)-(iii), 30-1-301(1), 30-29-301(1), 30-1-302(7), 30-29-302(7), 30-1-1201, 30-29-1201; *Kemmer*, 161 Idaho at 466, 387 P.3d at 134 ("Actions taken in violation of a corporation's bylaws are void."); *Rakes*, 918 S.W.2d at 134 ("meeting held without notice to some or any of the directors and in their absence is illegal, and action taken at such a meeting, although by a majority of the directors, is invalid."); *Stone*, 345 A.2d at 176-77 ("directors of a corporation may bind a corporation only when they act at a legal meeting of the board"); *Hill*, 183 S.E.2d at 753-54 (articles are the corporation's constitution and actions which violate articles are void).

Since the demand requirement is premised upon the assumption that the purported boards are at least duly elected and lawfully functioning ,[13] it follows that demand should be excused when there has not been any duly elected, fully seated and properly functioning boards of

---

[13] Mod. Bus. Corp. Act § 742 cmt. 4 (2002) (App. O); *Kamen*, Inc., 500 U.S. at 95-96, 100.

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 30

directors for the AIA Entities since the first demand 2008, nor were there any valid boards to respond to or reject the five demands. (*Id*.; App. A-E.) The Legislature did not intend Idaho Code sections 30-1-742 and 30-29-742 to be used as a sword by rogue management and third parties. [14]

In sum, the AIA Entities have been unlawfully acting through rogue directors (two of whom have been licensed to practice law in Idaho for decades, App. K-L) and thus the demand requirements should be excused. Miesen asserts that the Idaho Supreme Court would hold that he is "excused" from making a demand. *Kamen*, 500 U.S. at 96; *Gravquick A/S*, 323 F.3d at 1222.

## I. In any Event, the Motion Has No Impact on Miesen's Direct Claims.

The defendants seek the dismissal of Miesen's Third Amended Complaint in its entirety. (*E.g.*, Dkt. 1067-1 at 19.) However, they fail to address the fact that Miesen has asserted *both* direct and derivative claims. (E.g., Dkt. 211 at 1, 4-5, 225-230.) For example, under Idaho Code sections 30-1-304(2)(a) & (3) and 30-29-304(2)(a) & (3), Miesen is directly seeking to set aside various unauthorized transactions and agreements (including agreements with the Hawley Troxell Defendants) and to recover damages incurred from those unauthorized transactions and agreements (including recovering fees paid without authorization). *Id*. Miesen is also maintaining that certain acts are void for failing to comply with the bylaws and articles of incorporation. (E.g., Dkt. 211 at ¶¶ 225-230.) *Kemmer*, 161 Idaho at 466, 387 P.3d at 134 ("Actions taken in violation of a corporation's bylaws are void."); *Hill*, 183 S.E.2d at 753-754 (transactions that violated articles are void). The above are just two examples of his direct claims. Thus, the Third Amended Complaint cannot be dismissed in its entirety.

---

[14] Mod. Bus. Corp. Act § 742 cmts. 1-4 (2002) (App. O).

MIESEN'S RESPONSE TO HTEH'S MOTION TO DISMISS AND JOINDER - 31

**J.** **If this Court Finds the Third Amended Complaint Fails to Allege Sufficient Facts, Miesen Should Be Provided the Opportunity to Amend His Complaint.**

If this Court finds that the Third Amended Complaint is deficient, Miesen should be granted leave to amend. *Polich v. Burlington Northern, Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991).

**K. Miesen Respectfully Requests Oral Argument.**

Because the issues above are complex and a condition precedent to Miesen's derivative claims, Miesen respectfully requests oral argument. *See* L. Civ. R. 7.1(d).

## III.   CONCLUSION

For the reasons stated above, the motion and joinder should be denied. (Dkts. 1067, 1090.) This Court should award fees and costs to Miesen and strike the defendants' defenses based on the adequacy of the derivative demands.

DATED:  This 6th day of August 2021.

RODERICK BOND LAW OFFICE, PLLC

By:   */s/ Roderick C. Bond*
Roderick C. Bond
Attorney for the Plaintiff Dale L. Miesen

ANDREW SCHWAM LAW FIRM

By:   */s/ Andrew Schwam*
Andrew Schwam
Attorney for the Plaintiff Dale L. Miesen

14-ER-3547

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 6th day of August 2021, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Jeffrey A. Thomson:    jat@elamburke.com
Loren C. Ipsen:    lci@elamburke.com
Joyce A. Hemmer:    jah@elamburke.com
Bradley S. Keller:    bkeller@byrneskeller.com
Alyson A. Foster:    alyson@dempseyfoster.com
William E. Adams:  bill@weadamslaw.com
Tyler S. Waite:        twaite@campbell-bissell.com
Michael S. Bissell:    mbissell@campbell-bissell.com
Daniel L. Glynn:    dglynn@idalaw.com
Andrew Schwam:  amschwam@turbonet.com


