**Consolidated Case Nos. 25-3552 and 25-3800**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,

**Plaintiff-Appellant**,

v.

R. JOHN TAYLOR, an individual, CONNIE TAYLOR HENDERSON, an individual, JAMES BECK, an individual, MICHAEL W. CASHMAN, SR., an individual, CROP USA INSURANCE AGENCY, INC., an Idaho corporation, CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company, AIA SERVICES CORPORATION, an Idaho corporation, AND AIA INSURANCE, INC., an Idaho corporation,

**Defendants-Appellees**,

and

Reed J. Taylor, an individual,

**Third-Party Defendant-Appellee.**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO,
CHIEF DISTRICT COURT JUDGE DAVID C. NYE, PRESIDING

**APPELLANT'S EXCERPTS OF THE RECORD – VOLUME - 15**

| | |
|---|---|
| Roderick C. Bond | Andrew Schwam |
| Roderick Bond Law Office, PLLC | Andrew Schwam Law Firm |
| 10900 NE 4th St., Suite 2300 | 705 SW Fountain St. |
| Bellevue, WA 98004 | Pullman, WA 99163-2128 |
| Tel: (425) 591-6903 | Tel: (208) 874-3684 |
| Email: rod@roderickbond.com | Email: amschwam@turbonet.com |
| Attorney for Appellant | Attorney for Appellant |

### SHAREHOLDER DEMAND

The undersigned shareholder(s), as an owner(s) of record or beneficial holder(s) of preferred and/or common shares in AIA Services Corporation, hereby makes the following Shareholder Demand upon AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc. (collectively "Company") and the Company's Boards of Directors (this Demand also constitutes a derivative demand and double derivative demand) (collectively "Demand"):

1.      That R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, JoLee Duclos and Aimee Gordon be barred from serving as directors or officers of the Company based upon the ongoing malfeasance, conflicts of interest, failure to act in good faith, breaches of fiduciary duties (including the duties of loyalty, care and good faith) and other acts and/or omissions committed under their direction, participation and/or acquiescence, including, without limitation, those acts and/or omissions identified in the First Amended Complaint in *Donna J. Taylor v. Hawley Troxell Ennis & Hawley, R. John Taylor, Michael Cashman, James Beck, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case"), which said First Amended Complaint is incorporated by reference herein, and that legal action be taken against them.

2.      That Paul D. Durant be appointed as a director of AIA Services Corporation as requested and duly authorized and appointed by the sole Series A Preferred Shareholder of the Company, Donna J. Taylor.

3.      That Paul D. Durant be appointed as the President of AIA Services Corporation and AIA Insurance, Inc., to be duly compensated, and to operate those entities in the best interests of the corporations and their shareholders (with an emphasis on recovering damages and sums from majority shareholder R. John Taylor and Connie Taylor Henderson and others for the benefit of the corporations and their innocent shareholders) and to retain and/or terminate such employee(s) and/or officer(s) as he deems appropriate to properly operate the corporations and pursue any claims set forth in the First Amended Complaint in the Federal Court Case and similar or other claims against named and unnamed parties.  Mr. Durant should also be authorized to appoint other parties to the Board of Directors to serve until the next annual meeting as provided under the Restated Bylaws.

4.      That the Company (regardless of Mr. Durant's appointment as an officer or director of the Company), and Paul D. Durant if appointed as an director and/or officer, be authorized to pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case through the date of this Demand and for all related acts after the date of this Demand, including, without limitation, requesting and praying for punitive damages against the parties named in the Federal Court Case and any other responsible parties named in this Demand.  A copy of said First Amended Complaint is incorporated by reference herein and is already in the possession of the Company and its purported officers and purported directors (a copy can also be obtained from PACER (the online filing system for the United States District Court for the District of Idaho)).

5.      That the Company refrain from pursuing a reverse stock split (which violates Articles 4.2.9(f), 4.3.3 and 11 of the Company's amended articles of incorporation and the Company's Restated Bylaws) or any other corporate action which is not in the best interests of the Company's preferred shareholders and minority shareholders or otherwise violates the Company's articles of incorporation, restated bylaws and/or Idaho law (including oppressive conduct and breaches of fiduciary duties). That any and all shares held by R. John Taylor and/or Connie Taylor Henderson be barred and disqualified from voting on the reverse stock split since that transaction is preferential to them and is being pursued without full disclosure.

1

Exhibit 41 - Page - 1

App. - C, p. 1

15-ER-3554

6.      That the Company demand repayment of, and refrain from paying or advancing, any sums or assets for the payment of all attorneys' fees, expert witness fees, costs and expenses paid, advanced or lent by the Company for JoLee Duclos, R. John Taylor, Connie Taylor Henderson, James Beck, Corrine Beck, Michael Cashman, Jane Doe Cashman, and CropUSA Insurance Agency, Inc.

7.      That Paul D. Durant be authorized to appoint persons to committee(s) of the Board of Directors of the Company, with each committee comprised of at least two (2) of the minority shareholders of the Company to be determined in Mr. Durant's sole discretion and at least one (1) outside and independent person (or more should Mr. Durant desire).   Said committee(s) should be used by Mr. Durant, in his discretion, to govern the Company and to maximize the value of the Company's shareholders and to wind up the affairs of the Company should no new viable businesses be obtained and the assets and funds used to pay creditors, preferred shareholders and distributed to common shareholders. Mr. Durant should be authorized to obtain approval for any acts from the Judge in the Federal Court Case or other court of competent jurisdiction to the extent required (including ultimately filing an action or taking action to dissolve the Company once all assets and funds have been identified and recovered or upon court or shareholder approval).

8.      That the Company rescind and/or revoke 818,659 of the common shares held by R. John Taylor and Connie Taylor Henderson as those shares were unlawfully issued by the Company when R. John Taylor violated his Executive Officer's Agreement with Company and they have acted as faithless fiduciaries of the Company (500,000 were granted as an option of the Executive Officers Agreement breached by R. John Taylor) and the other 318,659 shares obtained by R. John Taylor and/or Connie Taylor Henderson from Michael W. Cashman and Corrine M. Beck and/or James Beck were unlawfully issued to them and other former Series C Preferred Shareholders of the Company and are therefore not properly issued shares and those certificates and any subsequent certificates representing those common shares are illegal and void.   The foregoing shares, along with the common shares unlawfully issued to Distribution Services, Inc., Bruce E. Knutson, Charles B. Rapp, Daryl R. Verdoorn and any other commons shares unlawfully issued to the former Series C Preferred Shareholders were illegally issued and void.   The proper rescission and/or revocation of the foregoing shares increases the minority shareholder's ownership interest in the Company, instead of improperly diluting their ownership interest and increasing R. John Taylor and Connie Taylor Henderson's majority interest.

9.      That the Company terminate JoLee Duclos as the trustee of the Company's 401(k) Plan ("Plan") and appoint a disinterested party or person as the trustee of said Plan and that said person be provided full disclosure of all transactions, loans, malfeasance, redemptions, transfers and all other acts and/or omissions of R. John Taylor and JoLee Duclos as the former co-trustees of the Plan.

10.      That the Company rescind and cancel the prior payments for the recent termination of the Employee Stock Ownership Plan of the Company ("ESOP") because the value of said shares cannot be fairly ascertained until the Federal Court Case has been concluded or resolved and other matters and claims resolved by the Company. The participants in the ESOP, like the other common shareholders, should receive the benefit of a fair valuation and/or distribution at the appropriate time.

11.      That Paul D. Durant be authorized to conduct such investigations and retain such services as he deems appropriate and/or necessary pertaining to any and all past transactions, loans, encumbrances, asset sales, share sales or transfers, share redemptions, salaries, payments, exchange offers and/or any other act or omission pertaining to the operations of AIA Services Corporation and AIA Insurance, Inc. and that the Company report said findings to the appropriate authorities and/or State Bar Associations and/or to take such other actions as Mr. Durant deems appropriate and in the best interest of the corporations.

2

Exhibit 41 - Page - 2

App. - C, p. 2

15-ER-3555

12.     That the common shares of R. John Taylor, Connie Taylor Henderson and the other persons and entities identified in Paragraph 8 be barred from voting on any matters relative to the appointment of themselves to the Board of Directors and any other matters in which their shares have a conflict of interest by way of their participation in the malfeasance and/or covering up of the malfeasance against the Company and its other shareholders.

13.     That R. John Taylor, Connie Taylor Henderson, JoLee Duclos, James Beck and Michael Cashman be required to disgorge all compensation, directors fees, indemnification payments or cost advances, benefits, salaries, bonuses, reimbursements, and shares obtained through or from the Company (until the Federal Court Case is resolved) based of them being faithless fiduciaries of the Company.

14.     All actions and demands that are demanded to be taken by Paul Durant are also hereby demanded to be taken by the Company and/or its authorized Board of Directors to the extent persons named in this Demand or others seek to thwart any action by Paul Durant.

15.     That the Company fully disclose all transactions, obligations, loans and footnotes in the recent financial statements provided to shareholders and fully disclose how R. John Taylor, Connie Taylor Henderson and other persons identified in this Demand acquired their respective ownership interests in the entities identified in the footnotes, how the Company's ownership interests were eliminated, transferred or otherwise extinguished and how the transactions, obligations, loans, and share transfers, redemptions and issuances were authorized by the Company, the Company's amended articles of incorporation and restated bylaws.

16.     By making this Demand, the undersigned shareholder(s) does not waive any legal rights or remedies and hereby maintains and asserts that the Company is being irreparably injured and reserves the right to take legal action, without a derivative demand, based upon such irreparable injury.

17.     This Demand may be executed by counterparts and by facsimile and/or pdf attachment, which together shall constitute an original. The undersigned shareholder(s) authorize Dale Miesen or Paul Durant to deliver this Demand to the Company at the time of the shareholder meeting scheduled for July 16, 2012 or anytime before or thereafter.

18.     All further communications to the undersigned shareholder(s) regarding this Demand should be directed to Roderick C. Bond, Roderick Bond Law Office, PLLC, 800 Bellevue Way NE, *Suite* 400, Bellevue, WA 98004 - Tel: (425) 591-6903 - Fax (425) 321-0343 – Email: rod@roderickbond.com.

Dated this _13_ day of July, 2012.

John R. Taylor

3

Exhibit 41 - Page - 3

App. - C, p. 3

15-ER-3556

### SHAREHOLDER DEMAND

The undersigned shareholder(s), as an owner(s) of record or beneficial holder(s) of preferred and/or common shares in AIA Services Corporation, hereby makes the following Shareholder Demand upon AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc. (*collectively* "Company") and the Company's Boards of Directors (this Demand also constitutes a derivative demand and double derivative demand) (collectively "Demand"):

1.      That R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, JoLee Duclos and Aimee Gordon be barred from serving as directors or officers of the Company based upon the ongoing malfeasance, conflicts of interest, failure to act in good faith, breaches of fiduciary duties (including the duties of loyalty, care and good faith) and other acts and/or omissions committed under their direction, participation and/or acquiescence, including, without limitation, those acts and/or omissions identified in the First Amended Complaint in *Donna J. Taylor v. Hawley Troxell Ennis & Hawley, R. John Taylor, Michael Cashman, James Beck, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case"), which said First Amended Complaint is incorporated by reference herein, and that legal action be taken against them.

2.      That Paul D. Durant be appointed as a director of AIA Services Corporation as requested and duly authorized and appointed by the sole Series A Preferred Shareholder of the Company, Donna J. Taylor.

3.      That Paul D. Durant be appointed as the President of AIA Services Corporation and AIA Insurance, Inc., to be duly compensated, and to operate those entities in the best interests of the corporations and their shareholders (with an emphasis on recovering damages and sums from majority shareholder R. John Taylor and Connie Taylor Henderson and others for the benefit of the corporations and their innocent shareholders) and to retain and/or terminate such employee(s) and/or officer(s) as he deems appropriate to properly operate the corporations and pursue any claims set forth in the First Amended Complaint in the Federal Court Case and similar or other claims against named and unnamed parties.  Mr. Durant should also be authorized to appoint other parties to the Board of Directors to serve until the next annual meeting as provided under the Restated Bylaws.

4.      That the Company (regardless of Mr. Durant's appointment as an officer or director of the Company), and Paul D. Durant if appointed as an director and/or officer, be authorized to pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case through the date of this Demand and for all related acts after the date of this Demand, including, without limitation, requesting and praying for punitive damages against the parties named in the Federal Court Case and any other responsible parties named in this Demand.  A copy of said First Amended Complaint is incorporated by reference herein and is already in the possession of the Company and its purported officers and purported directors (a copy can also be obtained from PACER (the online filing system for the United States District Court for the District of Idaho)).

5.      That the Company refrain from pursuing a reverse stock split (which violates Articles 4.2.9(f), 4.3.3 and 11 of the Company's amended articles of incorporation and the Company's Restated Bylaws) or any other corporate action which is not in the best interests of the Company's preferred shareholders and minority shareholders or otherwise violates the Company's articles of incorporation, restated bylaws and/or Idaho law (including oppressive conduct and breaches of fiduciary duties). That any and all shares held by R. John Taylor and/or Connie Taylor Henderson be barred and disqualified from voting on the reverse stock split since that transaction is preferential to them and is being pursued without full disclosure.

1

Exhibit 41 - Page - 4

App. - C, p. 4

15-ER-3557

6.      That the Company demand repayment of, and refrain from paying or advancing, any sums or assets for the payment of all attorneys' fees, expert witness fees, costs and expenses paid, advanced or lent by the Company for JoLee Duclos, R. John Taylor, Connie Taylor Henderson, James Beck, Corrine Beck, Michael Cashman, Jane Doe Cashman, and CropUSA Insurance Agency, Inc.

7.      That Paul D. Durant be authorized to appoint persons to committee(s) of the Board of Directors of the Company, with each committee comprised of at least two (2) of the minority shareholders of the Company to be determined in Mr. Durant's sole discretion and at least one (1) outside and independent person (or more should Mr. Durant desire).  Said committee(s) should be used by Mr. Durant, in his discretion, to govern the Company and to maximize the value of the Company's shareholders and to wind up the affairs of the Company should no new viable businesses be obtained and the assets and funds used to pay creditors, preferred shareholders and distributed to common shareholders. Mr. Durant should be authorized to obtain approval for any acts from the Judge in the Federal Court Case or other court of competent jurisdiction to the extent required (including ultimately filing an action or taking action to dissolve the Company once all assets and funds have been identified and recovered or upon court or shareholder approval).

8.      That the Company rescind and/or revoke 818,659 of the common shares held by R. John Taylor and Connie Taylor Henderson as those shares were unlawfully issued by the Company when R. John Taylor violated his Executive Officer's Agreement with Company and they have acted as faithless fiduciaries of the Company (500,000 were granted as an option of the Executive Officers Agreement breached by R. John Taylor) and the other 318,659 shares obtained by R. John Taylor and/or Connie Taylor Henderson from Michael W. Cashman and Corrine M. Beck and/or James Beck were unlawfully issued to them and other former Series C Preferred Shareholders of the Company and are therefore not properly issued shares and those certificates and any subsequent certificates representing those common shares are illegal and void.  The foregoing shares, along with the common shares unlawfully issued to Distribution Services, Inc., Bruce E. Knutson, Charles B. Rapp, Daryl R. Verdoorn and any other commons shares unlawfully issued to the former Series C Preferred Shareholders were illegally issued and void.  The proper rescission and/or revocation of the foregoing shares increases the minority shareholder's ownership interest in the Company, instead of improperly diluting their ownership interest and increasing R. John Taylor and Connie Taylor Henderson's majority interest.

9.      That the Company terminate JoLee Duclos as the trustee of the Company's 401(k) Plan ("Plan") and appoint a disinterested party or person as the trustee of said Plan and that said person be provided full disclosure of all transactions, loans, malfeasance, redemptions, transfers and all other acts and/or omissions of R. John Taylor and JoLee Duclos as the former co-trustees of the Plan.

10.      That the Company rescind and cancel the prior payments for the recent termination of the Employee Stock Ownership Plan of the Company ("ESOP") because the value of said shares cannot be fairly ascertained until the Federal Court Case has been concluded or resolved and other matters and claims resolved by the Company. The participants in the ESOP, like the other common shareholders, should receive the benefit of a fair valuation and/or distribution at the appropriate time.

11.      That Paul D. Durant be authorized to conduct such investigations and retain such services as he deems appropriate and/or necessary pertaining to any and all past transactions, loans, encumbrances, asset sales, share sales or transfers, share redemptions, salaries, payments, exchange offers and/or any other act or omission pertaining to the operations of AIA Services Corporation and AIA Insurance, Inc. and that the Company report said findings to the appropriate authorities and/or State Bar Associations and/or to take such other actions as Mr. Durant deems appropriate and in the best interest of the corporations.

2

Exhibit 41 - Page - 5

App. - C, p. 5

15-ER-3558

12.     That the common shares of R. John Taylor, Connie Taylor Henderson and the other persons and entities identified in Paragraph 8 be barred from voting on any matters relative to the appointment of themselves to the Board of Directors and any other matters in which their shares have a conflict of interest by way of their participation in the malfeasance and/or covering up of the *malfeasance* against the Company and its other shareholders.

13.     That R. John Taylor, Connie Taylor Henderson, JoLee Duclos, James Beck and Michael Cashman be required to disgorge all compensation, directors fees, indemnification payments or cost advances, benefits, salaries, bonuses, reimbursements, and shares obtained through or from the Company (until the Federal Court Case is resolved) based of them being faithless fiduciaries of the Company.

14.     All actions and demands that are demanded to be taken by Paul Durant are also hereby demanded to be taken by the Company and/or its authorized Board of Directors to the extent persons named in this Demand or others seek to thwart any action by Paul Durant.

15.     That the Company fully disclose all transactions, obligations, loans and footnotes in the recent financial statements provided to shareholders and fully disclose how R. John Taylor, Connie Taylor Henderson and other persons identified in this Demand acquired their respective ownership interests in the entities identified in the footnotes, how the Company's ownership interests were eliminated, transferred or otherwise extinguished and how the transactions, obligations, loans, and share transfers, redemptions and issuances were authorized by the Company, the Company's amended articles of incorporation and restated bylaws.

16.     By making this Demand, the undersigned shareholder(s) does not waive any legal rights or remedies and hereby maintains and asserts that the Company is being irreparably injured and reserves the right to take legal action, without a derivative demand, based upon such irreparable injury.

17.     This Demand may be executed by counterparts and by facsimile and/or pdf attachment, which together shall constitute an original. The undersigned shareholder(s) authorize Dale Miesen or Paul Durant to deliver this Demand to the Company at the time of the shareholder meeting scheduled for July 16, 2012 or anytime before or thereafter.

18.     All further communications to the undersigned shareholder(s) regarding this Demand should be directed to Roderick C. Bond, Roderick Bond Law Office, PLLC, 800 Bellevue Way NE, Suite 400, Bellevue, WA 98004 - Tel: (425) 591-6903 - Fax (425) 321-0343 – Email: rod@roderickbond.com.

Dated this 12 day of July, 2012.

Kay Hanchett

3

Exhibit 41 - Page - 6

App. - C, p. 6

15-ER-3559

### SHAREHOLDER DEMAND

The undersigned shareholder(s), as an owner(s) of record and/or beneficial holder(s) of over $450,000 in Series A Preferred Shares (plus accrued interest and attorneys' fees and costs) and 9,296.5 common shares in AIA Services Corporation, hereby makes the following Shareholder Demand upon AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc. (collectively "Company") and the Company's Boards of Directors (this Demand also constitutes a derivative demand and double derivative demand) (collectively "Demand"):

1. That R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, JoLee Duclos and Aimee Gordon be barred from serving as directors or officers of the Company based upon the ongoing malfeasance, conflicts of interest, failure to act in good faith, breaches of fiduciary duties (including the duties of loyalty, care and good faith) and other acts and/or omissions committed under their direction, participation and/or acquiescence, including, without limitation, those acts and/or omissions identified in the First Amended Complaint in *Donna J. Taylor v. Hawley Troxell Ennis & Hawley, R. John Taylor, Michael Cashman, James Beck, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case"), which said First Amended Complaint is incorporated by reference herein, and that legal action be taken against them.

2. That Paul D. Durant be appointed as a director of AIA Services Corporation as requested and duly authorized and appointed by the sole Series A Preferred Shareholder of the Company, Donna J. Taylor.

3. That Paul D. Durant be appointed as the President of AIA Services Corporation and AIA Insurance, Inc., to be duly compensated, and to operate those entities in the best interests of the corporations and their shareholders (with an emphasis on recovering damages and sums from majority shareholder R. John Taylor and Connie Taylor Henderson and others for the benefit of the corporations and their innocent shareholders) and to retain and/or terminate such employee(s) and/or officer(s) as he deems appropriate to properly operate the corporations and pursue any claims set forth in the First Amended Complaint in the Federal Court Case and similar or other claims against named and unnamed parties. Mr. Durant should also be authorized to appoint other parties to the Board of Directors to serve until the next annual meeting as provided under the Restated Bylaws.

4. That the Company (regardless of Mr. Durant's appointment as an officer or director of the Company), and Paul D. Durant if appointed as an director and/or officer, be authorized to pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case through the date of this Demand and for all related acts after the date of this Demand, including, without limitation, requesting and praying for punitive damages against the parties named in the Federal Court Case and any other responsible parties named in this Demand. A copy of said First Amended Complaint is incorporated by reference herein and is already in the possession of the Company and its purported officers and purported directors (a copy can also be obtained from PACER (the online filing system for the United States District Court for the District of Idaho)).

5. That the Company refrain from pursuing a reverse stock split (which violates Articles 4.2.9(f), 4.3.3 and 11 of the Company's amended articles of incorporation and the Company's Restated Bylaws) or any other corporate action which is not in the best interests of the Company's preferred shareholders and minority shareholders or otherwise violates the Company's articles of incorporation, restated bylaws and/or Idaho law (including oppressive conduct and breaches of fiduciary duties). That any and all shares held by R. John Taylor and/or Connie Taylor Henderson be barred and disqualified from voting on the reverse stock split since that transaction is preferential to them and is being pursued without full disclosure.

1

Exhibit 41 - Page - 7

App. - C, p. 7

15-ER-3560

6.      That the Company demand repayment of, and refrain from paying or advancing, any sums or assets for the payment of all attorneys' fees, expert witness fees, costs and expenses paid, advanced or lent by the Company for JoLee Duclos, R. John Taylor, Connie Taylor Henderson, James Beck, Corrine Beck, Michael Cashman, Jane Doe Cashman, and CropUSA Insurance Agency, Inc.

7.      That Paul D. Durant be authorized to appoint persons to committee(s) of the Board of Directors of the Company, with each committee comprised of at least two (2) of the minority shareholders of the Company to be determined in Mr. Durant's sole discretion and at least one (1) outside and independent person (or more should Mr. Durant desire).  Said committee(s) should be used by Mr. Durant, in his discretion, to govern the Company and to maximize the value of the Company's shareholders and to wind up the affairs of the Company should no new viable businesses be obtained and the assets and funds used to pay creditors, preferred shareholders and distributed to common shareholders. Mr. Durant should be authorized to obtain approval for any acts from the Judge in the Federal Court Case or other court of competent jurisdiction to the extent required (including ultimately filing an action or taking action to dissolve the Company once all assets and funds have been identified and recovered or upon court or shareholder approval).

8.      That the Company rescind and/or revoke 818,659 of the common shares held by R. John Taylor and Connie Taylor Henderson as those shares were unlawfully issued by the Company when R. John Taylor violated his Executive Officer's Agreement with Company and they have acted as faithless fiduciaries of the Company (500,000 were granted as an option of the Executive Officers Agreement breached by R. John Taylor) and the other 318,659 shares obtained by R. John Taylor and/or Connie Taylor Henderson from Michael W. Cashman and Corrine M. Beck and/or James Beck were unlawfully issued to them and other former Series C Preferred Shareholders of the Company and are therefore not properly issued shares and those certificates and any subsequent certificates representing those common shares are illegal and void.  The foregoing shares, along with the common shares unlawfully issued to Distribution Services, Inc., Bruce E. Knutson, Charles B. Rapp, Daryl R. Verdoorn and any other commons shares unlawfully issued to the former Series C Preferred Shareholders were illegally issued and void.  The proper rescission and/or revocation of the foregoing shares increases the minority shareholder's ownership interest in the Company, instead of improperly diluting their ownership interest and increasing R. John Taylor and Connie Taylor Henderson's majority interest.

9.      That the Company, through Paul D. Durant, if the demand made to appoint him as Director and President of the Company is honored or through the Company and its duly authorized and non-conflicted Board of Directors if that demand is not honored, terminate JoLee Duclos as the trustee of the Company's 401(k) Plan ("Plan") and appoint a disinterested party as the trustee of the Plan and that said successor trustee be provided full disclosure of all transactions, loans, malfeasance, redemptions, transfers and all other acts and/or omissions of R. John Taylor and JoLee Duclos as the former co-trustees of the Plan and JoLee Duclos as former successor trustee and that said newly appointed successor trustee also vote the Series C Preferred Shares hold in the Plan to appoint a director to the Board of Directors of AIA Services to represent the interests of the Series C Preferred Shareholders in the Plan as required Article 4.3.2 of Company's Amended Articles of Incorporation. The undersigned, being a beneficial owner of tens of thousands of dollars in Series C Preferred Shares in the Company, demands that no common shares or fractional common shares be redeemed until all accrued dividends have been paid or the funds set aside as required by Article 4.3.3 of the Company's Amended Articles of Incorporation and further demands that if the value of those shares is less than the face value, plus accrued dividends, then no common shares may be redeemed under any circumstances. Further, no dividends may be paid or declared any common shares or the Series C Preferred Shares nor may any of those shares be redeemed until all of the Series A Preferred Shares have been redeemed since those payments are in arrears, as provided under Articles 4.2.9(f)-(g) & (i), 4.3.3, 4.3.4 and 4.4 of Company's Amended Articles of

2

Exhibit 41 - Page - 8

Incorporation. The undersigned shareholder is not consenting, acquiescing or authorizing any modification of rights or preferences as provided under Articles 4.2.12 of Company's Amended Articles of Incorporation. As a Series A Preferred Shareholders and Common Stock Shareholder, the undersigned has and will fairly represent all classes of shares and will endeavor to not resolve any claims unless and until a settlement, resolution or judgment is obtained for all classes of Preferred Shares and Common Shares, excluding certain other shareholders (i.e., R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, etc.) who have of participated in, assisted in covering up or otherwise aiding and abetted or committed torts against the Company and/or other preferred and common shareholders.

10.     That the Company rescind and cancel the prior payments for the recent termination of the Employee Stock Ownership Plan of the Company ("ESOP") because the value of said shares cannot be fairly ascertained until the Federal Court Case has been concluded or resolved and other matters and claims resolved by the Company. The participants in the ESOP, like the other common shareholders, should receive the benefit of a fair valuation and/or distribution at the appropriate time.

11.     That Paul D. Durant be authorized to conduct such investigations and retain such services as he deems appropriate and/or necessary pertaining to any and all past transactions, loans, encumbrances, asset sales, share sales or transfers, share redemptions, salaries, payments, exchange offers and/or any other act or omission pertaining to the operations of AIA Services Corporation and AIA Insurance, Inc. and that the Company report said findings to the appropriate authorities and/or State Bar Associations and/or to take such other actions as Mr. Durant deems appropriate and in the best interest of the corporations.

12.     That the common shares of R. John Taylor, Connie Taylor Henderson and the other persons and entities identified in Paragraph 8 be barred from voting on any matters relative to the appointment of themselves to the Board of Directors and any other matters in which their shares have a conflict of interest by way of their participation in the malfeasance and/or covering up of the malfeasance against the Company and its other shareholders.

13.     That R. John Taylor, Connie Taylor Henderson, JoLee Duclos, James Beck and Michael Cashman be required to disgorge all compensation, directors fees, indemnification payments or cost advances, benefits, salaries, bonuses, reimbursements, and shares obtained through or from the Company (until the Federal Court Case is resolved) based of them being faithless fiduciaries of the Company.

14.     All actions and demands that are demanded to be taken by Paul Durant are also hereby demanded to be taken by the Company and/or its authorized Board of Directors to the extent persons named in this Demand or others seek to thwart any action by Paul Durant.

15.     That the Company fully disclose all transactions, obligations, loans and footnotes in the recent financial statements provided to shareholders and fully disclose how R. John Taylor, Connie Taylor Henderson and other persons identified in this Demand acquired their respective ownership interests in the entities identified in the footnotes, how the Company's ownership interests were eliminated, transferred or otherwise extinguished and how the transactions, obligations, loans, and share transfers, redemptions and issuances were authorized by the Company, the Company's amended articles of incorporation and restated bylaws.

16.     By making this Demand, the undersigned shareholder(s) does not waive any legal rights or remedies and hereby maintains and asserts that the Company is being irreparably injured and reserves the right to take legal action, without a derivative demand, based upon such irreparable injury.

3

Exhibit 41 - Page - 9

App. - C, p. 9

15-ER-3562

17.     This Demand may be executed by counterparts and by facsimile and/or pdf attachment, which together shall constitute an original. In the event that the undersigned shareholder does not attend the Company's shareholder meeting, the undersigned shareholder authorize Dale Miesen or Paul Durant to deliver this Demand to the Company at the time of the shareholder meeting scheduled for July 16, 2012 or anytime before or thereafter. This Demand is made effective, however, upon receipt by Company.

18.     Nothing in this Demand should be construed as a waiver or limitation of any claims, causes of action, and/or relief requested presently asserted by the undersigned in the First Amended Complaint in the Federal Court Case.  This Demand is intended to supplement and assert demand for action to pursue claims, causes of action, and damages asserted in the First Amended Complaint and to include causes of action, claims and damages accrued since the undersigned's last demand. By making this Demand, Donna Taylor is also asserting additional claims and relief to add to her claims in the Federal Court Case and to include the presently pled claims and other claims through the present time and/or as set forth above.  Donna Taylor asserts that her presently pled claims have all been adequately covered by her prior derivative demand letters and this Demand is not a waiver of any claims presently pled in the Federal Court Case.

19.     Special Notice Regarding Series A Preferred Shareholder Agreement and Alignment of Interests.  This also serves as notice that the undersigned asserts that the Company is not properly stating the amount owed to her for her Series A Preferred Shares, as indicated in the Company's most recent accounting of the sums owed to her for her Series A Preferred Shares in the Company's purported financial statements (the Company, through its unauthorized present management, has still failed to provide full disclosure to the shareholders). The amount owed to the undersigned exceeds $500,000, excluding attorneys' fees and costs. Notwithstanding other legal arguments, the undersigned asserts that her Series A Preferred Shareholder Agreement is not governed by I.C. § 30-1-6 because her shares are only redeemed as payments are made, and, therefore, the Series A Preferred Shareholder Agreement is governed now by I.C. § 30-1-631 and I.C. § 30-1-640, i.e., the legality is determined based upon when payments are made. Thus, the notes to the Company's year-end 2011 financial statements (which were presumably recently drafted by or through R. John Taylor and are not drafted in accordance with GAP or the disclosures required under the law) are incorrect and any reliance on purported statements from the undersigned's attorneys is misplaced, mistaken and taken out of context, as there is no such agreement that the Series A Preferred Shareholder Agreement is presently illegal. Rather, R. John Taylor and Connie Taylor asserted it was illegal before the district court in Nez Perce County District Court. The undersigned is not waiving or modifying any rights or remedies under the Series A Preferred Shareholder Agreement nor is she waiving any of the present breaches and the attorneys' fees and costs she has incurred or will incur in the future, including, without limitation, the right to demand payment of sums owed to her under the Agreement and/or pursuant to Article 4.2.3 of Company's Amended Articles of Incorporation. The undersigned expressly reserves all rights under the Series A Preferred Shareholder Agreement and the law (including, whether she desires to have the Series A Shareholder Agreement rescinded to permit her to convert the presently owed sums into common shares to maximize her return based upon the damages and punitive damages which may be recovered in the Federal Court Case. All of the innocent minority shareholders who have also asserted demands contemporaneously with this Demand against the Company and others are aware that the undersigned's Series A Preferred Shares take priority over payments and assets, followed by the Series C Preferred Shares, followed lastly by the commons shares.  The undersigned, as a common shareholder and like other innocent common shareholders, has a vested interest in recovering sufficient funds to properly pay the Series A Preferred Shares and Series C Preferred Shares to maximize the recovery received for the innocent minority common shareholders (which include the common shares held by her). The undersigned is simply focusing on recovering all assets and damages for the benefit of all the Company's innocent preferred and common shareholders and will not accept any settlement that does not include the Company's innocent

4

Exhibit 41 - Page - 10

Series C Preferred Shareholders and the innocent common shareholders and defer the determination of the amount each shareholder will receive for a court or the recipients to agree.

20.     All further communications to the undersigned shareholder(s) regarding this Demand should be directed to Roderick C. Bond, Roderick Bond Law Office, PLLC, 800 Bellevue Way NE, Suite 400, Bellevue, WA 98004 - Tel: (425) 591-6903 - Fax (425) 321-0343 – Email: rod@roderickbond.com.

Dated this ⟋5⟍ day of July, 2012.


_Donna J. Taylor_
Donna J. Taylor                               .

5

Exhibit 41 - Page - 11

App. - C, p. 11

15-ER-3564

## SHAREHOLDER DEMAND

The undersigned shareholder(s), as an owner(s) of record or beneficial holder(s) of preferred and/or common shares in AIA Services Corporation, hereby makes the following Shareholder Demand upon AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc. (collectively "Company") and the Company's Boards of Directors (this Demand also constitutes a derivative demand and double derivative demand) (collectively "Demand"):

1.       That R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, JoLee Duclos and Aimee Gordon be barred from serving as directors or officers of the Company based upon the ongoing malfeasance, conflicts of interest, failure to act in good faith, breaches of fiduciary duties (including the duties of loyalty, care and good faith) and other acts and/or omissions committed under their direction, participation and/or acquiescence, including, without limitation, those acts and/or omissions identified in the First Amended Complaint in *Donna J. Taylor v. Hawley Troxell Ennis & Hawley, R. John Taylor, Michael Cashman, James Beck, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case"), which said First Amended Complaint is incorporated by reference herein, and that legal action be taken against them.

2.       That Paul D. Durant be appointed as a director of AIA Services Corporation as requested and duly authorized and appointed by the sole Series A Preferred Shareholder of the Company, Donna J. Taylor.

3.       That Paul D. Durant be appointed as the President of AIA Services Corporation and AIA Insurance, Inc., to be duly compensated, and to operate those entities in the best interests of the corporations and their shareholders (with an emphasis on recovering damages and sums from majority shareholder R. John Taylor and Connie Taylor Henderson and others for the benefit of the corporations and their innocent shareholders) and to retain and/or terminate such employee(s) and/or officer(s) as he deems appropriate to properly operate the corporations and pursue any claims set forth in the First Amended Complaint in the Federal Court Case and similar or other claims against named and unnamed parties.  Mr. Durant should also be authorized to appoint other parties to the Board of Directors to serve until the next annual meeting as provided under the Restated Bylaws.

4.       That the Company (regardless of Mr. Durant's appointment as an officer or director of the Company), and Paul D. Durant if appointed as an director and/or officer, be authorized to pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case through the date of this Demand and for all related acts after the date of this Demand, including, without limitation, requesting and praying for punitive damages against the parties named in the Federal Court Case and any other responsible parties named in this Demand.  A copy of said First Amended Complaint is incorporated by reference herein and is already in the possession of the Company and its purported officers and purported directors (a copy can also be obtained from PACER (the online filing system for the United States District Court for the District of Idaho)).

5.       That the Company refrain from pursuing a reverse stock split (which violates Articles 4.2.9(f), 4.3.3 and 11 of the Company's amended articles of incorporation and the Company's Restated Bylaws) or any other corporate action which is not in the best interests of the Company's preferred shareholders and minority shareholders or otherwise violates the Company's articles of incorporation, restated bylaws and/or Idaho law (including oppressive conduct and breaches of fiduciary duties).  That any and all shares held by R. John Taylor and/or Connie Taylor Henderson be barred and disqualified from voting on the reverse stock split since that transaction is preferential to them and is being pursued without full disclosure.

1

Exhibit 41 - Page - 12

6.     That the Company demand repayment of, and refrain from paying or advancing, any sums or assets for the payment of all attorneys' fees, expert witness fees, costs and expenses paid, advanced or lent by the Company for JoLee Duclos, R. John Taylor, Connie Taylor Henderson, James Beck, Corrine Beck, Michael Cashman, Jane Doe Cashman, and CropUSA Insurance Agency, Inc.

7.     That Paul D. Durant be authorized to appoint persons to committee(s) of the Board of Directors of the Company, with each committee comprised of at least two (2) of the minority shareholders of the Company to be determined in Mr. Durant's sole discretion and at least one (1) outside and independent person (or more should Mr. Durant desire).  Said committee(s) should be used by Mr. Durant, in his discretion, to govern the Company and to maximize the value of the Company's shareholders and to wind up the affairs of the Company should no new viable businesses be obtained and the assets and funds used to pay creditors, preferred shareholders and distributed to common shareholders. Mr. Durant should be authorized to obtain approval for any acts from the Judge in the Federal Court Case or other court of competent jurisdiction to the extent required (including ultimately filing an action or taking action to dissolve the Company once all assets and funds have been identified and recovered or upon court or shareholder approval).

8.     That the Company rescind and/or revoke 818,659 of the common shares held by R. John Taylor and Connie Taylor Henderson as those shares were unlawfully issued by the Company when R. John Taylor violated his Executive Officer's Agreement with Company and they have acted as faithless fiduciaries of the Company (500,000 were granted as an option of the Executive Officers Agreement breached by R. John Taylor) and the other 318,659 shares obtained by R. John Taylor and/or Connie Taylor Henderson from Michael W. Cashman, Corrine M. Beck, and/or others were unlawfully issued to them and other former Series C Preferred Shareholders of the Company and are therefore not properly issued shares and those certificates and any subsequent certificates representing those common shares are illegal and void.  The foregoing shares, along with the common shares unlawfully issued to Distribution Services, Inc., Bruce E. Knutson, Charles B. Rapp, Daryl R. Verdoorn and any other commons shares unlawfully issued to the former Series C Preferred Shareholders were illegally issued and void.  The proper rescission and/or revocation of the foregoing shares increases the minority shareholder's ownership interest in the Company, instead of improperly diluting their ownership interest and increasing R. John Taylor and Connie Taylor Henderson's majority interest.

9.     That the Company, through Paul D. Durant, if the demand made to appoint him as Director and President of the Company is honored or through the Company and its duly authorized and non-conflicted Board of Directors if that demand is not honored, terminate JoLee Duclos as the trustee of the Company's 401(k) Plan ("Plan") and appoint a disinterested party as the trustee of the Plan and that said successor trustee be provided full disclosure of all transactions, loans, malfeasance, redemptions, transfers and all other acts and/or omissions of R. John Taylor and JoLee Duclos as the former co-trustees of the Plan and JoLee Duclos as former successor trustee and that said newly appointed successor trustee also vote the Series C Preferred Shares hold in the Plan to appoint a director to the Board of Directors of AIA Services to represent the interests of the Series C Preferred Shareholders in the Plan as required Article 4.3.2 of Company's Amended Articles of Incorporation. The undersigned, being a beneficial owner of tens of thousands of dollars in Series C Preferred Shares in the Company, demands that no common shares or fractional common shares be redeemed until all accrued dividends have been paid or the funds set aside as required by Article 4.3.3 of the Company's Amended Articles of Incorporation and further demands that if the value of those shares is less than the face value, plus accrued dividends, then no common shares may be redeemed under any circumstances.

10.     That the Company rescind and cancel the prior payments for the recent termination of the Employee Stock Ownership Plan of the Company ("ESOP") because the value of said shares cannot be fairly ascertained until the Federal Court Case has been concluded or resolved and other matters and

Exhibit 41 - Page - 13

claims resolved by the Company. The participants in the ESOP, like the other common shareholders, should receive the benefit of a fair valuation and/or distribution at the appropriate time.

11. That Paul D. Durant be authorized to conduct such investigations and retain such services as he deems appropriate and/or necessary pertaining to any and all past transactions, loans, encumbrances, asset sales, share sales or transfers, share redemptions, salaries, payments, exchange offers and/or any other act or omission pertaining to the operations of AIA Services Corporation and AIA Insurance, Inc. and that the Company report said findings to the appropriate authorities and/or State Bar Associations and/or to take such other actions as Mr. Durant deems appropriate and in the best interest of the corporations.

12. That the common shares of R. John Taylor, Connie Taylor Henderson and the other persons and entities identified in Paragraph 8 be barred from voting on any matters relative to the appointment of themselves to the Board of Directors and any other matters in which their shares have a conflict of interest by way of their participation in the malfeasance and/or covering up of the malfeasance against the Company and its other shareholders.

13. That R. John Taylor, Connie Taylor Henderson, JoLee Duclos, James Beck and Michael Cashman be required to disgorge all compensation, directors fees, indemnification payments or cost advances, benefits, salaries, bonuses, reimbursements, and shares obtained through or from the Company (until the Federal Court Case is resolved) based of them being faithless fiduciaries of the Company.

14. All actions and demands that are demanded to be taken by Paul Durant are also hereby demanded to be taken by the Company and/or its authorized Board of Directors to the extent persons named in this Demand or others seek to thwart any action by Paul Durant.

15. That the Company fully disclose all transactions, obligations, loans and footnotes in the recent financial statements provided to shareholders and fully disclose how R. John Taylor, Connie Taylor Henderson and other persons identified in this Demand acquired their respective ownership interests in the entities identified in the footnotes, how the Company's ownership interests were eliminated, transferred or otherwise extinguished and how the transactions, obligations, loans, and share transfers, redemptions and issuances were authorized by the Company, the Company's amended articles of incorporation and restated bylaws.

16. By making this Demand, the undersigned shareholder(s) does not waive any legal rights or remedies and hereby maintains and asserts that the Company is being irreparably injured and reserves the right to take legal action, without a derivative demand, based upon such irreparable injury.

17. This Demand may be executed by counterparts and by facsimile and/or pdf attachment, which together shall constitute an original. The undersigned shareholder(s) authorize Dale Miesen or Paul Durant to deliver this Demand to the Company at the time of the shareholder meeting scheduled for July 16, 2012 or any time before or thereafter.

18. All further communications to the undersigned shareholder(s) regarding this Demand should be directed to Roderick C. Bond, Roderick Bond Law Office, PLLC, 800 Bellevue Way NE, Suite 400, Bellevue, WA 98004 - Tel: (425) 591-6903 - Fax (425) 321-0343 – Email: rod@roderickbond.com.

Dated this __13__ day of July, 2012.

_Lee Ann Hostetler_
Lee Ann Hostetler

3

Exhibit 41 - Page - 14

## SHAREHOLDER DEMAND

The undersigned shareholder(s), as an owner(s) of record or beneficial holder(s) of preferred and/or common shares in AIA Services Corporation, hereby makes the following Shareholder Demand upon AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc. (collectively "Company") and the Company's Boards of Directors (this Demand also constitutes a derivative demand and double derivative demand) (collectively "Demand"):

1.      That R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, JoLee Duclos and Aimee Gordon be barred from serving as directors or officers of the Company based upon the ongoing malfeasance, conflicts of interest, failure to act in good faith, breaches of fiduciary duties (including the duties of loyalty, care and good faith) and other acts and/or omissions committed under their direction, participation and/or acquiescence, including, without limitation, those acts and/or omissions identified in the First Amended Complaint in *Donna J. Taylor v. Hawley Troxell Ennis & Hawley, R. John Taylor, Michael Cashman, James Beck, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case"), which said First Amended Complaint is incorporated by reference herein, and that legal action be taken against them.

2.      That Paul D. Durant be appointed as a director of AIA Services Corporation as requested and duly authorized and appointed by the sole Series A Preferred Shareholder of the Company, Donna J. Taylor.

3.      That Paul D. Durant be appointed as the President of AIA Services Corporation and AIA Insurance, Inc., to be duly compensated, and to operate those entities in the best interests of the corporations and their shareholders (with an emphasis on recovering damages and sums from majority shareholder R. John Taylor and Connie Taylor Henderson and others for the benefit of the corporations and their innocent shareholders) and to retain and/or terminate such employee(s) and/or officer(s) as he deems appropriate to properly operate the corporations and pursue any claims set forth in the First Amended Complaint in the Federal Court Case and similar or other claims against named and unnamed parties.  Mr. Durant should also be authorized to appoint other parties to the Board of Directors to serve until the next annual meeting as provided under the Restated Bylaws.

4.      That the Company (regardless of Mr. Durant's appointment as an officer or director of the Company), and Paul D. Durant if appointed as an director and/or officer, be authorized to pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case through the date of this Demand and for all related acts after the date of this Demand, including, without limitation, requesting and praying for punitive damages against the parties named in the Federal Court Case and any other responsible parties named in this Demand.  A copy of said First Amended Complaint is incorporated by reference herein and is already in the possession of the Company and its purported officers and purported directors (a copy can also be obtained from PACER (the online filing system for the United States District Court for the District of Idaho)).

5.      That the Company refrain from pursuing a reverse stock split (which violates Articles 4.2.9(f), 4.3.3 and 11 of the Company's amended articles of incorporation and the Company's Restated Bylaws) or any other corporate action which is not in the best interests of the Company's preferred shareholders and minority shareholders or otherwise violates the Company's articles of incorporation, restated bylaws and/or Idaho law (including oppressive conduct and breaches of fiduciary duties). That any and all shares held by R. John Taylor and/or Connie Taylor Henderson be barred and disqualified from voting on the reverse stock split since that transaction is preferential to them and is being pursued without full disclosure.

1

Exhibit 41 - Page - 15

App. - C, p. 15

15-ER-3568

6.      That the Company demand repayment of, and refrain from paying or advancing, any sums or assets for the payment of all attorneys' fees, expert witness fees, costs and expenses paid, advanced or lent by the Company for JoLee Duclos, R. John Taylor, Connie Taylor Henderson, James Beck, Corrine Beck, Michael Cashman, Jane Doe Cashman, and CropUSA Insurance Agency, Inc.

7.      That Paul D. Durant be authorized to appoint persons to committee(s) of the Board of Directors of the Company, with each committee comprised of at least two (2) of the minority shareholders of the Company to be determined in Mr. Durant's sole discretion and at least one (1) outside and independent person (or more should Mr. Durant desire).  Said committee(s) should be used by Mr. Durant, in his discretion, to govern the Company and to maximize the value of the Company's shareholders and to wind up the affairs of the Company should no new viable businesses be obtained and the assets and funds used to pay creditors, preferred shareholders and distributed to common shareholders. Mr. Durant should be authorized to obtain approval for any acts from the Judge in the Federal Court Case or other court of competent jurisdiction to the extent required (including ultimately filing an action or taking action to dissolve the Company once all assets and funds have been identified and recovered or upon court or shareholder approval).

8.      That the Company rescind and/or revoke 818,659 of the common shares held by R. John Taylor and Connie Taylor Henderson as those shares were unlawfully issued by the Company when R. John Taylor violated his Executive Officer's Agreement with Company and they have acted as faithless fiduciaries of the Company (500,000 were granted as an option of the Executive Officers Agreement breached by R. John Taylor) and the other 318,659 shares obtained by R. John Taylor and/or Connie Taylor Henderson from Michael W. Cashman and Corrine M. Beck and/or James Beck were unlawfully issued to them and other former Series C Preferred Shareholders of the Company and are therefore not properly issued shares and those certificates and any subsequent certificates representing those common shares are illegal and void.  The foregoing shares, along with the common shares unlawfully issued to Distribution Services, Inc., Bruce E. Knutson, Charles B. Rapp, Daryl R. Verdoorn and any other commons shares unlawfully issued to the former Series C Preferred Shareholders were illegally issued and void.  The proper rescission and/or revocation of the foregoing shares increases the minority shareholder's ownership interest in the Company, instead of improperly diluting their ownership interest and increasing R. John Taylor and Connie Taylor Henderson's majority interest.

9.      That the Company terminate JoLee Duclos as the trustee of the Company's 401(k) Plan ("Plan") and appoint a disinterested party or person as the trustee of said Plan and that said person be provided full disclosure of all transactions, loans, malfeasance, redemptions, transfers and all other acts and/or omissions of R. John Taylor and JoLee Duclos as the former co-trustees of the Plan.

10.     That the Company rescind and cancel the prior payments for the recent termination of the Employee Stock Ownership Plan of the Company ("ESOP") because the value of said shares cannot be fairly ascertained until the Federal Court Case has been concluded or resolved and other matters and claims resolved by the Company. The participants in the ESOP, like the other common shareholders, should receive the benefit of a fair valuation and/or distribution at the appropriate time.

11.     That Paul D. Durant be authorized to conduct such investigations and retain such services as he deems appropriate and/or necessary pertaining to any and all past transactions, loans, encumbrances, asset sales, share sales or transfers, share redemptions, salaries, payments, exchange offers and/or any other act or omission pertaining to the operations of AIA Services Corporation and AIA Insurance, Inc. and that the Company report said findings to the appropriate authorities and/or State Bar Associations and/or to take such other actions as Mr. Durant deems appropriate and in the best interest of the corporations.

2

Exhibit 41 - Page - 16

App. - C, p. 16

15-ER-3569

12.     That the common shares of R. John Taylor, Connie Taylor Henderson and the other persons and entities identified in Paragraph 8 be barred from voting on any matters relative to the appointment of themselves to the Board of Directors and any other matters in which their shares have a conflict of interest by way of their participation in the malfeasance and/or covering up of the malfeasance against the Company and its other shareholders.

13.     That R. John Taylor, Connie Taylor Henderson, JoLee Duclos, James Beck and Michael Cashman be required to disgorge all compensation, directors fees, indemnification payments or cost advances, benefits, salaries, bonuses, reimbursements, and shares obtained through or from the Company (until the Federal Court Case is resolved) based of them being faithless fiduciaries of the Company.

14.     All actions and demands that are demanded to be taken by Paul Durant are also hereby demanded to be taken by the Company and/or its authorized Board of Directors to the extent persons named in this Demand or others seek to thwart any action by Paul Durant.

15.     That the Company fully disclose all transactions, obligations, loans and footnotes in the recent financial statements provided to shareholders and fully disclose how R. John Taylor, Connie Taylor Henderson and other persons identified in this Demand acquired their respective ownership interests in the entities identified in the footnotes, how the Company's ownership interests were eliminated, transferred or otherwise extinguished and how the transactions, obligations, loans, and share transfers, redemptions and issuances were authorized by the Company, the Company's amended articles of incorporation and restated bylaws.

16.     By making this Demand, the undersigned shareholder(s) does not waive any legal rights or remedies and hereby maintains and asserts that the Company is being irreparably injured and reserves the right to take legal action, without a derivative demand, based upon such irreparable injury.

17.     This Demand may be executed by counterparts and by facsimile and/or pdf attachment, which together shall constitute an original. The undersigned shareholder(s) authorize Dale Miesen or Paul Durant to deliver this Demand to the Company at the time of the shareholder meeting scheduled for July 16, 2012 or anytime before or thereafter.

18.     All further communications to the undersigned shareholder(s) regarding this Demand should be directed to Roderick C. Bond, Roderick Bond Law Office, PLLC, 800 Bellevue Way NE, Suite 400, Bellevue, WA 98004 - Tel: (425) 591-6903 - Fax (425) 321-0343 – Email: rod@roderickbond.com.

Dated this __/1__ day of July, 2012.

Dale L. Miesen

3

Exhibit 41 - Page - 17

App. - C, p. 17

15-ER-3570

## SHAREHOLDER DEMAND

The undersigned shareholder(s), as an owner(s) of record or beneficial holder(s) of preferred and/or common shares in AIA Services Corporation, hereby makes the following Shareholder Demand upon AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc. (collectively "Company") and the Company's Boards of Directors (this Demand also constitutes a derivative demand and double derivative demand) (collectively "Demand"):

1.     That R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, JoLee Duclos and Aimee Gordon be barred from serving as directors or officers of the Company based upon the ongoing malfeasance, conflicts of interest, failure to act in good faith, breaches of fiduciary duties (including the duties of loyalty, care and good faith) and other acts and/or omissions committed under their direction, participation and/or acquiescence, including, without limitation, those acts and/or omissions identified in the First Amended Complaint in *Donna J. Taylor v. Hawley Troxell Ennis & Hawley, R. John Taylor, Michael Cashman, James Beck, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case"), which said First Amended Complaint is incorporated by reference herein, and that legal action be taken against them.

2.     That Paul D. Durant be appointed as a director of AIA Services Corporation as requested and duly authorized and appointed by the sole Series A Preferred Shareholder of the Company, Donna J. Taylor.

3.     That Paul D. Durant be appointed as the President of AIA Services Corporation and AIA Insurance, Inc., to be duly compensated, and to operate those entities in the best interests of the corporations and their shareholders (with an emphasis on recovering damages and sums from majority shareholder R. John Taylor and Connie Taylor Henderson and others for the benefit of the corporations and their innocent shareholders) and to retain and/or terminate such employee(s) and/or officer(s) as he deems appropriate to properly operate the corporations and pursue any claims set forth in the First Amended Complaint in the Federal Court Case and similar or other claims against named and unnamed parties.  Mr. Durant should also be authorized to appoint other parties to the Board of Directors to serve until the next annual meeting as provided under the Restated Bylaws.

4.     That the Company (regardless of Mr. Durant's appointment as an officer or director of the Company), and Paul D. Durant if appointed as an director and/or officer, be authorized to pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case through the date of this Demand and for all related acts after the date of this Demand, including, without limitation, requesting and praying for punitive damages against the parties named in the Federal Court Case and any other responsible parties named in this Demand.  A copy of said First Amended Complaint is incorporated by reference herein and is already in the possession of the Company and its purported officers and purported directors (a copy can also be obtained from PACER (the online filing system for the United States District Court for the District of Idaho)).

5.     That the Company refrain from pursuing a reverse stock split (which violates Articles 4.2.9(f), 4.3.3 and 11 of the Company's amended articles of incorporation and the Company's Restated Bylaws) or any other corporate action which is not in the best interests of the Company's preferred shareholders and minority shareholders or otherwise violates the Company's articles of incorporation, restated bylaws and/or Idaho law (including oppressive conduct and breaches of fiduciary duties). That any and all shares held by R. John Taylor and/or Connie Taylor Henderson be barred and disqualified from voting on the reverse stock split since that transaction is preferential to them and is being pursued without full disclosure.

1

Exhibit 41 - Page - 18

App. - C, p. 18

15-ER-3571

6.     That the Company demand repayment of, and refrain from paying or advancing, any sums or assets for the payment of all attorneys' fees, expert witness fees, costs and expenses paid, advanced or lent by the Company for JoLee Duclos, R. John Taylor, Connie Taylor Henderson, James Beck, Corrine Beck, Michael Cashman, Jane Doe Cashman, and CropUSA Insurance Agency, Inc.

7.     That Paul D. Durant be authorized to appoint persons to committee(s) of the Board of Directors of the Company, with each committee comprised of at least two (2) of the minority shareholders of the Company to be determined in Mr. Durant's sole discretion and at least one (1) outside and independent person (or more should Mr. Durant desire).  Said committee(s) should be used by Mr. Durant, in his discretion, to govern the Company and to maximize the value of the Company's shareholders and to wind up the affairs of the Company should no new viable businesses be obtained and the assets and funds used to pay creditors, preferred shareholders and distributed to common shareholders. Mr. Durant should be authorized to obtain approval for any acts from the Judge in the Federal Court Case or other court of competent jurisdiction to the extent required (including ultimately filing an action or taking action to dissolve the Company once all assets and funds have been identified and recovered or upon court or shareholder approval).

8.     That the Company rescind and/or revoke 818,659 of the common shares held by R. John Taylor and Connie Taylor Henderson as those shares were unlawfully issued by the Company when R. John Taylor violated his Executive Officer's Agreement with Company and they have acted as faithless fiduciaries of the Company (500,000 were granted as an option of the Executive Officers Agreement breached by R. John Taylor) and the other 318,659 shares obtained by R. John Taylor and/or Connie Taylor Henderson from Michael W. Cashman and Corrine M. Beck and/or James Beck were unlawfully issued to them and other former Series C Preferred Shareholders of the Company and are therefore not properly issued shares and those certificates and any subsequent certificates representing those common shares are illegal and void.  The foregoing shares, along with the common shares unlawfully issued to Distribution Services, Inc., Bruce E. Knutson, Charles B. Rapp, Daryl R. Verdoorn and any other commons shares unlawfully issued to the former Series C Preferred Shareholders were illegally issued and void.  The proper rescission and/or revocation of the foregoing shares increases the minority shareholder's ownership interest in the Company, instead of improperly diluting their ownership interest and increasing R. John Taylor and Connie Taylor Henderson's majority interest.

9.     That the Company terminate JoLee Duclos as the trustee of the Company's 401(k) Plan ("Plan") and appoint a disinterested party or person as the trustee of said Plan and that said person be provided full disclosure of all transactions, loans, malfeasance, redemptions, transfers and all other acts and/or omissions of R. John Taylor and JoLee Duclos as the former co-trustees of the Plan.

10.     That the Company rescind and cancel the prior payments for the recent termination of the Employee Stock Ownership Plan of the Company ("ESOP") because the value of said shares cannot be fairly ascertained until the Federal Court Case has been concluded or resolved and other matters and claims resolved by the Company. The participants in the ESOP, like the other common shareholders, should receive the benefit of a fair valuation and/or distribution at the appropriate time.

11.     That Paul D. Durant be authorized to conduct such investigations and retain such services as he deems appropriate and/or necessary pertaining to any and all past transactions, loans, encumbrances, asset sales, share sales or transfers, share redemptions, salaries, payments, exchange offers and/or any other act or omission pertaining to the operations of AIA Services Corporation and AIA Insurance, Inc. and that the Company report said findings to the appropriate authorities and/or State Bar Associations and/or to take such other actions as Mr. Durant deems appropriate and in the best interest of the corporations.

2

Exhibit 41 - Page - 19

App. - C, p. 19

15-ER-3572

12. That the common shares of R. John Taylor, Connie Taylor Henderson and the other persons and entities identified in Paragraph 8 be barred from voting on any matters relative to the appointment of themselves to the Board of Directors and any other matters in which their shares have a conflict of interest by way of their participation in the malfeasance and/or covering up of the malfeasance against the Company and its other shareholders.

13. That R. John Taylor, Connie Taylor Henderson, JoLee Duclos, James Beck and Michael Cashman be required to disgorge all compensation, directors fees, indemnification payments or cost advances, benefits, salaries, bonuses, reimbursements, and shares obtained through or from the Company (until the Federal Court Case is resolved) based of them being faithless fiduciaries of the Company.

14. All actions and demands that are demanded to be taken by Paul Durant are also hereby demanded to be taken by the Company and/or its authorized Board of Directors to the extent persons named in this Demand or others seek to thwart any action by Paul Durant.

15. That the Company fully disclose all transactions, obligations, loans and footnotes in the recent financial statements provided to shareholders and fully disclose how R. John Taylor, Connie Taylor Henderson and other persons identified in this Demand acquired their respective ownership interests in the entities identified in the footnotes, how the Company's ownership interests were eliminated, transferred or otherwise extinguished and how the transactions, obligations, loans, and share transfers, redemptions and issuances were authorized by the Company, the Company's amended articles of incorporation and restated bylaws.

16. By making this Demand, the undersigned shareholder(s) does not waive any legal rights or remedies and hereby maintains and asserts that the Company is being irreparably injured and reserves the right to take legal action, without a derivative demand, based upon such irreparable injury.

17. This Demand may be executed by counterparts and by facsimile and/or pdf attachment, which together shall constitute an original. The undersigned shareholder(s) authorize Dale Miesen or Paul Durant to deliver this Demand to the Company at the time of the shareholder meeting scheduled for July 16, 2012 or anytime before or thereafter.

18. All further communications to the undersigned shareholder(s) regarding this Demand should be directed to Roderick C. Bond, Roderick Bond Law Office, PLLC, 800 Bellevue Way NE, Suite 400, Bellevue, WA 98004 - Tel: (425) 591-6903 - Fax (425) 321-0343 – Email: rod@roderickbond.com.

Dated this 17th day of July, 2012.

_____

Jennifer Miesen
Jennifer Miesen Living Trust

3

Exhibit 41 - Page - 20

App. - C, p. 20

15-ER-3573

### SHAREHOLDER DEMAND

The undersigned shareholder(s), as an owner(s) of record or beneficial holder(s) of preferred and/or common shares in AIA Services Corporation, hereby makes the following Shareholder Demand upon AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc. (collectively "Company") and the Company's Boards of Directors (this Demand also constitutes a derivative demand and double derivative demand) (collectively "Demand"):

1.      That R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, JoLee Duclos and Aimee Gordon be barred from serving as directors or officers of the Company based upon the ongoing malfeasance, conflicts of interest, failure to act in good faith, breaches of fiduciary duties (including the duties of loyalty, care and good faith) and other acts and/or omissions committed under their direction, participation and/or acquiescence, including, without limitation, those acts and/or omissions identified in the First Amended Complaint in *Donna J. Taylor v. Hawley Troxell Ennis & Hawley, R. John Taylor, Michael Cashman, James Beck, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case"), which said First Amended Complaint is incorporated by reference herein, and that legal action be taken against them.

2.      That Paul D. Durant be appointed as a director of AIA Services Corporation as requested and duly authorized and appointed by the sole Series A Preferred Shareholder of the Company, Donna J. Taylor.

3.      That Paul D. Durant be appointed as the President of AIA Services Corporation and AIA Insurance, Inc., to be duly compensated, and to operate those entities in the best interests of the corporations and their shareholders (with an emphasis on recovering damages and sums from majority shareholder R. John Taylor and Connie Taylor Henderson and others for the benefit of the corporations and their innocent shareholders) and to retain and/or terminate such employee(s) and/or officer(s) as he deems appropriate to properly operate the corporations and pursue any claims set forth in the First Amended Complaint in the Federal Court Case and similar or other claims against named and unnamed parties.  Mr. Durant should also be authorized to appoint other parties to the Board of Directors to serve until the next annual meeting as provided under the Restated Bylaws.

4.      That the Company (regardless of Mr. Durant's appointment as an officer or director of the Company), and Paul D. Durant if appointed as an director and/or officer, be authorized to pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case through the date of this Demand and for all related acts after the date of this Demand, including, without limitation, requesting and praying for punitive damages against the parties named in the Federal Court Case and any other responsible parties named in this Demand.  A copy of said First Amended Complaint is incorporated by reference herein and is already in the possession of the Company and its purported officers and purported directors (a copy can also be obtained from PACER (the online filing system for the United States District Court for the District of Idaho)).

5.      That the Company refrain from pursuing a reverse stock split (which violates Articles 4.2.9(f), 4.3.3 and 11 of the Company's amended articles of incorporation and the Company's Restated Bylaws) or any other corporate action which is not in the best interests of the Company's preferred shareholders and minority shareholders or otherwise violates the Company's articles of incorporation, restated bylaws and/or Idaho law (including oppressive conduct and breaches of fiduciary duties). That any and all shares held by R. John Taylor and/or Connie Taylor Henderson be barred and disqualified from voting on the reverse stock split since that transaction is preferential to them and is being pursued without full disclosure.

1

Exhibit 41 - Page - 21

App. - C, p. 21

15-ER-3574

6. That the Company demand repayment of, and refrain from paying or advancing, any sums or assets for the payment of all attorneys' fees, expert witness fees, costs and expenses paid, advanced or lent by the Company for JoLee Duclos, R. John Taylor, Connie Taylor Henderson, James Beck, Corrine Beck, Michael Cashman, Jane Doe Cashman, and CropUSA Insurance Agency, Inc.

7. That Paul D. Durant be authorized to appoint persons to committee(s) of the Board of Directors of the Company, with each committee comprised of at least two (2) of the minority shareholders of the Company to be determined in Mr. Durant's sole discretion and at least one (1) outside and independent person (or more should Mr. Durant desire). Said committee(s) should be used by Mr. Durant, in his discretion, to govern the Company and to maximize the value of the Company's shareholders and to wind up the affairs of the Company should no new viable businesses be obtained and the assets and funds used to pay creditors, preferred shareholders and distributed to common shareholders. Mr. Durant should be authorized to obtain approval for any acts from the Judge in the Federal Court Case or other court of competent jurisdiction to the extent required (including ultimately filing an action or taking action to dissolve the Company once all assets and funds have been identified and recovered or upon court or shareholder approval).

8. That the Company rescind and/or revoke 818,659 of the common shares held by R. John Taylor and Connie Taylor Henderson as those shares were unlawfully issued by the Company when R. John Taylor violated his Executive Officer's Agreement with Company and they have acted as faithless fiduciaries of the Company (500,000 were granted as an option of the Executive Officers Agreement breached by R. John Taylor) and the other 318,659 shares obtained by R. John Taylor and/or Connie Taylor Henderson from Michael W. Cashman and Corrine M. Beck and/or James Beck were unlawfully issued to them and other former Series C Preferred Shareholders of the Company and are therefore not properly issued shares and those certificates and any subsequent certificates representing those common shares are illegal and void. The foregoing shares, along with the common shares unlawfully issued to Distribution Services, Inc., Bruce E. Knutson, Charles B. Rapp, Daryl R. Verdoorn and any other commons shares unlawfully issued to the former Series C Preferred Shareholders were illegally issued and void. The proper rescission and/or revocation of the foregoing shares increases the minority shareholder's ownership interest in the Company, instead of improperly diluting their ownership interest and increasing R. John Taylor and Connie Taylor Henderson's majority interest.

9. That the Company terminate JoLee Duclos as the trustee of the Company's 401(k) Plan ("Plan") and appoint a disinterested party or person as the trustee of said Plan and that said person be provided full disclosure of all transactions, loans, malfeasance, redemptions, transfers and all other acts and/or omissions of R. John Taylor and JoLee Duclos as the former co-trustees of the Plan.

10. That the Company rescind and cancel the prior payments for the recent termination of the Employee Stock Ownership Plan of the Company ("ESOP") because the value of said shares cannot be fairly ascertained until the Federal Court Case has been concluded or resolved and other matters and claims resolved by the Company. The participants in the ESOP, like the other common shareholders, should receive the benefit of a fair valuation and/or distribution at the appropriate time.

11. That Paul D. Durant be authorized to conduct such investigations and retain such services as he deems appropriate and/or necessary pertaining to any and all past transactions, loans, encumbrances, asset sales, share sales or transfers, share redemptions, salaries, payments, exchange offers and/or any other act or omission pertaining to the operations of AIA Services Corporation and AIA Insurance, Inc. and that the Company report said findings to the appropriate authorities and/or State Bar Associations and/or to take such other actions as Mr. Durant deems appropriate and in the best interest of the corporations.

2

Exhibit 41 - Page - 22

App. - C, p. 22

15-ER-3575

12. That the common shares of R. John Taylor, Connie Taylor Henderson and the other persons and entities identified in Paragraph 8 be barred from voting on any matters relative to the appointment of themselves to the Board of Directors and any other matters in which their shares have a conflict of interest by way of their participation in the malfeasance and/or covering up of the malfeasance against the Company and its other shareholders.

13. That R. John Taylor, Connie Taylor Henderson, JoLee Duclos, James Beck and Michael Cashman be required to disgorge all compensation, directors fees, indemnification payments or cost advances, benefits, salaries, bonuses, reimbursements, and shares obtained through or from the Company (until the Federal Court Case is resolved) based of them being faithless fiduciaries of the Company.

14. All actions and demands that are demanded to be taken by Paul Durant are also hereby demanded to be taken by the Company and/or its authorized Board of Directors to the extent persons named in this Demand or others seek to thwart any action by Paul Durant.

15. That the Company fully disclose all transactions, obligations, loans and footnotes in the recent financial statements provided to shareholders and fully disclose how R. John Taylor, Connie Taylor Henderson and other persons identified in this Demand acquired their respective ownership interests in the entities identified in the footnotes, how the Company's ownership interests were eliminated, transferred or otherwise extinguished and how the transactions, obligations, loans, and share transfers, redemptions and issuances were authorized by the Company, the Company's amended articles of incorporation and restated bylaws.

16. By making this Demand, the undersigned shareholder(s) does not waive any legal rights or remedies and hereby maintains and asserts that the Company is being irreparably injured and reserves the right to take legal action, without a derivative demand, based upon such irreparable injury.

17. This Demand may be executed by counterparts and by facsimile and/or pdf attachment, which together shall constitute an original. The undersigned shareholder(s) authorize Dale Miesen or Paul Durant to deliver this Demand to the Company at the time of the shareholder meeting scheduled for July 16, 2012 or anytime before or thereafter.

18. All further communications to the undersigned shareholder(s) regarding this Demand should be directed to Roderick C. Bond, Roderick Bond Law Office, PLLC, 800 Bellevue Way NE, Suite 400, Bellevue, WA 98004 - Tel: (425) 591-6903 - Fax (425) 321-0343 – Email: rod@roderickbond.com.

Dated this _11_ day of July, 2012.

_____
Dale L. Miesen

_____
Jonathan Eckburg Brown Jr.

_____
Jonathan Ekberg *corrected*

3

Exhibit 41 - Page - 23

## SHAREHOLDER DEMAND

The undersigned shareholder(s), as an owner(s) of record or beneficial holder(s) of preferred and/or common shares in AIA Services Corporation, hereby makes the following Shareholder Demand upon AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc. (collectively "Company") and the Company's Boards of Directors (this Demand also constitutes a derivative demand and double derivative demand) (collectively "Demand"):

1.      That R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, JoLee Duclos and Aimee Gordon be barred from serving as directors or officers of the Company based upon the ongoing malfeasance, conflicts of interest, failure to act in good faith, breaches of fiduciary duties (including the duties of loyalty, care and good faith) and other acts and/or omissions committed under their direction, participation and/or acquiescence, including, without limitation, those acts and/or omissions identified in the First Amended Complaint in *Donna J. Taylor v. Hawley Troxell Ennis & Hawley, R. John Taylor, Michael Cashman, James Beck, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case"), which said First Amended Complaint is incorporated by reference herein, and that legal action be taken against them.

2.      That Paul D. Durant be appointed as a director of AIA Services Corporation as requested and duly authorized and appointed by the sole Series A Preferred Shareholder of the Company, Donna J. Taylor.

3.      That Paul D. Durant be appointed as the President of AIA Services Corporation and AIA Insurance, Inc., to be duly compensated, and to operate those entities in the best interests of the corporations and their shareholders (with an emphasis on recovering damages and sums from majority shareholder R. John Taylor and Connie Taylor Henderson and others for the benefit of the corporations and their innocent shareholders) and to retain and/or terminate such employee(s) and/or officer(s) as he deems appropriate to properly operate the corporations and pursue any claims set forth in the First Amended Complaint in the Federal Court Case and similar or other claims against named and unnamed parties.  Mr. Durant should also be authorized to appoint other parties to the Board of Directors to serve until the next annual meeting as provided under the Restated Bylaws.

4.      That the Company (regardless of Mr. Durant's appointment as an officer or director of the Company), and Paul D. Durant if appointed as an director and/or officer, be authorized to pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case through the date of this Demand and for all related acts after the date of this Demand, including, without limitation, requesting and praying for punitive damages against the parties named in the Federal Court Case and any other responsible parties named in this Demand.  A copy of said First Amended Complaint is incorporated by reference herein and is already in the possession of the Company and its purported officers and purported directors (a copy can also be obtained from PACER (the online filing system for the United States District Court for the District of Idaho)).

5.      That the Company refrain from pursuing a reverse stock split (which violates Articles 4.2.9(f), 4.3.3 and 11 of the Company's amended articles of incorporation and the Company's Restated Bylaws) or any other corporate action which is not in the best interests of the Company's preferred shareholders and minority shareholders or otherwise violates the Company's articles of incorporation, restated bylaws and/or Idaho law (including oppressive conduct and breaches of fiduciary duties). That any and all shares held by R. John Taylor and/or Connie Taylor Henderson be barred and disqualified from voting on the reverse stock split since that transaction is preferential to them and is being pursued without full disclosure.

1

Exhibit 41 - Page - 24

App. - C, p. 24

15-ER-3577

6.     That the Company demand repayment of, and refrain from paying or advancing, any sums or assets for the payment of all attorneys' fees, expert witness fees, costs and expenses paid, advanced or lent by the Company for JoLee Duclos, R. John Taylor, Connie Taylor Henderson, James Beck, Corrine Beck, Michael Cashman, Jane Doe Cashman, and CropUSA Insurance Agency, Inc.

7.     That Paul D. Durant be authorized to appoint persons to committee(s) of the Board of Directors of the Company, with each committee comprised of at least two (2) of the minority shareholders of the Company to be determined in Mr. Durant's sole discretion and at least one (1) outside and independent person (or more should Mr. Durant desire).  Said committee(s) should be used by Mr. Durant, in his discretion, to govern the Company and to maximize the value of the Company's shareholders and to wind up the affairs of the Company should no new viable businesses be obtained and the assets and funds used to pay creditors, preferred shareholders and distributed to common shareholders. Mr. Durant should be authorized to obtain approval for any acts from the Judge in the Federal Court Case or other court of competent jurisdiction to the extent required (including ultimately filing an action or taking action to dissolve the Company once all assets and funds have been identified and recovered or upon court or shareholder approval).

8.     That the Company rescind and/or revoke 818,659 of the common shares held by R. John Taylor and Connie Taylor Henderson as those shares were unlawfully issued by the Company when R. John Taylor violated his Executive Officer's Agreement with Company and they have acted as faithless fiduciaries of the Company (500,000 were granted as an option of the Executive Officers Agreement breached by R. John Taylor) and the other 318,659 shares obtained by R. John Taylor and/or Connie Taylor Henderson from Michael W. Cashman and Corrine M. Beck and/or James Beck were unlawfully issued to them and other former Series C Preferred Shareholders of the Company and are therefore not properly issued shares and those certificates and any subsequent certificates representing those common shares are illegal and void.  The foregoing shares, along with the common shares unlawfully issued to Distribution Services, Inc., Bruce E. Knutson, Charles B. Rapp, Daryl R. Verdoorn and any other commons shares unlawfully issued to the former Series C Preferred Shareholders were illegally issued and void.  The proper rescission and/or revocation of the foregoing shares increases the minority shareholder's ownership interest in the Company, instead of improperly diluting their ownership interest and increasing R. John Taylor and Connie Taylor Henderson's majority interest.

9.     That the Company terminate JoLee Duclos as the trustee of the Company's 401(k) Plan ("Plan") and appoint a disinterested party or person as the trustee of said Plan and that said person be provided full disclosure of all transactions, loans, malfeasance, redemptions, transfers and all other acts and/or omissions of R. John Taylor and JoLee Duclos as the former co-trustees of the Plan.

10.    That the Company rescind and cancel the prior payments for the recent termination of the Employee Stock Ownership Plan of the Company ("ESOP") because the value of said shares cannot be fairly ascertained until the Federal Court Case has been concluded or resolved and other matters and claims resolved by the Company. The participants in the ESOP, like the other common shareholders, should receive the benefit of a fair valuation and/or distribution at the appropriate time.

11.    That Paul D. Durant be authorized to conduct such investigations and retain such services as he deems appropriate and/or necessary pertaining to any and all past transactions, loans, encumbrances, asset sales, share sales or transfers, share redemptions, salaries, payments, exchange offers and/or any other act or omission pertaining to the operations of AIA Services Corporation and AIA Insurance, Inc. and that the Company report said findings to the appropriate authorities and/or State Bar Associations and/or to take such other actions as Mr. Durant deems appropriate and in the best interest of the corporations.

2

Exhibit 41 - Page - 25

App. - C, p. 25

15-ER-3578

12.     That the common shares of R. John Taylor, Connie Taylor Henderson and the other persons and entities identified in Paragraph 8 be barred from voting on any matters relative to the appointment of themselves to the Board of Directors and any other matters in which their shares have a conflict of interest by way of their participation in the malfeasance and/or covering up of the malfeasance against the Company and its other shareholders.

13.     That R. John Taylor, Connie Taylor Henderson, JoLee Duclos, James Beck and Michael Cashman be required to disgorge all compensation, directors fees, indemnification payments or cost advances, benefits, salaries, bonuses, reimbursements, and shares obtained through or from the Company (until the Federal Court Case is resolved) based of them being faithless fiduciaries of the Company.

14.     All actions and demands that are demanded to be taken by Paul Durant are also hereby demanded to be taken by the Company and/or its authorized Board of Directors to the extent persons named in this Demand or others seek to thwart any action by Paul Durant.

15.     That the Company fully disclose all transactions, obligations, loans and footnotes in the recent financial statements provided to shareholders and fully disclose how R. John Taylor, Connie Taylor Henderson and other persons identified in this Demand acquired their respective ownership interests in the entities identified in the footnotes, how the Company's ownership interests were eliminated, transferred or otherwise extinguished and how the transactions, obligations, loans, and share transfers, redemptions and issuances were authorized by the Company, the Company's amended articles of incorporation and restated bylaws.

16.     By making this Demand, the undersigned shareholder(s) does not waive any legal rights or remedies and hereby maintains and asserts that the Company is being irreparably injured and reserves the right to take legal action, without a derivative demand, based upon such irreparable injury.

17.     This Demand may be executed by counterparts and by facsimile and/or pdf attachment, which together shall constitute an original. The undersigned shareholder(s) authorize Dale Miesen or Paul Durant to deliver this Demand to the Company at the time of the shareholder meeting scheduled for July 16, 2012 or anytime before or thereafter.

18.     All further communications to the undersigned shareholder(s) regarding this Demand should be directed to Roderick C. Bond, Roderick Bond Law Office, PLLC, 800 Bellevue Way NE, Suite 400, Bellevue, WA 98004 - Tel: (425) 591-6903 - Fax (425) 321-0343 – Email: rod@roderickbond.com.

Dated this __11__ day of July, 2012.

_____
Jerry A. Legg

3

Exhibit 41 - Page - 26

App. - C, p. 26

## SHAREHOLDER DEMAND

The undersigned shareholder(s), as an owner(s) of record or beneficial holder(s) of preferred and/or common shares in AIA Services Corporation, hereby makes the following Shareholder Demand upon AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc. (collectively "Company") and the Company's Boards of Directors (this Demand also constitutes a derivative demand and double derivative demand) (collectively "Demand"):

1.      That R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, JoLee Duclos and Aimee Gordon be barred from serving as directors or officers of the Company based upon the ongoing malfeasance, conflicts of interest, failure to act in good faith, breaches of fiduciary duties (including the duties of loyalty, care and good faith) and other acts and/or omissions committed under their direction, participation and/or acquiescence, including, without limitation, those acts and/or omissions identified in the First Amended Complaint in *Donna J. Taylor v. Hawley Troxell Ennis & Hawley, R. John Taylor, Michael Cashman, James Beck, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case"), which said First Amended Complaint is incorporated by reference herein, and that legal action be taken against them.

2.      That Paul D. Durant be appointed as a director of AIA Services Corporation as requested and duly authorized and appointed by the sole Series A Preferred Shareholder of the Company, Donna J. Taylor.

3.      That Paul D. Durant be appointed as the President of AIA Services Corporation and AIA Insurance, Inc., to be duly compensated, and to operate those entities in the best interests of the corporations and their shareholders (with an emphasis on recovering damages and sums from majority shareholder R. John Taylor and Connie Taylor Henderson and others for the benefit of the corporations and their innocent shareholders) and to retain and/or terminate such employee(s) and/or officer(s) as he deems appropriate to properly operate the corporations and pursue any claims set forth in the First Amended Complaint in the Federal Court Case and similar or other claims against named and unnamed parties.  Mr. Durant should also be authorized to appoint other parties to the Board of Directors to serve until the next annual meeting as provided under the Restated Bylaws.

4.      That the Company (regardless of Mr. Durant's appointment as an officer or director of the Company), and Paul D. Durant if appointed as an director and/or officer, be authorized to pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case through the date of this Demand and for all related acts after the date of this Demand, including, without limitation, requesting and praying for punitive damages against the parties named in the Federal Court Case and any other responsible parties named in this Demand.  A copy of said First Amended Complaint is incorporated by reference herein and is already in the possession of the Company and its purported officers and purported directors (a copy can also be obtained from PACER (the online filing system for the United States District Court for the District of Idaho)).

5.      That the Company refrain from pursuing a reverse stock split (which violates Articles 4.2.9(f), 4.3.3 and 11 of the Company's amended articles of incorporation and the Company's Restated Bylaws) or any other corporate action which is not in the best interests of the Company's preferred shareholders and minority shareholders or otherwise violates the Company's articles of incorporation, restated bylaws and/or Idaho law (including oppressive conduct and breaches of fiduciary duties). That any and all shares held by R. John Taylor and/or Connie Taylor Henderson be barred and disqualified from voting on the reverse stock split since that transaction is preferential to them and is being pursued without full disclosure.

1

Exhibit 41 - Page - 27

App. - C, p. 27

15-ER-3580

6.      That the Company demand repayment of, and refrain from paying or advancing, any sums or assets for the payment of all attorneys' fees, expert witness fees, costs and expenses paid, advanced or lent by the Company for JoLee Duclos, R. John Taylor, Connie Taylor Henderson, James Beck, Corrine Beck, Michael Cashman, Jane Doe Cashman, and CropUSA Insurance Agency, Inc.

7.      That Paul D. Durant be authorized to appoint persons to committee(s) of the Board of Directors of the Company, with each committee comprised of at least two (2) of the minority shareholders of the Company to be determined in Mr. Durant's sole discretion and at least one (1) outside and independent person (or more should Mr. Durant desire).  Said committee(s) should be used by Mr. Durant, in his discretion, to govern the Company and to maximize the value of the Company's shareholders and to wind up the affairs of the Company should no new viable businesses be obtained and the assets and funds used to pay creditors, preferred shareholders and distributed to common shareholders. Mr. Durant should be authorized to obtain approval for any acts from the Judge in the Federal Court Case or other court of competent jurisdiction to the extent required (including ultimately filing an action or taking action to dissolve the Company once all assets and funds have been identified and recovered or upon court or shareholder approval).

8.      That the Company rescind and/or revoke 818,659 of the common shares held by R. John Taylor and Connie Taylor Henderson as those shares were unlawfully issued by the Company when R. John Taylor violated his Executive Officer's Agreement with Company and they have acted as faithless fiduciaries of the Company (500,000 were granted as an option of the Executive Officers Agreement breached by R. John Taylor) and the other 318,659 shares obtained by R. John Taylor and/or Connie Taylor Henderson from Michael W. Cashman and Corrine M. Beck and/or James Beck were unlawfully issued to them and other former Series C Preferred Shareholders of the Company and are therefore not properly issued shares and those certificates and any subsequent certificates representing those common shares are illegal and void.  The foregoing shares, along with the common shares unlawfully issued to Distribution Services, Inc., Bruce E. Knutson, Charles B. Rapp, Daryl R. Verdoorn and any other commons shares unlawfully issued to the former Series C Preferred Shareholders were illegally issued and void.  The proper rescission and/or revocation of the foregoing shares increases the minority shareholder's ownership interest in the Company, instead of improperly diluting their ownership interest and increasing R. John Taylor and Connie Taylor Henderson's majority interest.

9.      That the Company terminate JoLee Duclos as the trustee of the Company's 401(k) Plan ("Plan") and appoint a disinterested party or person as the trustee of said Plan and that said person be provided full disclosure of all transactions, loans, malfeasance, redemptions, transfers and all other acts and/or omissions of R. John Taylor and JoLee Duclos as the former co-trustees of the Plan.

10.     That the Company rescind and cancel the prior payments for the recent termination of the Employee Stock Ownership Plan of the Company ("ESOP") because the value of said shares cannot be fairly ascertained until the Federal Court Case has been concluded or resolved and other matters and claims resolved by the Company. The participants in the ESOP, like the other common shareholders, should receive the benefit of a fair valuation and/or distribution at the appropriate time.

11.     That Paul D. Durant be authorized to conduct such investigations and retain such services as he deems appropriate and/or necessary pertaining to any and all past transactions, loans, encumbrances, asset sales, share sales or transfers, share redemptions, salaries, payments, exchange offers and/or any other act or omission pertaining to the operations of AIA Services Corporation and AIA Insurance, Inc. and that the Company report said findings to the appropriate authorities and/or State Bar Associations and/or to take such other actions as Mr. Durant deems appropriate and in the best interest of the corporations.

2

Exhibit 41 - Page - 28

App. - C, p. 28

15-ER-3581

12.    That the common shares of R. John Taylor, Connie Taylor Henderson and the other persons and entities identified in Paragraph 8 be barred from voting on any matters relative to the appointment of themselves to the Board of Directors and any other matters in which their shares have a conflict of interest by way of their participation in the malfeasance and/or covering up of the malfeasance against the Company and its other shareholders.

13.    That R. John Taylor, Connie Taylor Henderson, JoLee Duclos, James Beck and Michael Cashman be required to disgorge all compensation, directors fees, indemnification payments or cost advances, benefits, salaries, bonuses, reimbursements, and shares obtained through or from the Company (until the Federal Court Case is resolved) based of them being faithless fiduciaries of the Company.

14.    All actions and demands that are demanded to be taken by Paul Durant are also hereby demanded to be taken by the Company and/or its authorized Board of Directors to the extent persons named in this Demand or others seek to thwart any action by Paul Durant.

15.    That the Company fully disclose all transactions, obligations, loans and footnotes in the recent financial statements provided to shareholders and fully disclose how R. John Taylor, Connie Taylor Henderson and other persons identified in this Demand acquired their respective ownership interests in the entities identified in the footnotes, how the Company's ownership interests were eliminated, transferred or otherwise extinguished and how the transactions, obligations, loans, and share transfers, redemptions and issuances were authorized by the Company, the Company's amended articles of incorporation and restated bylaws.

16.    By making this Demand, the undersigned shareholder(s) does not waive any legal rights or remedies and hereby maintains and asserts that the Company is being irreparably injured and reserves the right to take legal action, without a derivative demand, based upon such irreparable injury.

17.    This Demand may be executed by counterparts and by facsimile and/or pdf attachment, which together shall constitute an original. The undersigned shareholder(s) authorize Dale Miesen or Paul Durant to deliver this Demand to the Company at the time of the shareholder meeting scheduled for July 16, 2012 or anytime before or thereafter.

18.    All further communications to the undersigned shareholder(s) regarding this Demand should be directed to Roderick C. Bond, Roderick Bond Law Office, PLLC, 800 Bellevue Way NE, Suite 400, Bellevue, WA 98004 - Tel: (425) 591-6903 - Fax (425) 321-0343 – Email: rod@roderickbond.com.

Dated this 12 day of July, 2012.

_Heather Miesen_

Heather Miesen
Heather Miesen Living Trust

3

Exhibit 41 - Page - 29

App. - C, p. 29

15-ER-3582

## SHAREHOLDER DEMAND

The undersigned shareholder(s), as an owner(s) of record or beneficial holder(s) of preferred and/or common shares in AIA Services Corporation, hereby makes the following Shareholder Demand upon AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc. (collectively "Company") and the Company's Boards of Directors (this Demand also constitutes a derivative demand and double derivative demand) (collectively "Demand"):

1.      That R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, JoLee Duclos and Aimee Gordon be barred from serving as directors or officers of the Company based upon the ongoing malfeasance, conflicts of interest, failure to act in good faith, breaches of fiduciary duties (including the duties of loyalty, care and good faith) and other acts and/or omissions committed under their direction, participation and/or acquiescence, including, without limitation, those acts and/or omissions identified in the First Amended Complaint in *Donna J. Taylor v. Hawley Troxell Ennis & Hawley, R. John Taylor, Michael Cashman, James Beck, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case"), which said First Amended Complaint is incorporated by reference herein, and that legal action be taken against them.

2.      That Paul D. Durant be appointed as a director of AIA Services Corporation as requested and duly authorized and appointed by the sole Series A Preferred Shareholder of the Company, Donna J. Taylor.

3.      That Paul D. Durant be appointed as the President of AIA Services Corporation and AIA Insurance, Inc., to be duly compensated, and to operate those entities in the best interests of the corporations and their shareholders (with an emphasis on recovering damages and sums from majority shareholder R. John Taylor and Connie Taylor Henderson and others for the benefit of the corporations and their innocent shareholders) and to retain and/or terminate such employee(s) and/or officer(s) as he deems appropriate to properly operate the corporations and pursue any claims set forth in the First Amended Complaint in the Federal Court Case and similar or other claims against named and unnamed parties.  Mr. Durant should also be authorized to appoint other parties to the Board of Directors to serve until the next annual meeting as provided under the Restated Bylaws.

4.      That the Company (regardless of Mr. Durant's appointment as an officer or director of the Company), and Paul D. Durant if appointed as an director and/or officer, be authorized to pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case through the date of this Demand and for all related acts after the date of this Demand, including, without limitation, requesting and praying for punitive damages against the parties named in the Federal Court Case and any other responsible parties named in this Demand.  A copy of said First Amended Complaint is incorporated by reference herein and is already in the possession of the Company and its purported officers and purported directors (a copy can also be obtained from PACER (the online filing system for the United States District Court for the District of Idaho)).

5.      That the Company refrain from pursuing a reverse stock split (which violates Articles 4.2.9(f), 4.3.3 and 11 of the Company's amended articles of incorporation and the Company's Restated Bylaws) or any other corporate action which is not in the best interests of the Company's preferred shareholders and minority shareholders or otherwise violates the Company's articles of incorporation, restated bylaws and/or Idaho law (including oppressive conduct and breaches of fiduciary duties). That any and all shares held by R. John Taylor and/or Connie Taylor Henderson be barred and disqualified from voting on the reverse stock split since that transaction is preferential to them and is being pursued without full disclosure.

1

Exhibit 41 - Page - 30

App. - C, p. 30

15-ER-3583

6.      That the Company demand repayment of, and refrain from paying or advancing, any sums or assets for the payment of all attorneys' fees, expert witness fees, costs and expenses paid, advanced or lent by the Company for JoLee Duclos, R. John Taylor, Connie Taylor Henderson, James Beck, Corrine Beck, Michael Cashman, Jane Doe Cashman, and CropUSA Insurance Agency, Inc.

7.      That Paul D. Durant be authorized to appoint persons to committee(s) of the Board of Directors of the Company, with each committee comprised of at least two (2) of the minority shareholders of the Company to be determined in Mr. Durant's sole discretion and at least one (1) outside and independent person (or more should Mr. Durant desire).   Said committee(s) should be used by Mr. Durant, in his discretion, to govern the Company and to maximize the value of the Company's shareholders and to wind up the affairs of the Company should no new viable businesses be obtained and the assets and funds used to pay creditors, preferred shareholders and distributed to common shareholders. Mr. Durant should be authorized to obtain approval for any acts from the Judge in the Federal Court Case or other court of competent jurisdiction to the extent required (including ultimately filing an action or taking action to dissolve the Company once all assets and funds have been identified and recovered or upon court or shareholder approval).

8.      That the Company rescind and/or revoke 818,659 of the common shares held by R. John Taylor and Connie Taylor Henderson as those shares were unlawfully issued by the Company when R. John Taylor violated his Executive Officer's Agreement with Company and they have acted as faithless fiduciaries of the Company (500,000 were granted as an option of the Executive Officers Agreement breached by R. John Taylor) and the other 318,659 shares obtained by R. John Taylor and/or Connie Taylor Henderson from Michael W. Cashman and Corrine M. Beck and/or James Beck were unlawfully issued to them and other former Series C Preferred Shareholders of the Company and are therefore not properly issued shares and those certificates and any subsequent certificates representing those common shares are illegal and void.   The foregoing shares, along with the common shares unlawfully issued to Distribution Services, Inc., Bruce E. Knutson, Charles B. Rapp, Daryl R. Verdoorn and any other commons shares unlawfully issued to the former Series C Preferred Shareholders were illegally issued and void.   The proper rescission and/or revocation of the foregoing shares increases the minority shareholder's ownership interest in the Company, instead of improperly diluting their ownership interest and increasing R. John Taylor and Connie Taylor Henderson's majority interest.

9.      That the Company terminate JoLee Duclos as the trustee of the Company's 401(k) Plan ("Plan") and appoint a disinterested party or person as the trustee of said Plan and that said person be provided full disclosure of all transactions, loans, malfeasance, redemptions, transfers and all other acts and/or omissions of R. John Taylor and JoLee Duclos as the former co-trustees of the Plan.

10.      That the Company rescind and cancel the prior payments for the recent termination of the Employee Stock Ownership Plan of the Company ("ESOP") because the value of said shares cannot be fairly ascertained until the Federal Court Case has been concluded or resolved and other matters and claims resolved by the Company. The participants in the ESOP, like the other common shareholders, should receive the benefit of a fair valuation and/or distribution at the appropriate time.

11.      That Paul D. Durant be authorized to conduct such investigations and retain such services as he deems appropriate and/or necessary pertaining to any and all past transactions, loans, encumbrances, asset sales, share sales or transfers, share redemptions, salaries, payments, exchange offers and/or any other act or omission pertaining to the operations of AIA Services Corporation and AIA Insurance, Inc. and that the Company report said findings to the appropriate authorities and/or State Bar Associations and/or to take such other actions as Mr. Durant deems appropriate and in the best interest of the corporations.

2

Exhibit 41 - Page - 31

App. - C, p. 31

15-ER-3584

12.     That the common shares of R. John Taylor, Connie Taylor Henderson and the other persons and entities identified in Paragraph 8 be barred from voting on any matters relative to the appointment of themselves to the Board of Directors and any other matters in which their shares have a conflict of interest by way of their participation in the malfeasance and/or covering up of the malfeasance against the Company and its other shareholders.

13.     That R. John Taylor, Connie Taylor Henderson, JoLee Duclos, James Beck and Michael Cashman be required to disgorge all compensation, directors fees, indemnification payments or cost advances, benefits, salaries, bonuses, reimbursements, and shares obtained through or from the Company (until the Federal Court Case is resolved) based of them being faithless fiduciaries of the Company.

14.     All actions and demands that are demanded to be taken by Paul Durant are also hereby demanded to be taken by the Company and/or its authorized Board of Directors to the extent persons named in this Demand or others seek to thwart any action by Paul Durant.

15.     That the Company fully disclose all transactions, obligations, loans and footnotes in the recent financial statements provided to shareholders and fully disclose how R. John Taylor, Connie Taylor Henderson and other persons identified in this Demand acquired their respective ownership interests in the entities identified in the footnotes, how the Company's ownership interests were eliminated, transferred or otherwise extinguished and how the transactions, obligations, loans, and share transfers, redemptions and issuances were authorized by the Company, the Company's amended articles of incorporation and restated bylaws.

16.     By making this Demand, the undersigned shareholder(s) does not waive any legal rights or remedies and hereby maintains and asserts that the Company is being irreparably injured and reserves the right to take legal action, without a derivative demand, based upon such irreparable injury.

17.     This Demand may be executed by counterparts and by facsimile and/or pdf attachment, which together shall constitute an original. The undersigned shareholder(s) authorize Dale Miesen or Paul Durant to deliver this Demand to the Company at the time of the shareholder meeting scheduled for July 16, 2012 or anytime before or thereafter.

18.     All further communications to the undersigned shareholder(s) regarding this Demand should be directed to Roderick C. Bond, Roderick Bond Law Office, PLLC, 800 Bellevue Way NE, Suite 400, Bellevue, WA 98004 - Tel: (425) 591-6903 - Fax (425) 321-0343 – Email: rod@roderickbond.com.

Dated this __12__ day of July, 2012.

_____
Robert L. Miesen
Robert L. Miesen Living Trust

3

Exhibit 41 - Page - 32

App. - C, p. 32

15-ER-3585

### SHAREHOLDER DEMAND

The undersigned shareholder(s), as an owner(s) of record or beneficial holder(s) of preferred and/or common shares in AIA Services Corporation, hereby makes the following Shareholder Demand upon AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc. (collectively "Company") and the Company's Boards of Directors (this Demand also constitutes a derivative demand and double derivative demand) (collectively "Demand"):

1.      That R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, JoLee Duclos and Aimee Gordon be barred from serving as directors or officers of the Company based upon the ongoing malfeasance, conflicts of interest, failure to act in good faith, breaches of fiduciary duties (including the duties of loyalty, care and good faith) and other acts and/or omissions committed under their direction, participation and/or acquiescence, including, without limitation, those acts and/or omissions identified in the First Amended Complaint in *Donna J. Taylor v. Hawley Troxell Ennis & Hawley, R. John Taylor, Michael Cashman, James Beck, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case"), which said First Amended Complaint is incorporated by reference herein, and that legal action be taken against them.

2.      That Paul D. Durant be appointed as a director of AIA Services Corporation as requested and duly authorized and appointed by the sole Series A Preferred Shareholder of the Company, Donna J. Taylor.

3.      That Paul D. Durant be appointed as the President of AIA Services Corporation and AIA Insurance, Inc., to be duly compensated, and to operate those entities in the best interests of the corporations and their shareholders (with an emphasis on recovering damages and sums from majority shareholder R. John Taylor and Connie Taylor Henderson and others for the benefit of the corporations and their innocent shareholders) and to retain and/or terminate such employee(s) and/or officer(s) as he deems appropriate to properly operate the corporations and pursue any claims set forth in the First Amended Complaint in the Federal Court Case and similar or other claims against named and unnamed parties. Mr. Durant should also be authorized to appoint other parties to the Board of Directors to serve until the next annual meeting as provided under the Restated Bylaws.

4.      That the Company (regardless of Mr. Durant's appointment as an officer or director of the Company), and Paul D. Durant if appointed as an director and/or officer, be authorized to pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case through the date of this Demand and for all related acts after the date of this Demand, including, without limitation, requesting and praying for punitive damages against the parties named in the Federal Court Case and any other responsible parties named in this Demand. A copy of said First Amended Complaint is incorporated by reference herein and is already in the possession of the Company and its purported officers and purported directors (a copy can also be obtained from PACER (the online filing system for the United States District Court for the District of Idaho)).

5.      That the Company refrain from pursuing a reverse stock split (which violates Articles 4.2.9(f), 4.3.3 and 11 of the Company's amended articles of incorporation and the Company's Restated Bylaws) or any other corporate action which is not in the best interests of the Company's preferred shareholders and minority shareholders or otherwise violates the Company's articles of incorporation, restated bylaws and/or Idaho law (including oppressive conduct and breaches of fiduciary duties). That any and all shares held by R. John Taylor and/or Connie Taylor Henderson be barred and disqualified from voting on the reverse stock split since that transaction is preferential to them and is being pursued without full disclosure.

1

Exhibit 41 - Page - 33

App. - C, p. 33

15-ER-3586

6.      That the Company demand repayment of, and refrain from paying or advancing, any sums or assets for the payment of all attorneys' fees, expert witness fees, costs and expenses paid, advanced or lent by the Company for JoLee Duclos, R. John Taylor, Connie Taylor Henderson, James Beck, Corrine Beck, Michael Cashman, Jane Doe Cashman, and CropUSA Insurance Agency, Inc.

7.      That Paul D. Durant be authorized to appoint persons to committee(s) of the Board of Directors of the Company, with each committee comprised of at least two (2) of the minority shareholders of the Company to be determined in Mr. Durant's sole discretion and at least one (1) outside and independent person (or more should Mr. Durant desire).   Said committee(s) should be used by Mr. Durant, in his discretion, to govern the Company and to maximize the value of the Company's shareholders and to wind up the affairs of the Company should no new viable businesses be obtained and the assets and funds used to pay creditors, preferred shareholders and distributed to common shareholders. Mr. Durant should be authorized to obtain approval for any acts from the Judge in the Federal Court Case or other court of competent jurisdiction to the extent required (including ultimately filing an action or taking action to dissolve the Company once all assets and funds have been identified and recovered or upon court or shareholder approval).

8.      That the Company rescind and/or revoke 818,659 of the common shares held by R. John Taylor and Connie Taylor Henderson as those shares were unlawfully issued by the Company when R. John Taylor violated his Executive Officer's Agreement with Company and they have acted as faithless fiduciaries of the Company (500,000 were granted as an option of the Executive Officers Agreement breached by R. John Taylor) and the other 318,659 shares obtained by R. John Taylor and/or Connie Taylor Henderson from Michael W. Cashman and Corrine M. Beck and/or James Beck were unlawfully issued to them and other former Series C Preferred Shareholders of the Company and are therefore not properly issued shares and those certificates and any subsequent certificates representing those common shares are illegal and void.  The foregoing shares, along with the common shares unlawfully issued to Distribution Services, Inc., Bruce E. Knutson, Charles B. Rapp, Daryl R. Verdoorn and any other commons shares unlawfully issued to the former Series C Preferred Shareholders were illegally issued and void.   The proper rescission and/or revocation of the foregoing shares increases the minority shareholder's ownership interest in the Company, instead of improperly diluting their ownership interest and increasing R. John Taylor and Connie Taylor Henderson's majority interest.

9.      That the Company terminate JoLee Duclos as the trustee of the Company's 401(k) Plan ("Plan") and appoint a disinterested party or person as the trustee of said Plan and that said person be provided full disclosure of all transactions, loans, malfeasance, redemptions, transfers and all other acts and/or omissions of R. John Taylor and JoLee Duclos as the former co-trustees of the Plan.

10.     That the Company rescind and cancel the prior payments for the recent termination of the Employee Stock Ownership Plan of the Company ("ESOP") because the value of said shares cannot be fairly ascertained until the Federal Court Case has been concluded or resolved and other matters and claims resolved by the Company. The participants in the ESOP, like the other common shareholders, should receive the benefit of a fair valuation and/or distribution at the appropriate time.

11.     That Paul D. Durant be authorized to conduct such investigations and retain such services as he deems appropriate and/or necessary pertaining to any and all past transactions, loans, encumbrances, asset sales, share sales or transfers, share redemptions, salaries, payments, exchange offers and/or any other act or omission pertaining to the operations of AIA Services Corporation and AIA Insurance, Inc. and that the Company report said findings to the appropriate authorities and/or State Bar Associations and/or to take such other actions as Mr. Durant deems appropriate and in the best interest of the corporations.

2

Exhibit 41 - Page - 34

App. - C, p. 34

15-ER-3587

12.     That the common shares of R. John Taylor, Connie Taylor Henderson and the other persons and entities identified in Paragraph 8 be barred from voting on any matters relative to the appointment of themselves to the Board of Directors and any other matters in which their shares have a conflict of interest by way of their participation in the malfeasance and/or covering up of the malfeasance against the Company and its other shareholders.

13.     That R. John Taylor, Connie Taylor Henderson, JoLee Duclos, James Beck and Michael Cashman be required to disgorge all compensation, directors fees, indemnification payments or cost advances, benefits, salaries, bonuses, reimbursements, and shares obtained through or from the Company (until the Federal Court Case is resolved) based of them being faithless fiduciaries of the Company.

14.     All actions and demands that are demanded to be taken by Paul Durant are also hereby demanded to be taken by the Company and/or its authorized Board of Directors to the extent persons named in this Demand or others seek to thwart any action by Paul Durant.

15.     That the Company fully disclose all transactions, obligations, loans and footnotes in the recent financial statements provided to shareholders and fully disclose how R. John Taylor, Connie Taylor Henderson and other persons identified in this Demand acquired their respective ownership interests in the entities identified in the footnotes, how the Company's ownership interests were eliminated, transferred or otherwise extinguished and how the transactions, obligations, loans, and share transfers, redemptions and issuances were authorized by the Company, the Company's amended articles of incorporation and restated bylaws.

16.     By making this Demand, the undersigned shareholder(s) does not waive any legal rights or remedies and hereby maintains and asserts that the Company is being irreparably injured and reserves the right to take legal action, without a derivative demand, based upon such irreparable injury.

17.     This Demand may be executed by counterparts and by facsimile and/or pdf attachment, which together shall constitute an original. The undersigned shareholder(s) authorize Dale Miesen or Paul Durant to deliver this Demand to the Company at the time of the shareholder meeting scheduled for July 16, 2012 or anytime before or thereafter.

18.     All further communications to the undersigned shareholder(s) regarding this Demand should be directed to Roderick C. Bond, Roderick Bond Law Office, PLLC, 800 Bellevue Way NE, Suite 400, Bellevue, WA 98004 - Tel: (425) 591-6903 - Fax (425) 321-0343 – Email: rod@roderickbond.com.

Dated this __11th__ day of July, 2012.

_Bobette N. Ruddell_
Bobette N. Ruddell

3

Exhibit 41 - Page - 35

### SHAREHOLDER DEMAND

The undersigned shareholder(s), as an owner(s) of record and/or beneficial holder(s) of over $300,000 in Series C Preferred Shares (plus accrues dividends) and 9,296.5 common shares in AIA Services Corporation, hereby makes the following Shareholder Demand upon AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc. (collectively "Company") and the Company's Boards of Directors (this Demand also constitutes a derivative demand and double derivative demand) (collectively "Demand"):

1.      That R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, JoLee Duclos and Aimee Gordon be barred from serving as directors or officers of the Company based upon the ongoing malfeasance, conflicts of interest, failure to act in good faith, breaches of fiduciary duties (including the duties of loyalty, care and good faith) and other acts and/or omissions committed under their direction, participation and/or acquiescence, including, without limitation, those acts and/or omissions identified in the First Amended Complaint in *Donna J. Taylor v. Hawley Troxell Ennis & Hawley, R. John Taylor, Michael Cashman, James Beck, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case"), which said First Amended Complaint is incorporated by reference herein, and that legal action be taken against them.

2.      That Paul D. Durant be appointed as a director of AIA Services Corporation as requested and duly authorized and appointed by the sole Series A Preferred Shareholder of the Company, Donna J. Taylor.

3.      That Paul D. Durant be appointed as the President of AIA Services Corporation and AIA Insurance, Inc., to be duly compensated, and to operate those entities in the best interests of the corporations and their shareholders (with an emphasis on recovering damages and sums from majority shareholder R. John Taylor and Connie Taylor Henderson and others for the benefit of the corporations and their innocent shareholders) and to retain and/or terminate such employee(s) and/or officer(s) as he deems appropriate to properly operate the corporations and pursue any claims set forth in the First Amended Complaint in the Federal Court Case and similar or other claims against named and unnamed parties.  Mr. Durant should also be authorized to appoint other parties to the Board of Directors to serve until the next annual meeting as provided under the Restated Bylaws.

4.      That the Company (regardless of Mr. Durant's appointment as an officer or director of the Company), and Paul D. Durant if appointed as an director and/or officer, be authorized to pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case through the date of this Demand and for all related acts after the date of this Demand, including, without limitation, requesting and praying for punitive damages against the parties named in the Federal Court Case and any other responsible parties named in this Demand.  A copy of said First Amended Complaint is incorporated by reference herein and is already in the possession of the Company and its purported officers and purported directors (a copy can also be obtained from PACER (the online filing system for the United States District Court for the District of Idaho)).

5.      That the Company refrain from pursuing a reverse stock split (which violates Articles 4.2.9(f), 4.3.3 and 11 of the Company's amended articles of incorporation and the Company's Restated Bylaws) or any other corporate action which is not in the best interests of the Company's preferred shareholders and minority shareholders or otherwise violates the Company's articles of incorporation, restated bylaws and/or Idaho law (including oppressive conduct and breaches of fiduciary duties). That any and all shares held by R. John Taylor and/or Connie Taylor Henderson be barred and disqualified from voting on the reverse stock split since that transaction is preferential to them and is being pursued without full disclosure.

1

Exhibit 41 - Page - 36

App. - C, p. 36

**15-ER-3589**

6.      That the Company demand repayment of, and refrain from paying or advancing, any sums or assets for the payment of all attorneys' fees, expert witness fees, costs and expenses paid, advanced or lent by the Company for JoLee Duclos, R. John Taylor, Connie Taylor Henderson, James Beck, Corrine Beck, Michael Cashman, Jane Doe Cashman, and CropUSA Insurance Agency, Inc.

7.      That Paul D. Durant be authorized to appoint persons to committee(s) of the Board of Directors of the Company, with each committee comprised of at least two (2) of the minority shareholders of the Company to be determined in Mr. Durant's sole discretion and at least one (1) outside and independent person (or more should Mr. Durant desire).  Said committee(s) should be used by Mr. Durant, in his discretion, to govern the Company and to maximize the value of the Company's shareholders and to wind up the affairs of the Company should no new viable businesses be obtained and the assets and funds used to pay creditors, preferred shareholders and distributed to common shareholders. Mr. Durant should be authorized to obtain approval for any acts from the Judge in the Federal Court Case or other court of competent jurisdiction to the extent required (including ultimately filing an action or taking action to dissolve the Company once all assets and funds have been identified and recovered or upon court or shareholder approval).

8.      That the Company rescind and/or revoke 818,659 of the common shares held by R. John Taylor and Connie Taylor Henderson as those shares were unlawfully issued by the Company when R. John Taylor violated his Executive Officer's Agreement with Company and they have acted as faithless fiduciaries of the Company (500,000 were granted as an option of the Executive Officers Agreement breached by R. John Taylor) and the other 318,659 shares obtained by R. John Taylor and/or Connie Taylor Henderson from Michael W. Cashman, Corrine M. Beck, and/or others were unlawfully issued to them and other former Series C Preferred Shareholders of the Company and are therefore not properly issued shares and those certificates and any subsequent certificates representing those common shares are illegal and void.  The foregoing shares, along with the common shares unlawfully issued to Distribution Services, Inc., Bruce E. Knutson, Charles B. Rapp, Daryl R. Verdoorn and any other commons shares unlawfully issued to the former Series C Preferred Shareholders were illegally issued and void.  The proper rescission and/or revocation of the foregoing shares increases the minority shareholder's ownership interest in the Company, instead of improperly diluting their ownership interest and increasing R. John Taylor and Connie Taylor Henderson's majority interest.

9.      That the Company, through Paul D. Durant, if the demand made to appoint him as Director and President of the Company is honored or through the Company and its duly authorized and non-conflicted Board of Directors if that demand is not honored, terminate JoLee Duclos as the trustee of the Company's 401(k) Plan ("Plan") and appoint a disinterested party as the trustee of the Plan and that said successor trustee be provided full disclosure of all transactions, loans, malfeasance, redemptions, transfers and all other acts and/or omissions of R. John Taylor and JoLee Duclos as the former co-trustees of the Plan and JoLee Duclos as former successor trustee and that said newly appointed successor trustee also vote the Series C Preferred Shares hold in the Plan to appoint a director to the Board of Directors of AIA Services to represent the interests of the Series C Preferred Shareholders in the Plan as required Article 4.3.2 of Company's Amended Articles of Incorporation. The undersigned, being a beneficial owner of over $300,000 in Series C Preferred Shares in the Company, demands that no common shares or fractional common shares be redeemed until all accrued dividends have been paid or the funds set aside as required by Article 4.3.3 of the Company's Amended Articles of Incorporation and further demands that if the value of those shares is less than the face value, plus accrued dividends, then no common shares may be redeemed under any circumstances.

10.      That the Company rescind and cancel the prior payments for the recent termination of the Employee Stock Ownership Plan of the Company ("ESOP") because the value of said shares cannot be fairly ascertained until the Federal Court Case has been concluded or resolved and other matters and claims resolved by the Company. The participants in the ESOP, like the other common shareholders, should receive the benefit of a fair valuation and/or distribution at the appropriate time.

2

Exhibit 41 - Page - 37

Case 1:10-cv-00404-DCN-CWD   Document 1131-4   Filed 08/06/21   Page 38 of 100

Case 1:10-cv-00404-CWD   Document 67-42   Filed 07/30/12   Page 38 of 44

11.    That Paul D. Durant be authorized to conduct such investigations and retain such services as he deems appropriate and/or necessary pertaining to any and all past transactions, loans, encumbrances, asset sales, share sales or transfers, share redemptions, salaries, payments, exchange offers and/or any other act or omission pertaining to the operations of AIA Services Corporation and AIA Insurance, Inc. and that the Company report said findings to the appropriate authorities and/or State Bar Associations and/or to take such other actions as Mr. Durant deems appropriate and in the best interest of the corporations.

12.    That the common shares of R. John Taylor, Connie Taylor Henderson and the other persons and entities identified in Paragraph 8 be barred from voting on any matters relative to the appointment of themselves to the Board of Directors and any other matters in which their shares have a conflict of interest by way of their participation in the malfeasance and/or covering up of the malfeasance against the Company and its other shareholders.

13.    That R. John Taylor, Connie Taylor Henderson, JoLee Duclos, James Beck and Michael Cashman be required to disgorge all compensation, directors fees, indemnification payments or cost advances, benefits, salaries, bonuses, reimbursements, and shares obtained through or from the Company (until the Federal Court Case is resolved) based of them being faithless fiduciaries of the Company.

14.    All actions and demands that are demanded to be taken by Paul Durant are also hereby demanded to be taken by the Company and/or its authorized Board of Directors to the extent persons named in this Demand or others seek to thwart any action by Paul Durant.

15.    That the Company fully disclose all transactions, obligations, loans and footnotes in the recent financial statements provided to shareholders and fully disclose how R. John Taylor, Connie Taylor Henderson and other persons identified in this Demand acquired their respective ownership interests in the entities identified in the footnotes, how the Company's ownership interests were eliminated, transferred or otherwise extinguished and how the transactions, obligations, loans, and share transfers, redemptions and issuances were authorized by the Company, the Company's amended articles of incorporation and restated bylaws.

16.    By making this Demand, the undersigned shareholder(s) does not waive any legal rights or remedies and hereby maintains and asserts that the Company is being irreparably injured and reserves the right to take legal action, without a derivative demand, based upon such irreparable injury.

17.    This Demand may be executed by counterparts and by facsimile and/or pdf attachment, which together shall constitute an original. The undersigned shareholder(s) authorize Dale Miesen or Paul Durant to deliver this Demand to the Company at the time of the shareholder meeting scheduled for July 16, 2012 or anytime before or thereafter.

18.    All further communications to the undersigned shareholder(s) regarding this Demand should be directed to Roderick C. Bond, Roderick Bond Law Office, PLLC, 800 Bellevue Way NE, Suite 400, Bellevue, WA 98004 - Tel: (425) 591-6903 - Fax (425) 321-0343 – Email: rod@roderickbond.com.

Dated this _15_ day of July, 2012.

Reed J. Taylor

3

Exhibit 41 - Page - 38

App. - C, p. 38

15-ER-3591

### SHAREHOLDER DEMAND

The undersigned shareholder(s), as an owner(s) of record or beneficial holder(s) of preferred and/or common shares in AIA Services Corporation, hereby makes the following Shareholder Demand upon AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc. (collectively "Company") and the Company's Boards of Directors (this Demand also constitutes a derivative demand and double derivative demand) (collectively "Demand"):

1.      That R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, JoLee Duclos and Aimee Gordon be barred from serving as directors or officers of the Company based upon the ongoing malfeasance, conflicts of interest, failure to act in good faith, breaches of fiduciary duties (including the duties of loyalty, care and good faith) and other acts and/or omissions committed under their direction, participation and/or acquiescence, including, without limitation, those acts and/or omissions identified in the First Amended Complaint in *Donna J. Taylor v. Hawley Troxell Ennis & Hawley, R. John Taylor, Michael Cashman, James Beck, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case"), which said First Amended Complaint is incorporated by reference herein, and that legal action be taken against them.

2.      That Paul D. Durant be appointed as a director of AIA Services Corporation as requested and duly authorized and appointed by the sole Series A Preferred Shareholder of the Company, Donna J. Taylor.

3.      That Paul D. Durant be appointed as the President of AIA Services Corporation and AIA Insurance, Inc., to be duly compensated, and to operate those entities in the best interests of the corporations and their shareholders (with an emphasis on recovering damages and sums from majority shareholder R. John Taylor and Connie Taylor Henderson and others for the benefit of the corporations and their innocent shareholders) and to retain and/or terminate such employee(s) and/or officer(s) as he deems appropriate to properly operate the corporations and pursue any claims set forth in the First Amended Complaint in the Federal Court Case and similar or other claims against named and unnamed parties. Mr. Durant should also be authorized to appoint other parties to the Board of Directors to serve until the next annual meeting as provided under the Restated Bylaws.

4.      That the Company (regardless of Mr. Durant's appointment as an officer or director of the Company), and Paul D. Durant if appointed as an director and/or officer, be authorized to pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case through the date of this Demand and for all related acts after the date of this Demand, including, without limitation, requesting and praying for punitive damages against the parties named in the Federal Court Case and any other responsible parties named in this Demand. A copy of said First Amended Complaint is incorporated by reference herein and is already in the possession of the Company and its purported officers and purported directors (a copy can also be obtained from PACER (the online filing system for the United States District Court for the District of Idaho)).

5.      That the Company refrain from pursuing a reverse stock split (which violates Articles 4.2.9(f), 4.3.3 and 11 of the Company's amended articles of incorporation and the Company's Restated Bylaws) or any other corporate action which is not in the best interests of the Company's preferred shareholders and minority shareholders or otherwise violates the Company's articles of incorporation, restated bylaws and/or Idaho law (including oppressive conduct and breaches of fiduciary duties). That any and all shares held by R. John Taylor and/or Connie Taylor Henderson be barred and disqualified from voting on the reverse stock split since that transaction is preferential to them and is being pursued without full disclosure.

1

Exhibit 41 - Page - 39

App. - C, p. 39

15-ER-3592

6.      That the Company demand repayment of, and refrain from paying or advancing, any sums or assets for the payment of all attorneys' fees, expert witness fees, costs and expenses paid, advanced or lent by the Company for JoLee Duclos, R. John Taylor, Connie Taylor Henderson, James Beck, Corrine Beck, Michael Cashman, Jane Doe Cashman, and CropUSA Insurance Agency, Inc.

7.      That Paul D. Durant be authorized to appoint persons to committee(s) of the Board of Directors of the Company, with each committee comprised of at least two (2) of the minority shareholders of the Company to be determined in Mr. Durant's sole discretion and at least one (1) outside and independent person (or more should Mr. Durant desire).  Said committee(s) should be used by Mr. Durant, in his discretion, to govern the Company and to maximize the value of the Company's shareholders and to wind up the affairs of the Company should no new viable businesses be obtained and the assets and funds used to pay creditors, preferred shareholders and distributed to common shareholders. Mr. Durant should be authorized to obtain approval for any acts from the Judge in the Federal Court Case or other court of competent jurisdiction to the extent required (including ultimately filing an action or taking action to dissolve the Company once all assets and funds have been identified and recovered or upon court or shareholder approval).

8.      That the Company rescind and/or revoke 818,659 of the common shares held by R. John Taylor and Connie Taylor Henderson as those shares were unlawfully issued by the Company when R. John Taylor violated his Executive Officer's Agreement with Company and they have acted as faithless fiduciaries of the Company (500,000 were granted as an option of the Executive Officers Agreement breached by R. John Taylor) and the other 318,659 shares obtained by R. John Taylor and/or Connie Taylor Henderson from Michael W. Cashman and Corrine M. Beck and/or James Beck were unlawfully issued to them and other former Series C Preferred Shareholders of the Company and are therefore not properly issued shares and those certificates and any subsequent certificates representing those common shares are illegal and void.  The foregoing shares, along with the common shares unlawfully issued to Distribution Services, Inc., Bruce E. Knutson, Charles B. Rapp, Daryl R. Verdoorn and any other commons shares unlawfully issued to the former Series C Preferred Shareholders were illegally issued and void.  The proper rescission and/or revocation of the foregoing shares increases the minority shareholder's ownership interest in the Company, instead of improperly diluting their ownership interest and increasing R. John Taylor and Connie Taylor Henderson's majority interest.

9.      That the Company terminate JoLee Duclos as the trustee of the Company's 401(k) Plan ("Plan") and appoint a disinterested party or person as the trustee of said Plan and that said person be provided full disclosure of all transactions, loans, malfeasance, redemptions, transfers and all other acts and/or omissions of R. John Taylor and JoLee Duclos as the former co-trustees of the Plan.

10.      That the Company rescind and cancel the prior payments for the recent termination of the Employee Stock Ownership Plan of the Company ("ESOP") because the value of said shares cannot be fairly ascertained until the Federal Court Case has been concluded or resolved and other matters and claims resolved by the Company. The participants in the ESOP, like the other common shareholders, should receive the benefit of a fair valuation and/or distribution at the appropriate time.

11.      That Paul D. Durant be authorized to conduct such investigations and retain such services as he deems appropriate and/or necessary pertaining to any and all past transactions, loans, encumbrances, asset sales, share sales or transfers, share redemptions, salaries, payments, exchange offers and/or any other act or omission pertaining to the operations of AIA Services Corporation and AIA Insurance, Inc. and that the Company report said findings to the appropriate authorities and/or State Bar Associations and/or to take such other actions as Mr. Durant deems appropriate and in the best interest of the corporations.

2

Exhibit 41 - Page - 40

App. - C, p. 40

15-ER-3593

### SHAREHOLDER DEMAND

The undersigned shareholder(s), as an owner(s) of record or beneficial holder(s) of preferred and/or common shares in AIA Services Corporation, hereby makes the following Shareholder Demand upon AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc. (collectively "Company") and the Company's Boards of Directors (this Demand also constitutes a derivative demand and double derivative demand) (collectively "Demand"):

1. That R. John Taylor, Connie Taylor Henderson, James Beck, Michael Cashman, JoLee Duclos and Aimee Gordon be barred from serving as directors or officers of the Company based upon the ongoing malfeasance, conflicts of interest, failure to act in good faith, breaches of fiduciary duties (including the duties of loyalty, care and good faith) and other acts and/or omissions committed under their direction, participation and/or acquiescence, including, without limitation, those acts and/or omissions identified in the First Amended Complaint in *Donna J. Taylor v. Hawley Troxell Ennis & Hawley, R. John Taylor, Michael Cashman, James Beck, et al.*, United States District Court for the District of Idaho, Civil No. 1:10-cv-00404-MLB (the "Federal Court Case"), which said First Amended Complaint is incorporated by reference herein, and that legal action be taken against them.

2. That Paul D. Durant be appointed as a director of AIA Services Corporation as requested and duly authorized and appointed by the sole Series A Preferred Shareholder of the Company, Donna J. Taylor.

3. That Paul D. Durant be appointed as the President of AIA Services Corporation and AIA Insurance, Inc., to be duly compensated, and to operate those entities in the best interests of the corporations and their shareholders (with an emphasis on recovering damages and sums from majority shareholder R. John Taylor and Connie Taylor Henderson and others for the benefit of the corporations and their innocent shareholders) and to retain and/or terminate such employee(s) and/or officer(s) as he deems appropriate to properly operate the corporations and pursue any claims set forth in the First Amended Complaint in the Federal Court Case and similar or other claims against named and unnamed parties. Mr. Durant should also be authorized to appoint other parties to the Board of Directors to serve until the next annual meeting as provided under the Restated Bylaws.

4. That the Company (regardless of Mr. Durant's appointment as an officer or director of the Company), and Paul D. Durant if appointed as an director and/or officer, be authorized to pursue the claims and causes of action identified in the First Amended Complaint filed in the Federal court Case through the date of this Demand and for all related acts after the date of this Demand, including, without limitation, requesting and praying for punitive damages against the parties named in the Federal Court Case and any other responsible parties named in this Demand. A copy of said First Amended Complaint is incorporated by reference herein and is already in the possession of the Company and its purported officers and purported directors (a copy can also be obtained from PACER (the online filing system for the United States District Court for the District of Idaho)).

5. That the Company refrain from pursuing a reverse stock split (which violates Articles 4.2.9(f), 4.3.3 and 11 of the Company's amended articles of incorporation and the Company's Restated Bylaws) or any other corporate action which is not in the best interests of the Company's preferred shareholders and minority shareholders or otherwise violates the Company's articles of incorporation, restated bylaws and/or Idaho law (including oppressive conduct and breaches of fiduciary duties). That any and all shares held by R. John Taylor and/or Connie Taylor Henderson be barred and disqualified from voting on the reverse stock split since that transaction is preferential to them and is being pursued without full disclosure.

1

Exhibit 41 - Page - 42

App. - C, p. 42

15-ER-3594

6. That the Company demand repayment of, and refrain from paying or advancing, any sums or assets for the payment of all attorneys' fees, expert witness fees, costs and expenses paid, advanced or lent by the Company for JoLee Duclos, R. John Taylor, Connie Taylor Henderson, James Beck, Corrine Beck, Michael Cashman, Jane Doe Cashman, and CropUSA Insurance Agency, Inc.

7. That Paul D. Durant be authorized to appoint persons to committee(s) of the Board of Directors of the Company, with each committee comprised of at least two (2) of the minority shareholders of the Company to be determined in Mr. Durant's sole discretion and at least one (1) outside and independent person (or more should Mr. Durant desire). Said committee(s) should be used by Mr. Durant, in his discretion, to govern the Company and to maximize the value of the Company's shareholders and to wind up the affairs of the Company should no new viable businesses be obtained and the assets and funds used to pay creditors, preferred shareholders and distributed to common shareholders. Mr. Durant should be authorized to obtain approval for any acts from the Judge in the Federal Court Case or other court of competent jurisdiction to the extent required (including ultimately filing an action or taking action to dissolve the Company once all assets and funds have been identified and recovered or upon court or shareholder approval).

8. That the Company rescind and/or revoke 818,659 of the common shares held by R. John Taylor and Connie Taylor Henderson as those shares were unlawfully issued by the Company when R. John Taylor violated his Executive Officer's Agreement with Company and they have acted as faithless fiduciaries of the Company (500,000 were granted as an option of the Executive Officers Agreement breached by R. John Taylor) and the other 318,659 shares obtained by R. John Taylor and/or Connie Taylor Henderson from Michael W. Cashman and Corrine M. Beck and/or James Beck were unlawfully issued to them and other former Series C Preferred Shareholders of the Company and are therefore not properly issued shares and those certificates and any subsequent certificates representing those common shares are illegal and void. The foregoing shares, along with the common shares unlawfully issued to Distribution Services, Inc., Bruce E. Knutson, Charles B. Rapp, Daryl R. Verdoorn and any other commons shares unlawfully issued to the former Series C Preferred Shareholders were illegally issued and void. The proper rescission and/or revocation of the foregoing shares increases the minority shareholder's ownership interest in the Company, instead of improperly diluting their ownership interest and increasing R. John Taylor and Connie Taylor Henderson's majority interest.

9. That the Company terminate JoLee Duclos as the trustee of the Company's 401(k) Plan ("Plan") and appoint a disinterested party or person as the trustee of said Plan and that said person be provided full disclosure of all transactions, loans, malfeasance, redemptions, transfers and all other acts and/or omissions of R. John Taylor and JoLee Duclos as the former co-trustees of the Plan.

10. That the Company rescind and cancel the prior payments for the recent termination of the Employee Stock Ownership Plan of the Company ("ESOP") because the value of said shares cannot be fairly ascertained until the Federal Court Case has been concluded or resolved and other matters and claims resolved by the Company. The participants in the ESOP, like the other common shareholders, should receive the benefit of a fair valuation and/or distribution at the appropriate time.

11. That Paul D. Durant be authorized to conduct such investigations and retain such services as he deems appropriate and/or necessary pertaining to any and all past transactions, loans, encumbrances, asset sales, share sales or transfers, share redemptions, salaries, payments, exchange offers and/or any other act or omission pertaining to the operations of AIA Services Corporation and AIA Insurance, Inc. and that the Company report said findings to the appropriate authorities and/or State Bar Associations and/or to take such other actions as Mr. Durant deems appropriate and in the best interest of the corporations.

2

Exhibit 41 - Page - 43

App. - C, p. 43

15-ER-3595

12.    That the common shares of R. John Taylor, Connie Taylor Henderson and the other persons and entities identified in Paragraph 8 be barred from voting on any matters relative to the appointment of themselves to the Board of Directors and any other matters in which their shares have a conflict of interest by way of their participation in the malfeasance and/or covering up of the malfeasance against the Company and its other shareholders.

13.    That R. John Taylor, Connie Taylor Henderson, JoLee Duclos, James Beck and Michael Cashman be required to disgorge all compensation, directors fees, indemnification payments or cost advances, benefits, salaries, bonuses, reimbursements, and shares obtained through or from the Company (until the Federal Court Case is resolved) based of them being faithless fiduciaries of the Company.

14.    All actions and demands that are demanded to be taken by Paul Durant are also hereby demanded to be taken by the Company and/or its authorized Board of Directors to the extent persons named in this Demand or others seek to thwart any action by Paul Durant.

15.    That the Company fully disclose all transactions, obligations, loans and footnotes in the recent financial statements provided to shareholders and fully disclose how R. John Taylor, Connie Taylor Henderson and other persons identified in this Demand acquired their respective ownership interests in the entities identified in the footnotes, how the Company's ownership interests were eliminated, transferred or otherwise extinguished and how the transactions, obligations, loans, and share transfers, redemptions and issuances were authorized by the Company, the Company's amended articles of incorporation and restated bylaws.

16.    By making this Demand, the undersigned shareholder(s) does not waive any legal rights or remedies and hereby maintains and asserts that the Company is being irreparably injured and reserves the right to take legal action, without a derivative demand, based upon such irreparable injury.

17.    This Demand may be executed by counterparts and by facsimile and/or pdf attachment, which together shall constitute an original. The undersigned shareholder(s) authorize Dale Miesen or Paul Durant to deliver this Demand to the Company at the time of the shareholder meeting scheduled for July 16, 2012 or anytime before or thereafter.

18.    To the extent that any of the above-referenced demands pertain to me taking action or accepting the appointment as a director or officer of the Company, I am joining in those demands upon the request of the other shareholders who have made the same demands.

Dated this _____ day of July, 2012.

_____

Paul D. Durant

3

Exhibit 41 - Page - 44

15-ER-3596

LEE H. ROUSSO, ISB No. 8353
LAW OFFICES OF LEE H. ROUSSO PLLC
800 Fifth Avenue, Suite 4100
Seattle, WA  98104
Tel: (206) 623-3818
Fax: (206) 705-1240
lee@leerousso.com

Attorneys for Plaintiff Donna Taylor

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| DONNA J. TAYLOR, a shareholder who is bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc., <br><br> Plaintiff, <br><br> v. <br><br> HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; RICHARD A. RILEY, an individual; D. JOHN ASHBY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; and AIA INSURANCE, INC., an Idaho corporation. <br><br> Defendants. | Case No.: 10-cv-00404-LMB <br><br> FIRST AMENDED COMPLAINT |

FIRST AMENDED COMPLAINT - 1

Plaintiff Donna J. Taylor, by and through her attorney of record, alleges as follows:

## I.   STATEMENT OF JURISDICTION

1.1   This Court has jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1332(a)(1) as the amount in controversy exceeds $75,000.00 and the action is between citizens of different States.

1.2   This Court also has jurisdiction over the subject matter of this lawsuit under 18 U.S.C. § 1964(c), which grants federal jurisdiction to actions brought under § 1962 of the federal Racketeering and Corruption Influenced Organizations ("RICO") statute, 18 U.S.C. § 1961 *et seq.*

1.3   This Court has supplemental jurisdiction, 28 U.S.C. § 1367(a), over the state claims asserted herein as the state claims arise from the same common nucleus of operative facts as the federal claims.

## II.      STATEMENT OF VENUE

2.1   Venue is proper in the District of Idaho under 28 U.S.C. § 1391(a)(2) as a substantial part of the errors and omissions giving rise to these claims occurred in this district.

2.2   Venue is also proper in the District of Idaho under 18 U.S.C. § 1965(a), as this action involves a civil RICO claim under 18 U.S.C. § 1964, and certain RICO defendants reside in the District of Idaho.

## III.      PARTIES

3.1   Plaintiff Donna J. Taylor is a resident of Clarkston, Washington.  Donna Taylor is bringing this derivative action on behalf of the preferred and common shareholders of

FIRST AMENDED COMPLAINT - 2

**App. - C, p. 46**

AIA Services Corporation ("**AIA Services**").  In addition, Donna Taylor also brings a double derivative on behalf of AIA Insurance, Inc. ("**AIA Insurance**"), which is a wholly owned subsidiary of AIA Services.  AIA Services and AIA Insurance are collectively referred to as "**AIA**."  AIA Services and AIA Insurance are nominal defendants because they are controlled by the Controlling Defendants (Taylor, Beck and Cashman) in this action and are therefore antagonistic to the shareholders' interest.

**3.2**     Defendant Hawley Troxell Ennis & Hawley LLP ("**Hawley Troxell**") is an Idaho limited liability partnership in the business of practicing law, with its principle place of business in Boise, Idaho.  Hawley Troxell has no office in the state of Washington. None of the individual members of Hawley Troxell are residents of Washington.  Hawley Troxell has purportedly acted as counsel for AIA Services, AIA Insurance and CropUSA Insurance Agency, Inc. ("**CropUSA**").   Hawley Troxell is named herein as it is liable for the acts and/or omissions of defendants Gary D. Babbitt, Richard Riley, and D. John Ashby.

**3.3**     Defendant Gary D. Babbitt ("**Babbitt**") is an individual residing in the state of Idaho and is an attorney practicing law in the state of Idaho with and for Hawley Troxell.

**3.4**     Defendant Richard A. Riley ("**Riley**") is an individual residing in the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

**3.5**     Defendant D. John Ashby ("**Ashby**") is an individual residing in the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

**3.6**     Defendant R. John Taylor ("**Taylor**") is an individual residing in the state of Idaho. At all times relevant to this lawsuit, Taylor served on the Board of Directors for AIA Services, AIA Insurance, and CropUSA and continues to serve on those boards.

FIRST AMENDED COMPLAINT - 3

**App. - C, p. 47**

Taylor also served as an officer of each of these corporations during all times relevant to this lawsuit.  Taylor is licensed to practice law in the state of Idaho. Taylor is a common shareholder in AIA Services and asserts that he is a shareholder in CropUSA.  Taylor also owns shares in other entities that have engaged in inappropriate transactions with AIA.

**3.7**   Defendant James Beck ("**Beck**") is an individual residing in the state of Minnesota. Beck currently serves on the Board of Directors for AIA Services and AIA Insurance and has served on those boards during certain periods relevant to this lawsuit. Beck asserts that he is a shareholder in AIA Services and CropUSA.

**3.8**   Defendant Michael Cashman, Sr. ("**Cashman**") is an individual residing in the state of Minnesota.  Cashman has served on the Board of Directors for AIA Services during certain times relevant to this lawsuit.  Cashman asserts that he is a shareholder in AIA Services and CropUSA. Taylor, Beck and Cashman are collectively referred to herein as the "**Controlling Defendants**."

**3.9**   Defendant AIA Services is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501.  At all time relevant to this lawsuit, AIA Services is or has been the parent corporation of AIA Insurance.

**3.10**   Defendant AIA Insurance is an Idaho corporation with its principle place of business at 111 Main Street, Lewiston, Idaho, 83501.  AIA Insurance is a wholly owned subsidiary of AIA Services.

**3.11**   Defendant CropUSA is an Idaho corporation with its principle place of business at 111 Main Street, Lewiston, Idaho, 83501.

## IV.   FACTS

**4.1**   AIA Services is a closely held Idaho corporation that was formed as a holding

FIRST AMENDED COMPLAINT - 4

company for AIA Insurance and other subsidiaries. AIA's business model was to work with growers' associations to form trusts and/or related cooperatives through various growers and farmers associations, with the members of those associates also becoming members of the trusts and/or cooperatives. For example, AIA created the Grain Growers Membership & Insurance Trust, the National Contract Poultry Grower's Membership & Insurance Trust, and other, similar trusts. By way of its relationships with these various organizations, AIA was able to market health insurance (*e.g.*, Group Universal Health Policies) to the members of the various associations. Reed Taylor, a non-party to this suit, and his former wife, plaintiff Donna Taylor, were issued Series A Preferred and common shares in AIA Services. Pursuant to the dissolution of the Reed Taylor/Donna Taylor marriage, Donna Taylor was issued 200,000 shares of Series A Preferred shares on or about February 12, 1988, and has held those shares ever since, less those shares which have been redeemed over the years. Donna Taylor is also the beneficial owner of one half of the common shares of AIA Services held by the estate of her deceased daughter, Sara Taylor, who had owned the shares since at least 1995.

4.2     In 1995 the Controlling Defendants and Richard Campanaro (a non-party) sought to gain operational control of AIA Services and did in fact obtain operational control by having AIA Services enter into an agreement wherein AIA Services redeemed the common shares in AIA Services owned by Reed Taylor. Campanaro purchased his shares with funds provided by Beck and Cashman and later transferred those shares back to Beck and Cashman. The Controlling Defendants have maintained operational control of AIA from 1995 through the date of this complaint.

4.3     Since acquiring operational control of AIA Services in 1995, the Controlling

FIRST AMENDED COMPLAINT - 5

Defendants have engaged in repeated acts of faithless self-dealing, transactions detrimental to AIA, and have committed intentional torts, have conspired to commit intentional torts, and have aided and abetted in the commission of intentional torts, to the detriment of AIA and its innocent shareholders, including but not limited to: (1) controlling the Board of Directors and/or the decisions made by the Board and refusing to act in the best interests of AIA; (2) violating AIA's bylaws, including but not limited to failing to hold shareholder meetings; (3) violating AIA's articles of incorporation; (4) diverting corporate opportunities belonging to AIA; (5) conveying, encumbering, utilizing, and/or pledging corporate assets to themselves or other entities; (6) inappropriately redeeming, acquiring and/or issuing shares of stock and/or making payments on put options, including but not limited to, issuing shares to the Controlling Defendants; (7) inappropriately paying dividends; (8) intentionally failing to comply with conflict of interest provisions in AIA bylaws; (9) guaranteeing loans for CropUSA and failing to guarantee loans for AIA; (10) paying excessive compensation to officers and directors, including but not limited to, paying Taylor $250,000.00 per year to purportedly act as CEO and President of AIA Services after his contractual entitlement to such salary had expired and Taylor had represented that he would not take salary in certain years; (11) wasting corporate assets; (12) divulging and/or utilizing AIA's trade secrets for the benefit of themselves and other entities; (13) soliciting and transferring AIA employees to work for CropUSA; (14) engaging in acts and/or decisions without making full disclosure and without obtaining the required approval of shareholders; (15) engaging in millions of dollars of transactions wherein AIA conveyed benefits without the receipt of consideration; (16) forming and operating entities in direct competition with AIA in the

FIRST AMENDED COMPLAINT - 6

**App. - C, p. 50**

**15-ER-3602**

insurance marketplace, including without limitation, CropUSA and Pacific Empire Holdings Corp.; (17) making false representations, including, without limitation, regarding share values, omitting material facts in AIA's financial statements, falsely certifying AIA's financial statements, and that AIA was being operated for the benefit of the corporation; (18) concealing and failing to disclose material facts to AIA pertaining to loans, transfers, and utilization of assets, including without limitation; concealing or omitting material facts, including the facts related to virtually each and every transaction described herein; (19) making false representations to AIA, including without limitation, making and certifying false and misleading financial statements to AIA; (20) inappropriately loaning corporate funds to themselves and to other entities under their control; (21) failing to obtain security, failing to charge interest, and failing to collect on loans of at least $307,000.00 made to Taylor; (22) paying attorneys' fees and costs in various legal proceedings on behalf of past and present directors when it was clear that the individual past and present directors had intentionally failed to act in good faith and by failing to obtain security for repayment of said funds; (23) acquiring a parking lot with AIA funds and charging AIA, and making AIA pay, excessive rent for use of the parking lot even though AIA did not actually use the parking lot; (24) failing to seat the full and required board of directors; (25) improperly transferring shares held by AIA to themselves, including without limitation shares in Pacific Empire Radio Corp., and Pacific Empire Holding Corp., with damages occurring and set on the date of transfer; (26) failing to honor AIA contracts; (27) failing to take appropriate legal action in the interests of AIA; (28) removing a tenant from an AIA owned building to another building owned personally by Taylor; (29) failing to properly allocate expenses to CropUSA;  (30)

FIRST AMENDED COMPLAINT - 7

selling assets and or/contracts belonging to AIA to others; and (31) assisting one another and others (including Hawley Troxell, Babbitt, Riley and Ashby) in committing the intentional torts described herein and concealing acts and omissions that constituted intentional torts against AIA.

**4.4**    From 1995 to the filing of this suit, each of the Controlling Defendants has served at various times on the board of directors for AIA Services, AIA Insurance and/or CropUSA.  The Controlling Defendants have also served from time to time on purported "advisory boards" that make decisions on behalf of AIA and CropUSA.  Beck receives $5,000.00 per quarter to sit on the board of AIA and also receives shares for his "service."  Beck has stated that he serves on this board to protect his own interests and those of his friends.

**4.5**    By 1998, AIA's ability to sell health insurance had been impaired by undercapitalization in its underwriting subsidiary the Universal Life.  Accordingly, the company considered proposals to sell other forms of insurance, and in particular crop insurance, to be underwritten by other insurance companies. In 1999, AIA Services, then under the control of Controlling Defendants, began selling crop insurance through a wholly owned subsidiary of AIA Services formed under the name "AIA Crop Insurance, Inc."  The first purported meeting of shareholders of AIA Crop Insurance, Inc. was held on January 11, 2000. (See *Minutes of the First Meeting of Shareholders, January 11, 2000*, which is attached as **Exhibit A**[1] to this First Amended Complaint and incorporated by reference herein.**)**  The first purported meeting of the AIA Crop Insurance, Inc., board of directors was held on the same day.  (See *Minutes of the First Meeting of Directors,*

---

[1] The documents attached to this First Amended Complaint as exhibits have never been provided to the disinterested shareholders and were otherwise concealed from AIA.

FIRST AMENDED COMPLAINT - 8

*January 11, 2000*, which is attached as **Exhibit B** to this First Amended Complaint and incorporated by reference herein.**)** The purported minutes of the shareholder's meeting indicate that Taylor claimed to be the sole shareholder of AIA Crop Insurance at the time of incorporation.  Upon information and belief, at the time of its formation, Riley and/or Hawley Troxell were providing legal services to AIA Crop Insurance, Inc.  At a special meeting of the shareholders of AIA Crop Insurance, Inc., held on November 13, 2000, AIA Crop Insurance, Inc., was renamed CropUSA in an apparent attempt to conceal its corporate lineage and origins.  The minutes of the November 13, 2000, special meeting of the shareholders also show that Taylor continued to claim that he was the sole shareholder of CropUSA, while he was simultaneously representing in business plans provided to others that CropUSA was a subsidiary of AIA. At the time CropUSA was formed, Taylor was employed by AIA Services under an Executive Officer's Agreement, dated August 1, 1995, which contained express covenants not to compete.  Upon information and belief, Taylor's Executive Officer's Agreement and AIA Service's Amended and Restated Articles of Incorporation and Bylaws were drafted by defendant Riley.[2]

**4.6**    CropUSA held its purported annual shareholder's meeting on January 10, 2001. By this time, the illegal "spin off" of CropUSA had been accomplished by having AIA's Preferred C shareholders (primarily the Controlling Defendants) exchange their Preferred C shares for common shares in CropUSA.[3]   (If CropUSA were in fact an independent entity, these maneuvers would have been completely unnecessary.)  The minutes for this

---

[2] As noted elsewhere in this First Amended Complaint, Hawley Troxell later wrote an improper opinion letter approving a line of $15,000,000.00 credit that was barred by the Amended and Restated Articles of Incorporation.

[3] These shares were later "repurchased" for over $1.5 million in an egregious act of corporate looting.

FIRST AMENDED COMPLAINT - 9

meeting reveal that CropUSA had retained defendant Hawley Troxell as its advisor and SEC counsel and, upon information and belief, Hawley Troxell has served continuously as counsel ever since. (See *Minutes of the Board of Directors, January 10, 2001,* which is attached as **Exhibit C** to this First Amended Complaint and incorporated by reference herein.) According to the minutes, negotiations between AIA Services and CropUSA had resulted in an agreement whereby AIA Services would no longer operate CropUSA as a subsidiary. However, the negotiations referred to in minutes did not in fact occur. There was no decision, nor has there ever been a decision, on the part of AIA Services to discontinue the subsidiary status of CropUSA. None of the preferred or common shareholders of AIA Services (other than those present at the January 10, 2001, meeting) were given notice of or the opportunity to approve this corporate action. In spite the fact that Taylor asserted on January 10, 2001 that CropUSA would no longer be a subsidiary of AIA, Taylor wrote in a February 27, 2001, letter to Donna Taylor that "AIA is developing a new crop insurance program through a new company called CropUSA." (See *February 27, 2001, Letter to Donna Taylor*, which is attached as **Exhibit D** to this First Amended Complaint and is incorporated by reference herein.) The letter went on to state that "[t]he costs of putting the CropUSA program together have been paid. *AIA* now needs to launch five new territories next Month." (emphasis added) This letter constituted an unambiguous representation by Taylor that CropUSA was a subsidiary of AIA and was being operated for the benefit of AIA. This representation was false, Taylor knew it was false, and also knew that Donna Taylor was likely to rely on this representation. She did in fact justifiably rely on this representation and was severely damaged thereby.

FIRST AMENDED COMPLAINT - 10

**4.7**     Notwithstanding the fact that Taylor was operating under an employment agreement that required that he not compete with AIA Services, and notwithstanding the fact that he owed fiduciary duties to the shareholders of AIA Services, Taylor set forth his plans to exploit the assets of AIA Services for the benefit of CropUSA (and himself as the majority purported shareholder) in the purported minutes of the purported January 10, 2001, meeting.  For example, the meeting minutes reveal that CropUSA authorized its officers to execute a Master Marketing Agreement with AIA Insurance that would allow CropUSA access to all of AIA's customers and customer lists, as well as all of AIA's trade secrets.  AIA received no consideration for conveying this access.  CropUSA's officers (including Taylor) were also purportedly authorized to enter into a Management Agreement with AIA Insurance wherein AIA Insurance purportedly agreed to provide management and administrative support to CropUSA without charge.   However, Taylor has since testified under oath that AIA's board never authorized this agreement. The innocent shareholders of AIA (nor AIA itself) were never given notice of these proposed agreements, nor were they given the opportunity to approve or reject these agreements. Each of these agreements, if executed, would constitute a violation of Taylor's Executive Officer's Agreement, which contains a strict non-compete clause.   Each of these agreements, if executed, would also constitute a direct breach of fiduciary duty or aiding and abetting same on behalf of each of the Controlling Defendants.

**4.8**     Upon information and belief, Hawley Troxell was providing legal services to CropUSA and/or its board of directors as of January 10, 2001, and such provision of services has continued through the date of this complaint.  Upon information and belief, from January 10, 2001, and continuing through the period relevant to this lawsuit,

FIRST AMENDED COMPLAINT - 11

Hawley Troxell and Riley (and later Babbitt and Ashby) had knowledge of Taylor's Executive Officer's Agreement with AIA Services, had knowledge of the conflict of interest provision in AIA's bylaws, and had knowledge of provisions in AIA's articles of incorporation, but intentionally refused to comply with them. Hawley Troxell and Riley knew or should have known that the purported Master Marketing Agreement and Management Agreement constituted breaches of Taylor's Executive Officer's Agreement, violations of AIA's articles of incorporation, violations of AIA bylaws, and consequently breaches of his fiduciary duties to AIA Services. Upon information and belief, Hawley Troxell and Riley also representing CropUSA from January 10, 2001, to the present, and by way of that representation Hawley Troxell, Babbitt, Riley and/or Ashby breached their fiduciary duties to AIA (including their undivided duty of loyalty owed to AIA) and took steps that materially assisted Taylor and the Controlling Defendants in the commission of the various torts described in this complaint and assisted in the concealment of those torts.

4.9     Beginning in 1999 and continuing through the date of this Complaint, CropUSA has been funded and operated with assets improperly transferred from AIA, including, but not limited to, operating capital, customer lists and other trade secrets, agents and staff, and goodwill. CropUSA paid nothing for these assets.

4.10     The Controlling Defendants were all shareholders of AIA at the time CropUSA was formed and later purportedly became shareholders of CropUSA. The Controlling Defendants all served on a purported "advisory board" of CropUSA and/or AIA, and this advisory board exercised actual control over these corporations. By exercising control over these entities and committing acts that benefitted CropUSA at the expense of AIA,

FIRST AMENDED COMPLAINT - 12

these defendants engaged in a conspiracy to defraud AIA, which have right and title to the property of CropUSA. Due to the fact that the Controlling Defendants have complete control over AIA and would never assert claims against themselves on behalf of AIA, the adverse dominion doctrine applies to all claims asserted herein, thereby barring any defense based on a statute of limitations. *Freeland v. Enosis Corp.,* 540 F.3d 721 (7th Cir. 2008).

**4.11** On January 10, 2002, CropUSA purportedly entered into a Memorandum of Understanding with the Controlling Defendants. Under the terms of this memorandum, Beck and Cashman were obligated to guarantee loans on behalf of CropUSA. However, Beck and Cashman were also obligated to guarantee loans on behalf of AIA. Notwithstanding this obligation, the Controlling Defendants subsequently arranged for AIA to guarantee CropUSA's lines of credit even though the guarantees were barred by AIA's articles of incorporation and bylaws.

**4.12** In 2004, the Controlling Defendants attempted to raise capital for CropUSA by selling shares in CropUSA to private investors by way of a $10,000,000.00 private placement. Upon information and belief, Hawley Troxell drafted the July 15, 2004, Private Placement Memorandum, despite its obligations to AIA.

**4.13** When CropUSA began distributing the Private Placement Memorandum in 2004, the company was experiencing financial difficulties that made it difficult, if not impossible, to attract investors to the private placement. In addition, the company's financial difficulties threatened its ability to participate in the Federal Crop Insurance program.

**4.14** In order to boost CropUSA's balance sheet for the purpose of operating the

FIRST AMENDED COMPLAINT - 13

company, attracting investors and maintaining access to the Federal Crop Insurance program, the Controlling Defendants devised a scheme to illegally transfer a large sum of money from AIA Insurance to CropUSA.  The Controlling Defendants conspired with each other in the formation and execution of this scheme. Upon information and belief, Hawley Troxell provided counsel to CropUSA with respect to the unlawful transfer of funds and/or has at a minimum assisted in covering up the facts of this illegal transfer.

**4.15**  In August, 2004, AIA Insurance received a payment of $1,510,693 from Trustmark.

**4.16**  Rather than deposit the payment of $1,510,693 into the account of AIA Insurance, where it would have benefited AIA and its innocent shareholders, Taylor deposited the funds into a new account entitled "AIA Insurance Inc. CropUSA."  The address for this account coincided with the address for Taylor's personal residence at 2020 Broadview Drive in Lewiston, Idaho.

**4.17**  Shortly after diverting the $1,510,693 into the "AIA Insurance Inc. CropUSA" account, AIA Insurance illegally transferred the funds to CropUSA.  The Controlling Defendants attempted to disguise this conversion of funds by characterizing the transaction as a purchase of Preferred C Shares in AIA Services.  However, as the Controlling Defendants acknowledged at the time, there was no market for these shares. At the time these funds were converted by CropUSA, there was no authorization of any kind for the transaction.  In order to create a plausible explanation for the transfer of funds, CropUSA eventually produced a document designated as a Consent in Lieu of Meeting dated August 26, 2004.  (See *Consent in Lieu of Meeting, August 26, 2004*, attached as **Exhibit E** to this First Amended Complaint and incorporated by reference

FIRST AMENDED COMPLAINT - 14

herein.)  However, this document itself is completely fraudulent, as it was retroactively created months later than the purported date in order to deceive auditors who questioned the validity of this transaction.  Furthermore, this transaction violated the terms of AIA Services' Amended and Restated Articles of Incorporation, which required that all Preferred C shares be redeemed equally and simultaneously.

**4.18**    CropUSA was carrying these shares on its books with a value of $21,693, which means that CropUSA realized a gain of $1,489,000 on this purported sale of shares. (See *CropUSA Financial Statement,* relevant pages of which attached as **Exhibit F** to this First Amended Complaint and incorporated by reference herein.)  "Corporate Theft" is an accurate description of this transaction.

**4.19**    Taylor was CEO and director of AIA Services, AIA Insurance and CropUSA at the time of the fraudulent transaction described in paragraphs 4.15 through 4.18 and other fraudulent transactions identified in this First Amended Complaint, and unlawfully benefited from those transactions.

**4.20**    The Controlling Defendants were all purported shareholders of CropUSA and benefited from the fraudulent transaction described in paragraphs 4.15 through 4.18 of this First Amended Complaint and the other unlawful transactions described herein.

**4.21**    The innocent shareholders of AIA Services were given no notice of the 2004 stock transaction, nor were any proper board meetings held to approve the transaction. However, as with the fraudulent document prepared on behalf of CropUSA, a fraudulent Consent if Lieu of Meeting, dated August 26, 2004, was prepared on behalf of AIA.  (See *Consent in Lieu of Meeting, AIA, August 26, 2004*, attached as **Exhibit G** to this First Amended Complaint and incorporated by reference herein).  This document was actually

FIRST AMENDED COMPLAINT - 15

produced several months after the transaction and was created to deceive auditors.

**4.22**   Upon information and believe, Hawley Troxell provided legal services to both AIA and CropUSA at the time of the 2004 transaction.  Hawley Troxell, Babbitt, Ashby and/or Riley at various times, as purported counsel for AIA, failed to disclose to AIA that the acts of the Controlling Defendants constituted a breach of their fiduciary duties owed to AIA.  Hawley Troxell failed to disclose to AIA, or to anyone else, that this transaction was unlawful on many levels, including but not limited to the fact that it did not comply with articles of incorporation and bylaws, caused a breach of AIA's other contracts, and could not be justified by the balance sheet of either AIA Insurance or CropUSA.  Upon information and belief, Hawley Troxell had knowledge of the back-dated Consent in Lieu of Meeting documents.

**4.23**   After robbing AIA Insurance of over $1,500,000.00 in 2004, the Controlling Defendants continued to operate CropUSA with assets both tangible and intangible that rightly belonged to AIA and continued to conceal their actions from the plaintiff and other shareholders.

**4.24**   Under the management and direction of the Controlling Defendants, AIA regularly failed to allocate costs to CropUSA and other entities and failed to charge markup, interest or profit on costs paid for other entities.  For example, Taylor's own salary of $250,000.00 was allocated entirely to AIA Services even though Taylor's contractual right to salary from AIA Services had expired in 1998 and had never been renewed by an authorized board. (And, further, Taylor performed no actual work for AIA during the time in question.)  Hawley Troxell failed to take appropriate action or to advise AIA or duly authorized disinterested constituents of AIA that the failure to

FIRST AMENDED COMPLAINT - 16

allocate costs to CropUSA constituted fraud, conversion, and breach of fiduciaries and/or aiding and abetting the breach of fiduciary duties on the part of the Controlling Defendants. Taylor, with the knowledge and complicity of the other Controlling Defendants also performed work for other entities while on AIA's payroll, *i.e.*, Pacific Empire Radio Corp., Pacific Empire Communications Corp., Pacific Empire Holdings Corp., Radio Leasing I LLC and Radio Leasing II LLC. Taylor also had other AIA employees work for these entities without compensation to AIA.

**4.25** Between its founding in 1999 and the filing of this lawsuit, CropUSA and other entities generated tens of millions of dollars of revenue (including premiums) and other benefits that would have flowed to AIA but for the unlawful and unauthorized acts of the Controlling Defendants.

**4.26** As of 2006, Taylor owed AIA at least $307,000.00 for personal loans he had taken from the company without shareholder knowledge or approval. For several years, Taylor concealed these loans be engaging in false accounting whereby loans to him were treated as payments of principle on AIA's indebtedness to Reed Taylor. In 2006, Taylor "corrected" an accounting "error" by increasing the balance due on Reed Taylor's note to $6 million. Taylor has still not repaid his unauthorized personal loans. Taylor also had AIA pay his personal maid, his personal credit card bills, donations, cash advances, family cell phone bills, and other personal expenses. Taylor also had AIA purchase several vehicles from him, and Taylor continued to drive these vehicles after the sales. Taylor also had AIA employees perform work on his personal residence and on other real property not owned by AIA. These acts were all committed with the knowledge and complicity of the Controlling Defendants.

FIRST AMENDED COMPLAINT - 17

App. - C, p. 61

15-ER-3613

**4.27**   As the purported attorneys for AIA, two entities, Hawley Troxell, Babbitt, Ashby and/or Riley owed duties of loyalty, care, and good faith to AIA and these defendants breached these duties by engaging in the simultaneous representation of the Controlling Defendants, CropUSA, and other parties with interests adverse to AIA. In addition, and/or in the alternative, these attorney defendants have exceeded the scope of their representation and all acts taken beyond the scope of representation constitute acts of aiding and abetting exposing the lawyer defendants to liability as joint tortfeasors.

**4.28**   In August, 2007, AIA settled litigation with the state of Idaho whereby AIA received a promissory worth approximately $1.5 million. Although AIA Insurance paid the costs of this litigation, the Controlling Defendants, with the assistance of Riley and Hawley Troxell, improperly titled the note in the name of AIA Services only, and then pledged the note to CropUSA so that the Controlling Defendants could borrow money to pay their attorneys' fees to Hawley Troxell. As with the 2004 transactions (4.15-4.18), the transaction is indistinguishable from theft. Upon information and belief, the pledge agreement was drafted by Hawley Troxell and/or Riley, although they later asserted that they were only "scriveners" for the transaction.

**4.29**   On October 26, 2007, Hawley Troxell and/or Riley drafted and delivered an opinion letter falsely representing that AIA Insurance was authorized to guarantee a $15,000,000.00 line of credit on behalf of CropUSA.  (See *Hawley Troxell Opinion Letter, October 26, 2007*, which is attached as **Exhibit G** to this First Amended Complaint and is incorporated by reference herein.) This letter was delivered in violation of the Amended and Restated Articles of Incorporation of AIA Services, the bylaws of AIA Services and the restated bylaws of AIA Insurance, and in violation of the duty of

FIRST AMENDED COMPLAINT - 18

loyalty owed by Hawley Troxell to AIA.  This letter was distributed in furtherance of the scheme to enrich CropUSA at the expense of AIA and to further the RICO enterprise operated by the Controlling Defendants.  Additionally, Lancelot, the lender on this $15,000,000.00 line of credit was subsequently exposed as a Ponzi scheme, and its founder, Gregory Bell, pleaded guilty to criminal charges in federal court.  Mr. Bell was the signee for Lancelot on the $15,000,000.00 line of credit.  These facts, along with others, were never disclosed to AIA or duly authorized and disinterested constituents of AIA by Hawley Troxell or the attorney defendants.

V.     **CERTIFICATE OF COMPLIANCE WITH I.C. § 30-1-742, FED. R. CIV. P. 23.1, AND I.R.C.P.  23(1)(A) and OTHER FACTS**

**5.1** As a prerequisite to filing this lawsuit under Idaho Code § 30-1-742, Federal Rule of Civil Procedure 23.1, and Idaho Rule of Civil Procedure 23(1)(a), Donna Taylor served a derivative demand letter on the purported boards of directors of AIA Services and AIA Insurance on July 21, 2008.  (See *Derivative Demand Letter, July 21, 2008*, attached as **Demand Letter**  and incorporated by reference herein.)  RICO actions may be brought derivatively.  *Diduck v. Kaszycki & Sons, Contractors, Inc.,* 737 F. Supp. 792 (S.D.N.Y. 1990).

**5.2** On July 23, 2008, Hawley Troxell, Babbitt, Ashby and Riley, filed a Motion for Stay of Proceedings in *Taylor v. AIA Services*, and asserted that the stay was necessary so that AIA Services and AIA Insurance could conduct an inquiry into the demands made by Donna Taylor in her letter of July 21, 2008.

**5.3** On July 31, 2008, attorney James LaRue, representing Hawley Troxell and the attorney defendants, responded to those portions of the demand letter that asked the purported board of directors to terminate Hawley Troxell.   In this letter, LaRue

FIRST AMENDED COMPLAINT - 19

disingenuously demanded that Donna Taylor provide the complete factual basis for each and every one of her claim when he knew that his clients and the Controlling Defendants had full knowledge of Donna Taylor's claims and unfettered access to and control of all documents relevant to claims asserted in Donna Taylor's demand letter.

5.4     On August 14, 2008, Hawley Troxell and the attorney defendants disingenuously filed a petition for a court appointed independent inquiry on behalf of AIA when they had no intention of following through with the inquiry.

5.5     On September 4, 2008, Reed Taylor responded to the petition for a court appointed independent inquiry.  Notably, Reed Taylor did not oppose the appointment of independent investigators.  Instead, he objected to the investigators proposed by Hawley Troxell, Judges Schilling and Reinhardt, as both of these judges had previous professional relationships with the defendants and their attorneys.

5.6     Although the parties had filed briefing with respect to the appointment of independent investigators, Hawley Troxell and the attorney defendants never noted the motion for a hearing and the court never ruled on the request, and they intentionally abandoned the appointment of an independent inquiry.

5.7     Upon information and belief, the defendants have never conducted a further investigation of the demands made in Donna Taylor's letter of July 21, 2008.

5.8     The defendants have not taken any of the actions demanded by Donna Taylor in her demand letter.  All of the claims made in this lawsuit were reasonably contemplated by the derivative demand letter, as it demanded that the board take all actions against all parties.

5.9     As owner of Preferred A Shares in AIA Services, and as beneficial owner

FIRST AMENDED COMPLAINT - 20

common shares in AIA Services, Donna Taylor fairly represents the interests of shareholders not named in this suit. Taylor is not pursuing this matter in a collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims.

## VI.     CAUSES OF ACTION

The facts alleged in paragraphs 4.1 through 4.29 and paragraphs 5.1 through 5.9 are re-alleged and restated herein to the extent necessary to maintain each cause of action herein.  Where necessary, each of the causes of action pled herein shall be construed as having been pled in the alternative.

### FIRST CAUSE OF ACTION—RICO, 18 U.S.C. § 1961 *et seq.*
### (Controlling Defendants, CropUSA,  Hawley Troxell, Riley, Babbitt and Ashby)

**6.1**     Under 18 U.S. C. § 1961(1), "racketeering activity" includes a violation of certain federal statutes, including 18 U.S.C.  § 1341, which makes it a crime to "devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses representations or promises…" with a further requirement that the fraud include the use of the mails or interstate carriers.  Racketeering activity also includes fraud committed through the use of interstate wires.  18 U.S.C. § 1343.  A "pattern or racketeering activity" includes at least two acts of racketeering occurring after the enactment of the statute, with the last act occurring within ten years of the prior act. 18 U.S.C. § 1961(5).

**6.2**     18 U.S.C. 1962(a) makes it illegal for anyone who has received income from a pattern of racketeering activity to invest any of the income received in any enterprise which is engaged in or effects interstate or international commerce.  18 U.S.C. 1962(b) makes it illegal for a person to obtain interest in or control over any enterprise engaged in

FIRST AMENDED COMPLAINT - 21

or effecting interstate or international commerce by engaging in a pattern of racketeering activity.  18 U.S.C. 1962(c) makes it illegal for employees or associates of enterprises engaged in or effecting interstate or international commerce to participate in or conduct the enterprise's affairs through a pattern of racketeering activity.  18 U.S.C. § 1962(d) makes it illegal for any person to conspire with another to violate subsections (a),(b) or (c) of the statute.  A person damaged by any violation of 18 U.S.C. § 1962 has a cause of action for treble damages under 18 U.S.C. § 1964(c).

6.3     CropUSA was formed by the Controlling Defendants in 2000, and was operated thereafter as a scheme or artifice to defraud AIA or to obtain money or property from AIA by means of false or fraudulent pretenses, representations, or promises, *i.e.*, as a "racketeering enterprise" under 18 U.S.C. § 1961(4).  The RICO Defendants utilized the United States mail and/or interstate wire communications in furtherance of this scheme or artifice, and their actions had an effect on interstate commerce.

6.4     The actions taken by CropUSA and the Controlling Defendants with respect to the purported January 10, 2001, shareholders' meeting advanced the scheme to obtain money or property by means of false or fraudulent pretenses, representations, or promises. These defendants falsely represented that negotiations had taken place and that AIA Services had authorized CropUSA to operate as an independent company, rather than as a wholly-owned subsidiary.  These defendants further acted to deprive AIA of money and property by agreeing to transfer AIA corporate assets, including trade secrets, to CropUSA, without compensation to AIA.  This scheme to deprive AIA of money and property was advanced by concealing the contents of the purported January 10, 2001 board of directors meeting from the innocent shareholders of AIA.

FIRST AMENDED COMPLAINT - 22

App. - C, p. 66

**6.5**     From 2000 and continuing through the filing of this lawsuit, CropUSA and the Controlling Defendants further acted to fraudulently deprive AIA of money and property by arranging for AIA to pay CropUSA's expenses, including but not limited to the salaries of Taylor and Petersen, and employee benefits, as well as arranging for AIA to provide corporate infrastructure to CropUSA without compensation to AIA.

**6.6**     The Controlling Defendants and CropUSA further acted to deprive AIA of money and property in 2004, when CropUSA converted over $1.5 million belonging to AIA Insurance for its own use.

**6.7**     All defendants named under this cause of action further acted to deprive AIA of money and property in 2007, when the deed of trust received from the state of Idaho in settlement of a lawsuit was titled to AIA Services and subsequently pledged to CropUSA so that CropUSA could borrow money to pay the attorney's fees of Hawley Troxell, Babbitt, Ashby and Riley for providing legal services beyond their respective scopes of representation.

**6.8**     A pattern of racketeering activity is established by, *inter alia*, the following acts:

a.     The unlawful transfer of AIA assets to CropUSA without shareholder approval and in contradiction of express representations that CropUSA would be operated for the benefit of AIA;

b.     The daily operation of CropUSA with assets unlawfully converted from AIA;

c.     The unlawful transfer of $1.5 million from AIA to CropUSA in 2004, wherein AIA received consideration worth approximately $20,000;

d.     The 2007 transfer of the deed of trust belonging to AIA to CropUSA, with AIA receiving no consideration for this transaction;

FIRST AMENDED COMPLAINT - 23

e.      The use of the deed of trust acquired by AIA in 2007 to pay the personal legal fees of the Controlling Defendants.

Each of these acts is the direct and proximate cause of the damages claimed by the plaintiff in this case.

**6.9**      With respect to the illegal acts described in paragraphs 6.3 through 6.7, the defendants utilized the United States mail and/or interstate wires, *e.g.,* email, in furtherance of their activities, thereby establishing a predicate offense to RICO under 18 U.S. C. § 1341 and/or 18 U.S.C. § 1343.  18 U.S.C. § 1961(1).

a.      The February 27, 2001, letter to Donna Taylor, **Exhibit D,** constituted mail fraud and advanced the scheme of the racketeering enterprise.

b.      The funds obtained by AIA in 2004 (the Trustmark settlement) were fraudulently converted by CropUSA by way of a wire transfer from "AIA Insurance CropUSA" (a fictional entity) to CropUSA on or about August 26, 2004.

c.      Upon information and belief, the fraudulent documents entitled "Consent in Lieu of Meeting," which were created months later than the dates represented, were created to deceive auditors and were in fact mailed to auditors.

d.      Upon information and belief, the unlawful 2007 pledge of the mortgage belonging to AIA was accomplished through  the use of the United States mail.

**6.10**      The Controlling Defendants all used funds and/or assets received through a pattern of racketeering activity to invest in or obtain control of an enterprise  engaged in a pattern of racketeering activity and are liable to AIA for treble damages and attorney's fees under 18 U.S.C. § 1962(a).  Specifically, each of these defendants used money and assets obtained in 2004 and on an ongoing basis thereafter to further the continued

FIRST AMENDED COMPLAINT - 24

existence and operation of the racketeering enterprise, CropUSA.

6.11   Defendants Beck, Cashman and Petersen were all employees or associates (as purported board members) of CropUSA during the period of racketeering activities and participated in or controlled its affairs. Beck and Cashman were members of CropUSA's purported "advisory board," were involved in all important financial decisions, and otherwise participated in the activities of CropUSA in furtherance of racketeering activity. These defendants are liable to AIA under 18 U.S.C. § 1962(c) for treble damages and attorney's fees for the damages caused by their conduct.

6.12   All defendants named under this cause of action had knowledge of CropUSA's pattern of racketeering activity, agreed with the objectives of the racketeering activity, and took overt acts to advance the interests of CropUSA, thereby rendering each of these defendants liable to the innocent shareholders of AIA under 18 U.S.C. § 1962(d) for triple damages and attorney's fees for damages caused by their conduct. With respect to Hawley Troxell, Babbitt, Ashby and/or Riley, a cause of action against corporate counsel of the RICO enterprise exists where the law firm communicates or disseminates the misrepresentations of the RICO enterprise or breaches fiduciary duties to clients in the course of providing representation to the RICO enterprise, which describes the conduct of these defendants in this case. See, e.g., *Design Pallets, Inc., v. GrayRobinson P.A.*, 515 F.Supp.2d 1246 (M.D. Fla. 2007). RICO liability can also arise from nondisclosure of material facts where there is a duty to disclose, which once again describes the conduct of these defendants in this case. *Design Pallets*, 515 F.Supp.2d at 1255. By taking these actions to the detriment of shareholders, Hawley Troxell should be found to have undertaken the representation of the various entities in bad faith.

FIRST AMENDED COMPLAINT - 25

15-ER-3621

### SECOND CAUSE OF ACTION—BREACH OF FIDUCIARY DUTY
### (Taylor, Beck, Cashman, Babbitt, Riley, Ashby, Hawley Troxell)

**6.13** As members, or purported members of the board of directors for AIA Services and/or AIA Insurance, the Controlling Defendants owed fiduciary duties to the corporations. As a corporate officer, and as an attorney, Taylor owed an elevated level of fiduciary duties to the corporations. As AIA's retained corporate counsel, Hawley Troxell, if authorized, owed fiduciary duties to the corporations. This duty extended to defendants Babbitt, Riley and Ashby. If not authorized to act as counsel, Hawley Troxell acted with apparent authority as agent and owes fiduciary duties as a result of that agency relationship. All of these defendants have breached their fiduciary duties to AIA and those breaches are the proximate cause of the damages claimed herein.

**6.14** By using AIA corporate assets to fund, form and operate CropUSA, a competing entity, the defendants breached their fiduciary duties to the corporation.

**6.15** Hawley Troxell represented or was retained by AIA at the time CropUSA was formed. By failing to advise that shareholder approval of any such transaction would be necessary, and by failing to advise that the transaction constituted a breach of fiduciary duty, individually and collectively, on the part of the board members, and by failing to advise that the transaction constituted a violation of the non-compete clause in Taylor's employment contract, Hawley Troxell breached the fiduciary duties it owed to AIA and its representation was taken in bad faith. A shareholder's allegations of a law firm's conflict of interest in representing two corporations is sufficient to state a claim for breach of fiduciary duty. *Reis v. Barley, Snyder, Senft & Cohen LLC,* 484 F.Supp.2d 337 (E.D. Pa. 2007)

**6.16** The defendants further breached their fiduciary duties to the corporation when

FIRST AMENDED COMPLAINT - 26

they orchestrated the transfer of over $1.5 million to CropUSA in 2004.   These defendants unlawfully funneled funds from AIA Insurance to CropUSA to enrich themselves and to artificially enhance CropUSA's balance sheet.

6.17   The defendants on AIA's board of directors further breached their fiduciary duties to the corporation by allowing CropUSA to utilize AIA Services' corporate assets, including agents, customer lists and trade secrets.

6.18   All defendants named under this cause of action breached their fiduciary duties to AIA when they caused the deed of trust received through the settlement of litigation with the state of Idaho to be titled with AIA Services and subsequently pledged to CropUSA so that CropUSA could borrow money to pay the attorney's fees of Hawley Troxell.

6.19   All defendants named under this cause of action further breached their fiduciary duties to AIA when they caused AIA Insurance to guarantee a $15 million line of credit on behalf of and for the sole benefit of CropUSA, and thereafter concealed this transaction from AIA.  Hawley Troxell and/or Riley violated its fiduciary duties to AIA by writing an opinion letter stating that AIA had authority to make this loan when this loan guarantee was in fact barred by the articles of incorporation and bylaws of AIA.

6.20   The defendants named in this cause of action further breached their fiduciary duties to the corporation by failing to act on Donna Taylor's July 21, 2008 demand letter.

6.21   Hawley Troxell and the individual lawyers have acted continuously as purported counsel for AIA and CropUSA during the period from 2001, at the latest, and  through the filing of this lawsuit.  As counsel, Hawley Troxell, has committed numerous acts and/or omissions that were detrimental to the interests of AIA, and, upon information and belief, was providing legal advice when the Controlling Defendants, without notice or

FIRST AMENDED COMPLAINT - 27

15-ER-3623

authority, converted CropUSA from a wholly owned subsidiary of AIA Services into a separate corporate entity of which Taylor was purportedly the sole shareholder. These defendants provided legal advice with respect to CropUSA's Private Offering Memorandum, while at the same time representing AIA. This was akin to simultaneously representing both the thief and the victim.

6.22    Each of these defendants is a "faithless fiduciary" as defined by law and is therefore required to disgorge all compensation and consideration received from AIA and/or CropUSA. The disgorgement is in addition to liability caused by the breaches of fiduciary duty. In the case of Hawley Troxell, the disgorgement goes to all fees received from any of the defendants. In the case of the faithless board members, the disgorgement goes to all salary, bonuses, warrants, stock options, or stock received from AIA.

6.23    The defendants named under this cause of action are jointly and severally liable to AIA for all damages arising from their breaches of fiduciary duty.

### THIRD CAUSE OF ACTION—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY
### (Taylor, Beck, Cashman, Hawley Troxell, Babbitt, Riley, Ashby)

6.24    One who counsels, advises, abets or assists in the commission of an actionable wrong is responsible to the injured person for the entire loss or damage. 86 C.J.S. Torts § 105; RESTATEMENT (FIRST) OF TORTS § 876 (1939). Aiding and abetting in the commission of an actionable wrong may be inferred from the fact that one aided and abetted efforts to conceal the wrong. 86 C.J.S. Torts § 105. Liability for aiding and abetting the commission of a tort may be established by showing the person was present at the time of the actionable wrong and did not disapprove or oppose the action. Plaintiffs alleging aiding and abetting need not prove that the aiding and abetting was

FIRST AMENDED COMPLAINT - 28

necessary for the commission of the tort, only that the aiding and abetting made it easier for the tort to occur. *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12 (2002).

**6.25**   During certain relevant times, each of the defendants named under this cause of action had knowledge of the other defendants' act and omissions, knew that the acts or omissions constituted a breach of fiduciary duty, did not disapprove of the acts or omissions, took no steps to prevent the commission of the torts, and assisted in the concealment of the acts and omissions described herein, thereby damaging AIA.

**6.26**   Beck and Cashman aided and abetted the breaches of fiduciary duty committed by Taylor by assisting in and concealing the actions described in this complaint. Beck and Cashman aided and abetted the purported "spin off" of CropUSA from AIA Services, aided and abetted Taylor's scheme to divert $1.5 million from AIA Insurance in 2004, aided and abetted Taylor's failed effort to achieve a private placement for CropUSA (the "exit strategy"), aided and abetted the 2007 scheme to pledge the mortgage owned by AIA Services to CropUSA, aided and abetted the action of Taylor in having AIA Services guarantee CropUSA's line of credit when Beck and Cashman should have guaranteed the line of credit.

**6.27**   Hawley Troxell and each of the named attorney defendants aided and abetted in the commission of torts committed by The Controlling Defendants by assisting in and covering up the tortious acts described herein.  Hawley Troxell and the named attorneys were present at the commission of the torts and did not disapprove or oppose the acts.  To the contrary, Hawley Troxell and the named attorneys provided legal advice and/or opinion letters that facilitated the breaches of fiduciary duty by the other defendants.

FIRST AMENDED COMPLAINT - 29

Hawley Troxell was present as counsel when Taylor purportedly spun off CropUSA and failed to counsel that the conduct was improper and, in fact, concealed the impropriety from AIA. Hawley Troxell assisted in 2004 when The Controlling Defendants engineered the illicit transfer of funds from AIA Insurance in order to prop up the proposed private placement, which Hawley Troxell also handled. Hawley Troxell was present as counsel and issued an improper opinion letter when The Controlling Defendants arranged for AIA Services to guarantee the line of credit of CropUSA. Hawley Troxell, Babbitt, Ashby and Riley assisted when Taylor, Beck and Cashman pledged a $1.2 million mortgage belonging to CropUSA so that CropUSA could borrow money to pay Hawley Troxell's attorney's fees, and failed to counsel that the transaction was improper.

**6.28**   Each of these defendants, by aiding and abetting the acts described herein, is jointly and severally liable for all damages resulting from these breaches of fiduciary duty.

### FOURTH CAUSE OF ACTION—BREACH OF CONTRACT
### (John Taylor)

**6.29**   On August 1, 1995, Taylor and AIA Services entered into an Executive Officer's Agreement.

**6.30**   Section 9 of the Executive Officer's Agreement sets for express covenants not to compete. Subsection A of the covenants prohibits Taylor from soliciting AIA customers or otherwise diverting the business of AIA Services customers. Subsection B prohibits Taylor from participating in any insurance business that underwrites, markets or administers insurance products for commodity associations. Subsection C prohibits Taylor from soliciting AIA Services employees for other employment. Subsection D of

FIRST AMENDED COMPLAINT - 30

the covenants bars Taylor from divulging or exploiting trade secrets belonging to AIA.

**6.31** By forming CropUSA as anything other than a wholly-owned subsidiary of AIA, Taylor breached all four subsections of Section 9 of the Executive Officer's Agreement.

**6.32** By continuing to operate CropUSA with assets belonging to AIA, including AIA employees, Taylor has committed an ongoing breach of all four subsections of Section 9 of the Executive Officer's Agreement. Taylor has further breached Section 9 by operating Pacific Empire Holdings.

**6.33** Taylor's breaches of the Executive Officer's Agreement have damaged AIA in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION—LEGAL MALPRACTICE
#### (Hawley Troxell, Babbitt, Riley, Ashby)

**6.34** A law firm is liable for malpractice where (1) there exists and attorney client relationship; (2) where the lawyers owe duties pursuant to the relationship; (3) where the lawyers breach their duties or negligently perform them; and (4) such breaches proximately cause damage to the plaintiffs. *Harrigfeld v. Hancock,* 140 Idaho 134, 90 P.3d 884 (2004). A legal malpractice claim may be brought in a derivative action. *Schulman v. Wolf & Samson, PC,* 951 A.2d 1051 (N.J. 2008). Upon information and belief, Hawley Troxell has provided ongoing legal services to AIA from 1999 through the filing of this complaint. An attorney-client relationship exists between AIA and Hawley Troxell as well as between AIA and the individually named attorney defendants.

**6.35** Pursuant to the attorney-client relationship, Hawley Troxell and its lawyers owe AIA an undivided duty of loyalty. Hawley Troxell and its lawyers, including those named in this complaint, are required at all times to provide legal advice and take action that is in the best interests of AIA. Hawley Troxell violated this duty of loyalty by

FIRST AMENDED COMPLAINT - 31

15-ER-3627

simultaneously representing AIA and CropUSA, and by taking funds from AIA for the defense of CropUSA and the Controlling Defendants.

**6.36**   Hawley Troxell and the named attorney defendants also committed legal malpractice when they breached fiduciary duties to AIA as described herein.

**6.37**   AIA suffered damages as a direct, foreseeable and proximate result of the breaches of duty and the acts of malpractice described herein.

**SIXTH CAUSE OF ACTION—FRAUD/FRAUDULENT CONCEALMENT/CONSTRUCTIVE FRAUD**
**(Controlling Defendants)**

**6.38**   These defendants are liable to AIA for fraud because each of them (1) made representations of fact as asserted throughout this complaint, including but not limited to representations that CropUSA was being operated for the benefit of AIA; (2) which were false; (3) which were material; (4) which they knew to be false; (5) intended that there be reliance; (6) where other party was ignorant of the falsity of the statement; (7) and the other party did rely; (8) and the reliance was justified; and (9) injury resulted. *Mannos v. Moss,* 143 Idaho 927, 155 P.3d 1166 (2007)(holding that misrepresentations in financial statements precluded summary judgment).   Constructive fraud is identical to fraud, except that the plaintiff need not prove speaker's knowledge of the fraud and the speaker's intent that the other party rely on the representations.  37 Am. Jur. 2d Fraud and Deceit § 9.

**6.39**   In addition to making false representations, these defendants also concealed information from AIA with knowledge that the concealed information was material and that the concealment would cause AIA to suffer otherwise avoidable damages.  Failure to disclose a fact where one has a duty to disclose is the legal equivalent of representing the

FIRST AMENDED COMPLAINT - 32

non-existence of the fact. Where facts are fraudulently concealed, plaintiffs need not show reliance as there is nothing other than silence upon which to rely.

6.40   The Controlling Defendants represented to AIA Services that CropUSA was a wholly owned subsidiary of AIA Services. Simultaneously, the Controlling Defendants adopted the position, not disclosed to AIA or its shareholders, that CropUSA was an independent entity with Taylor as its sole shareholder. These representations were false, the defendants knew of their falsity, these defendants intended that there be reliance, there was justifiable reliance and AIA was damaged as a result.

6.41   By operating CropUSA as an independent entity, and by using CropUSA as a vehicle for misappropriating and converting corporate assets, the named defendants committed ongoing fraud that has persisted through the date of this complaint.

6.42   The Controlling Defendants also made misrepresentations to AIA in the form of false, misleading and fraudulent financial statements, upon which AIA reasonably relied, with that reliance being the proximate cause of AIA's damages.

6.43   When the Controlling Defendants transferred more than $1.5 million to CropUSA in 2004, they concealed the fact of this transaction from AIA and AIA was damaged by this concealment.

6.44   When the Controlling Defendants transferred AIA corporate assets, including employees, goodwill and trade secrets, to CropUSA, they concealed the fact of this transfer from AIA and AIA was damaged by this concealment.

6.45   When the Controlling Defendants had AIA pay CropUSA's corporate expenses, including the salaries of Taylor and Petersen, they concealed this fact from AIA and its innocent shareholders. AIA suffered damages as a result of this concealment.

FIRST AMENDED COMPLAINT - 33

App. - C, p. 77

**6.46** When the Controlling Defendants pledged the mortgage obtained by AIA from the state of Idaho to CropUSA so that CropUSA could borrow money to pay the attorney's fees of Hawley Troxell, they concealed this fact from AIA and its innocent shareholders. AIA suffered damages as a result of this concealment.

**6.47** When the Controlling Defendants had AIA Insurance guarantee CropUSA's $15 million line of credit, they concealed the fact of this guarantee from AIA.

**6.48** These defendants are jointly and severally liable to AIA for all damages arising from the fraud described herein and, further, are the ongoing fraud bars these defendants from asserting a statute of limitations defense.

### SEVENTH CAUSE OF ACTION—AIDING AND ABETTING FRAUD
**(Controlling Defendants, Babbitt, Riley, Ashby, Hawley Troxell)**

**6.49** As discussed under the Third Cause of Action, one who aids and abets in the commission of a tort is liable with the primary tortfeasor(s) for all damages resulting from the tort. Aiding and abetting is established where one has knowledge of the tort, does not disapprove, and takes no action to prevent the commission of the tort. Hawley Troxell and one or more of the named lawyer defendants were providing legal representation to AIA at the time of each of the fraudulent acts alleged in this complaint. The individual non-lawyer defendants, in addition to committing individual acts of fraud, aided and abetted each other's actions.

**6.50** Hawley Troxell and/or the individual lawyers named herein knew or should have known that the acts of the Controlling Defendants constituted fraud. Hawley Troxell and the individual lawyers knew or should have known that these acts were detrimental to of AIA. Hawley Troxell's silence, failure to act and intentional acts to cover up fraud upon AIA constituted aiding and abetting the fraud upon AIA.

FIRST AMENDED COMPLAINT - 34

**6.51**   Hawley Troxell and the individual lawyers knew or should have known that the transfer of AIA assets to CropUSA constituted a fraud against AIA.

**6.52**   Hawley Troxell and the individual lawyers knew or should have known that the transfer of approximately $1,500,000.00 to CropUSA in 2004 constituted a fraud on AIA.

**6.53**   Hawley Troxell and the individual lawyers knew or should have known that the practice of allocating CropUSA expenses to AIA, and otherwise failing to maintain arms' length transactions between CropUSA and AIA, constituted a fraud on AIA.

**6.54**   By knowingly providing legal cover for the fraudulent acts described herein, Hawley Troxell and the individual lawyers have aided and abetted the fraud committed by the Controlling Defendants and Petersen.

**6.56**   As aiders and abettors, Hawley Troxell and the individual lawyers are liable to the innocent shareholders of AIA Services to the same extent as the primary tortfeasors. RESTATEMENT (FIRST) OF TORTS § 876 (1939).  Likewise, Taylor, Beck, Cashman and Petersen are all liable for aiding and abetting each other in the commission of fraud.

### EIGHTH CAUSE OF ACTION—EXCESSIVE COMPENSATION/CORPORATE WASTE
#### (Taylor and Beck)

**6.57**   To support a claim for excessive compensation, plaintiff need only show that the board lacked independence and/or lacked good faith.  *In Re: Tyson Foods, Inc.,* 919 A.2d 563 (Del. 2000).  The Controlling Defendants have controlled AIA's boards from 1995 to the present.  They lack independence and have not acted in good faith.

**6.58**   The Controlling Defendants paid excessive compensation and have wasted corporate assets during the course of managing the corporations.

**6.59**   These defendants are liable to AIA for damages caused by paying excessive

FIRST AMENDED COMPLAINT - 35

compensation and otherwise wasting corporate assets.

### NINTH CAUSE OF ACTION—ACCOUNT STATED
### (John Taylor)

**6.60**   John Taylor established an account by borrowing $307,000.00 from AIA for his personal use.

**6.61**   Taylor subsequently confirmed the amount of the debt by "correcting" an accounting "error" so that AIA's book show that AIA is creditor and Taylor is debtor for $307,000.00.

**6.62**   Taylor has not paid any portion of this debt and the entire balance remains due and payable to AIA.

**6.63**   Taylor is liable to AIA for $307,000.00 on the account stated, plus prejudgment interest according to statute.

### VII.   JURY DEMAND

**7.1**   Plaintiffs hereby demand a trial by jury on all causes of action for which a jury trial is allowed by law.

### VIII.   PRAYER FOR RELIEF

Wherefore Plaintiffs pray for the following relief:

1.   For a judgment jointly and severally against all defendants for damages in an amount to be proven at trial;

2.   For judgments against individual defendants in an amount to be proven at trial, where appropriate, for damages for which joint and several liability does not apply to all defendants;

3.   For a judgment of treble damages against all RICO defendants as authorized by statute;

FIRST AMENDED COMPLAINT - 36

**App. - C, p. 80**

4.      For an order requiring the Hawley Troxell to disgorge all attorneys fees paid to it by AIA Services, AIA Insurance, CropUSA and any of the named defendants and judgment in favor of AIA for that amount;

5.      For an order requiring the Controlling Defendants to disgorge all compensation received from AIA or CropUSA since 1999, including stock, cash and other assets, including, without limitation, as faithless fiduciaries.

6.      For an award to plaintiffs of attorneys' fees and cost incurred in this action as allowed by statute, contract, or recognized grounds of equity;

7.      For an order requiring that all funds recovered as a result of this litigation, minus fees, costs  and bona fide debts, be deposited with the Court registry and distributed only after court order, and that no funds from this litigation be paid to faithless fiduciaries Taylor, Beck and Cashman.

8.      For judgments against Taylor, Beck and Cashman, jointly and severally, as the alter-ego of CropUSA, for all damages incurred by AIA and attributable in whole or in part to CropUSA.

9.      For any such further relief or remedy, including injunctive relief, as Plaintiffs may demand prior to or at trial or as this Court may find just and equitable.

DATED this the 18th day of November, 2010 in Seattle, Washington.

LAW OFFICE OF LEE H. ROUSSO

By: /s/ Lee H. Rousso
Lee H. Rousso, ISB # 8353
800 Fifth Avenue, Suite 4100
Seattle, Washington 98104
 (206) 623-3818
 lee@leerousso.com
 Attorneys for Donna J. Taylor

FIRST AMENDED COMPLAINT - 37

**App. - C, p. 81**

VERIFICATION

STATE OF IDAHO           )
                         ) ss.
COUNTY OF NEZ PERCE  )

I, Donna J. Taylor, being first duly sworn on oath, deposes and says:

I am the plaintiff in the above-entitled action. I have read the contents of this First Amended Complaint, know the contents of this First Amended Complaint, and have knowledge that the facts alleged herein are true, except those facts that have been alleged upon information and belief, and as to those matters I believe them to be true.

_____
Donna  J. Taylor

SUBSCRIBED AND SWORN to before me this _18th_ day of November, 2010.

_____
Notary Public for Idaho
Residing at: _Lewiston_
My commission expires: _6/11/2014_

## MINUTES OF THE FIRST MEETING OF SHAREHOLDERS

AIA Crop Insurance, Inc.

The first meeting of the incorporator and the subscribers of the company's capital stock was held at the Lewis-Clark Plaza, 111 Main Street, Lewiston, Idaho, on January 11, 2000.

R. John Taylor, incorporator, was present.  Also present were Paul Schrette and JoLee Duclos.

R. John Taylor represents 1,000 shares of the stock of the corporation.  There are no other shareholders.

The Articles of Incorporation were read and discussed.  It was determined that the Articles of Incorporation be inserted into the corporate record book and become a permanent part of the records of the corporation.

The proposed Bylaws were read and discussed.  The Bylaws were inserted into the corporate record book to become a permanent part of the records of the corporation.

The following were duly elected as directors to serve until the next annual meeting:

R. John Taylor
Paul D. Schrette
JoLee K. Duclos

There being no further business, the meeting was adjourned.

_____
R. John Taylor

**Exhibit - A**

CROP000060

**App. - C, p. 83**

**15-ER-3635**

MINUTES OF THE FIRST MEETING OF DIRECTORS

AIA Crop Insurance, Inc.

The first meeting of the Board of Directors was held at the Lewis Clark Plaza, 111 Main Street, Lewiston, Idaho, on January 11, 2000. Of the elected Directors of the corporation, the following were present:

R. John Taylor
Paul D. Schrette
JoLee K. Duclos

No Directors were absent.

The Directors unanimously elected R. John Taylor to preside as Chairman of the meeting and JoLee K. Duclos as Secretary of the meeting.

Mr. Taylor presented and read the company's Articles of Incorporation and reported that to incorporate this company the same had been filed with and accepted by the appropriate officers of the State of Idaho in the manner required by the laws of Idaho. The Articles of Incorporation were accepted, and a copy thereof was ordered to be filed in the company's Minute Book.

Mr. Taylor presented and read proposed Bylaws for the regulation and management of the affairs of the company. They were read article by article and adopted as the Bylaws of this company. An executed copy thereof was ordered to be filed in the company's minute book.

The following individuals were nominated and unanimously elected to hold office in accordance with the provisions of the Articles of Incorporation, the Bylaws, and the policies and procedures of this company:

| Name | Office |
|------|--------|
| Paul D. Schrette | President |
| Jay R. Taylor | Vice President |
| JoLee K. Duclos | Vice President/Secretary |
| R. John Taylor | Treasurer |

The Secretary of the meeting stated that a company undertaking business operations is often required to file certain documents or be licensed under certain laws and regulations, specifically including applicable insurance laws. She requested that the President, with the advice and assistance of legal counsel, determine the filing and licensing requirements to comply with all the laws which apply to this company's operations. Upon motion duly made, seconded and unanimously carried, it was:

CROP000066

**Exhibit - B**

RESOLVED: That the President or Secretary, with the advice and assistance of legal counsel, is hereby authorized and directed to determine what actions this company is required to take under any federal, state, or local laws, ordinances, rules, or regulations which regulate or apply to the operations of this company and to take any action found necessary for this purpose.

FURTHER RESOLVED: That the President and Secretary are hereby authorized to execute and deliver such documents and take such action as may be necessary or proper for that purpose, including the appointment of a resident agent and designation of a registered office in the states in which the company chooses to do business, and otherwise take any other action that may be required by the laws of such state. The Secretary is hereby authorized to attest to any such documents executed hereunder.

Upon motion duly made, seconded and unanimously carried, it was:

RESOLVED: That the Treasurer is hereby authorized to pay all expenses and fees necessary or incidental to the organization of this company.

Upon recommendation of the chair, and motion duly made, seconded and unanimously carried, it was

RESOLVED: That the funds of this company shall be deposited in:

U.S. Bank of Clarkston, Washington

FURTHER RESOLVED: That any two of the following officers of this corporation, namely, Paul D. Schrette, President; JoLee K. Duclos, Vice President/Secretary; and R. John Taylor, Treasurer; or his/her successor in office; or any other person specifically appointed for the following purposes, be and are hereby authorized for, on behalf of, and in the name of AIA Crop Insurance, Inc. to:

a)   Negotiate and procure loans from a commercial lending institution, in an unlimited amount;
b)   Discount with said lending institution, commercial or other business paper belonging to this Corporation, made or drawn by or upon third parties, without limit as to amount;
c)   Give security for any liabilities of this Corporation to said lending institution by pledge, assignment, or lien upon any real or personal property, tangible or intangible, of this Corporation;
d)   Execute in such form as may be required by the lending institution all notes and other evidences of such loans; repurchase agreements; and all instruments of pledge, assignment or lien, and that none of the same shall be valid unless so signed or endorsed; provided, the endorsement of promissory notes discounted may be effected by any one of them; and

CROP000067

e)      Execute in such form as may be required any standard banking resolution required by such lending institution; provided, a certified copy of this resolution shall also be submitted.

RESOLVED FURTHER, that said lending institution be and it is hereby authorized and directed to pay the proceeds of any such loans or discounts as directed by the persons so authorized to sign, whether so payable to the order of any of said persons in their individual capacities or not, and whether such proceeds are deposited in the individual credit of any said persons or not;

RESOLVED FURTHER, that checks, drafts, notes, and acceptances of this company shall be honored by such bank only when signed on its behalf by two of said officers;

RESOLVED FURTHER, that this resolution shall continue in force, and said lending institution may consider the holders of said offices and their signatures, respectively, to be and continue as set forth in the certificate of the Secretary of this corporation accompanying a copy of this resolution when delivered to said lending institution or in any similar subsequent certificate, until notice to the contrary in writing is duly served on said lending institution.

RESOLVED FURTHER, the Officers of AIA Crop Insurance, Inc. are authorized to sign pre-printed bank resolutions for signature cards, custodian agreements, etc. and to sign any state required admission and reporting documents, all in the normal course of business, and to incorporate by reference the specific language required by each institution.

BE IT FURTHER RESOLVED, the corporate secretary shall be authorized to sign all certificates and affix the corporate seal as necessary to accomplish the responsibilities authorized above.

There being no further business, it was unanimously voted to adjourn.

_____
Secretary - JoLee K. Duclos

CROP000068

MINUTES OF THE BOARD OF DIRECTORS
Crop USA Insurance Agency, Inc.

The annual meeting was called to order on January 10, 2001, by Chairman, R. John Taylor. Others in attendance were JoLee Duclos and Paul Schrette. The minutes of the prior meeting were reviewed and approved without comment.

The Directors reviewed the business model and written business plan of the Company and authorized the President and Chairman to finalize negotiations with Great American to begin operations. Great American has been selected as the insurer through which Crop USA will market its business.

The Directors discussed the necessity for additional funding to operate the corporation. AIA Services Corporation has declined to continue to operate the company as a subsidiary of AIA and wants the Company to be independent. As part of the negotiations with AIA, the Directors believe it would be in the best interest of the company that Crop USA offer to purchase the Series C Preferred stock currently outstanding of AIA as set forth in a Master Marketing Agreement with AIA. The Directors authorized the officers to continue negotiations on Crop USA's purchase of AIA Services Corporation's outstanding Series C Preferred stock.

It was moved, seconded and unanimously passed that Crop USA enter into and its executive officers be authorized to execute the following agreements on behalf of the corporation:

1)      Crop Insurance Division Agency-Company Agreement with Great American Insurance Companies;
2)      Master Marketing Agreement with AIA Insurance, Inc. that provides Crop USA access to grower associations represented by AIA Insurance;
3)      Management Agreement in which AIA Insurance agrees to provide management and administrative support services to Crop USA;
4)      Management Agreement with Growers National Cooperative Insurance Agency, Inc. in which Crop USA agrees to provide management and administrative support services to Growers National, with the assistance of AIA Insurance; and
5)      Agency and Development Agreement with Growers National Cooperative that provides for the appointment of the cooperative as a sub-agent of Crop USA.

The Board authorized, subject to shareholder agreement, amendment of Crop USA's Articles of Incorporation to increase the authorized common stock from one million shares to twenty million shares.

**Exhibit - C**

CROP000069

**App. - C, p. 87**

**15-ER-3639**

The following nominees for officers were unanimously elected:

| | |
|---|---|
| President /CEO | Paul D. Schrette |
| Vice President | Bryan Freeman |
| Vice President | Jay Taylor |
| Vice President/Secretary | JoLee K. Duclos |
| Treasurer | R. John Taylor |

The board reviewed a proposal to retain the law firm of Hawley, Troxell, Ennis & Hawley LLP of Boise, Idaho, as its advisor and SEC counsel. The motion was so made, second and approved. A copy of said agreement is attached hereto and incorporated herein by reference.

There being no further business, the meeting was adjourned.

_____
Secretary

CROP000070

**App. - C, p. 88**

**15-ER-3640**

Donna Taylor                                          February 27, 2001
3730 Nicklaus Drive
Clarkston, Wa. 99403

Dear Ms. Taylor,

AIA is developing a new crop insurance program through a
new company called CropUSA. We will be filing a Form D stock
registration for the agencies who join with CropUSA.

The costs of putting the CropUSA program together in Texas
have been paid. AIA now needs to launch in five new territories next
Month.

AIA requests it be allowed to defer the stock redemption payments
to you for the next five months. Even though redemption is deferred, AIA will
continue to accrue the interest on the interest payments not made.

AIA will agree to work with you to restructure your payments so your
redemption payments are converted to other income so you can set up a SEP or Defined
Benefit plan. When you become a consultant, we can add you to the current
AIA health plan. You will have the option to convert some of your Preferred A
Stock to CropUSA on the same rate as offered to the C stock

It will take a few months to set this all up. We will work with your
Accountant or will introduce you to CPA's here or in Spokane who can set up
the right tax plan.

Your preferred A stock has the highest priority, above the payments
to Reed, the Preferred C, and the common stock.. Reed and John will
guarantee the deferred payments.

Sincerely,

Reed J. Taylor                              R. John Taylor

Accepted _Donna J. Taylor_____

## Exhibit - D

**15-ER-3641**

State of ___Idaho___ )
                              S.S.
County of _Nez Perce_ )

On this 27th day of ___February___, in the year of 20 01, before me

___Diane Whisner___, a notary public, personally appeared

___Reed J. Taylor, R. John Taylor, Donna J. Taylor,___

personally known to me to be the persons whose names are subscribed to the within

instrument, and acknowledged to me that they executed the same.

___Diane R. Whisner___
Notary Public
My Commission Expires on 10-4-2001

(Seal: DIANE R. WHISNER / NOTARY PUBLIC / STATE OF IDAHO)

**App. - C, p. 90**

**15-ER-3642**

CropUSA Insurance Agency, Inc.
Board of Directors
Consent in Lieu of Meeting
August 26, 2004

Whereas, CropUSA Insurance Agency, Inc. owns 205,000 Class C Preferred Shares of AIA Services Corporation, with a par value of $10.00, which CropUSA acquired though an exchange offering with non-employee shareholders; and

Whereas, CropUSA is not allowed to carry the value of the Preferred Shares on its balance sheet at fair market value due to applicable accounting rules; and

Whereas, CropUSA desires to liquidate its investment in the Preferred Shares to provide resources for its expansion plans; and

Whereas, AIA Insurance, Inc. desires to purchase said shares; and

Whereas; the most recent appraised value for the shares is $9.39 per share; and

Whereas, the redemption value is $10.00 per share plus accumulated but undeclared dividends of approximately $551,000, or a total redemption value of $15.51 per share; and

Whereas, the marketability of the shares to a third party would be problematic; and

Whereas, CropUSA desires to sell the shares for an amount less than appraised value or redemption value.

NOW THEREFORE, be it resolved that CropUSA hereby authorizes the sale of 205,000 shares of AIA Services Corporation Series C Preferred Shares to AIA Insurance for the sum of $1,510,693.

Be it further resolved that the officers are hereby authorized to execute such documents as are necessary to effectuate this sale and to deliver the shares to AIA Insurance, Inc. upon receipt of the funds.

The Board adopts this resolution by unanimous consent.

_____          _____
R. John Taylor                                              JoLee K. Duclos

_____
Bryan Freeman

**Exhibit - E**                                                 Crop002226

App. - C, p. 91

15-ER-3643

# CropUSA Insurance Agency, Inc.

## Financial Statements
Year Ending December 31, 2004
And Audited December 31, 2003

**Exhibit - F**

CROP001100

15-ER-3644

## CropUSA Insurance Agency, Inc.

**Balance Sheet**
*In Thousands*

| December 31, | | 2004 | | 2003 |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash | $ | 308 | $ | 4 |
| Commissions receivable | | 12 | | 32 |
| Prepaid Expenses (Note 6) | | 8 | | — |
| Agent advances, net (Note 2) | | 333 | | 275 |
| Due from Related Companies (Note 6) | | 279 | | 6 |
| Office Equipment (net of depreciation) (Note 7) | | 669 | | 6 |
| Investment in AIA Services Corporation (Note 3) | | | | 22 |
| Mortgages (net of depreciation) (Note 7) | | 2,000 | | — |
| Total assets | $ | 3,609 | $ | 345 |
| **Liabilities and Stockholders' (Deficit) / Equity** | | | | |
| **Liabilities:** | | | | |
| Bank note payable (Note 5) | $ | 560 | $ | 560 |
| Accounts payable and accrued expenses | | 60 | | 10 |
| Commissions payable | | 9 | | 40 |
| Lease (Note 7) | | 349 | | — |
| Due to related companies (Note 6) | | — | | 91 |
| Total liabilities | | 978 | | 701 |
| Commitments and Contingencies (Notes 1, 5, 6 and 8) | | — | | — |
| **Stockholders' (Deficit) / Equity:** | | | | |
| Common stock $.01 par value, 20 million shares authorized, 7,394,300 shares issued and outstanding | | 74 | | 74 |
| Common Stock Subscribed, 2 million shares (Note 7) | | 20 | | — |
| Additional paid-in capital (Note 1) | | 3,487 | | 18 |
| Accumulated deficit  (Note 1) | | (950) | | (448) |
| Total Stockholders' (Deficit) / Equity | | 2,631 | | (356) |
| Total liabilities and Stockholders' Equity | $ | 3,609 | $ | 345 |

*See accompanying summary of accounting policies and notes to financial statements.*

4

CROP001103

**15-ER-3645**

# CropUSA Insurance Agency, Inc.

## Statement of Changes in Stockholders' Equity (Deficit)
### In Thousands

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **Balance,** January 1, 2003 | 7,394 | $ 74 | $ 17 | $ (113) | $ (22) |
| Common stock issued for | — | — | 1 | — | 1 |
| Common stock issued for | — | — | — | — | — |
| Net loss | — | — | — | (335) | (335) |
| **Balance,** December 31, 2003 | 7,394 | $ 74 | $ 18 | $ (448) | $ (356) |
| Common stock | — | — | — | — | — |
| Sale of AIA Services Corp Stock (Investment) | | | 1,488 | | 1,488 |
| Common Stock Subscribed | 2,000 | 20 | 1,980 | | 2,000 |
| Net loss | — | — | — | (501) | (501) |
| **Balance,** December 31, 2004 | 9,394 | $ 94 | $ 3,486 | $ (949) | $ 2,631 |

*See accompanying summary of accounting policies and notes to financial statements.*

6

CROP001105

# CropUSA Insurance Agency, Inc.

## Notes to Financial Statements

| | | |
|---|---|---|
| 3. | Investment in AIA Services Corporation | On August of 2004, the company sold its investment in AIA Services (205,000 shares) for $1,510,693 to AIA Insurance, Inc. The sale included an adjustment to Additional Paid In Capital of $1,488,843. |
| 4. | Deferred Income Taxes | The Company's deferred tax assets principally relate to net operating loss carry forwards that are available, within statutory annual limits, to offset future taxable income, if any. These deferred tax assets, which approximated $40,000 at December 31, 2003, were fully reserved by the use of valuation allowance for financial reporting purposes. At December 31, 2003, the Company had net operating loss carry forwards of approximately $113,758 that expire in calendar year 2023. |
| 5. | Bank Note Payable | The Company executed an agreement with a financial institution that was modified in January 2003 to provide for a revolving line of credit. Maximum borrowings under the facility are limited to $750,000. All outstanding borrowings accrue interest at a fixed rate of 5.25% per annum and are personally guaranteed by certain stockholders of the Company. The Company is required to service all accrued interest monthly. As of February 15, 2005 the company re-signed the agreement and extending the terms. |
| 6. | Related Party Transactions | For the year ending December 31, 2003, $39,564 was recognized as a receivable from AIA for payments made in excess of services rendered. On December 31, 2004 CropUSA has a recognized receivable of $274,589, which is the net of all related party transactions between AIA and CropUSA. This receivable will be off set by future salary and other expenses paid by AIA on behalf of CropUSA. |
| | | Additional inter-company disclosures include a receivable from GNCIA for $4,650 on December 31, 2004. |
| | | In addition, the company has disclosed a pre-paid amount of $7,581. This represents pre-paid rent and insurance. |

11

CROP001110

AIA Insurance, Inc.
Board of Directors
Consent in Lieu of Meeting
August 26, 2004

Whereas, CropUSA Insurance Agency, Inc. is owner of 205,000 Class C Preferred Shares of AIA Services Corporation, Par value $10.00, which the Company acquired though an exchange offering with non-employee shareholders; and

Whereas, CropUSA desires to liquidate its investment in the Preferred Shares; and

Whereas, AIA Insurance, Inc., desires to purchase the shares; and

Whereas, the most recent appraised value for the shares is $9.39 per share; and

Whereas, the redemption value is $10.00 per share plus accumulated but undeclared dividends of approximately $551,000, or a total redemption value of $15.51 per share; and

Whereas, AIA desires to purchase the shares at a discount; and

Whereas, CropUSA desires to sell the shares for an amount less than appraised value or redemption value.

NOW, THEREFORE, be it resolved that the Company hereby authorizes the purchase of 205,000 Series C Preferred shares from CropUSA for the sum of $1,510,693.

Be it further resolved that the officers are hereby authorized to execute such documents as are necessary to effectuate this sale and to disburse such funds.

The Board adopts this resolution by unanimous consent.

_____          _____
R. John Taylor                                          JoLee K. Duclos

_____
Bryan Freeman

**Exhibit - G**                                          AIA0001009

**App. - C, p. 96**

**15-ER-3648**

## Campbell, Bissell & Kirby, PLLC
### Attorneys & Counselors at Law

Michael S. Bissell • Licensed in WA, ID & AK
Richard D. Campbell • Licensed in WA, ID & MT
Patrick J. Kirby • Licensed in WA & ID

July 21, 2008

**Via Certified Mail and**
**Regular Mail**

Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc.
111 Main Street
Lewiston, ID 83501

**Re:   Demand of Donna Taylor and Reed Taylor Pursuant to Idaho Code 30-1-742**

Dear Board Members of AIA Services Corporation and AIA Insurance Inc.:

As you know, this firm represents Donna J. Taylor ("Donna"), the Series A Preferred Shareholder in AIA Services Corporation ("AIA Services"), and Reed Taylor ("Reed"), the pledgee of AIA Insurance, Inc. ("AIA Insurance") and creditor of AIA Services who is owed over $8.5 Million.

Donna and Reed hereby make demand upon the Board of Directors of AIA Services and AIA Insurance pursuant to Idaho Code 30-1-742 to take the action described herein. Specifically, demand is made that said entities immediately take action against the law firms of Hawley Troxell Ennis & Hawley; Clements, Brown & McNichols; Quarles & Brady; together with the responsible attorneys of said firms (and any other firms which have wrongfully represented the entities) for violating applicable Rules of Professional Conduct, malpractice, breach of fiduciary duties, and aiding and abetting, including, without limitation, all acts related to or involving the following claims and/or causes of action:

1. Wrongfully simultaneously representing Crop USA Insurance Agency, Inc. ("Crop USA") and AIA Services and AIA Insurance, while knowing these entities had divergent interests;

2. Taking action against the best interests of AIA Services and/or AIA Insurance;

3. Assisting in the commission of fraud and/or illegal activities;

4. Wrongfully allowing interested directors and other interested parties to direct litigation in light of substantial claims against them;

5. Issuing inappropriate opinion letters to lenders and auditors;

6. Failing to recover moneys and/or stock in Crop USA;

509-455-7100 • Fax 509-455-7111 • www.cbklawyers.com
416 Symons Building • 7 South Howard Street • Spokane, Washington 99201

**App. - C, p. 97**

**15-ER-3649**

Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc.
July 21, 2008
Page - 2

7. Preventing claims from being made against present and past directors, including, without limitation, R. John Taylor, Michael Cashman, James Beck and Connie Taylor;

8. Failing to take action against Crop USA to recover funds owed;

9. Failing to take action against responsible present and past directors for violating the corporate opportunity doctrine by permitting Crop USA to become a separate company from AIA;

10. Failing to take action against interested directors and parties who took part in fraud, conspiracy and other illegal activities, including, without limitation, R. John Taylor, James Beck, Michael Cashman and Connie Taylor;

11. Breaching fiduciary duties (including the duty of loyalty) owed to AIA Services and AIA Insurance;

12. Aiding and abetting R. John Taylor, James Beck, Michael Cashman, Connie Taylor, Crop USA, and other interested parties who participated in the misappropriation of assets, opportunities, and funds of AIA Services and AIA Insurance (including the $1.5 Million wrongfully transferred from AIA Insurance to Crop USA);

13. Not ensuring that separate counsel was retained for AIA Services;

14. Not ensuring that separate counsel was retained for AIA Insurance knowing that it was pledged to Reed;

15. Assisting in illegal loan guarantees by AIA Services and/or AIA Insurance;

16. Wrongfully entering into a Joint Defense Agreement knowing that such an agreement was inappropriate in light of the significant claims AIA Services and AIA Insurance have against interested individuals and Crop USA;

17. Wrongfully obtaining shareholder consent to pay the attorneys' fees of past and present directors of AIA Services and AIA Insurance without full disclosure or obtaining votes only from disinterested shareholders;

18. Permitting Michael McNichols and Clements, Brown & McNichols to remain as counsel for R. John Taylor in violation of their duty of loyalty to AIA Services and AIA Insurance;

Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc.
July 21, 2008
Page - 3

19. Assisting in pledging the assets of AIA Services and AIA Insurance to Crop USA for the payment of attorneys' fees and costs of interested parties and others;

20. Permitting the business and employees of AIA Insurance and AIA Services to be detrimentally effected by the actions of interested parties (e.g., transferring AIA Insurance's employees to Crop USA);

21. Failing to take action against R. John Taylor and Connie Taylor for the significant breaches of R. John Taylor's employment agreement with AIA Services;

22. Failing to comply with contractual obligations owed to Reed and Donna;

23. Failing to recover inappropriate salaries, advances, loans, benefits, and compensation paid to R. John Taylor, Connie Taylor, James Beck and others;

24. Assisting in, and failing to take action pertaining to, the improper allocation expenses, labor, rent and other expenditures inappropriately utilized for the benefit of Crop USA.

25. Accepting payments of attorneys' fees in violation of the Rules of Professional Conduct;

26. Representing AIA Services and/or AIA Insurance in making inappropriate arguments (including alleged illegality of the debt to Reed) knowing that such arguments were counter to AIA Services' obligations to Reed and Donna and knowing that Richard Riley was a witness who provided a legal opinion counter to such arguments; and

27. Accepting payment of attorneys' fees and costs which should have been allocated to other parties, including, without limitation, fees and costs that should have been paid by Crop USA, R. John Taylor, James Beck, Michael Cashman and Connie Taylor.

Based upon the above wrongful acts (and others reasonably contemplated from the above acts and other acts known only to insiders at AIA Services and/or AIA Insurance), demand is made upon you to initiate legal action against the above-referenced law firms and lawyers to recover all applicable damages and to require a disgorgement of all attorneys' fees and costs paid to them, including, without limitation, for all inappropriate transactions and the litigation involving Reed and/or Donna. Based upon the foregoing demand is also made for action against R. John Taylor, Michael Cashman, James Beck, Connie Taylor, Crop USA and all other responsible parties for the recovery of damages and the disgorgement of all compensation and attorneys' fees and costs paid to or on their behalf.

Board of Directors
AIA Services Corporation, Inc. and AIA Insurance, Inc.
July 21, 2008
Page - 4

Please note that I have sent a copy of this notice to present counsel for AIA Services and AIA Insurance, and trust that they will ensure copies of this Notice are provided to all board members and shareholders.  I would appreciate it if you would let me know as soon as possible whether AIA Services and/or AIA Insurance will be taking any of the requested action.  The failure to respond or to immediately take action shall be construed as a rejection of the demands made by this letter.

Nothing herein should be considered or relied upon as a waiver of Donna and Reed's right to take immediate action on behalf of AIA Services and/or AIA Insurance due to exigent circumstances.

Very truly yours,

CAMPBELL, BISSELL & KIRBY, PLLC

MICHAEL S. BISSELL

MSB:mah
cc: Gary Babbitt (via email)
 D. John Ashby (via email)
 James Gatziolis (via email)
 Charles Harper (via email)
 Michael McNichols (via email)
 David Gittins (via email)
 Jon Hally (via email)
 Roderick Bond (via email)
 Reed Taylor (via email)
 Donna Taylor (via regular mail)
Data\1312\notice.072108.doc



June 13, 2016

*VIA U.S. Mail and Facsimile (208) 799-9172*

Board of Directors
AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

Board of Directors
AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  83501

**Re:**    *Shareholder Derivative Demand*

Dear Purported Boards of Directors:

As you are well aware, Dale Miesen, Jerry Legg and Donna Taylor (individually and as Personal Representative of the Estate of Sara Taylor) have all been shareholders of AIA Services Corporation since well before 1995, and this firm represents them for purposes of this shareholder derivative demand ("derivative demand").

As you know, there have been, and continues to be, extensive malfeasance, torts and illegal conduct occurring at AIA Services Corporation and AIA Insurance, Inc., and the unlawfully covering up of the foregoing acts, omissions and torts. Consequently, this letter is yet another derivative demand being provided in accordance with Idaho Code, including I.C. §§ 30-1-742 and 30-29-742 (to the extent that the former may apply to certain acts, omissions and/or torts). However, despite my prior requests to inspect documents and records on behalf of the below named shareholders in accordance with Idaho Code, you have refused to allow such inspections to take place or otherwise provide responsive documents. As a result, this derivative demand was delayed and is based only on the most recent information obtained to date.

**App. - D, p. 1**

For purposes of this derivative demand, the following terms shall apply: (a) "AIA" means AIA Services Corporation and its wholly owned subsidiary AIA Insurance; (b) "CropUSA" means CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC; (c) "John" means R. John Taylor and his spouse as to any property transferred to such spouse, together with any entities partially or wholly owned by him (including Green Leaf RE, Reinsurance Partners, Weskan Agency, Pacific Empire Holdings, Sound Insurance and other entities); (d) "Connie" means Connie Taylor, Connie Taylor Henderson, and Connie Wright Henderson and her spouse as to any property transferred to such spouse; (e) "Beck" means James Beck and his spouse as to any property transferred to such spouse; (f) "Cashman" means Michael W. Cashman, Sr. and his spouse as to any property transferred to such spouse; (g) "Duclos" means JoLee K. Duclos and her spouse as to any property transferred to such spouse; (h) "Hawley Troxell" means Hawley Troxell Ennis & Hawley LLP and the applicable present and former attorneys at Hawley Troxell (including, without limitation, D. John Ashby, Gary Babbitt and Richard A. Riley); (i) "Pacific Empire Radio" means Pacific Empire Radio Corporation; (j) "GemCap" means GemCap Lending I, LLC, together with all of its applicable officer(s) and agents; (k) "Combined Defendants" means all of the foregoing parties except as to AIA (but includes attorneys, law firms and agents of AIA), but "Combined Defendants may include or not include Hawley Troxell and/or Pacific Empire Radio to the extent applicable based on certain facts and circumstances and/or when such facts and circumstance ocurred; and (l) "Controlling AIA Defendants" means John, Connie, Beck, Cashman and Duclos.  For each of the foregoing terms which define more than one party, each such term shall also mean any one or more of the defined parties for purposes of demanding in the alternative.

Dale Miesen, Jerry Legg and Donna Taylor hereby demand that all possible claims and legal action be immediately taken in a court of law on behalf of AIA as follows (including claims which may be contemplated and/or related in any way to the following):[1]

1.  Pursue all possible claims and defenses, and seek the maximum damages, against the Combined Defendants, including, without limitation, all possible tort claims (including, without limitation, aiding and abetting in the commission of torts against AIA), contract claims, declaratory relief, injunctive relief and punitive damages based on all acts, omissions, concealments, and failure to disclose. Without limiting the foregoing and so there is no confusion (even though you are well aware of the facts, lawsuits and legal issues as having full access to information at AIA and the most of the Combined Defendants), more specific examples are included below and demand is hereby made to take action against those parties and any of the other Combined Defendants to recover damages based on any of such specific examples.

---

[1] This derivative demand shall also be construed as being provided by any and/or all of the other innocent minority common and preferred shareholders of AIA Services Corporation. The undersigned apologizes for any spelling or grammatical errors, but he wanted to get this derivative demand submitted to AIA as soon as possible.

**App. - D, p. 2**

2.  Pursue all possible claims and defenses against the Combined Defendants relating in any way to all loans, guarantees, settlement agreements and any other agreements or instruments involving GemCap and AIA (including, without limitation, the loans, guarantees, security agreements, settlements, agreements and all other instruments which are the subject matter of the lawsuit *Gemcap Lending I, LLC v. CropUSA Insurance Agency, Inc., et al.*, in the U.S. District Court, Central District of California, Case No. CV 13-05504 SJO (MANx) ("California Lawsuit"). As you know, AIA was barred from guaranteeing any loans for CropUSA or entering into any settlement agreements under AIA Services' amended articles of incorporation and restated bylaws and all agreements and guarantees were not properly authorized by AIA's board of directors (i.e., Donna Taylor's board designee did not authorize the guarantees and settlements). In addition, AIA received no consideration for entering into the guarantees, security agreements or settlement agreements. As a result, demand is further made to assert all possible claims and defenses in any pending and future lawsuits to have the guarantees, instruments, all settlement agreements and judgments declared illegal, ultra-vires acts, void or voidable and thus unenforceable and to pursue all related claims against GemCap, the Controlling AIA Defendants, and any other responsible parties or parties who have aided and abetted or assisted in such acts and/or omissions.

3.  Pursue all possible claims and defenses against GemCap and the other Combined Defendants to recover all property, real property and/or funds transferred or paid to it directly or indirectly from AIA (including, without limitation, the transfer of AIA Services' interest in the mortgage and real property known as the Lewis/Clark Plaza located at 111 Main Street in Lewiston, Idaho), together with all damages, attorneys' fees and costs paid or incurred by AIA based on the foregoing.

4.  Pursue all possible claims and defenses against GemCap, and to the extent necessary any of the other Combined Defendants, to extricate AIA from all settlement agreements entered into with GemCap and have such agreements declared illegal and/or unenforceable as to AIA, including, without limitation, the written Settlement Agreement which was filed by Doug Siddoway in Nez Perce County District Court dated effective September 15, 2014, together with all Assignments Agreements, related agreements, related instruments and judgments relating in any way to that Settlement Agreement and any prior or subsequent settlement agreements (including amendments or modifications thereto) in the California Lawsuit.

5.  Pursue all possible claims and defenses against GemCap, and to the extent necessary any of the other Combined Defendants, to vacate any judgments entered in favor of GemCap against AIA, including, without limitation the judgments entered in the California Lawsuit and any subsequently entered foreign judgments (including, upon belief, the foreign judgment recently entered against AIA Insurance in Nez Perce County District Court). Included in this demand is also the demand to assert that there was no jurisdiction over AIA in the California Lawsuit and thus the judgments should be voided.

**App. - D, p. 3**

6.  Pursue all possible claims and defenses against GemCap for aiding and abetting John, Connie, Beck, Cashman, CropUSA, Pacific Empire Radio any other parties in committing torts against AIA (including assisting in breaches of fiduciary duties, fraud and other torts and covering up such breaches and torts). GemCap was aware of the malfeasance occurring at AIA when it first entered into the loans and guarantees with CropUSA and AIA, that AIA was being used improperly by the Controlling AIA Defendants to fund and/or support entities partially or wholly owned by them, and GemCap became more aware of these facts as time went on, yet GemCap continued to assist the foregoing parties committing and covering up torts against AIA (including, without limitation, breaches of fiduciary duties and fraud).

7.  Pursue all possible claims against the Combined Defendants for their torts committed against AIA (including, without limitation, breaches of fiduciary duties, fraud and any other claims contemplated or related to any of the facts or issues disclosed in this letter) and the aiding and abetting of torts committed against AIA by one or more of the Combined Defendants (including, without limitation, assisting in the commission of the torts or covering up the torts).

8.  Pursue all possible claims against Controlling AIA Defendants requiring them to disgorge all compensation, consulting fees, fees, salary, benefits or any other type of payments made to them directly or indirectly from AIA (including, based on being faithless fiduciaries and/or receiving such compensation without proper authorization from AIA) and to require them to repay any funds, expenses, fees, reimbursements, and costs incurred by AIA or paid by AIA for their benefit in any legal action or matter and to obtain damage judgments for such payments and compensation. Included in this demand is disgorgement or damages for all salary, bonuses, benefits and other compensation paid to John, Beck, Connie, Cashman and Duclos from being an officer, director or other agent of AIA and all attorneys' fees, expenses and costs paid on their behalf. This demand includes the $5,000 per quarter paid to Connie and Beck to purportedly serve on AIA's Board of Directors and all compensation paid to John and Duclos for purportedly being officers and/or directors of AIA.

9.  Pursue all possible claims against GemCap and the other responsible Combined Defendants (including the Controlling AIA Defendants) for all of the attorneys' fees, costs, expenses and damages proximately caused directly or indirectly from GemCap's loans to CropUSA and AIA's guarantees of those loans, including, without limitation, all attorneys' fees, costs and expensed incurred or paid directly or indirectly by AIA for the California Lawsuit and any other lawsuit. But for GemCap agreeing to improperly make the loans and improperly agree to accept AIA's guarantees, none of the lawsuits would have occurred.

10. Pursue all possible claims and defenses against GemCap that it was not a good faith lender, had unclean hands, and/or is not entitled to any relief against AIA.

11. Pursue all possible claims against Hawley Troxell requiring it to disgorge all compensation received or paid to Hawley Troxell directly or indirectly from AIA based on Hawley Troxell's conflicts of interest, breached fiduciary duties (including the duties of loyalty) and related malpractice, including, without limitation, all subsequent payments made by AIA to Hawley Troxell.

12. Pursue all possible claims against Pacific Empire Radio for all sums owed by it to AIA, including, without limitation, the over $1,400,000 owed as disclosed in 2015) and all amounts which have been subsequently improperly lent to Pacific Empire Radio.

13. Pursue all possible claims against the Controlling AIA Defendants for allowing any funds to be lent to Pacific Empire Radio in the first place (including without limitation, for the breaches of fiduciary duties by them as present or former officers and/or directors of AIA and the aiding and abetting in assisting and/or covering up of the improper loans to Pacific Empire Radio). As you are fully aware, these loans violated AIA's amended articles of incorporation, AIA's bylaws, constituted conflicts of interest, provided no benefit to AIA and were made when AIA was not meeting its obligations to others.

14. Pursue all possible claims against Pacific Empire Radio, the Controlling AIA Defendants and any other parties relating to any agreements and subordination agreements improperly entered into between AIA, Pacific Empire Radio and any other party, as such agreements were not authorized by AIA and were not in AIA's best interests.

15. Pursue all possible claims against the Controlling AIA Defendants for allowing John to operate AIA for his benefit and/or to assist AIA in funding and the operation of entities partially or wholly owned by the Controlling AIA Defendants without AIA receiving any benefit, proper compensation, without full disclosure to AIA, in violation of applicable conflicts of interest (including under AIA Services' amended articles of incorporation and bylaws) and without obtaining proper authorization from AIA or its innocent minority shareholders.

16. Pursue all possible claims against the Controlling AIA Defendants and any other responsible party for all damages relating to all payments made directly or indirectly from AIA to the attorneys and law firms of Hawley Troxell, Crumb & Munding, Gordon & Reese, Risley Law Office PLLC, Randall Blake and Cox, Clark and Feeney, Quarles & Brady, Randall Danskin, David Gittins, Connie Taylor (and her law firms Clark and Feeney and Henderson Law Firm) and any other law firm (including for declaratory relief that no further sums are owed by AIA to any of the foregoing and that any fee agreements or conflict waivers are void), as such payments should never have been made, were never authorized by AIA, were not properly incurred or necessary for AIA, were never authorized by AIA's shareholders after full disclosure was made, and involved the attorneys and law firms taking action or performing work not in the best interests of AIA and/or in violation

**App. - D, p. 5**

**15-ER-3657**

of the duty of loyalty owed to AIA. Demand is further made to pursue all possible claims, including, without limitation, for the disgorgement of all fees, costs and expenses paid or discharge of any debts allegedly owed, to any of the foregoing attorneys, law firms and/or attorneys working at such law firms to the extent that they represented AIA based on conflicts of interest, breached fiduciary duties (including the duty of loyalty), and malpractice. To the extent that any of the forgoing law firm and attorneys did not represent AIA, then demand is made to pursue all possible claims against the Controlling AIA Defendants for all sums paid and/or owed to such attorneys and law firms by AIA. In addition, demand is made to assert all possible claims against the foregoing parties for participating and/or allowing AIA to be improperly utilized to fund the defense and prosecution of lawsuits which were not in AIA's best interests, but were instead pursued based on the interests of the Controlling AIA Defendants.

17. Pursue all possible claims against the Controlling AIA Defendants, and to the extent necessary AIA or any other Combined Defendant to ensure that AIA is not bound or obligated by any act or omission of the Controlling AIA Defendants or AIA, for not honoring Donna Taylor's unqualified appointment of a designee to AIA Services' Board of Directors (Patrick Moran and Paul Durant) and for declaratory relief that all such actions purportedly taken by the Board of Directors of AIA Services without the consent or approval of Donna Taylor's designee (who would have been the only director without a conflict of interest) were the unauthorized acts of AIA, ultra-vires and void. Such acts and omissions, include, without limitation, all guarantees and settlements with GemCap, all loans to Pacific Empire Radio, all conflict waivers or other agreements with attorneys and law firms, all board resolutions (including any resolutions provided to GemCap), and all other acts of the purported Board of Directors of AIA Services.

18. Pursue all possible claims against the Controlling AIA Defendants, CropUSA and any other of the Combined Defendants or responsible parties for all payments made to any and all vendors, creditors, consultants, agents, customers or other parties owed money by CropUSA, by the Controlling AIA Defendants, any entity partially or wholly owned by any one of the Controlling AIA Defendants, or paid at the direction of any one or more of the Controlling AIA Defendants, including, without limitation, the more recent hundreds of thousands of dollars in payments AIA made to certain agents and customers of CropUSA in 2013 and any previously or subsequently paid for CropUSA and any other entity.

19. Pursue all possible claims against the Combined Defendants for taking action violating AIA's amended articles of incorporation, violating AIA's bylaws, violating statutory and common law, and committing torts against AIA, together with aiding and abetting others (including other Combined Defendants) in covering up the torts committed against AIA. Examples of the torts and the covering up of those torts are contained with the proposed Second Amended Complaint recently filed in the federal derivative lawsuit by Dale Miesen and Donna Taylor—the facts and torts alleged in that Second Amended Complaint have continued since prior demands.

App. - D, p. 6

20. Pursue all possible claims against the Combined Defendants for failing to properly allocate costs, labor, expenses and other items between AIA and other entities, including, CropUSA, and by allowing such issues to take place in the first place, including, without limitation, based on the conflicts of interest and restrictions under AIA's amended articles of incorporation, bylaws and the undivided duties of loyalty owed by the Controlling AIA Defendants to AIA, among others, and for continuing to conceal and cover up all such issues and related issues.

21. Pursue all possible claims against the Controlling AIA Defendants for all damages, fees and costs incurred or paid by AIA for attempting to effectuate a reverse stock split to eliminate the minority common shareholders of AIA Services in violation of AIA Services' amended articles of incorporation, bylaws and Idaho Code, including, without limitation, the hundreds of thousands of dollars of attorneys' fees and costs paid to Randall Danskin for the improper reverse stock split and to purportedly represent AIA in the subsequent lawsuit against certain of AIA Services' shareholders. Demand is further made to pursue all possible claims against Doug Siddoway (and any other responsible attorney) and Randall Danskin, including, for breach fiduciary duties, conflicts of interest, and disgorgement of all attorneys' fees and costs paid to them and to have declared unlawful or uncollectable any attorneys' fees and costs allegedly owed to them by AIA, including, without limitation, based on their malpractice, breaches of duty of loyalty owed to AIA, conflicts of interest, for aiding and abetting the Controlling AIA Defendants in the commission of torts (including in that lawsuit and others), and taking action in violation of their undivided fiduciary duties of loyalty owed to AIA. To be clear, full and complete disgorgement should be sought and obtained for all fees, costs and expenses paid directly or indirectly by AIA (or by GemCap) to Randall Danskin for all work that it and its attorneys have directly or indirectly performed for AIA and for concealing from AIA the conflicts of interest, breaches of fiduciary duties and malpractice committed by Randall Danskin against AIA—Mr. Siddoway and Randall Danskin placed their interests in earning fees ahead of AIA's interests, are faithless fiduciaries and are not entitled to retain any compensation relating to AIA.

22. Pursue all possible claims against John Munding and Crumb & Munding (or such other firm Mr. Munding is operating through) for malpractice, breach of fiduciary duties and to disgorge all attorneys' fees, costs and expenses paid to them directly or indirectly by AIA for the California Lawsuit as Mr. Munding intentionally violated his duties owed to AIA, including, without limitation, his duties of loyalty owed to AIA and by taking direction and action benefitting other defendants (including John's) and placing their interests in front of AIA and by representing CropUSA, AIA and other parties when there were conflicts of interest in doing so and Mr. Munding knew that he could not properly represent AIA's interests and when he had no intention of doing so. Demand is further made to pursue all possible claims against Mr. Munding and Crumb & Munding for improperly failing to assert that the guarantees and settlement agreements entered into by AIA were not

**App. - D, p. 7**

authorized and were thus illegal or ultra-vires and by allowing AIA to enter into them in the first place. Mr. Munding places his interests in earning fees ahead of AIA's interests.

23. Pursue all possible claims against the Controlling Defendants, the applicable Combined Defendants and any other parties or entities to recover all sums paid directly or indirectly on behalf of any such parties (including the Controlling Defendants) by AIA, including, without limitation, loan payments (including loans paid for John and others), consulting fees (including for past and present employees and/or purported consultants for CropUSA, Sound Insurance, Weskan, AIA (to the extent unnecessary) and other entities or parties, and wages or benefits paid for the foregoing), expenses, costs, litigation expenses, commission refunds, credit card payments (made for John and others) cell phone bills, insurance payments, CropUSA commissions to agents (which was hundreds of thousands of dollars), telephone costs, advances (including to John, Weskan Agency, and others), tax payments, and other payments. As you are aware, the foregoing are easily determined by reviewing AIA's check registers and by ascertaining from John, Duclos or others regarding items not listed in the check registers, including, such information which has never been disclosed to AIA's minority shareholders or their attorneys and all subsequent ones to this demand.

24. Pursue all possible claims against the Controlling Defendants for wasting AIA's assets and funds and paying excessive compensation to any and/or all of them, including, without limitation, for the purpose of concealing and aiding and abetting in the covering up of torts committed against AIA.

25. Pursue all possible claims against the Controlling Defendants for allowing other entities partially or wholly owned by them, including CropUSA, to compete against AIA in violation of John's Executive Officer's Agreement and the undivided duty of loyalty owed to AIA by them as majority shareholders, directors, and/or officers of AIA.

26. Pursue all possible claims against John for representing AIA in any lawsuit, including, without limitation, the lawsuit that Dale Miesen, Donna Taylor and Paul Durant filed against GemCap and AIA to have the illegal guarantees and settlement agreements, which were the subject matter of the California Lawsuit, voided, including, without limitation, claims for intentional breaches of fiduciary duty and intentional malpractice for failing to represent the interests of AIA and by breaching the duty of loyalty owed to AIA.

27. Pursue all possible claims against the Combined Defendants for all damages and relief proximately caused from their acts and/or omissions in leading to the decimation of AIA and its present financial condition.

28. Pursue all possible claims against the Controlling AIA Defendants for any and all damages, tax liabilities, interest, penalties and any other source of damages causes by their acts, omissions and/or torts against AIA.

**App. - D, p. 8**

**15-ER-3660**

29. Pursue all possible claims requiring an accounting of all funds, assets, labor, expenses, costs and the allocation of such items between or among other individuals and parties (including the Controlling AIA Defendants and any entities partially or wholly owned by any one or more them).

30. To the extent necessary, pursue all possible claims and defenses for equitable subordination, indemnification (including equitable indemnification) and all related claims and defenses against the Combined Defendants in any pending or future lawsuit.

31. Pursue all possible claims and relief to obtain an accounting from Trustmark of all payments made to AIA and the subsequent use of such funds.

32. Pursue all possible claims seeking all necessary declaratory relief to make AIA whole and its innocence minority common and preferred shareholders whole (to the extent that shares have been cancelled or redeemed).

33. Pursue all possible claims requiring Donna Taylor's designee to be appointed to the Board of Directors of AIA Services and to require that the board of directors comply with AIA's amended articles of incorporation, AIA's bylaws, statutory and common law and to ensure full disclosure is made to AIA.

34. Pursue all possible claims that CropUSA and other entities (including Pacific Empire Radio) are the alter-ego of the Controlling AIA Defendants and thus they are individually liable for all damages.

35. To the extent John or others of the Controlling AIA Defendants have transferred real or personal property to their present or former spouses or any other party, pursue all possible claims to recover such property for the benefit of AIA and to help satisfy any judgment(s) which may be entered in favor of AIA.

36. Pursue all possible claims to prevent any of the Controlling AIA Defendants from being directors or officers of AIA.

37. Pursue all possible claims to seek declaratory judgment requiring AIA's officers, directors and shareholders to comply with AIA's amended articles of incorporation, AIA's bylaws and statutory and common law.

38. Pursue all possible claims against David Riley and his law firm (including Riley Law Offices) for malpractice and breaching his fiduciary duties owed to AIA, including, without limitation, requiring the repayment of all sums paid to them directly or indirectly from AIA, for disgorgement of all attorneys' fees, costs and expenses paid to them when they breached their fiduciary duties owed to AIA (including the undivided duty of loyalty),

**App. - D, p. 9**

engaged in impermissible conflicts of interest (representing the interests of the Controlling AIA Defendants over the interest of AIA), aided and abetted the Controlling AIA Defendants, and for all other damages (including, without limitation, allowing property owned by AIA to be transferred to others (including GemCap) and/or utilized by the Controlling AIA Defendants).

39. Pursue all possible claims against the Combined Defendants and any and all of the parties listed above for concealing from AIA the facts, conflicts and failing to disclose all necessary facts and claims.

40. Pursue all possible claims against John and Connie relative to litigation expenses and costs paid for other lawsuits (including the lawsuit against John and Connie in Ada County), including fees and costs paid to Connie (or her firm) and/or on behalf of her or John.

41. Pursue all possible claims against the Combined Defendants, which have not been specifically stated above, to recover all damages and money owed and/or traced directly or indirectly to AIA and/or otherwise derived from its labor, office space, trade secrets, funds, commissions, agency force, loans, guarantees, lines of credit and/or any other asset.

42. Pursue all possible claims of prejudgment interest for all sums and damages owed to AIA in the maximum amount permitted under the law.

43. Pursue all possible claims against any of the Combined Defendants or any other parties identified above to recover any attorneys' fees and costs incurred in any lawsuit or litigation directly or indirectly involving AIA.

44. To the extent that the conduct and claims discussed above continues after this derivative demand, to pursue all possible claims based on all future action based upon the same or similar acts, omissions, conduct, claims and damages.

Please note that to the extent that any of the above demands overlap or are duplicative with prior demands or may include acts and claims which occurred after one of the prior demands, Dale Miesen, Jerry Legg and Donna Taylor are not waiving any claims for such prior demands or conceding that you have the right to now address those demands nor are they waiving the right to seek relief based on irreparable harm to AIA. To the contrary, Dale Miesen and Donna Taylor are already asserting, or seeking to assert, many claims on behalf of AIA.

In addition, please note that time is of the essence on many of the above claims and to the extent that AIA is harmed based on your failure to promptly act or promptly reject this derivative demand, you and any others (including other Controlling AIA Defendants) will be held liable. The torts, facts and issues are well known to you and you are in control of the facts and documents. Thus, you bear the risk of dragging out this demand and failing to take action on behalf of AIA.

App. - D, p. 10

Sincerely,

RODERICK BOND LAW OFFICE, PLLC

By: Roderick C. Bond

cc:  Dale Miesen
     Donna Taylor
     Jerry Legg
     Steve Wielend
     Shawnee Perdue

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiffs

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual and the Personal representative of the Estate of Sarah Taylor; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC.;<br><br>          Plaintiffs,<br><br>      v.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation,<br><br>          Defendants. | Civil No. 1:10-cv-00404-CWD<br><br>SECOND AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL<br><br>[PROPOSED] |

**TABLE OF CONTENTS**

I.     STATEMENT OF JURISDICTION ........................................................................ 1

II.    STATEMENT OF VENUE .................................................................................... 1

III.   PARTIES AND DEFINITIONS OF THE PARTIES ............................................. 1

IV.    FACTS .................................................................................................................. 5

A.     The Background Facts Regarding AIA Services and AIA Insurance ................... 5

B.     John, Connie, Beck and Cashman Take Operational Control of AIA and AIA
       Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in
       Its Amended Articles of Incorporation ................................................................. 6

C.     AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer
       CropUSA to Themselves ...................................................................................... 9

D.     The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants
       in Taking CropUSA from AIA and Having AIA Fund CropUSA ...................... 13

E.     The Controlling AIA Defendants Steal $1,510,693 From AIA to Fund CropUSA
       and Then They Use $634,269 of Those Funds to Repay a Debt CropUSA Owed to
       AIA—thereby Resulting in a $2,144,962 Fraud Against AIA. ........................ 15

F.     The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and
       Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal ......... 19

G.     The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and
       Financial Wherewithal with the Improper Assistance from the Hawley Troxell
       Defendants ......................................................................................................... 21

H.     The Controlling AIA Defendants Enter Into Tolling Agreements, but Those
       Tolling Agreements Do Not Save the Hawley Troxell Defendants from the
       Unwaivable Conflicts of Interest ...................................................................... 22

I.     The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA
       and Intentionally Committing Torts against AIA with the Assistance of the Hawley
       Troxell Defendants—Even While this Lawsuit Was Pending ........................... 27

J.     There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants ................................... 31

V.     CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 .......... 35

VI.    COUNT I—BREACH OF FIDUCIARY DUTY ............................................................... 38

VII.   COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES ....... 39

VIII.  COUNT III—LEGAL MALPRACTICE .......................................................................... 40

IX.    COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ ......................................... 42

X.     COUNT V—AIDING AND ABETTING FRAUD ........................................................... 45

XI.    COUNT VI—BREACH OF CONTRACT........................................................................ 47

XII.   COUNT VII—DECLARATORY JUDGMENT ............................................................... 48

XIII.  COUNT VIII—EXCESSIVE COMPENSATION/CORPORATE WASTE .................... 49

XIV.   COUNT IX—ACCOUNT STATED ............................................................................... 50

XV.    JURY DEMAND ............................................................................................................. 51

XVI.   PRAYER FOR RELIEF .................................................................................................. 51

VERIFICATION OF DALE L. MIESEN ................................................................................ 53

VERIFICATION OF DONNA J. TAYLOR ............................................................................ 54

CERTIFICATE OF SERVICE ................................................................................................ 55

Plaintiffs Donna J. Taylor and Dale L. Miesen allege cumulatively and, when necessary and/or applicable, in the alternative, as follows:

### I.    STATEMENT OF JURISDICTION

1.    This Court has jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1332(a)(1), as the amount in controversy exceeds $75,000 and the action, when filed, was between citizens of different states.

### II.    STATEMENT OF VENUE

2.    Venue is proper in the District of Idaho under 28 U.S.C. § 1391(b)(2) as a substantial part of the errors and omissions giving rise to the claims asserted in this Second Amended Complaint occurred in the District of Idaho.

3.    Venue is also proper in the District of Idaho under 18 U.S.C. § 1391(c), as certain of the defendants reside in the District of Idaho.

### III.    PARTIES AND DEFINITIONS OF THE PARTIES

4.    Plaintiff Dale L. Miesen ("Miesen") is a resident of Colleyville, Texas.  Miesen has been a common shareholder of AIA Services during all relevant times.

5.    Plaintiff Donna J. Taylor, as an individual and the Personal Representative of the Estate of Sara Taylor (collectively "Donna"), is a resident of Clarkston, Washington. Donna has been a Series A Preferred Shareholder of AIA Services during all relevant times. Donna has also been a common shareholder of AIA Services during all relevant times, through her beneficial ownership as the Personal Representative of the Estate of Sara Taylor.

6.    Plaintiffs Dale Miesen and Donna J. Taylor are collectively referred to as the "Plaintiffs" in this Second Amended Complaint, and they were innocent minority shareholders.

7.    Plaintiffs are bringing this derivative action on behalf of AIA Services Corporation ("AIA Services"). In addition, Plaintiffs are bringing this action as a double derivative on behalf

AIA Insurance, Inc. ("AIA Insurance"), which is a wholly owned subsidiary of AIA Services. AIA Services and AIA Insurance are collectively referred to as "AIA" in this Second Amended Complaint. The definition of "AIA" includes AIA Services and/or AIA Insurance for purposes of pleading in the alternative, and includes the Plaintiffs to extent they are required to support any derivative cause of action set forth in this Second Amended Complaint.

8.    Defendant AIA Services is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. At all times relevant to this lawsuit, AIA Services is or has been the parent corporation of AIA Insurance.

9.    Defendant AIA Insurance is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. AIA Insurance is, or was at all relevant times, a wholly owned subsidiary of AIA Services.

10.    Defendant CropUSA Insurance Agency, Inc. ("CropUSA") is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. CropUSA was formerly known as AIA Crop Insurance, Inc.

11.    Defendant R. John Taylor ("John") is an individual residing in the state of Idaho. At all times relevant to this lawsuit, John served on the Board of Directors of AIA Services, AIA Insurance, and CropUSA and continues to serve on those boards. John also served as President of each of these corporations during all times relevant to this lawsuit. John is also licensed to practice law in the state of Idaho. John is a common shareholder of AIA Services and a common shareholder of the CropUSA. John also owns shares or ownership interests in other entities that have engaged in inappropriate transactions with AIA and/or which have improperly benefitted from AIA during all relevant times.

///

12.     Defendant James Beck ("Beck") is an individual residing in the state of Minnesota. Beck served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until he resigned in 2014. Beck was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA.

13.     Defendant Michael Cashman, Sr. ("Cashman") is an individual residing in the state of Minnesota. Cashman served on the Board of Directors of AIA Services during certain relevant times. Cashman was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA.

14.     Defendant Connie Taylor Henderson ("Connie") is a resident of Vancouver, Washington. Connie served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2014. Connie jointly owns with John the common shares of AIA Services held in John's name. Connie has actively asserted community ownership of those shares and specifically did so before the district court and on appeal in *Taylor v. AIA Services Corp.*, *et al*.

15.     Defendant JoLee K. Duclos ("Duclos") is a resident of Clarkston, Washington. Duclos has severed as Secretary of AIA Services, AIA Insurance and other entities partially or wholly owned by John during certain relevant times. Duclos served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2007. Duclos is a common shareholder of CropUSA. Duclos has knowledge of the law by and through her training and performing the duties of a paralegal. Duclos has served as John's "lieutenant" during all relevant times.

16.     John, Beck, Cashman, Connie and Duclos are collectively referred to herein as the "Controlling AIA Defendants." The Controlling AIA Defendants have acted in concert and

assisted one another in committing various torts described in this Second Amended Complaint and covering up and/or concealing those torts. The definition of "Controlling AIA Defendants" includes the acts and/or omissions of one or more of John, Beck, Cashman and/or Duclos for purposes of pleading in the alternative.

17.     Defendant Gary D. Babbitt ("Babbitt") is an individual residing in the state of Idaho and is an attorney practicing law in the state of Idaho with and for Hawley Troxell.

18.     Defendant Richard A. Riley ("Riley") is an individual residing in the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

19.     Defendant D. John Ashby ("Ashby") is an individual residing in the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

20.     Defendant Hawley Troxell Ennis & Hawley LLP ("Hawley Troxell") is an Idaho limited liability partnership in the business of practicing law, with its principal place of business in Boise, Idaho. Hawley Troxell has no office in the state of Washington. None of the individual members of Hawley Troxell are residents of Washington. Hawley Troxell, though its attorneys, acted as counsel for AIA Services, AIA Insurance and CropUSA during certain relevant times and in certain lawsuits. Hawley Troxell is also named herein as it is vicariously liable for the acts and/or omissions of Babbitt, Riley, Ashby and its other attorneys.

21.     Babbitt, Ashby, Riley, other Hawley Troxell attorneys, and Hawley Troxell are collectively referred to as the "Hawley Troxell Defendants" in this Second Amended Complaint. The definition of "Hawley Troxell Defendants" includes the acts and/or omissions of one or more of Babbitt, Ashby, Riley, other attorneys at Hawley Troxell and/or Hawley Troxell for purposes of pleading in the alternative.

///

## IV.    FACTS

### A.  The Background Facts Regarding AIA Services and AIA Insurance

22.    In 1983, AIA Services was formed as a closely held Idaho corporation for the purpose of acting as a holding company for various other wholly owned subsidiaries. AIA's business model was to work with farmers and growers to form trusts and/or related cooperatives through various growers and farmers' associations and the members of those associates also becoming members of the trusts and/or cooperatives.

23.    AIA created the Grain Growers Membership & Insurance Trust, the National Contract Poultry Grower's Membership & Insurance Trust, and other, similar trusts. By way of its relationships with these various organizations, AIA held contracts for the exclusive right to market health insurance (*e.g.*, Group Universal Health Policies) and other insurance products to the members of the various trusts and associations.

24.    In 1987, Donna and Reed Taylor, a non-party to this suit, were issued Series A Preferred Shares in AIA Services in connection with their divorce. Pursuant to the dissolution of their marriage, Donna was issued the 200,000 shares of Series A Preferred shares on or about February 12, 1988, and has held those shares ever since, less those shares which have been redeemed in part over the years. (*See* Dkt. #67-1 and #67-2.)

25.    In connection with the issuance of the Series A Preferred Shares to Donna, AIA Services' shareholders adopted amendments to its articles of incorporation with restrictions on the manner in which AIA Services and AIA Insurance could conduct business. (*See* Dkt. #67-3.) AIA Services' amended articles of incorporation included, without limitation, the restrictions that: (a) barred AIA Services and AIA Insurance from guaranteeing any loans for any individual or entities which were not wholly owned subsidiaries; (b) barred certain transactions with shareholders and affiliates; and (c) required AIA Services to maintain certain financial covenants. (*Id.*)

26.     In addition, AIA Services' amended articles of incorporation also provied Donna with the unqualified right as the Series A Preferred Shareholder to appoint a person, to be determined in her sole discretion, to the Board of Directors of AIA Services. (*See* Dkt. #67-3.)

27.     The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the restrictions under AIA Services' amended articles of incorporation for the benefit of AIA Services and the Series A Preferred Shares.

28.     Donna's Series A Preferred Shares have not been fully redeemed to this day, and the restrictions under AIA Services' amended articles of incorporation remain in full force and effect to this day and fully applicable. (*See* Dkt. #67-42, pp. 10-11 ¶ 19.)

### B. John, Connie, Beck and Cashman Take Operational Control of AIA and AIA Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in Its Amended Articles of Incorporation

29.     In 1995, the Controlling AIA Defendants, other than Duclos (although she did assist the Controlling AIA Defendants as an employee and officer (assistant secretary) of AIA), spearheaded a transaction to redeem Reed Taylor's majority common stock interest in AIA Services. (*See* Dkt. 67-5 and #67-6.)

30.     As part of the redemption, Beck, Cashman and certain of their friends acquired Series C Preferred Shares in AIA Services. When AIA Services amended its articles of incorporation to allow the issuance of the Series C Preferred Shares, AIA Services included additional restrictions in its articles of incorporation. Riley assisted and/or approved these restrictions and he was fully aware of them.

31.     Under the new and additional restrictions in AIA Services' amended articles of incorporation (these restrictions were in addition to others adopted in connection with the issuance of Donna's Series A Preferred Shares), AIA Services was barred from doing a number of corporate

actions, including, but not limited to: (a) AIA Services could not acquire any common shares from any shareholders unless all dividends due on the Series C Preferred Shares has been paid (10% dividend per year) or those funds set aside; (b) the Series C Preferred Shareholders had the right to elect one director to AIA Services' Board of Directors; and (c) if any Series C Preferred Shares are redeemed, such redemptions must be equally from all shareholders. (*See* Dkt. #67-3.)

32.    Although the Series C Preferred Shares held by Beck, Cashman and their friends were eventually unlawfully and effectively redeemed by AIA, other Series C Preferred Shares were later issued to the AIA Services 401(k) Plan and those shares remain issued and outstanding to this day and no dividends have been paid as required since approximately 1997. As a result, these new restrictions under AIA Services amended articles of incorporation for the benefit of AIA Services and the Series C Preferred Shares, which have remained in full force and effect to this day.  The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the additional restrictions under AIA Services' amended articles of incorporation.

33.    Upon the redemption of Reed Taylor's majority common shares, Beck, Cashman, John and Connie directly or indirectly became the majority common shareholders of AIA Services. (*See* Dkt. #67-5.) In addition, Beck, Cashman and John entered into a Voting Agreement to ensure that they would maintain control of AIA Services' Board of Directors. As a result, the Controlling AIA Defendants have maintained operational control of AIA from 1995 through the present time.

34.    In connection with the redemption of Reed Taylor's shares, John entered into an Executive Officer's Agreement with AIA Services, which guaranteed him certain salary payments and other compensation for three years; that agreement also contained non-compete and non-solicitation provisions. (*See* Dkt. #67-8.) John's salary after the first three years was required to be determined by AIA Services' Board of Directors, which was never done after the first three years.

**App. - D, p. 21**

35.     From 1999-2012, John improperly paid himself millions of dollars pursuant to his Executive Officer's Agreement for his and Connie's benefit (the amount of which in itself was improper based on AIA's business prospects and John's inability to do anything for the benefit of AIA), while he intentionally and repeated violated the non-compete and non-solicitation provisions of his Executive Officer's Agreement.

36.     In connection with the redemption of Reed Taylor's shares in August 1995, AIA Services contributed funds to The Universe Life Insurance Company, which was a wholly owned subsidiary of AIA Services, in order to make AIA Insurance, which was then a wholly owned subsidiary of The Universe Life Insurance Company, a subsidiary of AIA Services. After that transaction, AIA Insurance became a wholly owned subsidiary of AIA Services.

37.     As a result, from August 1995 through all relevant times, AIA Insurance was a wholly owned subsidiary through which AIA Services derived its commissions and administrative fees from insurance policies, which accounted the bulk of AIA's revenues and profits.

38.     From 1995 through 2005, AIA Insurance generated over $65 million in revenues from commissions (over $33 million) and administrative fees (over $27 million), and it continued to generate revenues thereafter.

39.     From 1995 through all relevant times, each of the Controlling AIA Defendants has served at various times on the Board of Directors for AIA Services, AIA Insurance and/or CropUSA, while John has continuously served as the President of AIA and Duclos has continuously served as a Secretary of AIA.

40.     From 1999 through certain relevant times, the Controlling AIA Defendants have also served from time to time on purported "advisory board" of CropUSA, which actually made the decisions on behalf of AIA and CropUSA. Specifically, Cashman, Beck and John served on

**App. - D, p. 22**

the "advisory board" of CropUSA from 1999 through certain relevant times.

41. The Controlling AIA Defendants intentionally concealed from AIA and its minority shareholders of the existence and authority of the "advisory board" of CropUSA.

**C. AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer CropUSA to Themselves**

42. By 1998, AIA's ability to sell health insurance had been impaired by undercapitalization in its underwriting subsidiary the Universal Life. Accordingly, the company considered proposals to sell other forms of insurance, and in particular crop insurance, to be underwritten by other insurance companies. At a 1998 Board Directors of Meeting, AIA Services' Board of Directors specifically discussed selling crop insurance and elected to have AIA pursue selling crop insurance.

43. In 1999, AIA, then under the control of Controlling AIA Defendants, began selling crop insurance through a wholly owned subsidiary of AIA Services formed under the name "AIA Crop Insurance, Inc."

44. The first purported meeting of shareholders of AIA Crop Insurance, Inc. ("AIA Crop Insurance") was held on January 11, 2000. The first purported meeting of the AIA Crop Insurance's Board of Directors was held on the same day. The purported minutes of the shareholder's meeting indicate that John, not the true owner AIA Services, claimed to be the sole shareholder of AIA Crop Insurance at the time of incorporation; these facts were concealed from AIA and AIA Services' innocent minority shareholders.

45. Upon information and belief, at or shortly after the time of its formation, the Hawley Troxell Defendants began providing legal services to AIA Crop Insurance.

46. At a special meeting of the shareholders of AIA Crop Insurance held on November 13, 2000, AIA Crop Insurance was renamed CropUSA in an apparent attempt to conceal its

corporate lineage and origins.

47.     The minutes of the November 13, 2000, special meeting of the shareholders also show that John continued to claim that he was the sole shareholder of CropUSA, while he was simultaneously representing in business plans provided to others that CropUSA was a subsidiary of AIA Insurance. (*See* Dkt. # 67-66.)

48.     At the time CropUSA was formed, John was employed by AIA Services under an Executive Officer's Agreement, dated August 1, 1995, Dkt. #67-8, which contained express covenants not to compete. Upon information and belief, John's Executive Officer's Agreement and AIA Service's amended articles of incorporation and restated bylaws were drafted and/or approved by Riley, and he had full knowledge of the restrictions under the terms of the foregoing documents.

49.     CropUSA held its purported annual shareholder's meeting on January 10, 2001. By this time, the illegal "spin off" of CropUSA had been accomplished by having AIA Service's Series C Preferred Shareholders (primarily Beck and Cashman) exchange their Series C Preferred Shares for common shares in CropUSA (if CropUSA were in fact an independent entity, these maneuvers would have been completely unnecessary).

50.     The minutes for the shareholder meeting held on January 10, 2001 for CropUSA revealed that CropUSA had retained Hawley Troxell as its advisor and SEC counsel and, upon information and belief, the Hawley Troxell Defendants have served continuously as CropUSA's attorneys in one form or the other ever since. According to the minutes, negotiations between AIA Services and CropUSA had resulted in an agreement whereby AIA Services would no longer operate CropUSA as a subsidiary.

///

51.     However, the negotiations referred to in the January 10, 2001 shareholder meeting minutes for CropUSA did not in fact occur. There was no decision, nor has there ever been a decision, on the part of AIA Services to discontinue the subsidiary status of CropUSA. The January 10, 2001 meeting minutes for CropUSA were concealed from AIA.

52.     None of the preferred or common shareholders of AIA Services (other than those present at the January 10, 2001 meeting) were given notice of or the opportunity to approve or oppose this corporate action; instead, it was concealed from them and AIA.

53.     In spite the fact that John asserted on January 10, 2001 that CropUSA would no longer be a subsidiary of AIA Services, John wrote in a letter dated February 27, 2001 sent on behalf of AIA to Donna that "AIA is developing a new crop insurance program through a new company called CropUSA." (The letter went on to state that "[t]he costs of putting the CropUSA program together have been paid. AIA now needs to launch five new territories next Month"). This January 27, 2001 letter constituted an unambiguous representation by John to AIA and Donna that CropUSA was a subsidiary of AIA and was being operated for the benefit of AIA and implicitly to AIA Services' innocent minority shareholders (which included Donna). This representation to AIA and Donna was false, and John knew it was false. Upon information and belief, the other Controlling AIA Defendants were aware of this January 27, 2001 letter and the misrepresentations contained within the letter.

54.     Notwithstanding the fact that John was obligated under the terms of his Executive Officer's Agreement that required that he not compete with AIA Services, and notwithstanding the fact that he owed fiduciary duties to the AIA and AIA Services' shareholders, John set forth his plans to exploit the assets of AIA for the benefit of CropUSA (and himself as the majority purported shareholder) in the purported minutes of the purported January 10, 2001 meeting.

55.     The January 10, 2001 meeting minutes reveal that CropUSA authorized its officers to execute a Master Marketing Agreement with AIA Insurance that would allow CropUSA access to all of AIA's customers and customer lists, as well as all of AIA's trade secrets. AIA received no consideration for conveying this access or to enter into these agreements.

56.     CropUSA's officers (including John) were also purportedly authorized to enter into a Management Agreement with AIA Insurance wherein AIA Insurance purportedly agreed to provide management and administrative support to CropUSA without charge. However, John has since testified under oath that AIA's Board of Directors never authorized this agreement, although the Board has acquiesced in the action.

57.     AIA itself was never given notice of the Master Marketing Agreement and the Management Agreement, nor was AIA given the opportunity to approve or reject these agreements. Each of these agreements, when executed, constituted a violation of John's Executive Officer's Agreement, which contains a strict non-compete clause. Each of these agreements also constituted a direct breach of fiduciary duty or aiding and abetting same on behalf of each of the Controlling AIA Defendants in the commission of torts against AIA.

58.     Meanwhile, in 2001, John and Connie acquired a parking lot for $8,000 using AIA's line-of-credit. Upon information and belief, AIA was required to maintain control of the parking lot as part of its lease with Washington Bank Properties. John then increased the rent that AIA paid to use the parking lot to benefit him and Connie. For example, although John and Connie paid only $8,000 for the parking lot, they subsequently charged AIA $60,750 in rent to use the parking lot from 2004 through 2006. These unfair and self-serving rental payments to John and Connie were concealed from AIA and AIA Services' innocent minority shareholders and were never disclosed to either of them, as was their purchase of the parking lot.

**App. - D, p. 26**

**D. The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants in Taking CropUSA from AIA and Having AIA Fund CropUSA**

59.     Upon information and belief, the Hawley Troxell Defendants were providing legal services to CropUSA and/or its board of directors as of January 10, 2001, and such providing of legal services has continued through the date of this complaint.

60.     Upon information and belief, from January 10, 2001, and continuing through the period relevant to this lawsuit, the Hawley Troxell Defendants had knowledge of John's Executive Officer's Agreement with AIA Services, had knowledge of the conflict of interest provision in AIA's bylaws, and had knowledge of restrictions in AIA's articles of incorporation, but intentionally refused to comply with them and assisted John in violating them or covering up the violations.

61.     The Hawley Troxell Defendants knew or should have known that the purported Master Marketing Agreement and Management Agreement constituted breaches of John's Executive Officer's Agreement, violations of AIA Service' amended articles of incorporation, violations of AIA Services' restated bylaws, and constituted breaches of John and the other Controlling AIA Defendants' fiduciary duties owed to AIA and AIA Services' minority shareholders.

62.     Upon information and belief, the Hawley Troxell Defendants were also representing CropUSA from January 10, 2001, to the present, and by way of that representation they breached their fiduciary duties to AIA (including their undivided duty of loyalty owed to AIA) and took steps that materially assisted John and the Controlling AIA Defendants in the commission of the various torts described in this complaint and assisted in the concealment of those torts.

///

**App. - D, p. 27**

63.     Beginning in 1999 and continuing through the date of this Complaint, CropUSA has been funded and operated with assets improperly transferred from AIA, including, but not limited to, operating capital, office space, customer lists and other trade secrets, agents and staff, goodwill and other assistance. CropUSA paid nothing for these assets.

64.     The Controlling AIA Defendants, except Duclos, were all shareholders of AIA at the time CropUSA was formed and later purportedly became shareholders of CropUSA.

65.     The Controlling AIA Defendants, except Duclos (although she improperly took part in the meetings and acted as the Secretary) and Connie, all served on a purported "advisory board" of CropUSA and/or AIA, and this advisory board exercised actual control over CropUSA and AIA. By exercising control over these entities and committing acts that benefitted CropUSA at the expense of AIA, the Controlling AIA Defendants engaged in a conspiracy to defraud AIA, which have right and title to the property of CropUSA.

66.     Due to the fact that the Controlling AIA Defendants have complete control over AIA and would never assert claims against themselves on behalf of AIA, the adverse dominion doctrine applies to all claims asserted herein, thereby barring any defense based on a statute of limitations. *Freeland v. Enosis Corp.,* 540 F.3d 721 (7th Cir. 2008).

67.     On January 10, 2002, CropUSA purportedly entered into a Memorandum of Understanding with the Controlling AIA Defendants. Under the terms of this memorandum, Beck and Cashman were obligated to guarantee loans on behalf of CropUSA.

68.     Notably, Beck and Cashman had also been obligated to guarantee over $1,000,000 in loans on behalf of AIA since 1995, but they never did. Notwithstanding this obligation, the Controlling AIA Defendants subsequently arranged for AIA to guarantee CropUSA's lines of credit even though the guarantees were barred by AIA's amended articles of incorporation and

bylaws.

69.      In 2004, the Controlling AIA Defendants attempted to raise capital for CropUSA by selling shares in CropUSA to private investors by way of a $10,000,000 private placement. The Hawley Troxell Defendants drafted the July 15, 2004, Private Placement Memorandum, despite their knowledge of the illegal "spin-off" of CropUSA and the fiduciary duties they owed to AIA.

70.      When CropUSA began distributing the Private Placement Memorandum in 2004, the company was experiencing financial difficulties that made it difficult, if not impossible, to attract investors to the private placement.

71.      In addition, in 2004, the CropUSA's lack of adequate funding threatened its ability to participate in the Federal Crop Insurance program. To alleviate these problems, the Controlling AIA Defendants would improperly turn to AIA to obtain the necessary funding.

E.   **The Controlling AIA Defendants Steal $1,510,693 From AIA to Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt CropUSA Owed to AIA— thereby Resulting in a $2,144,962 Fraud Against AIA.**

72.      In order to boost CropUSA's balance sheet for the purpose of operating the company, attracting investors and maintaining access to the Federal Crop Insurance program, the Controlling AIA Defendants devised a scheme to illegally transfer $1,510,693 from AIA Insurance to CropUSA.

73.      The Controlling AIA Defendants conspired with each other in the formation and execution of this scheme to unlawfully transfer $1,510,693 of AIA's funds to CropUSA, and aided and abetted one another in carrying out the scheme and ultimately covering it up.

74.      Upon information and belief, the Hawley Troxell Defendants provided counsel to CropUSA with respect to the unlawful transfer of funds and/or has at a minimum assisted in covering up the facts of this illegal transfer.

75.     The scheme involved money derived from AIA Insurance. In August, 2004, AIA Insurance received a payment of $1,510,693 from Trustmark. (*See* Dkt. #67-59.) Rather than deposit the payment of $1,510,693 into the account of AIA Insurance, where it would have benefited AIA and its innocent shareholders, John deposited the funds into a new account entitled "AIA Insurance Inc. CropUSA." (*See* Dkt. #67-60.) The address for this account coincided with the address for John's personal residence at 2020 Broadview Drive in Lewiston, Idaho, rather than any address used by AIA. (*Id.*)

76.     Shortly after diverting the $1,510,693 into the "AIA Insurance Inc. CropUSA" account, the Controlling AIA Defendants illegally transferred the funds to CropUSA. The Controlling AIA Defendants attempted to disguise this conversion of AIA Insurance's funds by characterizing the transaction as an alleged purchase by AIA Insurance of Series C Preferred Shares in its parent corporation, AIA Services. (*See* Dkt. #67-59.) Then, the Controlling AIA Defendants carried AIA Insurance's alleged investment in the Series C Preferred Shares as having a purported value of $1,510,693 when that was not the true value of the shares.

77.     However, as the Controlling AIA Defendants acknowledged at the time, there was no market for the Series C Preferred Shares which were purportedly being repurchased. At the time the $1,510,693 in funds were converted by CropUSA, there was no authorization of any kind for the transaction, and the transaction was concealed from AIA.

78.     In order to create a plausible explanation for the transfer of the $1,510,693, CropUSA eventually produced a document designated as a Consent in Lieu of Meeting dated August 26, 2004. (*See* Dkt. #67-61.) However, this document itself is completely fraudulent, as it was retroactively created the following year in order to deceive auditors who questioned the validity of this transaction.

**App. - D, p. 30**

79.     In addition, this $1,510,693 purported repurchase of shares separately violated the terms of AIA Services' amended articles of incorporation, which required that all Series C Preferred Shares be redeemed equally and simultaneously from all shareholders. (*See* Dkt. #67-3.) Instead of repurchasing an equal portion of the Series C Preferred Shares from AIA Services' 401(k) Plan, the Controlling AIA Defendants intentionally only repurchased the Series C Preferred Shares held by CropUSA (which had been previously held by Beck, Cashman and their friends).

80.     CropUSA was carrying these Series C Preferred Shares in AIA Services on its books with a value of $21,693, which means that CropUSA realized a gain of $1,489,000 on this purported sale of shares. (*See* Dkt. #67-59.) At that time, although the Controlling AIA Defendants had not properly accounted for all funds, assets, labor and other costs advanced from AIA for CropUSA, they had actually accounted for there being a debt of $634,269 owed by CropUSA to AIA.

81.     After unlawfully transferring the $1,510,693 received by AIA Insurance to CropUSA, the Controlling AIA Shareholders had CropUSA repay the $634,269 debt owed to AIA, thereby committing a double fraud upon AIA, i.e., AIA should have the $1,510,693 in its bank account now and it should have never lent the $634,269 to CropUSA in the first place. In other words, those fraudulent transactions alone resulted in the loss of $2,144,962 in funds to AIA and thus damaged AIA in the amount of $2,144,962. The Controlling AIA Defendants have actively concealed, or covered up, these transactions from AIA with the assistance of the Hawley Troxell Defendants.

82.     AIA and the innocent shareholders of AIA Services were never given notice of the 2004 stock transaction, nor were any proper board meetings held to approve the transaction. However, as with the fraudulent document prepared on behalf of CropUSA, a fraudulent Consent

if Lieu of Meeting, dated August 26, 2004, was prepared on behalf of AIA. This document was actually produced several months after the transaction and was created to deceive auditors.

83.     Upon information and believe, the Hawley Troxell Defendants provided legal services to both AIA and CropUSA at the time of the 2004 transaction or had actually knowledge of the 2004 transaction.

84.     The Hawley Troxell Defendants at various times, as purported counsel for AIA, failed to disclose to AIA the 2004 transaction to transfer $1,510,693 to CropUSA and that the acts of the Controlling AIA Defendants constituted an intentional breach of their fiduciary duties (including the duty of loyalty) owed to AIA and a concealment of a prohibited transaction. For this reason alone, the Hawley Troxell Defendants could not reasonably rely on a tolling agreement to represent AIA, CropUSA and the interest of the Controlling AIA Defendants in later litigation.

85.     The Hawley Troxell Defendants failed to disclose to AIA, or to anyone else, that this $1,510,693 transaction was unlawful on many levels, including but not limited to the fact that it did not comply with articles of incorporation and bylaws, caused a breach of AIA's other contracts, and could not be justified by the balance sheet of either AIA Insurance or CropUSA. Upon information and belief, the Hawley Troxell Defendants had knowledge of the back-dated Consent in Lieu of Meeting documents.

86.     On February 16, 2005, Beck sent an email to John and Cashman confirming the Controlling AIA Defendants' scheme to steal CropUSA in an effort to profit: "[Cashman] and I are so convinced that CropUSA is a winner that anything standing in the way of a good result will be a crime." (Dkt. #67-54.) The crime was stealing CropUSA from AIA and then to drain AIA of its funds and assets to pursue the Controlling AIA Defendants' scheme.

///

**App. - D, p. 32**

**F.** **The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal**

87. After unlawfully taking $2,144,962 from AIA Insurance in 2004, the Controlling AIA Defendants continued to operate CropUSA with assets both tangible and intangible that rightly belonged to AIA, continued to improperly subsidize CropUSA with AIA's labor, and continued to conceal their actions from AIA and AIA Services' innocent minority shareholders.

88. Under the management and direction of the Controlling AIA Defendants, AIA regularly failed to allocate costs to CropUSA and other entities and failed to charge markup, interest or profit on costs paid for other entities. For example, John's own salary of $250,000 was allocated entirely to AIA Services even though John's contractual right to salary from AIA Services had expired in 1998 and had never been renewed by an authorized board. (And, further, John performed no actual work for AIA during the time in question.)

89. John, with the knowledge and complicity of the other Controlling AIA Defendants, also performed work for other entities owned in full or in part by him while on AIA's payroll, i.e., Pacific Empire Radio Corp., Pacific Empire Communications Corp., Pacific Empire Holdings Corp., Radio Leasing I LLC and Radio Leasing II LLC. John also had other AIA employees work for these entities without compensation to AIA. These facts, like virtually all of the others referenced in this Second Amended Complaint, were concealed from AIA and AIA Services' innocent minority shareholders.

90. Between its founding in 1999 and the filing of this lawsuit, CropUSA and other entities generated tens of millions of dollars of revenue (including premiums) and other benefits that would have flowed to AIA but for the unlawful and unauthorized acts of the Controlling AIA Defendants.

///

**App. - D, p. 33**

91.     As of 2006, John owed AIA at least $307,000 for personal loans he had taken from AIA Services. For several years, John concealed these loans by engaging in false accounting whereby loans to him were treated as payments of principal on AIA Service' indebtedness due to Reed Taylor on his $6 million promissory note (which was later ruled to be illegal).  In 2006, John "corrected" an accounting "error" by increasing the balance due on Reed Taylor's note to $6 million. John has still not repaid his personal loans.

92.     Over the years, John had AIA pay his personal maid, his personal credit card bills, donations, cash advances, family cell phone bills, and other personal expenses. John also had AIA purchase several vehicles from him, and he continued to drive these vehicles after the sales and purchase other vehicles with AIA's funds to use for his benefit when there was no reason to do so. John also had AIA employees perform work on his personal residence and on other real property not owned by AIA. These acts were all committed with the knowledge and complicity of the Controlling AIA Defendants and without paying AIA the fair value of the services or expenses.

93.     At year-end 2006, AIA had improperly lent $95,000 to Pacific Empire Radio Corp., a corporation partially owned by John and Connie and in which they both served as directors at certain times. The Controlling AIA Defendants transferred that $95,000 receivable from AIA to CropUSA. Before it was over, AIA would lend over $1,400,000 in additional funds to Pacific Empire Radio Corp., when all such loans violated AIA Services' amended articles of incorporation and were not authorized under the circumstances by AIA Services' restated bylaws.

94.     In August 2007, AIA settled litigation with the state of Idaho whereby AIA received a mortgage worth approximately $1.5 million for the amounts owed by Washington Bank Properties on the real property where AIA's offices are located. Although AIA Insurance paid the

costs of this litigation, the Controlling AIA Defendants, with the assistance of the Hawley Troxell Defendants, improperly titled the note in the name of AIA Services only, and then pledged the note to CropUSA so that the Controlling AIA Defendants could borrow money to pay their attorneys' fees and costs incurred defending in *Taylor v. AIA Services Corp., et al.*, to the Hawley Troxell Defendants.

95. As with the 2004 transactions, the transaction pledging the mortgage owned by AIA Services to CropUSA for purportedly paying the Hawley Troxell Defendants' attorneys fees and costs incurred representing AIA, CropUSA and the Controlling AIA Defendants was a blatant misappropriation and/or illegal pledging of AIA's asset. The loan documents and the pledge agreement were drafted by the Hawley Troxell Defendants, although they later asserted that they were only "scriveners" for the transaction. This transaction was improper and barred by AIA's amended articles of incorporation and bylaws.

G. **The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and Financial Wherewithal with the Improper Assistance from the Hawley Troxell Defendants**

96. On October 26, 2007, the Hawley Troxell Defendants drafted and delivered an opinion letter falsely representing that AIA Insurance was authorized to guarantee a $15,000,000 line of credit on behalf of CropUSA, which carried a hard-money loan exorbitant interest rate.

97. The Hawley Troxell Defendants' opinion letter was delivered for a loan guarantee which violated AIA Services' amended articles of incorporation, its restated bylaws and AIA Insurance's bylaws, and in violation of the duty of loyalty owed by the Hawley Troxell Defendants to AIA.

98. Additionally, Lancelot, the lender for this $15,000,000 line of credit was subsequently exposed as a Ponzi scheme, and its founder, Gregory Bell, pleaded guilty to criminal

**App. - D, p. 35**

charges in federal court. Mr. Bell was the signee for Lancelot on the $15,000,000 line of credit. These facts pertaining to the $15,000,000 loan for CropUSA and AIA Insurance's guarantee of that loan, along with other transactions, were never disclosed to AIA by the Hawley Troxell Defendants or the Controlling AIA Defendants and the payment of interest on that loan was detrimental to AIA because most of CropUSA's assets could be traced directly to AIA (and the depletion of CropUSA's funds resulted in less funds available to recover).

**H. The Controlling AIA Defendants Enter Into Tolling Agreements, but Those Tolling Agreements Do Not Save the Hawley Troxell Defendants from the Unwaivable Conflicts of Interest**

99.     In 2007, Reed Taylor filed suit against AIA and certain of the Controlling AIA Defendants, asserting claims for breaches of contract, breaches of fiduciary duties, conversion, fraud and other claims ("*Taylor v. AIA Services Corp., et al.*"). In 2007, the Hawley Troxell Defendants appeared as counsel for AIA Services and AIA Insurance in that lawsuit. Later, Reed Taylor amended his complaint and named CropUSA as a defendant, after recognizing that millions of dollars had been transferred to it from AIA, among other improper transactions (including some of those transactions described in this Second Amended Complaint). (*See* Dkt. #82-2.) The Hawley Troxell Defendants also appeared and represented CropUSA in that lawsuit. (*Id.*)

100.    As the purported attorneys for AIA, two entities, the Hawley Troxell Defendants owed duties of loyalty, care, and good faith to AIA and the Hawley Troxell Defendants breached their duties of care and fiduciary duties by engaging in the simultaneous representation of the Controlling AIA Defendants, AIA, CropUSA, and other parties with interests adverse to AIA (including Bryan Freeman).

101.    In 2007, Connie and Beck were appointed the Boards of Directors of AIA Service and AIA Insurance by John. Connie and Beck were paid $5,000 per quarter to sit on the Boards of

**App. - D, p. 36**

**15-ER-3688**

AIA and also receives shares for his "service." Beck later testified that he serves on this board to protect his own interests and those of his friends (the same friends who previously acquired Series C Preferred Shares in AIA Services and illegally exchanged them for common shares in CropUSA).

102.    In 2007 and 2008, the Controlling AIA Defendants entered into written tolling agreements in connection with the various litigation directly or indirectly involving AIA. The Hawley Troxell Defendants were improperly involved with and/or facilitated the Controlling AIA Defendants entering into such tolling agreements for the purpose of allowing the Hawley Troxell Defendants to continue to represent AIA, CropUSA and directly or indirectly certain of the Controlling AIA Defendants.

103.    By tolling the statute of limitation for claims against the Controlling AIA Defendants, the Hawley Troxell Defendants sought to use the tolling agreements to authorize the waiver of their conflicts of interest representing AIA, CropUSA and the interests of the Controlling AIA Defendants in litigation that could have and should have exposed the fraud and intentional breaches of fiduciary duties committed by the Controlling AIA Defendants.

104.    The purpose of a properly drafted and executed tolling agreement is to allow conflicts of interest to be waived under certain limited permissible circumstances in order to waive a conflict of interest so that an attorney or law firm can represent clients with diverging interests. Those limited permissible circumstances were not present here.

105.    The Hawley Troxell Defendants knew or should have known that the Controlling AIA Defendants had committed intentional acts of fraud and breaches of fiduciary duties (including the duty of loyalty) owed to AIA. The Hawley Troxell Defendants knew or should have known that by allowing the Controlling AIA Defendants to continue to operate and control AIA

**App. - D, p. 37**

that they would continue to conceal their past torts and likely continue to commit new torts, which is precisely what occurred here as demonstrated by the facts alleged in this Second Amended Complaint.

106.    Although these tolling agreements tolled the statute of limitations for claims AIA could assert against the Controlling AIA Defendants (which eliminates any defense they may have to assert any statute of limitations defenses), the facts set forth in this Second Amended Complaint provide a classic example of why such tolling agreements were improper under the circumstances as the agreements involved tolling intentional torts committed against AIA. While the claims were being tolled, the Controlling AIA Defendants' continued to unlawfully use AIA's cash, resources and ability to borrow funds to funds other businesses and pay compensation to themselves.

107.    During the course of the litigation in *Taylor v. AIA Services Corp.*, *et al*., Reed Taylor attempted to negotiate a settlement, but he insisted that any settlement must include full disclosure to, and authorization by, AIA Services minority shareholders and to allow them to participate in CropUSA common share ownership. (*See* Dkt. #67-18.) Not only did the Controlling AIA Defendants and Hawley Troxell Defendants reject Reed Taylor's offer, but they still refused and failed to provide full disclosure to AIA and its innocent shareholders of the malfeasance and torts committed against AIA. The untenable position of the Hawley Troxell Defendants was confirmed when the only person seeking to obtain full and fair disclosure was a creditor, Reed Taylor. (*Id.*)

108.    During the course of *Taylor v. AIA Services Corp, et al.*, Connie and Beck represented to Judge Brudie, the Idaho Supreme Court and AIA that the redemption of Reed Taylor's shares should be illegal to benefit AIA Services' minority shareholders. (*See* Dkt. #67-23 and #67-25.)

109.   After Judge Brudie ruled the redemption of Reed Taylor's shares was illegal, neither Connie, Beck nor any of the other Controlling AIA Defendants did anything for the minority shareholders of AIA nor did they ever have any intention of helping them, contrary to what they had represented to Judge Brudie and the Idaho Supreme Court.

110.   Instead of sharing equally in AIA's assets with AIA Services' innocent minority shareholders, the Controlling AIA Defendants later sought to eliminate those minority shareholders for only ten cents per share, even though Connie and John both previously valued the shares much higher even after considering the over $6 million owed to Reed Taylor at the time of valuation (a debt that was later ruled to be illegal and void). (*See* Dkt. #67-24 and #67-50.)

111.   Riley was an attorney at the law firm of Eberle Berlin at the time of the redemption of Reed Taylor's shares in 1995 and he breached his duty of care by advising AIA Services and Reed Taylor[1] to enter into the illegal stock redemption transaction. *See Taylor v. AIA Servs. Corp.*, 151 Idaho 552, 261 P.3d 829 (2011).

112.   The illegal redemption of Reed Taylor's common shares ultimately led to AIA incurring over $1 million in attorneys' fees and costs to fight and resulted in AIA Services being required to report to the IRS a gain from the $6 million it never had to pay Reed Taylor.

113.   Upon information and belief, the Controlling AIA Defendants never reported the gain from the extinguished $6 million debt to Reed Taylor on AIA Services' tax return. If the Controlling AIA Defendants did not report the $6 million income to the IRS and AIA Services is

---

[1] The Controlling AIA Defendants have brought bread to many defense attorneys. Notably, the Controlling AIA Defendants (except Cashman, who was not a party to the lawsuit) successfully asserted that the Stock Redemption Agreement was illegal. (*See* Dkt. #83-5.) Consequently, Reed Taylor sued Riley, Turnbow and Eberle Berlin for their incorrect third-party closing opinion letter. *Taylor v. Riley*, 157 Idaho 323, 336 P.3d 256, 261 (2014). He later settled his claims against Turnbow and Eberle Berlin, but his claims against Riley are on appeal as noted by the Ninth Circuit Court of Appeals. *Taylor v. Hawley Troxell Ennis & Hawley, LLP*, 628 Fed.Appx. 490 (9th Cir. 2015). Reed Taylor also sued his independent counsel. *Taylor v. Bell*, 185 Wn. App. 270, 273-79, 340 P.3d 951, 954-56 (2014), *review denied*, 352 P.3d 188 (2015).

**App. - D, p. 39**

obligated to pay taxes, penalties and interest on that gain, the Controlling AIA Defendants are liable for those sums as well for breaching their fiduciary duties owed to AIA.

114.    Based on the intentional acts of the Hawley Troxell Defendants, AIA has been decimated because the Controlling AIA Defendants remained in control of AIA through those tolling agreements. The end result of these tolling agreements was that the Hawley Troxell Defendants improperly ensured that the Controlling AIA Defendants would retain control over AIA to the detriment of AIA and for the improper benefit to the Hawley Troxell Defendants and the Controlling AIA Defendants.

115.    In or around 2007 or 2008, AIA Insurance received a settlement of approximately $800,000 for litigation that AIA Insurance had funded for certain policy holders. Instead of utilizing or retaining those funds exclusively for AIA, the Controlling AIA Defendants improperly used those funds, in full or in part, to continue their intentional acts of funding CropUSA, litigation caused by them or other unauthorized uses. Upon information and belief, the Hawley Troxell Defendants had knowledge of the receipt of those funds, yet they did nothing to protect them even though the funds were at issue in a lawsuit.

116.    In 2008, the Controlling AIA Defendants and the Hawley Troxell Defendants permitted CropUSA to sell over $10,000,000 in crop insurance business to Hudson Insurance for the benefit of CropUSA when approximately 75% of the business had been derived directly from AIA's agency force (i.e., such agents as Larry Whitehead). The over $7.5 million should have been paid to AIA rather than to pay the debts incurred by the Controlling AIA Defendants through CropUSA.

117.    Sometime after CropUSA sold the bulk of its assets to Hudson in 2008, which were derived primarily from AIA, the Controlling AIA Defendants obtained further funds from Hudson

**App. - D, p. 40**

Insurance for Growers National Cooperative Insurance Agency, Inc. ("<u>Growers National</u>"), an entity formed and funded by AIA for purposed of selling crop insurance and providing a form of rebate to farmers.

118.    Upon information and belief, CropUSA received over $500,000 from Hudson for Growers National. These funds should have been paid to AIA and the receipt of the funds was concealed from AIA. Plaintiffs will establish the exact amount of funds that the Controlling AIA Defendants and/or CropUSA received from Hudson for Growers National at the time of trial.

**I.**  **<u>The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA and Intentionally Committing Torts against AIA with the Assistance of the Hawley Troxell Defendants—Even While this Lawsuit Was Pending</u>**

119.    Upon information and belief, the Hawley Troxell Defendants have been paid the bulk of the over $2,000,000 in attorneys' fees and costs incurred and/or paid for the various lawsuits. Plaintiffs will establish the exact amount of funds paid to the Hawley Troxell Defendants by AIA and/or on behalf of AIA, which Plaintiffs are seeking to be disgorged and returned to AIA.

120.    From 2009 through the present time, Donna exercised her right under the amended articles of incorporation to appoint two different directors to AIA Services' Board of Directors, but the Controlling AIA Defendants and/or the Hawley Troxell Defendants refused to honor her unqualified right thereby resulting in all action taken by AIA Services' Board of Directors during that period of time being unauthorized and thus a breach of the fiduciary duties of the Controlling AIA Defendants.

121.    In December 2009, Donna filed suit against AIA Services to exercise her unequivocal right to appoint her designee, Patrick Moran, to the Board of Directors of AIA Services and to appoint a receiver for AIA Services. The Hawley Troxell Defendants once again appeared in that lawsuit and successfully opposed Donna's designee being appointed to the Board

of Directors or a receiver being appointed by improperly seeking a stay in the lawsuit.

122.    Had the Hawley Troxell Defendants joined Donna in having a receiver appointed for AIA Services, which the Hawley Troxell Defendants should have done in light of the countless intentional torts committed against AIA by the Controlling AIA Defendants, there is no doubt that they could have stopped the Controlling AIA Defendants from carrying out their ongoing fraud, intentionally breaches of fiduciary duties and their ultimate decimation of AIA. At a minimum, the Hawley Troxell Defendants acts and/or omissions in this regard was a substantial factor of the improper transactions, unlawful acts, and the ultimate decimation of AIA, which ocurred after 2009.

123.    This lawsuit was filed by Plaintiffs on August 11, 2010, and subsequently stayed at the request of the Controlling AIA Defendants and the Hawley Troxell Defendants. During that stay, inappropriate and unlawful transactions have continued.

124.    In March 2012, the Controlling AIA Defendants, with, information and belief, the improper assistance of new attorneys at the law firm of Randall & Danskin, improperly terminated AIA Services' ESOP and paid those shareholders three cents per shares for their hard-earned common shares and failed to disclose the facts pertaining to the malfeasance and torts described in this Second Amended Complaint to those shareholders. (*See* Dkt. #67-30-33, 34.)

125.    However, the Controlling AIA Defendants knew that AIA Services' amended articles of incorporation barred all stock redemptions, including any purchases of shares held by the ESOP, until the Series A Preferred Shares were all fully redeemed and the Series C Preferred Shares had been paid the approximately $1,000,000 in dividends owed. The repurchase of the ESOP shares for three cents per shares was illegal, ultra-vires and improper.

///

126.    In 2012, the Controlling AIA Defendants, again with the improper assistance of Randall & Danskin (*See* Dkt. #67-48, 67-48), improperly sought to effectuate a reverse stock split and to only pay AIA Services' minority common shareholders ten cents per share and paying those common shareholders (including Plaintiffs) without disclosing any facts and without offering full and fair compensation for the value of the shares. (*See* Dkt. #66-3.) The notice to the shareholders was signed by Duclos and the improper and unlawful reverse stock split was approved by Beck, John and Connie. (*Id*.)

127.    Thirteen shareholders objected. (*See* Dkt. #67-41.) The ill-conceived reverse stock split violated AIA Services' amended articles of incorporation and the Controlling AIA Defendants did not even bother to comply with Idaho Code, including, by failing to provide the form for the shareholders to state the value that they believed should be paid for their common shares thereby further establishing the true improper purpose of the failed reverse stock split.

128.    In response to the thirteen shareholder objections and notices of demands for payment, the Controlling AIA Defendants, through Randall & Danskina and without regard to the fact that they would expend tens of thousands of dollars more in funds litigating the issue rather than simply paying the shareholders the true fair value of their shares, had AIA Services file suit against the thirteen shareholders. (*See* Dkt. #83-15.) Judge Carl Kerrick properly dismissed the lawsuit, and further noted that it was disingenuous to seek a reverse stock split until this lawsuit was resolved. (*See* Dkt. #86-1.)

129.    The failed reverse stock split fiasco drained AIA of significant and unnecessary attorneys' fees and costs (fees and costs which could have been paid to those shareholders or for other AIA obligations). This purported reverse stock split was approved and/or acquiesced in by the Controlling AIA Defendants. Upon information and belief, the Hawley Troxell Defendants

**App. - D, p. 43**

were aware of the scheme to effectuate reverse stock split to eliminate AIA Services' innocent minority shareholders which would in turn eliminate shareholder standing for this lawsuit.

130.    After the Controlling AIA Defendants had AIA Services file suit against the thirteen objecting common shareholders who demanded fair payment, Nez Perce County District Court Judge Carl Kerrick dismissed the lawsuit and awarded those minority shareholders attorneys' fees and costs. That judgment in favor of those shareholders has still never been paid by the Controlling AIA Defendants or AIA, and the Controlling AIA Defendants should be required to pay that judgment on behalf of AIA.

131.    From 2009 through 2015, the Controlling AIA Defendants continued loaning money to, or allowed money to be lent to, Pacific Empire Radio Corporation in an amount exceeding $1,400,000 by year-end 2012 when that corporation had no ability to repay the sums owed and it benefitted John and Connie (who owned shares in that corporation at certain relevant times) as those were funds they would not have to provide Pacific Empire Radio Corp.

132.    From 1999 through 2012, the Controlling AIA Defendants concealed their ownership interests in other entities from AIA which were derived from and/or funded by AIA, including, without limitation, CropUSA, CropUSA Insurance Services, LLC, Pacific Empire Holdings Corp.

133.    From 1995 through 2012, John received over $2,729,557 in cash compensation from AIA. This amount does not include any compensation, payments or other improper distributions he may have received from CropUSA and other entities funded or launched using AIA. At a minimum, John should be required to disgorge the over $2,038,657 he received from AIA from 1999 through 2012 and other compensation or funds received since 1999, which John received while improperly competing against AIA through CropUSA and other entities (including

**App. - D, p. 44**

Pacific Empire Holdings Corp.).

**J.** **There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants**

**134.** Since acquiring operational control of AIA Services in 1995, the Controlling AIA Defendants have engaged in repeated acts of faithless self-dealing, transactions detrimental to AIA, committed intentional torts (including fraud and breaches of fiduciary duties), breached their fiduciary duties (including their duties of loyalty), concealed, conspired to commit intentional torts, aided and abetted in the commission of intentional torts and to cover up those torts, to the detriment of AIA, including, but not limited to, the following specific examples: **(a)** controlling the Board of Directors and/or the decisions made by the Board and refusing to act in the best interests of AIA; **(b)** violating AIA's Restated Bylaws, including but not limited to, failing to hold annual shareholder meetings, failing to obtain proper shareholder approval for certain transactions, failing to comply with conflicts of interest provision in the bylaws and articles of incorporation which restricted many of the unlawful or improper transactions described herein, and failing to properly comply with applicable corporate governance; **(c)** violating AIA's Amended Articles of Incorporation thereby allowing substantial funds and assets to be depleted from AIA and obligating AIA to be liable for loans or guarantees which were barred by those amended articles of incorporation; **(d)** diverting corporate opportunities belonging to AIA; **(e)** conveying, encumbering, utilizing, and/or pledging corporate assets to themselves or other entities; **(f)** inappropriately redeeming, acquiring and/or issuing shares of stock and/or making payments on put options, including but not limited to, issuing shares to the Controlling AIA Defendants; **(g)** inappropriately paying dividends; **(h)** intentionally failing to comply with conflict of interest provisions in AIA bylaws; **(i)** guaranteeing loans for CropUSA and failing to guarantee loans for AIA; **(j)** paying excessive compensation to officers and directors, including but not limited to,

**App. - D, p. 45**

paying John $250,000 per year to purportedly act as CEO and President of AIA Services after his contractual entitlement to such salary had expired and John had represented that he would not take salary in certain years; **(k)** wasting corporate assets, including by paying Connie and Beck $20,000 per year to purportedly serve on the Board of Directors of AIA Services; **(l)** divulging and/or utilizing AIA's trade secrets for the benefit of themselves and other entities, including CropUSA; **(m)** soliciting and transferring AIA employees to work for CropUSA; **(n)** engaging in acts and/or decisions without making full disclosure and without obtaining the required approval of shareholders; **(o)** engaging in millions of dollars of transactions wherein AIA conveyed benefits without the receipt of any consideration or without being repaid; **(p)** forming and operating entities in direct competition with AIA in the insurance marketplace, including without limitation, CropUSA and Pacific Empire Holdings Corp.; **(q)** making false representations, including, without limitation, regarding share values, omitting material facts in AIA's financial statements, falsely certifying AIA's financial statements, and that AIA was being operated for the benefit of the corporation; **(r)** concealing and failing to disclose material facts to AIA pertaining to loans, transfers, and utilization of assets, including without limitation, concealing or omitting material facts, including all of the necessary facts related to virtually each and every transaction described in this Second Amended Complaint; **(s)** making false representations to AIA, including without limitation, making and certifying false and misleading financial statements to AIA and representing that AIA was being properly operated when it was instead being used to fund the lifestyle, payments and other businesses owned or partial owned by the Controlling AIA Defendants; **(t)** inappropriately loaning AIA's funds, or guaranteeing loans, to themselves and to other entities under their control in violation of AIA's amended articles of incorporation, bylaws and fiduciary duties; **(u)** paying tens of thousands of dollars in yearly fees to purportedly serve on

the Board of Directors of AIA, excessive compensation and benefits when such amounts were excessive and they were violating their fiduciary duties owed to AIA and they were all acting as faithless fiduciaries; **(v)** paying attorneys' fees and costs in various legal proceedings on behalf of the Controlling AIA Defendants and others when it was clear that they had intentionally failed to act in good faith, were not entitled to indemnification or to have attorneys' fees and costs advanced on their behalf and by failing to obtain security for repayment of said funds; **(x)** acquiring a parking lot with AIA funds and charging AIA, and making AIA pay, excessive rent for use of the parking lot even though AIA did not actually use the parking lot; **(y)** failing to seat the full and required Board of Directors for AIA Services, including, without limitation, by failing to honor Donna's appointment of Patrick Moran and Paul Durant to AIA Services' Board of Directors; **(z)** improperly purchasing and transferring shares held by AIA or which should have been held by AIA to themselves, including without limitation shares in Pacific Empire Radio Corp., Pacific Empire Communications Corp., and Pacific Empire Holdings Corp. (this entity was formed by AIA's assets by John, improperly competed against AIA, and was later sold for $240,000); **(aa)** allowing John to profit from CropUSA's sale of assets to Hudson by improperly allowing him to retain a monthly fee of $10,000 per month when those funds should have gone to AIA; **(bb)** failing to take appropriate legal action in the interests of AIA; **(cc)** removing a tenant from an AIA owned building to another building owned personally by John and/or other Controlling AIA Defendants; **(dd)** improperly subsidizing CropUSA and other entities with AIA's funds, labor and assets, failing to properly allocate expenses to CropUSA and failing to have other expenses paid back at all (which have already been identified as being approximately $500,000 as of 2008); **(ee)** selling and/or transferring assets and or/contracts belonging to AIA to others (including the contract with Growers National); **(ff)** improperly paying numerous law firms other than the Hawley Troxell

Defendants hundreds of thousands of dollars representing AIA and the Controlling AIA Defendants in litigation caused by their own intentional acts and torts; **(gg)** paying more of AIA's funds to litigate disputes (including with Donna in the Idaho state courts) than it would have taken to simply pay the money owed; **(hh)** failing to obtain security, failing to charge interest, and failing to collect on loans of at least $307,000 made to John; **(ii)** removing the $400,000 held in the court registry and the $200,000 in a bank account in *Taylor v. AIA Services Corp., et al.* and allowing the Controlling AIA Defendants to utilize those funds when the Hawley Troxell Defendants should have ensured that those funds were kept from them; **(jj)** expending significant sums on the illegal repurchase of common shares in AIA Services, which also resulted in the ownership interest of the Controlling AIA Defendants increasing; and **(kk)** allowing AIA to engage in the transactions identified in this Second Amended Complaint when no dividends had been declared or paid on the Series C Preferred Shares held in the AIA Services 401(k) Plan and those shares now have accrued dividends owed of over $1,000,000. The Controlling AIA Defendants and/or the Hawley Troxell Defendants have assisted one another and others in committing the intentional torts against AIA described herein and concealing, or covering up, the facts and the intentional torts committed against AIA, including those specifically referenced in this paragraph and elsewhere in this Second Amended Complaint.

135.    At all relevant times, John was CEO, President and director of AIA Services, AIA Insurance and CropUSA and a shareholder of AIA Services at the time of all of the improper transactions with CropUSA and other improper acts identified in this Second Amended Complaint (also a classic example of a conflict of interest), and he improperly benefited from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

**136.** At all relevant times, John was also owned interests in other entities who improperly benefitted directly or indirectly from AIA, which forms additional conflicts and proof of self-dealing.

**137.** At all relevant times, the Controlling AIA Defendants were all purported shareholders of CropUSA and either majority shareholders (as a group) or officers of AIA Services at the time of the improper transactions and malfeasance identified in this Second Amended Complaint (also a classic example of conflict of interest), and they improperly benefited, directly or indirectly, from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

**138.** As a result of the acts and omissions set forth and/or contemplated above and other acts and/or omissions which will be established at or before trial, the Controlling AIA Defendants and the Hawley Troxell Defendant have proximately caused AIA millions of dollars in damages.

## V.   CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 AND FEDERAL RULE OF CIVIL PROCEDURE 23.1

**139.** As a prerequisite to filing this lawsuit under Idaho Code § 30-1-742 and Federal Rule of Civil Procedure 23.1, Plaintiffs (and over ten other shareholders of AIA Services) have been shareholders of AIA Services during all relevant times to the claims asserted in this Second Amended Complaint.

**140.** On July 21, 2008, Donna served a written derivative demand letter on the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #23-9 and #67-19.)

**141.** On July 23, 2008, the Hawley Troxell Defendants filed a Motion for Stay of Proceedings in *Taylor v. AIA Services Corp.*, *et al.*, and asserted that the stay was necessary so that AIA Services and AIA Insurance could conduct an inquiry into the demands made by Donna in

**App. - D, p. 49**

her letter dated July 21, 2008.

142.    On August 14, 2008, in *Taylor v. AIA Services Corp.*, *et al.*, the Hawley Troxell Defendants disingenuously filed a petition for a court appointed independent inquiry on behalf of AIA when they had no intention of following through with the inquiry. (*See* Dkt. #67-20.)

143.    On September 4, 2008, Reed Taylor supported the appointment of independent investigators. However, Reed Taylor objected to the investigators proposed by the Hawley Troxell Defendants, who were purportedly representing AIA, and the Controlling AIA Defendants. (*See* Dkt. #67-21.) Reed Taylor believed totally independent people should be appointed.

144.    Although the parties had filed briefing with respect to the appointment of independent investigators, the Hawley Troxell Defendants never noted the motion for a hearing and the court never ruled on the request, and they intentionally abandoned the appointment of an independent inquiry.

145.    The Hawley Troxell Defendants and Controlling AIA Defendants have never conducted a further investigation of the demands made in Donna's derivative demand letter of July 21, 2008. No action was ever taken by the Boards of Directors.

146.    On April 3, 2012, Plaintiffs made another written demand on the Boards of Directors of AIA Services and AIA Insurance, which included demands to keep the $400,000 cash held in the Court registry in *Taylor v. AIA Services Corp.*, *et al*., to comply with AIA's amended articles of incorporation, to comply with AIA's bylaws, provide full disclosure, and to protect certain other assets. (Dkt. #67-33.) This particular demand was copied directly to Babbitt and Ashby, so they had full knowledge of it. This demand, like all of the others, was ignored. (*See* Dkt. #67, p. 11 ¶ 29.)

///

147.    On July 16, 2012, the Plaintiffs and over ten other shareholders of AIA Services served additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #67-42.) The demands requested, among other things, that AIA pursue this lawsuit with all claims as of July 16, 2012 and future claims, including punitive damages. (*Id.*) In addition, Plaintiffs have made additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance, but no action has ever been taken by the Boards of Directors.

148.    Over ninety days have elapsed since the Plaintiffs' written derivative demands were made and no action has been taken by AIA whatsoever, and all of the claims asserted in this lawsuit flowed from those derivative demands.

149.    As owner of Preferred A Shares in AIA Services, and as beneficial owner common shares in AIA Services, Donna fairly represents the interests of shareholders not named in this lawsuit. She also assisted in defeating the litigation involved the Controlling AIA Defendants' efforts to effectuate an improper reverse stock split to eliminate shareholder standing in this lawsuit, when she could have simply sought to solely protect her interests only. Donna is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims. Donna has pursued this lawsuit solely for the benefit of AIA and their shareholders.

150.    As the second largest common shareholder AIA Services (who traded a book of insurance business worth approximately $500,000 to AIA Services in exchange for his common shares), Miesen also fairly represents the interest of AIA and their shareholders. Miesen has never received a penny in return for his investment in AIA. Miesen is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims. Miesen has pursued this lawsuit solely for the benefit of AIA and their

shareholders.

### VI.     COUNT I—BREACH OF FIDUCIARY DUTY
**(Against the Controlling AIA Defendants and the Hawley Troxell Defendants)**

**151.**     Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

**152.**     The Controlling AIA Defendants owed fiduciary duties to AIA as the majority and controlling shareholders. As members, or purported members, of the Board of Directors for AIA Services and/or AIA Insurance, the Controlling AIA Defendants, who have each served as a director of AIA Services at one time, owed fiduciary duties to the corporations. As corporate officers of AIA, John, as President and CEO, and Duclos, as Secretary owed fiduciary duties to AIA, which were further elevated during the times in which the both served as directors too (which is from 1995 to the present time for John).

**153.**     As attorneys for AIA, the Hawley Troxell Defendants owed fiduciary duties to AIA (including the undivided duty of loyalty). If not authorized to act as attorneys for AIA, the Hawley Troxell Defendants acted with apparent authority as agent and owes fiduciary duties as a result of that agency relationship. The Hawley Troxell Defendants had conflicts of interest when they undertook to represent AIA and CropUSA, and when they proceeded in the manner directed by any one or more of the Controlling AIA Defendants, thereby improperly representing the interests of the Controlling AIA Defendants, instead of in the best interests of AIA. *Reis v. Barley, Snyder, Senft & Cohen LLC,* 484 F.Supp.2d 337 (E.D. Pa. 2007).

**154.**     Based on any and/or all of the acts and/or omissions set forth in this Second Amended Complaint and/or those facts proven at or before the time of trial, the Controlling AIA Defendants and the Hawley Troxell Defendants have breached their fiduciary duties owed to

**App. - D, p. 52**

AIA, including, without limitation, breaching their undivided duties of loyalty, trust and confidence owed to AIA, and by placing their interest in earning hundreds of thousands of dollars, and ultimately over $1,000,000, in attorneys' fees over looking after the interests of AIA.

155.   The Hawley Troxell Defendants have separately breached their fiduciary duties as matter of law when they simultaneously represented AIA and CropUSA. In addition, Riley was aware that CropUSA was derived from AIA and he was further aware of the restrictions in AIA Services' amended articles of incorporation as he helped prepare them. The Hawley Troxell Defendants have further breached their fiduciary duties as a matter of law for the violations of the Rules of Professional Conduct dealing with loyalty to a client and conflicts of interest.

156.   As a direct and/or proximate cause of the Controlling AIA Defendants and the Hawley Troxell Defendants breaches of their fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

157.   In addition, each of the Controlling AIA Defendants and the Hawley Troxell Defendants is a "faithless fiduciary" as defined by law and is therefore required to disgorge all compensation and consideration received from AIA and/or CropUSA. The disgorgement is in addition to liability caused by the breaches of fiduciary duty. In the case of the Hawley Troxell Defendants, the disgorgement goes to all fees received for or paid on behalf of AIA and CropUSA. In the case of the faithless Controlling AIA Defendants, the disgorgement goes to all salary, bonuses, warrants, stock options, or stock received from AIA.

## VII.   COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

158.   Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

**App. - D, p. 53**

**15-ER-3705**

159.     One who counsels, advises, abets or assists in the commission of an actionable wrong is responsible to the injured person for the entire loss or damage. 86 C.J.S. Torts § 105; RESTATEMENT (FIRST) OF TORTS § 876 (1939). Aiding and abetting in the commission of an actionable wrong may be inferred from the fact that one aided and abetted efforts to conceal the wrong. 86 C.J.S. Torts § 105. Liability for aiding and abetting the commission of a tort may be established by showing the person was present at the time of the actionable wrong and did not disapprove or oppose the action. Plaintiffs alleging aiding and abetting need not prove that the aiding and abetting was necessary for the commission of the tort, only that the aiding and abetting made it easier for the tort to occur. *See Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12 (2002).

160.     During certain relevant times, the Hawley Troxell Defendants and the Controlling AIA Defendants had knowledge of the other defendants' acts and/or omissions as described in this Second Amended Complaint and as proven at trial, knew that such acts and/or omissions constituted a breach of fiduciary duty, did not disapprove of such acts or omissions, took no steps to prevent the commission of the breaches of fiduciary duties flowing from the acts and/or omissions, and assisted in the concealment of such acts and/or omissions described herein, thereby damaging AIA.

161.     As a direct and/or proximate cause of the Hawley Troxell Defendants and the Controlling AIA Defendants aiding and abetting one another in the breaches of fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

### VIII.    COUNT III—LEGAL MALPRACTICE
**(Against the Hawley Troxell Defendants)**

162.     Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this

**App. - D, p. 54**

cause of action.

163.    A legal malpractice claim may be brought in a derivative action. *Schulman v. Wolf & Samson, PC,* 951 A.2d 1051 (N.J. 2008).

164.    Since at least 1999, the Hawley Troxell Defendants had an attorney-client relationship with AIA, while Riley has had an attorney-client relationship with AIA since prior to 1995. The Hawley Troxell Defendants owed duties to AIA, including, without limitation, duties of care, good faith and loyalty. Despite the duties owed to AIA, the Hawley Troxell Defendants also improperly represented CropUSA.

165.    The Hawley Troxell Defendants have breached their duties owed to AIA, including, without limitation, the breached duties described in this Second Amended Complaint. The Hawley Troxell Defendants have further violated their duty of loyalty owed to AIA by improperly simultaneously representing AIA and CropUSA, together with directly and/or indirectly improperly representing the interests of the Controlling AIA Defendants.

166.    AIA suffered damages as a direct, foreseeable and/or proximate result of the breaches of duty and the acts of the Hawley Troxell Defendants, including those acts described in this Second Amended Complaint and/or proven at the time of trial. At a minimum, the Hawley Troxell Defendants were also a substantial factor in the harm and damages inflicted upon AIA, including, without limitation, the ultimate decimation of AIA by the Controlling AIA Defendants. Had the Hawley Troxell Defendants properly discharged their duties, the Controlling AIA Defendants would never have decimated AIA.

167.    As a direct and/or proximate cause of such acts and/or omissions, the Hawley Troxell Defendants are liable to AIA for damages in the amount to be proven at or before the time of trial.

### IX.   COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ CONSTRUCTIVE FRAUD
#### (Against the Controlling AIA Defendants)

**168.** Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

**169.** The Controlling AIA Defendants are liable to AIA for fraud because: **(a)** they made representations of fact to AIA and AIA Services' innocent minority shareholders as asserted throughout this Second Amended Complaint, including but not limited to, (i) representations that CropUSA was being operated for the benefit of AIA, (ii) representations that AIA was being properly operated (including that the Boards of Directors had properly authorized certain transactions when Donna's designee was not on the Board of AIA Services and the provisions in the amended articles and bylaws had not been complied with), (iii) representations that the information on AIA's financial statements was true (John separately certified to auditors and others that the information contained on certain of AIA's financial statements was true and correct), (iv) representations that expenses and loans between AIA and other entities or parties were properly entered into and accounted for (i.e., there are hundreds of thousands of dollars, if not millions of dollars, in funds and other assets used by CropUSA which were derived from AIA and never accounted for), and (v) other representations referenced in this Second Amended Complaint; **(b)** these representations were false; **(c)** these representations were material; **(d)** they knew these representations were false; **(e)** they intended that there be reliance; **(f)** AIA was ignorant of the falsity of these representations; **(g)** AIA relied on these representations; **(h)** AIA's reliance was justified; and **(i)** injury resulted. *See, e.g., Mannos v. Moss,* 143 Idaho 927, 155 P.3d 1166 (2007) (holding that misrepresentations in financial statements precluded summary

judgment). Constructive fraud is identical to fraud, except that the plaintiff need not prove speaker's knowledge of the fraud and the speaker's intent that the other party rely on the representations.

170. The Controlling AIA Defendants owed duties to AIA during certain relevant times as majority shareholders, board members and/or officers of AIA. In addition to making false representations, the Controlling AIA Defendants also concealed information from AIA and its innocent minority shareholders with knowledge that the concealed information was material and that the concealment would cause AIA to suffer otherwise avoidable damages, including without limitation, information contained in this Second Amended Complaint. The Controlling AIA Defendants' failure to disclose a fact to AIA and AIA Services' innocent minority shareholders where one has a duty to disclose is the legal equivalent of representing the non-existence of the fact. Where facts are fraudulently concealed, Plaintiffs need not show reliance as there is nothing other than silence upon which to rely.

171. The Controlling AIA Defendants represented to AIA Services that CropUSA was a wholly owned subsidiary of AIA Services. Simultaneously, the Controlling AIA Defendants adopted the position, not disclosed to AIA or its innocent minority shareholders, that CropUSA was an independent entity with John as its alleged sole shareholder and subsequently failed to disclose that CropUSA was not a separate entity. These representations were false, the Controlling AIA Defendants knew of their falsity, the Controlling AIA Defendants intended that there be reliance, there was justifiable reliance by AIA and AIA Services' innocent minority shareholders, and AIA was damaged as a result.

172. By operating CropUSA as an independent entity, and by using CropUSA as a vehicle for misappropriating and converting corporate assets, the Controlling AIA Defendants

**App. - D, p. 57**

committed ongoing fraud that has persisted through the date of this Second Amended Complaint.

173.    The Controlling AIA Defendants also made misrepresentations to AIA and AIA Services' innocent minority shareholders in the form of false, misleading and fraudulent financial statements (which such financial statements also failed to disclose numerous improper and unlawful transactions and their ownership interests in CropUSA and other entities), upon which AIA and AIA Services' innocent minority shareholders reasonably relied, with that reliance being the proximate cause of AIA's damages.

174.    When the Controlling AIA Defendants transferred more than $1.5 million to CropUSA in 2004, they concealed the fact of this transaction from AIA and AIA Services' innocent minority shareholders and AIA was damaged by this concealment.

175.    When the Controlling AIA Defendants transferred AIA corporate assets, including funds, employees, goodwill and trade secrets to CropUSA and other entities and were subsidizing CropUSA and other entities, they concealed these facts from AIA and AIA Services' innocent minority shareholders. AIA suffered damages by these concealments.

176.    When the Controlling AIA Defendants had AIA pay certain of CropUSA's corporate expenses, they concealed this fact from AIA.  AIA suffered damages as a result of this concealment.

177.    When the Controlling AIA Defendants pledged the mortgage obtained by AIA from the state of Idaho to CropUSA so that CropUSA could borrow money to pay the attorney's fees of the Hawley Troxell Defendants, they concealed this fact from AIA.  AIA suffered damages as a result of this concealment.

178.    When the Controlling AIA Defendants had AIA Insurance guarantee CropUSA's $15 million line of credit and later sold over $10,000,000 in assets derived from AIA to Hudson

**App. - D, p. 58**

Insurance, they concealed the fact of this guarantee and asset sale from AIA.

179.    When the Controlling AIA Defendants finally disclosed their ownership interests in CropUSA, CropUSA Insurance Services, LLC and other entities in AIA Services' financial statements in July 2012[2] (*See* Dkt. #67-38), they continued to conceal how they obtained their ownership interest in those entities (and in the case of CropUSA that the ownership interest came from AIA) and many transactions and purported loans between the entities and AIA (loans and guarantees made by AIA which were prohibited by AIA Services' amended articles of incorporation and restated bylaws).

180.    As a direct and/or proximate cause of the Controlling AIA Defendants' fraudulent acts, AIA has been damaged in an amount to be proven at or before trial, and the ongoing fraud bars the Controlling AIA Defendants from asserting statute of limitations defenses. To the extent that the Hawley Troxell Defendants seek to assert the statute of limitations as a defense, they too are barred from doing so through their fraudulent concealment of facts from AIA.

### X.    COUNT V—AIDING AND ABETTING FRAUD
**(Against the Controlling AIA Defendants and the Hawley Troxell Defendants)**

181.    Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

182.    One who aids and abets in the commission of a tort is liable with the primary tortfeasor(s) for all damages resulting from the tort. Aiding and abetting is established where one has knowledge of the torts, does not disapprove, and takes no action to prevent the commission of the torts or assists in covering up such torts. The foregoing applies to the Controlling AIA

---

[2] While the financial statements were dated as of year-end 2011, they were not provided to AIA or its shareholders until July 2012 in connection with the failed ill-conceived reverse stock split.

Defendants and the Hawley Troxell Defendants.

183.    The Controlling AIA Defendants have aided and abetted in one another's fraud committed against AIA. The Controlling AIA Defendants' silence, failure to act and intentional acts to cover up fraud upon AIA constitutes the aiding and abetting of fraud upon AIA.

184.    The Hawley Troxell Defendants have aided and abetted in the fraud committed against AIA by the Controlling AIA Defendants by assisting in the commission of fraud. The Hawley Troxell Defendants' silence, failure to act and intentional acts to cover up fraud upon AIA constitutes the aiding and abetting the fraud upon AIA.

185.    The Hawley Troxell Defendants knew or should have known that the transfer of AIA's assets, loans and other unauthorized transactions to CropUSA constituted a fraud against AIA.

186.    The Hawley Troxell Defendants knew or should have known that the transfer of approximately $1,500,000 to CropUSA in 2004 constituted a fraud on AIA.

187.    The Hawley Troxell Defendants knew or should have known that the practice of allocating CropUSA expenses to AIA, and otherwise failing to maintain arms' length transactions between CropUSA and AIA, constituted a fraud on AIA.

188.    By knowingly providing legal cover for the fraudulent acts described herein, the Hawley Troxell Defendatns have aided and abetted the fraud committed by the Controlling AIA Defendants and CropUSA.

189.    As aiders and abettors, the Hawley Troxell Defendants are liable to AIA to the same extent as the primary tortfeasors. RESTATEMENT (FIRST) OF TORTS § 876 (1939). Likewise, the Controlling AIA Defendants are all liable for aiding and abetting each other in the commission of fraud against AIA.

190.     As a direct and/or proximate cause of the Hawley Troxell Defendants and the Controlling AIA Defendant aiding and abetting in fraud, AIA has been damaged in the amount to be proven at or before the time of trial.

### XI.     COUNT VI—BREACH OF CONTRACT
#### (Against John)

191.     Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

192.     On August 1, 1995, John and AIA Services entered into an Executive Officer's Agreement. (*See* Dkt. #67-8.)

193.     The Executive Officer's Agreement contains contractual provisions preventing John from doing certain acts. For example, Section 9 of the Executive Officer's Agreement sets for express covenants not to compete. Subsection A of the covenants prohibits John from soliciting AIA customers or otherwise diverting the business of AIA customers. Subsection B prohibits John from participating in any insurance business that underwrites, markets or administers insurance products for commodity associations. Subsection C prohibits John from soliciting AIA Services employees for other employment.  Subsection D of the covenants bars John from divulging or exploiting trade secrets belonging to AIA.

194.     John has breached his contractual obligations owed to AIA, including, without limitation, by forming CropUSA as anything other than a wholly-owned subsidiary of AIA, competing against AIA with CropUSA and other entities (including Pacific Empire Holdings and CropUSA Insurance Services, LLC). John has breached all four subsections of Section 9 of the Executive Officer's Agreement.

///

195.     As a direct and/or proximate cause of John's breaches of the Executive Officer's Agreement, AIA has been damaged in an amount to be proven at or before trial. Such breaches also constitute the breaches of his fiduciary duties owed to AIA.

## XII.    COUNT VII—DECLARATORY JUDGMENT
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

196.     Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

197.     Plaintiffs seek a declaratory judgment against Controlling AIA Defendants, including, without limitation, for the following relief: (a) for a full accounting with supporting documentation of all of AIA's funds, assets, loans and other transactions from 1999 through the present time; (b) requiring the Controlling AIA Defendants to comply with AIA's amended articles of incorporation, bylaws and the Idaho Business Corporation Act; (c) rescinding the purchases of the shares held by the ESOP and/or ensuring that those shareholders receive fair value for their shares; (d) rescinding and/or declaring void the common shares issued to John through is Executive Officer's Agreement; and (d) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this Second Amended Complaint).

198.     Plaintiffs seek a declaratory judgment against the Hawley Troxell Defendants, including, without limitation, for the following relief: (a) that the representation agreement, fee agreements and any related agreements entered into with them and AIA be declared void (including, without limitation, because such agreements violated the applicable Rules of Professional Conduct); (b) any agreements or accounts regarding any sums owed by AIA, if any, be declared void; and (c) such other relief as may be requested at or before trial (including any

App. - D, p. 62

declaratory relief contemplated by any of the acts and/or omissions set forth in this Second Amended Complaint).

### XIII.   COUNT VIII—EXCESSIVE COMPENSATION/CORPORATE WASTE
#### (Against the Controlling AIA Defendants)

199.   Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

200.   To support a claim for excessive compensation, plaintiff need only show that the board lacked independence and/or lacked good faith. *In Re: Tyson Foods, Inc.,* 919 A.2d 563 (Del. 2000). The Controlling AIA Defendants have been officers and/or controlled AIA's Boards of Directors from 1995 through certain relevant times.  The Controlling AAI Defendants have lacked independence and have not acted in good faith, including, without limitation, by committing the intentional acts and/or omissions described in this Second Amended Complaint.

201.   The Controlling AIA Defendants paid excessive compensation and have wasted corporate assets during the course of managing and/or operating AIA, including, without limitation, by paying themselves excessive compensation (and practically speaking, any compensation at all based on their acts and omissions) and operating AIA for the benefit of CropUSA, the Controlling AIA Defendants and other entities they partially or wholly own, including Pacific Empire Radio Corp., CropUSA Insurance Services, LLC, and Pacific Empire Holdings Corp. The Controlling AIA Defendants also decimated AIA's agency force and caused them to transfer to CropUSA and ultimately Hudson and other entities. In addition, notwithstanding the fact that John is not entitle to retain any of his compensation or benefits as a faithless fiduciary, it was separately corporate waste to pay him in the first place as he did nothing for AIA (AIA's business was simply running off the commissions received for policies sold years

before). The other transactions and malfeasance described in this Second Amended Complaint also constitute corporate waste, and none of those transactions and malfeasance were properly disclosed to all of AIA Services' shareholders nor was any authorization from them ever sought or obtained.

202. The Controlling AIA Defendants are liable to AIA for damages caused by paying excessive compensation and otherwise wasting and needlessly depleting AIA's funds and assets for their own benefit and with disregard for AIA.

203. As a direct and/or proximate cause of the Controlling AIA Defendants' waste, AIA has been damaged in the amount to be proven at or before trial.

### XIV.   COUNT IX—ACCOUNT STATED
#### (Against John)

204. Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

205. John established an account by borrowing $307,000 from AIA for his personal use. John subsequently confirmed the amount of the debt by "correcting" an alleged so-called accounting "error" when he had previously extinguished the $307,000 debt by improperly crediting the payment of Reed Taylor's $6 million promissory after the issue arose in *Taylor v. AIA Services Corp., et al.*, so that AIA's book show that AIA is creditor and John is debtor for $307,000, i.e., the correction was only made because Reed Taylor demanded it and he was suing AIA Services for repaying of the $6 million note.

206. John has not paid any portion of this debt and the entire balance remains due and payable to AIA. John is liable to AIA for $307,000 on the account stated and/or such other amount as may be presently owed, plus prejudgment interest from the date the obligation was incurred.

If John has since paid back the $307,000 or any part of the sums he owes, then Plaintiffs still seek the balance owed and prejudgment interest for the benefit of AIA, including, because John has been a faithless fiduciary who is not entitled to any interest-free loans from AIA.

## XV.   JURY DEMAND

207.   Plaintiffs hereby demand a trial by jury on all causes of action for which a jury trial is allowed by law.

## XVI.   PRAYER FOR RELIEF

Wherefore Plaintiffs pray for the following relief:

1.   For a judgment jointly and severally against the Controlling AIA Defendants and the Hawley Troxell Defendants for damages in an amount to be proven at trial, plus prejudgment interest;

2.   For judgments against the Controlling AIA Defendants and the Hawley Troxell Defendants in an amount to be proven at trial for damages for which joint and several liability does not apply to all defendants, plus prejudgment interest;

3.   For a judgment or order requiring the Hawley Troxell Defendants to disgorge all attorneys' fees and costs paid to them by AIA Services, AIA Insurance, CropUSA and by any other party on behalf of those entities in the amount to be proven at the time of trial, plus prejudgment interest;

4.   For a judgment or order requiring the Controlling AIA Defendants to disgorge all compensation received from AIA or CropUSA since 1999, including stock, cash, benefits, and other assets because they intentionally breached their fiduciary duties and were thus faithless fiduciaries;

5.   For judgment against John in the amount to be proven at the time of trial, plus prejudgment interest;

6.      For an order requiring that all funds recovered as a result of this litigation, minus fees, costs and bona fide debts, be deposited with the Court registry and distributed only after court order, and that no funds from this litigation be paid to faithless fiduciary Controlling AIA Defendants;

7.      For judgments against the Controlling AIA Defendants, jointly and severally, as the alter-ego of CropUSA or to pierce its corporate veil, for all damages incurred by AIA and attributable in whole or in part to CropUSA;

8.      For a declaratory judgment for the relief specified in this Second Amended Complaint and any other declaratory relief requested at or before trial;

9.      For an award of the attorneys' fees and cost incurred in this action as allowed by statute, contract, or recognized grounds of equity; and

10.      For any such further relief or remedy, including preliminary and/or permanent injunctive relief, as Plaintiffs may request or as this Court may find just and equitable.

DATED:  This _____ day of May, 2016.

RODERICK BOND LAW OFFICE, PLLC


By:   _/s/ Roderick C. Bond_____
        Roderick C. Bond
        Attorney for Plaintiffs

**App. - D, p. 66**

**15-ER-3718**

### <u>VERIFICATION OF DALE L. MIESEN</u>

STATE OF TEXAS           )
                                      ) ss.
COUNTY OF TARRANT        )

       I, Dale L. Miesen, being first duly sworn on oath, deposes and says:

       I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Second Amended Complaint, know the contents of this Second Amended Complaint, and believe that the facts in set forth in this Second Amended Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.

_____
Dale L. Miesen

SUBSCRIBED AND SWORN to before me this _____ day of _____, 2016.

_____
Notary Public for Texas
Residing at: _____
My commission expires: _____

## VERIFICATION OF DONNA J. TAYLOR

STATE OF IDAHO                    )
                                 )  ss.
COUNTY OF NEZ PERCE              )

I, Donna J. Taylor, being first duly sworn on oath, deposes and says:

I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Second Amended Complaint, know the contents of this Second Amended Complaint, and believe that the facts in set forth in this Second Amended Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.

_____
Donna J. Taylor

SUBSCRIBED AND SWORN to before me this ___ day of _____, 2016.

_____
Notary Public for Idaho
Residing at: _____
My commission expires: _____

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the _____ day of _____, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:   jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:   jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:   lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:   sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:   swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com


AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501


_____*/s/ Roderick C. Bond*_____
Roderick C. Bond

Case 1:10-cv-00404-DCN-CWD   Document 1131-6   Filed 08/06/21   Page 1 of 131

Case 1:10-cv-00404-CWD   Document 186-2   Filed 11/28/16   Page 1 of 13



# Roderick Bond
## Law Office, PLLC

August 23, 2016

**_VIA U.S. Mail and Facsimile (208) 798-0110 and Email: johntaylor@greenleafalliance.com_**

Board of Directors
AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

Board of Directors
AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  83501

**Re:**     *Shareholder Derivative Demand*

Dear Purported Boards of Directors:

As you are well aware, Dale Miesen, Jerry Legg and Donna Taylor (individually and as Personal Representative of the Estate of Sara Taylor) have all been shareholders of AIA Services Corporation since well before 1995 and creditors of AIA Services since October 1, 2013, and this firm represents them for this shareholder/creditor derivative demand ("derivative demand").

As you know, there have been, and continues to be, extensive malfeasance, torts and illegal conduct occurring at AIA Services Corporation and AIA Insurance, Inc., and the unlawfully covering up of the foregoing acts, omissions and torts. Consequently, this letter is yet another derivative demand being provided in accordance with Idaho Code, including I.C. §§ 30-1-742 and 30-29-742 (to the extent that the former may apply to certain acts, omissions and/or torts). However, despite my prior requests to inspect documents and records on behalf of the below named shareholders in accordance with Idaho Code, you have refused to allow such inspections to take place or otherwise provide responsive documents. As a result, this derivative demand was delayed and is based only on the most recent information obtained to date. More recently, John Taylor provided purported financial statements for the periods ending December 31, 2014 and December 31, 2015, respectively. He also provided copies of alleged amended bylaws, which are contrary to law and improperly adopted. For these reasons and others, yet another derivative demand is being provided.

601 108th Ave, Suite 1900, Bellevue, WA 98004  |  Phone: (425) 591-6903  |  Web: www.roderickbond.com
Roderick C. Bond – Attorney  |  Email: rod@roderickbond.com  |  Licensed in Washington and Idaho

EXHIBIT B

**App. - E, p. 1**

**15-ER-3722**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 2


For purposes of this derivative demand, the following terms shall apply: (a) "AIA" means AIA Services Corporation and its wholly owned subsidiary AIA Insurance; (b) "CropUSA" means CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC; (c) "John" means R. John Taylor and his spouse as to any property transferred to such spouse, together with any entities partially or wholly owned by him (including Green Leaf RE, Reinsurance Partners, Weskan Agency, Pacific Empire Holdings, Sound Insurance and other entities); (d) "Connie" means Connie Taylor, Connie Taylor Henderson, and Connie Wright Henderson and her spouse as to any property transferred to such spouse; (e) "Beck" means James Beck and his spouse as to any property transferred to such spouse; (f) "Cashman" means Michael W. Cashman, Sr. and his spouse as to any property transferred to such spouse; (g) "Duclos" means JoLee K. Duclos and her spouse as to any property transferred to such spouse; (h) "Hawley Troxell" means Hawley Troxell Ennis & Hawley LLP and the applicable present and former attorneys at Hawley Troxell (including, without limitation, D. John Ashby, Gary Babbitt and Richard A. Riley); (i) "Pacific Empire Radio" means Pacific Empire Radio Corporation; (j) "GemCap" means GemCap Lending I, LLC, together with all of its applicable officer(s) and agents; (k) "Combined Defendants" means all of the foregoing parties except as to AIA (but includes attorneys, law firms and agents of AIA), but "Combined Defendants may include or not include Hawley Troxell and/or Pacific Empire Radio to the extent applicable based on certain facts and circumstances and/or when such facts and circumstance occurred; and (l) "Controlling AIA Defendants" means John, Connie, Beck, Cashman and Duclos. For each of the foregoing terms which define more than one party, each such term shall also mean any one or more of the defined parties for purposes of demanding in the alternative.

Dale Miesen, Jerry Legg and Donna Taylor hereby demand that all possible claims and legal action be immediately taken in courts of law on behalf of AIA as follows (including claims which may be contemplated and/or related in any way to the following and this derivative demand is not seeking or requiring that all of the claims and parties be named in a single lawsuit):[1]

1.  Pursue all possible claims and defenses, and seek the maximum damages, against the Combined Defendants and any other party or entity named in this derivative demand, including, without limitation, all possible tort claims (including, without limitation, aiding and abetting in the commission of torts against AIA), contract claims, declaratory relief, injunctive relief and punitive damages based on all acts, omissions, concealments, and failure to disclose through the date of this letter and for the foregoing which continues past the date of this letter. Without limiting the foregoing and so there is no confusion (even though you are well aware of the facts, lawsuits and legal issues as having full access to information at AIA and the most of the Combined Defendants), more specific examples are included below and demand is hereby made to take action against those parties and any of the other Combined Defendants to recover damages based on any of such specific examples.

---

[1] This derivative demand shall also be construed as being provided by any and/or all of the other innocent creditors, minority common and preferred shareholders of AIA Services Corporation.


EXHIBIT B

15-ER-3723

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 3

2. Pursue all possible claims against John, the Combined Defendants, any other party or entity named in this derivative demand, and any of their responsible agents and/or attorneys for improperly amending AIA Services and AIA Insurance's bylaws to include the illegal, unauthorized and improper provisions allegedly on May 26, 2016, including, without limitation, because such amendments are contrary to the law and public policy in Idaho (including, without limitation, by creating an improper standard for fees to be awarded in derivative actions through improperly acting as the Idaho Legislature to extend the circumstances fees can be awarded under I.C. § 30-29-746, which is contrary to Idaho law and would discourage derivative actions by shareholders seeking to address wrongs to an Idaho corporation), such amendments were allegedly adopted through John when he had conflicts of interest (including under common law, Idaho Code, the bylaws and the articles of incorporation) and thus could not approve such amendments as the sole board member, when Donna Taylor's designee was not appointed to the board of directors and thus such amendments were not properly authorized, when such amendments should have been submitted to the minority shareholders for vote with John's shares being conflicted from voting on such amendments, creating new standards through such amendments which are inconsistent with Idaho law, AIA's existing bylaws at the time of the purported amendment and AIA's amended articles of incorporation, and by improperly seeking to retroactively adopt improper provisions after years of malfeasance, fraud and breached fiduciary duties by the Controlling AIA Defendants.

3. Pursue all possible claims and defenses against John, the Combined Defendants, any other party or entity named in this derivative demand, and any of their responsible agents and/or attorneys for the improper and unlawful issuance of the purported 7,500 Series A Preferred Shares to John, including, without limitation, claims pertaining to the fact that the only Series A Preferred Shares authorized were the 200,000 shares originally issued to Donna Taylor and, even if additional shares were authorized, John's acquisition of them was unauthorized and violated Idaho law because such acquisition was not for proper purposes, a proper board of directors was not seated at the time of such acquisition (including, without limitation, Donna Taylor's board designee), no proper authorization was obtained for such acquisition or the consideration therefore, John had conflicts of interest which prevented him from making or approving the acquisition (including, without limitation, under Idaho Code, the bylaws and articles of incorporation), the other shareholders of AIA Services were never offered the Series A Preferred Shares, the purported issuance of the shares served no legitimate business transaction, and the sums owed by John for his acts and omissions against AIA far exceed any sums to which he could have used to acquire such Series A Preferred Shares.

4. Pursue all possible claims against John, the Combined Defendants and any other person or entity named in this derivative demand for the property transferred to AIA from John and debts assumed for such property (including taxes, insurance or other expenses paid after transfer), including, without limitation, to rescind such transactions based on conflicts of interest and failure to property obtain approval from the rightfully seated board or

EXHIBIT B

**App. - E, p. 3**

**15-ER-3724**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 4

shareholders, AIA had no business assuming more debt or acquiring property requiring funds it did not have to maintain (e.g., corporate waste), entering into any transactions with John, or, alternatively, to determine the true fair value of the property if the transfers are upheld (these transfers were disclosed to shareholders for the very first time in the recent financial statements).

5. Pursue all claims against the Controlling AIA Defendants for all litigation expenses incurred directly and indirectly by AIA, including, without limitation, as to any foreclosure action because such action would not have taken place but for the Controlling AIA Defendants' acts and omissions depleting AIA's funds and assets for their self-interests.

6. Pursue all possible claims against Jordan Taylor for any property (including money or real property derived directly or indirectly from AIA or funds derived from AIA) transferred to him from John or any of the other Combined Defendants, including, without limitation, the parking lot transferred to Jordan Taylor located in Lewiston, Idaho (which had been previously purchased with AIA Insurance's line-of-credit).

7. Pursue all possible claims against the Controlling AIA Defendants (including for breaching their fiduciary duties and aiding and abetting in the breach of those fiduciary duties) by incurring nearly as much or more attorneys' fees and costs fighting Donna Taylor for the redemption of her Series A Preferred Shares as it would have taken to simply pay her the sums the Controlling AIA Defendants and AIA Services promised to pay (as reflected in the recent financial statements).

8. Pursue all possible claims against GemCap, its representatives and attorneys (including David Risley and Risley Law Office) for improperly recording in Idaho an unlawfully obtained, non-final judgment from California Federal Court, including, without limitation, all damages, attorneys' fees and costs incurred as a result of the recording of that judgment and/or the removal thereof.

9. Pursue all possible claims against John for placing his interests above those of AIA and their innocent minority shareholders, including, without limitation, by allowing the transfer and sale of any property held by AIA to GemCap.

10. Pursue all possible claims against John, and against the other Controlling AIA Defendants for continuing to aid and abet him, for continuing to fail to properly disclose all financial information and transactions, for continuing to violate AIA's bylaws and articles of incorporation (including, without limitation the conflict of interest provisions), intentionally breach his fiduciary duties owed to AIA (including the duty of loyalty), for continuing to intentionally violate Idaho Code and common law and for all other claims mentioned in this derivative demand.

EXHIBIT B

**App. - E, p. 4**

**15-ER-3725**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 5

11. Pursue all possible claims against the Controlling AIA Defendants for entering into any notes, deeds of trust, mortgages or any other instruments with Randall Danskin, Risley Law Office or any other law firm named in this derivative demand (and to take action against them as necessary to rescind such instruments and recover all funds paid). These instruments include those recently disclosed for the first time in the recent financial statements).

12. Pursue all possible claims and defendants against the Combined Defendants and/or any other person or entity named in this derivative demand for all ultra-vires actions taken by the boards of AIA as all such action dating back to at least 2001 was improper based on conflicts of interest, Donna Taylor's designee not being named to the board of AIA Services, and/or a designee representing the interests of the Series C Preferred Shareholders was never designated. As a result, no purported board action was properly authorized.

13. Pursue all possible claims against the Controlling AIA Defendants, including declaratory relief, barring them from requesting and AIA from paying, advancing or indemnifying the Controlling AIA Defendants for any attorneys' fees, costs, damages and any other claims or defenses.

14. Pursue all possible claims against John, GemCap and the Controlling AIA Defendants and any other persons or entities named in this derivative demand requiring them to disclose any and all agreements, deeds, deeds of trust, mortgages, settlements, settlement agreements and/or other instruments, whether oral or written, with GemCap or any of its agents or assigns, including, without limitation, any agreements and instruments relating in any way to any sums and/or property owed, borrowed, transferred and/or pledged or promised to GemCap.

15. Pursue all claims set forth and/or contemplated in the Second Amended Complaint and/or the Third Amended Complaint (depending on which complaint is operative after the pending motions) filed in U.S. District Court of Idaho. This demand is based is to clarify that the above-named shareholders have also been creditors of AIA Services to the extent that a court may deem AIA Services and/or AIA Insurance are insolvent and rule that fiduciary duties are no longer owed to the shareholders or corporation (issues the above-named shareholders dispute). In other words, the above-named shareholders have standing as shareholders or creditors.

16. Pursue all possible claims and defenses against GemCap and the other Combined Defendants to recover all proceeds from any sale of the real property known as the Lewis/Clark Plaza located at 111 Main Street in Lewiston, Idaho), together with all damages, attorneys' fees and costs paid or incurred by AIA based on the foregoing.

17. Pursue all possible claims and defenses against GemCap, and to the extent necessary any of the other Combined Defendants, to extricate AIA from all settlement agreements entered

EXHIBIT B

15-ER-3726

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 6

into with GemCap and have such agreements declared illegal and/or unenforceable as to AIA, including, without limitation, any agreements, stipulations or orders since the last derivative demand was provided (which includes the alleged sealed order entered in the California Federal Court action and any related or subsequent agreements, stipulations, orders, or judgments).

18. Pursue all possible claims and defenses against GemCap, and to the extent necessary any of the other Combined Defendants, to vacate any judgments entered in favor of GemCap against AIA, including, without limitation the judgments entered in the California Lawsuit and any subsequently entered foreign judgments (including, upon belief, the foreign judgment recently entered against AIA Insurance in Nez Perce County District Court). Included in this demand is also the demand to assert that there was no jurisdiction over AIA in the California Lawsuit and thus the judgments should be voided.

19. Pursue all possible claims and defenses against GemCap for aiding and abetting John, Connie, Beck, Cashman, CropUSA, Pacific Empire Radio any other parties in committing torts against AIA (including assisting in breaches of fiduciary duties, fraud and other torts and covering up such breaches and torts). GemCap was aware of the malfeasance occurring at AIA when it first entered into the loans and guarantees with CropUSA and AIA, that AIA was being used improperly by the Controlling AIA Defendants to fund and/or support entities partially or wholly owned by them, and GemCap became more aware of these facts as time went on, yet GemCap continued to assist the foregoing parties committing and covering up torts against AIA (including, without limitation, breaches of fiduciary duties and fraud).

20. Pursue all possible claims against the Combined Defendants for their torts committed against AIA (including, without limitation, breaches of fiduciary duties, fraud and any other claims contemplated or related to any of the facts or issues disclosed in this letter) and the aiding and abetting of torts committed against AIA by one or more of the Combined Defendants (including, without limitation, assisting in the commission of the torts or covering up the torts).

21. Pursue all possible claims against Controlling AIA Defendants requiring them to disgorge all compensation, consulting fees, fees, salary, benefits or any other type of payments made to them directly or indirectly from AIA (including, based on being faithless fiduciaries and/or receiving such compensation without proper authorization from AIA) and to require them to repay any funds, expenses, fees, reimbursements, and costs incurred by AIA or paid by AIA for their benefit in any legal action or matter and to obtain damage judgments for such payments and compensation. Included in this demand is disgorgement or damages for all salary, bonuses, benefits and other compensation paid to John, Beck, Connie, Cashman and Duclos from being an officer, director or other agent of AIA and all attorneys' fees, expenses and costs paid on their behalf. This demand includes the $5,000 per quarter paid to Connie and Beck to purportedly serve on AIA's Board of Directors and

EXHIBIT B

15-ER-3727

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 7

all compensation paid to John and Duclos for purportedly being officers and/or directors of AIA.

22. Pursue all possible claims against GemCap and the other responsible Combined Defendants (including the Controlling AIA Defendants) for all of the attorneys' fees, costs, expenses and damages proximately caused directly or indirectly from GemCap's loans to CropUSA and AIA's guarantees of those loans, including, without limitation, all attorneys' fees, costs and expensed incurred or paid directly or indirectly by AIA for the California Lawsuit and any other lawsuit. But for GemCap agreeing to improperly make the loans and improperly agree to accept AIA's guarantees, none of the lawsuits would have occurred.

23. Pursue all possible claims and defenses against GemCap that it was not a good faith lender, had unclean hands, and/or is not entitled to any relief against AIA.

24. Pursue all possible claims against Hawley Troxell requiring it to disgorge all compensation received or paid to Hawley Troxell directly or indirectly from AIA based on Hawley Troxell's conflicts of interest, breached fiduciary duties (including the duties of loyalty) and related malpractice, including, without limitation, all subsequent payments made by AIA to Hawley Troxell.

25. Pursue all possible claims against Pacific Empire Radio for all sums owed by it to AIA, and all amounts which have been subsequently improperly lent to Pacific Empire Radio.

26. Pursue all possible claims against the Controlling AIA Defendants for allowing any funds to be lent to Pacific Empire Radio in the first place (including without limitation, for the breaches of fiduciary duties by them as present or former officers and/or directors of AIA and the aiding and abetting in assisting and/or covering up of the improper loans to Pacific Empire Radio). As you are fully aware, these loans violated AIA's amended articles of incorporation, AIA's bylaws, constituted conflicts of interest, provided no benefit to AIA and were made when AIA was not meeting its obligations to others.

27. Pursue all possible claims against Pacific Empire Radio, the Controlling AIA Defendants and any other parties relating to any agreements and subordination agreements improperly entered into between AIA, Pacific Empire Radio and any other party, as such agreements were not authorized by AIA and were not in AIA's best interests.

28. Pursue all possible claims against the Controlling AIA Defendants for allowing John to operate AIA for his benefit and/or to assist AIA in funding and the operation of entities partially or wholly owned by the Controlling AIA Defendants without AIA receiving any benefit, proper compensation, without full disclosure to AIA, in violation of applicable conflicts of interest (including under AIA Services' amended articles of incorporation and bylaws) and without obtaining proper authorization from AIA or its innocent minority shareholders.

EXHIBIT B

15-ER-3728

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 8

29. Pursue all possible claims against the Controlling AIA Defendants and any other responsible party for all damages relating to all payments made directly or indirectly from AIA to the attorneys and law firms of Hawley Troxell, Crumb & Munding, Gordon & Reese, Risley Law Office PLLC, Randall Blake and Cox, Clark and Feeney, Quarles & Brady, Randall Danskin, David Gittins, Connie Taylor (and her law firms Clark and Feeney and Henderson Law Firm) and any other lawyer and law firm (including any attorneys who have represented AIA) for malpractice, for declaratory relief that no further sums are owed by AIA to any of the foregoing and that any fee agreements or conflict waivers are void), as such payments should never have been made, were never authorized by AIA, were not properly incurred or necessary for AIA, were never authorized by AIA's shareholders after full disclosure was made, and involved the attorneys and law firms taking action or performing work not in the best interests of AIA and/or in violation of the duty of loyalty owed to AIA. Demand is further made to pursue all possible claims, including, without limitation, for the disgorgement of all fees, costs and expenses paid or discharge of any debts allegedly owed, to any of the foregoing attorneys, law firms and/or attorneys working at such law firms to the extent that they represented AIA based on conflicts of interest, breached fiduciary duties (including the duty of loyalty), and malpractice. To the extent that any of the forgoing law firm and attorneys did not represent AIA, then demand is made to pursue all possible claims against the Controlling AIA Defendants for all sums paid and/or owed to such attorneys and law firms by AIA. In addition, demand is made to assert all possible claims against the foregoing parties for participating and/or allowing AIA to be improperly utilized to fund the defense and prosecution of lawsuits which were not in AIA's best interests, but were instead pursued based on the interests of the Controlling AIA Defendants.

30. Pursue all possible claims against the Controlling AIA Defendants, and to the extent necessary AIA or any other Combined Defendant to ensure that AIA is not bound or obligated by any act or omission of the Controlling AIA Defendants or AIA, for not honoring Donna Taylor's unqualified appointment of a designee to AIA Services' Board of Directors (Patrick Moran and Paul Durant) and for declaratory relief that all such actions purportedly taken by the Board of Directors of AIA Services without the consent or approval of Donna Taylor's designee (who would have been the only director without a conflict of interest) were the unauthorized acts of AIA, ultra-vires and void. Such acts and omissions, include, without limitation, all guarantees and settlements with GemCap, all loans to Pacific Empire Radio, all conflict waivers or other agreements with attorneys and law firms, all board resolutions (including any resolutions provided to GemCap), and all other acts of the purported Board of Directors of AIA Services.

31. Pursue all possible claims against the Controlling AIA Defendants, CropUSA and any other of the Combined Defendants or responsible parties for all payments made to any and all vendors, creditors, consultants, agents, customers or other parties owed money by CropUSA, by the Controlling AIA Defendants, any entity partially or wholly owned by

EXHIBIT B

15-ER-3729

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 9

any one of the Controlling AIA Defendants, or paid at the direction of any one or more of the Controlling AIA Defendants, including, without limitation, the more recent hundreds of thousands of dollars in payments AIA made to certain agents and customers of CropUSA in 2013 and any previously or subsequently paid for CropUSA and any other entity.

32. Pursue all possible claims against the Combined Defendants for taking action violating AIA's amended articles of incorporation, violating AIA's bylaws, violating statutory and common law, and committing torts against AIA, together with aiding and abetting others (including other Combined Defendants) in covering up the torts committed against AIA. Examples of the torts and the covering up of those torts are contained with the proposed Second and Third Amended Complaints recently filed in the federal derivative lawsuit by Dale Miesen and Donna Taylor—the facts and torts alleged in that Second Amended Complaint have continued since prior demands.

33. Pursue all possible claims against the Combined Defendants for failing to properly allocate costs, labor, expenses and other items between AIA and other entities, including, CropUSA, and by allowing such issues to take place in the first place, including, without limitation, based on the conflicts of interest and restrictions under AIA's amended articles of incorporation, bylaws and the undivided duties of loyalty owed by the Controlling AIA Defendants to AIA, among others, and for continuing to conceal and cover up all such issues and related issues.

34. Pursue all possible claims against the Controlling AIA Defendants for all damages, fees and costs incurred or paid by AIA for attempting to effectuate a reverse stock split to eliminate the minority common shareholders of AIA Services in violation of AIA Services' amended articles of incorporation, bylaws and Idaho Code, including, without limitation, the hundreds of thousands of dollars of attorneys' fees and costs paid to Randall Danskin for the improper reverse stock split and to purportedly represent AIA in the subsequent lawsuit against certain of AIA Services' shareholders. Demand is further made to pursue all possible claims against Doug Siddoway (and any other responsible attorney) and Randall Danskin, including, for breach fiduciary duties, conflicts of interest, and disgorgement of all attorneys' fees and costs paid to them and to have declared unlawful or uncollectable any attorneys' fees and costs allegedly owed to them by AIA, including, without limitation, based on their malpractice, breaches of duty of loyalty owed to AIA, conflicts of interest, for aiding and abetting the Controlling AIA Defendants in the commission of torts (including in that lawsuit and others), and taking action in violation of their undivided fiduciary duties of loyalty owed to AIA. To be clear, full and complete disgorgement should be sought and obtained for all fees, costs and expenses paid directly or indirectly by AIA (or by GemCap) to Randall Danskin for all work that it and its attorneys have directly or indirectly performed for AIA and for concealing from AIA the conflicts of interest, breaches of fiduciary duties and malpractice committed by Randall Danskin against AIA—Mr. Siddoway and Randall Danskin placed their interests in earning

EXHIBIT B

**App. - E, p. 9**

**15-ER-3730**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 10

fees ahead of AIA's interests, are faithless fiduciaries and are not entitled to retain any compensation relating to AIA.

35. Pursue all possible claims against John Munding and Crumb & Munding (or such other firm Mr. Munding is operating through) for malpractice, breach of fiduciary duties and to disgorge all attorneys' fees, costs and expenses paid to them directly or indirectly by AIA for the California Lawsuit as Mr. Munding intentionally violated his duties owed to AIA, including, without limitation, his duties of loyalty owed to AIA and by taking direction and action benefitting other defendants (including John's) and placing their interests in front of AIA and by representing CropUSA, AIA and other parties when there were conflicts of interest in doing so and Mr. Munding knew that he could not properly represent AIA's interests and when he had no intention of doing so. Demand is further made to pursue all possible claims against Mr. Munding and Crumb & Munding for improperly failing to assert that the guarantees and settlement agreements entered into by AIA were not authorized and were thus illegal or ultra-vires and by allowing AIA to enter into them in the first place. Mr. Munding places his interests in earning fees ahead of AIA's interests.

36. Pursue all possible claims against the Controlling Defendants, the applicable Combined Defendants and any other parties or entities to recover all sums paid directly or indirectly on behalf of any such parties (including the Controlling Defendants) by AIA, including, without limitation, loan payments (including loans paid for John and others), consulting fees (including for past and present employees and/or purported consultants for CropUSA, Sound Insurance, Weskan, AIA (to the extent unnecessary) and other entities or parties, and wages or benefits paid for the foregoing), expenses, costs, litigation expenses, commission refunds, credit card payments (made for John and others) cell phone bills, insurance payments, CropUSA commissions to agents (which was hundreds of thousands of dollars), telephone costs, advances (including to John, Weskan Agency, and others), tax payments, and other payments. As you are aware, the foregoing are easily determined by reviewing AIA's check registers and by ascertaining from John, Duclos or others regarding items not listed in the check registers, including, such information which has never been disclosed to AIA's minority shareholders or their attorneys and all subsequent ones to this demand.

37. Pursue all possible claims against the Controlling Defendants for wasting AIA's assets and funds and paying excessive compensation to any and/or all of them, including, without limitation, for the purpose of concealing and aiding and abetting in the covering up of torts committed against AIA.

38. Pursue all possible claims against the Controlling Defendants for allowing other entities partially or wholly owned by them, including CropUSA, to compete against AIA in violation of John's Executive Officer's Agreement and the undivided duty of loyalty owed to AIA by them as majority shareholders, directors, and/or officers of AIA.

EXHIBIT B

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 11

39. Pursue all possible claims against John for representing AIA in any lawsuit, including, without limitation, the lawsuit that Dale Miesen, Donna Taylor and Paul Durant filed against GemCap and AIA to have the illegal guarantees and settlement agreements, which were the subject matter of the California Lawsuit, voided, including, without limitation, claims for intentional breaches of fiduciary duty and intentional malpractice for failing to represent the interests of AIA and by breaching the duty of loyalty owed to AIA.

40. Pursue all possible claims against the Combined Defendants for all damages and relief proximately caused from their acts and/or omissions in leading to the decimation of AIA and its present financial condition.

41. Pursue all possible claims against the Controlling AIA Defendants for any and all damages, tax liabilities, interest, penalties and any other source of damages causes by their acts, omissions and/or torts against AIA.

42. Pursue all possible claims requiring an accounting of all funds, assets, labor, expenses, costs and the allocation of such items between or among other individuals and parties (including the Controlling AIA Defendants and any entities partially or wholly owned by any one or more them).

43. To the extent necessary, pursue all possible claims and defenses for equitable subordination, indemnification (including equitable indemnification) and all related claims and defenses against the Combined Defendants in any pending or future lawsuit.

44. Pursue all possible claims and relief to obtain an accounting from Trustmark of all payments made to AIA and the subsequent use of such funds, including, without limitation, identifying any checks or payments made directly into any account by John or any of the other Controlling AIA Defendants.

45. Pursue all possible claims seeking all necessary declaratory relief to make AIA whole and its innocence minority common and preferred shareholders whole (to the extent that shares have been cancelled or redeemed).

46. Pursue all possible claims requiring Donna Taylor's designee to be appointed to the Board of Directors of AIA Services and to require that the board of directors comply with AIA's amended articles of incorporation, AIA's bylaws, statutory and common law and to ensure full disclosure is made to AIA.

47. Pursue all possible claims that CropUSA and other entities (including Pacific Empire Radio) are the alter-ego of the Controlling AIA Defendants and thus they are individually liable for all damages.

EXHIBIT B

15-ER-3732

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 12

48. To the extent John or others of the Controlling AIA Defendants have transferred real or personal property to their present or former spouses or any other party, pursue all possible claims to recover such property for the benefit of AIA and to help satisfy any judgment(s) which may be entered in favor of AIA.

49. Pursue all possible claims to prevent any of the Controlling AIA Defendants from being directors or officers of AIA.

50. Pursue all possible claims to seek declaratory judgment requiring AIA's officers, directors and shareholders to comply with AIA's amended articles of incorporation, AIA's bylaws and statutory and common law.

51. Pursue all possible claims against David Risley and his law firm (including Risley Law Offices) and any other attorneys or law firms named or referenced in this derivative demand (including those listed only as agents or attorneys) for malpractice and breaching his fiduciary duties owed to AIA, including, without limitation, requiring the repayment of all sums paid to them directly or indirectly from AIA, for disgorgement of all attorneys' fees, costs and expenses paid to them when they breached their fiduciary duties owed to AIA (including the undivided duty of loyalty), engaged in impermissible conflicts of interest (representing the interests of the Controlling AIA Defendants over the interest of AIA), aided and abetted the Controlling AIA Defendants, and for all other damages (including, without limitation, allowing property owned by AIA to be transferred to others (including GemCap) and/or utilized by the Controlling AIA Defendants).

52. Pursue all possible claims against the Combined Defendants and any and all of the parties listed above for concealing from AIA the facts, conflicts and failing to disclose all necessary facts and claims.

53. Pursue all possible claims against John and Connie relative to litigation expenses and costs paid for other lawsuits (including the lawsuit against John and Connie in Ada County), including fees and costs paid to Connie (or her firm) and/or on behalf of her or John.

54. Pursue all possible claims against the Combined Defendants, which have not been specifically stated above, to recover all damages and money owed and/or traced directly or indirectly to AIA and/or otherwise derived from its labor, office space, trade secrets, funds, commissions, agency force, loans, guarantees, lines of credit and/or any other asset.

55. Pursue all possible claims and/or declaratory relief that the Controlling AIA Defendants and/or any other party named in this derivative demand is not entitled to be indemnified by AIA and must repay all sums paid to date and/or judgment be obtained against them.

56. Pursue all possible claims of prejudgment interest for all sums and damages owed to AIA in the maximum amount permitted under the law.

EXHIBIT B

15-ER-3733

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 13

57. Pursue all possible claims against any of the Combined Defendants or any other parties identified above to recover any attorneys' fees and costs incurred in any lawsuit or litigation directly or indirectly involving AIA.

58. To the extent that the conduct and claims discussed above continues after this derivative demand, to pursue all possible claims based on all future action based upon the same or similar acts, omissions, conduct, claims and damages.

Please note that to the extent that any of the above demands overlap or are duplicative with prior demands or may include acts and claims which occurred after one of the prior demands, Dale Miesen, Jerry Legg and Donna Taylor are not waiving any claims for such prior demands or conceding that you have the right to now address those demands nor are they waiving the right to seek relief based on irreparable harm to AIA. To the contrary, Dale Miesen and/or Donna Taylor are already asserting, or seeking to assert, many claims on behalf of AIA.

In addition, please note that time is of the essence on many of the above claims and to the extent that AIA is harmed based on your failure to promptly act or promptly reject this derivative demand, you and any others (including other Controlling AIA Defendants) will be held liable. The torts, facts and issues are well known to you and you are in control of the facts and documents. Thus, you bear the risk of dragging out this demand and failing to take action on behalf of AIA.

Sincerely,

RODERICK BOND LAW OFFICE, PLLC

By: Roderick C. Bond

cc:  Dale Miesen
     Donna Taylor
     Jerry Legg
     Lee Ann Hostetler
     Paul Durant
     Steve Wieland
     Shawnee Perdue

EXHIBIT B

15-ER-3734

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiffs

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual and the Personal representative of the Estate of Sarah Taylor; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC.; <br><br> Plaintiffs, <br><br> v. <br><br> CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation, <br><br> Defendants. | Civil No. 1:10-cv-00404-CWD <br><br> SECOND AMENDED COMPLAINT <br><br> DEMAND FOR JURY TRIAL <br><br> [PROPOSED] |

SECOND AMENDED COMPLAINT - i

Exhibit - A

App. - E, p. 14

15-ER-3735

**TABLE OF CONTENTS**

I.     STATEMENT OF JURISDICTION ......................................................................... 1

II.    STATEMENT OF VENUE ..................................................................................... 1

III.   PARTIES AND DEFINITIONS OF THE PARTIES........................................................ 1

IV.    FACTS ................................................................................................................... 5

A.     The Background Facts Regarding AIA Services and AIA Insurance.................................. 5

B.     John, Connie, Beck and Cashman Take Operational Control of AIA and AIA
       Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in
       Its Amended Articles of Incorporation ...................................................................... 6

C.     AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer
       CropUSA to Themselves ........................................................................................ 9

D.     The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants
       in Taking CropUSA from AIA and Having AIA Fund CropUSA .................................... 13

E.     The Controlling AIA Defendants Steal $1,510,693 From AIA to Fund CropUSA
       and Then They Use $634,269 of Those Funds to Repay a Debt CropUSA Owed to
       AIA—thereby Resulting in a $2,144,962 Fraud Against AIA. ....................................... 15

F.     The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and
       Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal ......... 19

G.     The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and
       Financial Wherewithal with the Improper Assistance from the Hawley Troxell
       Defendants ......................................................................................................... 21

H.     The Controlling AIA Defendants Enter Into Tolling Agreements, but Those
       Tolling Agreements Do Not Save the Hawley Troxell Defendants from the
       Unwaivable Conflicts of Interest ........................................................................... 22

I.     The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA
       and Intentionally Committing Torts against AIA with the Assistance of the Hawley
       Troxell Defendants—Even While this Lawsuit Was Pending......................................... 27

SECOND AMENDED COMPLAINT - ii

**Exhibit - A**

**App. - E, p. 15**

**15-ER-3736**

J.     There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and
       Intentional Torts Committed by the Controlling AIA Defendants ................................... 31

V.     CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 .......... 35

VI.    COUNT I—BREACH OF FIDUCIARY DUTY ............................................................... 38

VII.   COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES ....... 39

VIII.  COUNT III—LEGAL MALPRACTICE .......................................................................... 40

IX.    COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ ........................................... 42

X.     COUNT V—AIDING AND ABETTING FRAUD ........................................................... 45

XI.    COUNT VI—BREACH OF CONTRACT ........................................................................ 47

XII.   COUNT VII—DECLARATORY JUDGMENT ............................................................... 48

XIII.  COUNT VIII—EXCESSIVE COMPENSATION/CORPORATE WASTE .................... 49

XIV.   COUNT IX—ACCOUNT STATED ................................................................................ 50

XV.    JURY DEMAND ............................................................................................................... 51

XVI.   PRAYER FOR RELIEF .................................................................................................... 51

VERIFICATION OF DALE L. MIESEN ................................................................................ 53

VERIFICATION OF DONNA J. TAYLOR ............................................................................ 54

CERTIFICATE OF SERVICE ................................................................................................. 55

SECOND AMENDED COMPLAINT - iii

# Exhibit - A

App. - E, p. 16

15-ER-3737

Plaintiffs Donna J. Taylor and Dale L. Miesen allege cumulatively and, when necessary and/or applicable, in the alternative, as follows:

### I.   STATEMENT OF JURISDICTION

1.   This Court has jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1332(a)(1), as the amount in controversy exceeds $75,000 and the action, when filed, was between citizens of different states.

### II.   STATEMENT OF VENUE

2.   Venue is proper in the District of Idaho under 28 U.S.C. § 1391(b)(2) as a substantial part of the errors and omissions giving rise to the claims asserted in this Second Amended Complaint occurred in the District of Idaho.

3.   Venue is also proper in the District of Idaho under 18 U.S.C. § 1391(c), as certain of the defendants reside in the District of Idaho.

### III.   PARTIES AND DEFINITIONS OF THE PARTIES

4.   Plaintiff Dale L. Miesen ("Miesen") is a resident of Colleyville, Texas.  Miesen has been a common shareholder of AIA Services during all relevant times.

5.   Plaintiff Donna J. Taylor, as an individual and the Personal Representative of the Estate of Sara Taylor (collectively "Donna"), is a resident of Clarkston, Washington. Donna has been a Series A Preferred Shareholder of AIA Services during all relevant times. Donna has also been a common shareholder of AIA Services during all relevant times, through her beneficial ownership as the Personal Representative of the Estate of Sara Taylor.

6.   Plaintiffs Dale Miesen and Donna J. Taylor are collectively referred to as the "Plaintiffs" in this Second Amended Complaint, and they were innocent minority shareholders.

7.   Plaintiffs are bringing this derivative action on behalf of AIA Services Corporation ("AIA Services"). In addition, Plaintiffs are bringing this action as a double derivative on behalf

SECOND AMENDED COMPLAINT - 1

Exhibit - A

15-ER-3738

AIA Insurance, Inc. ("AIA Insurance"), which is a wholly owned subsidiary of AIA Services. AIA Services and AIA Insurance are collectively referred to as "AIA" in this Second Amended Complaint. The definition of "AIA" includes AIA Services and/or AIA Insurance for purposes of pleading in the alternative, and includes the Plaintiffs to extent they are required to support any derivative cause of action set forth in this Second Amended Complaint.

8.      Defendant AIA Services is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. At all times relevant to this lawsuit, AIA Services is or has been the parent corporation of AIA Insurance.

9.      Defendant AIA Insurance is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. AIA Insurance is, or was at all relevant times, a wholly owned subsidiary of AIA Services.

10.      Defendant CropUSA Insurance Agency, Inc. ("CropUSA") is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. CropUSA was formerly known as AIA Crop Insurance, Inc.

11.      Defendant R. John Taylor ("John") is an individual residing in the state of Idaho. At all times relevant to this lawsuit, John served on the Board of Directors of AIA Services, AIA Insurance, and CropUSA and continues to serve on those boards. John also served as President of each of these corporations during all times relevant to this lawsuit. John is also licensed to practice law in the state of Idaho. John is a common shareholder of AIA Services and a common shareholder of the CropUSA. John also owns shares or ownership interests in other entities that have engaged in inappropriate transactions with AIA and/or which have improperly benefitted from AIA during all relevant times.

///

SECOND AMENDED COMPLAINT - 2

Exhibit - A

15-ER-3739

12.     Defendant James Beck ("Beck") is an individual residing in the state of Minnesota. Beck served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until he resigned in 2014. Beck was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA.

13.     Defendant Michael Cashman, Sr. ("Cashman") is an individual residing in the state of Minnesota. Cashman served on the Board of Directors of AIA Services during certain relevant times. Cashman was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA.

14.     Defendant Connie Taylor Henderson ("Connie") is a resident of Vancouver, Washington. Connie served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2014. Connie jointly owns with John the common shares of AIA Services held in John's name. Connie has actively asserted community ownership of those shares and specifically did so before the district court and on appeal in *Taylor v. AIA Services Corp.*, *et al*.

15.     Defendant JoLee K. Duclos ("Duclos") is a resident of Clarkston, Washington. Duclos has severed as Secretary of AIA Services, AIA Insurance and other entities partially or wholly owned by John during certain relevant times. Duclos served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2007. Duclos is a common shareholder of CropUSA. Duclos has knowledge of the law by and through her training and performing the duties of a paralegal. Duclos has served as John's "lieutenant" during all relevant times.

16.     John, Beck, Cashman, Connie and Duclos are collectively referred to herein as the "Controlling AIA Defendants." The Controlling AIA Defendants have acted in concert and

SECOND AMENDED COMPLAINT - 3

Exhibit - A

15-ER-3740

assisted one another in committing various torts described in this Second Amended Complaint and covering up and/or concealing those torts. The definition of "Controlling AIA Defendants" includes the acts and/or omissions of one or more of John, Beck, Cashman and/or Duclos for purposes of pleading in the alternative.

17.     Defendant Gary D. Babbitt ("Babbitt") is an individual residing in the state of Idaho and is an attorney practicing law in the state of Idaho with and for Hawley Troxell.

18.     Defendant Richard A. Riley ("Riley") is an individual residing in the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

19.     Defendant D. John Ashby ("Ashby") is an individual residing in the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

20.     Defendant Hawley Troxell Ennis & Hawley LLP ("Hawley Troxell") is an Idaho limited liability partnership in the business of practicing law, with its principal place of business in Boise, Idaho. Hawley Troxell has no office in the state of Washington. None of the individual members of Hawley Troxell are residents of Washington. Hawley Troxell, though its attorneys, acted as counsel for AIA Services, AIA Insurance and CropUSA during certain relevant times and in certain lawsuits. Hawley Troxell is also named herein as it is vicariously liable for the acts and/or omissions of Babbitt, Riley, Ashby and its other attorneys.

21.     Babbitt, Ashby, Riley, other Hawley Troxell attorneys, and Hawley Troxell are collectively referred to as the "Hawley Troxell Defendants" in this Second Amended Complaint. The definition of "Hawley Troxell Defendants" includes the acts and/or omissions of one or more of Babbitt, Ashby, Riley, other attorneys at Hawley Troxell and/or Hawley Troxell for purposes of pleading in the alternative.

///

SECOND AMENDED COMPLAINT - 4

Exhibit - A

15-ER-3741

### IV.   <u>FACTS</u>

#### A.  <u>The Background Facts Regarding AIA Services and AIA Insurance</u>

**22.**     In 1983, AIA Services was formed as a closely held Idaho corporation for the purpose of acting as a holding company for various other wholly owned subsidiaries. AIA's business model was to work with farmers and growers to form trusts and/or related cooperatives through various growers and farmers' associations and the members of those associates also becoming members of the trusts and/or cooperatives.

**23.**     AIA created the Grain Growers Membership & Insurance Trust, the National Contract Poultry Grower's Membership & Insurance Trust, and other, similar trusts. By way of its relationships with these various organizations, AIA held contracts for the exclusive right to market health insurance (*e.g.*, Group Universal Health Policies) and other insurance products to the members of the various trusts and associations.

**24.**     In 1987, Donna and Reed Taylor, a non-party to this suit, were issued Series A Preferred Shares in AIA Services in connection with their divorce. Pursuant to the dissolution of their marriage, Donna was issued the 200,000 shares of Series A Preferred shares on or about February 12, 1988, and has held those shares ever since, less those shares which have been redeemed in part over the years. (*See* Dkt. #67-1 and #67-2.)

**25.**     In connection with the issuance of the Series A Preferred Shares to Donna, AIA Services' shareholders adopted amendments to its articles of incorporation with restrictions on the manner in which AIA Services and AIA Insurance could conduct business. (*See* Dkt. #67-3.) AIA Services' amended articles of incorporation included, without limitation, the restrictions that: (a) barred AIA Services and AIA Insurance from guaranteeing any loans for any individual or entities which were not wholly owned subsidiaries; (b) barred certain transactions with shareholders and affiliates; and (c) required AIA Services to maintain certain financial covenants. (*Id.*)

SECOND AMENDED COMPLAINT - 5

## Exhibit - A

**15-ER-3742**

26.     In addition, AIA Services' amended articles of incorporation also provied Donna with the unqualified right as the Series A Preferred Shareholder to appoint a person, to be determined in her sole discretion, to the Board of Directors of AIA Services. (*See* Dkt. #67-3.)

27.     The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the restrictions under AIA Services' amended articles of incorporation for the benefit of AIA Services and the Series A Preferred Shares.

28.     Donna's Series A Preferred Shares have not been fully redeemed to this day, and the restrictions under AIA Services' amended articles of incorporation remain in full force and effect to this day and fully applicable. (*See* Dkt. #67-42, pp. 10-11 ¶ 19.)

B. **John, Connie, Beck and Cashman Take Operational Control of AIA and AIA Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in Its Amended Articles of Incorporation**

29.     In 1995, the Controlling AIA Defendants, other than Duclos (although she did assist the Controlling AIA Defendants as an employee and officer (assistant secretary) of AIA), spearheaded a transaction to redeem Reed Taylor's majority common stock interest in AIA Services. (*See* Dkt. 67-5 and #67-6.)

30.     As part of the redemption, Beck, Cashman and certain of their friends acquired Series C Preferred Shares in AIA Services. When AIA Services amended its articles of incorporation to allow the issuance of the Series C Preferred Shares, AIA Services included additional restrictions in its articles of incorporation. Riley assisted and/or approved these restrictions and he was fully aware of them.

31.     Under the new and additional restrictions in AIA Services' amended articles of incorporation (these restrictions were in addition to others adopted in connection with the issuance of Donna's Series A Preferred Shares), AIA Services was barred from doing a number of corporate

SECOND AMENDED COMPLAINT - 6

actions, including, but not limited to: (a) AIA Services could not acquire any common shares from any shareholders unless all dividends due on the Series C Preferred Shares has been paid (10% dividend per year) or those funds set aside; (b) the Series C Preferred Shareholders had the right to elect one director to AIA Services' Board of Directors; and (c) if any Series C Preferred Shares are redeemed, such redemptions must be equally from all shareholders. (*See* Dkt. #67-3.)

32.     Although the Series C Preferred Shares held by Beck, Cashman and their friends were eventually unlawfully and effectively redeemed by AIA, other Series C Preferred Shares were later issued to the AIA Services 401(k) Plan and those shares remain issued and outstanding to this day and no dividends have been paid as required since approximately 1997. As a result, these new restrictions under AIA Services amended articles of incorporation for the benefit of AIA Services and the Series C Preferred Shares, which have remained in full force and effect to this day.  The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the additional restrictions under AIA Services' amended articles of incorporation.

33.     Upon the redemption of Reed Taylor's majority common shares, Beck, Cashman, John and Connie directly or indirectly became the majority common shareholders of AIA Services. (*See* Dkt. #67-5.) In addition, Beck, Cashman and John entered into a Voting Agreement to ensure that they would maintain control of AIA Services' Board of Directors. As a result, the Controlling AIA Defendants have maintained operational control of AIA from 1995 through the present time.

34.     In connection with the redemption of Reed Taylor's shares, John entered into an Executive Officer's Agreement with AIA Services, which guaranteed him certain salary payments and other compensation for three years; that agreement also contained non-compete and non-solicitation provisions. (*See* Dkt. #67-8.) John's salary after the first three years was required to be determined by AIA Services' Board of Directors, which was never done after the first three years.

SECOND AMENDED COMPLAINT - 7

Exhibit - A

15-ER-3744

35.     From 1999-2012, John improperly paid himself millions of dollars pursuant to his Executive Officer's Agreement for his and Connie's benefit (the amount of which in itself was improper based on AIA's business prospects and John's inability to do anything for the benefit of AIA), while he intentionally and repeated violated the non-compete and non-solicitation provisions of his Executive Officer's Agreement.

36.     In connection with the redemption of Reed Taylor's shares in August 1995, AIA Services contributed funds to The Universe Life Insurance Company, which was a wholly owned subsidiary of AIA Services, in order to make AIA Insurance, which was then a wholly owned subsidiary of The Universe Life Insurance Company, a subsidiary of AIA Services. After that transaction, AIA Insurance became a wholly owned subsidiary of AIA Services.

37.     As a result, from August 1995 through all relevant times, AIA Insurance was a wholly owned subsidiary through which AIA Services derived its commissions and administrative fees from insurance policies, which accounted the bulk of AIA's revenues and profits.

38.     From 1995 through 2005, AIA Insurance generated over $65 million in revenues from commissions (over $33 million) and administrative fees (over $27 million), and it continued to generate revenues thereafter.

39.     From 1995 through all relevant times, each of the Controlling AIA Defendants has served at various times on the Board of Directors for AIA Services, AIA Insurance and/or CropUSA, while John has continuously served as the President of AIA and Duclos has continuously served as a Secretary of AIA.

40.     From 1999 through certain relevant times, the Controlling AIA Defendants have also served from time to time on purported "advisory board" of CropUSA, which actually made the decisions on behalf of AIA and CropUSA. Specifically, Cashman, Beck and John served on

SECOND AMENDED COMPLAINT - 8

the "advisory board" of CropUSA from 1999 through certain relevant times.

41.     The Controlling AIA Defendants intentionally concealed from AIA and its minority shareholders of the existence and authority of the "advisory board" of CropUSA.

**C. AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer CropUSA to Themselves**

42.     By 1998, AIA's ability to sell health insurance had been impaired by undercapitalization in its underwriting subsidiary the Universal Life. Accordingly, the company considered proposals to sell other forms of insurance, and in particular crop insurance, to be underwritten by other insurance companies. At a 1998 Board Directors of Meeting, AIA Services' Board of Directors specifically discussed selling crop insurance and elected to have AIA pursue selling crop insurance.

43.     In 1999, AIA, then under the control of Controlling AIA Defendants, began selling crop insurance through a wholly owned subsidiary of AIA Services formed under the name "AIA Crop Insurance, Inc."

44.     The first purported meeting of shareholders of AIA Crop Insurance, Inc. ("AIA Crop Insurance") was held on January 11, 2000. The first purported meeting of the AIA Crop Insurance's Board of Directors was held on the same day. The purported minutes of the shareholder's meeting indicate that John, not the true owner AIA Services, claimed to be the sole shareholder of AIA Crop Insurance at the time of incorporation; these facts were concealed from AIA and AIA Services' innocent minority shareholders.

45.     Upon information and belief, at or shortly after the time of its formation, the Hawley Troxell Defendants began providing legal services to AIA Crop Insurance.

46.     At a special meeting of the shareholders of AIA Crop Insurance held on November 13, 2000, AIA Crop Insurance was renamed CropUSA in an apparent attempt to conceal its

SECOND AMENDED COMPLAINT - 9

**Exhibit - A**

15-ER-3746

corporate lineage and origins.

47.     The minutes of the November 13, 2000, special meeting of the shareholders also show that John continued to claim that he was the sole shareholder of CropUSA, while he was simultaneously representing in business plans provided to others that CropUSA was a subsidiary of AIA Insurance. (*See* Dkt. # 67-66.)

48.     At the time CropUSA was formed, John was employed by AIA Services under an Executive Officer's Agreement, dated August 1, 1995, Dkt. #67-8, which contained express covenants not to compete. Upon information and belief, John's Executive Officer's Agreement and AIA Service's amended articles of incorporation and restated bylaws were drafted and/or approved by Riley, and he had full knowledge of the restrictions under the terms of the foregoing documents.

49.     CropUSA held its purported annual shareholder's meeting on January 10, 2001. By this time, the illegal "spin off" of CropUSA had been accomplished by having AIA Service's Series C Preferred Shareholders (primarily Beck and Cashman) exchange their Series C Preferred Shares for common shares in CropUSA (if CropUSA were in fact an independent entity, these maneuvers would have been completely unnecessary).

50.     The minutes for the shareholder meeting held on January 10, 2001 for CropUSA revealed that CropUSA had retained Hawley Troxell as its advisor and SEC counsel and, upon information and belief, the Hawley Troxell Defendants have served continuously as CropUSA's attorneys in one form or the other ever since. According to the minutes, negotiations between AIA Services and CropUSA had resulted in an agreement whereby AIA Services would no longer operate CropUSA as a subsidiary.

///

SECOND AMENDED COMPLAINT - 10

**Exhibit - A**

**15-ER-3747**

51.     However, the negotiations referred to in the January 10, 2001 shareholder meeting minutes for CropUSA did not in fact occur. There was no decision, nor has there ever been a decision, on the part of AIA Services to discontinue the subsidiary status of CropUSA. The January 10, 2001 meeting minutes for CropUSA were concealed from AIA.

52.     None of the preferred or common shareholders of AIA Services (other than those present at the January 10, 2001 meeting) were given notice of or the opportunity to approve or oppose this corporate action; instead, it was concealed from them and AIA.

53.     In spite the fact that John asserted on January 10, 2001 that CropUSA would no longer be a subsidiary of AIA Services, John wrote in a letter dated February 27, 2001 sent on behalf of AIA to Donna that "AIA is developing a new crop insurance program through a new company called CropUSA." (The letter went on to state that "[t]he costs of putting the CropUSA program together have been paid. AIA now needs to launch five new territories next Month"). This January 27, 2001 letter constituted an unambiguous representation by John to AIA and Donna that CropUSA was a subsidiary of AIA and was being operated for the benefit of AIA and implicitly to AIA Services' innocent minority shareholders (which included Donna). This representation to AIA and Donna was false, and John knew it was false. Upon information and belief, the other Controlling AIA Defendants were aware of this January 27, 2001 letter and the misrepresentations contained within the letter.

54.     Notwithstanding the fact that John was obligated under the terms of his Executive Officer's Agreement that required that he not compete with AIA Services, and notwithstanding the fact that he owed fiduciary duties to the AIA and AIA Services' shareholders, John set forth his plans to exploit the assets of AIA for the benefit of CropUSA (and himself as the majority purported shareholder) in the purported minutes of the purported January 10, 2001 meeting.

SECOND AMENDED COMPLAINT - 11

Exhibit - A

15-ER-3748

55.     The January 10, 2001 meeting minutes reveal that CropUSA authorized its officers to execute a Master Marketing Agreement with AIA Insurance that would allow CropUSA access to all of AIA's customers and customer lists, as well as all of AIA's trade secrets. AIA received no consideration for conveying this access or to enter into these agreements.

56.     CropUSA's officers (including John) were also purportedly authorized to enter into a Management Agreement with AIA Insurance wherein AIA Insurance purportedly agreed to provide management and administrative support to CropUSA without charge. However, John has since testified under oath that AIA's Board of Directors never authorized this agreement, although the Board has acquiesced in the action.

57.     AIA itself was never given notice of the Master Marketing Agreement and the Management Agreement, nor was AIA given the opportunity to approve or reject these agreements. Each of these agreements, when executed, constituted a violation of John's Executive Officer's Agreement, which contains a strict non-compete clause. Each of these agreements also constituted a direct breach of fiduciary duty or aiding and abetting same on behalf of each of the Controlling AIA Defendants in the commission of torts against AIA.

58.     Meanwhile, in 2001, John and Connie acquired a parking lot for $8,000 using AIA's line-of-credit. Upon information and belief, AIA was required to maintain control of the parking lot as part of its lease with Washington Bank Properties. John then increased the rent that AIA paid to use the parking lot to benefit him and Connie. For example, although John and Connie paid only $8,000 for the parking lot, they subsequently charged AIA $60,750 in rent to use the parking lot from 2004 through 2006. These unfair and self-serving rental payments to John and Connie were concealed from AIA and AIA Services' innocent minority shareholders and were never disclosed to either of them, as was their purchase of the parking lot.

SECOND AMENDED COMPLAINT - 12

# Exhibit - A

15-ER-3749

**D. The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants in Taking CropUSA from AIA and Having AIA Fund CropUSA**

59.     Upon information and belief, the Hawley Troxell Defendants were providing legal services to CropUSA and/or its board of directors as of January 10, 2001, and such providing of legal services has continued through the date of this complaint.

60.     Upon information and belief, from January 10, 2001, and continuing through the period relevant to this lawsuit, the Hawley Troxell Defendants had knowledge of John's Executive Officer's Agreement with AIA Services, had knowledge of the conflict of interest provision in AIA's bylaws, and had knowledge of restrictions in AIA's articles of incorporation, but intentionally refused to comply with them and assisted John in violating them or covering up the violations.

61.     The Hawley Troxell Defendants knew or should have known that the purported Master Marketing Agreement and Management Agreement constituted breaches of John's Executive Officer's Agreement, violations of AIA Service' amended articles of incorporation, violations of AIA Services' restated bylaws, and constituted breaches of John and the other Controlling AIA Defendants' fiduciary duties owed to AIA and AIA Services' minority shareholders.

62.     Upon information and belief, the Hawley Troxell Defendants were also representing CropUSA from January 10, 2001, to the present, and by way of that representation they breached their fiduciary duties to AIA (including their undivided duty of loyalty owed to AIA) and took steps that materially assisted John and the Controlling AIA Defendants in the commission of the various torts described in this complaint and assisted in the concealment of those torts.

///

SECOND AMENDED COMPLAINT - 13

Exhibit - A

15-ER-3750

63.     Beginning in 1999 and continuing through the date of this Complaint, CropUSA has been funded and operated with assets improperly transferred from AIA, including, but not limited to, operating capital, office space, customer lists and other trade secrets, agents and staff, goodwill and other assistance. CropUSA paid nothing for these assets.

64.     The Controlling AIA Defendants, except Duclos, were all shareholders of AIA at the time CropUSA was formed and later purportedly became shareholders of CropUSA.

65.     The Controlling AIA Defendants, except Duclos (although she improperly took part in the meetings and acted as the Secretary) and Connie, all served on a purported "advisory board" of CropUSA and/or AIA, and this advisory board exercised actual control over CropUSA and AIA. By exercising control over these entities and committing acts that benefitted CropUSA at the expense of AIA, the Controlling AIA Defendants engaged in a conspiracy to defraud AIA, which have right and title to the property of CropUSA.

66.     Due to the fact that the Controlling AIA Defendants have complete control over AIA and would never assert claims against themselves on behalf of AIA, the adverse dominion doctrine applies to all claims asserted herein, thereby barring any defense based on a statute of limitations. *Freeland v. Enosis Corp.,* 540 F.3d 721 (7th Cir. 2008).

67.     On January 10, 2002, CropUSA purportedly entered into a Memorandum of Understanding with the Controlling AIA Defendants. Under the terms of this memorandum, Beck and Cashman were obligated to guarantee loans on behalf of CropUSA.

68.     Notably, Beck and Cashman had also been obligated to guarantee over $1,000,000 in loans on behalf of AIA since 1995, but they never did. Notwithstanding this obligation, the Controlling AIA Defendants subsequently arranged for AIA to guarantee CropUSA's lines of credit even though the guarantees were barred by AIA's amended articles of incorporation and

SECOND AMENDED COMPLAINT - 14

**Exhibit - A**

**15-ER-3751**

bylaws.

69.     In 2004, the Controlling AIA Defendants attempted to raise capital for CropUSA by selling shares in CropUSA to private investors by way of a $10,000,000 private placement. The Hawley Troxell Defendants drafted the July 15, 2004, Private Placement Memorandum, despite their knowledge of the illegal "spin-off" of CropUSA and the fiduciary duties they owed to AIA.

70.     When CropUSA began distributing the Private Placement Memorandum in 2004, the company was experiencing financial difficulties that made it difficult, if not impossible, to attract investors to the private placement.

71.     In addition, in 2004, the CropUSA's lack of adequate funding threatened its ability to participate in the Federal Crop Insurance program. To alleviate these problems, the Controlling AIA Defendants would improperly turn to AIA to obtain the necessary funding.

**E.  The Controlling AIA Defendants Steal $1,510,693 From AIA to Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt CropUSA Owed to AIA— thereby Resulting in a $2,144,962 Fraud Against AIA.**

72.     In order to boost CropUSA's balance sheet for the purpose of operating the company, attracting investors and maintaining access to the Federal Crop Insurance program, the Controlling AIA Defendants devised a scheme to illegally transfer $1,510,693 from AIA Insurance to CropUSA.

73.     The Controlling AIA Defendants conspired with each other in the formation and execution of this scheme to unlawfully transfer $1,510,693 of AIA's funds to CropUSA, and aided and abetted one another in carrying out the scheme and ultimately covering it up.

74.     Upon information and belief, the Hawley Troxell Defendants provided counsel to CropUSA with respect to the unlawful transfer of funds and/or has at a minimum assisted in covering up the facts of this illegal transfer.

SECOND AMENDED COMPLAINT - 15

**App. - E, p. 31**

**Exhibit - A**

**15-ER-3752**

75.     The scheme involved money derived from AIA Insurance. In August, 2004, AIA Insurance received a payment of $1,510,693 from Trustmark. (*See* Dkt. #67-59.) Rather than deposit the payment of $1,510,693 into the account of AIA Insurance, where it would have benefited AIA and its innocent shareholders, John deposited the funds into a new account entitled "AIA Insurance Inc. CropUSA." (*See* Dkt. #67-60.) The address for this account coincided with the address for John's personal residence at 2020 Broadview Drive in Lewiston, Idaho, rather than any address used by AIA. (*Id.*)

76.     Shortly after diverting the $1,510,693 into the "AIA Insurance Inc. CropUSA" account, the Controlling AIA Defendants illegally transferred the funds to CropUSA. The Controlling AIA Defendants attempted to disguise this conversion of AIA Insurance's funds by characterizing the transaction as an alleged purchase by AIA Insurance of Series C Preferred Shares in its parent corporation, AIA Services. (*See* Dkt. #67-59.) Then, the Controlling AIA Defendants carried AIA Insurance's alleged investment in the Series C Preferred Shares as having a purported value of $1,510,693 when that was not the true value of the shares.

77.     However, as the Controlling AIA Defendants acknowledged at the time, there was no market for the Series C Preferred Shares which were purportedly being repurchased. At the time the $1,510,693 in funds were converted by CropUSA, there was no authorization of any kind for the transaction, and the transaction was concealed from AIA.

78.     In order to create a plausible explanation for the transfer of the $1,510,693, CropUSA eventually produced a document designated as a Consent in Lieu of Meeting dated August 26, 2004. (*See* Dkt. #67-61.) However, this document itself is completely fraudulent, as it was retroactively created the following year in order to deceive auditors who questioned the validity of this transaction.

SECOND AMENDED COMPLAINT - 16

App. - E, p. 32

Exhibit - A

15-ER-3753

79. In addition, this $1,510,693 purported repurchase of shares separately violated the terms of AIA Services' amended articles of incorporation, which required that all Series C Preferred Shares be redeemed equally and simultaneously from all shareholders. (*See* Dkt. #67-3.) Instead of repurchasing an equal portion of the Series C Preferred Shares from AIA Services' 401(k) Plan, the Controlling AIA Defendants intentionally only repurchased the Series C Preferred Shares held by CropUSA (which had been previously held by Beck, Cashman and their friends).

80. CropUSA was carrying these Series C Preferred Shares in AIA Services on its books with a value of $21,693, which means that CropUSA realized a gain of $1,489,000 on this purported sale of shares. (*See* Dkt. #67-59.) At that time, although the Controlling AIA Defendants had not properly accounted for all funds, assets, labor and other costs advanced from AIA for CropUSA, they had actually accounted for there being a debt of $634,269 owed by CropUSA to AIA.

81. After unlawfully transferring the $1,510,693 received by AIA Insurance to CropUSA, the Controlling AIA Shareholders had CropUSA repay the $634,269 debt owed to AIA, thereby committing a double fraud upon AIA, i.e., AIA should have the $1,510,693 in its bank account now and it should have never lent the $634,269 to CropUSA in the first place. In other words, those fraudulent transactions alone resulted in the loss of $2,144,962 in funds to AIA and thus damaged AIA in the amount of $2,144,962. The Controlling AIA Defendants have actively concealed, or covered up, these transactions from AIA with the assistance of the Hawley Troxell Defendants.

82. AIA and the innocent shareholders of AIA Services were never given notice of the 2004 stock transaction, nor were any proper board meetings held to approve the transaction. However, as with the fraudulent document prepared on behalf of CropUSA, a fraudulent Consent

SECOND AMENDED COMPLAINT - 17

**App. - E, p. 33**

**Exhibit - A**

**15-ER-3754**

if Lieu of Meeting, dated August 26, 2004, was prepared on behalf of AIA. This document was actually produced several months after the transaction and was created to deceive auditors.

83.     Upon information and believe, the Hawley Troxell Defendants provided legal services to both AIA and CropUSA at the time of the 2004 transaction or had actually knowledge of the 2004 transaction.

84.     The Hawley Troxell Defendants at various times, as purported counsel for AIA, failed to disclose to AIA the 2004 transaction to transfer $1,510,693 to CropUSA and that the acts of the Controlling AIA Defendants constituted an intentional breach of their fiduciary duties (including the duty of loyalty) owed to AIA and a concealment of a prohibited transaction. For this reason alone, the Hawley Troxell Defendants could not reasonably rely on a tolling agreement to represent AIA, CropUSA and the interest of the Controlling AIA Defendants in later litigation.

85.     The Hawley Troxell Defendants failed to disclose to AIA, or to anyone else, that this $1,510,693 transaction was unlawful on many levels, including but not limited to the fact that it did not comply with articles of incorporation and bylaws, caused a breach of AIA's other contracts, and could not be justified by the balance sheet of either AIA Insurance or CropUSA. Upon information and belief, the Hawley Troxell Defendants had knowledge of the back-dated Consent in Lieu of Meeting documents.

86.     On February 16, 2005, Beck sent an email to John and Cashman confirming the Controlling AIA Defendants' scheme to steal CropUSA in an effort to profit: "[Cashman] and I are so convinced that CropUSA is a winner that anything standing in the way of a good result will be a crime." (Dkt. #67-54.) The crime was stealing CropUSA from AIA and then to drain AIA of its funds and assets to pursue the Controlling AIA Defendants' scheme.

///

SECOND AMENDED COMPLAINT - 18

Exhibit - A

15-ER-3755

F.  **The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal**

87.  After unlawfully taking $2,144,962 from AIA Insurance in 2004, the Controlling AIA Defendants continued to operate CropUSA with assets both tangible and intangible that rightly belonged to AIA, continued to improperly subsidize CropUSA with AIA's labor, and continued to conceal their actions from AIA and AIA Services' innocent minority shareholders.

88.  Under the management and direction of the Controlling AIA Defendants, AIA regularly failed to allocate costs to CropUSA and other entities and failed to charge markup, interest or profit on costs paid for other entities. For example, John's own salary of $250,000 was allocated entirely to AIA Services even though John's contractual right to salary from AIA Services had expired in 1998 and had never been renewed by an authorized board. (And, further, John performed no actual work for AIA during the time in question.)

89.  John, with the knowledge and complicity of the other Controlling AIA Defendants, also performed work for other entities owned in full or in part by him while on AIA's payroll, i.e., Pacific Empire Radio Corp., Pacific Empire Communications Corp., Pacific Empire Holdings Corp., Radio Leasing I LLC and Radio Leasing II LLC. John also had other AIA employees work for these entities without compensation to AIA. These facts, like virtually all of the others referenced in this Second Amended Complaint, were concealed from AIA and AIA Services' innocent minority shareholders.

90.  Between its founding in 1999 and the filing of this lawsuit, CropUSA and other entities generated tens of millions of dollars of revenue (including premiums) and other benefits that would have flowed to AIA but for the unlawful and unauthorized acts of the Controlling AIA Defendants.

///

SECOND AMENDED COMPLAINT - 19

Exhibit - A

15-ER-3756

91.     As of 2006, John owed AIA at least $307,000 for personal loans he had taken from AIA Services. For several years, John concealed these loans by engaging in false accounting whereby loans to him were treated as payments of principal on AIA Service' indebtedness due to Reed Taylor on his $6 million promissory note (which was later ruled to be illegal).  In 2006, John "corrected" an accounting "error" by increasing the balance due on Reed Taylor's note to $6 million. John has still not repaid his personal loans.

92.     Over the years, John had AIA pay his personal maid, his personal credit card bills, donations, cash advances, family cell phone bills, and other personal expenses. John also had AIA purchase several vehicles from him, and he continued to drive these vehicles after the sales and purchase other vehicles with AIA's funds to use for his benefit when there was no reason to do so. John also had AIA employees perform work on his personal residence and on other real property not owned by AIA. These acts were all committed with the knowledge and complicity of the Controlling AIA Defendants and without paying AIA the fair value of the services or expenses.

93.     At year-end 2006, AIA had improperly lent $95,000 to Pacific Empire Radio Corp., a corporation partially owned by John and Connie and in which they both served as directors at certain times. The Controlling AIA Defendants transferred that $95,000 receivable from AIA to CropUSA. Before it was over, AIA would lend over $1,400,000 in additional funds to Pacific Empire Radio Corp., when all such loans violated AIA Services' amended articles of incorporation and were not authorized under the circumstances by AIA Services' restated bylaws.

94.     In August 2007, AIA settled litigation with the state of Idaho whereby AIA received a mortgage worth approximately $1.5 million for the amounts owed by Washington Bank Properties on the real property where AIA's offices are located. Although AIA Insurance paid the

SECOND AMENDED COMPLAINT - 20

**Exhibit - A**

**App. - E, p. 36**

**15-ER-3757**

costs of this litigation, the Controlling AIA Defendants, with the assistance of the Hawley Troxell Defendants, improperly titled the note in the name of AIA Services only, and then pledged the note to CropUSA so that the Controlling AIA Defendants could borrow money to pay their attorneys' fees and costs incurred defending in *Taylor v. AIA Services Corp., et al.*, to the Hawley Troxell Defendants.

95. As with the 2004 transactions, the transaction pledging the mortgage owned by AIA Services to CropUSA for purportedly paying the Hawley Troxell Defendants' attorneys fees and costs incurred representing AIA, CropUSA and the Controlling AIA Defendants was a blatant misappropriation and/or illegal pledging of AIA's asset. The loan documents and the pledge agreement were drafted by the Hawley Troxell Defendants, although they later asserted that they were only "scriveners" for the transaction. This transaction was improper and barred by AIA's amended articles of incorporation and bylaws.

G. **The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and Financial Wherewithal with the Improper Assistance from the Hawley Troxell Defendants**

96. On October 26, 2007, the Hawley Troxell Defendants drafted and delivered an opinion letter falsely representing that AIA Insurance was authorized to guarantee a $15,000,000 line of credit on behalf of CropUSA, which carried a hard-money loan exorbitant interest rate.

97. The Hawley Troxell Defendants' opinion letter was delivered for a loan guarantee which violated AIA Services' amended articles of incorporation, its restated bylaws and AIA Insurance's bylaws, and in violation of the duty of loyalty owed by the Hawley Troxell Defendants to AIA.

98. Additionally, Lancelot, the lender for this $15,000,000 line of credit was subsequently exposed as a Ponzi scheme, and its founder, Gregory Bell, pleaded guilty to criminal

SECOND AMENDED COMPLAINT - 21

**App. - E, p. 37**

# Exhibit - A

**15-ER-3758**

charges in federal court. Mr. Bell was the signee for Lancelot on the $15,000,000 line of credit. These facts pertaining to the $15,000,000 loan for CropUSA and AIA Insurance's guarantee of that loan, along with other transactions, were never disclosed to AIA by the Hawley Troxell Defendants or the Controlling AIA Defendants and the payment of interest on that loan was detrimental to AIA because most of CropUSA's assets could be traced directly to AIA (and the depletion of CropUSA's funds resulted in less funds available to recover).

H. **The Controlling AIA Defendants Enter Into Tolling Agreements, but Those Tolling Agreements Do Not Save the Hawley Troxell Defendants from the Unwaivable Conflicts of Interest**

99.     In 2007, Reed Taylor filed suit against AIA and certain of the Controlling AIA Defendants, asserting claims for breaches of contract, breaches of fiduciary duties, conversion, fraud and other claims ("*Taylor v. AIA Services Corp., et al.*"). In 2007, the Hawley Troxell Defendants appeared as counsel for AIA Services and AIA Insurance in that lawsuit. Later, Reed Taylor amended his complaint and named CropUSA as a defendant, after recognizing that millions of dollars had been transferred to it from AIA, among other improper transactions (including some of those transactions described in this Second Amended Complaint). (*See* Dkt. #82-2.) The Hawley Troxell Defendants also appeared and represented CropUSA in that lawsuit. (*Id.*)

100.    As the purported attorneys for AIA, two entities, the Hawley Troxell Defendants owed duties of loyalty, care, and good faith to AIA and the Hawley Troxell Defendants breached their duties of care and fiduciary duties by engaging in the simultaneous representation of the Controlling AIA Defendants, AIA, CropUSA, and other parties with interests adverse to AIA (including Bryan Freeman).

101.    In 2007, Connie and Beck were appointed the Boards of Directors of AIA Service and AIA Insurance by John. Connie and Beck were paid $5,000 per quarter to sit on the Boards of

SECOND AMENDED COMPLAINT - 22

Exhibit - A

15-ER-3759

AIA and also receives shares for his "service." Beck later testified that he serves on this board to protect his own interests and those of his friends (the same friends who previously acquired Series C Preferred Shares in AIA Services and illegally exchanged them for common shares in CropUSA).

102.   In 2007 and 2008, the Controlling AIA Defendants entered into written tolling agreements in connection with the various litigation directly or indirectly involving AIA. The Hawley Troxell Defendants were improperly involved with and/or facilitated the Controlling AIA Defendants entering into such tolling agreements for the purpose of allowing the Hawley Troxell Defendants to continue to represent AIA, CropUSA and directly or indirectly certain of the Controlling AIA Defendants.

103.   By tolling the statute of limitation for claims against the Controlling AIA Defendants, the Hawley Troxell Defendants sought to use the tolling agreements to authorize the waiver of their conflicts of interest representing AIA, CropUSA and the interests of the Controlling AIA Defendants in litigation that could have and should have exposed the fraud and intentional breaches of fiduciary duties committed by the Controlling AIA Defendants.

104.   The purpose of a properly drafted and executed tolling agreement is to allow conflicts of interest to be waived under certain limited permissible circumstances in order to waive a conflict of interest so that an attorney or law firm can represent clients with diverging interests. Those limited permissible circumstances were not present here.

105.   The Hawley Troxell Defendants knew or should have known that the Controlling AIA Defendants had committed intentional acts of fraud and breaches of fiduciary duties (including the duty of loyalty) owed to AIA. The Hawley Troxell Defendants knew or should have known that by allowing the Controlling AIA Defendants to continue to operate and control AIA

SECOND AMENDED COMPLAINT - 23

that they would continue to conceal their past torts and likely continue to commit new torts, which is precisely what occurred here as demonstrated by the facts alleged in this Second Amended Complaint.

106.     Although these tolling agreements tolled the statute of limitations for claims AIA could assert against the Controlling AIA Defendants (which eliminates any defense they may have to assert any statute of limitations defenses), the facts set forth in this Second Amended Complaint provide a classic example of why such tolling agreements were improper under the circumstances as the agreements involved tolling intentional torts committed against AIA. While the claims were being tolled, the Controlling AIA Defendants' continued to unlawfully use AIA's cash, resources and ability to borrow funds to funds other businesses and pay compensation to themselves.

107.     During the course of the litigation in *Taylor v. AIA Services Corp.*, *et al.*, Reed Taylor attempted to negotiate a settlement, but he insisted that any settlement must include full disclosure to, and authorization by, AIA Services minority shareholders and to allow them to participate in CropUSA common share ownership. (*See* Dkt. #67-18.) Not only did the Controlling AIA Defendants and Hawley Troxell Defendants reject Reed Taylor's offer, but they still refused and failed to provide full disclosure to AIA and its innocent shareholders of the malfeasance and torts committed against AIA. The untenable position of the Hawley Troxell Defendants was confirmed when the only person seeking to obtain full and fair disclosure was a creditor, Reed Taylor. (*Id.*)

108.     During the course of *Taylor v. AIA Services Corp, et al.*, Connie and Beck represented to Judge Brudie, the Idaho Supreme Court and AIA that the redemption of Reed Taylor's shares should be illegal to benefit AIA Services' minority shareholders. (*See* Dkt. #67-23 and #67-25.)

SECOND AMENDED COMPLAINT - 24

Exhibit - A

15-ER-3761

109.  After Judge Brudie ruled the redemption of Reed Taylor's shares was illegal, neither Connie, Beck nor any of the other Controlling AIA Defendants did anything for the minority shareholders of AIA nor did they ever have any intention of helping them, contrary to what they had represented to Judge Brudie and the Idaho Supreme Court.

110.  Instead of sharing equally in AIA's assets with AIA Services' innocent minority shareholders, the Controlling AIA Defendants later sought to eliminate those minority shareholders for only ten cents per share, even though Connie and John both previously valued the shares much higher even after considering the over $6 million owed to Reed Taylor at the time of valuation (a debt that was later ruled to be illegal and void). (*See* Dkt. #67-24 and #67-50.)

111.  Riley was an attorney at the law firm of Eberle Berlin at the time of the redemption of Reed Taylor's shares in 1995 and he breached his duty of care by advising AIA Services and Reed Taylor[1] to enter into the illegal stock redemption transaction. *See Taylor v. AIA Servs. Corp.*, 151 Idaho 552, 261 P.3d 829 (2011).

112.  The illegal redemption of Reed Taylor's common shares ultimately led to AIA incurring over $1 million in attorneys' fees and costs to fight and resulted in AIA Services being required to report to the IRS a gain from the $6 million it never had to pay Reed Taylor.

113.  Upon information and belief, the Controlling AIA Defendants never reported the gain from the extinguished $6 million debt to Reed Taylor on AIA Services' tax return. If the Controlling AIA Defendants did not report the $6 million income to the IRS and AIA Services is

---

[1] The Controlling AIA Defendants have brought bread to many defense attorneys. Notably, the Controlling AIA Defendants (except Cashman, who was not a party to the lawsuit) successfully asserted that the Stock Redemption Agreement was illegal. (*See* Dkt. #83-5.) Consequently, Reed Taylor sued Riley, Turnbow and Eberle Berlin for their incorrect third-party closing opinion letter. *Taylor v. Riley*, 157 Idaho 323, 336 P.3d 256, 261 (2014). He later settled his claims against Turnbow and Eberle Berlin, but his claims against Riley are on appeal as noted by the Ninth Circuit Court of Appeals. *Taylor v. Hawley Troxell Ennis & Hawley, LLP*, 628 Fed.Appx. 490 (9th Cir. 2015). Reed Taylor also sued his independent counsel. *Taylor v. Bell*, 185 Wn. App. 270, 273-79, 340 P.3d 951, 954-56 (2014), *review denied*, 352 P.3d 188 (2015).

SECOND AMENDED COMPLAINT - 25

# Exhibit - A

**15-ER-3762**

obligated to pay taxes, penalties and interest on that gain, the Controlling AIA Defendants are liable for those sums as well for breaching their fiduciary duties owed to AIA.

114.   Based on the intentional acts of the Hawley Troxell Defendants, AIA has been decimated because the Controlling AIA Defendants remained in control of AIA through those tolling agreements. The end result of these tolling agreements was that the Hawley Troxell Defendants improperly ensured that the Controlling AIA Defendants would retain control over AIA to the detriment of AIA and for the improper benefit to the Hawley Troxell Defendants and the Controlling AIA Defendants.

115.   In or around 2007 or 2008, AIA Insurance received a settlement of approximately $800,000 for litigation that AIA Insurance had funded for certain policy holders. Instead of utilizing or retaining those funds exclusively for AIA, the Controlling AIA Defendants improperly used those funds, in full or in part, to continue their intentional acts of funding CropUSA, litigation caused by them or other unauthorized uses. Upon information and belief, the Hawley Troxell Defendants had knowledge of the receipt of those funds, yet they did nothing to protect them even though the funds were at issue in a lawsuit.

116.   In 2008, the Controlling AIA Defendants and the Hawley Troxell Defendants permitted CropUSA to sell over $10,000,000 in crop insurance business to Hudson Insurance for the benefit of CropUSA when approximately 75% of the business had been derived directly from AIA's agency force (i.e., such agents as Larry Whitehead). The over $7.5 million should have been paid to AIA rather than to pay the debts incurred by the Controlling AIA Defendants through CropUSA.

117.   Sometime after CropUSA sold the bulk of its assets to Hudson in 2008, which were derived primarily from AIA, the Controlling AIA Defendants obtained further funds from Hudson

SECOND AMENDED COMPLAINT - 26

**Exhibit - A**

**15-ER-3763**

Insurance for Growers National Cooperative Insurance Agency, Inc. ("Growers National"), an entity formed and funded by AIA for purposed of selling crop insurance and providing a form of rebate to farmers.

118.    Upon information and belief, CropUSA received over $500,000 from Hudson for Growers National. These funds should have been paid to AIA and the receipt of the funds was concealed from AIA. Plaintiffs will establish the exact amount of funds that the Controlling AIA Defendants and/or CropUSA received from Hudson for Growers National at the time of trial.

I.    **The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA and Intentionally Committing Torts against AIA with the Assistance of the Hawley Troxell Defendants—Even While this Lawsuit Was Pending**

119.    Upon information and belief, the Hawley Troxell Defendants have been paid the bulk of the over $2,000,000 in attorneys' fees and costs incurred and/or paid for the various lawsuits. Plaintiffs will establish the exact amount of funds paid to the Hawley Troxell Defendants by AIA and/or on behalf of AIA, which Plaintiffs are seeking to be disgorged and returned to AIA.

120.    From 2009 through the present time, Donna exercised her right under the amended articles of incorporation to appoint two different directors to AIA Services' Board of Directors, but the Controlling AIA Defendants and/or the Hawley Troxell Defendants refused to honor her unqualified right thereby resulting in all action taken by AIA Services' Board of Directors during that period of time being unauthorized and thus a breach of the fiduciary duties of the Controlling AIA Defendants.

121.    In December 2009, Donna filed suit against AIA Services to exercise her unequivocal right to appoint her designee, Patrick Moran, to the Board of Directors of AIA Services and to appoint a receiver for AIA Services. The Hawley Troxell Defendants once again appeared in that lawsuit and successfully opposed Donna's designee being appointed to the Board

SECOND AMENDED COMPLAINT - 27

Exhibit - A

15-ER-3764

of Directors or a receiver being appointed by improperly seeking a stay in the lawsuit.

122.    Had the Hawley Troxell Defendants joined Donna in having a receiver appointed for AIA Services, which the Hawley Troxell Defendants should have done in light of the countless intentional torts committed against AIA by the Controlling AIA Defendants, there is no doubt that they could have stopped the Controlling AIA Defendants from carrying out their ongoing fraud, intentionally breaches of fiduciary duties and their ultimate decimation of AIA. At a minimum, the Hawley Troxell Defendants acts and/or omissions in this regard was a substantial factor of the improper transactions, unlawful acts, and the ultimate decimation of AIA, which ocurred after 2009.

123.    This lawsuit was filed by Plaintiffs on August 11, 2010, and subsequently stayed at the request of the Controlling AIA Defendants and the Hawley Troxell Defendants. During that stay, inappropriate and unlawful transactions have continued.

124.    In March 2012, the Controlling AIA Defendants, with, information and belief, the improper assistance of new attorneys at the law firm of Randall & Danskin, improperly terminated AIA Services' ESOP and paid those shareholders three cents per shares for their hard-earned common shares and failed to disclose the facts pertaining to the malfeasance and torts described in this Second Amended Complaint to those shareholders. (*See* Dkt. #67-30-33, 34.)

125.    However, the Controlling AIA Defendants knew that AIA Services' amended articles of incorporation barred all stock redemptions, including any purchases of shares held by the ESOP, until the Series A Preferred Shares were all fully redeemed and the Series C Preferred Shares had been paid the approximately $1,000,000 in dividends owed. The repurchase of the ESOP shares for three cents per shares was illegal, ultra-vires and improper.

///

SECOND AMENDED COMPLAINT - 28

Exhibit - A

15-ER-3765

126.    In 2012, the Controlling AIA Defendants, again with the improper assistance of Randall & Danskin (*See* Dkt. #67-48, 67-48), improperly sought to effectuate a reverse stock split and to only pay AIA Services' minority common shareholders ten cents per share and paying those common shareholders (including Plaintiffs) without disclosing any facts and without offering full and fair compensation for the value of the shares. (*See* Dkt. #66-3.) The notice to the shareholders was signed by Duclos and the improper and unlawful reverse stock split was approved by Beck, John and Connie. (*Id.*)

127.    Thirteen shareholders objected. (*See* Dkt. #67-41.) The ill-conceived reverse stock split violated AIA Services' amended articles of incorporation and the Controlling AIA Defendants did not even bother to comply with Idaho Code, including, by failing to provide the form for the shareholders to state the value that they believed should be paid for their common shares thereby further establishing the true improper purpose of the failed reverse stock split.

128.    In response to the thirteen shareholder objections and notices of demands for payment, the Controlling AIA Defendants, through Randall & Danskina and without regard to the fact that they would expend tens of thousands of dollars more in funds litigating the issue rather than simply paying the shareholders the true fair value of their shares, had AIA Services file suit against the thirteen shareholders. (*See* Dkt. #83-15.) Judge Carl Kerrick properly dismissed the lawsuit, and further noted that it was disingenuous to seek a reverse stock split until this lawsuit was resolved. (*See* Dkt. #86-1.)

129.    The failed reverse stock split fiasco drained AIA of significant and unnecessary attorneys' fees and costs (fees and costs which could have been paid to those shareholders or for other AIA obligations). This purported reverse stock split was approved and/or acquiesced in by the Controlling AIA Defendants. Upon information and belief, the Hawley Troxell Defendants

SECOND AMENDED COMPLAINT - 29

Exhibit - A

15-ER-3766

were aware of the scheme to effectuate reverse stock split to eliminate AIA Services' innocent minority shareholders which would in turn eliminate shareholder standing for this lawsuit.

130.    After the Controlling AIA Defendants had AIA Services file suit against the thirteen objecting common shareholders who demanded fair payment, Nez Perce County District Court Judge Carl Kerrick dismissed the lawsuit and awarded those minority shareholders attorneys' fees and costs. That judgment in favor of those shareholders has still never been paid by the Controlling AIA Defendants or AIA, and the Controlling AIA Defendants should be required to pay that judgment on behalf of AIA.

131.    From 2009 through 2015, the Controlling AIA Defendants continued loaning money to, or allowed money to be lent to, Pacific Empire Radio Corporation in an amount exceeding $1,400,000 by year-end 2012 when that corporation had no ability to repay the sums owed and it benefitted John and Connie (who owned shares in that corporation at certain relevant times) as those were funds they would not have to provide Pacific Empire Radio Corp.

132.    From 1999 through 2012, the Controlling AIA Defendants concealed their ownership interests in other entities from AIA which were derived from and/or funded by AIA, including, without limitation, CropUSA, CropUSA Insurance Services, LLC, Pacific Empire Holdings Corp.

133.    From 1995 through 2012, John received over $2,729,557 in cash compensation from AIA. This amount does not include any compensation, payments or other improper distributions he may have received from CropUSA and other entities funded or launched using AIA. At a minimum, John should be required to disgorge the over $2,038,657 he received from AIA from 1999 through 2012 and other compensation or funds received since 1999, which John received while improperly competing against AIA through CropUSA and other entities (including

SECOND AMENDED COMPLAINT - 30

Exhibit - A

15-ER-3767

Pacific Empire Holdings Corp.).

**J.** **There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants**

**134.** Since acquiring operational control of AIA Services in 1995, the Controlling AIA Defendants have engaged in repeated acts of faithless self-dealing, transactions detrimental to AIA, committed intentional torts (including fraud and breaches of fiduciary duties), breached their fiduciary duties (including their duties of loyalty), concealed, conspired to commit intentional torts, aided and abetted in the commission of intentional torts and to cover up those torts, to the detriment of AIA, including, but not limited to, the following specific examples: **(a)** controlling the Board of Directors and/or the decisions made by the Board and refusing to act in the best interests of AIA; **(b)** violating AIA's Restated Bylaws, including but not limited to, failing to hold annual shareholder meetings, failing to obtain proper shareholder approval for certain transactions, failing to comply with conflicts of interest provision in the bylaws and articles of incorporation which restricted many of the unlawful or improper transactions described herein, and failing to properly comply with applicable corporate governance; **(c)** violating AIA's Amended Articles of Incorporation thereby allowing substantial funds and assets to be depleted from AIA and obligating AIA to be liable for loans or guarantees which were barred by those amended articles of incorporation; **(d)** diverting corporate opportunities belonging to AIA; **(e)** conveying, encumbering, utilizing, and/or pledging corporate assets to themselves or other entities; **(f)** inappropriately redeeming, acquiring and/or issuing shares of stock and/or making payments on put options, including but not limited to, issuing shares to the Controlling AIA Defendants; **(g)** inappropriately paying dividends; **(h)** intentionally failing to comply with conflict of interest provisions in AIA bylaws; **(i)** guaranteeing loans for CropUSA and failing to guarantee loans for AIA; **(j)** paying excessive compensation to officers and directors, including but not limited to,

SECOND AMENDED COMPLAINT - 31

Exhibit - A

15-ER-3768

paying John $250,000 per year to purportedly act as CEO and President of AIA Services after his contractual entitlement to such salary had expired and John had represented that he would not take salary in certain years; **(k)** wasting corporate assets, including by paying Connie and Beck $20,000 per year to purportedly serve on the Board of Directors of AIA Services; **(l)** divulging and/or utilizing AIA's trade secrets for the benefit of themselves and other entities, including CropUSA; **(m)** soliciting and transferring AIA employees to work for CropUSA; **(n)** engaging in acts and/or decisions without making full disclosure and without obtaining the required approval of shareholders; **(o)** engaging in millions of dollars of transactions wherein AIA conveyed benefits without the receipt of any consideration or without being repaid; **(p)** forming and operating entities in direct competition with AIA in the insurance marketplace, including without limitation, CropUSA and Pacific Empire Holdings Corp.; **(q)** making false representations, including, without limitation, regarding share values, omitting material facts in AIA's financial statements, falsely certifying AIA's financial statements, and that AIA was being operated for the benefit of the corporation; **(r)** concealing and failing to disclose material facts to AIA pertaining to loans, transfers, and utilization of assets, including without limitation, concealing or omitting material facts, including all of the necessary facts related to virtually each and every transaction described in this Second Amended Complaint; **(s)** making false representations to AIA, including without limitation, making and certifying false and misleading financial statements to AIA and representing that AIA was being properly operated when it was instead being used to fund the lifestyle, payments and other businesses owned or partial owned by the Controlling AIA Defendants; **(t)** inappropriately loaning AIA's funds, or guaranteeing loans, to themselves and to other entities under their control in violation of AIA's amended articles of incorporation, bylaws and fiduciary duties; **(u)** paying tens of thousands of dollars in yearly fees to purportedly serve on

SECOND AMENDED COMPLAINT - 32

Exhibit - A

15-ER-3769

the Board of Directors of AIA, excessive compensation and benefits when such amounts were excessive and they were violating their fiduciary duties owed to AIA and they were all acting as faithless fiduciaries; **(v)** paying attorneys' fees and costs in various legal proceedings on behalf of the Controlling AIA Defendants and others when it was clear that they had intentionally failed to act in good faith, were not entitled to indemnification or to have attorneys' fees and costs advanced on their behalf and by failing to obtain security for repayment of said funds; **(x)** acquiring a parking lot with AIA funds and charging AIA, and making AIA pay, excessive rent for use of the parking lot even though AIA did not actually use the parking lot; **(y)** failing to seat the full and required Board of Directors for AIA Services, including, without limitation, by failing to honor Donna's appointment of Patrick Moran and Paul Durant to AIA Services' Board of Directors; **(z)** improperly purchasing and transferring shares held by AIA or which should have been held by AIA to themselves, including without limitation shares in Pacific Empire Radio Corp., Pacific Empire Communications Corp., and Pacific Empire Holdings Corp. (this entity was formed by AIA's assets by John, improperly competed against AIA, and was later sold for $240,000); **(aa)** allowing John to profit from CropUSA's sale of assets to Hudson by improperly allowing him to retain a monthly fee of $10,000 per month when those funds should have gone to AIA; **(bb)** failing to take appropriate legal action in the interests of AIA; **(cc)** removing a tenant from an AIA owned building to another building owned personally by John and/or other Controlling AIA Defendants; **(dd)** improperly subsidizing CropUSA and other entities with AIA's funds, labor and assets, failing to properly allocate expenses to CropUSA and failing to have other expenses paid back at all (which have already been identified as being approximately $500,000 as of 2008); **(ee)** selling and/or transferring assets and or/contracts belonging to AIA to others (including the contract with Growers National); **(ff)** improperly paying numerous law firms other than the Hawley Troxell

SECOND AMENDED COMPLAINT - 33

Defendants hundreds of thousands of dollars representing AIA and the Controlling AIA Defendants in litigation caused by their own intentional acts and torts; **(gg)** paying more of AIA's funds to litigate disputes (including with Donna in the Idaho state courts) than it would have taken to simply pay the money owed; **(hh)** failing to obtain security, failing to charge interest, and failing to collect on loans of at least $307,000 made to John; **(ii)** removing the $400,000 held in the court registry and the $200,000 in a bank account in *Taylor v. AIA Services Corp., et al.* and allowing the Controlling AIA Defendants to utilize those funds when the Hawley Troxell Defendants should have ensured that those funds were kept from them; **(jj)** expending significant sums on the illegal repurchase of common shares in AIA Services, which also resulted in the ownership interest of the Controlling AIA Defendants increasing; and **(kk)** allowing AIA to engage in the transactions identified in this Second Amended Complaint when no dividends had been declared or paid on the Series C Preferred Shares held in the AIA Services 401(k) Plan and those shares now have accrued dividends owed of over $1,000,000. The Controlling AIA Defendants and/or the Hawley Troxell Defendants have assisted one another and others in committing the intentional torts against AIA described herein and concealing, or covering up, the facts and the intentional torts committed against AIA, including those specifically referenced in this paragraph and elsewhere in this Second Amended Complaint.

135.    At all relevant times, John was CEO, President and director of AIA Services, AIA Insurance and CropUSA and a shareholder of AIA Services at the time of all of the improper transactions with CropUSA and other improper acts identified in this Second Amended Complaint (also a classic example of a conflict of interest), and he improperly benefited from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

SECOND AMENDED COMPLAINT - 34

Exhibit - A

15-ER-3771

136.     At all relevant times, John was also owned interests in other entities who improperly benefitted directly or indirectly from AIA, which forms additional conflicts and proof of self-dealing.

137.     At all relevant times, the Controlling AIA Defendants were all purported shareholders of CropUSA and either majority shareholders (as a group) or officers of AIA Services at the time of the improper transactions and malfeasance identified in this Second Amended Complaint (also a classic example of conflict of interest), and they improperly benefited, directly or indirectly, from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

138.     As a result of the acts and omissions set forth and/or contemplated above and other acts and/or omissions which will be established at or before trial, the Controlling AIA Defendants and the Hawley Troxell Defendant have proximately caused AIA millions of dollars in damages.

V.     **CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 AND FEDERAL RULE OF CIVIL PROCEDURE 23.1**

139.     As a prerequisite to filing this lawsuit under Idaho Code § 30-1-742 and Federal Rule of Civil Procedure 23.1, Plaintiffs (and over ten other shareholders of AIA Services) have been shareholders of AIA Services during all relevant times to the claims asserted in this Second Amended Complaint.

140.     On July 21, 2008, Donna served a written derivative demand letter on the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #23-9 and #67-19.)

141.     On July 23, 2008, the Hawley Troxell Defendants filed a Motion for Stay of Proceedings in *Taylor v. AIA Services Corp.*, *et al.*, and asserted that the stay was necessary so that AIA Services and AIA Insurance could conduct an inquiry into the demands made by Donna in

SECOND AMENDED COMPLAINT - 35

Exhibit - A

15-ER-3772

her letter dated July 21, 2008.

142.    On August 14, 2008, in *Taylor v. AIA Services Corp.*, *et al.*, the Hawley Troxell Defendants disingenuously filed a petition for a court appointed independent inquiry on behalf of AIA when they had no intention of following through with the inquiry. (*See* Dkt. #67-20.)

143.    On September 4, 2008, Reed Taylor supported the appointment of independent investigators. However, Reed Taylor objected to the investigators proposed by the Hawley Troxell Defendants, who were purportedly representing AIA, and the Controlling AIA Defendants. (*See* Dkt. #67-21.) Reed Taylor believed totally independent people should be appointed.

144.    Although the parties had filed briefing with respect to the appointment of independent investigators, the Hawley Troxell Defendants never noted the motion for a hearing and the court never ruled on the request, and they intentionally abandoned the appointment of an independent inquiry.

145.    The Hawley Troxell Defendants and Controlling AIA Defendants have never conducted a further investigation of the demands made in Donna's derivative demand letter of July 21, 2008. No action was ever taken by the Boards of Directors.

146.    On April 3, 2012, Plaintiffs made another written demand on the Boards of Directors of AIA Services and AIA Insurance, which included demands to keep the $400,000 cash held in the Court registry in *Taylor v. AIA Services Corp.*, *et al.*, to comply with AIA's amended articles of incorporation, to comply with AIA's bylaws, provide full disclosure, and to protect certain other assets. (Dkt. #67-33.) This particular demand was copied directly to Babbitt and Ashby, so they had full knowledge of it. This demand, like all of the others, was ignored. (*See* Dkt. #67, p. 11 ¶ 29.)

///

SECOND AMENDED COMPLAINT - 36

App. - E, p. 52

Exhibit - A

15-ER-3773

147. On July 16, 2012, the Plaintiffs and over ten other shareholders of AIA Services served additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #67-42.) The demands requested, among other things, that AIA pursue this lawsuit with all claims as of July 16, 2012 and future claims, including punitive damages. (*Id.*) In addition, Plaintiffs have made additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance, but no action has ever been taken by the Boards of Directors.

148. Over ninety days have elapsed since the Plaintiffs' written derivative demands were made and no action has been taken by AIA whatsoever, and all of the claims asserted in this lawsuit flowed from those derivative demands.

149. As owner of Preferred A Shares in AIA Services, and as beneficial owner common shares in AIA Services, Donna fairly represents the interests of shareholders not named in this lawsuit. She also assisted in defeating the litigation involved the Controlling AIA Defendants' efforts to effectuate an improper reverse stock split to eliminate shareholder standing in this lawsuit, when she could have simply sought to solely protect her interests only. Donna is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims. Donna has pursued this lawsuit solely for the benefit of AIA and their shareholders.

150. As the second largest common shareholder AIA Services (who traded a book of insurance business worth approximately $500,000 to AIA Services in exchange for his common shares), Miesen also fairly represents the interest of AIA and their shareholders. Miesen has never received a penny in return for his investment in AIA. Miesen is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims. Miesen has pursued this lawsuit solely for the benefit of AIA and their

SECOND AMENDED COMPLAINT - 37

Exhibit - A

15-ER-3774

shareholders.

## VI.    COUNT I—BREACH OF FIDUCIARY DUTY
**(Against the Controlling AIA Defendants and the Hawley Troxell Defendants)**

**151.**    Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

**152.**    The Controlling AIA Defendants owed fiduciary duties to AIA as the majority and controlling shareholders. As members, or purported members, of the Board of Directors for AIA Services and/or AIA Insurance, the Controlling AIA Defendants, who have each served as a director of AIA Services at one time, owed fiduciary duties to the corporations. As corporate officers of AIA, John, as President and CEO, and Duclos, as Secretary owed fiduciary duties to AIA, which were further elevated during the times in which the both served as directors too (which is from 1995 to the present time for John).

**153.**    As attorneys for AIA, the Hawley Troxell Defendants owed fiduciary duties to AIA (including the undivided duty of loyalty). If not authorized to act as attorneys for AIA, the Hawley Troxell Defendants acted with apparent authority as agent and owes fiduciary duties as a result of that agency relationship. The Hawley Troxell Defendants had conflicts of interest when they undertook to represent AIA and CropUSA, and when they proceeded in the manner directed by any one or more of the Controlling AIA Defendants, thereby improperly representing the interests of the Controlling AIA Defendants, instead of in the best interests of AIA. *Reis v. Barley, Snyder, Senft & Cohen LLC,* 484 F.Supp.2d 337 (E.D. Pa. 2007).

**154.**    Based on any and/or all of the acts and/or omissions set forth in this Second Amended Complaint and/or those facts proven at or before the time of trial, the Controlling AIA Defendants and the Hawley Troxell Defendants have breached their fiduciary duties owed to

SECOND AMENDED COMPLAINT - 38

**Exhibit - A**

**15-ER-3775**

AIA, including, without limitation, breaching their undivided duties of loyalty, trust and confidence owed to AIA, and by placing their interest in earning hundreds of thousands of dollars, and ultimately over $1,000,000, in attorneys' fees over looking after the interests of AIA.

155.    The Hawley Troxell Defendants have separately breached their fiduciary duties as matter of law when they simultaneously represented AIA and CropUSA. In addition, Riley was aware that CropUSA was derived from AIA and he was further aware of the restrictions in AIA Services' amended articles of incorporation as he helped prepare them. The Hawley Troxell Defendants have further breached their fiduciary duties as a matter of law for the violations of the Rules of Professional Conduct dealing with loyalty to a client and conflicts of interest.

156.    As a direct and/or proximate cause of the Controlling AIA Defendants and the Hawley Troxell Defendants breaches of their fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

157.    In addition, each of the Controlling AIA Defendants and the Hawley Troxell Defendants is a "faithless fiduciary" as defined by law and is therefore required to disgorge all compensation and consideration received from AIA and/or CropUSA. The disgorgement is in addition to liability caused by the breaches of fiduciary duty. In the case of the Hawley Troxell Defendants, the disgorgement goes to all fees received for or paid on behalf of AIA and CropUSA. In the case of the faithless Controlling AIA Defendants, the disgorgement goes to all salary, bonuses, warrants, stock options, or stock received from AIA.

VII.    **COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES**
        **(Against the Controlling AIA Defendants and the Hawley Troxell Defendants)**

158.    Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

SECOND AMENDED COMPLAINT - 39

Exhibit - A

15-ER-3776

159.    One who counsels, advises, abets or assists in the commission of an actionable wrong is responsible to the injured person for the entire loss or damage. 86 C.J.S. Torts § 105; RESTATEMENT (FIRST) OF TORTS § 876 (1939). Aiding and abetting in the commission of an actionable wrong may be inferred from the fact that one aided and abetted efforts to conceal the wrong. 86 C.J.S. Torts § 105. Liability for aiding and abetting the commission of a tort may be established by showing the person was present at the time of the actionable wrong and did not disapprove or oppose the action. Plaintiffs alleging aiding and abetting need not prove that the aiding and abetting was necessary for the commission of the tort, only that the aiding and abetting made it easier for the tort to occur. *See Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12 (2002).

160.    During certain relevant times, the Hawley Troxell Defendants and the Controlling AIA Defendants had knowledge of the other defendants' acts and/or omissions as described in this Second Amended Complaint and as proven at trial, knew that such acts and/or omissions constituted a breach of fiduciary duty, did not disapprove of such acts or omissions, took no steps to prevent the commission of the breaches of fiduciary duties flowing from the acts and/or omissions, and assisted in the concealment of such acts and/or omissions described herein, thereby damaging AIA.

161.    As a direct and/or proximate cause of the Hawley Troxell Defendants and the Controlling AIA Defendants aiding and abetting one another in the breaches of fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

## VIII.    COUNT III—LEGAL MALPRACTICE
### (Against the Hawley Troxell Defendants)

162.    Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this

SECOND AMENDED COMPLAINT - 40

cause of action.

163.    A legal malpractice claim may be brought in a derivative action. *Schulman v. Wolf & Samson, PC,* 951 A.2d 1051 (N.J. 2008).

164.    Since at least 1999, the Hawley Troxell Defendants had an attorney-client relationship with AIA, while Riley has had an attorney-client relationship with AIA since prior to 1995. The Hawley Troxell Defendants owed duties to AIA, including, without limitation, duties of care, good faith and loyalty. Despite the duties owed to AIA, the Hawley Troxell Defendants also improperly represented CropUSA.

165.    The Hawley Troxell Defendants have breached their duties owed to AIA, including, without limitation, the breached duties described in this Second Amended Complaint. The Hawley Troxell Defendants have further violated their duty of loyalty owed to AIA by improperly simultaneously representing AIA and CropUSA, together with directly and/or indirectly improperly representing the interests of the Controlling AIA Defendants.

166.    AIA suffered damages as a direct, foreseeable and/or proximate result of the breaches of duty and the acts of the Hawley Troxell Defendants, including those acts described in this Second Amended Complaint and/or proven at the time of trial. At a minimum, the Hawley Troxell Defendants were also a substantial factor in the harm and damages inflicted upon AIA, including, without limitation, the ultimate decimation of AIA by the Controlling AIA Defendants. Had the Hawley Troxell Defendants properly discharged their duties, the Controlling AIA Defendants would never have decimated AIA.

167.    As a direct and/or proximate cause of such acts and/or omissions, the Hawley Troxell Defendants are liable to AIA for damages in the amount to be proven at or before the time of trial.

SECOND AMENDED COMPLAINT - 41

# Exhibit - A

### IX. COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ CONSTRUCTIVE FRAUD
#### (Against the Controlling AIA Defendants)

**168.** Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

**169.** The Controlling AIA Defendants are liable to AIA for fraud because: **(a)** they made representations of fact to AIA and AIA Services' innocent minority shareholders as asserted throughout this Second Amended Complaint, including but not limited to, (i) representations that CropUSA was being operated for the benefit of AIA, (ii) representations that AIA was being properly operated (including that the Boards of Directors had properly authorized certain transactions when Donna's designee was not on the Board of AIA Services and the provisions in the amended articles and bylaws had not been complied with), (iii) representations that the information on AIA's financial statements was true (John separately certified to auditors and others that the information contained on certain of AIA's financial statements was true and correct), (iv) representations that expenses and loans between AIA and other entities or parties were properly entered into and accounted for (i.e., there are hundreds of thousands of dollars, if not millions of dollars, in funds and other assets used by CropUSA which were derived from AIA and never accounted for), and (v) other representations referenced in this Second Amended Complaint; **(b)** these representations were false; **(c)** these representations were material; **(d)** they knew these representations were false; **(e)** they intended that there be reliance; **(f)** AIA was ignorant of the falsity of these representations; **(g)** AIA relied on these representations; **(h)** AIA's reliance was justified; and **(i)** injury resulted. *See, e.g., Mannos v. Moss,* 143 Idaho 927, 155 P.3d 1166 (2007) (holding that misrepresentations in financial statements precluded summary

SECOND AMENDED COMPLAINT - 42

## Exhibit - A

judgment). Constructive fraud is identical to fraud, except that the plaintiff need not prove speaker's knowledge of the fraud and the speaker's intent that the other party rely on the representations.

170.   The Controlling AIA Defendants owed duties to AIA during certain relevant times as majority shareholders, board members and/or officers of AIA. In addition to making false representations, the Controlling AIA Defendants also concealed information from AIA and its innocent minority shareholders with knowledge that the concealed information was material and that the concealment would cause AIA to suffer otherwise avoidable damages, including without limitation, information contained in this Second Amended Complaint. The Controlling AIA Defendants' failure to disclose a fact to AIA and AIA Services' innocent minority shareholders where one has a duty to disclose is the legal equivalent of representing the non-existence of the fact. Where facts are fraudulently concealed, Plaintiffs need not show reliance as there is nothing other than silence upon which to rely.

171.   The Controlling AIA Defendants represented to AIA Services that CropUSA was a wholly owned subsidiary of AIA Services. Simultaneously, the Controlling AIA Defendants adopted the position, not disclosed to AIA or its innocent minority shareholders, that CropUSA was an independent entity with John as its alleged sole shareholder and subsequently failed to disclose that CropUSA was not a separate entity. These representations were false, the Controlling AIA Defendants knew of their falsity, the Controlling AIA Defendants intended that there be reliance, there was justifiable reliance by AIA and AIA Services' innocent minority shareholders, and AIA was damaged as a result.

172.   By operating CropUSA as an independent entity, and by using CropUSA as a vehicle for misappropriating and converting corporate assets, the Controlling AIA Defendants

SECOND AMENDED COMPLAINT - 43

Exhibit - A

15-ER-3780

committed ongoing fraud that has persisted through the date of this Second Amended Complaint.

173.    The Controlling AIA Defendants also made misrepresentations to AIA and AIA Services' innocent minority shareholders in the form of false, misleading and fraudulent financial statements (which such financial statements also failed to disclose numerous improper and unlawful transactions and their ownership interests in CropUSA and other entities), upon which AIA and AIA Services' innocent minority shareholders reasonably relied, with that reliance being the proximate cause of AIA's damages.

174.    When the Controlling AIA Defendants transferred more than $1.5 million to CropUSA in 2004, they concealed the fact of this transaction from AIA and AIA Services' innocent minority shareholders and AIA was damaged by this concealment.

175.    When the Controlling AIA Defendants transferred AIA corporate assets, including funds, employees, goodwill and trade secrets to CropUSA and other entities and were subsidizing CropUSA and other entities, they concealed these facts from AIA and AIA Services' innocent minority shareholders. AIA suffered damages by these concealments.

176.    When the Controlling AIA Defendants had AIA pay certain of CropUSA's corporate expenses, they concealed this fact from AIA.  AIA suffered damages as a result of this concealment.

177.    When the Controlling AIA Defendants pledged the mortgage obtained by AIA from the state of Idaho to CropUSA so that CropUSA could borrow money to pay the attorney's fees of the Hawley Troxell Defendants, they concealed this fact from AIA.  AIA suffered damages as a result of this concealment.

178.    When the Controlling AIA Defendants had AIA Insurance guarantee CropUSA's $15 million line of credit and later sold over $10,000,000 in assets derived from AIA to Hudson

SECOND AMENDED COMPLAINT - 44

Exhibit - A

15-ER-3781

Insurance, they concealed the fact of this guarantee and asset sale from AIA.

179.     When the Controlling AIA Defendants finally disclosed their ownership interests in CropUSA, CropUSA Insurance Services, LLC and other entities in AIA Services' financial statements in July 2012[2] (*See* Dkt. #67-38), they continued to conceal how they obtained their ownership interest in those entities (and in the case of CropUSA that the ownership interest came from AIA) and many transactions and purported loans between the entities and AIA (loans and guarantees made by AIA which were prohibited by AIA Services' amended articles of incorporation and restated bylaws).

180.     As a direct and/or proximate cause of the Controlling AIA Defendants' fraudulent acts, AIA has been damaged in an amount to be proven at or before trial, and the ongoing fraud bars the Controlling AIA Defendants from asserting statute of limitations defenses. To the extent that the Hawley Troxell Defendants seek to assert the statute of limitations as a defense, they too are barred from doing so through their fraudulent concealment of facts from AIA.

### X.     COUNT V—AIDING AND ABETTING FRAUD
**(Against the Controlling AIA Defendants and the Hawley Troxell Defendants)**

181.     Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

182.     One who aids and abets in the commission of a tort is liable with the primary tortfeasor(s) for all damages resulting from the tort. Aiding and abetting is established where one has knowledge of the torts, does not disapprove, and takes no action to prevent the commission of the torts or assists in covering up such torts. The foregoing applies to the Controlling AIA

---

[2] While the financial statements were dated as of year-end 2011, they were not provided to AIA or its shareholders until July 2012 in connection with the failed ill-conceived reverse stock split.

SECOND AMENDED COMPLAINT - 45

Exhibit - A

15-ER-3782

Defendants and the Hawley Troxell Defendants.

183. The Controlling AIA Defendants have aided and abetted in one another's fraud committed against AIA. The Controlling AIA Defendants' silence, failure to act and intentional acts to cover up fraud upon AIA constitutes the aiding and abetting of fraud upon AIA.

184. The Hawley Troxell Defendants have aided and abetted in the fraud committed against AIA by the Controlling AIA Defendants by assisting in the commission of fraud. The Hawley Troxell Defendants' silence, failure to act and intentional acts to cover up fraud upon AIA constitutes the aiding and abetting the fraud upon AIA.

185. The Hawley Troxell Defendants knew or should have known that the transfer of AIA's assets, loans and other unauthorized transactions to CropUSA constituted a fraud against AIA.

186. The Hawley Troxell Defendants knew or should have known that the transfer of approximately $1,500,000 to CropUSA in 2004 constituted a fraud on AIA.

187. The Hawley Troxell Defendants knew or should have known that the practice of allocating CropUSA expenses to AIA, and otherwise failing to maintain arms' length transactions between CropUSA and AIA, constituted a fraud on AIA.

188. By knowingly providing legal cover for the fraudulent acts described herein, the Hawley Troxell Defendatns have aided and abetted the fraud committed by the Controlling AIA Defendants and CropUSA.

189. As aiders and abettors, the Hawley Troxell Defendants are liable to AIA to the same extent as the primary tortfeasors. RESTATEMENT (FIRST) OF TORTS § 876 (1939). Likewise, the Controlling AIA Defendants are all liable for aiding and abetting each other in the commission of fraud against AIA.

SECOND AMENDED COMPLAINT - 46

Exhibit - A

15-ER-3783

**190.**     As a direct and/or proximate cause of the Hawley Troxell Defendants and the Controlling AIA Defendant aiding and abetting in fraud, AIA has been damaged in the amount to be proven at or before the time of trial.

### XI.     COUNT VI—BREACH OF CONTRACT
#### (Against John)

**191.**     Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

**192.**     On August 1, 1995, John and AIA Services entered into an Executive Officer's Agreement. (*See* Dkt. #67-8.)

**193.**     The Executive Officer's Agreement contains contractual provisions preventing John from doing certain acts. For example, Section 9 of the Executive Officer's Agreement sets for express covenants not to compete. Subsection A of the covenants prohibits John from soliciting AIA customers or otherwise diverting the business of AIA customers. Subsection B prohibits John from participating in any insurance business that underwrites, markets or administers insurance products for commodity associations. Subsection C prohibits John from soliciting AIA Services employees for other employment.  Subsection D of the covenants bars John from divulging or exploiting trade secrets belonging to AIA.

**194.**     John has breached his contractual obligations owed to AIA, including, without limitation, by forming CropUSA as anything other than a wholly-owned subsidiary of AIA, competing against AIA with CropUSA and other entities (including Pacific Empire Holdings and CropUSA Insurance Services, LLC). John has breached all four subsections of Section 9 of the Executive Officer's Agreement.

///

SECOND AMENDED COMPLAINT - 47

# Exhibit - A

195.    As a direct and/or proximate cause of John's breaches of the Executive Officer's Agreement, AIA has been damaged in an amount to be proven at or before trial. Such breaches also constitute the breaches of his fiduciary duties owed to AIA.

### XII.    COUNT VII—DECLARATORY JUDGMENT
**(Against the Controlling AIA Defendants and the Hawley Troxell Defendants)**

196.    Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

197.    Plaintiffs seek a declaratory judgment against Controlling AIA Defendants, including, without limitation, for the following relief: (a) for a full accounting with supporting documentation of all of AIA's funds, assets, loans and other transactions from 1999 through the present time; (b) requiring the Controlling AIA Defendants to comply with AIA's amended articles of incorporation, bylaws and the Idaho Business Corporation Act; (c) rescinding the purchases of the shares held by the ESOP and/or ensuring that those shareholders receive fair value for their shares; (d) rescinding and/or declaring void the common shares issued to John through is Executive Officer's Agreement; and (d) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this Second Amended Complaint).

198.    Plaintiffs seek a declaratory judgment against the Hawley Troxell Defendants, including, without limitation, for the following relief: (a) that the representation agreement, fee agreements and any related agreements entered into with them and AIA be declared void (including, without limitation, because such agreements violated the applicable Rules of Professional Conduct); (b) any agreements or accounts regarding any sums owed by AIA, if any, be declared void; and (c) such other relief as may be requested at or before trial (including any

SECOND AMENDED COMPLAINT - 48

App. - E, p. 64

Exhibit - A

15-ER-3785

declaratory relief contemplated by any of the acts and/or omissions set forth in this Second Amended Complaint).

### XIII.    COUNT VIII—EXCESSIVE COMPENSATION/CORPORATE WASTE
#### (Against the Controlling AIA Defendants)

199.    Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

200.    To support a claim for excessive compensation, plaintiff need only show that the board lacked independence and/or lacked good faith. *In Re: Tyson Foods, Inc.,* 919 A.2d 563 (Del. 2000). The Controlling AIA Defendants have been officers and/or controlled AIA's Boards of Directors from 1995 through certain relevant times.  The Controlling AAI Defendants have lacked independence and have not acted in good faith, including, without limitation, by committing the intentional acts and/or omissions described in this Second Amended Complaint.

201.    The Controlling AIA Defendants paid excessive compensation and have wasted corporate assets during the course of managing and/or operating AIA, including, without limitation, by paying themselves excessive compensation (and practically speaking, any compensation at all based on their acts and omissions) and operating AIA for the benefit of CropUSA, the Controlling AIA Defendants and other entities they partially or wholly own, including Pacific Empire Radio Corp., CropUSA Insurance Services, LLC, and Pacific Empire Holdings Corp. The Controlling AIA Defendants also decimated AIA's agency force and caused them to transfer to CropUSA and ultimately Hudson and other entities. In addition, notwithstanding the fact that John is not entitle to retain any of his compensation or benefits as a faithless fiduciary, it was separately corporate waste to pay him in the first place as he did nothing for AIA (AIA's business was simply running off the commissions received for policies sold years

SECOND AMENDED COMPLAINT - 49

**Exhibit - A**

15-ER-3786

before). The other transactions and malfeasance described in this Second Amended Complaint also constitute corporate waste, and none of those transactions and malfeasance were properly disclosed to all of AIA Services' shareholders nor was any authorization from them ever sought or obtained.

202.    The Controlling AIA Defendants are liable to AIA for damages caused by paying excessive compensation and otherwise wasting and needlessly depleting AIA's funds and assets for their own benefit and with disregard for AIA.

203.    As a direct and/or proximate cause of the Controlling AIA Defendants' waste, AIA has been damaged in the amount to be proven at or before trial.

### XIV.    COUNT IX—ACCOUNT STATED
#### (Against John)

204.    Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

205.    John established an account by borrowing $307,000 from AIA for his personal use. John subsequently confirmed the amount of the debt by "correcting" an alleged so-called accounting "error" when he had previously extinguished the $307,000 debt by improperly crediting the payment of Reed Taylor's $6 million promissory after the issue arose in *Taylor v. AIA Services Corp., et al.*, so that AIA's book show that AIA is creditor and John is debtor for $307,000, i.e., the correction was only made because Reed Taylor demanded it and he was suing AIA Services for repaying of the $6 million note.

206.    John has not paid any portion of this debt and the entire balance remains due and payable to AIA. John is liable to AIA for $307,000 on the account stated and/or such other amount as may be presently owed, plus prejudgment interest from the date the obligation was incurred.

SECOND AMENDED COMPLAINT - 50

If John has since paid back the $307,000 or any part of the sums he owes, then Plaintiffs still seek the balance owed and prejudgment interest for the benefit of AIA, including, because John has been a faithless fiduciary who is not entitled to any interest-free loans from AIA.

### XV.   JURY DEMAND

207.   Plaintiffs hereby demand a trial by jury on all causes of action for which a jury trial is allowed by law.

### XVI.   PRAYER FOR RELIEF

Wherefore Plaintiffs pray for the following relief:

1.   For a judgment jointly and severally against the Controlling AIA Defendants and the Hawley Troxell Defendants for damages in an amount to be proven at trial, plus prejudgment interest;

2.   For judgments against the Controlling AIA Defendants and the Hawley Troxell Defendants in an amount to be proven at trial for damages for which joint and several liability does not apply to all defendants, plus prejudgment interest;

3.   For a judgment or order requiring the Hawley Troxell Defendants to disgorge all attorneys' fees and costs paid to them by AIA Services, AIA Insurance, CropUSA and by any other party on behalf of those entities in the amount to be proven at the time of trial, plus prejudgment interest;

4.   For a judgment or order requiring the Controlling AIA Defendants to disgorge all compensation received from AIA or CropUSA since 1999, including stock, cash, benefits, and other assets because they intentionally breached their fiduciary duties and were thus faithless fiduciaries;

5.   For judgment against John in the amount to be proven at the time of trial, plus prejudgment interest;

SECOND AMENDED COMPLAINT - 51

**Exhibit - A**

**App. - E, p. 67**

**15-ER-3788**

6.      For an order requiring that all funds recovered as a result of this litigation, minus fees, costs and bona fide debts, be deposited with the Court registry and distributed only after court order, and that no funds from this litigation be paid to faithless fiduciary Controlling AIA Defendants;

7.      For judgments against the Controlling AIA Defendants, jointly and severally, as the alter-ego of CropUSA or to pierce its corporate veil, for all damages incurred by AIA and attributable in whole or in part to CropUSA;

8.      For a declaratory judgment for the relief specified in this Second Amended Complaint and any other declaratory relief requested at or before trial;

9.      For an award of the attorneys' fees and cost incurred in this action as allowed by statute, contract, or recognized grounds of equity; and

10.      For any such further relief or remedy, including preliminary and/or permanent injunctive relief, as Plaintiffs may request or as this Court may find just and equitable.

DATED:  This _____ day of May, 2016.

RODERICK BOND LAW OFFICE, PLLC


By:   */s/ Roderick C. Bond*
      Roderick C. Bond
      Attorney for Plaintiffs

SECOND AMENDED COMPLAINT - 52

# Exhibit - A

15-ER-3789

<u>**VERIFICATION OF DALE L. MIESEN**</u>

STATE OF TEXAS         )
                                 ) ss.
COUNTY OF TARRANT     )

      I, Dale L. Miesen, being first duly sworn on oath, deposes and says:

      I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Second Amended Complaint, know the contents of this Second Amended Complaint, and believe that the facts in set forth in this Second Amended Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.


_____
Dale L. Miesen


SUBSCRIBED AND SWORN to before me this _____ day of _____, 2016.


_____
Notary Public for Texas
Residing at: _____
My commission expires: _____


SECOND AMENDED COMPLAINT - 53

**Exhibit - A**

**15-ER-3790**

**<u>VERIFICATION OF DONNA J. TAYLOR</u>**

STATE OF IDAHO         )
                                       ) ss.
COUNTY OF NEZ PERCE   )

     I, Donna J. Taylor, being first duly sworn on oath, deposes and says:

     I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Second Amended Complaint, know the contents of this Second Amended Complaint, and believe that the facts in set forth in this Second Amended Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.


_____
Donna J. Taylor


SUBSCRIBED AND SWORN to before me this \_\_\_ day of _____, 2016.


_____
Notary Public for Idaho
Residing at: _____
My commission expires: _____


SECOND AMENDED COMPLAINT - 54

**Exhibit - A**

**15-ER-3791**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the _____ day of _____, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:    jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:    jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:    lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:    sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:    swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com


AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501


_____/s/ Roderick C. Bond_____
Roderick C. Bond

SECOND AMENDED COMPLAINT - 55

# Exhibit - A

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiffs

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC.; <br><br> Plaintiffs, <br><br> v. <br><br> HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation, <br><br> Defendants. | Civil No. 1:10-cv-00404-CWD <br><br> THIRD AMENDED COMPLAINT <br><br> DEMAND FOR JURY TRIAL <br><br> [PROPOSED] |

THIRD AMENDED COMPLAINT - i

**Exhibit - A**

**App. - E, p. 72**

**15-ER-3793**

## TABLE OF CONTENTS

I.    STATEMENT OF JURISDICTION...................................................................................... 1

II.   STATEMENT OF VENUE ................................................................................................. 1

III.  PARTIES AND DEFINITIONS OF THE PARTIES.......................................................... 1

IV.   FACTS ............................................................................................................................... 4

A.    The Background Facts Regarding AIA Services and AIA Insurance.................................. 4

B.    John, Beck and Cashman Take Operational Control of AIA and AIA
      Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions
      in Its Amended Articles of Incorporation ........................................................................... 6

C.    AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer
      CropUSA to Themselves ..................................................................................................... 9

D.    The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants
      in Taking CropUSA from AIA and Having AIA Fund CropUSA ..................................... 13

E.    The Controlling AIA Defendants Steal $1,510,693 From AIA to Fund CropUSA
      and Then They Use $634,269 of Those Funds to Repay a Debt CropUSA Owed to
      AIA—thereby Resulting in a $2,144,962 Fraud Against AIA. ........................................ 15

F.    The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and
      Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal ......... 19

G.    The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and
      Financial Wherewithal with the Improper Assistance from the Hawley Troxell
      Defendants ........................................................................................................................ 21

H.    The Controlling AIA Defendants Enter Into Tolling Agreements, but Those
      Tolling Agreements Do Not Save the Hawley Troxell Defendants from the
      Unwaivable Conflicts of Interest ...................................................................................... 22

I.    The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA
      and Intentionally Committing Torts against AIA with the Assistance of the Hawley
      Troxell Defendants—Even While this Lawsuit Was Pending........................................... 27

THIRD AMENDED COMPLAINT - ii

# Exhibit - A

**App. - E, p. 73**

**15-ER-3794**

J.      There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants ................................... 31

V.      CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 AND FEDERAL RULE OF CIVIL PROCEDURE 23.1 ................................................ 36

VI.     COUNT I—BREACH OF FIDUCIARY DUTY .............................................................. 40

VII.    COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES ....... 42

VIII.   COUNT III—LEGAL MALPRACTICE .......................................................... 43

IX.     COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ CONSTRUCTIVE FRAUD.......................................................................... 44

X.      COUNT V—AIDING AND ABETTING FRAUD ....................................................... 47

XI.     COUNT VI—BREACH OF CONTRACT.......................................................... 49

XII.    COUNT VII—DECLARATORY JUDGMENT.............................................................. 50

XIII.   COUNT VIII—EXCESSIVE COMPENSATION/CORPORATE WASTE .................... 51

XIV.    COUNT IX—ACCOUNT STATED.................................................................. 52

XV.     JURY DEMAND ............................................................................................ 53

XVI.    PRAYER FOR RELIEF .................................................................................. 53

VERIFICATION OF DALE L. MIESEN ................................................................................ 55

VERIFICATION OF DONNA J. TAYLOR ........................................................................... 56

CERTIFICATE OF SERVICE ................................................................................................ 57

THIRD AMENDED COMPLAINT - iii

Exhibit - A

App. - E, p. 74

15-ER-3795

Plaintiffs Donna J. Taylor and Dale L. Miesen allege cumulatively and, when necessary and/or applicable, in the alternative, as follows:

## I.   STATEMENT OF JURISDICTION

1.      This Court has jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1332(a)(1), as the amount in controversy exceeds $75,000 and the action, when filed, was between citizens of different states.

2.      This Court also has personal jurisdiction pursuant to I.C. § 5-514 because the defendants: (a) committed torts within the state of Idaho and covered up and aided in the commission of torts committed within the state of Idaho, which injured AIA in Idaho; and (b) transacted business within the state of Idaho and engaged in transactions with the state of Idaho in an effort to obtain a pecuniary benefit and/or enhance their investment in Idaho corporations (including, without limitation, CropUSA Insurance Agency, Inc.). Examples of the specific facts supporting personal jurisdiction are set forth in certain of the paragraphs below.

## II.   STATEMENT OF VENUE

3.      Venue is proper in the District of Idaho under 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the acts, errors and omissions giving rise to the claims asserted in this Third Amended Complaint and the torts committed against AIA occurred in the District of Idaho, and certain of the defendants reside in the District of Idaho. Examples of the specific facts supporting venue are set forth in certain of the paragraphs below.

## III.   PARTIES AND DEFINITIONS OF THE PARTIES

4.      Plaintiff Dale L. Miesen ("Miesen") is a citizen and resident of Colleyville, Texas. Miesen has been a common shareholder of AIA Services during all relevant times.

5.      Plaintiff Donna J. Taylor ("Donna") is a citizen and resident of Clarkston, Washington. Donna has been a Series A Preferred Shareholder of AIA Services during all relevant

THIRD AMENDED COMPLAINT - 1

Exhibit - A

15-ER-3796

times.

6.      Plaintiffs Dale Miesen and Donna J. Taylor are collectively referred to as the "Plaintiffs" in this Third Amended Complaint, and they were innocent minority shareholders.

7.      Plaintiffs are bringing this derivative action on behalf of AIA Services Corporation ("AIA Services"). In addition, Plaintiffs are bringing this action as a double derivative action on behalf AIA Insurance, Inc. ("AIA Insurance"), which is a wholly owned subsidiary of AIA Services. AIA Services and AIA Insurance are collectively referred to as "AIA" in this Third Amended Complaint. The definition of "AIA" includes AIA Services and/or AIA Insurance for purposes of pleading in the alternative, and includes the Plaintiffs to extent they are required to support any derivative cause of action set forth in this Third Amended Complaint.

8.      Defendant AIA Services is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. At all times relevant to this lawsuit, AIA Services is or has been the parent corporation of AIA Insurance.

9.      Defendant AIA Insurance is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. AIA Insurance is, or was at all relevant times, a wholly owned subsidiary of AIA Services.

10.     Defendant CropUSA Insurance Agency, Inc. ("CropUSA") is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. CropUSA was formerly known as AIA Crop Insurance, Inc.

11.     Defendant R. John Taylor ("John") is citizen and resident of the state of Idaho. At all times relevant to this lawsuit, John served on the Board of Directors of AIA Services, AIA Insurance, and CropUSA and continues to serve on those boards. John also served as President of each of these corporations during all times relevant to this lawsuit. John is also licensed to practice

THIRD AMENDED COMPLAINT - 2

Exhibit - A

15-ER-3797

law in the state of Idaho. John is a common shareholder of AIA Services and a common shareholder of the CropUSA. John also owns shares or ownership interests in other entities that have engaged in inappropriate transactions with AIA and/or which have improperly benefitted from AIA during all relevant times.

12.     Defendant James Beck ("Beck") is a citizen and resident of the state of Minnesota. Beck served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until he resigned in 2014. Beck was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA.

13.     Defendant Michael Cashman, Sr. ("Cashman") is a citizen and resident of the state of Minnesota. Cashman served on the Board of Directors of AIA Services during certain relevant times. Cashman was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA.

14.     John, Beck, and Cashman, are collectively referred to herein as the "Controlling AIA Defendants." The Controlling AIA Defendants have acted in concert and assisted one another in committing various torts described in this Third Amended Complaint and covering up and/or concealing those torts. The definition of "Controlling AIA Defendants" includes the acts and/or omissions of one or more of John, Beck, and/or Cashman for purposes of pleading in the alternative.

15.     Defendant Gary D. Babbitt ("Babbitt") is a citizen and resident of the state of Idaho and was an attorney practicing law in the state of Idaho with and for Hawley Troxell.

16.     Defendant Richard A. Riley ("Riley") is a citizen and resident of the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

///

THIRD AMENDED COMPLAINT - 3

Exhibit - A

App. - E, p. 77

15-ER-3798

17.     Defendant D. John Ashby ("Ashby") is a citizen and resident of the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

18.     Defendant Hawley Troxell Ennis & Hawley LLP ("Hawley Troxell") is an Idaho limited liability partnership in the business of practicing law, with its principal place of business in Boise, Idaho. Hawley Troxell has no office in the state of Washington. None of the individual partners of Hawley Troxell are residents of Washington. Hawley Troxell, though its attorneys, acted as counsel for AIA Services, AIA Insurance and CropUSA during certain relevant times and in certain lawsuits. Hawley Troxell is also named herein as it is vicariously liable for the acts and/or omissions of Babbitt, Riley, Ashby and its other attorneys.

19.     Babbitt, Ashby, Riley, other Hawley Troxell attorneys, and Hawley Troxell are collectively referred to as the "Hawley Troxell Defendants" in this Third Amended Complaint. The definition of "Hawley Troxell Defendants" includes the acts and/or omissions of one or more of Babbitt, Ashby, Riley, other attorneys at Hawley Troxell and/or Hawley Troxell for purposes of pleading in the alternative. The Hawley Troxell Defendants conducted business from their office in Boise, Idaho during all relevant times.

### IV.     FACTS

#### A.  The Background Facts Regarding AIA Services and AIA Insurance

20.     In 1983, AIA Services was formed as a closely held Idaho corporation for the purpose of acting as a holding company for various other wholly owned subsidiaries. AIA's business model was to work with farmers and growers to form trusts and/or related cooperatives through various growers and farmers' associations and the members of those associates also becoming members of the trusts and/or cooperatives.

21.     AIA created the Grain Growers Membership & Insurance Trust, the National Contract Poultry Grower's Membership & Insurance Trust, and other, similar trusts. By way of its

THIRD AMENDED COMPLAINT - 4

Exhibit - A

15-ER-3799

relationships with these various organizations, AIA held contracts for the exclusive right to market health insurance (*e.g.*, Group Universal Health Policies) and other insurance products to the members of the various trusts and associations.

22.    In 1987, Donna and Reed Taylor, a non-party to this suit, were issued Series A Preferred Shares in AIA Services in connection with their divorce. Pursuant to the dissolution of their marriage, Donna was issued the 200,000 shares of Series A Preferred shares on or about February 12, 1988, and has held those shares ever since, less those shares which have been redeemed in part over the years. (*See* Dkt. #67-1 and #67-2.)

23.    In connection with the issuance of the Series A Preferred Shares to Donna, AIA Services' shareholders adopted amendments to its articles of incorporation with restrictions on the manner in which AIA Services and its subsidiaries could conduct business. (*See* Dkt. #67-3.) AIA Services' amended articles of incorporation included, without limitation, the restrictions that: (a) barred AIA Services and AIA Insurance from guaranteeing any loans for any individual or entities which were not wholly owned subsidiaries; (b) barred certain transactions with shareholders and affiliates; and (c) required AIA Services to comply with certain financial covenants. (*Id.*)

24.    In addition, AIA Services' amended articles of incorporation also provided Donna with the unqualified right, as the Series A Preferred Shareholder, to appoint a person, to be determined in her sole discretion, to the Board of Directors of AIA Services. (*See* Dkt. #67-3.)

25.    The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the restrictions under AIA Services' amended articles of incorporation for the benefit of AIA Services and the Series A Preferred Shares.

26.    Donna's Series A Preferred Shares have not been fully redeemed to this day, and the restrictions under AIA Services' amended articles of incorporation remain in full force and

THIRD AMENDED COMPLAINT - 5

Exhibit - A

15-ER-3800

effect to this day and fully applicable. (*See* Dkt. #67-42, pp. 10-11 ¶ 19.)

**B.  John, Beck and Cashman Take Operational Control of AIA and AIA Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in Its Amended Articles of Incorporation**

27.     In 1995, the Controlling AIA Defendants spearheaded a transaction to redeem Reed Taylor's majority common stock interest in AIA Services. (*See* Dkt. 67-5 and #67-6.)

28.     As part of the redemption, Beck, Cashman and certain of their friends acquired Series C Preferred Shares in AIA Services through an Investment Agreement, which was entered into with AIA Services and transmitted to AIA Services in Idaho and involved the transaction to redeem Reed Taylor's common shares in Idaho. When AIA Services amended its articles of incorporation to allow the issuance of the Series C Preferred Shares, AIA Services included additional restrictions in its articles of incorporation. Riley assisted in drafting and/or approving these restrictions and he was fully aware of them.

29.     Under the new and additional restrictions in AIA Services' amended articles of incorporation (these restrictions were in addition to others adopted in connection with the issuance of Donna's Series A Preferred Shares), AIA Services was barred from engaging in a number of corporate actions, including, but not limited to: (a) AIA Services could not acquire any common shares from any shareholders unless all dividends due on the Series C Preferred Shares has been paid (10% dividend per year) or those funds were set aside; (b) the Series C Preferred Shareholders had the right to elect one director to AIA Services' Board of Directors; and (c) if any Series C Preferred Shares are redeemed, such redemptions must be equally from all shareholders. (*See* Dkt. #67-3.)

30.     Although the Series C Preferred Shares held by Beck, Cashman and their friends were eventually unlawfully and effectively redeemed by AIA, other Series C Preferred Shares

THIRD AMENDED COMPLAINT - 6

were later issued to the AIA Services 401(k) Plan and those shares remain issued and outstanding to this day and no dividends have been paid as required since approximately 1997. As a result, these new restrictions under AIA Services amended articles of incorporation were in place for the benefit of AIA Services and the Series C Preferred Shares, which have remained in full force and effect to this day.  The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the additional restrictions under AIA Services' amended articles of incorporation.

31.     Upon the redemption of Reed Taylor's majority common shares, Beck, Cashman, and John directly or indirectly became the majority common shareholders of AIA Services. (*See* Dkt. #67-5.) In addition, Beck, Cashman and John entered into a Voting Agreement to ensure that they would maintain control of AIA Services' Board of Directors, which was signed by Beck and Cashman and transmitted by them to Idaho. As a result, the Controlling AIA Defendants have maintained operational control of AIA from 1995 through the present time. Beck and Cashman attended certain board and shareholder meetings for AIA Services in person in Idaho and via telephone from Minnesota for meetings held in Idaho.

32.     In connection with the redemption of Reed Taylor's shares, John entered into an Executive Officer's Agreement with AIA Services, which guaranteed him certain salary payments and other compensation for three years; that agreement also contained non-compete and non-solicitation provisions. (*See* Dkt. #67-8.) John's salary after the first three years was required to be determined by AIA Services' Board of Directors, which was never done after the first three years.

33.     From 1999-2012, John improperly paid himself millions of dollars pursuant to his Executive Officer's Agreement for his benefit (the amount of which in itself was improper based on AIA's business prospects and John's inability to do anything for the benefit of AIA), while he intentionally and repeatedly violated the non-compete and non-solicitation provisions of his

THIRD AMENDED COMPLAINT - 7

Exhibit - A

15-ER-3802

Executive Officer's Agreement.

34.     In connection with the redemption of Reed Taylor's shares in August 1995, AIA Services contributed funds to The Universe Life Insurance Company, which was a wholly owned subsidiary of AIA Services, in order to make AIA Insurance, which was then a wholly owned subsidiary of The Universe Life Insurance Company, a subsidiary of AIA Services. After that transaction, AIA Insurance became a wholly owned subsidiary of AIA Services.

35.     As a result, from August 1995 through all relevant times, AIA Insurance was a wholly owned subsidiary through which AIA Services derived its commissions and administrative fees from insurance policies, which accounted the bulk of AIA's revenues and profits.

36.     From 1995 through 2005, AIA Insurance generated over $65 million in revenues from commissions (over $33 million) and administrative fees (over $27 million), and it continued to generate revenues thereafter.

37.     From 1995 through all relevant times, each of the Controlling AIA Defendants has served at various times on the Board of Directors for AIA Services, AIA Insurance and/or CropUSA, while John has continuously served as the President of AIA.

38.     From 1999 through certain relevant times (Plaintiffs' counsel has purported copies of certain of these meetings through 2006), the Controlling AIA Defendants have also served from time to time on a purported so-called "advisory board" of CropUSA, which actually made the decisions on behalf of AIA and CropUSA. Upon information and belief, Cashman, Beck and John served on the "advisory board" of CropUSA. Certain of the so-called "advisory board" meetings were conducted via telephone originating in Idaho and in person in Idaho.

39.     The Controlling AIA Defendants intentionally concealed from AIA and AIA Services' minority shareholders of the existence and authority of the "advisory board" of

THIRD AMENDED COMPLAINT - 8

CropUSA.

**C. AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer CropUSA to Themselves**

40.     By 1998, AIA's ability to sell health insurance had been impaired by undercapitalization in its underwriting subsidiary the Universal Life. Accordingly, the company considered proposals to sell other forms of insurance, and in particular crop insurance, to be underwritten by other insurance companies. At a 1998 Board Directors of Meeting, AIA Services' Board of Directors specifically discussed selling crop insurance and elected to have AIA pursue selling crop insurance.

41.     In 1999, AIA, then under the control of Controlling AIA Defendants, began selling crop insurance through a wholly owned subsidiary of AIA Services formed under the name "AIA Crop Insurance, Inc."

42.     The first purported meeting of shareholders of AIA Crop Insurance, Inc. ("AIA Crop Insurance") was held on January 11, 2000. The first purported meeting of the AIA Crop Insurance's Board of Directors was held on the same day. The purported minutes of the shareholder's meeting indicate that John, not the true owner AIA Services, claimed to be the sole shareholder of AIA Crop Insurance at the time of incorporation; these facts were concealed from AIA and AIA Services' innocent minority shareholders.

43.     Upon information and belief, at or shortly after the time of its formation, the Hawley Troxell Defendants began providing legal services to AIA Crop Insurance.

44.     At a special meeting of the shareholders of AIA Crop Insurance held on November 13, 2000, AIA Crop Insurance was renamed CropUSA in an apparent attempt to conceal its corporate lineage and origins.

///

THIRD AMENDED COMPLAINT - 9

**Exhibit - A**

**App. - E, p. 83**

**15-ER-3804**

**45.**     The minutes of the November 13, 2000 special meeting of the shareholders also show that John continued to claim that he was the sole shareholder of CropUSA, while he was simultaneously representing in business plans provided to others that CropUSA was a subsidiary of AIA Insurance. (*See* Dkt. # 67-66.)

**46.**     At the time CropUSA was formed, John was employed by AIA Services under an Executive Officer's Agreement, dated August 1, 1995, Dkt. #67-8, which contained express covenants not to compete. Upon information and belief, John's Executive Officer's Agreement and AIA Service's amended articles of incorporation and restated bylaws were drafted and/or approved by Riley, and he had full knowledge of the restrictions under the terms of the foregoing documents.

**47.**     CropUSA held its purported annual shareholder's meeting on January 10, 2001. By this time, the illegal "spin off" of CropUSA had been accomplished by having AIA Service's Series C Preferred Shareholders (primarily Beck and Cashman) exchange their Series C Preferred Shares for common shares in CropUSA (if CropUSA were in fact an independent entity, these maneuvers would have been completely unnecessary).  The documents for Beck and Cashman to "exchange" their Series C Preferred Shares in AIA Services for common shares in CropUSA were transmitted to them from Idaho and they delivered the signed documents to AIA's offices in Idaho.

**48.**     The minutes for the shareholder meeting held on January 10, 2001 for CropUSA revealed that CropUSA had retained Hawley Troxell as its advisor and SEC counsel and, upon information and belief, the Hawley Troxell Defendants have served continuously as CropUSA's attorneys in one form or the other ever since. According to the minutes, negotiations between AIA Services and CropUSA had resulted in an agreement whereby AIA Services would no longer operate CropUSA as a subsidiary.

THIRD AMENDED COMPLAINT - 10

**App. - E, p. 84**

# Exhibit - A

**15-ER-3805**

49.     However, the negotiations referred to in the January 10, 2001 shareholder meeting minutes for CropUSA did not in fact occur. There was no decision, nor has there ever been a decision, on the part of AIA Services to discontinue the subsidiary status of CropUSA. The January 10, 2001 meeting minutes for CropUSA were concealed from AIA.

50.     None of the preferred or common shareholders of AIA Services (other than those present at the January 10, 2001 meeting) were given notice of or the opportunity to approve or oppose this corporate action; instead, it was concealed from them and AIA.

51.     In spite the fact that John asserted on January 10, 2001 that CropUSA would no longer be a subsidiary of AIA Services, John wrote in a letter dated February 27, 2001, sent on behalf of AIA to Donna, that "AIA is developing a new crop insurance program through a new company called CropUSA." (The letter went on to state that "[t]he costs of putting the CropUSA program together have been paid. AIA now needs to launch five new territories next Month"). This January 27, 2001 letter constituted an unambiguous representation by John to AIA and Donna that CropUSA was a subsidiary of AIA and was being operated for the benefit of AIA and implicitly also for AIA Services' innocent minority shareholders (which included Donna). This representation to AIA and Donna was false, and John knew it was false. Upon information and belief, the other Controlling AIA Defendants were aware of this January 27, 2001 letter and the misrepresentations contained within the letter.

52.     Notwithstanding the fact that John was obligated under the terms of his Executive Officer's Agreement that required that he not compete with AIA Services, and notwithstanding the fact that he owed fiduciary duties to the AIA and AIA Services' shareholders, John set forth his plans to exploit the assets of AIA for the benefit of CropUSA (and himself as the majority purported shareholder) in the purported minutes of the purported January 10, 2001 meeting.

THIRD AMENDED COMPLAINT - 11

Exhibit - A

53.     The January 10, 2001 meeting minutes reveal that CropUSA authorized its officers to execute a Master Marketing Agreement with AIA Insurance that would allow CropUSA access to all of AIA's customers and customer lists, as well as all of AIA's trade secrets. AIA received no consideration for conveying this access or to enter into these agreements.

54.     CropUSA's officers (including John) were also purportedly authorized to enter into a Management Agreement with AIA Insurance wherein AIA Insurance purportedly agreed to provide management and administrative support to CropUSA without charge. However, John has since testified under oath that AIA's Board of Directors never authorized this agreement, although the Board has acquiesced in the action.

55.     AIA itself was never given notice of the Master Marketing Agreement and the Management Agreement, nor was AIA given the opportunity to approve or reject these agreements or any subsequent ones. Each of these agreements, when executed, constituted a violation of John's Executive Officer's Agreement, which contains a strict non-compete clause. Each of these agreements also constituted a direct breach of fiduciary duty or the aiding and abetting on behalf of each of the Controlling AIA Defendants in the commission of torts against AIA.

56.     Meanwhile, in 2001, John acquired a parking lot for $8,000 using AIA's line-of-credit. Upon information and belief, AIA was required to maintain control of the parking lot as part of its lease with Washington Bank Properties. John then increased the rent that AIA paid to use the parking lot to benefit him. For example, although John paid only $8,000 for the parking lot, they subsequently charged AIA $60,750 in rent to use the parking lot from 2004 through 2006. These unfair and self-serving rental payments to John were concealed from AIA and AIA Services' innocent minority shareholders and were never disclosed to either of them, as was John's purchase of the parking lot.

THIRD AMENDED COMPLAINT - 12

**D. The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants in Taking CropUSA from AIA and Having AIA Fund CropUSA**

57.     Upon information and belief, the Hawley Troxell Defendants were providing legal services to CropUSA and/or its board of directors as of January 10, 2001, and such providing of legal services has continued through certain relevant times.

58.     Upon information and belief, from January 10, 2001, and continuing through the period relevant to this lawsuit, the Hawley Troxell Defendants had knowledge of John's Executive Officer's Agreement with AIA Services, had knowledge of the conflict of interest provisions in AIA's bylaws, and had knowledge of restrictions in AIA's amended articles of incorporation, but intentionally refused to comply with them and assisted John in violating them or covering up the violations.

59.     The Hawley Troxell Defendants knew or should have known that the purported Master Marketing Agreement and Management Agreement constituted breaches of John's Executive Officer's Agreement, violations of AIA Service' amended articles of incorporation, violations of AIA Services' restated bylaws, and constituted breaches of John and the other Controlling AIA Defendants' fiduciary duties owed to AIA and AIA Services' minority shareholders.

60.     Upon information and belief, the Hawley Troxell Defendants were also representing CropUSA from January 10, 2001, through certain relevant times, and by way of that representation they breached their fiduciary duties to AIA (including their undivided duty of loyalty owed to AIA) and took steps that materially assisted John and the Controlling AIA Defendants in the commission of the various torts described in this Third Amended Complaint and assisted in the concealment of those torts.

61.     Beginning in 1999 and continuing through the through the time CropUSA ceased

THIRD AMENDED COMPLAINT - 13

operating, CropUSA was funded and operated with assets improperly transferred from AIA, including, but not limited to, operating capital, office space, customer lists and other trade secrets, agents and staff, goodwill and other assistance. CropUSA paid nothing for these assets.

62.     The Controlling AIA Defendants were all shareholders of AIA at the time CropUSA was formed and later purportedly became shareholders of CropUSA.

63.     The Controlling AIA Defendants all served on a purported "advisory board" of CropUSA and/or AIA, and this advisory board exercised actual control over CropUSA and AIA. By exercising control over these entities and committing acts that benefitted CropUSA at the expense of AIA, the Controlling AIA Defendants engaged in a conspiracy to defraud AIA, which should have had the right and title to the property of CropUSA.

64.     Due to the fact that the Controlling AIA Defendants have complete control over AIA and would never assert claims against themselves on behalf of AIA, the adverse dominion doctrine applies to all claims asserted herein, thereby barring any defense based on a statute of limitations. *Freeland v. Enosis Corp.,* 540 F.3d 721 (7th Cir. 2008).

65.     On January 10, 2002, CropUSA purportedly entered into a Memorandum of Understanding with the Controlling AIA Defendants. Under the terms of this memorandum, Beck and Cashman were obligated to guarantee loans on behalf of CropUSA. The Controlling AIA Defendants guaranteed loans for CropUSA in Idaho and sent their financial information to Idaho for the guarantees.

66.     Notably, Beck and Cashman had also been obligated to guarantee over $1,000,000 in loans on behalf of AIA since 1995, but they never did. Notwithstanding this obligation, the Controlling AIA Defendants subsequently arranged for AIA to guarantee CropUSA's lines of credit, even though the guarantees were barred by AIA's amended articles of incorporation and

THIRD AMENDED COMPLAINT - 14

bylaws.

67.     In 2004, the Controlling AIA Defendants attempted to raise capital for CropUSA by selling shares in CropUSA to private investors by way of a $10,000,000 private placement. The Hawley Troxell Defendants drafted the July 15, 2004 Private Placement Memorandum, despite their knowledge of the illegal "spin-off" of CropUSA and the fiduciary duties they owed to AIA.

68.     When CropUSA began distributing the Private Placement Memorandum in 2004, the company was experiencing financial difficulties that made it difficult, if not impossible, to attract investors to purchase shares pursuant to the private placement.

69.     In addition, in 2004, the CropUSA's lack of adequate funding threatened its ability to participate in the Federal Crop Insurance program. To alleviate these problems, the Controlling AIA Defendants would improperly turn to AIA to obtain the necessary funding.

**E.     The Controlling AIA Defendants Steal $1,510,693 From AIA to Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt CropUSA Owed to AIA— thereby Resulting in a $2,144,962 Fraud Against AIA.**

70.     In order to boost CropUSA's balance sheet for the purpose of operating the company, attracting investors and maintaining access to the Federal Crop Insurance program, the Controlling AIA Defendants devised a scheme to illegally transfer $1,510,693 from AIA Insurance to CropUSA.

71.     The Controlling AIA Defendants conspired with each other in the formation and execution of this scheme to unlawfully transfer $1,510,693 of AIA's funds to CropUSA, and aided and abetted one another in carrying out the scheme and ultimately covering it up.

72.     Upon information and belief, the Hawley Troxell Defendants provided counsel to CropUSA with respect to the unlawful transfer of funds and/or has at a minimum assisted in covering up the facts of this illegal transfer.

THIRD AMENDED COMPLAINT - 15

Exhibit - A

73.    The scheme involved money derived from AIA Insurance. In August 2004, AIA Insurance received a payment of $1,510,693 from Trustmark. (*See* Dkt. #67-59.) Rather than deposit the payment of $1,510,693 into the account of AIA Insurance, where it would have benefited AIA and its innocent shareholders, John deposited the funds into a new account entitled "AIA Insurance Inc. CropUSA." (*See* Dkt. #67-60.) The address for this account coincided with the address for John's personal residence at 2020 Broadview Drive in Lewiston, Idaho, rather than any address used by AIA. (*Id.*)

74.    Shortly after diverting the $1,510,693 into the "AIA Insurance Inc. CropUSA" account, the Controlling AIA Defendants illegally transferred the funds to CropUSA. The Controlling AIA Defendants attempted to disguise this conversion of AIA Insurance's funds by characterizing the transaction as an alleged purchase by AIA Insurance of Series C Preferred Shares in its parent corporation, AIA Services. (*See* Dkt. #67-59.) Then, the Controlling AIA Defendants carried AIA Insurance's alleged investment in the Series C Preferred Shares as having a purported value of $1,510,693 when that was not the true value of the shares.

75.    However, as the Controlling AIA Defendants acknowledged at the time, there was no market for the Series C Preferred Shares which were purportedly being repurchased. At the time the $1,510,693 in funds were converted by CropUSA, there was no authorization of any kind for the transaction, and the transaction was concealed from AIA.

76.    In order to create a plausible explanation for the transfer of the $1,510,693, CropUSA eventually produced a document designated as a Consent in Lieu of Meeting dated August 26, 2004. (*See* Dkt. #67-61.) However, this document itself is completely fraudulent, as it was retroactively created the following year in order to deceive auditors who questioned the validity of this transaction.

THIRD AMENDED COMPLAINT - 16

**Exhibit - A**

**App. - E, p. 90**

**15-ER-3811**

77.     In addition, this $1,510,693 purported repurchase of shares separately violated the terms of AIA Services' amended articles of incorporation, which required that all Series C Preferred Shares be redeemed equally and simultaneously from all shareholders. (*See* Dkt. #67-3.) Instead of repurchasing an equal portion of the Series C Preferred Shares from AIA Services' 401(k) Plan, the Controlling AIA Defendants intentionally only repurchased the Series C Preferred Shares held by CropUSA (which had been previously held by Beck, Cashman and their friends).

78.     CropUSA was carrying these Series C Preferred Shares in AIA Services on its books with a value of $21,693, which means that CropUSA realized a gain of $1,489,000 on this purported sale of shares. (*See* Dkt. #67-59.) At that time, although the Controlling AIA Defendants had not properly accounted for all funds, assets, labor and other costs advanced from AIA for CropUSA, they had actually accounted for there being a debt of $634,269 owed by CropUSA to AIA.

79.     After unlawfully transferring the $1,510,693 received by AIA Insurance to CropUSA, the Controlling AIA Shareholders had CropUSA repay the $634,269 debt owed to AIA, thereby committing a double fraud upon AIA, i.e., AIA should have the $1,510,693 in its bank account now and it should have never lent the $634,269 to CropUSA in the first place. In other words, those fraudulent transactions alone resulted in the loss of $2,144,962 in funds to AIA and thus damaged AIA in the amount of $2,144,962. The Controlling AIA Defendants have actively concealed, or covered up, these transactions from AIA with the assistance of the Hawley Troxell Defendants.

80.     AIA and the innocent shareholders of AIA Services were never given notice of the 2004 stock transaction, nor were any proper board or shareholder meetings held to approve the transaction. However, as with the fraudulent document prepared on behalf of CropUSA, a

THIRD AMENDED COMPLAINT - 17

Exhibit - A

15-ER-3812

fraudulent Consent if Lieu of Meeting, dated August 26, 2004, was prepared on behalf of AIA. This document was actually produced several months after the transaction and was created to deceive auditors.

81.    Upon information and believe, the Hawley Troxell Defendants provided legal services to both AIA and CropUSA at the time of the 2004 transaction or had actually knowledge of the 2004 transaction.

82.    The Hawley Troxell Defendants at various times, as purported counsel for AIA, failed to disclose to AIA the 2004 transaction to transfer $1,510,693 to CropUSA and that the acts of the Controlling AIA Defendants constituted an intentional breach of their fiduciary duties (including the duty of loyalty) owed to AIA and a concealment of a prohibited transaction. For this reason alone, the Hawley Troxell Defendants could not reasonably rely on a tolling agreement to represent AIA, CropUSA and the interest of the Controlling AIA Defendants in later litigation.

83.    The Hawley Troxell Defendants failed to disclose to AIA, or to anyone else, that this $1,510,693 transaction was unlawful on many levels, including but not limited to the fact that it did not comply with articles of incorporation and bylaws, caused a breach of AIA's other contracts, and could not be justified by the balance sheet of either AIA Insurance or CropUSA. Upon information and belief, the Hawley Troxell Defendants had knowledge of the back-dated Consent in Lieu of Meeting documents.

84.    On February 16, 2005, Beck sent an email to John and Cashman confirming the Controlling AIA Defendants' scheme to steal CropUSA in an effort to profit: "[Cashman] and I are so convinced that CropUSA is a winner that anything standing in the way of a good result will be a crime." (Dkt. #67-54.) The crime was stealing CropUSA from AIA and then to drain AIA of its funds and assets to pursue the Controlling AIA Defendants' scheme. This was not the only

THIRD AMENDED COMPLAINT - 18

Exhibit - A

15-ER-3813

email exchanged between the Controlling AIA Defendants, as they emailed one another on numerous occasions, including emails originating from Idaho or directed to a recipient in Idaho.

**F.** **The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal**

85. After unlawfully taking $2,144,962 from AIA Insurance in 2004, the Controlling AIA Defendants continued to operate CropUSA with assets both tangible and intangible that rightfully belonged to AIA, continued to improperly subsidize CropUSA with AIA's assets and labor, and continued to conceal their actions from AIA and AIA Services' innocent minority shareholders.

86. Under the management and direction of the Controlling AIA Defendants, AIA regularly failed to allocate costs to CropUSA and other entities and failed to charge markup, interest or profit on costs paid for other entities. For example, John's own salary of $250,000 was allocated entirely to AIA Services even though John's contractual right to salary from AIA Services had expired in 1998 and had never been renewed by an authorized board. (And, further, John performed no actual work for AIA during the time in question.)

87. John, with the knowledge and complicity of the other Controlling AIA Defendants, also performed work for other entities owned in full or in part by him while on AIA's payroll, i.e., CropUSA, Pacific Empire Radio Corp., Pacific Empire Communications Corp., Pacific Empire Holdings Corp., Radio Leasing I LLC and Radio Leasing II LLC. John also had other AIA employees work for these entities without compensation to AIA. These facts, like virtually all of the others referenced in this Third Amended Complaint, were concealed from AIA and AIA Services' innocent minority shareholders.

88. Between its founding in 1999 and the filing of this lawsuit, CropUSA and other entities generated tens of millions of dollars of revenue (including premiums) and other benefits

THIRD AMENDED COMPLAINT - 19

that would have flowed to AIA but for the unlawful and unauthorized acts of the Controlling AIA Defendants.

89.     As of 2006, John owed AIA at least $307,000 for personal loans he had taken from AIA Services. For several years, John concealed these loans by engaging in false accounting whereby loans to him were treated as payments of principal on AIA Service' indebtedness due to Reed Taylor on his $6 million promissory note (which was later ruled to be illegal).  In 2006, John "corrected" the alleged accounting "error" by increasing the balance due on Reed Taylor's note to $6 million and reinstating John's $307,000 debt. John had still not repaid this personal loan.

90.     Over the years, John had AIA pay his personal maid, his personal credit card bills, donations, cash advances, family cell phone bills, and other personal expenses. John also had AIA purchase several vehicles from him, and he continued to drive these vehicles after the sales and purchase other vehicles with AIA's funds to use for his benefit when there was no reason to do so. John also had AIA employees perform work on his personal residence and on other real property not owned by AIA. These acts were all committed with the knowledge and complicity of the Controlling AIA Defendants and without paying AIA the fair value of the services or expenses.

91.     At year-end 2006, AIA had improperly lent $95,000 to Pacific Empire Radio Corp., a corporation partially owned by John in which he served as a director during all relevant times. The Controlling AIA Defendants transferred that $95,000 receivable from AIA to CropUSA. By the end of 2012, AIA would lend over $1,400,000 in additional funds to Pacific Empire Radio Corp., when all such loans violated AIA Services' amended articles of incorporation and were not authorized under the circumstances by AIA Services' restated bylaws.

THIRD AMENDED COMPLAINT - 20

92.     In August 2007, AIA settled litigation with the state of Idaho whereby AIA received a mortgage worth approximately $1.5 million for the amounts owed by Washington Bank Properties on the real property where AIA's offices are located. Although AIA Insurance paid the costs of this litigation, the Controlling AIA Defendants, with the assistance of the Hawley Troxell Defendants, improperly titled the note in the name of AIA Services only, and then pledged the note to CropUSA so that the Controlling AIA Defendants could borrow money to pay their attorneys' fees and costs incurred defending in *Taylor v. AIA Services Corp., et al.* to the Hawley Troxell Defendants.

93.     As with the 2004 transactions, the transaction pledging the mortgage owned by AIA Services to CropUSA for purportedly paying the Hawley Troxell Defendants' attorneys' fees and costs incurred representing AIA, CropUSA and the Controlling AIA Defendants was a blatant misappropriation and/or illegal pledging of AIA's asset. The loan documents and the pledge agreement were drafted by the Hawley Troxell Defendants, although they later asserted that they were only "scriveners" for the transaction. This transaction was improper and barred by AIA's amended articles of incorporation and bylaws.

G.  **The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and Financial Wherewithal with the Improper Assistance from the Hawley Troxell Defendants**

94.     On October 26, 2007, the Hawley Troxell Defendants drafted and delivered an opinion letter falsely representing that AIA Insurance was authorized to guarantee a $15,000,000 line-of-credit on behalf of CropUSA, which carried a hard-money loan with an exorbitant interest rate.

95.     The Hawley Troxell Defendants' opinion letter was delivered for a loan guarantee which violated AIA Services' amended articles of incorporation, its restated bylaws and AIA

THIRD AMENDED COMPLAINT - 21

Exhibit - A

Insurance's bylaws, and in violation of the duty of loyalty owed by the Hawley Troxell Defendants to AIA.

**96.** Additionally, Lancelot, the lender for this $15,000,000 line-of-credit was subsequently exposed as a Ponzi scheme, and its founder, Gregory Bell, pleaded guilty to criminal charges in federal court. Mr. Bell was the signee for Lancelot on the $15,000,000 line-of-credit. These facts pertaining to the $15,000,000 loan for CropUSA and AIA Insurance's guarantee of that loan, along with other transactions, were never disclosed to AIA by the Hawley Troxell Defendants or the Controlling AIA Defendants and the payment of interest on that loan was detrimental to AIA because most of CropUSA's assets could be traced directly to AIA (and the depletion of CropUSA's funds resulted in less funds available to recover).

**H. The Controlling AIA Defendants Enter Into Tolling Agreements, but Those Tolling Agreements Do Not Save the Hawley Troxell Defendants from the Unwaivable Conflicts of Interest**

**97.** In 2007, Reed Taylor filed suit against AIA and certain of the Controlling AIA Defendants, asserting claims for breaches of contract, breaches of fiduciary duties, conversion, fraud and other claims ("*Taylor v. AIA Services Corp., et al.*"). In 2007, the Hawley Troxell Defendants appeared as counsel for AIA Services and AIA Insurance in that lawsuit. Later, Reed Taylor amended his complaint and named CropUSA as a defendant, after recognizing that millions of dollars had been transferred to it from AIA, among other improper transactions (including some of those transactions described in this Third Amended Complaint). (*See* Dkt. #82-2.) The Hawley Troxell Defendants also appeared and represented CropUSA in that lawsuit. (*Id.*)

**98.** As the purported attorneys for AIA, two entities, the Hawley Troxell Defendants owed duties of loyalty, care, and good faith to AIA and the Hawley Troxell Defendants breached their duties of care and fiduciary duties by engaging in the simultaneous representation of the

THIRD AMENDED COMPLAINT - 22

Controlling AIA Defendants, AIA, CropUSA, and other parties (including Bryan Freeman) with interests adverse to the interests of AIA.

99.     In 2007, Beck was purportedly appointed the Boards of Directors of AIA Service and AIA Insurance by John. Beck was improperly paid $5,000 per quarter to sit on the Boards of AIA and also were to receive common shares for his purported "service." Beck attended certain AIA board meetings in person in Idaho or through telephone calls directed to, or originating from, Idaho. Beck later testified that he serves on AIA's Boards to protect his own interests and those of his friends (the same friends who previously acquired Series C Preferred Shares in AIA Services and illegally exchanged them for common shares in CropUSA).

100.    In 2007 and 2008, the Controlling AIA Defendants entered into written tolling agreements in connection with the various litigation directly or indirectly involving AIA. The Hawley Troxell Defendants were improperly involved with and/or facilitated the Controlling AIA Defendants entering into such tolling agreements for the purpose of allowing the Hawley Troxell Defendants to continue to represent AIA, CropUSA and directly or indirectly certain of the Controlling AIA Defendants.

101.    By tolling the statute of limitation for claims against the Controlling AIA Defendants, the Hawley Troxell Defendants sought to use the tolling agreements to authorize the waiver of their conflicts of interest representing AIA, CropUSA and the interests of the Controlling AIA Defendants in litigation that could have and should have exposed the fraud and intentional breaches of fiduciary duties committed by the Controlling AIA Defendants.

102.    The purpose of a properly drafted and executed tolling agreement is to allow conflicts of interest to be waived under certain limited permissible circumstances in order to waive a conflict of interest so that an attorney or law firm can represent clients with diverging interests.

THIRD AMENDED COMPLAINT - 23

Exhibit - A

15-ER-3818

Those limited permissible circumstances were not present here.

103.    The Hawley Troxell Defendants knew or should have known that the Controlling AIA Defendants had committed intentional acts of fraud and breaches of fiduciary duties (including the duty of loyalty) owed to AIA. The Hawley Troxell Defendants knew or should have known that by allowing the Controlling AIA Defendants to continue to operate and control AIA that they would continue to conceal their past torts and likely continue to commit new torts, which is precisely what occurred here as demonstrated by the facts alleged in this Third Amended Complaint.

104.    Although these tolling agreements tolled the statute of limitations for claims AIA could assert against the Controlling AIA Defendants (which eliminates any defense they may have to assert any statute of limitations defenses), the facts set forth in this Third Amended Complaint provide a classic example of why such tolling agreements were improper under the circumstances as the agreements involved tolling intentional torts committed against AIA. While the claims were being tolled, the Controlling AIA Defendants' continued to unlawfully use AIA's cash, resources and ability to borrow to fund other businesses and pay compensation to themselves.

105.    During the course of the litigation in *Taylor v. AIA Services Corp.*, *et al.*, Reed Taylor attempted to negotiate a settlement, but he insisted that any settlement must include full disclosure to, and authorization by, AIA Services' minority shareholders and to allow them to participate in CropUSA common share ownership. (*See* Dkt. #67-18.) Not only did the Controlling AIA Defendants and Hawley Troxell Defendants reject Reed Taylor's offer, but they still refused and failed to provide full disclosure to AIA and AIA Services' innocent minority shareholders of the malfeasance and torts committed against AIA. The untenable position of the Hawley Troxell Defendants was confirmed when the only person seeking to require full and fair disclosure was a

THIRD AMENDED COMPLAINT - 24

Exhibit - A

15-ER-3819

creditor, Reed Taylor. (*Id.*)

106.     During the course of *Taylor v. AIA Services Corp, et al.*, Hawley Troxell, Ashby, Babbitt, Riley and Beck represented to Judge Brudie, the Idaho Supreme Court and AIA that the redemption of Reed Taylor's shares should be illegal to benefit AIA Services' minority shareholders. (*See* Dkt. #67-23 and #67-25.)

107.     After Judge Brudie ruled the redemption of Reed Taylor's shares was illegal, neither Beck, the Hawley Troxell Defendants nor any of the other Controlling AIA Defendants did anything to benefit the minority shareholders of AIA Services nor did they ever have any intention of helping them, contrary to what they had represented to Judge Brudie and the Idaho Supreme Court.

108.     Instead of sharing equally in AIA's assets with AIA Services' innocent minority shareholders, the Controlling AIA Defendants later sought to eliminate those minority shareholders for only ten cents per share, even though John previously valued the shares much higher even after considering the over $6 million that AIA Services owed to Reed Taylor at the time of valuation (a debt that was later ruled to be illegal and void). (*See* Dkt. #67-50.)

109.     Riley was an attorney at the law firm of Eberle Berlin at the time of the redemption of Reed Taylor's shares in 1995 and he breached his duty of care by advising AIA Services and Reed Taylor[1] to enter into the illegal stock redemption transaction. *See Taylor v. AIA Servs. Corp.*, 151 Idaho 552, 261 P.3d 829 (2011).

---

[1] The Controlling AIA Defendants have brought bread to many defense attorneys. Notably, the Controlling AIA Defendants (except Cashman, who was not a party to the lawsuit) successfully asserted that the Stock Redemption Agreement was illegal. (*See* Dkt. #83-5.) Consequently, Reed Taylor sued Riley, Turnbow and Eberle Berlin for their incorrect third-party closing opinion letter. *Taylor v. Riley*, 157 Idaho 323, 336 P.3d 256, 261 (2014). He later settled his claims against Turnbow and Eberle Berlin, but his claims against Riley are on appeal as noted by the Ninth Circuit Court of Appeals. *Taylor v. Hawley Troxell Ennis & Hawley, LLP*, 628 Fed.Appx. 490 (9th Cir. 2015). Reed Taylor also sued his independent counsel. *Taylor v. Bell*, 185 Wn. App. 270, 273-79, 340 P.3d 951, 954-56 (2014), *review denied*, 352 P.3d 188 (2015).

THIRD AMENDED COMPLAINT - 25

Exhibit - A

15-ER-3820

110.     The illegal redemption of Reed Taylor's common shares ultimately led to AIA incurring over $1 million in attorneys' fees and costs litigating and resulted in AIA Services being required to report to the IRS a gain from the $6 million it never had to pay Reed Taylor.

111.     Upon information and belief, the Controlling AIA Defendants never reported the gain from the extinguished $6 million debt to Reed Taylor on AIA Services' tax return. If the Controlling AIA Defendants did not report the $6 million income to the IRS and AIA Services is obligated to pay taxes, penalties and interest on that gain, the Controlling AIA Defendants are liable for those sums as well for breaching their fiduciary duties owed to AIA.

112.     Based on the intentional acts of the Hawley Troxell Defendants, AIA has been decimated because the Controlling AIA Defendants remained in control of AIA through those tolling agreements. The end result of these tolling agreements was that the Hawley Troxell Defendants improperly ensured that the Controlling AIA Defendants would retain control over AIA to the detriment of AIA and for the improper benefit to the Hawley Troxell Defendants and the Controlling AIA Defendants.

113.     In or around 2007 or 2008, AIA Insurance received a settlement of approximately $800,000 for litigation that AIA Insurance had funded for certain policy holders. Instead of utilizing or retaining those funds exclusively for AIA, the Controlling AIA Defendants improperly used those funds, in full or in part, to continue their intentional acts of funding CropUSA, litigation caused by them or other unauthorized uses. Upon information and belief, the Hawley Troxell Defendants had knowledge of the receipt of those funds, yet they did nothing to protect the funds even though the funds were at issue in *Taylor v. AIA Services Corp., et al*.

114.     In 2008, the Controlling AIA Defendants and the Hawley Troxell Defendants permitted CropUSA to sell over $10,000,000 in crop insurance business to Hudson Insurance for

THIRD AMENDED COMPLAINT - 26

Exhibit - A

15-ER-3821

the benefit of CropUSA when approximately 75% of the business had been derived directly from AIA's agency force (i.e., such agents as Larry Whitehead). The over $7.5 million should have been paid to AIA rather than to pay the debts incurred by the Controlling AIA Defendants through CropUSA.

115.    Sometime after CropUSA sold the bulk of its assets to Hudson in 2008, which were derived primarily from AIA, the Controlling AIA Defendants obtained further funds from Hudson Insurance for Growers National Cooperative Insurance Agency, Inc. ("Growers National"), an entity formed and funded by AIA for purposed of selling crop insurance and providing a form of rebate to farmers.

116.    Upon information and belief, CropUSA received over $500,000 from Hudson for Growers National. These funds should have been paid to AIA and the receipt of the funds was concealed from AIA. Plaintiffs will establish the exact amount of funds that the Controlling AIA Defendants and/or CropUSA received from Hudson for Growers National at the time of trial.

I.    **The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA and Intentionally Committing Torts against AIA with the Assistance of the Hawley Troxell Defendants—Even While this Lawsuit Was Pending**

117.    Upon information and belief, the Hawley Troxell Defendants have been paid the bulk of the over $2,000,000 in attorneys' fees and costs incurred and/or paid for the various lawsuits. Plaintiffs will establish the exact amount of funds paid to the Hawley Troxell Defendants by AIA and/or on behalf of AIA, which Plaintiffs are seeking to be disgorged and returned to AIA.

118.    From 2009 through the present time, Donna exercised her right under the amended articles of incorporation to appoint two different directors to AIA Services' Board of Directors, but the Controlling AIA Defendants and/or the Hawley Troxell Defendants refused to honor her unqualified right thereby resulting in all actions taken by AIA Services' Board of Directors during

THIRD AMENDED COMPLAINT - 27

that period of time being unauthorized and thus a breach of the fiduciary duties of the Controlling AIA Defendants.

119.    In December 2009, Donna filed suit against AIA Services to exercise her unequivocal right to appoint her designee, Patrick Moran, to the Board of Directors of AIA Services and to appoint a receiver for AIA Services. The Hawley Troxell Defendants once again appeared in that lawsuit and successfully opposed Donna's designee being appointed to the Board of Directors or a receiver being appointed by improperly seeking a stay in the lawsuit.

120.    Had the Hawley Troxell Defendants joined Donna in having a receiver appointed for AIA Services, which the Hawley Troxell Defendants should have done in light of the countless intentional torts committed against AIA by the Controlling AIA Defendants, there is no doubt that they could have stopped the Controlling AIA Defendants from carrying out their ongoing fraud, intentional breaches of fiduciary duties and their ultimate decimation of AIA. At a minimum, the Hawley Troxell Defendants acts and/or omissions in this regard was a substantial factor of the improper transactions, unlawful acts, and the ultimate decimation of AIA, which occurred after 2009.

121.    This lawsuit was filed by Plaintiffs on August 11, 2010, and subsequently stayed at the request of the Controlling AIA Defendants and the Hawley Troxell Defendants. During that stay, inappropriate and unlawful transactions continued to occur.

122.    In March 2012, the Controlling AIA Defendants, with, upon information and belief, the improper assistance of new attorneys at the law firm of Randall & Danskin, improperly terminated AIA Services' ESOP and paid those shareholders three cents per shares for their hard-earned common shares and failed to disclose the facts pertaining to the malfeasance and torts described in this Third Amended Complaint to those shareholders. (*See* Dkt. #67-30-33, 34.)

THIRD AMENDED COMPLAINT - 28

Exhibit - A

15-ER-3823

123.    However, the Controlling AIA Defendants knew that AIA Services' amended articles of incorporation barred all stock redemptions, including any purchases of shares held by the ESOP, until the Series A Preferred Shares were all fully redeemed and the Series C Preferred Shares had been paid the over $1,000,000 in dividends owed. The repurchase of the ESOP shares for three cents per shares was illegal, ultra-vires and improper.

124.    Effective March 23, 2012, Beck and Cashman purportedly transacted with John to sell their purported common shares in AIA Services (some of which were never properly or legally issued to them and, even if they were properly issued, common shares were never properly issued to AIA Services' 401(k) Plan when it also held Series C Preferred Shares) to John through a written agreement, which was executed and transmitted by Beck and Cashman to Idaho and provided that Idaho law applied. Upon information and belief, the Controlling AIA Defendants entered into that agreement in preparation for their plan to attempt to effectuate a reverse stock split and to provide false information as to other share sales in an attempt to justify the share price offered for the reverse stock split.

125.    In 2012, the Controlling AIA Defendants, again with the improper assistance of Randall & Danskin (*See* Dkt. #67-48, 67-48), improperly sought to effectuate a reverse stock split and to only pay AIA Services' minority common shareholders ten cents per share to repurchase those common shareholders (including Plaintiffs) without disclosing any facts and without offering full and fair compensation for the value of the shares. (*See* Dkt. #66-3.) The notice to the shareholders and the improper and unlawful reverse stock split was approved by the Controlling AIA Defendants.

126.    Thirteen shareholders objected. (*See* Dkt. #67-41.) The ill-conceived reverse stock split violated AIA Services' amended articles of incorporation and the Controlling AIA

THIRD AMENDED COMPLAINT - 29

Exhibit - A

15-ER-3824

Defendants did not even bother to comply with Idaho Code, including, by failing to provide the form for the shareholders to state the value that they believed should be paid for their common shares thereby further establishing the true improper purpose of the failed reverse stock split.

127.    In response to the thirteen shareholder objections and notices of demands for payment, the Controlling AIA Defendants, through Randall & Danskin and without regard to the fact that they would expend tens of thousands of dollars more in funds litigating the issue rather than simply paying the shareholders the true fair value of their shares, had AIA Services file suit against the thirteen shareholders. (*See* Dkt. #83-15.) Judge Carl Kerrick dismissed the lawsuit, and further noted that it was disingenuous to seek a reverse stock split until this lawsuit was resolved. (*See* Dkt. #86-1.)

128.    The failed reverse stock split fiasco drained AIA of significant and unnecessary attorneys' fees and costs (fees and costs which could have been paid to those shareholders or for other AIA obligations). This purported reverse stock split was approved and/or acquiesced in by the Controlling AIA Defendants. Upon information and belief, the Hawley Troxell Defendants were aware of the scheme to effectuate reverse stock split to eliminate AIA Services' innocent minority shareholders, which would in turn eliminate common shareholder standing for this lawsuit.

129.    After the Controlling AIA Defendants had AIA Services filed suit against the thirteen objecting common shareholders who demanded fair payment, Nez Perce County District Court Judge Carl Kerrick dismissed the lawsuit and awarded those minority shareholders attorneys' fees and costs. That judgment in favor of those shareholders has still never been paid by the Controlling AIA Defendants or AIA, and the Controlling AIA Defendants should be required to pay that judgment on behalf of AIA.

THIRD AMENDED COMPLAINT - 30

Exhibit - A

15-ER-3825

130.    From 2009 through 2015, the Controlling AIA Defendants continued loaning money to, or allowed money to be lent to, Pacific Empire Radio Corporation in an amount exceeding $1,400,000 by year-end 2012 when that corporation had no ability to repay the sums owed and it benefitted John (who owned shares in that corporation at certain relevant times) as those were funds they would not have to personally provide to Pacific Empire Radio Corp.

131.    From 1999 through 2012, the Controlling AIA Defendants concealed their ownership interests in other entities from AIA, which were derived from and/or funded by AIA, including, without limitation, CropUSA, CropUSA Insurance Services, LLC, Pacific Empire Holdings Corp.

132.    From 1995 through 2012, John received over $2,729,557 in cash compensation from AIA. This amount does not include any compensation, payments or other improper distributions he may have received from CropUSA and other entities funded or launched using AIA. At a minimum, John should be required to disgorge the over $2,038,657 he received from AIA from 1999 through 2012 and other compensation or funds received since 1999, which John received while improperly competing against AIA through CropUSA and other entities (including Pacific Empire Holdings Corp.).

J.    **There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants**

133.    Since acquiring operational control of AIA Services in 1995, the Controlling AIA Defendants have engaged in repeated acts of faithless self-dealing, transactions detrimental to AIA, committed intentional torts (including fraud and breaches of fiduciary duties), breached their fiduciary duties (including their duties of loyalty), concealed, conspired to commit intentional torts, aided and abetted in the commission of intentional torts and to cover up those torts, to the detriment of AIA in Idaho, including, but not limited to, the following specific examples: **(a)**

THIRD AMENDED COMPLAINT - 31

Exhibit - A

15-ER-3826

controlling the Board of Directors and/or the decisions made by the Board and refusing to act in the best interests of AIA; **(b)** violating AIA Services' restated bylaws, including but not limited to, failing to hold annual shareholder meetings, failing to obtain proper shareholder approval for certain transactions, failing to comply with conflicts of interest provision in the bylaws and articles of incorporation which restricted many of the unlawful or improper transactions described herein, and failing to properly comply with applicable corporate governance; **(c)** violating AIA's amended articles of incorporation thereby allowing substantial funds and assets to be depleted from AIA and obligating AIA to be liable for loans or guarantees which were barred by those amended articles of incorporation; **(d)** diverting corporate opportunities belonging to AIA; **(e)** conveying, encumbering, utilizing, and/or pledging AIA's assets to themselves or other entities; **(f)** inappropriately redeeming, acquiring and/or issuing shares of stock and/or making payments on put options in AIA Services and CropUSA, including but not limited to, issuing shares to the Controlling AIA Defendants; **(g)** inappropriately paying dividends from AIA Services; **(h)** intentionally failing to comply with conflict of interest provisions in AIA's bylaws; **(i)** guaranteeing loans for CropUSA and failing to guarantee loans for AIA; **(j)** paying excessive compensation to officers and directors, including but not limited to, paying John $250,000 per year to purportedly act as CEO and President of AIA Services after his contractual entitlement to such salary had expired and John had represented that he would not take salary in certain years; **(k)** wasting corporate assets and making improper payments, including by paying Beck $20,000 per year to purportedly serve on the Board of Directors of AIA Services; **(l)** divulging and/or utilizing AIA's trade secrets for the benefit of themselves and other entities, including CropUSA; **(m)** soliciting and transferring AIA employees to work for CropUSA; **(n)** engaging in acts and/or decisions without making full disclosure and without obtaining the required approval of AIA

THIRD AMENDED COMPLAINT - 32

Exhibit - A

15-ER-3827

Services' shareholders; **(o)** engaging in millions of dollars of transactions wherein AIA conveyed benefits without the receipt of any consideration or without being repaid; **(p)** forming and operating entities in direct competition with AIA in the insurance marketplace, including without limitation, CropUSA and Pacific Empire Holdings Corp.; **(q)** making false representations, concealing facts, and omitting material facts from AIA, including, without limitation, regarding share values in AIA's financial statements, assets and debts in AIA's financial statements, funds and assets utilized for other entities (including CropUSA), and that AIA was being operated for the benefit of the corporation; **(r)** concealing and failing to disclose material facts to AIA pertaining to loans, transfers, and utilization of assets, including without limitation, concealing or omitting material facts, including all of the necessary facts related to virtually each and every transaction described in this Third Amended Complaint in this lawsuit; **(s)** making false representations to AIA, including without limitation, making and certifying false and misleading financial statements to AIA and representing that AIA was being properly operated when it was instead being used to fund the lifestyle, payments and other businesses owned or partial owned by the Controlling AIA Defendants; **(t)** inappropriately loaning AIA's funds, or guaranteeing loans, to themselves and to other entities under their control in violation of AIA's amended articles of incorporation, bylaws and fiduciary duties; **(u)** paying tens of thousands of dollars in yearly fees to purportedly serve on the Board of Directors of AIA and other compensation and benefits, when such amounts were excessive and they were violating their fiduciary duties owed to AIA and they were all acting as faithless fiduciaries; **(v)** paying attorneys' fees and costs in various legal proceedings on behalf of the Controlling AIA Defendants and others when it was clear that they had intentionally failed to act in good faith, were not entitled to indemnification or to have attorneys' fees and costs advanced on their behalf, and by failing to obtain security for repayment

THIRD AMENDED COMPLAINT - 33

App. - E, p. 107

Exhibit - A

15-ER-3828

of said funds; **(x)** acquiring a parking lot with AIA funds and charging AIA, and making AIA pay, excessive rent for use of the parking lot even though AIA did not actually use the parking lot; **(y)** failing to seat the full and required Board of Directors for AIA Services, including, without limitation, by failing to honor Donna's appointment of Patrick Moran and Paul Durant to AIA Services' Board of Directors; **(z)** improperly purchasing and transferring shares held by AIA or which should have been held by AIA to themselves, including without limitation shares in Pacific Empire Radio Corp., Pacific Empire Communications Corp., and Pacific Empire Holdings Corp. (this entity was formed with AIA's assets by John, improperly competed against AIA, and was later sold for $240,000); **(aa)** allowing John to profit from CropUSA's sale of assets to Hudson by improperly allowing him to retain a monthly fee of $10,000 per month when those funds should have gone to AIA; **(bb)** failing to take appropriate legal action in the interests of AIA; **(cc)** removing a tenant from an AIA owned building to another building owned personally by John and/or other Controlling AIA Defendants; **(dd)** improperly subsidizing CropUSA and other entities with AIA's funds, labor and assets, failing to properly allocate expenses to CropUSA and failing to have other expenses paid back at all (which have already been identified as being approximately $500,000 as of 2008); **(ee)** selling and/or transferring assets and or/contracts belonging to AIA to others (including the contract with Growers National); **(ff)** improperly paying numerous law firms other than the Hawley Troxell Defendants hundreds of thousands of dollars representing AIA and the Controlling AIA Defendants in litigation caused by their own intentional acts and torts; **(gg)** paying more of AIA's funds to litigate disputes (including with Donna in the Idaho state courts) than it would have taken to simply pay the money owed; **(hh)** failing to obtain security, failing to charge interest, and failing to collect on loans of at least $307,000 made to John; **(ii)** removing the $400,000 held in the court registry and the over $200,000 in a bank account in

THIRD AMENDED COMPLAINT - 34

Exhibit - A

15-ER-3829

*Taylor v. AIA Services Corp., et al.*, and allowing the Controlling AIA Defendants to utilize those funds when the Hawley Troxell Defendants should have ensured that those funds were kept from them; **(jj)** expending significant sums on the illegal repurchase of common shares in AIA Services, which also resulted in the ownership interest of the Controlling AIA Defendants increasing; **(kk)** allowing AIA to engage in the transactions identified in this Third Amended Complaint when no dividends had been declared or paid on the Series C Preferred Shares held in the AIA Services 401(k) Plan and those shares now have accrued dividends owed of over $1,000,000; and **(ll)** engaged in a number of transactions in Idaho for the benefit of, or with, CropUSA in an effort to profit from CropUSA.  The Controlling AIA Defendants and/or the Hawley Troxell Defendants have assisted one another and others in committing the intentional torts against AIA described herein and concealing, or covering up, the facts and the intentional torts committed against AIA, including those specifically referenced in this paragraph and elsewhere in this Third Amended Complaint.

134.    At all relevant times, John was CEO, President and director of AIA Services, AIA Insurance and CropUSA and a shareholder of AIA Services at the time of all of the improper transactions with CropUSA and other improper acts identified in this Third Amended Complaint (also a classic example of a conflict of interest), and he improperly benefited from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

135.    At all relevant times, John was also owned interests in other entities who improperly benefitted directly or indirectly from AIA, which were additional conflicts of interest and proof of self-dealing.

///

THIRD AMENDED COMPLAINT - 35

Exhibit - A

15-ER-3830

136.     During certain relevant times, the Controlling AIA Defendants were all purported shareholders of CropUSA and either majority shareholders (as a group) or officers of AIA Services at the time of the improper transactions and malfeasance identified in this Third Amended Complaint (also a classic example of conflict of interest), and they improperly benefited, directly or indirectly, from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

137.     Beck and Cashman engaged in numerous telephone conversations and emails with John and other representatives from AIA in Idaho, including regarding CropUSA and the status of various lawsuits.

138.     As a result of the acts and omissions set forth and/or contemplated above and other acts and/or omissions which will be established at or before trial, the Controlling AIA Defendants and the Hawley Troxell Defendant committed torts in Idaho and proximately caused AIA millions of dollars in damages in Idaho.

## V.     CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 AND FEDERAL RULE OF CIVIL PROCEDURE 23.1

139.     As a prerequisite to filing this lawsuit under Idaho Code § 30-1-742 and Federal Rule of Civil Procedure 23.1, Plaintiffs (and over ten other shareholders of AIA Services) are shareholders of AIA Services and have been shareholders of AIA Services during all relevant times to the claims asserted in this Third Amended Complaint.

140.     On July 21, 2008, Donna served a written derivative demand letter on AIA and the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #23-9 and #67-19.) Miesen was not required to serve a separate written demand under I.C. § 30-1-702 because that statute does not require every shareholder filing suit to serve a separate demand, as confirmed by the comment

THIRD AMENDED COMPLAINT - 36

Exhibit - A

15-ER-3831

to that statute: "It should be noted that the shareholder bringing suit does not necessarily have to be the person making the demand. Only one demand need be made in order for the corporation to consider whether to take corrective action."

141.    On July 23, 2008, the Hawley Troxell Defendants filed a Motion for Stay of Proceedings in *Taylor v. AIA Services Corp.*, *et al.*, and asserted that the stay was necessary so that AIA Services and AIA Insurance could conduct an inquiry into the demands made by Donna in her letter dated July 21, 2008.

142.    On August 14, 2008, in *Taylor v. AIA Services Corp.*, *et al.*, the Hawley Troxell Defendants disingenuously filed a petition for a court appointed independent inquiry on behalf of AIA when they had no intention of following through with the inquiry. (*See* Dkt. #67-20.)

143.    On September 4, 2008, Reed Taylor supported the appointment of independent investigators. However, Reed Taylor objected to the investigators proposed by the Hawley Troxell Defendants, who were purportedly representing AIA, and the Controlling AIA Defendants. (*See* Dkt. #67-21.) Reed Taylor believed totally independent people should be appointed.

144.    Although the parties had filed briefing with respect to the appointment of independent investigators, the Hawley Troxell Defendants never noted the motion for a hearing and the court never ruled on the request, and they intentionally abandoned the appointment of an independent inquiry.

145.    Upon information and belief, neither AIA Services, AIA Insurance, the Hawley Troxell Defendants nor the Controlling AIA Defendants ever conducted a further investigation of the demands made in Donna's derivative demand letter of July 21, 2008. No action was ever taken by AIA or AIA's Boards of Directors regarding July 21, 2008 demand. (Dkt. #23-9 and #67-19.)

///

THIRD AMENDED COMPLAINT - 37

Exhibit - A

15-ER-3832

146.    On April 3, 2012, Plaintiffs, although only one demand was required, made another written demand on AIA and the Boards of Directors of AIA, which included demands to keep the $400,000 cash held in the Court registry in *Taylor v. AIA Services Corp.*, *et al*., to comply with AIA's amended articles of incorporation, to comply with AIA's bylaws, provide full disclosure, and to protect certain other assets. (Dkt. #67-33.) This particular demand was copied directly to Babbitt and Ashby, so they had full knowledge of it. This demand, like all of the others, was ignored by AIA and AIA's Boards of Directors. (*See* Dkt. #67, p. 11 ¶ 29.)

147.    On July 16, 2012, while the instant case was stayed, the Plaintiffs and other common and preferred shareholders of AIA Services, although only one demand was required, served additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #67-42.) The demands requested, among other things, that AIA pursue this lawsuit with all claims as of July 16, 2012 and future claims, including punitive damages (and also provided AIA and the Boards of Directors yet another opportunity to address the demands previously made by Donna on in 2008 (although Plaintiffs were under no obligation to provide another demand and did not waive the prior demand)). (*Id*.) In addition, Plaintiffs have made additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance, but no action has ever been taken by AIA or AIA's Boards of Directors to any of the demands.

148.    Over ninety days have elapsed since the Plaintiffs' written derivative demands were made to AIA and AIA's Boards of Directors and no action has been taken by AIA or AIA's Boards of Directors whatsoever, and all of the claims asserted in this lawsuit flowed from those derivative demands.

///

THIRD AMENDED COMPLAINT - 38

**Exhibit - A**

**App. - E, p. 112**

**15-ER-3833**

149.    As owner of Preferred A Shares in AIA Services seeking to recover all possible funds and damages for the benefit of AIA, Donna fairly represents the interests of all shareholders not named in this lawsuit (including prior employees who participated in AIA Services' ESOP, whose shares were eliminated for pennies without disclosure). Donna is not seeking the payment of her Series A Preferred Shares in this lawsuit nor could she. Donna has proven her efforts to fairly representing the interests of all shareholders by spearheading and assisting in defeating the litigation involved the Controlling AIA Defendants' efforts to effectuate an improper reverse stock split to eliminate shareholder standing in this lawsuit (Dkt. #86-1) and when she intervened in *GemCap Lending I, LLC v. CropUSA Insurance Agency, Inc., et al.,* U.S. District Court for the Central District of California Case No. CV13-5504 SJO (MAN) to assert AIA's $10 million guarantees of loans for CropUSA were illegal and ultra-virus and later appealed the denial of her effort to intervene to the Ninth Circuit Court of Appeals in Docket No. 15-55332, when she had no obligation to do so. Donna also paid the attorneys' fees and costs necessary to defend and prevent the illegal reverse stock split which would have eliminated many of AIA Services' common shareholders for pennies when she had no obligation to do so. Many other shareholders have asserted that they fully support Donna. (Dkt. #67-42.) Donna is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims. Donna is pursuing this lawsuit solely for the benefit of AIA and their innocent shareholders.

150.    As the second largest common shareholder AIA Services (who traded a book of insurance business worth approximately $500,000 to AIA Services in exchange for his common shares), Miesen also fairly represents the interest of AIA and their shareholders. Miesen has never received a penny in return for his investment in AIA. Miesen is not pursuing this lawsuit in a

THIRD AMENDED COMPLAINT - 39

Exhibit - A

15-ER-3834

collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims. Miesen is pursuing this lawsuit solely for the benefit of AIA and their innocent shareholders.

### VI. COUNT I—BREACH OF FIDUCIARY DUTIES
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

151.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

152.    The Controlling AIA Defendants owed fiduciary duties to AIA as the majority and controlling shareholders. As members, or purported members, of the Board of Directors for AIA Services and/or AIA Insurance, the Controlling AIA Defendants, who have each served as a director of AIA Services at one time, owed fiduciary duties to the corporations. As corporate officers of AIA, John, as President and CEO owed fiduciary duties to AIA, which were further elevated during the times in which the both served as directors too (which is from 1995 to the present time for John).

153.    As attorneys for AIA, the Hawley Troxell Defendants owed fiduciary duties to AIA (including the undivided duty of loyalty). If not authorized to act as attorneys for AIA, the Hawley Troxell Defendants acted with apparent authority as agents and owed fiduciary duties as a result of that agency relationship. The Hawley Troxell Defendants had conflicts of interest when they undertook to represent AIA and CropUSA, and when they proceeded in the manner directed by any one or more of the Controlling AIA Defendants, thereby improperly representing the interests of the Controlling AIA Defendants, instead of the best interests of AIA. *Reis v. Barley, Snyder, Senft & Cohen LLC,* 484 F.Supp.2d 337 (E.D. Pa. 2007).

///

THIRD AMENDED COMPLAINT - 40

Exhibit - A

15-ER-3835

154.    Based on any and/or all of the acts and/or omissions set forth in this Third Amended Complaint and/or those facts proven at or before the time of trial, the Controlling AIA Defendants and the Hawley Troxell Defendants have breached their fiduciary duties owed to AIA, including, without limitation, breaching their undivided duties of loyalty, trust and confidence owed to AIA, and by placing their interest in earning hundreds of thousands of dollars, and ultimately over $1,000,000, in attorneys' fees over looking after the interests of AIA.

155.    The Hawley Troxell Defendants have separately breached their fiduciary duties as matter of law when they simultaneously represented AIA and CropUSA. In addition, Riley was aware that CropUSA was derived from AIA and he was further aware of the restrictions in AIA Services' amended articles of incorporation as he helped draft them. The Hawley Troxell Defendants have further breached their fiduciary duties as a matter of law for the violations of the Rules of Professional Conduct dealing with loyalty to a client and conflicts of interest.

156.    As a direct and/or proximate cause of the Controlling AIA Defendants and the Hawley Troxell Defendants breaches of their fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

157.    In addition, each of the Controlling AIA Defendants and the Hawley Troxell Defendants is a "faithless fiduciary" as defined by law and is therefore required to disgorge all compensation and consideration received from AIA and/or CropUSA. The disgorgement is in addition to liability caused by the breaches of fiduciary duty. In the case of the Hawley Troxell Defendants, the disgorgement goes to all fees received for or paid on behalf of AIA and CropUSA. In the case of the faithless Controlling AIA Defendants, the disgorgement goes to all salary, bonuses, warrants, stock options, or stock received from AIA.

///

THIRD AMENDED COMPLAINT - 41

Exhibit - A

15-ER-3836

## VII.   COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

158.   Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

159.   One who counsels, advises, abets or assists in the commission of an actionable wrong is responsible to the injured person for the entire loss or damage. 86 C.J.S. Torts § 105; RESTATEMENT (FIRST) OF TORTS § 876 (1939). Aiding and abetting in the commission of an actionable wrong may be inferred from the fact that one aided and abetted efforts to conceal the wrong. 86 C.J.S. Torts § 105. Liability for aiding and abetting the commission of a tort may be established by showing the person was present at the time of the actionable wrong and did not disapprove or oppose the action. Plaintiffs alleging aiding and abetting need not prove that the aiding and abetting was necessary for the commission of the tort, only that the aiding and abetting made it easier for the tort to occur. *See Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12 (2002).

160.   During certain relevant times, the Hawley Troxell Defendants and the Controlling AIA Defendants had knowledge of the other defendants' acts and/or omissions as described in this Third Amended Complaint and as proven at trial, knew that such acts and/or omissions constituted breaches of fiduciary duties, did not disapprove of such acts or omissions, took no steps to prevent the commission of the breaches of fiduciary duties flowing from the acts and/or omissions, and assisted in the concealment of such acts and/or omissions described herein, thereby damaging AIA.

161.   As a direct and/or proximate cause of the Hawley Troxell Defendants and the Controlling AIA Defendants aiding and abetting one another in the breaches of fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

THIRD AMENDED COMPLAINT - 42

**App. - E, p. 116**

**Exhibit - A**

**15-ER-3837**

## VIII.   COUNT III—LEGAL MALPRACTICE
### (Against the Hawley Troxell Defendants)

**162.**   Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

**163.**   A legal malpractice claim may be brought in a derivative action. *Schulman v. Wolf & Samson, PC,* 951 A.2d 1051 (N.J. 2008).

**164.**   Since at least 1999, the Hawley Troxell Defendants had an attorney-client relationship with AIA, while Riley has had an attorney-client relationship with AIA since prior to 1995. The Hawley Troxell Defendants owed duties to AIA, including, without limitation, duties of care, good faith and loyalty. Despite the duties owed to AIA, the Hawley Troxell Defendants also improperly represented CropUSA.

**165.**   The Hawley Troxell Defendants have breached their duties owed to AIA, including, without limitation, the breached duties described in this Third Amended Complaint. The Hawley Troxell Defendants have further violated their duty of loyalty owed to AIA by improperly simultaneously representing AIA and CropUSA, together with directly and/or indirectly improperly representing the interests of the Controlling AIA Defendants.

**166.**   AIA suffered damages as a direct, foreseeable and/or proximate result of the breaches of duty and the acts of the Hawley Troxell Defendants, including those acts described in this Third Amended Complaint and/or proven at the time of trial. At a minimum, the Hawley Troxell Defendants were also a substantial factor in the harm and damages inflicted upon AIA, including, without limitation, the ultimate decimation of AIA by the Controlling AIA Defendants. Had the Hawley Troxell Defendants properly discharged their duties, the Controlling AIA Defendants would never have decimated AIA.

THIRD AMENDED COMPLAINT - 43

167.    As a direct and/or proximate cause of such acts and/or omissions, the Hawley Troxell Defendants are liable to AIA for damages in the amount to be proven at or before the time of trial.

## IX.    COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ CONSTRUCTIVE FRAUD
**(Against the Controlling AIA Defendants)**

168.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

169.    The Controlling AIA Defendants are liable to AIA for fraud because: **(a)** they made representations of fact to AIA and AIA Services' innocent minority shareholders as asserted throughout this Third Amended Complaint, including but not limited to, (i) representations that CropUSA was being operated for the benefit of AIA, (ii) representations that AIA was being properly operated (including that the Boards of Directors had properly authorized certain transactions when Donna's designee was not on the Board of AIA Services and the provisions in the amended articles and bylaws had not been complied with), (iii) representations that the information on AIA's financial statements was true (John separately certified to auditors and others that the information contained on certain of AIA's financial statements was true and correct), (iv) representations that expenses and loans between AIA and other entities or parties were properly entered into and accounted for (i.e., there are hundreds of thousands of dollars, if not millions of dollars, in funds and other assets used by CropUSA which were derived from AIA and never accounted for), and (v) other representations referenced in this Third Amended Complaint; **(b)** these representations were false; **(c)** these representations were material; **(d)** they knew these representations were false; **(e)** they intended that there be reliance; **(f)** AIA was ignorant of the

THIRD AMENDED COMPLAINT - 44

falsity of these representations; **(g)** AIA relied on these representations; **(h)** AIA's reliance was justified; and **(i)** injury resulted. *See, e.g., Mannos v. Moss,* 143 Idaho 927, 155 P.3d 1166 (2007) (holding that misrepresentations in financial statements precluded summary judgment). Constructive fraud is identical to fraud, except that the plaintiff need not prove speaker's knowledge of the fraud and the speaker's intent that the other party rely on the representations.

170.    The Controlling AIA Defendants owed duties to AIA during certain relevant times as majority shareholders, board members and/or officers of AIA. In addition to making false representations, the Controlling AIA Defendants also concealed information from AIA and its innocent minority shareholders with knowledge that the concealed information was material and that the concealment would cause AIA to suffer otherwise avoidable damages, including without limitation, information contained in this Third Amended Complaint. The Controlling AIA Defendants' failure to disclose a fact to AIA and AIA Services' innocent minority shareholders where one has a duty to disclose is the legal equivalent of representing the non-existence of the fact. Where facts are fraudulently concealed, Plaintiffs need not show reliance as there is nothing other than silence upon which to rely.

171.    The Controlling AIA Defendants represented to AIA Services that CropUSA was a wholly owned subsidiary of AIA Services. Simultaneously, the Controlling AIA Defendants adopted the position, not disclosed to AIA or its innocent minority shareholders, that CropUSA was an independent entity with John as its alleged sole shareholder and subsequently failed to disclose that CropUSA was not a separate entity. These representations were false, the Controlling AIA Defendants knew of their falsity, the Controlling AIA Defendants intended that there be reliance, there was justifiable reliance by AIA and AIA Services' innocent minority shareholders, and AIA was damaged as a result.

THIRD AMENDED COMPLAINT - 45

Exhibit - A

15-ER-3840

172.    By operating CropUSA as an independent entity, and by using CropUSA as a vehicle for misappropriating and converting corporate assets, the Controlling AIA Defendants committed ongoing fraud that has persisted through the date of this Third Amended Complaint.

173.    The Controlling AIA Defendants also made misrepresentations to AIA and AIA Services' innocent minority shareholders in the form of false, misleading and fraudulent financial statements (which such financial statements also failed to disclose numerous improper and unlawful transactions and their ownership interests in CropUSA and other entities), upon which AIA and AIA Services' innocent minority shareholders reasonably relied, with that reliance being the proximate cause of AIA's damages.

174.    When the Controlling AIA Defendants transferred more than $1.5 million to CropUSA in 2004, they concealed the fact of this transaction from AIA and AIA Services' innocent minority shareholders and AIA was damaged by this concealment.

175.    When the Controlling AIA Defendants transferred AIA corporate assets, including funds, employees, goodwill and trade secrets to CropUSA and other entities and were subsidizing CropUSA and other entities, they concealed these facts from AIA and AIA Services' innocent minority shareholders. AIA suffered damages by these concealments.

176.    When the Controlling AIA Defendants had AIA pay certain of CropUSA's corporate expenses, they concealed this fact from AIA.  AIA suffered damages as a result of this concealment.

177.    When the Controlling AIA Defendants pledged the mortgage obtained by AIA from the state of Idaho to CropUSA so that CropUSA could borrow money to pay the attorney's fees of the Hawley Troxell Defendants, they concealed this fact from AIA.  AIA suffered damages as a result of this concealment.

THIRD AMENDED COMPLAINT - 46

App. - E, p. 120

Exhibit - A

15-ER-3841

178.    When the Controlling AIA Defendants had AIA Insurance guarantee CropUSA's $15 million line of credit and later sold over $10,000,000 in assets derived from AIA to Hudson Insurance, they concealed the fact of this guarantee and asset sale from AIA.

179.    When the Controlling AIA Defendants finally disclosed their ownership interests in CropUSA, CropUSA Insurance Services, LLC and other entities in AIA Services' financial statements in July 2012[2] (*See* Dkt. #67-38), they continued to conceal how they obtained their ownership interest in those entities (and in the case of CropUSA that the ownership interest came from AIA) and many transactions and purported loans between the entities and AIA (loans and guarantees made by AIA which were prohibited by AIA Services' amended articles of incorporation and restated bylaws).

180.    As a direct and/or proximate cause of the Controlling AIA Defendants' fraudulent acts, AIA has been damaged in an amount to be proven at or before trial, and the ongoing fraud bars the Controlling AIA Defendants from asserting statute of limitations defenses. To the extent that the Hawley Troxell Defendants seek to assert the statute of limitations as a defense, they too are barred from doing so through their fraudulent concealment of facts from AIA.

### X.    COUNT V—AIDING AND ABETTING FRAUD
**(Against the Controlling AIA Defendants and the Hawley Troxell Defendants)**

181.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

182.    One who aids and abets in the commission of a tort is liable with the primary tortfeasor(s) for all damages resulting from the tort. Aiding and abetting is established where one

---

[2] While the financial statements were dated as of year-end 2011, they were not provided to AIA or its shareholders until July 2012 in connection with the failed ill-conceived reverse stock split.

THIRD AMENDED COMPLAINT - 47

Exhibit - A

15-ER-3842

has knowledge of the torts, does not disapprove, and takes no action to prevent the commission of the torts or assists in covering up such torts. The foregoing applies to the Controlling AIA Defendants and the Hawley Troxell Defendants.

183.    The Controlling AIA Defendants have aided and abetted in one another's fraud committed against AIA. The Controlling AIA Defendants' silence, failure to act and intentional acts to cover up fraud upon AIA constitutes the aiding and abetting of fraud upon AIA.

184.    The Hawley Troxell Defendants have aided and abetted in the fraud committed against AIA by the Controlling AIA Defendants by assisting in the commission of fraud. The Hawley Troxell Defendants' silence, failure to act and intentional acts to cover up fraud upon AIA constitutes the aiding and abetting the fraud upon AIA.

185.    The Hawley Troxell Defendants knew or should have known that the transfer of AIA's assets, loans and other unauthorized transactions to CropUSA constituted a fraud against AIA.

186.    The Hawley Troxell Defendants knew or should have known that the transfer of approximately $1,500,000 to CropUSA in 2004 constituted a fraud on AIA.

187.    The Hawley Troxell Defendants knew or should have known that the practice of allocating CropUSA expenses to AIA, and otherwise failing to maintain arms' length transactions between CropUSA and AIA, constituted a fraud on AIA.

188.    By knowingly providing legal cover for the fraudulent acts described herein, the Hawley Troxell Defendatns have aided and abetted the fraud committed by the Controlling AIA Defendants and CropUSA.

189.    As aiders and abettors, the Hawley Troxell Defendants are liable to AIA to the same extent as the primary tortfeasors. RESTATEMENT (FIRST) OF TORTS § 876 (1939). Likewise, the

THIRD AMENDED COMPLAINT - 48

App. - E, p. 122

Exhibit - A

15-ER-3843

Controlling AIA Defendants are all liable for aiding and abetting each other in the commission of fraud against AIA.

190.    As a direct and/or proximate cause of the Hawley Troxell Defendants and the Controlling AIA Defendant aiding and abetting in fraud, AIA has been damaged in the amount to be proven at or before the time of trial.

### XI.    COUNT VI—BREACH OF CONTRACT
#### (Against John)

191.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

192.    On August 1, 1995, John and AIA Services entered into an Executive Officer's Agreement. (*See* Dkt. #67-8.)

193.    The Executive Officer's Agreement contains contractual provisions preventing John from doing certain acts. For example, Section 9 of the Executive Officer's Agreement sets for express covenants not to compete. Subsection A of the covenants prohibits John from soliciting AIA customers or otherwise diverting the business of AIA customers. Subsection B prohibits John from participating in any insurance business that underwrites, markets or administers insurance products for commodity associations. Subsection C prohibits John from soliciting AIA Services employees for other employment.  Subsection D of the covenants bars John from divulging or exploiting trade secrets belonging to AIA.

194.    John has breached his contractual obligations owed to AIA, including, without limitation, by forming CropUSA as anything other than a wholly-owned subsidiary of AIA, competing against AIA with CropUSA and other entities (including Pacific Empire Holdings and CropUSA Insurance Services, LLC). John has breached all four subsections of Section 9 of the

THIRD AMENDED COMPLAINT - 49

Exhibit - A

15-ER-3844

Executive Officer's Agreement.

195.    As a direct and/or proximate cause of John's breaches of the Executive Officer's Agreement, AIA has been damaged in an amount to be proven at or before trial. Such breaches also constitute the breaches of his fiduciary duties owed to AIA.

### XII.    COUNT VII—DECLARATORY JUDGMENT
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

196.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

197.    Plaintiffs seek a declaratory judgment against Controlling AIA Defendants, including, without limitation, for the following relief: (a) for a full accounting with supporting documentation of all of AIA's funds, assets, loans and other transactions from 1999 through the present time; (b) requiring the Controlling AIA Defendants to comply with AIA's amended articles of incorporation, bylaws and the Idaho Business Corporation Act; (c) rescinding the purchases of the shares held by the ESOP and/or ensuring that those shareholders receive fair value for their shares; (d) rescinding and/or declaring void the common shares issued to John through is Executive Officer's Agreement; (d) rescinding certain common shares issued to Beck, Cashman and their friends which were improperly issued or, alternatively, declare that the same ratio of common shares in AIA Services be issued to AIA Services' 401(k) Plan based on the Series C Preferred Shares issued to that Plan; and (e) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this Third Amended Complaint).

198.    Plaintiffs seek a declaratory judgment against the Hawley Troxell Defendants, including, without limitation, for the following relief: (a) that the representation agreement, fee

THIRD AMENDED COMPLAINT - 50

Exhibit - A

15-ER-3845

agreements and any related agreements entered into with them and AIA be declared void (including, without limitation, because such agreements violated the applicable Rules of Professional Conduct); (b) any agreements or accounts regarding any sums owed by AIA, if any, be declared void; and (c) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this Third Amended Complaint).

### XIII.   COUNT VIII—EXCESSIVE COMPENSATION/CORPORATE WASTE
### (Against the Controlling AIA Defendants)

199.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

200.    To support a claim for excessive compensation, Plaintiffs need only show that the board lacked independence and/or lacked good faith. *In Re: Tyson Foods, Inc.,* 919 A.2d 563 (Del. 2000). The Controlling AIA Defendants have been officers and/or controlled AIA's Boards of Directors from 1995 through certain relevant times.  The Controlling AIA Defendants have lacked independence and have not acted in good faith, including, without limitation, by committing the intentional acts and/or omissions described in this Third Amended Complaint.

201.    The Controlling AIA Defendants paid excessive compensation and have wasted corporate assets during the course of managing and/or operating AIA, including, without limitation, by paying themselves excessive compensation (and practically speaking, any compensation at all based on their acts and omissions) and operating AIA for the benefit of CropUSA, the Controlling AIA Defendants and other entities they partially or wholly own, including Pacific Empire Radio Corp., CropUSA Insurance Services, LLC, and Pacific Empire Holdings Corp. The Controlling AIA Defendants also decimated AIA's agency force and caused

THIRD AMENDED COMPLAINT - 51

them to transfer to CropUSA and ultimately Hudson and other entities. In addition, notwithstanding the fact that John is not entitled to retain any of his compensation or benefits as a faithless fiduciary, it was separately corporate waste to pay him in the first place as he did nothing for AIA (AIA's business was simply running off the commissions received for policies sold years before). The other transactions and malfeasance described in this Third Amended Complaint also constitute corporate waste, and none of those transactions and malfeasance were properly disclosed to all of AIA Services' shareholders nor was any authorization from them ever sought or obtained.

202.    The Controlling AIA Defendants are liable to AIA for damages caused by paying excessive compensation and otherwise wasting and needlessly depleting AIA's funds and assets for their own benefit and with disregard for AIA.

203.    As a direct and/or proximate cause of the Controlling AIA Defendants' waste, AIA has been damaged in the amount to be proven at or before trial.

### XIV.    COUNT IX—ACCOUNT STATED
#### (Against John)

204.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

205.    John established an account by borrowing $307,000 from AIA for his personal use. John subsequently confirmed the amount of the debt by "correcting" an alleged so-called accounting "error" when he had previously extinguished the $307,000 debt by improperly crediting the payment of Reed Taylor's $6 million promissory after the issue arose in *Taylor v. AIA Services Corp., et al.*, so that AIA's book show that AIA is creditor and John is debtor for $307,000, i.e., the correction was only made because Reed Taylor demanded it and he was suing AIA Services for repaying of the $6 million note.

THIRD AMENDED COMPLAINT - 52

Exhibit - A

15-ER-3847

**206.** John has not paid any portion of this debt and the entire balance remains due and payable to AIA. John is liable to AIA for $307,000 on the account stated and/or such other amount as may be presently owed, plus prejudgment interest from the date the obligation was incurred. If John has since paid back the $307,000 or any part of the sums he owes, then Plaintiffs still seek the balance owed and prejudgment interest for the benefit of AIA, including, because John has been a faithless fiduciary who is not entitled to any interest-free loans from AIA.

## XV.   JURY DEMAND

**207.** Plaintiffs hereby demand a trial by jury of no less than the maximum number of jurors permitted on all causes of action for which a jury trial is allowed by law.

## XVI.   PRAYER FOR RELIEF

Wherefore Plaintiffs pray for the following relief:

1.     For a judgment jointly and severally against the Controlling AIA Defendants and the Hawley Troxell Defendants for damages in an amount to be proven at trial, plus prejudgment interest;

2.     For judgments against the Controlling AIA Defendants and the Hawley Troxell Defendants in an amount to be proven at trial for damages for which joint and several liability has not been proven as to all defendants, plus prejudgment interest;

3.     For a judgment or order requiring the Hawley Troxell Defendants to disgorge all attorneys' fees and costs paid to them by AIA Services, AIA Insurance, CropUSA and by any other party on behalf of those entities in the amount to be proven at the time of trial, plus prejudgment interest;

4.     For a judgment or order requiring the Controlling AIA Defendants to disgorge all compensation received from AIA or CropUSA since 1999, including stock, cash, benefits, and other assets, including based on intentionally breaching their fiduciary duties and being faithless

THIRD AMENDED COMPLAINT - 53

Exhibit - A

15-ER-3848

fiduciaries;

5.  For judgment against John in the amount to be proven at the time of trial, plus prejudgment interest;

6.  For an order requiring that all funds recovered as a result of this litigation, minus fees, costs and bona fide debts, be deposited with the Court registry and distributed only after court order, and that no funds from this litigation be paid to faithless fiduciary Controlling AIA Defendants;

7.  For judgments against the Controlling AIA Defendants, jointly and severally, as the alter-ego of CropUSA or to pierce its corporate veil, for all damages incurred by AIA and attributable in whole or in part to CropUSA;

8.  For a declaratory judgment for the relief specified in this Third Amended Complaint and any other declaratory relief requested at or before trial;

9.  For an award of the attorneys' fees and cost incurred in this action as allowed by statute, contract, or recognized grounds of equity; and

10.  For any such further relief or remedy, including preliminary and/or permanent injunctive relief, as Plaintiffs may request or as this Court may find just and equitable.

DATED:  This ____ day of _____, 2016.

RODERICK BOND LAW OFFICE, PLLC


By: ___/s/ Roderick C. Bond_____
     Roderick C. Bond
     Attorney for Plaintiffs

THIRD AMENDED COMPLAINT - 54

# Exhibit - A

App. - E, p. 128

15-ER-3849

<u>**VERIFICATION OF DALE L. MIESEN**</u>

STATE OF TEXAS )
                 ) ss.
COUNTY OF TARRANT )

        I, Dale L. Miesen, being first duly sworn on oath, deposes and says:

        I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Third Amended Complaint, know the contents of this Third Amended Complaint, and believe that the facts set forth in this Third Amended Complaint are true and accurate to the best of my knowledge and belief.


_____
Dale L. Miesen


SUBSCRIBED AND SWORN to before me this _____ day of _____, 2016.


_____
Notary Public for Texas
Residing at: _____
My commission expires: _____


THIRD AMENDED COMPLAINT - 55

## <u>VERIFICATION OF DONNA J. TAYLOR</u>

STATE OF IDAHO        )
                                     ) ss.
COUNTY OF NEZ PERCE    )

       I, Donna J. Taylor, being first duly sworn on oath, deposes and says:

       I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Third Amended Complaint, know the contents of this Third Amended Complaint, and believe that the facts set forth in this Third Amended Complaint are true and accurate to the best of my knowledge and belief.


_____
Donna J. Taylor


SUBSCRIBED AND SWORN to before me this \_\_\_ day of _____, 2016.


_____
Notary Public for Idaho
Residing at: _____
My commission expires: _____

THIRD AMENDED COMPLAINT - 56

Exhibit - A

15-ER-3851

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the ___ day of _____, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:    jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:    jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:    lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:    sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:    swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

_/s/ Roderick C. Bond_
Roderick C. Bond

THIRD AMENDED COMPLAINT - 57

Exhibit - A

App. - E, p. 131

15-ER-3852