**Consolidated Case Nos. 25-3552 and 25-3800**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,

**Plaintiff-Appellant**,

v.

R. JOHN TAYLOR, an individual, CONNIE TAYLOR HENDERSON, an individual, JAMES BECK, an individual, MICHAEL W. CASHMAN, SR., an individual, CROP USA INSURANCE AGENCY, INC., an Idaho corporation, CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company, AIA SERVICES CORPORATION, an Idaho corporation, AND AIA INSURANCE, INC., an Idaho corporation,

**Defendants-Appellees**,

and

Reed J. Taylor, an individual,

**Third-Party Defendant-Appellee.**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO,
CHIEF DISTRICT COURT JUDGE DAVID C. NYE, PRESIDING

**APPELLANT'S EXCERPTS OF THE RECORD – VOLUME - 16**

Roderick C. Bond
Roderick Bond Law Office, PLLC
10900 NE 4th St., Suite 2300
Bellevue, WA  98004
Tel: (425) 591-6903
Email: rod@roderickbond.com
Attorney for Appellant

Andrew Schwam
Andrew Schwam Law Firm
705 SW Fountain St.
Pullman, WA  99163-2128
Tel: (208) 874-3684
Email: amschwam@turbonet.com
Attorney for Appellant

 **AIA Services Corporation**

AIA Services Corporation
One Lewis Clark Plaza
PO Box 538
Lewiston, Idaho 83501-0538
(208) 799-9000    FAX (208) 746-8159

September 12, 2016

Roderick Bond
Roderick Bond Law Office, PLLC
601 108th Ave., Suite 1900
Bellevue, WA 98004

Re:   June 13, 2016, Shareholder Derivative Demand Letter;
      August 23, 2016, Shareholder Derivative Demand Letter

Dear Mr. Bond:

In response to your shareholder derivative demand letters dated June 13, 2016, and August 23, 2016 (the "Demand Letters", the  boards of directors of AIA Services Corporation and of AIA Insurance, Inc. (the "Boards"), have determined not to take any action in response to the Demand Letters.

The Boards have rejected your Demand Letters because they do not provide a coherent description of the wrongful transactions for which you seek a remedy. The scope of conduct described in the Demand Letters is so broad they are impossible to address in any meaningful way. Although the Boards are not able to determine the wrongful conduct you seek to remedy, it appears that any legal remedies would be futile for numerous reasons, including without limitation applicable law relating to fiduciary duties; statutes of limitations; res judicata; the business judgment rule; equitable remedies such as laches and unclean hands. The Demand Letters also seem to refer to transactions that involved no conflict of interest or which were properly approved by disinterested directors pursuant to Idaho state law. Last, it appears that some or all of the shareholders you represent lack standing to bring a derivative claim.

EXHIBIT C

**App. - F, p. 1**

**16-ER-3854**

The Board has determined it would not be in the best interest of either the corporation or its shareholders to take any action.   Further, the claims appear to be subject to other pending actions.

Because of a pattern of abusive and frivolous litigation against the company and its managers, the bylaws for both corporations now include Section 11.11. Provisions like it have been upheld in other states such as Delaware. Section 11.11 permits the company's constituents, including individual directors, to recover attorney fees against shareholders who fail to fully succeed on their derivative claims. Given the sweeping scope of the Demand Letters, it is almost certain your clients will not prevail on all of their claims, and therefore will be liable for directors' attorney fees in future litigation.

Sincerely,

John Taylor
President
AIA Services Corporation and AIA Insurance, Inc.

EXHIBIT C

**App. - F, p. 2**

**16-ER-3855**

# State of Idaho

## Department of State

CERTIFICATE OF AMENDMENT
OF

AIA SERVICES CORPORATION
File Number C 74568

I, PETE T. CENARRUSA, Secretary of State of the State of Idaho, hereby certify that duplicate originals of Articles of Amendment to the Articles of Incorporation of AIA SERVICES CORPORATION duly executed pursuant to the provisions of the Idaho Business Corporation Act, have been received in this office and are found to conform to law.

ACCORDINGLY and by virtue of the authority vested in me by law, I issue this Certificate of Amendment to the Articles of Incorporation and attach hereto a duplicate original of the Articles of Amendment.

Dated: May 8, 1996

SECRETARY OF STATE

By _____

Exhibit 3 - Page - 1

App. - I, p. 1

16-ER-3856

ORIGINAL

MAY 8  10 59 AM '96

SECRETARY
STATE OF IDAHO

## ARTICLES OF AMENDMENT
## TO THE ARTICLES OF INCORPORATION
### OF
## AIA SERVICES CORPORATION

Pursuant to the provisions of §30-1-58, §30-1-59 and §30-1-61 of the Idaho Business Corporation Act, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation, as filed on December 20, 1983 and previously amended on October 14, 1986, December 29, 1987, April 11, 1995 and August 3, 1995.

**FIRST:**  The name of the corporation is **AIA SERVICES CORPORATION**.

**SECOND:**  On December 14, 1995, the shareholders of the corporation adopted and approved the following Amended and Restated Articles of Incorporation of AIA Services Corporation, pursuant to which Section 4.3.3 of Article Fourth was amended by replacing it in its entirety.

## "AMENDED AND RESTATED ARTICLES OF INCORPORATION
### OF
## AIA SERVICES CORPORATION

Except for the amendment of Section 4.3.3 of Article Fourth by replacing it in its entirety, these Amended and Restated Articles of Incorporation of AIA Services Corporation correctly set forth without change the corresponding provisions of the original Articles of Incorporation as hereinbefore filed on December 20, 1983 and amended on October 14, 1986, December 29, 1987, April 11, 1995 and August 3, 1995; and these Amended and Restated Articles of Incorporation, including the amended Article Fourth, supersede the original Articles of Amendment and all previous amendments thereto.

### FIRST

The name of the corporation is **AIA SERVICES CORPORATION**.

### SECOND

The period of its duration is perpetual.

IDAHO SECRETARY OF STATE
DATE 05/08/1996  0900  60950

CK #: 63564   CUST# 20168
AMEND  PROF
1@    30.00=    30.00

ARTICLES OF AMENDMENT - Page 1

#:
Exhibit 3 - Page - 2

**App. - I, p. 2**

**16-ER-3857**

### THIRD

The purpose for which the corporation is organized is for the transaction of any or all lawful business for which the corporation may be incorporated under the Idaho Business Corporation Act.

### FOURTH

**4.1    Authorized Capital.**  The aggregate number of shares which this corporation shall have authority to issue is 11,700,000 shares, of which 700,000 shares shall be Preferred Stock and 11,000,000 shares shall be Common Stock ($0.01 par value).  The corporation is authorized to issue the Preferred Stock in two  classes designated as "Series A", consisting of 200,000 shares of Stated Value Preferred Stock (without par value); and "Series C", consisting of 500,000 shares of 10% Preferred Stock ($1 par value).  The respective preferences, limitations and relative rights of each of the two classes of Preferred Stock and the Common Stock of the corporation are set forth in the following provisions of Article Fourth:

**4.2    Series A Preferred Stock.**

**4.2.1  General.**  Each share of Series A Preferred Stock shall have the rights and preferences conferred in this Section 4.2 of Article Fourth.  Holders of Series A Preferred Stock shall have no rights to share in any distribution of the profits or assets of the corporation, whether in the form of cash or stock or dividends or otherwise, except to the extent specifically provided herein.

**4.2.2  No Dividends.**  The Series A Preferred Stock shall not pay or accrue any dividends.

**4.2.3  Demand for Redemption.**  (a)  The holder of Series A Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds upon breach of any covenant of the corporation set forth in this Article Fourth, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares.  This right may be exercised by giving the corporation written notice of demand for redemption specifying the default and a redemption date not less than ninety (90) days from the date such notice delivered to the corporation; provided however that, if the corporation cures such specified default within sixty (60) days after receipt of such notice by corporation, the right to redeem Series A Preferred Stock on account of such specified default shall be extinguished.

(b)    The holder of Series A Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds at any time after September 14, 1993, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares.  This right may be exercised by giving the corporation written notice of demand for redemption specifying a redemption date after September 14, 1993 and not less than ninety (90) days or more than one hundred eighty (180) days from the date such notice is delivered to the corporation.

**4.2.4  Call for Redemption.**  The Series A Preferred Stock may be called for redemption by the corporation, in whole or in part, upon payment of the redemption price from legally available funds at any time prior to the demand for redemption by the holder of Series A

ARTICLES OF AMENDMENT - Page 2

Exhibit 3 - Page - 3

**App. - I, p. 3**

**16-ER-3858**

Preferred Stock. Notice of such call for redemption, specifying the redemption date not less than thirty (30) days from the date such notice is mailed, shall be mailed to each record holder of Series A Preferred Stock. If fewer than all shares of Series A Preferred Stock are to be redeemed, the shares shall be redeemed prorata from the holders thereof.

**4.2.5  Redemption Price**  If Series A Preferred Stock is redeemed on or before September 14, 1990, the redemption price is $8.00 per share if paid in a lump sum. If Series A Preferred Stock is redeemed any time during the three-year period beginning September 15, 1990 and ending on September 14, 1993, the redemption price is $8.50 per share if paid in a lump sum. If not paid in a lump sum on or before September 14, 1993, the redemption price for Series A Preferred Stock is $10.00 per share, provided that the redemption price may be paid, at the corporation's sole option, in monthly installments on a fifteen (15) year amortization schedule beginning on the day after the redemption date and accruing interest at a rate of one-and one-half (1½) points under the First Interstate Bank of Idaho, N.A., prime lending rate, adjusted quarterly.

**4.2.6  Redemption Procedure and Effect.**

(a)     Lump Sum Payment.  If the redemption price is to be paid in a lump sum, the corporation shall deposit, or shall cause its nominee to deposit, on or before the redemption date specified in the notice of redemption, the aggregate redemption price of the shares of Series A Preferred Stock to be redeemed with a bank or trust company specified in the notice, payable on the redemption date in the amounts and to the respective orders of the holders of the shares of Series A Preferred Stock to be redeemed, on endorsement to the corporation or its nominee as may be required and upon surrender of the certificates for such shares. Unless the corporation or its nominee fails to pay the lump sum redemption price on or before the redemption date, the shares of Series A Preferred Stock subject to such redemption shall be deemed to have been redeemed, and shall be deemed no longer to be outstanding, from and after the redemption date set forth in the notice of redemption. On or after the redemption date, subject only to payment of the redemption price, Series A Preferred Stock so called for redemption shall cease to be entitled to any interest or right in the corporation; and holders of such Series A Preferred Stock shall thereafter cease to be shareholders and shall be entitled only to payment of the amount of the redemption price, without interest, upon surrender of the certificates evidencing such stock. If the lump sum redemption price shall be paid by a nominee of the corporation, such nominee shall upon such payment become the owner of the shares with respect to which such payment was made; and certificates of stock may be issued to such nominee in evidence of such ownership.

(b)     Installment Payment.  If the corporation elects to pay the redemption price in installments, the number of shares of Series A Preferred Stock equal to the principal portion of each installment divided by $10.00 per share shall be deemed to have been redeemed and to be no longer outstanding from and after the date of such installment. On and after such payment date, such number of shares of Series A Preferred Stock shall cease to be entitled to any interest or right in the corporation; and holders of such shares shall thereafter cease to be shareholders of the corporation with respect to such shares, whether or not the certificates evidencing such shares have been surrendered. Upon request of the corporation from time to time, certificates evidencing shares of Series A Preferred Stock including redeemed shares shall be surrendered to and reissued by the corporation in reduced amount to reflect any and all installment redemptions of shares prior to such request.

ARTICLES OF AMENDMENT - Page 3

Exhibit 3 - Page - 4

App. - I, p. 4

16-ER-3859

**4.2.7  Liquidation Preference.** In case of the voluntary liquidation or dissolution of the corporation, the holder of Series A Preferred Stock shall have the right to be paid in full, before any amount shall be paid to the owners of the Common Stock or to the owners of the Series C Preferred Stock, as follows:

> $8.00 per share if the liquidation price is paid on or before September 14, 1990.
>
> $8.50 per share if the liquidation price is paid after September 14, 1990 and on or before September 14, 1993.
>
> $10.00 per share if the liquidation price is paid after September 14, 1993.

In case of the involuntary liquidation or dissolution of the corporation, the holder of Series A Preferred Stock shall have the right to be paid $10.00 per share, in full, before any amount shall be paid to the owners of the Common Stock or to the owners of the Series C Preferred Stock. After payment to the holders of the Series A Preferred Stock of the full preferential amounts hereinabove provided, the holders of the Series A Preferred Stock as such shall have no right or claim to any of the remaining assets of the corporation either upon any distribution of such assets or upon dissolution, liquidation or winding up; and the remaining assets to be distributed, if any, upon a distribution of such assets or upon dissolution, liquidation or winding up, may be distributed among the holders of the Series C Preferred Stock and the Common Stock in accordance with the provisions of this Article Fourth.

**4.2.8  Limited Voting Rights.** The Series A Preferred Stock shall have no right (except as required by law or as provided by Section 4.2.12 of this Article Fourth) to receive notice of or to vote at any regular or special meeting of stockholders, except that the holders of a majority of the shares of Series A Preferred Stock shall have the right, voting separately as a class, to elect one director to the board of directors of the corporation.

**4.2.9  Covenants.** So long as any shares of Series A Preferred Stock are outstanding, and except with the consent of the holders of a majority of the outstanding shares of Series A Preferred Stock.

(a)      Common Stock. The corporation shall not issue any Common Stock for less than book value (determined as of the end of the immediately preceding fiscal year), except for Common Stock issued to pay a dividend payable solely in shares of Common Stock or issued to employees or agents pursuant to incentive stock option or bonus plan.

(b)      Preferred Stock. The corporation shall issue no Preferred Stock or securities convertible into such stock, other than the Series A and Series C Preferred Stock.

(c)      Indebtedness. The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume, guaranty or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

ARTICLES OF AMENDMENT - Page 4

Exhibit 3 - Page - 5

App. - I, p. 5

16-ER-3860

(1)    The corporation may remain liable in respect of Indebtedness outstanding on the date of adoption of this Article Fourth by the corporation's shareholders.

(2)    The corporation and its Subsidiaries may become and remain liable with respect to Indebtedness that is not secured by a Lien on any of the assets of the corporation or its Subsidiaries, provided that the aggregate principal amount of such unsecured Indebtedness shall not exceed Consolidated Net Worth less goodwill of the corporation at any time; and

(3)    The corporation and its Subsidiaries may become and remain liable in respect of Indebtedness secured by any of the following Liens:

(i)    Liens for taxes, assessments or governmental charges or claims the payment of which is not yet delinquent or is being contested in good faith, if such reserve or other provision, if any, as shall be required by generally accepted accounting principles, consistently applied, shall have been made therefor;

(ii)    Statutory Liens of landlords and lines of carriers, warehousemen, mechanics, materialmen and other liens imposed by law incurred in the ordinary courses of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by generally accepted accounting principles, consistently applied shall have been made therefor;

(iii)    Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, governmental contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(iv)    Any attachment or judgment Lien; provided that if the judgment it secures exceeds $250,000 (alone or when aggregated with all other judgments secured by Liens permitted by this clause (vi)), such judgment shall, within forty-five (45) days after the entry thereof, have been discharged or execution thereof stayed pending appeal, or shall have been discharged within forty-five (45) days after the expiration of any such stay;

(v)    Easements, rights-of-way, restrictions and other similar charges or encumbrances not interfering with the ordinary conduct of the business of the corporation or any of its Subsidiaries;

(vi)    Any interest or title of a lessor under any lease;

(vii)    Any Lien existing on any asset of any corporation at the time such corporation becomes a subsidiary if such Lien was not created in contemplation of such event;

ARTICLES OF AMENDMENT - Page 5

Exhibit 3 - Page - 6

App. - I, p. 6

16-ER-3861

(viii)    Any Lien on any asset securing Indebtedness incurred or assume for the purpose of financing not more than Eighty-five percent (85%) of the cost of acquiring such assets; <u>provided</u> that such line attaches to such asset concurrently with or within ninety (90) days after the acquisition thereof;

(ix)    Any Lien on any asset of any corporation existing at the time such corporation is merged into or consolidated with the corporation or a subsidiary, if such Lien was not created in contemplation of such event;

(x)    Any Lien existing on any asset prior to the acquisition thereof by the corporation or a Subsidiary, if such Lien was not created in contemplation of such acquisition;

(xi)    Any Lien arising out of the refinancing, extension, renewal or refunding of any Indebtedness secured by any Lien permitted by any of the foregoing clauses of this Section 4.2.9(c); <u>provided</u> that the amount of such Indebtedness is not increased and that such Indebtedness is not secured by any additional assets; and

(xii)    Liens not otherwise permitted by the foregoing clauses of this Section 4.2.9(c) (including, without limitation, Liens on stock of Subsidiaries, whether consolidated or unconsolidated) securing Indebtedness in an aggregate principal amount of any time outstanding not to exceed ten percent (10%) of the difference between Consolidated Net Worth and the amount of the goodwill of the corporation.

(d)    <u>Corporate Existence</u>.  The corporation will maintain its corporate existence and will not liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or enter into any transaction of merger or consolidation with any Person (including any Subsidiary) unless (i) this corporation is the surviving corporation following any such merger or consolidation, and (ii) the Consolidated Net Worth of the surviving corporation immediately following such merger or consolidation equals or exceeds the Consolidated Net Worth of this corporation immediately prior to such merger or consolidation.

(e)    <u>Sale of Assets</u>.  The corporation will not, and will not permit any of its Subsidiaries to, convey, sell, lease, transfer or otherwise dispose of all or any material part of its business, property or assets, whether now owned or hereafter acquired, except:

(1)    The corporation and its Subsidiaries may convey, sell, lease, transfer or otherwise dispose of investment assets in the ordinary course of business;

(2)    The corporation and its Subsidiaries may sell or otherwise dispose of Capital Assets or real property if the asset so disposed of is concurrently replaced by a substantially equivalent asset having a value equal to or greater than the assets disposed of;

(3)    The corporation and is Subsidiaries may sell or otherwise dispose of obsolete or worn out property in the ordinary course of business;

ARTICLES OF AMENDMENT - Page 6

Exhibit 3 - Page - 7

App. - I, p. 7

16-ER-3862

(4)    The corporation and its Subsidiaries may sell and lease back any newly acquired asset for the purpose of financing the acquisition of such asset and securing the repayment of Indebtedness, provided that such Indebtedness shall not exceed eighty-five percent (85%) of the cost of such asset and is otherwise permitted by the covenants contained in this Article Fourth; and

(5)    The corporation and its Subsidiaries may sell or otherwise dispose of any of their other assets; provided that any such sale or other disposition is made for the fair market value of such assets.

(f)    Acquisitions.  The corporation will not, and will not permit any of its Subsidiaries to, acquire by purchase or otherwise all or substantially all the business, property or fixed assets, or the stock or other evidence of beneficial ownership, of any Person unless, immediately prior to and after giving effect to such transaction, no violation of any of the covenants or other provisions contained in this Article Fourth shall have occurred and be continuing or would be caused by such acquisition.

(g)    Transactions with Shareholders and Affiliates.  The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease, loan or exchange of any property or the rendering of any service) with any director or officer or any holder of equity securities of the corporation, or with any Affiliate of the corporation or of such director, officer or holder, on terms that are less favorable to the corporation or that Subsidiary, as the case may be, than those which might be obtained at the time from Persons who are not such a director, officer, holder or Affiliate; provided that the foregoing restriction shall not apply to (i) any transaction in effect at the date of adoption of this Article Fourth by the corporation's shareholders; (ii) any transaction between the corporation and any of its wholly-owned Subsidiaries or between any of its wholly-owned Subsidiaries; (iii) compensation (net of amounts contributed or repaid to the corporation or any Subsidiary or to Lewiston Land Company and contributed or repaid to the corporation or any Subsidiary), by way of salary or bonus, paid to director or officers of the corporation in an amount, as to any one individual, not greater than the greater of $400,000 or the total compensation paid in calendar year 1986; (iv) compensation paid to any director or officer of the corporation in amounts equal to income tax liability of such director or officer attributable to transactions involving the corporation, A.I.A., Inc., AIA Travel Services, Inc., AIA Travel, Inc., Lewiston Land Company, AIA Bancard Services Corporation or Taylor Brothers Aircraft on or before January 1, 1988 or to other personal income tax liability of such director or officer for tax years ended before January 1, 1988;  or (v) any loan to or account receivable from an officer, director or stockholder which is repaid in full at least annually on or before the last day of the fiscal year.

(h)    Consolidated Net Worth.  The corporation will not permit Consolidated Net Worth at any date to be less than the number of shares of Series A Preferred Stock outstanding at such date multiplied by $10.00 per share.

(i)    Dividend Restriction.  The corporation will not, directly or indirectly, declare, order, make or set apart any sum for payment of any dividend in respect of its Common Stock (other than a dividend payable solely in shares of Common Stock), except that the corporation may declare and pay Common Stock dividends in an aggregate amount not exceeding the Dividend Availability

ARTICLES OF AMENDMENT - Page 7

Exhibit 3 - Page - 8

Amount.

(j)   Debt/Equity Ratio.  Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.2.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of Consolidated Long Term Debt to Consolidated Net Worth exceeds, or such additional Indebtedness would cause such ratio to exceed, 3.6 to 1.0.

(k)   Debt Service Coverage.  Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.2.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of (i) Consolidated Net Income plus depreciation and amortization expenses plus compensation contributed or repaid to the corporation, any Subsidiary, Lewiston Land Company or AIA Travel Services, Inc. during the immediately preceding fiscal year of the corporation, divided by (ii) current maturities of Long Term Debt is, or such additional Indebtedness would cause such ratio to be, less than .8 to 1.0.

**4.2.10  Definitions.**  For the purpose of Section 4.2.9 of this Article Fourth, the following terms shall have the following meanings:

**"Affiliate"**, as applied to any Person, shall mean any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

**"Capital Asset"** shall mean, as at any date of determination, those assets of a Person that would, in conformity with generally accepted accounting principles, consistently applied, be classified as plant, property or equipment on the balance sheet of that Person.

**"Consolidated Long Term Debt"** shall mean, as at any date of determination, the total of all Long Term Debt of the corporation and its Subsidiaries on a consolidated basis determined in accordance with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

**"Consolidated Net Worth"** shall mean, as at any date of determination, the sum of (a) the capital stock and additional paid-in capital, (b) plus retained earnings (or minus accumulated deficit) of the corporation and its Subsidiaries on a consolidated basis, determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

**"Consolidated Net Income"** for any period, shall mean the net income (or loss) of the corporation and its Subsidiaries on a consolidated basis determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

ARTICLES OF AMENDMENT - Page 8

Exhibit 3 - Page - 9

App. - I, p. 9

16-ER-3864

"Dividend Availability Amount" shall mean, as at any date of determination, an amount equal to fifty percent (50%) of Consolidated Net Income for the period (taken as single accounting period) commencing January 31, 1987 and ending on the last day of the fiscal quarter immediately preceding such date of determination.

"Indebtedness" as applied to any person, means (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to finance leases which is capitalized on a balance sheet in conformity with generally accepted accounting principles, consistently applied, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money, (d) any obligation owed for all or any part of the deferred purchase price of property or services which purchase price is (i) due more than six (6) months from the date of incurrence of the obligation in respect thereof, or (ii) evidenced by a note or similar written instrument, and (e) all indebtedness secured by any Lien or vendor's interest under any conditional sale or other title retention agreement existing on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person; provided, however, that "Indebtedness" shall not include policy claims, policy reserves or mandatory securities valuation reserves of a regulated insurance company; and further provided that "Indebtedness" shall not include indebtedness of the corporation to any Subsidiary.

"Lien" shall mean any lien, mortgage, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give a security interest).

"Long Term Debt", as applied to any Person, shall mean all Indebtedness of that Person which by its terms or by the terms of any instrument or agreement relating thereto matures more than one year, or is directly renewable or extendable at the option of the debtor to a date more than one year (including an option of the debtor under a revolving credit or similar agreement obligating the lenders to extend credit over a period of one year or more), from the date of creation thereof, but excluding any payments due under the terms thereof within twelve (12) months of any date of determination.

"Person" shall mean an individual, corporation, partnership, joint venture, trust, unincorporated organization or any other jurisdictional entity, or a foreign state or any agency or political subdivision thereof.

"Subsidiary" shall mean any corporation of which at least a majority of the outstanding stock having by the terms thereof ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether or not at the time stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the corporation or one or more of its Subsidiaries or by the corporation and one or more of its Subsidiaries.

4.2.11  **Conversion Right.** The holders of the Series A Preferred Stock shall have the following conversion right ("Conversion Right"):

(a)    Right to Convert. Each share of Series A Preferred Stock shall be convertible,

ARTICLES OF AMENDMENT - Page 9

Exhibit 3 - Page - 10

App. - I, p. 10

16-ER-3865

at the option of the holder thereof, at any time prior to the date on which notice of redemption is given under Section 4.2.3 or Section 4.2.4, at the office of the corporation or any transfer agent for the Series A Preferred Stock or Common Stock, into one fully paid and nonassessable share of Common Stock.

(b)　Mechanics of Conversion.  Before any holder of Series A Preferred Stock shall be entitled to convert such stock into shares of Common Stock, he shall surrender the certificate or certificates for such Preferred Stock, duly endorsed, at the office of the corporation or any transfer agent for the Common Stock, and shall give written notice to the corporation at such office that he elects to convert such Preferred Stock and shall state therein the number of shares of Series A Preferred Stock being converted.  Thereupon the corporation shall promptly issue and deliver at such office to such holder of a certificate or certificates for the number of shares of Common Stock to which he shall be entitled.

Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Series A  Stock to be converted (the "Conversion Date"); and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date.

(c)　Fractional Shares.  No fractional share of Common Stock shall be issued upon conversion of Series A  Stock.  In lieu of any fractional shares to which the holder would otherwise be entitled, the corporation shall pay cash equal to the product of such fraction multiplied by the fair market value of one share of the corporation's Common Stock on the Conversion Date, such value to be determined in good faith by the Board of Directors.

(d)　Reservation of Stock Issuable Upon Conversion.  The corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the shares of the Series A  Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Series A Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series A Preferred Stock, the corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

(e)　Termination of Redemption Right.  Upon exercise of the Conversion Right under this Section 4.2.11, all rights of a holder of Series A  Stock to require redemption of such stock under Section 4.2.3 shall automatically be terminated; and no holder of Common Stock acquired upon conversion of Series A Preferred Stock shall have any right of redemption.

**4.2.12 Modification of Rights and Preferences.**  The rights and preferences hereby conferred on the Series A Preferred Stock shall not be changed, altered or revoked without the consent of the holders of the majority of the Series A Preferred Stock outstanding at the time.

**4.3　Series C Preferred Stock.**

ARTICLES OF AMENDMENT - Page 10

Exhibit 3 - Page - 11

App. - I, p. 11

16-ER-3866

**4.3.1  General.** Each share of Series C Preferred Stock shall have the relative rights, preferences and limitations set forth in this Section 4.3 of Article Fourth.

**4.3.2  Restricted Voting Rights.** The holders of the Series C Preferred Stock shall have no right (except as required by law) to receive notice of or to vote on any matter (including, without limitation, the election of directors of the corporation) at any regular or special meeting of stockholders of the corporation, except that the holders of a majority of the shares of Series C Preferred Stock shall have the right, voting separately as a class, to elect one director to the Board of Directors of the corporation.

**4.3.3  Cumulative Dividend Preference** The Series C Preferred Stock shall be entitled to receive, when and as declared by the corporation's Board of Directors, cash dividends at the per annum rate of 10% of the Liquidation Rate (as defined in Section 4.3.4), cumulative, payable quarterly at March 31, June 30, September 30 and December 31 of each calendar year out of any funds legally available for the payment of dividends, and in preference to any dividends upon the Common Stock. The dividends on the Series C Preferred Stock shall be cumulative, whether or not declared, so that, if for any period such dividend shall not be paid, the right to such dividend shall accumulate as against the Common Stock; and all arrears so accumulated shall be paid before any dividends shall be declared or paid upon the Common Stock. No dividends shall be declared or paid on the Series C Preferred Stock if the redemption payments due to the holders of the Series A Preferred Stock under Section 4.2. of this Article Fourth are in arrears. No dividend shall be declared or paid upon the Common Stock nor shall any Common Stock be purchased or otherwise acquired by the corporation for value (other than payment of amounts due to Reed J. Taylor for redemption of his Common Stock), unless all dividends on the Series C Preferred Stock for all past period shall have been paid or shall have been declared and a sum sufficient for the payment thereof set apart for payment.

**4.3.4  Liquidation Preference.** In the event of any liquidation, dissolution or winding-up of the corporation, whether voluntary or involuntary, before any other distribution or payment is made to the holders of Common Stock or any other series of Preferred Stock (except the corporation's Series A Preferred Stock), the holders of the Series C Preferred Stock shall be entitled to receive, out of the assets of the corporation legally available therefor, a liquidation payment in the amount of $10.00 cash per share of Series C Preferred Stock ("Liquidation Rate"), plus a further amount equal to the dividends accumulated and unpaid thereon to the date of such liquidation payment. If, upon any liquidation, dissolution or winding up of the corporation, the assets available for distribution are insufficient to pay to the holders of all outstanding Series C Preferred Stock the full amount of the Liquidation Rate and all accumulated but unpaid dividends, the holders of the Series C Preferred Stock shall share pro rata in any such distribution of assets. Such rights of the holders of the Series C Preferred Stock shall be subordinate only to the right of the holder of the Series A Preferred Stock to be paid the redemption price of such stock in full, together with accrued interest, in accordance with Section 4.2 of this Article Fourth. After payment to the holders of the Series C Preferred Stock of the full preferential amounts hereinabove provided, the holders of the Series C Preferred Stock as such shall have no right or claim to any of the remaining assets of the corporation either upon any distribution of such assets or upon dissolution, liquidation or winding up; and the remaining assets to be distributed, if any, upon a distribution of such assets or upon dissolution, liquidation or winding up, may be distributed among the holders of the Common Stock.

ARTICLES OF AMENDMENT - Page 11

Exhibit 3 - Page - 12

App. - I, p. 12

16-ER-3867

### 4.3.5   Redemption.

(a)   <u>Mandatory Redemption by Corporation.</u>   Subject to the conversion rights provided in Section 4.3.6 of Article Fourth, the Series C Preferred Stock shall be called for redemption by the corporation upon payment of the aggregate Redemption Rate from legally available funds upon the closing of the earliest of the following events ("Equity Offering"):

(i)   an offering of the corporation's securities conducted pursuant to the registration requirements of the Securities Act of 1933 ("1933 Act") in which gross proceeds of at least $5,000,000 are raised;

(ii)   an offering of the corporation's securities pursuant to exemptions from registration under the 1933 Act in which gross proceeds of at least $5,000,000 are raised; or

(iii)   an offering of any securities convertible into corporation's Common Stock that are sold in an offering that conforms to the parameters of subparagraph (i) or (ii) above.

The redemption price for each share of Series C Preferred Stock ("Redemption Price") shall be the "Redemption Rate" equal to 100% of the Liquidation Rate if such redemption occurs within two (2) years from the issuance of the first shares of Series C Preferred Stock. After such two year period, an amount equal to 5% of the Liquidation Rate will be added to the Redemption Rate immediately and each 180 days thereafter until all outstanding shares of the Series C Preferred Stock are fully redeemed, <u>viz</u>:

| Time from Original Issuance | Percentage of Liquidation Rate |
|---|---|
| Within two years | 100% |
| After two years but before two years plus 181 days | 105% |
| After two years plus 180 days but before two years plus 361 days | 110% |
| After two years plus 360 days but before two years plus 541 days | 115% |
| . . . | . . . |

Notice of such call for redemption, specifying the anticipated date of closing of the Equity Offering, shall be mailed to each record holder of Series C Preferred Stock as soon as practicable before such closing date.  The redemption date for mandatory redemption of the Series C Preferred Stock shall be the actual closing date of the Equity Offering.  Mandatory redemption of the Series C Preferred

ARTICLES OF AMENDMENT - Page 12

Exhibit 3 - Page - 13

App. - I, p. 13

16-ER-3868

Stock under this Section 4.3.5 of Article Fourth shall automatically be cancelled upon determination by corporation's board of directors that the Equity Offering will not be consummated for any reason.

(b) Voluntary Redemption by Corporation. The Series C Preferred Stock may be called for redemption by the corporation, in whole or in part, upon payment of the Redemption Price from legally available funds at any time prior to the closing of an Equity Offering. Notice of such call for redemption, specifying the redemption date not less than thirty days from the date such notice is mailed and the number or percentage of outstanding shares of Series C Preferred Stock to be redeemed, shall be mailed to each record holder of Series C Preferred Stock. If fewer than all shares of Series C Preferred Stock are to be redeemed, the shares shall be redeemed prorata from the holders thereof; and, upon request of the corporation, certificates evidencing shares of Series C Preferred Stock including redeemed shares shall be surrendered to and reissued by the corporation in reduced amount to reflect any and all partial redemptions of such shares prior to such request.

(c) Redemption Procedure and Effect.
The corporation shall deposit, on or before the redemption date specified in the notice of redemption, the aggregate Redemption Price of the shares of Series C Preferred Stock to be redeemed with a bank or trust company specified in the notice, payable on the redemption date in the amounts and to the respective orders of the holders of the shares of Series C Preferred Stock to be redeemed, on endorsement to the corporation as may be required and upon surrender of the certificates for such shares. Unless the corporation fails to pay the Redemption Price on or before the redemption date, the shares of Series C Preferred Stock subject to such redemption shall be deemed to have been redeemed, and shall be deemed no longer to be outstanding, from and after the redemption date set forth in the notice of redemption. On or after the redemption date, subject only to payment of the redemption price, Series C Preferred Stock so called for redemption shall cease to be entitled to any interest or right in the corporation; and holders of such Series C Preferred Stock shall thereafter cease to be shareholders and shall be entitled only to payment of the amount of the redemption price, without interest, upon surrender of the certificates evidencing such stock.

4.3.6 Conversion of Series C Preferred Stock. Subject to the provisions of Section 4.3.7, each holder of Series C Preferred Stock shall have the right, exercisable beginning at the earlier of the date of receipt of notice of mandatory redemption of the Series C Preferred Stock pursuant to Section 4.3.5(a) or two years after the first issuance of Series C Preferred Stock and ending on the closing date of an Equity Offering, to convert Series C Preferred Stock into Common Stock at the Conversion Rate determined as follows: Each share of Series C Preferred Stock shall be convertible into that number of shares of Common Stock which equals .0000693% of the Common Stock on a fully diluted basis at the effective date of exercise, including by way of inclusion and without limiting the foregoing, any conversion or exercise rights contained in any Preferred Stock, options, warrants, or other rights to Common Stock, granted by the corporation in any form or manner, as if fully exercised at the effective date of exercise. Any holder of Series C Preferred Stock who exercises this conversion right prior to the closing date of an Equity Offering shall be protected against dilution in the event of any Common Stock issuance or other transaction which occurs prior to an Equity Offering and increases the number of outstanding shares of Common Stock on a fully diluted basis: For each share of Series C Preferred Stock converted prior to an Equity Offering, the Company shall issue to the holder thereof such number of additional

ARTICLES OF AMENDMENT - Page 13

Exhibit 3 - Page - 14

App. - I, p. 14

16-ER-3869

shares of Common Stock as necessary to maintain, at all times prior to an Equity Offering, such holder's 0.0000693% interest in Company's outstanding Common Stock on a fully diluted basis.

Subject to the provisions of Section 4.3.7, this conversion right shall be exercisable by any holder of Series C Preferred Stock as to all or any number of the shares of Series C Preferred Stock owned of record by such holder and shall be exercised by giving the corporation written notice of the exercise of such right, specifying the number of shares of Series C Preferred Stock to be converted and the effective date of such conversion, provided that the effective date of the conversion shall not be later than the closing date of an Equity Offering.

**4.3.7** <u>**Regulatory Limitation on Conversion Right.**</u> Notwithstanding any other provision of Section 4.3.6, the right to convert the Series C Preferred Stock into Common Stock of the Company shall be subject to receipt of prior approval by all regulatory authorities with jurisdiction over the acquisition of such Common Stock. Without limiting the generality of the foregoing limitation, the Holder shall not be permitted to convert Series C Preferred Stock into Common Stock if and to the extent that, after such exercise, the Holder would, directly or indirectly (or by exercise of any unrestricted right to convert into or to acquire Company's voting securities or otherwise) be in "control" of an insurer within the meaning of any applicable state insurance holding company act, unless and until such change of "control" has been approved by all applicable state insurance regulators under their respective insurance holding company acts. If the time for exercise of any conversion rights shall expire or be scheduled to expire within two weeks of any final regulatory approval, then the applicable time periods to exercise any such conversion rights shall be extended for such a period of time equal to the period of time from delivery of notice of exercise of any rights until the corporation notifies such rights holders of all applicable regulatory approvals.

**4.4** <u>**Common Stock.**</u> Holders of the Common Stock are entitled to one vote per share on all matters to be voted on by stockholders, including the election of directors. Common Stockholders are not entitled to vote their shares cumulatively in the election of directors. Holders of Common Stock of the corporation shall be entitled to elect all of the directors of the corporation other than the director appointed by the holders of the Series A Preferred Stock and the director elected by the holders of Series C Preferred Stock. The holders of any series of Preferred Stock of the corporation have a preference over the holders of Common Stock of the corporation on the assets of the corporation legally available for distribution to stockholders in the event of any liquidation, dissolution, or winding up of the affairs of the corporation. In the event of any liquidation, dissolution or winding up of the affairs of the corporation, holders of the Common Stock will share ratably in any assets of the corporation legally available for distribution to holders of Common Stock after satisfying the liquidation preferences of the Series A and Series C Preferred Stock. Holders of Series C Preferred Stock have a preference over the holders of Common Stock as to the payment of dividends. Holders of Common Stock have rights, share for share, to receive dividends if and when declared by the Board of Directors out of funds legally available therefor, after paying preferred dividends to the holders of Series C Preferred Stock.

<u>**FIFTH**</u>

Holders of any class or series of corporation's stock shall not have a preemptive right to acquire unissued or treasury shares of any class or series or securities convertible into such shares

ARTICLES OF AMENDMENT - Page 14

Exhibit 3 - Page - 15

App. - I, p. 15

16-ER-3870

or carrying a right to subscribe to or acquire such shares, except as provided in the Idaho Business Corporation Act.

## SIXTH

The location of the initial registered office of the corporation is One Lewis Clark Plaza, Lewiston, Idaho 83501; and the name of its initial registered agent at such address is R. John Taylor.

## SEVENTH

The number of directors constituting the initial Board of Directors is four, and the names and addresses of the persons who are to serve until the first annual meeting of the shareholders and until their successors are elected and qualified are:

| Name | Address |
|---|---|
| Reed J. Taylor | P.O. Box 538<br>Lewiston ID 83501 |
| R. John Taylor | P.O. Box 538<br>Lewiston ID 83501 |
| Raymond R. Heilman | P.O. Box 538<br>Lewiston ID 83501 |
| Mary K. Frost | P.O. Box 538<br>Lewiston ID 83501 |

## EIGHTH

The name and address of the incorporator is as follows:

Reed J. Taylor
P.O. Box 538
Lewiston ID 83501

## NINTH

The Board of Directors is expressly authorized to alter, amend or repeal the Bylaws of the corporation and to adopt new Bylaws, subject to repeal or change by a majority vote of the shareholders.

## TENTH

Shareholders entitled under Article Fourth to vote in the election of directors of the corporation shall not be entitled to vote their shares cumulatively in the election of directors of the corporation.

ARTICLES OF AMENDMENT - Page 15

Exhibit 3 - Page - 16

App. - I, p. 16

16-ER-3871

## ELEVENTH

A director of this corporation shall not be personally liable to this corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (a) for any breach of the director's duty of loyalty to this corporation or its shareholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Idaho Code §30-1-48, or (d) for any transaction from which the director derived an improper personal benefit. If the Idaho Business Corporation Act is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of this corporation shall be eliminated or limited to the fullest extent permitted by the Idaho Business Corporation Act, as so amended. Any repeal or modification of this Article Eleventh by the shareholders of the corporation shall not adversely affect any right or protection of a director of the corporation existing at the time of such repeal or modification."

THIRD: The number of shares of the corporation outstanding at the time of such adoption was 1,079,520 shares of Common Stock, 170,562 shares of Series A Stated Value Preferred Stock, and 185,000 shares of Series C Preferred Stock; and the number of shares entitled to vote thereon was 1,079,520 shares of Common Stock and 185,000 shares of Series C Preferred Stock.

FOURTH: The designation and number of outstanding shares of each class entitled to vote thereon as a class were as follows:

| Class | Number of Shares |
|---|---|
| Common | 1,079,520 |
| Series C Preferred | 185,000 |

FIFTH: The following table sets forth the number of shares of Common Stock and the number of shares of Series C Preferred Stock voted for and against such amendment:

| Class | Number of Shares | |
|---|---|---|
| | For | Against |
| Common | 865,093.5 | 48,153.5 |
| Series C Preferred | 165,000 | -0- |

DATED this 1st day of May, 1996.

AIA SERVICES CORPORATION

By _Daniel L. Spickler_

Daniel L. Spickler, Secretary

ARTICLES OF AMENDMENT - Page 17

Exhibit 3 - Page - 17

App. - I, p. 17

16-ER-3872

*effective 4-10-89*
*ratified at 5-5-89 board*
*meeting*

## NEW RESTATED BYLAWS

### OF

### AIA SERVICES CORPORATION
(an Idaho corporation)

### ARTICLE I

### OFFICES

Section 1.1  **Registered Office.**  The registered office of the corporation required by the Idaho Business Corporation Act to be maintained in the State of Idaho may, but need not be, identical with the principal office in the State of Idaho; and the address of the registered office may be changed from time to time by the Board of Directors or the President of the corporation.  (Idaho Code Sections 30-1-12(a) and 30-1-13.)

Section 1.2  **Principal Office; Other Offices.**  The corporation shall also have and maintain an office or principal place of business in Lewiston, Idaho or at such other place as may be fixed by the Board of Directors, and may also have offices at such other places, both within and without the State of Idaho, as the Board of Directors may from time to time determine or the business of the corporation may require.

### ARTICLE II

### CORPORATE SEAL

Section 2.1  **Corporate Seal.**  The corporate seal shall consist of a die bearing the name of the corporation and the inscription, "Corporate Seal -- State of Idaho".  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.  The seal may be altered at the pleasure of the Board of Directors.  (Idaho Code Section 30-1-4(c)).

### ARTICLE III

### STOCKHOLDERS' MEETINGS

Section 3.1  **Place of Meetings.**  The Board of Directors may designate any place, either within or without the State of Idaho, as the place of meeting for any annual meeting or for any special meeting of stockholders called by the Board of Directors.  A waiver of notice signed

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 1



EXHIBIT 1

A000962

Exhibit 4 - Page - 1

by all stockholders entitled to vote at a meeting may designate any place, either within or without the State of Idaho, as the place for the holding of such meeting. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal office of the corporation in the State of Idaho. (Idaho Code Section 30-1-28).

Section 3.2   Annual Meetings.   The annual meeting of the stockholders of the corporation shall be held on the first Monday in the month of May each year at the hour of 10:00 o'clock a.m., or on such other date and at such other time which may from time to time be designated by the Board of Directors, for the purpose of electing directors and for the transaction of such other business as may properly come before the meeting. (Idaho Code Section 30-1-28).

Section 3.3 Special Meetings. Special meetings of the stockholders of the corporation may be called at any time, for any purpose or purposes, by the Board of Directors or by the holders of not less than one-fifth (1/5) of all outstanding shares of stock of the corporation entitled to vote at the meeting or by the president of the corporation. Special meetings of the stockholders of the corporation may not be called by any other person or persons. (Idaho Code Section 30-1-28).

Section 3.4 Notice of Meetings. Written notice stating the place, day and hour of the meeting and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall, unless otherwise prescribed by statute, be delivered not less than ten nor more than fifty days before the date of the meeting, either personally or by mail, by or at the direction of the president, or the secretary, or the officer or other persons calling the meeting, to each stockholder of record entitled to vote at such meeting, or to each specified beneficial stockholder certified for the purpose of receiving such notice under Section 3.10. (Idaho Code Section 30-1-29).

Such notice of any meeting of stockholders may be waived in writing, signed by the person entitled to notice thereof, either before or after such meeting, and will be waived by any stockholder by his attendance thereat in person or by proxy, except when the stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Any stockholder so waiving notice of such meeting shall be bound by the proceedings of any such meeting in all respects as if due notice hereof had been given. (Idaho Code Section 30-1-144).

Section 3.5 Quorum. Except as otherwise provided in the Articles of Incorporation, a majority of the outstanding shares of the corporation entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of stockholders. Any shares, the voting of which at said meeting has been enjoined, or which for any reason cannot be lawfully voted at such meeting, shall not be counted to determine a quorum at such meeting. In the absence of a quorum any meeting of stockholders may be

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 2

Exhibit 4 - Page - 2   AIA000963

App. - J, p. 2

16-ER-3874

adjourned, from time to time, by vote of the holders of a majority of the shares represented thereat; but no other business shall be transacted at such meeting. The stockholders present at a duly organized and convened meeting where a quorum has been present can continue to transact business as a quorum until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum. Except as otherwise provided by law, the Articles of Incorporation or these Bylaws, if a quorum is present, the affirmative vote of a majority of the shares represented at the meeting and entitled to vote on the subject matter shall be the act of the stockholders. (Idaho Code Section 30-1-32).

Section 3.6 **Adjournment and Notice of Adjourned Meetings.** Any meeting of stockholders at which a quorum is present, whether annual or special, may be adjourned from time to time by the vote of a majority of the shares, the holders of which are present either in person or by proxy. When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjournment meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 3.7 **Proxies.** At all meetings of stockholders, a stockholder may vote either in person or by proxy executed in writing by the stockholder or by his duly authorized attorney-in-fact. Such proxy shall be filed with the secretary of the corporation before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy. (Idaho Code Section 30-1-33(c)).

Section 3.8 **Voting Rights.** Except as otherwise provided in the Articles of Incorporation, each outstanding share, regardless of class, entitled to vote shall be entitled to one vote upon each matter submitted to a vote at a meeting of stockholders. Cumulative voting of shares shall not be permitted in the election of directors. For the purpose of determining those stockholders entitled to vote in any meeting of the stockholders, except as otherwise provided by law, only persons in which names shares stand on the stock record of the corporation on the record date, as provided in Sections 3.11 and 7.4 of these Bylaws, shall be entitled to vote at any meeting of stockholders. All elections of directors shall be by written ballot.

Section 3.9 **Voting of Shares by Certain Holders.** Shares standing in the name of another corporation, domestic or foreign, may be voted by such officer, agent or proxy as the bylaws of such other corporation may prescribe or, in the absence of such provision, as the Board of Directors of such other corporation may determine. (Idaho Code Section 30-1-22(e)).

Shares held by an administrator, executor, guardian or conservator

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 3

Exhibit 4 - Page - 3

AIA000964

may be voted by him, either in person or by proxy, without a transfer of such shares into his name. Shares standing in the name of a trustee may be voted by him, either in person or by proxy; but no trustee shall be entitled to vote shares held by him without a transfer of such shares into his name. (Idaho Code Section 30-1-33(f)).

Shares standing in the name of a receiver may be voted by such receiver; and shares held by or under the control of a receiver may be voted by such receiver without the transfer thereof into his name if authority so to do be contained in an appropriate order of the court by which such receiver was appointed. (Idaho Code Section 30-1-33(g)).

A stockholder whose shares are pledged shall be entitled to vote such shares until the shares have been transferred into the name of the pledgee; and thereafter the pledgee shall be entitled to vote the shares so transferred unless the pledgor shall have obtained from the pledgee a proxy to vote or take other action thereon in accordance with law. (Idaho Code Section 30-1-33(c)(3),(h)).

Neither treasury shares of its own stock held by the corporation, nor shares held by another corporation if a mahority of the shares entitled to vote for the elections of directors of such other corporation is held by the corporation, shall be voted at any meeting or counted in determining the total number of outstanding shares at any given time. (Idaho Code Section 30-1-33(b)).

Section 3.10 **Joint Owners of Stock**. If shares or other securities having voting power stand of record in the names of two (2) or more persons, whether fiduciaries, members of a partnership, joint tenants, tenants in common, tenants by the entirety, or otherwise, or if two (2) or more persons have the same fiduciary relationship respecting the same shares, unless the Secretary is given written notice to the contrary and is furnished with a copy of the instrument or order appointing them or creating the relationship wherein it is so provided, their acts with respect to voting shall have the following effect: (a) if only one votes, his act binds all; (b) if more than one votes, the act of the majority so voting binds all; (c) if more than one votes, but the vote is evenly split on any particular matter, each faction may vote the securities in question proportionally. If the instrument filed with the secretary shows that any such tenancy is held in unequal interests, a majority or even-split for the purpose of this Section 3.10 shall be a majority or even-split interest.

The Board of Directors may adopt by resolution a procedure whereby a stockholder of the corporation may certify in writing to the corporation that all or a portion of the shares registered in the name of such stockholder are held for the account of a specified person or persons. The resolution shall set forth (a) the classification of stockholder who may certify, (b) the purpose or purposes for which the certification may be made, (c) the form of certification and information to be contained therein, (d) the number of days before or after any record date or date

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 4

AIA000965

Exhibit 4 - Page - 4

App. - J, p. 4

16-ER-3876

of closing of the stock transfer books, and (e) such other provisions with respect to the procedure as are deemed necessary or desirable. Upon receipt by the corporation of a certification complying with the procedure, the persons specified in the certification shall be deemed, for the purpose or purposes set forth in the certification, to be the holders of record of the number of shares specified in place of the shareholder making the certification. (Idaho Code Section 30-1-2(f)).

Section 3.11 **List of Stockholders.** The secretary shall make, at least ten (10) days before every meeting of stockholders, a complete record of the stockholders entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order and showing the addresses of each stockholder and the number of shares registered in the name of each stockholder. Such record shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting or, if not specified, at the place where the meeting is to be held. The list shall be produced and kept open at the time and place of meeting, and shall be subject to inspection by any stockholder during the whole time of the meeting for the purposes thereof. (Idaho Code Section 30-1-31).

Section 3.12 **Organization.** At every meeting of stockholders, the Chairman of the Board of Directors, or, if a Chairman has not been appointed or is absent, the president, or, if the president is absent, the most senior vice president present, or in the absence of any such officer, a chairman of the meeting chosen by a majority in interest of the stockholders entitled to vote, present in person or by proxy, shall act as chairman. The secretary or, in his absence, an assistant secretary directed to do so by the president, shall act as secretary of the meeting.

Section 3.13 **Nomination of Directors.** Nominations of persons for election to the Board of Directors of this corporation at the annual meeting of stockholders may be made at such meeting by or at the direction of the Board of Directors, by any nominating committee or person appointed by the Board of Directors, or by any stockholder of the corporation entitled to vote for the election of directors at the meeting who timely complies with the notice procedures herein set forth. To be timely, a stockholder's notice must be delivered to, or mailed to and received by, the secretary of the corporation at the corporation's principal executive offices not later than the December 31 immediately preceding the annual meeting.

Section 3.14 **Business Introduced by Stockholders at Annual Meetings.** Where business introduced by a stockholder is not specified in the notice of annual meeting, then (in addition to any other applicable requirements) for business to be properly introduced by a stockholder at an annual meeting of stockholders, the stockholder must have given timely notice thereof in writing to the secretary of the corporation. To be timely, a stockholder's notice must be delivered to, or mailed to and

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 5

Exhibit 4 - Page - 5

AIA000966

received by, the secretary of the corporation in the same manner and subject to the same time requirements provided in Section 3.13 of these Bylaws for stockholder notice of nominations to the Board of Directors. A stockholder's notice must set forth, as to each matter the stockholder proposes to bring before the meeting, (a) a brief description of the business desired to be brought before the meeting and the reasons for conducting such business at the meeting, (b) the name and record address of the stockholder proposing such business, (c) the class, series and number of shares of the corporation's stock which are beneficially owned by the stockholder, and (d) any material interest of the stockholder in such business.

Section 3.15  **Informal Action by Stockholder.**  Any action required or permitted to be taken at a meeting of the stockholders may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the stockholders entitled to vote with respect to the subject matter thereof.  Such consent shall have the same effect as a unanimous vote of stockholders.  (Idaho Code Section 30-1-145).

## ARTICLE IV

## DIRECTORS

Section 4.1  **Number; Qualifications.**  The number of directors presently authorized is six (6).  The authorized number of directors of the corporation shall be fixed, and may be increased to as many as nine or decreased to as few as one, from time to time by the Board of Directors either by a resolution or a bylaw duly adopted by the Board of Directors. No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director.  Directors need not be residents of the State of Idaho or stockholders unless so required by the Articles of Incorporation.  If for any cause the directors shall not have been elected at an annual meeting, they may be elected as soon thereafter as convenient at a special meeting of the stockholders called for that purpose in the manner provided by law or in these Bylaws.  (Idaho Code Sections 30-1-28, 30-1-35 and 30-1-36).

Section 4.2  **Term.**  Each director shall serve until the next annual meeting of stockholders and his successor is duly elected and qualified, or until his death, resignation or removal.  (Idaho Code Section 30-1-36).

Section 4.3  **Newly created Directorships and Vacancies.**  Newly created directorships resulting from any increase in the number of directors and any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other cause shall be filled by the affirmative vote of a majority of the remaining directors then in office (and not by stockholders), even if less than a quorum of the authorized Board of Directors.  A director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office.  The stockholders may elect his successor at the next annual meeting of

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 6

AIA000967

Exhibit 4 - Page - 6

App. - J, p. 6

stockholders or at any special meeting duly called for that purpose and held prior to the next annual meeting.

Section 4.4 **Powers.** All corporate powers shall be exercised by and under the authority of, and the business and affairs of the corporation shall be managed under the direction of, the Board of Directors except as may otherwise be provided in the Idaho Business Corporation Act or the Articles of Incorporation. (Idaho Code Section 30-1-35).

Section 4.5 **Resignation.** Any director may resign at any time by delivering his written resignation to the secretary, such resignation to specify whether it will be effective at a particular time, upon receipt by the secretary or at the pleasure of the Board of Directors. If no such specification is made, it shall be deemed effective at the pleasure of the Board of Directors. When one or more directors shall resign from the Board of Directors, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective; and, subject to Section 4.3, each director so chosen shall hold office for the unexpired portion of the terms of the director whose place shall be vacated and until his successor shall have been duly elected and qualified.

Section 4.6 **Removal.** At a special meeting of stockholders called for the purpose in the manner hereinabove provided, the entire Board of Directors, or any individual director, may be removed from office, with or without cause, and one or more new directors may be elected, by a vote of stockholders holding a majority of the outstanding shares then entitled to vote at an election of directors. The holders of the corporation's Stated Value Preferred Stock being entitled to elect one (1) director by the provisions of the Articles of Incorporation, the provisions of this Section 4.6 shall apply, in respect to the removal of the director so elected, to the vote of the holders of the outstanding shares of Stated Value Preferred Stock and not to the vote of the outstanding shares as a whole. (Idaho Code Section 30-39.)

Section 4.7 **Meetings.**

(a) **Annual Meetings.** The annual meeting of the Board of Directors shall be held immediately after the annual meeting of stockholders and at the place where such meeting is held. No notice of an annual meeting of the Board of Directors shall be necessary; and such meeting shall be held for the purpose of electing officers and transacting such other business as may lawfully come before it. (Idaho Code Section 30-1-43).

(b) **Other Meetings.** Regular and special meetings of the Board of Directors, or of any committee designated by the Board, may be held at any place within or without the State of Idaho (Idaho Code Section 30-1-43).

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 7

Exhibit 4 - Page - 7   AA000968

App. - J, p. 7

16-ER-3879

(c)    **Telephone Meetings.**   Any member of the Board of Directors, or of any committee thereof, may participate in a meeting by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other at the same time; and participation in a meeting by such means shall constitute presence in person at such meeting.  (Idaho Code 30-1-43).

(d)  **Notice of Meetings.**  Notice of the time and place of any regular or special meeting of the Board of Directors shall be given at least three (3) days previously thereto by written notice delivered personally or mailed to each director at his business address, or by telegram;   provided that the Board of Directors may provide, by resolution, the time and place, either within or without the State of Idaho, for the holding of regular meetings without notice other than such resolution.  Any director may waive notice of any meeting, in writing, at any time before or after the meeting.  The attendance of a director at a meeting shall constitute a waiver of notice of such meeting, except where a director attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting.  (Idaho Code Section 30-1-43).

(e)    **Waiver of Notice; Consent.**   The transaction of all business at any meeting of the Board of Directors, or any committee thereof, however called or noticed, or wherever held, shall be as valid as though taken at a meeting duly held after regular call and notice, if a quorum is present and if, either before or after the meeting, each of the directors not present signs a written waiver of notice, or a consent to holding such meeting, or an approval of the minutes thereof.  All such waivers, consents or approvals shall be filed with the corporate records or made a part of the minutes of the meeting.  (Idaho Code Section 30-1-43, 30-1-144).

Section 4.8   **Quorum and Voting.**

(a)    **Quorum.**  A majority of the number of directors fixed by or in the manner provided in Section 4.1 shall constitute a quorum for the transaction of business at any meeting of the Board of Directors.  If less than such majority is present at any meeting, a majority of the directors present may adjourn the meeting from time to time until the time fixed for the next regular meeting of the Board of Directors, without further notice other than by announcement at the meeting.  (Idaho Code Section 39-1-40).

(b)  **Majority Vote.**  At each meeting of the Board of Directors at which a quorum is present, all questions and business shall be determined by a vote of a majority of the directors present; and the act of the majority of the directors present shall be the act of the Board of Directors, unless a different vote is required by law, the Articles of

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 8

AIA000969

Exhibit 4 - Page - 8

App. - J, p. 8

16-ER-3880

Incorporation or these Bylaws.  (Idaho Code Section 30-1-40).

(c) <u>Presumption of Assent</u>. A director of the corporation who is present at a meeting of the Board of Directors (or any committee thereof) at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by registered mail to the secretary of the corporation within three (3) days after the adjournment of the meeting.  Such right to dissent shall not apply to a director who voted in favor of such action.  (Idaho Code Section 30-1-35).

Section 4.9 <u>Action Without a Meeting</u>. Unless otherwise restricted by the Articles of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if a consent in writing, setting forth the action so taken is signed by all members of the Board of Directors or of the committee, as the case may be. (Idaho Code Section 30-1-44).

Section 4.10 <u>Fees and Compensation</u>. By resolution of the Board of Directors, a fixed fee or salary payable in cash or the corporation's stock or any combination thereof, with or without expenses or attendance, may be allowed for serving on the Board of Directors and/or attendance at each meeting of the Board of Directors and at each meeting of any committee of the Board of Directors.  Noting herein contained shall be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, consultant, employee, or otherwise and receiving compensation therefor.  (Idaho Code Section 30-1-35).

Section 4.11 <u>Performance of Duties</u>.  A director shall perform his duties as director, including his duties as a member of any committee of the Board of Directors on which he may serve, in good faith, in a manner he reasonably believes to be in the best interests of the corporation, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  In performing his duties, a director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by:

(a) One (1) or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented;

(b)  Counsel, public accountants or other persons as to matters which the director reasonably believes to be within such persons' professional or expert competence; or

(c) A committee of the Board upon which he does not serve,

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 9

Exhibit 4 - Page - 9

AIA000970

duly designated in accordance with a provision of the Articles of Incorporation or the Bylaws, as to matters within its designated authority, which committee the director reasonably believes to merit confidence; but he shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would cause such reliance to be unwarranted.

A person who so performs his duties shall have no liability by reason of being or having been a director of the corporation. (Idaho Code Sections 30-1-35, 30-1-42).

Section 4.12  **Committees**.

(a)  **Executive Committee**. The Board of Directors may, by resolution adopted by a majority of the full Board of Directors, appoint an Executive Committee to consist of one (1) or more members of the Board of Directors. The Executive Committee, to the extent permitted by law and specifically granted by the Board of Directors, shall have and may exercise when the Board of Directors is not in session all powers and authority of the Board of Directors in the management of the business and affairs of the corporation, except such committee shall not have the power or authority to (i) declare dividends or distributions, (ii) approve or recommend to stockholders actions or proposals required by the Idaho Business Corporation Act to be approved by stockholders, (iii) designate candidates for the office of director, for purposes of proxy solicitation or otherwise, or fill vacancies on the Board of Directors or any committee thereof, (iv) amend the Bylaws, (v) approve a plan of merger not requiring stockholder approval, (vi) reduce earned or capital surplus, (vii) authorize or approve the reacquisition of shares unless pursuant to a general formula or method specified by the Board of Directors, or (viii) authorize or approve the issuance or sale of, or ny contract to issue or sell, shares or designate the terms of a series of a class of shares, provided that the Board of Directors, having acted regarding general authorization for the issuance or sale of shares, or any contract therefor, and, in the case of a series, the designation thereof, may, pursuant to a general formula or method specified by the Board by resolution or by adoption of a stock option or other plan, authorized a committee to fix the terms of any contract for the sale of the shares and to fix the terms upon which such shares may be issued or sold, including, without limitation, the price, the dividend rate, provisions for redemption, sinking fund, conversion, voting or preferential rights, and provisions for other features of a class of shares, or a series of a class of shares, with full power in such committee to adopt any final resolution setting forth all the terms thereof and to authorize the statement of the terms of a series for filing with the Secretary of State under the Idaho Business Corporation Act. (Idaho Code Section 30-1-42).

(b)  **Other Committees**. The Board of Directors may, by resolution adopted by a majority of the full Board of Directors, from time to time appoint such other committees as may be permitted by law. Such other committees appointed by the Board of Directors shall consist of one

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 10

Exhibit 4 - Page - 10

AIA000971

App. - J, p. 10

16-ER-3882

(1) or more members of the Board of Directors, and shall have such powers and perform such duties as may be prescribed by the resolution or resolutions creating such committees; but in no event shall such committee have the powers denied to the Executive Committee in Section 4.12(a). (Idaho Code Section 30-1-42).

(c)   **Terms**.   The members of all committees of the Board of Directors shall serve at the pleasure of the Board of Directors.   The Board of Directors, subject to the provisions of subsections (a) or (b) of this Section 4.12, may at any time increase or decrease the number of members of a committee or terminate the existence of a committee.   The membership of a committee member shall terminate on the date of his death or voluntary resignation.   Any committee member may resign at any time by giving written notice to the president or secretary of the corporation. The Board of Directors may at any time for any reason, with or without cause, remove any individual committee member; and the Board of Directors may fill any committee vacancy created by death, resignation, removal or increase in the number of members of the committee.   The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee; and, in addition, in the absence or disqualification of any member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in place of any such absent or disqualified member.

(d)   **Meetings**.   Unless the Board of Directors shall otherwise provide, regular meetings of the Executive Committee or any other committee appointed pursuant to this Section 4.12 shall be held at such times and places as are determined by the Board of Directors, or by any such committee; and when notice thereof has been given to each member of such committee, no further notice of such regular meetings need be given thereafter.   Special meetings of any such committee may be held at any place which has been designated from time to time by resolution of such committee or by written consent of all members thereof, and may be called by any director who is a member of such committee, upon written notice to the members of such committee of the time and place of such special meeting given in the manner provided for the giving of written notice to members of the Board of Directors of the time and place of special meetings of the Board of Directors; provided that notice of a special meeting need not state the business proposed to be transacted at the meeting.   Notice of any special meeting of any committee may be waived in writing at any time before or after the meeting and will be waived by any director by attendance thereat, except when the director attends such special meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.   Each committee shall elect a presiding officer from its members and may fix its own rules of procedure which shall not be inconsistent with these Bylaws.   It shall keep regular minutes of its proceedings and report them to the Board of Directors for

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 11

Exhibit 4 - Page - 11

AIA000972

its information at the meeting thereof held next after the proceedings shall have been taken. A majority of the authorized number of members of any such committee shall constitute a quorum for the transaction of business; and the act of a majority of those present at any meeting at which a quorum is present shall be the act of such committee.

(e) **Responsibility**. Neither the designation of an Executive Committee or other committee, the delegation thereto of authority, nor action by such committee shall relieve the Board of Directors, or any member thereof, of any responsibility or duty imposed by law.

Section 4.13   **Organization**.  At every meeting of the Board of Directors, the Chairman of the Board of Directors, or, if a chairman has not been appointed or is absent, the president, or if the president is absent, the most senior vice president, or, in the absence of any such officer, a chairman of the meeting chosen by a majority of the directors present, shall preside over the meeting.  The secretary, or in his absence, an assistant secretary directed to do so by the president shall act as secretary of the meeting and shall keep regular minutes of the proceedings of the Board of Directors.

Section 4.14 **Director Conflicts of Interest**. No contract or other transaction between the corporation and one or more of its directors or any other corporation, firm, association or entity in which one or more of its directors are directors or officers or are financially interested, shall be either void or voidable because of such relationship or interest or because such director or directors are present at the meeting of the Board of Directors or a committee thereof which authorizes, approves or ratifies such contract or transaction or because his or their votes are counted for such purposes, if:

(a)  the fact of such relationship or interest is disclosed or known to the Board of Directors or committee which authorizes, approves or ratifies the contract or transaction by a vote or consent sufficient for the purpose without counting the votes or consents of such interested directors; or

(b)  the fact of such relationship or interest is disclosed or known to the shareholders entitled to vote and they authorize, approve or ratify such contract or transaction by vote or written consent, in which vote or consent such interested directors may participate to the extent that they are also shareholders; or

(c)  the contract or transaction is fair and reasonable to the corporation and the fact of such relationship or interest is fully and fairly disclosed or known to the corporation.

Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or a committee thereof which autorizes, approves or ratifies such contract or transaction.

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 12

AIA000973

Exhibit 4 - Page - 12

# ARTICLE V

## OFFICERS

Section 5.1 **Officers Designated**. The officers of the corporation consist of a president, one or more vice presidents (the number thereof to be determined by the Board of Directors), a secretary, and a treasurer, each of whom shall be elected by the Board of Directors. The order of seniority of vice presidents shall be the order of their nomination, unless otherwise determined by the Boared of Directors. Such other officers and assistant officers as may be deemed necessary may be elected or appointed by the Board of Directors. Any two or more offices may be held by the same person, except the offices of president and secretary. (Idaho Code Section 30-1-50).

Section 5.2 **Tenure and Duties of Officers.**

(a) **Term of Office**. All officers shall hold office at the pleasure of the Board of Directors and until their successors shall have been duly elected and qualified, or until their resignation or removal. If the office of any officer becomes vacant for any reqson, the vacancy may be filled by the Board of Directors. (Idaho Code Section 30-1-50).

(b) **The President**. The president shall be the principal executive officer of the corporation and, subject to the control of the Board of Directors, shall in general supervise and control all of the business and affairs of the corporation. He shall, when present, preside at all meetings of the stockholders and of the Board of Directors. He may sign, with the secretary or any other proper officer of the corporation thereunder authorized by the Board of Directors, certificates for shares of the corporation, any deeds, mortgages, bonds, contracts, or other instruments which the Board of Directors has authorized to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws to some other officer or agent of the corporation, or shall be required by law to be otherwise signed or executed; and in general the president shall perform all duties commonly incident to the office of president and such other duties as may be prescribed by the Board of Directors from time to time.

(c) **The Vice President**. In the absence of the president or in the event of his death, inability or refusal to act, the vice president (or in the event there is more than one vice president, the vice presidents in the order designated at the time of their election, or in the absence of any designation, then in the order of their election) shall perform the duties of the president and, when so acting, shall hae all the powers of and be subject to all the restrictions upon the president. Any vice president may sign, with the secretary or an assistant secretary, certificates for shares of the corporation; and the vice president shall perform other duties commonly incdent to the office of vice president and such other duties as from time to time may be assigned to him by the

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 13

Exhibit 4 - Page - 13
AIA000974

president or by the Board of Directors.

(d)   **The Secretary.**   The secretary shall:  (a) attend all meetings and keep the minutes of the proceedings of the stockholders and of the Board of Directors in one or more books provided for that purpose; (b) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law; (c) be custodian of the corporate records and of the seal of the corporation and see that the seal of the corporation is affixed to all documents the execution of which on behalf of the corporation under its seal is duly authorized; (d) keep a register of the post office address of each shareholder which shall be furnished to the secretary by such shareholder; (e) sign, with the president, or a vice president, certificates for shares of the corporation, issuance of which shall have been authorized by resolution of the Board of Directors; (f) have general charge of the stock transfer books of the corporation; and (g) in general perform all duties commonly incident to the office of secretary and such other duties as from time to time may be assigned to him by the president or by the Board of Directors.

(e)   **The Treasurer.**   The treasurer shall: (a) have charge and custody of and be responsible for all funds and securities of the corporation; (b)  receive and give receipts for monies due and payable to the corporation from any source whatsoever, and deposit all such monies in the name of the corporation in such banks, trust companies or other depositories as shall be selected in accordance with the provisions of Article VI of these Bylaws; and (c) in general perform all of the duties commonly incident to the office of treasurer and such other duties as from time to time may be assigned to him by the president or by the Board of Directors.  If required by the Board of Directors, the treasurer shall give a bond for the faithful discharge of his duties in such sum and with such surety or sureties as the Board of Directors shall determine.

(f)   **Assistant Secretaries and Assistant Treasurers.**   The assistant secretaries, when authorized by the Board of Directors, may sign with the president or a vice president certificates for shares of the corporation the issuance of which shall have been authorized by a resolution of the Board of Directors.   The assistant treasurers shall respectively, if required by the Board of Directors, give bonds for the faithful discharge of their duties in such sums and with such sureties as the Board of Directors shall determine.   The assistant secretaries and assistant treasurers, in general shall perform such duties as shall be assigned to them by the secretary or the treasurer, or by the president or the Board of Directors.

Section 5.3   **Resignations.**   Any officer may resign at any time by giving written notice to the Board of Directors or to the president or to the secretary.   Any such resignation shall be effective when received by the person or persons to whom such notice is given, unless a later time is specified therein, in which event the resignation shall become effective at such later time.   Unless otherwise specified in such notice, the acceptance of any such resignation shall not be necessary to make it

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 14

Exhibit 4 - Page - 14

AIA000975

effective.

Section 5.4 **Removal**. Any officer or agent may be removed by the Board of Directors whenever, in its judgment, the best interests of the corporation will be served thereby; but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Election or appointment of an officer or agent shall not of itself create contract rights. (Idaho Code Section 30-1-51).

Section 5.5 **Compensation**. The compensation of the officers shall be fixed from time to time by the Board of Directors. No officer shall be prevented from receiving such compensation by reason of the fact that such officer is also a director of the corporation.

### ARTICLE VI

### EXECUTION OF CORPORATE INSTRUMENTS AND VOTING OF SECURITIES OWNED BY THE CORPORATION

Section 6.1 **Execution of Corporate Instruments**. The Board of Directors may, in its discretion, determine the method and designate the signatory officer or officers, or other person or persons, to execute on behalf of the corporation any corporate instrument or document, or to sign on behalf of the corporation the corporate name without limitation, or to enter into contracts on behalf of the corporation, except where otherwise provided by law or these Bylaws; and such execution or signature shall be binding upon the corporation. Authorization granted to any person hereunder may be general or confined to specific instances.

Unless otherwise specifically determined by the Board of Directors or otherwise required by law, promissory notes, deeds of trust, mortgages and other evidences of indebtedness of the corporation, and certificates of shares of stock owned by the corporation, shall be executed, signed or endorsed by the president or any vice president, and by the secretary or treasurer or any assistant secretary or assistant treasurer. All other instruments and documents requiring the corporate signature may be executed as aforesaid or in such manner as may be directed by the Board of Directors.

Section 6.2 **Loans**. No loan shall be contracted on behalf of the corporation and no evidence of indebtedness shall be issued in its name unless authorized by resolution of the Board of Directors. Such authorization may be general or confined to specific instances.

Section 6.3 **Deposits and Checks**. All funds of the corporation not otherwise employed shall be deposited from time to time to the credit of the corporation in such banks, trust companies or other depositories as the Board of Directors may select. All checks and drafts drawn on banks or other depositaries on funds to the credit of the corporation or in special accounts of the corporation shall be signed by such person or persons as the Board of Directors shall authorize to do so. Such

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 15

Exhibit 4 - Page - 15

AIA000976

App. - J, p. 15

16-ER-3887

authorization may be general or confined to specific instances.

Section 6.4   **Voting of Securities Owned by the Corporation.**   All stock and other securities of other corporations owned or held by the corporation for itself, or for other parties in any capacity, shall be voted, and all proxies with respect thereto shall be executed, by the person authorized to do so by resolution of the Board of Directors, or, in the absence of such authorization, by the president or any vice president.

## ARTICLE VII

### SHARES OF STOCK

Section 7.1   **Form and Execution of Certificates.**   Certificates representing shares of the corporation shall be in such form as shall be determined by the Board of Directors.   Such certificates shall be signed by the president or a vice president and by the secretary or an assistant secretary and may be sealed with the corporate seal or a facsimile thereof.   The signatures of such officers upon a certificate may be facsimiles if the certificate is manually signed on behalf of a transfer agent or a registrar, other than the corporation itself or one of its employees.   In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the corporation with the same effect as if he were such officer transfer agent or registrar at the date of issue.   (Idaho Code Section 30-1-23).

Section 7.2   **Lost Certificates.**   The corporation may issue a new certificate of stock in place of any certificate theretofore issued by the corporation alleged to have been lost, stolen, destroyed or mutilated; and the corporation may require the owner of such lost, stolen, destroyed or mutilated certificate, or his legal representative, to give the corporation a bond sufficient to indemnify it against any claim that may be made against the corporation on account of the alleged loss, theft, destruction or mutilation of any such certificate or the issuance of such new certificate.

Section 7.3   **Transfers.**   Each certificte for shares shall be consecutively numbered or otherwise identified.   The name and address of the person to whom the shares represented thereby are issued, with the number of shares and date of issue, shall be entered on the stock transfer books of the corporation.   All certificates surrendered to the corporation for transfer shall be cancelled; and, except as provided in Section 7.2, no new certificate shall be issued until the former certificate for a like number of shares shall have been surrendered and cancelled.   Transfer of record shares of stock of the corporation shall be made only on the stock transfer books of the corporation by the holder of record thereof or by his legal representative, who shall furnish proper evidence of authority to transfer, or by his attorney thereunto authorized by power of attorney

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 16

Exhibit 4 - Page - 16

AIA000977

duly executed and filed with the secretary of the corporation, and on surrender for cancellation of a properly endorsed certificate or certificates for a like number of shares.

Section 7.4  **Fixing Record Dates.**  In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or to receive payment of any dividend or other distribution or allotment of any rights or to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may provide that the stock transfer books shall be closed for a stated period but not to exceed, in any case, fifty (50) days.  If the stock transfer books shall be closed for the purpose of determining stockholders entitled to notice of or to vote at a meeting of stockholders, such books shall be closed for at least ten (10) days immediately preceding such meeting.  In lieu of closing the stock transfer books, the Board of Directors may fix, in advance, a record date for any such determination of stockholders.  Such record date shall be not more than fifty (50) days and, in the case of a meeting of stockholders, not less than ten (10) days prior to the date on which the particular action, requiring such determination of stockholders, is to be taken.  If the stock transfer books are not closed and no record date is fixed: (a) the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day on which notice is mailed, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held; (b) the record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is necessary, shall be the day on which the first written consent is expressed; and (c) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.  (Idaho Code Section 39-1-30).

Section 7.5  **Registered Stockholders.**  The corporation shall be entitled to recognize the exclusive right of a person registered in its books as the owner of shares to receive dividends and to vote as such owner, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Idaho.

Section 7.6  **Issuance, Transfer and Registration of Shares.**  The Board of Directors may make such rules and regulations, not inconsistent with law or with these Bylaws, as it may deem advisable concerning the issuance, transfer and registration of certificates for shares of the

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 17

Exhibit 4 - Page - 17

AIA000978

capital stock of the corporation. The Board of Directors may appoint a transfer agent or registrar of transfers or both, and may require all certificates for shares of the corporation to bear the signature of either or both.

## ARTICLE VIII

### OTHER SECURITIES OF THE CORPORATION

Section 8.1 Execution of Other Securities. All bonds, debentures and other corporate securities of the corporation, other than stock certificates, may be signed by the president or any vice president, or such other person as may be authorized by the Board of Directors; and the corporate seal may be impressed thereon or a facsimile of such seal imprinted thereon and attested by the signature of the secretary or an assistant secretary; provided, however, that where any such bond, debenture or other corporate security shall be authenticated by the manual signature of a trustee under an indenture pursuant to which such bond, debenture or other corporate security shall be issued, the signatures of the persons signing and attesting the corporate seal on such bond, debenture or other corporate security may be the imprint facsimile of the signature of such persons. Interest coupons appertaining to any such bond, debenture or other corporate security, authenticated by a trustee as aforesaid, shall be signed by the treasurer or an assistant treasurer of the corporation or such other person as may be authorized by the Board of Directors, or be imprinted thereon the facsimile signature of such person. In case any officer who shall have signed or attested any bond, debenture or other corporate security, or whose facsimile signature shall appear thereon or on any such interest coupon, shall have ceased to be such officer before the bond, debenture or other corporate security so signed or attested shall have been delivered, such bond, debenture or other corporate security nevertheless may be adopted by the corporation and issued and delivered as though the person who signed the same or whose facsimile signture shall have been used thereon had not ceased to be such officer of the corporation.

## ARTICLE IX

### DIVIDENDS

Section 9.1 Declaration and Payment of Dividends. Dividends upon the capital stock of the corporation, subject to the provisions of the Articles of Incorporation, if any, may be declared by the Board of Directors pursuant to law at any regular or special meeting. Dividends may be paid by the corporation in cash, in property, or in shares of its capital stock, subject to the provisions of the Articles of Incorporation. (Idaho Code Section 30-1-45).

Section 9.2 Dividend Reserve. Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the Board of Directors may from time to

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 18

Exhibit 4 - Page - 18 AIA000979

time, in its absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or for such other purpose as the Board of Directors shall think conducive to the interests of the corporation; and the Board of Directors may modify or abolish any such reserve in the manner in which is was created.

## ARTICLE XI

### INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES AND OTHER AGENTS

Section 11.1  **Directors and Executive Officers**  The corporation shall indemnify the directors and executive officers of the corporation or another enterprise to the full extent permitted by the Idaho Business Corporation Act, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the corporation to provide broader indemnification rights than siad Act permitted the corporation to provide prior to such amendment); provided, however, that the corporation may limit the extent of such indemnification by individual contracts with its directors and executive officers; and provided, further, that the corporation shall not be required to indemnify any director or executive officer in connection with any proceeding (or part thereof) initiated by such person or any proceeding by such person against the corporation or its directors, officers, employees or other agents unless (a) such indemnification is expressly required to be made by law; (b) the proceeding was authorized by the Board of Directors of the corporation or (c) such indemnification is provided by the corporation under the Idaho Business Corporation Act. (Idaho Code Section 30-1-5(a),(b)).

Section 11.2  **Other Officers, Employees and Agents**.  The corporation shall have the power to indemnify other officers, employees and other agents of the corporation or another enterprise as set forth in the Idaho Business Corporation Act.  (Idaho Code Section 30-1-5(a),(b)).

Section 11.3  **Good Faith**.  For purposes of any determination under this Bylaw, a director, officer, employee or other agent of the corporation or another enterprise shall be deemed to have acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, to have had no reasonable cause to believe that his conduct was unlawful, if his action is based on the records or books of account of the corporation or another enterprise, or on information supplied or reports made to him by the officers of the corporation or another enterprise in the course of their duties, or on the advice of legal counsel for the corporation or another enterprise or on information or records given or reports made to the corporation or another enterprise by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the corporation or another

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 19

Exhibit 4 - Page - 19

AIA000980

App. - J, p. 19

16-ER-3891

enterprise.  The provisions of this Section 11.3 shall not be deemed to be exclusive and/or to limit in any way the circumstances in which a person may be deemed to have met the applicable standard of conduct set forth by the Idaho Business Corporation Act.  (Idaho Code Sections 30-1-5(a),(b); 30-1-35).

Section 11.4 **Another Enterprise**.  The term "another enterprise" as used in this Article XI shall mean any other corporation, partnership, joint venture, trust or other enterprise, including any employee benefit plan, or which a person is or was serving at the request of the corporation as a director, officer, employee or other agent.  (Idaho Code Section 30-1-5(a),(b)).

Section 11.5 **Expenses**.  The corporation shall advance, prior to the final disposition of any proceeding, promptly following request therefor, all expenses incurred by any director, officer, or employee or other agent of the corporation or another enterprise in connection with such proceeding upon receipt of an undertaking by or on behalf of such person to repay said amount if it should be determined ultimately that such person is not entitled to be indemnified under this Article XI or otherwise.  (Idaho Code Section 30-1-5(e)).

Notwithstanding the foregoing, unless otherwise determined pursuant to Section 11.6, no advance shall be made by the corporation if a determination is reasonably and promptly made (a) by the Board of Directors by a majority vote of a quorum consisting of directors who were not parties to the proceeding, or (b) if such quorum is not obtainable or, even if obtainable, a quorum of disinterested directors so directs, by independent legal counsel in a written opinion that, based upon the facts known to the decision-making party at the time such determination is made, such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the best interests of the corporation, or, with respect to any criminal proceeding, such person believed or had reasonable cause to believe that his conduct was unlawful.  (Idaho Code Section 30-1-5(d)).

Section 11.6 **Enforcement**.  Without the necessity of entering into an express contract, all rights to indemnification and advances under this Article XI shall be deemed to be contractual rights and to be effective to the same extent and as if provided for in a contract between the corporation and the person who serves as a director, officer, employee or other agent of the corporation or another enterprise at any time while this Article XI and relevant provisions of the Idaho Business Corporation Act and other applicable law, if any, are in efefct.  Any right to indemnification or advances granted by this Article XI to any person shall be enforceable by or on behalf of the person holding such right in any court of competent jurisdiction if (a) the claim for indemnification or advances is denied, in whole or in part, or (b) no disposition of such claim is made within ninety (90) days of request therefor.  The claimant in such enforcement action, if successful in whole or in part, shall be entitled to be paid also the expense of prosecuting his claim.  It shall

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 20

Exhibit 4 - Page - 20

AIA000981

be a defense to any such action that the claimant has not met the standards of conduct which make it permissible under the Idaho Business Corporation Act for the corporation to indemnify the claimant for the amount claimed; but the burden of proving such defense shall be on the corporation. Neither the failure of the corporation (including its Board of Directors, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he has met the applicable standard of conduct set forth in the Idaho Business Corporation Act, nor an actual determination by the corporation (including its Board of Directors, independent legal counsel or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that claimant has not met the applicabe standard of conduct.

Section 11.7 **Non-exclusivity of rights.** The rights conferred on any person by this Article XI shall not be exclusive of any other right to which such person may now or hereafter be entitled under any statute, provision of the Articles of Incorporation, or Bylaws, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding office. The corporation is specifically authorized to enter into individual contracts with any or all directors, officers, employees or other agents of the corporation or another enterprise respecting indemnification and advances, as provided by law. (Idaho Code Section 30-1-5(f)).

Section 11.8 **Survival of rights.** The rights conferred on any person by this Article XI shall continue as to a person who has ceased to be a director, officer, employee or other agent of the corporation or another enterprise and shall inure to the benefit of the heirs, executors and administrators such a person. (Idaho Code Section 30-1-5(i)).

Section 11.9 **Amendments.** Any repeal or modification of this Article XI shall only be prospective and shall not affect the rights under this Article XI in effect at the time of the alleged occurrence of any action or omission to act that is the cause of any proceeding against any agent of the corporation or another enterprise.

Section 11.10 **Savings Clause.** If this Article XI of the Bylaws or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the corporation shall nevertheless indemnify each agent to the full extent permitted by any applicable portion of this Article XI that shall not have been invalidated, or by any other applicable law.

## ARTICLE XII

### NOTICES

Section 12.1 **Notice to Stockholders.** Whenever under any provision

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 21

Exhibit 4 - Page - 21  AA000982

App. - J, p. 21

16-ER-3893

of these Bylaws notice is required to be given to any stockholder, it shall be given in writing, timely and duly deposited in the United States mail, postage prepaid, and addressed to his last known post office address as shown by the stock transfer books of the corporation or its transfer agent or to such other last known address of which the corporation may have notice.   Such notice to any stockholder shall be deemed to be delivered when deposited in the United States mail in accordance with this Section 12.1.   (Idaho Code Section 30-1-29).

Section 12.2   **Notice to Directors**.   Any notice required to be given to any director may be given by the method stated in Section 12.1, or by telegram except that such notice other than one which is delivered personally shall be sent to such address as such director shall have filed in writing with the secretary, or, in the absence of such filing, to the last known post office address of such director.   (Idaho Code Section 30-1-43).

Section 12.3   **Address Unknown**.   If no address of a stockholder or director be known, notice may be sent to the office of the corporation required to be maintained pursuant to Section 1.1 hereof.

Section 12.4   **Affidavit of Mailing**.   An affidavit of mailing, executed by a duly authorized and competent employee of the corporation or its transfer agent appointed with respect to the class of stock affected, specifying the name and address or the names and addresses ot the stockholder or stockholders, or director of directors, to whom any such notice or notices was or were given, and the time and method of giving the same, shall be conclusive evidence of the statements therein contained.

Section 12.5   **Time Notices Deemed Given**.   All notices given by mail, as above provided, shall be deemed to have been given at the time of mailing; and all notices given by telegram shall be deemed to have been given at the sending time recorded by the telegraph company transmitting the notices.

Section 12.6   **Methods of Notice**.   The period or limitation of time within which any stockholder may exercise any option or right, or enjoy any privilege or benefit, or be required to act, or within which any director may exercise any power or right, or enjoy any privilege, pursuant to any notice sent him in the manner above provided, shall not be affected or extended in any manner by the failure of such stockholder or such director to receive such notice.

Section 12.7   **Failure to Receive Notice**.   The period or limitation of time within which any stockholder may exercise any option or right, or enjoy any privilege or benefit, or be required to act, or within which any director may exercise any power or right, or enjoy any privilege, pursuant to any notice sent him in the manner above provided, shall not be affected or extended in any manner by the failure of such stockholder or such director to receive such notice.

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 22

Exhibit 4 - Page - 22

AIA000983

Section 12.8 **Notice to Person with Whom Communication is Unlawful.** Whenever notice is required to be given, under any provision of law or of the Articles of Incorporation or Bylaws of the corporation, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. In the event that the action taken by the corporation is such as to require the filing of a certificate under any provision of the Idaho Business Corporation Act, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communications is unlawful.

Section 12.9 **Waiver of Notice.** Whenever any notice is required to be given to any stockholder or director of the corporation under the provisions of these Bylaws or under the provisions of the Articles of Incorporation or under the provisions of the Idaho Business Corporation, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. (Idaho Code Section 30-1-144).

## ARTICLE XIII

### AMENDMENTS

Section 13.1 **Amendments.** These Bylaws may be altered, amended or repealed and new Bylaws may be adopted by the Board of Directors or by the stockholders at any regular or special meeting.

## ARTICLE XIV

### LOANS TO DIRECTORS AND OTHERS

Section 14.1 **Certain Corporate Loans and Guaranties.** The corporation may make loans of money or property to, or guarantee the obligations of, or otherwise use its credit to assist any officer or other employee of the corporation, its parent or a subsidiary, including any such person who is also a director of the corporation or its parent or any subsidiary, or adopt any employee benefit plan or plans authorizing such loan, guaranties or other assistance, upon the approval of the Board of Directors alone if the Board of Directors determines that such a loan or guaranty or plan may reasonably be expected to benefit the corporation. In all other circumstances, the corporation shall not lend money or use its credit to assist its directors without authorization in the particular case by its stockholders. (Idaho Code Section 30-1-47).

NEW RESTATED BYLAWS OF
AIA SERVICES CORPORATION - P. 23

Exhibit 4 - Page - 23

AIA000984

App. - J, p. 23

16-ER-3895

Attorney Roster Search | State Bar                    https://isb.idaho.gov/licensing-mcle/attorney-roster-search/

<div style="border:1px solid; display:inline-block; padding:4px 12px;">Search again</div>

Results (as of 7/27/21)

### R. John Taylor

| | |
|---|---|
| Status | Senior |
| Admittance Date | 09/24/1976 |
| Firm | Green Leaf Alliance |
| Mailing Address | PO Box 538 |
| | Lewiston, ID 83501 |
| Phone | (208) 799-9012 |
| Phone Ext | |
| Fax | |
| Bar Email Address | johntaylor@greenleafalliance.com |
| Website Address | |
| Court eService Email | johntaylor@greenleafalliance.com |

### Need a correction?

Is something not correct? Please use the Address Change Form

The information above is based on the Idaho State Bar records as of the date listed above. To send us an update on your own listing, please use the online Address Change Form or send an email to the Licensing Department. Please notify the Licensing Department if you find that another attorney's information is incorrect. Questions on attorney status and good standing should also be directed to the Licensing Department at (208) 334-4500.

Current Status Definitions

### Disciplinary History

Contact the Bar Counsel's Office at (208) 334-4500 to request a disciplinary history on an attorney.

### Former Members

Information on former members of the Idaho State Bar is limited to name, admission date and status. The online records include former members going back to approximately 1994. Records on former members from before 1994 are not available online. Please contact the Licensing Department for more information on former members.

**App. - K, p. 1**

8/4/2021, 2:36 PM

**16-ER-3896**

Attorney Roster Search | State Bar                    https://isb.idaho.gov/licensing-mcle/attorney-roster-search/

⌂ **Home** (https://isb.idaho.gov/)  /  **Licensing & MCLE** (https://isb.idaho.gov/licensing-mcle/)  /  Attorney Roster Search

Attorney Roster Search

Type the last name or the beginning of the last name of the attorney you are trying to find. Use more letters to narrow your search. If you cannot find the attorney you are looking for, contact the Licensing Department at (208) 334-4500.

**Current Status Definitions** (https://isb.idaho.gov/licensing-mcle/membership-count-statuses/)

Search again

## Results (as of 7/27/21)

### Connie Wright Henderson

| | |
|---|---|
| Status | Active |
| Admittance Date | 09/23/1993 |
| | |
| Firm | The Henderson Taylor Law Firm |
| Mailing Address | 900 Washington Street, Ste. 1010 |
| | Vancouver, WA 98660 |
| | |
| Phone | (360) 737-1478 |
| Phone Ext | |
| Fax | (360) 397-1567 |
| | |
| Bar Email Address | connie@hlf-law.com |
| Website Address | www.hlf-law.com |
| Court eService Email | connie@hlf-law.com |

## Need a correction?

Is something not correct? Please use the Address Change Form

The information above is based on the Idaho State Bar records as of the date listed above. To send us an update on your own listing, please use the online Address Change Form or send an email to the Licensing Department. Please notify the Licensing Department if you find that another attorney's information is incorrect. Questions on attorney status and good standing should also be directed to the Licensing Department at (208) 334-4500.

Current Status Definitions

## Disciplinary History

Contact the Bar Counsel's Office at (208) 334-4500 to request a disciplinary history on an attorney.

## Former Members

Information on former members of the Idaho State Bar is limited to name, admission date and status. The online records include former members going back to approximately 1994. Records on former members from before 1994 are not available online. Please contact the Licensing Department for more information on former members.

**App. - L, p. 1**

**16-ER-3897**

Case 2:18-cv-00270-RMP   ECF No. 34   filed 03/28/19   PageID.1541   Page 1 of 20

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 28, 2019

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary, AIA Insurance Inc., <br><br> Plaintiff, <br><br> v. <br><br> JOHN D. MUNDING and KAREN MUNDING, married individuals and the community property comprised thereof; JOHN or JANE DOES 1-111, unknown individuals; MUNDING PS, a Washington professional services corporation; CRUMB & MUNDING PS, a Washington professional services corporation; AIA SERVICES CORPORATION, an Idaho corporation; and AIA INSURANCE INC., an Idaho corporation, <br><br> Defendants. | NO:  2:18-CV-270-RMP <br><br> ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE |

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND
DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 1

BEFORE THE COURT is a motion by Defendants John Munding, Karen Munding, Munding P.S., and Crumb and Munding P.S., the latter two Defendants being firms in which Mr. Munding is allegedly a shareholder (collectively the "Munding Defendants"), ECF No. 19. Also before the Court is Plaintiff Dale Miesen's motion to strike certain documents in the record, ECF No. 22. The Court heard oral argument from the parties, at which Roderick Bond appeared for Plaintiff and James King and Markus Louvier appeared for the Munding Defendants, and reviewed all briefing submitted by the parties as well as relevant authority. *See* ECF Nos. 19, 20, 22, 23, 24, 27, 28, and 30. Consequently, the Court is fully informed.

## BACKGROUND

Plaintiff Mr. Miesen is a minority shareholder of AIA Services Corporation ("AIA Services"). ECF No. 10 at 8, 10−11, 20. Defendant Mr. Munding is an attorney based in Spokane, Washington, who represented AIA Services and AIA Insurance, Inc. (collectively the "AIA Entities") in litigation in California. *Id.* at 37−38, 40, 43. Through his amended complaint, Mr. Miesen seeks to sue the Munding Defendants for legal malpractice in a derivative capacity on behalf of AIA Services and in a "double derivative" capacity on behalf of AIA Insurance, which Mr. Miesen alleges is a fully owned subsidiary of AIA Services. *Id.* at 4−5, 7−10; *see also* ECF No. 23 at 10−11. He also names as Defendants John or Jane Does I-III, "individuals, attorneys practicing law in . . . Washington [who] . . . along with

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 2

John D. Munding, also provided legal services and/or Crumb & Munding, P.S.[,]" and the AIA Entities.  ECF No. 1 at 6−8.

Plaintiff brings the following claims against "Defendants," without excluding any Defendant from the collective: breaches of fiduciary duties (Count 1); fraudulent concealment (Count 2); aiding and abetting in other parties' breaches of fiduciary duties and fraud (Count 3); legal malpractice (Count 4); violations of Washington Consumer Protection Act (Count 5); and declaratory judgment (Count 6).  ECF No. 10.

Plaintiff alleges that, prior to Mr. Munding's representation of the AIA Entities, AIA Insurance seated an improperly elected board of directors.  ECF No. 10 at 13.  Subsequently, the AIA Entities secured lines of credit ultimately totaling $10,000,000.00 from a "hard money" lender, GemCap Lending I, LLC ("GemCap").  *Id.* at 14−15.  When the loans went unpaid, GemCap sued the AIA Entities, and the AIA Entities hired Mr. Munding to represent them in that litigation.  *See id.* at 17.  That litigation resulted in entry of a judgment against AIA Entities "in excess of $12,000,000" pursuant to a settlement agreement.  *Id.* at 23.  Plaintiff asserts that Mr. Munding, in the course of his representation of the AIA Entities, committed malpractice, acted despite a conflict of interest, and breached fiduciary duties owed to the AIA Entities, including affirmative duties to disclose information to shareholders, and "aided and abetted" AIA Entities officers in breaching fiduciary duties.  *Id.* at 5−60.

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 3

Plaintiff characterizes this action as "a classic example of an attorney who placed his interests in earning fees above the interests of two of his clients, the AIA Entities, thereby committing numerous torts and violating numerous Rules of Professional Conduct ('RPC')." ECF No. 23 at 4 (underlining in original). Plaintiff summarizes the factual basis for his claims as follows:

> [T]he Defendants undertook to impermissibly represent the AIA Entities and other defendants when AIA Services and AIA Insurance (collectively herein the 'AIA Entities') had materially adverse interests to those of the Defendants' other clients and with full knowledge that the AIA Entities were being improperly operated. Rather than seeking to extricate the AIA Entities from any indebtedness under their unauthorized and illegal guarantees, the Defendants ignored their duties owed to the AIA Entities and allowed John Taylor to enter into an unauthorized and illegal Settlement Agreement, which was concealed from the AIA Entities and their shareholders.

ECF No. 23 at 4−5 (internal citations to Amended Complaint omitted).

**MOTION TO STRIKE**

As a preliminary matter, during oral argument the Court denied as moot Plaintiff's request to strike a declaration and exhibit that Defendants had filed contemporaneously with their motion to dismiss Plaintiff's initial complaint, ECF Nos. 8 and 9. The Court found the issue moot after Plaintiff filed his First Amended Complaint. *See* ECF No. 26. Those documents are not part of the record concerning Defendants' instant motion to dismiss Plaintiff's amended complaint.

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 4

Plaintiff also seeks to strike the "Declaration of John Munding," and attached exhibits, submitted by Defendants in support of their motion to dismiss, as well as portions of the motion to dismiss itself.  ECF Nos. 19, 20, and 22.

In resolving a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court normally confines its review to the complaint and does not consider extrinsic materials such as facts presented in briefs, affidavits, or discovery materials.  *In re American Continental Corp./Lincoln Sav. & Loan Securities, Litig.*, 102 F.3d 1524, 1537 (9th Cir. 1996), *reversed on other grounds sub nom Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).  Under Rule 12(d), subject to two exceptions set forth below, if "matters outside the pleadings are presented to and not excluded by the court," the Court must convert the motion to dismiss under Rule 12(b)(6) into a motion for summary judgment under Rule 56 and give "[a]ll parties . . . a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).

It is proper for a court to consider exhibits submitted with the complaint and documents whose contents are alleged in the complaint when their authenticity is not questioned.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).  In addition, a court may take judicial notice under Federal Rule of Evidence 201 of "matters of public record" without converting a motion to dismiss into a motion for summary judgment.  *Lee*, 250 F.3d at 689.  Court documents already in the public record and

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 5

documents filed in other courts are appropriate subjects of judicial notice. *Anderson v. Holder*, 673 F.3d 1089, 1094 n. 1 (9th Cir. 2012).  However, a court may not take judicial notice of a fact that is "subject to reasonable dispute." *Lee*, 250 F.3d at 689.

### Declaration of Plaintiff Mr. Munding

Defendants assert that the Court may consider Mr. Munding's declaration, ECF No. 20, in resolving the instant motion to dismiss because the declaration is "integral" to the claims raised by Plaintiff in the amended complaint.  ECF No. 27 at 9.

Although Mr. Munding's declaration adds detail and his own perspective regarding events referred to in Plaintiff's amended complaint, the contents of his declaration are not alleged in the amended complaint.  In addition, the Court cannot take judicial notice of the statements in the declaration because the accuracy of Mr. Munding's statements cannot be characterized as beyond dispute.  Therefore, the Court cannot consider the declaration without converting the motion to dismiss into a motion for summary judgment, which it declines to do.  Fed. R. Civ. P. 12(d).  Therefore, the declaration is stricken.

### Copy of California docket

Plaintiff objects to the Court taking judicial notice of the portions of the docket that Defendants submitted at Exhibit A, ECF No. 20-1, arguing that the entire docket should be submitted rather than a portion.  ECF No. 22 at 10.  Plaintiff also

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 6

disputes that the docket verifies the issuance of a final judgment in the Central District of California litigation, the purpose for which Defendants submitted it. *Id.*

Defendants maintain that the exhibit is admissible and argue that Plaintiff does not adequately expand upon any assertion that the exhibit is inauthentic, inaccurate, or inadmissible. ECF No. 27 at 10. As provided by Federal Rule of Evidence 106, "[i]f a party introduces all or part of a writing . . . , an adverse party may require the introduction . . . of any other part . . . that in fairness ought to be considered at the same time." The Court agrees that the partial copy of the docket from the Central District of California is inappropriate to consider at this time. Therefore, the Court strikes ECF No. 20-1 from the docket and does not consider it for purposes of resolving Defendants' motion to dismiss.

Copy of September 6, 2013 email from Plaintiff's counsel Mr. Bond regarding intervention in the California litigation; copy of minutes from California litigation; copy of August 13, 2014 email from Mr. Bond; and copy of January 13, 2016 email from Mr. Bond

With respect to the remaining attachments to Mr. Munding's declaration, ECF Nos. 20-2 through 20-5, Plaintiff disputes the authenticity and/or the admissibility of the documents and maintains that they should not be considered unless the motion to dismiss is converted into a summary judgment motion under Rule 12(d). Defendants argue that the documents are admissible on various grounds and posit that Plaintiff "does not explain to this Court why" he disputes the authenticity,

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 7

accuracy, and admissibility of the attached exhibits.  The Court concludes that the appropriate approach, short of converting Defendants' motion to dismiss into a motion for summary judgment, is to strike the exhibits at ECF Nos. 20-2, 20-3, 20-4, and 20-5 for falling outside of the narrow exceptions to Rule 12(d).  Therefore, the Court does not consider the exhibits for purposes of resolving Defendants' motion to dismiss.

<div align="center">Portions of Defendants' motion to dismiss</div>

Plaintiff argues that the Court should strike portions of Defendants' briefing that: "(1) is unsupported by authority; (2) exceeds the briefing page limits without having obtained prior approval; and (3) relies upon matters outside of the pleadings."  ECF No. 22 at 10.  Defendants' motion to dismiss exceeded the allowable page limit by one page.  LCivR 7(f); *see* ECF No. 19 (21-page memorandum).  The Court has discretion in deciding what it will consider in overlength briefs, and will not strike Defendants' motion to dismiss on the basis of submitting one page over the briefing length.

Plaintiff further argues that the portion of Defendants' motion arguing for application of res judicata should be stricken because Defendants rely on briefing submitted in litigation in the United States District Court, District of Idaho, submitted with Defendants' first motion to dismiss, and, therefore, allegedly "assert an additional 22 pages of briefing."  ECF No. 22 at 9 (referring to ECF No. 8-15).  The Court also declines to strike any portion of Defendants' motion on this basis.

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 8

However, the Court will not consider the exhibit submitted at ECF No. 8-15 as part of the record for the current motion because it was submitted in support of Defendants' first motion to dismiss, which, as discussed above, the Court already denied as moot, so it is not part of the current record.  *See* ECF No. 26.

Therefore, the Court grants in part, denies in part, and denies as moot in part Plaintiff's motion to strike as set forth above.

### MOTION TO DISMISS

The Munding Defendants move to dismiss Plaintiff's amended complaint on the grounds that: (1) Plaintiff states insufficient facts alleging antagonism to support aligning the AIA Entities solely as Defendants in this action, thereby failing to establish diversity jurisdiction; (2) the amended complaint includes an inadequate demand under Federal Rule of Civil Procedure 23.1; (3) the doctrine of res judicata precludes the instant lawsuit, based on Plaintiff's alleged failure to timely intervene in the California litigation; (4) the relevant statute of limitations, whether from Idaho, Washington, or California, bars any of Plaintiff's claims stating legal malpractice because Plaintiff instituted this action more than three years after the relevant judgment in the California litigation; and (5) Plaintiff deficiently pleaded his unfair or deceptive act or practice claim under the Washington Consumer Protection Act.  ECF Nos. 19 and 28.

/ / /

/ / /

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 9

***Legal Standards***

Defendants move to dismiss Plaintiff's amended complaint "pursuant to Fed. R. Civ. P. 12(b)(1), (3), (6), and 23.1[.]" ECF No. 19 at 2. "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . . ." Fed. R. Civ. P. 8(a)(2). A derivative complaint must "state with particularity":

> (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and
> (B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1(b)(3).

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when a complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted).

"All allegations of material fact in the complaint are taken as true and construed in the light most favorable to the plaintiff." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 937 (9th Cir. 2008). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and need not be accepted as true. *Iqbal*, 556 U.S. at 679 ("Rule 8 marks a notable and generous departure from the hypertechnical code-pleading regime of a

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 10

prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may challenge the plaintiff's jurisdictional allegations through either a "facial" or "factual" attack. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  A district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6), accepting plaintiff's allegations as true and drawing reasonable inferences in plaintiff's favor, to determine whether plaintiff's allegations are sufficient as a matter of law to establish jurisdiction.  *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013).  When a defendant instead raises a factual attack, contesting the truth of plaintiff's allegations, the court often looks to evidence outside of the pleadings. *Safe Air for Everyone*, 373 F.3d at 1039.  In any case, the party asserting subject matter jurisdiction bears the burden of proving its existence.  *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009).

### *Rule 23.1 Notice*

Rule 23.1 provides the pleading standard for derivative actions in federal court, requiring "any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members" to be stated with particularity.  *See Potter v. Hughes*, 546 F.3d 1051, 1056 (9th Cir. 2008).  However, the substantive rules for determining whether a plaintiff has satisfied that standard, and whether a pre-litigation demand should be excused

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 11

Case 2:18-cv-00270-RMP   ECF No. 34   filed 03/28/19   PageID.1552   Page 12 of 20

for futility, are a matter of state law.  *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  District courts must follow the substantive law, including choice-of-law rules, of the forum state.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  In Washington State, "[s]hareholder claims involving a corporation's internal affairs are governed by the law of the state in which the corporation was incorporated." *Rodriguez v. Loudeye Corp.*, 144 Wn. App. 709, 718 (Wash. Ct. App., Div. 1, 2008).  Consequently, this Court must follow Idaho law, because the AIA Entities are incorporated under Idaho law according to the amended complaint.  ECF No. 10 at 7−8.

Idaho law does not recognize a futility exception to the demand requirement. *Kugler v. Nelson*, 160 Idaho 408, 415 (Idaho 2016).  Rather "[n]o shareholder may commence a derivative proceeding until":

> (1) A written demand has been made upon the corporation to take suitable action; and
> (2) Ninety (90) days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the ninety (90) day period.

Idaho Code § 30-29-742.

Plaintiff's amended complaint recites that Plaintiff provided a "comprehensive written demand" to the "purported boards of directors of AIA Services and AIA Insurance" that the AIA Entities:

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 12

App. - M, p. 12

[p]ursue all possible claims and defenses, and seek the maximum damages, against . . . any other party or entity named in this derivative demand, including, without limitation, all possible tort claims (including, without limitation, aiding and abetting in the commission of torts against AIA), contract claims, declaratory relief, injunctive relief, and punitive damages based on all acts, omissions, concealments, and failure to disclose through the date of this letter and for the foregoing which continues past the date of this letter. Without limiting the foregoing and so there is no confusion (even though you are well aware of the facts, lawsuits and legal issues as having full access to information at AIA and the [sic] most of the Combined Defendants), more specific examples are included below and demand is hereby made to take action against those parties and any of the other Combined Defendants to recover damages based on any of such specific examples.

. . .

[p]ursue all possible claims against . . . any other persons or entities named in this derivative demand requiring them to disclose any and all agreements, deeds, deeds of trust, mortgages, settlements, settlement agreements and/or other instruments, whether oral or written, with GemCap or any of its agents or assigns, including, without limitation, any agreements and instruments relating in any way to any sums and/or property owed, borrowed, transferred and/or pledged or promised to GemCap[.]

. . .

[p]ursue all possible claims against . . . any other responsible party for all damages relating to all payments made directly or indirectly from AIA to the attorneys and law firm[] of . . . Crumb & Munding . . . and any other law firm (including for declaratory relief that no further sums are owed by AIA to any of the foregoing and that any fee agreements or conflict waivers are void), as such payments should never have been made, were never authorized by AIA, were not properly incurred or necessary for AIA, were never authorized by AIA's shareholders after full disclosure was made, and involved the attorneys and law firms taking action or performing work not in the best interests of AIA and/or in violation of the duty of loyalty owed to AIA. Demand is further made to pursue all possible claims, including, without limitation, for the disgorgement of all fees, costs and expenses paid or discharge of any debts allegedly owed, to any of the foregoing attorneys, law firms, and/or attorneys working at such law firms to the extent that they represented AIA based on conflicts of interest, breached fiduciary

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 13

duties (including the duty of loyalty), and malpractice. . . . In addition, demand is made to assert all possible claims against the foregoing parties for participating and/or allowing AIA to be improperly utilized to fund the defense and prosecution of lawsuits which were not in AIA's best interests, but were instead pursued based on the interests of the Controlling AIA Defendants.

. . .

[p]ursue all possible claims against John Munding and Crumb & Munding (or such other firm Mr. Munding is operating through) for malpractice, breach of fiduciary duties and to disgorge all attorneys' fees, costs and expenses paid to them directly or indirectly by AIA for the California Lawsuit as Mr. Munding intentionally violated his duties owed to AIA, including, without limitation, his duties of loyalty owed to AIA and by taking direction and action benefitting other defendants (including John's) and placing their interests in front of AIA and by representing CropUSA, AIA and other parties when there were conflicts of interest in doing so and Mr. Munding knew that he could not properly represent AIA's interests and when he had no intention of doing so. Demand is further made to pursue all possible claims against Mr. Munding and Crumb & Munding for improperly failing to assert that the guarantees and settlement agreements entered into by AIA were not authorized and were thus illegal or ultra-vires and by allowing AIA to enter into them in the first place. Mr. Munding places his interests in earning fees ahead of AIA's interests.

. . .

[p]ursue all possible claims against . . . any other parties identified above to recover any attorneys' fees and costs incurred in any lawsuit or litigation directly or indirectly involving AIA.

. . .

[t]o the extent that the conduct and claims discussed above continues after this derivative demand, to pursue all possible claims based on all future action based upon the same or similar acts, omissions, conduct, claims and damages.

*Id.* at 42−43.

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 14

Case 2:18-cv-00270-RMP   ECF No. 34   filed 03/28/19   PageID.1555   Page 15 of 20

and, in a second demand:

> [p]ursue all possible claims against . . . any and all of the parties listed above [(including John Munding, Crumb & Munding, or any law firm Mr. Munding may be operating through)] for concealing from AIA the facts, conflicts and failing to disclose all necessary facts and claims.

*Id.* at 44.

Defendants argue that it "is impossible to tell what legal claims are contemplated by the demand letter." ECF No. 19 at 7. The Court agrees that Plaintiff's derivative demands, as replicated in Plaintiff's amended complaint, do not sufficiently describe the "suitable action" to satisfy notice under Idaho Code § 30-29-742, that Plaintiff demanded that the AIA Entities take action on their own behalf. Each and every passage of the demand letters that Plaintiff included in his amended complaint, ostensibly to show statutory standing under Rule 23.1, states claims in terms of "all possible claims" or similarly generic, conclusory, language, rather than describing with particularity the claims for relief sought and the factual bases for those claims as required by Rule 23.1's pleading requirements. *See Shenk v. Karmazin*, 867 F.Supp.2d 379, 382 (S.D.N.Y. 2011) (interpreting Delaware law and Rule 23.1(b) to require a plaintiff to "state with particularity how he has identified the wrongdoers, wrongful acts, and harms on which he bases his demand for action."). Plaintiff argues that United States Magistrate Judge Candy Dale in the District of Idaho found "the same demand letters" to be sufficient. ECF No. 23 at 8. However, there are insufficient allegations before this Court to understand the

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 15

context of what that lawsuit entailed in comparison to the lawsuit here, and whether Judge Dale addressed the same demand language as is at issue here.

Accordingly, Plaintiff's amended complaint fails to provide specific information from which the Court can conclude that Plaintiff has established statutory standing under Rule 23.1.

### *Alignment*

Subject matter jurisdiction may be challenged "at any time," either by the parties or by the court sua sponte.  Fed. R. Civ. P. 12(h)(3).  For purposes of determining whether diversity of citizenship exists in a shareholder derivative lawsuit, the general rule is that a corporation is "properly realigned as a plaintiff since it is the real party in interest" and stands to benefit from the suit.  *Duffey v. Wheeler*, 820 F.2d 1161, 1163 (11th Cir. 1987) (citing *Koster v. (American) Lumbermans Mut. Casualty Co.*, 330 U.S. 518, 522–23 (1947)); *see also Diaz v. Davis (In re Digimarc Corp. Derivative Litig.)*, 549 F.3d 1223, 1234 (9th Cir. 2008).

However, a well-settled exception to the general rule applies when a corporation is "in antagonistic hands."  *Koster*, 330 U.S. at 523 (citing *Doctor v. Harrington*, 196 U.S. 579 (1905)).  The Supreme Court has recognized that antagonism is present "whenever the management is aligned against the stockholder and defends a course of conduct which [the stockholder] attacks."  *Smith v. Sperling*, 354 U.S. 91, 95 (1957).  "The [complaint] and answer normally determine whether the management is antagonistic to the stockholder."  *Id.* at 96.  To qualify as

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 16

**App. - M, p. 16**

**16-ER-3913**

"antagonistic" the corporation must do more than decline the remedies that the shareholder has demanded through his derivative demand. *See Diversity of citizenship, for purposes of federal jurisdiction, in stockholders' derivative action*, 68 A.L.R.2d 824 at *9a (West Group 2005).

Just as Plaintiff's Rule 23.1 demand was insufficiently pleaded, Plaintiff's jurisdictional allegations also fall short on the basis that they are conclusory and fail to offer "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. Plaintiff alleges only that the "purported boards of directors" of the AIA Entities "refused to take action" as demanded in Plaintiff's derivative demand letters. ECF No. 10 at 45. Plaintiff failed to point the Court to any authority supporting that declining to take the demanded action, alone, is enough to establish the corporation as antagonistic. The extensive authority reviewed by the Court supports otherwise. *See* 68 A.L.R.2d 824 at *9a (collecting cases). The Court finds that Plaintiff has not alleged sufficient factual matter to elucidate whether "'management is aligned against the stockholder and defends a course of conduct which he attacks,' *Smith*, 354 U.S. at 95, or merely where 'management—for good reasons or for bad—is definitely and distinctly opposed to the institution of [the derivative] litigation,' *Swanson [v. Traer* 354 U.S. 114, 116 (1957)]." *In re Digimarc Corp. Derivative Litig.*, 549 F.3d at 1235.

Plaintiff argues that diversity exists in this matter regardless of how the corporation is aligned. *See* ECF No. 23 at 10. However, a complaint that does not

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 17

allege with sufficient specificity information to determine proper alignment is untenable. *See Indianapolis v. Chase National Bank*, 314 U.S. 63, 69 (1941) ("Diversity jurisdiction cannot be conferred upon the federal courts by the parties' own determination of who are plaintiffs and who defendants. It is our duty, as it is that of the lower federal courts, to look beyond the pleadings and arrange the parties according to their sides in the dispute.") (internal quotation omitted). Therefore, the Court finds that Plaintiff's allegations are insufficient to determine proper alignment as a matter of law and to establish jurisdiction. *Pride*, 719 F.3d at 1133.

Subject matter jurisdiction is a threshold issue. *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007) (observing that "a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)."). Although the Court has serious concerns going to the merits of Plaintiff's claims, particularly whether the legal malpractice claim can survive the challenge of an expired statute of limitation or whether the legal malpractice claim is subject to the Washington Consumer Protection Act, the Court does not reach the numerous other arguments raised by Defendants in their motion to dismiss  because Plaintiff has not established subject matter jurisdiction.

At this stage, having determined that subject matter jurisdiction has not been established, dismissal without prejudice is appropriate. If this case is refiled, the Court encourages the parties to submit any future dispositive motions in a summary

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 18

judgment posture unless the parties intend for the Court's examination to rely solely on the complaint. *See* Fed. R. Civ. P. 56 and LCivR 56. In addition, the parties are instructed to refile any documents that they want the Court to consider in connection with any newly filed motion and not refer the Court to documents filed with dispositive motions that the Court previously resolved.

Accordingly, **IT IS HEREBY ORDERED**:

1.      Plaintiff's Motion to Strike, **ECF No. 22**, is **GRANTED IN PART, DENIED IN PART,** and **DENIED AS MOOT IN REMAINING PART**. The Court strikes and does not consider the declaration and exhibits that the Munding Defendants submitted in support of the motion to dismiss. ECF No. 20. However, the Court does not find a basis to strike portions of Defendant's motion to dismiss. ECF No. 19. The remaining documents that Plaintiff seeks to strike were submitted in response to Defendants' first motion to dismiss Plaintiff's original complaint, which the Court denied as moot after Plaintiff filed the amended complaint, and therefore are not part of the current record. *See* ECF Nos. 8, 9, and 26.

2.      Although the Court is not striking any portions of Defendants' motion to dismiss for failing to abide by the Local Rules, all counsel are directed to adhere to the mandates of the Local Civil Rules and the Federal Rules of Civil Procedure.

3.      The Munding Defendants' Motion to Dismiss, **ECF No. 19**, is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's claims are **dismissed**

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 19

**without prejudice** for insufficient pleading regarding federal jurisdiction and statutory standing to raise derivative claims.

**IT IS SO ORDERED**.  The District Court Clerk is directed to enter this Order and provide copies to counsel, and **close this case**.

**DATED** March 28, 2019.

_s/ Rosanna Malouf Peterson_
ROSANNA MALOUF PETERSON
United States District Judge

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S CLAIMS WITHOUT PREJUDICE ~ 20

**NOT FOR PUBLICATION**

# FILED

UNITED STATES COURT OF APPEALS

JUL 30 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc., | No.   19-35255 |
| Plaintiff-Appellant, | D.C. No. 2:18-cv-00270-RMP |
| v. | MEMORANDUM[*] |
| JOHN D. MUNDING, married individual and the community property comprised thereof; et al., | |
| Defendants-Appellees, | |
| and | |
| AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation, | |
| Defendants. | |

Appeal from the United States District Court
for the Eastern District of Washington
Rosanna Malouf Peterson, District Judge, Presiding

Submitted July 9, 2020[**]

---

[*]      This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

**App. - N, p. 1**

**16-ER-3918**

Seattle, Washington

Before:  FERNANDEZ and NGUYEN, Circuit Judges, and BOLTON,*** District Judge.

Plaintiff-Appellant Dale L. Miesen ("Mr. Miesen") is a minority shareholder of AIA Services Corporation ("AIA Services") seeking to assert claims related to legal malpractice against Defendant-Appellee John D. Munding ("Mr. Munding") in a derivative capacity on behalf of AIA Services and in a "double derivative" capacity on behalf of AIA Services' wholly owned subsidiary, AIA Insurance, Inc. ("AIA Insurance").  The district court dismissed Mr. Miesen's claims without prejudice and denied leave to amend after concluding that (1) it lacked subject-matter jurisdiction and (2) Mr. Miesen's two demand letters were insufficient under Federal Rule of Civil Procedure 23.1.  Mr. Miesen appeals.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.  Although the district court erred in concluding it lacked subject-matter jurisdiction, it correctly dismissed the Amended Complaint without prejudice and without leave to amend based on the insufficiency of the Rule 23.1 demand letters.

1. Diversity jurisdiction exists where an action is between "citizens of

---

** The panel unanimously concludes this case is suitable for decision without oral argument.  *See* Fed. R. App. P. 34(a)(2).

*** The Honorable Susan R. Bolton, United States District Judge for the District of Arizona, sitting by designation.

**App. - N, p. 2**

**16-ER-3919**

different States" and "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs."[1] 28 U.S.C. § 1332(a). Section 1332 requires "'complete diversity' of citizenship, meaning that 'the citizenship of each plaintiff is diverse from the citizenship of each defendant.'" *Demarest v. HSBC Bank USA, N.A.*, 920 F.3d 1223, 1226 (9th Cir. 2019) (quoting *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996)).

Complete diversity exists whether AIA Services and AIA Insurance (collectively, "AIA Entities") are aligned as plaintiffs or defendants. Mr. Miesen is a citizen of Texas. Mr. Munding, his wife, and his law firm are citizens of Washington. The AIA Entities are citizens of Idaho. Mr. Munding argues that because the Amended Complaint "designated [the AIA Entities] as plaintiffs and defendants," and because both AIA Entities are Idaho citizens, diversity jurisdiction is "destroy[ed]." But subject-matter jurisdiction is not destroyed because a corporation is listed on both sides of the caption in a derivative action. *See, e.g.*, *Arduini v. Hart*, 774 F.3d 622 (9th Cir. 2014) (case proceeded in diversity where corporation named on both sides); *Rosenbloom v. Pyott*, 765 F.3d 1137 (9th Cir. 2014) (same); *Larson v. Dumke*, 900 F.2d 1363 (9th Cir. 1990) (same). Mr. Munding cites no authority requiring a district court to determine party alignment where diversity of citizenship exists regardless of alignment.

---

[1] The parties do not dispute that the amount-in-controversy requirement is met.

**App. - N, p. 3**

**16-ER-3920**

Because the parties are completely diverse regardless of alignment, and the amount-in-controversy requirement is undisputedly met, the district court had subject-matter jurisdiction.

2. District court determinations regarding the demand requirement for derivative actions are reviewed for abuse of discretion. *Potter v. Hughes*, 546 F.3d 1051, 1056 (9th Cir. 2008). "A district court abuses its discretion when it applies an incorrect rule of decision, or when it applies the correct rule to factual conclusions that are 'illogical, implausible, or without support in the record.'" *Stetson v. Grissom*, 821 F.3d 1157, 1163 (9th Cir. 2016) (quoting *Rodriguez v. Disner*, 688 F.3d 645, 653 (9th Cir. 2012)). Conclusions of law are reviewed de novo. *Id.*

In his Amended Complaint, Mr. Miesen included excerpts of the two demand letters he sent to the boards of the AIA Entities. The Federal Rules of Civil Procedure required Mr. Miesen to "state with particularity . . . any effort . . . to obtain the desired action from the directors" and to establish that this demand was "adequate" under applicable state law. Fed. R. Civ. P. 23.1(b); *Potter*, 546 F.3d at 1055 (citing Fed. R. Civ. P. 23.1). Applicable state law required Mr. Miesen to make a "written demand . . . upon the corporation to take suitable action." Idaho Code § 30-29-742.

The district court correctly concluded that Mr. Miesen's letters, as excerpted

19-35255

**App. - N, p. 4**

**16-ER-3921**

in the Amended Complaint, did not make an adequate demand on the boards because it did not sufficiently describe the action he sought to have the boards take. Mr. Miesen's excerpted letters described his proposed claims in terms of "all possible claims" or similarly generic, conclusory language.  The letters failed to describe with particularity the claims for relief he sought or the factual bases for those claims.  Such language cannot have been expected to provide the boards with enough information to take "suitable action." Without knowing the factual bases for the claims, the boards could not determine the likelihood of the lawsuit's success and would have had difficulty weighing factors like the expenses involved in litigation or whether litigation would further the AIA Entities' general business interests.  These are considerations the boards were entitled to make.  *See Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 533 & n.9 (1984).  The district court did not abuse its discretion by dismissing Mr. Miesen's Amended Complaint for failure to meet Rule 23.1's pleading requirements.

3. A district court's denial of leave to amend is reviewed for abuse of discretion.  *Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112, 1114 (9th Cir. 2014).  After a party has amended a pleading once as a matter of course, the Federal Rules of Civil Procedure permit the party to further amend "only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

19-35255

**App. - N, p. 5**

**16-ER-3922**

Leave should be "freely give[n] . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).

Here, amendment would have been futile.  Mr. Miesen suggests that were he given leave to amend, he would "quote the entire letters or attach the letters to his amended complaint."  But the omitted portions of the letters are no more specific, nor any more relevant, than the excerpts included in the Amended Complaint. Because amendment could not have cured the deficiencies of the Amended Complaint, the district court did not abuse its discretion by denying Mr. Miesen's request for leave to amend.

**AFFIRMED.**

6                                        19-35255

# IDAHO CODE

CONTAINING THE

# GENERAL LAWS OF IDAHO

## ANNOTATED

———

ORIGINALLY PUBLISHED BY AUTHORITY OF
LAWS 1947, CHAPTER 224

REPUBLISHED BY AUTHORITY OF
LAWS 1949, CHAPTER 167 AS AMENDED

Compiled Under the Supervision of the
Idaho Code Commission

R. DANIEL BOWEN
JEREMY P. PISCA        ANDREW P. DOMAN
COMMISSIONERS

———

**TITLES 29-30**

# MICHIE

**App. - O, p. 1**

**16-ER-3924**

30-1-742                         CORPORATIONS                         152

(2) Fairly and adequately represents the interests of the corporation in enforcing the right of the corporation.

**History.**
I.C., § 30-1-741, as added by 1998, ch. 223, § 3, p. 766.

### JUDICIAL DECISIONS

**Lack of Standing.**
Creditor, who sued his debtors' attorneys, could not amend pursuant to Idaho R. Civ. P. 15(a) to assert derivative claims because he was not a shareholder of the debtor entities and, thus, lacked standing. Taylor v. McNichols, 149 Idaho 826, 243 P.3d 642 (2010).

### ABA OFFICIAL COMMENT

The Model Act and the statutes of many states have long imposed a "contemporaneous ownership" rule, i.e., the plaintiff must have been an owner of shares at the time of the transaction in question. This rule has been criticized as being unduly narrow and technical and unnecessary to prevent the transfer or purchase of lawsuits. A few states, particularly California, Cal. Corp. Code section 800(B) (West 1977 & Supp. 1989), have relaxed this rule in order to grant standing to some subsequent purchasers of shares in limiting circumstances.

The decision to retain the contemporaneous ownership rule in section 741(1) was based primarily on the view that it was simple, clear, and easy to apply. In contrast, the California approach might encourage the acquisition of shares in order to bring a lawsuit, resulting in litigation on peripheral issues such as the extent of the plaintiff's knowledge of the transaction in question when the plaintiff acquired the shares. Further, there has been no persuasive showing that the contemporaneous ownership rule has prevented the litigation of substantial suits, at least with respect to publicly held corporations where there are many persons who might qualify as plaintiffs to bring suit even if subsequent purchasers are disqualified.

Section 741 requires the plaintiff to be a shareholder and therefore does not permit creditors or holders of options, warrants, or conversion rights to commence a derivative proceeding.

Section 741(2) follows the requirement of Federal Rule of Civil Procedure 23.1 with the exception that the plaintiff must fairly and adequately represent the interests of the corporation rather than shareholders similarly situated as provided in the rule. The clarity of the rule's language in this regard has been questioned by the courts. See *Nolen v. Shaw-Walker Company*, 449 F.2d 506, 508 n.4 (6th Cir. 1972). Furthermore, it is believed that the reference to the corporation in section 741(2) more properly reflects the nature of the derivative suit.

The introductory language of section 741 refers both to the commencement and maintenance of the proceeding to make it clear that the proceeding should be dismissed if, after commencement, the plaintiff ceases to be a shareholder or a fair and adequate representative. The latter would occur, for example, if the plaintiff were using the proceeding for personal advantage. If a plaintiff no longer has standing, courts have in a number of instances provided an opportunity for one or more other shareholders to intervene.

**30-1-742.   Demand.** — No shareholder may commence a derivative proceeding until:

(1) A written demand has been made upon the corporation to take suitable action; and

(2) Ninety (90) days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the ninety (90) day period.

**History.**
I.C., § 30-1-742, as added by 1998, ch. 223, § 4, p. 766.

App. - O, p. 2

153        GENERAL BUSINESS CORPORATIONS        30-1-742

## JUDICIAL DECISIONS

ANALYSIS

Applicability.
Form of demand.

**Applicability.**

Where the actions of a corporation and its directors have an effect on an individual shareholder above and beyond the effect of every other shareholder and there is evidence that that shareholder may have been the target of a squeeze-out, an action by that shareholder may be an individual, not derivative, proceeding and not be governed by the notice requirement of this section. McCann v. McCann, 152 Idaho 809, 275 P.3d 824 (2012).

**Form of Demand.**

Merely sending of a letter to the president of the corporation or the service upon the corporation's attorney of a demand that the corporation take legal action in connection with a transaction complained of did not meet the demand requirement of this section to maintain a shareholder derivative action. McCann v. McCann, 138 Idaho 228, 61 P.3d 585 (2002).

Demand on the directors under this section need not assume a particular form nor include any special language; however, the stockholder had to make a sincere effort to induce the directors to take remedial action in the corporate name, and statements should have been presented to the directors showing the wrong complained of, accompanied by sufficient responsible data which would enable the directors to determine whether litigation could be engaged in with some hope of success. McCann v. McCann, 138 Idaho 228, 61 P.3d 585 (2002).

**Cited in:** Mannos v. Moss, 143 Idaho 927, 155 P.3d 1166 (2007).

## ABA OFFICIAL COMMENT

Section 742 requires a written demand on the corporation in all cases. The demand must be made at least 90 days before commencement of suit unless irreparable injury to the corporation would result. This approach has been adopted for two reasons. First, even though no director may be independent, the demand will give the board of directors the opportunity to re-examine the act complained of in the light of a potential lawsuit and take corrective action. Secondly, the provision eliminates the time and expense of the litigants and the court involved in litigating the question whether demand is required. It is believed that requiring a demand in all cases does not impose an onerous burden since a relatively short waiting period of 90 days is provided and this period may be shortened if irreparable injury to the corporation would result by waiting for the expiration of the 90-day period. Moreover, the cases in which demand is excused are relatively rare. Many plaintiffs' counsel as a matter of practice make a demand in all cases rather than litigate the issue whether demand is excused.

1. **FORM OF DEMAND.** Section 742 specifies only that the demand shall be in writing. The demand should, however, set forth the facts concerning share ownership and be sufficiently specific to apprise the corporation of the action sought to be taken and the grounds for that action so that the demand can be evaluated. See *Allison v. General Motors Corp.*, 604 F. Supp. 1106, 1117 (D. Del. 1985). Detailed pleading is not required since the corporation can contact the shareholder for clarification if there are any questions. In keeping with the spirit of this section, the specificity of the demand should not become a new source of dilatory motions.

2. **UPON WHOM DEMAND SHOULD BE MADE.** Section 742 states that demand shall be made upon the corporation. Reference is not made specifically to the board of directors as in pre-1998 section 740(2) since there may be instances such as a decision to sue a third party for an injury to the corporation, in which the taking of, or refusal to take, action would fall within the authority of an officer of the corporation. Nevertheless, it is expected that in most cases the board of directors will be the appropriate body to review the demand. To ensure that the demand reaches the appropriate person for review, it should be addressed to the board of directors, chief executive officer, or corporate secretary of the corporation at its principal office.

3. **THE 90-DAY PERIOD.** Section 742(2) provides that the derivative proceeding may not be commenced until 90 days after demand has been made. Ninety days has been chosen as a reasonable minimum time within which the board of directors can meet, direct the necessary inquiry into the charges, receive the results of the inquiry and make its decision. In many instances a longer period may be required. See, e.g., *Mozes v. Welch*, 638 F. Supp. 215 (D. Conn. 1986) (eight month delay in responding to demand not unreasonable). However, a fixed time period eliminates further litigation over what is or is not a reasonable time. The corporation may request counsel for the shareholder to delay filing suit until the inquiry is completed or, if suit is commenced, the corporation can apply to the court for a stay under section 743.

**App. - O, p. 3**

30-1-743                         CORPORATIONS                              154

Two exceptions are provided to the 90-day waiting period. The first exception is the situation where the shareholder has been notified of the rejection of the demand prior to the end of the 90 days. The second exception is where irreparable injury to the corporation would otherwise result if the commencement of the proceeding is delayed for the 90-day period. The standard to be applied is intended to be the same as that governing the entry of a preliminary injunction. Compare *Gimbel v. Signal Cos.*, 316 A.2d 599 (Del. Ch. 1974) with *Gelco Corp. v. Coniston Partners*, 811 F.2d 414 (8th Cir. 1987). Other factors may also be considered, such as the possible expiration of the statute of limitations, although this would depend on the period of time during which the shareholder was aware of the grounds for the proceeding. It should be noted that the shareholder bringing suit does not necessarily have to be the person making the demand. Only one demand need be made in order for the corporation to consider whether to take corrective action.

4. RESPONSE BY THE CORPORATION. There is no obligation on the part of the corporation to respond to the demand. However, if the corporation, after receiving the demand, decides to institute litigation or, after a derivative proceeding has commenced, decides to assume control of the litigation, the shareholder's right to commence or control the proceeding ends unless it can be shown that the corporation will not adequately pursue the matter. As stated in *Lewis v. Graves*, 701 F.2d 245, 247-48 (2d Cir. 1983):

> The [demand] rule is intended "to give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place, and thus to allow the directors the chance to occupy their normal status as conductors of the corporation's affairs." Permitting corporations to assume control over shareholder derivative suits also has numerous practical advantages. Corporate management may be in a better position to pursue alternative remedies, resolving grievances without burdensome and expensive litigation. Deference to directors' judgments may also result in the termination of meritless actions brought solely for their settlement or harassment value. Moreover, where litigation is appropriate, the derivative corporation will often be in a better position to bring or assume the suit because of superior financial resources and knowledge of the challenged transactions. [Citations omitted.]

**30-1-743.   Stay of proceedings.** — If the corporation commences an inquiry into the allegations made in the demand or complaint, the court may stay any derivative proceeding for such period as the court deems appropriate.

**History.**
I.C., § 30-1-743, as added by 1998, ch. 223, § 5, p. 766.

### ABA OFFICIAL COMMENT

Section 743 provides that if the corporation undertakes an inquiry, the court may in its discretion stay the proceeding for such period as the court deems appropriate. This might occur where the complaint is filed 90 days after demand but the inquiry into matters raised by the demand has not been completed or where a demand has not been investigated but the corporation commences the inquiry after the complaint has been filed. In either case, it is expected that the court will monitor the course of the inquiry to ensure that it is proceeding expeditiously and in good faith.

**30-1-744.   Dismissal.** — (1) A derivative proceeding shall be dismissed by the court on motion by the corporation if one (1) of the groups specified in subsection (2) or (6) of this section has determined in good faith after conducting a reasonable inquiry upon which its conclusions are based that the maintenance of the derivative proceeding is not in the best interests of the corporation.

(2) Unless a panel is appointed pursuant to subsection (6) of this section, the determination in subsection (1) of this section shall be made by:

(a) A majority vote of independent directors present at a meeting of the board of directors if the independent directors constitute a quorum;

**App. - O, p. 4**

---

> West's Annotated California Codes
>   Corporations Code (Refs & Annos)
>     Title 1. Corporations
>       Division 1. General Corporation Law (Refs & Annos)
>         Chapter 8. Shareholder Derivative Actions (Refs & Annos)

West's Ann.Cal.Corp.Code § 800

## § 800. Conditions; security; motion for order; determination

Currentness

(a) As used in this section, "corporation" includes an unincorporated association; "board" includes the managing body of an unincorporated association; "shareholder" includes a member of an unincorporated association; and "shares" includes memberships in an unincorporated association.

(b) No action may be instituted or maintained in right of any domestic or foreign corporation by any holder of shares or of voting trust certificates of the corporation unless both of the following conditions exist:

(1) The plaintiff alleges in the complaint that plaintiff was a shareholder, of record or beneficially, or the holder of voting trust certificates at the time of the transaction or any part thereof of which plaintiff complains or that plaintiff's shares or voting trust certificates thereafter devolved upon plaintiff by operation of law from a holder who was a holder at the time of the transaction or any part thereof complained of; provided, that any shareholder who does not meet these requirements may nevertheless be allowed in the discretion of the court to maintain the action on a preliminary showing to and determination by the court, by motion and after a hearing, at which the court shall consider such evidence, by affidavit or testimony, as it deems material, that (i) there is a strong prima facie case in favor of the claim asserted on behalf of the corporation, (ii) no other similar action has been or is likely to be instituted, (iii) the plaintiff acquired the shares before there was disclosure to the public or to the plaintiff of the wrongdoing of which plaintiff complains, (iv) unless the action can be maintained the defendant may retain a gain derived from defendant's willful breach of a fiduciary duty, and (v) the requested relief will not result in unjust enrichment of the corporation or any shareholder of the corporation; and

(2) The plaintiff alleges in the complaint with particularity plaintiff's efforts to secure from the board such action as plaintiff desires, or the reasons for not making such effort, and alleges further that plaintiff has either informed the corporation or the board in writing of the ultimate facts of each cause of action against each defendant or delivered to the corporation or the board a true copy of the complaint which plaintiff proposes to file.

(c) In any action referred to in subdivision (b), at any time within 30 days after service of summons upon the corporation or upon any defendant who is an officer or director of the corporation, or held such office at the time of the acts complained of, the corporation or the defendant may move the court for an order, upon notice and hearing, requiring the plaintiff to furnish a bond as hereinafter provided. The motion shall be based upon one or both of the following grounds:

---

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(1) That there is no reasonable possibility that the prosecution of the cause of action alleged in the complaint against the moving party will benefit the corporation or its shareholders.

(2) That the moving party, if other than the corporation, did not participate in the transaction complained of in any capacity.

The court on application of the corporation or any defendant may, for good cause shown, extend the 30-day period for an additional period or periods not exceeding 60 days.

(d) At the hearing upon any motion pursuant to subdivision (c), the court shall consider such evidence, written or oral, by witnesses or affidavit, as may be material (1) to the ground or grounds upon which the motion is based, or (2) to a determination of the probable reasonable expenses, including attorneys' fees, of the corporation and the moving party which will be incurred in the defense of the action. If the court determines, after hearing the evidence adduced by the parties, that the moving party has established a probability in support of any of the grounds upon which the motion is based, the court shall fix the amount of the bond, not to exceed fifty thousand dollars ($50,000), to be furnished by the plaintiff for reasonable expenses, including attorneys' fees, which may be incurred by the moving party and the corporation in connection with the action, including expenses for which the corporation may become liable pursuant to Section 317. A ruling by the court on the motion shall not be a determination of any issue in the action or of the merits thereof. If the court, upon the motion, makes a determination that a bond shall be furnished by the plaintiff as to any one or more defendants, the action shall be dismissed as to the defendant or defendants, unless the bond required by the court has been furnished within such reasonable time as may be fixed by the court.

(e) If the plaintiff shall, either before or after a motion is made pursuant to subdivision (c), or any order or determination pursuant to the motion, furnish a bond in the aggregate amount of fifty thousand dollars ($50,000) to secure the reasonable expenses of the parties entitled to make the motion, the plaintiff has complied with the requirements of this section and with any order for a bond theretofore made, and any such motion then pending shall be dismissed and no further or additional bond shall be required.

(f) If a motion is filed pursuant to subdivision (c), no pleadings need be filed by the corporation or any other defendant and the prosecution of the action shall be stayed until 10 days after the motion has been disposed of.

**Credits**
(Added by Stats.1975, c. 682, § 7, eff. Jan. 1, 1977. Amended by Stats.1976, c. 641, § 17, eff. Jan. 1, 1977; Stats.1982, c. 517, p. 2364, § 186.)

**Editors' Notes**

**LAW REVISION COMMISSION COMMENTS**

1982 Amendment

Section 800 is amended to delete provisions duplicated in the Bond and Undertaking Law. See Code Civ.Proc. §§ 996.010 (insufficient bond), 996.030 (reduced bond), 996.460 (judgment of liability), 995.710 (deposit in lieu of bond). The other changes in Section 800 are technical. [16 Cal.L.Rev.Comm. Reports 501 (1982)].

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**LEGISLATIVE COMMITTEE COMMENTS--ASSEMBLY**

1975 [Corrected]

Source: Cal. § 834. Under prior law a plaintiff in a shareholder derivative action must have been a shareholder of record at the time of the alleged wrong or the shares later devolved upon him by operation of law. To avoid the harsh results sometimes encountered in the application of this so-called "contemporaneous ownership" requirement, subdivision (b) relaxes that rule somewhat to give a shareholder standing to institute a derivative action where he acquires shares prior to disclosure of any alleged wrongdoing provided certain other conditions are satisfied.

Subdivision (b) also expressly authorizes a beneficial owner of shares to bring a derivative action since such a person's interest in the shares is essentially the same as that of a record owner.

Subdivision (d) changes prior law by increasing the total amount of security which a plaintiff may be required to furnish for reasonable expenses. This increase is intended to partially compensate for the effects of inflation since this provision was enacted.

Notes of Decisions (363)

West's Ann. Cal. Corp. Code § 800, CA CORP § 800
Current with all laws through Ch. 372 of 2020 Reg.Sess.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

App. - P, p. 3

16-ER-3930

Gary D. Babbitt, ISB No. 1486
D. John Ashby, ISB No. 7228
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone: (208) 344-6000
Facsimile: (208) 342-3829
Email: gdb@hteh.com
       jash@hteh.com

Attorneys for AIA Services Corporation,
AIA Insurance, Inc., and CropUSA
Insurance Agency, Inc

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT

OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | | |
|---|---|---|
| REED J. TAYLOR, a single person, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. CV-07-00208 |
| vs. | ) | |
| | ) | AIA'S PETITION FOR COURT |
| AIA SERVICES CORPORATION, an Idaho | ) | APPOINTED INDEPENDENT INQUIRY |
| corporation; AIA INSURANCE, INC., an | ) | PURSUANT TO I.C. § 30-1-743 AND |
| Idaho corporation; R. JOHN TAYLOR and | ) | I.C. § 30-1-744 AND FOR GRANT OF |
| CONNIE TAYLOR, individually and the | ) | PENDING MOTION TO STAY |
| community property comprised thereof; | ) | PROCEEDINGS |
| BRYAN FREEMAN, a single person; JOLEE | ) | |
| DUCLOS, a single person; CROP USA | ) | |
| INSURANCE AGENCY, INC., an Idaho | ) | |
| Corporation; and JAMES BECK and | ) | |
| CORRINE BECK, individually and the | ) | |
| community property comprised thereof, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| _____ | ) | |
| AIA SERVICES CORPORATION, an Idaho | ) | |

AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO
I.C. § 30-1-743 AND I.C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY
PROCEEDINGS - 1

40005 0006 1261375 4

**App. - Q, p. 1**

**16-ER-3931**

corporation; and AIA INSURANCE, INC., an )
Idaho corporation,                        )
                                          )
          Counterclaimants,               )
vs.                                       )
                                          )
REED J. TAYLOR, a single person,          )
                                          )
          Counterdefendant                )
                                          )
_____ )

Defendants AIA Services Corporation and AIA Insurance, Inc. (collectively, "AIA"), by and through their counsel of record, move this Court to for an order (1) appointing, pursuant to Idaho Code Section 30-1-744(6), an independent person/panel to make a determination whether the maintenance of a derivative proceeding against AIA's defense counsel and other defendants' counsel is in the best interests of the two corporations and other defendants' counsel, as more particularly explained below; and (2) granting AIA's motion, previously filed on July 23, 2008, to stay all proceedings in this case until the independent inquiry under Idaho Code Section 30-1-744(6) has been completed and the issues concerning legal representation of the two corporations have been fully resolved.  This motion is based on the Affidavit of Gary D. Babbitt in Support of Motion for Stay previously filed on July 23, 2008 and the Affidavit of Gary D. Babbitt filed contemporaneously with this motion.

**Independent inquiry into purportedly derivative claims.**  In connection with the Motion for Stay of Proceedings previously filed on July 23, 2008, AIA advised the Court of the circumstances involving AIA's receipt of a July 21, 2008 letter from attorney Michael S. Bissell purportedly under Idaho Code Section 30-1-742 demanding, on behalf of Donna Taylor and Reed Taylor, that the boards of directors of the two corporations, who are defendants in this lawsuit brought by Reed J. Taylor, take action against the corporations' defense counsel and

AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO I.C. § 30-1-743 AND I.C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY PROCEEDINGS - 2

40005 0006 1261375 4

**App. - Q, p. 2**

**16-ER-3932**

other attorneys involved in this case for alleged malpractice, violation of the Idaho Rules of Professional Conduct, breach of fiduciary duties, and "aiding and abetting" the defendants in various transactions and/or the handling of the defense of this litigation. Pursuant to Idaho Code Section 30-1-742 and Rule 23(f) of the Idaho Rules of Civil Procedure, the demand letter is a condition precedent to commencement of a derivative action by Donna Taylor and Reed Taylor on behalf of the corporations.

This petition is being filed at this time in compliance with the Court's Order dated July 25, 2008 and filed July 28, 2008 that, within the next twenty (20) days, counsel for AIA shall notify the Court in the event that the corporations undertake an inquiry pursuant to Idaho Code Section 30-1-743 into the demand submitted by Reed Taylor and Donna Taylor via Mr. Bissell's July 21, 2008 letter. The boards of directors of the two corporations met on August 7, 2008 and considered how to respond to that demand. The boards concluded that, because Reed Taylor has sued all present directors of AIA Services Corporation and AIA Insurance, Inc., there are no independent directors serving on the corporations' boards of directors; and the corporations are therefore unable to appoint independent directors to conduct a good faith reasonable inquiry as contemplated by Idaho Code Section 30-1-744(2)(a) or (b). Accordingly, the boards of directors of AIA Services Corporation and AIA Insurance, Inc. directed their counsel of record to petition the Court to appoint, pursuant to Idaho Code Section 30-1-744(6), an independent person/panel to conduct in good faith a reasonable inquiry into the claims made in Mr. Bissell's letter and to determine whether maintenance of a derivative proceeding by Donna Taylor and Reed Taylor on behalf of the two corporation is in the best interest of the two corporations.

AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO I.C. § 30-1-743 AND I.C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY PROCEEDINGS - 3

40005.0006.1261375.4

**App. - Q, p. 3**

**16-ER-3933**

Accordingly, AIA hereby requests that this Court's appoint, pursuant to Idaho Code Section 30-1-744(6), an independent person/panel to conduct an inquiry and make a determination whether the maintenance of a derivative proceeding against counsel for the defendants is in the best interests of AIA Services Corporation and AIA Insurance, Inc. In particular, AIA suggests that the Court appoint the Honorable Ronald Schilling (retired), or the Honorable George R. Reinhardt (retired), or such other independent retired judge or lawyer as the Court, in its discretion, deems qualified to conduct the inquiry and make the determination contemplated by Idaho Code Section 30-1-744

**Motion for Stay of Proceedings.** The allegations against defense counsel set forth in Mr. Bissell's letter and the action that Donna and Reed Taylor demand be taken by the two corporations would directly pit the AIA entities against their attorneys of record in this case As a result, until the propriety of the threatened derivative action is resolved by the independent person/panel appointed by the Court, the ability of AIA's chosen lawyers to represent the defendant corporations is potentially compromised. By merely submitting the demand, Plaintiffs' co-counsel has manufactured the appearance of a conflict of interest between client and clients' chosen attorneys without having proven a single allegation Moreover, Plaintiff's counsel Roderick C. Bond has notified defendants that Reed Taylor will seek to disqualify all defense counsel in this case (except Dave Gittins), presumably on the same grounds as alleged by his co-counsel in the July 21, 2008 demand letter.

Accordingly, in order to protect the rights of AIA Service Corporation and AIA Insurance, Inc. to be represented by their chosen defense attorneys in this case, AIA requests that the Court grant AIA's previously filed motion for a stay of all proceedings in this action until the

AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO I.C. § 30-1-743 AND I.C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY PROCEEDINGS - 4

40005 0006 1261375 4

**App. - Q, p. 4**

**16-ER-3934**

statutory inquiry and determination contemplated by Idaho Code Sections 30-1-744(6) have been completed and the status of AIA's counsel of record in this case has been resolved.

DATED THIS __14__ day of August, 2008.

HAWLEY TROXELL ENNIS & HAWLEY LLP

By _____
Gary D. Babbitt, ISB No. 1486
Attorneys for AIA Services Corporation,
AIA Insurance, Inc., and CropUSA

AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO
I.C. § 30-1-743 AND I.C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY
PROCEEDINGS - 5

40005.0006.1261375.4

**App. - Q, p. 5**

**16-ER-3935**

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this **14** day of August, 2008, I caused to be served a true copy of the foregoing AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO I.C. § 30-1-743 AND I.C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY PROCEEDINGS by the method indicated below, and addressed to each of the following:

Roderick C. Bond
Ned A. Cannon
Smith, Cannon & Bond PLLC
508 Eighth Street
Lewiston, ID 83501
[Attorneys for Plaintiff]

_____ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
_____ Telecopy
__✔ Email

Michael S. Bissell
Campbell, Bissell & Kirby, PLLC
416 Symons Building
7 South Howard Street
Spokane, WA 99201
[Attorneys for Plaintiff]

_____ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
__✔ Email

David A. Gittins
Law Office of David A. Gittins
P.O. Box 191
Clarkston, WA 99403
[Attorney for Defendants Duclos and Freeman]

_____ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
_____ Telecopy
✔ Email

Michael E. McNichols
Clements Brown & McNichols
321 13th Street
Lewiston, ID 83501
[Attorneys for Defendant R. John Taylor]

_____ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
_____ Telecopy
✔ Email

Jonathan D. Hally
Clark & Feeney
P.O. Box 285
Lewiston, ID 83501
[Attorneys for Defendants Connie Taylor, James Beck and Corrine Beck]

_____ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
_____ Telecopy
✔ Email

AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO I.C. § 30-1-743 AND I.C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY PROCEEDINGS - 6

40005 0006 1261375 4

**App. - Q, p. 6**

**16-ER-3936**

James J. Gatziolis
Charles E. Harper
QUARLES & BRADY LLP
500 West Madison Street, Suite 3700
Chicago, Illinois 60661-2511
[Attorneys for Crop USA Insurance]

_____ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
_____ Telecopy
__✔__ Email

Gary D. Babbitt

AIA'S PETITION FOR COURT APPOINTED INDEPENDENT INQUIRY PURSUANT TO
I.C. § 30-1-743 AND I.C. § 30-1-744 AND FOR GRANT OF PENDING MOTION TO STAY
PROCEEDINGS - 7

40005 0006 1261375 4

**App. - Q, p. 7**

**16-ER-3937**

FILED

2008 FEB 1 PM 12 57

PATTY O. WEEKS
CLERK OF THE DIST. COURT
DIANE ASH
DEPUTY

RODERICK C. BOND
NED A. CANNON, ISB #2331
SMITH, CANNON & BOND PLLC
508 8th Street
Lewiston, Idaho 83501
Telephone: (208) 743-9428
Fax: (208) 746-8421
Attorneys for Plaintiff Reed J. Taylor

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE STATE OF
IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

REED J. TAYLOR, a single person,

              Plaintiff,

    v.

AIA SERVICES CORPORATION, an
Idaho corporation; AIA INSURANCE,
INC., an Idaho corporation; R. JOHN
TAYLOR and CONNIE TAYLOR,
individually and the community property
comprised thereof; BRYAN FREEMAN,
a single person; JOLEE DUCLOS, a single
person; CROP USA INSURANCE
AGENCY, INC., an Idaho Corporation; and
JAMES BECK and CORRINE BECK,
individually and the community property
comprised thereof;

              Defendants.

Case No.: CV-07-00208

FIFTH AMENDED COMPLAINT

Plaintiff Reed J. Taylor submits this Fifth Amended Complaint against the Defendants

alleging as follows:

FIFTH AMENDED COMPLAINT – 1



EXHIBIT
A

App. - R, p. 1

## I. PARTIES, JURISDICTION AND VENUE

1.1     Plaintiff Reed J. Taylor ("**Reed**") is a single person and a resident of Lewiston, Nez Perce County, Idaho.

1.2     Defendant AIA Services Corporation ("**AIA Services**") is an Idaho corporation with its principal place of business located in Lewiston, Nez Perce County, Idaho.

1.3     Defendant AIA Insurance, Inc. ("**AIA Insurance**") is an Idaho corporation with its principal place of business is located in Lewiston, Nez Perce County, Idaho.  AIA Insurance is a wholly owned subsidiary of AIA Services.

1.4     Defendant Connie Taylor ("**Connie**") is a single person residing in Lewiston, Nez Perce County, Idaho.

1.5     Defendants R. John Taylor and Connie Taylor, were husband and wife until on or about December 16, 2005 (collectively "**John**"), and at all relevant times were residents of Lewiston, Nez Perce County, Idaho.  All references to "**John**" are for acts, omissions, claims, causes of action, damages, and/or liabilities that accrued on or before December 16, 2005, are for John individually, and were also performed on behalf of R. John Taylor and Connie Taylor's marital community (which benefited from R. John Taylor's acts and/or omissions) as to divided and undivided community property.  All references to "**John**" for acts, omission, claims, causes of action, damages, and/or liabilities that accrued after December 16, 2005, are for John individually and pertain to Connie as to their divided and undivided community property, including, without limitation, community property in which Reed is requesting to be awarded.

1.6     Defendant JoLee Duclos ("**Duclos**") is a single person residing in Clarkston, Washington.

///

FIFTH AMENDED COMPLAINT – 2

1.7    Defendant Bryan Freeman ("**Freeman**") is a single person residing in Lewiston, Nez Perce County, Idaho.

1.8    Defendant Crop USA Insurance Agency, Inc. ("**Crop USA**") is an Idaho corporation, with its principal place of business located in Lewiston, Nez Perce County, Idaho.

1.9    Defendant James Beck and Corrine Beck (individually and collectively "**Beck**") are residents of the state of Minnesota. All references to "Beck" are for acts, omissions, claims, causes of action, damages, and/or liabilities that accrued are for James Beck individually, and were also performed on behalf of James Beck and Corrine Beck's marital community (which benefited from James Beck's acts and/or omissions) and pertain to Corrine Beck as to damages, acts and/or omissions on behalf of their community and as to all community property, including, without limitation, community property Reed is seeking to be awarded.

1.10    The District Court has jurisdiction over this matter under I.C. § 1-705.

1.11    Venue is proper in the District Court of the Second Judicial District, Nez Perce County pursuant to I.C. § 5-404.

## II. FACTUAL BACKGROUND

2.1    John, was at all relevant times, an officer and director of AIA Services, AIA Insurance, and Crop USA. During the certain relevant times in which John was a director and officer of AIA Insurance, AIA Services and Crop USA, he owed fiduciary duties to Reed as the single largest creditor of AIA Insurance and AIA Services.    John and Connie are the majority shareholders in AIA Services and own approximately 40% of the outstanding shares of Crop USA, specifically 4,645,000 shares as of July 31, 2006.

2.2    R. John Taylor and Connie were divorced through an Interlocutory Decree filed on December 16, 2005, under which only a portion of their community assets were divided and

FIFTH AMENDED COMPLAINT – 3

other property remained undivided. This action includes, but is not limited to, acts, omissions, transactions, debts, claims, and/or causes of action which accrued prior to R. John Taylor and Connie's dissolution. All references to "**John**" in this Complaint are for, but not limited to, claims, causes of action, breaches of duties, fraud, acts, omissions and liabilities incurred by R. John Taylor on behalf of the marital community of R. John Taylor and Connie, together with their community property, whether divided or not through the effective date of their dissolution decree entered on or about December 16, 2005. Reed is requesting and entitled to be awarded shares of stock and property jointly owned by R. John Taylor and Connie.

2.3 After the effective date of R. John Taylor and Connie Taylor's decree of dissolution, all references to "**John**" in this Complaint are for claims, breaches of duties, acts, omissions and/or liabilities incurred by John individually. One of the reasons Connie is named as a party in this action for her liabilities and/or derivative liability by virtue of her marriage to John and her interest in the community property of the marriage (including all divided and undivided community property of their marriage for which Reed is requesting to be awarded through a constructive trust) all of which is subject to liability for the allegations in this Complaint of the acts, breaches of duties, claims, omissions, and conduct of John on and prior to December 16, 2005.

2.4 During the certain relevant times that Connie was a director of AIA Insurance and AIA Services, she owed fiduciary duties to Reed as the single largest creditor of AIA Services. Connie is also individually liable for all claims, breaches of duties, acts, omissions and/or liabilities during certain relevant times in which she was a member of the board of directors of AIA Services and AIA Insurance.

///

FIFTH AMENDED COMPLAINT – 4

**App. - R, p. 4**

2.5     Duclos is, and was at certain relevant times, an officer and director of AIA Services, AIA Insurance, and Crop USA. Duclos is a shareholder in AIA Services and Crop USA. During the certain relevant times that Duclos was a director and officer of AIA Insurance and AIA Services, she owed fiduciary duties to Reed as the single largest creditor of AIA Services.

2.6     Freeman is, and was at certain relevant times, a director and/or officer of AIA Services, AIA Insurance, and Crop USA. Freeman is a shareholder in AIA Services and Crop USA. During the certain relevant times that Freeman was a director of AIA Insurance and AIA Services, he owed fiduciary duties to Reed as the single largest creditor of AIA Services.

2.7     Crop USA was formed and operated using AIA Services and AIA Insurance's assets, funds, employees, office space, trade secrets, business relationships, equipment, good will, reputation, financial wherewithal (including loan guarantees), and other assets. But for AIA Insurance's assets, trade secrets, reputation and relationships, Crop USA would never have been formed and operated. Since Crop USA's formation, funds were inappropriately loaned and/or transferred back and forth from AIA Services and/or AIA Insurance to and from Crop USA and other entities partially owned by John and/or Connie.

2.8     John and Connie own approximately 40% of Crop USA, which also remained undivided community property at the time Reed filed his original Complaint.

2.9     Beck is a shareholder in AIA Services and Crop USA and acquired Crop USA shares from the inappropriate and/or unlawful conversation of their Preferred C Shares of AIA Services to shares of Crop USA. During the certain relevant times that Beck was a member of the board of directors boards of AIA Insurance, AIA Services and/or Crop USA, he owed fiduciary duties to Reed as the single largest creditor of the corporations. During certain relevant

FIFTH AMENDED COMPLAINT – 5

**App. - R, p. 5**

times, Beck was a member of the boards for Crop USA, AIA Insurance, and/or AIA Services and directed, consented, approved and/or acquiesced in inappropriate and/or unlawful corporate activities at AIA Insurance, AIA Services and/or Crop USA.

2.10   Reed was the founder and majority shareholder of AIA Services.  In 1995, John desired to redeem Reed's 613,494 shares of common stock in AIA Services through a stock redemption agreement.  Upon the closing of the transaction of AIA Services' redemption of Reed's shares, John became the majority shareholder in AIA Services.

2.11   AIA Insurance, a subsidiary of AIA Services, is wholly owned by AIA Services and where virtually all of AIA Services' revenues are derived and was the basis for security interests provided to Reed.  AIA Insurance is lessee of the office building located at 111 Main Street, Lewiston, Idaho.

2.12   On or about July 22, 1995, AIA Services and Reed entered into a Stock Redemption Agreement, Stock Pledge Agreement, and Security Agreement.  Under the terms of the Stock Redemption Agreement and related agreements, AIA Services agreed to execute promissory note to timely pay Reed $1,500,000 Million in 90 days ("**Down Payment Note**") and $6,000,000, plus accrued interest due and payable monthly at the rate of 8¼% per annum ("**Promissory Note**").

2.13   The Promissory Note was executed by John on behalf of AIA Services on or about August 1, 1995. Under the terms of the Promissory Note, AIA Services was required to timely pay all accrued interest monthly to Reed and the principal amount of $6,000,000, plus all accrued but unpaid interest was due and payable on August 1, 2005.   Donna Taylor, the holder of the Series A Preferred Shares in AIA Services, subordinated all of her rights to payment of the redemption of her shares in favor of Reed.  Through the date of Reed's Complaint, AIA Services

FIFTH AMENDED COMPLAINT – 6

App. - R, p. 6

had not timely and properly paid all sums owed to Donna Taylor.

2.14    Under the terms of the Stock Redemption Agreement, AIA Services and AIA Insurance also agreed to contemporaneously execute a Security Agreement and Stock Pledge Agreement, among other agreements and documents. The Stock Redemption Agreement, Stock Pledge Agreement, and Security Agreement were all either authorized by the Board of Directors of AIA Services and/or AIA Insurance and/or approved by a shareholder vote.

2.15    When AIA Services was unable to comply with the Stock Redemption Agreement, Stock Pledge Agreement, and Security Agreement, John, on behalf of AIA Services and AIA Insurance, entered into negotiations with Reed regarding restructuring the obligations. In 1996, AIA Services, AIA Insurance and Reed agreed to modify the Stock Redemption Agreement and executed the Stock Redemption Restructure Agreement ("**Restructure Agreement**"). Contemporaneously with the execution of the Restructure Agreement, the parties executed the Amended and Restated Stock Pledge Agreement ("**Amended Stock Pledge Agreement**") and Amended and Restated Security Agreement ("**Amended Security Agreement**").

2.16    Under the terms of the Restructure Agreement, the terms of the Promissory Note remained unchanged and were not modified (including the $6,000,000 principal amount, due date, and required monthly interest payments). Under the terms of the Amended Security Agreement, Reed received a security interest in all of AIA Services and AIA Insurance's commissions and related services (and all proceeds thereof), and AIA Services and AIA Insurance were required to have a Lock Box for all commissions for the protection and benefit of Reed.

///

FIFTH AMENDED COMPLAINT – 7

**App. - R, p. 7**

2.17    Under the terms of the Amended Stock Pledge Agreement, AIA Services pledged all of the outstanding shares in AIA Insurance to Reed as partial security for AIA Services' indebtedness to Reed under the Promissory Note, Restructure Agreement, and Amended Security Agreement. Under the terms of the Amended Stock Pledge Agreement, AIA Services' failure to timely pay Reed interest or principal under the Promissory Note or the Down Payment Note constituted an Event of Default. In an Event of Default for failure to timely pay interest or principal under the Promissory Note, AIA Services' insolvency, or AIA Services' failure to maintain the required Lock Box (among other Events of Default), AIA Services' right to vote the pledged shares of AIA Insurance ceased and terminated and vested exclusively in Reed.

2.18    Under the terms of the Amended Stock Pledge Agreement, AIA Services and/or AIA Insurance owed Reed continuing contractual obligations, including, without limitation, the obligation that Reed was required to be a member of the board of directors of AIA Services until Reed was paid in full or sufficient security was posted to ensure the payment of the Promissory Note. AIA Services never posted bonds or other security for the payment of the Promissory Note. AIA Services, John, Duclos, Freeman, Connie, and/or Beck have intentionally refused to appoint Reed to the Board of AIA Services as required and/or unilaterally created new conditions upon which Reed's appointment would be based. A new right to be a member of the board of AIA Services is created every year as directors are required to be elected yearly under the Bylaws of AIA Services. Despite Reed's demands and AIA Services' continuing contractual obligations to keep Reed on the board of directors, AIA Services, John, Duclos, Freeman, Connie, and/or Beck have refused to appoint Reed to the Board of Directors of AIA Services as required. Because Reed has not been on the Board of AIA Services as required, all actions taken by AIA Services' board were not properly authorized and, therefore, not ratified by AIA

FIFTH AMENDED COMPLAINT – 8

Services; and such acts are the personal actions of John, Duclos, Freeman, Connie, and/or Beck during their tenure on the board of AIA Services.

2.19    Under the Amended Stock Pledge Agreement, AIA Services had continuing contractual obligations to not loan money to any affiliate other than a wholly owned subsidiary. AIA Services has loaned money on countless occasions to and/or lent other services, office space or benefits to affiliates and other parties in violation of the Amended Stock Pledge Agreement, and such loans or benefits were made during times in which John, Duclos, Freeman, Connie, and/or Beck were board members of AIA Services and/or AIA Insurance.  In addition, the Amended Articles of Incorporation of AIA Services prevents it or any of its subsidiaries (including, without limitation, AIA Insurance), from guaranteeing the loans of any other entity that is not a wholly owned subsidiary of AIA Services.

2.20    The Promissory Note required monthly interest payments with an acceleration clause if payments were not timely or properly made to Reed.  The acceleration clause requires written notice from Reed to AIA Services of default and AIA Services would be entitled to a five day opportunity to cure before Reed could exercise his rights under the Amended Stock Pledge Agreement or Amended Security Agreement.  The obligations owed to Reed under the Promissory Note are independent of any other obligations owed by the Defendants and secured by the Restructure Agreement, Amended Stock Pledge Agreement and Amended Security Agreement.

2.21    During relevant times, the fair-market value of AIA Services and AIA Insurance was less than the aggregate amount of their total debts, which constitutes AIA Services and AIA Insurance's insolvency. During relevant times, AIA Services and/or AIA Insurance were unable to pay their debts as they became due (including, without limitation, debts to Reed and Donna

FIFTH AMENDED COMPLAINT – 9

Taylor), which also constitutes AIA Services insolvency and AIA Insurance's insolvency.

2.22   During all relevant times, Reed was the largest and most significant creditor of AIA Services. Because AIA Services has failed to timely and properly pay creditors as required during certain relevant times and/or was insolvent, John, Duclos, Freeman, Connie, and/or Beck owed fiduciary duties to creditors, specifically Reed because of his status as AIA Services' largest and most significant creditor.

2.23   The value of AIA Services and AIA Insurance's assets (including, without limitation, if both corporations are sold and/or their assets independently sold) at the time Reed filed his original Complaint was insufficient to pay Reed the $6,000,000, plus prejudgment interest in excess of $2,000,000 owed to him. The value of AIA Services and AIA Insurance's assets (including if both corporations are sold) for at least 7 years of time preceding the time Reed filed his original Complaint was insufficient to pay Reed the $6,000,000 principal, plus prejudgment interest owed to him.

2.24   During certain relevant times, AIA Services and/or AIA Insurance were in default of various provisions of the agreements with Reed, insolvent and/or unable to timely pay its debts to Reed and/or other creditors, including Donna Taylor. During certain relevant times, AIA Services has failed to comply with the terms of the Promissory Note.

2.25   Instead of paying Reed as required, AIA Services, AIA Insurance, Crop USA, John, Duclos, Connie, Beck, and/or Freeman utilized funds that Reed had a security interest in to make investments in, transfer assets to, or loan money to, or provide services on behalf of Crop USA, John and/or entities operated and/or partially owned by John, Connie, Beck, Freeman, Duclos, and/or one or more of the other Defendants.

///

FIFTH AMENDED COMPLAINT – 10

2.26    On or about December 12, 2006, Reed provided AIA Services written notice of default under various provisions of the Restructure Agreement, Amended Stock Pledge Agreement, and Amended Security Agreement, including, without limitation, AIA Services' failure to pay principal and interest due under the Promissory Note, failure to maintain the Lock Box, loaning money to non-wholly owned subsidiaries (including guaranteeing the $15 Million revolving line-of-credit for Crop USA), failure to provide all required financial information, and other defaults as set forth in the notice. AIA Services and AIA Insurance have failed to timely cure the defaults and all applicable cure periods have expired. As of the date of this Complaint, the principal owed to Reed under the Promissory Note of $6,000,000, plus accrued interest of over $2,000,000 had not been paid in full as required.

2.27    Prior to Reed's Notice of Default dated December 12, 2006, Reed had never accelerated any of the indebtedness due under the Promissory Note. Even though AIA Services and AIA Insurance failed to cure the defaults specifically set forth in Reed's Notice of Default dated December 12, 2006, AIA Services continued to make partial and inconsistent interest payments (including the payment of certain employees and other services on behalf of Reed) before and after the date of Reed's original Complaint. All amounts due under the Promissory Note are secured by the remedies available under the Promissory Note, Restructure Agreement, Amended Stock Pledge Agreement and Amended Security Agreement.

2.28    Despite Reed's demands, AIA Services, AIA Insurance, John, Freeman, Duclos, Connie, and/or Beck have failed to comply and/or as officers and/or directors to ensure that AIA Services and AIA Insurance complies with the obligations owed to Reed under the terms of the Promissory Note, Restructure Agreement, Amended Stock Pledge Agreement, and Amended Security Agreement. Under the Amended Stock Pledge Agreement, the right to vote all of AIA

FIFTH AMENDED COMPLAINT – 11

Insurance's shares ceased and terminated for AIA Services and became vested in Reed when AIA Services failed to timely pay the required monthly interest payments due under the Promissory Note and its subsequent failure to pay the $6,000,000 principal due under the Promissory Note on August 1, 2005 (and other breaches set forth in this Complaint). AIA Services was in default and had failed to cure such defaults before Reed demanded to exercise his right to hold a special shareholder meeting to vote the shares to appoint a new board of directors for AIA Insurance.

2.29    On December 12, 2006, Reed timely provided notice of his demand for a special shareholder meeting of AIA Insurance for the purpose of removing and appointing new board members on December 26, 2006. AIA Services, AIA Insurance, John, Duclos, and/or Freeman (and the other Defendants if applicable) refused to comply with Reed's demand for a special shareholder meeting by representing that AIA Insurance's offices were closed on December 26, 2006.

2.30    Through a letter dated January 3, 2007, John acknowledged Reed's right to call a shareholder meeting under the Amended Stock Pledge Agreement when he stated "I fully recognize that [Reed] Taylor may take actions he deems appropriate, including calling a special shareholders meeting."

2.31    On or about January 25, 2007, Reed hand delivered another demand for a special shareholder meeting for the removal and appointment of the board of directors for February 5, 2007, pursuant to his rights under the Amended Stock Pledge Agreement. Through a letter from Duclos, AIA Insurance refused Reed's request and denied that he had the right to call a meeting to vote the AIA shares. Despite Reed's demands, AIA Insurance refused to hold a special shareholder meeting.

FIFTH AMENDED COMPLAINT – 12

2.32    Despite Reed's demands, AIA Services and AIA Insurance failed to cure the numerous Defaults under the terms of the Promissory Note, Restructure Agreement, Amended Stock Pledge Agreement and Amended Security Agreement, among other obligations (as described above). Through the date of this Complaint, AIA Services and AIA Insurance's Defaults were not timely cured and they remained in default of the foregoing Agreements.

2.33    On February 22, 2007, Reed exercised his right to vote the pledged shares by executing a Consent in Lieu of Special Shareholder Meeting of AIA Insurance removing John, Duclos and Freeman from the Board of Directors and appointed himself the sole Board Member, pursuant to his right to vote the pledged shares under the Amended Stock Pledge Agreement. Because AIA Services' right to vote the pledged shares had ceased and terminated when it became in Default and failed to timely cure such Defaults, the right to vote the pledged shares in AIA Insurance vested exclusively in Reed and he exercised his right to vote the pledged shares pursuant to the Amended Stock Pledge Agreement and the Articles of Incorporation of AIA Insurance. Because the shares pledged to Reed account for all the outstanding shares of AIA Insurance, Reed had the authority to waive the notice requirement, notice period, and the formality of holding a shareholder meeting as he was the only party authorized to vote any shares of AIA Insurance. Because Reed appointed himself as the sole director of AIA Insurance, he had the exclusive authority to appoint himself as the officers of AIA Insurance through a Consent in Lieu of a Board Meeting.

2.34    In the weeks leading up to the filing of this action, Reed discovered that more than one transfer of assets occurred during the time in which AIA Services had failed to service its debt to Reed. In 2004, AIA Insurance paid $1,510,693 to purchase Series C Preferred Shares in AIA Services from Crop USA. This transaction inappropriately, unlawfully, and/or

FIFTH AMENDED COMPLAINT – 13

fraudulently transferred $1,510,693 of AIA Insurance's funds to Crop USA when such funds should have been tendered to Reed or been retained to benefit AIA Insurance. This $1,510,693 transfer occurred at a time in which AIA Services was insolvent. This $1,510,693 transfer also occurred at the same time that AIA Services' 401(k) Plan (the "Plan") held over $750,000 in Preferred C Shares in AIA Services. No shares were purchased or redeemed from the Plan, even though John and Duclos were the Co-Trustees of the Plan at the time of the transfer. This transaction constitutes the fraudulent transfer of funds from AIA Insurance to Crop USA.

2.35    Reed also discovered that John and Connie had purchased a parking lot for $8,000 and later entered into a lease agreement with AIA Services and/or AIA Insurance to lease the parking lot from John and Connie for $1,250 per month. This transaction was also the fraudulent transfer of funds to John and Connie, when such funds should have been paid to Reed during a time in which AIA Services was unable to service its debt to Reed and was otherwise insolvent. John and Connie also inappropriately paid lump sums for rent before such inappropriate rent was due. The parking lot is not utilized by AIA Insurance or AIA Services. Such acts and/or transfers have occurred during John, Freeman, Duclos, Connie, and/or Beck's tenure as members of the boards of AIA Insurance and/or AIA Services.

2.36    Based upon the above-referenced acts, transfers and transactions, together with transactions referenced in the notes to AIA Services and/or AIA Insurance's financial statements, there are other unauthorized and inappropriate transfers, loans, payments, advances and other actions which occurred during times AIA Services defaults and inability to timely pay Reed and at times in which AIA Services was insolvent. Forensic accounting and further scrutiny of AIA Insurance and/or AIA Services' books and records will reveal additional improper, unlawful and/or fraudulent transfers, transactions and the like that directly and/or indirectly benefited the

FIFTH AMENDED COMPLAINT – 14

individual Defendants, Crop USA and/or entities partially owned by John.

2.37    During times in which John, Freeman, Duclos, Connie, and/or Beck owed Reed fiduciary duties, they have used AIA Services and AIA Insurance as their personal source of funds and/or assets, including, without limitation, acts in which John has transferred assets to his name; taken advances that John never paid back; transferred assets, resources, and/or funds to Crop USA, Sound Insurance and/or other entities partially owned or controlled by John and/or the other individual Defendants; entered into transactions which constitute a violation of AIA Insurance and/or AIA Services' Articles of Incorporation; made transfers and/or entered into transactions which benefited them; and provided services for entities partially owned by them without such actions being arms-length transactions.   The above acts occurred when John, Duclos, Freeman, Connie, and/or Beck were directors and/or officers of AIA Services, AIA Insurance and/or Crop USA. All of the above acts occurred during certain relevant times in which AIA Services was not current with payments of interest and/or principal owed to Reed under the Promissory Note and when AIA Services was insolvent.

2.38    On February 22, 2007 (after executing the Consent in Lieu of Special Shareholder Meeting), Reed executed a Consent in Lieu of Board Meeting to terminate all officers, terminate the employment of John, authorize the change of locks, and take such other actions deemed appropriate.   When Reed attempted to take action in accordance with the Consents described above, the Defendants refused to abide by the Consents.

2.39    During certain relevant times that John, Duclos, Freeman, Connie, and/or Beck were directors of AIA Services and AIA Insurance, they failed make proper corporate governance decisions and failed to take appropriate legal action on behalf of AIA Insurance and/or AIA Services to protect Reed's interests.   During the relevant times that John, Duclos,

FIFTH AMENDED COMPLAINT – 15

Freeman, Connie, and/or Beck were directors and/or officers of AIA Services and AIA Insurance, they breached their fiduciary duties owed to Reed.

2.40    Sometime after filing Reed's original Complaint, Freeman and Duclos resigned as members of the board of directors of AIA Insurance and AIA Services. John, in breach of his fiduciary duties owed to Reed and in violation of Reed's right to vote the shares and prior vote of the pledge shares in AIA Insurance, appointed himself, Connie and Beck to the board of AIA Insurance. John also appointed himself, Connie and Beck to the board of AIA Services in breach of his fiduciary duties owed to Reed. These appointments were conflicts of interest and breaches of John's fiduciary duties owed to Reed and the appointed Defendants' acceptance of such appointments was a further breach of duties owed to Reed. Finally, Beck, John and Connie approved inappropriate payments to the directors of AIA Services and AIA Insurance, which such payments must all be disgorged and awarded to Reed.

2.41    During certain relevant times that John, Connie and Beck were directors of AIA Services and AIA Insurance, they failed to take appropriate legal action on behalf of AIA Insurance and AIA Services. During certain relevant times that John, Connie and Beck were directors of AIA Services and AIA Insurance, they breached their fiduciary duties owed to Reed.

2.42    Reed has a valid and perfected security interest in all commissions from sale of insurance and related services received by or on behalf of, or payable to, AIA Insurance and AIA Services, proceeds thereof and interest thereon. Reed demanded that no funds which he had a security interest in and/or which should be paid to him could be used to pay the legal fees of any of the individual Defendants. Despite Reed's demands, the Defendants have unlawfully, improperly and inappropriately diverted funds to the individual Defendants for their attorneys' fees and costs, and the Defendants have unlawfully and/or inappropriately accepted such

FIFTH AMENDED COMPLAINT – 16

payments.   Because all of AIA Services' revenues are derived from AIA Insurance's commissions and related services that Reed has a valid security interest in, such payments also constitute an illegal and/or unauthorized dividend from AIA Insurance to AIA Services, conversion, fraud and fraudulent conveyances.

2.43   Prior to the filing of Reed's original Complaint and without Reed's knowledge or consent, John paid a debt he owed to AIA Services in the amount of $307,271 by transferring said indebtedness to Reed's Promissory Note.   Such payment constitutes fraud (as set forth below) and John later moved the debt back to Reed's Promissory Note.

2.44   Pacific Empire Holdings Corporation d/b/a Sound Insurance has been operating through AIA Services and/or AIA Insurance and with funds, assets, rent, and/or services provided by AIA Services and/or AIA Insurance for free or at rates below fair-market-value during certain relevant times that John, Freeman, Duclos, Connie, and/or Beck owed fiduciary duties to Reed.   Since the filing of Reed's Original Complaint, Crop USA purchased Sound Insurance from John and/or other unknown parties.   The Defendants' operation of Sound Insurance and subsequent sale constitutes breaches of fiduciary duties, conversion, fraud and/or a fraudulent conveyance.

2.45   Global Travel was a tenant in AIA Insurance's office building located in Lewiston, Idaho.   Since the filing of Reed's original Complaint, Global Travel has relocated as a tenant in an office building owned by John.   Such actions are a breach of John Duclos, Freeman, Connie, and Beck's fiduciary duties owed to Reed, fraud and/or a fraudulent conveyance.

2.46   Through a letter dated February 27, 2001, John represented to Reed (individually and on behalf of the corporations) that AIA Services and/or AIA Insurance was developing a new crop insurance program through a new company called Crop USA.   Reed relied on AIA

FIFTH AMENDED COMPLAINT – 17

Services, AIA Insurance and John's representations that AIA Services and/or AIA Insurance were the owners of Crop USA and developing Crop USA, when AIA Services, AIA Insurance and John's representations were false in that Crop USA was never owned by AIA Insurance or AIA Services, but instead owned by John, Connie, Duclos, Beck, Freeman, and others. By John's own admission, Crop USA should have been a subsidiary of AIA Services or AIA Insurance but for certain liabilities.

2.47    John made representations to Reed and Donna Taylor that he would not be taking a salary in certain year(s). Reed relied on John's false representation when he did not accelerate payments due to him or place AIA Services in default, and in late 2006 or early 2007 learned that John had in fact taken a salary during the respective times to Reed's detriment.

2.48    John, Beck, Duclos, and/or Freeman made representations and/or omitted material facts to Reed through letters and financial statements that AIA Services and AIA Insurance were being operated for the benefit of AIA Services and AIA Insurance. AIA Services and AIA Insurance made representations and/or omitted material facts to Reed through correspondence and their financial statements that they were being operated for the benefit of AIA Insurance and AIA Services. Reed relied on John, Beck, Duclos and/or Freeman's false representations and/or omissions of material facts when in fact AIA Services and AIA Insurance were not being operated for the benefit of the corporations, but instead were being operated for the benefit of John, Freeman, Duclos, Crop USA, Sound Insurance, Beck, and other entities controlled or partially owned by John and/or Connie. As directors, Freeman, John, Duclos, and/or Beck also made the false representations and/or omitted material facts by and through the corporations' financial statements.

///

FIFTH AMENDED COMPLAINT – 18

2.49    John, Freeman, Duclos, and/or Beck breached their fiduciary duties owed to Reed when AIA Insurance inappropriately and/or fraudulently guaranteed a $15,000,000 loan for Crop USA. This guarantee is also a violation of AIA Services' Amended Articles of Incorporation, AIA Services and AIA Insurance's Bylaws, and the terms of the Amended Stock Pledge Agreement. AIA Insurance received no benefit from this loan and received no consideration.

2.50    After the inappropriate and fraudulent transfer of $1,510,693 to Crop USA described above, the wrongful transfer was misrepresented on the financial statements of AIA Insurance as an investment with a value of approximately $1,500,000, when the "investment" was worthless. John, Duclos, Beck and/or Freeman were aware, or should have been aware, of this false fact as AIA Services was insolvent.

2.51    Reed believes that there are other acts, fraud, breaches of fiduciary duties, wrongful transfers and/or fraudulent transactions that he will itemize and detail through future amended complaints upon completion of discovery and/or at trial. By and through this paragraph, the Defendants should be placed on notice that Reed intends to recover every dollar of funds, assets, services, loans, barters and the like that were taken, utilized and/or transferred from AIA Services and/or AIA Insurance through fraud, constructive fraud, breaches of fiduciary duties, fraudulent conveyances, and any other causes of action set forth below.

2.52    The unity and commonality of the ownership, officers and/or directors of AIA Services, AIA Insurance and/or Crop USA is such that the separate personalities of the corporations and the individuals no longer exist. Equity should prevent the acts and omissions from being solely those of AIA Services, AIA Insurance and/or Crop USA. As a result of the commonality of ownership and governance, unlawful acts, conduct, omissions, fraud, failure to observe corporate governance, and breaches of fiduciary duties as set forth in this Complaint,

FIFTH AMENDED COMPLAINT – 19

AIA Insurance, AIA Services and/or Crop USA are the alter-egos of John, Duclos, Freeman, Connie, and/or Beck and such corporate veils should be pierced thereby imposing personal liability on John, Duclos, Freeman, Connie and/or Beck.

2.53   AIA Services, AIA Insurance, John, Duclos, Freeman, Connie, and/or Beck unlawfully provided Crop USA, Sound Insurance, and/or other entities with free or reduced rent, labor, funds, services, resources, and/or other assets without any and/or fair compensation to the detriment of AIA Services, AIA Insurance and Reed.  John, Duclos, Freeman, Connie, and/or Beck entered into or approved transactions that were not fair for AIA Services or AIA Insurance, transactions that were not entered into in good faith, transactions that involved self-dealing, and transactions that involved any one or more of the interested individual Defendants in violation of applicable conflicts of interest procedures and/or proper corporate governance.

2.54   During certain relevant times, John utilized AIA Services, AIA Insurance and/or Crop USA as a means to pay personal bills, obtain loans, and obtain reimbursements for "alleged" expenses he incurred on behalf of AIA Services, AIA Insurance and/or Crop USA. However, many of the expenses for food, lodging and travel were inappropriately charged to AIA Services and/or AIA Insurance.  This is further evidenced by the fact that John failed to remit and/or fully complete forms required by AIA Services and AIA Insurance for employees to be reimbursed.

2.55   From August 1, 1995, through the present time, John owed obligations and duties to AIA Services and Reed (including, without limitation, obligation to not compete and confidentiality) through the Executive Officer's Agreement between John and AIA Services dated August 1, 1995.  John has breached the forgoing obligations, which such breaches also constitute breaches of John, Duclos, Freeman, Connie, and/or Beck's fiduciary duties owed to

FIFTH AMENDED COMPLAINT – 20

Reed. AIA Insurance and Reed are also third party beneficiaries of John's Executive Officer's Agreement and entitled to damages from the Defendants for such breached obligations.

2.56   AIA Insurance and AIA Services could have been operated with a substantially lower number of employees than presently employed and with reduced overhead and costs. The Defendants have represented that Crop USA (and other parties) have been reimbursing AIA Services and/or AIA Insurance for all employee labor, expenses, costs, assets, and services utilized for Crop USA's benefit, when such representations are false. The Defendants have failed to disclose material facts that AIA Services and AIA Insurance employees, expenses, costs, assets, and services have also been utilized for the benefit of John, Connie, and entities partially owned by John and/or Connie without them paying AIA Services or AIA Insurance.

2.57   The Defendants have represented through board resolutions, private placement memorandum, correspondence, agreements, and/or other transactions that AIA Services and/or AIA Insurance have benefited from transactions with Crop USA (including, without limitation, Crop USA's $15 Million line of credit and the repurchase of the Series C Preferred Shares of AIA Services), which the Defendants knew that such transactions were not beneficial to AIA Services and/or AIA Insurance. In fact, AIA Services and/or AIA Insurance did not benefit from such false representations and Reed's collateral was also impaired.

2.58   The Defendants have engaged in the improper and/or unlawful activities of utilizing AIA Services and AIA Insurance for their benefit and/or for the benefit of themselves and/or entities partially owned by one or more of the individual Defendants to the detriment of Reed.

2.59   Should any part or one or more of the following causes of action or relief be denied at or before trial, such allegations and requested relief are incorporated by reference here

FIFTH AMENDED COMPLAINT – 21

**App. - R, p. 21**

to support other causes of action and/or requested relief.

### III. FIRST CAUSE OF ACTION—BREACHES OF CONTRACT

3.1    Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or the relief sought under this cause of action.

3.2    The Defendants owed Reed obligations and/or continuing contractual obligations to timely pay him and comply with specific terms, conditions, covenants, warranties and the like required by the Promissory Note, Amended Stock Pledge Agreement, Amended Security Agreement, and Restructure Agreement.

3.3    AIA Services, AIA Insurance, Crop USA, John, Freeman, Duclos, Beck, and/or Connie's acts, omissions and failure to pay Reed the amounts owed and comply with continuing contractual obligations under the Promissory Note, Amended Stock Pledge Agreement, Amended Security Agreement and Restructure Agreement constitute a breach of their contractual obligations owed to Reed (whether or not any of the foregoing agreements were orally modified as alleged by the Defendants or not).

3.4    As a result of AIA Services, AIA Insurance, Crop USA, John, Freeman, Duclos, Beck, and/or Connie's acts and/or omissions which constitute breaches of their contractual obligations, Reed has suffered and is entitled to damages of $6,000,000, plus accrued interest in an amount to be determined at trial, jointly and severally or to be allocated between the defendants as the evidence and claims show at trial.    As set forth in this Complaint, the Defendants are jointly and severally liable for all claims and damages flowing from the various breaches by and through the legal theories set forth in this Complaint.    In addition, Reed is entitled to an award of attorneys' fees and costs as under the Promissory Note, Amended Stock

FIFTH AMENDED COMPLAINT – 22

Pledge Agreement, I.C. § 12-120 and/or I.C. § 12-121.

**IV. SECOND CAUSE OF ACTION—FRAUDULENT TRANSFERS/CONVEYANCES**

4.1   Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or the relief sought under this cause of action.

4.2   The Defendants' actions constitute fraudulent transfers and/or conveyances under I.C. § 55-901, *et seq.* and/or the common law doctrine of Fraudulent Transfers/Conveyances.

4.3   As a result of John, Duclos, Freeman, Connie, and/or Beck's participation, consent, approval and/or acquiescence of the fraudulent transfers and/or as direct recipients and/or indirect recipients (also by and through their ownership of shares in the recipient corporations) of the fraudulent transfers, John, Duclos, Freeman, Connie, and/or Beck are personally liable for all fraudulent transfers, plus accrued interest, in an amount to be proved at trial. All fraudulent transfers should be avoided and/or rescinded to the extent possible and/or all assets placed in a constructive trust for the benefit of Reed and such assets awarded to Reed.

4.4   John, Duclos, Freeman, Connie, Beck, and/or Crop USA and other entities controlled or partially owned by John or the Defendants are and/or were the recipients of various fraudulent transfers from AIA Services and/or AIA Insurance, and should be required to return all funds to Reed, rescind all transactions; and John, Connie, Freeman, Duclos, and/or Beck's ownership interests in Crop USA and such other entities should be placed in a constructive trust for the benefit of Reed and such shares and/or ownership awarded to him.

///

///

///

FIFTH AMENDED COMPLAINT – 23

## V. THIRD CAUSE OF ACTION—MISREPRESENTATIONS/FRAUD
### (Fraud, Constructive Fraud, and/or Shareholder, Officer Director Fraud)

5.1    Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

5.2    AIA Services, AIA Insurance, Crop USA, Beck, Freeman, Connie, Duclos, and/or John made, ratified, acquiesced, and/or consented to statements of fact and/or omitted material statements of fact, including, without limitation, those facts and/or omissions of fact set forth in Paragraphs 2.23, 2.36, 2.44-2.49 and 2.51 above; such statements of fact were false or omitted material facts; such false statements or omitted facts were material; AIA Services, AIA Insurance, Crop USA, Beck, Freeman, Duclos, Connie and/or John knew or should have known the falsity of such statements; AIA Services, AIA Insurance Crop USA, Beck, Freeman, Duclos, and/or John intended to induce reliance; Reed was ignorant to the falsity of such statements and/or omissions; and Reed relied on such statements and/or omissions; Reed had a right to rely on such false statements and/or omissions.

5.3    By and through the Defendants' fraudulent acts and/or omissions, including, without limitation, the allegations set forth in this Complaint and as specifically alleged in Paragraphs 2.22, 2.25, 2.34, 2.35, 2.37, 2.40, 2.43-2.49, 2.53, 2.54, 2.57 and 2.58 above, AIA Services, AIA Insurance, Crop USA, John, Freeman, Duclos, Connie, and/or Beck's acts and/or omissions constitute fraud, constructive fraud (e.g., the Defendants owed Reed fiduciary duties, duties to maintain AIA Insurance's assets to protect Reed, and other duties contemplated by the parties and/or referenced in this Complaint, and the Defendants breached such duties), and/or shareholder/officer/director fraud (e.g., the siphoning off of corporate assets to the individual

FIFTH AMENDED COMPLAINT – 24

Defendants' gain and to the detriment of Reed), including, without limitation, the less stringent means of proving fraud as set forth in *Smith v. Great Basin Grain Co.*, 98 Idaho 266, 561 P.2d 1299 (1977) (and other law relating to shareholder, officer and/or director fraud), and Reed is entitled to recover all damages attributable to such fraud.  Under the theory discussed in *Smith v. Great Basin Grain Co.* (and other cases), AIA Services, AIA Insurance, Crop USA, John, Freeman, Duclos, Connie, and/or Beck are liable for all funds, assets, and services that were unlawfully and/or inappropriately transferred and/or utilized directly and/or indirectly to their benefit during their tenure as officers, directors, and/or shareholders in AIA Services, AIA Insurance, and/or Crop USA.

5.4    As a consequential and/or proximate result of AIA Services, AIA Insurance, Crop USA, John, Duclos, Freeman, Connie, and/or Beck's fraud (including, without limitation, any one or more of the types of fraud listed above), Reed has suffered and is entitled to recover all damages from the Defendants, jointly and severally.

### VI.  FOURTH CAUSE OF ACTION—CONVERSION

6.1    Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

6.2    AIA Services, AIA Insurance, Crop USA, John, Duclos, Connie, Freeman, and/or Beck's (including, without limitation, as officers and/or members of the boards) conduct and/or consent to such conduct constitutes the willful interference with Reed's property and money which should have been paid to him or been held for his benefit (including, without limitation, money in which Reed had a valid and perfected security interest, e.g., whether through UCC filings and/or through security interests and/or rights in the Amended Stock Pledge Agreement),

FIFTH AMENDED COMPLAINT – 25

**App. - R, p. 25**

without lawful justification, which deprived Reed of the possession of such money and/or property. Crop USA, John, Duclos, Freeman, Connie, Beck and/or entities controlled or partially owned by John were recipients of the converted assets, funds, labor, and/or services (including for any attorneys' fees and costs paid by AIA Services and/or AIA Insurance for any of the individual Defendants).

6.3     As a result of the AIA Services, AIA Insurance, Crop USA, John, Duclos, Freeman, Connie, and/or Beck's unlawful acts, conduct, and interference with Reed's valid and perfected security interests and other rights, Reed has been damaged and is entitled to damages proven at trial.

## VII. <u>FIFTH CAUSE OF ACTION—ALTER EGO/PIERCING CORPORATE VAIL</u>
### (A Cause of Action and/or Remedy)

7.1     Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim under this cause of action and/or requested relief.

7.2     Reed also specifically re-alleges and incorporates Paragraph 2.52 above.

7.3     AIA Insurance, AIA Services, and Crop USA have been operated, organized and controlled, and their affairs are so conducted that they are the instrumentality, agency, and/or conduit of one another and for John, Beck, Duclos, Freeman and/or Connie to their benefit and Reed's detriment.

7.4     Because of the lack of proper corporate governance; common officers, directors, and shareholders; lack of capitalization; fraud; overreaching; breaches of good faith and fair dealing; and the other unlawful and/or inappropriate acts and/or omissions of AIA Insurance, AIA Services, Crop USA, John, Duclos, Freeman, Beck, and Connie, the corporate veils of AIA

FIFTH AMENDED COMPLAINT – 26

Services, AIA Insurance and Crop USA should be pierced thereby holding AIA Services, AIA Insurance, Crop USA, John, Duclos, Freeman, Connie, and/or Beck jointly and severally liable for all of Reed's damages that lie in tort or contract (including, without limitation, the sums due under the Promissory Note) as equity requires such action.

7.5    In addition and/or in the alternative, because of the common ownership, common governance, fraud, conversion, breached duties, unlawful acts, improper acts and/or omissions of John, Duclos, Freeman, Connie, and/or Beck, the corporations AIA Services and Crop USA should be liable for all of Reed's damages under the theory of reverse piercing of the corporate veil.

### VIII.  SIXTH CAUSE OF ACTION—CONSTRUCTIVE TRUST
#### (A Cause of Action and/or as Remedies)

8.1    Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

8.2    Reed has a valid security interest in AIA Services and/or AIA Insurance's commissions and all of the outstanding shares of AIA Insurance, among other security interests. The boards of AIA Services and AIA Insurance owed Reed fiduciary duties to Reed.  AIA Services, AIA Insurance, Crop USA, John, Duclos, Freeman, Connie, and/or Beck fraudulently, wrongfully and/or improperly used funds, transferred assets and/or provided services (which should have been paid to Reed or benefited AIA Services and/or AIA Insurance) for investments, personal use, inappropriate transactions, loans, advances, self-dealing, and/or other wrongful, fraudulent and/or inappropriate purposes (including, without limitation, approving, consenting, and/or acquiescing in such activities and the failure to take appropriate action).

FIFTH AMENDED COMPLAINT – 27

**App. - R, p. 27**

**16-ER-3964**

8.3    AIA Services, AIA Insurance, Crop USA John, Duclos, Freeman, Connie, and/or Beck's acts and/or omissions resulted in Crop USA, John, Duclos, Freeman, Connie and/or Beck's acquisition of money, securities and/or services which should have been paid to Reed or retain by AIA Insurance but for their fraud, deepening insolvency, civil conspiracy, misrepresentation(s), bad faith, self-dealing, fraudulent conveyances, breached fiduciary duties, and/or overreaching activities; and AIA Services, Crop USA, John, Duclos, Freeman, Beck and/or other entities' retention of the money, investments, securities and property would be unjust.

8.4    Reed requests the imposition of a constructive trust for his benefit to recover the proceeds of all from the Defendants' fraud, fraudulent conveyances, breaches of fiduciary duties, overreaching, conspiracy, deepening insolvency (as a remedy only), improper, self-dealing, wrongful and/or inappropriate transfers, acts and/or omissions.

### IX.  SEVENTH CAUSE OF ACTION—DIRECTOR LIABILITY
#### (A Cause of Action and/or a Remedy)

9.1    Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

9.2    John, Duclos, Freeman, Connie, and/or Beck are personally liable for all relevant breached fiduciary duties, deepening insolvency, wrongful acts, improper acts, omissions, overreaching transactions, fraud, civil conspiracy, faithless fiduciary activities, loans, advances, improper loan guarantees and/or fraudulent conveyances which occurred during their tenure as a member of the board of directors of AIA Service, Crop USA and/or AIA Insurance.

///

FIFTH AMENDED COMPLAINT – 28

**App. - R, p. 28**

**16-ER-3965**

9.3    Because John, Duclos and Freeman were both directors and officers during certain relevant times, they owed Reed even more elevated fiduciary duties. John, Duclos, and Freeman breached their elevated fiduciary duties owed to Reed.

9.4    During the relevant times that John, Connie, Beck, Freeman and/or Duclos were members of boards of AIA Insurance, AIA Services, and/or Crop USA, they each should be held personally liable for all Reed's damages in contract and tort.

## X. EIGHTH CAUSE OF ACTION—SPECIFIC PERFORMANCE
### (A Cause of Action and/or as Remedies)

10.1    Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

10.2    Under the Amended Stock Pledge Agreement, Amended Security Agreement, and Restructure Agreement, Reed is entitled to vote the pledged shares of AIA Insurance (and all ancillary rights, including, without limitation, to vote the shares to remove the board and take all actions related in any way to his right to vote the pledged shares), sell the shares of AIA Insurance at public or private sale, judicially sell the pledged shares in AIA Insurance, entitled to timely receive audited financial statements and financial information, and/or seize all of the AIA Insurance and AIA Services' commissions in the required Lock Box. When AIA Services became in Default, it lost its right to vote the pledged shares of AIA Insurance and the right vested exclusively in Reed.

10.3    Despite Reed's demands for the Defendants to comply with the provisions in the Promissory Note, Amended Stock Pledge Agreement, Amended Security Agreement and Restructure Agreement, AIA Services, AIA Insurance, the Defendants have refused to comply.

FIFTH AMENDED COMPLAINT – 29

Reed is entitled to the relief afforded to him or reasonably contemplated under the foregoing agreements and such other rights, remedies and/or relief as may be available under Idaho Code, including, without limitation, any action, relief and/or order authorized under I.C. § 30-1-701 *et seq.* and/or I.C. § 28-9-101 *et seq.* (including the sale of the pledged shares, protection of security interest, seizure of security, and any other available remedy).

10.4   As a direct or proximate result of the Defendants' acts and/or omissions, Reed has suffered and is entitled to an award of attorneys' fees and costs incurred, at or before trial, in enforcing any provision of the Promissory Note, Amended Stock Pledge Agreement, Amended Security Agreement, and/or Restructure Agreement for relief sought before or at trial.

## XI. NINTH CAUSE OF ACTION—BREACH OF FIDUCIARY DUTIES

11.1   Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

11.2   During certain relevant times, John, Connie, Beck, Duclos,, and/or Freeman owes and/or owed Reed fiduciary duties, including, without limitation, because of his status as the largest creditor of AIA Services, AIA Insurance and/or Crop USA; and because AIA Services and/or AIA Insurance were insolvent as described in this Complaint. The individual Defendants' fiduciary duties include, without limitation, the duties of care and loyalty to Reed. During the relevant times that John, Freeman and Duclos acted as both a director and an officer of AIA Insurance, AIA Services and/or Crop USA, they owed even more elevated fiduciary duties to Reed as the single largest creditor of AIA Services and/or AIA Insurance.

11.3   John, Connie, Beck, Duclos, and/or Freeman breached their fiduciary duties owed to Reed, including, without limitation, when they failed to operate AIA Services and AIA

FIFTH AMENDED COMPLAINT – 30

**App. - R, p. 30**

**16-ER-3967**

Insurance for the benefit of Reed. John, Connie, Beck, Duclos, and/or Freeman breached their fiduciary duties when they failed to take legal action against past and/or present officers and/or directors of AIA Services and AIA Insurance, and when they prevented Reed from taking any action he deemed appropriate under the Amended Stock Pledge Agreement, Amended Security Agreement and/or Restructure Agreement.

11.4   As a result of John, Connie, Beck, Duclos, and/or Freeman's breaches of their fiduciary duties owed to Reed, they are individually liable to Reed for all damages he suffered and/or deemed the product of their breached fiduciary duties, including without limitation, all damages attributable to inappropriate transfers of assets and/or services, inappropriate use of assets and/or services, inappropriate payment of salaries, the failure to pursue claims against other past and/or present officers and directors, inappropriate guarantee of loans, all claims in this Complaint, and such other wrongful acts and/or omissions that Reed may demonstrate at trial.

## XII.   TENTH CAUSE OF ACTION—BREACH OF IMPLIED COVENANTS OF GOOD FAITH AND FAIR DEALING

12.1   Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

12.2   There is an implied obligation of good faith and fair dealing between the parties in the performance and enforcement of the terms and conditions of the Promissory Note, Amended Stock Pledge Agreement, Amended Security Agreement and Restructure Agreement. This duty embraces, among other things, an implied obligation that AIA Services, AIA Insurance, and their directors and officers, specifically, Defendants Duclos, Freeman, John, Connie, and/or Beck

FIFTH AMENDED COMPLAINT – 31

**App. - R, p. 31**

**16-ER-3968**

shall not do anything to injure or destroy Reed's rights to receive the benefits of the Promissory Note, Amended Stock Pledge Agreement, Amended Security Agreement and/or Restructure Agreement. The Defendants have breached their obligations of good faith and fair dealing owed to Reed when they, among other things, intentionally injured and/or destroyed Reed rights.

12.3   As a result of the Defendants' acts and/or omissions, Reed has suffered and is entitled to damages in the amount to be proven at trial, including, without limitation, all damages incurred since the Defendants have refused to abide by the terms and conditions of the Promissory Note, Restructure Agreement, Amended Stock Pledge Agreement and/or Amended Security Agreement. In addition, Reed is entitled to recover all damages incurred after his vote of the pledged shares under because of the individual Defendants' interference with Reed's contractual rights.

## XIII.   ELEVENTH CAUSE OF ACTION—CIVIL CONSPIRACY
### (A Cause of Action and/or Remedy)

13.1   Reed re-alleges and incorporates each and every allegation contained in other paragraphs of this Complaint necessary to support every claim and/or remedy sought under this cause of action.

13.2   AIA Services, AIA Insurance, Crop USA, John, Connie, Duclos, Freeman, and/or Beck engaged in a pattern of behavior and/or agreement to accomplish an unlawful objective and/or to accomplish a lawful objective in an unlawful manner. AIA Services, AIA Insurance, Crop USA, John, Connie, Duclos, Freeman, and/or Beck's acts, omissions, and/or acquiescence constitute civil conspiracy.

13.3   As a result of AIA Services, AIA Insurance, Crop USA, John, Connie, Duclos, Freeman, and/or Beck's wrongful and unlawful acts and/or acquiescence, they should all be held

FIFTH AMENDED COMPLAINT – 32

jointly and severally liable for all of Reed's damages in this action.

## XIV. PRAYER FOR RELIEF

Without waiving any claims, rights and/or remedies under any of the above-referenced agreements and/or Idaho Code as a secured party, Reed respectfully requests the following relief:

14.1    For a judgment against AIA Services for the principal of $6,000,000, plus accrued pre-judgment interest, in the total amount to be proven at or before trial.

14.2    Reed requests a preliminary and permanent injunction against the Defendants as follows (any one or more of the following at or before trial):

(a) Enjoining any of the Defendants from interfering with the actions taken pursuant to the February 22, 2007, Consent in Lieu of Special Meeting of Shareholders of AIA Insurance and the actions taken pursuant to the February 22, 2007, Consent in Lieu of Meeting of Board of Directors of AIA Insurance.

(b) Enjoining any of the Defendants from preventing Reed from exercising his right under the Amended Stock Pledge Agreement to vote the pledged shares in AIA Insurance and taking any ancillary actions which relate in any way to voting the pledged shares, including, without limitation, removing the board of directors of AIA Insurance and appointing a revised board and such other actions he deems appropriate in his sole discretion as the exclusive person entitled to vote all the outstanding shares of AIA Insurance.

(c) Requiring the Defendants to timely and promptly provide Reed with all financial information required under the Amended Stock Pledge Agreement.

(d) Enjoining John and any of the other individual Defendants from entering the offices of AIA Insurance, if necessary

FIFTH AMENDED COMPLAINT – 33

(e) Enjoining the Defendants and any entity owned, partially owned or operated by any one or more of them from interfering with, disturbing, and transferring any of AIA Services, AIA insurance and Crop USA's customers, trade secrets, contracts, agreements and business.

(f) Enjoining the Defendants from utilizing, transferring or disposing of any funds, assets, property, labor, facilities or services of AIA Insurance, AIA Services and/or Crop USA for any other person, entity or business, unless such transactions are arms-length and payment is received by AIA Insurance, AIA Services and/or Crop USA prior to providing such funds, assets, labor, facilities or services (e.g., no free use or credit arrangements for such activities).

(g) Enjoining the Defendants from disposing of, using, transferring or utilizing any of the funds, assets (including, without limitation, mortgages) and/or property received from AIA Services, AIA Insurance, and/or Crop USA from the lawsuit entitled In re: Universe Liquidator Grain Growers Trust, et al. v. Idaho Department of Insurance a/k/a GGMIT suit, all other lawsuits, litigation and disputes in which AIA Services, AIA Insurance and/or Crop USA obtains any financial gain. All funds, assets and/or property from the foregoing should be held in trust until further notice from the Court.

(h) Enjoining the Defendants from negotiating or entering into any loans, credit arrangements, credit facilities, or borrowing any funds under any loan, line-of-credit, credit facility, open account and the like for which AIA Insurance or AIA Services is a guarantor or a signatory, unless utilized for the exclusive

FIFTH AMENDED COMPLAINT – 34

benefit of AIA Insurance to provide funding for AIA Insurance and approved by Reed or such other party appointed by Reed or the Court.

(i) Enjoining the Defendants from destroying, altering, deleting, purging, and/or removing any documents (including drafts, proposals, electronic files, email, back-up media and the like), property, computers and the like from AIA Insurance, AIA Services and Crop USA's offices.

(j) Enjoining the Defendants from advancing or lending any funds, assets or services to John, Duclos, Freeman, Connie, Beck, or AIA Services without first obtaining written consent from Reed or permission from the Court.

(k) Enjoining the Defendants from entering into or negotiating any substantive contracts or agreements without first obtaining approval from Reed or permission from the Court.

(l) Enjoining the Defendants from holding, calling or participating in any shareholder meetings, board meeting, and/or executing any Consents in Lieu of the foregoing without permitting Reed to vote the pledged shares or take such other action permitted to him as the holder of the right to vote all outstanding shares of AIA Insurance.

(m) Enjoining the Defendants from using or transferring any funds, assets, or services of AIA Insurance for the purpose of providing any retainers or payments for the legal services for John, Freeman, Duclos, Connie, and/or Beck.

(n) Enjoining John from being paid compensation for work not performed for AIA Insurance and/or AIA Services.   John's time expended for Crop USA

FIFTH AMENDED COMPLAINT – 35

and any other entities partially or wholly owned by him shall be paid by the appropriate entity and not AIA Insurance, AIA Services, but by the entity for which John performed the work.

(o) Enjoining the Defendants from paying any of the members of the board of directors of AIA Services or AIA Insurance unreasonable compensation for serving on the board of directors of AIA Services or AIA Insurance.

(p) Enjoining the Defendants requiring AIA Insurance, AIA Services and Crop USA to accurately and properly itemize every employee's daily time sheet to reflect the number of hours of work performed for AIA Services, AIA Insurance, Crop USA and any other entities or persons.

(q) Enjoining the Defendants from such other actions as may be reasonably contemplated from this Complaint, the Amended Stock Pledge Agreement, the Amended Security Agreement, the Restructure Agreement and/or which would otherwise protect Reed's interests and to prevent further deepening of the insolvency at AIA Services.

(r) Enjoining John, Beck, Freeman, Duclos, and/or Connie from appointing any directors for Crop USA, AIA Services and AIA Insurance.

(s) Invalidating the appointment of Connie and Beck from the Boards of AIA Services and AIA Insurance.

14.3    Enjoining the Defendants from transferring, encumbering or otherwise disposing of any improperly and/or fraudulently obtained and/or transferred assets under I.C. § 55-916, *et seq.* and/or other applicable legal authority.

///

FIFTH AMENDED COMPLAINT – 36

14.4    For the imposition of a constructive trust for the benefit of Reed and awarding to Reed all shares of common and/or preferred shares in Crop USA owned and/or held by John, Connie, Freeman, Duclos, and Beck and for all ancillary actions necessary to transfer said shares to Reed.

14.5    For the imposition of a constructive trust for the benefit of Reed and awarding to Reed that certain real property located in Nez Perce County and owed by John and Connie that was purchased from the Camas Praire RailNet, Inc., recorded under instrument number 672508 in Nez Perce County and all rental proceeds paid from AIA Services and/or AIA Insurance to John and Connie.

14.6    For a prejudgment writ of attachment against certain assets, funds and/or property of AIA Services, AIA Insurance, Crop USA and any other assets, funds and/or property of any of the other Defendants shown to be the proceeds or result of any or all of the Defendants' wrongful, unlawful, fraudulent and/or inappropriate acts and/or omissions.

14.7    For an order and/or judgment permitting Reed to sell the pledged shares of AIA Insurance at public or private sale or, in the alternative, judicially.  In the event the pledged shares of AIA Insurance are sold (whether or not Reed is the high bidder), for a deficiency judgment against the Defendants for all amounts exceeding the amount received and/or credited from the sale, including, without limitation, all damages, attorneys' fees and costs incurred by Reed in this action.  In the event Reed elects to purchase or otherwise obtain the shares of AIA Insurance, he hereby requests that only relief necessary for him to carry out his rights as owner of the shares of AIA Insurance.

14.8    For a judgment against the Defendants and/or the $200,000 bond posted for the preliminary injunction against Reed for all damages, attorneys' fees, costs and expenses incurred

FIFTH AMENDED COMPLAINT – 37

by Reed from being wrongfully enjoined, plus judgment against the Defendants for all amounts exceeding the $200,000 bond.

14.9    For judgment against the Defendants, jointly and severally, for all damages incurred by Reed as a result of the Defendants' breaches of implied duties of good faith and fair dealing, conversion, deepening insolvency, breaches of fiduciary duties and other claims, including, without limitation, pre and post filing damages that include, but are not limited to: all pay to present directors and officers, damages for the compensation and benefits paid to all employees paid by AIA Services or AIA Insurance that would not have been needed, lost tenants, misuse of assets and labor, and all other items detailed at trial.

14.10   For an order compelling an audit of AIA Services, AIA Insurance and Crop USA.

14.11   For a declaratory judgment or order requiring specific performance of AIA Services and/or AIA Insurance's obligations, covenants, warranties and/or other rights granted to Reed under the Amended Stock Pledge Agreement, Amended Security Agreement, Promissory Note and/or Restructure Agreement.

14.12   For judgment that AIA Insurance, AIA Services and Crop USA have been operated as the alter-egos of John, Duclos, Freeman, Connie and/or Beck, and their corporate veils should be pierced thereby imposing personal liability on all of the individual and corporate Defendants, jointly and severally, for all of Reed's damages and sums owed to him under the Promissory Note in an amount to be proven at trial.

14.13   For judgment that Crop USA is the alter-ego of AIA Insurance and AIA Services and all the foregoing corporations for all of Reed's damages and sums owed to him in both contract and tort in an amount to be proven at trial.

14.14   For a declaratory judgment and/or order enforcing the February 22, 2007, Consent

FIFTH AMENDED COMPLAINT – 38

in Lieu of Special Meeting of Shareholders of AIA Insurance and the actions taken pursuant to the February 22, 2007, Consent in Lieu of Meeting of Board of Directors of AIA Insurance.

14.15   For a judgment for damages and attorneys' fees incurred by Reed as a result of being wrongfully enjoined by the Defendants.

14.16   For such other relief that Reed may request before or at trial to enforce his rights under the Amended Stock Pledge Agreement, Amended Security Agreement, and/or Restructure Agreement, including, without limitation, any action or order authorized under I.C. § 30-1-701 *et seq.* and/or I.C. § 28-9-101 *et seq.*

14.17   For judgment, order and/or declaratory relief as may be necessary for Reed to effectuate any and all rights and remedies under I.C. § 28-9-101 *et seq.*, including, without limitation, the sale of the pledged shares, protection of security interest, seizure of security, return of funds protected by his security interest (e.g., attorneys fees paid for individual directors, etc.) and any other available remedy.

14.18   For the avoidance/rescission of the improper and/or fraudulent transactions, transfers of funds, assets and/or services from AIA Services and/or AIA Insurance to John, Beck, Freeman, Connie, Duclos, Crop USA, and any entity partially owned by John, and/or any other party who received such transfers under I.C. § 55-916, *et seq.* and/or other applicable legal authority.

14.19   For judgment against John and Connie for $307,271, plus accrued interest, for the money he owed AIA Services which was improperly paid by inappropriately transferring his indebtedness to Reed's Promissory Note and then backing out the transaction in 2006 or 2007, and awarding this account receivable from AIA Services to Reed.

///

FIFTH AMENDED COMPLAINT – 39

14.20  For judgment against Connie to the fullest extent of her liability by virtue of her marriage to John and/or his acts during their marriage, and her interest in the community property in an amount to be proven at the time of trial, plus prejudgment interest.

14.21  For judgment against Connie individually for an amount to be proven at trial, plus pre-judgment interest.

14.22  For a judgment against John (both individually and through his marriage to Connie) in an amount to be proven at trial, plus prejudgment interest.

14.23  For judgment against John, Connie, Duclos, Freeman, and Beck, jointly and severally, for all funds, assets, services, property and/or any other benefit fraudulently transferred, converted and/or fraudulently conveyed, and which such transferred thing of value may not be avoided, rescinded and/or paid to Reed.

14.24  For judgment against Crop USA for all sums and the fair market value of all services, labor, funds, and assets wrongfully, fraudulently, and/or inappropriately transferred, converted and/or conveyed, directly or indirectly, from AIA Insurance and/or AIA Services.

14.25  For judgment against John, Duclos, Connie, Freeman, and Beck, jointly and severally, for amounts owed to Reed in an amount to be proven at the time of trial because AIA Services and AIA Insurance are alter egos of John, Duclos, Freeman, and Beck.

14.26  For judgment against John, Connie, Duclos, Freeman, and Beck disgorging all salaries, compensation (including payments of fees for being board members and/or advisory board members), benefits, assets, stock (including, without limitation, shares held directly or indirectly in Crop USA) and other ill-gotten gains as a result of the breaches of their fiduciary duties, fraudulent transfers, unlawful acts, fraud and/or other causes of action.

///

FIFTH AMENDED COMPLAINT – 40

14.27   For the imposition of a constructive trust for the benefit of Reed and awarding to Reed all funds, investments, loans, advances, securities, property, transactions, services and/or self-dealing which were converted or fraudulently, wrongfully, unlawfully and/or improperly made for the benefit of Duclos, Freeman, John, Beck, Connie and/or other parties or entities controlled and/or partially owned by any of them as may be requested at trial.

14.28   For the imposition of a constructive trust for the benefit of Reed and awarding to Reed all securities, stock, options and the like transferred, together with all proceeds thereof, converted, sold or awarded or acquired by John and/or Connie from AIA Services, AIA Insurance and/or Crop USA, including, without limitation, shares (and proceeds thereof) and/or funds, and/or distributions received in or from Pacific Empire Holdings Corporation, Pacific Empire Radio Corporation, and Pacific Empire Communications Corporation.

14.29   For the imposition of a constructive trust for the benefit of Reed and awarding to Reed all shares and options of AIA Services and Crop USA acquired by the Defendants during their employment and/or when they were officers and/or members of the boards of AIA Insurance, AIA Services, and/or Crop USA.

14.30   For the disgorgement of all salary, bonuses, compensation (including all compensation and benefits received as directors), stock options, benefits, reimbursements (all proper, improper and/or undocumented reimbursements for travel, meals, lodging, etc.) and any other payments and/or assets received by John, Connie, Beck, Duclos, and Freeman and award all such funds and assets to Reed.

14.31   For a judgment against John, Freeman, Duclos, Connie and Beck, jointly and severally, for all damages resulting from the breaches of their fiduciary duties owed to Reed during the periods of time of their relevant tenures as directors of AIA Insurance and AIA

FIFTH AMENDED COMPLAINT – 41

App. - R, p. 41

16-ER-3978

Services, in an amount to be proven at trial.

14.32 For a declaratory judgment imposing personal liability on the individual Defendants and Crop USA for all loans guaranteed by AIA Services or AIA Insurance.

14.33 For an award of Reed's attorneys' fees and costs from all of the Defendants, jointly and severally, under the Promissory Note, Amended Stock Pledge Agreement, I.C. § 12-120, I.C. § 12-121 and/or as may be available under equity and law.

14.34 For judgment against the Defendants, jointly and severally, for all damages in tort and contract proven by Reed at trial based upon one or more of the following: civil conspiracy, fraud (any type, including misrepresentations), fraudulent conveyances, conversion, breaches of contract, alter-ego, breaches of fiduciary duties, deepening insolvency, breaches of implied duties of good faith and fair dealing, specific performance of any of Reed's rights under contract or law.

14.35 John, Connie, Beck, Duclos, and Freeman's wrongful, self-serving, fraudulent, deepening insolvency, conspiracy, inappropriate and unlawful acts and/or omissions as described in this Complaint constitute that of "faithless fiduciaries." Accordingly, all salary, compensation (including all compensation and benefits received as directors), stock options, benefits, reimbursements (all proper, improper and/or undocumented reimbursements for travel, meals, lodging, etc.) and any other payments and/or assets received by John, Connie, Beck, Duclos, and/or Freeman should be disgorged and awarded to Reed.

14.36 AIA Services and AIA Insurance have alleged that Reed agreed to orally modify the terms of the Promissory Note, Amended Stock Pledge Agreement, Amended Security Agreement and Restructure Agreement, which such allegations Reed expressly denies. If the Defendants are able to prove that such an oral modification exists at or before trial, AIA

FIFTH AMENDED COMPLAINT – 42

**App. - R, p. 42**

Services, AIA Insurance and Crop USA are in breach of such orally modified agreements and Reed is entitled to the damages and relief set forth in this Complaint.

14.37   Reed incorporates by reference into this Section all allegations and requested relief set forth in the above causes of action and/or remedies. Should any of the causes of action fail at or before trial, all of such allegations are incorporated by reference into this Section as requested relief and/or as support for Reed's requested relief.

14.38   Reed expressly reserves the right to amend this Complaint upon the completion of discovery and/or present causes of action and remedies which conform to the evidence at the time of trial.

14.39   For judgment against the Defendants and/or such relief for all claims and causes of action which conform to the evidence obtained through discovery and/or forensic accounting.

14.40   For such other relief as Reed may request before or at the time of trial and/or that the Court may find just, equitable, or warranted before or at the time of trial.

14.41   The Defendants are placed on notice that future amendments to this Complaint will be likely and Reed reserves the right to do so, particularly based upon the Defendants' intentional refusal to respond to Reed's discovery requests.

///

///

///

///

///

///

FIFTH AMENDED COMPLAINT – 43

**App. - R, p. 43**

**16-ER-3980**

14.42   The Defendants are placed on notice that Reed may likely move the Court in the future to permit him to request an award of punitive damages against the Defendants at trial.

DATED this 1st day of February, 2008.

SMITH, CANNON & BOND PLLC

By: _____
Roderick C. Bond
Ned A. Cannon
Attorneys for Plaintiff Reed J. Taylor

FIFTH AMENDED COMPLAINT – 44

**App. - R, p. 44**

## CERTIFICATE OF SERVICE

I, Roderick C. Bond, declare that, on the date indicated below, I served a true and correct copy of Plaintiff Reed Taylor's Fifth Amended Complaint on the following parties via the methods indicated below:

David A. Gittins
Law Office of David A. Gittins
P.O. Box 191
Clarkston, WA 99403
Attorney for Defendants JoLee Duclos and
Bryan Freeman

**Via:**
( ) U.S. Mail, Postage Prepaid
(**X**) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(**X**) Email (pdf attachment)

Michael E. McNichols
Clements Brown & McNichols
321 13th Street
Lewiston, ID 83501
Attorney for R. John Taylor

**Via:**
( ) U.S. Mail, Postage Prepaid
(**X**) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(**X**) Email (pdf attachment)

Jonathan D. Hally
Clark & Feeney
P.O. Box 285
Lewiston, ID 83501
Attorney for Connie Taylor, James Beck and
Corrine Beck

**Via:**
( ) U.S. Mail, Postage Prepaid
(**X**) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(**X**) Email (pdf attachment)

Gary D. Babbitt
D. John Ashby
Hawley Troxell Ennis & Hawley LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, Idaho 83701-1617
Attorneys for AIA Services, AIA Insurance, and
Crop USA Insurance Agency

**Via:**
(**X**) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(**X**) Email (pdf attachment)

FIFTH AMENDED COMPLAINT – 45

**App. - R, p. 45**

James J. Gatziolis
Charles E. Harper
Quarles & Brady LLP
Citigroup Center, 500 West Madison Street
Suite 3700
Chicago, IL  60661-2511
Attorneys for Crop USA Insurance Agency

**Via:**
(X) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(X) Email (pdf attachment)

Signed this 1st day of February, 2008, at Lewiston, Idaho.

_____
Roderick C. Bond

FIFTH AMENDED COMPLAINT – 46

**App. - R, p. 46**

**16-ER-3983**

Jeffrey A. Thomson ISB #3380
jat@elamburke.com
Loren C. Ipsen ISB #1767
lci@elamburke.com
Joyce A. Hemmer ISB #7202
jah@elamburke.com
ELAM & BURKE, P.A.
251 East Front Street, Suite 300
P.O. Box 1539
Boise, Idaho 83701
Telephone:  (208) 343-5454
Facsimile:  (208) 384-5844

Attorneys for Defendants Hawley Troxell Ennis & Hawley LLP,
Gary D. Babbitt, D. John Ashby and Richard A. Riley

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, et al.<br><br>Defendants. | Case No.  1:10-cv-00404-DCN<br><br>REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] |

Defendants Hawley Troxell Ennis & Hawley LLP, Gary D. Babbitt, D. John Ashby and

Richard A. Riley ("HT Defendants"), by and through their counsel of record, Elam & Burke,

P.A., submit the following Reply in Support of the Hawley Troxell Defendants' Motion to

Dismiss All Claims for Failure to Satisfy Mandatory Derivative Demand Requirements

[Dkt. 1067].

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL
CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS
[Dkt. 1067] - 1

## I.    The Court should take judicial notice of certain materials.

Plaintiff raises, as a preliminary matter, the fact that the HT Defendants did not attach to their opening brief any documents subject to judicial notice. *See* Dkt. 1131 at 4. The HT Defendants' opening brief cited documents already in the record in this case, and also made a few specific citations to relevant documents in other cases that are publicly accessible on Pacer, which the HT Defendants understood to be adequate and acceptable practice under Fed. R. Evid. 201. *See, e.g.*, Dkt. 1067 at 8 n. 2. The HT Defendants filed their Motion in January 2021, and the Court subsequently asked that parties seeking judicial notice attach the documents to their briefs even if they are well-cited and available through Pacer. *See* Dkt. 1119 (entered June 25, 2021). The HT Defendants, therefore, attach hereto a copy of the June 13, 2016, demand letter at issue in the Eastern District of Washington case of *Miesen v. Munding* (also at issue in this case), as well as Plaintiff's amended complaint in *Miesen v. Munding* (E.D. Wash. Dkts. 8-13 & 10).[1]

Plaintiff objects to the Court taking judicial notice of the proceedings in the related case of *Miesen v. Munding*. *See* Dkt. 1131 at 4. However, as this Court has previously recognized, the Court may take notice of matters of public record, as well as proceedings in other courts if those proceedings have a direct relation to the matters at issue. *See* Dkt. 1119 at 2. These materials "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). And Fed. R. Evid. 201(c) provides that: "The court: (1) may take judicial notice on its own; or (2) must take judicial notice if a party requests it and the court is supplied with the necessary information."

---

[1] The HT Defendants find it unnecessary to attach *Miesen v. Munding*, 9th Cir. Case No. 19-35255, Dkt. 19 (Munding's brief describing the June 13, 2016, letter), which they originally referenced in their opening brief [Dkt. 1067-1 at 8 n. 2], because Plaintiff does not dispute that *Miesen v. Munding* involved the exact same June 13, 2016, demand letter that is at issue here. The HT Defendants also do not attach E.D. Wash. Dkt. 1 (the original complaint in *Miesen v. Munding*), since the *Miesen v. Munding* decisions involved the amended complaint.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 2

Ultimately, the parties agree regarding the propriety of taking judicial notice of the materials that are most pertinent to this Motion. For example, Plaintiff agrees that judicial notice may be taken of his five derivative demands that are referenced in his Third Amended Complaint [Dkt. 211] (hereinafter "TAC"). The HT Defendants' opening brief cited to these demands as they already existed in the record, and Plaintiff additionally attached copies to his opposition brief. *See* Dkt. 1131-2 – 1131-6. It should be noted that, in addition to the demand letters themselves, Plaintiff proposes taking judicial notice of certain pleadings and proposed pleadings that some of the demands referenced and which Plaintiff has also attached to his opposition brief. *See, e.g.* Dkts. 1131-4 – 1131-6. It is not apparent from the demand letters that the pleadings and proposed pleadings were actually delivered to the boards with the demands, but to the extent they are in fact mentioned in the letters and they may assist the Court's review, the HT Defendants do not object to Plaintiff's presentation of those materials.

Plaintiff attaches some other documents he would like the Court to judicially notice, but the appropriateness of doing so and the particular relevance of the materials to the present Motion are questionable, and they appear to be presented as an invitation for the Court to judicially notice disputed facts, such as how certain directors/defendants subjectively interpreted the demand letters and other issues Plaintiff raises to support an argument that the Court should overlook the deficiencies of his derivative demands. *See, e.g.* Dkt. 1131 at 21 (citing Dkt. 1131-19 [a.k.a. "App. R"])). As this Court has recognized: "Even though a court may take judicial notice of matters of public record, the Court cannot take judicial notice of disputed facts contained in such public records. Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 3

truth." Dkt. 1119 at 2 (cleaned up). Therefore, the HT Defendants object to Plaintiff's proposal to take judicial notice of Dkts. 1131-10 – 13 and 1131-18 – 19.

## II.   The HT Defendants' Motion is not "another bite at the apple."

Citing earlier orders from Judge Boyle [Dkt. 46] and Judge Dale [Dkt. 210], Plaintiff argues that this is the third time the Court has been asked to decide the adequacy of Plaintiff's derivative demand letters. *See* Dkt. 1131 at 7-11. This is not an accurate representation.

The only derivative demand that existed when Judge Boyle issued his Order dated June 29, 2011 [Dkt. 46], was the one dated July 21, 2008. Therefore, that Order could not possibly have decided the sufficiency of any subsequently issued demands. And Judge Boyle's order obviously did not rule upon either the substantive adequacy of the July 21, 2008, letter (or any other purported derivative demands) or Rule 23.1 pleading sufficiency with respect to any claims against the HT Defendants. Rather, Judge Boyle applied the *Colorado River* doctrine to stay this action pending resolution of parallel state court cases, and in light of that ruling he simply did not reach the substance of any other issues that may have been presented at that time. *See* Dkt. 46; Dkt. 1131 at 7 (acknowledging the order "did not provide any analysis of the demand issue").

Judge Dale's Order dated April 21, 2017, addresses only the letters dated June 13, 2016, and August 23, 2016, and not any of Plaintiff's previous demand attempts. *See* Dkt. 210. It is also important to keep in mind that the motion Judge Dale was deciding at that time was Plaintiff's motion to amend his complaint under Fed. R. Civ. P. 15(a)(2)'s liberal standards, which do not apply to the present Motion. Furthermore, Judge Dale's Order ruled upon *other defendants'* objections to Plaintiff's proposed amended complaint. The Order clearly did not decide the adequacy of *any* derivative demand as to the claims against *the HT Defendants*. This

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 4

is starkly illustrated by the fact that Judge Dale's Order makes no findings whatsoever regarding whether the June 13, 2016, or August 23, 2016, derivative demands were sufficient as to any legal malpractice claims. *See id*. at 20. In fact, Plaintiff has acknowledged and affirmatively argued that a demand may be sufficient as to one group of defendants and insufficient as to another, which is directly contrary to his "law of the case" argument with respect to Judge Dale's order. Dkt. 1131 at 6 (arguing that the *Miesen v. Munding* decisions are irrelevant and inapposite here because they determined demand sufficiency as to claims against another of AIA's outside counsel who is not a defendant in this case). For these reasons, the Court should reject Plaintiff's argument that Judge Dale's order is the "law of the case" regarding the sufficiency of derivative demands for claims against the HT Defendants.

Simply stated, neither Judge Boyle nor Judge Dale previously decided the issues raised by the HT Defendants' present Motion, and Plaintiff is simply wrong that these orders established an applicable "law of the case" or that the HT Defendants somehow erred by seeking dismissal without first moving for reconsideration.[2] *See* Dkt. 1131 at 7.

### III.    The HT Defendants' Motion does not violate any court orders.

Plaintiff argues that the HT Defendants' Motion violates a footnote in Judge Dale's October 31, 2016, Memorandum Decision and Order [Dkt. 178]. *See* Dkt. 1131 at 11-12. In that order's discussion of this case's procedural background, the Court explained that the HT Defendants had filed a notice of non-opposition to Plaintiff's motion to amend his complaint to

---

[2] Even if the standards for a motion for reconsideration were applicable here (again, they are not), the Ninth Circuit's decision in *Miesen v. Munding* supports reconsideration to reverse clear error and avoid manifest injustice with respect to how the principles of Idaho law and Fed. R. Civ. P. 23.1 are interpreted and applied to determine whether the derivative demands for action against the HT Defendants were sufficient. *See Dickinson Frozen Foods, Inc. v. FF5 Food Process Solutions Corp*., Case No: 1:1 7-cv-005 19-DCN, 2020 WL 2841517 at *10 Slip Copy (D. Idaho 2020).

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 5

### 16-ER-3988

add new parties, and after Plaintiff filed the Second Amended Complaint (hereinafter "SAC") the HT Defendants filed a motion to dismiss on the basis that new parties destroyed diversity. The Court's footnoted comment was this:

> The Court would have expected (and expects in the future) grounds for dismissal to have been raised in response to the motion to amend instead of misleading representations that Defendants did not oppose Plaintiffs' motion to amend. The notices of non-opposition were not consistent with Rule 1. *See* Fed. R. Civ. P. 1. 2015 Comm. Note. ("[D]iscussions of ways to improve the administration of civil justice regularly include pleas to discourage over-use, misuse, and *abuse of procedural tools that increase cost and result in delay*.")

Dkt. 178 at 3, n. 2 (emphasis original). The Court's footnote does not prohibit the present Motion for a number of reasons. First, a defendant's notice of non-opposition to a motion to amend a complaint is not a representation that the defendant finds no deficiencies in the complaint or the allegations contained therein, or that the defendant has no defenses warranting dismissal, particularly where, as here, the HT Defendants' notices of non-opposition specifically reserved the right to assert all defenses and avoidances. *See, e.g.,* Dkts. 133 & 183. Furthermore, Rule 12(b) expressly provides that certain defenses must be raised by motion, and it is entirely proper for a party to agree that the plaintiff can amend his complaint under the liberal rule that "[t]he court should freely give leave when justice so requires," and then file a motion to dismiss rather than arguing futility before amendment. F.R.C.P. 15(a)(2). This is routine and accepted practice and typically adds no additional time or expense. Rule 12(c) also allows a party to file a post-pleading motion that is subject to the same legal standards as a pre-pleading motion to dismiss, such as the present Motion.

Additionally, Judge Dale's order was concerned with "procedural tools," and Judge Dale appears to have been persuaded by Plaintiff's 20/20 hindsight argument that he would not have added the new parties if he had known the defendants would move to dismiss based on the

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 6

destruction of diversity. *See* Dkt. 139-1. However, the insufficiency of Plaintiff's derivative demands raised in the present Motion is not just a matter of pleading deficiencies under Fed. R. Civ. P. 23.1; it is a matter of substantive law that cannot be cured by amending the complaint, as further explained below. In short, the footnote in Judge Dale's previous order does not preclude this Rule 12(c) Motion.

Plaintiff also argues that the alleged violation of Judge Dale's order renders this Motion "dilatory." Dkt. 1131 at 12. This Motion is not some sort of delay tactic; it is a worthy and meritorious motion based upon an issue of substantive law that was timely made within the period required by the Court's scheduling order for summary judgment motions, despite the fact that Plaintiff's claims were an ever-moving target, with three complaint amendments and five separate derivative demands. In addition, the HT Defendants filed their Motion only a few months after the Ninth Circuit decided in *Miesen v. Munding* that two of the exact same derivative demand letters Plaintiff relies upon in this case were insufficient under Idaho law and that Plaintiff's claims against AIA's outside counsel in Washington were, therefore, properly dismissed without leave to amend the complaint. *Miesen v. Munding*, 822 F. App'x 546 (9th Cir. 2020) (unpublished), cert. denied, 141 S. Ct. 1464, 209 L. Ed. 2d 181 (2021). Plaintiff's petition for writ of certiorari in *Miesen v. Munding* was still pending when the HT Defendants filed the present Motion, and the U.S. Supreme Court subsequently denied the petition on March 1, 2021. *Miesen v. Munding*, 141 S. Ct. 1464 (Mem), 209 L. Ed. 2d 181 (2021). The HT Defendants' Motion is timely and well-founded.

Plaintiff's citation to an ABA comment on the Model Business Corporations Act – for the notion that "[i]n keeping with the spirit of this section, the specificity of the demand should not become a new source of dilatory motions" – is also unconvincing. Dkt. 1131 at 12. The HT

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 7

Defendants have readily explained that the "specificity" of Plaintiff's demands is not the only issue that makes them insufficient. *See* Dkt. 1067-1 and *infra*. In any event, a merely instructive comment regarding the "spirit" of the statute as it pertains to a procedural issue should not be applied to absolve Plaintiff of the statutory mandate to present a sufficient derivative demand, which is a matter of *substantive* law and a *precondition* to any right Plaintiff may have to file a derivative claim. *Kugler v. Nelson*, 160 Idaho 408, 415, 374 P.3d 571, 578 (2016) ("[T]he function of the demand doctrine … clearly is a matter of 'substance,' not 'procedure.'"); *see also McCann v. McCann*, 138 Idaho 228, 235, 61 P.3d 585, 592 (2002) (stating a sufficient demand is required to maintain a derivative claim, and a sufficient demand under Idaho law "must state facts, not mere general charges and conclusions" to show "the wrong complained of, accompanied by sufficient responsible data which will enable the directors to determine whether litigation could be engaged in with some hope of success").

Plaintiff also makes the misguided argument that the HT Defendants violated this Court's standing order, which states in pertinent part that "Chief Judge Nye expects that counsel, prior to filing a motion to dismiss based upon *Iqbal-Twombley*, will contact opposing counsel, advise them of the perceived shortcomings in the allegations of the complaint, and attempt to reach agreement for the filing of an amended complaint." Dkt. 1131 at 12-13. The HT Defendants cited *Iqbal-Twombley* as part of the legal standard generally applicable to Rule 12(b) and 12(c) motions. *See* Dkt. 1067-1 at 3. However, this Motion is clearly not what would fairly be considered an *Iqbal-Twombley* motion. Not only did the HT Defendants not elsewhere cite *Iqbal-Twombley*, but the grounds for dismissal cannot be eliminated by mere pleading amendment.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 8

In summary, the HT Defendants have not violated, let alone willfully violated, any order, and the Court should deny Plaintiff's request for sanctions. *See* Dkt. 1131 at 13 (asking the Court to strike defenses and award fees and costs).

### IV. The Court should consider the *Miesen v. Munding* decisions.

Plaintiff argues that *Miesen v. Munding*, 822 F. App'x 546 (9th Cir. 2020) (unpublished), cert. denied, 141 S. Ct. 1464 (2021), and the underlying decision from the Eastern District of Washington[3] are "inadmissible hearsay" and "irrelevant" cases that this Court should not consider because they purportedly did not apply Idaho law and are unpublished (*i.e.*, not precedent). Dkt. 1131 at 6 & 16-17. Plaintiff's arguments are factually and legally false.

Clearly, the federal court decisions are not "evidence" subject to hearsay admissibility determinations. More importantly, the Eastern District of Washington and the Ninth Circuit in *Miesen v. Munding* expressly (and correctly) applied Idaho law to find that Plaintiff failed to satisfy mandatory derivative demand requirements under Idaho Code § 30-29-742 (previously I.C. § 30-1-742; hereinafter "Section 742" collectively) and Fed. R. Civ. P. 23.1's pleading requirements.[4] Furthermore, the *Miesen v. Munding* courts cited *Potter v. Hughes*, 546 F.3d 1051 (9th Cir. 2008), not in order to apply another state's demand requirements as Plaintiff suggests, but for *Potter's* discussion of Fed. R. Civ. P. 23.1's pleading requirement and the standard of

---

[3] *Miesen v. Munding*, No. 2:18-CV-270-RMP, 2019 WL 1410899 (E.D. Wash. Mar. 28, 2019), aff'd, 822 F. App'x 546 (9th Cir. 2020), cert. denied, 141 S. Ct. 1464, 209 L. Ed. 2d 181 (2021) The appellate history of this case is omitted from future citations for the sake of brevity.

[4] The district court stated "the substantive rules for determining whether a plaintiff has satisfied that standard, and whether a pre-litigation demand should be excused for futility, are a matter of state law" and "this Court must follow Idaho law, because the AIA Entities are incorporated under Idaho law according to the amended complaint." *Miesen v. Munding*, No. 2:18-CV-270-RMP, 2019 WL 1410899, at *5 (E.D. Wash. Mar. 28, 2019). The Ninth Circuit similarly stated that Idaho Code § 30-29-742 was the applicable law. *See Munding*, 822 F. App'x at 548.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 9

review. *Munding*, 822 F. App'x at 548; *see also Miesen v. Munding*, No. 2:18-CV-270-RMP, 2019 WL 1410899, at *5 (E.D. Wash. Mar. 28, 2019).

Plaintiff's argument that the *Miesen v. Munding* decisions did not "address *McCann*, the Comments under Idaho Code § 30-1-742 or follow Idaho's more relaxed standard for derivative demands" is equally unconvincing. Dkt. 1131 at 6; *see also id*. at 13 (characterizing Idaho's demand standard as "relaxed"). However, there is nothing to suggest that the result in *Miesen v. Munding* would have been any different if the courts had expressly cited *McCann* or addressed any comments (which Plaintiff fails to specify) under § 30-1-742, and Plaintiff offers no support for his argument that Idaho's derivative demand standard is somehow more relaxed than the way the *Miesen v. Munding* courts applied Idaho Code § 30-29-742. To be sure, the Idaho Supreme Court in *McCann,* 138 Idaho at 235, 61 P.3d at 592, adopted the rule that "[t]he demand on the directors need not assume a particular form nor need it be made in any special language," but that does <u>not</u> mean that Idaho's standards are "relaxed" or "more relaxed" than that which the *Miesen v. Munding* courts applied. *Id*. (internal quotation omitted). The *McCann* court more fully explained the applicable principles as follows:

> <u>The demand on the directors need not assume a particular form nor need it be made in any special language. However, the stockholder must make an earnest and sincere, and not a feigned or simulated, effort to induce the directors to take remedial action in the corporate name.</u> **Statements should be presented to the directors showing the wrong complained of, accompanied by sufficient responsible data which will enable the directors to determine whether litigation could be engaged in with some hope of success. The shareholder must state facts, not mere general charges and conclusions.**
>
> **The demand should give the directors a fair opportunity to initiate the action which the shareholder wants to undertake, and name the potential defendants, as well as the shareholder making the demand**.
>
> ....

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 10

> The shareholder should allow sufficient time for the directors to act upon the demand before initiating the action. The directors' response must be obtained, if possible. The shareholder must comply with the reasonable requests of the directors in an effort to resolve the problems before commencing an action. Thus, a shareholder may be required to provide additional information to the directors.
>
> **Merely bringing the allegations of the complaint to the attention of the corporation's controlling authority does not constitute adequate demand for board action. Moreover, the filing of a derivative complaint is not a sufficient demand.**

*Id*. (emphasis added).[5] Plaintiff focuses his arguments on the <u>portions underlined above</u> to suggest Idaho has a "relaxed" standard, going so far as to argue that Idaho law "simply requires" compliance with that portion. Dkt. 1131 at 15 & 18. However, the appropriate focus for determining whether the substance of a derivative demand meets the requirements of Idaho law is, instead, on the **portions stated above in bold**.

The Ninth Circuit's finding of demand insufficiency in *Miesen v. Munding* conforms to the standards articulated in *McCann*. Specifically, the Ninth Circuit found that the June 13, 2016, and August 23, 2016, demand letters (upon which Plaintiff also relies in this case) do not satisfy Idaho's derivative demand requirements for the following reasons:

> … Applicable state law required Mr. Miesen to make a "written demand ... upon the corporation to take suitable action." Idaho Code § 30-29-742.
>
> The district court correctly concluded that Mr. Miesen's letters, as excerpted in the Amended Complaint, did not make an adequate demand on the boards because it did not sufficiently describe the action he sought to have the boards take. Mr. Miesen's excerpted letters described his proposed claims in terms of "all possible claims" or similarly generic, conclusory language. The letters failed to describe with particularity the claims for relief he sought or the factual bases for those claims. Such language cannot have been expected to provide the boards with enough information to take "suitable action." Without knowing the factual bases for the claims, the boards could not determine the

---

[5] The ABA comments to Section 742 of the Model Business Corporations Act also state that "[t]he demand should … be sufficiently specific to apprise the corporation of the action sought to be taken and the grounds for that action so that the demand can be evaluated." Dkt. 1131-16 (attaching Mod. Bus. Corp. Act § 742 cmts. 1 & 4 (2002)).

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 11

> likelihood of the lawsuit's success and would have had difficulty weighing factors like the expenses involved in litigation or whether litigation would further the AIA Entities' general business interests. These are considerations the boards were entitled to make. …
>
> … Mr. Miesen suggests that were he given leave to amend, he would "quote the entire letters or attach the letters to his amended complaint." But the omitted portions of the letters are no more specific, nor any more relevant, than the excerpts included in the Amended Complaint.

*Munding*, 822 F. App'x at 548–49.

Plaintiff's argument that the Court should reject any consideration of the Ninth Circuit's decision in *Miesen v. Munding*, which Plaintiff characterizes as "not authority" or "not precedent" because it is "unpublished," is particularly troubling. *See* Dkt. 1131 at 11. Ninth Circuit Rule 36-3 expressly allows citation to unpublished decisions, and it is well recognized that unpublished cases (including orders issued by sister courts) that are not "precedent" are, nonetheless, entitled to "the weight they generate by the persuasiveness of their reasoning." *Hupman v. Cook*, 640 F.2d 497, 501 (4th Cir. 1981)[6]; *Tugaw Ranches, LLC v. United States Dep't of the Interior*, 362 F.Supp.3d 879, 885 (D. Idaho 2019) (citing a discussion in an unpublished sister court's opinion as persuasive and insightful); *Wheaton Equip. Co. v. Franmar, Inc.*, No. CV08-276-S-EJL, 2009 WL 464337, at *17 (D. Idaho Feb. 24, 2009) ("Although this is an unpublished opinion from another circuit, the reasoning is persuasive here."); *Hall v. Haws*, 861 F.3d 977, 993 n. 11 (9th Cir. 2017) ("Though [the decision] is an unpublished memorandum disposition that is not binding on us, it is quite persuasive because the analysis arose from the very same trial."); *LN Mgmt., LLC v. JPMorgan Chase Bank, N.A.*, 957 F.3d 943, 952 (9th Cir. 2020) (finding another circuit's unpublished decision persuasive); *Gray v. Astrue*, No. CV 11-294-C-REB, 2012 WL 4097762, at *9 (D. Idaho Sept. 17, 2012) (recognizing an

---

[6] Plaintiff cited *Hupman*, but he ignored this part of the opinion. *See* Dkt. 1131 at 6.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 12

**16-ER-3995**

unpublished Ninth Circuit decision was instructive and "of persuasive value"). The Eastern District of Washington and the Ninth Circuit's explanations of why the July 13, 2016, and August 23, 2016, letters were not sufficient derivative demands under Idaho law or Rule 23.1 are persuasive – and are in fact quite compelling given their factual and legal overlaps with this case – regarding why Plaintiff's derivative demands are insufficient as to the HT Defendants in this case, and the Court should consider the *Miesen v. Munding* decisions for their persuasive value.

**V.      Plaintiff's claims against the HT Defendants should be dismissed for failure to make sufficient pre-suit derivative demands.**

The issue presented by the HT Defendants' Motion is: Did Plaintiff make a sufficient pre-suit derivative demand for each claim he has asserted against the HT Defendants in the TAC [Dkt. 211]? For the reasons explained in the HT Defendants' opening brief [Dkt. 1067-1], the answer to that question is "no" for a variety of reasons, which include insufficient descriptions of and supporting data for the claims, as well as filing claims in court before making a demand and/or without observing the statutory 90-day waiting period. Plaintiff's arguments in opposition the present Motion should be rejected for the reasons the HT Defendants further explain below.

**a.      The July 21, 2008, demand letter is legally insufficient and all claims that rely upon it should be dismissed. *See* Dkt. 1067-1 at 13.**

The heart of the HT Defendants' argument regarding the insufficiency of July 21, 2008, letter is that it:

> contains merely a list of vague labels and conclusions, devoid of description of any factual basis that would support taking legal action against the HT Defendants. *See* Dkt. 23-9. It is even more bereft of facts, and even more generic and conclusory, than the letter the Ninth Circuit found to be insufficient in *Miesen v. Munding*.

Dkt. 1067-1 at 11. Plaintiff does not address this argument in any meaningful way. Instead, he simply recites a list of names and claim labels from the July 21, 2008, letter and makes a

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 13

conclusory statement that it was sufficient because, according to him, no further detail was required. Dkt. 1131 at 18-19.

Plaintiff also appears to engage in a strategy to deflect from the weakness in his position by mischaracterizing the HT Defendants' position so he can argue against it. At the core of this misguided strategy is Plaintiff's misrepresentation that the HT Defendants argued that the letter "fails to name 'any particular law firm or lawyer' to take action against." Dkt. 1131 at 19. The HT Defendants very clearly argued that the letter was insufficient as to the HT Defendants because its allegations were "asserted collectively against three separate law firms" (including Hawley Troxell) and numerous others (some of whom were vaguely described, such as "all other responsible parties"), and the letter entirely failed to describe which HT Defendant, if any, was allegedly responsible for any of the 27 numbered paragraphs of conclusory and factually bereft assertions. *See* Dkt. 1067-1 at 12.

Plaintiff offers a number of misleading examples of why the HT Defendants' argument, as mischaracterized by Plaintiff, is untrue. He argues that "all three names [of the individual HT Defendants] are listed in the demand" by name, when in fact the letter described Mr. Riley as "a witness" regarding a topic that was allegedly relevant to *some other unidentified person's* conduct and the other two attorneys were merely listed at the bottom of the letter to indicate that they, along with eight other people (including Mr. Bond, Reed Taylor, and Donna Taylor) were sent a carbon copy of it. *See* Dkt. 1131 at 19, and Dkt. 1131-2. Plaintiff also argues that the HT Defendants' arguments, as mischaracterized by Plaintiff, are "belied" by a petition for court appointed inquiry filed in the Nez Perce County case of *Reed Taylor v. AIA Services Corp., et al.* The argument is that because the HT Defendants (as AIA's defense counsel in that case) filed the petition stating that it regarded the letter's purportedly derivative claims against "AIA's defense

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 14

**16-ER-3997**

counsel," they acknowledged that the July 21, 2008, letter listed them as alleged wrongdoers. Dkt. 1131 at 19-20; Dkt. 1131-18. This argument is misplaced. What the target of a derivative demand subjectively might have understood regarding the fact that allegations were being made against him is wholly irrelevant to the determination of whether the demand itself is sufficient under the applicable standards of Idaho law. Plaintiff's final point of opposition regarding the insufficiency of the July 21, 2008, letter's identification of alleged wrongdoers aggressively lambasts yet another argument that the HT Defendants never actually made; that is the alleged argument "that Miesen should have known all of the names of the attorneys at Hawley Troxell purporting to represent the AIA Entities." Dkt. 1131 at 20.

> **b.      Miesen failed to make legally sufficient derivative demands regarding claims that arose after July 21, 2008, and/or were not raised in the July 21, 2008, demand letter.** *See* **Dkt. 1067-1 at 13-14.**

Plaintiff argues that the July 21, 2008, derivative demand is sufficient to cover further allegations of wrongdoing because that letter made broad allegations pertaining to usurpation of corporate opportunities and the misuse of corporate funds. Dkt. 1131 at 20. To accept this argument would condone the violation of the derivative demand principles established by *McCann v. McCann*, 138 Idaho 228, 235, 61 P.3d 585, 592 (2002). That case provides that "[t]he shareholder must state facts, not mere general charges and conclusions" and the derivative demand must make a "showing of the wrong complained of" accompanied by "sufficient responsible data" regarding the claim's chances of success. *Id*.

Plaintiff also argues the HT Defendants have cited no authority suggesting a new derivative demand is required "each time the wrongdoers and their attorneys commit similar wrongful acts," which, according to Plaintiff, would be "nonsensical." Dkt. 1131 at 20. For example, Plaintiff argues that the allegations in the July 21, 2008, demand regarding general

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 15

topics of asset misappropriation and usurpation of corporate opportunities were sufficient to cover further allegations of wrongdoing regarding the CropUSA sale to Hudson, alleged misuse of funds, the Growers National contract, and "other alleged items of misconduct allegedly occurring after the July 21, 2008 demand." Dkt. 1131 at 20. In their opening brief, the HT Defendants cited *McCann v. McCann*, 138 Idaho 228, 61 P.3d 585 (2002), for the rule that further allegations of wrongdoing must comply with Section 742's demand requirement before they are filed in a complaint. *See* Dkt. 1067-1 at 13. In *McCann*, the Idaho Supreme Court held that even if the pre-suit demand requirement had been met for the claims in the plaintiff's original complaint (they had not):

> any further allegations [in the amended complaint] not contained in the demand letter would be subject to the statutory demand and waiting period requirements. [The plaintiff's] additional allegations of corporate misconduct would have to be presented to the directors in a subsequent written demand requesting action be taken on those items, as well, for the proceeding to be justiciable under I.C. § 30–1–742.

*Id*. at 235, 61 P.3d at 592.

Furthermore, in this case, Judge Dale recognized that further allegations of wrongdoing must be presented in a pre-suit derivative demand even if they relate to alleged "ongoing conduct." In her order dated April 21, 2017, Judge Dale stated that Plaintiff had to comply with the pre-suit derivative demand requirement for his newly asserted allegations relating to the GemCap loan guarantee and settlement agreement, even though she also found that those assertions related to alleged ongoing conduct and "events that have happened since the original complaint was filed." *See* Dkt. 210 at 33-34 & 36. The idea that generalized allegations of wrongdoing in a derivative demand, such as "misappropriation of corporate assets," could be used to avoid a derivative demand requirement for further allegations of wrongdoing should be

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 16

rejected, as it is entirely inconsistent with the basic purposes and established principles of Section 742's demand requirement.

Finally, Plaintiff argues that the demand was "not created in a vacuum," which he apparently intends to mean that the Court should not look to the form or contents of the written derivative demand itself to determine its sufficiency, but should instead consider extraneous information and speculate regarding the purported knowledge and intent of the board, the corporation's attorneys,[7] and/or the alleged wrongdoers to fill the gaps and make up for what the demand itself obviously lacks. Dkt. 1131 at 20-21. This argument is directly contrary to express requirements of Section 742 and cases like *McCann*, which mandate delivery to the boards of a written demand to take suitable action that contains a statement "showing the wrong complained of, accompanied by sufficient responsible data" and "facts, not mere general charges and conclusions." *McCann* at 235, 61 P.3d at 592. Furthermore, the Idaho Supreme Court has already considered and rejected this sort of argument. In *McCann*, the plaintiff argued that a sufficient derivative demand could be "inferred from discussions taking place during conferences" and the court should have found that his "numerous oral demands and letters sent to the corporation's attorney" were sufficient. *Id.* at 234, 61 P.3d at 591. The court disagreed, finding that only one of the letters contained the information needed to constitute a sufficient derivative demand because it was the only letter delivered to the directors that requested that the corporation take suitable action and was "sufficiently detailed with facts" regarding the alleged corporate misconduct. *Id.* at 235, 61 P.3d at 592.

---

[7] Notably, a corporation's attorney is not even a legitimate or effective recipient of a derivative demand. *See McCann*, 138 Idaho at 235, 61 P.3d at 592 (2002) (holding letter delivered only to corporation's attorney was insufficient).

The Ninth Circuit in *Potter* addressed a similar attempt by a shareholder to satisfy her derivative demand requirements by relying on the disclosure at an oral conference of information that state law required to be, but which was not in that case, contained in a written derivative demand. There, the court held that the derivative demand's omission of legally required information rendered it insufficient, even though the information was separately disclosed, because "[t]he Board was entitled to receive a valid demand and was not required to piece together by inference the disparate events that, if taken together, might have been sufficient to require corporate action." *Potter*, 546 F.3d at 1058. Contrary to Plaintiff's argument here [*see* Dkt. 1131 at 17], the fact that *Potter* involved California's particular requirements for a derivative demand does not diminish its applicability here. The *Potter* court's reasoning is consistent with, and is no less persuasive in relation to, the derivative demand requirements set forth in Idaho's Section 742 and cases like *McCann*. As *McCann* made clear and *Potter* reinforces, if the demand lacks information required under the applicable state's law, then the demand is insufficient.

        **c.**      **The subsequent demand dated April 3, 2012, was a not a legally sufficient derivative demand. *See* Dkt. 1067-1 at 14.**

Plaintiff argues that the April 3, 2012, email that Mr. Bond sent to four attorneys, some of whom represented AIA as outside counsel, was a sufficient derivative demand because it stated it was intended for "Counsel and Board of Directors of AIA Services and AIA Insurance" and it directed the attorneys "to ensure that your clients and the Boards of AIA Services and AIA Insurance receive this demand and that appropriate action is taken." Dkt. 1131 at 22-23; Dkt. 1131-3. Even assuming for the sake of argument that the information Mr. Bond provided in his April 3, 2012, email sufficiently described the action he was demanding and the information that supported it (it does not), Plaintiff's argument that this email to counsel was sufficient

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 18

entirely ignores the Idaho precedent squarely holding that "the service upon the corporation's attorney of a demand that the corporation take legal action in connection with a transaction complained of does not meet the demand requirement" and the shareholder's delivery of a derivative demand letter only to the corporation's attorneys is "not sufficient to constitute a written demand pursuant to I.C. § 30-1-742." *McCann*, 138 Idaho at 235, 61 P.3d at 592 (quotations omitted).

     **d.    The shareholder statements purportedly delivered to the boards on July 16, 2012, were not legally sufficient derivative demands as to any claims asserted against the HT Defendants (*see* Dkt. 1067-1 at 15-16); and no pre-suit demand was made with respect to certain transactions and claims asserted in the SAC [Dkt. 137] filed June 20, 2016 (*see* Dkt. 1067-1 at 16-17).**

Plaintiff does not address the particular inadequacies that the HT Defendants identified with respect to the July 16, 2012, shareholder statements' failure to sufficiently describe actions the shareholders wanted the directors to take against the HT Defendants. *See* Dkt. 1067-1 at 15-16; Dkt. 1131 at 22-23. Instead, Plaintiff argues that the shareholder statements are sufficient demands because they incorporated by reference the entire First Amended Complaint [Dkt. 23] (hereinafter "FAC") and demanded that the boards: (1) pursue the claims identified in that complaint; and (2) pursue "all related acts after the date of this Demand …." Dkt. 1131 at 22. According to Plaintiff, these shareholder statements "covered all potential claims and conduct occurring after the original demand was made on July 21, 2008 through the date the [July 16, 2012] demands …and thereafter for the continuing acts and omissions." Dkt. 1131 at 23 (relying on the same faulty logic to oppose the arguments set forth in Dkt. 1067-1 at 16 §§ c & d). Plaintiff has expressed disbelief that these attempts would be insufficient (*see id.*), but the fact is that they fail to meet the derivative demand requirements in more ways than one and Plaintiff's arguments are hopelessly convoluted and unsupported by the law, as explained below.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 19

The FAC that the shareholders "incorporated by reference" into the July 16, 2012, shareholder statements was filed almost two years earlier. *See* Dkt. 23 (filed Nov. 22, 2010). A derivative complaint that has already been filed does not, and cannot, constitute a sufficient derivative demand, regardless of whether it is "incorporated by reference" in a subsequent demand. This was the clear holding of the Supreme Court in *Mannos v. Moss*, 143 Idaho 927, 933–34, 155 P.3d 1166, 1172–73 (2007), which held that the plaintiff's derivative demand issued after he filed the complaint was "inconsequential because Idaho Code § 30–1–742 requires the demand be made ninety days before the commencement of the derivative action." The Court explained its holding as follows:

> Idaho Code § 30–1–742 provides that a shareholder may not commence a derivative proceeding until he makes a written demand upon the corporation to take suitable action at least ninety days prior to the commencement of the action. Mannos did not make a written demand upon [the corporation] before he commenced this derivative action. Nevertheless, Mannos contends that the district court's grant of summary judgment on this issue should be reversed because (1) he made a written demand upon [the corporation] subsequent to the district court's entry of judgment ….

*Id*. (affirming summary judgment based on plaintiff's failure to make a pre-suit demand).

Similarly, the *McCann* court held that a complaint filed in violation of the requirement that a derivative demand be made at least 90 days before commencement of an action "is not a sufficient demand under I.C. § 30-1-742," and the court rejected the notion that a stay of proceedings could cure the plaintiff's noncompliance with the 90-day pre-suit demand requirement. *McCann* at 235, 61 P.3d at 592. Rather, the court made clear that "[u]nless one of the enumerated exceptions applies, a written demand and 90–days must expire before a complaint for a derivative proceeding may be filed." *Id*. The Sixth Circuit stated it well: "Obviously the filing of the complaint cannot be regarded as a demand to sue, for by starting the

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 20

action appellants have usurped the field." *Lucking v. Delano*, 117 F.2d 159, 160 (6th Cir. 1941) (cited by *McCann*, *supra*, for its refusal to treat a complaint as a derivative demand).

Adopting Plaintiff's argument here – that a demand could be rendered timely or otherwise sufficient by reference back to claims that have already been filed – would be tantamount to creating a universal exception to the statutory pre-suit demand requirement, which is not tolerated by applicable law. Plaintiff's claim that the July 16, 2012, shareholder statements are sufficient derivative demands as to "all related acts," even though they were not therein alleged, fails for the reasons discussed in § V.b, above.

> **e.     The June 13, 2016, and August 23, 2016, demand letters Miesen relies upon in his TAC [Dkt. 211] filed April 24, 2017, are insufficient for the same reasons stated in *Miesen v. Munding. See* Dkt. 1067-1 at 17-18.**

Plaintiff attempts to refute the fact that the HT Defendants are identified by name in only two of the 44 numbered allegations of the June 13, 2016, demand letter by arguing that the HT Defendants are also included in all of the paragraphs mentioning the "Combined Defendants" because the letter defines that term to include the HT Defendants. Dkt. 1131 at 24. Actually, the letter defines "Combined Defendants" as:

> all [10] of the foregoing parties except as to AIA (but includes attorneys, law firms and agents of AIA), but "Combined Defendants" may include or not include Hawley Troxell and/or Pacific Empire Radio to the extent applicable based on certain facts and circumstances and/or when such facts and circumstances occurred.

Dkt. 1131-5 at 2. This definition is as clear as mud. It gives no suggestion of which allegations, if any, supposedly apply to the HT Defendants. The June 13, 2016, demand letter mentions Hawley Troxell in paragraphs 11 and 16, only, and the remainder of the numbered allegations – which, as the Ninth Circuit held in *Miesen v. Munding*, describe the proposed claims in insufficiently generic and conclusory terms without providing necessary factual basis and fail to sufficiently

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 21

describe the action Plaintiff wanted the boards to take – contain no reasonably apparent demand for action against the HT Defendants. *See* Dkt. 1067-1 at 18. Tellingly, Plaintiff's opposition brief does not identify any other paragraphs of the June 13, 2016, letter that allegedly apply to the HT Defendants, either. Dkt. 1131 at 23-25.

Plaintiff also argues that the demand was sufficient because the proposed Second Amended Complaint ("proposed SAC") was "incorporated into the demand." *See* Dkt. 1131-5. There are numerous problems with this argument. The single paragraph that mentions the proposed SAC is alleged in the same generic and conclusory language as the June 13, 2016, letter's paragraphs 16 and 22, which the Ninth Circuit found insufficient in *Miesen v. Munding*. *Id*. at 6 ¶ 19. Furthermore, the proposed SAC Plaintiff is relying upon to try to convince the Court that he met the derivative demand requirements for "all acts, omissions and causes of action occurring since the July 2012 demands" [Dkt. 1131 at 24] – a span of four years – was proposed to the Court with Plaintiff's motion to amend his pleading on May 29, 2016 – approximately two weeks *before* Plaintiff made the June 13, 2016, demand. *See* Dkt. 131-2. Judge Dale recognized in this case that filing a motion to amend the complaint before making a derivative demand and waiting the requisite 90 days is improper. *See* Dkt. 210 at 34 (stating Plaintiff "could not have moved to amend the complaint [to assert claims relating to the GemCap settlement agreement in the TAC] until 90 days after he served the [June 13, 2016] demand letter, or until AIA responded to the demand"). Yet that is precisely what Plaintiff did with respect to his proposed SAC and the June 13, 2016, demand letter. Plaintiff then jumped the gun *a second time* by failing to wait the requisite 90 days after providing his demand before he filed the SAC on June 20, 2016 – just one week after making the July 13, 2016, demand. *See*

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 22

Dkt. 137. The July 13, 2016, letter demanding that the boards pursue the claims asserted in the proposed SAC is, therefore, a clearly insufficient derivative demand as to those claims.

Plaintiff admits that the August 23, 2016, demand "provided the same information" as the June 13, 2016, demand, though there were some minor differences such as renumbered paragraphs and added reference to the proposed Third Amended Complaint [Dkt. 139-2] (in addition to referencing the "proposed Second Amended Complaint"). *See* Dkt. 1131 at 24. The August 23, 2016, demand letter is insufficient as to the HT Defendants for the same reasons as the Ninth Circuit found it to be insufficient as to the attorney defendants in *Miesen v. Munding*. *See Munding*, 822 F. App'x at 548-49; *see also* Dkt. 1131-14 at 15 (noting Plaintiff's argument that Judge Dale in this case "found 'the same demand letters' to be sufficient"); Dkt. 210 at 2-5 (addressing the sufficiency of the June 13, 2016, and August 23, 2016, letters as to claims against other defendants).

The August 23, 2016, demand also did not cure any deficiencies of the June 13, 2016, demand. For one, the "proposed Second Amended Complaint" referenced in the August 23, 2016, demand had actually been filed two months earlier. *See* Dkt. 137 (filed June 20, 2016). A complaint does not and cannot constitute a sufficient pre-suit derivative demand. Furthermore, although the proposed Third Amended Complaint [Dkt. 139-2] had not been filed (and ultimately never was filed), the only material difference between it and the SAC was the removal of parties who destroyed diversity when they were added to the SAC. Plaintiff explained that the proposed Third Amended Complaint "simply returns this [case] to the status quo [that existed] on June 19, 2016 – the day before Plaintiffs filed the [SAC]." Dkt. 139-1 at 12 (inviting comparison between Dkt. 137 and 139-2). In other words, the August 23, 2016, letter's reference to the proposed Third Amended Complaint provided the same information as the June 13, 2016, letter's

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 23

reference to the proposed SAC, which by August 23, 2016, was no longer "proposed" and had been filed. The August 23, 2016, demand, like the June 13, 2016, letter, was not a sufficient pre-suit demand, not only because it failed to meet substantive content and support requirements, but also because it contained claims and information that had already been asserted in a filed complaint.

The August 23, 2016, demand letter was the last demand Plaintiff made before he filed the TAC on April 24, 2017. Plaintiff therefore relies upon the June 13, 2016, and August 23, 2016, demand letters for claims that allegedly arose or were newly asserted after those dates. *See* Dkt. 1131 at 24. The argument that these demands are sufficient with respect to further allegations of wrongdoing fails for the same reasons discussed in § V.b., above.

> **f.     Idaho's mandatory pre-suit derivative demand requirement cannot be relaxed or excused.**

Plaintiff's arguments that the Court should relax or excuse the derivative demand requirement in this case boil down to a single flawed idea: Because Plaintiff alleges that the defendants mismanaged and committed bad acts against the corporations, Plaintiff should be excused from having to make the pre-suit demand required Section 742. *See* Dkt. 1131 at 25-27 & 29-31. What Plaintiff is asking the Court to do is to apply a futility exception to the pre-suit derivative demand requirement. The futility exception, in jurisdictions that recognize it, "places a *limit* upon the directors' usual power to control the initiation of corporate litigation" by allowing the plaintiff to deprive the corporation of the power and opportunity in the first instance to assume control of the proposed litigation. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991) (emphasis original).

The first obvious problem with Plaintiff's futility argument is that Idaho does not recognize a futility exception.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 24

**16-ER-4007**

> The futility exception arose by case law under the court rule addressing such actions. In 1998, the legislature adopted a comprehensive enactment relating to the rights of parties to shareholder derivative actions as part of the corporations code. This included I.C. § 30–1–742, specifying the conditions under which a shareholder may commence a derivative proceeding.
>
> Neither of the two exceptions to the demand requirement set forth in I.C. § 30–1–742 encompasses the doctrine of futility. "Statutes are construed under the assumption that the legislature was aware of all other statutes and legal precedence at the time the statute was passed." "The legislature is presumed not to intend to overturn long established principles of law unless an intention to do so plainly appears by express declaration or the language employed admits of no other reasonable construction."
>
> Accordingly, we presume the legislature was aware of the common law futility exception when the statute including two exceptions to the demand requirement was adopted, but the legislature chose not to add a provision expressing the concept of futility as an exception. This appears to be a clear demonstration of the legislature's intent to no longer recognize "futility" as an exception to the requirement of demand as a condition preceding the institution of a shareholder's derivative action. This Court affirms the district court's decision that written demand was not excused in this case and holds that the futility exception no longer applies to the demand requirement as set forth in the statute.

*McCann v. McCann*, 138 Idaho 228, 236, 61 P.3d 585, 593 (2002) (citations omitted). Plaintiff's arguments based on alleged demand futility meritless.[8]

Just like Plaintiff's futility argument, his argument that Idaho's requirement of a sufficient pre-suit demand should be "excused by extraordinary circumstances" must fail. Dkt. 1131 at 33. Plaintiff argues that the Idaho Supreme Court has yet to address whether to recognize the "extraordinary circumstances" exception to the derivative demand requirement, and he invites this Court to predict that the Idaho Supreme Court would recognize such an exception under the circumstances of this case. Dkt. 1131 at 29-31. Plaintiff fails to recognize that the concept of "extraordinary circumstances" arose in late 1800's and early 1900's as an

---

[8] It is also worth noting that Plaintiff is invoking futility, not to prevent the directors from assuming control of the corporation, but to try to excuse his failed attempts to satisfy the statutory derivative demand requirements after the fact. This is an obvious misuse of the futility exception, even if it were to be recognized in Idaho.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 25

**16-ER-4008**

exception to the preconditions to bringing derivative actions that were developed in the common law by courts of equity. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991), quoting *Ross v. Bernhard*, 396 U.S. 531, 534 (1970). And Idaho has, since that time, codified its derivative demand requirement, along with the only potential exceptions to it. This was expressly recognized by the Idaho Supreme Court in *McCann* when it rejected the futility exception. There is simply no legitimate basis to argue that Idaho, which has expressly codified the derivative demand exceptions it recognizes, would nonetheless recognize an "extraordinary circumstances" exception after rejecting the futility exception.

Plaintiff also attempts to distinguish himself from the rest of the universe of shareholders who are required to comply with the mandatory pre-suit demand requirements of Section 742 by arguing this case involves *especially* egregious behavior and mismanagement by sophisticated directors (some of whom were attorneys) and others allegedly exercising wrongful control over the corporation's affairs. *See* Dkt. 1131 at 25-27 & 29-31. Idaho's derivative demand statute does not condition its application on how offensive the alleged acts or omissions are, whether the alleged wrongdoers are the directors, or whether they were experts in corporate law. Again, there are statutorily enumerated exceptions to the derivative demand requirement, and allegations that someone in control of the corporation did "really bad" things, intentionally broke the rules of corporate governance, or "went rogue" acting outside the authority of a properly constituted board are simply not recognized as exceptions. *See id.* Rather, these are precisely the types of things that shareholder derivative actions, complete with their unambiguous statutory pre-suit demand requirements, are designed to address. *See McCann* at 233, 61 P.3d at 590 (recognizing derivative actions are available to pursue a remedy on the corporation's behalf when the corporation fails to protect itself "because it is controlled by the wrongdoers"); *Kamen v. Kemper*

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 26

*Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (stating derivative actions exist as a means to "protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers'"); Mod. Bus. Corp. Act § 742 cmt. [Dkt. 1131-16] (explaining that a written demand is required "in all cases … even though no director may be independent"). Plaintiff's argument that the Court should apply an exception that swallows the rule is entirely meritless, especially in light of Idaho's outright rejection of the futility exception.

Plaintiff also argues that the only possible reason that the boards did not respond to his derivative demands or request additional information was that they "were well aware of what was requested by the demands." Dkt. 1131 at 25. Earlier in his brief, Plaintiff made a similar argument that the defendants would have responded to the July 21, 2008, demand with the arguments they make in this Motion if they had been unsure of the conduct or parties to which the letter referred. Dkt. 1131 at 21. These are entirely improper arguments. Not only do they ask the Court to speculate about how particular directors subjectively interpreted the Plaintiff's derivative demands, but it also ignores the fact that a board has no obligation to respond to a derivative demand. *See* I.C. § 30-1-742 / § 30-29-742; Dkt. 1131-16 (attaching Mod. Bus. Corp. Act § 742 cmt. 4 (2002), which states "[t]here is no obligation on the part of the corporation to respond to the demand").

Plaintiff's argument that applying Idaho Code's pre-suit derivative demand requirement in this case would lead to an "absurd result" was also firmly rejected by the Idaho Supreme Court a decade ago. *See* Dkt. 1131 at 26, 29 & 30.

> [W]e have never revised or voided an unambiguous statute on the ground that it is patently absurd or would produce absurd results when construed as written, and we do not have the authority to do so. "The public policy of legislative enactments cannot be questioned by the courts and avoided simply because the courts might not agree with the public policy so announced."

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 27

*Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 896, 265 P.3d 502, 509 (2011) (internal citations omitted) (also stating that "the contention that [the court] could revise an unambiguous statute because [the court] believed it was absurd or would produce absurd results is itself illogical" under the rules of statutory construction).

### VI.   The HT Defendants have the right to contest the sufficiency of the derivative demands; they do not "lack standing."

Plaintiff cites three foreign cases for the proposition that only the corporation should have standing to challenge the sufficiency of a derivative demand. *See* Dkt. 1131 at 28. Plaintiff also represents that Idaho has not addressed the issue. *Id*. at 28. To the very clear contrary, the Idaho Supreme Court has expressly held in multiple cases that "a defendant's standing 'is not at issue' when evaluating the merits of a defense." *Stonebrook Const., LLC v. Chase Home Fin., LLC*, 152 Idaho 927, 930, 277 P.3d 374, 377 (2012) (holding plaintiff's argument that defendant did not have standing to raise a statute as a defense was "without merit"). The *Stonebrook Const.* court cited *Taylor v. AIA Servs. Corp.*, 151 Idaho 552, 564, 261 P.3d 829, 841 (2011), an underlying case relating to the AIA corporations in which Mr. Bond was counsel for the plaintiff Reed Taylor. The *Taylor* court held:

> Standing is a subcategory of justiciability, and the standing inquiry is focused on the party seeking relief. The Respondents are defendants and have invoked I.C. § 30–1–6 as a defense; thus, standing is not at issue.

*Id*. Idaho clearly does not follow the infirm principle advanced by Plaintiff, and there is no doubt that the HT Defendants have the right to raise Plaintiff's failure to comply with Section 742 as a defense in this Rule 12(c) motion.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 28

**VII.    All of Plaintiff's claims against the HT Defendants should be dismissed; they are derivative, not direct, claims.**

The HT Defendants' Motion seeks dismissal of all of Plaintiff's claims against them (*see* Dkt. 1067-1 at 19), which Plaintiff convolutes to mean that "[t]he defendants seek the dismissal of Miesen's Third Amended Complaint in its entirety." Dkt. 1131 at 31. Obviously that is not the case; the HT Defendants did not move on behalf of any other defendants and not all defendants joined the Motion.

In any event, Plaintiff argues in his opposition brief that, even if all of the derivative claims were dismissed, the entire case cannot be dismissed because he has asserted direct claims. *Id*. It appears Plaintiff does not appreciate the well-established difference between derivative and direct claims.

> The distinction between individual and derivative actions has been explained by one treatise as follows:
>
> [I]t is generally held that a stockholder may maintain an action in his own right for an injury directly affecting him, although the corporation also may have a cause of action growing out of the same wrong, where it appears that the injury to the stockholder resulted from the violation of some special duty owed to the stockholder by the wrongdoer and having its origin in circumstances independent of the plaintiff's status as a shareholder.
>
> A stockholder's derivative action is an action brought by one or more stockholders of a corporation to enforce a corporate right or remedy a wrong to the corporation in cases where the corporation, because it is controlled by the wrongdoers or for other reasons fails and refuses to take appropriate action for its own protection....
>
> An action brought by a shareholder is derivative if the gravamen of the complaint is the injury to the corporation or to the whole body of its stock or property and not injury to the plaintiff's individual interest as a stockholder.

*McCann v. McCann*, 138 Idaho 228, 233, 61 P.3d 585, 590 (2002) (internal citations omitted). In *McCann*, the plaintiff's complaint against the corporation's directors "alleged both derivative and individual claims relating to the following causes of action: breach of fiduciary duties,

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 29

**16-ER-4012**

negligence by the directors, conversion of corporate property, self-dealing and conflict of interest transactions." *Id*. at 231, 61 P.3d at 588. The court affirmed that the plaintiff's claims were derivative rather than direct in nature because none of the duties he alleged appeared to be a "special duty owed to the stockholder by the wrongdoer and having its origin in circumstances independent of the plaintiff's status as a shareholder." *Id*. at 233–34, 61 P.3d at 590–91. Rather, the claims were that the corporation was "controlled by the wrongdoers or for other reasons fails and refuses to take appropriate action for its own protection." *Id*. at 234, 61 P.3d at 591. The *McCann* court further explained that, even if there were some potential injury to the plaintiff, his "alleged injuries appear to be dependent on his status as a shareholder, and solely an injury to the corporation but not to him personally as an individual." *Id*.

Similarly, in *Mannos v. Moss*, 143 Idaho 927, 933, 155 P.3d 1166, 1172 (2007), the plaintiff alleged that other shareholders of a closely-held corporation breached fiduciary duties they owed to him, including conversion of the corporation's assets for personal use. The court held that the plaintiff's assertion of direct causes of action, rather than derivative claims, was misplaced because any claim he had "regarding the defendants' depletion of corporate assets can only be pursued by him through a derivative action." *Id*.

Likewise, Plaintiff's complaint does not reveal any factual allegations that would support direct claims; Plaintiff's claims are clearly derivative. Nowhere in the TAC [Dkt. 211] or in Plaintiff's opposition brief [Dkt. 1131] does Plaintiff allege any conduct that resulted in damages incurred by Mr. Miesen individually, as compared to allegations of conduct causing injury to AIA Services' assets or to the whole body of its stock, and all of his claims against the HT Defendants are dependent upon his status as a shareholder of AIA Services. For the same reasons, Plaintiff's assertion that the declaratory judgment claim asserted in his TAC is a direct

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 30

**16-ER-4013**

cause of action against the HT Defendants is equally misguided. *See* Dkt. 1131 at 31 (citing Dkt. 211 ¶¶ 225-27).

Plaintiff also argues that he is pursuing direct claims pursuant to Idaho Code § 30-1-304(2)(a) & (3) (now § 30-29-304(b)(1) & (c)), which provide that "[a] corporation's power to act may be challenged … [i]n a proceeding by a shareholder against the corporation to enjoin the act" and, in such a proceeding, "the court may enjoin or set aside the act, if equitable and if all affected persons are parties to the proceeding, and may award damages for loss, other than anticipated profits, suffered by the corporation or another party because of enjoining the unauthorized act."[9] Contrary to Plaintiff's argument, this case is not a proceeding against the AIA entities to enjoin an act. The AIA entities are merely nominal defendants. In fact, Plaintiff vigorously argued that because the AIA entities are merely "nominal corporate defendants," they "may not defend against Miesen's claims and must remain neutral in this lawsuit." Dkt. 562-1 at 11 (arguing, therefore, that the AIA entities "cannot have any common interest privileges with any of the defendants in this lawsuit as to any of Miesen's claims"). Furthermore, Plaintiff does not seek to "enjoin" AIA from doing anything with respect to the HT Defendants; none of the claims Plaintiff asserts under Section 304 allege any transaction involving the HT Defendants that could possibly have been enjoined by the Court. *See* Dkt. 211 ¶ 229 (filed April 24, 2017). Rather than seeking to enjoin the corporation from taking any action with respect to the HT Defendants, Plaintiff's TAC seeks to have the attorney fees that AIA already paid to the HT

---

[9] Notably, Plaintiff's TAC alleges claims under Idaho Code § 30-1-304 / § 30-29-304 without specifying a particular subsection. *See* Dkt. 211 ¶ 229. The complaint's general reference to Section 304 as a whole does not necessarily support the argument that Plaintiff has alleged direct claims pursuant to Section 304(2)(a) & (3) (now § 304(b)(1) & (c)), as his present argument appears intended to suggest, because Section 304(2)(b) (now § 304(b)(2)) provides for a derivative cause of action to challenge a corporation's power to act, stating: "[a] corporation's power to act may be challenged: … [i]n a proceeding by the corporation … derivatively … against an incumbent or former director, officer, employee or agent of the corporation."

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 31

Defendants "disgorged and returned to AIA." Dkt. 211 ¶ 119; *see also* Dk. 1131 at 31 (arguing Plaintiff is seeking to set aside or void completed transactions and recover paid fees).

In summary, the claims asserted by Plaintiff against the HT Defendants are all derivative claims that should be dismissed for Plaintiff's failure to provide sufficient derivative demands with respect to his claims against the HT Defendants.

## VIII.   Plaintiff's request to amend the complaint should be denied.

At the end of his opposition brief, Plaintiff makes a one-sentence argument that he should be granted leave to amend if the Court finds that the Third Amended Complaint fails to allege specific facts or is otherwise deficient. *See* Dkt. 1131 at 32. He provides no argument, and cites only one case without explaining why he does so. *Id*. The HT Defendants surmise (which they would not have to do if Plaintiff offered any reasonable amount of support for his argument), that Plaintiff cited this case because it stands for the proposition that "[d]ismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991). Plaintiff has not submitted a proposed amended complaint as required for a motion for leave to amend pursuant to Dist. Idaho Loc. Civ. R. 15.1, but it would not matter anyway. Plaintiff could copy and paste his derivative demands into the body of his complaint and it would not save the claims against the HT Defendants because the derivative demands themselves are insufficient. This is the same reason that the Ninth Circuit in *Miesen v. Munding* affirmed the district court's dismissal of Plaintiff's complaint without leave to amend. *See Munding*, 822 F. App'x at 549.

## IX.   The Court should decide this Motion without oral argument.

The HT Defendants object to Plaintiff's request for oral argument, which would add unnecessary time and expense to the decision process.

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 32

DATED this 20th day of August, 2021.

ELAM & BURKE, P.A.


By:   /s/ *Joyce A. Hemmer*
      Loren C. Ipsen, Of the Firm
      Joyce A. Hemmer, Of the Firm
      Attorneys for Defendants Hawley Troxell
      Ennis & Hawley LLP, Gary D. Babbitt,
      D. John Ashby, and Richard A. Riley

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL
CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS
[Dkt. 1067] - 33

**16-ER-4016**

CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of August, 2021, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons via email:

| | |
|---|---|
| Roderick C. Bond<br>rod@roderickbond.com<br>*Attorney for Plaintiff* | Daniel L. Glynn<br>dglynn@idalaw.com<br>*Attorneys for Michael W. Cashman, Sr., R. John Taylor, James Beck, Connie Taylor Henderson, Crop USA Insurance Services, LLC and Crop USA Insurance Agency, Inc.* |
| Andrew M. Schwam<br>amschwam@turbonet.com<br>*Attorney for Plaintiff* | Michael S. Bissell<br>mbissell@campbell-bissell.com<br>Tyler S. Waite<br>twaite@campbell-bissell.com<br>*Attorneys for Reed J. Taylor* |
| Alyson A. Foster<br>alyson@dempseyfoster.com<br>William E. Adams<br>bill@weadamslaw.com<br>*Attorneys for Intervenor GemCap Lending I, LLC* | |

/s/ *Joyce A. Hemmer*
Joyce A. Hemmer

4845-8799-0773, v. 1

REPLY IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO DISMISS ALL CLAIMS FOR FAILURE TO SATISFY MANDATORY DERIVATIVE DEMAND REQUIREMENTS [Dkt. 1067] - 34

**16-ER-4017**

Case: 18-cv-00040-RDP-ECW Document 189 Filed 08/20/21 Page 35 of 111



## Roderick Bond
### Law Office, PLLC

June 13, 2016

<u>*VIA U.S. Mail and Facsimile (208) 799-9172*</u>

Board of Directors
AIA Services Corporation
P.O. Box 538
Lewiston, ID 83501

Board of Directors
AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID 83501

Re:     *Shareholder Derivative Demand*

Dear Purported Boards of Directors:

As you are well aware, Dale Miesen, Jerry Legg and Donna Taylor (individually and as Personal Representative of the Estate of Sara Taylor) have all been shareholders of AIA Services Corporation since well before 1995, and this firm represents them for purposes of this shareholder derivative demand ("<u>derivative demand</u>").

As you know, there have been, and continues to be, extensive malfeasance, torts and illegal conduct occurring at AIA Services Corporation and AIA Insurance, Inc., and the unlawfully covering up of the foregoing acts, omissions and torts. Consequently, this letter is yet another derivative demand being provided in accordance with Idaho Code, including I.C. §§ 30-1-742 and 30-29-742 (to the extent that the former may apply to certain acts, omissions and/or torts). However, despite my prior requests to inspect documents and records on behalf of the below named shareholders in accordance with Idaho Code, you have refused to allow such inspections to take place or otherwise provide responsive documents. As a result, this derivative demand was delayed and is based only on the most recent information obtained to date.

601 108th Ave, Suite 1900, Bellevue, WA 98004 | Phone: (425) 591-6903 | Web: www.roderickbond.com
Roderick C. Bond - Attorney | Email: rod@roderickbond.com | Licensed in Washington and Idaho

**16-ER-4018**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 2

For purposes of this derivative demand, the following terms shall apply: (a) "AIA" means AIA Services Corporation and its wholly owned subsidiary AIA Insurance; (b) "CropUSA" means CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC; (c) "John" means R. John Taylor and his spouse as to any property transferred to such spouse, together with any entities partially or wholly owned by him (including Green Leaf RE, Reinsurance Partners, Weskan Agency, Pacific Empire Holdings, Sound Insurance and other entities); (d) "Connie" means Connie Taylor, Connie Taylor Henderson, and Connie Wright Henderson and her spouse as to any property transferred to such spouse; (e) "Beck" means James Beck and his spouse as to any property transferred to such spouse; (f) "Cashman" means Michael W. Cashman, Sr. and his spouse as to any property transferred to such spouse; (g) "Duclos" means JoLee K. Duclos and her spouse as to any property transferred to such spouse; (h) "Hawley Troxell" means Hawley Troxell Ennis & Hawley LLP and the applicable present and former attorneys at Hawley Troxell (including, without limitation, D. John Ashby, Gary Babbitt and Richard A. Riley); (i) "Pacific Empire Radio" means Pacific Empire Radio Corporation; (j) "GemCap" means GemCap Lending I, LLC, together with all of its applicable officer(s) and agents; (k) "Combined Defendants" means all of the foregoing parties except as to AIA (but includes attorneys, law firms and agents of AIA), but "Combined Defendants may include or not include Hawley Troxell and/or Pacific Empire Radio to the extent applicable based on certain facts and circumstances and/or when such facts and circumstance ocurred; and (l) "Controlling AIA Defendants" means John, Connie, Beck, Cashman and Duclos. For each of the foregoing terms which define more than one party, each such term shall also mean any one or more of the defined parties for purposes of demanding in the alternative.

Dale Miesen, Jerry Legg and Donna Taylor hereby demand that all possible claims and legal action be immediately taken in a court of law on behalf of AIA as follows (including claims which may be contemplated and/or related in any way to the following):[1]

1. Pursue all possible claims and defenses, and seek the maximum damages, against the Combined Defendants, including, without limitation, all possible tort claims (including, without limitation, aiding and abetting in the commission of torts against AIA), contract claims, declaratory relief, injunctive relief and punitive damages based on all acts, omissions, concealments, and failure to disclose. Without limiting the foregoing and so there is no confusion (even though you are well aware of the facts, lawsuits and legal issues as having full access to information at AIA and the most of the Combined Defendants), more specific examples are included below and demand is hereby made to take action against those parties and any of the other Combined Defendants to recover damages based on any of such specific examples.

---

[1] This derivative demand shall also be construed as being provided by any and/or all of the other innocent minority common and preferred shareholders of AIA Services Corporation. The undersigned apologizes for any spelling or grammatical errors, but he wanted to get this derivative demand submitted to AIA as soon as possible.

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 3

2.  Pursue all possible claims and defenses against the Combined Defendants relating in any way to all loans, guarantees, settlement agreements and any other agreements or instruments involving GemCap and AIA (including, without limitation, the loans, guarantees, security agreements, settlements, agreements and all other instruments which are the subject matter of the lawsuit *Gemcap Lending I, LLC v. CropUSA Insurance Agency, Inc., et al.*, in the U.S. District Court, Central District of California, Case No. CV 13-05504 SJO (MANx) ("California Lawsuit"). As you know, AIA was barred from guaranteeing any loans for CropUSA or entering into any settlement agreements under AIA Services' amended articles of incorporation and restated bylaws and all agreements and guarantees were not properly authorized by AIA's board of directors (i.e., Donna Taylor's board designee did not authorize the guarantees and settlements). In addition, AIA received no consideration for entering into the guarantees, security agreements or settlement agreements. As a result, demand is further made to assert all possible claims and defenses in any pending and future lawsuits to have the guarantees, instruments, all settlement agreements and judgments declared illegal, ultra-vires acts, void or voidable and thus unenforceable and to pursue all related claims against GemCap, the Controlling AIA Defendants, and any other responsible parties or parties who have aided and abetted or assisted in such acts and/or omissions.

3.  Pursue all possible claims and defenses against GemCap and the other Combined Defendants to recover all property, real property and/or funds transferred or paid to it directly or indirectly from AIA (including, without limitation, the transfer of AIA Services' interest in the mortgage and real property known as the Lewis/Clark Plaza located at 111 Main Street in Lewiston, Idaho), together with all damages, attorneys' fees and costs paid or incurred by AIA based on the foregoing.

4.  Pursue all possible claims and defenses against GemCap, and to the extent necessary any of the other Combined Defendants, to extricate AIA from all settlement agreements entered into with GemCap and have such agreements declared illegal and/or unenforceable as to AIA, including, without limitation, the written Settlement Agreement which was filed by Doug Siddoway in Nez Perce County District Court dated effective September 15, 2014, together with all Assignments Agreements, related agreements, related instruments and judgments relating in any way to that Settlement Agreement and any prior or subsequent settlement agreements (including amendments or modifications thereto) in the California Lawsuit.

5.  Pursue all possible claims and defenses against GemCap, and to the extent necessary any of the other Combined Defendants, to vacate any judgments entered in favor of GemCap against AIA, including, without limitation the judgments entered in the California Lawsuit and any subsequently entered foreign judgments (including, upon belief, the foreign judgment recently entered against AIA Insurance in Nez Perce County District Court). Included in this demand is also the demand to assert that there was no jurisdiction over AIA in the California Lawsuit and thus the judgments should be voided.

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 4

6.  Pursue all possible claims and defenses against GemCap for aiding and abetting John, Connie, Beck, Cashman, CropUSA, Pacific Empire Radio any other parties in committing torts against AIA (including assisting in breaches of fiduciary duties, fraud and other torts and covering up such breaches and torts). GemCap was aware of the malfeasance occurring at AIA when it first entered into the loans and guarantees with CropUSA and AIA, that AIA was being used improperly by the Controlling AIA Defendants to fund and/or support entities partially or wholly owned by them, and GemCap became more aware of these facts as time went on, yet GemCap continued to assist the foregoing parties committing and covering up torts against AIA (including, without limitation, breaches of fiduciary duties and fraud).

7.  Pursue all possible claims against the Combined Defendants for their torts committed against AIA (including, without limitation, breaches of fiduciary duties, fraud and any other claims contemplated or related to any of the facts or issues disclosed in this letter) and the aiding and abetting of torts committed against AIA by one or more of the Combined Defendants (including, without limitation, assisting in the commission of the torts or covering up the torts).

8.  Pursue all possible claims against Controlling AIA Defendants requiring them to disgorge all compensation, consulting fees, fees, salary, benefits or any other type of payments made to them directly or indirectly from AIA (including, based on being faithless fiduciaries and/or receiving such compensation without proper authorization from AIA) and to require them to repay any funds, expenses, fees, reimbursements, and costs incurred by AIA or paid by AIA for their benefit in any legal action or matter and to obtain damage judgments for such payments and compensation. Included in this demand is disgorgement or damages for all salary, bonuses, benefits and other compensation paid to John, Beck, Connie, Cashman and Duclos from being an officer, director or other agent of AIA and all attorneys' fees, expenses and costs paid on their behalf. This demand includes the $5,000 per quarter paid to Connie and Beck to purportedly serve on AIA's Board of Directors and all compensation paid to John and Duclos for purportedly being officers and/or directors of AIA.

9.  Pursue all possible claims against GemCap and the other responsible Combined Defendants (including the Controlling AIA Defendants) for all of the attorneys' fees, costs, expenses and damages proximately caused directly or indirectly from GemCap's loans to CropUSA and AIA's guarantees of those loans, including, without limitation, all attorneys' fees, costs and expensed incurred or paid directly or indirectly by AIA for the California Lawsuit and any other lawsuit. But for GemCap agreeing to improperly make the loans and improperly agree to accept AIA's guarantees, none of the lawsuits would have occurred.

10. Pursue all possible claims and defenses against GemCap that it was not a good faith lender, had unclean hands, and/or is not entitled to any relief against AIA.

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 5

11. Pursue all possible claims against Hawley Troxell requiring it to disgorge all compensation received or paid to Hawley Troxell directly or indirectly from AIA based on Hawley Troxell's conflicts of interest, breached fiduciary duties (including the duties of loyalty) and related malpractice, including, without limitation, all subsequent payments made by AIA to Hawley Troxell.

12. Pursue all possible claims against Pacific Empire Radio for all sums owed by it to AIA, including, without limitation, the over $1,400,000 owed as disclosed in 2015) and all amounts which have been subsequently improperly lent to Pacific Empire Radio.

13. Pursue all possible claims against the Controlling AIA Defendants for allowing any funds to be lent to Pacific Empire Radio in the first place (including without limitation, for the breaches of fiduciary duties by them as present or former officers and/or directors of AIA and the aiding and abetting in assisting and/or covering up of the improper loans to Pacific Empire Radio). As you are fully aware, these loans violated AIA's amended articles of incorporation, AIA's bylaws, constituted conflicts of interest, provided no benefit to AIA and were made when AIA was not meeting its obligations to others.

14. Pursue all possible claims against Pacific Empire Radio, the Controlling AIA Defendants and any other parties relating to any agreements and subordination agreements improperly entered into between AIA, Pacific Empire Radio and any other party, as such agreements were not authorized by AIA and were not in AIA's best interests.

15. Pursue all possible claims against the Controlling AIA Defendants for allowing John to operate AIA for his benefit and/or to assist AIA in funding and the operation of entities partially or wholly owned by the Controlling AIA Defendants without AIA receiving any benefit, proper compensation, without full disclosure to AIA, in violation of applicable conflicts of interest (including under AIA Services' amended articles of incorporation and bylaws) and without obtaining proper authorization from AIA or its innocent minority shareholders.

16. Pursue all possible claims against the Controlling AIA Defendants and any other responsible party for all damages relating to all payments made directly or indirectly from AIA to the attorneys and law firms of Hawley Troxell, Crumb & Munding, Gordon & Reese, Risley Law Office PLLC, Randall Blake and Cox, Clark and Feeney, Quarles & Brady, Randall Danskin, David Gittins, Connie Taylor (and her law firms Clark and Feeney and Henderson Law Firm) and any other law firm (including for declaratory relief that no further sums are owed by AIA to any of the foregoing and that any fee agreements or conflict waivers are void), as such payments should never have been made, were never authorized by AIA, were not properly incurred or necessary for AIA, were never authorized by AIA's shareholders after full disclosure was made, and involved the attorneys and law firms taking action or performing work not in the best interests of AIA and/or in violation

Case: 1:10-cv-00274-RDP-ECV-DN Document 189/18 Filed 08/20/21 Page 40 of 211

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 6

of the duty of loyalty owed to AIA. Demand is further made to pursue all possible claims, including, without limitation, for the disgorgement of all fees, costs and expenses paid or discharge of any debts allegedly owed, to any of the foregoing attorneys, law firms and/or attorneys working at such law firms to the extent that they represented AIA based on conflicts of interest, breached fiduciary duties (including the duty of loyalty), and malpractice. To the extent that any of the forgoing law firm and attorneys did not represent AIA, then demand is made to pursue all possible claims against the Controlling AIA Defendants for all sums paid and/or owed to such attorneys and law firms by AIA. In addition, demand is made to assert all possible claims against the foregoing parties for participating and/or allowing AIA to be improperly utilized to fund the defense and prosecution of lawsuits which were not in AIA's best interests, but were instead pursued based on the interests of the Controlling AIA Defendants.

17. Pursue all possible claims against the Controlling AIA Defendants, and to the extent necessary AIA or any other Combined Defendant to ensure that AIA is not bound or obligated by any act or omission of the Controlling AIA Defendants or AIA, for not honoring Donna Taylor's unqualified appointment of a designee to AIA Services' Board of Directors (Patrick Moran and Paul Durant) and for declaratory relief that all such actions purportedly taken by the Board of Directors of AIA Services without the consent or approval of Donna Taylor's designee (who would have been the only director without a conflict of interest) were the unauthorized acts of AIA, ultra-vires and void. Such acts and omissions, include, without limitation, all guarantees and settlements with GemCap, all loans to Pacific Empire Radio, all conflict waivers or other agreements with attorneys and law firms, all board resolutions (including any resolutions provided to GemCap), and all other acts of the purported Board of Directors of AIA Services.

18. Pursue all possible claims against the Controlling AIA Defendants, CropUSA and any other of the Combined Defendants or responsible parties for all payments made to any and all vendors, creditors, consultants, agents, customers or other parties owed money by CropUSA, by the Controlling AIA Defendants, any entity partially or wholly owned by any one of the Controlling AIA Defendants, or paid at the direction of any one or more of the Controlling AIA Defendants, including, without limitation, the more recent hundreds of thousands of dollars in payments AIA made to certain agents and customers of CropUSA in 2013 and any previously or subsequently paid for CropUSA and any other entity.

19. Pursue all possible claims against the Combined Defendants for taking action violating AIA's amended articles of incorporation, violating AIA's bylaws, violating statutory and common law, and committing torts against AIA, together with aiding and abetting others (including other Combined Defendants) in covering up the torts committed against AIA. Examples of the torts and the covering up of those torts are contained with the proposed Second Amended Complaint recently filed in the federal derivative lawsuit by Dale Miesen and Donna Taylor—the facts and torts alleged in that Second Amended Complaint have continued since prior demands.

16-ER-4023

Case: 1:10-cv-00274-RDP-EJW Document 18-1 filed 09/17/18 08/20/21 Page 41 of 11 211

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 7

20. Pursue all possible claims against the Combined Defendants for failing to properly allocate costs, labor, expenses and other items between AIA and other entities, including, CropUSA, and by allowing such issues to take place in the first place, including, without limitation, based on the conflicts of interest and restrictions under AIA's amended articles of incorporation, bylaws and the undivided duties of loyalty owed by the Controlling AIA Defendants to AIA, among others, and for continuing to conceal and cover up all such issues and related issues.

21. Pursue all possible claims against the Controlling AIA Defendants for all damages, fees and costs incurred or paid by AIA for attempting to effectuate a reverse stock split to eliminate the minority common shareholders of AIA Services in violation of AIA Services' amended articles of incorporation, bylaws and Idaho Code, including, without limitation, the hundreds of thousands of dollars of attorneys' fees and costs paid to Randall Danskin for the improper reverse stock split and to purportedly represent AIA in the subsequent lawsuit against certain of AIA Services' shareholders. Demand is further made to pursue all possible claims against Doug Siddoway (and any other responsible attorney) and Randall Danskin, including, for breach fiduciary duties, conflicts of interest, and disgorgement of all attorneys' fees and costs paid to them and to have declared unlawful or uncollectable any attorneys' fees and costs allegedly owed to them by AIA, including, without limitation, based on their malpractice, breaches of duty of loyalty owed to AIA, conflicts of interest, for aiding and abetting the Controlling AIA Defendants in the commission of torts (including in that lawsuit and others), and taking action in violation of their undivided fiduciary duties of loyalty owed to AIA. To be clear, full and complete disgorgement should be sought and obtained for all fees, costs and expenses paid directly or indirectly by AIA (or by GemCap) to Randall Danskin for all work that it and its attorneys have directly or indirectly performed for AIA and for concealing from AIA the conflicts of interest, breaches of fiduciary duties and malpractice committed by Randall Danskin against AIA—Mr. Siddoway and Randall Danskin placed their interests in earning fees ahead of AIA's interests, are faithless fiduciaries and are not entitled to retain any compensation relating to AIA.

22. Pursue all possible claims against John Munding and Crumb & Munding (or such other firm Mr. Munding is operating through) for malpractice, breach of fiduciary duties and to disgorge all attorneys' fees, costs and expenses paid to them directly or indirectly by AIA for the California Lawsuit as Mr. Munding intentionally violated his duties owed to AIA, including, without limitation, his duties of loyalty owed to AIA and by taking direction and action benefitting other defendants (including John's) and placing their interests in front of AIA and by representing CropUSA, AIA and other parties when there were conflicts of interest in doing so and Mr. Munding knew that he could not properly represent AIA's interests and when he had no intention of doing so. Demand is further made to pursue all possible claims against Mr. Munding and Crumb & Munding for improperly failing to assert that the guarantees and settlement agreements entered into by AIA were not

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 8

authorized and were thus illegal or ultra-vires and by allowing AIA to enter into them in the first place. Mr. Munding places his interests in earning fees ahead of AIA's interests.

23. Pursue all possible claims against the Controlling Defendants, the applicable Combined Defendants and any other parties or entities to recover all sums paid directly or indirectly on behalf of any such parties (including the Controlling Defendants) by AIA, including, without limitation, loan payments (including loans paid for John and others), consulting fees (including for past and present employees and/or purported consultants for CropUSA, Sound Insurance, Weskan, AIA (to the extent unnecessary) and other entities or parties, and wages or benefits paid for the foregoing), expenses, costs, litigation expenses, commission refunds, credit card payments (made for John and others) cell phone bills, insurance payments, CropUSA commissions to agents (which was hundreds of thousands of dollars), telephone costs, advances (including to John, Weskan Agency, and others), tax payments, and other payments. As you are aware, the foregoing are easily determined by reviewing AIA's check registers and by ascertaining from John, Duclos or others regarding items not listed in the check registers, including, such information which has never been disclosed to AIA's minority shareholders or their attorneys and all subsequent ones to this demand.

24. Pursue all possible claims against the Controlling Defendants for wasting AIA's assets and funds and paying excessive compensation to any and/or all of them, including, without limitation, for the purpose of concealing and aiding and abetting in the covering up of torts committed against AIA.

25. Pursue all possible claims against the Controlling Defendants for allowing other entities partially or wholly owned by them, including CropUSA, to compete against AIA in violation of John's Executive Officer's Agreement and the undivided duty of loyalty owed to AIA by them as majority shareholders, directors, and/or officers of AIA.

26. Pursue all possible claims against John for representing AIA in any lawsuit, including, without limitation, the lawsuit that Dale Miesen, Donna Taylor and Paul Durant filed against GemCap and AIA to have the illegal guarantees and settlement agreements, which were the subject matter of the California Lawsuit, voided, including, without limitation, claims for intentional breaches of fiduciary duty and intentional malpractice for failing to represent the interests of AIA and by breaching the duty of loyalty owed to AIA.

27. Pursue all possible claims against the Combined Defendants for all damages and relief proximately caused from their acts and/or omissions in leading to the decimation of AIA and its present financial condition.

28. Pursue all possible claims against the Controlling AIA Defendants for any and all damages, tax liabilities, interest, penalties and any other source of damages causes by their acts, omissions and/or torts against AIA.

.

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 9

29. Pursue all possible claims requiring an accounting of all funds, assets, labor, expenses, costs and the allocation of such items between or among other individuals and parties (including the Controlling AIA Defendants and any entities partially or wholly owned by any one or more them).

30. To the extent necessary, pursue all possible claims and defenses for equitable subordination, indemnification (including equitable indemnification) and all related claims and defenses against the Combined Defendants in any pending or future lawsuit.

31. Pursue all possible claims and relief to obtain an accounting from Trustmark of all payments made to AIA and the subsequent use of such funds.

32. Pursue all possible claims seeking all necessary declaratory relief to make AIA whole and its innocence minority common and preferred shareholders whole (to the extent that shares have been cancelled or redeemed).

33. Pursue all possible claims requiring Donna Taylor's designee to be appointed to the Board of Directors of AIA Services and to require that the board of directors comply with AIA's amended articles of incorporation, AIA's bylaws, statutory and common law and to ensure full disclosure is made to AIA.

34. Pursue all possible claims that CropUSA and other entities (including Pacific Empire Radio) are the alter-ego of the Controlling AIA Defendants and thus they are individually liable for all damages.

35. To the extent John or others of the Controlling AIA Defendants have transferred real or personal property to their present or former spouses or any other party, pursue all possible claims to recover such property for the benefit of AIA and to help satisfy any judgment(s) which may be entered in favor of AIA.

36. Pursue all possible claims to prevent any of the Controlling AIA Defendants from being directors or officers of AIA.

37. Pursue all possible claims to seek declaratory judgment requiring AIA's officers, directors and shareholders to comply with AIA's amended articles of incorporation, AIA's bylaws and statutory and common law.

38. Pursue all possible claims against David Riley and his law firm (including Riley Law Offices) for malpractice and breaching his fiduciary duties owed to AIA, including, without limitation, requiring the repayment of all sums paid to them directly or indirectly from AIA, for disgorgement of all attorneys' fees, costs and expenses paid to them when they breached their fiduciary duties owed to AIA (including the undivided duty of loyalty),

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 10

engaged in impermissible conflicts of interest (representing the interests of the Controlling AIA Defendants over the interest of AIA), aided and abetted the Controlling AIA Defendants, and for all other damages (including, without limitation, allowing property owned by AIA to be transferred to others (including GemCap) and/or utilized by the Controlling AIA Defendants).

39. Pursue all possible claims against the Combined Defendants and any and all of the parties listed above for concealing from AIA the facts, conflicts and failing to disclose all necessary facts and claims.

40. Pursue all possible claims against John and Connie relative to litigation expenses and costs paid for other lawsuits (including the lawsuit against John and Connie in Ada County), including fees and costs paid to Connie (or her firm) and/or on behalf of her or John.

41. Pursue all possible claims against the Combined Defendants, which have not been specifically stated above, to recover all damages and money owed and/or traced directly or indirectly to AIA and/or otherwise derived from its labor, office space, trade secrets, funds, commissions, agency force, loans, guarantees, lines of credit and/or any other asset.

42. Pursue all possible claims of prejudgment interest for all sums and damages owed to AIA in the maximum amount permitted under the law.

43. Pursue all possible claims against any of the Combined Defendants or any other parties identified above to recover any attorneys' fees and costs incurred in any lawsuit or litigation directly or indirectly involving AIA.

44. To the extent that the conduct and claims discussed above continues after this derivative demand, to pursue all possible claims based on all future action based upon the same or similar acts, omissions, conduct, claims and damages.

Please note that to the extent that any of the above demands overlap or are duplicative with prior demands or may include acts and claims which occurred after one of the prior demands, Dale Miesen, Jerry Legg and Donna Taylor are not waiving any claims for such prior demands or conceding that you have the right to now address those demands nor are they waiving the right to seek relief based on irreparable harm to AIA. To the contrary, Dale Miesen and Donna Taylor are already asserting, or seeking to assert, many claims on behalf of AIA.

In addition, please note that time is of the essence on many of the above claims and to the extent that AIA is harmed based on your failure to promptly act or promptly reject this derivative demand, you and any others (including other Controlling AIA Defendants) will be held liable. The torts, facts and issues are well known to you and you are in control of the facts and documents. Thus, you bear the risk of dragging out this demand and failing to take action on behalf of AIA.

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 11

Sincerely,

RODERICK BOND LAW OFFICE, PLLC

By: Roderick C. Bond

cc: Dale Miesen
    Donna Taylor
    Jerry Legg
    Steve Wielend
    Shawnee Perdue

16-ER-4028

RODERICK C. BOND, WSBA NO. 32172
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA 98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiff Dale L. Miesen

UNITIED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>v.<br><br>JOHN D. MUNDING and KAREN MUNDING, married individuals and the community property comprised thereof; JOHN OR JANE DOES I-III, unknown individuals; MUNDING, P.S., a Washington Professional Services Corporation; CRUMB & MUNDING, P.S., a Washington Professional Services Corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation;<br><br>Defendants. | CASE NO.: 2:18-cv-00270-RMP<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**FIRST AMENDED COMPLAINT - i**

16-ER-4029

**TABLE OF CONTENTS**

I. STATEMENT OF JURISDICTION ..................................................................1

II. STATEMENT OF VENUE ..............................................................................1

III. PARTIES AND DEFINITIONS OF THE PARTIES ......................................1

IV. STATEMENT OF FACTS ...............................................................................6

    A. AIA's Ownership Structure and Corporate Governance ...........................6

    B. The Unlawful GemCap Guarantees and Subsequent Litigation. ..............11

    C. The GemCap Lawsuit and the Unlawful Settlements. ..............................14

    D. The Ongoing Conflicts of Interest and the Defendants' Breached Duties. .......22

    E. Washington Law Applies to Plaintiff's Claims ........................................36

V. COMPLIANCE WITH RULE 23.1 ................................................................38

VI. COUNT I—BREACHES OF FIDUCIARY DUTIES ....................................45

VII. COUNT II—FRAUDULENT CONCEALMENT .........................................50

VIII. COUNT III—AIDING AND ABETTING IN OTHER PARTIES'
    BREACHES OF FIDUCIARY DUTIES AND FRAUD .............................52

IX. COUNT IV—LEGAL MALPRACTICE .......................................................54

X. COUNT V—VIOLATIONS OF CONSUMER PROTECTION ACT ..........56

XI. COUNT VI—DECLARATORY JUDGMENT ..............................................58

XII. COUNT V—EQUITABLE INDEMNIFICATION ........................................59

XIII. JURY DEMAND .............................................................................................60

**FIRST AMENDED COMPLAINT - ii**

16-ER-4030

XIV. PRAYER FOR RELIEF ........................................................................61

VERIFICATION OF DALE L. MIESEN ..................................................63

CERTIFICATE OF SERVICE ..................................................................64

**FIRST AMENDED COMPLAINT - iii**

16-ER-4031

Plaintiff Dale L. Miesen alleges cumulatively, or when necessary and where applicable in the alternative, against the defendants as follows in this First Amended Complaint ("Complaint"):

## I.    STATEMENT OF JURISDICTION

1.    This Court has diversity jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $1,000,000 and this action is between citizens of different states.

2.    This Court has personal jurisdiction because the Defendants are citizens and residents of Spokane County, Washington and the Defendants engage(d) in the practice of law in Spokane County, Washington.

## II.    STATEMENT OF VENUE

3.    Venue is proper in the Eastern District of Washington under 28 U.S.C. § 1391(b)(2) & (c) because a substantial part of the acts, errors and omissions giving rise to the claims asserted in this Complaint occurred in, and the Defendants are citizens and residents of, Spokane County, Washington.

## III.    PARTIES AND DEFINITIONS OF THE PARTIES

4.    Plaintiff Dale L. Miesen (hereinafter referred to as "Plaintiff") is an individual, a resident of Tarrant County, Texas, and thus a citizen of the state of Texas. Plaintiff is, and has been, a common shareholder of AIA Services Corporation (hereinafter referred to as "AIA Services") during all relevant times and

**FIRST AMENDED COMPLAINT - 1**

16-ER-4032

Case 2:18-cv-00240-RMP-ECF No. 10 filed 11/08/18 PageID.50 Page 50 of 117

specifically at the time of the transactions, acts, omissions, malfeasance, and damages at issue in this lawsuit.

5.    Defendant John D. Munding is an individual, the husband of defendant Karen Munding, a resident of Spokane County, Washington and thus a citizen of the state of Washington. All acts and omissions of John D. Munding were committed with the intent to benefit the community of John D. Munding and Karen Munding.

6.    During all relevant times, the defendant John D. Munding was an attorney practicing law in Washington, an experienced bankruptcy attorney and an experienced bankruptcy trustee; thus, Mr. Munding had extensive knowledge of fiduciary duties, improper/unlawful acts and improper/unlawful agreements or transactions. Yet, the defendant John D. Munding, the lead attorney representing AIA, intentionally breached his fiduciary duties owed to AIA, including, without limitation, as described in part in this Complaint.

7.    Upon information and belief, defendant Karen Munding is an individual, the wife of John D. Munding, a resident of Spokane County, Washington, and thus a citizen of the state of Washington. Upon information and belief, defendant Karen Munding is the co-owner of assets and property with defendant John Munding, which is a reason why she is named as a defendant.

8.    Defendant Munding, P.S., is a citizen of the state of Washington because it is a Washington corporation and its principal place of business is located

**FIRST AMENDED COMPLAINT - 2**

in Spokane County, Washington. Upon information and belief, defendant John D. Munding is a shareholder of the defendant Munding, P.S. The defendant Munding, P.S. has never been registered to conduct business in California.

9. Defendant Crumb & Munding, P.S. is a citizen of the state of Washington because it is a Washington corporation and its principal place of business is located in Spokane County, Washington. Upon information and belief, John D. Munding is a shareholder of defendant Crumb & Munding, P.S. and thus personally liable for any acts, omissions or damages caused by defendant Crumb & Munding, P.S. because defendant Crumb & Munding, P.S. has been administratively dissolved. Defendant Crumb & Munding, P.S. has never been registered to conduct business in California.

10. Defendants John or Jane Does I-III may be individuals, attorneys practicing law in the state of Washington, residents of Spokane County Washington, and thus citizens of the state of Washington. Defendants John or Jane Does I-III may be attorneys who, along with John D. Munding, also provided legal services and/or represented AIA Services and AIA Insurance on behalf of the defendants Munding, P.S. and/or Crumb & Munding, P.S. Plaintiff anticipates ascertaining the identities

**FIRST AMENDED COMPLAINT - 3**

of John or Jane Does I-III (if they exist) in discovery.[1]

11.     John D. Munding and John and Jane Does I-III provided the bulk of the representation and legal services which is the subject of this lawsuit from their offices in Spokane County, Washington. All acts and omissions of defendants John D. Munding and John or Jane Does I-III were also done on behalf of Munding, P.S. and Crumb & Munding, P.S. in the course of a valid agency relationship, and thus those entities are also liable for all damages, relief and attorneys' fees.

12.     Plaintiff will refer to John D. Munding, Karen Munding, Munding, P.S., Crumb & Munding, P.S., and John or Jane Does I-III collectively herein as the "Defendants".

13.     The Defendants have never had an office in California or Idaho. The Defendants conducted most, if not all, legal research for the Lawsuit in Washington. The Defendants prepared most, if not all, fillings for the Lawsuit in Washington and electronically filed them from Washington.

14.     Defendant AIA Services Corporation (referred to herein as "AIA Services") is a citizen of the state of Idaho because it is an Idaho corporation and its

---

[1] While Plaintiff is aware of the names to two associate attorneys, Plaintiff has no knowledge that either of them was involved in any of the acts, omissions and/or concealments at issue in this Complaint. Thus, Plaintiff is unable to name them yet.

**FIRST AMENDED COMPLAINT - 4**

principal place of business is located in Lewiston, Idaho.

15. Defendant AIA Insurance, Inc. (referred to herein as "AIA Insurance") is a citizen of the state of Idaho because it is an Idaho corporation and its principal place of business is located in Lewiston, Idaho. During all relevant times, AIA Services was the sole shareholder of AIA Insurance. During all relevant times, AIA Insurance has been a wholly-owned subsidiary of AIA Services.

16. AIA Services and AIA Insurance are also collectively referred to herein as "AIA". The definition of "AIA" includes AIA Services and AIA Insurance, or either of those corporations for purposes of pleading in the alternative, and also includes the Plaintiff to the extent he is required to support any cause of action and/or any of the relief requested in this Complaint.

17. While AIA's primary business over the years was selling insurance products in many states (including Washington state), AIA has never conducted business in California. AIA has never had an office in California. AIA owns no property in California. AIA Insurance conducted business in Washington and was formerly registered to conduct business in the state of Washington.

18. Plaintiff is bringing this derivative action as a common shareholder and on behalf of AIA Services. In addition, Plaintiff is bringing this action as a double derivative action on behalf of AIA Insurance, which is a wholly-owned subsidiary of AIA Services. AIA Services and AIA Insurance are also defendants in this lawsuit

**FIRST AMENDED COMPLAINT - 5**

based because the purported boards of directors and management of AIA Services and AIA Insurance (who are not properly elected or lawfully acting in any event) are antagonistic to the interests of the Plaintiff and the interests of AIA Services and AIA Insurance (including, without limitation, for the reasons stated in this Complaint). As a result, AIA Services and AIA Insurance are not, and could not be, named as plaintiffs or nominal plaintiffs in this Complaint.

19. Plaintiff's assertions as to AIA's boards of directors and/or officers in this Complaint are not intended to be admissions or acknowledgements that such boards of directors and officers were able to take any action, that such boards of directors or officers were properly seated and elected, or that the necessary quorum was present for any AIA board meeting or resolution, and, indeed, Plaintiff asserts that such was not the case during all relevant times (which Defendants knew or should have known by exercising even the slightest due care).

## IV. STATEMENT OF FACTS

### A. AIA's Ownership Structure and Corporate Governance.

20. During all relevant times, the Defendants knew, or should have known by exercising even the slightest due care, the ownership of AIA Services is divided among three different types of shares: **(a)** the Series A Preferred Shares (which have a face value of $10 per share, plus accrued interest, and payment priority over the Series C Shares and common shares); **(b)** the Series C Preferred Shares (which have

**FIRST AMENDED COMPLAINT - 6**

Case: 1:10-cv-00400-NPC-ECF No. Document 1089/13 Filed 08/2021 Page 55 of 101 267

a face value of $10 per share, plus accrued dividends, and payment priority over the common shares); and **(c)** the common shares. AIA Services owns all of the outstanding common shares of its subsidiary AIA Insurance.

21.   During the time that the Defendants have represented and provided legal services to AIA (which is ongoing), Defendants knew, or should have known through exercising even the slightest due care, that there were restrictions regarding the operation and corporate governance under AIA Services' amended articles of incorporation and Restated Bylaws. A true and correct copy of applicable provisions of AIA Services' amended articles of incorporation is attached as ___*Exhibit A*___ and incorporated by reference herein. A true and correct copy of the applicable provisions of AIA Services' Restated Bylaws is attached as ___*Exhibit B*___ and incorporated by reference herein. Even if the Defendants were not aware of the restrictions in Exhibits A and B when the first began representing AIA, they were specifically advised of them by Plaintiff's counsel after they began representing and providing legal services to AIA; yet the Defendants ignored and intentionally violated the applicable restrictions in their representation of AIA.

22.   During all relevant times, the Defendants knew, or should have known by exercising even the slightest due care, Plaintiff owned 45,000 common shares in AIA Services and owned another 13,656 common shares that he held for the benefit of his children (after a 3 to 1 stock split in 1995, i.e., the shares issued to Plaintiff

**FIRST AMENDED COMPLAINT - 7**

were originally 1/3 less), which cumulatively made the Plaintiff the second largest common shareholder of AIA Services. Plaintiff traded a book of business worth approximately $500,000 for his common shares in AIA Services. Plaintiff has owned his common shares for well over twenty years and during all relevant times necessary for the claims and relief requested in this lawsuit. Plaintiff has never received a single monetary dividend or any other compensation for any of these 58,656 shares.

23. During the time that the Defendants have represented and provided legal services to AIA (which is ongoing), there were 41,651.25 validly issued and outstanding Series A Preferred Shares in AIA Services with a value of $416,512.50, plus accrued prejudgment interest since May 30, 2008, which are held by Donna J. Taylor (referred to herein as "Donna Taylor"). These Series A Preferred Shares were required to be redeemed in full no later than December 2, 2003, but all 41,651.25 shares remain outstanding to this day. John Taylor has purportedly recently issued himself 7,500 Series A Preferred Shares, but all such shares were unlawfully issued to him. In any event, Donna Taylor remains the largest and controlling Series A Preferred Shareholder to this day (assuming that the Series A Preferred Shares that John Taylor issued to himself were validly issued).

24. During the time that the Defendants have represented and provided legal services to AIA (which is ongoing), the Defendants knew, or should have known by exercising even the slightest due care, that the Series A Preferred

**FIRST AMENDED COMPLAINT - 8**

Case: 18-cv-00704-DPC-ECF No. Document 1089/13 Filed Page 57 of 21 of 267

Shareholder, Donna Taylor, was entitled to appoint a director to the board of directors of AIA Services, but that her appointments have not been honored.

25. During the time that the Defendants have represented and provided legal services to AIA (which is ongoing), the Defendants should have ensured that Donna Taylor's appointment was honored to ensure that the board of directors of AIA Services was properly seated. Thus, AIA Services' board was never properly seated and there was never a quorum because Donna Taylor's appointee was never provided notice of, or allowed to participate in, any board meetings (which would include for the appointment of any purported officers).

26. During the time that the Defendants have represented and provided legal services to AIA (which is ongoing), Defendants knew, or should have known by exercising even the slightest due care, that there were at least 92,500 validly issued and outstanding Series C Preferred Shares in AIA Services with a value of $925,000, plus accrued and unpaid dividends in excess of $1,800,000, which are held by the AIA Services Corporation 401(k) Profit Sharing Plan.

27. During the time that the Defendants have represented and provided legal services to AIA (which is ongoing), Defendants knew, or should have known by exercising even the slightest due care, the Series C Preferred Shareholders were entitled to appoint a director to the board of directors of AIA Services, but no such director was ever appointed. Thus, AIA Services' board was never properly seated

**FIRST AMENDED COMPLAINT - 9**

**16-ER-4040**

Case: 1:10-cv-00704-DCN-ECF No Document 1089/1 Filed 08/20/21 Page 58 of 267

and there was never a quorum because the Series C Preferred Shareholders' appointee was never allowed to participate in any board meetings.

28.     During the time that the Defendants have represented and provided legal services to AIA (which is ongoing), Defendants knew, or should have known by exercising even the slightest due care, that AIA Services was the sole shareholder in AIA Insurance, and AIA Insurance's board of directors was never properly elected or seated.

29.     During the time that the Defendants have represented and provided legal services to AIA (which is ongoing), Defendants knew that the members of the boards of directors of AIA (including John Taylor, Beck and Henderson), together with AIA's officers (including Duclos), owed fiduciary duties to AIA and their shareholders, and that such purported directors and officers of AIA were not properly discharging their fiduciary duties because they were, among other things, improperly: **(a)** placing their interests and the interests in other entities that they partially owned above AIA's interests (in violation of their fiduciary duties of loyalty); **(b)** intentionally violating AIA's amended articles of incorporation and bylaws (in violation of the fiduciary duties of loyalty); **(c)** engaging in interested transactions without making proper disclosures or obtaining proper consents to cure the conflicts of interest (in violation of their fiduciary duties of loyalty); **(d)** intentionally failing to follow proper corporate governance (in violation of their

**FIRST AMENDED COMPLAINT - 10**

16-ER-4041

fiduciary duties of loyalty); and **(e)** concealing facts from AIA and their shareholders (in violation of their fiduciary duties of loyalty). Defendants participated in the conduct described in this Paragraph and provided counsel to those parties.

## B. The Unlawful GemCap Guarantees and Subsequent Litigation.

30. Despite having not met the financial obligations owed to the Series A and Series C Preferred Shareholders and the lack of proper corporate governance (including the failure to hold shareholder meetings for AIA Services or make full disclosure to AIA's disinterested shareholders), R. John Taylor (referred to herein as "John Taylor"), James Beck (referred to herein as "Beck"), Connie Taylor Henderson (referred to herein as "Henderson"), JoLee Duclos (referred to herein as "Duclos"), and/or other parties obtained a $5,000,000 line-of-credit for parties CropUSA Insurance Agency, Inc. (referred hereinafter as "CropUSA Agency") and CropUSA Insurance Services, LLC (referred to herein as "CropUSA Services") from a "hard money" lender, GemCap Lending I, LLC (referred to herein as "GemCap"). John Taylor also guaranteed the entire $5,000,000 line-of-credit.

31. Despite there being claims and allegations in other lawsuits regarding unauthorized guarantees, John Taylor, Henderson, Beck, Duclos and other AIA officers had AIA unlawfully guarantee $1,113,930 of that loan from GemCap without disclosing the guarantee or the loan to AIA or its shareholders and without obtaining the required consent from AIA's disinterested shareholders and Donna

**FIRST AMENDED COMPLAINT - 11**

Taylor (consents that would have never been provided because, among other things, AIA was prohibited from guaranteeing the loan, it was not in AIA's interests to fund other entities). This guarantee was concealed from AIA and their innocent shareholders. AIA's board resolution purportedly signed by John Taylor, Henderson, and Beck was never authorized and constituted a breach of their fiduciary duties owed to AIA. AIA's guarantee was signed by John Taylor purportedly on behalf of AIA (when AIA did not even have any knowledge of the guarantee), which was a breach of his fiduciary duties owed to AIA.

32.    Over time, the $5,000,000 line-of-credit with GemCap was subsequently amended on more than one occasion to ultimately be $10,000,000, and this "hard money" line-of-credit carried an interest rate of 18.5% per annum and a default interest rate of 24% per annum, along with other excessive fees and minimum interest charges (the original $5,000,000 line-of-credit and subsequent amendments are collectively referred to herein as the "GemCap Loan").

33.    When the GemCap Loan was ultimately increased to $10,000,000 and despite the fact that John Taylor had been improperly using loan proceeds for unauthorized purposes, John Taylor, Beck, and Henderson (the purported directors of AIA) also had AIA ultimately unlawfully guarantee the entire $10,000,000 of the indebtedness of the GemCap Loan (even though AIA was not entitled to borrow or use any of the loan proceeds and AIA was prohibited from guaranteeing the loan).

**FIRST AMENDED COMPLAINT - 12**

16-ER-4043

AIA's unlimited guarantee was, once again, concealed from AIA and their innocent shareholders. AIA's unlimited guarantee was signed by John Taylor purportedly on behalf of AIA (when AIA did not even have any knowledge of the guarantee). AIA's board resolution purportedly signed by John Taylor, Henderson, and Beck for the unlimited guarantee was never authorized and constituted a breach of their fiduciary duties owed to AIA. AIA's unlimited guarantee was signed by John Taylor purportedly on behalf of AIA (when AIA did not even have any knowledge of the unlimited guarantee), which was a breach of his fiduciary duties owed to AIA.

34. John Taylor also guaranteed of the entire $10,000,000 of the indebtedness under the GemCap Loan. John Taylor's guarantee of the GemCap Loan and John Taylor's improper use of the loan proceeds created additional independent conflicts of interest between John Taylor and AIA because, among other things, John Taylor had adverse interests to AIA and AIA's rightful position should have been that John Taylor should be required to pay the entire GemCap Loan, not AIA.

35. During the time that the Defendants represented and provided legal services to AIA, the Defendants knew, or should have known by exercising even the slightest due care, that the guarantees were never disclosed to AIA and the required consents for the guarantees was never sought or obtained from AIA's disinterested common shareholders and the Series A Preferred Shareholder Donna Taylor. The guarantees were a fraud upon AIA and their innocent preferred and common

**FIRST AMENDED COMPLAINT - 13**

**16-ER-4044**

Case 1:18-cv-00704-DCN-EOF No Document 1089/13 Filed 08/20/21 Page 62 of 71

shareholders.

36. During the time that the Defendants represented and provided legal services to AIA, the Defendants knew, or should have known by exercising even the slightest due care, that AIA's guarantees of the GemCap Loan were never properly authorized, the guarantees violated applicable provisions of AIA's articles of incorporation and bylaws, and AIA received no consideration for them; AIA's guarantees were unlawful, ultra vires, intra vires (but unauthorized), and illegal.

## C. The GemCap Lawsuit and the Unlawful Settlements.

37. After CropUSA Agency and CropUSA Insurance failed to repay the GemCap Loan, GemCap filed suit against AIA, CropUSA Agency, CropUSA Services, John Taylor and other parties with respect to the $10 million line-of-credit ("Lawsuit"). GemCap's claims included ones against AIA for the alleged guarantees and others against John Taylor fraud, conversion, his personal guarantee and other claims. GemCap's claims against John Taylor alone created additional conflicts of interest that, among other things, prevented John Taylor from making any decisions on behalf of AIA relative to the Lawsuit, including as to joint representation of AIA and other defendants and any later alleged settlements.

38. Upon information and belief, John Taylor contacted the Defendants in Spokane, Washington to jointly represent AIA, CropUSA, John Taylor and other defendants in the Lawsuit. Upon belief and in particular based on the Defendants'

**FIRST AMENDED COMPLAINT - 14**

counsel's refusal to provide a redacted copy of the Fee Agreement after Plaintiff requested it to ascertain the existence of a jurisdiction and venue provision, the Defendants agreed to represent AIA, CropUSA, John Taylor and other defendants through a fee agreement that contained a jurisdiction and venue provision designating the state of Washington as the agreed location of legal action. The defendant Crum & Munding, P.S. denied that the U.S. District Court of Idaho had jurisdiction over it after GemCap asserted a third-party complaint against it.

39.     Rather than insist upon AIA having their own independent counsel, the Defendants appeared as counsel and purportedly represented AIA and the other defendants in the Lawsuit (although John Taylor later retained his own counsel shortly before trial based on admitted and obvious conflicts of interest). Despite John Taylor having retained his own counsel in the Lawsuit based on his conflicts of interest, upon information and belief, the Defendants continued to take directions in the Lawsuit from John Taylor relative to AIA and they did not withdraw from representing AIA as required or take appropriate action to protect AIA's interests, even though John Taylor's conflicts of interest were even more serious and irreconcilable as to any decision he might make for AIA in the Lawsuit.

40.     After appearing as counsel for AIA in the Lawsuit, the Defendants were specifically advised that AIA's guarantees were unauthorized and unlawful because they, among other things, violated AIA's amended articles of incorporation and

**FIRST AMENDED COMPLAINT - 15**

bylaws and AIA received no consideration for them. After appearing as counsel for AIA in the Lawsuit, Defendants were also specifically advised that any settlement would be unauthorized and unlawful for the same reasons. Despite having such knowledge and upon information and belief, the Defendants failed to take any action to extricate AIA from any liability under the guarantees, other than at least one effort to settle the case without any liability to AIA (which was an admission by the Defendants that AIA had no liability under the guarantees).

41.     After the Plaintiff and two other shareholders believed that it appeared that the Defendants might not be representing the interests of AIA in the lawsuit, Plaintiff and the two shareholders filed a lawsuit asserting direct claims relative to the guarantees and that they were illegal and unauthorized. While the complaint in that lawsuit was later dismissed without prejudice for lack of standing (GemCap asserted that the claims must be asserted derivatively), no final judgment was ever entered by the court, and Plaintiff amended his complaint in a different pending action to assert the claims derivatively as requested by GemCap.

42.     Despite the fact that the lawsuit mentioned in the preceding Paragraph was pending, on or about the first day of trial in the Lawsuit and despite having full knowledge that AIA was unable to lawfully enter into to any settlement that obligated AIA to pay anything, the Defendants improperly, fraudulently, unlawfully and in violation of their fiduciary duties owed to AIA (including the duty of loyalty)

**FIRST AMENDED COMPLAINT - 16**

Case: 18-cv-00740-RMP-ECF No. Document 1089/Filed 08/20/21 Page 05 of 10267

advised AIA to enter into a tentative settlement of the Lawsuit (referred to herein as the "Initial Settlement"). The Initial Settlement was only a tentative one and required the additional negotiations of additional terms to be included in a later agreement.

43. No prior disclosure or shareholder approval was ever obtained for the Initial Settlement, despite the Defendants' knowledge that among other things: **(a)** the Initial Settlement was ultra vires and illegal because it violated AIA's amended articles of incorporation and bylaws; and **(b)** even if within AIA's powers, John Taylor lacked the authority to bind AIA based on his conflicts of interest. In fact, the Defendants actively concealed the Initial Settlement from AIA, the Plaintiff and other innocent minority shareholders of AIA. To this day, the Defendants have continued to conceal the terms of the Initial Settlement from AIA and their innocent minority shareholders.

44. For several months after the Initial Settlement, the Defendants negotiated the terms of a formal settlement agreement, which such negotiations were conducted by the Defendants in Washington. With the assistance and approval of the Defendants and over four months after the Initial Settlement, the parties (other than AIA because it still has no knowledge of the Agreement) ultimately agreed to the terms of a final written settlement agreement (referred to herein as the

**FIRST AMENDED COMPLAINT - 17**

Case: 1:10-cv-00740-ADR-NPC-ECF No. filed 11/89/13 Filed 08/20/21 Page 66 of 110 267

"Settlement Agreement"), which superseded and replaced the Initial Settlement.[2]

**45.** The Settlement Agreement was purportedly signed by John Taylor (unlawfully) on behalf of AIA, even though the Defendants knew that: **(a)** John Taylor had conflicts of interest that prevented him from entering into the Settlement Agreement (including for the reasons stated in this Complaint); **(b)** John Taylor failed to disclose the terms of the Settlement Agreement to, and obtain the required consent from, AIA's disinterested constituents, common shareholders or the Series A Preferred Shareholder Donna Taylor; and **(c)** and the Defendants also failed to insist the necessary consents be obtained from AIA's shareholders prior to advising AIA to enter into the Initial Settlement or the Settlement Agreement (of course, no reasonably informed disinterested shareholder of AIA would have voted for, or approved, AIA's entry into the Settlement Agreement).

**46.** The Settlement Agreement even contained a provision prohibiting John Taylor from seeking bankruptcy protection for AIA (making the Settlement Agreement separately illegal and unenforceable) and a provision assigning

---

[2] None of Plaintiff's allegations in this Complaint shall be an admission that the Guarantees, Initial Settlement or Settlement Agreement were: (a) lawful; (b) within the powers of AIA; (c) properly authorized; or (d) in AIA's best interests—they were not.

**FIRST AMENDED COMPLAINT - 18**

16-ER-4049

malpractice claims against the law firm of Quarles & Brady (yet again making the Settlement Agreements separately illegal and unenforceable).

47.     Defendants representation and/or advice given to AIA for the entry into the Settlement Agreement included, among other things, impermissibly and unlawfully obligating AIA to pay over $12,000,000 to GemCap. Defendants' acts and omissions were, among other things, a violation of the Defendants' fiduciary duties of loyalty owed to AIA.

48.     To this day, during the Defendants representation and legal services provided to AIA, the Defendants have failed to ensure, nor has John Taylor or anyone else ensured, that full disclosure of the Settlement Agreement and all of the terms of the Settlement Agreement be been made to AIA, their disinterested shareholders, and that the required consents were obtained to authorize the Settlement Agreement (i.e., from AIA Services' shareholders and Donna Taylor).

49.     After Plaintiff and certain other shareholders of AIA were able to first learn of all of the terms of, and obtained a copy of, the Settlement Agreement after it was filed in a different lawsuit (which was within three years of the filing date of this lawsuit), another shareholder, Donna Taylor, sought to intervene in the Lawsuit to have the Settlement Agreement set aside and declared illegal. Instead of supporting Donna Taylor's intervention (as would any reasonable and honest attorney truly representing the interests of AIA), the Defendants opposed her

**FIRST AMENDED COMPLAINT - 19**

intervention and thereby, once again, placed the Defendants' interests in earning fees and the interests of their other clients (including CropUSA Agency and CropUSA Services) and their former client John Taylor above the interests of AIA in violation of their duties of loyalty owed to AIA. As a result, the Defendants are estopped from asserting the Plaintiff or any other shareholder should have taken action when the Defendants opposed Donna Taylor's intervention.

50. As a result of AIA's improper and unlawful entry into the Settlement Agreement, the Defendants permitted, and stipulated to, the entry of judgments against AIA in excess of $12,000,000 (which included millions of dollars in so-called penalties, interest and attorneys' fees); Defendants' acts and omissions were, among other things, a violation of the Defendants' fiduciary duties of loyalty owed to AIA. Those judgment, however, are not yet final and the Settlement Agreement calls for years of further litigation pursued by GemCap that must be completed before any final judgments may be entered or the judgment against AIA may be executed upon. In other words, the Defendants still could seek to rectify the wrongs.

51. As a result of AIA's entry into the improper and unlawful Settlement Agreement, AIA unlawfully transferred its interest in the real property where its corporate headquarters had been located to GemCap. The value of AIA's headquarters was estimated to exceed $7,000,000. As a result of the Settlement Agreement, AIA's headquarters was later sold for a reduced amount and the net

**FIRST AMENDED COMPLAINT - 20**

16-ER-4051

funds were paid to GemCap and others thereby damaging AIA; Defendants' acts and omissions were, among other things, a violation of their fiduciary duties of loyalty to AIA.

52. Instead of properly representing AIA to seek that the entire proceeds from the unlawful sale of AIA's headquarters be paid to AIA and assert that the Settlement Agreement was unauthorized and illegal, the Defendants permitted a portion of the net proceeds to be paid to GemCap and the remaining portion be paid to for John Taylor's own benefit in the 401(k) Plan, even though John Taylor was also the trustee for the 401(k) Plan (another conflict of interest for John Taylor).

53. The Lawsuit is still pending, and the Defendants have never withdrawn from representing AIA (including for any subsequent appeals) and they continue to have opportunities to rectify their wrongs to extricate AIA from the Settlement Agreement and make AIA whole.

54. In one of the appeals in the Lawsuit, Defendants continued to represent the interests of AIA (improperly) and had opportunities to attempt to rectify the wrongs against AIA (but failed to do so) and preventing the filing of this Lawsuit, but the Defendants ultimately chose not to act in the best interests of AIA. In addition, the Defendants have improperly represented AIA at subsequent hearings and proceedings after the Settlement Agreement was purportedly executed and after the appeal thereby further breaching the duties owed to AIA when the Defendants

**FIRST AMENDED COMPLAINT - 21**

16-ER-4052

again failed to rectify the wrongs against AIA, including, without limitation, by failing to take action to recover the entire net proceeds for the sale of AIA's headquarters and to allow any of those sale funds or allow any interest in the property to be transferred to GemCap in the first place. To this day and even though the Defendants still represent AIA in the Lawsuit, the Defendants have failed to take any action to extricate AIA from the guarantees or the Settlement Agreement in violation of their fiduciary duties (including their undivided duty of loyalty) and duties of care owed to AIA.

55.     Because the Defendants (or at least John Munding, Crumb & Munding, P.S. and Munding, P.S.) continue to purportedly represent AIA in the Lawsuit and continue to have opportunities to rectify their wrongs (at least in part) because there is no final judgment in the Lawsuit, all applicable statutes of limitations continue to be tolled (and also because the Defendants continue to conceal facts from AIA).

### D. The Ongoing Conflicts of Interest and the Defendants' Breached Duties.

56.     During the relevant times that the Defendants have represented and provided legal services to AIA (which is ongoing), AIA's board of directors were purportedly comprised of Henderson, Beck and/or John Taylor. While the Plaintiff is not conceding that they were properly elected as directors of AIA (they were not) or the boards of AIA was properly seated (they were not), the foregoing parties were all interested directors in that they had an ownership interest in CropUSA Agency",

**FIRST AMENDED COMPLAINT - 22**

among other conflicts of interest (including those set forth in this Complaint).

57. During the time that the Defendants represented and provided legal services to AIA, the Defendants knew, or should have known by exercising even the slightest due care, that the Plaintiff and Donna Taylor had already sued CropUSA Agency (along with other parties named in this Complaint, including John Taylor) derivatively on behalf of AIA for: **(a)** having unlawfully transferred millions of dollars of funds, assets and trade secrets from, and belonging to, AIA; **(b)** having unlawfully taken CropUSA Agency from AIA, by and through the actions of John Taylor, Beck, Duclos, Michael Cashman, Sr. (hereinafter referred to as "<u>Cashman</u>"), and other parties; and **(c)** seeking to recover such assets and other damages from CropUSA Agency, John Taylor, Beck, Cashman, and other parties.

58. During the time that the Defendants have represented and provided legal services to AIA (which is ongoing), the Defendants were aware, or should have been aware by exercising even the slightest due care, that CropUSA Agency, John Taylor, Beck, Henderson, Duclos and other parties (including Cashman) had been accused by other shareholders and in other lawsuits of misappropriating millions of dollars of AIA's funds and assets, and unlawfully having AIA guarantee other loans for CropUSA Agency (and, indeed, stealing CropUSA Agency from AIA). Defendants knew, or should have known by exercising even the slightest due care, that AIA was being operated unlawfully, including as to AIA's retention and

**FIRST AMENDED COMPLAINT - 23**

Case: 18-cv-00740-RDCN-ECF No Document 1089/Filed 08/2021 Page 72 of 267

continued use of the Defendants as counsel for AIA in the Lawsuit, when AIA's interests were materially adverse other defendants.

59.     During the time that the Defendants represented and provided legal services to AIA (which is ongoing), the Defendants knew, or should have known by exercising even the slightest due care, that John Taylor, Henderson and Beck had purportedly executed two board resolutions for the guarantees as purported directors for AIA even though the guarantees violated AIA's articles of incorporation and bylaws and when the guarantees were not in the best interest of AIA (and that the boards were never properly seated). Thus, the Defendants knew, or should have known by exercising even the slightest due care, that AIA should be asserting defenses to void any obligations under the guarantees and to assert claims against John Taylor, Henderson and Beck in the Lawsuit, and that the execution of the two board resolutions, alone, created conflicts of interest that prevented any of them from being involved in making any decision on behalf of AIA relative to the Lawsuit (including retaining or keeping the Defendants as counsel for AIA) or relative to the entry into the Initial Settlement and the Settlement Agreement. The Defendants knew, or should have known by exercising even the slightest due care, that the facts and conflicts of interest set forth in this Paragraph alone warranted AIA retaining separate and independent counsel for the Lawsuit and to refuse to have AIA enter into the Initial Settlement or the Settlement Agreement.

**FIRST AMENDED COMPLAINT - 24**

Case: 1:10-cv-00240-ADC-CWD Document 100 filed 11/09/18 PageID 2114 Page 73 of 267

**60.** In addition to other conflicts of interest set forth in this Complaint, during the time that the Defendants represented and provided legal services to AIA (which is ongoing), the Defendants also knew, or should have known by exercising even the slightest due care, that John Taylor had other conflicts of interest that prevented him from being involved in making any decisions on behalf of AIA relative to the Lawsuit (including retaining or keeping the Defendants as counsel for AIA) or the subsequent Initial Settlement and the Settlement Agreement because, among other things: **(a)** John Taylor was simultaneously serving as the Presidents of AIA and CropUSA Agency, while also simultaneously serving as the governing person of CropUSA Services and other entities that were defendants in the Lawsuit; **(b)** John Taylor was a shareholder of AIA Services and CropUSA Agency, and a part owner of CropUSA Services and other entities that were defendants in the Lawsuit; **(c)** John Taylor had personally guaranteed the entire $10 million loan and he was acting in his self-interests, including to have AIA be bound by the Initial Settlement or the Settlement Agreement and to have judgments entered against AIA when AIA's articles of incorporation and bylaws barred AIA from doing so, and to allow John Taylor to defer entry of any judgment against him; **(d)** John Taylor was not ensuring that the board of AIA Services was properly seated, including honoring the appointment of a board member by the Series A Preferred Shareholder Donna Taylor, thereby resulting in all purported board action being null and void; **(e)** John

**FIRST AMENDED COMPLAINT - 25**

Taylor did not seek to extricate AIA from any liability under the guarantees when AIA should have had no obligation under the guarantees whatsoever, the Initial Settlement or the Settlement Agreement; **(f)** John Taylor was being sued in multiple lawsuits for millions of dollars in corporate malfeasance occurring at AIA and the improper corporate governance of AIA; **(g)** John Taylor was also serving as the Trustee of the AIA Services 401(k) Plan, which held 92,500 Series C Preferred Shares in AIA Services, and that John Taylor was not proceeding in a manner to protect the 401(k) Plan or to properly discharge his fiduciary duties as the trustee under ERISA (the 401(k) Plan's interests was to prevent AIA from having any liability under guarantees, the Initial Settlement or the Settlement Agreement); and **(h)** John Taylor had a long and documented history of <u>not</u> looking after the best interests of AIA, but instead putting his interests ahead of AIA's interests.

**61.** In addition to other conflicts of interest set forth in this Complaint, during the time that the Defendants represented and provided legal services to AIA (which is ongoing), the Defendants also knew, or should have known by exercising even the slightest due care, that Henderson and Beck had conflicts of interest that prevented them from being involved in making any decisions on behalf of AIA relative to the Lawsuit (including retaining or keeping the Defendants as counsel for AIA) or the subsequent Initial Settlement and the Settlement Agreement because, among other things: **(a)** Henderson and Beck were shareholders in CropUSA

**FIRST AMENDED COMPLAINT - 26**

16-ER-4057

Case 1:10-cv-00740-PCN-ECW No Document 1389/18 Filed 08/2021 14 Page 75 of 10267

Agency (and Henderson was also a shareholder of AIA Services); **(b)** Henderson and Beck were being sued in at least two other lawsuits for millions of dollars in corporate malfeasance occurring at AIA and the improper corporate governance of AIA; **(c)** Henderson and Beck were not ensuring that the board of AIA Services was properly seated, including honoring the board member appointed by the Series A Preferred Shareholder Donna Taylor (Ex. A, Section 4.2.8), thereby resulting in all purported board action being null and void; **(d)** Henderson and Beck, as purported directors of AIA Services, had control over the appointment of John Taylor as trustee of the AIA Services 401(k) Plan and they knew that John Taylor was not properly discharging his fiduciary duties as trustee or as a director or officer of AIA; and **(e)** Henderson and Beck had a long and documented history of <u>not</u> looking after the best interests of AIA.

62.    During the time that the Defendants represented and provided legal services to AIA (which is ongoing), the Defendants also knew, or should have known by exercising even the slightest due care, that Duclos had conflicts of interest that prevented her from being involved in making any decisions on behalf of AIA relative to the Lawsuit (including retaining or keeping the Defendants as counsel for AIA) or the subsequent Initial Settlement and the Settlement Agreement because, among other things: **(a)** Duclos was a shareholder of CropUSA Agency; **(b)** Duclos simultaneously served as an officers of AIA, CropUSA Services and other entities

**FIRST AMENDED COMPLAINT - 27**

16-ER-4058

partially owned by John Taylor; **(c)** Duclos has been sued in at least two other lawsuits for millions of dollars in corporate malfeasance occurring at AIA and improper corporate governance of AIA; **(d)** Duclos served as John Taylor's "lieutenant" and she had intimate knowledge of the extensive corporate malfeasance that had been inflicted upon AIA; and **(e)** Duclos had a long and documented history of <u>not</u> looking after the best interests of AIA.

63. During the time that the Defendants represented and provided legal services to AIA, the Defendants also knew, or should have known by exercising even the slightest due care, that any other parties (including Bryan Freeman or Aimee Gordon) also had conflicts of interest that prevented them from being involved in making any decision on behalf of AIA relative to the Lawsuit (including retaining or keeping the Defendants as counsel for AIA) or the subsequent Initial Settlement and the Settlement Agreement because, among other things: **(a)** such parties (including Freeman and Gordon) were officers, directors or employees of CropUSA Agency and AIA; **(b)** such parties (including Freeman and Gordon) had intimate knowledge of the extensive corporate malfeasance that had been inflicted upon AIA and the improper corporate governance of AIA; and **(c)** such parties (including Freeman and Gordon) had a long history of <u>not</u> looking after the best interests of AIA.

**FIRST AMENDED COMPLAINT - 28**

**64.** Despite the other conflicts of interest set forth in this Complaint or proven at or before trial, the Defendants failed to ethically and properly represent AIA in the Lawsuit and failed to seek the required disinterested consent from AIA's shareholders for any of their representation, actions taken in this Lawsuit and AIA's subsequent entry into the subsequent Initial Settlement and the Settlement Agreement (again, a consent that the Defendants knew would never be provided by a disinterested and fully informed director or shareholder of AIA, let alone the Series A Shareholder Donna Taylor).

**65.** Upon information and belief, during the time that the Defendants have represented and provided legal services to AIA (which is ongoing), the Defendants failed to disclose the conflicts of interest that prevented them from representing AIA and the conflicts of interest that prevented them from advising AIA to enter into the Initial Settlement or the Settlement Agreement; such conflicts of interest were irreconcilable and unwaivable under the circumstances, including for the reasons described in this Complaint.

**66.** Upon information and belief, during the time that the Defendants have represented and provided legal services to AIA (which is ongoing) and based on the conflicts of interest of John Taylor, Beck, Henderson, Duclos and other parties relative to the management of AIA, the Defendants further failed to obtain proper consents from disinterested constituents of AIA for their representation (assuming a

**FIRST AMENDED COMPLAINT - 29**

16-ER-4060

conflict waiver was even permissible and not unreasonable under the circumstances, which neither would have been permissible under the circumstances) or allowing them to advise AIA to enter into the Initial Settlement and the Settlement Agreement. To this day, AIA has no knowledge of the terms of the Defendants' representation of AIA as that information has been concealed from AIA.

67. During the time that the Defendants represented and provided legal services to AIA, the Defendants knew, or should have known by exercising even the slightest due care, that under the definitions and restrictions set forth under Section 4.2.9 of AIA Services' amended articles of incorporation (Ex. A, p. 5-10), AIA Services and its subsidiary AIA Insurance were barred from, among other things: **(a)** guaranteeing, assuming or remaining liable for any "Indebtedness" under the guarantees for CropUSA Agency and CropUSA Services and the subsequent Initial Settlement and the Settlement Agreement because none of the permitted exceptions are present, i.e., AIA could not guarantee CropUSA Agency and CropUSA Services' line-of-credit with GemCap because CropUSA Agency and CropUSA Services were not wholly owned subsidiaries of AIA nor could AIA incur an over $12,000,000 indebtedness (Ex. A, Section 4.2.9(c)); **(b)** entering into the Initial Settlement and the Settlement Agreement were separately barred because it required AIA to transfer its interest in its headquarters to GemCap, which was a sale of a material part of AIA's business (the headquarters was by far AIA's largest asset and generated

**FIRST AMENDED COMPLAINT - 30**

substantial rental income) (Ex. A, Section 4.2.9(e)); **(c)** entering into the guarantees, Initial Settlement and the Settlement Agreement because they constituted impermissible transactions with shareholders and affiliates since the terms were unfavorable to AIA (no reasonable disinterested officer or director of AIA would have entered into the guarantees, the Initial Settlement or the Settlement Agreement under the terms of those instruments) (Ex. A, Section 4.2.9(g)); **(d)** entering into the guarantees, the Initial Settlement and the Settlement Agreement because they resulted in AIA Services' consolidated net worth being less than the over $416,000 owed to Donna Taylor for her Series A Preferred Shares (Ex. A, Section 4.2.9(h)); **(e)** entering into the guarantees, the Initial Settlement and the Settlement Agreement because they resulted in AIA Services' ratio of "Consolidated Long Term Debt" to "Consolidated Net Worth" to exceed a ratio of 3.6 to 1.0 (Ex. A, Section 4.2.9(j)); and **(f)** entering into the guarantees, the Initial Settlement or the Settlement Agreement because they caused the ratio of "Debt Service Coverage" for AIA to be less than .8 to 1.0 (Ex. A, Section 4.2.9 (k)). Donna Taylor, the Series A Preferred Shareholder, also never consented to any of the foregoing violations nor did AIA's shareholders.

68. During the time that the Defendants represented and provided legal services to AIA, the Defendants knew, or should have known by exercising even the slightest due care, that under the restrictions of AIA Services' Restated Bylaws (Ex.

**FIRST AMENDED COMPLAINT - 31**

B), AIA Services was barred from, among other things: **(a)** entering into the guarantees, the Initial Settlement and the Settlement Agreement because it violated the "Director Conflict of Interest" provision because John Taylor, Henderson, Beck were interested and conflicted directors (as described in detail in this Complaint) and no disinterested directors, nor a disinterested committee on the board, approved the guarantees, the Initial Settlement or Settlement Agreement, and they were never submitted to, or approved by, AIA Services' common shareholders (Ex. B, Section 4.14); and **(b)** there is no way that the guarantees, Initial Settlement and the Settlement Agreement were reasonably expected to benefit AIA Services since it was not able to draw on the loan and received no benefit from becoming indebted to over $12,000,00 under the Settlement Agreement and was separately required to transfer its corporate headquarters (assuming that the board of directors did not have conflicts and were properly seated and approved the guarantees, the Initial Settlement, and the Settlement Agreement, i.e., Donna Taylor's board designee was seated and the board was properly elected after proper shareholder vote and assuming that no other restrictions under the bylaws or articles of incorporation barred them) (Ex. B, Section 14.1).

69. During the time that the Defendants have represented and provided legal services to AIA Insurance (which is ongoing), there were also restrictions regarding the operation and corporate governance under AIA Insurance's applicable

**FIRST AMENDED COMPLAINT - 32**

Case: 1:10-cv-00404-DCN-CVF No. Document 1089/18 Filed 08/20/21 15 Page 81 of 267

articles of incorporation and Bylaws in substantially the same form as contained in Exhibit B, and Defendants knew, or should have known through exercising even the slightest due care, of such restrictions. Even if the Defendants were not aware of such restrictions when they first began representing AIA Insurance, they were advised of them after they began representing and providing legal services to AIA Insurance; yet the Defendants ignored and intentionally violated such restrictions in their representation of AIA Insurance.

70. During the time that the Defendants have represented and provided legal services to AIA (which is ongoing) and despite demands by Plaintiff and other AIA Services' shareholders, AIA Services has failed to hold any shareholder meetings or seek shareholder approval for any decision or transaction (including for the Initial Settlement or the Settlement Agreement or any purported representation agreement or conflict of interest waiver pertaining to the Defendants) and Defendants knew, or should have known through exercising even the slightest due care, that no shareholder meetings had been held for AIA Services and no proper consent was ever obtained. Indeed, the Defendants had been advised prior to the entry into the Initial Settlement and execution of the Settlement Agreement that proper shareholder consent had not been obtained and would not be given (including the required consent from Donna Taylor, the Series A Preferred Shareholder and the Defendants knew that other shareholders had even filed a lawsuit asserting direct

**FIRST AMENDED COMPLAINT - 33**

claims relating to the unauthorized guarantees and settlements).

71.     Based on the conflicts of interest of John Taylor, Beck, Henderson and other parties as set forth in this Complaint, the Defendants have never made any disclosure whatsoever to AIA and the knowledge held by those parties may not be imputed upon AIA. *E.g., Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 774 (4th Cir. 1995); *Ray v. Karris*, 780 F.2d 636, 641-642 (7th Cir. 1985). In other words, Plaintiff and AIA have yet to discover the specific facts and claims pertaining to the specific documents, agreements, and communications involving the Defendants' representation and legal services provided to AIA in the Lawsuit and for entry into the Initial Settlement or the Settlement Agreement or for any actions taken thereafter.

72.     In short, the Defendants cannot point to a single action taken by them to truly benefit AIA in the Lawsuit (other than making an offer early in the litigation to settle the case without liability to AIA) or for the entry into the Initial Settlement or the Settlement Agreement; they simply improperly represented AIA to generate fees and disregarded the applicable Rules of Professional Conduct, the restrictions under AIA's articles of incorporation and bylaws, and their fiduciary duties owed to AIA. Rather than independently and ethically represent AIA in the Lawsuit or withdraw as counsel for AIA, the Defendants purported to represent AIA and other defendants with interests materially adverse to AIA and advised AIA to enter into

**FIRST AMENDED COMPLAINT - 34**

16-ER-4065

the Initial Settlement or the Settlement Agreement obligating AIA to pay over $12,000,000 and to later transfer its multi-million-dollar interest in its corporate headquarters, which were separately illegal, intra-vires and ultra vires acts and in clear violation of the Defendants' fiduciary duties of loyalty owed to AIA, thereby causing millions of dollars of damages to AIA.

73. After conducting discovery and obtaining information from the Defendants (including representation agreements, purported conflict waivers (if any), communications, billing records, and other relevant documents), Plaintiff anticipates discovering additional facts to support such other claims such as fraud, aiding and abetting parties in the breaches of their fiduciary duties, etc., which will enable Plaintiff to amend this Complaint and assert such new facts and claims.

74. One of Plaintiff's expert witnesses for this lawsuit will be Professor Richard T. McDermott, who is also an experienced practitioner and an author (including an author of a corporate law casebook used at a number of law schools). Indeed, Division One of the Washington Court of Appeals recently held that Professor McDermott was "eminently qualified to testify as an expert" in Washington. *Taylor v. Bell*, 185 Wn. App. 270, 287, 340 P.3d 951, 960 (2014), *review denied*, 183 Wn.2d 1012, 352 P.3d 188 (2015). Professor McDermott will testify that, among other things, there is no doubt that the Defendants breached their fiduciary duties of loyalty owed to AIA (among breaches of other duties and

**FIRST AMENDED COMPLAINT - 35**

violations of applicable Rules of Professional Conduct) relative to the facts in this Complaint.

75. While Plaintiff is presently seeking to have the Settlement Agreement to be set aside (nothing herein shall be an admission that the guarantees or Settlement Agreement are valid and enforceable) and recover damages against GemCap, John Taylor, Beck, Henderson and others in a different lawsuit (Plaintiff offered to discuss stipulating to the Plaintiff bringing his claims in that lawsuit, but the Defendants refused and never even provided the courtesy of a response), this lawsuit will nevertheless be necessary because the net amounts recovered from the other lawsuit, if any, will be diminished by attorneys' fees and costs, and AIA would likely never be made whole (Plaintiff is also separately seeking to obtain disgorgement all of the fees and costs paid to the Defendants, as well as other distinct relief).

E. **Washington Law Applies to Plaintiff's Claims**.

76. Based on the facts asserted above relative to Washington and the following additional facts, Plaintiff maintains that Washington law applies to his claims in this lawsuit.

77. John Taylor, purportedly on behalf of AIA, reached out to the Defendants in Washington. Defendants contracted with AIA in Washington for the purported representation in the Lawsuit. The Defendants prepared letters to AIA in Washington and communicated those letters from Washington. Defendants made

**FIRST AMENDED COMPLAINT - 36**

16-ER-4067

telephone calls from Washington to John Taylor (the purported President of AIA). AIA's purported relationship with the Defendants was centered in Washington, the state where the Defendants' office was located and the state where the conduct occurred that caused AIA's injuries. Defendants' privilege and work product information is stored in Washington.

78. The Defendants' negotiation of the terms of the Initial Settlement and the Settlement Agreement occurred in Washington and the related Tolling Agreement was signed by the Defendant John Munding in Washington. Defendants sent emails from Washington negotiating the terms of the Settlement Agreement.

79. Despite the filing of this lawsuit, the Defendants have continued to represent AIA in the Lawsuit, continued to fail to take action in the best interests of AIA (including by failing to extricate AIA from the Settlement Agreement and recover the proceeds from the sale of AIA's headquarters), continued to conceal facts from AIA, aided and abetted other parties in the commissions of torts against AIA, and continued to commit torts against AIA, which such conduct, acts and omissions have all occurred in Washington.

80. Because John Taylor never had authority to act on behalf of AIA and he had serious conflicts of interest (including those set forth in this Complaint), the Defendants' communications never left Washington and no communications were ever made to AIA anywhere; instead, such communications were concealed from

**FIRST AMENDED COMPLAINT - 37**

Case: 1:10-cv-00704-NPC-ECF No. 100 filed 11/09/18 PageID: 41 Page 86 of 267

AIA in Washington and held by the Defendants in Washington.

81. Irrespective of where the Defendants are licensed to practice law, the Defendants' are licensed to practice law in Washington, the Defendants' tortious conduct was committed in Washington, and the Defendants' office is located in Washington. As a result, Washington has a superior interest in the regulation of the Defendants in their business and practice of law, and to prevent improper conduct from occurring in Washington again.

## V. COMPLIANCE WITH RULE 23.1

82. As stated above, Plaintiff has been a common shareholder of AIA Services during all relevant times for the claims and relief asserted in this Complaint.

83. Prior to filing this lawsuit, Plaintiff made two separate written derivative demands upon the purported boards of directors of AIA Services and AIA Insurance (which such boards were comprised solely of John Taylor as the only purported director of both boards).[3]

84. Prior to filing this lawsuit, Plaintiff provided a comprehensive written demand upon the purported boards of directors of AIA Services and AIA Insurance, which included, but were not limited to, a demand to take the following actions:

Dale Miesen, Jerry Legg and Donna Taylor hereby demand that all

---

[3] As in this Complaint, the First Derivative Demand and Second Derivative Demand define "AIA" to include both AIA Services and AIA Insurance.

**FIRST AMENDED COMPLAINT - 38**

possible claims and legal action be immediately taken in courts of law on behalf of AIA as follows (including claims which may be contemplated and/or related in any way to the following and this derivative demand is not seeking or requiring that all of the claims and parties be named in a single lawsuit):

1. Pursue all possible claims and defenses, and seek the maximum damages, against…any other party or entity named in this derivative demand, including, without limitation, all possible tort claims (including, without limitation, aiding and abetting in the commission of torts against AIA), contract claims, declaratory relief, injunctive relief and punitive damages based on all acts, omissions, concealments, and failure to disclose through the date of this letter and for the foregoing which continues past the date of this letter. Without limiting the foregoing and so there is no confusion (even though you are well aware of the facts, lawsuits and legal issues as having full access to information at AIA and the most of the Combined Defendants), more specific examples are included below and demand is hereby made to take action against those parties and any of the other Combined Defendants to recover damages based on any of such specific examples.

. . .

14. Pursue all possible claims against…any other persons or entities named in this derivative demand requiring them to disclose any and all agreements, deeds, deeds of trust, mortgages, settlements, settlement agreements and/or other instruments, whether oral or written, with GemCap or any of its agents or assigns, including, without limitation, any agreements and instruments relating in any way to any sums and/or property owed, borrowed, transferred and/or pledged or promised to GemCap

. . .

16. Pursue all possible claims against…any other responsible party for all damages relating to all payments made directly or indirectly from AIA to the attorneys and law firm[] of …Crumb & Munding…and any other law firm (including for declaratory relief that no further sums are owed by AIA to any of the foregoing and that any fee agreements or conflict waivers are void), as such payments should never have been made, were never authorized by AIA, were not properly incurred or necessary for AIA, were never authorized by AIA's shareholders after full disclosure was made, and involved the attorneys and law firms taking action or performing work not in the best interests of AIA and/or

**FIRST AMENDED COMPLAINT - 39**

in violation of the duty of loyalty owed to AIA. Demand is further made to pursue all possible claims, including, without limitation, for the disgorgement of all fees, costs and expenses paid or discharge of any debts allegedly owed, to any of the foregoing attorneys, law firms and/or attorneys working at such law firms to the extent that they represented AIA based on conflicts of interest, breached fiduciary duties (including the duty of loyalty), and malpractice...In addition, demand is made to assert all possible claims against the foregoing parties for participating and/or allowing AIA to be improperly utilized to fund the defense and prosecution of lawsuits which were not in AIA's best interests, but were instead pursued based on the interests of the Controlling AIA Defendants.

. . .

22. Pursue all possible claims against John Munding and Crumb & Munding (or such other firm Mr. Munding is operating through) for malpractice, breach of fiduciary duties and to disgorge all attorneys' fees, costs and expenses paid to them directly or indirectly by AIA for the California Lawsuit as Mr. Munding intentionally violated his duties owed to AIA, including, without limitation, his duties of loyalty owed to AIA and by taking direction and action benefitting other defendants (including John's) and placing their interests in front of AIA and by representing CropUSA, AIA and other parties when there were conflicts of interest in doing so and Mr. Munding knew that he could not properly represent AIA's interests and when he had no intention of doing so. Demand is further made to pursue all possible claims against Mr. Munding and Crumb & Munding for improperly failing to assert that the guarantees and settlement agreements entered into by AIA were not authorized and were thus illegal or ultra-vires and by allowing AIA to enter into them in the first place. Mr. Munding places his interests in earning fees ahead of AIA's interests.

. . .

43. Pursue all possible claims against…any other parties identified above to recover any attorneys' fees and costs incurred in any lawsuit or litigation directly or indirectly involving AIA.

44. To the extent that the conduct and claims discussed above continues after this derivative demand, to pursue all possible claims based on all future action based upon the same or similar acts, omissions, conduct, claims and damages.

**FIRST AMENDED COMPLAINT - 40**

Case: 1:10-cv-00400-RNC-ECF No. 100 filed 11/09/18 PageID.411 Page 89 of 267

The above-referenced written demand, including the above-quoted portions, is referred to herein as Plaintiff's "First Derivative Demand".

85. The purported boards of directors of AIA Services and AIA Insurance, comprised solely of John Taylor at the time, did not respond to Plaintiff's First Derivative demand within 90 days as required, nor did the boards of directors request any further information or clarification from Plaintiff regarding the issues raised in the First Derivative Demand.

86. Then, a little over two months later and again prior to filing this lawsuit, Plaintiff provided a second written demand upon the purported boards of directors of AIA Services and AIA Insurance to take additional actions not described in the First Derivative Demand, which included, but were not limited to, a demand to take the following actions:

> 52. Pursue all possible claims against…any and all of the parties listed above [(including John Munding, Crumb & Munding, or any law firm Mr. Munding may be operating through)] for concealing from AIA the facts, conflicts and failing to disclose all necessary facts and claims.
> . . .
> Please note that to the extent that any of the above demands overlap or are duplicative with prior demands or may include acts and claims which occurred after one of the prior demands, Dale Miesen, Jerry Legg and Donna Taylor are not waiving any claims for such prior demands or conceding that you have the right to now address those demands…

The above-referenced written demand, including the above-quoted portions, is referred to herein as Plaintiff's "Second Derivative Demand". Plaintiff's Second Derivative Demand included some, but not all, of the same content contained in the

**FIRST AMENDED COMPLAINT - 41**

16-ER-4072

First Derivative Demand merely to provide the necessary background facts and party names to support the new demands in the Second Derivative Demand—not to provide the boards of AIA with another bite at the apple to respond to the First Derivative Demand.

87. The purported boards of directors of AIA Services and AIA Insurance, comprised solely of John Taylor at the time, responded in writing within 90 days to Plaintiff's Second Derivative Demand wherein John Taylor refused to take action. However, the boards of directors of AIA Services and AIA Insurance, again comprised solely of John Taylor, did not request any further information or clarification from Plaintiff regarding the issues raised in the Second Derivative Demand (or the First Derivative Demand).

88. From the time of the First Derivative Demand was made through the date that John Taylor timely responded to Plaintiff's Second Derivative Demand, John Taylor, the sole purportedly director for both AIA Services and AIA Insurance during that period of time, was not independent and, in fact, had serious conflicts of interest (including those conflict of interest referenced in this Complaint) that prevented him from addressing, let alone rejecting, the Second Derivative Demand (or the First Derivative Demand).

89. Upon information and belief, the purported boards of directors of AIA Services and AIA Insurance did not even bother to investigate the issues raised by

**FIRST AMENDED COMPLAINT - 42**

the Plaintiff's First Derivative Demand or Second Derivative Demand, even assuming that John Taylor did not have conflicts of interest that precluded him from even conducting an investigation. Again, John Taylor never contacted Plaintiff or his counsel requesting additional information or facts regarding the First Derivative Demand or the Second Derivative Demand.

90.     The decisions of the purported boards of directors of AIA Services and AIA Insurance, comprised again solely of John Taylor, to not take any of the action requested in Plaintiff's First Derivative Demand (assuming John Taylor had timely responded to that demand) and the Second Derivative Demand do not fall within the business judgment rule based on John Taylor's conflicts of interest (including by way of directly or indirectly being involved in all of the issues) and because he failed to comply with AIA's amended articles of incorporation and bylaws. In fact, as described elsewhere in this Complaint, John Taylor refused to ensure that the boards of directors were even properly seated.

91.     The purported boards of directors of AIA Services and AIA Insurance separately had the conflicts of interest set forth in the Complaint and other conflicts that prevented them from even considering Plaintiff's derivative demands. However, it was not surprising that AIA refused to take action since John Taylor purports to be the President and sole director of AIA Services and AIA Insurance and he would never take any action that could implicate himself or the Defendants because he

**FIRST AMENDED COMPLAINT - 43**

16-ER-4074

purported to retain them, and keep them, as counsel for AIA to benefit his self-interests, including obligating AIA to pay over $12,000,000 for a loan that he obtained for CropUSA and also personally guaranteed.

92.     Over ninety days have elapsed since the written derivative demands set forth above were made to the boards of directors of AIA, no action has been taken by AIA whatsoever, and all of Plaintiff's claims and requested relief asserted in this lawsuit flow from those derivative demands.

93.     It is anticipated that the Defendants will allege that the First Derivative Demand and the Second Derivative Demand were inadequate because they were "vague and ambiguous" and "legally insufficient", but such challenges to both letters are unsupported by the above-quoted portions of the First Derivative Demand and Second Derivative Demand. Moreover, Judge Candy Dale already found "the content of Miesen's demand letters constituted a sufficient demand on the AIA board of directors." The Defendants are collaterally estopped from asserting otherwise.

94.     As the second largest common shareholder of AIA Services (who traded a book of insurance business worth approximately $500,000 to AIA Services in exchange for his common shares), the Plaintiff fairly represents the interest of AIA and their innocent shareholders (including the preferred shareholders, 401(k) Plan shareholders, and former ESOP shareholders) and lawful creditors (to the extent that AIA have any bona fide creditors that have not been paid). Plaintiff has never

**FIRST AMENDED COMPLAINT - 44**

received a return on his investment in AIA Services. Plaintiff is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist, but instead to only pursue *bona fide* claims on behalf of, for the benefit of, AIA and ultimately their innocent shareholders. At this time, AIA's major and only remaining significant assets are claims in lawsuits, including this lawsuit.

95. Plaintiff is pursuing this derivative action in an effort to help make AIA whole and recover the millions of dollars in damages inflicted upon them by the Defendants. Upon obtaining judgment in this lawsuit and the other lawsuit, the funds will be held by this Court or another court pending lawful distribution of them. Alternatively, Plaintiff will seek to have AIA Services dissolved with the funds being used to pay lawful creditors and the remaining funds to be distributed to the Series A Preferred Shareholder (Donna Taylor), the Series C Preferred Shareholders (the innocent 401(k) Plan participants) and then to the innocent common shareholders.

## VI. COUNT I—BREACHES OF FIDUCIARY DUTIES

96. Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Complaint to the extent necessary to support this cause of action.

97. As attorneys for AIA, the Defendants owed fiduciary duties to AIA (including the undivided duties of loyalty, trust, honesty and to speak) to properly

**FIRST AMENDED COMPLAINT - 45**

and loyally represent AIA or not represent AIA at all. Defendants also owed duties and obligations to properly comply with, and make all necessary disclosures required by, the Rules of Professional Conduct and their duties to speak. In addition, the standard of care, fiduciary duties owed and the Rules of Professional Conduct involving the Defendants' acts and/or omissions do not involve any local or specialized aspect of California law.

98. Defendants had conflicts of interest when they undertook to represent AIA, CropUSA Agency, CropUSA Services, John Taylor and other parties in the Lawsuit, and when they improperly proceeded in the manner directed by John Taylor, thereby improperly representing the interests of John Taylor and other parties, instead of proceeding solely in the best interests of AIA, which would have been to, among other things, prevent AIA from being liable for the unlawful guarantees and prevent AIA from signing or being liable under the terms of the Initial Settlement or the Settlement Agreement because all of those instruments were never properly authorized by AIA or its disinterested constituents (and separately violated AIA's articles of incorporation and bylaws).

99. Defendants were never retained to represent AIA by authorized, disinterested and unconflicted officers and directors of AIA; Defendants' representation and any agreements and waivers were void based on violations of the Rules of Professional Conduct and were separately ultra vires and intra vires (but

**FIRST AMENDED COMPLAINT - 46**

16-ER-4077

Case: 18-cv-00240-REC-CWD Document 100 filed 11/08/21 Page 50 of 267

unauthorized) acts by AIA. The Defendants placed their self-interests in earning fees ahead of, and in direct conflict with, AIA's interests in having loyal, undivided and unconflicted representation. The Defendants allowed the self-interests of CropUSA Agency, CropUSA Services, John Taylor and other parties to be placed above AIA's interests during the representation and for the entry into the Initial Settlement or the Settlement Agreement (and thereafter).

100. As a result of the Defendants the acts and/or omissions set forth in this Complaint and/or those facts proven at or before the time of trial, the Defendants have breached their fiduciary duties owed to AIA (including, without limitation, their undivided duties of loyalty, obedience, care, good faith, trust, confidence and duty to speak owed to AIA) and/or engaging in collusive acts and behavior against AIA. The Defendants have also breached their fiduciary duties by concealing facts from AIA and their shareholders in violation of their duties to speak. Many of the Defendants' breaches of their fiduciary duties owed to AIA were intentional.

101. For example, the Defendants have also breached their fiduciary duties and violated the Rules of Professional Conduct (which also constitute breaches of fiduciary duties as a matter of law), including the Washington Rules of Professional Conduct, 1.1, 1.2, 1.3, 1.7, 1.9, 1.13, 1.14 and 1.16, when they, among other things: **(a)** simultaneously represented AIA, CropUSA Agency, CropUSA Services and other parties in the Lawsuit (including for the Initial Settlement and the Settlement

**FIRST AMENDED COMPLAINT - 47**

Agreement) and when the representation of AIA was materially adverse to the representation of the Defendants' other clients because AIA should not have been liable under the guarantees, the Initial Settlement or the Settlement Agreement and that all of those instruments were a fraud upon AIA; **(b)** failed to proceed in the best interests of AIA, i.e., to take all action or steps to ensure that AIA was not obligated under the guarantees, the Initial Settlement or the Settlement Agreement, when AIA's interests were materially adverse to the Defendants' other clients and John Taylor; **(c)** failed to provide full disclosure and obtain informed consent to represent AIA, and continued representing AIA, without authorization or direction from authorized, unconflicted and disinterred constituents of AIA; **(d)** placed their interests in retaining AIA as clients and keeping them as clients solely to earn significant attorneys' fees above the interests of AIA in being loyally, properly and ethically represented in the Lawsuit; **(e)** prepared and/or entered into Agreements and/or waivers that were not in the best interest of AIA and without making full disclosure to AIA or obtaining consent from disinterested and unconflicted constituents of AIA; **(f)** engaged in representation and advised AIA to enter into the Initial Settlement and the Settlement Agreement when it was not in AIA's best interests and in violation of AIA's articles of incorporation and bylaws; **(g)** continued representing AIA and taking directions from John Taylor in the Lawsuit when John Taylor had conflicts of interest that disqualified him from making any

**FIRST AMENDED COMPLAINT - 48**

16-ER-4079

Case 1:10-cv-00704-NPC-ECF No Document 1089/18 Filed 08/20/21 17 Page 97 of 210267

decisions for AIA and even after John Taylor admitted that he had conflicts of interest that required him to retain independent counsel; **(h)** failed to withdraw from representing AIA rather than allow AIA to enter into, and be bound by the terms of, the Initial Settlement or the Settlement Agreement; **(i)** simultaneously represented AIA, CropUSA Agency, CropUSA Services and other parties when the Defendants should have been asserting claims against those parties and John Taylor, Beck and Henderson for having signed the board resolutions purporting to authorize AIA to enter into the guarantees for the line-of-credit; **(j)** at a minimum, failed to treat AIA as a diminished client since John Taylor's conflicts of interest and tortious conduct against AIA prevented him or any of the other parties (they had conflicts, too) from making any litigation decisions for AIA or even permitting the Defendants to represent AIA; **(k)** failed to terminate or withdraw as counsel for AIA when the Defendants knew that the guarantees, Initial Settlement and Settlement Agreement violated AIA's articles of incorporation, bylaws and various sections of Idaho Code (and were not properly authorized); **(l)** failed to terminate or withdraw as counsel for AIA rather than allow AIA to enter into the Initial Settlement or the Settlement Agreement, which was a fraud upon AIA and its innocent shareholders (nothing has yet been disclosed to AIA based on the John Taylor's conflicts of interest); **(m)** if applicable, entered into an unreasonable limited scope of representation of AIA (assuming that the Defendants limited their scope of representation of AIA in some

**FIRST AMENDED COMPLAINT - 49**

Case: 18-cv-00704-NDF-ECF No. Document 1089/18 Filed 08/20/21 Page 51 of 267

fashion) and, of so, such limited scope of representation was unreasonable under the circumstances; **(n)** failed to diligently and competently represent AIA and communicate with, and make full disclosure to, AIA (including disinterested constituents of AIA); **(o)** advised AIA to enter the Initial Settlement or the Settlement Agreement when that Agreement unlawfully assigned legal malpractice claims and unlawfully purported to prevent AIA from filing bankruptcy; **(p)** failing to extricate AIA from the Initial Settlement and the Settlement Agreement and to allow AIA's headquarters to be sold and the proceeds given to GemCap when it was not entitled to them (which Defendants could still take action to rectify); and **(q)** engaged in other acts, omissions and concealments (including those described or contemplated in this Complaint) or may be presented at or before the time of trial.

102. As a direct and/or proximate cause of the Defendants' breaches of their fiduciary duties (or a substantial factor thereof), AIA has been damaged in the amount to be proven at or before trial, including, without limitation, that the Defendants be required to disgorge all compensation and consideration received from, or on behalf of, AIA because they are faithless fiduciaries.

### VII. COUNT II—FRAUDULENT CONCEALMENT

103. Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Complaint to the extent necessary to support this cause of action.

**FIRST AMENDED COMPLAINT - 50**

16-ER-4081

**104.** The Defendants (as fiduciaries) owed AIA a duty to speak, and to not conceal any facts from AIA. While Plaintiff believes that discovery will reveal that there are many facts that Defendants concealed from AIA, Plaintiff is unable to plead fraud as to such facts because he has not yet discovered them (nor has AIA because John Taylor and other insiders had conflict of interest that prevent their knowledge from being imputed on AIA), but he anticipates being able to do so once discovery is conducted. Despite requests to counsel for the Defendants, they have refused to provide any billing records or fee agreements to facilitate Plaintiff's discovery of additional facts.

**105.** Nevertheless, the Defendants **(a)** concealed or suppressed material facts from AIA as set forth in this Complaint, including, without limitation, the terms of their representation of AIA, all of the terms of the Initial Settlement, and all of the terms the Settlement Agreement filed on pages 21 through 48 of Docket No. 128 in *Taylor v. Hawley Troxell et al.*, U.S. District Court Case No. 1:10-cv-00404-DCN-CWD (a/k/a *Miesen v. Henderson et al.*), which such Settlement Agreement is incorporated by reference herein. The Defendants concealed that John Taylor had allegedly authorized the Initial Settlement and the Settlement Agreement, that AIA would be unlawfully liable for over $12,000,000, that AIA's purported officer and director John Taylor would illegality not seek bankruptcy protection for AIA, that AIA would illegally assign to GemCap any legal malpractice claims that it had

**FIRST AMENDED COMPLAINT - 51**

against Quarles & Brady, and that John Taylor would once again place his interests above AIA so that he was able to defer paying any of the amount owed under the Settlement Agreement yet AIA was required to transfer its headquarters to GemCap and it be sold with the proceeds going to GemCap; **(b)** the Defendants were under a duty to disclose all such facts to AIA and have still never disclosed them to this day because John Taylor's knowledge (or the knowledge of any other former officer and director of AIA) is not imputed upon AIA; **(c)** the Defendants intentionally concealed and suppressed all such facts with the intent to defraud AIA; **(d)** AIA was unaware of such facts and would not have acted as AIA purportedly did if AIA had known of such concealed and suppressed facts; and **(c)** as a result of the concealment or suppression of such facts, AIA has sustained damages in the amount to be proven at or before the time of trial.

106. As a result of the concealments stated above, the others set forth in this Complaint and the others that Plaintiff anticipates discovering once discovery take place, the Defendants are barred and equitably estopped from asserting the statutes of limitations as defenses in this lawsuit.

## VIII. COUNT III—AIDING AND ABETTING IN OTHER PARTIES' BREACHES OF FIDUCIARY DUTIES AND FRAUD

107. Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Complaint to the extent necessary to support this cause of action.

**FIRST AMENDED COMPLAINT - 52**

**108.** The Defendants were aware that John Taylor, Duclos, Henderson, Beck and other AIA officers and directors owed fiduciary duties to AIA because they were directors, officers, and controlling shareholders, which were separate and distinct fiduciary duties from the fiduciary duties that the Defendants owed to AIA.

**109.** During all relevant times, the Defendants: **(a)** had knowledge that the acts and/or omissions of John Taylor, Beck, Henderson, Duclos and other AIA officers and AIA directors constituted the breaches of fiduciary duties owed to AIA (including duties of loyalty, good faith and proceeding in the best interests of AIA) as further described in this Complaint and/or proven at the time of trial (including that they were breaching their fiduciary duties by entering into the guarantees, Initial Settlement and the Settlement Agreement with GemCap); **(b)** knew that such acts and/or omissions by John Taylor, Beck, Henderson, Duclos and other AIA officers and directors constituted breaches of fiduciary duties owed to AIA; **(c)** counseled, encouraged and/or substantially participated in such breaches of fiduciary duties owed to AIA; **(d)** did not disapprove or seek ratification or disclosure of such breaches of fiduciary duties owed to AIA; **(e)** took no steps, and continues to take no steps, to prevent such breaches of fiduciary duties owed to AIA; and/or **(f)** assisted in the concealment, and covering up, of such breaches of fiduciary duties owed to AIA.

**FIRST AMENDED COMPLAINT - 53**

16-ER-4084

110. During all relevant times, the Defendants: **(a)** had knowledge that John Taylor, Beck, Henderson, Duclos and other AIA officers and AIA directors' acts and/or omissions constituted fraud upon AIA (including fraudulent concealment) as further described in this Complaint and/or proven at the time of trial (including, without limitation, concealing the guarantees, Initial Settlement and the Settlement Agreement); **(b)** knew that such acts and/or omissions by other defendants constituted fraud upon AIA; **(c)** counseled, encouraged and/or substantially participated in such fraud upon AIA; **(d)** did not disapprove or seek ratification or disclosure of such fraud upon AIA; **(e)** took no steps, and continue to take no steps, to prevent such fraud upon AIA; and/or **(f)** assisted in the concealment, and covering up, of such fraud upon AIA.

111. As a result of the Defendants' aiding and abetting of breaches of fiduciary duties and aiding and abetting fraud committed against AIA by John Taylor, Beck, Henderson, Duclos and other AIA officers and directors, AIA has sustained damages in the amount to be proven at or before the time of trial. These causes of action are independent, separate and distinct from the fiduciary duties owed by the Defendants to AIA.

## IX.    COUNT IV—LEGAL MALPRACTICE

112. Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Complaint to the extent necessary to support

**FIRST AMENDED COMPLAINT - 54**

this cause of action.

113. The Defendants owed duties to AIA (including, without limitation, duties of care and good faith), and the Defendants breached those duties by, among other things, representing AIA in the Lawsuit and for entry into the Initial Settlement Agreement and the Settlement Agreement, along with the representation and legal services provided in connection with, or related to, the Lawsuit, the Initial Settlement, the Settlement Agreement and the legal proceedings and transactions subsequent to the entry of the Settlement Agreement.

114. The Defendants have breached their duties of care and good faith owed to AIA, including, without limitation, the breached duties attributable to the acts and omissions described in this Complaint, concealing facts from AIA and their shareholders, and the acts and omissions proven at or before the time of trial. The Defendants have further breached their duties owed to AIA by improperly simultaneously representing AIA, CropUSA Agency, CropUSA Services and other parties and when the Defendants advised and permitted AIA to enter into the Initial Settlement and the Settlement Agreement that later led to the transfer of AIA's interest in its headquarters. To the extent that the Defendants purportedly limited any scope of representation of AIA, Plaintiff asserts that such limitation was unreasonable under the facts and circumstances (including based on the facts alleged in this Complaint).

**FIRST AMENDED COMPLAINT - 55**

**115.** AIA has suffered damages as a direct, foreseeable and/or proximate result of the breaches of duties and the acts of the Defendants, including, without limitation, those acts described in this Complaint and/or proven at the time of trial. At a minimum, the Defendants were also a substantial factor in the harm and damages inflicted upon AIA. Had the Defendants properly discharged their duties, AIA would never have been liable under the guarantees or be bound or potentially liable under the Initial Settlement or the Settlement Agreement nor would AIA have transferred its multi-million-dollar interest in its headquarters.

**116.** As a direct and/or proximate cause of the Defendants' acts and/or omissions, the Defendants are liable to AIA for damages in the amount to be proven at or before the time of trial.

## X. COUNT V—VIOLATIONS OF CONSUMER PROTECTION ACT

**117.** Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Complaint to the extent necessary to support this cause of action.

**118.** During all relevant times, the Defendants engaged in the trade and profession of practicing law in Spokane County, Washington.

**119.** Defendants engaged in unfair and deceptive acts or practices in the entrepreneurial aspects of the practice of law in their dealings with AIA.

**FIRST AMENDED COMPLAINT - 56**

16-ER-4087

Case 2:18-cv-00240-RMP-ECF Document 110-9 Filed 09/30/21 Page 105 of 117

**120.** The Defendants unfair or deceptive acts or practices include those acts and/or omissions described in the Complaint and specifically that the Defendants, among other things: **(a)** failed to disclose and concealed conflicts of interest from AIA in order to initially obtain AIA as clients; **(b)** failed to disclose and concealed conflicts of interest from AIA in order to retain AIA as clients; **(c)** continued representing AIA (despite having irreconcilable conflicts of interest and concealing those conflicts of interest from AIA and its disinterested constituents) in order to retain AIA as clients to earn fees and costs; **(d)** allowed AIA to enter into the Initial Settlement or the Settlement Agreement (despite having irreconcilable conflicts of interest and while concealing those conflicts of interest) in order to retain AIA as clients to earn fees and costs; and **(e)** allowed John Taylor, CropUSA Agency and CropUSA Services to place their interests above AIA's interests by allowing AIA to enter into the Initial Settlement or the Settlement Agreement in order to retain AIA as clients to earn fees and sweep under the carpet the claims asserted in this Complaint. The foregoing acts, along with other acts in this Complaint and other acts that Plaintiff may submit at or before trial (including acts that may be learned through discovery), were unfair and deceptive acts and practices in the entrepreneurial aspects of practicing law in violation of RCW 19.86.020, *et seq.*

**121.** As a direct and/or proximate cause of the Defendants' unfair or deceptive trade practices, AIA Services and AIA Insurance have been damaged in

**FIRST AMENDED COMPLAINT - 57**

the amount to be proven at or before trial, including, without limitation, treble damages and an aware of attorneys' fees as provided under RCW 19.86.090.

## XI.   COUNT VI—DECLARATORY JUDGMENT

**122.**   Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Complaint to the extent necessary to support this cause of action.

**123.**   The Defendants have violated numerous duties and Rules of Professional Conduct (including Washington Rules of Professional Conduct) 1.1, 1.2, 1.3, 1.7, 1.9, 1.13, 1.14 and 1.16). As a result, Plaintiff seeks a declaratory judgment against Defendants, including, without limitation, for the following relief: **(a)** declaring void or unenforceable any purported representation/fee agreements, conflict waivers, limited scopes of representation, common interest or joint defense agreements, any other agreement relating to Defendants and AIA, and voiding any sums that the Defendants may claim is owed by AIA; and **(b)** such other declaratory relief as may be requested at or before trial, any declaratory relief related to any other acts and/or omissions described in, or contemplated by, this Complaint (including setting aside any agreements or conflict waivers for being ultra vires, intra vires (but unauthorized) and/or illegal), and/or any declaratory relief based on any facts which may be learned in discovery.

**FIRST AMENDED COMPLAINT - 58**

Case 2:18-cv-00240-RMP-ECF No. 10 filed 11/09/18 PageID.107 Page 62 of 117

124.  To the extent necessary, Plaintiff also requests declaratory relief against AIA (and the Defendants to the extent necessary) for any relief contemplated or flowing from the facts and claims in this lawsuit, including without limitation: **(a)** declaratory relief against AIA based on the claims or declaratory relief asserted against the Defendants because AIA were parties to any applicable agreements (oral or written) with the Defendants; and **(b)** the attorney-client privilege and work product involving the Defendants' legal services provided to AIA have been waived (including because John Taylor was never an authorized agent of AIA and was thus a third party) and do not apply based on fraud, breaches of fiduciary duties and for good cause, including without limitation, based on the factors articulated in *Garner v. Wolfinbarger*, 430 F.2d 1093, 1104 (5th Cir. 1970), which such factors all support the waiver of privilege and work product held by the Defendants.

## XII.    COUNT V—EQUITABLE INDEMNIFICATION

125.  Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Complaint to the extent necessary to support this cause of action.

126.  The Defendants have committed wrongful acts and omissions against AIA (including those set forth in this Complaint), such acts and omissions exposed AIA to litigation in Idaho with the Plaintiff and in this lawsuit (both of which obligate AIA to pay the attorneys' fees and costs incurred by the Plaintiff under

**FIRST AMENDED COMPLAINT - 59**

common fund and derivative action theories), and the Plaintiff was not connected with any of Defendants' wrongful acts and omissions against AIA. As a result, the Defendants are obligated to pay all of the attorneys' fees, expert fees and costs incurred by the Plaintiff in the Idaho lawsuit, including any fees or costs paid under the common fund or derivative action statute, under the theory of equitable indemnity.

**127.** In addition, Plaintiff asserts that the ABC Rule is an antiquated rule and that Plaintiff should be entitled to recover all such consequential damages and other damages under the wrongful act doctrine, as articulated in the Restatement (Second) of Torts § 914 (1979), which the Washington Supreme Court did <u>not</u> reject in *LK Operating, LLC v. Collection Group, LLC*, 181 Wash.2d 117, 125, 330 P.3d 190, 195 (2014). This Court must predict how the Washington Supreme Court would rule if Plaintiff's theory was submitted. As a result, this Court should also rule that the wrongful act doctrine applies in this lawsuit.

## XIII.   JURY DEMAND

**1.** Plaintiff, through the signature of his attorney below, hereby respectfully demands a trial by jury of no less than the maximum number of jurors permitted on all causes of action for which a jury trial is allowed by law.

///

///

**FIRST AMENDED COMPLAINT - 60**

16-ER-4091

## XIV. **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for the following relief:

1. For a judgment against the Defendants, jointly and severally, for all damages in an amount to be proven at or before trial, including, without limitation, consequential damages, incidental damages, lost profits, and all other damages, plus prejudgment interest;

2. For a judgment or order requiring the Defendants to disgorge all attorneys' fees and costs received from, or on behalf of, AIA Services and AIA Insurance in the amount to be proven at or before trial, plus prejudgment interest;

3. For a judgment requiring the Defendants to indemnify AIA for, or pay, all sums purportedly owed to GemCap (assuming Plaintiff is unsuccessful in setting aside AIA's obligations under the Settlement Agreement);

4. For judgment against the Defendants, jointly and severally, for all damages, treble damages, other relief (including injunctive relief), and the award of attorneys' fees as provided or available under RCW 19.86.090;

5. For a declaratory judgment for the relief specified, or contemplated, in this Complaint and any other declaratory relief requested at or before trial, including, without limitation, voiding any purported agreements or purported conflict waivers;

6. For judgment against the Defendants for all consequential damages directly or indirectly flowing from their acts and omissions;

**FIRST AMENDED COMPLAINT - 61**

16-ER-4092

7. For judgment for this Court to retain jurisdiction to deposit any funds recovered into this Court's registry, or the registry of another court, pending the ultimate dissolution of AIA at which such time the funds may be distributed (Plaintiff is not seeking to recover damages only to allow John Taylor or other parties to obtain control or otherwise utilize them);

8. For judgment that the guilty directors, officers and shareholders of AIA not receive any of the net proceeds recovered from this lawsuit;

9. For an award of the attorneys' fees and costs incurred in this action as allowed by statute (including for derivative actions), contract, or recognized grounds of equity (including common fund/common benefit); and

10. For any such further relief or remedy, including preliminary and/or permanent injunctive relief, that Plaintiff may request at or before trial and/or as this Court may find just and equitable.

DATED: This 9th day of October 2018.

RODERICK BOND LAW OFFICE, PLLC

By: _/s/ Roderick C. Bond_
Roderick C. Bond
Attorney for Plaintiff Dale L. Miesen

**FIRST AMENDED COMPLAINT - 62**

16-ER-4093

## <u>VERIFICATION OF DALE L. MIESEN</u>

STATE OF TEXAS                    )
                                  ) ss.
COUNTY OF TARRANT                 )

I, Dale L. Miesen, declare:

I am the Plaintiff in the above-entitled action. I have read the contents of this First Amended Complaint ("Complaint"), know the contents of this Complaint, and believe that the facts set forth in this Complaint are true and accurate to the best of my knowledge and belief.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

*October 9, 2018, Hurst, Texas*                    */s/ Dale L. Miesen*
Date and City and State Signed                     Dale L. Miesen

**FIRST AMENDED COMPLAINT - 63**

16-ER-4094

Case 2:18-cv-00240-RMP-ECF No. 10 filed 11/09/18 PageID.186 Page 167 of 177

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 9th day of October 2018, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Markus William Louvier:    mlouvier@ecl-law.com, byesland@ecl-law.com

James B King:    jking@ecl-law.com, byesland@ecl-law.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

_/s/ Roderick C. Bond_
Roderick C. Bond

**FIRST AMENDED COMPLAINT - 64**

16-ER-4095

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
10900 N.E. 4th St., Suite 2300
Bellevue, WA  98004
Telephone: (425) 591-6903
Email: rod@roderickbond.com

ANDREW SCHWAM, ISB NO. 1573
ANDREW SCHWAM LAW FIRM
705 SW Fountain Street
Pullman, WA 99163-2128
Telephone: (208) 874-3684
Email: amschwam@turbonet.com

Attorneys for the Plaintiff Dale L. Miesen

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>**v.**<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 1:10-cv-00404-DCN-CWD<br><br>PLAINTIFF DALE L. MIESEN'S MEMORANDUM OF LAW IN SUPPPORT OF HIS MOTION TO CERTIFY CONTROLLING QUESTIONS OF LAW TO THE IDAHO SUPREME COURT OR, ALTERNATELY, THAT THIS COURT ANSWER THE QUESTIONS IN MIESEN'S FAVOR IN CONNECTION WITH THE DEFENDANTS' PENDING MOTIONS (Dkts. 1067, 1071, 1077.)<br><br>**ORAL ARGUMENT REQUESTED** |

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - i

CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; R. JOHN TAYLOR, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual,

Defendants/Third-Party Plaintiffs,

v.

REED TAYLOR, an individual,

Third-Party Defendant.

REED TAYLOR, an individual,

Third-Party Defendant/ Counterclaimant,

v.

CONNIE TAYLOR HENDERSON, an individual; R. JOHN TAYLOR, an individual; JAMES BECK, an individual, and UNKNOWN BONDING COMPANY, an unknown entity that issued the unknown fidelity ERISA Bond,

Counterdefendants.

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     ARGUMENT...................................................................................................... 2

        A.      The Legal Standards for Certifying Questions to the Idaho Supreme Court
                Are Met. ................................................................................................ 2

        B.      This Court Should Certify the Controlling Question of Law to the Idaho
                Supreme Court Pertaining to the Requirements of Shareholder Derivative
                Demands Under Idaho Law. ................................................................. 3

                1.      May a Derivative Demand Be Excused When There Is Not a Duly
                        Elected, Fully Seated and Lawfully Functioning Board of Directors?....... 5

                2.      Can Any Party Other than the Corporation Challenge the Adequacy of
                        Derivative Demands?.................................................................. 9

                3.      Is the Board of Director's Failure to Request a Shareholder to Clarify
                        or Provide Additional Information a Waiver of the Right to Challenge
                        the Adequacy of the Derivative Demands? ............................................. 12

                4.      Is the Adequacy of a Derivative Demand Relaxed or Excused When
                        the Corporate Insiders Are Concealing Virtually All Matters from
                        Shareholders and Refusing to Engage in Proper Fundamental
                        Corporate Governance? ............................................................ 14

        C.      Does Idaho Recognize the Adverse Domination Doctrine or Similar Doctrine
                that Holds the Statutes of Limitations Do Not Run and/or Are Tolled Because
                the Corporation Has Been Controlled by Unlawfully Acting Directors and the
                Corporation Has No Knowledge of What Occurred Under the Adverse
                Interest Exception?.................................................................................. 15

        D.      If this Court Declines to Certify Any of the Above Questions, this Court
                Should Answer the Questions in Miesen's Favor in the Pending Motions. ......... 20

III.    CONCLUSION.................................................................................................. 20

CERTIFICATE OF SERVICE ...................................................................................... 21

## I.   INTRODUCTION

"Certification of open questions of state law to the state supreme court can 'in the long run save time, energy, and resources and helps build a cooperative judicial federalism.'" *Thompson v. Paul*, 547 F.3d 1055, 1065 (9th Cir. 2008) (citation omitted). These principles are served here by certifying the questions presented in the instant motion to the Idaho Supreme Court.

Currently pending before this Court is the defendants' motion to dismiss[1] based on the alleged inadequacy of the five derivative demands at issue in the instant lawsuit. (*See* Dkts. 1067, 1090, 1131, 1131-1–19, 1138.) While Miesen maintains the over 300 pages of derivative demand letter documents were more than adequate under Idaho law and that the defendants are prohibited from challenging the adequacy of those demands under the "law of the case" doctrine (Dkt. 1131 at 11-15[2]), there are several first impression controlling questions of law at issue in the motion, any one of which would forever render moot any challenges to the demands if answered in Miesen's favor. (*See* Dkt. 1131 at 15-35.) The resolution of these first impression issues by the Idaho Supreme Court would definitively determine these controlling questions of law and could also prevent this Court from having to review and address the over 500 pages of documents and briefing at issue in the defendants' motion and prevent any future appeals by them on the derivative demand issues. The certification of these questions is even more appropriate if Miesen is permitted to appeal the two orders excluding McDermott. (Dkts. 1335, 1140.) This would allow both appeals to be efficiently simultaneously adjudicated.

In addition, the defendants' pending motions for summary judgment assert statutes of limitations as defenses. (Dkts. 1077-1 at 9-15, 1071-1 at 15-23.) Based on the facts in the instant

---

[1] The HT Defendants filed the motion. The other defendants, except GemCap, joined in the motion. Thus, when Miesen refers to the "defendants" in this motion, he is referring to all of the defendants except for GemCap.

[2] When citing to dockets, Miesen will cite to the blue, file-stamped page numbers at the top.

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 1

**16-ER-4099**

lawsuit, Miesen asserts that the Idaho Supreme Court would also recognize the "adverse domination" doctrine or a similar rule and the "adverse interest" exception to toll or prevent the statutes of limitations from running because the AIA Entities have been controlled by unlawfully acting directors for over decade. (*See generally* Dkt. 211) Certifying these questions would also materially advance the adjudication of the instant lawsuit and be an efficient resolution of these questions based on the derivative demand questions and the pending appeal regarding McDermott.

Consequently, this Court should certify the questions stated below to the Idaho Supreme Court so that the appellate issues can be efficiently and effectively simultaneously adjudicated by the Idaho Supreme Court and the Ninth Circuit. This will save this Court and the parties significant time and resources litigating over these matters before this Court and on any subsequent appeals and definitively adjudicate the questions. Thus, this Court should certify the questions identified below. Alternatively, if certification is not granted, this Court should decide the questions below in the manner which Miesen asserts below is how the Idaho Supreme Court would decide them.

## II.    ARGUMENT

### A.  The Legal Standards for Certifying Questions to the Idaho Supreme Court Are Met.

"In a federal diversity action, state substantive law applies to the claims and defenses raised by the parties." *Expeditors Int'l of Wash., Inc. v. Expeditors (Japan), Ltd.*, 224 F.R.D. 661, 664 (W.D. Wash. 2004); *see First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1153 (9th Cir. 2015).

The certification of questions to the Idaho Supreme Court are governed by I.A.R. 12.3(a):

(a) Certification of a Question of Law. The Supreme Court of the United States, a Court of Appeals of the United States or a United States District Court may certify in writing to the Idaho Supreme Court a question of law asking for a declaratory judgment or decree adjudicating the Idaho law on such question if such court, on the court's own motion or upon the motion of any party, finds in a pending action that:

(1) The question of law certified is a controlling question of law in the pending action in the United States court as to which there is no controlling precedent in the decisions of the Idaho Supreme Court, and

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 2

> (2) An immediate determination of the Idaho law with regard to the certified question would materially advance the orderly resolution of the litigation in the United States court.

The decision to certify any questions of law to the Idaho Supreme Court is in the sound discretion of the district court. *Paul*, 547 F.3d at 1065. "Certification of open questions of state law to the state supreme court can 'in the long run save time, energy, and resources and helps build a cooperative judicial federalism.'" *Id*. (citation omitted). "There is a presumption against certifying a question to a state supreme court after the federal district court has issued a decision. A party should not be allowed 'a second chance at victory' through certification by the appeals court after an adverse district court ruling."[3] *Id*. (citations omitted).

Here, as explained in Section B below, the four first impression issues involving the demand requirements under Idaho Code sections 30-1-742 and 30-29-742 are controlling questions of law as to the precondition to pursuing a derivative action. In addition, as explained in Section C below, the question of whether the Idaho Supreme Court will recognize adverse domination, adverse interest exception or related doctrines are controlling questions of law for the statutes of limitations defenses. The resolution of these questions by the Idaho Supreme Court would materially advance the instant lawsuit and "in the long run save time, energy, and resources and helps build a cooperative judicial federalism." *Paul*, 547 F.3d at 1065 (quotation marks omitted).

**B.** **This Court Should Certify the Controlling Question of Law to the Idaho Supreme Court Pertaining to the Requirements of Shareholder Derivative Demands Under Idaho Law.**

The HT Defendants, joined by other defendants, argue for the third time before the third judge in the instant lawsuit that Miesen's 305 pages of derivative demands were inadequate. (Dkts. 1067, 1090, 1131 at 11-15.) Miesen maintains that, among other things, the demand letters were

---

[3] This is another reason why Miesen is bringing this motion now.

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 3

adequate and that other exceptions also apply which have not been addressed by the Idaho Supreme Court. (Dkt. 1131 at 11-35.) The parties' respective arguments regarding the derivative demands are governed by Idaho law because AIA Services Corporation and AIA Insurance, Inc. (collectively the "AIA Entities") are Idaho corporations. (E.g., Dkt. 211 at 1, 6 ¶¶ 5-7.)

"[A] court that is entertaining a derivative action under that statute must apply the demand [requirement] as it *is defined by the law of the State of incorporation.*" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991) (italics added). When interpreting the Idaho Business Corporation Act, the Idaho Supreme Court looks to the ABA Comments. *See, e.g., Wagner v. Wagner*, 160 Idaho 294, 298, 371 P.3d 807, 811 (2016). The intent of Idaho Code sections 30-1-742 and 30-29-742 was not to create the demand requirement to be used as a sword by rogue directors unlawfully acting and third parties who have assisted them. *See generally* Mod. Bus. Corp. Act §§ 740-44 cmts. (2002); Appendix ("App.") A; *see generally* Dkt. 211. In *Orrock v. Appleton*, the Idaho Supreme summarized the purpose for requiring derivative demands:

> "To prevent abuse of [a shareholder derivative suit] ... equity courts established as a precondition 'for the suit' that the shareholder demonstrate 'that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions.' " The demand requirement "affords the directors an opportunity to exercise their reasonable business judgment[.]"

*Orrock v. Appleton*, 147 Idaho 613, 618, 213 P.3d 398, 403 (2009) (citations omitted).

> The [demand] rule is intended "to give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place, and thus to allow the directors the chance to occupy their normal status as conductors of the corporation's affairs."

Mod. Bus. Corp. Act § 742 cmt. 4 (2002); App. A at 7. Consistent with these principles, Idaho Code sections 30-1-742 and 30-29-742 provide:

No shareholder may commence a derivative proceeding until:

(1) A written demand has been made upon the corporation to take suitable action;

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 4

and

 (2) Ninety (90) days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the ninety (90) day period.

I.C. § 30-1-742; *see also* I.C. § 30-29-742.[4]

The Idaho Supreme Court has not addressed the questions presented below regarding derivative demands. *See, e.g., Kugler v. Nelson*, 160 Idaho 408, 413-15, 374 P.3d 571, 576-78 (2016); *McCann v. McCann*, 138 Idaho 228, 232-37, 61 P.3d 585, 589-94 (2002) ("*McCann I*"); *Orrock*, 147 Idaho at 618-19, 213 P.3d at 403-04.

Here, while Judge Boyle or Judge Dale properly rejected the defendants' challenges to the adequacy of the derivative demands (Dkt. 1131 at 11-15), in light of Miesen's notice of direct appeal and motion for interlocutory appeal regarding McDermott, Miesen asserts certification of the questions below will efficiently and effectively move this complex lawsuit towards an ultimate resolution. Because the first impression issues raised in this motion could render moot any future appeal by the defendants of the adequacy of the five derivative demands, which is a controlling threshold precondition to Miesen's derivative claims, this Court should certify the questions for appeal. The Idaho Supreme Court has never spoken to following four controlling questions, which could be rephrased as one or two broad questions, involving derivative demands, which are addressed in turn as follows:

 **1. May a Derivative Demand Be Excused When There Is Not a Duly Elected, Fully Seated and Lawfully Functioning Board of Directors?**

In response to the defendants' motion, Miesen asserted that demand should be excused because there was not a lawfully elected, fully seated and properly functioning board of directors

---

[4] The first three derivative demands are governed by I.C. § 30-1-742 and the last two demands are governed by I.C. § 30-29-742. (Dkts. 1131-2, 1131-3, 1131-4, 1131-5, 1131-6.)

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 5

since the first demand was made in 2008, and the defendants do not dispute that this question has never been decided by the Idaho Supreme Court. (Dkts. 1131 at 33-35, 1138 at 24-28.)

It is well-settled that the precondition to provide a derivative demand may be "'excused by extraordinary conditions.'" *Orrock*, 147 Idaho at 618, 213 P.3d at 403 (citations omitted).

In *McCann v. McCann*, the Idaho Supreme Court stated that the Idaho Legislature's apparent "intent to no longer recognize 'futility' as an exception to the requirement of demand as a condition preceding the institution of a shareholder's derivative action." *McCann I*, 138 Idaho at 236, 61 P.3d at 593. "[D]emand typically is deemed to be futile when a ***majority*** of the directors have participated in or approved the alleged wrongdoing, or are otherwise financially interested in the challenged transactions." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 102 (1991) (emphasis added). The Idaho Supreme Court expressly acknowledged that demand could be excused in other situations when it stated: "Although a few of Ron's requests had been rejected by the corporation in the past, ***the record does not appear to support a conclusion that demand should be excused because of those few rejections***." *McCann I*, 138 Idaho at 236, 61 P.3d at 593 (emphasis added).

Here, Miesen asserts that the Idaho Supreme Court would reach a different result here and would hold that demand was excused or that Idaho Code sections 30-1-742 and 30-29-742 did not apply because the AIA Entities did not have any lawfully elected, fully seated and lawfully functioning boards of directors to serve a derivative demand upon (under the negligent guidance of the HT Defendants for a number of those years). (*See generally* Dkt. 211.) The Idaho Supreme Court made clear that, under Idaho Code section 30-1-742, "demand upon the corporation" means "[t]he demand must be made on the directors in office at the time the shareholders' derivative action is commenced." *McCann I*, 138 Idaho at 234-35, 61 P.3d at 591-92 (quotation marks and

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 6

citation omitted). When there is not any lawfully elected and lawfully functioning boards of directors, the "intent" of the demand statutes is not served. *Id.*; *Smith v. City of Preston*, 99 Idaho 618, 622, 586 P.2d 1062, 1067 (1978); Mod. Bus. Corp. Act §§ 740-44 cmts. (2002); App A.

Indeed, as Miesen pointed out in his Response (Dkt. 1131 at 33-35), there is no dispute that, from date of the first derivative demand in 2008 through the present time, there was no lawful board of directors for the AIA Entities because the defendants: (1) intentionally failed to properly hold annual shareholder meetings (in violation of the bylaws); (2) intentionally failed to properly nominate and elect directors (in violation of the bylaws); (3) intentionally refused to fully seat the board with the director required under the articles for the Series A and Series C Preferred shareholders; (4) intentionally failed to comply with the articles of incorporation (including failing to honor the appointment of the preferred shareholder directors and by engaging in prohibited transactions); (5) intentionally failed to comply with the bylaws (including conflicts of interest restrictions); (6) intentionally concealed facts and improper transactions from shareholders and refused to provide disclosures; and (7) intentionally continuing to engage in the foregoing unlawful conduct and much more, despite having received five demands by numerous shareholders over the course of over a decade demanding action and proper corporate governance, much of which the Hawley Troxell Defendants were directly or indirectly involved in. (E.g., Dkt. 211 at ¶¶ 4-244; Dkt. 1131-10 §§ 4.2.8, 4.2.9, 4.2.12, 4.3.2, 4.3.3, 4.3.5; Dkt. 1131-11 §§ 3.2, 4.2, 4.4, 4.6, 4.7, 4.14, 6.1, 6.2, 14.1.) It would be nonsensical and an absurd result to allow the defendants to avoid liability for alleging demands were inadequate when fundamental corporate governance and the corresponding Idaho Code sections are being intentionally violated. E.g., I.C. §§ 30-1-801(2), 30-29-801(2), 30-1-202(2)(b)(ii)-(iii), 30-29-202(2)(b)(ii)-(iii), 30-1-301(1), 30-29-301(1), 30-1-302(7), 30-29-302(7), 30-1-1201, 30-29-1201; *Kemmer v. Newman*, 161 Idaho 463, 466, 387 P.3d

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 7

131, 134 (2016) ("Actions taken in violation of a corporation's bylaws are void."); *Marine Services Unlimited, Inc. v. Rakes*, 918 S.W.2d 132, 134 (Ark. 1996) ("meeting held without notice to some or any of the directors and in their absence is illegal, and action taken at such a meeting, although by a majority of the directors, is invalid."); *Stone v. American Lacquer Solvents Co.*, 345 A.2d 174, 176-77 (Pa. 1975) ("directors of a corporation may bind a corporation only when they act at a legal meeting of the board"); *Hill v. Small*, 183 S.E.2d 752, 753-54 (Ga. 1971) (articles of incorporation are the corporation's constitution and actions which violate articles are void); 2 Fletcher Cyc. Corp. § 505 (2020). Indeed, even the board had properly rejected the demands, the decisions would have been void. *Id*.

Moreover, contrary to the defendants' contentions (Dkt. 1138 at 27-28), because Idaho Code sections 30-1-742 and 30-29-742 are ambiguous, they do not speak to whether a demand is required when there are not any lawfully elected and fully seated boards of directors and the intent of the statute should not be frustrated. The Idaho Supreme Court will need to resolve the ambiguity and prevent an absurd result and inconsistency "with the basic intent and purpose of the statute, which is the primary rule of statutory construction." *Smith*, 99 Idaho at 622, 586 P.2d at 1067; *see also Corder v. Idaho Farmway, Inc.*, 133 Idaho 353, 986 P.2d 1019 (1999); *Ada Cnty. Highway Dist. v. Total Success Inv., LLC*, 145 Idaho 360, 368, 179 P.3d 323, 331 (2008) ("The Court interprets statutes according to their plain, express meaning, but will resort to judicial construction when the statute is '***ambiguous, incomplete, absurd, or arguably in conflict with other laws***.'" (emphasis added)). The Idaho Supreme Court should confirm this statutory interpretation.

In sum, the intent of requiring derivative demands is not present when there aren't any lawfully elected, fully seated and lawfully function boards because "[t]he demand requirement

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 8

'affords the directors an opportunity to exercise their reasonable business judgment.'" *Orrock*, 147 Idaho at 618, 213 P.3d at 403 (citation omitted). It is an impossibility for unlawfully acting boards to exercise reasonable business judgment because, by definition, their conduct exceeds the business judgment rule. (Dkt. 211.) *See, e.g., Melgard v. Moscow Idaho Seed Co.*, 73 Idaho 265, 271, 251 P.2d 546, 550 (1952); *Steelman v. Mallory*, 110 Idaho 510, 513, 716 P.2d 1282, 1285 (1986). The Idaho Supreme Court would hold that demand is excused under these circumstances.

### 2.  Can Any Party Other than the Corporation Challenge the Adequacy of Derivative Demands?

In response to the defendants' motion, Miesen asserted that only the AIA Entities may challenge the adequacy of his derivative demands and the defendants do not dispute that the question has never been addressed by the Idaho Supreme Court. (Dkts. 1131 at 32-33, 1138 at 28.)

While the Idaho Supreme Court has never addressed the issue, it has been widely recognized by courts that *only* the corporation may raise demand defenses in a derivative action.[5] *Haberman v. Washington Pub. Power Supply Sys.*, 109 Wash.2d 107, 148, 744 P.2d 1032, 1060 (1987) ("Standing to challenge a derivative plaintiff's failure to comply with the procedural requirements of a derivative suit lies with the entity the plaintiff seeks to represent."); *Colan v. Monumental Corp.*, 524 F.Supp. 1023, 1028 (N.D. Ill. 1981) ("Defendants lack standing to complain of any deficiencies in the demand made by the plaintiff upon [the] directors."); *Prager v. Sylvestri*, 449 F.Supp. 425, 429 (S.D.N.Y.1978) ("Under these circumstances, standing to challenge plaintiff's failure to make the demand to sue lies only with the corporation."); *Abbey v. Computer & Commc'ns Tech. Corp.*, 457 A.2d 368, 374-75 (Del. Ch. 1983). The rationale for

---

[5] Other courts have held that third parties may assert defenses on demand issues. *See, e.g., Shlensky v. Dorsey*, 574 F.2d 131, 142 (3d Cir. 1978). Those courts did not consider the intent of demands and involve cases where pleading futility is available, which renders moot the adequacy of a demand. Idaho does not recognize the futility exception, which is another reason why only the corporation should have the right or standing to challenging the adequacy of demands. At most, insiders and third parties should only be able to object if a demand was not made.

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 9

only allowing the corporation to challenge was well-stated in a law review article:

> It is suggested here that the proper party to invoke a given defense should be the party whom the defense is designed to protect. The applicability of this principle to three general categories of defenses must be examined: first, conventional defenses which defeat the corporate right of recovery (*e.g.*, no wrong has been committed); second, conventional defenses valid only against the plaintiff-shareholder (*e.g.*, laches of the individual shareholder); and, third, defenses which are *sui generis* to shareholders' derivative suits (*e.g.*, failure to make demand on the board of directors).
>
> \*     \*     \*
>
> There remains a class of defenses which are peculiar to the derivative suit, such as failure to make demand on the board of directors. **Insofar as these defenses are intended to protect the interests of the corporation (e.g., as preliminaries to an effective exercise of business judgment), only the corporation should be permitted to raise them. Where the corporation is not hostile to the shareholder's suit, it would seem strange to permit the alleged wrongdoer to avoid liability under the guise of protecting the interests of the corporation**.

Note, *Defenses in Shareholders' Derivative Suits—Who May Raise Them* 66 Harv. L.Rev. 342, 343 & 346 (1952) (footnotes omitted and emphasis added).

The limitation to grant only the corporation the standing or the right to challenge the adequacy of demands is consistent with the purpose for requiring a derivative demand in the first place. If the intent of "[t]he demand requirement 'affords the directors an opportunity to exercise their reasonable business judgment,'" *Orrock*, 147 Idaho at 618, 213 P.3d at 403, and "'to give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place,'" Mod. Bus. Corp. Act § 742 cmt. 4 (2002); App. A at 7, it would be nonsensical and defeat the intent of the demand requirement by allowing guilty corporate insiders or third parties to interfere with board decisions by asserting a demand was inadequate. Moreover, since Idaho does not recognize the futility exception to a demand, this is even more reason why parties other than the AIA Entities should not be permitted to challenge the adequacy of the demands. Indeed, if futility was an exception, the instant case would have far exceeded the pleading standard required for futility. (Dkt. 211.)

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 10

To illustrate this point one need to only consider the following example. If a shareholder (e.g., Miesen) had provided his derivative demands and a duly elected board of directors responded that the company (e.g., AIA Services) "takes no position on any issue in the case; the Company stands ready to receive…the net proceeds of any settlement or judgment,"[6] *Packer on Behalf of 1–800–flowers.com, Inc. v. Raging Cap. Mgmt., LLC*, 242 F.Supp.3d 141, 143 n. 1 (E.D. N.Y. 2017), the corporate insiders guilty of serious unlawful conduct (e.g., John Taylor) and third parties (e.g., the HT Defendants) could not challenge that response and assert that the derivative demands were inadequate. Under this same rationale, guilty corporate insiders and third parties should have no right to challenge the adequacy of derivative demands. Only the corporation should be permitted to do so. It would be nonsensical for "the alleged wrongdoer[s] to avoid liability under the guise of protecting the interests of the corporation." 66 Harv. L.Rev. at 346.

Miesen asserts that courts which have permitted guilty insiders and third parties to challenge the adequacy of demands have not properly considered the purpose and intent of the demand rule, which is not to provide rogue management and third parties with a sword to avoid liability for meritorious derivative actions. This is not a "so-called 'strike suit'" filed to extract attorneys' fees—the AIA Entities very existence depend on the successful outcome of the instant lawsuit. (*See generally* Dkt. 211.)  Mod. Bus. Corp. Act § 740 cmt. (2002); App. A at 4. This would not even be an issue if Idaho permitted derivative plaintiffs to plead futility as an excuse to making written demands because Miesen would have pleaded futility and rightfully so based on the facts. (E.g., Dkt. 211.) Miesen asserts that courts which have permitted third parties and guilty insiders to challenge the adequacy of demands did not consider the purpose of a derivative demand.

With respect to whether the Idaho Supreme Court would adopt a rule that limits the parties

---

[6] This is precisely what the AIA Entities should have done in the instant lawsuit had they acted lawfully.

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 11

who may challenge the adequacy of demands under Idaho Code sections 30-1-742 and 30-29-742, the Idaho Supreme Court has not hesitated to carve out such limitations as to the categories of parties who may challenge a statute or transaction. For example, the Idaho Supreme Court has ruled that only shareholders and creditors existing at the time transaction may challenge the redemption of shares by a corporation and the violation of a redemption statute.[7] *Taylor v. AIA Servs. Corp.*, 151 Idaho 552, 564, 261 P.3d 829, 841 (2011) (stating that the issue is not one of standing, but holding that only two of the shareholders could assert the legality of the stock redemption agreement as a defense and the other defendants could not);[8] *La Voy Supply Co. v. Young*, 84 Idaho 120, 127, 369 P.2d 45, 49 (1962) ("A corporation itself cannot have a stock repurchase declared illegal, nor can creditors who are not injured have a right to complain.").

3.  **Is the Board of Director's Failure to Request a Shareholder to Clarify or Provide Additional Information a Waiver of the Right to Challenge the Adequacy of the Derivative Demands?**

In response to the defendants' motion, Miesen asserted that the defendants cannot assert the demands were unclear or inadequate when they never requested any clarification or additional information in over a decade. (Dkt. 1131 at 15-31.) The defendants disagree. (Dkt. 1138 at 13-28.)

The Idaho Supreme Court has never addressed this question. *McCann I*, 138 Idaho at 234-35, 61 P.3d at 591-92. Once again, the ABA Comments are instructive.

> Section 742 specifies only that the demand shall be in writing…Detailed pleading is not required since the corporation can contact the shareholder for clarification if there are any questions. In keeping with the spirit of this section, the **specificity of the demand should not become a new source of dilatory motions**.

---

[7] The HT Defendants argue that the issue is not one of "standing." (Dkt. 1131 at 28.) When addressing the issue, Miesen asserted both that the defendants had "no standing" and "no right to challenge" the adequacy of the demands. (Dkt. 1131 at 32-33.) The reason Miesen used both quoted terms is because federal courts have referred to "standing" being the issue for defenses *F.D.I.C. v. Main Hurdman*, 655 F.Supp. 259, 264 (E.D. Cal. 1987). Whether the proper terms are "no standing" or "no right to challenge" or "not intended beneficiaries" the outcome is the same. The defendants may not assert the adequacy of the demands as a defense. It is a distinction without a difference.

[8] Attorney Bond and the HT Defendants were counsel on this appeal. The HT Defendants purported clients, the AIA Entities, were not permitted to challenge the redemption despite the HT Defendants' extensive arguments.

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 12

Mod. Bus. Corp. Act § 742 cmt. 1 (2002); App. A at 6. Dilatory means "Given to or characterized by tardiness." Black's Law Dictionary (11th ed. 2019).

Here, Miesen asserts that the Idaho Supreme Court would hold that defendants are barred from challenging the adequacy of five derivative demands when there was never a request for clarification or additional information in over a decade, and it would follow Judge Dale's holding:

> To argue that Miesen could have attempted to clarify his allegations is disingenuous, considering AIA itself did not ask for clarifications. Because no follow up was requested by AIA, Miesen was left with no alternative, other than to file suit.

(Dkt. 210 at 16.) Judge Dale also followed the spirit and intent that challenges to demands should not be "dilatory" prior to the filing of the Third Amended Complaint when she ordered:

> The Court would have expected (and expects in the future) grounds for dismissal to have been raised in response to the motion to amend instead of misleading representations that Defendants did not oppose Plaintiffs' motion to amend.

(Dkt. 178 at 3 n.2.) The defendants' motion was filed over four years after that order and despite the HT Defendants having filed a non-opposition to the filing of the Third Amended Complaint. (Dkts. 183, 1067.) While the purported board was never duly elected, they nevertheless assumed fiduciary duties to Miesen and the other shareholders. *Melgard*, 73 Idaho at 271, 251 P.2d at 550; *Steelman*, 110 Idaho at 513, 716 P.2d at 1285. They owed fiduciary duties to contact Miesen and the over ten other shareholders requesting clarification or additional information if they truly believed that the demands were inadequate, but they failed to do so in violation of their fiduciary duties. (Dkts. 1131-2–7.) The HT Defendants were involved in much of this misconduct as explained in Section B(1) above. (Dkt. 211.) Indeed, the HT Defendants filed a petition for court appointed inquiry for the 2008 derivative demand purportedly on behalf of the AIA Entities thereby further waiving any challenges to the adequacy of the 2008 demand. (Dkt. 1131-18.) If the demands were inadequate and the defendants had not been involved in the misconduct, there would

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 13

have been no reason to request a court appointed inquiry to investigate the 2008 demand. The petition for a court appointed inquiry is a concession the 2008 demand was adequate and that the defendants were all directly or indirectly involved. (*Id*.; Dkts. 211, 1131-2.) The intentional failure to conduct the inquiry confirms the defendants did not proceed "expeditiously and in good faith" as required. Mod. Bus. Corp. Act § 743 cmt. (2002); App. A at 7. (Dkt. 211 ¶¶ 173-76.)

Miesen asserts that the Idaho Supreme Court would hold that the challenges to the adequacy of the five derivative demands have been implicitly or expressly waived because of the so-called boards of directors' failure to ask for any clarification or additional information in over a decade and that the defendants further waived any challenging by bringing their present motion over twelve years after the first demand and over four years after the last one. (Dkts. 1031-2–7.) *Cf. Seaport Citizens Bank v. Dippel*, 112 Idaho 736, 739, 735 P.2d 1047, 1050 (1987). Derivative demands are not a game. Demands were never intended to serve as a sword for purported directors and third parties to use to avoid liability, especially through dilatory motions.

**4. Is the Adequacy of a Derivative Demand Relaxed or Excused When the Corporate Insiders Are Concealing Virtually All Matters from Shareholders and Refusing to Engage in Proper Fundamental Corporate Governance?**

In response to the defendants' motion, Miesen asserted that this Court should apply an even more relaxed standard for the adequacy of the derivative demands because the defendants had unlawfully operated the AIA Entities, concealed material facts and transactions and continued to conceal them to this day—and they were all directly or indirectly involved in the misconduct. (Dkt. 1131 at 29-31.) The defendants argue the standard should not be relaxed. (Dkt. 1138 at 24-28.)

The Idaho Supreme Court has never addressed whether the adequacy of a demand may be further relaxed or excused in certain circumstances. *McCann I*, 138 Idaho at 234-35, 61 P.3d at 591-92. However, the Court expressly recognized that demand could be excused under circumstances other than futility when it stated: "Although a few of Ron's requests had been

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 14

rejected by the corporation in the past, the record does not appear to support a conclusion that demand should be excused because of those few rejections." 138 Idaho at 236, 61 P.3d at 593. The ABA Comments are clear that "[d]etailed pleading is not required since the corporation can contact the shareholder for clarification if there are any questions." Mod. Bus. Corp. Act § 742 cmt. 4 (2002); App. A at 6. While the ABA Comments also state that there "is no obligation on the part of the corporation to respond to the demand," *Id.* at cmt. 4, this would not apply in situations when the board is alleging the demands are unclear or fail to provide sufficient information and directors owe fiduciary duties to shareholders to deal with them in good faith. *Melgard*, 73 Idaho at 271, 251 P.2d at 550; *Steelman*, 110 Idaho at 513, 716 P.2d at 1285. In addition, the defendants cannot assert that they need any additional information when they were all involved in the malfeasance and refused to hold shareholder meeting and conduct proper corporate governance as further explained in Section B(1) above. (*See generally* Dkt. 211.)

Thus, in the circumstances present here as more fully discussed in Sections B(1)-(3) above, the demand requirements should be relaxed or excused when five derivative demands are provided and there is no request for clarification or additional information. The defendants should not be permitted to argue the demands were unclear or inadequate when they never requested any clarification or additional information and when they were directly involved in the misconduct. In such circumstances, at most, a demand asserting to simply take legal action against the crooks and guilty parties should be sufficient, if one should be required at all.

**C.** **Does Idaho Recognize the Adverse Domination Doctrine or Similar Doctrine that Holds the Statutes of Limitations Do Not Run and/or Are Tolled Because the Corporation Has Been Controlled by Unlawfully Acting Directors and the Corporation Has No Knowledge of What Occurred Under the Adverse Interest Exception?**

The defendants assert numerous statutes of limitations defenses in their motions for summary judgment. (E.g., Dkts. 1077-1 at 9-15, 1071-1 at 15-23.) The HT Defendants argue the

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 15

Idaho Supreme Court would not adopt the adverse domination doctrine. (Dkt. 1077-1 at 13-15.) The question of whether Idaho recognizes the "adverse domination" doctrine or a similar rule and the "adverse interest" exception should be certified for appeal to the Idaho Supreme Court. These are first impression controlling issues of law involving the statutes of limitations defenses based on the over decade unlawful control of the AIA Entities by unlawfully acting directors. (*See generally* Dkt. 211.) Miesen asserts that the Idaho Supreme Court would adopt these doctrines.

"A derivative action is an extraordinary process where courts permit 'a shareholder to step into the corporation's shoes and to seek in its right the restitution he could not demand in his own.'" *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1112 (9th Cir. 2010) (citation omitted).

In diversity cases, courts "apply substantive state law, including state law regarding statutes of limitations and tolling."[9] *G and G Prod. LLC v. Rusic*, 902 F.3d 940, 946 (9th Cir. 2018). Similarly, "[m]atters peculiar to the relationships among a corporation, its officers, its directors and its stockholders are considered to be internal affairs of the corporation. Those affairs are governed by the law of the state of its incorporation." *Horwitz v. Southwest Forest Indus., Inc.*, 612 F.Supp. 179, 182 (D. Nev. 1985) (citations omitted).

The Idaho Supreme Court has never addressed the question of: When does the statutes of limitations run and/or are tolled when a corporation is exclusively controlled by unlawfully acting directors and whether their knowledge imputed upon the corporation? This question should also be certified to be answered by the Idaho Supreme Court. In short, Miesen asserts that the Idaho Supreme Court would adopt the adverse domination doctrine or a similar doctrine and would also adopt the adverse interest exception.

The first part of the question addresses the question of when claims accrue and whether the

---

[9] There is no dispute that Idaho law applies to Miesen's derivative claims. (Dkt. 211.)

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 16

statute of limitation runs when a corporation is being controlling by unlawfully acting directors and officers. Miesen asserts that the Idaho Supreme Court would adopt the "disinterested majority" of the "adverse domination" doctrine or a similar rule.

While the Idaho Supreme Court has never decided the issue of when the statutes of limitations accrue for a corporation's claims or whether they are tolled when that corporation is under the control of unlawfully acting directors and officers, other courts have held that the statutes of limitations does not run and/or are tolled in such circumstances. *See, e.g.*, *Cedar Rapids Lodge & Suites, LLC v. JFS Dev., Inc.*, 789 F.3d 821, 824 (8th Cir. 2015) (the adverse domination doctrine "holds that the statute of limitations is tolled as to claims of wrongdoing against officers or directors of a corporation as long as they control the corporation"); *Resolution Trust Corp. v. Grant*, 901 P.2d 807, 811 (Okl. 1995) ("Adverse domination is an equitable doctrine which tolls statutes of limitations for claims by corporations against its officers, directors, lawyers and accountants while the corporation is controlled by those acting against its interests"); Hecht v. Resolution Trust, 333 Md. 324, 349-51, 635 A.2d 394, 407-08 (Md. 1994); *F.D.I.C. v. Cocke*, 7 F.3d 396, 402 (4th Cir. 1993) ("Under the doctrine of adverse domination, a statute of limitations is tolled on an action against director/officer misconduct so long as a majority of the board is controlled by the alleged wrongdoers. The doctrine rests on the theory that if the wrongdoers "controlled the corporation through a majority of stock ownership and control of the directorate[,] there [would] consequently [be] no one to sue them." (alterations in original and citation omitted)); *Resolution Trust Corp. v. Gardner*, 798 F.Supp. 790, 794-95 (1992) ("While the Court is aware of no cases in this jurisdiction recognizing the applicability of the adverse domination doctrine, it has been widely applied in other federal courts...Tolling is considered appropriate because where culpable directors and officers control a corporation, they are unlikely to initiate actions or

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 17

investigations for fear that such actions will reveal their own wrongdoing."); *Resolution Trust Corp. v. Scaletty*, 810 F.Supp. 1505, 1512 (1992) ("In *Hudson*, the court concluded that the principle of adverse domination was not only consistent with Kansas law, it also reflected a 'post-Depression approach to corporate responsibility and the realities of corporate control by directors.'"); *Admiralty Fund v. Peerless Ins. Co.*, 143 Cal.App.3d 379, 384-89, 191 Cal.Rptr. 753, 756-59 (Cal. Ct. App. 1983); *Allen v. Wilkerson*, 396 S.W.2d 493, 501 (Tex. 1965) ("In order for limitations to run against a corporation's right of action against one of its own directors, two things must concur: (1) notice (2) to a disinterested majority of its board members."); *San Leandro Canning Co. v. Perillo*, 211 Cal. 482, 487, 295 P. 1026, 1028 (Cal. 1931) (the statute of limitations did not run "under what we deem to be a well-settled principle of law, that the statute of limitations does not commence to run against unlawful acts and expenditures made by or under the direction of the directors of the corporation while they were in full control of its affairs and of the expenditure of its funds.").

Courts have applied the above principles to include third parties, including attorneys. *See, e.g., In re American Cont'l Corp./Lincoln Sav. And Loan Sec. Litig.*, 794 F.Supp. 1424, 1453 (D. Ariz. 1992); *Gardner*, 798 F.Supp. at 795-96; *F.D.I.C. v. Nathan*, 804 F.Supp. 888, 894-95 (S.D. Tex. 1992); *Bornstein v. Poulos*, 793 F.2d 444, 448 (1st Cir. 1986); *Admiralty Fund*, 143 Cal.App.3d at 384-89, 191 Cal.Rptr. at 756-59; *Grant*, 901 P.2d at 811.

Miesen asserts that the Idaho Supreme Court would adopt the "disinterested majority" version of the adverse domination doctrine or a similar rule to hold that the statutes of limitations have not run and/or are tolled during the period of time a corporation is under the control of unlawfully acting directors as alleged in the instant lawsuit. (*See, e.g.*, Dkt. 211.) Indeed, "the principle of equitable estoppel is reflected in the principal of adverse domination." *Scaletty*, 810

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 18

**16-ER-4116**

F.Supp. at 1512. There is no reason why the Idaho Supreme Court would not adopt adverse domination or a similar doctrine to prevent or toll the statute of limitations from running when Idaho has adopted equitable estoppel and virtually every other type of estoppel. *See, e.g.*, *Williams v. Blakley*, 114 Idaho 323, 325, 757 P.2d 186, 188 (1987) (equitable estoppel); *Zollinger v. Carrol*, 137 Idaho 397, 404-05, 49 P.3d 402, 399-400 (2002) (promissory estoppel); *Atwood v. Smith*, 143 Idaho 110, 114, 138 P.3d 310, 314 (2006) (quasi-estoppel); *Heinze v. Bauer*, 145 Idaho 232, 235, 178 P.3d 597, 600 (2008) (judicial estoppel).

Notably, in Idaho's sister state, the Oregon Supreme Court adopted the "disinterested majority" version of the adverse domination doctrine when questions were certified to it by Ninth Circuit Court of Appeals. *F.D.I.C. v. Smith*, 328 Or. 420, 980 P.2d 141 (1999); *F.D.I.C. v. Smith*, 189 F.3d 472 (9th Cir. 1999). Miesen asserts that the same result should occur here.

The second part of the question is whether Idaho, like other courts, would recognize the "adverse interest" exception. *In re Bill Johnson's Rest., Inc.*, 255 F.Supp.3d 927, 934 (D. Ariz. 2017) ("If the shareholders, at the time the dividend transactions, 'were acting in a manner adverse to the interests of the corporation, the so-called 'adverse interest exception' applies, with the result that the actions of the agents are not imputed to the corporation.'"); *Smith*, 328 Or. at 429, 980 P.2d at 146 ("a corporation is charged with knowledge of what its agent knows, unless 'the agent's *relations to the subject matter are so adverse as to practically destroy the relationship*, as when the agent is acting in his own interest and adversely to that of his principal, or is secretly engaged in attempting to accomplish a fraud which would be defeated by a disclosure to his principal." (emphasis in original)); *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 771-772 (4th Cir. 1995) ("[T]he adverse interest exception permits a principal to avoid imputation when the agent's interests are sufficiently adverse to the principal's interests."); *Clark v. Milam*, 192 W.Va. 398,

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 19

16-ER-4117

452 S.E.2d 714, 718 (1994) ("[A] corporate plaintiff cannot 'discover' injuries to the corporation caused by those who control the corporation."); *Ray v. Karris*, 780 F.2d 636, 642 (7th Cir. 1985) ("Generally the 'knowledge' of the corporate entity will turn on whether a disinterested majority of the shareholders or directors, depending on the state law requirements for the particular transaction, ratified the securities transference after full disclosure.").

As discussed in detail in Sections B(1)-(4) above, the defendants have unlawfully controlled the AIA Entities for over a decade. (Dkt. 211.) Under these facts, Miesen asserts that the Idaho Supreme Court would recognize the "adverse interest" exception just like Idaho's sister state.   The Oregon Supreme Court noted when it recognized the "adverse domination" doctrine that "Oregon courts long have recognized an 'adverse interest' exception." *Smith*, 328 Or. at 429, 980 P.2d at 146. The result should be the same here.

**D.  If this Court Declines to Certify Any of the Above Questions, this Court Should Answer the Questions in Miesen's Favor in the Pending Motions.**

If certification is denied, "the [Court] must predict how the [Idaho] Supreme Court would decide the issue, using intermediate appellate court decisions, statutes, and decisions from other jurisdictions as interpretive aids." *Gravquick A/S v. Trimble Navigation Intern. Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003) (citation omitted). This Court should answer the above questions in Miesen's favor in connection with the pending motions consistent with the arguments stated above.

## III.    CONCLUSION

For the reasons stated above, this Court should certify the above questions to the Idaho Supreme Court. In the alternative, this Court should answer the questions in Miesen's favor in connection with the adjudication of the pending motions. (Dkts. 1067, 1071, 1077.)

DATED:  This 27th day of August 2021.

RODERICK BOND LAW OFFICE, PLLC

By:  */s/ Roderick C. Bond*
    Roderick C. Bond
    Attorney for the Plaintiff Dale L. Miesen

ANDREW SCHWAM LAW FIRM

By:  */s/ Andrew Schwam*
    Andrew Schwam
    Attorney for the Plaintiff Dale L. Miesen

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 27th day of August 2021, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Jeffrey A. Thomson:   jat@elamburke.com
Loren C. Ipsen:   lci@elamburke.com
Joyce A. Hemmer:   jah@elamburke.com
Bradley S. Keller:   bkeller@byrneskeller.com
Alyson A. Foster:   alyson@dempseyfoster.com
William E. Adams:   bill@weadamslaw.com
Tyler S. Waite:   twaite@campbell-bissell.com
Michael S. Bissell:   mbissell@campbell-bissell.com
Daniel L. Glynn:   dglynn@idalaw.com
Andrew Schwam:   amschwam@turbonet.com

*/s/ Roderick C. Bond*
Roderick C. Bond

MEMORANDUM ISO PLAINTIFF'S MOTION TO CERTIFY QUESTIONS - 21