**Consolidated Case Nos. 25-3552 and 25-3800**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.,

**Plaintiff-Appellant**,

v.

R. JOHN TAYLOR, an individual, CONNIE TAYLOR HENDERSON, an individual, JAMES BECK, an individual, MICHAEL W. CASHMAN, SR., an individual, CROP USA INSURANCE AGENCY, INC., an Idaho corporation, CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company, AIA SERVICES CORPORATION, an Idaho corporation, AND AIA INSURANCE, INC., an Idaho corporation,

**Defendants-Appellees**,

and

Reed J. Taylor, an individual,

**Third-Party Defendant-Appellee.**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO,
CHIEF DISTRICT COURT JUDGE DAVID C. NYE, PRESIDING

**APPELLANT'S EXCERPTS OF THE RECORD – VOLUME - 21**

Roderick C. Bond
Roderick Bond Law Office, PLLC
10900 NE 4th St., Suite 2300
Bellevue, WA 98004
Tel: (425) 591-6903
Email: rod@roderickbond.com
Attorney for Appellant

Andrew Schwam
Andrew Schwam Law Firm
705 SW Fountain St.
Pullman, WA 99163-2128
Tel: (208) 874-3684
Email: amschwam@turbonet.com
Attorney for Appellant

MICHAEL S. BISSELL, ISB NO. 5762
Email: mbissell@campbell-bissell.com
CAMPBELL & BISSELL, PLLC
820 West 7th Avenue
Spokane, WA  99204
Telephone: (509) 455-7100
Fax: (509) 455-7111
Attorneys for Reed J. Taylor

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>v.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>Defendants. | Civil No. 1:10-cv-00404-DCN<br><br><br>**NOTICE OF WITHDRAWAL OF MOTION FOR PARTIAL SUMMARY JUDGMENT [Dkt. 1076]** |

Reed Taylor, by and through counsel, Campbell & Bissell, PLLC, hereby gives notice of

withdrawal of his motion for partial summary judgment filed on January 29, 2021 [**Dkt. 1076**].

NOTICE OF WITHDRAWAL OF MOTION FOR PARTIAL SUMMARY JUDGMENT
[Dkt. 1076] - 1

21-ER-5280

The reason for withdrawal is that this partial motion for summary judgment has been pending for four years, it is past time to expedite resolution of the entire matter,[1] and John Taylor's Response [**Dkt. 1332**] highlighted the plethora of issues which would remain even if Reed's Motion is granted.  Note that the pending motion seeks summary judgment on only a few of the many breaches of fiduciary duty by John Taylor (referred to hereafter as "John" to distinguish him from Reed Taylor, or "Reed"), thereby requiring a trial on the remaining issues, as well as the claims against the other defendants (Beck and Henderson), regardless of the outcome.  Given that this matter cannot be set for trial until all dispositive motions are decided, the inherent delay in deciding the pending motion, and the possibility of further delay by virtue of an appeal if the motion is granted, the most expeditious procedure for resolving this dispute in its entirety (and also the most efficient use of court resources and time) is to set it for trial without further delay.  Secondarily, the financial resources necessary for Reed to reply to John's Response are better spent on pre-trial motions (such as motions *in limine*) and the trial itself – activities which will impact the entire matter as opposed to a discrete portion thereof.

Notwithstanding Reed's withdrawal of his motion, certain actions by John related to his Response merit comment:

1.      John has failed to properly dispute any facts upon which Reed's Motion relies, and therefore Reed's facts should be considered as undisputed.  Dist. Idaho Loc. Civ. R. 7.1(c)(2) states ".  .  . the responding party *must* also file a separate statement, not to exceed ten (10) pages, of all material facts which the responding party contends are in dispute."  (Emphasis added.)  Local Rule

---

[1] It is of no small moment that Reed Taylor will be 88 years old in October of this year, furthering the need to expedite resolution of this matter.

NOTICE OF WITHDRAWAL OF MOTION FOR PARTIAL SUMMARY JUDGMENT [Dkt. 1076] - 2

7.1(e)(2) states that if a party fails to respond to another party's assertion fact as required by the Rules, "the Court may consider the uncontested material facts as undisputed for purposes of the motion . . ." There is no justifiable reason for John's failure to comply with the Rules, and to avoid encouraging such disregard the Court should impose consequences for his failure – especially since this is not the first time John has ignored the Rules[2] and the Court previously cautioned to the Parties "to comply with the local rules . . ." [**Dkt. 1089**, n. 1.][3]

2.      Any implied cross-motion by John should be ignored, as the deadline for filing dispositive motions expired on January 29, 2021. [**Dkt. 1024**, p. 3.]

3.      Even if John had timely asserted a cross-motion, he has failed to support it with a "separate statement of all material facts" as required by Local Rule 7.1(b)(1).

4.      Even if John had timely and properly asserted a cross-motion, a cursory review of his Response shows it should be denied. The following partially addresses just some of the issues, and of course Reed would respond in detail with supporting facts if John had timely and properly brought a motion (and requests leave to do so if this Court decides it will consider John's implied cross-motion despite its untimeliness and failure to comply with the Rules):

a.      John's argument that Reed's claims are time barred is based on a confusing montage of utterly unrelated facts and argument immaterial to Reed's motion. Reed's motion is quite narrowly tailored and is based solely on the PERC loans – which occurred between 2010

---

[2] An admonition the Individual Defendants have previously disregarded as it pertains to Local Rule 7.1(b)(1). *See* **Dkt. 1248**, n. 19. Here, John Taylor has also violated Fed. R. Civ. P. 5.2, Dist. Idaho Loc. Civ. R. 5.5 and Dist. Idaho General Rule No. 179, and violated the privacy of the 401(k) Plan participants, by submitting their complete Social Security numbers with his declaration. *See e.g.*, **Dkt. 1322-1**, pp. 96-97.

[3] On two other occasions the Court once again admonished the Parties to comply with Local Rule 7.1. *See* **Dkt. Nos**. **1238**, p. 4 and **1245**, p. 2.

NOTICE OF WITHDRAWAL OF MOTION FOR PARTIAL SUMMARY JUDGMENT [Dkt. 1076] - 3

and 2013, inclusive. (*SUMF ¶12*).  John nevertheless makes the quite bizarre argument that his breaches of his fiduciary obligations as early as 2008 somehow provided Reed "actual knowledge" that John was going to commit other *and different* breaches of his fiduciary obligations in the future.  [**Dkt. 1322**, p. 13.]  In essence, John is arguing that *any* breach of fiduciary obligation by him constituted actual knowledge by Reed of future breaches of any sort, and that somehow Reed could assert claims regarding those future, unknown breaches – an argument obviously devoid of logic.  John has the burden of proving when Reed knew about the PERC notes at issue here and has presented no evidence to that effect. Indeed, at trial the evidence will show that Reed was unaware of the notes until shortly before filing his claims (and well within the 3 or 6 year statutory periods).

b.   John's argument regarding res judicata is similarly misplaced, i.e., that the claims involving the PERC notes were somehow decided in the "Reed Taylor Action," because the notes did not even exist at the time of the Fifth Amended Complaint therein.  [**Dkt. 278-8**.] Moreover, there is no final judgment in the Reed Taylor Action.  Finally, Reed's breach of fiduciary duty claims against John at issue here could not have been decided in the Reed Taylor Action (a state court action), as such claims fall under the *exclusive* jurisdiction of the federal courts.  "Federal courts, however, have exclusive jurisdiction over all claims for breach of fiduciary duty under ERISA plans." *Hansen v. Blue Cross of California*, 891 F.2d 1384, 1387 (9th Cir. 1989), *citing* 29 U.S.C. §§ 1132(e) & 1132(a)(2).

c.   John's argument that Reed received his "full distribution" under the plan suffers from at least one glaring error – there is no evidence the Randall & Hurley or anyone else considered the amounts which John should have deposited into the plan in its calculations.

NOTICE OF WITHDRAWAL OF MOTION FOR PARTIAL SUMMARY JUDGMENT
[Dkt. 1076] - 4

Moreover, Randall & Hurley based its calculations on information provided to it by AIA Services – i.e., John, the wrongdoer here – *and Randall & Hurley did not verify or audit the information*. [**Dkt. 1322-1**, pp. 81, 125, 167, 205 and 242.]  Wherefore, the information is not reliable.  Finally, whether the Plan was properly valued despite John's malfeasance and whether the calculation of Reed's distributions were proper would require expert testimony, and John has never disclosed such an expert.[4]

d.  Finally, John twists the condition of AIA paying Donna before it pays dividends to the 401(k) Plan into the nonsensical argument that because AIA has not paid Donna – *because AIA's doesn't believe she is owed anything* - it has no obligation to pay dividends to the 401(k) Plan.  This argument is as devoid of logic as it is of merit, as of course payment to Donna is only a prerequisite to paying dividends to the 401(k) Plan if Donna is actually owed anything from AIA, and AIA's position is that she is not (a position John has doubled-down on in his Response to Reed's Motion [**Dkt 1322**, pp. 7-9]).  Wherefore, John cannot rely on AIA's failure to pay Donna Taylor as a basis for avoiding his fiduciary obligations to the 401(k).

DATED:  This 10th day of July, 2025.

CAMPBELL & BISSELL, PLLC

By:  */s/ Michael S. Bissell*
MICHAEL S. BISSELL
820 W. 7th Avenue
Spokane, WA  99204
Attorneys for the Third-Party
Defendant/Counterclaimant Reed Taylor

---

[4] On the other hand, Reed's motion is an undisputed simple math calculation. (*SUMF* ¶¶ 7 and 14.)

NOTICE OF WITHDRAWAL OF MOTION FOR PARTIAL SUMMARY JUDGMENT
[Dkt. 1076] - 5

**21-ER-5284**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 10th day of July, 2025, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Jeffrey A. Thomson: jat@elamburke.com
Loren C. Ipsen: lci@elamburke.com
Joyce Ann Hemmer: jah@elamburke.com
Bradley S. Keller: bkeller@byrneskeller.com
Alyson Anne Foster: alyson@dempseyfoster.com
Roderick C. Bond:  rod@roderickbond.com
Andrew Schwam: amschwam@turbonet.com
Kim Trout: ktrout@trout-law.com
Markus Louvier: mlouvier@ecl-law.com
James B. King: jking@ecl-law.com
Daniel Loras Glynn: dglynn@idalaw.com

*/s/ Michael S. Bissell*
MICHAEL S. BISSELL

NOTICE OF WITHDRAWAL OF MOTION FOR PARTIAL SUMMARY JUDGMENT
[Dkt. 1076] - 6

**21-ER-5285**

MICHAEL S. BISSELL, ISB NO. 5762
Email: mbissell@campbell-bissell.com
CAMPBELL & BISSELL, PLLC
820 West 7th Avenue
Spokane, WA  99204
Telephone: (509) 455-7100
Fax: (509) 455-7111
Attorneys for Reed J. Taylor

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>v.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>Defendants. | Civil No. 1:10-cv-00404-DCN<br><br>**REED TAYLOR'S REQUEST FOR STATUS CONFERENCE TO SET FOR TRIAL** |

Third-Party Defendant/Claimant Reed Taylor respectfully requests this Court schedule a

status conference to set this matter for trial.  Although the Case Management Order(s) in this case

REED TAYLOR'S REQUEST FOR STATUS CONFERENCE TO SET FOR TRIAL - 1

**21-ER-5286**

21-ER-5287

all recite that "[a] trial, if necessary, will be set within 60 to 120 days after dispositive motion(s) are ruled upon" [*e.g.*, **Dkt. 398**, ⁋ 6], a trial within that time is impossible given counsel's trials which are already scheduled during and around that period.  Wherefore, Reed Taylor requests a status conference to set a date.

DATED:  This 10th day of July, 2025.

CAMPBELL & BISSELL, PLLC

By:  */s/ Michael S. Bissell*
MICHAEL S. BISSELL
820 W. 7th Avenue
Spokane, WA  99204
Attorneys for the Third-Party
Defendant/Counterclaimant Reed Taylor

REED TAYLOR'S REQUEST FOR STATUS CONFERENCE TO SET FOR TRIAL - 2

21-ER-5287

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 10th day of July, 2025, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Jeffrey A. Thomson: jat@elamburke.com
Loren C. Ipsen: lci@elamburke.com
Joyce Ann Hemmer: jah@elamburke.com
Bradley S. Keller: bkeller@byrneskeller.com
Alyson Anne Foster: alyson@dempseyfoster.com
Roderick C. Bond:  rod@roderickbond.com
Andrew Schwam: amschwam@turbonet.com
Kim Trout: ktrout@trout-law.com
Markus Louvier: mlouvier@ecl-law.com
James B. King: jking@ecl-law.com
Daniel Loras Glynn: dglynn@idalaw.com

*/s/ Michael S. Bissell*
MICHAEL S. BISSELL

REED TAYLOR'S REQUEST FOR STATUS CONFERENCE TO SET FOR TRIAL - 3

**21-ER-5288**

DANIEL LORAS GLYNN, ISB #5113
JONES ♦ WILLIAMS ♦ FUHRMAN ♦ GOURLEY, P.A.
The 9th & Idaho Center
225 N. 9th Street, Suite 820
PO Box 1097
Boise, ID 83701
Telephone:  (208) 331-1170
Facsimile:  (208) 331-1529
dglynn@idalaw.com
Attorneys for James Beck, Michael Cashman, Connie Henderson, John Taylor, Crop USA
Insurance Agency, Inc., and Crop USA Insurance Services, LLC

KIM J. TROUT, ISB #2468
TROUT & JONES, PLLC
3778 N. Plantation River Dr., Ste. 101
Boise, ID  83703
Telephone (208) 577-5755
Facsimile (208) 577-5756
service@trout-law.com

Attorneys for Defendant AIA Services Corporation & AIA Insurance, Inc.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY, LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho | Case No. 1:10-CV-404-DCN<br><br>**REPLY MEMORANDUM IN SUPPORT OF JOINT MOTION FOR AWARD OF FEES AND COSTS (DKT. 1314)** |

corporation; CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,

Defendants.

COMES NOW, AIA Insurance, Inc. and AIA Services Corporation (the "AIA Defendants") by and through its counsel of record, Trout & Jones, PLLC (f/k/a Trout Law, PLLC), and James Beck, Michael Cashman, Connie Henderson, John Taylor (the "Individual Defendants") and Crop USA Insurance Agency, Inc., and Crop USA Insurance Services, LLC (the "CropUSA Entities"), by and through their counsel of record, Daniel Loras Glynn of Jones Williams Fuhrman Gourley, P.A., and hereby files its Reply Memorandum in Support of their Motion for Fees and Costs.

## INTRODUCTION

After over 10 years of litigation, this Court entered a final judgment in favor of the Defendants, dismissing all of Plaintiff's claims with prejudice. The AIA Defendants, the Individual Defendants, and the CropUSA Parties (the "Moving Defendants") sought an award of Fees and Costs. (Dkt. 1314).

Plaintiff, through his counsel, primarily argues that the AIA Defendants, the Individual Defendants, and the CropUSA Parties are not entitled to an award of fees and costs for three reasons: (1) this matter was not brought without reasonable cause or for an improper purpose, (2) they are not entitled to fees and costs pursuant to Idaho Code § 12-120(3) or Idaho Code § 30-29-746(2), (3) the Defendants did not segregate their fees and costs incurred in litigating third-party claims, and (4) the Individual Defendants are not entitled to indemnification for the fees and costs incurred.

To support Plaintiff's arguments, Mr. Miesen again asserts that each of the Defendants acted egregiously, and due to the egregious facts of the case, the Defendants should not be awarded the fees and costs incurred. Plaintiff's arguments wholly miss the mark.

## ARGUMENT

**1. This matter was pursued without reasonable cause and maintained for an improper purpose.**

Plaintiff argues that this matter was "dismissed based on technical arguments," but also argues that the Defendants are not entitled to an award of fees and costs on the basis that there was

**REPLY MEMORANDUM IN SUPPORT OF JOINT MOTION FOR AWARD OF FEES AND COSTS (DKT. 1314) | Page 2**

21-ER-5290

"undeniably wrongful behavior."[1] (Dkt. 1324, p. 5). Furthermore, the Plaintiff asserts that the Defendants did not prevail on the merits but won on Hawley Troxell's technical arguments. *Id.* That is not the case. As discussed in the Moving Defendants' opening brief (Dkt. 1314), this Court has properly found that Miesen did not make a <u>proper</u> demand. The Moving Defendants have not asserted, as the Plaintiff claims, that they violated the 90-day demand requirement, but that they sent a <u>defective</u> demand. Failing to comply with the 90-day demand requirement versus a defective demand, are two different issues.

Miesen goes on to make the unimaginable argument that two prior judges declined to dismiss the case. First, the Honorable Larry M. Boyle, at Dkt. 46, found there were "several related and over-lapping cases in various stages of litigation in state court . . . . Therefore…a stay in the above-captioned action is appropriate pending resolution of the state actions, particularly *Reed Taylor v. AIA et al,* and *Donna Taylor v. John Taylor.*" (Dkt. 46).

Second, the Honorable Candy W. Dale entered her order at Dkt. 210 wherein she granted yet another motion to amend the Plaintiff's Complaint. Judge Dale's Order addresses only the letters dated June 13, 2016 and August 23, 2016. She does not address any of Plaintiff's previous demand attempts. Further, Dkt. 185 is titled "Brief in Opposition to Plaintiff's Motion to Amend and Supplement Complaint." At pages 3-8 of Dkt. 185, certain defendants opposed it on the basis that the Plaintiff failed to state with particularity the efforts he made to obtain the desired actions from the board of directors. This is the exact same basis this Honorable Court entered its Order of Dismissal. Dkt. 1301.

---

[1] In support of Plaintiff's allegations of corporate malfeasance, Plaintiff makes selective and out of context quotations from other proceedings. To unwind the factual inaccuracies of Plaintiff's representations would require more space than permitted by the rules for this response. However, Plaintiff's counsel has attempted to prosecute these claims against the Moving Defendants for over eighteen years and to date has not proven a single allegation – whether that be the dismissed claims originally prosecuted by Plaintiff's counsel on behalf of Reed Taylor from an action initiated in 2007, the now dismissed claims of Donna Taylor from an action initiated in 2008 and consolidated with the subsequent action in 2013, and now dismissed claims of Dale Miesen originally initiated in 2010. This, of course, does not include the multiple ancillary actions commenced by Plaintiff's counsel, these individuals, or their surrogates. After 18 years, and multiple litigations, these allegations remain just that – allegations and should have no weight in the consideration of the present motion.

**REPLY MEMORANDUM IN SUPPORT OF JOINT MOTION FOR AWARD OF FEES AND COSTS (DKT. 1314) | Page 3**

It is important that Judge Dale and Judge Boyle were both deciding Plaintiff's motion under Fed. R. Civ. P. 15(a)(2)'s very liberal standards and did not address the sufficiency of the demands made by the Plaintiff. This Court has addressed this claim by the Plaintiff at Dkt. 1203, pp. 29-30. Plaintiff focuses on the phrase: "changed circumstances" and alleges that because the "bulk of all the attorneys' time on this case was spent while the derivative demands were considered adequate" the Defendants are not entitled to an award of fees and costs. (Dkt. 1324, p. 9-10).

However, that is simply not a reasonable reading of either the case law or the statute. Here, the Court at Dkt 1203 directly addressed Judge Dale's finding stating: "Although Judge Dale originally found the letters to be adequate, the Court now has the benefit of a Ninth Circuit case on this exact matter." Following a detailed review of the Plaintiff's letters (Dkt. 1203, p. 4), the Court then reviewed the adequacy of the demands contained <u>within</u> the letters themselves. This Court cited to *Miesen v. Munding* stating that "the Ninth Circuit has issued its *Munding* ruling, **which conflicts with Judge Dale's order**." (Dkt. 1203, p. 31) (emphasis added). As said best by this Court, "The decision is final that the June 2016 Demand is insufficient under Idaho law in [the *Munding*] Case."

This Court then reviewed each of the demands. The Court found the June 2016 demand to be inadequate, specifically finding that the demands are "generic and conclusory" and, just like in *Munding*, fail to "describe with particularity the claims for relief [Miesen] sought or the factual bases for those claims." (Dkt. 1203, pp. 38-39). The remaining four demand letters were found by this Court to contain deficiencies.

Pursuant to Idaho Code § 30-29-742 a shareholder <u>may not</u> commence a derivative proceeding until a written demand, which describes with particularity the claims for relief or the factual bases for those claims, has been made upon the corporation's board of directors. As described in *Miesen v. Munding*, the failure to comply with the derivative demand requirement is an absolute bar to the shareholder's standing. Finally, failure to comply with the statutory requirements is the very definition of the proceeding being "commenced or maintained without reasonable cause <u>or</u> for an improper purpose." *See,* Idaho Code § 30-29-746(b). This is the same result reached in *McCann v. McCann*, 138 Idaho 228, 61 P.3d 585 (2002), where the Idaho Supreme Court affirmed the award of attorney's fees

**REPLY MEMORANDUM IN SUPPORT OF JOINT MOTION FOR AWARD OF FEES AND COSTS (DKT. 1314) | Page 4**

to the corporation and shareholders under Idaho Code § 30-1-746(2) after finding the Plaintiff "repeatedly sought to circumvent the requirements of Idaho Code § 30-1-742." The Idaho Supreme Court awarded respondents attorney fees on appeal pursuant to Idaho Code § 30-1-746(2), on the same basis.

That is the same result here – the Plaintiff has continually tried to circumvent the requirements of Idaho Code § 30-29-742 by making only general and conclusory demands, and not including the specificity required under the statute. Addressing an attempted attorney fees recovery by a plaintiff who failed to comply with the demand requirement, the court in *Cent. Laborers' Pension Fund v. Blankfein*, 971 N.Y.S.2d 282 (App. Div. 1st Dept. 2013) stated, "[a]bsent a showing that the demand requirement has been complied with or excused, a derivative plaintiff has no justification for acting on behalf of the corporation." *Id.*, 971 N.Y.S.2d at 287. This Court's rulings have unequivocally concluded that the Plaintiff wholly failed to comply with the derivative demand requirements and hence the entire litigation was pursued unjustifiably on behalf of AIA, forcing the Moving Defendants to incur fees and costs as a consequence of Plaintiff's unlawfully pursued action. As such, fees and costs should be awarded in favor of the Moving Defendants pursuant to Idaho Code § 30-29-746.

**2.  Plaintiff's limited recovery is not indicative of a claim on the merits:**

Plaintiff argues that this matter could not possibly have been commenced or maintained without reasonable cause or for an improper purpose because he achieved success by getting a $1.4 million dollar settlement between the Plaintiff and a former-defendant, Hawley Troxell, and discharging $26,620,874 of debt. However, Plaintiff fails to acknowledge that he has now made a claim of attorney's fees and costs for approximately two-thirds of that very settlement (i.e. the $1.4 million dollars) plus the interest, leaving less than $400,000 to AIA.

Moreover, what Plaintiff's argument fails to recognize is that this settlement extracted from HTEH has come at the cost and expense of AIA itself. As noted by the Moving Defendants in their Opposition to Plaintiff Dale L. Miesen's Motion to Approve the Payment of Attorney Fees and Costs (Dkt. 1323), the burden borne by Plaintiff's unlawful pursuit of a derivative action has cost AIA nearly $975,000 in costs and fees in this case alone (let alone the myriad of multiple other litigations spawned

**REPLY MEMORANDUM IN SUPPORT OF JOINT MOTION FOR AWARD OF FEES AND COSTS (DKT. 1314) | Page 5**

by Plaintiff and his surrogates). Thus, in the final analysis, AIA is worse off than it would have been absent this litigation.

This was precisely the point expressed by HTEH, which even after settling this matter, objected to the fees and costs being sought by Plaintiff's counsel stating: "Between the fees AIA incurred defending those other lawsuits, and the fees it incurred and continues to incur in defending this case, if Plaintiff's counsel is awarded the fees requested, any benefit to AIA will be substantially reduced." (Dkt. 1219, p. 14). It cannot be considered pursuit with reasonable cause given the flood of filings by Plaintiff, voluminous discovery requests chided by not only the Court but also the discovery master, and having been sanctioned.

### 3. The Individual Defendants have been wholly successful.

Plaintiff attacks the Individual Defendants as being not entitled to any indemnity. Plaintiff argues this on the basis that the Individual Defendants failed to segregate or apportion fees and costs incurred in litigating the third-party claims with Reed Taylor (i.e. his ERISA claims), or the prosecution/defense of various cross-claims with GemCap. Plaintiff also argues the Individual Defendant have not been "wholly successful" because Reed Taylor's ERISA claims are still pending. Next, Plaintiff argues the Individual Defendants fought Miesen on "his successful efforts to obtain recoveries and settlements from the Hawley Troxell Defendants and GemCap." Finally, Plaintiff argues that the Defendants should not be indemnified because of the egregious facts of the case.

### A. Segregation and Commercial Transaction

Miesen argues that this case is not ripe for an award of fees and costs under Idaho Code § 12-120(3), as this was not a commercial transaction. In response Miesen argues that the allegation he traded a book of business for his shares was only included in the TAC to demonstrate he is a shareholder of AIA. However, it inextricably demonstrates that he viewed this matter as a commercial transaction – at least between himself and AIA. These claims are not only tangentially involved – one does not exchange a book of business worth $500,000 and an expectation for dividends on a tangential basis – but wholly for a commercial basis.

**REPLY MEMORANDUM IN SUPPORT OF JOINT MOTION FOR AWARD OF FEES AND COSTS (DKT. 1314) | Page 6**

Next, Miesen argues that this is transaction sounds in tort and not in a commercial transaction. Even though Miesen asserts that these are primarily tort actions, the Court must look towards how the claims were alleged and brought.  Miesen had no ability to bring the claims unless he was a shareholder of the corporation.  The Idaho Supreme Court in *Kugler v. Nelson*, 160 Idaho 408, 374 P.3d 571 (2016) stated: "Kugler's causes of action arise from a commercial transaction. His causes of action relate to transactions between H & M, its shareholders, and Kugler for commercial purposes, not personal or household purposes. We find that the district court properly concluded that Kugler's claims were governed by Idaho Code section 12–120(3)."  *Kugler v. Nelson*, 160 Idaho 408, 416, 374 P.3d 571, 579 (2016).  Here, the same is applicable – Miesen's cause of action relates to transactions between AIA, its shareholders and Miesen for commercial purposes.  None of the actions or issues complained of are for personal or household purposes.  However, as Miesen pointed out, there is the derivative statute itself, which governs an award of fees and costs to the Moving Defendants, and specifically to AIA upon the finding that the Plaintiff filed this action without reasonable cause or maintained it for an improper purpose.

Miesen next argues that the attorneys were required to segregate the fees and costs incurred, and that the failure to do so precludes any such award.  Miesen relies on *Smith v. Mitton*, 140 Idaho 893, 104 P.3d 367 (Idaho 2004) for this statement, which in turn cites to *Hackett v. Streeter*, 109 Idaho 261, 706 P.2d 1372 (Ct. App. 1985).  In *Smith*, an employee sued the City of Burley for, among other things, intentional infliction of emotional distress.  Four days before trial, he filed a notice that he was abandoning that claim.  Smith was awarded 75% of his fees and costs requested by the district court, and the City appealed.  The City argued, with respect to the award of fees and costs, the district court erred in granting them because the attorney did not segregate his billings to the claims that were pursued at trial and those that were not.  The City cited *Hackett*, however the Idaho Supreme Court disagreed stating the holding in *Hackett* was inapplicable because "Smith's counsel only represented one party.  *Hackett* mandates segregation of fees for multiple clients; it does not require that fees be segregated according to the specific claims of each client." *Smith v. Mitton*, 140 Idaho 893, 104 P.3d

**REPLY MEMORANDUM IN SUPPORT OF JOINT MOTION FOR AWARD OF FEES AND COSTS (DKT. 1314) | Page 7**

367 (Idaho 2004). However, a reading of *Hackett* is extremely important, as this case, like *Smith*, is easily distinguishable from *Hackett*.

In *Hackett*, an attorney represented two defendants in a lawsuit – Streeter and the Parker estate. Following a bench trial, the district court determined that Streeter was not liable, however the Parker estate was liable. The district court denied Streeter's request for attorney's fees stating Streeter had failed to file a memorandum of fees and costs stating: "no memorandum was filed on his behalf within the 10 days permitted to support any costs or attorney fees incurred by him which were not necessary to the defense of the defendant Parker Estate." Here, we have multiple firms which represented the Moving Defendants. *Hackett* has been clarified in several follow-on cases, including *Taylor v. Riley*, 162 Idaho 692, 708, 403 P.3d 636, 652 (2017), wherein the Supreme Court stated:

> In this case, we do not have a prevailing defendant and a nonprevailing defendant. Both Hawley Troxell and Mr. Riley were prevailing parties, and Hawley Troxell was alleged to be liable for the conduct of Mr. Riley. Each of them was entitled to conduct a defense with separate counsel, which would have increased the attorney fees incurred in defending against Mr. Taylor's claims. Their agreement to conduct a joint defense reduced the total amount of attorney fees incurred. Each of Mr. Taylor's four causes of action stated that he had been damaged in an amount to be proved at trial, with no assertion that the damages claimed against Hawley Troxell differed from the damages claimed against Mr. Riley. Mr. Taylor has failed to show that the district court abused its discretion in apportioning the attorney fees awarded for the joint defenses one-half to each party.

As stated in *Fletcher v. Lone Mountain Rd. Ass'n*, 165 Idaho 780, 787, 452 P.3d 802, 809 (2019), "where there is one overall prevailing party entitled to an award of attorney fees by statute or contract, "the award of reasonable attorney fees is not required to be limited to the claims upon which the prevailing party prevailed." *See also*, *McCarthy Corp. v. Stark Inv. Grp., LLC*, 168 Idaho 893, 908–09, 489 P.3d 804, 819–20 (2021) (holding *Hackett* was not applicable where jointly represented parties were successful and their fees were not segregated).

Unlike in *Hackett*, the Moving Defendants were wholly successful – i.e. the Plaintiff's entire complaint was dismissed <u>with prejudice</u> as against <u>all</u> the Defendants. Therefore, Miesen's argument is misplaced. Furthermore, Miesen's TAC contains a laundry list of wrongful acts over a decade that he sought to hold <u>everyone</u> liable for. At no point did Plaintiff in his pleadings, in discovery, or in the

**REPLY MEMORANDUM IN SUPPORT OF JOINT MOTION FOR AWARD OF FEES AND COSTS (DKT. 1314) | Page 8**

prosecution of his claims ever attempt to segregate the claims he was pursuing against the AIA Entities, the Individual Defendants, or the Crop USA Entities.

Rather, Plaintiff asserted that everyone who had any relationship with AIA, were involved in a mass conspiracy and thereby drew in not just AIA's officers and directors, excepting of course his former client Reed Taylor, but its lawyers (Hawley Troxell) and creditor (GemCap). Plaintiff even went so far as to include AIA itself, seeking a default against AIA and thereby forcing a further expenditure of legal fees and costs.

The recognition of this point is crucial because it addresses Plaintiff's other basis for objection related to the claimed lack of segregation – the pursuit of indemnity claims against Reed Taylor and GemCap.[2] The Moving Parties did not seek affirmative, individual relief against either Reed Taylor or GemCap, but instead asserted only that if AIA and/or the Individual Defendants had liability for Plaintiff's claims then GemCap and Reed Taylor's participation in those very same acts required that these parties be liable for indemnification or contribution. Thus, there is nothing that was done as concerned GemCap or Reed Taylor by the Moving Parties that would not have been done even if there weren't indemnity claims asserted. The fees and costs requested are attributable to Miesen's allegations and his prosecution of claims against GemCap and the actions of the AIA Entities and Crop USA Entities, including Reed Taylor's participation in those entities.

In fact, a review of Plaintiff's various fee requests confirms that his all-inclusive scattergun approach to this litigation does not lend itself to a segregation of fees in view of the intertwinement of the claims. Plaintiff's own fee requests do not seek to distinguish for the work performed as against Hawley Troxell, GemCap, the AIA Entities, the Crop USA Entities, or the Individual Defendants. Rather, Plaintiff views his entitlement in lump sum as to all regardless of the fact that his claims against

---

[2] Of additional import, Plaintiff alleges that the Moving Parties were on notice of the need to segregate given the challenge to Reed Taylor's fees and costs requests. However, the Plaintiff only uses a half-truth here – as the Moving Parties objected to Reed Taylor's motion on the basis that Reed Taylor was not seeking fees and costs solely for his defense. In fact, the Court stated, "The Court suspects the legal fees will be significantly less than $75,000 as the bulk of Reed's actions appear to be in pursuit of his counterclaim." Dkt. 1194, p. 8. The court, thereafter, limited its award to Reed Taylor in the amount of $22,412.00 in expenses. Dkt. 1206.

**REPLY MEMORANDUM IN SUPPORT OF JOINT MOTION FOR AWARD OF FEES AND COSTS (DKT. 1314) | Page 9**

all parties were dismissed excepting GemCap which claims were dismissed only after John Taylor had already secured GemCap's release of claims against AIA. Having pursued his claims en mass and in lump sum against all parties, Plaintiff cannot now be heard to complain about the manner in which the Moving Parties were required to respond and the fees and costs they incurred as a consequence.

Simply put, the Moving Parties are the overall prevailing parties as against the Plaintiff's claims, having received a judgment of dismissal with prejudice. Therefore, no segregation was necessary as to individual defendants or claims, and an award of fees and costs as against the Plaintiff is appropriate.

**B. The Individual Defendants were "wholly successful" with regards to the Derivative Lawsuit and the "egregious facts" alleged.**

As discussed above, Plaintiff's claims failed because of a proper statutory interpretation by this Court. The Plaintiff's failure to comply with the statute providing that more than conclusory statements were required, permits the Court to make the conclusion that the Individual Defendants were "wholly" successful either "on the merits or otherwise." Simply because the Plaintiff alleged "egregious facts," the Plaintiff's claims were disallowed for failing to comply with statutory requirements. The Defendants were "wholly successful on the merits <u>or otherwise</u>." The Moving Defendants achieved a dismissal of the derivative lawsuit, even if they achieved it by joining with the Hawley Troxell Defendants.[3] If the dismissal of an entire lawsuit, and a judgment dismissing the claims as to each Defendant <u>with prejudice</u> is not "wholly successful on the merits or otherwise," what is?

**C. The Individual Defendants did not fight the Hawley Troxell and GemCap settlements.**

Plaintiff seems to object to the Individual Defendants filings with respect to the Hawley Troxell and the GemCap settlements. However, Plaintiff does not expand on this argument, he simply throws it against the wall hoping it will stick. Correctly stated, the Moving Defendants did not object to the settlements themselves. In fact, the AIA Defendants specifically stated (with respect to the

---

[3] In a telling admission as to the true motivation for Reed Taylor's claims against the Individual Defendants, Plaintiff seeks to claim that the Individual Defendants have not been wholly successful as the claim is still pending. Having failed to lawfully pursue his claims, Plaintiff now seeks to wrap himself in the claims of Reed Taylor. This argument should also be rejected as it is irrelevant to the assertion of fees and costs against Plaintiff arising from claims asserted here.

**REPLY MEMORANDUM IN SUPPORT OF JOINT MOTION FOR AWARD OF FEES AND COSTS (DKT. 1314) | Page 10**

Hawley Troxell Settlement) at Dkt 1221, "AIA does not object to the approval of the Settlement Agreement, but does object to Plaintiff's motion for the payment of attorneys' fees and costs sought at Dkt. 1214." Similarly, the Individual Defendants and the CropUSA Parties stated, at Dkt. 1222, "this Court should approve the settlement reached between Plaintiff and HTEH but deny Plaintiff's request for attorney fees and costs so that the entirety of these settlement funds are made available for its intended beneficiary – AIA Services." Thereafter, Plaintiff's counsel withdrew his request for attorney's fees and costs. (Dkt. 1228).

Furthermore, regarding the GemCap Settlement, Plaintiff filed his motion for approval as Dkt. 1231 on July 27, 2022. There were no oppositions filed against the approval of the settlement agreement, and on March 26, 2024 at Dkt. 1289, the Court ordered the approval of the settlement.[4] Therefore, Plaintiff's allegations hold no water.

## CONCLUSION

The Moving Defendants request the Court award them their fees and costs. With respect to Donna Taylor, individually, the Moving Defendants only point out that Donna Taylor was the original party Plaintiff until Mr. Miesen became the party Plaintiff. Mr. Miesen as the party Plaintiff in this matter is responsible for all fees and costs incurred.

DATED July 16, 2025.

TROUT & JONES, PLLC                          Jones Williams Fuhrman Gourley, P.A.

_/s/ Kim J. Trout_                            _/s/ Daniel Loras Glynn_
Kim J. Trout                                  Daniel Loras Glynn
Attorney for AIA Defendants                   Attorney for the Individual Defendants and the
                                              CropUSA Entities

---

[4] Of course, it goes without saying, that GemCap Lending I, LLC had already entered into a settlement agreement with R. John Taylor, the CropUSA Parties, and the AIA Entities wherein the Parties resolved all outstanding claims then asserted, and therefore the Plaintiff's settlement with GemCap did not provide value to the AIA Entities.

**REPLY MEMORANDUM IN SUPPORT OF JOINT MOTION FOR AWARD OF FEES AND COSTS (DKT. 1314) | Page 11**

| Description of Certain Wrongful Acts by the Defendants Followed by the Resulting Legal Proceedings Caused by Their Wrongful Acts |
|---|
| **A.** Failure to lawfully operate the AIA Entities to the detriment of stakeholders. (Dkts. 211, 1098-3–1098-7.) |
| **1.** The instant case. (Dkt. 211.) Miesen and Donna Taylor asserted tort and related claims based on the Defendants' wrongful acts, which continued after the complaint was filed and led to additional named defendants after the stay was reversed. (Dkts. 1, 211, 1214-3, 1240-3, 1242-2 ¶50(g); *see also* Dkts. 1–1326.) |
| **2.** *AIA Servs. Corp. v. Durant, et al.*, Nez Perce County District Court Case No. CV-12-01483. While the instant case was stayed, the Individual Defendants had AIA Services assert claims to eliminate Miesen and other shareholders' standing to pursue claims in the instant case through a reverse split. Judge Kerrick dismissed the case. The shareholder defendants (represented by Mr. Bond) were awarded $10,107.72 in attorneys' fees and costs, which AIA Services never paid. (Dkts. 84-8, 84-9, 86-1, 168-2, 1242-2 ¶50(h).) |
| **B.** Failure to pay GemCap's $10 million loan to CropUSA. (Dkts. 440-1 at 35–81, 440-2.) |
| **3.** *GemCap Lending I, LLC v. CropUSA Ins. Agency, Inc., et al.*, U.S. District Court, Central District of California, Western Division, Case No. 2:13-cv-05504. GemCap asserts numerous intentional torts (including fraud and conversion) and contract claims against John Taylor, the CropUSA Defendants, the AIA Entities, and other parties pertaining to GemCap's $10 million to the CropUSA. John Taylor unilaterally settles on the eve of trial without any board or shareholder approval consenting to entry of a $12,125,534.61 judgment against the AIA Entities and CropUSA Entities, but entry of judgment against John was deferred. (Dkt. 440-1, 440-2, 128 at 21–48, 306-8, 573-1, 573-2, 749-4, 1242-2 ¶50(i).) |
| **4.** *Durant, et al. v. GemCap Lending I, LLC, et al.*, Nez Perce County District Court Case No. CV-14-01444. Miesen and two other shareholders asserted claims to prevent GemCap from collecting from the AIA Entities. John Taylor appeared as counsel for the AIA Entities, and their Answer stated that these claims should be brought in the instant case. Judge Brudie dismissed the case for lack of standing. No attorneys' fees or costs were sought or awarded. Thus, Miesen served derivative demands and named GemCap as a defendant in the instant case. (Dkts. 440-15, 440-16, 440-19, 1242-2 ¶50(k).) |
| **5.** *GemCap Lending I, LLC v. Taylor*, 677 F. App'x 351 (9th Cir. 2017). Donna moved to intervene because the AIA Entities were not asserting regarding. The court denied Donna's intervention as untimely. Thus, the merits of her claims were not reached. (Dkts. 141-4, 141-5, 449-5 ¶34, 560-2 ¶20.) |
| **6.** *GemCap Lending I, LLC v. Quarles & Brady, et al.,* U.S. District Court, Central District of California, Western Division, Case No. 2:14-cv-07937. GemCap asserted claims against CropUSA's attorneys. (Dkt. 153-5.) *GemCap Lending, LLC v. Quarles & Brady, LLP*, 269 F. Supp. 3d 1007 (C.D. Cal. 2017). |
| **7.** *Church Crop Ins. Servs., Inc. v. CGB Diversified Crop Ins. Servs., et al.*, Polk County (Iowa) District Court Case No. EQCE077193. Church asserted claims to recover commissions John Taylor had improperly pledged to GemCap as collateral. The court found John Taylor had improperly diverted funds. (Dkt. 449-32, 449-33.) |
| **8.** *GemCap Lending I, LLC v. Scottsdale Indem. Co.*, U.S. District Court, Central District of California, Case No. 2:15-cv-09942. GemCap asserted claims to recover from CropUSA's E&O policy. (Dkt. 153-4, 443-31.) |
| **9.** *Missouri Crop, LLC, et al. v. CGB Diversified Crop Ins. Servs., Inc., et al.*, U.S. District Court, Easter District of Missouri, Court Case No. 2:15-cv-00024. Plaintiffs asserted claims to recover commissions that John Taylor had improperly pledged to GemCap. (Dkts. 449-34,  449-35.) |
| **10.** *GemCap Lending I, LLC v. AIA Servs. Corp., et al.*, Nez Perce County District Court Case No. CV-16-02207. GemCap asserted claims against AIA Services and John Taylor. After a bench trial, Judge Brudie ruled that John Taylor committed intentional fraud. (Dkts. 449-37,1082-4, 1242-2 ¶50(i).) |
| **11.** *CropUSA Ins. Agency, Inc. v. CGB Diversified Crop Ins. Servs., Inc.,* in U.S. District Court, Central District of Illinois, Case No. 3:18-cv-03219. (Dkts. 128 at 21–48, 749-11, 749-12.) |
| **12.** *Weskan Agency, LLC v. CGB Diversified Crop Ins. Servs., et al.*, Nez Perce County District Court Case No. CV35-18-1278. (Dkts. 128 at 21–48, 449-38, 1073-3.) |

**Appendix A, p. 1**
**21-ER-5300**

| |
|---|
| **13.** *Miesen v. Munding, et al.*, U.S. District Court, Eastern District of Washington, Case No. 2:18-cv-00270. Miesen asserted malpractice claims against Munding, who was the AIA Entities' counsel. The court ruled that Miesen's derivative demands were inadequate (only 4 of the 102 paragraphs in the two demands addressed Munding and he was not the target). No attorneys' fees and costs were awarded by the court. (Dkts. 1138 at 46–112, 1131-5, 1131-6, 1131-14, 1034-2 ¶2.) *Miesen v. Munding*, 822 F. App'x 546 (9th Cir. 2020). |
| **14.** *CropUSA Ins. Agency, Inc. v. CGB Diversified Servs., Inc.*, the Seventh Judicial Circuit, Morgan County, Case No. 2020L5. (Dkts. 128 at 21–48, 449-41.) |
| **15.** *GemCap Lending I, LLC v. CropUSA Ins. Agency, Inc., et al.*, U.S. District Court, District of Idaho, Case No. 1:19-mc-10568. GemCap registered the $12,125,534.61 judgment from Cal. (Dkts.1315-3 at 15–17.) |
| **16.** *GemCap Lending I, LLC v. R. John Taylor,* U.S. District Court, Central District of California, Western Division, Case No. 2:19-cv-08008. GemCap asserted the fraud claims against John. GemCap obtained a judgment against John Taylor in the amount of $12,125,534.61 (Dkts. 128 at 21-48, 730-4, 749-3, 1167-10.) |
| **17.** *CropUSA Ins. Agency, Inc., et al. v. GemCap Lending I, LLC*, in U.S. District Court, District of Idaho, Case No. 1:21-cv-34. CropUSA and John Taylor asserted claims for breach of the same settlement agreement with GemCap that Miesen was seeking extricate the AIA Entities from. (Dkt. 1282-3, 1247.) |
| **C.** Failure to comply with obligations to AIA Services' 401k Plan. |
| **18.** Reed's counterclaims in the instant case. Reed alleges that John Taylor, Beck and Henderson violated obligations owed to him as a 401k plan participant under ERISA. (Dkts. 276, 416, 1325, 1326.) |
| **19.** *In re AIA Sers. Corp. 401k Profit Sharing Plan*, EBSA case No. 71-010953 (48). The Department of Labor commenced an action and found John breached his duties pay back the $271,294. (Dkt. 1260-9.) |
| **D.** Failure to comply with obligations by John Taylor and other entities. |
| **20.** *Americanwest Bank v. Bolland, et al.*, Nez Perce County District Court Case No. CV10-01826. Plaintiff asserted claims against PERC, John Taylor and others a $5.5 million loan to PERC. (Bond Decl. Ex. 1–2.) |
| **21.** *Washington Bank Prop. v. AIA Servs. Corp.*, King County Superior Court, Case No. 12-2-16332-4. Plaintiff asserted AIA Services breached its guaranty of AIA Insurance's obligations. (Bond Dec., Ex.  3.) |
| **22.** *Dept. of Treasury Notice of Federal Tax Lien* filed on January 27, 2016. A $540,434.21 tax lien was filed against Pacific Empire Radio ("PERC") for unpaid employee payroll taxes. (Bond Decl. Ex. 4.) |
| **23.** *Broadcast Music, Inc. v. Pacific Empire Radio Corp.*, Nez Perce County District Court Case No. CV16-01933. Plaintiff filed to confirm an arbitration award against PERC for $210,673.24. (Bond Decl. Ex. 5–6.) |
| **24.** *United States of America v. Pacific Empire Radio Corp.*, U.S. District Court, District of Idaho, Case No. 3:16-cv-00340. The U.S. asserted claims against PERC for an FCC forfeiture order. (Bond Decl., Ex. 7.) |
| **25.** *R. John Taylor v. United States of America*, U.S. District Court, District of Idaho, Case No. 2:17-cv-00410. John asserted that he should not be liable for PERC unpaid payroll taxes. The court found John Taylor personally liable under 26 U.S.C. § 6672 and entered judgment for $263,295.10. (Bond Decl. Ex. 8–10.) |
| **26.** *Zions First Nat'l Bank v. 17 State St. Partners LLC, et al.*, Nez Perce County District Court Case No. CV-15-02084. Plaintiff asserted claims for failing to pay a mortgage. (Dkt. 449-36; Bond Decl. Ex. 11.) |
| **E.** Failure to pay Reed the $6 million, plus interest, owed by AIA Services in 2005 (Dkts. 390-5–390-9.) |
| **27.** *Taylor v. AIA Servs. Corp., et al.*, Nez Perce County District Court Case No. CV-07-00208. Reed asserted contract and tort claims against the AIA Entities, Individual Defendants and CropUSA to collect the over $6 million, plus interest. After Reed had obtained partial summary judgment on the default of the $6M Note, Defendants successfully asserted the redemption was illegal and rejected Reed's settlement offer that would have prevented the instant case and many others. No attorneys' fees were awarded.  (Dkts. 67-18, 67-62, 389-1, 389-16–389-20, 1242-2 ¶50(a).) *Taylor v. AIA Servs. Corp.*, 261 P.3d 829 (Idaho 2011). |

| |
|---|
| **28.** *Taylor v. Babbitt, et al.*, Nez Perce County District Court Case No. CV-08-01765. Through Mr. Bissell, Reed asserted tort claims based on the Defendants using funds subject to Reed's security interests and he alleged that they aided and abetted. The Idaho Supreme Court largely affirmed and awarded fees, but importantly found that Reed's most important aiding and abetting claims were adequately pleaded but must await the outcome of his claims in *Taylor v. AIA Servs*. Fees and costs were awarded against Reed, which he paid in full. (Dkts. 83-9, 83-10, 1242-2 ¶50(b).) *Taylor v. McNichols*, 243 P.3d 642 (Idaho 2010). |
| **29.** *Taylor v. McNichols, et al.*, Nez Perce County District Court Case No. CV-08-01763. This case was consolidated with *Taylor v. Babbitt*. Thus, the description above applies. (Dkts. 12-1, 1242-2 ¶50(b).) |
| **30.** *Taylor v. Riley, et al.*, Ada County District Court Case No. CV-OC-09-18868. Reed asserted malpractice claims against Rily, Turnbow, Eberle Berlin and HTEH on the illegal stock redemption. Reed's claims were dismissed as to Riley and HTEH and he settled with Turnbow and Eberle Berlin. *Taylor v. Riley*, 336 P.3d 256 (Idaho 2014); *Taylor v. Riley*, 403 P.3d 636 (Idaho 2017). (Dkts. 83-11–83-13, 390-6, 1242-2 ¶50(c).) |
| **31.** *Taylor v. Bell, et al.*, King County Superior Court Case No. 12-2-10803-0-SEA. Reed filed legal malpractice claims against the attorneys and law firm that represented him for the illegal 1995 stock redemption. Reed's claims were dismissed with prejudice after a settlement was reached. (Dkts. 74-3, 1242-2 ¶50(d).) *Taylor v. Bell*, 340 P.3d 951 (Wash. Ct. App. 2014). |
| **32.** *In Re: Petitions to Quash Reed Taylor's Foreign Subpoenas*, Nez Perce County District Court Case Nos. CV16-02243, CV16-02244, and CV16-02368. John fought Reed from obtaining discovery in *Taylor v. Bell*. While John assisted the law firm defendants for free, he spent money fighting Reed's foreign subpoenas and Reed paid to obtain discovery. (Dkts. 449-5 ¶73, 449-67–449-69, 562-24, 1260-1 ¶21, 1242-2 ¶50(d).) |
| **F.** Failure to pay Donna Taylor the sums owed for her redemption by Dec. 2003. (Dkt. 449-4, 576-8.) |
| **33.** *Taylor v. R. John Taylor, et al.,* Nez Perce District Court Case No. CV-08-1150. Donna asserted claims against John for breaches of fiduciary duty, fraud and breach of his guarantee, and Henderson for community property distributed to her. A trial is scheduled to start on April 27, 2026. (Dkts.  390-39, 1242-2 ¶50(e).) |
| **34.** *Taylor v. AIA Servs. Corp.*, Nez Perce County District Court Case No. CV-09-02470. Donna asserted claims to appoint a receiver for AIA Services and honor her board designee. AIA Services requested the case be stayed.  voluntarily dismissed the case without prejudice.  (Dkts. 1220-2, 1220-3, 1242-2 ¶50(f).) |
| **35.** *Taylor v. AIA Servs. Corp., et al.,* Nez Perce District Court Case No. CV-13-1075. Donna asserted tort and contract claims against certain of the Defendants for failing to comply with their obligations. That case was consolidated with Case No. CV-08-1150. She substantially prevailed on appeal. The $27,907.89 in fees and costs awarded to Donna on appeal remain unpaid. A trial is scheduled to start on April 27, 2026. (Dkts. 1220-5, 1220-6, 1242-2 ¶50(e).) *Taylor v. Taylor*, 422 P.3d 1116 (Idaho 2018). |
| **36.** *Taylor v. Riley*, U.S. District Court, District of Idaho, Case No. 1:17-cv-255. After Judge Brudie ruled Donna's redemption was unauthorized, she asserted claims. She agreed to dismiss her claims because she believed (correctly) she would prevail in on appeal. (Dkts. 390-38, 827-7, 1220-7–1220-9, 1260-1 ¶23.) |

Dennis M. Davis, ISB No. 2133
Mark A. Ellingsen, ISB No. 4720
WITHERSPOON KELLEY
Attorneys & Counselors
The Spokesman Review Building
608 Northwest Blvd., Suite 300
Coeur d'Alene, ID 83814
Phone: (208) 667-4000
Fax: (208) 667-8470
Email: dmd@witherspoonkelley.com
        mae@witherspoonkelley.com

*Attorneys for Plaintiff AmericanWest Bank*

IN THE DISTRICT COURT FOR THE SECOND JUDICIAL DISTRICT OF THE
STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| AMERICANWEST BANK, a Washington state chartered bank,<br><br>Plaintiff,<br><br>v.<br><br>MARK L. BOLLAND, individually and his marital community; BETSY BOLLAND, individually and her marital community; RANDOLPH D. LAMBERJACK, individually and his marital community; JANE DOE LAMBERJACK, as to her marital community; R. JOHN TAYLOR, individually and his marital community; JANE DOE TAYLOR, as to her marital community, and HILLCREST AIRCRAFT COMPANY, an Idaho corporation,<br><br>Defendants. | Case No. **CV10 01826**<br><br>COMPLAINT FOR MONEY DUE<br><br>Fee Category: A<br>Fee: $88 |

COMPLAINT FOR MONEY DUE—PAGE 1

**WK** WITHERSPOON·KELLEY
Attorneys & Counselors

J:\wdocs\spokmain\88129\0110\S0189671.DOC

Case Assigned to:

CARL B. KERRICK    ORIGINAL

**Exhibit - 1, p. 1**

**21-ER-5303**

COMES NOW Plaintiff, AmericanWest Bank, a Washington state chartered bank, by and through its attorneys, Witherspoon Kelley, and for causes of action against the above-named Defendants, alleges and states as follows:

## I. STATUS OF PARTIES, JURISDICTION AND VENUE

1.1    Status of Plaintiff.    Plaintiff, AmericanWest Bank ("AmericanWest"), is a Washington state chartered bank, duly authorized to do business in the State of Idaho. AmericanWest is the owner and holder of the Note and Guaranties hereinafter described and is entitled to enforce the same.

1.2    Status of Defendant Mark L. Bolland.    Upon information and belief, Defendant Mark L. Bolland, a married person, is a resident of Nez Perce County, State of Idaho.  Mark L. Bolland is a guarantor of the Promissory Note described herein.

1.3    Status of Defendant Betsy Bolland.    Upon information and belief, Defendant Betsy Bolland, a married person, is a resident of Nez Perce County, State of Idaho.  Betsy Bolland is a guarantor of the Promissory Note described herein.

1.4    Status of Defendant Randolph D. Lamberjack.    Upon information and belief, Defendant Randolph D. Lamberjack ("Lamberjack") is a resident of the State of Indiana. Lamberjack is a guarantor of the Promissory Note described herein.  Plaintiff alleges on information and belief that Lamberjack is married to Defendant Jane Doe Lamberjack, (collectively referred to herein as "Defendants Lamberjack") and that Defendants Lamberjack currently possess assets and income which constitute community property in which both Defendants Lamberjack have an interest.  Plaintiff further alleges that the actions which are the subject of this cause were performed by Lamberjack on behalf of the marital community of he and his spouse, Jane Doe Lamberjack.  Therefore, to the extent that a judgment is rendered against Defendant Randolph D. Lamberjack, it is enforceable against both the separate estate of Defendant Randolph D. Lamberjack and all of the marital community assets and income of Defendants Lamberjack.

COMPLAINT FOR MONEY DUE—PAGE 2

**WK** WITHERSPOON·KELLEY
Attorneys & Counselors

L:\wdocs\spokmain\88129\0110\S0189671.DOC

**Exhibit - 1, p. 2**
**21-ER-5304**

1.5   Status of Defendant R. John Taylor.  Upon information and belief, Defendant R. John Taylor ("Taylor") is a resident of Nez Perce County, State of Idaho.  Taylor is a guarantor of the Promissory Note described herein.  Plaintiff alleges on information and belief that Taylor is married to Defendant Jane Doe Taylor, (collectively referred to herein as "Defendants Taylor") and that Defendants Taylor currently possess assets and income which constitute community property in which both Defendants Taylor have an interest.  Plaintiff further alleges that the actions which are the subject of this cause were performed by Taylor on behalf of the marital community of he and his spouse, Jane Doe Taylor.  Therefore, to the extent that a judgment is rendered against Defendant R. John Taylor, it is enforceable against both the separate estate of Defendant R. John Taylor and all of the marital community assets and income of Defendants Taylor.

1.6   Status of Defendant Hillcrest Aircraft Company.  Upon information and belief, Defendant Hillcrest Aircraft Company ("Hillcrest") is an Idaho corporation organized under the laws of the State of Idaho whose principal place of business is located in Nez Perce County, Idaho.  Hillcrest is a guarantor of the Promissory Note described herein.

1.7   Guarantors.  Defendants Mark L. Bolland, Betsy Bolland, Lamberjack, Taylor and Hillcrest are collectively referred to herein as the "Guarantors".

1.8   Jurisdiction and Venue.  The Court has original jurisdiction pursuant to I.C. § 1-705 in that the amount in controversy exceeds the sum of $10,000.00.  The Court also has jurisdiction over Defendant Lamberjack pursuant to I.C. § 5-514(a).  Venue is appropriate pursuant to the terms of the Guaranties executed by the Defendants as described herein.

1.9   Other Suits and Actions.  No other suits or actions have been instituted or are now pending under the Notes and Guaranties described below.

1.10   Military Service.  Upon information and belief, the Defendants are not enlisted in the Armed Forces of the United States of America.

COMPLAINT FOR MONEY DUE - PAGE 3

 WITHERSPOON·KELLEY
Attorneys & Counselors

L:\wdocs\spokmain\88129\0110\S0189671.DOC

**Exhibit - 1, p. 3**
**21-ER-5305**

## II. FACTS

2.1    Realleging Each and Every Allegation. AmericanWest realleges each and every allegation set forth above as though the same were repeated at this point verbatim.

2.2    Execution of Promissory Note. On or about April 29, 2005, Pacific Empire Radio Corporation ("PERC") made, executed and delivered to AmericanWest for good and valuable consideration, a written Promissory Note in the principal amount of $6,200,000.00, together with interest thereon (the "Note"). A true and correct copy of the Note is attached hereto as Exhibit A and by this reference incorporated herein.

2.3    The Note was subsequently amended to mature on September 30, 2010 by five (5) Change in Terms Agreements executed by PERC. True and correct copies of the Change in Terms Agreements are attached hereto as Exhibits B through F and by this reference incorporated herein.

2.4    Execution of Mark L. Bolland Guaranty. On or about April 30, 2005, Defendant Mark L. Bolland, for valuable consideration and in order to induce AmericanWest to fund the Note, executed a Commercial Guaranty unconditionally guaranteeing the payment and performance of PERC's obligations under the Note ("Mark Bolland Guaranty"). A true and correct copy of the Mark Bolland Guaranty is attached hereto as Exhibit G and by this reference incorporated herein.

2.5    Execution of Betsy Bolland Guaranty. On or about April 30, 2005, Defendant Betsy Bolland, for valuable consideration and in order to induce AmericanWest to fund the Note, executed a Commercial Guaranty unconditionally guaranteeing the payment and performance of PERC's obligations under the Note ("Betsy Bolland Guaranty"). A true and correct copy of the Betsy Bolland Guaranty is attached hereto as Exhibit H and by this reference incorporated herein.

2.6    Execution of Lamberjack Guaranty. On or about April 30, 2005, Defendant Lamberjack, for valuable consideration and in order to induce AmericanWest to fund the Note, executed a Commercial Guaranty unconditionally guaranteeing the payment and performance

COMPLAINT FOR MONEY DUE —PAGE 4

**W̶K̶ WITHERSPOON·KELLEY**
Attorneys & Counselors

L:\wdocs\spokmain\88129\0110\S0189671.DOC

**Exhibit - 1, p. 4**
**21-ER-5306**

Lamberjack under the Lamberjack Guaranty is $900,000.00. A true and correct copy of the Lamberjack Guaranty is attached hereto as Exhibit I and by this reference incorporated herein.

2.7     Execution of Taylor Guaranty. On or about April 30, 2005, Defendant Taylor, for valuable consideration and in order to induce AmericanWest to fund the Note, executed a Commercial Guaranty unconditionally guaranteeing the payment and performance of PERC's obligations under the Note ("Taylor Guaranty"). A true and correct copy of the Taylor Guaranty is attached hereto as Exhibit J and by this reference incorporated herein.

2.8     Execution of Hillcrest Guaranty. On or about April 30, 2005, Defendant Hillcrest, for valuable consideration and in order to induce AmericanWest to fund the Note, executed a Commercial Guaranty unconditionally guaranteeing the payment and performance of PERC's obligations under the Note ("Hillcrest Guaranty"). The maximum liability of Hillcrest under the Hillcrest Guaranty is $900,000.00. A true and correct copy of the Hillcrest Guaranty is attached hereto as Exhibit K and by this reference incorporated herein.

2.9     The Mark Bolland Guaranty, the Betsy Bolland Guaranty, the Lamberjack Guaranty, the Taylor Guaranty and the Hillcrest Guaranty are collectively referred to herein as the "Guaranties."

2.10     Guaranty of Payment. The Guaranties are guaranties of payment, as well as performance, and thus AmericanWest can proceed directly against the Guarantors without first proceeding against PERC.

2.11     Default on PERC Loan Obligations. AmericanWest has not received payment on the Note since March 26, 2010. PERC has failed to make subsequent scheduled payments when due on the Note and is therefore in default under the terms of the same.

2.12     Acceleration of the Note. The Note provides that, upon default, AmericanWest may declare the entire unpaid principal balance and all accrued unpaid interest immediately due. AmericanWest hereby exercises its right to accelerate the Note and declares the entire unpaid principal balance and all accrued unpaid interest immediate due and owing.

COMPLAINT FOR MONEY DUE---PAGE 5

**WK** WITHERSPOON·KELLEY
Attorneys & Counselors

L:\wdocs\spokmain\88129\0110\S0189671 DOC

**Exhibit - 1, p. 5**
**21-ER-5307**

2.13    Amount Due and Owing on the Note.    As of July 26, 2010, there is due and owing under the Note, the principal amount of $5,592,223.19, plus unpaid accrued interest in the amount of $150,426.87 with interest continuing to accrue at the rate of $893.20 per diem, plus outstanding late fees, charges and collection costs allowed under the Note.

2.14    Attorneys' Fees and Costs.    The Plaintiff is entitled to recover under the Note and Guaranties as against Defendants, its reasonable attorneys' fees and costs.  Plaintiff alleges that in the event this action is uncontested such attorneys' fees and costs shall be based upon counsels' hourly rates and due in an amount not greater than $25,000.00, and in the event of contest, such sums to be determined by this Court.

### III. BREACH OF CONTRACT-MONEY DUE-GUARANTIES

3.1    Realleging Each and Every Allegation.  AmericanWest realleges each and every allegation set forth above as though the same were repeated at this point verbatim.

3.2    Guarantor Mark L. Bolland is Personally Liable.  Pursuant to the terms of the Mark Bolland Guaranty, Mark L. Bolland agreed to be unconditionally personally liable for any amounts due and owing to AmericanWest by PERC, including AmericanWest's reasonable costs and attorneys' fees.  PERC has defaulted by reason of its failure to make payments on the Note when due.  As such, Mark L. Bolland is liable to AmericanWest for the amounts set forth in paragraph 2.13 above.

3.3    Guarantor Betsy Bolland is Personally Liable.  Pursuant to the terms of the Betsy Bolland Guaranty, Betsy Bolland agreed to be unconditionally personally liable for any amounts due and owing to AmericanWest by PERC, including AmericanWest's reasonable costs and attorneys' fees.  PERC has defaulted by reason of its failure to make payments on the Note when due.  As such, Betsy Bolland is liable to AmericanWest for the amounts set forth in paragraph 2.13 above.

3.4    Liability of Defendants Lamberjack.  Pursuant to the terms of the Lamberjack Guaranty, Lamberjack agreed to be unconditionally personally liable, in an amount not to

COMPLAINT FOR MONEY DUE—PAGE 6

**WK** WITHERSPOON·KELLEY
Attorneys & Counselors

L:\wdocs\spokane\88129\0110\S0389671.DOC

**Exhibit - 1, p. 6**
**21-ER-5308**

exceed $900,000.00, for any amounts due and owing to AmericanWest by PERC, including AmericanWest's reasonable costs and attorneys' fees. PERC has defaulted by reason of its failure to make payments on the Note when due. As such, Lamberjack and the marital community of Defendants Lamberjack are liable to AmericanWest for the amounts set forth in paragraph 2.13 above, but not to exceed $900,000.00.

3.5    Liability of Defendants Taylor. Pursuant to the terms of the Taylor Guaranty, Taylor agreed to be unconditionally personally liable for any amounts due and owing to AmericanWest by PERC, including AmericanWest's reasonable costs and attorneys' fees. PERC has defaulted by reason of its failure to make payments on the Note when due. As such, Taylor and the marital community of Defendants Taylor are liable to AmericanWest for the amounts set forth in paragraph 2.13 above

3.6    Guarantor Hillcrest Aircraft Company is Personally Liable. Pursuant to the terms of the Hillcrest Guaranty, Hillcrest agreed to be unconditionally personally liable, in an amount not to exceed $900,000.00, for any amounts due and owing to AmericanWest by PERC, including AmericanWest's reasonable costs and attorneys' fees. PERC has defaulted by reason of its failure to make payments on the Note when due. As such, Hillcrest is liable to AmericanWest for the amounts set forth in paragraph 2.13 above, but not to exceed $900,000.00.

### PRAYER FOR RELIEF

WHEREFORE, AmericanWest Bank prays for relief and judgment as follows:

1.    For a decree of judgment in favor of AmericanWest Bank and against Defendants Mark L. Bolland, Betsy Bolland and R. John Taylor individually and the marital community of R. John Taylor and Jane Doe Taylor, as to all jointly and severally, for the principal sum of $5,592,223.19, plus interest in the amount of $150,426.87 accrued through July 26, 2010, and thereafter at the rate of $893.20 per diem to the date of judgment and

COMPLAINT FOR MONEY DUE—PAGE 7

 WITHERSPOON·KELLEY
Attorneys & Counselors

L:\wdocs\spokmain\88129\0110\S0189571.DOC

**Exhibit - 1, p. 7**
**21-ER-5309**

thereafter until paid in full, plus outstanding late fees, charges and collection costs allowed under the Note and Guaranties.

2.    For a decree of judgment in favor of AmericanWest Bank and against Defendant Randolph D. Lamberjack individually and the marital community of Randolph D. Lamberjack and Jane Doe Lamberjack, in the amount of $900,000.00, plus all costs and expenses incurred in the enforcement of the Lamberjack Guaranty, which judgment shall be joint and several with the other named Defendants.

3.    For a decree of judgment in favor of AmericanWest Bank and against Defendant Hillcrest Aircraft Company, in the amount of $900,000.00, plus all costs and expenses incurred in the enforcement of the Hillcrest Guaranty, which judgment shall be joint and several with the other named Defendants.

4.    For an award of Plaintiff AmericanWest Bank's attorneys fees in the sum of $25,000.00 as against Defendants, jointly and severally, if judgment is taken by default or in the event of contest, as set by this Court, plus Plaintiff's costs and disbursements incurred herein;

5.    For such other and further relief as this Court deems just and equitable in the premises.

DATED this 30th day of August, 2010.

WITHERSPOON KELLEY

By: _____
DENNIS M. DAVIS
Attorneys for Plaintiff

COMPLAINT FOR MONEY DUE—PAGE 8

WK WITHERSPOON·KELLEY
Attorneys & Counselors

L:\wdocs\spokmain\88129\0110\50189671.DOC

http://lmtribune.com/northwest/radio-company-debt-partially-settled/article_5d481fc4-db5a-5494-9993-4a789b8c223c.html

TOP STORY

# Radio company debt partially settled

Bank reaches agreement with five defendants in Pacific Empire Radio lawsuit

Tribune    Oct 22, 2011

Five of the defendants in a lawsuit brought by AmericanWest Bank seeking repayment of the bulk of a $6.2 million loan taken out in 2005 by Pacific Empire Radio Corp. have settled.

In an agreement filed in 2nd District Court at Lewiston, R. John Taylor and Pacific Empire Radio, described as the successor company to Pacific Empire Communications Corp., agreed to pay $1.2 million jointly and Hillcrest Aircraft Co. to pay $900,000. All are of Nez Perce County. In addition, Randolph D. Lamberjack and Jane Doe Lamberjack of Indiana will pay another $900,000.



More coverage. Less Spendage.
Car & Renters Combo
Combine your insurance and save big time. It's that easy.
STATE FARM INSURANCE
State Farm
Steve Forge  208-746-7052

In return, AmericanWest agreed to drop any further claims against those individuals and entities, but reserved the right to pursue payment of the balance from Mark Bolland and Betsy Bolland.

According to court files, about $5.59 million of the original loan was unpaid as of June 24, 2011.

**Exhibit - 2, p. 1**                         4/24/2018, 11:03 AM
**21-ER-5311**

Interest of $513,960, plus late fees, unpaid appraisal fees and legal costs of $68,456 brought the balance owed at that time to more than $6.3 million.



Real and personal property in Madison, Bannock, Bonne-ville and Nez Perce counties in Idaho, Union County in Oregon and Asotin and Whitman counties in Washington had been pledged as security. According to the court file, parties agreed the value of that property is less than the amount owed, and the bank agreed to release its claim on any assets owned by the radio company.

According to a news release from Pacific Empire Radio dated Monday, its corporate offices are located at 111 Main St., in the Lewis-Clark Plaza and Taylor is a member of the board.

The release says the corporation's radio stations include Classic Rock 102.9, CAT-FM 101.5, KOOL 94FM, and ESPN Radio AM 1430 in Lewiston and Clarkston, plus stations in Moscow, Idaho Falls and Potatello in Idaho and La Grande and Baker City in Oregon.

**Exhibit - 2, p. 2**
**21-ER-5312**

4/24/2018, 11:03 AM

| Form 668 (Y)(c) | 6788 | Department of the Treasury - Internal Revenue Service |
|---|---|---|
| (Rev. February 2004) | | **Notice of Federal Tax Lien** |

| Area: SMALL BUSINESS/SELF EMPLOYED AREA #6 Lien Unit Phone: (800) 913-6050 | Serial Number   194209216 | For Optional Use by Recording Office |
|---|---|---|

As provided by section 6321, 6322, and 6323 of the [ ] Code, we are giving a notice that taxes (including inter[ ] have been assessed against the following-named taxpay[ ] a demand for payment of this liability, but it remains [ ] there is a lien in favor of the United States on all prop[ ] property belonging to this taxpayer for the amount o[ ] additional penalties, interest, and costs that may accr[ ]

**FILED: JAN 27, 2016 02:50 PM OREGON SECRETARY OF STATE**

IRS     LIEN NO. 90703485     PACIFIC EMPIRE RADIO

Name of Taxpayer PACIFIC EMPIRE RADIO CORPORATION
a Corporation

Residence     403 CAPITAL ST
LEWISTON, ID 83501-1815

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of the lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ending (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 941 | 12/31/2012 | XX-XXX7865 | 06/17/2013 | 07/17/2023 | 87996.82 |
| 941 | 03/31/2013 | XX-XXX7865 | 06/24/2013 | 07/24/2023 | 75889.92 |
| 941 | 06/30/2013 | XX-XXX7865 | 09/16/2013 | 10/16/2023 | 67631.95 |
| 941 | 09/30/2013 | XX-XXX7865 | 12/30/2013 | 01/29/2024 | 41677.07 |
| 941 | 12/31/2013 | XX-XXX7865 | 03/31/2014 | 04/30/2024 | 5644.75 |
| 941 | 03/31/2014 | XX-XXX7865 | 06/16/2014 | 07/16/2024 | 5268.72 |
| 941 | 06/30/2014 | XX-XXX7865 | 09/08/2014 | 10/08/2024 | 29132.49 |
| 941 | 09/30/2014 | XX-XXX7865 | 12/15/2014 | 01/14/2025 | 59391.09 |
| 941 | 12/31/2014 | XX-XXX7865 | 03/30/2015 | 04/29/2025 | 60994.47 |
| 941 | 03/31/2015 | XX-XXX7865 | 06/15/2015 | 07/15/2025 | 52221.35 |
| 941 | 06/30/2015 | XX-XXX7865 | 09/21/2015 | 10/21/2025 | 54207.70 |
| 941 | 09/30/2015 | XX-XXX7865 | 11/16/2015 | 12/16/2025 | 377.88 |

| Place of Filing | | |
|---|---|---|
| UCC DIVISION, ROOM 142 SECRETARY OF STATE SALEM, OR 97310 | Total | $ 540434.21 |

This notice was prepared and signed at     SEATTLE, WA     , on this,

the ____13th____ day of ___January___ , __2016__.

| Signature *Cheryl Corder* for JOYCE K LINSENMANN | Title REVENUE OFFICER (208) 363-8846 | 26-06-3335 |
|---|---|---|

**(NOTE:** Certificate of officer authorized by law to take acknowledgment is not essential to the validity of Notice of Federal Tax lien Rev. Rul. 71-466, 1971 - 2 C.B. 409)

Part 1 - Kept By Recording Office     Form **668(Y)(c)** (Rev. 2-2004) CAT. NO 60025X

**Exhibit - 4, p. 1**

**21-ER-5313**

UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | |
|---|---|
| R. JOHN TAYLOR,<br><br>        Plaintiff/Counterclaim Defendant,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant/Counterclaim Plaintiff. | No. 2:17-CV-00410-SAB<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Before the Court is Defendant's Motion for Summary Judgment, ECF No. 51. The motion was considered without oral argument. Plaintiff R. John Taylor is represented by Martin J. Martelle. Defendant the United States of America is represented by Landon Monte Yost and Rick Watson.

The Court reviewed the parties' submissions and applicable law. There are no genuine disputes of material fact, and the United States is entitled to judgment as a matter of law. The motion is granted.

## BACKGROUND

This case concerns outstanding tax liabilities of the Pacific Empire Radio Corporation ("PERC"), and whether Plaintiff R. John Taylor, the President of the corporation, can be held personally liable. At the time PERC was formed in 2004, Plaintiff directly owned 12–13% of the company and was the Chairman of the Board of Directors. He has remained the Chairman since then and, as of today, is the sole Board Member and President.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** *1

Between 2004 and 2011, Mark Boland was President of PERC. Plaintiff claims he and PERC became unhappy with Mr. Boland's management of the company and hired a search firm to find a new president, Kurt Luchs. Mr. Luchs remained President until his resignation in May of 2013. Plaintiff became Acting President after the resignation and formally adopted the role of President in December of 2014.

Plaintiff was assessed trust fund recovery penalties for PERC, for various tax periods between December 31, 2012 and June 30, 2015. As of February 28, 2023, the United States claims Plaintiff owes a total of $263,295.10. Plaintiff filed this action to challenge the tax assessment and obtain a refund for amounts already paid. The United States filed a counterclaim to reduce its assessment to judgment.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The moving party has the initial burden of showing the absence of a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

In addition to showing there are no questions of material fact, the moving party must also show it is entitled to judgment as a matter of law. *Smith v. Univ. of Wash. Law Sch.*, 233 F.3d 1188, 1193 (9th Cir. 2000). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of a claim on which the non-moving party has the burden of proof. *Celotex*, 477 U.S. at 323. The non-moving party

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** *2

Case 2:17-cv-04400-SAB Document 336-1 Filed 07/27/25 Page 3 of 8

cannot rely on conclusory allegations alone to create an issue of material fact. *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993). When considering a motion for summary judgment, a court may neither weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## DISCUSSION

The United States moves for summary judgment to establish Plaintiff's liability for withheld payroll taxes under 26 U.S.C. § 6672. Plaintiff claims he cannot be liable under § 6672, because he is not a responsible party under the statute and did not willfully fail to pay over the withheld taxes.

The Internal Revenue Code requires employers to withhold federal income and social security taxes from the wages of their employees. 26 U.S.C. § 3402. The amounts withheld constitute a special fund held in trust for the benefit of the United States and to be paid over quarterly. 26 U.S.C. § 7501(a); *see Slodov v. United States*, 436 U.S. 238, 243 (1978).

Section 6672 of Title 26 of the United States Code provides, in relevant part:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

Under this section, the Internal Revenue Service (IRS) may assess a 100% penalty on responsible persons who willfully fail to collect, account for, and pay over the taxes to the United States. *United States v. Jones*, 33 F.3d 1137, 1139 (9th Cir. 1994).

An individual is liable under § 6672 if they (1) were a "responsible person," and (2) acted willfully in failing to collect or pay over the withheld taxes. *Maggy v. United States*, 560 F.2d 1372, 1374 (9th Cir. 1977). "The individual against whom

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT *3**

Case 1:10-cv-00404-SAB Document 136-1 Filed 07/27/25 Page 4 of 8

the assessment is made bears the burden of proving by a preponderance of the evidence that one or both of [the elements of responsibility and willfulness] is not present." *Jones*, 33 F.3d at 1139 (citing *Hochstein v. United States*, 900 F.2d 543, 547 (2d Cir. 1990)).

   1. Disputes of Material Fact

Plaintiff claims summary judgment is improper because there are factual disputes as to his control over PERC's finances, whether he willfully failed to pay over the withheld taxes, and the amount due. The material facts of the case are not genuinely disputed.

Plaintiff provides only conclusory assertions that he was not responsible for the finances and accounting of the company and that he did not act willfully in paying other creditors before the United States. The record evidence firmly demonstrates otherwise: Plaintiff was the Chairman of the Board of Directors and President of PERC and made voluntary, conscious decisions to pay other creditors first. Plaintiff's self-serving assertions in opposition to summary judgment are uncorroborated and, when construing the evidence in Plaintiff's favor, are insufficient to create a genuine dispute of fact. *See Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

Plaintiff further argues there is a dispute of fact as the accuracy of the IRS's tax calculations. He claims the tax assessment is incorrect because the IRS improperly applied trust fund payments to non-trust fund liabilities. However, IRS policy is to allocate payments first to non-trust fund liabilities and only secondly to trust fund liabilities. *Davis v. United States*, 961 F.2d 867, 878 (9th Cir. 1992). This practice has been repeatedly affirmed by courts. *Id.* The record shows Plaintiff's payments were not designated for trust find liabilities specifically, and thus, the IRS was not required to apply the payments in a particular manner. Whether the policy increases the liability of a responsible party for unpaid trust

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT \*4**

recovery penalties is immaterial. *Buffalow v. United States*, 109 F.3d 570, 574 (9th Cir. 1997). Therefore, there are no genuine disputes of material fact that preclude summary judgment.

2. Responsibility

A responsible person includes "an officer or employee of a corporation, or a member or employee of a partnership, who as such officer employee, or member is under a duty to perform the act in respect of which the violation occurs." 26 U.S.C. § 6671(b). A responsible person is one who has the "final word as to what bills should or should not be paid and when." *Buffalow*, 109 F.3d at 574 (quoting *Purcell v. United States*, 1 F.3d 932, 936 (9th Cir. 1993)). The final word does not actually mean final, but instead "the authority required to exercise significant control over the corporation's financial affairs, regardless of whether [the individual] exercised such control in fact." *Id.* (citing *Purcell*, 1 F.3d at 936) (emphasis added). It means significant, rather than exclusive control. *Turner v. United States*, 423 F.2d 448, 449 (9th Cir. 1970).

"[R]esponsibility is a matter of status, duty, and authority, not knowledge." *Davis*, 961 F.2d at 873. "Authority turns on the scope and nature of an individual's power to determine how the corporation conducts its financial affairs; the duty to ensure that withheld employment taxes are paid over flows from the authority that enables one to do so." *Purcell*, 1 F.3d at 937. Courts may consider the following factors to determine whether a party is a responsible person under § 6672: (1) the individual's duties as outlined in the corporate bylaws; (2) the individual's ability to sign checks; (3) the individual's status as an officer or director; (4) whether the individual could hire and fire employees; and (5) whether the individual had significant control over the enterprise's finances. *Jones*, 33 F.3d at 1140.

At the time of PERC's incorporation until the present, Plaintiff was the Chairman of the Board of Directors. Plaintiff ensured PERC made payments on specific loans and, at times, even bypassed the company's President to do so. And

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT *5**

while Plaintiff generally denies he was "involved" in preparation of PERC's tax returns, he admits he likely signed them. Plaintiff also does not dispute that, at all times, he directed and supervised PERC's Treasurer, who would prepare the company's tax returns.

Plaintiff became Acting President of PERC in May of 2013, and formally assumed the role of President in December of 2014. He remains President and is now the only member of the Board of Directors. Plaintiff's authorization was required for certain payments and transmittal of tax returns, and he approved salary increases for employees. The record also shows Plaintiff has the same level of authority as prior Presidents of PERC, can draw upon the corporation's line of credit to pay bills, and makes decisions about which creditors to pay first.

Plaintiff argues that other company employees primarily controlled the company's finances; however, Plaintiff does not need exclusive control over financial affairs to be a responsible person under the statute. *See Turner*, 423 F.2d at 449. Plaintiff also disputes that he was responsible for signing checks because, most of the time, his signature was computer-generated and stamped by employees of PERC as a matter of routine. Whether Plaintiff personally signed every check issued by the company does not demonstrate Plaintiff lacked authority to do so, which is the central issue to liability. *See Buffalow*, 109 F.3d at 574. Plaintiff's signature was stamped on these documents because he was one of a few individuals that had such authority. No reasonable jury could find that Plaintiff is not a responsible person for PERC during the relevant tax periods.

3. Willfulness

A responsible person acts "willfully in failing to collect or pay over the withheld taxes" if there is a "voluntary, conscious, and intentional act to prefer other creditors over the United States" while they are aware that such funds are owed to the United States. *Teel v. United States*, 529 F.2d 903, 905 (9th Cir. 1976) (quoting *Sorenson v. United States*, 521 F.2d 325, 328 (9th Cir. 1975)); *Maggy*,

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** *6

**Exhibit - 9, p. 6**
**21-ER-5319**

560 F.2d at 1375. The Court should look to the person's actions after they learn of the tax debt to determine willfulness. *See Davis*, 961 F.2d at 876. "A mistaken belief on the part of the responsible person that the tax need not or cannot be paid over does not suffice to render the failure to pay nonwillful." *Teel*, 529 F.3d at 906. Even reckless disregard of whether taxes are being paid over, in contrast to actual knowledge of whether they are being paid over, may suffice to establish willfulness. *Phillips v. U.S. I.R.S.*, 73 F.3d 939, 942 (9th Cir. 1996).

Plaintiff was aware of PERC's tax debt during his tenure as Chairman and President, and he made voluntary, conscious, and intentional decisions to prefer other creditors before satisfying those tax liabilities. A reasonable jury could not find otherwise.

Plaintiff regularly met with the Board of Directors and other executives to discuss unpaid bills, including payroll tax liabilities. Minutes from PERC Board meetings on December 3, 2012, January 7, 2013, February 4, 2013, and April 9, 2013, mention the payroll taxes due to the IRS. At these meetings, the Board discussed penalties from the IRS for the delinquent tax payments and the fact that PERC was behind on its plan to address the liabilities. Plaintiff claims the Board minutes reference other tax liabilities, but this claim is purely self-serving; the Board conversations occurred when the IRS penalties in this lawsuit were accruing, and Plaintiff did not proffer any corroborating evidence to indicate there were separate tax liabilities.

After he became aware of the tax liabilities, Plaintiff ensured PERC made payments toward employee salaries and loans. Plaintiff disbursed funds for payroll from other entities he controlled when PERC was cash deficient. He also authorized payments on a loan from Washington Trust, which he personally guaranteed, among other things. The material facts regarding these issues are not disputed and, therefore, Plaintiff is liable under § 6672.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** *7

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendant's Motion for Summary Judgment, ECF No. 51, is **GRANTED**.

2. Judgment will be entered in favor of Defendant and against Plaintiff.

3. Plaintiff is declared liable for trust fund recovery penalties for tax periods ending 06/30/2013, 09/30/2013, 06/30/2014, 09/30/2014, 12/31/2014, 03/31/2015, and 06/30/2015,[1] in the amount of **$263,295.10**, as of February 28, 2023, plus interest and other statutory accruals from that date.

4. The pretrial conference on August 23, 2023, final pretrial conference and jury trial on September 11, 2023, and all pretrial deadlines are **STRICKEN** from the Court's calendar.

**IT IS SO ORDERED**. The District Court Clerk is hereby directed to enter this Order, provide copies to counsel, and **close** the case.

**DATED** this 12th day of July 2023.

_____
Stanley A. Bastian
United States District Judge

---

[1] For the reasons articulated in this Order, Plaintiff is not entitled to a refund for the tax periods ending 12/31/2012 and 03/31/2013.

The United States indicates that the balances for these periods were paid during the pendency of this case and, therefore, judgment is only entered for periods with balances due.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT *8

## PROMISSORY NOTE

$680,365.85                    January 1, 2010                    Lewiston, Idaho

On or before the dates hereinafter mentioned and provided, for value received, Pacific Empire Radio Corporation promises to pay to the order of AIA Services Corporation the sum of SIX HUNDRED EIGHTY THOUSAND THREE HUNDRED SIXTY-FIVE AND 85/100 DOLLARS ($680,365.85), with interest accrued thereon from the date of this Note, at the rate of Twelve Percent (12%) per annum, until paid in the following manner, to-wit: Principle and accrued interest shall be due on demand at any time; or upon sale and closing of any one of the radio stations of Pacific Empire Radio Corporation; or June 30, 2010; whichever occurs earliest.

Maker reserves the right to prepay said sums in whole or in part without penalty. If suit is instituted to collect the balance of principal and interest due at any time under the terms hereof, maker promises and agrees to pay, in addition to the costs and disbursements as provided by statute, such additional sum as the Court may adjudge reasonable as attorney's fees in such suit or action.

The undersigned shall, to secure payment of this note, grant to AIA Services Corporation a security interest (with a corresponding UCC-1 financing statement) in the property more specifically described in Exhibit A which is attached hereto and incorporated herein by reference.

Each and every person signing this note hereby waives presentment, demand, protest and notice of protest and of non-payment hereof.

Pacific Empire Radio Corporation

By _____
Mark Bolland, President

**Exhibit - 13, p. 1**
**21-ER-5322**

## EXHIBIT A

DEBTOR:          Pacific Empire Radio Corporation
SECURED PARTY:   AIA Services Corporation

All tangible and intangible personal property and fixtures now owned or hereafter acquired by the Debtor, or in which the Debtor may now have or hereafter acquire an interest, including without limitation, all equipment, accounts, inventory, chattel paper, documents, general intangibles and all property described as follows:

(A)  all properties and assets of every type used or useful in connection with the ownership or operation of broadcast radio stations and any and all other communication businesses (collectively "Communication Businesses");

(B)  all equipment (including, without limitation, all machinery, motor vehicles, tools, furniture, studio equipment, towers, transmitters, translators, antennas, microphones, audio equipment, video equipment, tape recorders, connectors, broadcasting and receiving equipment, and all other equipment relating to the operation of Communication Businesses), inventory (including, without limitation, all merchandise, raw materials, work in process, finished goods, and supplies) and goods, whether now owned or hereafter acquired by the Debtor or in which the Debtor may have or hereafter acquire an interest;

(C)  all accounts, accounts receivable and other receivables (including, without limitation, intercompany receivables, rights to receive payments of money under contracts, chattel paper and rights to receive payments of money under leases) and general intangibles, including without limitation:

(i)  distributions and other payments relating to all limited partnership interests, partnership interests and limited liability company member interests now or hereafter held by or issued to the Debtor;

(ii)  all existing and future rights of the Debtor to any refund of any tax assessed against or paid by the Debtor, loss carryback tax refunds, insurance premium refunds, unearned premiums, insurance proceeds, choses in action, goodwill, going concern value, trademarks, service marks, tradenames, patents, blueprints, designs, product lines, and research and development, and all of the Debtor's rights to receive payments of money as a tenant under any and all leases;

(iii)  all of the Debtor's rights under all present and future authorizations, permits, licenses and franchises heretofore or hereafter granted or assigned to the Debtor by the Federal Communications Commission (the "FCC") or any other public or governmental agency or regulatory body for the operation and ownership of broadcast radio stations and other Communications Businesses (such authorizations, licenses, permits and franchises, together with any extensions or renewals thereof, being referred to collectively as the "Franchises") (excluding, however, such Franchises to the extent, and only to the extent, it is unlawful to grant a security interest in such Franchises), but including, to the maximum extent permitted by law, all rights incident or appurtenant to such Franchises, including, without limitation, the right to receive all proceeds derived or arising from or in connection with the sale, assignment or transfer of such Franchises);

whether now owned or hereafter acquired by the Debtor, or in which the Debtor may now have or hereafter acquire an interest;

(iv)    all of the Debtor's rights under all construction contracts and licenses, leases, permits, authorizations and other agreements;

(v)    all management agreements, programming agreements, network affiliate agreements and all other agreements for the provision of management, engineering or similar services;

(vi)    all other agreements relating to Communication Businesses, whether nor owned or hereafter acquired by the Debtor, in which the Debtor may now have or hereafter acquire an interest; and

(vii)    all right, title and interest, if any, under any intercompany notes, obligations or agreements, whether now owned or hereafter acquired by the Debtor or in which the Debtor may now have or hereafter acquire an interest;

(D) all investment property, securities, securities entitlements and other equity interests now or hereafter held by or issued to the Debtor, including, without limitation, all shares of stock, warrants, options, notes, investment contracts, partnership interests and member interests in limited liability companies, including without limitation (i) all rights of the Debtor as a limited partner, general partner or member to participate in the operation or management of any partnership or limited liability company in which the Debtor holds an equity interest; (ii) all rights of the Debtor to the property, assets, partnership interests, membership interests and distributions under the applicable partnership agreement, limited liability company agreement, operating agreement or other organizational documents; (iii) all present and future rights of the Debtor to receive payment of money or other distributions or payments arising out of or in connection with any such equity interests of the Debtor and its rights under such organizational documents and any and all other related agreements; and (iv) all other general intangibles relating thereto and proceeds resulting therefrom;

(E) all instruments, documents of title, policies and certificates of insurance, securities, bank deposits, deposit accounts, checking accounts and cash now or hereafter owned by the Debtor, or in which the Debtor may now have or hereafter acquire an interest;

(F) all accessions, additions or improvements to all replacements, substitutions and parts for, and all proceeds and products of, and all distributions and dividends relating to, all of the foregoing, including, without limitation, proceeds of insurance; and

(G) all books, records and documents relating to all of the foregoing.

**Exhibit - 13, p. 3**
**21-ER-5324**

## PROMISSORY NOTE

$787,599.07                     September 20, 2011                     Lewiston,
Idaho

On or before the dates hereinafter mentioned and provided, for value received, Pacific Empire Radio Corporation promises to pay to the order of AIA Services Corporation the sum of SEVEN HUNDRED EIGHTY EIGHT THOUSAND FIVE HUNDRED NINETY NINE AND 07/100 DOLLARS ($788,599.07), with interest accrued thereon from the date of this Note, at the rate of Twelve Percent (12%) per annum, until paid in the following manner, to-wit:  Principle and accrued interest shall be due  on demand at any time or September 20, 2016; whichever occurs earliest.

Maker reserves the right to prepay said sums in whole or in part without penalty. If suit is instituted to collect the balance of principal and interest due at any time under the terms hereof, maker promises and agrees to pay, in addition to the costs and disbursements as provided by statute, such additional sum as the Court may adjudge reasonable as attorney's fees in such suit or action.

The undersigned shall, to secure payment of this note, grant to AIA Services Corporation a security interest (with a corresponding UCC-1 financing statement) in the property more specifically described in Exhibit A which is attached hereto and incorporated herein by reference.

Each and every person signing this note hereby waives presentment, demand, protest and notice of protest and of non-payment hereof.

Pacific Empire Radio Corporation

By _____
Kurt Luchs, President

RJT - 090254



EXHIBIT A

DEBTOR:              Pacific Empire Radio Corporation
SECURED PARTY:   AIA Services Corporation

All tangible and intangible personal property and fixtures now owned or hereafter acquired by the Debtor, or in which the Debtor may now have or hereafter acquire an interest, including without limitation, all equipment, accounts, inventory, chattel paper, documents, general intangibles and all property described as follows:

(A)   all properties and assets of every type used or useful in connection with the ownership or operation of broadcast radio stations and any and all other communication businesses (collectively "Communication Businesses");

(B)   all equipment (including, without limitation, all machinery, motor vehicles, tools, furniture, studio equipment, towers, transmitters, translators, antennas, microphones, audio equipment, video equipment, tape recorders, connectors, broadcasting and receiving equipment, and all other equipment relating to the operation of Communication Businesses), inventory (including, without limitation, all merchandise, raw materials, work in process, finished goods, and supplies) and goods, whether now owned or hereafter acquired by the Debtor or in which the Debtor may have or hereafter acquire an interest;

(C)  all accounts, accounts receivable and other receivables (including, without limitation, intercompany receivables, rights to receive payments of money under contracts, chattel paper and rights to receive payments of money under leases) and general intangibles, including without limitation:

       (i)  distributions and other payments relating to all limited partnership interests, partnership interests and limited liability company member interests now or hereafter held by or issued to the Debtor;

       (ii)  all existing and future rights of the Debtor to any refund of any tax assessed against or paid by the Debtor, loss carryback tax refunds, insurance premium refunds, unearned premiums, insurance proceeds, choses in action, goodwill, going concern value, trademarks, service marks, tradenames, patents, blueprints, designs, product lines, and research and development, and all of the Debtor's rights to receive payments of money as a tenant under any and all leases;

       (iii)  all of the Debtor's rights under all present and future authorizations, permits, licenses and franchises heretofore or hereafter granted or assigned to the Debtor by the Federal Communications Commission (the "FCC") or any other public or governmental agency or regulatory body for the operation and ownership of broadcast radio stations and other Communications Businesses (such authorizations, licenses, permits and franchises, together with any extensions or renewals thereof, being referred to collectively as the "Franchises") (excluding, however, such Franchises to the extent, and only to the extent, it is unlawful to grant a security interest in such Franchises), but including, to the maximum extent permitted by law, all rights incident or appurtenant to such Franchises, including, without limitation, the right to receive all proceeds derived or arising from or in connection with the sale, assignment or transfer of such Franchises),

RJT - 090255

Exhibit - 13, p. 5
**21-ER-5326**

whether now owned or hereafter acquired by the Debtor, or in which the Debtor may now have or hereafter acquire an interest;

(iv)   all of the Debtor's rights under all construction contracts and licenses, leases, permits, authorizations and other agreements;

(v)   all management agreements, programming agreements, network affiliate agreements and all other agreements for the provision of management, engineering or similar services;

(vi)   all other agreements relating to Communication Businesses, whether nor owned or hereafter acquired by the Debtor, in which the Debtor may now have or hereafter acquire an interest; and

(vii)   all right, title and interest, if any, under any intercompany notes, obligations or agreements, whether now owned or hereafter acquired by the Debtor or in which the Debtor may now have or hereafter acquire an interest;

(D)   all investment property, securities, securities entitlements and other equity interests now or hereafter held by or issued to the Debtor, including, without limitation, all shares of stock, warrants, options, notes, investment contracts, partnership interests and member interests in limited liability companies, including without limitation (i) all rights of the Debtor as a limited partner, general partner or member to participate in the operation or management of any partnership or limited liability company in which the Debtor holds an equity interest; (ii) all rights of the Debtor to the property, assets, partnership interests, membership interests and distributions under the applicable partnership agreement, limited liability company agreement, operating agreement or other organizational documents; (iii) all present and future rights of the Debtor to receive payment of money or other distributions or payments arising out of or in connection with any such equity interests of the Debtor and its rights under such organizational documents and any and all other related agreements; and (iv) all other general intangibles relating thereto and proceeds resulting therefrom;

(E)   all instruments, documents of title, policies and certificates of insurance, securities, bank deposits, deposit accounts, checking accounts and cash now or hereafter owned by the Debtor, or in which the Debtor may now have or hereafter acquire an interest;

(F)   all accessions, additions or improvements to all replacements, substitutions and parts for, and all proceeds and products of, and all distributions and dividends relating to, all of the foregoing, including, without limitation, proceeds of insurance; and

(G)   all books, records and documents relating to all of the foregoing.

RJT - 090256

## PROMISSORY NOTE

$457,650.00                December 31, 2012               Lewiston, Idaho

On or before the dates hereinafter mentioned and provided, for value received, Pacific Empire Radio Corporation promises to pay to the order of AIA Services Corporation the sum of FOUR HUNDRED FIFTY SEVEN AND SIX HUNDRED FIFTY THOUSAND DOLLARS ($457,650.00), with interest accrued thereon from the date of this Note, at the rate of Twelve Percent (12%) per annum, until paid in the following manner, to-wit: Principle and accrued interest shall be due on demand at any time, but not later than September 20, 2016.

Maker reserves the right to prepay said sums in whole or in part without penalty. If suit is instituted to collect the balance of principal and interest due at any time under the terms hereof, maker promises and agrees to pay, in addition to the costs and disbursements as provided by statute, such additional sum as the Court may adjudge reasonable as attorney's fees in such suit or action.

The undersigned shall, to secure payment of this note, grant to AIA Services Corporation a security interest (with a corresponding UCC-1 financing statement) in the property more specifically described in Exhibit A which is attached hereto and incorporated herein by reference.

This note is subordinate to the full and absolute payment of the Pacific Empire Radio Corporation's senior obligation to Washington Trust Bank, as amended, and the Subordination Agreement dated September, 29, 2011 (attached hereto).

Each and every person signing this note hereby waives presentment, demand, protest and notice of protest and of non-payment hereof.

Pacific Empire Radio Corporation

_____
R. JOHN TAYLOR, CHAIRMAN AND CEO

**Exhibit - 13, p. 7**

**21-ER-5328**

AIAPROD00294298

## EXHIBIT A

DEBTOR:          Pacific Empire Radio Corporation
SECURED PARTY:  _____

All tangible and intangible personal property and fixtures now owned or hereafter acquired by the Debtor, or in which the Debtor may now have or hereafter acquire an interest, including without limitation, all equipment, accounts, inventory, chattel paper, documents, general intangibles and all property described as follows:

(A)  all properties and assets of every type used or useful in connection with the ownership or operation of broadcast radio stations and any and all other communication businesses (collectively "Communication Businesses");

(B)  all equipment (including, without limitation, all machinery, motor vehicles, tools, furniture, studio equipment, towers, transmitters, translators, antennas, microphones, audio equipment, video equipment, tape recorders, connectors, broadcasting and receiving equipment, and all other equipment relating to the operation of Communication Businesses), inventory (including, without limitation, all merchandise, raw materials, work in process, finished goods, and supplies) and goods, whether now owned or hereafter acquired by the Debtor or in which the Debtor may have or hereafter acquire an interest;

(C) all accounts, accounts receivable and other receivables (including, without limitation, intercompany receivables, rights to receive payments of money under contracts, chattel paper and rights to receive payments of money under leases) and general intangibles, including without limitation:

(i)  distributions and other payments relating to all limited partnership interests, partnership interests and limited liability company member interests now or hereafter held by or issued to the Debtor;

(ii)  all existing and future rights of the Debtor to any refund of any tax assessed against or paid by the Debtor, loss carryback tax refunds, insurance premium refunds, unearned premiums, insurance proceeds, choses in action, goodwill, going concern value, trademarks, service marks, tradenames, patents, blueprints, designs, product lines, and research and development, and all of the Debtor's rights to receive payments of money as a tenant under any and all leases;

(iii)  all of the Debtor's rights under all present and future authorizations, permits, licenses and franchises heretofore or hereafter granted or assigned to the Debtor by the Federal Communications Commission (the "FCC") or any other public or governmental agency or regulatory body for the operation and ownership of broadcast radio stations and other Communications Businesses (such authorizations, licenses, permits and franchises, together with any extensions or renewals thereof, being referred to collectively as the "Franchises") (excluding, however, such Franchises to the extent, and only to the extent, it is unlawful to grant a security interest in such Franchises), but including, to the maximum extent permitted by law, all rights incident or appurtenant to such Franchises, including, without limitation, the right to receive all proceeds derived or arising from or in connection with the sale, assignment or transfer of such Franchises),

**Exhibit - 13, p. 8**
**21-ER-5329**

AIAPROD00294299

whether now owned or hereafter acquired by the Debtor, or in which the Debtor may now have or hereafter acquire an interest;

(iv) all of the Debtor's rights under all construction contracts and licenses, leases, permits, authorizations and other agreements;

(v) all management agreements, programming agreements, network affiliate agreements and all other agreements for the provision of management, engineering or similar services;

(vi) all other agreements relating to Communication Businesses, whether nor owned or hereafter acquired by the Debtor, in which the Debtor may now have or hereafter acquire an interest; and

(vii) all right, title and interest, if any, under any intercompany notes, obligations or agreements, whether now owned or hereafter acquired by the Debtor or in which the Debtor may now have or hereafter acquire an interest;

(D) all investment property, securities, securities entitlements and other equity interests now or hereafter held by or issued to the Debtor, including, without limitation, all shares of stock, warrants, options, notes, investment contracts, partnership interests and member interests in limited liability companies, including without limitation (i) all rights of the Debtor as a limited partner, general partner or member to participate in the operation or management of any partnership or limited liability company in which the Debtor holds an equity interest; (ii) all rights of the Debtor to the property, assets, partnership interests, membership interests and distributions under the applicable partnership agreement, limited liability company agreement, operating agreement or other organizational documents; (iii) all present and future rights of the Debtor to receive payment of money or other distributions or payments arising out of or in connection with any such equity interests of the Debtor and its rights under such organizational documents and any and all other related agreements; and (iv) all other general intangibles relating thereto and proceeds resulting therefrom;

(E) all instruments, documents of title, policies and certificates of insurance, securities, bank deposits, deposit accounts, checking accounts and cash now or hereafter owned by the Debtor, or in which the Debtor may now have or hereafter acquire an interest;

(F) all accessions, additions or improvements to all replacements, substitutions and parts for, and all proceeds and products of, and all distributions and dividends relating to, all of the foregoing, including, without limitation, proceeds of insurance; and

(G) all books, records and documents relating to all of the foregoing.

AIAPROD00294300

IDSOS UCC1 ONLINE FILING #: B 2010-1076257-2                                    Page 1 of 3

## UCC FINANCING STATEMENT
ELECTRONIC FILING*

| A. NAME, PHONE, EMAIL, FAX OF CONTACT AT FILER: |
|---|
| ---- \| ---- \| jtaylor@cropusainsurance.com \| ---- |

| B. SEND ACKNOWLEDGMENT TO: (Name and Address) |
|---|
| TAYLOR, JOHN |
| 111 MAIN |
| LEWISTON, ID  83501 |

IDAHO SECRETARY OF STATE
03/19/2010 13:11
$3.00
Filing Number:
B 2010-1076257-2
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME: - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME:
PACIFIC EMPIRE RADIO CORPORATION

OR 1b. LAST NAME: | FIRST NAME: | MIDDLE NAME: | SUFFIX:

| 1c. MAILING ADDRESS: | CITY: | STATE | POSTAL CODE: | COUNTRY: |
|---|---|---|---|---|
| 403 "C" STREET | LEWISTON | ID | 83501 | USA |

| 1 TAX ID #: SSN OR TIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORG: CORPORATION | 1f. JURISDICTION OF ORG: ID | 1g. ORGANIZATIONAL ID #: (if any) C141368 |
|---|---|---|---|---|

3. SECURED PARTY'S NAME: (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME:
AIA SERVICES CORPORATION

OR 3b. LAST NAME: | FIRST NAME: | MIDDLE NAME: | SUFFIX:

| 3c. MAILING ADDRESS: | CITY: | STATE: | POSTAL CODE: | COUNTRY: |
|---|---|---|---|---|
| 111 MAIN STREET | LEWISTON | ID | 83501 | USA |

4. This FINANCING STATETMENT covers the following collateral:
ALL TANGIBLE AND INTANGIBLE PERSONAL PROPERTY AND FIXTURES NOW OWNED OR HEREAFTER ACQUIRED BY THE DEBTOR, OR IN WHICH THE DEBTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AN INTEREST, INCLUDING WITHOUT LIMITATION, ALL EQUIPMENT, ACCOUNTS, INVENTORY, CHATTEL PAPER, DOCUMENTS, GENERAL INTANGIBLES AND ALL PROPERTY DESCRIBED AS FOLLOWS:

(A) ALL PROPERTIES AND ASSETS OF EVERY TYPE USED OR USEFUL IN CONNECTION WITH THE OWNERSHIP OR OPERATION OF BROADCAST RADIO STATIONS AND ANY AND ALL OTHER COMMUNICATION BUSINESSES (COLLECTIVELY "COMMUNICATION BUSINESSES");

(B) ALL EQUIPMENT (INCLUDING, WITHOUT LIMITATION, ALL MACHINERY, MOTOR VEHICLES, TOOLS, FURNITURE, STUDIO EQUIPMENT, TOWERS, TRANSMITTERS, TRANSLATORS, ANTENNAS, MICROPHONES, AUDIO EQUIPMENT, VIDEO EQUIPMENT, TAPE RECORDERS, CONNECTORS, BROADCASTING AND RECEIVING EQUIPMENT, AND ALL OTHER EQUIPMENT RELATING TO THE OPERATION OF COMMUNICATION BUSINESSES), INVENTORY (INCLUDING, WITHOUT LIMITATION, ALL MERCHANDISE, RAW MATERIALS, WORK IN PROCESS, FINISHED GOODS, AND SUPPLIES) AND GOODS, WHETHER NOW OWNED OR HEREAFTER ACQUIRED BY THE DEBTOR OR IN WHICH THE DEBTOR MAY HAVE OR HEREAFTER ACQUIRE AN INTEREST;

(C) ALL ACCOUNTS, ACCOUNTS RECEIVABLE AND OTHER RECEIVABLES (INCLUDING, WITHOUT LIMITATION, INTERCOMPANY RECEIVABLES, RIGHTS TO RECEIVE PAYMENTS OF MONEY UNDER CONTRACTS, CHATTEL PAPER AND RIGHTS TO RECEIVE PAYMENTS OF MONEY UNDER LEASES) AND GENERAL INTANGIBLES, INCLUDING WITHOUT LIMITATION:

(I) DISTRIBUTIONS AND OTHER PAYMENTS RELATING TO ALL LIMITED PARTNERSHIP INTERESTS, PARTNERSHIP INTERESTS AND LIMITED LIABILITY COMPANY MEMBER INTERESTS NOW OR HEREAFTER HELD BY OR ISSUED TO THE DEBTOR;

(II) ALL EXISTING AND FUTURE RIGHTS OF THE DEBTOR TO ANY REFUND OF ANY TAX ASSESSED AGAINST OR PAID BY THE DEBTOR, LOSS CARRYBACK TAX REFUNDS, INSURANCE PREMIUM REFUNDS, UNEARNED PREMIUMS, INSURANCE PROCEEDS, CHOSES IN ACTION, GOODWILL, GOING CONCERN VALUE, TRADEMARKS, SERVICE MARKS, TRADENAMES, PATENTS, BLUEPRINTS, DESIGNS, PRODUCT LINES, AND RESEARCH AND DEVELOPMENT, AND ALL OF THE DEBTOR'S RIGHTS TO RECEIVE PAYMENTS OF MONEY AS A TENANT UNDER ANY AND ALL LEASES;

(III) ALL OF THE DEBTOR'S RIGHTS UNDER ALL PRESENT AND FUTURE AUTHORIZATIONS,

http://www.sos.idaho.gov/servlet/TransformXMLDoc?URL=file%3A%5C%5CAS_IDS...    12/14/2011

**Exhibit - 13, p. 10**
**21-ER-5331**

AIAPROD00294301

IDSOS UCC1 ONLINE FILING #: B 2010-1076257-2                              Page 2 of 3

PERMITS, LICENSES AND FRANCHISES HERETOFORE OR HEREAFTER GRANTED OR ASSIGNED TO THE DEBTOR BY THE FEDERAL COMMUNICATIONS COMMISSION (THE "FCC") OR ANY OTHER PUBLIC OR GOVERNMENTAL AGENCY OR REGULATORY BODY FOR THE OPERATION AND OWNERSHIP OF BROADCAST RADIO STATIONS AND OTHER COMMUNICATIONS BUSINESSES (SUCH AUTHORIZATIONS, LICENSES, PERMITS AND FRANCHISES, TOGETHER WITH ANY EXTENSIONS OR RENEWALS THEREOF, BEING REFERRED TO COLLECTIVELY AS THE "FRANCHISES") (EXCLUDING, HOWEVER, SUCH FRANCHISES TO THE EXTENT, AND ONLY TO THE EXTENT, IT IS UNLAWFUL TO GRANT A SECURITY INTEREST IN SUCH FRANCHISES), BUT INCLUDING, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ALL RIGHTS INCIDENT OR APPURTENANT TO SUCH FRANCHISES, INCLUDING, WITHOUT LIMITATION, THE RIGHT TO RECEIVE ALL PROCEEDS DERIVED OR ARISING FROM OR IN CONNECTION WITH THE SALE, ASSIGNMENT OR TRANSFER OF SUCH FRANCHISES), WHETHER NOW OWNED OR HEREAFTER ACQUIRED BY THE DEBTOR, OR IN WHICH THE DEBTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AN INTEREST;

(IV) ALL OF THE DEBTOR'S RIGHTS UNDER ALL CONSTRUCTION CONTRACTS AND LICENSES, LEASES, PERMITS, AUTHORIZATIONS AND OTHER AGREEMENTS;

(V) ALL MANAGEMENT AGREEMENTS, PROGRAMMING AGREEMENTS, NETWORK AFFILIATE AGREEMENTS AND ALL OTHER AGREEMENTS FOR THE PROVISION OF MANAGEMENT, ENGINEERING OR SIMILAR SERVICES;

(VI) ALL OTHER AGREEMENTS RELATING TO COMMUNICATION BUSINESSES, WHETHER NOR OWNED OR HEREAFTER ACQUIRED BY THE DEBTOR, IN WHICH THE DEBTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AN INTEREST; AND

(VII) ALL RIGHT, TITLE AND INTEREST, IF ANY, UNDER ANY INTERCOMPANY NOTES, OBLIGATIONS OR AGREEMENTS, WHETHER NOW OWNED OR HEREAFTER ACQUIRED BY THE DEBTOR OR IN WHICH THE DEBTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AN INTEREST;

(D) ALL INVESTMENT PROPERTY, SECURITIES, SECURITIES ENTITLEMENTS AND OTHER EQUITY INTERESTS NOW OR HEREAFTER HELD BY OR ISSUED TO THE DEBTOR, INCLUDING, WITHOUT LIMITATION, ALL SHARES OF STOCK, WARRANTS, OPTIONS, NOTES, INVESTMENT CONTRACTS, PARTNERSHIP INTERESTS AND MEMBER INTERESTS IN LIMITED LIABILITY COMPANIES, INCLUDING WITHOUT LIMITATION (I) ALL RIGHTS OF THE DEBTOR AS A LIMITED PARTNER, GENERAL PARTNER OR MEMBER TO PARTICIPATE IN THE OPERATION OR MANAGEMENT OF ANY PARTNERSHIP OR LIMITED LIABILITY COMPANY IN WHICH THE DEBTOR HOLDS AN EQUITY INTEREST; (II) ALL RIGHTS OF THE DEBTOR TO THE PROPERTY, ASSETS, PARTNERSHIP INTERESTS, MEMBERSHIP INTERESTS AND DISTRIBUTIONS UNDER THE APPLICABLE PARTNERSHIP AGREEMENT, LIMITED LIABILITY COMPANY AGREEMENT, OPERATING AGREEMENT OR OTHER ORGANIZATIONAL DOCUMENTS; (III) ALL PRESENT AND FUTURE RIGHTS OF THE DEBTOR TO RECEIVE PAYMENT OF MONEY OR OTHER DISTRIBUTIONS OR PAYMENTS ARISING OUT OF OR IN CONNECTION WITH ANY SUCH EQUITY INTERESTS OF THE DEBTOR AND ITS RIGHTS UNDER SUCH ORGANIZATIONAL DOCUMENTS AND ANY AND ALL OTHER RELATED AGREEMENTS; AND (IV) ALL OTHER GENERAL INTANGIBLES RELATING THERETO AND PROCEEDS RESULTING THEREFROM;

(E) ALL INSTRUMENTS, DOCUMENTS OF TITLE, POLICIES AND CERTIFICATES OF INSURANCE, SECURITIES, BANK DEPOSITS, DEPOSIT ACCOUNTS, CHECKING ACCOUNTS AND CASH NOW OR HEREAFTER OWNED BY THE DEBTOR, OR IN WHICH THE DEBTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AN INTEREST;

(F) ALL ACCESSIONS, ADDITIONS OR IMPROVEMENTS TO ALL REPLACEMENTS, SUBSTITUTIONS AND PARTS FOR, AND ALL PROCEEDS AND PRODUCTS OF, AND ALL DISTRIBUTIONS AND DIVIDENDS RELATING TO, ALL OF THE FOREGOING, INCLUDING, WITHOUT LIMITATION, PROCEEDS OF INSURANCE; AND

(G) ALL BOOKS, RECORDS AND DOCUMENTS RELATING TO ALL OF THE FOREGOING.

http://www.sos.idaho.gov/servlet/TransformXMLDoc?URL=file%3A%5C%5CAS_IDS...    12/14/2011

Exhibit - 13, p. 11                              AIAPROD00294302
21-ER-5332

IDSOS UCC1 ONLINE FILING #: B 2010-1076257-2    Page 3 of 3

| 5. ALTERNATIVE DESIGNATION (if applicable): | |
|---|---|
| [ ] LESSEE/LESSOR  [ ] CONSIGNEE/CONSIGNOR  [ ] BAILEE/BAILOR  [ ] SELLER/BUYER | |
| 6. [ ] This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum    (if applicable) | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) (ADDITIONAL FEE) (optional)  [ ] All Debtors  [ ] Debtor 1  [ ] Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA: | |

*Electronically generated from original XML Document

http://www.sos.idaho.gov/servlet/TransformXMLDoc?URL=file%3A%5C%5CAS_IDS...    12/14/2011

Exhibit - 13, p. 12

**21-ER-5333**

AIAPROD00294303



## SUBORDINATION AGREEMENT

| Principal | Loan Date | Maturity | | | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $5,000,000.00 | 09/25/2011 | 10-02-2021 | | | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Pacific Empire Radio Corporation
111 Main Street
Lewiston, ID 83501

**Lender:** WASHINGTON TRUST BANK
Spokane Region Corporate Banking
717 West Sprague Avenue
Spokane, WA 99201
(800) 788-4578

**Creditor:** AIA Services Corporation
P.O. Box 538
Lewiston, ID 83501

THIS SUBORDINATION AGREEMENT dated September 23, 2011, is made and executed among Pacific Empire Radio Corporation, 111 Main Street, Lewiston, ID 83501 ("Borrower"); AIA Services Corporation, P.O. Box 538, Lewiston, ID 83501 ("Creditor"); and WASHINGTON TRUST BANK, Spokane Region Corporate Banking , 717 West Sprague Avenue, Spokane, WA 99201 ("Lender").

**REQUESTED FINANCIAL ACCOMMODATIONS.** Creditor and Borrower each want Lender to provide financial accommodations to Borrower in the form of (A) new credit or loan advances, (B) an extension of time to pay or other compromises regarding all or part of Borrower's present indebtedness to Lender, or (C) other benefits to Borrower. Borrower and Creditor each represent and acknowledge to Lender that Creditor will benefit as a result of these financial accommodations from Lender to Borrower, and Creditor acknowledges receipt of valuable consideration for entering into this Agreement. Based on the representations and acknowledgments contained in this Agreement, Borrower and Creditor agree with Lender as follows:

**SUBORDINATED INDEBTEDNESS.** The words "Subordinated Indebtedness" as used in this Agreement mean the following specific indebtedness from Borrower to Creditor, including all renewals, extensions, modifications and substitutions for the indebtedness, including principal, interest, and all costs and attorneys' fees, relating to the indebtedness: Promissory Note dated 9/20/11 in the amount of $788,599.07.

**SUPERIOR INDEBTEDNESS.** The words "Superior Indebtedness" as used in this Agreement mean and include all present and future indebtedness, obligations, liabilities, claims, rights, and demands of any kind which may be now or hereafter owing from Borrower to Lender. The term "Superior Indebtedness" is used in its broadest sense and includes without limitation all principal, all interest, all costs, attorneys' fees, all sums paid for the purpose of protecting Lender's rights in security (such as paying for insurance on collateral if the owner fails to do so), all contingent obligations of Borrower (such as a guaranty), all obligations arising by reason of Borrower's accounts with Lender (such as an overdraft on a checking account), and all other obligations of Borrower to Lender, secured or unsecured, of any nature whatsoever.

**SUBORDINATION.** All Subordinated Indebtedness of Borrower to Creditor is and shall be subordinated in all respects to all Superior Indebtedness of Borrower to Lender. If Creditor holds one or more Security Interests, whether now existing or hereafter acquired, in any of Borrower's real property or personal property, Creditor also subordinates all Creditor's Security Interests to all Security Interests held by Lender, whether now existing or hereafter acquired.

**PAYMENTS TO CREDITOR.** Except as provided below, Borrower will not make and Creditor will not accept, at any time while any Superior Indebtedness is owing to Lender, (A) any payment upon any Subordinated Indebtedness, (B) any advance, transfer, or assignment of assets to Creditor in any form whatsoever that would reduce at any time or in any way the amount of Subordinated Indebtedness, or (C) any transfer of any assets as security for the Subordinated Indebtedness. Notwithstanding the foregoing, Borrower may make regularly scheduled payments of interest only to Creditor so long as Borrower is not in default under any agreement between Lender and Borrower. Creditor may not accelerate any amounts owed to Creditor without Lender's prior written consent.

In the event of any distribution, division, or application, whether partial or complete, voluntary or involuntary, by operation of law or otherwise, of all or any part of Borrower's assets, or the proceeds of Borrower's assets, in whatever form, to creditors of Borrower or upon any indebtedness of Borrower, whether by reason of the liquidation, dissolution or other winding-up of Borrower, or by reason of any execution sale, receivership, insolvency, or bankruptcy proceeding, assignment for the benefit of creditors, proceedings for reorganization, or readjustment of Borrower or Borrower's properties, then and in such event, (A) the Superior Indebtedness shall be paid in full before any payment is made upon the Subordinated Indebtedness, and (B) all payments and distributions, of any kind or character and whether in cash, property, or securities, which shall be payable or deliverable upon or in respect of the Subordinated Indebtedness shall be paid or delivered directly to Lender for application in payment of the amounts then due on the Superior Indebtedness until the Superior Indebtedness shall have been paid in full.

In order that Lender may establish its right to prove claims and recover for its own account dividends based on the Subordinated Indebtedness, Creditor does hereby assign all its right, title, and interest in such claims to Lender. Creditor further agrees to supply such information and evidence, provide access to and copies of such of Creditor's records as may pertain to the Subordinated Indebtedness, and execute such instruments as may be required by Lender to enable Lender to enforce all such claims and collect all dividends, payments, or other disbursements which may be made on account of the Subordinated Indebtedness. For such purposes, Creditor hereby irrevocably authorizes Lender in its discretion to make and present for or on behalf of Creditor such proofs of claims on account of the Subordinated Indebtedness as Lender may deem expedient and proper and to vote such claims in any such proceeding and to receive and collect any and all dividends, payments, or other disbursements made thereon in whatever form the same may be paid or issued and to apply the same on account of the Superior Indebtedness.

Should any payment, distribution, security, or proceeds thereof be received by Creditor at any time on the Subordinated Indebtedness contrary to the terms of this Agreement, Creditor immediately will deliver the same to Lender in precisely the form received (except for the endorsement or assignment of Creditor if necessary), for application on or to secure the Superior Indebtedness, whether it is due or not due, and until so delivered the same shall be held in trust by Creditor as property of Lender. In the event Creditor fails to make any such endorsement or assignment, Lender, or any of its officers on behalf of Lender, is hereby irrevocably authorized by Creditor to make the same.

**CREDITOR'S NOTES.** Creditor agrees to deliver to Lender, at Lender's request, all notes of Borrower to Creditor, or other evidence of the Subordinated Indebtedness, now held or hereafter acquired by Creditor, while this Agreement remains in effect. At Lender's request, Borrower also will execute and deliver to Creditor a promissory note evidencing any book account or claim now or hereafter owed by Borrower to Creditor, which note also shall be delivered by Creditor to Lender. Creditor agrees not to sell, assign, pledge or otherwise transfer any of such notes except subject to all the terms and conditions of this Agreement.

**CREDITOR'S REPRESENTATIONS AND WARRANTIES.** Creditor represents and warrants to Lender that: (A) no representations or agreements of any kind have been made to Creditor which would limit or qualify in any way the terms of this Agreement; (B) this Agreement is executed at Borrower's request and not at the request of Lender; (C) Lender has made no representation to Creditor as to the creditworthiness of Borrower; and (D) Creditor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Creditor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Creditor's risks under this Agreement, and Creditor further agrees that Lender shall have no obligation to disclose to Creditor information or material acquired by Lender in the course of its relationship with Borrower.

**CREDITOR'S WAIVERS.** Creditor waives any right to require Lender: (A) to make, extend, renew, or modify any loan to Borrower or to grant any other financial accommodations to Borrower whatsoever; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Superior Indebtedness or of any nonpayment related to any Security Interests, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Superior Indebtedness, or in connection with the creation of new or additional Superior Indebtedness; (C) to resort for payment or to proceed directly or at once against any person, including Borrower; (D) to proceed directly against or exhaust any Security Interests held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, at any time, with respect to any matter whatsoever.

**LENDER'S RIGHTS.** Lender may take or omit any and all actions with respect to the Superior Indebtedness or any Security Interests for the Superior Indebtedness without affecting whatsoever any of Lender's rights under this Agreement. In particular, without limitation, Lender may, without notice of any kind to Creditor, (A) make one or more additional secured or unsecured loans to Borrower; (B) repeatedly alter, compromise, renew, extend, accelerate, or otherwise change the time for payment or other terms of the Superior Indebtedness or any part

AIAPROD00294304

Exhibit - 13, p. 13
21-ER-5334

SUBORDINATION AGREEMENT
(Continued)

Page 3

BORROWER:

PACIFIC EMPIRE RADIO CORPORATION

By: _____
Kurt Luchs, President of Pacific Empire Radio
Corporation

By: _____
Jofeg K. Duclos, Secretary of Pacific Empire Radio
Corporation

CREDITOR:

AIA SERVICES CORPORATION

By: _____
Authorized Signer for AIA Services Corporation

By: _____
Authorized Signer for AIA Services Corporation

LASER PRO Lending, Ver. 5.57.10.001 Copr. Harland Financial Solutions, Inc. 1997, 2011. All Rights Reserved. - WA eACFI\WIN\CFI\LPL\710.FC TR-136175 PR-80

**Exhibit - 13, p. 14**

**21-ER-5335**

AIAPROD00294305

SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT (the "Agreement") is made this $29\underline{\text{th}}$ day of September, 2011, by and among WASHINGTON TRUST BANK, a Washington corporation engaged in the business of banking (the "Lender"), PACIFIC EMPIRE RADIO CORPORATION, an Idaho corporation (the "Debtor"), and HILLCREST AIRCRAFT COMPANY, AIA SERVICES CORPORATION, and RAY JOHNSON TAYLOR (collectively, the "Creditor").

RECITALS

R.1 Debtor is indebted to Lender pursuant to various credit facilities provided by Lender to Debtor, as more fully described in various Loan and Security Agreements executed or to be executed by Debtor and Lender (collectively, the "Loan Agreement").

R.2 Debtor is indebted to Creditor pursuant to a Promissory Note delivered by Debtor to Creditor in the original principal amount of One Million Five Hundred Thousand and no/100 Dollars ($1,500,000.00) (as amended, restated or modified from time to time, the "Creditor Note"). The payment and performance of the Creditor Note is secured by all business assets of Debtor at various locations (the "Facility") pursuant to a Security Agreement executed by Debtor dated 9-23-11 (as amended, restated or modified from time to time, the "Creditor Security Agreement").

R.3 In order to induce Lender to extend credit to Debtor and, at Lender's option, to make future loans, extensions of credit, or other accommodations to or for the account of Debtor, or to grant renewals or extensions of any such loan, extension of credit or other accommodation as Lender may deem advisable, Creditor is willing to subordinate all of Debtor's indebtedness and obligations to Creditor, whether presently existing or arising in the future, to all indebtedness and obligations of Debtor to Lender, whether presently existing or arising in the future.

R.4 This Agreement sets forth the relative rights, obligations and priorities of Lender and Creditor with respect to the payment and collection of the Senior Obligations (as defined in Section 1.9) and Junior Obligations (as defined in Section 1.4).

NOW, THEREFORE, in consideration of this Agreement and of Lender's agreement to extend credit to Debtor, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree to the following:

1. Definitions

1.1 "Creditor's Collateral" shall mean the property of Debtor located at the Facility as more fully described in Creditor's Security Agreement, and any replacements, additions, accessions or substitutions thereof, and the proceeds and products thereof.

1.2 "Creditor's Security Agreement" shall mean all security agreements executed by Debtor for the benefit of Creditor in connection with the Junior Obligations, and all amendments, modifications and renewals thereto.

1.3 "Creditor's Security Interests" shall mean any and all security interests and liens in Creditor's Collateral granted by Debtor to Creditor in Creditor's Security Agreement as security for the Junior Obligations.

1.4 "Junior Obligations" shall mean all liabilities, indebtedness and obligations of Debtor to Creditor, whether presently existing or arising in the future, and all claims, demands, actions and causes of action arising therefrom. Junior Obligations shall include, without limitation, all indebtedness of Debtor to Creditor evidenced by the Creditor Note, a copy of which is attached to and incorporated in this Agreement.

1.5 "Lender's Collateral" shall mean all property directly or indirectly securing the Loan, whether presently existing or arising in the future, and any replacements, additions, accessions or substitutions thereof, and the proceeds and products thereof.

1.6 "Lender's Security Interests" shall mean any and all security interests and liens in Lender's Collateral, whether presently existing or arising in the future, granted by Debtor to Lender as security for the Senior Obligations.

1.7 "Loan" shall mean any loan and/or other financial accommodation made or to be made by Lender to Debtor.

1.8 "Loan Documents" shall mean any loan and security agreement, promissory note, guaranty, mortgage, deed of trust, indemnity deed of trust, pledge agreement, letter of credit application, letter of credit, commitment letter, opinion of counsel, subordination agreement, financing statement, certification or any other agreement made or to be made by Debtor, Lender, or any other person as evidence of, security for, guarantee of, or in connection with the Loan.

1

K:\17255B5\00033\17083_TTB\17083A235F

Exhibit - 13, p. 15

AIAPROD00294306

21-ER-5336

1.9  "Senior Obligations" shall mean all liabilities, indebtedness and obligations of Debtor to Lender in connection with the Loan. Senior Obligations shall include, without limitation, all indebtedness of Debtor to Lender evidenced by the Loan Documents.

2.  Subordination

Creditor subordinates, to the extent and in the manner provided in this Agreement, payment of the Junior Obligations to the full and absolute payment of all of the Senior Obligations. Debtor consents to and acknowledges the subordination provided for in this Section.  Without limiting the generality of the foregoing, Creditor subordinates its security interest in certain collateral of the Debtor, as reflected on financing statements filed with the Idaho Secretary of State, Filing No. B 2010-1075558-6 on March 2, 2010, Filing No. B 2010-1076257-2 on March 19, 2010, and Filing No. B 2010-1076258-1 on March 19, 2010.

3.  Warranties and Representations of Creditor

Creditor represents and warrants that: (a) it has full power and authority to enter into this Agreement and to perform the obligations provided for herein, all of which have been duly authorized by all necessary and proper corporate and other action; (b) it has not relied and will not rely on any representation or information of any nature made by or received from Lender relative to Debtor in deciding to execute this Agreement or to permit it to continue in effect; (c) it has received from Debtor all Loan Documents requested by Creditor for its review prior to the execution of this Agreement; (d) Creditor is the lawful owner of the Junior Obligations; (e) except for Creditor's Security Interests in Creditor's Collateral, Creditor has no security interest or lien in any other assets or property of Debtor, including any property or assets constituting Lender's Collateral, to secure the Junior Obligations; (f) Creditor has not previously assigned or transferred any of the Junior Obligations or any interest therein; and (g) other than to Lender, Creditor has not previously given any subordination in respect to the Junior Obligations.

4.  Additional Covenants of Creditor

Until all of the Senior Obligations have been paid, Creditor shall not permit any of the following to occur unless Lender shall have consented in writing: (a) Creditor shall not commence or join with any other creditors of Debtor in commencing any bankruptcy, reorganization, receivership or insolvency proceeding against Debtor; (b) Creditor shall not take or permit any action prejudicial to or inconsistent with Lender's priority position over Creditor that is created by this Agreement; (c) Creditor shall not receive from Debtor any security interest in any assets of Debtor (other than the Creditor's Collateral) after the date of this Agreement and if Creditor does obtain such security interest or lien in violation of this covenant, Creditor agrees and hereby subordinates such lien to Lender's Security Interests; and (d) except as set forth in Section 6 below, Creditor shall not demand, take or receive any payments upon the Junior Obligations unless and until all of the Senior Obligations shall have been satisfied in full and no commitment by Lender to extend credit, make loans, or otherwise extend financial accommodations to or for Debtor is outstanding.

5.  Enforcement of Junior Obligations

Without Lender's prior written consent or unless expressly provided in Section 7 below, Creditor (a) will take no action to assert, sue upon, set off against, collect or enforce all or any part of the Junior Obligations, including principal and interest; and (b) will take no enforcement actions against Debtor with respect to the Junior Obligations, unless and until all of the Senior Obligations shall have been satisfied in full and no commitment by Lender to extend credit, make loans or otherwise extend financial accommodations to or for Debtor is outstanding.

6.  Payment of Junior Obligations Prohibited

Except as provided in Section 7 below, at such time as an Event of Default shall occur under any of the Loan Documents, Debtor shall not pay and Creditor shall not receive, by setoff or in any other manner, all or any part of the Junior Obligations. Prior to the occurrence of any Event of Default, as set forth in any of the Loan Documents, Debtor may pay and Creditor may receive payments in the ordinary course as set forth in the Creditor Note, as in effect on the date hereof, without giving effect to (a) any mandatory or permissive prepayment provisions or call provisions, (b) any provisions requiring the payment of principal upon demand and (c) any amendments or modifications thereof or any default interest rate, penalties or other charges which would have the effect of increasing the amount of such payment.

7.  Distributions

In the event of any distribution or payment to Creditor on or with respect to the Junior Obligations, other than as permitted in Section 6 above, whether partial or complete, voluntary or involuntary, by operation of law or otherwise, then, in such event, such payment or distribution shall be paid or delivered directly to Lender for application against such of the Senior Obligations, whether due or not due and whether secured or unsecured, as Lender shall determine in its sole discretion. Such distribution or payment shall be delivered in the form of its receipt (except for the addition of any endorsement or assignment necessary to effect a transfer of all rights therein to Lender), and Lender is irrevocably authorized to supply any endorsement or assignment which may have been

2

K:\1726565\00033\17063_TTB\17063A235F

omitted or is insufficient. Until so delivered, any such distribution or payment shall be held in trust by Creditor for Lender and shall not be commingled with other funds or property of Creditor. Notwithstanding the foregoing or the payment prohibition set forth in Section 6 above, in the event Debtor is in default under the Junior Obligations, Creditor may proceed against Debtor and Creditor's Collateral, provided (a) any payments received by Creditor from the liquidation of Creditor's Collateral may be applied by Creditor to satisfy the Junior Obligations and (b) any other payments, of any nature whatsoever, received by Creditor from Debtor or any guarantor of the Junior Obligations shall first be paid to Lender to repay the Senior Obligations and the balance, if any, may be retained by Creditor to satisfy the Junior Obligations.

8.  Authority to Act for Creditor

8.1    For so long as any of the Senior Obligations remain unpaid, Creditor irrevocably appoints Lender as Creditor's attorney-in- fact, and grants to Lender a power of attorney with full power of substitution, in the name of Creditor or in the name of Lender, for the use and benefit of Lender, without notice to Creditor or any of its representatives, successors or assigns, to perform at Lender's option the following acts: (a) at any meeting of creditors of Debtor or in connection with any case or proceeding, whether voluntary or involuntary, for the distribution, division or application of assets of Debtor or the proceeds thereof, in bankruptcy or in connection with a receivership, or under an assignment for the benefit of creditors of Debtor or otherwise: (i) to enforce claims comprising the Junior Obligations, either in its own name or in the name of Creditor, by proof of debt, proof of claim, suit, or otherwise; (ii) to collect any assets of Debtor (other than Creditor's Collateral) distributed, divided or applied by way of dividend or payment, or any securities issued, on account of the Junior Obligations and to apply the same, or the proceeds thereof, to the Senior Obligations until all of the Senior Obligations (including, without limitation, collection expenses and all interest accruing on the Senior Obligations after the commencement of any bankruptcy case) have been paid in full, tendering any surplus to Creditor if and to the extent permitted by law; (iii) to vote claims comprising the Junior Obligations to accept or reject any plan of partial or complete liquidation, reorganization, arrangement, composition or extension; and (iv) to take generally any action in connection with any such meeting, case or proceeding that Creditor would be authorized to take but for this Agreement; and (b) to execute any endorsement, assignment, power of attorney or instruments provided for in this Agreement.

8.2    In no event shall Lender be liable to Creditor for any failure to prove the Junior Obligations or exercise any right with respect to the Junior Obligations, or to collect any sums payable on the Junior Obligations.

8.3    This power of attorney shall be deemed to be coupled with an interest and shall survive the disability, if any, of Creditor.

9.  Consents, Waivers and Indulgences

9.1    Lender may, at any time and from time to time, with or without consideration, and without further consent of or notice to Creditor and without in any manner affecting, impairing, lessening, discharging or releasing the Senior Obligations or Creditor or Debtor from the terms of this Agreement: (a) renew, extend, alter, change the manner, time, place and terms of payment of, grant any indulgence with respect to, sue for and collect upon and otherwise deal with the Loan or Senior Obligations; (b) sell, exchange, release, substitute, surrender, realize upon or otherwise dispose of or deal with any Lender's Collateral securing the Loan; and (c) grant any indulgence to, release or otherwise deal with any party primarily or secondarily liable upon the Loan or Senior Obligations.

9.2    Creditor waives notice of acceptance of this Agreement and of the creation of the Senior Obligations.

9.3    To the fullest extent permitted by law, Creditor further waives any and all notices and demands of any kind in connection with this Agreement. Creditor assents to any release, renewal, extension, expansion, compromise or postponement of the time of payment of the Loan or Senior Obligations, or any increase in the amount of the Loan or Senior Obligations, and to any substitution, exchange or release of the Collateral. Lender may continue, without notice to Creditor, to lend monies, extend credit and make other accommodations to or for the account of Debtor.

9.4    Creditor consents and agrees that the Loan and the Senior Obligations shall be deemed to have been made or incurred in reliance upon this Agreement.

10.   Transfer or Assignment of Claims by Creditor

Creditor shall not assign or transfer to others any claim that Creditor has or may have against Debtor while any of the Senior Obligations remain unpaid or there exists any commitment of Lender which could give rise to any Senior Obligations unless such assignment or transfer is expressly made subject to this Agreement. Creditor agrees to indemnify Lender and hold Lender harmless from and against any loss sustained or incurred by Lender as a result of Creditor's failure to comply with the provisions of this Section.

3

K:\17255081000033\17083_TTB\17083A238F

AIAPROD00294308

11.  Transfer or Assignment of Senior Obligations by Lender

If any of the Senior Obligations is transferred or assigned by Lender, this Agreement will inure to the benefit of Lender's transferee or assignee to the extent of such transfer or assignment; provided, however, that Lender shall continue to have the unimpaired right to enforce this Agreement as to any of the Senior Obligations not so transferred or assigned.

12.  Validity of Junior Obligations

The provisions of this Agreement subordinating the Junior Obligations are solely for the purpose of defining the relative rights of Lender and Creditor and shall not impair, as between Creditor and Debtor, the obligation of Debtor to pay Creditor in accordance with its terms. Nothing contained in this Agreement shall be deemed to confer any rights upon Debtor or to alter or modify any of the rights or duties of Debtor with respect to either the Senior Obligations or the Junior Obligations.

13.  Default on Obligations

Creditor shall provide Lender with notice of the occurrence of any default by Debtor under the documentation establishing the Junior Obligations and Lender shall provide Creditor with notice of any default triggering the prohibition of payments to Creditor under the Junior Obligations.

14.  Duration

This Agreement shall constitute an absolute, unconditional and continuing agreement of subordination and shall remain in effect until the Senior Obligations have been paid in full.

15.  Modifications

No modification or waiver of any provision of this Agreement and no consent by Lender or Creditor to any departures from the provisions of this Agreement shall be effective unless in writing and signed by Lender and Creditor, and then such modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

16.  Rights and Remedies

The rights and remedies under this Agreement and all other rights and remedies available to Lender and Creditor under applicable law are cumulative and may be exercised alternatively, concurrently or successively at the sole discretion of Lender or Creditor (as applicable) and the exercise of any one or more of them will not be a waiver of the other. No delay or failure on the part of Lender or Creditor to exercise any of its rights and remedies, or any partial or single exercise of its rights and remedies, shall constitute a waiver of any such rights and remedies.

17.  Legend Evidencing Subordination

All notes, guaranties, security agreements and financing statements delivered by Debtor in connection with the Junior Obligations, whether presently existing or arising in the future, shall contain a specific statement that the Junior Obligations are subordinated to the Senior Obligations and are subject to provisions of this Agreement. Upon Lender's request, Creditor shall deliver to Lender a copy of all such instruments and documents certified by Creditor to be a true, accurate and complete copy of the original instrument or document.

18.  Additional Documentation

Creditor shall execute and deliver to Lender such further instruments and shall take such further action as Lender may at any time or times reasonably request in order to carry out the provisions and intent of this Agreement.

19.  Applicable Law and Consent to Venue and Jurisdiction

The performance and construction of this Agreement shall be governed by the internal laws of the State of Washington. The parties hereto agree that any suit, action, or proceeding against them, jointly and/or severally, with respect to this Agreement MAY BE BROUGHT IN ANY COURT OF COMPETENT JURISDICTION LOCATED IN SPOKANE COUNTY, WASHINGTON. The parties hereto irrevocably waive any objection and any right of immunity on the ground of venue, the convenience of the forum or the jurisdiction of such courts or from the execution of judgments resulting therefrom. The parties hereto agree to stipulate in any future proceeding that this Agreement is to be considered for all purposes to have been executed and delivered within the geographical boundaries of the State of Washington, even if it was, in fact, executed and delivered elsewhere.

20.  Assignability

This Agreement shall benefit and be enforceable by Lender and Lender's successors and assigns and any other person to whom Lender may grant an interest in the Senior Obligations, and shall be binding and enforceable against Creditor, Debtor and each of their successors and assigns.

21.  Severability

If any provision or part of any provision of this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or any remaining part of any provision) of this Agreement and this Agreement shall survive and be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained in this Agreement.

4

K:\1726585\00003\17083_TTG\17083A23LF

AIAPROD00294309

22.    Entire Agreement

This Agreement constitutes and expresses the entire understanding between the parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, whether express or implied, oral or written.

23.    Counterparts

This Agreement may be executed in duplicate originals or in several counterparts, each of which shall be deemed an original but all of which together shall constitute one instrument.

24.    Notices

Any notices or other communications in connection with this Agreement shall be in writing and shall be effective only when sent by hand delivery, overnight service or certified mail, return receipt requested: (a) if to Debtor at the address set forth below Debtor's signature, or at such other address as Debtor shall have furnished in writing to Lender; (b) if to Creditor at the address set forth below Creditor's signature, or such other address as Creditor shall have furnished in writing to Lender; or (c) if to Lender, at the address set forth below Lender's signature, or at such other address as Lender shall have furnished in writing to Creditor, or Debtor.

25.    Gender and Plurals

The use of any gender or the neuter in this Agreement shall also refer to the other gender or the neuter. The use of the plural shall also refer to the singular, and vice versa.

26.    Headings and Recitals

The headings used in this Agreement are for convenience only and do not constitute part of this Agreement.

27.    Waiver of Jury Trial

THE PARTIES HERETO AGREE THAT ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT OR INSTITUTED BY ANY PARTY OR ANY SUCCESSOR OR ASSIGN OF SUCH PARTY ON OR WITH RESPECT TO THIS AGREEMENT OR WHICH IN ANY WAY RELATES, DIRECTLY OR INDIRECTLY, TO THE OBLIGATIONS UNDER THIS AGREEMENT, OR THE DEALINGS OF THE PARTIES WITH RESPECT TO THIS AGREEMENT, SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY. THE PARTIES HERETO EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH AFORESAID SUITS, ACTIONS OR PROCEEDINGS. THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS PROVISION IS A SPECIFIC AND MATERIAL ASPECT OF THIS AGREEMENT AND THAT LENDER WOULD NOT MAKE THE LOAN TO DEBTOR IF THIS PROVISION WERE NOT PART OF THIS AGREEMENT.

ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement intending to create a document as of the date first above written.

[Debtor:]
PACIFIC EMPIRE RADIO CORPORATION

By _____
Name: KURT LUCAS
Title: PRESIDENT / CEO
Debtor's Address
111 MAIN ST
2ND FLOOR
LEWISTON ID 83501

K:\17255\95\00033\7003_TTB\17003JA235F

AIAPROD00294310

[Lender:]
WASHINGTON TRUST BANK

By _Larry Vandenberg_

Name: _LARRY VANDENBURG_
Title: _VICE PRESIDENT_
Lender's Address:
_Box 2127_
_Spokane, WA, 99210_

[Creditor:]
HILLCREST AIRCRAFT COMPANY

By _Gale Wilson_

Name: _GALE WILSON_
Title: _President_
Creditor's Address:
_P.O. Box 504_
_Lewiston, ID_
_83501_

AIA SERVICES CORPORATION

By _____
      Name: _____
      Title: _____
Creditor's Address:
_____
_____
_____
_____

RAY JOHNSON TAYLOR
Creditor's Address:
_____
_____
_____
_____

6

K:\1725585\0003\17093_TTB\17093A235F

Exhibit - 13, p. 20

AIAPROD00294311

21-ER-5341

## PROMISSORY NOTE

$310,245.00                    December 31, 2013                    Lewiston, Idaho

On or before the dates hereinafter mentioned and provided, for value received, Pacific Empire Radio Corporation promises to pay to the order of AIA Services Corporation the sum of THREE HUNDRED TEN THOUSAND TWO HUNDRED FORTY-FIVE AND NO/100 DOLLARS ($310,245.00), with interest accrued thereon from the date of this Note, at the rate of Twelve Percent (12%) per annum, until paid in the following manner, to-wit:  Principle and accrued interest shall be due on demand at any time, but not later than September 20, 2016.

Maker reserves the right to prepay said sums in whole or in part without penalty. If suit is instituted to collect the balance of principal and interest due at any time under the terms hereof, maker promises and agrees to pay, in addition to the costs and disbursements as provided by statute, such additional sum as the Court may adjudge reasonable as attorney's fees in such suit or action.

The undersigned shall, to secure payment of this note, grant to AIA Services Corporation a security interest (with a corresponding UCC-1 financing statement) in the property more specifically described in Exhibit A which is attached hereto and incorporated herein by reference.

This note is subordinate to the full and absolute payment of Pacific Empire Radio Corporation's senior obligation to Washington Trust Bank, as amended, and the Subordination Agreement dated September 29, 2011 (attached hereto).

Each and every person signing this note hereby waives presentment, demand, protest and notice of protest and of non-payment hereof.

Pacific Empire Radio Corporation

By _____
R. John Taylor, Chairman & CEO

**EXHIBIT A**

DEBTOR:              Pacific Empire Radio Corporation
SECURED PARTY:   AIA Services Corporation

All tangible and intangible personal property and fixtures now owned or hereafter acquired by the Debtor, or in which the Debtor may now have or hereafter acquire an interest, including without limitation, all equipment, accounts, inventory, chattel paper, documents, general intangibles and all property described as follows:

(A)   all properties and assets of every type used or useful in connection with the ownership or operation of broadcast radio stations and any and all other communication businesses (collectively "Communication Businesses");

(B)   all equipment (including, without limitation, all machinery, motor vehicles, tools, furniture, studio equipment, towers, transmitters, translators, antennas, microphones, audio equipment, video equipment, tape recorders, connectors, broadcasting and receiving equipment, and all other equipment relating to the operation of Communication Businesses), inventory (including, without limitation, all merchandise, raw materials, work in process, finished goods, and supplies) and goods, whether now owned or hereafter acquired by the Debtor or in which the Debtor may have or hereafter acquire an interest;

(C)   all accounts, accounts receivable and other receivables (including, without limitation, intercompany receivables, rights to receive payments of money under contracts, chattel paper and rights to receive payments of money under leases) and general intangibles, including without limitation:

(i)   distributions and other payments relating to all limited partnership interests, partnership interests and limited liability company member interests now or hereafter held by or issued to the Debtor;

(ii)   all existing and future rights of the Debtor to any refund of any tax assessed against or paid by the Debtor, loss carryback tax refunds, insurance premium refunds, unearned premiums, insurance proceeds, choses in action, goodwill, going concern value, trademarks, service marks, tradenames, patents, blueprints, designs, product lines, and research and development, and all of the Debtor's rights to receive payments of money as a tenant under any and all leases;

(iii)   all of the Debtor's rights under all present and future authorizations, permits, licenses and franchises heretofore or hereafter granted or assigned to the Debtor by the Federal Communications Commission (the "FCC") or any other public or governmental agency or regulatory body for the operation and ownership of broadcast radio stations and other Communications Businesses (such authorizations, licenses, permits and franchises, together with any extensions or renewals thereof, being referred to collectively as the "Franchises") (excluding, however, such Franchises to the extent, and only to the extent, it is unlawful to grant a security interest in such Franchises), but including, to the maximum extent permitted by law, all rights incident or appurtenant to such Franchises, including, without limitation, the right to receive all proceeds derived or arising from or in connection with the sale, assignment or transfer of such Franchises);

**Exhibit - 13, p. 22**
**21-ER-5343**

whether now owned or hereafter acquired by the Debtor, or in which the Debtor may now have or hereafter acquire an interest;

(iv) all of the Debtor's rights under all construction contracts and licenses, leases, permits, authorizations and other agreements;

(v) all management agreements, programming agreements, network affiliate agreements and all other agreements for the provision of management, engineering or similar services;

(vi) all other agreements relating to Communication Businesses, whether nor owned or hereafter acquired by the Debtor, in which the Debtor may now have or hereafter acquire an interest; and

(vii) all right, title and interest, if any, under any intercompany notes, obligations or agreements, whether now owned or hereafter acquired by the Debtor or in which the Debtor may now have or hereafter acquire an interest;

(D) all investment property, securities, securities entitlements and other equity interests now or hereafter held by or issued to the Debtor, including, without limitation, all shares of stock, warrants, options, notes, investment contracts, partnership interests and member interests in limited liability companies, including without limitation (i) all rights of the Debtor as a limited partner, general partner or member to participate in the operation or management of any partnership or limited liability company in which the Debtor holds an equity interest; (ii) all rights of the Debtor to the property, assets, partnership interests, membership interests and distributions under the applicable partnership agreement, limited liability company agreement, operating agreement or other organizational documents; (iii) all present and future rights of the Debtor to receive payment of money or other distributions or payments arising out of or in connection with any such equity interests of the Debtor and its rights under such organizational documents and any and all other related agreements; and (iv) all other general intangibles relating thereto and proceeds resulting therefrom;

(E) all instruments, documents of title, policies and certificates of insurance, securities, bank deposits, deposit accounts, checking accounts and cash now or hereafter owned by the Debtor, or in which the Debtor may now have or hereafter acquire an interest;

(F) all accessions, additions or improvements to all replacements, substitutions and parts for, and all proceeds and products of, and all distributions and dividends relating to, all of the foregoing, including, without limitation, proceeds of insurance; and

(G) all books, records and documents relating to all of the foregoing.

7.A.

**Pacific Empire Radio Corp**
Shares and options  Outstanding
June 30, 2016

| | Total | SHARES | Original issue | Reissued | % |
|---|---|---|---|---|---|
| Mark and Betsey Bolland | 553,000 | 553,000 | 1/2/2002 | | 14.15% |
| R John Taylor | 543,000 | 27,500 | 1/2/2002 | 12/22/2008 | 13.89% |
| | | 246,000 | 2/1/2002 | 12/22/2008 | |
| | | 66,000 | 11/30/2006 | 12/22/2008 | |
| | | 7,500 | 9/30/2007 | 12/22/2008 | |
| | | 21,250 | 10/31/2007 | 12/22/2008 | |
| | | 50,000 | 11/30/2007 | 12/22/2008 | |
| | | 124,750 | 9/23/2011 | | |
| | | 543,000 | | | |
| Connie Taylor Henderson | 470,647 | 27,500 | 2/1/2002 | 12/22/2008 | 12.04% |
| | | 246,000 | 2/1/2002 | 12/22/2008 | |
| | | 66,000 | 11/30/2006 | 12/22/2008 | |
| | | 7,500 | 9/30/2007 | 12/22/2008 | |
| | | 21,250 | 10/31/2007 | 12/22/2008 | |
| | | 50,000 | 11/30/2007 | 12/22/2008 | |
| | | 52,397 | 9/23/2011 | | |
| | | 470,647 | | | |
| AIA 401k Plan fbo | 797,147 | 125,000 | 2/1/2002 | | 20.39% |
| John Taylor(and Connie Taylor) | | 42,044 | 2/3/2002 | | |
| | | 40,000 | 7/25/2006 | | |
| | | 38,000 | 11/30/2006 | | |
| | | 22,500 | 2/1/2008 | | |
| | | 2,500 | 3/31/2008 | | |
| | | 100,000 | 10/31/2008 | | |
| | | 24,250 | 11/10/2008 | | |
| | | 402,853 | 9/23/2011 | | |
| | | 797,147 | | | |
| Linda Rule | 48,016 | 48,016 | 1/20/2002 | | 1.23% |
| Dennis Shapiro | 20,578 | 20,578 | 2/1/2002 | | 0.53% |
| Global Inc | 27,438 | 27,438 | 2/7/2002 | | 0.70% |
| Hillcrest Aircraft | 709,804 | 109,804 | 2/8/2002 | | 18.16% |
| | | 600,000 | 9/23/2011 | | |
| | | 709,804 | | | |
| Chuck Bolland | 22,500 | 22,500 | 1/16/2006 | | 0.58% |
| John Hiler Pension Plan | 20,000 | 15,367 | 2/10/2002 | | 0.51% |
| John Hiler | | 4,633 | 2/10/2002 | | |
| Randy Lamberjack | 696,911 | 69,473 | 1/2/2002 | | 17.83% |
| Randy Lamberjack | | 27,438 | 2/1/2002 | | |
| | | 600,000 | 9/23/2011 | | |
| | | 696,911 | | | |
| Total | 3,909,041 | 3,909,041 | - | | 100.00% |

**OPTIONS OUTSTANDING**

| (name on grant document) | | | |
|---|---|---|---|
| R John Taylor | .01 (2014) | 600,000 | |
| Gale Wilson | .01 (2014) | 600,000 | |
| Randy Lamberjack | .01 (2014) | 600,000 | |

**Exhibit - 14, p. 1**
**21-ER-5345**

GC0771107

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
10900 N.E. 4th St., Suite 2300
Bellevue, WA  98004
Telephone: (425) 591-6903
Email: rod@roderickbond.com

ANDREW SCHWAM, ISB NO. 1573
ANDREW SCHWAM LAW FIRM
705 SW Fountain Street
Pullman, WA 99163-2128
Telephone: (208) 874-3684
Email: amschwam@turbonet.com

Attorneys for the Plaintiff Dale L. Miesen

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>**v.**<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 1:10-cv-00404-DCN-CWD<br><br>DECLARATION OF PAUL D. DURANT |

DECLARATION OF PAUL D. DURANT - i

**21-ER-5346**

CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; R. JOHN TAYLOR, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual,

       Defendants/Third-Party Plaintiffs,

    v.

REED TAYLOR, an individual,

       Third-Party Defendant.

REED TAYLOR, an individual,

       Third-Party Defendant/ Counterclaimant,

    v.

CONNIE TAYLOR HENDERSON, an individual; R. JOHN TAYLOR, an individual; JAMES BECK, an individual, and UNKNOWN BONDING COMPANY, an unknown entity that issued the unknown fidelity ERISA Bond,

       Counterdefendants.

DECLARATION OF PAUL D. DURANT - ii

**21-ER-5347**

I, Paul D. Durant, declare:

1. I am a citizen of the United States, over the age of eighteen, and competent to testify in court, including as to the matters in this Declaration. This Declaration is based upon my personal knowledge.

2. In 1958, I obtained an undergraduate degree in accounting. In 1962, I obtained my license in Texas as a Certified Public Accountant. I began working at AIA on October 1, 1985, as Vice-President of AIA Services Corp. ("AIA Services"). My responsibilities included acquiring and managing a life insurance company, designing and pricing health insurance policies and general managerial responsibilities. I left AIA Services in or around 1999.

3. I am the owner of 7,360.5 common shares in AIA Services. I have never received any compensation or any dividends on my 7,360.5 common shares. Despite demands by me and other shareholders, the last shareholder meeting held for AIA Services was on July 16, 2012, which I attended and that meeting was not even properly held. John Taylor refused to recognize that Donna Taylor had appointed me to AIA Services' board as discussed below. John Taylor refused to answer any questions with respect to the funds and assets of AIA Services and AIA Insurance being used for other improper purposes such as funding CropUSA Insurance Agency, Inc. To confirm, there have been no annual or special shareholder meetings held for AIA Services (including to address conflicts of interest as required by the bylaws) since July 16, 2012.

4. Based on my past experience and knowledge working at AIA Services and its subsidiaries and my willingness to serve, Donna Taylor voted her Series A Preferred Shares in AIA Services to appoint me as a director of AIA Services on July 15, 2012. Attached as **Exhibit A** is a true and correct copy of the Appointment of Director and Consent in Lieu of Meeting Vote signed by Donna Taylor to appoint me to the board of directors for AIA Services on July 15, 2012.

DECLARATION OF PAUL D. DURANT - 1

I still live at the same address indicated in Exhibit A. Donna Taylor instructed me to independently act as a director of AIA Services (i.e., not worry about her) and to look after the interests of the minority shareholders. Despite Donna Taylor appointing me, I have never received a single notice of any board meetings for AIA Services, and I have not been asked or permitted to attend any board meetings or participate in any board actions or decisions for AIA Services.

5.    After Jud Taylor was appointed as the Personal Representative of Donna Taylor's estate after she passed away, I was again asked to continue my service as a member of the board of directors of AIA Services for the estate. My instructions were the same as with Donna Taylor. I agreed to continue serving as a director of AIA Services. Despite Jud Taylor having confirmed that I would remain the director appointed by the Series A Preferred Shares, I have never received a single notice of any board meetings for AIA Services, and I have not been asked or permitted to attend a single board meeting or participate in any board decision for AIA Services since the time that Donna Taylor passed away on August 16, 2023.

6.    I am familiar with Miesen's Third Amended Complaint. I also understand that this Court ruled that Mr. Miesen's derivative demands were inadequate in 2022. If I had been permitted to participate as a member of AIA Services' board of directors, I would have approved having independent corporate counsel being retained for AIA Services, who had no ties to any of the parties in this case, to assume control and assert the derivative claims that Miesen had asserted against the defendants in his Third Amended Complaint.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF IDAHO THAT THE FOREGOING IS TRUE AND CORRECT.

_June 30, 2025_                                          _/s/ Paul D. Durant_
Date Signed                                             Paul D. Durant

DECLARATION OF PAUL D. DURANT - 2

**21-ER-5349**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 15th day of July 2025, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Jeffrey A. Thomson:     jat@elamburke.com
Loren C. Ipsen:     lci@elamburke.com
Joyce A. Hemmer:     jah@elamburke.com
Bradley S. Keller:     bkeller@byrneskeller.com
Alyson A. Foster:     alyson@dempseyfoster.com
Tyler S. Waite:     twaite@campbell-bissell.com
Michael S. Bissell:     mbissell@campbell-bissell.com
Daniel L. Glynn:     dglynn@idalaw.com
Andrew Schwam:     amschwam@turbonet.com
Kim J Trout:     ktrout@trout-law.com
Markus William Louvier:     mlouvier@ecl-law.com
James B. King:     jking@ecl-law.com

_/s/ Roderick C. Bond_
Roderick C. Bond

DECLARATION OF PAUL D. DURANT - 3

**21-ER-5350**

## APPOINTMENT OF DIRECTOR AND CONSENT IN LIEU OF MEETING VOTE

**To:     AIA Services Corporation for inclusion in the minutes and filing with the corporate records.**

The undersigned, Donna J. Taylor, the sole shareholder of all outstanding Series A Preferred shares of AIA Services Corporation ("Company"), takes the following actions:

Pursuant to Article 4.2.8 of the Articles of Amendment to the Articles of Incorporation of AIA Services Corporation ("Amended Articles of Incorporation") and effective immediately, Donna J. Taylor hereby nominates and votes all of her Series A Preferred Shares in Company and appoints Paul D. Durant as a Director of the Board of Directors of the Company. Donna J. Taylor certifies that she has not assigned or encumbered her Series A Preferred Shares nor has she granted any other person or entity the right to vote such shares. Prior notice of any meetings of the Board of Directors, or action by the Directors, must be made to Paul D. Durant as follows:

> Paul D. Durant
> 3440 Selway Dr.
> Lewiston, ID  83501
> Tel: (208) 743-0930

This consent also constitutes a vote by Donna J. Taylor, without a meeting, nominating and voting all of her Series A Preferred Shares in favor of the election and appointment of Paul D. Durant to Company's Board of Directors as provided under I.C. § 30-1-704. Although Donna Taylor disputes the number of Series A Preferred Shares indicated on recently provided Company financial statements, the dispute is irrelevant for purposes of this vote and the appointment of Paul D. Durant as a Director because she is the sole Series A Preferred Shareholder of the Company and has voted all of her shares to appoint Paul D. Durant.

Dated this _15_ day of July, 2012, at Clarkston, WA.

Donna J. Taylor

SUBSCRIBED AND SWORN BEFORE ME THIS _15_ DAY OF JULY, 2012.

Roderick C. Bond
Notary Public for the State of Washington
Residing at Bellevue, WA.

1

**Exhibit - A**

**21-ER-5351**

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
10900 N.E. 4th St., Suite 2300
Bellevue, WA  98004
Telephone: (425) 591-6903
Email: rod@roderickbond.com

ANDREW SCHWAM, ISB NO. 1573
ANDREW SCHWAM LAW FIRM
705 SW Fountain Street
Pullman, WA 99163-2128
Telephone: (208) 874-3684
Email: amschwam@turbonet.com

Attorneys for the Plaintiff Dale L. Miesen

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.; <br><br> Plaintiff, <br><br> **v.** <br><br> CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company, <br><br> Defendants. | Case No. 1:10-cv-00404-DCN <br><br> PLAINTIFF DALE L. MIESEN'S REPLY IN SUPPPORT OF HIS SECOND MOTION TO APPROVE THE PAYMENT OF ATTORNEYS' FEES AND COSTS **[Dkt. 1315]** |

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - i

21-ER-5352

CROP USA INSURANCE AGENCY, INC., an
Idaho corporation; CONNIE TAYLOR
HENDERSON, an individual; JOLEE
DUCLOS, an individual; R. JOHN TAYLOR,
an individual; MICHAEL W. CASHMAN SR.,
an individual; JAMES BECK, an individual,

       Defendants/Third-Party
       Plaintiffs,

    **v.**

REED TAYLOR, an individual,

       Third-Party Defendant.

REED TAYLOR, an individual,

       Third-Party Defendant/
       Counterclaimant,

    **v.**

CONNIE TAYLOR HENDERSON, an
individual; R. JOHN TAYLOR, an individual;
JAMES BECK, an individual, and UNKNOWN
BONDING COMPANY, an unknown entity
that issued the unknown fidelity ERISA Bond,

       Counterdefendants.

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - ii

**21-ER-5353**

**TABLE OF CONTENTS**

A.    Defendants argue AIA Services should not pay Miesen's attorneys' fees and costs since the Defendants incurred "nearly $975,000" in fees and costs in this case, which would consume much of the over $1.5 million that Miesen successfully recovered, and since they incurred fees and costs in other cases. (Dkt. 1323.) To understand why this argument has no merit, we need to review facts regarding some examples of the Defendants' wrongful behavior which are beyond dispute: ................................................................... 1

B.    In addition, Defendants argument that Miesen has not provided a substantial benefit because AIA Services has incurred "nearly $975,000" in fees is meritless for the following reasons. ................................................... 8

C.    Defendants argue fees and costs should not be awarded or should be reduced under the common fund doctrine. (Dkt. 1223 at 14–18.) Their arguments are meritless. ............................................................. 10

D.    Defendants argue, by relying on distinguishable cases, Miesen is not entitled to fees and costs because he failed to make a demand as required by I.C. § 30-29-742. (Dkt. 1323 at 8–11.) ............................................ 11

E.    Defendants argue that Miesen's costs are not recoverable under federal rules, but Miesen is seeking costs under I.C. § 30-29-746(1) and the common fund doctrine pursuant to Idaho law ............................................. 13

CERTIFICATE OF SERVICE ........................................................ 14

**A.**      Defendants argue AIA Services should not pay Miesen's attorneys' fees and costs since the Defendants incurred "nearly $975,000" in fees and costs in this case, which would consume much of the over $1.5 million that Miesen successfully recovered, and since they incurred fees and costs in other cases. (Dkt. 1323.) To understand why this argument has no merit, we need to review facts regarding some examples of the Defendants' wrongful behavior which are beyond dispute:

▶ **1**      Defendants' nearly $975,000 in defense costs were improperly advanced and incurred because: (a) no authorization was ever obtained from the boards of the AIA Entities (hereafter "AIA"), their shareholders, or this Court to advance any defense costs or to even retain any attorneys for AIA, (b) no affirmations of good faith or undertakings to repay the defense costs were obtained, and (c) no reports were provided to shareholders that defense costs were being advanced, in violation of the Idaho Code and Sections 4.4 and 11.1 through 11.5 of AIA's bylaws. I.C. §§ 30-29-853, 30-29-855, 30-29-856, 30-29-859, 30-29-1621(1). AIA's attorney should have found that <u>no</u> defense costs be advanced under Section 11.5(b) based on the facts here. Instead, defense costs were improperly advanced for all Defendants, including for the CropUSA Defendants, even for times when Beck, Henderson and Cashman were not directors, for the third party complaint, and for cross claims and defenses against GemCap. It is remarkable that the Defendants claim that AIA has paid and must pay the defense costs for *all* of the Defendants, and that AIA is supporting that request.[1]

▶ **2**      The Individual Defendants Formed and funded CropUSA Insurance Agency ("<u>CropUSA</u>") with millions of dollars of AIA's funds, assets, and credit to compete against AIA selling insurance when John Taylor was prohibited from competing with AIA and he even received

---

[1] Dkts. 211, 215, 218, 276, 290, 292, 366, 1056, 1057, 1094, 1194, 1198, 1206, 1324-9 ¶2, 1262-2 at 757–58, 1260-2–1260-5, 1260-15 ¶5, 1314-2–1314-11, 1324-9, 1330-17 ¶3.

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - 1

over $2 million in *known* compensation from CropUSA. The Individual Defendants did this keeping it a secret from AIA Services' other innocent shareholders who did not own shares in CropUSA. Later, the Individual Defendants made bad decisions and CropUSA was decimated. (Dkts. 67-8, 128 at 21–48, 211, 1260-8.) Yet, AIA has improperly paid CropUSA's defense costs.

► 3    From AIA, John Taylor took over $4 million in *known* compensation and funds used to pay his personal bills unrelated to AIA without board or shareholder approval in violation of Sections 4.4, 4.14, 5.5, 6.2, and 14.1 of AIA's bylaws, and when he was improperly competing with AIA in violation of his non-compete obligation. Thus, John Taylor received over $6 million, and Miesen and the other innocent shareholders never received anything. John Taylor's recent testimony that the *only* board decisions are the written board meeting minutes and written board resolutions, which shows that the board never authorized any compensation or other payments. This also pertains to the other bullet points where the board did not authorize the actions.[2]

► 4    When AIA and Pacific Empire Radio ("PERC") were not meeting their obligations to creditors and shareholders, John Taylor had AIA Services loan PERC, in which John Taylor and Henderson owned an interest and AIA Services and its innocent shareholders did not, over $1.4 million without disclosing or obtaining approval from the board or shareholders. The $1.4 million, plus over $1.6 million in accrued interest (an over $3 million debt), has not been paid back and AIA Services does not even receive or accrue interest on the loans to PERC.[3]

► 5    John Taylor, Henderson and Beck were on AIA's boards of directors, and they had AIA guarantee a $10 million loan for CropUSA in violation of AIA Services' articles and AIA's bylaws. CropUSA defaulted on the loan. Later, John Taylor had AIA agree to be bound to a

---

[2] Dkts. 64, 66, 67-8, 211 ¶¶164(z), 221–222, 1260-2 at 435–41, 558, 1260-3, 1260-4, 1260-5, 1260-8, 1324-9, 1330-17.

[3] Dkts. 211 ¶¶93 & 132, 1242-4, 1260-2 at 66, 1330-3, 1330-6–1330-12, 1330-15, 1330-16.

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - 2

21-ER-5357

settlement agreement, which resulted in AIA owing $12,125,534.61 to GemCap and having to transfer its headquarters to GemCap, which was insured for $7 million, in violation of Sections 4.2.9(c), (e), (g), (h), (j) and (k) of AIA Services' articles and Sections 4.14 and 14.1 of AIA's bylaws. Later, in 2021, John Taylor had AIA enter into a new settlement with GemCap, which also violated the same articles and bylaws, and required AIA to pay even more money to GemCap.[4]

▶ 6    Despite repeated demands by Donna Taylor (the Series A Preferred Shareholder), Defendants refused to honor the agreement to seat Donna's board member. This agreement is embodied in Sections 4.2.8 and 4.4 of AIA Services' articles (a right only Donna could waive under Section 4.2.12) and only she could remove the director under Section 4.6 of AIA's bylaws. Donna's unseated designees to AIA Services' board were Patrick Moran from December 28, 2009, through July 14, 2012, and Paul Durant from July 15, 2012, through the present time. Thus, nothing was duly authorized during the foregoing periods of time because Donna's board designee was not present. This allowed the Defendants to conduct their wrongful behavior and the Individual Defendants to breach their fiduciary duties. Mr. Durant testified that, if he had been permitted to be a director, he would have voted to retain independent counsel for AIA Services and would have voted to have AIA Services assume control of Miesen's derivative claims (he was the only duly elected and unconflicted director).[5]

▶ 7    Despite demands, no annual shareholder meetings have been held for AIA Services since July 16, 2012, including to elect directors, in violation of the Idaho Code and Sections 3.2 and 4.6 of AIA's bylaws. E.g., I.C. §§ 30-29-701(1), 30-29-803(3). Thus, there have not been duly

---

[4] Dkts. 128 at 21–48, 211, 152-6, 440-1, 440-2, 1131-10, 1247, 1255-9, 1260-3 at 42–49, 1260-4, 1260-5, 1260-8, 1315-3, 1315-4, 1323.

[5] Dkts. 67-51 at 21, 152, 941-9, 941-10, 1131-10, 1260-3, 1260-4, 1260-5, 1260-14, 1330-17, 1330-18.

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - 3

elected and authorized boards for AIA since 2012 (assuming that meeting was lawful), and shareholders were complaining that shareholder meetings were not being held.[6]

► 8      Despite demands, no special shareholder meetings have been held for AIA to address conflicts of interest pertaining to the transactions and litigation decisions at issue in the instant case, in violation of the Idaho Code and Section 4.14 of AIA's bylaws.[7] E.g., I.C. §§ 30–29–702(3); 30-29-861(2)(b). Thus, none of the conflicts of interest, related party transactions or other matters such as advancing defense costs for any of the Defendants in this case have been authorized because the purported boards had conflicts of interest as set out in the allegations in the verified complaints. (Dkts. 1, 23, 137, 211.) The Individual Defendants were all involved in the wrongful acts or covering them up for many years. Despite demands, no annual board meetings have been held to duly elect any officers for AIA for over 15 years in violation of the Idaho Code and Section 4.7(a) of AIA's bylaws (other than John appointed himself as Secretary in 2016, but that was done without Donna's director).[8] I.C. § 30-29-840(2). No officer has been authorized to act for AIA for over 15 years, and John Taylor has been the only board member since 2014.

► 9      In connection with Miesen and other shareholders' efforts to obtain information from AIA to make additional derivative demands, the Defendants refused to permit Miesen or other shareholders to inspect and copy records on two different occasions in violation of the Idaho Code and Idaho criminal law. I.C. §§ 30-29-1602, 30-29-1603, 30-29-1605, 30-29-1620, 18-1907 (a misdemeanor). Beck and Henderson were serving on the board during one of the requests (they purportedly served from 2007 through 2014) and John was on the board for both.[9]

---

[6] Dkts. 64, 65, 66, 211, 1260-2 at 19–21, 42–44, 48–49, 238–39, 539, 748–49, 754, 757–59, 980, 1260-5, 1324-9 ¶2, 1330-17, 1330-18.

[7] *Id*.; Dkts. 1260-2, 1324-9 ¶2, 1260-5, 1322-1 ¶1; 1330-17, 1330-18.

[8] Dkts. 1260-3, 1260-5, 1330-17, 1330-18.

[9] Dkts. 211, 1071-4 ¶4, 1260-1 ¶7, 1260-2 at 1145, 1260-3 at 30, 1260-6, 1260-7,1260-15 ¶7.

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - 4

► **10**      The Individual Defendants (particularly John Taylor) have never retained independent counsel for AIA, and the attorneys for AIA have improperly advocated for the Individual Defendants' defense and interests. For example, Mr. Trout previously represented John Taylor in another related lawsuit, and his billing statements in this current lawsuit state that his client is "Mr. John Taylor" and this confirms that it is John Taylor who improperly directs Mr. Trout. These improper actions have persisted despite Miesen's objections and the Defendants' acknowledgement that Miesen was correct. John Taylor even had AIA file a joint motion for attorneys' fees and costs requesting that AIA indemnify the Individual Defendants, i.e., AIA filed a motion against themselves and supported the Individual and CropUSA Defendants' improper request for fees and costs, which if successful would be to the detriment of AIA. (Dkt. 1314.) This increased the fees incurred by AIA (they should have incurred none) and prejudiced Miesen.[10]

► **11**      In 2016, John Taylor improperly retroactively amended AIA's bylaws to include a provision stating that a shareholder is obligated to pay the fees and costs incurred by AIA and any "Constituents" (which is defined to even include affiliates, i.e., CropUSA) if the shareholder "does not obtain a judgment . . . that substantially achieves, in substance and amount, the full remedy sought."[11] Those amendments are also void for violating Sections 4.11 and 13.1 of AIA's bylaws because John had conflicts by being a defendant in this case, he was not an elected director, and Donna's director did not authorize them (*see* bullet point #6 and #13).

► **12**      Attorneys are "presumed to know the law." *Miller v. Smith*, 61 P. 824, 827 (Idaho 1900). Because John Taylor and Henderson are attorneys, they have no excuse for their wrongful

---

[10] E.g., Dkts. 366, 562-1 at 15–17, 901 at 6–7, 1198, 1239, 1246, 1254, 1255 at 6, 1260-15 ¶9, 1264, 1272 at 7 n.3, 1274, 1282-1 at 17–18, 1282-3, 1282-4, 1314-1, 1314-10, 1314-11, 1315-1 at 18 1328. *See, e.g., In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1189–90 (N.D. Cal. 1993); *Krakow Bus. Park v. Locke Lord, LLP*, 135 F. Supp. 3d 770, 791–92 (N.D. Ill. 2015).

[11] Dkts. 211 ¶¶162, 226, 1260-3 at 52–55, 1260-5, 1330-17, 1330-18.

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - 5

behavior and their numerous violations of statutes and common law. (Dkts. 1131-12, 1131-13.)

► **13**    The above wrongful behavior and many others confirms that the Defendants repeatedly violated AIA Services' articles (Dkt. 1131-10), AIA's bylaws (Dkt. 126-5), statutes, and common laws rendering the actions void (including advancing defense costs). *See* I.C. §§ 30-29-206(2), 30-29-801(2), 30-29-830(1), 30-29-841, 30-29-842; *Kemmer v. Newman*, 387 P.3d 131, 134–35 (Idaho 2016); *McCann v. McCann*, 275 P.3d 824, 830 & n.5 (Idaho 2012); *Hill v. Small*, 183 S.E.2d 752, 753–54 (Ga. 1971); *Yarnall Warehouse & Transfer, Inc. v. Three Ivory Bros. Moving Co.*, 226 So.2d 887, 891 (Fla. 1969); *Marine Servs. Unlimited, Inc. v. Rakes*, 918 S.W.2d 132, 134 (Ark. 1996); *Glahe v. Arnett*, 225 P. 796, 798 (Idaho 1924).

► **14**    The Defendants' wrongful behavior is what has led to the filing of this case and many others all over the country that would have never occurred but for the Individual Defendants' wrongful behavior. Miesen has identified 36 of the legal proceedings or claims which were caused by the Defendants' wrongful behavior (there are more). (Dkt. 1324-1.) Miesen was involved in 4 of them (including this case), and he was not the cause of any of those lawsuits. If the Defendants had paid Reed Taylor by August 1, 2005, and Donna Taylor by December 1, 2003, as required by the contracts signed by John Taylor (Dkts. 390-5–390-9, 449-4, 576-8, 67-62), Reed and Donna would not have filed any lawsuits. If the $10 million debt to GemCap had been paid or if AIA had not improperly guaranteed that debt (Dkts. 440-1, 440-2), *Miesen v. Munding* and *Durant v. AIA Services* would not have been filed. If the Defendants had acted lawfully, this case would not exist.

► **15**    Miesen is not the only victim. While not exhaustive, various courts and a regulatory authority found John Taylor had: **(a)** committed "intentional fraud" against GemCap (Dkt. 1082-4 at 12); **(b)** "as a fiduciary, [he] breached [his] obligations to the [AIA Services 401(k)] Plan and violated several provisions of . . . ERISA" (Dkt. 1260-9 at 1); **(c)** unlawfully withheld payroll taxes

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - 6

under 26 U.S.C. § 6672 (Dkt. 1330-11); **(d)** "improperly spent the loan proceeds on personal expenses and business expenses unrelated to crop insurance payments" (Dkt. 229-7 at 5); **(e)** a California federal court entered a $12,126,584.61 judgment against John Taylor (Dkt. 1167-10), and later John Taylor got out of this judgment by having the AIA Services' 401k plan pay money to GemCap (Dkt. 1247); **(f)** the Idaho Supreme Court held that Reed's 1995 agreement and Donna's 1996 agreement were illegal contracts, which were signed by John Taylor as part of the Individual Defendants' plan to take control of AIA. (Dkts. 211 ¶32, 389-20, 1248-4); and **(g)** this Court held John Taylor could not unilaterally act for a corporation, but he has continued doing so. *Weskan Agency, LLC v. CGB Diversified Servs., Inc.*, 2019 WL 1450527, at *3 (D. Idaho Mar. 31, 2019). Worst of all, AIA improperly advanced over $2 million in costs for other cases, which the Defendants are improperly seeking to recover in part here as confirmed by the billing entries. (Dkts. 211 ¶¶22–37, 1314-3–1314-7, 1260-8 at 125, 143–157.)

The effort to blame Miesen and his attorneys for defendants' vast legal expenses is unjustified as the following analogy shows. Imagine a man who is president of a bank, its sole board member, and largest shareholder who steals a million dollars from the bank and this is finally discovered. The innocent shareholders sue derivatively to recover the stolen funds. They recover the million and ask for an award of attorney fees and costs. The thief responds that this should be denied because the bank has gained nothing since he had the bank pay his million dollars in attorney fees and the shareholders are to blame for this because they sued him. The victim is never the cause of the wrongdoer's legal bills. The wrongdoer is. Imagine a rapist at his sentencing arguing that he has suffered enough because the victim brought charges and she is the cause of his large legal bills. The victim is never the cause of the wrongdoer's legal expenses.

Courts in derivative actions have recognized this and have sometimes required defendants

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - 7

to reimburse a derivative plaintiff for fees paid. "In the instant case we think the individual defendants, 'according to equitable rules and principles,' could be properly required to pay either all or part of the costs and solicitor's fees." *Ross v. 311 North Central Ave. Bldg. Corp.*, 264 N.E.2d 406, 415 (Ill. Ct. App. 1970); *Grizzard v. Petkas*, 327 S.E.2d 514, 515 (Ga. Ct. App. 1985). This principle of law is consistent with the broad equitable relief available under Idaho law to require the Individual Defendants to reimburse AIA for all attorneys' fees and costs advanced and incurred in this case,[12] which would largely render moot the Defendants' arguments. *E.g., Dickens v. Heston*, 21 P.2d 905, 909–10 (Idaho 1933) ("If there is vice in the transaction, the law . . . will compel him to give back that which he has taken with unclean hands.").

Thus, Miesen and his attorneys have succeeded in producing and preserving $1,520,474.88, plus accrued interest, available for distribution to those found entitled to a portion of it which should not include any of the wrongdoers. *E.g.,* 13 Fletcher Cyc. Corp. § 6028 (2024).

As previously shown in this and prior briefing there are a variety of legal means to award fees and costs to Miesen's attorneys, and the facts, law and justice fully justify the requested award. It would be unjust to allow anyone to benefit from Miesen's attorneys' time and over $400,000 in advanced costs which secured the over $1.5 million held by this Court without compensating Miesen's attorneys for their time and costs.

**B.**    In addition, Defendants argument that Miesen has not provided a substantial benefit because AIA Services has incurred "nearly $975,000" in fees is meritless for the following reasons.

---

[12] *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991); *Lunneborg v. My Fun Life*, 421 P.3d 187, 198 (Idaho 2018); *Schmidt v. Huston*, 470 P.3d 1129, 1133 (Idaho 2016); *Gilbert v. Nampa Sch. Dist. No. 131*, 657 P.2d 1, 9 (Idaho 1983); *Rowe v. Burrup*, 518 P.2d 1386, 1389 (Idaho 1974); *Dickens v. Heston*, 21 P.2d 905, 909–10 (Idaho 1933); I.C. § 1-1603; *In re Bertuccio*, No. 04–56255, 2009 WL 3380605, at *10 (Bankr. N.D. Cal. 2009); *Goodman v. Njust*, 622 P.2d 761, 762 (Or. Ct. App. 1981); *North Pac. Lumber Co. v. Oliver*, 596 P.2d 931, 946 (Or. 1979).

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - 8

Defendants still have "not cited any legal authority" that their fees and costs are relevant. *Anderton v. Avery Fin. Servs.*, No. 4:10–cv–00392, 2011 WL 4584979 at *5 (D. Idaho Aug. 23, 2011). Defendants' rationale would cause all defendants to run up their fees and costs to show the plaintiffs did not provide a substantial benefit. This is why courts consider the gross recoveries and <u>not</u> the defendants' fees and costs. *E.g.*, *Cattano v. Bragg*, 727 S.E.2d 625, 631–32 (Va. 2012) ("substantial benefit" after a $234,000 recovery that made up one-quarter of the company's gross revenue and affirming the award of $289,228.71 in fees, costs, and expert fees, which *exceeded* the recovery); *Millsap v. Lane*, 706 S.W.2d 378, 443 (Ark. 1986) (rejecting a contingent liability); *Shlensky v. Dorsey*, 574 F.2d 131, 145 (3d Cir. 1978) (rejecting a corporation's indemnity obligations); *Crandon Capital Partners v. Shelk*, 181 P.3d 773, 780 (Or. Ct App. 2008); *Crandon Capital Partners v. Shelk*, 157 P.3d 176, 183 (Or. 2007); *Elite of New York Cars, Ltd. v. Zarbhanelian*, 215 A.D.2d 429, 430 (N.Y. 1995) (affirming the award of fees and costs when a $250,000 debt was forgiven).

Here, the over $1.5 million in settlement funds are almost *30 times* AIA's reported revenues of $50,932 generated in 2021, and Miesen seeks a voluntarily reduced award of attorneys' fees and costs that are less than two-thirds of the total recoveries. (Dkts. 1242-4 at 3, 1315-6.) Also, Miesen was able to extricate AIA from the $26,620,874.10 owed to GemCap, and he preserved the over $1.5 from being seized by GemCap and its bankruptcy trustee. (Dkts. 1315-2 ¶¶7, 9, 40–41, 59(j), 1315-4 at 12, 1315-5 at 8.) Defendants caused their $891,759.86 in fees, which are irrelevant, except to show Miesen's are reasonable since his counsel performed much more work and Miesen is seeking far less in attorney's fees. Also, the plain meaning of I.C. § 30-29-746(1) does not state defense costs should be considered. This is why "[c]ourts have consistently approved attorneys' fees and expenses . . . where . . . no monetary relief" was obtained. *In re Taronis Tech.,*

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - 9

*Inc.*, No.: CV-19-04547, 2021 WL 842137, at *3 (D. Ariz. Mar. 5, 2021).

Assuming the 2021 settlement agreement with GemCap was authorized (*see* Section A #5), Miesen would still be entitled to fees and costs, which is another reason defense costs are irrelevant. *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 432–33 (Del. 2012); *Crain v. Crain*, 708 S.W.3d 356, 374 (Ark. 2025). Defendants did what Miesen had demanded back in 2016, which was to "extricate [AIA] from the settlement agreements entered into with GemCap" that led to an over $26 million debt. (Dkts. 1131-5 at 3 ¶4, 1131-6 at 5–6 ¶17, 1315 at 12.) Miesen's claims were meritorious when filed—Judge Dale declined to dismiss these claims when GemCap made a motion to do so. (Dkts. 128 at 21–48, 263.) Thus, Miesen should still be awarded fees and costs.[13]

**C.**    Defendants argue fees and costs should not be awarded or should be reduced under the common fund doctrine. (Dkt. 1223 at 14–18.) Their arguments are meritless.

Defendants offer no viable reason why the Idaho Supreme Court would not extend the common doctrine and award 40% here. "The rationales for awarding fees at or below the 25% benchmark in some cases—i.e. to avoid a windfall for . . . counsel— do not apply here. As detailed [below], the hours . . . counsel reasonably spent on this case and the relevant factors support the requested fee award." *In re In re Lidoderm Antitrust Litig.,* 2018 WL 4620695, at *4 (N.D. Cal. Sept. 20, 2018). Miesen's counsel estimated that he incurred $612,000 in fees (over 1,800 hours @ $340 per hour) in achieving the settlement with GemCap and $1,054,000 in fees (over 3,100 hours @ $340 per hour) in achieving the settlement with the Haley Troxell Defendants—for a

---

[13] Miesen objects to Defendants' arguments lacking support or authority. For example,  Miesen was not "seeking $90 million in damages," Dkt. 1323 at 12, as previously stated. (Dkts. 1252 at 2 & 15, 1260-1 ¶8, 1260-8.) Miesen's damages contained alternative and/or duplicative items. (E.g., Dkt. 1260-8 at 113 n.4, 114–115, 134–137, 162–163.) Miesen has always taken viable positions in good faith, even if some were rejected. (Dkts. 67–1324.) As seen in Dkt. 1324-1 (excluding motions for extensions, extra pages, etc.), Miesen's attorneys have lost only thirteen or 22.4% of their 58 substantive motions, excluding two denials later reversed and one other. (Dkt. 704).

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - 10

grant total of $1,666,000 in fees. (Dkts. 1242-2 ¶13, 1315-2 ¶30.) *In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1450 (N.D. Cal. 1994). Miesen's attorneys are only seeking $617,573.76 in fees so funds can be hopefully be left for the innocent stakeholders.

Defendants disregard that the Idaho Supreme Court has never adopted "lodestar" or any of the percentage of the settlement fund benchmarks established in federal courts. *Perkins v. U.S. Transformer West*, 974 P.2d 73, 76 (Idaho 1999). Instead, the Idaho Supreme Court has held the benefiting parties must pay their "proportionate share" of the fees and costs. *Wensman v. Farmers Ins. Co. of Idaho*, 997 P.2d 609, 612 (Idaho 2000). There is no reason the Idaho Supreme Court would depart from the requirement that the "proportionate share" of attorney's fees and costs must be paid. *Wensman v. Farmers Ins. Co. of Idaho*, 997 P.2d 609, 613 (Idaho 2000).

In situations like this case, the 25% benchmark are often not applied. In cases like ours that go on for many years without the attorneys receiving any compensation, courts have awarded bigger percentages. *See, e.g., In re Lidoderm*, 2018 WL 4620695, at *4 (collecting cases awarding 32% and 33 1/3% with multipliers). Miesen's counsel has waited almost thirteen years for a payment of the attorneys' fees and the repayment of some of the over $400,000 in costs incurred in obtaining the settlements. Miesen's requested fees and costs are extremely reasonable considering the length of this case, the over $400,000 in costs (plus the lost use of those funds for many years), the intensity of the litigation, the purely contingent fee nature of the case, and based on being less than the hourly rates. (Dkts. 1315-1 at 10; *see* Dkts. 67–1324.)

**D.**    Defendants argue, by relying on distinguishable cases, Miesen is not entitled to fees and costs because he failed to make a demand as required by I.C. § 30-29-742. (Dkt. 1323 at 8–11.)

Miesen complied with the plain words of I.C. § 30-29-742 and Fed. R. Civ. P. 23.1. Five written derivative demands were served on AIA's board over a period of years. (Dkts. 1131-2–

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - 11

1131-6.) Miesen waited well over 90 days after each demand was served before filing any complaint based on that demand. (Dkts. 1, 23, 137, 211.) Each of those complaints was verified and contained the information required by I.C. § 30-29-742 and Rule 23.1. *Id.*   Thus, Miesen complied with the plain words of I.C. § 30-29-742. Also, the plain words of I.C. § 30-29-742 do not state that demands must include all claims and all facts. (Dkt. 1203.) Thus, Miesen substantially complied with I.C. § 30-29-742 for purposes of his request for attorneys' fees and costs. *Idahoans for Open Primaries v. Labrador*, 533 P.3d 1262, 1274 (Idaho 2023).

Miesen's most recent request is based on the attorneys' fees and costs in extricating AIA from the $26 million debt to GemCap. Thus, Miesen preserved the over $1.5 million in settlement funds from GemCap and its bankruptcy trustee. (Dkt. 1315-1 at 7–18.) GemCap did not join in the motion to dismiss. This Court never found that Miesen's derivative demands were inadequate for GemCap, nor did it dismiss those derivative claims. (Dkt. 1203.) This is dispositive.

Defendants omit from their response that the case proceeded for the bulk of its life without any findings that the derivative demands were inadequate. (Dkts. 12-1 at 3–10, 17 at 11–12, 46, 185 at 3–8, 210 at 6–20.) Then, almost 12 years after this case was filed and over five years after Judge Dale's decision finding the derivative demands were adequate, this Court found the demands inadequate based on "changed circumstances." (Dkt. 1203 at 50.) Those "changed circumstances" was the Ninth Circuit's unpublished decision in *Miesen v. Munding*, which did not even exist until many years after Misen's derivative demands had been served and his complaints had been filed here. (Dkt. 1203.) Defendants *untimely* joined the Hawley Troxell Defendants' motion without offering any arguments as to why this Court should reconsider and they have still failed to do so. (Dkts. 210, 1067-1, 1090, 1131.) *Zeyen v. Bonneville Joint Dist.*, # 93, 114 F.4th 1129, 1136–39 (9th Cir. 2024). The Hawley Troxell Defendants were clear they were not addressing the adequacy

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - 12

of the demands for the Defendnats. (Dkt. 1138.) If the demands were so obviously inadequate, it is notable that Mr. Glynn did not seek dismissal shortly after appearing in 2018. (Dkts. 515, 545.) Indeed, the privileged documents produced confirm the demands were adequate. (Dkt. 1330-14.)

**E.**    Defendants argue that Miesen's costs are not recoverable under federal rules, but Miesen is seeking costs under I.C. § 30-29-746(1) and the common fund doctrine pursuant to Idaho law.

I.C. § 30-29-746(1) broadly states that all "reasonable expenses, including counsel fees" are awardable. Under Idaho law, the "proportionate share" of the costs must be paid. *Wensman v*, 997 P.2d at 612. The categories of costs requested by Miesen are appropriate and other courts agree. *In re Omnivision Tech., Inc.*, 559 F. Supp. 2d 1036, 1048 (N.D. Cal. 2008); *In re Lidoderm*, 2018 WL 4620695, at *4. Defendants here argue certain costs are not recoverable, but their argument has no merit because they also seek these types of costs. (Dkts. 1314-1–1314-12.) Miesen is not directly seeking costs for Westlaw, paralegal fees, or interest. (Dkt. 1315-7). These and others are raised as back-up costs to ensure the full $380,621.23 is awarded (Dkt. 1315-2 ¶¶59(k)–(s)), and paralegal fees are now recoverable under I.R.C.P. 54(e)(1). Miesen's counsel submitted a spreadsheet and eleven pages of sworn testimony describing each cost item and the reason it was incurred. (Dkts. 1315-2 ¶¶59(a)–(s), 60, 1315-7.) *Lola L. Cazier Revocable Tr. v. Cazier*, 468 P.3d 239, 249 (Idaho 2020). Miesen has provided the required information.

Miesen has prevailed through his settlements. It would be unjust to allow anyone to benefit from Miesen's attorneys' time and over $400,000 in advanced costs which secured the over $1.5 million held by this Court without compensating Miesen's attorneys for their time and costs. This Court should approve the payment of $617,573.76 in fees and $380,621.23 in costs, which have been reduced so that funds might be available for the innocent stakeholders. This award would still leave to the benefit of AIA much more than it has had in total revenues over the past five years.

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - 13

DATED:  This 22nd day of July 2025.

RODERICK BOND LAW OFFICE, PLLC

By:    */s/ Roderick C. Bond*
       Roderick C. Bond
       Attorney for the Plaintiff Dale L. Miesen

ANDREW SCHWAM LAW FIRM

By:    */s/ Andrew Schwam*
       Andrew Schwam
       Attorney for the Plaintiff Dale L. Miesen

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of July 2025, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Jeffrey A. Thomson:    jat@elamburke.com
Loren C. Ipsen:    lci@elamburke.com
Joyce A. Hemmer:    jah@elamburke.com
Bradley S. Keller:    bkeller@byrneskeller.com
Alyson A. Foster:    alyson@dempseyfoster.com
Tyler S. Waite:    twaite@campbell-bissell.com
Michael S. Bissell:    mbissell@campbell-bissell.com
Daniel L. Glynn:    dglynn@idalaw.com
Andrew Schwam:    amschwam@turbonet.com
Kim J Trout:    ktrout@trout-law.com
Markus William Louvier:    mlouvier@ecl-law.com
James B. King:    jking@ecl-law.com

                    */s/ Roderick C. Bond*
                    Roderick C. Bond

REPLY ISO MIESEN'S 2nd MOTION TO APPROVE FEES & COSTS - 14

**21-ER-5368**

**KIM J. TROUT, ISB #2468**
TROUT & JONES, PLLC
3778 N. Plantation River Dr., Ste. 101
Boise, ID  83703
Telephone (208) 577-5755
Facsimile (208) 577-5756
service@trout-law.com

Attorneys for Defendant AIA Services Corporation & AIA Insurance, Inc.

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>           Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY, LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation; CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>           Defendants. | Case No. 1:10-CV-404-DCN-CWD<br><br>**TROUT & JONES, PLLC'S APPLICATION FOR PAYMENT OF FEES AND COSTS** |

**Trout & Jones, PLLC's Application for Payment of Fees and Costs | Page 1**

21-ER-5369

COMES NOW, Trout & Jones, PLLC and hereby requests the Court enter an order and disburse the sum of $79,530.65 to Trout Law, PLLC for the payment of outstanding fees incurred in representing AIA Services Corporation and AIA Insurance, Inc.

### ARGUMENT

Trout & Jones, PLLC (formerly Trout Law, PLLC) was retained on behalf of AIA Insurance, Inc. And AIA Services Corporation (the "AIA Entities").  On December 22, 2021, Trout Law, PLLC ("Trout Law") entered its appearance on behalf of the AIA Parties (Dkt 1184).  Trout Law made its appearance on the basis that, and pursuant to Plaintiff's request, the Court entered a Notice of Intent (Dkt 1180) wherein the Court advised the AIA Parties that "[o]n September 12, 2019, when the last set of attorneys withdrew from representing the AIA Entities, this Court ordered that [the AIA Entities] needed to appoint another attorney."  The Court further advised the AIA Entities of its intent to "enter default against them… if they do not appoint an attorney and make an appearance within twenty-one days of this Notice." *Id.* at p. 2.  This followed the demand by Miesen, through its counsel of record, that the AIA Entities had to secure counsel.

Following the Notice of Intent, Trout Law was retained and has participated in this case on behalf of the AIA Entities.  Mr. Miesen has previously acknowledged that the settlement proceeds are an asset of the AIA Entities.  In this matter, John Taylor has individually paid over $30,000 in fees and costs to Trout Law, PLLC for its representation of the AIA Entities.  However, Trout Law, PLLC has an outstanding balance, on this matter, of $79,530.65, which is for time entries that date as far back as May 2022.  Rather than withdrawing as counsel, the undersigned has chosen to stay engaged representing the AIA Entities by asserting Miesen's claims, especially as against the AIA Entities, are derivative in nature. (Dkt. 1209). The Court has made that finding (Dkt. 1301) and entered subsequent a subsequent judgment.

**Trout & Jones, PLLC's Application for Payment of Fees and Costs | Page 2**

**21-ER-5370**

As advised in Dkt. 1209, the AIA Entities stated they would be "filing a Motion for Attorney's Fes which motion is assumed to be one to be decided at a time to be determined by the Court." Here, it is unreasonable to ask Trout & Jones, PLLC to continue its representation of the AIA Entities, including responding to Miesen's myriad of filings such as the Motion for Writ of Mandamus and pending appeal, without further compensation. These bills were incurred after May 2022 and directly correspond to responding to Miesen's filings and/or the Court's subsequent request for additional briefing.

Following the Court's entry of Dkt. 1301 and subsequent judgment(s), the AIA Entities jointly filed a memorandum of fees and costs (Dkt. 1314). The AIA Entities are not asking the Court to rule on those pending motions, however as the Plaintiff has alleged and is aware of, the settlement proceeds which the Court is retaining is the primary asset of the AIA Entities. The AIA Entities are unable to pay their attorney for work which was necessitate by the Plaintiff, and therefore it is appropriate for the Court to order payment to Trout & Jones, PLLC for work performed in this matter and which has been unpaid since 2022.

The Court has ordered, pursuant to FRCP 67, settlement funds from the Hawley Troxell Enniss & Hawley settlement to be deposited into an interest-bearing account. This settlement was approved by the Court and was directed to be deposited into the Court's registry (Dkt. 1235). The Settlement Agreement (Dkt. 1208-1) explicitly states that the "Settlement Payment, which is for the benefit of the AIA Entities". Pursuant to FRCP 67(b), the AIA Entities are requesting the Court order payment to Trout & Jones, PLLC for its representation of the AIA Entities.

**CONCLUSION**

Trout & Jones, PLLC requests the Court order the Clerk of the Court to issue a check to Trout & Jones, PLLC in the amount of $79,530.65 for the outstanding invoices incurred to date.

DATED January 14, 2026.

TROUT & JONES, PLLC


     /s/ Kim J. Trout
Kim J. Trout
Attorney for Defendants AIA Services
Corporation and AIA Insurance, Inc.

**21-ER-5372**

**KIM J. TROUT, ISB #2468**
TROUT & JONES, PLLC
3778 N. Plantation River Dr., Ste. 101
Boise, ID  83703
Telephone (208) 577-5755
Facsimile (208) 577-5756
service@trout-law.com

Attorneys for Defendant AIA Services Corporation & AIA Insurance, Inc.

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>             Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY, LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation; CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>             Defendants. | Case No. 1:10-CV-404-DCN-CWD<br><br>**DECLARATION OF KIM J. TROUT IN SUPPORT OF TROUT & JONES, PLLC'S APPLICATION FOR PAYMENT OF FEES AND COSTS** |

**Declaration of Kim J. Trout in Support of Trout & Jones, PLLC's Application for Payment of Fees and Costs | Page 1**

I, Kim J. Trout, declare:

1.     I am counsel for Defendants Defendant AIA Services Corporation & AIA Insurance, Inc. and have personal knowledge of the statements made herein.

2.     Trout & Jones, PLLC (formerly Trout Law, PLLC) was retained on behalf of AIA Insurance, Inc. And AIA Services Corporation (the "AIA Entities").

3.     On December 22, 2021, Trout Law, PLLC ("Trout Law") entered its appearance on behalf of the AIA Parties (Dkt 1184).  Trout Law made its appearance due to the Notice of Intent (Dkt 1180) wherein the Court advised the AIA Parties that "[o]n September 12, 2019, when the last set of attorneys withdrew from representing the AIA Entities, this Court ordered that [the AIA Entities] needed to appoint another attorney."  This followed the demand by Miesen, through its counsel of record, that the AIA Entities had to secure counsel.

4.     Following the Notice of Intent, Trout Law was retained and has participated in this case on behalf of the AIA Entities.  Mr. Miesen has previously acknowledged that the settlement proceeds are an asset of the AIA Entities.

5.     John Taylor has personally paid over $30,000 in fees to Trout Law, PLLC for its representation of the AIA Entities.  However, Trout Law, PLLC has an outstanding balance of $79,530.65, which include time entries back as far as May 2022.

6.     It is unreasonable to ask Trout & Jones, PLLC to continue to represent the AIA Entities, without further compensation.  The work directly corresponds to responding to Miesen's filings and/or the Court's subsequent request for additional briefing.

7.     Attached hereto as Exhibit 1 is a true and correct copy of the Statement of Account from my firms' accounting department showing the invoices and the payments received.

**Declaration of Kim J. Trout in Support of Trout & Jones, PLLC's Application for Payment of Fees and Costs | Page 2**

**21-ER-5374**

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF IDAHO THAT THE FOREGOING IS TRUE AND CORRECT.

DATED January 14, 2026.

TROUT & JONES, PLLC

_/s/ Kim J. Trout_
Kim J. Trout
Attorney for Defendants AIA Services
Corporation and AIA Insurance, Inc.

**Declaration of Kim J. Trout in Support of Trout & Jones, PLLC's Application for Payment of Fees and Costs | Page 3**

**21-ER-5375**

EXHIBIT 1

# EXHIBIT 1

**21-ER-5376**

**Trout & Jones, PLLC**

# Statement of Account

3778 Plantation River Dr., Ste. 101
Boise, ID 83703
Phone: (208) 577-5755
Fax: (208) 577-5756
www.trout-law.com

Mr. John Taylor

01/13/2026

## 278-00001: CROPUSA

Billing Method: Hourly
Responsible Attorney: Kim Trout

| Date | Activity | Due Date | Invoice Amount | Payments | Balance |
|---|---|---|---|---|---|
| | Opening Balance | | | | $0.00 |
| 03/10/2021 | Invoice #1393 | 04/09/2021 | $472.00 | | $472.00 |
| 06/16/2021 | Invoice #1429 | 07/16/2021 | $14,964.00 | | $15,436.00 |
| 07/12/2021 | Invoice #1445 | 08/11/2021 | $11,119.50 | | $26,555.50 |
| 07/12/2021 | Credits applied to invoice #1393 | | | $472.00 | $26,083.50 |
| 07/12/2021 | Credits applied to invoice #1429 | | | $14,964.00 | $11,119.50 |
| 07/12/2021 | Credits applied to invoice #1445 | | | $36.00 | $11,083.50 |
| 08/24/2021 | Payment on invoice #1445 | | | $5,119.50 | $5,964.00 |
| 10/25/2021 | Invoice #1584 | 11/25/2021 | $27,898.00 | | $33,862.00 |
| 04/14/2022 | Payment on invoice #1445 | | | $5,964.00 | $27,898.00 |
| 04/14/2022 | Credits applied to invoice #1584 | | | $5,000.00 | $22,898.00 |
| 06/14/2022 | Payment on invoice #1584 | | | $4,036.00 | $18,862.00 |

**Balance Due:** **$18,862.00**

**Overdue Balance:** **$18,862.00**

## 278-00002: AIA-Meisen

Billing Method: Hourly
Responsible Attorney: Kim Trout

| Date | Activity | Due Date | Invoice Amount | Payments | Balance |
|---|---|---|---|---|---|
| | Opening Balance | | | | $0.00 |
| 05/17/2022 | Invoice #1552 | 06/16/2022 | $16,285.00 | | $16,285.00 |
| 05/23/2022 | Invoice #1554 | 06/22/2022 | $2,762.50 | | $19,047.50 |

21-ER-5377

| 06/24/2022 | Credits applied to invoice #1552 | | | $16,285.00 | $2,762.50 |
|---|---|---|---|---|---|
| 06/24/2022 | Credits applied to invoice #1554 | | | $2,762.50 | $0.00 |
| 08/17/2022 | Invoice #1605 | 09/16/2022 | $4,042.50 | | $4,042.50 |
| 08/25/2022 | Payment on invoice #1605 | | | $4,042.50 | $0.00 |
| 10/13/2022 | Invoice #1610 | 11/12/2022 | $27,870.50 | | $27,870.50 |
| 10/14/2022 | Invoice #1635 | 11/13/2022 | $7,810.00 | | $35,680.50 |
| 12/13/2022 | Credit card payment on invoice #1610 | | | $10,000.00 | $25,680.50 |
| 02/08/2023 | Invoice #1686 | 03/10/2023 | $3,308.50 | | $28,989.00 |
| 06/29/2023 | Invoice #1766 | 07/29/2023 | $1,750.00 | | $30,739.00 |
| 09/07/2023 | Invoice #1814 | 10/07/2023 | $840.00 | | $31,579.00 |
| 10/05/2023 | Payment on invoice #1814 | | | $840.00 | $30,739.00 |
| 01/24/2024 | Invoice #1894 | 02/23/2024 | $4,095.00 | | $34,834.00 |
| 02/24/2024 | Interest charge on invoice #1894 | 03/25/2024 | $60.58 | | $34,894.58 |
| 03/25/2024 | Interest charge on invoice #1894 | 04/24/2024 | $60.58 | | $34,955.16 |
| 04/10/2024 | Invoice #1987 | 05/10/2024 | $6,055.00 | | $41,010.16 |
| 04/24/2024 | Interest charge on invoice #1894 | 05/24/2024 | $60.58 | | $41,070.74 |
| 05/11/2024 | Interest charge on invoice #1987 | 06/10/2024 | $89.58 | | $41,160.32 |
| 05/24/2024 | Interest charge on invoice #1894 | 06/23/2024 | $60.58 | | $41,220.90 |
| 06/10/2024 | Interest charge on invoice #1987 | 07/10/2024 | $89.58 | | $41,310.48 |
| 06/23/2024 | Interest charge on invoice #1894 | 07/23/2024 | $60.58 | | $41,371.06 |
| 07/10/2024 | Interest charge on invoice #1987 | 08/09/2024 | $89.58 | | $41,460.64 |
| 07/23/2024 | Interest charge on invoice #1894 | 08/22/2024 | $60.58 | | $41,521.22 |
| 08/09/2024 | Interest charge on invoice #1987 | 09/08/2024 | $89.58 | | $41,610.80 |
| 08/22/2024 | Interest charge on invoice #1894 | 09/21/2024 | $60.58 | | $41,671.38 |
| 09/08/2024 | Interest charge on invoice #1987 | 10/08/2024 | $89.58 | | $41,760.96 |
| 09/21/2024 | Interest charge on invoice #1894 | 10/21/2024 | $60.58 | | $41,821.54 |
| 10/08/2024 | Interest charge on invoice #1987 | 11/07/2024 | $89.58 | | $41,911.12 |
| 10/21/2024 | Interest charge on invoice #1894 | 11/20/2024 | $60.58 | | $41,971.70 |
| 11/07/2024 | Interest charge on invoice #1987 | 12/07/2024 | $89.58 | | $42,061.28 |
| 11/20/2024 | Interest charge on invoice #1894 | 12/20/2024 | $60.58 | | $42,121.86 |
| 11/27/2024 | Invoice #2404 | 12/27/2024 | $110.00 | | $42,231.86 |
| 12/07/2024 | Interest charge on invoice #1987 | 01/06/2025 | $89.58 | | $42,321.44 |
| 12/20/2024 | Interest charge on invoice #1894 | 01/19/2025 | $60.58 | | $42,382.02 |

21-ER-5378

| 12/28/2024 | Interest charge on invoice #2404 | 01/27/2025 | $1.63 | $42,383.65 |
| 01/06/2025 | Interest charge on invoice #1987 | 02/05/2025 | $89.58 | $42,473.23 |
| 01/19/2025 | Interest charge on invoice #1894 | 02/18/2025 | $60.58 | $42,533.81 |
| 01/27/2025 | Interest charge on invoice #2404 | 02/26/2025 | $1.63 | $42,535.44 |
| 02/05/2025 | Interest charge on invoice #1987 | 03/07/2025 | $89.58 | $42,625.02 |
| 02/17/2025 | Invoice #2638 | 03/19/2025 | $1,687.50 | $44,312.52 |
| 02/18/2025 | Interest charge on invoice #1894 | 03/20/2025 | $60.58 | $44,373.10 |
| 02/26/2025 | Interest charge on invoice #2404 | 03/28/2025 | $1.63 | $44,374.73 |
| 03/07/2025 | Interest charge on invoice #1987 | 04/06/2025 | $89.58 | $44,464.31 |
| 03/20/2025 | Interest charge on invoice #1894 | 04/19/2025 | $60.58 | $44,524.89 |
| 03/20/2025 | Interest charge on invoice #2638 | 04/19/2025 | $24.97 | $44,549.86 |
| 03/28/2025 | Interest charge on invoice #2404 | 04/27/2025 | $1.63 | $44,551.49 |
| 04/06/2025 | Interest charge on invoice #1987 | 05/06/2025 | $89.58 | $44,641.07 |
| 04/19/2025 | Interest charge on invoice #1894 | 05/19/2025 | $60.58 | $44,701.65 |
| 04/19/2025 | Interest charge on invoice #2638 | 05/19/2025 | $24.97 | $44,726.62 |
| 04/25/2025 | Invoice #2900 | 05/25/2025 | $1,480.00 | $46,206.62 |
| 04/27/2025 | Interest charge on invoice #2404 | 05/27/2025 | $1.63 | $46,208.25 |
| 05/06/2025 | Interest charge on invoice #1987 | 06/05/2025 | $89.58 | $46,297.83 |
| 05/19/2025 | Interest charge on invoice #1894 | 06/18/2025 | $60.58 | $46,358.41 |
| 05/19/2025 | Interest charge on invoice #2638 | 06/18/2025 | $24.97 | $46,383.38 |
| 05/26/2025 | Interest charge on invoice #2900 | 06/25/2025 | $21.90 | $46,405.28 |
| 05/27/2025 | Interest charge on invoice #2404 | 06/26/2025 | $1.63 | $46,406.91 |
| 06/05/2025 | Interest charge on invoice #1987 | 07/05/2025 | $89.58 | $46,496.49 |
| 06/18/2025 | Interest charge on invoice #1894 | 07/18/2025 | $60.58 | $46,557.07 |
| 06/18/2025 | Interest charge on invoice #2638 | 07/18/2025 | $24.97 | $46,582.04 |
| 06/19/2025 | Invoice #3057 | 07/19/2025 | $405.00 | $46,987.04 |
| 06/25/2025 | Interest charge on invoice #2900 | 07/25/2025 | $21.90 | $47,008.94 |
| 06/26/2025 | Interest charge on invoice #2404 | 07/26/2025 | $1.63 | $47,010.57 |
| 07/05/2025 | Interest charge on invoice #1987 | 08/04/2025 | $89.58 | $47,100.15 |
| 07/18/2025 | Interest charge on invoice #1894 | 08/17/2025 | $60.58 | $47,160.73 |
| 07/18/2025 | Interest charge on invoice #2638 | 08/17/2025 | $24.97 | $47,185.70 |
| 07/20/2025 | Interest charge on invoice #3057 | 08/19/2025 | $5.99 | $47,191.69 |
| 07/25/2025 | Invoice #3201 | 08/24/2025 | $14,588.50 | $61,780.19 |

**21-ER-5379**

| 07/25/2025 | Interest charge on invoice #2900 | 08/24/2025 | $21.90 | $61,802.09 |
| 07/26/2025 | Interest charge on invoice #2404 | 08/25/2025 | $1.63 | $61,803.72 |
| 08/04/2025 | Interest charge on invoice #1987 | 09/03/2025 | $89.58 | $61,893.30 |
| 08/17/2025 | Interest charge on invoice #1894 | 09/16/2025 | $60.58 | $61,953.88 |
| 08/17/2025 | Interest charge on invoice #2638 | 09/16/2025 | $24.97 | $61,978.85 |
| 08/19/2025 | Interest charge on invoice #3057 | 09/18/2025 | $5.99 | $61,984.84 |
| 08/24/2025 | Interest charge on invoice #2900 | 09/23/2025 | $21.90 | $62,006.74 |
| 08/25/2025 | Interest charge on invoice #2404 | 09/24/2025 | $1.63 | $62,008.37 |
| 08/25/2025 | Interest charge on invoice #3201 | 09/24/2025 | $215.83 | $62,224.20 |
| 09/03/2025 | Interest charge on invoice #1987 | 10/03/2025 | $89.58 | $62,313.78 |
| 09/12/2025 | Invoice #3449 | 10/12/2025 | $4,635.00 | $66,948.78 |
| 09/16/2025 | Interest charge on invoice #1894 | 10/16/2025 | $60.58 | $67,009.36 |
| 09/16/2025 | Interest charge on invoice #2638 | 10/16/2025 | $24.97 | $67,034.33 |
| 09/18/2025 | Interest charge on invoice #3057 | 10/18/2025 | $5.99 | $67,040.32 |
| 09/23/2025 | Interest charge on invoice #2900 | 10/23/2025 | $21.90 | $67,062.22 |
| 09/24/2025 | Interest charge on invoice #2404 | 10/24/2025 | $1.63 | $67,063.85 |
| 09/24/2025 | Interest charge on invoice #3201 | 10/24/2025 | $215.83 | $67,279.68 |
| 10/03/2025 | Interest charge on invoice #1987 | 11/02/2025 | $89.58 | $67,369.26 |
| 10/08/2025 | Invoice #3602 | 11/07/2025 | $8,015.00 | $75,384.26 |
| 10/13/2025 | Interest charge on invoice #3449 | 11/12/2025 | $68.57 | $75,452.83 |
| 10/16/2025 | Interest charge on invoice #1894 | 11/15/2025 | $60.58 | $75,513.41 |
| 10/16/2025 | Interest charge on invoice #2638 | 11/15/2025 | $24.97 | $75,538.38 |
| 10/18/2025 | Interest charge on invoice #3057 | 11/17/2025 | $5.99 | $75,544.37 |
| 10/23/2025 | Interest charge on invoice #2900 | 11/22/2025 | $21.90 | $75,566.27 |
| 10/24/2025 | Interest charge on invoice #2404 | 11/23/2025 | $1.63 | $75,567.90 |
| 10/24/2025 | Interest charge on invoice #3201 | 11/23/2025 | $215.83 | $75,783.73 |
| 11/02/2025 | Interest charge on invoice #1987 | 12/02/2025 | $89.58 | $75,873.31 |
| 11/08/2025 | Interest charge on invoice #3602 | 12/08/2025 | $118.58 | $75,991.89 |
| 11/11/2025 | Invoice #3790 | 12/11/2025 | $1,575.00 | $77,566.89 |
| 11/12/2025 | Interest charge on invoice #3449 | 12/12/2025 | $68.57 | $77,635.46 |
| 11/15/2025 | Interest charge on invoice #1894 | 12/15/2025 | $60.58 | $77,696.04 |
| 11/15/2025 | Interest charge on invoice #2638 | 12/15/2025 | $24.97 | $77,721.01 |
| 11/17/2025 | Interest charge on invoice #3057 | 12/17/2025 | $5.99 | $77,727.00 |

21-ER-5380

| 11/22/2025 | Interest charge on invoice #2900 | 12/22/2025 | $21.90 | $77,748.90 |
| 11/23/2025 | Interest charge on invoice #2404 | 12/23/2025 | $1.63 | $77,750.53 |
| 11/23/2025 | Interest charge on invoice #3201 | 12/23/2025 | $215.83 | $77,966.36 |
| 12/02/2025 | Interest charge on invoice #1987 | 01/01/2026 | $89.58 | $78,055.94 |
| 12/08/2025 | Interest charge on invoice #3602 | 01/07/2026 | $118.58 | $78,174.52 |
| 12/11/2025 | Invoice #3945 | 01/10/2026 | $225.00 | $78,399.52 |
| 12/12/2025 | Interest charge on invoice #3449 | 01/11/2026 | $68.57 | $78,468.09 |
| 12/12/2025 | Interest charge on invoice #3790 | 01/11/2026 | $23.30 | $78,491.39 |
| 12/15/2025 | Interest charge on invoice #1894 | 01/14/2026 | $60.58 | $78,551.97 |
| 12/15/2025 | Interest charge on invoice #2638 | 01/14/2026 | $24.97 | $78,576.94 |
| 12/17/2025 | Interest charge on invoice #3057 | 01/16/2026 | $5.99 | $78,582.93 |
| 12/22/2025 | Interest charge on invoice #2900 | 01/21/2026 | $21.90 | $78,604.83 |
| 12/23/2025 | Interest charge on invoice #2404 | 01/22/2026 | $1.63 | $78,606.46 |
| 12/23/2025 | Interest charge on invoice #3201 | 01/22/2026 | $215.83 | $78,822.29 |
| 01/01/2026 | Interest charge on invoice #1987 | 01/31/2026 | $89.58 | $78,911.87 |
| 01/05/2026 | Invoice #4086 | 02/04/2026 | $405.00 | $79,316.87 |
| 01/07/2026 | Interest charge on invoice #3602 | 02/06/2026 | $118.58 | $79,435.45 |
| 01/11/2026 | Interest charge on invoice #3449 | 02/10/2026 | $68.57 | $79,504.02 |
| 01/11/2026 | Interest charge on invoice #3790 | 02/10/2026 | $23.30 | $79,527.32 |
| 01/11/2026 | Interest charge on invoice #3945 | 02/10/2026 | $3.33 | $79,530.65 |

**Balance Due:** **$79,530.65**

**Overdue Balance:** **$78,491.39**

Please make all amounts payable to: Trout & Jones, PLLC

**21-ER-5381**

*MARTELLE & ASSOCIATES, P.A.*
Martin J. Martelle
ISB No. 3304
380 West State Street
Eagle, ID 83616
Telephone: (208) 938-8500
Facsimile: (208) 938-8503
E-mail: attorney@martellelaw.com

*Attorney for Defendants Connie Taylor Henderson, R. John Taylor,*
*Michael W. Cashman, Sr., James Beck,*
*Crop USA Insurance Services, LLC, and*
*Crop USA Insurance, Inc.*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.; <br><br> Plaintiff, <br><br> v. <br><br> HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company, <br><br> Defendants, | Case No.  1:10-cv-00404-CWD <br><br> DEFENDANTS: CROP USA INSURANCE SERVICES, LLC.; CROP USA INSURANCE AGENCY, INC.; CONNIE TAYLOR HENDERSON; R. JOHN TAYLOR; MICHAEL W. CASHMAN SR.; AND JAMES BECK'S ANSWER TO DEFENDANT GEMCAP LENDING I, LLC'S CROSSCLAIM, COUNTER-CROSSCLAIM, AND DEMAND FOR JURY TRIAL |

1

CROSS-DEFENDANT'S ANSWER TO DEFENDANT GEMCAP'S CROSSCLAIM -

and

CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; R. JOHN TAYLOR, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual,

Defendants/Third-Party Plaintiffs,

vs.

REED TAYLOR, an individual,

Third-Party Defendant.

Defendants R. John Taylor, Connie Taylor Henderson, CropUSA Insurance Agency, Inc., CropUSA Insurance Services, LLC, Michael Cashman Sr., and James Beck ("Cross-Defendants") responses to the following *Defendant GemCap Lending I, LLC* ("GemCap") *Crossclaim* (Dkt. 273.)

Cross-Defendants deny all allegations contained in GemCap's Crossclaim except those expressly admitted herein.

## **PARTIES**

1. Answering Paragraph 1, Cross-Defendants deny that GemCap is entitled to any contribution and/or indemnification from R. John Taylor, Connie Taylor Henderson, CropUSA Insurance Agency, Inc., CropUSA Insurance Services, LLC, Michael Cashman Sr., and James Beck. Cross-defendants deny remaining allegations.

2. In answering Paragraph 2, Cross-Defendants deny all allegations contained therein.

2

CROSS-DEFENDANT'S ANSWER TO DEFENDANT GEMCAP'S CROSSCLAIM -

3. In answering Paragraph 3, Cross-Defendants admit the allegations contained therein.

4. In answering Paragraph 4, Cross-Defendants admit the allegations contained therein.

5. In answering Paragraph 5, Cross-Defendants admit the allegations contained therein.

6. In answering Paragraph 6, Cross-Defendants admit the allegations contained therein.

7. In answering Paragraph 7, Cross-Defendants admit the allegations contained therein.

8. In answering Paragraph 8, Cross-Defendants admit the allegations contained therein.

9. In answering Paragraph 9, no response is necessary as it contains no factual allegations.

10. In answering Paragraph 10, Cross-Defendants admit the allegations contained therein.

11. In answering Paragraph 11, Cross-Defendants deny the allegations contained therein.

12. In answering Paragraph 12, no response is necessary as it contains no factual allegations.

13. In answering Paragraph 13, Cross-Defendants admit the allegations contained therein.

14. In answering Paragraph 14, no response is necessary as it contains no factual allegations directed at the Cross-Defendants.

15. In answering Paragraph 15, no response is necessary as it contains no factual allegations directed at the Cross-Defendants.

## JURISDICTION

16. In answering Paragraph 16, Cross-Defendants deny all allegations contained therein.

17. In answering Paragraph 17, Cross-Defendants deny all allegations contained therein.

18. In answering Paragraph 18, Cross-Defendants deny all allegations contained therein.

## COUNT I – CONTRIBUTION/INDEMNIFICATION

19. In answering Paragraph 19, Cross-Defendants admit the allegations contained therein.

20. In answering Paragraph 20, Cross-Defendants deny the allegations contained therein.

21. In answering Paragraph 21, Cross-Defendants deny the allegations contained therein.

3

CROSS-DEFENDANT'S ANSWER TO DEFENDANT GEMCAP'S CROSSCLAIM -

22. In answering Paragraph 22, Cross-Defendants deny the allegations contained therein.

## DEMAND FOR JURY TRIAL

In answering GemCap's demand for a jury trial, Cross-Defendants deny the allegations contained therein.

## ATTORNEY'S FEES

23. Cross-Defendants deny all allegations contained in paragraph 23.

## AFFIRMATIVE DEFENSES TO CROSS-CLAIM

Cross-Defendants assert the following affirmative defenses:

1. GemCap's Crossclaim fails to state a claim upon which relief may be granted.

2. GemCap's Crossclaim contains claims that are barred by collateral estoppel/res judicata.

3. GemCap's crossclaim is barred in part or whole by the doctrine of acquiescence.

4. GemCap's Crossclaim is barred by the Statute of Limitations.

5. GemCap's Crossclaim is barred by the doctrines of waiver, laches, and estoppel.

6. GemCap's claims are barred by assumption of risk.

7. GemCap's claims are barred as it failed to mitigate its damages, if any.

8. GemCap's damages, if any, were caused by its own acts or omissions, by other parties to this lawsuit, or by non-parties, not by any act or omission by the Cross-Defendants.

9. GemCap's claims are barred by supervening events and/or the proximate cause of others.

10. GemCap's claims are barred by the doctrine of unclean hands.

11. GemCap's claims are barred by the doctrine of *in pari delicto*.

12. If in the event that GemCap is successful on its crossclaim, set-off.

13. Cross-Defendants reserve the right, after relevant discovery has taken place, to amend this answer to add additional affirmative defenses supported by the facts, and a failure to

4

CROSS-DEFENDANT'S ANSWER TO DEFENDANT GEMCAP'S CROSSCLAIM -

include all such defenses in this Answer does not constitute a waiver of any right to further amend this Answer.

## I.  COUNTER-CROSSCLAIM

1.    This is a claim for contribution against GemCap Lending I, LLC pursuant to Idaho common law and I.C. § 6-801 *et seq.* Defendants/Third-Party Plaintiffs/Cross-Defendants Crop USA Insurance Agency, Inc., Crop USA Insurance Services, LLC, Connie Henderson, R. John Taylor, Michael Cashman, and James Beck (collectively the "Cross-Defendants") seek for contribution and indemnity, whether express, implied, equitable, or otherwise, for GemCap's proportionate share of liability for claims arising from its conduct in business dealings with AIA.

2.    Nothing herein is an admission of wrongdoing by any of the Cross-Defendants or of the veracity of any claims or allegations asserted by Cross-claimant, GemCap.

## II.    PARTIES

3.    John Taylor is an Idaho citizen who has served as an officer and/or director of AIA at various times.

4.    Ms. Henderson is a Washington citizen who has served as a director of AIA at various times.

5.    Mr. Beck is a Minnesota citizen who served as a director of AIA at various times.

6.    Mr. Cashman is a Minnesota citizen who served as a director of AIA at various times.

7.    Crop USA Insurance Agency, Inc. is an Idaho corporation.

8.    Crop USA Insurance Services, LLC is an Idaho Limited Liability Company.

9.    Upon information and belief, GemCap is a California Limited Liability Company and a citizen of California.

CROSS-DEFENDANT'S ANSWER TO DEFENDANT GEMCAP'S CROSSCLAIM - 5

### III.   JURISDICTION AND VENUE

10.   This Court has subject-matter jurisdiction over Ms. Henderson, Mr. Cashman, and Mr. Beck under 28 U.S.C. § 1332 because those Cross-Defendants are not citizens of Idaho.

11.   This Court has subject-matter jurisdiction over GemCap under 28 U.S.C. §1332 and/or 28 U.S.C. § 1367(a) because GemCap is a citizen of California and the Cross-Defendants' claim is so related to Plaintiff's claims that it forms part of the same case or controversy under Article III of the U.S. Constitution.

12.   Venue is proper in this district under the doctrine of ancillary venue.

13.   Venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district under 28 U.S.C. § 1391(b)(2)

14.   The amount in controversy exceeds $75,000.00 exclusive of interest and costs

### IV.   COUNT I – CONTRIBUTION/INDEMNIFICATION

15.   GemCap and all Cross-Defendants have been named as defendants in the Third Amended Complaint filed by Plaintiff.

16.   The Cross-Defendants have denied all wrongdoing alleged against them by the Plaintiff.

17.   If the Cross-Defendants are found liable to Plaintiff, either through judgment, settlement, or otherwise, then its liability is caused by the acts or omissions of GemCap as alleged in the Third Amended Complaint and Third-Party Complaint.

18.   Cross-Defendants are therefore entitled to contribution and/or express, implied, and/or equitable indemnification from GemCap for all sums which Cross-Defendants pay or is adjudged liable to pay through settlement, judgment, or otherwise.

### V.   DEMAND FOR JURY TRIAL

6

CROSS-DEFENDANT'S ANSWER TO DEFENDANT GEMCAP'S CROSSCLAIM -

Cross-Defendant's hereby demand a trial by jury of no less that the maximum number of jurors permitted on all causes of action for which a jury is allowed by law.

### CROSS-DEFENDANT'S PRAYER FOR RELIEF

Wherefore, Cross-Defendants, prays for the following relief:

19.     GemCap's crossclaim against the Cross-Defendants be dismissed with prejudice;

20.     Cross-Defendant's be awarded attorney's fees and costs incurred in defending against GemCap's crossclaim against them under Rules 11 and 54 of the Federal Rules of Civil Procedure.

21.     The Court order further relief as may be requested or finds just.

### ATTORNEY FEES

22.      Cross-Defendants request that it be awarded their attorney fees and costs incurred herein pursuant to Idaho Code §§ 12-210(3) and 12-121, and Rules 11 and 54 of the Federal Rules of Civil Procedure.

WHEREFORE Cross-Defendants demand judgment for indemnity and/or contribution as appropriate against Gem-Cap, plus interest, attorneys' fees, and costs.

DATED: December 4, 2017

                              /s/ Martin Martelle
                              Martin Martelle
                              Attorney

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 4, 2017 I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

7

CROSS-DEFENDANT'S ANSWER TO DEFENDANT GEMCAP'S CROSSCLAIM -

Roderick Cyr Bond:   rod@roderickbond.com

James D LaRue:   jdl@elamburke.com

Jeffrey A Thomson:   jat@elamburke.com

Loren C Ipsen:   lci@elamburke.com

Martin J. Martelle:   attorney@martellelaw.com

Vanessa Ann Mooney:  vanessa@martellelaw.com

Alyson Anne Foster:   aaf@aswblaw.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated: Via first class mail, postage prepaid addressed as follows (sent by email to John Taylor on December 4, 2017):

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  83501

　　　　　　　　　　　　　　　　_____*/s/Martin Martelle*_____
　　　　　　　　　　　　　　　　Martin Martelle
　　　　　　　　　　　　　　　　Attorney

8

CROSS-DEFENDANT'S ANSWER TO DEFENDANT GEMCAP'S CROSSCLAIM -

| Date | Amount | billed/ unbilled | Description of Cost | Expert |
|---|---|---|---|---|
| 04/17/2019 | 5,000.00 | Billed | Lewis A. Remele, Jr. (expert witness retainer fee) | Remele |
| 08/08/2019 | 2,980.00 | Billed | Lewis A. Remele (expert fees) | Remele |
| 09/11/2019 | 21,160.00 | Billed | Lewis A. Remele (expert fees) | Remele |
| 10/09/2019 | 59,302.34 | Billed | Lewis Remele (expert fees) | Remele |
| 11/20/2019 | 54,640.00 | Billed | Bassford Remele (expert fees) | Remele |
| 02/20/2020 | 16,947.20 | Billed | Bassford Remele (expert fees) | Remele |
| 04/14/2020 | 5,970.00 | Billed | Bassford Remele (expert fees) | Remele |
| 10/12/2020 | 30.00 | Billed | Bassford Remele (expert fees) | Remele |
| 10/12/2020 | 2,280.00 | Billed | Bassford Remele (expert fees) | Remele |
| 02/04/2021 | 13,860.00 | Unbilled | Bassford Remele (expert fees) | Remele |
| TOTAL | 182,169.54 | | | |

| Date | Amount | billed/ unbilled | Description of Cost | Expert |
|---|---|---|---|---|
| 09/09/2019 | 10,000.00 | Billed | Herrick K. Lipstone, Jr. (retainer for expert witness) | Lidstone |
| 10/16/2019 | 7,560.00 | Billed | Burns, Figa & Will (expert fees) | Lidstone |
| 11/20/2019 | 4,140.00 | Billed | Burns, Figa & Will (expert fees) | Lidstone |
| 12/10/2019 | 4,826.00 | Billed | Burns, Figa & Will (expert fees) | Lidstone |
| 01/15/2020 | 2,486.00 | Billed | Burns, Figa & Will (expert fees) | Lidstone |
| TOTAL | 29,012.00 | | | |

| Date | Amount | billed/ unbilled | Description of Cost | Expert |
|---|---|---|---|---|
| 10/16/2019 | 12,102.50 | Billed | Coles Reinstein (expert fees) | Pinkerton |
| 11/20/2019 | 13,359.50 | Billed | Coles Reinstein (expert fees) | Pinkerton |
| 01/15/2020 | 1,402.50 | Billed | Coles Reinstein (expert fees) | Pinkerton |
| 03/17/2020 | 16,841.00 | Billed | Coles Reinstein (expert fees) | Pinkerton |
| 10/23/2020 | 2,892.75 | Billed | Coles Reinstein (expert fees) | Pinkerton |
| 11/09/2020 | 3,719.25 | Billed | Coles Reinstein (expert fees - Oct.) | Pinkerton |
| 12/15/2020 | 8,737.50 | Billed | Coles Reinstein, PLLC (expert fees) | Pinkerton |
| TOTAL | 59,055.00 | | | |

Grand Total    270,236.54

1

**Exhibit - L, p. 1**

**21-ER-5390**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| DALE L. MIESEN, an individual) who is a shareholder and who ) is also bringing this action ) on behalf of and/or in the ) right of AIA Services ) Corporation and its wholly ) owned subsidiary AIA ) Insurance, Inc., ) ) Plaintiff, ) ) vs. ) ) ) CONNIE TAYLOR HENDERSON, an ) Individual; JOLEE K. DUCLOS, ) An individual; HAWLEY TROXELL) ENNIS & HAWLEY, LLP, an Idaho) Limited liability partnership) GARY D. BABBITT, an ) Individual; D. JOHN ASHBY, an) Individual; RICHARD A. RILEY,) An individual; MICHAEL W. ) CASHMAN SR., an individual; ) JAMES BECK, an individual; ) R. JOHN TAYLOR, an individual) CROP USA INSURANCE AGENCY, ) INC., an Idaho corporation; ) AIA SERVICES CORPORATION, an ) Idaho corporation; AIA ) INSURANCE, INC.; an Idaho ) Corporation; CROP USA ) INSURANCE SERVICES, LLC; an ) Idaho limited liability ) Company; and GEMCAP LENDING ) I, LLC, a Delaware limited ) Liability company, ) ) Defendants, ) ) And all related actions. ) ) ) _____ ) | Case No. 1:10-CV-00404-DCN-CWD NONCONFIDENTIAL PORTION DEPOSITION OF R. JOHN TAYLOR VOLUME II 30(b)(6) DESIGNEE FOR AIA INSURANCE, INC. AIA SERVICES CORPORATION CROP USA INSURANCE SERVICES, LLC CROP USA INSURANCE AGENCY, INC. July 28 - 31, 2020 Lewiston, Idaho Reported by: Andrea J. Wecker, CSR #716, RDR, CRR, CRC |

**R. John Taylor (Volume II)**                    **July 28 - July 31, 2020**

DEPOSITION OF R. JOHN TAYLOR

VOLUME II

BE IT REMEMBERED that Volume II of the deposition of R. JOHN TAYLOR  was taken by the Plaintiff at Knox Concrete, located at 913 Snake River Avenue, Lewiston, Idaho, before Associated Reporting & Video, Andrea J. Wecker, Court Reporter and Notary Public in and for the County of Ada, State of Idaho, on Tuesday, the 28th day of July, 2020, continuing through Friday, the 31st day of July, 2020, in the above-entitled matter.

APPEARANCES:

For the Plaintiff:   RODERICK BOND LAW OFFICE
                     By:  Roderick C. Bond, Esq.
                     601 108th Avenue Northeast
                     Suite 1900
                     Bellevue, Washington 98004
                     Telephone:  (425) 591-6903
                     Facsimile:  (425) 321-0343
                     rod@roderickbond.com

For the Defendants, Hawley Troxell Ennis & Hawley,
Richard A. Riley, D. John Ashby, and Gary D. Babbitt:

                     ELAM & BURKE
                     By:  Loren Ipsen, Esq.
                     251 East Front Street
                     Suite 300
                     Boise, Idaho 83702
                     Telephone:  (208) 343-5454
                     Facsimile:  (208) 384-5844
                     lci@elamburke.com

**Exhibit - 1, p. 2**

**21-ER-5392**

R. John Taylor (Volume II)                    July 28 - July 31, 2020

APPEARANCES (Contd.)

For the Defendants, Crop USA, James Beck, Michael W. Cashman Sr., Connie Taylor Henderson, and R. John Taylor:

                    JONES WILLIAMS FUHRMAN GOURLEY
                    By:  Daniel Loras Glynn, Esq.
                    225 North 9th Street
                    Suite 820
                    Boise, Idaho 83702
                    Telephone:  (208) 331-1170
                    Facsimile:  (208) 331-1529
                    dglynn@idalaw.com

For the Defendant Third-Party Defendant, Reed Taylor:

                    CAMPBELL & BISSELL
                    By:   Michael S. Bissell, Esq.
                    820 West 7th Avenue
                    Spokane, Washington 99204
                    Telephone:  (509) 455-7100
                    Facsimile:  (509) 455-7111
                    mbissell@campbell-bissell.com


APPEARING REMOTELY VIA VIDEOCONFERENCING:

For the Defendant, GemCap Lending I, LLC:

                    GEMCAP SOLUTIONS
                    By:  William E. Adams, Esq.
                    24955 Pacific Coast Highway
                    Suite A202
                    Malibu, CA 90265
                    Telephone:  (424) 216-5457
                    wadams@gemcapsolutions.com


Also Present via Videoconferencing:

                    Dale Miesen
                    Richard T. McDermott
                    Richard Ellis

Exhibit - 1, p. 3

21-ER-5393

**R. John Taylor (Volume II)**                    **July 28 - July 31, 2020**

I N D E X

E X A M I N A T I O N

R. JOHN TAYLOR                                          PAGE

By:    Mr. Bond...............................8, 968

       Mr. Ipsen.................................843

       Mr. Bissell........................790, 1147

       Mr. Adams.................................892

       Mr. Glynn..........................965, 1158


E X H I B I T S

NO.

74-B.   2019 Crop USA Insurance Agency............36
        Tax Return (20 pages)

479.    Supplemental Declaration of................7
        R. John Taylor (145 pages)

480.    12/31/1996 AIA Services Dividends........803
        Paid or Accrued, AIA0024306 (1 page)

481.    3/27/2001 E-mail String..................790
        (1 page)

482.    3/27/2001 E-mail String..................791
        (1 page)

484.    1/10/2005 Crop USA Insurance Agency......828
        Minutes, AIAPROD00192566 (1 page)

485.    AIA Services Corporation 401(k)..........822
        Profit Sharing Plan for 2010
        AIA0313-AIA00355 (43 pages)

487.    12/31/2012 AIA Services Corporation......805
        Preferred Stock, AIAPROD00299195 (1 page)

489.    AIA Services Corporation 401(k) Profit...812
        Sharing Plan for Reed Taylor
        7/1/2006 through 9/30/2006 (4 pages)

**Exhibit - 1, p. 4**


**21-ER-5394**

**R. John Taylor (Volume II)**                    **July 28 - July 31, 2020**

EXHIBITS (Contd.)

490.    R. John Taylor Exhibit Index..............47
        (26 pages)

491.    Notes Prepared by R. John Taylor.........47
        (7 pages)

492.    2019 Crop USA Insurance Services.........76
        Tax Return (24 pages)

493.    12/31/2012 AIA Services Corporation......145
        Due From PERC, AIAPROD00299199 (1 page)

494.    11/17/1995 AIA Services Corporation......229
        Board of Directors Meeting Minutes
        AIA0025531-AIA0025534 (4 pages)

495.    5/9/2017 Deposition Transcript of........301
        R. John Taylor, GC0753944-GC0754202
        (259 pages)

496.    12/31/2012 and 12/31/2013 AIA Services...301
        Corporation and Subsidiary Consolidated
        Financial Statements, RJT036419-RJT036429
        (11 pages)

497.    Declaration of R. John Taylor............416
        (6 pages)

498.    10/27/2004 E-mail String.................797
        (1 page)

499.    AIA Services Corporation 401(k) Profit...824
        Sharing Plan for Reed Taylor
        10/1/2010 through 12/31/2010 (1 page)

500.    Affidavit of Reed Taylor.................969
        RJT039013-RJT039211 (199 pages)

501.    Reed Taylor's Statements of Facts........969
        RJT049163-RJT049222 (60 pages)

502.    Handwritten Notes Prepared by..........1074
        R. John Taylor (5 pages)

503.    8/3/2004 E-mail String.................1147
        AIA0000214720 (1 page)

**R. John Taylor (Volume II)**                    **July 28 - July 31, 2020**

EXHIBITS (Contd.)

504.    8/26/2004 AIA Insurance Board of........1148
        Directors Consent in Lieu of Meeting
        AIA0027502 (1 page)

505.    8/26/2004 Crop USA Insurance Agency.....1149
        Board of Directors Consent in Lieu of
        Meeting, AIA0027355 (1 page)

506.    Copies of AIA Services Corporation......1151
        Checks (7 pages)

507.    Typewritten Notes Prepared by...........1162
        R. John Taylor (5 pages)

**Exhibit - 1, p. 6**

**21-ER-5396**

R. John Taylor (Volume II)                          July 28 - July 31, 2020

P R O C E E D I N G S


R. JOHN TAYLOR,
a witness having been first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:


(Deposition Exhibit No. 479 was marked.)

MR. BOND:  Okay.  Can everyone state their name for the record, other than my client is watching or listening over the video as well.

MR. GLYNN:  Daniel Glynn, counsel for the Crop USA entities, R. John Taylor, Henderson, Jim Beck, and Michael Cashman.

MR. IPSEN:  And I am Loren Ipsen.  I'll try to speak up.  I represent the Hawley Troxell defendants for Hawley Troxell Ennis & Hawley; Richard Riley, John Ashby, and Gary Babbitt.

MR. BISSELL:  Mike Bissell for Reed Taylor.

MR. ELLIS:  Richard Ellis with GemCap.

THE WITNESS:  John Taylor.

MR. GLYNN:  Mr. Adams?

You're still on mute.

MR. ADAMS:  Sorry.  William Adams, counsel for GemCap Lending I, LLC.

R. John Taylor (Volume II)                    July 28 - July 31, 2020

Q.   And is there some reason why you don't have annual shareholder meetings as required by the bylaws?

MR. GLYNN:  Object to form.

THE WITNESS:  There's --

Q.   (BY MR. BOND) Let me ask you a different question.  Let me rephrase that question.

Is there some reason why AIA Services does not have annual shareholder meetings as required under the bylaws?

MR. GLYNN:  Object to form.

THE WITNESS:  I believe that there is no purpose in having annual shareholder meetings during this litigation.  Period.

Q.   (BY MR. BOND) And that's your personal belief on behalf of AIA Services?

A.   It is.

Q.   Okay.  Do you have any legal basis for that?

MR. GLYNN:  Object to form.

THE WITNESS:  I don't -- I don't know how to answer that.  I'm not here to provide legal basis.

Q.   (BY MR. BOND) Okay.  So the only reason AIA Services has not had a shareholder meeting since 2012 is because you have determined that one

R. John Taylor (Volume II)                    July 28 - July 31, 2020

AIA Insurance.

          You're aware of that, correct?

     A.   Right.

     Q.   Okay.  And I want to nail this down because I need to know whether they exist or not.

          Are there any oral board decisions, board resolutions, any board action taken that's not been reduced in writing for AIA Services?

     MR. GLYNN:  Object to form.

     THE WITNESS:  If I make a decision, is that a board decision?  What are you referring to?  Every decision I make is also a board decision, I guess, or vice versa because I'm it.  I'm the last man standing for the last five years, so --

     Q.   (BY MR. BOND) Okay.  So is it your testimony that every decision that you have made for AIA Services since you've been the sole purported director has been made on behalf of you as a director and as the president and CEO of AIA Services?

     A.   No.  My position has always been that as CEO, I make the decisions.  And those board meetings that we have -- that need to be authorized were given, and I have provided all of the board meetings, very few of which there are, since

Exhibit - 1, p. 436

21-ER-5399

R. John Taylor (Volume II)                    July 28 - July 31, 2020

1913 -- 2013.

Q.   And you understand again that part of why I'm here today is to find out whether certain transactions or actions were not authorized by the board because certain transactions are required to be authorized by the board.

Do you understand that?

MR. GLYNN:  Object to form.

MR. IPSEN:  Objection to the form.

THE WITNESS:  I am -- have provided any board meeting that has occurred since 2013.

Q.   (BY MR. BOND) You've provided the minutes?

A.   Yes.

Q.   Okay.  Or the board resolutions?

A.   Yes.

Q.   Okay.  So if there's no minutes or board resolutions reflecting a board decision that's been produced since 2013, then there would have been no board decision.

Is that correct?

A.   The decision would have been made by me as CEO of the company.

Q.   And "company," you mean AIA Services, correct?

R. John Taylor (Volume II)                    July 28 - July 31, 2020

A.   Yes.

Q.   Okay.  So now I'm going to ask you the same question for AIA Insurance with your hat specifically as -- your testimony as on behalf of AIA Insurance.

Since you've been the sole purported director of AIA Insurance, the only board decisions are reflected in either meeting minutes or board resolutions that have been produced in this lawsuit?  Any other decisions would have been made on behalf of you as the president and CEO of AIA Insurance, correct?

A.   Yes.

Q.   Okay.  And now let's go back for the time -- or the period of time in which Jim Beck, Connie Henderson, and yourself were on the board of directors of AIA Services, okay?

A.   [Witness indicates.]

Q.   During that period of time, would all board decisions be reflected in either board meeting minutes or board resolutions for AIA Services during the period of time that you, Connie Henderson, and Jim Beck were on the board of AIA Services?

MR. GLYNN:  Object to form.

R. John Taylor (Volume II)                    July 28 - July 31, 2020

THE WITNESS: Unless --

Yes, unless we don't have a copy of it or we don't know or don't have a copy in our business records. But I --

The only board minutes that they were involved in were -- have been given to you, that I'm aware of.

Q.   (BY MR. BOND) And board resolutions as well?

A.   Resolutions, yeah.

Q.   Okay. So now I'm going to ask you the same question with your hat as AIA Insurance, your testimony on behalf of AIA Insurance.

During the time in which you, Jim Beck, and Connie Henderson were on the boards, the board of AIA Insurance, would all board decisions be reflected in either board resolutions or board meeting minutes?

A.   Sure.

Q.   And those documents would have all been produced to us, correct?

A.   To the best of my knowledge, they have.

Q.   Okay. So prior to the time that Connie Henderson and Jim Beck were on the boards of the AIA corporations, I want to just start from

Exhibit - 1, p. 439

21-ER-5402

R. John Taylor (Volume II)                    July 28 - July 31, 2020

January 1st, 1999, through the time that Connie Taylor-Henderson and Jim Beck were appointed to the boards of the AIA corporations.

Were all decisions for the AIA corporations' board of directors reflected in board meeting minutes and board resolutions that have been produced to us?

A.   Yes.  I know of no others that happened without the production of those documents.

Q.   And so as we sit here today, for the AIA corporations, meaning AIA Services and AIA Insurance, there are no board decisions for those companies from January 1st, 1999, to the present time that are not reflected in board resolutions or board meeting minutes that have been produced to us in this lawsuit, correct?

MR. GLYNN:  Object to form.

THE WITNESS:  I believe all of the decisions by the board have been provided to you, and you should have all of them.

Q.   (BY MR. BOND) Okay.  And as we sit here today, you're not aware of any oral decisions by the board of directors of AIA Services or AIA Insurance that have not been reduced in writing and produced to us, correct?

R. John Taylor (Volume II)                    July 28 - July 31, 2020

A.   No.  I don't know that.  I can't answer that question.

Q.   What's that?

A.   I can't answer that question.

Q.   Okay.  But you're not aware of any decisions that have not been --

A.   No.

Q.   -- by the board of directors of AIA Services or AIA Insurance that have not been reduced in writing through a resolution or board meeting minutes and produced to us, correct?

A.   Not that I know of today.

Q.   Okay.  Okay.  And then so Item 25 --

A.   Yes.

Q.   -- or Topic 25 is the approval of and the total amount of attorney fees and costs paid, advanced, and/or reimbursed for John Taylor, Connie Taylor-Henderson, James Beck, and Michael Cashman Sr. in this lawsuit.

So does the $500,000 that you've testified previously include the fees and costs -- these fees and costs as well?

A.   Not since 2015 or '14, somewhere in that period when this case reactivated.

Q.   And are the fee statements that are

R. John Taylor (Volume II)                    July 28 - July 31, 2020

THE WITNESS:  If you represent that these are the only shareholder -- for this particular case who were named to be indemnified, I would have no reason to disagree with you.

Q.   (BY MR. BOND) Yeah.  And the problem is, Mr. Taylor, it's not what I'm representing that we're here to talk about today.  Part of your -- the preparation today was to tell me how -- what shareholder meetings.

So -- and so we have the --

A.   Well --

Q.   Okay.  Let's just start here.

You would agree with me that the shareholder meeting that was held --

And to be clear, just look at the exhibit in 204, okay?  In Exhibit 204, Exhibit B to -- that's contained within Exhibit 204, it says, "Notice of special shareholder meeting to be held at March 28th, 2007."

A.   204?

Q.   Exhibit 204.

A.   Okay.

Q.   Okay.  So the shareholder meeting for AIA Services that was held on March 28, 2007, that was the only shareholder meeting held for

R. John Taylor (Volume II)                    July 28 - July 31, 2020

AIA Services in 2007, correct?

A.   I believe, yes.

Q.   Okay.  And then there was a shareholder meeting in 2012 that was held to, among other things, try to effectuate the reverse stock split, correct?

A.   Correct.

Q.   Okay.  And so from March 28th, 2007, to the present time, those are the two only shareholder meetings that have been held for AIA Services, correct?

A.   I believe, yes.

Q.   Okay.

A.   I do.

Q.   Thank you.

And can you --

MR. BOND:  Can we just take a quick little break then?  Ten-minute break?

Is that okay, Bill, and everyone?

MR. ADAMS:  Sure.  Let's be back in 10.

(Break taken from 11:41 a.m. to 11:52 a.m.)

Q.   (BY MR. BOND) Mr. Taylor, we're back on the record.  You're still under oath.

I had some questions I want to ask you about the Crop USA -- from Crop USA's standpoint.

Exhibit - 1, p. 759

21-ER-5406

R. John Taylor (Volume II)                              July 28 - July 31, 2020

this deposition?

MR. GLYNN:  That is correct.

MR. ADAMS:  And it was brought to the deposition?

MR. BOND:  Yep.

MR. GLYNN:  It was brought to the deposition.

MR. BOND:  Thank you, Bill.

MR. ADAMS:  And it was not prepared by you?

MR. GLYNN:  It was not prepared by me.

MR. ADAMS:  It was prepared by the witness?

MR. GLYNN:  It was prepared by the witness.

MR. ADAMS:  Okay.  Thanks.  Can we mark it as an exhibit so that we have at least a piece of reference.

MR. GLYNN:  Sure.

THE REPORTER:  That will be No. 507.

MR. GLYNN:  That will be 507.

MR. ADAMS:  Thank you.

(Deposition Exhibit No. 507 was marked.)

MR. GLYNN:  I have no other questions.


(The deposition concluded at 1:15 p.m.
on Friday, July 31, 2020)
* * *
(Signature was requested.)

**Exhibit - 1, p. 1162**


**21-ER-5407**

R. John Taylor (Volume II)                    July 28 - July 31, 2020

VERIFICATION

STATE OF _____)
                         )  ss.
COUNTY OF _____)

I, R. JOHN TAYLOR, being first duly sworn on my oath, depose and say:

That I am the witness named in the foregoing deposition taken the 28th, 29th, 30th, and 31st days of July, 2020, consisting of pages numbered 1 to 1162, inclusive; that I have read the said deposition and know the contents thereof; that the questions contained therein were propounded to me; that the answers to said questions were given by me, and that the answers as contained therein (or as corrected by me therein) are true and correct.

Corrections Made:  Yes_____  No_____


_____
        R. JOHN TAYLOR


Subscribed and sworn to before me this _____ day of _____, 2020, at _____, Idaho.


_____
Notary Public for Idaho
Residing at_____, Idaho
My Commission Expires: _____.

**Associated Reporting & Video**                    **1163**
**(208) 343-4004**

**Exhibit - 1, p. 1163**


**21-ER-5408**

R. John Taylor (Volume II)                         July 28 - July 31, 2020

                    REPORTER'S CERTIFICATE

STATE OF IDAHO   )
                 )  ss.
COUNTY OF ADA    )

   I, ANDREA J. WECKER, Certified Shorthand Reporter and
Notary Public in and for the State of Idaho, do hereby
certify:

     That prior to being examined, the witness named in
the foregoing deposition was by me duly sworn to testify
to the truth, the whole truth and nothing but the truth;

     That said deposition was taken down by me in
shorthand at the time and place therein named and
thereafter reduced to typewriting under my direction, and
that the foregoing transcript contains a full, true
and verbatim record of said deposition.

     I further certify that I have no interest in the
event of the action.

     WITNESS my hand and seal this 15th day of August,
2020.

                              _____
                              ANDREA J. WECKER
                              CSR, RDR, CRR, CRC and Notary
                              Public in and for the
                              State of Idaho.

My Commission Expires:  02-14-23

**Exhibit - 1, p. 1164**

**21-ER-5409**

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiffs

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual and the Personal representative of the Estate of Sarah Taylor; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC.; <br><br> Plaintiff, <br><br> v. <br><br> CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation, <br><br> Defendants. | Civil No. 1:10-cv-00404-CWD <br><br> PLAINTIFFS DALE L. MIESEN AND DONNA J. TAYLOR'S MEMORANDUM OF LAW IN SUPPORT OF AMENDED MOTION TO AMEND AND SUPPLEMENT COMPLAINTS (Dkt. #1 and #23) |

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR AMENDED MOTION TO AMEND COMPLAINTS  - 1 -

Plaintiffs Donna J. Taylor and Dale L. Miesen submit this Memorandum of Law in Support of their Amended Motion to Amend and Supplement Complaints:

## I.     FACTS

Plaintiffs Dale L. Miesen and Donna J. Taylor seek to amend their complaints to assert additional claims and facts in one consolidated Second Amended Complaint. (*See* the attached Exhibit A.) The Plaintiffs are supported in this lawsuit by other shareholders too. (Dkt. #64, #66 and #67-42.) This lawsuit was filed on August 11, 2010. (Dkt. #1.) However, the original Complaint was amended omitting Dale L. Miesen as a plaintiff. (Dkt. #23.) As a result, plaintiff Dale L. Miesen's claims are presently pending in the original Complaint (Dkt. #1), while the plaintiff Donna J. Taylor's claims are presently pending in the First Amended Complaint (Dkt. #23). The attached proposed Second Amended Complaint consolidates both complaints, and names two additional defendants along with setting forth additional facts and claims which occurred since the filing of the original complaint (as evidence by demands made by thirteen shareholders, Dkt. #67-42, and to clarify certain facts and claims.[1] (*See* the attached Exhibit A.)

## II.     ARGUMENT AND AUTHORITIES

Plaintiffs Dale L. Miesen and Donna J. Taylor respectfully request leave to amend and supplement their complaints (Dkt. #1 and #23) to name two additional parties and assert additional claims and facts.

"The court should freely give leave when justice so requires." **Fed. R. Civ. P. 15(a)(2)**. "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the

---

[1] Plaintiffs have also simplified the Second Amended Complaint by omitting the RICO claims previously pleaded, which renders the Hawley Troxell Defendants' Motion to Dismiss moot. (Dkt. #115.)

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR AMENDED MOTION TO AMEND COMPLAINTS  2

date of the pleading to be supplemented." **Fed. R. Civ. P. 15(d)**.

Within the Ninth Circuit, Fed. R. Civ. P. 15 "is to be applied extraordinary liberality." ***Morongo Band of Mission Indians v. Rose***, 893 F.2d 1074, 1079 (9th Cir.1990). "Where there is lack of prejudice to the opposing party and the amended complaint is obviously not frivolous or made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny such motion." ***Hurn v. Retirement Fund Trust of Plumbing, Heating & Piping Industry of So. Calif.***, 648 F.2d 1252, 1254 (9th Cir.1981).

Here, this Court should allow the Plaintiffs' Dale L. Miesen and Donna J. Taylor to consolidate their complaints into one the Proposed Second Amended Complaint attached hereto as Exhibit A. At this stage of this litigation and the fact that virtually nothing has transpired in this case, there can be no prejudice to any of the defendants and the proposed amendment will streamline this case and allow this Court to prevent the necessity of the Plaintiffs or other shareholders of AIA Services from filing additional lawsuits. Moreover, while this Court has set a tentative deadline for amendments as October 2016, this amendment is well within that deadline.

The defendants are expected to argue that the Plaintiff Dale L. Miesen has been dismissed as a plaintiff because his former counsel, Lee Rousso, apparently filed the First Amended Complaint with the intention of omitting the Plaintiff Dale L. Miesen because the defendants argued that he had not made his own derivative demand in 2008. However, the comment to the applicable Idaho Code Section make clear that only one demand need be made. *See* **I.C. § 30-1-742 cmt. 3** ("It should be noted that the shareholder bringing suit does not necessarily have to be the person making the demand. Only one demand need be made").[2] In any event, Mr. Miesen,

---

[2] While the Idaho Business Corporation Act was recently amended, I.C. § 30-1-742 applies and the new Idaho Code Section is unchanged. *See* I.C. § 30-29-742.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR AMENDED MOTION TO AMEND COMPLAINTS  3

**21-ER-5412**

along with twelve other shareholders, submitted another derivative demand requesting that AIA Services and AIA Insurance take actions in this lawsuit. (*See* Dkt. #67-42, pp. 15-17.) As with all other demands made on AIA Services and AIA Insurance's purported boards of directors, no action was taken and Mr. Miesen's demand was ignored (as was the other twelve shareholders' demands). Thus, any argument the defendants may have regarding Mr. Miesen's alleged failure to separately make a derivative demand is rendered moot because he made a demand.

In addition, Mr. Miesen's prior counsel did not file or seek a voluntary dismissal of Mr. Miesen and "[a] derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval." **Fed. R. Civ. P. 23.1(c)**. Upon a review of the record, the undersigned could not locate any such order nor did any of the defendants request such an order when Mr. Rousso filed the First Amended Complaint without naming Mr. Miesen in the caption. *See* **Fed. R. Civ. P. 41(a)(1)-(2)**. Thus, the defendants' arguments, if any, that Mr. Miesen is no longer a plaintiff are without merit. Consequently, there are effectively two complaints pending in this lawsuit— Mr. Miesen's original complaint, Dkt. #1, and Ms. Taylor's First Amended Complaint, Dkt. #23. As a result, the Proposed Second Amended Complaint will cure that issue by consolidating both complaints into one in the form of the attached Second Amended Complaint.

Finally, the undersigned counsel apologizes to this Court for filing the original motion later in the evening on May 27, 2016, but the undersigned is a solo-practitioner who has had a very hectic schedule these past couple of weeks. In addition, the undersigned counsel also apologizes to this Court and counsel for having filed an amended motion with additional revisions to the proposed Second Amended Complaint, but he recently acquired Microsoft Word 2016 and the software was crashing causing him problems saving and completing the final proposed Second Amended Complaint (work was lost and required to be completed again and again). The revised

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR AMENDED MOTION TO AMEND COMPLAINTS  4

Second Amended Complaint is attached. Lastly, the undersigned counsel inadvertently filed a motion and memorandum of law in one pleading, so he also filed an amended motion with a separate memorandum of law to cure that issue, too, and clarify facts and arguments.

Accordingly, the proposed Second Amended Complaint states valid causes of action pleaded with extensive supporting facts. Plaintiffs are seeking to vindicate the rights of AIA Services and AIA Insurance as conclusively as possible through the proposed Second Amended Complaint.[3]  As such, this Court should grant the motion and allow the Plaintiffs to file the Second Amended Complaint attached as Exhibit A.

### III.    CONCLUSION

For the reasons stated above, this Court should grant Plaintiffs' Dale L. Miesen and Donna J. Taylor's Motion to Amend and Supplement Complaints, and allow them to file the Second Amended Complaint in the form attached as Exhibit A. The undersigned counsel also requests approval to correct any typographical and grammatical errors in Exhibit A prior to filing it.

DATED:  This 29th day of May, 2016.

RODERICK BOND LAW OFFICE, PLLC


By:    */s/ Roderick C. Bond*
          Roderick C. Bond
          Attorney for Plaintiffs

---

[3] Plaintiffs will seek to amend again to assert other claims accruing since the last derivative demands and to GemCap Lending I, LLC for claims and damages flowing from any illegal guarantee provided to it by the non-Hawley Troxell defendants (which will also include additional claims against Connie Taylor Henderson, James Beck and John Taylor for purportedly authorizing the illegal guarantee). (*See* Dkt. #67-3 and #94-1.) The restrictions under AIA Services' amended articles of incorporation barred that $10 million guarantee. (Dkt. 67-3, pp. 5-8.) In addition, the Hawley Troxell Defendants agree that GemCap Lending I, LLC is a necessary party to this lawsuit.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR AMENDED MOTION TO AMEND COMPLAINTS  5

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 29th day of May, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:    jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:    jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:    lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:    sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:    swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

_____/s/ Roderick C. Bond_____
Roderick C. Bond

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR AMENDED MOTION TO AMEND COMPLAINTS  6

**21-ER-5415**

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiffs

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual and the Personal representative of the Estate of Sarah Taylor; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC.;<br><br>Plaintiffs,<br><br>v.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation,<br><br>Defendants. | Civil No. 1:10-cv-00404-CWD<br><br>SECOND AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL<br><br>[PROPOSED] |

SECOND AMENDED COMPLAINT - i

# Exhibit - A

## 21-ER-5416

**TABLE OF CONTENTS**

I.   STATEMENT OF JURISDICTION ................................................................................ 1

II.   STATEMENT OF VENUE .......................................................................................... 1

III.   PARTIES AND DEFINITIONS OF THE PARTIES.............................................................. 1

IV.   FACTS ..................................................................................................................... 5

A.   The Background Facts Regarding AIA Services and AIA Insurance.................................. 5

B.   John, Connie, Beck and Cashman Take Operational Control of AIA and AIA
Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in
Its Amended Articles of Incorporation ................................................................... 6

C.   AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer
CropUSA to Themselves ...................................................................................... 9

D.   The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants
in Taking CropUSA from AIA and Having AIA Fund CropUSA ................................... 13

E.   The Controlling AIA Defendants Steal $1,510,693 From AIA to Fund CropUSA
and Then They Use $634,269 of Those Funds to Repay a Debt CropUSA Owed to
AIA—thereby Resulting in a $2,144,962 Fraud Against AIA. ...................................... 15

F.   The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and
Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal ......... 19

G.   The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and
Financial Wherewithal with the Improper Assistance from the Hawley Troxell
Defendants ......................................................................................................... 21

H.   The Controlling AIA Defendants Enter Into Tolling Agreements, but Those
Tolling Agreements Do Not Save the Hawley Troxell Defendants from the
Unwaivable Conflicts of Interest ........................................................................... 22

I.   The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA
and Intentionally Committing Torts against AIA with the Assistance of the Hawley
Troxell Defendants—Even While this Lawsuit Was Pending.......................................... 27

# Exhibit - A

**21-ER-5417**

J.      There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and
        Intentional Torts Committed by the Controlling AIA Defendants ................................... 31

V.      CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 .......... 35

VI.     COUNT I—BREACH OF FIDUCIARY DUTY ................................................ 38

VII.    COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES ....... 39

VIII.   COUNT III—LEGAL MALPRACTICE ........................................................... 40

IX.     COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ ........................................... 42

X.      COUNT V—AIDING AND ABETTING FRAUD ............................................ 45

XI.     COUNT VI—BREACH OF CONTRACT ...................................................... 47

XII.    COUNT VII—DECLARATORY JUDGMENT ................................................ 48

XIII.   COUNT VIII—EXCESSIVE COMPENSATION/CORPORATE WASTE .................... 49

XIV.    COUNT IX—ACCOUNT STATED ............................................................... 50

XV.     JURY DEMAND ...................................................................................... 51

XVI.    PRAYER FOR RELIEF ............................................................................. 51

VERIFICATION OF DALE L. MIESEN ................................................................. 53

VERIFICATION OF DONNA J. TAYLOR .............................................................. 54

CERTIFICATE OF SERVICE ............................................................................. 55

SECOND AMENDED COMPLAINT - iii

# Exhibit - A

## 21-ER-5418

Plaintiffs Donna J. Taylor and Dale L. Miesen allege cumulatively and, when necessary and/or applicable, in the alternative, as follows:

## I.    STATEMENT OF JURISDICTION

1.    This Court has jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1332(a)(1), as the amount in controversy exceeds $75,000 and the action, when filed, was between citizens of different states.

## II.    STATEMENT OF VENUE

2.    Venue is proper in the District of Idaho under 28 U.S.C. § 1391(b)(2) as a substantial part of the errors and omissions giving rise to the claims asserted in this Second Amended Complaint occurred in the District of Idaho.

3.    Venue is also proper in the District of Idaho under 18 U.S.C. § 1391(c), as certain of the defendants reside in the District of Idaho.

## III.    PARTIES AND DEFINITIONS OF THE PARTIES

4.    Plaintiff Dale L. Miesen ("Miesen") is a resident of Colleyville, Texas.  Miesen has been a common shareholder of AIA Services during all relevant times.

5.    Plaintiff Donna J. Taylor, as an individual and the Personal Representative of the Estate of Sara Taylor (collectively "Donna"), is a resident of Clarkston, Washington. Donna has been a Series A Preferred Shareholder of AIA Services during all relevant times. Donna has also been a common shareholder of AIA Services during all relevant times, through her beneficial ownership as the Personal Representative of the Estate of Sara Taylor.

6.    Plaintiffs Dale Miesen and Donna J. Taylor are collectively referred to as the "Plaintiffs" in this Second Amended Complaint, and they were innocent minority shareholders.

7.    Plaintiffs are bringing this derivative action on behalf of AIA Services Corporation ("AIA Services"). In addition, Plaintiffs are bringing this action as a double derivative on behalf

SECOND AMENDED COMPLAINT - 1

# Exhibit - A

## 21-ER-5419

AIA Insurance, Inc. ("AIA Insurance"), which is a wholly owned subsidiary of AIA Services. AIA Services and AIA Insurance are collectively referred to as "AIA" in this Second Amended Complaint. The definition of "AIA" includes AIA Services and/or AIA Insurance for purposes of pleading in the alternative, and includes the Plaintiffs to extent they are required to support any derivative cause of action set forth in this Second Amended Complaint.

8.     Defendant AIA Services is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. At all times relevant to this lawsuit, AIA Services is or has been the parent corporation of AIA Insurance.

9.     Defendant AIA Insurance is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. AIA Insurance is, or was at all relevant times, a wholly owned subsidiary of AIA Services.

10.     Defendant CropUSA Insurance Agency, Inc. ("CropUSA") is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. CropUSA was formerly known as AIA Crop Insurance, Inc.

11.     Defendant R. John Taylor ("John") is an individual residing in the state of Idaho. At all times relevant to this lawsuit, John served on the Board of Directors of AIA Services, AIA Insurance, and CropUSA and continues to serve on those boards. John also served as President of each of these corporations during all times relevant to this lawsuit. John is also licensed to practice law in the state of Idaho. John is a common shareholder of AIA Services and a common shareholder of the CropUSA. John also owns shares or ownership interests in other entities that have engaged in inappropriate transactions with AIA and/or which have improperly benefitted from AIA during all relevant times.

///

SECOND AMENDED COMPLAINT - 2

# Exhibit - A

## 21-ER-5420

12. Defendant James Beck ("Beck") is an individual residing in the state of Minnesota. Beck served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until he resigned in 2014. Beck was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA.

13. Defendant Michael Cashman, Sr. ("Cashman") is an individual residing in the state of Minnesota. Cashman served on the Board of Directors of AIA Services during certain relevant times. Cashman was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA.

14. Defendant Connie Taylor Henderson ("Connie") is a resident of Vancouver, Washington. Connie served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2014. Connie jointly owns with John the common shares of AIA Services held in John's name. Connie has actively asserted community ownership of those shares and specifically did so before the district court and on appeal in *Taylor v. AIA Services Corp.*, *et al*.

15. Defendant JoLee K. Duclos ("Duclos") is a resident of Clarkston, Washington. Duclos has severed as Secretary of AIA Services, AIA Insurance and other entities partially or wholly owned by John during certain relevant times. Duclos served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2007. Duclos is a common shareholder of CropUSA. Duclos has knowledge of the law by and through her training and performing the duties of a paralegal. Duclos has served as John's "lieutenant" during all relevant times.

16. John, Beck, Cashman, Connie and Duclos are collectively referred to herein as the "Controlling AIA Defendants." The Controlling AIA Defendants have acted in concert and

SECOND AMENDED COMPLAINT - 3

# Exhibit - A

## 21-ER-5421

assisted one another in committing various torts described in this Second Amended Complaint and covering up and/or concealing those torts. The definition of "Controlling AIA Defendants" includes the acts and/or omissions of one or more of John, Beck, Cashman and/or Duclos for purposes of pleading in the alternative.

17.     Defendant Gary D. Babbitt ("Babbitt") is an individual residing in the state of Idaho and is an attorney practicing law in the state of Idaho with and for Hawley Troxell.

18.     Defendant Richard A. Riley ("Riley") is an individual residing in the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

19.     Defendant D. John Ashby ("Ashby") is an individual residing in the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

20.     Defendant Hawley Troxell Ennis & Hawley LLP ("Hawley Troxell") is an Idaho limited liability partnership in the business of practicing law, with its principal place of business in Boise, Idaho. Hawley Troxell has no office in the state of Washington. None of the individual members of Hawley Troxell are residents of Washington. Hawley Troxell, though its attorneys, acted as counsel for AIA Services, AIA Insurance and CropUSA during certain relevant times and in certain lawsuits. Hawley Troxell is also named herein as it is vicariously liable for the acts and/or omissions of Babbitt, Riley, Ashby and its other attorneys.

21.     Babbitt, Ashby, Riley, other Hawley Troxell attorneys, and Hawley Troxell are collectively referred to as the "Hawley Troxell Defendants" in this Second Amended Complaint. The definition of "Hawley Troxell Defendants" includes the acts and/or omissions of one or more of Babbitt, Ashby, Riley, other attorneys at Hawley Troxell and/or Hawley Troxell for purposes of pleading in the alternative.

///

SECOND AMENDED COMPLAINT - 4

# Exhibit - A

## IV.   FACTS

### A.  The Background Facts Regarding AIA Services and AIA Insurance

22.     In 1983, AIA Services was formed as a closely held Idaho corporation for the purpose of acting as a holding company for various other wholly owned subsidiaries. AIA's business model was to work with farmers and growers to form trusts and/or related cooperatives through various growers and farmers' associations and the members of those associates also becoming members of the trusts and/or cooperatives.

23.     AIA created the Grain Growers Membership & Insurance Trust, the National Contract Poultry Grower's Membership & Insurance Trust, and other, similar trusts. By way of its relationships with these various organizations, AIA held contracts for the exclusive right to market health insurance (*e.g.*, Group Universal Health Policies) and other insurance products to the members of the various trusts and associations.

24.     In 1987, Donna and Reed Taylor, a non-party to this suit, were issued Series A Preferred Shares in AIA Services in connection with their divorce. Pursuant to the dissolution of their marriage, Donna was issued the 200,000 shares of Series A Preferred shares on or about February 12, 1988, and has held those shares ever since, less those shares which have been redeemed in part over the years. (*See* Dkt. #67-1 and #67-2.)

25.     In connection with the issuance of the Series A Preferred Shares to Donna, AIA Services' shareholders adopted amendments to its articles of incorporation with restrictions on the manner in which AIA Services and AIA Insurance could conduct business. (*See* Dkt. #67-3.) AIA Services' amended articles of incorporation included, without limitation, the restrictions that: (a) barred AIA Services and AIA Insurance from guaranteeing any loans for any individual or entities which were not wholly owned subsidiaries; (b) barred certain transactions with shareholders and affiliates; and (c) required AIA Services to maintain certain financial covenants. (*Id.*)

SECOND AMENDED COMPLAINT - 5

# Exhibit - A

## 21-ER-5423

26.     In addition, AIA Services' amended articles of incorporation also provied Donna with the unqualified right as the Series A Preferred Shareholder to appoint a person, to be determined in her sole discretion, to the Board of Directors of AIA Services. (*See* Dkt. #67-3.)

27.     The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the restrictions under AIA Services' amended articles of incorporation for the benefit of AIA Services and the Series A Preferred Shares.

28.     Donna's Series A Preferred Shares have not been fully redeemed to this day, and the restrictions under AIA Services' amended articles of incorporation remain in full force and effect to this day and fully applicable. (*See* Dkt. #67-42, pp. 10-11 ¶ 19.)

B. <u>**John, Connie, Beck and Cashman Take Operational Control of AIA and AIA Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in Its Amended Articles of Incorporation**</u>

29.     In 1995, the Controlling AIA Defendants, other than Duclos (although she did assist the Controlling AIA Defendants as an employee and officer (assistant secretary) of AIA), spearheaded a transaction to redeem Reed Taylor's majority common stock interest in AIA Services. (*See* Dkt. 67-5 and #67-6.)

30.     As part of the redemption, Beck, Cashman and certain of their friends acquired Series C Preferred Shares in AIA Services. When AIA Services amended its articles of incorporation to allow the issuance of the Series C Preferred Shares, AIA Services included additional restrictions in its articles of incorporation. Riley assisted and/or approved these restrictions and he was fully aware of them.

31.     Under the new and additional restrictions in AIA Services' amended articles of incorporation (these restrictions were in addition to others adopted in connection with the issuance of Donna's Series A Preferred Shares), AIA Services was barred from doing a number of corporate

SECOND AMENDED COMPLAINT - 6

# Exhibit - A

**21-ER-5424**

actions, including, but not limited to: (a) AIA Services could not acquire any common shares from any shareholders unless all dividends due on the Series C Preferred Shares has been paid (10% dividend per year) or those funds set aside; (b) the Series C Preferred Shareholders had the right to elect one director to AIA Services' Board of Directors; and (c) if any Series C Preferred Shares are redeemed, such redemptions must be equally from all shareholders. (*See* Dkt. #67-3.)

32.     Although the Series C Preferred Shares held by Beck, Cashman and their friends were eventually unlawfully and effectively redeemed by AIA, other Series C Preferred Shares were later issued to the AIA Services 401(k) Plan and those shares remain issued and outstanding to this day and no dividends have been paid as required since approximately 1997. As a result, these new restrictions under AIA Services amended articles of incorporation for the benefit of AIA Services and the Series C Preferred Shares, which have remained in full force and effect to this day.  The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the additional restrictions under AIA Services' amended articles of incorporation.

33.     Upon the redemption of Reed Taylor's majority common shares, Beck, Cashman, John and Connie directly or indirectly became the majority common shareholders of AIA Services. (*See* Dkt. #67-5.) In addition, Beck, Cashman and John entered into a Voting Agreement to ensure that they would maintain control of AIA Services' Board of Directors. As a result, the Controlling AIA Defendants have maintained operational control of AIA from 1995 through the present time.

34.     In connection with the redemption of Reed Taylor's shares, John entered into an Executive Officer's Agreement with AIA Services, which guaranteed him certain salary payments and other compensation for three years; that agreement also contained non-compete and non-solicitation provisions. (*See* Dkt. #67-8.) John's salary after the first three years was required to be determined by AIA Services' Board of Directors, which was never done after the first three years.

SECOND AMENDED COMPLAINT - 7

# Exhibit - A

## 21-ER-5425

35.     From 1999-2012, John improperly paid himself millions of dollars pursuant to his Executive Officer's Agreement for his and Connie's benefit (the amount of which in itself was improper based on AIA's business prospects and John's inability to do anything for the benefit of AIA), while he intentionally and repeated violated the non-compete and non-solicitation provisions of his Executive Officer's Agreement.

36.     In connection with the redemption of Reed Taylor's shares in August 1995, AIA Services contributed funds to The Universe Life Insurance Company, which was a wholly owned subsidiary of AIA Services, in order to make AIA Insurance, which was then a wholly owned subsidiary of The Universe Life Insurance Company, a subsidiary of AIA Services. After that transaction, AIA Insurance became a wholly owned subsidiary of AIA Services.

37.     As a result, from August 1995 through all relevant times, AIA Insurance was a wholly owned subsidiary through which AIA Services derived its commissions and administrative fees from insurance policies, which accounted the bulk of AIA's revenues and profits.

38.     From 1995 through 2005, AIA Insurance generated over $65 million in revenues from commissions (over $33 million) and administrative fees (over $27 million), and it continued to generate revenues thereafter.

39.     From 1995 through all relevant times, each of the Controlling AIA Defendants has served at various times on the Board of Directors for AIA Services, AIA Insurance and/or CropUSA, while John has continuously served as the President of AIA and Duclos has continuously served as a Secretary of AIA.

40.     From 1999 through certain relevant times, the Controlling AIA Defendants have also served from time to time on purported "advisory board" of CropUSA, which actually made the decisions on behalf of AIA and CropUSA. Specifically, Cashman, Beck and John served on

SECOND AMENDED COMPLAINT - 8

# Exhibit - A

the "advisory board" of CropUSA from 1999 through certain relevant times.

41.     The Controlling AIA Defendants intentionally concealed from AIA and its minority shareholders of the existence and authority of the "advisory board" of CropUSA.

**C.  AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer CropUSA to Themselves**

42.     By 1998, AIA's ability to sell health insurance had been impaired by undercapitalization in its underwriting subsidiary the Universal Life. Accordingly, the company considered proposals to sell other forms of insurance, and in particular crop insurance, to be underwritten by other insurance companies. At a 1998 Board Directors of Meeting, AIA Services' Board of Directors specifically discussed selling crop insurance and elected to have AIA pursue selling crop insurance.

43.     In 1999, AIA, then under the control of Controlling AIA Defendants, began selling crop insurance through a wholly owned subsidiary of AIA Services formed under the name "AIA Crop Insurance, Inc."

44.     The first purported meeting of shareholders of AIA Crop Insurance, Inc. ("AIA Crop Insurance") was held on January 11, 2000. The first purported meeting of the AIA Crop Insurance's Board of Directors was held on the same day. The purported minutes of the shareholder's meeting indicate that John, not the true owner AIA Services, claimed to be the sole shareholder of AIA Crop Insurance at the time of incorporation; these facts were concealed from AIA and AIA Services' innocent minority shareholders.

45.     Upon information and belief, at or shortly after the time of its formation, the Hawley Troxell Defendants began providing legal services to AIA Crop Insurance.

46.     At a special meeting of the shareholders of AIA Crop Insurance held on November 13, 2000, AIA Crop Insurance was renamed CropUSA in an apparent attempt to conceal its

SECOND AMENDED COMPLAINT - 9

# Exhibit - A

corporate lineage and origins.

47.    The minutes of the November 13, 2000, special meeting of the shareholders also show that John continued to claim that he was the sole shareholder of CropUSA, while he was simultaneously representing in business plans provided to others that CropUSA was a subsidiary of AIA Insurance. (*See* Dkt. # 67-66.)

48.    At the time CropUSA was formed, John was employed by AIA Services under an Executive Officer's Agreement, dated August 1, 1995, Dkt. #67-8, which contained express covenants not to compete. Upon information and belief, John's Executive Officer's Agreement and AIA Service's amended articles of incorporation and restated bylaws were drafted and/or approved by Riley, and he had full knowledge of the restrictions under the terms of the foregoing documents.

49.    CropUSA held its purported annual shareholder's meeting on January 10, 2001. By this time, the illegal "spin off" of CropUSA had been accomplished by having AIA Service's Series C Preferred Shareholders (primarily Beck and Cashman) exchange their Series C Preferred Shares for common shares in CropUSA (if CropUSA were in fact an independent entity, these maneuvers would have been completely unnecessary).

50.    The minutes for the shareholder meeting held on January 10, 2001 for CropUSA revealed that CropUSA had retained Hawley Troxell as its advisor and SEC counsel and, upon information and belief, the Hawley Troxell Defendants have served continuously as CropUSA's attorneys in one form or the other ever since. According to the minutes, negotiations between AIA Services and CropUSA had resulted in an agreement whereby AIA Services would no longer operate CropUSA as a subsidiary.

///

SECOND AMENDED COMPLAINT - 10

# Exhibit - A

**21-ER-5428**

51.      However, the negotiations referred to in the January 10, 2001 shareholder meeting minutes for CropUSA did not in fact occur. There was no decision, nor has there ever been a decision, on the part of AIA Services to discontinue the subsidiary status of CropUSA. The January 10, 2001 meeting minutes for CropUSA were concealed from AIA.

52.      None of the preferred or common shareholders of AIA Services (other than those present at the January 10, 2001 meeting) were given notice of or the opportunity to approve or oppose this corporate action; instead, it was concealed from them and AIA.

53.      In spite the fact that John asserted on January 10, 2001 that CropUSA would no longer be a subsidiary of AIA Services, John wrote in a letter dated February 27, 2001 sent on behalf of AIA to Donna that "AIA is developing a new crop insurance program through a new company called CropUSA." (The letter went on to state that "[t]he costs of putting the CropUSA program together have been paid. AIA now needs to launch five new territories next Month"). This January 27, 2001 letter constituted an unambiguous representation by John to AIA and Donna that CropUSA was a subsidiary of AIA and was being operated for the benefit of AIA and implicitly to AIA Services' innocent minority shareholders (which included Donna). This representation to AIA and Donna was false, and John knew it was false. Upon information and belief, the other Controlling AIA Defendants were aware of this January 27, 2001 letter and the misrepresentations contained within the letter.

54.      Notwithstanding the fact that John was obligated under the terms of his Executive Officer's Agreement that required that he not compete with AIA Services, and notwithstanding the fact that he owed fiduciary duties to the AIA and AIA Services' shareholders, John set forth his plans to exploit the assets of AIA for the benefit of CropUSA (and himself as the majority purported shareholder) in the purported minutes of the purported January 10, 2001 meeting.

SECOND AMENDED COMPLAINT - 11

# Exhibit - A

## 21-ER-5429

55.     The January 10, 2001 meeting minutes reveal that CropUSA authorized its officers to execute a Master Marketing Agreement with AIA Insurance that would allow CropUSA access to all of AIA's customers and customer lists, as well as all of AIA's trade secrets. AIA received no consideration for conveying this access or to enter into these agreements.

56.     CropUSA's officers (including John) were also purportedly authorized to enter into a Management Agreement with AIA Insurance wherein AIA Insurance purportedly agreed to provide management and administrative support to CropUSA without charge. However, John has since testified under oath that AIA's Board of Directors never authorized this agreement, although the Board has acquiesced in the action.

57.     AIA itself was never given notice of the Master Marketing Agreement and the Management Agreement, nor was AIA given the opportunity to approve or reject these agreements. Each of these agreements, when executed, constituted a violation of John's Executive Officer's Agreement, which contains a strict non-compete clause. Each of these agreements also constituted a direct breach of fiduciary duty or aiding and abetting same on behalf of each of the Controlling AIA Defendants in the commission of torts against AIA.

58.     Meanwhile, in 2001, John and Connie acquired a parking lot for $8,000 using AIA's line-of-credit. Upon information and belief, AIA was required to maintain control of the parking lot as part of its lease with Washington Bank Properties. John then increased the rent that AIA paid to use the parking lot to benefit him and Connie. For example, although John and Connie paid only $8,000 for the parking lot, they subsequently charged AIA $60,750 in rent to use the parking lot from 2004 through 2006. These unfair and self-serving rental payments to John and Connie were concealed from AIA and AIA Services' innocent minority shareholders and were never disclosed to either of them, as was their purchase of the parking lot.

SECOND AMENDED COMPLAINT - 12

# Exhibit - A

## 21-ER-5430

**D.** **The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants in Taking CropUSA from AIA and Having AIA Fund CropUSA**

59.     Upon information and belief, the Hawley Troxell Defendants were providing legal services to CropUSA and/or its board of directors as of January 10, 2001, and such providing of legal services has continued through the date of this complaint.

60.     Upon information and belief, from January 10, 2001, and continuing through the period relevant to this lawsuit, the Hawley Troxell Defendants had knowledge of John's Executive Officer's Agreement with AIA Services, had knowledge of the conflict of interest provision in AIA's bylaws, and had knowledge of restrictions in AIA's articles of incorporation, but intentionally refused to comply with them and assisted John in violating them or covering up the violations.

61.     The Hawley Troxell Defendants knew or should have known that the purported Master Marketing Agreement and Management Agreement constituted breaches of John's Executive Officer's Agreement, violations of AIA Service' amended articles of incorporation, violations of AIA Services' restated bylaws, and constituted breaches of John and the other Controlling AIA Defendants' fiduciary duties owed to AIA and AIA Services' minority shareholders.

62.     Upon information and belief, the Hawley Troxell Defendants were also representing CropUSA from January 10, 2001, to the present, and by way of that representation they breached their fiduciary duties to AIA (including their undivided duty of loyalty owed to AIA) and took steps that materially assisted John and the Controlling AIA Defendants in the commission of the various torts described in this complaint and assisted in the concealment of those torts.

///

SECOND AMENDED COMPLAINT - 13

# Exhibit - A

## 21-ER-5431

63.     Beginning in 1999 and continuing through the date of this Complaint, CropUSA has been funded and operated with assets improperly transferred from AIA, including, but not limited to, operating capital, office space, customer lists and other trade secrets, agents and staff, goodwill and other assistance. CropUSA paid nothing for these assets.

64.     The Controlling AIA Defendants, except Duclos, were all shareholders of AIA at the time CropUSA was formed and later purportedly became shareholders of CropUSA.

65.     The Controlling AIA Defendants, except Duclos (although she improperly took part in the meetings and acted as the Secretary) and Connie, all served on a purported "advisory board" of CropUSA and/or AIA, and this advisory board exercised actual control over CropUSA and AIA. By exercising control over these entities and committing acts that benefitted CropUSA at the expense of AIA, the Controlling AIA Defendants engaged in a conspiracy to defraud AIA, which have right and title to the property of CropUSA.

66.     Due to the fact that the Controlling AIA Defendants have complete control over AIA and would never assert claims against themselves on behalf of AIA, the adverse dominion doctrine applies to all claims asserted herein, thereby barring any defense based on a statute of limitations. *Freeland v. Enosis Corp.,* 540 F.3d 721 (7th Cir. 2008).

67.     On January 10, 2002, CropUSA purportedly entered into a Memorandum of Understanding with the Controlling AIA Defendants. Under the terms of this memorandum, Beck and Cashman were obligated to guarantee loans on behalf of CropUSA.

68.     Notably, Beck and Cashman had also been obligated to guarantee over $1,000,000 in loans on behalf of AIA since 1995, but they never did. Notwithstanding this obligation, the Controlling AIA Defendants subsequently arranged for AIA to guarantee CropUSA's lines of credit even though the guarantees were barred by AIA's amended articles of incorporation and

SECOND AMENDED COMPLAINT - 14

# Exhibit - A

## 21-ER-5432

bylaws.

69.     In 2004, the Controlling AIA Defendants attempted to raise capital for CropUSA by selling shares in CropUSA to private investors by way of a $10,000,000 private placement. The Hawley Troxell Defendants drafted the July 15, 2004, Private Placement Memorandum, despite their knowledge of the illegal "spin-off" of CropUSA and the fiduciary duties they owed to AIA.

70.     When CropUSA began distributing the Private Placement Memorandum in 2004, the company was experiencing financial difficulties that made it difficult, if not impossible, to attract investors to the private placement.

71.     In addition, in 2004, the CropUSA's lack of adequate funding threatened its ability to participate in the Federal Crop Insurance program. To alleviate these problems, the Controlling AIA Defendants would improperly turn to AIA to obtain the necessary funding.

   E.   **The Controlling AIA Defendants Steal $1,510,693 From AIA to Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt CropUSA Owed to AIA— thereby Resulting in a $2,144,962 Fraud Against AIA.**

72.     In order to boost CropUSA's balance sheet for the purpose of operating the company, attracting investors and maintaining access to the Federal Crop Insurance program, the Controlling AIA Defendants devised a scheme to illegally transfer $1,510,693 from AIA Insurance to CropUSA.

73.     The Controlling AIA Defendants conspired with each other in the formation and execution of this scheme to unlawfully transfer $1,510,693 of AIA's funds to CropUSA, and aided and abetted one another in carrying out the scheme and ultimately covering it up.

74.     Upon information and belief, the Hawley Troxell Defendants provided counsel to CropUSA with respect to the unlawful transfer of funds and/or has at a minimum assisted in covering up the facts of this illegal transfer.

SECOND AMENDED COMPLAINT - 15

# Exhibit - A

## 21-ER-5433

75.     The scheme involved money derived from AIA Insurance. In August, 2004, AIA Insurance received a payment of $1,510,693 from Trustmark. (*See* Dkt. #67-59.) Rather than deposit the payment of $1,510,693 into the account of AIA Insurance, where it would have benefited AIA and its innocent shareholders, John deposited the funds into a new account entitled "AIA Insurance Inc. CropUSA." (*See* Dkt. #67-60.) The address for this account coincided with the address for John's personal residence at 2020 Broadview Drive in Lewiston, Idaho, rather than any address used by AIA. (*Id*.)

76.     Shortly after diverting the $1,510,693 into the "AIA Insurance Inc. CropUSA" account, the Controlling AIA Defendants illegally transferred the funds to CropUSA. The Controlling AIA Defendants attempted to disguise this conversion of AIA Insurance's funds by characterizing the transaction as an alleged purchase by AIA Insurance of Series C Preferred Shares in its parent corporation, AIA Services. (*See* Dkt. #67-59.) Then, the Controlling AIA Defendants carried AIA Insurance's alleged investment in the Series C Preferred Shares as having a purported value of $1,510,693 when that was not the true value of the shares.

77.     However, as the Controlling AIA Defendants acknowledged at the time, there was no market for the Series C Preferred Shares which were purportedly being repurchased. At the time the $1,510,693 in funds were converted by CropUSA, there was no authorization of any kind for the transaction, and the transaction was concealed from AIA.

78.     In order to create a plausible explanation for the transfer of the $1,510,693, CropUSA eventually produced a document designated as a Consent in Lieu of Meeting dated August 26, 2004. (*See* Dkt. #67-61.) However, this document itself is completely fraudulent, as it was retroactively created the following year in order to deceive auditors who questioned the validity of this transaction.

SECOND AMENDED COMPLAINT - 16

# Exhibit - A

## 21-ER-5434

79.     In addition, this $1,510,693 purported repurchase of shares separately violated the terms of AIA Services' amended articles of incorporation, which required that all Series C Preferred Shares be redeemed equally and simultaneously from all shareholders. (*See* Dkt. #67-3.) Instead of repurchasing an equal portion of the Series C Preferred Shares from AIA Services' 401(k) Plan, the Controlling AIA Defendants intentionally only repurchased the Series C Preferred Shares held by CropUSA (which had been previously held by Beck, Cashman and their friends).

80.     CropUSA was carrying these Series C Preferred Shares in AIA Services on its books with a value of $21,693, which means that CropUSA realized a gain of $1,489,000 on this purported sale of shares. (*See* Dkt. #67-59.) At that time, although the Controlling AIA Defendants had not properly accounted for all funds, assets, labor and other costs advanced from AIA for CropUSA, they had actually accounted for there being a debt of $634,269 owed by CropUSA to AIA.

81.     After unlawfully transferring the $1,510,693 received by AIA Insurance to CropUSA, the Controlling AIA Shareholders had CropUSA repay the $634,269 debt owed to AIA, thereby committing a double fraud upon AIA, i.e., AIA should have the $1,510,693 in its bank account now and it should have never lent the $634,269 to CropUSA in the first place. In other words, those fraudulent transactions alone resulted in the loss of $2,144,962 in funds to AIA and thus damaged AIA in the amount of $2,144,962. The Controlling AIA Defendants have actively concealed, or covered up, these transactions from AIA with the assistance of the Hawley Troxell Defendants.

82.     AIA and the innocent shareholders of AIA Services were never given notice of the 2004 stock transaction, nor were any proper board meetings held to approve the transaction. However, as with the fraudulent document prepared on behalf of CropUSA, a fraudulent Consent

SECOND AMENDED COMPLAINT - 17

# Exhibit - A

**21-ER-5435**

if Lieu of Meeting, dated August 26, 2004, was prepared on behalf of AIA. This document was actually produced several months after the transaction and was created to deceive auditors.

83.     Upon information and believe, the Hawley Troxell Defendants provided legal services to both AIA and CropUSA at the time of the 2004 transaction or had actually knowledge of the 2004 transaction.

84.     The Hawley Troxell Defendants at various times, as purported counsel for AIA, failed to disclose to AIA the 2004 transaction to transfer $1,510,693 to CropUSA and that the acts of the Controlling AIA Defendants constituted an intentional breach of their fiduciary duties (including the duty of loyalty) owed to AIA and a concealment of a prohibited transaction. For this reason alone, the Hawley Troxell Defendants could not reasonably rely on a tolling agreement to represent AIA, CropUSA and the interest of the Controlling AIA Defendants in later litigation.

85.     The Hawley Troxell Defendants failed to disclose to AIA, or to anyone else, that this $1,510,693 transaction was unlawful on many levels, including but not limited to the fact that it did not comply with articles of incorporation and bylaws, caused a breach of AIA's other contracts, and could not be justified by the balance sheet of either AIA Insurance or CropUSA. Upon information and belief, the Hawley Troxell Defendants had knowledge of the back-dated Consent in Lieu of Meeting documents.

86.     On February 16, 2005, Beck sent an email to John and Cashman confirming the Controlling AIA Defendants' scheme to steal CropUSA in an effort to profit: "[Cashman] and I are so convinced that CropUSA is a winner that anything standing in the way of a good result will be a crime." (Dkt. #67-54.) The crime was stealing CropUSA from AIA and then to drain AIA of its funds and assets to pursue the Controlling AIA Defendants' scheme.

///

SECOND AMENDED COMPLAINT - 18

# Exhibit - A

## 21-ER-5436

**F.** **The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal**

87.     After unlawfully taking $2,144,962 from AIA Insurance in 2004, the Controlling AIA Defendants continued to operate CropUSA with assets both tangible and intangible that rightly belonged to AIA, continued to improperly subsidize CropUSA with AIA's labor, and continued to conceal their actions from AIA and AIA Services' innocent minority shareholders.

88.     Under the management and direction of the Controlling AIA Defendants, AIA regularly failed to allocate costs to CropUSA and other entities and failed to charge markup, interest or profit on costs paid for other entities. For example, John's own salary of $250,000 was allocated entirely to AIA Services even though John's contractual right to salary from AIA Services had expired in 1998 and had never been renewed by an authorized board. (And, further, John performed no actual work for AIA during the time in question.)

89.     John, with the knowledge and complicity of the other Controlling AIA Defendants, also performed work for other entities owned in full or in part by him while on AIA's payroll, i.e., Pacific Empire Radio Corp., Pacific Empire Communications Corp., Pacific Empire Holdings Corp., Radio Leasing I LLC and Radio Leasing II LLC. John also had other AIA employees work for these entities without compensation to AIA. These facts, like virtually all of the others referenced in this Second Amended Complaint, were concealed from AIA and AIA Services' innocent minority shareholders.

90.     Between its founding in 1999 and the filing of this lawsuit, CropUSA and other entities generated tens of millions of dollars of revenue (including premiums) and other benefits that would have flowed to AIA but for the unlawful and unauthorized acts of the Controlling AIA Defendants.

///

SECOND AMENDED COMPLAINT - 19

# Exhibit - A

## 21-ER-5437

91.     As of 2006, John owed AIA at least $307,000 for personal loans he had taken from AIA Services. For several years, John concealed these loans by engaging in false accounting whereby loans to him were treated as payments of principal on AIA Service' indebtedness due to Reed Taylor on his $6 million promissory note (which was later ruled to be illegal).  In 2006, John "corrected" an accounting "error" by increasing the balance due on Reed Taylor's note to $6 million. John has still not repaid his personal loans.

92.     Over the years, John had AIA pay his personal maid, his personal credit card bills, donations, cash advances, family cell phone bills, and other personal expenses. John also had AIA purchase several vehicles from him, and he continued to drive these vehicles after the sales and purchase other vehicles with AIA's funds to use for his benefit when there was no reason to do so. John also had AIA employees perform work on his personal residence and on other real property not owned by AIA. These acts were all committed with the knowledge and complicity of the Controlling AIA Defendants and without paying AIA the fair value of the services or expenses.

93.     At year-end 2006, AIA had improperly lent $95,000 to Pacific Empire Radio Corp., a corporation partially owned by John and Connie and in which they both served as directors at certain times. The Controlling AIA Defendants transferred that $95,000 receivable from AIA to CropUSA. Before it was over, AIA would lend over $1,400,000 in additional funds to Pacific Empire Radio Corp., when all such loans violated AIA Services' amended articles of incorporation and were not authorized under the circumstances by AIA Services' restated bylaws.

94.     In August 2007, AIA settled litigation with the state of Idaho whereby AIA received a mortgage worth approximately $1.5 million for the amounts owed by Washington Bank Properties on the real property where AIA's offices are located. Although AIA Insurance paid the

SECOND AMENDED COMPLAINT - 20

# Exhibit - A

costs of this litigation, the Controlling AIA Defendants, with the assistance of the Hawley Troxell Defendants, improperly titled the note in the name of AIA Services only, and then pledged the note to CropUSA so that the Controlling AIA Defendants could borrow money to pay their attorneys' fees and costs incurred defending in *Taylor v. AIA Services Corp., et al.*, to the Hawley Troxell Defendants.

95.     As with the 2004 transactions, the transaction pledging the mortgage owned by AIA Services to CropUSA for purportedly paying the Hawley Troxell Defendants' attorneys fees and costs incurred representing AIA, CropUSA and the Controlling AIA Defendants was a blatant misappropriation and/or illegal pledging of AIA's asset. The loan documents and the pledge agreement were drafted by the Hawley Troxell Defendants, although they later asserted that they were only "scriveners" for the transaction. This transaction was improper and barred by AIA's amended articles of incorporation and bylaws.

G.  **The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and Financial Wherewithal with the Improper Assistance from the Hawley Troxell Defendants**

96.     On October 26, 2007, the Hawley Troxell Defendants drafted and delivered an opinion letter falsely representing that AIA Insurance was authorized to guarantee a $15,000,000 line of credit on behalf of CropUSA, which carried a hard-money loan exorbitant interest rate.

97.     The Hawley Troxell Defendants' opinion letter was delivered for a loan guarantee which violated AIA Services' amended articles of incorporation, its restated bylaws and AIA Insurance's bylaws, and in violation of the duty of loyalty owed by the Hawley Troxell Defendants to AIA.

98.     Additionally, Lancelot, the lender for this $15,000,000 line of credit was subsequently exposed as a Ponzi scheme, and its founder, Gregory Bell, pleaded guilty to criminal

SECOND AMENDED COMPLAINT - 21

# Exhibit - A

**21-ER-5439**

charges in federal court. Mr. Bell was the signee for Lancelot on the $15,000,000 line of credit. These facts pertaining to the $15,000,000 loan for CropUSA and AIA Insurance's guarantee of that loan, along with other transactions, were never disclosed to AIA by the Hawley Troxell Defendants or the Controlling AIA Defendants and the payment of interest on that loan was detrimental to AIA because most of CropUSA's assets could be traced directly to AIA (and the depletion of CropUSA's funds resulted in less funds available to recover).

**H.** **The Controlling AIA Defendants Enter Into Tolling Agreements, but Those Tolling Agreements Do Not Save the Hawley Troxell Defendants from the Unwaivable Conflicts of Interest**

99.    In 2007, Reed Taylor filed suit against AIA and certain of the Controlling AIA Defendants, asserting claims for breaches of contract, breaches of fiduciary duties, conversion, fraud and other claims ("*Taylor v. AIA Services Corp., et al.*"). In 2007, the Hawley Troxell Defendants appeared as counsel for AIA Services and AIA Insurance in that lawsuit. Later, Reed Taylor amended his complaint and named CropUSA as a defendant, after recognizing that millions of dollars had been transferred to it from AIA, among other improper transactions (including some of those transactions described in this Second Amended Complaint). (*See* Dkt. #82-2.) The Hawley Troxell Defendants also appeared and represented CropUSA in that lawsuit. (*Id.*)

100.    As the purported attorneys for AIA, two entities, the Hawley Troxell Defendants owed duties of loyalty, care, and good faith to AIA and the Hawley Troxell Defendants breached their duties of care and fiduciary duties by engaging in the simultaneous representation of the Controlling AIA Defendants, AIA, CropUSA, and other parties with interests adverse to AIA (including Bryan Freeman).

101.    In 2007, Connie and Beck were appointed the Boards of Directors of AIA Service and AIA Insurance by John. Connie and Beck were paid $5,000 per quarter to sit on the Boards of

SECOND AMENDED COMPLAINT - 22

# Exhibit - A

## 21-ER-5440

AIA and also receives shares for his "service." Beck later testified that he serves on this board to protect his own interests and those of his friends (the same friends who previously acquired Series C Preferred Shares in AIA Services and illegally exchanged them for common shares in CropUSA).

102.    In 2007 and 2008, the Controlling AIA Defendants entered into written tolling agreements in connection with the various litigation directly or indirectly involving AIA. The Hawley Troxell Defendants were improperly involved with and/or facilitated the Controlling AIA Defendants entering into such tolling agreements for the purpose of allowing the Hawley Troxell Defendants to continue to represent AIA, CropUSA and directly or indirectly certain of the Controlling AIA Defendants.

103.    By tolling the statute of limitation for claims against the Controlling AIA Defendants, the Hawley Troxell Defendants sought to use the tolling agreements to authorize the waiver of their conflicts of interest representing AIA, CropUSA and the interests of the Controlling AIA Defendants in litigation that could have and should have exposed the fraud and intentional breaches of fiduciary duties committed by the Controlling AIA Defendants.

104.    The purpose of a properly drafted and executed tolling agreement is to allow conflicts of interest to be waived under certain limited permissible circumstances in order to waive a conflict of interest so that an attorney or law firm can represent clients with diverging interests. Those limited permissible circumstances were not present here.

105.    The Hawley Troxell Defendants knew or should have known that the Controlling AIA Defendants had committed intentional acts of fraud and breaches of fiduciary duties (including the duty of loyalty) owed to AIA. The Hawley Troxell Defendants knew or should have known that by allowing the Controlling AIA Defendants to continue to operate and control AIA

SECOND AMENDED COMPLAINT - 23

## Exhibit - A

## 21-ER-5441

that they would continue to conceal their past torts and likely continue to commit new torts, which is precisely what occurred here as demonstrated by the facts alleged in this Second Amended Complaint.

106.    Although these tolling agreements tolled the statute of limitations for claims AIA could assert against the Controlling AIA Defendants (which eliminates any defense they may have to assert any statute of limitations defenses), the facts set forth in this Second Amended Complaint provide a classic example of why such tolling agreements were improper under the circumstances as the agreements involved tolling intentional torts committed against AIA. While the claims were being tolled, the Controlling AIA Defendants' continued to unlawfully use AIA's cash, resources and ability to borrow funds to funds other businesses and pay compensation to themselves.

107.    During the course of the litigation in *Taylor v. AIA Services Corp.*, *et al*., Reed Taylor attempted to negotiate a settlement, but he insisted that any settlement must include full disclosure to, and authorization by, AIA Services minority shareholders and to allow them to participate in CropUSA common share ownership. (*See* Dkt. #67-18.) Not only did the Controlling AIA Defendants and Hawley Troxell Defendants reject Reed Taylor's offer, but they still refused and failed to provide full disclosure to AIA and its innocent shareholders of the malfeasance and torts committed against AIA. The untenable position of the Hawley Troxell Defendants was confirmed when the only person seeking to obtain full and fair disclosure was a creditor, Reed Taylor. (*Id.*)

108.    During the course of *Taylor v. AIA Services Corp, et al.*, Connie and Beck represented to Judge Brudie, the Idaho Supreme Court and AIA that the redemption of Reed Taylor's shares should be illegal to benefit AIA Services' minority shareholders. (*See* Dkt. #67-23 and #67-25.)

SECOND AMENDED COMPLAINT - 24

# Exhibit - A

# 21-ER-5442

**109.** After Judge Brudie ruled the redemption of Reed Taylor's shares was illegal, neither Connie, Beck nor any of the other Controlling AIA Defendants did anything for the minority shareholders of AIA nor did they ever have any intention of helping them, contrary to what they had represented to Judge Brudie and the Idaho Supreme Court.

**110.** Instead of sharing equally in AIA's assets with AIA Services' innocent minority shareholders, the Controlling AIA Defendants later sought to eliminate those minority shareholders for only ten cents per share, even though Connie and John both previously valued the shares much higher even after considering the over $6 million owed to Reed Taylor at the time of valuation (a debt that was later ruled to be illegal and void). (*See* Dkt. #67-24 and #67-50.)

**111.** Riley was an attorney at the law firm of Eberle Berlin at the time of the redemption of Reed Taylor's shares in 1995 and he breached his duty of care by advising AIA Services and Reed Taylor[1] to enter into the illegal stock redemption transaction. *See Taylor v. AIA Servs. Corp.*, 151 Idaho 552, 261 P.3d 829 (2011).

**112.** The illegal redemption of Reed Taylor's common shares ultimately led to AIA incurring over $1 million in attorneys' fees and costs to fight and resulted in AIA Services being required to report to the IRS a gain from the $6 million it never had to pay Reed Taylor.

**113.** Upon information and belief, the Controlling AIA Defendants never reported the gain from the extinguished $6 million debt to Reed Taylor on AIA Services' tax return. If the Controlling AIA Defendants did not report the $6 million income to the IRS and AIA Services is

---

[1] The Controlling AIA Defendants have brought bread to many defense attorneys. Notably, the Controlling AIA Defendants (except Cashman, who was not a party to the lawsuit) successfully asserted that the Stock Redemption Agreement was illegal. (*See* Dkt. #83-5.) Consequently, Reed Taylor sued Riley, Turnbow and Eberle Berlin for their incorrect third-party closing opinion letter. *Taylor v. Riley*, 157 Idaho 323, 336 P.3d 256, 261 (2014). He later settled his claims against Turnbow and Eberle Berlin, but his claims against Riley are on appeal as noted by the Ninth Circuit Court of Appeals. *Taylor v. Hawley Troxell Ennis & Hawley, LLP*, 628 Fed.Appx. 490 (9th Cir. 2015). Reed Taylor also sued his independent counsel. *Taylor v. Bell*, 185 Wn. App. 270, 273-79, 340 P.3d 951, 954-56 (2014), *review denied*, 352 P.3d 188 (2015).

SECOND AMENDED COMPLAINT - 25

# Exhibit - A

**21-ER-5443**

obligated to pay taxes, penalties and interest on that gain, the Controlling AIA Defendants are liable for those sums as well for breaching their fiduciary duties owed to AIA.

114.    Based on the intentional acts of the Hawley Troxell Defendants, AIA has been decimated because the Controlling AIA Defendants remained in control of AIA through those tolling agreements. The end result of these tolling agreements was that the Hawley Troxell Defendants improperly ensured that the Controlling AIA Defendants would retain control over AIA to the detriment of AIA and for the improper benefit to the Hawley Troxell Defendants and the Controlling AIA Defendants.

115.    In or around 2007 or 2008, AIA Insurance received a settlement of approximately $800,000 for litigation that AIA Insurance had funded for certain policy holders. Instead of utilizing or retaining those funds exclusively for AIA, the Controlling AIA Defendants improperly used those funds, in full or in part, to continue their intentional acts of funding CropUSA, litigation caused by them or other unauthorized uses. Upon information and belief, the Hawley Troxell Defendants had knowledge of the receipt of those funds, yet they did nothing to protect them even though the funds were at issue in a lawsuit.

116.    In 2008, the Controlling AIA Defendants and the Hawley Troxell Defendants permitted CropUSA to sell over $10,000,000 in crop insurance business to Hudson Insurance for the benefit of CropUSA when approximately 75% of the business had been derived directly from AIA's agency force (i.e., such agents as Larry Whitehead). The over $7.5 million should have been paid to AIA rather than to pay the debts incurred by the Controlling AIA Defendants through CropUSA.

117.    Sometime after CropUSA sold the bulk of its assets to Hudson in 2008, which were derived primarily from AIA, the Controlling AIA Defendants obtained further funds from Hudson

SECOND AMENDED COMPLAINT - 26

# Exhibit - A

21-ER-5444

Insurance for Growers National Cooperative Insurance Agency, Inc. ("Growers National"), an entity formed and funded by AIA for purposed of selling crop insurance and providing a form of rebate to farmers.

118.    Upon information and belief, CropUSA received over $500,000 from Hudson for Growers National. These funds should have been paid to AIA and the receipt of the funds was concealed from AIA. Plaintiffs will establish the exact amount of funds that the Controlling AIA Defendants and/or CropUSA received from Hudson for Growers National at the time of trial.

I.    **The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA and Intentionally Committing Torts against AIA with the Assistance of the Hawley Troxell Defendants—Even While this Lawsuit Was Pending**

119.    Upon information and belief, the Hawley Troxell Defendants have been paid the bulk of the over $2,000,000 in attorneys' fees and costs incurred and/or paid for the various lawsuits. Plaintiffs will establish the exact amount of funds paid to the Hawley Troxell Defendants by AIA and/or on behalf of AIA, which Plaintiffs are seeking to be disgorged and returned to AIA.

120.    From 2009 through the present time, Donna exercised her right under the amended articles of incorporation to appoint two different directors to AIA Services' Board of Directors, but the Controlling AIA Defendants and/or the Hawley Troxell Defendants refused to honor her unqualified right thereby resulting in all action taken by AIA Services' Board of Directors during that period of time being unauthorized and thus a breach of the fiduciary duties of the Controlling AIA Defendants.

121.    In December 2009, Donna filed suit against AIA Services to exercise her unequivocal right to appoint her designee, Patrick Moran, to the Board of Directors of AIA Services and to appoint a receiver for AIA Services. The Hawley Troxell Defendants once again appeared in that lawsuit and successfully opposed Donna's designee being appointed to the Board

SECOND AMENDED COMPLAINT - 27

# Exhibit - A

of Directors or a receiver being appointed by improperly seeking a stay in the lawsuit.

122.    Had the Hawley Troxell Defendants joined Donna in having a receiver appointed for AIA Services, which the Hawley Troxell Defendants should have done in light of the countless intentional torts committed against AIA by the Controlling AIA Defendants, there is no doubt that they could have stopped the Controlling AIA Defendants from carrying out their ongoing fraud, intentionally breaches of fiduciary duties and their ultimate decimation of AIA. At a minimum, the Hawley Troxell Defendants acts and/or omissions in this regard was a substantial factor of the improper transactions, unlawful acts, and the ultimate decimation of AIA, which ocurred after 2009.

123.    This lawsuit was filed by Plaintiffs on August 11, 2010, and subsequently stayed at the request of the Controlling AIA Defendants and the Hawley Troxell Defendants. During that stay, inappropriate and unlawful transactions have continued.

124.    In March 2012, the Controlling AIA Defendants, with, information and belief, the improper assistance of new attorneys at the law firm of Randall & Danskin, improperly terminated AIA Services' ESOP and paid those shareholders three cents per shares for their hard-earned common shares and failed to disclose the facts pertaining to the malfeasance and torts described in this Second Amended Complaint to those shareholders. (*See* Dkt. #67-30-33, 34.)

125.    However, the Controlling AIA Defendants knew that AIA Services' amended articles of incorporation barred all stock redemptions, including any purchases of shares held by the ESOP, until the Series A Preferred Shares were all fully redeemed and the Series C Preferred Shares had been paid the approximately $1,000,000 in dividends owed. The repurchase of the ESOP shares for three cents per shares was illegal, ultra-vires and improper.

///

SECOND AMENDED COMPLAINT - 28

# Exhibit - A

126.   In 2012, the Controlling AIA Defendants, again with the improper assistance of Randall & Danskin (*See* Dkt. #67-48, 67-48), improperly sought to effectuate a reverse stock split and to only pay AIA Services' minority common shareholders ten cents per share and paying those common shareholders (including Plaintiffs) without disclosing any facts and without offering full and fair compensation for the value of the shares. (*See* Dkt. #66-3.) The notice to the shareholders was signed by Duclos and the improper and unlawful reverse stock split was approved by Beck, John and Connie. (*Id.*)

127.   Thirteen shareholders objected. (*See* Dkt. #67-41.) The ill-conceived reverse stock split violated AIA Services' amended articles of incorporation and the Controlling AIA Defendants did not even bother to comply with Idaho Code, including, by failing to provide the form for the shareholders to state the value that they believed should be paid for their common shares thereby further establishing the true improper purpose of the failed reverse stock split.

128.   In response to the thirteen shareholder objections and notices of demands for payment, the Controlling AIA Defendants, through Randall & Danskina and without regard to the fact that they would expend tens of thousands of dollars more in funds litigating the issue rather than simply paying the shareholders the true fair value of their shares, had AIA Services file suit against the thirteen shareholders. (*See* Dkt. #83-15.) Judge Carl Kerrick properly dismissed the lawsuit, and further noted that it was disingenuous to seek a reverse stock split until this lawsuit was resolved. (*See* Dkt. #86-1.)

129.   The failed reverse stock split fiasco drained AIA of significant and unnecessary attorneys' fees and costs (fees and costs which could have been paid to those shareholders or for other AIA obligations). This purported reverse stock split was approved and/or acquiesced in by the Controlling AIA Defendants. Upon information and belief, the Hawley Troxell Defendants

SECOND AMENDED COMPLAINT - 29

# Exhibit - A

were aware of the scheme to effectuate reverse stock split to eliminate AIA Services' innocent minority shareholders which would in turn eliminate shareholder standing for this lawsuit.

130.    After the Controlling AIA Defendants had AIA Services file suit against the thirteen objecting common shareholders who demanded fair payment, Nez Perce County District Court Judge Carl Kerrick dismissed the lawsuit and awarded those minority shareholders attorneys' fees and costs. That judgment in favor of those shareholders has still never been paid by the Controlling AIA Defendants or AIA, and the Controlling AIA Defendants should be required to pay that judgment on behalf of AIA.

131.    From 2009 through 2015, the Controlling AIA Defendants continued loaning money to, or allowed money to be lent to, Pacific Empire Radio Corporation in an amount exceeding $1,400,000 by year-end 2012 when that corporation had no ability to repay the sums owed and it benefitted John and Connie (who owned shares in that corporation at certain relevant times) as those were funds they would not have to provide Pacific Empire Radio Corp.

132.    From 1999 through 2012, the Controlling AIA Defendants concealed their ownership interests in other entities from AIA which were derived from and/or funded by AIA, including, without limitation, CropUSA, CropUSA Insurance Services, LLC, Pacific Empire Holdings Corp.

133.    From 1995 through 2012, John received over $2,729,557 in cash compensation from AIA. This amount does not include any compensation, payments or other improper distributions he may have received from CropUSA and other entities funded or launched using AIA. At a minimum, John should be required to disgorge the over $2,038,657 he received from AIA from 1999 through 2012 and other compensation or funds received since 1999, which John received while improperly competing against AIA through CropUSA and other entities (including

SECOND AMENDED COMPLAINT - 30

# Exhibit - A

**21-ER-5448**

Pacific Empire Holdings Corp.).

**J.** **There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants**

**134.** Since acquiring operational control of AIA Services in 1995, the Controlling AIA Defendants have engaged in repeated acts of faithless self-dealing, transactions detrimental to AIA, committed intentional torts (including fraud and breaches of fiduciary duties), breached their fiduciary duties (including their duties of loyalty), concealed, conspired to commit intentional torts, aided and abetted in the commission of intentional torts and to cover up those torts, to the detriment of AIA, including, but not limited to, the following specific examples: **(a)** controlling the Board of Directors and/or the decisions made by the Board and refusing to act in the best interests of AIA; **(b)** violating AIA's Restated Bylaws, including but not limited to, failing to hold annual shareholder meetings, failing to obtain proper shareholder approval for certain transactions, failing to comply with conflicts of interest provision in the bylaws and articles of incorporation which restricted many of the unlawful or improper transactions described herein, and failing to properly comply with applicable corporate governance; **(c)** violating AIA's Amended Articles of Incorporation thereby allowing substantial funds and assets to be depleted from AIA and obligating AIA to be liable for loans or guarantees which were barred by those amended articles of incorporation; **(d)** diverting corporate opportunities belonging to AIA; **(e)** conveying, encumbering, utilizing, and/or pledging corporate assets to themselves or other entities; **(f)** inappropriately redeeming, acquiring and/or issuing shares of stock and/or making payments on put options, including but not limited to, issuing shares to the Controlling AIA Defendants; **(g)** inappropriately paying dividends; **(h)** intentionally failing to comply with conflict of interest provisions in AIA bylaws; **(i)** guaranteeing loans for CropUSA and failing to guarantee loans for AIA; **(j)** paying excessive compensation to officers and directors, including but not limited to,

SECOND AMENDED COMPLAINT - 31

paying John $250,000 per year to purportedly act as CEO and President of AIA Services after his contractual entitlement to such salary had expired and John had represented that he would not take salary in certain years; (**k**) wasting corporate assets, including by paying Connie and Beck $20,000 per year to purportedly serve on the Board of Directors of AIA Services; (**l**) divulging and/or utilizing AIA's trade secrets for the benefit of themselves and other entities, including CropUSA; (**m**) soliciting and transferring AIA employees to work for CropUSA; (**n**) engaging in acts and/or decisions without making full disclosure and without obtaining the required approval of shareholders; (**o**) engaging in millions of dollars of transactions wherein AIA conveyed benefits without the receipt of any consideration or without being repaid; (**p**) forming and operating entities in direct competition with AIA in the insurance marketplace, including without limitation, CropUSA and Pacific Empire Holdings Corp.; (**q**) making false representations, including, without limitation, regarding share values, omitting material facts in AIA's financial statements, falsely certifying AIA's financial statements, and that AIA was being operated for the benefit of the corporation; (**r**) concealing and failing to disclose material facts to AIA pertaining to loans, transfers, and utilization of assets, including without limitation, concealing or omitting material facts, including all of the necessary facts related to virtually each and every transaction described in this Second Amended Complaint; (**s**) making false representations to AIA, including without limitation, making and certifying false and misleading financial statements to AIA and representing that AIA was being properly operated when it was instead being used to fund the lifestyle, payments and other businesses owned or partial owned by the Controlling AIA Defendants; (**t**) inappropriately loaning AIA's funds, or guaranteeing loans, to themselves and to other entities under their control in violation of AIA's amended articles of incorporation, bylaws and fiduciary duties; (**u**) paying tens of thousands of dollars in yearly fees to purportedly serve on

SECOND AMENDED COMPLAINT - 32

# Exhibit - A

the Board of Directors of AIA, excessive compensation and benefits when such amounts were excessive and they were violating their fiduciary duties owed to AIA and they were all acting as faithless fiduciaries; **(v)** paying attorneys' fees and costs in various legal proceedings on behalf of the Controlling AIA Defendants and others when it was clear that they had intentionally failed to act in good faith, were not entitled to indemnification or to have attorneys' fees and costs advanced on their behalf and by failing to obtain security for repayment of said funds; **(x)** acquiring a parking lot with AIA funds and charging AIA, and making AIA pay, excessive rent for use of the parking lot even though AIA did not actually use the parking lot; **(y)** failing to seat the full and required Board of Directors for AIA Services, including, without limitation, by failing to honor Donna's appointment of Patrick Moran and Paul Durant to AIA Services' Board of Directors; **(z)** improperly purchasing and transferring shares held by AIA or which should have been held by AIA to themselves, including without limitation shares in Pacific Empire Radio Corp., Pacific Empire Communications Corp., and Pacific Empire Holdings Corp. (this entity was formed by AIA's assets by John, improperly competed against AIA, and was later sold for $240,000); **(aa)** allowing John to profit from CropUSA's sale of assets to Hudson by improperly allowing him to retain a monthly fee of $10,000 per month when those funds should have gone to AIA; **(bb)** failing to take appropriate legal action in the interests of AIA; **(cc)** removing a tenant from an AIA owned building to another building owned personally by John and/or other Controlling AIA Defendants; **(dd)** improperly subsidizing CropUSA and other entities with AIA's funds, labor and assets, failing to properly allocate expenses to CropUSA and failing to have other expenses paid back at all (which have already been identified as being approximately $500,000 as of 2008); **(ee)** selling and/or transferring assets and or/contracts belonging to AIA to others (including the contract with Growers National); **(ff)** improperly paying numerous law firms other than the Hawley Troxell

SECOND AMENDED COMPLAINT - 33

# Exhibit - A

Defendants hundreds of thousands of dollars representing AIA and the Controlling AIA Defendants in litigation caused by their own intentional acts and torts; **(gg)** paying more of AIA's funds to litigate disputes (including with Donna in the Idaho state courts) than it would have taken to simply pay the money owed; **(hh)** failing to obtain security, failing to charge interest, and failing to collect on loans of at least $307,000 made to John; **(ii)** removing the $400,000 held in the court registry and the $200,000 in a bank account in *Taylor v. AIA Services Corp., et al.* and allowing the Controlling AIA Defendants to utilize those funds when the Hawley Troxell Defendants should have ensured that those funds were kept from them; **(jj)** expending significant sums on the illegal repurchase of common shares in AIA Services, which also resulted in the ownership interest of the Controlling AIA Defendants increasing; and **(kk)** allowing AIA to engage in the transactions identified in this Second Amended Complaint when no dividends had been declared or paid on the Series C Preferred Shares held in the AIA Services 401(k) Plan and those shares now have accrued dividends owed of over $1,000,000. The Controlling AIA Defendants and/or the Hawley Troxell Defendants have assisted one another and others in committing the intentional torts against AIA described herein and concealing, or covering up, the facts and the intentional torts committed against AIA, including those specifically referenced in this paragraph and elsewhere in this Second Amended Complaint.

135.    At all relevant times, John was CEO, President and director of AIA Services, AIA Insurance and CropUSA and a shareholder of AIA Services at the time of all of the improper transactions with CropUSA and other improper acts identified in this Second Amended Complaint (also a classic example of a conflict of interest), and he improperly benefited from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

SECOND AMENDED COMPLAINT - 34

# Exhibit - A

**21-ER-5452**

**136.** At all relevant times, John was also owned interests in other entities who improperly benefitted directly or indirectly from AIA, which forms additional conflicts and proof of self-dealing.

**137.** At all relevant times, the Controlling AIA Defendants were all purported shareholders of CropUSA and either majority shareholders (as a group) or officers of AIA Services at the time of the improper transactions and malfeasance identified in this Second Amended Complaint (also a classic example of conflict of interest), and they improperly benefited, directly or indirectly, from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

**138.** As a result of the acts and omissions set forth and/or contemplated above and other acts and/or omissions which will be established at or before trial, the Controlling AIA Defendants and the Hawley Troxell Defendant have proximately caused AIA millions of dollars in damages.

## V.  CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 AND FEDERAL RULE OF CIVIL PROCEDURE 23.1

**139.** As a prerequisite to filing this lawsuit under Idaho Code § 30-1-742 and Federal Rule of Civil Procedure 23.1, Plaintiffs (and over ten other shareholders of AIA Services) have been shareholders of AIA Services during all relevant times to the claims asserted in this Second Amended Complaint.

**140.** On July 21, 2008, Donna served a written derivative demand letter on the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #23-9 and #67-19.)

**141.** On July 23, 2008, the Hawley Troxell Defendants filed a Motion for Stay of Proceedings in *Taylor v. AIA Services Corp.*, *et al.*, and asserted that the stay was necessary so that AIA Services and AIA Insurance could conduct an inquiry into the demands made by Donna in

SECOND AMENDED COMPLAINT - 35

# Exhibit - A

**21-ER-5453**

her letter dated July 21, 2008.

142.    On August 14, 2008, in *Taylor v. AIA Services Corp.*, *et al.*, the Hawley Troxell Defendants disingenuously filed a petition for a court appointed independent inquiry on behalf of AIA when they had no intention of following through with the inquiry. (*See* Dkt. #67-20.)

143.    On September 4, 2008, Reed Taylor supported the appointment of independent investigators. However, Reed Taylor objected to the investigators proposed by the Hawley Troxell Defendants, who were purportedly representing AIA, and the Controlling AIA Defendants. (*See* Dkt. #67-21.) Reed Taylor believed totally independent people should be appointed.

144.    Although the parties had filed briefing with respect to the appointment of independent investigators, the Hawley Troxell Defendants never noted the motion for a hearing and the court never ruled on the request, and they intentionally abandoned the appointment of an independent inquiry.

145.    The Hawley Troxell Defendants and Controlling AIA Defendants have never conducted a further investigation of the demands made in Donna's derivative demand letter of July 21, 2008. No action was ever taken by the Boards of Directors.

146.    On April 3, 2012, Plaintiffs made another written demand on the Boards of Directors of AIA Services and AIA Insurance, which included demands to keep the $400,000 cash held in the Court registry in *Taylor v. AIA Services Corp.*, *et al.*, to comply with AIA's amended articles of incorporation, to comply with AIA's bylaws, provide full disclosure, and to protect certain other assets. (Dkt. #67-33.) This particular demand was copied directly to Babbitt and Ashby, so they had full knowledge of it. This demand, like all of the others, was ignored. (*See* Dkt. #67, p. 11 ¶ 29.)

///

SECOND AMENDED COMPLAINT - 36

# Exhibit - A

147.    On July 16, 2012, the Plaintiffs and over ten other shareholders of AIA Services served additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #67-42.) The demands requested, among other things, that AIA pursue this lawsuit with all claims as of July 16, 2012 and future claims, including punitive damages. (*Id.*) In addition, Plaintiffs have made additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance, but no action has ever been taken by the Boards of Directors.

148.    Over ninety days have elapsed since the Plaintiffs' written derivative demands were made and no action has been taken by AIA whatsoever, and all of the claims asserted in this lawsuit flowed from those derivative demands.

149.    As owner of Preferred A Shares in AIA Services, and as beneficial owner common shares in AIA Services, Donna fairly represents the interests of shareholders not named in this lawsuit. She also assisted in defeating the litigation involved the Controlling AIA Defendants' efforts to effectuate an improper reverse stock split to eliminate shareholder standing in this lawsuit, when she could have simply sought to solely protect her interests only. Donna is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims. Donna has pursued this lawsuit solely for the benefit of AIA and their shareholders.

150.    As the second largest common shareholder AIA Services (who traded a book of insurance business worth approximately $500,000 to AIA Services in exchange for his common shares), Miesen also fairly represents the interest of AIA and their shareholders. Miesen has never received a penny in return for his investment in AIA. Miesen is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims. Miesen has pursued this lawsuit solely for the benefit of AIA and their

SECOND AMENDED COMPLAINT - 37

# Exhibit - A

shareholders.

### VI.     COUNT I—BREACH OF FIDUCIARY DUTY
**(Against the Controlling AIA Defendants and the Hawley Troxell Defendants)**

**151.**     Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

**152.**     The Controlling AIA Defendants owed fiduciary duties to AIA as the majority and controlling shareholders. As members, or purported members, of the Board of Directors for AIA Services and/or AIA Insurance, the Controlling AIA Defendants, who have each served as a director of AIA Services at one time, owed fiduciary duties to the corporations. As corporate officers of AIA, John, as President and CEO, and Duclos, as Secretary owed fiduciary duties to AIA, which were further elevated during the times in which the both served as directors too (which is from 1995 to the present time for John).

**153.**     As attorneys for AIA, the Hawley Troxell Defendants owed fiduciary duties to AIA (including the undivided duty of loyalty). If not authorized to act as attorneys for AIA, the Hawley Troxell Defendants acted with apparent authority as agent and owes fiduciary duties as a result of that agency relationship. The Hawley Troxell Defendants had conflicts of interest when they undertook to represent AIA and CropUSA, and when they proceeded in the manner directed by any one or more of the Controlling AIA Defendants, thereby improperly representing the interests of the Controlling AIA Defendants, instead of in the best interests of AIA. *Reis v. Barley, Snyder, Senft & Cohen LLC,* 484 F.Supp.2d 337 (E.D. Pa. 2007).

**154.**     Based on any and/or all of the acts and/or omissions set forth in this Second Amended Complaint and/or those facts proven at or before the time of trial, the Controlling AIA Defendants and the Hawley Troxell Defendants have breached their fiduciary duties owed to

SECOND AMENDED COMPLAINT - 38

# Exhibit - A

## 21-ER-5456

AIA, including, without limitation, breaching their undivided duties of loyalty, trust and confidence owed to AIA, and by placing their interest in earning hundreds of thousands of dollars, and ultimately over $1,000,000, in attorneys' fees over looking after the interests of AIA.

155.    The Hawley Troxell Defendants have separately breached their fiduciary duties as matter of law when they simultaneously represented AIA and CropUSA. In addition, Riley was aware that CropUSA was derived from AIA and he was further aware of the restrictions in AIA Services' amended articles of incorporation as he helped prepare them. The Hawley Troxell Defendants have further breached their fiduciary duties as a matter of law for the violations of the Rules of Professional Conduct dealing with loyalty to a client and conflicts of interest.

156.    As a direct and/or proximate cause of the Controlling AIA Defendants and the Hawley Troxell Defendants breaches of their fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

157.    In addition, each of the Controlling AIA Defendants and the Hawley Troxell Defendants is a "faithless fiduciary" as defined by law and is therefore required to disgorge all compensation and consideration received from AIA and/or CropUSA. The disgorgement is in addition to liability caused by the breaches of fiduciary duty. In the case of the Hawley Troxell Defendants, the disgorgement goes to all fees received for or paid on behalf of AIA and CropUSA. In the case of the faithless Controlling AIA Defendants, the disgorgement goes to all salary, bonuses, warrants, stock options, or stock received from AIA.

### VII.    COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES
**(Against the Controlling AIA Defendants and the Hawley Troxell Defendants)**

158.    Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

SECOND AMENDED COMPLAINT - 39

# Exhibit - A

## 21-ER-5457

159.    One who counsels, advises, abets or assists in the commission of an actionable wrong is responsible to the injured person for the entire loss or damage. 86 C.J.S. Torts § 105; RESTATEMENT (FIRST) OF TORTS § 876 (1939). Aiding and abetting in the commission of an actionable wrong may be inferred from the fact that one aided and abetted efforts to conceal the wrong. 86 C.J.S. Torts § 105. Liability for aiding and abetting the commission of a tort may be established by showing the person was present at the time of the actionable wrong and did not disapprove or oppose the action. Plaintiffs alleging aiding and abetting need not prove that the aiding and abetting was necessary for the commission of the tort, only that the aiding and abetting made it easier for the tort to occur. *See Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12 (2002).

160.    During certain relevant times, the Hawley Troxell Defendants and the Controlling AIA Defendants had knowledge of the other defendants' acts and/or omissions as described in this Second Amended Complaint and as proven at trial, knew that such acts and/or omissions constituted a breach of fiduciary duty, did not disapprove of such acts or omissions, took no steps to prevent the commission of the breaches of fiduciary duties flowing from the acts and/or omissions, and assisted in the concealment of such acts and/or omissions described herein, thereby damaging AIA.

161.    As a direct and/or proximate cause of the Hawley Troxell Defendants and the Controlling AIA Defendants aiding and abetting one another in the breaches of fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

## VIII.    COUNT III—LEGAL MALPRACTICE
### (Against the Hawley Troxell Defendants)

162.    Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this

SECOND AMENDED COMPLAINT - 40

# Exhibit - A

# 21-ER-5458

cause of action.

163.    A legal malpractice claim may be brought in a derivative action. *Schulman v. Wolf & Samson, PC,* 951 A.2d 1051 (N.J. 2008).

164.    Since at least 1999, the Hawley Troxell Defendants had an attorney-client relationship with AIA, while Riley has had an attorney-client relationship with AIA since prior to 1995. The Hawley Troxell Defendants owed duties to AIA, including, without limitation, duties of care, good faith and loyalty. Despite the duties owed to AIA, the Hawley Troxell Defendants also improperly represented CropUSA.

165.    The Hawley Troxell Defendants have breached their duties owed to AIA, including, without limitation, the breached duties described in this Second Amended Complaint. The Hawley Troxell Defendants have further violated their duty of loyalty owed to AIA by improperly simultaneously representing AIA and CropUSA, together with directly and/or indirectly improperly representing the interests of the Controlling AIA Defendants.

166.    AIA suffered damages as a direct, foreseeable and/or proximate result of the breaches of duty and the acts of the Hawley Troxell Defendants, including those acts described in this Second Amended Complaint and/or proven at the time of trial. At a minimum, the Hawley Troxell Defendants were also a substantial factor in the harm and damages inflicted upon AIA, including, without limitation, the ultimate decimation of AIA by the Controlling AIA Defendants. Had the Hawley Troxell Defendants properly discharged their duties, the Controlling AIA Defendants would never have decimated AIA.

167.    As a direct and/or proximate cause of such acts and/or omissions, the Hawley Troxell Defendants are liable to AIA for damages in the amount to be proven at or before the time of trial.

SECOND AMENDED COMPLAINT - 41

# Exhibit - A

**21-ER-5459**

### IX.  COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ CONSTRUCTIVE FRAUD
**(Against the Controlling AIA Defendants)**

**168.**  Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

**169.**  The Controlling AIA Defendants are liable to AIA for fraud because: **(a)** they made representations of fact to AIA and AIA Services' innocent minority shareholders as asserted throughout this Second Amended Complaint, including but not limited to, (i) representations that CropUSA was being operated for the benefit of AIA, (ii) representations that AIA was being properly operated (including that the Boards of Directors had properly authorized certain transactions when Donna's designee was not on the Board of AIA Services and the provisions in the amended articles and bylaws had not been complied with), (iii) representations that the information on AIA's financial statements was true (John separately certified to auditors and others that the information contained on certain of AIA's financial statements was true and correct), (iv) representations that expenses and loans between AIA and other entities or parties were properly entered into and accounted for (i.e., there are hundreds of thousands of dollars, if not millions of dollars, in funds and other assets used by CropUSA which were derived from AIA and never accounted for), and (v) other representations referenced in this Second Amended Complaint; **(b)** these representations were false; **(c)** these representations were material; **(d)** they knew these representations were false; **(e)** they intended that there be reliance; **(f)** AIA was ignorant of the falsity of these representations; **(g)** AIA relied on these representations; **(h)** AIA's reliance was justified; and **(i)** injury resulted. *See, e.g., Mannos v. Moss,* 143 Idaho 927, 155 P.3d 1166 (2007) (holding that misrepresentations in financial statements precluded summary

SECOND AMENDED COMPLAINT - 42

# Exhibit - A

## 21-ER-5460

judgment). Constructive fraud is identical to fraud, except that the plaintiff need not prove speaker's knowledge of the fraud and the speaker's intent that the other party rely on the representations.

170.    The Controlling AIA Defendants owed duties to AIA during certain relevant times as majority shareholders, board members and/or officers of AIA. In addition to making false representations, the Controlling AIA Defendants also concealed information from AIA and its innocent minority shareholders with knowledge that the concealed information was material and that the concealment would cause AIA to suffer otherwise avoidable damages, including without limitation, information contained in this Second Amended Complaint. The Controlling AIA Defendants' failure to disclose a fact to AIA and AIA Services' innocent minority shareholders where one has a duty to disclose is the legal equivalent of representing the non-existence of the fact. Where facts are fraudulently concealed, Plaintiffs need not show reliance as there is nothing other than silence upon which to rely.

171.    The Controlling AIA Defendants represented to AIA Services that CropUSA was a wholly owned subsidiary of AIA Services. Simultaneously, the Controlling AIA Defendants adopted the position, not disclosed to AIA or its innocent minority shareholders, that CropUSA was an independent entity with John as its alleged sole shareholder and subsequently failed to disclose that CropUSA was not a separate entity. These representations were false, the Controlling AIA Defendants knew of their falsity, the Controlling AIA Defendants intended that there be reliance, there was justifiable reliance by AIA and AIA Services' innocent minority shareholders, and AIA was damaged as a result.

172.    By operating CropUSA as an independent entity, and by using CropUSA as a vehicle for misappropriating and converting corporate assets, the Controlling AIA Defendants

SECOND AMENDED COMPLAINT - 43

# Exhibit - A

## 21-ER-5461

committed ongoing fraud that has persisted through the date of this Second Amended Complaint.

173.    The Controlling AIA Defendants also made misrepresentations to AIA and AIA Services' innocent minority shareholders in the form of false, misleading and fraudulent financial statements (which such financial statements also failed to disclose numerous improper and unlawful transactions and their ownership interests in CropUSA and other entities), upon which AIA and AIA Services' innocent minority shareholders reasonably relied, with that reliance being the proximate cause of AIA's damages.

174.    When the Controlling AIA Defendants transferred more than $1.5 million to CropUSA in 2004, they concealed the fact of this transaction from AIA and AIA Services' innocent minority shareholders and AIA was damaged by this concealment.

175.    When the Controlling AIA Defendants transferred AIA corporate assets, including funds, employees, goodwill and trade secrets to CropUSA and other entities and were subsidizing CropUSA and other entities, they concealed these facts from AIA and AIA Services' innocent minority shareholders. AIA suffered damages by these concealments.

176.    When the Controlling AIA Defendants had AIA pay certain of CropUSA's corporate expenses, they concealed this fact from AIA.  AIA suffered damages as a result of this concealment.

177.    When the Controlling AIA Defendants pledged the mortgage obtained by AIA from the state of Idaho to CropUSA so that CropUSA could borrow money to pay the attorney's fees of the Hawley Troxell Defendants, they concealed this fact from AIA.  AIA suffered damages as a result of this concealment.

178.    When the Controlling AIA Defendants had AIA Insurance guarantee CropUSA's $15 million line of credit and later sold over $10,000,000 in assets derived from AIA to Hudson

SECOND AMENDED COMPLAINT - 44

# Exhibit - A

Insurance, they concealed the fact of this guarantee and asset sale from AIA.

179.    When the Controlling AIA Defendants finally disclosed their ownership interests in CropUSA, CropUSA Insurance Services, LLC and other entities in AIA Services' financial statements in July 2012[2] (*See* Dkt. #67-38), they continued to conceal how they obtained their ownership interest in those entities (and in the case of CropUSA that the ownership interest came from AIA) and many transactions and purported loans between the entities and AIA (loans and guarantees made by AIA which were prohibited by AIA Services' amended articles of incorporation and restated bylaws).

180.    As a direct and/or proximate cause of the Controlling AIA Defendants' fraudulent acts, AIA has been damaged in an amount to be proven at or before trial, and the ongoing fraud bars the Controlling AIA Defendants from asserting statute of limitations defenses. To the extent that the Hawley Troxell Defendants seek to assert the statute of limitations as a defense, they too are barred from doing so through their fraudulent concealment of facts from AIA.

## X.    COUNT V—AIDING AND ABETTING FRAUD
**(Against the Controlling AIA Defendants and the Hawley Troxell Defendants)**

181.    Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

182.    One who aids and abets in the commission of a tort is liable with the primary tortfeasor(s) for all damages resulting from the tort. Aiding and abetting is established where one has knowledge of the torts, does not disapprove, and takes no action to prevent the commission of the torts or assists in covering up such torts. The foregoing applies to the Controlling AIA

---

[2] While the financial statements were dated as of year-end 2011, they were not provided to AIA or its shareholders until July 2012 in connection with the failed ill-conceived reverse stock split.

SECOND AMENDED COMPLAINT - 45

# Exhibit - A

# 21-ER-5463

Defendants and the Hawley Troxell Defendants.

183.     The Controlling AIA Defendants have aided and abetted in one another's fraud committed against AIA. The Controlling AIA Defendants' silence, failure to act and intentional acts to cover up fraud upon AIA constitutes the aiding and abetting of fraud upon AIA.

184.     The Hawley Troxell Defendants have aided and abetted in the fraud committed against AIA by the Controlling AIA Defendants by assisting in the commission of fraud. The Hawley Troxell Defendants' silence, failure to act and intentional acts to cover up fraud upon AIA constitutes the aiding and abetting the fraud upon AIA.

185.     The Hawley Troxell Defendants knew or should have known that the transfer of AIA's assets, loans and other unauthorized transactions to CropUSA constituted a fraud against AIA.

186.     The Hawley Troxell Defendants knew or should have known that the transfer of approximately $1,500,000 to CropUSA in 2004 constituted a fraud on AIA.

187.     The Hawley Troxell Defendants knew or should have known that the practice of allocating CropUSA expenses to AIA, and otherwise failing to maintain arms' length transactions between CropUSA and AIA, constituted a fraud on AIA.

188.     By knowingly providing legal cover for the fraudulent acts described herein, the Hawley Troxell Defendatns have aided and abetted the fraud committed by the Controlling AIA Defendants and CropUSA.

189.     As aiders and abettors, the Hawley Troxell Defendants are liable to AIA to the same extent as the primary tortfeasors. RESTATEMENT (FIRST) OF TORTS § 876 (1939). Likewise, the Controlling AIA Defendants are all liable for aiding and abetting each other in the commission of fraud against AIA.

SECOND AMENDED COMPLAINT - 46

# Exhibit - A

## 21-ER-5464

**190.**    As a direct and/or proximate cause of the Hawley Troxell Defendants and the Controlling AIA Defendant aiding and abetting in fraud, AIA has been damaged in the amount to be proven at or before the time of trial.

### XI.    COUNT VI—BREACH OF CONTRACT
### (Against John)

**191.**    Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

**192.**    On August 1, 1995, John and AIA Services entered into an Executive Officer's Agreement. (*See* Dkt. #67-8.)

**193.**    The Executive Officer's Agreement contains contractual provisions preventing John from doing certain acts. For example, Section 9 of the Executive Officer's Agreement sets for express covenants not to compete. Subsection A of the covenants prohibits John from soliciting AIA customers or otherwise diverting the business of AIA customers. Subsection B prohibits John from participating in any insurance business that underwrites, markets or administers insurance products for commodity associations. Subsection C prohibits John from soliciting AIA Services employees for other employment.  Subsection D of the covenants bars John from divulging or exploiting trade secrets belonging to AIA.

**194.**    John has breached his contractual obligations owed to AIA, including, without limitation, by forming CropUSA as anything other than a wholly-owned subsidiary of AIA, competing against AIA with CropUSA and other entities (including Pacific Empire Holdings and CropUSA Insurance Services, LLC). John has breached all four subsections of Section 9 of the Executive Officer's Agreement.

///

SECOND AMENDED COMPLAINT - 47

# Exhibit - A

## 21-ER-5465

**195.** As a direct and/or proximate cause of John's breaches of the Executive Officer's Agreement, AIA has been damaged in an amount to be proven at or before trial. Such breaches also constitute the breaches of his fiduciary duties owed to AIA.

### XII.     COUNT VII—DECLARATORY JUDGMENT
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

**196.** Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

**197.** Plaintiffs seek a declaratory judgment against Controlling AIA Defendants, including, without limitation, for the following relief: (a) for a full accounting with supporting documentation of all of AIA's funds, assets, loans and other transactions from 1999 through the present time; (b) requiring the Controlling AIA Defendants to comply with AIA's amended articles of incorporation, bylaws and the Idaho Business Corporation Act; (c) rescinding the purchases of the shares held by the ESOP and/or ensuring that those shareholders receive fair value for their shares; (d) rescinding and/or declaring void the common shares issued to John through is Executive Officer's Agreement; and (d) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this Second Amended Complaint).

**198.** Plaintiffs seek a declaratory judgment against the Hawley Troxell Defendants, including, without limitation, for the following relief: (a) that the representation agreement, fee agreements and any related agreements entered into with them and AIA be declared void (including, without limitation, because such agreements violated the applicable Rules of Professional Conduct); (b) any agreements or accounts regarding any sums owed by AIA, if any, be declared void; and (c) such other relief as may be requested at or before trial (including any

SECOND AMENDED COMPLAINT - 48

# Exhibit - A

# 21-ER-5466

declaratory relief contemplated by any of the acts and/or omissions set forth in this Second Amended Complaint).

### XIII.   COUNT VIII—EXCESSIVE COMPENSATION/CORPORATE WASTE
(Against the Controlling AIA Defendants)

199.   Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

200.   To support a claim for excessive compensation, plaintiff need only show that the board lacked independence and/or lacked good faith. *In Re: Tyson Foods, Inc.,* 919 A.2d 563 (Del. 2000). The Controlling AIA Defendants have been officers and/or controlled AIA's Boards of Directors from 1995 through certain relevant times.  The Controlling AAI Defendants have lacked independence and have not acted in good faith, including, without limitation, by committing the intentional acts and/or omissions described in this Second Amended Complaint.

201.   The Controlling AIA Defendants paid excessive compensation and have wasted corporate assets during the course of managing and/or operating AIA, including, without limitation, by paying themselves excessive compensation (and practically speaking, any compensation at all based on their acts and omissions) and operating AIA for the benefit of CropUSA, the Controlling AIA Defendants and other entities they partially or wholly own, including Pacific Empire Radio Corp., CropUSA Insurance Services, LLC, and Pacific Empire Holdings Corp. The Controlling AIA Defendants also decimated AIA's agency force and caused them to transfer to CropUSA and ultimately Hudson and other entities. In addition, notwithstanding the fact that John is not entitled to retain any of his compensation or benefits as a faithless fiduciary, it was separately corporate waste to pay him in the first place as he did nothing for AIA (AIA's business was simply running off the commissions received for policies sold years

SECOND AMENDED COMPLAINT - 49

# Exhibit - A

## 21-ER-5467

before). The other transactions and malfeasance described in this Second Amended Complaint also constitute corporate waste, and none of those transactions and malfeasance were properly disclosed to all of AIA Services' shareholders nor was any authorization from them ever sought or obtained.

202.    The Controlling AIA Defendants are liable to AIA for damages caused by paying excessive compensation and otherwise wasting and needlessly depleting AIA's funds and assets for their own benefit and with disregard for AIA.

203.    As a direct and/or proximate cause of the Controlling AIA Defendants' waste, AIA has been damaged in the amount to be proven at or before trial.

### XIV.    COUNT IX—ACCOUNT STATED
#### (Against John)

204.    Plaintiffs re-allege and incorporates by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

205.    John established an account by borrowing $307,000 from AIA for his personal use. John subsequently confirmed the amount of the debt by "correcting" an alleged so-called accounting "error" when he had previously extinguished the $307,000 debt by improperly crediting the payment of Reed Taylor's $6 million promissory after the issue arose in *Taylor v. AIA Services Corp., et al.*, so that AIA's book show that AIA is creditor and John is debtor for $307,000, i.e., the correction was only made because Reed Taylor demanded it and he was suing AIA Services for repaying of the $6 million note.

206.    John has not paid any portion of this debt and the entire balance remains due and payable to AIA. John is liable to AIA for $307,000 on the account stated and/or such other amount as may be presently owed, plus prejudgment interest from the date the obligation was incurred.

SECOND AMENDED COMPLAINT - 50

# Exhibit - A

## 21-ER-5468

If John has since paid back the $307,000 or any part of the sums he owes, then Plaintiffs still seek the balance owed and prejudgment interest for the benefit of AIA, including, because John has been a faithless fiduciary who is not entitled to any interest-free loans from AIA.

### XV.    JURY DEMAND

207.    Plaintiffs hereby demand a trial by jury on all causes of action for which a jury trial is allowed by law.

### XVI.    PRAYER FOR RELIEF

Wherefore Plaintiffs pray for the following relief:

1.    For a judgment jointly and severally against the Controlling AIA Defendants and the Hawley Troxell Defendants for damages in an amount to be proven at trial, plus prejudgment interest;

2.    For judgments against the Controlling AIA Defendants and the Hawley Troxell Defendants in an amount to be proven at trial for damages for which joint and several liability does not apply to all defendants, plus prejudgment interest;

3.    For a judgment or order requiring the Hawley Troxell Defendants to disgorge all attorneys' fees and costs paid to them by AIA Services, AIA Insurance, CropUSA and by any other party on behalf of those entities in the amount to be proven at the time of trial, plus prejudgment interest;

4.    For a judgment or order requiring the Controlling AIA Defendants to disgorge all compensation received from AIA or CropUSA since 1999, including stock, cash, benefits, and other assets because they intentionally breached their fiduciary duties and were thus faithless fiduciaries;

5.    For judgment against John in the amount to be proven at the time of trial, plus prejudgment interest;

SECOND AMENDED COMPLAINT - 51

# Exhibit - A

6.      For an order requiring that all funds recovered as a result of this litigation, minus fees, costs and bona fide debts, be deposited with the Court registry and distributed only after court order, and that no funds from this litigation be paid to faithless fiduciary Controlling AIA Defendants;

7.      For judgments against the Controlling AIA Defendants, jointly and severally, as the alter-ego of CropUSA or to pierce its corporate veil, for all damages incurred by AIA and attributable in whole or in part to CropUSA;

8.      For a declaratory judgment for the relief specified in this Second Amended Complaint and any other declaratory relief requested at or before trial;

9.      For an award of the attorneys' fees and cost incurred in this action as allowed by statute, contract, or recognized grounds of equity; and

10.      For any such further relief or remedy, including preliminary and/or permanent injunctive relief, as Plaintiffs may request or as this Court may find just and equitable.

DATED:  This _____ day of May, 2016.

RODERICK BOND LAW OFFICE, PLLC


By:  ___*/s/ Roderick C. Bond*_____
         Roderick C. Bond
         Attorney for Plaintiffs


SECOND AMENDED COMPLAINT - 52

# Exhibit - A

**21-ER-5470**

## <u>VERIFICATION OF DALE L. MIESEN</u>

STATE OF TEXAS            )

                                         ) ss.

COUNTY OF TARRANT      )

        I, Dale L. Miesen, being first duly sworn on oath, deposes and says:

        I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Second Amended Complaint, know the contents of this Second Amended Complaint, and believe that the facts in set forth in this Second Amended Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.


_____

Dale L. Miesen


SUBSCRIBED AND SWORN to before me this _____ day of _____, 2016.


_____

Notary Public for Texas

Residing at: _____

My commission expires: _____


SECOND AMENDED COMPLAINT - 53

# Exhibit - A

## 21-ER-5471

## <u>VERIFICATION OF DONNA J. TAYLOR</u>

STATE OF IDAHO          )
                                     ) ss.
COUNTY OF NEZ PERCE      )

        I, Donna J. Taylor, being first duly sworn on oath, deposes and says:

        I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Second Amended Complaint, know the contents of this Second Amended Complaint, and believe that the facts in set forth in this Second Amended Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.

_____
Donna J. Taylor

SUBSCRIBED AND SWORN to before me this ___ day of _____, 2016.

_____
Notary Public for Idaho
Residing at: _____
My commission expires: _____

SECOND AMENDED COMPLAINT - 54

# Exhibit - A

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the _____ day of _____, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:    jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:    jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:    lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:    sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:    swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

_____/s/ Roderick C. Bond_____
Roderick C. Bond

SECOND AMENDED COMPLAINT - 55

# Exhibit - A

## 21-ER-5473