Nos. 25-3552, 25-3800

# In the United States Court of Appeals
# for the Ninth Circuit

DALE L. MIESEN,

*Plaintiff-Appellant,*

v.

R. JOHN TAYLOR, CONNIE TAYLOR HENDERSON, JAMES BECK, MICHAEL W. CASHMAN, SR., CROP USA INSURANCE AGENCY, INC., CROP USA INSURANCE SERVICES, LLC, AIA SERVICES CORPORATION, AND AIA INSURANCE, INC.,

*Defendants-Appellees,*

AND
REED J. TAYLOR, AN INDIVIDUAL,

*Third-Party Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Idaho
Hon. David Nye

## SUPPLEMENTAL EXCERPTS OF RECORD

Daniel Loras Glynn (ISB # 5113)
JONES WILLIAMS FUHRMAN GOURLEY, P.A.
225 N. 9th St., Ste. 820
Boise, ID 83701
(208) 331-1170
dglynn@idalaw.com
*Attorney for Defendants-Appellees*
James Beck, Michael Cashman, Connie Henderson, John Taylor, Crop USA Insurance Agency, Inc., and Crop USA Insurance Services, LLC

Kim J. Trout (ISB #2468)
Alyssa R. Jones (ISB #12181)
TROUT & JONES, PLLC
3778 N. Plantation River Dr., Ste. 101
Boise, ID 83703
(208) 577-5755
service@trout-law.com
*Attorneys for Defendants-Appellees*
AIA Services Corporation & AIA Insurance, Inc.

**Volume 1 (of 2)**
**Pages 1–220**

**1 SER 1**

DANIEL LORAS GLYNN, ISB #5113
JONES ♦ WILLIAMS ♦ FUHRMAN ♦ GOURLEY, P.A.
The 9th & Idaho Center
**225 N. 9th Street, Suite 820**
PO Box 1097
Boise, ID 83701
Telephone:  (208) 331-1170
Facsimile:  (208) 331-1529
dglynn@idalaw.com
Attorneys for James Beck, Michael Cashman, Connie Henderson, John Taylor, Crop USA
Insurance Agency, Inc., and Crop USA Insurance Services, LLC

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br>vs.<br><br>HAWLEY TROXELL ENNIS & HAWLEY, LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation; CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 1:10-CV-404-DCN-CWD<br><br>**DECLARATION OF R. JOHN TAYLOR IN RESPONSE TO PLAINTIFF'S MOTION TO APPROVE SETTLEMENT AND MOTION FOR FEES AND COSTS AS FILED ON MAY 31, 2022 [DKT. 1214]** |

**DECLARATION OF R. JOHN TAYLOR IN RESPONSE TO PLAINTIFF'S MOTION TO APPROVE
SETTLEMENT AND MOTION FOR FEES AND COSTS AS FILED ON MAY 31, 2022 [DKT. 1214] - 1**

I, R. JOHN TAYLOR, declare:

1.     I am over the age of eighteen, make this Declaration based on my personal knowledge, and if called to testify under oath am otherwise competent to testify to the matters stated herein. I am the President of the Defendant AIA Services Corporation ("AIA Services"), the President of the Defendant AIA Insurance, Inc. ("AIA Insurance") (AIA Services and AIA Insurance will be collectively referred to as "AIA Entities"), the President of CropUSA Insurance Services, LLC ("CropUSA Services"), and the Manager of CropUSA Insurance Agency, Inc. ("CropUSA Agency"), and named as an individual Defendant in this litigation. As the sole remaining employee of these entities, I am responsible for the preparation of these entities tax filings as well as financial statements. As such I have personal knowledge of not only their income but the expenses that have been incurred during this instant litigation.

2.     Over the course of the last fourteen years, I have been involved in various lawsuits directed at me individually as well as the AIA Entities. While the named plaintiff differed, each case involved the present counsel for the Plaintiff, Roderick Cyr Bond, representing that named plaintiff.  These cases include *Reed Taylor v. AIA, et al.*, CV07-00208 (Nez Perce County District Court), *Donna Taylor v. R. John Taylor, et al.*, CV08-1150 (Nez Perce County District Court) as consolidated with *Donna Taylor v. AIA Services, et al.*, CV-13-1075 (Nez Perce County District Court), and this present litigation on behalf of Mr. Miesen.

3.     The matter of *Donna Taylor v. R. John Taylor, et al.*, CV08-1150 (Nez Perce County District Court) as consolidated with *Donna Taylor v. AIA Services, et al.*, CV-13-1075 (Nez Perce County District Court) is still pending. Donna Taylor claims entitlement to $416,510 pursuant to a certain agreement between AIA Services and herself.  The matter is still pending as

**DECLARATION OF R. JOHN TAYLOR IN RESPONSE TO PLAINTIFF'S MOTION TO APPROVE SETTLEMENT AND MOTION FOR FEES AND COSTS AS FILED ON MAY 31, 2022 [DKT. 1214] - 2**

**1 SER 3**

the Court recently denied Donna Taylor's Motion for Summary Judgment on the basis that there remains a genuine issue of material fact as to whether at any point since 2008 AIA Services has had "legally available funds" with which to make any payments. As explained herein, the litigation costs of Plaintiff's litigation, combined with their ancillary proceedings pursued by the Plaintiff's counsel, has been a substantial cause of that lack of legally available funds.

4.    In addition to these cases, Mr. Bond has been responsible for the filing of a receivership action against AIA Services on behalf of Donna Taylor (*Donna Taylor v. AIA Services*, CV CV09-02470 (Nez Perce)) filed in 2009 and ultimately voluntarily dismissed by her in 2012. Mr. Bond was also the counsel of record in the matter of *Miesen v. GemCap & AIA Services,* CV CV14-01444 (Nez Perce) filed in 2014 in which the district court found the claims asserted to be derivative in nature and, as such, not properly asserted by the named defendant. Mr. Bond also represented Donna Taylor in an attempt to intervene in the California lawsuit between GemCap and AIA Services (*GemCap v. AIA Services*, Case No. 13-05504 (U.S. District Court for Central District of California)) which intervention was ultimately denied by the district court and affirmed on appeal to the Ninth Circuit Court of Appeals.

5.    Beyond these cases, and in addition to the instant matter's assertion of claims against the lawyers at the firm of Hawley Troxell Ennis & Hawley, P.A. ("HTEH"), Mr. Bond has been responsible for the assertion of malpractice claims against attorneys who have represented AIA Services including *Reed Taylor v. Eberle, Berlin, Kading, Turnbow & McKlveen*, CV OC 0918868 (Ada County District Court), *Reed Taylor v. Scott Bell*, Case No. 12-2-10803-0 SEA (King County, Washington), and *Miesen v. Munding* 2:18-CV-270 (U.S. Dist. Court of WA.)

**DECLARATION OF R. JOHN TAYLOR IN RESPONSE TO PLAINTIFF'S MOTION TO APPROVE SETTLEMENT AND MOTION FOR FEES AND COSTS AS FILED ON MAY 31, 2022 [DKT. 1214] - 3**

6.      Mr. Bond also was Plaintiff's counsel in *Reed Taylor v. McNichols*, CV 98-1763 (Nez Perce County), an action against the then attorney for AIA Services, which was ultimately consolidated with a contemporaneously filed lawsuit that included Richard Riley and John Ashby (*Reed Taylor v. Babbit*, Case No. CV08-1765 (Nez Perce)), which was not only dismissed, but fees were awarded to the defendants as it was found to have been "brought spuriously and without foundation, for harassment purposes only." *Taylor v. McNichols*, 149 Idaho 826, 849, 243 P.3d 642, 665 (2010). Mr. Bond also represented Reed Taylor in an action against the Defendants Richard Riley and HTEH (*Reed Taylor v. Riley*, Case No. CV-OC-09-18868) wherein the Idaho Supreme Court not only dismissed the claims against Mr. Riley and HTEH, but awarded attorney fees as the claims were barred by the doctrine of *res judicata*. *Taylor v. Riley*, 162 Idaho 692, 709, 403 P.3d 636, 653 (2017). Mr. Bond also filed an action which included Richard Riley and John Ashby in 2008, which was ultimately consolidated with another case

7.      The consequences of these various litigations over the last fourteen years has had a crippling consequence on AIA Services. Over the last fourteen years, and not including the attorney fees and costs incurred in this litigation, AIA Services has expended over $2,474,363 in legal fees related to the actions prosecuted by Mr. Bond on behalf of his clients Reed Taylor, Donna Taylor, and Dale Miesen. CropUSA has expended an additional $531,62 for its part. Even when AIA Services was not a named party, as for example was the case in *Reed Taylor v. Scott Bell,* AIA Services has been required to incur substantial attorney fees and expenses responding to third party discovery from Mr. Bond's client.

8.      As it relates to this specific litigation, and through to June 1, 2022, AIA Services has incurred at least $786.961.02 in legal fees and related costs in its defense of the claims against

**DECLARATION OF R. JOHN TAYLOR IN RESPONSE TO PLAINTIFF'S MOTION TO APPROVE SETTLEMENT AND MOTION FOR FEES AND COSTS AS FILED ON MAY 31, 2022 [DKT. 1214] - 4**

it and its officers and directors. Most recently, included within this amount is $21,127 in fees necessitated by AIA Service's retention of Trout Law, PLLC in December of 2021 upon Plaintiff's notice of intent to default AIA Services and this Court's Order in regards to that notice.  I do note that this amount includes $295,383 which was paid from my own funds and for which I have identified as owed to me in AIA Service's financial statements.  Attached as **Exhibit A** hereto is a spreadsheet that I prepared based upon my review of AIA Services financial records as well as the invoicing provided by each of the identified firms in the attached spreadsheet. **Exhibit A** also similarly summarizes the attorney fees and costs incurred by AIA Services in the ancillary matters pursued by Mr. Bond and referenced above.

9.      In addition, in the various litigations asserted against AIA Services, just as in this case, the clients represented by Mr. Bond have also named as defendants individuals who have served as officers and directors of AIA Services. This, combined with AIA Services inability to obtain a policy of insurance which would provide for director and officer coverage, has quite literally left me as the last person standing with regard to the affairs of AIA Services.

10.      As explained in my Affidavit filed in support of the motion for summary judgment [Dkt. 1072], multiple changes in the insurance market over the decades have had a significant impact on AIA Service's business affairs.  However, as the sole remaining employee of AIA Services this litigation required the devotion of my substantial time and efforts on AIA Services behalf. As this Court is aware, I am under Court order to not only produce information and documents which I have a legal right to obtain from AIA Services, as well as the related entities, [Dkt. 925 & 994], but moreover compelled to respond on the AIA entities behalf [Dkt. 939 & 994]. In this litigation alone, the Plaintiff has served (1) 24 Interrogatories and 169 Requests for

**DECLARATION OF R. JOHN TAYLOR IN RESPONSE TO PLAINTIFF'S MOTION TO APPROVE SETTLEMENT AND MOTION FOR FEES AND COSTS AS FILED ON MAY 31, 2022 [DKT. 1214] - 5**

Production served upon each of the AIA Entities, (2) 23 Interrogatories, 73 Requests for Admission, and 169 Requests for Production on each of the CropUSA Entities, and (3) 25 Interrogatories, 231 Requests for Admission, and 194 Requests for Production on myself personally.  This does not include the near equal number of discovery requests served on Messrs. Beck and Cashman as well Ms. Henderson. As a consequence, not only have I had to respond to this written discovery I have been required to locate, assemble, organize, and produce over 1.5 million pages of documentation. In addition, I have sat for nearly eight (8) full days of deposition testimony. These costs do not include any payments for my time or the contract labor for data services necessary to respond to the requests. Thus, in many respects, this litigation has been a full-time dedication of my time as it relates to AIA Services.

11.     In this case, Plaintiff has asserted that his claim for damages against all Defendants is in the amount of $90 million.  Attached as **Exhibit B** is a true and correct copy of what I understand to be Plaintiff's basis for the assertion of this amount. Plaintiff now proposes a settlement with the only Defendant that has any significant financial resource in the amount of $1.4 million.  While I do not oppose the settlement, I do oppose any request by Plaintiff's counsel for fees and costs to be paid from that settlement. As the foregoing should make abundantly evident, rather than providing a benefit to AIA Services and its shareholders, this litigation has actually worked a substantial detriment to the ongoing business affairs of AIA Services. Between this litigation and the ancillary litigation, these litigatory tactics have cost AIA Services and the defendants over $3.3 million in legal fees and direct expenses for a case that has ultimately been dismissed as to all claims against AIA Services and the individual directors and officers of AIA Services.

**DECLARATION OF R. JOHN TAYLOR IN RESPONSE TO PLAINTIFF'S MOTION TO APPROVE SETTLEMENT AND MOTION FOR FEES AND COSTS AS FILED ON MAY 31, 2022 [DKT. 1214] - 6**

**1 SER 7**

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF IDAHO THAT THE FOREGOING IS TRUE AND CORRECT

DATED This _8th_ day of July, 2022.

R. JOHN TAYLOR

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of July, 2022, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF System which sent a Notice of Electronic Filing to the following persons:

Roderick Cyr Bond        rod@roderickbond.com
Andrew Schwam            amschwam@turbonet.com
Michael S. Bissell       mbissell@campbell-bissell.com
Tyler S. Waite           twaite@campbell-bissell.com
Jeffrey A. Thomson       jat@elamburke.com
Loren C. Ipsen           lci@elamburke.com
Joyce A. Hemmer          JAH@ElamBurke.com
Bradley S. Keller        bkeller@bryneskeller.com
Alyson Anne Foster       alyson@dempseyfoster.com

_/s/ Daniel Loras Glynn_
Daniel Loras Glynn

**DECLARATION OF R. JOHN TAYLOR IN RESPONSE TO PLAINTIFF'S MOTION TO APPROVE SETTLEMENT AND MOTION FOR FEES AND COSTS AS FILED ON MAY 31, 2022 [DKT. 1214] - 7**

# EXHIBIT A

**AIA CropUSA  legal fees and related**
**Legal Fee Expense Payments**
**Bond Related Actions**
**2006-2022**

| Lawyer, Law Firm | from | to | Donna/Meisen v HTEH, et al (Fed ID) | Reed Taylor v. AIA Services et al (ID) | Donna Taylor Cases (Id) | AIA v. Durant Id | Durant, Meisen Donna v. GemCap, AIA (Id) | Reed Taylor v. Bell, et al (Wa) | Total Related Actions |
|---|---|---|---|---|---|---|---|---|---|
| Risley Law Office PLLC | 2008 | 2015 | 189,493.39 | | 189,493.40 | | | | 189,493.40 |
| Charles Brown, 401K Plan | 2008 | 2010 | | 193,258.77 | | | | | 193,258.77 |
| Jim Gatz, Quarles and Brady | 2007 | 2013 | | 287,485.55 | 16,549.73 | | | | 304,035.28 |
| Randall Danskin Attorneys | 2010 | 2019 | 12,022.50 | | 177,306.08 | 70,528.35 | 8,776.46 | | 256,610.89 |
| Hawley Troxell | 2006 | 2013 | | 976,370.56 | 66,321.84 | | | | 1,042,692.40 |
| Clark and Feeney | 2009 | 2012 | | 45,303.58 | 21,877.83 | | | | 67,181.41 |
| Dave Gittins | 2007 | 2012 | | 102,249.52 | | | | | 102,249.52 |
| Mike McNichols, Clements Brown | 2007 | 2011 | | 187,027.16 | | | | | 187,027.16 |
| Crumb and Munding | 2013 | 2015 | | | | | | | 0.00 |
| Mooney Weiland Rose | 2015 | 2018 | 69,033.08 | | 93,616.47 | | | 45,711.22 | 139,327.69 |
| Martelle and Associates | 2017 | 2019 | 124,485.12 | | | | | | 0.00 |
| Jones Williams | 2019 | 6/15/2022 | 266,784.61 | | 31,971.90 | | | | 31,971.90 |
| Jones williams costs | 2019 | 6/15/2022 | 82,270.52 | | | | | | 0.00 |
| Doug Siddoway (Randall Danskin) | 2019 | 2021 | 21,061.80 | | | | | | 0.00 |
| Trout Law | 2022 | 6/15/2022 | 21,810.00 | | | | | | 0.00 |
| | | | | | | | | | 0.00 |
| Total Fees Billed to Date: | | | 786,961.02 | 1,791,695.14 | 597,137.25 | 70,528.35 | 8,776.46 | 45,711.22 | 2,513,848.42 |
| | | | | | | | | | |
| Amounts  Paid by AIA | | | 491,577.33 | 1,277,182.43 | 580,587.52 | 70,528.35 | 8,776.46 | 45,711.22 | 1,982,785.98 |
| Amounts Paid by John Taylor | | | 295,383.69 | | | | | | |
| Total paid and payable by AIA | | | | | | | | | |
| Amounts Paid by CropUSA | | | | 514,512.71 | 16,549.73 | | | | 531,062.44 |
| | | | 786,961.02 | 1,791,695.14 | 597,137.25 | 70,528.35 | 8,776.46 | 45,711.22 | 2,513,848.42 |
| | | | | | | | | | |
| Related  Fees and Costs | | | 2,513,848.42 | | | | | | |
| | | | | | | | | | |
| Total all Actions | | | 3,300,809.44 | | | | | | |

# EXHIBIT B

***Dale L. Miesen v. Hawley Troxell Ennis & Hawley LLP, et al.***

| Item No. | Description of Damages | Base Damages |
|:---:|:---|---:|
| 1. | Book of Business Belonging to AIA and sold to Hudson Insurance in 2008 (sold during *Reed Taylor v. AIA Services, et al.* and at issue in that lawsuit)[1] | $11,588,245.00 |
| 2. | Consulting Fees for John Taylor paid to CropUSA by Hudson Insurance in 2008 - 2009 which should have been paid to AIA (See Item No. 1)* | $120,000.00 |
| 3. | Unauthorized Series C Preferred Shares repurchased in 2004 by AIA Insurance from CropUSA with the $1,510,693.00 bonus paid by Trustmark to AIA Insurance | $1,510,693.00 |
| 4. | Unauthorized Attorneys' Fees and Costs Paid to Hawley Troxell for legal representation of AIA and CropUSA in *Reed Taylor v. AIA Services, et al* . and *Donna Taylor v. John Taylor, et al.*  which should separately be disgorged* | $1,007,786.72 |
| 5. | Unpaid Dividends owed to Series C Shares in AIA Services' 401(k) Plan since 2009 (Shares should have been redeemed no later than 2009)[2] | $1,063,750.00 |
| 6. | Unauthorized Attorneys' Fees and Costs paid to Clements, Brown & McNichols for legal representation of John Taylor in *Reed Taylor v. AIA Services, et al.*  and *Donna Taylor v. John Taylor, et al.* * | $187,027.16 |
| 7. | Unauthorized Attorneys' Fees and Costs paid to David Risley's firms and Clark & Feeney for legal representation of James Beck and Connie Henderson in *Reed Taylor v. AIA Services, et al.*  and *Donna Taylor v. John Taylor, et al.* * | $361,131.28 |
| 8. | Unauthorized Attorney's Fees and Costs paid to David Gittins' firm for legal representation of JoLee Duclos and Bryan Freeman in *Reed Taylor v. AIA Services, et al.* * | $99,710.30 |
| 9. | Unauthorized Attorney's Fees and Costs paid to Chuck Brown for legal representation of AIA Services' 401(k) Plan in *Reed Taylor v. AIA Services, et al.* * | $193,258.77 |
| 10. | Money owed to AIA Policyholders from Settlement of Trust Litigation in 2008 which was never paid or submitted as Unclaimed Property to each respective State | $425,116.00 |
| 11. | Settlement Proceeds received by AIA Insurance in 2008 for prosecuting claims in the Trust Litigation | $800,000.00 |
| 12. | Security Posted in Court Registry in *Reed Taylor v. AIA Services, et al* . which was improperly released and not safeguarded* | $413,972.05 |
| 13. | Unauthorized loans and advances made to Pacific Empire Radio Corporation by AIA Corporations (face value of four Promissory Notes and advances without accrued interest)* | $2,264,359.92 |
| 14. | Interest, Attorneys' Fees, and Costs owed to Donna Taylor re: *Donna v. John, et al.*  (Donna's Series A Shares should have been redeemed by 2003)* [1] | $1,067,188.91 |
| 15. | AIA Corporations' liability under the 2015 Settlement Agreement as claimed by GemCap (Dkt. 128 at 31-48) in *GemCap v. CropUSA, et al* .[3] | $20,130,701.01 |
| 16. | Value of AIA Services' Former Headquarters and AIA Insurance's Two Condos which were improperly transferred to GemCap and Sold (See Item No. 15) | $1,154,634.72 |

**Exhibit - A, p. 1**

***Dale L. Miesen v. Hawley Troxell Ennis & Hawley LLP, et al.***

| Item No. | Description of Damages | Base Damages |
|:---:|---|:---:|
| 17. | Value of Parking Lot purchased by John Taylor and Connie Henderson in 2001 and the Rent paid to John Taylor and Connie Henderson (or John Taylor) which was subsequently transferred to Jordan Taylor and sold for $50,000.00* | $123,749.89 |
| 18. | Identified Compensation paid to John Taylor by AIA from Tax Returns and IRS Forms (does not include other improper advances/benefits/compensation)[1] * | $3,043,705.45 |
| 19. | Directors' Fees and Costs paid to Connie Henderson and James Beck for acting as Directors of AIA Corporations from 2007 to 2014* | $163,480.74 |
| 20. | Certain known payments made by AIA on behalf of CropUSA and various other entities (does not include many unallocated and unknown payments and/or advances)* | $1,505,303.84 |
| 21. | Unauthorized Attorney's Fees and Costs paid to David Risely's firms for legal representation of Connie Henderson on other legal matters* | $7,211.28 |
| 22. | Unauthorized Attorneys' Fees and Costs paid to Martelle Law Offices for legal representation in *Miesen v. HTEH, et al.*; *GemCap v. AIA, et al.;* and *Donna Taylor v. John Taylor, et al.* * | $176,837.54 |
| 23. | Unauthorized Attorneys' Fees and Costs paid to Steve Wieland and Shawnee Perdue's firms for legal representation in *Miesen v. HTEH, et al.;* *Donna Taylor v. John Taylor, et al.*; and other legal matters* | $99,756.55 |
| 24. | Unauthorized Attorneys' Fees and Costs paid to Daniel Glynn's firm for legal representation in *Miesen v. HTEH, et al.;* *GemCap v. AIA, et al.; and Donna Taylor v. John Taylor, et al.* * | $97,500.00 |
| 25. | Unauthorized Attorneys' Fees and Costs paid to Crumb & Munding for legal representation in *GemCap v. CropUSA, et al.* * | $109,854.41 |
| 26. | Unauthorized Attorney's Fees and Costs paid to Connie Henderson and her firms for legal representation in other legal matters* | $18,283.48 |
| 27. | Payments to/for Reed Taylor for his Illegal Redemption in 2007 and 2008 (the illegality defense should have been asserted no later than January of 2007)* | $394,630.00 |
| 28. | Certain known payments made to credit cards and other creditors on behalf of John Taylor* | $553,155.71 |
| 29. | Unauthorized Attorneys' Costs paid in *Maile v. Taylor* * | $19,718.51 |
| 30. | Unauthorized Attorneys' Fees and Costs paid to Doug Siddoway's firm for legal representation, including the reverse stock split and in *AIA Services v. Paul Durant, et al.* (includes the sums paid from the sale of AIA Services' former headquarters)* | $162,013.29 |
| 31. | Unauthorized miscellaneous Attorneys' Fees and Costs paid in various lawsuits, including *Miesen v. HTEH, et al.; Reed Taylor v. AIA Services, et al.;* and *Donna Taylor v. John Taylor, et al.* * | $90,446.71 |
| 32. | Unauthorized Attorneys' Fees and Costs paid to Clark & Feeney for legal representation of Connie Henderson in *Donna Taylor v. John Taylor, et al.* * | $21,877.83 |

**Exhibit - A, p. 2**

*Dale L. Miesen v. Hawley Troxell Ennis & Hawley LLP, et al.*

| Item No. | Description of Damages | Base Damages |
|---|---|---|
| 33. | Unauthorized Fees and Costs paid to Coles Reinstein Accounting & Consulting for improper valuation of $0 for the Series C Shares in 401(k) Plan* | $4,263.00 |
| 34. | Growers National Cooperative (GNC) Settlement with CropUSA which should have been paid to AIA since AIA formed and initially funded GNC | $430,000.00 |
| 35. | Unauthorized Compensation paid to certain competing employees of AIA who competed by also working for CropUSA* | $863,617.20 |
| 36. | Attorney Fees and Costs awarded to GemCap in *GemCap v. AIA, et al*. (to the extent any such fees and costs are awarded against AIA Services)* | $466,372.49 |
| 37. | Principal and Interest owed by John Taylor for advances taken from AIA Corporations which were never paid back* [1] | $307,271.00 |
| 38. | Revenues of AIA Corporations from 1999 through the Present Time (the Defendants have not proven where the money went, whether any payments or transactions were authorized, or the fairness of any transactions and payments because they all involve conflicts of interest)* | $39,577,697.00 |
| 39. | Sale of Sound Insurance Agency to CropUSA in 2006 for $240,000 which was a business formed and operated using the AIA Corporations, improperly competing against AIA, and usurping yet another corporate opportunity of the AIA Corporations | $240,000.00 |
| 40. | John Taylor's Series A Preferred Shares and Common Shares in AIA Services which were improperly Issued to John Taylor and should be canceled** | $0.00 |
| | | **$90,864,320.76** |

[1]Alternative scenarios set forth on spreadsheet with itemization of damges, but alternative with most substantial amount of damages are used for purposes of this summary.
[2] Interest has been calculated through June 30, 2020, as dividends are paid quarterly.

[3]GemCap has failed to produce sufficient information to justify the amount owed by AIA, and the numbers used to calculate damages have been provided by GemCap.  GemCap has calculated interest at 10% although the Settlement Agreement is based upon the Federal Post-Judgement Interest Rate.  GemCap has included attorney fees and costs in the amount of $8,004,116.40 without accrued interest as part of the amount due.

* John Taylor and the AIA Corporations are in contempt of court for not providing all the information.  Work continues.  Additional records are expected to be produced and are continually reviewed.  Damages will be updated as records are received and reviewed.

** No value is placed on the common and Series A Preferred shares because they should be canceled and the shares were never authorized to be issued.

DANIEL LORAS GLYNN, ISB #5113
JONES ♦ WILLIAMS ♦ FUHRMAN ♦ GOURLEY, P.A.
The 9ᵗʰ & Idaho Center
225 N. 9ᵗʰ Street, Suite 820
PO Box 1097
Boise, ID 83701
Telephone: (208) 331-1170
Facsimile: (208) 331-1529
dglynn@idalaw.com

Attorneys for James Beck, Michael Cashman, Connie Henderson, John Taylor, Crop USA
Insurance Agency, Inc., and Crop USA Insurance Services LLC

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY, LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation; CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>　　　　　　Defendants. | Case No. 1:10-CV-404-DCN-CWD<br><br>**AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 1

1 SER 15

STATE OF IDAHO  )
                :    ss.
County of       )

R. JOHN TAYLOR, first being duly sworn on oath, deposes and says:

1.    I am the President of the Defendant AIA Services Corporation ("AIA Services"), the President of the Defendant AIA Insurance, Inc. ("AIA Insurance"), the Manager of CropUSA Insurance Services, LLC ("CropUSA Services"), the President of CropUSA Insurance Agency, Inc. ("CropUSA Agency"), and named as an individual Defendant in this litigation. I have personal knowledge of all facts stated herein.

2.    I have held the position of President of AIA Services and AIA Insurance (collectively referred to as "the AIA Entities") since at least 1995. I have also held the position of President of CropUSA Agency since its creation in 1999 and CropUSA Services since its creation in 2009 (collectively referred to as "CropUSA Entities"). In my role of President for the AIA/CropUSA Entities I was responsible for all aspects of the operations of these entities, including, but not limited to the assurance of regulatory compliance within the states in which the AIA/CropUSA Entities marketed their insurance products as well as interaction with the Risk Management Agency (RMA), the regulatory agency of the United States Department of Agriculture (USDA) responsible for, among others, the regulation of crop insurance products.

3.    AIA Services has its origins in the combined efforts of myself and my brother Reed Taylor to market and administer group health and life policies to farmers in the northwest through the entity named Agriculture Insurance Administrators, later called AIA Insurance. These group policies were endorsed by the Idaho, Oregon and Montana state wheat grower associations. In time, we expanded our marketing operations into over forty other markets across the United States and were  sponsored by state and national farm commodity associations.

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 2

Thereafter, we formed AIA Services for the purpose of acquiring other health and life insurance companies to be operated as subsidiaries of AIA Services. At no point has either AIA Services, or any subsidiary it created or acquired, ever been licensed to market property and casualty insurance in Idaho let alone any other state jurisdiction in which it transacted business.

4. In late 1987, AIA Insurance was made a wholly owned subsidiary of AIA Services to facilitate a resolution of the divorce between Reed Taylor and his then wife, Donna Taylor. As a consequence of this reorganization, AIA Services issued to Donna Taylor Series A Preferred Shares in AIA Services. In addition, and as part of the same transaction, AIA Services issued Reed Taylor shares of common stock in AIA Services, which issuance resulted in his ownership of sixty-five (65%) of the then issued common stock in AIA Services.

5. In 1993 Donna Taylor made demand for the redemption of the Series A Preferred Shares and AIA Services began making payments to Donna Taylor.

6. However, the growth and profitability that AIA Services had seen in its marketing of health and life insurance products began to decline significantly in the 1990s because of significant legislative changes to health and life insurance at the state and local levels prompted by policies promoted by the Clinton administration. In addition to prohibiting denial of insurance coverage for pre-existing coverage or waiting periods before coverage application for the type of policies marketed by AIA, legislative changes were made to mandate minimum policy loss ratios which effectively reduced any agency commissions in excess of ten percent , increased a company's capital requirements and restricted the manner and method in which the products offered by AIA Services could be marketed. In other words, throughout the 1990s AIA Services experienced increases in the cost of doing business that it was not able to absorb or pass through in the cost of the products it marketed, destroying the viability of association group sales

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 3

and the profitability of AIA Services employing full time agents to market its products. I disagreed strongly with Reed Taylor regarding how AIA Services should adapt to these changes. As a result, I ultimately determined that our differences were irreconcilable. I understood Reed Taylor to agree with this conclusion.

7.    Thus in late 1994, early 1995, Reed Taylor and I made purposeful efforts to attract additional investors to AIA Services with the specific purpose of raising sufficient capital to buy out Reed Taylor's interest in AIA Services.    These marketing efforts included negotiations with Defendant Michael Cashman and Defendant James Beck as well as others. These efforts involving myself and Reed Taylor ultimately resulted in Messrs. Cashman and Beck agreeing to become investors in AIA Services through the purchase of Series C Preferred Shares. In this regard Mr. Cashman invested $1,000,000 in AIA Services.    Mr. Beck invested $500,000 in AIA Services. Following their investment in 1995, and continuing through the year 2001, Messrs. Beck and Cashman held positions on the Board of Directors for AIA Services.    At no point did Messrs. Beck or Cashman ever hold an officer position with AIA Services.

8.    As a result, on July 22, 1995, AIA Services and Reed Taylor entered into a Stock Redemption Agreement which provided for the redemption of Reed Taylor's common stock in AIA Services in exchange for an initial $1,500,000 payment to Reed Taylor and an additional $6,000,000, plus interest, to be paid in monthly installments. Incident to this transaction, Reed Taylor agreed to subordinate principal payments to be paid to him by AIA Services in favor of the payments to Donna Taylor.

9.    Unfortunately, the above referenced changes in the insurance industry continued to affect the profitability of AIA Services. In 1996 AIA Services obtained Reed Taylor's assent to a restructuring of the terms of the 1995 Redemption Agreement and providing for interest only

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 4

payments to Reed Taylor. Donna Taylor's assent to subordination of AIA Service's payments to her remained unaltered.

10.    Despite these changes to AIA Services' bottom line the negative downward trend of AIA Services profitability continued unabated as revenues decreased and expenses increased. Significantly, on or about December 4, 1998, AIA Services was compelled to place one of its subsidiary entities, The Universe Life Insurance Company, into liquidation for reasons of insolvency.   Moreover, Trustmark Insurance Company, likewise facing the same regulatory changes and consequences on its operations, began to aggressively increase the rates on its products and ultimately began to discontinue accepting any new entrants into AIA's association plans.  As AIA Services was dependent upon the Trustmark products as the main product in its portfolio offerings, Trustmark's actions left AIA Services, essentially, without any nationwide group insurance plan to offer.

11.    Accordingly, with the active participation of Reed Taylor, I began to explore the possibility of entering the insurance market pertaining to property and casualty insurance products and specifically crop insurance. Initially, it was my intent for AIA Services to pursue this previous unexplored by AIA Services market of property, casualty and/or crop insurance. However, based on my multiple communications with representatives of the RMA as well as representatives of the various state insurance agencies into which I hoped to market crop insurance that AIA Services could not do so as a result of its existing financial condition.

12.    Any assertion that that there are no financial restrictions imposed upon an entity to sell property and casualty insurance and that all one has to do to market and administer national crop insurance is to obtain a resident producer license in Idaho lacks a fundamental understanding of the crop insurance generally and the regulatory process applicable to crop

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 5

**1 SER 19**

insurance specifically. At no point was it ever contemplated that the entity established to market crop insurance programs would be designated as a Managing General Agent (MGA) in Idaho or in any other state for that matter. This is because federal law as overseen by the RMA pre-empts state law regarding crop insurance and therefore approval and appointment of such must be obtained at the federal level. The RMA does require that an entity possess either a property or casualty license, or a license to market crop insurance in those states where such a license exists, in those states in which it intends to market of crop insurance. However, the RMA requires far more than the possession of an appropriate license in the identified state. This is because a Standard Reinsurance Agreement (SRA) is a financial agreement between the Federal Crop Insurance Corporation (FCIC), as administered by the RMA, and the applicant. Thus, an applicant seeking to obtain a SRA with the RMA, among other submissions, is required to submit its financials to the RMA and demonstrate that it is in financial good standing with sufficient financial capacity to provide the RMA with reasonable assurance that it can deliver the product to be offered. In addition, an applicant must also demonstrate that it is in good standing with the regulatory agency in which it domiciled and that it possessed errors and omissions coverage for processing and agency activities. AIA Services could not meet any of these requirements.

13.    Most significantly, AIA Services did not have a sufficient net worth to pursue an application with the RMA.  Between the decreasing profitability resulting from regulatory changes in the health and life insurance market coupled with the liabilities to Donna Taylor and Reed Taylor, AIA Services possessed a negative net worth.  Attached as Exhibit "A" is a true and correct copy of the consolidated financial statement of AIA Services and its subsidiaries for 1998 and 1999. In my capacity as President of the AIA Entities, I reviewed these consolidated

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 6

financial statements, as I did for every year's financial statements for the AIA/CropUSA entities, for accuracy prior to publication. As noted therein, in 1998 AIA Services was operating at a net loss with liabilities exceeding assets of more than $6 million (and not including the liability attributable to Donna Taylor's ownership of Series A preferred stock). In 1999, AIA Services again operated at a net loss with liabilities exceeding assets by increasing to more than $7 million.

14.    This negative net worth continued in the years that followed and specifically during the time period in which I explored the opportunity to enter into crop insurance market. Attached as Exhibits "B," "C," "D," "E," "F," and "G" are true and correct copies of the financial statements of AIA Services and its subsidiaries for the years 2000 through 2007.

15.    Moreover, even aside from the clear inability of AIA Services to meet the financial wherewithal, and as noted above, AIA Services was involved in liquidation proceedings concerning its subsidiary entity the Universe Life Insurance Company. Additionally, as a result of AIA Services financial condition evident in its financial statements, AIA Services found itself unable to meet the growing capital requirements of various states in which it was marketing life and health insurance and had its insurance company licenses to do so revoked in those states. Thus, AIA Services, and any subsidiary entity, was simply unable obtain approval from the RMA.

16.    On or about June 18, 2001, AIA Services advised all of its shareholders, including the Plaintiff Dale Miesen, of AIA Services' decision not make CropUSA a subsidiary of AIA Services and that instead that CropUSA would be "an independent property and casualty agency." A true and correct copy of this correspondence is attached as Exhibit "H."

17.    Any doubt about AIA Services inability to obtain approval from the RMA for a

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 7

SRA was made evident in the efforts to obtain approval of CropUSA as an MGA even without all the attendant issues of AIA Services' negative net worth with liabilities exceeding $8million, the liquidation of AIA Services' subsidiary Universal Life Insurance Company or its issues with other state regulatory agencies. These difficulties were noted in the CropUSA Financial Statements for the years 2002 through 2006, true and correct copies of which are attached as Exhibits "I," "J," "K," and "L." After multiple attempts to obtain approval from the RMA, CropUSA was only able to obtain such approval when I, along with Messrs. Beck and Cashman, agreed to personally guarantee a revolving line of credit with a maximum borrowing of $750,000. In further supplement of these financial commitments, Mr. Beck, with a business partner, contributed $2,000,000 of real estate mortgages to CropUSA. Ultimately, Mr. Beck and I were required to personally guarantee a $2 million loan from Zions Bank.

18.    Coincident in time with establishment of the CropUSA Entities, Jim Beck and Michael Cashman resigned their positions on the Board of Directors of AIA Services in or about March 2001. Although Messrs. Beck and Cashman participated in an group that was called the Advisory Board for CropUSA, along with other individuals including Reed Taylor, this Advisory Board was advisory only as CropUSA possessed its own duly constituted board of directors. Neither Messrs. Beck or Cashman held a position on the CropUSA Board of Directors or as an officer to those entities.

19.    In late December of 2006, Reed Taylor purported to issue a notice of default to AIA Services with regard to the agreements between AIA Services and himself.   As evident from the foregoing referenced financial statements, AIA Services clearly did not have the capital to redeem Reed Taylor's shares as demanded and I cannot believe that Reed Taylor and/or Donna Taylor were not aware of this fact.  Given the lack of capital and on the belief that AIA

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 8

Services was barred from doing so under the Idaho Business Corporation Act, AIA Services refused Reed Taylor's demand. In January 2007, Roderick Cyr Bond, on behalf of Reed Taylor filed *Reed Taylor v. AIA, et al.*, CV07-00208 (Nez Perce County District Court) (hereinafter referred to as "Reed Taylor Case"). The AIA Entities retained the law firm of Hawley Troxell Ennis & Hawley LLP ("HTEH") to defend the AIA Entities in the Reed Taylor Case.

20.    Compounding this state of affairs, I learned that Reed Taylor and Donna Taylor entered into a subordination agreement that essentially reversed the order of the prior agreement that they and AIA Services had reached in 1996. It is my understanding that although the agreement between Reed and Donna Taylor purports to be effective December 1, 2006, it was not actually signed until some point in February of 2007. I was not advised of any discussions concerning this agreement nor advised of its existence at the time of its execution. Reed Taylor and Donna Taylor's agreement was made without any regard for AIA Services as it had the immediate effect of purporting to accelerating AIA Services' approximately $8 million redemption obligation to Reed Taylor and subordinating the company's then $450,000 redemption obligation to Donna Taylor. The other consequence of Donna Taylor and Reed Taylors conduct was to force AIA Services into the financial position that it could no longer make payment to Donna Taylor and be in compliance with the Idaho Business Corporation Act. AIA Services ceased payments to Donna Taylor in May of 2008. On June 2, 2008, Michael Bissell, now counsel for Reed Taylor in the Miesen matter, filed *Donna Taylor v. R. John Taylor, et al.*, CV08-1150 (Nez Perce County District Court). Attached as Exhibit "M" hereto is the Complaint filed in this action. Subsequently, on May 24, 2013, Mr. Bond filed another action on Donna Taylor's behalf, *Donna Taylor v. AIA Services, et al.*, CV-13-1075 (Nez Perce County District Court). Attached as Exhibit "N" hereto is the Complaint in the 2013 action. The

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 9

2013 action was consolidated with the 2008 (hereinafter referred to as "Donna Taylor Case"). The original complaint filed by Donna Taylor included specific allegations asserting "violation of the corporate opportunity doctrine" as concerned the relation between AIA Services and CropUSA.

21.    Although the original complaint filed in the Reed Taylor case was a two-count complaint seeking relief against the AIA Entities and myself personally with regard to the Stock Redemption Agreement within a year that original complaint had been amended five times to add my ex-wife Connie Taylor, Jim Beck and his wife Corrine, the CropUSA Entities and others and to assert many of the identical issues that are present in this litigation. Attached as Exhibit "O" hereto is the Fifth Amended Complaint in the Reed Taylor Case. As I confirmed to Mr. Bond during his questioning in the course of a during a four day deposition "at issue" in the Reed Taylor Case was (1) the formation and ownership of CropUSA, (2) the business relationship of the AIA entities and the CropUSA entities in terms of assets, employees, master marketing agreements and administrative agreements, (3) the 2001 exchange of Series C preferred shares of AIA Services that were converted to common shares of CropUSA, (4) 2001 purchase of a parking lot, (5) the transactions between AIA Services and Pacific Empire Radio Corporation ("PERC"), (6) assertions of conflicts of interest, (7) issues pertaining to the Trustmark Settlement, (8) CropUSA asset sale to Hudson Insurance, (9) consulting payments received by me, (10) my compensation from AIA Services, (11) the attorney fees paid on behalf of the individual defendants in the Reed Taylor case, (12) the loans between CropUSA and AIA Services, and (13) compensation of the AIA Services' directors. Based on these allegations, in addition to the assertion of a breach of the stock redemption agreement, Reed Taylor asserted, among other, claims for fraud, director liability, breach of fiduciary duty, and conspiracy of all

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 10

named Defendants.

22. I also note that the Fifth Amended Complaint, like the present litigation, sought to challenge AIA Services' guarantee of CropUSA's loan. In this regard, in October 2006 HTEH prepared an attorney opinion letter regarding a loan transaction involving the CropUSA Entities and Lancelot Investors Fund, L.P. and to which AIA Insurance was to be a guarantor to the loan transaction. A true and correct copy of this attorney letter is attached as Exhibit "P." With regard to this attorney opinion letter, I relied upon the opinions expressed therein in proceeding with the loan transaction.

23. In addition, during the course of HTEH's representation in the Reed Taylor case, HTEH provided me with certain correspondences regarding engagement letters, conflict waivers and tolling agreements. With regard to the matters contained in these letters I relied upon the advice given by HTEH.

24. At the time of the filing of the Reed Taylor Case, the Board of Directors for AIA Services consisted of myself, Jolee Duclos and Bryan Freeman. Upon the filing of the Reed Taylor Case which named Ms. Duclos and Mr. Freeman as defendants, these two individuals resigned their directorship from AIA Services. As such, I requested, and upon their consent, appointed Connie Henderson and James Beck as directors for AIA Services. Connie Henderson and I were once married, but we were separated in 2002 and divorced on December 16, 2005. Prior to 2005, I had no discussions with Ms. Henderson, then Mrs. Taylor, regarding the operations or affairs of the AIA Services/CropUSA. I did not consult with her in this time period regarding her opinions on any business matters nor did I seek her approval. Ms. Henderson remained on the AIA Services Board of Directors until early September of 2014. In this regard, I have reviewed the Affidavit of Connie Henderson in Support of Motion for Summary Judgment

**AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 11**

and agree with her recollections as expressed therein.

25.    Likewise Mr. Beck remained on the AIA Services Board of Directors from April of 2007 through September of 2014. Mr. Beck was not involved in the negotiations which led to the ultimate resolution of the litigation between the Defendant GemCap Lending I, LLC and AIA Services, and others, as pending in the U.S. District Court of California, Case No. CV13-5504 nor was his consent obtained with regard to any resolution terms with GemCap.

26.    Upon the filing of the Reed Taylor Case, AIA Services directed correspondence to the AIA Services' shareholders, to include Mr. Miesen, of the fact of the Reed Taylor lawsuit and requesting shareholder approval to advance funds for the defense to the corporate directors. The letter also advised the shareholders that in addition to alleging a default of the obligations owed to him Reed Taylor had asserted that the company and its directors have taken actions which diminished the value of the company. The letter also advised the shareholders of their right to obtain a copy Reed Taylor's Complaint. A true and correct copy of this correspondence is attached as Exhibit "Q."

27.    Thereafter, on March 28, 2007, AIA Services held a special meeting of the shareholders with regard to the request for advancement of funds for attorney fees to be incurred by the directors of AIA Services in defense of Reed Taylor litigation. A true and correct copy of this special meeting of the AIA Services shareholders is attached as Exhibit "R."

28.    Thereafter, in a letter dated July 21, 2008, Donna Taylor in her identified capacity as a Series A Preferred Shareholder in AIA Services made demand upon AIA Services for corrective action pursuant to Idaho Code 30-1-742. Like the Complaint in Reed Taylor's case, Donna Taylor's letter asserted the existence of 27 matters to which she asserted liability existed including, but not limited to the alleged usurpation of a corporate opportunity with regard to the

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 12

CropUSA Entities, illegal loan guarantees as well as assertions of fraud, misappropriation and breach of fiduciary duties. A true and correct copy of this correspondence is attached is attached as Exhibit "S." As the docket in this matter reflects, this present action purporting to be a derivative case was not commenced until August 11, 2010.

29.    On June 17, 2009, the District Court in the Reed Taylor Case granted the Defendants' Motion for Summary Judgment, dismissing Reed Taylor's Fifth Amended Complaint. Reed Taylor moved for reconsideration, which motion was denied on August 13, 2009. Reed Taylor appealed and the decision was affirmed by the Idaho Supreme Court on September 7, 2011. Upon remand, and as to the remaining claims, the District Court granted Defendants' Motion for Judgment on the Pleadings as to the claims for fraudulent conveyances, director liability, breach of fiduciary duties, and civil conspiracy on December 28, 2011. A true and correct copy of the Opinion and Order on Plaintiff's Amended Motion to Supplement and Amend Complaint and Defendants' Motion for Judgment on the Pleadings is attached hereto as Exhibit "T."

30.    Plaintiff's Third Amended Complaint also challenges the authority of AIA to guarantee certain loans. In particular, Plaintiff challenges a guarantee given incidental to a loan transaction involving the CropUSA Entities and GemCap Lending I, LLC in 2011 as well as a subsequent guarantee given to GemCap Lending I, LLC in 2013. With regard to each of these transactions I received an attorney opinion letter indicating that these transactions were permissible. Specifically, I also relied upon Robert Van Idour's attorney opinion letter of November 21, 2011, Mr. Van Idour's attorney opinion letter of February 7, 2013 as well as an attorney opinion letter prepared by James Gatziolis of the firm Quarles & Brady dated November 23, 2011.

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 13

31.     As should be evident from the preceding, over the course of the last fourteen years, I have been involved in various lawsuits directed at me individually as well as the AIA Entities and CropUSA entities. In these cases, while the named plaintiff differed, each case was prosecuted by Mr. Bond representing the party pursuing the claims.  These cases include, but are not limited to the Reed Taylor Case, the Donna Taylor Case which remains pending, and this present litigation on behalf of Mr. Miesen.  In each of these cases, Mr. Bond, on behalf of whichever client he happens to be representing in the proceedings, has alleged, and continues to allege similar allegations of wrongdoing and malfeasance against myself, the AIA/CropUSA entities, and the former directors of AIA Services. However, these are not the only litigations that Mr. Bond has initiated and/or otherwise involved himself in the representation of various clients against myself personally, the AIA entities, the CropUSA entities, or the various attorneys who have represented me or the AIA/CropUSA Entities in the past.  By my count over the last fourteen years Mr. Bond, on behalf of his various clients, has initiated or sought to involve himself in no less than thirteen different lawsuits not including the foregoing, including two separate suits alleging similar aiding and abetting claims as present in this lawsuit on behalf of Reed Taylor against the firm of Hawley Troxell Ennis & Hawley and Clements Brown in 2008, a malpractice claim on behalf of Reed Taylor against Eberle, Berlin, Kading, Turnbow & McKlveen in 2009, a malpractice claim on behalf of Reed Taylor against CairnCross & Hempelmann in 2012, and a malpractice claim on behalf of Dale Miesen as a derivative plaintiff against John Munding in 2019.  In many of these cases, although not named as a Defendant, I was required to respond and provide information relative to the AIA entities. The financial toll on the AIA/CropUSA entities, as well as myself individually, cannot be understated and easily exceeds millions of dollars.  Moreover, the foregoing has had a consequential chilling effect on

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 14

the ability of the AIA/CropUSA entities to operate as a going concern and has made the ability to secure, and retain, attorneys to represent the interests of these entities challenging. Thus the damage caused to these entities in these multiple litigations cannot be overstated.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

DATED This 29th day of January, 2021

_____
R. John Taylor

SUBSCRIBED AND SWORN TO before me this 29 day of January, 2021.

_____
Notary Public for
Residing at Clarkston  w A
My Commission Expires: 12/30/20

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 15

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of January, 2021, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF System which sent a Notice of Electronic Filing to the following persons:

Roderick Cyr Bond     rod@roderickbond.com
Michael S. Bissell     mbissell@campbell-bissell.com
Tyler S. Waite      twaite@campbell-bissell.com
Jeffrey A. Thomson    jat@elamburke.com
Loren C. Ipsen      lci@elamburke.com
Joyce A. Hemmer     JAH@ElamBurke.com
Bradley S. Keller     bkeller@bryneskeller.com
William E. Adams     bill@weadamslaw.com
Alyson Anne Foster    alyson@dempseyfoster.com


           _/s/ Daniel Loras Glynn_
           Daniel Loras Glynn

**AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 16**

Jeffrey A. Thomson ISB #3380
jat@elamburke.com
Loren C. Ipsen ISB #1767
lci@elamburke.com
Joyce A. Hemmer ISB #7202
jah@elamburke.com
ELAM & BURKE, P.A.
251 East Front Street, Suite 300
P.O. Box 1539
Boise, Idaho 83701
Telephone: (208) 343-5454
Facsimile: (208) 384-5844

Attorneys for Defendants Hawley Troxell Ennis & Hawley LLP,
Gary D. Babbitt, D. John Ashby and Richard A. Riley

UNITED STATES DISTRICT COURT<br>FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, et al.<br><br>Defendants. | Case No. 1:10-cv-00404-DCN<br><br>THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE |

Defendants Hawley Troxell Ennis & Hawley LLP, Gary D. Babbitt, D. John Ashby and Richard A. Riley ("Hawley Troxell Defendants" or "HT Defendants"), by and through their counsel of record, Elam & Burke, P.A., respectfully move this Court for an order prohibiting Plaintiff's expert witness Richard McDermott from testifying at trial pursuant to Fed. R. Civ. P. 26(a)(2)(B)(vi) and 37(c)(1), Dist. Idaho Loc. Civ. R. 83.5(a), Idaho Rule of Professional Conduct 3.4(b), and the Court's inherent powers to manage the trial and safeguard the integrity of the legal process, as well as Fed. R. Evid. 104(a) and 403.

THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 1

**1 SER 31**

1 SER 32

This Motion is supported by the Declaration of Loren C. Ipsen in Support of the Hawley Troxell Defendants' Motions to Exclude Plaintiff's Expert Witness Richard McDermott and the Memorandum in Support of Hawley Troxell Defendants' Motion to Exclude Plaintiff's Expert Witness Richard McDermott Re: Expert Contingency Fee.

DATED this ___19___ day of January, 2021.

ELAM & BURKE, P.A.

By:_____
Loren C. Ipsen, Of the Firm
Joyce A. Hemmer, Of the Firm
Attorneys for Defendants Hawley Troxell
Ennis & Hawley LLP, Gary D. Babbitt,
D. John Ashby, and Richard A. Riley

THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT
WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 2

CERTIFICATE OF SERVICE

I hereby certify that on this _____ day of January, 2021, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons via email:

| | |
|---|---|
| Roderick C. Bond<br>rod@roderickbond.com<br>*Attorney for Plaintiff* | Daniel L. Glynn<br>dglynn@idalaw.com<br>*Attorneys for Michael W. Cashman, Sr., R. John Taylor, James Beck, Connie Taylor Henderson, Crop USA Insurance Services, LLC and Crop USA Insurance Agency, Inc.* |
| Alyson A. Foster<br>alyson@dempseyfoster.com<br>William E. Adams<br>bill@weadamslaw.com<br>*Attorneys for Intervenor GemCap Lending I, LLC* | Michael S. Bissell<br>mbissell@campbell-bissell.com<br>Tyler S. Waite<br>twaite@campbell-bissell.com<br>*Attorneys for Reed J. Taylor* |

Loren C. Ipsen

4845-6571-9258, v. 1

THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 3

Jeffrey A. Thomson ISB #3380
jat@elamburke.com
Loren C. Ipsen ISB #1767
lci@elamburke.com
Joyce A. Hemmer ISB #7202
jah@elamburke.com
ELAM & BURKE, P.A.
251 East Front Street, Suite 300
P.O. Box 1539
Boise, Idaho 83701
Telephone:  (208) 343-5454
Facsimile:  (208) 384-5844

Attorneys for Defendants Hawley Troxell Ennis & Hawley LLP,
Gary D. Babbitt, D. John Ashby and Richard A. Riley

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, et al.<br><br>Defendants. | Case No.  1:10-cv-00404-DCN<br><br>MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE |

Defendants Hawley Troxell Ennis & Hawley LLP, Gary D. Babbitt, D. John Ashby, and

Richard A. Riley (collectively, "HT Defendants"), by and through their counsel of record, Elam

& Burke, P.A., submit this Memorandum in Support of their Motion in to Exclude Plaintiff's

Expert Witness Richard McDermott Re: Expert Contingency Fee as follows:

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO
EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT
CONTINGENCY FEE - 1

1 SER 34

## I.    INTRODUCTION

It was discovered during the deposition of Miesen's expert witness, Richard McDermott, that Mr. McDermott is not actually charging Miesen or his attorney, Roderick Bond, on the hour and rate basis that Mr. McDermott disclosed in his expert witness report. Nor has Mr. McDermott sent bills to or received regular payments from Mr. Bond for his work in this case. Rather, Mr. McDermott testified that he has accrued an estimated $100,000.00 in earned but unpaid expert witness fees for his work on this matter, including his purported full-time devotion to this case from at least August 2019 until the disclosure of the latest iteration of his report on November 1, 2020. Significantly, if Mr. McDermott's fee is calculated based on the rate of $350.00 per hour that he represented in his expert witness report, his accrued fees for the same time period total more than $700,000.00. Mr. McDermott testified that, at the conclusion of this matter, he will render a bill based on his subjective estimation of the value of his work.

In the meantime, Mr. Bond (who is representing Miesen on a contingency fee basis) has indicated by his representations and actions before this Court that he cannot now pay such a significant expense, and neither can Miesen. As a result, Mr. McDermott's self-described "unofficial" and "unorthodox" fee arrangement with Mr. Bond amounts to an impermissible *de facto*, if not explicit, contingency fee agreement, and Mr. McDermott has developed and disclosed hundreds upon hundreds of pages of purported expert witness opinions and testified at his deposition while having a significant financial stake in the outcome of this case.

For these reasons, as explained in further detail below, the HT Defendants request that the Court enter an order prohibiting Mr. McDermott from testifying at trial pursuant to Fed. R. Civ. P. 26(a)(2)(B)(vi) and 37(c)(1), Dist. Idaho Loc. Civ. R. 83.5(a), Idaho Rule of Professional Conduct

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 2

3.4(b), and the Court's inherent power to manage the trial in a fair and orderly manner and to safeguard the integrity of the legal process, as well as Fed. R. Evid. 104(a) and 403.

## II.    LEGAL STANDARD

Courts have "broad discretion in deciding whether to admit or exclude expert testimony." *United States v. Christophe*, 833 F.2d 1296, 1300 (9th Cir. 1987).

<u>Federal Rules of Civil Procedure</u>: Under Fed. R. Civ. P. 37(c)(1),[1] the Court may exclude expert witness testimony if the expert witness was not disclosed as required by Rule 26(a). In pertinent part, Fed. R. Civ. P. 26(a)(2)(B)(vi) requires an expert witness's report to contain "a statement of the compensation to be paid for the study and testimony in the case."

<u>Local Rules</u>: Dist. Idaho Loc. Civ. R. 83.5 confirms the Court's power to control the conduct of attorneys appearing before it to prevent, or to issue sanctions for, a violation of the ethical rules and/or Rules of Civil Procedure, including the power to exclude evidence as a

---

[1] Fed. R. Civ. P. 37(c)(1) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
> - (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> - (B) may inform the jury of the party's failure; and
> - (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)—(vi).

Rule 37(b)(2)(A)(i)—(vi), in turn, provides that the Court may make the following orders:

- (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
- (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
- (iii) striking pleadings in whole or in part;
- (iv) staying further proceedings until the order is obeyed;
- (v) dismissing the action or proceeding in whole or in part;
- (vi) rendering a default judgment against the disobedient party; or
- (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 3

sanction. Dist. Idaho Loc. Civ. R. 83.5(a) requires familiarity and compliance with the Idaho Rules of Professional Conduct, as well as any judicial decisions interpreting them.

> All members of the bar of the District Court ... for the District of Idaho (hereafter the "Court") and all attorneys permitted to practice in this Court must familiarize themselves with and comply with the Idaho Rules of Professional Conduct of the Idaho State Bar and decisions of any court interpreting such rules. These provisions are adopted as the standards of professional conduct for this Court but must not be interpreted to be exhaustive of the standards of professional conduct. No attorney permitted to practice before this court will engage in any conduct which degrades or impugns the integrity of the Court or in any manner interferes with the administration of justice therein.

Dist. Idaho Loc. Civ. R. 83.5(a). "In the event any attorney engages in conduct which may warrant discipline or other sanctions, the Court may ... [impose] appropriate sanctions pursuant to the Court's inherent powers and/or the Federal Rules of [Civil Procedure]...." Dist. Idaho Loc. Civ. R. 83.5(b)(1). District courts have "a large measure of discretion in interpreting and applying" their local rules. *Lance, Inc. v. Dewco Servs., Inc.*, 422 F.2d 778, 784 (9th Cir. 1970).

The Court's Inherent Powers: The inherent powers of the Court are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (internal quotes omitted) (affirming exclusion of evidence based on the district court's exercise of its inherent powers). The Ninth Circuit has recognized that the Court's inherent powers include "broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial, and that "[w]ithin this discretion lies the power ... to exclude testimony of witnesses whose use at trial ... would unfairly prejudice an opposing party." *Id.* (internal citation omitted). The Court's inherent powers include the power to dismiss a case if the Court finds "the presence of willfulness, bad faith, or fault by the offending party," that lesser sanctions would be ineffective, and there is a "nexus between the misconduct drawing the dismissal sanction and the matters in controversy in the case." *Litle & Co.*

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 4

*v. Mann*, 145 F.3d 1339 (9th Cir. 1998) (stating a court engaging in this analysis may consider "the prejudice to the party victim of the misconduct"). Willfulness, bad faith and/or fault need not be shown if the court exercises its inherent power to impose a sanction that excludes evidence but does not have the effect of ending the case. *See id.*

Federal Rules of Evidence: Under Fed. R. Evid. 104(a): "The court must decide any preliminary question about whether ... evidence is admissible." Fed. R. Evid. 104(a). Fed. R. Evid. 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

## III.   ARGUMENT

Mr. McDermott should be excluded from testifying at trial because he has an improper expert witness fee arrangement with Mr. Bond that amounts to a *de facto*, if not express, contingency fee arrangement that is prohibited by public policy and Idaho Rule of Professional Conduct 3.4(b), and Mr. McDermott developed and disclosed his expert witness opinions while having a significant financial interest in achieving a successful outcome of this case for Miesen. Further the realities of Mr. McDermott's fee arrangement with Mr. Bond were not timely or accurately disclosed in Mr. McDermott's expert witness report as required by the Federal Rules of Civil Procedure and the Court's scheduling order.

### A. Mr. McDermott should be excluded based on his inappropriate expert witness contingency fee arrangement with M. Bond.

The Rules of Professional Conduct in Idaho (as well as in New York, where Mr. McDermott is licensed)[2] prohibit a lawyer from offering an inducement to a witness that is

---

[2] *See* Declaration of Loren C. Ipsen in Support of the HT Defendants' Motions to Exclude Plaintiff's Expert Witness Richard McDermott (hereinafter "Ipsen Decl."), Exh. B (hereinafter "McDermott Depo"), at 6:21-22.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 5

prohibited by law. *See* I.R.P.C. 3.4(b)[3]; *see also* N.Y.R.P.C. 3.4(b) (expressly prohibiting a lawyer from offering to pay or "acquiescing in the payment of compensation to a witness contingent upon ... the outcome of the matter"). The comments to Idaho Rule of Professional Conduct 3.4 explain that the purpose of such a prohibition is to protect the integrity of the adversarial system of law.

> The procedure of the adversary system contemplates that the evidence in a case is to be marshaled competitively by the contending parties. Fair competition in the adversary system is secured by prohibitions against destruction or concealment of evidence, improperly influencing witnesses, obstructive tactics in discovery procedure, and the like.

I.R.P.C. 3.4, Cmt. 1. It appears that Idaho appellate courts have not had occasion to address Rule 3.4(b) in the context of an expert witness contingency fee arrangement, but Comment 3 to Idaho's Rule 3.4(b) addresses the issue by expressly recognizing that in most jurisdictions "it is improper to pay an expert witness a contingent fee."

A number of courts that have had the occasion to decide the admissibility of expert witness testimony based on the existence of an expert witness contingency fee arrangement (be it express or *de facto*) have held that the expert's testimony must be excluded. A relatively recent example of a U.S. District Court excluding expert witness testimony based on a contingency fee is the case of *Straughter v. Raymond*, No. CV 08-2170, 2011 WL 1789987 (C.D. Cal. May 9, 2011). Applying California's equivalent of Idaho Rule of Professional Conduct 3.4(b), the Central District of California excluded expert witness testimony in circumstances quite similar to the present case and the court's reasoning is persuasive. California's ethical rule forbidding improper inducement of witnesses prohibits an attorney from "[d]irectly or indirectly pay[ing], offer[ing] to pay, or acquies[ing] in the payment of compensation to a witness contingent upon ... the outcome of the case." *Straughter*, at *2 (stating that this rule "codified California's long-standing common law

---

[3] Idaho Rule of Professional Conduct 3.4(b) provides: "A lawyer shall not ... falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law."

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 6

prohibition of contingency fee arrangements with expert witnesses"); *see also id.* at n. 2 (quoting the Model Rule of Professional Conduct 3.4(b), which was adopted in Idaho). In *Straughter*, the plaintiff's expert was paid a retainer and compensated by the plaintiff's attorney at the expert's hourly rate for a period of time before the plaintiff's original attorney withdrew. *Id.* at *1. The plaintiff's new attorney could not afford to advance the expert's fees and entered into a contingency fee agreement with the expert witness, under which the expert would be compensated only if the plaintiff recovered a judgment. *Id.* at *2. The nature of the expert's contingency fee arrangement was not disclosed in her initial expert disclosure. *Id.* After the defendant filed a motion to exclude the expert's testimony based on violation of California's rules of professional conduct prohibiting expert witness contingency fee agreements, plaintiff cancelled the contingency fee agreement and retroactively reinstated the expert's hourly rate of compensation, but because neither the plaintiff nor his attorney could afford the hourly rate, the plaintiff gave the expert a lien on any recovery the plaintiff might obtain in the action (and other personal property). *Id.*

In its analysis, the *Straughter* court noted that courts in California and other jurisdictions had relied on the common law and "the court's authority to forestall violations of ethical principles" to conclude that "the testimony of expert witnesses whose compensation is contingent upon the outcome of the case must be excluded." *Id.* at *2. The *Straughter* court rejected the approach of some jurisdictions that had held there is no *per se* exclusion of contingency fee expert witnesses. *Id.* at *3.[4] The *Straughter* court instead found that "the better course of action is to

---

[4] The courts that have found no *per se* exclusion of contingency fee expert witnesses have generally recognized that the testimony violates the rules of ethics, but because it implicates an ethical rule instead of a rule of evidence, the issue of expert witness fees is a credibility issue for the jury. However, these decisions in effect allow an attorney to benefit from a violation of the rules of ethics so long as the violation happens in a courtroom. This is contrary to the very purpose of the ethical rule, which is to protect not just the parties to the action but the justice system. And the approach of these courts that do not *per se* exclude the testimony fails to adequately appreciate the courts' inherent power to protect legal proceedings from ethical violations and enforce their local rules. This is particularly important when dealing with expert witness testimony, which the U.S. Supreme Court has recognized can be "powerful and

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 7

exclude the testimony of expert witnesses in civil cases whose compensation is contingent on the outcome of the case." *Id.* "The fact that [the expert's] opinions were rendered when she had a direct financial interest in the outcome of this action, raises serious questions about the integrity of her expert testimony," which is the very same concern that the ethical rules' prohibition of expert witness contingency fees is meant to address. *Id.* The fact that the plaintiff and his expert later reverted to an hourly rate did not cure the impermissible taint of the opinions that the contingency fee arrangement created. *Id.*

As an additional basis for exclusion of the expert witness's testimony, the *Straughter* court found that, even though the plaintiff and the expert had reverted to observing an hourly rate for the expert's work, the expert still maintained "a direct financial stake in the outcome" of the litigation indicative of a contingency fee – what the court called a *de facto* contingency fee – because the plaintiff's inability to pay the expert's hourly rate and the resultant debt created by accrual of the expert witness fees meant that, "as a practical matter, [the expert] will not be paid for her work unless and until plaintiff recovers a sum of money in connection with this case." *Id.* Therefore, the *Straughter* court granted the defendant's motion to exclude the expert's testimony as improper and unethical because agreeing to pay an expert witness "a fee contingent on the success of the litigation" is against public policy and poses "too great a temptation to practice deceit and to commit the too common crime of perjury." *Id.* at *2-3.

The court in *Riley v. Liberty Ins. Corp.*, No. 3:17 CV 1595, 2019 WL 5420590, at *3 (N.D. Ohio Feb. 15, 2019), agreed with the reasoning of the *Straughter* decision and recognized the

---

quite misleading," and the financial incentive supplied by an expert witness contingency fee to exaggerate or otherwise color testimony (consciously or subconsciously) to enhance the chances of success and payment compounds the difficulty of the Court's already challenging (and vital) gatekeeping task of ensuring the reliability of expert testimony offered to the jury. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). As the *Straughter* court determined, the better rule is exclusion of expert witnesses who have a financial stake in the outcome of the case based on a contingency fee arrangement.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 8

"serious ethical issues surrounding [the plaintiff's expert witness's] contingency fee arrangement." *Id.* The plaintiff had attempted to remedy the problem by entering a new agreement with the expert to charge an hourly rate, but the court explained that "[t]his bandage … does not repair the wound because [the expert] produced his 'expert report' and testified at his deposition *while the contingent fee was still in place.*" *Id.* (emphasis original). "As the *Straughter* Court persuasively held – timing matters." *Id.*

Other courts have reached the same or similar conclusions and have excluded the testimony of expert witnesses who have worked in whole or in part under a contingency fee agreement or *de facto* contingency fee arrangement. In *Estate of Mikeska*, 217 A.3d 329, 335 (Pa. Super. 2019), the court described Pennsylvania's prohibition of testimony by experts with contingency fee agreements based on the principle that "improper conduct or bias can be predicted easily when the compensation of the witness is directly related to the absolute amount of an award which may in turn be dependent to a great degree on the testimony of that same witness." Similarly, in *Swafford v. Harris*, 967 S.W.2d 319, 322 (Tenn. 1998), the court explained that expert witness contingency fee agreements violate public policy because they "threaten the legitimate recoveries of injured plaintiffs," "imperil defendants and the fundamental truth-seeking mission of our court system," and the expert witness's "interest in the amount of the damages furnishe[s] a powerful motive for exaggeration, suppression, and misrepresentation, a temptation to swell the damages so likely to color his testimony as to be inimical to the pure administration of justice …." The court in *Dupree v. Malpractice Research, Inc.*, 445 N.W.2d 498, 500 (Mich. App. 1989), recognized that expert witness contingency fee agreements are "so repugnant to established Michigan public policy" that permitting compensation to an expert for testimony rendered while a party to a contingency fee agreement "would defeat or subvert those policies and threaten the integrity of the judicial system."

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 9

*See also Farmer v. Ramsay*, 159 F.Supp.2d 873, 883 (D.Md. 2001), aff'd on other grounds (noting the comment to Maryland's Rule of Professional Conduct 3.4 – which like Idaho's Rule 3.4 states that "[u]nder the common law in most jurisdictions … 'it is improper to pay an expert witness a contingent fee'" – and agreeing that "witness contingency fee agreements affirmatively violate the fundamental policy of Maryland and the United States"; also noting that lack of funds to retain an expert witness is an unsatisfactory excuse for entering an impermissible expert witness contingency fee agreement); *Followwill v. Merit Energy Co.*, Civil No. 03–CV–62–D, 2005 WL 5988695, at *1 (D. Wyo. Apr. 11, 2005) (excluding the plaintiffs' expert and striking his report because he was paid on an impermissible contingency basis); *In re SMTC Mfg.*, 421 B.R. 251, 264 n. 2 (W.D.Tex.Bankr. 2009) (noting the expert witness hired by the trustee had been "disqualified from testifying as an expert witness at the trial because she had been employed on a contingency basis"); *Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 300 (4th Cir. 2002) (noting expert witness contingency fees violate public policy and are impermissible because "[f]inancial arrangements that provide incentives for the falsification or exaggeration of testimony threaten the very integrity of the judicial process which depends upon the truthfulness of the witnesses").

In this case, Miesen and Mr. McDermott represented in expert witness disclosures that Mr. McDermott was charging Mr. Bond $350 per hour for his pre-trial expert witness services. Mr. McDermott's report states:

> I was retained by Roderick Bond Law Office, PLLC and am compensated solely by Roderick Bond Law Office, PLLC. I charge $350 per hour for my work preparing this Report and $400 for testifying at trial, plus reimbursement of all out-of-pocket expenses and travel costs. All sums owed to me up through the time of trial are required to be paid in full prior to the time that I appear and testify at trial. I also reserve the right to require advance deposits if I am not being timely paid. I have never had to request any deposits from Roderick Bond Law Office, PLLC.[5]

---

[5] Ipsen Decl., Exh. A, at § IV.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 10

However, it was revealed during the deposition examination of Mr. McDermott on November 5, 2020, that Mr. Bond and Mr. McDermott have engaged in what Mr. McDermott himself characterizes as an "unofficial, if you will, unorthodox, if you will, way of proceeding" with respect to expert witness compensation, which is not based on itemized bills reflecting Mr. McDermott's time charged at the stated hourly rate.[6] Mr. McDermott describes his relationship with Mr. Bond as "so satisfactory and of such a – of such a quality, [that] I had no need to be concerned about retainers or sending periodic bills or anything."[7] "It's as trustworthy a relationship as I could imagine having with someone."[8]

Based on Mr. McDermott's level of satisfaction and trust in his relationship with Mr. Bond, Mr. McDermott has not sent bills to Mr. Bond or received regular payments based on the application of his hourly rate to the time he has spent working on this matter. In fact, he has never tallied his time, which he keeps written in "little notebooks."[9] Rather, Mr. Bond has sporadically paid Mr. McDermott chunks of money with no objectively identifiable correlation to the amount of time Mr. McDermott has actually expended on this case.[10] Mr. McDermott explained in his deposition that, instead of sending itemized bills to Mr. Bond, he has "had occasion to request payment from Mr. Bond for this or that particular reason," such as when he wanted money to pay his grandchild's tuition.[11] Other times, Mr. Bond might notice it has been some time since he paid Mr. McDermott any money and ask Mr. McDermott to send him a bill; in response, Mr. McDermott will send Mr. Bond a request via LawPay for payment of an arbitrary, round figure

---

[6] McDermott Depo, 56:12-14.
[7] McDermott Depo, 57:24-58:2.
[8] McDermott Depo, 58:11-12.
[9] McDermott Depo, 58:23-25.
[10] McDermott Depo, 56:7-8; 57:4-16; 58:3-8; 65:20-25.
[11] McDermott Depo, 56:7-8; 58:3-8.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 11

(*e.g.*, a request for $5,000 during a month in which Mr. McDermott would have accumulated about $40,000 in fees if he charged Mr. Bond his stated rate of $350 per hour).[12]

The result of this "unofficial" and "unorthodox" expert witness fee arrangement is that Mr. McDermott purportedly worked full-time (35 hours per week)[13] on this case between August 2019 and November 5, 2020, and logged enough hours to have earned more than $700,000 in expert witness fees during that fifteen-month period of time if he were to charge Mr. Bond the rate of $350 per hour stated in his report.[14] But Mr. Bond has paid Mr. McDermott only a small fraction of that amount – about $115,000 for work between his retention as an expert witness in 2017 and his November 5, 2020, deposition[15] – and Mr. McDermott roughly estimated during his November 5, 2020, deposition that his past work was "worth another $100,000" in earned but unpaid (and unbilled) expert witness fees.[16] Mr. McDermott explained that his estimate was based on his subjective assessment of the value of his work and the "quality of those hours."[17]

Mr. McDermott and Mr. Bond have essentially abandoned the rate and hour compensation structure represented in Mr. McDermott's report, as even more clearly illustrated by the following testimony:

> Q. So at $350 an hour for a 35-hour week, what does that work out to? About $10,000 a week?
> ...
> A. THE WITNESS [Mr. McDermott]: Okay. Yes, $10,000.
> Q. (BY MR. KELLER) So it would be your testimony that if you were to charge on an hourly basis, your fees would be about $10,000 a week since at least August of 2019, correct?
> A. That's a big if. ... It's a big if because I wouldn't charge [Mr. Bond] $350 an hour for every hour.[18]

---

[12] McDermott Depo, 57:4-16; 63:8-16; 65:20-25.
[13] McDermott Depo, 62:14-17.
[14] McDermott Depo, 64:5-11.
[15] McDermott Depo, 55:4-22.
[16] McDermott Depo, 67:9-20.
[17] McDermott Depo, 59:4-18.
[18] McDermott Depo, 63:17-64:4.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 12

Mr. McDermott attempted to explain his significant deviation from the compensation structure he disclosed in his report by stating, "I never said I was [charging $350 an hour in this case] as a practical matter."[19] (In contrast, when asked about his hourly rate for testimony in his deposition, Mr. McDermott made sure to confirm that Defendants were going to pay him for his deposition time at $400 per hour, answering: "[My rate is] $400 per hour for testimony, which I understand you will be paying me for this?")[20] Ultimately, Mr. McDermott testified that, "at the conclusion of this matter,"[21] he will subjectively determine what his expert witness services are worth and render a bill to Mr. Bond for whatever amount he concludes his fee should be.[22] The financial engagement between Mr. McDermott and Mr. Bond bears virtually no resemblance to the rate and hour compensation structure that Mr. McDermott represented in his report.

This record shows that, in the fifteen months leading up to his deposition, Mr. McDermott purports to have accrued about $100,000 in earned but unpaid (and unbilled) expert witness fees for work that would gross more than $700,000 if Mr. McDermott charged Mr. Bond his stated rate of $350 per hour. Regardless of whether Mr. McDermott thinks he should be paid $100,000 or $700,000, he wants to be paid a six-figure sum of money for what he perceives is the value of his work at the conclusion of this matter. In the meantime, over the course of that same fifteen-month period when Mr. McDermott was purportedly working full-time on this case, Mr. Bond and Miesen submitted multiple declarations to this Court stating under penalty of perjury that Miesen is personally indigent and unable to pay even a modest $500 cost bill,[23] that Mr. Bond has bankrolled

---

[19] McDermott Depo, 65:3-8.
[20] McDermott Depo, 62:24-63:1.
[21] McDermott Depo, 65:13-16.
[22] McDermott Depo. 59:1-3; 59:22-60:2.
[23] Dkt. 941-2, ¶ 8.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 13

this action by advancing more than $250,000 in costs (as of October 15, 2019),[24] and that Mr. Bond's financial backing of this lawsuit was a tremendous financial burden on him. Notably, Mr. Bond stated, "I do not have unlimited resources and this case was already becoming a financial burden on my firm prior to August 5, 2019," *which is the same time Mr. McDermott testified he started working full-time on this case.*[25]

Under what Mr. Bond has described as heavy and burdensome financial pressure from the cost of pursuing this lawsuit, he has on numerous occasions unreasonably sought to avoid paying litigation expenses and/or to shift them to Defendants. On October 18, 2019, Mr. Bond sought an order terminating the Discovery Master's services or, in the alternative, requiring Defendants to pay all of the Discovery Master's fees due to the financial burden already placed on Mr. Bond by his having to pay more than $20,000 for Plaintiff's share of the Discovery Master fees charged up to that time.[26] And Mr. Bond stated that he had been "forced to incur over $250,000 in costs for this lawsuit," which "has been a huge burden on me and my firm, especially because I stand no chance of ever recovering those funds from Mr. Miesen if this lawsuit is not successful because of his inability to pay."[27] In November 2019 and January 2020, Mr. Bond sought to avoid $6,975 in sanctions relating to the HT Defendants' motion to compel based on Mr. Bond's argument that he has already shouldered a heavy financial burden to pursue this case.[28] Mr. Bond noted at that time that he "will be stuck with no reimbursement of expenses" totaling more than $250,000 if Plaintiff is not successful in this lawsuit.[29] On January 17, 2020, Mr. Bond filed a declaration stating that the costs he incurred continued to "balloon" beyond what he had originally anticipated, and he

---

[24] Dkt. 719-1, ¶ 5.
[25] Dkt. 941-2, ¶ 2; *see also* Dkts. 941-1 at 6, 947-2 at ¶ 3, 963, 964 & 986-1 at ¶ 9; Dkt. 725-1, ¶ 2.
[26] *See* Dkt. 725-1.
[27] Dkt. 725-1, ¶ 2.
[28] *See* Dkt. 746.
[29] Dkt. 746, at 5-6; Dkt. 808, at 7-8.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 14

asked the Court to absolve him of the obligation to compensate the HT Defendants' expert witnesses for their deposition time.[30] In support of that effort, Mr. Bond argued that:

> While sometimes it is possible to not depose expert witnesses for various reasons (including strategic ones), this is not one of those situations. It is important for me to question all three experts at length about their opinions and the basis for their opinions in order for me to effectively represent Mr. Miesen and prepare for trial.[[31]]

Despite Mr. Bond's representation that deposing the HT Defendants' expert witnesses was vital to Mr. Bond's ability to effectively represent Miesen in this case and prepare for trial, he waived taking those depositions after the Court ruled that he and/or Miesen were responsible for paying the witnesses' fees for deposition time.[32] And once again, just a few days ago, Mr. Bond filed a motion seeking to shift to Defendants the Discovery Master's fees that have been assessed to Miesen.[33]

The record here shows that Mr. McDermott undertook fifteen months of purportedly full-time work on this case at a time when Mr. Bond was already feeling overly burdened by the cost of pursuing the action. Mr. McDermott had no reasonable expectation that he would be compensated at his stated rate of $350 per hour unless Miesen were to succeed in this lawsuit. Even if Mr. McDermott subjectively values his work at $100,000 instead of $700,000 as he claims, the fact remains that Mr. McDermott and Mr. Bond have allowed a six-figure debt of expert witness fees to accrue with no apparent means of payment unless Miesen succeeds in this case. Under these circumstances, as in *Straughter*, there is an impermissible *de facto*, if not express, expert witness contingency fee arrangement.[34] And the record shows that Mr. McDermott

---

[30] Dkt. 812-2, ¶¶ 4 & 7.

[31] Dkt. 812-2, ¶ 3.

[32] *See* Dkt. 1001; *see also* Ipsen Decl., ¶ 9.

[33] *See* Dkt. 1053.

[34] As the *Straughter* court recognized, the hallmark of a contingency fee is payment that is dependent in whole or in part on a successful recovery (and the corresponding risk of nonpayment), and a contingency fee need not be named as such by the parties or be based on a percentage of recovery to be properly categorized as a contingency fee. *See*

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 15

developed and disclosed his expert witness opinions regarding liability and damages in this case while at the same time having a large and ever-expanding financial interest in its outcome. This type of expert witness fee arrangement is against public policy, as well as the rules of ethics, because it poses unacceptable risks to the judicial system and the fair administration of justice by providing an incentive to flavor opinions with exaggeration, suppression, misrepresentation and improper advocacy, thereby unduly prejudicing the HT Defendants and harming the integrity and reliability of the testimony and the trial process. As a result of Mr. McDermott's improper financial relationship and fee arrangement with Mr. Bond, Mr. McDermott should not be permitted to testify as an expert witness at trial pursuant to Local Rule 83.5, the inherent powers of the Court, and Fed. R. Evid. 403.[35]

### B. Mr. McDermott should be excluded as a witness for failure to timely and accurately disclose the information required by the Federal Rules of Civil Procedure.

As explained above, the expert witness fee arrangement disclosed in Mr. McDermott's report is not the fee arrangement that Mr. McDermott and Mr. Bond have applied in this case. Notably, even if Mr. McDermott and Mr. Bond somehow did not realize they were engaging in a contingency fee arrangement at the time of Mr. McDermott's original report dated August 5, 2019, the abandonment of the $350 hourly rate and the true nature of the financial relationship was well-established by the time Mr. McDermott issued subsequent reports, including the last iteration of

---

*also Clark v. Sage*, 102 Idaho 261, 265, 629 P.2d 657, 661 (1981) (discussing the general type of a attorney contingency fee that is based on a percentage of recovery, and noting that "a contingent fee is both a contingency and a fee" involving payment contingent on success and a corresponding risk of nonrecovery and nonpayment).

[35] Please see the HT Defendants' separate Motion to Exclude Testimony of Plaintiff's Expert Witness Richard McDermott for further discussion regarding exclusion of McDermott pursuant to Fed. R. Evid. 403 and 702 based upon his improper advocacy for Miesen's case, the unreliability of his opinions, and the unduly prejudicial impact that admitting his testimony would have on the HT Defendants.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 16

his report on November 1, 2020,[36] and yet that report gave no hint of the circumstances that Defendants uncovered at Mr. McDermott's deposition just four days later. Miesen failed to timely and accurately disclose the "compensation to be paid for [Mr. McDermott's] study and testimony in the case" as required by Fed. R. Civ. P. 26(a)(2)(B)(vi). Pursuant to Fed. R. Civ. P. 37(c)(1), Mr. McDermott should be excluded for the failure to timely and accurately disclose the terms of his compensation.

## IV.    CONCLUSION

For the reasons set forth above, the HT Defendants respectfully request that this Court enter an order excluding the testimony of Mr. McDermott from the trial of this case.

DATED this ___29___ day of January, 2021.

ELAM & BURKE, P.A.

By:_____
Loren C. Ipsen, Of the Firm
Joyce A. Hemmer, Of the Firm
Attorneys for Defendants Hawley Troxell
Ennis & Hawley LLP, Gary D. Babbitt,
D. John Ashby, and Richard A. Riley

---

[36] Again, the report grew from 181 pages to 653 pages while McDermott was operating under the contingency fee arrangement described above.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 17

## CERTIFICATE OF SERVICE

I hereby certify that on this __19__ day of January, 2021, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons via email:

| | |
|---|---|
| Roderick C. Bond<br>rod@roderickbond.com<br>*Attorney for Plaintiff* | Daniel L. Glynn<br>dglynn@idalaw.com<br>*Attorneys for Michael W. Cashman, Sr., R. John Taylor, James Beck, Connie Taylor Henderson, Crop USA Insurance Services, LLC and Crop USA Insurance Agency, Inc.* |
| Alyson A. Foster<br>alyson@dempseyfoster.com<br>William E. Adams<br>bill@weadamslaw.com<br>*Attorneys for Intervenor GemCap Lending I, LLC* | Michael S. Bissell<br>mbissell@campbell-bissell.com<br>Tyler S. Waite<br>twaite@campbell-bissell.com<br>*Attorneys for Reed J. Taylor* |

Loren C. Ipsen

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT RE: EXPERT CONTINGENCY FEE - 18

Jeffrey A. Thomson ISB #3380
jat@elamburke.com
Loren C. Ipsen ISB #1767
lci@elamburke.com
Joyce A. Hemmer ISB #7202
jah@elamburke.com
ELAM & BURKE, P.A.
251 East Front Street, Suite 300
P.O. Box 1539
Boise, Idaho 83701
Telephone: (208) 343-5454
Facsimile: (208) 384-5844

Attorneys for Defendants Hawley Troxell Ennis & Hawley LLP,
Gary D. Babbitt, D. John Ashby and Richard A. Riley

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, et al.<br><br>Defendants. | Case No.  1:10-cv-00404-DCN<br><br>THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT |

Defendants Hawley Troxell Ennis & Hawley LLP, Gary D. Babbitt, D. John Ashby and

Richard A. Riley ("Hawley Troxell Defendants" or "HT Defendants"), by and through their

counsel of record, Elam & Burke, P.A., respectfully move this Court for an order prohibiting

Plaintiff's expert witness Richard McDermott from testifying at trial pursuant to Fed. R. Evid.

104, 403 and 702.

This Motion is supported by the Declaration of Loren C. Ipsen in Support of the Hawley

Troxell Defendants' Motions to Exclude Plaintiff's Expert Witness Richard McDermott and the

HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S
EXPERT WITNESS RICHARD MCDERMOTT - 1

Memorandum in Support of the Hawley Troxell Defendants' Motion to Exclude Testimony from Plaintiff's Expert Witness Richard McDermott filed contemporaneously herewith.

DATED this ___29___ day of January, 2021.

ELAM & BURKE, P.A.

By:___Loren C. Ipsen___
Loren C. Ipsen, Of the Firm
Joyce A. Hemmer, Of the Firm
Attorneys for Defendants Hawley Troxell
Ennis & Hawley LLP, Gary D. Babbitt,
D. John Ashby, and Richard A. Riley

CERTIFICATE OF SERVICE

I hereby certify that on this ___29___ day of January, 2021, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons via email:

| | |
|---|---|
| Roderick C. Bond<br>rod@roderickbond.com<br>*Attorney for Plaintiff* | Daniel L. Glynn<br>dglynn@idalaw.com<br>*Attorneys for Michael W. Cashman, Sr., R. John Taylor, James Beck, Connie Taylor Henderson, Crop USA Insurance Services, LLC and Crop USA Insurance Agency, Inc.* |
| Alyson A. Foster<br>alyson@dempseyfoster.com<br>William E. Adams<br>bill@weadamslaw.com<br>*Attorneys for Intervenor GemCap Lending I, LLC* | Michael S. Bissell<br>mbissell@campbell-bissell.com<br>Tyler S. Waite<br>twaite@campbell-bissell.com<br>*Attorneys for Reed J. Taylor* |

___Loren C. Ipsen___
Loren C. Ipsen

4847-2550-7802, v. 1

HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 2

Jeffrey A. Thomson ISB #3380
jat@elamburke.com
Loren C. Ipsen ISB #1767
lci@elamburke.com
Joyce A. Hemmer ISB #7202
jah@elamburke.com
ELAM & BURKE, P.A.
251 East Front Street, Suite 300
P.O. Box 1539
Boise, Idaho 83701
Telephone:  (208) 343-5454
Facsimile:  (208) 384-5844

Attorneys for Defendants Hawley Troxell Ennis & Hawley LLP,
Gary D. Babbitt, D. John Ashby and Richard A. Riley

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, et al.<br><br>Defendants. | Case No.  1:10-cv-00404-DCN<br><br>MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT |

## I.    INTRODUCTION

The latest iteration of Richard McDermott's expert witness report, produced on November 1, 2020, is **653 pages** long, having swelled to more than three times the length of the original 181-page report dated August 5, 2019. *See* Declaration of Loren Ipsen ("Ipsen Decl."), Exh. A ("McDermott Report"). Substantively, Mr. McDermott's report is a sprawling, repetitive collection of unreliable, unhelpful, unfairly prejudicial, speculative, inappropriate and inadmissible opinions offered by a lawyer who has taken on the role of advocate and co-counsel

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO
EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 1

for Miesen and who hopes to vouch for, argue, and summarize Miesen's claims from the witness stand under the guise of purported expert opinions. The HT Defendants ask the Court to exclude Mr. McDermott's testimony at trial.

## II.    LEGAL STANDARD

Under Fed. R. Evid. 104(a): "The court must decide any preliminary question about whether a witness is qualified ... or evidence is admissible." Fed. R. Evid. 104(a). It is Miesen's burden to prove by a preponderance of the evidence that Mr. McDermott's opinions are admissible. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Courts have "broad discretion in deciding whether to admit or exclude expert testimony." *United States v. Christophe*, 833 F.2d 1296, 1300 (9th Cir. 1987).

Under Fed. R. Evid. 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" only if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

In deciding the admissibility of expert testimony, the Court serves an important gatekeeping function "to ensure that the testimony is reliable and will help the trier of fact." *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997); *see also Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 & 158 (1999) (determining reliability "in light of the particular facts and circumstances"). "The judge is 'supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043–44 (9th Cir. 2014) (internal quotations omitted). In other words, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO
EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 2

his testimony has substance such that it would be helpful to a jury." *Id.* (internal quotations omitted). The Court's gatekeeping obligation applies equally to scientific and non-scientific evidence. *See Kumho Tire*, 526 U.S. at 147-49; F.R.E. 702 advisory committee's note (a non-scientific opinion "should receive the same degree of scrutiny for reliability" as a purported scientist's opinion).

In *Daubert*, the Supreme Court listed a number of factors that a district court may consider in assessing the reliability of an expert opinion.[1] None of those factors are dispositive; some may not apply in a given context; and other factors not listed in *Daubert* may be relevant to whether an expert's testimony is sufficiently reliable and helpful. For example, the court may consider whether an expert "developed their opinions expressly for purposes of testifying," versus developing them naturally while engaged in their expertise. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). Another proper consideration is whether the witness's opinion accounts for obvious alternative explanations or major variables. *See Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994). The court may also consider "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion." F.R.E. 702 advisory committee's note, citing *Gen. Elec. Co. v. Joiner*, 522 U.S. at 146. Similarly, if an expert claims to apply an accepted method but renders opinions that other experts in the field do not share, "the district court should be wary that the method has not been faithfully applied." *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

> [T]he trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of

---

[1] The *Daubert* factors include: "(1) whether the expert's technique or theory can be or has been tested — that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community." F.R.E. 702 advisory committee's note.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 3

the case [and] "any step that renders the analysis unreliable ... renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."

F.R.E. 702 advisory committee's note.

Expert testimony that has only "scant basis in the record" or "rests on unsupported assumptions and unsound extrapolation" should be excluded. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988); *see also Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) (stating that opinions based on "unsubstantiated and undocumented information" are not reliable and are inadmissible under *Daubert* and Rule 702). Where "unwarranted theories of law or assumptions of fact guide the expert ..., the evaluation will be set aside." *United States v. Honolulu Plantation Co.*, 182 F.2d 172, 178 (9th Cir. 1950). Further, an expert opinion is inadmissible if it "is connected to existing data only by the *ipse dixit* of the expert" or if the Court concludes "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." F.R.E. 702 advisory committee's note. Expert testimony "may not include unsupported speculation and subjective beliefs." *Greenawalt v. Sun City W. Fire Dist.*, 23 F. App'x 650, 652 (9th Cir. 2001); *see also Diviero*, 114 F.3d at 853 (same). And a party may not introduce a speculative or conjectural assertion "simply by finding an expert who is willing to assume its correctness." *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856–57 (9th Cir. 2019) (internal citations omitted).

Courts have cautioned that expert testimony can be "powerful and quite misleading." *Daubert*, 509 U.S. at 595. Therefore, a court "weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than over lay witnesses," *id.*

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 4

(internal citation omitted), and the Court is "not required to admit expert testimony every time a party is able to make the threshold *Daubert* showing." *United States v. Hicks*, 103 F.3d 837, 847 (9th Cir. 1996). Expert testimony may be excluded under Fed. R. Evid. 403, which provides that the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See also Hicks*, 103 F.3d at 847 (stating the court may exclude testimony that would "not materially assist the trier of fact, or [would] be better served through cross-examination or a comprehensive jury instruction").

### III.  ARGUMENT

**A. Mr. McDermott should be excluded as an expert witness because he has assumed the role of an advocate, and his opinions are unreliable and inadmissible.**

"An expert's role is to assist the trier of fact by providing information and explanations; the expert's role is not to be an advocate." *Haldiman v. Cont'l Cas. Co.*, No. CV-13-736, 2014 WL 12670637, at *8 (D. Ariz. Aug. 26, 2014), aff'd, 666 F. App'x 612 (9th Cir. 2016).

> Attorneys are advocates, charged with selflessly serving their client's interests. Expert witnesses, on the other hand, are employed to assist the parties in their pretrial preparation, and if called to testify, to give their unbiased opinion in order to assist the trier of fact in understanding the relevant evidence.

*Stencel v. Fairchild Corp.*, 174 F. Supp. 2d 1080, 1085–86 (C.D. Cal. 2001). "When expert witnesses become partisans, objectivity is sacrificed to the need to win." *Cacciola v. Selco Balers, Inc.*, 127 F.Supp.2d 175, 184 (E.D.N.Y. 2001) (internal citation omitted).[2]

In *Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003), the court excluded an expert witness because the role the witness played in the case crossed the line from expert to advocate.

---

[2] This is especially true when the expert witness's compensation is contingent on the success of the claims. *See* Memorandum in Support of the Hawley Troxell Defendants' Motion to Exclude Plaintiff's Expert Witness Richard McDermott Re: Expert Contingency Fee, § III.A.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 5

The *Lippe* court noted that the expert, who (like Mr. McDermott) was a law professor, "carried out the traditional functions of a lawyer" in the case, such as providing legal advice and helping to anticipate, identify, evaluate and/or develop legal theories, legal arguments, facts necessary to support claims, defenses to the claims, responses to the defenses, and witness cross-examination topics. *Id.* at 584. The court found it would be improper to allow the witness to testify because:

> He functioned not just as an expert witness providing information, but he carried on the traditional functions of a lawyer-advocate.... [He] saw himself as "counsel" to plaintiffs' lawyers and he acted in a completely partisan manner. It would be most inappropriate to permit him now to testify as an expert witness about the very matters he helped develop as a lawyer-advocate.

*Id.* at 688.

The *Lippe* court also noted that these circumstances compounded another significant admissibility problem with the expert's intended testimony – that "he would be giving, in essence, a summation from the witness stand." *Id.* The court explained that:

> [The expert's] report and deposition testimony make clear [that he] was going to do his best to persuade the jury that the 'business purpose' of the transactions in question was an improper one – that defendants' "real purpose," their true motivation, in engaging in the transactions was to hide the assets from asbestos creditors. Plaintiffs envisioned that [the expert] would testify to and summarize the relevant facts (as to which he had no personal knowledge) and then opine—or, more accurately, argue—that defendants were intending to defraud asbestos claimants by engaging in fraudulent transactions. But this is what a lawyer does in his or her summation to the jury. This is not the function of an expert witness. [The expert's] views as to the credibility of defendants' witnesses and defendants' "real" motivations are simply not relevant.

*Id.* The *Lippe* court rejected the plaintiffs' attempt to salvage allegedly proper portions of the expert's opinions (which were set forth in his 129-page report, as well as his deposition testimony) because the court did not believe the expert would or could restrict his trial testimony to permissible areas. *Id.* The court reasoned that, given the expert witness's role in the case and the focus and substance of the opinions he disclosed, the court did not believe that the expert could "now sanitize from any testimony his views as to defendants' motivations and the

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO
EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 6

credibility of their witnesses" or "testify with the detachment and independence that one would expect from an expert witness offering views as a professional." *Id.*

The court in *GST Telecom., Inc. v. Irwin*, 192 F.R.D. 109, 110 (S.D.N.Y. 2000), reached a similar result. That case (like the present case) involved the business judgment of a corporate board and claims of legal malpractice asserted against corporate attorneys "for failing to overrule the Board of Directors, whom the lawyers served, by failing to restrain the votes and directions of the Board." *Id.* After noting that such claims against the corporate attorneys were misguided, and that the plaintiffs' experts "furnish[ed] assumptions and conclusions disregarding the authority and supremacy of the Board in order to opine malpractice of the attorneys,"[3] the court excluded the testimony of the plaintiffs' experts for invading the province of the court and jury and failing to meet the admissibility requirements of Rule 702. The court explained:

> It is evident that the contentious advocacy of the experts – illustrated by conclusions on the credibility of explanations regarding the business judgment of the board of directors, its officers and attorneys, in clearly expressed, biased viewpoints – do little to aid the triers of fact on the underlying transactions.

*Id.* at 110. The court further observed that:

> A fair reading and appraisal of the animated assessments of the experts suggests it would be virtually impossible for them to put aside their expressed previous judgments and render judgment simply on the corporate and professional conduct involved and its credibility and conformity with standards described by them. Testimony from an expert, predicated on "subjective belief" and "unsupported [factual] speculation" violates the Supreme Court's directions for expert testimony in *Daubert* ....

*Id.* at 111.

Like the experts in *Lippe* and *GST Telecom.*, Mr. McDermott should not be allowed to testify as an expert at trial because he has assumed the role of an advocate, in reality functioning

---

[3] Similarly, in this case, McDermott's opinions against the HT Defendants are based on arguments that they breached their duties to AIA by failing to control or remove the directors, despite clear Idaho law stating that the attorney-client relationship "'is one of agency' in which the client is the principal and the attorney is the agent." *Taylor v. McNichols*, 149 Idaho 826, 844, 243 P.3d 642, 660 (2010) (internal citations omitted).

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 7

as Mr. Bond's co-counsel and litigation strategy consultant. Mr. McDermott has been instrumental to Miesen and Mr. Bond in identifying and developing legal arguments and theories, anticipating and preparing rebuttals to defenses, and dealing with evidentiary issues. Tellingly, Mr. McDermott directly advocated for Miesen through the declarations he has filed in this case, and his report is written as a legal advocacy memorandum embodying the entire theory, basis, and strategy of Miesen's claims, complete with legal arguments and opinions touching upon all aspects of this litigation, including interpretation of allegedly applicable law, viability of claims, damage theories and availability of remedies (some of which are not even alleged in Miesen's complaint), discovery matters, evidentiary issues, burdens of proof, rebuttal of defenses, witness credibility and legal conclusions. Mr. McDermott intends to offer an improper and unreliable narrative of subjective, partisanship-skewed assessments of witnesses and evidence and legal conclusions couched as expert opinions. Any legitimate expert witness testimony he might offer is so badly tainted by advocacy that it cannot be "sanitized" (using the *Lippe* court's term) for jury consumption. Under *Daubert/Kumho Tire* and Rules 702 and 403, Mr. McDermott should not be permitted to offer his opinions to the jury. These issues are further explained below.

### a. Mr. McDermott functions and views himself as an advocate in this litigation.

It appears that Mr. McDermott first became involved in litigation relating to issues raised in this case when Miesen's counsel Mr. Bond, who was then representing Reed Taylor, retained Mr. McDermott in August 2012 as an expert witness regarding third party opinion practice in *Reed Taylor v. Richard Riley, et al.*, Ada County Case No. CV-OC-2009-18868. *See* Ipsen Decl. ¶ 7. Since then, Mr. Bond has retained Mr. McDermott in at least three more cases, including this one, involving AIA's shareholders or creditors. *Id.* In this case, Mr. McDermott's opinions have

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 8

ballooned to cover all claims against all defendants, including directors, outside counsel, and a lender/creditor, even though he lacks experience in the relevant fields. *See, inter alia,* Ipsen Decl., Exh. B ("McDermott Depo") at 6:18-30:4; 35:16-40:17; 334:7-338:5; 360:24-361:8 (stating his "specialized knowledge" is his "knowledge as a lawyer in drawing inferences and conclusions from a set of facts," *i.e.*, his ability to draw legal conclusions that are inadmissible).[4]

What Mr. McDermott lacks in any apparent qualification to render the range of opinions he has disclosed, he seems to be making up for in eagerness to assist Mr. Bond, to whom Mr. McDermott has shown surprising professional devotion. In his deposition, Mr. McDermott testified to having unflinching trust in Mr. Bond. He said, "I have no reason to doubt any statement that comes from Rod Bond." McDermott Depo at 456:2-470:24-25; *see also* McDermott Report at n. 1965 (stating he is "certain" that Mr. Bond has given him all of the information he needs to express his opinions). Mr. McDermott explained that his relationship with Mr. Bond is "as trustworthy a relationship as I could imagine having with someone." *Id.* at 58:11-12. In fact, Mr. McDermott describes his relationship with Mr. Bond as "so satisfactory and of such a – of such a quality, [that Mr. McDermott] had no need to be concerned about retainers or sending periodic bills or anything," which has resulted in the accrual of a six-figure expert witness contingency fee generated over the course of fifteen months that has not been billed to or paid by Mr. Bond. McDermott Depo at 57:24-58:2; 62:5-10. (Mr. McDermott's self-described "unofficial" and "unorthodox" financial relationship with Mr. Bond is discussed in more detail in the HT Defendants' Motion to Exclude Plaintiff's Expert Witness Richard McDermott Re: Expert Contingency Fee.) Mr. McDermott even took an opportunity during his

---

[4] *See Kaufman v. Pfizer Pharm., Inc.,* No. 1:02-CV-22692, 2011 WL 7659333, at *9 (S.D. Fla. Aug. 4, 2011) (excluding expert's opinions as unreliable where the expert "generally takes a collection of facts, imputes [defendants'] motive and knowledge to those facts, and draws unsupported conclusions" unrelated to her experience); *Highland Capital Mgmt., L.P. v. Schneider,* 379 F.Supp.2d 461, 469 (S.D.N.Y. 2005) (expert may not testify "for the purpose of constructing a factual narrative based upon record evidence").

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 9

deposition to compliment Mr. Bond's performance in this and related cases, stating that under the circumstances he believes Mr. Bond is doing "extremely well" in his litigation efforts,[5] McDermott Depo at 529:23-532:3, and that this lawsuit would not have been necessary if the HT Defendants had been "as diligent and conscientious as Mr. Bond." McDermott Report at 629.

In addition to viewing Mr. Bond as a close and trusted colleague, Mr. McDermott has directly and significantly assisted Mr. Bond in the prosecution of this action, taking an active advocacy role in developing pleadings, discovery and arguments to the Court on procedural and discovery motions. For example, Mr. McDermott's unusually deep involvement in discovery includes traveling from his home in New York to Chicago and also to Boise in 2019 to personally attend four depositions with Mr. Bond. *See* Ipsen Decl., Exh. C; *see also* Dkt. 812-2. Mr. McDermott has also reviewed all motions and other filings in this case as the matter has progressed. *See* Dkt. 403-2 ¶ 22; Dkt. 783-2 ¶ 40; *see also* McDermott Report at § III(a) (listing information reviewed). He personally engaged in the prosecution of the case by filing a number of so-called declarations that were, in substance, actually supplemental legal briefs that contained recitations of the case's procedural history, citations to authority, legal arguments, requests for relief from the Court, and other elements appropriate only for legal advocacy and briefing, and inappropriate for expert testimony. *See* Dkts. 194-6; 403-2; 419-16; 493-2; 758-2; 783-2; 829-1; 838-3. Examples include the following:

*Example 1:* Mr. McDermott assisted Mr. Bond's effort to obtain the Court's leave to file the Third Amended Complaint ("TAC") by submitting a declaration to ensure "the Court understands that the causes of action and damages at issue in this lawsuit are substantiated." Dkt.

---

[5] McDermott vouches for Mr. Bond's ethics and ability, seemingly unconcerned that the Idaho Supreme Court concluded in 2012 that Mr. Bond pursued a lawsuit against Hawley Troxell "frivolously, unreasonably, and without foundation," filed conclusory claims with insufficient factual allegations that also demonstrated "an often-incorrect understanding of the law," "ignored well-established Idaho precedent," and pursued an appeal "spuriously and without foundation, for harassment purposes only." *Taylor*, 149 Idaho at 844 & 848, 243 P.3d at 660 & 664.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 10

194-6 ¶ 24. To that end, Mr. McDermott argued that the letters Miesen relies upon for statutory standing satisfy Idaho Code § 30-1-742's derivative demand prerequisites to filing suit, accused John Taylor of making disingenuous arguments, inferred that John Taylor knew the basis for the claims listed in the derivative demand letters because he was involved in the alleged misconduct, stated that the Controlling AIA Defendants acted in bad faith and had conflicts of interest that rendered the business judgment defense inapplicable in this case, and opined that the length of the TAC was appropriate and necessary to cover the relevant history and claims. Dkt. 194-6 ¶¶ 21-23. As in *Lippe* and *GST Telecom.*, these declarations are inappropriate contentious advocacy and animated assessments relating to credibility and motivations of witness. These are arguments properly asserted by litigation counsel, not an expert witness.

*Example 2:* Mr. McDermott supported Mr. Bond's motion to continue the HT Defendants' motion for summary judgment. Dkt. 403-2. In his declaration, he stated he was familiar with the parties' discovery disputes regarding privilege, presumed to instruct the Court that the "attorney-client privilege is generally always waived" when a client sues an attorney, and argued it would be "unfair" to deny Miesen access to AIA's attorney-client communications. Dkt. 403-2 ¶ 26.

*Example 3:* Mr. McDermott supported Mr. Bond's effort to compel discovery by filing a declaration in which he argued that John Taylor could not assert privilege and work product protections, the Controlling AIA Defendants' knowledge could not be imputed to AIA due to alleged conflicts of interest and therefore as a matter of law AIA had not discovered allegedly unlawful activities and fraud, he needed additional discovery to "rebut certain affirmative defenses asserted by the defendants," the conflict waiver and joint defense agreements (which were reviewed *in camera* and approved by Judge Brudie in the *Reed Taylor* case) "are void and

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 11

of no legal force or effect," it was "grossly unfair" for GemCap to have information while denying it to Miesen, and the Defendants committed fraud, conspired with or aided and abetted each other, breached duties, and acted unlawfully. Dkt. 419-16 ¶¶ 34-40, 44 & 47 (footnotes omitted); *see also id.* at n. 1. He also "reserve[d] the right" to raise the crime/fraud exception to privilege, opined regarding the scope of John Taylor's privilege waiver, and made a myriad of other conclusory arguments regarding his interpretation of the law and AIA's governing documents, all with the goal of persuading the Court to adopt Miesen's position on a discovery motion addressing privilege and work product protections. *Id.* Mr. McDermott's role here was clearly as an advocate and is in no manner helpful to the trier of fact.

*Example 4:* Mr. McDermott opposed the HT Defendants' motion to modify Discovery Master Order No. 1 regarding categorical privilege logs, arguing that such logs are inappropriate because they do not provide sufficient information to allow Mr. McDermott to assess "whether privilege applies or has been waived" and "whether any disputed documents should be submitted to the Discovery Master or the Court for an *in camera* review." Dkt. 493-2 ¶ 4.

*Example 5:* In a declaration supporting Miesen's motion to modify the scheduling order to extend his rebuttal expert opinion disclosure deadline, Mr. McDermott took an adversarial stance and argued the procedural history of discovery. *See* Dkt. 758-2 ¶ 4.

*Example 6:* Mr. McDermott submitted a 50-page legal brief masquerading as a declaration to support Miesen's motion to compel. It contains a procedural history of this case, citations to legal authority, and legal arguments regarding his views on the fairness of privilege application, general counsel's scope of representation, the case of *Taylor v. Bell*, 185 Wash. App. 270, 340 P.3d 951 (2014), the adverse interest exception, selective and subject matter waivers of privilege, prejudice to Miesen, etc. Dkt. 783-2 ¶¶ 44-52, 54, 61 & 72-73.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 12

Mr. McDermott's declarations even directly petitioned the Court for procedural concessions and discovery orders as if he were plaintiff's counsel. *See* Dkt. 403-2 ¶ 29 (asking for a continuance of other witnesses' depositions so he could personally attend them); Dkt. 783-2 ¶ 77 (asking for additional time to prepare his report); Dkt. 829-1 ¶ 8 (same).

Mr. McDermott has also expressly stated his belief that his role in this case is to secure relief for Miesen. Mr. McDermott declared he needed to receive additional information in discovery *"[i]n order for me and Mr. Miesen to fully and fairly present his claims."* Dkt. 783-2 ¶ 60 (emphasis added). Mr. McDermott saw it as his purpose to make AIA whole through successful prosecution of Miesen's claims. He declared that "[t]he successful prosecution of Miesen's claims in this Lawsuit is critical to making the AIA Corporations partially whole," and "Miesen's claims in this Lawsuit are the last hope of those former employees of ever receiving any payment for their retirement funds and the innocent common shareholders of ever receiving any dividends or distributions for their common shares." Dkt. 783-2 ¶ 56; *see also* Dkt. 783-2 ¶ 56 (similarly arguing that the Court should compel Defendants to produce documents "so that [Miesen] and I are able to fully and fairly consider the information ... in an effort to make the AIA Corporations whole, especially when those corporations have been decimated"). In another declaration in support of a motion to compel, Mr. McDermott vouched that "Miesen's claims are meritorious (i.e., are colorable), not being pursued for any improper or unlawful purposes, and fully supported by the evidence and authorities." Dkt. 783-2 ¶ 55. He testified in his deposition that "[t]he opinions that I'm giving overall are quite favorable to AIA corporations, which they deserve." McDermott Depo at 296:5-7. Mr. McDermott also revealed that he sees himself as a type of legal consultant or advisor to Mr. Bond with respect to how to prosecute this action. For example, he declared that he had "consulted with Roderick Bond, including as to matters relative

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 13

**1 SER 66**

to the discovery disputes," and that he was submitting the declaration "to further substantiate the Plaintiff's claims for purposes of showing good cause" for the Court to grant Miesen's motion to compel. Dkt. 419-16 ¶¶ 24-25.

Mr. McDermott's role as an advocate and as *de facto* co-counsel for Miesen in this litigation is further illustrated in his expert witness report. Mr. McDermott claims to have worked full-time for 15 months (between August 2019 and November 2020) working on this case and developing his opinions, including more than two weeks spent with Mr. Bond in person to work on the report together. McDermott Depo at 61:23-62:17; Change Sheet re: 304:9. Ultimately, Mr. Bond and Mr. McDermott co-wrote the 653-page report, with Mr. Bond having typed as much as half of it. McDermott Depo at 305:11-18. Mr. Bond's heavy involvement in the report is not surprising given that the tone, style and phraseology bear a remarkable resemblance to Mr. Bond's briefing. In any event, Mr. McDermott signed the report and adopted it as his own opinions. *See* McDermott Report; McDermott Depo at 344:19-20 (stating "[t]he opinions that I express are set forth in my report"); *see also id.* at 30:5-18; 31:7-8; 71:18-19; 94:14; 258:16; 290:15-16; 312:22-24; 318:19-21; 326:1-10; 329:22-23; 339:1-4 (testifying, when asked about his opinions, that the report "speaks for itself"). In the report, Mr. McDermott fails to restrict himself to proper subjects of expert witness opinion, and instead has approached the report as an attorney-advocate by laying out a roadmap of how he believes this litigation should be conducted by the parties and the Court, followed by his subjective interpretation of the evidence and his legal conclusions that the Defendants breached their duties and are liable for Miesen's alleged damages. *See* McDermott Report. His report comments on virtually every legal and evidentiary issue likely to unfold before and during trial, including his opinions regarding the law the Court should apply and its interpretation, the merit and viability of claims and defenses, interpretation

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 14

of evidence, legal issues such as statute of limitations tolling, the conduct of discovery in this case, legal conclusions the jury should reach, and widespread witness credibility assessments (which are further discussed in the following section of this Memorandum). This report is a legal memorandum prepared by an advocate, not the report of an expert witness assisting the jury.

### b. If permitted to testify, Mr. McDermott will give an improper summation of Miesen's claims, akin to a closing argument, from the witness stand.

Mr. McDermott's partisanship has often been on prominent display through his results-oriented approach and his propensity to indulge in and rely upon speculation and his own witness credibility assessments that unfairly frame the Defendants in a poor light.

### i. Mr. McDermott has employed a partisan, results-oriented approach to the development and expression of his opinions.

The first opinion Mr. McDermott disclosed in this case more than four years ago was the hyperbolic statement that "[i]n all my years of practice and experience, I have never seen such wide-spread corporate malfeasance and inappropriate conduct as was committed by the defendants in this lawsuit and/or covered up by them ...." Dkt. 194-6 ¶ 21. Since making that statement, he has consistently demonstrated that he does not view the case objectively and, instead, seeks to support his preconceived notions of liability. For example, he stated his belief that evidence he had not obtained and had never reviewed would "likely further support," "likely confirm," "likely establish" and "likely reveal" information supporting the claims against the HT Defendants. Dkt. 403-2 ¶ 28.a.-k. Similarly, he later argued in a declaration that he needed to review privileged and work product documents "in order to further establish" how the HT Defendants had breached their duties and committed torts. Dkt. 783-2 ¶ 59. In the same breath that Mr. McDermott stated he needed access to certain information to enable him to "develop, formulate, and articulate definitive opinions" regarding Miesen's claims, he incorporated all 181 paragraphs of factual *allegations* set forth in Miesen's Third Amended Complaint "*as support*

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 15

*for [his] opinions.*" Dkt. 419-16 ¶¶ 31-32 (emphasis added). Given that this is the way Mr. McDermott chose to operate as a purported expert witness, it was not surprising when he later engaged in speculation and drew improper inferences to reach the ill-conceived opinion that because the HT Defendants asserted privilege and work product protections, it appeared to be a "foregone conclusion" that the documents are "problematic" for their defenses, and that if the HT Defendants "have nothing to hide, they would have readily disclosed all of the privilege and work product information to Miesen because they would want him and this Court to know that they had nothing to hide." Dkt. 783-2 at 62-63; *see also id.* at ¶ 61 (similarly speculating that the HT Defendants would have disclosed privileged billing records if they "truly believed that there was a limited scope of representation or that they had not served as general counsel," and their continued withholding "suggests that they are concealing relevant information that does not support the existence of an alleged limited scope of representation").[6]

### ii. Mr. McDermott's improper assumptions and assessments regarding the parties' intent, motive, knowledge, state of mind and credibility should be excluded, along with any opinions tainted by them.

"Courts routinely exclude as impermissible expert testimony as to intent, motive, or state of mind." *Siring v. Or. State Bd. of Higher Educ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013).

> Expert testimony as to intent, motive, or state of mind offers no more than the drawing of an inference from the facts of the case. The jury is sufficiently capable of drawing its own inferences regarding intent, motive, or state of mind from the evidence, and permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful to the jury.

*Id.* (citing additional cases); *see also United States v. Idaho Cty. Light & Power Coop. Ass'n, Inc.*, No. 3:17-CV-00391-CWD, 2020 WL 1105091, at *13 (D. Idaho Mar. 6, 2020) (citing D. Nev. case that held expert's opinion would not assist the trier of facts to determine defendants'

---

[6] Not only is this opinion improper intent testimony and an inadmissible comment on an assertion of privilege, but McDermott fails to account for the court's order defining the HT Defendants' permissible disclosures. *See* Dkt. 466.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 16

intent); *Oracle Am., Inc. v. HP Enter. Co.*, No. 16-CV-01393-JST, 2018 WL 6511146, at *3 (N.D. Cal. Dec. 11, 2018) (an expert "may not opine about why any person in this case took or did not take a particular action or made or did not make a particular decision"); *Lippe*, 288 B.R. at 687 (stating an expert's opinions are irrelevant and inadmissible under Rule 702 if he "is offering a personal evaluation of the testimony and credibility of others or the motivations of the parties"); *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 565 (11th Cir. 1998) (excluding expert's "characterizations of documentary evidence as reflective of collusion, and his characterizations of particular bids as 'signals,'" because the jury was capable of determining whether to draw such conclusions without expert assistance).

Expert witnesses may not comment on the credibility of witnesses or offer expert opinions that are entrenched in or based upon their own assessments of witness credibility.

> [E]expert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony. The credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial.

*United States v. Scop*, 846 F.2d 135, 142 (2d Cir.), on reh'g, 856 F.2d 5 (2d Cir. 1988); *see also United States v. Rahm*, 993 F.2d 1405, 1413 (9th Cir. 1993) (stating "expert testimony to bolster or impugn the credibility of a witness is properly excluded"). In *Scop*, the court affirmed the exclusion of an expert witness who revealed on cross-examination that his "opinions were based on his positive assessment of the trustworthiness and accuracy of the testimony of the government's witnesses." *Id.* The *Scop* court explained its decision as follows:

> Our objection to testimony on credibility is not limited, however, to the prejudicial effect such testimony may have on the jury. Rather, we believe that such testimony not only should be excluded as overly prejudicial but also renders inadmissible any secondary opinion based upon it. Our holding, therefore, is that witness A may not offer an opinion as to relevant facts based on A's assessment of the trustworthiness or accuracy of witness B where B's credibility is an issue to be determined by the trier of fact. Were we to rule otherwise, triers of fact would be called upon either to evaluate opinion testimony in

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 17

ignorance of an important foundation for that opinion or to hear testimony that is otherwise inadmissible and highly prejudicial.

*Id.* Although an expert may base their opinion on inadmissible evidence, Fed. R. Evid. 703 "in no way purports to allow witnesses to assess the trustworthiness or accuracy of testimony given in the same case or to offer opinions based on such an assessment." *Id.*

Similarly, the Ninth Circuit has held that witness credibility is an issue for the jury, and expert testimony may not "improperly buttress" or "bolster" another witness's credibility. *United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985), overruled on other grounds by *United States v. Morales*, 108 F.3d 1031, 1035 n. 1 (9th Cir.1997). The *Binder* court excluded expert testimony where "[t]he jury in effect was impermissibly being asked to accept an expert's determination that … particular witnesses were truthful." *Id.*; *see also United States v. Ravel*, 930 F.2d 721, 726 (9th Cir. 1991) (excluding expert testimony regarding the reasonableness of the defendant's subjective belief because it would confuse rather than help the jury); *United States v. Antone*, 412 F. App'x 10, 11 (9th Cir. 2011) (excluding expert testimony regarding false confessions that was reliable under *Daubert*, but risked usurping the jury's determination of witness credibility).

Mr. McDermott's descriptions of the "facts" of the case and the bases and contents of his opinions are replete with his personal assessments of the parties' intent, knowledge, state of mind, motives, and credibility. Presented here are merely a few of Mr. McDermott's numerous improper opinions.[7] *Example 1:* Mr. McDermott stated "there is a serious question as to [Mr. Riley's] credibility." McDermott Report at 608. *Example 2:* Mr. McDermott stated "there is no doubt that [the HT Defendants'] primary concern was John Taylor, whose interests they were most concerned in protecting." McDermott Report at n. 1689. *Example 3:* Mr. McDermott stated the HT Defendants' "engagement letters and certain other communications were nothing more

---

[7] Please see Ipsen Decl. ¶ 8, for additional examples.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 18

than a futile and ineffective effort to limit their responsibilities after the fact and disingenuously communicating with boards." McDermott Report at 628. *Example 4:* In contrast, Mr. McDermott opines favorably about the motives and credibility of witnesses he views as friendly to Miesen's case, stating for example that "Moran is an ethical attorney." McDermott Report at 566.

As illustrated by this record, Mr. McDermott, a lawyer and law professor who presumably should know the rules of evidence applicable to his testimony, has demonstrated time and again in his reports, deposition testimony, and declarations that he is incapable of following basic and vitally important evidentiary rules. Given the prevalence of his improper intent and credibility assessments and the confidence he places in his own ability to determine the "true facts,"[8] he is seemingly unable to recognize an improper attribution of motive, intent, credibility, or similar speculation and improper basis for his opinions, versus a proper assumption for an expert. Mr. McDermott's approach has consistently been one of partisanship and contentious advocacy unsuitable for an expert, and his determinations regarding witness credibility/truthfulness and the believability of evidence go to the root and substance of his opinions, which in turn address core issues pertaining to liability and damages in this litigation. His improper assessments and speculation are so intertwined with his opinions that he would not possibly be able to set aside and ignore those foundations of his testimony when he steps onto the witness stand at trial. Under these circumstances, a ruling prohibiting Mr. McDermott from offering inadmissible testimony at trial would be wholly ineffective. It further begs the question of what, after excluding his improper interpretations of evidence and the opinions based on those improper foundations, would be left for Mr. McDermott to testify about at trial? Like the

---

[8] McDermott has no personal knowledge of the facts of this case (McDermott Depo at 123:4-124:9), but he has adopted the allegations of Miesen's complaint as truth and views his own report as a thorough and accurate factual authority. *See* McDermott Depo at 274:8-277:19; *see also* McDermott Report at 567 (stating Miesen's claims against the HT Defendants "do not rest [on] any 'assumption,' but are grounded on the factual predicates therefor as detailed extensively in this Report").

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 19

expert's opinions that were excluded in *Lippe* and *GST Telecom.*, Mr. McDermott's opinions cannot be sufficiently scrubbed of his improper and partisan assessments, witness credibility determinations, and subjective beliefs regarding the evidence to render his testimony helpful to the jury. Nothing short of excluding Mr. McDermott as a witness will adequately protect the trial process and the defendants in this case.

## IV.  CONCLUSION

Mr. McDermott has stepped far beyond the bounds of acceptable expert witness testimony, and his opinions are inextricably rooted in and intertwined with his role as a zealous advocate for Miesen's case. Allowing Mr. McDermott to testify would be the equivalent of putting plaintiff's counsel on the witness stand. Mr. McDermott should not be allowed to don the robe of an expert, sit in the witness chair, and advocate to the jury by arguing, summarizing, and endorsing Miesen's theories of the case. That role is reserved for counsel in closing argument, and the integrity and fairness of a jury trial hinges on confining unabashed advocacy to attorney-presented closing argument. When an expert becomes essentially no more than a mouthpiece for plaintiff's counsel, witness exclusion is warranted, if not required. In this case, it is especially important that the Court prevent Mr. McDermott's testimony from serving as a proxy for plaintiff's counsel's arguments because plaintiff's counsel here, Mr. Bond, has been the driving force behind more than a decade of litigation relating to the AIA Corporations and years ago proclaimed himself to be a "star witness" against the HT Defendants with respect to claims he is now pursuing against them in this case.[9] For the reasons stated above, the HT Defendants respectfully request that the Court exclude Mr. McDermott's testimony from trial.

---

[9] As counsel for Reed Taylor in the underling *Reed Taylor* case, Mr. Bond accused the HT Defendants (his opposing counsel at the time) of the same wrongdoing Miesen eventually alleged in this case, including conflicts of interest, ethical breaches, aiding and abetting, and failing to take action against the Controlling AIA Defendants. When Mr. Bond was threatening to file a motion to disqualify the HT Defendants as defense counsel in the *Reed Taylor* case,

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 20

DATED this _79_ day of January, 2021.

ELAM & BURKE, P.A.

By: _Loren C Ipsen_

Loren C. Ipsen, Of the Firm
Joyce A. Hemmer, Of the Firm
Attorneys for Defendants Hawley Troxell
Ennis & Hawley LLP, Gary D. Babbitt,
D. John Ashby, and Richard A. Riley

## CERTIFICATE OF SERVICE

I hereby certify that on this _79_ day of January, 2021, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons via email:

| | |
|---|---|
| Roderick C. Bond<br>rod@roderickbond.com<br>*Attorney for Plaintiff* | Daniel L. Glynn<br>dglynn@idalaw.com<br>*Attorneys for Michael W. Cashman, Sr., R. John Taylor, James Beck, Connie Taylor Henderson, Crop USA Insurance Services, LLC and Crop USA Insurance Agency, Inc.* |
| Alyson A. Foster<br>alyson@dempseyfoster.com<br>William E. Adams<br>bill@weadamslaw.com<br>*Attorneys for Intervenor GemCap Lending I, LLC* | Michael S. Bissell<br>mbissell@campbell-bissell.com<br>Tyler S. Waite<br>twaite@campbell-bissell.com<br>*Attorneys for Reed J. Taylor* |

_Loren C Ipsen_

Loren C. Ipsen

---

Mr. Bond proclaimed that he would be a "star witness" against the HT Defendants as to those claims. Ipsen Decl., Exh. D. After losing his motion to disqualify the HT Defendants in the *Reed Taylor* case – the judge found "no violation of the ethical rules, the attorneys and law firms having acted within those rules by fully informing their clients regarding possible conflicts of interest, having obtained written waivers of those conflicts and having preserved any and all claims that may exist between the various Defendants," Ipsen Decl., Exh. E – Mr. Bond continued his misguided crusade against the HT Defendants in *Reed Taylor v. Gary Babbitt, et al.*, Nez Perce County Case No. CV-2008-1765 (the HT Defendants won their motion to dismiss and the appeal; fees and costs were assessed against Reed Taylor), *Reed Taylor v. Richard Riley, et al.*, Ada County Case No. CV-OC-2009-18868 (the HT Defendants won summary judgment and the appeal; fees and costs were assessed against Reed Taylor), and then again when he appeared in this case as counsel for Miesen.

MEMORANDUM IN SUPPORT OF THE HAWLEY TROXELL DEFENDANTS' MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS RICHARD MCDERMOTT - 21

Steve Wieland, ISB No. 8282
Shawnee Perdue, ISB No. 8888
WIELAND PERDUE PLLC
405 South 8th Street, Suite 295
Boise, Idaho 83702
p: 208.401.9219
f: 208.401.9218
swieland@wielandperdue.com
sperdue@wielandperdue.com

*Attorneys for Defendants Connie Taylor Henderson,*
*Jolee Duclos, R. John Taylor, Michael W. Cashman Sr.,*
*James Beck, and Crop USA Insurance Agency, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| **Dale Miesen**, an individual, a shareholder bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> **Connie Taylor Henderson**, an individual; **et al.**, <br><br> Defendants. | Case No. 1:10-CV-00404-CWD <br><br> **Declaration of R. John Taylor in Opposition to Plaintiff's Motion to Amend and Supplement Complaint [Doc. 182]** |

I, R. John Taylor, declare:

1.    I am a named defendant in the above action and serve as president and

director of Defendants AIA Services Corporation and AIA Insurance, Inc.

Declaration of R. John Taylor in Opposition to Motion to Amend and    Page 1 of 2
Supplement Complaint [Doc. 182]

**1 SER 75**

2.      Attached as **Exhibit A** is a true and correct copy of a derivative demand letter, dated June 13, 2016, which I received from Plaintiff's counsel via U.S. Mail and fax.

3.      Attached as **Exhibit B** is a true and correct copy of a derivative demand letter, dated August 23, 2016, which I received from Plaintiff's counsel via U.S. Mail, fax, and email.

4.      Attached as **Exhibit C** is a true and correct copy of a letter I sent to Plaintiff's counsel, dated September 12, 2016, via U.S. Mail.

**I declare under penalty of perjury under the laws of the United States of America and the State of Idaho that the foregoing is true and correct.**

November 28, 2016 at Lewiston, Idaho
Date, City, and State Signed           R. John Taylor

**1 SER 76**

### CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

| | |
|---|---|
| **Roderick Cyr Bond**<br>rod@roderickbond.com<br>*Attorney for Plaintiff Dale Miesen* | **Loren C. Ipsen**<br>lci@elamburke.com<br><br>**James D. LaRue**<br>jdl@elamburke.com |
| **Alyson Anne Foster**<br>aaf@aswblaw.com<br>*Attorney for Intervenor GemCap Lending I LLC* | **Jeffrey A. Thomson**<br>jat@elamburke.com<br><br>*Attorneys for Hawley Troxell Defendants* |

I further certify that on such date I served the foregoing on the following non-CM/ECF registered participants by email as follows:

| | |
|---|---|
| **AIA Services Corporation**<br>P.O. Box 538<br>Lewiston, ID  83501<br>jtaylor@cropusainsurance.com | **AIA Insurance, Inc.**<br>P.O. Box 538<br>Lewiston, ID  830501<br>jtaylor@cropusainsurance.com |

_____
Steve Wieland
Attorney for Defendants R. John Taylor, Michael W. Cashman Sr., James Beck, Connie Taylor Henderson, JoLee Duclos, and Crop USA Insurance Agency, Inc.

 **AIA Services Corporation**

AIA Services Corporation
One Lewis Clark Plaza
PO Box 538
Lewiston, Idaho 83501-0538
(208) 799-9000    FAX (208) 746-8159

September 12, 2016

Roderick Bond
Roderick Bond Law Office, PLLC
601 108th Ave., Suite 1900
Bellevue, WA 98004

Re:    June 13, 2016, Shareholder Derivative Demand Letter;
       August 23, 2016, Shareholder Derivative Demand Letter

Dear Mr. Bond:

In response to your shareholder derivative demand letters dated June 13, 2016, and August 23, 2016 (the "Demand Letters", the  boards of directors of AIA Services Corporation and of AIA Insurance, Inc. (the "Boards"), have determined not to take any action in response to the Demand Letters.

The Boards have rejected your Demand Letters because they do not provide a coherent description of the wrongful transactions for which you seek a remedy. The scope of conduct described in the Demand Letters is so broad they are impossible to address in any meaningful way. Although the Boards are not able to determine the wrongful conduct you seek to remedy, it appears that any legal remedies would be futile for numerous reasons, including without limitation applicable law relating to fiduciary duties; statutes of limitations; res judicata; the business judgment rule; equitable remedies such as laches and unclean hands. The Demand Letters also seem to refer to transactions that involved no conflict of interest or which were properly approved by disinterested directors pursuant to Idaho state law. Last, it appears that some or all of the shareholders you represent lack standing to bring a derivative claim.

EXHIBIT C

**1 SER 78**

The Board has determined it would not be in the best interest of either the corporation or its shareholders to take any action.   Further, the claims appear to be subject to other pending actions.

Because of a pattern of abusive and frivolous litigation against the company and its managers, the bylaws for both corporations now include Section 11.11. Provisions like it have been upheld in other states such as Delaware. Section 11.11 permits the company's constituents, including individual directors, to recover attorney fees against shareholders who fail to fully succeed on their derivative claims. Given the sweeping scope of the Demand Letters, it is almost certain your clients will not prevail on all of their claims, and therefore will be liable for directors' attorney fees in future litigation.

Sincerely,

John Taylor
President
AIA Services Corporation and AIA Insurance, Inc.

EXHIBIT C

1 SER 79



**Roderick Bond**
Law Office, PLLC

August 23, 2016

**_VIA U.S. Mail and Facsimile (208) 798-0110 and Email: johntaylor@greenleafalliance.com_**

Board of Directors
AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

Board of Directors
AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  83501

**Re:**    *Shareholder Derivative Demand*

Dear Purported Boards of Directors:

As you are well aware, Dale Miesen, Jerry Legg and Donna Taylor (individually and as Personal Representative of the Estate of Sara Taylor) have all been shareholders of AIA Services Corporation since well before 1995 and creditors of AIA Services since October 1, 2013, and this firm represents them for this shareholder/creditor derivative demand ("derivative demand").

As you know, there have been, and continues to be, extensive malfeasance, torts and illegal conduct occurring at AIA Services Corporation and AIA Insurance, Inc., and the unlawfully covering up of the foregoing acts, omissions and torts. Consequently, this letter is yet another derivative demand being provided in accordance with Idaho Code, including I.C. §§ 30-1-742 and 30-29-742 (to the extent that the former may apply to certain acts, omissions and/or torts). However, despite my prior requests to inspect documents and records on behalf of the below named shareholders in accordance with Idaho Code, you have refused to allow such inspections to take place or otherwise provide responsive documents. As a result, this derivative demand was delayed and is based only on the most recent information obtained to date. More recently, John Taylor provided purported financial statements for the periods ending December 31, 2014 and December 31, 2015, respectively. He also provided copies of alleged amended bylaws, which are contrary to law and improperly adopted. For these reasons and others, yet another derivative demand is being provided.

601 108th Ave, Suite 1900, Bellevue, WA 98004 | Phone: (425) 591-6903 | Web: www.roderickbond.com
Roderick C. Bond - Attorney | Email: rod@roderickbond.com | Licensed in Washington and Idaho

EXHIBIT B

**1 SER 80**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 2

For purposes of this derivative demand, the following terms shall apply: (a) "AIA" means AIA Services Corporation and its wholly owned subsidiary AIA Insurance; (b) "CropUSA" means CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC; (c) "John" means R. John Taylor and his spouse as to any property transferred to such spouse, together with any entities partially or wholly owned by him (including Green Leaf RE, Reinsurance Partners, Weskan Agency, Pacific Empire Holdings, Sound Insurance and other entities); (d) "Connie" means Connie Taylor, Connie Taylor Henderson, and Connie Wright Henderson and her spouse as to any property transferred to such spouse; (e) "Beck" means James Beck and his spouse as to any property transferred to such spouse; (f) "Cashman" means Michael W. Cashman, Sr. and his spouse as to any property transferred to such spouse; (g) "Duclos" means JoLee K. Duclos and her spouse as to any property transferred to such spouse; (h) "Hawley Troxell" means Hawley Troxell Ennis & Hawley LLP and the applicable present and former attorneys at Hawley Troxell (including, without limitation, D. John Ashby, Gary Babbitt and Richard A. Riley); (i) "Pacific Empire Radio" means Pacific Empire Radio Corporation; (j) "GemCap" means GemCap Lending I, LLC, together with all of its applicable officer(s) and agents; (k) "Combined Defendants" means all of the foregoing parties except as to AIA (but includes attorneys, law firms and agents of AIA), but "Combined Defendants may include or not include Hawley Troxell and/or Pacific Empire Radio to the extent applicable based on certain facts and circumstances and/or when such facts and circumstance occurred; and (l) "Controlling AIA Defendants" means John, Connie, Beck, Cashman and Duclos. For each of the foregoing terms which define more than one party, each such term shall also mean any one or more of the defined parties for purposes of demanding in the alternative.

Dale Miesen, Jerry Legg and Donna Taylor hereby demand that all possible claims and legal action be immediately taken in courts of law on behalf of AIA as follows (including claims which may be contemplated and/or related in any way to the following and this derivative demand is not seeking or requiring that all of the claims and parties be named in a single lawsuit):[1]

1.  Pursue all possible claims and defenses, and seek the maximum damages, against the Combined Defendants and any other party or entity named in this derivative demand, including, without limitation, all possible tort claims (including, without limitation, aiding and abetting in the commission of torts against AIA), contract claims, declaratory relief, injunctive relief and punitive damages based on all acts, omissions, concealments, and failure to disclose through the date of this letter and for the foregoing which continues past the date of this letter. Without limiting the foregoing and so there is no confusion (even though you are well aware of the facts, lawsuits and legal issues as having full access to information at AIA and the most of the Combined Defendants), more specific examples are included below and demand is hereby made to take action against those parties and any of the other Combined Defendants to recover damages based on any of such specific examples.

---

[1] This derivative demand shall also be construed as being provided by any and/or all of the other innocent creditors, minority common and preferred shareholders of AIA Services Corporation.

EXHIBIT B

**1 SER 81**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 3

2.  Pursue all possible claims against John, the Combined Defendants, any other party or entity named in this derivative demand, and any of their responsible agents and/or attorneys for improperly amending AIA Services and AIA Insurance's bylaws to include the illegal, unauthorized and improper provisions allegedly on May 26, 2016, including, without limitation, because such amendments are contrary to the law and public policy in Idaho (including, without limitation, by creating an improper standard for fees to be awarded in derivative actions through improperly acting as the Idaho Legislature to extend the circumstances fees can be awarded under I.C. § 30-29-746, which is contrary to Idaho law and would discourage derivative actions by shareholders seeking to address wrongs to an Idaho corporation), such amendments were allegedly adopted through John when he had conflicts of interest (including under common law, Idaho Code, the bylaws and the articles of incorporation) and thus could not approve such amendments as the sole board member, when Donna Taylor's designee was not appointed to the board of directors and thus such amendments were not properly authorized, when such amendments should have been submitted to the minority shareholders for vote with John's shares being conflicted from voting on such amendments, creating new standards through such amendments which are inconsistent with Idaho law, AIA's existing bylaws at the time of the purported amendment and AIA's amended articles of incorporation, and by improperly seeking to retroactively adopt improper provisions after years of malfeasance, fraud and breached fiduciary duties by the Controlling AIA Defendants.

3.  Pursue all possible claims and defenses against John, the Combined Defendants, any other party or entity named in this derivative demand, and any of their responsible agents and/or attorneys for the improper and unlawful issuance of the purported 7,500 Series A Preferred Shares to John, including, without limitation, claims pertaining to the fact that the only Series A Preferred Shares authorized were the 200,000 shares originally issued to Donna Taylor and, even if additional shares were authorized, John's acquisition of them was unauthorized and violated Idaho law because such acquisition was not for proper purposes, a proper board of directors was not seated at the time of such acquisition (including, without limitation, Donna Taylor's board designee), no proper authorization was obtained for such acquisition or the consideration therefore, John had conflicts of interest which prevented him from making or approving the acquisition (including, without limitation, under Idaho Code, the bylaws and articles of incorporation), the other shareholders of AIA Services were never offered the Series A Preferred Shares, the purported issuance of the shares served no legitimate business transaction, and the sums owed by John for his acts and omissions against AIA far exceed any sums to which he could have used to acquire such Series A Preferred Shares.

4.  Pursue all possible claims against John, the Combined Defendants and any other person or entity named in this derivative demand for the property transferred to AIA from John and debts assumed for such property (including taxes, insurance or other expenses paid after transfer), including, without limitation, to rescind such transactions based on conflicts of interest and failure to property obtain approval from the rightfully seated board or

EXHIBIT B

**1 SER 82**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 4

shareholders, AIA had no business assuming more debt or acquiring property requiring funds it did not have to maintain (e.g., corporate waste), entering into any transactions with John, or, alternatively, to determine the true fair value of the property if the transfers are upheld (these transfers were disclosed to shareholders for the very first time in the recent financial statements).

5. Pursue all claims against the Controlling AIA Defendants for all litigation expenses incurred directly and indirectly by AIA, including, without limitation, as to any foreclosure action because such action would not have taken place but for the Controlling AIA Defendants' acts and omissions depleting AIA's funds and assets for their self-interests.

6. Pursue all possible claims against Jordan Taylor for any property (including money or real property derived directly or indirectly from AIA or funds derived from AIA) transferred to him from John or any of the other Combined Defendants, including, without limitation, the parking lot transferred to Jordan Taylor located in Lewiston, Idaho (which had been previously purchased with AIA Insurance's line-of-credit).

7. Pursue all possible claims against the Controlling AIA Defendants (including for breaching their fiduciary duties and aiding and abetting in the breach of those fiduciary duties) by incurring nearly as much or more attorneys' fees and costs fighting Donna Taylor for the redemption of her Series A Preferred Shares as it would have taken to simply pay her the sums the Controlling AIA Defendants and AIA Services promised to pay (as reflected in the recent financial statements).

8. Pursue all possible claims against GemCap, its representatives and attorneys (including David Risley and Risley Law Office) for improperly recording in Idaho an unlawfully obtained, non-final judgment from California Federal Court, including, without limitation, all damages, attorneys' fees and costs incurred as a result of the recording of that judgment and/or the removal thereof.

9. Pursue all possible claims against John for placing his interests above those of AIA and their innocent minority shareholders, including, without limitation, by allowing the transfer and sale of any property held by AIA to GemCap.

10. Pursue all possible claims against John, and against the other Controlling AIA Defendants for continuing to aid and abet him, for continuing to fail to properly disclose all financial information and transactions, for continuing to violate AIA's bylaws and articles of incorporation (including, without limitation the conflict of interest provisions), intentionally breach his fiduciary duties owed to AIA (including the duty of loyalty), for continuing to intentionally violate Idaho Code and common law and for all other claims mentioned in this derivative demand.

EXHIBIT B

**1 SER 83**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 5

11. Pursue all possible claims against the Controlling AIA Defendants for entering into any notes, deeds of trust, mortgages or any other instruments with Randall Danskin, Risley Law Office or any other law firm named in this derivative demand (and to take action against them as necessary to rescind such instruments and recover all funds paid). These instruments include those recently disclosed for the first time in the recent financial statements).

12. Pursue all possible claims and defendants against the Combined Defendants and/or any other person or entity named in this derivative demand for all ultra-vires actions taken by the boards of AIA as all such action dating back to at least 2001 was improper based on conflicts of interest, Donna Taylor's designee not being named to the board of AIA Services, and/or a designee representing the interests of the Series C Preferred Shareholders was never designated. As a result, no purported board action was properly authorized.

13. Pursue all possible claims against the Controlling AIA Defendants, including declaratory relief, barring them from requesting and AIA from paying, advancing or indemnifying the Controlling AIA Defendants for any attorneys' fees, costs, damages and any other claims or defenses.

14. Pursue all possible claims against John, GemCap and the Controlling AIA Defendants and any other persons or entities named in this derivative demand requiring them to disclose any and all agreements, deeds, deeds of trust, mortgages, settlements, settlement agreements and/or other instruments, whether oral or written, with GemCap or any of its agents or assigns, including, without limitation, any agreements and instruments relating in any way to any sums and/or property owed, borrowed, transferred and/or pledged or promised to GemCap.

15. Pursue all claims set forth and/or contemplated in the Second Amended Complaint and/or the Third Amended Complaint (depending on which complaint is operative after the pending motions) filed in U.S. District Court of Idaho. This demand is based is to clarify that the above-named shareholders have also been creditors of AIA Services to the extent that a court may deem AIA Services and/or AIA Insurance are insolvent and rule that fiduciary duties are no longer owed to the shareholders or corporation (issues the above-named shareholders dispute). In other words, the above-named shareholders have standing as shareholders or creditors.

16. Pursue all possible claims and defenses against GemCap and the other Combined Defendants to recover all proceeds from any sale of the real property known as the Lewis/Clark Plaza located at 111 Main Street in Lewiston, Idaho), together with all damages, attorneys' fees and costs paid or incurred by AIA based on the foregoing.

17. Pursue all possible claims and defenses against GemCap, and to the extent necessary any of the other Combined Defendants, to extricate AIA from all settlement agreements entered

EXHIBIT B

**1 SER 84**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 6

into with GemCap and have such agreements declared illegal and/or unenforceable as to AIA, including, without limitation, any agreements, stipulations or orders since the last derivative demand was provided (which includes the alleged sealed order entered in the California Federal Court action and any related or subsequent agreements, stipulations, orders, or judgments).

18. Pursue all possible claims and defenses against GemCap, and to the extent necessary any of the other Combined Defendants, to vacate any judgments entered in favor of GemCap against AIA, including, without limitation the judgments entered in the California Lawsuit and any subsequently entered foreign judgments (including, upon belief, the foreign judgment recently entered against AIA Insurance in Nez Perce County District Court). Included in this demand is also the demand to assert that there was no jurisdiction over AIA in the California Lawsuit and thus the judgments should be voided.

19. Pursue all possible claims and defenses against GemCap for aiding and abetting John, Connie, Beck, Cashman, CropUSA, Pacific Empire Radio any other parties in committing torts against AIA (including assisting in breaches of fiduciary duties, fraud and other torts and covering up such breaches and torts). GemCap was aware of the malfeasance occurring at AIA when it first entered into the loans and guarantees with CropUSA and AIA, that AIA was being used improperly by the Controlling AIA Defendants to fund and/or support entities partially or wholly owned by them, and GemCap became more aware of these facts as time went on, yet GemCap continued to assist the foregoing parties committing and covering up torts against AIA (including, without limitation, breaches of fiduciary duties and fraud).

20. Pursue all possible claims against the Combined Defendants for their torts committed against AIA (including, without limitation, breaches of fiduciary duties, fraud and any other claims contemplated or related to any of the facts or issues disclosed in this letter) and the aiding and abetting of torts committed against AIA by one or more of the Combined Defendants (including, without limitation, assisting in the commission of the torts or covering up the torts).

21. Pursue all possible claims against Controlling AIA Defendants requiring them to disgorge all compensation, consulting fees, fees, salary, benefits or any other type of payments made to them directly or indirectly from AIA (including, based on being faithless fiduciaries and/or receiving such compensation without proper authorization from AIA) and to require them to repay any funds, expenses, fees, reimbursements, and costs incurred by AIA or paid by AIA for their benefit in any legal action or matter and to obtain damage judgments for such payments and compensation. Included in this demand is disgorgement or damages for all salary, bonuses, benefits and other compensation paid to John, Beck, Connie, Cashman and Duclos from being an officer, director or other agent of AIA and all attorneys' fees, expenses and costs paid on their behalf. This demand includes the $5,000 per quarter paid to Connie and Beck to purportedly serve on AIA's Board of Directors and

EXHIBIT B

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 7

all compensation paid to John and Duclos for purportedly being officers and/or directors of AIA.

22. Pursue all possible claims against GemCap and the other responsible Combined Defendants (including the Controlling AIA Defendants) for all of the attorneys' fees, costs, expenses and damages proximately caused directly or indirectly from GemCap's loans to CropUSA and AIA's guarantees of those loans, including, without limitation, all attorneys' fees, costs and expensed incurred or paid directly or indirectly by AIA for the California Lawsuit and any other lawsuit. But for GemCap agreeing to improperly make the loans and improperly agree to accept AIA's guarantees, none of the lawsuits would have occurred.

23. Pursue all possible claims and defenses against GemCap that it was not a good faith lender, had unclean hands, and/or is not entitled to any relief against AIA.

24. Pursue all possible claims against Hawley Troxell requiring it to disgorge all compensation received or paid to Hawley Troxell directly or indirectly from AIA based on Hawley Troxell's conflicts of interest, breached fiduciary duties (including the duties of loyalty) and related malpractice, including, without limitation, all subsequent payments made by AIA to Hawley Troxell.

25. Pursue all possible claims against Pacific Empire Radio for all sums owed by it to AIA, and all amounts which have been subsequently improperly lent to Pacific Empire Radio.

26. Pursue all possible claims against the Controlling AIA Defendants for allowing any funds to be lent to Pacific Empire Radio in the first place (including without limitation, for the breaches of fiduciary duties by them as present or former officers and/or directors of AIA and the aiding and abetting in assisting and/or covering up of the improper loans to Pacific Empire Radio). As you are fully aware, these loans violated AIA's amended articles of incorporation, AIA's bylaws, constituted conflicts of interest, provided no benefit to AIA and were made when AIA was not meeting its obligations to others.

27. Pursue all possible claims against Pacific Empire Radio, the Controlling AIA Defendants and any other parties relating to any agreements and subordination agreements improperly entered into between AIA, Pacific Empire Radio and any other party, as such agreements were not authorized by AIA and were not in AIA's best interests.

28. Pursue all possible claims against the Controlling AIA Defendants for allowing John to operate AIA for his benefit and/or to assist AIA in funding and the operation of entities partially or wholly owned by the Controlling AIA Defendants without AIA receiving any benefit, proper compensation, without full disclosure to AIA, in violation of applicable conflicts of interest (including under AIA Services' amended articles of incorporation and bylaws) and without obtaining proper authorization from AIA or its innocent minority shareholders.

EXHIBIT B

**1 SER 86**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 8

29. Pursue all possible claims against the Controlling AIA Defendants and any other responsible party for all damages relating to all payments made directly or indirectly from AIA to the attorneys and law firms of Hawley Troxell, Crumb & Munding, Gordon & Reese, Risley Law Office PLLC, Randall Blake and Cox, Clark and Feeney, Quarles & Brady, Randall Danskin, David Gittins, Connie Taylor (and her law firms Clark and Feeney and Henderson Law Firm) and any other lawyer and law firm (including any attorneys who have represented AIA) for malpractice, for declaratory relief that no further sums are owed by AIA to any of the foregoing and that any fee agreements or conflict waivers are void), as such payments should never have been made, were never authorized by AIA, were not properly incurred or necessary for AIA, were never authorized by AIA's shareholders after full disclosure was made, and involved the attorneys and law firms taking action or performing work not in the best interests of AIA and/or in violation of the duty of loyalty owed to AIA. Demand is further made to pursue all possible claims, including, without limitation, for the disgorgement of all fees, costs and expenses paid or discharge of any debts allegedly owed, to any of the foregoing attorneys, law firms and/or attorneys working at such law firms to the extent that they represented AIA based on conflicts of interest, breached fiduciary duties (including the duty of loyalty), and malpractice. To the extent that any of the forgoing law firm and attorneys did not represent AIA, then demand is made to pursue all possible claims against the Controlling AIA Defendants for all sums paid and/or owed to such attorneys and law firms by AIA. In addition, demand is made to assert all possible claims against the foregoing parties for participating and/or allowing AIA to be improperly utilized to fund the defense and prosecution of lawsuits which were not in AIA's best interests, but were instead pursued based on the interests of the Controlling AIA Defendants.

30. Pursue all possible claims against the Controlling AIA Defendants, and to the extent necessary AIA or any other Combined Defendant to ensure that AIA is not bound or obligated by any act or omission of the Controlling AIA Defendants or AIA, for not honoring Donna Taylor's unqualified appointment of a designee to AIA Services' Board of Directors (Patrick Moran and Paul Durant) and for declaratory relief that all such actions purportedly taken by the Board of Directors of AIA Services without the consent or approval of Donna Taylor's designee (who would have been the only director without a conflict of interest) were the unauthorized acts of AIA, ultra-vires and void. Such acts and omissions, include, without limitation, all guarantees and settlements with GemCap, all loans to Pacific Empire Radio, all conflict waivers or other agreements with attorneys and law firms, all board resolutions (including any resolutions provided to GemCap), and all other acts of the purported Board of Directors of AIA Services.

31. Pursue all possible claims against the Controlling AIA Defendants, CropUSA and any other of the Combined Defendants or responsible parties for all payments made to any and all vendors, creditors, consultants, agents, customers or other parties owed money by CropUSA, by the Controlling AIA Defendants, any entity partially or wholly owned by

EXHIBIT B

**1 SER 87**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 9

any one of the Controlling AIA Defendants, or paid at the direction of any one or more of the Controlling AIA Defendants, including, without limitation, the more recent hundreds of thousands of dollars in payments AIA made to certain agents and customers of CropUSA in 2013 and any previously or subsequently paid for CropUSA and any other entity.

32. Pursue all possible claims against the Combined Defendants for taking action violating AIA's amended articles of incorporation, violating AIA's bylaws, violating statutory and common law, and committing torts against AIA, together with aiding and abetting others (including other Combined Defendants) in covering up the torts committed against AIA. Examples of the torts and the covering up of those torts are contained with the proposed Second and Third Amended Complaints recently filed in the federal derivative lawsuit by Dale Miesen and Donna Taylor—the facts and torts alleged in that Second Amended Complaint have continued since prior demands.

33. Pursue all possible claims against the Combined Defendants for failing to properly allocate costs, labor, expenses and other items between AIA and other entities, including, CropUSA, and by allowing such issues to take place in the first place, including, without limitation, based on the conflicts of interest and restrictions under AIA's amended articles of incorporation, bylaws and the undivided duties of loyalty owed by the Controlling AIA Defendants to AIA, among others, and for continuing to conceal and cover up all such issues and related issues.

34. Pursue all possible claims against the Controlling AIA Defendants for all damages, fees and costs incurred or paid by AIA for attempting to effectuate a reverse stock split to eliminate the minority common shareholders of AIA Services in violation of AIA Services' amended articles of incorporation, bylaws and Idaho Code, including, without limitation, the hundreds of thousands of dollars of attorneys' fees and costs paid to Randall Danskin for the improper reverse stock split and to purportedly represent AIA in the subsequent lawsuit against certain of AIA Services' shareholders. Demand is further made to pursue all possible claims against Doug Siddoway (and any other responsible attorney) and Randall Danskin, including, for breach fiduciary duties, conflicts of interest, and disgorgement of all attorneys' fees and costs paid to them and to have declared unlawful or uncollectable any attorneys' fees and costs allegedly owed to them by AIA, including, without limitation, based on their malpractice, breaches of duty of loyalty owed to AIA, conflicts of interest, for aiding and abetting the Controlling AIA Defendants in the commission of torts (including in that lawsuit and others), and taking action in violation of their undivided fiduciary duties of loyalty owed to AIA. To be clear, full and complete disgorgement should be sought and obtained for all fees, costs and expenses paid directly or indirectly by AIA (or by GemCap) to Randall Danskin for all work that it and its attorneys have directly or indirectly performed for AIA and for concealing from AIA the conflicts of interest, breaches of fiduciary duties and malpractice committed by Randall Danskin against AIA—Mr. Siddoway and Randall Danskin placed their interests in earning

EXHIBIT B

**1 SER 88**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 10

fees ahead of AIA's interests, are faithless fiduciaries and are not entitled to retain any compensation relating to AIA.

35. Pursue all possible claims against John Munding and Crumb & Munding (or such other firm Mr. Munding is operating through) for malpractice, breach of fiduciary duties and to disgorge all attorneys' fees, costs and expenses paid to them directly or indirectly by AIA for the California Lawsuit as Mr. Munding intentionally violated his duties owed to AIA, including, without limitation, his duties of loyalty owed to AIA and by taking direction and action benefitting other defendants (including John's) and placing their interests in front of AIA and by representing CropUSA, AIA and other parties when there were conflicts of interest in doing so and Mr. Munding knew that he could not properly represent AIA's interests and when he had no intention of doing so. Demand is further made to pursue all possible claims against Mr. Munding and Crumb & Munding for improperly failing to assert that the guarantees and settlement agreements entered into by AIA were not authorized and were thus illegal or ultra-vires and by allowing AIA to enter into them in the first place. Mr. Munding places his interests in earning fees ahead of AIA's interests.

36. Pursue all possible claims against the Controlling Defendants, the applicable Combined Defendants and any other parties or entities to recover all sums paid directly or indirectly on behalf of any such parties (including the Controlling Defendants) by AIA, including, without limitation, loan payments (including loans paid for John and others), consulting fees (including for past and present employees and/or purported consultants for CropUSA, Sound Insurance, Weskan, AIA (to the extent unnecessary) and other entities or parties, and wages or benefits paid for the foregoing), expenses, costs, litigation expenses, commission refunds, credit card payments (made for John and others) cell phone bills, insurance payments, CropUSA commissions to agents (which was hundreds of thousands of dollars), telephone costs, advances (including to John, Weskan Agency, and others), tax payments, and other payments. As you are aware, the foregoing are easily determined by reviewing AIA's check registers and by ascertaining from John, Duclos or others regarding items not listed in the check registers, including, such information which has never been disclosed to AIA's minority shareholders or their attorneys and all subsequent ones to this demand.

37. Pursue all possible claims against the Controlling Defendants for wasting AIA's assets and funds and paying excessive compensation to any and/or all of them, including, without limitation, for the purpose of concealing and aiding and abetting in the covering up of torts committed against AIA.

38. Pursue all possible claims against the Controlling Defendants for allowing other entities partially or wholly owned by them, including CropUSA, to compete against AIA in violation of John's Executive Officer's Agreement and the undivided duty of loyalty owed to AIA by them as majority shareholders, directors, and/or officers of AIA.

EXHIBIT B

1 SER 89

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 11

39. Pursue all possible claims against John for representing AIA in any lawsuit, including, without limitation, the lawsuit that Dale Miesen, Donna Taylor and Paul Durant filed against GemCap and AIA to have the illegal guarantees and settlement agreements, which were the subject matter of the California Lawsuit, voided, including, without limitation, claims for intentional breaches of fiduciary duty and intentional malpractice for failing to represent the interests of AIA and by breaching the duty of loyalty owed to AIA.

40. Pursue all possible claims against the Combined Defendants for all damages and relief proximately caused from their acts and/or omissions in leading to the decimation of AIA and its present financial condition.

41. Pursue all possible claims against the Controlling AIA Defendants for any and all damages, tax liabilities, interest, penalties and any other source of damages causes by their acts, omissions and/or torts against AIA.

42. Pursue all possible claims requiring an accounting of all funds, assets, labor, expenses, costs and the allocation of such items between or among other individuals and parties (including the Controlling AIA Defendants and any entities partially or wholly owned by any one or more them).

43. To the extent necessary, pursue all possible claims and defenses for equitable subordination, indemnification (including equitable indemnification) and all related claims and defenses against the Combined Defendants in any pending or future lawsuit.

44. Pursue all possible claims and relief to obtain an accounting from Trustmark of all payments made to AIA and the subsequent use of such funds, including, without limitation, identifying any checks or payments made directly into any account by John or any of the other Controlling AIA Defendants.

45. Pursue all possible claims seeking all necessary declaratory relief to make AIA whole and its innocence minority common and preferred shareholders whole (to the extent that shares have been cancelled or redeemed).

46. Pursue all possible claims requiring Donna Taylor's designee to be appointed to the Board of Directors of AIA Services and to require that the board of directors comply with AIA's amended articles of incorporation, AIA's bylaws, statutory and common law and to ensure full disclosure is made to AIA.

47. Pursue all possible claims that CropUSA and other entities (including Pacific Empire Radio) are the alter-ego of the Controlling AIA Defendants and thus they are individually liable for all damages.

EXHIBIT B

**1 SER 90**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 12

48. To the extent John or others of the Controlling AIA Defendants have transferred real or personal property to their present or former spouses or any other party, pursue all possible claims to recover such property for the benefit of AIA and to help satisfy any judgment(s) which may be entered in favor of AIA.

49. Pursue all possible claims to prevent any of the Controlling AIA Defendants from being directors or officers of AIA.

50. Pursue all possible claims to seek declaratory judgment requiring AIA's officers, directors and shareholders to comply with AIA's amended articles of incorporation, AIA's bylaws and statutory and common law.

51. Pursue all possible claims against David Risley and his law firm (including Risley Law Offices) and any other attorneys or law firms named or referenced in this derivative demand (including those listed only as agents or attorneys) for malpractice and breaching his fiduciary duties owed to AIA, including, without limitation, requiring the repayment of all sums paid to them directly or indirectly from AIA, for disgorgement of all attorneys' fees, costs and expenses paid to them when they breached their fiduciary duties owed to AIA (including the undivided duty of loyalty), engaged in impermissible conflicts of interest (representing the interests of the Controlling AIA Defendants over the interest of AIA), aided and abetted the Controlling AIA Defendants, and for all other damages (including, without limitation, allowing property owned by AIA to be transferred to others (including GemCap) and/or utilized by the Controlling AIA Defendants).

52. Pursue all possible claims against the Combined Defendants and any and all of the parties listed above for concealing from AIA the facts, conflicts and failing to disclose all necessary facts and claims.

53. Pursue all possible claims against John and Connie relative to litigation expenses and costs paid for other lawsuits (including the lawsuit against John and Connie in Ada County), including fees and costs paid to Connie (or her firm) and/or on behalf of her or John.

54. Pursue all possible claims against the Combined Defendants, which have not been specifically stated above, to recover all damages and money owed and/or traced directly or indirectly to AIA and/or otherwise derived from its labor, office space, trade secrets, funds, commissions, agency force, loans, guarantees, lines of credit and/or any other asset.

55. Pursue all possible claims and/or declaratory relief that the Controlling AIA Defendants and/or any other party named in this derivative demand is not entitled to be indemnified by AIA and must repay all sums paid to date and/or judgment be obtained against them.

56. Pursue all possible claims of prejudgment interest for all sums and damages owed to AIA in the maximum amount permitted under the law.

EXHIBIT B

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
August 23, 2016
Page - 13

57.  Pursue all possible claims against any of the Combined Defendants or any other parties identified above to recover any attorneys' fees and costs incurred in any lawsuit or litigation directly or indirectly involving AIA.

58.  To the extent that the conduct and claims discussed above continues after this derivative demand, to pursue all possible claims based on all future action based upon the same or similar acts, omissions, conduct, claims and damages.

Please note that to the extent that any of the above demands overlap or are duplicative with prior demands or may include acts and claims which occurred after one of the prior demands, Dale Miesen, Jerry Legg and Donna Taylor are not waiving any claims for such prior demands or conceding that you have the right to now address those demands nor are they waiving the right to seek relief based on irreparable harm to AIA. To the contrary, Dale Miesen and/or Donna Taylor are already asserting, or seeking to assert, many claims on behalf of AIA.

In addition, please note that time is of the essence on many of the above claims and to the extent that AIA is harmed based on your failure to promptly act or promptly reject this derivative demand, you and any others (including other Controlling AIA Defendants) will be held liable. The torts, facts and issues are well known to you and you are in control of the facts and documents. Thus, you bear the risk of dragging out this demand and failing to take action on behalf of AIA.

Sincerely,

RODERICK BOND LAW OFFICE, PLLC

By: Roderick C. Bond

cc:  Dale Miesen
     Donna Taylor
     Jerry Legg
     Lee Ann Hostetler
     Paul Durant
     Steve Wieland
     Shawnee Perdue

EXHIBIT B

**1 SER 92**



# Roderick Bond
### Law Office, PLLC

June 13, 2016

**_VIA U.S. Mail and Facsimile (208) 799-9172_**

Board of Directors
AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

Board of Directors
AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  83501

**Re:**   **_Shareholder Derivative Demand_**

Dear Purported Boards of Directors:

As you are well aware, Dale Miesen, Jerry Legg and Donna Taylor (individually and as Personal Representative of the Estate of Sara Taylor) have all been shareholders of AIA Services Corporation since well before 1995, and this firm represents them for purposes of this shareholder derivative demand ("derivative demand").

As you know, there have been, and continues to be, extensive malfeasance, torts and illegal conduct occurring at AIA Services Corporation and AIA Insurance, Inc., and the unlawfully covering up of the foregoing acts, omissions and torts. Consequently, this letter is yet another derivative demand being provided in accordance with Idaho Code, including I.C. §§ 30-1-742 and 30-29-742 (to the extent that the former may apply to certain acts, omissions and/or torts). However, despite my prior requests to inspect documents and records on behalf of the below named shareholders in accordance with Idaho Code, you have refused to allow such inspections to take place or otherwise provide responsive documents. As a result, this derivative demand was delayed and is based only on the most recent information obtained to date.

601 108th Ave, Suite 1900, Bellevue, WA 98004 | Phone: (425) 591-6903 | Web: www.roderickbond.com
Roderick C. Bond - Attorney | Email: rod@roderickbond.com | Licensed in Washington and Idaho

EXHIBIT A

**1 SER 93**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 2

For purposes of this derivative demand, the following terms shall apply: (a) "AIA" means AIA Services Corporation and its wholly owned subsidiary AIA Insurance; (b) "CropUSA" means CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC; (c) "John" means R. John Taylor and his spouse as to any property transferred to such spouse, together with any entities partially or wholly owned by him (including Green Leaf RE, Reinsurance Partners, Weskan Agency, Pacific Empire Holdings, Sound Insurance and other entities); (d) "Connie" means Connie Taylor, Connie Taylor Henderson, and Connie Wright Henderson and her spouse as to any property transferred to such spouse; (e) "Beck" means James Beck and his spouse as to any property transferred to such spouse; (f) "Cashman" means Michael W. Cashman, Sr. and his spouse as to any property transferred to such spouse; (g) "Duclos" means JoLee K. Duclos and her spouse as to any property transferred to such spouse; (h) "Hawley Troxell" means Hawley Troxell Ennis & Hawley LLP and the applicable present and former attorneys at Hawley Troxell (including, without limitation, D. John Ashby, Gary Babbitt and Richard A. Riley); (i) "Pacific Empire Radio" means Pacific Empire Radio Corporation; (j) "GemCap" means GemCap Lending I, LLC, together with all of its applicable officer(s) and agents; (k) "Combined Defendants" means all of the foregoing parties except as to AIA (but includes attorneys, law firms and agents of AIA), but "Combined Defendants may include or not include Hawley Troxell and/or Pacific Empire Radio to the extent applicable based on certain facts and circumstances and/or when such facts and circumstance ocurred; and (l) "Controlling AIA Defendants" means John, Connie, Beck, Cashman and Duclos.  For each of the foregoing terms which define more than one party, each such term shall also mean any one or more of the defined parties for purposes of demanding in the alternative.

Dale Miesen, Jerry Legg and Donna Taylor hereby demand that all possible claims and legal action be immediately taken in a court of law on behalf of AIA as follows (including claims which may be contemplated and/or related in any way to the following):[1]

1.  Pursue all possible claims and defenses, and seek the maximum damages, against the Combined Defendants, including, without limitation, all possible tort claims (including, without limitation, aiding and abetting in the commission of torts against AIA), contract claims, declaratory relief, injunctive relief and punitive damages based on all acts, omissions, concealments, and failure to disclose. Without limiting the foregoing and so there is no confusion (even though you are well aware of the facts, lawsuits and legal issues as having full access to information at AIA and the most of the Combined Defendants), more specific examples are included below and demand is hereby made to take action against those parties and any of the other Combined Defendants to recover damages based on any of such specific examples.

---

[1] This derivative demand shall also be construed as being provided by any and/or all of the other innocent minority common and preferred shareholders of AIA Services Corporation. The undersigned apologizes for any spelling or grammatical errors, but he wanted to get this derivative demand submitted to AIA as soon as possible.

EXHIBIT A

**1 SER 94**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 3

2.  Pursue all possible claims and defenses against the Combined Defendants relating in any way to all loans, guarantees, settlement agreements and any other agreements or instruments involving GemCap and AIA (including, without limitation, the loans, guarantees, security agreements, settlements, agreements and all other instruments which are the subject matter of the lawsuit *Gemcap Lending I, LLC v. CropUSA Insurance Agency, Inc., et al.*, in the U.S. District Court, Central District of California, Case No. CV 13-05504 SJO (MANx) ("California Lawsuit"). As you know, AIA was barred from guaranteeing any loans for CropUSA or entering into any settlement agreements under AIA Services' amended articles of incorporation and restated bylaws and all agreements and guarantees were not properly authorized by AIA's board of directors (i.e., Donna Taylor's board designee did not authorize the guarantees and settlements). In addition, AIA received no consideration for entering into the guarantees, security agreements or settlement agreements. As a result, demand is further made to assert all possible claims and defenses in any pending and future lawsuits to have the guarantees, instruments, all settlement agreements and judgments declared illegal, ultra-vires acts, void or voidable and thus unenforceable and to pursue all related claims against GemCap, the Controlling AIA Defendants, and any other responsible parties or parties who have aided and abetted or assisted in such acts and/or omissions.

3.  Pursue all possible claims and defenses against GemCap and the other Combined Defendants to recover all property, real property and/or funds transferred or paid to it directly or indirectly from AIA (including, without limitation, the transfer of AIA Services' interest in the mortgage and real property known as the Lewis/Clark Plaza located at 111 Main Street in Lewiston, Idaho), together with all damages, attorneys' fees and costs paid or incurred by AIA based on the foregoing.

4.  Pursue all possible claims and defenses against GemCap, and to the extent necessary any of the other Combined Defendants, to extricate AIA from all settlement agreements entered into with GemCap and have such agreements declared illegal and/or unenforceable as to AIA, including, without limitation, the written Settlement Agreement which was filed by Doug Siddoway in Nez Perce County District Court dated effective September 15, 2014, together with all Assignments Agreements, related agreements, related instruments and judgments relating in any way to that Settlement Agreement and any prior or subsequent settlement agreements (including amendments or modifications thereto) in the California Lawsuit.

5.  Pursue all possible claims and defenses against GemCap, and to the extent necessary any of the other Combined Defendants, to vacate any judgments entered in favor of GemCap against AIA, including, without limitation the judgments entered in the California Lawsuit and any subsequently entered foreign judgments (including, upon belief, the foreign judgment recently entered against AIA Insurance in Nez Perce County District Court). Included in this demand is also the demand to assert that there was no jurisdiction over AIA in the California Lawsuit and thus the judgments should be voided.

EXHIBIT A

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 4

6.  Pursue all possible claims and defenses against GemCap for aiding and abetting John, Connie, Beck, Cashman, CropUSA, Pacific Empire Radio any other parties in committing torts against AIA (including assisting in breaches of fiduciary duties, fraud and other torts and covering up such breaches and torts). GemCap was aware of the malfeasance occurring at AIA when it first entered into the loans and guarantees with CropUSA and AIA, that AIA was being used improperly by the Controlling AIA Defendants to fund and/or support entities partially or wholly owned by them, and GemCap became more aware of these facts as time went on, yet GemCap continued to assist the foregoing parties committing and covering up torts against AIA (including, without limitation, breaches of fiduciary duties and fraud).

7.  Pursue all possible claims against the Combined Defendants for their torts committed against AIA (including, without limitation, breaches of fiduciary duties, fraud and any other claims contemplated or related to any of the facts or issues disclosed in this letter) and the aiding and abetting of torts committed against AIA by one or more of the Combined Defendants (including, without limitation, assisting in the commission of the torts or covering up the torts).

8.  Pursue all possible claims against Controlling AIA Defendants requiring them to disgorge all compensation, consulting fees, fees, salary, benefits or any other type of payments made to them directly or indirectly from AIA (including, based on being faithless fiduciaries and/or receiving such compensation without proper authorization from AIA) and to require them to repay any funds, expenses, fees, reimbursements, and costs incurred by AIA or paid by AIA for their benefit in any legal action or matter and to obtain damage judgments for such payments and compensation. Included in this demand is disgorgement or damages for all salary, bonuses, benefits and other compensation paid to John, Beck, Connie, Cashman and Duclos from being an officer, director or other agent of AIA and all attorneys' fees, expenses and costs paid on their behalf. This demand includes the $5,000 per quarter paid to Connie and Beck to purportedly serve on AIA's Board of Directors and all compensation paid to John and Duclos for purportedly being officers and/or directors of AIA.

9.  Pursue all possible claims against GemCap and the other responsible Combined Defendants (including the Controlling AIA Defendants) for all of the attorneys' fees, costs, expenses and damages proximately caused directly or indirectly from GemCap's loans to CropUSA and AIA's guarantees of those loans, including, without limitation, all attorneys' fees, costs and expensed incurred or paid directly or indirectly by AIA for the California Lawsuit and any other lawsuit. But for GemCap agreeing to improperly make the loans and improperly agree to accept AIA's guarantees, none of the lawsuits would have occurred.

10. Pursue all possible claims and defenses against GemCap that it was not a good faith lender, had unclean hands, and/or is not entitled to any relief against AIA.

EXHIBIT A

**1 SER 96**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 5

11. Pursue all possible claims against Hawley Troxell requiring it to disgorge all compensation received or paid to Hawley Troxell directly or indirectly from AIA based on Hawley Troxell's conflicts of interest, breached fiduciary duties (including the duties of loyalty) and related malpractice, including, without limitation, all subsequent payments made by AIA to Hawley Troxell.

12. Pursue all possible claims against Pacific Empire Radio for all sums owed by it to AIA, including, without limitation, the over $1,400,000 owed as disclosed in 2015) and all amounts which have been subsequently improperly lent to Pacific Empire Radio.

13. Pursue all possible claims against the Controlling AIA Defendants for allowing any funds to be lent to Pacific Empire Radio in the first place (including without limitation, for the breaches of fiduciary duties by them as present or former officers and/or directors of AIA and the aiding and abetting in assisting and/or covering up of the improper loans to Pacific Empire Radio). As you are fully aware, these loans violated AIA's amended articles of incorporation, AIA's bylaws, constituted conflicts of interest, provided no benefit to AIA and were made when AIA was not meeting its obligations to others.

14. Pursue all possible claims against Pacific Empire Radio, the Controlling AIA Defendants and any other parties relating to any agreements and subordination agreements improperly entered into between AIA, Pacific Empire Radio and any other party, as such agreements were not authorized by AIA and were not in AIA's best interests.

15. Pursue all possible claims against the Controlling AIA Defendants for allowing John to operate AIA for his benefit and/or to assist AIA in funding and the operation of entities partially or wholly owned by the Controlling AIA Defendants without AIA receiving any benefit, proper compensation, without full disclosure to AIA, in violation of applicable conflicts of interest (including under AIA Services' amended articles of incorporation and bylaws) and without obtaining proper authorization from AIA or its innocent minority shareholders.

16. Pursue all possible claims against the Controlling AIA Defendants and any other responsible party for all damages relating to all payments made directly or indirectly from AIA to the attorneys and law firms of Hawley Troxell, Crumb & Munding, Gordon & Reese, Risley Law Office PLLC, Randall Blake and Cox, Clark and Feeney, Quarles & Brady, Randall Danskin, David Gittins, Connie Taylor (and her law firms Clark and Feeney and Henderson Law Firm) and any other law firm (including for declaratory relief that no further sums are owed by AIA to any of the foregoing and that any fee agreements or conflict waivers are void), as such payments should never have been made, were never authorized by AIA, were not properly incurred or necessary for AIA, were never authorized by AIA's shareholders after full disclosure was made, and involved the attorneys and law firms taking action or performing work not in the best interests of AIA and/or in violation

EXHIBIT A

1 SER 97

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 6

of the duty of loyalty owed to AIA. Demand is further made to pursue all possible claims, including, without limitation, for the disgorgement of all fees, costs and expenses paid or discharge of any debts allegedly owed, to any of the foregoing attorneys, law firms and/or attorneys working at such law firms to the extent that they represented AIA based on conflicts of interest, breached fiduciary duties (including the duty of loyalty), and malpractice. To the extent that any of the forgoing law firm and attorneys did not represent AIA, then demand is made to pursue all possible claims against the Controlling AIA Defendants for all sums paid and/or owed to such attorneys and law firms by AIA. In addition, demand is made to assert all possible claims against the foregoing parties for participating and/or allowing AIA to be improperly utilized to fund the defense and prosecution of lawsuits which were not in AIA's best interests, but were instead pursued based on the interests of the Controlling AIA Defendants.

17. Pursue all possible claims against the Controlling AIA Defendants, and to the extent necessary AIA or any other Combined Defendant to ensure that AIA is not bound or obligated by any act or omission of the Controlling AIA Defendants or AIA, for not honoring Donna Taylor's unqualified appointment of a designee to AIA Services' Board of Directors (Patrick Moran and Paul Durant) and for declaratory relief that all such actions purportedly taken by the Board of Directors of AIA Services without the consent or approval of Donna Taylor's designee (who would have been the only director without a conflict of interest) were the unauthorized acts of AIA, ultra-vires and void. Such acts and omissions, include, without limitation, all guarantees and settlements with GemCap, all loans to Pacific Empire Radio, all conflict waivers or other agreements with attorneys and law firms, all board resolutions (including any resolutions provided to GemCap), and all other acts of the purported Board of Directors of AIA Services.

18. Pursue all possible claims against the Controlling AIA Defendants, CropUSA and any other of the Combined Defendants or responsible parties for all payments made to any and all vendors, creditors, consultants, agents, customers or other parties owed money by CropUSA, by the Controlling AIA Defendants, any entity partially or wholly owned by any one of the Controlling AIA Defendants, or paid at the direction of any one or more of the Controlling AIA Defendants, including, without limitation, the more recent hundreds of thousands of dollars in payments AIA made to certain agents and customers of CropUSA in 2013 and any previously or subsequently paid for CropUSA and any other entity.

19. Pursue all possible claims against the Combined Defendants for taking action violating AIA's amended articles of incorporation, violating AIA's bylaws, violating statutory and common law, and committing torts against AIA, together with aiding and abetting others (including other Combined Defendants) in covering up the torts committed against AIA. Examples of the torts and the covering up of those torts are contained with the proposed Second Amended Complaint recently filed in the federal derivative lawsuit by Dale Miesen and Donna Taylor—the facts and torts alleged in that Second Amended Complaint have continued since prior demands.

EXHIBIT A

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 7

20.  Pursue all possible claims against the Combined Defendants for failing to properly allocate costs, labor, expenses and other items between AIA and other entities, including, CropUSA, and by allowing such issues to take place in the first place, including, without limitation, based on the conflicts of interest and restrictions under AIA's amended articles of incorporation, bylaws and the undivided duties of loyalty owed by the Controlling AIA Defendants to AIA, among others, and for continuing to conceal and cover up all such issues and related issues.

21.  Pursue all possible claims against the Controlling AIA Defendants for all damages, fees and costs incurred or paid by AIA for attempting to effectuate a reverse stock split to eliminate the minority common shareholders of AIA Services in violation of AIA Services' amended articles of incorporation, bylaws and Idaho Code, including, without limitation, the hundreds of thousands of dollars of attorneys' fees and costs paid to Randall Danskin for the improper reverse stock split and to purportedly represent AIA in the subsequent lawsuit against certain of AIA Services' shareholders. Demand is further made to pursue all possible claims against Doug Siddoway (and any other responsible attorney) and Randall Danskin, including, for breach fiduciary duties, conflicts of interest, and disgorgement of all attorneys' fees and costs paid to them and to have declared unlawful or uncollectable any attorneys' fees and costs allegedly owed to them by AIA, including, without limitation, based on their malpractice, breaches of duty of loyalty owed to AIA, conflicts of interest, for aiding and abetting the Controlling AIA Defendants in the commission of torts (including in that lawsuit and others), and taking action in violation of their undivided fiduciary duties of loyalty owed to AIA. To be clear, full and complete disgorgement should be sought and obtained for all fees, costs and expenses paid directly or indirectly by AIA (or by GemCap) to Randall Danskin for all work that it and its attorneys have directly or indirectly performed for AIA and for concealing from AIA the conflicts of interest, breaches of fiduciary duties and malpractice committed by Randall Danskin against AIA—Mr. Siddoway and Randall Danskin placed their interests in earning fees ahead of AIA's interests, are faithless fiduciaries and are not entitled to retain any compensation relating to AIA.

22.  Pursue all possible claims against John Munding and Crumb & Munding (or such other firm Mr. Munding is operating through) for malpractice, breach of fiduciary duties and to disgorge all attorneys' fees, costs and expenses paid to them directly or indirectly by AIA for the California Lawsuit as Mr. Munding intentionally violated his duties owed to AIA, including, without limitation, his duties of loyalty owed to AIA and by taking direction and action benefitting other defendants (including John's) and placing their interests in front of AIA and by representing CropUSA, AIA and other parties when there were conflicts of interest in doing so and Mr. Munding knew that he could not properly represent AIA's interests and when he had no intention of doing so. Demand is further made to pursue all possible claims against Mr. Munding and Crumb & Munding for improperly failing to assert that the guarantees and settlement agreements entered into by AIA were not

EXHIBIT A

**1 SER 99**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 8

authorized and were thus illegal or ultra-vires and by allowing AIA to enter into them in the first place. Mr. Munding places his interests in earning fees ahead of AIA's interests.

23. Pursue all possible claims against the Controlling Defendants, the applicable Combined Defendants and any other parties or entities to recover all sums paid directly or indirectly on behalf of any such parties (including the Controlling Defendants) by AIA, including, without limitation, loan payments (including loans paid for John and others), consulting fees (including for past and present employees and/or purported consultants for CropUSA, Sound Insurance, Weskan, AIA (to the extent unnecessary) and other entities or parties, and wages or benefits paid for the foregoing), expenses, costs, litigation expenses, commission refunds, credit card payments (made for John and others) cell phone bills, insurance payments, CropUSA commissions to agents (which was hundreds of thousands of dollars), telephone costs, advances (including to John, Weskan Agency, and others), tax payments, and other payments. As you are aware, the foregoing are easily determined by reviewing AIA's check registers and by ascertaining from John, Duclos or others regarding items not listed in the check registers, including, such information which has never been disclosed to AIA's minority shareholders or their attorneys and all subsequent ones to this demand.

24. Pursue all possible claims against the Controlling Defendants for wasting AIA's assets and funds and paying excessive compensation to any and/or all of them, including, without limitation, for the purpose of concealing and aiding and abetting in the covering up of torts committed against AIA.

25. Pursue all possible claims against the Controlling Defendants for allowing other entities partially or wholly owned by them, including CropUSA, to compete against AIA in violation of John's Executive Officer's Agreement and the undivided duty of loyalty owed to AIA by them as majority shareholders, directors, and/or officers of AIA.

26. Pursue all possible claims against John for representing AIA in any lawsuit, including, without limitation, the lawsuit that Dale Miesen, Donna Taylor and Paul Durant filed against GemCap and AIA to have the illegal guarantees and settlement agreements, which were the subject matter of the California Lawsuit, voided, including, without limitation, claims for intentional breaches of fiduciary duty and intentional malpractice for failing to represent the interests of AIA and by breaching the duty of loyalty owed to AIA.

27. Pursue all possible claims against the Combined Defendants for all damages and relief proximately caused from their acts and/or omissions in leading to the decimation of AIA and its present financial condition.

28. Pursue all possible claims against the Controlling AIA Defendants for any and all damages, tax liabilities, interest, penalties and any other source of damages causes by their acts, omissions and/or torts against AIA.

EXHIBIT A

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 9

29. Pursue all possible claims requiring an accounting of all funds, assets, labor, expenses, costs and the allocation of such items between or among other individuals and parties (including the Controlling AIA Defendants and any entities partially or wholly owned by any one or more them).

30. To the extent necessary, pursue all possible claims and defenses for equitable subordination, indemnification (including equitable indemnification) and all related claims and defenses against the Combined Defendants in any pending or future lawsuit.

31. Pursue all possible claims and relief to obtain an accounting from Trustmark of all payments made to AIA and the subsequent use of such funds.

32. Pursue all possible claims seeking all necessary declaratory relief to make AIA whole and its innocence minority common and preferred shareholders whole (to the extent that shares have been cancelled or redeemed).

33. Pursue all possible claims requiring Donna Taylor's designee to be appointed to the Board of Directors of AIA Services and to require that the board of directors comply with AIA's amended articles of incorporation, AIA's bylaws, statutory and common law and to ensure full disclosure is made to AIA.

34. Pursue all possible claims that CropUSA and other entities (including Pacific Empire Radio) are the alter-ego of the Controlling AIA Defendants and thus they are individually liable for all damages.

35. To the extent John or others of the Controlling AIA Defendants have transferred real or personal property to their present or former spouses or any other party, pursue all possible claims to recover such property for the benefit of AIA and to help satisfy any judgment(s) which may be entered in favor of AIA.

36. Pursue all possible claims to prevent any of the Controlling AIA Defendants from being directors or officers of AIA.

37. Pursue all possible claims to seek declaratory judgment requiring AIA's officers, directors and shareholders to comply with AIA's amended articles of incorporation, AIA's bylaws and statutory and common law.

38. Pursue all possible claims against David Riley and his law firm (including Riley Law Offices) for malpractice and breaching his fiduciary duties owed to AIA, including, without limitation, requiring the repayment of all sums paid to them directly or indirectly from AIA, for disgorgement of all attorneys' fees, costs and expenses paid to them when they breached their fiduciary duties owed to AIA (including the undivided duty of loyalty),

EXHIBIT A

1 SER 101

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 10

engaged in impermissible conflicts of interest (representing the interests of the Controlling AIA Defendants over the interest of AIA), aided and abetted the Controlling AIA Defendants, and for all other damages (including, without limitation, allowing property owned by AIA to be transferred to others (including GemCap) and/or utilized by the Controlling AIA Defendants).

39. Pursue all possible claims against the Combined Defendants and any and all of the parties listed above for concealing from AIA the facts, conflicts and failing to disclose all necessary facts and claims.

40. Pursue all possible claims against John and Connie relative to litigation expenses and costs paid for other lawsuits (including the lawsuit against John and Connie in Ada County), including fees and costs paid to Connie (or her firm) and/or on behalf of her or John.

41. Pursue all possible claims against the Combined Defendants, which have not been specifically stated above, to recover all damages and money owed and/or traced directly or indirectly to AIA and/or otherwise derived from its labor, office space, trade secrets, funds, commissions, agency force, loans, guarantees, lines of credit and/or any other asset.

42. Pursue all possible claims of prejudgment interest for all sums and damages owed to AIA in the maximum amount permitted under the law.

43. Pursue all possible claims against any of the Combined Defendants or any other parties identified above to recover any attorneys' fees and costs incurred in any lawsuit or litigation directly or indirectly involving AIA.

44. To the extent that the conduct and claims discussed above continues after this derivative demand, to pursue all possible claims based on all future action based upon the same or similar acts, omissions, conduct, claims and damages.

Please note that to the extent that any of the above demands overlap or are duplicative with prior demands or may include acts and claims which occurred after one of the prior demands, Dale Miesen, Jerry Legg and Donna Taylor are not waiving any claims for such prior demands or conceding that you have the right to now address those demands nor are they waiving the right to seek relief based on irreparable harm to AIA. To the contrary, Dale Miesen and Donna Taylor are already asserting, or seeking to assert, many claims on behalf of AIA.

In addition, please note that time is of the essence on many of the above claims and to the extent that AIA is harmed based on your failure to promptly act or promptly reject this derivative demand, you and any others (including other Controlling AIA Defendants) will be held liable. The torts, facts and issues are well known to you and you are in control of the facts and documents. Thus, you bear the risk of dragging out this demand and failing to take action on behalf of AIA.

EXHIBIT A

**1 SER 102**

Board of Directors of AIA Services Corporation
Board of Directors of AIA Insurance, Inc.
June 13, 2016
Page - 11


Sincerely,

RODERICK BOND LAW OFFICE, PLLC

By: Roderick C. Bond

cc:  Dale Miesen
     Donna Taylor
     Jerry Legg
     Steve Wielend
     Shawnee Perdue

EXHIBIT A

**1 SER 103**

Steve Wieland, ISB No. 8282
Shawnee Perdue, ISB No. 8888
WIELAND PERDUE PLLC
405 South 8th Street, Suite 295
Boise, Idaho 83702
p: 208.401.9219
f: 208.401.9218
swieland@wielandperdue.com
sperdue@wielandperdue.com

*Attorneys for Defendants Connie Taylor Henderson,*
*Jolee Duclos, R. John Taylor, Michael W. Cashman Sr.,*
*James Beck, and Crop USA Insurance Agency, Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| **Dale Miesen**, an individual, a shareholder bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> **Connie Taylor Henderson**, an individual; **et al.**, <br><br> Defendants. | Case No. 1:10-CV-00404-CWD <br><br> **Brief in Opposition to Plaintiff's Motion to Amend and Supplement Complaint [Doc. 182]** |

Defendants Connie Taylor Henderson, Jolee Duclos, R. John Taylor, Michael W.

Cashman Sr., and James Beck (the "**Directors**"), and Crop USA Insurance Agency, Inc.

("**Crop USA**"), through their counsel of record, WIELAND PERDUE PLLC, respectfully

submit this Brief in Opposition to Plaintiff's Motion to Amend and Supplement Complaint

Brief in Opposition to Plaintiff's Motion to Amend and Supplement
Complaint                                                                    Page 1 of 18

**1 SER 104**

("**Brief**"). Collectively, this Brief refers to the Directors and Crop USA as the "**Defendants**."

## I.    INTRODUCTION

The Motion to Amend and Supplement Complaint ("**Motion**") seeks leave to file a Third Amended Complaint ("**TAC**"). The TAC would add wide-ranging allegations that Defendants improperly caused AIA Services to guarantee a loan from GemCap Lending I ("**GemCap**") to Crop USA and then improperly permitted John Taylor to settle a subsequent collection suit filed by GemCap against AIA when Crop USA defaulted. (TAC ¶¶ 135–56.) The TAC also adds other allegations that John Taylor improperly transferred real estate to AIA Services, that the Directors spent too much on attorney fees defending a state-court lawsuit brought by Plaintiff's counsel on behalf of Donna Taylor, and that John Taylor "improperly" amended the bylaws and was issued additional Series A shares. (TAC ¶¶ 157–63.)[1]

The Court should deny the Motion because: Plaintiff has failed to seek board action by submitting a proper derivative demand letter; Plaintiff's allegations are futile in significant part; and the Motion is not brought timely or in good faith. Instead, to keep this litigation moving smoothly, the Court should require Plaintiff to seek leave to file a complaint that: (i) omits all the new claims in the TAC; (ii) complies with a reasonable page limit[2]; and (iii) complies with Rule 8 pleading requirements for directness and concision.

---

[1] Nothing in this Brief is intended to suggest that Defendants took part in any illegal conduct or are liable for any of the new or preexisting claims in the TAC.

[2] Defendants suggest that 30 pages, plus a reasonable number of attachments, would be an appropriate page limit. *See Cal. Coalition for Families & Children v. San Diego Cnty. Bar Ass'n*, --- Fed App'x ---, 2016 WL 4174772, at *1–2 (9th Cir. Aug. 8, 2016) (affirming dismissal where

Brief in Opposition to Plaintiff's Motion to Amend and Supplement
Complaint                                                                      Page 2 of 18

## II.   GOVERNING STANDARD

In deciding whether to grant leave to amend, the Court should consider five factors: "(1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the plaintiff has previously amended his complaint." *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004). Although the Court can consider all the factors, "[f]utility alone can be enough to deny a motion for leave to amend." *Schwartz v. Adams Cnty.*, No. CV 09-019-S-EJL-CWD, 2010 WL 2011582, at *3 (D. Idaho May 20, 2010) (citing *Nunes*, 375 F.3d at 808)).

## III.   ARGUMENT ON FUTILITY

None of the new derivative claims against Defendants are viable because Plaintiff has failed to make a proper demand, thereby failing to make even a prima facie showing of a substantive—not merely procedural—element of his requested new derivative claims. Further, Plaintiffs new claims that are unrelated to the GemCap transaction are not viable for other reasons. On these grounds alone the Court can refuse the Motion.

**A.   The Amendment Should Not Be Permitted Because Plaintiff Has Failed to Attempt to Obtain Board Action Through a Proper Demand Letter**

A derivative plaintiff in federal court must state with particularity the efforts the plaintiff made to obtain the desired actions from the board of directors. Fed. R. Civ. P. 23.1(b)(3). Although Rule 23.1 creates a federal pleading requirement, the demand is a substantive element of a derivative lawsuit. The substantive demand requirement is governed by the law of the state where the company is incorporated, which is Idaho in this case. *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014).

---

plaintiffs failed to reduce a 175-page amended complaint to 30 pages as required by the district court).

In Idaho, as a precondition to ***commencing*** a derivative suit, the plaintiff must make a written demand upon the corporation to take suitable action to redress the plaintiff's concerns. I.C. § 30-29-742. The demand requirement rests on an "important policy" of protecting the board of director's right to direct the company's affairs. *Kugler v. Nelson*, 160 Idaho 408, ---, 374 P.3d 571, 578 (2016) (applying Delaware law). "[T]he demand requirement implements 'the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 100, 111 S. Ct. 1711, 1718 (1991). In short, the demand requirement prevents shareholders from abusing the derivative-suit process. *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 542, 104 S. Ct. 831, 841 (1984).

Again, the demand letter "is not merely a technical or unimportant requirement." *Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008). To ensure the board of directors had an adequate opportunity to evaluate potential litigation, the plaintiff "must make an earnest and sincere, and not a feigned or simulated, effort to induce the directors to take remedial action." *McCann v. McCann*, 138 Idaho 228, 235, 61 P.3d 585, 592 (2002) (quotation omitted). The amendments relating to the GemCap transactions rest on two derivative demand letters dated June 13, 2016, and August 23, 2016, respectively (the "**Demand Letters**"). (TAC ¶¶ 179–80.) Neither is attached to the TAC, but Defendants provided them to the Court contemporaneously with this Brief.[3] (Taylor Decl. Exs. A, B.) The Demand Letters do not satisfy the demand requirement for three broad reasons.

---

[3] The June 2016 letter also was attached to a declaration filed by Mr. Ipsen, [Doc. 148-2], but the August 2016 letter has not found its way into the record yet.

Brief in Opposition to Plaintiff's Motion to Amend and Supplement Complaint                                                                    Page 4 of 18

To start, the letters taken together are not an "earnest and sincere" effort to help the AIA board remedy Plaintiff's alleged concerns. Rather than an attempt to alert the AIA board to discrete issues for investigation, the letters read as if Plaintiff's counsel viewed the task as a mere formality, listing every conceivable claim AIA might consider asserting against any conceivable person. Moreover, on September 12, 2016, the board informed Plaintiff in writing that his Demand Letters were too nebulous to enable the board to investigate the alleged claims. (Taylor Decl. Ex. C.) Rather than attempting to clarify the grounds for the Demand Letters or to describe discrete claims, Plaintiff simply filed the Motion. *See McCann*, 138 Idaho at 235, 61 P.3d at 592 (stating that the shareholder cannot merely make a "feigned or simulated . . . effort to induce the directors to take remedial action").

Second, the letters must specifically identify the alleged wrongdoers. A demand must "name the potential defendants." *McCann*, 138 Idaho at 235, 61 P.3d at 592 (quotation omitted). It cannot simply describe an open universe of wrongdoers. *See Simmons v. Credit Suisse Sec. (USA) LLC*, 638 F.3d 1072, 1092 (9th Cir. 2010) *vacated on other grounds*, 132 S. Ct. 1414 (2012) (noting that a letter barely met this requirement because it "identified a closed set of alleged wrongdoers").

Here, however, the Demand Letters give an open universe of potential defendants. They describe the term "Combined Defendants" to include the defendants of this lawsuit plus "agents of AIA," an enormous group of people numbering in the thousands. (Taylor Decl. Ex. A, at 2, Ex. B, at 2.) Many of the numbered paragraphs are directed at certain people plus "any other parties" that may have taken part in some real or imagined transaction. (*E.g.* Taylor Decl. Ex. B, ¶¶ 19, 27, 29, 47.) Other paragraphs name no potential defendant at all. (*E.g. id.* ¶¶ 42, 45.) Simply identifying these formless categories

is not enough to meet the demand requirement. *See Shlensky v. Dorsey*, 574 F.2d 131, 141 (3rd Cir. 1978) (stating that it was insufficient to request action against "responsible individuals" for "all damages").

Third, the letter must give sufficient information about the claims themselves to enable a board to determine if litigation would be successful. The letter "must state facts, not mere general charges and conclusions." *McCann*, 138 Idaho at 235, 61 P.3d at 592 (quotation omitted). Particularity is necessary since, otherwise, "to require a board to investigate claims asserted ambiguously in an equivocal communication would not be an efficient use of corporate resources, because the board would lack the information to make a good faith inquiry." *Yaw v. Talley*, Civ. A. No. 12882, 1994 WL 89019, at *8 (Del. Ch. Mar. 2, 1994).

Another federal derivative case is illustrative. In *Stoner v. Walsh*, 772 F. Supp. 790 (S.D.N.Y. 1991), plaintiff's counsel sent a letter with a list of generalized grievances, for example demanding that the board undo "the decision to reward some of the very individuals responsible for [the company's] financial decay with lavish raises, bonuses and other perks," and to punish the board for "the company's decision to squander $200 million to construct its new art bedecked headquarters." 772 F. Supp. at 793 (quotations omitted; modification added). In other words, the letter merely made conclusory accusations rather than providing facts and information upon which the board in that case could base an investigation. Accordingly, the court observed that these allegations did not describe the company's potential causes of action with sufficient particularity. *Id.* at 797.

The Demand Letters dramatically exceed the *Stoner* letter in their breadth and lack of particularity. Both the Demand Letters open their list of grievances by instructing the AIA board to "[p]ursue all possible claims and defenses" for "all possible tort claims . . .

Brief in Opposition to Plaintiff's Motion to Amend and Supplement Complaint                                                                         Page 6 of 18

contract claims, declaratory relief, injunctive relief and punitive damages based on all acts, omissions, concealments, and failure [sic] to disclose through the date of this letter and for the foregoing which continues past the date of this letter." (Taylor Decl. Ex. A ¶ 1, Ex. B ¶ 1.) Both letters follow this broad demand description with dozens of numbered claim paragraphs, but those numbered paragraphs are only given *by way of example*. (*Id.*) Put another way, the Demand Letters seek board action on all claims against any agent who has ever acted on behalf of AIA at any time, past, present, and future.

Even if it were possible to draw a line around any specific claims identified in the Demand Letters, the individually numbered items describe the subject matter so broadly that no board could possibly have investigated them. Although the Demand Letters overlap significantly, Plaintiff's counsel described a combined total of over 100 categories for the AIA board to investigate. (Taylor Decl. Exs. A, B.) Each of them are standalone examples of impossibly broad subject matter, such as one demanding the board "[p]ursue all possible claims against the Combined Defendants for their torts committed against AIA," or another demanding the board "[p]ursue all possible claims against the Controlling AIA Defendants and any other responsible party" for paying attorney fees to any of nine law firms that supposedly committed malpractice at some point in AIA's history. (Taylor Decl. ¶¶ 20, 29.) No board of directors could use this information to investigate a company's claims against anyone. *See Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 409 (S.D.N.Y. 2007) ("[T]he demand must inform the board with particularity of the complained of acts and the potential defendants." (quotation omitted)).

In addition, the Court should deny the Motion *without* allowing Plaintiff leave to amend. A derivative claim failing to comply with the demand requirement must be dismissed with prejudice. In re *Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 991 (9th

Cir. 1999). The Ninth Circuit has overturned a district court decision granting dismissal without prejudice where the plaintiff failed to make an adequate demand. *Simmonds*, 638 F.3d at 1097. Both potentially operative Demand Letters are now before the Court, so Plaintiff cannot allege any additional facts that might show compliance with the demand requirement. (Taylor Decl. Exs. A and B.) Since no amendment would save Plaintiff's allegations, the Court should deny the Motion without leave to amend. *E.g. Gulbrandsen v. Stumpf*, No. 12-5968 JSC, 2013 WL 6406922, at \*10 (N.D. Cal. Dec. 6, 2013) (dismissal with prejudice); *Weinstein v. Kirkman*, No. C13-0769-JCC, 2013 WL 12121125, at \*5 (W.D. Wash. Sep. 16, 2013) (dismissal with prejudice). Further, refusal without leave to amend is necessary because the corporation has a substantive right to investigate potential wrongdoing before a shareholder sues, not after.[4]

**B.      Breach-of-Fiduciary-Duty Claims Relating to Bylaw Amendments, Stock Issuances, Property Contributions, and Litigation Costs Are Futile**

Idaho applies the business judgment rule, *McCann v. McCann*, 152 Idaho 809, 815, 275 P.3d 824, 830 (2012), but appellate case law provides little guidance, see *Steelman v. Mallory*, 110 Idaho 510, 513, 716 P.2d 1282, 1285 (1986) (stating the general rule). The legislature, however, has helped fill some gaps.[5] A plaintiff asserting breach of fiduciary

---

[4] Plaintiff might be allowed leave to amend if he merely failed to *allege* making a proper derivative demand, but here the problem is not a procedural failure of pleading but a substantive failure of compliance. *See In re Polycom, Inc.*, 78 F. Supp. 3d 1006, 1021 (N.D. Cal. 2015) (granting dismissal without prejudice because the shareholder failed to plead demand futility under Delaware law).

[5] It appears the legislature enacted the statutes as an "adjunct" to the court-made business-judgment rule. I.C. § 30-1-831 (2004) Rptr. Cmt.; *cf. Jordan v. Hunter*, 124 Idaho 899, 905 n.3, 865 P.2d 990, 996 n.3 (Ct. App. 1993) (stating that the statute in effect at the time was "essentially a codification" of the business-judgment rule but had no effect on director or officer fiduciary duties). In addition to statutes, Idaho's appellate courts also look to case law from other states when applying the business-judgment rule. *E.g. Steelman*, 110 Idaho at 513, 716 P.2d at 1285 (citing Colorado, Arizona, and Oregon cases); *McCann*, 152 Idaho at 817, 275 P.3d at 832 (citing a Massachusetts case).

Brief in Opposition to Plaintiff's Motion to Amend and Supplement
Complaint                                                                                    Page 8 of 18

duty must prove that liability is not limited by the articles of incorporation and, pertinent here, the conduct was an:

> (i)   Action not in good faith; or
>
> (ii)   A decision:
>
>> (A)   Which the director did not reasonably believe to be in the best interests of the corporation; or
>>
>> (B)   As to which the director was not informed to an extent the director reasonably believed appropriate in the circumstances . . . ; or
>
> (iii)   [A result of a] lack of objectivity due to the director's familial, financial, or business relationship with . . . another person having a material interest in the challenged conduct . . . ; or
>
> . . .
>
> (v)   Receipt of a financial benefit to which the director was not entitled . . . .

I.C. § 30-29-831(b).[6] Then, the plaintiff must prove causation, damages, and any other elements otherwise necessary to prevail on the claim for legal or equitable relief. I.C. § 30-29-831(2).

In federal court, the plaintiff cannot plead facts "that are merely consistent with a defendant's liability," but must provide sufficient factual content for the Court to infer that the defendant is liable. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). Since overcoming the business-judgment rule is a substantive element of proof, Plaintiff must allege facts sufficient to rebut or "plead around" the presumption that the

---

[6] The legislature replaced an earlier corporate code with a very similar statutory regime effective July 1, 2015. 2015 Idaho Sess. Laws ch. 243. There is no significant difference between the current and old statutes cited here and their numbering schemes are the same, so for brevity the current sections will be cited. *Compare, e.g.*, I.C. § 30-1-831 (2004) *with* I.C. § 30-29-831 (2015).

**1 SER 112**

directors acted within their permissible business judgment. *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 679–80 (N.D. Tex. 2011).

Applying this pleading standard shows that many of the new allegations in the TAC do not state a claim for breach of fiduciary duty and are therefore futile.

### 1. Transfer and Valuation of Real Estate by John Taylor

The TAC alleges that John Taylor transferred real property from related entities to AIA, had AIA assume $393,863 in debts on the properties, and improperly assigned a book value to them. (TAC ¶¶ 157–58.) There are no facts suggesting that transferring the properties or assigning a given book value was done in bad faith; without a legitimate purpose; or, as a potentially conflicting-interest transaction, harmed AIA. *See* I.C. § 30-29-831(2) (requiring a showing of harm to merit damages); *see generally McGowan v. Ferro*, 859 A.2d 1012 (Del. Ch. 2004) (discussing whether a board's decision to extend a merger agreement was a breach of loyalty). For instance, there is no allegation the encumbrances exceeded the properties' value, that the book value is too low or, even if it was, that having a low book value harms the company. These allegations do not state a cause of action.

### 2. Issuance of Series A Shares to John Taylor

Next, the TAC alleges John Taylor was issued 7,500 Series A Preferred Shares in AIA Services. (TAC ¶¶ 160–61.) The TAC does not suggest the company received insufficient value or that the issuance was a conflicting interest transaction that harmed the company or Plaintiff. *See Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 655 (Del. Ch. 2013) (stating that overpayment in stock can be actionable). There are no facts amounting to an improper business purpose, either, since exchanging cash for shares is certainly a proper corporate endeavor, especially when a company is cash-strapped. To

the extent such an issuance might conceivably dilute the rights of the only other Series A shareholder, Donna Taylor, her claim would be direct, not derivative, and she is not a party. *See Lipton v. News Int'l, PLC*, 514 A.2d 1075, 1079 (Del. 1986) (holding that a shareholder should bring a direct action to challenge a stock exchange agreement that supposedly violated the shareholder's voting rights) *abrogated on other grounds by Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1037–38 (Del. 2004).

### 3.     *Amendment of Bylaws*

The TAC alleges that John Taylor improperly amended the AIA bylaws to require an unsuccessful plaintiff in an intracompany lawsuit to pay attorney fees. (TAC ¶ 162.) Such provisions are valid unless adopted for an improper purpose. *ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014). Given that AIA and its constituents have been racked by unrelenting and unsuccessful litigation over the past nine years, the obvious purpose for the bylaw is a proper one: to deter meritless litigation. *See id.* at 560 (stating that even an intent to generally deter all litigation would not necessarily invalidate a fee-shifting bylaw). The TAC asserts no invalid purpose for the bylaw amendment and therefore states no claim.

### 4.     *Overspending on Donna Taylor Litigation*

Last, the TAC alleges that the Directors overspent on attorney fees defending a lawsuit Donna Taylor filed against AIA to collect redemption payments for stock she received in her divorce from Reed Taylor. (TAC ¶ 163.) Plaintiff alleges no facts suggesting that defending the litigation was not done for a legitimate business purpose or suggested the case was meritless. Like the others, this claim is futile.

**C.    The New Fraud, Concealment, and Constructive Fraud Allegations in Count V Do Not State a Cause of Action**

*1.    Plaintiff Fails to Plead His Fraud Claim with Particularity*

A party alleging fraud must state with particularity the circumstances constituting the fraud. Fed. R. Civ. P. 9(b). A fraud claim must specifically allege facts such as the times, dates, places, benefits received, and other details of the alleged fraudulent activity. *Neubronner v. Milken*, 6 F.3d. 666, 672 (9th Cir. 1993). Plaintiff's new allegations do not satisfy the heightened pleading requirement under Rule 9(b). Plaintiff fails to allege the specific content of the alleged fraudulent communications and the times and dates that such conduct occurred.  For these reasons, Plaintiff's new fraud claims in Count V are not properly pled.

*2.    Plaintiff Fails to State a Cause of Action for Fraud or Constructive Fraud in His New Allegations*

A party alleging fraud must make the following allegations with specificity: (1) the defendant made a statement or representation of fact; (2) it's falsity; (3) it's materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) the reliance by the hearer; (8) justifiable reliance; and (9) resultant injury. *Doe v. Boy Scouts of America*, 159 Idaho 103, 108, 356 P.3d 1049, 1055 (2015).  A party alleging constructive fraud must plead that there was a duty of trust and confidence between plaintiff and the defendant, the duty was breached, and (1) the defendant made a statement or representation of fact; (2) it's falsity; (3) it's materiality; (4) the hearer's ignorance of the falsity of the statement; (5) the reliance by the hearer; (6) justifiable reliance; and (7) resultant injury. *Id*. at 109, 356 P.3d at 1055. Last, in a claim for fraud by concealment, a plaintiff must plead at the very least that there was a nondisclosure, the plaintiff relied on the nondisclosure, plaintiff's reliance on

**1 SER 115**

the nondisclosure was material to the transaction, and that plaintiff was damaged because of the nondisclosure. *Watts v. Krebs*, 131 Idaho 616, 620, 962 P.2d 387, 391 (1998).

In the TAC, Plaintiff alleges the following:

> The Controlling AIA Defendants, Crop USA, and GemCap concealed from AIA that they had AIA unlawfully and improperly enter into the Guarantees, Settlement Agreements, and related agreements and instruments, together with unlawfully transferring property and making payments under those unlawful agreements and instruments.

(TAC ¶ 214).

Plaintiff's allegations, even taken together with the existing fraud allegations, fail to properly plead a claim for fraud or constructive fraud. Although conclusory accusations abound, Plaintiff has failed to plead with particularity that Defendants made any misrepresentations of fact or material nondisclosures, that anyone actually relied on those misrepresentations or nondisclosures, that such activity caused damages, or that the other elements of fraud or constructive fraud exist. *See Stack v. Lobo*, 903 F. Supp. 1361, 1367 (N.D. Cal. 1995) ("[M]ere conclusory allegations of fraud are insufficient."). Further, Plaintiff has failed to allege how Crop USA or GemCap could have concealed anything from AIA. For this reason, Plaintiff's request to add new allegations for fraud should be denied.

## D.    The New Conspiracy to Commit Fraud Allegations in Count V Do Not State a Cause of Action

A civil conspiracy that gives rise to legal remedies exists only if there is an agreement between two or more to accomplish an unlawful objective or to accomplish a lawful objective in an unlawful manner. "'Civil conspiracy is not, by itself, a claim for relief.'" *Mannos v. Moss*, 143 Idaho 927, 935, 155 P.3d 1166, 1174 (2007) (quoting *McPheters v. Maile*, 138 Idaho 391, 395, 64 P.3d 317, 324 (2003)). A conspiracy is only

actionable if some actionable wrong results from an agreed effort to achieve that wrong. *Id.* "An agreement is the foundation of a conspiracy charge and there must be some showing of specific evidence of a plan or agreement to defraud to demonstrate the pendency of the conspiracy at the time the alleged fraud occurred." *Id.* Where a plaintiff's conspiracy claims are based in fraud, the conspiracy claim must also be pled with particularity. *Taylor v. McNichols,* 149 Idaho 826, 844, 243 P.3d 642, 660 (2010).

As noted above, Plaintiff has failed to properly plead a claim for fraud against Defendants, which alone renders his conspiracy claim futile. Further, Plaintiff has failed to plead with particularity, or at all, that there was any plan or agreement to defraud the Company or Plaintiff. Plaintiff has failed to properly plead a claim for aiding and abetting and conspiracy of fraud. Count V of the TAC is therefore futile.

**E.      Count VIII Does Not State a Valid Cause of Action for "Statutory Relief"**

Finally, under a new Count VII, Plaintiff wants damages and equitable relief under I.C. §§ 30-1-304 (repealed) and 30-29-304. The statutes Plaintiff relies on merely describe who can raise the ultra-vires doctrine when challenging corporate transactions and what remedies are available if certain classes of challengers succeed. I.C. § 30-29-304(2). The statutes provide rules and remedies to guide that apply to causes of action such as derivative claims for breach of fiduciary duty or for direct suits against a company to enjoin acts. However, "when a statute is silent regarding private enforcement, courts may recognize a private right only when it is necessary to assure the effectiveness of the statute." *Brock v. Bd. of Directors, Indep. Sch. Dist. No. 1*, 134 Idaho 520, 523, 5 P.3d 981, 984 (2000). "In the absence of strong indicia of a contrary legislative intent, courts must conclude that the legislature provided precisely the remedies it considered appropriate."

*Yoakum v. Hartford Fire Ins. Co.*, 129 Idaho 171, 176, 923 P.2d 416, 421 (1996). Count VIII is futile because it alleges no private cause of action.

### IV.    ARGUMENT ON FACTORS OTHER THAN FUTILITY

If the Court determines that the Motion does not fail on the grounds of futility alone, the other factors also weigh against granting the Motion.

### A.    Bad Faith

This factor weighs against granting the Motion. The Civil Rules require "a short and plain statement of the claim" and that "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(a)(2) and 8(d)(1). "Something labeled a complaint but written more as a press release, prolix in evidentiary detail, yet without simplicity, conciseness and clarity as to whom plaintiffs are suing for what wrongs, fails to perform the essential functions of a complaint." *Flores v. EMC Mortg. Co.*, 997 F. Supp. 2d 1088, 1102 (E.D. Cal. 2014).

The TAC is anything but simple and direct—it is a "laundry list" of most of the significant transactions any of the Defendants have taken part in since the 1990s. Unlike most pleadings, which clearly separate allegations of fact from accusations of wrongdoing, many of the new allegations are extended paragraphs mixing argumentative assertions with factual allegations. (*E.g.* TAC ¶¶ 145–56, 172, 179–81.) Perhaps most egregious is TAC ¶ 164, which comprises several pages of sweeping but conclusory allegations. *Cf. McHenry v. Renne*, 84 F.3d 1172, 1177 (9th Cir. 1996) (affirming dismissal of a complaint that was "argumentative, prolix, replete with redundancy, and largely irrelevant").

Instead, the object of the TAC is not to clarify the issues but to obfuscate them. Defendants and Hawley Troxell extricated AIA from a redemption agreement between

Brief in Opposition to Plaintiff's Motion to Amend and Supplement
Complaint                                                                    Page 15 of 18

AIA and Reed Taylor in 2011. *See generally Taylor v. AIA Services Corp.*, 151 Idaho 552, 261 P.3d 829 (2011). This litigation is part of an ongoing effort against Defendants, Hawley Troxell, and other law firms on the periphery of the redemption deal through relentless litigation. Similar allegations appear in numerous other lawsuits, and this Motion is merely a continuation of the attrition strategy.[7]

Further, Plaintiff accuses the Directors of wrongfully resisting a lawsuit brought by another of Plaintiff counsel's clients, Donna Taylor, to recover redemption payments from AIA. (*See* TAC ¶ 163.). Offering this allegation is particularly inappropriate given that Plaintiff's counsel represents Donna Taylor in the suit and is a major factor driving litigation costs. Further, it is questionable whether Plaintiff's counsel can continue pursuing a lawsuit for Donna Taylor, who seeks a direct personal judgment against AIA, while also representing Plaintiff, who seeks to recover and conserve corporate resources in this derivative suit. This is especially problematic because AIA's case against Donna Taylor demonstrably has merit.[8]

**B.     Undue Delay**

Plaintiff has unduly delayed in bringing claims relating to the GemCap loan guarantees. Plaintiff filed his Second Amended Complaint in June 2016. (2nd Am. Compl., June 20, 2016 [Doc. 137].) Plaintiff should have brought claims he was aware of at that

---

[7] These other lawsuits include: *Reed Taylor v. AIA Services Corp., et al.*, Nez Perce County No. CV-07-208; *Donna Taylor v. John Taylor*, Nez Perce County No. CV-08-1150; *Donna Taylor v. AIA Services Corp., et al.*, Nez Perce County No. CV-13-1075; *Taylor v. McNichols*, 149 Idaho 826, 243 P.3d 642 (2010); *Taylor v. Riley*, 157 Idaho 323, 336 P.3d 256 (2014); *Durant v. GemCap Lending I, LLC*, Nez Perce County No. CV-14-1444.

[8] Plaintiff omits the fact that AIA has, through dispositive motion practice, successfully reduced Donna Taylor's original claim of $450,000 (plus interest) to less than a quarter of that amount. AIA has been so successful that the court vacated trial set for the summer of 2015 so Donna Taylor could appeal the rulings against her on a 54(b) certificate. Plaintiff's counsel successfully had trial vacated by arguing that going to trial would not be worth the expense if the claims were so limited.

Brief in Opposition to Plaintiff's Motion to Amend and Supplement
Complaint                                                                                    Page 16 of 18

time. *See Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990) (stating that a court can deny leave to amend where the movant failed to bring known claims in the original pleading). Now, Plaintiff offers new allegations that the Directors improperly authorized AIA Services to guarantee Crop USA's loan from GemCap Lending I, LLC ("**GemCap**") in 2011–2012. (TAC ¶¶ 135–36.) GemCap filed suit against AIA, plus others, in California in July 2013. (*Id.* ¶ 146.) Yet, Plaintiff waited years before filing the Motion. *See Garcia v. Vilsack*, 628 F. Supp. 2d 1306, 1312 (D.N.M. 2009) (holding that a Court can deny leave to amend where a plaintiff knew of the facts upon which the new claim was based at the time of filing original complaint).

### C.    Previous complaints

This factor also weighs against the amendment. Plaintiff has amended the complaint twice before, including once already this year in June. Plaintiff offers no explanation why he did not attempt to obtain board action sooner to file these new derivative claims in June of this year.

### D.    Prejudice

Last, prejudice would result if the Motion is granted. For the reasons described throughout this brief, the amendment would subject Defendants to a case of sprawling and amorphous scope, including new claims not properly presented to the AIA directors, prejudicing Defendants' ability to marshal the evidence and mount a defense. Accordingly, the Court should reject the Motion. Further, the Court should require Plaintiff to seek leave to file a new complaint without the new claims that also is within a reasonable page limit and complies with Rule 8.

## V.    CONCLUSION

The Court should resist Plaintiff's attempt to broaden and complicate this already onerous lawsuit with derivative claims never properly presented to AIA's board for investigation. Instead, the Court should require Plaintiff to file a new complaint of reasonable length that also complies with the pleading rules.

Dated November 28, 2016.

WIELAND PERDUE PLLC

_____

Steve Wieland, ISB No. 8282

**CERTIFICATE OF SERVICE**

I hereby certify that on November 28, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

| | |
|---|---|
| **Roderick Cyr Bond**<br>rod@roderickbond.com<br>*Attorney for Plaintiff Dale Miesen* | **Loren C. Ipsen**<br>lci@elamburke.com<br><br>**James D. LaRue**<br>jdl@elamburke.com |
| **Alyson Anne Foster**<br>aaf@aswblaw.com<br>*Attorney for Intervenor GemCap Lending I LLC* | **Jeffrey A. Thomson**<br>jat@elamburke.com<br><br>*Attorneys for Hawley Troxell Defendants* |

I further certify that on such date I served the foregoing on the following non-CM/ECF registered participants by email as follows:

| | |
|---|---|
| **AIA Services Corporation**<br>P.O. Box 538<br>Lewiston, ID  83501<br>jtaylor@cropusainsurance.com | **AIA Insurance, Inc.**<br>P.O. Box 538<br>Lewiston, ID  830501<br>jtaylor@cropusainsurance.com |

_____

Steve Wieland
Attorney for Defendants R. John Taylor, Michael W. Cashman Sr., James Beck, Connie Taylor Henderson, JoLee Duclos, and Crop USA Insurance Agency, Inc.

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiff

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual and the Personal representative of the Estate of Sarah Taylor; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC.; <br><br> Plaintiff, <br><br> v. <br><br> CONNIE TAYLOR HENDERSON, an individual; JOLEE DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation, <br><br> Defendants. | Civil No. 1:10-cv-00404-CWD <br><br> PLAINTIFF DALE L. MIESEN'S MOTION TO AMEND AND SUPPLEMENT COMPLAINT |

PLAINTIFF'S MOTION TO AMEND & SUPPLEMENT COMPLAINT - 1

1 SER 123

Plaintiff Dale L. Miesen respectfully move to amend and supplement his complaint pursuant to Federal Rules of Procedure 15. A memorandum of law in support of Plaintiff's motion has been filed contemporaneously with this motion.

DATED:  This 4th day of November, 2016.

RODERICK BOND LAW OFFICE, PLLC


By:   */s/ Roderick C. Bond*
        Roderick C. Bond
        Attorney for Plaintiffs

PLAINTIFF'S MOTION TO AMEND & SUPPLEMENT COMPLAINT - 2

1 SER 124

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 4th day of November, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Alyson Anne Foster    aaf@aswblaw.com, mar@aswblaw.com
James D LaRue:    jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:    jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:    lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:    sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:    swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

_____/s/ Roderick C. Bond_____
Roderick C. Bond

PLAINTIFF'S MOTION TO AMEND & SUPPLEMENT COMPLAINT - 3

RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for ~~Plaintiffs~~Plaintiff

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; ~~DONNA J. TAYLOR, an individual~~ who is a shareholder and ~~the Personal representative of the Estate of Sarah Taylor; WHO ARE SHAREHOLDERS~~who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.; | Civil No. 1:10-cv-00404-CWD <br><br> ~~SECOND~~THIRD AMENDED COMPLAINT <br><br> DEMAND FOR JURY TRIAL |
| ~~Plaintiffs~~Plaintiff, | |
| v. | |
| CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company, | |
| Defendants. | |

Formatted: Not All caps

SECOND AMENDED COMPLAINT - i

# Exhibit - B

**TABLE OF CONTENTS**

I.    STATEMENT OF JURISDICTION ........................................................ 1

II.    STATEMENT OF VENUE ..................................................................... 1

III.    PARTIES AND DEFINITIONS OF THE PARTIES ............................. 1

IV.    FACTS .................................................................................................. 5

A.    The Background Facts Regarding AIA Services and AIA Insurance .................................. 5

B.    John, Connie, Beck and Cashman Take Operational Control of AIA and AIA Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in Its Amended Articles of Incorporation .................................. 6

C.    AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer CropUSA to Themselves .................................. 9

D.    The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants in Taking CropUSA from AIA and Having AIA Fund CropUSA .................................. 13

E.    The Controlling AIA Defendants Steal $1,510,693 From AIA to Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt CropUSA Owed to AIA – thereby Resulting in a $2,144,962 Fraud Against AIA. .................................. 15

F.    The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal ......... 19

G.    The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and Financial Wherewithal with the Improper Assistance from the Hawley Troxell Defendants .................................. 21

H.    The Controlling AIA Defendants Enter Into Tolling Agreements, but Those Tolling Agreements Do Not Save the Hawley Troxell Defendants from the Unwaivable Conflicts of Interest .................................. 22

I.    The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA and Intentionally Committing Torts against AIA with the Assistance of the Hawley

SECOND AMENDED COMPLAINT - ii

# Exhibit - B

Troxell Defendants—Even While this Lawsuit Was Pending.............................27

J.      There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and
        Intentional Torts Committed by the Controlling AIA Defendants ...................................31

V.      CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742
        AND FEDERAL RULE OF CIVIL PROCEDURE 23.1 .............................................35

VI.     COUNT I—BREACH OF FIDUCIARY DUTY .............................................38

VII.    COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES .......40

VIII.   COUNT III—LEGAL MALPRACTICE .............................................41

IX.     COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/
        CONSTRUCTIVE FRAUD.............................................42

X.      COUNT V—AIDING AND ABETTING FRAUD .............................................46

XI.     COUNT VI—BREACH OF CONTRACT.............................................47

XII.    COUNT VII—DECLARATORY JUDGMENT.............................................48

XIII.   COUNT VIII—EXCESSIVE COMPENSATION/CORPORATE WASTE ...................49

XIV.    COUNT IX—ACCOUNT STATED.............................................50

XV.     JURY DEMAND.............................................51

XVI.    PRAYER FOR RELIEF.............................................51

VERIFICATION OF DALE L. MIESEN .............................................53

VERIFICATION OF DONNA J. TAYLOR.............................................54

CERTIFICATE OF SERVICE.............................................55

SECOND AMENDED COMPLAINT - iii

# Exhibit - B

Plaintiffs

I.      STATEMENT OF JURISDICTION...................................................................1

II.     STATEMENT OF VENUE ...........................................................................1

III.    PARTIES AND DEFINITIONS OF THE PARTIES............................................1

IV.     FACTS .........................................................................................................7

A.      The Background Facts Regarding AIA Services and AIA Insurance................................7

B.      John, Connie, Beck and Cashman Take Operational Control of AIA and AIA Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in Its Amended Articles of Incorporation ........................................................................8

C.      AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer CropUSA to Themselves ...........................................................................................12

D.      The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants in Taking CropUSA from AIA and Having AIA Fund CropUSA .....................................15

E.      The Controlling AIA Defendants Unlawfully Transfer $1,510,693 From AIA to Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt that CropUSA Owed to AIA—thereby Resulting in a $2,144,962 Fraud Against AIA............18

F.      The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal .........22

G.      The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and Financial Wherewithal with the Improper Assistance from the Hawley Troxell Defendants ........................................................................................................24

H.      The Controlling AIA Defendants Enter Into Tolling Agreements, but Those Tolling Agreements Do Not Save the Hawley Troxell Defendants from the Unwaivable Conflicts of Interest ......................................................................25

I.      The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA and Intentionally Committing Torts against AIA with the Assistance of the Hawley Troxell Defendants—Even While This Lawsuit Was Pending............................32

SECONDTHIRD AMENDED COMPLAINT - iv

# Exhibit - B

J.      The Controlling AIA Defendants, with GemCap Aiding and Abetting Them, Illegally Had AIA Guarantee Loans Made to CropUSA by GemCap, Concealed the Guarantees from AIA, Illegally Entered into Settlement Agreements with GemCap, Concealed the Settlement Agreements from AIA, and Unlawfully Transferred Property to GemCap Thereby Damaging AIA. ................................................... 37

K.      John Unlawfully Transfers Certain Real Property to AIA and Requires AIA to Pay the Liabilities on the Property and He Alleges that AIA Owes Him $545,563 in Accrued Salary.................................................................................................. 45

L.      John Unlawfully Amends AIA Services and AIA Insurance's Bylaws and Issues Himself Series A Preferred Shares in AIA Services.......................................... 46

M.      There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants ..................................... 47

V.      CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 .......... 56

VI.     COUNT I—BREACH OF FIDUCIARY DUTIES ................................................................ 60

VII.    COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES ....... 64

VIII.   COUNT III—LEGAL MALPRACTICE ........................................................................ 65

IX.     COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ ........................................... 66

X.      COUNT V—AIDING AND ABETTING AND CONSIPIRACY OF FRAUD ............... 71

XI.     COUNT VI—BREACH OF CONTRACT ...................................................................... 73

XII.    COUNT VII—DECLARATORY JUDGMENT .............................................................. 75

XIII.   COUNT VIII—STATUTORY RELIEF (INCLUDING FOR ULTRA VIRES) .............. 77

XIV.    COUNT IX—CORPORATE WASTE/EXCESSIVE COMPENSATION ....................... 78

XV.     COUNT X—VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT ....... 80

XVI.    COUNT XI—ACCOUNT STATED ............................................................................... 81

XVII.   JURY DEMAND ............................................................................................................ 82

SECONDTHIRD AMENDED COMPLAINT - v

# Exhibit - B

XVIII.    PRAYER FOR RELIEF.......................................................................................82

VERIFICATION OF DALE L. MIESEN ..................................................................86

CERTIFICATE OF SERVICE ..................................................................................87

~~SECOND~~THIRD AMENDED COMPLAINT - vi

# Exhibit - B

1 SER 131

Plaintiff~~Donna J. Taylor and~~ Dale L. Miesen ~~allege~~alleges cumulatively ~~and~~, or when necessary and~~/or~~ where applicable, in the alternative, as follows:

### I.     STATEMENT OF JURISDICTION

1.     This Court has jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1332(a)(1~~), as~~) because the amount in controversy exceeds $75,000 and ~~the~~this action~~, when filed, was~~ is between citizens of different states.

2.     This Court has personal jurisdiction pursuant to I.C. § 5-514 because the defendants: (a) committed torts within the state of Idaho (including conspiring to commit, covering up, and aiding in the commission of torts committed within the state of Idaho), which injured AIA in Idaho; and/or (b) transacted business within the state of Idaho and engaged in transactions within the state of Idaho in an effort to obtain a pecuniary benefit and/or enhance their investment in Idaho corporations named as defendants in this Third Amended Complaint. Examples of the specific facts supporting personal jurisdiction are set forth in certain of the paragraphs below.

### II.     STATEMENT OF VENUE

~~2.~~     Venue is proper in the District of Idaho under 28 U.S.C. § 1391(b)(2~~), as~~) and (c) because a substantial part of the acts, errors and omissions giving rise to the claims asserted in this ~~Second~~Third Amended Complaint (and the torts committed against AIA Services Corporation and AIA Insurance, Inc.) occurred in the District of Idaho~~.~~

3.     ~~Venue is also proper in the District of Idaho under 18 U.S.C. § 1391(c), as~~and certain of the defendants ~~reside in~~are citizens and residents of the District of Idaho.

### III.     PARTIES AND DEFINITIONS OF THE PARTIES

~~4.~~     Plaintiff Dale L. Miesen ("Plaintiff" or "Miesen") is a citizen and resident of Colleyville, Texas. ~~Miesen~~Plaintiff is, and has been, a common shareholder of AIA Services Corporation ("AIA Services") during all relevant times~~.~~

~~SECOND~~THIRD AMENDED COMPLAINT - 1

# Exhibit - B

5.4. Plaintiff Donna J. Taylor, as an individual and and specifically at the Personal Representativetime of the Estate of Sara Taylor (collectively "Donna"), is a resident of Clarkston, Washington. Donna has been a Series A Preferred Shareholder of AIA Services during all relevant times. Donna has transactions, acts, omissions, malfeasance, and damages at issue in this lawsuit. Plaintiff is also beenpresently a common shareholdercreditor of AIA Services during all relevant times, through her beneficial ownership as the Personal Representative of the Estate of Sara Taylor..

6. Plaintiffs Dale Miesen and Donna J. Taylor are collectively referred to as the "Plaintiffs" in this Second Amended Complaint, and they were innocent minority shareholders.

7.5. Plaintiffs arePlaintiff is bringing this derivative action as a shareholder and on behalf of AIA Services Corporation ("AIA Services").. In addition, Plaintiffs arePlaintiff is bringing this action as a double derivative action on behalf of AIA Insurance, Inc. ("AIA Insurance"), which is a wholly- owned subsidiary of AIA Services. AIA Services and AIA Insurance are collectively referred to as "AIA" in this SecondThird Amended Complaint. The definition of "AIA" includes AIA Services and/or AIA Insurance for purposes of pleading in the alternative, and includes the PlaintiffsPlaintiff to the extent they arehe is required to support any derivative cause of action set forthand/or any of the relief requested in this SecondThird Amended Complaint.

8.6. Defendant AIA Services is a citizen of Idaho because it is an Idaho corporation with, its principal place of business at 111 Main Street, is in Lewiston, Idaho, 83501. Atand its primary purported officer, John Taylor, resides in Lewiston, Idaho. During all times relevant to this lawsuittimes, AIA Services is or has been the parent corporation of AIA Insurance.

9.7. Defendant AIA Insurance is a citizen of Idaho because it is an Idaho corporation

SECONDTHIRD AMENDED COMPLAINT - 2

# Exhibit - B

with, its principal place of business at 111 Main Street, is in Lewiston, Idaho, 83501. AIA Insurance is, or was at and its primary purported officer, John Taylor, resides in Lewiston, Idaho.  During all relevant times, AIA Insurance has been a wholly-owned subsidiary of AIA Services.

8.    Plaintiff's assertions as to AIA Services' and/or AIA Insurance's board of directors and/or officers in this Third Amended Complaint is not intended to be an admission or an acknowledgement that the board of directors or officers were properly seated and elected or that the necessary quorum was present, and Plaintiff asserts that such was not the case for a number of years.

10.9.    Defendant CropUSA Insurance Agency, Inc. ("CropUSA") is a citizen of Idaho because it is an Idaho corporation with, its principal place of business at 111 Main Street, is in Lewiston, Idaho, 83501 and its primary purported officer, John Taylor, resides in Lewiston, Idaho. CropUSA was formerly known as AIA Crop Insurance, Inc.

10.    Defendant CropUSA Insurance Services, LLC ("CropUSA Insurance Services") is a citizen of Idaho because it is an Idaho limited liability company, its principal place of business is in Lewiston, Idaho, and its manager, John Taylor, is a resident of Lewiston, Idaho.

11.    CropUSA and CropUSA Insurance Services are referred to collectively and/or individually when pleading in the alternative as "CropUSA" in this Third Amended Complaint.

11.12.    Defendant R. John Taylor ("John Taylor ("John" or "John Taylor") is an individual residing in the state a citizen and resident of Lewiston, Idaho. At During all times relevant to this lawsuit, John served on the Board of Directors of AIA Services, AIA Insurance, and CropUSA and continues to serve on those boards. John also served as President of each of these corporations during all times relevant to this lawsuit. John is also licensed to practice law in the state of Idaho. John is a common shareholder of AIA Services and a common shareholder of the CropUSA.

**Formatted:** No underline

SECOND THIRD AMENDED COMPLAINT - 3

# Exhibit - B

(although Plaintiff asserts those shares were unlawfully issued to him). John also owns shares or ownership interests in other entities that have engaged in inappropriate transactions with AIA and/or which have improperly benefitted from AIA during all relevant times.

///

12.13. Defendant James Beck ("Beck") is an individual residing ina citizen and resident of the state of Minnesota. Beck served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until he resigned in 2014.. Beck was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA. (although Plaintiff maintains that his common shares in AIA Services and CropUSA were unlawfully issued).

13.14. Defendant Michael Cashman, Sr. ("Cashman") is an individual residing ina citizen and resident of the state of Minnesota. Cashman served on the Board of Directors of AIA Services during certain relevant times. Cashman was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA. (although Plaintiff maintains that his common shares in AIA Services and CropUSA were unlawfully issued).

14.15. Defendant Connie Taylor Henderson ("Connie") is a citizen and resident of Vancouver,the state of Washington. Connie served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2014. Connie jointly owns with John the common shares of AIA Services held in John's name. Connie has actively asserted community ownership of those shares and specifically did so before the district court and on appeal in *Taylor v. AIA Services Corp., et al.* .

15.16. Defendant JoLee K. Duclos ("Duclos") is a citizen and a resident of Clarkston, Washington, or, alternatively, upon information and belief, she is now a citizen and a resident of

SECONDTHIRD AMENDED COMPLAINT - 4

# Exhibit - B

the state of Idaho. Duclos has served as Secretary of AIA Services, AIA Insurance, CropUSA and other entities partially or wholly owned by John during certain relevant times. Duclos served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2007. Duclos also served as a director of CropUSA curing certain relevant times. Duclos is a common shareholder of CropUSA. (although Plaintiff maintains that those shares were unlawfully issued). Duclos has knowledge of the law by and through her training and performing the duties of a paralegal. Duclos has served as John's "lieutenant" during all relevant times.

16.17. John, Beck, Cashman, Connie and Duclos are collectively referred to herein as the "Controlling AIA Defendants." The Controlling AIA Defendants have acted in concert and assisted one another in committing various torts described in this SecondThird Amended Complaint and covering up and/or concealing those torts. The definition of "Controlling AIA Defendants" includes the acts and/or omissions of one or more of John, Beck, Connie, Cashman and/or Duclos for purposes of pleading in the alternative.

17.18. Defendant Gary D. Babbitt ("Babbitt") is an individual residing ina citizen and resident of the state of Idaho and was an attorney practicing law in the state of Idaho with and foron behalf of Hawley Troxell. Upon information and belief, Babbitt began representing AIA and CropUSA in 2007.

19. Defendant Richard A. Riley ("Riley") is a citizen and resident of the state of Idaho and is an attorney in the state of Idaho with and on behalf of Hawley Troxell. Riley represented AIA and/or CropUSA from time to time from 1995 through the present time.

18.1. Defendant D. an individual residing inJohn Ashby ("Ashby") is a citizen and resident of the state of Idaho and is an attorney in the state of Idaho with and foron behalf of Hawley Troxell. Upon information and belief,

SECONDTHIRD AMENDED COMPLAINT - 5

# Exhibit - B

19.20.  Defendant D. John Ashby ("Ashby") is an individual residing in the state of Idaho and is an attorney in the state of Idaho withbegan representing AIA and for Hawley TroxellCropUSA in 2007.

20.21.  Defendant Hawley Troxell Ennis & Hawley LLP ("Hawley Troxell") is a citizen of the state of Idaho because it is an Idaho limited liability partnership in the business of practicing law, with its principal place of business in Boise, Idaho., and its principal officers or managers reside in the state of Idaho. Hawley Troxell has no office in the state of Washington. None of the individual partners of Hawley Troxell are residents of Washington. Hawley Troxell, though its attorneys, acted as counsel for AIA Services, AIA Insurance and CropUSA during certain relevant times and in certain lawsuits. Hawley Troxell is also named herein as it is vicariously liable for the acts and/or omissions of Babbitt, Riley, Ashby and its other attorneys.

21.22.  Babbitt, Ashby, Riley, other Hawley Troxell attorneys, and Hawley Troxell are collectively referred to as the "Hawley Troxell Defendants" in this SecondThird Amended Complaint. The definition of "Hawley Troxell Defendants" includes the acts and/or omissions of one or more of Babbitt, Ashby, Riley, other attorneys at Hawley Troxell and/or Hawley Troxell for purposes of pleading in the alternative. The Hawley Troxell Defendants conducted business from their office in Boise, Idaho.

23.  Defendant GemCap Lending I, LLC ("GemCap") is a Delaware limited liability company and it conducts business throughout the United States, including in Nez Perce County, Idaho with CropUSA and CropUSA Insurance Services, respectively, both of which have principal places of business in Lewiston, Idaho. GemCap is a citizen of California because its principal place of business is in Malibu, California and its primary officers, Richard Ellis and David Ellis, are residents of the state of California. However, AIA conducts no business in California.

SECONDTHIRD AMENDED COMPLAINT - 6

# Exhibit - B

Donna J. ///

24.     Taylor ("Donna Taylor"), a non-party to this lawsuit, is and has been the sole Series A Preferred Shareholder of AIA Services during all relevant times, and she never authorized any of the transactions at issue in this lawsuit from 1995 through the present time. While John alleges to have "purchased" 7,500 Series A Preferred Shares in 2016, Plaintiff maintains that the purchase was unauthorized and improper, and that Donna Taylor remains the sole Series A Preferred Shareholder of AIA Services.

### IV.   FACTS

**A.  The Background Facts Regarding AIA Services and AIA Insurance**

22.25.  In 1983, AIA Services was formed as a closely-held Idaho corporation for the purpose of acting as a holding company for various other wholly-owned subsidiaries. AIA's business model was to work with farmers and growers to form trusts and/or related cooperatives through various growers and farmers' associations and sell insurance products to the members of those associatesassociations also becoming members of the trusts and/or cooperatives.

23.26.  AIA created the Grain Growers Membership & Insurance Trust, the National Contract Poultry Grower's Membership & Insurance Trust, and other, similar trusts. By way of its relationships with these various organizations, AIA held contracts for the exclusive right to market health insurance (*e.g.*, Group Universal Health Policies) and other insurance products to the members of the various trusts and associations.

24.27.  In 1987, Donna Taylor and Reed Taylor, a non-partyparties to this suitlawsuit, were issued Series A Preferred Shares in AIA Services in connection with their divorce. Pursuant to the dissolution of their marriage, Donna Taylor was issued the 200,000 shares of Series A Preferred shares on or about February 12, 1988, and has held those shares ever since, less those shares which have been redeemed in part over the years. (*See* Dkt. #67-1 and #67-2.)

SECONDTHIRD AMENDED COMPLAINT - 7

# Exhibit - B

25.28.  In connection with the issuance of the Series A Preferred Shares to Donna Taylor, AIA Services' shareholders adopted amendments to its articles of incorporation with restrictions on the manner in which AIA Services and its subsidiaries could conduct business. (*See* Dkt. #67-3.) AIA Services' amended articles of incorporation included, without limitation, the restrictions that: (a) barred AIA Services and AIA Insurance from guaranteeing any loans for any individual or entities which were not wholly- owned subsidiaries; (b) barred certain transactions with shareholders and affiliates; and (c) required AIA Services to comply with certain financial covenants. (*Id.*)(*Id.*)  These amendments were expressly adopted to protect AIA from precisely the type of acts, omissions, guarantees, loans and transactions at issue in this lawsuit.

26.29.  In addition, AIA Services' amended articles of incorporation also provided Donna Taylor with the unqualified right, as the Series A Preferred Shareholder, to appoint a person, to be determined in her sole discretion, to the Board of Directors of AIA Services. (*See* Dkt. #67-3.)

27.30.  The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the restrictions under AIA Services' amended articles of incorporation for the benefit of AIA Services and the Series A Preferred Sharesand bylaws.

28.31.  Donna'sDonna Taylor's Series A Preferred Shares have not been fully redeemed to this day, and the restrictions under AIA Services' amended articles of incorporation remain in full force and effect to this day and fully applicable. (*See* Dkt. #67-42, pp. 10-11 ¶ 19.)

**B. John, Connie, Beck and Cashman Take Operational Control of AIA and AIA Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in Its Amended Articles of Incorporation**

29.32.  In 1995, the Controlling AIA Defendants, other than Duclos (although she did assist the Controlling AIA Defendants as an employee and officer (assistant secretary) of AIA), spearheaded a transaction to redeem Reed Taylor's majority common stock interest in AIA

SECONDTHIRD AMENDED COMPLAINT - 8

Services. (*See* Dkt. 67-5 and #67-6.)

~~30.~~33.  As part of the redemption, Beck~~,~~ and Cashman ~~and certain of their friends~~ acquired Series C Preferred Shares in AIA Services, through an Investment Agreement, which was entered into with AIA Services and transmitted to AIA Services in Idaho and involved the transaction to redeem Reed Taylor's common shares in Idaho. When AIA Services amended its articles of incorporation to allow the issuance of the Series C Preferred Shares, AIA Services included additional restrictions in its articles of incorporation. Riley assisted in drafting and/or approving these restrictions and he was fully aware of them.

34.    Under the new and additional restrictions in AIA Services' amended articles of incorporation (these restrictions were in addition to others adopted in connection with the issuance of ~~Donna's~~Donna Taylor's Series A Preferred Shares), AIA Services was barred from engaging in a number of corporate actions, including, but not limited to: (a) AIA Services could not acquire any common shares from any shareholders unless all dividends due on the Series C Preferred Shares ~~has~~had been paid (10% dividend per year) or those funds were set aside; (b) the Series C Preferred Shareholders had the right to elect one director to AIA Services' Board of Directors; and (c) if any Series C Preferred Shares ~~are~~were redeemed, such redemptions must be equally from all shareholders. (*See* Dkt. #67-3.)

~~31.~~

**Formatted:** No bullets or numbering

~~32.~~35.  Although the Series C Preferred Shares held by Beck, Cashman and their friends were eventually unlawfully and effectively redeemed by AIA, other Series C Preferred Shares were later issued to the AIA Services 401(k) Plan and those shares remain issued and outstanding to this day and no dividends have been paid as required since approximately 1997. As a result, these new restrictions under AIA Services amended articles of incorporation were in place for the

~~SECOND~~THIRD AMENDED COMPLAINT - 9

# Exhibit - B

benefit of AIA Services and the Series C Preferred Shares, which have remained in full force and effect to this day.  The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the additional restrictions under AIA Services' amended articles of incorporation.

33.36.  Upon the redemption of Reed Taylor's majority common shares, Beck, Cashman, John and Connie directly or indirectly became the majority common shareholders of AIA Services. (*See* Dkt. #67-5.) In addition, Beck, Cashman and John entered into a Voting Agreement to ensure that they would maintain control of AIA Services' Board of Directors., which was signed by Beck and Cashman and transmitted by them to Idaho. As a result, the Controlling AIA Defendants have maintained operational control of AIA from 1995 through the present time. Beck and Cashman attended certain board and shareholder meetings for AIA Services in person in Idaho and via telephone from Minnesota for meetings held in Idaho.

34.37.  In connection with the redemption of Reed Taylor's shares, John entered into an Executive Officer's Agreement with AIA Services, which guaranteed him certain salary payments and other compensation for three years; that agreement also contained non-compete and non-solicitation provisions. (*See* Dkt. #67-8.) John's salary after the first three years was required to be determined by AIA Services' Board of Directors, which was never done after the first three years.

35.38.  From 1999-2012, John improperly paid himself millions of dollars pursuant to his Executive Officer's Agreement for his and Connie's benefit (the amount of which in itself was improper based on AIA's business prospects and John's inability to do anything for the benefit of AIA), while he intentionally and repeatedly violated the non-compete and non-solicitation provisions of his Executive Officer's Agreement.

36.39.  In connection with the redemption of Reed Taylor's shares in August 1995, AIA Services contributed funds to The Universe Life Insurance Company, which was a wholly--owned

SECONDTHIRD AMENDED COMPLAINT - 10

# Exhibit - B

subsidiary of AIA Services, in order to make AIA Insurance, which was then a wholly-owned subsidiary of The Universe Life Insurance Company, a subsidiary of AIA Services. After that transaction, AIA Insurance became a wholly-owned subsidiary of AIA Services.

40. As a result, from August 1995 through all relevant times, AIA Insurance was a wholly-owned subsidiary through which AIA Services derived its commissions and administrative fees from insurance policies, which accounted for the bulk of AIA's revenues and profits.

41. From 1995 through 2005, AIA Insurance generated over $65 million in revenues from commissions (over $33 million) and administrative fees (over $27 million), and it continued to generate revenues thereafter.

42. From 1995 through all relevant times, each of the Controlling AIA Defendants has served at various times on the Board of Directors for AIA Services, AIA Insurance and/or CropUSA, while John has continuously served as the President of AIA and Duclos has continuously served as the Secretary of AIA.

43. From 1999 through certain relevant times, the Controlling AIA Defendants have also served from time to time on purported "advisory board" of CropUSA, which actually made the decisions on behalf of AIA and CropUSA. Specifically, Cashman, Beck and John served on the "advisory board" of CropUSA from 1999 through certain relevant times. Certain of the so-called "advisory board" meetings were conducted via telephone originating in Idaho and in person in Idaho.

44. The Controlling AIA Defendants intentionally concealed from AIA and AIA Services' minority shareholders of the existence and authority of the "advisory board" of CropUSA.

THIRD AMENDED COMPLAINT - 11

# Exhibit - B

**C.  AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer CropUSA to Themselves**

~~42.~~45. By 1998, AIA's ability to sell health insurance had been impaired by undercapitalization in its underwriting subsidiary ~~the Universal~~, The Universe Life Insurance Company. Accordingly, the company considered proposals to sell other forms of insurance, and in particular crop insurance, to be underwritten by other insurance companies. At a 1998 Board of Directors ~~of Meeting~~meeting, AIA Services' Board of Directors specifically discussed selling crop insurance and elected to have AIA pursue selling crop insurance.

~~43.~~46. In 1999, AIA, then under the control of the Controlling AIA Defendants, began selling crop insurance through a wholly-owned subsidiary of AIA Services formed under the name "AIA Crop Insurance, Inc."

~~44.~~47. The first purported meeting of shareholders of AIA Crop Insurance, Inc. ("AIA Crop Insurance") was held on January 11, 2000. The first purported meeting of the AIA Crop Insurance's Board of Directors was held on the same day. The purported minutes of the shareholder's meeting indicate that John, not the true owner AIA Services, claimed to be the sole shareholder of AIA Crop Insurance at the time of incorporation; these facts were concealed from AIA and AIA Services' innocent minority shareholders.

~~45.~~48. Upon information and belief, at or shortly after the time of its formation, the Hawley Troxell Defendants began providing legal services to AIA Crop Insurance.

~~46.~~49. At a special meeting of the shareholders of AIA Crop Insurance held on November 13, 2000, AIA Crop Insurance was renamed CropUSA in an apparent attempt to conceal its corporate lineage and origins.

~~47.~~50. The minutes of the November 13, 2000 special meeting of the shareholders also

~~SECOND~~THIRD AMENDED COMPLAINT - 12

**Exhibit - B**

show that John continued to claim that he was the sole shareholder of CropUSA, while he was simultaneously representing in business plans provided to others that CropUSA was a subsidiary of AIA Insurance. (*See* Dkt. # 67-66.)

48.51.  At the time CropUSA was formed, John was employed by AIA Services under an Executive Officer's Agreement, dated August 1, 1995, Dkt. #67-8, which contained express covenants not to compete. Upon information and belief, John's Executive Officer's Agreement and AIA Service's amended articles of incorporation and restated bylaws were drafted and/or approved by Riley, and he had full knowledge of the restrictions under the terms of the foregoing documents.

49.52.  CropUSA held its purported annual shareholder's meeting on January 10, 2001. By this time, the illegal "spin off" of CropUSA had been accomplished by having AIA Service'sServices' Series C Preferred Shareholders (primarily Beck and Cashman) exchange their Series C Preferred Shares for common shares in CropUSA (if CropUSA were in fact an independent entity, these maneuvers would have been completely unnecessary).

50.53.  The minutes for the shareholder meeting held on January 10, 2001 for CropUSA revealed that CropUSA had retained Hawley Troxell as its advisor and SEC counsel and, upon information and belief, the Hawley Troxell Defendants have served continuously as CropUSA's attorneys in one form or the other ever since. According to the minutes, negotiations between AIA Services and CropUSA had resulted in an agreement whereby AIA Services would no longer operate CropUSA as a subsidiary.

51.54.  However, the negotiations referred to in the January 10, 2001 shareholder meeting minutes for CropUSA did not in fact occur. There was no decision, nor has there ever been a decision, on the part of AIA Services to discontinue the subsidiary status of CropUSA. The January

SECONDTHIRD AMENDED COMPLAINT - 13

# Exhibit - B

10, 2001 meeting minutes for CropUSA were concealed from AIA.

52.55.  None of the preferred or common shareholders of AIA Services (other than those present at the January 10, 2001 meeting) were given notice of or the opportunity to approve or oppose this corporate action; instead, it was concealed from them and AIA.

53.56.  In spite of the fact that John asserted on January 10, 2001 that CropUSA would no longer be a subsidiary of AIA Services, John wrote in a letter dated February 27, 2001, sent on behalf of AIA to Donna Taylor, that "AIA is developing a new crop insurance program through a new company called CropUSA." (The letter went on to state that "[t]he costs of putting the CropUSA program together have been paid. AIA now needs to launch five new territories next Month")." This JanuaryFebruary 27, 2001 letter constituted an unambiguous representation by John to AIA (and Donna Taylor) that CropUSA was a subsidiary of AIA and was being operated for the benefit of AIA and implicitly also for AIA Services' innocent minority shareholders (which included Donna Taylor). This representation to AIA and Donna was false, and John knew it was false. Upon information and belief, the other Controlling AIA Defendants were aware of this JanuaryFebruary 27, 2001 letter and the misrepresentations contained within the letter.

54.57.  Notwithstanding the fact that John was obligated under the terms of his Executive Officer's Agreement that required that he not compete with AIA Services, and notwithstanding the fact that he owed fiduciary duties to the AIA and AIA Services' shareholders, John set forth his plans to exploit the assets of AIA for the benefit of CropUSA (and himself as the majority purported shareholder) in the purported minutes of the purported January 10, 2001 meeting.

55.58.  The January 10, 2001 meeting minutes reveal that CropUSA authorized its officers to execute a Master Marketing Agreement with AIA Insurance that would allow CropUSA access to all of AIA's customers and customer lists, as well as all of AIA's trade secrets. AIA received

SECONDTHIRD AMENDED COMPLAINT - 14

# Exhibit - B

no consideration for conveying this access or to enter into these agreements.

56.59. CropUSA's officers (including John) were also purportedly authorized to enter into a Management Agreement with AIA Insurance wherein AIA Insurance purportedly agreed to provide management and administrative support to CropUSA without charge. However, John has since testified under oath that AIA's Board of Directors never authorized this agreement, although the Board has acquiesced in the action.

57.60. AIA itself was never given notice of the Master Marketing Agreement and the Management Agreement, nor was AIA given the opportunity to approve or reject these agreements or any subsequent ones. Each of these agreements, when executed, constituted a violation of John's Executive Officer's Agreement, which contains a strict non-compete clause. Each of these agreements also constituted a direct breach of fiduciary duty or the aiding and abetting on behalf of each of the Controlling AIA Defendants in the commission of torts against AIA.

58.61. Meanwhile, in 2001, John and Connie acquired a parking lot for $8,000 using AIA's line-of-credit. Upon information and belief, AIA was required to maintain control of the parking lot as part of its lease with Washington Bank Properties. John then increased the rent that AIA paid to use the parking lot to benefit him and Connie. For example, although John and Connie paid only $8,000 for the parking lot, they subsequently charged AIA $60,750 in rent to use the parking lot from 2004 through 2006. These unfair and self-serving rental payments to John and Connie were concealed from AIA and AIA Services' innocent minority shareholders and were never disclosed to either of them, as was John and Connie's purchase of the parking lot.

**D. The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants in Taking CropUSA from AIA and Having AIA Fund CropUSA**

59.62. Upon information and belief, certain of the Hawley Troxell Defendants were providing legal services to CropUSA and/or its board of directors as of January 10, 2001, and

SECONDTHIRD AMENDED COMPLAINT - 15

# Exhibit - B

such providing of legal services has continued through certain relevant times.

60.63. Upon information and belief, from January 10, 2001, and continuing through the period relevant to this lawsuit, the Hawley Troxell Defendants had knowledge of John's Executive Officer's Agreement with AIA Services, had knowledge of the conflict of interest provisions in AIA's bylaws, and had knowledge of restrictions in AIA's amended articles of incorporation, but intentionally refused to comply with them and assisted John in violating them or covering up the violations.

61.64. The Hawley Troxell Defendants knew or should have known that the purported Master Marketing Agreement and Management Agreement constituted breaches of John's Executive Officer's Agreement, violations of AIA Service' amended articles of incorporation, violations of AIA Services' restated bylaws, and constituted breaches of John and the other Controlling AIA Defendants' fiduciary duties owed to AIA and AIA Services' minority shareholders.

62.65. Upon information and belief, the Hawley Troxell Defendants were also representing CropUSA from January 10, 2001, through certain relevant times, and by way of that representation they breached their fiduciary duties to AIA (including their undivided duty of loyalty owed to AIA) and took steps that materially assisted John and the Controlling AIA Defendants in the commission of the various torts described in this SecondThird Amended Complaint and assisted in the concealment of those torts.

63.66. Beginning in 1999 and continuing through the through the time CropUSA ceased operating, CropUSA was funded and operated with assets improperly transferred from AIA, including, but not limited to, operating capital, office space, customer lists and other trade secrets, agents and staff, goodwill and other assistance. CropUSA paid nothing for these assets.

SECONDTHIRD AMENDED COMPLAINT - 16

# Exhibit - B

64.67.  The Controlling AIA Defendants, except Duclos, were all shareholders of AIA at the time CropUSA was formed and later purportedly became shareholders of CropUSA.

65.68.  The Controlling AIA Defendants, except Duclos (although she improperly took part in the meetings and acted as the Secretary) and Connie, all served on a purported "advisory board" of CropUSA and/or AIA, and this advisory board exercised actual control over CropUSA and AIA. By exercising control over these entities and committing acts that benefitted CropUSA at the expense of AIA, the Controlling AIA Defendants engaged in a conspiracy to defraud AIA, which should have had the right and title to the property of CropUSA.

66.    Due to the fact that the Controlling AIA Defendants have complete control over AIA and would never assert claims against themselves on behalf of AIA, the adverse dominion doctrine applies to all claims asserted herein, thereby barring any defense based on a statute of limitations. *Freeland v. Enosis Corp.*, 540 F.3d 721 (7th Cir. 2008).

67.69.  On January 10, 2002, CropUSA purportedly entered into a Memorandum of Understanding with the Controlling AIA Defendants. Under the terms of this memorandum, Beck and Cashman were obligated to guarantee loans on behalf of CropUSA. Beck and Cashman guaranteed loans for CropUSA, an Idaho corporation, in Idaho and sent their financial information to Idaho for the guarantees.

68.70.  Notably, Beck and Cashman had also been obligated to guarantee over $1,000,000 in loans on behalf of AIA since 1995, but they never did. Notwithstanding this obligation, the Controlling AIA Defendants subsequently arranged for AIA to guarantee CropUSA's lines of credit, even though the guarantees were barred by AIA's amended articles of incorporation and bylaws.

SECONDTHIRD AMENDED COMPLAINT - 17

# Exhibit - B

1 SER 148

69.71.  In 2004, the Controlling AIA Defendants attempted to raise capital for CropUSA by selling shares in CropUSA to private investors by way of a $10,000,000 private placement. The Hawley Troxell Defendants drafted the July 15, 2004 Private Placement Memorandum, despite their knowledge of the illegal "spin-off" of CropUSA and the fiduciary duties they owed to AIA.

70.72.  When CropUSA began distributing the Private Placement Memorandum in 2004, the company was experiencing financial difficulties that made it difficult, if not impossible, to attract investors to purchase shares pursuant to the private placement.

71.73.  In addition, in 2004, the CropUSA's lack of adequate funding threatened its ability to participate in the Federal Crop Insurance program.sell crop insurance. To alleviate these problems, the Controlling AIA Defendants would improperly turnturned to AIA to obtain the necessary funding.

**E.  The Controlling AIA Defendants StealUnlawfully Transfer $1,510,693 From AIA to Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt that CropUSA Owed to AIA— therebyThereby Resulting in a $2,144,962 Fraud Against AIA.**

72.  In order to boost CropUSA's balance sheet for the purpose of operating the company, attracting investors and maintaining access to the Federal Crop Insurance program, the Controlling AIA Defendants devised a scheme to illegally transfer $1,510,693 from AIA Insurance to CropUSA.

73.  The Controlling AIA Defendants conspired with each other in the formation and execution of this scheme to unlawfully transfer $1,510,693 of AIA's funds to CropUSA, and aided and abetted one another in carrying out the scheme and ultimately covering it up.

74.  Upon information and belief, the Hawley Troxell Defendants provided counsel to CropUSA with respect to the unlawful transfer of funds and/or has, at a minimum, assisted in covering up the facts of this illegal transfer.

SECONDTHIRD AMENDED COMPLAINT - 18

# Exhibit - B

75.    The scheme involved money derived from AIA Insurance. In August 2004, AIA Insurance received a payment of $1,510,693 from Trustmark. (*See* Dkt. #67-59.) Rather than deposit the payment of $1,510,693 into the account of AIA Insurance, where it would have benefited AIA and its innocent shareholders, John deposited the funds into a new account entitled "AIA Insurance Inc. CropUSA." (*See* Dkt. #67-60.) The address for this account coincided with the address for John's personal residence at 2020 Broadview Drive in Lewiston, Idaho, rather than any address used by AIA. (*Id.*)

76.    Shortly after diverting the $1,510,693 into the "AIA Insurance Inc. CropUSA" account, the Controlling AIA Defendants illegally transferred the funds to CropUSA. The Controlling AIA Defendants attempted to disguise this conversion of AIA Insurance's funds by characterizing the transaction as an alleged purchase by AIA Insurance of Series C Preferred Shares in its parent corporation, AIA Services. (*See* Dkt. #67-59.) Then, the Controlling AIA Defendants carried AIA Insurance's alleged investment in the Series C Preferred Shares as having a purported value of $1,510,693 when that was not the true value of the shares.

77.    However, as the Controlling AIA Defendants acknowledged at the time, there was no market for the Series C Preferred Shares which were purportedly being repurchased. At the time the $1,510,693 in funds were converted by CropUSA, there was no authorization of any kind for the transaction, and the transaction was concealed from AIA.

78.    In order to create a plausible explanation for the transfer of the $1,510,693, CropUSA eventually produced a document designated as a Consent in Lieu of Meeting dated August 26, 2004. (*See* Dkt. #67-61.) However, this document itself is completely fraudulent, as it was retroactively created the following year in order to deceive auditors who questioned the validity of this transaction.

~~SECOND~~THIRD AMENDED COMPLAINT - 19

# Exhibit - B

79.    In addition, this $1,510,693 purported repurchase of shares separately violated the terms of AIA Services' amended articles of incorporation, which required that all Series C Preferred Shares be redeemed equally and simultaneously from all shareholders. (*See* Dkt. #67-3.) Instead of repurchasing an equal portion of the Series C Preferred Shares from AIA Services' 401(k) Plan, the Controlling AIA Defendants intentionally only repurchased the Series C Preferred Shares held by CropUSA (which had been previously held by Beck, Cashman and their friends).

80.    CropUSA was carrying these Series C Preferred Shares in AIA Services on its books with a value of $21,693, which means that CropUSA realized a gain of $1,489,000 on this purported sale of shares. (*See* Dkt. #67-59.) At that time, although the Controlling AIA Defendants had not properly accounted for all funds, assets, labor and other costs advanced from AIA for CropUSA, they had actually accounted for there being a debt of $634,269 owed by CropUSA to AIA.

81.    After unlawfully transferring the $1,510,693 received by AIA Insurance to CropUSA, the Controlling AIA Shareholders had CropUSA repay the $634,269 debt owed to AIA, thereby committing a double fraud upon AIA, i.e., AIA should have the $1,510,693 in its bank account now and it should have never lent the $634,269 to CropUSA in the first place. In other words, those fraudulent transactions alone resulted in the loss of $2,144,962 in funds to AIA and thus damaged AIA in the amount of $2,144,962. The Controlling AIA Defendants have actively concealed, or covered up, these transactions from AIA with the assistance of the Hawley Troxell Defendants.

82.    AIA and the innocent shareholders of AIA Services were never given notice of the 2004 stock transaction, nor were any proper board or shareholder meetings held to approve the transaction. However, as with the fraudulent document prepared on behalf of CropUSA, a

SECONDTHIRD AMENDED COMPLAINT - 20

# Exhibit - B

fraudulent Consent ~~if~~in Lieu of Meeting, dated August 26, 2004, was prepared on behalf of AIA. This document was actually produced several months after the transaction and was created to deceive auditors.

83.    Upon information and believe, the Hawley Troxell Defendants provided legal services to both AIA and CropUSA at the time of the 2004 transaction or had ~~actually~~actual knowledge of the 2004 transaction.

84.    The Hawley Troxell Defendants at various times, as purported counsel for AIA, failed to disclose to AIA the 2004 transaction to transfer $1,510,693 to CropUSA and that the acts of the Controlling AIA Defendants constituted an intentional breach of their fiduciary duties (including the duty of loyalty) owed to AIA and a concealment of a prohibited transaction. For this reason alone, the Hawley Troxell Defendants could not reasonably rely on a tolling agreement to represent AIA, CropUSA and the interest of the Controlling AIA Defendants in later litigation.

85.    The Hawley Troxell Defendants failed to disclose to AIA, or to anyone else, that this $1,510,693 transaction was unlawful on many levels, including but not limited to the fact that it did not comply with the articles of incorporation and bylaws, caused a breach of AIA's other contracts, and could not be justified by the balance sheet of either AIA Insurance or CropUSA. Upon information and belief, the Hawley Troxell Defendants had knowledge of the back-dated Consent in Lieu of Meeting documents.

86.    On February 16, 2005, Beck sent an email to John and Cashman confirming the Controlling AIA Defendants' scheme to ~~steal~~misappropriate CropUSA in an effort to profit at the expense of AIA: "[Cashman] and I are so convinced that CropUSA is a winner that anything standing in the way of a good result will be a crime." (Dkt. #67-54.) The crime was stealing CropUSA from AIA and then to drain AIA of its funds and assets to pursue the Controlling AIA

~~SECOND~~THIRD AMENDED COMPLAINT - 21

# Exhibit - B

Defendants' scheme. This was not the only email exchanged between the Controlling AIA Defendants, as they emailed one another on numerous occasions, including emails directed to recipients in Idaho.

**F. The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal**

87.     After unlawfully taking $2,144,962 from AIA Insurance in 2004, the Controlling AIA Defendants continued to operate CropUSA with assets both tangible and intangible that rightfully belonged to AIA, continued to improperly subsidize CropUSA with AIA's assets and labor, and continued to conceal their actions from AIA and AIA Services' innocent minority shareholders.

88.     Under the management and direction of the Controlling AIA Defendants, AIA regularly failed to allocate costs to CropUSA and other entities and failed to charge markup, interest or profit on costs paid for other entities. For example, John's own salary of $250,000 was allocated entirely to AIA Services even though John's contractual right to a salary from AIA Services had expired in 1998 and had never been renewed by an authorized board. (And, further, John performed no actual work for AIA during the time in question.)

89.     John, with the knowledge and complicity of the other Controlling AIA Defendants, also performed work for other entities owned in full or in part by him while on AIA's payroll, i.e., CropUSA, Pacific Empire Radio Corp., Pacific Empire Communications Corp., Pacific Empire Holdings Corp., Radio Leasing I LLC and Radio Leasing II LLC. John also had other AIA employees work for these entities without compensation to AIA. These facts, like virtually all of the others referenced in this SecondThird Amended Complaint, were concealed from AIA and AIA Services' innocent minority shareholders.

90.     Between its founding in 1999 and the filing of this lawsuit, CropUSA and other

SECONDTHIRD AMENDED COMPLAINT - 22

# Exhibit - B

entities generated tens of millions of dollars of revenue (including premiums) and other benefits that would have flowed to AIA but for the unlawful and unauthorized acts of the Controlling AIA Defendants.

91.    As of 2006, John owed AIA at least $307,000 for personal loans he had taken from AIA Services. For several years, John concealed these loans by engaging in false accounting whereby loans to him were treated as payments of principal on AIA ~~Service'~~Services' indebtedness due to Reed Taylor on his $6 million promissory note (which was later ruled to be illegal).  In 2006, John "corrected" the alleged accounting "error" by increasing the balance due on Reed Taylor's note to $6 million and reinstating John's $307,000 debt. John had still not repaid this personal loan.

92.    Over the years, John had AIA pay his personal maid, his personal credit card bills, donations, cash advances, family cell phone bills, and other personal expenses. John also had AIA purchase several vehicles from him, and he continued to drive these vehicles after the sales and purchase of other vehicles with AIA's funds to use for his benefit when there was no reason to do so. John also had AIA employees perform work on his personal residence and on other real property not owned by AIA. These acts were all committed with the knowledge and complicity of the Controlling AIA Defendants and without paying AIA the fair value of the services or expenses.

93.    At year-end 2006, AIA had improperly lent $95,000 to Pacific Empire Radio Corp., a corporation partially owned by John and Connie and in which they both served as directors at certain times. The Controlling AIA Defendants transferred that $95,000 receivable from AIA to CropUSA. By the end of 2012, AIA would lend over $1,400,000 in additional funds to Pacific Empire Radio Corp., when all such loans violated AIA Services' amended articles of

~~SECOND~~THIRD AMENDED COMPLAINT - 23

# Exhibit - B

incorporation and were not authorized under the circumstances by AIA Services' restated bylaws.

94.    In August 2007, AIA settled litigation with the state of Idaho whereby AIA received a mortgage worth approximately $1.5 million for the ~~amounts~~amount owed by Washington Bank Properties on the real property where ~~AIA's offices are~~AIA Services' headquarters was located.[1] Although AIA Insurance paid the costs of this litigation, the Controlling AIA Defendants, with the assistance of the Hawley Troxell Defendants, improperly titled the note in the name of AIA Services only, and then pledged the note to CropUSA so that the Controlling AIA Defendants could borrow money to pay their attorneys' fees and costs incurred defending in *Taylor v. AIA Services ~~Corp., et al.~~* to the Hawley Troxell Defendants.

> **Formatted:** Font: Italic

95.    As with the 2004 transactions, the transaction pledging the mortgage owned by AIA Services to CropUSA for purportedly paying the Hawley Troxell Defendants' attorneys' fees and costs incurred representing AIA, CropUSA and the Controlling AIA Defendants was a blatant misappropriation and/or illegal pledging of AIA's ~~asset~~assets. The loan documents and the pledge agreement were drafted by the Hawley Troxell Defendants, although they later asserted that they were only "scriveners" for the transaction. This transaction was improper and barred by AIA's amended articles of incorporation and bylaws.

### G.  The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and Financial Wherewithal with the Improper Assistance from the Hawley Troxell Defendants

96.    On October 26, 2007, the Hawley Troxell Defendants drafted and delivered an opinion letter falsely representing that AIA Insurance was authorized to guarantee a $15,000,000

---

[1] AIA Services' headquarters was previously owned by its wholly-owned subsidiary the Universe Life Insurance Company, which had sold the building through a lease-back with an option to purchase in the 1990s. After the state of Idaho later took control of Universe Life through a receivership when the capital requirements were changed, the state of Idaho became the owner of the mortgage. Later, AIA was involved in litigation with the state of Idaho over its receivership over Universe Life. The litigation was settled and the state of Idaho transferred the mortgage back to AIA as the consideration for the settlement. AIA ultimately foreclosed on the mortgage thereby obtaining ownership of its headquarters, which was later unlawfully transferred to GemCap, as discussed below.

~~SECOND~~THIRD AMENDED COMPLAINT - 24

# Exhibit - B

line-of-credit on behalf of CropUSA, which carried a hard-money loan with an exorbitant interest rate.

97.     The Hawley Troxell Defendants' opinion letter was delivered for a loan guarantee which violated AIA Services' amended articles of incorporation, its restated bylaws and AIA Insurance's bylaws, and in violation of the duty of loyalty owed by the Hawley Troxell Defendants to AIA.

98.     ~~Additionally,~~ Lancelot, the lender for this $15,000,000 line-of-credit was subsequently exposed as a Ponzi scheme, and its founder, Gregory Bell, pleaded guilty to criminal charges in federal court. Mr. Bell was the signee for Lancelot on the $15,000,000 line-of-credit. These facts pertaining to the $15,000,000 loan for CropUSA and AIA Insurance's guarantee of that loan, along with other transactions, were never disclosed to AIA by the Hawley Troxell Defendants or the Controlling AIA Defendants and the payment of interest on that loan was detrimental to AIA because most of CropUSA's assets could be traced directly to AIA (and the depletion of CropUSA's funds resulted in less funds available to recover).

**H. The Controlling AIA Defendants Enter Into Tolling Agreements, but Those Tolling Agreements Do Not Save the Hawley Troxell Defendants from the Unwaivable Conflicts of Interest**

99.     In 2007, Reed Taylor filed suit against AIA and certain of the Controlling AIA Defendants, asserting claims for breaches of contract, breaches of fiduciary duties, conversion, fraud and other claims ("*Taylor v. AIA Services ~~Corp., et al.~~*"~~).~~"). In 2007, the Hawley Troxell Defendants appeared as counsel for AIA Services and AIA Insurance in that lawsuit. Later, Reed Taylor amended his complaint and named CropUSA as a defendant, after recognizing that millions of dollars had been transferred to it from AIA, among other improper transactions (including some

~~SECOND~~THIRD AMENDED COMPLAINT - 25

**Exhibit - B**

of those transactions described in this Second̶Third Amended Complaint). (*See* Dkt. #̶82-2.) The Hawley Troxell Defendants also appeared and represented CropUSA in that lawsuit. (*Id.*) Although Riley did not formally appear as counsel in *Taylor v. AIA Services*, Riley took an active interest in *Taylor v. AIA Services* and consulted with Babbitt, Ashby and/or other attorneys at Hawley Troxell relative to that case. The scope of representation of the Hawley Troxell Defendants in *Taylor v. AIA Services* could not have included representing the interest of CropUSA or the Controlling AIA Defendants.

100.    As the purported attorneys for AIA, two entities, the Hawley Troxell Defendants owed duties of loyalty, care, and good faith to AIA and the Hawley Troxell Defendants breached their duties of care and fiduciary duties by engaging in the simultaneous representation of the Controlling AIA Defendants, AIA, CropUSA, and other parties (including Bryan Freeman) with interests adverse to the interests of AIA.

101.    The Controlling AIA Defendants, and any other former AIA directors or officers, had conflicts of interest that prevented any of them from waiving the conflicts of interest involved in the Hawley Troxell Defendants' joint representation of AIA Services, AIA Insurance and CropUSA. In addition, the Controlling AIA Defendants had conflicts of interest that prevented them from being disinterested or proper constituents or officers of AIA to direct the Hawley Troxell Defendants' representation of AIA Services, AIA Insurance and CropUSA.

101.̶102.    In 2007, Connie and Beck were purportedly appointed to the Boards of Directors of AIA Service and AIA Insurance by John. Connie and Beck were paid $5,000 per quarter to sit̶"serve" on the Boards of Directors of AIA and they also were to receive common shares for their purported "service." Beck and Connie attended certain AIA board meetings in person in Idaho or through telephone calls to Idaho, which further directed aspects of AIA's

SECOND̶THIRD AMENDED COMPLAINT - 26

# Exhibit - B

businesses and certain other transactions. Beck later testified that he serves on AIA's Boards to protect his own interests and those of his friends (the same friends who previously acquired Series C Preferred Shares in AIA Services and illegally exchanged them for common shares in CropUSA).

102.103.     In 2007 and 2008, the Controlling AIA Defendants entered into written tolling agreements in connection with the various litigationlitigations directly or indirectly involving AIA. The Hawley Troxell Defendants were improperly involved with and/or facilitated the Controlling AIA Defendants entering into such tolling agreements for the purpose of allowing the Hawley Troxell Defendants to continue to represent AIA, CropUSA and directly or indirectly certain of the Controlling AIA Defendants.

103.104.     By tolling the statute of limitationlimitations for claims against the Controlling AIA Defendants, the Hawley Troxell Defendants sought to use the tolling agreements to authorize the waiver of their conflicts of interest representing AIA, CropUSA and the interests of the Controlling AIA Defendants in litigation that could have and should have exposed the fraud and intentional breaches of fiduciary duties committed by the Controlling AIA Defendants.

105.   The purpose of a properly drafted and executed tolling agreement is to allow conflicts of interest to be waived under certain limited permissible circumstances in order to waive a conflict of interest so that an attorney or law firm can represent clients with diverging interests. Those limited permissible circumstances were not present here. The limited permissible circumstances when tolling agreements and conflict waivers may be appropriate were not present when the Hawley Troxell Defendants prepared and/or entered into agreements with AIA, CropUSA and/or the Controlling AIA Defendants. Upon information and belief, the Hawley Troxell Defendants prepared and/or entered into agreements and/or amended agreements without

SECONDTHIRD AMENDED COMPLAINT - 27

# Exhibit - B

requiring AIA to have independent counsel and without involving disinterested and unconflicted constituents from AIA in violation of the Rules of Professional Conduct, including RPC 1.7, RPC 1.8 and RPC 1.13. Throughout the Hawley Troxell Defendants' representation of AIA and CropUSA, they failed to act in the best interests of AIA and to address the conflicts of interest and malfeasance committed against AIA with the highest unconflicted and disinterested constituents from AIA in violation of the Rules of Professional Conduct, including, RPC 1.13.

104.

**Formatted:** No bullets or numbering

105.106.    The Hawley Troxell Defendants knew or should have known that the Controlling AIA Defendants had committed intentional acts of fraud and breaches of fiduciary duties (including the duty of loyalty) owed to AIA. The Hawley Troxell Defendants knew or should have known that by allowing the Controlling AIA Defendants to continue to operate and control AIA that they would continue to conceal their past torts and likely continue to commit new torts, which is precisely what occurred here as demonstrated by the facts alleged in this SecondThird Amended Complaint.

106.107.    Although these tolling agreements tolled the statute of limitations for claims AIA could assert against the Controlling AIA Defendants (which eliminates any defense they may have to assert any statute of limitations defenses), the facts set forth in this SecondThird Amended Complaint provide a classic example ofdemonstrate why such tolling agreements were improper under the circumstances as the agreements involved tolling intentional torts committed against AIA. While the claims were being tolled, the Controlling AIA Defendants'Defendants continued to unlawfully use AIA's cash, resources and ability to borrow to fund other businesses and pay compensation to themselves.

107.108.    During the course of the litigation in *Taylor v. AIA Services Corp., et al.*.

SECONDTHIRD AMENDED COMPLAINT - 28

# Exhibit - B

Reed Taylor attempted to negotiate a settlement, but he insisted that any settlement must include full disclosure to, and authorization by, AIA Services' minority shareholders and to allow them to participate in CropUSA common share ownership. (*See* Dkt. #67-18.) Not only did the Controlling AIA Defendants and Hawley Troxell Defendants reject Reed Taylor's offer, but they still refused and failed to provide full disclosure to AIA and AIA Services' innocent minority shareholders of the malfeasance and torts committed against AIA. The untenable position of the Hawley Troxell Defendants was confirmed when the only person seeking to require full and fair disclosure to the shareholders and for them to rightfully participate in AIA's business was a former creditor, Reed Taylor. (*Id.*)

108.   During the course of *Taylor v. AIA Services Corp, et al.,*. Connie and Beck represented to Judge Brudie, the Idaho Supreme Court, and AIA that the redemption of Reed Taylor's shares should be illegal to benefit AIA Services' minority shareholders. (*See* Dkt. #67-23 and #67-25.)

109.   After Judge Brudie ruled the redemption of Reed Taylor's shares was illegal, neither Connie, Beck, the Hawley Troxell Defendants nor any of the other Controlling AIA Defendants did anything to benefit theAIA or its minority shareholders of AIA Services nor did they ever have any intention of helping them, contrary to what they had represented to Judge Brudie and the Idaho Supreme Court.

110.   Instead of sharing equally in AIA's assets with AIA Services' innocent minority shareholders, the Controlling AIA Defendants later sought to eliminate those minority shareholders for only ten cents per share, even though Connie and John both previously valued the shares much higher even after considering the over $6 million that AIA Services owed to Reed Taylor at the time of valuation (a debt that was later ruled to be illegal and void). (*See* Dkt. #67-

SECONDTHIRD AMENDED COMPLAINT - 29

# Exhibit - B

24 and #67-50.)

111.   Riley was an attorney at the law firm of Eberle Berlin at the time of the redemption of Reed Taylor's shares in 1995 and he breached his duty of care by advising AIA Services ~~and Reed Taylor²~~ to enter into the illegal stock redemption transaction. *See Taylor v. AIA Servs. Corp.*, 151 Idaho 552, 261 P.3d 829 (2011). Riley concealed facts from AIA regarding the redemption.

112.   The illegal redemption of Reed Taylor's common shares ultimately led to AIA incurring over $1 million in attorneys' fees and costs litigating and resulted in AIA Services being required to report to the IRS a gain from the $6 million it never had to pay Reed Taylor.

113.   Upon information and belief, the Controlling AIA Defendants never reported the gain from the extinguished $6 million debt to Reed Taylor on AIA Services' tax return. If the Controlling AIA Defendants did not report the $6 million income to the IRS and AIA Services is obligated to pay taxes, penalties and interest on that gain, the Controlling AIA Defendants and Hawley Troxell Defendants are liable for those sums as well for breaching their fiduciary duties owed to AIA.

114.   Based on the intentional acts of the Hawley Troxell Defendants, AIA has been decimated because the Controlling AIA Defendants remained in control of AIA through those tolling agreements~~.~~ and the Hawley Troxell Defendants' ongoing representation of AIA. The end result of these tolling agreements and ongoing representation was that the Hawley Troxell Defendants improperly ensured that the Controlling AIA Defendants would retain control over

---

² ~~The Controlling AIA Defendants have brought bread to many defense attorneys. Notably, the Controlling AIA Defendants (except Cashman, who was not a party to the lawsuit) successfully asserted that the Stock Redemption Agreement was illegal. (*See* Dkt. #83-5.) Consequently, Reed Taylor sued Riley, Turnbow and Eberle Berlin for their incorrect third party closing opinion letter. *Taylor v. Riley*, 157 Idaho 323, 336 P.3d 256, 261 (2014). He later settled his claims against Turnbow and Eberle Berlin, but his claims against Riley are on appeal as noted by the Ninth Circuit Court of Appeals. *Taylor v. Hawley Troxell Ennis & Hawley, LLP*, 628 Fed.Appx. 490 (9th Cir. 2015). Reed Taylor also sued his independent counsel. *Taylor v. Bell*, 185 Wn. App. 270, 273-79, 340 P.3d 951, 954-56 (2014), *review denied*, 352 P.3d 188 (2015).~~

~~SECOND~~THIRD AMENDED COMPLAINT - 30

# Exhibit - B

AIA to the detriment of AIA and for the improper benefit to the Hawley Troxell Defendants and the Controlling AIA Defendants.

115.   In or around 2007 or 2008, AIA Insurance received a settlement of approximately $800,000 for litigation that AIA Insurance had funded for certain policy holders. Instead of utilizing or retaining thoseAIA's portion of such funds exclusively for AIA, the Controlling AIA Defendants improperly used those funds, in full or in part, to, *inter alia*, continue their intentional acts of funding CropUSA. and to pay litigation expenses caused by them or other unauthorized uses. Upon information and belief, the Hawley Troxell Defendants had knowledge of the receipt of those funds, yet they did nothing to protect the funds even though the funds were at issue in *Taylor v. AIA Services Corp., et al.*.

116.   In 2008, the Controlling AIA Defendants and the Hawley Troxell Defendants permitted CropUSA to sell over $10,000,000 ina book of crop insurance business to Hudson Insurance for the benefit of CropUSA when approximately 75% of the business had been derived directly from AIA's agency force (i.e., such agents such as Larry Whitehead). The over $7.515 million sale price should have been paid to AIA, rather than to CropUSA or to pay the debts incurred by the Controlling AIA Defendants through CropUSA. Even if the sale of this book of business rightfully occurred, AIA should have been the recipient of the sale proceeds and there should not have been any money owed to Lancelot or others because the Controlling AIA Defendants had engaged in corporate waste and other breached fiduciary duties that resulted in the sums being allegedly owed.

117.   Sometime after CropUSA sold the bulk of its assets to Hudson Insurance in 2008, which were derived primarily from AIA, the Controlling AIA Defendants obtained further funds from Hudson Insurance for Growers National Cooperative Insurance Agency, Inc. ("Growers

SECONDTHIRD AMENDED COMPLAINT - 31

# Exhibit - B

National"), an entity formed and funded by AIA for ~~purposed~~the purpose of selling crop insurance ~~and providing a form of rebate~~that allowed the members to ~~farmers~~participate in the agency by receiving patronage dividends.

118.    Upon information and belief, CropUSA received over $500,000 from Hudson Insurance for Growers National. These funds should have been paid to AIA and the receipt of the funds was concealed from AIA. ~~Plaintiffs~~Plaintiff will establish the exact amount of funds that the Controlling AIA Defendants and/or CropUSA received from Hudson Insurance for Growers National at the time of trial.

**I.    The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA and Intentionally Committing Torts against AIA with the Assistance of the Hawley Troxell Defendants—Even While ~~this~~This Lawsuit Was Pending**

119.    Upon information and belief, the Hawley Troxell Defendants have been paid the bulk of the over $2,000,000 in attorneys' fees and costs incurred and/or paid for the various lawsuits. ~~Plaintiffs~~Plaintiff will establish the exact amount of funds paid to the Hawley Troxell Defendants by AIA and/or on behalf of AIA, which ~~Plaintiffs are~~Plaintiff is seeking to be disgorged and returned to AIA.

120.    From 2009 through the present time, Donna Taylor exercised her right under the amended articles of incorporation to appoint two different directors to AIA Services' Board of Directors, but the Controlling AIA Defendants and/or the Hawley Troxell Defendants refused to honor her unqualified right thereby resulting in all actions taken by AIA Services' Board of Directors during that period of time being unauthorized and thus a breach of the fiduciary duties of the Controlling AIA Defendants.

///

121.    In December 2009, Donna Taylor filed suit against AIA Services to exercise her

~~SECOND~~THIRD AMENDED COMPLAINT - 32

# Exhibit - B

unequivocal right to appoint her designee, Patrick Moran, to the Board of Directors of AIA Services and to appoint a receiver for AIA Services. The Hawley Troxell Defendants once again appeared in that lawsuit and successfully opposed ~~Donna's~~Donna Taylor's designee being appointed to the Board of Directors or a receiver being appointed by improperly seeking a stay in the lawsuit.

122.    Had the Hawley Troxell Defendants joined Donna Taylor in having a receiver appointed for AIA Services, which the Hawley Troxell Defendants should have done in light of the countless intentional torts committed against AIA by the Controlling AIA Defendants, there is no doubt that they could have stopped the Controlling AIA Defendants from carrying out their ongoing fraud, intentional breaches of fiduciary duties and their ~~ultimate decimation~~destruction of AIA. At a minimum, the Hawley Troxell ~~Defendants~~Defendants' acts and/or omissions in this regard was a substantial factor of the improper transactions, unlawful acts, and the ~~ultimate decimation~~cause of millions of dollars of damages to AIA~~, which occurred after 2009~~.

123.    This lawsuit was filed by ~~Plaintiffs~~Plaintiff on August 11, 2010, and subsequently stayed at the request of the Controlling AIA Defendants and the Hawley Troxell Defendants. During that stay, inappropriate and unlawful transactions continued to occur.

124.    The Controlling AIA Defendants continued to utilize AIA's funds, assets, labor, trade secrets and borrowing ability to unlawfully assist CropUSA and other entities owned by the Controlling AIA Defendants.

~~124.~~125.    In March 2012, the Controlling AIA Defendants, ~~with, upon information and belief, the improper assistance of new attorneys at the law firm of Randall & Danskin,~~ improperly terminated AIA Services' ESOP and paid those shareholders three cents per

~~SECOND~~THIRD AMENDED COMPLAINT - 33

**Exhibit - B**

sharesshare for their hard-earned common shares and failed to. At no time prior to or after the termination of the ESOP did the Controlling AIA Defendants disclose the facts pertaining to the malfeasance and torts existing at that time (as described in this SecondThird Amended Complaint or otherwise) to those shareholders. (*See* Dkt. #67-30-33, 34.) AIA Services was separately barred from purchasing or redeeming the common shares held in the ESOP.

125.126.     However, the Controlling AIA Defendants knew that AIA Services' amended articles of incorporation barred all stock redemptions, including any purchases of shares held by the ESOP, until the Series A Preferred Shares were all fully redeemed and the Series C Preferred Shares had been paid the over $1,000,000 in dividends owed. The repurchase of the ESOP shares for three cents per sharesshare was illegal, ultra- vires and improper.

127.     Effective March 23, 2012, Beck and Cashman purportedly entered into an agreement with John to sell their purported common shares in AIA Services, which such shares had never been properly or lawfully issued in the first place. The agreement provided that Idaho law applied and, upon information and belief, Beck and Cashman entered into that agreement in connection with the failed effort to effectuate a reverse stock split to eliminate the minority shareholders.

126.128.     In 2012, the Controlling AIA Defendants, again with the improper assistance of Randall & Danskin (See Dkt. #67-48, 67-48), improperly sought to effectuate a reverse stock split and to only pay AIA Services' minority common shareholders ten cents per share to repurchase those common shareholdersshares (including PlaintiffsPlaintiff's shares) without disclosing any facts and without offering full and fair compensation for the value of the shares. (*See* Dkt. #66-3, 67-48, 67-48.) The notice to the shareholders was signed by Duclos and the improper and unlawful reverse stock split was approved by Beck, John and Connie. (*Id.*)

SECONDTHIRD AMENDED COMPLAINT - 34

# Exhibit - B

127.129.    ThirteenFourteen shareholders objected. to the alleged reverse stock split. (*See* Dkt. #67-41.) The ill-conceived reverse stock split violated AIA Services' amended articles of incorporation and the Controlling AIA Defendants did not even bother to comply with Idaho Code, including, by failing to provide the form for the shareholders to state the value that they believed should be paid for their common shares thereby further establishing the true improper purpose of the failed reverse stock split. The reverse stock split was not pursued for any proper business purpose.

128.130.    In response to the thirteenfourteen shareholder objections and notices of demands for payment, the Controlling AIA Defendants, through Randall & Danskin and without regard to the fact that they would expend tens of thousands of dollars more in funds litigating the issue rather than simply paying the shareholders the true fair value of their shares, had AIA Services file suit against the thirteenfourteen shareholders. (*See* Dkt. #83-15.) Judge Carl Kerrick properly dismissed the lawsuit, and further noted that it was disingenuous to seek a reverse stock split until this lawsuit was resolved. (*See* Dkt. 86-1.) Judge Kerrick later awarded attorneys' fees and costs to the shareholder defendants. That judgment in favor of those fourteen shareholders has still never been paid by the Controlling AIA Defendants or AIA, and the Controlling AIA Defendants should be required to pay that judgment on behalf of AIA. (See Dkt. #86-1.)

///

129.131.    The failed reverse stock split fiasco drained AIA of significant and unnecessary attorneys' fees and costs (fees and costs which could have been paid to those shareholders or for other AIA obligations).) and constituted a waste of AIA's assets. This purported reverse stock split was approved and/or acquiesced in by the Controlling AIA Defendants., which was a breach of their fiduciary duties. Upon information and belief, the Hawley

SECONDTHIRD AMENDED COMPLAINT - 35

# Exhibit - B

Troxell Defendants were aware of the scheme to effectuate the reverse stock split to eliminate AIA Services' innocent minority shareholders, which would in turn eliminate common shareholder standing for this lawsuit.

130.    After the Controlling AIA Defendants had AIA Services file suit against the thirteen objecting common shareholders who demanded fair payment, Nez Perce County District Court Judge Carl Kerrick dismissed the lawsuit and awarded those minority shareholders attorneys' fees and costs. That judgment in favor of those shareholders has still never been paid by the Controlling AIA Defendants or AIA, and the Controlling AIA Defendants should be required to pay that judgment on behalf of AIA.

131.132.    From 2009 through 20152016, the Controlling AIA Defendants continued loaning money to, or allowed money to be lent to, Pacific Empire Radio Corporation in an amount exceeding $1,400600,000 by year-end 20122015 when that corporation had no ability to repay the sums owed and it benefitted John and Connie (who owned shares in that corporation at certain relevant times) as those were funds they would not have to personally provide to Pacific Empire Radio CorpCorporation.  In 2015 and 2016, the IRS filed liens against Pacific Empire Radio Corporation in excess of $500,000 for the non-payment of employee withholding taxes, yet the Controlling AIA Defendants permitted AIA Services to lend over $1,600,000 to Pacific Empire Radio Corporation.

132.133.    From 1999 through 2012, the Controlling AIA Defendants concealed their ownership interests in other entities from AIA, which were derived from and/or funded by AIA, including, without limitation, CropUSA, CropUSA Insurance Services, LLC, and Pacific Empire Holdings Corp.

133.134.    From 1995 through 20122016, John received over $2,729,557700,000 in

SECONDTHIRD AMENDED COMPLAINT - 36

# Exhibit - B

cash salary, compensation, benefits and property from AIA. This amount does not include any compensation, payments or other improper distributions he may have received from CropUSA and other entities funded or launched using AIA. At a minimum, John should be required to disgorge the over $2,038,657000,000 that he received from AIA from 1999 through 20122016 and other compensation or, funds and benefits received from AIA since 1999, which John received while acting as a faithless fiduciary and while improperly competing against AIA through CropUSA and other entities (including Pacific Empire Holdings Corp.).

///

///

> **Formatted:** No bullets or numbering

> **Formatted:** Font: Times New Roman, 12 pt, Bold, Underline

**J.   The Controlling AIA Defendants, with GemCap Aiding and Abetting Them, Illegally Had AIA Guarantee Loans Made to CropUSA by GemCap, Concealed the Guarantees from AIA, Illegally Entered into Settlement Agreements with GemCap, Concealed the Settlement Agreements from AIA, and Unlawfully Transferred Property to GemCap Thereby Damaging AIA.**

135.   While the instant lawsuit was pending, the Controlling AIA Defendants sought additional funding for CropUSA. GemCap agreed to make the loan to CropUSA in Idaho for the purpose of operating its business in Idaho. On or about November 23, 2011, the Controlling AIA Defendants obtained a $5,000,000 line-of-credit from GemCap for CropUSA, which was subsequently amended on April 1, 2012, July 18, 2012, and February 4, 2013 to be a $10,000,000 line-of-credit (the original loan and all subsequent modifications and amendments are collectively the "GemCap Loan").

136.   On November 23, 2011, the Controlling AIA Defendants, with the substantial assistance from GemCap, had AIA Services and AIA Insurance guarantee $1,113,930 of the GemCap Loan. In connection with that guarantee, John, Beck and Connie executed a board

SECONDTHIRD AMENDED COMPLAINT - 37

# Exhibit - B

resolution for AIA Services purportedly authorizing that guarantee, even though they all had conflicts of interest that prevented them from authorizing the guarantee, AIA was separately barred from guaranteeing the loans, they did not obtain consent from Donna Taylor for the guarantee, and Donna Taylor's designee on AIA Services' Board of Directors was not provided notice of the GemCap Loan. On October 1, 2012, the Controlling AIA Defendants had AIA purportedly guaranteed the entire $10,000,000 GemCap Loan (the 2011 $1,113,930 limited guarantee executed in 2011 and the $10,000,000 unlimited guarantee executed in 2012 are collectively referred to as the "Guarantees"). Even though AIA purportedly executed the Guarantees, AIA could not borrow funds from the GemCap Loan and AIA obtained no benefit whatsoever.

137.	Upon information and belief, GemCap was aware of the existence of this lawsuit, or should have been aware of its existence, at the time of the GemCap Loan and AIA's Guarantees (which asserted claims based on other unlawful guarantees and alleged substantial other misconduct, including claims against the assets GemCap was purportedly accepting from AIA and CropUSA). Upon information and belief, GemCap was aware or should have been aware, that AIA Services' board of directors was not fully and properly seated (including that the Controlling AIA Defendants were not honoring Donna Taylor's unequivocal right to appoint a director) and that AIA's officers were not properly elected. Upon information and belief, GemCap knew, or should have known, that AIA Services was not conducting the required annual shareholder meetings and was not lawfully complying with fundamental corporate governance procedures.

138.	When GemCap accepted the first of the Guarantees from AIA, GemCap requested and was provided with an Officer's Certificate, signed by John and Duclos, that attached copies of AIA Services' amended articles of incorporation and bylaws (both of which contained provisions

SECONDTHIRD AMENDED COMPLAINT - 38

# Exhibit - B

barring the Guarantees). As a result, GemCap was aware, or should have been aware, that AIA, and its purported officers, were not authorized to execute the Guarantees or pledge any of its assets to GemCap. AIA received no consideration for entry into the Guarantees and most of the GemCap Loan's indebtedness was already owed as of the date of the unlimited Guarantee executed on October 1, 2012.

139.    In connection with the GemCap Loan and AIA's Guarantees of that loan, GemCap requested, and was provided with, copies of AIA Services' amended articles of incorporation and restated bylaws, which expressly barred the Guarantees because, *inter alia*, the GemCap Loan was not for a wholly-owned subsidiary of AIA Services and the Loan implicated conflicts of interest provisions that pertained to the Controlling AIA Defendants. As a result, GemCap was fully aware, or should have been fully aware, that AIA was not authorized to execute the Guarantees or to perform under the Guarantees.

140.    The Guarantees were signed by John Taylor, as the purported President of AIA Services and the purported President of AIA Insurance. GemCap was aware, or should have been aware with the exercise of reasonable diligence, that John Taylor had no authority to execute the Guarantees on behalf of AIA Services or AIA Insurance, and that, under the circumstances, the Guarantees were barred by AIA Services' amended articles of incorporation and AIA's bylaws. The Controlling AIA Defendants all had knowledge of the Guarantees and the fact that they were barred, and they never provided notice of the Guarantees or obtained shareholder approval from them (including, without limitation, approval from Donna Taylor, who was the sole Series A Preferred Shareholder of AIA Services). The Guarantees are illegal and/or ultra vires because they violated AIA Services' amended articles of incorporation, AIA's bylaws and numerous Idaho Code sections.

SECONDTHIRD AMENDED COMPLAINT - 39

# Exhibit - B

141. On December 20, 2012, GemCap filed a UCC financing statement with the Idaho Secretary of State stating that AIA Services and AIA Insurance had pledged "All of each of Debtor's right, title and interest, whether now existing or hereafter acquired, in and to all assets of such Debtor, wherever located, whether tangible or intangible, and the proceeds and products thereof" ("Financing Statement"). The Financing Statement was not properly authorized or disclosed to AIA's shareholders, and it violated AIA Services' amended articles of incorporation and AIA's bylaws.

142. Under the terms of the GemCap Loan, CropUSA could borrow up to $10,000,000. Upon information and belief, CropUSA owed GemCap $8,676,288.39, plus interest, attorneys' fees and costs, as of July 26, 2013. Under the terms of the hard-money GemCap Loan, interest accrued at 18.5% per annum and 24% upon a default.

143. According to a document later filed in 2014 in federal court in California, from April 15, 2013 through April 19, 2013, GemCap's agent traveled to Idaho to conduct a purported audit of CropUSA, AIA, and other entities at AIA's headquarters in Lewiston, Idaho. John was present at the purported audit. Upon information and belief, GemCap's agent discovered facts that demonstrated that AIA and other entities owned by the Controlling AIA Defendants were engaging in improper transactions. This audit further reveals that the Hawley Troxell Defendants provided further legal work for CropUSA (despite the allegations and claims in this lawsuit). Upon information and belief, GemCap's agent traveled to Idaho to conduct other audits of CropUSA and AIA in Lewiston, Idaho. GemCap and the Controlling AIA Defendants never disclosed or provided the results of any of the audits to disinterested constituents at AIA or to AIA Services' minority shareholders.

144. Upon information and belief, Gemcap provided CropUSA and other parties a notice

SECONDTHIRD AMENDED COMPLAINT - 40

# Exhibit - B

of default through a notice dated July 16, 2013. Upon information and belief, GemCap provided a purported notice of default and demand for payment to AIA Services and AIA Insurance of the $8,676,288.39 owed by CropUSA through a notice dated July 29, 2013.

145.    GemCap, CropUSA and the Controlling AIA Defendants failed to disclose to properly elected and unconflicted directors of AIA, the Plaintiff, or AIA Services' other innocent minority common shareholders the GemCap Loan (including its terms), AIA's Guarantees (including their terms), and the subsequent notices of default of the GemCap Loan.

146.    On July 30, 2013, GemCap filed suit against CropUSA, John and others for the default of the GemCap Loan. GemCap asserted claims for breach of contract, fraud, conversion and other claims. The Controlling AIA Defendants and GemCap did not provide any notice of this lawsuit to AIA Services' shareholders nor did they take any action to proceed in the best interests of AIA.

147.    After certain of AIA Services' shareholders learned of the GemCap lawsuit in California, GemCap was advised that AIA's Guarantees and the Settlement Agreements were unauthorized and illegal and that AIA was not being properly operated. Nevertheless, GemCap sought to collect from AIA based on the unauthorize and illegal Guarantees. At this point in time, GemCap had further actual knowledge of the unauthorized and illegal Guarantees and that AIA was not being operated properly (including that the Controlling AIA Defendants were breaching fiduciary duties owed to AIA), assuming that it was not aware of these facts prior to accepting AIA's Guarantees. As a result, GemCap was aware that AIA's Guarantees had been improperly and unlawfully executed.

148.    Despite complaints from AIA Services' minority shareholders and even though GemCap, AIA, CropUSA and the Controlling AIA Defendants knew that AIA was barred from

~~SECOND~~THIRD AMENDED COMPLAINT - 41

**Exhibit - B**

executing the Guarantees and entering into any settlement agreement that required the payment of any funds or transfer of any assets from AIA. GemCap and AIA, purportedly on behalf of John, purportedly entered into a purported settlement and a written settlement agreement sometime after January 9, 2015 (collectively the "Settlement Agreement" or "Settlement Agreements"). The Settlement Agreements were concealed from AIA and its shareholders by the Controlling AIA Defendants and GemCap, and further constitute a conspiracy to defraud AIA. AIA received no consideration for the Settlement Agreements.

149. Under the terms of the Settlement Agreements, AIA Services and AIA Insurance were require to transfer certain real property to GemCap and judgments would be entered against them in the amount of $12,126,584.61, which included $3,986,368.78 in interest, penalties and costs. The Settlement Agreements were barred by AIA Services' amended articles of incorporation and AIA's bylaws for the same reasons that the Guarantees were barred, and it was a breach of John's fiduciary duties owed to AIA when he executed the Settlement Agreement (which GemCap was fully aware). In addition, the Settlement Agreements illegally provided that AIA would not file for bankruptcy protection and that malpractice claims would be assigned to GemCap. The Settlement Agreements are illegal and/or ultra vires because they violated AIA Services' amended articles of incorporation, AIA's bylaws, numerous Idaho Code sections, and were the product of intentional breaches of John's fiduciary duties owed to AIA.

150. Under the terms of the Settlement Agreements, GemCap required John and/or certain other Controlling AIA Defendants to continue to improperly and unlawfully operate AIA in the manner that AIA had been operated in the past. The Controlling AIA Defendants have continued to improperly and unlawfully operate AIA since that time by and through their direct or indirect participation, lack of action, acquiescence and covering up of the improper and unlawful

SECONDTHIRD AMENDED COMPLAINT - 42

# Exhibit - B

operation of AIA, which further resulted in GemCap substantially assisting and acquiescing in the Controlling AIA Defendants' breaches of fiduciary duties, fraud and other malfeasance by and through the continued improper operation of AIA, including, without limitation, allowing the Controlling AIA Defendants to operate AIA without having shareholder meetings, without having proper boards of directors, and in violation of AIA's amended articles of incorporation and bylaws.

151.    Upon information and belief, the Controlling AIA Defendants were aware of the GemCap litigation and Settlement Agreements, but they and GemCap continued to aid and abet John by allowing him to unlawfully enter into the Settlement Agreements and to improperly operate AIA. The Controlling AIA Defendants and GemCap, assisted, acquiesced and assisted in covering up the transactions.

152.    According to the financial statements for AIA for 2015 (which were belatedly provided to AIA Services' shareholders in August 2016 after many demands),[3] AIA disclosed the Guarantees and Settlement Agreements for the first time to AIA Services' shareholders. However, John inaccurately stated that the "Company admitted no liability, but entered into settlement discussions and reached a confidential settlement agreement in late 2014…". However, John failed to disclose to AIA Services' shareholders that he had agreed to allow judgments in the amount of $12,126,584.61 to be unlawfully and inappropriately entered against AIA and that any judgment against him would be delayed (i.e., he once again placed his interests above the interests of AIA, even assuming that the Settlement Agreement was legal and authorized).

153.    The real property located at 111 Main Street, Lewiston, Idaho (AIA Services' former headquarters) was ultimately transferred to GemCap and sold. As with the Guarantees and

---

[3] Plaintiff is not alleging in this Third Amended Complaint that the applicable financial statements prepared for AIA or CropUSA are accurate. To the contrary, Plaintiff is alleging that certain financial statements were fraudulently prepared and/or approved by the Controlling AIA Defendants.

SECONDTHIRD AMENDED COMPLAINT - 43

# Exhibit - B

Settlement Agreements, the transfer of AIA Services' former headquarters to GemCap was not disclosed or authorized by AIA Services' shareholders. According to recently provided 2015 financial statements for AIA (which were provided in August 2016), John disclosed for the first time that the real property located at 111 Main Street, Lewiston, Idaho (AIA Services' headquarters) was purportedly transferred to GemCap as a reduction of amounts allegedly owed to CropUSA, when AIA owed nothing to CropUSA and CropUSA actually owed AIA. Upon information and belief, AIA Services' headquarters had a replacement value exceeding $7,000,000.

154. As a result of the Guarantees and Settlement Agreements, AIA paid sums for CropUSA and other entities, incurred and/or paid substantial attorneys' fees and costs, and/or were damaged. Once again, John placed his interests and the interests of the other Controlling AIA Defendants above the interests of AIA by improperly stipulating to judgments against AIA in excess of $12,000,000, but no judgment was entered against him even though he personally guaranteed the GemCap Loan, too. To the extent that the Guarantees and/or Settlement Agreements are not declared illegal or ultra vires and Plaintiff recovers all damages, the Controlling AIA Defendants are liable for all such damages not recovered and they are separately liable for any other damages caused by the ultra vires acts.

155. GemCap knew that John had no apparent or actual authority to execute the Guarantees and Settlement Agreements on behalf of AIA, which is further supported by the fact that GemCap's attorneys were specifically advised that the Guarantees and Settlement Agreements were not authorized. GemCap knew that, by making the GemCap Loan, accepting the Guarantees and entering in the Settlement Agreements, it would be aiding and abetting and conspiring with

SECONDTHIRD AMENDED COMPLAINT - 44

# Exhibit - B

the Controlling AIA Defendants and CropUSA by providing improper funding to the Controlling AIA Defendants and CropUSA and by assisting them in engaging in unauthorized, intra vires, ultra vires and/or illegal conduct.

156.    GemCap knew that the Controlling AIA Defendants breached their fiduciary duties owed to AIA, and/or aiding and abetting others in those breaches, by entering into the Guarantees and Settlement Agreements (and requiring AIA's assets and/or funds to be paid to GemCap or others because of GemCap (including attorneys)) and participating in, and covering up, the Controlling AIA Defendants' breaches of fiduciary duties against AIA. GemCap has aided and abetted one or more of the Controlling AIA Defendants in breaching their fiduciary duties and in the commission of fraud against AIA. GemCap has also aided and abetted the Controlling AIA Defendants by allowing them to maintain control over AIA when GemCap knew that they were not operating AIA in the best interests of AIA, and by concealing and covering up the Controlling AIA Defendants' breaches of fiduciary duties and fraud.

**K.  John Unlawfully Transfers Certain Real Property to AIA and Requires AIA to Pay the Liabilities on the Property and He Alleges that AIA Owes Him $545,563 in Accrued Salary.**

157.    Subsequent to the GemCap Loan and according to AIA Services' purported 2015 financial statements (which were belatedly provided in August 2016 after many demands), John allegedly executed quitclaim deeds purportedly transferring certain real property, held in the name of other entities John controls, to AIA with a purported book value of $820,668, and AIA was improperly required to assume a purported $393,863 in debts on the real property. These real property transfers and assumptions of debts were unauthorized and ultra vires. Upon information and belief, GemCap was involved in these real property transfers and assumption of debts, and GemCap knew that such transfers were aiding and abetting John and other Controlling AIA

SECOND THIRD AMENDED COMPLAINT - 45

# Exhibit - B

Defendants in the breach of their fiduciary duties owed to AIA.

158.    Even if authorized, the determination of the $820,668 purported book value of such real property was not authorized and John and the Controlling AIA Defendants had conflicts of interest that prevented any of them from making any determination of value or authorizing the alleged transfers or assumption of debts. AIA's proper Board of Directors did not authorize the transactions nor did AIA Services' shareholders.

159.    According to the same recently provided financial statements for AIA for 2015, John alleges that AIA owes him $545,563 in alleged accrued salary as of December 31, 2015, but AIA owes John nothing and he is not entitled to any compensation because he has been a faithless fiduciary of AIA.  Upon information and belief, at least one of the parcels of real property has already been transferred or lost as a result of foreclosure proceedings for less than the purported book value.  AIA seeks to rescind the real property transfers and assumption of debts.

**L. John Unlawfully Amends AIA Services and AIA Insurance's Bylaws and Issues Himself Series A Preferred Shares in AIA Services.**

160.    According to the recently provided financial statements for AIA for 2015 (which were belatedly provided in 2016 after many demands), sometime in 2016, John purportedly purchased 7,500 Series A Preferred Shares in AIA Services, but those shares were improperly issued and were never authorized by a properly seated and unconflicted Board of Directors of AIA Services, as required. In addition, AIA Services' amended articles of incorporation authorized the Series A Preferred Shares to only be issued to Donna Taylor in connection with the prior restructuring of AIA Services, and not to issue more Series A Preferred Shares to John.

161.    It is unclear why John improperly issued the 7,500 Series A Preferred Shares in AIA Services when those shares were not purchased or issued for any legitimate business purposes, they were never properly authorized by AIA Services' Board of Directors or shareholders, and

SECONDTHIRD AMENDED COMPLAINT - 46

# Exhibit - B

John had conflicts of interest that prevented him from purchasing or issuing those shares on behalf of the Board of Directors of AIA Services even if the shares were authorized to be issued under AIA Services' amended articles of incorporation (which they were not).

162. According to the same recently provided financial statements for AIA for 2015 and the letter accompanying those financial statements, John allegedly amended the bylaws of AIA Services and AIA Insurance to provide for an award of attorneys' fees and costs for "intracompany suits" if a "claiming party does not obtain a favorable judgment on the merits of the claim." These purported amendments were never adopted for a legitimate purpose, John had conflicts of interest that prevented him from adopting the provision, and the provisions are unenforceable.

163. According to the same recently provided financial statements for AIA for 2015, the Controlling AIA Defendants have spent over $400,000 litigating against Donna Taylor in an effort to not pay her the just over $400,000 in principal owed on her Series A Preferred Shares. This further demonstrates the breached fiduciary duties and corporate waste occurring at AIA by and through the Controlling AIA Defendants because AIA Services should have simply paid Donna Taylor the $400,000 instead of spending that money to fight her.

**J.M. There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants**

164. Since acquiring operational control of AIA Services in 1995, the Controlling AIA Defendants have engaged in repeated acts of faithless self-dealing, transactions detrimental to AIA, committed intentional torts (including fraud and breaches of fiduciary duties), breached their fiduciary duties (including their duties of loyalty), concealed, conspired to commit intentional torts, aided and abetted in the commission of intentional torts and to cover up those torts, to the detriment of AIA in Idaho, including, but not limited to, the following specific examples: intentional acts:

SECONDTHIRD AMENDED COMPLAINT - 47

# Exhibit - B

(a) controlling theControlling AIA's Board of Directors and/or the decisions made by theAIA's Board andof Directors and intentionally refusing to act in the best interests of AIA;

**Formatted:** Font: Not Bold

(b) violatingViolating AIA Services' restated bylaws, including but not limited to, failing to hold annual shareholder meetings, failing to provide notice or obtain proper shareholder approval for certain transactions, failing to comply with conflicts of interest provision in the bylaws and articles of incorporation which restricted many of the unlawful or improper transactions described hereinin this Third Amended Complaint, and failing to properly comply with applicable corporate governance;

**Formatted:** Font: Not Bold

(c) violatingViolating AIA's amended articles of incorporation thereby allowing substantial funds and assets to be depleted from AIA and obligating AIA to be liable for loans or guarantees which were barred by those amended articles of incorporation;

**Formatted:** Font: Not Bold

(d) divertingDiverting corporate opportunities belonging to AIA;, including CropUSA and Pacific Empire Holdings Corp. (a/k/a Sound Insurance);

**Formatted:** Font: Not Bold

(e) Unlawfully conveying, encumbering, utilizing, and/or pledging corporateAIA's assets to themselves or other entities;

**Formatted:** Font: Not Bold

(f) inappropriatelyInappropriately redeeming, acquiring and/or issuing shares of stock and/or making payments on put options in AIA Services, including but not limited to, issuing shares to the Controlling AIA Defendants;

**Formatted:** Font: Not Bold

(g) inappropriatelyInappropriately paying dividends;, and failing to pay dividends;

**Formatted:** Font: Not Bold

(h) intentionally failing toEngaging in transactions and actions in direct conflict of interest with their duties owed to AIA and failing to comply with conflict of interest provisions in AIA's bylaws;, and the law;

**Formatted:** Font: Not Bold

(i) guaranteeingGuaranteeing loans for CropUSA and failing to guarantee loans for AIA;

**Formatted:** Font: Not Bold

SECONDTHIRD AMENDED COMPLAINT - 48

# Exhibit - B

(j) ~~paying~~Paying excessive compensation to officers and directors, including but not limited to, paying John $250,000 per year to purportedly act as CEO and President of AIA Services after his contractual entitlement to such salary had expired ~~and~~, when John had conflicts of interest that barred him from determining his pay, and he had represented that he would not take salary in certain ~~years;~~ year(s);

*Formatted:* Font: Not Bold

(k) ~~wasting corporate~~Wasting AIA's assets and making improper payments, including by paying Connie and Beck $20,000 per year to purportedly serve on the ~~Board~~Boards of Directors of AIA ~~Services;~~ and paying John compensation when he was doing nothing for the benefit of AIA;

*Formatted:* Font: Not Bold

(l) ~~divulging~~Divulging and/or utilizing AIA's trade secrets for the benefit of themselves and other entities, including CropUSA~~;~~ (including, without limitation, AIA's agency force and customer lists);

*Formatted:* Font: Not Bold

(m) ~~soliciting~~Soliciting and transferring AIA employees to work for CropUSA;

*Formatted:* Font: Not Bold

(n) ~~engaging~~Engaging in acts and/or decisions without making full disclosure and without obtaining the required approval of AIA Services' shareholders~~;~~ resulting in none of the transactions and acts referenced in this Third Amended Complaint (and any that may be at issue at or before trial) being properly ratified by AIA Services, AIA Insurance or their shareholders;

*Formatted:* Font: Not Bold

(o) ~~engaging~~Engaging in millions of dollars of transactions ~~wherein~~that resulted in AIA ~~conveyed~~conveying benefits without the receipt of any consideration ~~or~~, without being repaid, and/or without being paid any mark-up or profit;

*Formatted:* Font: Not Bold

(p) ~~forming~~Forming and operating entities in direct competition with AIA in the insurance marketplace, including without limitation, CropUSA and Pacific Empire Holdings Corp.;

*Formatted:* Font: Not Bold

(q) ~~making~~Making false representations, concealing facts, and omitting material facts from

*Formatted:* Font: Not Bold

~~SECOND~~THIRD AMENDED COMPLAINT - 49

# Exhibit - B

AIA, including, without limitation, regarding share values, ~~omitting material facts~~ items in AIA's financial statements~~, falsely certifying~~ (including notes), assets and debts in AIA's financial statements, the true value of funds and assets (including employees and trade secrets) utilized for other entities (including CropUSA), and that AIA was being operated for the benefit of the corporation;

(r) ~~concealing~~Concealing and failing to disclose material facts to AIA pertaining to loans, transfers, and utilization of assets, including without limitation, concealing or omitting material facts, including all of the necessary facts related to virtually each and every transaction described in this ~~Second~~Third Amended Complaint;

(s) ~~making~~Making false representations to AIA, including without limitation, making and certifying false and misleading financial statements to AIA and representing that AIA was being properly operated when it was instead being used to fund the lifestyle, payments and other businesses owned or ~~partial~~partially owned by the Controlling AIA Defendants;

(t) ~~inappropriately~~Inappropriately loaning AIA's funds, or guaranteeing loans, to themselves and to other entities under their control in violation of AIA's amended articles of incorporation, bylaws and fiduciary duties;

(u) ~~paying~~Paying tens of thousands of dollars in yearly fees to purportedly serve on the Board of Directors of AIA and other compensation and benefits, when such amounts were excessive and they were violating their fiduciary duties owed to AIA and they were all acting as faithless fiduciaries;

(v) ~~paying~~Paying attorneys' fees and costs in various legal proceedings on behalf of the Controlling AIA Defendants and others when it was clear that they had intentionally failed to act

~~SECOND~~THIRD AMENDED COMPLAINT - 50

**Exhibit - B**

1 SER 181

in good faith, were not entitled to indemnification or to have attorneys' fees and costs advanced on their behalf, and by failing to obtain security for repayment of said funds;

(x) acquiringAcquiring a parking lot with AIA funds and charging AIA, and making AIA pay, excessive rent for use of the parking lot (John increased the rent to $15,000 per year) even though AIA did not actually use the parking lot;. Later, upon information and belief, the parking lot was transferred to Jordan Taylor, John and Connie's son (who is also a lawyer), for no consideration so he could sell it for $50,000;

(y) failingFailing to seat the full and required Board of Directors for AIA Services and thus there was never a required quorum for AIA Services' Board to take any action and further resulting in all purported actions being unauthorized, including, without limitation, by failing to honor Donna'sDonna Taylor's appointment of Patrick Moran and Paul Durant to AIA Services' Board of Directors;

(z) improperlyImproperly purchasing and transferring shares held by AIA or which should have been held by AIA to themselves, including without limitation shares in Pacific Empire Radio Corp., Pacific Empire Communications Corp., and Pacific Empire Holdings Corp. (this entity was formed with AIA's assets by John, improperly competed against AIA, and was later sold for $240,000);

(aa) allowingAllowing John to profit from CropUSA's sale of assets to Hudson Insurance by improperly allowing him to retain a monthly fee of $10,000 per month when those funds should have gone to AIA;

(bb) failingFailing to take appropriate legal action in the interests of AIA;, including by failing to bar John from being an officer and director of AIA and failing to claw back CropUSA as a subsidiary of AIA and properly operate CropUSA (which would have resulted in CropUSA

SECONDTHIRD AMENDED COMPLAINT - 51

**Exhibit - B**

being worth millions of dollars);

(cc) ~~removing a tenant~~Removing tenants from an AIA owned building to another building owned personally by John and/or other Controlling AIA Defendants;

(dd) ~~improperly~~Improperly subsidizing CropUSA and other entities with AIA's funds, labor and assets, failing to properly allocate expenses to CropUSA and failing to have other expenses paid back at all (which have already been identified as being approximately $500,000 as of 2008~~);~~ after Plaintiff's expert was able to identify certain transactions that were actually accounted for);

(ee) ~~selling~~Selling and/or transferring assets and or/contracts belonging to AIA to others (including the contract with Growers National);

(ff) ~~improperly~~Improperly paying numerous law firms other than the Hawley Troxell Defendants hundreds of thousands of dollars representing AIA and the Controlling AIA Defendants in litigation caused by their own intentional acts and torts~~;~~ and when the Controlling AIA Defendants had not acted in good faith or complied with their duties of loyalty to AIA;

(gg) ~~paying~~Paying more of AIA's funds to litigate disputes (including with Donna Taylor in the Idaho state courts) than it would have taken to simply pay the money owed;

(hh) ~~failing~~Failing to obtain security, failing to charge interest, and failing to collect on loans of at least $307,000 made to John;

(ii) ~~removing~~Removing the $400,000 held in the court registry and the over $200,000 in a bank account in *Taylor v. AIA Services ~~Corp., et al.~~*, and allowing the Controlling AIA Defendants to utilize those funds when the Hawley Troxell Defendants should have ensured that those funds were kept from them;

~~SECOND~~THIRD AMENDED COMPLAINT - 52

# Exhibit - B

(jj) expendingExpending significant sums on the illegal repurchase of common shares in AIA Services, which also resulted in increasing the ownership interest of the Controlling AIA Defendants increasing; and ;

> **Formatted:** Font: Not Bold

(kk) allowingAllowing AIA to engage in the transactions identified in this SecondThird Amended Complaint when no dividends had been declared or paid on the Series C Preferred Shares held in the AIA Services 401(k) Plan and those shares now have accrued dividends owed of over $1,000,000.;

> **Formatted:** Font: Not Bold

(ll) Wasting AIA's funds and assets (and CropUSA's) on needlessly rented office space, unneeded employees and other wasted expenditures;

(mm) Allowing Connie to represent CropUSA in litigation involving Growers National in conflict with her duties of loyalty as a director of AIA, which such litigation resulted in approximately $500,000 being transferred to CropUSA for Growers National, even though AIA created Growers National (she separately aided and abetted in CropUSA's receipt of these funds);

(nn) Allowing John to make decisions for the management and operation of AIA when he had conflicts of interest and a long-standing track record of diverting money, labor, credit, trade secrets and other assets to CropUSA and other entities that he partially or wholly owned;

(oo) Engaging in numerous illegal, ultra vires, and intra vires acts and transactions for, or in the name of, AIA, including, without limitation, entering into the Guarantees for the $10,000,000 GemCap Loan, and later transferring property worth over $1,000,000 to GemCap;

(pp) Engaging in countless improper transactions in Idaho for the benefit of themselves, CropUSA and/or other entities partially or wholly owned by the Controlling AIA Defendants (including the other transactions and allegations set forth in this Third Amended Complaint);

SECONDTHIRD AMENDED COMPLAINT - 53

# Exhibit - B

(qq) Organized, operated, controlled, and conducted CropUSA as their instrumentality, agency and/or conduit to the detriment of AIA, and they have further operated CropUSA improperly without complying with proper corporate governance procedures and as a means to defraud AIA.

134. The Controlling AIA Defendants, CropUSA, GemCap and/or the Hawley Troxell Defendants have assisted one another and others in committing the intentional acts and torts against AIA described hereinin this paragraph and concealing, or covering up, the facts and the intentional torts committed against AIA, including those specifically referenced in this paragraph and elsewhere in this Second Amended ComplaintThird Amended Complaint. The Hawley Troxell Defendants continued to conceal facts from AIA and to aid and abet the Controlling AIA Defendants and CropUSA even after any representation may have terminated when they owed the duty to AIA to not do so.

*Formatted: Indent: Left: 0.07", No bullets or numbering*

135.165. At all relevant times, John was CEO, President and director of AIA Services, AIA Insurance and CropUSA and a shareholder of AIA Services at the time of all of the improper transactions with CropUSA and other improper acts identified in this SecondThird Amended Complaint (which were also a classic example of a conflictconflicts of interest), and he improperly benefited from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance). In 2016, John became the sole purported director, secretary and president of AIA Services, AIA Insurance and CropUSA Insurance Agency, Inc.

136.166. At all relevant times, John was also owned interests in other entities who improperly benefitted directly or indirectly from AIA, and CropUSA (including Green Leaf Alliance, Green Leaf Re, Reinsurance Partners and Pacific Empire Radio Corp.), which were

SECONDTHIRD AMENDED COMPLAINT - 54

# Exhibit - B

additional conflicts of interest and proof of self-dealing. The Controlling AIA Defendants were aware of these facts.

137.167.   During certain relevant times, the Controlling AIA Defendants were all purported shareholders of CropUSA and either majority shareholders (as a group) or officers of AIA Services at the time of the improper transactions and malfeasance identified in this SecondThird Amended Complaint (which were also a classic example of conflictconflicts of interest), and they improperly benefited, directly or indirectly, from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

138.168.   As a result of the acts and omissions set forth and/or contemplated above and other acts and/or omissions which will be established at or before trial, the Controlling AIA Defendants and the Hawley Troxell Defendant have proximately caused AIA millions of dollars in damages, CropUSA, GemCap and the Hawley Troxell Defendants have committed numerous torts against AIA in Idaho thereby proximately causing AIA to incur millions of dollars in damages. Indeed, had the Hawley Troxell Defendants simply sought on behalf of AIA to immediately bar John from serving as a director and officer of AIA Services and ensured that AIA was properly operated and its assets and CropUSA properly marshalled, the GemCap Guarantees and Settlement Agreement would never had occurred and AIA would not have been damaged by millions of dollars.

169.   Because discovery has not yet commenced, Plaintiff expects to obtain additional evidence in discovery and to conduct further investigation, which will further support the causes of action and relief requested below.

170.   Due to the fact that the Controlling AIA Defendants have had complete control over

SECONDTHIRD AMENDED COMPLAINT - 55

# Exhibit - B

1 SER 186

AIA during all relevant times and have never asserted, nor would they ever assert, claims against themselves or others on behalf of AIA, the adverse dominion doctrine bars the assertion of statute of limitations defenses to all claims and relief requested in this Third Amended Complaint. *Freeland v. Enosis Corp.,* 540 F.3d 721 (7th Cir. 2008).

**V.   CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 AND FEDERAL RULE OF CIVIL PROCEDURE 23.1**

139.171.    As a prerequisite to filing this lawsuit under Idaho Code §§§ 30-1-742, 30-29-742, and Federal Rule of Civil Procedure 23.1, Plaintiffs (and over ten other shareholders of AIA Services) havePlaintiff has been shareholdersa common shareholder of AIA Services during all relevant times to the transactions at issue and the claims asserted in this SecondThird Amended Complaint.

140.172.    On July 21, 2008, Donna Taylor, another shareholder of AIA Services, served a written derivative demand letter on the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #23-9 and #67-19.)  In accordance with the then-applicable I.C. § 30-1-742, the Plaintiff was not required to make another demand under I.C. § 30-1-742 because that statute does not require every shareholder filing suit to serve a separate demand, as confirmed by the comment: "It should be noted that the shareholder bringing suit does not necessarily have to be the person making the demand. Only one demand need be made in order for the corporation to consider whether to take corrective action."

141.173.    On July 23, 2008, the Hawley Troxell Defendants filed a Motion for Stay of Proceedings in *Taylor v. AIA Services Corp., et al.,* and asserted that the stay was necessary so that AIA Services and AIA Insurance could conduct an inquiry into the demands made by Donna Taylor in her letter dated July 21, 2008. (Donna Taylor was not a party to that lawsuit, however).

142.174.    On August 14, 2008, in *Taylor v. AIA Services Corp., et al.,* the Hawley

SECONDTHIRD AMENDED COMPLAINT - 56

**Exhibit - B**

Troxell Defendants ~~disingenuously~~ filed a purported petition for a court appointed independent inquiry on behalf of AIA when they had no intention of following through with the inquiry. (*See* Dkt. #67-20.)

143.175.    On September 4, 2008, Reed Taylor supported the appointment of independent investigators. However, Reed Taylor objected to the investigators proposed by the Hawley Troxell Defendants, who were purportedly representing AIA, and the Controlling AIA Defendants. (*See* Dkt. #67-21.) Reed Taylor believed totally independent people should be appointed.

144.176.    Although the parties had filed briefing with respect to the appointment of independent investigators in *Taylor v. AIA Services*, the Hawley Troxell Defendants never noted the motion for a hearing and the court never ruled on the request, and they intentionally abandoned the appointment of an independent inquiry. The Hawley Troxell Defendants and Controlling AIA Defendants have never conducted a further investigation of the demands made in Donna Taylor's derivative demand letter of July 21, 2008. No action was ever taken by AIA or AIA's Boards of Directors.

~~145.    The Hawley Troxell Defendants and Controlling AIA Defendants have never conducted a further investigation of the demands made in Donna's derivative demand letter of July 21, 2008. No action was ever taken by the Boards of Directors.~~

146.177.    On April 3, 2012, ~~Plaintiffs~~Plaintiff, along with other shareholders, made another written demand on the Boards of Directors of AIA Services and AIA Insurance, which included demands to keep the $400,000 cash held in the Court registry in *Taylor v. AIA Services Corp., et al.*, to comply with AIA's amended articles of incorporation, to comply with AIA's bylaws, provide full disclosure, and to protect certain other assets. (Dkt. #67-33.) This particular

**Formatted:** Font: Italic

~~SECOND~~THIRD AMENDED COMPLAINT - 57

# Exhibit - B

demand was copied directly to Babbitt and Ashby, so they had full knowledge of it. This demand, like all ~~of~~ the others, was ignored. (*See* Dkt. #67, p. 11 ¶ 29.)

~~147.~~178.    On July 16, 2012, while the ~~Plaintiffs and~~instant case was stayed, the Plaintiff, along with over ten other shareholders of AIA Services, served additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #67-42.) The demands requested, among other things, that AIA pursue this lawsuit with all claims as of July 16, 2012 and future claims, including punitive damages. ~~(*Id.*) In addition, Plaintiffs have made additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance, but no action has ever been taken by the Boards of Directors.~~, which also provided AIA and the Board of Directors yet another opportunity to address the demands previously made by Donna Taylor in 2008 (although Plaintiff was under no obligation to do so).

179.    On June 13, 2016, in accordance with I.C. § 30-29-742, Plaintiff, along with other shareholders of AIA Services, served yet another detailed derivative demand upon the Boards of Directors of AIA Services and AIA Insurance. (*See* Dkt. 148-2.) Plaintiff demanded, *inter alia*, that additional claims be asserted against the previously named defendants (including for more recent torts and damages) and to assert claims against GemCap and CropUSA Insurance Services. AIA failed to respond to this demand within ninety days.

180.    On August 23, 2016, in accordance with I.C. § 30-29-742, Plaintiff, along with other shareholders of AIA Services, served a substantially similar demand previously provided (Dkt. 148-2) in which Plaintiff demanded further action be taken, including, without limitation, to seek, *inter alia*, further claims and damages since the last derivative demand, to seek damages against GemCap for selling AIA's property, to void the improperly and allegedly amended bylaws of AIA Services and AIA Insurance, and to rescind the Series A Preferred Shares that John

~~SECOND~~THIRD AMENDED COMPLAINT - 58

# Exhibit - B

improperly issued to himself. The August 23, 2016 demand was made by Plaintiff as a shareholder and as a creditor of AIA Services. AIA's purported Board of Directors, through John, responded to this demand in writing, rejected the demand, belatedly rejected the prior June 13, 2016 demand (after ninety days had already expired), and refused to have AIA pursue the claims.

181.    In addition, Plaintiff has made additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance, but no action has ever been taken by the purported Boards of Directors.

148.182.    Over ninety days have elapsed since the Plaintiffs' written derivative demands set forth above were made to AIA and its Boards of Directors, and no action has been taken by AIA whatsoever, and all of thePlaintiff's claims and requested relief asserted in this lawsuit flowedflow from those derivative demands.  AIA and its purported Boards of Directors never asked for any additional information or specificity regarding the derivative demands.

149.    As owner of Preferred A Shares in AIA Services, and as beneficial owner common shares in AIA Services, Donna fairly represents the interests of shareholders not named in this lawsuit. She also assisted in defeating the litigation involved the Controlling AIA Defendants' efforts to effectuate an improper reverse stock split to eliminate shareholder standing in this lawsuit, when she could have simply sought to solely protect her interests only. Donna is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue bona fide claims. Donna has pursued this lawsuit solely for the benefit of AIA and their innocent shareholders.

///

150.183.    As the second largest common shareholder of AIA Services (who traded a book of insurance business worth approximately $500,000 to AIA Services in exchange for his

SECONDTHIRD AMENDED COMPLAINT - 59

# Exhibit - B

common shares), Miesen alsothe Plaintiff fairly represents the interest of AIA and their shareholders. Miesen (including the preferred shareholders, 401(k) Plan shareholders, and former ESOP shareholders) and lawful creditors (to the extent that AIA Services is deemed to be insolvent). Plaintiff has never received a penny in return foron his investment in AIA. Miesen Services. Plaintiff is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist, but instead to only pursue *bona fide* claims. Miesen has pursued this lawsuit solely on behalf of, for the benefit of, AIA and their innocent shareholders.

184.    Plaintiff is pursuing this derivative action to make AIA whole and recover the millions of dollars in damages inflicted upon it by the defendants. Upon obtaining judgment, the funds will allow AIA to continue to operate as a going concern or, alternatively, to be dissolved with the funds used to pay lawful creditors and the remaining funds to be distributed to the Series A Preferred Shareholders, the Series C Preferred Shareholders and then to the common shareholders.

### VI.    COUNT I—BREACH OF FIDUCIARY DUTIES
**(Against the Controlling AIA Defendants and the Hawley Troxell Defendants)**

151.185.    PlaintiffsPlaintiff re-allegealleges and incorporateincorporates by reference herein each and every allegation asserted elsewhere in this SecondThird Amended Complaint to the extent necessary to support this cause of action.

152.186.    The Controlling AIA Defendants owed fiduciary duties to AIA as the majority and controlling shareholders. As members, or purported members, of the Board of Directors for AIA Services and/or AIA Insurance, the Controlling AIA Defendants, who have each served as a director of AIA Services at one timeduring certain relevant times, owed fiduciary duties to AIA, including, without limitation, duties of good faith and to act in the best interests of AIA. Beck, Cashman and John continued to also serve on the corporationsboard of directors of AIA

SECONDTHIRD AMENDED COMPLAINT - 60

# Exhibit - B

Services through a so-called "advisory board," which controlled AIA and CropUSA. As corporate officers of AIA, John, as President and CEO, and Duclos, as Secretary, owed fiduciary duties to AIA, which were further elevated during the times in which the~~the~~they both served as directors of AIA, too (which is from 1995 to the present time for John). During certain relevant times, Beck, Cashman, John and Connie owed fiduciary duties to AIA because they were the majority shareholders of AIA Services, including, without limitation, to use their majority control of AIA in a fair, just and equitable manner. The Controlling AIA Defendants had conflicts of interest by and through their positions as officers, directors and/or shareholders of AIA Services and CropUSA.

~~153.~~187.    As attorneys for AIA, the Hawley Troxell Defendants owed fiduciary duties to AIA (including the undivided duty of loyalty). If not authorized to act as attorneys for AIA, the Hawley Troxell Defendants acted with apparent authority as agents and owed fiduciary duties as a result of that agency relationship. The Hawley Troxell Defendants had conflicts of interest when they undertook to represent AIA and CropUSA, and when they improperly proceeded in the manner directed by any one or more of the Controlling AIA Defendants, thereby improperly representing the interests of the Controlling AIA Defendants, instead of the best interests of AIA. *Reis v. Barley, Snyder, Senft & Cohen LLC, 484 F.Supp.2d 337 (E.D. Pa. 2007).* The Hawley Troxell Defendants were never retained to represent AIA and CropUSA by disinterested and unconflicted officers and directors of AIA. The Hawley Troxell Defendants placed their self-interests in earning in excess of $1,000,000 in fees in various lawsuits ahead of, and in direct conflict with, AIA's interests in having undivided and unconflicted representation. The Hawley Troxell Defendants knew that they were improperly retained to purportedly represent CropUSA and AIA when AIA's litigation decisions were being made by, and AIA improperly operated by,

~~SECOND~~THIRD AMENDED COMPLAINT - 61

# Exhibit - B

disinterested and unconflicted officers and directors who were also placing their self-interests ahead of AIA's interests, as more full discussed throughout this Third Amended Complaint.

154.188.     Based on any and/or all of the acts and/or omissions set forth in this SecondThird Amended Complaint and/or those facts proven at or before the time of trial, (including conflicts of interest that prevent the Controlling AIA Defendants to use the business judgment rule as a defense), the Controlling AIA Defendants and the Hawley Troxell Defendants have breached their fiduciary duties owed to AIA, including, without limitation, breaching their undivided duties of loyalty, care, good faith, trust and confidence owed to AIA, and by placing their interest in earning hundreds of thousands of dollars, and/or engaging in collusive acts and ultimately over $1,000,000, in attorneys' fees over looking after the interests of AIA. behavior against AIA. In addition, Beck, Cashman, John and Connie have further breached their fiduciary duties owed to AIA as to the controlling majority shareholders of AIA Services by and through, *inter alia*, using their control of AIA in an unjust, unfair and inequitable manner to benefit themselves and other entities that they partially own or control to the detriment of AIA and Plaintiff.

155.189.     The Hawley Troxell Defendants have separately breached their fiduciary duties as matter of law by violating the Rules of Professional Conduct, including, without limitation, when they: (a) simultaneously represented AIA and CropUSA.; (b) failed to proceed in the best interests of AIA; (c) failed to obtain information consent from authorized, unconflicted and disinterred constituents of AIA; (d) placed their interests in earning over $1,000,000 in attorneys' fees over the interests of AIA; (e) prepared and/or entered into Agreements and/or Amended Agreements involving AIA, CropUSA and/or the Controlling AIA Defendants that were not in the best interest of AIA and without requiring AIA to obtain independent counsel; and (f)

SECONDTHIRD AMENDED COMPLAINT - 62

# Exhibit - B

assisting the Controlling AIA Defendants in the commission and/or covering up of fraud (including by failing to require full disclosure to AIA and AIA Services' shareholders). In addition, Riley was previously aware that CropUSA was derived from AIA and he was(the other Hawley Troxell Defendants became aware in *Taylor v. AIA Services*) and they were further aware of the restrictions in AIA Services' amended articles of incorporation as he helped draftand bylaws when Riley had been aware of them., and assisted in preparing them. The Hawley Troxell Defendants have further breached their fiduciary duties as a matter of law for the violations of the Rules of Professional Conduct dealing with loyalty to a client and conflicts of interest., which separately requires disgorgement of all compensation (the over $1,000,000 in attorneys' fees and costs paid to it by and/or on behalf of AIA).

156.190.    As a direct and/or proximate cause of the Controlling AIA DefendantsDefendants' and the Hawley Troxell DefendantsDefendants' breaches of their fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

157.191.    In addition, each of the Controlling AIA Defendants and the Hawley Troxell Defendants is a "faithless fiduciary" as defined by law and is therefore required to disgorge all compensation and consideration received from AIA and/or CropUSA. The disgorgement is. irrespective of if they prove that they acted in AIA's interests as to any other issues. The disgorgements sought are in addition to liability caused by the breaches of fiduciary duty. In the case of the Hawley Troxell Defendants, the disgorgement goes toincludes all fees and costs received for or paid on behalf of AIA and/or CropUSA. In the case of the faithless Controlling AIA Defendants, the disgorgement goes toincludes all salary, bonuses, benefits, warrants, stock options, or stock received from AIA.

///

SECONDTHIRD AMENDED COMPLAINT - 63

# Exhibit - B

///

**VII.     COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES**
**(Against the Controlling AIA Defendants ~~and~~, the Hawley Troxell Defendants, CropUSA, and GemCap)**

~~158.~~192.          ~~Plaintiffs~~Plaintiff re-~~allege~~alleges and ~~incorporate~~incorporates by reference herein each and every allegation asserted elsewhere in this ~~Second~~Third Amended Complaint to the extent necessary to support this cause of action.

~~159.     One who counsels, advises, abets or assists in the commission of an actionable wrong is responsible to the injured person for the entire loss or damage. 86 C.J.S. Torts § 105; RESTATEMENT (FIRST) OF TORTS § 876 (1939). Aiding and abetting in the commission of an actionable wrong may be inferred from the fact that one aided and abetted efforts to conceal the wrong. 86 C.J.S. Torts § 105. Liability for aiding and abetting the commission of a tort may be established by showing the person was present at the time of the actionable wrong and did not disapprove or oppose the action. Plaintiffs alleging aiding and abetting need not prove that the aiding and abetting was necessary for the commission of the tort, only that the aiding and abetting made it easier for the tort to occur. See Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund, 201 Ariz. 474, 38 P.3d 12 (2002).~~

~~160.~~193.        During certain relevant times, the Hawley Troxell Defendants ~~and~~, the Controlling AIA Defendants, CropUSA and/or GemCap: (a) had knowledge of the other defendants' acts and/or omissions ~~as~~constituting the breaches of fiduciary duties owed to AIA (including duties of loyalty, good faith and proceeding in the best interests of AIA) as further described in this ~~Second~~Third Amended Complaint and ~~as~~/or proven at the time of trial.; (b) knew that such acts and/or omissions by other defendants constituted breaches of fiduciary duties ~~, did not disapprove of~~ owed to AIA; (c) substantially participated in such ~~acts~~breaches of fiduciary duties owed to AIA; (d) did not disapprove or seek ratification or ~~omissions,~~disclosure of such

~~SECOND~~THIRD AMENDED COMPLAINT - 64

**Exhibit - B**

breaches of fiduciary duties owed to AIA; (e) took no steps to prevent the commission of thesuch breaches of fiduciary duties flowing from the actsowed to AIA; and/or omissions, and(f) assisted in the concealment, and covering up, of such acts and/or omissions described herein, thereby damagingbreaches of fiduciary duties owed to AIA.

161.194.    As a direct and/or proximate cause of the Hawley Troxell Defendants and, the Controlling AIA Defendants, CropUSA and GemCap's aiding and abetting of one another and/or others in the breaches of fiduciary duties owed by other defendants to AIA, AIA has been damaged in the amount to be proven at or before trial. As aiders and abettors, the defendants are jointly and severally liable for the underlying tort committed by one or more defendants.

### VIII.    COUNT III—LEGAL MALPRACTICE
**(Against the Hawley Troxell Defendants)**

162.195.    PlaintiffsPlaintiff re-allegealleges and incorporateincorporates by reference herein each and every allegation asserted elsewhere in this SecondThird Amended Complaint to the extent necessary to support this cause of action.

163.    A legal malpractice claim may be brought in a derivative action. *Schulman v. Wolf & Samson, PC,* 951 A.2d 1051 (N.J. 2008).

164.196.    Since at least 1999, the Hawley Troxell Defendants had an attorney-client relationship with AIA, while Riley has had an attorney-client relationship with AIA since prior to 1995. The Hawley Troxell Defendants owed duties to AIA, including, without limitation, duties of care, good faith and loyalty. Despite the duties owed to AIA, the Hawley Troxell Defendants also improperly represented CropUSA.

165.197.    The Hawley Troxell Defendants have breached their duties of care, good faith and loyalty owed to AIA, including, without limitation, the breached duties attributable to the acts and omissions described in this SecondThird Amended Complaint. The Hawley Troxell

SECONDTHIRD AMENDED COMPLAINT - 65

# Exhibit - B

Defendants have further violatedbreached their duty ofduties of good faith, care and loyalty owed to AIA by improperly simultaneously representing AIA and CropUSA, together with directly and/or indirectly improperly representing the interests of the Controlling AIA Defendants.

198.    AIA suffered damages as a direct, foreseeable and/or proximate result of the breaches of duty and the acts of the Hawley Troxell Defendants, including, without limitation, those acts described in this SecondThird Amended Complaint and/or proven at the time of trial. (including damages and the lost profits associated with CropUSA). At a minimum, the Hawley Troxell Defendants were also a substantial factor in the harm and damages inflicted upon AIA, including, without limitation, the ultimate decimationinflicting millions of dollars of damages against AIA by the Controlling AIA Defendants and the failure of CropUSA to be a profitable and valuable subsidiary of AIA today. Had the Hawley Troxell Defendants properly discharged their duties, the Controlling AIA Defendants would never have decimated AIA.significantly damaged AIA, and it and CropUSA would be profitable today (and CropUSA a valuable subsidiary of AIA). In addition and/or alternative, millions of dollars of AIA's funds, assets, trade secrets, labor and other valuable consideration would have been recovered and/or not unlawfully transferred and/or utilized by CropUSA, the Controlling AIA Defendants and/or other entities that they own.

166.

167.199.    As a direct and/or proximate cause of such acts and/or omissions, the Hawley Troxell Defendants are liable to AIA for damages in the amount to be proven at or before the time of trial.

IX.    COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/
CONSTRUCTIVE FRAUD
(Against the Controlling AIA Defendants, CropUSA and GemCap)

168.200.    PlaintiffsPlaintiff re-allegealleges and incorporateincorporates by reference

SECONDTHIRD AMENDED COMPLAINT - 66

**Exhibit - B**

herein each and every allegation asserted elsewhere in this SecondThird Amended Complaint to the extent necessary to support this cause of action.

201.   The acts, omissions, decisions, contracts, transactions, allocations, investments, and/or other business dealings of the Controlling AIA Defendants that were purportedly entered into on behalf of AIA were not disclosed or approved by fully seated and disinterested Boards of Directors of AIA and, therefore, AIA had no knowledge of any such acts, omissions, decisions, contracts, transactions, allocations, investments, and/or malfeasance.

202.   The Controlling AIA Defendants are liable to AIA for fraud because: **(a)** they made representations of material fact to AIA and AIA Services' innocent minority shareholders as asserted throughout this SecondThird Amended Complaint, including but not limited to,: (i) representations that CropUSA was being operated for the benefit of AIA, (ii) representations that AIA was being properly operated (including that the Boards of Directors had properly authorized certain transactions when Donna'sDonna Taylor's designee was not on the Board of AIA Services and the provisions in the amended articles of incorporation and bylaws had not been complied with), (iii) representations that the information on AIA's financial statements was true (John separately certified to auditors and others that the information contained on certain of AIA's financial statements was true and correct), (iv) representations that expenses, compensation, and/or loans between AIA and other entities or parties were properly entered into and accounted for (i.e., there are hundreds of thousands of dollars, if not millions of dollars, in funds and other assets used by CropUSA which were derived from AIA and never accounted for), (v) representations that they had the authority to act on behalf of AIA when they did not (including failing to disclose conflicts of interest that prevented them from acting on behalf of AIA); and (vvi) other representations

SECONDTHIRD AMENDED COMPLAINT - 67

# Exhibit - B

referenced in this ~~Second~~Third Amended Complaint and/or proven at or before trial since discovery has not begun; **(b)** ~~these~~such representations were false; **(c)** ~~these~~such representations were material~~;~~ and AIA would never have entered into or approved any of the acts, conduct or transactions if AIA had been provided with full disclosure and the true representations); **(d)** they knew ~~these~~such representations were false; **(e)** they intended that there be reliance by AIA on such representations; **(f)** AIA was ignorant of the falsity of ~~these~~such representations; **(g)** AIA relied on ~~these~~such representations; **(h)** AIA's reliance was justified; and **(i)** injury resulted. ~~See, e.g., Mannos v. Moss, 143 Idaho 927, 155 P.3d 1166 (2007) (holding that misrepresentations in financial statements precluded summary judgment).~~ to AIA.

~~169.~~203.    Constructive fraud is identical to fraud, except that the ~~plaintiff~~Plaintiff need not prove ~~speaker's~~the Controlling AIA Defendants' knowledge of the fraud and ~~the speaker's~~their intent that ~~the other party~~AIA rely on the representations.

~~170.~~204.    The Controlling AIA Defendants owed duties to AIA during certain relevant times as majority shareholders, board members and/or officers of AIA. In addition to making false representations, the Controlling AIA Defendants also concealed information from AIA and its innocent minority shareholders with knowledge that the concealed information was material and that the concealment would cause AIA to suffer otherwise avoidable damages, including without limitation, information contained in this ~~Second~~Third Amended Complaint. The Controlling AIA Defendants' failure to disclose a fact to AIA and AIA Services' innocent minority shareholders where one has a duty to disclose is the legal equivalent of representing the non-existence of the fact. Where facts are fraudulently concealed, ~~Plaintiffs~~Plaintiff need not show reliance as there is nothing other than silence upon which to rely.

~~171.~~205.    The Controlling AIA Defendants represented to AIA Services that

~~SECOND~~THIRD AMENDED COMPLAINT - 68

**Exhibit - B**

Formatted: Font: Bold

CropUSA was a wholly- owned subsidiary of AIA Services. Simultaneously, the Controlling AIA Defendants adopted the position, not disclosed to AIA or its innocent minority shareholders, that CropUSA was an independent entity with John as its alleged sole shareholder and subsequently failed to disclose that CropUSA was not a separate entity. These representations were false, the Controlling AIA Defendants knew of their falsity, the Controlling AIA Defendants intended that there be reliance, there was justifiable reliance by AIA and AIA Services' innocent minority shareholders, and AIA was damaged as a result.

172.206.    By operating CropUSA as an independent entity, and by using CropUSA as a vehicle for misappropriating and converting corporate assets, the Controlling AIA Defendants committed ongoing fraud that has persisted through the date of this SecondThird Amended Complaint.

173.207.    The Controlling AIA Defendants also made misrepresentations to AIA and AIA Services' innocent minority shareholders in the form of false, misleading and fraudulent financial statements (which such financial statements also failed to disclose numerous improper and unlawful transactions and their ownership interests in CropUSA and other entities), upon which AIA and AIA Services' innocent minority shareholders reasonably relied, with that reliance being the proximate cause of AIA's damages.

174.208.    When the Controlling AIA Defendants transferred more than $1.5 million to CropUSA in 2004, they concealed the fact of this transaction from AIA and AIA Services' innocent minority shareholders and AIA was damaged by this concealment.

175.209.    When the Controlling AIA Defendants transferred AIA corporate assets, including funds, employees, goodwill and trade secrets to CropUSA and other entities and were subsidizing CropUSA and other entities, they concealed these facts from AIA and AIA Services'

SECONDTHIRD AMENDED COMPLAINT - 69

# Exhibit - B

innocent minority shareholders. AIA suffered damages by these concealments.

176.210.    When the Controlling AIA Defendants had AIA pay certain of CropUSA's corporate expenses and unfairly used AIA's employees, trade secrets and facilities for CropUSA, they concealed this factthese facts from AIA.  AIA suffered damages as a result of this concealmentthese concealments.

///

177.211.    When the Controlling AIA Defendants pledged the mortgage obtained by AIA from the state of Idaho to CropUSA so that CropUSA could borrow money to pay the attorney's fees of the Hawley Troxell Defendants to facilitate covering up the AIA Defendants' fraud, they concealed this factthese facts from AIA.  AIA suffered damages as a result of this concealmentthese concealments.

178.212.    When the Controlling AIA Defendants had AIA Insurance guarantee CropUSA's $15 million line of credit and later sold over $10,000,000 in assets derived from AIA to Hudson Insurance, they concealed the fact of this guarantee and asset sale from AIA.

179.213.    When the Controlling AIA Defendants finally disclosed their ownership interests in CropUSA, CropUSA Insurance Services, LLC and other entities in AIA Services' financial statements in July 2012[4] (*See* Dkt. #67-38), they continued to conceal how they obtained their ownership interest in those entities (and in the case of CropUSA that the ownership interest came from AIA) and many transactions and purported loans between the entities and AIA (loans and guarantees made by AIA which were prohibited by AIA Services' amended articles of incorporation and restated bylaws).

---

[4] While the financial statements were dated as of year-end 2011, they were not provided to AIA or its shareholders until July 2012 in connection with the failed ill-conceived reverse stock split.

SECONDTHIRD AMENDED COMPLAINT - 70

# Exhibit - B

**214.** The Controlling AIA Defendants, CropUSA and GemCap concealed from AIA that they had AIA unlawfully and improperly enter into the Guarantees, Settlement Agreements and related agreements and instruments, together with unlawfully transferring property and making payments under those unlawful agreements and instruments.

~~180.~~215.    As a direct and/or proximate cause of the Controlling AIA Defendants' fraudulent acts, AIA has been damaged in an amount to be proven at or before trial, and the ongoing fraud bars the Controlling AIA Defendants from asserting statute of limitations defenses. To the extent that the Hawley Troxell Defendants seek to assert the statute of limitations as a defense, they too are barred from doing so through their fraudulent concealment of facts from AIA.

///

///

///

### X.    COUNT V—AIDING AND ABETTING AND CONSIPIRACY OF FRAUD
**(Against the Controlling AIA Defendants, CropUSA, GemCap and the Hawley Troxell Defendants)**

~~181.~~216.    ~~Plaintiffs~~Plaintiff re-~~allege~~alleges and ~~incorporate~~incorporates by reference herein each and every allegation asserted elsewhere in this ~~Second~~Third Amended Complaint to the extent necessary to support this cause of action.

~~182.    One who aids and abets in the commission of a tort is liable with the primary tortfeasor(s) for all damages resulting from the tort. Aiding and abetting is established where one has knowledge of the torts, does not disapprove, and takes no action to prevent the commission of the torts or assists in covering up such torts. The foregoing applies to the Controlling AIA Defendants and the Hawley Troxell Defendants.~~

~~183.    The Controlling AIA Defendants have aided and abetted in one another's fraud committed against AIA. The Controlling AIA Defendants' silence, failure to act and intentional~~

~~SECOND~~THIRD AMENDED COMPLAINT - 71

# Exhibit - B

acts to cover up fraud upon AIA constitutes the aiding and abetting of fraud upon AIA.

217.    The Hawley Troxell Defendants have aided and abetted in the fraud committed against AIA by the Controlling AIA Defendants by assisting in the commission of fraud. The Hawley Troxell Defendants' silence, failure to act and intentional acts to cover up fraud upon AIA constitutes the aiding and abetting the fraud upon AIA.During certain relevant times, the Hawley Troxell Defendants, the Controlling AIA Defendants, CropUSA and/or GemCap: (a) had knowledge of the other defendants' acts and/or omissions constituting fraud upon AIA (including fraudulent concealment) as further described in this Third Amended Complaint and/or proven at the time of trial; (b) knew that such acts and/or omissions by other defendants constituted fraud upon AIA; (c) substantially participated in such fraud upon AIA; (d) did not disapprove or seek ratification or disclosure of such fraud upon AIA; (e) took no steps to prevent such fraud upon AIA; and/or (f) assisted in the concealment, and covering up, of such fraud upon AIA.

218.    In addition, through various agreements and actions, the Controlling AIA Defendants, CropUSA and/or GemCap: (a) conspired to defraud AIA and were members of the conspiracy at relevant times; (b) provided a substantial act and/or a substantial effect in furtherance of the conspiracy against AIA in Idaho; (c) are attributable to the acts of one another; and (d) engaged in a pattern of behavior and/or agreements to accomplish unlawful objectives and/or to accomplish a lawful objectives in an unlawful manner.

184.

185.    The Hawley Troxell Defendants knew or should have known that the transfer of AIA's assets, loans and other unauthorized transactions to CropUSA constituted a fraud against AIA.

186.    The Hawley Troxell Defendants knew or should have known that the transfer of

**Formatted:** No bullets or numbering

**Formatted:** Font: Bold, Underline

SECONDTHIRD AMENDED COMPLAINT - 72

# Exhibit - B

~~approximately $1,500,000 to CropUSA in 2004 constituted a fraud on AIA.~~

~~187.    The Hawley Troxell Defendants knew or should have known that the practice of allocating CropUSA expenses to AIA, and otherwise failing to maintain arms' length transactions between CropUSA and AIA, constituted a fraud on AIA.~~

~~188.    By knowingly providing legal cover for the fraudulent acts described herein, the Hawley Troxell Defendatns have aided and abetted the fraud committed by the Controlling AIA Defendants and CropUSA.~~

~~189.    As aiders and abettors, the Hawley Troxell Defendants are liable to AIA to the same extent as the primary tortfeasors. RESTATEMENT (FIRST) OF TORTS § 876 (1939). Likewise, the Controlling AIA Defendants are all liable for aiding and abetting each other in the commission of fraud against AIA.~~

~~190.~~<u>219.</u>    As a direct and/or proximate cause of the Hawley Troxell Defendants ~~and~~, the Controlling AIA ~~Defendant~~<u>Defendants, CropUSA and/or GemCap's</u> aiding and abetting <u>of one another and/or others</u> in <u>the commission of</u> fraud <u>upon AIA</u>, AIA has been damaged in the amount to be proven at or before ~~the time of~~ trial.

### XI.    <u>COUNT VI—BREACH OF CONTRACT</u>
**(Against ~~John~~<u>the Controlling AIA Defendants</u>)**

~~191.~~<u>220.</u>    ~~Plaintiffs~~<u>Plaintiff</u> re-~~allege~~<u>alleges</u> and ~~incorporate~~<u>incorporates</u> by reference herein each and every allegation asserted elsewhere in this ~~Second~~<u>Third</u> Amended Complaint to the extent necessary to support this cause of action.

~~192.~~    On August 1, 1995, John and AIA Services entered into an Executive Officer's Agreement. (*See* Dkt. #67-8.)

~~193.~~<u>221.</u>    The Executive Officer's Agreement contains contractual provisions preventing John from doing certain acts. For example, Section 9 of the Executive Officer's

~~SECOND~~<u>THIRD</u> AMENDED COMPLAINT - 73

Agreement sets ~~for~~forth express covenants not to compete. Subsection A of the covenants prohibits John from soliciting AIA customers or otherwise diverting the business of AIA customers. Subsection B prohibits John from participating in any insurance business that underwrites, markets or administers insurance products for commodity associations. Subsection C prohibits John from soliciting AIA Services employees for other employment.  Subsection D of the covenants bars John from divulging or exploiting trade secrets belonging to AIA.

~~194.~~222.   John has breached his contractual obligations owed to AIA, including, without limitation, by forming CropUSA as anything other than a wholly-owned subsidiary of AIA, competing against AIA with CropUSA and other entities (including Pacific Empire Holdings and CropUSA Insurance Services, LLC). John has breached all four subsections of Section 9 of the Executive Officer's Agreement.

~~195.~~223.   As a direct and/or proximate cause of John's breaches of the Executive Officer's Agreement, AIA has been damaged in an amount to be proven at or before trial. Such breaches also constitute the breaches of his fiduciary duties owed to AIA.

224.   Upon information and belief, certain and/or all of the Controlling AIA Defendants entered into agreements with AIA regarding the payment of certain of their attorneys' fees and costs in litigation, which such agreements were never properly presented to or approved by disinterested shareholders. Upon information and belief, such agreements required the Controlling AIA Defendants to pay back the funds advanced for their defense if it was determined that they did not act in good faith or in accordance with other required standards.  Certain and/or all of the Controlling AIA Defendants breached their contracts when they failed to discharge their duties in good faith and failed to comply with all applicable standards. As a direct and/or proximate cause of such breaches, AIA has been damaged and is entitled to be paid back for all attorneys' fees and

~~SECOND~~THIRD AMENDED COMPLAINT - 74

# Exhibit - B

costs advanced or paid, directly or indirectly, by AIA, plus prejudgment interest.

### XII.   COUNT VII—DECLARATORY JUDGMENT
**(Against the Controlling AIA Defendants and, the Hawley Troxell Defendants).,**

**PlaintiffsCropUSA and GemCap)**

> **Formatted:** Font: Bold, (Intl) +Body (Calibri)

196.225.    Plaintiff re-allegealleges and incorporateincorporates by reference herein each and every allegation asserted elsewhere in this SecondThird Amended Complaint to the extent necessary to support this cause of action.

197.226.    Plaintiffs seekPlaintiff seeks a declaratory judgment against Controlling AIA Defendants, Hawley Troxell Defendants, CropUSA, and GemCap, including, without limitation, for the following relief: (a) for a full accounting with supporting documentation of all of AIA's funds, assets, loans and other transactions from 1999 through the present time; (b) requiring the Controlling AIA Defendants to comply with AIA's amended articles of incorporation, bylaws and the Idaho Business Corporation Act; (c) rescinding the purchases of the shares held by the ESOP and/or ensuring that those shareholders receive fair value for their shares; (d) rescinding and/or declaring void the common shares issued to John through is Executive Officer's Agreement; and (d) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this Second Amended Complaintthis Executive Officer's Agreement; (e) voiding any purported common interest or joint defense agreements, jurisdiction consent agreements and any other improper agreement pertaining to AIA Services and/or AIA Insurance; (f) declaring illegal, at a minimum as to AIA Services and AIA Insurance, the Guarantees and Settlement Agreements entered into in favor of GemCap; (g) declaring as illegal and/or setting aside any agreements between AIA Services and/or AIA Insurance and CropUSA; (h) setting aside, rescinding and/or voiding any transfers of real property or other purported asset to AIA from John (John executed quitclaim deeds

SECONDTHIRD AMENDED COMPLAINT - 75

# Exhibit - B

to AIA for certain properties held in the names of others, did not properly value the properties, and required AIA to assume the liabilities for those properties without proper board or shareholder approval); (i) settling aside, voiding or rescinding recent purported amendments to AIA Services and AIA Insurance's bylaws, which were adopted without shareholder approval and for improper purposes (including because John had conflicts of interest); (j) setting aside, voiding and/or rescinding the 7,500 Series A Preferred Shares purportedly issued to John, including, because a proper board never authorized the issuance of those shares, the shares were not issued for legitimate purposes, and the articles of incorporation were not amended to authorize the issuance of any Series A Preferred Shares to anyone other than Donna Taylor; (k) setting aside, rescinding and/or voiding any contracts, agreements, guarantees, financing statements and/or other instruments that were illegal, intra vires, ultra vires (including transfers of real or personal property); (l) setting aside, voiding and/or rescinding the 475,000 common shares purportedly issued to John and/or Connie under John's Executive Officer's Agreement (which he breached countless times) and because he is a faithless fiduciary and is not entitled to any compensation; (m) rescinding the common shares issued originally to Beck, Cashman and the other Series C Preferred Shareholders, which were later transferred to John; (n) for a determination that the Controlling AIA Defendants did not act in good faith and were not entitled to have any attorneys' fees or costs paid or advanced for them by AIA; and (o) such other declaratory relief as may be requested at or before trial (including any declaratory relief related to any other acts and/or omissions described in this Third Amended Complaint or as may be contemplated by any cause of action).

198.227.    Plaintiffs seekPlaintiff seeks a declaratory judgment against the Hawley Troxell Defendants, including, without limitation, for the following relief: (a) that the

SECONDTHIRD AMENDED COMPLAINT - 76

# Exhibit - B

representation agreement, fee agreements and any related agreements entered into with them and AIA be declared void (including, without limitation, because such agreements violated the applicable Rules of Professional Conduct); (b) any agreements or accounts regarding any sums owed by AIA, if any, be declared void; and (c) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this ~~Second~~Third Amended Complaint).

### XIII.    COUNT VIII— ~~EXCESSIVE COMPENSATION/CORPORATE WASTE~~STATUTORY RELIEF (INCLUDING FOR ULTRA VIRES)
#### (Against ~~the Controlling AIA~~All Defendants)

~~199.~~228.        ~~Plaintiffs~~Plaintiff re-~~allege~~alleges and ~~incorporate~~incorporates by reference herein each and every allegation asserted elsewhere in this ~~Second~~Third Amended Complaint to the extent necessary to support this cause of action.

229.   ~~To support a claim for excessive compensation, Plaintiffs need only show that the board lacked independence and/or lacked good faith. *In Re: Tyson Foods, Inc.*, 919 A.2d 563 (Del. 2000). The Controlling AIA Defendants have been officers and/or controlled AIA's Boards of Directors from 1995 through certain relevant times.~~Plaintiff seeks all damages, equitable relief, injunctive relief and other relief available against the Defendants under applicable Idaho Code, including, but not limited to I.C. §§ 30-1-304 and 30-29-304: (a) if this Court does not find the Guarantees and/or Settlement Agreements illegal as to AIA Services and AIA Insurance, Plaintiff requests a judgment that the Guarantees and/or Settlement Agreements are ultra vires and this Court should set aside the Guarantees, Settlement Agreements and related instruments (including Financing Statements and deeds) and enjoin AIA Services and AIA Insurance from complying with the Guarantees, Settlement Agreements and related instruments; (b) award damages to AIA Services and AIA Insurance for damages and losses already sustained from the Guarantees and

~~SECOND~~THIRD AMENDED COMPLAINT - 77

> **Formatted:** Font: (Intl) Times New Roman
> **Formatted:** Font: (Intl) Times New Roman
> **Formatted:** Font: Bold
> **Formatted:** Font: Times New Roman, 12 pt, Bold
> **Formatted:** Centered, Indent: Left: 0.12", Right: 0.13", Line spacing: single

# Exhibit - B

Settlement Agreements (including attorneys' fees and costs); (c) award AIA Services and AIA Insurance anticipated lost profits and other losses, including, the lost profits and damages attributable to the money received by GemCap for the sale of AIA Services' former headquarters in Lewiston, Idaho (approximately $1,000,000) and any other damages and lost profits relating to that property and any other damage claim, and enjoin the transfer of any funds to GemCap; (d) setting aside and/or enjoining any other transfers, payments, obligations, notes, contracts, agreements, guarantees, and instruments (including deeds) which were ultra vires (including the payment of attorneys' fees and costs for any of the defendants); and (e) award all damages and relief (including setting aside any agreements) pertaining to all ultra vires acts involving AIA Services and/or AIA Insurance.

230.    To the extent that there is no cause of action under this Count VIII, then the allegations in this Count VIII are incorporated by reference to support other causes of action and relief in this Third Amended Complaint (including in Count VII and the prayer for relief below).

### XIV.    COUNT IX—CORPORATE WASTE/EXCESSIVE COMPENSATION
(Against the Controlling AIA Defendants)

231.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

200.232.    The Controlling AIA Defendants have been officers and/or controlled AIA's Boards of Directors from 1995 through certain relevant times.  The Controlling AIA Defendants have lacked independence and have not acted in good faith, including, without limitation, by committing the intentional acts and/or omissions described in this SecondThird Amended Complaint.

233.    The Controlling AIA Defendants paid Defendants' waste and excessive

SECONDTHIRD AMENDED COMPLAINT - 78

# Exhibit - B

compensation and have wasted, includes, without limitation: (a) the payment of excessive and unnecessary compensation to officers and employees; (b) the waste of corporate assets during the course of managing and/or operating AIA, including, without limitation, by paying themselves excessive compensation (and practically speaking, any compensation at all based on their acts and omissions) and operating AIA using millions of dollars of AIA's funds, assets, employees and property for the improper and unnecessary purposes; (c) diverting millions of dollars of AIA's assets and funds to benefit of CropUSA, the Controlling AIA Defendants themselves, and other entities they partially or wholly own, including Pacific Empire Radio Corp., CropUSA Insurance Services, LLC, and Pacific Empire Holdings Corp. The Controlling AIA Defendants also decimated(a/k/a Sound Insurance); (d) destroying AIA's agency force and causedcausing them to transfer to CropUSA and ultimately Hudson Insurance and other entities.; (e) diverting CropUSA's business from AIA and running that business improperly by renting needless office space, employing unnecessary persons (including high-paying executives who did nothing for the business), entering into unnecessary high-interest loans, and engaging in other improper and unnecessary transactions (some of which AIA received no consideration); and (f) impairing and destroying AIA's businesses, including CropUSA. In addition, notwithstanding the fact that John isthe Controlling AIA Defendants are not entitled to retain any of histheir compensation or benefits as a faithless fiduciary, it was separately corporate waste to pay himthem in the first place as he didthey have done nothing forto benefit AIA (AIA's business was simply running off the commissions received for policies sold years before). .

201.234.    The other transactions and malfeasance described in this SecondThird Amended Complaint also constitute corporate waste, and none of those transactions and

SECONDTHIRD AMENDED COMPLAINT - 79

# Exhibit - B

malfeasance were properly disclosed to all of AIA Services' shareholders nor was any authorization from them ever sought or obtained.

202.235.     The Controlling AIA Defendants are liable to AIA for damages caused by paying excessive compensation and otherwise diverting, wasting and needlessly depleting AIA's funds and assets for their own benefit and with disregard for AIA.

203.236.     As a direct and/or proximate cause of the Controlling AIA Defendants' waste and excessive compensation, AIA has been damaged in the amount to be proven at or before trial.

### XV.     COUNT IXX—VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT
### (Against GemCap)

237.     Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

238.     GemCap is defined as a "Person" under I.C. § 48-602(1).  GemCap knowingly had AIA enter into the written Settlement Agreements and related agreements and instruments when the transactions were one-sided in favor of GemCap and the transactions were a pattern of conduct that would outrage and offend the public conscience as provided under I.C. § 48-603C. Such unconscionable conduct includes knowingly and intentionally violating AIA Services' amended articles of incorporation, AIA's bylaws and Idaho Code sections, together with contractual provisions which violate the law and public policy without regard to AIA or their innocent minority shareholders.

239.     As described in this Third Amended Complaint and/or as proven at or before trial, GemCap engaged in misleading, false and deceptive practices when it entered into and negotiated

SECONDTHIRD AMENDED COMPLAINT - 80

# Exhibit - B

the one-sided written Settlement Agreement when it knew that AIA Services' shareholders were challenging the Guarantees and they had never been presented with the facts nor were they even asked to authorize the Settlement Agreement and related agreements and instruments, including, without limitation, through illegal provisions in the Settlement Agreement barring AIA from seeking bankruptcy protection and unlawfully requiring legal malpractice claims to be assigned. The Settlement Agreements and the prior Guarantees were all entered into with GemCap.

240. GemCap's acts and/or practices, as described above and in this Third Amended Complaint and/or as proven at or before trial, are misleading, deceptive, and unconscionable methods, acts and practices in the conduct of trade and commerce in violation of the Idaho Consumer Protection Act, I.C. § 48-602, *et seq*. Based on the ongoing flagrant violations that commenced with the original Guarantee and continued through the unlimited Guarantee and the subsequently written Settlement Agreement, the Guarantees and Settlement Agreements should be voided and GemCap should be ordered to pay punitive damages of three times the damages inflicted upon AIA, which now stand at over $1,000,000 by way of the property transferred via the written Settlement Agreement.

241. As a direct and/or proximate cause of GemCap's violations of the Idaho Consumer Protection Act, AIA has been damaged in the amount to be proven at or before trial, including for the approximately $1,000,000 in cash proceeds unconscionably obtained by GemCap in 2016 for the sale of AIA Services' former headquarters, and all other damages incurred by AIA, and this Court should award punitive damages for all such damages.

### XIV.XVI.     COUNT XI—ACCOUNT STATED
(Against John)

204.242.     PlaintiffsPlaintiff re-allegealleges and incorporateincorporates by reference herein each and every allegation asserted elsewhere in this SecondThird Amended Complaint to

SECONDTHIRD AMENDED COMPLAINT - 81

# Exhibit - B

the extent necessary to support this cause of action.

205.243.    John established an account by borrowing $307,000 from AIA for his personal use. John subsequently confirmed the amount of the debt by "correcting" an alleged so-calleda purported accounting "error" when he had previously extinguished the $307,000 debt by improperly crediting the payment of Reed Taylor's $6 million promissory note after the issue arose in *Taylor v. AIA Services Corp., et al.,* so that AIA's bookbooks show that AIA is creditor and John is debtor for $307,000, i.e., the correction was only made because Reed Taylor demanded it and he was suing AIA Services for repayingrepayment of the $6 million promissory note.

206.244.    Upon information and belief, John has not paid any portion of this debt and the entire balance remains due and payable to AIA. John is liable to AIA for $307,000 on the account stated and/or such other amount as may be presently owed, plus prejudgment interest from the date the obligation was incurred. If John has since paid back the $307,000 or any part of the sums he owes, then PlaintiffsPlaintiff still seekseeks the balance owed and prejudgment interest for the benefit of AIA, including, because John has been a faithless fiduciary who is not entitled to any interest-free loans from AIA.

XV.XVII.    JURY DEMAND

207.1.  Plaintiffs hereby demandPlaintiff, through the signature of his attorney below, hereby demands a trial by jury of no less than the maximum number of jurors permitted on all causes of action for which a jury trial is allowed by law.

XVI.XVIII.    PRAYER FOR RELIEF

Wherefore Plaintiffs pray, Plaintiff prays for the following relief:

1.    For a judgment against the defendants, jointly and severally against the Controlling AIA Defendants and the Hawley Troxell Defendants/or individually, for all damages in an amount to be proven for each defendant at or before trial, including, without limitation, consequential

SECONDTHIRD AMENDED COMPLAINT - 82

> **Formatted:** Outline numbered + Level: 2 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

# Exhibit - B

damages, incidental damages, lost profits, lost business opportunities, unlawful distributions, corporate waste, and all other damages, plus prejudgment interest;

2.    For judgments against the Controlling AIA Defendants and the Hawley Troxell Defendants in an amount to be proven at trial for damages for which joint and several liability does not apply to all defendants, plus prejudgment interest;

3.2.    For a judgment or order requiring the Hawley Troxell Defendants for all damages and ordering them to disgorge all attorneys' fees and costs paid to them by AIA Services, AIA Insurance, CropUSA and by any other party on behalf of those entities in the amount to be proven at the time of trial, plus prejudgment interest;

4.3.    For a judgment or order requiring the Controlling AIA Defendants to disgorge all compensation received from AIA or CropUSA since 1999, including stock, cash, benefits, and other assets, including based on intentionally breaching their fiduciary duties and being faithless fiduciaries for being faithless fiduciaries and breaching their fiduciary duties, including, without limitation, all stock, cash, benefits, and other cash and non-cash compensation, attorneys' fees and costs (i.e., Connie received payments for attorneys' fees and costs from AIA or from CropUSA in violation of her duties to AIA) and that John is owed no compensation by AIA;

4.    For judgment against GemCap, AIA, John and CropUSA declaring that AIA's Guarantees, the Settlement Agreements and all related agreements and instruments illegal, ultra vires, intra vires, void and/or unenforceable and awarding AIA damages;

5.    For judgment against John in the amount to be proven at the time of trial, plus prejudgment interest;

6.    For judgments against the Controlling AIA Defendants, jointly and severally, as the alter-ego of CropUSA and/or to pierce its corporate veil, for all damages incurred by AIA and

SECONDTHIRD AMENDED COMPLAINT - 83

# Exhibit - B

attributable in whole or in part to CropUSA;

7.    For judgments against any one or more of the defendants and for any and all damages and relief available under Idaho Code (including, without limitation, I.C. §§ 30-29-304, 30-29-833 (and their predecessors), 48-608, and the common law;

8.    For a preliminary and/or permanent injunction and/or declaratory relief against AIA enjoining them from complying with the unauthorized, improper, intra vires, and ultra vires transactions and agreements relating in any way to AIA, including, without limitation, the Guarantees, Settlement Agreements, and all agreements and instruments related to the foregoing (including from transferring any money or property and from distributing the proceeds of any property or asset sales); to set aside and void such agreements and instruments; and award damages;

9.    For declaratory judgment requiring the reissuance of the common shares in AIA Services to the ESOP participants and voiding and/or rescinding John's alleged purchase of 7,500 Series A Preferred Shares in AIA Services and the 475,000 common shares in AIA Services improperly issued to him under his Executive Officer's Agreement that he violated on countless occasions;

10.    For a declaratory judgment requiring AIA Services to reissue the common shares formerly held by the innocent ESOP participants because the Controlling AIA Defendants' improperly terminated the ESOP;

6.11.    For an order requiring that all funds recovered as a result of this litigation, minus fees, costs and bona fide debts, be deposited with the Court registry and distributed only after court order, and that no funds recovered from this litigation be paid to faithless fiduciary, or for the

SECONDTHIRD AMENDED COMPLAINT - 84

**Exhibit - B**

benefit of, the Controlling AIA Defendants;

~~7.     For judgments against the Controlling AIA Defendants, jointly and severally, as the alter ego of CropUSA or to pierce its corporate veil, for all damages incurred by AIA and attributable in whole or in part to CropUSA;~~

12.     To the extent that GemCap is deemed to be owed any money as a creditor, for a judgment declaring any such rights or judgments to be inferior to AIA and AIA Services' innocent minority shareholders (including those holding shares through the ESOP and 401(k) Plan), under an equitable subordination theory or such other theory Plaintiff may assert at or before trial;

~~8.~~13.     For a declaratory judgment for the relief specified in this ~~Second~~Third Amended Complaint and any other declaratory relief requested at or before trial~~,~~, including, without limitation, setting aside obligations, notes, guarantees, settlement agreements, agreements, contracts, transfers of assets, amendments to AIA's bylaws, and repurchase or the issuance of shares;

~~9.~~14.     For an award of the attorneys' fees and ~~cost~~costs incurred in this action as allowed by statute, contract, or recognized grounds of equity, including, under I.C. § 12-121; and

~~10.~~15.     For any such further relief or remedy, including preliminary and/or permanent injunctive relief, ~~as Plaintiffs~~equitable subordination, or other relief Plaintiff may request and/or as this Court may find just and equitable.

        DATED:  This ~~20ᵗʰ~~___ day of ~~June,~~_____, 2016.

                                RODERICK BOND LAW OFFICE, PLLC


                        By:  ___/s/ Roderick C. Bond_____
                             Roderick C. Bond
                             Attorney for ~~Plaintiffs~~Plaintiff


~~SECOND~~THIRD AMENDED COMPLAINT - 85

# Exhibit - B

**VERIFICATION OF DALE L. MIESEN**

STATE OF TEXAS          )
                        ) ss.
COUNTY OF TARRANT       )

I, Dale L. Miesen, being first duly sworn on oath, ~~deposes~~depose and ~~says~~say:

I am ~~one of~~ the ~~Plaintiffs~~Plaintiff in the above-entitled action. I have read the contents of this ~~Second~~Third Amended Complaint, know the contents of this ~~Second~~Third Amended Complaint, and believe that the facts ~~in~~ set forth in this ~~Second~~Third Amended Complaint ~~and exhibits attached thereto~~ are true and accurate to the best of my knowledge and belief.

_____
Dale L. Miesen

SUBSCRIBED AND SWORN to before me this _____ day of ~~June,~~_____, 2016.

_____
Notary Public for Texas
Residing at: _____
My commission expires: _____

~~SECOND~~THIRD AMENDED COMPLAINT - 86

**Exhibit - B**

1 SER 217

**Formatted:** No underline

**Formatted:** Justified

**VERIFICATION OF DONNA J. TAYLOR**

STATE OF IDAHO                    )
                                  ) ss.
COUNTY OF NEZ PERCE               )

I, Donna J. Taylor, being first duly sworn on oath, deposes and says:

I am one of the Plaintiffs in the above entitled action. I have read the contents of this Second Amended Complaint, know the contents of this Second Amended Complaint, and believe that the facts in set forth in this Second Amended Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.

_____
Donna J. Taylor

_____

SUBSCRIBED AND SWORN to before me this ____ day of June, 2016.

_____
Notary Public for Idaho
Residing at: _____
My commission expires: _____

SECONDTHIRD AMENDED COMPLAINT - 87

# Exhibit - B

1 SER 218

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the ~~20~~<sup>th</sup>___ day of ~~June,~~_____, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:    jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:    jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:    lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:    sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:    swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

~~SECOND~~THIRD AMENDED COMPLAINT - 88

# Exhibit - B

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501


_____ */s/ Roderick C. Bond*_____
Roderick C. Bond

~~SECOND~~THIRD AMENDED COMPLAINT - 89

# Exhibit - B