            /s/ Roderick C. Bond
            Roderick C. Bond

## Campbell, Bissell & Kirby, PLLC

### Attorneys & Counselors at Law

Michael S. Bissell • Licensed in WA, ID & AK
Richard D. Campbell • Licensed in WA, ID & MT
Patrick J. Kirby • Licensed in WA & ID

July 21, 2008

**Via Certified Mail and**
**Regular Mail**

Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc.
111 Main Street
Lewiston, ID 83501

**Re:    Demand of Donna Taylor and Reed Taylor Pursuant to Idaho Code 30-1-742**

Dear Board Members of AIA Services Corporation and AIA Insurance Inc.:

As you know, this firm represents Donna J. Taylor ("Donna"), the Series A Preferred Shareholder in AIA Services Corporation ("AIA Services"), and Reed Taylor ("Reed"), the pledgee of AIA Insurance, Inc. ("AIA Insurance") and creditor of AIA Services who is owed over $8.5 Million.

Donna and Reed hereby make demand upon the Board of Directors of AIA Services and AIA Insurance pursuant to Idaho Code 30-1-742 to take the action described herein. Specifically, demand is made that said entities immediately take action against the law firms of Hawley Troxell Ennis & Hawley; Clements, Brown & McNichols; Quarles & Brady; together with the responsible attorneys of said firms (and any other firms which have wrongfully represented the entities) for violating applicable Rules of Professional Conduct, malpractice, breach of fiduciary duties, and aiding and abetting, including, without limitation, all acts related to or involving the following claims and/or causes of action:

1. Wrongfully simultaneously representing Crop USA Insurance Agency, Inc. ("Crop USA") and AIA Services and AIA Insurance, while knowing these entities had divergent interests;

2. Taking action against the best interests of AIA Services and/or AIA Insurance;

3. Assisting in the commission of fraud and/or illegal activities;

4. Wrongfully allowing interested directors and other interested parties to direct litigation in light of substantial claims against them;

5. Issuing inappropriate opinion letters to lenders and auditors;

6. Failing to recover moneys and/or stock in Crop USA;

509-455-7100 • Fax 509-455-7111 • www.cbklawyers.com
416 Symons Building • 7 South Howard Street • Spokane, Washington 99201

**App. - A, p. 1**

**14-ER-3548**

Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc.
July 21, 2008
Page - 2

7. Preventing claims from being made against present and past directors, including, without limitation, R. John Taylor, Michael Cashman, James Beck and Connie Taylor;

8. Failing to take action against Crop USA to recover funds owed;

9. Failing to take action against responsible present and past directors for violating the corporate opportunity doctrine by permitting Crop USA to become a separate company from AIA;

10. Failing to take action against interested directors and parties who took part in fraud, conspiracy and other illegal activities, including, without limitation, R. John Taylor, James Beck, Michael Cashman and Connie Taylor;

11. Breaching fiduciary duties (including the duty of loyalty) owed to AIA Services and AIA Insurance;

12. Aiding and abetting R. John Taylor, James Beck, Michael Cashman, Connie Taylor, Crop USA, and other interested parties who participated in the misappropriation of assets, opportunities, and funds of AIA Services and AIA Insurance (including the $1.5 Million wrongfully transferred from AIA Insurance to Crop USA);

13. Not ensuring that separate counsel was retained for AIA Services;

14. Not ensuring that separate counsel was retained for AIA Insurance knowing that it was pledged to Reed;

15. Assisting in illegal loan guarantees by AIA Services and/or AIA Insurance;

16. Wrongfully entering into a Joint Defense Agreement knowing that such an agreement was inappropriate in light of the significant claims AIA Services and AIA Insurance have against interested individuals and Crop USA;

17. Wrongfully obtaining shareholder consent to pay the attorneys' fees of past and present directors of AIA Services and AIA Insurance without full disclosure or obtaining votes only from disinterested shareholders;

18. Permitting Michael McNichols and Clements, Brown & McNichols to remain as counsel for R. John Taylor in violation of their duty of loyalty to AIA Services and AIA Insurance;

**App. - A, p. 2**

**14-ER-3549**

Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc.
July 21, 2008
Page - 3

19. Assisting in pledging the assets of AIA Services and AIA Insurance to Crop USA for the payment of attorneys' fees and costs of interested parties and others;

20. Permitting the business and employees of AIA Insurance and AIA Services to be detrimentally effected by the actions of interested parties (e.g., transferring AIA Insurance's employees to Crop USA);

21. Failing to take action against R. John Taylor and Connie Taylor for the significant breaches of R. John Taylor's employment agreement with AIA Services;

22. Failing to comply with contractual obligations owed to Reed and Donna;

23. Failing to recover inappropriate salaries, advances, loans, benefits, and compensation paid to R. John Taylor, Connie Taylor, James Beck and others;

24. Assisting in, and failing to take action pertaining to, the improper allocation expenses, labor, rent and other expenditures inappropriately utilized for the benefit of Crop USA.

25. Accepting payments of attorneys' fees in violation of the Rules of Professional Conduct;

26. Representing AIA Services and/or AIA Insurance in making inappropriate arguments (including alleged illegality of the debt to Reed) knowing that such arguments were counter to AIA Services' obligations to Reed and Donna and knowing that Richard Riley was a witness who provided a legal opinion counter to such arguments; and

27. Accepting payment of attorneys' fees and costs which should have been allocated to other parties, including, without limitation, fees and costs that should have been paid by Crop USA, R. John Taylor, James Beck, Michael Cashman and Connie Taylor.

Based upon the above wrongful acts (and others reasonably contemplated from the above acts and other acts known only to insiders at AIA Services and/or AIA Insurance), demand is made upon you to initiate legal action against the above-referenced law firms and lawyers to recover all applicable damages and to require a disgorgement of all attorneys' fees and costs paid to them, including, without limitation, for all inappropriate transactions and the litigation involving Reed and/or Donna. Based upon the foregoing demand is also made for action against R. John Taylor, Michael Cashman, James Beck, Connie Taylor, Crop USA and all other responsible parties for the recovery of damages and the disgorgement of all compensation and attorneys' fees and costs paid to or on their behalf.

Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc.
July 21, 2008
Page - 4

Please note that I have sent a copy of this notice to present counsel for AIA Services and AIA Insurance, and trust that they will ensure copies of this Notice are provided to all board members and shareholders. I would appreciate it if you would let me know as soon as possible whether AIA Services and/or AIA Insurance will be taking any of the requested action. The failure to respond or to immediately take action shall be construed as a rejection of the demands made by this letter.

Nothing herein should be considered or relied upon as a waiver of Donna and Reed's right to take immediate action on behalf of AIA Services and/or AIA Insurance due to exigent circumstances.

Very truly yours,

CAMPBELL, BISSELL & KIRBY, PLLC

MICHAEL S. BISSELL

MSB:mah
cc: Gary Babbitt (via email)
    D. John Ashby (via email)
    James Gatziolis (via email)
    Charles Harper (via email)
    Michael McNichols (via email)
    David Gittins (via email)
    Jon Hally (via email)
    Roderick Bond (via email)
    Reed Taylor (via email)
    Donna Taylor (via regular mail)
Data\1312\notice.072108.doc

**App. - A, p. 4**

**14-ER-3551**

**Roderick Bond**

| | |
|---|---|
| **From:** | Roderick Bond [rod@roderickbond.com] |
| **Sent:** | Tuesday, April 03, 2012 8:16 PM |
| **To:** | 'David Risley'; 'James LaRue'; 'John Ashby'; 'Gary Babbitt' |

Counsel and Board of Directors of AIA Services and AIA Insurance:

This firm represents Donna Taylor, Dale Miesen (and his trusts), LeeAnn Hostetler, Kay Hanchett, Jerry Legg, and Bobette Ruddell.

Demand is hereby made to the board of directors of AIA Services and AIA Insurance to; (1) cease all efforts to withdraw the $400,000 in the court registry in Taylor v. AIA Services; (2) cease paying any attorneys' fees or costs for John Taylor, Michael Cashman, and James Beck; (3) secure the mortgage of the Lewis Clark Hotel; (4) cease all compensation to the foregoing individuals; (5) hold annual shareholder meetings; (6) comply with all applicable Bylaws and Articles of Incorporation of the corporations; and (7) make full disclosure to all shareholders of all of the inappropriate and illegal transactions which have occurred over the years. Obviously, complying with the Bylaws, Articles of Incorporation and Idaho law results in the present purported board members being conflicted from taking any action whatsoever, including withdrawing the $400,000 held in the court registry or taking any other funds or assets from the corporations.

My clients will be making further demands in the future. But time is of the essence in light of the wholly inappropriate recent action. My clients reserve the right to seek court assistance in the future without the necessity of further derivative demands based upon the ongoing malfeasance at AIA Services and AIA Insurance.

You are directed to ensure that your clients and the Boards of AIA Services and AIA Insurance receive this demand and that appropriate action is taken, including electing and naming non-conflicted board members for both corporations. Time is of the essence.

**By: Roderick C. Bond**
**Roderick Bond Law Office, PLLC**
800 Bellevue Way NE, Suite 400
Bellevue, WA  98004
Tel: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Website: www.roderickbond.com

This email and any attachments may be attorney-client privileged, protected as attorney work product, and/or subject to any other applicable privileges. The unauthorized viewing or dissemination of any email or attachment is prohibited. If you have recieved this email in error or it was not intended to be delivered to you, please immediately delete this email and all attachments and contact the sender at the address indicated above. Thank you.

App. - B, p. 1

14-ER-3552